## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., | )  Civil Action No. |
| Plaintiff, | ) |
| v. | )  COMPLAINT |
| | )  DEMAND FOR A JURY TRIAL |
| WATERSTONE MORTGAGE CORPORATION, | ) |
| Defendant. | ) |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual Mortgage"), by and through its undersigned counsel, hereby brings this complaint against defendant WaterStone Mortgage Corporation ("Defendant" or "WaterStone") and alleges, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      Mutual Mortgage brings this action against WaterStone in response to a brazen and unlawful scheme by WaterStone to solicit and hire over sixty Mutual Mortgage employees (the "Departed Employees"), causing Mutual Mortgage to have to shutter three entire branches after the Departed Employees resigned *en masse* – many within minutes of one another – in what was clearly a coordinated plan.

2.      Not content to merely poach employees from Mutual Mortgage, WaterStone also encouraged and assisted the Departed Employees to solicit other employees to leave Mutual Mortgage for WaterStone, encouraged and assisted the

ACTIVE:15797561.2

Departed Employees to provide confidential and trade secret information belonging to Mutual Mortgage ("Confidential and Trade Secret Information") to WaterStone, and encouraged and assisted the Departed Employees to breach their fiduciary duties to Mutual Mortgage by diverting customers to WaterStone while the Departed Employees were still licensed with and working for Mutual Mortgage.

3. To give but one example, on March 3, 2022, one of the Departed Employees, Dwyane Hutto, used his Mutual Mortgage email to send Confidential and Trade Secret Information to Dustin Owen, WaterStone's Regional Vice President-Southeast. Specifically, the email attached a spreadsheet with a dozen tabs, each containing Confidential and Trade Secret Information, such as Mutual Mortgage's historical and current profit and loss statements, loan rates, fee structures, profit margins, employee compensation data, and other detailed information. After receiving the email, WaterStone responded as follows: "Received. Thank you. I have sent this off to Kevin Allen. Let's look at some times/dates for next week. We'll want and [*sic*] hour with you and then an hour with Smitty." According to WaterStone's website, Kevin Allen is WaterStone's Senior Vice President of Sales,[1] and, upon information and belief, "Smitty" refers to Chris Smith, another of the Departed Employees.

---

[1] *See* WaterStone, Leadership Team, *available at* https://www.waterstonemortgage.com/about/leadership (last visited July 21, 2022).

2

4.      Mutual Mortgage brings this action to hold WaterStone accountable for its willful and egregious misconduct.

## PARTIES

5.      Mutual Mortgage is a Delaware corporation with its principal place of business at 3131 Camino Del Rio North, Suite 1100, San Diego, California, 92108. Mutual Mortgage is a residential mortgage lender with a number of branch offices in Florida, including now-shuttered locations at 4902 Eisenhower Boulevard, Suite 385, Tampa, Florida, 33634 (the "Tampa Branch"), 900 West Granada, Suite 4, Ormond Beach, Florida, 32174 (the "Daytona Branch").   As relevant for the instant case, Mutual Mortgage also had a branch office in Paramus, New Jersey (the "Paramus Branch").

6.      WaterStone is a licensed residential mortgage banker (NMLS number 186434) with its principal place of business at N25W23255 Paul Road, Pewaukee, Wisconsin, 53072.  Among other things, WaterStone is a residential mortgage lender. WaterStone has multiple offices in Florida, including at 2699 Lee Road, Suite 600, Winter Park, Florida, 32789.

## JURISDICTION AND VENUE

7.      The Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because Mutual Mortgage and WaterStone are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

ACTIVE:15797561.2

8.     The Court has subject matter jurisdiction over Mutual Mortgage's federal claims under 28 U.S.C. § 1331 because those claims arise under federal law.

9.     The Court has subject matter jurisdiction over Mutual Mortgage's state law claims under 28 U.S.C. § 1367(a) because the state law claims are so closely related to the federal claims, and share a common nucleus of operative facts with the federal claims, such that the state law claims and the federal claims form part of the same case or controversy.

10.     The Court has personal jurisdiction over WaterStone because the unlawful conduct at issue in this case took place in Florida.

11.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mutual Mortgage's claims occurred, and a substantial part of the property that is the subject of this action is located, in the Middle District of Florida, Tampa Division.

## FACTUAL BACKGROUND

12.     As a threshold matter, it is important to emphasize that Mutual Mortgage has only begun its investigation into the damage done by WaterStone, and its investigation is ongoing.  Moreover, Mutual Mortgage's investigation has been made difficult by the fact that at least some of the Departed Employees appear to have taken steps to avoid leaving a record of their misconduct.  For example, on April 5, 2022 Zeke Waterman – then at Mutual Mortgage – emailed his assistant with instructions that she blind carbon copy him on emails to borrowers because Waterman was "just

4

trying to keep myself out of emails." His assistant responded: "I understand and rightfully so." A few weeks later Waterman and his assistant left Mutual Mortgage for WaterStone.

13.    Similarly, in an April 7, 2022 email from Maria De Sevilla to Dawson Walker regarding their impending move to Waterstone, De Sevilla wrote that "I figure you're probably good at 'code.'" At the time both De Sevilla and Walker were employed in Mutual Mortgage's Daytona Branch, and one week later they resigned to join WaterStone.

14.    In addition, the Departed Employees used their personal email accounts to engage in their unlawful scheme, and Mutual Mortgage does not currently have access to the Departed Employees' personal email accounts. Mutual Mortgage intends to conduct extensive discovery of these personal email accounts on an expedited basis, including forensic auditing if Mutual Mortgage uncovers evidence that the Departed Employees attempted to destroy evidence in their personal email accounts.

15.    As Mutual Mortgage's investigation progresses, Mutual Mortgage expects to amend this complaint to add evidence of additional misconduct and additional claims.

16.    Even based on Mutual Mortgage's investigation to date, however, there is substantial evidence, described in detail below, to support the claims and relief Mutual Mortgage seeks through this action.

**Provisions of the Employment Agreements that WaterStone Encouraged and Assisted the Departed Employees to Breach**

17.     The Departed Employees were each employed by Mutual Mortgage under a written employment agreement (the "Employment Agreements").

18.     The Employment Agreements were voluntarily entered into by the Departed Employees and were valid and enforceable contracts.

19.     The Employment Agreements make clear that the Departed Employees owed fiduciary duties to borrowers, and were expressly prohibited from placing their own interests ahead of a borrower's:

> Loan Originator acknowledges that Company and Loan Originator owe fiduciary duties to Company's borrowers.  Any violation of a fiduciary duty can subject Company and/or Loan Originator to license discipline up to and including license revocation.  Loan Originator shall not make any representation, or perform any act, during the term of your employment with Company which would constitute a breach of a fiduciary duty owed to a borrower including, without limitation, placing his/her economic interest ahead of the economic interest of a borrower.

Employment Agreement § 7.3.

20.     The Employment Agreements require the Departed Employees to comply with all policies and procedures of Mutual Mortgage:

> Loan Originator agrees to comply with all applicable Company policies, procedures, and requirements imposed as set forth in this Agreement and those policies applicable to Loan Originator and required under applicable law, including those related to the origination and processing of loans, payment of commissions, licensing, reporting loan activity, each applicable policy contained in the Company's Employee Handbook, and each other applicable policy governing your employment now in force or which the Company may adopt in the future or as amended from time-to-time.

Employment Agreement § 8.

6

21.    The Employment Agreement further provides that the Departed Employees "agree to abide by all applicable duties and requirements of the Company regarding confidentiality, non-disclosure, and additional restrictive covenants, to the fullest extent allowed by applicable law."  Employment Agreement § 15.2.

22.    The Employment Agreements establish the duty of loyalty the Departed Employees owed to Mutual Mortgage:

> As a Loan Originator for the Company, Loan Originator acknowledges that he/she has a general duty of loyalty to the Company and agrees to devote his/his entire productive time, ability, and attention to the business of the Company consistent with good industry practices, the terms of this Agreement, and with the long-term best interests Company and the applicable policies and procedures set by the Company.  Loan Originator will not render any loan origination services to any other person or entity, regardless of whether or not those loan origination services would present a conflict of interest for Loan Originator in the performance of his/her duties for Company.   In addition, Loan Originator agrees not to work in any other "real estate related areas" as defined by the U.S. Department of Housing and Urban Development.

Employment Agreement § 9.1.

23.    The Employment Agreements prohibit employees from misusing personal information of borrowers:

> Because of Loan Originator's employment with the Company, Loan Originator will have access to the nonpublic personal information of consumers ("Personal Information").   "Personal Information" means personally identifiable financial information, or any list, description, or other grouping of consumers (and publicly available information pertaining to them) derived using any personally identifiable information not publicly available.   Loan Originator agrees to comply with the Company's policies regarding Personal Information and any applicable consumer privacy laws  or rules (the "Privacy Requirements").   Loan Originator will limit the use of Personal Information to the express purposes set forth in this Agreement, will not disclose Personal Information to any unauthorized person, and will strictly abide by the Privacy Requirements.

ACTIVE:15797561.2

Employment Agreement § 15.1.

24.     The Employment Agreements prohibit the Departed Employees from misappropriating, misusing, or disclosing confidential and trade secret information belonging to Mutual Mortgage:

> Accordingly, Employee agrees that Employee will not, and will not permit any other person or entity to, directly or Indirectly, without the prior written consent of the Company: (a) use Confidential Information or Trade Secrets for the benefit of any person or entity other than the Company; (b) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information or Trade Secrets, except as required to perform responsibilities for Company; and (c) while employed and thereafter, publish, release, disclose, deliver or otherwise make available to any third party any Confidential Information or Trade Secrets by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

Employment Agreement, Protective Agreement (Non-Solicit) § 4.1.

25.     The Employment Agreements define "Confidential Information" as follows:

> "Confidential Information" means information that is created and used in the Company's business and which is not generally known by the public, including but not limited to: confidential information related to (a) the internal business and structure of the Company, concepts, techniques, pricing or cost strategies and information, business plans and strategies, marketing (and advertising) plans and strategies, advertising budgets, unpublished financial information, terms of the Company's agreements or contracts (oral or written, including investors of the Company, third-party underwriters, third-party originators, etc.), supplier information, proprietary or customized software and databases; (b) the Company's records pertaining to customers (including key customer contact information), potential customers (including key contact information of anyone who applies for a mortgage with the Company or contacts the Company for mortgage needs), mortgage loan terms and related information; (c) the Company's records pertaining to Referral Sources (including key contact information), potential Referral Sources (including key contact information, amount / nature of business, etc.);

8

and (d) personnel lists, confidential employee information and data (including information pertaining to compensation or work specialization), training, policies and procedures. Employee specifically understands and agrees that information pertaining to borrowers or potential borrowers of the Company that Employee obtains as an employee of the Company is and shall remain the Confidential Information of the Company and shall not be used by Employee at any time, including after the Last Day (defined below), for any purpose unrelated to Employee's work for the Company. Employee specifically understands and agrees that the term Confidential Information also includes all confidential information of a third party that may be communicated to, acquired by, learned of, or developed by Employee in the course of or as a result of Employee's employment with the Company. Confidential Information does not include information that is or may become known to Employee or to the public from sources outside the Company and through means other than a breach of this Agreement or disclosed by Employee after written approval from the Company.

Employment Agreement, Protective Agreement (Non-Solicit) § 2.1.

26.     The Employment Agreements prohibit the Departed Employees from soliciting or inducing other employees to leave Mutual Mortgage:

During the Restricted Period, Employee shall not directly or Indirectly: (a) solicit, recruit, encourage (or attempt to solicit, recruit or encourage), or assist others in soliciting, recruiting or encouraging, any Company Employees or Former Employees with whom Employee worked, had business contact, or about whom Employee gained non-public or Confidential Information; (b) contact or communicate with Employees or Former Employees for the purpose of inducing, assisting, encouraging and/or facilitating them to terminate their employment with the Company or find employment or work with another person or entity; (c) provide or pass along to any person or entity the name, contact and/or background information about any Employees or Former Employees or provide references or any other information about them; (d) provide or pass along to Employees or Former Employees any information regarding potential jobs or entities or persons for which to work, including but not limited to job openings, job postings, or the names or contact information of individuals or companies hiring people or accepting job applications; and/or (e) offer employment or work to any Employees or Former Employees.  For purposes of this covenant, "Former Employees" shall refer to employees who are not employed by the Company at the time of the attempted recruiting or hiring, but were

ACTIVE:15797561.2

> employed by or working for the Company in the six (6) months prior to
> the time of the attempted recruiting or hiring and/or interference.

Employment Agreement, Non-Solicit § 3.3.

## WaterStone Encourages and Assists the Departed Employees to Solicit Fellow Mutual Mortgage Employees for Employment with WaterStone

27.     WaterStone actively encouraged and assisted the Departed Employees in soliciting other Mutual Mortgage employees to terminate their employment with Mutual Mortgage and join WaterStone.  The Departed Employees engaged in the solicitation while still employed by Mutual Mortgage, in breach of their contractual and fiduciary duties.

28.     For example, in an April 7, 2022 email from Maria De Sevilla to Dawson Walker, De Sevilla writes that "Chris debriefed me on Waterstone today!  I remain excited!  Yaay!"  At the time both De Sevilla and Walker were employed in Mutual Mortgage's Daytona Branch, and one week later they resigned to join WaterStone.

29.     The "Chris" referred to in De Sevilla's email was Chris Wolf, who at the time was Mutual Mortgage's Vice President of Mortgage Lending.  On April 8, 2022, Wolf sent an email to an unknown group of recipients advising them to "not discuss what we talked about on today's call with anyone outside of your families.  We are still finalizing details."

30.     Maria De Sevilla described this April 8, 2022 call as follows:  "Chris was on our team call and spoke to me, Mike, Sunshine & Beatrice about the move!  OMG!  I SO want us to develop those builder relationships and become a preferred lender for

ACTIVE:15797561.2

some!  I'm totally up for going out and talking to the builders and earning their business!"

31.    Following this April 8, 2022 meeting, Michael Irish emailed Chris Wolf that Irish was "beyond excited for this new endeavor" and was eager to start at WaterStone as soon as possible because he had leads on loans developed during his time at Mutual Mortgage and wanted to divert those loans to WaterStone:

> For the personal request, could I be one of the first people to transition over?  I only ask because currently I do not have any working loans in my pipeline but, I do have quite a few pre-approvals out that the realtors are actively showing their clients properties and every Thursday on the PAL's call I continue to engage with the buyers. I would hate to have my pipeline pop off within the next 30 days and then be out of my commissions if that in fact would be the case.

32.    On April 28, 2022, Kiera Tully sent Chris Smith an email requesting a meeting "to go over a few things," including "[h]ow is compensation going to work." At the time both Tully and Smith were employed in Mutual Mortgage's Tampa Branch, until they resigned a few weeks later to join WaterStone.

33.    WaterStone employees also regularly held video conferences with Mutual Mortgage employees on weekdays during business hours.

34.    For example, on April 22, 2022 at 2:00 p.m. at least two Mutual Mortgage employees (William Henry Jr. and Mike Gurley) had a video conference with Kyrstin Friebis of WaterStone.  Friebis had been a Mutual Mortgage employee until April 15, 2022, when she resigned to work at WaterStone.

11

**WaterStone Encourages and Assists the Departed Employees in Disclosing to WaterStone Confidential and Trade Secret Information**

35.    On multiple occasions, WaterStone encouraged and assisted the Departed Employees to send WaterStone Confidential and Trade Secret Information.

36.    In some instances, the Departed Employees sent Confidential and Trade Secret Information directly to WaterStone.   In other instances, the Departed Employees sent Confidential and Trade Secret Information to their personal email addresses and, upon information and belief, subsequently sent such Confidential and Trade Secret Information to WaterStone.  Mutual Mortgage does not yet have access to the Departed Employees' personal email accounts but intends to obtain access in discovery and conduct a forensic audit of the Departed Employees' use of their personal email accounts to transfer Confidential and Trade Secret Information.

37.    For example, on February 17, 2022, Dwayne Hutto sent an email from his work email address to a WaterStone employee named Dustin Owen attaching a copy of Mutual Mortgage's December 31, 2021 Profit and Loss Statement for the Daytona Branch.  At the time, Hutto was the branch manager of the Daytona Branch. Owen responded to the email to confirm that he had received the information.  At the time, Owen was WaterStone's Regional Vice President-Southeast.

38.    On March 3, 2022, Hutto sent another email to Owen, this time attaching a copy of Mutual Mortgage's December 31, 2021 Profit and Loss Statement for the Tampa branch.  Owen responded to the email as follows:  "Received.  Thank you.  I have sent this off to Kevin Allen.  Let's look at some times/dates for next week.  We'll

12

want and [sic] hour with you and then an hour with Smitty."  At the time, Owen was WaterStone's Regional Vice President-Southeast.

39.     The "Smitty" referred to is Chris Smith, who was Mutual Mortgage's Senior Vice President of Sales based in the Tampa Branch.  On March 2, 2022, Smith used his Mutual Mortgage email address to send a copy of this same spreadsheet to his personal email address (husky5417@yahoo.com).  Smith resigned from Mutual Mortgage and joined WaterStone a few weeks later.  Upon information and belief, Smith forwarded the spreadsheet from his personal account to WaterStone, and Mutual Mortgage expects to obtain confirmation of this fact when it conducts a forensic examination of Smith's Yahoo account.

40.     On April 26, 2022, Lorri Hutchcraft – then a Mutual Mortgage employee in the Daytona Branch – used her Mutual Mortgage email account to send to her personal email account (lorrihutchcraft@gmail.com) dozens of confidential documents, including documents containing policies and procedures of Mutual Mortgage on Mutual Mortgage letterhead, templates for borrower communications, forms, work flows, and other confidential documents.  She also sent confidential information to her personal email account about at least two borrowers.  Hutchcraft left Mutual Mortgage that same day.

41.     On June 10, 2022, Fred Stalls used his Mutual Mortgage email address to forward to his personal email address (fredstalls@fresliefinancial.com) approximately 19 confidential documents, including customer address lists, lists of

closed loans, lists of prospective borrowers, listing agent information, templates for communications, policy and procedure documents, and other confidential documents. One of these attachments was a spreadsheet, entitled "Customer address list" that contained not only the addresses of Mutual Mortgage customers, but 22 columns of detailed data about the customers, their loans, and the loan terms.

42. Similarly, on June 15, 2022 Cody Lamb used their Mutual Mortgage email address to forward to their personal email address (woofstar1@hotmail.com) three separate emails, together attaching approximately 50 confidential documents, including customer pipeline lists, balance sheets, templates for communications with borrowers, policies and procedures, and other confidential documents. Lamb resigned from Mutual Mortgage that same day.

**WaterStone Encourages and Assists the Departed Employees to Divert Borrowers from Mutual Mortgage to WaterStone**

43. When a consumer applies for a loan with Mutual Mortgage, the consumer provides Mutual Mortgage with a wide variety of personal and confidential information, including Social Security numbers, dates of birth, contact information, sensitive credit history, wage statements, bank account numbers, mortgage amounts, tax returns, and all the financial information that is necessary to facilitate a home loan.

44. This type of information has independent economic value because of it enables and facilitates the preparation of a loan application. It also separates those borrowers ready, willing, and able to proceed with a loan application from those that are not able or willing to proceed. Indeed, lenders spend millions of dollars each year

on leads that have a fraction of the value in comparison to the information Mutual Mortgage had obtained on these borrowers.

45.     Consumers provide this highly sensitive, private, and confidential information with the understanding Mutual Mortgage will protect it.   Mutual Mortgage is required to maintain the privacy of this information by extremely strict federal laws that carry substantial penalties if violated.

46.     Mutual Mortgage does not release, share, or disclose such confidential information to the general public.   Mutual Mortgage maintains the secrecy of this confidential information and derives an economic and competitive advantage from maintaining the secrecy of such information.

47.     If a competitor obtained this information, it could undercut Mutual Mortgage on Mutual Mortgage's loans and divert Mutual Mortgage's customers by aggressively pursuing those customers based on the information kept by Mutual Mortgage.   That is precisely what WaterStone has done here.

48.     On March 29, 2022, Dwayne Hutto sent an email to Zeke Waterman and Chris Wolf asking them to "forward the full [borrower] file to Mike Smalley at Waterstone?   They can get it done."   Wolf responded that same day that the file had been sent.   At the time, all three of these employees were employed by Mutual Mortgage and subject to all restrictions in the Employment Agreements, and these communications all took place using Mutual Mortgage's email system.

49.   On April 12, 2022, Fred Stalls used his Mutual Mortgage email address to forward to his personal email address (fredstalls@fresliefinancial.com) documents and information from a prospective borrower regarding a refinancing of the borrower's property in Hollywood, Florida.

50.   On April 13, 2022, Dwayne Hutto sent an email to Mike Smalley at WaterStone attaching information about a prospective borrower.

51.   On April 15, 2022, Hutto used his Mutual Mortgage email address to forward to his personal email address (Dwayne.hutto@yahoo.com) documentation provided to Mutual Mortgage by a prospective borrower, including confidential financial documents.  Upon information and belief, Hutto then forwarded this email to WaterStone.[2]

52.   Hutto appears to have diverted this borrower from Mutual Mortgage to WaterStone.  On April 24, 2022, Dwayne Hutto wrote that he had spoken to the borrower that day and that the borrower "said he sent over the actual statements to Waterstone Friday afternoon.  I'm going to confirm in the morning."  At the time Hutto was employed by Mutual Mortgage.

53.   On May 25, 2022, Lucas Van Dame – then a Mutual Mortgage Loan Originator – sent an email to a prospective borrower stating that the borrower's loan was not approved by Mutual Mortgage, misrepresenting the basis for the underwriting

---

[2] As noted above, Mutual Mortgage currently lacks access to the Departed Employees' personal email accounts but will seek such access in discovery on an expedited basis.

ACTIVE:15797561.2

decision, referring the borrower to WaterStone, and transferring the borrower's file to

WaterStone:

> I wanted to send you an update on our current situation.  Unfortunately, we are unable to approve your loan.  The reason for denial is due to your home being used as collateral on the BB&T/Truist Business Installment Loan.  Since there was a 30+ Day Late payment on this business loan in the past 12 months, our underwriter would not approve the loan (Because it is technically a second mortgage).  I have done some research, and this appears to be a company specific guideline.  My branch manager has reached out to one of his long time friends at Waterstone Mortgage and their underwriter assured us that your situation is something that they would be able to approve.  We are going to go ahead and transfer your information over to Dwayne Hutto at Waterstone Mortgage.  Since we already have all of your documents and information, Dwayne expects this to close within a 30 day period.

> I do apologize that we were unable to complete this process with you.  I appreciate your patience through this entire process and am confident that Dwayne will be able to get this to the finish line.

54.    Van Dame's statement to the borrower that the loan was denied because

of late payments on the borrower's business loan, and that this denial was due to a

Mutual Mortgage-specific underwriting guideline, is false and misleading.  In fact,

Chris Smith escalated this loan to Chris Leyden, Mutual Mortgage's Chief Operating

Officer, who approved the loan notwithstanding late payments on a related loan.  Van

Dame was aware of these facts, but nonetheless he made false and misleading

statements to this borrower to divert the loan.

55.    Moreover, as is evident from the foregoing email, Van Dame transferred

the borrower's loan to WaterStone without the borrower's consent, stating simply that

"[w]e are going to go ahead and transfer your information over to Dwayne Hutto at

Waterstone Mortgage."  At the time Van Dame was employed by Mutual Mortgage, until he resigned on June 15, 2022 to join WaterStone.

56.     Other Departed Employees worked closely with Hutto after he moved to WaterStone.  For example, on June 7, 2022 Fred Stalls used his Mutual Mortgage email address to send several questions about WaterStone to Hutto at his new WaterStone email address (dhutto@waterstonemortgage.com):

> Hey Dwayne
> 1.  Does Waterstone offer HELOC's, either directly or brokered?
>
> 2.  Does Waterstone have broker's relationships?  Can you send me a list of who Waterstone is signed up with to Broker loans?
>
> Thank you. And Thank you for the Joey Roces referral – he is a great guy.

57.     On June 7, 2022 Fred Stalls had a conversation with Hutto regarding a borrower who had initiated an application with Mutual Mortgage about transferring the borrower's application to WaterStone.  According to Stalls' notes, the borrower had submitted an application with Mutual Mortgage several months before, in January of 2022.

58.     On June 8, 2022 Fred Stalls used his Mutual Mortgage email address to send to his personal email address (fredstalls@fresliefinancial.com) documentation provided by multiple prospective borrowers to Mutual Mortgage.  At the time Stalls was employed in Mutual Mortgage's Tampa Branch as a Mortgage Loan Originator. On June 10, 2022, Stalls received an email at his Mutual Mortgage email address from

18

WaterStone congratulating him on being hired by WaterStone and providing new hire documents.

59.    On June 8, 2022, Fred Stalls sent an email to his colleague Cody Lamb asking Lamb to forward Chris Wolf documents related to four borrowers.  Stalls copied Chris Wolf's WaterStone email address on the email.  On June 9, 2022, Wolf responded that he had received all five of the emails sent by Lamb with borrower information.  Stalls and Wolf subsequently engaged in multiple communications regarding the terms of the borrower's loan, with Stalls using his Mutual Mortgage email address to communicate with Wolf at his WaterStone email address.  Stalls appears to have transferred this borrower's loan to WaterStone, as evidenced by a June 14, 2022 letter Stalls printed and signed on Mutual Mortgage letterhead stating that Mutual Mortgage was transferring ownership of the borrower's appraisal report to WaterStone.

60.    On June 8, 2022 Cynthia Manley used her Mutual Mortgage email address to send to her personal email address (cindyvoo@icloud.com) dozens of documents provided by a prospective borrower, as well as extensive correspondence between the borrower and Mutual Mortgage.  At the time Manley was employed by Mutual Mortgage in its Tampa Branch, until June 15, 2022 when she resigned from Mutual Mortgage to work at WaterStone.

61.    On June 13, 2022, Justin DePalma sent an email to Chris Smith and John Utsch regarding a number of borrower leads he had acquired that weekend by

attending a number of open houses, and stated his intent to divert those prospective borrowers to WaterStone: "After we transition I will go as a just a lender and pitch and talk business." At the time DePalma, Smith, and Utsch were Mutual Mortgage employees in the Tampa Branch, and all have since resigned from Mutual Mortgage to work at WaterStone. Smith responded to the email with "Nice!!"

62.    On June 13, 2022, Jordan Ebelini sent an email to Chris Smith regarding a borrower that Ebelini intended to divert from Mutual Mortgage to WaterStone, writing that "I just submitted an app through waterstone that I need a rescore on. Need to boost them to 620 please." At the time Ebelini and Smith were Mutual Mortgage employees in the Tampa Branch, and both have since resigned from Mutual Mortgage to work at WaterStone.

63.    On June 14, 2022, a Departed Employee in the Tampa Branch named Eric Mueller sent himself a note memorializing a conversation he had with a prospective borrower in which Mueller assisted the borrower in transferring her loan application from Mutual Mortgage to WaterStone, and answered the borrower's questions about her loan application with WaterStone. At the time Mueller was employed by Mutual Mortgage in the Tampa Branch, until June 15, 2022 when he resigned from Mutual Mortgage to join WaterStone.

64.    On June 14, 2022, Fred Stalls used his Mutual Mortgage email address to send to his personal email address (fredstalls@fresliefinancial.com) documentation

provided by multiple prospective borrowers to Mutual Mortgage.  At the time Stalls was employed in Mutual Mortgage's Tampa Branch as a Mortgage Loan Originator.

65.     The next day Stalls continued to use his Mutual Mortgage email address to send confidential borrower information to his personal email address.

## CLAIM I:     MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

66.     Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

67.     Mutual Mortgage derives independent economic value from the Confidential and Trade Secret Information, the Confidential and Trade Secret Information is not generally known or public, and Mutual Mortgage took reasonable measures to maintain and protect the secret nature of the Confidential and Trade Secret Information.

68.     The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 183(3), defines a trade secret as, *inter alia*, "all forms and types of financial, business, scientific, technical, economic, or engineering information … whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret and advantage over competitors who do not know or use the trade secret.

21

69.     The Confidential and Trade Secret Information at issue in this case was non-public, and Mutual Mortgage undertook substantial measures to protect the secrecy of the Confidential and Trade Secret Information.

70.     Mutual Mortgage's Confidential and Trade Secret Information is related to products and/or services used in interstate commerce.

71.     The Departed Employees were entrusted with this Confidential and Trade Secret Information in the performance of their job.

72.     At WaterStone's direction, the Departed Employees improperly and unlawfully accessed and disclosed Confidential and Trade Secret Information to WaterStone, which knew or had reason to know that the Confidential and Trade Secret Information was acquired by improper means.

73.     WaterStone utilized the Confidential and Trade Secret Information in breach of applicable law and duties, without Mutual Mortgage's express or implied consent, all to Mutual Mortgage's detriment.

74.     WaterStone actions directly caused Mutual Mortgage harm through the loss of current and future business and good will.

75.     Unless Mutual Mortgage is made whole through damages attributable to business and good will lost, WaterStone's conduct has and will continue to cause Mutual Mortgage harm.

ACTIVE:15797561.2

76.     WaterStone willfully and maliciously misappropriated the Confidential and Trade Secret Information, and thus is liable to Mutual Mortgage for exemplary damages "in an amount not more than 2 times the amount of the damages awarded," 18 U.S.C. § 1836(b)(3)(C).

## CLAIM II:  FALSE ADVERTISING AND UNFAIR COMPETITION UNDER THE LANHAM ACT, 15 U.S.C. § 1125

77.     Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

78.     Mutual Mortgage offers products and/or services used in interstate commerce.

79.     The Departed Employees created consumer confusion by representing to consumers that they worked for Mutual Mortgage when, in fact, the Departed Employees were acting on behalf of Waterstone.  Indeed, as set forth above, in some instances the Departed Employees intentionally made false and misleading statements to borrowers that their loans had been denied by Mutual Mortgage in an effort to divert the borrowers to Waterstone, in whose interest the Departed Employees were acting.

80.     The Departed Employees created further confusion as to the identify of the licensed entity with whom they were working, and indeed who the loan officers themselves worked for.  Borrowers were confused as to who they were dealing with, which entities had access to their personal information, and who was responsible for their loan.

ACTIVE:15797561.2

81.     The Departed Employees also misrepresented to consumers that the Departed Employees were acting as representatives and agents of Mutual Mortgage, when they were actually affiliated with and working on behalf of WaterStone.

82.     WaterStone was not only aware of these misrepresentations, but encouraged and facilitated them, and WaterStone did so willfully and maliciously.

83.     As described above, Mutual Mortgage has uncovered substantial evidence of borrowers who applied for loans with Mutual Mortgage and whose loans were subsequently transferred to WaterStone without the borrowers' consent.

84.     Similarly, Mutual Mortgage has uncovered evidence of false and misleading statements made by the Departed Employees to borrowers, as part of a coordinated effort with WaterStone to diver borrowers from Mutual Mortgage to WaterStone.

85.     These communications between Departed Employees and borrowers included emails that prominently displayed Mutual Mortgage's licensing information designed to permit borrowers to look up its NMLS license number to ascertain the Mutual Mortgage's regulatory and legal history.

86.     Unbeknownst to these consumers who thought they were doing business with Mutual Mortgage, the Departed Employees were originating, processing, underwriting, approving, pricing, and funding consumer loans with the intention of diverting them – and in fact, did so divert them – to WaterStone, a direct competitor of Mutual Mortgage.

24

87.     The Departed Employees also used confidential information and documents provided to Mutual Mortgage by borrowers to close those loans at WaterStone.

88.     The Departed Employees transferred loans from Mutual Mortgage to WaterStone without the borrower's consent.

89.     The Departed Employees made false and misleading statements to borrowers, including false and misleading statements about the basis for Mutual Mortgage's denial of a loan application intended to divert the borrowers to WaterStone.   WaterStone facilitated these false and misleading statements by the conduct described above.

90.     By the conduct described herein, WaterStone caused confusion among consumers as to the entity that was offering them a mortgage loan, and WaterStone did so willfully and maliciously.   Consumers who applied for loans with Mutual Mortgage based on, among other things, Mutual Mortgage's NMLS license number, were diverted to WaterStone without the consumers' consent.

91.     As a direct result of WaterStone's actions, Mutual Mortgage has been harmed and continues to be harmed by the loss of business and goodwill in the marketplace and consumers harmed through WaterStone's material misrepresentations.

92.     WaterStone has acted knowingly, willfully, and in conscious disregard of the rights of consumers, Mutual Mortgage, and the general public.

ACTIVE:15797561.2

## <u>CLAIM III:  MISAPPROPRIATION OF TRADE SECRETS UNDER THE FLORIDA TRADE SECRETS ACT</u>

93.    Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

94.    Mutual Mortgage derives independent economic value from the Confidential and Trade Secret Information, the Confidential and Trade Secret Information is not generally known or public, and Mutual Mortgage took reasonable measures to maintain and protect the secret nature of the Confidential and Trade Secret Information.

95.    The Departed Employees were entrusted with this Confidential and Trade Secret Information in the performance of their job.

96.    At WaterStone's direction, the Departed Employees improperly and unlawfully accessed and disclosed Confidential and Trade Secret Information to WaterStone, which knew or had reason to know that the Confidential and Trade Secret Information was acquired by improper means.

97.    WaterStone utilized the Confidential and Trade Secret Information in breach of applicable law and duties, without Mutual Mortgage's express or implied consent, all to Mutual Mortgage's detriment.

98.    WaterStone's actions directly caused Mutual Mortgage harm through the loss of current and future business and good will.

ACTIVE:15797561.2

99.    WaterStone has acted knowingly, willfully, and in conscious disregard of the rights of consumers, Mutual Mortgage, and the general public.

100.    Unless Mutual Mortgage is made whole through damages attributable to business and good will lost, WaterStone's conduct has and will continue to cause Mutual Mortgage harm.

## CLAIM IV:  TORTIOUS INTERFERENCE WITH CONTRACT

101.    Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

102.    The Employment Agreements described in detail above were valid, binding, and enforceable contracts voluntarily entered into by the Departed Employees and Mutual Mortgage.

103.    WaterStone was aware of the Employment Agreements, and it influenced, induced, or coerced the Departed Employees to breach the Employment Agreements in multiple ways.

104.    First, WaterStone influenced, induced, or coerced the Departed Employees to violate the non-solicitation provision of the Employment Agreements, which provided, in relevant part, that the Departed Employees "shall not directly or Indirectly . . . solicit, recruit, encourage (or attempt to solicit, recruit or encourage), or assist others in soliciting, recruiting or encouraging, any Company Employees . . . for the purpose of inducing, assisting, encouraging and/or facilitating them to terminate their employment with the Company or find employment or work with another person

27

or entity."   Employment Agreement, Non-Solicit § 3.3.   Through the conduct described in detail above, WaterStone influenced, induced, or coerced the Departed Employees to violate this provision of the Employment Agreements.

105.   Second, WaterStone influenced, induced, or coerced the Departed Employees to violate the confidentiality and trade secret provisions of the Employment Agreements.   The Employment Agreements provide, in relevant part, that the Departed Employees:

> will not, and will not permit any other person or entity to, directly or Indirectly, without the prior written consent of the Company: (a) use Confidential Information or Trade Secrets for the benefit of any person or entity other than the Company; (b) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information or Trade Secrets, except as required to perform responsibilities for Company; and (c) while employed and thereafter, publish, release, disclose, deliver or otherwise make available to any third party any Confidential Information or Trade Secrets by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

Employment Agreement, Protective Agreement (Non-Solicit) § 4.1.   Through the conduct described in detail above, WaterStone influenced, induced, or coerced the Departed Employees to violate this provision of the Employment Agreements.

106.   Third, WaterStone influenced, induced, or coerced the Departed Employees to violate the provision of the Employment Agreements imposing a duty of loyalty.   Specifically, the Employment Agreements provide that the duty of loyalty owed by the Departed Employees to Mutual Mortgage, and that the duty of loyalty required the Departed Employees to "devote his/his entire productive time, ability, and attention to the business of the Company consistent with good industry practices"

28

and prohibits the Departed Employees from "render[ing] any loan origination services to any other person or entity, regardless of whether or not those loan origination services would present a conflict of interest for Loan Originator in the performance of his/her duties for Company."  Employment Agreement § 9.1.  Through the conduct described in detail above, WaterStone influenced, induced, or coerced the Departed Employees to violate this provision of the Employment Agreements.

107.   Fourth, WaterStone influenced, induced, or coerced the Departed Employees to violate the provision of the Employment Agreements prohibiting the Departed Employees from disclosing personal borrower information "to any unauthorized person."   Employment Agreement § 15.1.   Through the conduct described in detail above, WaterStone influenced, induced, or coerced the Departed Employees to violate this provision of the Employment Agreements.

108.   Mutual Mortgage has suffered harm through the lost profits, loss of business and goodwill in the marketplace and with consumers due to WaterStone's misconduct.

### CLAIM V:  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

109.   Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

110.   The Departed Employees owed a fiduciary duty to Mutual Mortgage to act in the best interests of Mutual Mortgage.  The Departed Employees violated their fiduciary duty when they acted not for Mutual Mortgage's benefit, but to benefit

themselves and WaterStone by soliciting Mutual Mortgage employees to leave Mutual Mortgage to work at WaterStone, diverting borrowers to WaterStone, and giving WaterStone Confidential and Trade Secret Information.

111.   WaterStone knew the Departed Employees it solicited for employment, and for disclosure of Confidential and Trade Secret Information, owed fiduciary duties to Mutual Mortgage.

112.   WaterStone's actions substantially assisted and encouraged the Departed Employees to breach their fiduciary duties owed to Mutual Mortgage.

113.   WaterStone's unlawful conduct has caused Mutual Mortgage to suffer substantial damages.

### CLAIM VI:  UNJUST ENRICHMENT

114.   Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

115.   WaterStone unlawfully induced the Departed Employees to divert loans from Mutual Mortgage to WaterStone.

116.   Mutual Mortgage invested substantial time, money, and resources into developing relationships with prospective borrowers and originating mortgage loans from them.

117.   By unlawfully diverting these borrowers from Mutual Mortgage to WaterStone, Mutual Mortgage conferred a direct benefit upon WaterStone.

30

118.   WaterStone was aware that Mutual Mortgage was conferring such benefits upon WaterStone.

119.   WaterStone voluntarily accepted and retained the benefits conferred by Mutual Mortgage.

120.   Under the circumstances, it would be inequitable for WaterStone to retain these benefits without paying Mutual Mortgage for the value of the benefits.

### CLAIM VII:  FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

121.   Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

122.   WaterStone, through the Departed Employees, unlawfully poached Mutual Mortgage's employees in three of their branches, diverted borrowers and loans from Mutual Mortgage to WaterStone, and misappropriated Confidential and Trade Secret Information.

123.   WaterStone did this maliciously, surreptitiously and with the intent to effectuate its scheme without Mutual Mortgage's knowledge.

124.   At no point did WaterStone take steps to ensure that Mutual Mortgage was aware of WaterStone's conduct.

125.   Rather, WaterStone acted covertly divert Mutual Mortgage loans to WaterStone.

31

126.    WaterStone engaged in this misconduct for the purpose of directly and unfairly competing with Mutual Mortgage and stealing its customers and business opportunities.

127.    As a direct result of WaterStone's actions, Mutual Mortgage has suffered damages and continues to be harmed in the loss of business and goodwill in the marketplace.

## CLAIM VIII:  CONVERSION

128.    Mutual Mortgage repeats and realleges the foregoing allegations as if fully set forth herein.

129.    WaterStone, through the Departed Employees, unlawfully diverted borrowers and loans from Mutual Mortgage to WaterStone, and misappropriated Confidential and Trade Secret Information.

130.    Mutual Mortgage had an ownership interest in the borrowers and loans unlawfully diverted to WaterStone, and in the Confidential and Trade Secret Information unlawfully transmitted to WaterStone.

131.    WaterStone's attempts to exercise dominion over these borrowers, loans, and the Confidential and Trade Secret Information is inconsistent with Mutual Mortgage's ownership interest.

132.    As a direct result of WaterStone's actions, Mutual Mortgage has suffered damages and continues to be harmed in the loss of business and goodwill in the marketplace.

ACTIVE:15797561.2

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff respectfully requests that the Court:

1.      Enter an order in favor of Mutual Mortgage and against WaterStone:

    a.      awarding Mutual Mortgage compensatory damages in an amount to be determined at trial;

    b.      awarding Mutual Mortgage exemplary, punitive, and liquidated damages in an amount to be determined at trial;

    c.      awarding Mutual Mortgage pre-judgment and post-judgment interest;

    d.      awarding Mutual Mortgage reasonable attorneys' fees and costs incurred herein; and

    e.      for such other relief as the Court deems just and proper.

Dated:      July 22, 2022

GUNSTER, YOAKLEY & STEWART, P.A.

By: _John A. Schifino_
John A. Schifino
Florida Bar No. 0072321
Justin P. Bennett
Florida Bar No. 112833
401 East Jackson Street, Suite 1500
Tampa, Florida  33602
Primary email:  jschifino@gunster.com
Primary email:  jbennett@gunster.com
Secondary email: csanders@gunster.com
Secondary email: kkovach@gunster.com
Telephone:  (813) 228-9080

ACTIVE:15797561.2

MITCHELL SANDLER LLC
Christopher L. McCall (*pro hac vice*
application forthcoming)
1120 20th Street N.W., Suite 725
Washington, D.C.  20036
Primary email:  cmcall@mitchellsandler.com
Telephone:  (202) 886-5292

GUNSTER, YOAKLEY & STEWART, P.A.
Aron Raskas  (*pro hac vice* application forthcoming)
600 Brickell Avenue, Suite 3500
Miami, Florida  33131
Primary email:  araskas@gunster.com
Secondary email:  avalido@gunster.com
Telephone:  (305) 376-6000


*Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc.*

ACTIVE:15797561.2