IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____
                              )
MUTUAL OF OMAHA               )
MORTGAGE, INC.,               )
                              )
        Plaintiff,            )
                              )
vs.                           )   Case No.:  8:22-CV-1660
                              )
WATERSTONE MORTGAGE           )
CORPORATION,                  )
                              )
        Defendant.            )
_____)


**MOTION PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**October 12, 2022**
**9:56 a.m. to 11:09 a.m.**


**APPEARANCES:**
**FOR THE PLAINTIFF:**          CHRISTOPHER L. MCCALL, ESQUIRE
                                Mitchell Sandler LLC
                                1120 20th Street NW
                                Suite 725
                                Washington, DC 20036

                                JOHN A. SCHIFINO, ESQUIRE
                                ALEXIS DION DEVEAUX, ESQUIRE
                                Gunster, Yoakley & Stewart, PA
                                401 East Jackson Street
                                Suite 1500
                                Tampa, Florida 33602

**FOR THE DEFENDANT:**          MARIA L. KREITER, ESQUIRE
                                Godfrey & Kahn, SC
                                833 East Michigan Street
                                Suite 1800
                                Milwaukee, Wisconsin 53202


(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**APPEARANCES (CONTINUED):**

**FOR THE DEFENDANT:**      SCOTT A. MCLAREN, ESQUIRE
                             Hill Ward Henderson
                             3700 Bank of America Plaza
                             101 East Kennedy Boulevard
                             Tampa, Florida 33602

1          (Call to Order of the Court at 9:56 a.m.)

2          **THE COURT:**  Morning, everybody.  Nice to see you.

3   This is Mutual of Omaha versus WaterStone Mortgage, Case Number

4   22-CV-1660.

5          Who's representing the plaintiff?

6          **MR. McCALL:**  Good morning, Your Honor.  My name is

7   Christopher McCall from the law firm Mitchell Sandler, LLC, and

8   I represent the plaintiff, Mutual of Omaha Mortgage.  And with

9   me is my colleague John Schifino from the law firm Gunster.

10          **THE COURT:**  You don't have to stand up.  It's okay.

11   Just make sure the mic is in your face when you talk.

12          Defense.

13          **MR. McLAREN:**  Your Honor, Scott McLaren, here on

14   behalf of the defense.  Along with Maria Kreiter, national

15   counsel from Milwaukee.

16          **THE COURT:**  Okay.  I had y'all come in to talk about

17   this, because I'm wanting to kind of get involved in this

18   pretty early on and find out what's happening.  And I'm kind of

19   doing that in all the cases.  I've gone over to kind of a

20   hands-on case management plan, and I think you're supposed to

21   come in on the 26th already.  We don't have to do that.  That

22   court date is canceled.  We'll talk about that stuff right now

23   before we get into the meat of this exact case.

24          So what I'm doing with the case is -- Sonya, get them

25   a handout, please.  What I'm doing with the cases is having

UNITED STATES DISTRICT COURT

4

1    y'all come in at the beginning.  We kind of talk about it.  I

2    find out what's going on in the case, kind of get my arms

3    around it, and then I'm going to give you a future court date

4    in a couple months and kind of see what's going on in the case.

5          If you need to talk to me about something, I guess I

6    should be very explicit about this.  I am trying to change the

7    federal court culture, at least with me.  I'm not trying to

8    change with any other judges.  But I don't want to see 10-page

9    motions on something that we can fix with a conversation.  All

10   right?

11         So these future court dates, which Sonya is going

12   give us one in February, we can talk about any outstanding

13   issues, little motions that are kicking around out there.  If

14   you're fighting about little things and you want the judge to

15   resolve it, you can call Sonya and come in on a Wednesday

16   afternoon and we'll just talk about it.  And, you know, if it's

17   something I can resolve with a conversation, I'd like do that.

18         **THE COURTROOM DEPUTY:**  February 22nd at 1:30.

19         **THE COURT:**  February 22nd at 1:30 is your future

20   court date.  If the case settles, then it settles, and you

21   don't have to come in.  We had a case set at 10:30 today, and

22   guess what, at eight o'clock last night it settled.  So it

23   tends to work out that way.

24         I don't have to give you-all the speech, because

25   you're local.  But just keep in mind, these dates are live

                    UNITED STATES DISTRICT COURT

5

1    court dates in Tampa, Florida, not Zoom.  I only do Zoom when

2    it's really, really, really necessary.  Most of our friends in

3    South Florida like to practice law in the Middle District of

4    Florida by doing Zoom from their offices in Miami, which I

5    don't like, and I don't agree with, and I don't allow.  So

6    future court dates are live here.

7            You don't have to come.  None of us are

8    indispensable.  Sometimes I might have a magistrate cover it.

9    If you have someone else in your office that wants to come and

10   cover it, that's a great opportunity for young lawyers to get

11   some face time in court.  Again, I have some lawyers that call

12   in, and they're in very large law firms, and they think that

13   they're the only single person that can come in and cover one

14   of these dates when all we're going to do is talk about what's

15   going on and nothing big is going to happen.

16           So that's kind of the game plan.  That's what we're

17   going to be doing, irrespective of what we're going to talk

18   about today.

19           Anybody have any questions on that, thoughts,

20   comments?  Good?

21           **MR. McCALL:**  Your Honor, I did not hear the February

22   date.  Was it February 2nd?

23           **THE COURT:**  What was it?

24           **THE COURTROOM DEPUTY:**  22nd.

25           **THE COURT:**  February 22nd at 1:30.  And that's a mass

UNITED STATES DISTRICT COURT

1    docket.  There will be 20 other cases in court at that time, or

2    15.  I think we said we would limit it to 15.

3          But if you have something that comes up and, you

4    know, you want to have a quick little hearing on it, just let

5    me know, we'll do that.  The magistrates still do discovery

6    disputes and things like that.  But, you know, if I -- if we're

7    here and you have a discovery dispute and we can talk about it,

8    I'll be happy to try to resolve it for you.

9          All right.  So that's that.  So now this case -- talk

10   to me about this.  What -- what are you trying to accomplish on

11   this thing?  What are you -- what does a win look like for you?

12         **MR. McCALL:**  Yes, Your Honor.  The relief that we're

13   seeking in this case is damages for, among other things, you

14   know, as far as specifically borrower loans that were diverted

15   from my client to the defendant unlawfully as a result out of

16   this massive poaching of 60 employees of my client that

17   resulted in the total closure of three of their branch offices

18   and in addition to, you know, the poaching of the -- of these

19   employees, we allege sort of generally three buckets of

20   misconduct.  There's the soliciting employees to leave.

21   There's the misappropriation of trade secrets.  And then

22   there's the diversion of borrower loans.

23         **THE COURT:**  Okay.  One step at a time here.  So

24   nobody -- there are not -- this is hard to say.  There are not

25   noncompete agreements with any of these people, I take it.

                    UNITED STATES DISTRICT COURT

1    Right?

2            **MR. McCALL:**  There -- Your Honor, does Your Honor

3    mean with -- there are no allegations that the employees are

4    violating a noncompete provision.

5            **THE COURT:**  And you're not trying to get some kind of

6    an injunction to stop them from working for the other company?

7            **MR. McCALL:**  No, Your Honor.  They're already working

8    for the other company.

9            **THE COURT:**  Sometimes under the trade secret laws,

10   people have argued that that can give a basis for an injunction

11   to prevent people from working for a new company, but I

12   actually think it only can enjoin them from sharing the trade

13   secrets with a new company, not outright working there.  But

14   you're not even going there, which is fine.

15           **MR. McCALL:**  Your Honor, can I just correct something

16   that I said?  I said there are no noncompetes at issue.  It --

17   which is -- there's a clause that I believe might be styled as

18   a noncompete that also contains non-solicitation provisions.

19   Those are at issue in this case, not a -- specifically a

20   noncompete.  I just wanted to be clear.

21           **THE COURT:**  So I may have missed that.  So do these

22   employees actually have an employment contract?

23           **MR. McCALL:**  Yes, Your Honor.

24           **THE COURT:**  And what is it -- what does it say about

25   nonsolicitation?

UNITED STATES DISTRICT COURT

1        **MR. McCALL:**  It prohibits them from a period of time,

2  I believe it's six months, following their departure from the

3  company from soliciting or recruiting other employees to leave.

4        **THE COURT:**  Okay.  I missed that.  So this -- this

5  really dovetails into the subject of -- the technical subject

6  of this motion, which is you're suing the company.  You can't

7  sue that company for breach of that contract because they

8  weren't a signatory to that contract.  You could sue the

9  employees, but you're not suing the employees.  This would all

10  be a lot simpler legally if you were suing the employees

11  directly.

12        I'm not trying to get involved in, you know,

13  attorney-client privilege stuff, but I mean, is there a reason

14  why you're not suing any employees?  You're comfortable

15  sharing, or if you want to say no, it's not going to hurt my

16  feelings.  But I'm just wondering.

17        **MR. McCALL:**  Your Honor, we are suing the party that

18  we believe to have orchestrated these events to be the ring

19  leader, so to speak.  That's why we're pursuing WaterStone and

20  not the individual employees, because we believe that the

21  individual employees acted at the direction of WaterStone.

22        **THE COURT:**  Yeah.  This requires kind of an extra

23  step, because, you know, they're arguing on the other side here

24  that, well, that's nice, you haven't really said that

25  WaterStone has done all of these eight different things.  Maybe

UNITED STATES DISTRICT COURT

1    one of them.  But there isn't enough allegations to get them on

2    the hook for all of this, which we'll get into more in a

3    second.

4          But what do you think the value of this case is?  A

5    real number.  This is not the place or the time for bloviating

6    and puffery.  I mean, what do you think roughly we're talking

7    about here?  If you won, what would an outright win, yes, you

8    get everything that you think you're entitled to, what would

9    that be?

10          **MR. McCALL:**  Your Honor, if Your Honor is asking for

11    a sort of dollar amount, the answer is I don't know.

12          **THE COURT:**  Well, okay.  See, this is -- this is

13    something else that I do that lawyers are not comfortable with,

14    but I've researched it in terms of if it's a jury trial, the

15    judge is -- has the leeway to get deeper into like settlement

16    and things like that.  I need to know what we're talking about

17    here, because it's impossible to effectively -- I'm glad the

18    clients are here, too, to hear this, the corporate legal people

19    at least.

20          Right?  That's your job.  Right?  I'm pointing -- I

21    thought you said you were with the client?

22          **MS. KREITER:**  Sir, Your Honor, I'm Maria Kreiter.

23    I'm national counsel for WaterStone.  We do not have a client

24    here today.

25          **THE COURT:**  You're the client.  I mean, you're like

UNITED STATES DISTRICT COURT

10

1    the client.  Right?  You're the in-house legal department?

2              **MS. KREITER:**  No.  I'm outside litigation.

3              **THE COURT:**  Oh, I misunderstood.

4              **MS. KREITER:**  Mr. McLaren is our local counsel.

5              **THE COURT:**  Right.  You're also a lawyer, but not --

6    I thought you were an in-house lawyer.

7              How about you?  What's your job?

8              **MS. DEVEAUX:**  Your Honor, Alexis Dion Deveaux with

9    the law firm of Gunster.  I'm also an attorney.

10             **THE COURT:**  No good.

11             **MS. DEVEAUX:**  No.

12             **THE COURT:**  I was hoping the people on the end were

13   like the clients.

14             All right.  But in any event, it's impossible to

15   effectively litigate, you know, a hundred-thousand dollar case

16   in state or federal court.  What's the number you can

17   effectively litigate a case in federal court?  I don't know.  I

18   don't know what the number is.  I'm trying to make it lower.

19             I'm trying to make it so people can effectively

20   litigate cases that are like something under a million dollars,

21   but -- and I handle those cases differently.  You know, if

22   you're telling me this is several million dollars, that gets

23   one version of case management.  If you're telling me it's

24   200,000, it's a whole nother version of case management.  And

25   one of the things I do is really streamline everything if

UNITED STATES DISTRICT COURT

1    there's not a lot of money involved.

2           And so, I mean, what's a -- just a thought, I mean,

3    you know?

4           **MR. McCALL:**  Yes, Your Honor.  So in terms of the

5    uncertainty surrounding the damages at issue, there's sort of

6    two things I would say.  One is one of the sources of our

7    damages would be loans that were -- that started at my client

8    and that ultimately closed at WaterStone.  We don't have

9    insight yet into whether those loans actually closed at

10   WaterStone and the terms of those loans.

11          Second, with respect to the misappropriation of trade

12   secret claims, we don't yet have insight into -- we --

13   discovery in this case has just commenced.  We served discovery

14   requests a few weeks ago.  And in -- so we don't yet know

15   precisely what WaterStone did with our trade secret

16   information.

17          **THE COURT:**  So if -- so it's possible that maybe zero

18   loans closed because interest rates are going up, and maybe

19   they didn't do anything with the trade secrets, so it could be,

20   you know, a $50,000 case?

21          **MR. McCALL:**  Your Honor, I don't think that's likely.

22   And we do know at least -- I'm aware of at least two loans that

23   we know closed based on documentary evidence stating that the

24   loans closed, but we don't know the exact terms.

25          **THE COURT:**  Okay.  I know you don't know the real

UNITED STATES DISTRICT COURT

1  number.  This is not a math exercise.  I'm getting a little

2  frustrated here, because no lawyer takes a case and charges a

3  client however many dollars an hour you're charging your

4  clients without some idea of roughly, roughly what the case

5  might be worth.

6          So what's your rough guess about what it's -- and

7  you're not bound by it.  No one is going to come back and say,

8  aha, he said it was a hundred thousand dollars.  Oh.  This

9  can't be used against you in any way, shape, or form.  All

10  right.  So what's your best guess?

11          **MR. McCALL:**  My best guess, Your Honor, is $250,000.

12          **THE COURT:**  All right.  Good.  That's very helpful.

13  Because for all I know, I don't know this business.  For all I

14  know, it could be $2.5 trillion.

15          **MR. McCALL:**  Understood, Your Honor.

16          **THE COURT:**  So good.  All right.  Thank you.

17          Okay.  So let's go back over here and talk about this

18  before we get into the meat of the motion itself.  All these

19  people definitely went over to work for your client.  That's a

20  fact.  Nobody is disputing that.  Right?  They're there.

21          There's an allegation right in there that they've got

22  some guy sending e-mails of -- what is it, Paragraph 14, Mutual

23  Mortgage intends to conduct extensive discovery of the personal

24  e-mail accounts on an expedited basis, including forensic

25  auditing.  Sorry, that's not what I meant to read.

UNITED STATES DISTRICT COURT

 1              Paragraph 3, a spreadsheet with a dozen tabs, each

 2    containing confidential and trade secret information, such as

 3    Mutual Mortgage's historical profit-and-loss statements, loan

 4    rates, fee -- you know, usually in these cases, people say, oh,

 5    trade secrets, it's stuff, it's all publicly available, it's

 6    not really trade secrets.  Some of it sounds like it's

 7    legitimate trade secret stuff.  There's an e-mail trail

 8    already.

 9              What's your take on this in terms of -- can they do

10    that?  Can all these employees just go and send, you know,

11    profit-and-loss statements of their former employer by e-mail

12    over to the new company and the new company is not on the hook?

13    I understand the employees are.  But is there -- I mean, I'm

14    kind of cutting to the chase with a motion and skipping a

15    technical legal details, talking practically.  There's got to

16    be a way that your client can be sued if that happened.

17              I mean, but what's -- where is this going from your

18    end?  I'm not asking a specific question.  I'm engaging in a

19    thinking-out-loud stream of consciousness, but where does this

20    go from the defense side of things?

21              **MS. KREITER:**  So I recognize that there is the

22    allegation that the Court has honed in on.  There's very few

23    allegations.  And specific to that allegations, it's that

24    WaterStone received the P-and-L spreadsheet, so receipt of the

25    information.  Whether or not there's a component of that

                    UNITED STATES DISTRICT COURT

1    spreadsheet that could be a trade secret, possibly.  But I

2    think we're entitled to know what it is.  Is it the whole

3    thing?  Is there a theory that this is compilation trade

4    secret, or is it, you know, certain tabs of the spreadsheet?

5         There's certain information that is alleged to be in

6    that trade secret -- or in that spreadsheet that is necessarily

7    not a trade secret.  The loan rates, that's public information.

8    So with respect to the trade secret claims in that specific

9    allegation, there could be a trade secret claim pled.  Not

10   here, though, not based on what we have.  There's no

11   allegations that WaterStone solicited that information, you

12   know, frankly, no notice of what is the trade secret, no

13   allegations about secrecy efforts with respect to whatever that

14   is.

15        **THE COURT:**  Let me just interrupt you for a second.

16   I don't disagree with anything you just said.

17        **MS. KREITER:**  Sure.

18        **THE COURT:**  All right.  But I'm -- I'm now cutting to

19   the chase a little bit.  I'm looking bigger than just the

20   narrow points that you're making, which I generally agree with.

21        Something is going to stay live in court.  They're

22   going to get a bunch of discovery.  They're going to be able to

23   look at all the e-mails.  You're not going to be able to stop

24   any of that.  Eventually, whatever happened, they're going

25   figure out.

1        **MS. KREITER:**  Sure.

2        **THE COURT:**  Because there's an e-mail chain here.

3   And if -- even if the allegations right now, and they're

4   saying, well, we don't know enough now be more specific, but

5   sooner or later, they will get that information, and then they

6   will be able to, if I were to agree with you now and say, well,

7   this doesn't, you know, dismiss it now, they will -- they will

8   get enough information to be able to hook the company as

9   opposed to the individuals sooner or later if these e-mails

10  really happen.  And you-all would know that.  I'm sure you've

11  talked to your people and everything like that.

12        So what's this going to look like?  Big picture is

13  what I'm trying to figure out.  And when I hear $250,000 may be

14  at issue, that's not enough money to go back and forth for a

15  couple years lawyer-wise.

16        So he sent you a note you're dying to say.  Go ahead.

17  What was it?

18        **MS. KREITER:**  Yeah.  I just -- you know, in addition

19  to just the challenges about what is the trade secret, you

20  know, here, it's employee supplies information to WaterStone.

21  No allegations about how it was used, how did that information

22  harm WaterStone.  Usually it's I got this trade secret and I'm

23  using it to my competitive advantage to develop X in a way

24  that's expedited as opposed to if I didn't have the trade

25  secret.

1        Here, it's an e-mail, which plaintiffs do have, that

2   attaches a spreadsheet, and it's simply, you know, the fact of

3   that transmittal to my client.  There's no allegation of

4   causation, harm.  So I don't necessarily disagree with the

5   Court that limited to that specific transmittal document --

6   could there be more?  Yes.  Is there sufficiency now?  No.

7        And I don't think that one is one that is susceptible

8   to being improved by discovery, because plaintiffs do have that

9   e-mail.  They have the spreadsheet.  If they thought that

10  tab three was a trade secret, that could have been said.  If

11  they thought tab four was used to WaterStone's competitive

12  advantage in some way that was unfair, that could have been

13  said.

14        I don't see that as something that's going to get

15  cured with discovery.  You know, I'm assuming that the

16  plaintiffs put forth their best case in the complaint based on

17  that e-mail, and it doesn't -- it doesn't pass muster under the

18  trade secret elements as pled.

19        **THE COURT:**  Right.  I understand the argument.  But

20  this is -- this is complicated by the fact of having eight

21  different counts.  I might have just talked about one of the

22  strongest counts in terms of what information you-all have now

23  that you put in the complaint.

24        But by trying to hook the company for all of these

25  different legal theories -- and I'll try not to give a speech.

                    UNITED STATES DISTRICT COURT

1    Okay.  But this is one of the problems with civil litigation

2    lawyers, oh, belt and suspenders.  I won't just have two

3    counts.  I'll have eight.  And I'll put one that gets attorney

4    fees, like, where is it, deceptive and unfair trade practices.

5    All right.  Then we get into, you know, having so go through

6    each one of these legal theories, causes of action, and trying

7    to figure out is there really enough here to keep the company

8    in the case right now or ever.  And it just -- I understand why

9    it's done, but it really now -- I mean, what's your argument?

10         Let me give you an example.  Talk to me about this

11   deceptive unfair trade practices count.  What do you have in

12   here that would say that the company, suppose the individuals,

13   even if the individuals could be used under this, I mean,

14   what's the theory on that?

15         **MR. McCALL:**  Sure, Your Honor.  So our theory on the

16   unfair trade practices claim is that the -- is that the

17   employees at issue acting at the direction of WaterStone

18   misrepresented to consumers on whose behalf they were acting.

19   They purported to be acting on behalf of Mutual Mortgage when

20   in fact they were acting on behalf of Mutual Mortgage's

21   competitor WaterStone.

22         **THE COURT:**  So you're saying that when they were

23   actually working for WaterStone, they were pretending they were

24   working for your client?

25         **MR. McCALL:**  Vice versa, Your Honor.

UNITED STATES DISTRICT COURT

1      **THE COURT:**  Right.  Sorry.  And you have evidence of

2  that?

3      **MR. McCALL:**  Yes, Your Honor.  So, for example, in

4  the complaint, we cite e-mails between our then employees and

5  borrowers in which -- so one e-mail we cite, for example, a

6  former employee tells about -- falsely tells a borrower that

7  Mutual Mortgage was not able to issue the loan and refers that

8  borrower to WaterStone, and then subsequent evidence shows that

9  that loan ultimately closed.

10      **THE COURT:**  While he was working for?

11      **MR. McCALL:**  My client.  And we also have e-mail

12  communications to -- between then employee --

13      **THE COURT:**  Let's just stick with that for a second.

14  I do want to hear what you're just getting ready to say.  But

15  let's just stick with that for a second.

16      So that's the -- I mean, these guys that do this

17  stuff are kind of like salesmen, if you will.  Right?  And so,

18  you know, he knows he's going to work for another company.  So

19  he's negotiating a deal, and he says whatever he says because

20  he's not going to get paid.  He knows he's leaving.  So he

21  needs that deal to go with him to the new company.  And so he

22  might have said a lot of stuff that he shouldn't have said that

23  was not even true, and it could have been deceptive.

24      But -- and her point is going to be, well, that's

25  nice.  How do you know, how do any of us know it wasn't a rogue

UNITED STATES DISTRICT COURT

1   salesman trying to make money for himself versus this new

2   company having anything do with it?

3          That's -- I mean, what do you think about that?

4          **MR. McCALL:**  So the reason we think that this is not

5   a case of a rogue salesman is because of a pattern and the

6   large number of instances of this occurring.  So in addition to

7   the e-mails that we cite, one of our then employees went to --

8   spent the weekend going to open houses and interacting with

9   real estate agents and borrowers at the time he was employed by

10  Mutual Mortgage, and on the way out, and, you know, is pushing,

11  diverting business from his then employer to his future

12  employer.

13         And I would also add, and I know I've mentioned this

14  before, that because of the use of personal e-mail accounts

15  that we do not have access to, our insight into the precise

16  nature of these communications is somewhat limited at this

17  time.  We only have access to our e-mail system.  And so

18  e-mails that were sent to personal e-mail accounts, we see

19  that, but we don't know what the next step was.

20         And, Your Honor, if I may, on the topic of e-mails,

21  we were discussing the spreadsheet that was sent to WaterStone,

22  and I just want to be clear, this is not the case of sort of

23  passive receipt of information.  We -- WaterStone responded to

24  that e-mail when they received that spreadsheet.  It -- the

25  regional vice president of sales responded and said thank you

UNITED STATES DISTRICT COURT

 1    and said that he had forwarded it off to the senior vice

 2    president of sales at WaterStone.  We don't have that e-mail

 3    where he forwarded it off or what he said.  And that's why --

 4    that is one of the obviously one of the things we're seeking in

 5    discovery is there internal correspondence.

 6         **THE COURT:**  That's what I -- that's what I'm trying

 7    to get at here is that on the other side of the equation, if

 8    you've talked to your people at all on this, the people that

 9    came over from the other company, they're going know what --

10    you're going to figure out what happened, if you haven't

11    figured it out already, and then we're going to have to

12    confront the question at some point, did the company itself do

13    anything that is -- and somehow actionable?

14         And I guess what I'm asking from your side of the

15    equation is, we can spend another two years doing -- doing this

16    litigation exercise of pulling -- doing discovery and looking

17    at e-mails and figuring out, but you can just figure it out,

18    and you can know what actually happened and whether the case

19    should be settled or not, like pretty soon, I would think, as

20    opposed to all this legal maneuvering and going back and forth.

21         The fact of the matter is, how many employees?

22         **MR. McCALL:**  Approximately 60.

23         **THE COURT:**  Sixty employees all went from one company

24    to the other, and it may be perfectly lawful.  But there may

25    have been some things that happened along the way that

UNITED STATES DISTRICT COURT

1    shouldn't have.  I mean, why do we have to do all -- if people

2    from -- when they left sent trade secrets to the new company,

3    that's bad.  They shouldn't have done it.  And that creates

4    some exposure on your side of the case.  It just does.  All

5    right.  So why can't we figure this out pretty quickly and

6    either settle it or not?  What's -- what --

7           **MS. KREITER:**  Frankly, on behalf of WaterStone, we

8    are not opposed to some kind of early mediation.

9           **THE COURT:**  But we need to know exactly, you know,

10   what happened.  And if everyone is going to, you know, hold

11   their cards very close to the vest like -- I don't know that

12   you know what all the cards are.  I don't know if you've talked

13   to the people yet and figured it out.

14          **MS. KREITER:**  I will tell you, Your Honor, the first

15   transition of employees was in April.  I have been very

16   aggressively interviewing the employees.

17          **THE COURT:**  Good.  Good.

18          **MS. KREITER:**  I do have a pretty good grasp of the

19   facts here.

20          **THE COURT:**  Excellent.

21          **MS. KREITER:**  So I understand that perhaps the other

22   side wants to see some discovery.  Frankly, both sides have

23   served discovery.  So I think to the extent that there's some

24   uncertainty, you know, in short order, that should position the

25   parties to be able to have a meaningful conversation.  On

22

1    behalf of WaterStone, I think that would be welcomed.

2         **THE COURT:**  Yeah.  I don't hear him asking for, you

3    know, $20 million.  What I heard was a realistic number.  I'm

4    not going to hold it against you.  But, you know, if they have

5    a realistic number in mind, sounds like they're accepting the

6    fact these employees are gone and they're not coming back.

7    And -- right?  I mean --

8         **MR. McCALL:**  That's correct.  That's correct.  The

9    employees are gone and not coming back.  We are certainly

10   willing to, you know, consider a resolution of this.

11        I would say -- our concern about mediating at this

12   point is as I was saying before, we just don't know the scope

13   of what happened.  And, again, to the extent that counts, you

14   know, that early in discovery, we can get access to that

15   information.  To Your Honor's point, maybe none of these loans

16   closed because interest rate, because the market changed in the

17   interim period.  We don't think that's the case, but that --

18   you know, absent those facts, it's just hard for us to, you

19   know, to sit down and have a meaningful negotiation and talk

20   numbers when we don't know the scope of what happened.

21        **THE COURT:**  I understand.  I understand that.  And

22   another problem that somebody is going to have to figure out

23   and I really -- this would be a great thing to figure out

24   sooner rather than later, really great thing to figure out

25   sooner rather than later.  What's the shelf life of a claim?

UNITED STATES DISTRICT COURT

1    Meaning when they go and they work for a new company and maybe

2    they used, I don't know, contacts, information, or whatever

3    that they learned from the prior employer, how many deals can

4    they close working for the new company that your client is

5    entitled to get a piece of?  In other words, what's the

6    limitation on the damages?  I don't know that any of us in this

7    room, we've all been lawyers for a while, could answer that.

8    The law is very tricky on that stuff.

9            What about this no solicitation agreement thing?

10   What does that say?

11           **MR. McCALL:**  It prohibits the employees from a period

12   of time from -- you know, obviously employees are free leave as

13   they please -- from soliciting or recruiting other employees

14   for a period of time.  I want to say it's six months.

15           **THE COURT:**  All right.  So one might argue that one

16   way to figure out how long their new employment, the -- you

17   could get damages from their new employment.  That might be one

18   thing to look at is that six months.  I'm not saying the law

19   says that, but, you know, that might be something.  You know,

20   if they go to work for a new company, they -- eventually,

21   there's no damages.  I mean, if they stay there for 20 years,

22   but where that line is and where that cutoff is another piece

23   of uncertainty that would keep the case from getting worked out

24   in the short run, but --

25           **MR. McCALL:**  It is six months, Your Honor.

UNITED STATES DISTRICT COURT

1      **THE COURT:**  Yeah.  And for six months they're not

2   supposed to be?

3      **MR. McCALL:**  Recruiting or soliciting other

4   employees.

5      **THE COURT:**  All right.  So.

6      **MR. McCALL:**  So once they --

7      **THE COURT:**  That sounds pretty clean.  Right?  So if

8   there's e-mails where some of the people that are now working

9   for your side of the conversation here are, you know, e-mailing

10  their friends, hey, come work over here, everyone is a lot

11  nicer, and, you know, we make more money, and, you know, the

12  grass is greener, it really is greener, you know, that's --

13  that is another -- not that the company -- I understand that

14  point.  I'm not forgetting that point.  But eventually that

15  would be something that would be very easy to figure out one

16  way or the other.

17      But, I mean, ultimately you're going to talk about

18  deposing all 60 people and say what is it that got you to

19  switch teams here?  That's a big endeavor.  But, you know,

20  maybe you could do a few and see what they say.  That would be

21  interesting to know.

22      Anybody have any guesses on that?  Any speculation

23  what are the employees saying?

24      **MR. McCALL:**  It appears as though most of the

25  conversations took place over the phone or perhaps in person.

UNITED STATES DISTRICT COURT

1    We -- I'm aware of one piece of documentary evidence of a

2    WaterStone employee doing a -- like a Zoom meeting with then

3    current Mutual Mortgage employees.  But we don't -- you know,

4    we don't have like a transcript or anything like that.

5        **MS. KREITER:**  There's no twisting of any arms.  The

6    industry is very transient.  The employees have worked for

7    certain managers for years and frankly came to Mutual in a

8    pack.  So the fact that there's a pack moving is not, you know,

9    the sexiest.  That's kind of how it is.

10            In addition, you know, there's two offices in

11   Florida.  So, you know, manager says I'm moving to WaterStone.

12   There is real -- no option to stay at Mutual.  There's no

13   office in the state of Florida.  So I think there's a lot of

14   dynamics related to the relationships.  You're going to hear

15   the employees say, well, of course I followed Mr. Smith.  I've

16   worked with him for 20 years.  I came with him to Mutual.  I've

17   traveled with him the last three companies that he's worked

18   for.  And, frankly, how could I have stayed at Mutual?  There's

19   no place for me to go.  Unless I want to move to a different

20   state, I'm going to go to WaterStone.

21            You're going to hear about, you know, dissatisfaction

22   with the underwriting, dissatisfaction with the loan products

23   that Mutual is offering.  You know, I don't want to belabor

24   that, but --

25        **THE COURT:**  I'll tell you exactly what it was.  I

                    UNITED STATES DISTRICT COURT

1  think we all know what it was.  There's a gentleman named

2  Mr. Green, you can make more money.

3          **MS. KREITER:**  Sure, but that's not unlawful.

4          **THE COURT:**  That's why people leave mortgage

5  companies.  That's why people leave law firms.  All right.

6  Eventually somebody, I'm sure, led them to believe that they

7  were going to make more money.  And, you know, we'll see.

8  Maybe they do, maybe they don't.

9          But I understand what you're telling me about that.

10         **MR. McCALL:**  Your Honor, if I could just make one

11  point.  No one is disputing these employees have the right to

12  earn a livelihood and to work in the industry.  It's whether

13  they have the right to recruit others to leave with them.  So

14  if an employee decides independently I want to follow

15  Mr. Smith, he can follow Mr. Smith.

16         But what they can't do is then go talk to his other

17  employees and say, hey, I'm going with Mr. Smith, why don't you

18  come too, because that violates the contract.

19         **THE COURT:**  Right.  Right.  Maybe you'll see some

20  e-mails.  But maybe it's all phone conversations, and then

21  you're left with, you know -- you're left with the person says,

22  you know, I went because I had no choice.  Everybody else was

23  going, and, you know -- don't know.  There's plenty of moving

24  parts on this thing.  I've just tried to identify some that

25  weren't moving that were pretty clean.  But even those, you

1    know, aren't totally clean.

2         Okay.  Well, this is helpful.  Let's be very

3    technical now and talk about the actual motion that we've got.

4    And go ahead.  You started to say some of this before, and I

5    kind of diverted the conversation to try be a little bit bigger

6    picture.  So what about the -- what do you think strongest

7    claim against the company is, the trade secret?  I mean,

8    strong, meaning factually pled, one where there's enough to

9    keep the company in the case.

10        **MS. KREITER:**  I think it's the trade secret claims if

11   they're amended and more particularity is stated.  There's a

12   number of claims that I just think as a matter of law can't go

13   forward regardless of facts.

14        **THE COURT:**  Yeah.  Talk to me about those.  I'm

15   interested.  I think you might be right about that.  But go

16   ahead.

17        **MS. KREITER:**  Yeah.  I'm going to start with the

18   Florida Deceptive and Uniform Trade Practices Act that you were

19   talking with Mr. McCall about.  It's Claim Number 7.  I

20   actually think that's a pretty clean legal dismissal on two

21   grounds.

22        The first is preemption.  That claim as pled is based

23   on misappropriation of trade secret allegations.  The plaintiff

24   doesn't really dispute anywhere in its brief that to the extent

25   that claim relies on misappropriation of trade secret

UNITED STATES DISTRICT COURT

1    allegations, the claim is preempted.

2           The only thing that Mutual has said with respect to

3    that claim is, there's additional allegations beyond

4    preemption, which I agree.  The motion was based in part on

5    preemption.  So if you cut out all of the grounds for that

6    claim that are based on trade secret misappropriation, which

7    you can and should, and frankly it's undisputed that that's the

8    likely -- that's the correct result, then you look at, okay,

9    what is left to support that claim?

10           Mr. McCall said, well, there's allegations about

11    e-mails, about solicitation of employees.  As a matter of law,

12    that's a consumer act.  So the argument that WaterStone made to

13    get rid of what's left of that claim is that there's no

14    allegation of harm to the end consumer.  This is a consumer

15    claim.  We cited a number of cases, Car and Body Lab, CEMEX

16    Construction, and the -- those two, Car and Body Lab again.

17           So no actual harm to the end consumer, not Mutual.

18    There was nothing in the response brief that talked about

19    either of those cases or that responded in any way to the

20    argument WaterStone made with respect to the lack of pleading

21    of any harm to the consumer.

22           The allegations are, well, these employees were

23    masquerading as employees of Mutual.  Really, they were

24    intending to benefit WaterStone.  It would be pure speculation,

25    and there's certainly nothing in the complaint itself that

UNITED STATES DISTRICT COURT

1   explains how that harmed the consumer.

2         So, you know, it's kind of those two clean preemption

3   and no harm to the consumer that requires that to be dismissed

4   as a matter of law.  Cherry on top is just what did WaterStone

5   do, what was its involvement?  That gets back to the same

6   discussion that we had earlier about the sufficiency of the

7   allegations vis-a-vis WaterStone versus the employees.  So I

8   won't belabor that.

9         But, to me, the cleanest path to dismissal are the

10  two legal theories of preemption and no allegations of harm to

11  the end consumer, including just no response from Mutual on the

12  second argument that WaterStone made regarding harm to the

13  consumer.

14        **THE COURT:**  What are the other ones you think can't

15  be against the company no matter what the facts may end up

16  being?

17        **MS. KREITER:**  Lanham Act claim.  To be honest, I

18  found that to be the most tortured of the claims that were set

19  forth in the complaint.  Kind of looking at what do we know,

20  what do the parties potentially agree on?  Mutual agrees to the

21  five elements that were set forth, and Mutual's response brief

22  at Pages 12 through 13, we agree on the elements.

23        And what else do we kind of know about that claim?

24  You know, what is the false statement?  It's a statement again

25  that employees were employees of Mutual.  That's a truthful

UNITED STATES DISTRICT COURT

1    statement.  So as a fundamental matter, there's no false

2    statement, be it by the employees or by WaterStone.  It is not

3    possible for there to be a cause of action anytime an employee

4    that's thinking about changing employers and thinking about how

5    he or she may benefit the future employer, that that's somehow

6    a Lanham Act claim.  Mutual really concedes for the first time

7    in its response brief at Pages 13 to 14 that, yes, it doesn't

8    have a direct claim against WaterStone, vis-a-vis that claim.

9    It's really derivative of something that the employees might

10    have said.

11              So I think, you know, that's kind of what you can

12    glean from the complaint and the response brief.  But, you

13    know, again, there's no false statement, so I think you could

14    dismiss it on that ground.

15              But, you know, maybe a cleaner ground is that there's

16    no commercial advertising here.  These are, you know, an e-mail

17    to a particular borrower, or, you know, somebody attended an

18    open house and said to attendees at the open house that they're

19    employees of Mutual.

20              The cases that WaterStone cited in its brief, the

21    Middle District of Florida 2011 case, and then also the case

22    out of Georgia talk about the fact that it doesn't necessarily

23    have to be a TV commercial, but it does have to be some kind of

24    advertising that is sufficiently disseminated to the public.

25              Here, we're not talking about that.  Even if you

                    UNITED STATES DISTRICT COURT

```
1   assume that somebody having the intention to benefit WaterStone
2   is some kind of false advertising, which should not be assumed,
3   but you don't have any kind of commercial advertising by way of
4   the Mutual employees stating that they are employed by Mutual.
5           In addition to that, there has to be allegations that
6   there's a likely deception of consumers.  No response to that
7   argument by Mutual in their response brief.  And then on top of
8   that, no likely influence on the purchasing decision.  You
9   know, did these borrowers enter into loans because they thought
10  that the employees were employees of Mutual, which they were?
11  Ultimately, those borrowers necessarily knew if they
12  transferred their loans, and this is an inactionable claim,
13  that they were closing with WaterStone.
14          So there's no likelihood of influencing the
15  purchasing decision.  And so there's an array of reasons with
16  respect to that claim that, as a matter of law, that could not
17  possibly proceed.
18          The unjust enrichment claim, I would put that -- it's
19  cause of action number six.  I would put that in the bucket of
20  really can't proceed.  I think the easiest way to dispose of
21  that claim is, again, based on an argument that WaterStone
22  made, which Mutual did not respond to at all, and that is that
23  unjust enrichment cannot be pursued simultaneous with other
24  theories of wrongdoing.  WaterStone cited three different
25  cases, the Tilton case, the Taxinet case, and the State v.
```

1    Tenet case.

2              I think the Tilton case has the nicest quote, but it

3    states liability and unjust enrichment has in principle nothing

4    do with fault.  The paradigm examples of unjust enrichment are

5    mistaken transfers where a plaintiff predicates their unjust

6    enrichment claim on the wrongful conduct of the defendant.

7    Then the plaintiffs right of recovery, if any, arises from the

8    wrongful tort, not unjust enrichment.

9              So in other words, if there's wrongdoing involved,

10   sue on the theories that involve wrongdoing.  You can't have a

11   simultaneous unjust enrichment claim.

12        **THE COURT:**  Well, I mean, this is one of those things

13   that drives me crazy, and I think there's a lot of unnecessary

14   ink spilled and trees killed.  I know what you're saying.  I

15   know what some of the cases say.  But why isn't it always just

16   fine, it's in the alternative.  Right?  If everything else

17   doesn't work, it's an equitable count that's -- you know,

18   you're right.  You can't win both of them.  But if something

19   goes wrong with the other one, it's in the alternative?  What's

20   wrong with that?

21        **MS. KREITER:**  I don't think that works when you have

22   allegations of affirmative wrongdoing.

23        **THE COURT:**  Well, right.  That would just be like if

24   there's contract, right, a written contract and somebody also

25   then throws in some equitable count for unjust enrichment or

                      UNITED STATES DISTRICT COURT

1   something like that.  And the people argue, well, but if

2   there's a contract that governs is relationship, you can't have

3   an equitable count.  Then people come back and say, well, but

4   it's just pled in the alternative.  And then the law on that

5   goes both ways, ultimately.

6          What's the note say?  You can talk if you want.  I

7   mean, it's okay.

8          **MS. KREITER:**  I think what Mr. McLaren was noting to

9   me is that, you know, that's one of the arguments that

10  WaterStone raised.  There's also an argument about there has to

11  be a direct benefit to WaterStone.  I had discussed just now

12  with the Court the third argument because it's one that's not

13  opposed by the other side.  There are other alternate grounds

14  for dismissal of this claim, one of them being there's not a

15  direct benefit conferred on WaterStone.  The other being, of

16  course, that --

17         **THE COURT:**  Well, I guess direct, then, if it's some

18  benefit, the reason they hired all these people.  Right?  I

19  mean, they're going to make money off of them.  They're going

20  to close -- those 60 people are going to close deals that are

21  going to -- eventually WaterStone makes money off of.  I don't

22  know.  Maybe that's an indirect benefit.  But making money is

23  why companies are in business.

24         **MS. KREITER:**  I think it would be indirect because

25  it's vis-a-vis the actions of the employees.  The employees are

UNITED STATES DISTRICT COURT

1    the ones that are diverting the loans.  It is true that

2    WaterStone closes the loans, but that would not be considered a

3    direct benefit on WaterStone.

4                **THE COURT:**  Yeah.

5                **MS. KREITER:**  With the employees in the mix.

6                **THE COURT:**  Okay.  Keep going.

7                **MS. KREITER:**  The other ground for unjust enrichment

8    is again similar to what we talked about, just it's wholly

9    reliant on legal conclusions, recitation of claim elements.

10               I personally -- I guess let me close the loop on

11   this.  I want to at some point go back to just what are the

12   specific allegations in the complaint that target WaterStone,

13   because I do think it's a helpful lens to assess the different

14   claims.

15               But just to close the loop on the ones I think are

16   very clean in terms of legal grounds for dismissal.  The last

17   one is the conversion claim.  It's Claim 8.  With respect to

18   that claim, again, preemption.  I don't think that there's a

19   dispute among the parties to the extent that the conversion

20   claim is based upon misappropriation of trade secrets.  It is

21   preempted.

22               Then we shift to, okay, what is left of that

23   conversion claim and its allegations that there has been a

24   conversion of relationships, borrowers and loans.  WaterStone

25   took the position, you know, this isn't tangible property.

1          The response on behalf of Mutual was, well, there's a

2    Florida case, this VSI Sales case that says you can have

3    actions for conversion for a wrongful taking of intangible

4    interests in a business venture.

5          I took a look at that VSI case.  This is not a

6    business venture scenario, as in VSI, where the defendants

7    there sold their business.  They were then alleged to be

8    competing for the customers that they had just monetized.  So

9    in that context, in the context of a business venture, the VSI

10   case holds that you could have a conversion claim based on

11   intangible assets.

12         Here, we don't have any kind of business venture.  We

13   don't have anybody monetizing the relationships.  It's simply a

14   loss in clients or loans when these employees transitioned.

15   Mutual's argument would really mean that every single case

16   involving competitors taking clients could also have a

17   conversion claim, which is just not consistent with the law.

18         So I think that conversion one is another one that,

19   as a matter of law, does not state a possible cause of action,

20   and it wouldn't help to have more discovery on that one.

21         **THE COURT:**  Okay.  Let's stick with that line of

22   attack here and let me hear the response, and then we'll talk

23   about some of the other things.

24         Go ahead.  Start with -- why don't you just start

25   with she -- where she just ended with the conversion thing.

                    UNITED STATES DISTRICT COURT

1    **MR. McCALL:**  Sure, Your Honor.

2         So, first, as is very clear from our complaint, I'm

3    looking at Paragraph 129, the allegations underlying our

4    conversion claim are not only misappropriation of trade

5    secrets.  It's also the unlawful diversion of borrowers and

6    loans.  Ms. Kreiter said a moment ago that this -- these

7    intangible interests are distinguishable from others that

8    courts have held can be appropriate for a conversion claim

9    because these weren't monetized.  But they were monetized.

10   These relationships were monetized when these loans closed and

11   WaterStone received money from closing those loans.

12        **THE COURT:**  Right.  But the employees are allowed to

13   go work for another company.  What's the -- what has been

14   converted?

15        **MR. McCALL:**  So loans that were started as Mutual,

16   you know, borrowers who submitted loan applications, extensive

17   documentation, and then sometimes without their knowledge or

18   consent were diverted over the WaterStone.

19        **THE COURT:**  So this picks up only loans that were

20   actually in the works before the employee went to the other

21   team?

22        **MR. McCALL:**  Yes.  I -- subject to our earlier

23   discussion that the contours of when exactly an employee is

24   entitled to compensation for a loan is somewhat unclear, but

25   certainly, yes.  You know, but there are borrowers who

UNITED STATES DISTRICT COURT

1    submitted loan applications to Mutual, and those loans closed

2    with -- at WaterStone.

3            THE COURT:  It's a rather narrow group of -- I mean,

4    that's however many -- we can figure that out if we had

5    unlimited resources.  That doesn't -- that doesn't -- this is

6    not a game-changing count, if you will.

7            But go ahead.  What else?

8            MR. McCALL:  On the conversion point, Your Honor?

9            THE COURT:  Or all -- I mean, she talked about

10   conversion, deceptive unfair trade practices, Lanham Act, and

11   unjust enrichment.

12           MR. McCALL:  Sure.  Let me start with the Lanham Act,

13   and I also just want to be clear that I disagree with the

14   characterization that we conceded anything or, you know,

15   abandoned any claims in our opposition brief.

16           With respect to the Lanham Act claim, Your Honor, so

17   the defendants move to dismiss that claim for two reasons.  One

18   is that the -- that the supposed messages were not -- were not

19   disseminated publicly, and they say that we rely on a single

20   isolated e-mail.

21           But that isn't the case.  We -- so as we cite in our

22   complaint and brief, you know, these -- the employees were --

23   sorry.  Let me step back, first, that the notion that an

24   employee can state that he works for one company while acting

25   in -- while acting solely in the interest of another company is

UNITED STATES DISTRICT COURT

1     not a false statement.  I think it is just totally unsupported

2     by the law.

3              The -- in addition to the limited e-mails that we

4     have access to, because of the -- you know what I've mentioned

5     before, the use of personal e-mails and whatnot, the open

6     houses where at least one employee was talking to borrowers,

7     talking to real estate agents, and also the NMLS website, which

8     is a sort of a central repository of information about loan

9     officers and mortgages where those employees were identified as

10    being employed by Mutual Mortgage when in fact they were acting

11    totally contrary to the interest of Mutual Mortgage.  So this

12    is not a case where we just have like an isolated statement or

13    a single e-mail.  We have -- we have lots that -- we have a lot

14    of communications.

15             And also with respect to whether we're asserting a

16    derivative claim under the Lanham Act, the answer is no.  So,

17    you know, based on the information that we have right now, we,

18    you know, these -- defense counsel is correct, that, you know,

19    those e-mails were not from -- were not from WaterStone.

20             But we believe that -- we think discovery will show

21    that statements were made by WaterStone that false -- false or

22    misleading statements about on whose interest they were acting.

23    So, for example, we have in our complaint written notes that

24    employees took of conversations with borrowers, references to,

25    you know, borrowers contacting WaterStone.  We don't know -- we

1    don't know what those -- we don't know what those conversations

2    were.  We don't know, you know, presumably, there was e-mail

3    correspondence between WaterStone and those borrowers, which we

4    have not yet seen.  So we are not -- it isn't a derivative

5    claim in that sense.  And, again, the, you know, the fact that

6    we cited a case does not mean we're abandoning any aspect of

7    that claim.

8              The -- on the unfair trade practices claim, again,

9    I -- we are aware that the statute preempts certain causes of

10   action including misappropriation of trade secrets.  But as I

11   mentioned --

12             **THE COURT:**  You lost me on the consumer harm point.

13   This comes up in these cases all the time.  There's a bunch of

14   law on it.  You know, that -- what's your point on that?

15             **MR. McCALL:**  So the point is that we --

16             **THE COURT:**  The consumer is the person who's getting

17   the loan.  Do they really care who the mortgage salesman works

18   for?

19             **MR. McCALL:**  Well, so I think the answer is yes.

20   And, you know, I think it's also important to consider the

21   context that for most people, a home purchase is the largest

22   and most significant purchase they'll ever make.  And so a lot

23   of thought and care goes into who you're going to do business

24   with.

25             In terms of the -- the sort of specific harm, this

 1    is, again, and I -- you know, just by the nature of the posture

 2    of this case, we don't have access to this information, so we

 3    don't know what terms those loans closed on.  Now, presumably,

 4    the borrower would not have, you know -- would have chosen the

 5    lower interest rate.

 6              **THE COURT:**  Right.  I'm working with the mortgage

 7    broker, and we have an interest rate in mind, and then he goes

 8    to work for another company, and all of a sudden, the number

 9    goes up, I'm probably not going to want to do that.  Right?

10              **MR. McCALL:**  Correct.  Yes.  That is correct, Your

11    Honor.  But there are other terms of a mortgage that could

12    potentially cause -- that could potentially cause that consumer

13    financial harm.  You know, for example, if there is a -- you

14    know, the type of the mortgage, if there are balloon payments

15    or, you know, certain interest rate triggers or things like

16    that, that we just don't have insight into at this point,

17    because, again, these loans did not close with us.

18              **THE COURT:**  Okay.

19              Is there a such thing as aiding and abetting

20    breach -- because another thing that's very clean, I think may

21    be already in the case, and there's nothing you can do about

22    it, I don't -- I may be wrong, but I thought I read somewhere

23    that some of these employees were doing business for the new

24    company while still getting a paycheck from the old company,

25    that's a breach of fiduciary duty.  There's plenty of law on

UNITED STATES DISTRICT COURT

1    that.  If the employees had been sued for that, that's a

2    problem for them.  I think that's what they're trying to get at

3    by saying aiding and abetting breach of fiduciary duty.  Right?

4         **MR. McCALL:**  That is correct, Your Honor.

5         **THE COURT:**  Is there such a thing as that?  I mean,

6    what do you think?

7         **MR. McCALL:**  Oh, was that at me?

8         **THE COURT:**  I know you do because you pled it.

9         Let's see what she says.  Go ahead.

10         **MS. KREITER:**  You know, with that, I see

11    WaterStone's -- you know, again, we're going back to are there

12    allegations that WaterStone did something, and are there

13    allegations that WaterStone knew of the particular duties?

14         **THE COURT:**  Well, you got that e-mail from that guy

15    that was working for your client.  Right?  What's his name?

16         **MR. McCALL:**  Dwayne -- oh, the WaterStone employee

17    was Mr. --

18         **THE COURT:**  Smith?  Whatever.  Mr. Whoever.

19         Go ahead.

20         **MS. KREITER:**  Your Honor maybe be referring to

21    there's an e-mail from a Mr. Stalls, while he's employed by

22    Mutual, to WaterStone to the effect of I'm transferring these

23    loans to WaterStone.

24         **THE COURT:**  And somebody responds with great or good

25    idea or something like that?

UNITED STATES DISTRICT COURT

1      **MS. KREITER:**  Something to that effect.  You know, in

2   my mind, is that a breach of fiduciary duty?  Loans can

3   transfer to other institutions.  I think that there has to be

4   some allegation -- you know, why did those loans transfer?  Was

5   it because of some breach of duty on the part of Mutual?  It

6   could be that the borrower couldn't -- didn't have the product

7   at Mutual that that was desired, and they're transferred to

8   WaterStone.

9      So I think there has to be more allegations about

10  knowledge of a duty, knowledge of wrongdoing.  You know, I

11  found it interesting with respect to that allegation, there is

12  no effort at secrecy.  It's from a Mutual employee Mr. Stalls,

13  using his Mutual e-mail to a WaterStone employee using a

14  WaterStone e-mail address.

15     So I don't think that the mere transfer of loans is

16  sufficient without more to substantiate breach of fiduciary

17  duty, especially when the breach of fiduciary duty is not based

18  on just general common law here, but it's based on a contract

19  provision with no allegations that WaterStone knew of that

20  contract provision.

21     **THE COURT:**  Well, it could be either.  It could be

22  either.  I mean, I think the law in Florida on this point is

23  basically that when you're getting a paycheck from company A,

24  you're not -- and you're planning on going to company B, you're

25  not allowed to -- I think the case law talks in terms of you

UNITED STATES DISTRICT COURT

1    can do things to prepare, you know, but you can't actually be

2    getting a paycheck from company A and doing business for --

3    making money for company B at that time.

4          And I think -- I think these allegations would be

5    that these employees, while getting a paycheck from company A

6    were working up new loans and stuff like that, that they know

7    they were going to do at company B while on the dime of -- or

8    on the clock of company A.

9          I think that's what they're arguing, and so how's --

10   is there -- can you -- can you aid and abet that at all, is

11   kind of what I'm wondering?

12         **MS. KREITER:**  You know, I guess one response, Your

13   Honor, is that's duplicative of the tortious interference

14   claim.  So I don't know that --

15         **THE COURT:**  It might be.

16         **MS. KREITER:**  -- these array of claims based on these

17   singular set of facts should be permitted to proceed.  You

18   know, but, frankly, if the case is narrowed to, okay, we're

19   talking about allegations that survive based on the transfer of

20   these four loans, then so be it.  Let's talk about that.

21         But that single allegation doesn't support eight

22   causes of action.  And I still do think there has to be some --

23   at least an allegation in the complaint about WaterStone

24   engaging in some kind of wrongful conduct, because merely

25   accepting loans that could transfer for an array of reasons

                    UNITED STATES DISTRICT COURT

 1    underwriting at Mutual doesn't qualify these borrowers, or

 2    borrowers are looking for a construction loan that's not

 3    offered.

 4           **THE COURT:**  Right.  Right.  If they just accept loans

 5    and they had no idea that the employees from the old company --

 6    or company A were actually working on those deals while getting

 7    a paycheck from company A, and they had no way of knowing that,

 8    fine, you're right.  I mean, they didn't aid and abet anything

 9    or have any involvement.

10           Now, receiving one e-mail, one person at the company

11    receiving one e-mail, but he's going to come back and say,

12    well, but we don't know what all the other e-mails say, we

13    don't know what all the other activities may have been.

14           But I don't know.  I'm putting words in your mouth.

15    Go ahead.

16           **MR. McCALL:**  Yes, Your Honor.  So, first, as a sort

17    of threshold matter, I just want to point out that some of the

18    arguments that defense counsel is making now were not made in

19    the motion to dismiss.

20           **THE COURT:**  Of course not.  90 percent of what we

21    talked about this morning isn't in anybody's motion.  We're

22    trying to talk turkey here and get this case down to something

23    we can get our arms around and get it resolved and not charge

24    the clients $700,000 in legal fees for a $200,000 case.  So

25    that's all we're trying to do.  I get it.

                      UNITED STATES DISTRICT COURT

1        **MR. McCALL:**  Understood, Your Honor.

2        So, first, I think it is -- it's not correct that,

3   you know, we only have one e-mail here.  And, you know,

4   focusing specifically on the aiding and abetting, breach of

5   fiduciary duty claim, and to Your Honor's point about, you

6   know, getting -- employees getting a paycheck from Mutual while

7   working on WaterStone's behalf, in paragraph's 53 to 57 of our

8   client, we cite an e-mail from an Mutual employee to a

9   borrower, in which that Mutual employee falsely states that the

10  loan could not be approved when in fact our client -- our

11  client did approve that loan and then that employee refers the

12  loan over to WaterStone.

13        And so -- and then we cite other instances here where

14  communications between Mr. -- between Dwayne Hutto, the former

15  Mutual employee, and Fred Stalls, and as to counsel's point

16  that -- the fact that they used e-mail to communicate about

17  the -- their tortious conduct somehow suggests they are

18  innocent, I don't -- I think that's wrong.  The fact that they

19  were brazen in their misconduct does not mean they should

20  somehow be rewarded or that their brazenness is indicative that

21  they weren't doing anything wrong or didn't think they were.

22        **THE COURT:**  Who knows.  Who knows.

23        What about this interference claim?  Back over here

24  on the interference claim.  That's the next -- to me, the next

25  strongest claim for them in just my own reading of the case.  I

1    guess you have to know that the people had a contract to

2    interfere with.  Right?

3            But he's saying they have employment -- or not

4    employment.  What do you call them?

5            **MR. McCALL:**  Employment contracts.

6            **THE COURT:**  Employment contracts that say that the --

7    you know, you're not allowed to do this, and they did it.  So

8    isn't that an interference claim?

9            **MS. KREITER:**  Well, there really are -- there's no

10   allegations that WaterStone, you know, did know about the

11   employment agreement.  And, in addition, even assuming

12   WaterStone knew there's an employment agreement out there

13   somewhere, here it's particular -- you know, did WaterStone

14   know that there's a nonsolicit that lasts for six months as to

15   employees?  Did WaterStone know X, Y, and Z?

16           And I don't think you can just infer that WaterStone

17   knew all of the particulars of an employment agreement, even if

18   you assume maybe WaterStone still thinks there's an employment

19   agreement in the mix.  I don't think there's an ability to just

20   assume that WaterStone was aware of the particular duties or

21   that WaterStone was aware of, you know, the actions of any

22   particular employee.

23           So there's -- there's a big jump here in my mind

24   between maybe WaterStone knows about an employment contract and

25   WaterStone knows that a particular employee is telling a

47

1    borrower that a loan is not approved when Mutual contends it

2    was approved.

3           I think this claim very much goes back to what is in

4    this complaint that indicates WaterStone knew of both a duty

5    and then did something to incentivize the employees to breach

6    that duty.  It is not the case that whenever you have a large

7    number of employees leave and there's some wrongdoing, that you

8    can just assume the new employer is a mastermind behind that.

9    Employers are not automatically responsible for whatever

10   actions the recruits are taking.  Some employees can make bad

11   choices.  That doesn't mean that the employer absolutely knows

12   everything about it and is some kind of mastermind.

13          **THE COURT:**  Yeah.  The part about the case that is --

14   that's good for them, in my opinion, that's a little bit

15   different from what you just said is everybody goes -- you

16   know, it's like how -- is everybody going because, you know,

17   they're being recruited and it all makes sense, or does

18   everybody go because once one or two key people leave, then

19   everybody has to go?  I don't know.  I mean, that's -- we have

20   to see how that comes out.

21          All right.  Anybody have anything else they want to

22   say on this?  I'm ready to move forward.  I've obviously looked

23   at this already, and I'm familiar with it.  Any other thoughts?

24          Okay.  I'm going give you a very unorthodox ruling,

25   which neither side will like, that's fine.  I'm going try to

 1    save you from yourselves here.

 2            Counts 2, 6, 7, and 8 are dismissed without

 3    prejudice.  Do not file an amended complaint.  File an answer.

 4    If you need to add those back in later, and you think that you

 5    have a factual basis to do it after doing discovery, I'll be

 6    very open to an amended complaint.  Doesn't mean you can't try

 7    to dismiss the amended complaint if it's filed.  But don't -- I

 8    don't want to go back and forth with a bunch of pleadings right

 9    now.

10            This ruling doesn't change the scope of discovery in

11    any way, shape, or form, as far as I can tell.  So the other --

12    the other counts are staying in the case as against WaterStone.

13    And, you know, do the discovery you need to do to try to figure

14    out what you think happened here.  At some point, you're going

15    to have enough -- sounds like she's done a lot of work already.

16    She knows what happened.  But you're going to have to get to a

17    point where you're comfortable that you know what happened so

18    you can get this case worked out.

19            I don't know -- is there two or three key people you

20    think are the masterminds of this that you want to depose first

21    that you can -- you know, that would get you 90 percent of

22    where you need to be?

23            **MR. McCALL:**  Yes.  I mean, there are certainly names,

24    Dwayne Hutto, Chris Smith, Chris Wolf appear to be, based on

25    the evidence we've seen, the ring leaders here.

                    UNITED STATES DISTRICT COURT

49

1          **THE COURT:**  Right.  And do you have their e-mails

2   already, those guys?

3          **MR. McCALL:**  Their personal e-mails or their --

4          **THE COURT:**  I don't know.  I don't know what e-mails

5   they have.

6          **MR. McCALL:**  Oh, I'm sorry.  We haven't obtained any

7   discovery from them yet.  I know what their e-mail addresses

8   are.

9          **THE COURT:**  Right.  Because you got to do third-party

10  discovery because you didn't sue them.  All right.  But do

11  something to cut to the chase on this, because, you know, they

12  might -- my read on this would be that if they're going to pay

13  you something, they're probably likely to do it more in the

14  short run to just be done with all this, than to go through all

15  this and spend years and years paying lawyers and then they're

16  going to not want to pay you anything, if possible.

17          Does that sound reasonable?  I'm not saying you're

18  promising to pay anything.  But doesn't it seem like the odds

19  are better in the short run to get the case settled versus

20  paying lawyers for another two years?

21          **MS. KREITER:**  I would much rather, if the case is

22  going to settle, for it to happen sooner rather than later.

23          **THE COURT:**  Yeah.  Where are you from, by the way?

24          **MS. KREITER:**  Milwaukee, Wisconsin.

25          **THE COURT:**  I was trying to figure it out.  I was

                    UNITED STATES DISTRICT COURT

1    thinking is this Michigan that I'm hearing?  Buffalo, New York

2    sounds a lot like Wisconsin too.  And, you know, Chicago is in

3    there, is in the mix.

4            So you want -- you're looking forward to this hearing

5    in February, I set?

6            **MS. KREITER:**  I will take a trip to Tampa in

7    February.

8            **THE COURT:**  All right.  Anything else?  Is it clear

9    what I just said?  You understand the strategy here?

10           **MS. KREITER:**  Yes.

11           **MR. McCALL:**  Yes, Your Honor.

12           **THE COURT:**  Anything else I can do to help you get

13   the case resolved sooner rather than later?  Any ideas?

14           **MS. KREITER:**  None come to mind.

15           **THE COURT:**  Any ideas?  None?

16           **MR. SCHIFINO:**  She's got ideas, Your Honor.

17           **THE COURT:**  You have any ideas?

18           **MS. DEVEAUX:**  Not at this time, Your Honor.

19   Thank you.

20           **MS. KREITER:**  I guess ordering us to early mediation

21   after some period of initial discovery.

22           **THE COURT:**  I don't want to order it if -- I'd say

23   after a couple key depos have been taken, but what do you

24   think?

25           **MR. McCALL:**  Your Honor, as I said earlier, we are

                    UNITED STATES DISTRICT COURT

1    certainly amenable to resolving this.  We don't want to spend

2    years doing discovery.  I do think there are -- there is -- you

3    know, we can do sort of targeting discovery so we can have a

4    better understanding of this scope, which without understanding

5    the scope of what happened makes it very difficult for us to

6    have meaningful settlement discussions, but I think that those

7    are things we can work together to get that information so we

8    can all make informed decisions.

9            THE COURT:  You're going to have to do third-party

10   discovery.  Right?

11           MR. McCALL:  So we -- yes.  But I think a lot -- so

12   we think that a lot of the -- the employees sent information

13   from their personal e-mail accounts to WaterStone.

14           THE COURT:  Oh, so you might get it from them?

15           MR. McCALL:  So we would get it from them.

16           THE COURT:  Yeah.  I mean, that sounds like a plan.

17   If you can identify the two or three people that you're focused

18   on and get their e-mails and get them deposed first without

19   using the strategy of, no, we're going to depose the other 59

20   people and then depose this person last.  Sometimes people like

21   to do -- you know, don't over think it.  Just cut to the chase,

22   see what these guys are saying, and we might be able to make

23   some progress on this.  Hopefully you'll get that done by

24   February.

25           The new date was when, Sonya?

                    UNITED STATES DISTRICT COURT

1          **THE COURTROOM DEPUTY:**  February 22nd.

2          **THE COURT:**  Okay.  I'm going to put next time ask

3     what happened with depos, discovery of -- who are the names.

4          **MR. McCALL:**  Dwayne Hutto.

5          **THE COURT:**  How do you spell that?

6          **MR. McCALL:**  H-u-t-t-o.

7          **THE COURT:**  Who else?

8          **MR. McCALL:**  Chris Wolf and Chris Smith.

9          **THE COURT:**  Okay.  Good.  Well, I appreciate your

10    time on this.

11         And we'll see -- we'll do an endorsed order on what I

12    just said, Amanda.  Okay.  Good.

13         **MS. KREITER:**  Thank you.

14         **MR. McCALL:**  Thank you, Your Honor.

15         (Proceedings adjourned at 11:09 a.m.)

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 23rd day of November 2022.

REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida