```
1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                       TAMPA DIVISION

3

4   MUTUAL OF OMAHA MORTGAGE, INC.,  )
                                     )
5              Plaintiff,            )
                                     )
6                                    ) Case No.
        vs.                          ) 8:22-CV-01660-TPB-JSS
7                                    )
                                     )
8   WATERSTONE MORTGAGE CORPORATION, )
                                     )
9              Defendant.            )

10

11
   _____
12
                        MOTION HEARING
13              (Held via Zoom videoconference)
           BEFORE THE HONORABLE JULIE S. SNEED
14              UNITED STATES MAGISTRATE JUDGE

15                     MARCH 1, 2023
                        10:00 A.M.
16                    TAMPA, FLORIDA
   _____
17

18

19

20

21        Proceedings transcribed via courtroom digital audio
   recording by transcriptionist using computer-aided
22   transcription.
   _____
23
                  DAVID J. COLLIER, RMR, CRR
24               FEDERAL OFFICIAL COURT REPORTER
              801 NORTH FLORIDA AVENUE, 7TH FLOOR
25                  TAMPA, FLORIDA  33602
```

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:

 4

 5              Christopher L. McCall

 6              Mitchell Sandler, LLC

 7              1120 20th Street N.W.

 8              Suite 725

 9              Washington, D.C.  20036

10              (202) 886-5292

11

12

13    FOR THE DEFENDANT:

14

15              Maria L. Kreiter

16              Godfrey & Kahn, S.C.

17              833 East Michigan Street

18              Suite 1800

19              Milwaukee, Wisconsin  53202-5615

20              (414) 287-9466

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                    - - - o0o - - -

 3          THE COURT:  Hello, and good morning, everyone.  We're

 4   here in the case of Mutual of Omaha Mortgage versus WaterStone

 5   Mortgage, and it's Case 8:22-CV-1660.

 6          Can I ask the lawyers to state your appearances for

 7   the record, starting with counsel for plaintiff.

 8          MR. McCALL:  Good morning, Your Honor.  Christopher

 9   McCall from Mitchell Sandler, LLC on behalf of the plaintiff,

10   Mutual of Omaha Mortgage.

11          MS. KREITER:  Scott, I think you're on mute.

12          This is Maria Kreiter from Godfrey & Kahn, also

13   joined by Scott McLaren from Hill Ward Henderson.  We're here

14   on behalf of WaterStone, the defendant.

15          THE COURT:  Good morning to everyone.  Good morning,

16   Mr. McLaren.

17          We are here on the motion to compel filed by

18   WaterStone, filed as document number 42.

19          We did have some preliminary discussions about the

20   motion at the status conference.  Let me ask, were you all able

21   to make any headway with your discussions that I hope that you

22   had after that conference?

23          MS. KREITER:  Judge, I don't know that we have.

24   You know, a couple of things.

25          WaterStone is willing to limit the request for
```

1    personnel files, that was one of the things that we talked

2    about last week.  You know, I'm interested in really getting

3    the fundamental contracts for the different employees,

4    you know, and any onboarding materials I don't need,

5    performance reviews, health care information, you know, any of

6    those things.  I let Mr. McCall know that.

7           I have not received -- unless I was, you know,

8    misunderstanding the Court, you know, I was hoping to receive

9    information about the damages and Bates numbers for the

10   interrogatory requests.  I will just say that, you know, one of

11   the things that I'm really struggling with with respect to this

12   motion is, you know, kind of what do you do when you don't get

13   the information that you've requested and there's a statement

14   that, well, we've produced it, and I know that it hasn't been

15   produced.

16          So I think that's where I'm just personally

17   struggling with how to advance things.  You know, when I ask

18   for, you know -- for example, you know, has there been a

19   production of the loans that plaintiffs contend were originated

20   at Mutual, such that I can then go and compare it to the list

21   of loans that were closed at, you know, WaterStone.  I've

22   inventoried the production, it's just not in there.  The

23   responses say it is in there.  My, you know, effort with

24   respect to the motion to compel was, you know, I've checked,

25   it's not in there; if you think it is, give me the Bates

1    number, you know; and then the response that I saw in the

2    response brief was, you know, well, that's too burdensome and

3    you should have to do the same, WaterStone.

4         So that's where I'm really just struggling, because

5    my feeling is, you know, certain information I need from a

6    damages perspective.  The example that I just gave, I mean,

7    I need to know what loans were allegedly in the pipeline as

8    just a fundamental matter in the case, and I just don't have

9    the information that has been requested, and not really hearing

10   anything to the contrary other than the one example that we

11   talked about last time related to the policies, which I just

12   think is not applicable.  So I -- you know, I'm certainly

13   trying to keep an open mind, but I don't know that we've made

14   much progress on some of these.

15        I'm interested in, unless I misunderstood the Court,

16   you know, getting perhaps timing for the damages information

17   and the Bates numbers for the interrogatories, and I guess I'll

18   just stop there.  I hope that was responsive to your question.

19        THE COURT:  Yes, and I -- you know, that is

20   definitely, you know, what we talked about at the status

21   conference, and we will let Mr. McCall -- Mr. McCall, I'd

22   certainly want to hear from you on this point, but hearing,

23   you know, what sounds like a lack of progress, let's just

24   go ahead and talk about the motion.

25        Let me hear from you, Ms. Kreiter.  Go ahead with --

1    if you could start with discussion related to interrogatory 8.

2             MS. KREITER:  Sure.

3             THE COURT:  You're mentioning that you wanted the

4    descriptions of the trade secrets that were stolen, and,

5    you know, you had some indication of what was provided, but

6    then in Mr. McCall's response he really -- he seems to indicate

7    that there was actually a long list of items that were

8    described.

9             MS. KREITER:  So I think, you know, just to back up,

10   you know, broader context for this issue, there's two trade

11   secret misappropriation claims.  We moved to dismiss the

12   Complaint.  One of the grounds was, you know, there's a lot of

13   allegations that the employees took information, sent it to

14   their personal e-mail accounts or put it on a flash drive.

15   There's really not allegations indicating WaterStone knew about

16   that or had anything to do with it.  Those trade secret

17   misappropriation claims remained in the case, other claims were

18   dismissed, but those are still in play.

19             There is a list in the Complaint of alleged trade

20   secrets.  I -- you know, I don't doubt that, but my issue is

21   it's things like, you know, forms, workflows, borrower

22   documents.  From a legal perspective, I do not believe that was

23   there any trade secret information in play that WaterStone knew

24   about or, frankly, even that these employees took.  I want to

25   be in a position to say, you know, plaintiff, you haven't met

1  your burden of proof that the items you're talking about meet

2  the definition of a trade secret, specifically, you know, is it

3  the subject of secrecy efforts by Mutual of Omaha, does it have

4  value, is it something different than general skill and

5  knowledge.  So I want to be in a position to attack whatever it

6  is from a legal standpoint.

7        You know, while it is a long list of things,

8  you know, I don't really know what he's referring to, so when

9  he says borrower documents and information, you know, what is

10  that?  Because there's a lot of borrower information that is

11  ultimately put in the public record when a loan closes and

12  somebody purchases a property.  By definition that's -- that's

13  not a trade secret.  So separate from whether something is a

14  trade secret or not at the end of the day, which, you know,

15  I took to be some of the argument in the response brief, I need

16  to back up a step, just what documents are we talking about.

17        It is highly likely that I will hire an industry

18  expert to explain why whatever is alleged to be a trade secret,

19  you know, is not trade secret, but I don't have right now

20  information sufficient to equip my expert.

21        As I indicated at the last hearing, you know,

22  Plaintiff's expert disclosure deadlines are today, I've got

23  two months, and I'm, you know, looking to find an expert but

24  I don't really have information to give my expert if --

25  you know, if I had one that I could educate right now, because

1    I don't really know what trade secrets we're talking about.

2         The one exception to that, you know, I do have kind

3    of an understanding that plaintiffs are taking the position

4    that transmittal of a profit and loss sheet was a trade secret,

5    but even with that, that profit and loss statement, you know,

6    it's 20 different tabs on an Excel spreadsheet, so -- you know,

7    some of those tabs are clearly not trade secret, and I just

8    really want to know what are the alleged trade secrets with

9    greater particularity.

10        That's one issue, but the other thing is, you know,

11   one of the main defenses in the case is that, again, WaterStone

12   did not have anything to do with, you know, perhaps unwise

13   decisions by some of the recruits, didn't know about it, didn't

14   use it, you know, just -- I have nothing to do with this.  That

15   relates to your agreements with third-parties who you didn't

16   bring into the lawsuit.  Where is the evidence that WaterStone

17   knew this, used it to its advantage?

18        I do foresee WaterStone, you know, hiring perhaps a

19   e-forensic exert.  To the extent that Mr. McCall on behalf --

20   Mr. McCall on behalf of Mutual says, you know, okay, my trade

21   secret is Bates number, you know, 5 through 10, that's borrower

22   information, I want to be able to e-forensically have an expert

23   that says, okay, I've traced that, you know, maybe an employee

24   took that information, they sent it to their Gmail, it never

25   hit WaterStone's servers.  You know, this issue was raised to

WaterStone's attention very early on.  You know, it just has no
possible correlation to any damages, was not misappropriated by
WaterStone.

You know, but, again, to even be in a position to
work with an e-forensic specialist I really need to know what
documents are the alleged trade secrets, so just from a factual
perspective, on page 7 of Mr. McCall's response brief there's
not greater particularity, it's just repeating what has already
been said in the Complaint, but again, when he says forms or
workflows, I really don't know what that means, only Mutual of
Omaha knows what it is referring to.

I want to start depositions.  Frankly, I wanted to
start depositions earlier than now, but I'm really feeling like
I need to do them in March.  One of the topics of the
depositions is going to be, Mutual, you claim item X is a trade
secret, what are the secrecy efforts that you made with respect
to item X, or is it something that's, you know, never stamped
Confidential, you know, not subject to the restraints that the
law would require for a trade secret.  I don't feel right now
that I'm in a position to do any of that without knowing what
the trade secrets are, and, frankly, those are two important
claims in the case.

So for all of those reasons, I feel -- you know, of
the things in my motion to compel, I feel all of them are
important or I wouldn't have brought them to the Court's

1    attention, but damages and trade secret information, I just

2    feel severely handicapped on that and I'm looking for greater

3    particularity.

4            At this point I really think I need to know the Bates

5    number.  You know, if it changes as discovery goes on,

6    Mr. McCall could supplement, but for me to defend the case

7    I really need that information specific to the Bates number,

8    and if he thinks that forms are or workflows are trade secrets,

9    you know, so be it, he can have a long list, I just want to

10   know exactly what it is.

11           THE COURT:  And you also talk about request 112, the

12   list of all loan products.

13           MS. KREITER:  Yeah.  So with respect to the request

14   for loan products, that really goes to the causation element.

15   If I understand Mr. McCall's theory of the case, he is leaning

16   into the allegations that there was a breach of the

17   nonsolicitation provision that was binding on some of the

18   higher level employees, meaning, you know, those employees had

19   us solicit the lower level employees to leave Mutual and join

20   WaterStone.  In my investigation of the facts of the case, my

21   understanding is that is not at all true.

22           One of the reasons why the employees were looking to

23   leave Mutual and there was no need for arm twisting by anyone

24   was because the products available at Mutual and some of the

25   underwriting requirements were prohibitive of generating

1    business, such that a large number of the employees were

2    unhappy with the loan products offered, were looking to,

3    you know, if not WaterStone, another mortgage company that had

4    a broader array of products.

5         At the time that these employees left, you know, this

6    was on the heels of the COVID real estate boom.  My

7    understanding is that a number of employees felt, look, I lost

8    money, I -- you know, I had loans I could have closed, I'm paid

9    on commissions, I wanted to get out of Mutual for that reason.

10   If that evidence comes to fruition, I think that that cuts --

11   cuts against the main theory of the case being pursued by

12   plaintiffs, which is that there was an effort by some of the

13   branch managers to solicit.

14        Our position is, you know, those branch managers at

15   some point have to tell the employees that are working with

16   them and have worked for that -- for them for, you know, in

17   some instances decades, you know, "I'm leaving."

18   My understanding is, you know, upon getting that announcement,

19   you know, the downstream employees -- there's no arm twisting

20   to even occur because those downstream employees are unhappy

21   with the loan product offerings and are -- and are jumping for

22   joy to follow the branch managers, without any solicitation or

23   wrongdoing, let alone solicitation that was influenced by

24   WaterStone as opposed to the branch managers.

25        THE COURT:  You may not need a list of loan products

1    to make that argument.  It sounds like you've already made that

2    argument, you have the witnesses that can make that argument,

3    so you may not need the list from plaintiff about the loan

4    products.

5              MS. KREITER:  Understood.

6              THE COURT:  Let's -- you know, and I have a grasp of

7    the rest of your motion.  Unless you want to emphasize anything

8    else, I'd like to hear from Mr. McCall.

9              MS. KREITER:  Nothing further.

10             THE COURT:  All right.  Mr. McCall?

11             MR. McCALL:  Good morning, Your Honor.

12             THE COURT:  Mr. McCall, let me just mention, we do

13   need to have that list that lists all of the Bates numbers that

14   correspond to the request, and I think that will cut down on

15   some of the matters raised in the motion.  So when are you

16   going to be able to provide that?

17             MR. McCALL:  So, Your Honor, if I could just clarify

18   one thing, because I do think we're in agreement that -- the

19   parties are in agreement based on our prior conference.

20             I -- my understanding based on our prior conference

21   where your -- was that we got -- Your Honor directed us to --

22   for the interrogatory responses for 2 -- that we would provide

23   the Bates numbers for interrogatory responses 2 through 7, and

24   that was what -- and those -- and those were -- were resolved,

25   and those are in progress and we should -- we will be able to

```
 1   provide.

 2              I did not understand Your Honor to have ordered --

 3   I -- my understanding from our -- the hearing was that we --

 4   Your Honor deferred decision on the respect to interrogatories

 5   1 and 8 discussions.

 6              THE COURT:  I only sort of talked about a couple of

 7   the interrogatory requests, that's true, but I think as a

 8   general determination I do think it will be helpful for you to

 9   go ahead and provide those Bates numbers for all of the -- that

10   correspond to the -- the responses that you provided to the

11   interrogatory requests, especially where you said "look to the

12   documents that I produced for the answer."  That may not be

13   true with respect to interrogatory 8, so do you have an

14   argument about interrogatory 8?

15              MR. McCALL:  Yes.  So sorry, Your Honor.  I'm just

16   look -- I'm -- yeah.  So with respect to interrogatory 1, we do

17   not refer to -- we do not -- our response does not refer to

18   answers that can be obtained from documents, so does that --

19   would we be required to provide a Bates -- Bates ranges for

20   interrogatory 1, damages?

21              THE COURT:  Only where you talk about -- you know,

22   where you refer the defendant to the -- to the documents.

23              MR. McCALL:  Okay.

24              THE COURT:  That's where we need to provide that

25   Bates number.
```

1          Let me take a look at the interrogatories.

2          So with 1 you're mentioning that you -- well, you do

3   say the answers can be ascertained from the documents produced

4   on a rolling basis, you do say that there.

5          MR. McCALL:  I'm sorry, Your Honor, I am not seeing

6   that.

7          THE COURT:  I'm looking at document 43-2 on page 5.

8   Is that the correct set?

9          MR. McCALL:  Yes.  I don't --

10         THE COURT:  And then subject to, without waiving.

11         MR. McCALL:  I don't -- Your Honor, that may not be

12   the amended response.  The amended response, I'm sorry,

13   I don't -- was Exhibit 8 to my declaration, does not have --

14   I'm sorry, I'm just reading -- does not have that language.

15         THE COURT:  Okay.  Let's see.  The amended -- it's

16   Exhibit H, you say?

17         MR. McCALL:  It was Exhibit H to my declaration,

18   Your Honor, and I apologize, I don't have the docket version

19   printed in front of me.

20         THE COURT:  That's all right.  Let's see here.

21         All right.  So I have Exhibit H, and here --

22         MR. McCALL:  On page 5 is --

23         THE COURT:  I see.

24         MR. McCALL:  -- where the response --

25         THE COURT:  Okay.  There are a number -- there's a

1  response, there's a request, and then is that your response on

2  page 5?

3          MR. McCALL:  It's on page 5 after the -- there's

4  bolded text that says "Response."

5          THE COURT:  Okay.

6          MR. McCALL:  Then there's a paragraph and then Bates

7  number --

8          THE COURT:  Are you talking about --

9          MR. McCALL:  (Inaudible) bullet points.

10         THE COURT:  -- legal conclusion, and then you

11  produced the documents necessary for the analysis on

12  December 22nd, and then there's argument there, and then your

13  damages are included and then you include some categories

14  there, and so you're not referring to documents there.

15         MR. McCALL:  That is correct, Your Honor.

16         THE COURT:  Now, Ms. Kreiter, you looked at that

17  amended response.  It doesn't apparently relate to -- refer to

18  documents.  Are you contending that's not specific enough

19  because it doesn't include the loans that were going to close?

20         MS. KREITER:  So I think in terms of the Bates

21  numbers Mr. McCall is correct, it's interrogatories 2 through

22  8.

23         THE COURT:  Okay.

24         MS. KREITER:  With respect to interrogatory 1, that

25  is the interrogatory that asks for damages.  My concern,

1    Your Honor, is that he has really three buckets of damages.

2    You know, there's only one that has any numbers associated with

3    it.  I don't have any lost revenues or profits.  You know, at

4    this point I don't know -- you know, just from -- in terms of

5    assessing the case value, Mr. McCall indicated to Judge Barber

6    at the first hearing, you know, not holding him to it, but his

7    estimate at that time was total damages of 250,000.  Now I'm

8    seeing damages in just one category of 4.4, and then ill-gotten

9    gains, you know, I don't really know what that means,

10   compensation paid or advanced to the employees.

11           THE COURT:  So it's the ill-gotten gains and it's the

12   lost revenue and profits categories?

13           MS. KREITER:  Correct.  So, you know, I just want to

14   have a sense of, you know, what is he claiming there.

15   You know, if Mr. McCall is going to produce a damages expert

16   report today, today is his deadline for damages experts,

17   you know, that could satisfy this.  I don't know if that's his

18   intent or not.  If it's not his intent and he intends to

19   proceed via fact witnesses, you know, again, that would be

20   something I would want to, you know, address at depositions in

21   March, how did you calculate this number.  I don't even know

22   what the numbers are.  I don't want to --

23           THE COURT:  Okay.  Okay.  All right.

24           Mr. McCall, let's talk about those two categories,

25   ill-gotten gains and lost revenues and profits.  Do you have a

1  calculation for those or information about how you calculated

2  them?

3       MR. McCALL:  Yes, Your Honor, and I think the

4  ill-gotten gains example perfectly illustrates the issue that

5  we're having.

6       So we -- the ill-gotten gains refer to bonuses that

7  were -- that -- that WaterStone paid to certain employees that

8  were dispro -- so disproportionate to the employees' salaries

9  that they suggested that the bonuses were being paid for

10  something else.  We learned about those bonuses after this

11  initial -- after the initial hearing before Judge Barber, and

12  our initial information was that these bonuses were -- that

13  there were three bonuses of $1 million each paid.

14       Subsequently we looked at the documents WaterStone

15  produced, and lo and behold, they did not produce compensation

16  agreements between WaterStone and key -- certain of the key

17  employees, including Dwayne Hutto and a number of others

18  identified in the Complaint and focused on in the Complaint

19  who we -- it was very clear we believe were the ringleaders.

20       We brought this to WaterStone's attention and they

21  did -- and so this was -- our document request clearly asked

22  for all employment agreements and compensation information.

23  We didn't ultimately receive that information until

24  December twenty -- December 29th of this year, despite the fact

25  that we had requested it on September, and I -- Counsel is

1  correct that they promptly produced those categories of

2  documents after we requested them, but the fact is that we

3  first had access to that information two months ago, of

4  these -- of these agreements referring to these bonuses, and it

5  turns out they were not million dollar bonuses and the amounts

6  were in the agreements that WaterStone produced to us.  So

7  I don't know -- and we -- those depositions have not yet been

8  taken.  We just started taking depositions.

9          Also we have a -- the discovery cutoff in this case

10  is July 17th, so I -- I guess, you know, with respect to the

11  ill-gotten gains, I -- that that is -- that is -- again, having

12  just received these -- these documents and we haven't deposed

13  those three witnesses yet, it's -- it's hard to describe --

14  it's hard to know exactly what amounts of those -- I believe it

15  totaled like $750,000 bonuses are thing -- are damages that we

16  could plausibly recover at this -- at this stage, and --

17          THE COURT:  What about the other, the lost revenue

18  and profits?

19          MR. McCALL:  Yeah.  So that -- this is -- again, so

20  as our -- as our understanding of the case progressed and we

21  reviewed discovery materials and analyzed our case, we

22  decide -- determined that the accounting for the lost revenues

23  from like specific borrower loans would not adequately account

24  for the damages sustained, and those damages are the lost

25  profits for this time period, which are described -- I -- which

1   are -- I assume -- I mean, I think a lot of what I'm struggling

2   with is that Counsel's -- a lot of what their -- the arguments

3   they're making they are -- sound like merits arguments that I'm

4   not sure how to address.  I have no doubt that they object, do

5   not believe that our damages total $5 million, but I'm not sure

6   how I can be more specific in here.

7           THE COURT:  Well, I guess what you -- it sounds like

8   you have that information now about the lost revenue and the

9   ill-gotten gains, and so will you be able to then supplement

10  the response then to number 1 with that information?  At least

11  the information that you have now, understanding, you know, you

12  may take depositions, maybe you'll get more refined data, but

13  based on the information that you have now, when would you be

14  able to amend that response?

15          MR. McCALL:  Um, does Your Honor mean the -- are we

16  just talking about 1 or the -- the Bates ranges -- all the

17  responses to the interrogatories?

18          THE COURT:  Well, I was asking about 1, but I guess,

19  you know, previously I had asked -- you all had let me know

20  that it would be 2 through 8, we still need to talk about 8,

21  but, sure, why don't you give me a date that, you know, you

22  would be able to provide those Bates numbers and then also,

23  you know, provide the amendment to request 1.

24          MR. McCALL:  Any -- anything -- if we could have one

25  week from today for any -- anything agreed on with respect to

1   the interrogatories, we -- we could provide a week from today,

2   if that's possible, Your Honor.  We did --

3           THE COURT:  So the 10th --

4           MR. McCALL:  It is underway -- oh, I'm sorry.

5           THE COURT:  The 10th would be fine, I think, the 10th

6   of March.

7           MR. McCALL:  Okay.  Okay.  March 10th.  Got it.

8           THE COURT:  So now let's talk about -- I think we're

9   down to 8, where we sort of were discussing a need for that

10  information.

11          MR. McCALL:  So, Your Honor, a couple of things, and

12  if the -- the -- importantly, I just want to note that our --

13  you know, Counsel was referring to our Amended Complaint for

14  our trade secrets, but the -- the rel -- the operative trade

15  secrets description we're talking about is in our interrogatory

16  response 8, which has seven bullet points of -- of -- of types

17  of trade secret information that are identified by what -- by

18  the name.

19          So, for example, Ms. Kreiter raised the spreadsheet.

20  Well, these are the -- these are -- are names of the tab of --

21  tabs in that spreadsheet, um, and also I said I -- you know,

22  there seems to be a lot of merits-based arguments going on,

23  because Counsel was saying that, you know, there's no evidence

24  that WaterStone received or used any of these things.  The

25  first two bullet points are describing documents that were sent

1  directly by Dwayne Hutto to Water -- to Dustin -- to

2  Dustin Owen at WaterStone and are cited in our Complaint and

3  have been produce -- prominently cited in our Complaint and

4  have been produced, so I don't know how we could -- I don't

5  know how we could provide any more gran -- granular details

6  other than -- I mean, these are like the cat -- the names of

7  the columns themselves in the -- in the spreadsheet.  I don't

8  know how we could be any more granular.

9          I would also note that a lot of -- you know,

10  Judge Barber did decide -- did already decide that the -- that

11  the -- the trade secrets had been -- for the purposes of the

12  Complaint and the motion to dismiss had been described with

13  particularity, and we've only added to that since.  And, again,

14  I'm just look -- you know, more of the -- the bullet points,

15  the customer address lists with 22 columns of detailed data,

16  it's -- I mean, that seems -- and, again, so that's also a

17  document cited in our Complaint with the attachments that's

18  been provided, and I'm just not sure -- I'm just not sure

19  what -- what out -- what other information we need to provide.

20          THE COURT:  Has it all been produced then?

21          MR. McCALL:  Yes, Your Honor.

22          THE COURT:  Okay.  So it may be helpful to go ahead

23  and then specify the documents that had been produced that

24  correspond to this request as well, particularly where you're

25  referring to the forms and workflows.  That will just help

1    ensure that everyone is talking about the same set of

2    documents.

3          MR. McCALL:  Absolutely, Your Honor.  We will do

4    that.  And I just want to note specifically on the workflows

5    that that refers to that -- files that were sent that have the

6    title "Workflows," but we will provide the Bates numbers.

7          THE COURT:  All right.  And then let me ask you to

8    discuss whether or not any documents have been withheld on the

9    basis of privilege at all, such that there would be a need for

10   a privilege log.

11         MR. McCALL:  Um, yes, Your Honor.  So we have not

12   withheld any documents on the basis of privilege.  The reason

13   that we -- I -- I understand that a privilege log will be

14   produced by us even if it states that.  The reason that we

15   didn't previously produce one is because in -- in my experience

16   they're typically produced at the end of fact discovery, and so

17   that's what -- that was what we were planning to do, in the

18   event that there are disputes like this as things come up and

19   we have to produce more documents, so that we only have to

20   produce one -- so that we only have to do it once.

21         We could also do that -- I -- we could also do that

22   by -- by -- by the 10th, and like I can produce a formal

23   response document stating that no documents were withheld.

24         THE COURT:  All right.  So if you haven't produced

25   any -- if you haven't withheld any documents, I'm not sure what

```
1   you would include on a privilege log.  I think it would be
2   sufficient for you to just --
3              MR. McCALL:  Okay.
4              THE COURT:  -- indicate that in the -- in some sort
5   of -- in your supplement.  I think that would be fine, if you
6   just include in your supplement department that no documents
7   have been withheld on a basis of privilege, that would be
8   sufficient.
9              MR. McCALL:  Okay.  Understood, and we will do that,
10  Your Honor.
11             THE COURT:  Now, there are some other requests beyond
12  number 8.
13             MR. McCALL:  Um, is this -- I -- I -- I believe that
14  we -- the inter -- oh, I believe the interrogatory request --
15  is Your Honor talking about document request 8?
16             THE COURT:  Let's see.  We are talking -- I'm looking
17  at the motion, and then we go into the requests for production.
18             MR. McCALL:  Understood.
19             THE COURT:  And then we start with request 3 -- 2 and
20  3, the forensics image.  Have you produced that?
21             MR. McCALL:  Um, so, Your Honor, to the -- to the
22  extent that "forensic image" means what a layperson would
23  understand it to mean, that -- like a -- someone took their
24  cell phone and forensically imaged it, that -- that didn't take
25  place, and therefore there are no documents to that effect.
```

 1            I would just note that in our response to both 2 and

 2    3 of these document requests we explain why -- what our -- what

 3    our object -- why the request is vague, why -- the basis of our

 4    argument that the request is vague, because for -- I don't know

 5    what they mean by "forensic image," and arguably these requests

 6    could refer to e-mails.  There's another -- the other request

 7    asks for reports or -- forensic reports or analysis.  So to the

 8    extent that this is -- you know, that they're asking did a

 9    third-party vendor or someone, you know, make a forensic image,

10    the answer is no, and our response to this was based on these

11    very -- these vague wordings in these 30 requests.

12            MS. KREITER:  So, Your Honor, that's where I'm really

13    struggling, because with respect to this request, and, frankly,

14    all of the requests for production other than 3, there were

15    some objections but then there's a statement, "Plaintiff has

16    produced documents in its possession, custody and control

17    responsive to this request," so with respect to this category,

18    you know, I was under the impression that, you know, something

19    has been produced, maybe subject to some objections, then

20    I reviewed the production, I don't find it.  I mean, if it

21    doesn't exist, I would want an amended response that says no

22    such reports exist, and, frankly, that illustrates the issue

23    that I'm having.

24            I've spent a lot of time and attorney's fees trying

25    to vet whether it is true that documents have been produced as

1   claimed by plaintiff in response to this and the vast majority

2   of the requests, you know, then to find that that is just not

3   true, you know, which is why I said, I think -- you know, to

4   the extent that documents have been produced at this point

5   subject to these requests, I feel I've lost a lot of time and

6   I'd like to get the Bates numbers or a statement, you know, we

7   don't have this information, that's unambiguous.

8            THE COURT:  So, Mr. McCall, there's no documents

9   related to number 2.  What about number 3, are there documents

10  related to number 3?

11           MR. McCALL:  No, Your Honor.  And, again, the reason

12  that we responded as we did was because these requests -- a

13  request for any report or analysis could arguably mean an

14  e-mail from that employee's e-mail account.  Those documents --

15  sort of documents were produced.  If, again, they mean a

16  forensic examination, that did -- that did not happen.

17           THE COURT:  And number 3, it's asking for a report or

18  analysis of activity, some sort of analysis from an electronic

19  device.  That wasn't done either?

20           MR. McCALL:  No such monitoring occurred that would

21  produce any sort of report or analysis.

22           THE COURT:  Well, what about 5, 10, 28 and 29?

23           MR. McCALL:  So, Your Honor, this -- so these --

24  these are -- these are internal documents from -- from Mutual,

25  and this is a -- I guess from my perspective a good example

1   of -- I'm not sure -- the defendant's only objection to our

2   production so far is that they say key decision makers'

3   documents haven't been produced.  The key decision makers were

4   the employees who left.  The -- their -- their e-mails have

5   been produced.  That's been produced.  I don't know -- I --

6   these -- all of the doc -- the documents responsive to this

7   request have been produced, and I don't know, based on,

8   you know, sort of Counsel's like speculation that they -- they

9   thought something would be in there and it wasn't, I don't --

10  I don't know what to do with that or -- or -- I mean, again,

11  the key decision makers with respect to what happened were the

12  employees who left, um, and their -- we -- and their

13  communications have been produced.

14          THE COURT:  So you produced everything that you have

15  related to these requests?

16          MR. McCALL:  That is correct.

17          THE COURT:  And if you can just provide the Bates

18  numbers for those, I think that would be helpful as well.

19          MR. McCALL:  Your Honor, if I -- so part of -- I --

20  I -- the -- with respect to the interrogatories, I guess I --

21  I'm just struggling because that is -- providing these numbers

22  by Bates number in these document requests is an undertaking, a

23  significant undertaking that requires a lot of time to be spent

24  to create these documents, and I'm just not -- you know,

25  I don't -- it's not -- I mean, certainly WaterStone hasn't

 1   provided us with any sort of index identifying exactly what

 2   documents are responsive to exactly what -- to what request,

 3   and obviously we'll do -- we'll do -- we will do this, but

 4   I just -- it seems -- it seems unreasonable and

 5   disproportionate to this case.

 6          I mean, I would just note that Ms. Kreiter was just,

 7   you know, apparently characterizing this as a case -- you know,

 8   small peanuts, like $200,000, and yet, you know, we're being

 9   asked to do all of this extremely burdensome and expensive

10   work.

11          THE COURT:  Well, it's -- you know, it's just -- it's

12   helpful because that way you know exactly which documents

13   correspond to which requests and there's not just sort of a

14   dump of different documents.  This way you can correlate them.

15   I think it would be helpful to you, as the plaintiff, and

16   you know, the defendant, and then, you know, you all, if you do

17   get to summary judgment or trial, it will help everybody

18   identify the set of documents and avoid any surprises down the

19   line.

20          Now, 7, I'm not really sure about this request for

21   production.  It's talking about policies and procedures that,

22   you know, might have allegedly been breached.  What are -- what

23   are the policies and procedures, do you think, Mr. McCall, that

24   might have been breached?

25          MR. McCALL:  The only policy as -- as explained in

1  those paragraphs of the Amended Complaint, the policies and

2  procedures are -- referred to are those set forth in the

3  employment agreements.  There are --

4  　　　　　THE COURT:  And those --

5  　　　　　MR. McCALL:  We do not allege that there are any

6  other policies or procedures that were breached.

7  　　　　　THE COURT:  And those were produced already?

8  　　　　　MR. McCALL:  Correct.  And so -- correct, Your Honor,

9  and cited and quoted at length in our Complaint.

10 　　　　　THE COURT:  Okay.

11 　　　　　MS. KREITER:  So if I could interject on that one,

12 Your Honor, the employment agreements, and specifically I'm --

13 you know, these requests are the ones that are routed in

14 paragraphs 20 and 21 of the Complaint.  So paragraph 20 of the

15 Complaint reads:  "The employment agreements require the

16 departed employees to comply with all policies and procedures

17 of Mutual," and then there's a block quote, "Loan originator

18 agrees to apply with all applicable company policies,

19 procedures and requirements," and then it goes on.

20 　　　　　MR. McCALL:  "Imposed as set forth in this

21 agreement."  You left out that.  It then says "Imposed as set

22 forth in this agreement."

23 　　　　　THE COURT:  It's Plaintiff's Complaint, and so if

24 that's what the policy is, that's what the policy is, so

25 that -- he's saying that's what the policy is that was

1  breached, that's what it is, that's all it is, you know, that's

2  all he can contend was breached.  So, you know, if he says

3  there's nothing else, that's -- then there's nothing else.

4           MS. KREITER:  Understood.  And if -- if there was,

5  you know, maybe a more clear representation that it's just the

6  employment agreements -- I read this to mean the employment

7  agreements incorporate other policies outside of that.  If he

8  is representing that it's nothing -- you know, nothing more

9  than that, I would be satisfied.  My concern is I don't want to

10 hear, well, the employment agreements reference, you know,

11 other policies and there's a handbook.  So I just want to make

12 sure that that's the understanding, I'm not going to hear about

13 any other documents later down the road, then I can focus on

14 just the employment agreements as opposed to something else

15 that's incorporated.

16          THE COURT:  Mr. McCall?

17          MR. McCALL:  Yes, that is correct, that the -- the

18 policy and procedures breached were those set forth in the

19 employment agreements.

20          THE COURT:  Do they incorporate by reference other

21 policies?

22          MR. McCALL:  I -- no, Your Honor.  I will say that

23 this one appears to incorporate other requirement under

24 applicable law, policies under applicable laws.

25          THE COURT:  But not any other policies or procedures

1    that might be in other handbooks or other material?

2              MR. McCALL:  Correct, Your Honor.

3              THE COURT:  Okay.  Now, let's talk about -- so with

4    that one what we'll do is amend the response to just indicate

5    that it refers to the employment agreement at issue.

6              And then we talked about personnel files already, and

7    that one is really just going to be narrowed to the contracts

8    at issue, and then let's talk about number 11.

9              Mr. McCall.

10             MR. McCALL:  Yes, Your Honor.

11             So in the first instance, this -- this appears --

12   you know, it's -- we are -- our -- my client is not required to

13   create a document to -- to create something to re -- to respond

14   to this request, and I don't know that it -- that -- that there

15   exists a -- a list in the -- in the form that, you know, that

16   they're -- that they're seeking, rather that the types of loan

17   product -- products are described in different documents, and

18   I -- the -- the -- the -- the list that they're asking for

19   doesn't -- with all these -- with these categories -- those

20   categories in that timeframe doesn't exist and I -- and they're

21   not -- it would require them to put it together.

22             THE COURT:  I think -- and I heard Ms. Kreiter's

23   argument on this issue before.  I agree with you, Mr. McCall,

24   it's not proportional to the needs of the case and you

25   shouldn't be required to create a new document, but if you

1    would just amend the response to 11 to indicate that you don't

2    have any documents in your possession, custody and control

3    that, you know -- that relates to the request in number 11.

4            MR. McCALL:  Understood, Your Honor.

5            THE COURT:  And then the last one that I have here is

6    14 through 23 and 25 and 26.

7            And here I think, again, it will be helpful to just

8    have the Bates number, I think that's all that's needed there,

9    to correspond to these requests, and, again, if there aren't

10   any documents then you can specify that as well.

11           MR. McCALL:  Your Honor, if I may, so, again, I -- we

12   will obviously comply and we will do that.  These are the --

13   WaterStone in its motion to compel devotes a total of one

14   paragraph consisting of two sentences of their motion to compel

15   about these -- the 14 to 23 and 25 through 26, and based on

16   that it's just hard to -- it's hard to understand why I'm

17   being -- based off -- based on these two sentences why I'm

18   being ordered to undertake this project to identify all -- to

19   associate all of our documents with a document request that the

20   other side is not required to undertake.

21           THE COURT:  Well, do you contend -- you know, that's

22   a separate issue, about whether or not -- what they are

23   required to undertake.

24           I do think it's a good practice to go ahead and

25   indicate with respect to the documents that you're producing

1    which document relates to which request.

2           Now, you know, alternatively, what you could have

3    done is identify each of the documents that you're producing in

4    the response to the request for production; but just saying

5    that all of the documents have been produced gives no

6    information about which documents have been produced that

7    relate to the request.  So, you know, you didn't know this

8    earlier, that this was going to be required, you could have

9    done it when you produced the documents, but now you know it,

10   and so you can know that going forward, that you need to do

11   that.  And if you want Ms. Kreiter to do that, if you have an

12   issue where you can't understand which -- where she didn't --

13   she says that she did provide that information with respect to

14   the interrogatories where she referred to any documents, but if

15   you think it would be helpful as it relates to any production

16   that you've requested, she should do that and undertake that

17   procedure as well.

18           MR. McCALL:  We did not serve any interrogatories,

19   Your Honor, and we served only 14 document requests.  We

20   would -- yes, we would request that WaterStone be required to

21   associate -- to inform us, you know, which document corresponds

22   to which document request.

23           THE COURT:  And you should do that not because she's

24   being required to do that but because you think that you can't

25   understand what documents correlate to each request.

1          MR. McCALL:  Correct, Your Honor.  And to be clear,

2    I'm not engaging in a tit for tat.  I have legitimately never

3    had to do this, a requirement like that before, and so that

4    is -- I'm just -- that's all a -- that's all I'm --

5          THE COURT:  Okay.

6          MR. McCALL:  Why I am asking the Court, because --

7          THE COURT:  So it would be helpful to you, so,

8    Ms. Kreiter, on the defense, can undertake that procedure if

9    you haven't done that already.

10         MS. KREITER:  Yeah.  I guess I will just say

11   I believe that the WaterStone requests were very clear about

12   what was produced, so I don't know that we're in the same --

13         MR. McCALL:  But I don't think you identified by

14   Bates numbers.

15         THE COURT:  Did you identify each of the documents in

16   the response to the requests for production?

17         MS. KREITER:  So, for example, if there was a request

18   that we thought was too broad, we would object and then say,

19   you know, subject to these objections we're producing X

20   documents.  It did not have the Bates number, but it did

21   specifically say what was produced.

22         THE COURT:  I -- you know, because Mr. -- you know,

23   Mr. McCall has mentioned that he lacks some clarity on this

24   issue, you all should undertake that procedure as well.

25         So let's -- let's -- you know, and you don't need to

```
1    produce the documents again, you sort of -- you can really just
2    amend your production and then provide those Bates numbers on
3    the defense side as well.
4            Now, Mr. McCall -- I think that takes us to the end
5    of the motion of Ms. Kreiter.
6            Mr. McCall, you know, we mentioned with respect to
7    the requests for production you're going to amend some of the
8    requests and then also provide the Bates numbers.  Will you be
9    able to do that by the 10th as well, or is additional time
10   needed?
11           MR. McCALL:  Yes, Your Honor, we can do all -- we can
12   do that by -- by March 10th, yes.
13           THE COURT:  Okay.  Great.
14           And then, Ms. Kreiter, will you be able to provide
15   your Bates numbers by the 10th as well?
16           MS. KREITER:  I guess I just want to make sure, so is
17   it with respect to all of the document requests or ones that
18   Mr. McCall feels he has a lack of clarity as to?
19           THE COURT:  You said Exhibit 10; is that right?  Did
20   you say 10?
21           MR. McCALL:  We had 14 document requests.
22           THE COURT:  14.  Okay.  So, yes, with respect to each
23   of the 14.
24           You know, again, it will just provide clarity for
25   each side about which documents correlate to each request.
```

```
 1                MS. KREITER:  Sure.

 2                One question related to the personnel files.  I heard

 3     Your Honor say I'm ordering the production of the contracts at

 4     issue.  I just want to be clear about the contracts at issue.

 5     The employment agreements, you know, certainly I don't think

 6     anyone disputes that, but in addition, you know, the contracts

 7     at issue in my mind include the compensation agreements for the

 8     individuals, and I just wanted to be clear before the end of

 9     the hearing about the scope of the, quote, unquote, contracts

10     at issue.

11                THE COURT:  Right.

12                MS. KREITER:  Specifically that it includes

13     compensation and commission agreements, that type of thing.

14                THE COURT:  Thank you for bringing that up.

15                The ones that are -- that were operative, the

16     contracts that were operative at the time of the employee's

17     departure.  So that would be the employment agreement, any

18     compensation agreement, any other agreements or documents in

19     the file that were related to -- actually, I'm not -- I'm going

20     to just say the employment agreement and the compensation

21     agreement.  Is there anything else?

22                MS. KREITER:  No.

23                THE COURT:  Okay.

24                MS. KREITER:  No, that would be fine.

25                THE COURT:  Okay.  Those two documents with respect
```

1    to each of the employees' information requested.

2              MS. KREITER:  Okay.  And then I think -- sorry, I'm

3    not sure I answered your question.

4              We will aim to get our, you know, Bates numbering by

5    the 10th as well.

6              THE COURT:  All right.  All right.

7              Is there -- and I am going to deny the request for

8    fees.  You know, it's -- you know, this is, you know,

9    unfortunate, it's part of litigation.  I do think that

10   everybody should work harder together to try to resolve these

11   disputes, but I am going to deny that request.

12             Is there anything else that we should discuss that we

13   haven't discussed here today?

14             MS. KREITER:  Nothing from WaterStone.

15             MR. McCALL:  Not from our -- the Plaintiff's

16   perspective, Your Honor.

17             THE COURT:  All right.  And I'll enter a short order

18   really just documenting what we have decided on here today.

19             Thank you, everyone.  We're in recess.

20                         - - - - -

21             (Proceedings concluded at 10:51 a.m.)

22                         - - - - -

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          This is to certify that the foregoing transcript of

 4   proceedings taken in a motion hearing in the United States

 5   District Court is a true and accurate transcript of the

 6   proceedings taken by me in machine shorthand and transcribed by

 7   computer under my supervision, this the 29th day of March,

 8   2023.

 9

10

11                                   /S/ DAVID J. COLLIER

12

13                                   DAVID J. COLLIER

14                                   OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25
```