## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MUTUAL OF OMAHA
MORTGAGE, INC.

              Plaintiff,

v.

WATERSTONE MORTGAGE
CORPORATION,

              Defendant.

CASE NO. 8:22-cv-01660-TPB-JSS

## DEFENDANT WATERSTONE MORTGAGE CORPORATION'S MOTION *IN LIMINE* TO EXCLUDE PLAINTIFF'S CATEGORY 2 ($4,440,002.42) AND CATEGORY 3 ($750,000) DAMAGES

### I.  INTRODUCTION

To say Mutual's alleged $4,440,002.42 in damages are speculative is an understatement. The damages assume dozens of branch employees across three offices would have remained with Mutual for 18 months after the Mutual branch managers resigned and joined Waterstone. The branch employees have no employment contract requiring them to stay at Mutual for 18 months and, while the managers were subject to a non-solicit that prevented them from recruiting the branch employees, the non-solicit was 12 months, not 18 months.

In addition, Mutual's damages are based on profitability in years past, including 2020 and 2021, which were historic market highs following the Covid-19 pandemic. The profit from that highly anomalous period in the mortgage loan industry is not

possibly representative of lost profit following the branch departures starting in July of 2022 — when the market and Mutual admittedly experienced severe decline.

Mutual also did not carve out the profit associated with the managers themselves, whose resignation has nothing to do with whether those same managers solicited branch employees in violation of their non-solicit duty to Mutual and, thus, caused the branches to close. Nor did Mutual make any effort to factor in what caused the branch employees to resign—including whether they simply wanted to follow their managers, as they have done in the past, with no wrongdoing by anyone.

Further still, Mutual failed to support its alleged damages: it did not retain a damages expert and the Federal Rule 30(b)(6) corporate representative Mutual designated to explain the damages could not do so.  Without providing the foundation for its alleged damages to Waterstone, Mutual cannot present the demand at trial.

The Court should also exclude Mutual's alleged "ill-gotten gains" damages of $750,000.  Mutual contends Waterstone *paid* $750,000 to the Mutual managers it recruited, not that Waterstone *received* $750,000. As such, the amount sought is not a gain to Waterstone, ill-gotten or otherwise, and the theory of damages is illogical.

## II.    BACKGROUND FACTS

Mutual seeks three categories of damages: (1) unquantified lost profits based on loans allegedly diverted to Waterstone ("Category 1 Damages"); (2) $4,440,002.42 in profits the branches would have made if they had stayed affiliated with Mutual from June 30, 2022 to December 31, 2023 ("Category 2 Damages"); and (3) $750,000 in "ill-gotten gains" ("Category 3 Damages") (Ex. A at Mutual's Resp. to Interrog. 1

(calling for an itemization of damages "including the formula used to calculate those damages").)

Mutual did not disclose a damages expert to support any of its alleged damages. (*See id*.) This motion *in limine* targets the Category 2 and 3 Damages. It does not target the Category 1 Damages, which Mutual testified it has not made any effort to quantify (*see* Gennarelli Dep. Tr. (Ex. B) 21:22-28:12, 30:23-31:1) and Waterstone's damages expert estimates to be less than $60,000. (Expert Report of Seven Oscher (Ex. C) at 9.)

### A. Category 2 Damages: $4,440,002.42.

To support its Category 2 Damages, Mutual produced a single page spreadsheet that calculates future profits for the Tampa and Daytona branches over an 18-month period of July 1, 2022 through December 31, 2023. (Ex. D, "Summary of Corporate Earnings.")[1] This period is after the branches closed, as most of the employees at the Daytona branch resigned by April 26, 2022, most of the employees at the Tampa branch resigned June 15, 2022, and most of employees at the Paramus, New Jersey branch resigned July 5, 2022. (Ex. E, e-mail correspondence showing timing of each branch resignation).

Specifically, Mutual claims it would have enjoyed $2,716,040.53 if its Tampa and Paramus branches would have remained open until December 31, 2023 and

---

[1] Mutual designated Exhibit D as "Confidential" under the Court's protective order. The same is true with respect to Exhibit E and Exhibit F, cited herein. In addition, Exhibit G, cited herein, consists of excerpts of deposition testimony for which Mutual's deadline to make confidentiality designations has not yet expired. As such, Waterstone is simultaneously submitting a motion to file those exhibits under seal and providing a hard copy to the Court for review, along with an unredacted version of this brief.

$1,723,961.89 if its Daytona branch would have remained open until December 31, 2023, for a total of $4,440,002.42. (*See* Ex. D damages spreadsheet; *see also* Gennarelli Dep Tr. (Ex. B) 167:16-21.)

### 1. That The Employees Would Have Stayed At Mutual For 18 Months After the Branch Closed and the Managers Resigned is Speculative.

That the dozens of branch employees at the three branches would have stayed at Mutual for 18 months is entirely speculative. Mutual's corporate representative, Jeff Gennarelli, one of the authors of the Category 2 Damages spreadsheet, testified there were no contracts requiring the branch employees to stay at Mutual for an 18-month period. (Gennarelli Dep. Tr. (Ex. B) 172:2-8.) In addition, while each of the managers is alleged to have a non-solicitation agreement, the non-solicitation is for 12 months. (*See id*. at 172:24-173:4.) Mutual testified it was aware of the 12-month non-solicit duration but did not use it in connection with the damages analysis (*Id*. at 172:24-173:7), despite that the managers would have been free to solicit after a year. (*Id.* at 173:8-174:2.)

When asked if Mutual had reason to assume the branch employees would have stayed with Mutual for 18 months, Gennarelli could only speculate: "[w]e now are the lender for Keller Williams. I would imagine that that may be more attractive…". (*See, e.g, id.* at 174:10-23.) But Mutual did not ask any of the employees if Keller Williams would have motivated them to stay with Mutual. (*Id.*) Mutual also admitted it has no evidence the branch employees would have continued working for a different manager at Mutual. (*Id.* at 95:16-96:1 (Q: "Does Mutual have evidence that the employees

4

would've stayed and worked for Kiley King? […] A: "No, no evidence.")

## 2. Mutual Made No Attempt To Consider Causation.

Mutual also made no attempt to consider what caused its former employees to follow their managers to Waterstone. Mutual acknowledges that it is "not necessarily uncommon" in the mortgage industry for an entire branch of employees to transition from one mortgage company to another. (*See* Gennarelli Dep. Tr. (Ex. B) 97:17-23.) In fact, some of the employees who followed their managers to Waterstone, had previously followed their managers to Mutual and to prior employers before Mutual. (*See id.* at 101:25-102:23.)

Mutual also acknowledges there is an element of natural attrition in the mortgage industry that's expected when a branch manager resigns. (*Id.* at 104:15-105:5 ("…Q: So just in the ordinary course, people are going to follow for whatever reason; correct? A: Yes.") Mutual has itself experienced an entire branch leaving due to natural attrition absent any wrongdoing. (*Id.* at 105:6-20.) Mutual admits that it has internal data related to its own natural attrition rate, yet none of that information was factored into the Category 2 Damages. (*See id.* at 105:21-106:18.) In addition, Mutual agrees that its former employees' personal relationships with their managers and the employees' dependency on the managers for business are relevant to whether natural attrition caused the employees to transition to Waterstone, but again, none of these considerations were factored into the Category 2 Damages. (*See id.* at 107:7-108:15, 114:16-20, 116:21-118:3.)

Furthermore, Mutual acknowledges that some employees did not follow their

former branch managers to Waterstone and instead left Mutual for a third party. (*See id.* at 90:3-14.) Mutual does not know however how many employees fall into this category (*id.* at 91:12-16 ("A: And I really don't know who was offered a job from Waterstone or who wasn't."), or whether Mutual offered these employees a position to stay despite the branch managers' departures. (*Id.* at 91:17-19.) Yet, Mutual does not know if the loan volume for these employees is included in its Category 2 Damages and could not explain how it may have been excluded. (*See id.* at 90:11-91:19.)

### 3. The Category 2 Damages Are Based On An Historically Anomalous Period In The Mortgage Industry that is Not Possibly Representative of Future Lost Profits.

Mutual's $4,440,002.42 demand is also calculated from historic loan volumes and profits dating back to 2019, inclusive of the 2020-2021 period that Mutual acknowledges was highly anomalous for the mortgage industry. (*See* Gennarelli Dep. Tr. (Ex. B) 163:4-165:11.) Gennarelli recalls 2020, in particular, as being "absolutely" a record year for Mutual, a "record high" for the branches at issue, and a "historically anomalous year for the industry" with activity triggered by the COVID-19 pandemic (*Id.* at 163:10-164:24.)

That 2020 and 2021 were anomalous is clear from the spike in volume for those years, as shown in Mutual's own damages spreadsheet:



(*See* Ex. D, Summary of Corporate Earnings.)

Furthermore, Mutual admits that in 2022 the market was in a downturn after going through 2020-2021, which Gennarelli referred to as the "greatest mortgage market in decades." (*Id.* at 189:10-13, 192:2-9; Ex. F, Gennarelli Dep. Ex. 12.) Mutual's Forward Division, which encompasses the branches at issue, ███████ ███████████████████—just one month before Mutual's damages period. (*See* Gennarelli Dep. Tr. (Ex. B) 181:6-187:13.) Mutual's performance was ████████ ████████████████████████. (*Id.*) Further, in July 2022, Mutual was considering getting ███████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████ (*Id.* at 186:16-22; Ex. F, Gennarelli Dep. Ex. 12.)

Chris Leyden, Chief Operating Officer of the Forward Division, testified that the company's performance ██████████████████. (*See* Leyden Dep. Tr. (Ex. G.) 25:3-26:14.) In fact, Leyden admitted that Mutual is ███████████████

██████████████████████████████████████████████████████

████████ (*Id.* at 26:8-22.) Leyden confirmed that overall Mutual projected ████

██████████████████████████████████████████████████████

████████████████████████████████████ (*Id.* at 36:13-18.)

In addition, Leyden's compensation, which is tied to performance, is "████████

█████" –i.e., "██████████████████" ████████████████. (*Id.* at 17:13-

18:5.)

Waterstone's damages expert, Steven Oscher, used published data from the

Mortgage Bankers Association to compare Mutual's historic and projected

performance to the mortgage industry generally. (Ex. C at 12.) Oscher concluded that,

historically, Mutual's loan volume tracked very closely to the mortgage industry from

Q1 2019 to Q3 2022. (*Id.*) However, the loan volume projected in Mutual's Category

2 Damages diverges significantly with industry projections for Q3 2022 to Q4 2023, as

shown below:



(*Id.*)

### 4. The Lost Profit Damages Improperly Include Loan Volume Attributable To The Former Branch Managers.

Mutual also included the loan volume attributable to its former branch managers, Chris Smith, Dwayne Hutto, and Chris Wolf, in its Category 2 Damages even though Mutual acknowledges there is nothing unlawful about Waterstone recruiting the branch managers. (Gennarelli Dep. Tr. (Ex. B) 77:9-78:25). In fact, Mutual admitted that if Waterstone recruited only the branch managers then "absolutely we should take that money out" of the damages demand. (*See id.* at 93:1-5.) The omission is significant: Waterstone's damages expert, Oscher, calculated the volume attributable to Hutto, Wolf, and Smith for 2019 through 2022 and concluded the branch managers were responsible for roughly 44.77% to 47.77% of the Daytona Branch loan volume. (Ex. C at 11, Ex. VII.)  In Tampa, the branch manager originated 11.61% to 18.83 % of loan volume. (*Id.*)

### 5. Mutual Refused To Substantiate The $4,440,002.42 in Damages.

Mutual did not specify any damages in its Rule 26 disclosures, estimated its damages to be $250,000 at the October 12, 2022 motion hearing (Dkt. 40 at p. 12) and did not provide an expert report to substantiate the now claimed $4,440,002.42 in damages. In addition, Gennarelli, Mutual's designated corporate representative, was unable to explain the numbers and assumptions underlying Mutual's demand despite appearing to testify on the "damages sought by Mutual, including the calculation and basis of all such alleged damages." (Notice of Federal Rule 30(B)(6) Deposition (Ex.

H) at Ex. A Topic 1; *see also* Gennarelli Dep. Tr. (Ex. B) 6:21-25.) Specifically, when asked to substantiate the corporate profits multiplier reflected in the spreadsheet, Gennarelli testified: "I don't really know what's in there. I don't really know if there's a – if there's a corporate P&L or we can use the Richey May documents. I don't know." (Gennarelli Dep. Tr. (Ex. B) 158:17-159:1.) When counsel for Waterstone presented Gennarelli with the Richey May documents, Gennarelli responded, "I'm afraid you're going to need an accountant to figure this out… This is not going to be helpful to us." (*Id.* at 159:2-21.) Gennarelli testified that similar information was available in Mutual's tax returns, but that "tax returns are going to make it more tricky," and he therefore needed to use the corporate P&L statement that Mutual refused to produce to explain the corporate profits multiplier. (*Id.* at 132:8-11, 134:7-15.)

In addition, in response to Waterstone's request that Mutual identify and produce all documents referred to or relied on to create the Summary of Corporate Earnings damages spreadsheet, Mutual identified and produced monthly profit and loss statements for its branches. (*See* Ex. I at Resp. to Interrog. 10.) However, Gennarelli testified that he did not rely upon the branch-level P&L statements to prepare the damages assessment and instead relied upon data in Mutual's accounting system and a corporate P&L statement. (Gennarelli Dep. Tr. (Ex. B) 136:8-138:1, 154:10-159:21.) For example, when asked why the "Volume of Loans Funded" as shown in the Summary of Corporate Earnings damages spreadsheet could not be reconciled with loan volumes shown in the branch-level P&L statements, Gennarelli

explained that the loan volumes shown in the damages spreadsheet "came out of a system much more recently than when the [branch] P&L was created." *Id.* at 154:5-22. When asked to explain the discrepancy, Gennarelli answered, "somebody from accounting is going to have to explain to you why, you know, if there's an accrual or if these accruals are common or if there was misallocation." *See id.* at 139:19-154:22.

Mutual refused to produce the actual data and documents relied upon to support the alleged damages at deposition and to date has not produced them. (*See id.* at 141:2-159:17; Ex. I at Mutual's Resp. to Interrog. 10) (requesting Mutual identify all documents referred to or relied upon to create the Summary of Corporate Earnings damages spreadsheet)); Ex. J at Mutual's Resp. to Request for Production 31) (calling for production of all documents referred to or relied upon to prepare the damages spreadsheet).)

Without the supporting documentation relied on by Mutual to create the damages spreadsheet, Waterstone's damages expert was unable to verify or test the Category 2 damages demanded. (Ex. C at 10.)

**B. Mutual's Alleged Ill-Gotten Gains Damages.**

Mutual's third and final category of alleged damages is based on $750,000 in alleged payments that Waterstone made in connection with its hiring of the former Mutual employees. (Ex. A at Resp. to Interrog. 1.) Mutual alleges that these payments, despite being expenses incurred by Waterstone, were "ill-gotten gains" to Waterstone. (*Id.*) Specifically, Mutual alleges that Waterstone paid "Branch Financial Credits" in the amount of $500,000 to Chris Smith and $250,000 to Dwayne Hutto "in exchange

for the individuals' participation in Defendant's unlawful scheme." (*Id.*)

The $750,000 in branch financial credits were expenses that Waterstone incurred, not gains, which Mutual's corporate representative admitted:

> Q: . . . so this is money that Waterstone is paying out to the employees; correct?
> A: Yes.
> Q: It's not money that Waterstone is enjoying. It's a cost to Waterstone, correct?
> A: Correct.
>
> ***
> Q: . . . The employees gained the money, not Waterstone; right?
> A: Yeah.

(Gennarelli Dep. Tr. (Ex. B) 63:25-64:12).

## III.  ARGUMENT

### A. The Court Should Exclude Mutual's Damages Associated with All Employees Remaining at Mutual for 18 Months: $4,440,002.42.

#### i.  The Lost Profit Damages Are Speculative And Not Grounded In Facts.

To recover lost profit damages, Mutual must prove that 1) Waterstone's action "caused the damage" and 2) there is "some standard by which the amount of damages may be adequately determined." *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1342 (11th Cir. 2019) (quoting *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989)). Lost profit damages must be "established with reasonable certainty." *Id.* (quoting *Twyman v. Roell*, 123 Fla. 2, 166 So. 215, 217 (1936)). "Florida law is clear that an award of lost profits must be supported by evidence and cannot be based on mere speculation or conjecture." *Id.* (quotations omitted). *See also McMahan Sec. Co. L.P. v. FB Foods, Inc.,* No. 8:04CV1791-T-24TGW,

2007 WL 704916, at *5 (M.D. Fla. Mar. 2, 2007) (granting motion to exclude business plan containing "hoped for future earnings projections" as evidence of lost profit damages).

Courts routinely reject lost profit damages that rely on speculative assumptions. *See, e.g.*, *Pier 1 Cruise Experts*, 929 F.3d at 1342 (affirming district court's determination that plaintiff's lost profits calculation was too speculative where the only evidence offered was lay witness projections of the plaintiff's financial manager who testified that it was her intent to "be conservative" and "reasonable"). *See also Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,* 254 F.Supp.2d 1239, 1247-49 (M.D. Fla. 2003) ("Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions."); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344-45 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (rejecting lost profits as too speculative where plaintiff did not establish each of the "but for" assumptions required for it to generate future profits).

Furthermore, lost profit damages will not be awarded "when those profits are dependent on a party taking an action that it is unclear he would have taken." *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002). For example, in *Himes,* an investor argued that he should be awarded lost profits against a securities firm, because the firm's actions prevented him from buying and selling securities at the optimal time. *Himes v. Brown & Co. Sec. Corp.*, 518 So. 2d 937, 938 (Fla. DCA 1987). The Florida Court of Appeals held that there was no evidence that the

investor "would have completed the time-sensitive transactions at precisely the correct time" and therefore any damages were speculative and non-recoverable. *Id.*

Here, Mutual has no evidence that its branches would have stayed open or that the dozens of employees at three different branches in Florida and New Jersey would have continued working for Mutual for 18 months. Mutual admits that each of the former employees were at-will employees with no contractual obligation to remain employed for any amount of time. Mutual's corporate representative could only speculate as to reasons the employees might have wanted to stay at Mutual, admitting there is "no evidence" the employees would have stayed to work for a different manager.

Mutual's corporate representative's admissions make clear Mutual cannot establish that "but for" Waterstone's actions, all of the branch employees would have remained at Mutual. Mutual's corporate representative testified at length about the transient nature of the mortgage industry, admitting that it is not uncommon for an entire branch of employees to transition to another company. In fact, Mutual knows that the employees had previously followed their branch managers to Mutual. Mutual further agreed that the employees' personal friendships with the branch managers and dependency on the mangers for business are relevant to whether natural attrition played a part in their departures, yet it did not consider any of these factors in its damages analysis. (Gennarelli Dep. Tr. (Ex. B) 107:7-108:15, 114:16-20, 116:21-118:3.)

14

Mutual does not even known which employees' loan volumes are included in the damages demand. Gennarelli could not say how many employees left Mutual for a third party, if their loan volume was excluded from the damages demand, or how it may have been excluded. (*Id.* at 90:3-91:19.) As to the branch managers, Mutual admitted that there is nothing improper about Waterstone recruiting the branch managers and the loan volumes attributable to the managers should "absolutely" be taken out of the damages demand. (*Id.* at 93:1-5.)

In addition, even if Mutual could somehow prove the employees would have remained with Mutual for 18 months (it cannot) and that Waterstone (as opposed to any number of factors) caused the employees to leave, damages must be established with reasonable certainty. Here, Mutual relied upon retroactive data that includes 2020-2021 — what Mutual called the "greatest mortgage market in decades" — to project lost profits for the period of June 30, 2022-December 31, 2023. Yet, Mutual admitted the market has been experiencing a significant downturn in 2022 and is not at all similar to the boom of 2020-2021:

- The 2020 figures Mutual relied upon reflect the "record high" for the branches at issue. (Gennarelli Dep. Tr. (Ex. B) 163:10-163:22.)

- 2020 was "absolutely" a record year in terms of volume for Mutual overall, as the pandemic hit and the housing market went crazy, and that anomaly continued into 2021. (*Id.* at 163:10-164:24.)

- Mutual admits that in 2022 the market was in a downturn after going

15

through 2020-2021, which Gennarelli referred to as the "greatest mortgage market in decades." (*Id.* at 189:10-13, 192:2-9, Ex. F, Gennarelli Dep. Ex. 12.)

- Chris Leyden, Mutual's Chief Operating Officer, testified that the company's performance has been ███████████████. (*See* Leyden Dep. Tr. (Ex. G) 25:3-26:14.)

- In fact, Leyden admitted that Mutual is "████████████████" for 2023, and that the Forward Division which encompassed the branches at issue is "████████████" and "███████████████" (*Id.* at 26:8-22.)

- Leyden confirmed that overall Mutual projected ████████████ ████████████████████████████████████ ████████████████████████████████. (*Id.* at 36:13-18.)

- Leyden's compensation, which is tied to performance was "████████ ██████████" for ███████████████. (*Id.* at 17:13-18:5.)

- As of June 2022, one month prior to the start of Mutual's damages period, Mutual's Forward Division, which encompasses the branches at issue, was not profitable. (Gennarelli Dep. Tr. (Ex. B) at 181:6-187:13.)

- Mutual's performance in June of 2022 was significantly lower compared to its own projected budget. (*Id.*)

16

- In July 2022, Mutual was considering getting 

." (*Id.* at 186:16-22 and Ex. F, Gennarelli Dep. Ex. 12.)

In addition, Mutual has historically aligned with the industry in terms of performance, and Waterstone's damages expert provided industry data indicating decline over the period of Mutual's alleged damages, not anomalous profitability — just as the multiple Mutual witnesses have admitted.

The only explanation for Mutual using the "greatest mortgage market in decades" as the premise for its damage calculation is that Mutual artificially inflated its projected lost profits over a period Mutual knows it has not performed at the same level. The damages should be excluded as not possibly "reasonably certain," as Florida law requires, but rather completely divorced from reality.

  ii. **The Court Should Also Exclude the Lost Profit Damages as Unsupported.**

Mutual's failure to substantiate its Category 2 Damages provides a separate and independent basis to exclude the $4,440,002.42 demand.

As an initial matter, when a corporate representative "lacks the ability to answer relevant questions on listed topics… then the 'we-don't-know' response can be binding on the corporation and prohibit it from offering evidence at trial on those points." *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012). If a corporate

representative "testifies that the corporation does not know the answers to the questions [the corporation] 'will not be allowed effectively to change its answer by introducing evidence at trial.'" *Id.* (quoting *Ierardi v. Lorillard,* No. 90–7049, 1991 WL 158911 (Aug. 13, 1991) (E.D. Pa. 1991, at *4)). Moreover, the duty to prepare a corporate representative "goes beyond matters personally known to th[e] designee," and instead requires a business . . . to prepare its designee using "reasonably available… documents, past employees, or other sources." *Avenatti*, 2022 WL 3134425, at *2 (internal quotations omitted). In fact, corporate representatives are "to testify as to the organization's collective knowledge." *Avenatti v. Gree USA, Inc.*, No. 22-CV-354, 2022 WL 3134425, at *2 (S.D. Ind. Aug. 5, 2022) (citing FED. R. CIV. P. 30(b)(6)). Indeed, a corporate party "has a duty to gather the information and prepare the designee(s) so that they can give complete, knowledgeable, and binding testimony," about "facts within the [business]'s knowledge, … its subjective beliefs and opinions, … [and its] interpretation of documents and events." *Avenatti*, 2022 WL 3134425, at *2 (omitting internal quotations of *United States v. Taylor*, 166 F.R.D. 356, 361 (M.D.N.C. 1996) and *Alliance for Global Justice v. District of Columbia*, 437 F. Supp. 2d 32, 37 (D.D.C. 2006)).

Here, Gennarelli, Mutual's Rule 30(b)(6) corporate representative, was unable to substantiate the corporate profits multiplier reflected in the damages spreadsheet. He testified it came from a corporate profit and loss statement that Mutual never produced or could possibly be derived from audit documents prepared by Richey May about which Gennarelli then testified "I'm afraid you're going to need an accountant

to figure this out." Nor could Gennarelli explain the corporate profits multiplier Mutual used to calculate the $4,440,002.42 demand based on Mutual's tax returns, or any of the branch level profit and loss statements Mutual listed by bates number in its written discovery responses as the documents Mutual relied upon to prepare the damages spreadsheet (bates-number listings in response to Waterstone's discovery targeting damages was required as a result of Waterstone's successful motion to compel, *see* Order at Dkt. 52).

Gennarelli also could not explain why the loan volume reflected in Mutual's damages spreadsheet differed from the loan volume shown in the branch profit and loss statements, repeatedly deferring to persons "in accounting." *See*, *e.g.*, 139:19-154:22. Eventually, Gennarelli explained that the loan volume shown in the damages spreadsheet came from updated data on Mutual's system that would not be in the branch profit and loss statements, and which Mutual refused to produce. *Id.* Gennarelli's inability to explain Mutual's alleged damages is binding. As a result of Mutual's failure to substantiate its damages, Waterstone's damages expert was unable to test Mutual's $4,440,002.42 demand, and the Court should exclude it.

### B. The Court Should Exclude Mutual's Category 3 Damages of $750,000.

Mutual claims that money Waterstone ***paid*** to its branch managers represents an ill-gotten gain to Waterstone; however, the measurement for equitable restitution of ill-gotten gains is based on a benefit unjustly ***received*** by a defendant. *See F.T.C. v. Washington Data Res.*, No. 8:09-CV-2309-T-23TBM, 2011 WL 3566612 *3 (M.D. Fla.

July 15, 2011); *see also F.T.C. v. CCAC*, 2016-2 Trade Cases P 79747, 2015 WL 12533013, at *7 (S.D. Fla. Sept. 9, 2015), *aff'd*, 668 F. App'x 357 (11th Cir. 2016). It is a basic principle of damages that restitution of ill-gotten gains is measured by the defendant's **gain**. *See Washington Data*, 2011 WL at 3566612; *F.T.C. v. Verity Int'l, Ltd.,* 443 F.3d 48, 67 (2d Cir. 2006).

The $750,000 that Waterstone paid as branch financial credits was an expense to Waterstone, not a gain, which Mutual acknowledges. Allowing Mutual to present this figure as an ill-gotten gain misconstrues black-letter law on restitution damages. *Royale Green Condo. Ass'n, Inc. v. Aspen Specialty Ins. Co.*, No. 07-CIV-21404, 2009 WL 2208166, at *2 (S.D. Fla. July 24, 2009) (quoting FED. R. EVID. 403) (courts should exclude evidence that results in "unfair prejudice, confusion of the issues, or misleading the jury…"). Because Mutual has not articulated any other basis for seeking $750,000 as an ill-gotten gain the Court should exclude this theory of damages and the associated demand.

## C. CONCLUSION

For the reasons set forth above, Waterstone requests the Court exclude Mutual's Category 2 Damages of $4,440,002.42 and Category 3 Damages of $750,000.

Respectfully Submitted,

*s/Maria L. Kreiter*
Maria Kreiter (*Admitted PHV*)
mkreiter@gklaw.com
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)

20

Scott McLaren (FBN: 414816)
Scott.mclaren@hwhlaw.com
Carolina Y. Blanco (FBN: 0098878)
Carolina.blanco@hwhlaw.com
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)

*Attorneys for Defendant Waterstone Mortgage Corporation*

## LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Waterstone certifies they have conferred in good faith with opposing counsel concerning the issues presented in this Motion. Specifically, Waterstone's counsel contacted Mutual's counsel by e-mail and by phone on June 30, 2023 and also spoke with Mutual's counsel on that date regarding the two categories of damages targeted by the Motion and the grounds for the Motion. Mutual indicated it does not agree to the relief sought in this Motion. On July 3, 2023, shortly before the filing of this motion, Mutual's counsel indicated it will consent to the exclusion of the Category 3 damages with prejudice but that it reserves argument based on that amount. Waterstone does not believe argument to the finder of fact based on the $750,000 in damages is appropriate where the damages are not sought.

s/Maria L. Kreiter
Maria Kreiter (*Admitted PHV*)
mkreiter@gklaw.com
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
scott.mclaren@hwhlaw.com
carolina.blanco@hwhlaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*

22