# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA MORTGAGE, INC.,

Plaintiff,

vs.

WATERSTONE MORTGAGE CORPORATION,

Defendant.
____________________________/

DEPOSITION OF: **JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC.**

TAKEN: Pursuant to Notice by Counsel for Defendant

DATE: May 25, 2023

TIME: 9:17 a.m. to 4:53 p.m. EST

LOCATION: Hill Ward Henderson
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602

REPORTED BY: Melanie Keefe, FPR
Notary Public
State of Florida at Large

APPEARANCES: COURTNEY WALTER, ESQUIRE
CHRIS McCALL, ESQUIRE (Zoom)
Mitchell Sandler LLC
1120 20th Street Northwest
Suite 725
Washington, DC 20036

MARK CARROLL, ESQUIRE
Mutual of Omaha Mortgage, Inc.
100 West 22nd Street
Suite 101
Lombard, Illinois 60148

Attorneys for the Plaintiff

MARIA L. KREITER, ESQUIRE
EMMA J. JEWELL, ESQUIRE (Zoom)
Godfrey & Kahn, S.C.
833 East Michigan Street
Suite 1800
Milwaukee, Wisconsin 53202

CAROLINA Y. BLANCO, ESQUIRE (Zoom)
Hill Ward Henderson
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602

STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
Waterstone Mortgage Corporation
N25W23255 Paul Road
Pewaukee, Wisconsin 53072

Attorneys for the Defendant

ALSO PRESENT: Carrie Macsuga

| INDEX | PAGE NUMBER |
|---|---|
| Examination by Ms. Kreiter | 5 |
| Read Letter | 255 |
| Errata Sheet | 256 |
| Reporter's Certificate | 257 |

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

THEREUPON,

JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC.,

a witness herein, having been duly sworn, was examined and testified upon his oath as follows:

THE WITNESS: I do.

EXAMINATION

BY MS. KREITER:

Q. Mr. Gennarelli, state your name and spell it for the record, please.
A. Jeff Gennarelli, G-e-n-n-a-r-e-l-l-i.
Q. Have you had your deposition taken before?
A. I have.
Q. Just a few ground rules that I'm going to go over before we get started. First, there's a court reporter here. She's taking down everything that you say, everything that I say. Because of that, I'm going to have to police myself and make a point of talking slow, waiting until you finish with your answer before I speak, and I'll ask that you do the same.
A. Sure.
Q. In addition, because she's typing down the answers, I need you to give verbal answers, yes, no, et cetera, as opposed to nods of the head, which she can't take down.

And then, finally, if you need a break at any time during the deposition, it's not a, you know, federal investigation here. Just let me know, and we will take a break. I would just ask that if there's a question that I have pending to you, answer the question prior to taking a break. Does that make sense?
A. It does.
Q. If you don't understand a question that I ask you, let me know that. If you don't let me know, I'm going to assume that you understood the question. Agreed?
A. Yeah, yes.
Q. Great. Start with Exhibit 1. Hand that to the court reporter, please.
A. Then I can look at it?

(Exhibit No. 1 is marked for identification.)

Q. Yes, please do. Exhibit 1 is the notice for this deposition. You understand that you're testifying today not in your personal capacity but on behalf of the plaintiff in this case, Mutual of Omaha Mortgage; correct?
A. Yes.
Q. My understanding is that you're testifying on behalf of Mutual with respect to Topics 1 through 12 in the deposition notice; correct? And there's a separate witness tomorrow testifying as to the remaining topics; correct?
A. Yes. Correct.

Q. What did you do to prepare for your testimony today?
A. I read over the Complaint. I looked at some of the e-mails. There's not a lot of discovery yet, I don't think, but I looked at what I did, looked at the -- that's really -- that's really about it, a couple of conversations with -- with counsel.
Q. You said you looked over e-mails. What e-mails would those be?
A. E-mails that were in the discovery folder.
Q. Got it. So was it that somebody shared a discovery folder with you and --
A. Yes.
Q. Okay. How would you go about identifying that folder that was shared with you in prep for the deposition?
A. I don't understand what you mean.
Q. Did you get a link in an e-mail, or how did the documents come to you?
A. Oh, sure. Yeah, link and e-mail. Yeah.
Q. How many e-mails were in this folder available through the link?
A. I mean, not that many. We -- we didn't do a ton of preparation in that regard. There's maybe -- I don't know. I'll say 20, 30 e-mails, something like that.
Q. You say you didn't do much preparation in that

regard. In that regard with respect to e-mails or in general for the deposition?
A. Yeah, I think in general. I mean, I think I am going off of just I was around when this happened.
Q. Were there other documents besides the 20 to 30 e-mails in the folder that you received?
A. There's a -- I don't know if -- you know, if it was the same e-mail, but there's a spreadsheet that showed calculations of -- for damages, and really that was the majority of it.
Q. Any other spreadsheets that you looked at?
A. Not really, no.
Q. Who sent you the link with the documents to review?
A. Counsel.
Q. Did you take notes as to any of the documents that you reviewed?
A. I did not take -- we had verbal conversations. I didn't take notes.

MS. WALTER: Object to form that any of this is going to call for any sort of attorney-client privileged conversations.

MS. KREITER: I don't think that's the case.

Q. How long did you spend reviewing the documents that were sent to you?

A. Okay.
Q. For now, I want to just focus on Bucket No. 1, the bucket that is associated with lost revenue and profits from loans that were improperly diverted, so the first bucket --
A. Yes.
Q. So my understanding is that the contention is there were loans that should've closed at Mutual that did not and instead closed at Waterstone with respect to that first bucket?
A. Correct.
Q. I don't see in the written responses, as to the first bucket, any type of number demand. I do see that when you get to page 27, when you start talking about the second bucket.
A. Yeah.
Q. So for purposes of this deposition --
A. Sure.
Q. -- now is the time when I get to exhaust and find out exactly what damages are sought.
A. Sure.
Q. With respect to the first bucket, what are the damages sought?
A. Well, I think a lot of that has to do with discovery we haven't been provided yet. We don't know. We

haven't looked at Waterstone's books to see what loans have closed. We only -- how do we know -- we know of a couple of instances of loans that were diverted for sure, but we don't know the totality of the loans that were diverted because we don't have access to Waterstone's closed loan report.
Q. Mr. Gennarelli, when was the lawsuit filed? It was filed in July.
A. Okay.
Q. It's been pending for ten months.
A. Okay.
Q. Has Mutual served discovery on Waterstone?
MS. WALTER: Object to the form.
MS. KREITER: The witness is testifying that he doesn't believe Mutual has had a chance to explore the claims. I'm following up on that testimony.
Q. Do you know whether Mutual of Omaha has served discovery on Waterstone?
MS. WALTER: Object to the extent it implicates attorney work product.
Q. Go ahead and answer.
A. I'll say I have not seen a closed loan report coming from Waterstone. If I have seen that, then we can go back and backtrack.
Q. Are you --
A. What I have seen, though --

Q. Sorry. Go ahead.
A. What I have seen were our customers sent to Waterstone to the head underwriter at Waterstone asking if these loans would work by -- by Mutual of Omaha Mortgage employees. I have seen that. So I know that there was some. Do I know the extent of it? I haven't seen that. And I didn't think I was going to -- I didn't think I was asked to testify to the fact of what Waterstone has.
Q. Well, you're here to testify about the damages, and I heard you say that you haven't been able to calculate damages because discovery has just started.
MS. WALTER: Object to form.
Q. Is that accurate?
A. In my mind, I have not received enough information. I haven't seen -- I do know this: Customer information was sent to personal e-mails. We don't -- we haven't -- we haven't looked at any personal e-mails.
Q. Mr. Gennarelli, are you aware that in the fall of '22 Waterstone produced in discovery a list of the loans that had been closed at the branches within the first three months? Are you aware of that?
MS. WALTER: Object to form.
MS. KREITER: What's wrong with the form?
MS. WALTER: Maria, carry on.
Answer the question.

MS. KREITER: What is the objection to the form? Because I'll restate it.
MS. WALTER: I am objecting properly pursuant to how I'm supposed to object.
Q. Do you understand the question, Mr. Gennarelli?
A. I do.
Q. Go ahead and answer.
A. I was aware of a small list that was provided. I'm also aware that we have not looked at personal e-mails. Our customer list was sent numerous times to personal e-mail addresses. We haven't looked at those e-mails and what happened to that data after it was in the personal e-mail.
Q. When you were preparing to testify on behalf of the company today as to the loans that have improperly transferred to Waterstone, did you go back and look at the list of loans closed at Waterstone that was produced in discovery in the fall?
A. Yes. But I didn't think it was an all-inclusive list, to be honest with you.
Q. Did you compare that list to the list of loans in the pipeline at Mutual of Omaha?
A. Well, they wouldn't be in the pipeline.
Q. Did you use that list produced by Waterstone back in the fall and try to analyze which of those loans closed at Waterstone you believe should've been closed at Mutual?

MS. WALTER: Object to the extent it implicates attorney work product. He's here as -- he's --
MS. KREITER: He's --
MS. WALTER: He's not the attorney.
MS. KREITER: He's not here as an individual. He's here as a corp rep.
MS. WALTER: I did not say individual. I said he is not the attorney in the case.
MS. KREITER: I'm entitled to ask what documents and what preparation this witness did to testify about damages for which ten months into the case Mutual has not disclosed any number, so that's the line of my questions.
Q. Do you have a number, Mr. Gennarelli, with respect to this first bucket, the loans that have transferred to Waterstone from Mutual of Omaha? Have you looked at the loans, and do you have a number that you're ready to present at the deposition today with respect to Bucket 1?
A. I don't have a number with respect to Bucket 1.
Q. Is Mutual seeking damages with respect to Bucket 1?
A. I believe so.
Q. But you're not able to tell me what those damages are?

A. Not at this moment.
Q. Has you or anyone at Mutual made an attempt to calculate those damages?
A. I have not.
Q. Has anybody at Mutual?
A. Not that I'm aware of.
Q. And your position is that you're waiting to do more discovery?
MS. WALTER: Object to form.
A. It is.
Q. What more discovery do you need to do?
MS. WALTER: Object to form.
A. Well, I'd like to see the personal e-mails where all of our data was sent to. That's what I'd really like to know so that I can understand the absolute damage caused by this unbelievable breach of conduct.
Q. Did Mutual of Omaha Mortgage send subpoenas to any of the individuals who have those e-mails?
MS. WALTER: Object to the extent it implicates attorney work product.
MS. KREITER: Work product --
MS. WALTER: Mr. Gennarelli isn't going to be able to answer how discovery is being conducted in the case. That's my job.
MS. KREITER: The fact that subpoenas have gone

out is not a privileged question.
MS. WALTER: I didn't -- I said it implicates attorney work product. I didn't say it was privileged. I'm not instructing him not to answer.
Q. Do you have an understanding --
A. I'm not aware of the subpoenas or not. I don't know.
Q. So you don't know whether Mutual has made an effort to, for example, subpoena the personal e-mails of any of the individuals that you claim are necessary?
A. I am not aware.
Q. When you were preparing to testify for the deposition, did you have discussions or requests, access to the e-mails that you believe are necessary to calculate Category 1 damages?
MS. WALTER: Object to the extent it implicates attorney work product or goes to attorney-client discussions.
Q. Go ahead.
A. Repeat the question.
Q. Sure. I hear you testifying that Mutual is unable to calculate damages with respect to Category 1, which we've defined as the loans that have closed at Waterstone due to some unlawful conduct. And I'm trying to understand your testimony.

I've heard you say that calculation hasn't been done because you haven't seen personal e-mails, and I've heard you testify that you don't know whether there have been any subpoenas issued by Mutual in an effort to try to get the e-mails. So now my question is in connection with preparing for this deposition --
A. Yes.
Q. -- did you make any efforts at that point in time to seek out the e-mails that you believe are necessary to testify on the topic noticed?
MS. WALTER: Object to form.
A. I didn't -- I did not.
MS. WALTER: Can we take a ten-minute break?
MS. KREITER: Sure.
(A recess was taken.)
MS. KREITER: Can you just read back the last question and last answer, please?
(The previous question and answer was read by the reporter.)
Q. (By Ms. Kreiter) So there may be times during this deposition when I say "you." You're testifying on behalf of Mutual. If I say "you" during this deposition, just understand that I mean Mutual collectively as a company; correct or understood?
A. Yes.

Q. Would it surprise you if a comparison of the loans that had closed at Waterstone compared to the loans that were in the pipeline of Mutual had been done and that the damages resulting from that analysis was less than $50,000?
MS. WALTER: Object to form.
A. In the three-month period, is that what you're referencing, that --
Q. In that interim period of time.
A. Yes, then it would surprise me and --
Q. What do you think the lost profits are? Are you able to give a ballpark?
A. For Bucket 1?
Q. For Bucket 1.
MS. WALTER: Object to form.
A. This is something the attorneys worked on, to be perfectly frank, you know. And I know, you know, it would not surprise me -- if it was just for a three-month period, it would not surprise me.
Q. If it's less than $50,000?
A. For a three-month --
MS. WALTER: Object --
A. -- period.
Q. Correct. What about for an 18-month period? Do you have any sense as to what that number is?

MS. WALTER: Object to form.
A. On Bucket 1 only?
Q. Bucket 1 only.
A. No, I wouldn't know whether it was for 18 months.
Q. When you say this is something that the attorneys worked on, what do you mean?
MS. WALTER: Object to form.
A. Well --
MS. KREITER: What's the objection?
MS. WALTER: The objection is if it calls for a discussion with counsel, it's privileged.
MS. KREITER: My question was what are the damages sought? And the witness testified it's something the attorneys worked out.
Q. Is that a correct statement of your position? You believe that the damages sought are something the attorneys worked out with respect to Bucket 1?
A. Yes.
Q. What do you mean by that?
MS. WALTER: Object to form.
A. I don't know. I don't know what else I can mean by that.
Q. Regardless, on behalf of Mutual, you're not prepared to testify today as to any particular number sought with respect to Bucket 1; correct?

A. Not for -- not for Bucket 1.
Q. I'm going to go back to my original question. Bucket 1 talks about lost revenue and profits. I understand you have a personal view that it should be lost revenue on behalf of Mutual today at the deposition on this topic. Which is it, revenue or profits?
MS. WALTER: Object to form.
A. I'm happy to talk to either one if you'd like. So, you know, again, it's -- generally, it's -- it would be gross profits, not net profits, you know, on cost of goods sold.
Q. So I'm just trying to pin down at this deposition what is sought by Mutual in the case. The bullet on the bottom of page 5 reads "Lost revenue and profits." Is it Mutual's contention that it's entitled to both lost revenue and lost profits with respect to Bucket 1?
A. Yes.
Q. Explain that.
A. I just did. There's -- there's gross revenue. That's, you know, cost of goods sold, and there's the profit.
Q. Okay. And your position is that Mutual should collect both the revenue and the profits?
A. Yes.
Q. Okay. Let's play this out so I understand. With

respect to a loan that closed, say the revenue -- and I'm just using hypothetical numbers. The revenue coming in to Mutual from that loan is a hundred grand. What would be the profits approximately? Strike that.
Let me ask it a different -- assume the profits -- when you take out all the costs, assume the profits are $20,000. Is it your position that Mutual is seeking both the hundred-thousand-dollar revenue and the $20,000 profits for a total of 120-?
A. Well, if you sell -- if you sell a loan for a hundred thousand dollars, the revenue isn't a hundred thousand dollars; right? It is -- the revenue of a hundred-thousand-dollar loan, generally speaking, at these branches is going to be about $4,200 after commissions.
Q. I'm concerned about double-dipping. Does that make sense to you? And I'm trying to understand, are you counting twice? So for example, are you counting a hundred thousand dollars as the revenue and then also seeking 20,000 --
A. I said a hundred thousand dollars, not the revenue. You said that was the loan amount.
Q. No. Wait a minute. So sorry. Let's start again. Assume revenue from a loan -- I just picked that number. I can pick a smaller number if that's --
A. We're only seeking -- we're only seeking the

and 2. And I want to understand from this witness what was factored in for purposes of the damage analysis.

Q. You're telling me that you're looking at loans that transferred to Waterstone, and I'm trying to understand does Mutual have any evidence with respect to any of the loans on which it's claiming that confidential information was transferred and was put to use by Waterstone, for how many loans fall into that category, if you can say?

MS. WALTER: Before he responds, I'm going to object because I waited and I let you say your piece. And I am, again, going to preserve my objection for Topics 9 through 13. I am not instructing him not to speak, but I am entitled to put that objection on the record.

Go ahead, Jeff.

A. I mean, you're asking a -- we don't know the inner workings of Waterstone, so how can we answer that question? How do we -- how could we ever know? I mean, it's an impossibility. There's no way we can know what happens at Waterstone. We don't know what goes on, what information was used or was not used. So what you're asking is impossible for me to answer.

Q. Well, we're ten months into the case. There's discovery that's available. So do you think --

A. You can't discover someone's conversation. We





can't discover -- so someone is going to say, "Oh, we disregarded that loan application that came out, and we took a new loan application." Okay. It's -- listen, you're going to say something, but let me finish. I'm happy to go on the stand in front of a jury or whatever and say the same exact thing because in my experience of over 20 years, that information was used. That loan would've never got to Waterstone. How else would the loan have gotten to Waterstone?

Q. For how many --

A. Can you answer me how that loan got to Waterstone?

Q. No. And how it works at the deposition is I ask you the questions. You can answer if you can.

A. I know, but I --

Q. For how many borrowers does Mutual have evidence that information was taken and put to use by Waterstone?

MS. WALTER: Objection. Asked and answered.

A. Every borrower was part of information that was sent in one way or another. I mean, there's huge databases that were sent.

Q. What evidence does Mutual have that Waterstone took advantage of huge databases of data?

MS. WALTER: Object to form.

MS. KREITER: What's the objection?





MS. WALTER: What do you mean by "huge databases"? Where is that from?

MS. KREITER: From the witness's testimony just now.

A. Yeah, I said we had sent. I didn't say they received.

MS. WALTER: What's the question? Ask the question.

A. They had sent databases --

MS. KREITER: Read the question back, please.

(The previous question was read by the reporter.)

A. Yes, I don't have any evidence of that right now.

Q. Let's talk for a moment about the category that we haven't talked about, ill-gotten gains.

A. Okay.

Q. If you would turn in Exhibit 4, please, to page 28, there's a bullet that reads "Ill-gotten gains, including compensation paid or advanced by defendant," meaning Waterstone, "to plaintiff's prior employees in exchange for the unlawful conduct that has caused the closure of two of plaintiff's branches." Do you see that?

A. I do.

Q. I want to focus on the start of it. It says "Ill-gotten gains, including compensation paid or advanced by Waterstone," so this is money that Waterstone is paying





out to the employees; correct?

A. Yes.

Q. It's not money that Waterstone is enjoined. It's a cost to Waterstone; correct?

A. Correct.

Q. In what sense is money paid out by Waterstone a gain to Waterstone, ill-gotten or otherwise?

A. I think the folks that that money -- got is part of the -- is part of the --

Q. Sure. The employees gained the money, not Waterstone; right?

A. Yeah.

Q. Mutual claims that these ill-gotten gains to Waterstone that actually went to the employees and not Waterstone consists of $500,000 that Waterstone paid to Chris Smith and 250,000 that Waterstone paid to Dwayne Hutto for a total of $750,000; correct?

A. Yes.

Q. Is Mutual seeking $750,000 from Waterstone that it paid to third parties?

A. I -- I believe what -- what the premise is, at least my understanding is, that's the value that Waterstone placed on these two people, and so that's the -- you know, that -- that's how they came up with that number.

MS. KREITER: Can you read my question back,

MS. WALTER: He is not a lawyer. How is he supposed to know?

MS. KREITER: I asked him is there anything unlawful? I'm going off of the written responses of Mutual. I don't know why you put this, but you did, and I'm following up on the position of Mutual. I'm allowed to follow up on your written responses. This alleges unlawful conduct.

Q. I'm asking is there anything unlawful about Waterstone recruiting Dwayne Hutto?

A. I would said that recruiting Dwayne Hutto, had they just recruited Dwayne Hutto as a loan officer and he didn't move customers and he didn't move employees, that's fine. But that wasn't enough for Waterstone; right? I mean, they wanted the whole group --

Q. Is there anything unlawful about Waterstone recruiting Chris Wolf?

A. Again, same answer. If it's one person and they're not encouraged to violate their nonsolicit, then there's nothing wrong with that, but that's not what happened.

Q. Was -- is there anything unlawful about Waterstone recruiting Chris Smith?

A. Same answer. If it was just Chris Smith and you say you want to take this job as RVP or whatever the case is

and you build your branch up from scratch, fantastic, but that's not what they wanted to do. It's certainly not what you pay $500,000 for.

Q. What evidence do you have that Waterstone encouraged Dwayne Hutto to solicit -- I'm going to call them the downstream employees just for convenience --

A. Yeah.

Q. -- but the employees at the Daytona branch. What evidence do you have that Waterstone encouraged Dwayne Hutto to solicit those employees?

A. Well, there's e-mails that go back and forth setting up calls with Dwayne and Chris and "You call Chris now. We'll get Chris on the phone. That's great news." There's -- there's a decent amount of e-mails that show that this was a really -- a planned coup, so to speak. I mean, there's a decent amount of -- and then there's also -- you know, again, there's $250,000 that says that that would probably be the case.

Q. If Waterstone had simply recruited the managers, Chris Wolf, Chris Smith, and Dwayne Hutto, would that be unlawful?

A. And -- and had them stick to their restrictive covenants, meaning not recruit their folks and not --

Q. Sure.

A. I would say that that would be okay. You have

every right to -- people can work where they want. What you can't do is you can't encourage them to violate their nonsolicits.

Q. Do you have any evidence on behalf of Mutual that Dwayne Hutto solicited any of the downstream employees?

A. Yes.

Q. What is the evidence?

A. E-mails.

Q. In which Dwayne Hutto says "Come to Waterstone with me" or something that is --

A. Well --

Q. -- with regard to solicitation in Mutual's perspective?

A. I -- I would say yes. Yeah.

Q. What are those?

A. I can't recite the 800 e-mails, but we're sitting here because those e-mails exist. My time is extremely valuable, as is yours, as is everyone else's. And if those e-mails didn't exist, we'd just be on our way, but those e-mails do exist.

Q. Do you -- let me ask it this way: Do you think that it's unlawful for Dwayne Hutto to make an announcement to the downstream employees to the effect of "Wanted to give you a heads-up. I'm leaving and going to Waterstone"? If he says just that, is that unlawful?

A. I would say if he does it while he's employed here via his -- yes, it's unlawful. Yes, he should not be making announcements on to his future employment while he's employed with Mutual.

Q. Is that solicitation in your mind, or is it just unlawful because he's still employed?

A. No, it's --

MS. WALTER: Object to form.

A. Okay.

MS. WALTER: Go ahead.

A. In my mind, it's solicitation; right? It is.

Q. Is it your position that Dwayne Hutto is supposed to give his resignation and then never breathe a word of it to any of the employees?

MS. WALTER: Object to form.

A. That's not what I said.

Q. I'm asking, I mean, is that what you contend Dwayne Hutto should've done to avoid solicitation?

MS. WALTER: Object to form.

A. Yes, that's what he should've done to avoid solicitation. That's exactly what he should've done.

Q. Mutual's position is that an employee, who is a branch manager, who has worked with employees for maybe a decade, is prohibited from letting them know that he's resigning?

A. Yeah. We have a very large Mutual of Omaha financial planning office in Tampa, very large, that we use space in that as well.
Q. How many of the employees did Mutual make efforts to try to keep?
A. You know, I would think that Brian and Kiley probably reached out to the majority of them.
Q. And none of them were interested?
A. Apparently not.
Q. There were -- you understand that there's certain employees that didn't go over to Waterstone --
A. I do.
Q. -- for whatever reason?
A. Yes.
Q. Did Mutual attempt to make a branch of those employees?
A. Yes, or had conversations, I believe. And I believe they weren't very large -- very good producers, so maybe the effort wasn't that great. But again, this was not -- I was not involved in it, so...
Q. Okay. So let's talk about what it means to lose the branch, then. I mean, the lease, I mean, is that part of what you consider the branch?
A. No.
Q. No. Is the branch really the people?

A. The branch is the people and the production that go along with those people, yeah.
Q. With respect to the employees that didn't go over to Waterstone and didn't find a home at Mutual for whatever reason or employees that decided, "Look, I'm going to go to a third party. I don't want to go Mutual. I don't want to go to Waterstone" --
A. Sure.
Q. -- those people are part of the branch; correct?
A. Yes.
Q. And those people didn't go over to Waterstone. Are you -- for purposes of Category 2 damages, are you counting the production of those people?
A. I don't believe so.
Q. How did you go about excluding them from the damages analysis?
A. I don't think there's much production that they had.
Q. There's an individual that went to -- I think his name is Jake. Apologies. I don't know his last name. Do you know who I'm referring to?
A. I don't.
Q. You don't. Okay. If there was a producing loan officer that decided not to go to Waterstone and instead went to a different financial institution and that was a

producing loan officer, you would agree that that loan officer should have his or her production carved out of the damages in Bucket 2; correct?
MS. WALTER: Object to form.
A. Not necessarily. I think what you're saying is that the spread is generally -- when you're trying to estimate the -- moving forward, this branch generally produces this amount of loans a month. So a loan officer may come. A loan officer may go generally. But in general, this is their production in the course of, you know, several years, and that was the average we used.
Q. How many employees decided not to work for Waterstone or Mutual and instead find some other job?
MS. WALTER: Object to form.
A. And I really don't know who was offered a job from Waterstone or who wasn't.
Q. What about Mutual? I mean, do you know who was offered a job by Mutual?
A. Not off the top of my head, no.
Q. For the employees that decide, "I don't want to go to Waterstone," you know, can't come to Mutual, or it's not working out, you know, or go to some other employer, is their departure attributable to some unlawful conduct by Waterstone?
MS. WALTER: Object to form.

A. Well, I think when there's a chaos at a branch when people are leaving and everyone is talking about, you know, what's wrong here so that they can get their money to leave and go somewhere else, that causes certainly disruption and could cause people to -- to leave; right?
Q. You testified earlier that there would be nothing wrongful about Waterstone recruiting Mr. Hutto; correct?
A. Right.
Q. Mr. Hutto was a producing loan officer?
A. Correct.
Q. Did you carve Mr. Hutto's production out of the damages that you're seeking in Bucket 2?
A. No.
Q. Why not? What was wrongful about Waterstone soliciting Mr. Hutto?
A. They didn't solicit Mr. Hutto. They solicited the group.
Q. But you're counting his production, and you're saying that his departure was caused by unlawful conduct by Waterstone, and you also said Waterstone is permitted to recruit Mr. Hutto?
A. Yeah. You said without using these -- I didn't say Waterstone was allowed to take Mr. Hutto to Costa Rica, the underwriting manager. I also didn't say they were allowed to look at loans ahead of time, take information

while Mr. Hutto is still an employee. So let's not act like Waterstone here -- Bank of America, if they wanted to recruit Dwayne Hutto, absolutely we should take that money out, but that's not what happened. What happened was different than how you're painting the picture.

Q. So is it -- I'm trying to understand here why you are counting Mr. Hutto in the damages analysis.

A. Right.

Q. And is it -- and you're saying that Waterstone could solicit him and could recruit him if it wanted to do that?

A. If they did it in an aboveboard way, but that's not what happened. So you can't have your cake and eat it too. You can't take the context of what really happened out of the equation. That doesn't work.

Q. Are you aware that Mr. Hutto and Mr. Smith were looking to leave Mutual and go somewhere else? It just happened to be Waterstone?

A. I was not aware of that. I mean, I think after Dwayne left, we were aware that Chris was probably going to depart. I know that Brian brought up the fact that they were always -- you know, they were pretty -- they talked a lot to Brian, and there was a comment/conversation with them that this place had this, but they didn't leave ever, so...

Q. There were conversations between Mr. Hutto and

Mr. Wolf with Kiley King and Brian Tomalak about --

A. I think. I mean, they were always trying to finagle for a little bit of a better deal here and there but never -- they never left obviously until -- until this, until Waterstone got involved.

Q. Did Mutual ever have a discussion with Mr. Hutto about why he resigned?

A. Brian and Kiley did.

Q. What was the reason?

A. I think you better ask them because it was a conversation, so third party. I think a lot had to do with a check being written, from my recollection.

Q. Same question for Mr. Smith and Mr. Wolf. Was there ever a conversation between Mutual and those managers, Mr. Smith and Mr. Wolf --

A. Yes.

Q. -- about why they were leaving?

A. Yes.

Q. Why were they leaving?

A. Well, Chris told Brian it was because of the check and it was too good of a check to pass up.

Q. Which Chris?

A. Smith.

Q. Do you believe that the managers were genuinely unhappy at Mutual of Omaha?

MS. WALTER: Object to form.

A. No, I don't believe that.

Q. Did Mutual factor in the cause of the managers' departure when it was considering the damages?

MS. WALTER: Object to form.

A. Yes, I believe so. I mean, the cause that -- yeah, that they left because of -- yeah, were coerced to leave and take their branches. Yes, that's why we're here. If there was no cause, we wouldn't be here; right?

Q. Did you -- but in your mind, is it, look, we're convinced these managers left because of the payday, or does Mutual believe that there's other considerations?

MS. WALTER: Object to form.

A. Well, I think there's other considerations as well.

Q. If Mr. Hutto and Mr. Wolf had resigned but none of the other branch employees resigned, who would Mutual have put in place as the branch manager?

MS. WALTER: Object to form.

A. I think Kiley King.

Q. Kiley King?

A. Yeah.

Q. Does Mutual have evidence that the employees would've stayed and worked for Kiley King?

MS. WALTER: Object to form.

A. No, no evidence.

THE WITNESS: I could use a bio break whenever is convenient --

MS. KREITER: It's a convenient time for me too. Why don't we -- do we want to put a lunch order in now? Take a short break.

MS. WALTER: I'm fine with that.

MR. CARROLL: Yeah.

MS. KREITER: Okay.

(A recess was taken.)

Q. (By Ms. Kreiter) Mr. Gennarelli, are you aware of any complaints or frustrations by the downstream employees about Mutual's underwriting requirement's ability to efficiently close loans, limited loan products, or compensation?

A. Not directly. I did see an e-mail, I think, that -- in this where they talked about an underwriting situation and actually was -- he was confused. It was actually overturned by the chief operating officer. Then he went ahead and told the customer that we couldn't do it at Mutual and should send it to Waterstone, but that is one that I did see.

Q. Did any of those issues come up in the exit interviews that Mutual conducted when the downstream employees left?

A. Not that I'm aware of. And we don't have any overlays -- we have no overlays to agency guidelines. So our underwriting would be the same as anywhere else. So this, again -- who knows if this is manufactured or what -- what the claim is, but we have no overlays to agency guidelines.

Q. Regardless of whether it was in conjunction with an exit interview or an informal discussion, I mean, is it Mutual's position that none of the downstream employees left because of frustration with the underwriting department and an inability to effectively close loans, limited loan products, or compensation?

MS. WALTER: Object to form.

A. Not to my knowledge. And, you know, we run a pretty successfully large mortgage company, close loans all the time.

Q. Given your time in the industry, are you aware of other instances where a branch of employees moved together?

A. You mean to us or just in general?

Q. In general in the industry. I mean, is it common in the industry for branches to move together?

A. I think, generally speaking, it's not necessarily uncommon. It's just not done this way. Generally, there's some compensation paid to the company that they're leaving, et cetera, et cetera. Things are aboveboard. It certainly

is not done this way.

Q. You mentioned that about six months ago Mutual recruited a branch back?

A. Yes.

Q. Did the entire branch come to Mutual in that instance?

A. I think a decent amount came back, yes.

Q. Okay. And do you believe that there was solicitation involved?

MS. WALTER: Object to form.

A. Well, we -- we actually spoke to the company that they were at and let them know that these folks were entertaining coming back and would this be a problem? And they said no. So we were very up-front, and we've done this several times, just up front with the company that -- that is -- that is --

Q. How did you know that most of the employees wanted to come? I mean, it sounds like you approached the employer and said, "Look, most of your employees want to come." I mean, how did you discern that?

A. Well, they worked for us previously.

Q. Right.

A. Yeah.

Q. Right. And then they didn't, and they went somewhere else?

A. Yeah.

Q. And then you had knowledge that the group, not just one individual, wanted to come back. How did you have that knowledge? Were there conversations with the different downstream employees in that instance?

MS. WALTER: Object to form.

Go ahead.

A. I believe that there were conversations had by managers at -- the Tampa relationships with -- already at our company, yeah.

Q. Okay. But there was knowledge while the employees were still working for the other employer that the group wanted to move to Mutual; correct?

A. Correct.

Q. Did the employees that we're talking about here -- I've called them the downstream employees. They're the employees of the three branches or the two branches, the Paramus, New Jersey; Tampa; and Daytona. Did those employees follow the managers, Dwayne, Chris, and Chris, when those managers joined Mutual?

MS. WALTER: Object to form.

A. I would say not all of them. The branches grew since they were here.

Q. Were there some of the employees that followed the branch managers?

A. I would say probably, yes.

Q. The employees following the managers to Mutual, did that involve solicitation?

MS. WALTER: Object to form.

A. I believe that -- I'm not -- I'm not sure, but I would say that we certainly didn't take any loans ahead of time. We certainly didn't solicit -- we certainly didn't encourage anyone to violate their restrictive covenants on their agreements. That's, I think, a little different. I know I didn't take anybody to Costa Rica to encourage them to come over. I do know that, nor do I know we've never written checks like this to entice someone to come over.

Q. I guess, so my question was not about soliciting borrowers. It was strictly about solicitation of employees.

A. That's what I'm talking about, so that's all I'm talking about, yeah.

Q. So in that instance, when the downstream employees followed Chris Smith, Chris Wolf, and Dwayne Hutto to Mutual in a group, is it Mutual's position that that didn't involve any kind of solicitation of the employees?

MS. WALTER: Object to form.

A. Yeah, I think it's Mutual's assertion that they weren't violating restrictive covenants in their current agreements. That's the difference here.

Q. Okay.

A. We're saying that they violated restrictive covenants in their agreement with Mutual. We're saying in the past that they didn't have those restrictive covenants that were -- that were -- that needed to be violated in order to move them over.

Q. Okay. So there were no restrictive covenants in place binding upon the employees when they followed the managers to Mutual; correct?

A. As far as I know, correct.

Q. It's -- I mean, it sounds like in the industry there's some employees that are subject to restrictive covenants and some that are not. It's not uniform that in this industry everybody has a restrictive covenant; correct?

A. Yes, I think that that probably is correct.

Q. Do you know whether the downstream employees followed Mr. Smith, Mr. Hutto, and Mr. Wolf to BBMC?

A. Some did. I mean, that's where the relationship started, so some did.

Q. At BBMC?

A. Yes.

Q. When was the acquisition of BBMC by Mutual? 2018?

A. I believe December 2018 to the end of December -- I think that generally everyone was over in January of 2019.

Q. So there are some downstream employees that

followed the managers to BBMC and then through the acquisition and then followed the managers again to Waterstone; correct?

A. Yeah, there was an acquisition. Everyone was -- you know, Bridgeview Bank was the owner of BBMC, was paid for those people to leave and -- and go.

Q. Sure. But it was a new employer, and there were new employment agreements put in place --

A. Yes.

Q. -- at the time of Mutual --

A. But there was no violating of any restrictive covenants because the -- the original company was aware of the -- that there was an acquisition and they agreed to allow those employees to leave and --

Q. But my question isn't necessarily about solicitation here. I just want to establish how many times have these employees followed the managers? And I'm hearing that there was one instance when employees followed the managers to BBMC. Then the downstream employees stuck with the managers through the transition when BBMC was acquired. And now these same employees are following the managers again to Waterstone; correct?

A. Well, I think some employees, yes.

Q. Do you have a sense as to how many of the employees followed the branch managers through those three

transitions?

A. I don't.

Q. Has Mutual experienced other instances of a branch manager leaving but the branch employees stay at Mutual?

A. Yes.

Q. How many times in your tenure at Mutual has that happened where the branch manager leaves but the branch remains?

A. Yeah, we really don't have a lot of branches that leave, to be perfectly frank, but I can think of -- I can think of three or four cases that that did happen.

Q. Forget about your time at Mutual as a limitation. Over the course of your entire career in the industry, how many times has it been where the branch manager leaves but the downstream employees stay?

A. I think in my career, generally speaking, we don't have this big problem with branches leaving. So I don't have a wide breadth of this experience, but I would say that at Bridgeview and BBMC, I don't know if we -- if we lost one branch. We're talking about branches that we don't want to lose -- right? -- I mean, not branches that we may part company with for --

Q. Right.

A. -- production reason; right? You know, so that's

a -- that's a different story, but there are definitely several -- several times where we lost a branch manager and we retained the folks, more than several probably in my experience.

Q. How about when Mutual recruits a branch manager? Is it more common for the branch manager to come alone or for downstream employees to come with?

A. I would say generally it's more common in our -- in our world where they come alone or with one or two other, like, co-managers perhaps and then build a branch. We don't -- we don't have, like, these -- you know, we did an acquisition, Keller Williams. That's different; right? We -- we acquired the -- the assets of the company. It's different.

Q. Is it more common in the industry, would you say, for entire branches to move or a single branch manager to move and start anew?

A. I'd say it's probably equal.

Q. Are there any instances in which Mutual loses an entire branch but does not believe that there was any kind of unlawful activity and instead believes the departures were just a function of what I'll call natural attrition? I'll define natural attrition for purposes of this deposition as resignations that an employer really should expect naturally when branch leaders resign but there's no

wrongdoing. Do you understand that definition?
A. Yes.
Q. So just in the ordinary course, people are going to follow for whatever reason; correct?
A. Yes.
Q. Are there instances in which Mutual has lost an entire branch and didn't think that there was any wrongdoing but rather just thought this is natural attrition?
A. Yes.
Q. How many times has that happened?
A. Well, the one I'm thinking about is the group that came back, that branch in particular. I didn't know -- I'm not -- I don't know how many times, but that branch in particular, they were very up-front about it, left all their loans here. There weren't -- you know, left on a good note.
Q. And that does happen, entire branches move as a result of natural attrition as opposed to any kind of wrongdoing. It's not the only time in this industry, the one that you're mentioning?
A. True. That's right.
Q. Does Mutual have any internal data about the rate of natural attrition that is typically experienced when there's a branch leader resignation?
A. I don't know. We can probably get you that, but I don't have it off the top of my head. Certainly, I can

tell you just personally we really don't have this attrition problem. Like, generally speaking, people don't leave.
Q. When Mutual was preparing the damages analysis in this case, did you or anyone else at Mutual look for any kind of industry guidance on natural attrition rates in conjunction with your analysis?
A. Yeah, I think that we discussed our attrition rate but not industry attrition because it's two separate things. People -- people -- what the industry does is not really relevant to what -- how we perform necessarily.
Q. You said you discussed Mutual's natural attrition rate?
A. Yeah. It's -- I mean, it's very, very slim, if you talk about a productive individual leaving the company.
Q. Did you factor in natural attrition with respect to the analysis applicable here?
MS. WALTER: Object to form.
A. No.
Q. I want to move from natural attrition kind of on an industrial level to natural attrition that would be specific to the relationships that we're talking about here. Is it Mutual's contention that every single one of the employees who left, left due to some kind of wrongdoing by Waterstone and that none of the employees left because of natural attrition?

A. I think our assertion is that by causing these leaders to encourage them to violate their nonsolicits, it caused everyone to leave, yes.
Q. Okay. So to be clear, Mutual's position is that none of the employees left due to natural attrition?
A. It's -- yes, that's our assertion, I believe.
Q. You do agree things like personal friendships, how long the employees have worked together, whether the employees have transferred firms together in the past, and other considerations would be relevant to whether natural attrition should be expected as between managers and downstream employees; correct?
MS. WALTER: Object to the form.
A. Yeah, I think we talked about that. You know, I think, you know, when you encourage the managers to solicit the folks that work for them, this is what happens, so...
Q. So not my question. My question was just, you know, do you agree with the concept that things like personal friendships, how long employees have worked together, whether the employees have transferred in the past, other considerations similar to that would be relevant to whether natural attrition should be expected?
MS. WALTER: Same objection.
A. I guess I'm just -- this natural attrition is something that is new to me. I've never heard this phrase.

I don't know. I'd have to think about it. I'm not sure.
Q. So the definition that I assigned to it -- and let me know if this doesn't resonate with you, but it's attrition of employees that should be expected by an employer regardless of -- or not regardless, but without any kind of wrongdoing, so just people leaving in the natural course and following a manager. That's what I'm saying natural attrition is. Attrition that doesn't involve any kind of wrongdoing. So do you understand that definition?
A. I do.
Q. Okay. So then my question is now -- I mean, there's considerations that are relevant to natural attrition. I want to understand do you agree with that or not?
A. Sure.
Q. Things like how long have you known the person, friendships, does make it more likely that there's going to be natural attrition?
A. So my problem is I can't take it out of context. That's my whole problem. If you're talking generically, that's perhaps true, but I can't take it out of context, what occurred here, which is entirely different.
Q. Let me ask it this way: I mean, assume, for example, that Chris Wolf makes an announcement to the employees, "I'm leaving, and I'm joining Waterstone," and

then doesn't say a peep. He packs up his stuff and leaves. And the employees initiate contact to Mr. Smith and say, "Where are you going? I'm coming with you. I'm going to follow you to the ends of the earth"?

A. Let me answer this way: What if he said, "The underwriting is so strict here. We can't get anything done," or, "We can't get certain things done. The underwriting there is going to be much better"? What if he said that? I would say that that's more in line with what happened.

Q. So that's where, I think, we're talking about a difference of making a pure announcement and something that is solicitation?

A. Right.

Q. Do you have any evidence on behalf of Mutual that Mr. Smith, Mr. Hutto, or Mr. Wolf --

A. Yeah.

Q. -- made solicitation comments --

A. Yes.

Q. -- versus an announcement?

A. Yes.

MS. WALTER: Object to form.

Q. What is that evidence?

A. Well, there's e-mails, and there's conversations that you can see e-mails saying "I'm very excited to leave.

There seems like there's great, you know -- much better underwriting with" -- whatever the case was. There's a lot of e-mails where folks other than those three individuals are talking about what they learned from having conversations with one of those three individuals.

Q. The downstream employees are saying "I'm excited about the opportunities at Waterstone and the products, their pricing," whatever it is?

A. Right, right.

Q. And so your assumption is, well, the managers must've informed them about those things?

A. Well, I think in one case they actually -- they actually cite the fact that -- I think they said "Chris was on the Teams call, our Teams call, and told us about the -- you know, the products at Waterstone. It's very exciting." That was, I think, the e-mail.

Q. Do you know with respect to that Teams meeting that you're talking about, the attendees, are those people who had already said, "Take me with you," or are those people that were undecided?

MS. WALTER: Object to form.

A. I think -- I'm sorry. I think in the same e-mail it stated this was exciting news, like, meaning they didn't -- at least how I understood the e-mail, reading, this was -- that this was the first they were hearing of it and they

were excited about it. That's how I took the e-mail to mean.

Q. But does Mutual -- I mean, you're looking at e-mails, and you're making assumptions. Do you have any evidence gathered in the case about what Mr. Smith, Mr. Hutto, or Mr. Wolf said to the employees?

MS. WALTER: Object to form.

A. I mean, the e-mails aren't evidence? So other evidence, are you saying?

Q. Sorry.

A. Yeah.

Q. I heard you say that there are e-mails coming from the downstream employees. I'm now focused on what evidence does Mutual --

A. But they --

Q. -- have as to what was said by the managers?

A. One e-mail I'm referencing, it definitely said that Chris was on the call with the Teams, Chris Wolf, and let them know what was happening, and they're very excited about it. So that would be -- Chris was an employee at the time, and it was a Teams call that was on our system.

So yeah, I don't know -- again, we can go through all of the e-mails. And I'm sure if it gets to trial, we're going to do that. But, you know, where there's smoke, there's fire. I'll put it out there.

Q. Did you have a conversation with Ms. King or Mr. Tomalak about the natural attrition they would expect with respect to the downstream employees at the branches?

MS. WALTER: Object to form.

A. I think it's -- Kiley is a male, so --

Q. Oh, I apologize. Thank you for saying that.

A. That's okay.

Q. Okay. So I guess Mr. King and Mr. Tomalak, the question was did you have a discussion with either of them about the natural attrition they would expect with respect to the downstream employees?

A. I don't think we had that discussion, no.

Q. I think you testified earlier it was Mr. King and Mr. Tomalak that knew the relationships best; correct?

A. Yeah.

Q. Did you talk to anyone else at Mutual in conjunction with the damages analysis about natural attrition and what could be expected given the relationship to these individuals?

A. No.

Q. Let's talk about the Paramus branch. My understanding -- and I don't want to just assume it. I want you to confirm, but the Paramus, New Jersey, branch reports up to Chris Smith in Florida; is that correct?

A. Yeah.

Q. Did Paramus report to Chris Smith prior to Mutual's acquisition of BBMC?
A. Well, they came much later. I don't -- I don't -- I really don't know. They came after Chris was established here at Mutual. I don't -- I don't -- I really don't know.
Q. Do you know how it came to be that a branch in New Jersey is reporting --
A. Well, I think they --
Q. -- to a branch in Florida?
A. You know, again, I think they all worked at the same company. Brian, Kiley, Chris, they worked for The Money Store. They all worked for the same company, Brian Tomalak, Kiley King, Chris, and the group in New Jersey, at least one of them. They all worked in -- I believe at a -- I think it is The Money Store, something --
Q. And they all moved together to BBMC?
A. No, they didn't move together. They went at separate times. Chris came -- I don't even know if he had many people that came with him when he came. But, you know, again, I didn't go back to the BBMC days, you know.
Q. Sure. Do you know whether Mr. Smith recruited the New Jersey branch to either BBMC or Mutual?
A. I don't know if it was Chris or if it was Brian or what the -- I really don't know.

Q. Was -- is Chris Smith originally from New Jersey?
A. I know he went to school in Connecticut, but -- in Yukon, but I don't know. Is he from New Jersey? I know Brian Tomalak lived in New Jersey for quite some time as well, so I don't really know.
Q. Do you know whether Mr. Smith moved from New Jersey to become the Tampa manager?
A. That's not my understanding. I thought he was already in Tampa, living in Tampa. I don't -- I don't know. I don't want to be wrong, but it's not my understanding.
Q. If you don't know, just let me know that.
A. It would surprise me. I thought his kids were here and going to school here and --
Q. Do you know how long the Paramus branch has been reporting up to Mr. Smith?
A. Since they -- since they arrived. I don't know how long that is, yeah.
Q. A couple of years at least?
A. A couple years, yeah.
Q. How many of the downstream employees were friends with the managers outside of work?
MS. WALTER: Object to form.
A. I really don't know.
Q. How many of the downstream employees worked with the managers more than five years?

A. Again, I don't know.
Q. How many of the employees worked with the managers more than ten years?
A. I don't know.
Q. How many of the employees have worked with these managers their entire career?
A. I don't know.
Q. Are any of the employees financially reliant on the managers for business generation purposes?
MS. WALTER: Object to form.
A. I'm not sure what that means. I mean, I don't -- explain what you mean by that.
Q. Sure. Let me ask it a different way. Do you consider Mr. Hutto a rainmaker?
MS. WALTER: Object to form.
A. I -- I don't know if I'd use the term "rainmaker." He certainly is a -- he develops -- yeah, I guess if you want to use that term, he's a business development guy, sure.
Q. Were there rankings of the different branches that Mutual had kept based on performance?
A. Like, by volume or --
Q. Yeah. I'm just trying to get a sense, you know, is -- was Mr. Hutton in the top five of the revenue generators from Mutual, or was he at the bottom of the list?

A. Top. He was a top --
Q. Top producer?
A. Top. One of the top, yeah. I mean, I don't know what number, but yeah.
Q. What about Mr. Wolf? Was he a top producer for Mutual?
A. It's the same branch; right? I mean, it's the same -- they co-managed it all together, so...
Q. So I'm trying to get --
A. But I think Chris was more in operations -- right? -- and I think where -- where Dwayne was more on the sales side.
Q. In generating loans?
A. I think generating relationships with perhaps Realtors and --
Q. Do you know, did Dwayne Hutto ever, you know, bring in a loan or a Realtor relationship, and rather than him closing the loan himself, pass it on to one of the downstream employees?
A. Possibly.
Q. So that's what I'm trying to understand. If, you know, Mr. Hutto is passing loans on and giving business and commission opportunities to the downstream employees and he leaves, to me that's a factor that would indicate natural attrition is more likely. Do you agree?

MS. WALTER: Object to form.
A. I'm not so sure that -- it's all the loans. So, I mean, yeah, if this person is getting all their business from Dwayne, possibly, yeah.
Q. They've got to have some money. And if Dwayne is the one that's filling their place and Dwayne leaves, do you think the natural attrition would be more likely?
MS. WALTER: Object to form.
A. I would say it would be more likely.
Q. Do you know whether the downstream employees had that type of relationship with Mr. Hutto where he was filling some of the -- some or all of their plate?
MS. WALTER: Object to form.
A. Well, the only -- the only way I can answer is I know that Dwayne was -- you know, always -- we called the top performers, you know, an executive club member. And I don't know many other people on the staff that were executive club members, so I don't know how much business he was passing along. I just don't -- I really don't know. I'm not familiar with it.
Q. Okay. But you would agree if you assume those set of facts where Mr. Hutto is not filling just his plate but some of the downstream employees, that could be a consideration that would make natural attrition more likely with respect to those employees?

A. I think -- I think it would be, but I also think it would be strange to pass along that much business. It would be strange, but...
Q. I now want to change from the topic of natural attrition as between the downstream employees and the managers and just talk about the managers themselves, the three managers. How long has Chris Smith known Dwayne Hutto?
A. I think a long -- I think a long time. I'm just going with Brian Tomalak because he -- they all worked together, I think. So I think Brian has known Dwayne a long time as well, so I don't know. I really don't know.
Q. Do you know whether Chris Smith views Mr. Hutto as a mentor?
MS. WALTER: Object to form.
A. I don't know that.
Q. Do you know whether Chris Smith and Dwayne Hutto are friends?
MS. WALTER: Object to form.
A. I don't know that.
Q. Do you know whether Chris Smith and Dwayne Hutto gather socially outside of work?
MS. WALTER: Object to form.
A. I really don't know that.
Q. Do you know if they vacation together?

A. I don't know that.
Q. How would you describe the relationship between Mr. Smith and Mr. Hutto?
A. I really don't have intimate knowledge about their relationship. I really don't.
Q. The people that would have more knowledge are Mr. King and Mr. Tomalak --
A. Sure.
Q. -- but you didn't talk to them in conjunction with the damages analysis; correct?
A. We did. We didn't talk about their personal relationship and their vacation habits. The only vacation I know of is Costa Rica. That's the only one that's really interesting to me.
Q. So you keep bringing up this Costa Rica trip.
A. Yeah.
Q. I want to just be clear how much you know about this trip. Who attended the trip?
A. I -- I just know that I just saw the e-mails. I don't know much about it --
Q. Okay.
A. -- other than an underwriting manager planned the trip.
Q. And you don't know the name of that underwriting manager?

A. I -- I mean, it's here somewhere.
Q. And the underwriting manager is the person on the Waterstone side?
A. Yes.
Q. Do you know who attended the trip?
MS. WALTER: Objection. Asked and answered.
A. Yeah, I know who that e-mail was directed to, and it was to Dwayne and his wife.
Q. So you know an underwriter planned it, but you don't know who any other Waterstone attendees were?
MS. WALTER: Objection. Asked and answered.
A. I know that the underwriting managers planned to go by the context of the -- of the e-mail.
Q. Okay. But you can't remember who that was?
MS. WALTER: Objection.
A. Come on.
Q. I'm just trying be clear.
A. Yeah.
Q. I don't -- I'm not trying to be difficult. I want to --
A. Yeah, you are being difficult, first of all. Second of all, I'm not the one who did anything wrong. Let's be perfectly clear.
Q. Okay. But you brought this up.
A. I'm getting frustrated because -- I did bring it

A. Not that I'm aware of. Not that I can remember.
Q. Do you remember when you first started putting pen to paper to create Exhibit 7?
A. I don't. I don't know that.
Q. Okay. Take a look at Exhibit 7, and I just want to get, you know, bearings here. It's a document entitled Summary of Corporate Earnings, Contribution from Tampa and Daytona Branches. Do you see that at the top?
A. Yes.
Q. And for purposes of this analysis, any damages associated with the Paramus branch are built into the Tampa branch; correct?
A. Correct.
Q. Let's just walk through each of the columns here starting with the column on the left, Year of Fundings. You've selected 2019 through 2022 year to date; correct?
A. Yes.
Q. Then the next column, Volumes of Loans Funded, so you're looking at the loan volume associated with each of the branches for the year?
A. Right.
Q. And then the next column is Corporate Profits Earned BPS. Do you see that?
A. Yes.
Q. What is BPS?

A. Basis points.
Q. How is -- for example, the first line item under that column is .530. Do you see that?
A. Yeah.
Q. How is that number calculated?
A. We took our -- the year of 2019. Okay? Our financials, Mutual of Omaha, and that was the return of profit was 53 basis points in 2019.
Q. Are you using data, you know, from a P&L and then dividing or what --
A. Financials. From the financials, yeah, P&Ls. Yeah.
Q. Okay. Can you tell me which financials --
A. Corporate --
Q. -- and P&Ls --
A. Corporate financials.
Q. So here's the thing: There were 25 P&Ls that were produced in the case. I'm trying to understand what the analysis was to understand the math. How do I know --
A. I think -- are you talking about branch P&Ls?
Q. I'm talking about branch P&Ls.
A. Well, branch P&Ls are really not so relevant. They're really designed for compensation.
Q. Okay.
A. But they don't capture a lot of expense and a lot

of income -- right? -- because there's income and expenses that occur past the branch. And so in order to do that, the only way to do -- there's two ways to do it. The one way -- and this is why most people use this way, because it's simpler. You simply take the cost of goods sold approach, which was -- which you would take the volume, times what you sold the loan for, less commissions.
Q. Sorry. Can you just go slower?
A. Yeah.
Q. Cost of goods sold, and then you're subtracting out what?
A. Commissions.
Q. Commissions.
A. Yeah.
Q. Subtracting out anything else?
A. No.
Q. So it's just cost of goods sold subtracting out commissions?
A. It's -- well, you -- so it's the revenue generated by the loan at sale minus commissions.
Q. And you said that you were pulling not from branch P&Ls but from some other P&L for this data?
A. That isn't the way we did it. That's one of the ways, the simpler way to do it. But like I said, if we would've done the cost of goods sold approach, this number

would've been almost $19 million. So we used a, we felt, more conservative approach, which is we took all the fixed expenses that occur on the corporate side --
Q. Okay. Can you pause there just for a second?
A. Yeah.
Q. All the fixed expenses on the corporate side?
A. Fixed -- all expenses on the corporate side.
Q. Where do those corporate expenses appear, in the branch P&Ls, or some other P&L?
A. Yeah, the financial -- the corporate financials, the corporate income statement on our tax return.
Q. Okay. So with respect to this analysis, Waterstone served discovery and specifically asked what are the documents that were relied upon to create Exhibit 7?
A. Yeah.
Q. Tax returns and corporate income statements were not identified, which is why I'm kind of struggling to understand the analysis. You're going to have to help me here. I need to leave the deposition with a clear understanding of how this was calculated and what documents you relied on. Are you able to locate those documents? And, I mean, we can take a break. I just need to know. Do you have the documents that you used to calculate this column --
A. Sure.

Q. -- Corporate Profits Earned BPS?
A. Yeah. All you have to do is look at the -- it's actually public information, I think. But yeah, you can -- we used the corporate P&L. Did you not ask for -- I mean, I would imagine we sent the corporate P&L. I don't know.
MS. KREITER: I mean, if you can help me here, Courtney, I don't believe --
MS. WALTER: Where are you referring to? We did produce tax returns. We produced tax returns in response to your most recent request for production.
MS. KREITER: Right. But there's a request for production specific to what documents were relied on to create Exhibit 7 --
MS. WALTER: Can you point me to that? I'm not being difficult. I'm genuinely asking.
MS. KREITER: Let's take a five-minute break.
(A recess was taken.)
MS. KREITER: So for purposes of the record, we took a break. My concern was that the documents identified in response to Interrogatory No. 10 lists documents that Mutual relied on to prepare Deposition Exhibit 7.
The witness has started testifying that he relied on corporate tax returns and corporate financials that are not identified within the Bates ranges listed by

Mutual in response to Interrogatory No. 10.
We took a short break to try to discern if we can readily access the documents that the witness did rely on. The witness indicated that tax returns is one of the documents that we could look to for this information.
Q. (By Ms. Kreiter) And I think that I'll let the witness say on the record -- I mean, if we pull up the tax return, are you able to then testify as to how the Corporate Profits Earned Basis Points in Exhibit 7 were calculated?
A. The tax returns are going to make it more tricky because of the reverse mortgage. You know, if we used the tax returns, it's going to include the reverse mortgage and this number is going to be significantly higher. We need to use the corporate P&L, it's called. That's what we call it. And I find it -- I'm surprised you guys don't have it with all the other P&Ls.
Q. I'm going to --
A. It's a corporate income statement. And if we looked at the tax returns, it's going to be difficult.
Q. Are you able to readily access it? I mean, can you send an e-mail and get it e-mailed to you? I'm just looking to facilitate the deposition. There's 25 P&Ls. I just show a Bates number.
A. It's up to the attorneys.

MS. KREITER: I don't want to come back and redo this deposition.
MS. WALTER: So what exactly are you asking?
MS. KREITER: I'm asking the witness to provide at the deposition today any documents that he needs to -- in order to testify as to how the Corporate Profits Earned column of Exhibit 7 were calculated.
MS. WALTER: With specificity? Like, pulling the actual number to do the calculation right here?
MS. KREITER: I need to understand how this was done and what documents were relied on because I do not believe they are the ones listed in response to Interrogatory 10.
In addition, I'm going to be asking the witness to identify the P&L statement that he relied on to come up with the figures that are in the second column of Exhibit 7, which is Volume of Loans Funded. The witness has said that that data came from an internal system.
A. I mean, it came from the P&Ls as well. Those should -- as long as we're looking at the right P&Ls, it should certainly cross-reference. Bernie tends to not make mistakes. He's an Eagle Scout, by the way, really legitimately, not just a Boy Scout, an Eagle Scout. We can provide the corporate P&L. I just don't know if -- you

know, that's up to counsel. I don't know --
Q. Let me do this. So for example --
MS. KREITER: Have that marked.
(Exhibit No. 8 is marked for identification.)
MS. KREITER: Number 8.
Q. So take a look at Deposition Exhibit No. 8.
A. Okay.
Q. Go to page 5. It says "Identify" -- this is Interrogatory No. 10. It says "Identify, as defined above, all documents that Mutual referred to or relied on to prepare Exhibit 1." Exhibit 1 of this discovery request is the same as Deposition Exhibit 7 that we're using today.
A. Okay.
Q. So we've asked you to identify all of the documents that were relied on, and then there's a series of Bates numbers. Do you see that?
A. I do.
Q. So MOM-10942, that's a particular P&L. I'm going to have that marked as well.
(Exhibit No. 9 is marked for identification.)
Q. So Deposition Exhibit No. 9 that has just been marked is Bates No. MOM-0010942. Do you see that, the first page of the document?
A. Yes.
Q. And do you see how that's also one of the

documents that is listed in response to Interrogatory 10 as one that you relied on to prepare the lost profits analysis? Do you see how the Bates number matches up to what's written there on behalf of Mutual?
A. I do.
Q. So take a look at the document that Mutual identified as one you relied on and explain to me how this document was relied on and how it is reflected in Exhibit 7.
A. This does -- this -- this isn't right. This P&L here is not right because it shows -- well, hang on. '19 -- no, it's just not right. Yeah, I don't know why this would be off. It doesn't make any sense.
MS. WALTER: Can we go off the record for a second?
MS. KREITER: I guess I have a few more questions about this, if you don't mind.
MS. WALTER: Okay.
Q. On the record. Mr. Gennarelli, so did you or Mr. Mayle rely on what we've now marked Deposition Exhibit 9 in conjunction with the lost profits analysis that is Deposition Exhibit 7?
A. I -- I did not rely upon this 9, no.
Q. Do you know why Mutual identified it as one of the documents you relied on?

A. I do not know.
Q. I will represent to you that this first Bates range listed for Interrogatory No. 10 that starts with the document you're looking at, Bates 100942, and then it goes on to MOM-11032, that's about 25 different P&Ls. Are you able, as you sit here today, to let me know which of those 25 P&Ls you relied on to create Exhibit 7?
A. We relied upon -- if I looked at them all -- but this volume is off on this P&L for some reason. I have no idea why, but the volume is off. I don't know if it was a misprint or something. You look at it. It's common sense. In January 2019, unless I'm missing -- this is not extrapolated out?
Q. Do you see the different Bates numbers that are listed in response to Interrogatory No. 10?
A. I'm still going over this. Hang on one second.
Q. Sure.
A. This -- this P&L is from January 31, 2019. It's only a one-month P&L.
Q. It's something that Mutual produced and said you relied on, so I can't explain the origin of it. I'm just trying to understand were we given the information necessary --
A. Well, you just probably -- maybe there -- is there more? Is there another P&L?

Q. There definitely is. There's about 24 more. So I need to know which one did you rely on because when I --
A. The full -- full years. I mean, this is -- this is why -- there's nothing wrong with this P&L other than it's only for the month of January. And I think the reasoning provided for this was to show the 2018 volume at BBMC. Probably that's the reason it was -- it was provided.
Q. Okay. So I'm going to just share my screen.
A. Were you using this to -- as an offage in 2019? Is that the problem?
Q. I don't know what that was used for. I'm trying to sift through the volume of documents and understand the analysis, and I'm, frankly, not able to do so.
A. Well, you guys had the P&Ls. They sent you all the P&Ls --
Q. I don't --
A. -- for the branch levels before they -- before they joined the company.
Q. Are you able to -- for example, let me ask you this question: Volume of Loans Funded, Tampa Volume --
A. Yeah.
Q. -- it says 115,699,761?
A. Yeah.
Q. I do not find that number on any of the -- I mean, we've spent hours, understand, looking through the

documents that Mutual identified. None of those documents reference a loan volume of that amount, and I'm trying to understand why and where that number came from.
A. Yeah, I'd have to see the documents you looked at, but we -- there's a closed loan number. There's funded loans, so make sure you look at funded, not closed. I don't know. I don't know what you're looking at.
Q. Well, I looked at all the documents that Mutual identified.
A. Okay.
Q. And it's not there. Are you able to tell me which of these Bates numbers you relied on?
A. Bates number, no, I don't know what that Bates number is.
Q. How is Waterstone supposed to know what you relied on at this deposition today to come up with the 115- shown as the Tampa volume for 2019?
MS. WALTER: Object to the form.
A. Other than the fact that the P&Ls were sent to you before these folks even left by themselves, you could've cross-referenced those P&Ls because those were accurate.
Q. But those weren't the ones that Mutual has said it looked at. How would I have known that you looked at those other P&Ls and not the ones that Mutual said it did?
A. I don't know what you're looking at. I don't

know what you're seeing.
Q. So my problem is plaintiff, Mutual, has the burden of proof. It's alleging damages north of $4 million. It has to demonstrate how those damages are calculated --
A. Absolutely. There's --
Q. Are you able to, at this deposition today, tell me how Mutual came up with the --
A. Yes.
Q. -- 115 --
A. Yeah.
Q. -- million?
A. It was the volume produced by the Tampa office, Tampa combined with Paramus.
Q. But you're not able to tell me what document that comes from?
A. The Tampa -- the Tampa P&L. This is one-month P&L you showed me.
Q. Sure. Are you able to tell me which of the documents identified in response to Interrogatory 10 it comes from?
MS. WALTER: Object to the form.
A. Well, I don't -- did you want me to memorize what --
Q. I want Mutual to come to a deposition prepared to testify about its damages. Did you look at any of these

documents in preparation for your testimony today?
MS. WALTER: Object to the form.
A. Yes.
Q. How can I get at the document you looked at without spending another 50 hours trying to look at these documents and then finding that it doesn't exist?
MS. WALTER: Object to the form.
Q. Are you able to go on Mutual's system or e-mail Mr. Mayle and find the document that shows --
A. Yes.
Q. -- the loan volume?
MS. WALTER: Object to the form.
A. Yes.
Q. Can you do that if we take a break and e-mail the documents that show these volume numbers? That would help me a lot.
THE WITNESS: Are you guys okay with this?
MS. WALTER: Can we take ten minutes, please?
MS. KREITER: Yes.
MS. WALTER: I asked that previously.
(A recess was taken.)
MS. KREITER: So opposing counsel had asked for a break. The request that I had posed was that the witness access the documents he used to calculate Exhibit 7 and provide them at the deposition today such

that he could walk through the calculations. Is that something that can happen today? Is Mutual willing to do that?
MS. WALTER: Our position is that we will not be producing additional documents but that the documents referred to in response to Interrogatory No. 10, Mr. Gennarelli will walk you through his calculation and the data that was considered within those documents.
And to be clear, Interrogatory No. 10 requests "Identify, as defined above, all documents that Mutual referred to or relied upon to prepare Exhibit 1." You requested documents. Waterstone requested documents. Mr. Gennarelli referred -- relied on data within our -- within the system.
So we did identify the documents that -- the relevant data that was used for Mr. Gennarelli to come up with his calculation, and he is able to testify to that today.
MS. KREITER: A witness that's putting forth damages can't rely on documents in a system or elsewhere that they don't produce in discovery.
MS. WALTER: You can send another request for potential -- for additional data.
MS. KREITER: Why don't we try and see if he can

walk through it. I mean, you indicate that he can walk through it with me?
MS. WALTER: Yes.
MS. KREITER: Okay. Let's do that.
Q. (By Ms. Kreiter) Let me start with, Mr. Gennarelli, I'm going to put up on my computer screen -- and I understand with your counsel that they're amenable to you just looking at my computer for efficiency in the deposition.
A. Sure.
MS. KREITER: Courtney, it's document Bates No. 10964.
Q. So I've got the document up on my screen here.
A. Okay.
MS. KREITER: Can I orally designate this a deposition exhibit? I can get a hard copy for it. But just for purposes of the record, I guess I'd like this to be Deposition Exhibit 10. It's Bates No. MOM-0010964. It's an Excel spreadsheet.
(Exhibit No. 10 is marked for identification.)
Q. Do you recognize this document as a P&L?
A. Yes.
Q. Up in the left-hand corner, it says "Mutual of Omaha Profit and Loss Statement." This is for the Tampa branch, and it's dated December 31, 2019. Do you see that?

A. Yes.
Q. There's different years in the document. I'm going to direct you to the column that says "2019 Year to Date." Do you see that?
A. Yes.
Q. And there's a row that says "Total Loan Volume," and then the year-to-date total loan volume is 114,750,394. Do you see that?
A. I do.
Q. Yet on Deposition Exhibit 7, the Volume of Loans Funded for 2019 that's listed is not an amount that matches the 114- but rather is 115,699,671. Do you see that?
A. I do.
Q. I am trying to understand where the data you relied on came from because it doesn't reconcile the year-end P&L for 2019. Can you explain that?
A. Well, I can -- I can -- I'd prefer if an accountant did it, but there's accruals that happened after the month. This was presented at month end. And then subsequent to that, there might've been loans that -- mistakes happen; right? If a loan is funded at a different branch, it was added back to that. This is -- this is the up-to-date in our system today. I can say that because that's the data we used, but you're off by -- what is that? -- probably two loans, I would estimate.

Q. Has Mutual produced the documents in its system that you relied on to prepare Exhibit 7?
MS. WALTER: Object to the form.
A. I -- I used data, not the documents.
Q. Okay. When you pull up the data that you were referencing, can you print it out from the system?
A. I would imagine I could.
Q. Okay. Could you take a screenshot and produce it?
A. Bernie -- I couldn't do it now.
Q. No, I'm not saying now. I'm just saying in general, can you take a screenshot of it, get it produced to us?
A. Yes. These numbers didn't come out of thin air.
Q. Sure.
A. These are the updated numbers, yeah.
Q. And you can print it off your system; correct?
A. Yeah.
MR. CARROLL: So --
MS. WALTER: Send another request, Maria.
MS. KREITER: Courtney, this is for documents referred to or relied on.
MS. WALTER: He responded.
MS. KREITER: So he can push print. I mean, that doesn't -- just because you haven't printed something

doesn't mean it's not a document that has to be produced in discovery.
MS. WALTER: We don't have to create a document.
MS. KREITER: He's not creating it. He's pulling it up, and he's pushing print.
MS. WALTER: I'm not getting into this argument.
Q. Is that correct? Bernie or you pulls up your system, and you can print that document; correct?
MS. WALTER: To be clear, he -- I also think you're misrepresenting his testimony.
MS. KREITER: I'm asking him.
MS. WALTER: He said, "I would imagine."
MS. KREITER: I'm asking him right now.
Read my last question back.
(The previous question was read by the reporter.)
A. I'm not sure exactly what we can provide to you, but I'm sure there's something that we can give you that shows this number. It didn't come out of thin air.
Q. Okay. I will make a request on the record that you produce that document immediately.
Is that the same -- I mean, we were talking about loan volume with respect to the year 2019?
A. I'm sorry. If I just could ask a question, and I don't know if this is inclusive of Paramus or if this may be inclusive of Paramus. You know what I'm saying? He

combined Paramus and Tampa on this sheet, you know, when we did it. I don't -- that may be the problem, which we can show you, so...
Q. Okay. But -- so that's the problem. Today is the day when I need to know and you are to be in a position to walk me through this. I'm now hearing at the deposition that you cannot and that you're not sure if one of the three branches is included; is that accurate?
A. I'm not sure. I'm not sure if that's accurate or not.
Q. You don't know whether Paramus is included in Exhibit 7?
A. I know it's included in this number here under Tampa.
Q. When you say "this number," just we've got the reporter --
A. I'm sorry.
Q. You're talking about --
A. The Exhibit 7.
Q. You're not sure if Paramus is included in Exhibit 7?
A. No. In Exhibit 7, I know it is included.
Q. It is included?
A. Yes.
Q. Okay.

A. You referenced a P&L of Tampa, so I'm not sure that that was inclusive of Paramus, and that -- that may be the difference.

Q. I am going to put a request on the record that you ask Mr. Mayle or somebody at your office to print the documents that would allow you to walk me through the volumes of loans funded. 3

MS. KREITER: Ms. Walter, are you amenable to that?

MS. WALTER: No. I'm objecting to that, Maria. He's -- let me just go on the record and say that you did put in a request for the profit and loss statements for the Paramus branch. It's Request for Production No. 40, and we identified the P&Ls that corresponded to Paramus -- to those branches.

MS. KREITER: Request No. 40 has nothing to do with your response to Interrogatory 10.

MS. WALTER: Yes, it does. You're insinuating that we didn't identify the P&Ls that correspond to Paramus, and we did in response to --

MS. KREITER: In 10?

MS. WALTER: In -- it's in there. The Bates ranges are included in there.

MS. KREITER: Bottom line, I need to how this was calculated.

MS. WALTER: He's walking you through that.

A. I can walk you through that.

Q. Can you -- I mean, are you -- it sounds like you're amenable to getting the documents from Mr. Mayle. Your counsel is saying --

MS. WALTER: I'm objecting. I'm objecting.

MS. KREITER: Okay. Understand we may need to come back here, and I'm going to move the court for fees.

MS. WALTER: File your motion.

MS. KREITER: Okay.

A. If I may, I can still walk you through the philosophy. The philosophy --

Q. I want to get whatever mileage I can. And then if there's an efficient way to avoid bringing you back to Florida, I'll do that, but I -- so let's see what we can --

A. I don't mind coming back either, but --

Q. Let's see what we can get through. Why don't you explain to me -- you mentioned the philosophy surrounding the Volumes of Loans Funded?

A. Yes.

Q. Walk me through that, please.

A. The philosophy of the loans funded are just that, the loans -- so the Tampa volume would be Tampa and Paramus, and that's the loans -- the volume funded that year.

Q. Okay.

A. Okay. So that's pretty cut and dry.

Q. And they're taken off of -- just to be clear, they're taken off of documents in your system --

A. A system, not documents.

Q. In a system?

A. Yeah.

Q. They're taken off of the system --

A. Yeah.

Q. -- and they've not been produced?

MS. WALTER: Object to the characterization of that.

A. I actually think they have been produced but not in the way -- the manner in which you would like them produced is how I understand it.

Q. So this is where I'm struggling. Where can I -- I mean, the point of this deposition is that I get to verify what you did. Where in the documents are there numbers from which I can verify the volume of loans funded?

A. Do you have Paramus's P&L in there?

Q. I have Tampa. Is it separate from Tampa?

A. It may be, you know.

Q. I don't have separate P&Ls for Tampa.

MS. WALTER: Maria, we identified those P&Ls correspond also to Paramus and Tampa.

MS. KREITER: That's what I'm saying. That's what I'm saying. I don't have P&Ls specific to Paramus. I only have Tampa.

Q. I mean, this is one. I guess that's what I'm wondering. What -- so this is a P&L for Tampa in 2019?

A. Right. Yeah. Right, right, right. Yeah.

Q. Okay. So walk me through what we've virtually marked as Exhibit 10.

A. I want to check. Do you mind if I just look at one thing?

Q. Go for it.

A. Okay. So, I mean, the only -- the only thing we used from this document is volume in this exercise.

Q. Okay.

A. I was just trying to see if there was -- in the payroll tab, if there were people from Paramus in there. I really can't recognize anybody, so I'm not sure. I don't have the time that they joined. That was what I was just trying to see.

Q. Sure. But the volume here doesn't match up?

A. Right, right. And that's something Bernie is going to have to explain and somebody from accounting is going to have to explain to you why, you know, if there's an accrual or if these accruals are common or if there was misallocation. You know, you're funding a lot of loans.

It's very common for a loan to fund and maybe get applied to a different P&L, and then it gets reapplied when we correct it down the road.

Q. Okay. Are you willing to call Bernie and ask him about this one in particular? And maybe that will call clarity --

MS. WALTER: Object to that. You can depose Bernie.

MS. KREITER: He's the corporate rep on this document.

MS. WALTER: He is walking you through exactly how to do this, and he explained the discrepancy. I don't know what more you want. You can ask him all the questions about the P&Ls and the calculations. He's not calling Bernie.

MS. KREITER: Okay. Look, this is going to be a second deposition of a corporate rep. Instead of that, why are you opposed to him calling Bernie and taking care of this in about ten minutes?

MS. WALTER: To ask him what exactly?

MS. KREITER: To ask him to educate your corporate rep on why there's a discrepancy in the documents you've identified and the damages --

MS. WALTER: He responded. He responded to that question.

MS. KREITER: He said he didn't know. He'd have to ask Bernie.

MS. WALTER: Well, he provided an explanation about the accruals.

Q. Do you know that that's the reason for the discrepancy between the 115 million volume and the 114 million volume?

A. I know generally that that's what happened, but I don't know for a fact in this case, no.

Q. Okay. What about with respect to all of the other loan volumes? Are you able to tell me here at the deposition where these numbers come from and if there's a discrepancy?

A. These numbers are going to be most correct because they are the most recent. They came out of a system much more recently than when the P&L was created in January or December of 2019.

Q. And you're going to follow your counsel's instruction not to have them printed and produced today at the deposition --

A. Well, I'm going to follow my counsel's instructions, yeah.

Q. What about Corporate Profits Earned BPS, that column that we were talking about?

A. Yeah.

Q. We've had a few breaks.

A. Yeah.

Q. Again, I'm just looking for you today at the deposition be able to walk me through, for example, how did you calculate the .530, and what documents did you rely on to do that?

A. Okay. There's a Richey May tax return in the file. I'm not an accountant, but that'll have all the information that you would need to calculate this. We basically took the total profit for Mutual of Omaha Mortgage in 2019 divided by the volume to get a basis point calculation.

Q. Sorry. You're going to have to go slow. You took the profit for 2019?

A. Yeah, took the profit for 2019, divided that by the loan volume to get a basis point calculation.

Q. And you said the document that this profit and loan volume came from is what?

A. Well, there's a Richey May document in there. There's several documents --

Q. The audited financial statements?

A. Yeah.

MS. KREITER: Emma, are you able to e-mail those to me?

MS. JEWELL: Yes. I'll do that now.

Q. Is there more -- while she's sending those over to me, is there more explanation before we turn to the documents?

A. Well, you know, again, these Richey May, you know, audited financials are going to be difficult for laypeople like us to understand them, to be honest. I mean, I -- you can have your accountants look at them. They can figure it out easily, but I don't know that we can. I mean, I would go off of our corporate P&L, which I don't know if it wasn't requested or what the case is, but that's how I would -- I understand an income statement. I don't necessarily understand how they then take the income statement and make this.

Q. So if I pulled up the Richey financial statements, would you be able to walk me through this or not?

A. I don't know. I don't know. I -- I don't know.

Q. Okay.

A. It's -- they're complicated, so...

Q. And are you saying that you instead looked at a corporate P&L?

A. I used data, so I pulled data from our system, which goes into all of that.

Q. Got it.

A. That's how I used it, yeah.

Q. Is the data that we talked about similar to the system that has the volume of loans funded data, or is it a separate -- I mean, you mentioned corporate P&L --
A. It's an accounting system, yeah.
Q. Okay. But --
A. When I say "I," I had Bernie -- that's the data he pulled, so we can look at it, yeah.
Q. Got it. And you said it is a corporate P&L, or is it --
A. Yeah.
Q. -- something in the system?
A. Corporate P&L, but that's in the system, right.
Q. Is that too -- I mean, a corporate P&L, that's a document you can print from the system?
A. Yes.
MS. KREITER: Do you know, Courtney, has the corporate P&L been produced?
MS. WALTER: Did you request that?
MS. KREITER: I requested all documents referred to or relied on. He says he relied on the corporate P&L.
MR. CARROLL: That's not what he --
A. That's not what I said. I said I relied on the data that is in -- it's in a lot of places. It's also on this -- it's also on the Richey May deal, but I can't

explain the Richey May. I can explain this sheet to you, what we did, but I can't explain the Richey May deal. I'm not a CPA.
Q. Okay. Would that be the same with respect to all of the -- I mean, you've got various years here, '19, '20, '21, '22 year to date. Would that be true with respect to all of this data under the Corporate Profits Earned BPS?
A. Yes.
Q. It comes from data on a system that has not been produced?
MS. WALTER: Object to the form.
A. Yeah, the monthly P&Ls have been produced, I believe, but...
Q. The corporate P&Ls?
A. The corporate P&Ls is just an aggregate of the monthly P&Ls at the branch level. I mean, it's...
Q. Right. So I guess I'm trying to understand are there documents that you can use today to tell me how to calculate this corporate BPS? I thought the answer was no, but I want to make sure that that's true and not miss the opportunity.
MS. WALTER: Object to the form.
A. I don't know what -- I don't know what's in there. I don't really know if there's a -- if there's a corporate P&L or if we can use the Richey May documents. I

don't know.
Q. Okay. Well, let's try with the Richey May documents since I have those here.
MS. KREITER: So Bates No. MOM-0011163, let's have that designated Deposition Exhibit 11.
(Exhibit No. 11 is marked for identification.)
Q. I'll turn the computer over to you. Take a look at that, and let me know if there's data within Exhibit 11 that you can use to help identify the corporate profits and BPS.
A. So this is for year ending December 31, 2022, and '21, so it wouldn't have '19 in there.
Q. But what about -- I mean, you have the corporate BPS for those other years too, so take a stab at 2021.
MS. WALTER: Object to the form.
A. Yeah, I'm afraid you're going to need an accountant to figure this out. You see a reverse mortgage combined in here. We don't want to use that. It will inflate the numbers, yeah, $700 million reverse mortgage. Yeah, I'm sorry. This is not going to be helpful to us.
Q. I appreciate the effort. Let's turn back to Exhibit 7, please. The fourth column there, it's Branch Contributions to Corporate Profits. Do you see that?
A. Yes.

Q. This is simply the volume from Column 2 times the corporate profits basis points in Column 3 multiplying --
A. That's correct. That's correct.
Q. Then off to the right-hand side, there's no column, but there's some percentages, .92 percent associated with Tampa and then .97 percent associated with Daytona. Do you see that?
A. Yeah.
Q. What are those percentages?
A. That's the accumulative on average. So if you took the average of those -- those time frames, that was the basis points in corporate profits derived for the branches.
Q. Okay. So it's the average of Column 3, Corporate Profits Earned BPS?
A. But it's a weighted average, so it takes into account the -- the volumes on the -- on the -- as well.
Q. Got it. Then let's go down to the bottom right. It says "Tampa Corporate Profit Expectation." Do you see that?
A. Yes.
Q. So the total that Mutual is demanding related to the Tampa branch inclusive of the Paramus branch is the 2,716,040 --
A. Correct.
Q. -- correct?

A. Yes.
Q. And then, similarly, with respect to Daytona, the amount that Mutual is seeking with respect to the Bucket 2 damages is the 1,723,961.89; correct?
A. That's right.
Q. So a total of about 4.4, a little over 4.4?
A. Yeah.
Q. You have here a date range highlighted. "Expected corporate profit for 18 months," it says "July of '22 through December 31, 2022." I'm assuming that should be 2023?
A. Yes.
Q. And is the starting date -- it just says July. Is it July 1?
A. Yes.
Q. Okay. With respect to the Corporate Profits Earned BPS, the amounts for 2019, 2020, and 2021 are the same for both Daytona and Tampa, but then you get to 2022, and it's different. Do you see that?
A. Say -- walk me through that one more time.
Q. Yeah. So 2019 Tampa, the corporate BPS is .53. And then for Daytona it's also .53?
A. Yeah, because I think they left sooner.
Q. So that's what I'm trying to understand. It's the same, and then --

A. Yeah, because they were there a full year.
Q. Got it.
A. Yeah. And they -- so we -- so the first quarter of the year that they had left, we earned -- corporate earned more money, and that was the amount that corporate earned. And then for the full year, the corporate profit dropped to 43 basis points. Does that make sense?
Q. Okay. I just wanted to understand --
A. Through June 30th, that is. The difference between April 30th and June 30th.
Q. With respect to the Daytona branch, you have listed down in the -- let's take the bottom right-hand corner. You have profit for 42 months. Do you see that?
A. Yes.
Q. Why is it not 40 months? You've got three years. That's 36. And then you've got four months: January, February, March, April.
A. I think -- I think he just wanted to compare apples to apples, which is 42 months, even though there was, I don't think, any profit there.
Q. So it's not a mistake. It's intentionally 42 months rather than 40?
A. I can do the math. I don't know if the math works out. Let me do the math real quick.
Q. Sure.

MS. KREITER: I'll just let the record reflect the witness is using presumably a calculator on his phone to check some of the math in Exhibit 7.
A. That's right. I think he just did it apples to apples, so he used 42 months --
Q. Mutual's position is it's not an error?
A. Yeah.
Q. It's done intentionally?
A. Yeah.
Q. For the -- in the fourth column there, Branch Contributions to Corporate Profits, you can see for Tampa in 2019, it's 600,000. Then it jumps 3,232,144 for 2020. Do you see that?
A. Yes.
Q. Is that a record high for the Tampa branch?
A. I think so.
Q. Similarly, for the Daytona branch, it jumps from 400,000 to 1.7 million --
A. Yes.
Q. -- 53?
Is that a record high for the Daytona branch?
A. I believe so.
Q. You would agree that 2020 was a record year in terms of volume for Mutual overall?
A. Yeah, yes. Absolutely. And 2019 was also

artificially low because there was a switchover to Bridgeview. But yes, generally, you're still correct.
Q. In 2020, the pandemic hit. The housing market went crazy?
A. Right.
Q. And then that anomaly continued into 2021; correct?
A. Yes.
Q. In fact, the volume for Tampa in 2020 is more than five times the prepandemic volume of 2019; correct?
A. Not volume, no.
Q. Sorry. The -- I'm looking at the Branch Contributions to Corporate Profits column.
A. Yeah, what was your -- what was your question?
Q. The volume for -- sorry. I'm saying "volume" again, but the amount for Tampa is five times the prepandemic volume of 2019 if you're looking at 2020?
A. Yes. Correct.
Q. The same for Tampa, not five times?
A. But yes.
Q. But it's multitudes higher in 2020. You would agree with me that 2020 was a historically anomalous year for the industry?
A. Yes.
Q. Why did you use a date range to calculate damages

that included a historical anomaly in the market?

A. Well, there was the data we had. We have to use all the data. You don't know what the next year is going to bring. Next year could be a great year as well. These are purchase-driven folks too. I mean, they do purchases, you know, heavy refinances.

And the other thing is with the arrival of Keller Williams, that relationship, they would've benefited substantially. I would venture to say if they were still here with the Keller Williams acquisition, that their volume would be near that level again.

Q. The year to date for Tampa in that fourth column of Branch Contributions to Profits is 406,810. Do you see that?

A. Yes.

Q. If you double that, that would give you a full year because it --

A. Right.

Q. -- so happens that the departure was --

A. That's right.

Q. -- six months into the year?

A. Yeah.

Q. Did you or Mr. Mayle or anyone else at Mutual consider using that most recent time frame as your baseline for estimating the damages?

A. I don't know that we considered that. The one thing we did consider, like I said before, was using the cost of goods sold method. And I thought that if we would've used the cost of goods sold method, these numbers would've been through the roof, so we chose just an average.

And you're not going to -- when you're doing an average, it's going to be an average. You have to use all the data in front of you. We don't know what tomorrow brings; right? Keller Williams arrived this year. That would've been exponentially valuable having them there.

Q. But somebody had to make a choice as to how far back you were going to go with respect to the data. And either you --

A. We went back the whole way, the whole time -- we just went back to the history here at Mutual Mortgage.

Q. Do you believe that it's more reliable to use data that includes a historical anomaly than it is to use the most recent data available?

MS. WALTER: Object to the form.

A. Yeah, I think that what you're calling historic anomaly is one person's perception. We don't know what next year brings or the year after or the year after.

Q. So let me ask you this question. I want to make sure I'm understanding this. You looked at historical data going back to 2019 --

A. That's right.

Q. -- including the pandemic, which was a high for both of the branches, and then you used that data to project losses associated with the branches if they had stayed open going into the future; correct?

MS. WALTER: Object to the form.

A. I think that's what we -- we average the volume the times that they were here. That's why if you noticed the lowest -- the lowest really year volume is 2019. We used that. We didn't just use 2020. We didn't just use 2021. We averaged the volume for the time they were here. I can't tell you what the future will bring; right? I would say if they knew that Keller Williams was coming on, they probably wouldn't have left and they would benefit. Their volume would be more than this.

Q. So my question is more just to make sure we're aligned on what Bucket 2 represented. My understanding -- but I don't want to assume. I want to check with you -- is it represents the profits as if the branches would've stayed open for 18 months into the future?

A. That's right.

Q. And to estimate those damages of profits into the future, you looked at retrospective data; correct?

A. Yeah, that's the only data we have.

Q. So it's May 25th of 2023, which includes the date

range that you're estimating damages. And I'll go back to Exhibit 7 here. So the damage range that you're using is July 1, 2022, to December 31, 2023; correct?

A. That's correct.

Q. We're a number of months into that damage period now; correct?

A. Yes.

Q. Is the market now and since July 1, 2022, better or worse than it was in the pandemic?

MS. WALTER: Object to the form.

A. Our -- our -- our volume today is better than it was last year. Now, is it better than the pandemic? No. But it's better than it was last year.

Q. Okay. Has Mutual -- in July of 2022, was Mutual laying off employees?

A. We laid off nonperformers, yes. I don't know if that was the exact time, but sure.

Q. In July of 2022, was Mutual's profitability consistent with its budgeting and estimates?

A. Well, I think that, you know, we were very negatively impacted by these groups leaving at that time because when you -- each loan that you do is exponentially more valuable, especially when you are dealing with purchase teams. So we still have all these fixed costs at the corporate level that we have to -- that we have to assume.

And when this volume leaves, those costs become a much larger percent of the expense.

So that's why I keep going back to this -- maybe that's the route we should take, is using the cost of goods sold approach because you take those variables out of it. Each loan -- each additional loan is exponentially more profitable than the last -- right? -- because the first loan pays for all -- you don't make any money; right? It pays for the expense. The second one you make a little bit. The third loan, you make more money, et cetera, et cetera.

Q. Does Mutual look at the profitability at the branch level?

A. Yes.

Q. Were there any profitable Mutual branches in July of 2022?

A. Yes.

Q. How many?

A. I don't know.

Q. Were there a number of Mutual branches that were not profitable in July of 2022?

A. In July of 2022?

Q. Correct.

A. I don't know if there were a number that weren't profitable. When you -- when you say "branch profitability," how we look at it is just exactly how I

walked through this; right? It's taken into account those expenses and revenue occurred at the -- at the corporate level. So a branch P&L may be negative, but we're still making -- corporate may still be making money from that branch. Does that make sense?

Q. How about looking at the forward division?

A. Yeah.

Q. I mean, if you just look at the forward division in July of 2022, was the forward division profitable at that time?

A. Well, I know through June we were very profitable. Through June we were profitable.

Q. What about after June? July of 2022? And I ask that because that's when your damage period starts. So in July of 2022, was forward profitable?

A. I don't know. I'd have to go back and look. We -- we ended the year being profitable but not by much, but I know for the first half of the year we were, I believe, 20-some million in profit. And again, I think that shows the damage caused when groups like this leave, purchase groups. It becomes exponentially more damaged.

Q. What was the rationale for using an 18-month period to calculate the lost profit damages associated with the branches closing?

A. Yeah, I mean, we didn't want to use any -- again,

we were trying to be reasonable. You know, I think you can make a case for using longer. Most of our branches have been here 10, 15 years, so -- at least the core group. So we could've used longer, but we thought 18 months was a reasonable amount of time.

Q. We talked earlier in the context of the discussion about natural attrition and if the branch managers had simply, you know, said nothing but then the employees obviously learn after the fact the branch manager left, that there may be some employees that go and follow that branch manager due to natural attrition. And I think your testimony was, yeah, eventually that could happen. Do you recall that testimony?

A. I do.

Q. Okay. Do you have any data within Mutual or otherwise that you relied on for purposes of this analysis that says it will take about 18 months for employees to follow a branch manager in the context of natural attrition?

MS. WALTER: I'll object to the form.

A. No, I did not do that. But what we did do is, you know, we looked at how long branches stay. And, you know, we talked a little bit about what a branch is, and a branch is -- you know, individuals come and go, but that branch continues to grow. And I think that that's important. Even today some of our branches are growing and

doing well.

Q. Did Mutual have employment contracts with any of the downstream employees that required them to stay on for 18 months?

A. No.

Q. Did Mutual have employment contracts with any of the managers that required them to stay for 18 months?

A. No.

Q. What was the rationale for choosing 18 months as opposed to 12 months or 24?

MS. WALTER: Object to the form.

A. You asked me that. You know, again, it was -- we were trying to be reasonable.

Q. Did you consider other periods of time?

MS. WALTER: Object to the form.

A. We did.

Q. What other periods did you consider?

A. Well, we considered looking at our large branches, so that would be, you know, branches that were similar to these branches. So you would have a St. Louis, Seven Hills, Columbia, and they stay for, you know, eight years, ten years. But we didn't think that was necessarily reasonable, so we came up with 18 months.

Q. You understand that the employment contracts in place with the managers, to the extent that there are such

contracts that have an employee nonsolicit, do you know how long the duration of the nonsolicit is?

MS. WALTER: Object to the form.

A. I believe it's a year generally.

Q. Okay. Did you consider using a year?

A. No. We did consider it, but, I mean, that's what we wound up at, no.

Q. So if your testimony is these branch managers solicited the employees and then came and that shouldn't have happened, what's to stop the branch managers from waiting a year and then soliciting the employees and then the employees leaving at that point in time?

MS. WALTER: Object to the form.

A. Repeat the question.

Q. Sure. I mean, the managers only have a contractual prohibition, to the extent that it's enforceable or even exists. The ones I've seen are for 12 months.

A. Yes.

Q. So after that 12-month period, Mr. Hutto or Mr. Wolf or Mr. Smith could go to the branch employees and solicit them to leave the branch?

A. Yes.

Q. And that could've happened at the one-year mark. So I'm trying to understand was that -- you know, that situation factored in at all for purposes of your damages

analysis?

A. Not really. They also could've still been here. Keller Williams comes into play, and they stay for six or seven years, so we didn't use six or seven years. We didn't use ten years. We used 18 months. I mean, I don't know how much we can, you know --

Q. Do you have any evidence if the downstream employees would have stayed because Keller Williams came in?

MS. WALTER: Object to the form.

A. Well, you're the one who made a statement that said they went with Dwayne because he provided loans. Where do you think Keller Williams -- one out of every five real estate transactions is Keller Williams signed. We now are the lender for Keller Williams. I would imagine that that may be more attractive than the one-offs that Dwayne was handing them.

Q. So again, I want to talk about evidence that Mutual has versus just speculation about what the employees might have thought. Has Mutual asked any of the employees would they have been motivated to stay knowing that Keller Williams was joining?

MS. WALTER: Object to the form.

A. Not that I'm aware of, no.

Q. Does Mutual have reports that show the monthly volume for all branches?

A. Yes.

Q. What are those reports called?

A. Well, I think they come in different formats, so there's P&Ls. There's also, you know, a business intelligence system that you can see the volume by branch, so it's called BI, clever name.

Q. The P&Ls, are those the corporate P&Ls that we've been referencing?

A. Branch-level P&Ls and corporate P&Ls.

Q. Okay. Do the corporate P&Ls pull together --

A. Yes.

Q. -- the monthly volume for the branches?

A. Yes.

Q. Does it itemize which branch contributes to the total?

A. Yes.

Q. Is there a particular branch that had volume closest to the volume of the Tampa branch?

A. In what year?

Q. Let's just say in 2021.

A. I think you would probably have maybe Columbia; Maryland would be very close, I think.

Q. What about Daytona? Is there a branch that you would say is comparable to Daytona in terms of revenue, I guess?

A. I would say that would be more like a -- more volume than that. That northwest branch I referenced earlier, very similar.

Q. Okay. Does Mutual make efforts to assess its performance relative to the industry overall?

A. Yes.

Q. How does it do that?

A. You know, it's done -- that's how they kind of manage me, so I'm not sure exactly how they do it, but I know that they do it. They can -- I think Richey May has reports that they use. They also use the MBA reports, but that's how they kind of measure, I think, my performance is how we relate to the industry.

Q. Does Mutual track market trends for loan originations?

A. When you say "track," I don't know if we track it. We're aware of it.

Q. Okay. Do you know how Mutual performs in terms of loan originations relative to the market? I mean, if there's a peak in the market, is there generally a peak for Mutual or is it that there's something different about the business model?

A. There is something relatively unique about the business model, that we have a large amount of consumer direct folks. So they're not only purchase driven. So if

the purchase market suffers, we're able to capture some volume with debt consolidation loans and things like that, so it's a little unique.

But generally speaking, if the market is doing well, we do well. If the market is underperforming -- we tend to perform better in the underperforming market than our peers, but we still suffer; right? We're still not doing the same as we were.

Q. Do interest rates have an impact on volume?

A. They have an impact on volume, but they're not the sole driving force, I think.

Q. Were the interest rates generally lower in 2020 than in 2023?

A. Yes.

Q. The rates were lower in 2021 than they are in 2023; correct?

A. Yes.

Q. Does Mutual have any records that show the interest rates it offered historically and currently for different loan products? Take, for example, a 30-year fixed.

A. Do we have --

Q. Do you have historical records that would show, for example, here's the interest rate that Mutual was offering over periods of time?

A. I don't know that we keep that in a record, like, per se. I think we can pull it off of systems. I know we're not allowed to say systems because it's got to be documents for this conversation, but we do use systems --

Q. What systems --

A. -- and data.

Q. -- do you pull those from?

A. You can pull it from Encompass. You can pull from the accounting system. You can pull it from different -- the business intelligence system.

Q. Does Mutual have branches right now that are operating at a loss?

A. Yes.

Q. How many?

A. I believe two.

Q. Were those same branches profitable in 2020 and 2021?

A. One of them was, and one of them was not, the ebb and flow.

Q. You would agree the housing market and the mortgage industry has taken a turn for the worse since the branches left Mutual; correct?

MS. WALTER: Object to the form.

A. I would say that, yeah, it's more difficult. Yeah.

MS. KREITER: 12. I don't have another copy of that. Courtney, are you able to look at --

MS. WALTER: Yeah.

MS. KREITER: So it's Bates No. MOM-1467.

MS. WALTER: Just give me a second to pull it up, please.

MS. KREITER: Sure.

(Exhibit No. 12 is marked for identification.)

MS. WALTER: 1467, you said?

MS. KREITER: Correct. Just let me know when you're ready.

MS. WALTER: Can I take a look at it? Because it's not matching up with what I'm seeing. Oh, 14667. Okay. I'm there. Thank you.

Q. I'm going to start on -- there's a couple pages to this document. I'm going to start on the page that's labeled 14667. It should be the first page of the exhibit.

A. Yes.

Q. And specifically, the e-mail that's from Tyler Larsen, that's Mutual's CFO; correct?

A. Correct.

Q. The date of the e-mail is July 12, 2022. Do you see that?

A. I do.

Q. So this is just a few days after the July 1st start date of the damages period that Mutual is claiming; correct? Sorry. For the record, maybe you said correct. I just didn't hear it.

A. Oh, you didn't hear me? Yes. Correct.

Q. The e-mail is sent to, it looks like, a Listserv, MOOM Executives, exec@mutualmortgage.com. Do you see that?

A. I do.

Q. Are you one of the Mutual executives included in this Listserv?

A. I am.

Q. Do you remember receiving this e-mail in July of 2022?

A. No. But I receive a lot of these e-mails, so okay.

Q. Do these -- are there monthly performance e-mails similar to this that go out to the Mutual executives on a monthly basis?

A. Yes.

Q. And so were there monthly e-mails similar to this over the entirety of the damages period? I realize we're not quite to December yet, but -- so July, August, September, October, November, December of 2022, and then all of 2023, including through April.

A. Yes.

Q. I'll ask or request that those be produced.
This e-mail is designated "Importance: High." And the Subject line is "MOOM Financial Performance for June of 2022." Do you see that?
A. Yes.
Q. So Mutual's CFO writes "Good afternoon. Attached please find June '22 financial results. See below comments for detail on each division. Overall there continues to be heavy downward pressure on margins on both sides of the business for slightly different reasons." I'm going to pause there. "Heavy downward pressure on margins," does that mean pressure to lower the BPS profitability margin?
MS. WALTER: Object to the form, and Mr. Gennarelli did not send this e-mail.
A. Yeah, I'm -- I'm not sure at what margins he's talking about. I would imagine he's just talking about the gain on sale margins. I could be wrong.
Q. The gain on sale margins, what is that?
A. Like, that's what we sell a loan for.
Q. Okay. Is that different than the BPS in Exhibit 7?
A. It would be different.
Q. Okay. Maybe just explain to me the margins that you sell a loan for --
A. Yeah.

Q. -- as opposed to the BPS in Exhibit 7. What is the difference between those two margins? Does Exhibit 7 assume you hold the loan?
A. No. No, it has nothing to do with that. This margin in Exhibit 7, that's the profit margin. What I think he's referring to is the margin at time of sale that investors are willing to pay for the loan.
Q. Okay.
A. Two different things.
Q. And then it says "on both sides of the business," meaning the forward side and the reverse side --
A. Correct.
Q. -- correct?
A. Yeah.
Q. The next sentence talks about forward. And just to be clear, forward is the division for which you're president, and it's the division in which the Tampa and Daytona branches were part of?
A. Yes.
Q. "Forward margins are being compressed due to the recent increase in interest rates, which pushes competitors to lower margins in an effort to capture volume to support their expense structure that has scaled over the past two years." Does that in general mean competitors are lowering their profit margins? They need to increase volume in order

to support the staff that they've hired on during the pandemic?
A. Yeah.
MS. WALTER: Object to the form.
A. I think it -- yes. And it also points to the -- kind of like the theme is the extreme value it is when you lose purchase business like this because then we have fixed costs that are -- interest rates are less likely to affect purchases than they are refinances.
Q. In the 2020 period and 2021 period, I mean, it talks about scaling structures over the past two years. In general in the industry, were mortgage companies hiring more, more employees, more loans to process, the volumes were high?
A. Yeah.
Q. So there's -- and now we have less volume, and so there's a need to cut some of the employees; correct?
MS. WALTER: Object to the form.
A. Generally, I think that's correct, yeah. Nonproducing, nonproductive employees needed to --
Q. And then it says "On the reverse side of the house" -- let me just stop there. Is there any connection between the profitability of the reverse side of the house and the forward side of the house?
A. No. I mean, I don't know what you mean by

"connection."
Q. Well --
A. It doesn't relate to -- it doesn't relate to our P&L.
Q. That's what I'm looking for.
A. Yeah.
Q. And for example, changes at the reverse side of the house, would that have an impact on Exhibit 7?
A. Correct, it would not.
Q. Okay. Then there's some text that's in all caps and bold. It says "Consolidated June pretax earnings were negative 3.2k," presumably 3.2 thousand?
MS. WALTER: Object to the form.
A. Where are you looking at this? I'm sorry.
Q. Sure. The paragraph that we just went through, I'm now moving down from that.
A. Yes.
Q. There's an all caps, bold statement still on that page 14667, that first page.
A. Yes.
Q. It says "Consolidated June pretax earnings were negative 3.2k." Is that -- I guess what is that? A thousand? A hundred thousand?
A. Yeah, K is thousands, so...
Q. Okay. So there's a loss in terms of June pretax

earnings?

A. Yes.

Q. And then it says "versus plan of 3.2 million." Do you see that?

A. I do.

Q. What is the plan?

A. The plan is the budget.

Q. Okay. So the budget was 3.2 million. Suffice to say the budget has not been met. And in fact, there's a loss as to pretax earnings?

A. That's correct.

Q. And then it says "on total volume of 353 million versus the plan was 705 million"?

A. Correct.

Q. So volume is not exactly half but close to half of what the plan --

A. Sure.

Q. -- had contemplated?

A. Yes.

Q. It goes on to talk about "Consolidated year-to-date 2022 results." And again, there it looks at pretax earnings versus the plan down 76 percent. And then PY is down 89 percent. What is PY?

MS. WALTER: I'm going to object to this line of questioning to the extent you're asking him to read

what is included on this e-mail --

MS. KREITER: I'm asking him what PY stands for.

MS. WALTER: -- that he didn't send, mind you -- if I can finish.

MS. KREITER: It doesn't mater if he sent it.

Q. Do you know what PY stands for?

A. I -- prior year, I would imagine.

Q. Thank you. Okay. Then if you would turn to the next page in the exhibit, Bates No. 14668, it starts with "Forward," the entity of which you're president, and it has your name in parentheticals there, Jeff Gennarelli?

A. Yeah.

Q. This appears to be a statement that you wrote, and the CFO is including it in his report; is that correct?

A. Yeah.

Q. Okay. So let's walk through what you wrote here in July of 2022 when we're looking at damages from Waterstone. You say "Progress, although slower than we had hoped, the key to profit is rightsizing the staff" -- does that mean firing staff?

A. It means rightsizing as getting rid of people that are not productive, not performing.

Q. Then you say "as they relate to lead spend and lead conversion." What is lead spend?

A. That's advertising.

Q. Recruiting --

A. No.

Q. -- sales efforts -- sorry. Not recruiting employees, trying to recruit business development efforts to bring in loans?

A. You want to think about it as advertising.

Q. Okay. Then you say "lead spend and conversion of leads did not move. This will be reduced significantly in July with a path toward profit." Do you see that?

A. Yes.

Q. Was June '22 not profitable?

A. We -- we covered it. You already said it wasn't profitable. We read that.

Q. I just want to make sure. My understanding is it wasn't profitable from this document. Was July of 2022 profitable?

MS. WALTER: Object to the form.

A. I don't remember. I'd have to look at this.

Q. You say "The continued reduction in nonperformers on the sales side is critical." So again, reduction in nonperformers, firing employees; correct?

MS. WALTER: Object to the form.

A. I would say, you know, I think it's important to segregate this conversation. What I'm talking about is folks that worked consumer direct leads. That's not the

groups that were Tampa and Daytona, which is really important to the conversation.

Tampa and Daytona were self-sourced purchase folks. They don't have these huge marketing expenses that go along with consumer direct efforts. So it makes them increasingly more valuable and more profitable in downturns because you don't have to support them with lead purchases, advertising, things like that. So it's important that we -- that we understand that and understand what we're talking about.

Q. "We termed 55 MLOs" -- is that -- I get loan officers. What's the M, Mutual?

A. Mortgage loan officers.

Q. Mortgage loan officers. -- "in June with another 30 on final write-ups." What's a final write-up?

A. Warning, written warning.

Q. "The next target is the junior MLO and MLO assistant area. We feel this is an area we can pick up savings with very little disruption to sales." Do you see that?

A. Yes.

Q. And then it talks about terminating 18 who were in this role in June.

I'm going to skip down to the next paragraph there. The second sentence says "As the market stabilizes"

-- what about the market was not stable at this time?

A. Well, you had the second -- the capital markets was very unstable, volatile. It means that the market was up and down dramatically on a daily basis. There was not stability. When I say "market," I mean the capital markets.

Q. And then you go on to say "and we do not see wide swings in the servicing value," et cetera, et cetera. Then in that last line, you have a phrase that I want to focus on. "...to be in terms of margin to successfully manage in this downturn." You agree the market was in a downturn at this period?

MS. WALTER: Object to the form.

A. Yes.

Q. Going down to the next paragraph, the fourth line that starts with "The departing thoughts," do you see that?

A. Yeah.

Q. So third paragraph, fourth sentence, "The departing thoughts" --

A. Yeah.

Q. -- "from the manager of Daytona."

A. Yeah.

Q. Are you referring to Mr. Hutto or Mr. Smith?

MS. WALTER: Object to the form.

A. I don't recall. I believe it was Mr. Smith, and I was told Brian Tomalak.

Q. Or sorry. So it says "the manager of Daytona," so that's Mr. Wolf or Mr. Hutto?

A. Maybe that was -- maybe it was Mr. Hutto.

Q. Okay. "The departing thoughts from the manager of Daytona were directed at the surprisingly little cooperation we had with the insurance company in terms of cross-marketing, et cetera." Was there, in your mind, little cooperation with the insurance company in terms of cross-marketing?

A. At that time, I would say there was little cooperation, yeah.

Q. Do you believe that that was a genuine concern of the managers?

MS. WALTER: Object to the form.

A. I believe that that's what Dwayne said to Brian Tomalak at the time that he left.

Q. Had you personally heard that from the managers here or other managers?

A. No.

Q. What is the insurance company?

A. I'm sorry?

Q. So sorry. Let me back up here. I'll read a little bit more and maybe that gives context. "We all need to understand this was a big reason our staff stuck with us through the licensing process, the belief we would have some

benefit to sales of being part of such a great company." Does this refer to the acquisition --

MS. WALTER: Object.

Q. -- and BBMC joining Mutual?

MS. WALTER: Object to the form.

A. I believe it does theoretically, but there was a -- yes, I think that that's what would it be.

Q. "There is progress being made now, but it is slow." So what does that mean? I mean, was there an issue in your mind in terms of the insurance company's cross-marketing efforts?

A. Well, here we didn't have any cross-marketing at BBMC. So now you go to a large company. I think people assume there would be more opportunity to cross-market with a large company that has, you know, a $25 million -- a 25 million-person database. It's a slow grind because you have to get compliance to write off on it, et cetera.

So I'm sure people's perceptions was that they were going to have a great opportunity to do that, and that didn't come through. We didn't really push that because we didn't know how -- how effective it would be to cross- -- it's going better today than it was back then, but nevertheless...

Q. And back then, this is closer to the time of the departures?

A. It is, yes.

Q. You then say "To give some context, we went through the greatest mortgage market in decades" -- meaning the 2020 pandemic?

A. Yeah.

Q. -- "and received less than a hundred referrals in those two years." So which two years are the greatest mortgage market in decades, '21 and -- sorry -- '20 and '21?

A. Correct.

Q. Okay. And then I'm going to direct you down to the all caps, bold language following that paragraph again. Now, this is reflective of earnings specific to the forward business unit in the relevant time period; correct?

A. Yes.

Q. "Forward June pretax earnings were negative 439,000 versus the plan for that year was to be positive 3.2 million"; correct?

A. Correct.

Q. And then on total volume, it's 246 million versus the plan of 619 million. Would you agree that these are material and adverse deviations from the budget?

MS. WALTER: Object to the form.

A. Yeah.

Q. And then it continues below that with year-to-date 2022 results. Do you see that?