# EXHIBIT G

Page 1

```
         IN THE UNITED STATES DISTRICT CIRCUIT
              MIDDLE DISTRICT OF FLORIDA
                     TAMPA DIVISION
             CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

       Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

       Defendant.
_____/


DEPOSITION OF:    CHRISTINE LEYDEN

TAKEN:            Pursuant to Notice by
                  Counsel for Defendant

DATE:             June 22, 2023

TIME:             9:01 a.m. to 11:24 a.m. EST

LOCATION:         Hill Ward Henderson
                  101 East Kennedy Boulevard
                  Suite 3700
                  Tampa, Florida  33602

REPORTED BY:      Melanie Keefe, FPR
                  Notary Public
                  State of Florida at Large
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

Page 2

```
APPEARANCES:    COURTNEY WALTER, ESQUIRE
                Mitchell Sandler LLC
                1120 20th Street Northwest
                Suite 725
                Washington, DC  20036

                MARK M. CARROLL, ESQUIRE (Via Zoom)
                Law Offices of Mark M. Carroll
                1000 South Pine Island Road
                Suite 420
                Plantation, Florida  33324

                    Attorneys for the Plaintiff

                MARIA L. KREITER, ESQUIRE
                Godfrey & Kahn, S.C.
                833 East Michigan Street
                Suite 1800
                Milwaukee, Wisconsin  53202

                    Attorney for the Defendant
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

Page 3

| INDEX | PAGE NUMBER |
|---|---|
| Examination by Ms. Kreiter | 5 |
| Read Letter | 111 |
| Errata Sheet | 112 |
| Reporter's Certificate | 113 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

Page 4

(Exhibit numbers continued from a prior deposition.)

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 20 | LinkedIn for Christine Leyden | 19 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 5

1  THEREUPON,
2              CHRISTINE LEYDEN,
3    a witness herein, having been duly sworn, was examined
4  and testified upon her oath as follows:
5         THE WITNESS:  Yes.
6                 EXAMINATION
7  BY MS. KREITER:
8    Q.  Ms. Leyden, if you would just state your name,
9  spell it for the record.
10   A.  Christine Leyden, C-h-r-i-s-t-i-n-e L-e-y-d-e-n.
11   Q.  Have you been deposed before?
12   A.  I have.
13   Q.  So some rules of the road for this deposition,
14 we've got the court reporter here.  She's typing down
15 everything that I say, everything that you say, everything
16 that your counsel says.  A few things follow from that.
17 First, I need you to give me oral responses as opposed to
18 nods of the head.  Agreed?
19   A.  Yes.
20   Q.  In addition -- and I will have to police myself
21 as well, but I will try to make a point of waiting for you
22 to answer the full question that I ask.  Sometimes, I think,
23 it's just natural folks think that they know what the
24 question is, I think I know what your answer is, and we
25 start talking.  It makes for a messy record.

## Page 6

1        So I'm going to make a point to try to wait until
2  you're completely finished with your answer.  In turn, I
3  guess I would ask that you wait until I'm completely
4  finished with my question before you start answering.
5  Agreed?
6    A.  Yes.
7    Q.  In addition, if you don't understand one of the
8  questions that I ask you today, just let me know that.  I
9  will try to rephrase it.  If you don't say anything, I'm
10 going to assume that you understood.  Agreed?
11   A.  Yes.
12   Q.  You're the COO of the forward mortgage --
13   A.  Yes.
14   Q.  -- division of Mutual?
15       What is forward mortgage?
16   A.  Just to distinguish our mortgage division from
17 the reverse mortgage division.  So the forward mortgage
18 division is your traditional mortgage where we lend money to
19 borrowers to purchase or refinance their home as opposed to
20 the reverse division, which is a product for elderly people
21 who don't have payments on the loan.  They get the money up
22 front, and then they -- the payments come out of the equity
23 of their home.  So it's just to distinguish the two.
24   Q.  Okay.  Just from a financial perspective, does
25 any -- does the financial success of the purchase division

## Page 7

1  at all relate to the financial success of the reverse
2  division or are they completely separate?
3    A.  The financials do consolidate, so I would say
4  that it's -- it does contribute to the overall success of
5  the entity.
6    Q.  Okay.  Is it a situation where if reverse is
7  doing well, that somehow has an impact on forward and that
8  forward will do better or is the performance completely
9  separate?
10   A.  The performance is separate.
11   Q.  Do Kiley King and Brian Tomalak report to you?
12   A.  Yes.  And not directly, but indirectly, yes.
13   Q.  Is there someone between --
14   A.  Well, it's Jeff and I sort of run the company
15 together, Jeff Gennarelli.
16   Q.  Okay.  Is it that they report more directly to
17 Jeff --
18   A.  Yeah.  It's just -- I mean, we run the company
19 together.  He's more on the sales side of it, and I'm more
20 on the operations side.  So they do report, I would say,
21 more directly to Jeff, but it's both.
22   Q.  Is there anyone else that reports to you or to
23 you and Jeff collectively?
24   A.  I mean, ultimately everyone in the company, I
25 would say, through the org chart.

## Page 8

1    Q.  Okay.  How many other regional managers are there
2  besides Brian and Kiley?
3    A.  Gosh, I don't know the number.  I don't know how
4  many.
5    Q.  Less than five or --
6    A.  No.  More than five.
7    Q.  More than 20?
8    A.  No.
9    Q.  Okay.  And would those other regional managers
10 report to you or you and Jeff in the same fashion that
11 Mr. King and Mr. Tomalak do?
12   A.  Yes.
13   Q.  Who do you report up to at Mutual?
14   A.  Terry Connealy.
15   Q.  What is Terry's role?
16   A.  He is the president of forward and the -- forward
17 and reverse divisions.
18   Q.  Is it Connealy?
19   A.  Connealy, C-o-n-n-e-a-l-y.
20   Q.  Did Mr. Connealy have any role or involvement in
21 the transition of the Tampa and Daytona offices that are at
22 issue here?
23   A.  I guess I don't really understand the
24 question.  They were -- the Tampa and Daytona offices were
25 part of BBMC when BBMC transitioned over to Synergy One,

9

1 which was at the time doing business as Mutual of Omaha
2 Mortgage. Terry Connealy was involved, but the initial
3 onboarding when we started with them back at BBMC, I would
4 say no.
5     Q. Okay. What about the transition of the offices
6 from Mutual of Omaha to Waterstone?
7     A. What's the question?
8     Q. Did he have a role in that transition or the
9 disputed issue? Is he someone that you talked to about this
10 issue?
11     A. I didn't personally, no.
12     Q. Was he involved, for example, in assessing any
13 kind of losses associated with the transition of the
14 employees to Waterstone?
15     A. Not to my knowledge.
16     Q. Is he somebody that you talked to about -- that
17 either you or others, Jeff Gennarelli, Kiley King, Brian
18 Tomalak, were there any meetings in which Mr. Connealy was a
19 participant relevant to the issues in this suit?
20     A. Yes.
21     Q. Okay. Tell me about those meetings.
22     A. I mean, I think it was just we would have -- we
23 have our monthly calls, and Mark Carroll would be on --
24     MS. WALTER: Object to the form to the extent
25   it's getting into any sort of privileged conversations

10

1 with Mr. Carroll.
2     Q. Go ahead.
3     MS. WALTER: She's not going to speak about those
4   if Mark was leading these or in any way talking about
5   the issues in this case.
6     THE WITNESS: Do I have to answer?
7     MS. WALTER: To the extent Mark wasn't -- I
8   mean --
9     A. Mark was always on the calls.
10     Q. Okay. But Mark's presence on the call doesn't
11 make it privileged. I mean, was Mark, Mr. Carroll, giving
12 you legal advice on these calls?
13     A. Yes, I'd say so.
14     Q. Why don't you just tell me who were the
15 participants on these calls.
16     A. Terry Connealy, Tyler Larsen, Tim Larsen, Torrey
17 Larsen, Jeff Gennarelli, myself, Mark Carroll, and then
18 there were some people from the reverse that were most
19 likely on the call.
20     Q. These are regularly scheduled calls?
21     A. Yeah.
22     Q. Monthly? Weekly? What?
23     A. Monthly.
24     Q. Okay. What was the -- I guess what was the
25 subject matter of the discussion on these calls relevant to

11

1 this suit?
2     A. Mark Carroll would just give updates on any --
3 any legal issues. It was an -- it's an executive call, so
4 he would just update us on any legal issues, status.
5     Q. What -- so the Daytona branch departed at the end
6 of April. When would the first of these calls that you're
7 referring to have addressed issues relevant to this suit?
8 April of '22 is when the --
9     A. I don't recall. I don't know when they -- when
10 they started doing any research or discovery, so I don't
11 know.
12     Q. Was it shortly after the Daytona branch departed?
13     A. Within six months, I would say. I don't know an
14 exact date.
15     Q. Were there ever any notes or agenda items -- were
16 there any agenda items? Let's start there. Were there ever
17 agendas circulated with respect to these calls?
18     A. No.
19     Q. What about notes taken during the call? Was
20 there somebody taking notes?
21     A. No.
22     Q. Would it be the same attendees on these -- on
23 each of these calls?
24     A. Yes, unless someone was on vacation or something.
25     Q. Separate from the calls that you mentioned, was

12

1 there any -- was there ever any discussion between you and
2 Mr. Larsen or Mr. Connealy about the matters that are at
3 issue in this suit?
4     A. Not that I recall.
5     Q. What about between you and Mr. Gennarelli? Have
6 you talked about the suit and the issues that are relevant
7 to the suit with Mr. Gennarelli?
8     A. Maybe. It's not our main topic of conversation.
9 We might've mentioned it.
10     Q. Okay. Do you have a role at Mutual with respect
11 to the underwriting process, or is that not within your
12 jurisdiction?
13     A. It is, yes.
14     Q. Tell me about that role.
15     A. So I run all of the operations, so I have an
16 underwriting -- well, we don't really have an underwriting
17 manager. Lucas Curtolo manages the time off requests and
18 file allocation to the underwriters, but ultimately they
19 report to me. Lucas and I man an underwriting help desk
20 where they can escalate issues or ask questions. And all of
21 the loan officers know that ultimately I'm the final
22 decision-maker or chief credit officer basically.
23     Q. How often -- you know, take a given day. How
24 often are you presented with a question from an underwriter?
25     A. Frequently. More than ten times a day but on the

## Page 13

1  underwriting help desk. It's not only directed to me,
2  but...
3      Q.  Okay. When you get inquiries through the help
4  desk, do they come to you by e-mail or someone calls you or
5  how does that work?
6      A.  Both.
7      Q.  Both. And is it that you and Mr. Curtolo split
8  time on doing a certain day, or how do you manage who's --
9      A.  It's a joint -- sorry. It's a joint e-mail, so
10 whoever is on it. And there's times that Lucas will --
11 Lucas reports to me. So there's -- sometimes he doesn't
12 know the answer, and then he'll escalate to me if he doesn't
13 -- he'll say "I looked at this. I don't know what it is.
14 Can you take a look?" So --
15     Q.  Got it. So it could be the underwriter writes a
16 question to both of you or to a DDL or something like that?
17     A.  Correct. Yes.
18     Q.  And then whoever is free chimes in?
19     A.  Correct.
20     Q.  Is there an effort for Mr. Curtolo to take the
21 first cut of it to save you time, or is it just --
22     A.  Primarily, he does. He will -- I will usually
23 let him take the first cut just so that I'm not always in
24 there.
25     Q.  You say that's a primary function of your job.

## Page 14

1  It sounds like you're spending quite a bit of time on it.
2      A.  One of the primary functions, yes.
3      Q.  What are the other primary functions?
4      A.  Recruiting branches and originators, looking for
5  new products, dealing with post-closing issues as well,
6  post-closing reports up through me. The whole entire loan
7  process reports up through me, so underwriting is just one
8  piece of that --
9      Q.  Got it.
10     A.  -- the entire fulfillment of the loan.
11     Q.  So underwriting, recruiting, looking for new
12 products, post-closing, and essentially the whole process
13 with respect to loans that are closed through Mutual in the
14 forward division?
15     A.  Correct.
16     Q.  With respect to recruiting, what is your role in
17 the recruiting process?
18     A.  Typically, I'll be brought in just to discuss our
19 fulfillment, our underwriting philosophy, and then our
20 process of getting loans from application to closing.
21     Q.  Okay. So essentially, explaining the business,
22 you're not the one that's initially bringing in candidates.
23 But once a candidate has brought -- been brought to Mutual,
24 you would have a discussion with that candidate to explain
25 the benefits of Mutual?

## Page 15

1      A.  Correct.
2      Q.  Who is the person that is involved in actually
3  sourcing the recruit and bringing them in?
4      A.  A number of different people. The regional
5  managers are doing that. I believe that at times we have
6  had an external recruiter looking for candidates and just
7  really anyone who has got -- you know, knows someone in the
8  industry or there's people that will, you know, look at
9  LinkedIn but primarily the regional managers or an external
10 recruiter.
11     Q.  Who makes the decision to say yes or no to a
12 potential candidate?
13     A.  I would say ultimately it would be Jeff
14 Gennarelli's decision and HR. I mean, there are times where
15 HR has to get involved.
16     Q.  But you're not involved in that final decision?
17     A.  No.
18     Q.  What about compensation levels paid to a
19 particular candidate? Is that something that you're
20 involved in?
21     A.  No.
22     Q.  Who would that be? Mr. Gennarelli and HR?
23     A.  Yes.
24     Q.  Is your compensation tied to the revenue of any
25 particular branch or division?

## Page 16

1      A.  My compensation is tied to the overall
2  profitability of the company.
3      Q.  The overall profitability of the forward mortgage
4  division or Mutual inclusive of reverse?
5      A.  Forward mortgage only.
6      Q.  Okay. What was your -- you don't have to tell me
7  the number, but maybe I'll just ask you relative. Was your
8  compensation in 2020 higher -- or for the year 2020, so I
9  don't know if you get paid at the end of the year, but if
10 you look at what was the compensation that I earned in 2020,
11 was that higher or lower than the compensation you earned in
12 -- for 2021?
13     A.  Higher.
14     Q.  Was your compensation for 2020 higher than it was
15 for '22?
16     A.  Yes.
17     Q.  Was your compensation for 2020 the highest that
18 it has ever been?
19     A.  I'm not sure. Probably close to it.
20     Q.  Is there another year that comes to mind that you
21 can recall as being higher than 2020?
22     A.  At a former employer, not with Mutual.
23     Q.  Okay. Approximately when was that? I mean, are
24 we talking ten years --
25     A.  Yeah, more than ten years ago.

## Page 17

Q. So your compensation based on the 2020 performance was the highest compensation that you've received in at least the ten years; correct?

A. Yes.

Q. What about the compensation that you received for 2021? Was that higher or lower than '22?

A. Higher.

Q. And I think you already answered this, but maybe my notes -- was the compensation for '21 higher or lower than '20?

A. Higher, I believe. I'm not sure. Honestly, I'd have to look.

Q. Okay. Both '20 and '21 were relatively high compensation years?

A. Yes, yeah.

Q. What about 2023? We're nearing the halfway mark in 2023. How does your compensation for '23 compare to 2020?

A. It's lower.

Q. Significantly lower?

A. Yes.

Q. I'm trying to not ask you your exact compensation here on the record, but --

A. I don't know if you did, so I don't --

Q. If you can tell me percentage-wise, is it

## Page 18

50 percent lower for '23 than 2020 or how would you quantify it in a way -- and if you're comfortable, you can say what the numbers are --

A. It's significantly lower. It's way more than half lower.

Q. Are you comfortable saying what the numbers are or not?

A. I honestly don't -- I don't even know. My paychecks are direct deposit, and I don't even look at them.

Q. Got it. But you would say it's significantly lower, your compensation, which is tied to the performance of forward mortgage for 2023 compared to 2020?

A. Correct.

Q. Is your compensation for '23 significantly lower than it was for '21?

A. Yes.

Q. Okay. I have kind of a general understanding as to how you fit in on the front end when there's recruiting of branches. Now let's talk about what role you have, if any, when there's a branch departure. I guess can you just explain to me in general when a branch leaves, what is your role, if any, in connection with that process?

A. Nothing really other than to make sure that if there's loans in the pipeline that need help from me, that I'm involved in that but really no involvement.

## Page 19

Q. Okay. Are you involved, for example, in reallocating the loans to a different loan officer within Mutual?

A. I am not.

Q. Who would be in charge of that?

A. Probably Lucas.

Q. Would, for example, a regional manager, Mr. King or Mr. Tomalak, be involved in that process?

A. They would probably have some input, yes.

MS. KREITER: Have the reporter mark Exhibit 20.

MS. WALTER: Thank you.

(Exhibit No. 20 is marked for identification.)

Q. Ms. Leyden, take a look at Exhibit 20. You recognize this as your LinkedIn profile; correct?

A. Yes.

Q. Just take a look at it. I don't know how close you update your LinkedIn profile. Is this accurate, or is there anything missing in terms of your career path in the industry?

A. I think it looks -- I don't really go in and update it very much, but I think it looks --

Q. So for example, you're currently a chief operating officer for forward operations. You were previously with Bridgeview Bank Mortgage, which we've been calling BBMC?

## Page 20

A. Um-hmm, yes.

Q. And then before that, American Bank & Trust?

A. Yes.

Q. Okay. How did you first meet Chris Smith?

A. I think Brian and Kiley brought him into the Lombard office. I believe that was the first time I met Chris Smith.

Q. The Lombard office? Sorry. What --

A. That's where I work when I'm in Illinois.

Q. So they brought him into that office. When are we talking about? Is that in connection with your role at BBMC?

A. Yes.

Q. Okay. And what was the context of bringing Mr. Smith into the BBMC office in Illinois?

A. I believe just to meet the operations staff and just to see the fulfillment center.

Q. In connection with recruiting Mr. Smith to BBMC?

A. I believe he was already employed. I'm not 100 percent sure. It was a long time ago, but I think he -- I don't think I met him until after he was onboarded.

Q. Okay. What about Mr. Hutto? When did you first meet Mr. Hutto?

A. I don't believe he came to Lombard that time, so it would've -- I don't know. It would've been way after

21

1   that. It could've even just been on the first executive
2   trip, the rewards trip that we had. I don't remember.
3       Q.   Is that executive trip -- it's a trip that BBMC
4   put on for high producers?
5       A.   Yes.
6       Q.   And Mr. Hutto attended that trip?
7       A.   Yes.
8       Q.   So he did pretty well at BBMC?
9       A.   Yes.
10      Q.   What about Mr. Smith? Was he similarly on the
11  executive trips for high producers?
12      A.   Yes.
13      Q.   Would you say that he also did well at BBMC?
14      A.   Yes.
15      Q.   And when I say "doing well," meaning
16  profitability of his branch; correct?
17      A.   Yes.
18      Q.   Mr. Hutto's branch at the time that he worked for
19  BBMC was the Daytona branch; correct?
20      A.   Yes.
21      Q.   And Mr. Smith's branch that he developed and was
22  doing well was the Tampa branch; correct?
23      A.   Yes.
24      Q.   Do you know how long Mr. Smith had the Tampa
25  branch before that branch came over to BBMC?
           REGENCY REPORTING SERVICE, INC. (813)224-0224

22

1       A.   I don't know.
2       Q.   Do you know how long Mr. -- sorry.
3            MS. KREITER: Can you read back my last question?
4   I think I might've reversed them.
5            (The previous question was read by the reporter.)
6       Q.   And then -- so I did get it right. With respect
7   to Mr. Hutto, do you know how long Mr. Hutto had the Daytona
8   branch that was doing well before bringing that branch to
9   BBMC?
10      A.   I don't.
11      Q.   You're aware that Mr. Hutto and Mr. Smith were
12  both running their branches successfully before bringing
13  those branches to BBMC?
14      A.   I don't know that. I would assume it, but I
15  don't know it.
16      Q.   They were attractive candidates to BBMC?
17      A.   Again, I wasn't involved. I don't think I met
18  them until after they were onboarded, so I can't really
19  answer that, but I would assume so.
20      Q.   The branches were in the same locations, same
21  physical -- I mean, we talked about them being both in Tampa
22  and Daytona, but were they in the same office space?
23      A.   I don't know.
24      Q.   How well do you know Mr. Smith?
25      A.   I mean, I don't know him that well. I know him
           REGENCY REPORTING SERVICE, INC. (813)224-0224

23

1   as an employee.
2       Q.   You don't know him socially?
3       A.   Other than the executive trips, I did not do
4   anything social with him, no.
5       Q.   How often did Mr. Smith attend the executive
6   trips that you mentioned?
7       A.   I only really remember him on two, but he
8   could've been on more.
9       Q.   Does -- at some point, there's a transition from
10  BBMC to Mutual of Omaha?
11      A.   Yes.
12      Q.   Or to Synergy One?
13      A.   Yes.
14      Q.   Did Synergy One and/or Mutual also have the
15  executive trips?
16      A.   Yes.
17      Q.   Do you know whether Mr. Smith and Mr. Hutto were
18  invited on those executive trips hosted by either Synergy
19  One or Mutual?
20      A.   I know we had a trip in Miami that I know
21  Mr. Hutto was on. I don't remember if Mr. Smith was there.
22  There was a lot of people. I don't remember if he was there
23  or not.
24      Q.   How exclusive are those executive trips? Is it,
25  you know, jeez, most of the branch officers get an invite,
           REGENCY REPORTING SERVICE, INC. (813)224-0224

24

1   or is there -- this is just for our top five producers?
2   What are the thresholds for getting an invite?
3       A.   It's based on production. So 2020 when there was
4   a lot of volume, it was a large trip, and I would say most
5   of the regionals would -- they -- they get invited if
6   they've got producers on that were also invited to the trip.
7   So it's -- there's a lot of people that go typically in a
8   good year.
9       Q.   Okay. So 2020, you mentioned, was a higher --
10      A.   Yeah.
11      Q.   -- attendance rate?
12           That was obviously a very good year?
13      A.   Right.
14      Q.   What about '22?
15      A.   We did not even have a real trip last year. Each
16  of the regionals did a smaller trip. There just was not
17  enough people -- not enough people that would've qualified.
18      Q.   What about for '23? Has there -- I don't know
19  what time of year this trip is or if there's multiple. Has
20  there been any executive trips in '23?
21      A.   Again, the trips in '23 were from '22 production.
22      Q.   Got it.
23      A.   So nothing from -- I mean, the small regional
24  ones that they've had, some of them might've been towards
25  the end of '22. I know there was one -- a small one for the
           REGENCY REPORTING SERVICE, INC. (813)224-0224

Page 25

-- a regional in '23, but it would've been for '22 production.

Q. Is it accurate to say '22 wasn't a good year?
A. Yes.
Q. Is it accurate to say that '23, at least the first six months, hasn't been a good year?
A. Yes.
Q. Is there any sense that the next six months or so are going to pick up such that '23 ends being a good year versus the first six months?
    MS. WALTER: Object to the form.
Q. Do you understand the question?
A. I do. It's hard to say. I mean, I do think that there's potential that it improves significantly. But to the extent that it's as good as former years, you know, probably not just based on the market.
Q. Are you somebody that receives -- we saw in an earlier deposition that there's monthly performance e-mails that go out to a list of executives. I'm assuming you're one of the recipients of those monthly e-mails?
A. Yes.
Q. Okay. So thinking about the e-mails that have gone out talking about the performance in '23, is the performance in '23 consistent with the budget for '23, let's say, or is the performance such that, look, we're not even

Page 26

meeting budget for '23?
    MS. WALTER: Object to the form.
Q. Do you understand the question?
A. Yes.
Q. Go ahead.
A. We're below budget. We're not meeting budget.
Q. By how much, if you can estimate a percentage?
A. I mean, we're significantly below budget. I don't have the exact numbers. I can't even estimate a percentage.
Q. Okay. Is it just -- you know, help me understand -- ballpark, significantly below? Is it more than 50 percent?
A. We're barely breaking even, so...
Q. And when you say we are barely breaking even, is that on a corporate level? Is it at the branch level, or is it at all levels?
A. I mean, some branches are still making money, so it's at the forward division's level.
Q. So Mutual is barely breaking even at the forward division level?
A. Correct. It's probably even a loss still. We've made money a couple of months, but it's still -- overall year to date, it's still a loss, so...
Q. In terms of documents that show Mutual as

Page 27

operating at barely breaking even or possibly a loss, is it those monthly e-mails that would show that or is there some other form of report?
A. The monthly e-mails.
Q. And when you say forward division is operating barely breaking even or at a loss, is there a difference between the profitability of the forward mortgage division and Mutual of Omaha corporate?
A. Yes.
Q. Is -- so let's put aside forward division. Are you privy to the income level at the corporate profitability levels?
A. I don't really see it or pay attention to it. I think I do get the e-mails on the reverses, but I focus primarily on forward since that's what I'm responsible for.
Q. Okay. I guess let me ask this question: My understanding is that -- and maybe this is incorrect, but is it true that the branches might be performing poorly, but Mutual as a corporation can still profit based on those loans that are closed at the branches regardless of how the branches' overall performance --
A. Well, yes, just based on the number of branches that we have. If one branch performs poorly but other branches are performing well, then the entity --
Q. It can even out?

Page 28

A. (Nodding.)
Q. In general, though, all of the branches are performing not as good as they did in prior years at this time?
A. We do have at least one branch that is still performing as they had in the past. Their production and their profitability has remained pretty stable.
Q. Which branch is that?
A. Columbia, Maryland.
Q. So what do you attribute the success of the Columbia, Maryland, branch?
A. I don't know. Good management and the type of leads that they are acquiring and their ability to convert those leads.
Q. Does the Columbia branch focus on purchase loans or refinanced loans?
A. Refinance.
Q. Can you say what the approximate split is for that branch between refinance and purchase?
A. It's mostly refinance. I'd say -- I'm guessing but 75 percent refinance at least.
Q. Okay. So I want to get back to the profitability of Mutual of Omaha corporate, understanding that you may have one branch that performs better than the other branch, and so maybe it can be a wash. If you've got one that's

29

1 down a little bit, but then you've got an all-star branch,
2 maybe overall the company is doing better, but would you say
3 that the corporate level profitability tends to trend
4 proportionately with the performance of the branches?
5     A.  Overall, yes.
6     Q.  For example, in terms of Mutual corporate, is it
7 your understanding that Mutual corporate was less profitable
8 2023 to date compared to 2020, for example?
9     A.  Yes.
10    Q.  What about looking again at just Mutual corporate
11 comparing 2022, the profitability of '22 compared to 2020?
12    A.  It was less.
13    Q.  Suffice to say, looking at the corporate level
14 profitability for Mutual corporate was much higher in 2020
15 and 2021 than in 2022 and 2023; correct?
16    A.  Yes.
17        MS. WALTER:  Object to the form.
18    Q.  Go ahead.
19    A.  Yes.
20    Q.  With respect to Mutual corporate, suffice to say
21 2020 and 2021 were historically high years?
22        MS. WALTER:  Object to the form.
23    A.  Yes.
24    Q.  Were 2020 and 2021 the highest from a
25 profitability perspective for Mutual corporate in recent
         REGENCY REPORTING SERVICE, INC. (813)224-0224

30

1 memory?
2        MS. WALTER:  Object to the form.
3     A.  Yes.
4     Q.  Okay.  You had talked before about, you know, in
5 the last ten years looking at just forward mortgage, 2020
6 and 2021 were the highest.  Is the same true looking at the
7 last ten years but focusing on corporate profitability?
8        MS. WALTER:  Object to the form.
9     A.  I haven't been there for ten years, so I couldn't
10 answer that.
11    Q.  Okay.  How long have you been there?
12    A.  We moved over to Mutual of Omaha in -- I don't
13 know.  I think it was --
14    Q.  Take a look at Exhibit 20 if that helps
15 you.  Exhibit 20 was --
16    A.  Yeah, 2018.  December 2018.
17    Q.  So since 2018, would you agree that 2020 and 2021
18 were the highest years since you've been at Mutual dating
19 back --
20    A.  Yes.
21    Q.  -- to 2018?
22    A.  Yes.
23    Q.  Take a look at what has been marked previously at
24 a deposition as Exhibit 14.  Do you recognize Exhibit 14?
25 It says "2024 Plan vs. 2023 Plan" at the top.  Do you see
         REGENCY REPORTING SERVICE, INC. (813)224-0224

31

1 that?
2     A.  Yes.
3     Q.  What is Exhibit 14 in your own words?
4     A.  I think it's just the pro forma.
5     Q.  The pro forma?
6     A.  Yeah.
7     Q.  For Mutual overall?
8     A.  Yes.
9     Q.  Is Exhibit 14 something that you have a role in
10 preparing?
11    A.  No.
12    Q.  Who prepares Exhibit 14?
13    A.  I would say it's probably Tyler Larsen and Jeff
14 Gennarelli together.
15    Q.  But it's something that you've seen before?
16    A.  Yes.
17    Q.  In what context have you seen Exhibit 14?
18    A.  Just I know that when they present it to the
19 board, I get a copy.
20    Q.  Are you a member of the board at Mutual?
21    A.  No, no.
22    Q.  Is this Exhibit 14 something that you weigh in
23 on, analyze, and discuss, or you're just copied when it goes
24 to the board?
25    A.  Just copied.
         REGENCY REPORTING SERVICE, INC. (813)224-0224

32

1     Q.  Are there other documents that would show the
2 performance of Mutual that go to the board besides
3 Exhibit 14?
4     A.  Not that I'm aware of.
5     Q.  Let's take a look -- if I can direct you, do you
6 see there's four columns in blue, Combined Divisions,
7 Forward Division, Reverse Division, Corporate?  Do you see
8 that?
9     A.  Yes.
10    Q.  The branches that are at issue in this case were
11 located in Tampa, Daytona, and then Paramus, New Jersey.
12 All of those branches were part of the forward division;
13 correct?
14    A.  Yes.
15    Q.  So if you look at the -- under the Forward
16 Division column, there's three subcolumns.  The first is
17 Year-to-Date June 2022 Forecast.  Do you see that?
18    A.  Yes.
19    Q.  And then the middle column is 2023 Plan, and then
20 the far column is 2024 Plan.  Do you see that?
21    A.  Yes.
22    Q.  So if you look at the Net Profit Before Tax
23 associated with the Forward Division Year-to-Date June 2022
24 Forecast, it says 9 million.  Do you see that?
25    A.  Yes.
         REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 33

1  Q. And then if you look at 2023, that same row, Net
2  Profit, it's 4.26 million; correct?
3  A. Yes.
4  Q. So the forecast was that the net profit for the
5  forward division would be cut in half for '23; correct?
6  A. Yes.
7  Q. To what do you attribute that decrease?
8     MS. WALTER: Object to the form.
9  Q. Go ahead.
10 A. Just the market in general. We've never seen a
11 market where interest rates have increased so quickly and
12 the purchase activity has decreased as -- as quickly.
13 Q. How long has the market been in the condition
14 that you just described?
15    MS. WALTER: Object to the form.
16 A. Over a year.
17 Q. Is the market that you've just described, which
18 has been the case over a year, does that even compare to the
19 market in 2020 or 2021?
20    MS. WALTER: Object to the form.
21 A. No.
22 Q. This is Year-to-Date June '22 Forecast, 9
23 million. Has that forecast come to fruition, or is the
24 profit less than 9 million for '22 to date?
25 A. It's less.

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 34

1  Q. By how much?
2  A. Significantly less. If we -- below -- we're in
3  the red, I believe, for year to date.
4  Q. So sorry. Just so I'm clear on the record, so
5  the forward division is in the red year to date for 2023?
6  A. Yes.
7  Q. Okay. What about for 2022? It says 9 million.
8  Do you know how -- well, year-to-date June '22. We're in
9  June of '23, I guess.
10 A. Yeah.
11 Q. Do you know, for June of '22 --
12 A. I don't remember.
13 Q. -- was 9 million achieved?
14 A. I don't know. I don't recall.
15 Q. Are you doubtful about that?
16    MS. WALTER: Object to the form.
17 A. I don't know. I don't remember.
18 Q. And then a minute ago, I think you said year to
19 date was in the red?
20 A. Correct.
21 Q. You were talking about 2023 year to date;
22 correct?
23 A. Yes.
24 Q. So on this Exhibit 14, it's forecasting net
25 profit of 4.276 million. That's not reflective of reality;

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 35

1  correct?
2  A. Yes.
3  Q. Do you know how much in the red the business is
4  for 2023?
5     MS. WALTER: Object to the form.
6  A. No.
7  Q. More than a million?
8     MS. WALTER: Object to the form.
9  A. I don't know.
10 Q. You just know it's in the red?
11 A. Yes.
12 Q. Okay. Then if you would slide over, I'm going to
13 skip the Reverse Division because it sounds like that
14 performance is separate. And then do you see the column on
15 the right where it says "Corporate"?
16 A. Yes.
17 Q. The Year-to-Date June '22 Forecast was negative
18 15 million. Do you see that?
19 A. Yes.
20 Q. Do you know if that is accurate?
21 A. I don't know.
22 Q. Do you know whether at the corporate level,
23 looking at the period of -- you know, through June of '22,
24 the corporation was in the red?
25 A. I don't know.

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 36

1  Q. What about if you slide, then there's those same
2  three subcolumns, so Corporate column. And then looking at
3  the 2023 Plan subcolumn, it says minus 18 million. Do you
4  see that?
5  A. Yes.
6  Q. So certainly, the projection was that 2023 would
7  be worse than 2022; correct?
8     MS. WALTER: Object to the form.
9  A. Yes.
10 Q. And then you see the projection for the 2024 Plan
11 is negative 42 million; correct?
12 A. Yes.
13 Q. So clearly, the projection is underwater in '22,
14 even worse in '23 by about $3 million, and then negative 42
15 million for 2024, so a downward trajectory; correct?
16 A. Yes.
17 Q. At the corporate level?
18 A. Yes.
19 Q. I'm going to direct you now before we get to
20 those four columns in blue on the left, there's -- it
21 doesn't have a column title, but there's different rows.
22 We've been looking at the Net Profit Before Tax row. Do you
23 see that?
24 A. Yes.
25 Q. And that's under -- it says "$ Financials." If

REGENCY REPORTING SERVICE, INC. (813)224-0224