# **EXHIBIT I**

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
 3                       Civil Action No.: 22-CV-01660
 4
     MUTUAL OF OMAHA
 5   MORTGAGE INC.,
 6        Plaintiff,
     v.
 7
     WATERSTONE MORTGAGE
 8   CORPORATION,
 9        Defendant.
     _____/
10
11                         DEPOSITION OF
12                         DWAYNE HUTTO
13                    (Volume I, pages 1 - 171)
14   DATE TAKEN:       June 15, 2023
15   TIME:             9:03 a.m. to 3:57 p.m.
16   PLACE:            Gunster, Yoakley & Stewart, P.A.
                       401 East Jackson Street
17                     Suite 1500
                       Tampa, Florida 33602
18
     TAKEN BY:         The Plaintiff
19
     REPORTED BY:      Victoria White
20                     Court Reporter and Notary Public
21
22
23
24
25
```

Page 2

1  A P P E A R A N C E S:
2  ARI KAREN, ESQUIRE
   COURTNEY WALTER, ESQUIRE (Via Zoom)
3  MARK CARROL, ESQUIRE
   OF: MITCHELL SANDLER, LLC
4     1120 20th Street N.W.
      Suite 725
5     Washington, D.C. 20036
      202.886.5265
6     Akaren@mitchellsanders.com
7     APPEARING ON BEHALF OF THE PLAINTIFF MUTUAL OF
      OMAHA MORTGAGE, INC.
8
   MARIA L. KREITER, ESQUIRE
9  OF: GODFREY & KAHN
      833 East Michigan Street
10    Suite 1800
      Milwaukee, Wisconsin 53202
11    414.287.9466
      Mkreiter@gklaw.com
12
   STEPHANIE ZIEBELL, ESQUIRE (Via Zoom)
13 GENERAL COUNSEL WATERSTONE MORTGAGE CORPORATION
14    APPEARING ON BEHALF OF THE DEFENDANT WATERSTONE
      MORTGAGE CORPORATION
15
16 ALSO PRESENT:
17 Rob Williams - Videographer
18
19
20
21
22
23
24
25

Page 3

1           INDEX OF PROCEEDINGS
2                VOLUME I
3  Witness                                Page
   DWAYNE HUTTO
4    Direct Examination by Mr. Karen         5
5
           PLAINTIFF'S INDEX OF EXHIBITS
6                VOLUME I
7  Exhibit    Description              Marked
8  Exhibit 1    Waterstone Mortgage          9
              Corporation Producing Branch
9             Manager Employment Agreement
10 Exhibit 2    E-mail from Michael Smalley  37
              Dated August 14, 2019
11
   Exhibit 3    Dustin Owen E-mail dated     39
12            October 8, 2021
13 Exhibit 4    Dustin Owen E-mail dated     45
              January 31, 2022
14
   Exhibit 5    Waterstone April 20, 2022    61
15            E-mail
16 Exhibit 6    February 17, 2022 E-mail     82
              (December P&I)
17
   Exhibit 7    Employee Offer Letter       100
18            Date/Resignation Letter Date
              Document
19
   Exhibit 8    April 27, 2022 E-mail       107
20
   Exhibit 9    January 10, 2022 E-mail from 119
21            Chris Wolf
22 Exhibit 10   March 3, 2022 E-mail        146
23 Exhibit 11   March 29, 2022 E-mail       151
24 Exhibit 12   April 8, 2022 E-mail        155
              (Today's Call)
25
   Exhibit 13   April 8, 2022 E-mail        165

Page 4

1
2              P R O C E E D I N G S
3                   * * * * *
4       THE VIDEOGRAPHER: Good morning. We're going on
5  the record at 9:03 a.m. on June 15, 2023. This is
6  media unit one of the video-recorded deposition of
7  Dwayne Hutto in the matter of Mutual of Omaha
8  Mortgage Incorporated versus Waterstone Mortgage
9  Corporation, civil action number 22-CV01660. The
10 location of the deposition is 401 East Jackson
11 Street, Suite 1500, Tampa, Florida 33602.
12      My name is Rob Williams representing Veritext
13 and I'm the videographer. The court reporter is
14 Victoria White from Veritext. Counsel and all
15 present, including remotely, will now state their
16 appearances and affiliations for the record beginning
17 with the noticing attorney.
18      MR. KAREN: Ari Karen with Mitchell Sandler on
19 behalf of Mutual of Omaha.
20      MS. KREITER: Maria Kreiter, Godfrey & Khan, on
21 behalf of defendant Waterstone.
22      MS. WALTER: Courtney Walter on behalf of
23 plaintiff Mutual of Omaha.
24      MS. KREITER: And then go ahead, Stephanie.
25      MS. ZIEBELL: Yeah, Stephanie Ziebell on behalf

Page 5

1  of Waterstone Mortgage. I also have a paralegal
2  intern here, Mary Curry.
3       THE VIDEOGRAPHER: Okay. Will the court
4  reporter please swear in the witness.
5       THE COURT REPORTER: Raise your right hand,
6  please. Do you swear or affirm the testimony you
7  will give in this matter will be the truth, the whole
8  truth, and nothing but the truth?
9       THE WITNESS: Yes, ma'am.
10      THE COURT REPORTER: Thank you.
11         DWAYNE HUTTO,
12 having first been duly sworn, was examined and testified as
13 follows:
14            DIRECT EXAMINATION
15 BY MR. KAREN:
16  Q.  Good morning, Mr. Hutto, how are you?
17  A.  Good morning. How are you doing?
18  Q.  I want to go over some rules of deposition just
19 so we understand how this works. Just really quickly. Have
20 you ever been deposed before?
21  A.  No.
22  Q.  Okay. Have you ever been a witness in a case
23 before?
24  A.  No --
25  Q.  Okay.

Page 62

1    Q.  -- fair assumption?
2    A.  Um-hmm.
3    Q.  And on the bottom of this document it's dated
4 April 20, 2022 and it seems to be a -- either it's a
5 signature or an electronic signature; do you see that?
6    A.  Correct.
7    Q.  And is that yours?
8    A.  Yes, it looks like it, correct.
9    Q.  Do you know if that's an electronic signature or
10 if that's a -- it looks to be electronic if you look at the
11 back.
12    A.  It looks electronic.
13    Q.  And it's dated April 20th, right?
14    A.  Correct.
15    Q.  And is this a document that you did receive,
16 execute and return to Waterstone?
17    A.  Correct, it looks like it, yes.
18    Q.  And I wanted to point out to you, again, the
19 date of this is April 18th on the letter and it indicates
20 that you were going to receive one, two, three, fourth
21 paragraph, a $250,000 credit provided to your branch?
22    A.  Correct.  I believe that was for up and running.
23 We had quite a bit of bad months, might I say.  So it wasn't
24 money that was coming in my pocket, it was money pretty much
25 to keep us afloat through the change.

Page 63

1    Q.  And who is us?
2    A.  Me, basically, I mean --
3    Q.  I mean, well --
4    A.  Chris Wolf at the other side, but it's basically
5 me.  Keep water -- myself, my branch.
6    Q.  Okay.  Let's just clarify because I want to make
7 sure we get the right --
8    A.  Keep my branch up, up and running through the
9 change.
10    Q.  Okay.  So I'll just restate it to make sure I'm
11 clear about it, okay?
12    A.  Um-hmm.
13    Q.  So what we're talking about is here is $250,000
14 to bring your branch over and support your branch the first
15 couple of months?
16    A.  Correct.  We needed it because Mutual didn't pay
17 any of our people for seven -- six, seven, eight months, so
18 then I ended up using that money to pay the employees for
19 the month.  I believe we did right at 19 million the month
20 before so there was a quite a bit of money owed.
21    Q.  And this money, again, went to the branch P&L,
22 the 250,000?
23    A.  Correct.
24    Q.  Is it fair to say that all times you were
25 talking to Waterstone, you were talking to Waterstone about

Page 64

1 you coming over with your branch?
2    A.  At all times, no.  I was talking to multiple
3 banks, but, yes, I talked to them about it.
4    Q.  Let me rephrase the question.  At all times you
5 were talking to Waterstone, the understanding that you
6 had -- strike that.
7        At all times in your discussions with
8 Waterstone, those discussions surrounded you coming over
9 with your branch?
10    A.  Correct.
11    Q.  It was never just you alone?
12    A.  Well, no, it was me coming.  I hadn't told my
13 branch.  I was leaving no matter what.  Chris Wolf and I had
14 made the decision that we were leaving.  So, you know, I
15 hadn't made the announcement to my branch yet.  You know, I
16 did that later.
17    Q.  I understand that but I'm only asking in regard
18 to your conversation with Waterstone, the conversations that
19 you had with Waterstone surrounding you and Chris Wolf
20 leaving with your branch.
21    A.  Leaving with us, too, and my branch because it's
22 in my -- it's in my name.
23    Q.  Okay.  And is it fair to say, sir, that you
24 consider the branch -- I mean, you've used it a couple of
25 times so you just tell me -- but you consider the branch

Page 65

1 sort of yours?
2    A.  Not really.  I mean, it's -- I have a personal
3 guarantee for the payment on it so I consider it that, you
4 know, that I'm responsible for paying the bill.  But,
5 obviously, you know, the people that work with me, it's
6 their decision.  So Chris Wolf and I made the decision that
7 we're going together, but we leave that to them to make the
8 decision what's best for them and their families.
9    Q.  Sure.  I understand that.  But when you left
10 there wasn't going -- when you and Chris Wolf and Chris
11 Smith left, there wasn't really going to be a Mutual branch
12 left anyway at any point, right, because you were taking
13 everything; isn't that true?
14    A.  No, no, there wasn't going to be.  A lot of
15 those people that worked remote for Mutual, there's no
16 branches in the states, so they could always stay with
17 Mutual if they wanted.  I believe a few of them did and they
18 were fired by Mutual.
19    Q.  And, again, I just want to go back to the point
20 that when you were talking to Waterstone, those discussions
21 pretty early on centered around you bringing your branch
22 over and that's what the 250,000 was for?
23    A.  Never found about the 250,000 until the very
24 end.  Never knew anything -- that it was even going to be a
25 thing.  But really it was Chris Wolf and I, that was -- we

17 (Pages 62 - 65)

Page 90

1 available, right?
2   A.  I would not think so.
3   Q.  Okay.  And if you go two more down there's loan
4 repurchase expense; do you see where it says that?
5   A.  Yes, sir.
6   Q.  And just tell me again if I have this correctly.
7 Loan repurchase is when somebody who bought a loan from your
8 mortgage company comes back and for some reason and says
9 something was done wrong on this loan and you have to buy it
10 back because your company did something wrong in its
11 origination?
12   A.  I'm not as familiar with that as the EPO, to be
13 honest.
14   Q.  Okay.  Can you tell me -- just from your
15 knowledge of industry when a repurchase happens?  I'm just
16 trying to get some sense of it.
17   A.  I don't know.  I really don't.  The EPO I'm very
18 familiar with; the loan repurchase, it sounds bad, but I
19 don't know a lot about it.  I should have kept a better P&L
20 obviously or looked at it a little more in depth, but, no.
21   Q.  And again, I'm not suggesting this is bad or
22 good about your branch, I'm just trying to understand --
23   A.  Well, I'm being honest.  I really don't.  The
24 loan repurchase I'm not sure.
25   Q.  Okay.  So you don't -- you don't know -- do you

Page 91

1 even know what a repurchase is?
2   A.  I know the way it sounds but I don't know what
3 it is.
4   Q.  Do your best for me since you have --
5   A.  Repurchase I'm assuming that you've got to buy
6 the loan -- you've got to repurchase the loan back, which to
7 me would be the same as an early -- an EPO.
8   Q.  Okay.  All right.  But, again, that's not going
9 to be publicly available number, right?
10   A.  I wouldn't think so.
11   Q.  And you would agree that in assessing a branch,
12 right, as a prospective employer, this kind of information
13 is useful to assess it's profitability, right?
14       MS. KREITER:  Object to the form.
15       THE WITNESS:  I would think so.
16 BY MR. KAREN:
17   Q.  Okay.  Because obviously if you had a branch
18 with tons of repurchases and tons of early payoffs and tons
19 of tolerance cures, those would all be things that you would
20 want to know before you brought them on, right?
21   A.  I would think so.  It's -- that wasn't something
22 I was thinking about or I've never brought on branches.
23 But, me, I would look at the volume and their customer
24 service score, if I was in their shoes, but...
25   Q.  But if you were trying to figure out what to pay

Page 92

1 somebody -- you talk -- you hire loan officers, right?
2   A.  Correct.
3   Q.  And if you hired loan officers, how do you
4 figure out what you pay a loan officer?
5   A.  It's the same with everyone.
6   Q.  I'm sorry, I don't understand.
7   A.  I said, we've had set in the branch the same, we
8 don't pay one different than the other, it's a tier system
9 that we have.
10   Q.  Okay.  But if you had, for example, you were
11 hiring for a loan officer and you knew in particular one
12 officer had lots of loans get repurchased and a lots of
13 loans have early -- let me finish my question.  If you knew
14 that information, that would affect your hiring decision,
15 right?
16   A.  If I knew, but I would never ask.  So that's a
17 question I've never asked.
18   Q.  I understand.  I'm only asking if you had that
19 information, that would be very useful for you, wouldn't it?
20   A.  Yes.
21   Q.  Okay.  But usually you don't have that
22 information, right?
23       MS. KREITER:  Object to the form.
24       THE WITNESS:  No.
25 BY MR. KAREN:

Page 93

1   Q.  But here Waterstone did have that information
2 about your branch because you provided it to them, right?
3   A.  Correct, yes, I did provide it to them.
4   Q.  Now, you mentioned leads.
5   A.  Yes, sir.
6   Q.  Do you remember mentioning leads?
7   A.  Yes.
8   Q.  Why did you purchase leads?
9   A.  Something that we've always done, that we
10 purchase leads.  We have realtors, a lot of our realtor
11 partners are good friends, we go in to help them out, they
12 send us business and, you know, it's kind of a weighted
13 system, the way I've set the system up.
14   Q.  But, like, when you get a lead to -- pick like
15 whichever one you're most familiar with.
16   A.  Referral.
17   Q.  It's called referral?
18   A.  Yeah, I get a referral from a previous customer.
19   Q.  Okay.  Well, I'm talking about purchase leads.
20   A.  Purchase leads.  You get a referral from a, you
21 know, a realtor refers you.
22   Q.  No, no, no, I'm sorry, let me start this over.
23 When you buy a lead, because you don't by a referral lead,
24 do you?
25   A.  You buy leads for the realtors.

24 (Pages 90 - 93)