# **EXHIBIT K**

## Page 1

```
            IN THE UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                     TAMPA DIVISION
              CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

      Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

      Defendant.
_____/


DEPOSITION OF:   JEFFREY GENNARELLI, CORPORATE
                 REPRESENTATIVE OF MUTUAL OF OMAHA
                 MORTGAGE, INC.

TAKEN:           Pursuant to Notice by
                 Counsel for Defendant

DATE:            May 25, 2023

TIME:            9:17 a.m. to 4:53 p.m. EST

LOCATION:        Hill Ward Henderson
                 101 East Kennedy Boulevard
                 Suite 3700
                 Tampa, Florida  33602

REPORTED BY:     Melanie Keefe, FPR
                 Notary Public
                 State of Florida at Large


          REGENCY REPORTING SERVICE, INC. (813)224-0224
```

## Page 2

```
APPEARANCES:   COURTNEY WALTER, ESQUIRE
               CHRIS McCALL, ESQUIRE (Zoom)
               Mitchell Sandler LLC
               1120 20th Street Northwest
               Suite 725
               Washington, DC  20036

               MARK CARROLL, ESQUIRE
               Mutual of Omaha Mortgage, Inc.
               100 West 22nd Street
               Suite 101
               Lombard, Illinois  60148

                  Attorneys for the Plaintiff

               MARIA L. KREITER, ESQUIRE
               EMMA J. JEWELL, ESQUIRE (Zoom)
               Godfrey & Kahn, S.C.
               833 East Michigan Street
               Suite 1800
               Milwaukee, Wisconsin  53202

               CAROLINA Y. BLANCO, ESQUIRE (Zoom)
               Hill Ward Henderson
               101 East Kennedy Boulevard
               Suite 3700
               Tampa, Florida  33602

               STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
               Waterstone Mortgage Corporation
               N25W23255 Paul Road
                 Pewaukee, Wisconsin  53072

                  Attorneys for the Defendant

ALSO PRESENT:  Carrie Macsuga


          REGENCY REPORTING SERVICE, INC. (813)224-0224
```

## Page 3

| | INDEX | PAGE NUMBER |
|---|---|---|
| | Examination by Ms. Kreiter | 5 |
| | Read Letter | 255 |
| | Errata Sheet | 256 |
| | Reporter's Certificate | 257 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 4

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

5

1  THEREUPON,
2  JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF
3           OMAHA MORTGAGE, INC.,
4  a witness herein, having been duly sworn, was examined
5  and testified upon his oath as follows:
6         THE WITNESS: I do.
7                 EXAMINATION
8  BY MS. KREITER:
9      Q.  Mr. Gennarelli, state your name and spell it for
10 the record, please.
11     A.  Jeff Gennarelli, G-e-n-n-a-r-e-l-l-i.
12     Q.  Have you had your deposition taken before?
13     A.  I have.
14     Q.  Just a few ground rules that I'm going to go over
15 before we get started. First, there's a court reporter
16 here. She's taking down everything that you say, everything
17 that I say. Because of that, I'm going to have to police
18 myself and make a point of talking slow, waiting until you
19 finish with your answer before I speak, and I'll ask that
20 you do the same.
21     A.  Sure.
22     Q.  In addition, because she's typing down the
23 answers, I need you to give verbal answers, yes, no, et
24 cetera, as opposed to nods of the head, which she can't take
25 down.
          REGENCY REPORTING SERVICE, INC. (813)224-0224

6

1          And then, finally, if you need a break at any
2  time during the deposition, it's not a, you know, federal
3  investigation here. Just let me know, and we will take a
4  break. I would just ask that if there's a question that I
5  have pending to you, answer the question prior to taking a
6  break. Does that make sense?
7      A.  It does.
8      Q.  If you don't understand a question that I ask
9  you, let me know that. If you don't let me know, I'm going
10 to assume that you understood the question. Agreed?
11     A.  Yeah, yes.
12     Q.  Great. Start with Exhibit 1. Hand that to the
13 court reporter, please.
14     A.  Then I can look at it?
15         (Exhibit No. 1 is marked for identification.)
16     Q.  Yes, please do. Exhibit 1 is the notice for this
17 deposition. You understand that you're testifying today not
18 in your personal capacity but on behalf of the plaintiff in
19 this case, Mutual of Omaha Mortgage; correct?
20     A.  Yes.
21     Q.  My understanding is that you're testifying on
22 behalf of Mutual with respect to Topics 1 through 12 in the
23 deposition notice; correct? And there's a separate witness
24 tomorrow testifying as to the remaining topics; correct?
25     A.  Yes. Correct.
          REGENCY REPORTING SERVICE, INC. (813)224-0224

7

1      Q.  What did you do to prepare for your testimony
2  today?
3      A.  I read over the Complaint. I looked at some of
4  the e-mails. There's not a lot of discovery yet, I don't
5  think, but I looked at what I did, looked at the -- that's
6  really -- that's really about it, a couple of conversations
7  with -- with counsel.
8      Q.  You said you looked over e-mails. What e-mails
9  would those be?
10     A.  E-mails that were in the discovery folder.
11     Q.  Got it. So was it that somebody shared a
12 discovery folder with you and --
13     A.  Yes.
14     Q.  Okay. How would you go about identifying that
15 folder that was shared with you in prep for the deposition?
16     A.  I don't understand what you mean.
17     Q.  Did you get a link in an e-mail, or how did the
18 documents come to you?
19     A.  Oh, sure. Yeah, link and e-mail. Yeah.
20     Q.  How many e-mails were in this folder available
21 through the link?
22     A.  I mean, not that many. We -- we didn't do a ton
23 of preparation in that regard. There's maybe -- I don't
24 know. I'll say 20, 30 e-mails, something like that.
25     Q.  You say you didn't do much preparation in that
          REGENCY REPORTING SERVICE, INC. (813)224-0224

8

1  regard. In that regard with respect to e-mails or in
2  general for the deposition?
3      A.  Yeah, I think in general. I mean, I think I am
4  going off of just I was around when this happened.
5      Q.  Were there other documents besides the 20 to 30
6  e-mails in the folder that you received?
7      A.  There's a -- I don't know if -- you know, if it
8  was the same e-mail, but there's a spreadsheet that showed
9  calculations of -- for damages, and really that was the
10 majority of it.
11     Q.  Any other spreadsheets that you looked at?
12     A.  Not really, no.
13     Q.  Who sent you the link with the documents to
14 review?
15     A.  Counsel.
16     Q.  Did you take notes as to any of the documents
17 that you reviewed?
18     A.  I did not take -- we had verbal conversations. I
19 didn't take notes.
20         MS. WALTER: Object to form that any of this is
21     going to call for any sort of attorney-client
22     privileged conversations.
23         MS. KREITER: I don't think that's the case.
24     Q.  How long did you spend reviewing the documents
25 that were sent to you?
          REGENCY REPORTING SERVICE, INC. (813)224-0224

129

1   A.  Not that I'm aware of.  Not that I can remember.
2   Q.  Do you remember when you first started putting
3   pen to paper to create Exhibit 7?
4   A.  I don't.  I don't know that.
5   Q.  Okay.  Take a look at Exhibit 7, and I just want
6   to get, you know, bearings here.  It's a document entitled
7   Summary of Corporate Earnings, Contribution from Tampa and
8   Daytona Branches.  Do you see that at the top?
9   A.  Yes.
10  Q.  And for purposes of this analysis, any damages
11  associated with the Paramus branch are built into the Tampa
12  branch; correct?
13  A.  Correct.
14  Q.  Let's just walk through each of the columns here
15  starting with the column on the left, Year of Fundings.
16  You've selected 2019 through 2022 year to date; correct?
17  A.  Yes.
18  Q.  Then the next column, Volumes of Loans Funded, so
19  you're looking at the loan volume associated with each of
20  the branches for the year?
21  A.  Right.
22  Q.  And then the next column is Corporate Profits
23  Earned BPS.  Do you see that?
24  A.  Yes.
25  Q.  What is BPS?

130

1   A.  Basis points.
2   Q.  How is -- for example, the first line item under
3   that column is .530.  Do you see that?
4   A.  Yeah.
5   Q.  How is that number calculated?
6   A.  We took our -- the year of 2019.  Okay?  Our
7   financials, Mutual of Omaha, and that was the return of
8   profit was 53 basis points in 2019.
9   Q.  Are you using data, you know, from a P&L and then
10  dividing or what --
11  A.  Financials.  From the financials, yeah, P&Ls.
12  Yeah.
13  Q.  Okay.  Can you tell me which financials --
14  A.  Corporate --
15  Q.  -- and P&Ls --
16  A.  Corporate financials.
17  Q.  So here's the thing:  There were 25 P&Ls that
18  were produced in the case.  I'm trying to understand what
19  the analysis was to understand the math.  How do I know --
20  A.  I think -- are you talking about branch P&Ls?
21  Q.  I'm talking about branch P&Ls.
22  A.  Well, branch P&Ls are really not so relevant.
23  They're really designed for compensation.
24  Q.  Okay.
25  A.  But they don't capture a lot of expense and a lot

131

1   of income -- right? -- because there's income and expenses
2   that occur past the branch.  And so in order to do that, the
3   only way to do -- there's two ways to do it.  The one way --
4   and this is why most people use this way, because it's
5   simpler.  You simply take the cost of goods sold approach,
6   which was -- which you would take the volume, times what you
7   sold the loan for, less commissions.
8   Q.  Sorry.  Can you just go slower?
9   A.  Yeah.
10  Q.  Cost of goods sold, and then you're subtracting
11  out what?
12  A.  Commissions.
13  Q.  Commissions.
14  A.  Yeah.
15  Q.  Subtracting out anything else?
16  A.  No.
17  Q.  So it's just cost of goods sold subtracting out
18  commissions?
19  A.  It's -- well, you -- so it's the revenue
20  generated by the loan at sale minus commissions.
21  Q.  And you said that you were pulling not from
22  branch P&Ls but from some other P&L for this data?
23  A.  That isn't the way we did it.  That's one of the
24  ways, the simpler way to do it.  But like I said, if we
25  would've done the cost of goods sold approach, this number

132

1   would've been almost $19 million.  So we used a, we felt,
2   more conservative approach, which is we took all the fixed
3   expenses that occur on the corporate side --
4   Q.  Okay.  Can you pause there just for a second?
5   A.  Yeah.
6   Q.  All the fixed expenses on the corporate side?
7   A.  Fixed -- all expenses on the corporate side.
8   Q.  Where do those corporate expenses appear, in the
9   branch P&Ls, or some other P&L?
10  A.  Yeah, the financial -- the corporate financials,
11  the corporate income statement on our tax return.
12  Q.  Okay.  So with respect to this analysis,
13  Waterstone served discovery and specifically asked what are
14  the documents that were relied upon to create Exhibit 7?
15  A.  Yeah.
16  Q.  Tax returns and corporate income statements were
17  not identified, which is why I'm kind of struggling to
18  understand the analysis.  You're going to have to help me
19  here.  I need to leave the deposition with a clear
20  understanding of how this was calculated and what documents
21  you relied on.  Are you able to locate those documents?
22  And, I mean, we can take a break.  I just need to know.  Do
23  you have the documents that you used to calculate this
24  column --
25  A.  Sure.

133

1  Q.  -- Corporate Profits Earned BPS?
2  A.  Yeah. All you have to do is look at the -- it's
3  actually public information, I think. But yeah, you can --
4  we used the corporate P&L. Did you not ask for -- I mean, I
5  would imagine we sent the corporate P&L. I don't know.
6        MS. KREITER: I mean, if you can help me here,
7  Courtney, I don't believe --
8        MS. WALTER: Where are you referring to? We did
9  produce tax returns. We produced tax returns in
10 response to your most recent request for production.
11       MS. KREITER: Right. But there's a request for
12 production specific to what documents were relied on to
13 create Exhibit 7 --
14       MS. WALTER: Can you point me to that? I'm not
15 being difficult. I'm genuinely asking.
16       MS. KREITER: Let's take a five-minute break.
17       (A recess was taken.)
18       MS. KREITER: So for purposes of the record, we
19 took a break. My concern was that the documents
20 identified in response to Interrogatory No. 10 lists
21 documents that Mutual relied on to prepare Deposition
22 Exhibit 7.
23       The witness has started testifying that he relied
24 on corporate tax returns and corporate financials that
25 are not identified within the Bates ranges listed by

REGENCY REPORTING SERVICE, INC. (813)224-0224

134

1  Mutual in response to Interrogatory No. 10.
2        We took a short break to try to discern if we can
3  readily access the documents that the witness did rely
4  on. The witness indicated that tax returns is one of
5  the documents that we could look to for this
6  information.
7  Q.  (By Ms. Kreiter) And I think that I'll let the
8  witness say on the record -- I mean, if we pull up the tax
9  return, are you able to then testify as to how the Corporate
10 Profits Earned Basis Points in Exhibit 7 were calculated?
11 A.  The tax returns are going to make it more tricky
12 because of the reverse mortgage. You know, if we used the
13 tax returns, it's going to include the reverse mortgage and
14 this number is going to be significantly higher. We need to
15 use the corporate P&L, it's called. That's what we call it.
16 And I find it -- I'm surprised you guys don't have it with
17 all the other P&Ls.
18 Q.  I'm going to --
19 A.  It's a corporate income statement. And if we
20 looked at the tax returns, it's going to be difficult.
21 Q.  Are you able to readily access it? I mean, can
22 you send an e-mail and get it e-mailed to you? I'm just
23 looking to facilitate the deposition. There's 25 P&Ls. I
24 just show a Bates number.
25 A.  It's up to the attorneys.

REGENCY REPORTING SERVICE, INC. (813)224-0224

135

1        MS. KREITER: I don't want to come back and redo
2  this deposition.
3        MS. WALTER: So what exactly are you asking?
4        MS. KREITER: I'm asking the witness to provide
5  at the deposition today any documents that he needs to
6  -- in order to testify as to how the Corporate Profits
7  Earned column of Exhibit 7 were calculated.
8        MS. WALTER: With specificity? Like, pulling the
9  actual number to do the calculation right here?
10       MS. KREITER: I need to understand how this was
11 done and what documents were relied on because I do not
12 believe they are the ones listed in response to
13 Interrogatory 10.
14       In addition, I'm going to be asking the witness
15 to identify the P&L statement that he relied on to come
16 up with the figures that are in the second column of
17 Exhibit 7, which is Volume of Loans Funded. The
18 witness has said that that data came from an internal
19 system.
20 A.  I mean, it came from the P&Ls as well. Those
21 should -- as long as we're looking at the right P&Ls, it
22 should certainly cross-reference. Bernie tends to not make
23 mistakes. He's an Eagle Scout, by the way, really
24 legitimately, not just a Boy Scout, an Eagle Scout. We can
25 provide the corporate P&L. I just don't know if -- you

REGENCY REPORTING SERVICE, INC. (813)224-0224

136

1  know, that's up to counsel. I don't know --
2  Q.  Let me do this. So for example --
3        MS. KREITER: Have that marked.
4        (Exhibit No. 8 is marked for identification.)
5        MS. KREITER: Number 8.
6  Q.  So take a look at Deposition Exhibit No. 8.
7  A.  Okay.
8  Q.  Go to page 5. It says "Identify" -- this is
9  Interrogatory No. 10. It says "Identify, as defined above,
10 all documents that Mutual referred to or relied on to
11 prepare Exhibit 1." Exhibit 1 of this discovery request is
12 the same as Deposition Exhibit 7 that we're using today.
13 A.  Okay.
14 Q.  So we've asked you to identify all of the
15 documents that were relied on, and then there's a series of
16 Bates numbers. Do you see that?
17 A.  I do.
18 Q.  So MOM-10942, that's a particular P&L. I'm going
19 to have that marked as well.
20       (Exhibit No. 9 is marked for identification.)
21 Q.  So Deposition Exhibit No. 9 that has just been
22 marked is Bates No. MOM-0010942. Do you see that, the first
23 page of the document?
24 A.  Yes.
25 Q.  And do you see how that's also one of the

REGENCY REPORTING SERVICE, INC. (813)224-0224

137

1  documents that is listed in response to Interrogatory 10 as
2  one that you relied on to prepare the lost profits analysis?
3  Do you see how the Bates number matches up to what's written
4  there on behalf of Mutual?
5     A.  I do.
6     Q.  So take a look at the document that Mutual
7  identified as one you relied on and explain to me how this
8  document was relied on and how it is reflected in
9  Exhibit 7.
10    A.  This does -- this -- this isn't right.  This P&L
11 here is not right because it shows -- well, hang on.  '19 --
12 no, it's just not right.  Yeah, I don't know why this would
13 be off.  It doesn't make any sense.
14        MS. WALTER:  Can we go off the record for a
15    second?
16        MS. KREITER:  I guess I have a few more questions
17    about this, if you don't mind.
18        MS. WALTER:  Okay.
19    Q.  On the record.  Mr. Gennarelli, so did you or
20 Mr. Mayle rely on what we've now marked Deposition Exhibit 9
21 in conjunction with the lost profits analysis that is
22 Deposition Exhibit 7?
23    A.  I -- I did not rely upon this 9, no.
24    Q.  Do you know why Mutual identified it as one of
25 the documents you relied on?
       REGENCY REPORTING SERVICE, INC. (813)224-0224

138

1     A.  I do not know.
2     Q.  I will represent to you that this first Bates
3  range listed for Interrogatory No. 10 that starts with the
4  document you're looking at, Bates 100942, and then it goes
5  on to MOM-11032, that's about 25 different P&Ls.  Are you
6  able, as you sit here today, to let me know which of those
7  25 P&Ls you relied on to create Exhibit 7?
8     A.  We relied upon -- if I looked at them all -- but
9  this volume is off on this P&L for some reason.  I have no
10 idea why, but the volume is off.  I don't know if it was a
11 misprint or something.  You look at it.  It's common sense.
12 In January 2019, unless I'm missing -- this is not
13 extrapolated out?
14    Q.  Do you see the different Bates numbers that are
15 listed in response to Interrogatory No. 10?
16    A.  I'm still going over this.  Hang on one second.
17    Q.  Sure.
18    A.  This -- this P&L is from January 31, 2019.  It's
19 only a one-month P&L.
20    Q.  It's something that Mutual produced and said you
21 relied on, so I can't explain the origin of it.  I'm just
22 trying to understand were we given the information
23 necessary --
24    A.  Well, you just probably -- maybe there -- is
25 there more?  Is there another P&L?
       REGENCY REPORTING SERVICE, INC. (813)224-0224

139

1     Q.  There definitely is.  There's about 24 more.  So
2  I need to know which one did you rely on because when I --
3     A.  The full -- full years.  I mean, this is -- this
4  is why -- there's nothing wrong with this P&L other than
5  it's only for the month of January.  And I think the
6  reasoning provided for this was to show the 2018 volume at
7  BBMC.  Probably that's the reason it was -- it was provided.
8     Q.  Okay.  So I'm going to just share my screen.
9     A.  Were you using this to -- as an offage in 2019?
10 Is that the problem?
11    Q.  I don't know what that was used for.  I'm trying
12 to sift through the volume of documents and understand the
13 analysis, and I'm, frankly, not able to do so.
14    A.  Well, you guys had the P&Ls.  They sent you all
15 the P&Ls --
16    Q.  I don't --
17    A.  -- for the branch levels before they -- before
18 they joined the company.
19    Q.  Are you able to -- for example, let me ask you
20 this question:  Volume of Loans Funded, Tampa Volume --
21    A.  Yeah.
22    Q.  -- it says 115,699,761?
23    A.  Yeah.
24    Q.  I do not find that number on any of the -- I
25 mean, we've spent hours, understand, looking through the
       REGENCY REPORTING SERVICE, INC. (813)224-0224

140

1  documents that Mutual identified.  None of those documents
2  reference a loan volume of that amount, and I'm trying to
3  understand why and where that number came from.
4     A.  Yeah, I'd have to see the documents you looked
5  at, but we -- there's a closed loan number.  There's funded
6  loans, so make sure you look at funded, not closed.  I don't
7  know.  I don't know what you're looking at.
8     Q.  Well, I looked at all the documents that Mutual
9  identified.
10    A.  Okay.
11    Q.  And it's not there.  Are you able to tell me
12 which of these Bates numbers you relied on?
13    A.  Bates number, no, I don't know what that Bates
14 number is.
15    Q.  How is Waterstone supposed to know what you
16 relied on at this deposition today to come up with the 115-
17 shown as the Tampa volume for 2019?
18        MS. WALTER:  Object to the form.
19    A.  Other than the fact that the P&Ls were sent to
20 you before these folks even left by themselves, you could've
21 cross-referenced those P&Ls because those were accurate.
22    Q.  But those weren't the ones that Mutual has said
23 it looked at.  How would I have known that you looked at
24 those other P&Ls and not the ones that Mutual said it did?
25    A.  I don't know what you're looking at.  I don't
       REGENCY REPORTING SERVICE, INC. (813)224-0224

141

1  know what you're seeing.
2      Q.  So my problem is plaintiff, Mutual, has the
3  burden of proof.  It's alleging damages north of $4 million.
4  It has to demonstrate how those damages are calculated --
5      A.  Absolutely.  There's --
6      Q.  Are you able to, at this deposition today, tell
7  me how Mutual came up with the --
8      A.  Yes.
9      Q.  -- 115 --
10     A.  Yeah.
11     Q.  -- million?
12     A.  It was the volume produced by the Tampa office,
13 Tampa combined with Paramus.
14     Q.  But you're not able to tell me what document that
15 comes from?
16     A.  The Tampa -- the Tampa P&L.  This is one-month
17 P&L you showed me.
18     Q.  Sure.  Are you able to tell me which of the
19 documents identified in response to Interrogatory 10 it
20 comes from?
21         MS. WALTER:  Object to the form.
22     A.  Well, I don't -- did you want me to memorize
23 what --
24     Q.  I want Mutual to come to a deposition prepared to
25 testify about its damages.  Did you look at any of these
         REGENCY REPORTING SERVICE, INC. (813)224-0224

142

1  documents in preparation for your testimony today?
2          MS. WALTER:  Object to the form.
3      A.  Yes.
4      Q.  How can I get at the document you looked at
5  without spending another 50 hours trying to look at these
6  documents and then finding that it doesn't exist?
7          MS. WALTER:  Object to the form.
8      Q.  Are you able to go on Mutual's system or e-mail
9  Mr. Mayle and find the document that shows --
10     A.  Yes.
11     Q.  -- the loan volume?
12         MS. WALTER:  Object to the form.
13     A.  Yes.
14     Q.  Can you do that if we take a break and e-mail the
15 documents that show these volume numbers?  That would help
16 me a lot.
17         THE WITNESS:  Are you guys okay with this?
18         MS. WALTER:  Can we take ten minutes, please?
19         MS. KREITER:  Yes.
20         MS. WALTER:  I asked that previously.
21         (A recess was taken.)
22         MS. KREITER:  So opposing counsel had asked for a
23     break.  The request that I had posed was that the
24     witness access the documents he used to calculate
25     Exhibit 7 and provide them at the deposition today such
         REGENCY REPORTING SERVICE, INC. (813)224-0224

143

1  that he could walk through the calculations.  Is that
2  something that can happen today?  Is Mutual willing to
3  do that?
4          MS. WALTER:  Our position is that we will not be
5  producing additional documents but that the documents
6  referred to in response to Interrogatory No. 10,
7  Mr. Gennarelli will walk you through his calculation
8  and the data that was considered within those
9  documents.
10         And to be clear, Interrogatory No. 10 requests
11 "Identify, as defined above, all documents that Mutual
12 referred to or relied upon to prepare Exhibit 1."  You
13 requested documents.  Waterstone requested documents.
14 Mr. Gennarelli referred -- relied on data within our --
15 within the system.
16         So we did identify the documents that -- the
17 relevant data that was used for Mr. Gennarelli to come
18 up with his calculation, and he is able to testify to
19 that today.
20         MS. KREITER:  A witness that's putting forth
21 damages can't rely on documents in a system or
22 elsewhere that they don't produce in discovery.
23         MS. WALTER:  You can send another request for
24 potential -- for additional data.
25         MS. KREITER:  Why don't we try and see if he can
         REGENCY REPORTING SERVICE, INC. (813)224-0224

144

1  walk through it.  I mean, you indicate that he can walk
2  through it with me?
3          MS. WALTER:  Yes.
4          MS. KREITER:  Okay.  Let's do that.
5      Q.  (By Ms. Kreiter)  Let me start with,
6  Mr. Gennarelli, I'm going to put up on my computer screen --
7  and I understand with your counsel that they're amenable to
8  you just looking at my computer for efficiency in the
9  deposition.
10     A.  Sure.
11         MS. KREITER:  Courtney, it's document Bates
12 No. 10964.
13     Q.  So I've got the document up on my screen here.
14     A.  Okay.
15         MS. KREITER:  Can I orally designate this a
16 deposition exhibit?  I can get a hard copy for it.  But
17 just for purposes of the record, I guess I'd like this
18 to be Deposition Exhibit 10.  It's Bates
19 No. MOM-0010964.  It's an Excel spreadsheet.
20         (Exhibit No. 10 is marked for identification.)
21     Q.  Do you recognize this document as a P&L?
22     A.  Yes.
23     Q.  Up in the left-hand corner, it says "Mutual of
24 Omaha Profit and Loss Statement."  This is for the Tampa
25 branch, and it's dated December 31, 2019.  Do you see that?
         REGENCY REPORTING SERVICE, INC. (813)224-0224

145

1  A. Yes.
2  Q. There's different years in the document. I'm
3  going to direct you to the column that says "2019 Year to
4  Date." Do you see that?
5  A. Yes.
6  Q. And there's a row that says "Total Loan Volume,"
7  and then the year-to-date total loan volume is 114,750,394.
8  Do you see that?
9  A. I do.
10 Q. Yet on Deposition Exhibit 7, the Volume of Loans
11 Funded for 2019 that's listed is not an amount that matches
12 the 114- but rather is 115,699,671. Do you see that?
13 A. I do.
14 Q. I am trying to understand where the data you
15 relied on came from because it doesn't reconcile the
16 year-end P&L for 2019. Can you explain that?
17 A. Well, I can -- I can -- I'd prefer if an
18 accountant did it, but there's accruals that happened after
19 the month. This was presented at month end. And then
20 subsequent to that, there might've been loans that --
21 mistakes happen; right? If a loan is funded at a different
22 branch, it was added back to that. This is -- this is the
23 up-to-date in our system today. I can say that because
24 that's the data we used, but you're off by -- what is that?
25 -- probably two loans, I would estimate.

REGENCY REPORTING SERVICE, INC. (813)224-0224

146

1  Q. Has Mutual produced the documents in its system
2  that you relied on to prepare Exhibit 7?
3      MS. WALTER: Object to the form.
4  A. I -- I used data, not the documents.
5  Q. Okay. When you pull up the data that you were
6  referencing, can you print it out from the system?
7  A. I would imagine I could.
8  Q. Okay. Could you take a screenshot and produce
9  it?
10 A. Bernie -- I couldn't do it now.
11 Q. No, I'm not saying now. I'm just saying in
12 general, can you take a screenshot of it, get it produced to
13 us?
14 A. Yes. These numbers didn't come out of thin air.
15 Q. Sure.
16 A. These are the updated numbers, yeah.
17 Q. And you can print it off your system; correct?
18 A. Yeah.
19     MR. CARROLL: So --
20     MS. WALTER: Send another request, Maria.
21     MS. KREITER: Courtney, this is for documents
22 referred to or relied on.
23     MS. WALTER: He responded.
24     MS. KREITER: So he can push print. I mean, that
25 doesn't -- just because you haven't printed something

REGENCY REPORTING SERVICE, INC. (813)224-0224

147

1  doesn't mean it's not a document that has to be
2  produced in discovery.
3      MS. WALTER: We don't have to create a document.
4      MS. KREITER: He's not creating it. He's pulling
5  it up, and he's pushing print.
6      MS. WALTER: I'm not getting into this argument.
7  Q. Is that correct? Bernie or you pulls up your
8  system, and you can print that document; correct?
9      MS. WALTER: To be clear, he -- I also think
10 you're misrepresenting his testimony.
11     MS. KREITER: I'm asking him.
12     MS. WALTER: He said, "I would imagine."
13     MS. KREITER: I'm asking him right now.
14     Read my last question back.
15     (The previous question was read by the reporter.)
16 A. I'm not sure exactly what we can provide to you,
17 but I'm sure there's something that we can give you that
18 shows this number. It didn't come out of thin air.
19 Q. Okay. I will make a request on the record that
20 you produce that document immediately.
21     Is that the same -- I mean, we were talking about
22 loan volume with respect to the year 2019?
23 A. I'm sorry. If I just could ask a question, and I
24 don't know if this is inclusive of Paramus or if this may be
25 inclusive of Paramus. You know what I'm saying? He

REGENCY REPORTING SERVICE, INC. (813)224-0224

148

1  combined Paramus and Tampa on this sheet, you know, when we
2  did it. I don't -- that may be the problem, which we can
3  show you, so...
4  Q. Okay. But -- so that's the problem. Today is
5  the day when I need to know and you are to be in a position
6  to walk me through this. I'm now hearing at the deposition
7  that you cannot and that you're not sure if one of the three
8  branches is included; is that accurate?
9  A. I'm not sure. I'm not sure if that's accurate or
10 not.
11 Q. You don't know whether Paramus is included in
12 Exhibit 7?
13 A. I know it's included in this number here under
14 Tampa.
15 Q. When you say "this number," just we've got the
16 reporter --
17 A. I'm sorry.
18 Q. You're talking about --
19 A. The Exhibit 7.
20 Q. You're not sure if Paramus is included in
21 Exhibit 7?
22 A. No. In Exhibit 7, I know it is included.
23 Q. It is included?
24 A. Yes.
25 Q. Okay.

REGENCY REPORTING SERVICE, INC. (813)224-0224

149

1  A.  You referenced a P&L of Tampa, so I'm not sure
2  that that was inclusive of Paramus, and that -- that may be
3  the difference.
4  Q.  I am going to put a request on the record that
5  you ask Mr. Mayle or somebody at your office to print the
6  documents that would allow you to walk me through the
7  volumes of loans funded.  3
8      MS. KREITER:  Ms. Walter, are you amenable to
9  that?
10     MS. WALTER:  No.  I'm objecting to that, Maria.
11 He's -- let me just go on the record and say that you
12 did put in a request for the profit and loss statements
13 for the Paramus branch.  It's Request for Production
14 No. 40, and we identified the P&Ls that corresponded to
15 Paramus -- to those branches.
16     MS. KREITER:  Request No. 40 has nothing to do
17 with your response to Interrogatory 10.
18     MS. WALTER:  Yes, it does.  You're insinuating
19 that we didn't identify the P&Ls that correspond to
20 Paramus, and we did in response to --
21     MS. KREITER:  In 10?
22     MS. WALTER:  In -- it's in there.  The Bates
23 ranges are included in there.
24     MS. KREITER:  Bottom line, I need to how this was
25 calculated.

REGENCY REPORTING SERVICE, INC. (813)224-0224

150

1      MS. WALTER:  He's walking you through that.
2  A.  I can walk you through that.
3  Q.  Can you -- I mean, are you -- it sounds like
4  you're amenable to getting the documents from Mr. Mayle.
5  Your counsel is saying --
6      MS. WALTER:  I'm objecting.  I'm objecting.
7      MS. KREITER:  Okay.  Understand we may need to
8  come back here, and I'm going to move the court for
9  fees.
10     MS. WALTER:  File your motion.
11     MS. KREITER:  Okay.
12 A.  If I may, I can still walk you through the
13 philosophy.  The philosophy --
14 Q.  I want to get whatever mileage I can.  And then
15 if there's an efficient way to avoid bringing you back to
16 Florida, I'll do that, but I -- so let's see what we can --
17 A.  I don't mind coming back either, but --
18 Q.  Let's see what we can get through.  Why don't you
19 explain to me -- you mentioned the philosophy surrounding
20 the Volumes of Loans Funded?
21 A.  Yes.
22 Q.  Walk me through that, please.
23 A.  The philosophy of the loans funded are just that,
24 the loans -- so the Tampa volume would be Tampa and Paramus,
25 and that's the loans -- the volume funded that year.

REGENCY REPORTING SERVICE, INC. (813)224-0224

151

1  Q.  Okay.
2  A.  Okay.  So that's pretty cut and dry.
3  Q.  And they're taken off of -- just to be clear,
4  they're taken off of documents in your system --
5  A.  A system, not documents.
6  Q.  In a system?
7  A.  Yeah.
8  Q.  They're taken off of the system --
9  A.  Yeah.
10 Q.  -- and they've not been produced?
11     MS. WALTER:  Object to the characterization of
12 that.
13 A.  I actually think they have been produced but not
14 in the way -- the manner in which you would like them
15 produced is how I understand it.
16 Q.  So this is where I'm struggling.  Where can I --
17 I mean, the point of this deposition is that I get to verify
18 what you did.  Where in the documents are there numbers from
19 which I can verify the volume of loans funded?
20 A.  Do you have Paramus's P&L in there?
21 Q.  I have Tampa.  Is it separate from Tampa?
22 A.  It may be, you know.
23 Q.  I don't have separate P&Ls for Tampa.
24     MS. WALTER:  Maria, we identified those P&Ls
25 correspond also to Paramus and Tampa.

REGENCY REPORTING SERVICE, INC. (813)224-0224

152

1      MS. KREITER:  That's what I'm saying.  That's
2  what I'm saying.  I don't have P&Ls specific to
3  Paramus.  I only have Tampa.
4  Q.  I mean, this is one.  I guess that's what I'm
5  wondering.  What -- so this is a P&L for Tampa in 2019?
6  A.  Right.  Yeah.  Right, right, right.  Yeah.
7  Q.  Okay.  So walk me through what we've virtually
8  marked as Exhibit 10.
9  A.  I want to check.  Do you mind if I just look at
10 one thing?
11 Q.  Go for it.
12 A.  Okay.  So, I mean, the only -- the only thing we
13 used from this document is volume in this exercise.
14 Q.  Okay.
15 A.  I was just trying to see if there was -- in the
16 payroll tab, if there were people from Paramus in there.  I
17 really can't recognize anybody, so I'm not sure.  I don't
18 have the time that they joined.  That was what I was just
19 trying to see.
20 Q.  Sure.  But the volume here doesn't match up?
21 A.  Right, right.  And that's something Bernie is
22 going to have to explain and somebody from accounting is
23 going to have to explain to you why, you know, if there's an
24 accrual or if these accruals are common or if there was
25 misallocation.  You know, you're funding a lot of loans.

REGENCY REPORTING SERVICE, INC. (813)224-0224

153

1   It's very common for a loan to fund and maybe get applied to
2   a different P&L, and then it gets reapplied when we correct
3   it down the road.
4       Q.   Okay.  Are you willing to call Bernie and ask him
5   about this one in particular?  And maybe that will call
6   clarity --
7           MS. WALTER:  Object to that.  You can depose
8       Bernie.
9           MS. KREITER:  He's the corporate rep on this
10      document.
11          MS. WALTER:  He is walking you through exactly
12      how to do this, and he explained the discrepancy.  I
13      don't know what more you want.  You can ask him all the
14      questions about the P&Ls and the calculations.  He's
15      not calling Bernie.
16          MS. KREITER:  Okay.  Look, this is going to be a
17      second deposition of a corporate rep.  Instead of that,
18      why are you opposed to him calling Bernie and taking
19      care of this in about ten minutes?
20          MS. WALTER:  To ask him what exactly?
21          MS. KREITER:  To ask him to educate your
22      corporate rep on why there's a discrepancy in the
23      documents you've identified and the damages --
24          MS. WALTER:  He responded.  He responded to that
25      question.
            REGENCY REPORTING SERVICE, INC. (813)224-0224

154

1           MS. KREITER:  He said he didn't know.  He'd have
2       to ask Bernie.
3           MS. WALTER:  Well, he provided an explanation
4       about the accruals.
5       Q.   Do you know that that's the reason for the
6   discrepancy between the 115 million volume and the 114
7   million volume?
8       A.   I know generally that's what happened, but I
9   don't know for a fact in this case, no.
10      Q.   Okay.  What about with respect to all of the
11  other loan volumes?  Are you able to tell me here at the
12  deposition where these numbers come from and if there's a
13  discrepancy?
14      A.   These numbers are going to be most correct
15  because they are the most recent.  They came out of a system
16  much more recently than when the P&L was created in January
17  or December of 2019.
18      Q.   And you're going to follow your counsel's
19  instruction not to have them printed and produced today at
20  the deposition --
21      A.   Well, I'm going to follow my counsel's
22  instructions, yeah.
23      Q.   What about Corporate Profits Earned BPS, that
24  column that we were talking about?
25      A.   Yeah.
            REGENCY REPORTING SERVICE, INC. (813)224-0224

155

1       Q.   We've had a few breaks.
2       A.   Yeah.
3       Q.   Again, I'm just looking for you today at the
4   deposition be able to walk me through, for example, how did
5   you calculate the .530, and what documents did you rely on
6   to do that?
7       A.   Okay.  There's a Richey May tax return in the
8   file.  I'm not an accountant, but that'll have all the
9   information that you would need to calculate this.  We
10  basically took the total profit for Mutual of Omaha Mortgage
11  in 2019 divided by the volume to get a basis point
12  calculation.
13      Q.   Sorry.  You're going to have to go slow.  You
14  took the profit for 2019?
15      A.   Yeah, took the profit for 2019, divided that by
16  the loan volume to get a basis point calculation.
17      Q.   And you said the document that this profit and
18  loan volume came from is what?
19      A.   Well, there's a Richey May document in there.
20  There's several documents --
21      Q.   The audited financial statements?
22      A.   Yeah.
23          MS. KREITER:  Emma, are you able to e-mail those
24      to me?
25          MS. JEWELL:  Yes.  I'll do that now.
            REGENCY REPORTING SERVICE, INC. (813)224-0224

156

1       Q.   Is there more -- while she's sending those over
2   to me, is there more explanation before we turn to the
3   documents?
4       A.   Well, you know, again, these Richey May, you
5   know, audited financials are going to be difficult for
6   laypeople like us to understand them, to be honest.  I mean,
7   I -- you can have your accountants look at them.  They can
8   figure it out easily, but I don't know that we can.  I mean,
9   I would go off of our corporate P&L, which I don't know if
10  it wasn't requested or what the case is, but that's how I
11  would -- I understand an income statement.  I don't
12  necessarily understand how they then take the income
13  statement and make this.
14      Q.   So if I pulled up the Richey financial
15  statements, would you be able to walk me through this or
16  not?
17      A.   I don't know.  I don't know.  I -- I don't know.
18      Q.   Okay.
19      A.   It's -- they're complicated, so...
20      Q.   And are you saying that you instead looked at a
21  corporate P&L?
22      A.   I used data, so I pulled data from our system,
23  which goes into all of that.
24      Q.   Got it.
25      A.   That's how I used it, yeah.
            REGENCY REPORTING SERVICE, INC. (813)224-0224