IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC.<br><br>Plaintiff,<br><br>v.<br><br>WATERSTONE MORTGAGE CORPORATION,<br><br>Defendant. | CASE NO. 8:22-cv-01660-TPB-JSS |

**DEFENDANT WATERSTONE MORTGAGE CORPORATION'S
MOTION TO STRIKE REBUTTAL EXPERT CANDICE L. ROSEVEAR**

**I.      INTRODUCTION**

The expert witness Mutual disclosed for the first time on July 14, 2023, Candice Rosevear, just two weeks before the close of discovery, is not a rebuttal expert. Rather, Rosevear offers an entirely new damages estimate of $28 million, which is exponentially higher than the $4,440,002.42 demand by Mutual that has been the target of Waterstone's defense efforts.  Mutual elected not to retain a damages expert and instead support its $4,440,002.42 demand with an analysis prepared by the president of the division that housed the branches at issue, Jeff Gennarelli, and one of its finance executives (the "Gennarelli Analysis"). Waterstone deposed Mutual's corporate representative based on the Gennarelli Analysis and hired a damages expert, Steve Oscher, to rebut that analysis. For many months, Waterstone has been defending what it believed was a $4.4 million case, not

a $28 million case. Mutual does not get a redo. A rebuttal expert is to address assertions raised by an opponent's expert. Here, Rosevear does not rebut Oscher's opinions — which focus on the speculative and unreliable nature of the Gennarelli Analysis. In fact, Rosevear testified she did not analyze the Gennarelli Analysis and was not familiar with its particulars. Rather, Rosevear felt no obligation to understand how her model differed from Gennarelli's, testifying, "my task is to conduct an independent analysis that's not influenced by prior models."

Waterstone will be substantially prejudiced by a new damages estimate nearly seven times higher than (and approximately $23.5 million greater than) Mutual's damages pursued throughout the case, injected two weeks before the close of discovery. Mutual's untimely disclosure of an opening expert witness violates Rule 26, and this Court should strike the Rosevear Report in its entirety pursuant to Rule 37(c)(1).

## II.     RELEVANT BACKGROUND

### A. Mutual's Alleged Damages.

Mutual articulated three categories of damages: (1) unquantified lost profits based on loans allegedly diverted to Waterstone ("Category 1 Damages"); (2) $4,440,002.42 in profits the branches would have made if they had stayed affiliated with Mutual from June 30, 2022 to December 31, 2023 ("Category 2 Damages"); and (3) $750,000 in "ill-gotten gains" ("Category 3 Damages"). (Exhibit 1 at Mutual's Resp. to Interrog. 1.)  The Court's October 12, 2022, Scheduling Order required Mutual to submit its expert disclosures by March 1, 2023.  (DE 34, ¶ 2.)

Mutual made the strategic choice not to retain an affirmative damages expert to support any of its alleged damages.

To date, Mutual has not made any effort to quantify its Category 1 Damages (*see* Gennarelli Dep. Tr. (Exhibit 2) 21:22-28:12, 30:23-31:1), and has now stipulated to the dismissal of the alleged Category 3 Damages. (DE 76.)

To support its Category 2 Damages and $4,440,002.42 demand, Mutual relies on the Gennarelli Analysis, attached as Exhibit 3, and presented Gennarelli as its Federal Rule 30(b)(6) witness on various topics targeting Mutual's alleged damages. (*See* Exhibit 4 at Ex. A.)

**B. Waterstone's Damages Expert: Steve Oscher.**

Waterstone retained Steven Oscher as its damages expert to opine on Mutual's three categories of damages. (*See* Exhibit 5, "Oscher Report.") With respect to the $4,440,002.42 Category 2 damages, Oscher's focus was the Gennarelli Analysis. Specifically, Oscher concluded that (1) without the supporting documentation relied upon by Mutual, the demand reflected in Gennarelli's Analysis cannot be verified or tested (Ex. 5 at 10.); (2) the Gennarelli Analysis was based on unsupported assumptions including that the branches would have remained open for 18 months despite none of the employees having any contractual obligation to remain employed by Mutual for any set period of time (*id.*); (3) the loan volumes produced by the three branch managers should not have been included in Gennarelli's calculation (*id.* at 10-11); and (4) the Gennarelli Analysis projections were derived from data from 2020-2021, a historically anomalous time period in the mortgage lending industry

3

triggered by the COVID-19 pandemic that is not representative of the current market. (*Id.* at 11-12.) Further, to demonstrate the unreasonableness of Gennarelli's reliance on COVID-era data, Oscher compared Gennarelli's projections to data from the Mortgage Bankers Association ("MBA"). (*Id.* at 13.) Oscher's reference to MBA data was clearly in the context of a critique of the Gennarelli Analysis.

### C. The Rosevear "Rebuttal" Report.

On July 14, 2023, Mutual disclosed Rosevear and her report, attached as Exhibit 6 (the "Rosevear Report"), which asserts for the first time that Mutual's damages for lost profits are "approximately $28 million." (Ex. 6 at 5.) Tellingly, the report admits that Rosevear was not asked to respond to Oscher's report or rebut his conclusions, but rather, Rosevear was "asked by counsel for Mutual to calculate the lost profits … resulting from the closure of [Mutual's] Tampa and Daytona branches." (*Id.* at 3.) To do so, Rosevear states she employed "a well-known valuation technique known as a discounted cash flow (DCF) analysis to estimate the present value of lost profits." (*Id.* at 5.) Outside of a footnote citing to a dataset used by Oscher, the Rosevear Report's analysis does not even mention the Oscher report. (*Id.* at 3.) Moreover, the Rosevear Report ignores Mutual's prior damages model entirely, omitting reference to the $4.4 million-dollar demand, the 18-month period, and Gennarelli's calculations.

Instead, the Rosevear Report outlines two brand new methods for calculating lost profits. (*Id.* at 6.) The first, a "peer" model, looks at monthly sales for Mutual's St. Louis and Maryland branches to predict loan sales for the former Daytona and

4

Tampa branches. (*Id.* at 8.) The second, an "MBA-Based Model," uses quarterly MBA data to predict future sales for Tampa and Daytona. (*Id.* at 9.) Neither methodology was used by Gennarelli (*see* Ex. 3), and therefore, neither was reviewed by Oscher. (*See* Ex. 5.)

### D. Rosevear's Deposition Testimony.

Waterstone deposed Rosevear on July 20, 2023 (given that discovery would soon close, on July 31, 2023). Rosevear admitted her report has nothing to do with the Gennarelli Analysis, that she was unaware of the particulars of the Gennarelli Analysis, and that her analysis is markedly different:

- Rosevear did not compare her analysis to Gennarelli's (Rosevear Dep. Tr. (Exhibit 7) 7:21-8:2) or attempt to determine whether the Gennarelli estimate is accurate. (*Id.* at 23:4-7, 23:20-24:4.)

- Rosevear knew of the Gennarelli analysis but never asked Mutual why she was not analyzing it (*id.* at 21:20-22:6), and stated "I didn't analyze that number or spend timing thinking about that number in particular, I did my own independent analysis." (*Id.* at 22:6-14.)

- Rosevear could not say whether she relied upon the same data as Gennarelli because she "didn't analyze [his spreadsheet] in depth." (*Id.* at 25:3-8.)

- Mutual retained Rosevear to independently calculate damages, not to support the Gennarelli model. (*Id.* at 27:7-9; 31:19-32:5.)

5

- Rosevear had no discussions with anyone at Mutual about why there was a multi-million dollar difference between the Gennarelli Analysis and her $28 million estimate. (*Id.* at 29:22-30:11.)

- Rosevear projected damages out ten years, to 2031, whereas Gennarelli projected damages out 18 months (*id.* at 43:1-45:9), with Rosevear noting "I don't understand fully why 18 months is selected." (*Id.* at 45:8-9.)

- Rosevear did not know whether Gennarelli factored in the 2020-2021 COVID-19 anomalous time period that drew criticism from Oscher because she "didn't look closely at the underlying assumptions of that analysis." (*Id.* at 84:11-16.)

- When using the 18-month period Gennarelli used but applying Rosevear's methodology, the lost profits are $2.6 million—40% less than the prior $4,440,002.42 Gennarelli demand. (*Id.* at 99:11-103:10.)

- Rosevear's damages model is "very different" from the Gennarelli Analysis, as she used a forecasting model based off branches Mutual viewed as "peer" branches and MBA data, which was not relied upon in the Gennarelli Analysis. (*Id.* at 123:16-124:5.)

In sum, when asked if her analysis has nothing to do with the Gennarelli Analysis, Rosevear agreed, stating: "That's correct. My analysis is an independent analysis." (*Id.* at 124:17-20.) Rosevear further testified she had no obligation to understand how her model differed from Gennarelli's or discuss his assumptions and

considerations, as she was to "conduct an independent analysis, that's not influenced by prior models." (*Id*. at 175:19-176:1.)

Nor is Rosevear's analysis possibly in rebuttal to any opinion in the Oscher Report because Oscher focused exclusively on the Gennarelli Analysis (and the Category 1 and Category 3 damages Mutual appears to have abandoned). In fact, when pressed to identify which aspects of the Oscher Report her report rebuts, Rosevear paged through the Oscher Report, could not identify anything specific, and offered that her analysis rebuts an "implied analysis" put forth in Oscher's report. (*Id*. at 134:8-136:19.) In addition, Rosevear pointed out that she and Oscher both considered MBA data (*id.* at 137:8-15), although Rosevear admitted Oscher did not calculate any Category 2 damages based on MBA data or otherwise. (*Id*. at 139:8-140:21.)

Further, when asked if she could have done her analysis in the winter of 2022 or the spring of 2023 — i.e., before Mutual's March 1, 2023 opening expert disclosure deadline — Rosevear indicated she could have done the analysis then: the framework and approach would have been the same, with the damages being only slightly different because she would have used data available at that time and not as current as May or June of 2023. (*Id*. at 30:16-31:4, 42:21-24.)

## III.  ARGUMENT

### A.  Rosevear Is Not A Rebuttal Expert.

"Rebuttal testimony is permitted only when it directly addresses an assertion raised by an opponent's experts." *In re Trasylol Prod. Liab. Litig.*, No. 1:08-MD-01928, 2010 WL 4065501, at *2 (S.D. Fla. Aug. 30, 2010) (citation omitted). *See* Fed. R. Civ. P. 26(a)(2)(D)(ii); *Bradenton Beauty & Barber Academy, Inc. v. First Nat'l Ins. Co. of America*, 2017 WL 2868405, at *2 (M.D. Fla. April 6, 2017) (rebuttal evidence can only be provided by an expert "to contradict or rebut evidence" on the same subject matter of the opposing party's expert).

Put differently, "[r]ebuttal expert reports are only appropriate to rebut opposing opinions, not create new ones." *Zurich American Ins. Co. v. Hardin*, 2020 WL 1150981, at *3 (M.D. Fla. March 10, 2020). *See also Lebron v. Royal Caribbean Cruises, Ltd.*, No. 16-24687-CIV, 2018 WL 3583002, at *2 (S.D. Fla. July 26, 2018) ("a rebuttal opinion should not be used to advance new arguments or present new evidence"). A plaintiff is therefore not permitted to "offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016) (rebuttal expert opinion that bolsters plaintiff's initial expert witness and attempts to "obtain a do-over" of the initial expert's report is not proper rebuttal).

Here, Rosevear's report and opinions are not rebuttal. Rosevear attempts to inject a $28 million estimate that is nearly seven times greater than the $4,440,002.42 Gennarelli demand. Rosevear also made no attempt to consider the Gennarelli Analysis and admits her analysis has nothing to do with the Gennarelli Analysis. These admissions are dispositive because Oscher's critique of the Category 2 damages focuses on the Gennarelli Analysis exclusively. Moreover, Rosevear advances two wholly new methodologies for calculating damages and abandons the methodology of Gennarelli that problematically relies upon the historically anomalous 2020 and 2021 COVID-19 time period. Further, Rosevear relies upon two entirely different data sets for her calculations: (1) the loan production of Mutual's St. Louis and Maryland branches, which she contends are "peer" branches to the Daytona and Tampa branches that left Mutual and (2) MBA data. Gennarelli never considered or used that data and, as result, Oscher never analyzed it either.

That Rosevear was retained to advance new arguments in support of Mutual's damages is also clear from what is—and is not—included in her report. First, Rosevear admits she was retained by Mutual "to calculate the lost profits" allegedly resulting from the closure of its branches, not to rebut the conclusions or opinions offered by Waterstone's damages expert. Other than a footnote, the report omits any reference to Oscher or his conclusions which is telling. *See, e.g., Kroll v. Carnival Corp.*, No. 19-23017-CIV, 2020 WL 4793444, at *6 (S.D. Fla. Aug. 17, 2020) (expert's "phrasing alone confirms that rebutting [opposing expert] was not the primary intent of his retention" where "most of his report did not even mention [opposing expert]").

9

Second, Rosevear introduces two new Mutual of Omaha branches to the case. Discovery in the case has been ongoing for almost a year and Mutual has not once alleged that its St. Louis and Maryland branches are "peer" to Tampa and Daytona, let alone introduced them as a basis for seeking damages. Third, neither Mutual nor Oscher employed a "discounted cash flow (DCF) analysis" to any aspect of this case, yet Rosevear devotes an entire section of her report to explaining her use of this newly introduced valuation technique.

Importantly, Oscher did not calculate Mutual's lost profits—he reviewed and expressed an opinion on the Gennarelli Analysis Mutual put forward to support its Category 2 Damages, setting forth multiple reasons why the assumptions underlying Mutual's $4,440,002.42 demand are speculative and unsupported. The subject matter of Oscher's report was the Gennarelli Analysis. Rosevear does not even mention the Gennarelli Analysis, the $4,440,002.42 demand, or any of Mutual's assumptions including the 18-month timeframe that are the focus of Oscher's report. Rosevear further admitted she did not consider the Gennarelli Analysis and instead performed her own "independent analysis."

In sum, Rosevear's opinions reflect a belated attempt by Mutual to introduce new arguments and evidence on damages. She is not a proper rebuttal expert.

### B.  The Court Should Strike Rosevear.

The Court has authority "to strike an expert report as untimely disclosed if it is not a proper rebuttal report and instead introduces new topics." *Quantum Cap., LLC v. Banco De Los Trabajadores*, No. 1:14-CV-23193-UU, 2015 WL 12156137, at *3

10

(S.D. Fla. Oct. 19, 2015) (citing *1550 Brickell Assocs. v. QBE Ins. Corp.*, No. 07-22283, 2010 WL 1947636, at *2 (S.D. Fla. May 13, 2010)). Indeed, when "a party attempts to designate as a 'rebuttal' expert someone whose proposed testimony is beyond the scope of appropriate rebuttal, that witness may be viewed as an initial expert who was not timely designated and whose testimony may be stricken by the Court for violating Rule 26(a) and the Court's governing scheduling order." *Kroll v. Carnival Corp.*, No. 19-23017-CIV, 2020 WL 4793444, at *5 (S.D. Fla. Aug. 17, 2020). *See also Bradenton Beauty & Barber Academy, Inc.*, 2017 WL 2868405, at *2 (M.D. Fla. April 6, 2017) (expert who did not rebut the opposing expert's opinions was "at best…an untimely disclosed expert").

Rule 37(c)(1) compels exclusion when an initial expert is submitted "under the guise of a rebuttal expert" unless the violating party can establish that the improper disclosure was substantially justified or harmless. *Kroll*, 2020 WL 4793444 at *5. *See also* Fed. R. Civ. P. 37(c)(1); *Timber Pines Plaza, LLC*, 192 F.Supp.3d at 1291 ("pursuant to Rule 37(c)(1), 'failing to disclose an expert witness by a court-ordered deadline results in an automatic and mandatory exclusion of the witness, unless the non-disclosure was justified or harmless'").

Foiled strategic decisions are no excuse. *See, e.g., People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1191 (S.D. Cal. 2016) (striking experts improperly designated as "rebuttal" and agreeing that plaintiff's failure to disclose experts by the initial expert disclosure deadline "represents a strategic choice" that is "indefensible"). *See also Marjum Supply Co. of Florida, LLC v. Pliteq, Inc.*, 812 Fed.

11

Appx. 803, 813 (11th Cir. 2020) (Plaintiff's failure to designate expert as an affirmative expert as opposed to rebuttal was a "strategic error").

Here, Mutual chose not to retain a damages expert and to instead rely on the Gennarelli Analysis. Mutual could have timely disclosed Rosevear as its damages expert by the applicable March 1, 2023 expert disclosure deadline. Rosevear's calculations are based on information and data that has been available to Mutual since this case was filed over a year ago (e.g., Mutual's own profit and loss statements, tax returns, and information available online or other public sources). There is no new information relied upon by the Rosevear Report to come up with the $28 million lost profit estimate. In fact, Rosevear admitted she could have performed her same analysis in the winter of 2022 or the spring of 2023, well in advance of the March 1, 2023 deadline. (*See* Rosevear Dep. Tr. (Ex. 7) 30:16-31:4.) Mutual does not get a redo.

To allow Rosevear to testify or for Mutual to use her report would be extremely prejudicial to Waterstone. Discovery closes in a few days, on July 31, 2023. Waterstone invested substantial time and money evaluating and responding to the Category 2 Damages sought by Mutual, including deposing Gennarelli as the Mutual corporate representative about his analysis, retention of Oscher to respond to the $4,440,002.42 demand, subsequent discovery efforts, and preparation of the pending motion *in limine* to exclude Gennarelli's analysis.

Further, the efforts to defend a $28 million case are not comparable to those necessary for a $4.4 million case. Waterstone would have approached its defense in a far more robust fashion and, at the very least would need to (1) redo the deposition of Mutual's corporate representative, Gennarelli, who testified at length about his analysis in light of Rosevear's drastically different estimate, which is intentionally divorced from some of Gennarelli's speculative assumptions; (2) retain an expert to evaluate the Rosevear Report or expand the scope of Oscher's engagement so that he could analyze the Rosevear Report and issue a new report of his own; and (3) conduct further, robust discovery upon Rosevear and Mutual, including requests for production of documents, as Waterstone only had three business days to review the Rosevear report before her deposition on July 20, 2023. It is well established that Waterstone should not be prejudiced in this fashion. *See, e.g., Quantum Capital, LLC,* 2015 WL 12156137 at *3 (if a party is permitted to introduce new evidence through a rebuttal expert the opposing party would be "prejudiced by being unable to proffer their own rebuttal expert" on the topics); *1550 Brickell Associates*, 2010 WL 1947636 at *2 (holding that allowing rebuttal witnesses to introduce new topics would cause prejudice in the form of additional time, expense, and further prolonging discovery, and striking improper rebuttal experts accordingly). The Court should strike Rosevear and hold Mutual to the $4,440,002.42 it elected to put forth through Gennarelli.

## IV.  CONCLUSION

For all of the reasons discussed, the Court should grant Waterstone's motion and strike Candice Rosevear.

Dated this 26th day of July, 2023.

*s/Maria L. Kreiter*
Maria Kreiter (*Admitted PHV*)
mkreiter@gklaw.com
Emma Jewell (Admitted PHV)
ejewell@gklaw.com
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)

Scott McLaren (FBN: 414816)
Scott.mclaren@hwhlaw.com
Carolina Y. Blanco (FBN: 0098878)
Carolina.blanco@hwhlaw.com
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)

*Attorneys for Defendant Waterstone Mortgage Corporation*

14

## LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g), Waterstone's counsel certifies it conferred in good faith with Mutual's counsel concerning the issues presented in this Motion. Specifically, counsel exchanged e-mails about the motion on July 20, 2023 and spoke by phone on July 21, 2023 regarding the grounds for the motion. Mutual opposes the motion.

Dated this 26th day of July, 2023.

s/*Maria L. Kreiter*
Maria Kreiter (*Admitted PHV*)
mkreiter@gklaw.com
Emma Jewell (Admitted PHV)
ejewell@gklaw.com
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
scott.mclaren@hwhlaw.com
carolina.blanco@hwhlaw.com
*Attorneys for Defendant Waterstone Mortgage Corporation*

29652272.5