# EXHIBIT 2

## Page 1

```
            IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                        TAMPA DIVISION
               CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

      Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

      Defendant.
_____/


DEPOSITION OF:    JEFFREY GENNARELLI, CORPORATE
                  REPRESENTATIVE OF MUTUAL OF OMAHA
                  MORTGAGE, INC.

TAKEN:            Pursuant to Notice by
                  Counsel for Defendant

DATE:             May 25, 2023

TIME:             9:17 a.m. to 4:53 p.m. EST

LOCATION:         Hill Ward Henderson
                  101 East Kennedy Boulevard
                  Suite 3700
                  Tampa, Florida  33602

REPORTED BY:      Melanie Keefe, FPR
                  Notary Public
                  State of Florida at Large


              REGENCY REPORTING SERVICE, INC. (813)224-0224
```

## Page 2

```
APPEARANCES:   COURTNEY WALTER, ESQUIRE
               CHRIS McCALL, ESQUIRE (Zoom)
               Mitchell Sandler LLC
               1120 20th Street Northwest
               Suite 725
               Washington, DC  20036

               MARK CARROLL, ESQUIRE
               Mutual of Omaha Mortgage, Inc.
               100 West 22nd Street
               Suite 101
               Lombard, Illinois  60148

                  Attorneys for the Plaintiff

               MARIA L. KREITER, ESQUIRE
               EMMA J. JEWELL, ESQUIRE (Zoom)
               Godfrey & Kahn, S.C.
               833 East Michigan Street
               Suite 1800
               Milwaukee, Wisconsin  53202

               CAROLINA Y. BLANCO, ESQUIRE (Zoom)
               Hill Ward Henderson
               101 East Kennedy Boulevard
               Suite 3700
               Tampa, Florida  33602

               STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
               Waterstone Mortgage Corporation
               N25W23255 Paul Road
                 Pewaukee, Wisconsin  53072

                  Attorneys for the Defendant

ALSO PRESENT:  Carrie Macsuga

              REGENCY REPORTING SERVICE, INC. (813)224-0224
```

## Page 3

| INDEX | PAGE NUMBER |
|---|---|
| Examination by Ms. Kreiter | 5 |
| Read Letter | 255 |
| Errata Sheet | 256 |
| Reporter's Certificate | 257 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

## Page 4

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

REGENCY REPORTING SERVICE, INC. (813)224-0224

**Page 21**

1  A. Okay.
2  Q. For now, I want to just focus on Bucket No. 1,
3  the bucket that is associated with lost revenue and profits
4  from loans that were improperly diverted, so the first
5  bucket --
6  A. Yes.
7  Q. So my understanding is that the contention is
8  there were loans that should've closed at Mutual that did
9  not and instead closed at Waterstone with respect to that
10 first bucket?
11 A. Correct.
12 Q. I don't see in the written responses, as to the
13 first bucket, any type of number demand. I do see that when
14 you get to page 27, when you start talking about the second
15 bucket.
16 A. Yeah.
17 Q. So for purposes of this deposition --
18 A. Sure.
19 Q. -- now is the time when I get to exhaust and find
20 out exactly what damages are sought.
21 A. Sure.
22 Q. With respect to the first bucket, what are the
23 damages sought?
24 A. Well, I think a lot of that has to do with
25 discovery we haven't been provided yet. We don't know. We

REGENCY REPORTING SERVICE, INC. (813)224-0224

**Page 22**

1  haven't looked at Waterstone's books to see what loans have
2  closed. We only -- how do we know -- we know of a couple of
3  instances of loans that were diverted for sure, but we don't
4  know the totality of the loans that were diverted because we
5  don't have access to Waterstone's closed loan report.
6  Q. Mr. Gennarelli, when was the lawsuit filed? It
7  was filed in July.
8  A. Okay.
9  Q. It's been pending for ten months.
10 A. Okay.
11 Q. Has Mutual served discovery on Waterstone?
12    MS. WALTER: Object to the form.
13    MS. KREITER: The witness is testifying that he
14    doesn't believe Mutual has had a chance to explore the
15    claims. I'm following up on that testimony.
16 Q. Do you know whether Mutual of Omaha has served
17 discovery on Waterstone?
18    MS. WALTER: Object to the extent it implicates
19    attorney work product.
20 Q. Go ahead and answer.
21 A. I'll say I have not seen a closed loan report
22 coming from Waterstone. If I have seen that, then we can go
23 back and backtrack.
24 Q. Are you --
25 A. What I have seen, though --

REGENCY REPORTING SERVICE, INC. (813)224-0224

**Page 23**

1  Q. Sorry. Go ahead.
2  A. What I have seen were our customers sent to
3  Waterstone to the head underwriter at Waterstone asking if
4  these loans would work by -- by Mutual of Omaha Mortgage
5  employees. I have seen that. So I know that there was
6  some. Do I know the extent of it? I haven't seen that.
7  And I didn't think I was going to -- I didn't think I was
8  asked to testify to the fact of what Waterstone has.
9  Q. Well, you're here to testify about the damages,
10 and I heard you say that you haven't been able to calculate
11 damages because discovery has just started.
12    MS. WALTER: Object to form.
13 Q. Is that accurate?
14 A. In my mind, I have not received enough
15 information. I haven't seen -- I do know this: Customer
16 information was sent to personal e-mails. We don't -- we
17 haven't -- we haven't looked at any personal e-mails.
18 Q. Mr. Gennarelli, are you aware that in the fall of
19 '22 Waterstone produced in discovery a list of the loans
20 that had been closed at the branches within the first three
21 months? Are you aware of that?
22    MS. WALTER: Object to form.
23    MS. KREITER: What's wrong with the form?
24    MS. WALTER: Maria, carry on.
25    Answer the question.

REGENCY REPORTING SERVICE, INC. (813)224-0224

**Page 24**

1     MS. KREITER: What is the objection to the form?
2     Because I'll restate it.
3     MS. WALTER: I am objecting properly pursuant to
4     how I'm supposed to object.
5  Q. Do you understand the question, Mr. Gennarelli?
6  A. I do.
7  Q. Go ahead and answer.
8  A. I was aware of a small list that was provided.
9  I'm also aware that we have not looked at personal e-mails.
10 Our customer list was sent numerous times to personal e-mail
11 addresses. We haven't looked at those e-mails and what
12 happened to that data after it was in the personal e-mail.
13 Q. When you were preparing to testify on behalf of
14 the company today as to the loans that have improperly
15 transferred to Waterstone, did you go back and look at the
16 list of loans closed at Waterstone that was produced in
17 discovery in the fall?
18 A. Yes. But I didn't think it was an all-inclusive
19 list, to be honest with you.
20 Q. Did you compare that list to the list of loans in
21 the pipeline at Mutual of Omaha?
22 A. Well, they wouldn't be in the pipeline.
23 Q. Did you use that list produced by Waterstone back
24 in the fall and try to analyze which of those loans closed
25 at Waterstone you believe should've been closed at Mutual?

REGENCY REPORTING SERVICE, INC. (813)224-0224

25

1   MS. WALTER: Object to the extent it implicates
2   attorney work product. He's here as -- he's --
3   MS. KREITER: He's --
4   MS. WALTER: He's not the attorney.
5   MS. KREITER: He's not here as an individual.
6   He's here as a corp rep.
7   MS. WALTER: I did not say individual. I said he
8   is not the attorney in the case.
9   MS. KREITER: I'm entitled to ask what documents
10  and what preparation this witness did to testify about
11  damages for which ten months into the case Mutual has
12  not disclosed any number, so that's the line of my
13  questions.
14  Q. Do you have a number, Mr. Gennarelli, with
15  respect to this first bucket, the loans that have
16  transferred to Waterstone from Mutual of Omaha? Have you
17  looked at the loans, and do you have a number that you're
18  ready to present at the deposition today with respect to
19  Bucket 1?
20  A. I don't have a number with respect to Bucket 1.
21  Q. Is Mutual seeking damages with respect to
22  Bucket 1?
23  A. I believe so.
24  Q. But you're not able to tell me what those damages
25  are?

REGENCY REPORTING SERVICE, INC. (813)224-0224

26

1   A. Not at this moment.
2   Q. Has you or anyone at Mutual made an attempt to
3   calculate those damages?
4   A. I have not.
5   Q. Has anybody at Mutual?
6   A. Not that I'm aware of.
7   Q. And your position is that you're waiting to do
8   more discovery?
9   MS. WALTER: Object to form.
10  A. It is.
11  Q. What more discovery do you need to do?
12  MS. WALTER: Object to form.
13  A. Well, I'd like to see the personal e-mails where
14  all of our data was sent to. That's what I'd really like to
15  know so that I can understand the absolute damage caused by
16  this unbelievable breach of conduct.
17  Q. Did Mutual of Omaha Mortgage send subpoenas to
18  any of the individuals who have those e-mails?
19  MS. WALTER: Object to the extent it implicates
20  attorney work product.
21  MS. KREITER: Work product --
22  MS. WALTER: Mr. Gennarelli isn't going to be
23  able to answer how discovery is being conducted in the
24  case. That's my job.
25  MS. KREITER: The fact that subpoenas have gone

REGENCY REPORTING SERVICE, INC. (813)224-0224

27

1   out is not a privileged question.
2   MS. WALTER: I didn't -- I said it implicates
3   attorney work product. I didn't say it was privileged.
4   I'm not instructing him not to answer.
5   Q. Do you have an understanding --
6   A. I'm not aware of the subpoenas or not. I don't
7   know.
8   Q. So you don't know whether Mutual has made an
9   effort to, for example, subpoena the personal e-mails of any
10  of the individuals that you claim are necessary?
11  A. I am not aware.
12  Q. When you were preparing to testify for the
13  deposition, did you have discussions or requests, access to
14  the e-mails that you believe are necessary to calculate
15  Category 1 damages?
16  MS. WALTER: Object to the extent it implicates
17  attorney work product or goes to attorney-client
18  discussions.
19  Q. Go ahead.
20  A. Repeat the question.
21  Q. Sure. I hear you testifying that Mutual is
22  unable to calculate damages with respect to Category 1,
23  which we've defined as the loans that have closed at
24  Waterstone due to some unlawful conduct. And I'm trying to
25  understand your testimony.

REGENCY REPORTING SERVICE, INC. (813)224-0224

28

1   I've heard you say that calculation hasn't been
2   done because you haven't seen personal e-mails, and I've
3   heard you testify that you don't know whether there have
4   been any subpoenas issued by Mutual in an effort to try to
5   get the e-mails. So now my question is in connection with
6   preparing for this deposition --
7   A. Yes.
8   Q. -- did you make any efforts at that point in time
9   to seek out the e-mails that you believe are necessary to
10  testify on the topic noticed?
11  MS. WALTER: Object to form.
12  A. I didn't -- I did not.
13  MS. WALTER: Can we take a ten-minute break?
14  MS. KREITER: Sure.
15  (A recess was taken.)
16  MS. KREITER: Can you just read back the last
17  question and last answer, please?
18  (The previous question and answer was read by the
19  reporter.)
20  Q. (By Ms. Kreiter) So there may be times during
21  this deposition when I say "you." You're testifying on
22  behalf of Mutual. If I say "you" during this deposition,
23  just understand that I mean Mutual collectively as a
24  company; correct or understood?
25  A. Yes.

REGENCY REPORTING SERVICE, INC. (813)224-0224

29

1  Q. Would it surprise you if a comparison of the
2  loans that had closed at Waterstone compared to the loans
3  that were in the pipeline of Mutual had been done and that
4  the damages resulting from that analysis was less than
5  $50,000?
6       MS. WALTER: Object to form.
7  A. In the three-month period, is that what you're
8  referencing, that --
9  Q. In that interim period of time.
10 A. Yes, then it would surprise me and --
11 Q. What do you think the lost profits are? Are you
12 able to give a ballpark?
13 A. For Bucket 1?
14 Q. For Bucket 1.
15      MS. WALTER: Object to form.
16 A. This is something the attorneys worked on, to be
17 perfectly frank, you know. And I know, you know, it would
18 not surprise me -- if it was just for a three-month period,
19 it would not surprise me.
20 Q. If it's less than $50,000?
21 A. For a three-month --
22      MS. WALTER: Object --
23 A. -- period.
24 Q. Correct. What about for an 18-month period? Do
25 you have any sense as to what that number is?

30

1       MS. WALTER: Object to form.
2  A. On Bucket 1 only?
3  Q. Bucket 1 only.
4  A. No, I wouldn't know whether it was for 18 months.
5  Q. When you say this is something that the attorneys
6  worked on, what do you mean?
7       MS. WALTER: Object to form.
8  A. Well --
9       MS. KREITER: What's the objection?
10      MS. WALTER: The objection is if it calls for a
11      discussion with counsel, it's privileged.
12      MS. KREITER: My question was what are the
13      damages sought? And the witness testified it's
14      something the attorneys worked out.
15 Q. Is that a correct statement of your position?
16 You believe that the damages sought are something the
17 attorneys worked out with respect to Bucket 1?
18 A. Yes.
19 Q. What do you mean by that?
20      MS. WALTER: Object to form.
21 A. I don't know. I don't know what else I can mean
22 by that.
23 Q. Regardless, on behalf of Mutual, you're not
24 prepared to testify today as to any particular number sought
25 with respect to Bucket 1; correct?

31

1  A. Not for -- not for Bucket 1.
2  Q. I'm going to go back to my original question.
3  Bucket 1 talks about lost revenue and profits. I understand
4  you have a personal view that it should be lost revenue on
5  behalf of Mutual today at the deposition on this topic.
6  Which is it, revenue or profits?
7       MS. WALTER: Object to form.
8  A. I'm happy to talk to either one if you'd like.
9  So, you know, again, it's -- generally, it's -- it would be
10 gross profits, not net profits, you know, on cost of goods
11 sold.
12 Q. So I'm just trying to pin down at this deposition
13 what is sought by Mutual in the case. The bullet on the
14 bottom of page 5 reads "Lost revenue and profits." Is it
15 Mutual's contention that it's entitled to both lost revenue
16 and lost profits with respect to Bucket 1?
17 A. Yes.
18 Q. Explain that.
19 A. I just did. There's -- there's gross revenue.
20 That's, you know, cost of goods sold, and there's the
21 profit.
22 Q. Okay. And your position is that Mutual should
23 collect both the revenue and the profits?
24 A. Yes.
25 Q. Okay. Let's play this out so I understand. With

32

1  respect to a loan that closed, say the revenue -- and I'm
2  just using hypothetical numbers. The revenue coming in to
3  Mutual from that loan is a hundred grand. What would be the
4  profits approximately? Strike that.
5       Let me ask it a different -- assume the profits
6  -- when you take out all the costs, assume the profits are
7  $20,000. Is it your position that Mutual is seeking both
8  the hundred-thousand-dollar revenue and the $20,000 profits
9  for a total of 120-?
10 A. Well, if you sell -- if you sell a loan for a
11 hundred thousand dollars, the revenue isn't a hundred
12 thousand dollars; right? It is -- the revenue of a
13 hundred-thousand-dollar loan, generally speaking, at these
14 branches is going to be about $4,200 after commissions.
15 Q. I'm concerned about double-dipping. Does that
16 make sense to you? And I'm trying to understand, are you
17 counting twice? So for example, are you counting a hundred
18 thousand dollars as the revenue and then also seeking
19 20,000 --
20 A. I said a hundred thousand dollars, not the
21 revenue. You said that was the loan amount.
22 Q. No. Wait a minute. So sorry. Let's start
23 again. Assume revenue from a loan -- I just picked that
24 number. I can pick a smaller number if that's --
25 A. We're only seeking -- we're only seeking the