# EXHIBIT 7

Page 1

1          IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                      TAMPA DIVISION
3
   MUTUAL OF OMAHA MORTGAGE, INC.)
4                                  )
         Plaintiff;                )
5                                  )
                                   )
6      -vs-                        ) 8:22-cv-01660-TPB-JSS
                                   )
7                                  )
   WATERSTONE MORTGAGE             )
8  CORPORATION,                    )
                                   )
9        Defendant.                )
                                   )
10 ------------------------------)
11
12            REPORT OF PROCEEDINGS from the
13 deposition of CANDICE ROSEVEAR, taken by Paul W.
14 O'Connor, a CSR within and for the State of Illinois,
15 pursuant to the provisions of the Federal Code of
16 Civil Procedure and Rules of the Supreme Court thereof
17 pertaining to the taking of depositions, at 111 East
18 Wacker Drive, Suite 2600, Chicago, Illinois, 60601,
19 commencing at 9:00 a.m. on July 20, 2023.
20
21
22
23
24

```
                                                                  Page 6
 1        Did you analyze the Creasy report in
 2  conjunction with the damages that you're doing or was it
 3  something that just happened to be provided to you along
 4  with the Oscher Report?
 5     A.  I did not review that with respect to my
 6  damages report.
 7     Q.  So you're not going to opine about the forensic
 8  issues, what may or may not be a trade secret, what was
 9  on Waterstone's systems or any of the other topics that
10  were addressed by Mr. Creasy, correct?
11     A.  Correct.
12     Q.  With respect to the Category 2 damages, you
13  understand that Mutual previously put forth a damage
14  demand of approximately 4.4 million.  Correct?
15     A.  That is my recollection.
16     Q.  Who prepared the Category 2 damages analysis
17  for Mutual previously, the 4.4 million?
18     A.  I believe it's in the interrogatories,
19  paragraph three of my report.  Where I cite exactly where
20  that came from.  So but I believe that was prepared by
21  somebody at Mutual of Omaha Mortgage.
22     Q.  My question is are you able to tell me the
23  person or persons at Mutual of Omaha that prepared the
24  Category 2 $4.4 million damages analysis?
```

```
                                                                  Page 7
 1     A.  I believe that was Jeff.
 2     Q.  Jeff who?
 3     A.  Gennarelli I believe.
 4     Q.  Did anybody else work on that damages analysis
 5  with Mr. Gennarelli?
 6         MS. WALTER:  Object to form.
 7         THE WITNESS:  A  I don't know.
 8         MS. KREITER:  Q  Mutual of Omaha was previously
 9  asserting approximately 4.4 million.
10         Your report concludes that the estimated
11  damages are approximately 28 million, is that correct?
12     A.  That's correct.
13     Q.  So different numbers I'm just trying to
14  understand, did you analyze Mr. Gennarelli's analysis and
15  determine you wanted to go in a different direction or
16  what is the connection between your analysis and
17  Mr. Gennarelli's analysis?
18         MS. WALTER:  Object to form.
19         THE WITNESS:  A  My analysis --
20         MS. KREITER:  Q  Let me state it again.
21         So there's a -- in general, what is the
22  difference between your analysis and Mr. Gennarelli's
23  analysis?
24     A.  I didn't conduct a comparison.
```

```
                                                                  Page 8
 1     Q.  Of the two analyses?
 2     A.  Correct.
 3     Q.  Is it your understanding that Mutual is
 4  pursuing the 4.4 million that Mr. Gennarelli calculated
 5  or the 28 million that you've now calculated?
 6         MS. WALTER:  Object to form.
 7         THE WITNESS:  A  I don't know.
 8         MS. KREITER:  Q  Going back to your analysis
 9  versus what you assumed.  You assumed liability for
10  purposes of your damages analysis, is that correct?
11     A.  That's correct.
12         MS. WALTER:  Object to form.
13         MS. KREITER:  Q  When were you retained by Mutual?
14         THE WITNESS:  A  I don't have the exact date.  I
15  can get that for you.  I want to say estimated date
16  sometime before June 1st.
17     Q.  Before June 1st?
18     A.  I'm guessing at this point, but.
19     Q.  The Oscher Report was issued on June 5th.
20         At the time that you were engaged, did the
21  Oscher Report already come out?
22     A.  I believe it was after.  If I can get the exact
23  date for you I'd prefer to answer after I look at my
24  notes.
```

```
                                                                  Page 9
 1     Q.  Your report indicates that you're charging
 2  Mutual of Omaha $500 an hour, is that correct?
 3     A.  That's correct.
 4     Q.  Is there a difference in your rate for purposes
 5  of deposition testimony versus work preparing the report?
 6     A.  No.
 7     Q.  What is the total fees that you've charged to
 8  Mutual of Omaha to date?
 9     A.  I don't have that.  I can get that though.
10         It looks like it's actually late June, but
11  I can't find it, the engagement letter on my cell. phone.
12  So.  That didn't quite work out.
13     Q.  Okay.  Back on the record.  We had a brief
14  discussion off the record, you were looking to find the
15  dates you were engaged.  You indicated you couldn't
16  locate it on your phone but it may have been later in
17  June?
18     A.  Yes.
19     Q.  I'll just ask during a break, you can again
20  check the date, let me know.
21     A.  Okay.
22     Q.  We were talking about the fees you charged
23  Mutual of Omaha to date.  You indicated you couldn't
24  remember the total fees.
```

Page 18

1 prepared the data I needed, but I had specific requests
2 that I sent to Courtney and then Courtney sent it to
3 whomever was the appropriate party to send the data back
4 to me.
5     MS. KREITER: Q  Do you know whether
6 Mr. Gennarelli himself supplied data that you relied on
7 in conjunction with the report?
8   A.  He may have.
9   Q.  But you don't know one way or another?
10  A.  I don't know.
11  Q.  How many times did you personally speak with
12 Mr. Gennarelli?
13  A.  I think he was on two conference calls.
14  Q.  How many times did you personally speak with
15 Bernie Mayle?
16  A.  I believe Bernie was present on both calls as
17 well.
18  Q.  During the discussion on two calls -- you
19 mentioned you had discussions with Mr. Gennarelli in
20 which you walked through the exhibits and then you said
21 that there was -- is that the subject of one of the
22 calls?
23     MS. WALTER: Object to form.
24     MS. KREITER: Let me start again.  I want to go

Page 19

1 through both of the calls you had with Mr. Gennarelli.
2 And Mr. Mayle.  Let's talk about the first call.
3   Q.  At what point in the process was the first
4 call?
5     THE WITNESS: A  Fairly early on.  Maybe a week
6 into my engagement.
7   Q.  Was the purpose of the call for you to elicit
8 information from them that would drive your report
9 findings?
10     MS. WALTER: Object to form.
11     MS. KREITER: Q  Or was it presenting to them what
12 you had already done at that point?
13     MS. WALTER: Same objection.
14     THE WITNESS: A  I was presenting what I had done
15 up to that point.  I had the call to request additional
16 data.
17     MS. KREITER: Q  What additional data did you
18 request?
19  A.  I was curious about the peer branches at Mutual
20 of Omaha Mortgage that had remained in operation
21 following the closure of the Daytona and Tampa branches.
22  Q.  What were you curious about?
23  A.  The loan volume.
24  Q.  What specifically?

Page 20

1   A.  Of the monthly loan volume at Maryland and
2 Saint Louis.
3   Q.  Okay.  Just what are the numbers on those
4 branches or how do they compare to the other branches,
5 what was the ilk of the questions?
6     MS. WALTER: Object to form.
7     THE WITNESS: A  Monthly loan volume in dollars.
8     MS. KREITER: Q  Other than asking about monthly
9 loan volume in dollars with respect to Saint Louis and
10 Maryland, what else if any questions did you ask about
11 those branches?
12  A.  I wanted to understand if, what their product
13 mix was, get a good handle on the type of branch they
14 are, how long they had been in existence up to that
15 point.  For example.
16  Q.  Anything else that was the subject matter of
17 that first call?
18  A.  That's the gist of it.
19  Q.  There was a second call that you had with
20 Mr. Gennarelli and Mr. Mayle?
21  A.  Yes.
22  Q.  What was the topic of that call?
23  A.  That was a little bit farther along in my
24 analysis when I had prepared exhibits.  Same exhibits

Page 21

1 that I include in my report.  And the purpose of that
2 call was for me to present my exhibits to the group.
3   Q.  Did Mr. Gennarelli or Mr. Mayle suggest changes
4 to any of the exhibits?
5   A.  No.
6   Q.  Did anyone else from Mutual suggest changes to
7 any of the exhibits?
8   A.  No.
9   Q.  What about counsel for Mutual?
10  A.  No.
11  Q.  Was there anyone else from Mutual that you
12 spoke with in conjunction with your analysis besides
13 Mr. Gennarelli and Mr. Mayle?
14  A.  I believe we had a virtual meeting, Zoom or
15 Teams, and there were other parties.  I don't recall the
16 names of those on the call.
17     I believe Mark McCarroll attended.  Of
18 course Courtney.  There maybe another person on the call.
19 I don't remember who it was.
20  Q.  Were you aware at the time of your discussions
21 with Mr. Gennarelli and Mr. Mayle they had prepared a
22 lost profit analysis or did you find that out later?
23     MS. WALTER: Object to form.
24     THE WITNESS: A  I was aware.

Page 22

1      MS. KREITER:  Q  Did you ask them why it was that
2  you weren't analyzing the prior analysis Mutual had
3  performed?
4      MS. WALTER:  Object to form.
5      THE WITNESS:  A  No.
6      MS. KREITER:  Q  Did you wonder why am I not
7  looking at the 4.4 million analysis Mutual has already
8  presented in the case?
9      A.  Did I wonder.  Can you repeat the question?
10          (Record read as requested)
11     A.  I'm certainly aware that this number had been
12  presented.  I didn't analyze that number or spend time
13  thinking about that number in particular.  I did my own
14  independent analysis.
15     Q.  If Mutual of Omaha had already presented the
16  $4.4 million demand with respect to the Category 2 branch
17  damages, why was there a need to do a new analysis?
18     MS. WALTER:  Object to form.
19     THE WITNESS:  A  I don't know.
20     MS. KREITER:  Q  Did you ask why, did you ask that
21  question to Mutual, why am I re-doing the analysis of
22  Mr. Gennarelli and Mr. Mayle?
23     MS. WALTER:  Object to form, mischaracterizes
24  testimony.

Page 23

1      THE WITNESS:  A  No, I did not ask that question.
2      MS. KREITER:  Q  Do you agree that the work that
3  you did -- strike that.
4          Did you attempt to determine whether the
5  estimate by Mr. Gennarelli is accurate?
6      MS. WALTER:  Object to form.
7      THE WITNESS:  A  No.
8      MS. KREITER:  Q  You had no discussions with
9  Mr. Gennarelli or Mr. Mayle about the prior analysis that
10  they performed, correct?
11     A.  That's not correct.
12     Q.  What discussions did you have about the prior
13  work that was performed and the demand for 4.4 million
14  with Mr. Gennarelli and Mr. Mayle?
15     A.  They explained the documents to me in a general
16  sense.
17     Q.  What documents?
18     A.  The documents underlying their interrogatory
19  response.
20     MS. KREITER:  Show you what we previously marked at
21  a deposition.  Gennarelli Exhibit No. 7.
22     Q.  Have you seen this document before?
23     A.  Yes, I have.
24     Q.  Did you attempt to determine whether the

Page 24

1  estimates set forth in Gennarelli Exhibit No. 7 is
2  accurate?
3      MS. WALTER:  Asked and answered.
4      THE WITNESS:  A  No.
5      MS. KREITER:  Q  Did you speak with Jeff
6  Gennarelli or Bernie Mayle about Deposition Exhibit
7  Gennarelli 7?
8      MS. WALTER:  Asked and answered.
9      MS. KREITER:  It's not.  She said she talked with
10  them about documents.
11     Q.  Is this one of the documents that you spoke
12  with Mr. Gennarelli and Mr. Mayle about?
13     THE WITNESS:  A  This is what I was referring to,
14  yes.
15     Q.  Tell me about that conversation?
16     A.  As I previously mentioned, it was a general
17  conversation telling me what this document is.  I believe
18  this is the document used to get to the 4.4 million.
19          I don't see that total here though.  But I
20  believe that would be the sum of the two values here.
21     Q.  Okay.  So they were presenting this to you to
22  tell you this is the prior model that Mutual put forth,
23  something of that ilk?
24     MS. WALTER:  Objection.

Page 25

1      THE WITNESS:  A  General statements of that,
2  that's correct.
3      MS. KREITER:  Q  The analysis that you did, does
4  it rely upon the same, any of the same data that was
5  relied upon in Deposition Exhibit Gennarelli 7?
6      MS. WALTER:  Object to form.
7      MS. KREITER:  If you know.
8      THE WITNESS:  A  I didn't analyze this in depth.
9  But just looking at the title of volume of loans funded,
10  that is something I certainly considered from a different
11  data source as fully cited in my expert report.
12     MS. KREITER:  Q  Do you know what period of time
13  damages were extrapolated out for with respect to -- this
14  Deposition Exhibit Gennarelli 7, for ease of reference I
15  will call it the Gennarelli Category 2 model.
16          What period of time did Mr. Gennarelli
17  use?
18     MS. WALTER:  Object to form.
19     THE WITNESS:  A  I would need to study this, but.
20     MS. KREITER:  Q  You don't know right now?
21     A.  I see profit for 42 months.  And profit for
22  18 months.
23     Q.  Do you know?
24     A.  Not just by sitting here.  I would want to dig

Page 26

1  into the underlying data to give you the exact correct
2  answer.
3      Q.  Did you have any discussions with
4  Mr. Gennarelli or Mr. Mayle about the term used with
5  respect to the Gennarelli model?
6          MS. WALTER:  Object to form.
7          THE WITNESS:  A   Can you clarify what you mean by
8  term.
9          MS. KREITER:  Q   Sure.  The amount of time over
10 which damages are projected?
11     A.  You're referring to the $4.4 million figure?
12     Q.  Correct.  Let's define for purposes of this
13 deposition.  So when I am referring to the Category 2
14 damages previously presented by Mutual, in which Mutual
15 seeks approximately $4.4 million in damages, for ease of
16 reference I'm going to refer to that as the Gennarelli
17 Model for this deposition.  It's the model that's
18 reflected in Gennarelli Deposition Exhibit 7.
19 Understood?
20     A.  Okay.
21     Q.  With respect to the Gennarelli Model of
22 damages.  Did you have any discussions with
23 Mr. Gennarelli or Mr. Mayle about the duration of time
24 over which they calculated lost profits in order to come

Page 27

1  to the $4.4 million demand?
2      A.  I believe it's 18 months.  But I believe that
3  was discussed generally and I recall reading that in the
4  documents I reviewed.
5      Q.  Why didn't you use 18 months?
6      A.  That's not what my model is measuring.
7      Q.  Is it the case you're retained to independently
8  calculate damages, not to support the Gennarelli Model?
9      A.  Correct.
10     Q.  The Gennarelli Model concludes that Mutual has
11 lost profits associated with the Tampa branch are
12 2.7 million.  And that the damages -- and some change.
13 And the damages for the Daytona branch are 1.7 million.
14 Are you aware of that -- I will note for the record the
15 witness is reviewing Gennarelli Deposition Exhibit No. 7.
16         Were you aware of that without looking at
17 the exhibit?
18     A.  The exact breakdown of the 4.4 million, I was
19 not aware.  But from memory.
20     Q.  Okay.  But in general you had a sense that
21 there was approximately 2.7 million, not the exact
22 number, associated with Daytona, and 1.7 with the other
23 branch?
24         MS. WALTER:  Object to form.

Page 28

1          THE WITNESS:  A   I think I may have had, yeah, a
2  general understanding, but not the exact numbers in my
3  mind.
4          MS. KREITER:  Q   Does it concern you that Mutual
5  previously presented damages of 4.4 million and now your
6  report is asserting damages of 28 million?
7          MS. WALTER:  Objection.
8          THE WITNESS:  A   No.
9          MS. KREITER:  Q   Do you agree that's a big delta?
10     A.  Well I don't know what you mean by a big delta.
11     Q.  The difference between -- do you agree there's
12 a meaningful difference between 4.4 million and 28
13 million?
14         MS. WALTER:  Object to form.
15         THE WITNESS:  A   They are different numbers.
16         MS. KREITER:  Q   Sure.
17     A.  Certainly.
18     Q.  Your demand is about 4 to 5 times bigger than
19 the prior demand, correct?
20         MS. WALTER:  Object to form.  She never said it was
21 a demand.
22         MS. KREITER:  Q   Your lost profit estimates of 28
23 million is about 4 to 5 times bigger than Mutual's prior
24 demand, correct?

Page 29

1          MS. WALTER:  Object to form.
2          THE WITNESS:  A   My damages calculation is based
3  on a damages analysis I prepared.  And that yields a
4  figure that is larger than what was presented earlier.
5          MS. KREITER:  Q   Sure.
6      A.  Yes.
7      Q.  Do you agree it's materially larger?
8          MS. WALTER:  Object to form.
9          THE WITNESS:  A   Materially is a difficult thing
10 for me to agree to.  Because materially is subjective.
11 We can talk about if it's larger, yes.
12         MS. KREITER:  Q   Is it your testimony that a
13 demand that's more than four times larger, $24 million
14 larger, that's not a material difference to you?
15         MS. WALTER:  Object to form.
16         THE WITNESS:  A   I wouldn't use the word material.
17         MS. KREITER:  Q   How would you describe the delta
18 between those numbers?
19         MS. WALTER:  Object to form.
20         THE WITNESS:  A   I would use numbers to describe
21 it.  $24 million larger.
22         MS. KREITER:  Q   Did it concern you at all that
23 Mr. Gennarelli and Mr. Mayle had put forth a damages
24 analysis of 4.4 million and you went off on your own and

Page 30
1  did an analysis but it's larger than theirs?
2       MS. WALTER:  Object to form.  Please watch your
3  tone, Maria.
4       THE WITNESS:  Can you repeat the question.
5            (Record read as requested)
6       THE WITNESS:  A   It does not concern me.
7       MS. KREITER:  Q   Did you have any discussions with
8  anyone at Mutual about why there was a multimillion
9  difference between the Gennarelli Model and your
10 $28 million estimate?
11      A.  No.
12      Q.  In your report you indicate I calculate the
13 present value of lost profits at the Mutual of Omaha
14 Tampa and Daytona branches using standard valuation
15 methods.
16           If Mutual had hired you back in the Winter
17 of '22 or Spring of '23, could you have done the same
18 analysis at that time?
19      MS. WALTER:  Object to form.
20      THE WITNESS:  A   The damages would be slightly
21 different because I'm using data as of I believe May and
22 June.  So I wouldn't have that data available to me at
23 that time.  But in terms of the framework, the way I
24 would approach the problem would be the same.

Page 31
1       MS. KREITER:  Q   Okay.  You could perform the same
2  analysis, you would just have to use the data available
3  at whatever time you were hired, correct?
4       A.  Correct.
5       Q.  Did Mutual say why it chose to hire you as a
6  rebuttal expert rather than as its opening expert?
7       MS. WALTER:  Object to form.
8       THE WITNESS:  A   No.
9       MS. KREITER:  Q   Did Mr. Gennarelli, Mr. Mayle or
10 anyone at Mutual ever have discussions with you about
11 concerns related to the Gennarelli Model?
12      MS. WALTER:  Object to form.
13      MS. KREITER:  Strike that, let me rephrase.
14      Q.  Did Mr. Gennarelli, Mr. Mayle or anyone at
15 Mutual ever express concern about the viability of the
16 Gennarelli Model to you?
17      MS. WALTER:  Objection.
18      THE WITNESS:  A   Not that I recall, no.
19      MS. KREITER:  Q   Is the intent of your report to
20 replace the damages model that Mr. Gennarelli and
21 Mr. Mayle did?
22      MS. WALTER:  Object to form.
23      THE WITNESS:  A   My report is an independent
24 analysis.  And I am very clear in my report what the

Page 32
1  scope of the report is and how I approach the problem.
2  How it's used is a legal question.
3       MS. KREITER:  Q   It's completely independent of
4  the prior model, correct?
5       A.  My model is, yes.
6       Q.  You state in your report you reserve the right
7  to amend the report to reflect new information that
8  becomes available, including in discovery or from court
9  rulings, correct?
10      A.  Yes.
11      Q.  Are you continuing to work on the engagement
12 right now other than attendance at the deposition?
13      A.  No.
14      Q.  Do you have any outstanding requests for
15 information to Mutual at this time?
16      A.  No.
17      Q.  The report indicates that you were to calculate
18 lost profits resulting from closure of the branches and
19 express the amount in present value terms.
20           What assumptions were you instructed to
21 make with respect to that damages?
22      MS. WALTER:  Object to form, it assumes facts not
23 in evidence.
24      MS. KREITER:  Calculation.

Page 33
1       THE WITNESS:  A   I reviewed the complaint.  And
2  assumption I rely on is that closure of the branches is
3  direct result of defendants' action.  That's an implicit
4  assumption.
5       MS. KREITER:  Q   Did you do anything to vet the
6  reasonableness of the assumption that wrongdoing by
7  Waterstone caused the branches to close?
8       THE WITNESS:  Can you repeat that question.
9            (Record read as requested)
10      THE WITNESS:  A   Yes, I thought about the issues.
11 The actions.  And whether or not they were reasonable.
12      MS. KREITER:  Q   So to exhaust this.  I heard you
13 testify that the -- you thought about the issues and the
14 actions to see if you felt they were reasonable.
15           What issues did you think about?
16      A.  I'm thinking about the employees that left, the
17 timing, how many employees left alongside the three main
18 employees listed in the complaint.  And the timing of
19 their departure.
20      Q.  These are thoughts that you had yourself.
21           Did you speak about these thoughts with
22 Mutual, did you try to vet the facts of the case with
23 anyone at Mutual?
24      MS. WALTER:  Object to form.

Page 42

1  A. These I believe are the loan data that
2  defendant's expert relied on.
3  Q. With respect to the Category 1 damages,
4  correct?
5  A. I believe so, that's my understanding, yes.
6  Q. So if you were not analyzing Category 1
7  damages, why did you list the damages as ones that you
8  considered?
9  A. Do you mean these documents?
10  Q. Yes, the documents that are listed on page four
11  and going onto page five. I just again, my understanding
12  was that you didn't do any work with respect to
13  Category 1. Yet I see that you've listed a bunch of
14  documents related to the Category 1 damages as ones that
15  you have considered.
16      Why are these documents listed in your
17  reports as having been considered?
18  A. They were provided to me by counsel. I briefly
19  reviewed them. And decided that they weren't within the
20  scope of my report and what I was asked to calculate.
21  Q. Okay. So these documents listed under
22  defendant expert production, they have nothing to do with
23  the $28 million that you ultimately estimate, correct?
24  A. Correct.

Page 43

1  Q. With respect to your $28 million estimate,
2  you're assuming that the branches would have stayed open
3  till 2031, is that correct?
4  A. Part of the analysis runs through 2031, yes.
5  Q. Why did you select 2031?
6  A. That is a ten-year window, that I have included
7  in my discounted cash flow analysis.
8  Q. Why did you select a 10-year window?
9  A. To present my model annually through ten years.
10  Q. Why didn't you consider two years, 5 years, a
11  different number --
12     MS. WALTER: Object to form.
13     MS. KREITER: -- of years?
14     THE WITNESS: A  My model is set up to calculate
15  lost profits in each year through 2031 and beyond. So
16  the model is clear I believe in Exhibit 7 and 8 what
17  those values are.
18     MS. KREITER: Q  So my question is how did you
19  land on ten years. You could have said 30 years. I'm
20  trying to understand why is it 10.
21  A. It's standard in DCF modeling to use 10 years.
22  Gives us a nice view of what the cash flows look like, if
23  anything is changing over time. And how the impact of
24  the discount rate affects the numbers, cash flow coming

Page 44

1  back.
2      The goal of that exhibit is to express the
3  cash flows in present value terms. So I find that giving
4  a 10-year window has served that functional purpose.
5  There's no, you know, reason for using 10 years
6  specifically as a cutoff point in terms of the branch
7  closures analysis.
8  Q. So if I'm understanding your testimony, it's a
9  standard with respect to this particular form of
10  modeling, it's not a number selected specific to these
11  particular branches, is that accurate?
12  A. That's correct.
13  Q. You would apply 10 years if you had another
14  case -- strike that. Let me ask it this way.
15      Have you applied this same methodology in
16  other cases?
17  A. Yes.
18  Q. Have you used a 10-year duration in all of
19  those cases?
20  A. I don't believe in all of the cases. I might
21  look at seven years.
22      If I have, if I need to model changes that
23  I know of that are going to happen at some point in the
24  time horizon, I might go out a few more years. I have

Page 45

1  the flexibility to model the DCF, to set up the DCF
2  according to the facts and the issues I'm looking at.
3  Q. Did you consider using an 18 months duration
4  like Mr. Gennarelli did in his model?
5  A. No.
6  Q. Why not?
7  A. 18 months is something Mr. Gennarelli chose.
8  My model does not consider that time frame. I don't
9  understand fully why 18 months is selected.
10  Q. Did you consider a 12-month duration consistent
11  with the 12-month non solicit?
12     MS. WALTER: Object to form.
13     THE WITNESS: A  No.
14     MS. KREITER: Q  Why not?
15  A. That wouldn't apply here.
16  Q. Why not?
17  A. Because I'm measuring lost profits in the
18  branch, not to an individual employee.
19  Q. Do you understand that the branch managers had
20  a 12-month non solicit?
21     MS. WALTER: Object to form.
22     THE WITNESS: A  Yes.
23     MS. KREITER: Q  What certainty do you have that
24  any of the employees would have stayed beyond 12 months

Page 82
1  line, which is the MBA total mortgage originations.
2         We do see as no surprise that in 2020 and
3  2021, the gray line is higher, looks like on a quarterly
4  basis at about 1.2.  And by the time we get to 2022, I'd
5  say about 60 percent on a quarterly basis what it had
6  been before.  So.
7     Q.  Why do you believe that loan volume in 2020
8  when you can see in your chart in Exhibit 4 for example,
9  that peaks gets to almost, gets over 70 million for the
10 MBA, why is that time period representative of future
11 time periods, if you believe that it is?
12    A.  I don't believe that that would necessarily be
13 representative of future time periods on its own.
14    Q.  Explain that a little bit more, please.
15    A.  Sure.  So when an economist does a forecasting
16 exercise, we want to look at as much historical data as
17 we have here.  2019 to 2022.  And consider any other
18 factors that could influence the loan volume.
19        What we can do as forecasters is take
20 those periods out of consideration.  And look at periods
21 that are not affected by whatever we think is going on.
22 Could be related to the pandemic, interest rates,
23 whatever is sort of going on we know that would affect
24 numbers.

Page 83
1         So what I can do is I can prepare my
2  forecasts without letting my forecast be tainted by some
3  of these other affects that no longer are affecting the
4  numbers.
5     Q.  Did you do anything to carve out the period of
6  2020, 2021 where we have these anomalous peaks?
7     A.  Yes.
8     Q.  What did you do?
9     A.  Those peaks are not included in my forecast.
10    Q.  What is the time period you took out?
11    A.  I didn't take anything out per se.
12        My forecasts are based on the last months
13 of available data, which is 2022 Spring when we are
14 looking at quarterly data, I believe it's Q1, 2022.
15        When we are looking at the monthly data, I
16 believe it's the last full month of revenue, which would
17 be I believe April.  Have to look back at my report to
18 give you an exact date.
19    Q.  Now I'm confused.  I understood your testimony
20 to be that you did factor in the 2020 and 2021 time
21 period.  And the date associated with that.  Now I am
22 hearing maybe you didn't.  Which is it?
23    A.  I consider all the data.  Based on my analysis
24 of the data, I decide how I'm going to construct my

Page 84
1  forecasting.
2     Q.  So did you make a decision that 2020 and 2021
3  should be carved out because it was not representative
4  and instead reflected an anomalous period in the
5  industry?
6     A.  I recognize that that is a, the pandemic period
7  and I don't base my forecasts on that.
8     Q.  Do you think it would be inappropriate to base
9  forecasts on that anomalous period of 2020 to 2021?
10    A.  It depends on the application.
11    Q.  Do you know whether Mr. Gennarelli factored in
12 that 2020 to 2021 period in his analysis?
13    A.  I don't recall exactly.  You can look back at
14 the exhibit you handed me earlier and see.  But again, I
15 didn't look closely at the underlying assumptions of that
16 analysis.
17    Q.  Are there any, is there any modeling that
18 you're aware of that is recognized in the industry that
19 would permit the inclusion of anomalous data such as 2020
20 and 2021?
21    A.  It depends.  I have seen econometric models
22 developed that do include periods of time that might
23 deviate from the average, which is how I'm defining an
24 anomaly.

Page 85
1     Q.  What are those models?
2     A.  Think of an example.  It would be you can
3  imagine a regression analysis.  Trying to think of a
4  simple example.  Where you might have quite a bit of rich
5  data that's useful information to what we are trying to
6  understand.  Maybe it's a projection level.  We
7  understand that there's a time period in the data that
8  may not be representative of the norm.
9         There's several things we can do.  In
10 econometric terms, call it adding a dummy variable to the
11 data.  So we can remove the affects of it while still
12 keeping the data and creating a model around it.  So
13 there's many ways that economists would approach a
14 problem like that.
15        When we are talking about you can imagine
16 securities fraud, where we have disclosure of new
17 information.  We might not want to include the stock
18 price reaction on that day, so there's ways to remove
19 that from the analysis.
20    Q.  Do you know whether Mr. Gennarelli in his model
21 was performing the type of regression analysis for doing
22 any of the steps you talk about that are industry
23 recognized where anomalous periods are included in the
24 database?

Page 98

1  So one-year period.
2     A.  Through end of 2023?
3     Q.  I guess I'm looking at can you calibrate it by
4  months.  So for example could you tell me what would the
5  damages be for the period of Daytona leaves in April, so
6  May of '22 to May of '23.
7        Are you able to tell me that?
8     A.  I can give you the numbers through the end of
9  year from my exhibits.  But in terms of using this to
10 calculate any more precise numbers than what's presented
11 here in Exhibit 7A through B, I would need time to do
12 that.
13    Q.  So is your 7A and B, let's go there.  7A.
14       For example, are you able to tell me
15 looking at 7A what the damages would be with a one year
16 period of time?
17       I mean I heard you just say maybe I can't
18 do it May to May, but I can do it May of '22 through the
19 end of '23.
20       So is that accurate?
21    A.  So yeah, the data in the DCF exhibits which are
22 7A through 8B are done through the end of each year.  So
23 I can't get as precise as you're asking me to.
24       The model can if we really had the time

Page 99

1  and I could sit down and do it right and check it and all
2  of that.  That's certainly possible.  But from this
3  exhibit, we can give you number through say the end of
4  2023.
5     Q.  You can tell me just to be clear, you could
6  tell me based on 7A of your report the damages estimate
7  if you used the different duration not out to 2031, but
8  rather through the duration of December 31, 2023.
9        Is that accurate?
10    A.  That's right.
11    Q.  What is the lost profits associated with the
12 Daytona branch if you used that duration of, that
13 duration ending at December 31, 2023?
14    A.  2023?  Footnote 35 describes how to do this.
15       And so the way that this could be done
16 through 2023 is that the row called present value, PV,
17 free cash flows to the firm?
18    Q.  I see it.
19    A.  Gives you discounted value of the profit figure
20 after taxes.  So you can add the .46 and the .87.
21    Q.  Now you lost me.  I'm looking at 7A.
22    A.  You asked for Daytona so you need to turn to
23 Exhibit 7B.
24    Q.  Continue.

Page 100

1     A.  So do you see that row present value of free
2  cash flow?
3     Q.  I do.
4     A.  The sum of .46, .87 gets you the present value
5  of free cash flows to the end of 2023.
6     Q.  So you would add the -- let's just do that.
7        MS. WALTER:  For the record, Miss Kreiter is using
8  her phone to calculate figures.
9        MS. KREITER:  I'm an attorney, I am using my
10 calculator.  I'm an attorney not -- so .46 plus .87 is
11 1.33.  Correct?
12       MS. WALTER:  You need a calculator?
13       THE WITNESS:  A  Yeah, I prefer to have one.  To
14 follow along if we are going to keep going with
15 calculations.  Also this doesn't take into account any
16 rounding.  To be clear.  .46 plus .87 is 1.33.
17       MS. KREITER:  Q  So this was in conjunction with
18 trying to understand what the damages would be not using
19 the full duration, but rather to the end of '23.
20       What would you do next?
21    A.  That's it.
22    Q.  So the damages are 1.33 million?
23    A.  That's correct.  Just through the end of 2023,
24 the present value for the Daytona branch.  We haven't

Page 101

1  done the Tampa branch.
2     Q.  Let's go back and do that, please.
3        Would you again turning to Exhibit 7A to
4  calculate the damages under your model, but with a
5  duration ending in December 31, 2023.
6        You would add the present value .38 for
7  '22 and the present value .95 for '23?
8     A.  Yes.
9     Q.  What does that come out to?
10    A.  1.33.
11    Q.  Are they for both of the branches it's
12 1.33 million?
13    A.  For Tampa, the two together I believe is 2.66,
14 adding up the four figures we just went over.
15    Q.  So Tampa is 1.33 and Daytona is --
16    A.  1.33.
17    Q.  Both of them are the same?
18    A.  Uh-huh, coincidentally, yes.
19    Q.  So 2.66 million total?
20    A.  Yes.
21    Q.  It's roughly 2 million less than in the
22 Gennarelli Model, correct?
23    A.  I don't remember what his exact number was, 4.4
24 perhaps.

|  |  |
|---|---|
| Page 102<br>1  Q.  4.4 and change?<br>2  A.  So yeah, about 1.7.<br>3  Q.  Difference between your model with the same<br>4  duration and his model, correct?<br>5  A.  I don't know if it's the same duration.  If<br>6  it's covering the same time frame.  I don't recall.<br>7      I didn't really dig into his model like I<br>8  said.<br>9  Q.  If you assume his model also goes through the<br>10  end of '23, then it's the same duration but you have got<br>11  a delta between the two where you're saying the total<br>12  would be 2.66 and he's saying 4.4 and change?<br>13      MS. WALTER:  Object to form.<br>14      THE WITNESS:  A  But the difference between 4.4<br>15  and 2.66 is yes, about 1.74.<br>16      MS. KREITER:  Q  Do you believe that 1.74 million<br>17  is a material difference?<br>18      MS. WALTER:  Object to form.<br>19      THE WITNESS:  A  Again I would describe this in<br>20  terms of dollars, not whether or not it's material.<br>21      MS. KREITER:  Q  What number would make you say<br>22  this is material, maybe not 1.7, is there a number where<br>23  you would say look, I agree that's a material difference?<br>24  A.  Usually not how I would describe numbers to be | Page 104<br>1  Q.  Is there a way you can do it with something<br>2  less than precision but maybe -- strike that.<br>3      How would you do it if you were to go<br>4  about changing the duration to one year?<br>5  A.  I would look at my spread sheet.<br>6  Q.  Bates number 14778.<br>7  A.  And do a calculation over the time period of<br>8  interest.<br>9  Q.  Are you able to tell me specifically what in<br>10  14778 you would show me, the tab or show me what you<br>11  would look to?<br>12  A.  It's the tab we were just looking at.<br>13  Q.  Why don't you come back and point it out to me.<br>14  A.  MON-loan volume.<br>15  Q.  Is this a matter of changing a number or is it<br>16  no, this would take me ten hours?<br>17  A.  It would take time and I need to have it<br>18  audited.<br>19  Q.  Suffice to say it's going to be less than 2.6?<br>20      MS. WALTER:  Object to form.<br>21      THE WITNESS:  A  If you're looking at a time<br>22  period within the time period we just went over, it will<br>23  yes, it will be less because we do have volume in all<br>24  months. |
| Page 103<br>1  completely fair.  If I have a number in front of me, I<br>2  describe it in terms of either in dollar values or you<br>3  can use a multiple.  80 percent more or whatever the<br>4  number is.<br>5  Q.  So let's look at what is the percentage<br>6  difference then between those two numbers.<br>7  A.  His is 4.4.<br>8  Q.  Correct.<br>9  A.  Looks like about 40 percent, the difference is<br>10  about 40 percent.<br>11  Q.  You're not willing to say that's material or<br>12  not, that's not how you would characterize the numbers?<br>13  A.  I'm not willing to say whether or not it's<br>14  material, correct.<br>15  Q.  You think it's nominal?<br>16      MS. WALTER:  Object to form.<br>17      THE WITNESS:  A  Again, I'm not willing to<br>18  describe it in those terms.<br>19      MS. KREITER:  Q  Is there a way you could use your<br>20  Exhibit 7A and 7B to come up with a one year number?<br>21      So to be clear, that same methodology you<br>22  used, I want to shorten the term from 18 months to 12.<br>23  Is there a way you can do that?<br>24  A.  Not with precision, no. | Page 105<br>1      MS. KREITER:  You indicated that you read the<br>2  deposition transcript for Jeff Gennarelli.<br>3  Q.  Did you read any other deposition transcripts?<br>4  A.  I do not believe so.<br>5  Q.  Are you aware of which Mutual representatives<br>6  have been deposed?<br>7  A.  No.<br>8  Q.  Did you read the deposition transcript of Brian<br>9  Tomalak or Kiley King?<br>10  A.  No.<br>11  Q.  Did you ask to see any additional deposition<br>12  transcripts?<br>13  A.  No.<br>14  Q.  Do you know who Brian Tomalak and Kiley King<br>15  are?<br>16  A.  No.<br>17  Q.  Do you know who Chris Layden is?<br>18  A.  No.<br>19  Q.  We talked about whether the math that you<br>20  ultimately used to project the estimates in the peer<br>21  model included the 2020 and 2021 time period.  I think<br>22  the answer is no, you maybe considered it but you<br>23  ultimately did the math based on the April '22 period.<br>24      What about the MBA methodology, does that |

Page 122

1  Q. What is it?
2  A. It's an e-mail that I believe was produced in
3 the Gennarelli deposition.
4  Q. The information contained in Gennarelli
5 Deposition Exhibit 12 and specifically the information
6 related to the pretax earnings and the year-to-date
7 earnings associated with the Forward Division, did you
8 factor in any of this data into your analysis?
9  A. This appears to be corporate level information.
10 And oh, yeah. They reference that two good groups left
11 over the past 45 days, Tampa and Daytona.
12      I believe it is corporate level
13 information with reference to the two branches as being a
14 negative for corporate. Other than that, it didn't
15 factor into my analysis, no.
16  Q. I had directed you specifically to the Forward
17 Division earnings information.
18      Did any of the information in Exhibit 12
19 factor into your analysis in any way?
20  A. So my review here, I believe all of this is
21 corporate level information. Exception of the two
22 sentences on Tampa and Daytona. So with the exception of
23 that, I did not factor into my analysis.
24  Q. Are you using corporate level information for

Page 123

1 the weighted average cost of capital but not corporate
2 level information for other purposes?
3  A. I'm using information about the capital
4 structure.
5  Q. At the corporate level though?
6  A. Yes.
7  Q. But for purposes of projecting the volume, you
8 did not use any information relative to the corporate
9 level performance?
10  A. That's correct.
11  Q. Why is it that you look at the branch level for
12 one and corporate level for another purpose?
13  A. The projections are based off of branch level
14 projections and the free cash flow estimated from the
15 lost profits model is at the branch level as well.
16  Q. Are you able to explain the difference between
17 the 4.4 million that Gennarelli presented and the 28
18 million that you are estimating?
19  A. Can you repeat the question, please.
20  Q. Are you able to explain the difference between
21 Gennarelli's model which resulted in a demand of
22 4.4 million, and your estimate at 28 million?
23  A. They are very different as far as I can see. I
24 don't know what --

Page 124

1  Q. When you say very different, in what ways are
2 the analyses very different?
3  A. I'm using a forecasting model based off of peer
4 branches as well as off of national MBA data. I don't
5 believe that was relied upon in the other model.
6  Q. Any other differences?
7  A. I believe I'm -- look back.
8      I believe this estimate is conducted for
9 an 18-month window.
10  Q. Which?
11  A. The 4.4 million. Just looking back at
12 Exhibit 7 here.
13  Q. So the Gennarelli Model is different from yours
14 in that it used, finish your thought.
15  A. This is based off of an 18-month window,
16 July 2022 to December 31, 2022.
17  Q. Is it accurate to say your analysis has nothing
18 to do with the Gennarelli analysis, correct?
19  A. That's correct. My analysis is an independent
20 analysis.
21  Q. You indicated that you were retained sometime
22 in the June time frame.
23      When did you actually start doing work on
24 the matter?

Page 125

1  A. Within a few days.
2  MS. KREITER: I could use a two-minute break.
3      (Lunch recess)
4  MS. KREITER: Q  Did you write the report for this
5 Exhibit 30 yourself or did others in your office assist
6 with authoring the report?
7  THE WITNESS: A  I wrote the report and others
8 reviewed it and added at my direction.
9  Q. Who are the others?
10  A. Jeremy Marmer.
11  Q. Spell?
12  A. M-A-R-M-E-R, and Gabriel Ratliff,
13 R-A-T-L-I-F-F.
14  Q. Start with Mr. Marmer. Is Mr. Marmer junior to
15 you or senior to you?
16  A. I suppose he's junior to me.
17  Q. What about Mr. Ratliff?
18  A. Yes.
19  Q. Yes he's junior to you?
20  A. Yes, in title.
21  Q. How much time approximately did Mr. Ratliff put
22 in in the report?
23  A. I don't know, I need to look back at the
24 invoices. So I'd say my estimate is somewhere around

Page 134

1  A. I don't know. I think it might be Exhibit 7 we
2 went over today.
3  Q. The Gennarelli Model?
4  A. Yeah, I will continue reading here.
5      Gives a lot of arguments for not
6 calculating damages, including this next paragraph he's
7 talking about the non solicit agreement.
8  Q. Sure. Does he say anywhere that no valuation
9 is possible regarding the closed branch offices?
10  A. He says the Gennarelli Model is unsupported.
11 And cannot be verified and tested.
12  Q. There's a difference in my mind between the
13 Gennarelli Model is insufficient and nobody could ever do
14 this.
15   MS. WALTER: Object to form.
16   THE WITNESS: A It's implied in this section. He
17 doesn't say this verbatim, which is why I don't have it
18 in quotes in my report.
19      But he says that the data cannot be
20 verified or tested. He gives a lot of reasons for not
21 calculating damages, including that suggesting that the
22 volumes attributable to the managers shouldn't be
23 considered, that there's non solicit periods.
24   MS. KREITER: Q Do you understand that Mr. Oscher

Page 135

1 analyzed the Gennarelli damages model?
2  A. Yes.
3  Q. You did not analyze the Gennarelli damages
4 model so how is your opinion -- let me start a different
5 way.
6      In what manner does your report rebut
7 portions of the Oscher Report, which is focused on the
8 Gennarelli Model?
9   MS. WALTER: Object to form.
10   THE WITNESS: A It is answering, it's answering
11 the same question that Oscher is focused on in his
12 report.
13   MS. KREITER: Q What question is that, I'm not
14 clear.
15  A. The evaluation of these two branches.
16  Q. But Mr. Oscher doesn't try to value the
17 branches, he simply says the Gennarelli Model is
18 insufficient?
19  A. Uh-huh.
20  Q. Agreed?
21  A. Well he's talking about the, he says a lot of
22 things.
23  Q. So tell me what language in the Oscher Report
24 do you believe that your report rebuts?

Page 136

1   MS. WALTER: Object to form.
2   MS. KREITER: Let the record reflect the witness is
3 paging through the Oscher Report.
4   THE WITNESS: A So my report rebuts damages
5 Category 2 of the Oscher Report.
6   MS. KREITER: My question, I want to make sure
7 you're answering my question and not something else.
8  Q. My question was where is the language in the
9 Oscher Report that your analysis rebuts?
10   MS. WALTER: Object to form, she's answering that.
11   THE WITNESS: A Yes. My report rebuts damages
12 Category 2, the closing of the branch offices in Tampa
13 and Daytona. Implied in the Oscher Report is that there
14 are no damages here that he presents.
15   MS. KREITER: Q Does who present?
16  A. He does not present damages.
17  Q. Mr. Oscher doesn't present damages, correct?
18  A. He's implying, he gives a whole host of reasons
19 for why calculating damages would be wrong.
20  Q. Where are the words you're talking about
21 because he's not talking about in my mind an
22 impossibility in general, he's talking about the damages
23 presented by Gennarelli and he's commenting that they are
24 unsupported.

Page 137

1      Are there words in the Oscher Report in
2 which he says nobody can ever possibly calculate damages?
3   MS. WALTER: Object to form.
4   MS. KREITER: Q For the branch closing?
5   THE WITNESS: A He ends his section to damages --
6  Q. Where are you?
7  A. Page 12. Just by comparing forecast.
8  Q. Specifically where are you?
9  A. Page 12, the chart. He just kind of ends the
10 section pointing out that the forecast is -- he's
11 implying it's incorrect because look, it's a departure
12 from this MBA forecast.
13      So my report directly rebuts this by using
14 the same data even to present a forecast for Mutual
15 that's based on the MBA data.
16  Q. Is there any other manner in which you believe
17 that your report rebuts statements by Mr. Oscher besides
18 the paragraph that you've identified and the chart on
19 page 12 where Mr. Oscher is talking about the MBA data?
20  A. Yeah. He makes several statements for example
21 on page ten.
22  Q. Where are you?
23  A. The last paragraph. Mutual's inclusion of
24 volumes of loans attributable to the branch managers is

Page 138

1  without foundation, et cetera.
2     Q.  Stop there.  Mutual's inclusion of volumes of
3  loans attributable to the three branch managers Dwayne
4  Hutto, Chris Smith and Christopher Wolf, collectively the
5  branch managers, who left Mutual to work for Waterstone,
6  is without foundation as Mr. Gennarelli acknowledged
7  there's nothing unlawful about Waterstone recruiting
8  branch managers.
9         In what manner does your report rebut that
10 paragraph?
11    A.  The next paragraph, let's read that, too.
12    Q.  To the extent the trier of fact determines that
13 the defendant's recruitment of Messrs. Hutto, Smith and
14 Wolf should be considered, the loan volumes produced by
15 these three branch managers should not be included in the
16 damage calculation.
17    A.  My model directly rebuts that because I'm
18 including all of the loan volume in my consideration of
19 the model.  And again, Oscher stops there.  He doesn't go
20 forward and put out a number.  Had he, I could be able to
21 tell you exactly what his number is compared to mine.
22        What he's doing is building up his case
23 and then not providing any number.  That doesn't mean
24 that I can't calculate the number and make these

Page 139

1  assumptions that directly rebut his implied analysis
2  here.
3     Q.  So it's an implied analysis?
4     A.  This is the way that he's phrased this, to the
5  extent that the loan volumes produced by these branch
6  managers should not be included in the damages
7  calculation.
8     Q.  Did Mr. Oscher calculate any amount of damages
9  with respect to Category 2?
10       MS. WALTER:  Object to form.
11       THE WITNESS:  Does he calculate damages.  Let me
12 review.  I believe the answer is no.
13       MS. KREITER:  Let the record reflect the witness is
14 now paging through Mr. Oscher's report.
15       THE WITNESS:  A   I was reading carefully
16 footnote 10 to make sure there's no damages calculation
17 that snuck in.
18        He says that Oscher used Mutual's Category
19 No. 2 methodology to estimate what Mutual might claim if
20 it had calculated damages for Category 1.  But does not
21 credit Mutual's Category 2 methodology.
22        Not quite sure what he means by that.  But
23 I don't believe that's a damages estimate for damages
24 Category 2.  I want to be careful and read this again,

Page 140

1  which is why I am taking a moment to do so.  So I can
2  answer your question.
3     Q.  Footnote 10 relates to a portion of the report
4  prior to the subheading that kicks off discussion of
5  damage Category 2.
6         Do you see that?
7     A.  Yes.  It references damages Category 2
8  methodology.  Seems like he's using it for 1 but not
9  for 2.  Again there's a lot of evidence where he gives a
10 lot of reasons for not calculating damages, for damages
11 Category 2, which is totally rebutted by my report.
12    Q.  My question was did Mr. Oscher calculate
13 damages for Category 2, yes or no?
14    A.  He does not say that he calculates them in
15 damages Category 2, that section.  I just wanted to make
16 sure the footnotes aren't hiding something.
17    Q.  Do you believe the footnotes are hiding a
18 calculation of damages Category 2 by Mr. Oscher?
19       MS. WALTER:  Object to form.
20       THE WITNESS:  A   Not on my review.  I just wanted
21 to read footnote 10 very carefully.
22       MS. KREITER:  Let's talk about your analysis that
23 is the peer month to month analysis.
24         My understanding is that you identified

Page 141

1  two branch offices at Mutual, Saint Louis branch and
2  Maryland branch, and you believe those branches are peer
3  branches representative of the Tampa and Daytona
4  branches.
5     Q.  Is that accurate?
6     A.  They have structural and data coverage
7  resemblance to Tampa and Daytona.  As I describe in
8  footnote 20.
9     Q.  I'm just trying to understand, get a baseline
10 here.  The branches you identified as peer branches for
11 purposes of your Category 2 damages analysis is the Saint
12 Louis and Maryland branches, correct?
13    A.  Those are the two branches I'm using, yes.
14    Q.  Why did you believe that the Saint Louis and
15 the Maryland branches were peer branches that should be
16 used in your analysis?
17    A.  Because they exhibit similarities to Tampa and
18 Daytona in terms of their structural and data coverage.
19        So to be, to add more to that, all four
20 branches operate under the P&L model.  Meaning that MOM
21 charges them a portion of loan sales, they otherwise
22 operate independently in other aspects.
23        Also importantly for my modeling, all four
24 of these branches had productivity and loan volume

Page 170

 1  flow analysis.  You say I applied a corporate profit
 2  apportionment factor to each of the branch's projected
 3  loan sales over the damages time frame.
 4     Q.  Let me just ask you in general, who at Mutual
 5  provided you with the corporate profit apportionment
 6  factor that you used?
 7     A.  I don't know who it was.  That was provided me
 8  early on.  With several other documents, so.
 9     Q.  Did you do any diligence to check the validity
10  of the corporate profit apportionment factor?
11     A.  I looked at the underlying data which is at the
12  loan level, and I understand how they are applying the
13  BPS to corporate is the column heading.
14         I understand that relates to the type of
15  loan and can vary, depending on the type of loan whether
16  conventional or jumbo or FHA or VA loan.  And there's a
17  table that they apply to calculate what the BPS to
18  corporate is and that spread sheet provides the average
19  over -- for Tampa and Daytona over the time period of
20  interest.
21     Q.  My understanding is the corporate profit
22  apportionment you used is 75.3 basis points for Tampa and
23  89 for Daytona, is that correct?
24     A.  One moment while I find the page.

Page 171

 1         For 2022, the model relies on the 2022
 2  actual corporate margin of 75.3 BPS for Tampa and 89 BPS
 3  for Daytona.
 4     Q.  You're reading from your report?
 5     A.  Yes.
 6     Q.  How do those basis points translate to dollars,
 7  if they do?
 8     A.  They translate to dollars on, in my DCF
 9  analysis.  So if you turn to Exhibit 7A.
10         You will see the .75 is reflected on the
11  2022 figure.  And EBIT is calculated at .75 times the
12  branch loan sales of 68.95 million.
13     Q.  Where is the 75.3 in 7A you're looking at?
14     A.  It is in income to Mutual of Omaha, percentage.
15     Q.  .75?
16     A.  It's rounded, but it's the same value.
17     Q.  I am asking a general matter, is there a rule
18  of thumb one basis points equals a thousand dollars or is
19  that not apples to oranges?
20     A.  It depends on the volume.  So it's a percentage
21  term.  Taken as a percentage of the loan sales.
22     Q.  Okay.  So I mean in general the basis points
23  attributable to the corporate profit on the Tampa branch
24  is higher than for the Daytona branch, correct?

Page 172

 1     A.  It's higher for Daytona than it is for Tampa.
 2     Q.  Right.  Sorry.  89 for Daytona, then 75.3 for
 3  Tampa.  Do you know, that number is reflective of the
 4  money that Mutual corporate is making off the various
 5  loans that go with those branches, correct?
 6     A.  That's correct.
 7     Q.  Do you know whether the managers were upset
 8  about the amount of profit that Mutual was taking off of
 9  the loans that they closed?
10     A.  I don't know.
11     Q.  You don't know if one of the reasons the branch
12  managers left was because they were running the branches,
13  doing all the work and Mutual was taking all the profit?
14         MS. WALTER:  Object to form.
15         THE WITNESS:  A   Yeah, I don't know.
16         MS. KREITER:  Q   Does the -- I'm going to try to
17  simplify it so I don't have to keep saying corporate
18  profit apportionment factor.  Is it the profit margin
19  that goes to corporate on the loan --
20     A.  We can use that, that's fine.
21     Q.  So the profit margin, would you, does that
22  change over time?
23         So your damages are out to 2031.  Does
24  that profit margin change?

Page 173

 1     A.  In my model I am using the average over the
 2  historical data, which goes from 2019 to 2022.  The
 3  average is actually I believe below the 2019 margin.  So
 4  I use that from 2023 forward.
 5     Q.  Do you know whether Gennarelli used a variable
 6  corporate profit margin in his analysis?
 7     A.  He may have used another similar variable that
 8  includes more factors, like the mandatory margin and
 9  underwriting fees.  I am not completely sure but I have
10  seen those additional data.
11     Q.  Do you know what Mr. Gennarelli, do you know
12  how Mr. Gennarelli calculated his corporate profit
13  margin?
14     A.  No.
15     Q.  Do you have any discussions with Mr. Gennarelli
16  about the appropriate corporate profit margin to use when
17  projecting lost profits in the future?
18     A.  We talked about that on the group call.
19     Q.  What did you talk about?
20     A.  I had questions about the business and I needed
21  to understand the structure, the P&L model and how the
22  profits are calculated.  So we had a conversation about
23  that.
24     Q.  Tell me as clearly as you can, how does the

Page 174
1  profit margin that you used differ from the profit margin
2  Mr. Gennarelli used?
3      A.  I don't know.  I didn't analyze his work.
4      Q.  I thought I heard you say though you think he
5  considered different criteria than you or different data
6  than you?
7      A.  Yeah.  I know there's a mandatory margin
8  underwriting fee that is not reflected in this BPS to
9  corporate.  And so my model is conservative by that
10 measure.
11         Again, I didn't analyze his work carefully
12 enough to have an opinion on what it includes, but I know
13 that mine doesn't and possible that if he is looking at
14 those other variables that he included those, but again I
15 did not do a full analysis of his work.
16     Q.  Okay.  Are you able to say whether the
17 corporate profit margin he used changed over time?
18     MS. WALTER:  Object to form.
19     THE WITNESS:  A  I believe it did based on the
20 exhibit you handed me.  Yes.  It looks like 2019 and
21 2020, 2021 and 2022 are all different.
22     MS. KREITER:  Q  You're taking a look at the
23 Gennarelli Exhibit No. 7?
24     A.  Yes.

Page 175
1      Q.  Let's take a look at that.
2          The corporate profit margin relied upon by
3  Mr. Gennarelli is represented I believe, but I will ask
4  you to confirm in the column of the spread sheet labeled
5  corporate profits earned BPS?
6      A.  Uh-huh.
7      Q.  Is that your understanding?
8      A.  Yes, that's what I'm looking at.
9      Q.  Did you attempt to discern why there's a
10 difference between your use of the 75.3 basis points for
11 Tampa and Mr. Gennarelli's use of the corporate margin
12 numbers that he has listed in Exhibit 7,
13 specifically .53, 1.47?
14     A.  Looks like on average he's using 92 BPS.  I'm
15 looking at the exhibits.
16         I don't know why we have differences.
17 Because again I haven't analyzed this, the underlying
18 data.  I don't know where the data comes from.
19     Q.  As a rebuttal expert for Mutual of Omaha who's
20 presenting lost profits, you did not feel obligated to do
21 any diligence to understand how your model differed from
22 Mr. Gennarelli's model or discussed those assumptions and
23 considerations with him?
24     A.  No, my task is to conduct an independent

Page 176
1  analysis, that's not influenced by prior models.
2      Q.  You say I understand Mutual receives corporate
3  margin off the top and branches cover their own expenses.
4  And you say I fully understand that each branch is
5  managed independently by a branch manager.
6          Do you recall that?
7      A.  I think I said fully.
8      MS. WALTER:  Can you point us to where.
9      THE WITNESS:  I further understand.
10     MS. KREITER:  You're referring to your report.  I'm
11 also interested in separate from what is in your report,
12 and without you looking back at it what are your
13 opinions.
14     Q.  So I mean, do you have an understanding that
15 the branches are managed independently by a branch
16 manager?
17     MS. WALTER:  To be clear, that was not how you
18 phrased it initially.  And also case law is pretty clear
19 this isn't a memory test.  She's allowed to look at her
20 report.
21     MS. KREITER:  Q  So again my question is your
22 opinion, is it that the branches are managed
23 independently by a branch manager?
24         Are you looking at your report?  In this

Page 177
1  case I'm going to ask you testify based on your opinions
2  not within --
3      MS. WALTER:  Her opinions are in the report, Maria.
4  There's nothing improper about her looking at her report.
5      MS. KREITER:  Q  Okay.  Do you believe that the
6  branches are independently managed by a branch manager,
7  yes or no?
8      THE WITNESS:  A  Yes.
9      Q.  Is it your understanding that the branches
10 cover all of their own expenses?
11     A.  I believe so, yes.
12     Q.  Do you know whether Mutual sources any
13 customers to the branches?
14     A.  I don't know.
15     Q.  How did you determine the corporate profit
16 apportionment factor or the profit margin that you
17 applied?
18     A.  I evaluated the data set that calculates that
19 for every loan at the two branches.
20     Q.  Sorry, a data set that calculates it?
21     A.  It's an Excel data set.
22     Q.  Is it part of that same spread sheet we looked
23 at earlier?
24     A.  It's cited in my report.  It's different from