# WATERSTONE MORTGAGE CORPORATION
# NON-PRODUCING BRANCH MANAGER
# EMPLOYMENT & SERVICES AGREEMENT

THIS NON-PRODUCING BRANCH MANAGER EMPLOYMENT & SERVICES AGREEMENT (the "Agreement"), dated the _____ day of _____, 20___ , by and between WATERSTONE MORTGAGE CORPORATION, a Wisconsin corporation ("Waterstone" or "Company"), and_____, ("Employee" or "Manager") of the _____office of Waterstone (the "Branch") (collectively the "Parties").

RECITALS

WHEREAS, Waterstone is engaged as a Mortgage Banker in the State of Wisconsin and licensed as a Mortgage Broker, Mortgage Banker or Correspondent Lender to do business in other states whereby Waterstone currently carries a valid license; and

WHEREAS, Waterstone, being a wholly-owned subsidiary of a Wisconsin state-chartered financial institution is exempt from licensing requirements in various states; and

WHEREAS, Employee desires to be employed as Manager of the _____ Branch Office of Waterstone and Manager acknowledges as a prerequisite of employment that s/he must comply with all requirements of Waterstone and state lending licensing agencies and federal regulators.

WHEREAS, it is understood and agreed by Manager in entering this Agreement that s/he will not engage in any loan origination as defined herein while employed pursuant to this Agreement.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Waterstone and Manager hereby agree as follows:

**1.** **Acknowledgements.**  Manager acknowledges each of the following: Employee acknowledges that new compensation rules passed by the Board of Governors of the Federal Reserve System prohibit branch managers from being paid based upon the profitability of their branches unless the branch manager does not originate loans (the "Compensation Rules").                              Initial_____

The damages for violating the Compensation Rules is three (3) times the compensation paid, and may result in limitless rescission periods and liabilities for repurchase.
                                                    Initial_____

07152011

EXHIBIT 2

In addition, laws pertaining to the origination of loans, if violated, could give rise to claims against the Company for unlawful steering.   Initial_____

As defined herein, "origination" includes gaining, arranging, negotiating, or otherwise obtaining an extension of consumer credit for another person.  Employee may take no action that could reasonably be considered to amount to "origination" as defined herein.
Initial_____

To the extent permitted by RESPA and/or HUD, Employee hereby agrees to indemnify and defend Waterstone and its principals for any and all attorneys' fees, costs of prudent settlement, judgments, fines, or damages incurred by Employer as a result of Manager's breach of the terms of this Agreement.
Initial_____

Manager further assures Waterstone that s/he will strictly adhere to all policies and procedures of the Company and will not enter into any formal or informal arrangements or deals of any kind or nature with any other person or entity (including but not limited to another Waterstone employee) that directly or indirectly concern compensation of any form or manner for performing services in connection with the duties associated with originating, processing or closing residential mortgage loans.
Initial_____

    **2.**    **Employment & Appointment as Manager**.  Waterstone hereby employs Manager, and Manager hereby accepts such employment as Waterstone's Branch Manager. Waterstone hereby employs Manager to provide or cause to be provided to Waterstone the services set forth in this Agreement, and Manager agrees to provide or cause to be provided to Waterstone such services, subject to the terms and conditions hereof.  Manager will be responsible for the management of the Branch.  Except as provided herein, neither Manager nor any of Manager's loan officers or Branch employees will have any authority to bind or make commitments on behalf of Waterstone for any purpose and neither will hold itself, himself or herself out as having such authority.

    **3.**    **Obligations of Branch Manager.**  Manager acknowledges that Waterstone will have complete ownership of all property and all rights in property, including, but not limited to loan files, bank and financial records and information, patents, trademarks, copyrights for all publications, documents, data, information, lender lists, loan pricing and fees.

    Manager agrees to the following duties and responsibilities:

07152011

Page 3 of 19

(a) Subject to the ultimate supervision, direction and control of Waterstone, Manager will be responsible for the day to day operations of the Branch. This includes, but is not limited to, planning, managing, marketing, hiring and supervising, and doing any and all other acts as may reasonably be necessary or appropriate to carry out the duties and responsibilities of Manager and any and all other acts reasonably requested by Waterstone.

(b) Manager is authorized to and shall, for the benefit of Waterstone, among other things:

i) remain familiar with and ensure that all loans originated/processed by the Branch are originated, and processed in accordance with Waterstone's Guidelines, Quality Control measures, Investor Guidelines, and all applicable federal and state laws;

ii) remain familiar with and ensure compliance with all Waterstone's rules, policies, and procedures, as well as federal, state and county laws, regulations, and ordinances;

iii) ensure that all proper documentation is prepared, kept and maintained in accordance with all applicable laws, and is readily available for inspection at Waterstone's discretion;

iv) inform Waterstone immediately of any and all events, incidents, occurrences, complaints, lawsuits or other legal action, investigations or other material information or matters, including but not limited to incidents, complaints, or reports of illegal, unethical, or other inappropriate conduct;

v) inform Waterstone of all expenses on a timely basis in order to ensure prompt payment thereof;

vi) forward all fees, checks, deposits, etc. in the possession of Manager to Waterstone's corporate headquarters within three (3) days of receipt by Manager and/or when approved by Waterstone's corporate headquarters deposit such checks locally within three (3) days of receipt.

vii) ensure that all closed loan documents are stored in Waterstone's document storage system and accessible to Waterstone upon demand;

viii) hire, develop, maintain, train and supervise a sales force of loan originators and support staff to maximize Branch revenue and profit in accordance with and subject to Waterstone policies and procedures;

ix) comply and conform with all applicable federal, state and local laws and regulation, including but not limited to: (i) The Real Estate Settlement Procedures Act; (ii)

07152011

The Equal Credit Opportunity Act; (iii) the Truth in Lending Act; (iv) the Fair Credit Reporting Act; (v) the Fair Housing Act; (vi) any state or local anti-redlining act and/or consumer protection act.

x) ensure that all persons performing any services for Waterstone through the Branch are Waterstone employees and that all such employees sign all appropriate new-hire forms and complete all background checks and pre-hire paperwork, and are reported to and approved by Waterstone's payroll department on or prior to their first day of employment.

xi) ensure that all loan files and borrower checks for loans originated by the Branch, whether brokered or closed by Waterstone, are submitted in a timely manner to Waterstone's main office.

xii) provide Waterstone with a copy of all contracts to be entered into or developed by, for or under the direction of Manager in connection with the Branch, to corporate headquarters before the execution of the contract.

xiii) provide information and assistance necessary to obtain and maintain any licenses, permits, or authorizations required for the operation of the Branch.

xiv) ensure that all loan officers working for the Branch have passed appropriate background checks, complied with all licensing and registration requirements under applicable state and federal law, and have completed all pre-hire paperwork required by Waterstone's corporate headquarters, and have been approved by Waterstone's corporate headquarters.

xv) ensure that loans originated by Branch are locked with the Waterstone lock desk in a timely manner.

xvi) maintain the Branch as suitable for a mortgage origination operation, and ensure Branch has all equipment and supplies necessary for normal branch operations.

xvii) maintain copies of all loan files originated by the Branch, whether or not the corresponding loan was closed, rejected or withdrawn, for a period of the greater of three (3) years or the period required by the laws and/or regulations of the State where the loan file was originated.

xviii) ensure that all branch employees comply with and are subject to the policies and procedures of Waterstone's employee manual.

xix) ensure that all advertising and marketing is done only with the pre-approval of Company and that all telemarketing is performed in accordance with

07152011

Page 5 of 19

Company guidelines for use of the Do Not Call list and is in compliance with Federal and State rules.

xx) ensure that all websites or other social media used by the Branch or any Branch employees that relate in any way to financing residential real estate are approved by the Company prior to posting to/access by the general public.

xxi) ensure that any and all email communications on behalf of Company shall be sent from and directed through corporate email. Private email is not to be used for any official Company business.

xxii) ensure that all borrowers are advised of the most appropriate financing options, are not steered to products based on maximizing compensation, and are advised to close loans only if there is a good faith basis to believe that the borrower will be able to re-pay the loan.

(c) Notwithstanding any provision of this Agreement to the contrary, without the prior written consent of Waterstone, Manager is not authorized on behalf of Waterstone to:

i) sell, lease, trade, exchange or otherwise dispose of any capital asset of Waterstone;

ii) grant a security interest in, hypothecate or otherwise encumber any asset of Waterstone;

iii) incur any debt which is not contemplated by the budget approved by Waterstone or borrow money in the name of or on behalf of Waterstone;

iv) confess a judgment against Waterstone or settle or compromise in any manner any legal action, claim or litigation in the name of Waterstone brought by or against Waterstone;

v) implement material changes to the operation of the Branch;

vi) open any bank, savings or investment account in the name of Waterstone or any DBA, parent, subsidiary or affiliate thereof;

vii) deposit, cash, endorse, transfer or negotiate any check, instrument, draft or other payment payable to or intended for Waterstone;

07152011

       viii)    acquire or attempt to acquire any signature rights to any of the aforementioned accounts, nor may Manager open any account in the name of or a name similar to the foregoing;

       ix)    accept any funds or wire transfers intended or for the benefit or on behalf of Waterstone;

       x)    conduct any Realtor activities or hold an active Realtor license (or similar license) during the period of employment or permit or allow other loan officers of the Company to engage in such activities;

       xi)    obligate Waterstone on any lease, equipment lease or purchase, or incur any other obligation on behalf of Waterstone, outside his/her normal course of duties;

       xii)    sign any contract with any third party in Waterstone's name, unless it is first approved in writing by an officer of Waterstone;

       xiii)    endorse or receive any funds of any kind for Waterstone or any other Waterstone employee;

       xiv)    pay any expenses for the branch out of any personal funds, or funds from any source other than those of Waterstone;

       xv)    maintain any lease, utility, or other account related to branch business, in his/her personal name or in a name other than Waterstone;

       xvi)    obtain credit in the name of Waterstone or create indebtedness on behalf of Waterstone under any circumstances;

       xvii)    Pay or promise payment to any person who is not a Waterstone employee for services associated with the origination or processing of loans,;

       xviii)    issue or allow others to issue a commitment of financing without proper prior underwriting approval;

       xix)    waive any commitment fees or fees for appraisals, credit reports, title policies, flood certifications or surveys;

       xx)    undertake any financing or origination of loans in contravention of company policies, including but not limited to straw financing (in which a person purchases real property in his or her name and then holds it for sale to the person who supplied the money for the sale, the intended ultimate purchaser), flip financing (in

07152011

which a person attempts to buy low and sell high in a short period of time), or the transfer of loans from or to Waterstone without proper approval;

        xxi)    deviate from approved compensation plans for any loan officer;

        xxii)    encourage or permit loan officers to steer customers toward particular loans for the purpose of maximizing revenue at the expense of customers' interests and/or facilitate or encourage lending to consumers in the absence of any good faith belief that a borrower is able to repay the loan;

        xxiii)    encourage or permit any actions that result in lending to consumers under false pretenses, or put Company at risk for early pay-off, early payment default, repurchase or recapture;

        xxiv)    use the Company's name except in furtherance of his/her duties on behalf of the Company.  Manager has no ownership or other usage rights with respect to the Company's name and upon termination of this Agreement, Manager shall cease using the Company's name or any semblance thereof.

    (e)    <u>Professionalism: Loyalty: Illegal Acts</u>.  Manager agrees to do business in a professional manner, abide by all laws, operate in good faith toward the public, government, Waterstone and Waterstone's secondary market investors, and honor all commitments entered into by Manager and Waterstone.  Manager agrees to conduct business with the highest level of business ethics and practices, so as to minimize the potential of any charge of loan fraud or other claims of illegal or unfair dealings, and to avoid even the appearance of impropriety in any business dealing connected with Waterstone's clients.

    **4.**    **<u>Branch Operations</u>.**

    (a)    Manager shall follow Waterstone guidelines for all advertising activities.  A copy of all advertising in any media, including but not limited to, print, radio, television and electronic media, and brochures used by Branch must be sent to Waterstone's corporate headquarters.  No advertising may be used without the prior written approval of Waterstone's corporate headquarters. All advertising and marketing will be paid for by Waterstone and expensed against the Branch's Operating Account.

    (b)    All telemarketing done by the Branch or an outside vendor must be done in accordance with Waterstone guidelines for use of the Do Not Call list and must be in compliance with federal and state rules.  No telemarketing may be conducted without the prior written approval of Waterstone's corporate headquarters.   All telemarketing will be paid for by Waterstone and expensed against the Branch's Operating Account.

07152011

(c)   All websites must be approved in writing by Waterstone prior to posting to the general public.

(d)   Manager shall exclusively use the name "Waterstone Mortgage Corporation" only in furtherance of his/her duties on behalf of the Company. Manager has no ownership or other usage rights with respect to the name "Waterstone Mortgage Corporation" and upon termination of this Agreement, Manager shall cease using the name "Waterstone Mortgage Corporation" or any semblance thereof.

(e)   Any and all email communications on behalf of the Branch shall be sent from and directed through Waterstone's electronic communication systems, and all outgoing messages shall include only a Waterstone corporate email address in the signature.  Private email is not to be used for any official Waterstone business.

(f)   The Branch shall maintain an Operating Account as set forth herein.

(g)   Revenue of the Operating Account will be calculated as follows:

i) The Operating Account will be credited with any income from the loans closed by Branch employees.  Income includes all funds received by the Branch from closed loans as described herein.

(ii) Loans are considered closed and counted as income of the Branch on the last day of the month following the month in which the loan meets all of the following conditions:  the loan has been closed, funded, purchased by a secondary market investor (if applicable), and rescission periods have expired, all while Branch Manager is responsible for supervising the Branch. For example, a loan meeting all the conditions above as of January 15th shall be considered income of the Branch as of the last day in February.

(iii)  Revenue accruing to Branch profit will include 100% of the income earned on a loan as reflected by the Company's NYLX pricing system.

(h)   Expenses will be counted against Revenue in the Operating Account as follows:

(i)  the cost and expense of all branch equipment;

ii)  the cost of any building or rent leases, modifications, or repairs;

iii)  all costs associated with employees, (including Branch Manager) including but not limited to salaries, taxes, insurance, recruiting, licensing, and hiring;

07152011

    iv) the costs of all insurance payments and/or required governmental funds (e.g. workers compensation, etc);

    v) any and all third party vendor services provided to Branch, including but not limited to credit reports, quality control, warehouse fees, appraisals, and any other third party vendor service which is either required by Employer for the normal course of business or requested by Manager;

    vi)  all costs associated with obtaining or renewing state licenses.

    vii) for city, county, or other taxes associated with any and all Branch operations

    viii) any and all penalties or losses associated with recapture of commissions on loans generated by the Branch, repurchases of loans originated by the Branch, mandatory locks, loans locked at a loss, loans locked with one investor and switched to another, origination of fraudulent loans, failure to deliver loans to the investor on time, costs associated with any lawsuits arising out of Branch operations, and costs stemming from violations of this Agreement and/or Company policies and practices.

    ix). The Operating Account shall be charged for any and all losses, liabilities, costs and expenses (including reasonable attorney's fees), incurred by Waterstone relating to judgments, damages, claims, counterclaims, demands, actions or proceedings arising out of or connected to any breach of representations, covenants or warranties made by Manager or Branch employees in relation to loans originated as Section 32 High Cost Mortgages (pursuant to the Truth in Lending Act and regulations issued thereunder) or loans that are subject to any applicable law covering high cost or predatory loans.

  (i)  Reserve Account. Manager is required to maintain a minimum credit balance (the "Reserve") in the Operating Account. This Reserve will be established by Waterstone based on the size of the Branch, the number of Branch employees and the volume produced. Waterstone reserves the right to increase or decrease the Reserve amount at any time. The minimum Reserve will be set at 2.0 (two) times the monthly fixed Branch expenses provided, however, that Waterstone may at any time, in its sole discretion, increase the Reserve above the minimum or decrease the Reserve below such minimum. Any increase or decrease in Reserve shall be in writing and signed by Waterstone's President. This Reserve Account will be funded at all times from profits allocated to the Operating Account pursuant to this paragraph 3. Manager will not receive any profit from the Operating Account unless and until the Reserve Account has met the required minimums. In the event that the Reserve falls below the minimum, it shall be replenished with branch profits, prior to Branch manager receiving branch profits.

07152011

5. **Obligations of Waterstone**.

(a) Waterstone may, in its sole discretion, supply reasonable quantities of advertising materials to Manager, such as brochures and similar services documentation.

(b) Waterstone shall make training sessions and seminars available to Manager and its employees and loan officers.

(c) Waterstone will provide closing documentation services to the Branch at the Company's current closing documentation fee, which is subject to change at any time.

(d) Waterstone will obtain the appropriate licenses, permits and authorizations necessary or appropriate for the proper conduct of the Branch. The cost of obtaining and maintaining these licenses, permits, and authorizations will be charged to the Operating Account.

(e) All office equipment and furnishings needed for Branch operations shall be provided by Waterstone, and shall be held in its own name. All such equipment and furnishings will be charged to the Operating Account. In the event that Manager already owns certain equipment and/or furnishing that s/he wishes to continue using, Waterstone may elect to lease such equipment or furnishings from Manager at its fair market value, and the cost of such lease shall be charged to the Operating Account.

(f) Waterstone is responsible for all costs and expenses associated with the operation of the Branch.

6. **Compensation & Benefits**.

(a) Manager and employees of Branch may, in accordance with Waterstone policies and procedures, take advantage of employee benefit programs made available to all employees of Waterstone.

(b) Manager shall be entitled to a salary of $455.00 (four hundred fifty five dollars) per week to be paid every other week, as well as 100% of the branch profit after any salary is paid to Branch Manager and after maintenance of the Reserve, to be distributed monthly, based on the Operating Account and all terms and conditions herein.

07152011

**7.     Confidentiality.**

(a)     Employee acknowledges that by reason of his/her employment hereunder, Employee will occupy a position of trust and confidence with Waterstone and that Employee will have access to confidential and proprietary information and trade secrets of Waterstone, all of which are the unique and valuable property of Waterstone. Employee acknowledges that, among other things, its loan programs, advertising programs, referral sources, business plan, marketing strategies, software, customer lists, pricing, and investor lists ("Confidential Information") have been developed through the expenditure of substantial time, effort and money which Waterstone wishes to maintain in confidence and withhold from disclosure to other persons. Accordingly, as a material inducement to Waterstone to enter into this Agreement, Employee acknowledges that he/she will become intimately involved and/or knowledgeable in regard to Waterstone's business and will be entrusted with Waterstone's Confidential Information, and both during his/her employment and after any termination thereof, Employee will use such information solely for Waterstone' benefit, and maintain as secret and will not disclose any of the Confidential Information to any third party (except as Employee's duties may require) without Waterstone' prior express written authorization.

(b)     Employee agrees that during his/her employment with Waterstone he/she will not directly or indirectly, on behalf of himself/herself or any other individual, organization, or entity solicit any customer or client or prospective customer or client of Waterstone to engage in or transact business with any entity or person other than Waterstone.

(c)     Employee agrees that for a period of twelve (12) months following the cessation of employment with Waterstone (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein) he/she will not directly or indirectly, on behalf of himself/herself or any other individual, organization, or entity, solicit for the purpose of providing services of the type provided by Waterstone (i) any actual or prospective customer or client of Waterstone with whom during Employee's employment with Waterstone s/he has communicated or contacted during the prior twelve (12) month period ; and/or (ii) any actual or prospective customer about whom Employee has obtained confidential information in connection with his/her employment with Waterstone during the prior twelve (12) month period.

(d)     Employee agrees that during his /her employment with Waterstone and for a period of twelve (12) months after the termination of employment with Waterstone (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein) Employee will not on behalf of himself/herself or on behalf of any other person, firm, or entity, directly or indirectly solicit any of Waterstone' employees, consultants, or contractors to leave Waterstone; form or join another entity; and/or sever (or cause the termination of) their relationship with Waterstone.

(e)     Employee agrees that during the term of this Agreement and for a period of 12 months following such termination, s/he will not contact (i) any actual or

07152011

prospective customer or client of Waterstone with whom during Employee's employment with Waterstone s/he has communicated or contacted; and/or (ii) any actual or prospective customer about whom Employee has obtained confidential information in connection with his/her employment with Waterstone for the purpose of refinancing any loan closed through the Company, where any such refinance would result in an early pay-off resulting in the recapture of any revenue paid to the Company.   Employee agrees that in the event that employee encourages any customer to undertake any such transaction s/he shall be liable to the Company in the amount of any recaptured revenue in addition to any other damages as permitted under this Agreement or under applicable law.

(f)   Employee agrees that for twelve (12) months following the termination of employment with Waterstone, he/she will show this Agreement to any and every subsequent employer during such time.

(g)   Employee agrees that the restrictions herein will not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment. Employee acknowledges that the protections afforded to Waterstone herein, are reasonable and necessary.

(h)   Employee recognizes that irreparable damage will result to Waterstone in the event of the violation of any covenant contained herein made by him/her, and agrees that in the event of such violation Waterstone shall be entitled, in addition to its other legal or equitable remedies and damages as set out below, including costs and attorney's fees, to temporary and permanent injunctive relief to restrain against such violation(s) thereof by him and by all other persons acting for or with him/her.

**8.**   **Waterstone Representations.**  Waterstone represents, warrants and covenants to Manager as follows:

(a)  Waterstone has the requisite power and authority to own and operate its properties and assets, and to carry on its business as presently conducted and as proposed to be conducted;

(b) Waterstone has all requisite legal power and authority to execute, deliver and perform this Agreement;

(c) this Agreement, when executed and delivered by or on behalf of Waterstone, will constitute a valid and binding obligation of Waterstone, enforceable in accordance with its terms;

(d) there are no actions, suits, proceedings or investigations pending or threatened against Waterstone or its properties before any court or governmental agency which would adversely affect the ability of Waterstone to perform its obligations under this Agreement;

07152011

   (e) Waterstone will/has obtained all licenses, permits and authorizations necessary or appropriate to the proper conduct of the Branch and will use its best efforts to preserve such licenses, permits and authorizations; and

   (f) Waterstone will cooperate in good faith with Manager to accomplish the purposes of this Agreement.

  **9.** **Manager Representations.**  Manager hereby represents, warrants and covenants to Waterstone as follows:

   (a)  Manager has the requisite power and authority to own and operate its properties and assets, and to carry on its business as presently conducted and as proposed to be conducted, including, but not limited to, managing the Branch as provided for in this Agreement;

   (b) Manager has all requisite legal power and authority to execute, deliver and perform this Agreement;

   (c) This Agreement, when executed and delivered by or on behalf of Manager, will constitute a valid and binding obligation of Manager, enforceable in accordance with its terms;

   (d) There are no actions, suits, proceedings or investigations pending or threatened against Manager or its properties before any court or governmental agency which would adversely affect the ability of Manager to perform its obligations under this Agreement.

   (e) Manager will perform its obligations hereunder in compliance with all applicable federal, state and local laws and regulations; and

   (f) Manager will cooperate in good faith with Waterstone to accomplish the purposes of this Agreement.

   (g) Manager is not party to any Agreement that would interfere with or prohibit the performance of the duties or obligations set forth herein.

   (h) Manager represents s/he has the necessary training and educational knowledge to adequately understand the laws and requirements of the position and will maintain the training and knowledge necessary to adequately perform his duties under this Agreement.

   (i) Manager represents s/he is not subject to any non-compete agreement or non-solicitation agreement that would affect the Manager's ability to perform under this Agreement.

07152011

**10.** **Term.**  This Agreement will commence as of the date hereof, and will continue until terminated by either Manager or Waterstone.

(a)  Notwithstanding anything else contained in this Agreement, Manager or Waterstone may terminate this agreement at any time with or without cause upon the giving of written notice to the other party.

(b)  Upon termination of the Agreement, this subsection 10(b) shall be effective immediately and shall survive the termination of this Agreement.

- (1) All loan files, logs, records, and financial data and information must be delivered to Waterstone's corporate office within five (5) business days of the termination.
- (2) All final invoices must be promptly sent to Waterstone's Accounting Department for payment.  Any amounts remaining in the Operating Account following termination of the Agreement will be delivered as final payment to Manager after the Final Accounting of all Branch accounts (as described in subsection 10(b)(6)).
- (3) All Waterstone property, equipment and licenses must be returned to Waterstone's corporate office within five (5) business days of termination.  In addition, any reference to Waterstone must be promptly removed from Manager's website and all Waterstone signage taken down within five (5) business days of termination.
- (4) Any profits existing in or coming into the Operating Account as of the date of termination shall be held by Waterstone pending a Final Accounting (as defined in subsection 10(b)(6)) of the Branch Accounts by Waterstone, and no profits shall be paid out before the Final Accounting.
- (5) The Reserve requirement shall be maintained at the amount required by Waterstone immediately prior to termination of the Branch.  If the Reserve has not been met as of the termination date, any branch profits shall first be applied to the Reserve pending the Final Accounting.
- (6) Once the Branch's last loan is funded by a broker or purchased by a secondary market investor, as the case may be, Waterstone shall prepare a final accounting of the Branch wherein revenue shall be credited and expenses shall be applied against the Operating Account as described herein at Section 4, and any future, ongoing obligations incurred by Waterstone or reasonably expected to be incurred by Waterstone due to the Branch operation shall be applied against the Operating Account (the "Final Accounting").  For example, if Waterstone has a lease or any other agreement related to the Branch that cannot be terminated (i.e. an ongoing obligation), the amount of Waterstone's liability in relation to that lease or agreement shall be

07152011

        applied as an expense against the Branch Operating Account in the Final Accounting.  This paragraph shall be construed broadly and future obligations shall include, but not be limited to, pending or reasonably anticipated litigation and any costs or expenses associated with any agreement, contract or lease relating to the Branch or the operation of the Branch.

(7)    Provided that Manager is in compliance with all terms and provisions of this Agreement, , the Reserve will be liquidated and any amounts remaining in the Reserve following the payment of any and all expenses, will be paid to Manager within 180 days of completion of the Final Accounting..

(8)    The Branch HUD ID shall remain in effect at least until the last Branch FHA loan is funded by a secondary market investor and is properly FHA insured.

(9)    During termination and wind-down of the Branch, the Parties shall remain professional, and the Manager shall assist Waterstone as reasonably requested to complete the termination of the Branch operations.  Manager shall provide documentation and information related to the Branch within three (3) business days of a written request from Waterstone.

(10)    During and after the wind-down of the Branch, neither Party shall make disparaging, slanderous or libelous statements regarding the other party.

**11.**    **<u>Dispute Resolution and Arbitration</u>.**

    (a)    The parties agree that in the event of any dispute arising between them that arises out of the employment relationship and/or this Agreement, prior to initiating any civil lawsuit, the party intending to initiate such a claim or proceeding, will at least ten (10) days prior to doing so, provide the other party with a specific demand for monetary relief, as well as a calculation explaining the basis for said monetary demand, as well as a short and plain statement of the grounds upon which such demand is sought.  Notwithstanding the foregoing, this provision does not prohibit a party from immediately seeking injunctive relief limited to preventing irreparable harm.

    (b)    This Agreement is made and entered into in the State of Wisconsin and shall in all respects be interpreted, enforced, and governed by and in accordance with the laws of the State of Wisconsin.  In the event that the parties cannot resolve a dispute by the ADR provisions contained herein, any dispute between the parties concerning the wages, hours, working conditions, terms, rights, responsibilities or obligations between them or arising out of their employment relationship or this Agreement shall be resolved through binding arbitration in accordance with the rules of the American Arbitration Association applicable to employment claims.  Such arbitration may not be joined with or join or include any claims by any persons not party to this

07152011

Agreement.  The parties will share equally in the cost of such Arbitration, and shall be responsible for their own attorneys' fees, provided that if the Arbitration is brought pursuant to any statutory claim for which attorneys fees are expressly recoverable, the Arbitrator shall award such attorneys' fees and costs consistent with the statute at issue.  Nothing herein shall preclude a party from seeking temporary injunctive or declaratory relief in a court of competent jurisdiction to prevent irreparable harm, pending any ruling obtained through Arbitration, or to enforce the arbitration requirements set forth in this paragraph 11(b).  Further, nothing herein shall preclude or limit Manager from filing any complaint or charge with a State, Federal, or County agency.  By execution of this Agreement, the parties are consenting to personal jurisdiction and venue in Wisconsin with respect to matters concerning the employment relationship between them.

**12.** **Miscellaneous.**

(a) This Agreement constitutes the entire understanding of the parties and is intended as a final expression of their agreement and a complete statement of the terms thereof and merges and supersedes all prior discussions, agreements, negotiations, and understanding of any and every nature between them.

(b) This Agreement may not be changed or modified in any respect except by an agreement in writing signed by the parties hereto.

(c) This Agreement shall be construed and interpreted according to the laws of the State of Wisconsin.

(d) This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which shall be one and the same instrument.

(e) All notices, requests, demands, and other communications which are required or which may be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or telefacsimile with confirmation of receipt or by certified mail, return receipt requested, postage prepaid or by electronic mail delivery:

If to Manager, to:

_____
Name
_____
Address
_____
City, State, Zip

07152011

      Telefacsimile: (____)_____  
      Email: _____

If to Waterstone, to:

    Eric J. Egenhoefer, President  
    Waterstone Mortgage Corporation  
    1133 Quail Court  
    Pewaukee, Wisconsin 53072  
    Telefacsimile: (262) 264-5498  
    Email: eric@waterstonemortgage.com

      (f)    If any provision of this Agreement is prohibited by the laws of the State of Wisconsin, or rendered unenforceable by a court of competent jurisdiction, such provisions shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement.

      (g)    This Agreement shall be binding upon and inure to the benefit of the parties, their successors, and assigns.

      (h)    Any waiver of any default shall not constitute a waiver of any prior or subsequent other default.

      (i)    Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, or extend the scope or intent of this Agreement or any provision hereof.

      (j)    Neither party shall be liable to the other for nonperformance or delay in performance of any of its obligations under this Agreement due to causes reasonably beyond its control, including without limitation, fire, flood, strikes, labor troubles, or other industrial disturbances, unavoidable accidents, governmental regulations, riots, and insurrections.  Upon the occurrence of such force majeure condition, the effective party shall immediately notify the other party in writing of the circumstances which constitute a forced majeure.  Immediately after the cause of the forced majeure is removed, the effective party shall perform such obligations with all due diligence.

      (k)  The failure of a party to insist upon adherence to any term of this agreement on any occasion will not be considered a waiver or deprive that party of the right thereafter to insist upon adherence to that term or any other term of this Agreement.

07152011

   (l) This Agreement will be construed in accordance with and governed by the laws of the State of Wisconsin, without giving effect to the provisions thereof relating to choice or conflict of laws.

   (m)  Each provision of this Agreement is intended to be severable, and if any term or provision hereof is illegal or invalid for any reason whatsoever, such provision shall not effect the validity of the remainder hereof.

   (n)  This Agreement may not be assigned without the prior written consent of either party.

   (o)  The Parties agree that any lawsuit, proceeding or action with respect to this Agreement may be brought exclusively in the courts of the State of Wisconsin or of the United States of America located in Wisconsin.  By execution of this Agreement, the parties are consenting to personal jurisdiction in Wisconsin limited to the operation or interpretation of this Agreement.

   (p)  Manager agrees that Waterstone shall be entitled to the cost of all legal fees and expenses incurred in investigating and enforcing any terms and conditions of this Agreement against Manager.

[SIGNATURES ON FOLLOWING PAGE]

07152011

IN WITNESS WHEREOF, the parties hereto have executed this Non-Producing Branch Manager Employment & Services Agreement as of the date and year first above written.

MANAGER:

BRANCH MANAGER

_____

Print Name:_____

WATERSTONE MORTGAGE CORPORATION

By: _____
Name: Eric J. Egenhoefer
Its:     President

07152011