```
                                                              Page 1

 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION
 3                       Civil Action No.: 22-CV-01660
 4
     MUTUAL OF OMAHA
 5   MORTGAGE INC.,
 6          Plaintiff,
     v.
 7
     WATERSTONE MORTGAGE
 8   CORPORATION,
 9          Defendant.
     _____/
10
11                         DEPOSITION OF
12                         DWAYNE HUTTO
13                    (Volume I, pages 1 - 171)
14   DATE TAKEN:       June 15, 2023
15   TIME:             9:03 a.m. to 3:57 p.m.
16   PLACE:            Gunster, Yoakley & Stewart, P.A.
                       401 East Jackson Street
17                     Suite 1500
                       Tampa, Florida 33602
18
     TAKEN BY:         The Plaintiff
19
     REPORTED BY:      Victoria White
20                     Court Reporter and Notary Public
21
22
23
24
25                                                          EXHIBIT
                                                               4
```

Page 2

```
 1  A P P E A R A N C E S:
 2  ARI KAREN, ESQUIRE
    COURTNEY WALTER, ESQUIRE (Via Zoom)
 3  MARK CARROL, ESQUIRE
    OF: MITCHELL SANDLER, LLC
 4      1120 20th Street N.W.
        Suite 725
 5      Washington, D.C. 20036
        202.886.5265
 6      Akaren@mitchellsanders.com
 7      APPEARING ON BEHALF OF THE PLAINTIFF MUTUAL OF
        OMAHA MORTGAGE, INC.
 8
    MARIA L. KREITER, ESQUIRE
 9  OF: GODFREY & KAHN
        833 East Michigan Street
10      Suite 1800
        Milwaukee, Wisconsin 53202
11      414.287.9466
        Mkreiter@gklaw.com
12
    STEPHANIE ZIEBELL, ESQUIRE (Via Zoom)
13  GENERAL COUNSEL WATERSTONE MORTGAGE CORPORATION
14      APPEARING ON BEHALF OF THE DEFENDANT WATERSTONE
        MORTGAGE CORPORATION
15
16  ALSO PRESENT:
17  Rob Williams - Videographer
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX OF PROCEEDINGS
 2                   VOLUME I
 3  Witness                                    Page
    DWAYNE HUTTO
 4    Direct Examination by Mr. Karen            5
 5
              PLAINTIFF'S INDEX OF EXHIBITS
 6                    VOLUME I
 7  Exhibit       Description              Marked
 8  Exhibit 1     Waterstone Mortgage          9
                  Corporation Producing Branch
 9                Manager Employment Agreement
10  Exhibit 2     E-mail from Michael Smalley  37
                  Dated August 14, 2019
11
    Exhibit 3     Dustin Owen E-mail dated     39
12                October 8, 2021
13  Exhibit 4     Dustin Owen E-mail dated     45
                  January 31, 2022
14
    Exhibit 5     Waterstone April 20, 2022    61
15                E-mail
16  Exhibit 6     February 17, 2022 E-mail     82
                  (December P&I)
17
    Exhibit 7     Employee Offer Letter       100
18                Date/Resignation Letter Date
                  Document
19
    Exhibit 8     April 27, 2022 E-mail       107
20
    Exhibit 9     January 10, 2022 E-mail from 119
21                Chris Wolf
22  Exhibit 10    March 3, 2022 E-mail        146
23  Exhibit 11    March 29, 2022 E-mail       151
24  Exhibit 12    April 8, 2022 E-mail        155
                  (Today's Call)
25
    Exhibit 13    April 8, 2022 E-mail        165
```

Page 4

```
 1
 2                  P R O C E E D I N G S
 3                       * * * * *
 4       THE VIDEOGRAPHER:  Good morning.  We're going on
 5  the record at 9:03 a.m. on June 15, 2023.  This is
 6  media unit one of the video-recorded deposition of
 7  Dwayne Hutto in the matter of Mutual of Omaha
 8  Mortgage Incorporated versus Waterstone Mortgage
 9  Corporation, civil action number 22-CV01660.  The
10  location of the deposition is 401 East Jackson
11  Street, Suite 1500, Tampa, Florida 33602.
12       My name is Rob Williams representing Veritext
13  and I'm the videographer.  The court reporter is
14  Victoria White from Veritext.  Counsel and all
15  present, including remotely, will now state their
16  appearances and affiliations for the record beginning
17  with the noticing attorney.
18       MR. KAREN:  Ari Karen with Mitchell Sandler on
19  behalf of Mutual of Omaha.
20       MS. KREITER:  Maria Kreiter, Godfrey & Khan, on
21  behalf of defendant Waterstone.
22       MS. WALTER:  Courtney Walter on behalf of
23  plaintiff Mutual of Omaha.
24       MS. KREITER:  And then go ahead, Stephanie.
25       MS. ZIEBELL:  Yeah, Stephanie Ziebell on behalf
```

Page 5

```
 1  of Waterstone Mortgage.  I also have a paralegal
 2  intern here, Mary Curry.
 3       THE VIDEOGRAPHER:  Okay.  Will the court
 4  reporter please swear in the witness.
 5       THE COURT REPORTER:  Raise your right hand,
 6  please.  Do you swear or affirm the testimony you
 7  will give in this matter will be the truth, the whole
 8  truth, and nothing but the truth?
 9       THE WITNESS:  Yes, ma'am.
10       THE COURT REPORTER:  Thank you.
11              DWAYNE HUTTO,
12  having first been duly sworn, was examined and testified as
13  follows:
14              DIRECT EXAMINATION
15  BY MR. KAREN:
16       Q.  Good morning, Mr. Hutto, how are you?
17       A.  Good morning.  How are you doing?
18       Q.  I want to go over some rules of deposition just
19  so we understand how this works.  Just really quickly.  Have
20  you ever been deposed before?
21       A.  No.
22       Q.  Okay.  Have you ever been a witness in a case
23  before?
24       A.  No --
25       Q.  Okay.
```

Page 6

```
 1      A.  -- no, sir.
 2      Q.  This is your first time?
 3      A.  Yes, sir.
 4      Q.  All right.  So one of the things -- we just kind
 5  of did this, it's really important as we talk today, I know
 6  in our common vernacular, right, and talking back and forth,
 7  we often interrupt one other when we know what the other
 8  person is going to say.  It's really important today, even
 9  when you know what I'm going to ask you, not to cut me off
10  because it's really hard for the court reporter --
11      A.  I understand.
12      Q.  -- to -- exactly like that just happened.
13      A.  Sorry.
14      Q.  I know.  I know it's hard, it's hard for me,
15  too, but if you could just really try to do that, it's much
16  easier for the court reporter and it will actually get us
17  out of here faster because I don't kind of have to repeat
18  the question, because it's really important for the record
19  that we create that my whole question gets out there.  So if
20  you could just try to remember that.  I'll try to do the
21  same for you when you answer, but if you could try to be
22  conscious of that.
23          The other thing is not to nod and shake your
24  head.  You're great because right now you're giving me all
25  the examples of stuff not to do, sorry.  So it's very
```

Page 7

```
 1  important not to say um-hmm, uh-huh; very hard again for her
 2  to take that down on the record.  Also shaking or nodding
 3  your head, very hard for her to take down on the record,
 4  verbal response.  So if you could just try to keep that in
 5  mind as well.
 6          Additionally, as we go through today, if I ask
 7  you a question, if there's something you don't understand,
 8  if you didn't hear it, please stop me and I'll go back and
 9  do that for you.  But if you answer, I'm going assume that
10  you heard my question, you understood my question and you're
11  giving me a fully truthful answer; is that fair?
12      A.  Yes.
13      Q.  Okay.  Great.  Also, if you need breaks today,
14  that's fine, just not while a question's pending.  So if you
15  do have to take a break, you have to go to the bathroom or
16  whatever, just let us know, but just wait until you finish
17  your answer to my question and then you can take whatever
18  break you need, okay?
19      A.  Okay.
20      Q.  First question, since you -- you came to
21  Waterstone April 26th of 2022; is that right?
22      A.  Correct.
23      Q.  Okay.  That was your first official day here,
24  right?
25      A.  Yes.
```

Page 8

```
 1      Q.  Or not here, I'm sorry, your first official day
 2  at Waterstone, correct?
 3      A.  Correct.
 4      Q.  Since that time have you been disciplined by
 5  Waterstone?
 6      A.  No.
 7      Q.  Okay.  Had any verbal or written reprimands?
 8      A.  No, sir.
 9      Q.  Have your job duties changed in terms of what
10  you were supposed to be doing to what you're doing now?
11      A.  No, sir.
12      Q.  Have you been notified that you might have to --
13  have they made any claim against you for indemnification,
14  that is Waterstone?
15      A.  Not to my knowledge.
16      Q.  Have you been told that in any way you breached
17  your agreements with Waterstone?
18      A.  No.
19      Q.  Without counsel present -- I just want to make
20  sure that's the preface to this question, okay, I don't want
21  to ask -- I'm not asking you anything that you said in front
22  of or heard from an attorney, okay, Ms. Ziebell or I'm
23  sorry --
24          MS. KREITER:  Kreiter.
25  BY MR. KAREN:
```

Page 9

```
 1      Q.  -- Ms. Kreiter, thank you.  So I don't want to
 2  ask you any question about that, okay, just to be clear.  So
 3  I don't want you to share any of that information with me.
 4          Have you spoken outside the presence of counsel
 5  to anyone at Waterstone about the allegations in this case?
 6      A.  No.
 7      Q.  Has anyone told you in any way, again, outside
 8  the presence of counsel, that you did anything wrong in this
 9  case from Waterstone's perspective?
10      A.  No.
11          MR. KAREN:  I'm going to show you what I'll mark
12      as Exhibit 1.
13          (Plaintiff's Exhibit No. 1 was marked for
14          identification.)
15  BY MR. KAREN:
16      Q.  Mr. Hutto, do you see one, two, three lines
17  down, this appears to be an employment agreement between
18  yourself and Waterstone Mortgage?
19      A.  Correct.
20      Q.  Do you recall signing an agreement, sitting here
21  today, with Waterstone?
22      A.  I believe so.  I mean, that's pretty bad, but,
23  yeah, I believe I do.
24      Q.  And if you look to the back page, this appears
25  to be like a DocuSign record and it gives the dates when
```

Page 10

1 different things were sent and when it was completed; do you
2 see that?
3    A.  Yes.
4    Q.  Using your best recollection, does this look
5 accurate in terms of that you signed this agreement and when
6 you signed this agreement?
7    A.  It does.
8    Q.  Is this the first employment agreement you've
9 ever signed?
10   A.  No, sir.
11   Q.  Did you sign an employment agreement with Mutual
12 of Omaha?
13   A.  I believe so.
14   Q.  And I wanted to go through a couple of things in
15 this agreement.  If you can turn to page 16 and if you look
16 about halfway down in bold there's a B, a little B and a
17 little 1, it says 250 basis points for eligible loan; do you
18 see where it says that?
19   A.  Um-hmm.  Yes, sir.
20   Q.  And so tell me if I understand this correctly or
21 correct me if I'm wrong, what that means, if I understand
22 this, is that for every loan that comes in the branch that
23 you manage, you essentially get 250 basis points credited to
24 the branch; is that right?
25   A.  Yes, credited to the branch P&L.

Page 11

1    Q.  Okay.  And then are various expenses deducted
2 from that?
3    A.  Yes, sir.
4    Q.  And then what's left over you get?
5    A.  Correct, if I want to take it at that time.
6    Q.  Okay.  But at some point in time you can take
7 it?
8    A.  Correct.
9    Q.  Is there a limitation in how long you can leave
10 it there in the branch?
11   A.  Not to my knowledge.
12   Q.  Okay.  But that -- from your perspective
13 anything that's left over is your money?
14   A.  Yes.
15   Q.  Okay.  If -- let me ask this -- let's just say
16 you have money that you've built up in the branch, you left
17 it there a couple of months and then you have a loss, does
18 the loss take away that money that's in the branch?
19   A.  Correct.
20   Q.  Okay.  So you can sort of just leave this money
21 in the branch, kind of as almost like an operating account
22 and then you can pull from it when you want the income; is
23 that a fair understanding?
24   A.  Correct, when you feel comfortable, yes.
25   Q.  And if you can tell me just generally, I don't

Page 12

1 need every single detail, what are the expenses that go
2 against the branch?
3    A.  That would be impossible, there's a lot.  Paper,
4 rent, it's a long list.
5    Q.  Basically everything that goes into operating
6 the branch --
7    A.  Everything --
8    Q.  Again, please --
9    A.  Marketing and everything.  Sorry.
10   Q.  I'm only trying to make this go faster for both
11 of us, because I'm sure --
12   A.  Perfect.
13   Q.  -- you have better things to do today than this.
14       Okay.  So I think I understand.  Now, how did
15 that compare -- was that a similar model -- strike that.
16       Was that a similar model to what -- to how you
17 were compensated at Mutual?
18       MS. KREITER:  Object to the form.
19       MR. KAREN:  You can answer.
20       THE WITNESS:  Is a similar model the way -- did
21   you say on the P&L?
22 BY MR. KAREN:
23   Q.  Okay.  You're calling it -- let me say it this
24 way just for clarity:  When you say P&L you're referring to
25 the way you're compensated now, correct?

Page 13

1    A.  Correct.
2    Q.  Okay.  So were you compensated on a P&L
3 matter -- were you compensated in a P&L manner at Mutual?
4    A.  Correct.
5    Q.  Okay.  And the 250 basis points that you receive
6 now is credited on the branch; did you receive the same
7 amount at Mutual?
8    A.  Correct.  To my knowledge.
9    Q.  Is there any difference in the expenses that are
10 counted against that 250 basis points here versus Mutual?
11   A.  I'd have to go back and look at the P&L and
12 match them up.
13   Q.  Okay.  Is it fair to say that when you received
14 an offer from Waterstone it was essentially matching the
15 compensation you received at Mutual?
16       MS. KREITER:  Object to the form.
17       MR. KAREN:  You can answer.
18       THE WITNESS:  Yeah, that's not correct.
19 BY MR. KAREN:
20   Q.  Okay.  Can you tell me how it differed?
21   A.  I would have to go back and match up the P&Ls to
22 see how it differed with the pay.
23   Q.  Okay.  But you -- did you see this as an
24 increase in pay or an advantage in the way you were paid at
25 Waterstone versus Mutual?

Page 14

1    A.  I did not see it either way.  I wasn't looking
2  at pay when I went to make a move, if I chose, the company I
3  chose.
4    Q.  All right.  All I'm trying to clarify, sir,
5  you -- as I said, I asked you the question of was your
6  compensation essentially the same rate.
7    A.  Very close.  I would have to look and make sure.
8  Just being honest, I'd have to go back and look at Mutual's
9  last agreement I signed.
10    Q.  Okay.  That's fair.  But you're not aware of any
11  distinction in the compensation model sitting here today?
12    A.  Not to my knowledge.
13    Q.  Okay.  Now if you can also look at page 2 of
14  this agreement and you see three little I's and it
15  states recruiting.  These are the duties, right, in the
16  section 1.3?
17    A.  Correct.
18    Q.  And then there's a little three I's and it says
19  recruiting staff for the branch?
20    A.  Correct.
21    Q.  Is that in fact one of your duties?
22    A.  Correct.
23    Q.  And then if you look at Roman numeral 6 a couple
24  of lines down, it says assisting company's management in the
25  development of successful group of employees; do you see

Page 15

1  that?
2    A.  Correct, yes.
3    Q.  Is that one of your duties?
4    A.  Yes.
5    Q.  And if you could go to the next page we're going
6  to go to section 1.4.  If you look in the second line, tell
7  me if you see this sentence that says, employee shall assist
8  and work for only company and no other employee, lender,
9  broker or entity?
10    A.  I see it.
11    Q.  Okay.  Do you think that's reasonable?
12        MS. KREITER:  Object to the form.
13        MR. KAREN:  You can answer.
14        THE WITNESS:  Yes.
15  BY MR. KAREN:
16    Q.  And that was -- is it fair to say that was your
17  expectation when you came to Waterstone that you would abide
18  by that provision?
19    A.  Yes.
20    Q.  Okay.  If you look further down -- actually skip
21  that.  Now you can turn to page 5.  On page 5 if you look at
22  section 1.8 and it says, without limiting any obligations of
23  employee, employee represents and warrants to the company at
24  all times during employment as follows, and it has a number
25  of representations; do you see that?

Page 16

1    A.  Yes.
2    Q.  Okay.  And the first one says that employee's
3  employment with the company will not violate or conflict
4  with any obligations employee owes to any individual or
5  entity, including without limitation obligations arising out
6  of or relating to any non-compete, non-disclosure or
7  non-solicitation or confidentiality provisions; do you see
8  where it says that?
9    A.  Yes.
10    Q.  Do you think that's a reasonable request?
11        MS. KREITER:  Object to the form.
12        THE WITNESS:  Yes.
13  BY MR. KAREN:
14    Q.  Okay.  And have you been notified in any way
15  that you violated section 1.8 of this agreement?
16    A.  No.
17    Q.  It also says, one of the other -- Roman numeral
18  little 2, it says, any prior -- that employee's employment
19  will not violate any prior employer or employment; do you
20  see where it says that?
21    A.  I do not.
22    Q.  Roman numeral 2, any prior employer or
23  employment?
24    A.  Yes.
25    Q.  Okay.  And then it continues, employee

Page 17

1  represents and warrants that he or she has not and will not
2  attempt to transfer loans or other documentation or
3  information to the company that are the property of his or
4  her previous employer; do you see that?
5    A.  Yes.
6    Q.  Okay.  And it continues on, except in the event
7  employee has obtained prior written -- I'm sorry, prior
8  written consent from the customers whose information is
9  being transferred and from his or her previous employer; do
10  you see that?
11    A.  Yes.
12    Q.  Okay.  And, again, no one has in any way
13  reprimanded you or disciplined you for violating section
14  1.8, have they?
15    A.  With Waterstone?
16    Q.  With Waterstone.
17    A.  No.
18    Q.  And I presume nobody else has reprimanded or
19  disciplined you either, right, for section 1.8?
20    A.  Not to my knowledge.
21    Q.  One question I just wanted to go back to.  On
22  the -- we saw that compensation P&L model you referred to.
23    A.  Yes, sir.
24    Q.  Do you recall that a minute ago?
25    A.  Yes, sir.

Page 18

1  Q. The money that's -- okay. Let's just take a
2  step back.
3      You originate loans for Waterstone or I should
4  say -- strike that.
5      People in your branch originate loans for
6  Waterstone, right?
7  A. Correct.
8  Q. You don't actually originate loans?
9  A. I do.
10 Q. You do? You do. Okay. So you're a producing
11 manager?
12 A. Correct.
13 Q. But you don't get paid on personal production;
14 is that right?
15 A. Correct.
16 Q. Okay. So all you get is the override less those
17 costs we talked about?
18 A. Exactly.
19 Q. But you do produce loans yourself?
20 A. I do.
21 Q. And when you and your branch originate loans,
22 you guys make money, right, for originating them?
23 Commissions?
24 A. Correct.
25 Q. Overrides, right?

Page 19

1  A. Correct.
2  Q. And is it fair to say at least the goal is that
3  Waterstone makes money on those loans, too?
4  A. Correct.
5  Q. And, I mean, that's -- tell me if I'm wrong, for
6  bank -- mortgage bank with Waterstone, it primarily makes
7  money off of those loans by selling them service release
8  premiums; is that right?
9      MS. KREITER: Sorry, the videographer is
10     indicating that Mark Carrol is joining or wanting to
11     be admitted.
12     THE WITNESS: Sorry, can you repeat the
13     question?
14     MR. KAREN: Sure. I mean, it was a long one.
15 BY MR. KAREN:
16 Q. So if you could explain the business a little
17 bit to me, okay. When a mortgage bank -- how long have you
18 been in mortgage banking by the way?
19 A. Since 2004.
20 Q. Okay. And I should have --
21 A. I was out for a period of five years or so.
22 Q. Okay. And so since 2009 pretty much
23 consistently you've been in mortgage banking?
24 A. 2004 to approximately, I don't remember the
25 dates, 2010, 2011 to 2016, 2017.

Page 20

1  Q. So you were out of --
2  A. That was a gap in between there.
3  Q. Okay.
4  A. I worked for Humana --
5  Q. Got it.
6  A. -- at that time.
7  Q. And then since 2016 you've been back in mortgage
8  banking --
9  A. Approximately 2016, 2017.
10 Q. Where did you work prior to Mutual of Omaha?
11 A. I was going to school and bartending.
12 Q. Did you work for a company called Synergy One?
13 A. Yes.
14 Q. What was Synergy One?
15 A. I'm trying to think. I can't remember, it was
16 Synergy One doing business as. I can't remember. I've been
17 at multiple mortgage companies, five, six, seven, with the
18 same group with Chris Smith, but they were, you know, they
19 buy one out or we transferred to a different company.
20 Q. Okay.
21 A. I would have to think about it with that.
22 Q. Okay.
23 A. Synergy One was doing business as somebody. I
24 don't remember.
25 Q. But that was a different lender, yes?

Page 21

1  A. That was before, that was after 2004.
2  Q. Yes. Yes. Let's go backwards.
3  A. That was a different lender.
4  Q. Okay. And that was the lender you worked with
5  prior to Mutual, right?
6  A. Yes.
7  Q. Okay. Do you know if Synergy One was acquired
8  by Mutual or did you guys --
9  A. There we go, Synergy, yes. I believe Synergy
10 One and Mutual were together might I say. I don't remember
11 the relationship.
12 Q. Okay. And who did you work with prior to
13 Synergy One, was that when you were bartendering?
14 A. That was Humana.
15 Q. That was Humana, okay.
16 A. Um-hmm.
17 Q. Why did you leave the industry to go work for
18 Humana?
19 A. At the time it was I just had two small kids, I
20 was driving to Lake Mary, the market was crashing at the
21 time, it just -- stressful, not making money and said I need
22 to spend more time with family so I'll go do something else.
23 Q. And that was, you said, I think around 2011?
24 A. I think that's somewhere around there. Yes, I
25 don't remember the exact date.

Page 22

1  Q. And that was right around the time when all of
2  those foreclosures were really hitting Florida bad, right?
3  A. Correct.
4  Q. So the Florida market was not great?
5  A. Correct.
6  Q. Okay. I understand. What caused you to jump
7  back into the industry?
8  A. I was talking to Chris Smith, who I've always
9  worked with previous, asked how he was doing and he was
10 doing well so I decided to get back in.
11 Q. How do you know Chris, by the way, originally?
12 A. He was my boss at Ameriquest. He was my
13 regional manager when I was a branch manager --
14 Q. What years?
15 A. -- with Ameriquest and that was 2004.
16 Q. And that was when you --
17 A. 2006.
18 Q. And that's when you first got into the industry?
19 A. Yeah, I was a loan officer first and then I got
20 promoted to branch manager, correct.
21 Q. So he was essentially your first boss in the
22 industry?
23 A. Well, he was my -- he was my second. I mean,
24 Rich Williams was my boss and he took over for the regional
25 manager, at the time was Mario Demarin (phonetic), he took

Page 23

1  over for him.
2  Q. Got it. Okay. And you guys have kind of just
3  stayed together ever since, for the most part?
4  A. Correct.
5  Q. Okay.
6  A. He's one of my good friends.
7  Q. Were you guys friends outside of or prior to
8  working at Ameriquest?
9  A. Ameriquest was more business. I mean, we
10 became -- when I left Ameriquest, him and I, he brought me
11 into Florida -- I was always in Florida but wanted me to
12 open Lake Mary and then we became friends and we've worked
13 together at every place since.
14 Q. Right. My question is, did you know Mr. Smith
15 prior to working at Ameriquest --
16 A. I did not, I'm sorry. I did not.
17 Q. No, that's okay. And just again, sir, it
18 doesn't bother me at all, but I'm just trying to make this
19 easy for the court reporter. Just try to let me finish my
20 question, if that's okay.
21    All right. So let's now turn back or let me
22 change direction for a minute. So you bring in loans and
23 the goal is that from those loans in the mortgage banking
24 business, Waterstone takes those loans and sells them,
25 right?

Page 24

1  A. To my knowledge.
2  Q. Okay. Or services them?
3  A. Correct.
4  Q. Okay. And Waterstone then makes money off the
5  sale or services of those loans, yes?
6  A. To my knowledge.
7  Q. Or at least that's the goal?
8  A. That's the goal.
9  Q. So every loan you bring to Waterstone is
10 essentially an opportunity for Waterstone to make money; is
11 that fair to say?
12    MS. KREITER: Object to the form.
13    THE WITNESS: I would think so.
14 BY MR. KAREN:
15 Q. And that's certainly your goal, is to bring as
16 many loans as possible to Waterstone, right?
17 A. To give as good as customer service as possible
18 and do as, you know, obviously have a -- you know, a
19 producing branch that can support my family is the goal.
20 Q. Well --
21 A. I mean, that's the real goal.
22 Q. The real goal is to make money, right?
23 A. Exactly, yeah.
24 Q. We all have that goal. But I'm asking from a
25 corporate perspective, is it fair to say that the goal for

Page 25

1  you is to maximize your volume with performing loans?
2  A. That's my goal, that's correct, that makes
3  money.
4  Q. For you and the company, yes?
5  A. Correct.
6  Q. All right. Now I want to go back to this
7  employment agreement where it says article 5, it's on page
8  9. And is it fair to say -- well, strike that.
9     If you read section 5.1(a) and if you could just
10 read that first paragraph to yourself, I'm going to ask you
11 some specific questions about it.
12 A. Okay.
13 Q. Okay. So if you go midway down, this defines
14 what Waterstone thinks is confidential, right?
15 A. Correct.
16 Q. And the first thing -- the second thing it
17 mentioned, the second little bullet point here it says
18 essentially anything's confidential that gives the company a
19 competitive business advantage; do you see where it says
20 that?
21 A. Yes.
22 Q. And then it continues, or opportunity of
23 obtaining such advantage or disclosure of which would be
24 detrimental to the interest of the company; do you see where
25 it says that?

Page 26

1 A. Yes.
2 Q. Do you think that's a reasonable definition of
3 confidentiality from your perspective?
4     MS. KREITER: Object to the form.
5     MR. KAREN: You can answer.
6     THE WITNESS: Yes.
7 BY MR. KAREN:
8 Q. Okay. And let me ask you something: Is there
9 anything that is unique about Waterstone as a mortgage bank
10 that makes the information it considers confidential
11 different from the information another company -- another
12 similar company would consider confidential?
13 A. No.
14 Q. Okay. So the information that's confidential at
15 the Waterstone should kind of be the same as the information
16 that's confidential at Mutual, right?
17     MS. KREITER: Object to the form.
18     MR. KAREN: You can answer.
19     THE WITNESS: Correct.
20 BY MR. KAREN:
21 Q. And as we continue on this -- in this paragraph,
22 Roman numeral 3, little three says, information that is
23 designated as confidential material by the company is known
24 by the employee to be confidential or for all relevant
25 circumstances should be considered confidential; do you see

Page 27

1 where it says that?
2 A. Where are we at?
3 Q. Roman numeral 3.
4 A. I do.
5 Q. Okay. And, again, you don't have any problem
6 with that definition, that seems reasonable to you?
7 A. Yes.
8 Q. Okay. And if you continue on, sir, then there's
9 a bunch of little -- another set of Roman numerals defining
10 information that's confidential, it starts with little Roman
11 numeral 1, it says, internal, personal and financial
12 information; do you see that?
13 A. Um-hmm.
14 Q. Yes?
15 A. Yes.
16 Q. Okay. And would you agree that's also a
17 reasonable definition of concluding this information is
18 confidential?
19     MS. KREITER: I'm going to object to the form.
20     In addition, to the extent that you're asking the
21     witness for his opinion on reasonableness as a lay
22     person, that is not the same as reasonableness from a
23     legal perspective or enforceability analysis.
24     MR. KAREN: Okay. You can go ahead and answer.
25     THE WITNESS: Repeat the question?

Page 28

1 BY MR. KAREN:
2 Q. Where it says in terms of confidentiality, it
3 say information that's confidential includes internal,
4 personal and financial of the company, purchasing and
5 internal cost and revenue information, internal service and
6 operational manuals; do you see that?
7 A. Yes.
8 Q. Okay. And do you have any problems, do you
9 think that shouldn't be considered confidential personally
10 from your perspective?
11     MS. KREITER: Object to the form.
12     THE WITNESS: No.
13 BY MR. KAREN:
14 Q. And then it says, number 6, if you look down,
15 confidential and proprietary information provided to the
16 company by any actual or potential customer or other third
17 party; do you see where it says that?
18 A. Yes.
19 Q. And you would agree with me, again, that that
20 should be considered confidential, right?
21     MS. KREITER: Object to the form.
22     THE WITNESS: Right.
23 BY MR. KAREN:
24 Q. Now these provisions in section 5.1, did you
25 draft them with Waterstone or did Waterstone just give this

Page 29

1 to you and you didn't have a problem with it and signed it,
2 if you understand my question?
3 A. Yeah, I signed it, but I didn't draft it.
4 Q. So this wasn't something you guys negotiated
5 back and forth and changed the words on, right?
6 A. No.
7 Q. They just gave it to you? And, again, if you
8 didn't agree with something you would tell them, right?
9 A. Yes, if I read it.
10 Q. And then I'd like you to turn to page 12 and if
11 you could go to section 6.6. I'm going to read this bullet
12 to you, it says indemnification; do you see where I'm
13 pointing, sir?
14 A. Yes, sir.
15 Q. Okay. To the extent permitted under applicable
16 law employee hereby agrees to indemnify and defend company
17 and its principals for any and all attorneys' fees, costs of
18 prudent settlement, judgments, fines, or damages incurred by
19 company as a result of employee's breach of the terms of
20 this agreement; did you follow along with me on that?
21 A. Yes.
22 Q. Okay. And, again, I think you answered this
23 question, so I just want to make sure, I don't know if I
24 asked: No one has indicated to you that you may have an
25 obligation to indemnify Waterstone for the allegations in

Page 30

1  this lawsuit, right?
2     A.  Not to my knowledge.
3     Q.  No one's suggested that to you?
4     A.  Not to my knowledge.
5        MS. ZIEBELL:  Ari, can we take a quick break?
6  Maria, is that okay?  Can we take a quick break.
7        MS. KREITER:  Sure.
8        THE VIDEOGRAPHER:  Is that all right, sir?
9  Going off the record.  The time is 9:34.
10           (Off the record.)
11       THE VIDEOGRAPHER:  We're back on the record.
12  The time is 9:56.
13       MS. KREITER:  So I need to put on the record,
14  during the break Ms. Ziebell alerted me to the fact
15  that Ari Karen, the attorney representing Mutual in
16  this case was previously representing Waterstone.  In
17  fact, Mr. Karen was lead counsel for Waterstone for
18  nearly 10 years in a case that involved employment
19  practices.  That representation required Mr. Karen to
20  be in close communication with Waterstone leadership
21  and branch managers regarding employment matters.
22       Importantly, that representation included
23  drafting the Waterstone employment agreement that is
24  now marked as Deposition Exhibit No. 1.  Waterstone
25  objects to the entire line of questioning by Mr.

Page 31

1  Karen of this witness or any other witness due to a
2  clear conflict of interest by opposing counsel.  The
3  work-product of opposing counsel for its former
4  client Waterstone is now being used at a deposition
5  in which Waterstone is the adversary.  We ask that
6  opposing counsel refrain from any questioning of the
7  witness based on his work-product, namely, the
8  Waterstone employment agreement.
9        MR. KAREN:  Okay.  Well, let me respond to that.
10  That agreement is nothing I drafted.  What I drafted
11  for Waterstone was in 20 -- over ten years ago.  That
12  is not the same agreement.  I have -- you could
13  compare any agreement I drafted, I don't have that
14  language in there.  It doesn't look like anything
15  I've ever drafted.  So that's just simply wrong.
16       I realize you guys know how bad that just, but
17  if you had any concern about this alleged conflict of
18  interest, I have been noticed in this case for, I
19  don't know how long.  I have been -- you knew I was
20  taking this deposition and to try to raise this now
21  is, frankly, desperate.
22       So you can make whatever objections you want and
23  we'll have the court rule on it, but if you think
24  there's a conflict of interest, you should get the
25  judge on right now, because I'm going to ask whatever

Page 32

1  I feel like asking.
2        MS. KREITER:  I do think there's a conflict of
3  interest.  You may dispute this is your agreement
4  that is contested.  So for purposes of this
5  deposition, which I did not understand that you were
6  taking, but, regardless, this is the first time that
7  a Waterstone agreement drafted by you from
8  Waterstone's perspective --
9        MR. KAREN:  It isn't drafted by me.
10       MS. KREITER:  -- let me finish for the record --
11  our position is that it is drafted by you.  If you
12  want to do a comparison later and illustrate that
13  it's materially different, so be it.  My
14  understanding right now is that Exhibit 1 put into
15  evidence by you was drafted by you.  So I'm not going
16  to permit questioning of the witness --
17       MR. KAREN:  Let's get the judge on the phone.
18       MS. KREITER:  -- about Exhibit 1.
19       MR. KAREN:  Let's get the judge on the phone
20  right now.
21       MS. KREITER:  You should call him.  Because I
22  agree, this is not something where I want to waive
23  the conflict.  If you drafted this agreement and were
24  in communication with Waterstone managers --
25       MR. KAREN:  It's just simply not true.

Page 33

1        MS. KREITER:  Then I think you do need to raise
2  it to the judge --
3        MR. KAREN:  I don't think I need to raise it to
4  the judge.  You're the one who makes an objection.  I
5  get to ask my questions.  If you want to file a
6  motion, you file a motion.
7        MS. KREITER:  I'm going to instruct the witness
8  not to answer any questions about Exhibit 1 at this
9  deposition.
10       MR. KAREN:  Well, fortunately I'm pretty much
11  done with it anyhow.  But notwithstanding, you know,
12  we are going to have this issue tomorrow, so we
13  should discuss now because I plan on asking those
14  questions tomorrow.
15       MS. KREITER:  I will similarly object and
16  instruct the witness not to answer questions based on
17  Exhibit 1 tomorrow.
18       MR. KAREN:  Then we should probably talk
19  offline, we don't have to do this right now.
20       MS. KREITER:  I --
21       MR. KAREN:  Just hear me out for one second,
22  okay, before you object.  I am suggesting maybe we
23  talk about tomorrow because I really don't want to
24  come down, take a deposition, have to come down and
25  do the deposition again, and I'm sure you can

Page 34
1 appreciate that.
2     So what I'm saying is, if this is going to be an
3 issue let's -- we don't have to do it now, we can go
4 offline afterwards and have a discussion and figure
5 this out, but we should probably do that before
6 tomorrow's deposition starts because I don't want to
7 have to bring people back and I don't want to fly
8 back down here for that. I'm sure you can appreciate
9 that.
10     MS. KREITER: I can appreciate that. I'm
11 willing to have further discussions, but if you feel
12 that you need to move to compel the testimony and you
13 feel you need to contact the court, I think that that
14 should be probably done by you, because I am not
15 allowing this witness to, you know, to provide
16 testimony at the deposition.
17     Our position is that it is a conflict of
18 interest and I don't want it waived by way of
19 questioning at the deposition today.
20     MR. KAREN: I understand your objection. As I
21 said, I think it's a moot point anyhow because I'm
22 done with that exhibit. So we can move on, I'm not
23 going to fight about something today that -- there's
24 nothing to fight about because I already asked my
25 questions, but not withstanding we can move forward.

Page 35
1     Mr. Hutto, I just want to go on the record -- we
2 took a -- I would also suggest and may I add that I
3 was making these questions for a good 30 minutes,
4 that was almost the entirety of my first 30 minutes
5 of depositions and not once did I hear that
6 objection. So in terms of it not being waived, I
7 think ship sailed. But, again, we'll go on with
8 that. We'll --
9     MS. KREITER: I will put on the record that
10 Ms. Ziebell alerted me to the representation, the
11 scope of it during the break. I think that we raised
12 the issue as promptly as possible and my position on
13 behalf of Waterstone stands.
14     MR. KAREN: Okay.
15 BY MR. KAREN:
16   Q.  All right. Now, in terms of -- and, Mr. Hutto,
17 I just want to say for the record, we went off record at
18 9:36 and you guys came back at 9:56, and the court reporter
19 can confirm that. So after about 30 minutes of questioning
20 we had about a 20-minute break. And my question is that
21 during that period of time -- I don't want anything other
22 than a yes or no on this question, okay -- did you guys
23 discuss the subject of your testimony?
24     MS. KREITER: We discussed the matters that I
25 just put on the record.

Page 36
1     MR. KAREN: This is a question for Mr. Hutto,
2 not for you.
3     Mr. Hutto, could you answer, please.
4     THE WITNESS: No.
5 BY MR. KAREN:
6   Q.  What did you do to prepare for today? And,
7 again, I don't want anything said to your -- between you and
8 the lawyers, okay?
9   A.  Not a lot.
10   Q.  Tell me what you did do.
11   A.  I met with her for approximately two hours maybe
12 yesterday.
13   Q.  And her being?
14   A.  I'm sorry, My attorney.
15   Q.  Maria?
16   A.  Yes, correct.
17     MR. KAREN: And, I'm sorry to call you Maria, if
18 that's okay. I'm not a last name person. So if
19 that's all right. I don't want to do --
20     MS. KREITER: That's fine.
21     MR. KAREN: -- anything to disrespect you. And
22 you can call me Ari, by the way.
23 BY MR. KAREN:
24   Q.  So did you review any documents?
25   A.  A few.

Page 37
1   Q.  What documents were they?
2   A.  I don't -- I don't remember.
3   Q.  Did you review your Waterstone employment
4 agreement?
5   A.  No.
6   Q.  All right. So let me ask you this, sir: If you
7 could take me back to sort of the beginning of when you
8 started thinking about coming over to Waterstone. Why don't
9 I do it this way, let me start Exhibit 3 [sic].
10     So when you've had a chance to look at that,
11 sir, let me know.
12   A.  I'm done.
13     (Plaintiff's Exhibit No. 2 was marked for
14  identification.)
15 BY MR. KAREN:
16   Q.  Okay. So this is an e-mail from Mike Smalley to
17 you at Mutual Mortgage and it's dated August 14, 2019.
18   A.  Correct.
19   Q.  Do you see that? First of all, do you recall --
20   A.  I do not.
21   Q.  Again, I'm sorry, I'm not trying to give you a
22 hard time, it's for the benefit of the court reporter.
23   A.  Sorry.
24   Q.  Yeah, no, no problem. Just let me, again,
25 finish, I'll try to do the same to you. And trust me, I'm