## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., ) | Civil Action No. 22-CV-01660 |
| ) | |
| Plaintiff, ) | **PLAINTIFF MUTUAL OF OMAHA** |
| ) | **MORTGAGE, INC.'S MOTION FOR** |
| v. ) | **SUMMARY JUDGMENT ON LOST** |
| ) | **PROFIT DAMAGES AND** |
| WATERSTONE MORTGAGE ) | **INCORPORATED MEMORANDUM OF** |
| CORPORATION, ) | **LAW** |
| ) | |
| Defendant. ) | |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual") hereby moves pursuant to Fed. R. Civ. P. 56 for the entry of Summary Judgment on Lost Profit Damages. The grounds upon which this Motion are based are set forth below.

## INTRODUCTION

This case is about Defendant, Waterstone Mortgage Corporation's ("Defendant") decimation of the entirety of Mutual's business operations in the State of Florida. Waterstone conspired with three then-Mutual employees—Dwayne Hutto ("Hutto"), Christopher Smith ("Smith"), and Christopher Wolf ("Wolf") (collectively, the "Former Employees")—to use a combination of unlawful actions to steal the entirety of Mutual's Florida operations ("Mutual Florida"). Neither the Former Employees nor their entire branches would have joined Waterstone but for its conscious encouragement and facilitation of the misappropriation of trade secrets,

1

tortious interference with Mutual's former employees' contracts with Mutual, and aiding and abetting these employees' breach of fiduciary duty. These unlawful activities were a condition precedent to the hiring of the Departed Employees and the elimination of Mutual Florida. Yet, knowing this, Waterstone consciously decided to participate in and incentivize the unlawful activities, in order to hire the Departed Employees and assist them in absconding with Mutual Florida.

This Court has ordered Mutual to move for summary judgment on damages, including Mutual's claim for lost profit damages. Dkt. No. 94. Here, Mutual demonstrates that Waterstone's conduct was a "substantial factor" in causing its lost profits for each of the claims within its First Amended Complaint ("FAC") (Dkt. No. 37) when it engaged in a calculated scheme to steal Mutual Florida's operations. Because causation and liability are established as a matter of law for the reasons set forth herein, Mutual therefore need only adequately determine its amount of lost profit damages—absolute certainty is not required—which it does through its expert witness, Candice Rosevear, and documentation produced in this action. For these reasons, this Court should enter summary judgment in favor of Mutual.

## STATEMENT OF MATERIAL UNDISPUTED FACTS

### A. The Parties

1. Plaintiff, Mutual of Omaha Mortgage ("Mutual") is a residential mortgage lender headquartered in San Diego, California, which operates branches

across the United States.  Ex. A, Affidavit of Mark Carroll ("Carroll Aff.") ¶ 3.

2.      Mutual previously operated branches located in Tampa and Daytona, Florida, and Paramus, New Jersey ("Mutual Florida").  *Id.* ¶ 4.

3.      For all of the active branches that have been with Mutual for over twelve (12) months, the average time period that those branches have been with Mutual is approximately 51 months.  *Id.* ¶ 15.  Further, approximately 80% of the branches that have started with Mutual have remained with Mutual, to date.  *Id.*

4.      Defendant, Waterstone Mortgage Corporation ("Defendant"), is a residential mortgage lender that has approximately 30 branches across the United States.  Waterstone Answer, Dkt. No. 39 ¶ 5; Ex. B, Deposition of Elizabeth Spragg ("Spragg") 40:2-3.

**B. Mutual's Former Branch Managers**

5.      From November 2018 until April 2022, Dwayne Hutto served as the branch manager of Mutual's Daytona Branch.  Ex. A, Carroll Aff. ¶ 5.

6.      From December 2018 until April 2022, Christopher Wolf served as the co-branch manager of Mutual's Daytona Branch.  *Id.* ¶ 6.

7.      From December 2018 until June 2022, Christopher Smith served as the branch manager of Mutual's Tampa and Paramus branches.  *Id.* ¶ 7.

**C. Departed Employees' Agreements with Mutual**

8.      During their employment, each of the Departed Employees maintained

a written employment agreement ("Employment Agreements") with Mutual. *See, e.g.,* Ex. C, MOM0009510.

9.     The Employment Agreements contained several different provisions, including Mutual's (i) loan originator duties; (ii) standards of conduct; (iii) policies; (iv) employees' duty of loyalty and certain prohibitions; (v) clauses pertaining to the non-solicitation of employees and customers; and (vi) a prohibition against the sharing of Mutual's confidential information. *See, e.g., id.* at §§ 5, 7, 8, 9, 13, 15.

### D. Waterstone's Improper Recruitment Practices

10.     When Waterstone recruits a branch manager from another company, it knows there is a chance that a manager will, in turn, attempt to solicit his own branch's employees to Waterstone because there are obvious financial incentives for the branch manager to do so. Ex. D, Deposition of Waterstone 30(b)(6) Corporate Representative Kevin Allen ("Allen") 70:11-18; 85:3-9; 85:16-22-86:1-5; 141:21-22-142:1-5.

11.     But Waterstone knows that encouraging and allowing a branch manager to leave with the employees they are currently supervising for the benefit of another company in violation of their own contractual obligations is wrong. Ex. D, Allen 94:13-20; 129:6-12.

12.     Indeed, Waterstone knows that soliciting a branch manager's subordinate employees violates the duty of loyalty that a manager owes its employer

and would potentially violate contractual and other legal obligations the employees have with their employers. Ex. D, Allen 31:9-15; 33:1-5; 134:10-17, 135:2-14.

13.     Waterstone knows that if a branch manager was not able to bring his branch with him, the branch manager would look at Waterstone "sideways" because the branch manager assumes Waterstone would know the branch would be coming with him. Ex. D, Allen 280:13-22-281:1-7. Further, if the branch does not follow the manager, the manager may not come with him. *Id.* 144:1-15.

14.     So instead, when Waterstone recruits a branch manager, it allows the branch manager to talk to his own branch employees knowing that the manager will want to know whether the team will follow him before announcing his resignation. Ex. D, Allen 124:8-22; 125:1-5; 142:6-14; 144:1-7.

15.     Waterstone avoids being involved in these conversations to remain blissfully ignorant about whether a branch manager is actively soliciting the branch employees to transition to Waterstone. Ex. D, Allen 75:3-15, 124:15-22-125:1-5.

16.     Specifically, Waterstone knows that taking customer information, soliciting another company's employees, and stealing trade secrets would violate those obligations. *See, e.g.,* Ex. D, Allen 129:6-12; 155:8-14; 160:18-22-161:1-4; 171:6-17; 238:19-22-239:1-11; 240:6-14; 276:19-22-277:1-4.

**E.  Waterstone's Recruitment Efforts of the Departed Employees**

17.     Waterstone began its recruitment efforts of the Departed Employees as

early as October 2021.  Ex. E, WMC003673-003675.

18.     On November 3, 2021, Wolf e-mailed Dustin Owen ("Owen"), who at the time was Waterstone's Regional Vice President – Southeast, asking questions "from Chris [Smith] in Tampa and some others had [sic][.]"  Ex. F, WMC006263-WMC006271.  In there, Wolf asked "can we send loans over to start and build up a balance of money to fund transition."  *Id.* at WMC006267.

19.     Waterstone understood this to mean that Wolf wanted to send over some people and loans to build up money at Waterstone to fund a potential transition while the Departed Employees worked as branch managers overseeing Mutual Florida, but also knew that it is unethical for the Former Employees to bring loans over to Waterstone from Mutual.  Ex. D, Allen 103:7-14; 120:16-22.

20.     Waterstone fully understood that what they were asking – in writing – was unlawful, and carefully responded as follows: "We need to make sure anything you all do during transition does not violate any current agreement you have with your current employer as it pertains to leads generated and loans in the pipeline . . . We will assemble a transition team to help get everyone on-boarded and ready to field pre-quals, loan loans and disclose files on Day 1."  Ex. F, WMC006267.

21.     Despite claiming that it will never seek information from a previous employer (Ex. G, WMC005267), on February 17, 2022, Hutto sent an e-mail from his Mutual e-mail address to Owen at Waterstone, attaching a copy of Mutual's

December 31, 2021 Profit and Loss ("P&L") Statement for the Daytona Branch (Ex. H, MOM0000038).  Owen confirmed receipt of this e-mail.  *Id.*

22.     Waterstone knew this was a piece of internal confidential financial information that should not be sent from another company because it was not publicly available and was valuable for evaluating the profitability of a branch and its employees and facilitating the calculation of potential offers.  Ex. D, Allen 219:2-18; 223:13-22; 224:1-22; 225:1-8; Ex. I, Deposition of Dwayne Hutto ("Hutto") 88:20-22, 89:22-90:1-2.

23.     Despite knowing that it should not have this information, Waterstone never asked the Departed Employees to stop sending this information.  Ex. D, Allen 229:13-22; 230:16-22, 230:1-2.

24.     Rather, on March 3, 2022, Hutto e-mailed the Tampa P&L for December 2021 to his personal e-mail address.  Ex. J, MOM0000027-28.  Using his personal e-mail address, Hutto again forwarded the P&L to Owen.  *Id.*

25.     Owen responded to this e-mail stating, "Received.  Thank you.  I have sent this off to Kevin Allen ("Allen"), Waterstone's Senior Vice President of Sales. Ex. K, MOM0000035; Ex. D, Allen 33:17.

26.     On March 5, 2022, Owen wrote an e-mail to Wolf stating, "We then would want to start creating your database by transferring as much over as possible." Ex. L, WMC008400; Ex. D, Allen 151:9-16.

27.     This "database" relates to Encompass, which is a loan origination system that contains customers' sensitive information pertaining to interest rates on loans that a lender has closed, the type of loan product, as well as the contact and detailed personal financial information of its borrowers.  Ex. D, Allen 42:12-20; 169:18-22.  Sensitive information includes customers' personal information, Social Security numbers, credit scores, and bank account numbers.  *Id.* at 42:21-22; 43:1-5; 48:21-22-49:1-8.

28.     Waterstone knows this information is confidential proprietary information belonging to Mutual.  Ex. D, Allen 160:18-22; 161:1-4.

29.     Waterstone agreed that it is "problematic" if Owen intended to mean that Wolf should transfer over as much information from his current employer as possible.  Ex. D, Allen 50:11-16; 152:2-9, 18-22; 153:1; 155:5-14; 171:6-17.

## F.  Waterstone's Improper Diversion of Mutual Loans and Customers

30.     Although Waterstone previously recognized the impropriety of having Hutto and Wolf send over employees to begin siphoning loans off from Mutual, ultimately Owen invited Wolf to take such action.  Ex. L, WMC008400.

31.     On March 5, 2022, Wolf e-mailed Waterstone requesting a timeline for the move of the branch.  Ex. L, WMC008400.  Waterstone responded that same day stating that Waterstone "would want to plan out at least 2 to 3 weeks if possible." *Id.* Additionally, Waterstone asked Wolf whether Wolf intended to send over a small

team a week to 10 days earlier to get onboarded and "dive in headfirst." *Id.*

32.     Shortly thereafter, Hutto and Wolf caused five Mutual employees to resign from Mutual and join Waterstone to facilitate the transition. Ex. M, Deposition of Christopher Wolf ("Wolf") 55:3-9.

**G. Onboarding of the Mutual Florida Branch Employees**

33.     In early April, Wolf openly solicited the entire team to leave Mutual and join Waterstone during a team meeting. Ex. D, Allen 213:16-20. Wolf later instructed the branch to "not discuss what we talked about on today's call with anyone outside of your families." Ex. N, MOM0000233.

34.     On April 11, 2022, Elizabeth Spragg ("Spragg"), who served as the Chief People and Administrative Officer at Waterstone, requested and obtained from Wolf the "full roster," which included Mutual Florida employees' names, personal e-mail addresses, job, title, and compensation details so that she could prepare offer letters for them. Ex. O, WMC004569; Ex. B, Spragg 23:22; Ex. P, WMC000741-746; Ex. EE, WMC006899-006901.

35.     Spragg then requested compensation details for each of the individuals identified on the roster, which Wolf provided. Ex. P at WMC000741.

36.     In addition to obtaining personnel information that Waterstone knows is protected as confidential under Section 5.1 of its own Employment Agreement, Spragg worked with Wolf to facilitate the preparation of job offers to Mutual

9

employees because she knew he had access to their information as their supervisor. Ex. B, Spragg 28:6-20; 27:1-7; Ex. D, Allen 181:22-182:1-3, 185:2-10.

37.     Spragg ensured that Mutual would not find out about the solicitations of employees, by purposefully directing the solicitations to the employees' personal email addresses supplied by their manager Wolf, even though she did not have their consent.  Ex. Q, WMC009045; Ex. B, Spragg 53:2-5; Ex. M, Wolf 44:16-20.

38.     Waterstone was working with the Departed Employees to ensure that Mutual did not find out what was going on – *i.e.*, that its branch managers were conspiring with its employees to leave.  Ex. D, Allen 197:3-7.

## H. Waterstone's Theft of Mutual's Confidential Loan and Borrower Information

39.     After Waterstone onboarded the "transition team" – five loan officers that Waterstone onboarded while the remainder of Mutual Florida continued their employment at Mutual, Wolf and Hutto began sending Mutual's confidential loan and borrower information to Waterstone with the assistance of the individuals who joined to facilitate the transition.  *See, e.g.,* Ex. R, WMC002147, WMC002162, WMC006193.

40.     This loan information has significant value as it is not publicly available but provides a lender with a significant advantage in closing a loan for a borrower. Indeed, merely knowing which borrowers are qualified and willing to proceed with a loan is valuable.  Having the actual documentary information further assists in both

evaluation and ultimately obtaining the borrowers' consent to close a loan because an obstacle or fallout point in closing a loan is obtaining the required documentation from a borrower. Ex. I, Hutto 95:22-25-100:16.

41.     From February through the end of April 2022, on at least 20 occasions, Wolf emailed personal financial data including borrowers' income, assets, tax returns, account balances, credit scores, social security numbers and other similar materials entrusted to Mutual, by emailing it first to his prior email and then to Waterstone. *See* Ex. S, Compilation of E-mails.

42.     As an example, Wolf sent Waterstone a borrower's file by the name of Hennessey. Ex. S at WMC001185. The e-mail states, "Dwayne asked me to send you this file." *Id.* The file contained the borrower's driver's license, credit report, and contract for the potential borrower. *Id.*

43.     As another example, on April 21, 2022, Wolf e-mailed Waterstone with the "Sherwood file," requesting a credit score for this individual. Ex. S at WMC002162. In the e-mail, Wolf attached a number of documents containing personal identifying information, including the borrower's W-2, Driver's License, and copies of bank statements. *Id.*

44.     In addition, Waterstone's own management participated in and encouraged this activity. *See, e.g.,* Ex. T, MOM0001284, WMC006389-WMC006391, WMC007335.

45.     Waterstone admits that Wolf's request was problematic, but Waterstone did nothing to stop it and instead repeatedly received and used the information.   Ex. D, Allen 275:5-19; 277:1-2.   To the contrary, Waterstone continued to encourage, assist, and facilitate the theft of trade secrets as it would assist in financing the Branch transition.   *See, e.g.,* Ex. G, WMC005267; Ex. D, Allen 37:1-9; 38:3-22-39:1-2.

46.     Altogether, Waterstone diverted approximately 46 loans from Mutual. Ex. A, Carroll Aff. ¶ 13.

**I.  Mutual's Resignations**

47.     On April 26, 2022, Hutto resigned from Mutual.  Ex. U, MOM0009307. Wolf also resigned from Mutual on the same day (Ex. V, MOM0009306), as did all of the loan officers working at Mutual's Tampa and Daytona Branches (Ex. I, Hutto 230:16-20).

48.     At all times during his discussion with Waterstone, Waterstone was aware that Hutto would be bringing his entire branch with him.  Ex. I, Hutto 64:7-10.

49.     In exchange for bringing his entire branch with him, Waterstone offered Hutto $250,000 as support for the first couple of months.  Ex. I, Hutto 63:13-23.

50.     This amount directly corresponded to the concerns Wolf to Waterstone where he requests funding for the branch during the initial transition to facilitate the

solicitation. Ex. F, WMC006267.

51. The day after Hutto's resignation, on April 27, 2022, Waterstone and the Departed Employees continued its scheme of stealing Mutual's customers by utilizing a third-party, who was unaffiliated with Mutual, named Ellie Briones to contact Mutual Florida's customers and transition them into becoming Waterstone customers, using an e-mail address elliemutualmortgage@gmail.com to deceive these customers. Ex. W, MOM0014128; Ex. I, Hutto 109:21-24, 111:8-12.

**J. Mutual's Cease and Desist Letter and Waterstone's Ratification of Improper Conduct**

52. On April 29, 2022, Mr. Mark Carroll with Mutual sent Cease and Desist Letters to Waterstone's employees, copying Waterstone and its General Counsel, advising them of the violation of their contractual and legal obligations to Mutual and the necessity of avoiding further infractions. *See, e.g.,* Ex. X, WMC001528; Ex. D, Allen 199:5-21; 201:1-8.

53. Despite this, on May 11, 2022, Melanie Pischke Ferrera, a former Mutual employee who joined Waterstone, sent an e-mail to Smith providing a "suggested Encompass export map for the 'Completed Loans' folder." Ex. Y, MOM0015279.

54. In response, on June 13, 2022, John Utsch, who was still working as a loan officer at Mutual, responded, providing a "closed loan list" in the field mapping that Waterstone requested from Encompass. Ex. Z, MOM0015236; Ex. D, Allen

165:1-3.

55.     Waterstone knew that this would include private information about customers who closed loans at Mutual and further admitted that it would be problematic for someone to have exported Mutual's closed loan list out of Encompass.  Ex. D, Allen 168:11-18, 171:6-17; 174:6-8, 20-21; 176:15-17.

56.     Similarly, on June 9, 2022, Fred Stalls—another loan originator at Mutual—e-mailed Cody Lamb, also at Mutual, instructing him to send information pertaining to five sets of borrowers to Wolf at Waterstone.  Ex. AA, MOM0000238-39.  Wolf confirmed receipt of this information.  Ex. AA at MOM0000238.

57.     Thereafter, Smith and his branches, including Stalls and Lamb, resigned from Mutual on June 15, 2022.  Ex. BB, Deposition of Christopher Smith ("Smith") 41:11-13.

58.     Similar to Hutto, Waterstone offered Smith an amount of $500,000 in his initial offer letter for the same reasons as Hutto, namely, to bring his branch to Waterstone.  Ex. CC, WMC011460-11463.

**K. Ratification of the Departed Employees' Conduct**

59.     Waterstone's Employment Agreements provide a number of requirements requiring that employees comply with their contractual and legal obligations when joining Waterstone.  Ex. D, Allen Tr. 27:9-22-28:1-3; Ex. DD, WMC001732 at ¶ 1.4.

60.     Yet, Waterstone literally took no action to ascertain the nature and extent of the obligations the Departed Employees owed Mutual.  Ex. BB, Smith 162:23-25; 163:1-8; Ex. I, Hutto 60:15-19; 68:16-18; Ex. M. Wolf 95:20-22.

61.     Despite knowing that the Departed Employees violated these obligations, Waterstone has never disciplined, terminated or in any manner reprimanded them.  Ex. D, Allen 53:6-13; 55:7-11; 55:15-18; 56:2-9.

62.     This is true despite Waterstone admitting the Departed Employees engaged in behavior related to the solicitation of clients and transfer of information from Mutual in a manner "the wrong way."  Ex. D, Allen 276:19-22-277:1-2.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citations omitted); *see also Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004) ("A mere scintilla of evidence in support of the nonmoving party will not

suffice to overcome a motion for summary judgment.").

<u>**MEMORANDUM OF LAW**</u>

**I.    MUTUAL IS ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.**

Under Florida law, the primary determination of causation is necessarily a critical component in awarding lost profits—that is, a plaintiff can recover lost profits if "the defendant's actions caused the damage" and "there is some standard by which the amount of damages may be determined." *Cedar Hills Props. Corp. v. Eastern Fed. Corp.*, 575 So. 2d 673, 677 (Fla. 1st DCA 1991) (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989)); *see also Nebula Glass Intern., Inc v. Reichold*, 454 F.3d 1203, 1214 (11th Cir. 2006); *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 898-99 (Fla. 4th DCA 2007); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 181 F. Supp. 3d 957, 967 (M.D. Fla. 2016). The plaintiff need not show that the defendant's action was the sole cause of the damages sought; instead, the plaintiff's burden is to show that the defendant's action was a "substantial factor" in causing the lost profits and establish the amount with reasonable certainty. *Cedar Hills*, 575 So. 2d at 678; *Whitby*, 951 So. 2d at 898.

The Florida Supreme Court in *W.W. Gay* explained, "the 'uncertainty which defeats recovery in such cases' is the cause of the damage rather than the amount. 'If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial

person.'" 545 So. 2d at 1350-51 (quoting *Twyman v. Roell*, 166 So. 215, 218 (Fla. 1936)). Thus, lost profit damages are recoverable if there is "some standard by which the amount of damages may be adequately determined." *W.W. Gay*, 545 So. 2d at 1350-51; *accord Sostchin v. Doll Enters., Inc.*, 847 So. 2d 1123, 1128 (Fla. 3d DCA 2003). Florida law provides:

> Difficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as it is clear that substantial (rather than merely nominal) damages were suffered **as a result** of the wrong, and the competent evidence is sufficient to satisfy the mind of a prudent, impartial person as to the amount.

*James Crystal Licenses, LLC v. Infinity Radio, Inc.*, 43 So. 3d 68, 74 (Fla. 4th DCA 2010). In other words, so long as a plaintiff demonstrates a defendant "caused the damage," lost profits are recoverable and do not need to be pleaded with absolute certainty. Here, Mutual is able to satisfy both.

### a. Defendant's wrongful conduct caused Mutual's damages.

Before considering the amount of lost profit damages, this Court must first determine whether Defendant caused Mutual's damages, which it has. In its FAC, Mutual asserts the following claims against Defendant: (1) Misappropriation of Trade Secrets under Federal and Florida law (Counts I and II); (2) Tortious Interference with Contract (Count III); and (3) Aiding and Abetting Breach of Fiduciary Duty (Count IV). *See* FAC. Mutual is able to prove that Defendant's wrongful conduct caused Mutual's damages for each of these claims such that

Mutual is entitled to its lost profits as a matter of law.[1]

There is endless evidence establishing causation, and in turn, liability in this case. Documentary evidence and testimony reveals that to facilitate the departure of both the Departed Employees and the branches they supervised, Waterstone needed to create a seamless transition. That is, a transition where nothing changed for the branches' employees, except for the name on the door. By creating a scenario where the branches would transition with its pending customers, referral bases, customer lists, marketing materials, supervision, and entire staff, Waterstone removed any of the risks that might cause an employee to hesitate when switching employers.

The departures of the Departed Employees and their branches were not a cause and effect; rather, they were simultaneous and interdependent. Indeed, Waterstone knew that the managers of Mutual Florida would not leave unless they could take Mutual Florida with them. Statement of Material Undisputed Facts ("SOF") ¶¶ 10-16, 19, 32, 33, 48, 57. So, even though Waterstone knew it was unlawful, Waterstone consciously made the decision to participate in, encourage, and facilitate the illegal practices for the purpose of acquiring Mutual Florida at the same time they hired the Departed Employees. *Id*. ¶¶ 11-16, 20, 22, 23, 28, 29, 38, 39, 44, 45,

---

[1] This Court ordered that Mutual move for summary judgment on damages. Dkt. No. 94. Florida law is clear, however, that the determination of lost profits necessarily hinges on a plaintiff's ability to prove causation. For the limited purpose of this Motion, Mutual will solely focus on the "causation" element for each of its claims and will not set forth a discussion of the remaining prima facie elements. To the extent the Court believes a discussion of the prima facie elements is necessary, Mutual respectfully requests that it be given an opportunity to provide supplemental briefing.

53-56, 61. But for that decision, neither the Departed Employees nor the branches would have transitioned to Waterstone. *Id.* ¶¶ 10-19, 31-33, 39, 48, 58.

The e-mails show Waterstone asking for, and Mutual's former branches managers sending, dozens of e-mails containing borrower information, personnel information, Mutual's financial data, and other confidential information to Waterstone. *Id.* ¶¶ 21, 24, 26, 31, 34, 35, 39, 41-44, 51, 53-56. Waterstone itself admits that it obtained Mutual's trade secrets, including its Encompass files, the files it uploaded, and other trade secret information knowing it was problematic. *Id.* ¶¶ 21, 24, 26-29, 53-56. And still, Waterstone used this information for its own benefit.

Defendant went so far as to use Mutual's own trade secrets and corporate opportunities as seed money, diverting dozens of loans in process to provide the financing to commence operations. *Id.* ¶¶ 21-28, 41-44, 49, 58. And, Defendant's own agents confirm that such a diversion was critical to the transition of the business. *Id.* ¶ 20. Moreover, using the Manager's access to personnel information, as well as the branch financial performance, Defendant was able to exactly match or better the compensation of the entire branch so that they could seamlessly transition all of their staff and business. *Id.* ¶¶ 34-37. Additionally, to facilitate the departure of employees and continued operations, Mutual's customer information to continuing marketing to the same customers, using Mutual's information. *Id.* ¶¶ 41, 51. Defendant, using Mutual's business, its confidential information, its personnel

information, its marketing contacts, supervision of employees, and access to all of its financials and equipment, surreptitiously lifted the entirety of Mutual Florida's operations in the dead of the night. Waterstone consciously concealed what was happening and even worked with the Departed Employees to hire a transition team that facilitated the theft of information, customers, and revenue from Mutual. *Id.* ¶¶ 19, 32, 38, 39. There is no question that Defendant's wrongful conduct caused Mutual's damages.

Taken as a whole, this calculated scheme resulted in the lost profit damages sustained by Mutual in this case – namely, the destruction of Mutual Florida's entire operations. *See Mortgage Now, Inc. v. Stone*, No. 3:09cv80/MCR/MD, 2012 WL 4478950, at *16 (N.D. Fla. Sept. 20, 2012) (finding the "chaos" resulting from half a branch leaving "was caused by the disloyalty and interference" of the defendants and "undoubtedly resulted in damages" to plaintiff). The conduct discussed above cannot be separated for purposes of determining whether causation exists. Indeed, each of the wrongful acts contributed indivisibly to the creation of a seamless transition, which in totality, was Defendant's intent. But for Defendant's scheme – to essentially move Mutual Florida in whole to Waterstone – there is no record evidence to suggest that Mutual Florida's operations would not have continued into perpetuity. This is sufficient to establish causation for each of the claims contained within the FAC as a matter of law.

**b. Mutual can prove its entitlement to lost profits with reasonable certainty.**

Florida courts are clear that "once causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery as long as there is a reasonable yardstick by which to estimate the damages." *Nebula Glass Intern., Inc. v. Reichold, Inc.*, 454 F.3d 1203, 1216-17 (11th Cir. 2006). At that point, "absolute certainty" as to the amount of lost profits is not required. *See id.* at 1212; *see also* Richard A. Lord, *Williston on Contracts* § 64:8; *Mortgage Now, Inc.*, 2012 WL 4478950, at *16; *Miller v. Allstate Ins. Co.*, 573 So. 2d 24, 28 n.4 (Fla. 3d DCA 1990); *see also Conner v. Atlas Aircraft Corp.*, 310 So. 2d 352, 354 (Fla. 3d DCA 1975). Thus, lost profits are recoverable if there is "some standard by which the amount of damages may be adequately determined." *Nebula Glass*, 454 F.3d at 1217 (citing *W.W. Gay*, 545 So. 2d at 1350-51).

In support of its lost profits, Mutual relies upon its Expert Witness report of Candice Rosevear, where she sets forth in painstaking detail the methodology by which she calculates projected lost profits over a 10-year period. *See* Ex. FF. This is sufficient to demonstrate the reasonable certainty of Mutual's lost profits.

**1. Ms. Rosevear bases her projections on two datasets that establish the lost profits with reasonable certainty.**

Generally, there are two methods of proving lost profits: (1) the before and after theory and (2) the yardstick test. *See G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1538-39 (11th Cir. 1985). As the Eleventh Circuit has

recognized, "the before and after theory is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits." *Id.* at 1538. Therefore, the yardstick test is often employed, which "consists of a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for differences . . . the business used as a standard must be as nearly identical to the plaintiff's as possible." *Id.* at 1338-39. Under either test, Mutual proves its entitlement to lost profits.

In her Report, Ms. Rosevear states that she assumed that "the lost profits and lost business associated with the closure of the Tampa and Daytona branches was a direct result of Defendants' actions." Ex. FF at ¶ 2. Ms. Rosevear projects future sales at the Tampa and Daytona locations assuming the branches would have otherwise continued operating but for Defendant's misconduct. *Id.* at ¶ 12. In doing so, she bases her projections on (1) actual loan sales that occurred at two of Mutual's peer branches, St. Louis and Maryland branches; and (2) national data from the Mortgage Bankers of Association, a data source also relied upon by Defendant's expert witness. *Id.* From there, she uses a reasonable growth rate to project future loan sales. *Id.* In using those projections, she performed a valuation technique to estimate the present value of lost profits. *Id.* ¶ 13. According to Ms. Rosevear, the present value of lost profits is approximately $28 million over a ten-year period. *Id.*

¶ 16.

For purposes of this Motion, Ms. Rosevear's report clearly demonstrates that she considered not only the available historical data of the Mutual Florida branches and those of peer branches at Mutual, but also the nationally available data, which Defendant's own express witness also relies upon (*see* Ex. GG at 12). Both datasets have similar results. Ex. FF at ¶¶ 22-28. These projections – either considered alone or together – provide the necessary methodology, or "yardstick," sufficient to justify Mutual's entitlement to lost profits with reasonable certainty. *See G.M. Brod & Co., Inc.*, 759 F.2d at 1539 (finding it is "enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only appropriate" even with "indirect" proof and "estimate bases on assumptions, so long as the assumptions rest on adequate data").

## 2. Ms. Rosevear's model is amenable to different time periods, which is a factual question for a jury.

The lost profits at issue in this case do not arise from consideration of whether an individual employee would have stayed or left over a certain period of time, as Mutual anticipates Defendant will argue. This case should not be viewed in isolation. Rather, this case should be viewed through the lens of Waterstone's collective action in stealing and utilizing Mutual Florida's operations to its demise.

That said, there is an open question as to the time period for which Mutual should be entitled to lost profits. In her Report, Ms. Rosevear provides a

methodology and is clear that notwithstanding her approximated lost profits, her model is flexible to other damages timeframes and allows for the calculation of damages through any year up to 2031. *Id.* ¶ 32 n.35. In fact, Ms. Rosevear provided these different figures in response to Waterstone's recent interrogatory requests related to different time periods. *See* Ex. HH, MOM-015944. Thus, it cannot be argued that Ms. Rosevear has not provided a methodology for the factfinder to calculate the appropriate damages to be awarded in this case.

At worst, the time period may be limited to twelve months because Mutual's Employment Agreements include a twelve-month non-solicitation period during which the Departed Employees would not have otherwise been able to solicit the Mutual Florida branch employees—an argument that Defendant itself has raised throughout this case. *See* Dkt. No. 72. Yet, based on Ms. Rosevear's opinion, a jury could expand that liability to multiple years, predicated on the testimony and facts adduced at trial.

At best, there is no record evidence that Defendant can point to that suggests Mutual Florida's operations would have ceased any time in the near future but for Waterstone's wrongdoing. Indeed, Mutual's acquisition of Keller Williams certainly suggests that Mutual would have been able to retain the branch by virtue of the fact that it would have been able to pair it with a real estate company to partner and refer loans. It was Waterstone's partnership in stealing Mutual Florida that led

to the Departed Employees' resignation. Without that, they would have likely remained given that the Departed Employees' branches provided significant portions of their income. SOF ¶ 10. Further, the average duration that a branch remains at Mutual is approximately 51 months, which provides another plausible basis for a jury's consideration. Ex. A, Carroll Aff. ¶ 16. And approximately 80% of the branches that have started with Mutual have remained with Mutual, to date. *Id.* While the question of the appropriate time frame to determine lost profits is a question best suited for the fact finder,[2] there can be no question that Mutual has experienced lost profits as a result of Defendant's wrongful actions. Whether a factfinder determines that the appropriate time frame to one year (at a minimum), five years, ten years, or otherwise, does not affect that Mutual is entitled as a matter of law to lost profits.

## CONCLUSION

Plaintiff, Mutual of Omaha Mortgage, Inc., requests that this Court enter summary judgment against Defendant, Waterstone Mortgage Corporation for Mutual's damages, and requests such further relief as the Court deems necessary.

---

[2] Generally, the question of whether lost profits are reasonably certain is a question of fact to be determined by the finder of fact. *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So. 3d 374, 382-83 (Fla. 3d DCA 2013) (citing *State Rd. Dept. v. Tampa Bay Theatres, Inc.*, 208 So. 2d 485, 486-87 (Fla. 2d DCA 1968)); *IBP, Inc. v. Hady Enters., Inc.*, 267 F. Supp. 2d 1148, 1168-69 (N.D. Fla. 2002) (noting the role of the factfinder in determining lost profits); *Collins & Aikman Floor Coverings, Inc. v. Interface, Inc.*, No. 4:05-CV-0133-HLM, 2009 WL 10669578, at *4 (N.D. Ga. Jan. 8, 2009) (finding that so long as a party can provide a viable legal theory for recovering lost profits, it is "ultimately up to the jury . . . to weigh the credibility of the parties opposing theories and evidence").

Dated:     Washington, D.C.
           October 20, 2023

MITCHELL SANDLER LLC

By:  */s/ Ari Karen*

Ari Karen (admitted *pro hac vice*)
Christopher L. McCall (admitted *pro hac vice*)
Courtney E. Walter
1120 20th Street N.W., Suite 725
Washington, D.C.  20036
Email:  akaren@mitchellsandler.com
Email:  cmccall@mitchellsandler.com
Email:  cwalter@mitchellsandler.com
Telephone:  (202) 886-5292

GUNSTER, YOAKLEY & STEWART, P.A.

John A. Schifino
Florida Bar No. 0072321
401 East Jackson Street, Suite 1500
Tampa, Florida  33602
Primary email:  jschifino@gunster.com
Secondary email: eservice@gunster.com
Telephone:  (813) 739-6962


*Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc.*