# <u>EXHIBIT B</u>

Page 1

1          UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF FLORIDA

3               TAMPA DIVISION

4     _____

5     MUTUAL OF OMAHA MORTGAGE, INC.,

6          Plaintiff,

7        v.                          Case No:

8     WATERSTONE MORTGAGE CORPORATION,      8:22-cv-1660-

9          Defendant.                  TPB-JSS

10    _____

11          VIDEOCONFERENCE DEPOSITION OF

12              ELIZABETH SPRAGG

13    DATE:        Thursday, April 6, 2023

14    TIME:        10:09 a.m. EDT/ 9:09 a.m. CDT

15    LOCATION:    Remote Proceeding

16                 833 East Michigan Street, Suite 1800

17                 Milwaukee, WI 53202

18    REPORTED BY: Allison Diercks, Notary Public

19    JOB NO.:     5810076

20

21

22

Page 2

```
1        A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.:
3     COURTNEY WALTER, ESQUIRE (by videoconference)
4     CHRISTOPHER MCCALL, ESQUIRE (by videoconference)
5     Mitchell Sandler, LLC
6     1120 20th Street NW, Suite 725
7     Washington, DC 20036
8     cwalter@mitchellsandler.com
9     cmccall@mitchellsandler.com
10    (215)688-0834
11
12 ON BEHALF OF DEFENDANT WATERSTONE MORTGAGE
13 CORPORATION:
14    MARIA KREITER, ESQUIRE (by videoconference)
15    EMMA JEWELL, ESQUIRE (by videoconference)
16    Godfrey & Kahn, S.C.
17    833 East Michigan Street, Suite 1800
18    Milwaukee, WI 53202
19    mkreiter@gklaw.com
20    ejewell@gklaw.com
21    (414)287-9466
22
```

Page 3

```
1        A P P E A R A N C E S (Cont'd)
2  ALSO PRESENT:
3     Stephanie Ziebell, General Counsel
4     Waterstone Mortgage Corporation, (By
5     videoconference)
6     Jon Burgess, Shadowing Digital Reporter, (By
7     videoconference)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 4

```
1              I N D E X
2  EXAMINATION:                        PAGE
3     By Ms. Walter              8
4
5           E X H I B I T S
6  NO.      DESCRIPTION            PAGE
7  Exhibit 1    Email 4/11/22 From Spragg to Group
8        Re Employee Roster and Template   35
9  Exhibit 2    Email 4/12/22, Wolf to Spragg Re
10       Pre Employment Email        43
11 Exhibit 3    Email 4/12/22, From Ferrara to
12       Wolf Re Waterstone Onboarding    55
13 Exhibit 4    Emails 4/15/22, From Wolf to
14       Re Offer Letters and Resignations  56
15 Exhibit 5    Email 4/14/22, From Wolf Re Offers
16       Update and Agenda For Friday    60
17 Exhibit 6    Emails 4/19/22 Re 17 People Event
18       and Laptops etc.        62
19 Exhibit 7    Email 6/10/22 From Ferrara to
20       Group Re Tampa Event Review    64
21 Exhibit 8    Emails 6/10/22 Re Tampa
22       Onboarding and Wifi       68
```

Page 5

```
1           E X H I B I T S contd.
2  NO.      DESCRIPTION            PAGE
3  Exhibit 9    Emails Re Update Tampa Onboarding
4        and Mutual Network       74
5  Exhibit 10   Emails Re Fred Stalls Mutual
6        Mortgage Email        80
7  Exhibit 11   Agenda for Training and Onboarding
8        Meeting           82
9        (Exhibits attached.)
10
11
12
13
14
15
16
17
18
19
20
21
22
```

P R O C E E D I N G S

1
2     THE REPORTER:  Good morning, everyone.
3  My name's Allison Diercks; I'm the reporter assigned
4  by Veritext to take the record of this proceeding.  We
5  are now on the record at 10:09 a.m. Eastern Time, 9:09
6  a.m. Central Time, on Thursday, April 6, 2023.
7     This is the deposition of Elizabeth
8  Spragg taken in the matter of Mutual of Omaha
9  Mortgage, Inc. vs. Waterstone Mortgage Corporation.
10  And this deposition is being held remotely via Zoom.
11     I'm a notary authorized to take
12  acknowledgments and administer oaths in the
13  Commonwealth of Virginia.  The witness is testifying
14  today from Milwaukee, Wisconsin.  Parties agree that I
15  will swear in the witness remotely, and the parties
16  and the witness also understand and agree that the
17  oath I administer today will have the same force and
18  effect as if the witness were physically located in
19  Virginia.
20     Additionally, absent an objection on
21  the record before the witness is sworn, all parties
22  and the witness understand and agree that any

1  certified transcript produced from the recording of
2  this proceeding:
3     - is intended for all uses permitted
4     under applicable procedural and
5     evidentiary rules and laws in the same
6     manner as a deposition recorded by
7     stenographic means; and
8     - shall constitute written stipulation
9     of such.
10     At this time could I have counsel in
11  attendance please identify yourself for the record and
12  state your appearances, beginning with the noticing
13  attorney.
14     MS. WALTER:  Courtney Walter and
15  Christopher McCall, of Mitchell Sandler.  We represent
16  the Plaintiff Mutual of Omaha Mortgage, Inc.
17     MS. KREITER:  Maria Kreiter and Emma
18  Jewell, from Godfrey and Kahn, on behalf of the
19  Defendant Waterstone Mortgage.  Also here, General
20  Counsel for Waterstone Mortgage, Stephanie Ziebell.
21     THE REPORTER:  Okay.  Thank you very
22  much.

1     And prior to going on the record
2  Counsel indicated they had no objections to the
3  stipulations I recited.  As such, I will go ahead and
4  swear in the witness.
5     Ms. Spragg, will you please raise your
6  right hand.  Thank you.
7  WHEREUPON,
8     ELIZABETH SPRAGG,
9  called as a witness, and having been first duly sworn
10  to tell the truth, the whole truth, and nothing but
11  the truth, was examined and testified as follows:
12     THE REPORTER:  Thank you.  You can
13  lower your hand.  You are now under oath.
14     I will turn off my microphone and
15  Counsel will take it from here.
16     Thanks, everyone.
17     EXAMINATION
18  BY MS. WALTER:
19     Q   Good morning, Ms. Spragg.  Thank you for
20  being here today.  My name is Courtney Walter.  I'm
21  from the law firm Mitchell Sandler and we represent
22  the plaintiff in this case, Mutual of Omaha Mortgage,

1  Inc.
2     Can you please state your full name for the
3  record?
4     A   Elizabeth Spragg.
5     Q   Before we get started, I just want to go
6  over a couple of ground rules, particularly since
7  we're operating here in a virtual format.
8     Whatever we say will be taken down verbatim
9  by the court reporter, so please be sure to answer my
10  questions completely using words and not gestures so
11  that the court reporter can maintain an accurate
12  record.  The transcript may not accurately reflect if
13  you provide any sort of gestures or nods to the
14  question, so please just be sure to use full words.
15     If there is any technical difficulties or if
16  I freeze, please let us know.
17     Throughout our time I will ask you to review
18  some documents that I previously sent over to your
19  counsel this morning.  So if you require some
20  additional time to review them as I ask questions,
21  please feel free to take as much time as you need.
22  And if you have any questions about where I'm pointing

3 (Pages 6 - 9)

Page 10

1  to in the particular documents please just let me know
2  and I'm happy to show you.
3      We can aim to take a break every 90 minutes,
4  but if you require a break sooner than that please let
5  me know. All I ask is that if we're in the middle of
6  a question you complete the answer and then we can go
7  ahead and take a break from there.
8      And since we're in a virtual format and
9  you're in the same office as your attorney, all I ask
10  is that you please respond to the questions that I ask
11  and not look to your attorney for the answer to the
12  potential question.
13      And finally, please wait for my question to
14  finish before answering it. And if you don't
15  understand anything I ask just let me know. Your
16  counsel may object to a question, you still have to
17  answer the question unless your counsel specifically
18  instructs you not to.
19      Do you understand all of that, or do you
20  have any questions?
21  A  I understand.
22  Q  Have you ever been deposed before?

Page 11

1  A  Yes.
2  Q  How many times?
3  A  Once.
4  Q  When were you deposed?
5  A  Sometime in 2020, I'm not sure exactly --
6  Q  Where were you -- what type of case was the
7  deposition for?
8  A  It was a case, I was testifying on behalf of
9  Waterstone Mortgage.
10  Q  Did you -- did that case go to trial?
11  A  No.
12  Q  What did you do to prepare for today's
13  deposition?
14  A  I met with counsel.
15  Q  When did you meet with counsel?
16  A  Yesterday.
17  Q  How long did you meet with counsel?
18  A  Several hours.
19  Q  Was anyone outside of your counsel present
20  for the preparation session?
21  A  Godfrey and Kahn counsel and Stephanie
22  Ziebell, our Waterstone General Counsel.

Page 12

1  Q  Did you review any documents with counsel?
2  A  We did review some documents.
3  Q  Did you review any text messages with
4  counsel?
5  A  No.
6  Q  Have you spoken with anyone else about this
7  case?
8  A  No.
9  Q  Is there any reason you cannot answer my
10  questions truthfully today?
11  A  No.
12  Q  Before you came here did you take any
13  medication?
14  A  No.
15  Q  Did you consume any alcohol?
16  A  No.
17  Q  Did you take any narcotics?
18  A  No.
19  Q  Have you ever been convicted of a crime?
20  A  No.
21  Q  What is your highest level of education?
22  A  A bachelor's degree.

Page 13

1  Q  What is your bachelor's degree in?
2  A  Business administration.
3  Q  When did you graduate?
4  A  I don't remember the year specifically.
5  Q  Can you give me an approximate time?
6  A  I actually don't, I finished my degree later
7  in my career.
8  Q  Where did you receive your degree from?
9  A  University of Wisconsin-Platteville.
10  Q  I'm sorry, I froze up there. I didn't hear
11  your response.
12  A  University of Wisconsin-Platteville.
13  Q  Do you hold any licenses or certifications?
14  A  No.
15  Q  After you graduated from University of
16  Wisconsin where did you work?
17  A  I worked for -- my first job was with
18  Firstar Bank.
19  Q  What did you do for that bank?
20  A  I was a receptionist.
21  Q  How long did you work there?
22  A  Approximately three years.

4 (Pages 10 - 13)

Page 14

1    Q   How about after that, what was your next job
2    following your position at the bank?
3    A   I worked for Metavante in human resources.
4    Q   How long did you work there?
5    A   Approximately five years.
6    Q   And what did you do -- what were your
7    responsibilities within the human resources department
8    in that company?
9    A   I held various roles during my tenure there
10   in the human resources team, from recruitment to
11   compensation to HRIS.
12   Q   Following your position there did you have
13   another position between that one and your current
14   role?
15   A   I did.
16   Q   Okay.  Can you tell me a little bit about
17   that position as well?
18   A   I had several.
19   Q   Okay.
20   A   I went from there -- sorry.
21   Q   If you can just walk me through your
22   positions that you've held it might be a little bit

Page 15

1    more efficient, to your current position.  So if you
2    can just walk me through the position, what your
3    responsibilities were generally, how long you were
4    there; just up until your current role, that would be
5    easier.
6    A   All right.  So I went from Metavante to
7    Kohl's Department Stores, where I worked briefly doing
8    human resources information systems and compensation.
9       From Kohl's Department Stores I worked at
10   Roundy's, which is a supermarket, where I held various
11   management roles with oversight of HRIS, compensation,
12   and HR administration.
13      From there I worked at Stark Investments
14   doing management development and training, and other
15   HR responsibilities, over time became responsible for
16   the HR team while I was at Stark Investments.
17      From there I went to Artisan Partners where
18   I was responsible for the HR team.
19   Q   So --
20   A   And from there I --
21   Q   Go ahead.  I'm sorry.
22   A   [Unintelligible response.]

Page 16

1    Q   So is it fair to say that you have 15 to 20
2    years of HR experience?
3    A   Correct.  A little more, but correct.
4    Q   Okay.  And are you currently employed?
5    A   Yes.
6    Q   Where are you employed?
7    A   Waterstone Mortgage.
8    Q   When did you begin working at Waterstone?
9    A   December of 2019.
10   Q   When you first joined Waterstone what was
11   your title?
12   A   Senior vice president of human resources.
13   Q   What -- just curious, why did you apply to
14   Waterstone?
15   A   It was an excellent financial institution
16   with a good reputation and an excellent opportunity.
17   Q   Prior to joining Waterstone did any of your
18   prior positions -- were any of those companies focused
19   on the mortgage industry?
20   A   No.
21   Q   What is your current title at Waterstone?
22   A   Chief People and Administrative Officer.

Page 17

1    Q   How long have you had this title?
2    A   It was early 2022 when I received that
3    title.
4    Q   Did you apply for that position?
5    A   No.  It was a promotion.
6    Q   How did -- and to be clear, did you have any
7    other title between the position that you initially
8    joined, as senior vice president, and your current
9    position, did you have another title in there?
10   A   No.
11   Q   How did your responsibilities change between
12   the position you initially started at and your current
13   role?
14   A   So I have increasingly gotten other
15   responsibilities, from the senior v.p. of human
16   resources, I was responsible for only HR.  As the
17   chief people administrator and administrative officer
18   I have additional responsibilities working with our
19   CEO on our strategic plan for the business.
20      In addition, was also given oversight for
21   our IT team, and also oversight for our -- our
22   corporate office, our facilities there in the

5 (Pages 14 - 17)

Page 18

1  corporate office.
2      Q   Do you report to anyone currently?
3      A   Our CEO.
4      Q   Who is your CEO?
5      A   Jeff McGuiness.
6      Q   How long has Mr. McGuiness been in that
7  position?
8      A   Approximately two-and-a-half years, I don't
9  remember the exact date offhand.
10     Q   Okay.  That's fair.
11         Do you have anyone who reports to you?
12     A   Yes.
13     Q   How many approximately?
14     A   I have four direct reports and approximately
15 25 indirect reports.
16     Q   Does that comprise the entire -- so just
17 focusing on the HR department, putting aside your
18 other responsibilities, how many individuals would
19 fall within that department, notwithstanding whether
20 they're direct or indirect reports?
21     A   Six, for HR, not including training.
22     Q   Off the top of your head are you able to

Page 19

1  provide the names of who those six individuals are?
2      A   Yes.
3      Q   Can you please provide them?
4      A   Sure.  Melissa Wagner, Rachel Eisenhut,
5  Maddie Thronson, Jen Witon, Jenna Borts, and Abby
6  Aiken.
7      Q   Currently are you responsible for recruiting
8  potential employees to Waterstone?
9      A   Recruiting happens within various teams, but
10 HR does help in some recruiting efforts.
11     Q   Do you communicate with your co-workers via
12 text message?
13     A   Occasionally.
14     Q   Do you communicate via your personal phone
15 or does Waterstone provide a cell phone?
16     A   I text on my personal phone.
17     Q   Do you ever delete your text messages?
18     A   No.
19     Q   Do you still have any text messages that you
20 would have with co-workers on your phone?
21     A   Yes.
22     Q   Do you communicate with your co-workers

Page 20

1  using any messaging programs such as Team or Slack --
2  Teams, excuse me?
3      A   Yes.
4      Q   What messaging programs do you typically
5  use?
6      A   So we have several.  So we have Teams --
7  Microsoft Teams, we have Cisco Jabber, and we have
8  Zoom Chat.
9      Q   How often do you communicate with your
10 co-workers via these platforms?
11     A   Daily.
12     Q   For purposes of this case have you searched
13 through any of your messages on these platforms to
14 review them?
15     A   No.
16     Q   Do you ever communicate with co-workers at
17 Waterstone using your personal email address?
18     A   No.
19     Q   Is there any reason why you wouldn't
20 communicate with your co-workers using your email --
21 your personal email address?
22     A   Can you repeat that question, please?

Page 21

1      Q   Sure.  Is there any reason why you wouldn't
2  communicate with your co-workers using your personal
3  email address?
4      A   Work provides an email, I use my work email
5  address, 'cause it's --
6      Q   Okay.  Let me ask another question.  Are you
7  aware of whether Waterstone has any policy that
8  prohibits its employees from using their personal
9  email address for work purposes?
10     A   I'm not aware of any policy, off the top of
11 my head.
12     Q   Okay.  Do you know why you are here today?
13     A   Yes.
14     Q   Okay.  Why -- what is your understanding as
15 to why you're here?
16     A   I'm here to provide testimony.
17     Q   Are you aware of the lawsuit that has been
18 filed against Waterstone by Mutual of Omaha Mortgage,
19 Inc.?
20     A   Yes.
21     Q   What is your understanding of this lawsuit?
22     A   I briefly read the lawsuit last night, so I

6 (Pages 18 - 21)

Page 22

1 would be paraphrasing what I read briefly last night.
2 But the charges appear that Mutual of Omaha did not
3 want us hiring, and they also claim that we gave
4 instruction to employees to take information.
5    Q   So when you say you read the lawsuit, you
6 read the complaint that plaintiff had filed; is that
7 accurate?
8    A   Yes, I believe that's what I read last
9 night.
10    Q   Okay.  So can we agree that if I refer to
11 the sixty employees who left employment with Mutual of
12 Omaha to work at Waterstone, are you okay if I refer
13 to them throughout this deposition as "the Mutual
14 employees," just so that we're on the same page as far
15 as the terminology I'm using throughout the
16 deposition?
17    MS. KREITER:  I'll object to that as a
18 misstatement of facts.  If you want to use the
19 employees that left Mutual, Courtney, but I don't -- I
20 mean, the idea that there's sixty is not accurate.
21    MS. WALTER:  Okay.  That's fine.  If we
22 can just agree on a defined universe for the employees

Page 23

1 who joined Waterstone, that's fine.  Without --
2 notwithstanding the number.  I'm just trying to make
3 it clear throughout the deposition.  Is that okay,
4 Maria, or do you still have an objection?
5    MS. KREITER:  Sure.  You -- I think the
6 complaint uses "departed employees"; is that --
7    MS. WALTER:  That's fine, I can use --
8    MS. KREITER:  Sorry.  Is that the term
9 you're proposing?
10    MS. WALTER:  Sure.  Sure.  I can do
11 that.
12    Are you -- do you understand, Ms.
13 Spragg?
14    THE WITNESS:  Yes.
15    MS. WALTER:  Okay.
16 BY MS. WALTER:
17    Q   So when did you first become aware that the
18 departed employees would be leaving Mutual and joining
19 Waterstone?
20    A   I don't believe I remember a specific date.
21    Q   Can you approximate?
22    A   I believe it was April of 2022.

Page 24

1    Q   How did you first become aware of this?
2    A   I don't remember.
3    Q   At the time of the departed employees'
4 transition to Waterstone, going back to approximately
5 April 2022 based on your recollection, what was your
6 title at that time?
7    A   I believe my title was chief people and
8 administrative officer at that time.
9    Q   Did you ever personally interact with the
10 departed employees?
11    A   Can you be more specific, please?
12    Q   Sure.  So as I noted earlier there were a
13 large number of departed employees who intended to
14 leave Mutual and join Waterstone.  Did you, yourself,
15 personally interact with those employees?
16    A   I -- I had occasion to interact with some of
17 the employees through the hiring process.  Yes.
18    Q   Can you please provide the names of some of
19 those employees who you do remember?  I'm not asking
20 you for an exhaustive list, but if there are certain
21 individuals who come to top of mind, if you can
22 provide their names that would be helpful.

Page 25

1    A   Sure.  So Chris Wolf, Dwayne Hutto, Chris
2 Smith, are the ones I remember.
3    Q   Okay.  Let's go through each of them.
4    So who is Mr. -- who is Dwayne Hutto?
5    A   Dwayne Hutto is currently our leader and
6 branch manager of our Ormond Beach branch.
7    Q   When did you first meet Mr. Hutto?
8    A   Oh, I don't remember the dates.
9    Q   At the time you first met him where was he
10 working?
11    A   Mutual of Omaha.
12    Q   Did you assist Mr. Hutto in the transition
13 from Mutual to Waterstone?
14    MS. KREITER:  Object to the form.
15    THE WITNESS:  Can you rephrase the
16 question?
17 BY MS. WALTER:
18    Q   Let me rephrase it.  What was your
19 interaction with Mr. Hutto at the time -- what was
20 your first interaction with Mr. Hutto at the time he
21 was at Mutual, in April of 2022 approximately?
22    A   I had met with him to review steps that

7 (Pages 22 - 25)

Page 26

1 would be taken upon acceptance of a job offer, review
2 benefits information, talk about background checks,
3 talk about -- talk about, you know, signing the offer
4 letter, the background check process, signing an
5 employment agreement. What day one would feel like,
6 from signing up from NMLS, and going through HR
7 orientation.
8     Q    How often were you interacting with Mr.
9 Hutto throughout that process that you just described?
10    A    I don't remember specifically.
11    Q    Did someone introduce you to Mr. Hutto?
12    A    I don't remember.
13    Q    You mentioned Chris Smith. Who is Mr.
14 Smith?
15    A    Chris Smith is our branch leader for our
16 Tampa branch.
17    Q    That's a current leader for the Tampa
18 branch?
19    A    Correct.
20    Q    When did you first meet Mr. Smith?
21    A    I don't remember a specific date.
22    Q    Can you approximate?

Page 27

1     A    April of 2022.
2     Q    Where did Mr. Smith work during April of
3 2022, when you first met him?
4     A    Mutual of Omaha.
5     Q    Do you remember how you were first
6 introduced to Mr. Smith?
7     A    I do not.
8     Q    Was the -- was your interaction with Mr.
9 Smith similar to that that you described for Mr.
10 Hutto, in terms of the background process for
11 onboarding to Waterstone?
12    A    Yes. My meeting -- or discussions with
13 Chris talked about what would happen in the steps
14 of -- after signing an offer letter, doing a
15 background check, benefits information, signing up,
16 what would happen on first day, NMLS, orientation.
17 Yes, that information.
18    Q    Okay. And you also mentioned Chris Wolf.
19 Who was Mr. Wolf?
20    A    Chris Wolf works with Dwayne Hutto. I don't
21 remember his specific title with us.
22    Q    Do you mean his current specific title with

Page 28

1 you?
2     A    Correct.
3     Q    At the time you first met Mr. Wolf where was
4 he working?
5     A    Mutual of Omaha.
6     Q    And similar to what I just asked about Mr.
7 Smith and Mr. Hutton, what was your interaction like
8 with Mr. Wolf around the time of April 2022?
9     A    So I worked with Mr. Wolf, again, to
10 describe what would happen with offer letters,
11 background checks, employee benefits. What would
12 happen on day one with transitioning NMLS,
13 orientation. I also worked with Mr. Wolf as we began
14 to talk about the hiring process for individuals for
15 the Ormond Beach branch.
16    Q    Of those three individuals you just named
17 did you have more interactions with one over the other
18 two or would it be similar across all three?
19    A    Like more with Chris Wolf than the other
20 three.
21    Q    Would you ever meet with Mr. Wolf,
22 Mr. Smith, and Mr. Hutto at the same time?

Page 29

1     A    I don't remember for sure.
2     Q    Okay. I would just like to walk through
3 generally, really for my own understanding, the role
4 that Waterstone's human resources department plays in
5 the hiring of employees. And if I -- if it's -- if
6 the human resources department is called something
7 else I'm happy to refer to it as however you do,
8 that's just me simplifying it.
9          So how does the department typically solicit
10 applications for employment at the company?
11    A    The human resources team works differently
12 with different people. We certainly come in at
13 different points in either recruitment or once an
14 offer's been made. The HR team works differently. We
15 hire a lot of people so in 2022 we hired approximately
16 230 employees, with about twelve different branches.
17         It works differently in every scenario.
18 Sometimes we work more actively on the front end,
19 sometimes we are brought in once an offer's been made
20 and we simply make the steps of making the offer,
21 making sure an application is done, background check
22 is done, all of those steps that lead up to day one.

8 (Pages 26 - 29)

Page 30

1  So it depends.
2      Q   Who determines the level of involvement that
3  the human resource department will play at any given
4  time?
5      A   The business leaders.
6      Q   Who are the business leaders within the
7  company?
8      A   So it depends, for different situations we
9  have various, either our national sales leader or it
10  could be our regional sales leaders.  So it could be
11  different people.
12     Q   And you mentioned earlier, when I asked
13  about whether you personally recruit individuals, you
14  said it depends.  So can you sort of give some
15  background on how a recruiter may operate within the
16  company to sort of solicit new -- potential new hires?
17     MS. KREITER:  Object to the form.
18     THE WITNESS:  Can you be more specific?
19  BY MS. WALTER:
20     Q   Sure.  Do you have a recruiter within the
21  human resources department who solicits applications
22  for new hires?

Page 31

1      A   Yes.  We have one recruiter who recruits for
2  very specific roles.  The recruiter in the HR team
3  only recruits for corporate positions and that also --
4  what I'd characterize as administrative positions
5  within existing branches.
6      Q   Who is that person currently?
7      A   That person is Jenna Borts.
8      Q   Had that -- has Jenna always been in that
9  position -- has she been in that position since
10  January 2022?
11     A   I don't remember Jenna's start dates.
12     Q   Okay.
13     A   We have had a recruiter, I just don't
14  remember if she was hired, she's a more recent hire.
15     Q   In addition to a recruiter, are applicants
16  able to apply for employment with Waterstone through
17  some other means?
18     A   Yes.
19     Q   How can they apply?
20     A   So applicants can apply online through our
21  careers website, on our Waterstone Mortgage internet
22  page; there's a career section.

Page 32

1      Q   Is the process for hiring the same for
2  individuals who are recruited and for individuals who
3  also apply through your online portal?
4      MS. KREITER:  Object to the form.
5      THE WITNESS:  Yeah.  Could you be more
6  specific?
7  BY MS. WALTER:
8      Q   Sure.  So when the recruiter at Waterstone
9  is attempting to recruit an individual for employment,
10  what happens after that potential applicant has been
11  identified?
12     MS. KREITER:  Object to the form.
13     THE WITNESS:  Yeah.  Could you be more
14  specific?
15  BY MS. WALTER:
16     Q   Okay.  Let's start with if someone applies
17  through your website, what happens -- what is the next
18  step after an applicant applies?
19     A   It depends.  So it depends on the role that
20  they're applying for.  So it may be that Jenna reviews
21  their resume, it may be that she interviews them, it
22  may be that she sends it to a hiring manager.  It --

Page 33

1  it -- so it depends on what the role is, it depends on
2  what the activity is for that role.  So it --
3      Q   Does -- excuse me.  I'm sorry.
4      A   No, that's okay.  It's different depending
5  on what's going on with individual roles.
6      Q   Okay.  Does Waterstone have policies or
7  procedures that pertain to the hiring of individuals?
8      A   Yes.
9      Q   Are they documented?
10     A   Yes.  We have a policy about employment
11  eligibility, that documents -- and I don't -- I'm not
12  going to say the words "properly, explicitly," about
13  what the policy is, but it does govern our background
14  check process and our hiring.
15     Q   Okay.  So after an applicant applies the
16  resume is reviewed, they go through whatever
17  applicable process there is, they receive a -- an
18  offer letter.  Who approves that offer letter?
19     A   It depends.  Typically, a hiring manager.
20     Q   How many hiring managers are there at
21  Waterstone?
22     A   I -- I don't know that I know that number.

9 (Pages 30 - 33)

1  I don't -- it -- I don't know that I know that number.
2      Q   Do you oversee the hiring managers?
3      A   No.
4      Q   Is there one person who oversees the hiring
5  managers?
6      A   No.  The hiring managers are all our
7  managers within the company, could be considered a
8  hiring manager.
9      Q   Okay.
10     A   If any manager has an opening within their
11  team they're considered a hiring manager.
12     Q   Okay.  I am going to turn to our -- to talk
13  about some of the exhibits.
14         MS. WALTER:  Maria, I think your office
15  was able to access them, do you --
16         MS. KREITER:  Yes, they were.  Yep.
17         MS. WALTER:  Okay.
18         MS. KREITER:  We do.
19         MS. WALTER:  Okay.
20  BY MS. WALTER:
21     Q   So if we can turn to the first exhibit that
22  was pre-marked "1," WMC004569 to WMC003570.

1         (Exhibit 1 was marked for
2          identification.)
3         Ms. Spragg, take your time to take a look at
4  these documents as I ask you about them.  And I will
5  just walk through some of these questions.
6         Do you recognize this document?
7      A   Yes.
8      Q   What is this document?
9      A   It is an email.
10     Q   It's an email dated April 11, 2022, that you
11  sent to C. Wolf, Michael Smalley, and Melanie Piscke
12  Ferrara; is that correct?
13     A   Correct.
14     Q   Okay.  In this email you state that it was
15  great to meet Chris.  Who is Chris?
16     A   Chris Wolf.
17     Q   Here you state "it was great to meet you."
18  Do you remember where you first met him?
19     A   I believe there was a meeting preceding this
20  email.
21     Q   Was that meeting in person?
22     A   No.  Zoom.

1      Q   Who was at that meeting?
2      A   I don't remember all the people at that
3  meeting.
4      Q   Were there a lot of people there?
5      A   Again, I don't -- I don't remember exactly
6  who was all at that meeting.
7      Q   Do you remember how long the meeting was?
8      A   I do not.
9      Q   Do you remember what the purpose of the
10  meeting was?
11     A   Yes.  We were reviewing the steps of what
12  happens once an offer is made: For an offer letter to
13  go out, for background checks to go out, what the
14  steps are once an employee has accepted an offer, to
15  do -- they may have an employment agreement that also
16  needs to be executed.
17         What the first day would look like: going
18  through HR orientation, NMLS, talking about employee
19  benefits.  We reviewed all of that information.
20     Q   Where was Mr. Wolf working at the time that
21  you had this meeting with him?
22     A   Mutual of Omaha.

1      Q   Why were you meeting with Mr. Wolf to talk
2  about the pre-employment, as you just described, when
3  Mr. Wolf was working at Mutual at the time?
4      A   We often talk to, when candidates and people
5  want to join Waterstone Mortgage and they're going
6  through the process of vetting Waterstone Mortgage as
7  a future employer, we often talk to candidates while
8  they're employed somewhere else.
9      Q   On the email you also include Michael
10  Smalley.  Who is Mr. Smalley?
11     A   Mike Smalley is a leader -- a regional
12  leader of our east division.
13     Q   How long have you known him?
14     A   Only since working at Waterstone.
15     Q   What was -- okay, you had already described
16  what his role was.
17         Why did you include him on this email?
18     A   Because he's part of the team that was
19  ultimately our Ormond Beach and Tampa group report, up
20  through our regional east division.
21     Q   So is it fair to say that Mr. Smalley would
22  have been responsible for the departed employees who

Page 38

1  would be joining Waterstone?
2          MS. KREITER:  Object to the form.
3          THE WITNESS:  What -- can you ask that
4  again?
5  BY MS. WALTER:
6      Q   Sure.  So why did you include Mr. Smalley on
7  this email again?
8      A   He's ultimately as a regional -- the
9  regional east leader, a leader that was ultimately
10  going to have this branch report to him.
11      Q   "This branch" being -- can you be more
12  specific?
13      A   So at -- when we were looking to start a new
14  branch in the Florida area he would have been the
15  leader, he's the leader in east division.  So anytime
16  we're hiring for the east division he's potentially
17  involved.
18      Q   So through this email with Mr. Wolf was
19  Waterstone looking to create a new branch?
20      A   You know, we're often looking to create new
21  branches.  So when we talk to business leaders, yes,
22  when we're -- we're talking out there in the

Page 39

1  marketplace to candidates, we could be talking about a
2  new branch or we could be talking about individual
3  positions.  So it -- it depends on the candidate, it
4  depends on what's going on with the business.  But we
5  often could be looking to do either.
6      Q   Okay.  You also include
7  Melanie Piscke Ferrara.  And I don't believe I've been
8  saying her name correct, so if there's a different way
9  of pronouncing it please let me know.  It -- how do
10  you say her name?
11      A   Yeah.  It's Melanie Ferrara.
12      Q   Okay.  That's fine.
13          Who is Ms. Ferrara?
14      A   So Melanie Ferrara, I'm not positive about
15  her official job title, but she is an operations
16  manager of sorts for the Winter Park group.
17      Q   Just taking a step back from talking about
18  this particular email.  When you refer to these
19  different branches and these different groups, can you
20  just give me a general idea of how many branches there
21  are at Waterstone?
22      A   Gosh, I don't know that I have the exact

Page 40

1  number at this moment 'cause we've been adding and
2  branches come and go.  So we have approximately 30
3  branches across the U.S.
4      Q   And you had mentioned Winter Park branch, I
5  believe.  And where is -- can you just say --
6      A   Yes, I -- yes.
7      Q   No.  That's okay.
8          Where is Winter Park located?
9      A   So Winter Park is in Winter Park, Florida.
10      Q   What office do you currently work out of?
11      A   I work out of the Pewaukee, Wisconsin
12  office, corporate office.
13      Q   Going back to Ms. Ferrara, how long have you
14  known her?
15      A   Only since I've worked here.
16      Q   Why did you include Ms. Ferrara on this
17  email?
18      A   I was instructed to do so.
19      Q   Who instructed you to do that?
20      A   Dustin Owen.
21      Q   Who is Dustin Owen?
22      A   Dustin Owen is another regional -- east

Page 41

1  regional manager.
2      Q   How long have you known Mr. Owen?
3      A   Could you ask that again?
4      Q   How long have you known Mr. Owen?
5      A   Mr. Owen.  Since I worked here.
6      Q   What is Mr. Owen's current role at
7  Waterstone?
8      A   His current role is divisional east leader.
9      Q   Okay.  Going back to the email.  In here you
10  state that you're "excited to start working with Mr.
11  Wolf and the group."  Who is the group to which you
12  are referring there?
13      A   I am referring to Chris and there was a
14  group of individuals who had communicated their desire
15  to be employed by Waterstone Mortgage.
16      Q   Who are those individuals?
17      A   I don't know their names off the top of my
18  head.
19      Q   Do you know who those individuals
20  communicated their interests to, to join Waterstone?
21      A   I do not.
22      Q   Do you also -- well, in that same sentence

11 (Pages 38 - 41)

Page 42

1  you say you're "excited to start working with you and
2  the group." What did you mean by "start working" with
3  them?
4      A   Well, as employees accept offers they begin
5  to work with the human resources team on background
6  checks and onboarding of employment benefits, get on
7  our payroll, that process.
8      Q   You also, in the third paragraph you state
9  "under separate cover I will send a template of the
10  email which everyone will receive about starting their
11  background check and the application." Who do you
12  mean when you say "everyone"?
13     A   Those employees that have indicated their
14  desire to join Waterstone Mortgage.
15     Q   What was included on the template of the
16  email that you planned to send to Mr. Wolf?
17     A   It was an email that the HR team, after
18  talking to the individuals that decide to join
19  Waterstone Mortgage -- if I remember correctly it was
20  a email that just stated that they needed to complete
21  their background check and the next steps in the
22  process.

Page 43

1      Q   Do you remember who drafted that template?
2      A   It may have been me, I don't remember.
3      Q   What -- so you mentioned at the time you had
4  sent this email, Mr. Wolf was employed at Waterstone;
5  is that correct? Or, excuse me, at Mutual of Omaha?
6      A   Yes, I believe he was.
7      Q   Why did you intend to send Mr. Wolf a
8  template of that email?
9      A   Just sharing what -- what someone, including
10  him, would see from the human resources team, as an
11  email that the HR team what -- would send to an
12  individual who expresses interest in joining
13  Waterstone Mortgage.
14     Q   Do you remember whether Mr. Wolf ever
15  provided any feedback on that template?
16     A   I don't believe he did.
17     Q   Okay. All right. Let's go to what was
18  pre-marked as Exhibit 2, Bates WMC000741, WMC000745.
19         (Exhibit 2 was marked for
20         identification.)
21         THE WITNESS: Okay.
22  //

Page 44

1  BY MS. WALTER:
2      Q   Okay. Let's start at the -- what's going to
3  be the back of your document, page Bates number
4  WMC000744 to WMC000745. Do you see that?
5      A   Yes.
6      Q   Do you recognize this document?
7      A   Yes.
8      Q   What is it?
9      A   It is an email from me to Jen Witon and
10  Melissa Wagner.
11     Q   Do you recall sending this email?
12     A   yes.
13     Q   Why did you include Ms. Witon on this email?
14     A   She was -- she may have been the recruiter
15  at the time. Jen -- Jenna may not have been hired yet
16  and Jen may have been in that role.
17     Q   Is Ms. Witon still employed at Waterstone?
18     A   Yes.
19     Q   Does she report to you?
20     A   No. She reports to Melissa Wagner.
21     Q   And why did you include Ms. Wagner on that
22  email?

Page 45

1      A   Because she reports to me.
2      Q   Is there any other reason why Ms. Wagner
3  would have been included?
4      A   She was responsible for human resources.
5      Q   Was she also responsible for the onboarding
6  of the departed employees?
7      A   She played a -- as the HR manager she had
8  oversight of the team that was responsible for
9  creating offer letters, running the background checks,
10  first-day orientation. That's her -- part of her
11  role.
12     Q   Okay. So in looking at this email it looks
13  like there's a blank salutation, it says "hi, blank."
14  So can you just explain what the purpose of this email
15  was that you had sent?
16     A   Yes. So this was just to create for Melissa
17  and Jen, as they were talking to anyone who had
18  indicated a desire to join Waterstone Mortgage. We
19  wanted to create a consistent experience across that
20  group.
21     Q   How would Jen and Melissa have become aware
22  of anyone who was indicating interest to join

1  Waterstone?
2      A   Well, interest can come in from various
3  points.
4      Q   Is this a standard template that Waterstone
5  uses?
6      A   No.
7      Q   Does Waterstone have a standard template
8  that it uses?
9          MS. KREITER:  Object to the form.
10         THE WITNESS:  Yeah.  Can you be more
11 specific?
12 BY MS. WALTER:
13     Q   Sure.  So you said here this is not a
14 standard template that Waterstone uses.  So I'm asking
15 whether Waterstone has a standard template that they
16 send to individuals who indicate interest in joining
17 the company?
18     A   No.  Because individuals that indicate they
19 want to join the company can come in from various
20 places.  So they can come in from an application.
21 This is, you know, talking about, you know, getting
22 them to the application.

1      So, again, it depends on where a candidate
2  comes in at the process.  So that's why there's not
3  necessarily a standard because you can come into the
4  process at various different points.
5      Q   Was this email drafted specifically for
6  employees who were at that time employed by Mutual?
7      A   No.
8      Q   Okay.  If you can please scroll up to the
9  April 11, 2022 email that you wrote to Mr. Wolf, at
10 WMC000743.
11     A   Okay.
12     Q   Do you recognize that email?
13     A   Yes.
14     Q   Do you remember sending that email?
15     A   Yes.
16     Q   In there you state that Ms. Wagner, Ms.
17 Witon would begin calling the first five -- or begin
18 calling five names which Mr. Wolf had provided "first
19 thing in the morning."  Do you remember who those five
20 names were?
21     A   I don't remember those five names right now.
22     Q   What -- why would Ms. Wagner and Ms. Witon

1  have called those individuals?
2          MS. KREITER:  Object to the form.
3          THE WITNESS:  Yeah.  Can you be more
4  specific?
5  BY MS. WALTER:
6      Q   I'm sorry.  I froze up, I'm not sure if you
7  said anything there.
8      A   Be more specific with your question.  I
9  didn't -- I don't understand.
10     Q   Sure.  So you say here "Melissa Wagner and
11 Jen Witon from the HR team will begin calling the five
12 names which you gave us first thing in the morning."
13 Why would Melissa Wagner and Jen Witon from the HR
14 team have begun calling those five names?
15         MS. KREITER:  Object to the form.
16         THE WITNESS:  So we were given those
17 five names to begin -- because they had expressed
18 interest in being hired by Waterstone Mortgage.  So we
19 were beginning the process for them to do applications
20 and background checks because we were told they
21 expressed interest.
22 //

1  BY MS. WALTER:
2      Q   Okay.  You also state that other individuals
3  -- in this second paragraph you state that other
4  individuals can get started with the process by
5  emailing that email address and stating that they are
6  with the Ormond Beach team.  Who was the Ormond Beach
7  team?
8      A   We -- that was to indicate for us to make
9  sure that we understood -- we get a lot of emails and
10 so we wanted to make sure we understood anybody
11 expressing interest we had a way to delineate them
12 from other emails.  And so this was purely words we
13 picked so that we knew that it was individuals that
14 wanted to be considered/
15     Q   Where were those individuals employed?
16     A   They could have been employed from anywhere.
17     Q   But you specifically said that you wanted to
18 delineate them, who is the "them" that you were
19 referring to there?
20     A   Any candidates that wanted to express
21 interest in coming on board to Waterstone Mortgage, to
22 be in the future, to be a part of a team that would

1 eventually be at Ormond Beach.

2    Q   At the time was there an Ormond Beach

3 branch?

4    A   No.

5    Q   Why would -- if there was no Ormond

6 branch -- Ormond Beach branch at that time, why would

7 you have referred to that branch as Ormond Beach?

8         MS. KREITER:  Object to the form.

9         THE WITNESS:  Yeah.  Can you be more

10 specific on what you mean by that?

11 BY MS. WALTER:

12    Q   Sure.  So you say that you would like them

13 to send an email to this email address with the

14 message that states they are with the Ormond Beach

15 team.  But at the time the Ormond Beach branch did not

16 exist; correct?

17    A   Correct.

18    Q   So where did the term "Ormond Beach team"

19 come from?

20    A   That was simply words that I had -- to that

21 they could indicate that we needed to think about them

22 differently than any other emails that were coming

1 into the HR team.

2    Q   What was your role in working with the

3 inquiries into the Ormond Beach team?

4         Let me back up.

5    A   Yeah.

6    Q   I'll rephrase that.  For applicants -- for

7 individuals who applied and were currently employed at

8 that time, at Mutual, was the intention that those

9 individuals would become the Ormond Beach team?

10    A   Can you repeat your question?

11    Q   For the individuals who were applying, who

12 at that time were employed by Mutual, was the

13 intention that those individuals would establish the

14 Ormond Beach team?

15    A   Yes.

16    Q   Okay.  If you scroll up to the email from

17 April 12th, from Mr. Wolf to yourself, at the bottom

18 of WMC000742.

19    A   Yes.

20    Q   Okay.  Mr. Wolf says "here is our full

21 roster."  Do you see that?

22    A   Yes.

1    Q   Do you recall receiving that email?

2    A   Yes.

3    Q   Do you remember reviewing the full roster?

4    A   Yes.

5    Q   What sort of information was included on the

6 roster?

7    A   Oh, I don't remember specifically everything

8 that was on there, generally it was names of

9 individuals who had expressed interest in Waterstone

10 Mortgage.

11    Q   Why did Mr. Wolf give you this roster?

12    A   Many times when we're working with hiring

13 individuals in the mortgage industry and we hire on a

14 lot of people at once, it's helpful that information

15 comes in in a consolidated manner.  So that we can

16 execute on offer letters and -- and keep information

17 straight versus everything coming in separate.

18         But we do take it separate, but sometimes we

19 take a roster.  So, again, it depends on the

20 situation.

21    Q   What did you do with the information once

22 you received the roster from Mr. Wolf?

1    A   We began to make offer letters.

2    Q   Do you know -- did all of the individuals

3 within that roster provide their consent to be

4 contacted by your team?

5    A   I don't know, but I was told yes.

6    Q   Who told you that?

7    A   I don't remember.

8    Q   And then if we scroll up to the first email,

9 WMC000741 -- actually, if we go down to the email --

10 on that first page with the email that you had sent

11 Mr. Wolf at 9:54 a.m.  Do you see that?

12    A   Correct.

13    Q   Do you remember sending that email?

14    A   Yes.

15    Q   So generally speaking, what sort of

16 information is required for you to put together an

17 offer letter?

18    A   Generally speaking I'll need name, job

19 title, pay information depending on the role,

20 different details around pay, if there's going to be a

21 commission; generally those details.

22    Q   And generally who provides you the

14 (Pages 50 - 53)

Page 54

1  information that should go within the offer letter?
2      A   It depends.  It can come from various
3  different sources.
4      Q   Why did you request compensation details
5  from Mr. Wolf?
6      A   I was instructed to ask him for these
7  details.
8      Q   Who instructed you to do that?
9      A   Dustin Owen.
10     Q   At the time that you requested this, Mr.
11 Wolf was -- was Mr. Wolf employed by Waterstone?
12     A   No.
13     Q   Why would a non-employee of Waterstone be
14 providing compensation information to new hires for
15 Waterstone?
16     A   Mr. Wolf was working with Dustin as -- and
17 partnering with Dustin as we began to make offers for
18 the future of this team.
19     Q   Were you ever involved with conversations
20 between Mr. Wolf and Mr. Owen?
21     A   I don't remember.
22     Q   Who was ultimately responsible for drafting

Page 55

1  the offer letters for the departed employees from
2  Mutual?
3      A   The HR team is ultimately responsible for
4  drafting offer letters, and then they are reviewed by
5  the business leaders, or that's our general practice.
6      Q   Okay.  Is there anyone else who would have
7  reviewed them?
8      A   Any offer letters could -- I mean,
9  potentially be reviewed by legal if we needed them to.
10     Q   Okay.  Exhibit -- let's look at the document
11 pre-marked as Exhibit 3, Bates number WMC004565 to
12 4568.
13         (Exhibit 3 was marked for
14         identification.)
15         THE WITNESS:  This is the -- the font
16 is really small on this one.
17         MS. WALTER:  I know, I know.  Sorry.  I
18 tried to make that bigger but it wasn't working.
19         THE WITNESS:  Right.
20         All right.
21         MS. WALTER:  Okay.
22 //

Page 56

1  BY MS. WALTER:
2      Q   You recognize this document?
3      A   I mean, my name is on it, I don't recall
4  this document.
5      Q   Sorry.  I froze again.  Can you --
6      A   That's okay.  My name is on this document,
7  but I -- I don't recall it.
8      Q   Do you have any reason to believe that you
9  would not have received this email?
10     A   No.
11     Q   So the only email -- for the record -- the
12 only email that you are included on in this document
13 is on WMC004565, the email from Ms. Ferrara sent
14 April 12th at 8:45.  Why do you believe Ms. Ferrara
15 added you to this email chain?
16     A   I don't know.
17     Q   Did you do anything with the information
18 that Ms. Ferrara had sent to you on this chain?
19     A   I don't believe so.
20     Q   Okay.  Exhibit 4, WMC006745 to WMC006748.
21         (Exhibit 4 was marked for
22         identification.)

Page 57

1          THE WITNESS:  Okay.
2  BY MS. WALTER:
3      Q   Do you recognize this document?
4      A   Yes.
5      Q   Do you recall sending these emails?
6      A   Yes.
7      Q   Do you recall receiving these emails as
8  well?
9      A   Yes.
10     Q   Okay.  Looking at your email sent on April
11 15th, 9:25 a.m., on WMC006746 --
12     A   Yes.
13     Q   -- you say, "I hope all is going well on
14 your end with folks giving notice.  I know this can be
15 a difficult step."  What did you mean by that?
16     A   Generally, it can be a difficult step for
17 people to resign.
18     Q   Generally speaking, why -- in your
19 experience why is it difficult for people to resign?
20     A   Sometimes -- I mean, generally, people find
21 it hard to resign.
22     Q   I'm not -- I -- that is not a trick

Page 58

1  question, I really --
2      A  I mean, I'm not trying -- sometimes it's
3  hard to tell people good-bye.
4      Q  Is there anything in particular about this
5  situation -- or, excuse me -- is there anything in
6  particular about your involvement with the departed
7  employees that would have made this particularly
8  difficult?
9          MS. KREITER:  Object to the form.
10         THE WITNESS:  Could you ask me that
11  again?
12  BY MS. WALTER:
13     Q  Sure.  Would you say every resignation is
14  difficult?
15     A  Not every, but I don't know about
16  everybody's feelings that's ever resigned ever, I --
17     Q  Did Mr. Wolf ever convey to you that
18  resignations here would be a difficult step?
19     A  No, not that I recall.
20     Q  Okay.  If you scroll up to WMC006745, you
21  say -- or the email, at 10:19 that you had written,
22  April 15th, on the first page.

Page 59

1      A  Okay.
2      Q  You say "certainly let us know if any
3  complications given" -- or, excuse me -- "around
4  giving notice."  Did Mr. Wolf ever inform you of any
5  complications around giving notice?
6      A  No, not that I recall.
7      Q  What would you or your team have done if
8  Mr. Wolf had told you there were complications around
9  giving notice?
10         MS. KREITER:  Object to the form.
11         THE WITNESS:  Yeah.  Can you be more
12  specific?
13  BY MS. WALTER:
14     Q  Sure.  So in your email you offer, or you
15  ask that Mr. Wolf inform you if there are
16  complications around giving notice.  What could you
17  have done if there were complications given around
18  providing notice?
19         MS. KREITER:  Object to the form.
20         THE WITNESS:  Yeah.  I don't understand
21  what you're asking me.
22  //

Page 60

1  BY MS. WALTER:
2      Q  Why would you have asked Mr. Wolf to let you
3  know if there were complications around giving notice?
4      A  Potentially the start date wouldn't have --
5  would have had to have been pushed.
6      Q  Are there any other reasons?
7      A  There may be other that I can't think of
8  right now.  But there are situations where start dates
9  change as people give notice and various things happen
10  through the resignation notice, that potentially
11  people don't start as we would expect or as they've
12  communicated.  So start dates sometimes change.
13     Q  Okay.  Moving on to a document pre-marked as
14  Exhibit 5, WMC006922 to WMC006926.
15         (Exhibit 5 was marked for
16          identification.)
17         THE WITNESS:  Okay.
18  BY MS. WALTER:
19     Q  Okay.  Do you recognize this document?
20     A  Yes.
21     Q  What is it?
22     A  An email.  An email from me to a group,

Page 61

1  although the header only says to Chris.
2      Q  Do you remember who else would have been on
3  this email?
4      A  I -- I don't recall.
5      Q  Do you remember who the five new employees
6  were?
7      A  I don't remember their names.
8      Q  Do you know why they were -- strike that.
9          Who created this agenda?
10     A  I -- I don't remember.  I don't remember
11  specifically who created the agenda.
12     Q  Do you remember approximately when this
13  particular agenda was scheduled for?  So it says
14  "Friday's Agenda," do you remember approximately the
15  month and year for which this is referring?
16     A  Can you repeat that question again?
17     Q  Sure.  So it's a bit unclear as to when this
18  particular training and onboarding would have been
19  scheduled for.  Do you remember when it would have
20  been scheduled to take place?
21     A  I don't remember the specific date.
22     Q  Do you remember where it was scheduled to

16 (Pages 58 - 61)

1    take place?

2      A   I don't remember that either.

3      Q   Did you attend this?

4      A   I did not.

5      Q   Here it says "Dustin -- Friday's agenda,

6    Dustin will be on site." Is "Dustin" referring to

7    Mr. Owen?

8      A   Yes.

9      Q   Why was Mr. Owen on site?

10     A   Because he's the regional -- he's division

11   leader.

12     Q   Okay. Moving on to Exhibit 6. Get that

13   one. WMC007911 to WMC007917.

14         (Exhibit 6 was marked for

15         identification.)

16         THE WITNESS: Okay.

17         MS. WALTER: Okay.

18   BY MS. WALTER:

19     Q   Do you recognize this document?

20     A   I don't necessarily remember it, but I'm on

21   it.

22     Q   Okay. We'll just focus on the email from

1    Mr. Owen on WMC007911, that's the only email that

2    you're included on in this particular document.

3      A   Okay.

4      Q   Do you recall receiving this email?

5      A   I don't recall.

6      Q   Do you have any reason to believe that you

7    did not receive this email?

8      A   No.

9      Q   Do you remember -- strike that.

10         Who are the 17 associates that Mr. Owen is

11   referring to in the first bullet point, where he says

12   "the 17 associates are today completing their

13   employment applications"?

14     A   I don't know their names.

15     Q   Do you know where those 17 associates were

16   employed previously?

17     A   I don't know their -- all 17's background.

18     Q   Okay. When Mr. Owen says "we have a team

19   flying from the home office to assist with the onboard

20   and to make the magic happen"; what did you understand

21   that to mean?

22     A   So for -- Dustin is referring to the HR team

1    that we had -- I don't remember if it was one or two,

2    I don't recall, people go down to do the first day

3    orientation. Which includes IT gets people laptops,

4    and then HR helps people with their NMLS, if they have

5    NMLS, then HR does orientation.

6      Q   Who was that orientation for?

7      A   For new hires on that day.

8      Q   Where were those new hires going to be

9    working?

10     A   I -- I don't know that from this.

11     Q   Would those new hires be working at the

12   Ormond Beach branch?

13     A   Again, I don't -- I don't know that from

14   this email.

15     Q   Did you fly to assist with the onboarding?

16     A   No.

17     Q   Do you know where the onboarding took place?

18     A   I don't recall.

19     Q   Okay. Moving on to Exhibit 7, WMC006174.

20         (Exhibit 7 was marked for

21         identification.)

22         THE WITNESS: At some point we're going

1    to take a break soon?

2         MS. WALTER: As soon as we're -- we get

3    through this exhibit I think we can take a five to

4    ten-minute break.

5         THE WITNESS: Okay. Thank you.

6         MS. WALTER: Sure.

7         THE WITNESS: Okay.

8    BY MS. WALTER:

9      Q   Do you recognize this document?

10     A   My name is on it, I'm not familiar with it.

11     Q   Do you recall receiving this invite?

12     A   I don't recall.

13     Q   Is there any reason to believe that you

14   would not have received it?

15     A   No.

16     Q   So if you take a look at this invite it

17   looks like it's for an onboarding event review for

18   Tampa. Do you recall attending that?

19     A   I don't recall, I may have.

20     Q   Is it standard for Waterstone to have

21   onboarding events like this?

22     A   Can you be more specific?

17 (Pages 62 - 65)

Page 66

1    Q   Sure.  So when Waterstone is onboarding the
2   employees, does Waterstone typically have an
3   onboarding event review events?
4    A   It depends.  Like I said, we have different
5   scenarios for different -- you know, if you're an
6   individual employee getting hired at an existing
7   branch, your -- you know, have a virtual onboarding.
8   If we're hiring for a branch where we have a bunch of
9   people all at once, we may do something where we get
10  people together.  It depends.
11   Q   For this particular Tampa branch do you
12  recall why there would have been an event scheduled?
13   A   Again, I believe it was several people so we
14  do do onboarding and hiring of several people together
15  in a group.  Dustin characterizes it as an event, I
16  don't -- we don't generally call it an event, it's
17  your first day, it's the activities on your first day.
18   Q   Okay.
19       MS. WALTER:  I think we can take a
20  break right now, five to ten minutes -- I mean, five
21  or ten minutes, is that okay -- ten minutes?
22       MS. KREITER:  Yeah.

Page 67

1       MS. WALTER:  Okay.
2       MS. KREITER:  Sure.
3       Do you have a sense, Courtney -- and
4   I'm not looking to hold you to it -- but just, you
5   know, ballpark how much time you have to --
6       MS. WALTER:  Thirty -- thirty minutes;
7   thirty, forty-five minutes.
8       MS. KREITER:  Okay.  Forty-five?
9       MS. WALTER:  Yeah.
10      MS. KREITER:  We'll be back in ten.
11      MS. WALTER:  Okay.  Thank you.
12      THE REPORTER:  We're off the record at
13  11:29 a.m. Eastern, 10:29 a.m. Central.
14      (Off the record.)
15      THE REPORTER:  Here we go.  We are back
16  on the record at 11:41 a.m. Eastern, 10:41 a.m.
17  Central.
18  BY MS. WALTER:
19   Q   Okay.  Let's take a look at the document
20  pre-marked as Exhibit 8, Bates number WMC008938 to
21  WMC008942.
22  //

Page 68

1       (Exhibit 8 was marked for
2       identification.)
3       MS. KREITER:  This is "8," Courtney?
4       MS. WALTER:  Yes.
5       The font on this is small again so I
6   apologize.
7       THE WITNESS:  Okay.
8       MS. WALTER:  Okay.
9   BY MS. WALTER:
10   Q   Do you recognize this document?
11   A   Yes, I'm on it.
12   Q   For the record, I actually don't believe
13  you're included on this particular --
14   A   I'm not?
15   Q   No.
16   A   Okay.  Sorry, I --
17   Q   Have you ever seen -- have you ever seen
18  this document -- excuse me.  Sorry.  Go ahead.
19   A   No.  I just confused it with another one
20  that was talking about -- I was on a different string
21  talking about the network.  That's all.
22   Q   Okay.  Let's first move down to the email on

Page 69

1   WMC008941, from Ms. Ferrara to a group of individuals,
2   on June 10, 2022.
3   A   Okay.
4   Q   Are you familiar with the onboarding
5   meetings that Ms. Ferrara discusses in this email?
6   A   I believe so.
7   Q   Did you attend the June 16th to 17th Tampa
8   onboarding meetings?
9   A   No.
10   Q   What was the purpose of those meetings?
11   A   I don't -- I don't know that I know the full
12  agenda.  Certainly there is an HR piece, in which HR
13  does its orientation and gets employees on NMLS,
14  reviews benefits, that type of information.
15   Q   Who was the audience for these meetings?
16   A   New hires that were scheduled.
17   Q   Were these new hires all employed at Mutual?
18   A   I don't know.
19   Q   Okay.  Let's move up to the email dated June
20  10, 2022, from Brian Wesselhoff, it's on -- it's at
21  the bottom of WMC008939 and continues on 008940.
22   A   Okay.

18 (Pages 66 - 69)

Page 70

1    Q   First, who is Brian Wesselhoff?

2    A   Brian Wesselhoff, at the time, I believe he

3    was our VP of IT, he is currently our CIO.

4    Q   At the time did you work closely with

5    Mr. Wesselhoff?

6    A   Yes.

7    Q   In what capacity would his department have

8    interacted with the human resources department at the

9    time of that email?

10       MS. KREITER:  Object to the form.

11       THE WITNESS:  Yeah, can you be more

12   specific?

13   BY MS. WALTER:

14   Q   Sure.  So you said Mr. Wesselhoff was in

15   charge of IT at that time, or worked in the IT

16   department.  And these meetings were provided to new

17   hires.  Why would Mr. Wesselhoff's IT department have

18   been involved in these HR meetings?

19   A   Well, they're not HR meetings.  HR, as I

20   stated, that's a piece of the meetings.  IT also gets

21   -- is a part of giving employees their laptops, so

22   they do that portion where a new employee would get a

Page 71

1    laptop and they meet with -- potentially meet with a

2    IT professional to review how to get -- login their

3    passwords, try to get to Outlook, our basic systems at

4    Waterstone Mortgage.

5    Q   Okay.  Do you know if the June 16th and 17th

6    trainings were intended to be in person or were they

7    intended to be held virtually?

8    A   I believe they were in person.

9    Q   Where were they to be held in person?

10   A   I actually don't know specifically where

11   those meetings were held.

12   Q   Okay.  Do you see where Mr. Wesselhoff asks

13   this large group of people, "do we have confidence

14   that whatever network WIFI internet that is in the

15   office will be available and accessible without

16   interruption from Mutual of Omaha, to do this

17   training"?

18   A   I see that.

19   Q   Why would the training have needed to be

20   accessible -- let me rephrase that.

21       Why would Mutual of Omaha have been able to

22   interrupt this training?

Page 72

1    A   Well, I believe there was consideration of

2    the location that we did training.  And my

3    understanding is that Mr. Smith had the lease of the

4    location and, therefore, I believe Brian was just

5    asking who was in control of the network.  I believe

6    it was a simple question.

7    Q   What was that -- where was that location?

8    A   Again, I -- I don't know the address.

9    Q   And who was in control of that location?

10       MS. KREITER:  Object to the form.

11       THE WITNESS:  Yeah, I don't know.

12   BY MS. WALTER:

13   Q   In that email Mr. Wesselhoff also says, the

14   last sentence in the secondo paragraph, says, "be

15   prepared, we may need to pivot if Mutual cuts off

16   access to internet or network devices."  Do you see

17   that?

18   A   Yes, I see that.

19   Q   What do you -- based on your reading of that

20   what do you think Mr. Wesselhoff meant by "we may need

21   to pivot if Mutual cuts off access to internet or the

22   network devices"?

Page 73

1        MS. KREITER:  Object to the form.

2        THE WITNESS:  I don't know what he

3    meant.

4    BY MS. WALTER:

5    Q   Were the new hires, who were attending this

6    onboarding, where were they located?

7    A   What do you mean?

8    Q   Do you recall where this onboarding

9    happened?

10   A   No.

11   Q   -- or where this was located?

12   A   No.

13   Q   Okay.  Okay.  Moving up to the email from

14   Dustin Owen, on June 10, 2022, to this large group of

15   individuals.  Do you see this email, WMC008938?

16   A   Yes.

17   Q   Okay.  In that email Mr. Owen discusses

18   having some core members of the team, four to six

19   associates, work out of the Winter Park branch June

20   20th to 22nd.  Do you see that?

21   A   I see that.

22   Q   Do you know who the core members of the team

19 (Pages 70 - 73)

Page 74

1 were?

2    A  I don't know.

3    Q  Why do you think Mr. Owen and Mr. Smith

4 would have wanted four members of the team working out

5 of the Winter Park branch?

6    A  I don't know.

7    Q  Okay.  Moving on to Exhibit 9, WMC009212 to

8 WMC009215.

9            (Exhibit 9 was marked for

10            identification.)

11        THE WITNESS:  All right.  Yes.

12 BY MS. WALTER:

13    Q  Do you recognize that?

14    A  Yes.

15    Q  Okay.  Let's first take a look at the

16 June 10th email from Mr. Wesselhoff to Thomas Knapp,

17 on page WMC009213, the email towards the bottom.

18        Who is Mr. Knapp, who is Thomas Knapp?

19    A  Tom Knapp, at the time, was the CIO at the

20 time.  He has since retired.

21    Q  Okay.  Do you see where Mr. Wesselhoff says,

22 "this is why WP should not be running these efforts,

Page 75

1 they don't think of the things that corp would be

2 concerned about"?

3    A  I do see that.

4    Q  What -- do you know what Mr. Wesselhoff

5 means by "WP"?

6    A  I believe he means Winter Park.

7    Q  Is that a branch of Waterstone?

8    A  Correct.

9    Q  Okay.  Do you know why Mr. Wesselhoff would

10 not have wanted Winter Park to run these efforts?

11        MS. KREITER:  Object to the form.

12        THE WITNESS:  I don't know what Brian

13 meant.

14 BY MS. WALTER:

15    Q  Okay.  Let's scroll up to your email at 3:44

16 p.m., on June 10th, WMC009212.

17    A  Yes.

18    Q  Do you remember sending this email?

19    A  Yes.

20    Q  In there you say that you and Kevin have

21 been texting about this and Kevin is working with

22 Dustin on this.  Who is the "Kevin" that you're

Page 76

1 referring to?

2    A  Kevin Allen.

3    Q  What was Mr. Allen's position?

4    A  Senior vice president of sales.

5    Q  What exactly were you and Mr. Allen texting

6 about?

7    A  I don't remember specifically, but about the

8 location, I believe.

9    Q  So in there --

10    A  And making -- sorry -- and making sure that

11 we had -- mostly making sure we had internet.  Because

12 we can't do -- HR can't do our steps without internet

13 at wherever, anybody, anywhere does HR work on day

14 one.

15    Q  Would you still have those text messages

16 between you and Mr. Allen?

17    A  Yes.

18    Q  So in that email you also note that your

19 team was also concerned about the location.  What were

20 your concerns?

21    A  If we didn't have internet we can't do many

22 of the things we do with employees on day one.

Page 77

1    Q  Why were you concerned you wouldn't have

2 internet?

3    A  For the reasons Brian is stating, that he's

4 making sure that we have the appropriate gear and

5 information there -- or gear and connectivity in that

6 location.

7    Q  Who was controlling that gear and

8 information in that -- at that location?

9    A  I don't know.

10    Q  Did Mutual of Omaha have control over that

11 location?

12    A  I don't know.

13    Q  Okay.  And then moving up to Mr. Rich

14 Harkwell's email to you, on June 10th, at five o'clock

15 p.m.  Do you see that?

16    A  Yes.

17    Q  Do you remember that email?

18    A  Yes.

19    Q  Okay.  Who is Mr. Rich Harkwell?

20    A  He is our senior vice president and chief

21 sales officer.

22    Q  Is he still at the company?

20 (Pages 74 - 77)

Page 78

1    A    Yes.

2    Q    Is he still in that current position?

3    A    Yes.

4    Q    In the email, Mr. Harkwell says, "my two

5    cents, I don't think it's a good idea to be operating

6    on the Mutual of Omaha network. I know we are

7    pursuing every option possible so hopefully this won't

8    be an option we have to consider." Do you see that?

9    A    I do see that.

10   Q    What was your understanding as to why it

11   wouldn't be a good idea, from Mr. Harkwell's

12   perspective, to operate on the Mutual of Omaha

13   network?

14        MS. KREITER: Object to the form.

15        THE WITNESS: Yeah. I don't know why

16   he wrote what he did or what he was thinking.

17   BY MS. WALTER:

18   Q    Were you aware at the time that Waterstone

19   intended to operate their onboarding through Mutual of

20   -- or, Mutual's internet, or -- let me back up, that

21   was a jumble.

22        At the time, were you aware that Waterstone

Page 79

1    intended to operate its training using Mutual of

2    Omaha's network?

3    A    No.

4    Q    Based on this email is it your understanding

5    that the intention was to operate the training using

6    Mutual of Omaha's network?

7    A    Based on this email it's our intention that

8    we needed network and internet -- or that we needed

9    internet connectivity to do first day activities.

10   Q    Would it matter -

11   A    That was our primary concern.

12   Q    Would it matter to you whose internet

13   connectivity you were using?

14   A    I don't know.

15   Q    Just given your experience in human

16   resources and your background, do you think it's

17   appropriate for a company to use another company's

18   internet connectivity to conduct its own business?

19        MS. KREITER: Object to the form.

20        THE WITNESS: Yeah. Could you be more

21   specific?

22   //

Page 80

1    BY MS. WALTER:

2    Q    Sure. Here Waterstone seemingly intended to

3    use Mutual of Omaha's network to conduct its own

4    training for Mutual employees. Would you agree with

5    that?

6    A    I don't -- no, I don't agree with that

7    characterization.

8    Q    Okay. So then why would Mr. Harkwell not

9    have thought it was a good idea to be operating on a

10   Mutual of Omaha network?

11        MS. KREITER: Object to the form, calls

12   for speculation.

13        THE WITNESS: Yeah, you'd have to ask

14   Mr. Harkwell.

15   BY MS. WALTER:

16   Q    Okay. Moving on to Exhibit 10, WMC009042 to

17   WMC009047.

18        (Exhibit 10 was marked for

19        identification.)

20        THE WITNESS: Okay.

21        MS. WALTER: Okay.

22   //

Page 81

1    BY MS. WALTER:

2    Q    Do you recognize this document?

3    A    Yes.

4    Q    Do you recall receiving these emails?

5    A    Yes.

6    Q    Let's first take a look at the email from

7    Ms. Ferrara, on WMC009045, dated June 10th, at 3:09.

8    A    Yes.

9    Q    She says, "please see Fred's request below

10   regarding his email, I'm not sure who's requesting

11   Fred at his Mutual address, but he'd like it stopped

12   asap." Who is Fred?

13   A    Fred Stalls.

14   Q    Do you know Mr. Stalls?

15   A    I do not.

16   Q    Have you ever met Mr. Stalls?

17   A    I do not believe I have.

18   Q    Do you know who would have contacted Fred at

19   -- or excuse me -- Mr. Stalls at his Mutual address?

20   A    I do not.

21   Q    Do you recall whether you ever contacted an

22   individual at their Mutual email address?

21 (Pages 78 - 81)

1    A    Can you be more specific?

2    Q    Sure.  Do you recall whether you ever

3 contacted an individual using their Mutual of Omaha

4 email address?

5    A    Not that I recall.

6    Q    Why do you think Mr. Stalls asked that his

7 Hotmail account be used as his email address?

8    A    I don't know, you'd have to ask him.

9    Q    Does Waterstone have a policy or procedure,

10 to your awareness, addressing whether an employee can

11 use their work email address for their own personal

12 use?

13    Q    I don't know.

14    A    Moving onto Exhibit 11, WMC006175.

15         (Exhibit 11 was marked for

16         identification.)

17 BY MS. WALTER:

18    Q    Do you recognize this document?

19    A    I recognize the format.

20    Q    Is this a standard format?

21    A    It's a format we use on occasion.

22    Q    What is the purpose of this standard format?

1         MS. KREITER:  Object to the form.

2 BY MS. WALTER:

3    Q    Let me -- what is this document?

4    A    This document is our general format for an

5 agenda.

6    Q    Specifically here, did you attend these

7 meetings on Junee 16th or June 17th?

8    A    No.

9    Q    Do you know who organized these events on

10 June 16th and June 17th?

11    A    I don't remember.

12    Q    Is it standard for Waterstone to have events

13 such as these on June 16th and June 17th for its new

14 hires?

15         I'll rephrase.  When would Waterstone have

16 an event for new hires?

17    A    We don't call them events, but we do do our

18 first day and second day of when a new employee starts

19 with us.  And it can be in person or it can be on

20 Zoom.  Depending again if we have many individuals in

21 one place, we may go and send a few individuals to be

22 with those employees at a specific location, if we

1 have several new hires.  It -- it expedites things.

2    And you don't recall where June 16th and

3 June 17th's orientations were held; correct?

4    A    I don't.

5    Q    During these training sessions -- or during

6 these -- I don't want to call them events, so during

7 these sessions does Waterstone provide hand-outs to

8 its attendees?

9    A    I -- I don't recall this one specifically.

10 There may be different sessions that we do do hand-

11 outs for some of our encompass training.  I don't

12 remember specifically.

13    Q    During these training sessions does your

14 team, the HR team specifically, do they provide any

15 sort of PowerPoint presentation?

16    A    Yes.  The HR orientation is generally led

17 through a PowerPoint, that we present to new hires.

18    Q    Okay.  I don't have any more questions about

19 the exhibits, I just have a few more questions and

20 then I'll be finished.

21         Do you recall when Waterstone completed the

22 onboarding of the departed employees from Mutual?

1    A    Can you repeat that?

2    Q    Sure.  Let me just refresh that I'm

3 referring to the departed employees from Mutual that

4 are at issue in the lawsuit.

5         So do you recall when Waterstone completed

6 the onboarding and the -- those departed employees

7 became full employees of Waterstone?

8    A    Do I remember the specific dates of those?

9 No, I don't recall all of them.

10    Q    Can you -- do you know the approximate

11 dates?

12    A    April through June, I believe.

13    Q    Were the starting dates for those employees

14 staggered?

15    A    We had various employees starting at

16 different dates, as we often have employees starting

17 on various dates?

18    Q    Okay.  To your knowledge have any of those

19 employees who joined Waterstone from Mutual, have they

20 -- have any of them since left Waterstone?

21    A    Oh, I don't know that.

22    Q    Have any of them suffered any sort of

Page 86

1  disciplinary action?

2      A    Not to my knowledge -- or, and I don't know.

3      Q    Were you aware of any employment agreements

4  between the Mutual employees and Mutual of Omaha?

5      A    Could you just repeat that for me?

6      Q    Sure.  Were you aware of any employment

7  agreements between the Mutual employees and Mutual of

8  Omaha?

9      A    No.

10     Q    Does Waterstone have employment agreements

11  with its employees?

12     A    We have some, yes.

13     Q    Did you sign one?

14     A    No.

15         MS. WALTER:  I don't have any further

16  questions.

17         MS. KREITER:  Nothing here.  Thank you.

18         I guess logistics, Allison, I -- I

19  would like a condensed PDF with the exhibits attached.

20         THE REPORTER:  Okay.  And that will

21  conclude today's deposition.  We are now off the

22  record at 12:08 p.m. Eastern, 11:08 a.m. Central.

Page 87

1          (Signature reserved.)

2          (Whereupon, at 12:08 p.m. EDT/11:08

3          a.m. CDT, the proceeding was

4          concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 88

1          CERTIFICATE OF DEPOSITION OFFICER

2          I, ALLISON DIERCKS, the officer before whom

3  the foregoing proceedings were taken, do hereby

4  certify that any witness(es) in the foregoing

5  proceedings, prior to testifying, were duly sworn;

6  that the proceedings were recorded by me and

7  thereafter reduced to typewriting by a qualified

8  transcriptionist; that said digital audio recording of

9  said proceedings are a true and accurate record to the

10  best of my knowledge, skills, and ability; that I am

11  neither counsel for, related to, nor employed by any

12  of the parties to the action in which this was taken;

13  and, further, that I am not a relative or employee of

14  any counsel or attorney employed by the parties

15  hereto, nor financially or otherwise interested in the

16  outcome of this action.

17          ALLISON DIERCKS

18          Notary Public in and for the

19          Commonwealth of Virginia

20

21  [X] Review of the transcript was requested.

22

Page 89

1          CERTIFICATE OF TRANSCRIBER

2          I, KATHRYN MACHOL, do hereby certify that

3  this transcript was prepared from the digital audio

4  recording of the foregoing proceeding, that said

5  transcript is a true and accurate record of the

6  proceedings to the best of my knowledge, skills, and

7  ability; that I am neither counsel for, related to,

8  nor employed by any of the parties to the action in

9  which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13

14

15          KATHRYN MACHOL

16

17

18

19

20

21

22

23 (Pages 86 - 89)

Page 90

1  Maria Kreiter, Esquire
2  mkreiter@gklaw.com
3       April 24, 2023
4  RE: Mutual Of Omaha Mortgage v. Waterstone Mortgage Corporation
5  4/6/2023, Elizabeth Spragg (#5810076)
6    The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

Page 91

1  Mutual Of Omaha Mortgage v. Waterstone Mortgage Corporation
2  Elizabeth Spragg (#5810076)
3    E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Elizabeth Spragg       Date
25

Page 92

1  Mutual Of Omaha Mortgage v. Waterstone Mortgage Corporation
2  Elizabeth Spragg (#5810076)
3     ACKNOWLEDGEMENT OF DEPONENT
4    I, Elizabeth Spragg, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11  _____  _____
12  Elizabeth Spragg       Date
13  *If notary is required
14    SUBSCRIBED AND SWORN TO BEFORE ME THIS
15  _____ DAY OF _____, 20___.
16
17
18  _____
19  NOTARY PUBLIC
20
21
22
23
24
25

24 (Pages 90 - 92)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.