# **EXHIBIT BB**

Page 1

1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                           TAMPA DIVISION
3                    CASE NO.:   22-CV-01660
4

     MUTUAL OF OMAHA MORTGAGE, INC.,

5
                            Plaintiff,
6        vs.
7        WATERSTONE MORTGAGE CORPORATION,
8                           Defendant.
         _____/
9
10
11                   VIDEOTAPED DEPOSITION OF
12                      CHRISTOPHER SMITH
13
14
                          Pages 1 through 206
15
16                       Friday, June 16, 2023
                         9:07 a.m. - 12:45 p.m.
17
18                   Gunster Yoakley & Stewart, P.A.
                     401 East Jackson Street, Suite 1500
19                      Tampa, Florida 33602
20
21
22
23
24                   Stenographically Reported By:
25                   Denise Sankary, RPR, RMR, CRR

Page 2

```
 1  APPEARANCES:
 2
    On behalf of Plaintiff:
 3
       MITCHELL SANDLER, LLC
 4     1120 20th Street N.W., Suite 725
       Washington, D.C. 20036
 5     202-886-5292
       BY:  ARI KAREN, ESQUIRE
 6     akaren@mitchellsandler.com
       BY:  COURTNEY WALTER, ESQUIRE
 7      (via video teleconference)
       cwalter@mitchellsandler.com
 8
 9
10  On behalf of Defendant:
11     GODFREY KAHN S.C.
       833 East Michigan Street, Suite 1800
12     Milwaukee, WI 53202
       414-287-9466
13     BY:  MARIA KREITER, ESQUIRE
       mkreiter@gklaw.com
14
15
16
17  ALSO PRESENT:
18     Nick de Haas, Videographer
19     Stephanie Ziebell, In-house Counsel for
       Waterstone Mortgage Corporation
20      (via video teleconference)
21
22
23
24
25
```

Page 4

```
 1   8   05/25/22 E-mail from Rick Palmer to     201
         Lucas Van Dame Subject:  Mutual of
 2       Omaha Mortgage - Update MOM-0001218 -
         MOM-0001219
 3
     9   06/08/22 - 06/09/22 E-mail string        202
 4       between Chris Wolf, Cody Lamb and
         others Subject:  McIntosh
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1           I N D E X
 2
    Examination               Page
 3
    CHRISTOPHER SMITH
 4
    Direct       By Mr. Karen        7
 5  Cross        By Ms. Kreiter    188
    Redirect     By Mr. Karen      194
 6
    Certificate of Oath           205
 7  Certificate of Reporter       206
 8
 9         E X H I B I T S
10  No.                           Page
11  1   01/10/22 E-mail from Chris Wolf to      22
        Dustin Owen with attachment WMC006263
12      - WMC006271
13  2   01/31/22 E-mail from Dustin Owen to    116
        Dwayne Hutto and others Subject:
14      Thank you! WMC007376 - WMC007377
15  3   03/03/22 E-mail string between Dwayne  126
        Hutto and Dustin Owen with
16      attachments
17  4   List of names prepared by Mr. Karen   156
18  5   11/30/18 Mutual of Omaha Mortgage      161
        Loan Originator Employment Agreement
19
    6   Waterstone Mortgage Corporation       175
20      Producing Branch Manager Employment
        Agreement WMC011415 - WMC011436
21
    7   06/02/22 Letter from Jen Witon to      190
22      Tony Bertolotti WMC010639 - WMC010642
23
24
25
```

Page 5

```
 1  The following proceedings began at 9:07 a.m.:
 2       THE VIDEOGRAPHER:  Good morning.  We are
 3  going on the record at approximately 9:07 a.m.
 4  on June 16 of 2023.  Please note that the
 5  microphones are sensitive and may pick up
 6  whispering and private conversations.
 7       This is Media Unit Number 1 of the
 8  video-recorded deposition of Christopher Smith
 9  taken by counsel for the plaintiff in the
10  matter of Mutual of Omaha Mortgage Incorporated
11  versus WaterStone Mortgage Corporation.  This
12  case is filed in the United States District
13  Court for the Middle District of Florida, Tampa
14  Division.  This is Case Number 22-CV-01660.
15  The location of this deposition is the offices
16  of Gunster, Yoakley & Stewart at 401 East
17  Jackson Street, Suite 1500 in Tampa, Florida
18  33602.
19       My name is Nick de Haas, I'm the
20  videographer with Veritext.  The court reporter
21  is Denise Sankary, also with Veritext.
22       Will counsel please state their
23  appearances for the record, beginning with
24  plaintiff's counsel here in the room in Tampa.
25       MR. KAREN:  Ari Karen from Mitchell
```

Page 6

1 Sandler on behalf of Mutual of Omaha Mortgage.
2      THE VIDEOGRAPHER:  Go ahead, Counsel.
3      MR. KAREN:  Courtney?
4      MS. WALTER:  Courtney Walter, also here
5 from Mitchell Sandler on behalf of the
6 plaintiff.
7      MS. KREITER:  Maria Kreiter from Godfrey &
8 Kahn, S.C. on behalf of WaterStone.  Also on
9 appearing via Zoom, Stephanie Ziebell from
10 WaterStone.
11      THE VIDEOGRAPHER:  Will our court reporter
12 please swear in our witness, and we can
13 proceed.
14      THE COURT REPORTER:  Mr. Smith, would you
15 raise your right hand, please?
16      Do you swear the testimony you're about to
17 give today will be the truth, the whole truth,
18 and nothing but the truth?
19      THE WITNESS:  Yes.
20      THE COURT REPORTER:  Thank you.
21
22
23
24
25

Page 7

1 Thereupon:
2          CHRISTOPHER SMITH
3 having been first duly sworn, was examined and
4 testified as follows:
5          DIRECT EXAMINATION
6 BY MR. KAREN:
7    Q.  Good morning, Mr. Smith.
8    A.  Hello.
9    Q.  First of all, before we get into this,
10 have you ever taken a deposition before?
11    A.  I have not.
12    Q.  Okay.  Have you ever been a witness in a
13 case before?
14    A.  No.
15    Q.  Okay.  So this is the first time you've
16 testified?
17    A.  Yep.
18    Q.  Okay.  Have you ever been a party in a
19 case that's testified?
20    A.  No.
21    Q.  Okay.  All right.  So let me explain just
22 a little how this works.  First, a couple things
23 that are important are that, we have a court
24 reporter, she's taking everything down.  And so it's
25 important when you're answering a question not to go

Page 8

1 uh-huh or uh-uh or shake your head or nod your head,
2 only because that's hard for her --
3    A.  Sure.
4    Q.  -- obviously to take down.
5      The other thing that's very hard, it was
6 very difficult for everybody yesterday, is to
7 finish -- look, in general conversation, you
8 probably know what I'm about to ask and we typically
9 interrupt each other in a nice way and just, you
10 know, finish the question and answer for them,
11 right?  That's how we always talk to each other.
12    A.  Gotcha.
13    Q.  And in a deposition like this, it's super
14 important that you let me finish my question because
15 I have to create a record for the court.
16    A.  Uh-huh.
17    Q.  And if it cuts off and you answer, then
18 somebody could argue, well, you didn't finish that
19 question, right?  So it's super important, even
20 though you know what I'm going to ask, just let me
21 finish.  And I'll do the same kind of thing with
22 you.  We probably will do some of that because it's
23 just so normal, but if you could consciously try to
24 avoid that, it's just harder for her, and I've then
25 got to go and back and ask the question again --

Page 9

1    A.  Gotcha.
2    Q.  -- and get an answer anyhow.
3      So let's see.  Also you could take breaks
4 if you want.  Just let me finish asking or answering
5 -- just finish answering the question I asked.  So
6 you can't take a break while a question is pending.
7    A.  Got it.
8    Q.  But if one is finished.  Hopefully we
9 won't be here too, too long today, but, you know,
10 we'll see how it goes.
11      All right.  So with that, can you tell me
12 how long you've been in the mortgage business?
13    A.  Since 1993.  I've been managing mortgage
14 loan production offices for a lot of different
15 companies since 1998.
16    Q.  When you say managing for a lot of
17 companies since 1998, not simultaneously.
18    A.  Yeah.  Well, yeah, no.  So one company at
19 a time, yep.
20    Q.  Okay.  So you go from one company to the
21 next --
22    A.  Correct.
23    Q.  -- and to the next.
24    A.  Yep.
25    Q.  I don't necessarily need to go back all

3 (Pages 6 - 9)

Page 10

1 the way to 1998. If you can just tell me prior to
2 being employed by Mutual of Omaha Mortgage, you were
3 with Synergy One?
4    A. I believe Synergy One is owned by Mutual
5 of Omaha.
6    Q. Okay. So this is what I thought happened.
7 Mutual of Omaha, we're just going it call it Mutual,
8 is that okay?
9    A. Sure.
10    Q. Mutual purchased Synergy One?
11    A. To my understanding.
12    Q. Okay.
13    A. I don't know definitively though.
14    Q. Okay. What year was that around, 2018?
15    A. I don't know.
16    Q. Okay. But you were working for Synergy
17 One at that time?
18    A. When we joined -- we went to -- we
19 initially joined the group that we reported to the
20 leadership and it was BBMC Mortgage.
21    Q. Okay.
22    A. That's Jeff Gennarelli, Chris Leyden,
23 Brian Tomalak, Kiley King, all of those people were
24 at BBMC Mortgage, Bridgeview Bank Mortgage Company.
25    Q. Okay. And then --

Page 11

1    A. And then it became -- and then the
2 Bridgeview Bank we were told was being sold, and the
3 mortgage division for Bridgeview Bank was not going
4 with the sale, so we became technically I guess free
5 agents, if you will. And they apparently were
6 talking to different companies and decided on Mutual
7 of Omaha. So then BBMC, the whole group became
8 Mutual of Omaha. The relationship and when Mutual
9 of Omaha bought Synergy One, I don't know.
10    Q. Now, do you know if Synergy One was a
11 tradename or an actual mortgage company?
12    A. It was a mortgage company. I think they
13 focused on reverse, I believe, reverse mortgage
14 lending.
15    Q. Okay. Now, I'm just trying to make sure I
16 understand this. Were you part of Synergy One?
17    A. I think when we were hired, we were hired
18 by Synergy One. Synergy One I think was the lending
19 arm of Mutual of Omaha, but they were like a d/b/a,
20 doing business as Mutual.
21    Q. I see.
22    A. But Synergy One -- Synergy One was the
23 entity that we were hired by, yes.
24    Q. Gotcha. Okay. So just to make sure I
25 understand this: You're at BBMC. Something goes

Page 12

1 on, some transactions, stuff like that.
2    A. We were told the bank was being sold.
3    Q. Okay. And then --
4    A. Bridgeview Bank which owned Bridgeview
5 Bank Mortgage Company.
6    Q. Okay. And that's how you became Synergy
7 One/Mutual of Omaha.
8    A. Correct.
9    Q. Okay. Got it.
10    And before you were with BBMC, who were
11 you with?
12    A. Burling Bank.
13    Q. And approximately when did you go to BBMC?
14    A. March of 2016.
15    Q. Okay. And when did you first start
16 managing branches?
17    A. April of 1998.
18    Q. Okay. And were you a branch manager at
19 BBMC?
20    A. Yes.
21    Q. Okay. Were you a regional manager or
22 branch manager?
23    A. I guess you would call it branch, because
24 at the time, I only had one branch, but now I have
25 two.

Page 13

1    Q. You currently have two branches.
2    A. Correct.
3    Q. And what are the -- and when you were --
4 let's talk about prior to joining WaterStone.
5    You're at Mutual Mortgage. You're at
6 Mutual. Are you managing one or two branches then?
7    A. Two.
8    Q. And which were the two branches you
9 managed?
10    A. Tampa, Florida; Paramus, New Jersey.
11    Q. Okay. And did you have another manager at
12 Paramus, or did you actually kind of handle both?
13    A. They were -- I mean, you would call them
14 sales managers, managers, guys I've known for 22
15 years.
16    Q. Okay. And the branches in Paramus, did
17 they -- or the branch I should say in Paramus, did
18 that ultimately join WaterStone?
19    A. Yes.
20    Q. And when was that?
21    A. I believe July of 2022.
22    Q. Okay. Roughly around the same time that
23 the -- is it okay if I refer to it as the Tampa
24 branch?
25    A. Uh-huh, yep.

4 (Pages 10 - 13)

Page 14

1    Q.  The Tampa branch from Mutual joined
2 WaterStone?
3    A.  Correct.
4    Q.  Was it the same day or around the same
5 time?
6    A.  I believe it was a month or so later.  I
7 don't know the exact date.
8    Q.  Okay.  Right, because you left -- the
9 Tampa branch left in June.
10    A.  Correct.
11    Q.  Okay.  And how many employees were in the
12 Paramus branch?
13    A.  I don't recall exactly.  I would guess 10
14 to 15.
15    Q.  Okay.  Did you start the Paramus branch
16 for BBMC and then start the --
17    A.  I started the branch, Paramus branch for
18 Mutual.
19    Q.  For Mutual, I'm sorry.
20    A.  Yeah, based off my relationships with the
21 two gentlemen that run it.
22    Q.  Can you tell me how that came about in
23 terms of --
24    A.  Well, I've known them for -- since 2002.
25 We're very good friends, our families are friends.

Page 15

1 They were working for PNC at the time.  One of them
2 decided to join forces.  I was talking to him about,
3 you know, let's get back together.  We were very,
4 very good friends, did a lot of loans together at a
5 prior company, and they wanted to come work where I
6 was working.
7    Q.  So you essentially recruited them.
8    A.  Correct.
9    Q.  Got it.  And you got them to join Mutual,
10 and that's how it became a branch you were
11 responsible for.
12    A.  Correct.
13    Q.  Got it.  Now, when you were responsible
14 for branches at Mutual, did you receive after
15 override on the branch's discretion?
16    A.  They rolled under my P&L, so the Paramus
17 branch was part of the Tampa P&L.
18    Q.  So if I -- and I'll show it to you later,
19 there was a Tampa P&L, they were just kind of
20 included within --
21    A.  All their volume, expenses, revenue was in
22 that P&L, yep.
23    Q.  Got it.  Got it.  Got it.  So even though
24 they were physically not located there, for purposes
25 of the P&L they were considered within it?

Page 16

1    A.  Correct.  Yeah, I was responsible for that
2 branch, the expenses, revenue, hiring, firing,
3 training, everything.
4    Q.  Okay.  Now, the way it worked at Mutual,
5 you were on what I think is a called a P&L basis; is
6 that right?
7    A.  Correct, yep.
8    Q.  And just tell me if I've got this right.
9 The way it worked is that you would get paid
10 essentially -- well, strike that.
11        You would receive a fixed amount for every
12 loan you closed, a fixed number of basis points on
13 the volume of every loan you closed in a month.
14    A.  That would go into -- that would be how
15 the revenue was generated.
16    Q.  Right.  That would be the revenue side --
17    A.  Yep.
18    Q.  -- or the profit side, right?
19    A.  We would get the processing fee as well.
20    Q.  Okay.  And processing fees.  And so you
21 would add that to your plus column.
22    A.  Yep.
23    Q.  And then there would be various expense,
24 we'll go through it, and those would be in the minus
25 column.

Page 17

1    A.  Correct.
2    Q.  And then whatever was left over you get.
3    A.  Correct.  Well, I split it with.  At first
4 it was 50/50 -- it was actually first it was, which
5 to me was egregious, but it was 33 percent to me and
6 then 67 percent to Brian and Kiley, and then it went
7 to 50/50 and then it went to a sliding scale to
8 where if my profit was over 125,000, it was 75/25.
9    Q.  So essentially there was some split --
10    A.  Some split.
11    Q.  -- between you and --
12    A.  And these two gentlemen.
13    Q.  Who are these two gentlemen?
14    A.  Brian Tomalak and Kiley King.
15    Q.  And they were --
16    A.  -- which they were -- yeah, so I've known
17 Brian Tomalak since 1998, which is one of the
18 reasons why I came to BBMC.
19    Q.  Okay.  Let me just back up though.
20    A.  Sure.
21    Q.  They worked at Mutual.
22    A.  Correct.
23    Q.  Okay.
24    A.  And at BBMC.
25    Q.  Yeah.  I'm not worried about BBMC for the

5 (Pages 14 - 17)

Page 18

1  moment. We're just --
2     A.  Okay. All right. Gotcha. But that's how
3  I met them was back at BBMC.
4     Q.  So essentially you got a split of that
5  profit from the branch, we'll call it, I'll put it
6  an air quotes, profit --
7     A.  Correct.
8     Q.  -- from the branch, and that changed a
9  little bit over time.
10    A.  Correct.
11    Q.  But that was essentially the structure.
12    A.  Correct.
13    Q.  Okay. And that was a similar structure I
14  assume that Mr. Dwayne Hutto had?
15    A.  I believe he had a hundred percent profit.
16    Q.  I see. So you had -- you had a split and
17  he didn't.
18    A.  Correct.
19    Q.  Okay. Do you know why you had a split and
20  he didn't?
21    A.  I believe when he was hired, he wanted a
22  hundred percent, that was one of my issues with
23  Brian and Kiley, is that Dwayne came to BBMC/Mutual
24  after I did and got a better deal. So any time I
25  tried to negotiate a better deal, they dug their

Page 19

1  heels in and were very greedy. They didn't want
2  to -- they really didn't do anything for the last
3  three years. I mean I probably talked to Kiley once
4  in eight months. Tomalak, very rarely, no text
5  messages, no communications. Very few
6  communications. E-mails, support, guidance,
7  nothing. I mean, they really did nothing to help,
8  you know, help me run my operation, but they were
9  making insane amounts of money off my efforts and
10  production.
11    Q.  Okay.
12    A.  And that was something that bothered me
13  all along, that Dwayne came after me. I brought
14  Dwayne and they -- and he got a better deal than I
15  did. And they were making more money off Dwayne
16  than I was. I would get an override on Dwayne.
17    Q.  Okay. How would they make money off
18  Dwayne?
19    A.  They can add basis points to our pricing
20  engine without us knowing and then the bank pays
21  them that money.
22    Q.  An override. I see. It's essentially an
23  override.
24    A.  Well, it's a flat -- it's a flat
25  percentage. If the branch does 10 million and you

Page 20

1  have 20 basis points that you don't know is there,
2  then those guys split 20 grand.
3     Q.  So it's baked into the margin.
4     A.  Baked into the margin, correct.
5     Q.  Okay. And just so we all understand,
6  we're saying the same thing for the record.
7     A.  Yep.
8     Q.  The margin is the difference between
9  essentially the raw price --
10    A.  Correct.
11    Q.  -- that the bank could charge, and the
12  amount the consumer pays.
13    A.  Correct.
14    Q.  Is that right?
15    A.  Yep.
16    Q.  Okay. Let's see. So -- something is
17  going off. Do you need to...
18    A.  No. It's just vibrating. I don't have to
19  listen to it.
20    Q.  Oh, okay. I don't want to distract you.
21    A.  Sorry.
22    Q.  Okay. So tell me about how Dwayne Hutto
23  came to work for Mutual.
24    A.  I've known Dwayne since 2005, and he was
25  at American Bank Shares. Dwayne and I worked

Page 21

1  together at Ameriquest, Proficio -- no, Ameriquest,
2  Precision, Intercontinental, Guaranteed Home Rate,
3  Proficio. So for the last 15 years, all but one
4  year we've worked together at the same company.
5     Q.  Okay.
6     A.  And I believe he was at American Bank
7  Shares. He had left the mortgage industry sometime
8  in maybe '12, '13, '14 area, I don't know the exact
9  time frame, but then he got back into the business,
10  and he looks up to me. I'm kind of like a mentor to
11  him. I've always helped support him and guided him.
12  And so he said, hey, how is it going at BBMC, and it
13  was a better operation than where he was at, so he
14  wanted to come join us at BBMC, then which
15  ultimately became Mutual.
16    Q.  Okay. Now, when did Mr. Hutto first come
17  and talk to you about the possibility of joining
18  WaterStone?
19    A.  I don't recall the exact date.
20    Q.  All right. We'll look at some documents
21  to go through that.
22    A.  It was sometime I would guess early --
23    Q.  Early --
24    A.  -- late '21, early '22 if I had to guess.
25    Q.  Let's try to look at an e-mail here.

6 (Pages 18 - 21)

Page 22

1       MR. KAREN:  Mark that as Exhibit 1.
2       (Thereupon, marked as Exhibit 1.)
3   BY MR. KAREN:
4       Q.  I'm showing you Exhibit 1.  I realize you
5   were not on this e-mail, and you may not have seen
6   it before, but it's an e-mail dated -- the first top
7   e-mail is from Chris Wolf to Dustin Owen dated
8   January 10, 2022.
9       Do you see that?
10      A.  Yep.
11      Q.  Okay.  And if you scroll down past the
12  first, you're going to see on Tuesday, November 9,
13  and I believe there's an e-mail from Dustin Owen.
14      Do you see that?
15      A.  I see the one from Chris November 9.
16      Q.  It's on the first page.
17      A.  Yep, I see that.
18      Q.  Okay.  And then it says, the second
19  paragraph says, "Additionally, we look forward to
20  meeting Chris Smith"?
21      A.  Yep.
22      Q.  Okay.  And that's dated November 9?
23      A.  Okay.
24      Q.  Okay.  Does that give you some time frame
25  about when you would have first met with WaterStone

Page 23

1   personnel?
2       A.  Yeah.  If he said they were looking
3   forward to meeting me, then yeah, that would appear
4   to be the time frame.
5       Q.  Does that help you define the date any
6   more?  Do you think it was prior to the beginning of
7   that year, the next year 2022, or does that help you
8   at all?
9       A.  Yeah, I would say that it was towards the
10  end of 2021 and early 2022, correct.
11      Q.  Okay.
12      A.  I don't know the exact date though.
13      Q.  Sure.  That's fine.
14      And could you just tell me, prior to --
15  obviously it says here "looking forward to meeting."
16      A.  Yep.
17      Q.  That would at least suggest to me that you
18  probably had spoken to them prior to this.
19      A.  No, I had not spoken to them prior that,
20  no.
21      Q.  Okay.  But did you know of WaterStone
22  prior to this e-mail?
23      A.  Yes.
24      Q.  Okay.  And when I say "did you know of,"
25  had Dwayne or someone talked to you about

Page 24

1   WaterStone?
2       A.  Yes, in addition to other lending
3   institutions that we had been talking to throughout
4   the year.
5       Q.  Okay.  And I wanted to ask you about that.
6   You probably know Dwayne testified yesterday.
7       A.  Yes.
8       Q.  And by the way, did you guys talk about --
9   did you have any conversations with Dwayne --
10      A.  No.
11      Q.  -- outside of counsel about -- again, just
12  let me finish my question.
13      Did you have any conversations with Dwayne
14  outside the presence of counsel before today
15  pertaining to your deposition?
16      A.  Could you repeat the question?
17      Q.  Sure.  Did you have any conversations with
18  Dwayne Hutto prior to today pertaining to your
19  deposition?
20      A.  He -- I talked to him yesterday.  I asked
21  how it went.  He said he thought it went okay, but
22  specific details about the deposition, no.
23      Q.  Okay.  How about prior to yesterday?
24  After his deposition did you guys talk about the
25  depositions beforehand?

Page 25

1       A.  Before yesterday?
2       Q.  Yes.  Without -- excluding any
3   conversations with counsel.
4       A.  Just Dwayne and I in particular?
5       Q.  Any time there were no lawyers present.
6       A.  No.
7       Q.  Okay.
8       A.  I mean, I knew he was coming to a
9   deposition, so he was like yeah, I'm coming over
10  there for a deposition on Thursday, but nothing
11  specific about, you know, we didn't know
12  specifically what was going to be asked, so.
13      Q.  Okay.  Gotcha.  Other than the fact that
14  it was happening.
15      A.  It was happening, correct.
16      Q.  Got it.  All right.
17      Now, you said that Dwayne talked to you
18  about WaterStone at some point prior to this e-mail
19  dated November 9.  Yes?
20      A.  Yes.
21      Q.  Okay.  Can you recall for me the substance
22  of that conversation?
23      A.  I know that Dwayne's brother-in-law is
24  good friends with Melissa Ferenc, and she is the
25  head of operations.  And so I know over the course

7 (Pages 22 - 25)

1  of years he's -- they're very, very good friends,
2  and we would have loans turned down by Mutual, and
3  obviously if we can't close a loan, we don't
4  generate revenue.  And then he would ask, because
5  she's a head underwriter, hey, would you close this
6  loan?  She would say, yes, it's a no-brainer.  We
7  would close it.  So he would tell me, yeah, I lost
8  two more loans.  Melissa said we should write those
9  loans all day long, but Mutual of Omaha is not
10 writing the loan, and obviously every loan counts.
11 It makes, you know -- generates a lot of revenue.
12 That's how we pay the bills.  That's how we put
13 revenue in the P&L.  So I was familiar with Melissa,
14 and I was familiar with WaterStone, strictly because
15 they would close loans that we couldn't at Mutual of
16 Omaha.
17     Q.  Okay.  So when did he first talk to you
18 about, hey, we should think about going there?
19     A.  I don't think he ever said, hey, we should
20 think about going there.  He said that, I'm talking
21 to them.
22     Q.  Okay.  And then he -- I mean he at least
23 explained that he introduced you to some guys that
24 were at WaterStone to talk to.
25     A.  Correct.

1      Q.  Okay.  And how did that introduction
2  occur?  Did he say, here are the names of the people
3  you should talk to, if you can recall that?
4      A.  I believe -- well, Dustin and Mike Smalley
5  were the three people, and Dave Holbrook were the
6  three people that run the east region for
7  WaterStone.  So I would -- I would say that those
8  three people were the people that he would have
9  said, these are the people that we would talk to if
10 we decided, you know, if we wanted to join
11 WaterStone.
12     Q.  Was it always that you were going to leave
13 together?  Was that something you had
14 pre-determined, or was that something that was just
15 a possibility, if you could explain that?
16     A.  No, it wasn't pre-determined.
17     Q.  Okay.  So there was always the possibility
18 that he would go to WaterStone and you wouldn't.
19     A.  Correct.
20     Q.  Okay.  Now, did you see an advantage in
21 both of you going to the same place together?
22     A.  Well, Dwayne and I have always worked
23 together, so I like working with him.  And I help
24 his branch, he helps mine.  So I think there's
25 synergy.

1      Q.  Okay.  So there is no some advantage in
2  you guys making a move together to any institution
3  you go to.
4      A.  Only for the ability to work together and
5  remain friends.
6      Q.  What kind of synergies are there?
7      A.  Well, sometimes his processors would help
8  mine.  I would help answer a lot of their questions
9  about loan files, underwriting guidelines.
10     Q.  Okay.  So there is some sort of back and
11 forth professionally where you assist one another
12 and support one another.
13     A.  Correct.
14     Q.  Okay.  Now, when did -- you said you guys
15 had talked to a number of banks; is that right?
16     A.  Correct.
17     Q.  From talking to Dwayne yesterday, it
18 seemed like he kind of made the initial -- had the
19 initial discussions with banks, and then would kind
20 of bring you in later; is that a fair
21 characterization?
22         MS. KREITER:  Object to the form.
23     Misstates the testimony.
24         MR. KAREN:  You can answer.
25     A.  Repeat the question.

1  BY MR. KAREN:
2      Q.  From what I gathered yesterday -- and
3  again, correct me if I'm wrong -- I got the
4  impression that he talked to most of the banks first
5  and then would sort of report back to you.
6         MS. KREITER:  Same objection.
7  BY MR. KAREN:
8      Q.  You can answer.
9      A.  Dwayne was very unhappy, as I was, with
10 the level of support at Mutual, the lack of focus on
11 purchase business, the lack of competency in the
12 closing department, the delays in QC and QA.  And in
13 the purchase world, if you don't close on time, you
14 lose Realtor relationships.  And so he was very
15 vocal, very upset, and made it very well known to
16 the leadership at Mutual of Omaha that I'm unhappy,
17 you need to fix this, I'm losing Realtors, my
18 reputation is terrible in town.  Title companies
19 don't like us.  Title companies would little say --
20 literally say "Mutual of Omaha is the worst."
21     Q.  And sir, I'm not getting into --
22     A.  And it's --
23     Q.  -- any --
24     A.  -- no, no --
25     Q.  -- I want to be clear --

8 (Pages 26 - 29)

Page 30

1    A.  But yeah, yeah, no.  So I'm answering the
2   question.  So yes, he was unhappy, so he was talking
3   to lenders and he would tell me, we got to get out
4   of here, this place is terrible.
5        And so yes, he was talking to -- and I was
6   on a couple of conference calls with other lenders
7   as well asking questions about their process, their
8   products, their support, their closing, all of that.
9    Q.  Okay.  Well, that's really not my
10  question.  My question was simply that you talked to
11  a number of banks, correct?
12   A.  Correct.
13   Q.  Okay.  And who were -- who initiate -- who
14  was the first person to speak to -- how many banks
15  do you think you spoke to?
16   A.  Three or four.  He might have talked to
17  more that he didn't --
18   Q.  Okay.
19   A.  -- tell me about.
20   Q.  Okay.  And of those three or four, how
21  many banks were you in the initial conversation
22  versus coming in after that initial conversation?
23   A.  I think FCB was one I was in the initial
24  conversation.
25   Q.  Okay.  And the others --

Page 31

1    A.  Actually, I believe Chris Wolf initially
2   talked to FCB, and then Dwayne and I and Chris
3   talked to them.
4    Q.  Chris Wolf?  You said Dwayne and I and
5   Chris.  Are you saying --
6    A.  Correct.
7    Q.  -- Chris Wolf?
8    A.  Chris Wolf, yes.
9    Q.  Okay.  So then there were a couple of
10  other banks that he just spoke to without, and you
11  never spoke to, correct?
12   A.  Correct.
13   Q.  Were there any banks that you spoke to
14  that Dwayne never spoke to?
15   A.  Yeah.  I have friends in the industry, RFC
16  up in New Jersey, Sierra Pacific in Massachusetts.
17  So I've been running mortgage loan offices for, you
18  know, 25 years.  I have a ton of people I know in
19  the business.
20   Q.  And I should have clarified my question.
21  This is in and around the time of 2021.  What --
22  were there any --
23   A.  Probably from 2020 to 2021, we've, you
24  know, talked to different lenders, talked to
25  different companies.

Page 32

1    Q.  What's -- what I'm asking is, how many
2   banks do you think you spoke to about -- seriously
3   spoke to about --
4    A.  Yeah.
5    Q.  -- about the possibility of leaving during
6   2021 that Mr. Hutto never spoke to?
7    A.  Two.
8    Q.  Okay.  So you had two conversations --
9    A.  Yes.
10   Q.  -- with banks on your own, never mentioned
11  those to Mr. Hutto?
12   A.  No, I told -- I mentioned them to him.
13   Q.  Okay.  And what did -- did you tell him,
14  hey, let's talk to them or not talk to them?  What
15  did --
16   A.  It might be an option.
17   Q.  Okay.  But you never had any further
18  conversations?
19   A.  Correct.
20   Q.  Okay.  Why was that?
21   A.  We're busy.  We're closing loans.  It's
22  not -- it just maybe wasn't the right time or, you
23  know, it's -- I don't know specifically why we
24  didn't continue those conversations.
25   Q.  Okay.  But at some point, it's fair to say

Page 33

1   that -- that Mr. Hutto wouldn't recommend that you
2   speak to WaterStone unless he thought it was an
3   option?
4    A.  For his branch, yes.
5    Q.  Right.  So yes, I mean, obviously he's not
6   going to make a decision for you.
7    A.  Correct.
8    Q.  So when he recommend -- when he said, hey,
9   you should talk to those guys, is it fair to say
10  that you understood that he thought that was a
11  potential option for him?
12   A.  Yeah.  Everybody we talked to, I think,
13  was an option.
14   Q.  Yes, but you didn't continue those
15  conversations at some point, right?
16   A.  Correct.
17   Q.  At some point, you decided, hey, we're not
18  going to talk to these people and we are going to
19  talk to these people, right?
20   A.  Yes.
21   Q.  And that was something Mr. Hutto said,
22  hey, I'm going to continue talking to them, maybe
23  you should talk to them also, right?
24   A.  Yes.
25   Q.  Okay.  Did you get the impression

9 (Pages 30 - 33)

Page 34

1 Mr. Hutto wanted you to join him wherever he went?
2    A.   Actually, no.  He said, I don't care what
3 you do.
4    Q.   Okay.  But you see synergies in him -- in
5 that, and -- well, if he didn't care why at all, he
6 was totally agnostic?
7    A.   Again, we're really, really good friends.
8 We're going to be friends regardless of if we work
9 together or not.  So he was very unhappy with
10 Mutual, and he was -- he was going to leave Mutual
11 regardless of whether I decided to leave or not.
12    Q.   Right.  And my question was not would he
13 have left if you hadn't left.
14       My question was something that, all things
15 being equal, his preference is that you would join
16 him wherever he went next.
17    A.   I don't believe that to be true.
18    Q.   So he was -- he didn't care at all.
19    A.   Correct.
20    Q.   Then why would he have told you if he
21 didn't care at all, hey, you should probably go talk
22 to WaterStone?
23    A.   Because we worked together at 9 different
24 companies over 17 years.
25    Q.   And you prefer to keep working together.

Page 35

1    A.   We have.  That doesn't mean we're going to
2 continue.  So if we -- if we continue to work, if we
3 worked and we've had a history of working together,
4 and there was also times that he left the industry.
5 I didn't leave the industry because Dwayne left the
6 industry.
7    Q.   No, no.  And again, I think --
8    A.   Right.
9    Q.   -- you're misunderstanding my question.
10       My question was not could you, would you.
11 I'm simply saying, all things being equal, whether
12 for professional, personal reasons, there was a
13 preference that you two would continue to work
14 together?
15    A.   I can't answer for Dwayne.
16    Q.   Okay.  How about for you?
17    A.   All that matters to me is that I work for
18 a company that can help me close us loans and make
19 money --
20    Q.   Okay.
21    A.   -- regardless of who is there.
22    Q.   Okay.  Now, with respect to closing loans
23 and making money, do you get paid on individual
24 personal production, your own personal production?
25    A.   No.

Page 36

1    Q.   Okay.  So your -- your production --
2 strike that.
3       Your compensation at Mutual depends on how
4 many basis points, I guess, you're given credit,
5 right?  Yes?
6    A.   Yes.
7    Q.   The expenses that are taken out.
8    A.   Yes.
9    Q.   And obviously the volume of loans.
10    A.   Yes.
11    Q.   Those are -- any other factors that really
12 play into that?
13    A.   No.
14    Q.   Okay.
15    A.   Well, I would say, yeah, there are factors
16 that play into that.  So loans we can't close,
17 that's missed opportunity.
18    Q.   Well, yeah, but that's a corollary to
19 loans you do --
20    A.   Correct.
21    Q.   -- volume --
22    A.   Yeah.
23    Q.   -- right?
24    A.   Yeah, yeah.
25    Q.   I mean, I understand we can get --

Page 37

1    A.   Yep.
2    Q.   -- really granular --
3    A.   Sure.
4    Q.   -- here.  But on a -- in a large part --
5    A.   Yep.
6    Q.   -- that's -- those are the three factors,
7 right?
8    A.   Correct.
9    Q.   Okay.  So the more you close, the better
10 for you, correct?
11    A.   Correct.
12    Q.   And is it fair to say that --
13       Well, let me ask you this:  Are there --
14 how much personal -- I realize you're not paid
15 personally on your loans except the override.
16       Do you originate loans on your own?
17    A.   Yes.
18    Q.   Without a loan officer?
19    A.   Yes.
20    Q.   Okay.  And can you estimate for me in,
21 let's say, 2021 for example, what percentage of the
22 loans of your branch were, quote/unquote, your
23 production as opposed to those of other loan
24 officers?
25    A.   Roughly 10 percent.

10 (Pages 34 - 37)

1    Q.  Okay.  So 90 percent of the volume in your
2  branches comes from the people that work for you.
3    A.  Correct.
4    Q.  Okay.  Do you have any -- my familiarity
5  with most businesses is there's an 80/20 rule.  Is
6  that -- do you see the same?
7    A.  Yeah.  It's probably accurate here as
8  well.
9    Q.  Okay.
10    A.  In the -- in the mortgage industry in
11  general.
12    Q.  Right.  Right.  Again, I think it's a --
13    A.  Yeah.
14    Q.  -- general business, right --
15    A.  Yes.
16    Q.  -- is the reason they call it the 80/20
17  rule?
18    A.  Yep.
19    Q.  So who were your big producers that made
20  up the -- is it the 80 or the 20?  I never get that
21  straight.
22    A.  Eric Mueller --
23    Q.  Okay.
24    A.  -- Drew Callaway, Fred Stalls.  They both
25  left, though.  They're no longer -- one is at Guild,

1  one is at Supreme.  Patrick and Mike Lynch when they
2  came.  So Mike Lynch and Patrick Japaz run the New
3  Jersey branch.  Ingrid Ruiz.  I would say those are
4  the big producers.
5    Q.  Okay.  You mentioned a couple of people
6  who left.  That was -- they left after joining
7  WaterStone; is that correct?
8    A.  One left right -- one left in February of
9  2022.  Drew Callaway left --
10    Q.  Okay.
11    A.  -- to go to Supreme.
12    Q.  Okay.  And who was the one who left --
13    A.  Eric Mueller, he left in October of 2022
14  to go to Guild Mortgage --
15    Q.  20 --
16    A.  -- after we joined -- after we joined
17  WaterStone.
18    Q.  February of 2022 you're still --
19    A.  Yeah.
20    Q.  Oh, do you mean February 2023?
21    A.  No, February 2022 Drew Callaway left
22  Mutual --
23    Q.  Okay.
24    A.  -- when we were still at Mutual.
25    Q.  Okay.  That was Drew Callaway.  And then

1  Eric you said?
2    A.  Eric Mueller left WaterStone to go to
3  Guild.
4    Q.  Do you remember when that was?
5    A.  October of 2022.
6    Q.  Do you know why he left?
7    A.  They paid him a big guarantee, and he
8  wasn't closing loans.
9    Q.  Okay.
10    A.  He wasn't making money.
11    Q.  Now, did Eric Mueller bring any employees
12  with him from your branch when he left and went
13  to --
14    A.  No, there were two employees that -- one
15  of my sales managers when we were at Mutual, Nick
16  Babut, left Mutual to go to Guild, and Shane
17  Bittinger followed him the same day.  They both quit
18  on the same day and went to Guild.
19        And then he was -- he's been recruiting
20  heavily, Eric -- Nick Babut because he was a sales
21  manager in Tampa, was trying to get a lot of people
22  from Mutual, and then even after we left Mutual at
23  WaterStone to go work with him at Guild, and I
24  believe that he was successful -- well, not believe.
25  He was successful in getting Eric to leave

1  WaterStone to go to Guild.
2    Q.  Got it.  Okay.
3        Now, when --
4    A.  There's a theme here:  People leave and go
5  to different companies.
6    Q.  When -- when you left, that was around
7  June --
8    A.  Yep.
9    Q.  -- 15th of 2022, right?
10    A.  Correct.
11    Q.  And that's when your branch -- most of the
12  loan officers went with you that same day?
13    A.  We all resigned on the same day.
14    Q.  Yeah.  Okay.  And how was that date
15  determined?
16    A.  I believe it was after payroll day.
17    Q.  Okay.  But in other words, was that a
18  decision you made?  Did you all get collectively
19  together and talk about it?  How did you decide on
20  June 15?
21    A.  I believe we -- I resigned on June 15, and
22  everybody else resigned on June 15.
23    Q.  I understand that.
24    A.  Yeah.
25    Q.  But in other words --

11 (Pages 38 - 41)

Page 42

1    A.  We decided on that day because I found out
2  from Dwayne, when he left, none of his people got
3  paid, which is terrible to do to employees.
4    Q.  Okay.  So --
5    A.  We wanted to make sure that everybody got
6  paid on the 15th so the same thing didn't happen to
7  Tampa employees that happened to --
8    Q.  Okay.
9    A.  -- Dwayne's employees.
10    Q.  So when you say "we," who was part of that
11  we conversation?
12    A.  You want names?
13    Q.  Yeah.
14    A.  Nikki Edwards -- no, I'm not sure if Nikki
15  left.  Nikki didn't leave right away.  Matt
16  Landgraff, Nate Dahlin --
17    Q.  Sir, I want to be clear.  I'm not asking
18  who left on that day.  I already knew that.
19      My question is, when was -- in other
20  words, let's try it this way:  You didn't wake up at
21  12:01 a.m., everyone didn't have an epiphany and
22  say, oh, I'm leaving today, right?
23    A.  Correct.
24    Q.  Okay.  This was not everyone somehow
25  sensed it and just left in one unison, correct?

Page 43

1    A.  Correct.
2    Q.  There was some communication and
3  discussion, correct?
4    A.  No.  I told them I was leaving Mutual of
5  Omaha.
6    Q.  Okay.  And was it the expectation -- well,
7  you told them -- I understand you told them you were
8  leaving, but I'm talking about the day you were
9  leaving, right?
10      So did you walk into the office that
11  morning and say, I'm leaving; who's coming?  I
12  mean --
13    A.  I told them I'm resigning on June 15th.
14    Q.  Okay.  When did you tell them that?
15    A.  It would have been one or two days before.
16    Q.  Okay.  And prior to telling them the date,
17  they did know you were actually coming over to --
18    A.  No.
19    Q.  -- WaterStone?
20      No one knew that?
21    A.  Nope.
22    Q.  So you're saying you didn't tell anybody
23  in the branch prior to --
24    A.  Let's call it June 12th or 13th, correct.
25    Q.  Okay.  And had -- you didn't talk to any

Page 44

1  of your big producers, say, I'm unhappy, I'm
2  leaving, I'm going to WaterStone?
3    A.  My -- John Utsch is my sales manager, is
4  the only one that knew.  And then Mike Lynch and
5  then Patrick Japaz.
6    Q.  Okay.  So no one else other than those
7  three people knew.
8    A.  To my recollection, correct.
9    Q.  Okay.  Do you know if they told people?
10    A.  I do not know.
11    Q.  Okay.  So you told them.  Then did you
12  announce to your staff at once?  Did you have a
13  staff meeting?  How -- did you tell people one on
14  one?  How did you communicate your decision to go
15  to --
16    A.  I announced --
17    Q.  -- WaterStone?
18    A.  -- to the people that were coming to the
19  branch, and there weren't a ton of them.  We also
20  have remote loan officers.  I made the announcement,
21  I believe, whatever that Monday is, Monday or
22  Tuesday prior to the -- I think Wednesday -- the
23  15th was a Wednesday or a Thursday, I believe.  I
24  don't know exactly.  So I believe I announced to
25  everybody I was leaving Water -- leaving Mutual on

Page 45

1  June 15th.
2    Q.  Okay.  And that would have been the Monday
3  before?
4    A.  Monday or Tuesday.  I would have to look
5  at a calendar.
6    Q.  And before that, the -- who were the
7  people, again you had told prior to that you were
8  league?
9    A.  John Utsch.
10    Q.  And he's sort of your co-branch manager,
11  right?
12    A.  Correct.
13    Q.  Okay.  And do you know -- did you tell
14  John, hey, keep this a secret, don't tell anyone?
15    A.  I don't recall.
16    Q.  Okay.  Is it possible John Utsch had told
17  people?
18    A.  I can't.
19    Q.  You don't know.
20    A.  I don't know.
21    Q.  Okay.  So it's possible.  Okay.
22    A.  I don't believe he would have.  In my
23  opinion, I don't believe he would have told anyone.
24    Q.  Why?
25    A.  What's the point?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 46

1    Q.  Well, I mean, if people are all of a
2  sudden going to learn you're leaving, I mean,
3  maybe -- I mean, you would agree you want people to
4  follow you, don't you?
5    A.  They can do what they -- do what they want
6  to do.
7    Q.  It's a free country, right?
8    A.  Correct, yep.
9    Q.  No one can force you, right?  So we all
10 know that, right?
11   A.  Yep.
12   Q.  No one can -- you must come with me --
13   A.  Right, sure.
14   Q.  It doesn't work like that.
15   A.  Yep.
16   Q.  So -- but my question is what your
17 preference was.  I mean, here's what -- here's --
18       Let me ask it this way:  You get more
19 money by having more volume, right?
20   A.  Correct.
21   Q.  And you have -- at least some of your loan
22 officers are pretty important to that volume at this
23 point in time, right?
24   A.  Yes.
25   Q.  Okay.  So all things being equal, you

Page 47

1  prefer them to come with you than to stay behind at
2  Mutual or go to another company, right?
3    A.  Well, the way I would answer that question
4  is, seven years ago, I -- there was probably one --
5  no, there was probably two or three loan officers
6  that worked for me that -- back then.  So I'm good
7  at recruiting, hiring, training, and getting
8  production from loan officers.  If they decided to
9  come with me, that would be great.  If they didn't,
10 I'll hire and train more and get more volume
11 from them.
12   Q.  Okay.  But again, you have to go and find
13 them, right?
14   A.  Yep.
15   Q.  Find a new loan officer, that takes time,
16 right?  Yes?
17   A.  Sometimes.  I mean, sometimes people -- a
18 lot of people know a lot of people, so sometimes
19 people come find you.
20   Q.  Okay.
21   A.  But it could take some time, yes, to hire
22 more loan officers.
23   Q.  You would agree that, all things being
24 equal, not -- and that not everybody is going to
25 work, right?  I mean, hiring decisions are -- maybe

Page 48

1  they're better than 50/50 for you, but I know, at
2  least for me, like sometimes it works and sometimes
3  it doesn't, right?
4    A.  Yep.
5    Q.  Okay.  So when you have something and it
6  works, that's valuable to everybody, isn't it?
7    A.  Yes.
8    Q.  Okay.  And so all things being equal,
9  you'd rather keep your team together, wouldn't you?
10   A.  If that's what they wanted, yes.
11   Q.  Well, again, if that's what they didn't
12 want, then there's really nothing --
13   A.  Yeah.
14   Q.  -- you could do about it.
15   A.  Correct.
16   Q.  Right.
17   A.  Yep.
18   Q.  So -- but I'm asking you from your
19 perspective here.  So from your perspective it's
20 true that you wanted them to come with you.
21   A.  It a loan officer decided to resign and
22 join us at WaterStone, that would not have been a
23 bad thing.
24   Q.  It would actually have been a good thing.
25   A.  Correct.  Well --

Page 49

1    Q.  Okay.
2    A.  -- it's the opposite of not being a bad
3  thing.  It's a good thing, right.
4    Q.  Right.  But you're not agnostic about it.
5  Let's be honest, I mean, you -- your preference is
6  they come with you.
7        I mean, you're testifying under oath here,
8  sir.  You do --
9    A.  Yeah.
10   Q.  -- realize -- I mean, you're going -- are
11 you going to seriously tell me you didn't have a
12 preference that they come with you, these people who
13 you -- your income was based off them.
14   A.  Well, my income is based off of whoever I
15 hire and train and get to produce.  But if I have
16 people that are loyal to me and look up to me and
17 they decided to come with me, then yes, that would
18 not be a bad thing.
19   Q.  Okay.  It would be --
20   A.  It would be a good thing.
21   Q.  Yes, it would be your preference --
22   A.  Correct.
23   Q.  -- that happened --
24   A.  Yes, yes.
25   Q.  -- isn't that true?

13 (Pages 46 - 49)

Page 50

1  A. Yes.
2  Q. Okay. So given that it would be your
3  preference, my question is, you said what would be
4  the point, I would think if it's your preference
5  that they come with you, the point is that having
6  that advanced communication would increase the
7  likelihood they would come.
8       MS. KREITER: Object to the form.
9  A. Well, I think that in our industry, in our
10 world, giving -- telling someone, I'm leaving, and
11 our leader is moving to another company creates
12 uncertainty, creates questions. Loose lips sink
13 ships. So to me, I don't think there's any
14 advantage of telling them weeks ahead of time or who
15 I'm talking to. I don't believe there's any
16 advantage of that in any way, shape or form --
17 MR. KAREN:
18 Q. Okay.
19 A. -- because then they might start looking
20 at other companies.
21 Q. Or if -- or Mutual might find out, right?
22 A. Correct.
23 Q. Okay. So -- and so it's fair to say you
24 didn't necessarily want Mutual to know about this,
25 did you, not in advance?

Page 51

1  A. Well, yeah, but -- no.
2  Q. And here's my other question: With
3  respect to Paramus, when did you let the people in
4  Paramus know that you were going to be leaving?
5  A. Only Mike Lynch and Patrick Japaz knew
6  with any -- for -- knew ahead of time.
7  Q. Okay. And again, do you know if they
8  spoke to other people about it?
9  A. I don't believe so.
10 Q. Okay. But you don't know one way or the
11 other?
12 A. No.
13 Q. Okay. When did -- did anybody at
14 WaterStone, as far as you know, reach out to people
15 in your branch prior to you -- Let me rephrase this.
16      At the time frame I'm talking about now
17 is, February, March, April of 2022. Actually, let's
18 say -- let's call it March from 20 -- of 2022
19 through when you left in 2022, June, okay? So just
20 so we understand we're talking about that time
21 frame, fair enough?
22 A. Yep.
23 Q. Okay. So during that period of time, do
24 you know of anyone at WaterStone reaching out to
25 recruit any people at your branch?

Page 52

1  A. No.
2  Q. Okay. Do you think they would have told
3  you if they were doing that?
4  A. Yes.
5  Q. Okay. And is that for the obvious reason,
6  that it probably would have bothered you immensely
7  when you were talking to them to go behind your back
8  and talk to your people?
9  A. Yeah. It wouldn't serve any purpose.
10 Q. Right. And the reason being, that if they
11 weren't going to follow you and leave based on you
12 coming over, why would they join WaterStone, right?
13 A. Correct. I get a recruiting call twice a
14 week.
15 Q. Okay.
16 A. It's -- I'll probably get one today.
17 Q. Okay. So essentially, WaterStone was
18 leaving it up to you for the branch to come over or
19 not; is that fair to say?
20 A. They were leaving it up to me if I decided
21 I was going to leave, yes.
22 Q. Right. And that if you left, then your
23 branch would come with you?
24 A. Well, I think that one thing that needs to
25 be understood is that the commercial space in Tampa

Page 53

1  is leased by my LLC, so Mutual of Omaha is my
2  tenant. And so the office, the furniture, the
3  fixtures, the equipment, computers, chairs,
4  conference room, refrigerator, coffeemaker, pen,
5  stapler, everything I own. So if I leave and they
6  decided not to join me, they don't have a place to
7  work.
8  Q. Okay. Well, could -- could they work from
9  home?
10 A. They don't have -- they need the -- in the
11 office, they need -- a lot of loan officers are
12 inexperienced or up-and-coming. So being in an
13 office environment, being able to come talk to me
14 about guidelines, products, programs, it's
15 instantaneous support, and a lot of loan officers
16 are not successful working from home.
17 Q. Okay. But the point is -- he was
18 A. Eric Mueller was. He was successful
19 because he was an experienced LL veteran, he had
20 been involved in the industry for a long time.
21 Q. But the point is they didn't -- they could
22 have stayed -- they could have stayed and they could
23 have worked from home?
24 A. That's possible.
25 Q. Okay. I realize there was obviously, for

14 (Pages 50 - 53)

Page 54

1 lack of a better term, you had an advantage in -- in
2 recruiting them because of the staff -- the
3 situation, right?
4      MS. KREITER: Object to the form.
5 BY MR. KAREN:
6      Q. But my question is, though, it's correct
7 they didn't have to work from the office.
8      A. There's no leadership. So the two people
9 that I reported to, most of the people in my office,
10 they've never met them, don't know what they look
11 like, don't know who they are. They know them by
12 name, and that's it.
13      So if your leader leaves and your support
14 mechanism -- yeah, you can work from home, but I
15 can't go into an office, there's no one to go ask
16 about guidelines. So yeah, they would have, but
17 they would have failed.
18      Q. Okay. So the point is I understand there
19 was a lot --
20      A. Yes, they could have worked from home.
21      Q. And what you're telling me is there's a
22 lot of reasons why they would follow you.
23      A. Correct.
24      Q. Okay. Which, fair enough, gave you
25 confidence that they would come with you, right?

Page 55

1      A. I felt that some could and some would, but
2 I didn't know that definitively.
3      Q. Right. I'm just asking that you were
4 relatively confident, though; is that fair to say?
5      A. I would say optimistic.
6      Q. Okay. Let's look at -- you have this
7 exhibit in front of you, right?
8      A. Yep.
9      Q. Okay. And this is -- I would like you to
10 go back.
11      Before we get to that, can we go back down
12 to page 2? There's another November 9th e-mail.
13 And it's an e-mail from Chris Wolf to Dustin Owen.
14      And then if you -- do you see this e-mail
15 I'm talking about --
16      A. Yep.
17      Q. -- second page?
18      And it says, "Thank you for getting back
19 to me so quickly. I forwarded everything over to
20 Chris Smith in Tampa, and we will discuss."
21      So I just want to stop there. Chris Wolf
22 forwarded stuff, something, everything, I'm putting
23 in quotes, over to you and said then you guys were
24 going to talk.
25      Do you know what it was that he forwarded?

Page 56

1      A. I don't recall.
2      Q. Let me ask you this: There's a bunch of
3 e-mails and we'll put this aside --
4      A. Sure.
5      Q. -- if you don't recall it this way, that's
6 fine.
7      A. Uh-huh.
8      Q. It sounds like there was a lot of
9 communication where Dwayne was forwarding things to
10 WaterStone, and Chris Wolf was forwarding
11 information for -- to kind of -- acting as a
12 go-between, if you will, between you and WaterStone,
13 at least for a period of time. Is that a fair
14 characterization?
15      MS. KREITER: Object to the form.
16      A. Repeat the question.
17 BY MR. KAREN:
18      Q. Well, okay. Let's look, for example.
19 Let's continue looking down --
20      A. Okay.
21      Q. -- you'll just see what I mean.
22      A. Yep.
23      Q. So let's go to the next e-mail. So right
24 here, just to kind of tee up my question --
25      A. Okay.

Page 57

1      Q. -- you see where he's forwarding some
2 information over to you from WaterStone. That's
3 Chris Wolf.
4      A. Yeah.
5      Q. Right?
6      A. Okay.
7      Q. Okay. And that's November 9.
8      And then if you go back, go to
9 page 6266 --
10      A. Yep.
11      Q. -- you're going to see Wednesday,
12 November 3. It's about six days prior.
13      A. Yep.
14      Q. And if you look -- take a look at this in
15 the next page, if you don't mind real quick.
16      A. Sure.
17      Q. I'm not going to ask you a lot of
18 questions about it.
19      A. Yep, I see it.
20      Q. Okay. You see here, is it fair to say
21 that -- well, it says Chris Wolf to Dustin Owen
22 again, "Hi, Dustin. It was a pleasure meeting with
23 you, Dave and Ben yesterday. Here are some
24 questions from Chris in Tampa" --
25      That would be you, right?

15 (Pages 54 - 57)

Page 58

1     A.  Yes.
2     Q.  -- "and some others I had," right?
3         So you gave Chris Wolf some questions to
4  send over to the guys in WaterStone and to get
5  answers from them.
6     A.  Correct.
7     Q.  Okay.  And we saw in the prior e-mail
8  where he was forwarding some information from you.
9     A.  Correct.
10    Q.  Okay.  I'll also tell you and I could
11  show, but just assume, if you don't mind, for the
12  moment, to make things faster, I also saw e-mails
13  where Dwayne Hutto was forwarding your branch P&L to
14  people at WaterStone.
15    A.  (Nodding head.)
16    Q.  So there's a couple of different times
17  where I'm seeing Dwayne and/or Chris Wolf act as a
18  go-between in terms of information back and forth
19  between you and WaterStone.
20        So here's my question:  Is it fair to say
21  that for a period of time you allowed Chris and
22  Dwayne to sort of act as that go-between for
23  information transferring -- or information-sharing
24  purposes?
25        MS. KREITER:  Object to the form.

Page 59

1     A.  Well, they were initial -- they were the
2  first ones to contact them.
3     BY MR. KAREN:
4     Q.  Okay.  But in other words, if you had
5  questions, why -- why wouldn't you -- like there
6  were some questions in this e-mail -- we're going to
7  get to in a minute --
8     A.  Correct.
9     Q.  Why didn't you just reach out to
10  WaterStone directly?
11    A.  Because they were already talking to them.
12    Q.  Okay.  Were they sort of vetting
13  WaterStone for you?
14    A.  We vetted banks together.
15    Q.  Okay.
16    A.  And it's -- I guess what I would tell you,
17  in our industry, that's what happens.  Like, when
18  Drew Callaway left to go to Supreme, he asked about
19  their benefits, he asked about their pricing, their
20  products, their programs.  That's what people do
21  when you decide to -- you're considering making a
22  move to another lending institution.  Just like if a
23  lawyer were making a move to another law firm, you
24  ask about the support, what's my salary.
25    Q.  I --

Page 60

1     A.  But I'm just telling you, but that's --
2  that's what's happening.  Yeah, we're asking about
3  the operation, yes.
4     Q.  No, and that part I understand.
5     A.  Yep.
6     Q.  Okay.  But for example, if I was leaving
7  to go to another law firm, just me, I would want to
8  talk to them directly; I wouldn't have somebody else
9  get the information for me.
10    A.  Correct, which we ultimately did talk to
11  them.
12    Q.  I understand --
13    A.  Yeah.
14    Q.  -- but at this point in time, you're sort
15  of using, at least in this e-mail, I'm talking about
16  this e-mail --
17    A.  Sure.
18    Q.  -- Chris Wolf as a go-between, right?
19        MS. KREITER:  Object to the form.
20    BY MR. KAREN:
21    Q.  If you want to use a different
22  characterization --
23    A.  Yes, Chris had initially had spoken to --
24  Chris and Dwayne spoke to WaterStone first.  I knew
25  of WaterStone, I knew Melissa.  I knew they were

Page 61

1  talking to WaterStone, yes.
2     Q.  So my question, though, here is that -- is
3  simply why weren't you directly talking to them, and
4  why were you going and using Chris here to get
5  answers to questions for you?
6     A.  Because he's already been talking to them.
7  So to start a whole new conversation thread, he's
8  already talking to WaterStone.
9     Q.  But wouldn't -- I mean --
10    A.  So I'm friends with Chris as well --
11    Q.  Okay.
12    A.  -- and Dwayne.
13    Q.  I understand --
14    A.  Yep.
15    Q.  -- that, but I mean --
16    A.  There was a trust -- there was a trust
17  factor.  Like if you're --
18    Q.  But this --
19    A.  -- talking to them --
20    Q.  But this is an important decision,
21  correct?
22    A.  Yes.
23    Q.  Okay.  And is it fair to say that when you
24  make important decisions, details are really
25  important for you?

16 (Pages 58 - 61)

Page 62

1 A. Yes.
2 Q. Okay. And you understand any time, you
3 know, if I tell Maria to tell you something, there's
4 always the possibility of some misunderstanding in
5 that communication string, even when we use our best
6 efforts, fair enough?
7 A. Correct.
8 Q. Okay. So if you want to make sure
9 everything is detailed and totally accurate, the
10 best thing is for a one-on-one, direct conversation.
11 You would agree with that, right?
12 A. Correct.
13 Q. Okay. So these are questions that --
14 you're vetting WaterStone, right?
15 A. Yes.
16 Q. Okay. And so it's important -- it's an
17 important decision, right?
18 A. Yes.
19 Q. You want the details, right?
20 A. Yes.
21 Q. And you want them correct, right?
22 A. Yes.
23 Q. And so the best way, you just agreed with
24 me, is to actually have that direct conversation?
25 A. No, because I trust Chris, and why start a

Page 63

1 whole nother conversation? If Chris is already
2 talking to them, why would I start, initiate -- if I
3 trust Chris and if Chris is going to get the
4 answers, and then indirectly I'm getting the answers
5 from WaterStone because it's -- I'm sending them to
6 Chris, Chris is sending them to WaterStone, and
7 they're sending them back.
8 Q. So --
9 A. So it's just -- there is a go-between,
10 yes, but I'm still getting the answers directly from
11 the horse's mouth.
12 Q. Okay. So my -- so the -- so are you
13 saying yes, they were acting as a go-between, but
14 there was no great thought process on your part; it
15 just happened to be that they were acting as a
16 go-between?
17 A. I don't understand the question.
18 Q. Was it intentional -- was this an
19 intentional decision you made to have Chris and
20 Dwayne act as a go-between at certain times during
21 this discussion?
22 A. No, because I wouldn't --
23 MS. KREITER: Object to the form.
24 A. I wouldn't say it was -- have them -- I
25 don't need a go-between. I've got more experience

Page 64

1 than both Chris and Dwayne, and so I don't need them
2 to do my vetting. I don't need them to figure out
3 where I want to go. They were talking to them.
4 I've known them for a long time. We're good
5 friends. They were talking to WaterStone. I knew
6 of WaterStone. We were unhappy with Mutual. We
7 were talking to other banks. They happened to be
8 talking to WaterStone before I was.
9 And so yes, they asked me, what kind of
10 questions do you have for this bank?
11 I wouldn't call it a go-between. They
12 just made initial contact. If I wanted to reach out
13 to Dustin and Mike and Dave, I certainly could have.
14 I could have driven up to Winter Park and gotten all
15 the answers right from the three of them, but there
16 was already a communication thread in existence. So
17 I think it's a mischaracterization to say they were
18 a go-between because I could have gone directly to
19 them if I wanted to.
20 BY MR. KAREN:
21 Q. No, and I understand that --
22 A. Yep.
23 Q. -- but what I'm trying to get to -- and
24 you can use whatever characterization --
25 A. Yeah.

Page 65

1 Q. -- you want, right?
2 All I'm suggesting is that -- and you
3 wouldn't deny -- that you were giving information or
4 questions to Chris --
5 A. Correct.
6 Q. -- and to Dwayne, and they were
7 facilitating the communication through them back to
8 you for a period of time; is that a fair
9 characterization?
10 A. Yes, but what would be the point of
11 going --
12 Q. I'll get to the specific question --
13 A. Yeah, it was -- yeah, okay.
14 Q. -- okay?
15 A. Go ahead.
16 Q. So -- so my next question is simply
17 saying, is it fair to say, based on your prior
18 answer, that that was not something that you
19 seriously thought through and desired, per se, as
20 much as it was just a matter of convenience?
21 MS. KREITER: Object to the form.
22 A. If they were already in a communication
23 thread and it's a bank that we're considering to go
24 to and they're already talking to them and
25 communicating with them, what questions do you have,

17 (Pages 62 - 65)

Page 66

1 so I'll send the questions to Chris Wolf.
2 BY MR. KAREN:
3    Q.   Okay.  That, you would we say, is a matter
4 of convenience, is that fair, or whatever --
5    A.   Well, I could --
6    Q.   -- adjective you want to use.
7    A.   Well, I could --
8        MS. KREITER:  Object to the form.
9 BY MR. KAREN:
10    Q.   -- you want to use.
11    A.   I mean, how long -- how hard is it to type
12 Dustin Owen at WaterStone or Chris Wolf?  So
13 convenience is more of you're already in
14 communication with them; here are the questions I
15 have.
16    Q.   What adjective would you use?  Here's what
17 I'm asking you.
18    A.   I'm familiar with Chris Wolf.  I'm not
19 familiar with Dustin at that point in time.
20    Q.   So you were more comfortable going through
21 Chris Wolf?
22    A.   He was already in communication with
23 WaterStone and probably further along in discussions
24 with them, and I was introduced to them via these
25 e-mails.

Page 67

1    Q.   Okay.  I understand that.
2        And so those are the facts, and I'm asking
3 your rationale for -- if you could explain it, what
4 was the motivation for you to use Chris Wolf to
5 transfer this information back and forth as opposed
6 to you simply doing it yourself?
7        MS. KREITER:  Objection.  Asked and
8        answered many times.
9 BY MR. KAREN:
10    Q.   You can go ahead.
11    A.   Because if he's already talking to them,
12 and I trust Chris, it would be -- it would be -- it
13 would not make sense, and it would be weird for me
14 to say, Chris, I'm not talking to you; I'm going to
15 go directly to WaterStone.
16        I trust Chris.  This is not a recruiter
17 trying to come -- you know, this is Chris Wolf, who
18 is not a recruiter saying, hey, I'm going to recruit
19 the Tampa branch of Mutual.  I don't know who they
20 are, but let me see if I can get them to come to
21 WaterStone.
22        I've known Chris for a long time.  I've
23 helped mentor Chris.  I've helped mentor Dwayne.  I
24 think they look up to me.  They respect me.  And
25 they were already talking to them as we were talking

Page 68

1 to other lenders and other institutions.  And his
2 discussions progressed with WaterStone.  And so it's
3 not a matter of convenience.  It's a matter of
4 you're already having the conversation, so what
5 questions do you have?
6    Q.   So it just made more sense to you, put it
7 that way.
8    A.   Yes.
9    Q.   Okay.  All right.  So let's go down to the
10 next page, and there's a bullet.  It says
11 "transition team."
12        Do you see that?
13    A.   Yep.
14    Q.   It says, "Can we send loans over, starting
15 to build up a balance of money to fund transition?
16 This is a big one.  I am not and I am sure Dwayne is
17 not writing a check to them for $200,000 to fund the
18 first 60 days or so of fixed costs."
19        Here's my question:  When you say "I," is
20 that Chris Wolf speaking or is that you speaking?
21    A.   That's me.
22    Q.   Okay.  And when you're saying -- what are
23 you talking about, the first 60 days or so?  Like
24 what fixed costs do you have if you come over?
25    A.   Rent, salaries of anyone who decides that

Page 69

1 they want to resign and join us or apply at
2 WaterStone, credit report expenses, water bill,
3 Internet, cable.
4    Q.   Okay.  So those are not necessarily just
5 your personal -- your personal expenses.
6    A.   No.
7    Q.   Those are expenses of the branch?
8    A.   For the branch, to run the branch.
9    Q.   Okay.  And once the -- "Once the initial
10 time frame is agreed upon, would they allow it to be
11 paid back over twelve months?  My salaries," my
12 salaries, you used plural there.
13    A.   Plural.
14    Q.   And that -- so that's referring to people
15 that would come with you?
16    A.   Correct.
17    Q.   Okay -- "are 164 a month right now and
18 leads -- leads 70,000."
19    A.   Correct.
20    Q.   Okay.  And "leads," you're referring to
21 leads for the branch?
22    A.   Correct.
23    Q.   Okay.  "And rent will soon be -- will soon
24 be 30,000."
25    A.   Correct.

18 (Pages 66 - 69)

Page 70

1    Q.   Okay.  Here, I'm just -- what do you mean
2  soon will be 30,000?
3      A.   I was expanding in the Tampa office, so my
4  rent was being increased in the Tampa office.
5      Q.   Didn't you physically own the building?
6      A.   No, I don't own the building.  I have an
7  LLC, and I signed the commercial lease with my LLC,
8  and then I lease it back to Mutual, just like I'm
9  leasing it back to WaterStone.
10     Q.   Okay.
11     A.   I -- it's my -- I control the lease, so
12  now Mutual was and now WaterStone is my tenant, my
13  subtenant.
14     Q.   I understand, but what I'm -- just so I'm
15  understanding the situation --
16     A.   Your question was, do I own the building.
17  I do not own the building.
18     Q.   Your LLC -- an LLC you own owns the
19  building.
20     A.   Does not own the building.  It's a
21  commercial building, just like this law firm doesn't
22  own this building; they lease from the owner of the
23  building.
24     Q.   They might.  I don't know if they do or
25  not.

Page 71

1      A.   No, it's owned by Highwoods.  I saw it --
2      Q.   Okay.  Well --
3      A.   -- downstairs when I came in.
4      Q.   Then you know better than I do.
5      A.   Yeah, so it -- so this is a commercial
6  lease.  The law firm leases this building -- leases
7  this space from the owner of the building.
8      Q.   Yes.
9      A.   So I have an LLC that leases space in a
10  building that someone else owns.
11     Q.   I see.
12     A.   Gotcha.
13     Q.   Okay.  So when you were saying the rent
14  will soon be 30,000, the rent from the owner of the
15  building to your LLC.
16     A.   To the LLC, correct.
17     Q.   What's the name of your LLC?
18     A.   JSMS Equity, LLC.
19     Q.   So the rent from the owner of the
20  building, whoever that was, to JSMS, in turn to
21  whatever the mortgage company was going to be --
22     A.   Correct.
23     Q.   -- was going to go up to 30,000.
24     A.   Correct.
25     Q.   So that wasn't you directly or directly

Page 72

1  through your LLC charging more --
2      A.   No.
3      Q.   -- it was the owner charging more?
4      A.   Yeah.
5      Q.   Okay.
6      A.   I can't charge more, yeah.
7      Q.   Okay.  That's just what I was --
8      A.   I could try, but it wouldn't work.
9      Q.   Okay.  And then so your next sentence
10  says, "Suggest the Tampa branch alone, we are
11  talking over 500,000 in a cash for under a few
12  months, give or take."
13     A.   Correct.
14     Q.   Do you see that?
15     A.   Yep.
16     Q.   And again, so that's the costs of the
17  branch -- well, is that the -- those are -- those
18  are operating costs of the branch --
19     A.   Correct.
20     Q.   -- or is that income for you?
21     A.   Operating costs.
22     Q.   Okay.
23     A.   Not income.
24     Q.   So that's not your personal income,
25  it's --

Page 73

1      A.   No.
2      Q.   -- operating costs of the branch.
3      A.   Operating costs, yep.
4      Q.   Okay.  We need -- we need to make sure
5  anything -- okay, that's actually the end of your
6  discussion.  Then everything after that is their
7  response, right?
8      A.   Correct.
9      Q.   And is it fair to say that at some
10  point -- I don't see this e-mail, but at some point
11  Chris Wolf, did he send this back to you, these
12  answers?
13          I don't see it in these e-mails, and I'll
14  tell you I don't see any e-mail like that.
15     A.   I don't -- I think, I believe -- well, I
16  obviously had sent -- I must have sent these
17  questions to Chris.  I don't recall, but I don't
18  see -- yeah, I don't see an e-mail back to me in
19  this form, no.
20     Q.   Okay.  Is it fair to say that at some
21  point, you did learn this information?
22     A.   Yes.
23     Q.   Do you know how you learned this
24  information?
25     A.   I don't recall.

19 (Pages 70 - 73)

Page 74

1    Q.   Do you know if it was from Chris Wolf or
2  from WaterStone directly?
3    A.   I don't recall.
4    Q.   Okay.  So you know you learned it, but you
5  just can't remember any details how.
6    A.   Yeah, if it was an e-mail or a
7  conversation.
8    Q.   Okay.  Or with who.
9    A.   Correct.
10    Q.   Okay.  Do you -- look, you may not know;
11  I'm just going to ask, but do you know -- is it more
12  likely that you would have discussed this with Chris
13  Wolf before having a conversation with WaterStone?
14       MS. KREITER:  Object to the form.
15  BY MR. KAREN:
16    Q.   If you recall, if that helps you remember.
17    A.   No, because it -- if somehow this e-mail
18  came to me, then I would have gotten it.  This would
19  have been coming from Dustin, but I don't believe --
20  he could have, I don't know.  I don't recall if it
21  came from Chris or from Dustin.
22    Q.   You just don't know.  You just
23  don't recall one way or the other.
24    A.   Correct.
25    Q.   Okay.  Now, going to the top of this, you

Page 75

1  asked to start sending loans over to start and build
2  up a balance, right?
3    A.   Yep.
4    Q.   And you said "we."
5       MS. KREITER:  Sorry, Ari.  Where are you?
6  You said at the top of this.
7       MR. KAREN:  Transition team, Bullet 2.
8       MS. KREITER:  Okay.
9  BY MR. KAREN:
10    Q.   Can we send loans over, start and build up
11  a balance?
12    A.   Yep.
13    Q.   And who would "we" be?  That would be your
14  branch?
15    A.   Correct.
16    Q.   Okay.  That would -- now, that wouldn't
17  include the guys in Tampa, would it?
18    A.   What --
19    Q.   I'm sorry, so sorry.  I mean, that
20  wouldn't include the guys in Daytona.
21    A.   Correct.
22    Q.   So you were just talking about your branch
23  sending over.
24    A.   Correct.
25    Q.   Now, to send loan over and start building

Page 76

1  a balance, people would have to know in advance that
2  they were coming, wouldn't they?
3    A.   No, because we didn't -- if we made the
4  announcement a couple of days before, any loan that
5  was at Water -- at Mutual stayed there and closed
6  and funded.  So any business that's originated
7  within that couple-day window of being -- after the
8  announcement potentially would be a loan that we
9  would start at --
10    Q.   Well, how --
11    A.   -- WaterStone.
12    Q.   -- how many loans a day do you do, do you
13  originate?
14    A.   Back -- back in 2020 and 2021, when
15  business was booming, we were closing 70 to 80 loans
16  a month --
17    Q.   Closing --
18    A.   -- $20 million a month.
19    Q.   Closing 70 loans a month.  Okay.
20    A.   Today, back then in June, 15, 20.  So less
21  than one a day.
22    Q.   Okay.  But -- so wait.  In the time frame
23  that we're talking --
24    A.   During this time frame, probably less
25  than -- less than -- one to one and a half loans a

Page 77

1  day, if that.
2    Q.   One to one and a half loans a day.  Okay.
3       So my question is, assuming you did one to
4  one and a half loans a day, how many new loans did
5  you originate a day?
6    A.   Well, originate, there's -- the definition
7  of originate, does it -- is it we take applications?
8    Q.   Say lock.  How many loans did you lock a
9  day?
10    A.   One to one and a half.
11    Q.   So, okay.  So over a period of four days,
12  right --
13    A.   Yep.
14    Q.   -- that would be roughly, at max, eight
15  loans; is that fair, based on the math?
16    A.   Well, you guys have the numbers.  Don't
17  you guys have the numbers of what loans --
18    Q.   No, no, sir.  I'm asking you based on the
19  math.  You just told me one to -- one to two loans a
20  day.
21    A.   Yeah, it would be about eight loans, yeah.
22    Q.   Okay.  So it would be eight loans.
23       All right.  And if you were really
24  building up a balance of money, eight loans isn't
25  going to build when you're talking about $500,000,

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 78

1 eight loans isn't going to build that much of a
2 balance, is it?
3    A.  Correct.
4    Q.  Okay.  So the fact of the matter is, when
5 you say, we send -- can we send loans over to start
6 and build up a balance, you're talking about a
7 period of a lot longer than a couple of days, aren't
8 you?
9    A.  No.
10    Q.  So you were talking -- in talking about
11 building up a balance, you were talking about a
12 balance that would be really, really small in
13 comparison to $500,000, right?
14    A.  Well, ten loans could be $100,000 in
15 revenue.
16    Q.  Or it could be $20,000 in revenue, right?
17    A.  No.  It would never be that low.
18    Q.  Okay.  So somewhere between maybe 30, 40,
19 50?
20    A.  It would be 75 to 100.
21       And I think it's important to point out
22 that that's what happens in this industry.  And I
23 think it's also very important to go on record to
24 say that when my Tampa branch went from Reliant to
25 BBMC, BBMC was run by Chris Leyden, Jeff Gennarelli,

Page 79

1 Brian Tomalak, Kiley King.  I have e-mails -- the
2 exact same thing happened.  They were on the
3 receiving end of loans from my branch to the same
4 group that's suing us now.
5    Q.  So is that sort of like if -- if -- if
6 everyone else jumps off the roof of their house, you
7 should be able to too?
8       MS. KREITER:  Object to the form.
9    A.  No.
10 BY MR. KAREN:
11    Q.  So I just want to make sure I got -- I
12 understand this.  Your position --
13    A.  It's common in the industry.
14    Q.  Okay.  So it's common in the industry to
15 breach your fiduciary duty?
16       MS. KREITER:  Object to the form.
17 BY MR. KAREN:
18    Q.  Do you understand the question?
19    A.  No.
20    Q.  Do you understand what a fiduciary duty
21 is?
22    A.  I believe so.
23    Q.  Okay.  What do you think it is?
24    A.  I think it's you have a responsibility to
25 your clients.

Page 80

1    Q.  How about to the people you work for?
2    A.  Well, if I'm going to be leaving...
3    Q.  Okay.  But you haven't left yet, have you?
4    A.  No.
5    Q.  Okay.  So while you're still working
6 somewhere, don't you have a responsibility to the
7 people you work for until you leave?
8    A.  I was still working there, and I was
9 working on loans and closing loans and funding
10 loans.
11    Q.  So is that a yes, you have a
12 responsibility to the people you work for while
13 you're still there?
14    A.  Yes.
15    Q.  And you have a responsibility you work for
16 while you're still there, especially when you
17 haven't told them you're leaving, right?
18    A.  Correct.
19       MS. KREITER:  Object to the form.
20 BY MR. KAREN:
21    Q.  And you have a responsibility, when one of
22 your duties, isn't that right, is to supervise those
23 employees, right?
24    A.  Correct.
25    Q.  And so -- and you've heard of a corporate

Page 81

1 opportunity?  Do you know that -- what I'm referring
2 to?
3    A.  Not necessarily.
4       MS. KREITER:  Object to the form.  Calls
5    for a legal conclusion.
6 BY MR. KAREN:
7    Q.  Okay.  Well, let me ask you something:
8 When somebody calls you and says, hey, I want to do
9 a mortgage, right, and you work for WaterStone --
10 let's just talk about today, okay?  Somebody calls
11 you after you leave this deposition today and says,
12 hey, I want to do a loan.  That happens, right?
13    A.  Yes.
14    Q.  Okay.  And that's an opportunity for you,
15 right?
16    A.  Yes.
17    Q.  And that's an opportunity for WaterStone,
18 isn't it?
19    A.  Yes.
20    Q.  Okay.  And while you work for WaterStone,
21 you should take advantage of the opportunity for
22 WaterStone, shouldn't you?
23    A.  Yes.
24    Q.  That's your duty of loyalty in part, isn't
25 it?

21 (Pages 78 - 81)

Page 82

1    A.  Yes.
2    Q.  Okay.  So every opportunity, while you
3  still worked for Mutual of Omaha, was a potential
4  opportunity for Mutual of Omaha, wasn't it?
5    A.  Yes, but if Mutual of Omaha has proven
6  that they cannot close loans and they fumble the
7  ball and not had -- not been able to close all the
8  loans so they can't act on all those opportunities,
9  then if we can't -- if they can't close a loan --
10    Q.  Well, they closed 70 loans a month, didn't
11  they?
12    A.  They did, and they lost --
13    Q.  So they -- so it's not that they couldn't
14  close a loan --
15    A.  But they -- there were also a lot of loans
16  they could not close.
17    Q.  Sir, they could close a loan, couldn't
18  they?
19    A.  They could close loans, yes.
20    Q.  And they closed lots of loans, didn't
21  they?
22    A.  Yes, but they also turned down lots of
23  loans.
24    Q.  Okay.  Well, turning down is after they've
25  had that opportunity and evaluated that they've

Page 83

1  decided not to go forward, right?
2    A.  Correct.
3    Q.  But that doesn't mean it wasn't an
4  opportunity in the first place, does it?
5    A.  No.
6    Q.  And it's their choice, and they should
7  have that choice given by you as their supposedly
8  loyal employee to make that decision, shouldn't
9  they?
10    A.  Well, if I was leaving, then those
11  customers -- a lot of these customers are loyal to
12  the loan officers as well, and they probably
13  wouldn't have -- it's -- it's projection, but they
14  probably wouldn't have stayed on and closed loans.
15    Q.  That wasn't my question.
16        My question was, should -- should Mutual
17  have had the opportunity to at least compete for
18  opportunities that came in while you were still
19  their supposedly loyal employee?
20    A.  They did.
21    Q.  Not if you didn't tell them and you draft
22  them over to Mutual, right -- to WaterStone, right?
23        MS. KREITER:  Objection.  There's a total
24    lack of foundation.
25

Page 84

1    BY MR. KAREN:
2    Q.  You can answer.
3    A.  Repeat the question.
4    Q.  It's okay.
5        Obviously, if Water -- if Mutual knew that
6  you were going to be employed there for some period
7  of time while you sent loans over to start up and
8  build up a balance of money for WaterStone, they
9  wouldn't have been happy with that, right?
10    A.  No.
11        MS. KREITER:  Object to the form.
12    BY MR. KAREN:
13    Q.  You agree with me.
14    A.  Well, I wasn't happy when Drew Callaway
15  left.
16    Q.  Okay.  But you agree with me, yes?
17    A.  Yes.
18    Q.  Okay.  And one of the things they were
19  paying for you to do was to oversee their employees
20  too, weren't they?  That is Mutual.
21    A.  You know, it's interesting because I feel
22  that in running a P&L, it's my operation underneath
23  the umbrella of Water -- of Mutual of Omaha.
24    Q.  Okay.  So --
25    A.  So they're technically my employees.

Page 85

1  That's how I view it --
2    Q.  Okay.
3    A.  -- even though they're employed by Mutual
4  of Omaha.  So I'm overseeing my employees in my
5  branch in my office with my furniture, my fixtures,
6  my equipment --
7    Q.  So is it fair --
8    A.  -- and I'm making money for Mutual of
9  Omaha at the same time making money for myself and
10  my branch and my employees.  It's kind of like a
11  franchise.  I guess that's a good way to look at it.
12    Q.  Okay.  So that's how you -- I mean, and
13  I'm not -- I don't want to mischaracterize --
14    A.  Sure.
15    Q.  -- taking --
16    A.  Yeah.
17    Q.  -- I want to clarify what you just said --
18    A.  Yep.
19    Q.  -- okay?  So what I heard you say just now
20  is that you kind of see this as, look, this is --
21  maybe not technically, but for all intents and
22  purposes, I see the branch as sort of my company --
23    A.  Yes.
24    Q.  -- working with their company.
25    A.  Yes.

22 (Pages 82 - 85)

Page 86

1    Q.   Okay.
2    A.   Just as it was when I was at Reliant and
3  moved the exact same office and a lot of the exact
4  same employees from Reliant to BBMC.
5    Q.   Okay.  So you kind of see it -- I mean,
6  again, let's not get into the technicalities, but at
7  least morally you think you sort of have the right
8  to this; is that fair to say?
9        MS. KREITER:  Object to the form.
10  BY MR. KAREN:
11    Q.   Like, you have the right to bring your
12  employees with you, you just like --
13    A.   Well, I don't own --
14    Q.   -- being --
15    A.   No, I wouldn't characterize it as that.  I
16  have people that look up to me.  I'm their mentor --
17  mentor.  And just like Drew Callaway left and just
18  like Eric Mueller left, people -- some people decide
19  to follow me, some people don't.
20    Q.   Right.  And look, I'm not in any way
21  suggesting, okay, that there's slavery here --
22    A.   Right.
23    Q.   -- that you're forcing people.  I'm not --
24  that's not at all what I'm suggesting.
25        I'm simply saying that vis-a-vis whatever

Page 87

1  company, WaterStone, Mutual, whoever it is that
2  you're working technically for, you see that branch
3  as sort of yours and the people that work for you as
4  your employees, not necessarily theirs.
5    A.   I'm responsible for every -- everything
6  that happens in that branch; day-to-day operations,
7  who we hire, who we train, all of it.  So yes, I'm
8  responsible for managing a profitable mortgage loan
9  production office for the benefit of whatever lender
10  I'm doing that for, and for the benefit of myself
11  and the employees of my office.
12    Q.   And with that responsibility comes certain
13  rights, and so one of your rights should be, hey, if
14  I want to leave and take this with me, I should be
15  able to.
16        MS. KREITER:  Objection.
17  BY MR. KAREN:
18    Q.   I'm just asking how you feel about it.
19        MS. KREITER:  Objection.  Asked and
20  answered.
21    A.   Yeah, I asked and answered.
22        MR. KAREN:  You can't answer -- unless
23  you're instructing him not to answer, you
24  can't -- we're not going to play this game.
25        You really don't want to get on with the judge

Page 88

1  with this, do you?
2        MS. KREITER:  I objected.  Asked and
3  answered.
4        MR. KAREN:  Well, he's now parroting
5  you --
6        THE WITNESS:  Well --
7        MR. KAREN:  -- and that's a problem.
8  Okay.  Let's get the judge.
9        THE WITNESS:  Well, repeat --
10        MR. KAREN:  Courtney --
11        THE WITNESS:  Repeat the question.
12        MR. KAREN:  No, no.  If you want to do
13  with, we'll get the Judge, and you know how
14  he's going to react to this.
15        So do you want to get -- do you want to do
16  this --
17        MS. KREITER:  I don't know --
18        MR. KAREN:  -- or do you want to get an
19  answer?
20        MS. KREITER:  -- what you're saying,
21  Mr. Karen.  I don't understand what you're
22  saying.
23        MR. KAREN:  He's parroting your objections
24  back to me --
25        MS. KREITER:  And I'm --

Page 89

1        MR. KAREN:  -- and I'm not going to play
2  that game.
3        MS. KREITER:  And I'm not instructing him
4  not to answer, so I'm not sure what you're
5  complaining about.
6        MR. KAREN:  Well, why don't you instruct
7  him to answer since your his attorney.
8        MS. KREITER:  I objected, asked and
9  answered.
10        If you can answer the question yet again,
11  please do.
12    A.   All right.  And repeat the question.
13  BY MR. KAREN:
14    Q.   My question is, if you see -- okay, you
15  talked about how there's these responsibilities that
16  you take on, right?
17    A.   Yep.
18    Q.   Okay.  And I often think with
19  responsibilities come rights.  Would you agree?
20        MS. KREITER:  Object to the form.
21    A.   Responsibilities comes rights.  I don't
22  understand what you're asking.
23  BY MR. KAREN:
24    Q.   Okay.  Well, there's -- you've parroted --
25  you discussed all these responsibilities that you

23 (Pages 86 - 89)

Page 90

1 have running this kind of company as your own,
2 right?
3    A. I run a branch underneath the company that
4 I -- whatever company I work for, I run a branch,
5 yes.
6    Q. But a minute ago, you kind of said you see
7 this as your company.
8    A. I see this as my operation, yes.
9    Q. Okay. And so my question --
10    A. Because if I don't produce, I don't make
11 money. If I produce, I make money. So everything
12 is on my shoulders.
13    Q. I understand that.
14    A. Yep.
15    Q. I fully gather where you're coming from.
16       But with that responsibility that
17 everything is sort of on you, is it fair to say that
18 you see this as something that sort of gets to come
19 with you whenever you get to switch companies like
20 as it has in the past?
21    A. I wouldn't say that --
22       MS. KREITER: Object to the form.
23    A. I don't own -- I don't own employees. I
24 own the office because I have the lease, I own the
25 furniture, fixtures, and equipment. And so I made a

Page 91

1 decision that I wanted to leave Mutual of Omaha.
2 BY MR. KAREN:
3    Q. Right. But when you made that decision --
4    A. I wouldn't say that I had rights to
5 individuals. I don't own them.
6    Q. I'm not -- but you -- should you have --
7 do you believe you should have the right, if they
8 want to come with you --
9    A. If they decide to resign --
10    Q. -- to be able to solicit them to come with
11 you?
12       MS. KREITER: Object to the form.
13    A. There was no solicitation. I told them I
14 was leaving, and they all look up to me, and they
15 decided to leave as well.
16 BY MR. KAREN:
17    Q. Okay. Well, you told them a couple of
18 days before you --
19       Well, there were also people that you told
20 more than that, right? In other words, you
21 mentioned John Utsch?
22    A. Yep.
23    Q. When did you tell John Utsch?
24    A. Tell him what?
25    Q. That you were going -- planning to go to

Page 92

1 WaterStone.
2    A. Well, John Utsch helps run the branch for
3 me, so he -- he was also -- when we were talking to
4 FCB, talking to Sierra Pacific. So he was -- he was
5 kind of my right-hand man, so...
6    Q. So when did you tell him?
7    A. Tell him that we were leaving?
8    Q. Yeah.
9    A. I don't recall the exact date.
10    Q. Okay. Well, was it -- it was prior to
11 telling the other employees, right?
12    A. Correct.
13    Q. Okay. Was it a week before?
14    A. I would say maybe two weeks, a couple of
15 weeks before.
16    Q. Okay. And how about the people who ran
17 Paramus? When did you tell them? Same time?
18    A. About the same time, yeah.
19    Q. Okay. So it's probably a month before you
20 left in total?
21    A. Maybe a little less.
22    Q. Maybe a little more?
23    A. No.
24    Q. Okay. So a month maybe --
25    A. Or so.

Page 93

1    Q. -- three weeks to a month.
2    A. Correct.
3    Q. Okay. Now, were they aware -- in other
4 words, Chris Wolf was involved, was sort of the
5 right-hand man, so to speak, to Dwayne who was
6 involved in this in the beginning.
7       MS. KREITER: Object to the form.
8    A. Repeat the question.
9 BY MR. KAREN:
10    Q. Dwayne -- Chris -- Chris Wolf was involved
11 in this really from the beginning, right?
12    A. Involved in what?
13    Q. Going over to WaterStone and vetting
14 WaterStone.
15    A. He talked to them, yes.
16    Q. Okay.
17    A. We've established that already.
18    Q. Yeah, right, exactly. So I'm just asking,
19 did John -- is it Utsch?
20    A. Utsch.
21    Q. Was he -- did he have the same role in
22 this transaction as Chris Wolf did?
23    A. No.
24       MS. KREITER: Object to the form.
25    A. He didn't.

24 (Pages 90 - 93)

Page 94

1 BY MR. KAREN:
2 Q. Okay. So he was a lot less involved than
3 Chris Wolf?
4 A. He wasn't --
5 MS. KREITER: Object to the form.
6 A. -- involved at all.
7 BY MR. KAREN:
8 Q. Okay.
9 MS. KREITER: Let's take a ten-minute
10 break.
11 THE VIDEOGRAPHER: Is that okay, Counsel?
12 MR. KAREN: Yeah. I would just instruct
13 not to discuss the testimony during your break.
14 THE VIDEOGRAPHER: We're off the video
15 record at 10:23 a.m.
16 (Recess taken.)
17 THE VIDEOGRAPHER: This is the beginning
18 of Media Unit Number 2. We're on the video
19 record at 10:34 a.m.
20 BY MR. KAREN:
21 Q. When we broke last time, at some point you
22 made it -- you indicated that you had told John
23 Utsch, I'll call it, three weeks to a month before
24 you knew -- moved that you were, I guess, thinking
25 about or were going to move?

Page 95

1 A. Yes.
2 Q. Okay. And why did you tell him before you
3 told the rest of the employees?
4 A. Because I've known him for 18 years, and
5 we run the operation together.
6 Q. Okay. You've known some of those other
7 loan officers, though, for a really long time too,
8 haven't you?
9 A. Correct, but he's my -- he helps me run
10 the branch.
11 Q. Right, but if you were coming over
12 yourself, and it was just you and it wasn't about
13 the branch, then why did you need -- the feel to
14 tell him?
15 A. Because if I left, he was going to leave.
16 Q. But those other loan officers you had said
17 were probably going to leave too if you left, right?
18 I mean, you owned the branch, you knew them for a
19 really long time.
20 A. Well, I would say --
21 Q. What makes him different from the others?
22 A. Because I would say that he's -- he's more
23 of an operational guy. He's not a loan officer, so
24 he's not going to -- if he decided he wasn't going
25 to leave as well, then he wouldn't be able to go be

Page 96

1 a loan officer somewhere else. He could try, but
2 he's more of operational support. So he's not --
3 he's a loan officer.
4 To answer the question, if you tell loan
5 officers that you're leaving, then they could leave
6 and go somewhere else. They could -- yeah, that's
7 basically -- there's uncertainty, there's
8 nervousness, what's going on. Ultimately, I believe
9 that they would follow me, but to have a two- or
10 three- or four-week window to even, you know, let
11 them know that we were considering it doesn't
12 accomplish anything.
13 Q. Okay. But because Mr. -- it's Utsch,
14 right?
15 A. Utsch.
16 Q. Utsch, Utsch, okay. Mr. Utsch is
17 operational, that's why you told him in advance?
18 A. Well, he helps me run the branch.
19 Q. Okay. But --
20 A. I also respect his opinion.
21 Q. Okay. But --
22 A. He was also unhappy with Mutual of Omaha.
23 Q. But you made the decision separate from
24 Mr. Utsch, right?
25 A. Yes.

Page 97

1 Q. Okay. And when you told him -- fair to
2 say, did you tell him they were leaving or did you
3 tell him, I might, or did you tell him, hey, I'm
4 leaving?
5 A. I said, we're seriously considering it.
6 Q. And who is "we"?
7 A. Me.
8 Q. Well, you just said "we," the pronoun, and
9 we versus me is different.
10 A. Well, I think maybe I might have been
11 referring -- I'm not sure if this is after because
12 Dwayne -- when did Dwayne leave? Dwayne left --
13 Q. April.
14 A. April. So maybe that was we, we were
15 joining -- we're going to WaterStone.
16 Q. Well, this is June. So if you told him
17 only three weeks before, that would be May. That
18 would be a month after.
19 A. Correct.
20 Q. So it wouldn't have been "we" being Dwayne
21 because Dwayne had already left.
22 MS. KREITER: Object to the form.
23 A. Well, again, the assumption was that
24 people would leave with me. So if I'm saying "we"
25 --

25 (Pages 94 - 97)

Page 98

1 MR. KAREN:
2    Q.  Okay.
3    A.  -- I don't know if --
4    Q.  -- you're referring to the branch.
5    A.  Yes.
6    Q.  And he's part of the branch, isn't he?
7    A.  Correct.
8    Q.  So let me ask you this other thing:  Now,
9 here is -- what is a pipeline?
10    A.  It's loans that you're working on within.
11 It could be loans in processing and underwriting,
12 closing, funding.
13    Q.  Okay.  Now, when does a loan become part
14 of the pipeline?
15    A.  When you send disclosures.  When the
16 customer signs the disclosures.
17    Q.  Okay.  So help me out here.  And I'm
18 sorry --
19    A.  Sure.
20    Q.  -- you know this process better than I do.
21 What's the first thing that happens?
22    A.  Pull credit.  Take an application, pull
23 credit.
24    Q.  Well, let me back up.  You first, I guess,
25 have a conversation have with a customer --

Page 99

1    A.  Yep.
2    Q.  -- a potential customer, we should call
3 it, right?
4    A.  Yep.
5    Q.  And then, I guess, at some point in that
6 conversation, you say, hey, we should pull credit.
7    A.  Well, we ask them if they want to apply.
8 If you're interested in applying to buy a house or
9 refinance.
10    Q.  Okay.
11    A.  We can send them an e-mail or text them a
12 link.
13    Q.  Okay.  But at some point, they have to --
14 you can -- can you pull credit without their
15 approval?
16    A.  No.  They -- well, they have to -- they do
17 a consent.  So if they're on the website, they have
18 to consent to pull credit.
19    Q.  And if they're on a phone call with you,
20 can they verbally give you consent?
21    A.  We typically don't take a handwritten
22 application.  So if they apply using our website,
23 then that's all part of the consent.
24    Q.  Do you usually talk to somebody before
25 they go on the website, or is the website sort of

Page 100

1 agnostic, if that makes sense?
2    A.  Well, we have a consultation.  We have to
3 send them on e-mail, we have to send them a text.
4 So they have access to our website, yes.
5    Q.  Oh, I see.  Okay.  So it's not like I
6 could just go on your website and go do it myself.
7    A.  Well, you could.  I think that if -- if
8 someone were referred, said you should say Chris
9 Smith at Mutual of Omaha, they could go on Mutual of
10 Omaha's website, they could probably find me and
11 submit an application.
12    Q.  But in all likelihood, they're probably
13 going to first have a conversation --
14    A.  Yeah, there's usually a consultation; what
15 are you looking to do?  Do you want to buy?  Do you
16 want to buy an investment property, primary
17 residence, whatever the case may be.
18    Q.  Okay.  So you have this conversation.
19 They go to the website or you send them a link
20 somehow, and then they fill out --
21    A.  Correct.
22    Q.  What do they fill out?
23    A.  Name, date of birth, Social Security
24 number.  Like a credit application.  Where they
25 work, where they live, how much money they make.

Page 101

1    Q.  So isn't that -- I think it's called a
2 1003?
3    A.  Correct.
4    Q.  Is that what they fill out?
5    A.  Yep.
6    Q.  Okay.  There's a lot of information on a
7 1003.
8    A.  Correct.
9    Q.  Okay.  And when they fill out the 1003, is
10 there somewhere in a 1003 where they ask to pull --
11 or they give you permission to pull credit?
12    A.  No.
13    Q.  Okay.  So when does that come up?
14    A.  It comes up, I believe, in the actual --
15 on the website.  I think they have to e-consent.  So
16 they consent to get disclosures via electronic
17 signatures.
18       But in the course of the conversation, we
19 walk them through the process.  We say this is --
20 okay, do you want to buy a house?  We'll send you a
21 link; you'll fill out an application.  We're going
22 to pull your credit.  That's the only way that you
23 can -- and some people say, well, I don't -- I don't
24 want to have my credit pulled.  I'm like, well, I
25 can't really tell you what you qualify for.

26 (Pages 98 - 101)

1    So that's -- normally when you say this is
2  what the process is, the customer understands.  If
3  they don't want their credit pulled because of
4  taking enough applications where the customer says,
5  I don't want my credit pulled.
6    Q.  Yeah, no --
7    A.  Yeah.
8    Q.  -- I understand that.
9    A.  Yeah.
10    Q.  Can somebody have their credit pulled if
11  they were to say you, I don't feel like filling all
12  that stuff out if I can't get the loan anyhow,
13  right, so can you just pull my credit first?  Can
14  that happen?
15    A.  I think they could -- you could get name,
16  date of birth, Social Security number, and
17  residential address, and pull credit.  But that's --
18  after that it's just employment application -- where
19  do you work, how much money do you make.  So
20  there's, you know, another couple pieces of
21  information.
22    Q.  I remember I just -- I just actually did a
23  loan, and I remember that 1003 was brutal.
24    A.  Well, I mean -- but I mean the initial --
25    Q.  No offense.

1    A.  Yeah, yeah, no, but the initial intake --
2  because some people, in that scenario, if someone is
3  not sure if they want to go through the -- or if
4  they're going to qualify, all right, you know, give
5  me your name, date of -- you know, fill out your
6  name, date of birth, Social Security number, where
7  you live, and where you work and how much money you
8  make, and that you can fill out in less than ten
9  minutes.  And then we would pull credit and say,
10  yeah, you were right, you don't qualify or, hey, you
11  know, we might be able to help you get your credit
12  score up --
13    Q.  Okay.
14    A.  -- or whatever the case is.
15    Q.  Just so you -- I understand this, do
16  they -- in the way it typically works -- let me just
17  ask typically -- typically you have this
18  conversation, then somebody gets a link from you,
19  then they fill out the app, and then you pull
20  credit.
21    A.  Correct.
22    Q.  Is that typically how it works?
23    A.  Yes.
24    Q.  Okay.  And the app may be various aspects
25  of completion?

1    A.  Yes.
2    Q.  Okay.  So maybe I don't fill anything --
3  everything out.
4    A.  Correct.
5    Q.  Got it.
6    And -- okay.  So that credit
7  application -- that credit pull, is that what you
8  call it?
9    A.  Yep.
10    Q.  Is the -- one of the first stages of this.
11    A.  Correct.
12    Q.  Okay.  Who can pull credit on behalf of a
13  borrower?  Is it --
14    A.  It's a loan officer.
15    Q.  Can it be -- can a processor pull credit?
16    A.  I think loan partners can.
17    Q.  What are loan partners?
18    A.  Someone -- they help a loan officer get
19  their loans in the system.
20    Q.  Is that like a defined thing in the
21  system?  Like, what if I -- if I were to ask you,
22  who is your loan partner, is that designated?
23    A.  It's like a loan officer assistant for the
24  branch.  We have two of them in Tampa.
25    Q.  Got it.  Okay.

1    So you have two people other than the loan
2  officer?
3    A.  That potentially could, but 99.9 percent
4  of the time the loan officers going into the --
5  finding the file, they've seen they've applied, open
6  up the file, and pull credit.
7    Q.  Got it.
8    All right.  Who were the two designated
9  loan officer assistants, you called them --
10    A.  Yep.
11    Q.  -- for your branch?
12    A.  Cody Lamb and Brittanie Negrich.
13    Q.  Okay.  Do you -- did Daytona have a
14  similar structure with having a designated loan
15  officer?
16    A.  I believe so, yeah.
17    Q.  And who --
18    A.  They had support.
19    Q.  Who was theirs?
20    A.  I believe Cameron Holley, I know for sure,
21  but I don't know all of the loan -- the employees
22  there.  I know some people that have been there for
23  a while.  But I know Cameron Holley is, for sure, a
24  loan officer assistant.
25    Q.  Okay.  So he would be another person who

1 could pull credit?

2    A.  Potentially, yes.

3    Q.  Okay.  How about Kristin Frye or...

4    A.  Yeah, I'm not sure what her role is.  She

5 could be.

6    Q.  You just don't know.

7    A.  Yeah.

8    Q.  Got it.

9        Now, when you pull credit, can you -- does

10 it -- is it something that's tracked that you can

11 identify to a specific borrower?

12    A.  Yes.  The credit report's within that

13 borrower's file.

14    Q.  That was a bad question.

15        There's a system -- what system do you

16 pull credit on at Mutual?

17    A.  We use Encompass as our loan origination

18 system, and then at Mutual, I'm not sure if it was

19 CBC and Novus was our credit vendor.

20    Q.  Is it through Encompass?

21    A.  Yes.

22    Q.  So you would go on Encompass and then --

23    A.  And then we'd go on to order credit.

24    Q.  All right.  So you go on the Encompass

25 system and you, I guess, click through?

1    A.  Yeah, click "order credit," choose the

2 vender, hit the button, pulls the credit.

3    Q.  Okay.  Does that track, do you know, all

4 the credit pulls, who pulled it?  I assume it does,

5 right?

6    A.  I believe so, yeah.

7    Q.  Okay.  And what is the system at

8 WaterStone that you use?

9    A.  Encompass.

10    Q.  And what is the credit pull?

11    A.  I think it's a different vendor.

12 Informative Research, I believe.

13    Q.  Okay.  And that tracks too?

14    A.  Who pulled the credit?

15    Q.  Who pulled the credit --

16    A.  Yes.

17    Q.  -- for the name of the borrower?

18    A.  Yep.

19    Q.  Okay.  Would it track the date?

20    A.  What's that?

21    Q.  Would it track the date too?

22    A.  Yeah, the date that you pull credit would

23 be on the credit report, yeah.

24    Q.  And that's important because credit is

25 only good for so long, right?

1    A.  90 days.

2    Q.  90 days, okay.  Yes, I do remember that.

3        Now, we talked earlier about how Daytona

4 left in April.

5    A.  Yep.

6    Q.  Do you know why Daytona left in April as

7 opposed to you guys leaving in June?

8    A.  I believe they wanted out bad.

9    Q.  Okay.  Was that something you guys

10 coordinated?

11    A.  No.

12        MS. KREITER:  Object to the form.

13 BY MR. KAREN:

14    Q.  Is it something that you and Dwayne

15 discussed?

16    A.  No.  Quite frankly, I wasn't even positive

17 I was leaving when Dwayne left.

18    Q.  Okay.  So you were still in the

19 decision-making process?

20    A.  Correct.

21    Q.  What other banks, if any, were you

22 considering at that time other than going to

23 WaterStone?

24    A.  At that time, I wasn't in any serious

25 discussions with any other banks.

1    Q.  So it was either, at that time, WaterStone

2 or, for the moment, staying at Mutual.

3    A.  Correct.

4    Q.  Okay.  Did Dwayne talk to you at all in

5 terms of why -- and I want to be clear with my

6 question.  My question is not why did he want to

7 leave Mutual.

8    A.  Okay.

9    Q.  I understand that.

10    A.  Yep.

11    Q.  But obviously there are lots of places you

12 can go --

13    A.  Correct.

14    Q.  -- right?

15        And I presume there was a reason he wanted

16 to go to WaterStone as opposed to any of those other

17 places.

18    A.  Correct.

19    Q.  Okay.  So my question is only, without

20 going into all the history of why he wanted to

21 leave --

22    A.  Yep, yep.

23    Q.  -- do you -- did he ever express to you

24 the reasons why he wanted to go to WaterStone?

25    A.  He gave me his opinion on why it might be

28 (Pages 106 - 109)

Page 110

1  a better operation to close loans.
2      Q.  And what was that?
3      A.  Better operations, better closing, better
4  technology, better underwriting, better commonsense
5  underwriting, better products, better support,
6  technology, marketing.  I could go on.
7      Q.  He just thought it would be better
8  everything.
9      A.  Correct.
10     Q.  I know that's a bad question, but --
11     A.  Yeah.
12     Q.  -- you get my point.
13     A.  Correct, but yeah, and it was and it is.
14     Q.  Okay.  And you guys are friends, I think
15  you said?
16     A.  Yeah, really good friends.
17     Q.  Really good friends.
18     A.  Yep.
19     Q.  Okay.  So it's fair to say that when he
20  left in April, you guys spoke afterwards?
21     A.  Correct.
22     Q.  Okay.  I presume a topic of conversation
23  would have been, at some point, hey, how's it going?
24     A.  Correct.
25     Q.  Okay.  What did he tell you?

Page 111

1      A.  He said it was a good place to close
2  loans.
3      Q.  Okay.  He was happy?
4      A.  Yes.
5      Q.  Okay.  He expressed that -- did he ever
6  talk to you about -- did you guys ever discuss, what
7  if I came over?
8      A.  No.
9      Q.  Okay.  So other than he was happy, it was
10  a good place to close loans, what else did he tell
11  you about WaterStone?
12         MS. KREITER:  Object to the form.
13     A.  I don't recall.
14  BY MR. KAREN:
15     Q.  Did you talk about any people you worked
16  with, hey, this guy is a great guy, he's kind of a
17  pain in the butt?  Did you ever have any of those
18  kinds of conversations?
19     A.  Like, did he give me his opinion on -- of
20  the people that worked at WaterStone?
21     Q.  Yeah.
22     A.  No.
23     Q.  Did you guys talk about it?
24     A.  No.  The only person that we talked about
25  was Melissa, who was the head underwriter.

Page 112

1      Q.  Okay.  And what did you guys talk about
2  with that?
3      A.  She's a lot better at her job than the
4  people we worked with before in terms of the speed
5  with which we could get exception requests reviewed,
6  mortgage IQ.  It was really about responsiveness.
7          In our -- in our world, if a loan is being
8  suspended or a loan is trying to close and the
9  customer is closing next Friday and you run into an
10  issue today and you don't get an answer until next
11  Wednesday or Thursday, that's an issue because
12  buyer's agents are calling you, seller's agents are
13  calling you.  And so I think that was something he
14  was happy about, that when there was an issue, we
15  got an immediate response at WaterStone, which is
16  important in a purchase transaction because you have
17  a contract date you have to meet, and at Mutual
18  there was no sense of urgency.  It took way too long
19  to get answers.
20          So that's -- I think that was probably one
21  of the things -- or probably really the only thing
22  we talked about because everything else -- it's like
23  closing a loan, it's more the operational.  We were
24  upset with the operational efficiency at Mutual.
25     Q.  Okay.  Now, did he say anything negative

Page 113

1  about Mutual?  I'm sorry.
2      A.  When?
3      Q.  Time out, time out, time out.  That was a
4  bad question.  I know he said negative about Mutual.
5          Did he ever say anything negative about
6  WaterStone in between the time that he joined in
7  April and you joined in June?
8      A.  No.  No.
9      Q.  Okay.  So basically, it was all green
10  lights, all positive feedback?
11     A.  Better -- better than from where we came -- he
12  was at and where I was at.
13     Q.  Now, one thing I wanted to ask you -- I
14  don't know if I asked you this question.  If I did,
15  I apologize.  You had told me that one of the things
16  that bothered you was that at Mutual, you had to do
17  a split with some other people?
18     A.  Yep.
19     Q.  Of your branch profit?
20     A.  Correct.
21     Q.  Did you have to do that split at -- at
22  WaterStone?
23     A.  No.
24     Q.  Okay.  And do you recall what your
25  branch -- I'm going to call it assigned revenue or

29 (Pages 110 - 113)

Page 114

1 the -- what -- what should I call the number that
2 you got as credit for every loan that you did, the
3 basis points? I don't know what to call that.
4    A. So how much did Chris Smith make?
5    Q. No, no, no, no.
6       Oh, yeah. Well, okay. Your branch --
7    A. The branch generated probably 3 percent of
8 every loan, roughly.
9    Q. So about 300 basis points?
10   A. Correct.
11   Q. Okay. And that's what it set --
12 generated, is that what you received as a credit on
13 your P&L?
14   A. Correct.
15   Q. Okay. And that's at Mutual?
16   A. But I believe there was additional revenue
17 that we were unaware of.
18   Q. I'm only asking you --
19   A. Yeah, but I was told 300 basis points.
20 And then yes, that would -- but would be credited.
21 So if I did 10 million, then we would generate
22 300,000 in revenue.
23   Q. And that's what would be credited to your
24 branch?
25   A. Revenue, yep.

Page 115

1    Q. Okay. And so my question is, that revenue
2 credit -- is that a good word to use?
3    A. Revenue generated, revenue credit.
4    Q. Well, I'm just trying to figure out, the
5 300 basis points, what would you call that?
6    A. That's your revenue on every loan.
7    Q. Okay. So what's your revenue on every
8 loan at WaterStone?
9    A. Well, the market's changed. It's probably
10 a little bit less because it's gotten more
11 competitive. A lot of lenders out there are gouging
12 their pricing to try and generate volume. It's a
13 volume grab.
14      So the market in general right now today
15 is much different than it was in 2020 and 2021.
16   Q. Fair enough.
17      When you first came over, what was your
18 revenue generated?
19   A. Same.
20   Q. So it was --
21   A. Set up the same, yep.
22   Q. Set up the same and -- but you were not
23 splitting at WaterStone, whereas you were splitting
24 at Mutual.
25   A. Correct.

Page 116

1    Q. Okay. So do you know when offer letters
2 were given to your employees of your branch --
3    A. I don't recall the exact date.
4    Q. -- at Mutual? I'm sorry.
5    A. Oh. At --
6    Q. Let me just finish the question. I know I
7 paused. I'm sorry.
8    A. That's okay.
9    Q. Do you know when offer letters were given
10 by WaterStone to employees at your branch while you
11 were at Mutual?
12   A. I don't recall the exact date.
13   Q. Okay. Was it before the June 15th?
14   A. I don't recall.
15   Q. Okay. I'll show you an e-mail here.
16      (Thereupon, marked as Exhibit 2.)
17 BY MR. KAREN:
18   Q. Sir, again, I know this is not an e-mail
19 you were on.
20   A. Yep.
21   Q. So I'm going to just briefly ask you one
22 question about it. This is an e-mail from Dustin
23 Owen at WaterStone to Dwayne and Chris and some
24 other people are copied, dated January 31st.
25      Do you see that?

Page 117

1    A. Yes.
2    Q. And if you go three paragraphs down, it
3 says, "By the way, we really appreciate the
4 introduction to Smitty."
5      Are you Smitty?
6    A. Yes.
7    Q. Okay.
8    A. Chris Smith is kind of a common name, so
9 I've got to differentiate myself --
10   Q. I gotcha.
11   A. -- a little bit.
12   Q. Okay. I don't have that problem
13 obviously, but you know...
14   A. My middle name is Coryell. That's kind of
15 unique.
16   Q. Oh, that is kind of unique. That is true.
17      Not named after the San Diego Dodgers --
18 Chargers catchers, are you?
19   A. Yeah, Eric -- Don Coryell, Eric Coryell.
20 No, it's a family name, but --
21   Q. Got it. It's a cool name, though.
22   A. Yeah.
23   Q. Actually, I have a really fun story, off
24 the record.
25   A. I was born in San Diego.

30 (Pages 114 - 117)

Page 118

1    Q.  Oh, were you?  This is a really funny
2  story.  You'll like this.
3        MR. KAREN:  Off the video record.
4        THE VIDEOGRAPHER:  All right.  Off the
5  video record at 10:54 a.m.
6        (Recess taken.)
7        THE VIDEOGRAPHER:  On the video record at
8  10:55 a.m.
9  BY MR. KAREN:
10   Q.  I will never forget that one.
11       Okay.  The reason I'm asking you about
12 this, they say, "You know, he's a good dude.  We now
13 know why you speak so highly of him."
14       Do you see where it says that?
15   A.  Yep.
16   Q.  Does this indicate -- previously, I had
17 shown you an e-mail that was November 9th, and I
18 think you said you had not spoken to them yet?
19   A.  Okay.  Yep.
20   Q.  I'm sorry, that's not what you said.  You
21 said you had not met with them yet.
22   A.  Correct.
23   Q.  And then we see this e-mail January 31st.
24 Does this refresh your recollection at all about
25 when you actually met with WaterStone?

Page 119

1    A.  Yeah.  It probably would have been
2  sometime in January --
3    Q.  Okay.
4    A.  -- based on this e-mail, yep.
5    Q.  Okay.  But it doesn't help you like
6  specifically recall any day?
7    A.  Specific date, no.
8    Q.  Okay.  But it's fair to say it was
9  sometime between, I think it was, November 9th --
10   A.  Yep.
11   Q.  -- and January 31st?
12   A.  Correct.
13   Q.  Okay.  Tell me about that first meeting
14 you had with WaterStone.  What do you recall about
15 it?
16       MS. KREITER:  Object to the form.
17   A.  I think it was really just kind of getting
18 to know each other.
19 BY MR. KAREN:
20   Q.  Well, where was it?
21   A.  It was at a restaurant.
22   Q.  What was the name of the restaurant?
23   A.  Christner's.
24   Q.  Christner's.
25       Okay.  And where -- where in Florida?

Page 120

1    A.  Winter Park.
2    Q.  And who was there?
3    A.  Dwayne, Chris, myself, Dustin, and Mike
4  Smalley.
5    Q.  And what are Dustin and Mike Smalley's
6  role at WaterStone?
7    A.  They both -- Dustin and Mike Smalley and
8  David Holbrook collectively run the east region.
9    Q.  Okay.  Do you know why -- well, how come
10 it wasn't just you and the guys at WaterStone?  Do
11 you know why Chris and Dwayne were there too, Chris
12 Wolf?
13   A.  It's a good steak restaurant.
14   Q.  Okay.  I mean --
15   A.  It is a good steak restaurant.
16   Q.  Okay.  All right.  But I mean, I'm sure
17 they didn't just come for the steak, fair enough?
18   A.  Well, free meal.
19   Q.  Well, okay.  In all seriousness, though, I
20 mean, do you -- why did you guys meet collectively
21 as opposed to just one-on-one with you and --
22   A.  I couldn't give you an opinion on that.
23   Q.  Was it just it made sense or you didn't --
24 it just sort of developed that way?
25   A.  Maybe they knew them already or they had

Page 121

1  met with them before.  I don't know if they met with
2  them prior or not.
3    Q.  Okay.  There was nothing you ever
4  considered; it just sort of happened that way.
5    A.  Correct.  I didn't say, hey, we're going
6  to dinner make; sure you're there or -- yeah.
7    Q.  Okay.  Okay.  There was no real planning
8  from your --
9    A.  Correct.
10   Q.  -- perspective or anything like that.
11   A.  No, no.
12   Q.  Got it.
13       Do you know if that was the first time
14 Chris Wolf and Dwayne met with the individuals?
15   A.  I don't know.
16   Q.  Okay.  When did you tell WaterStone, hey,
17 I'm in, I'm coming?
18   A.  Probably sometime towards the -- maybe the
19 end of May, mid to end of May.
20   Q.  So that's when you made your decision?
21   A.  Correct.
22   Q.  Okay.
23   A.  It might have been when I got back from --
24 I was on a family vacation, so end of May.
25   Q.  All right.  And did you communicate that

31 (Pages 118 - 121)

1 to Dwayne?

2    A.   I don't recall.

3    Q.   At some point, you would have, right?

4    A.   Yeah, at some point.  Maybe they told him.

5 I don't -- I don't recall if I told him or he told

6 him.

7    Q.   Okay.  The loan officers that worked for

8 you at your branch at Mutual that went over to

9 WaterStone, do you know how their comp was

10 structured?

11   A.   I think all of them, it's 100 basis points

12 and 120 -- 125.

13   Q.   I'm sorry.  100 and 120 --

14   A.   Yeah, so if it's a self-generated loan,

15 they would get 125.  If it was like a lead-based

16 loan or something like that, 100.

17   Q.   Is that how it worked at Mutual?

18   A.   Yes.

19   Q.   Okay.

20   A.   Well, Mutual had different tiers.  I think

21 it was a little bit more complicated, but basically,

22 yes.

23   Q.   Okay.  Just a little bit simplified over

24 at WaterStone?

25   A.   Correct.

1    Q.   Okay.  Did they get -- when they were at

2 Mutual, did they get base compensation like --

3    A.   No.

4    Q.   -- a draw or anything?

5    A.   Some did, some didn't.

6    Q.   Okay.  And how did that work over at

7 WaterStone?

8    A.   I think one or two elected a draw, but in

9 the market we're in, I eliminated paying draws to

10 anyone.

11   Q.   Okay.  How much control at WaterStone do

12 you have over the compensation of your loan

13 officers?

14   A.   100 percent.

15   Q.   And was that the same at Mutual?

16   A.   Yes.

17   Q.   Okay.  So the reason why it would be the

18 same is essentially because you made it that way --

19   A.   Correct.

20   Q.   -- both places?

21        Okay.  Did any -- did you pay any bonuses

22 to you or -- well, did you or WaterStone, however

23 you want to view it, pay any bonuses for loan

24 officers to come over to WaterStone from Mutual?

25   A.   Yes.

1    Q.   Who got bonuses?

2    A.   Ingrid Ruiz, Mike Stefans.  It's just a

3 small amount per month, like a three-month, you

4 know, guaranteed commission.

5        So it was -- actually wasn't necessarily a

6 bonus.  It was guaranteed commission.  So if they

7 didn't -- if they didn't hit a certain number, they

8 got the difference.  So Mike Steffen, Ingrid Ruiz,

9 Matt Landgraff, Nate Dahlin.

10   Q.   Anyone else?

11   A.   Yeah.  I believe Lynch, Patty, and John.

12   Q.   Patty and John Lynch?

13   A.   No, John Utsch.

14   Q.   Oh, John Utsch --

15   A.   Yep.

16   Q.   -- and Patty Lynch --

17   A.   And then eventually, when -- if -- yeah,

18 when Lynch and Patty decided -- the two New Jersey

19 guys, they hadn't decided if they were going to come

20 or not, but when they did decide, then yeah, they

21 got a bonus.

22   Q.   Okay.  And who structured -- who

23 determined that?  Was that you?

24   A.   Yes.

25   Q.   Okay.  So you essentially determined that,

1 and then WaterStone okayed it?

2    A.   Correct.

3    Q.   Okay.  I presume WaterStone did need to

4 okay it?

5        MS. KREITER:  Object to the form.

6    A.   Needed to okay it?  I think it was more of

7 a, if I said we want to pay them a bonus, it was

8 going to be done.  I don't --

9 MR. KAREN:

10   Q.   Okay.

11   A.   -- I don't think they needed to approve

12 it.

13   Q.   Okay.  You had to advise them of it.

14   A.   I said, this is what I would like to do.

15   Q.   Okay.

16   A.   And it wasn't like, well, we'll think

17 about it.

18   Q.   Right, but you had at least advise --

19 advised them of that?

20   A.   Sure, yeah, because the HR had to write up

21 that offer letter.

22   Q.   Right.  And obviously, it's coming in

23 WaterStone's payroll, not yours.

24   A.   Correct.

25   Q.   So someone has to know about it, right?

32 (Pages 122 - 125)

Page 126

1    A.  Right.
2    Q.  And do you know when those decisions -- do
3  you know when those decisions were finalized or
4  made?
5    A.  Some right shortly around when we
6  announced that or I announced that we were leaving.
7        MR. KAREN:  Okay.  This is Exhibit 3,
8  right?
9        (Thereupon, marked as Exhibit 3.)
10  BY MR. KAREN:
11   Q.  Sir, I'm showing you a chain of e-mails,
12  and then a document attached to it.
13       Do you recognize the bottom of page 1?
14  There's an e-mail from ChrisSmith@MutualMortgage to
15  husky5417?
16   A.  Yes.
17   Q.  Okay.  That is your personal e-mail,
18  right?
19   A.  Correct.
20   Q.  Okay.  And that is March 2, 2022?
21   A.  Correct.
22   Q.  Okay.  And you were employed at Mutual at
23  that time, right?
24   A.  Correct.
25   Q.  Okay.  That's why you have a Mutual

Page 127

1  Mortgage e-mail address --
2    A.  Yes.
3    Q.  -- right?
4    A.  Yep.
5    Q.  I have a grasp for the obvious.
6        All right.  So is husky5417 your personal
7  e-mail?
8    A.  Yes.
9    Q.  Okay.  And it shows here that you were
10  forwarding a December -- it says December P&L.
11   A.  Correct.
12   Q.  It appears to be a December P&L attached.
13   A.  Yep.
14   Q.  And you were forwarding that to your
15  personal e-mail?
16   A.  Correct.
17   Q.  Okay.  Why did you do that?
18   A.  I always keep record of my P&Ls --
19   Q.  Okay.
20   A.  -- in personal e-mail.
21   Q.  So you routinely send them to your
22  personal e-mail?
23   A.  Correct.
24   Q.  Okay.
25   A.  I send my WaterStone P&Ls to my personal

Page 128

1  e-mail.
2    Q.  Okay.  Do you commonly use your personal
3  e-mail to either like store information, like
4  business information or communicate with employee --
5  you know, your employees --
6    A.  No communication with employees, but
7  anything, I think, pertinent to my business, my
8  operation, communication with a company that I feel
9  might -- I might need in the future if I lose that
10  e-mail or I lose that access to my Mutual of Omaha
11  e-mail, yes.
12   Q.  Okay.  Now, here you did communicate to
13  Dwayne, because I think it shows that Chris Smith,
14  husky5417, and it e-mails it to Dwayne Hutto.  You
15  can't necessarily see it, but then you see from
16  Dwayne Hutto to his Mutual, and then it goes over to
17  WaterStone.
18       Do you see that?
19   A.  Yes.
20   Q.  Okay.  So in this case, tell me if I'm
21  right.  You forwarded your P&L to your personal?
22   A.  Yep.
23   Q.  And then you sent it Dwayne, and then
24  Dwayne sent it over to WaterStone.
25   A.  That's what it looks like, yep.

Page 129

1    Q.  Okay.  And you sent it to Dwayne's, it
2  looks like, personal Yahoo e-mail address, right?
3    A.  Correct, yep.
4    Q.  Okay.  So my first question is, why did
5  you send it to Dwayne?
6    A.  Probably because I think in the discussion
7  of moving, if I'm going to move myself, that -- it's
8  like a loan officer sending their production
9  history.  So if I'm in communication with a bank,
10  whether it's WaterStone or FCB, sending them the
11  P&L, saying this is who I am, the production we do,
12  type of loans, purchase, refi.  So I sent it to
13  Dwayne, and he sent it to Dustin.
14   Q.  Okay.  My question is, by this point, you
15  had already met with WaterStone --
16   A.  Correct.
17   Q.  -- I think you said.
18       So you had already established some level
19  of relationship with them; is that fair to say?
20   A.  Yes, we were getting to know each other.
21   Q.  Right.  So my point, though, is -- or not
22  my point.  My question is, rather than you sending
23  it to Dwayne, and Dwayne sending it to, you know,
24  Dustin Owen or whoever at WaterStone, why didn't you
25  just send it to them?

33 (Pages 126 - 129)

Page 130

1  A. I don't -- I don't know.
2  Q. I mean, it would seem more efficient,
3 wouldn't it, to just send it to them directly?
4       MS. KREITER: Object to the form.
5  A. Potentially. I mean, I don't know if I
6 had Dustin's e-mail at the time. I probably could
7 have gotten it. I knew Dwayne's e-mail.
8  BY MR. KAREN:
9  Q. Right. I mean, was it because you didn't
10 necessarily think it was right to send a P&L over to
11 the other company?
12  A. No, I -- no, I wouldn't say that. I mean,
13 I've sent my P&L to companies before.
14  Q. Okay. So I guess then -- I mean, do you
15 know why -- you don't know why you did it or why did
16 you --
17  A. Well, no, the -- yeah, like I said, if a
18 loan officer is considering leaving, you know,
19 WaterStone to go to Guild, they would send the --
20 when you have a branch and you run a P&L branch,
21 that's -- that's a record of your production, your
22 volume. And so it's very similar to a loan officer
23 sending another lender, hey, here's all my
24 production, these are the loans I do. So it's just
25 a higher level of letting another company know who

Page 131

1 you are and what kind of volume and production you
2 do.
3  Q. And then --
4  A. Yeah, but why I sent it to Dwayne versus
5 Dustin, I can't -- I don't know.
6  Q. Okay. And you sent it to his personal
7 e-mail address. Why didn't you send it to his
8 WaterStone -- I mean, his WaterStone -- his Mutual
9 Mortgage e-mail address?
10  A. Because Mutual of Omaha didn't know we
11 were leaving.
12  Q. Okay. So to keep it secret?
13  A. And actually, he sends me his P&Ls. I --
14 he asked me to look at his P&Ls.
15  Q. Right, but he's -- you were sending his
16 P&L, I think you already testified to this, to
17 ultimately send it WaterStone.
18  A. Correct.
19  Q. Okay. So my question is then why weren't
20 you sending it to his Mutual Mortgage address? Is
21 that just because you didn't want Mutual Mortgage to
22 find out?
23  A. Correct.
24  Q. Okay. And so then Dwayne sends it to
25 Dustin Owen.

Page 132

1  Did you ever discuss with Dustin Owen your
2 P&L?
3  A. No.
4  Q. Okay. So I want to go through this P&L
5 quickly. If you could open up the next couple
6 pages.
7  A. Sure.
8       MS. KREITER: You're on the first page
9 here?
10       MR. KAREN: Yes, I am.
11  BY MR. KAREN:
12  Q. And on the top left corner, just so we
13 could identify it, sir, do you see where this says
14 "Mutual of Omaha Mortgage, profit and loss statement
15 Tampa"?
16  A. Yep.
17  Q. December 31, 2021?
18  A. Correct.
19  Q. And it has a Tampa 1728. What is that?
20  A. That's my call center.
21  Q. Okay. And then we go through it. It says
22 "loan production income." Do you see that first
23 column on the left?
24  A. I see loan production -- oh, loan
25 production income, yep.

Page 133

1  Q. Okay. And then underneath there, there's
2 like subcategories, right?
3  A. Yep.
4  Q. Gain and loss, what is that?
5  A. That is the -- presumably the 300 basis
6 points.
7  Q. Okay. And that's not publicly available
8 information, is it?
9  A. Well, if you're in the mortgage industry
10 and you price loans, you have a general idea of the
11 revenue generated on a loan.
12  Q. This isn't a general idea, this is a
13 precise specific number, isn't it?
14  A. Well, it varies. So it's 2.87, 3.02,
15 3.14, 2.97.
16  Q. That's my point.
17  So the question is, these are very
18 specific numbers; they're not general numbers.
19  A. For any particular month, correct.
20  Q. Right. So I'm just saying, these very
21 specific numbers are not publicly available, are
22 they?
23  A. Not to my loan officers. They're
24 available to me.
25  Q. No, publicly, the world can't find them.

34 (Pages 130 - 133)

Page 134

1    A.   I believe actually, if I were to send a
2  loan, a loan I priced -- so I would think that --
3  not publicly to someone that works at Google, but if
4  I were to take a loan and say, this is a loan I
5  closed, here are all the specifics, FICO score, LTV.
6         But I'm answering your question.  You're
7  saying it's not publicly available, but anyone in
8  the mortgage industry would say, okay, you closed
9  that loan, you generated -- this is also a blend of
10  all the loans I've closed, but down to -- if you
11  drill it down a specific loan --
12    Q.   No.  I'm asking, this blend -- this
13  reflects the average, I guess, it looks like on a
14  monthly basis.
15    A.   Right.
16    Q.   The average gain and loss on every --
17    A.   Correct.
18    Q.   Not every.
19    A.   Collectively --
20    Q.   Collectively.
21    A.   -- on that first column, 6.3 million.
22    Q.   Right.
23    A.   Yeah.
24    Q.   And so I'm not asking can somebody find
25  what the gain and loss was on a particular loan, I

Page 135

1  don't know if they could or couldn't.  That's not my
2  question.
3         To ascertain what was the gain/loss on all
4  loans in January of 2021, that would not be a --
5  that would not be publicly available information,
6  would it?
7    A.   It would not be publicly available, but if
8  I sent every loan I closed to another lender, they
9  would be able to come up with that number pretty
10  close.
11    Q.   I understand that --
12    A.   Yeah.
13    Q.   -- but without -- without that, you
14  wouldn't be able to find out.
15    A.   I would actually disagree because anyone
16  in the mortgage industry -- again, you're
17  publicly -- publicly available to -- someone that
18  works at Starbucks, it means nothing to them, right?
19  So it's not public to a Starbucks employee, but if I
20  send all of my loan data or if I --
21    Q.   What I'm saying --
22         MS. KREITER:  Let him finish.
23  BY MR. KAREN:
24    Q.   -- data --
25         MS. KREITER:  Let him finish.

Page 136

1    A.   So my point is is that within the industry
2  that we operate in, I could look at someone's loan
3  details or collectively all their loan details, and
4  then figure out pretty accurately what the revenue
5  generated on those loans are.
6         So it might not be public to someone at
7  Starbucks, but anybody who is in the industry can
8  look at the loan that you're trying to close if it's
9  FHA/VA, as a conventional.  So I do believe that
10  people within the industry would be very accurate at
11  predicting what that revenue is or guessing -- not
12  guessing -- predicting.
13         I have a very high accuracy rate on the
14  revenue generated, especially the secondary markets.
15    Q.   Okay.  But my question here wasn't about
16  on a particular loan.  It was on the collective
17  of --
18    A.   But I --
19    Q.   -- all of the loans.
20    A.   Correct.
21    Q.   And if I understand, you could take the
22  time and go through all of the loans every month,
23  that would take a lot of time, wouldn't it?
24    A.   Yeah.
25    Q.   Okay.  Now, let's go down to, say,

Page 137

1  tolerance cures.  And this, again, do you see 3, 4,
2  5 down?
3    A.   So the negative 23,264?
4    Q.   Yeah, I'm not talking about the number.
5  I'm really just asking about tolerance cures.
6    A.   Tolerance cures.
7    Q.   What are tolerance cures?
8    A.   So if there's -- you under-disclosed a fee
9  from a compliance standpoint, you can't charge the
10  customer that fee.  You would have to pay the fee
11  and absorb it in the branch level.
12    Q.   Okay.  And again, that reflects -- what
13  does that -- what does that tell you if you have a
14  lot of tolerance cures versus a few tolerance cures?
15    A.   It could be an operational mistake at
16  corporate at the branch level.
17    Q.   But it reflects some level of operational
18  mistake somewhere?
19    A.   Yes.
20    Q.   Okay.  And again, tolerance cures of your
21  particular branch cumulatively per month, that's not
22  going to be publicly available?
23    A.   No.
24    Q.   Okay.  Let's go further down to the next
25  page.  Actually, one, two, three pages.  Again, it

Page 138

1 has the Mutual of Omaha at the top left corner, and
2 it says "business and development marketing."
3    A.  Yep.
4    Q.  Do you see where I am?
5    A.  Yep.
6       MR. KAREN:  Are you following with us,
7 Maria?
8       MS. KREITER:  (Non-verbal response.)
9 BY MR. KAREN:
10    Q.  Okay.  So if you go down, you're going to
11 see a digital marketing expense.  What is that?  It
12 doesn't look like you had any.
13    A.  No.  Yeah, I don't know if that's like
14 social media that the company would charge me for.
15 I'm not -- obviously, I didn't get charged for any
16 of it, so...
17    Q.  Okay.  And then there is a lead expense.
18 What is that for?
19    A.  Zillow, LendingTree, Realtor.com, iLeads,
20 LoanBright.  Just different online lead providers
21 co-marketing with Realtors.
22    Q.  Okay.  Let me ask you quickly about that
23 with leads.  What do you -- in the leads you
24 identified, the ones you buy, I know there's a lot
25 of different lead sources out there.

Page 139

1    A.  Yep.
2    Q.  First of all, I made an assumption.  Do
3 you, in fact, pay for those leads?
4    A.  Yeah.  It's my P&L, so I pay for it, yep.
5    Q.  Okay.  Well, but in other words, they cost
6 money.
7    A.  Correct.
8    Q.  Okay.  And on the leads you guys buy, what
9 is the typical information you get in the leads that
10 you're purchasing?
11    A.  Name, cellphone, e-mail address.  We
12 weren't buying -- you could buy some that came with
13 a Social, but we didn't buy those.
14    Q.  Social?
15    A.  Social Security number.
16    Q.  Oh, okay.
17    A.  So you would get name, address, and --
18 name -- well, not address.  Name, phone number --
19 name, cell, e-mail.  So the name of the client or
20 the lead, their cellphone number, and their e-mail
21 address.
22    Q.  Okay.  And you said there's some that you
23 can get Social Security numbers?
24    A.  Long forms, they'll allow you to get
25 Social Security numbers with them, yep.

Page 140

1    Q.  How come you didn't buy those?
2    A.  Too expensive, didn't like the conversions
3 on them.
4    Q.  Okay.  Did they have higher conversion
5 rates as opposed to the conversion rates of the
6 leads you bought or were they the same?
7    A.  I think it's a preference for the sales
8 leader of a branch and what leads they want to buy.
9    Q.  Okay.  But those ones with the Socials are
10 more expensive.
11    A.  More expensive.
12    Q.  Okay.  Do you know why?
13    A.  Because it comes with a Social.
14    Q.  I mean, but what's the significance of
15 that?
16    A.  If someone is going to put their Social
17 Security number on a lead form and submit it in the
18 Internet, then they're pretty serious about applying
19 and buying -- buying and refinancing.
20    Q.  Got it.  I assume that's a place where --
21    A.  It's more -- it's probably a stronger
22 indication that they might want to do business.
23    Q.  Okay.  Yeah, have you found that the
24 conversion rates of those loans are any better than
25 the leads you buy?

Page 141

1    A.  I didn't have any real insight to, you
2 know, the conversion rates of other branches.
3    Q.  No, no, not other branches.  Off of those
4 leads.
5    A.  Yeah, I never -- so your question is, did
6 I -- repeat the question.
7    Q.  Sorry.  You don't buy the leads that comes
8 with Social Security numbers.
9    A.  Correct.
10    Q.  I thought you said you didn't love their
11 conversion rates.
12    A.  I think for the ROI, the return on
13 investment, they -- so if you bought 100 leads at
14 $100 a pop, that's $10,000, or I could buy 10,000
15 leads at 10 bucks apiece.
16    Q.  So they're a lot more expensive for the --
17    A.  They're a lot more expensive, yes.
18    Q.  Okay.
19    A.  Well, maybe that's -- they're probably 25
20 versus 100.  So it's about 4 times the cost.
21    Q.  Okay.  And so what you're saying, if I
22 understand is, the return on investment --
23    A.  I'd rather buy -- yeah.
24    Q.  Let me finish my question.
25    A.  Oh, sorry.

36 (Pages 138 - 141)

Page 142

1    Q.   The return on investment on those more
2  expensive loans wasn't worth the money to pay for
3  that --
4    A.   Correct.
5    Q.   -- additional money to pay, right?
6        Okay.  So I just want to talk to you, when
7  you have -- get a lead, and you already discussed
8  the process with me from getting somebody from lead
9  stage to application, let's say.
10   A.   Yep.
11   Q.   Can you tell me, from lead stage to
12 closing of a loan, are there, what I call, fallout
13 points, like places in particular parts of the
14 process, the loan process, where you tend to lose a
15 lot of people?
16   A.   Yes.
17   Q.   Can you explain to me where those are?
18   A.   If they shop you.  So they go online and
19 look for other quotes from other lenders, by the
20 time you get their income docs, they don't make
21 enough, the appraisal comes in short, there's an
22 issue on title.  I mean, there's cavers, government
23 losses on student loans can affect you getting an
24 FHA loan.  There's a whole bunch of different --
25 mainly, it's they shop you, they don't make enough

Page 143

1  money or there's an issue with the appraisal.  The
2  house isn't a -- in a state of disrepair, we can't
3  lend on it.
4    Q.   Okay.  So there are, it sounds like, a
5  lot; there aren't really a couple of fallouts --
6    A.   Yeah, there's a lot of different issues
7  that can kill a loan, yep.
8    Q.   Okay.  And they come at various times and
9  stages?
10   A.   Correct.
11   Q.   All right.  So -- but would you agree that
12 one of the big ones is getting from the lead to
13 somebody actually filling out an application?
14   A.   Yeah, converting a lead into an
15 application is -- yeah, that's --
16   Q.   Is that a big one?
17   A.   Yes.
18   Q.   What percentage, do you think, would fall
19 out right there?
20   A.   95 percent, 97.
21   Q.   Wow.
22   A.   No, not 97.  I would say if you're
23 converting 10 percent of your leads into
24 applications, that's good.
25   Q.   Okay.  All right.  And it's still worth

Page 144

1  paying all that money for leads?
2    A.   Yep.
3    Q.   Okay.  Is a place they fall out -- and I'm
4  only asking this because you said it's so much more
5  expensive to buy them with Socials, is that a big
6  fallout place when you're asking for that Social
7  Security number?
8    A.   Sometimes, yep.
9    Q.   So that's -- that's within that process,
10 that's a --
11   A.   Yeah, if you get them on the phone, have a
12 conversation, oh, I don't want to give you my
13 Social.
14   Q.   Okay.  All right.  And is that an
15 objection a lot of people have?
16   A.   So -- yes.  It's common when you don't
17 have the Social.
18   Q.   That somebody --
19   A.   Yeah, I'm not sure if I want to give my
20 Social, I don't want to have my credit pulled yet.
21   Q.   Right.  One of the reasons -- is one of
22 the reasons because people's credit scores can go
23 down by pulling too much credit?
24   A.   No, that's actually a myth.
25   Q.   Oh, really?

Page 145

1    A.   Yeah.
2    Q.   See, I thought that.
3    A.   Everybody thinks that, yeah.  It's true
4  when -- let's say this weekend you go car shopping
5  and you go to three different car dealerships, they
6  all pull your credit, then you're at the mall and
7  checking out a Macy's, oh, open a Macy's card and
8  you'll have your credit -- oh, we'll give you
9  30 percent off; you go to Home Depot and open up a
10 Home Depot card, 30 percent off; you come home on
11 Monday and there's a credit -- you know, Visa,
12 Mastercard, Discover, you applied for all three.  So
13 when you have a rapid number of credit pulls across
14 kind of like a broad spectrum of people that extend
15 credit, so you're applying for car loans, mortgages,
16 credit cards, department store cards, everything,
17 that's reckless use of credit.
18       But a one, single credit report is not
19 going to affect anyone's credit.
20   Q.   What if you pull like three different
21 lenders, is it all because it's all the same --
22   A.   No, I think it's -- if it's within, you
23 know, a reasonable number, you know, couple -- you
24 know, you shop for a car, you get a couple
25 different -- it's when people have, you know, 30, 40

37 (Pages 142 - 145)

Page 146

1 credit inquiries in a month.
2    Q.  I see.
3    A.  Yeah.
4    Q.  So a couple -- I get it.
5    A.  Yep.
6    Q.  So that's a myth, though, a lot of people,
7 like myself, believe, and that's one hesitation
8 point?
9    A.  Yeah, but we try and educate them on that.
10 Like if you're serious about getting an accurate --
11   Q.  I believed you, but that's okay.
12   A.  Yeah, but if you're accurate and if you're
13 serious about getting an accurate quote, you have to
14 have your credit pulled.  Anyone can just tell you,
15 oh, my credit is 780, but maybe it's not.
16       So you know, you really definitively need
17 that.  But you also see their liabilities, what are
18 their -- you know, what kind of debts they have, car
19 loans, credit cards, all of that, which also affects
20 their ability to qualify.
21   Q.  Okay.  So if that's one of their
22 objections, what other -- is it just people not that
23 serious?
24   A.  Yeah, sometimes leads are bad.  It's a
25 bogus number, bad e-mail, bad phone number, can't

Page 147

1 get them on the phone.
2    Q.  I'm sorry, no.  My question is why -- what
3 are the other reasons why people object to giving
4 you Socials --
5    A.  I mean --
6    Q.  -- other than -- other than this sort
7 of -- if you know.
8    A.  Yeah, yeah, I mean, maybe they're just not
9 sure they want to go through with it; maybe it could
10 be the person they're talking to on the phone, they
11 don't like how they sound; maybe they do some
12 research on your company, I've never heard of you.
13 Stuff like that.
14   Q.  Got it.
15   A.  Yep.
16   Q.  Got it.
17       Okay.  So continue back on this, lead
18 expense, again the amount that you spent on leads,
19 that wouldn't have been public, wouldn't it?
20   A.  No.
21   Q.  Okay.  Then you continue down --
22   A.  I would say that the cost of the leads is
23 public.  Anyone can call --
24   Q.  Right.
25   A.  Yeah, can call LendingTree and find out

Page 148

1 how much leads cost.
2    Q.  Sure, sure.  But the amount you spend per
3 week, per month or whatever, that's not?
4    A.  Correct.
5    Q.  Okay.  And can you go further down?
6 There's a thing that says "credit reports."
7    A.  Yep.
8    Q.  And I was just confused about something.
9 Never mind, I'm not confused anymore.
10       Well, let me ask you this:  Do customers
11 pay for credit reports or is that something you pay
12 for?
13   A.  We pay for them, but if the loan funds,
14 then we charge them for the cost of the credit
15 report.
16   Q.  I see.  So what it's charged by the credit
17 reports here, if you have 30 applications and one
18 closes, then you would only get paid the one that
19 closed, not the --
20   A.  Correct.
21   Q.  -- 29 other that didn't.
22   A.  Correct.
23   Q.  Okay.  So that's what that cost refers to.
24   A.  Correct.
25   Q.  Okay.  Do you guys get the credit back --

Page 149

1 or the credit back?  Do you guys at Mutual, did they
2 credit your P&L back when you got a credit report
3 paid for?
4    A.  Yes.
5    Q.  Okay.  How much is the average cost of a
6 credit report?
7    A.  It's gone up, but I mean, right now, I
8 think it's 30 -- I think it's $31 for a single, and
9 60 for a joint application.
10   Q.  Okay.  And then early path expense, what's
11 that?
12   A.  When a client pays you off within the
13 first 180 days of originating the loan.
14   Q.  All right.
15   A.  So you pay back that -- so that revenue
16 piece on the other side, so that 2.87 percent gets
17 charged back to the -- Mutual.
18   Q.  Okay.  That early path expense, again,
19 that's not something that's going to be publicly
20 available.
21   A.  No.
22   Q.  Okay.  And then when you go down, it says
23 loan repurchase expense.  What is that?
24   A.  Let me see.  I'm not sure if this is
25 the -- so that if they had to buy a loan back, I

38 (Pages 146 - 149)

Page 150

1 believe. I'm not -- I did -- I know I did build a
2 loan loss reserve, but I'm not sure if that's on
3 here anywhere. I would...
4     Q.  Yeah, and it may be. I mean, I'm just
5 trying to ask, sir --
6     A.  Yeah, I mean it -- so a loan repurchase
7 expense would be if we incurred costs -- oh, no.
8 This is -- this should -- this was actually -- they
9 took money out of my P&L for future loss on loans.
10 So if there was a repurchase, they had an issue with
11 a loan in my branch that wasn't an early payoff, so
12 they would take one basis point of every loan I
13 closed, and then build this account which -- yeah.
14     Q.  Let me just ask you generally, what is a
15 loan repurchase?
16     A.  If we have to buy a loan back from an
17 investor.
18     Q.  And why would you have to buy a loan back
19 from an investor?
20     A.  The underwriter made a mistake, branch
21 made a mistake. So there's a defect or flaw in the
22 underwriting of the loan.
23     Q.  Okay. And there's I guess, I assume, an
24 agreement between the investor, the person who buys
25 the loan --

Page 151

1     A.  Yep.
2     Q.  -- and your mortgage company; in this
3 case, Mutual, where if there's one of these types of
4 problems arises, they'll buy the loan back.
5     A.  Correct.
6     Q.  And then they charge-back to your P&L?
7     A.  Yeah. I don't think it ever happened, no.
8     Q.  Okay. But this loan repurchase expense,
9 again, is not a publicly available number.
10     A.  Correct.
11     Q.  Okay. Do you get loan repurchases -- do
12 you have loan repurchases and early P&L -- early --
13 early --
14     A.  Payoffs.
15     Q.  -- payoffs charged back to your branch at
16 WaterStone?
17     A.  Yes.
18     Q.  Okay. Is this -- are these expenses
19 consistent with the calculation that you use at
20 WaterStone?
21     A.  Yes.
22     Q.  Okay. Is there anything that's
23 additionally considered as an expense at WaterStone?
24     A.  Actually, WaterStone does not charge a
25 loan repurchase. They don't take money out of my --

Page 152

1 I think I left behind my P&L when I left. And I
2 believe, actually, there was a contract way back, I
3 can't find it, that when I left, I would get the
4 loan repurchased. I think there's about $150,000
5 collectively in that account that I never saw.
6     Q.  Okay. We'll go back and look for those
7 contracts later.
8     A.  Actually, I have an e-mail that I
9 forwarded to Yahoo that showed that I would receive
10 that money.
11     Q.  Your Yahoo personal account?
12     A.  Yeah. I sent it -- I sent it to myself
13 because it's a lot of money. It's 150,000.
14     Q.  Now, let me ask you something. You had
15 sent this P&L, we already talked about, to Dwayne
16 and his personal e-mail address.
17     A.  Yep.
18     Q.  You talk about it in the e-mail.
19         And were there other e-mails that you and
20 had -- you and Dwayne had on personal e-mail
21 pertaining to this during this period of time?
22     A.  Not that I recall.
23     Q.  So you're saying this is the only e-mail
24 you sent?
25     A.  I can't say if it is or isn't.

Page 153

1     Q.  Okay. Did you ever use your personal
2 e-mail to talk to John Utsch?
3     A.  No.
4     Q.  Okay. How about any employees at your
5 branch? Did you ever use your personal e-mail to
6 discuss?
7     A.  I don't recall.
8     Q.  How about Chris Wolf? I think we saw some
9 e-mails.
10     A.  Yeah, I think I communicated -- I think,
11 yeah, there were some communication with Chris, yep.
12     Q.  Okay. How else did you guys communicate
13 other than by e-mail?
14     A.  Verbally.
15     Q.  Do you ever text?
16     A.  No. John's in my office, so I see him all
17 day every day.
18     Q.  No, oh, how about, though, do you text
19 with Dwayne and/or Chris Wolf?
20     A.  Not really about work stuff. I just pick
21 up the phone and call them.
22     Q.  Okay.
23     A.  We talk a lot.
24     Q.  Did you ever have any communications with
25 WaterStone on your personal e-mail?

39 (Pages 150 - 153)

Page 154

1  A.  I don't recall.
2  Q.  It's possible?
3  A.  It's possible.
4  Q.  All right.  How about via text message?
5 Do you text with anybody at WaterStone?
6  A.  No.
7  Q.  So you're not a big texter?
8  A.  Not business stuff, no.
9  Q.  Okay.
10  A.  I believe in -- if I'm going to
11 communicate with a client, it's e-mail, or an
12 employee, e-mail.  And I have a record of it with
13 the company.
14  Q.  How about with customers, would you have
15 done any personal e-mails with customers?
16  A.  No, definitely not.
17  Q.  Okay.  And when I say "personal e-mails,"
18 not to their personal e-mails.  I was referring to
19 your personal e-mail.
20  A.  Yeah, yeah, correct, yeah.
21  Q.  Okay.  You understood that.
22  A.  Yep.
23  MR. KAREN:  Could we take a short break?
24 I'm waiting for a couple exhibits to come to
25 me, and I think they should be here by now.  Do

Page 155

1 you mind?
2  MS. KREITER:  Sure.
3  MR. KAREN:  Maybe five, ten minutes?
4  MS. KREITER:  That's fine.  Do you -- I
5 don't know -- I know you said shorter today.
6  MR. KAREN:  Yeah.  I mean -- off the
7 record.
8  THE VIDEOGRAPHER:  Off the video record at
9 11:29 a.m.
10  (Recess taken.)
11  THE VIDEOGRAPHER:  This is the beginning
12 of Media Unit Number 3.  We're on the video
13 record at 11:46 a.m.
14 BY MR. KAREN:
15  Q.  Sir, when we talked earlier, you had said
16 that you really didn't tell most of your loan
17 officers at your branch that you were leaving until
18 the week of your departure; is that right?
19  A.  If I recall correctly, it was, yeah,
20 somewhere -- I believe it was a week, less than a
21 week.
22  Q.  A couple of -- a couple of days to a week.
23  A.  Yeah.
24  Q.  Is that fair?
25  A.  Yes.

Page 156

1  Q.  And are you absolutely positive of that?
2  A.  Yes.
3  MR. KAREN:  I want you to take a look at
4 this document.
5  (Thereupon, marked as Exhibit 4.)
6 BY MR. KAREN:
7  Q.  All right.  Sir, I'm showing you a list
8 of -- and I will say, this is a document, just so
9 you know, that I've put together.  That's a
10 compilation of other materials.
11  A.  Okay.
12  Q.  Okay.  So I want to be clear with you that
13 it's not a WaterStone document.  It's a document I
14 generated from summarizing other --
15  A.  Okay.
16  Q.  -- documents, okay?
17  But what I've done here is I have lists of
18 names on the left, the date of their offer ltter
19 they received from WaterStone and their resignation
20 date, okay?
21  A.  Okay.
22  Q.  All right.  So here's what I would like
23 you to look at:  First of all, can you see with
24 people whose branch is listed as Tampa?
25  A.  Yep.

Page 157

1  Q.  Is there anybody on here that I have
2 listed as Tampa that was not Tampa, if you
3 understand my question?
4  A.  No.
5  Q.  Okay.  So from that perspective, my -- it
6 looks correct?
7  A.  Correct.
8  Q.  All right.  And then if you look in the
9 far right column, you see resignation date?
10  A.  Yep.
11  Q.  And it looks like from here, all of these
12 individuals from Tampa resigned -- resigned on 6/15.
13 Is that consistent with your recollection?
14  A.  Yes.
15  Q.  Okay.  Now, what I want you to do is if
16 you could look at Anthony Bertolotti.  Who is
17 Anthony Bertolotti?
18  A.  He was a loan officer.  He's not with us
19 anymore.
20  Q.  Okay.  And how about Robert Bowe?
21  A.  Loan officer.
22  Q.  How about Wadie Khalaf?
23  A.  Loan officer.
24  Q.  How about Cody Lamb?
25  A.  Loan officer assistant.

40 (Pages 154 - 157)

Page 158

1    Q.   Okay.  LOA.
2         All right.  How about Michael -- Matthew
3 Landgraff?
4    A.   Loan officer.
5    Q.   Okay.  Now, if you go across to the offer
6 letter date, do you see that?
7    A.   Yes.
8    Q.   That represents an offer letter of
9 June 3rd?
10   A.   Correct.
11   Q.   Okay.  Now, if you hadn't told -- and you
12 told me WaterStone had not reached out to these
13 people behind -- without you knowing, right?
14   A.   Correct.
15   Q.   And you had told me that you had only made
16 the decision to choose their compensation level the
17 time that you had told them about you were leaving,
18 right?
19   A.   Correct.
20   Q.   Okay.  Then how do you explain that
21 Matthew Landgraff received an offer letter from
22 WaterStone on June 2nd?
23   A.   Clearly --
24        MS. KREITER:  Object to the form.
25   A.   Well, clearly, I must have told them

Page 159

1 sooner.
2 BY MR. KAREN:
3    Q.   Clearly.
4    A.   Clearly.
5    Q.   So when you said a minute ago under oath
6 that you were absolutely sure, and you testified
7 repeatedly that you were sure that it was the week
8 of, you were seriously wrong about that, weren't
9 you?
10   A.   I was wrong.
11        MS. KREITER:  Object to the form.
12 BY MR. KAREN:
13   Q.   Are there any other aspects of your
14 testimony you're seriously wrong about today?
15        MS. KREITER:  Object to the form.
16   A.   Not that I'm aware of.
17        MS. KREITER:  Assumes facts not in
18 evidence.
19 BY MR. KAREN:
20   Q.   And so you must have been wrong about
21 Anthony Bertolotti, right?
22        MS. KREITER:  Object to the form.  Assumes
23 facts not in evidence.  This is based on an
24 attorney-created document that has an offer --
25        MR. KAREN:  Okay, speaking objection.

Page 160

1 That's great.  Put it all on the record, tell
2 him what to say, Maria.  This is great.  It
3 improves his credibility when you answer for
4 him on the transcript.  But please do.
5        MS. KREITER:  I don't appreciate the
6 tone --
7        MR. KAREN:  I don't appreciate --
8        MS. KREITER:  -- that you're speaking to
9 me.
10        MR. KAREN:  -- the intentional
11 interference that you know violates the rules.
12        MS. KREITER:  Okay.
13        MR. KAREN:  So I'll continue the tone if
14 you want to continue violating the rules.
15        MS. KREITER:  I will address it on
16 rebuttal.
17        MR. KAREN:  Perfect.
18 BY MR. KAREN:
19   Q.   So were you wrong about Mr. Robert Bowe?
20   A.   Yes.
21   Q.   And that would go for Nathan Dahlin?
22   A.   Yeah, clearly anybody in Tampa who got an
23 offer letter on 6/2 or 6/3 had applied with them and
24 gotten an offer letter.  So my recollection of when
25 I told them was inaccurate, yes.

Page 161

1    Q.   Okay.  And that would apply to all these
2 people, right?
3    A.   Yes.
4    Q.   Okay.  And you wouldn't have told only
5 these people.  You wouldn't have told people
6 differently, you would have told everyone around the
7 same amount of time, right?
8    A.   No, I believe that some of them that were
9 remote that maybe weren't in the Tampa office every
10 day, I told them I was leaving, and they were free
11 to do whatever they wanted to do.  And obviously,
12 some of them inquired about joining WaterStone --
13   Q.   Okay.
14   A.   -- sooner than I had previously testified.
15   Q.   Okay.  All right.  Now, if we go to -- I
16 want to show you another exhibit here.
17        (Thereupon, marked as Exhibit 5.)
18 BY MR. KAREN:
19   Q.   Sir, do you see the document I've put in
20 front of you?
21   A.   Yes.
22   Q.   Okay.  Can you tell me what that is?
23   A.   Loan originator employment agreement.
24   Q.   Okay.  And that's with Mutual of Omaha?
25   A.   It says Synergy One Lending, doing

41 (Pages 158 - 161)

Page 162

1 business as Mutual of Omaha.
2     Q.  Oh, you're looking at the first --
3     A.  Correct.
4     Q.  Okay.  I was looking at the top.  Okay, I
5 understand.  But we're --
6     A.  It appears to be a document between
7 Synergy One and a d/b/a and myself, yep.
8     Q.  Okay.  But it's for Mutual of Omaha
9 Mortgage too.
10     A.  As a d/b/a to Synergy One, yes.
11     Q.  Yes, okay.
12         And you see on the bottom, there's -- it
13 looks like a signature.  Is that your signature?
14     A.  Yes.
15     Q.  Okay.  And if you go all the way back to
16 the back, I think it has a date of 11/30/2018?
17     A.  Yes.
18     Q.  Okay.  And do you see your signature to
19 the left of that?
20     A.  Yes.
21     Q.  Okay.  And you signed this agreement?
22     A.  Electronically, yes.
23     Q.  Okay.  You've known -- let me ask you
24 this:  Were you ever asked by WaterStone to send
25 this agreement to them?

Page 163

1     A.  No.
2     Q.  Okay.  Did they -- did WaterStone ever ask
3 you if you had an agreement?
4     A.  It was over a year ago.  I don't recall.
5 I'm sure they assumed I did.  I mean, obviously if
6 you're going to work for a lending institution, you
7 have some sort of employment agreement.  Everybody
8 has one.
9     Q.  Okay.  But you just don't recall a
10 discussion --
11     A.  If they specifically said, do you have an
12 employment agreement, it's almost like a question
13 that doesn't need to be asked because every lender
14 I've ever worked for, you have an employment
15 agreement.
16     Q.  I understand, but you know, this is when
17 us idiot lawyers have to ask --
18     A.  Oh, gotcha.
19     Q.  -- these questions, you know?
20         So -- so you just don't recall one way or
21 the other?
22     A.  No.
23     Q.  Okay.  But you don't recall ever sending
24 to them -- this to them?
25     A.  No.

Page 164

1     Q.  If you would have sent this to them, would
2 you have sent it by your personal e-mail probably?
3     A.  Probably.
4     Q.  Okay.  Would you -- do you know if you --
5 if -- well, this is kind of another silly question.
6 If you would have sent -- you know what?  Forget it.
7     A.  Okay.
8     Q.  Strike that.
9     A.  I'm pretty sure I didn't send this to
10 them.  I probably couldn't have even found this
11 myself.
12     Q.  Okay.
13     A.  But that's just, you know...
14     Q.  But you don't recall them asking for it.
15     A.  No.
16     Q.  I mean, if they would have asked for it,
17 you probably would have called look -- would have
18 called looking for it, right, and trying to find it?
19     A.  Yeah, if they asked for it.  And they
20 might have.  I can't -- again, I can't recall, it's
21 over a year ago.  Obviously, I had other dates
22 wrong.  But yeah, they could have asked for it, but
23 that's -- you know, we're going back over a year.
24     Q.  Right, you just don't recall one way or
25 the other.

Page 165

1     A.  Correct, yeah.
2     Q.  And I think -- is it fair to say, though,
3 I mean, if they asked for it and you were spending
4 time looking through all your e-mails and stuff for
5 it, you probably would remember that?
6     A.  I probably would have found it, yeah.  I
7 probably would have remembered that, yeah.  But
8 again, I don't recall for sure.
9     Q.  Yeah, I understand.  I understand.
10     A.  If it's something that -- yeah.
11     Q.  That's fine.
12     A.  Yeah.
13     Q.  Do you recall -- when you signed this
14 agreement originally, do you recall if you
15 specifically negotiated terms of this agreement or
16 if you just kind of got the agreement and signed it
17 as it was?
18     A.  Yeah, it's very similar to -- because we
19 went from BBMC to Mutual of Omaha.  So this is
20 probably very similar to where everything was the
21 same as where I was at.
22     Q.  Got it.
23     A.  Nothing really changed.
24     Q.  Got it.
25         Do you read these types of employment

42 (Pages 162 - 165)

Page 166

1 agreements?
2    A. Not really.
3    Q. No? You just kind of --
4    A. Yeah, they're all the same, boilerplate.
5    Q. Got it.
6      Let me see if there's any of this in
7 there.
8      Let me ask you a couple questions. If you
9 can look to Section 15 of this agreement.
10    A. Yep.
11    Q. And there's a section called
12 "Non-Solicitation and Confidential Information."
13    A. Yep.
14    Q. Okay. Are you surprised to see this
15 language in this agreement?
16    A. No.
17    Q. Okay. Is it fair to say you were aware at
18 all times that you had these types of restrictions?
19    A. I didn't think about it on a daily basis,
20 no.
21    Q. Okay. When this lawsuit got filed, I'm
22 sure you discussed that -- I do not want to know any
23 discussions you had with lawyers, okay? So you
24 could tell me you had a discussion, but nothing else
25 that involves a lawyer, okay?

Page 167

1      Did you ever discuss this agreement with
2 anyone at WaterStone?
3    A. No.
4    Q. Okay. And I'm asking since the filing of
5 the lawsuit --
6    A. No.
7    Q. -- excluding any conversations with
8 counsel.
9      Okay. All right. Did you and Dwayne
10 Hutto ever discuss this agreement?
11    A. Nope.
12    Q. Did anyone ever point these provisions of
13 the Mutual agreement out to you?
14    A. I don't recall.
15    Q. Okay. Have you -- did you -- have you
16 looked at your Mutual agreement since leaving
17 WaterStone?
18    A. No.
19    Q. Did you prepare for today's deposition?
20    A. Yeah. I had some conversations, yes.
21    Q. Were those conversations -- who -- with
22 who?
23    A. With Maria.
24    Q. Okay. Your attorney?
25    A. Yes.

Page 168

1    Q. Okay.
2    A. WaterStone's attorney.
3    Q. Yes, WaterStone's attorney.
4    A. Yeah.
5    Q. Okay. And without telling me anything
6 that was said, when did you have those
7 conversations?
8    A. Wednesday.
9    Q. Okay. And that was the only time you guys
10 spoke?
11    A. Specifically about -- I've spoken to her
12 when the lawsuit was filed, and she was hired as
13 counsel.
14    Q. Okay. That's fine.
15    A. Yep.
16    Q. But other than those -- when you kind of
17 first spoke to her in regard to your deposition
18 today, the only time you spoke to her was Wednesday.
19    A. Repeat the question.
20    Q. In regard to your deposition today --
21    A. Yep.
22    Q. -- the only time you spoke to her was
23 Wednesday.
24    A. Correct.
25    Q. How long was your conversation?

Page 169

1    A. A couple of hours.
2    Q. Okay. And did she show you any documents?
3    A. A couple of e-mails.
4    Q. Okay. But -- never mind. Scratch that.
5      It sounds like when you're making your
6 transition, did you -- when you -- strike that.
7      When you were making your transition from
8 Mutual to WaterStone, did you consult your
9 employment agreement?
10    A. No.
11    Q. Okay. Can you take a look at just page 4
12 for a minute?
13    A. Uh-huh.
14    Q. Tell me when you're ready and had a chance
15 to look at it and review it.
16    A. All right.
17    Q. Is there anything, having read this, that
18 if you had reviewed it at the time of your
19 transition to WaterStone, you would have done
20 differently having read what you've read now on this
21 page?
22    A. I can't go back and say like it's --
23 that's, you know -- I can't answer that question.
24    Q. How come?
25    A. Because I can't go back and say if you had

43 (Pages 166 - 169)

Page 170

1 done this, that's -- you know, if you had read it,
2 what would you have done differently.
3    Q.   Well, I'm just asking you, sitting here
4 today -- and I'm not asking what would you have done
5 differently.  Do you think you would have done
6 differently?  Is there something possible, or you
7 don't know?
8    A.   I don't know.
9    Q.   Okay.  Let me ask you, has anybody said,
10 from WaterStone -- again, excluding -- all these
11 conversations I'm going to ask you about exclude
12 counsel, okay?
13    A.   Sure.
14    Q.   Has anybody said to you at WaterStone you
15 did something wrong with respect to this agreement
16 with Mutual?
17    A.   Repeat the question.
18    Q.   Has anyone at WaterStone said to you, you
19 should have done something different in regards to
20 your obligations with Water -- under this agreement
21 with WaterStone?
22    A.   I believe -- I can't recall if that -- yes
23 or no.
24    Q.   Yeah, that was a bad question.  Let me say
25 this differently, let me try this a different way.

Page 171

1        Has anyone criticized you at WaterStone
2 for the way you did the transition?
3        MS. KREITER:  Excluding any kind of --
4        MR. KAREN:  Excluding --
5        MS. KREITER:  This entire of line of
6    questioning, to be clear for the record, this
7    entire line of questioning is to the exclusion
8    of any privileged discussions between counsel.
9        MR. KAREN:  Yes, of course.
10    A.   So...
11 BY MR. KAREN:
12    Q.   Let's try this a different way.
13    A.   Okay.
14    Q.   Okay.  Have you been disciplined at
15 WaterStone?
16    A.   No.
17    Q.   Have you been reprimanded at WaterStone?
18    A.   No.
19    Q.   Have you had your duties, and the nature
20 of your duties and responsibilities, changed at
21 WaterStone?
22    A.   No.
23    Q.   Okay.  You haven't faced any type of
24 discipline, reprimand, or anything relating to your
25 conduct in how came over with a branch to

Page 172

1 WaterStone, right?
2    A.   No.
3    Q.   Okay.  Have you been criticized in the
4 performance of how you did the transition at
5 WaterStone?
6    A.   No.
7    Q.   Has anyone at WaterStone said that you
8 didn't accurately provide them information when you
9 came over to WaterStone?
10    A.   Say that again.
11    Q.   Has anyone said to you that you
12 misrepresented something to the company when you
13 came over the WaterStone?
14    A.   Did I misrepresent anything to WaterStone?
15    Q.   Yes.
16    A.   No.
17    Q.   Has anyone at WaterStone criticized you
18 for the way that you did the branch transition?
19    A.   I just answered that.
20    Q.   I don't think I asked that question.
21    A.   No.  You said that -- how I came over.
22    Q.   All right.  Well --
23    A.   No.
24    Q.   -- either way.  No?  Okay.
25        Let me ask you something:  How does -- to

Page 173

1 your understanding, how does a mortgage bank make
2 money?
3    A.   They have loan originators that originate
4 loans, convert -- you know, whether they buy leads,
5 meet with Realtors, take applications, close fund,
6 and then sell them.  Some big banks get the interest
7 spread.  So like a Chase would lend their own
8 customers money, and then they make the money on the
9 interest spread.  And smaller independent banks,
10 brokers, correspondent lenders sell those servicing
11 a loan, and they get a service release premium.
12    Q.   Does WaterStone sell or does WaterStone
13 service?
14    A.   They do both.
15    Q.   Okay.  So WaterStone makes money when it
16 sells a loan?
17    A.   Correct.
18    Q.   To another purchaser of loans, correct?
19    A.   Correct.
20    Q.   It's called the secondary market?
21    A.   Yep.
22    Q.   Okay.  And WaterStone makes money if it
23 keeps the loan and services and gets the interests
24 rates, correct?
25    A.   Correct.

44 (Pages 170 - 173)

Page 174

1    Q.  Okay.  And so again, when WaterStone --
2  when you guys, your branch, produces loans and you
3  guys make money, WaterStone also makes money because
4  each one of those loans is an opportunity --
5    A.  Correct.
6    Q.  -- right?
7      WaterStone can also lost money in those
8  things too, right?
9    A.  Sure.
10    Q.  Right, but the goal is for every loan that
11  comes over, WaterStone has a chance to make money.
12    A.  Correct.
13    Q.  Okay.  So the more loans that come to
14  WaterStone, if everyone is doing their job
15  correctly, the more money WaterStone makes.
16    A.  What do you mean by "comes to WaterStone"?
17  Like, when I'm here and I'm closing loans today?
18    Q.  No, no.  What I said, for every -- I'll
19  restate the question.
20      For every loan that's originated that is
21  closed at WaterStone --
22    A.  Yep.
23    Q.  -- that's an opportunity for WaterStone to
24  make more money.
25    A.  Correct.

Page 175

1    Q.  Okay.  Obviously, it's a risk too.
2    A.  Right.
3    Q.  We've all seen that.
4    A.  Yeah, but every lender I've ever worked
5  at, they've made money off the loans I've
6  originated.
7    Q.  Okay.
8    A.  That's how the business works.
9    Q.  Got it.
10      So really, WaterStone receives the
11  benefits of those transactions at the end of the
12  day, yes?
13    A.  As does any lender I work for.
14    Q.  Right.
15    A.  Yep.
16    Q.  Right.
17      MS. KREITER:  At this point, why don't you
18  mark the exhibit.
19      (Thereupon, marked as Exhibit 6.)
20      MS. KREITER:  So at this point, opposing
21  counsel has marked Deposition Exhibit 6, which
22  is the WaterStone Mortgage Producing Branch
23  Manager Agreement dated 6/16, signed by
24  Mr. Smith.
25      Yesterday at the deposition, I lodged an

Page 176

1  objection on the record related to any
2  questions about the WaterStone agreement.  I
3  will incorporate that same objection with
4  respect to any questions about this deposition
5  exhibit and any questions by Mr. Karen.  I'll
6  incorporate the statement I made yesterday in
7  full.  I won't repeat it here.  But in sum, the
8  objection is that Mr. Karen is an attorney who
9  represented WaterStone in the past, and in
10  connection with that representation, had a role
11  in drafting this employment agreement.
12      On that basis we are instructing the
13  witness not to answer any questions about this
14  exhibit.
15      MR. KAREN:  Okay.  So I just want to ask
16  you a question on the record.  Have you, in the
17  24 hours since you made that -- I represented
18  to you clearly that this agreement was not the
19  agreement I drafted, and it will be very easy
20  to see that when you put them side by side.
21  Have you endeavored, in that 24-hour period, to
22  compare these with that document?
23      MS. KREITER:  Okay.  I am not going to
24  reveal my privileged discussions with
25  WaterStone.

Page 177

1      MR. KAREN:  No, no, it's not a privileged
2  discussion.  I'm asking, did you look at it?
3      MS. KREITER:  Well, you're asking about my
4  efforts to vet the issue in support of a
5  position that WaterStone is taking, which I'm
6  not going to disclose.
7      MR. KAREN:  Okay.  Well, I don't think
8  it's a privilege.  I'm just simply asking if
9  you've done the due diligence that would be
10  appropriate to ascertain whether these are, in
11  fact, the same agreements, when I've
12  represented to you as an officer of the court
13  that they are not.
14      MS. KREITER:  Okay.  I maintain my
15  position that --
16      MR. KAREN:  Yes.
17      MS. KREITER:  -- my efforts in that regard
18  would be work product.  The discussions I would
19  have had with WaterStone yesterday about this
20  topic are also privileged, so I'm not going --
21      MR. KAREN:  I certainly am not asking
22  about your discussions.
23      Furthermore, have you reviewed the case of
24  Cox versus American Cast Iron Pipe Company, 847
25  F.2d 725, 11th Circuit decision of 1988?

45 (Pages 174 - 177)

1      MS. KREITER:  I have not reviewed that
2   decision --
3      MR. KAREN:  Okay.
4      MS. KREITER:  -- in connection with this
5   issue.
6      MR. KAREN:  Okay.  Have you done any
7   research as to whether you've waived this,
8   because you've guys have known for at least a
9   year that I'm counsel in this case.
10      MS. KREITER:  I think at this point we're
11   getting into arguments about waiver.
12      MR. KAREN:  Well --
13      MS. KREITER:  This is about my instruction
14   to the witness.
15      MR. KAREN:  Okay.  Well --
16      MS. KREITER:  If you would like to file a
17   motion to compel that sets forth the grounds
18   that you're arguing here, then you should do
19   that.
20      MR. KAREN:  Well --
21      MS. KREITER:  But I've stated my
22   objection.  I'm instructing the witness not to
23   answer.
24      I will further respond to any type of
25   motion that you put before the Court.

1      MR. KAREN:  I'm going to make a record
2   here because I'm going to seek sanctions
3   against you, okay?  And I want to give you
4   every single opportunity to think about this
5   before I seek those sanctions because I've
6   never done it in 30 years of practice against
7   another lawyer.  I've never sought sanctions
8   against another lawyer.
9      MS. KREITER:  If you are --
10      MR. KAREN:  I'm going to do that, okay,
11   but I want to give you every chance.  So
12   here's -- I just want to put this on the
13   record, and then I'm going to take a break to
14   let you think about it and you can maintain
15   your position, okay?
16      First, any -- you knew this issue was
17   going to rise yesterday.  You've known at least
18   for 24 hours.  And there was an opportunity to
19   review the two documents, which would clearly
20   reveal that they are highly different.
21      Second, there's case law that I was able
22   to research that shows that, when I've been
23   counsel for this matter for over a year,
24   clearly you guys have waived, and I think you
25   could look at it too.

1      Third, the idea that I wouldn't ask about
2   this -- you knew I would be asking about this.
3      I would also suggest if you look at the
4   conflict rules if, in fact, I had a conflict,
5   that conflict -- I don't know if it would
6   actually translate to the rest of my firm, but
7   it would certainly affect me being counsel to
8   the case, and it wouldn't matter whether I
9   asked it or somebody else in my firm asked it.
10   So I don't understand why that would be a valid
11   objection to instruct him not to answer.
12      And lastly, yesterday we called the Court.
13   And you heard the Judge's instructions.  And I
14   really want you to think about this, okay?  The
15   Judge -- we asked the Judge to talk, and he --
16   the Judges said they were busy, and they said
17   put your objections on the record.  And you are
18   now not only putting your objection on the
19   record, you are, despite the Court's clear
20   messages, communications to us, instructing the
21   witness not to answer.  And I want to make sure
22   that you are, in fact, going to maintain the
23   position that despite what the Court told us
24   yesterday, you are instructing this witness not
25   to answer any question about this agreement.

1      MS. KREITER:  Are you done?
2      MR. KAREN:  I am.
3      MS. KREITER:  Okay.  So in reference to
4   the call to the Court yesterday, that was at
5   your insistence on the grounds that I was
6   somehow improperly objecting.  I suggested to
7   you that if you were able to get the Court on
8   the line, we should also raise this issue to
9   the Judge.
10      We did put a statement on the record about
11   this issue at the outset of your questioning
12   yesterday, so I do feel that I've put it on the
13   record.
14      The things that you've mentioned now are,
15   perhaps, arguments that you could make in
16   support of a motion to compel or if you think
17   that sanctions are appropriate, I assume that
18   you will file a proper Rule 11 letter and send
19   it to me, and I will address all of those
20   concerns, either in response to --
21      MR. KAREN:  This is a Rule 37 issue.  This
22   isn't a Rule 11 issue.
23      MS. KREITER:  It's my turn to talk now.
24      MR. KAREN:  Okay.  But you're just
25   completely wrong.

Page 182

1    MS. KREITER: If you believe that there's
2  a Rule 11 issue, then you will send me a Rule
3  11 letter.
4    MR. KAREN: It's a Rule 37.
5    MS. KREITER: Okay. Well, a letter
6  regarding the Safe Harbor Provisions.
7    MR. KAREN: It has nothing to do with Safe
8  Harbor.
9    MS. KREITER: It's my turn to talk. I
10  didn't interrupt you.
11    MR. KAREN: Okay.
12    MS. KREITER: So if you're going to send
13  me any kind of -- under Rule 11 or Rule 37 --
14    MR. KAREN: I'm just going to file a
15  motion.
16    MS. KREITER: If you're going to seek
17  sanctions, then you will do that in the
18  ordinary course. I will respond in the
19  ordinary course. If it's in conjunction with a
20  motion to compel or under Rule 11, sobeit. I
21  don't -- I don't have anything before me about
22  what you're going to file, and I'll respond in
23  due course.
24    MR. KAREN: Okay. Well, so I'm going to
25  asking you -- you will not even allow him to

Page 183

1  answer if this is his agreement?
2    MS. KREITER: I think the document speaks
3  for itself. I'm not going to allow questioning
4  about this deposition exhibit.
5    MR. KAREN: Okay. So I understand what
6  the document says, but as you understand, I
7  need to authenticate these things eventually in
8  this case.
9    So you will not even allow me to ask him
10  whether he signed this agreement?
11    MS. KREITER: I'm not going to allow
12  questioning about this deposition exhibit.
13    MR. KAREN: So that's a yes?
14    Okay. Well, I'm asking anyhow because
15  I -- you're playing games, and I don't want to.
16  BY MR. KAREN:
17    Q.  Mr. Smith, do you see Exhibit 11415 in
18  front of you?
19    MS. KREITER: Mr. Smith, don't answer any
20  questions about this exhibit.
21  BY MR. KAREN:
22    Q.  Okay. Mr. Smith, would you please tell me
23  whether you signed this document?
24    A.  No comment.
25    MR. KAREN: Well, is he instructed not to

Page 184

1  answer?
2    MS. KREITER: I just did.
3    MR. KAREN: Okay. All right. Let me take
4  a break real quick and we'll come back.
5    MS. KREITER: I'm going to need a document
6  printed. Can you --
7    THE VIDEOGRAPHER: Off -- do you want that
8  on the record?
9    MS. KREITER: Sure. I'm going to need a
10  document printed in light of your questions.
11  Can you facilitate that?
12    MR. KAREN: I mean, you can ask them.
13  I -- I'm not saying no.
14    MS. KREITER: You're hosting the
15  deposition.
16    MR. KAREN: I don't think it's a problem,
17  but I mean, go and talk to them. I don't work
18  here. I had somebody deliver e-mailed
19  documents. I didn't have things printed. I
20  had things sent to me.
21    MS. KREITER: Can -- I mean, John is
22  hosting the deposition.
23    MR. KAREN: I'm not saying no.
24    MS. KREITER: Can I send it to you, and
25  can you get it printed?

Page 185

1    MR. KAREN: No, because I don't have a
2  laptop here.
3    MS. KREITER: Okay. So can I send it to
4  John? I don't know if he's in the office.
5  You're hosting the deposition. I need it
6  printed. How do I do that?
7    MR. KAREN: Maria, can you talk to
8  somebody at the front desk, because that's
9  how --
10    MS. KREITER: Okay.
11    MR. KAREN: -- it got printed, and then
12  they will print if for you, I'm sure. I just
13  don't have the ability to do it myself. So
14  just talk to them. I'm not your assistant.
15    THE VIDEOGRAPHER: All right. We're off
16  the video record at 12:12 p.m.
17    (Recess taken.)
18    THE VIDEOGRAPHER: On the video record at
19  12:27 p.m.
20  BY MR. KAREN:
21    Q.  Mr. Smith, after counsel took a break, you
22  guys went in the room together. During that break,
23  did you discuss the substance of your testimony
24  either now or in the future of this deposition?
25    A.  No. Actually, I was catching up on

47 (Pages 182 - 185)

Page 186

1  e-mails.
2      Q.  Okay.  But you had --
3      A.  Yeah, my laptop is in there.  I actually
4  can show you e-mails I sent to customers.
5      Q.  I -- I -- you don't need to do that.  I
6  just simply wanted to ask you --
7      A.  Yeah.
8      Q.  -- that question.  Your answer is no,
9  you --
10      A.  No.
11      Q.  -- did not discuss --
12      A.  No.
13      Q.  -- the substance of your testimony or
14  anything you would testify to?
15      A.  Nope.
16      Q.  Okay.  One other question:  What devices
17  do you -- did you own at the time that you left
18  Mutual Mortgage?  When I say "devices," I mean
19  electronic devices like a laptop.
20      A.  Cellphone, and I think -- they didn't
21  issue -- and I did have a Mutual of Omaha laptop,
22  yep.
23      Q.  And you returned that?
24      A.  I'm not sure.  I think they -- they never
25  sent me labels to collect any of our laptops.  They

Page 187

1  shut them all down.  So once we -- I resigned and
2  people on my team resigned, you could no longer get
3  into that laptop.
4      Q.  Got it.
5          Okay.  Did you have it -- so you have a
6  cellphone and I assume you have a laptop for
7  WaterStone?
8      A.  Yes.
9      Q.  Okay.  Do you have any kind of other PDA
10  like an iPad or anything like that?
11      A.  No.
12      Q.  So it's just a cellphone and your
13  computer?
14      A.  Yeah, and I have a personal laptop.
15      Q.  You have a personal laptop.
16      A.  Yeah.
17      Q.  Okay.  Did you store any WaterStone
18  materials or anything on that -- WaterStone? -- I'm
19  sorry, Mutual materials --
20      A.  I didn't store any materials, but if I
21  sent my P&L to my personal e-mail, then I could
22  access that from my personal laptop.
23      Q.  Yeah, and can you access -- can you access
24  your personal e-mail from your WaterStone laptop?
25      A.  Yes.

Page 188

1      Q.  Okay.  Do you know if you can download
2  from that personal e-mail to your personal -- to
3  your WaterStone laptop?
4      A.  So a document from my personal e-mail
5  to --
6      Q.  So let's say --
7      A.  Yeah, so if I -- I'm not sure.  I haven't
8  tried.  I don't believe so.  I can't -- I don't
9  know.
10      Q.  Okay.  But you can access your Y mail,
11  right?
12      A.  My Yahoo.
13      Q.  Yahoo, okay.  Right, Y mail, right?
14      A.  Yep.
15      Q.  So you can access your Y mail from your
16  WaterStone laptop?
17      A.  Yes.
18          MR. KAREN:  That's all I have.  Thank you.
19          THE WITNESS:  All right.
20              CROSS EXAMINATION
21  BY MS. KREITER:
22      Q.  Mr. Smith, if you would take out
23  Exhibit 4, please.
24      A.  Okay.
25      Q.  You've got it there?

Page 189

1      A.  Yep.
2      Q.  You heard Mr. Karen state that Exhibit 4
3  is not a document produced in the case, but rather
4  is a document that Mutual's counsel created,
5  correct?
6      A.  Yep.
7      Q.  Mr. Karen asked you questions about if you
8  were wrong regarding the date that you told Daytona
9  employees you were leaving and joining WaterStone
10  based on the offer lab -- offer letter date listed
11  in Exhibit 4, correct?
12      A.  Yeah.  Tampa employees, but yep.
13      Q.  Sorry, Tampa employees.
14      A.  That's okay, yep.
15      Q.  For example, the first Tampa employee
16  listed there is Anthony Bertolotti.
17          Do you see that?
18      A.  Yes.
19      Q.  It says branch, in Column 2, Tampa offer
20  letter, date 6/2/22.
21          Do you see that?
22      A.  Yes.
23      Q.  The next column over is doc number, and
24  then it says WMC010690.
25          Do you see that?

48 (Pages 186 - 189)

1    A.  Yep.
2        MR. KAREN:  Actually, it's --
3    A.  639.
4        MR. KAREN:  -- 639.
5    A.  Yeah.
6 MS. KREITER:
7    Q.  Sorry.
8    A.  010639, yeah.
9    Q.  Just so we have a clear record here,
10 Anthony Bertolotti, Tampa branch, the offer letter
11 date listed on the Mutual accounting's -- Mutual
12 attorney's created Exhibit 4 is 62.
13    A.  Correct.
14    Q.  And then there is a Bates number, and the
15 Bates number is WMC010639.
16        Do you see that?
17    A.  Yes.
18        (Thereupon, marked as Exhibit 7.)
19  BY MS. KREITER:
20    Q.  Take a look at what we've marked as
21 Deposition Exhibit 7.
22    A.  Okay.
23    Q.  Do you see at the bottom on the first page
24 that same Bates number, WMC010639?
25    A.  Yes.

1    Q.  And it matches back to what's listed in
2 Exhibit 4 for Mr. Bertolotti, correct?
3    A.  Yes.
4    Q.  The letter is dated June 2, 2022 at the
5 top.
6        Do you see that?
7    A.  Yes.
8    Q.  I want you to turn to the page that has
9 Mr. Bertolotti's signature on it.  It's WMC010641.
10        Do you see that?
11    A.  Yes.
12    Q.  What's the date?
13    A.  6/16.
14    Q.  '22?
15    A.  6/16/22, yep.
16    Q.  Turn to the very next page, please.
17    A.  Yes.
18    Q.  The next page is WMC010642.  It says
19 "WaterStone Mortgage Offer Letter History."
20        Do you see that?
21    A.  Yes.
22    Q.  It says, "Document created by Jenna
23 Borts," with what date?
24    A.  6/16/2022.
25    Q.  And then it says document e-mailed to

1 TBertolotti@WaterStoneMortgage.com for signature on
2 what date?
3    A.  6/16/2022.
4    Q.  What is the date that Mr. Bertolotti
5 viewed the offer letter?
6    A.  6/16/2022.
7    Q.  And then it indicates that Mr. Bertolotti
8 signed it on that same date, 6/16/22, correct?
9    A.  Correct, yes.
10    Q.  Mr. Bertolotti, according to this last
11 page of the exhibit, did not get the offer letter
12 until 6/16, correct?
13    A.  Correct.
14    Q.  Is that consistent with your initial
15 testimony that you told the Daytona employees about
16 your decision to join WaterStone close in time to
17 your 6/15 resignation?
18    A.  Yes, because I actually looked at my -- I
19 was in Italy, I believe, from May on a company -- or
20 company -- a family trip.  I was in Italy from
21 May 25th or 26th until June 5th.  And after
22 reviewing this, I do not believe that I told or
23 announced to anyone in the Tampa branch until what I
24 originally testified, the 13th and the 14th.
25    Q.  Okay.  You can put that document aside.

1        If you would turn to Deposition Exhibit 1,
2 please.  It's the e-mail that starts an exchange,
3 Chris Wolf.
4    A.  Yep.
5    Q.  Okay.  There were a slew of questions that
6 Mr. Karen asked about building up a pipeline in
7 relation to Deposition Exhibit 1.
8        Do you recall that line of questions?
9    A.  Yes.
10    Q.  Did you, in fact, try to build up a
11 pipeline at WaterStone in connection with your
12 transfer from Mutual to WaterStone?
13    A.  I do not recall.  I don't believe so.
14    Q.  Did WaterStone --
15    A.  We discussed it, but I don't believe we
16 physically started sending them loans.
17    Q.  Okay.  Did WaterStone tell you that you
18 would need to build up a pipeline in conjunction
19 with your transfer?
20    A.  No.  In this e-mail, it says anything
21 would be for pre-quals, lock loans, disclosed files
22 on day one.  I mean, I guess I would assume day one
23 of our employment, which would be June 16th.
24        MS. KREITER:  Okay.  Nothing further.
25

49 (Pages 190 - 193)

Page 194

1  REDIRECT EXAMINATION
2  BY MR. KAREN:
3  Q.  I have some questions about that.
4      First of all, sir, this says Tony
5  Bertolotti at the top.  I'll referring to Exhibit 1.
6      MS. KREITER:  7.
7  BY MR. KAREN:
8  Q.  7.  The last page is the DocuSign, right?
9  A.  Yep.
10  Q.  The DocuSign is.
11  A.  Correct.
12  Q.  Now, a document can be sent, you would
13  agree, via e-mail as a PDF to review.
14  A.  Correct.
15  Q.  And then separately sent as a DocuSign to
16  sign, right?
17  A.  Correct.
18  Q.  Okay.  And looking at this, you can't tell
19  if when it says Tony Bertolotti -- or Bertolotti --
20  A.  Uh-huh, Bertolotti, yep.
21  Q.  Bertolotti via e-mail June 2, 2022.  And
22  that's just an e-mail, right?  And then it's a
23  separate DocuSign.  You can't tell that, can you?
24      MS. KREITER:  Object to the form.
25  A.  Say that -- repeat the question again.

Page 195

1  BY MR. KAREN:
2  Q.  So in other words, this last page reflects
3  a DocuSign history, right?
4  A.  Correct.
5  Q.  And you agree with me that it's possible
6  that a document gets sent over for review, and then
7  separately sent over to DocuSign, right?
8  A.  Correct.  It could be, yes.
9  Q.  Okay.  And you can't tell from looking at
10  this exhibit whether that was a separate e-mail and
11  a subsequent DocuSign, can you?
12  A.  No.
13  Q.  Okay.  So it is entirely possible that
14  this e-mail was sent as it indicates on its face on
15  June 2, 2022 by e-mail, right?
16  A.  What I believe is that when I was
17  discussing with WaterStone the transition of our
18  branch for the people that potentially were going to
19  follow me, they created offer letters, but they were
20  not sent because I, unequivocally, for a fact know I
21  did not tell anyone or announce that I was leaving
22  until the 13th or 14th or 15th, because I wasn't
23  even in the country, and I certainly -- I don't even
24  believe I made the decision to make the move until
25  towards the end of May.

Page 196

1  So I certainly wouldn't have, hey
2  everybody, I'm leaving, do you want to join us?  All
3  right, by the way, I'm going to Italy for twelve
4  days.  That would have been reckless of me and
5  potentially would have given them the opportunity,
6  which they're more than welcome to do anyways, to
7  discuss, go to other lenders potentially, maybe we
8  don't want to follow Chris.
9      And so after the testimony earlier and
10  then reviewing these docs and looking at my
11  calendar, I knew I was out of the country -- it was
12  you know, May 26th to June 5th.  So I wouldn't have
13  told them and then be gone for two weeks or twelve
14  days.
15  Q.  Okay.  But then --
16  A.  But I don't -- I can't tell you if this
17  document was e-mailed to him.  I believe HR at
18  WaterStone was preparing all of these documents on
19  June 2nd once I told them at the end of May that I'm
20  leaving and these were potentially the group of
21  people that might follow me.  So they probably were
22  pre -- getting all these documents prepared to send
23  to the people that did, in fact, decide to leave,
24  because there are people that got these letters that
25  didn't leave and they went to other companies.

Page 197

1  Q.  So let me back up.  So you told me, I
2  thought, earlier that you didn't make the decision
3  to leave until you got back from vacation, but now
4  you're saying you made the decision before you left
5  for vacation.
6  A.  End of May.
7  Q.  That's right, though.  You said previously
8  that you didn't make your decision until you got
9  back, and now you're saying you made the decision
10  before you left.
11  A.  It was over a year ago, so I can't
12  definitively say --
13  Q.  I'm just asking --
14  A.  -- exactly yes --
15  Q.  I'm just asking to try to clarify.  Is
16  that --
17  A.  Correct.
18  Q.  -- correct?
19  A.  Yes.
20  Q.  Okay.  So now your recollection is that
21  you said it before you left that you made the
22  decision.
23  A.  If I had to look back at all the documents
24  and the exhibits presented, I would -- and I still
25  don't definitively know, I can't say because I don't

50 (Pages 194 - 197)

Page 198

1 have an e-mail or I don't have a text message
2 saying, hey guys, I'm coming.
3         But what I can tell you is that it didn't
4 happen on May 3rd, 4th, 5th, May 15th, May 16th.  It
5 was probably closer to before I left -- me
6 personally, when I made the decision, Chris Smith.
7 But when I announced to everybody, that was the 13th
8 and 14th.
9    Q.   That's not what I'm asking.
10   A.   Yeah.
11   Q.   I'm simply just asking --
12   A.   Yeah.
13   Q.   So -- because you would not have given
14 them the names and the e-mails and the information
15 about your staff, right, until you had made a
16 decision to leave, correct?
17   A.   Correct, yes.
18   Q.   Okay.  And so even if this was just
19 created on June 2nd, you had obviously made the
20 decision --
21   A.   To leave --
22   Q.   -- prior to June 2nd.
23   A.   -- prior to June 2nd, yes.
24   Q.   Right.  And since you were in Italy, I
25 guess you could have made the decision while you

Page 199

1 were in Italy and e-mailed WaterStone, but that's
2 probably unlikely --
3    A.   No, I probably made the decision prior to
4 leaving to go to Italy, yes.
5    Q.   Okay.  And then once you made that
6 decision, you provided WaterStone the identity
7 and the names of all the people at your branch,
8 right?
9    A.   Potentially could join, yes.
10   Q.   Right.
11        Okay.  And did you give them their
12 personal e-mails too?
13   A.   I believe so, yes.
14   Q.   Okay.  And you gave them the compensation
15 information that you wanted to pay them?
16   A.   Yes.
17   Q.   And that would include the bonus
18 structures?
19   A.   Yes.
20   Q.   Okay.  And that would have been all
21 provided to WaterStone before sometime in May.
22   A.   Yes.  Unbeknownst to the employees though,
23 yes.
24   Q.   And that's assuming, of course, that this
25 e-mail wasn't sent to their private e-mail

Page 200

1 addresses.
2    A.   I'm highly confident and almost a thousand
3 percent positive that there were no documents or
4 offer letters sent to any Tampa employees until I
5 got back, because I would not be there to answer
6 questions if they had questions about their
7 compensation agreement or their offer letter,
8 because they would have received this when I was in
9 Italy.  And if I wanted to have any -- have the
10 ability to answer any questions of employees that
11 received an offer letter and I'm on vacation with my
12 family, that didn't happen.
13   Q.   Unless you discussed it with them before
14 you left.
15   A.   That didn't happen either.
16   Q.   Or unless Mr. Utsch decided -- discussed
17 it with them.
18   A.   He doesn't do anything without my
19 approval, regarding work anyways.
20        He also understands the potential issues
21 that could arise in uncertainty.  You know, if I
22 announced to people I'm leaving on May 15th, and
23 then we don't leave until June 15th, certainly
24 there's going to be some uncertainty, some
25 nervousness, you know, people might go to other

Page 201

1 companies, which obviously they're free to do.
2 People did do that before and after we left, and
3 some didn't join us.
4    Q.   Let me show you another exhibit here.
5 Make this Exhibit 8.
6        (Thereupon, marked as Exhibit 8.)
7    A.   Oh, this is a good one.
8 BY MR. KAREN:
9    Q.   Sir, again, I know you're not on this
10 e-mail.
11   A.   I know all about this loan.
12   Q.   Okay.  Well, tell me -- tell me -- tell me
13 about it.
14   A.   So this is a loan -- if you read through
15 the history, he had a business loan against his
16 property, and there was a 30-day late, but it was a
17 business loan.  We proved it was a business loan.
18 And I convinced Chris Leyden, who is the head of
19 operations at Mutual of Omaha, that because he
20 didn't personally sign this, it was not on his
21 credit report, it was a 30-day late against his
22 business, not him as an individual, even though it
23 was on the property that we were trying to
24 refinance.  She said she agreed, and that we can
25 probably find e-mails from back around this time

51 (Pages 198 - 201)

Page 202

1  that she said yes, I agree, we can write the loan.
2  The underwriter, which is, again, just, you know,
3  a -- it is a -- indicative of what we experienced
4  a lot at Mutual. So the underwriter went above
5  and beyond around Chris Leyden, went to a
6  homeownership center, which is FHA and got an
7  under -- got someone at FHA to deny the loan
8  unbeknownst to Chris Leyden.
9      So I know Mutual's position is they
10 approved this loan. That is not the facts. That
11 loan was denied. And it never ended up closing at
12 WaterStone. It closed at Quicken Loans in two
13 weeks. And there would be e-mails definitively from
14 the underwriter overruling like her boss's boss's
15 boss or whatever you want to call it.
16     Q. Now, you -- but you did -- it says here
17 you did talk to Dwayne about doing a loan over at
18 WaterStone?
19     A. Correct, because we denied it at Mutual.
20 And we were trying to serve the customer. That's
21 our job, is to help customers get loans, even if we
22 can't do it.
23     MR. KAREN: Another document.
24     (Thereupon, marked as Exhibit 9.)
25

Page 203

1  BY MR. KAREN:
2      Q. Sir, do you know anything about -- again,
3  you're not on this e-mail. Do you know anything
4  about the McIntosh loan?
5      A. No. I wasn't intimately involved in that
6  one, because I had to go all the way to the very top
7  to try and get it approved with Chris Leyden. So I
8  don't have a recollection of this one, no.
9      Q. You don't know anything about McIntosh?
10     A. No, I don't have a familiarity with it. I
11 wasn't involved in that one.
12     Q. Okay. Do you know why -- I mean, I'm
13 going to ask the question, but I think I know your
14 answer is going to be. But do you know why Cody
15 Lamb or Fred Stalls would be sending this to Chris
16 Wolf on June 9th?
17     A. I would imagine it was another loan that
18 was turned down by Water -- by Mutual --
19     Q. But you --
20     A. -- if I had to guess. I can't say
21 definitively if it was or wasn't.
22     Q. Because you just don't know anything about
23 it.
24     A. Correct.
25     MR. KAREN: Okay. That's all I've got.

Page 204

1      MS. KREITER: Nothing further.
2      THE VIDEOGRAPHER: All right. This
3  concludes the videotaped deposition Christopher
4  Smith. We're off the video record at
5  12:45 p.m.
6      THE COURT REPORTER: Ms. Kreiter, did you
7  want to order a copy?
8      MS. KREITER: I do. If I could get
9  condensed PDF with the exhibits attached, that
10 would be great.
11     (The proceedings concluded at 12:45 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 205

1
2
3
4          CERTIFICATE OF OATH
5
6
7  STATE OF FLORIDA
8  COUNTY OF HILLSBOROUGH
9
10
11     I, the undersigned authority, certify
12 that CHRISTOPHER SMITH personally appeared before
13 me and was duly sworn on the 16th day of June,
14 2023.
15     Signed this 27th day of June, 2023.
16
17
18 _____
19 DENISE SANKARY, RPR, RMR, CRR
   Notary Public, State of Florida
   My Commission No. GG 944837
20 Expires: 1/27/24
21
22
23
24
25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 206

```
 1           CERTIFICATE OF REPORTER
 2
 3  STATE OF FLORIDA
 4  COUNTY OF HILLSBOROUGH
 5
 6
 7       I, DENISE SANKARY, Registered Merit
 8  Reporter, do hereby certify that I was authorized
 9  to and did stenographically report the foregoing
10  videotaped deposition of CHRISTOPHER SMITH; pages
11  1 through 204; that a review of the transcript
12  was not requested; and that the transcript is a
13  true record of my stenographic notes.
14       I FURTHER CERTIFY that I am not a
15  relative, employee, attorney, or counsel of any
16  of the parties, nor am I a relative or employee
17  of any of the parties' attorneys or counsel
18  connected with the action, nor am I financially
19  interested in the action.
20       Dated this 27th day of June, 2023.
21
22  _____
         DENISE SANKARY, RPR, RMR, CRR
23
24
25
```

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.