# **<u>EXHIBIT DD</u>**

### WATERSTONE MORTGAGE CORPORATION
### PRODUCING SALES MANAGER
### EMPLOYMENT AGREEMENT

This PRODUCING SALES MANAGER EMPLOYMENT AGREEMENT    ("Agreement"), effective as of 4/27/2022 _____ ("Effective Date"), is between Waterstone Mortgage Corporation, a Wisconsin corporation ("Company") and Chris Wolf _____ ("Employee") (individually, each a "Party," and collectively, the "Parties").

WHEREAS, Company is a wholly owned subsidiary of a Wisconsin state chartered financial institution engaged in the mortgage banking business in the State of Wisconsin and other states whereby Company currently carries a valid license or exemption therefrom;

WHEREAS, the Parties desire that Employee work in the employment of Company as the sales manager of Company's branch office located at Ormond Beach, FL _____ (the "Branch"), and Employee acknowledges as a prerequisite of employment that s/he must comply with all requirements of Company and state lending licensing agencies and federal regulators, as applicable; and

WHEREAS, the Parties desire to set forth their agreement with respect to such employment in this Agreement;

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, the consideration for which receipt and sufficiency are hereby acknowledged, the Parties agree as follows:

### ARTICLE I
### EMPLOYMENT AND DUTIES

1.1    Commencement. On the terms set forth herein, Company employs Employee, and Employee agrees to be employed by Company as provided for herein.

1.2    Duty to Comply with Company Policies. Employee shall comply with all duties and requirements imposed on Employee, as a branch manager, loan originator and employee, as set forth in this Agreement and the manuals, guides, memoranda, e-mails and other materials that set forth Company's policies and procedures ("Company Policies"), and shall cause all employees of Company who are under the supervision of Employee (the "Branch Employees") to comply with the Company Policies. The Company Policies are effective as of the date of issuance, unless otherwise specified. Company may modify the Company Policies at any time in its sole discretion.

1.3    General Duties.

(a)    Employee's primary duty shall be managerial. Employee shall at all times devote substantially more than fifty percent (50%) of Employee's working hours to supervising and managing the sales activities of the Branch, including its loan originators or any other Branch Employees. In this regard, Employee's managerial functions (collectively "Managerial Duties") shall include without limitation:

(i)    Supervising at least three (3) full time employees;

CONFIDENTIAL                                                                 WMC001730

(ii)    Developing and maintaining an attitude of teamwork, establishing a culture consistent with Company's corporate mission statements, and ensuring employees abide by the Company Policies;

(iii)    Recruiting staff for the Branch, reviewing payroll information and communicating with Company's Human Resources Department on personnel changes, including recommendations for new hires and terminations;

(iv)    Reviewing monthly commission calculation worksheets, remaining cognizant of their contents, modifying Branch efforts to keep results in line with expectations, and preparing and submitting periodic production projections in accordance with the Company Policies and Company's expectations;

(v)    Developing and maintaining a network of relationships with existing and prospective clients, promoting the image and reputation of Company as creative, dynamic and competitive, expanding Company's market share through the promotion of Company's business and sales, and actively holding sales meetings, training seminars, and other events (and ensuring attendance of such events by Branch Employees); and

(vi)    Assisting Company's management in the development of a successful group of employees.

(b)    Employee may also sell mortgage loan products and services to residential mortgage customers provided, however, Employee shall not permit these production duties to prevent Employee from devoting substantially more than fifty percent (50%) of his/her work time performing Managerial Duties. Employee's sales duties shall include without limitation:

(i)    Identifying potential mortgagors, acquiring a full understanding of, and analyzing, their respective financial needs, based on their individual financial health, economic goals and credit history;

(ii)    Working with clients to create loan packages that meet their particularized needs and goals, while guiding them through the complex requirements of the various lenders;

(iii)    Educating clients regarding mortgage loans generally, the mortgage loan process, the different types of loans available, and how costs and payments can vary under the numerous alternatives available, so clients can make informed decisions in acquiring the appropriate loan to fit their respective needs;

(iv)    Originating mortgages, and handling client questions and complaints; and

(v)    Overseeing the loan transaction from initiation, through processing, approval, closing and recording, while ensuring that the client understands and is satisfied with the process, and that the activities undertaken comply with Company and industry guidelines and policies.

CONFIDENTIAL                                                                                           WMC001731

(c)    Employee shall also perform any other or additional duties that are assigned by Company from time to time or that are contained in this Agreement or in the Company Policies.

(d)    Employee agrees to do business in a professional manner, abide by all laws, operate in good faith toward the public, government, Company, and Company's secondary market investors, and honor all commitments entered into by Employee and Company. Employee agrees to conduct business with the highest level of business ethics and practices, so as to minimize the potential of any charge of loan fraud or other claims of illegal or unfair dealings, and to avoid even the appearance of impropriety in any business dealing connected with Company's clients.

(e)    Employee understands and acknowledges that the foregoing description of Employee's duties is intended to establish, and does establish, Employee as an "executive employee," as defined under applicable law. Employee further understands and acknowledges that, as such, Employee is exempt from any provisions requiring payment of any minimum wage or overtime premiums.

1.4    Duty of Loyalty. Employee shall devote appropriate time and attention to his/her activities for and on behalf of Company. Absent written approval from Company, Employee shall assist and work for only Company and no other employer, lender, broker, or other entity, and shall not engage in any way in any mortgage lending or brokering, loan processing or underwriting services, loan modification services, real estate or insurance sales or acquisition, closing, settlement or title-related services, credit repair, credit counseling, borrower assistance, financial counseling, investment sales or other business or service of the same or similar nature. Additionally, Employee may not own an interest in any entity engaging in any such activities, other than a passive investment of less than one percent (1%), without the prior written consent of Company. Employee further assures Company that s/he will strictly adhere to all of the Company Policies and will not enter into any formal or informal arrangements or deals of any kind or nature with any other person or entity (including, but not limited to, another Company employee) that directly or indirectly concern compensation of any form or manner for performing services in connection with the duties associated with originating, processing, or closing residential mortgage loans.

1.5    Regulatory Compliance. Employee is familiar with and shall comply, and cause the Branch Employees to comply, with the Company Policies and all applicable federal, state and local laws, ordinances, rules, regulations, guidelines and other requirements pertaining to the mortgage banking industry, to the business of Company, and to the origination, processing, underwriting, closing, or funding of mortgages, or other activities of Company, including but not limited to the Equal Credit Opportunity Act, Gramm-Leach-Bliley Act, Truth in Lending Act, Real Estate Settlement Procedures Act, USA PATRIOT Act, Home Mortgage Disclosure Act, Federal Trade Commission Act, Telemarketing and Consumer Fraud and Abuse Prevention Act, Fair Credit Reporting Act, Fair Housing Act, Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act"), Dodd-Frank Wall Street Reform and Consumer Protection Act and all related regulations to the foregoing Acts, and all similar federal, state and local laws, rules, regulations and requirements, federal and state telemarketing and do-not-call laws, rules and regulations, and all applicable guidelines and requirements of the Consumer Financial Protection Bureau ("CFPB"), United States Department of Housing and Urban Development ("HUD"), Department of Veterans Affairs ("VA"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), Federal National Mortgage Association ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie Mae"), United States Department of Agriculture ("USDA") and all other applicable agencies, investors and insurers (altogether, the Company Policies and all such applicable laws, rules, regulations, guidelines and other requirements are referred to herein as the

CONFIDENTIAL                                                                                    WMC001732

"Applicable Requirements"), in each case as amended from time to time.     Employee agrees to develop and maintain his/her knowledge and understanding of all such Applicable Requirements. For purposes of emphasis, and without limitation of the foregoing, for the entire term of this Agreement, Employee shall:

        (a)        Not charge, nor allow any Branch Employee to charge, any consumer any fees in excess of that permitted under Applicable Requirements;

        (b)        Ensure compliance with all applicable (i) federal licensing, registration and training requirements, including without limitation those pursuant to the SAFE Act, (ii) state licensing, registration and training requirements of each state where Employee or any Branch Employee is required to be so licensed, registered and trained (including any initial testing and continuing education requirements), and (iii) the registration and compliance requirements of the Nationwide Mortgage Licensing System & Registry ("NMLSR"), for all Branch Employees;

        (c)        Comply with the Regulation Z provisions on loan originator compensation, steering and qualification (codified as 12 C.F.R. §1026.36), as may be amended from time to time; and

        (d)        Immediately report to Company any lawsuits, complaints, investigations or other similar actions which involve Employee's duties on behalf of Company or which could potentially affect Employee's licensing status or ability to perform his or her job for Company.

1.6     Certain Restrictions and Requirements. Except as expressly provided herein, Employee will not, and shall have no authority to (and will cause the Branch Employees not to):

        (a)        Enter into, act on behalf of, or bind Company with respect to any contract, commitment or agreement, unless Employee has first been expressly authorized in writing by an officer of Company.

        (b)        Close or arrange for the closing of any loan in the name of any person or entity other than Company, unless authorized in advance by Company.

        (c)        Use any name, trade name, trade mark, service mark or logo of Company or an affiliate of Company for advertising, marketing or other business purposes without the prior written approval of an officer of Company.

        (d)        Incur any expenses or obligations on behalf of Company unless permitted in the Company Policies or unless Company provides its prior written approval. Employee shall promptly submit invoices and other supporting documentation for reimbursement of permitted expenses in accordance with the Company Policies.

        (e)        Undertake or implement any business development plans or activities, without the prior approval of Company.

        (f)        Use any forms or documents in connection with any application or origination of any loan, other than those forms and documents provided to the Branch by Company or otherwise approved by Company. If Employee or a Branch Employee desires to use any form or document not provided to the Branch by Company, Employee must first submit the item to Company for approval.

        (g)        Use any Company e-mail addresses or technology, other than for the

CONFIDENTIAL            WMC001733

performance of Employee's and the Branch Employee's respective duties on behalf of Company. Any and all e-mail communications on behalf of Company shall be sent from and directed through corporate e-mail, and all outgoing messages shall include only a Company corporate e-mail address in the signature. Private e-mail is not to be used for any official Company business.

(h)     Use advertising, social media or post websites to the general public without the prior written approval of Company's corporate headquarters. Company must approve and pay for all advertising and marketing. A copy of all advertising in any media, and brochures used by Branch, must be sent to Company's corporate headquarters.

(i)     Conduct telemarketing without the prior written approval of Company's corporate headquarters. Company must approve and pay for all telemarketing. All telemarketing conducted by Branch or an outside vendor must be conducted in accordance with Company guidelines for use of the Do Not Call list and must be in compliance with applicable federal and state laws and regulations.

1.7     Remittance of Funds. Employee shall cause all fees, charges, funds, and other amounts received by Employee, by any Branch Employee or by the Branch to be immediately remitted to the applicable office of Company in accordance with the Company Policies. Without prior consent of Company, Employee is not authorized on behalf of Company to open any bank, savings, or investment account in the name of Company or any DBA, parent, subsidiary, or affiliate thereof, or a name similar to the foregoing.

1.8     Certain Employee Representations. Without limiting any obligations of Employee, Employee hereby represents and warrants to Company at all times during employment as follows:

(a)     Employee's employment with Company will not violate or conflict with any obligations Employee owes to any individual or entity, including without limitation, obligations arising out of or relating to (i) any non-compete, non-disclosure, non-solicitation or confidentiality agreements or provisions, and (ii) any prior employer or employment. Employee represents and warrants that he or she has not and will not attempt to transfer loans or other documentation or information to Company that are the property of his or her previous employer ("Previous Company Information"), except in the event that Employee has obtained prior written consent from the customers whose information is being transferred and from his or her previous employer to transfer Previous Company Information and such consent has been disclosed to Company. Any transfer violating this restriction may result in disciplinary action, up to and including termination of Employment. Employee understands and agrees that Company may send a copy of this Agreement to Employee's previous employer to verify adherence to this restriction.

(b)     Employee knows of no reason why Employee could not or should not accept an offer of employment from Company, or otherwise be employed by Company. Employee has not been subject to any investigation or sanction of any type, or denied any license or approval, by any federal, state or local government, quasi-government and private industry authority, including but not limited to any licensing authority, that would adversely affect Employee's license(s), authorizations or ability to perform his or her duties for Company.

(c)     In the ten (10) years immediately preceding the date of this Agreement, there has not been and there is not currently any outstanding orders, judgments, injunctions, awards or decrees of any court, governmental or regulatory body or arbitration tribunal against or involving Employee or his/her assets and there have been no actions, suits, administrative proceedings or claims against Employee, or, to his/her knowledge, pending, nor any actual or threatened

CONFIDENTIAL                                                                                                          WMC001734

investigations involving Employee and his/her assets that would adversely affect Employee's license(s), authorizations or ability to perform his or her duties for Company. In the ten (10) years immediately preceding the date of this Agreement and presently, Employee and any company or firm of Employee have not filed for bankruptcy nor been declared bankrupt or insolvent.

(d)     If applicable, Employee currently possesses, and at all relevant times has maintained in good standing, any and all licenses, registrations and authorizations required to conduct business as a loan originator and sales manager for each state in which such business will be conducted.

(e)     Employee has the requisite power and authority to carry on his/her business as presently conducted and as proposed to be conducted, including, but not limited to, managing the Branch as provided for in this Agreement.

(f)     Employee has all requisite legal power and authority to execute, deliver and perform this Agreement.

(g)     This Agreement, when executed and delivered by or on behalf of Employee, shall constitute a valid and binding obligation of Employee, enforceable in accordance with its terms.

1.9     Committing Rates and Pricing. Employee shall lock loans in accordance with Company Policies and lock with Company's secondary marketing department the same program, rate and price that were committed to the customer.

1.10     Truthfulness. At all times during the term of this Agreement, Employee agrees not to withhold or misrepresent material facts with regard to an applicant's income, assets, investments, debts, obligations, circumstances and information on the subject property. It is Employee's obligation and responsibility to disclose any and all information regarding an applicant's state of affairs that would customarily be taken into consideration in the evaluation of an applicant's creditworthiness. At no time will Employee advise an applicant to provide, or assist an applicant in providing, inaccurate information in relation to a loan application. Employee shall not make any representation or promise to any Branch Employee, borrower or applicant that a loan will be made or refinanced in the future unless a commitment for such loan has been issued by the Company. If a Commitment has been issued, any representation or promise made by the Employee to any such borrower or applicant must be consistent with the terms of the Commitment issued.

**ARTICLE II**
**EMPLOYEES**

2.1 Branch Employees. Employee acknowledges and agrees that the Company shall control all hiring decisions and shall be responsible for conducting interviews and background   checks on all Branch Employees prior to their hire date by Company, in the same manner as Company might or could do in making any other employee hiring decision generally. All Branch Employees will be hired as new employees of Company, and Company shall have no liability or responsibility for any obligation or liability related to any period of time prior to the time of such hiring. Employee acknowledges and agrees that all decisions to hire, terminate and discipline employees shall be made solely by Company and are solely within Company's discretion. Employee shall, and shall cause all Branch Employees to, participate in training sessions as required by Company from time to time.

**ARTICLE III**

CONFIDENTIAL                                                                                        WMC001735

## TERM AND TERMINATION

3.1     At-Will Employment. Notwithstanding anything to the contrary herein: (a) the Parties hereby agree and acknowledge that the employment relationship between them is wholly an "at-will" relationship, and neither Party shall have any obligation (whether arising by law, implication, custom or otherwise) to extend, maintain or continue Employee's employment with Company; (b) Employee's employment can be terminated at will, with or without cause, and with or without reason, at any time, upon written notice; (c) no employee or representative of Company has the authority to modify this at will nature of the employment except for the President of Company, and any such modification must be in a specific written agreement signed by both Employee and Company by its President.

3.2     Termination upon Death or Disability. If Employee becomes Disabled (as defined below) or dies while employed hereunder, Employee's employment and Employee's rights to compensation hereunder may terminate (without notice) at the close of business on the date on which death or disability occurs. For purposes of this Agreement, Employee shall be deemed to have become "Disabled" upon Employee's inability to perform the essential functions of Employee's job with Company, with or without reasonable accommodation, for a continuous period of three (3) months or more, or a total of four (4) months in the aggregate within any one (1) year period. A determination of disability shall be made by Company, which may, at its sole discretion, consult with a physician or physicians satisfactory to Company, and Employee shall cooperate with any efforts to make such determination. Company shall pay Employee any compensation earned by Employee as of the date of such termination in accordance with the normal payroll practices of Company or as otherwise required under applicable law.

3.3     Company Property. All loans initiated and handled by Employee while employed by Company, and all related information, shall at all times remain the sole and exclusive property of Company. Employee agrees to promptly return to Company immediately upon request, at any time, and upon termination of employment, all Company property, including office keys, access cards, any electronic communications equipment issued by Company, documents, files, correspondence and notes, containing or relating to Confidential Material (defined below), and including but not limited to information obtained from the customers and prospective customers contacted by Employee, and the loans handled by Employee, while employed by Company, without keeping any copies. Employee shall assist Company in securing all original loan files and copies thereof, as requested by Company.

3.4     Disclosure. Employee agrees that for twelve (12) months following the termination of employment with Company, s/he will show this Agreement to any and every subsequent employer during such time.

## ARTICLE IV
## COMPENSATION AND BENEFITS

4.1     Compensation. At all times during Employee's employment, as full compensation, Company hereby agrees to pay Employee as set forth below and in the compensation schedule attached hereto as Exhibit A. Company at all times shall have the right to modify the applicable compensation formula on a prospective basis upon notice to Employee. Compensation shall be paid to Employee at such times and in a manner consistent with Company Policies as may be in effect from time to time. Employee agrees that within thirty (30) days of the receipt of any compensation, s/he will bring to Company's attention, in writing, any and all objections, disputes, or concerns regarding omissions or errors in connection with compensation paid. Employee understands that if no such written dispute is initiated, Employee's silence constitutes an acknowledgment that compensation was properly calculated.

CONFIDENTIAL                                                                                          WMC001736

4.2    Benefits. While employed by Company, Employee shall be entitled to the rights and benefits under any employee benefit plans provided by Company to similarly situated employees.

4.3    Compensation at End of Employment. Upon cessation of Employee's employment, for any reason, Employee shall be paid, within a reasonable and permissible time frame, any compensation earned up to and including the date employment ends. Except as otherwise expressly provided herein, or required by applicable law, Employee shall not be entitled to any further compensation, including (but not limited to) draws, benefits, fringe benefits, commissions, or bonuses, as applicable. Notwithstanding the foregoing, if a loan is in Employee's pipeline on the date Employee ceases to be employed, Employee shall be paid commission as set forth in the Company policy related to commissions of terminated employees in effect at the time of termination. Employee acknowledges that all leads and loans in process are the Company's property. Upon termination, Employee agrees to provide a written account of any and all open leads, business prospects, and/or loans in process as to the date of his/her termination, and Employee hereby covenants not to attempt to move any pipeline loan to any other person or entity following the end of employment.

4.4    Withholding.    Employee acknowledges that all compensation earned under this Agreement shall be subject to applicable withholding and deductions.

4.5    Sole Compensation. Other than as provided for in this Article IV, Employee shall not be entitled to any other compensation or benefits.

**ARTICLE V**
**PROTECTED INFORMATION AND**
**RESTRICTIVE COVENANTS**

5.1    Protected Information.

(a)    Confidentiality. Employee hereby acknowledges, understands and agrees that all "Confidential Material," as defined below, is the exclusive and confidential property of Company which shall at all times be regarded, treated and protected as such in accordance with this Article V. For purposes of this Agreement, "Confidential Material" means information, which is available to or used in the business of Employee and (i) is proprietary to, about or created by Company, (ii) gives Company a competitive business advantage or the opportunity of obtaining such advantage or the disclosure of which would be detrimental to the interests of Company, or (iii) is designated as Confidential Material by Company, is known by Employee to be considered confidential by Company, or from all the relevant circumstances should reasonably be assumed by Employee to be confidential and proprietary to Company. Such Confidential Material includes, without limitation, the following types of information and other information of a similar nature (whether or not reduced to writing or designated as confidential):

(i)    Internal personnel and financial information of Company, purchasing and internal cost and revenue information, internal service and operational manuals, computer software and systems and the manner and methods of conducting the business of Company;

(ii)    Company personnel names and contact information;

(iii)    Employee's compensation arrangements with Company;

(iv)    Training and educational materials provided by Company to Employee;

CONFIDENTIAL                                                                                    WMC001737

(v)    Marketing materials and/or marketing plans provided by Company to Employee; and

(vi)    Confidential and proprietary information provided to Company by any actual or potential customer, or other third party (including businesses, consultants and other entities and individuals), and shall include, without limitation, all of the customer's "non-public personal information," as that term is defined under the Gramm-Leach-Bliley Act of 1999 and any amendments thereto.

(b)    *Non-Disclosure.* As a consequence of Employee's acquisition or anticipated acquisition of Confidential Material, Employee shall occupy a position of trust and confidence with respect to the affairs and business of Company. In view of the foregoing and of the consideration to be provided to Employee, Employee agrees that it is reasonable and necessary that Employee make each of the following covenants:

(i)    At any time during the term of this Agreement and thereafter, except as required by law, Employee shall not disclose Confidential Material to any person or entity, either inside or outside of Company, other than as necessary in carrying out the business of Employee, without first obtaining Company's prior written consent (unless such disclosure is compelled pursuant to court orders or subpoena, and at which time Employee shall give immediate notice of such proceedings to Company).

(ii)    At any time during the term of this Agreement and thereafter, Employee shall not use, copy or transfer Confidential Material other than as necessary in carrying out the business of Company, without first obtaining Company's prior written consent.

(iii)    Upon termination of this Agreement, Employee shall promptly deliver to Company (or its designee) all written materials, records, software and documents made by Employee or which came into his/her possession prior to or during the term of this Agreement, concerning the business and affairs of Company, including, without limitation, all materials containing Confidential Material.

5.2    Restrictive Covenants.

(a)    *Solicitation of Current or Prospective Customers or Clients.* Employee agrees that during his/her employment with Company s/he will not directly or indirectly, on behalf of himself/herself or any other individual, organization, or entity, solicit any customer or client or prospective customer or client of Company to engage in or transact business with any entity or person other than Company.

(b)    *No-Solicitation of Employees.* In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, commencing as of the date hereof and for a period of one (1) year following cessation of Employee's employment with Company (the "Limited Period") Employee shall not, directly or indirectly, separately or in association with others, interfere, disrupt or damage Company's business by soliciting, recruiting, attempting to recruit, or causing or assisting in the recruitment or attempted recruitment of, any then-current employee of Company, or any individual who has served in any such capacity at any time within the six (6) month period immediately prior thereto, for employment with another person or entity.

CONFIDENTIAL                                                     WMC001738

(c)    *No-Solicitation of Customers.* Employee agrees that for a period of twelve (12) months following the cessation of employment with Company (such period not to include any period(s) of violation or period(s) of time required for litigation to enforce the covenants herein) s/he will not directly or indirectly, on behalf of himself/herself or any other individual, organization, or entity, solicit for the purpose of providing services of the type provided by Company (i) any actual or prospective customer or client of Company with whom during

Employee's employment with Company s/he has communicated or contacted during the prior twelve (12) month period ; and/or (ii) any actual or prospective customer about whom Employee has obtained confidential information in connection with his/her employment with Company during the prior twelve (12) month period.

(d)    *No-Hire.* In order to protect and preserve Company's Confidential Materials, and Company's significant investment in developing its business, which investment Employee hereby acknowledges, unless prohibited by applicable law, during the Limited Period, Employee shall not, directly or indirectly, hire, attempt to hire, or cause or assist in the hiring or attempted hiring of, any then-current employee, consultant or exclusive independent contractor of Company, or any individual who has served in any such capacity at any time within the six (6) month period immediately prior thereto, for employment.

(e)    *Re-Solicitation of Borrowers.* Employee hereby expressly acknowledges that the solicitation of, or the origination of a loan for, a consumer for whom a loan previously was processed and closed by Company may result in the imposition against Company of fines, penalties, reimbursements, indemnifications, damages and expenses ("Re-Solicitation Losses"). Employee shall under no circumstances solicit, and Employee shall cause the Branch Employees to refrain from soliciting, any consumer for whom a loan previously was processed and closed by Company during the time period set forth on the then-current Early Payoff and Early Payment Default Policies Chart posted to the Company's Intranet page, if such solicitation or loan closing would result in a Re-Solicitation Loss to Company. Unless otherwise prohibited by applicable law, in the event of any breach of this Section, all Re- Solicitation Losses actually suffered, threatened or to which Company may as a result thereof be exposed in Company's reasonable determination shall be deducted from any compensation payable to Employee or otherwise reimbursed to Employee.

(f)    Employee agrees that the restrictions herein will not interfere with or unduly limit his/her ability to obtain suitable alternative employment following termination of employment. Employee acknowledges that the protections afforded to Company herein are reasonable and necessary.

5.3    Independent Covenants. All covenants and provisions contained in this Article V are independent of each other and may be separately enforced or enforced together. If any of the covenants set forth in this Article V is determined to be unenforceable because of its scope, duration, geographical area or similar factor, then the court making such determination shall have the power to reduce or limit such scope, duration, area or other factor, and such covenant shall then be enforceable in its reduced or limited form.

5.4    Irreparable Harm; Injunctive Relief. Company and Employee recognize and acknowledge that in the event of any breach of any provision of this Article, irreparable harm will be suffered by Company and that any remedy available at law will be inadequate and Company and Employee do, therefore, agree that in such event Company shall be entitled to injunctive relief in any court of competent jurisdiction against Employee and against any other person or entity involved in or connected with such breach, without necessity of posting any bond, cash or security against/for Employee

CONFIDENTIAL                                                                                                        WMC001739

or any individual or entity involved in or connected with such breach, which rights shall be in addition to such rights as Company may have for damages and in addition to such other remedies as the law or equity may provide.

*You are hereby notified in accordance with the Defend Trade Secrets Act of 2016 that you will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. You are further notified that if you file a lawsuit for retaliation by an employer for reporting a suspected violation of law, you may disclose the employer's trade secrets to your attorney and use the trade secret information in the court proceeding if you: (a) file any document containing the trade secret under seal; and (b) do not disclose the trade secret, except pursuant to court order.*

## ARTICLE VI
## MISCELLANEOUS PROVISIONS

6.1    Severability. The invalidity or unenforceability of any term or provision contained in this Agreement shall not void or impair the remaining provisions hereof, which shall remain in full force and effect as if such invalid or unenforceable provision had never been contained herein. The Parties agree that to the extent that any provision or portion of this Agreement shall be held, found, or deemed to be unreasonable, unlawful, or unenforceable by a court of competent jurisdiction, then any such provision or portion thereof shall be deemed to be modified or redacted to the extent necessary in order that any such provision or portion thereof shall be legally enforceable to the fullest extent permitted by applicable law, and that it will not affect any other portion or provision of this Agreement. The Parties hereto do further agree that any court of competent jurisdiction shall, and the Parties hereto do hereby expressly authorize, request, and empower any court of competent jurisdiction to, enforce this Agreement and any such provision or portion thereof to the fullest extent permitted by applicable law

6.2    Modifications, Alterations and Amendments. Company reserves the right to modify, alter or amend this Agreement prospectively upon written notice to Employee. Such modifications shall not affect commissions earned but not paid. Employee's continued employment after written notice of the modification, alteration or amendment shall constitute Employee's acceptance of the modification, alteration or amendment. No modification, alteration or amendment of Employee's at-will status is effective, however, unless it is in writing and signed by Employee and the President of Company.

6.3    Further Assurances. Employee agrees to execute, acknowledge and deliver or cause to be executed, acknowledged and delivered all such further documents that Company reasonably deems necessary or appropriate to carry out the terms and provisions of this Agreement.

6.4    No Waiver. No waiver by Company of any condition, or the breach of any  term, covenant, representation or warranty contained herein, whether by conduct or otherwise, by Employee in any one or more instances shall be deemed or construed as a further or continuing waiver of any such term, condition, representation or warranty set forth in the Agreement. Any waiver must be in writing in order to be enforceable against Company. The failure of a Party to insist upon adherence to any term of this Agreement on any occasion will not be considered a waiver or deprive that Party of the right thereafter to insist upon adherence to that term or any other term of this Agreement.

6.5    Successors and Assigns. Company may assign its rights and duties hereunder provided that the assignee is the successor, by operation of law or otherwise, to the business of Company. Employee's rights and obligations under this Agreement shall not be assignable absent Company's prior written consent, which Company may withhold in its sole and absolute discretion.

CONFIDENTIAL                                                                            WMC001740

6.6    Indemnification. To the extent permitted under applicable law, Employee hereby agrees to indemnify and defend Company and its principals for any and all attorneys' fees, costs of prudent settlement, judgments, fines, or damages incurred by Company as a result of Employee's breach of the terms of this Agreement.

6.7    Survival. Notwithstanding anything herein to the contrary, Sections 1.7, 1.8, 3.3, 4.3, and 4.4, and Articles V and VI shall survive termination of this Agreement and/or termination or resignation of Employee's employment with Company.

6.8    Notice. All notices, requests, demands, and other communications which are required or which may be given hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or Telefacsimile with confirmation of receipt or by certified mail, return receipt requested, postage prepaid or by electronic mail delivery:

If to Company:            Richard Tobias, Controller
                          Waterstone Mortgage Corporation
                          N25W23255 Paul Road, Pewaukee, Wisconsin 53072
                          Email: WMCComp@WaterstoneMortgage.com

With a copy to:           Stephanie Ziebell, Senior Vice President, General Counsel
                          Waterstone Mortgage Corporation
                          N25W23255 Paul Road, Pewaukee, Wisconsin 53072
                          Email: Legal@WaterstoneMortgage.com

          If to Employee, to the address provided in connection with the signature line below.

6.9    Construction. In the event of an ambiguity or if a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The Section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

6.10   No Third-Party Beneficiaries. This Agreement is not intended, and shall not be deemed, to confer upon or give rights to any person except as otherwise expressly provided herein.

6.11   Counterparts. This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed an original instrument but all of which together shall constitute one and the same instrument.

6.12   Entire Agreement. This Agreement sets forth all the promises, covenants, agreements and conditions between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, expressed or implied, oral, written or otherwise, except as set forth herein.

6.13   Cooperation. At all times during and after separation of employment, the Parties hereto shall cooperate in effecting an orderly transition of the business contemplated by this Agreement to avoid any interruption in the handling of the business contemplated by this Agreement.

6.14   Consultation. Employee agrees and acknowledges that, prior to signing, Company has

CONFIDENTIAL                                                                            WMC001741

granted Employee sufficient time to review the Agreement, including allowing Employee (in Employee's sole discretion) to take the Agreement home for further study and review. Company has encouraged Employee to freely discuss the terms of this Agreement with any lawyer of Employee's choosing prior to signing.

6.15    No Reliance. Employee is not resigning Employee's employment or relocating a residence in reliance on any promise or representation by Company regarding any guaranteed length of employment or guaranteed compensation by Company.

6.16    Incorporation. The attachments identified in this Agreement constitute a part of this Agreement and are hereby expressly and specifically incorporated herein by reference in their entirety as if fully set forth in this Agreement.

6.17    Expenses of Enforcement. Employee agrees that Company shall be entitled to the cost of all legal fees and expenses incurred in investigating and enforcing any terms and conditions of this Agreement against Employee.

6.18    Notice of Dispute. The Parties agree that in the event of any dispute arising between them that arises out of the employment relationship and/or this Agreement, prior to initiating any civil lawsuit, the Party intending to initiate such a claim or proceeding, will at least ten (10) days prior to doing so, provide the other Party with a specific demand for monetary relief, as well as a calculation explaining the basis for said monetary demand and a short and plain statement of the grounds upon which such demand is sought. Notwithstanding the foregoing, this provision does not prohibit a Party from immediately seeking injunctive relief limited to preventing irreparable harm.

6.19    Dispute Resolution. This Agreement is made and entered into in the state in which Employee is employed and governed by the law of the same. In the event of any dispute between the parties concerning or arising out of their employment relationship, it shall be resolved through binding arbitration in accordance with the rules of JAMS Arbitration, provided however, that notwithstanding any rules in JAMS to the contrary, employees' claims may not be joined with the claims of any other person or Employee and there will be no allowance for Employee to pursue or participate in relief on a class or collective action basis against the Company arising out of the employment relationship or this agreement. Notwithstanding any JAMS rule to the contrary, the parties will share equally in the cost of such Arbitration, and shall be responsible for their own attorneys' fees, provided that if the Arbitration is brought pursuant to any statutory claim for which attorneys' fees were expressly recoverable, the Arbitrator shall award such attorneys' fees and costs consistent with the statute at issue. Moreover, if the claim is *de minimus* in comparison with the amount of the arbitration fee, Employer may, in its discretion, agree to pay Employee's share of the Arbitration Fee. Nothing herein shall preclude a party from seeking temporary injunctive relief in a court of competent jurisdiction to prevent irreparable harm, pending any ruling obtained through Arbitration. Further, nothing herein shall preclude or limit Employee from filing any complaint or charge with a State, Federal, or County agency. Employee may opt out of this provision of the Agreement, thus relieving both parties of the obligations of this provision, simply by (1) sending a notarized letter to the attention of Employee's immediate supervisor copied to the Company's Human Resources department, both sent via Certified Mail within 30 days of the execution of this Agreement expressly opting out of this provision; or (2) striking the entirety of this paragraph and initialing here as follows:

**SIGNATURES ON NEXT PAGE**

CONFIDENTIAL                                                                                      WMC001742

IN WITNESS WHEREOF, the Parties hereto have caused their names to be hereunto subscribed, all as of the day and year first above written.

**EMPLOYEE**

*Chris Wolf*
Chris Wolf (Apr 20, 2021 15:00 EDT)

Print Name:      Chris Wolf

Home Address:    156 LUCKY DRIVE

                 ORMOND BEACH, FL 32176

Telephone:       3212789930

E-mail:          cwolf011@gmail.com

**WATERSTONE MORTGAGE CORPORATION**

By:    *Richard Tobias*

Name: Richard Tobias

Its:    Controller

CONFIDENTIAL                                                 WMC001743

## EXHIBIT A
### PRODUCING SALES MANAGER COMPENSATION

Employee's compensation shall be determined and calculated in accordance with this Exhibit A. Notwithstanding anything to the contrary herein, the timing of payments of compensation shall at all times be subject to Company Policies regarding payroll practices in effect from time to time, and Company may, in its sole and absolute discretion, change the compensation rates and formulas set forth in this Exhibit A, and the manner and schedule of payment, at any time on a prospective basis, but no such change will affect any compensation already earned by Employee as of the date the change is announced.

I. **Employee Compensation.**

    A. Guaranteed Salary. "Guaranteed Salary" means an amount equal to $1,500.00 or the prevailing minimum wage, whichever is higher, per workweek.

    B. Override Amount. "Override Amount" means the amount in Basis Points paid to Employee for each Eligible Loan (excluding Brokered Loans) his/her managerial responsibilities, which is calculated as follows:

    Team override, including personal production (retroactive tier):
    $0 - $5,000,000: 0 bps;
    $5,000,001 - $6,000,000: 7 bps;
    $6,000,001 - $7,000,000: 8 bps.

    C. Personal Production Commission.

    *Eligible Loans*

    For every Eligible Loan (excluding Brokered Loans) the Employee Originates in the month, Company will pay Employee a Personal Production Commission ("Commission") calculated as follows:
    Effective contract based on loan LOCK date.

    Based on closed/funded purchase loans: 125 bps;
    Minimum commission: $500 per loan; maximum commission: $8,000 per loan;
    Deduction: 10 bps per file.

CONFIDENTIAL        WMC001744

Commission ☐ is ☐ is not subject to a reduction for the amount of Guaranteed Salary identified under Section I.A. of this Exhibit payable during the pay period the loan was closed, as well as a reduction for any amounts previously paid as Guaranteed Salary that has not already been taken into account by a prior calculation.

*Brokered Loans*

For each Brokered Loan made by Employee, Company will pay a Commission Rate of Basis Points of the principal amount of the credit extended. The Basis Points to be paid for Brokered Loans will equal the Basis Points in the Commission Rate for Eligible Loans as determined by the calculation in Section I.C. above, except that Brokered Loans shall be excluded from consideration when determining commission tier levels, if applicable.

*Special Purpose Loans*

The Company shall be permitted to vary the Commission rate payable to Employee on Special Purpose Loans to the extent permitted by the LO Comp Rule and applicable employment laws. Company may elect to offer Employee a different Commission rate for legally permissible reasons (as determined by Company in its sole discretion), such as Commissions on loans in different geographical regions or on loans not subject to the LO Comp Rule. Such different Commission rates may apply to other types of loans so long as the Commission rates (i) do not vary based on a transaction term or a proxy for a transaction term or, (ii) if a "proxy" variance exists, the proxy cannot be influenced by the Employee. Subject to applicable law, if Company elects to do so, adjustments to the Commission rate for such loans may be made on a case by case basis or as set forth in the Company Policies.

For example, for each Construction Loan Originated by Employee in accordance with Company Policies, Company will pay a Commission Rate of Zero (0) Basis Points of the principal amount of the credit extended.

For example, for each HELOC Loan Originated by Employee, Company will pay an amount in accordance with Company Policies in effect at the time the HELOC Loan is closed and funded.

*Referrals*

For any Eligible Loan referred by Employee to another loan originator within the Company in accordance with Company policy, Company will pay an amount in accordance with the Company policy in effect at the time the referred Eligible Loan closes and funds.

D. Advanced Amounts; Early Pay Offs and Early Payment Defaults. Employee is only considered to have earned and be entitled to payment of Override Amounts on Eligible Loans and Special Purpose Loans, as applicable. If a loan Originated by Employee has closed and been funded and is subject to an Early Pay Off or Early Payment Default, the loan is not an Eligible Loan or Special Purpose Loan under this Agreement, and Employee is not entitled to an Override Amount on such loan. Notwithstanding the foregoing, Company may advance Override Amounts for all loans that meet (a), (b) and (c) of the Eligible Loan or Special Purpose Loan definition, as applicable, in the next payment cycle. If the Override Amount has been advanced on a loan that later results in an Early Pay Off or Early Payment Default, Employee shall owe Company the amount advanced to the Employee on such ineligible loan. In such case, subject to applicable law, (a) if Employee is still employed by Company, Company will reduce the amount of any

CONFIDENTIAL    WMC001745

such unearned advancement from the next Override Amount payment to Employee; or (b) if Employee is no longer employed by Company, Employee shall reimburse Company the amount of any such unearned advancement in cash or by check within 10 days of Company's notification to Employee of the amount due. Notwithstanding the foregoing, in no case will Employee receive less than the applicable minimum wage for any hours worked in each workweek during the employment period.

## II. **Definitions.**

A "Basis Point" is equal to one hundredth of one percentage point (0.01%) of the gross loan amount stated in the Note at settlement.

A "Brokered Loan" is an Eligible Loan in which the funds provided for settlement of the transaction were neither from the Company's own resources, nor from the Company having drawn upon a bona fide warehouse line of credit. Company requires all brokered transactions to be co-originated with the specialty products division.

"Construction Loan" means a Special Purpose Loan that represents the first phase of a single-close construction-to-permanent loan made for the purpose of financing the construction of a dwelling.

An "Early Payment Default" occurs when a loan becomes a certain number of days or more past due within a specified amount of time from the first payment due date, as defined by investor's guidelines.

An "Early Pay Off" occurs when a loan is repaid in full for any reason within a certain amount of time as set forth on the then-current Early Payoff and Early Payment Default Policies Chart posted to the Company's Intranet page.

An "Eligible Loan" is defined as a residential mortgage loan, other than a Special Purpose Loan, that is (a) Originated in accordance with Applicable Requirements; (b) closed and funded in accordance with Applicable Requirements, in the period in which the Override Amount is calculated; (c) not unfunded, cancelled or rescinded for any reason within five (5) days after settlement; and (d) the period for any Early Payment Default and Early Pay Off has expired.

A "HELOC Loan" means a Special Purpose Loan that is an open-end home equity line of credit.

"Originate" means, without limitation, at the combination of at least the following activities with respect to a particular loan: soliciting the potential applicant for a mortgage loan; taking information from the applicant and filling out the application; educating the applicant in the home buying and financing process; advising the applicant about the different types of loan products available, and demonstrating how closing costs and monthly payments would vary under each product; collecting financial information (such as tax returns and bank statements) and other related documents that are part of the application process; assisting the applicant in understanding and clearing credit problems; maintaining regular contact with the applicant, real estate broker/agent and Company during the time between application and closing to apprise each of the status of the application and to gather additional information as needed; ordering requests for mortgage and other loan verifications; providing the applicant with appropriate disclosures (such as truth in lending disclosures and good faith estimates); participating in the loan closing; and performing such other acts that are reasonably related or necessary to the above-mentioned activities, or as required by Applicable Requirements.

CONFIDENTIAL                                                                                    WMC001746

"Special Purpose Loan" means a residential mortgage loan, other than an Eligible Loan, (a) that is Originated in accordance with Applicable Requirements; (b) that is closed and funded in accordance with Applicable Requirements, in the period in which the Override Amount is calculated; (c) that is not unfunded, cancelled or rescinded for any reason within five (5) days after settlement; and (d) for which the period for any Early Payment Default and Early Pay Off has expired. For purposes of this Exhibit A, the following are Special Purpose Loans: Construction Loans and HELOC Loans.

## III. Periodic Reviews.

Periodically (but not more than quarterly), Company, in its sole discretion, will evaluate the amounts paid to its loan originators based on factors such as loan performance, transaction volume, and current market conditions, and prospectively revise the compensation it agrees to pay to Employee. In the event Employee's compensation is evaluated for adjustment, a variety of criteria including pull through rate, quality of loan files, total loan volume, seniority, loan performance, any relevant competitive forces impacting Employee's performance, and any relevant macroeconomic trends will be reviewed in establishing a new base price and/or compensation level as to prospective loans originated in the future. Employee's compensation may or may not be adjusted accordingly. Company will not establish or maintain a base price that it does not believe can be adhered to on an ongoing basis.

Company shall have the right, at its sole discretion, to modify this compensation schedule (Exhibit A), in whole or in part, at any time on a prospective (but not a retroactive) basis. In such event, Company shall issue and deliver to Employee a new Exhibit A which reflects such changes which shall, as of the effective date stated thereon, supersede and replace the prior Exhibit A. Upon modification of this Exhibit A, the calculations herein will apply to all transactions with a locked rate that is prior to the effective date of such modification.

**SIGNATURES ON NEXT PAGE**

CONFIDENTIAL

WMC001747

Employee and Company hereby agree to Employee's compensation as set forth in this Exhibit A, which shall be effective as of 4/27/2022                              .

**EMPLOYEE**

*Chris Wolf*

Print Name:  Chris Wolf

**WATERSTONE MORTGAGE CORPORATION**

By:        *Richard Tobias*

Name: Richard Tobias

Its:     Controller

CONFIDENTIAL                                                                        WMC001748

This page intentionally left blank.

CONFIDENTIAL

## 2022-04-27 - Wolf, Chris

Final Audit Report                                                      2022-04-27

| | |
|---|---|
| Created: | 2022-04-26 |
| By: | Marjorie Olsen (MOlsen@waterstonemortgage.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAtOtweLXOTAifego9bzFsoUEfDgG9_huU |

## "2022-04-27 - Wolf, Chris" History

🗎 Document created by Marjorie Olsen (MOlsen@waterstonemortgage.com)
2022-04-26 - 6:31:29 PM GMT

🖃 Document emailed to Chris Wolf (cwolf011@gmail.com) for signature
2022-04-26 - 6:33:02 PM GMT

🗎 Email viewed by Chris Wolf (cwolf011@gmail.com)
2022-04-26 - 6:37:15 PM GMT

🖉 Document e-signed by Chris Wolf (cwolf011@gmail.com)
Signature Date: 2022-04-26 - 8:00:22 PM GMT - Time Source: server- IP address: 184.90.57.153

🖃 Document emailed to Richard Tobias (rtobias@waterstonemortgage.com) for signature
2022-04-26 - 8:00:56 PM GMT

🗎 Email viewed by Richard Tobias (rtobias@waterstonemortgage.com)
2022-04-27 - 12:19:37 PM GMT- IP address: 104.47.73.126

🖉 Document e-signed by Richard Tobias (rtobias@waterstonemortgage.com)
Signature Date: 2022-04-27 - 12:21:03 PM GMT - Time Source: server- IP address: 173.89.34.4

✔ Agreement completed.
2022-04-27 - 12:21:03 PM GMT

⬛ **Adobe Acrobat Sign**