## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MUTUAL OF OMAHA
MORTGAGE, INC.

               Plaintiff,

v.

WATERSTONE MORTGAGE
CORPORATION,

               Defendant.

CASE NO. 8:22-cv-01660-TPB-JSS

## WATERSTONE MORTGAGE CORPORATION'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DAMAGES BRIEF

Maria Kreiter (*Admitted PHV*)
Emma Jewell (*Admitted PHV*)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
carolina.blanco@hwhlaw.com
scott.mclaren@hwhlaw.com
*Attorneys for Defendant Waterstone Mortgage Corporation*

## I.  INTRODUCTION

Waterstone cannot defend against a moving target. Counsel for Mutual estimated damages to be $250,000 but then Mutual claimed damages of $4,440,002.42 through an analysis by its mortgage division president, Jeff Gennarelli, as well as $750,000 in "ill-gotten gains" damages. Mutual then abandoned the $750,000 demand and, after Waterstone moved to exclude the $4,440,002.42 Gennarelli damages, Mutual's "rebuttal" expert, Candice Rosevear, claimed damages may be *up to* $28 million. Mutual has yet to say whether it is seeking $28 million, or some other undisclosed amount derived from Rosevear's analysis. And now, for the first time on summary judgment, Mutual's in-house counsel, who was never disclosed as a witness, contends 46 unidentified loans were diverted by Waterstone—without disclosing amounts tied to those unidentified loans or an associated demand.

Waterstone is not required to guess at its exposure or wait until the trial to understand the amount Mutual demands. The Court should grant judgment as to any undisclosed damages, including, but not limited to, unquantified damages associated with allegedly diverted loans and undisclosed damages and theories derivative of Rosevear's analysis.

In addition, the Court should exclude the $4,440,002.42 Gennarelli demand which, tellingly, Mutual's damages brief does not even mention. Further, regardless of whether Mutual relies on the Gennarelli demand or Rosevear's analysis, certain damages should be excluded:

- <u>Damages beyond the one-year duration of the employee non-solicits</u>. Any other period is speculative and not reasonably certain as Florida law requires.

- <u>Lost profits associated with the four branch managers</u>. The alleged wrongdoing stems not from the managers' decision to resign, but rather their and Waterstone's alleged coordination and solicitation with respect to the rest of the branch employees.

- <u>Damages associated with the Paramus, New Jersey branch</u>. Mutual's own regional manager admitted nothing nefarious occurred with respect to the Paramus branch that departed weeks later.

As a final matter, the vast majority of Mutual's brief is not addressed to damages as the Court instructed but rather causation and e-mails or testimony excerpts. Mutual is not entitled to judgment and a damages trial because Mutual made no effort to establish liability under the elements of each of its four claims. While Mutual discusses causation, that issue is riddled with disputed issues of material fact. This is easily illustrated by the chorus of branch managers and former employees who testify that Mutual caused its own damages by driving the employees to resign through habitually failing to timely close loans; focusing on refinance rather than purchase loans; lacking adequate resources and products; unfair compensation; and failing in its leadership. Mutual's motion should be denied.

# I. ARGUMENT AS TO DAMAGES.

## A. The Court Should Grant Judgment In Favor Of Waterstone As To Damages Mutual Never Disclosed.

### 1. The Court Should Exclude Any Alleged Diverted Loan Damages.

Waterstone needs an order confirming Mutual cannot inject undisclosed damages. To date, Mutual has not quantified or disclosed any alleged damages associated with diverted loans. Waterstone first produced documents showing loans that it closed within two months of the employees' transitioning to Waterstone in October 2022. (Kreiter Decl. (Ex. 1) ¶ 2.) Mutual could have compared those loans to its pipeline and claimed that certain Waterstone loans were diverted. Or, if Mutual thought additional information was needed to identify diverted loans, it could have sought additional discovery. Rather, and despite having Waterstone's closed loan data for months, Mutual's corporate representative testified on May 25, 2023 that Mutual still had not analyzed damages based on diverted loans:

> Q: Is Mutual seeking damages with respect to [diverted loans]?
> A: I believe so.
> Q: But you're not able to tell me what those damages are?
> A: Not at this moment.
> Q: Have you or anyone at Mutual made an attempt to calculate those damages?
> A: I have not.
> Q: Has anyone at Mutual?
> A: Not that I'm aware of.

(*See* Gennarelli Tr. (Ex. 2) 25:21-26:6.) The testimony by Mutual's corporate representative is binding on Mutual, such that diverted loan damages are no longer part of the case. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 690 (S.D.

3

Fla. 2012) (when a corporate representative "lacks the ability to answer relevant questions on listed topics... then the 'we-don't-know' response can be binding on the corporation and prohibit it from offering evidence at trial on those points.") The Court should exclude any diverted loan damages on this basis alone.

In addition, on June 5, 2023, nearly two months before the close of discovery, and without being asked by Mutual, Waterstone made an additional production of documents showing nearly an entire year of its loan closings, along with a report prepared by its damages expert who analyzed the loans in Mutual's pipeline compared to loans closed at Waterstone. (Steven Oscher Rpt. (Ex. 3); Kreiter Decl. ¶ 3.) Oscher concluded that, *at most*, 20 loans transferred from Mutual to Waterstone resulting in potential damages of less than $60,000. (Ex. 3 at 8-9.) The $60,000 maximum does not account for liability or causation, and Mutual has taken no third-party discovery of any borrowers to understand the circumstances of particular loans, including whether the loans were rejected by Mutual, or whether the borrowers simply picked Waterstone instead of Mutual.

Nor does Rosevear comment on or analyze diverted loan damages. (Rosevear Tr. (Ex. 4) 4:18-5:2.) Nor did Mutual ever supplement its discovery responses to articulate damages based on diverted loans. (Kreiter Decl. (Ex. 1) ¶¶ 4-5.)

Because Mutual never identified any diverted loans or lost profits associated with the diverted loans, the Court must eliminate any diverted loan damages. Under no circumstances should the Court countenance Mutual presenting a declaration of its in-house counsel, Mark Carroll, for the first time on summary judgment to claim

Waterstone diverted 46 loans. (DE 100-1 at 2-5.) It is simply too late to allow Mutual another do-over on its damages.

Moreover, even if Carroll's declaration is considered, it does not prevent partial judgment for Waterstone because Carroll's claim is based on credit inquiries pulled at Waterstone compared to Mutual's own credit inquiries—which Mutual never produced. Duplicate credit inquiries do not equate to diverted loans. A borrower may request multiple credit inquiries and never close a loan. Tellingly, Mutual still does not articulate any damages based on Carroll's statements. Further, Mutual never disclosed Carroll as a potential witness. Thus, he cannot testify at trial as to diverted loans or any other topic, as detailed in Waterstone's simultaneously filed motion to strike Carroll.

Each of these reasons, independently or collectively, entitle Waterstone to judgment as to any diverted loan damages.

### 2. The Court Should Exclude Mutual's Branch Departure Damages.

The Court should also exclude damages allegedly caused by Mutual losing its Tampa and Ormond Beach branches. Both Gennarelli and Rosevear focused on this category of damages, but Mutual does not even mention the Gennarelli demand in its damages brief. Nor does it make a demand based on Rosevear's model. Instead, Mutual states that the model provides means to measure damages that *could* range anywhere between $0 and $28 million. If Mutual is planning to wait until trial to disclose that it seeks $28 million — or another undisclosed amount between $0 and

$28 million — exclusion is appropriate. Waterstone is entitled to understand its exposure. A range of $0 to $28 million amounts to no disclosure at all.[1]

## B. The Court Should Exclude Mutual's Branch Departure Damages as Speculative and Unsupported.

### 1. That The Employees Would Have Stayed At Mutual After the Branch Closed and the Managers Resigned is Speculative.

If Mutual is relying on the Gennarelli analysis despite never mentioning it in its damages brief, the Court should nevertheless exclude those damages as speculative, unsupported, and not "reasonably certain" as Florida law requires.[2] The same is true with respect to the Rosevear analysis.

Mutual has no evidence that its branches would have stayed open or that the dozens of employees at three different branches in Florida and New Jersey would have continued working for Mutual for 18 months (as Gennarelli assumes) or for 10 years or more (as Rosevear assumes). While each of the managers is alleged to have an employee non-solicit, it is for 12 months. (*See id.* at 172:24-173:4.) Mutual testified it was aware of the 12-month non-solicit duration but did not use it in connection

---

[1] For all but the last two weeks of discovery when Mutual disclosed Rosevear's "rebuttal" report, Waterstone believed it was defending a $4.4 million case based on Gennarelli's non-expert analysis, vulnerable for many reasons. If Waterstone had known its exposure was up to $28 million based on an expert report, Waterstone would have defended the case far more aggressively, including additional depositions, corporate representative topics, subpoenas, and written discovery.

[2] *See Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,* 254 F.Supp.2d 1239, 1247-49 (M.D. Fla. 2003) ("Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions."); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344-45 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (rejecting lost profits as too speculative where plaintiff did not establish each of the "but for" assumptions required for it to generate future profits); *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002) (lost profit damages will not be awarded "when those profits are dependent on a party taking an action that it is unclear he would have taken.")

with the damages analysis (*Id*. at 172:24-173:7), despite that the managers would have been free to solicit after a year. (*Id.* at 173:8-174:2.)

When asked if Mutual had reason to assume the branch employees would have stayed with Mutual for 18 months, Gennarelli could only speculate: "[w]e now are the lender for Keller Williams. I would imagine that that may be more attractive…". (*See, e.g,* Ex. 2 at 174:10-23.) But Mutual did not ask any of the employees if Keller Williams would have motivated them to stay with Mutual. (*Id*.) Mutual also admitted it has no evidence the branch employees would have continued working for a different manager at Mutual. (*Id*. at 95:16-96:1 (Q: "Does Mutual have evidence that the employees would've stayed and worked for Kiley King? […] A: "No, no evidence.") The employees themselves indicate they were not going to stay at Mutual and, in fact, a number had been looking for alternate employment for many months. (*See e.g.,* Smith Decl. (Ex. 8) ¶ 13; Hutto Decl. (Ex. 9) ¶ 7; Utsch Decl. (Ex. 10) ¶ 2; Wolf Decl. (Ex. 11) ¶ 3; Walker (Ex. 12) ¶ 14; Lowe Decl. (Ex. 13) ¶ 7.)

While Mutual now claims that branches it retained for over 12 months have, on average, been affiliated with Mutual for approximately 51 months (DE 100 at 25), that data supports Waterstone's position because the Tampa and Ormond Beach branches had been with Mutual longer than the 51-month average when the employees resigned. (Kreiter Decl. ¶ 6.) That the branches would have continued to exceed Mutual's average for another 18 more months or another 10 years has no evidentiary support and is instead pure speculation.

### 2. The Lost Profit Damages Improperly Include Loan Volume Attributable to the Former Branch Managers.

The Court should also exclude the profits associated with the branch managers Waterstone lawfully hired, as the alleged wrongdoing stems not from the managers' resignation, but rather their and Waterstone's alleged coordination and solicitation with respect to the rest of the branch employees. The managers are employees at will who could resign without liability, just as Waterstone can recruit from a competitor without liability. In fact, Mutual admitted there is nothing unlawful about Waterstone recruiting the branch managers and that "absolutely we should take that money out" of Mutual's damages. (Gennarelli Tr. (Ex. 2) at 92:22-93:13.) Yet, both Gennarelli and Rosevear do not carve out the four managers and instead knowingly inflate their calculation. To do so is not "reasonably reliable," in any sense.

### 3. The Lost Profit Damages Improperly Include the Paramus Branch.

Mutual cannot seek damages based on the Paramus, New Jersey branch because the departure of that branch did not involve wrongdoing. While Paramus reported through Chris Smith and John Utsch (the Tampa managers), the Paramus branch also had local managers who considered staying with Mutual and simply decided against it—on July 5, 2022, weeks after the Tampa resignations. (*See* Tomalak Tr. (Ex. 7) 149:19-150:8 and Tomalak Dep. Ex. 28.) Specifically, after Smith resigned, Mutual's regional manager, Brian Tomalak talked through what options the Paramus managers would have if they remained at Mutual. (*Id*. 40:8-13.) The Paramus managers had called Mutual before deciding whether to move to

Waterstone. (*Id.* at 150:9-22.) Mutual answered their questions, provided a profit and loss statement, and thought through what the volume, costs, and revenue would look like. (*Id.*) The managers simply did not pick Mutual. (*Id.* 151:1-5.)

That decision is natural given that one of the Mutual managers tasked with overseeing operations in Paramus, Kiley King, could not name a single loan officer employed at the Paramus branch. (King Tr. (Ex. 17) at 46:4-7.)  The other Mutual manager, Tomalak, who was involved in Mutual's retention efforts, likewise could not name a single branch employee and only vaguely recalled the first names of the Paramus managers. (Tomalak Tr. (Ex. 7) at 37:23-39:6.) Neither King, nor Tomalak ever visited the Paramus office. (King Tr. (Ex. 17) at 46:8-10; Tomalak Tr. (Ex. 7) at39:7-9.) When asked if there is anything wrongful about the departure of the Paramus branch, Tomalak admitted there was not. (Tomalak Tr. (Ex. 7) at 151:6-9.) Both Paramus managers, Mike Lynch and Patrick Japaz agree. (*See* Japaz Decl. (Ex. 14) ¶¶ 2-7; *see* Lynch Decl. (Ex. 15) ¶¶ 9-15.) Moreover, Mutual fired all the remaining Paramus employees. (Lynch Decl. (Ex. 15) ¶ 16.) Not all of them went to Waterstone and some left the industry altogether. (Japaz Decl. (Ex. 14) ¶ 6.) As such, the demise of the branch was at Mutual's election, following fair and informed competition. No evidence suggests otherwise.

### 4. Both the Gennarelli and Rosevear Models Are Based On Hypothetical Projections that Intentionally Ignore Reality.

Rosevear's and Gennarelli's models should also be excluded because they are based on hypothetical projections that ignore reality. There is no need to speculate.

Waterstone turned over data regarding the loans it closed and unilaterally supplemented that data. The dollars at issue are easily measurable based on the production volume of the branches after the employees resigned, particularly since more than a year has passed since June of 2022 when the last employee resigned in Tampa. If Mutual suffered any actionable loss (it did not) that loss would be measurable by reference to how the Tampa and Daytona branches *actually* performed at Waterstone. There is no basis for Rosevear to estimate damages in excess of $1 million—let alone $28 million based on a "peer" model or "MBA-Based Model" to determine volume.

Similarly, as president of Mutual's mortgage division, Gennarelli is acutely aware that the 2020-2021 period he relied on to project damages of $4,440,002.42 was highly anomalous for the mortgage industry. (Gennarelli Tr. (Ex. 2) 163:4-165:11.) Gennarelli recalls 2020, in particular, as being "absolutely" a record year for Mutual, a "record high" for the branches at issue, and a "historically anomalous year for the industry" with activity triggered by the COVID-19 pandemic (*Id.* at 163:10-164:24.)

Further, Mutual admits that in 2022 the market was in a downturn after going through 2020-2021, which Gennarelli referred to as the "greatest mortgage market in decades." (*Id.* at 189:10-13, 192:2-9; Ex. F, Gennarelli Ex. 12.) Mutual's Forward Division, which encompasses the branches at issue, was not profitable as of June 2022—the very month the Tampa branch departed, and just two months after Ormond Beach departed. (*See* Gennarelli Tr. (Ex. B) 181:6-187:13.)

In fact, Chris Leyden, Chief Operating Officer of Mutual's Forward Division,

testified that the company's performance has been declining since 2022. (*See* Leyden Tr. (Ex. 18.) 25:3-26:14.) In fact, Leyden admitted that Mutual is "significantly below budget" for 2023, and that the Forward Division is "barely breaking even" and "probably even a loss still." (*Id.* 26:8-22.) Leyden confirmed that overall Mutual projected losses for 2022, and is projecting increased losses for 2023 and 2024, with $42 million in losses expected in 2024 and a downward trajectory at the corporate level. (*Id.* 36:13-18.) In addition, Leyden's compensation, which is tied to performance, is "way more than half lower" for 2023 than 2020. (*Id.* 17:13-18:5.)

Mutual does not consider this known fact about the market downturn because doing so means it cannot threaten Waterstone with millions in damages. However, the Court has authority to exclude unreliable damages and should do so here.

### C. At a Minimum, the Court Should Exclude Select Categories of Damages.

If the Court does not exclude the Rosevear and Gennarelli damages in full, at a minimum, the Court should exclude portions of damages:

(1) amounts beyond the 12-month non-solicitation period. According to Rosevear, Mutual's lost profits over 12 months range from $1.59 million to $1.68 million. (See Rosevear analysis (Ex. 6) at MOM0015944.)

(2) damages associated with the four managers. Waterstone's damages expert calculated the loan volume attributable to branch managers and concluded that in Daytona, Hutto and Wolf were responsible for roughly 44.77% to 47.77% of the branch's total loan volume. (Oscher Rpt. (Ex. 3) at 11, Ex. VII.) In Tampa, Smith originated 11.61% to 18.83% of the branch's total loan volume. (*Id.*) Oscher did not

11

calculate loan volume attributable to Utsch and doing so only increases the loan volume attributable to the Tampa branch managers.

(3) damages associated with the Paramus branch.

## II. ARGUMENT AS TO CAUSATION.

The Court directed the parties to focus on damages only, with liability and all other arguments reserved for a later date.[3] Yet, the first 20 pages of Mutual's brief focuses on Waterstone's alleged wrongdoing and a claim that Waterstone caused Mutual's losses. (DE 100.) Summary judgment cannot be granted in favor of Mutual on any of its claims because genuine issues of material fact abound with respect to both causation and liability. Waterstone disputes the allegations in paragraphs 10-62 of Mutual's brief and, despite that the focus was to be damages, includes a sample of the counter-veiling facts material to causation below. Liability is addressed in Section III below. Waterstone believes this global approach is appropriate and sufficient given the many issues of fact that exist separate from the discrete points raised by Mutual and given the Court's directive not to focus on these issues at this time.

### 1.  Mutual Caused its Own Losses by Treating the Managers Poorly.

Mutual caused its own losses, not Waterstone or the branch managers. The managers were extremely frustrated with Mutual long before they ever explored

---

[3] *See* August 23, 2023 Case Management Conference Tr. (DE102) at 4:25-5:5 ("Assume for purposes of an argument that the causes of action that have been pled are successful. What damages flow from that?"); *id.* at 6:3-9 ("Forget about liability, forget about – get out of – get out of the thinking that, oh, I have to file a summary judgment motion with every argument . . . this is a narrow motion to try to get some clarification on damages. Call it a motion in limine if you want.")

employment with Waterstone, as detailed in the supporting declarations of Smith and Utsch who managed the Tampa branch and Hutto and Wolf who managed the Ormond Beach branch. (Exs. 8-11.) Specifically, what caused the managers to resign was Mutual's inability to timely close loans; inadequate products, support, and resources; and frustration with Mutual's leadership. (Smith Decl. (Ex. 8) ¶¶ 2-14; Hutto Decl. (Ex. 9) ¶¶ 2-5; Utsch Decl. (Ex. 10) ¶¶ 2-3; Wolf Decl. (Ex. 11) ¶ 2.)

According to Hutto, for example, Mutual missed closing dates approximately fifty percent of the time. (Ex. 9) ¶ 2.) On one occasion, buyers had to keep their moving truck in the branch parking lot because Mutual did not timely close the loan and Hutto had to make hotel accommodations for the buyers. That situation, and many others like it where Mutual was unable to timely close loans, jeopardized Hutto's business. (*Id.* ¶ 3.)

The managers were also frustrated with Mutual's leadership. For example, Smith felt he had no support from Mutual's regional managers, Tomalak and King, who did nothing to support his branch and yet received 50% of the profits Smith generated, on top of Mutual taking a portion of the branch revenue. (Smith Decl. (Ex. 8) ¶ 9.) Smith viewed that structure as atypical and grossly unfair. (*Id.*) The money Tomalak and King made off Smith's efforts for years bothers him still, as does Mutual's failure to do anything to address Smith's concerns. (*Id.* ¶ 14.)

Further still, the managers felt Mutual lacked adequate loan products, such as down payment assistance programs and diverse construction loan products; the managers felt Mutual's underwriting process was far too conservative, and often

incomprehensible; Mutual was no longer an FDIC lender once it sold Mutual of Omaha Bank, requiring the managers to seek state-by-state accreditation; and Mutual's focus was refinance, not the purchase loan that the managers prioritized. (Smith Decl. (Ex. 8) ¶¶ 5-7; Utsch Decl. (Ex. 10) ¶ 3; Wolf Decl. (Ex. 11) ¶ 2.) Given these concerns, and the countless others that their declarations detail, the four managers were actively looking for another employer long before they explored Waterstone and would not have stayed with Mutual, even if they had not selected Waterstone. (*Id.* at Ex. 8 ¶ 20; Ex. 9 ¶ 7; Ex. 10 ¶ 4; and Ex. 11 ¶ 3.)

### 2. Mutual Has No Evidence As to Causation With Respect to the Branch Employees Who Contradict Mutual's Position.

Another layer of genuine issues of material exists with respect to the branch employees reporting to the four managers. While Mutual claims it was the managers' pre-resignation notice to the employees and coordination with Waterstone that caused Mutual to lose the branches, Mutual did not depose any of the branch employees except one. Thus, Mutual cannot possibly establish its theory is correct and undisputed for purposes of summary judgment.

Moreover, the one branch employee Mutual did depose, Dawson Walker from the Ormond Beach branch, resigned not because his managers told him of their plans to resign in advance, shared allegedly confidential information with Waterstone, or otherwise coordinated with Waterstone. Rather, Walker had no experience in the mortgage industry before meeting Hutto and Wolf, as he previously worked in a manufacturing job and as an unsuccessful realtor. (Walker Decl. (Ex.

12) ¶¶ 2-3.) With Hutto's and Wolf's training and mentorship, Walker became a top producer and attributes his success to Hutto and Wolf, who are now his close friends. (*Id.* ¶¶ 5-8, 15.) It did not matter where Hutto and Wolf were going, Walker was going to stay with them. (*Id.* ¶ 14.) Waterstone had nothing to do with Walker's decision. (*Id.*) In contrast, Mutual denied Walker a personal home loan, and Walker never met or spoke to Tomalak and King. (*Id.* ¶¶ 8-9, 12.)

With respect to another Ormond Beach employee, Jake Lowe, Waterstone cannot possibly have caused his departure because Lowe did not know the managers were going to Waterstone and still he resigned. (Lowe Decl. (Ex. 13) ¶¶ 8-9.) In fact, when Lowe gave Hutto and Wolf his resignation, they still did not reveal their plans, despite that they too would soon resign. (*Id.* ¶ 9.) Had Lowe known, he would have gone with Hutto and Wolf and not bothered with securing another job. (*Id.* ¶12.)

Top producers from the Tampa and Paramus branches tell a similar story of mentoring, friendship, and loyalty with respect to their managers, Smith and Utsch, and a lack of connection to Mutual. (Landgraff Decl. (Ex. 16) ¶¶ 2-11; Japaz Decl. (Ex. 14) ¶¶ 2-5; Lynch Decl. (Ex. 15) ¶¶ 3-6, 14.)

Given the many witnesses who will testify for Waterstone contrary to Mutual's position regarding causation, only a few of which are illustrated here, Mutual is not entitled to summary judgment. Rather, the jury will hear from the employees themselves and decide whether it was Waterstone's wrongdoing that caused the employees to leave (as Mutual claims) or natural attrition triggered by the

15

departure of much loved managers who the employees viewed as business leaders, mentors, and personal friends (as Waterstone claims).

Furthermore, Waterstone disputes the allegations in paragraphs 10-16, 17-29, 30-32, 33-38, and 47-51 in Mutual's brief regarding the alleged diversion of loans and borrower data. Waterstone did not seek borrower data from Mutual and explicitly instructed employees in its offer letters not to use or take confidential, proprietary or trade secret information belonging to Mutual. (*See, e.g.* Smith Offer (Ex. 21) at 2.) Regardless, Mutual's corporate representative admitted Mutual does not have any evidence Waterstone used any "confidential" information or caused any losses to Mutual: "We don't know what goes on, what information was used or not used." (Genneralli Dep. Tr. (Ex. 2) 61:3-22.) And with respect to whether any of the allegedly appropriated borrower information resulted in a loan closed for Waterstone, Mutual's second corporate representative and human resources director admitted she: "can't speak to the specifics of individual loan follow-through at Waterstone." (Theobald Dep. Tr. (Ex. 22) 57:4-10.)

## III.    ARGUMENT AS TO LIABILITY.

Mutual's motion should also be denied because (i) Mutual made no effort to establish liability and (ii) there are a wide array of genuine issues of material fact.

### 1.   Mutual Did Not Attempt to Satisfy Its Summary Judgment Burden of Proof as to Liability.

Mutual seeks a trial on damages without attempting to prove or argue liability. Instead, Mutual states that it only discussed the causation element of its claims and

not the remaining prima facie elements because the Court ordered a motion on damages. (DE 100 at n. 1.) The Court directing the parties to focus on damages does not translate to a liability judgment against Waterstone without Mutual satisfying its burden as to the summary judgment standards as to each element of each of its four claims. Fed. R. Civ. P. 56 (a) (movant must shows there is no genuine dispute as to any material fact and entitlement to judgment as a matter of law).

### 2. Genuine Issues of Material Fact as to Waterstone's Liability Preclude Summary Judgment.

Moreover, when the elements of Mutual's claims are considered, it is clear summary judgment is not available due to genuine issues of material fact. Mutual's claims are for misappropriation of trade secrets under the Defend Trade Secrets Act and the Florida Trades Secret Act (claims 1 and 2); tortious interference (claim 3); and aiding and abetting breach of fiduciary duty (claim 4).

A fundamental element of the trade secret claims is whether Mutual's information is a trade secret. Waterstone contends it is not. Mutual took a needle in a haystack approach to identifying its alleged trade secrets after the Court granted Waterstone's motion to compel (DE50). Specifically, Mutual identified 301 documents by bates-number that it claims are trade secrets. (*See* Mutual Resp. to Waterstone Interrog. No. 8 (Ex. 19).) Many of these 301 documents are not trade secrets. For example, a publicly available CFPB English-Spanish glossary of financial terms that is not owned by Mutual and not the subject secrecy efforts by Mutual is not a trade secret, as Mutual later admitted. (Gennarelli Tr. (Ex. 2) at 228:4-230:4.)

17

Moreover, Mutual must demonstrate misappropriation by Waterstone. While certain branch employees took borrower data, Mutual pursues Waterstone alone. Contrary to the allegations in paragraphs 39-46 and 52-62 of Mutual's brief, Waterstone's IT department detected the data put on Waterstone's systems without authorization prior to receiving any cease-and-desist letters and very quickly quarantined it, as detailed in the report of Waterstone's e-forensic expert. (Creasy Rpt. (Ex. 20).) Waterstone interviewed the employees called out in the cease-and-desist letters and required them to sign certifications. (*Id.* at 3.) Waterstone will vigorously defend the misappropriation claims on that basis and many others, including that (i) Mutual did not make a damages demand based on loans or borrower data and has no idea what loans or data were allegedly diverted to Waterstone (*see* Section I.A.1 above; *see also* Gennarelli Dep. Tr. (Ex. 2) 45:8-10, 49:25-50:2)); (ii) loans referred to Waterstone had already been rejected by Mutual (*see, e.g.,* Hutto Decl. (Ex. 9) ¶¶ 12-16); and (iii) borrowers who own the data directed its transmittal to Waterstone.

If Mutual will base its trade secrets claims on compensation or financial information, there is a genuine issue of fact as to whether Mutual itself treats such information as trade secret. When Smith was recruited from his prior employer, Tomalak and King asked Smith to provide a wide array of the same data, including pricing, margins, value ratios, branch expenses, and compensation information. (Smith Decl. ¶¶ 27-30.) Mutual will struggle to convince a jury that it treats this data as a trade secret given the actions of its own leadership. As such, summary judgment

is inappropriate. *Warrier Thombrigbee Trans. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294 (11th Cir. 1983) (the court should deny summary judgment where reasonable minds may differ on the inferences arising from undisputed facts).

With respect to Mutual's claim for tortious interference, which rests on the managers restrictive covenant agreements, one example of a genuine issue of fact is whether the four managers solicited the branch employees. The managers deny solicitation. (*See, e.g.,* Smith Decl. (Ex. 8) ¶¶ 15-16.); Hutto Decl. (Ex. 9) ¶ 11.) So do the employees. (*See, e.g.,* Walker (Decl. (Ex. 12.) Moreover, breach of the non-solicit by the managers is not attributable to Waterstone unless Waterstone knew of the non-solicits, interfered without being privileged to do so, and the non-solicits are enforceable in the first place. Here, two key managers, Hutto and Smith, have agreements governed by California law and, thus, are not enforceable under Cal. Prof. & Bus. Code s. 16600. In addition, Waterstone directs its employees' compliance with prior contractual obligations (Allen Tr. (DE 100-4) 90:9-22, 91:20-92:22, 216:3-217:15), contrary to the paragraphs 10-16 allegations.

Finally, the aiding and abetting fiduciary duty claim involves all the same issues as the tortious interference claim (including as to Cal. Prof. & Bus. Code s. 16600 if the activity that breaches the duty is protected by the statute).

In addition, while it is unclear that Mutual intended a number of its fact allegations to apply to this claim, such as paragraphs 33-38 and 47-51 of its brief that contend the managers conspired with the branch employees and that Waterstone encouraged mass resignations and offered payments to the managers in exchange for

19

recruiting the entire branch, there is an alternate view: the managers were rightfully concerned about getting the loans closed for Mutual if they exited at once given Mutual's inability to timely close its loans. (*See* Hutto Decl. (Ex. 9) ¶ 16.) That concern drove the decision to coordinate in advance, including staggering exits, which is not a violation of Mutual's interests. (*Id.*)

Mutual also takes an array of facts entirely out of context. For example, there was no payment to the managers for bringing their branches, but rather a credit for startup expenses in recognition of the fact that employees would *not* be transferring loans from Mutual. (Smith Decl. (Ex. 8) ¶ 31-32.) Further, Mutual is wrong about the role of Ellie Briones, see paragraph 51, as she was a virtual assistant to Wolf months before the resignations, not someone involved in the transition. (Hutto Tr. (DE100-9) 115:10-18; Wolf Tr. (DE100-13 151:4-7, 160:2-14.) Similarly, that Mutual argues Waterstone remained "blissfully ignorant" about whether the managers were soliciting in paragraph 15, is argument, not an admission and, in any event, as noted above, managers and employees deny solicitation.

Ultimately, whether the transition efforts involve a breach of duty or other wrongdoing by the managers and employees, and the extent of Waterstone's role in that breach, are clear questions of fact subject to inference in favor of Waterstone at the summary judgment stage. Mutual's motion should be denied.

Dated this 17th day of November, 2023.

*s/Maria L. Kreiter*
Maria Kreiter (*Admitted PHV*)
Emma Jewell (*Admitted PHV*)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
scott.mclaren@hwhlaw.com
carolina.blanco@hwhlaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*

30199454.5