IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

    Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

    Defendant.
_____/

| | |
|---|---|
| DEPOSITION OF: | **JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC.** |
| TAKEN: | Pursuant to Notice by Counsel for Defendant |
| DATE: | May 25, 2023 |
| TIME: | 9:17 a.m. to 4:53 p.m. EST |
| LOCATION: | Hill Ward Henderson<br>101 East Kennedy Boulevard<br>Suite 3700<br>Tampa, Florida  33602 |
| REPORTED BY: | Melanie Keefe, FPR<br>Notary Public<br>State of Florida at Large |

REGENCY REPORTING SERVICE, INC. (813)224-0224

**EXHIBIT 2**

25

1  MS. WALTER: Object to the extent it implicates
2  attorney work product. He's here as -- he's --
3  MS. KREITER: He's --
4  MS. WALTER: He's not the attorney.
5  MS. KREITER: He's not here as an individual.
6  He's here as a corp rep.
7  MS. WALTER: I did not say individual. I said he
8  is not the attorney in the case.
9  MS. KREITER: I'm entitled to ask what documents
10 and what preparation this witness did to testify about
11 damages for which ten months into the case Mutual has
12 not disclosed any number, so that's the line of my
13 questions.
14  Q. Do you have a number, Mr. Gennarelli, with
15 respect to this first bucket, the loans that have
16 transferred to Waterstone from Mutual of Omaha? Have you
17 looked at the loans, and do you have a number that you're
18 ready to present at the deposition today with respect to
19 Bucket 1?
20  A. I don't have a number with respect to Bucket 1.
21  Q. Is Mutual seeking damages with respect to
22 Bucket 1?
23  A. I believe so.
24  Q. But you're not able to tell me what those damages
25 are?

REGENCY REPORTING SERVICE, INC. (813)224-0224

26

1  A. Not at this moment.
2  Q. Has you or anyone at Mutual made an attempt to
3  calculate those damages?
4  A. I have not.
5  Q. Has anybody at Mutual?
6  A. Not that I'm aware of.
7  Q. And your position is that you're waiting to do
8  more discovery?
9  MS. WALTER: Object to form.
10 A. It is.
11 Q. What more discovery do you need to do?
12 MS. WALTER: Object to form.
13 A. Well, I'd like to see the personal e-mails where
14 all of our data was sent to. That's what I'd really like to
15 know so that I can understand the absolute damage caused by
16 this unbelievable breach of conduct.
17 Q. Did Mutual of Omaha Mortgage send subpoenas to
18 any of the individuals who have those e-mails?
19 MS. WALTER: Object to the extent it implicates
20 attorney work product.
21 MS. KREITER: Work product --
22 MS. WALTER: Mr. Gennarelli isn't going to be
23 able to answer how discovery is being conducted in the
24 case. That's my job.
25 MS. KREITER: The fact that subpoenas have gone

REGENCY REPORTING SERVICE, INC. (813)224-0224

27

1  out is not a privileged question.
2  MS. WALTER: I didn't -- I said it implicates
3  attorney work product. I didn't say it was privileged.
4  I'm not instructing him not to answer.
5  Q. Do you have an understanding --
6  A. I'm not aware of the subpoenas or not. I don't
7  know.
8  Q. So you don't know whether Mutual has made an
9  effort to, for example, subpoena the personal e-mails of any
10 of the individuals that you claim are necessary?
11 A. I am not aware.
12 Q. When you were preparing to testify for the
13 deposition, did you have discussions or requests, access to
14 the e-mails that you believe are necessary to calculate
15 Category 1 damages?
16 MS. WALTER: Object to the extent it implicates
17 attorney work product or goes to attorney-client
18 discussions.
19 Q. Go ahead.
20 A. Repeat the question.
21 Q. Sure. I hear you testifying that Mutual is
22 unable to calculate damages with respect to Category 1,
23 which we've defined as the loans that have closed at
24 Waterstone due to some unlawful conduct. And I'm trying to
25 understand your testimony.

REGENCY REPORTING SERVICE, INC. (813)224-0224

28

1  I've heard you say that calculation hasn't been
2  done because you haven't seen personal e-mails, and I've
3  heard you testify that you don't know whether there have
4  been any subpoenas issued by Mutual in an effort to try to
5  get the e-mails. So now my question is in connection with
6  preparing for this deposition --
7  A. Yes.
8  Q. -- did you make any efforts at that point in time
9  to seek out the e-mails that you believe are necessary to
10 testify on the topic noticed?
11 MS. WALTER: Object to form.
12 A. I didn't -- I did not.
13 MS. WALTER: Can we take a ten-minute break?
14 MS. KREITER: Sure.
15 (A recess was taken.)
16 MS. KREITER: Can you just read back the last
17 question and last answer, please?
18 (The previous question and answer was read by the
19 reporter.)
20 Q. (By Ms. Kreiter) So there may be times during
21 this deposition when I say "you." You're testifying on
22 behalf of Mutual. If I say "you" during this deposition,
23 just understand that I mean Mutual collectively as a
24 company; correct or understood?
25 A. Yes.

REGENCY REPORTING SERVICE, INC. (813)224-0224

45

 1  make sense to you?
 2          MS. WALTER: Object to form.
 3      A.  Your question makes sense, but the result doesn't
 4  make sense to me.
 5      Q.  That the loan would closed with Waterstone?
 6      A.  Right. I've -- I've had -- I've left companies.
 7  I leave the entire loan pipeline, you know, where it is.
 8      Q.  Sure. But you understand that the borrowers have
 9  the election to close the loan with one or the other?
10      A.  Yes, yes, yes.
11      Q.  And in some situations, it may be natural for the
12  borrower to want to close with Waterstone because the
13  relationship with the --
14      A.  I think it's important to understand that the
15  information that Waterstone had in terms of pricing of that
16  loan, in terms of creditworthiness of that loan made it --
17  made it easy to attract the borrower, meaning, like, if I'm
18  competing on a level playing field, the borrower doesn't --
19  I don't know what that borrower is offered by competitor
20  X.
21          In this case, they knew exactly what the borrower
22  was offered by Mutual, so you could undercut that by a few
23  hundred dollars and get that loan because you have
24  information that generally a competitor wouldn't have.
25      Q.  Does Mutual have evidence that that occurred,

46

 1  that pricing was undercut by Waterstone --
 2          MS. WALTER: Object to form.
 3      Q.  -- based on knowledge of pricing from Mutual?
 4          MS. WALTER: Object to form.
 5      A.  I have knowledge that our information was sent to
 6  Waterstone, and I don't know why else you would send that
 7  information unless you were going to use it in that regard.
 8  But I guess specifically I couldn't speak to it at this
 9  moment.
10      Q.  So my question about causation was just, you
11  know, you're seeking a dollar value.
12      A.  Sure.
13      Q.  And I want to understand was there an attempt to
14  think about causation, meaning --
15      A.  Yes.
16      Q.  -- is this loan attributable to wrongful conduct
17  or some other cause when you did your damages analysis?
18          MS. WALTER: Object to form.
19      Q.  Do you understand the question?
20      A.  I do. I do.
21      Q.  Go ahead and answer.
22      A.  Okay. I think there was definitely discussion of
23  causation; right? There was definitely --
24          MS. WALTER: Object to the extent that he is
25      going into any sort of discussions with -- that are

47

 1      protected by attorney-client privilege.
 2          MS. KREITER: This is not --
 3          MS. WALTER: This is a document that was served
 4      by counsel, so --
 5          MS. KREITER: I'm asking the witness whether he
 6      considered causation.
 7          MS. WALTER: He is not here to testify as a
 8      damage expert, Maria.
 9          MS. KREITER: Courtney, Topic 1 is itemize --
10      tell us what the --
11          MS. WALTER: He's a designated corporate
12      representative. He's answering your questions. He's
13      not a damage expert, though.
14          MS. KREITER: For the record, Topic 1 of the
15      deposition notice was "The damages sought by Mutual,
16      including the calculation and the basis of all such
17      alleged damages."
18      A.  Yeah.
19      Q.  My question --
20      A.  Yes.
21          MS. KREITER: Madam Court Reporter, read back the
22      question. I believe the witness understood the
23      question prior to objection by counsel.
24          (The previous question was read by the reporter.)
25      Q.  Let me start again. I think there was

48

 1  interruptions there. So the question was when you --
 2      A.  Yes.
 3      Q.  -- or Mutual were doing your damages analysis --
 4      A.  Yes.
 5      Q.  -- did you consider causation with respect to
 6  particular borrowers? For example, did all of the borrowers
 7  close with Waterstone due to wrongful conduct, or was there
 8  perhaps some other cause? Did that analysis of causation
 9  with respect to the borrowers occur in conjunction with your
10  damage calculation?
11          MS. WALTER: Object to form.
12      A.  Okay. When you first asked me, you said
13  causation in terms of everything; right? Now you're
14  defining it to just the borrower?
15      Q.  Sure. We'll get to that too. But, you know,
16  with respect to borrowers that may have transferred a loan
17  to Waterstone --
18      A.  Sure.
19      Q.  -- as part of the damages analysis, did Mutual
20  make any efforts to determine what caused the borrower to
21  transfer to Waterstone?
22          MS. WALTER: Object to form.
23      A.  I would say that in my experience when you're
24  sending loans to an underwriting manager and you're still
25  employed here, there is a -- it would be an interesting -- I

Page 49

1  guess there's more at stake for that underwriter to possibly
2  make a good decision in terms of the borrower when they're
3  recruiting this branch.
4      And I don't even understand how you could -- the
5  underwriter, I imagine, would report this as a SAR or
6  whatever the case is because she's getting nonpublic
7  information. You know, the customer hasn't signed any kind
8  of disclosures with Waterstone. The disclosures are with
9  Mutual.
10     So -- so the same underwriter manager is looking
11 at loans, and then she is at the same time booking trips to
12 Costa Rica for Dwayne and his family. I don't -- you know,
13 I think -- I mean, I've only been doing this for 20-some
14 years. I've never seen an underwriting manager look at
15 loans and then book a trip to Costa Rica.
16     So if you want to talk causation, I mean, it's --
17 you talk to most loan officers. If they can be this close
18 to an underwriting manager, most companies wouldn't allow
19 it. There's causation there.
20     Q. Was causation considered on a loan-by-loan basis
21 when you did the damages analysis?
22     MS. WALTER: Object to form.
23     A. I think, yeah, in my mind, it was a -- more in
24 total rather than on a loan-by-loan basis.
25     Q. Has Mutual asked any of the borrowers what caused

Page 50

1  the borrower not to close with Mutual?
2      A. No.
3      Q. You agree a borrower has a right to close its
4  loan with whichever mortgage company it wants; correct?
5      A. I do.
6      Q. What evidence besides what you have said already
7  does Mutual have that the loans it's counting for purposes
8  of damages moved to Waterstone due to wrongdoing versus
9  simply the borrower's preference?
10     A. Well, in my opinion, which this is what it's
11 about, they're all due to wrongdoing because the loan
12 officers worked for Mutual of Omaha. The wrongdoing
13 occurred when they steered this customer to Waterstone
14 without disclosures. Waterstone caused this by not saying,
15 "Hang on. We don't have disclosures in Waterstone's name.
16 Why is my underwriting looking at it?" prior to those
17 disclosures being sent.
18     You have an application -- and maybe Waterstone
19 did send disclosures at the same time as -- and that would
20 really be interesting that -- because who was the loan
21 officer on that file? And the NMLS, who was -- who was on
22 the loan application? So, I mean, it's -- there's a lot
23 going on here that, you know --
24     Q. Does --
25     A. -- is interesting.

Page 51

1      Q. Does Mutual have evidence of confidential
2  information being sent to Waterstone to back up all of the
3  loans that are included in its damage analysis?
4      A. I don't -- again, I'll go back to the private
5  e-mail. We do have information going to private e-mail
6  accounts, and we also have quite a few e-mails of nonpublic
7  information that went to Waterstone.
8      Q. Are you able to say what percent of loans that
9  are included in your damages analysis are supported by a
10 taking of confidential information?
11     MS. WALTER: Object to form.
12     A. Can I use an analogy?
13     Q. Answer however you think would be helpful.
14     A. If a guy robs a bank and on the way out, he sees
15 a dollar laying on the ground in the bank and picks it up,
16 that dollar wasn't -- he didn't rob from the bank, but he
17 still robbed the bank. So you're kind of -- it's kind of
18 like -- I mean, listen, nonprivate information was sent to
19 both Waterstone and to personal e-mail accounts and to third
20 parties. You don't have to be a rocket scientist to say
21 there was wrongdoing or causation.
22     And, you know, if you disagree, that's your
23 point, but I've been doing this a really long time. And I
24 would say that in my opinion, what you just sent me was
25 enough causation to say something is askew here, but --

Page 52

1      Q. Sure. And I want to understand the magnitude.
2  That's what I'm talking about.
3      A. Sure.
4      Q. I mean, you understand. Say someone made a
5  decision and sent a borrower application with respect to one
6  loan --
7      A. Sure.
8      Q. -- and it closed at Waterstone, but then there's
9  30 more loans, and none of those involve a taking of
10 confidential information. You wouldn't have damages as to
11 those 30 others absent some other kind of wrongdoing, and so
12 that's what I'm trying to get a sense of.
13     A. But we don't know -- we saw huge data being sent
14 out; right? And so -- and those loans were in that data.
15 Now, you know, so I don't know whether, you know -- the
16 wrongdoing occurred by sending that data.
17     Q. Did Waterstone send the data or the employees?
18     A. The employees. Waterstone received data.
19     Q. Do you know whether Waterstone IT quarantined
20 that data?
21     A. I do not.
22     Q. If that's what happened, would that change your
23 mind about Waterstone's liability?
24     MS. WALTER: Object to form.
25     A. I don't -- I don't believe so. I mean, then

REGENCY REPORTING SERVICE, INC. (813)224-0224

61

1  and 2. And I want to understand from this witness what
2  was factored in for purposes of the damage analysis.
3      Q.  You're telling me that you're looking at loans
4  that transferred to Waterstone, and I'm trying to understand
5  does Mutual have any evidence with respect to any of the
6  loans on which it's claiming that confidential information
7  was transferred and was put to use by Waterstone, for how
8  many loans fall into that category, if you can say?
9          MS. WALTER:  Before he responds, I'm going to
10     object because I waited and I let you say your piece.
11     And I am, again, going to preserve my objection for
12     Topics 9 through 13.  I am not instructing him not to
13     speak, but I am entitled to put that objection on the
14     record.
15         Go ahead, Jeff.
16     A.  I mean, you're asking a -- we don't know the
17 inner workings of Waterstone, so how can we answer that
18 question?  How do we -- how could we ever know?  I mean,
19 it's an impossibility.  There's no way we can know what
20 happens at Waterstone.  We don't know what goes on, what
21 information was used or was not used.  So what you're asking
22 is impossible for me to answer.
23     Q.  Well, we're ten months into the case.  There's
24 discovery that's available.  So do you think --
25     A.  You can't discover someone's conversation.  We

REGENCY REPORTING SERVICE, INC. (813)224-0224

62

1  can't discover -- so someone is going to say, "Oh, we
2  disregarded that loan application that came out, and we took
3  a new loan application."  Okay.  It's -- listen, you're
4  going to say something, but let me finish.  I'm happy to go
5  on the stand in front of a jury or whatever and say the same
6  exact thing because in my experience of over 20 years, that
7  information was used.  That loan would've never got to
8  Waterstone.  How else would the loan have gotten to
9  Waterstone?
10     Q.  For how many --
11     A.  Can you answer me how that loan got to
12 Waterstone?
13     Q.  No.  And how it works at the deposition is I ask
14 you the questions.  You can answer if you can.
15     A.  I know, but I --
16     Q.  For how many borrowers does Mutual have evidence
17 that information was taken and put to use by Waterstone?
18         MS. WALTER:  Objection.  Asked and answered.
19     A.  Every borrower was part of information that was
20 sent in one way or another.  I mean, there's huge databases
21 that were sent.
22     Q.  What evidence does Mutual have that Waterstone
23 took advantage of huge databases of data?
24         MS. WALTER:  Object to form.
25         MS. KREITER:  What's the objection?

REGENCY REPORTING SERVICE, INC. (813)224-0224

63

1          MS. WALTER:  What do you mean by "huge
2      databases"?  Where is that from?
3          MS. KREITER:  From the witness's testimony just
4      now.
5      A.  Yeah, I said we had sent.  I didn't say they
6  received.
7          MS. WALTER:  What's the question?  Ask the
8      question.
9      A.  They had sent databases --
10         MS. KREITER:  Read the question back, please.
11         (The previous question was read by the reporter.)
12     A.  Yes, I don't have any evidence of that right now.
13     Q.  Let's talk for a moment about the category that
14 we haven't talked about, ill-gotten gains.
15     A.  Okay.
16     Q.  If you would turn in Exhibit 4, please, to
17 page 28, there's a bullet that reads "Ill-gotten gains,
18 including compensation paid or advanced by defendant,"
19 meaning Waterstone, "to plaintiff's prior employees in
20 exchange for the unlawful conduct that has caused the
21 closure of two of plaintiff's branches."  Do you see that?
22     A.  I do.
23     Q.  I want to focus on the start of it.  It says
24 "Ill-gotten gains, including compensation paid or advanced
25 by Waterstone," so this is money that Waterstone is paying

REGENCY REPORTING SERVICE, INC. (813)224-0224

64

1  out to the employees; correct?
2      A.  Yes.
3      Q.  It's not money that Waterstone is enjoined.  It's
4  a cost to Waterstone; correct?
5      A.  Correct.
6      Q.  In what sense is money paid out by Waterstone a
7  gain to Waterstone, ill-gotten or otherwise?
8      A.  I think the folks that that money -- got is part
9  of the -- is part of the --
10     Q.  Sure.  The employees gained the money, not
11 Waterstone; right?
12     A.  Yeah.
13     Q.  Mutual claims that these ill-gotten gains to
14 Waterstone that actually went to the employees and not
15 Waterstone consists of $500,000 that Waterstone paid to
16 Chris Smith and 250,000 that Waterstone paid to Dwayne Hutto
17 for a total of $750,000; correct?
18     A.  Yes.
19     Q.  Is Mutual seeking $750,000 from Waterstone that
20 it paid to third parties?
21     A.  I -- I believe what -- what the premise is, at
22 least my understanding is, that's the value that Waterstone
23 placed on these two people, and so that's the -- you know,
24 that -- that's how they came up with that number.
25         MS. KREITER:  Can you read my question back,

REGENCY REPORTING SERVICE, INC. (813)224-0224

89

1  A. Yeah. We have a very large Mutual of Omaha
2  financial planning office in Tampa, very large, that we use
3  space in that as well.
4  Q. How many of the employees did Mutual make efforts
5  to try to keep?
6  A. You know, I would think that Brian and Kiley
7  probably reached out to the majority of them.
8  Q. And none of them were interested?
9  A. Apparently not.
10  Q. There were -- you understand that there's certain
11  employees that didn't go over to Waterstone --
12  A. I do.
13  Q. -- for whatever reason?
14  A. Yes.
15  Q. Did Mutual attempt to make a branch of those
16  employees?
17  A. Yes, or had conversations, I believe. And I
18  believe they weren't very large -- very good producers, so
19  maybe the effort wasn't that great. But again, this was not
20  -- I was not involved in it, so...
21  Q. Okay. So let's talk about what it means to lose
22  the branch, then. I mean, the lease, I mean, is that part
23  of what you consider the branch?
24  A. No.
25  Q. No. Is the branch really the people?
REGENCY REPORTING SERVICE, INC. (813)224-0224

90

1  A. The branch is the people and the production that
2  go along with those people, yeah.
3  Q. With respect to the employees that didn't go over
4  to Waterstone and didn't find a home at Mutual for whatever
5  reason or employees that decided, "Look, I'm going to go to
6  a third party. I don't want to go Mutual. I don't want to
7  go to Waterstone" --
8  A. Sure.
9  Q. -- those people are part of the branch; correct?
10  A. Yes.
11  Q. And those people didn't go over to
12  Waterstone. Are you -- for purposes of Category 2 damages,
13  are you counting the production of those people?
14  A. I don't believe so.
15  Q. How did you go about excluding them from the
16  damages analysis?
17  A. I don't think there's much production that they
18  had.
19  Q. There's an individual that went to -- I think his
20  name is Jake. Apologies. I don't know his last name. Do
21  you know who I'm referring to?
22  A. I don't.
23  Q. You don't. Okay. If there was a producing loan
24  officer that decided not to go to Waterstone and instead
25  went to a different financial institution and that was a
REGENCY REPORTING SERVICE, INC. (813)224-0224

91

1  producing loan officer, you would agree that that loan
2  officer should have his or her production carved out of the
3  damages in Bucket 2; correct?
4  MS. WALTER: Object to form.
5  A. Not necessarily. I think what you're saying is
6  that the spread is generally -- when you're trying to
7  estimate the -- moving forward, this branch generally
8  produces this amount of loans a month. So a loan officer
9  may come. A loan officer may go generally. But in general,
10  this is their production in the course of, you know, several
11  years, and that was the average we used.
12  Q. How many employees decided not to work for
13  Waterstone or Mutual and instead find some other job?
14  MS. WALTER: Object to form.
15  A. And I really don't know who was offered a job
16  from Waterstone or who wasn't.
17  Q. What about Mutual? I mean, do you know who was
18  offered a job by Mutual?
19  A. Not off the top of my head, no.
20  Q. For the employees that decide, "I don't want to
21  go to Waterstone," you know, can't come to Mutual, or it's
22  not working out, you know, or go to some other employer, is
23  their departure attributable to some unlawful conduct by
24  Waterstone?
25  MS. WALTER: Object to form.
REGENCY REPORTING SERVICE, INC. (813)224-0224

92

1  A. Well, I think when there's a chaos at a branch
2  when people are leaving and everyone is talking about, you
3  know, what's wrong here so that they can get their money to
4  leave and go somewhere else, that causes certainly
5  disruption and could cause people to -- to leave; right?
6  Q. You testified earlier that there would be nothing
7  wrongful about Waterstone recruiting Mr. Hutto; correct?
8  A. Right.
9  Q. Mr. Hutto was a producing loan officer?
10  A. Correct.
11  Q. Did you carve Mr. Hutto's production out of the
12  damages that you're seeking in Bucket 2?
13  A. No.
14  Q. Why not? What was wrongful about Waterstone
15  soliciting Mr. Hutto?
16  A. They didn't solicit Mr. Hutto. They solicited
17  the group.
18  Q. But you're counting his production, and you're
19  saying that his departure was caused by unlawful conduct by
20  Waterstone, and you also said Waterstone is permitted to
21  recruit Mr. Hutto?
22  A. Yeah. You said without using these -- I didn't
23  say Waterstone was allowed to take Mr. Hutto to Costa Rica,
24  the underwriting manager. I also didn't say they were
25  allowed to look at loans ahead of time, take information
REGENCY REPORTING SERVICE, INC. (813)224-0224

93

1 while Mr. Hutto is still an employee. So let's not act like
2 Waterstone here -- Bank of America, if they wanted to
3 recruit Dwayne Hutto, absolutely we should take that money
4 out, but that's not what happened. What happened was
5 different than how you're painting the picture.
6   Q. So is it -- I'm trying to understand here why you
7 are counting Mr. Hutto in the damages analysis.
8   A. Right.
9   Q. And is it -- and you're saying that Waterstone
10 could solicit him and could recruit him if it wanted to do
11 that?
12   A. If they did it in an aboveboard way, but that's
13 not what happened. So you can't have your cake and eat it
14 too. You can't take the context of what really happened out
15 of the equation. That doesn't work.
16   Q. Are you aware that Mr. Hutto and Mr. Smith were
17 looking to leave Mutual and go somewhere else? It just
18 happened to be Waterstone?
19   A. I was not aware of that. I mean, I think after
20 Dwayne left, we were aware that Chris was probably going to
21 depart. I know that Brian brought up the fact that they
22 were always -- you know, they were pretty -- they talked a
23 lot to Brian, and there was a comment/conversation with them
24 that this place had this, but they didn't leave ever, so...
25   Q. There were conversations between Mr. Hutto and
REGENCY REPORTING SERVICE, INC. (813)224-0224

94

1 Mr. Wolf with Kiley King and Brian Tomalak about --
2   A. I think. I mean, they were always trying to
3 finagle for a little bit of a better deal here and there but
4 never -- they never left obviously until -- until this,
5 until Waterstone got involved.
6   Q. Did Mutual ever have a discussion with Mr. Hutto
7 about why he resigned?
8   A. Brian and Kiley did.
9   Q. What was the reason?
10  A. I think you better ask them because it was a
11 conversation, so third party. I think a lot had to do with
12 a check being written, from my recollection.
13  Q. Same question for Mr. Smith and Mr. Wolf. Was
14 there ever a conversation between Mutual and those managers,
15 Mr. Smith and Mr. Wolf --
16  A. Yes.
17  Q. -- about why they were leaving?
18  A. Yes.
19  Q. Why were they leaving?
20  A. Well, Chris told Brian it was because of the
21 check and it was too good of a check to pass up.
22  Q. Which Chris?
23  A. Smith.
24  Q. Do you believe that the managers were genuinely
25 unhappy at Mutual of Omaha?
REGENCY REPORTING SERVICE, INC. (813)224-0224

95

1     MS. WALTER: Object to form.
2   A. No, I don't believe that.
3   Q. Did Mutual factor in the cause of the managers'
4 departure when it was considering the damages?
5     MS. WALTER: Object to form.
6   A. Yes, I believe so. I mean, the cause that --
7 yeah, that they left because of -- yeah, were coerced to
8 leave and take their branches. Yes, that's why we're here.
9 If there was no cause, we wouldn't be here; right?
10  Q. Did you -- but in your mind, is it, look, we're
11 convinced these managers left because of the payday, or does
12 Mutual believe that there's other considerations?
13     MS. WALTER: Object to form.
14  A. Well, I think there's other considerations as
15 well.
16  Q. If Mr. Hutto and Mr. Wolf had resigned but none
17 of the other branch employees resigned, who would Mutual
18 have put in place as the branch manager?
19     MS. WALTER: Object to form.
20  A. I think Kiley King.
21  Q. Kiley King?
22  A. Yeah.
23  Q. Does Mutual have evidence that the employees
24 would've stayed and worked for Kiley King?
25     MS. WALTER: Object to form.
REGENCY REPORTING SERVICE, INC. (813)224-0224

96

1   A. No, no evidence.
2     THE WITNESS: I could use a bio break whenever is
3 convenient --
4     MS. KREITER: It's a convenient time for me too.
5 Why don't we -- do we want to put a lunch order in now?
6 Take a short break.
7     MS. WALTER: I'm fine with that.
8     MR. CARROLL: Yeah.
9     MS. KREITER: Okay.
10    (A recess was taken.)
11  Q. (By Ms. Kreiter) Mr. Gennarelli, are you aware
12 of any complaints or frustrations by the downstream
13 employees about Mutual's underwriting requirement's ability
14 to efficiently close loans, limited loan products, or
15 compensation?
16  A. Not directly. I did see an e-mail, I think, that
17 -- in this where they talked about an underwriting situation
18 and actually was -- he was confused. It was actually
19 overturned by the chief operating officer. Then he went
20 ahead and told the customer that we couldn't do it at Mutual
21 and should send it to Waterstone, but that is one that I did
22 see.
23  Q. Did any of those issues come up in the exit
24 interviews that Mutual conducted when the downstream
25 employees left?
REGENCY REPORTING SERVICE, INC. (813)224-0224

161

1  A.  Yes.
2  Q.  And then, similarly, with respect to Daytona, the
3  amount that Mutual is seeking with respect to the Bucket 2
4  damages is the 1,723,961.89; correct?
5  A.  That's right.
6  Q.  So a total of about 4.4, a little over 4.4?
7  A.  Yeah.
8  Q.  You have here a date range highlighted.
9  "Expected corporate profit for 18 months," it says "July of
10 '22 through December 31, 2022."  I'm assuming that should be
11 2023?
12 A.  Yes.
13 Q.  And is the starting date -- it just says July.
14 Is it July 1?
15 A.  Yes.
16 Q.  Okay.  With respect to the Corporate Profits
17 Earned BPS, the amounts for 2019, 2020, and 2021 are the
18 same for both Daytona and Tampa, but then you get to 2022,
19 and it's different.  Do you see that?
20 A.  Say -- walk me through that one more time.
21 Q.  Yeah.  So 2019 Tampa, the corporate BPS is .53.
22 And then for Daytona it's also .53?
23 A.  Yeah, because I think they left sooner.
24 Q.  So that's what I'm trying to understand.  It's
25 the same, and then --

REGENCY REPORTING SERVICE, INC. (813)224-0224

162

1  A.  Yeah, because they were there a full year.
2  Q.  Got it.
3  A.  Yeah.  And they -- so we -- so the first quarter
4  of the year that they had left, we earned -- corporate
5  earned more money, and that was the amount that corporate
6  earned.  And then for the full year, the corporate profit
7  dropped to 43 basis points.  Does that make sense?
8  Q.  Okay.  I just wanted to understand --
9  A.  Through June 30th, that is.  The difference
10 between April 30th and June 30th.
11 Q.  With respect to the Daytona branch, you have
12 listed down in the -- let's take the bottom right-hand
13 corner.  You have profit for 42 months.  Do you see that?
14 A.  Yes.
15 Q.  Why is it not 40 months?  You've got three years.
16 That's 36.  And then you've got four months:  January,
17 February, March, April.
18 A.  I think -- I think he just wanted to compare
19 apples to apples, which is 42 months, even though there was,
20 I don't think, any profit there.
21 Q.  So it's not a mistake.  It's intentionally
22 42 months rather than 40?
23 A.  I can do the math.  I don't know if the math
24 works out.  Let me do the math real quick.
25 Q.  Sure.

REGENCY REPORTING SERVICE, INC. (813)224-0224

163

1  MS. KREITER:  I'll just let the record reflect
2  the witness is using presumably a calculator on his
3  phone to check some of the math in Exhibit 7.
4  A.  That's right.  I think he just did it apples to
5  apples, so he used 42 months --
6  Q.  Mutual's position is it's not an error?
7  A.  Yeah.
8  Q.  It's done intentionally?
9  A.  Yeah.
10 Q.  For the -- in the fourth column there, Branch
11 Contributions to Corporate Profits, you can see for Tampa in
12 2019, it's 600,000.  Then it jumps 3,232,144 for 2020.  Do
13 you see that?
14 A.  Yes.
15 Q.  Is that a record high for the Tampa branch?
16 A.  I think so.
17 Q.  Similarly, for the Daytona branch, it jumps from
18 400,000 to 1.7 million --
19 A.  Yes.
20 Q.  -- 53?
21 Is that a record high for the Daytona branch?
22 A.  I believe so.
23 Q.  You would agree that 2020 was a record year in
24 terms of volume for Mutual overall?
25 A.  Yeah, yes.  Absolutely.  And 2019 was also

REGENCY REPORTING SERVICE, INC. (813)224-0224

164

1  artificially low because there was a switchover to
2  Bridgeview.  But yes, generally, you're still correct.
3  Q.  In 2020, the pandemic hit.  The housing market
4  went crazy?
5  A.  Right.
6  Q.  And then that anomaly continued into 2021;
7  correct?
8  A.  Yes.
9  Q.  In fact, the volume for Tampa in 2020 is more
10 than five times the prepandemic volume of 2019; correct?
11 A.  Not volume, no.
12 Q.  Sorry.  The -- I'm looking at the Branch
13 Contributions to Corporate Profits column.
14 A.  Yeah, what was your -- what was your question?
15 Q.  The volume for -- sorry.  I'm saying "volume"
16 again, but the amount for Tampa is five times the
17 prepandemic volume of 2019 if you're looking at 2020?
18 A.  Yes.  Correct.
19 Q.  The same for Tampa, not five times?
20 A.  But yes.
21 Q.  But it's multitudes higher in 2020.  You would
22 agree with me that 2020 was a historically anomalous year
23 for the industry?
24 A.  Yes.
25 Q.  Why did you use a date range to calculate damages

REGENCY REPORTING SERVICE, INC. (813)224-0224

165

1 that included a historical anomaly in the market?
2  A.  Well, there was the data we had.  We have to use
3 all the data.  You don't know what the next year is going to
4 bring.  Next year could be a great year as well.  These are
5 purchase-driven folks too.  I mean, they do purchases, you
6 know, heavy refinances.
7  And the other thing is with the arrival of Keller
8 Williams, that relationship, they would've benefited
9 substantially.  I would venture to say if they were still
10 here with the Keller Williams acquisition, that their volume
11 would be near that level again.
12  Q.  The year to date for Tampa in that fourth column
13 of Branch Contributions to Profits is 406,810.  Do you see
14 that?
15  A.  Yes.
16  Q.  If you double that, that would give you a full
17 year because it --
18  A.  Right.
19  Q.  -- so happens that the departure was --
20  A.  That's right.
21  Q.  -- six months into the year?
22  A.  Yeah.
23  Q.  Did you or Mr. Mayle or anyone else at Mutual
24 consider using that most recent time frame as your baseline
25 for estimating the damages?

166

1  A.  I don't know that we considered that.  The one
2 thing we did consider, like I said before, was using the
3 cost of goods sold method.  And I thought that if we
4 would've used the cost of goods sold method, these numbers
5 would've been through the roof, so we chose just an average.
6  And you're not going to -- when you're doing an
7 average, it's going to be an average.  You have to use all
8 the data in front of you.  We don't know what tomorrow
9 brings; right?  Keller Williams arrived this year.  That
10 would've been exponentially valuable having them there.
11  Q.  But somebody had to make a choice as to how far
12 back you were going to go with respect to the data.  And
13 either you --
14  A.  We went back the whole way, the whole time -- we
15 just went back to the history here at Mutual Mortgage.
16  Q.  Do you believe that it's more reliable to use
17 data that includes a historical anomaly than it is to use
18 the most recent data available?
19  MS. WALTER:  Object to the form.
20  A.  Yeah, I think that what you're calling historic
21 anomaly is one person's perception.  We don't know what next
22 year brings or the year after or the year after.
23  Q.  So let me ask you this question.  I want to make
24 sure I'm understanding this.  You looked at historical data
25 going back to 2019 --

167

1  A.  That's right.
2  Q.  -- including the pandemic, which was a high for
3 both of the branches, and then you used that data to project
4 losses associated with the branches if they had stayed open
5 going into the future; correct?
6  MS. WALTER:  Object to the form.
7  A.  I think that's what we -- we average the volume
8 the times that they were here.  That's why if you noticed
9 the lowest -- the lowest really year volume is 2019.  We
10 used that.  We didn't just use 2020.  We didn't just use
11 2021.  We averaged the volume for the time they were here.
12 I can't tell you what the future will bring; right?  I would
13 say if they knew that Keller Williams was coming on, they
14 probably wouldn't have left and they would benefit.  Their
15 volume would be more than this.
16  Q.  So my question is more just to make sure we're
17 aligned on what Bucket 2 represented.  My understanding --
18 but I don't want to assume.  I want to check with you -- is
19 it represents the profits as if the branches would've stayed
20 open for 18 months into the future?
21  A.  That's right.
22  Q.  And to estimate those damages of profits into the
23 future, you looked at retrospective data; correct?
24  A.  Yeah, that's the only data we have.
25  Q.  So it's May 25th of 2023, which includes the date

168

1 range that you're estimating damages.  And I'll go back to
2 Exhibit 7 here.  So the damage range that you're using is
3 July 1, 2022, to December 31, 2023; correct?
4  A.  That's correct.
5  Q.  We're a number of months into that damage period
6 now; correct?
7  A.  Yes.
8  Q.  Is the market now and since July 1, 2022, better
9 or worse than it was in the pandemic?
10  MS. WALTER:  Object to the form.
11  A.  Our -- our -- our volume today is better than it
12 was last year.  Now, is it better than the pandemic?  No.
13 But it's better than it was last year.
14  Q.  Okay.  Has Mutual -- in July of 2022, was Mutual
15 laying off employees?
16  A.  We laid off nonperformers, yes.  I don't know if
17 that was the exact time, but sure.
18  Q.  In July of 2022, was Mutual's profitability
19 consistent with its budgeting and estimates?
20  A.  Well, I think that, you know, we were very
21 negatively impacted by these groups leaving at that time
22 because when you -- each loan that you do is exponentially
23 more valuable, especially when you are dealing with purchase
24 teams.  So we still have all these fixed costs at the
25 corporate level that we have to -- that we have to assume.

173

1  contracts that have an employee nonsolicit, do you know how
2  long the duration of the nonsolicit is?
3      MS. WALTER: Object to the form.
4  A. I believe it's a year generally.
5  Q. Okay. Did you consider using a year?
6  A. No. We did consider it, but, I mean, that's what
7  we wound up at, no.
8  Q. So if your testimony is these branch managers
9  solicited the employees and then came and that shouldn't
10 have happened, what's to stop the branch managers from
11 waiting a year and then soliciting the employees and then
12 the employees leaving at that point in time?
13     MS. WALTER: Object to the form.
14 A. Repeat the question.
15 Q. Sure. I mean, the managers only have a
16 contractual prohibition, to the extent that it's enforceable
17 or even exists. The ones I've seen are for 12 months.
18 A. Yes.
19 Q. So after that 12-month period, Mr. Hutto or
20 Mr. Wolf or Mr. Smith could go to the branch employees and
21 solicit them to leave the branch?
22 A. Yes.
23 Q. And that could've happened at the one-year mark.
24 So I'm trying to understand was that -- you know, that
25 situation factored in at all for purposes of your damages

174

1  analysis?
2  A. Not really. They also could've still been here.
3  Keller Williams comes into play, and they stay for six or
4  seven years, so we didn't use six or seven years. We didn't
5  use ten years. We used 18 months. I mean, I don't know how
6  much we can, you know --
7  Q. Do you have any evidence if the downstream
8  employees would have stayed because Keller Williams came in?
9      MS. WALTER: Object to the form.
10 A. Well, you're the one who made a statement that
11 said they went with Dwayne because he provided loans. Where
12 do you think Keller Williams -- one out of every five real
13 estate transactions is Keller Williams signed. We now are
14 the lender for Keller Williams. I would imagine that that
15 may be more attractive than the one-offs that Dwayne was
16 handing them.
17 Q. So again, I want to talk about evidence that
18 Mutual has versus just speculation about what the employees
19 might have thought. Has Mutual asked any of the employees
20 would they have been motivated to stay knowing that Keller
21 Williams was joining?
22     MS. WALTER: Object to the form.
23 A. Not that I'm aware of, no.
24 Q. Does Mutual have reports that show the monthly
25 volume for all branches?

175

1  A. Yes.
2  Q. What are those reports called?
3  A. Well, I think they come in different formats, so
4  there's P&Ls. There's also, you know, a business
5  intelligence system that you can see the volume by branch,
6  so it's called BI, clever name.
7  Q. The P&Ls, are those the corporate P&Ls that we've
8  been referencing?
9  A. Branch-level P&Ls and corporate P&Ls.
10 Q. Okay. Do the corporate P&Ls pull together --
11 A. Yes.
12 Q. -- the monthly volume for the branches?
13 A. Yes.
14 Q. Does it itemize which branch contributes to the
15 total?
16 A. Yes.
17 Q. Is there a particular branch that had volume
18 closest to the volume of the Tampa branch?
19 A. In what year?
20 Q. Let's just say in 2021.
21 A. I think you would probably have maybe Columbia;
22 Maryland would be very close, I think.
23 Q. What about Daytona? Is there a branch that you
24 would say is comparable to Daytona in terms of revenue, I
25 guess?

176

1  A. I would say that would be more like a -- more
2  volume than that. That northwest branch I referenced
3  earlier, very similar.
4  Q. Okay. Does Mutual make efforts to assess its
5  performance relative to the industry overall?
6  A. Yes.
7  Q. How does it do that?
8  A. You know, it's done -- that's how they kind of
9  manage me, so I'm not sure exactly how they do it, but I
10 know that they do it. They can -- I think Richey May has
11 reports that they use. They also use the MBA reports, but
12 that's how they kind of measure, I think, my performance is
13 how we relate to the industry.
14 Q. Does Mutual track market trends for loan
15 originations?
16 A. When you say "track," I don't know if we track
17 it. We're aware of it.
18 Q. Okay. Do you know how Mutual performs in terms
19 of loan originations relative to the market? I mean, if
20 there's a peak in the market, is there generally a peak for
21 Mutual or is it that there's something different about the
22 business model?
23 A. There is something relatively unique about the
24 business model, that we have a large amount of consumer
25 direct folks. So they're not only purchase driven. So if

181

1  Q. I'll ask or request that those be produced.
2      This e-mail is designated "Importance: High."
3  And the Subject line is "MOOM Financial Performance for June
4  of 2022." Do you see that?
5  A. Yes.
6  Q. So Mutual's CFO writes "Good afternoon. Attached
7  please find June '22 financial results. See below comments
8  for detail on each division. Overall there continues to be
9  heavy downward pressure on margins on both sides of the
10 business for slightly different reasons." I'm going to
11 pause there. "Heavy downward pressure on margins," does
12 that mean pressure to lower the BPS profitability margin?
13     MS. WALTER: Object to the form, and
14 Mr. Gennarelli did not send this e-mail.
15 A. Yeah, I'm -- I'm not sure at what margins he's
16 talking about. I would imagine he's just talking about the
17 gain on sale margins. I could be wrong.
18 Q. The gain on sale margins, what is that?
19 A. Like, that's what we sell a loan for.
20 Q. Okay. Is that different than the BPS in
21 Exhibit 7?
22 A. It would be different.
23 Q. Okay. Maybe just explain to me the margins that
24 you sell a loan for --
25 A. Yeah.

REGENCY REPORTING SERVICE, INC. (813)224-0224

182

1  Q. -- as opposed to the BPS in Exhibit 7. What is
2  the difference between those two margins? Does Exhibit 7
3  assume you hold the loan?
4  A. No. No, it has nothing to do with that. This
5  margin in Exhibit 7, that's the profit margin. What I think
6  he's referring to is the margin at time of sale that
7  investors are willing to pay for the loan.
8  Q. Okay.
9  A. Two different things.
10 Q. And then it says "on both sides of the business,"
11 meaning the forward side and the reverse side --
12 A. Correct.
13 Q. -- correct?
14 A. Yeah.
15 Q. The next sentence talks about forward. And just
16 to be clear, forward is the division for which you're
17 president, and it's the division in which the Tampa and
18 Daytona branches were part of?
19 A. Yes.
20 Q. "Forward margins are being compressed due to the
21 recent increase in interest rates, which pushes competitors
22 to lower margins in an effort to capture volume to support
23 their expense structure that has scaled over the past two
24 years." Does that in general mean competitors are lowering
25 their profit margins? They need to increase volume in order

REGENCY REPORTING SERVICE, INC. (813)224-0224

183

1  to support the staff that they've hired on during the
2  pandemic?
3  A. Yeah.
4      MS. WALTER: Object to the form.
5  A. I think it -- yes. And it also points to the --
6  kind of like the theme is the extreme value it is when you
7  lose purchase business like this because then we have fixed
8  costs that are -- interest rates are less likely to affect
9  purchases than they are refinances.
10 Q. In the 2020 period and 2021 period, I mean, it
11 talks about scaling structures over the past two years. In
12 general in the industry, were mortgage companies hiring
13 more, more employees, more loans to process, the volumes
14 were high?
15 A. Yeah.
16 Q. So there's -- and now we have less volume, and so
17 there's a need to cut some of the employees; correct?
18     MS. WALTER: Object to the form.
19 A. Generally, I think that's correct, yeah.
20 Nonproducing, nonproductive employees needed to --
21 Q. And then it says "On the reverse side of the
22 house" -- let me just stop there. Is there any connection
23 between the profitability of the reverse side of the house
24 and the forward side of the house?
25 A. No. I mean, I don't know what you mean by

REGENCY REPORTING SERVICE, INC. (813)224-0224

184

1  "connection."
2  Q. Well --
3  A. It doesn't relate to -- it doesn't relate to our
4  P&L.
5  Q. That's what I'm looking for.
6  A. Yeah.
7  Q. And for example, changes at the reverse side of
8  the house, would that have an impact on Exhibit 7?
9  A. Correct, it would not.
10 Q. Okay. Then there's some text that's in all caps
11 and bold. It says "Consolidated June pretax earnings were
12 negative 3.2k," presumably 3.2 thousand?
13     MS. WALTER: Object to the form.
14 A. Where are you looking at this? I'm sorry.
15 Q. Sure. The paragraph that we just went through,
16 I'm now moving down from that.
17 A. Yes.
18 Q. There's an all caps, bold statement still on that
19 page 14667, that first page.
20 A. Yes.
21 Q. It says "Consolidated June pretax earnings were
22 negative 3.2k." Is that -- I guess what is that? A
23 thousand? A hundred thousand?
24 A. Yeah, K is thousands, so...
25 Q. Okay. So there's a loss in terms of June pretax

REGENCY REPORTING SERVICE, INC. (813)224-0224

185

1  earnings?
2  A.  Yes.
3  Q.  And then it says "versus plan of 3.2 million."
4  Do you see that?
5  A.  I do.
6  Q.  What is the plan?
7  A.  The plan is the budget.
8  Q.  Okay.  So the budget was 3.2 million.  Suffice to
9  say the budget has not been met.  And in fact, there's a
10 loss as to pretax earnings?
11 A.  That's correct.
12 Q.  And then it says "on total volume of 353 million
13 versus the plan was 705 million"?
14 A.  Correct.
15 Q.  So volume is not exactly half but close to half
16 of what the plan --
17 A.  Sure.
18 Q.  -- had contemplated?
19 A.  Yes.
20 Q.  It goes on to talk about "Consolidated
21 year-to-date 2022 results."  And again, there it looks at
22 pretax earnings versus the plan down 76 percent.  And then
23 PY is down 89 percent.  What is PY?
24     MS. WALTER:  I'm going to object to this line of
25     questioning to the extent you're asking him to read

REGENCY REPORTING SERVICE, INC. (813)224-0224

186

1  what is included on this e-mail --
2     MS. KREITER:  I'm asking him what PY stands for.
3     MS. WALTER:  -- that he didn't send, mind you --
4     if I can finish.
5     MS. KREITER:  It doesn't mater if he sent it.
6  Q.  Do you know what PY stands for?
7  A.  I -- prior year, I would imagine.
8  Q.  Thank you.  Okay.  Then if you would turn to the
9  next page in the exhibit, Bates No. 14668, it starts with
10 "Forward," the entity of which you're president, and it has
11 your name in parentheticals there, Jeff Gennarelli?
12 A.  Yeah.
13 Q.  This appears to be a statement that you wrote,
14 and the CFO is including it in his report; is that correct?
15 A.  Yeah.
16 Q.  Okay.  So let's walk through what you wrote here
17 in July of 2022 when we're looking at damages from
18 Waterstone.  You say "Progress, although slower than we had
19 hoped, the key to profit is rightsizing the staff" -- does
20 that mean firing staff?
21 A.  It means rightsizing as getting rid of people
22 that are not productive, not performing.
23 Q.  Then you say "as they relate to lead spend and
24 lead conversion."  What is lead spend?
25 A.  That's advertising.

REGENCY REPORTING SERVICE, INC. (813)224-0224

187

1  Q.  Recruiting --
2  A.  No.
3  Q.  -- sales efforts -- sorry.  Not recruiting
4  employees, trying to recruit business development efforts to
5  bring in loans?
6  A.  You want to think about it as advertising.
7  Q.  Okay.  Then you say "lead spend and conversion of
8  leads did not move.  This will be reduced significantly in
9  July with a path toward profit."  Do you see that?
10 A.  Yes.
11 Q.  Was June '22 not profitable?
12 A.  We -- we covered it.  You already said it wasn't
13 profitable.  We read that.
14 Q.  I just want to make sure.  My understanding is it
15 wasn't profitable from this document.  Was July of 2022
16 profitable?
17     MS. WALTER:  Object to the form.
18 A.  I don't remember.  I'd have to look at this.
19 Q.  You say "The continued reduction in nonperformers
20 on the sales side is critical."  So again, reduction in
21 nonperformers, firing employees; correct?
22     MS. WALTER:  Object to the form.
23 A.  I would say, you know, I think it's important to
24 segregate this conversation.  What I'm talking about is
25 folks that worked consumer direct leads.  That's not the

REGENCY REPORTING SERVICE, INC. (813)224-0224

188

1  groups that were Tampa and Daytona, which is really
2  important to the conversation.
3     Tampa and Daytona were self-sourced purchase
4  folks.  They don't have these huge marketing expenses that
5  go along with consumer direct efforts.  So it makes them
6  increasingly more valuable and more profitable in downturns
7  because you don't have to support them with lead purchases,
8  advertising, things like that.  So it's important that we --
9  that we understand that and understand what we're talking
10 about.
11 Q.  "We termed 55 MLOs" -- is that -- I get loan
12 officers.  What's the M, Mutual?
13 A.  Mortgage loan officers.
14 Q.  Mortgage loan officers.  -- "in June with another
15 30 on final write-ups."  What's a final write-up?
16 A.  Warning, written warning.
17 Q.  "The next target is the junior MLO and MLO
18 assistant area.  We feel this is an area we can pick up
19 savings with very little disruption to sales."  Do you see
20 that?
21 A.  Yes.
22 Q.  And then it talks about terminating 18 who were
23 in this role in June.
24     I'm going to skip down to the next paragraph
25 there.  The second sentence says "As the market stabilizes"

REGENCY REPORTING SERVICE, INC. (813)224-0224

189

1  -- what about the market was not stable at this time?
2     A.  Well, you had the second -- the capital markets
3  was very unstable, volatile. It means that the market was
4  up and down dramatically on a daily basis. There was not
5  stability. When I say "market," I mean the capital markets.
6     Q.  And then you go on to say "and we do not see wide
7  swings in the servicing value," et cetera, et cetera. Then
8  in that last line, you have a phrase that I want to focus
9  on. "...to be in terms of margin to successfully manage in
10 this downturn." You agree the market was in a downturn at
11 this period?
12        MS. WALTER: Object to the form.
13    A.  Yes.
14    Q.  Going down to the next paragraph, the fourth line
15 that starts with "The departing thoughts," do you see that?
16    A.  Yeah.
17    Q.  So third paragraph, fourth sentence, "The
18 departing thoughts" --
19    A.  Yeah.
20    Q.  -- "from the manager of Daytona."
21    A.  Yeah.
22    Q.  Are you referring to Mr. Hutto or Mr. Smith?
23        MS. WALTER: Object to the form.
24    A.  I don't recall. I believe it was Mr. Smith, and
25 I was told Brian Tomalak.

REGENCY REPORTING SERVICE, INC. (813)224-0224

190

1     Q.  Or sorry. So it says "the manager of Daytona,"
2  so that's Mr. Wolf or Mr. Hutto?
3     A.  Maybe that was -- maybe it was Mr. Hutto.
4     Q.  Okay. "The departing thoughts from the manager
5  of Daytona were directed at the surprisingly little
6  cooperation we had with the insurance company in terms of
7  cross-marketing, et cetera." Was there, in your mind,
8  little cooperation with the insurance company in terms of
9  cross-marketing?
10    A.  At that time, I would say there was little
11 cooperation, yeah.
12    Q.  Do you believe that that was a genuine concern of
13 the managers?
14        MS. WALTER: Object to the form.
15    A.  I believe that that's what Dwayne said to Brian
16 Tomalak at the time that he left.
17    Q.  Had you personally heard that from the managers
18 here or other managers?
19    A.  No.
20    Q.  What is the insurance company?
21    A.  I'm sorry?
22    Q.  So sorry. Let me back up here. I'll read a
23 little bit more and maybe that gives context. "We all need
24 to understand this was a big reason our staff stuck with us
25 through the licensing process, the belief we would have some

REGENCY REPORTING SERVICE, INC. (813)224-0224

191

1  benefit to sales of being part of such a great company."
2  Does this refer to the acquisition --
3         MS. WALTER: Object.
4     Q.  -- and BBMC joining Mutual?
5         MS. WALTER: Object to the form.
6     A.  I believe it does theoretically, but there was a
7  -- yes, I think that that's what would it be.
8     Q.  "There is progress being made now, but it is
9  slow." So what does that mean? I mean, was there an issue
10 in your mind in terms of the insurance company's
11 cross-marketing efforts?
12    A.  Well, here we didn't have any cross-marketing at
13 BBMC. So now you go to a large company. I think people
14 assume there would be more opportunity to cross-market with
15 a large company that has, you know, a $25 million -- a 25
16 million-person database. It's a slow grind because you have
17 to get compliance to write off on it, et cetera.
18        So I'm sure people's perceptions was that they
19 were going to have a great opportunity to do that, and that
20 didn't come through. We didn't really push that because we
21 didn't know how -- how effective it would be to cross- --
22 it's going better today than it was back then, but
23 nevertheless...
24    Q.  And back then, this is closer to the time of the
25 departures?

REGENCY REPORTING SERVICE, INC. (813)224-0224

192

1     A.  It is, yes.
2     Q.  You then say "To give some context, we went
3  through the greatest mortgage market in decades" -- meaning
4  the 2020 pandemic?
5     A.  Yeah.
6     Q.  -- "and received less than a hundred referrals in
7  those two years." So which two years are the greatest
8  mortgage market in decades, '21 and -- sorry -- '20 and '21?
9     A.  Correct.
10    Q.  Okay. And then I'm going to direct you down to
11 the all caps, bold language following that paragraph again.
12 Now, this is reflective of earnings specific to the forward
13 business unit in the relevant time period; correct?
14    A.  Yes.
15    Q.  "Forward June pretax earnings were negative
16 439,000 versus the plan for that year was to be positive
17 3.2 million"; correct?
18    A.  Correct.
19    Q.  And then on total volume, it's 246 million versus
20 the plan of 619 million. Would you agree that these are
21 material and adverse deviations from the budget?
22        MS. WALTER: Object to the form.
23    A.  Yeah.
24    Q.  And then it continues below that with
25 year-to-date 2022 results. Do you see that?

REGENCY REPORTING SERVICE, INC. (813)224-0224

225

1   A.   So you would go to the Loan Officer column,
2   search down by Chris Smith.
3   Q.   Okay.
4   A.   Christopher Smith funded one loan, it looks like,
5   Loan 1728004368 for borrower Cossio, funded on 1/30/19 for
6   $299,653,000.
7   Q.   Okay.  So you would go through all of the P&L
8   statements, look at this YSP tab, and then find either
9   Mr. Smith, Mr. Hutto, or Mr. Wolf, add up all of the -- I
10  guess what would it be?  YSP Accrual, is that analogous to
11  revenue or not?
12  A.   YSP is revenue.
13  Q.   Okay.  And is your testimony that all of the P&Ls
14  have a YSP Accrual tab and that's the methodology that you
15  would use to calculate these numbers?
16       MS. WALTER:  Object to the form.
17  A.   Yes.
18  Q.   Is there another report that you could generate
19  on a person-by-person basis rather than looking through --
20       MS. WALTER:  Object to the form.
21  Q.   -- all of the P&L statements?
22  A.   Yes.
23  Q.   What is that?
24  A.   Well, like we said before, it's the Encompass
25  report.  There's a B&I report.  There's all different --

226

1   Q.   Reports that can be run?
2   A.   Yeah.
3        MS. WALTER:  Object to the form.
4   A.   But this is, you know, the accounting behind it.
5   Then you can look at the transactions listing,
6   cross-reference that loan with the actual YSP and the dollar
7   amount associated with it.
8   Q.   Sure.  Let me ask it this way:  So does -- P&L,
9   that's the raw data.  But then there's a report that you can
10  run that rather than going through all the raw data,
11  compiles the raw data, and there's a report that could be
12  generated that has the responsive information?
13       MS. WALTER:  Object to the form.
14  A.   Yes.
15  Q.   Is this sheet of Exhibit 9 that we've been
16  looking at, does that allow you to discern any information
17  relevant to Topics 6(a) and 6(b) that we were talking about?
18  I don't know if you remember which those are.  You can refer
19  back to -- do you have them in mind?
20  A.   No.
21  Q.   Okay.  So 6(a) is "All loans originated by the
22  departed employees while still employed by Mutual of Omaha
23  or the Ormond Beach branch and then closed with Mutual."
24  And then 6(b) was the same but with respect to the Tampa or
25  Paramus branches.  Is this page of Exhibit 9 illuminating as

227

1   to that?
2   A.   Yes.
3   Q.   In what way?
4   A.   It's the ones that closed.
5   Q.   I thought you had indicated that you were
6   uncertain about whether those loans would be booked under
7   the -- for example, for the Daytona branch, the loans that
8   were in the pipeline and closed by, say, the Tampa branch.
9   A.   Well, that's not what you just said.  You just
10  asked me what -- that's not what 6(a) and 6(b) said.  6(a)
11  and 6(b) simply said identify the loans of those three
12  managers, which we can do.
13  Q.   No.  It's the loan that closed after the
14  branches --
15  A.   Oh, we certainly can see -- we can compare the
16  two branches and certainly see them.  What loans closed, the
17  loan officer's name will be there.
18  Q.   Is it -- are you certain or uncertain that the
19  loans that were closed, say, in the pipeline for Daytona
20  would show on the Daytona P&L or on the Tampa P&L?
21  A.   I -- I would be fairly certain that they would
22  close under the Daytona branch P&L, but I'm not a hundred
23  percent.
24  Q.   Okay.  We have been talking before, revisiting
25  this topic of the loans and the different reports that are

228

1   available to Mutual.  We have been talking about the trade
2   secret claims, and I want to get back to that --
3   A.   Sure.
4   Q.   -- topic.  Just get organized for a minute
5   here.  Take a look at Deposition Exhibit 15.  This exhibit
6   is a compilation of different documents that Mutual has
7   identified as its trade secrets in this case.  I want to
8   start with the first document in the compilation.  It's
9   Bates No. 106.  It goes all the way through 182.  It's a
10  Consumer Financial Protection Bureau October 2018 report
11  that's titled Glossary of English-Spanish Financial Terms.
12  Do you see that?
13  A.   I do.
14  Q.   This isn't a document that was created by Mutual,
15  was it?
16  A.   It does not appear to be.
17  Q.   Is Mutual in any sense the owner of this CFPB
18  Glossary?
19  A.   Not -- not to my knowledge, no.
20  Q.   Are you aware of whether this document is
21  publicly available?
22  A.   I assume it's publicly available.
23  Q.   Is this document one that Mutual takes measures
24  to keep secret?
25  A.   No.

229

1  Q. Do all lenders have access to this CFPB
2  publication?
3  A. Probably.
4  Q. If you open it up, it consists largely of English
5  words and the Spanish translation. Do you see that?
6  A. I do.
7  Q. You could look up English words and Spanish words
8  on the Internet and get them translated; correct?
9  A. Yes, yes.
10 Q. Do you maintain on behalf of Mutual that this
11 document is a trade secret of Mutual of Omaha?
12 A. No.
13 Q. Do you know why this document was designated as a
14 Mutual trade secret?
15     MS. WALTER: Object to the form.
16 A. I don't know why other than I could imagine this
17 "Confidential" on the front page probably triggered some IT
18 system.
19 Q. Well, I'll just state for the record the document
20 is labeled Confidential --
21 A. Oh, you --
22 Q. -- with the Bates numbering in this case. Mutual
23 designated it confidential under the protective order.
24 Opposing counsel can correct me if I'm wrong, but that
25 confidential designation was adhered as part of the

REGENCY REPORTING SERVICE, INC. (813)224-0224

230

1  litigation. Do you know why this document would've been
2  designated by Mutual as a trade secret?
3      MS. WALTER: Object to the form.
4  A. No.
5  Q. Let's go to the next document in the compilation.
6  There's a blue sheet that kind of separates the documents.
7  I think you went a little too far. Bates No. 209, yep,
8  you're right there.
9  A. Okay.
10 Q. So this document is titled at the top -- there's
11 a heading for Factual Data. Factual Data is a third party
12 that provides consumer credit verification services to
13 lenders. Are you aware of that?
14 A. I am.
15 Q. Is this document in any sense authored by Mutual
16 or owned by Mutual?
17 A. No.
18 Q. Does this document have economic value because
19 it's not generally known?
20 A. I don't believe so.
21 Q. Does Mutual make efforts to keep this particular
22 document secret in any sense?
23 A. No.
24 Q. Is there any language that you can point to on
25 this document that you consider to be trade secret?

REGENCY REPORTING SERVICE, INC. (813)224-0224

231

1  A. No.
2  Q. In fact, this is -- it's written as if this is a
3  document that is given to a borrower. Do you agree with
4  that?
5  A. It appears that way.
6  Q. Do you maintain on behalf of Mutual that this is
7  a trade secret?
8  A. No.
9  Q. Do you have any information as to why Mutual
10 designated this document as one of its trade secrets?
11 A. I don't.
12 Q. Take a look at the other documents in this
13 compilation. I'll try to short-circuit it a bit. The next
14 document in the compilation is Bates numbered MOM-397. It's
15 a document published by the Department of Defense labeled
16 Fact Sheet. Do you contend that this is a Mutual of Omaha
17 trade secret?
18 A. I don't know what this is really, to be honest.
19 I just don't know what it is.
20 Q. Is it something that's created by Mutual of
21 Omaha? This is Department of Defense Fact Sheet.
22 A. It does not appear to be.
23 Q. What testimony can you provide that would explain
24 how this Document Bates No. 397 is a Mutual of Omaha trade
25 secret?

REGENCY REPORTING SERVICE, INC. (813)224-0224

232

1      MS. WALTER: Object to the form.
2  A. None.
3  Q. You agree it's not a trade secret of Mutual of
4  Omaha?
5  A. It appears not to be, no.
6  Q. Let's go to the next one, MOM-448. Terms and
7  Conditions is the title of the document. It reads "The
8  account owner named in the account application must read and
9  agree to the terms of the Fidelity Brokerage Retirement
10 Account Customer Agreement," and then it goes on. To me, it
11 appears that this is a document of Fidelity, not of Mutual.
12 Is this a Mutual of Omaha trade secret?
13 A. No. Was this part of another customer
14 information thing or something? I don't know. It seems
15 odd.
16 Q. Did you -- how much time did you spend reviewing
17 the volumes of documents that Mutual has identified as its
18 trade secrets?
19 A. I really only focused on the customer
20 information, things like that, yeah.
21 Q. So there's a lot of documents that have been
22 designated as Mutual trade secrets. It sounds like we're
23 abandoning the claim with respect to the documents that
24 we've talked about so far in Exhibit 15. And just for
25 completeness, there's one more document in Exhibit 15, the

REGENCY REPORTING SERVICE, INC. (813)224-0224