```
                                                          Page 1

 1            IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION
 3
     MUTUAL OF OMAHA MORTGAGE, INC.)
 4                                )
           Plaintiff;             )
 5                                )
                                  )
 6      -vs-                      ) 8:22-cv-01660-TPB-JSS
                                  )
 7                                )
     WATERSTONE MORTGAGE          )
 8   CORPORATION,                 )
                                  )
 9         Defendant.             )
                                  )
10   -----------------------------)
11
12              REPORT OF PROCEEDINGS from the
13   deposition of CANDICE ROSEVEAR, taken by Paul W.
14   O'Connor, a CSR within and for the State of Illinois,
15   pursuant to the provisions of the Federal Code of
16   Civil Procedure and Rules of the Supreme Court thereof
17   pertaining to the taking of depositions, at 111 East
18   Wacker Drive, Suite 2600, Chicago, Illinois, 60601,
19   commencing at 9:00 a.m. on July 20, 2023.
20
21
22
23
24
```

**EXHIBIT 4**

Page 2

1  APPEARANCES:
2
3     MITCHELL SANDLER, by
        MS. COURTNEY WALTER
4     1120 20th Street, NW, Suite 725
        Washington, DC, 20036
5     Cwalter@mitchellsandler.com.com
            Appearing on behalf of the Plaintiff;
6
7     GODFREY KAHN, SC, by
        MS. MARIA KREITER
8     833 East Michigan Street, Suite 1800
        Milwaukee, Wisconsin, 53202
9     Mkreiter@gklaw.com
            Appeared on behalf of the Defendant.
10
11
12  ALSO PRESENT: (Via Videoconference)
13     EMMA JEWEL
14     CARRIE MACSUJA
15     MARK McCARROLL

Page 3

1       I N D E X
2
3  WITNESS                    PAGE
4  CANDICE ROSEVEAR
5  Exam by Ms. Kreiter          4

   EXHIBITS:

   Gennarelli Exhibit 7        23
11 Deposition Exhibit 30       37 (Rosevear report)
   Tomalak Exhibit 24          59
12 Tomalak Exhibit 22          65
   Deposition Exhibit 31       79 (Oscher report)
13 Gennarelli Exhibit 14       115
   Gennarelli Exhibit 12       121

Page 4

1       (Witness sworn)
2       MS. KREITER:  Miss Rosevear, state your full name,
3  spell your last name for the record.
4       THE WITNESS:  Candice Leann Rosevear,
5  R-O-S-E-V-E-A-R.
6             CANICE ROSEVEAR,
7  called as a witness herein, having been first duly
8  sworn, was examined upon oral interrogatories and
9  testified as follows:
10            EXAMINATION
11            By Ms. Kreiter:
12     Q.  I want to start by just getting a baseline for
13  the opinions that you rendered.  You understand that
14  Mutual of Omaha, the plaintiff in this case, identified
15  three categories of damages, correct?
16     A.  According to the Oscher Report, that is my
17  understanding, yes.
18     Q.  I want to get an understanding what did you
19  opine on, what did you not opine on.  So Category 1
20  damages, is what we've been referring to as diverted loan
21  damages.  Previously Mutual had not calculated a damages
22  demand associated with the diverted loans Category 1
23  damages.
24        My understanding is that was not part of

Page 5

1  your analysis, is that correct?
2     A.  That is correct.
3     Q.  Then Category 3 damages are the ill-gotten
4  gains damages of 750,000.  Is that your understanding?
5     A.  I recall that number, yes.
6     Q.  Did you opine at all on the ill-gotten gains
7  damages asserted by Mutual?
8     A.  No.
9     Q.  Which leaves Category 2 damages.  Damages
10 associated with the branches closing rather than staying
11 open into some point in the future.
12        Your opinion is exclusively related to the
13 Category 2 damages, correct?
14     A.  That's correct.
15     Q.  You didn't do any analysis and you're not going
16 to express any opinions with respect to Mutual's trade
17 secret misappropriations claims, correct?
18     A.  Correct.
19     Q.  Did you review or opine on the expert witness
20 report prepared by Brett Creasy?
21     A.  I believe I reviewed that.  It was part of the
22 packet with the Oscher Report, so.
23     Q.  Are you again, I just want to understand are we
24 talking about something or not talking about something.

Page 170

1  flow analysis. You say I applied a corporate profit
2  apportionment factor to each of the branch's projected
3  loan sales over the damages time frame.
4      Q. Let me just ask you in general, who at Mutual
5  provided you with the corporate profit apportionment
6  factor that you used?
7      A. I don't know who it was. That was provided me
8  early on. With several other documents, so.
9      Q. Did you do any diligence to check the validity
10 of the corporate profit apportionment factor?
11     A. I looked at the underlying data which is at the
12 loan level, and I understand how they are applying the
13 BPS to corporate is the column heading.
14         I understand that relates to the type of
15 loan and can vary, depending on the type of loan whether
16 conventional or jumbo or FHA or VA loan. And there's a
17 table that they apply to calculate what the BPS to
18 corporate is and that spread sheet provides the average
19 over -- for Tampa and Daytona over the time period of
20 interest.
21     Q. My understanding is the corporate profit
22 apportionment you used is 75.3 basis points for Tampa and
23 89 for Daytona, is that correct?
24     A. One moment while I find the page.

Page 171

1         For 2022, the model relies on the 2022
2  actual corporate margin of 75.3 BPS for Tampa and 89 BPS
3  for Daytona.
4      Q. You're reading from your report?
5      A. Yes.
6      Q. How do those basis points translate to dollars,
7  if they do?
8      A. They translate to dollars on, in my DCF
9  analysis. So if you turn to Exhibit 7A.
10        You will see the .75 is reflected on the
11 2022 figure. And EBIT is calculated at .75 times the
12 branch loan sales of 68.95 million.
13     Q. Where is the 75.3 in 7A you're looking at?
14     A. It is in income to Mutual of Omaha, percentage.
15     Q. .75?
16     A. It's rounded, but it's the same value.
17     Q. I am asking a general matter, is there a rule
18 of thumb one basis points equals a thousand dollars or is
19 that not apples to oranges?
20     A. It depends on the volume. So it's a percentage
21 term. Taken as a percentage of the loan sales.
22     Q. Okay. So I mean in general the basis points
23 attributable to the corporate profit on the Tampa branch
24 is higher than for the Daytona branch, correct?

Page 172

1      A. It's higher for Daytona than it is for Tampa.
2      Q. Right. Sorry. 89 for Daytona, then 75.3 for
3  Tampa. Do you know, that number is reflective of the
4  money that Mutual corporate is making off the various
5  loans that go with those branches, correct?
6      A. That's correct.
7      Q. Do you know whether the managers were upset
8  about the amount of profit that Mutual was taking off of
9  the loans that they closed?
10     A. I don't know.
11     Q. You don't know if one of the reasons the branch
12 managers left was because they were running the branches,
13 doing all the work and Mutual was taking all the profit?
14        MS. WALTER: Object to form.
15        THE WITNESS: A  Yeah, I don't know.
16        MS. KREITER: Q  Does the -- I'm going to try to
17 simplify it so I don't have to keep saying corporate
18 profit apportionment factor. Is it the profit margin
19 that goes to corporate on the loan --
20     A. We can use that, that's fine.
21     Q. So the profit margin, would you, does that
22 change over time?
23        So your damages are out to 2031. Does
24 that profit margin change?

Page 173

1      A. In my model I am using the average over the
2  historical data, which goes from 2019 to 2022. The
3  average is actually I believe below the 2019 margin. So
4  I use that from 2023 forward.
5      Q. Do you know whether Gennarelli used a variable
6  corporate profit margin in his analysis?
7      A. He may have used another similar variable that
8  includes more factors, like the mandatory margin and
9  underwriting fees. I am not completely sure but I have
10 seen those additional data.
11     Q. Do you know what Mr. Gennarelli, do you know
12 how Mr. Gennarelli calculated his corporate profit
13 margin?
14     A. No.
15     Q. Do you have any discussions with Mr. Gennarelli
16 about the appropriate corporate profit margin to use when
17 projecting lost profits in the future?
18     A. We talked about that on the group call.
19     Q. What did you talk about?
20     A. I had questions about the business and I needed
21 to understand the structure, the P&L model and how the
22 profits are calculated. So we had a conversation about
23 that.
24     Q. Tell me as clearly as you can, how does the

Page 174

1  profit margin that you used differ from the profit margin
2  Mr. Gennarelli used?
3      A.  I don't know.  I didn't analyze his work.
4      Q.  I thought I heard you say though you think he
5  considered different criteria than you or different data
6  than you?
7      A.  Yeah.  I know there's a mandatory margin
8  underwriting fee that is not reflected in this BPS to
9  corporate.  And so my model is conservative by that
10 measure.
11         Again, I didn't analyze his work carefully
12 enough to have an opinion on what it includes, but I know
13 that mine doesn't and possible that if he is looking at
14 those other variables that he included those, but again I
15 did not do a full analysis of his work.
16     Q.  Okay.  Are you able to say whether the
17 corporate profit margin he used changed over time?
18         MS. WALTER:  Object to form.
19         THE WITNESS:  A   I believe it did based on the
20 exhibit you handed me.  Yes.  It looks like 2019 and
21 2020, 2021 and 2022 are all different.
22         MS. KREITER:  Q   You're taking a look at the
23 Gennarelli Exhibit No. 7?
24     A.  Yes.

Page 175

1      Q.  Let's take a look at that.
2          The corporate profit margin relied upon by
3  Mr. Gennarelli is represented I believe, but I will ask
4  you to confirm in the column of the spread sheet labeled
5  corporate profits earned BPS?
6      A.  Uh-huh.
7      Q.  Is that your understanding?
8      A.  Yes, that's what I'm looking at.
9      Q.  Did you attempt to discern why there's a
10 difference between your use of the 75.3 basis points for
11 Tampa and Mr. Gennarelli's use of the corporate margin
12 numbers that he has listed in Exhibit 7,
13 specifically .53, 1.47?
14     A.  Looks like on average he's using 92 BPS.  I'm
15 looking at the exhibits.
16         I don't know why we have differences.
17 Because again I haven't analyzed this, the underlying
18 data.  I don't know where the data comes from.
19     Q.  As a rebuttal expert for Mutual of Omaha who's
20 presenting lost profits, you did not feel obligated to do
21 any diligence to understand how your model differed from
22 Mr. Gennarelli's model or discussed those assumptions and
23 considerations with him?
24     A.  No, my task is to conduct an independent

Page 176

1  analysis, that's not influenced by prior models.
2      Q.  You say I understand Mutual receives corporate
3  margin off the top and branches cover their own expenses.
4  And you say I fully understand that each branch is
5  managed independently by a branch manager.
6          Do you recall that?
7      A.  I think I said fully.
8          MS. WALTER:  Can you point us to where.
9          THE WITNESS:  I further understand.
10         MS. KREITER:  You're referring to your report.  I'm
11 also interested in separate from what is in your report,
12 and without you looking back at it what are your
13 opinions.
14     Q.  So I mean, do you have an understanding that
15 the branches are managed independently by a branch
16 manager?
17         MS. WALTER:  To be clear, that was not how you
18 phrased it initially.  And also case law is pretty clear
19 this isn't a memory test.  She's allowed to look at her
20 report.
21         MS. KREITER:  Q   So again my question is your
22 opinion, is it that the branches are managed
23 independently by a branch manager?
24         Are you looking at your report?  In this

Page 177

1  case I'm going to ask you testify based on your opinions
2  not within --
3          MS. WALTER:  Her opinions are in the report, Maria.
4  There's nothing improper about her looking at her report.
5          MS. KREITER:  Q   Okay.  Do you believe that the
6  branches are independently managed by a branch manager,
7  yes or no?
8          THE WITNESS:  A   Yes.
9      Q.  Is it your understanding that the branches
10 cover all of their own expenses?
11     A.  I believe so, yes.
12     Q.  Do you know whether Mutual sources any
13 customers to the branches?
14     A.  I don't know.
15     Q.  How did you determine the corporate profit
16 apportionment factor or the profit margin that you
17 applied?
18     A.  I evaluated the data set that calculates that
19 for every loan at the two branches.
20     Q.  Sorry, a data set that calculates it?
21     A.  It's an Excel data set.
22     Q.  Is it part of that same spread sheet we looked
23 at earlier?
24     A.  It's cited in my report.  It's different from