IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MUTUAL OF OMAHA
MORTGAGE, INC.

    Plaintiff,

v.

WATERSTONE MORTGAGE
CORPORATION,

    Defendant.

CASE NO. 8:22-cv-01660-TPB-JSS

## DECLARATION OF CHRISTOPHER SMITH

I, Christopher Smith, declare and state as follows:

1. I am one the managers of the Tampa branch of Waterstone Mortgage Corporation ("Waterstone"). The other Tampa branch manager is my longtime friend, John Utsch.

**A. Causation: Mutual Caused My Resignation, Not Waterstone.**

2. I resigned from Mutual of Omaha Mortgage, Inc. ("Mutual") because of its inability to timely close loans; inadequate products, support, and resources; and my frustration with Mutual's leadership, as detailed below. Waterstone did not cause my resignation, nor did any of the other former Mutual employees who resigned.

    *i.    Mutual's Inability to Timely Close Purchase Loans.*

3. Mutual could not timely close loans, to my frustration and the expressed frustration of the realtor and title company referral sources that are the lifeblood of my

**EXHIBIT 8**

1

business. I was embarrassed and frustrated every time a loan did not close on time, and the number of times Mutual failed to timely close a loan left me feeling I would soon be unable to credibly pitch new or continued business. I felt it was critical to find a new business partner to avoid further tarnishing my reputation and losing the realtor and title company referral sources I had worked my 25+ year career to develop.

4.  I believe Mutual had difficulty closing purchase loans because its business is dominated by refinance loans. My focus and the focus of the Tampa branch is purchase loans. The difference is material. For example, for a refinance loan, closing at a set time is less critical because the customer is not moving to a new home, which may involve buyers waiting to get into their new home until the scheduled closing is complete or, conversely, sellers depending on timely receipt of closing funds to fund the purchase of their next residence, perhaps at a same day closing. When a closing fails to occur at the scheduled time, multiple parties are impacted: buyers, sellers, both parties' realtors, the title company handling the closing, and perhaps another closing. I was routinely left with no good explanation to these parties for Mutual's delay and incompetence. In fact, I thought the complaints I regularly received were valid, and I was extremely frustrated with Mutual myself.

> ii.  *Mutual's Inadequate Products, Support, and Resources.*

5.  Mutual also lacked the loan products I wanted to offer, such as loan products that include down payment assistance. Waterstone, and a large number of competing lenders that prioritize purchase loans, offer a robust array of products that include multiple down payment assistance programs. I want to be able to pitch myself

as a loan originator to whom realtors can send all their buyers, not a loan officer equipped to service only the traditional buyers whose needs can be met by most any lender. I felt I was losing many opportunities because of Mutual's relatively limited product offerings.

6. I also found Mutual's underwriting process far too conservative, and often incomprehensible. Even where potential borrowers met underwriting requirements, Mutual would reject loans with vague rationale, such as "it does not feel good about the loan." It was embarrassing and financially detrimental to have to relay that basis for rejection of a loan to a realtor, who would then easily and quickly close the borrower's loan with a different lender.

7. Further, Mutual was no longer an FDIC accredited lender once it sold Mutual of Omaha Bank to CIT Bank, N.A. on January 1, 2020. I would never have joined Mutual in late 2018 if I had known of the future sale because the lack of FDIC accreditation meant myself and the other loan officers in Tampa had to satisfy the licensing requirements of any state in which we were closing a loan. This meant a substantial time investment, cost, and material limitation on my business, which includes a meaningful number of out of state loans.

      *iii.*  *My Frustration with Mutual's Leadership.*

8. I was also extremely frustrated with Mutual's leadership.

9. I felt I had no support from my regional managers, Brian Tomalak and Kiley King, who did nothing to support my branch and yet received 50% of the profits

I generated, on top of Mutual taking a portion of the branch revenue. That structure is atypical and grossly unfair.

10. When I first joined Mutual in 2018, I was open to a profit split with Tomalak and King because I assumed they would be actively teaming with me to run the Tampa branch office I had been managing and brought to Mutual.

11. However, as time passed, it became clear that Tomalak and King did not contribute. Neither came to the branch, were involved in recruiting or training, or helped me troubleshoot the array of difficulties I experienced with respect to Mutual's underwriting department, inability to timely close loans, and lack of products, resources, and support (as detailed above).

12. I would have rather seen the money Tomalak and King enjoyed go to Utsch or the other Tampa employees that were working extremely hard to generate loans and make the branch profitable.

13. In 2021, I told Jeff Gennarelli, the president of the Mutual division that encompassed my branch, that I felt taken advantage of and wanted to divorce myself and my branch from Tomalak and King. Gennarelli said it was not going to happen, which was dispositive that I had no future with Mutual.

14. The money Tomalak and King made off my efforts for years bothers me still, as does Gennarelli's failure to do anything to address my concerns.

### B. I Did Not Improperly Solicit Mutual's Employees.

15. I did not solicit the Tampa branch employees to resign from Mutual and follow me to Waterstone.

16. I am not surprised that many of the employees did follow, however, as I have known them for years, and Utsch and I worked alongside them.

17. Moreover, Tomalak and King never came to the branch. I am unaware of any branch employee having a relationship with them, or anyone else at Mutual.

18. Further, the problems I experienced with respect to Mutual's failure to timely close loans, lack of products, and inadequate resources, and support were not unique to me but rather experienced regularly within the branch as a whole. For that additional reason, the branch employee departures are no surprise.

19. While Utsch and I did let the branch employees know of our resignation and that we were going to Waterstone, that was the right thing to do since I hold the lease for the Tampa office, which would immediately become a Waterstone office, and the employees had relied on myself and Utsch as their leaders for years.

20. Moreover, Utsch and I are the closest of friends. We have known each other since 2005 when we both worked for Ameriquest. We have co-managed the branch in Tampa together for years and frequently socialize outside of work, including that our families have become close. Given our relationship, there was no need for me to solicit Utsch. Rather, I consider us to be a package deal. We discussed leaving Mutual together for an alternate mortgage company for many months and were jointly pursuing other opportunities before finally deciding to join Waterstone. As such, I did not need to solicit Utsch, and I did not do so.

21. Nor was there a need for the branch managers of the Ormond Beach Branch, Dwayne Hutto and Chris Wolf, to solicit me. And, they did not do so. While

I am also friends with Hutto and Wolf, the issues, inadequacies, and frustrations I experienced at Mutual were motivation enough to resign.

22. Further, no one from Waterstone instructed or encouraged me to solicit Mutual employees.

### C. I Did Not Divert Loans to From Mutual to Waterstone.

23. I did not divert any loans from Mutual to Waterstone.

24. I did not instruct or encourage any of the branch employees to divert any loan from Mutual to Waterstone, and I am unaware of any employee doing so.

25. There may have been loans that were referred to Waterstone after Mutual rejected the loan, but I often had to refer realtors and buyers to alternate funding sources when Mutual could not, or would not, close the loan itself.

26. Nor did I receive $500,000 in exchange for bringing my branch to Waterstone. Rather, I received a branch credit to my profit and loss statement that allowed me to pay branch expenses before loans would start coming in. It reflected the reality that employees would *not* be diverting loans to Waterstone and, instead, that it would take time to build a pipeline.

### D. When I Joined Mutual's Predecessor, Tomalak and King Asked Me For and For An Array of Pricing, Compensation, and Product Information.

27. I do not believe I shared any information with Waterstone in connection with my discussions or transition that was inappropriate to disclose.

28. In fact, when Tomalak and King were pitching me to transition my branch to Mutual's predecessor, BBMC Mortgage, from my then current employer,

6

Reliant Bank, Tomalak asked me to price loans in the Reliant Bank pricing engine and share the information; I shared margins and loan to value ratios for a particular loan with Tomalak; and referred loans to Tomalak while still employed by Reliant, with those loans then closing with Mutual's predecessor.

29. Further, Tomalak asked me to provide him with an array of nonpublic data about the expenses associated with my branch, the names of the employees who would transition with me, the production of those employees, and their compensation.

30. In addition, King asked me to coordinate with the Reliant employees who wanted to follow me to Mutual's predecessor to submit their applications, resumes, and Form W2s to him.

31. Because moving my branch from Reliant to Mutual's predecessor was my most recent transition, I wondered whether the move to Waterstone would also involve starting a pipeline of loans at Waterstone while still with Mutual. When I asked Waterstone about that, however, (via an email submitted by Wolf, as we were all unhappy and aware of our job search efforts) Waterstone's Dustin Owen responded that there was no need to transfer loans ahead of time and that I must adhere to any agreement I had with Mutual:

> We need to make sure anything you all do during transition does not violate any current agreement you have with your current employer as it pertains to leads generated and loans in the pipeline. We are less concerned about forcing volume over to create instant revenue and more concerned about a smooth transition. This is a long play so there is no need to make short decisions. We will assemble a transition team to help get everyone onboarded and ready to field pre-quals, lock loans and disclose files on Day 1. There is an ability to establish a credit facility so that personal financial impact to [sic] non-existent.

See November 3, 2021 email, attached as <u>Exhibit 1</u> at WMC006267 ¶ 2.

32. Given Owen's direction, as well as the branch credit Waterstone provided to cover startup costs (see above at ¶ 26), I did not see a need to transition loans before joining Waterstone and did not do so.

**I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.**

Executed this 15th day of November 2023.

                                                 */s/ Christopher Smith*
                                                 Christopher Smith

30199113.2

| | |
|---|---|
| **From:** | Chris Wolf <cwolf011@gmail.com> |
| **Sent:** | 1/10/2022 7:21:46 PM -0600 |
| **To:** | Dustin Owen <dowen@waterstonemortgage.com> |
| **Subject:** | Re: Re: Follow up from meeting with Chris & Dwayne |
| **Attachments:** | image001.png |

**EXTERNAL EMAIL:** Use Caution!

Hey Dustin,
I hope you had a great holiday. Dwayne and I have talked and we are looking to set up another meeting with you. He should be reaching out to you tomorrow to set something up.
Thank you,

On Tue, Nov 9, 2021, 9:48 AM Dustin Owen <dowen@waterstonemortgage.com> wrote:

> Yes. David, Mike and I are very interested in continuing our talks with you and Dwayne.
>
> Additionally, we look forward to meeting Chris Smith and learning more about his operation and business goals.
>
> Let's try to find a date that works for some next week or the week of 11/29.
>
> Talk to soon.
>
> **Dustin Owen, CMB®**
>
> **Regional Vice President - Southeast**
>
> NMLS #322926
>
> 2699 Lee Road, Suite 600 Winter Park, FL 32789
>
> Office: 407.645.6363  Mobile: 407.497.8655
>
> Email: DOwen@WaterstoneMortgage.com

**EXHIBIT A**

CONFIDENTIAL                                                                                                                      WMC006263

Website: DustinOwen.com

*Host of "The Loan Officer Podcast"*



Equal Housing Lender. Waterstone Mortgage Corporation (NMLS #186434) is a wholly ownedsubsidiary of WaterStone Bank SSB (NASDAQ: WSBF. This message is intended only for the addressee. If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email to Info@WaterstoneMortgage.com and delete or destroy all copies of the original message and attachments thereto. E-mails sent to or from Waterstone Mortgage Corporation or any of its member companies may be retained as required by law or regulation. Nothing in this message is intended to constitute an Electronic signature for purposes of the Uniform Electronic Transactions Act (UETA) or the Electronic Signatures in Global and National Commerce Act ("E-Sign") unless a specific statement to the contrary is included in this message.

**From:** Chris Wolf <cwolf011@gmail.com>
**Sent:** Tuesday, November 9, 2021 7:36 AM
**To:** Dustin Owen <dowen@waterstonemortgage.com>
**Subject:** Re: Follow up from meeting with Chris & Dwayne

EXTERNAL EMAIL: Use Caution!

Thank you for getting back to me so quickly. I forwarded everything over to Chris Smith in Tampa and we will discuss. I look forward to our next meeting.

On Thu, Nov 4, 2021, 4:30 PM Dustin Owen <dowen@waterstonemortgage.com> wrote:

> Hello Chris,

Please see below for our answers in red. Obviously, reach out with any questions you have. A handful of these questions require a bit of unpacking which is why we look forward to being able to carve out half a day to meet in person to dive deep. (Maybe we can cap it off with a dinner over at Christner's.)

We don't believe in "one-size fits all". We have ways to on-board branches by tailor-making their on-board to best suit their needs. This has been Waterstone's way for the past 10+ years and has worked well regardless if it was a branch that funds $50 million a year or an entire region that funds $800 million a year. This goes back to what I shared with you on Tuesday as the top reason we have been here for 14+ years: we have autonomy and we have a voice. You will be much involved in helping us come up with the best way to successfully on-board your branch. We will also lean on our executive leadership team. Kevin Allen is our SVP of Sales and Jeff McGuiness is our CEO. Both will be involved where we need them to be involved and Kevin has already offered to fly down from our home office to participate early.

Let's go ahead and start looking for dates either next week or the week after where we can meet up for 4-5 hours and then possibly cap off those meetings with a nice dinner. Will you send us 2-3 that would work best for you?

Looking forward to reconnecting soon.

Sincerely,

**Dustin Owen, CMB®**

**Regional Vice President - Southeast**

NMLS #322926

2699 Lee Road, Suite 600 Winter Park, FL 32789

Office: 407.645.6363  Mobile: 407.497.8655

Email: DOwen@WaterstoneMortgage.com

CONFIDENTIAL

Website: DustinOwen.com

**Host of "The Loan Officer Podcast"**

Equal Housing Lender. Waterstone Mortgage Corporation (NMLS #186434) is a wholly ownedsubsidiary of WaterStone Bank SSB (NASDAQ: WSBF. This message is intended only for the addressee. If you are not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply email to Info@WaterstoneMortgage.com and delete or destroy all copies of the original message and attachments thereto. E-mails sent to or from Waterstone Mortgage Corporation or any of its member companies may be retained as required by law or regulation. Nothing in this message is intended to constitute an Electronic signature for purposes of the Uniform Electronic Transactions Act (UETA) or the Electronic Signatures in Global and National Commerce Act ("E-Sign") unless a specific statement to the contrary is included in this message.

**From:** Chris Wolf <cwolf011@gmail.com>
**Sent:** Wednesday, November 3, 2021 2:07 PM
**To:** Dustin Owen <dowen@waterstonemortgage.com>
**Subject:** Follow up from meeting with Chris & Dwayne

EXTERNAL EMAIL: Use Caution!

Hi Dustin!

It was a pleasure meeting with you, Dave, and Ben yesterday. Here are some questions from Chris in Tampa and some others I had:

1. Can we get a pricing engine to play with and need to know if it is raw pricing or what they bake into it that they keep, for example, if we see 3% on conventional, or FHA, is that with their bps already in there or do we take out? Yes. We can get this set up for you. We use Optimal Blue as our pricing engine. Kevin Allen will be able to create an account for

you all. Once we have a meeting date set we will get you all log-in credentials that will be available for 72 hours.

2. Transition team - can we send loans over to start and build up a balance of money to fund transition.  This is a big one. I am not and I am sure Dwayne is not writing a check to them for $200,000 to fund the first 60 days or so of fixed costs.  Once the initial time frame is agreed upon would they allow it to be paid back over 10-12 months.  My salaries are $164,000 month right now, and leads $70,000, rent will soon be $30,000, so just the Tampa branch alone we are talking over $500,000 in a cash burn in a few months give or take. We need to make sure anything you all do during transition does not violate any current agreement you have with your current employer as it pertains to leads generated and loans in the pipeline. We are less concerned about forcing volume over to create instant revenue and more concerned about a smooth transition. This is a long play so there is no need to make short decisions. We will assemble a transition team to help get everyone on-boarded and ready to field pre-quals, lock loans and disclose files on Day 1. There is an ability to establish a credit facility so that personal financial impact to non-existent.

3. Will they front the money for fixed costs for 3 months for salaries, rent, COBRA, leads, advertising etc. We will be able to assemble a package that helps fill the holes left during transition as well as avoid any personal financial impact. Three months is a reasonable timeline.

4. Fees per loan, underwriting? Processing? What do they charge branch of those fee's and what do we keep? Corporate UW fees are around $950. We add a Processing fee of $525to that. We (Your Branch P&L) keeps the Processing fee and you are allowed to charge what you want;  Most of our FL branches charge $525 for Processing fee.

5. What do they take of the broker comp for investor loans (Angel Oak, etc)? 275 bps is total comp/revenue on brokered loans. Corporate keeps 50bps and 225bps goes to the branch. We generally pay our LOâ€™s their full comp (average in FL is 115bps) on brokered loans. We have many brokered options but are able to do 97% of our loans in-house. Brokered loans are not a money maker for us; they are an extra tool to keep LO's happy.

CONFIDENTIAL

6. How many branches and what kind of volume are they closing? Through October our branches have done: Winter Park (401 million), Ft. Walton Beach (86), Lake Mary (62), St. Pete (60), Jupiter (46), Ft. Myers (37), Port Orange (23), Jacksonville (1)

7. Do they have a lead guy or someone that helps with consumer direct lead buys, conversions, etc. and do they have or use Velocify? The FL Region does not do a whole lot with consumer direct. Dustin Owen and Mike Smalley dabbled back in the day with in and used everything from Big Purple Dot to Agent Legend to manage those leads. Our current CRM of choice is JUNGO. We used to use SureFire (aka Top of Mind) and before that ACT!. We are huge into database management and database marketing. We have a team that builds, manages and markets to our LO's databases on their behalf. We have integrations and automations build within Encompass and all of our content is customized. We are intrigued by those who have a component of consumer direct and see the value when done properly. Our CIO and IS team are familiar with Velocify as well as Candid and Pipe Drive. We are an extremely tech forward company. We employ four (4) in-house software engineers and are currently rolling out our revamped and renamed propriety technology that is designed to be an absolute difference maker that will benefit both sales and ops. (LO's will love it. Processors will love. Clients will love. Referral partners will love it. It is called "ELEMENT".

8. What kind of marketing support help do they have?  Do they have a marketing department? A ton of support is offered; more than you can use at one time. Yes it is an in-house marketing department of 8+ associates including a social media expert and a video content creator.

9. What is % of purchase/refinance as a company? YTD company is 63% purchase; Florida is 69% purchase.

10. Waiting period for benefits? Medical benefits start on the 1st of the month after 60 days. (Example, on-board 11/30 and benefits start 2/1. On-board 12/7 and benefits start 3/1.)

11. 401k, when can we start, what is company match? You can start contributing Day 1. It is a 5-year vesting schedule for the match. The match is $.50 on the $1 up to 6% of associates pay. (There is a max annual company contribution of $3k per year per associate.)

12. Do they have or can they set up a deferred compensation plan for high wage earners? Not at this time but we are looking into it.

13. What out of the box loan programs do you have? Bank stmt loans, DSCR/Investor cash flow, Renovation loans, Physicians loans, Foreign National, Bridge Loans, etc. Do you have any broker partners that do programs like that or anything in house? Hmm...where to start? I will start with the stuff that packs the biggest punch:

    - In-House C/P Loans: 95% LTV up to $1,000,000 loan amount. It is a true one-time close.

    - Bank portfolio lending:

        - Think reduced waiting periods on foreclosures, short-sales and bankruptcies.

        - Think 95% LTV up to $1,000,000 loan amount. (In-House)

    - 585 FICO on FHA (in-house)

    - FL Housing and other DPA's

    - Non-warrantable condo's (in-house and broker options)

    - Manufactured housing (in-house and brokered options)

    - Doctor loans (in-house)

    - Wealth Builder Loan - This is 100% financing up to a $750k loan amount with no monthly PMI (in-house) *20-year loan*

    - Specialty loans for "Heroes" *(It sizzles when you sell it but you won't do many of these.)*

    - Specialty loans for "Professionals" (Think: CPA, CMB, CFA etc.) - *(It sizzles when you sell it but you won't do many of these.)*

    - In-house renovation lending

      - Other brokered options available for: bank statement, foreign national and DSCR.

      (However, full disclosure, it is the same types of investors the rest of the industry has and we have the same types of headaches    the rest of the industry has.)

**\*I am sure we left something off but hopefully your get the general idea**. 

14. Marketing budget/share of any expenses â€" Would we also have some assistance in marketing expenses to use on events, promotional materials, leads, etc? When running a P&L model there are many expenses that will be yours especially when it comes to purchased leads and events. There will be some things we do as a group that benefits all branches and if it is a group function that benefits the entire FL Region then it ends up not being a branch expense. We can work in an upfront allowance to be given to get the branch fully stocked. The FL Regional sales support staff in place to manage and market to LO's databases is not a branch expense. This is a service provided to the branches. There is also no cost allocation / cost sharing to help cover the costs of our marketing department associates, social media associates nor the FL Region's video content creator. (Yes. We have a videographer on staff to work with our LO's of just the FL Region on creating video content.)

15. Are you doing any virtual closings/hybrid closings? The vast majority of our closings are hybrid. We use a service provider called Snap Docs. Any closing document that isn't notarized can be signed pre-closing electronically. Only notarized docs get signed in person/ink. We also do RON closings when needed, but do not do many of them overall as not all title companies are set up for it.

Thank you!

Chris Wolf





CONFIDENTIAL  WMC006271