IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MUTUAL OF OMAHA MORTGAGE, INC.

    Plaintiff,

v.

WATERSTONE MORTGAGE CORPORATION,

    Defendant.

CASE NO. 8:22-cv-01660-TPB-JSS

**DECLARATION OF DWAYNE HUTTO**

I, Dwayne Hutto, declare as follows:

1. I am currently employed by Defendant Waterstone Mortgage Corporation as a loan originator in the Ormond Beach office.

2. I resigned from Mutual because it was not timely closing loans. In fact, I estimate Mutual missed closing dates and times approximately fifty percent of the time. On one particularly embarrassing occasion, buyers from up north had to keep their moving truck in the branch parking lot because Mutual did not timely close the loan and I had to make hotel accommodations for the buyers.

3. That situation, and many other egregious ones like it where Mutual was unable to timely close loans, jeopardized my business and the business of the loan officers I managed.

**EXHIBIT 9**

4. I was often embarrassed at golf and other networking events when confronted by realtors and title company representatives in front of other referral sources about loans that did not close.

5. There is a title company, Realty Pro Title, in the same office building as my Ormond Beach branch, which was an excellent referral source. However, after many missed closings, I had a hard time convincing Realty Pro representatives to do business with me, despite having regular contact with its agents over lunches, networking events, passing in the hallway, and otherwise. I was troubled that I could not even keep the business of a corporate neighbor.

6. I complained about Mutual's funding department countless times to Mutual leadership, but my concerns fell on deaf ears. Rather, the response was typically, "we are working on it," or a similar statement, but nothing improved.

7. Approximately three to four months before my resignation, I told Mutual's Kiley King that I planned to resign because of the large volume of missed closings, without improvement. I hoped the threat of my departure would make King finally take my concerns seriously and pursue meaningful change and improvement. Unfortunately, it did not. By then, I had already been actively looking for another job with an array of companies for at least six months. Specifically, my co-manager Chris Wolf and I had explored Homebridge, FBC, Fairway, and Guild Mortgage. As such, I felt we had good options and little to lose by revealing my resignation plans.

8. I was not initially considering Waterstone, until Melissa Ferenc, an underwriting employee at Waterstone and a close friend of my wife suggested I explore

Waterstone. I asked Ferenc for an introduction and was impressed with Waterstone's capabilities. In addition, Ferenc's recommendation, background in underwriting, and assurance that the pervasive problems at Mutual were not present at Waterstone carried significant weight with me.

9. In addition, I was comforted by the fact that Waterstone had a Port Orange office. Realtors I trusted commented favorably about that office's ability to timely close loans, which was further evidence that I could leave the loan closing problems at Mutual in the past if I resigned.

10. If Wolf and I had not selected Waterstone, I would have selected one of the other mortgage companies Wolf and I had been pursuing. Under no circumstance would I have remained with Mutual, as I had no hope that Mutual would suddenly improve and be able to timely close loans.

11. I did not solicit Wolf, Smith, Utsch, or any of the branch employees to follow me to Waterstone.

12. Nor did I divert any loans from Mutual to Waterstone.

13. There was one loan I sent to Waterstone while still working for Mutual, for a borrower named Muhammad Tariq, but Mutual had already rejected the Tariq loan. As such, I did not see the referral to Waterstone as a diversion, or in any way improper.

14. I also did not instruct the branch employees to transfer loans to Waterstone that could have been closed by Mutual.

15. I thought Mutual would pay commissions on all loans we were able to close with it and, as such, worked hard to make sure that the loans closed with Mutual as timely as possible. In fact, having five of the employees move to Waterstone first, rather than all employees moving at the same time, had the benefit of allowing us to try to close the loans in the pipeline for Mutual as smoothly as possible.

16. There was no plan to move as many loans as possible to Waterstone. In fact, when Mutual employees contacted me and other branch employees after we resigned with questions about the loans, we answered the questions and made an array of efforts to get the loans closed at Mutual, despite no longer working for Mutual. Again, I thought we would be paid commissions on those loans that could close before our departure or on the heels of it. I had no idea Mutual would refuse to pay commissions for many months, if at all, despite my and the other employees efforts.

**I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.**

Executed this 15th day of November, 2023.

/s/ Dwayne Hutto
Dwayne Hutto

30204682.3