```
                                              1
         IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                     TAMPA DIVISION
             CASE NO.: 8:22-cv-01660-TPB-JSS

   MUTUAL OF OMAHA
   MORTGAGE, INC.,

         Plaintiff,

   vs.

   WATERSTONE MORTGAGE
   CORPORATION,

         Defendant.
   _____/




   DEPOSITION OF:    KATHERINE THEOBALD, CORPORATE
                     REPRESENTATIVE OF MUTUAL OF OMAHA,
                     INC.

   TAKEN:            Pursuant to Notice by
                     Counsel for Defendant

   DATE:             May 26, 2023

   TIME:             9:02 a.m. to 2:23 p.m.

   LOCATION:         Hill Ward Henderson
                     101 East Kennedy Boulevard
                     Suite 3700
                     Tampa, Florida  33602

   REPORTED BY:      Melanie Keefe, FPR
                     Notary Public
                     State of Florida at Large




           REGENCY REPORTING SERVICE, INC. (813)224-0224
```

```
                                                              2
1  APPEARANCES:    COURTNEY WALTER, ESQUIRE
                   CHRIS McCALL, ESQUIRE (Zoom)
2                  Mitchell Sandler LLC
                   1120 20th Street Northwest
3                  Suite 725
                   Washington, DC  20036
4
                   MARK CARROLL, ESQUIRE
5                  Mutual of Omaha Mortgage, Inc.
                   100 West 22nd Street
6                  Suite 101
                   Lombard, Illinois  60148
7
                      Attorneys for the Plaintiff
8
                   MARIA L. KREITER, ESQUIRE
9                  Godfrey & Kahn, S.C.
                   833 East Michigan Street
10                 Suite 1800
                   Milwaukee, Wisconsin  53202
11
                   CAROLINA Y. BLANCO, ESQUIRE (Zoom)
12                 Hill Ward Henderson
                   101 East Kennedy Boulevard
13                 Suite 3700
                   Tampa, Florida  33602
14
                   STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
15                 Waterstone Mortgage Corporation
                   N25W23255 Paul Road
16                    Pewaukee, Wisconsin  53072

17                    Attorneys for the Defendant
```

```
                                                        3
1    INDEX                         PAGE NUMBER

2    Examination by Ms. Kreiter            5

3    Read Letter                         144

4    Errata Sheet                        145

5    Reporter's Certificate              146
```

```
                                                                    4
1    (Exhibit numbers continued from the previous deposition.)

2                        E X H I B I T S

3    Exhibit    Description                              Page
     18         First Amended Complaint, Demand for       20
4               Jury Trial
     19         5/2/23 Letter, Subject: Second Meet      129
5               and Confer
```

**EXHIBIT 5**

25

1  Q. So here at the deposition today, you have no
2  information that Mutual is prepared to present as to the
3  investigation of the rejection of the loan that is the
4  subject of the Van Dame allegations, and Mutual is taking
5  the position that counsel handled that, and therefore, it's
6  not to be disclosed?
7     MS. WALTER: Object to the form.
8  A. The discovery has a lot of information in it, and
9  I cannot speak to every item in the discovery. But again,
10 that discovery was handled by -- by Mark, so I can't speak
11 to every piece of it.
12 Q. That's a fair point. So let's not talk about
13 this one specifically, but let's talk globally. Is Mutual's
14 position that Mark Carroll or somebody in legal is the only
15 person that investigated whether these loans that were
16 transferred from Mutual to Waterstone while the employees
17 were still employed, Mark Carroll is the only person that
18 vetted whether, in fact, Mutual has rejected those loans?
19    MS. WALTER: Object to the form.
20 A. So Mark Carroll handled the discovery. Myself
21 and other members of the human resources team at the time
22 that Daytona departed, you know, very much multiple
23 employees resigning at the same time, the nature of the
24 departure of the Daytona branch did lead to our human
25 resources team in that earlier stage doing some

REGENCY REPORTING SERVICE, INC. (813)224-0224

26

1  investigation of their e-mails as well to understand the
2  scope and the context of what was happening, including
3  identifying e-mails that had been sent from employees that
4  included borrower data.
5  Q. Sure. So let me just -- I think that you're
6  trying to answer my question, but my question is a little
7  bit different. It's focused exclusively on -- sorry --
8  exclusively on Mutual's efforts to verify that the loans
9  current employees of Mutual were transferring to Waterstone,
10 whether those loans had been rejected by Mutual or not.
11    Is there someone within Mutual who was
12 investigating whether, in fact, as Mr. Van Dame claimed and
13 maybe some of the other employees will claim, these loans
14 have been rejected by Mutual, so we had to refer them out?
15 Because the complaint is making serious allegations that
16 these loans were unlawfully diverted. Waterstone's position
17 is, no, they were not. Those loans had been rejected by
18 Mutual. My understanding is that Mutual disputes it
19 rejected those loans, so I'm trying to understand who is the
20 person at Mutual that made the determination these loans
21 were never rejected?
22    MS. WALTER: Object to the form.
23 A. That portion or that part of the discovery would
24 have been handled by Mark Carroll.
25 Q. Are you prepared today to testify about those

REGENCY REPORTING SERVICE, INC. (813)224-0224

27

1  efforts to vet whether the loans had, in fact, been
2  rejected?
3     MS. WALTER: Object to the form.
4  A. Not that specifically.
5     MS. WALTER: Can we take a ten-minute break,
6  Maria, please?
7     MS. KREITER: Sure.
8     (A recess was taken.)
9  Q. (By Ms. Kreiter) Ms. Theobald, was Mr. Van Dame
10 even one of the employees who joined Waterstone?
11 A. I believe he was based on public visibility to
12 Consumer Access site, et cetera, but I don't know and can't
13 confirm specifically any employee situation with Waterstone.
14 Q. I want to make sure I understand your answer.
15 You say that Mutual believes Mr. Van Dame did go to
16 Waterstone based on some public information. What
17 information is that?
18 A. NMLS Consumer Access site.
19 Q. Who at Mutual vetted whether the various
20 employees that left Mutual actually joined Waterstone?
21    MS. WALTER: Object to the form.
22 A. I am not certain that anyone did a holistic view
23 of that. I'm not aware of it. I, through my review, have
24 done some of my own review of that in preparation but can't
25 say I have every employee memorized as to who reflected as a

REGENCY REPORTING SERVICE, INC. (813)224-0224

28

1  Waterstone employee.
2  Q. The extent of your efforts in preparation for
3  this deposition were reviewing NMLS data?
4     MS. WALTER: Object to the form.
5  A. I have looked to see if some of the employees
6  were aligned to Waterstone on the consumer direct NMLS site.
7  Q. And you believe Mr. Van Dame was one of those
8  employees --
9     MS. WALTER: Object to the form.
10 Q. -- that you researched?
11 A. I shouldn't say that because I don't recall each
12 individual.
13 Q. Sure. Do you know where Mr. Van Dame is working
14 today?
15 A. No, I do not.
16 Q. Would it surprise you if he never went to
17 Waterstone?
18    MS. WALTER: Object to the form.
19 A. No, not necessarily.
20 Q. Prior to filing a Complaint that makes pretty
21 serious allegations of wrongdoing against Waterstone, was
22 there someone -- I mean, you talk about efforts in
23 preparation for this deposition. This complaint was filed
24 back in July of last year. Prior to filing the complaint
25 making serious allegations about wrongdoing, did anyone

REGENCY REPORTING SERVICE, INC. (813)224-0224

57

1 had any business dealings whatsoever with Waterstone?
2           MS. WALTER: Object to the form.
3       A.  I don't have that information.
4       Q.  With respect to any of the borrower information
5 that is cited in the complaint, does Mutual know either way
6 whether those borrowers closed loans with Waterstone?
7           MS. WALTER: Object to the form.
8       A.  That was a part of Mark's discovery that I can't
9 speak to the specifics of individual loan follow-through at
10 Waterstone.
11      Q.  Do you know, is Mutual seeking damages based on
12 the loans associated with the borrowers and the examples of
13 transmittal of confidential information that are cited in
14 the complaint?
15      A.  Damages was not a part of the deposition that I
16 prepared for. My understanding is that was with Jeff.
17          MS. KREITER: If I could just have a five-minute
18      break.
19          MS. WALTER: Yeah.
20          (A recess was taken.)
21      Q.  (By Ms. Kreiter) Ms. Theobald, with respect to
22 the nonsolicitation of employees provision, is it the three
23 managers, Mr. Hutto, Mr. Wolf, and Mr. Smith, who Mutual
24 contends breached their agreements?
25          MS. WALTER: Object to the form.

REGENCY REPORTING SERVICE, INC. (813)224-0224

58

1       A.  So I can provide also the examples that I shared
2 earlier of after Krystin Friebis departed had been in
3 contact with active Mutual of Omaha Mortgage employees and
4 then, you know, Dwayne in active communication with Fred
5 Stalls. I don't -- you know, it's part of Mark's
6 determination ultimately of who specifically, you know, we
7 are indicating broke their nonsolicit, but I do have those
8 examples, you know, as well as Dwayne sharing employment
9 information with Waterstone and -- another one.
10          MS. KREITER: For the record, the witness was
11      interrupted by a fire alarm test notice. I don't think
12      we have to exit the building.
13      Q.  Go ahead and continue your answer. I can have
14 the reporter read it back if that helps you.
15      A.  So again, instances where it appears that there
16 was a breakaway from the nonsolicit were those two examples
17 of Krystin reaching out, of Dwayne being in contact with
18 active employees.
19          There's also some -- there was an e-mail with
20 Nicole Hutto as well, not in the act -- direct act of
21 recruitment but in communication with a Waterstone VP of
22 underwriting, Melissa Ferenc, who as early as early April
23 had been having communication about a trip, talking about an
24 itinerary of about an eight- -- you know, seven- or
25 eight-day trip to Costa Rica that seemed pretty evident that

REGENCY REPORTING SERVICE, INC. (813)224-0224

59

1 Waterstone was sponsoring for Nicole, not directly in the
2 e-mail, but there's some, you know, likeliness that that
3 trip would have also expanded to Dwayne Hutto through their
4 -- him and Nicole's relationship.
5           And so there's also some thought behind that, you
6 know, trip set up from Waterstone being kind of an abnormal
7 incentive for potentially recruiting and onboarding Dwayne
8 and Nicole, which neither of them being producers in -- and
9 also with Dwayne's sending of employment data prior to that
10 to Waterstone, that there is some thought that there was
11 some recruitment efforts or interest or potential that more
12 than just those two employees would be onboarding.
13          But as far as a specific list outside of those
14 examples that I just gave of who we are, you know, listing
15 as breaking their nonsolicit, you know, I just have to go
16 off the examples I have seen and have access to.
17      Q.  So separate in your mind recruiting efforts by
18 Waterstone; Waterstone doesn't have any agreement with
19 Mutual not to solicit. It's free to solicit whoever it
20 pleases as a matter of fair competition.
21          Put Waterstone's solicitation efforts to the
22 side. I want to get a comprehensive, an exhaustive list of
23 which of the employees who have contractual nonsolicit
24 obligations allegedly, which of those employees does Mutual
25 contend breached their employee nonsolicit? I heard you say

REGENCY REPORTING SERVICE, INC. (813)224-0224

60

1 Krystin Friebis, Nicole Hutto, Dwayne Hutto, Chris Smith,
2 and Chris Wolf; is that accurate?
3           MS. WALTER: Object to the extent she's not going
4      to sit here and list all 60 employees that are
5      referenced in the amended complaint. That's -- it's
6      unreasonable, and she's -- should not be and cannot be
7      expected to know all of their names.
8       Q.  Does Mutual contend that all 60 of the employees
9 breached their nonsolicitation of employee duty?
10      A.  I would want to rely on my legal counsel to
11 confirm if all of these employees are falling under the
12 realm of breaking their agreement. All of -- again, I've
13 given the examples that I can share.
14      Q.  Sure. But you're here on behalf of Mutual today.
15      A.  I am.
16      Q.  Are you prepared to testify which of the
17 allegedly 60 employees that came over breached their
18 nonsolicitation provisions?
19      A.  I'm unable to name every individual that
20 potentially broke their solicitation.
21      Q.  I need an exhaustive list of the ones you are
22 able to name. Are there any besides Krystin Friebis, Nicole
23 Hutto, Dwayne Hutto, Chris Smith, and Chris Wolf?
24          MS. WALTER: Object to form.
25      A.  So I'm thinking. Not any other names that I feel

REGENCY REPORTING SERVICE, INC. (813)224-0224

65

Q. For how many Mutual borrowers or prospects did the former Mutual employees take information?
A. I'm sorry. Can you rephrase it one more time or --
Q. Sure. My understanding is that Mutual alleges that its former employees took borrower information --
A. Yes.
Q. -- or prospective borrower information. I'm trying to get a sense of the quantity. How many borrower or prospective borrowers are we talking about?
MS. WALTER: Object to the extent that Mr. Gennarelli was designated on this area and spoke to it yesterday, but --
A. So I can -- I'm aware of probably at least 20 -- between 20 and 30 e-mails that are sending borrower data or referencing diverting a borrower. There are -- you know, I kind of head run through examples that I could think of as there are many in terms of borrower documents being sent to personal e-mail addresses; again, Beatrice Fleurio, eight e-mails; Tatiana; Cynthia Manley. Fred Stalls on four or five occasions sent e-mails with borrower documents to his personal e-mail. So there's a large volume of them. I'm not sure I can name every single one.
Q. Does Mutual have evidence that Waterstone told, instructed, or encouraged the former Mutual employees to

66

take borrower documents?
A. So for the examples that I had gone over where borrower documents were sent to Waterstone by actively employed employees, I mean, we have examples --
Q. Sure. And that's a --
A. -- where they were sent --
Q. That's a good point of clarification. Let's focus on the other examples where it's an e-mail from an employee to a personal e-mail account, not where the recipient or a party on the e-mail is somebody from Waterstone but just on the bucket where the employees are sending to their personal e-mail accounts.
Does Mutual have evidence that Waterstone told, instructed, or encouraged the former Mutual employees to take the borrower documents and transmit them to their personal e-mails?
MS. WALTER: Same objection as before.
A. So I'm trying to think through all the discovery materials. I'm not conjuring up right now a direct communication that's a direct request from Waterstone for those individuals to send borrower documents to their personal e-mail.
I can note that in, again, one of the e-mails where Kristie Johnson copied Zeke Waterman, Zeke made a clear indication that "Yes, we're holding off on doing

67

anything with this until the Waterstone move." So that gives some --
Q. Pause right there?
A. Yes.
Q. With respect to that one, what evidence does Mutual have that Waterstone was aware of Zeke Waterman's --
A. Yeah.
Q. -- intentions or efforts?
A. I'm not saying that there is but, again, bringing it to that context of there's some reason to believe that the intent behind these documents going to personal e-mails was to use at Waterstone in conjunction with actual documents being sent to Waterstone.
But do I have an e-mail to point you to that I can think of right now that is Waterstone asking to -- directing them to send e-mail -- or content to their personal e-mail? I don't have that example to give you.
Q. Rather than potential evidence of Waterstone telling, instructing, or encouraging the employees to send borrower documents, does Mutual have evidence that Waterstone even knew the employees who were sending borrower documents to a personal e-mail?
A. Not that I'm aware of because we don't know what happened with those e-mails once they were in the employee's personal e-mail account.

68

Q. With respect to the documents that were forwarded by the employees to their personal e-mail accounts, does Mutual have evidence that the documents were also forwarded on to Waterstone?
MS. WALTER: Object to the form.
A. So again, I -- Mark was in charge of the overall discovery, so I can't speak to every single e-mail that -- that we have access to at this point, but I can tell you I'm not aware of -- of that.
Q. When you say "Mark," you're referring to --
A. Mark Carroll. Sorry.
Q. -- in-house counsel?
A. Correct.
Q. Okay. As you sit here today as the representative today with respect to the e-mails that are cited in the complaint and relied upon by Mutual where the employees are e-mailing borrower documents or other confidential information belonging to Mutual to a personal e-mail account, does Mutual have evidence that the documents were also forwarded to Waterstone --
MS. WALTER: Objection.
Q. -- besides what Mr. Carroll might have?
A. So again, not that I'm aware of, but I don't want to exclude that there -- it's not that I'm aware of, but I want to -- I don't want to exclude that that could have ever

69

1  been part of the evidence. I haven't seen or been able to
2  memorize all of the discovery materials. But to more
3  directly answer your question, I do not have that example
4  that I can bring forward.
5    Q.  And your understanding is that Mr. Carroll may
6  have additional examples?
7    A.  I'm not saying that he does. I just don't want
8  to exclude --
9    Q.  He --
10   A.  -- the potential of that.
11   Q.  Got it. What does Mutual do when it's recruiting
12 new employees to protect against the new employees taking
13 information from their former employer?
14   A.  So, you know, as a company, you know, we do not
15 rely on taking borrower data from other companies. We
16 actually have -- in our employment agreements, we have
17 onboarding acknowledgment and sign off through the
18 employment agreement that any access to confidential
19 information or borrower information that they may have had
20 made available to them through their prior employer, that if
21 it's considered confidential or by a policy or a contract is
22 not something that they're able to disclose outside of their
23 prior employer, that they agree that they will abide to that
24 when they come on board. So it's part of our employment
25 agreement process.
       REGENCY REPORTING SERVICE, INC. (813)224-0224

70

1    Q.  Is there anything else that Mutual does to
2  prevent employees from taking information from their former
3  employer besides what you've talked about? I'm just looking
4  to exhaust --
5    A.  Um-hmm. I mean, that -- we, to a certain degree,
6  have to -- you know, as far as, you know, an employee -- an
7  employee can't, you know, enter or start originating a loan
8  with us until they're licensed with us. And so, you know,
9  they -- they can't access our systems to be able to do
10 origination activity until they are employed with us and
11 employed and licensed for the state that the loan is being
12 originated from.
13       And they have to be active with us at that point
14 of, you know, RESPA being triggered. So there is also --
15 just systemically, you know, they can't just enter and start
16 doing origination activity into our system prior to being
17 officially licensed with us.
18   Q.  Anything else?
19   A.  And then, I mean, just -- this is not so much for
20 the incoming employees but also just we have a process in
21 place for an employee who -- when they leave, if they're
22 commission eligible, we have a period of time where we will
23 keep the loan data, but we will continue to pay those loan
24 originators on the loans if they fund within a 30-day
25 window.
       REGENCY REPORTING SERVICE, INC. (813)224-0224

71

1        And so, you know, we do also try through our
2  policies to not have a reason for an employee who is leaving
3  the organization also to feel the need that they would need
4  to take loan data with them. But yes, for the onboarding
5  experience, it's primarily, you know, that we are asking
6  them to acknowledge that they are abiding to following their
7  prior employer contract.
8    Q.  Anything else?
9    A.  No.
10   Q.  Have you reviewed the offer letters and
11 employment agreements that were presented by Waterstone to
12 the employees?
13   A.  No, I have not.
14   Q.  Do you know whether Waterstone too has
15 prohibitions in those agreements that warn and prohibit the
16 employees from taking borrower and other confidential
17 information from a prior employer?
18       MS. WALTER: Object to the form.
19   A.  I'm not familiar with what's in their documents.
20   Q.  Do you -- and I -- here, again, I mean Mutual.
21   A.  Yes.
22   Q.  Does Mutual have any evidence that there were
23 employees of Mutual accessing Waterstone's systems prior to
24 the employees being licensed and active with Waterstone?
25       MS. WALTER: Object to the form.
       REGENCY REPORTING SERVICE, INC. (813)224-0224

72

1    A.  I don't have an awareness of that.
2    Q.  Do you have any knowledge of Waterstone's policy
3  on paying commissions? I understood your testimony to be
4  we're going to pay commissions on loans that are closed.
5  That will incentivize the loan officers to keep the loans
6  with Mutual, and there's no need to take borrower
7  information, do you know whether Waterstone has a similar
8  commission policy?
9        MS. WALTER: Object to the form.
10   A.  I do not know what their policies are.
11   Q.  Do you know anything about the efforts that
12 Waterstone made to ensure that the employees not make use of
13 the borrower data that they sent through personal e-mails?
14   A.  No, I'm not aware of Waterstone communicating
15 with them around that. Again, I'm aware of Waterstone
16 directly receiving borrower data.
17   Q.  Specific to the ones where it goes to a personal
18 e-mail --
19   A.  Right. No.
20   Q.  I mean, I understand -- and I'm putting that into
21 a separate category --
22   A.  Yes.
23   Q.  -- where's there's an actual Waterstone person on
24 the e-mail. Mutual's contention is there's this other
25 bucket of a large quantity of e-mails that go to a personal
       REGENCY REPORTING SERVICE, INC. (813)224-0224

85

1  that they, the two of them, were planning to go -- resign to
2  go to Waterstone. It was unclear in that situation exactly
3  which of the other 14 employees that, you know, now were
4  going to be without a managing team were -- you know, had
5  the potential to have an offer presented to them by
6  Waterstone or not.
7      That group, we ultimately coded as a branch
8  closure for the 14 employees that remained. And some of
9  them, through communication with Michael Lynch, were known
10 to have a home to go to for their next place of employment
11 in Waterstone, but we didn't have a clear list or
12 understanding of which of those employees that was the case
13 for.
14     Q.  To be clear, did Mutual fire any of the New
15 Jersey employees?
16     A.  The code that we ended up using for the -- the
17 other remaining New Jersey employees was a branch closure.
18 So yes, it was a termination because we no longer had a
19 managing team to support that branch.
20     Q.  You say that there was a code entered that the
21 branch has been closed. Did Mutual send any, you know,
22 written notification to the 14 New Jersey employees
23 indicating that Mutual was terminating their employment?
24     A.  There was -- if we had not heard from those
25 employees, which I don't believe we had any for the 14, but

REGENCY REPORTING SERVICE, INC. (813)224-0224

86

1  I could be wrong, we did -- we needed to do outreach to
2  those employees and explain that the two managers that they
3  may or may not be aware of -- we weren't sure who was aware
4  and not aware -- that their two managers had resigned. So
5  there was communication with them in regards to the nature
6  of that we were now in a position of needing to close that
7  branch.
8      Q.  Was there similarly written communication to the
9  three Tampa employees that Mutual fired?
10     A.  There was communication and then, you know,
11 verbal reaching out to them as well as a follow-up
12 communication confirming their end of employment and sharing
13 end of employment information.
14     Q.  Has Mutual produced those written communications
15 in discovery in this case?
16         MS. WALTER: Object to form.
17     A.  I'm not certain of -- of everything that was
18 submitted, so I'm not certain.
19         MS. KREITER: Okay. I'll make a request,
20     Courtney. That's directly responsive, should've been
21     produced. I ask that it immediately be produced with
22     respect to all of the terminations by Mutual.
23     Q.  There's some allegations in the amended
24 complaint, which we've been looking at Deposition
25 Exhibit 18. If you could turn to paragraphs 43 -- starting

REGENCY REPORTING SERVICE, INC. (813)224-0224

87

1  at paragraph 43, just let me know when you're there.
2      A.  I'm here.
3      Q.  Okay. So take a minute to look at paragraphs 43
4  through 46 and just acquaint yourself with the content of
5  those paragraphs.
6      A.  Okay.
7      Q.  Would you agree that in general paragraphs 43
8  through 46 talk about the fact that borrower information is
9  sensitive in nature and has competitive value?
10     A.  Correct.
11     Q.  And then I want to go on to focus on
12 paragraph 47. Paragraph 47 reads "If a competitor obtained
13 this information" -- referring back to the borrower
14 information; correct?
15     A.  Um-hmm.
16     Q.  "If a competitor obtained this information, it
17 could undercut Mutual Mortgage on Mutual's loans and divert
18 Mutual Mortgage's customers by aggressively pursuing those
19 customers based on the information kept by Mutual
20 Mortgage. That is precisely what Waterstone has done here."
21 Do you see that?
22     A.  Yes.
23     Q.  What evidence does Mutual rely upon to support
24 the serious claim that Waterstone undercut Mutual on loans
25 based on borrower information that it had procured from

REGENCY REPORTING SERVICE, INC. (813)224-0224

88

1  Mutual?
2      A.  So, you know, again, the examples that I have are
3  obtaining loan information directly from Mutual -- active
4  Mutual of Omaha Mortgage employees is --
5      Q.  The basis for paragraph 47?
6      A.  Unless there's -- you know, that is my
7  understanding essentially. I don't -- from the
8  perspective -- again, we talked about before that, you know,
9  Mark's role and anyone else he may have had to involve --
10 and I'm not certain what access we have to identify what
11 Waterstone did with the loans once received, but we do know
12 that they left our company to go to them.
13     Q.  The allegations are that Waterstone undercut
14 Mutual based on confidential information?
15         MS. WALTER: I just want to --
16     A.  So we do also --
17         MS. WALTER: I just want to go on the record and
18     say "It could undercut Mutual Mortgage."
19         MS. KREITER: It concludes by saying "That is
20     precisely what Waterstone has done."
21         MS. WALTER: And the entire paragraph says "It
22     could undercut Mutual Mortgage on Mutual Mortgage's
23     loans and divert Mutual Mortgage's customers by
24     pursuing -- by aggressively pursuing those customers
25     based on the information kept by Mutual Mortgage."

REGENCY REPORTING SERVICE, INC. (813)224-0224

109

1  the second check of the following month as kind of that
2  standard timing.
3      Q.  Okay.  The profit payment to Mr. Hutto, was that
4  the payment made in May of 2023?
5      A.  Yes.  Yes, it was --
6      Q.  For $60,000?
7      A.  That was the net.  The gross payment was 104,000,
8  and I don't know the full dollar amount past that.
9      Q.  Why was that payment not made until May of 2023?
10     A.  Again, any timing decisions or handling with any
11 of the incentive pay for -- associated with Daytona, like I
12 said, is all kind of in the jurisdiction of what Mark -- any
13 connection Mark would've had partnering with our payroll
14 team.
15     Q.  But in the ordinary course, that profit payment
16 would be made using the, you know, month lookback schedule
17 that we talked about; correct?
18     A.  Right.
19     Q.  So with Mr. Hutto exiting approximately the end
20 of April, his profit payment in the ordinary course would've
21 been paid, I guess, when?  The end of May?
22     A.  Yes, for -- so --
23     Q.  And to be clear, the end of May 2022?
24     A.  Of 2022, yes.  So that would've been, as an
25 example, March paid at the end of April, April paid at the

110

1  end of May, et cetera.  But with an employee who has profit
2  pay, which we don't -- it's not as common.  Profit pay is
3  not as common as a compensation setup.  It is for our more
4  higher level managers as a potential type of incentive.
5  Profit gets paid on what is calculated through the last
6  month that they were fully employed with us, so they need to
7  be active the full month.
8      Q.  With Mutual holding Mr. Hutto's profit pay for
9  nearly a year, did the profit payment made in May of 2023
10 include any interest to account for the year in which Mutual
11 was holding that money?
12     A.  I didn't see the breakdown of that profit, but
13 not that I'm aware of.
14     Q.  Are you privy to any correspondence in which
15 Waterstone was making demands that the employees be paid
16 their compensation inclusive of their commissions in full?
17     A.  No.  The -- the only possible example to that
18 that I can think of is Chris Smith, who was already at
19 Waterstone, and those two employees that I mentioned who had
20 questioned why they hadn't been paid on a loan, but they
21 were administrative logistical reasons.
22     Q.  Are you aware of a number of the departed
23 employees getting calls from other Mutual employees who had
24 stayed on in which the Mutual employees who had stayed on
25 were seeking help in getting loans closed for Mutual?

111

1          MS. WALTER:  Object to form.
2      A.  No.
3      Q.  Did you understand the question?
4      A.  I did.
5      Q.  Are you aware that after the filing of the
6  lawsuit, employees of Mutual were still reaching out to the
7  Waterstone employees for assistance with closing loans?
8          MS. WALTER:  Object to form.
9      A.  No, I was not aware.
10     Q.  Are you aware of Waterstone having to send Mutual
11 a letter in which it asked that given that Mutual had made
12 the decision to sue, to not pay out all of the compensation,
13 that Mutual should probably stop having its employees reach
14 out for help from the now Waterstone employees?
15         MS. WALTER:  Object to form.
16     A.  I was not aware.
17     Q.  I think you said this, but I just want to be
18 clear.  You don't have any information that you're able to
19 testify to today about the reason for delaying the profit
20 payment to Mr. Hutto until May of 2023 nor the delay in
21 paying the five Daytona employees until December of 2022; is
22 that correct?
23     A.  Correct.
24     Q.  And you're not in a position to testify about
25 that timing because it was a decision made by Mark Carroll

112

1  and the legal team?
2      A.  Well, I don't know if he made a decision about
3  it, but I know any dialogue that would've happened around
4  that for our payroll team would have come from Mark.  Again,
5  I don't know any specific conversations or e-mails that --
6  that I'm aware of or that I can think of about delaying pay.
7  So -- but no, I -- I can't speak to specifics around the
8  handling of that.
9      Q.  One of the topics for which Waterstone has
10 noticed this deposition is the adequacy of Mutual's efforts
11 to search for and produce responsive documents and to
12 provide complete discovery responses.  Are you aware that
13 that's a topic within the notice?
14     A.  Well, I know in the deposition topics there's a
15 question around -- or a topic around completeness of
16 discovery.  I don't recall exactly how it's worded.
17     Q.  Correct.  And that's a topic for which you're
18 designated to testify; correct?
19     A.  Um-hmm.
20     Q.  Did Mutual make any efforts to gather, review,
21 and produce the e-mails that Mr. Carroll or others at Mutual
22 had concerning the topic of the commissions and other
23 compensation to the former employees?
24         MS. WALTER:  Object.
25     A.  I'm going to have you repeat that one more time.

113

1  MS. KREITER: I'll ask the reporter to read the
2  question back, please.
3  (The previous question was read by the reporter.)
4  A. I would -- I don't know all the specifics of
5  every single element that went into the collection for
6  discovery. You know, I would imagine that if there's an
7  e-mail dialogue with a former employee specifically about
8  compensation, that that may have been part of that, but I
9  can't -- I'm not aware of specific examples speaking to
10 payment timing of compensation, like I said.
11 Q. Do you know whether Mutual made an effort to
12 gather and review Mr. Carroll's e-mails on the topic of
13 commissions?
14 MS. WALTER: Object to form.
15 A. I don't know that, no.
16 Q. What contract or other documents govern Mutual's
17 payment of commissions to the former employees?
18 A. That's mostly captured in what's called an LO
19 addendum. So when someone who has some type of commission
20 eligibility, they sign an offer letter, which is more so in
21 that part of the offer just capturing, you know, how an
22 hourly rate would work, maybe other details, if there's a
23 bonus, if there's -- you know, it captures some compensation
24 details.
25 But an LO addendum is a document tied with --
REGENCY REPORTING SERVICE, INC. (813)224-0224

114

1  sent at the same time with an offer letter that goes over
2  the nature of the compensation, how their commissions will
3  be paid, so based on the type of loan, what are the basis
4  points. It's where it references, you know, a definition of
5  what is a basis point. It's where it references the 30- --
6  we'll compensate on loans that fund within the 30-day
7  window. So that particular document, that LO addendum,
8  contains a lot of information about how commissions are
9  paid.
10 Q. What about with respect to the branch managers,
11 for example, Mr. Hutto? Is there a contract or other
12 document that governs his compensation besides the LO
13 addendum?
14 A. So he -- his compensation, I believe, is captured
15 in an offer letter format. So there is a section within the
16 offer letter following the information about his base salary
17 that he would -- of the profit pay that he would receive.
18 Q. Okay. So he -- I just want to be clear. He
19 would also still have an LO addendum that governs
20 commissions. It's just that any additional compensation
21 such as the profit payment would be in the offer letter?
22 A. I did look at this, and I'm trying recall if he
23 specifically has an LO addendum. He might -- might not
24 because he was not a -- brought on to produce individually.
25 He was brought on as a branch manager to manage the group,
REGENCY REPORTING SERVICE, INC. (813)224-0224

115

1  and so his only form of incentive pay besides the salary is
2  the profit pay. So he may not have that addendum format
3  tied to him because it's very structured around commission.
4  Q. Did Mutual pay Mr. Hutto commissions on loans?
5  A. I had reviewed his comp. Not that I'm -- not
6  that I recall. I think all of his -- over his course of
7  employment with Mutual of Omaha Mortgage was base salary and
8  profit pay, and he may at some point have received some form
9  of a bonus but not personal production.
10 Q. Let's move on to Chris Wolf. What documents
11 govern the commissions or other compensation due to
12 Mr. Wolf?
13 A. He does have an LO addendum.
14 Q. Is there other compensation that Mr. Wolf enjoyed
15 at Mutual besides commissions governed by the LO addendum?
16 A. No. He was a combination of base salary
17 commission on personal production and a calculation on
18 override for the branch.
19 Q. Did Mr. Hutto get a branch override payment?
20 A. No. He got profit instead.
21 Q. Okay. So just, again, completeness here, I want
22 to make sure we're aligned. Hutto gets base salary and
23 profit payments. Mr. Wolf gets commissions pursuant to the
24 loan addendum, a base salary, and an override?
25 A. Right.
REGENCY REPORTING SERVICE, INC. (813)224-0224

116

1  Q. Anything else for those two individuals in terms
2  of compensation?
3  A. Not as part of their standard compensation unless
4  they at some point may have received, again, some form of a
5  bonus or something along those lines but certainly not
6  anything that was a large part of their compensation over
7  the years.
8  Q. Got it. Just to close the loop, what about
9  Mr. Smith?
10 A. Chris Smith was set up to receive base salary and
11 profit pay. I'm trying to make sure that I'm not
12 overlooking if he had any period during his employment he
13 received an override. But to my recollection, he was set up
14 similarly to Dwayne in that it was focused on -- his comp
15 was giving him base salary profit pay. He -- actually, I
16 think the reason I'm questioning is I do believe he actually
17 had some form of an override as well. Sorry. I should --
18 trying to remember with everything that I looked at.
19 Q. With respect to the five Daytona employees that
20 we talked about, Dawson Walker --
21 A. Um-hmm.
22 Q. -- it sounds like he received override pay plus
23 commissions?
24 A. Yes.
25 Q. Was there any other form of compensation for
REGENCY REPORTING SERVICE, INC. (813)224-0224

121

1  A.  That's not something I'm familiar with.
2  Q.  To be clear, are you aware that Waterstone had to
3  file a motion to compel against -- sorry.  Strike that.
4      Are you aware that Waterstone had to file a
5  motion to compel against Mutual --
6      MS. WALTER:  Same objection.
7  Q.  -- related to Mutual's discovery responses?
8  A.  Just through a part of my deposition preparation
9  had an awareness of that.
10 Q.  And are you aware that the court ordered Mutual
11 to identify responsive documents by Bates number?
12 A.  No.
13 Q.  I'm going to now direct you to page 24.
14 A.  Okay.
15 Q.  Paragraph 9, "Produce all compensation agreements
16 and commission plans applicable to each of the departed
17 employees at the time of his or her resignation, including,
18 but not limited to, the loan originator compensation
19 addendum referenced in certain of the departed employees'
20 employment agreements."  Do you see that?
21 A.  Yes.
22 Q.  Do you see any Bates number designations in
23 response to Request No. 9?
24 A.  Let me get used to the format here.  No.
25 Q.  Do you know why Mutual didn't identify Bates

REGENCY REPORTING SERVICE, INC. (813)224-0224

122

1  numbers in response to Request No. 9 like it did for the
2  other requests that are within Exhibit 3?
3      MS. WALTER:  Object to form.
4  A.  No, I'm not aware.
5  Q.  When you were preparing for the deposition today
6  and specifically the topic on the adequacy of Mutual's
7  discovery responses and production of documents, did you
8  review Exhibit 3?
9  A.  This document?
10 Q.  Correct.
11 A.  No.
12 Q.  What did you do to prepare for the deposition
13 topic that required testimony about the adequacy of Mutual's
14 discovery responses?
15 A.  Well, so I -- I did review a lot of e-mails,
16 agreements, documentation.  But in terms of anything related
17 to the completeness or the method of discovery, that was all
18 handled by Mark Carroll, so that's a legal matter for our
19 company.
20 Q.  Okay.  Do you understand -- I mean, a corporation
21 can get advice from counsel?
22 A.  Um-hmm.
23 Q.  And that might inform the corporation's position?
24 A.  Yes, I understand.
25 Q.  And the discussions with counsel might be

REGENCY REPORTING SERVICE, INC. (813)224-0224

123

1  privileged, but the conclusion that the company comes to and
2  its position in litigation is something that needs to be
3  disclosed.  Do you understand the distinction?
4      MS. WALTER:  Objection.
5  A.  I do.
6  Q.  So for the deposition today, what is the position
7  of Mutual of Omaha in terms of, for example, the efforts
8  that Mutual of Omaha made to gather responsive compensation
9  agreements and commission plans?
10     MS. WALTER:  Objection.
11 A.  So, you know, I know that a lot of effort and
12 work was put into gathering the immense amounts of
13 documentation.  But in terms of, again, specifics of -- I'm
14 not sure if you're asking about completeness -- I guess
15 maybe I'm not understanding the question or what you're
16 looking for from me, if you don't mind --
17 Q.  Do you know whether Mutual of Omaha produced the
18 loan originator compensation addendums for the former
19 employees?
20 A.  Did -- did we produce it?
21 Q.  Correct.
22 A.  To whom?
23 Q.  Waterstone.
24 A.  That, I'm not aware of.  I'm not aware of what
25 was shared specifically with Waterstone.

REGENCY REPORTING SERVICE, INC. (813)224-0224

124

1  Q.  Did you make any effort in preparation for this
2  deposition to compare the documents produced by Mutual with
3  the requests of Waterstone?
4      MS. WALTER:  Objection.  That goes far beyond the
5      scope of what Ms. Theobald is required to do as a
6      designated 30(b)(6) corporate representative.
7  Q.  Go ahead.
8  A.  No.
9  Q.  Did you make any efforts to discern whether --
10 strike that.
11     Do you have access to the loan originator
12 compensation addendums for the former employees?
13 A.  I do.
14 Q.  Where would you find those documents?
15 A.  We have what we call a shared drive that is
16 secure in the sense that you can determine groups of who can
17 have visibility to that -- a section of documents.  And so
18 they're within a section of the shared drive that human
19 resources has access to.
20 Q.  So you personally have access to those documents?
21 A.  To employment agreements and offer letters and
22 addendums, yes.
23 Q.  How long do you think it would take you to gather
24 those loan originator compensation addendums for the former
25 employees?

REGENCY REPORTING SERVICE, INC. (813)224-0224

125

1  A.  Several hours, I'm sure. It's a lot of searching
2  and saving, if that's what you're asking.
3  Q.  Has anybody ever requested that you or anyone
4  else in the HR department gather those documents?
5      MS. WALTER: Objection. The witness has already
6      said that this was handled by legal counsel. So to the
7      extent it's going to implicate any conversation between
8      legal counsel and the witness, she's not testifying to
9      it.
10 Q.  Go ahead.
11 A.  So can you ask the question again? I'm sorry. I
12 get distracted when --
13 Q.  Sure.
14     MS. KREITER: Go ahead and read it back.
15     (The previous question was read by the reporter.)
16 A.  I believe initially when -- I don't recall. I'm
17 sorry. I really don't recall the specifics.
18 Q.  That's fine. If there's --
19 A.  I know that as a part of my preparation for this,
20 I did some review. I didn't memorize them all, but I did
21 some review of the agreements for those individuals, but I
22 don't -- it's been over a year. I don't recall the
23 specifics if our team was requested to access and save a
24 bunch of offer letters.
25 Q.  As part of your preparation for the deposition

REGENCY REPORTING SERVICE, INC. (813)224-0224

126

1  with respect to Deposition Topic No. 20, which is the topic
2  that requires testimony on Mutual's written responses to
3  Waterstone's discovery and the completeness of Mutual's
4  document production, including efforts to search for and
5  collect responsive documents and information, did you review
6  the different discovery requests that were issued by
7  Waterstone?
8      MS. WALTER: Object. Objection.
9  A.  I did not review a request specifically from
10 Waterstone, no.
11 Q.  Do you know how many discovery requests
12 Waterstone has served?
13     MS. WALTER: Objection. Asked and answered.
14 A.  No.
15 Q.  Do you know anything about the subject matter of
16 Waterstone's discovery requests?
17     MS. WALTER: Objection.
18 A.  I -- I -- like I said previously, I believe I'm
19 aware through just preparation of the deposition, not prior
20 to that, that there was a request of information. But
21 beyond that, you know, in terms of details, no.
22 Q.  Did you make any effort to have any discussions
23 about the subject matter of Waterstone's request for
24 information in conjunction with this deposition?
25     MS. WALTER: Object to form.

REGENCY REPORTING SERVICE, INC. (813)224-0224

127

1  A.  So my understanding is anything that I've
2  discussed, you know, just with legal counsel is not
3  something that I would speak to. But as far as, again,
4  outside of, yes, I have reviewed e-mails, I have reviewed
5  agreements, I have reviewed documents in preparation, the
6  details of the discovery process and what was handled, you
7  know, and overseen by Mark, I do not have that today.
8  Q.  So my question now is not about the specifics of,
9  you know, an e-mail that might've been produced but rather
10 it goes to your understanding of Waterstone's requests.
11 A.  Which I've said I don't have. I'm not aware of
12 the specifics of Waterstone's requests.
13 Q.  How were you in a position to assess and testify
14 about the adequacy of Mutual's response to Waterstone's
15 requests without having any knowledge about the requests
16 themselves?
17     MS. WALTER: Objection.
18 A.  You know, I certainly have done the best that I
19 could to prepare with all of the information that is
20 involved in this deposition situation. Going into the
21 detail of the document requests and all of the details
22 around the documents collected during discovery is a scope
23 that is beyond what I was involved in trying to recall and
24 remember and ascertain for this deposition session. You
25 know, the -- I'm not sure if that expectation was to know

REGENCY REPORTING SERVICE, INC. (813)224-0224

128

1  all of the documents that are involved in the discovery, but
2  that's not something that --
3      MS. KREITER: Could you read back my question?
4      (The previous question was read by the reporter.)
5  A.  Well, I have, you know, full trust in the process
6  that was handled by our legal counsel --
7  Q.  But you're not here --
8  A.  -- in the -- in what was requested and how that
9  was handled.
10 Q.  But you're not in a position today to testify at
11 all about the methodology used, the custodians that Mutual
12 gathered documents from, search terms used, date parameters.
13 Are you prepared today to talk about any of those topics?
14 A.  Those details --
15     MS. WALTER: Object to form.
16     Go ahead.
17     THE WITNESS: Sorry.
18 A.  Not that level of detail. I'm aware clearly also
19 through the complaint of the multiple examples that were
20 collected, but in terms of all of the records and dates, no.
21 Q.  How much time did you spend preparing for Topic
22 No. 20?
23 A.  I kind of didn't assess how much time I spent on
24 necessarily any one individual topic. Again, I was doing a
25 broader overview in preparation of understanding that I

REGENCY REPORTING SERVICE, INC. (813)224-0224