```
               IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF FLORIDA
                       TAMPA DIVISION
_____
                              )
MUTUAL OF OMAHA               )
MORTGAGE, INC.,               )
                              )
          Plaintiff,          )
                              )
v.                            )  Case No.:  8:22-CV-1660
                              )
WATERSTONE MORTGAGE           )
CORPORATION,                  )
                              )
          Defendant.          )
_____)
```

**CASE MANAGEMENT CONFERENCE PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**December 13, 2023**
**2:42 p.m. to 3:05 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**         COURTNEY E. WALTER, ESQUIRE
                               Mitchell Sandler LLC
                               1120 20th Street NW
                               Suite 725
                               Washington, DC 20036

**FOR THE DEFENDANT:**         MARIA L. KREITER, ESQUIRE
                               Godfrey & Kahn, SC
                               833 East Michigan Street
                               Suite 1800
                               Milwaukee, Wisconsin 53202

                               CAROLINA Y. BLANCO, ESQUIRE
                               Hill Ward Henderson
                               3700 Bank of America Plaza
                               101 East Kennedy Boulevard
                               Tampa, Florida 33602

(Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

1         (Call to Order of the Court at 2:42 p.m.)
2              **THE COURT:**  Next case.  Mutual of Omaha versus
3    Waterstone.  Come on down.
4              Go ahead and introduce yourselves, for the record,
5    please.
6              **MS. WALTER:**  Good afternoon, Your Honor.  Courtney
7    Walter on behalf of the plaintiff.
8              **MS. KREITER:**  Good afternoon.  Maria Kreiter and
9    Carolina Blanco on behalf of Defendant Waterstone.
10             **THE COURT:**  You're from Milwaukee.  Right?
11             **MS. KREITER:**  I am.
12             **THE COURT:**  This is a good time to come down.
13             **MS. KREITER:**  It's not bad.
14             **THE COURT:**  We talked about this last time.  I may
15   have mentioned to you last time I have another kind of related
16   case with a very similar legal issue.  And I looked at your
17   stuff, and I don't know -- I don't mean this to be critical.  I
18   don't know if there's -- if you could -- you could do -- you
19   could do a better job drilling into this or maybe there just
20   isn't any law out there.
21             But what I'm still not seeing is any real coming to
22   grips with the legal concept of this two-year cutoff, that the
23   defense wants it to be a two-year cutoff.  And the same thing I
24   said last time, is there a legal line that the judge draws or
25   is it ultimately a jury question?  And then when the jury comes

1  back with whatever they think it is, the judge has to then come
2  back and say, well, was this too speculative or whatever.
3        And so I don't see any cases -- and they don't have
4  to be in Florida.  All right.  What I'm going to say is, I'm
5  going to say take a second look and file supplemental briefs,
6  if you can.  I don't care if it's a case from North Dakota that
7  is under similar facts where it talks about at least the
8  analysis of how you go about looking at damages in a case like
9  this.  It doesn't have to be on these exact facts.  But,
10 basically, it's a noncompete-type scenario where it's a
11 two-year limit or one-year limit or five-year limit, and does
12 that cut off damages as a matter of law or not?
13       Because I think once I get that answered, if the
14 answer is, well, no, it's a jury question, well, then, that's
15 not good for the defense, and they might have to offer more
16 money if they want to settle.  Maybe they want a trial.  But
17 right now, as long as they think that they have that cut off,
18 they're not going to put any more money on the table, right,
19 more or less?
20       **MS. KREITER:**  Sorry.  So I'm defendant.  So we think
21 it should be a one-year cutoff.
22       **THE COURT:**  I keep saying two.
23       **MS. KREITER:**  Right.
24       **THE COURT:**  If you're right about the one-year cutoff
25 thing and they're at 19 million, and what were you at?  Two?

```
 1   Not even that.
 2           MS. KREITER:  So, Your Honor, I will tell you --
 3           THE COURT:  53,000.
 4           MS. KREITER:  -- I think the best-case scenario,
 5   giving a slew of inferences to the plaintiff, this is
 6   1-million-dollar case, max.
 7           THE COURT:  You're at a million, and they're at what,
 8   19?
 9           MS. WALTER:  We're not, Your Honor.  So --
10           THE COURT:  I thought you were.
11           MS. WALTER:  So no.  I think what's happening is our
12   expert produced a methodology that went up to ten -- it
13   considered ten years.
14           THE COURT:  You went up to 28 million.
15           MS. WALTER:  Well, her model allows for that, but
16   her -- but the expert witness also in a footnote says that
17   model is amenable to different time periods, and that time
18   period is a question for the jury.  And I will represent to you
19   that I do not believe, as a matter of law, there is a cutoff.
20           THE COURT:  Well, I know you think that, because
21   you're an advocate.  But I need to have it in writing
22   someplace.  She's insisting that there is.  You wanted to go
23   and just let the jury decide.  You may be right.  I said that
24   all along.  But you may be wrong.  And I just don't see that
25   these cases that y'all have come up with are really hitting --
```

1  I mean, hitting close enough that I'm comfortable saying, you
2  know what, as a matter of law, this is a jury question, and
3  we'll see what number they write on the bottom of the form
4  versus, no, it's a one-year and the best case is a million.
5  I'm not comfortable coming out either way on this right now.
6        And so I don't know what kind of research you did and
7  how if you just limited it to Florida or something like that,
8  because there's not always an answer in Florida.  But I just
9  got to believe that there's some cases -- I'm not sure with
10 what search query I would use to find them, but I do think it's
11 worth -- it's worth getting right, because this is a
12 fundamental legal issue in the case that if I answer it
13 incorrectly, it's a free appeal for somebody.  And you're going
14 to have to then at that point write -- you know, look deeply
15 for an Eleventh Circuit brief, and, you know, they want all the
16 law.
17       And so talk to me a little bit about -- did you write
18 it?
19       **MS. KREITER:**  So I wrote the brief, yes, saying
20 here's one way that we could, you know, reasonably limit this
21 case.
22       I think the only thing to consider, Your Honor, is
23 the burden of proof.  Is there any evidence that the -- you
24 know, the put-up-shut-up moment of the case in summary
25 judgment, has -- does the plaintiff have any evidence

UNITED STATES DISTRICT COURT

1    indicating that these individuals are going to stay two months,
2    five months, ten months, ten years.
3                The only piece of evidence that they put forth on
4    summary judgment is testimony that, on average, loan officers
5    stay at Mutual 51 months.  My position on that is, fine, these
6    branches were there longer than 51 months.  So as the plaintiff
7    with the burden of proof, regardless of what has happened in
8    other cases, what evidence do you have, plaintiff, at summary
9    judgment that it's ten years.
10               **THE COURT:**  I was looking at this more of a -- as a
11   legal point than factually what you're saying.  And I -- it's
12   kind of one of my questions I have in my notes is that -- I
13   mean, I was thinking of it in terms of causation.  But I think
14   that's what you're talking about.  In other words, whatever
15   happened here, what is -- what damages did that cause?  Right?
16               **MS. KREITER:**  Correct.  I think another really big
17   obstacle to talking about settlement or proceeding to trial,
18   what is plaintiff's position?  Is it -- I don't -- you know,
19   telling me the damages are zero to 28 million, it doesn't help
20   me.
21               **THE COURT:**  Well, no.  They'll settle it for -- I bet
22   you they'll settle it for 27 million, but --
23               **MS. KREITER:**  Sure.
24               **THE COURT:**  -- have you talked about real numbers at
25   all?

1          **MS. WALTER:**  We have not.

2          **THE COURT:**  Is it your case or the other guy doing
3  it?

4          **MS. WALTER:**  So Mr. Karen is lead counsel, but I was
5  very instrumental in the brief.  But we have not revisited
6  mediation or settlement discussions since the briefs have been
7  filed.

8          **THE COURT:**  Yeah.

9          **MS. WALTER:**  But I do --

10         **THE COURT:**  I said I would decide this to try to help
11 you get the way you might be able to settle it.  I've looked at
12 the briefs, and, you know, my thought was going to be, well,
13 let me just set a hearing on this and cancel today.  But I
14 wanted to try to talk to you today and ask you for more help.

15         If you can research more deeply and can be way
16 outside of Florida, but I'm just interested in cases, similar
17 fact -- I mean, similar -- a general factual similarity and how
18 the damages analysis works, because I think it really is a key
19 thing here.  And I'll look more deeply at your point that who
20 cares what the law is, the facts here don't open the doors
21 sufficiently to whatever it is that you're saying.

22         But you did research on this?

23         **MS. WALTER:**  Extensively.

24         **THE COURT:**  Yeah.  Where did you look?

25         **MS. WALTER:**  I did focus solely on Florida.  So I

1  will represent that there's not a similar case under these
2  factual circumstances, but I do think there's probably benefit
3  to looking outside of Florida.

4      **THE COURT:** Okay.  Did you do the research?

5      **MS. KREITER:** I did.  I mean, I think the case is
6  really wrapped into this concept of what's speculative versus
7  not, and there's got be a decision.  But I -- but I think
8  you're aligned, so I won't repeat myself.  I think this is
9  different from that because there's no evidence that the
10 plaintiff has.

11     **THE COURT:** Well, forget about that.  Let's assume
12 that there's -- I mean, assume there's plenty of evidence that
13 they could go over the one year.  All right.  Just assume there
14 is.  Legally, somehow or another, I think which is what you
15 were saying, that was your argument, legally, who cares what
16 the evidence is?  The contract was for one year.  After that,
17 they were allowed to do whatever they wanted to do.

18     **MS. KREITER:** That is a closer call, if there were
19 evidence on the other side.  That's not.  But I also think, you
20 know, then I would agree with you, that's probably a closer
21 call.  Because then I think you would get into the loyalty of
22 the loan officers to the manager and what kind of --

23     **THE COURT:** Sounds like a jury thing.

24     **MS. KREITER:** I agree with you.  I do agree with you
25 on that.  I just think that in this case, coming this far, you

1  know, we don't have, for example, statistical evidence beyond,
2  okay, they typically stay 51 months. Okay. Well, done.
3          Mutual is saying, you know, these branches were going
4  to somehow beat the curve. And that's the only piece of
5  evidence. For example, they could have gone in and deposed
6  these loan officers and asked them, you know, look, did you
7  have plans to leave but for this? How long would -- how long
8  do you typically stay at a job? But there's no -- there have
9  been no depositions by the plaintiff.
10         **THE COURT:** You're arguing a proof issue, which I
11 understand. But I'm focused on a legal issue, and so try to
12 look a little bit more.
13         **MS. KREITER:** Sure.
14         **THE COURT:** See if you can find something. I mean,
15 Christmas is coming up. I'm not going to be working on this
16 between now and Christmas. Maybe you are. I'm not. So let's
17 put it -- maybe give me something like by January 15th. Is
18 that reasonable? I mean --
19         **MS. KREITER:** I guess, Your Honor, that's certainly
20 reasonable.
21         **THE COURT:** If you want to. It's not required. If
22 you want to just say we're good enough with what we've got,
23 fine. You don't have to do anything. But if you want to, it
24 would be helpful to me. Otherwise, I'll give it my best guess.
25 And if I get it wrong, and somebody wants to appeal later, then

1  they find these cases, and they say, ah.

2  **MS. KREITER:** I am all for further briefing it. I
3  actually think focusing on these damages as the path forward in
4  this case, not just this issue. I was just going to raise,
5  though, so the current schedule is that we have a joint
6  pretrial statement due on the 15th of January, final pretrial
7  on the 22nd. I don't -- I welcome the Court's suggestion to
8  continue focusing on these damages issues, but I just want to
9  make sure we're not -- that we're changing the current schedule
10 so that we're not --

11 **THE COURT:** Well, I mean, I got to make a decision on
12 this. I'm not going to sit on this indefinitely. So once you
13 send your stuff in -- I mean, the only issue, I'll be honest
14 with you, we're not going to have a February trial date,
15 because we're not doing trials in February. I mean, we gave
16 you that date way back when, but things have changed now.

17 So maybe we should just, like, add 60 days on to
18 everything. Does that work? So instead of February, we'd have
19 an April trial date, which I would do anyway, because, like I
20 said, we're not doing trials in February.

21 So we'll do an order on that, Amanda, extending those
22 remaining deadlines by 60 days, and just -- is January 15th
23 is -- I don't know. Is that a Sunday? I haven't even looked
24 at my calendar. Give me a real date that works.

25 **MS. KREITER:** That should be fine. I have it noted

1   as our pretrial, so I assume -- the pretrial statement due, so
2   I'm assuming --
3           **MS. WALTER:**  I believe that was a Monday, yeah.
4           **THE COURTROOM DEPUTY:**  It is a Monday, however, it is
5   a federal holiday.
6           **THE COURT:**  So it's the 16th.  It's is 16th.  It's
7   optional.  This is just sending me -- no page limit.  If you --
8   I mean, if it's too long, I'm not going to read it.  But, I
9   mean, you know, keep it concise.
10          **MS. KREITER:**  Sure.
11          **THE COURT:**  And if you find something, you know, send
12  it to me, write it up a little bit.  You don't have to exchange
13  it.  If the other side says something you think you're just
14  dying to respond to, ask me -- you know, ask me if you should
15  respond, and I'll let you know.  Because otherwise my answer
16  will be no, we'll hold a hearing, and you can respond then.
17  All right?
18          **MS. WALTER:**  If I may, Judge, I think some of the
19  breakdown here is we're arguing the facts and our different
20  theories against each other, but it's not within the context of
21  what the law actually is.  So arguing -- I mean, in their
22  brief, they cited to five cases in their entire opposition.  So
23  to argue that something is speculative and our facts are
24  speculative doesn't help me, because I don't know what the --
25  you know, you're not pointing to anything --

1      **THE COURT:**  Now you see what my problem is.  Right?

2      **MS. WALTER:**  Yes.  That's why I appreciate the

3   opportunity to submit supplemental briefing.

4      **THE COURT:**  I'm glad we could talk through it and

5   kind of get on the same page.

6           Now, like most things like this, we think there

7   should be something out there, and usually there's not.  But,

8   hopefully, you guys find something somewhere someplace and you

9   can look at -- what was that -- I mean, there are treatises not

10  on damages.

11          Kelly, what is that one?  There's the one -- somebody

12  on damages.  I mean, like there's Wigmore evidence --

13     **MS. KREITER:**  Sure.

14     **THE COURT:**  -- and stuff like that.  No, not Coast,

15  not Coast.  I can't think of it now.  Maybe I'm thinking of

16  something different.  Even if it's treatises or something like

17  that.  Wouldn't it be great if our friends in legal academia

18  wrote articles on this as opposed to what they write about?  It

19  can be anything like that, anything that you think is helpful,

20  let me know about, and then we'll go from there.

21          All right.  So we don't need any future dates because

22  we have the -- you'll get future dates from Amanda on a

23  pretrial, and you'll get a summary judgment hearing date, in

24  all likelihood, from me at some point, and we'll go from there.

25     **MS. KREITER:**  Sorry.  Summary judgment as to the

1   other issues that were raised, or I think at the last
2   conference what the --
3           **THE COURT:**  I'm not sure yet.
4           **MS. KREITER:**  Okay.
5           **THE COURT:**  I'm not sure.  I might just want to talk
6   about this, but I'm not sure.
7           **MS. KREITER:**  Sure.
8           **THE COURT:**  I'll let you know.
9           **MS. KREITER:**  Sure.
10          **THE COURT:**  Okay?  Got all your Christmas shopping
11  done before you go back?
12      (Discussion off the record.)
13          **THE COURT:**  Time out.  I got something else.  We got
14  to deal with this in-house counsel as the expert problem.
15  Right?  That's kicking around in this?
16          **MS. WALTER:**  He's not an expert, Your Honor.
17          **THE COURT:**  That's what we got to talk about, because
18  they say he is.  All right.  So let's talk about it.  What's
19  going on with this?
20          **MS. KREITER:**  So the issue is there's an in-house
21  counsel that apparently did the analysis of what loans --
22          **THE COURT:**  Is he going to be a witness?
23          **MS. WALTER:**  At this point, Your Honor, no.
24          **THE COURT:**  At any point, if he's going to be a
25  witness, he's got to be open to be deposed, which no lawyer

```
 1    ever really wants to do.
 2            MS. WALTER:  So I will represent no.  We do not
 3    intend to call him as a witness.  His affidavit was for
 4    purposes of, like, a corporate representative to authenticate
 5    the documents and the analysis that identified the number of
 6    credit inquiries.  So if it's not Mr. Carroll, I mean,
 7    another -- the corporate representative likely.
 8            THE COURT:  So this is just a document custodian, if
 9    you will?
10            MS. WALTER:  More or less.
11            THE COURT:  They're complaining that some of the
12    documents you didn't give up because of attorney-client
13    privilege.
14            MS. WALTER:  That's incorrect.  That's incorrect.
15            THE COURT:  Okay.  So he's not a witness, he's just
16    giving an affidavit for admission of documents.
17            So why are you guys telling me he's an expert?
18            MS. KREITER:  I don't think he's an expert.  What I
19    will say is I disagree that he's just a document custodian.  I
20    deposed the corporate rep specifically on the topic of what are
21    your damages and specifically what are the diverted loan
22    damages that Mutual's claiming.  This is back in May.  I was
23    told I don't know anything about that.  Mark Carroll did it,
24    and that's privileged, we're not telling you.
25            And so now discovery comes to a close.  There's never
```

1  a disclosure of diverted loan damages.  And then, suddenly,
2  after discovery is closed and summary judgment, we're hearing
3  from Mark Carroll who -- you know, who couldn't have any
4  discussion about what he did, and now he's talking about, well,
5  there were some diverted loans.  There's 46.  And, you know,
6  here's a -- I did it based on credit pulls that were never
7  produced in discovery.
8        I got on Friday a spreadsheet that apparently
9  Mr. Carroll put together that is based on credit pulls that
10 were never produced.  And this is the problem where the case,
11 Your Honor.  It's like I think the damages are one thing, and
12 then it doesn't work out.  And now it changes to another thing,
13 but discovery is closed or we're past the deadline.
14        And I need to have an understanding what are the
15 damages in this case.  I have been operating for months that
16 there are no diverted loan damages.  And now on summary
17 judgment months after the close of discovery, we've got
18 Mr. Carroll saying, I want to talk about 46 loans that are
19 diverted.  I get this spreadsheet on Friday.  I have no idea
20 what it really is, who authored it.  It's over a thousand lines
21 of information that I've not talked to anybody --
22        **THE COURT:**  Is this your thing?  Are you working on
23 this part of it?
24        **MS. WALTER:**  Yes, Your Honor.
25        **THE COURT:**  What's going on?

1           **MS. WALTER:**  Okay.  So we served defendant with
2  document requests and interrogatories in June.  They responded
3  July.  Cutoff of discovery was July 31st, I believe.  At that
4  point then, we had requested a number of credit inquiries that
5  they -- that Waterstone had for a specified time period.  We
6  cross-referenced those loans, those credit inquiries with our
7  own credit inquiries, which Waterstone never requested.  That's
8  why they were never produced.  They were never requested.  We
9  cross-referenced them.  We identified 44 duplicate credit
10 inquiries.
11           To be clear, in our brief, we do not say that we had
12 that number -- that we're claiming that number for damages.
13 We're claiming -- we -- the credit inquiries are evidence of
14 Waterstone's wrongdoing that they were taking certain borrower
15 information and using it for their own gain after these
16 employees transitioned to Waterstone.
17           **THE COURT:**  Well, it's -- so what's -- what's the --
18 what difference -- what am I missing?  Why do you need that
19 piece if it's not --
20           **MS. KREITER:**  I think I've got to do something to
21 cover up this case.  I've got a case where I've got damages of
22 zero to 28 million.  I've got 300 mis -- 300 alleged trade
23 secrets.  I can't -- I do not feel like I'm adequately
24 defending Waterstone to let this case of this expanse continue.
25 I think discovery has to mean something.  I mean, there was an

1    expert disclosure deadline.  We didn't -- it's not that we
2    didn't ask about their damages.  We did.
3            **THE COURT:**  Well, he's not an expert or even a
4    witness.
5            **MS. WALTER:**  And, Your Honor, after the deposition of
6    Mr. Gennarelli, Ms. Kreiter turned to Mr. Carroll and said I'm
7    noticing you for deposition because your name came out
8    throughout the deposition, to which we were going to comply.
9    And she never did.
10           **THE COURT:**  Yeah.  Okay.  That -- the office of the
11   United States magistrate judge is a wonderful thing, because
12   then I -- this requires drilling deeper into this than what I'm
13   wanting to do right now.  So if there's motion filed, it will
14   go to the magistrate on this, and they can get into the level
15   of detail that you're getting into.
16           But what I just heard from her is, this guy is not a
17   witness at all, and he's certainly not an expert witness.  So
18   that much has been established, which maybe we don't need to
19   spend any more time on it.  If you want to, you can try to see
20   what happens.  Who's -- is it Judge Sansone on this one?
21           **MS. KREITER:**  Sneed.
22           **THE COURT:**  Well, she may be a district judge before
23   you get it to her, so maybe act quickly.
24           I don't know what we're going to do with the cases if
25   she goes through the Senate.  I guess they'll just split them

1   up, and who knows you who you'll get at that point.  So you may
2   want to act sooner rather than later if you really want to do
3   something with that.  Okay.
4       **MS. KREITER:**  So are we -- we're to reach out to
5   Judge Sneed and get a hearing on that motion?
6       **THE COURT:**  Motion filed on a discovery dispute, yes.
7   But, remember, she just said don't write up -- don't put in a
8   motion about undisclosed experts and stuff like that.  She just
9   said he's not an expert.  He's not even a -- they're going to
10  call him as a witness.  So if you have some other way of -- you
11  have some other issue or complaint, fine, but it's not that,
12  because she just said that's not what they're doing.
13      **MS. KREITER:**  Okay.
14      **THE COURT:**  Thank you.
15      **MS. WALTER:**  Thank you, Your Honor.
16      (Proceedings adjourned at 3:05 p.m.)

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

     I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

     I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

     IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 5th day of January 2023.

_____
REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida