## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MUTUAL OF OMAHA
MORTGAGE, INC.

                Plaintiff,

v.

WATERSTONE MORTGAGE
CORPORATION,

                Defendant.

CASE NO. 8:22-cv-01660-TPB-JSS

## WATERSTONE MORTGAGE CORPORATION'S MOTION TO EXCLUDE OR LIMIT PLAINTIFF'S EXPERT TESTIMONY ON DAMAGES

## I.     INTRODUCTION

The Court should exclude the testimony of Jeff Gennarelli and Candice Rosevear because both rely on speculation that will confuse, not assist, the jury. They project damages for eighteen months (Gennarelli) and *up to* ten years (Rosevear) with no evidence to support those periods. Mutual even admitted at the January 30, 2024 oral argument that "there is no rhyme or reason" for Rosevear to use the ten year period that results in alleged damages of $28 million, more than six times the $4,440,002 Gennarelli estimate. Two points are key:

First, the employees could resign at any time because they were at-will employees with no employment contract of a set duration. Thus, there was never certainty that the branches would remain affiliated with Mutual in light of that reality. While Mutual imposed a non-solicitation of employees provision upon its

branch managers, presumably in effort to lessen the chance of a branch departure, the non-solicits last only one year. Mutual could have tried to negotiate a longer non-solicit from the managers or tried to impose a non-compete upon the employees if it wanted greater certainty that the branches would be secure for more than one year (and no doubt compensated the employees sufficiently for the extra business security and restrictions). Those rights do not exist.

Second, Mutual has no evidence that the employees would have stayed eighteen months, ten years, or any set period but for the managers' alleged solicitation. The managers were looking to change employers for many months and happened to pick Waterstone from the alternate employers they had been weighing. The managers were free to leave, and there are no allegations of wrongdoing with respect to the managers' departure — and certainly no evidence the managers would have stayed at Mutual for eighteen additional months or up to ten years.

As to the branch employees under the managers, Mutual procured no testimony about why the employees resigned or whether they would have stayed absent the managers' alleged solicitation, and, if so, for what duration. To the contrary, the employees submitted affidavits stating they were looking to leave Mutual due to frustrations that have nothing to do with Waterstone, due to loyalty to the managers, or simply because they viewed Waterstone as the better option. None of those reasons support a damages period of eighteen months or up to ten years (or any damages).

2

The only evidence Mutual presented is the now stricken testimony of Mark Carroll that Mutual's branches remain open 51 months on average. Even if that testimony had not been stricken by Judge Sneed, it is irrelevant because the Tampa and Ormond Beach branches were already with Mutual for more than 51 months. There is no evidence the branches would have continued to beat the average and, even if they had, for what period. The jury is left to guess at the proper duration of damages, which is not permitted.

## II.    LEGAL STANDARD

Functioning as a gatekeeper, the district court plays an important role by ensuring expert testimony is reliable and relevant. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "The party offering the expert testimony bears the burden of establishing, by a preponderance of the evidence, the expert's qualification, reliability, and helpfulness." *Payne v. C.R. Bard, Inc.*, 606 F. App'x 940, 942 (11th Cir. 2015) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc)).

An expert witness may testify in the form of an opinion only where the party with the burden of proof, here Mutual, demonstrates all of the following: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the

facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597. Mutual cannot

satisfy these standards.

## III.   ARGUMENT

### A. The Court Should Exclude Mutual's Branch Departure Damages as Speculative and Unsupported.

#### 1. That The Employees Would Have Stayed At Mutual After the Branches Closed and the Managers Resigned is Speculative.

If Mutual is relying on the one-page analysis put forth by Jeff Gennarelli,

attached as <u>Exhibit 1</u>, despite Mutual never mentioning it in its recent summary

judgment damages briefing (Dkt. 100, 114, 125), the Court should exclude those

damages as speculative, unsupported, and not "reasonably certain" as Florida law

requires. The same is true with respect to the far more speculative Rosevear analysis

that seeks damages over a ten-year period. *See* Expert Report of Candice Rosevear,

attached as <u>Exhibit 2</u>.

Mutual has no evidence that its branches would have stayed open or that the

dozens of employees at three different branches in Florida and New Jersey would

have continued working for Mutual for eighteen months (as Gennarelli assumes) or

for ten years (as Rosevear assumes). While each of the managers is alleged to have

an employee non-solicit, it is for 12 months. *See, e.g.,* Hutto Employment Agreement,

attached as <u>Exhibit 3</u>, at ¶ 15.1. Gennarelli and Rosevear both testified they were

aware of the 12-month non-solicit duration but did not use it in connection with the

damages analysis (Gennarelli Dep. Tr., attached as <u>Exhibit 4</u>, at 172:24-173:7;

4

Rosevear Dep. Tr., attached as <u>Exhibit 5</u>, at 45:10-22), despite that the managers would have been free to solicit after a year.

When asked if Mutual had reason to assume the branch employees would have stayed with Mutual for eighteen months, Gennarelli could only speculate: "[w]e now are the lender for Keller Williams. I would imagine that that may be more attractive…". (*See, e.g,* Gennarelli Dep. Tr. (Ex. 4) at 174:10-23.) But Mutual did not ask any of the employees if Keller Williams would have motivated them to stay with Mutual. (*Id.*) Gennarelli also admitted Mutual has no evidence the branch employees would have continued working for a different manager at Mutual. (*Id.* at 95:16-96:1 (Q: "Does Mutual have evidence that the employees would've stayed and worked for Kiley King? […] A: "No, no evidence.") The employees themselves indicate they were not going to stay at Mutual and, in fact, a number had been looking for alternate employment for many months. (*See e.g.,* Smith Decl. (Dkt. 104-8) ¶ 13; Hutto Decl. (Dkt. 104-9) ¶ 7; Utsch Decl. (Dkt. 104-10) ¶ 2; Wolf Decl. (Dkt. 104-11) ¶ 3; Walker (Dkt. 104-12) ¶ 14; Lowe Decl. (Dkt. 104-13) ¶ 7.)

The only evidence Mutual put forward on summary judgment to support its claim that the branches would have continued with Mutual was an affidavit from its in-house counsel claiming the branches it retained for over 12 months have, on average, been affiliated with Mutual for approximately 51 months. (Dkt. 100 at 25.) This Court struck the affidavit, ruling that evidence is not to be considered for purposes of summary judgment, or at trial without affording Waterstone additional

discovery. (Dkt. 128.) Regardless, the data supports Waterstone's position because the Tampa and Ormond Beach branches had already been with Mutual longer than the 51-month average when the employees resigned. (Kreiter Decl., Dkt. 104-1 at ¶ 6.) That the branches would have continued to exceed Mutual's average for another eighteen months or ten years has no evidentiary support, is pure speculation, and is contradicted by the employees themselves.

In addition, at the January 30, 2024 oral argument, the Court asked whether a business person at Mutual might present testimony at trial that these particular branches are likely to beat the average. (Jan. 30, 2024 Hr'g Tr., Dkt. 131, at 35.) As counsel for Waterstone indicated, Mutual is the party with the evidentiary burden of proof and has not put forth any such evidence. (*See id*. at 35-36). In fact, Gennarelli testified to the exact opposite, stating that comparing these branches to larger ones within Mutual that stay eight or ten years is not reasonable and, for that reason, he selected an eighteen-month duration:

> Well, we considered looking at our large branches so that would be, you know, branches that were similar to these branches. So you would have a St. Louis, Seven Hills, Columbia, and they stay for, you know eight years, ten years. **But we didn't think that was necessarily reasonable, so we came up with 18 months.**

(Ex. 4 at 172:18-23 (emphasis added).) Gennarelli's testimony as Mutual's designated Rule 30(b)(6) corporate representative is binding. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012). A duration up to ten years as

6

used by Rosevear is not reasonable. In fact, Mutual admitted at oral argument on its

summary judgment motion that Rosevear's selection of ten years is entirely arbitrary:

> **The Court**: . . . . So there is – your expert picks ten years because of why?
> Or is there a some basis, or whatever the law exactly says, a yardstick on
> some basis? Where does the number come from?

> **Ms. Walter**: I think there is no rhyme or reason, Your Honor, to put it
> bluntly.

(Dkt. 131 at 21.) And, Rosevear herself testified she has no idea or opinion about

how long the employees would have stayed at Mutual:

> **Q**: Are you able to say to a reasonable degree of certainty that the
> employees at the Tampa and Daytona branches would have stayed with
> Mutual for any particular amount of time?

> **A**: I don't have an opinion on that.

> **Q**: So no?

> **A**: Correct.

(Rosevear Dep. Tr. (Ex. 5) at 131:15-23.)

With Mutual failing to put forward evidence to guide the jury in determining

the duration of its alleged damages and admitting that the duration Rosevear used is

not rooted in evidence (and its corporate representative, Gennarelli, testifying the

duration is not reasonable), Mutual cannot present the damages evidence to the jury

based on a duration of eighteen months or up to ten years. The only reasoned

approach based in the facts of the case is that the damages are limited to the one-year

non-solicit duration. Any other damages should be excluded under any and all of the

7

following three *Daubert* requirements because the speculative nature of the testimony means (i) it will only confuse and not help the trier of fact; (ii) it is not based on sufficient facts or data; and (iii) it does not involve principles and methods reliably applied to the facts of the case.

The cases Waterstone cited in its supplemental brief in opposition to Mutual's summary judgment motion (Dkt. 124) are on point and support exclusion of damages that extend beyond one year. Waterstone's prior arguments are incorporated in full by reference, including, but not limited to *Office Depot, Inc. v. Arnold*, 16-CV-81650, 2017 WL 11742779 (S.D. Fla. Aug. 14, 2017) in which the court agreed any damages for lost profits beyond the one-year period of the employee's non-solicit would be speculative and inadmissible:

> In sum, Office Depot has failed to convince me that it can recover lost future profits for diverted customers beyond the one-year term of the restrictive covenant for the period it normally retains customers. That is because, when the non-solicitation agreement expires, Arnold is allowed to solicit those customers.
>
> * * *
>
> Because [Office Depot's] theory and calculation of damages are inconsistent with Arnold's non-solicitation agreement and are divorced from the facts of this case, [Plaintiff's expert's] opinion concerning future lost profits is excluded as speculative.

*Id.* at *6. Because Office Depot's expert did not base his conclusions on evidence, such as multi-year contracts signed by the diverted customers, and instead simply multiplied the lost profits during the term of the non-solicitation period by five based

on Office Depot's alleged customer retention rate, the expert's opinion on lost profit damages beyond 12 months was therefore speculative and excluded. *Id.*

Similarly, in *Whitby v. Infinity Radio*, the case discussed by the Court at oral argument and cited at page 4 of Waterstone's prior brief (Dkt. 124), lost profit damages are speculative where an expert has no reason to select a five-year damages period, which the *Whitby* court correctly deemed arbitrary, speculative, and conjectural. 951 So. 2d 890, 899-900 (Fla. 4th DCA 2007).

An array of *Daubert* decisions support this same result. *See, e.g.*, *Fla. Virtual Sch. v. K12, Inc.*, No. 6:20-CV-2354-GAP-EJK, 2023 WL 6294214, at *2–3 (M.D. Fla. Aug. 25, 2023) (granting *Daubert* motion and excluding damages expert who assumed students would have registered with plaintiff, where there was no evidentiary support for that conclusion and, instead, it was speculative such that there was nothing for a jury to consider); *Banta Properties, Inc. v. Arch Specialty Ins. Co.*, 10-61485-CIV, 2011 WL 7118542 (S.D. Fla. Dec. 23, 2011) (quoting *Rink v. Cheminove, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (federal courts have recognized that their role as gatekeepers is essential "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony'"); *R&R Int'l, Inc. v. Manzen, LLC*, 2010 WL 3605234, at *6-16 (S.D. Fla. Sept. 12, 2010) (excluding lost profits expert who "merely speculated with regard to fundamental aspects of his lost profits projections" and "used methods that amounted to little, if anything, more than speculation and

conjuncture."); *McMahan Sec. Co. v. FB Foods, Inc.*, 2007 WL 704916, at *3-5 (M.D. Fla. Mar. 2, 2007) (excluding expert who relied on uncertain and speculative assumptions to calculate future lost profits); *Martinez v. Rabbit Tanaka Corp. Ltd.*, 2006 WL 5100536, at *9-15 (S.D. Fla. Jan. 6, 2006) (excluding lost profits expert opinion based on assumptions and lacked any underlying methodology).

Florida law requiring reasonably certain damages that are not speculative is also in accord. *See, e.g., Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.*, 254 F.Supp.2d 1239, 1247-49 (M.D. Fla. 2003) ("Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions."); *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1344-45 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) (rejecting lost profits as too speculative where plaintiff did not establish each of the "but for" assumptions required for it to generate future profits); *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002) (lost profit damages will not be awarded "when those profits are dependent on a party taking an action that it is unclear he would have taken.")

In sum, there is a weight of case law supporting Waterstone's position that damages beyond one year should be excluded and no authority or facts to support any other result. Mutual appears to be seeking a runaway jury verdict that is arbitrary, speculative, and based on nothing but conjecture. The Court is well within

its gate keeping authority to frame damages presented to the jury as those Mutual would suffer for a period of one year. The motion should be granted accordingly.

### 2. The Lost Profit Damages Improperly Include Loan Volume Attributable to the Former Branch Managers.

The Court should also exclude the profits associated with the branch managers Waterstone lawfully hired, as the alleged wrongdoing stems not from the managers' resignation, but rather their and Waterstone's alleged coordination and solicitation with respect to the rest of the branch employees. The managers are employees at will who could resign without liability, just as Waterstone can recruit from a competitor without liability. In fact, Mutual admitted there is nothing unlawful about Waterstone recruiting the branch managers and that "absolutely we should take that money out" of Mutual's damages. (Gennarelli Tr. (Ex. 4) at 92:22-93:13.) Yet, both Gennarelli and Rosevear do not carve out the managers and instead knowingly inflate their calculation. To do so is not "reasonably reliable," in any sense.[1]

### 3. The Lost Profit Damages Improperly Include the Paramus Branch.

Mutual cannot seek damages based on the Paramus, New Jersey branch because the departure of that branch did not involve wrongdoing. While Paramus reported through Chris Smith and John Utsch (the Tampa managers), the Paramus

---

[1] For context, assuming a one-year loss period, the revenue associated with the four managers is approximately $518,534 out of $1,378,826 — i.e., approximately 38%. Exclusion of these amounts is a conservative measure that will advance the parties' ability to realistically assess and discuss the case value.

branch also had local managers who considered staying with Mutual and simply decided against it—on July 5, 2022, weeks after the Tampa resignations. (*See* Tomalak Dep. Tr. (Dkt. 104-7) 149:19-150:8 and Dep. Ex. 28.) Specifically, after Smith resigned, Mutual's regional manager, Brian Tomalak talked through what options the Paramus managers would have if they remained at Mutual. (*Id.* 40:8-13.) The Paramus managers had called Mutual before deciding whether to move to Waterstone. (*Id.* at 150:9-22.) Mutual answered their questions, provided a profit and loss statement, and thought through what the volume, costs, and revenue would look like. (*Id.*) The managers simply did not pick Mutual. (*Id.* 151:1-5.)

That decision is natural given that one of the Mutual managers tasked with overseeing operations in Paramus, Kiley King, could not name a single loan officer employed at the Paramus branch. (King Dep. Tr. (Dkt. 104-17) at 46:4-7.)  The other Mutual manager, Tomalak, who was involved in Mutual's retention efforts, likewise could not name a single branch employee and only vaguely recalled the first names of the Paramus managers. (Tomalak Dep. Tr. (Dkt. 104-7) at 37:23-39:6.) Neither King, nor Tomalak ever visited the Paramus office. (King Dep. Tr. (Dkt. 104-17) at 46:8-10; Tomalak Dep. Tr. (Dkt. 104-7) at 39:7-9.) When asked if there is anything wrongful about the departure of the Paramus branch, Tomalak admitted there was not. (Tomalak Dep. Tr. (Dkt. 104-7) at 151:6-9.) Both Paramus managers, Mike Lynch and Patrick Japaz agree. (*See* Japaz Decl. (Dkt. 104-14) ¶¶ 2-7; *see* Lynch Decl. (Dkt. 104-15) ¶¶ 9-15.) Moreover, Mutual fired all the remaining Paramus

12

employees. (Lynch Decl. (Dkt. 104-15) ¶ 16.) Not all of them went to Waterstone and some left the industry altogether. (Japaz Decl. (Dkt. 104-14) ¶ 6.) As such, the demise of the Paramus branch was at Mutual's election, following fair and informed competition. No evidence suggests otherwise.

### B. Both the Gennarelli and Rosevear Models Are Based On Hypothetical Projections that Intentionally Ignore Reality.

The Court can and should exclude Rosevear's and Gennarelli's damage models under *Daubert* for an additional and independent reason: both models are based on hypothetical projections that ignore reality. For *Daubert* purposes, neither "has reliably applied the principles and methods to the facts of the case."

There is no need to speculate about the potential profitability of these branches. Waterstone turned over data regarding the loans it closed and unilaterally supplemented that data. The dollars at issue are easily measurable based on the production volume of the branches after the employees resigned, particularly since more than a year has passed since June of 2022 when the last employee resigned in Tampa. If Mutual suffered any actionable loss (it did not) that loss would be measurable by reference to how the Tampa and Daytona branches *actually* performed at Waterstone: through the end of 2023, which is the period Gennarelli used, Ormond Beach has resulted in a total *loss* to Waterstone of approximately $148,762 and Tampa has resulted in a total *loss* of approximately $602,458. That the branches lost money is consistent with the reality that the mortgage industry took an adverse

turn in 2022 after the employees resigned from Mutual and came to Waterstone, changing drastically from the anomalous 2020 and 2021 Covid-era boom. There is no basis for Rosevear to estimate damages of up to $28 million based on a "peer" model or "MBA-Based Model" to determine volume. There are no damages. To opine otherwise is only possible if reality is ignored and cherry-picked data with no bearing on the case is used to project damages, which *Daubert* does not allow.

In fact, as president of Mutual's mortgage division, Gennarelli is acutely aware that the 2020-2021 period he relied on to project damages of $4,440,002.42 was highly anomalous for the mortgage industry. (Gennarelli Dep. Tr. (Ex. 4) 163:4-165:11.) Gennarelli recalls 2020, in particular, as being "absolutely" a record year for Mutual, a "record high" for the branches at issue, and a "historically anomalous year for the industry" with activity triggered by the COVID-19 pandemic (*Id.* at 163:10-164:24.)

Further, Mutual admits that in 2022 the market was in a downturn after going through 2020-2021, which Gennarelli referred to as the "greatest mortgage market in decades." (*Id.* at 189:10-13, 192:2-9, Dep. Ex. 12.) Mutual's Forward Division, which encompasses the branches at issue, was not profitable as of June 2022—the very month the Tampa branch departed, and just two months after Ormond Beach departed. (*See* Gennarelli Dep. Tr. (Ex. 4) 181:6-187:13.)

In fact, Chris Leyden, Chief Operating Officer of Mutual's Forward Division, testified that the company's performance has been declining since 2022. (*See* Leyden Dep. Tr. (Dkt. 72-7) 25:3-26:14.) Leyden admitted that Mutual is "significantly

14

below budget" for 2023, and that the Forward Division is "barely breaking even" and "probably even a loss still." (*Id.* at 26:8-22.) Leyden confirmed that overall Mutual projected losses for 2022, and is projecting increased losses for 2023 and 2024, with $42 million in losses expected in 2024 and a downward trajectory at the corporate level. (*Id.* at 36:13-18.) In addition, Leyden's compensation, which is tied to performance, was "way more than half lower" for 2023 than 2020. (*Id.* at 17:13-18:5.)

Mutual does not consider this known fact about the market downturn because doing so means it cannot threaten Waterstone with millions in damages. However, the Court has authority to exclude unreliable damages and should do so here.

### C. At a Minimum, the Court Should Require Mutual to State the Damages it Seeks and Exclude Mutual's Alleged Diverted Loan Damages.

#### a. Mutual Should Be Required to State the Damages it Seeks.

As an additional matter, regardless of the result of this Motion, the Court should require Mutual to articulate the damages it seeks. Both Gennarelli and Rosevear propose damages allegedly caused by Mutual losing its Tampa and Ormond Beach branches. But, Mutual does not mention the Gennarelli demand in any of its multiple summary judgment damages briefs. (Dkt. 100, 114, 125.) And, Gennarelli's projections are irreconcilable with Rosevear's analysis. When using the eighteen-month period Gennarelli used but applying Rosevear's methodology, the lost profits are $2.6 million—40% less than the $4,440,002.42 Gennarelli model.

15

(Rosevear Dep. Tr. (Ex. 5) 99:11-103:10.) Is Gennarelli a damage witness such that Waterstone should dedicate time and resources to prepare to cross examine him at trial related to his damages model? If not and Mutual seeks to convert Rosevear, a rebuttal witness, to its primary damages witness, consistent with Mutual's briefing, it should be required to state just that.

Nor does Mutual make a demand based on Rosevear's model, which is problematic. Instead, Mutual states that the model provides means to measure damages that could range anywhere between $0 and $28 million. The Court should not permit Mutual to wait until trial to disclose that it seeks $28 million — or another undisclosed amount between $0 and $28 million. Waterstone is entitled to understand its exposure. Waterstone is also entitled to prepare its damages expert, Steve Oscher, to be ready to testify at trial in a meaningful and thoughtful way, not on the spot, about the amount Mutual then claims to seek. A range of $0 to $28 million amounts to no disclosure at all and does not allow Waterstone to prepare. *See, e.g.*, *Bostick v. State Farm Mut. Auto. Ins. Co.*, 2017 WL 4518665, at *2 (M.D. Fla. Oct. 10, 2017) (the "concept of trial by ambush has long ago fallen into desuetude in both state and federal courts," and excluding evidence that was not timely disclosed before trial); *see also Scipio v. State*, 928 So. 2d 1138, 1144 (Fla. 2006) (a new trial had to be conducted because it was "a classic case of trial by ambush" when a party's expert changed part of his opinion before trial without notifying the opposing party of the change).

16

## b. The Court Should Exclude Any Alleged Diverted Loan Damages.

As a final matter, Waterstone needs an order confirming Mutual cannot attempt to inject undisclosed diverted loan damages. To date, Mutual has not quantified or disclosed any alleged damages associated with diverted loans. Waterstone first produced documents showing loans that it closed within two months of the employees' transitioning to Waterstone in October 2022. (Kreiter Decl. (Dkt. 104-1) at ¶ 2.) Mutual could have compared those loans to its pipeline and claimed that certain Waterstone loans were diverted. Or, if Mutual thought additional information was needed to identify diverted loans, it could have sought additional discovery. Rather, and despite having Waterstone's closed loan data for months, Mutual's corporate representative testified on May 25, 2023 that Mutual still had not analyzed damages based on diverted loans:

> Q: Is Mutual seeking damages with respect to [diverted loans]?
> A: I believe so.
> Q: But you're not able to tell me what those damages are?
> A: Not at this moment.
> Q: Have you or anyone at Mutual made an attempt to calculate those damages?
> A: I have not.
> Q: Has anyone at Mutual?
> A: Not that I'm aware of.

(*See* Gennarelli Dep. Tr. (Ex. 4) at 25:21-26:6.) The testimony by Mutual's corporate representative is binding on Mutual, such that diverted loan damages are no longer part of the case. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) (when a corporate representative "lacks the ability to answer relevant

17

questions on listed topics... then the 'we-don't-know' response can be binding on the corporation and prohibit it from offering evidence at trial on those points.") The Court should exclude any diverted loan damages on this basis alone.

In addition, on June 5, 2023, nearly two months before the close of discovery, and without being asked by Mutual, Waterstone made an additional production of documents showing nearly an entire year of its loan closings, along with a report prepared by its damages expert who analyzed the loans in Mutual's pipeline compared to loans closed at Waterstone. (Steven Oscher Rpt. (Dkt. 104-3); Kreiter Decl. (Dkt. 104-2) ¶ 3.) Oscher concluded that, *at most*, 20 loans transferred from Mutual to Waterstone resulting in potential damages of less than $60,000. (Dkt. 104-3 at 8-9.) The $60,000 maximum does not account for liability or causation, and Mutual has taken no third-party discovery of any borrowers to understand the circumstances of particular loans, including whether the loans were rejected by Mutual, or whether the borrowers simply picked Waterstone instead of Mutual.

Nor does Rosevear comment on or analyze diverted loan damages. (Rosevear Dep. Tr. (Ex. 5) 4:18-5:2.) Nor did Mutual ever supplement its discovery responses to articulate damages based on diverted loans. (Kreiter Decl. (Dkt. 104-1) ¶¶ 4-5.) Further, Mutual did not assert a damages calculation related to diverted loans when it sought summary judgment on lost profit damages and has advised Waterstone's counsel it is not seeking diverted loan damages. Mutual, however, was not able to provide authorization for a stipulation to exclude those damages by the time of this

18

filing. Nevertheless, the longstanding position of Mutual that it is not proceeding with a claim of diverted loan damages should be confirmed in an order from the Court so that the damages sought is clear and Waterstone has certainty.

Each of these reasons, independently or collectively, entitle Waterstone to an order excluding any diverted loan damages.

## IV.    CONCLUSION

For the reasons stated, the Court should limit Mutual's expert testimony as requested above.

Dated this 6th day of February, 2024.

*s/Maria L. Kreiter*
Maria Kreiter (*Admitted PHV*)
Emma Jewell (*Admitted PHV*)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
scott.mclaren@hwhlaw.com
carolina.blanco@hwhlaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*

19