1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
                  CASE NO.: 8:22-cv-01660-TPB-JSS
 3

 4   MUTUAL OF OMAHA
     MORTGAGE, INC.,

 5        Plaintiff,

 6   vs.

 7   WATERSTONE MORTGAGE
     CORPORATION,

 8
          Defendant.
 9   _____/

10

11

12

13   DEPOSITION OF:        JEFFREY GENNARELLI, CORPORATE
                           REPRESENTATIVE OF MUTUAL OF OMAHA
                           MORTGAGE, INC.
14

15   TAKEN:                Pursuant to Notice by
                           Counsel for Defendant

16   DATE:                 May 25, 2023

17   TIME:                 9:17 a.m. to 4:53 p.m. EST

18   LOCATION:             Hill Ward Henderson
                           101 East Kennedy Boulevard
19                         Suite 3700
                           Tampa, Florida  33602
20
     REPORTED BY:          Melanie Keefe, FPR
21                         Notary Public
                           State of Florida at Large
22

23

24

25

           REGENCY REPORTING SERVICE, INC. (813)224-0224
```

EXHIBIT
4

25

1      MS. WALTER:  Object to the extent it implicates
2  attorney work product.  He's here as -- he's --
3      MS. KREITER:  He's --
4      MS. WALTER:  He's not the attorney.
5      MS. KREITER:  He's not here as an individual.
6  He's here as a corp rep.
7      MS. WALTER:  I did not say individual.  I said he
8  is not the attorney in the case.
9      MS. KREITER:  I'm entitled to ask what documents
10  and what preparation this witness did to testify about
11  damages for which ten months into the case Mutual has
12  not disclosed any number, so that's the line of my
13  questions.
14      Q.   Do you have a number, Mr. Gennarelli, with
15  respect to this first bucket, the loans that have
16  transferred to Waterstone from Mutual of Omaha?  Have you
17  looked at the loans, and do you have a number that you're
18  ready to present at the deposition today with respect to
19  Bucket 1?
20      A.   I don't have a number with respect to Bucket 1.
21      Q.   Is Mutual seeking damages with respect to
22  Bucket 1?
23      A.   I believe so.
24      Q.   But you're not able to tell me what those damages
25  are?

27

1  out is not a privileged question.
2      MS. WALTER:  I didn't -- I said it implicates
3  attorney work product.  I didn't say it was privileged.
4  I'm not instructing him not to answer.
5      Q.   Do you have an understanding --
6      A.   I'm not aware of the subpoenas or not.  I don't
7  know.
8      Q.   So you don't know whether Mutual has made an
9  effort to, for example, subpoena the personal e-mails of any
10  of the individuals that you claim are necessary?
11      A.   I am not aware.
12      Q.   When you were preparing to testify for the
13  deposition, did you have discussions or requests, access to
14  the e-mails that you believe are necessary to calculate
15  Category 1 damages?
16      MS. WALTER:  Object to the extent it implicates
17  attorney work product or goes to attorney-client
18  discussions.
19      Q.  Go ahead.
20      A.   Repeat the question.
21      Q.   Sure.  I hear you testifying that Mutual is
22  unable to calculate damages with respect to Category 1,
23  which we've defined as the loans that have closed at
24  Waterstone due to some unlawful conduct.  And I'm trying to
25  understand your testimony.

26

1      A.   Not at this moment.
2      Q.   Has you or anyone at Mutual made an attempt to
3  calculate those damages?
4      A.   I have not.
5      Q.   Has anybody at Mutual?
6      A.   Not that I'm aware of.
7      Q.   And your position is that you're waiting to do
8  more discovery?
9      MS. WALTER:  Object to form.
10      A.   It is.
11      Q.   What more discovery do you need to do?
12      MS. WALTER:  Object to form.
13      A.   Well, I'd like to see the personal e-mails where
14  all of our data was sent to.  That's what I'd really like to
15  know so that I can understand the absolute damage caused by
16  this unbelievable breach of conduct.
17      Q.   Did Mutual of Omaha Mortgage send subpoenas to
18  any of the individuals who have those e-mails?
19      MS. WALTER:  Object to the extent it implicates
20  attorney work product.
21      MS. KREITER:  Work product --
22      MS. WALTER:  Mr. Gennarelli isn't going to be
23  able to answer how discovery is being conducted in the
24  case.  That's my job.
25      MS. KREITER:  The fact that subpoenas have gone

28

1      I've heard you say that calculation hasn't been
2  done because you haven't seen personal e-mails, and I've
3  heard you testify that you don't know whether there have
4  been any subpoenas issued by Mutual in an effort to try to
5  get the e-mails.  So now my question is in connection with
6  preparing for this deposition --
7      A.   Yes.
8      Q.   -- did you make any efforts at that point in time
9  to seek out the e-mails that you believe are necessary to
10  testify on the topic noticed?
11      MS. WALTER:  Object to form.
12      A.   I didn't -- I did not.
13      MS. WALTER:  Can we take a ten-minute break?
14      MS. KREITER:  Sure.
15      (A recess was taken.)
16      MS. KREITER:  Can you just read back the last
17  question and last answer, please?
18      (The previous question and answer was read by the
19  reporter.)
20      Q.   (By Ms. Kreiter)  So there may be times during
21  this deposition when I say "you."  You're testifying on
22  behalf of Mutual.  If I say "you" during this deposition,
23  just understand that I mean Mutual collectively as a
24  company; correct or understood?
25      A.   Yes.

89

1    A.   Yeah.  We have a very large Mutual of Omaha
2 financial planning office in Tampa, very large, that we use
3 space in that as well.
4    Q.   How many of the employees did Mutual make efforts
5 to try to keep?
6    A.   You know, I would think that Brian and Kiley
7 probably reached out to the majority of them.
8    Q.   And none of them were interested?
9    A.   Apparently not.
10    Q.   There were -- you understand that there's certain
11 employees that didn't go over to Waterstone --
12    A.   I do.
13    Q.   -- for whatever reason?
14    A.   Yes.
15    Q.   Did Mutual attempt to make a branch of those
16 employees?
17    A.   Yes, or had conversations, I believe.  And I
18 believe they weren't very large -- very good producers, so
19 maybe the effort wasn't that great.  But again, this was not
20 -- I was not involved in it, so...
21    Q.   Okay.  So let's talk about what it means to lose
22 the branch, then.  I mean, the lease, I mean, is that part
23 of what you consider the branch?
24    A.   No.
25    Q.   No.  Is the branch really the people?

REGENCY REPORTING SERVICE, INC. (813)224-0224

91

1 producing loan officer, you would agree that that loan
2 officer should have his or her production carved out of the
3 damages in Bucket 2; correct?
4         MS. WALTER:  Object to form.
5    A.   Not necessarily.  I think what you're saying is
6 that the spread is generally -- when you're trying to
7 estimate the -- moving forward, this branch generally
8 produces this amount of loans a month.  So a loan officer
9 may come.  A loan officer may go generally.  But in general,
10 this is their production in the course of, you know, several
11 years, and that was the average we used.
12    Q.   How many employees decided not to work for
13 Waterstone or Mutual and instead find some other job?
14         MS. WALTER:  Object to form.
15    A.   And I really don't know who was offered a job
16 from Waterstone or who wasn't.
17    Q.   What about Mutual?  I mean, do you know who was
18 offered a job by Mutual?
19    A.   Not off the top of my head, no.
20    Q.   For the employees that decide, "I don't want to
21 go to Waterstone," you know, can't come to Mutual, or it's
22 not working out, you know, or go to some other employer, is
23 their departure attributable to some unlawful conduct by
24 Waterstone?
25         MS. WALTER:  Object to form.

REGENCY REPORTING SERVICE, INC. (813)224-0224

90

1    A.   The branch is the people and the production that
2 go along with those people, yeah.
3    Q.   With respect to the employees that didn't go over
4 to Waterstone and didn't find a home at Mutual for whatever
5 reason or employees that decided, "Look, I'm going to go to
6 a third party.  I don't want to go Mutual.  I don't want to
7 go to Waterstone" --
8    A.   Sure.
9    Q.   -- those people are part of the branch; correct?
10    A.   Yes.
11    Q.   And those people didn't go over to
12 Waterstone.  Are you -- for purposes of Category 2 damages,
13 are you counting the production of those people?
14    A.   I don't believe so.
15    Q.   How did you go about excluding them from the
16 damages analysis?
17    A.   I don't think there's much production that they
18 had.
19    Q.   There's an individual that went to -- I think his
20 name is Jake.  Apologies.  I don't know his last name.  Do
21 you know who I'm referring to?
22    A.   I don't.
23    Q.   You don't.  Okay.  If there was a producing loan
24 officer that decided not to go to Waterstone and instead
25 went to a different financial institution and that was a

REGENCY REPORTING SERVICE, INC. (813)224-0224

92

1    A.   Well, I think when there's a chaos at a branch
2 when people are leaving and everyone is talking about, you
3 know, what's wrong here so that they can get their money to
4 leave and go somewhere else, that causes certainly
5 disruption and could cause people to -- to leave; right?
6    Q.   You testified earlier that there would be nothing
7 wrongful about Waterstone recruiting Mr. Hutto; correct?
8    A.   Right.
9    Q.   Mr. Hutto was a producing loan officer?
10    A.   Correct.
11    Q.   Did you carve Mr. Hutto's production out of the
12 damages that you're seeking in Bucket 2?
13    A.   No.
14    Q.   Why not?  What was wrongful about Waterstone
15 soliciting Mr. Hutto?
16    A.   They didn't solicit Mr. Hutto.  They solicited
17 the group.
18    Q.   But you're counting his production, and you're
19 saying that his departure was caused by unlawful conduct by
20 Waterstone, and you also said Waterstone is permitted to
21 recruit Mr. Hutto?
22    A.   Yeah.  You said without using these -- I didn't
23 say Waterstone was allowed to take Mr. Hutto to Costa Rica,
24 the underwriting manager.  I also didn't say they were
25 allowed to look at loans ahead of time, take information

REGENCY REPORTING SERVICE, INC. (813)224-0224

93

1  while Mr. Hutto is still an employee.  So let's not act like
2  Waterstone here -- Bank of America, if they wanted to
3  recruit Dwayne Hutto, absolutely we should take that money
4  out, but that's not what happened.  What happened was
5  different than how you're painting the picture.
6       Q.  So is it -- I'm trying to understand here why you
7  are counting Mr. Hutto in the damages analysis.
8       A.  Right.
9       Q.  And is it -- and you're saying that Waterstone
10  could solicit him and could recruit him if it wanted to do
11  that?
12       A.  If they did it in an aboveboard way, but that's
13  not what happened.  So you can't have your cake and eat it
14  too.  You can't take the context of what really happened out
15  of the equation.  That doesn't work.
16       Q.  Are you aware that Mr. Hutto and Mr. Smith were
17  looking to leave Mutual and go somewhere else?  It just
18  happened to be Waterstone?
19       A.  I was not aware of that.  I mean, I think after
20  Dwayne left, we were aware that Chris was probably going to
21  depart.  I know that Brian brought up the fact that they
22  were always -- you know, they were pretty -- they talked a
23  lot to Brian, and there was a comment/conversation with them
24  that this place had this, but they didn't leave ever, so...
25       Q.  There were conversations between Mr. Hutto and

94

1  Mr. Wolf with Kiley King and Brian Tomalak about --
2       A.  I think.  I mean, they were always trying to
3  finagle for a little bit of a better deal here and there but
4  never -- they never left obviously until -- until this,
5  until Waterstone got involved.
6       Q.  Did Mutual ever have a discussion with Mr. Hutto
7  about why he resigned?
8       A.  Brian and Kiley did.
9       Q.  What was the reason?
10       A.  I think you better ask them because it was a
11  conversation, so third party.  I think a lot had to do with
12  a check being written, from my recollection.
13       Q.  Same question for Mr. Smith and Mr. Wolf.  Was
14  there ever a conversation between Mutual and those managers,
15  Mr. Smith and Mr. Wolf --
16       A.  Yes.
17       Q.  -- about why they were leaving?
18       A.  Yes.
19       Q.  Why were they leaving?
20       A.  Well, Chris told Brian it was because of the
21  check and it was too good of a check to pass up.
22       Q.  Which Chris?
23       A.  Smith.
24       Q.  Do you believe that the managers were genuinely
25  unhappy at Mutual of Omaha?

95

1       MS. WALTER:  Object to form.
2       A.  No, I don't believe that.
3       Q.  Did Mutual factor in the cause of the managers'
4  departure when it was considering the damages?
5       MS. WALTER:  Object to form.
6       A.  Yes, I believe so.  I mean, the cause that --
7  yeah, that they left because of -- yeah, were coerced to
8  leave and take their branches.  Yes, that's why we're here.
9  If there was no cause, we wouldn't be here; right?
10       Q.  Did you -- but in your mind, is it, look, we're
11  convinced these managers left because of the payday, or does
12  Mutual believe that there's other considerations?
13       MS. WALTER:  Object to form.
14       A.  Well, I think there's other considerations as
15  well.
16       Q.  If Mr. Hutto and Mr. Wolf had resigned but none
17  of the other branch employees resigned, who would Mutual
18  have put in place as the branch manager?
19       MS. WALTER:  Object to form.
20       A.  I think Kiley King.
21       Q.  Kiley King?
22       A.  Yeah.
23       Q.  Does Mutual have evidence that the employees
24  would've stayed and worked for Kiley King?
25       MS. WALTER:  Object to form.

96

1       A.  No, no evidence.
2       THE WITNESS:  I could use a bio break whenever is
3  convenient --
4       MS. KREITER:  It's a convenient time for me too.
5  Why don't we -- do we want to put a lunch order in now?
6  Take a short break.
7       MS. WALTER:  I'm fine with that.
8       MR. CARROLL:  Yeah.
9       MS. KREITER:  Okay.
10       (A recess was taken.)
11       Q.  (By Ms. Kreiter)  Mr. Gennarelli, are you aware
12  of any complaints or frustrations by the downstream
13  employees about Mutual's underwriting requirement's ability
14  to efficiently close loans, limited loan products, or
15  compensation?
16       A.  Not directly.  I did see an e-mail, I think, that
17  -- in this where they talked about an underwriting situation
18  and actually was -- he was confused.  It was actually
19  overturned by the chief operating officer.  Then he went
20  ahead and told the customer that we couldn't do it at Mutual
21  and should send it to Waterstone, but that is one that I did
22  see.
23       Q.  Did any of those issues come up in the exit
24  interviews that Mutual conducted when the downstream
25  employees left?

161

1    A.    Yes.

2    Q.    And then, similarly, with respect to Daytona, the

3    amount that Mutual is seeking with respect to the Bucket 2

4    damages is the 1,723,961.89; correct?

5    A.    That's right.

6    Q.    So a total of about 4.4, a little over 4.4?

7    A.    Yeah.

8    Q.    You have here a date range highlighted.

9    "Expected corporate profit for 18 months," it says "July of

10   '22 through December 31, 2022."  I'm assuming that should be

11   2023?

12   A.    Yes.

13   Q.    And is the starting date -- it just says July.

14   Is it July 1?

15   A.    Yes.

16   Q.    Okay.  With respect to the Corporate Profits

17   Earned BPS, the amounts for 2019, 2020, and 2021 are the

18   same for both Daytona and Tampa, but then you get to 2022,

19   and it's different.  Do you see that?

20   A.    Say -- walk me through that one more time.

21   Q.    Yeah.  So 2019 Tampa, the corporate BPS is .53.

22   And then for Daytona it's also .53?

23   A.    Yeah, because I think they left sooner.

24   Q.    So that's what I'm trying to understand.  It's

25   the same, and then --

162

1    A.    Yeah, because they were there a full year.

2    Q.    Got it.

3    A.    Yeah.  And they -- so we -- so the first quarter

4    of the year that they had left, we earned -- corporate

5    earned more money, and that was the amount that corporate

6    earned.  And then for the full year, the corporate profit

7    dropped to 43 basis points.  Does that make sense?

8    Q.    Okay.  I just wanted to understand --

9    A.    Through June 30th, that is.  The difference

10   between April 30th and June 30th.

11   Q.    With respect to the Daytona branch, you have

12   listed down in the -- let's take the bottom right-hand

13   corner.  You have profit for 42 months.  Do you see that?

14   A.    Yes.

15   Q.    Why is it not 40 months?  You've got three years.

16   That's 36.  And then you've got four months:  January,

17   February, March, April.

18   A.    I think -- I think he just wanted to compare

19   apples to apples, which is 42 months, even though there was,

20   I don't think, any profit there.

21   Q.    So it's not a mistake.  It's intentionally

22   42 months rather than 40?

23   A.    I can do the math.  I don't know if the math

24   works out.  Let me do the math real quick.

25   Q.    Sure.

163

1         MS. KREITER:  I'll just let the record reflect

2    the witness is using presumably a calculator on his

3    phone to check some of the math in Exhibit 7.

4    A.    That's right.  I think he just did it apples to

5    apples, so he used 42 months --

6    Q.    Mutual's position is it's not an error?

7    A.    Yeah.

8    Q.    It's done intentionally?

9    A.    Yeah.

10   Q.    For the -- in the fourth column there, Branch

11   Contributions to Corporate Profits, you can see for Tampa in

12   2019, it's 600,000.  Then it jumps 3,232,144 for 2020.  Do

13   you see that?

14   A.    Yes.

15   Q.    Is that a record high for the Tampa branch?

16   A.    I think so.

17   Q.    Similarly, for the Daytona branch, it jumps from

18   400,000 to 1.7 million --

19   A.    Yeah.

20   Q.    -- 53?

21        Is that a record high for the Daytona branch?

22   A.    I believe so.

23   Q.    You would agree that 2020 was a record year in

24   terms of volume for Mutual overall?

25   A.    Yeah, yes.  Absolutely.  And 2019 was also

164

1    artificially low because there was a switchover to

2    Bridgeview.  But yes, generally, you're still correct.

3    Q.    In 2020, the pandemic hit.  The housing market

4    went crazy?

5    A.    Right.

6    Q.    And then that anomaly continued into 2021;

7    correct?

8    A.    Yes.

9    Q.    In fact, the volume for Tampa in 2020 is more

10   than five times the prepandemic volume of 2019; correct?

11   A.    Not volume, no.

12   Q.    Sorry.  The -- I'm looking at the Branch

13   Contributions to Corporate Profits column.

14   A.    Yeah, what was your -- what was your question?

15   Q.    The volume for -- sorry.  I'm saying "volume"

16   again, but the amount for Tampa is five times the

17   prepandemic volume of 2019 if you're looking at 2020?

18   A.    Yes.  Correct.

19   Q.    The same for Tampa, not five times?

20   A.    But yes.

21   Q.    But it's multitudes higher in 2020.  You would

22   agree with me that 2020 was a historically anomalous year

23   for the industry?

24   A.    Yes.

25   Q.    Why did you use a date range to calculate damages

165

1  that included a historical anomaly in the market?

2      A.   Well, there was the data we had.  We have to use

3  all the data.  You don't know what the next year is going to

4  bring.  Next year could be a great year as well.  These are

5  purchase-driven folks too.  I mean, they do purchases, you

6  know, heavy refinances.

7          And the other thing is with the arrival of Keller

8  Williams, that relationship, they would've benefited

9  substantially.  I would venture to say if they were still

10  here with the Keller Williams acquisition, that their volume

11  would be near that level again.

12      Q.   The year to date for Tampa in that fourth column

13  of Branch Contributions to Profits is 406,810.  Do you see

14  that?

15      A.   Yes.

16      Q.   If you double that, that would give you a full

17  year because it --

18      A.   Right.

19      Q.   -- so happens that the departure was --

20      A.   That's right.

21      Q.   -- six months into the year?

22      A.   Yeah.

23      Q.   Did you or Mr. Mayle or anyone else at Mutual

24  consider using that most recent time frame as your baseline

25  for estimating the damages?

REGENCY REPORTING SERVICE, INC. (813)224-0224

166

1      A.   I don't know that we considered that.  The one

2  thing we did consider, like I said before, was using the

3  cost of goods sold method.  And I thought that if we

4  would've used the cost of goods sold method, these numbers

5  would've been through the roof, so we chose just an average.

6          And you're not going to -- when you're doing an

7  average, it's going to be an average.  You have to use all

8  the data in front of you.  We don't know what tomorrow

9  brings; right?  Keller Williams arrived this year.  That

10  would've been exponentially valuable having them there.

11      Q.   But somebody had to make a choice as to how far

12  back you were going to go with respect to the data.  And

13  either you --

14      A.   We went back the whole way, the whole time -- we

15  just went back to the history here at Mutual Mortgage.

16      Q.   Do you believe that it's more reliable to use

17  data that includes a historical anomaly than it is to use

18  the most recent data available?

19          MS. WALTER:  Object to the form.

20      A.   Yeah, I think that what you're calling historic

21  anomaly is one person's perception.  We don't know what next

22  year brings or the year after or the year after.

23      Q.   So let me ask you this question.  I want to make

24  sure I'm understanding this.  You looked at historical data

25  going back to 2019 --

REGENCY REPORTING SERVICE, INC. (813)224-0224

167

1      A.   That's right.

2      Q.   -- including the pandemic, which was a high for

3  both of the branches, and then you used that data to project

4  losses associated with the branches if they had stayed open

5  going into the future; correct?

6          MS. WALTER:  Object to the form.

7      A.   I think that's what we -- we average the volume

8  the times that they were here.  That's why if you noticed

9  the lowest -- the lowest really year volume is 2019.  We

10  used that.  We didn't just use 2020.  We didn't just use

11  2021.  We averaged the volume for the time they were here.

12  I can't tell you what the future will bring; right?  I would

13  say if they knew that Keller Williams was coming on, they

14  probably wouldn't have left and they would benefit.  Their

15  volume would be more than this.

16      Q.   So my question is more just to make sure we're

17  aligned on what Bucket 2 represented.  My understanding --

18  but I don't want to assume.  I want to check with you -- is

19  it represents the profits as if the branches would've stayed

20  open for 18 months into the future?

21      A.   That's right.

22      Q.   And to estimate those damages of profits into the

23  future, you looked at retrospective data; correct?

24      A.   Yeah, that's the only data we have.

25      Q.   So it's May 25th of 2023, which includes the date

REGENCY REPORTING SERVICE, INC. (813)224-0224

168

1  range that you're estimating damages.  And I'll go back to

2  Exhibit 7 here.  So the damage range that you're using is

3  July 1, 2022, to December 31, 2023; correct?

4      A.   That's correct.

5      Q.   We're a number of months into that damage period

6  now; correct?

7      A.   Yes.

8      Q.   Is the market now and since July 1, 2022, better

9  or worse than it was in the pandemic?

10          MS. WALTER:  Object to the form.

11      A.   Our -- our -- our volume today is better than it

12  was last year.  Now, is it better than the pandemic?  No.

13  But it's better than it was last year.

14      Q.   Okay.  Has Mutual -- in July of 2022, was Mutual

15  laying off employees?

16      A.   We laid off nonperformers, yes.  I don't know if

17  that was the exact time, but sure.

18      Q.   In July of 2022, was Mutual's profitability

19  consistent with its budgeting and estimates?

20      A.   Well, I think that, you know, we were very

21  negatively impacted by these groups leaving at that time

22  because when you -- each loan that you do is exponentially

23  more valuable, especially when you are dealing with purchase

24  teams.  So we still have all these fixed costs at the

25  corporate level that we have to -- that we have to assume.

REGENCY REPORTING SERVICE, INC. (813)224-0224

169

1 And when this volume leaves, those costs become a much
2 larger percent of the expense.
3          So that's why I keep going back to this -- maybe
4 that's the route we should take, is using the cost of goods
5 sold approach because you take those variables out of it.
6 Each loan -- each additional loan is exponentially more
7 profitable than the last -- right? -- because the first loan
8 pays for all -- you don't make any money; right?  It pays
9 for the expense.  The second one you make a little bit.  The
10 third loan, you make more money, et cetera, et cetera.
11      Q.   Does Mutual look at the profitability at the
12 branch level?
13      A.   Yes.
14      Q.   Were there any profitable Mutual branches in July
15 of 2022?
16      A.   Yes.
17      Q.   How many?
18      A.   I don't know.
19      Q.   Were there a number of Mutual branches that were
20 not profitable in July of 2022?
21      A.   In July of 2022?
22      Q.   Correct.
23      A.   I don't know if there were a number that weren't
24 profitable.  When you -- when you say "branch
25 profitability," how we look at it is just exactly how I

170

1 walked through this; right?  It's taken into account those
2 expenses and revenue occurred at the -- at the corporate
3 level.  So a branch P&L may be negative, but we're still
4 making -- corporate may still be making money from that
5 branch.  Does that make sense?
6      Q.   How about looking at the forward division?
7      A.   Yeah.
8      Q.   I mean, if you just look at the forward division
9 in July of 2022, was the forward division profitable at that
10 time?
11      A.   Well, I know through June we were very
12 profitable.  Through June we were profitable.
13      Q.   What about after June?  July of 2022?  And I ask
14 that because that's when your damage period starts.  So in
15 July of 2022, was forward profitable?
16      A.   I don't know.  I'd have to go back and look.  We
17 -- we ended the year being profitable but not by much, but I
18 know for the first half of the year we were, I believe,
19 20-some million in profit.  And again, I think that shows
20 the damage caused when groups like this leave, purchase
21 groups.  It becomes exponentially more damaged.
22      Q.   What was the rationale for using an 18-month
23 period to calculate the lost profit damages associated with
24 the branches closing?
25      A.   Yeah, I mean, we didn't want to use any -- again,

171

1 we were trying to be reasonable.  You know, I think you can
2 make a case for using longer.  Most of our branches have
3 been here 10, 15 years, so -- at least the core group.  So
4 we could've used longer, but we thought 18 months was a
5 reasonable amount of time.
6      Q.   We talked earlier in the context of the
7 discussion about natural attrition and if the branch
8 managers had simply, you know, said nothing but then the
9 employees obviously learn after the fact the branch manager
10 left, that there may be some employees that go and follow
11 that branch manager due to natural attrition.  And I think
12 your testimony was, yeah, eventually that could happen.  Do
13 you recall that testimony?
14      A.   I do.
15      Q.   Okay.  Do you have any data within Mutual or
16 otherwise that you relied on for purposes of this analysis
17 that says it will take about 18 months for employees to
18 follow a branch manager in the context of natural attrition?
19          MS. WALTER:  I'll object to the form.
20      A.   No, I did not do that.  But what we did do is,
21 you know, we looked at how long branches stay.  And, you
22 know, we talked a little bit about what a branch is, and a
23 branch is -- you know, individuals come and go, but that
24 branch continues to grow.  And I think that that's
25 important.  Even today some of our branches are growing and

172

1 doing well.
2      Q.   Did Mutual have employment contracts with any of
3 the downstream employees that required them to stay on for
4 18 months?
5      A.   No.
6      Q.   Did Mutual have employment contracts with any of
7 the managers that required them to stay for 18 months?
8      A.   No.
9      Q.   What was the rationale for choosing 18 months as
10 opposed to 12 months or 24?
11          MS. WALTER:  Object to the form.
12      A.   You asked me that.  You know, again, it was -- we
13 were trying to be reasonable.
14      Q.   Did you consider other periods of time?
15          MS. WALTER:  Object to the form.
16      A.   We did.
17      Q.   What other periods did you consider?
18      A.   Well, we considered looking at our large
19 branches, so that would be, you know, branches that were
20 similar to these branches.  So you would have a St. Louis,
21 Seven Hills, Columbia, and they stay for, you know,
22 eight years, ten years.  But we didn't think that was
23 necessarily reasonable, so we came up with 18 months.
24      Q.   You understand that the employment contracts in
25 place with the managers, to the extent that there are such

173

1  contracts that have an employee nonsolicit, do you know how
2  long the duration of the nonsolicit is?
3      MS. WALTER:  Object to the form.
4      A.  I believe it's a year generally.
5      Q.  Okay.  Did you consider using a year?
6      A.  No.  We did consider it, but, I mean, that's what
7  we wound up at, no.
8      Q.  So if your testimony is these branch managers
9  solicited the employees and then came and that shouldn't
10 have happened, what's to stop the branch managers from
11 waiting a year and then soliciting the employees and then
12 the employees leaving at that point in time?
13     MS. WALTER:  Object to the form.
14     A.  Repeat the question.
15     Q.  Sure.  I mean, the managers only have a
16 contractual prohibition, to the extent that it's enforceable
17 or even exists.  The ones I've seen are for 12 months.
18     A.  Yes.
19     Q.  So after that 12-month period, Mr. Hutto or
20 Mr. Wolf or Mr. Smith could go to the branch employees and
21 solicit them to leave the branch?
22     A.  Yes.
23     Q.  And that could've happened at the one-year mark.
24 So I'm trying to understand was that -- you know, that
25 situation factored in at all for purposes of your damages

174

1  analysis?
2      A.  Not really.  They also could've still been here.
3  Keller Williams comes into play, and they stay for six or
4  seven years, so we didn't use six or seven years.  We didn't
5  use ten years.  We used 18 months.  I mean, I don't know how
6  much we can, you know --
7      Q.  Do you have any evidence if the downstream
8  employees would have stayed because Keller Williams came in?
9      MS. WALTER:  Object to the form.
10     A.  Well, you're the one who made a statement that
11 said they went with Dwayne because he provided loans.  Where
12 do you think Keller Williams -- one out of every five real
13 estate transactions is Keller Williams signed.  We now are
14 the lender for Keller Williams.  I would imagine that that
15 may be more attractive than the one-offs that Dwayne was
16 handing them.
17     Q.  So again, I want to talk about evidence that
18 Mutual has versus just speculation about what the employees
19 might have thought.  Has Mutual asked any of the employees
20 would they have been motivated to stay knowing that Keller
21 Williams was joining?
22     MS. WALTER:  Object to the form.
23     A.  Not that I'm aware of, no.
24     Q.  Does Mutual have reports that show the monthly
25 volume for all branches?

175

1      A.  Yes.
2      Q.  What are those reports called?
3      A.  Well, I think they come in different formats, so
4  there's P&Ls.  There's also, you know, a business
5  intelligence system that you can see the volume by branch,
6  so it's called BI, clever name.
7      Q.  The P&Ls, are those the corporate P&Ls that we've
8  been referencing?
9      A.  Branch-level P&Ls and corporate P&Ls.
10     Q.  Okay.  Do the corporate P&Ls pull together --
11     A.  Yes.
12     Q.  -- the monthly volume for the branches?
13     A.  Yes.
14     Q.  Does it itemize which branch contributes to the
15 total?
16     A.  Yes.
17     Q.  Is there a particular branch that had volume
18 closest to the volume of the Tampa branch?
19     A.  In what year?
20     Q.  Let's just say in 2021.
21     A.  I think you would probably have maybe Columbia;
22 Maryland would be very close, I think.
23     Q.  What about Daytona?  Is there a branch that you
24 would say is comparable to Daytona in terms of revenue, I
25 guess?

176

1      A.  I would say that would be more like a -- more
2  volume than that.  That northwest branch I referenced
3  earlier, very similar.
4      Q.  Okay.  Does Mutual make efforts to assess its
5  performance relative to the industry overall?
6      A.  Yes.
7      Q.  How does it do that?
8      A.  You know, it's done -- that's how they kind of
9  manage me, so I'm not sure exactly how they do it, but I
10 know that they do it.  They can -- I think Richey May has
11 reports that they use.  They also use the MBA reports, but
12 that's how they kind of measure, I think, my performance is
13 how we relate to the industry.
14     Q.  Does Mutual track market trends for loan
15 originations?
16     A.  When you say "track," I don't know if we track
17 it.  We're aware of it.
18     Q.  Okay.  Do you know how Mutual performs in terms
19 of loan originations relative to the market?  I mean, if
20 there's a peak in the market, is there generally a peak for
21 Mutual or is it that there's something different about the
22 business model?
23     A.  There is something relatively unique about the
24 business model, that we have a large amount of consumer
25 direct folks.  So they're not only purchase driven.  So if

181

1    Q.  I'll ask or request that those be produced.

2        This e-mail is designated "Importance:  High."

3    And the Subject line is "MOOM Financial Performance for June

4    of 2022."  Do you see that?

5    A.  Yes.

6    Q.  So Mutual's CFO writes "Good afternoon.  Attached

7    please find June '22 financial results.  See below comments

8    for detail on each division.  Overall there continues to be

9    heavy downward pressure on margins on both sides of the

10   business for slightly different reasons."  I'm going to

11   pause there.  "Heavy downward pressure on margins," does

12   that mean pressure to lower the BPS profitability margin?

13       MS. WALTER:  Object to the form, and

14   Mr. Gennarelli did not send this e-mail.

15   A.  Yeah, I'm -- I'm not sure at what margins he's

16   talking about.  I would imagine he's just talking about the

17   gain on sale margins.  I could be wrong.

18   Q.  The gain on sale margins, what is that?

19   A.  Like, that's what we sell a loan for.

20   Q.  Okay.  Is that different than the BPS in

21   Exhibit 7?

22   A.  It would be different.

23   Q.  Okay.  Maybe just explain to me the margins that

24   you sell a loan for --

25   A.  Yeah.

182

1    Q.  -- as opposed to the BPS in Exhibit 7.  What is

2    the difference between those two margins?  Does Exhibit 7

3    assume you hold the loan?

4    A.  No.  No, it has nothing to do with that.  This

5    margin in Exhibit 7, that's the profit margin.  What I think

6    he's referring to is the margin at time of sale that

7    investors are willing to pay for the loan.

8    Q.  Okay.

9    A.  Two different things.

10   Q.  And then it says "on both sides of the business,"

11   meaning the forward side and the reverse side --

12   A.  Correct.

13   Q.  -- correct?

14   A.  Yeah.

15   Q.  The next sentence talks about forward.  And just

16   to be clear, forward is the division for which you're

17   president, and it's the division in which the Tampa and

18   Daytona branches were part of?

19   A.  Yes.

20   Q.  "Forward margins are being compressed due to the

21   recent increase in interest rates, which pushes competitors

22   to lower margins in an effort to capture volume to support

23   their expense structure that has scaled over the past two

24   years."  Does that in general mean competitors are lowering

25   their profit margins?  They need to increase volume in order

183

1    to support the staff that they've hired on during the

2    pandemic?

3    A.  Yeah.

4        MS. WALTER:  Object to the form.

5    A.  I think it -- yes.  And it also points to the --

6    kind of like the theme is the extreme value it is when you

7    lose purchase business like this because then we have fixed

8    costs that are -- interest rates are less likely to affect

9    purchases than they are refinances.

10   Q.  In the 2020 period and 2021 period, I mean, it

11   talks about scaling structures over the past two years.  In

12   general in the industry, were mortgage companies hiring

13   more, more employees, more loans to process, the volumes

14   were high?

15   A.  Yeah.

16   Q.  So there's -- and now we have less volume, and so

17   there's a need to cut some of the employees; correct?

18       MS. WALTER:  Object to the form.

19   A.  Generally, I think that's correct, yeah.

20   Nonproducing, nonproductive employees needed to --

21   Q.  And then it says "On the reverse side of the

22   house" -- let me just stop there.  Is there any connection

23   between the profitability of the reverse side of the house

24   and the forward side of the house?

25   A.  No.  I mean, I don't know what you mean by

184

1    "connection."

2    Q.  Well --

3    A.  It doesn't relate to -- it doesn't relate to our

4    P&L.

5    Q.  That's what I'm looking for.

6    A.  Yeah.

7    Q.  And for example, changes at the reverse side of

8    the house, would that have an impact on Exhibit 7?

9    A.  Correct, it would not.

10   Q.  Okay.  Then there's some text that's in all caps

11   and bold.  It says "Consolidated June pretax earnings were

12   negative 3.2k," presumably 3.2 thousand?

13       MS. WALTER:  Object to the form.

14   A.  Where are you looking at this?  I'm sorry.

15   Q.  Sure.  The paragraph that we just went through,

16   I'm now moving down from that.

17   A.  Yes.

18   Q.  There's an all caps, bold statement still on that

19   page 14667, that first page.

20   A.  Yes.

21   Q.  It says "Consolidated June pretax earnings were

22   negative 3.2k."  Is that -- I guess what is that?  A

23   thousand?  A hundred thousand?

24   A.  Yeah, K is thousands, so...

25   Q.  Okay.  So there's a loss in terms of June pretax

185

1  earnings?
2      A.  Yes.
3      Q.  And then it says "versus plan of 3.2 million."
4  Do you see that?
5      A.  I do.
6      Q.  What is the plan?
7      A.  The plan is the budget.
8      Q.  Okay.  So the budget was 3.2 million.  Suffice to
9  say the budget has not been met.  And in fact, there's a
10  loss as to pretax earnings?
11      A.  That's correct.
12      Q.  And then it says "on total volume of 353 million
13  versus the plan was 705 million"?
14      A.  Correct.
15      Q.  So volume is not exactly half but close to half
16  of what the plan --
17      A.  Sure.
18      Q.  -- had contemplated?
19      A.  Yes.
20      Q.  It goes on to talk about "Consolidated
21  year-to-date 2022 results."  And again, there it looks at
22  pretax earnings versus the plan down 76 percent.  And then
23  PY is down 89 percent.  What is PY?
24      MS. WALTER:  I'm going to object to this line of
25      questioning to the extent you're asking him to read

186

1  what is included on this e-mail --
2      MS. KREITER:  I'm asking him what PY stands for.
3      MS. WALTER:  -- that he didn't send, mind you --
4  if I can finish.
5      MS. KREITER:  It doesn't mater if he sent it.
6      Q.  Do you know what PY stands for?
7      A.  I -- prior year, I would imagine.
8      Q.  Thank you.  Okay.  Then if you would turn to the
9  next page in the exhibit, Bates No. 14668, it starts with
10  "Forward," the entity of which you're president, and it has
11  your name in parentheticals there, Jeff Gennarelli?
12      A.  Yeah.
13      Q.  This appears to be a statement that you wrote,
14  and the CFO is including it in his report; is that correct?
15      A.  Yeah.
16      Q.  Okay.  So let's walk through what you wrote here
17  in July of 2022 when we're looking at damages from
18  Waterstone.  You say "Progress, although slower than we had
19  hoped, the key to profit is rightsizing the staff" -- does
20  that mean firing staff?
21      A.  It means rightsizing as getting rid of people
22  that are not productive, not performing.
23      Q.  Then you say "as they relate to lead spend and
24  lead conversion."  What is lead spend?
25      A.  That's advertising.

187

1      Q.  Recruiting --
2      A.  No.
3      Q.  -- sales efforts -- sorry.  Not recruiting
4  employees, trying to recruit business development efforts to
5  bring in loans?
6      A.  You want to think about it as advertising.
7      Q.  Okay.  Then you say "lead spend and conversion of
8  leads did not move.  This will be reduced significantly in
9  July with a path toward profit."  Do you see that?
10      A.  Yes.
11      Q.  Was June '22 not profitable?
12      A.  We -- we covered it.  You already said it wasn't
13  profitable.  We read that.
14      Q.  I just want to make sure.  My understanding is it
15  wasn't profitable from this document.  Was July of 2022
16  profitable?
17      MS. WALTER:  Object to the form.
18      A.  I don't remember.  I'd have to look at this.
19      Q.  You say "The continued reduction in nonperformers
20  on the sales side is critical."  So again, reduction in
21  nonperformers, firing employees; correct?
22      MS. WALTER:  Object to the form.
23      A.  I would say, you know, I think it's important to
24  segregate this conversation.  What I'm talking about is
25  folks that worked consumer direct leads.  That's not the

188

1  groups that were Tampa and Daytona, which is really
2  important to the conversation.
3      Tampa and Daytona were self-sourced purchase
4  folks.  They don't have these huge marketing expenses that
5  go along with consumer direct efforts.  So it makes them
6  increasingly more valuable and more profitable in downturns
7  because you don't have to support them with lead purchases,
8  advertising, things like that.  So it's important that we --
9  that we understand that and understand what we're talking
10  about.
11      Q.  "We termed 55 MLOs" -- is that -- I get loan
12  officers.  What's the M, Mutual?
13      A.  Mortgage loan officers.
14      Q.  Mortgage loan officers.  -- "in June with another
15  30 on final write-ups."  What's a final write-up?
16      A.  Warning, written warning.
17      Q.  "The next largest is the junior MLO and MLO
18  assistant area.  We feel this is an area we can pick up
19  savings with very little disruption to sales."  Do you see
20  that?
21      A.  Yes.
22      Q.  And then it talks about terminating 18 who were
23  in this role in June.
24      I'm going to skip down to the next paragraph
25  there.  The second sentence says "As the market stabilizes"

189

1  -- what about the market was not stable at this time?
2      A.   Well, you had the second -- the capital markets
3  was very unstable, volatile.  It means that the market was
4  up and down dramatically on a daily basis.  There was not
5  stability.  When I say "market," I mean the capital markets.
6      Q.   And then you go on to say "and we do not see wide
7  swings in the servicing value," et cetera, et cetera.  Then
8  in that last line, you have a phrase that I want to focus
9  on.  "...to be in terms of margin to successfully manage in
10  this downturn."  You agree the market was in a downturn at
11  this period?
12         MS. WALTER:  Object to the form.
13     A.   Yes.
14     Q.   Going down to the next paragraph, the fourth line
15  that starts with "The departing thoughts," do you see that?
16     A.   Yeah.
17     Q.   So third paragraph, fourth sentence, "The
18  departing thoughts" --
19     A.   Yeah.
20     Q.   -- "from the manager of Daytona."
21     A.   Yeah.
22     Q.   Are you referring to Mr. Hutto or Mr. Smith?
23         MS. WALTER:  Object to the form.
24     A.   I don't recall.  I believe it was Mr. Smith, and
25  I was told Brian Tomalak.

REGENCY REPORTING SERVICE, INC. (813)224-0224

190

1      Q.   Or sorry.  So it says "the manager of Daytona,"
2  so that's Mr. Wolf or Mr. Hutto?
3      A.   Maybe that was -- maybe it was Mr. Hutto.
4      Q.   Okay.  "The departing thoughts from the manager
5  of Daytona were directed at the surprisingly little
6  cooperation we had with the insurance company in terms of
7  cross-marketing, et cetera."  Was there, in your mind,
8  little cooperation with the insurance company in terms of
9  cross-marketing?
10     A.   At that time, I would say there was little
11  cooperation, yeah.
12     Q.   Do you believe that that was a genuine concern of
13  the managers?
14         MS. WALTER:  Object to the form.
15     A.   I believe that that's what Dwayne said to Brian
16  Tomalak at the time that he left.
17     Q.   Had you personally heard that from the managers
18  here or other managers?
19     A.   No.
20     Q.   What is the insurance company?
21     A.   I'm sorry?
22     Q.   So sorry.  Let me back up here.  I'll read a
23  little bit more and maybe that gives context.  "We all need
24  to understand this was a big reason our staff stuck with us
25  through the licensing process, the belief we would have some

REGENCY REPORTING SERVICE, INC. (813)224-0224

191

1  benefit to sales of being part of such a great company."
2  Does this refer to the acquisition --
3         MS. WALTER:  Object.
4      Q.   -- and BBMC joining Mutual?
5         MS. WALTER:  Object to the form.
6      A.   I believe it does theoretically, but there was a
7  -- yes, I think that that's what it would be.
8      Q.   "There is progress being made now, but it is
9  slow."  So what does that mean?  I mean, was there an issue
10  in your mind in terms of the insurance company's
11  cross-marketing efforts?
12     A.   Well, here we didn't have any cross-marketing at
13  BBMC.  So now you go to a large company.  I think people
14  assume there would be more opportunity to cross-market with
15  a large company that has, you know, a $25 million -- a 25
16  million-person database.  It's a slow grind because you have
17  to get compliance to write off on it, et cetera.
18         So I'm sure people's perceptions was that they
19  were going to have a great opportunity to do that, and that
20  didn't come through.  We didn't really push that because we
21  didn't know how -- how effective it would be to cross- --
22  it's going better today than it was back then, but
23  nevertheless --
24     Q.   And back then, this is closer to the time of the
25  departures?

REGENCY REPORTING SERVICE, INC. (813)224-0224

192

1      A.   It is, yes.
2      Q.   You then say "To give some context, we went
3  through the greatest mortgage market in decades" -- meaning
4  the 2020 pandemic?
5      A.   Yeah.
6      Q.   -- "and received less than a hundred referrals in
7  those two years."  So which two years are the greatest
8  mortgage market in decades, '21 and -- sorry -- '20 and '21?
9      A.   Correct.
10     Q.   Okay.  And then I'm going to direct you down to
11  the all caps, bold language following that paragraph again.
12  Now, this is reflective of earnings specific to the forward
13  business unit in the relevant time period; correct?
14     A.   Yes.
15     Q.   "Forward June pretax earnings were negative
16  439,000 versus the plan for that year was to be positive
17  3.2 million"; correct?
18     A.   Correct.
19     Q.   And then on total volume, it's 246 million versus
20  the plan of 619 million.  Would you agree that these are
21  material and adverse deviations from the budget?
22         MS. WALTER:  Object to the form.
23     A.   Yeah.
24     Q.   And then it continues below that with
25  year-to-date 2022 results.  Do you see that?

REGENCY REPORTING SERVICE, INC. (813)224-0224

| From: | Lucas Curtolo |
|---|---|
| Sent: | Tuesday, July 12, 2022 4:04 PM EDT |
| To: | Tyler Larsen |
| Subject: | RE: MOOM Financial Performance for June 2022 |

Far from good. 90% of my focus has been on cost cutting to get to profitability. I feel we are in a good spot operationally. A little fat on there still but difficult loans requires us to be a little heavier than normal. Also, once we get through summer vacations I think we can look at some additional cuts.

90% of my focus last 45 days has been cutting all non-profitable sales. Have made significant progress and will make more by end of July.

I am back (bittersweet). Haven't swung a club in 7 months but would love to get out if you have an opening any time.

**From:** Tyler Larsen <tyler@mutualmortgage.com>
**Sent:** Tuesday, July 12, 2022 12:25 PM
**To:** MoOM Executives <exec@mutualmortgage.com>
**Cc:** Eric.Kuncl@mutualofomaha.com; Andrew Clements <andrew.clements@mutualofomaha.com>; Charlie Melton <Charlie.Melton@mutualofomaha.com>; Matthew Nyman <mnyman@mutualmortgage.com>
**Subject:** MOOM Financial Performance for June 2022
**Importance:** High

Good afternoon,

Attached please find June 2022 financial results. See below comments for detail on each Division. Overall, there continues to be heavy downward pressure on margins on both sides of the business for slightly different reasons. Forward margins are being compressed due to the recent increase in interest rates, which pushes competitors to lower margins in an effort to capture volume to support their expense structure that has scaled over the past 2 years. This will normally continue until there is consolidation (or exits altogether) in the space. On the Reverse side of the house, margins are at the lowest levels in decades due to the Refinance activity that was brought on due to the historic home price appreciation we have seen since the Pandemic and lower interest rates. Investor pricing (margins) should come back as HPA flattens and rates have moved north, but will probably take a little time (looking toward end of 2022).

**CONSOLIDATED JUNE PRETAX EARNINGS were -$3.2k (vs PLAN of +$3.2M) on Total Volume of $353M (vs PLAN of $705M).**

**CONSOLIDATED YTD 2022** results are as follows:
**Pretax Earnings of $4.5M vs PLAN of $19.2M (-76%) and PY of $42.2M (-89%)**
**Volumes of $2.7B vs PLAN of $4.0B (-33%) and PY of $5.0B (-46%)**



--------------------------------------------------------------------------------

**FORWARD** *(Jeff Gennarelli)*

*Progress...although slower than we hoped. The key to profit is right sizing the staff as they relate to lead spend and lead conversion. June moved in the right direction in terms of Payrolls down significantly. However, lead spend and conversion of leads did not move. This WILL be reduced significantly in July with a path toward profit. The continued reduction in non-performers on the sales side is critical. We termed 55 MLOs in June with another 30 on final right ups. The next target is the Junior MLO and MLO assistant area. We feel this is an area we can pick up savings with very little disruption to sales. We termed a total of 18 in this role during June.  We are being very cautious with how we term, to avoid any potential legal liability. This is a very prudent path but it does cause a delay in reductions.*

*June is a good snapshot of core earnings and break even.  As the market stabilizes, and we do not see wide swings in Servicing Values, the Locked Portfolio and other related market driven earnings components, we should have a very good understanding of where we need to be in terms of Margin to successfully manage this downturn. We have increased margin over the past couple of weeks.*

*We have seen 2 good groups leave over the past 45 days, Tampa and Daytona. The managers were paid very large bonuses to leave and join Waterstone.  We DO NOT pay these huge bonuses, but that is why it is critical to retain and recruit with other value. The departing thoughts from the manager of Daytona, were directed at the surprisingly little cooperation we had with the Insurance Company in terms of Cross Marketing etc...We all need to understand this was a big reason our staff stuck with us through the licensing process, the belief we would have some benefit to sales of being part of such a great company.  There is progress being made now, but it is slow. To give some context, we went through the greatest Mortgage Market in decades and received less than 100 referrals in those 2 years!*
*To finish on a couple high notes. For the first time we had more purchases close than refinances, our MORE benefit is taking off!!! And the wholesale pipeline continues to grow and should close 10M in July and 20M in August.*

**FORWARD JUNE PRETAX EARNINGS were -$439K (vs PLAN of $3.2M) on Total Volume of $246M (vs PLAN of $619M)**

-
**YTD 2022** results are as follows:
**Pretax Earnings of $11.7M vs PLAN of $18.3M (-36%) and PY of $43.0M (-73%)**
**Volumes of $2.0B vs PLAN of $3.5B (-43%) and PY of $4.6B (-57%)**

--------------------------------------------------------------------------------

**REVERSE** *(Alex Pistone)*
*We missed our fund goal for June, which resulted in volume that was $23M behind May, and our lowest of the year.  Our pipeline remains strong, however there were distractions and inefficiencies in June that contributed to the miss, which we are working to quickly clean up. The reduced volume was compounded by further deterioration in our margins, which also negatively affected the fair value of our portfolio.*

CONFIDENTIAL

*That being said, I am thankful that we started our HMBS securitization program when we did. Over the last 30 days, we have picked up an additional 154 bps in value, which added $1.08M to our bottom line. The plan was for our issuance program to be additive to our profitability, but for the month of June it has limited our downside.*

*As I have mentioned in previous narratives, the investment to grow our Consumer Direct division is and has been a short term drag on profitability. We are investing about $1M per month to hire, train, and supply leads to new teams that are currently unproductive. This investment is not producing any loans today, but we will see the fruits of our investment in Q4 as these teams season and start to produce.*

*We continue to be optimistic that our margins will improve as the industry H2H volume subsides. Our H2H volume has gone down from 25% of our production in January to just 8% in June. That being said, we are not waiting around for that to happen. We are working through a number of initiatives to increase revenues through rate sheets changes and compensation cuts. We are also looking to more aggressively move out lower performers in Operations and Sales in order to stay lean and top grade in some areas. The current challenges are not easy, but we have the right team to manage through it.*

**REVERSE JUNE PRETAX EARNINGS were -$1.7M (vs PLAN of $2.2M) on Total Volume of $107M (vs PLAN of $86M)**

**YTD 2022** results are as follows:
**Pretax Earnings of $3.7M vs PLAN of $12.0M (-69%) and PY of $13.6M (-73%)**
**Volumes of $738M vs PLAN of $486M (+52%) and PY of $361M (+104%)**

-----------------------------------------------------------------------------------

**CORPORATE EXPENSES were $1.1M for JUNE (vs PLAN of $2.2M)**

As always, please feel free to reach out with any questions.

Tyler

**Tyler Larsen**
Chief Financial Officer

**Cell:** (619) 454-1653
**Email:** tyler@mutualmortgage.com

**CONFIDENTIAL**

3131 Camino Del Rio North Suite 1100

San Diego, CA, 92108

Corporate NMLS #1025894

**MutualMortgage.com**

**MUTUAL of OMAHA**
MORTGAGE

Confidentiality Notice. The information contained in and transmitted with this communication is strictly confidential, is intended only for the use of the intended recipient, and is the property of Mutual of Omaha Mortgage. If you are not the intended recipient, you are hereby notified that any use of the information contained in or transmitted with the communication or dissemination, distribution, or copying of this communication is strictly prohibited by law. If you have received this communication in error, please immediately return this communication to the sender and delete the original message and any copy of it in your possession.