```
 1           IN THE UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
 2                    TAMPA DIVISION
 3
    MUTUAL OF OMAHA MORTGAGE, INC.)
 4                                )
          Plaintiff;              )
 5                                )
                                  )
 6      -vs-                      ) 8:22-cv-01660-TPB-JSS
                                  )
 7                                )
    WATERSTONE MORTGAGE           )
 8  CORPORATION,                  )
                                  )
 9        Defendant.              )
                                  )
10  ------------------------------)
11
12            REPORT OF PROCEEDINGS from the
13  deposition of CANDICE ROSEVEAR, taken by Paul W.
14  O'Connor, a CSR within and for the State of Illinois,
15  pursuant to the provisions of the Federal Code of
16  Civil Procedure and Rules of the Supreme Court thereof
17  pertaining to the taking of depositions, at 111 East
18  Wacker Drive, Suite 2600, Chicago, Illinois, 60601,
19  commencing at 9:00 a.m. on July 20, 2023.
20
21
22
23
24
```

EXHIBIT 5

Page 2

1  APPEARANCES:
2
3     MITCHELL SANDLER, by
       MS. COURTNEY WALTER
4      1120 20th Street, NW, Suite 725
       Washington, DC, 20036
5      Cwalter@mitchellsandler.com.com
          Appearing on behalf of the Plaintiff;
6
7     GODFREY KAHN, SC, by
       MS. MARIA KREITER
8      833 East Michigan Street, Suite 1800
       Milwaukee, Wisconsin, 53202
9      Mkreiter@gklaw.com
          Appeared on behalf of the Defendant.
10
11
12  ALSO PRESENT: (Via Videoconference)
13     EMMA JEWEL
14     CARRIE MACSUJA
15     MARK McCARROLL

Page 3

1       I N D E X
2
3  WITNESS                    PAGE
4  CANDICE ROSEVEAR
5  Exam by Ms. Kreiter         4
6
7
8
9
   EXHIBITS:
10
   Gennarelli Exhibit 7        23
11 Deposition Exhibit 30       37 (Rosevear report)
   Tomalak Exhibit 24          59
12 Tomalak Exhibit 22          65
   Deposition Exhibit 31       79 (Oscher report)
13 Gennarelli Exhibit 14       115
   Gennarelli Exhibit 12       121

Page 4

1        (Witness sworn)
2     MS. KREITER: Miss Rosevear, state your full name,
3  spell your last name for the record.
4     THE WITNESS: Candice Leann Rosevear,
5  R-O-S-E-V-E-A-R.
6            CANICE ROSEVEAR,
7  called as a witness herein, having been first duly
8  sworn, was examined upon oral interrogatories and
9  testified as follows:
10             EXAMINATION
11      By Ms. Kreiter:
12   Q.  I want to start by just getting a baseline for
13 the opinions that you rendered.  You understand that
14 Mutual of Omaha, the plaintiff in this case, identified
15 three categories of damages, correct?
16   A.  According to the Oscher Report, that is my
17 understanding, yes.
18   Q.  I want to get an understanding what did you
19 opine on, what did you not opine on.  So Category 1
20 damages, is what we've been referring to as diverted loan
21 damages.  Previously Mutual had not calculated a damages
22 demand associated with the diverted loans Category 1
23 damages.
24        My understanding is that was not part of

Page 5

1  your analysis, is that correct?
2    A.  That is correct.
3    Q.  Then Category 3 damages are the ill-gotten
4  gains damages of 750,000.  Is that your understanding?
5    A.  I recall that number, yes.
6    Q.  Did you opine at all on the ill-gotten gains
7  damages asserted by Mutual?
8    A.  No.
9    Q.  Which leaves Category 2 damages.  Damages
10 associated with the branches closing rather than staying
11 open into some point in the future.
12        Your opinion is exclusively related to the
13 Category 2 damages, correct?
14   A.  That's correct.
15   Q.  You didn't do any analysis and you're not going
16 to express any opinions with respect to Mutual's trade
17 secret misappropriations claims, correct?
18   A.  Correct.
19   Q.  Did you review or opine on the expert witness
20 report prepared by Brett Creasy?
21   A.  I believe I reviewed that.  It was part of the
22 packet with the Oscher Report, so.
23   Q.  Are you again, I just want to understand are we
24 talking about something or not talking about something.

Page 42

1  A.  These I believe are the loan data that
2  defendant's expert relied on.
3  Q.  With respect to the Category 1 damages,
4  correct?
5  A.  I believe so, that's my understanding, yes.
6  Q.  So if you were not analyzing Category 1
7  damages, why did you list the damages as ones that you
8  considered?
9  A.  Do you mean these documents?
10  Q.  Yes, the documents that are listed on page four
11  and going onto page five.  I just again, my understanding
12  was that you didn't do any work with respect to
13  Category 1.  Yet I see that you've listed a bunch of
14  documents related to the Category 1 damages as ones that
15  you have considered.
16        Why are these documents listed in your
17  reports as having been considered?
18  A.  They were provided to me by counsel.  I briefly
19  reviewed them.  And decided that they weren't within the
20  scope of my report and what I was asked to calculate.
21  Q.  Okay.  So these documents listed under
22  defendant expert production, they have nothing to do with
23  the $28 million that you ultimately estimate, correct?
24  A.  Correct.

Page 43

1  Q.  With respect to your $28 million estimate,
2  you're assuming that the branches would have stayed open
3  till 2031, is that correct?
4  A.  Part of the analysis runs through 2031, yes.
5  Q.  Why did you select 2031?
6  A.  That is a ten-year window, that I have included
7  in my discounted cash flow analysis.
8  Q.  Why did you select a 10-year window?
9  A.  To present my model annually through ten years.
10  Q.  Why didn't you consider two years, 5 years, a
11  different number --
12      MS. WALTER:  Object to form.
13      MS. KREITER:  -- of years?
14      THE WITNESS:  A  My model is set up to calculate
15  lost profits in each year through 2031 and beyond.  So
16  the model is clear I believe in Exhibit 7 and 8 what
17  those values are.
18      MS. KREITER:  Q  So my question is how did you
19  land on ten years.  You could have said 30 years.  I'm
20  trying to understand why is it 10.
21  A.  It's standard in DCF modeling to use 10 years.
22  Gives us a nice view of what the cash flows look like, if
23  anything is changing over time.  And how the impact of
24  the discount rate affects the numbers, cash flow coming

Page 44

1  back.
2      The goal of that exhibit is to express the
3  cash flows in present value terms.  So I find that giving
4  a 10-year window has served that functional purpose.
5  There's no, you know, reason for using 10 years
6  specifically as a cutoff point in terms of the branch
7  closures analysis.
8  Q.  So if I'm understanding your testimony, it's a
9  standard with respect to this particular form of
10  modeling, it's not a number selected specific to these
11  particular branches, is that accurate?
12  A.  That's correct.
13  Q.  You would apply 10 years if you had another
14  case -- strike that.  Let me ask it this way.
15      Have you applied this same methodology in
16  other cases?
17  A.  Yes.
18  Q.  Have you used a 10-year duration in all of
19  those cases?
20  A.  I don't believe in all of the cases.  I might
21  look at seven years.
22      If I have, if I need to model changes that
23  I know of that are going to happen at some point in the
24  time horizon, I might go out a few more years.  I have

Page 45

1  the flexibility to model the DCF, to set up the DCF
2  according to the facts and the issues I'm looking at.
3  Q.  Did you consider using an 18 months duration
4  like Mr. Gennarelli did in his model?
5  A.  No.
6  Q.  Why not?
7  A.  18 months is something Mr. Gennarelli chose.
8  My model does not consider that time frame.  I don't
9  understand fully why 18 months is selected.
10  Q.  Did you consider a 12-month duration consistent
11  with the 12-month non solicit?
12      MS. WALTER:  Object to form.
13      THE WITNESS:  A  No.
14      MS. KREITER:  Q  Why not?
15  A.  That wouldn't apply here.
16  Q.  Why not?
17  A.  Because I'm measuring lost profits in the
18  branch, not to an individual employee.
19  Q.  Do you understand that the branch managers had
20  a 12-month non solicit?
21      MS. WALTER:  Object to form.
22      THE WITNESS:  A  Yes.
23      MS. KREITER:  Q  What certainty do you have that
24  any of the employees would have stayed beyond 12 months

Page 98

1  So one-year period.
2     A.  Through end of 2023?
3     Q.  I guess I'm looking at can you calibrate it by
4  months.  So for example could you tell me what would the
5  damages be for the period of Daytona leaves in April, so
6  May of '22 to May of '23.
7          Are you able to tell me that?
8     A.  I can give you the numbers through the end of
9  year from my exhibits.  But in terms of using this to
10 calculate any more precise numbers than what's presented
11 here in Exhibit 7A through B, I would need time to do
12 that.
13    Q.  So is your 7A and B, let's go there.  7A.
14         For example, are you able to tell me
15 looking at 7A what the damages would be with a one year
16 period of time?
17         I mean I heard you just say maybe I can't
18 do it May to May, but I can do it May of '22 through the
19 end of '23.
20         So is that accurate?
21    A.  So yeah, the data in the DCF exhibits which are
22 7A through 8B are done through the end of each year.  So
23 I can't get as precise as you're asking me to.
24         The model can if we really had the time

Page 99

1  and I could sit down and do it right and check it and all
2  of that.  That's certainly possible.  But from this
3  exhibit, we can give you number through say the end of
4  2023.
5     Q.  You can tell me just to be clear, you could
6  tell me based on 7A of your report the damages estimate
7  if you used the different duration not out to 2031, but
8  rather through the duration of December 31, 2023.
9          Is that accurate?
10    A.  That's right.
11    Q.  What is the lost profits associated with the
12 Daytona branch if you used that duration of, that
13 duration ending at December 31, 2023?
14    A.  2023?  Footnote 35 describes how to do this.
15         And so the way that this could be done
16 through 2023 is that the row called present value, PV,
17 free cash flows to the firm?
18    Q.  I see it.
19    A.  Gives you discounted value of the profit figure
20 after taxes.  So you can add the .46 and the .87.
21    Q.  Now you lost me.  I'm looking at 7A.
22    A.  You asked for Daytona so you need to turn to
23 Exhibit 7B.
24    Q.  Continue.

Page 100

1     A.  So do you see that row present value of free
2  cash flow?
3     Q.  I do.
4     A.  The sum of .46, .87 gets you the present value
5  of free cash flows to the end of 2023.
6     Q.  So you would add the -- let's just do that.
7          MS. WALTER:  For the record, Miss Kreiter is using
8  her phone to calculate figures.
9          MS. KREITER:  I'm an attorney, I am using my
10 calculator.  I'm an attorney not -- so .46 plus .87 is
11 1.33.  Correct?
12         MS. WALTER:  You need a calculator?
13         THE WITNESS:  A   Yeah, I prefer to have one.  To
14 follow along if we are going to keep going with
15 calculations.  Also this doesn't take into account any
16 rounding.  To be clear.  .46 plus .87 is 1.33.
17         MS. KREITER:  Q   So this was in conjunction with
18 trying to understand what the damages would be not using
19 the full duration, but rather to the end of '23.
20         What would you do next?
21    A.  That's it.
22    Q.  So the damages are 1.33 million?
23    A.  That's correct.  Just through the end of 2023,
24 the present value for the Daytona branch.  We haven't

Page 101

1  done the Tampa branch.
2     Q.  Let's go back and do that, please.
3          Would you again turning to Exhibit 7A to
4  calculate the damages under your model, but with a
5  duration ending in December 31, 2023.
6          You would add the present value .38 for
7  '22 and the present value .95 for '23?
8     A.  Yes.
9     Q.  What does that come out to?
10    A.  1.33.
11    Q.  Are they for both of the branches it's
12 1.33 million?
13    A.  For Tampa, the two together I believe is 2.66,
14 adding up the four figures we just went over.
15    Q.  So Tampa is 1.33 and Daytona is --
16    A.  1.33.
17    Q.  Both of them are the same?
18    A.  Uh-huh, coincidentally, yes.
19    Q.  So 2.66 million total?
20    A.  Yes.
21    Q.  It's roughly 2 million less than in the
22 Gennarelli Model, correct?
23    A.  I don't remember what his exact number was, 4.4
24 perhaps.

Page 102

1  Q. 4.4 and change?
2  A. So yeah, about 1.7.
3  Q. Difference between your model with the same
4 duration and his model, correct?
5  A. I don't know if it's the same duration. If
6 it's covering the same time frame. I don't recall.
7     I didn't really dig into his model like I
8 said.
9  Q. If you assume his model also goes through the
10 end of '23, then it's the same duration but you have got
11 a delta between the two where you're saying the total
12 would be 2.66 and he's saying 4.4 and change?
13     MS. WALTER: Object to form.
14     THE WITNESS: A But the difference between 4.4
15 and 2.66 is yes, about 1.74.
16     MS. KREITER: Q Do you believe that 1.74 million
17 is a material difference?
18     MS. WALTER: Object to form.
19     THE WITNESS: A Again I would describe this in
20 terms of dollars, not whether or not it's material.
21     MS. KREITER: Q What number would make you say
22 this is material, maybe not 1.7, is there a number where
23 you would say look, I agree that's a material difference?
24  A. Usually not how I would describe numbers to be

Page 103

1 completely fair. If I have a number in front of me, I
2 describe it in terms of either in dollar values or you
3 can use a multiple. 80 percent more or whatever the
4 number is.
5  Q. So let's look at what is the percentage
6 difference then between those two numbers.
7  A. His is 4.4.
8  Q. Correct.
9  A. Looks like about 40 percent, the difference is
10 about 40 percent.
11  Q. You're not willing to say that's material or
12 not, that's not how you would characterize the numbers?
13  A. I'm not willing to say whether or not it's
14 material, correct.
15  Q. You think it's nominal?
16     MS. WALTER: Object to form.
17     THE WITNESS: A Again, I'm not willing to
18 describe it in those terms.
19     MS. KREITER: Q Is there a way you could use your
20 Exhibit 7A and 7B to come up with a one year number?
21     So to be clear, that same methodology you
22 used, I want to shorten the term from 18 months to 12.
23 Is there a way you can do that?
24  A. Not with precision, no.

Page 104

1  Q. Is there a way you can do it with something
2 less than precision but maybe -- strike that.
3     How would you do it if you were to go
4 about changing the duration to one year?
5  A. I would look at my spread sheet.
6  Q. Bates number 14778.
7  A. And do a calculation over the time period of
8 interest.
9  Q. Are you able to tell me specifically what in
10 14778 you would show me, the tab or show me what you
11 would look to?
12  A. It's the tab we were just looking at.
13  Q. Why don't you come back and point it out to me.
14  A. MON-loan volume.
15  Q. Is this a matter of changing a number or is it
16 no, this would take me ten hours?
17  A. It would take time and I need to have it
18 audited.
19  Q. Suffice to say it's going to be less than 2.6?
20     MS. WALTER: Object to form.
21     THE WITNESS: A If you're looking at a time
22 period within the time period we just went over, it will
23 yes, it will be less because we do have volume in all
24 months.

Page 105

1     MS. KREITER: You indicated that you read the
2 deposition transcript for Jeff Gennarelli.
3  Q. Did you read any other deposition transcripts?
4  A. I do not believe so.
5  Q. Are you aware of which Mutual representatives
6 have been deposed?
7  A. No.
8  Q. Did you read the deposition transcript of Brian
9 Tomalak or Kiley King?
10  A. No.
11  Q. Did you ask to see any additional deposition
12 transcripts?
13  A. No.
14  Q. Do you know who Brian Tomalak and Kiley King
15 are?
16  A. No.
17  Q. Do you know who Chris Layden is?
18  A. No.
19  Q. We talked about whether the math that you
20 ultimately used to project the estimates in the peer
21 model included the 2020 and 2021 time period. I think
22 the answer is no, you maybe considered it but you
23 ultimately did the math based on the April '22 period.
24     What about the MBA methodology, does that

27 (Pages 102 - 105)

Page 130

1 possibility that the loan volume is specific to
2 particular employees?
3    A.  We considered that, yes, I considered that.
4    Q.  Did you factor it in from a risk perspective?
5    A.  I'm not quite sure I understand what you mean
6 from a risk perspective.
7    Q.  Sure.  I'm trying to understand you're assuming
8 that the loan volume is the same even if Dwayne Hutto
9 quits.  Is that correct?
10    A.  Well it's more complicated than that.  I'm not
11 assuming that it's a, that the loan volume is going to
12 stay at a consistent level.
13       My loan volume tracks downward for several
14 months and quarters over this projection period relative
15 to what we observe from the other branches and from the
16 MBA data.  So looking at loan production, I'm not
17 assuming that the levels remain the same.
18    Q.  Do you attribute the loan production to the
19 people or to other components of Mutual?
20    A.  It's to the branch.  I attribute it to the
21 branch.
22    Q.  This again goes back to how we define a branch.
23 Is the branch the people and what part of the branch is
24 driving the revenue.

Page 131

1       If you have a empty building with no
2 people in it, you're not going to have any revenue,
3 agreed?
4       MS. WALTER:  Object to form.
5       THE WITNESS:  A  Yes, and when everybody at the
6 branch leaves you no longer have a branch.
7       MS. KREITER:  Q  Right.  What facts are you
8 relying on to assume that the employees of the branch are
9 going to stay at the branch for any period of time?
10    A.  So looking at individual employee, again it
11 doesn't factor into my model.  But if you were to -- if
12 you're asking me if I can predict which employees will
13 stay or leave and when they will leave, I can't predict
14 that.
15    Q.  Are you able to say to a reasonable degree of
16 certainty that the employees at the Tampa and Daytona
17 branches would have stayed with Mutual for any particular
18 amount of time?
19       MS. WALTER:  Object to form.
20       THE WITNESS:  A  I don't have an opinion on that.
21 I can't get inside their minds on that type of decision.
22       MS. KREITER:  Q  So no?
23    A.  Correct.
24    Q.  You stated in paragraph three of your report

Page 132

1 and you're referencing Steve Oscher's report, you state
2 second, he opines that no valuation is possible regarding
3 the closing branch offices.
4    A.  Okay.
5    Q.  I want to know what in Mr. Oscher's report
6 supports that statement.  Before we get to his report, I
7 want to make sure I understand your statement he opines
8 that no valuation is possible regarding the closing of
9 the branches.
10       Is it your belief that the Oscher Report
11 concludes no valuation is possible regarding the closing
12 of the branch offices?
13    A.  That's how his report is set up, yes.
14    Q.  I want you to point me to the words in
15 Mr. Oscher's report in which he states lost profits and
16 lost business associated with the closure of the Tampa
17 and Daytona branches -- sorry, I'm in the wrong place.
18       Point me to the words in Mr. Oscher's
19 report in which he opines that no valuation is possible
20 regarding the closing of the branch offices?
21    A.  So my first observation is that it's implied.
22 He doesn't offer a damage valuation in this report.
23    Q.  Correct.  He doesn't offer one but where does
24 he say that no valuation is possible?

Page 133

1    A.  That's just my first observation.
2    Q.  It's not stated in his report?
3       MS. WALTER:  She's answering the question.
4       THE WITNESS:  If I could have just a moment to
5 review his report, the section.
6       MS. KREITER:  Sure.
7       THE WITNESS:  A  He says that the data, page ten,
8 the demand reflected cannot, he says that it's
9 unsupported and cannot be verified or tested.  He says he
10 can't.
11       MS. KREITER:  Q  You're on page ten?
12    A.  Yes, the first full paragraph starts with the
13 word without.  Without the supporting documentation
14 relied upon by Mutual, the demand reflected in the
15 document ending in 3484 is unsupported and cannot be
16 verified or tested.
17       So he said that -- here that he can't do
18 this analysis based on the absence of data.
19    Q.  Well he's referring to the demand reflected in
20 Mutual of Omaha Bates number 3484.
21       Do you know what that document is?
22    A.  Is that the document that we went over earlier
23 today?
24    Q.  I'm asking you do you know what it is?