# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., | ) <br> ) Civil Action No. 22-CV-01660 <br> ) |
| Plaintiff, | ) **PLAINTIFF MUTUAL OF OMAHA** <br> ) **MORTGAGE, INC.'S RESPONSE IN** |
| v. | ) **OPPOSITION TO WATERSTONE** <br> ) **MORTGAGE CORPORATION'S** |
| WATERSTONE MORTGAGE CORPORATION, | ) **MOTION TO EXCLUDE OR LIMIT** <br> ) **PLAINTIFF'S EXPERT TESTIMONY ON** <br> ) **DAMAGES** |
| Defendant. | ) |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual") hereby files this Response in Opposition to Defendant Waterstone Mortgage Corporation's ("Defendant" or "Waterstone") Motion to Exclude or Limit Plaintiff's Expert Testimony on Damages ("Motion").[1] In support thereof, Plaintiff states as follows:

## **INTRODUCTION**

There is no basis – in law or fact – to exclude or limit the testimony of Mutual's expert witness, Candice Rosevear ("Ms. Rosevear"). In fact, this Court previously ruled that Ms. Rosevear would be in the case. As Mutual's expert witness, Ms. Rosevear crafted a flexible model that will allow a jury to assess and

---

[1] As directed by the Court, Mutual incorporates the arguments previously raised in its Motion for Summary Judgment on Lost Profit Damages briefing. *See* D.E. 100 and 114. Though no new arguments are raised, Mutual has responded to new material raised by Defendant in its Motion herein.

1

award lost profit damages in annual increments for a period *up to* ten years after careful consideration of the evidence. Thus, it is not a ten-year damage model but rather a model that enables the jury to apply damages on an annualized basis up to ten (10) years. Contrary to Waterstone's arguments, Ms. Rosevear was not retained to opine on the appropriate duration of the lost profit damages. That is not her role – that is the role of the jury. Rather, she created a model that would provide "some standard" for the jury to utilize to determine the amount of lost profits.

Based on well-established case law, Mutual believes that it is the role of the jury to hear and weigh the evidence, assess witness credibility, and determine the appropriate duration of time for which Mutual should be entitled to its lost profit damages. At trial, Mutual will present substantial evidence to demonstrate its entitlement to lost profit damages, which will include evidence relating to the average duration its branches remain with it and evidence demonstrating that Mutual recently obtained a major real estate referral system which would have incentivized its employees to stay.

As this Court acknowledged at the January 30, 2024 hearing on Plaintiff's Motion for Summary Judgment on Lost Profit Damages, this case is about the total destruction of Mutual's operations in the State of Florida caused by Defendant's wrongdoing. This is not a case about individual at-will employees who left Mutual of their own initiative for Waterstone without violating a non-solicitation clause.

And there is no case across the country where a court applied a bright-line test limiting damages to only the duration of the non-solicitation clause. Any argument raised by Waterstone asserting that Ms. Rosevear's testimony should be excluded because she failed to consider the 12-month non-solicitation clause simply has no bearing on this case given the facts. Mutual's damages should not be limited at this stage because Mutual will present evidence to the jury to support its lost profit awards. Accordingly, it is for the jury to determine the appropriate duration for which Mutual should be entitled to those amounts.

## LEGAL STANDARD

The trial court has a duty to ensure that expert testimony, whether "based on 'scientific knowledge'" or "on 'technical and other specialized knowledge,'" is sufficiently reliable before admitting it at trial. *Kumho Tire Co., Ltd, v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.* 509 U.S. 579 (1993)). The Court must therefore consider whether "(1) [t]he expert is qualified to testify competently as to the subject matter he intends to address; (2) [whether] the method employed by the expert is sufficiently reliable; and (3) [whether] the testimony assists the trier of fact to comprehend the evidence through application of the witness's expertise." *Quiet Tech. DC-8, Inc. v. Durel-Dubois UK Ltd*, 326 F.3d 1333, 1340-41 (11th Cir. 2003); *see also* Fed. R. Evid. 702.

An expert who satisfies this standard may be precluded from testifying only if the danger of unfair prejudice, confusion of the issues, or misleading the jury substantially outweighs the probative value of the expert's testimony. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). The party offering the expert testimony bears the burden of proving, by a preponderance of the evidence, that it is admissible. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)). While the consideration of the above criteria falls within the sound discretion of the Court, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1342 (11th Cir. 2003)). Cross-examination, the presentation of contrary evidence, and careful instruction on the burden of proof remain the preferred means for testing the validity of an expert's opinions. *Id.* at 1341.

## ARGUMENT

### I. THERE IS NO BASIS TO EXCLUDE OR OTHERWISE LIMIT MS. ROSEVEAR'S EXPERT WITNESS TESTIMONY.

Waterstone cannot point to any justification for either the exclusion of Ms. Rosevear nor a limitation on her lost profits damage model. As this Court acknowledged at a July 27, 2023 hearing, Ms. Rosevear is "helpful in the case" and is "in the case now" before denying Waterstone's initial Motion to Strike Ms. Rosevear (D.E. 84). D.E. 101 at 55:4, 56:7. In support of its lost profit damages, Mutual intends to rely upon the flexibility of Ms. Rosevear's model to allow the

factfinder to ascertain the amount of awardable lost profit damages after consideration of the evidence presented before it. This is precisely what is permissible, and in fact, required under Florida law to award lost profits. *See Nebula Glass Intern., Inc. v. Reichold, Inc.*, 454 F.3d 1203, 1217 (finding lost profits are recoverable if there is "some standard by which the amount of damages may be adequately determined").

Generally, there are two methods of proving lost profits: (1) the before and after theory and (2) the yardstick test. *See G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1538-39 (11th Cir. 1985). As the Eleventh Circuit has recognized, "the before and after theory is not easily adaptable to a plaintiff who is driven out of business before he is able to compile an earnings record sufficient to allow estimation of lost profits." *Id.* at 1538. Therefore, the yardstick test is often employed, which "consists of a study of the profits of business operations that are closely comparable to the plaintiff's. Although allowances can be made for differences . . . the business used as a standard must be as nearly identical to the plaintiff's as possible." *Id.* at 1338-39. Under either test, Mutual proves its entitlement to lost profits.

In her Report, Ms. Rosevear states that she assumed that "the lost profits and lost business associated with the closure of the Tampa and Daytona branches was a direct result of Defendants' actions." D.E. 100-32 at ¶ 2. Ms. Rosevear projects

5

future sales at the Tampa and Daytona locations assuming the branches would have otherwise continued operating but for Defendant's misconduct. *Id.* at ¶ 12. In doing so, she bases her projections on (1) actual loan sales that occurred at two of Mutual's peer branches, St. Louis and Maryland branches; and (2) national data from the Mortgage Bankers of Association, a data source also relied upon by Defendant's expert witness. *Id.* From there, she uses a reasonable growth rate to project future loan sales. *Id.* In using those projections, she performed a valuation technique to estimate the present value of lost profits. *Id.* ¶ 13. According to Ms. Rosevear, the present value of lost profits is approximately $28 million over a ten-year period. *Id.* ¶ 16.

Ms. Rosevear's report clearly demonstrates that she considered not only the available historical data of the Mutual Florida branches and those of peer branches at Mutual, but also the nationally available data, which Defendant's own express witness also relies upon (*see* D.E. 100-33 at 12). Both of Ms. Rosevear's datasets have similar results. D.E. 100-32 at ¶¶ 22-28. These projections – either considered alone or together – provide the necessary methodology, or "yardstick," sufficient to justify Mutual's entitlement to lost profits with reasonable certainty. *See G.M. Brod & Co., Inc.*, 759 F.2d at 1539 (finding it is "enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only appropriate" even with "indirect" proof and "estimate bases on assumptions, so

6

long as the assumptions rest on adequate data").

It bears emphasis that Ms. Rosevear's model allows for the jury to determine the damages in one year increments up to ten years of lost profit damages and is "flexible to other damages timeframes." *See* D.E. 100-32 at p. 11 n.35. As undersigned counsel represented to the Court at the January 30, 2024 hearing, Mutual does not intend to ask the jury for an award for ten years of lost profits. Contrary to Defendant's continued representations, the ten-year $28 million projection is *not* a demand nor is it Mutual's position that it is entitled to this amount. Rather, it simply represents the standard DCF modeling to project damages.

In its Motion, Waterstone complains that Ms. Rosevear's choice of utilizing ten years for her model is arbitrary and baseless. But, it is not true that Ms. Rosevear selected ten years without any justification.[2] In fact, Waterstone's counsel questioned Ms. Rosevear during her deposition on Ms. Rosevear's selection of ten years, and she explained the basis for doing so:

> Q: So my question is how did you land on ten years. You could have said 30 years. I'm trying to understand why is it 10.
>
> A: It's standard in DCF modeling to use 10 years. Gives us a nice view of what the cash flow looks like, if anything is changing over time. And how the impact of the discount rate affects the numbers, cash flow coming back. That goal of that exhibit is to express the cash flows in present value terms. So I find that

---

[2] Undersigned counsel acknowledges and apologizes that she misspoke at the January 30, 2024 hearing when she said that there was no reason for Ms. Rosevear's selection of ten (10) years in her model.

7

> giving a 10-year window has served that functional purpose. There's no, you know, reason for using 10 years specifically as a cutoff point in terms of the branch closures analysis.

*See* **Ex. A**, Rosevear Dep. 43:18-24-44:1-7.

Indeed, Ms. Rosevear was not retained to opine on the appropriate length of time for lost profits, unlike the expert witnesses in both cases relied upon by Defendant – *Office Depot, Inc. v. Arnold*, 16-CV-81650, 2017 WL 11742779 (S.D. Fla. Aug. 14, 2017) and *Whitby v. Infinity Radio*, 951 So. 2d 890, 899-900 (Fla. 4th DCA 2007). In both *Office Depot* and *Whitby*, the expert witnesses themselves opined on the applicable time frame that should be utilized to support damages. *Office Depot*, 2017 WL 11742779, at *5; *Whitby*, 951 So. 2d at 899-900. Ms. Rosevear instead created a flexible model that would allow the finder of fact to ascertain the amount of awardable lost profit damages after careful consideration of the evidence presented before it. In other words, she provides a "reasonable yardstick by which to estimate the damages." *Nebula Glass Intern.*, 454 F.3d at 1216-17.

Defendant argues that there is no basis for Ms. Rosevear to estimate damages in excess of $1 million (Mot. at 13-14) or that she failed to consider the anomaly in the mortgage industry in 2020-2021 (*id.*). As set forth above, that is belied by the fact that Ms. Rosevear provided a comprehensive expert witness report detailing her methodology and how she arrived at her conclusions. *See* D.E. 100-32. Ms.

Rosevear considered Mutual's historical loan sales at the Tampa and Daytona branches, and then based on those sales, she relied on two data sources to inform her extrapolation models—both monthly sales from peer branches and national data that Defendant's own expert witness relied on. *Id.* at 9-11. In doing so, she naturally accounted for the anomaly present in the mortgage industry in 2020-2021 because she reviewed and extrapolated that historical data. To say otherwise is patently false.

## II. THE DETERMINATION OF THE TIME PERIOD FOR WHICH MUTUAL SHOULD BE ENTITLED TO LOST PROFITS IS A FACTUAL QUESTION FOR THE JURY.

In support of its position that Mutual is entitled to damages that go beyond the period of the one-year non-solicitation period, Mutual intends to rely on evidence demonstrating that the average time period of a branch at Mutual is 51 months; that Mutual recently acquired Keller Williams, which would have brought on additional revenue and made it more appealable for employees to remain at Mutual; and turnover at Mutual is institutionally low. Despite openly admitting to the Court that there is no analogous case that applies a bright-line test limiting lost profit damages to the duration of a non-solicitation clause, Defendant still continues to insist that Mutual's damages should be limited to one year as a matter of law. But it is Mutual's position based on well-established case law that this is a factual question for the jury. *See Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So. 3d 374, 382-83 (Fla. 3d DCA 2013) (citing *State Rd. Dept. v. Tampa Bay Theatres, Inc.*, 208 So. 2d

485, 486-87 (Fla. 2d DCA 1968)); *IBP, Inc. v. Hady Enters., Inc.*, 267 F. Supp. 2d 1148, 1168-69 (N.D. Fla. 2002) (noting the role of the factfinder in determining lost profits); *Collins & Aikman Floor Coverings, Inc. v. Interface, Inc.*, No. 4:05-CV-0133-HLM, 2009 WL 10669578, at *4 (N.D. Ga. Jan. 8, 2009) (finding that so long as a party can provide a viable legal theory for recovering lost profits, it is "ultimately up to the jury . . . to weigh the credibility of the parties opposing theories and evidence").

The lost profits at issue in this case do not arise from consideration of whether an individual employee would have stayed or left over a certain period of time. This case should not be viewed in isolation. Rather, this case should be viewed through the lens of Waterstone's collective action in stealing and utilizing Mutual Florida's operations to its demise.

At best, there is no record evidence that Defendant can point to that suggests Mutual Florida's operations would have ceased any time in the near future but for Waterstone's wrongdoing. Indeed, Mutual's acquisition of Keller Williams certainly suggests that Mutual would have been able to retain the branch by virtue of the fact that it would have been able to pair it with a real estate company to partner and refer loans. It was Waterstone's partnership in stealing Mutual Florida that led to the Departed Employees' resignation. Without that, they would have likely remained given that the Departed Employees' branches provided significant portions

of their income. D.E. 100 ¶ 10. Further, the average duration that a branch remains at Mutual is approximately 51 months, which provides another plausible basis for a jury's consideration. D.E. 100-1 ¶ 16.³ At the January 30 hearing, this Court explicitly stated that this evidence could potentially serve as a "hook" to a jury. Hearing Trans. 37:19-23 ("But that type of thing, to me, is really – I think that is a hook if you have information about Mutual of Omaha's or Waterstone's or, you know, the idea of how long these branches typically stay open, then that would be something.") And approximately 80% of the branches that have started with Mutual have remained with Mutual, to date. *Id.* While the question of the appropriate time frame to determine lost profits is a question best suited for the fact finder, there can be no question that Mutual has experienced lost profits as a result of Defendant's wrongful actions. Whether a factfinder determines that the appropriate time frame to one year (at a minimum), five years, or otherwise, is a question better suited for resolution after consideration of all of the evidence in the case.

Finally, Waterstone's citation to an excerpt of Mr. Gennarelli's testimony in support of its argument that a jury would not be able to find lost profits for up to ten

---

³ On March 24, 2024, Magistrate Judge Sneed granted in part and denied in part Defendant's Motion to Strike Mark C. Carroll and Plaintiff's Credit Inquiries (D.E. 105). D.E. 128. Judge Sneed struck the affidavit for purposes of summary judgment but did not preclude Plaintiff from using the information contained within Mr. Carroll's declaration at trial. *Id.* At the hearing on Plaintiff's Motion for Summary Judgment on Lost Profit Damages on January 30, this Court did not seem inclined to disregard the affidavit. Nevertheless, should this case proceed to trial, Mutual will be prepared to present testimony from a Mutual representative who will testify to the information contained within Mr. Carroll's affidavit.

years is taken entirely out of context. Waterstone's counsel began asking Mr. Gennarelli about a potential damage model that Mr. Gennarelli previously created as Mutual's corporate representative.[4] Mr. Gennarelli's model only considered lost profit damages for 18 months and that is because it was being used to inform pre-suit negotiations.

> Q: How long did you spend preparing it?
>
> A: Well, I think a large part of the time we spent was trying to come up with a, you know, fair way to associate the lost revenue. And I really mean fair and be conservative about it because we were hoping for a settlement before this time.

*See* **Ex. B**, Gennarelli Dep. 126:12-17. Even so, during this line of questioning, Mr. Gennarelli testified that many branches stay much longer:

> Q: What was the rationale for using an 18-month period to calculate the lost profit damages associated with the branches closing?
>
> A: Yeah, I mean, we didn't want to use any-again we were trying to be reasonable. You know, I think you can make a case for using longer. Most of our branches have been here 10, 15 years, so – at least the core group. So we could've used longer, but we thought 18 months was a reasonable amount of time.

*Id.* 170:22-25-171:1-5. Should this case proceed to a jury, a representative from

---

[4] Mr. Gennarelli created this model before Mutual retained Ms. Rosevear as the expert witness in the case. To the extent there are inconsistencies, Mutual will be relying on Ms. Rosevear's model and her testimony at trial.

12

Mutual will be prepared to testify that although 51 months is the average time period that a branch stays with Mutual, it is more common that the branches remain much longer. This alone creates a jury question.

### III. THE LOST PROFIT DAMAGES SHOULD NOT EXCLUDE THE LOAN VOLUME ATTRIBUTABLE TO THE FORMER BRANCH MANAGERS.

Mutual's damage amount should not exclude the loan volume attributable to the former branch managers because Mutual's damages are not exclusively about them. This case is about Defendant's decimation of the entirety of Mutual's business operations in the State of Florida. It is about Defendant's planned and calculated scheme to utilize three of Mutual's then-employees—Christopher Smith, Dwayne Hutto, and Christopher Wolf (collectively, "Managers")—to embark on the theft of Mutual's presence in Florida. This case is ***not*** solely about the departure of individual employees as Defendant would have this Court believe. The departure of the individual employees is only one spoke in the wheel that was Defendant's illegal conspiracy to upend Mutual Florida's operations.

As demonstrated through undisputed record evidence, Defendant knew that the Managers would not Mutual leave without their branch employees (D.E. 100 ¶¶ 10, 16, 19, 32, 33, 48, 57); Defendant participated in, encouraged, and facilitated illegal practices in pursuing the branch employees to leave Mutual (*id.* ¶¶ 11-16, 20, 22, 23, 28, 29, 38, 39, 44, 45, 53-56, 61); and that but for those actions taken by

13

Waterstone, Mutual Florida would not have transitioned to Defendant (*id.* ¶¶ 10-19, 33, 39, 48, 58). In addition to the individual employees' departures that were caused by Defendant's wrongdoing, this case involves Defendant's theft of Mutual's borrowers' confidential information and trade secrets belonging to Mutual (*Id.* ¶¶ 21, 24, 26-29, 31, 34, 35, 39, 41-44, 51, 53-56). It involves Defendant's use of Mutual's information to divert loans (*id.* ¶¶ 21-28, 41-44, 49, 58) and directives to its Managers to obtain Mutual's employees' compensation information to entice them to join Waterstone (*id.* ¶¶ 34-37).

All of these actions, taken together, caused Mutual's damages to its *branches*. Not the recruitment of any one individual as Defendant argues. During her deposition, Ms. Rosevear explained why she did not rely upon the twelve-month non-solicitation clause as the basis for the projection of her damages:

> Q: Did you consider a 12-month duration consistent with the 12-month non-solicit?
> A: That wouldn't apply here.
>
> Q: Why not?
> A: Because I'm measuring lost profits in the branch, not to an individual employee.

**Ex. A**, 45:10-18. There is no basis for a factfinder's sole consideration of simply the 12-month non-solicitation duration. The facts here go beyond that. Accordingly,

14

the damages should include those loan amounts attributable to the former managers as those cannot be divorced from the branches' profits.[5]

## IV.  MR. GENNARELLI IS NOT AND NEVER WAS DESIGNATED AS MUTUAL'S EXPERT WITNESS.

To be clear, the only expert witness that Mutual disclosed in this case has been Ms. Rosevear. No one else. Yet Waterstone continues to insist that the testimony of Mutual's 30(b)(6) corporate representative, Mr. Jeffrey Gennarelli, should somehow be excluded as being speculative expert testimony. Mr. Gennarelli is not Mutual's expert witness in this case. At trial, Mutual will present Ms. Rosevear's model to the jury, and nothing else, for the jury's calculation of lost profit damages.

Notwithstanding this, Mutual intends to potentially rely on Mr. Gennarelli, or another qualified Mutual corporate representative, to speak to the turnover and retention rate at Mutual.

---

[5] Defendant also continues to insist that damages associated with the Paramus branch should be excluded. Mutual's counsel has explained to Waterstone's counsel that for purposes of Mutual Profit & Loss ("P&L") Statements, Paramus and Tampa operated on the same P&L because Christopher Smith (one of the former branch managers who left for Mutual) served as the branch manager for both. Therefore, the numbers for Paramus cannot be separated from Tampa. Further, Waterstone's wrongdoing in absconding with Mutual's branches included the Paramus branch as was extensively briefed in Plaintiff's Motion for Summary Judgment on Lost Profit Damages.

## V. THE COURT SHOULD NOT EXCLUDE EVIDENCE OF ANY ALLEGED DIVERTED LOAN DAMAGES.

Mutual represents to the Court that it is not seeking diverted loan damages that are separate and apart from the lost profit damages that Mutual seeks.[6]

Notwithstanding this, Mutual believes that evidence showing Waterstone's wrongdoing in diverting these loans is, in fact, relevant evidence that should be presented to the jury. Record evidence is clear that as one part of its overall scheme, Waterstone used Mutual's information to divert loans from Mutual to Waterstone (D.E. 100 ¶¶ 21-28, 41-44, 49, 58) and directed its Managers to obtain Mutual's employees' compensation information to entice them to join Waterstone (*id.* ¶¶ 34-37). This evidence is highly relevant, in and of itself represents the misuse of a trade secret, and should be deemed admissible.

## **CONCLUSION**

WHEREFORE, in light of the foregoing, Plaintiff respectfully requests that this Court deny Waterstone Mortgage Corporation's Motion to Exclude or Limit Plaintiff's Expert Testimony on Damages.

---

[6] In his affidavit in support of Plaintiff's Motion for Summary Judgment, Mr. Carroll attests that "Mutual is unable to identify the total profit on the diverted loans because this information is within Defendant's possession[.]" D.E. 100-1 ¶ 14. Thus, Mutual does not have even a number to make any such demand for diverted loan damages.

16

Dated: Washington, D.C.
February 13, 2024

        MITCHELL SANDLER LLC

        By: */s/ Ari Karen*

        Ari Karen (admitted *pro hac vice*)
        Christopher L. McCall (admitted *pro hac vice*)
        Courtney E. Walter
        1120 20th Street N.W., Suite 725
        Washington, D.C.  20036
        Email:  akaren@mitchellsandler.com
        Email:  cmccall@mitchellsandler.com
        Email:  cwalter@mitchellsandler.com
        Telephone:  (202) 886-5292

        GUNSTER, YOAKLEY & STEWART, P.A.

        John A. Schifino
        Florida Bar No. 0072321
        401 East Jackson Street, Suite 1500
        Tampa, Florida  33602
        Primary email:  jschifino@gunster.com
        Secondary email: eservice@gunster.com
        Telephone:  (813) 739-6962

        *Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc.*