# EXHIBIT B

```
                                                                    1
                   IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
                           TAMPA DIVISION
                  CASE NO.: 8:22-cv-01660-TPB-JSS

     MUTUAL OF OMAHA
     MORTGAGE, INC.,

          Plaintiff,

     vs.

     WATERSTONE MORTGAGE
     CORPORATION,

          Defendant.
     _____/


     DEPOSITION OF:        JEFFREY GENNARELLI, CORPORATE
                           REPRESENTATIVE OF MUTUAL OF OMAHA
                           MORTGAGE, INC.

     TAKEN:                Pursuant to Notice by
                           Counsel for Defendant

     DATE:                 May 25, 2023

     TIME:                 9:17 a.m. to 4:53 p.m. EST

     LOCATION:             Hill Ward Henderson
                           101 East Kennedy Boulevard
                           Suite 3700
                           Tampa, Florida  33602

     REPORTED BY:          Melanie Keefe, FPR
                           Notary Public
                           State of Florida at Large
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

126

1  Q.  Did one of you create the first draft?

2  A.  I think Bernie probably created the first draft,
3  but I was sitting in his office. I mean, he -- if it's on a
4  spreadsheet, he's the one to create it. I'm not a
5  spreadsheet guy.

6  Q.  Got it. So it sounds like there was a meeting
7  between you and Mr. Mayle?

8  A.  Yeah.

9  Q.  And you sat down and worked on the spreadsheet
10 together?

11 A.  Yes.

12 Q.  How long did you spend preparing it?

13 A.  Well, I think a large part of the time we spent
14 was trying to come up with a, you know, fair way to
15 associate the lost revenue. And I really mean fair and be
16 conservative about it because we were hoping for a
17 settlement before this time.

18         So, you know -- so that was the big -- because
19 there's two -- there's two ways we can do this; right? We
20 can do what we did here, which is take those loans and
21 multiply it times the basis points earned by corporate from
22 that volume, average it out monthly, and then show for
23 18 months had they stayed what the expected profit would
24 be.

25         The other the way we can do it is what I

REGENCY REPORTING SERVICE, INC. (813)224-0224

170

1    walked through this; right?  It's taken into account those
2    expenses and revenue occurred at the -- at the corporate
3    level.  So a branch P&L may be negative, but we're still
4    making -- corporate may still be making money from that
5    branch.  Does that make sense?
6         Q.   How about looking at the forward division?
7         A.   Yeah.
8         Q.   I mean, if you just look at the forward division
9    in July of 2022, was the forward division profitable at that
10   time?
11        A.   Well, I know through June we were very
12   profitable.  Through June we were profitable.
13        Q.   What about after June?  July of 2022?  And I ask
14   that because that's when your damage period starts.  So in
15   July of 2022, was forward profitable?
16        A.   I don't know.  I'd have to go back and look.  We
17   -- we ended the year being profitable but not by much, but I
18   know for the first half of the year we were, I believe,
19   20-some million in profit.  And again, I think that shows
20   the damage caused when groups like this leave, purchase
21   groups.  It becomes exponentially more damaged.
22        Q.   What was the rationale for using an 18-month
23   period to calculate the lost profit damages associated with
24   the branches closing?
25        A.   Yeah, I mean, we didn't want to use any -- again,

171

1       we were trying to be reasonable.  You know, I think you can
2       make a case for using longer.  Most of our branches have
3       been here 10, 15 years, so -- at least the core group.  So
4       we could've used longer, but we thought 18 months was a
5       reasonable amount of time.
6            Q.   We talked earlier in the context of the
7       discussion about natural attrition and if the branch
8       managers had simply, you know, said nothing but then the
9       employees obviously learn after the fact the branch manager
10      left, that there may be some employees that go and follow
11      that branch manager due to natural attrition.  And I think
12      your testimony was, yeah, eventually that could happen.  Do
13      you recall that testimony?
14           A.   I do.
15           Q.   Okay.  Do you have any data within Mutual or
16      otherwise that you relied on for purposes of this analysis
17      that says it will take about 18 months for employees to
18      follow a branch manager in the context of natural attrition?
19                MS. WALTER:  I'll object to the form.
20           A.   No, I did not do that.  But what we did do is,
21      you know, we looked at how long branches stay.  And, you
22      know, we talked a little bit about what a branch is, and a
23      branch is -- you know, individuals come and go, but that
24      branch continues to grow.  And I think that that's
25      important.  Even today some of our branches are growing and