IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC.<br><br>             Plaintiff,<br>v.<br><br>WATERSTONE MORTGAGE CORPORATION,<br><br>             Defendant. | CASE NO. 8:22-cv-01660-TPB-JSS |

**WATERSTONE MORTGAGE CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON MUTUAL'S TRADE SECRET CLAIMS**

**I.     INTRODUCTION**

After the Court ordered Mutual to identify its trade secrets, Mutual took a needle in the haystack approach and identified 186 documents. A number of these documents are not possibly Mutual's trade secrets, as they are published online and authored by third parties such as the Consumer Financial Protection Bureau. In addition, a large volume of the documents alleged to be Mutual's trade secrets were taken by the former Mutual employees and transmitted to their personal email accounts, not to anyone at Waterstone. The one item that might merit debate is the profit and loss statements that one of the former Mutual managers, Dwayne Hutto, sent to Waterstone. However, Mutual's corporate representative testified he was unaware of whether and how Waterstone used the P&Ls and was unable to articulate any damages caused by Hutto's P&L transmittal, which comports with

Waterstone's testimony that the P&Ls were not used and Hutto's testimony that Waterstone did not ask him for the P&Ls. Waterstone is thus entitled to summary judgment on the trade secret claims, as there is no trade secret misappropriated by Waterstone for which Mutual seeks damages.

## II.   STATEMENT OF MATERIAL UNDISPUTED FACTS

### A.   Mutual's Alleged Trade Secrets.

1. Mutual asserts claims for trade secret misappropriation under both the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") and the Florida Uniform Trade Secrets Act ("FUTSA"). (Am. Compl., Claims I-II, Dkt. 37.)

2. Other than certain profit and loss statements, Mutual's Amended Complaint does not specify the "Trade Secret Information" allegedly misappropriated. (*See* Am. Compl., Dkt. 37, ¶¶ 3, 37-39.)

3. Instead, the Amended Complaint contains broad allegations that former Mutual employees sent "policies and procedures," "templates," "forms," and other "confidential documents" from their Mutual Mortgage email addresses to their personal email accounts. (Am. Compl., Dkt. 37, ¶¶ 40-42.)

4. But, Mutual has sued Waterstone, not the former Mutual employees who allegedly took Mutual's trade secrets. (*See* Am. Compl.)

5. To understand Mutual's trade secret claims targeting it, Waterstone requested in discovery that Mutual "[i]dentify with particularity all trade secrets that [it] relies upon to support its Defend Trade Secrets Act and Florida Trade Secrets Act

2

claims, and any other claim pursued in this case." (Exhibit A, Waterstone's First Set of Interrogatories to Mutual at Interrog. No. 8.)

6. In response to Waterstone's Interrogatory 8, Mutual objected and referenced the broad allegations in the complaint. (Exhibit B, Mutual's Responses and Objections to Waterstone's First Set of Interrogatories at Resp. to Interrog. No. 8.)

7. Waterstone moved to compel identification of Mutual's purported trade secrets on February 6, 2023. (Waterstone's Motion to Compel, Dkt. 42.)

8. The Court granted Waterstone's Motion to Compel, ordering Mutual to identify its alleged trade secrets by Bates number. (March 1, 2023 Order, Dkt. 52.)

9. In response, Mutual identified **186 documents** as its alleged trade secrets. (Exhibit C, Mutual's Second Amended Responses and Objections to Waterstone's First Set of Interrogatories, at Resp. to Interrog. No. 8.).

10. The 186 documents include the following:

   a) Glossary of English-Spanish Financial Terms published by the Consumer Financial Protection Bureau in October 2018 (MOM-0000106-0000182);

   b) A document titled "Conference Calls FAQ" authored by Factual Data, a third-party consumer credit verification provider (MOM-0000209);

   c) A "Fact Sheet" published by the Department of Defense (MOM0000397);

   d) Fidelity Brokerage Services, LLC's "Terms & Conditions" (MOM-0000448-000449); and

      e)    Marketing Material created by BBMC Mortgage and distributed to the public (MOM-0001205).

(Ex. C, at Resp. to Interrog. No. 8.)

11. Mutual's corporate representative, Jeff Gennarelli, admitted that the above documents are not trade secrets and abandoned Mutual's trade secret claims with respect to those documents. (Exhibit D, (Gennarelli Dep. Tr.) at 228:8-25; 229:10-12; 231:6-8; 232:3-13; 233:4-18.)

### B. The Vast Majority of the Alleged Trade Secrets Were Never Misappropriated by Waterstone or Even on Waterstone's Systems.

12. Waterstone's e-forensics expert, Brett Creasey, conducted searches of Waterstone's system for the 186 alleged trade secrets identified by Mutual and concluded the vast majority were sent to nine personal or third-party accounts—not to any Waterstone e-mail account. (Exhibit E, Expert Report of Brett Creasy, ¶¶ 12-13.)

13. Further, when comparing Mutual's alleged trade secrets to the data found on Waterstone's Microsoft OneDrive system, Mr. Creasey identified only ten (10) matches. (Ex. E (Creasy Report) ¶ 15, Ex. F.)

14. This includes documents that were not misappropriated by Waterstone but instead put on Waterstone's systems by the employees and quickly quarantined by Waterstone's IT Department in response to a data security alert. Specifically, on April 27, 2022, Waterstone's IT security system alerted to a possible malware detection within Waterstone's Microsoft OneDrive environment related to the

account of Chris Wolf, one of the former Mutual employees from the Ormond Beach branch. (Ex. E (Creasy Report) ¶ 4.)

15. The next morning, Waterstone's IT Security Manager, Scott Howard, immediately investigated the malware alerts, and noticed that Mr. Wolf's OneDrive folder contained a large number of files, which was unusual because Waterstone just hired Mr. Wolf. (Ex. E (Creasy Report) ¶¶ 5-6, Exs. C1 and C2.)

16. Mr. Howard observed that some of the files on Mr. Wolf's account appeared to have originated from Mutual of Omaha. (Ex. E (Creasy Report) ¶ 6.) Recognizing the issue, Mr. Howard immediately removed access to files that the former Mutual of Omaha employees uploaded to their OneDrive accounts, including any documents that contained reference to Mutual of Omaha, appeared to contain borrower documents, personal identifying information, loans in progress, etc. (*Id.* ¶ 7.)

17. As a result of Mr. Howard's quick action, data from five new Waterstone employees' OneDrive accounts was quarantined. (*Id.*)

18. While Mr. Howard's efforts were already underway, Waterstone received multiple cease-and-desist letters from Mutual on April 29, 2022. (*Id.* ¶ 8.)

19. In addition to Mr. Howard's efforts, Waterstone interviewed the former Mutual employees regarding potential Mutual of Omaha documents in their possession, further quarantined any such data, and required the employees who were the target of Mutual's cease-and-desist demands to sign certifications that confirmed the employees did not possess any information belonging to Mutual. (*Id.* ¶¶ 10-11.)

5

20. Counsel for Waterstone questioned Mutual's corporate representative, Jeff Gennarelli, about the ten alleged trade secrets that did get onto Waterstone's OneDrive system (documents that were quickly quarantined per the above), and Gennarelli admitted that four of the ten documents are not trade secrets (MOM-0000080, MOM-0000327, MOM-0000334, and MOM-0000452). (Ex. D (Gennarelli Dep. Tr.) at 241:19-25; 242:1-15; 248:15-22.)

21. With respect to certain of the remaining six documents identified by Mr. Creasey, specifically (i) a buyer do's and don'ts tip sheet, MOM-0000055; (ii) a loan workflow list, MOM-0000065; (iii) a state-by-state appraisal fee list, MOM-0000342; and (iv) a manufactured property overview sheet, MOM-0000406; Gennarelli was not sure whether the documents were Mutual trade secrets, who the author was, where the documents were located on Mutual's systems, or whether the documents were subject to secrecy efforts on the part of Mutual. (Ex. D (Gennarelli Dep. Tr.) 238:10-13; 241:9-18; 243:9-17; 247:18-248:8.)

22. The remaining two alleged trade secrets that hit on the quarantined OneDrive documents are the P&L statements for Tampa and Daytona. (*See* Ex. E (Creasy Report) ¶ 15, Ex. F.)

23. Gennarelli could not identify any loans closed at Waterstone that were the product of alleged misappropriation of any alleged trade secret. (Ex. D (Gennarelli Dep. Tr.) 59:6-60:1.)

### C. Mutual Has No Evidence of Harm or Damages Associated with Hutto's P&L Statement Disclosure.

24. Gennarelli, as Mutual's Federal Rule 30(b)(6) corporate representative, testified that Mutual is unaware of any damages or harm associated with the P&L statements sent to Mutual by one of the former managers, Dwayne Hutto. (Ex. D (Gennarelli Dep. Tr.) 251:14-254:6.)

25. In fact, Gennarelli also testified Mutual has no evidence Waterstone used the P&L statements Hutto provided:

> **Q:** … What is your understanding of the use to which Waterstone put the P&L, if you know?
> **A:** Well, I don't know. […] I don't know how they used it.

(Ex. D (Gennarelli Dep. Tr.) 251:6-13.)

26. Waterstone's corporate representative, Kevin Allen, confirmed that the P&L statements were "irrelevant" to Waterstone and not used. (Exhibit F (Allen Dep. Tr.) at 220:18-221:15; 222:9-15; 230: 6-9.)

27. Mr. Allen further confirmed Waterstone did not ask or direct the former Mutual employees to provide P&L information. (Ex. F (Allen Dep. Tr.) 219:19-22; 220:11-17; 221:21-222:5.)

28. Hutto, who sent the P&L statements, also confirmed Waterstone did not request the P&L statements. (Exhibit G (Hutto Dep. Tr.) 69:24-25; 70:8-11.)

29. Rather, Hutto unilaterally sent the Mutual P&L statements to multiple companies he was interviewing with at the time, including Waterstone. (Ex. G (Hutto Dep. Tr.) at 70:1-7.)

30. Chris Smith, the branch manager of Mutual's former Tampa branch also previously sent his P&Ls to other companies. (Exhibit H (Smith Dep. Tr.) 130:9-13.)

## III. ARGUMENT

To prevail on its claims for trade secret misappropriation under the DTSA and the FUTSA, Mutual must prove: (1) it possessed a trade secret, and (2) the trade secret was misappropriated. *See ActivEngage, Inc. v. Smith* , 2019 WL 5722049, at *3 (M.D. Fla. Nov. 5, 2019) (citations omitted) (explaining claims under "FUTSA and DTSA can be analyzed together" and listing the elements for each). Remedies under the DTSA and FUTSA, include damages for actual loss, damages for unjust enrichment, or in lieu of damages measured by other methods, damages measured by imposition of liability for a reasonable royalty for unauthorized disclosure or use of a trade secret. *See* 18 U.S.C. § 1836(b)(3)(B); Fla. Stat. § 688.004(1).

Information is considered a "trade secret" if it (a) is the subject of reasonable measures to maintain its secrecy, and (b) derives independent economic value from not being generally known or readily ascertainable by proper means by other persons who can obtain economic value from the disclosure or use of such information. *See* 18 U.S.C. §§ 18 U.S.C. 1839(3)(A), (B); Fla. Stat. § 688.002(4). The fact that information is "confidential" does not, on its own, establish that information is a "trade secret." *See, e.g.*, *Godwin Pumps of Am., Inc. v. Ramer*, No. 8:11-CV-580-T-24-AEP, 2012 WL 1110068, at *7 (M.D. Fla. Apr. 3, 2012) (determination that information is "confidential" does not require a finding the same information is a

8

"trade secret"). In addition, "[i]nformation that is generally known or readily accessible to third parties cannot qualify for trade secret protection." *Future Metals LLC v. Ruggiero*, No. 21-CIV-60114, 2021 WL 1701568, at *18 (S.D. Fla. Apr. 13, 2021), *report and recommendation adopted,* No. 21-CV-60114-RAR, 2021 WL 1699877 (S.D. Fla. Apr. 28, 2021) (quoting *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998)).

A party establishes "misappropriation" under the DTSA and FUTSA if it proves (1) acquisition of a trade secret by someone who knows or has reason to know the trade secret was acquired by improper means; (2) disclosure of a trade secret without the owner's consent; or (3) use of the trade secret without the owner's consent. *See* 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2). "Improper means" include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6); Fla. Stat. § 688.002(1).

### A. Summary Judgment is Warranted as to the Vast Majority of Mutual's 186 Alleged Trade Secrets.

By Mutual's own admission, several of the documents it identified as trade secrets are simply not, including the third-party documents in Waterstone's Statement of Material Undisputed Facts ("SOF") ¶ 10 above that are publicly available.

Even for eight of the ten alleged trade secrets that hit on Waterstone's OneDrive system and not necessarily available to the public, Gennarelli admitted

9

either the documents were not trade secrets, or he did not know who created the purported trade secrets, where they were located, whether they were subject to efforts by Mutual to maintain secrecy, or whether Mutual believed they were trade secrets. (SOF ¶¶ 20-21.) Without this evidence, Mutual cannot satisfy its burden of proving the information it seeks to protect are its trade secrets.

And, Mutual cannot prove misappropriation. As Waterstone's e-forensic expert confirmed, the vast majority of Mutual's alleged trade secrets were never sent to Waterstone. (SOF ¶ 12.) Waterstone, therefore, never acquired the alleged trade secrets through improper means, used the trade secrets, or disclosed the trade secrets as required to establish misappropriation. To the contrary, as soon as Waterstone's IT department discovered documents potentially belonging to Mutual on its system, the employees' access to such documents was immediately terminated. (SOF ¶¶ 16-19.) Moreover, Mutual has neither identified harm based on the alleged trade secrets, nor explained how any alleged trade secrets unjustly enriched Waterstone. The court should grant judgment for Waterstone on Mutual's trade secret claims because there is simply no evidence to support them.

At a minimum, the court should grant judgment for Waterstone as to claims based on allegedly misappropriated borrower information. Mutual could not identify any loans closed at Waterstone that were the product of alleged misappropriation of any alleged trade secret. (SOF ¶ 23.) In fact, Mutual has *never* articulated a damage demand based on diverted loans. (*See* Dkt. 132 at 17-19.) Therefore, there is no basis for Mutual to pursue trade secret claims based on allegedly misappropriated

borrower information and the court should grant judgment for Waterstone as to this category of alleged trade secrets.

### B. The P&L Statements Do Not Avoid Summary Judgment.

That Mutual believes its P&L Statements contain confidential information is not enough to establish a trade secret under the DTSA and FUTSA. Mutual produced no evidence the P&L statements were the subject of efforts to maintain secrecy, and the former Mutual branch managers' own actions while at Mutual confirm the P&L statements were readily accessed, even sent to other companies. (SOF ¶¶ 29-30.)

Even if Mutual could establish the P&L statements are trade secrets, it cannot prove misappropriation. The P&L statements were never used or publicly disclosed by Waterstone, and the information was completely irrelevant to Waterstone's decision-making. (SOF ¶ 26.) Furthermore, Waterstone did not acquire the P&L statements through improper means, let alone willfully or maliciously. Waterstone did not ask or direct Hutto to send the P&L statements, and Waterstone certainly did not engage in theft, bribery, misrepresentation or espionage, nor did Waterstone breach a duty to maintain secrecy or induce such a breach. (SOF ¶¶ 27-29.)

Regardless, Mutual could not identify any damages specific to alleged misappropriation of the P&L statements. Mutual has no evidence of "actual loss" or unjust enrichment to Waterstone based on the alleged misappropriation. There is no basis for the court to award any remedy based on the P&L statements, or any other alleged trade secrets. The court should enter judgment for Waterstone.

## IV. CONCLUSION

For the reasons stated, the Court should grant Waterstone's motion for summary judgment.

| | |
|---|---|
| Dated this 29th day of February, 2024. | s/*Emma J. Jewell*<br>Maria Kreiter (*Admitted PHV*)<br>Emma Jewell (*Admitted PHV*)<br>GODFREY KAHN S.C.<br>833 East Michigan Street, Suite 1800<br>Milwaukee, WI 53202<br>(414) 287-9466 (Telephone)<br>mkreiter@gklaw.com<br>ejewell@gklaw.com<br><br>Scott A. McLaren (FBN: 414816)<br>Carolina Y. Blanco (FBN: 0098878)<br>HILL, WARD & HENDERSON, P.A.<br>101 East Kennedy Blvd., Suite 3700<br>Post Office Box 2231<br>Tampa, Florida 33601<br>(813) 221-3900 (Telephone)<br>scott.mclaren@hwhlaw.com<br>carolina.blanco@hwhlaw.com<br><br>*Attorneys for Defendant Waterstone Mortgage Corporation* |

30726492.3