IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA MORTGAGE, INC.,

Plaintiff,

vs.

WATERSTONE MORTGAGE CORPORATION,

Defendant.
____________________________/

DEPOSITION OF: **JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC.**

TAKEN: Pursuant to Notice by Counsel for Defendant

DATE: May 25, 2023

TIME: 9:17 a.m. to 4:53 p.m. EST

LOCATION: Hill Ward Henderson
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602

REPORTED BY: Melanie Keefe, FPR
Notary Public
State of Florida at Large

APPEARANCES: COURTNEY WALTER, ESQUIRE
CHRIS McCALL, ESQUIRE (Zoom)
Mitchell Sandler LLC
1120 20th Street Northwest
Suite 725
Washington, DC 20036

MARK CARROLL, ESQUIRE
Mutual of Omaha Mortgage, Inc.
100 West 22nd Street
Suite 101
Lombard, Illinois 60148

Attorneys for the Plaintiff

MARIA L. KREITER, ESQUIRE
EMMA J. JEWELL, ESQUIRE (Zoom)
Godfrey & Kahn, S.C.
833 East Michigan Street
Suite 1800
Milwaukee, Wisconsin 53202

CAROLINA Y. BLANCO, ESQUIRE (Zoom)
Hill Ward Henderson
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602

STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
Waterstone Mortgage Corporation
N25W23255 Paul Road
Pewaukee, Wisconsin 53072

Attorneys for the Defendant

ALSO PRESENT: Carrie Macsuga

| INDEX | PAGE NUMBER |
|---|---|
| Examination by Ms. Kreiter | 5 |
| Read Letter | 255 |
| Errata Sheet | 256 |
| Reporter's Certificate | 257 |

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

EXHIBIT D

would be, they had the employees violate the restrictive covenants. Waterstone enticed them with $750,000 checks and trips to Costa Rica and things like that to leave. That's what I would say is a problem.

Q. Let me ask it this way. I think you're trying to answer. I think something is lost in translation here, so let me just ask it a different way. Are you able to testify on behalf of Mutual as to how many loans involved an employee of Mutual sending confidential or borrower information?

MS. WALTER: Object to the extent it goes beyond any -- beyond the scope of any of the noticed topics.

A. And I --

MS. WALTER: Answer.

A. Again, it goes back to my whole speech that you're trying to put a dollar amount on confidential information. And, you know, that is a different deal there which you're walking down the path of. I mean, Mutual of Omaha has a brand. It's 112 years old.

Someone entrusted an employee of Mutual of Omaha with their information. Their information was then sent to Waterstone, which may or may not have the same brand, or the same customer may -- may not have chosen their information to be released. That's a whole different deal. It's not about the loan in that regard.

What is about the loan is the fact that -- listen, I mean, we can go round and round about this, but I've been in this business long enough to see you can't go in, and you know there's restrictive covenants. And you know how we know there's restrictive covenants? Because they set up little workarounds to be sneaky and to try not to get caught. Everyone agreed to say, "Oh, that was a good idea," except they did get caught. So everyone was aware.

If you're -- if what you were saying earlier, that these restrictive covenants weren't enforceable, the folks sure thought they were enforceable because they had set up the e-mails. They had little codes that they built in and tried to work around so people wouldn't know what they were doing. So -- and those e-mails were sent to sales management at Waterstone as well, so Waterstone was aware of that.

Q. For how many loans did the employees send confidential information?

MS. WALTER: Object.

A. Asked and answered, I believe is the objection, but we talked about this.

Q. I'm just not clear on it, so I just want a clear record.

A. Yeah.

Q. For how many loans did the employees send

confidential information?

MS. WALTER: Object.

A. I don't know.

Q. So confidential information --

A. Hundreds of loans.

Q. -- it could be taken by an employee. I will tell you employees make decisions sometimes, you know, but then some employees immediately regret it and delete it. And, you know, information was taken, but it was never put to use. Instead, the employee has second thoughts, deletes the information; or the employer, "Alert. Why do you have this? I don't want anything to do with that. You're deleting it," and it never really gets put to use.

So with respect to the information that Mutual contends was confidential or a trade secret or borrower information, does Mutual have evidence that that information was, in fact, put to use by Waterstone? And if so, with respect to how many loans?

A. Well, there is evidence that loans closed, as you referenced earlier. The exact amount, you already asked me, and I wasn't aware. But I'm sure counsel is aware of the exact number, but I wasn't aware of it. So --

Q. Okay.

A. -- according to this deposition, I won't be able to answer that. At trial, I'm sure we'll be able to answer

that.

Q. So to be clear, are you able to tell me at this deposition today on behalf of Mutual as the corporate rep for how many of the loans where confidential information was taken or transmitted -- for how many of those loans was the information actually put to use by Waterstone?

MS. WALTER: Object to form.

And before you answer that, I just want to put on the record that I did object to Topics 9 through 13 regarding all evidence insofar as it relates to attorney work product.

MS. KREITER: This is Topic 1, what are the damages and how were they calculated? So --

MS. WALTER: This is Topics 9 through 12 about how Waterstone used the confidential information.

MS. KREITER: Well, it also relates to the statement --

MS. WALTER: That's --

MS. KREITER: Let me say what I'm going to say, and then you can speak.

MS. WALTER: Okay.

MS. KREITER: It also relates to the statement in Mutual's written discovery response that there was unlawful conduct by Waterstone that caused the losses. So I'm following up on that. It's Deposition Topics 1

A. So you would go to the Loan Officer column, search down by Chris Smith.
Q. Okay.
A. Christopher Smith funded one loan, it looks like, Loan 1728004368 for borrower Cossio, funded on 1/30/19 for $299,653,000.
Q. Okay. So you would go through all of the P&L statements, look at this YSP tab, and then find either Mr. Smith, Mr. Hutto, or Mr. Wolf, add up all of the -- I guess what would it be? YSP Accrual, is that analogous to revenue or not?
A. YSP is revenue.
Q. Okay. And is your testimony that all of the P&Ls have a YSP Accrual tab and that's the methodology that you would use to calculate these numbers?
MS. WALTER: Object to the form.
A. Yes.
Q. Is there another report that you could generate on a person-by-person basis rather than looking through --
MS. WALTER: Object to the form.
Q. -- all of the P&L statements?
A. Yes.
Q. What is that?
A. Well, like we said before, it's the Encompass report. There's a B&I report. There's all different --

Q. Reports that can be run?
A. Yeah.
MS. WALTER: Object to the form.
A. But this is, you know, the accounting behind it. Then you can look at the transactions listing, cross-reference that loan with the actual YSP and the dollar amount associated with it.
Q. Sure. Let me ask it this way: So does -- P&L, that's the raw data. But then there's a report that you can run that rather than going through all the raw data, compiles the raw data, and there's a report that could be generated that has the responsive information?
MS. WALTER: Object to the form.
A. Yes.
Q. Is this sheet of Exhibit 9 that we've been looking at, does that allow you to discern any information relevant to Topics 6(a) and 6(b) that we were talking about? I don't know if you remember which those are. You can refer back to -- do you have them in mind?
A. No.
Q. Okay. So 6(a) is "All loans originated by the departed employees while still employed by Mutual of Omaha or the Ormond Beach branch and then closed with Mutual." And then 6(b) was the same but with respect to the Tampa or Paramus branches. Is this page of Exhibit 9 illuminating as

to that?
A. Yes.
Q. In what way?
A. It's the ones that closed.
Q. I thought you had indicated that you were uncertain about whether those loans would be booked under the -- for example, for the Daytona branch, the loans that were in the pipeline and closed by, say, the Tampa branch.
A. Well, that's not what you just said. You just asked me what -- that's not what 6(a) and 6(b) said. 6(a) and 6(b) simply said identify the loans of those three managers, which we can do.
Q. No. It's the loan that closed after the branches --
A. Oh, we certainly can see -- we can compare the two branches and certainly see them. What loans closed, the loan officer's name will be there.
Q. Is it -- are you certain or uncertain that the loans that were closed, say, in the pipeline for Daytona would show on the Daytona P&L or on the Tampa P&L?
A. I -- I would be fairly certain that they would close under the Daytona branch P&L, but I'm not a hundred percent.
Q. Okay. We have been talking before, revisiting this topic of the loans and the different reports that are

available to Mutual. We have been talking about the trade secret claims, and I want to get back to that --
A. Sure.
Q. -- topic. Just get organized for a minute here. Take a look at Deposition Exhibit 15. This exhibit is a compilation of different documents that Mutual has identified as its trade secrets in this case. I want to start with the first document in the compilation. It's Bates No. 106. It goes all the way through 182. It's a Consumer Financial Protection Bureau October 2018 report that's titled Glossary of English-Spanish Financial Terms. Do you see that?
A. I do.
Q. This isn't a document that was created by Mutual, was it?
A. It does not appear to be.
Q. Is Mutual in any sense the owner of this CFPB Glossary?
A. Not -- not to my knowledge, no.
Q. Are you aware of whether this document is publicly available?
A. I assume it's publicly available.
Q. Is this document one that Mutual takes measures to keep secret?
A. No.

Q. Do all lenders have access to this CFPB publication?
A. Probably.
Q. If you open it up, it consists largely of English words and the Spanish translation. Do you see that?
A. I do.
Q. You could look up English words and Spanish words on the Internet and get them translated; correct?
A. Yes, yes.
Q. Do you maintain on behalf of Mutual that this document is a trade secret of Mutual of Omaha?
A. No.
Q. Do you know why this document was designated as a Mutual trade secret?
MS. WALTER: Object to the form.
A. I don't know why other than I could imagine this "Confidential" on the front page probably triggered some IT system.
Q. Well, I'll just state for the record the document is labeled Confidential --
A. Oh, you --
Q. -- with the Bates numbering in this case. Mutual designated it confidential under the protective order. Opposing counsel can correct me if I'm wrong, but that confidential designation was adhered as part of the

litigation. Do you know why this document would've been designated by Mutual as a trade secret?
MS. WALTER: Object to the form.
A. No.
Q. Let's go to the next document in the compilation. There's a blue sheet that kind of separates the documents. I think you went a little too far. Bates No. 209, yep, you're right there.
A. Okay.
Q. So this document is titled at the top -- there's a heading for Factual Data. Factual Data is a third party that provides consumer credit verification services to lenders. Are you aware of that?
A. I am.
Q. Is this document in any sense authored by Mutual or owned by Mutual?
A. No.
Q. Does this document have economic value because it's not generally known?
A. I don't believe so.
Q. Does Mutual make efforts to keep this particular document secret in any sense?
A. No.
Q. Is there any language that you can point to on this document that you consider to be trade secret?

A. No.
Q. In fact, this is -- it's written as if this is a document that is given to a borrower. Do you agree with that?
A. It appears that way.
Q. Do you maintain on behalf of Mutual that this is a trade secret?
A. No.
Q. Do you have any information as to why Mutual designated this document as one of its trade secrets?
A. I don't.
Q. Take a look at the other documents in this compilation. I'll try to short-circuit it a bit. The next document in the compilation is Bates numbered MOM-397. It's a document published by the Department of Defense labeled Fact Sheet. Do you contend that this is a Mutual of Omaha trade secret?
A. I don't know what this is really, to be honest. I just don't know what it is.
Q. Is it something that's created by Mutual of Omaha? This is Department of Defense Fact Sheet.
A. It does not appear to be.
Q. What testimony can you provide that would explain how this Document Bates No. 397 is a Mutual of Omaha trade secret?

MS. WALTER: Object to the form.
A. None.
Q. You agree it's not a trade secret of Mutual of Omaha?
A. It appears not to be, no.
Q. Let's go to the next one, MOM-448. Terms and Conditions is the title of the document. It reads "The account owner named in the account application must read and agree to the terms of the Fidelity Brokerage Retirement Account Customer Agreement," and then it goes on. To me, it appears that this is a document of Fidelity, not of Mutual. Is this a Mutual of Omaha trade secret?
A. No. Was this part of another customer information thing or something? I don't know. It seems odd.
Q. Did you -- how much time did you spend reviewing the volumes of documents that Mutual has identified as its trade secrets?
A. I really only focused on the customer information, things like that, yeah.
Q. So there's a lot of documents that have been designated as Mutual trade secrets. It sounds like we're abandoning the claim with respect to the documents that we've talked about so far in Exhibit 15. And just for completeness, there's one more document in Exhibit 15, the

last page, BBMC Mortgage, "Need a 2nd Opinion?" Bates number MOM-1205. Do you see that?

A. Yes.

Q. Is this a Mutual of Omaha trade secret?

A. Well, Mutual of Omaha purchased the -- the assets of BBMC. This is marketing material created by BBMC, so I don't know.

Q. Sure. It's marketing material, meaning it's given out to members of the public; correct?

A. Yes.

Q. And is it your position that marketing material widely distributed to members of the public are trade secrets?

A. No.

Q. So is there any document within Deposition Exhibit 15 for which Mutual is not abandoning its position that the documents are trade secrets?

A. No.

Q. I want to go back to the time and effort that you spent preparing to talk about Mutual's alleged trade secrets. How much time did you spend preparing for those deposition topics?

MS. WALTER: Object to the form. Asked and answered.

A. Yeah, we talked about this.

Q. I think that we talked about your preparation overall. I want to know specific to the trade secrets and being in a position to identify which of the documents are trade secrets, how much time did you spend on that?

A. Well, again, we talked about it. I don't know. I spent --

Q. Does it surprise you that Mutual is making claims that the documents in Exhibit 15 are trade secrets?

MS. WALTER: Object to the form.

A. Yeah, I don't know if it would be surprise me if something gets put in when there's a lot of documentation sent. I don't know. I'm not a lawyer. I don't know what a trade secret is or what isn't either, so...

Q. Did you make any efforts in preparation for your testimony to understand what a trade secret is or is not?

A. I did.

Q. What did you do?

A. Discussed it with attorneys, my attorneys.

Q. Okay. Do you understand that there's a difference between confidential information and something that's a trade secret?

A. I do.

Q. What is the difference between confidential information and a trade secret?

A. Well, in my mind, it's -- so if you take

confidential information and then you take -- you process that confidential information, like, in the form of a loan, for instance, then that becomes a trade secret because the value of that is immense compared to just customer information, which is confidential, so...

Q. Let's look at another one.

(Exhibit No. 16 is marked for identification.)

Q. Exhibit 16 is another composite exhibit consisting of documents that Mutual of Omaha has designated as its trade secrets. Let's look at the first document, Bates No. 55. It says "Buyer Dos and Don'ts." Do you see this?

A. Yes.

Q. What is this document?

A. I believe it's to help the buyer along with the process of purchasing a home.

Q. So it's something given to the buyer?

A. I'm not sure it's given to or discussed. If it's for the loan officer to discuss it, I'm not sure.

Q. Well, let's take a look at it. The first one, it says "Dos. Check your e-mail at least daily. Most of our communication and documents are sent through e-mail for efficiency and to provide you with a fast and enjoyable process for closing." Do you believe that that statement is directed to the buyer?

MS. WALTER: Object to the form.

A. I -- I don't understand the checks -- the checkbox here. Like, that almost looks like the loan officer checks that out. Do we send that? But I really don't know, so...

Q. Let's look at No. 2. "Pay all your bills on time. Be extra careful to keep all the normal bills paid as usual." That wouldn't be something directed to an employee of Mutual. It's directed to the buyer; correct?

A. Could it be a script? I don't know. It sounds like a script to me.

Q. Have you seen this document before?

A. No.

Q. I want you to tell me all of the reasons that you contend on behalf of Mutual that this document is a trade secret, if you do; or if you think it's not a trade secret and should be in the category that we talked about with the others --

A. Well, I don't think it's in that category because it was produced by Mutual of Omaha, so that's a little different.

Q. Are there R&D efforts and significant monies invested to create Bates No. 55?

A. There's a marketing team.

Q. Specific to this Exhibit, though.

A. The marketing team did this?
Q. Sure. I mean, so do you have information that Mutual of Omaha invested significant time, money, resources, efforts to create this --
A. No.
Q. -- Bates No. 55?
MS. WALTER: Maria, I'd like to also get on the record that you're showing him an attachment to an e-mail, and so I think this line of questioning and the prior is a little taken out of context because you didn't produce the entire family. You're not showing him the entire family. You're showing him one attachment.
MS. KREITER: But this is what you identified. If you thought the e-mail and certain attachments were not trade secrets, you should've identified that, but Mutual didn't. It identified 55, so trying to understand, are these still something that Mutual is going to maintain is a trade secret, or is Mutual changing its mind as to this document?
Q. Is this document something that Mutual keeps under password protection or restricts access to in any fashion?
A. Well, all of our marketing materials are password-protected in our Knowledge Coop.

Q. Is there particular language on 55 that you believe is commercially valuable that would harm Mutual if it got into the hands of a competitor?
A. I mean, anytime you come up with a script like this and your competition gets it, they're at an advantage.
Q. Sure. I mean, are you saying that this is more than confidential and is a trade secret?
A. I don't know. I've done a lot of mortgages. I've never gotten this from other places, so...
Q. Do you believe this is confidential information or something that rises to the level of a trade secret, No. 55?
A. I'm not sure.
Q. Okay. Let's go to the next one, 65. Have you ever seen this document before? It's Bates No. 65 and then it continues through 74.
MS. WALTER: And for the record, we did identify MOM-0000054 as a trade secret on page 24 of our responses from March 10th of 2023. And you showed him 55, which was an attachment to that e-mail.
MS. KREITER: Right. You also identified 55.
Q. So 65, are you able to say what this document is?
A. It looks like a procedure.
Q. Is this something that -- I don't see any Mutual of Omaha letterhead. Do you know whether this was authored

by an employee of Mutual of Omaha?
A. I don't know other than it does look like our -- our procedures.
Q. Is this a document that you can say is subject to secrecy efforts on the part of Mutual?
A. You're showing what system, SimpleNexus, how that all works, so this is how DocuSign works with SimpleNexus.
Q. I'm going to direct you to page 67 of the document.
A. Yeah.
Q. "Once you have your print and signs, credit LOX, and other items ready for the DocuSign, review your file for additional borrower items needed. I start at the -- at home page and work through all the pages of the URLA and then check the itemization screen so I can see an estimated cash to close," and then it goes on. This appears to be authored by an employee, and it's a form of a checklist; correct?
MS. WALTER: Object to the form.
A. It's a form of a policy -- I mean a procedure. Sorry.
Q. What about this do you contend is a trade secret?
A. Well, I think it was valuable enough to send outside of our system; right? So that -- if it was -- if it was of no value, why would someone send it?
Q. Okay. Well, value can be confidential

information, or it can be a trade secret. Mutual has alleged this is a trade secret. I'm trying to understand -- or something can be just valuable but not even confidential. There can be checklists online, and that's maybe helpful but not confidential. So I'm trying to understand why Mutual believes that this checklist is not only confidential but is somehow a trade secret.
A. I think you're --
MS. WALTER: Object to the form.
A. I'm sorry. You're calling it a checklist. It doesn't appear to be a checklist to me.
Q. Well, it's "Loan Partner: File Kickoff To-Do List and Workflow."
MS. WALTER: Again, I want to object to the extent that the entire family wasn't produced. You're showing him piecemeal.
MS. KREITER: So what?
MS. WALTER: So it's taken out of context.
MS. KREITER: Then show him the full context, but you designated this document, and you can do that on rebuttal. But right now this is a document that Mutual designated, and I'm asking him why it's a trade secret. If he says it's not, we'll take it off the list.
A. I mean, the problem is what you captured here is our text stack, and I believe that is a trade secret.

You're not just talking about how to do one thing. You're showing how the file moves from SimpleNexus through Encompass, through DocuSign. These are all -- this is text stack that is --

Q. Are all employees of Mutual of Omaha subject to a confidentiality agreement?

MS. WALTER: Objection. Form.

A. Yes.

Q. With respect to this document, you have no idea who created it, however? You don't know who the author is?

A. What was that?

Q. 65.

A. Oh, we're still going -- yeah, I don't -- I don't know.

Q. Is this something that executives within Mutual of Omaha Mortgage would see?

A. I don't know. I don't know where this -- I don't know where it resided. I don't know. I just don't know.

Q. Let's go to the next one. There's a blue sheet, and then there's two documents, Profit and Loss Statement. It's a blank template. There's nothing filled in. Is this a trade secret of Mutual of Omaha?

MS. WALTER: What's the Bates on this one?

MS. KREITER: 80.

A. As this stands right here, I would say no.

Q. Let's go to the next one, Bates No. 327. It's a single-page document. It says "To whom it may concern. I am writing this letter to explain what the cash-out proceeds from my refinance will be used for." And then it's completely blank. Is this a trade secret of Mutual of Omaha Mortgage?

A. I think it's a form that this person didn't want to recreate, and then they --

Q. Is it a trade secret of Mutual of Omaha Mortgage?

A. I would say in this context, it is not a trade secret.

Q. Let's go to the next one, Bates No. 334. This is a completely blank Uniform Residential Loan Application. Is this a trade secret of Mutual of Omaha?

A. No.

Q. Let's go to the next document, No. 342. Just let me know when you're there.

A. I am.

Q. So there's a corporate heading on the top, Appraisal Linx. Do you see that?

A. I do.

Q. Is this document owned by and authored by a Appraisal Linx or Mutual of Omaha?

A. It's our negotiated terms with Appraisal Linx.

Q. Who owns the document? Who created it and who

owns it?

MS. WALTER: Object to form.

A. I don't know who owns it. I mean, this is -- it was created for us by Appraisal Linx. But, you know, the problem is, is you have all this information that we negotiated. So now I can take this and negotiate the same deal and show Appraisal Linx, "Hey, you did this for" -- and now we're at a competitive disadvantage, so, you know --

Q. Do you maintain that Bates No. 342 is a trade secret of Mutual of Omaha?

A. The pricing on this form is specific to Mutual of Omaha negotiated by us, so I believe that's probably why it's in here.

Q. And you believe that this is a trade secret, not just merely confidential?

A. You know, I think that's probably for a jury or a judge to decide. I don't know.

Q. Well, what do you think on behalf of Mutual today? Is it confidential, or is it a trade secret?

MS. WALTER: Object to form.

A. I think it depends on the context of it. I've spent 22 years working with Appraisal Linx to negotiate these prices.

Q. Is there a confidentiality agreement between Mutual of Omaha and Appraisal Linx?

A. An NDA, I believe. Certainly, there was one at one time.

Q. So I want to make sure that I'm clear on the part of this document that you believe -- that you contend is secret and is a trade secret. It's the pricing?

A. It's the pricing, yeah.

Q. So there's different columns here: Conventional, Field Review, Desk Review, Final Inspection, Recert. of Value, Rent Schedule, Operating Inc., Additional Upcharges, Estimated Value. All of that is a trade secret? Not the headings themselves, but the data --

A. The pricing. The pricing.

Q. What value would this document be to a competitor?

MS. WALTER: Object to form.

A. So I have a relationship with Appraisal Linx I have had for -- since I've been in the business really. Blake Chiado owns Appraisal Linx. I negotiated these terms on our behalf. If a competitor got this document, they could then get the same deal because, you know, it's difficult for Appraisal Linx to say, "Well, no, you haven't known me for 25 years, and so I can't give you the same deal."

So now they're going to be -- we're at a competitive advantage because we have negotiated very good

prices with our appraisal companies. That is passed along to the consumer, which makes our loans more appealing at times.

Q. So this reflects the pricing negotiated by Mutual with Appraisal Linx, and that applies to all of the different loans for which there's a working relationship?

A. That's right. And it's negotiated on the customer's behalf because we don't pay it. The customer pays for this.

Q. Sure.

A. But it's -- the lower we can get these fees, we're at a competitive advantage; right?

Q. So if this were in the hands of an individual loan officer, would it be valuable to that loan officer because the loan officer can then negotiate on a borrower-by-borrower basis, or would it only be valuable to Waterstone, the company, which is the party that's going to negotiate companywide?

A. I think it's -- I think in today's day and age, there are a lot of loan officers that negotiate and use their own appraisal management companies and bring that to the table. So it's valuable to both.

Q. Do you have any evidence that this document was given to Waterstone?

A. I don't.

Q. Do you have any evidence that Waterstone used this document to negotiate with Appraisal Linx or for any other purpose?

A. I don't.

Q. Are there any damages associated with 342 that Mutual is claiming?

MS. WALTER: Object to form.

A. Yeah, we don't -- we don't know what those damages may or may not be.

Q. Well, today here at the deposition, are there any damages that Mutual is claiming that are derivative of 342?

MS. WALTER: Object to form.

A. I don't think I'm comfortable answering that. We don't -- again, we don't -- I don't even know if they're using this, if they are using it or not, so...

Q. Let's go back to the other document that I think you did not rescind from a trade secret perspective. It was the Bates No. 65, the File Kickoff To-Do List and Workflow. Do you have any information that this document starting with Bates 65 was in the possession of Waterstone?

A. I don't know.

Q. Is Mutual making a damages claim specific to this Document 65?

MS. WALTER: Object to the form.

A. I'm not sure how that works, the damages. I'm

not -- is it a total of all of it? I think the damages, I think, are more related to the customer aspect of it all and not things like this but in total.

Q. But there's not a dollar amount that you associate and Mutual is demanding that is based on a derivative of 65?

MS. WALTER: Object to form.

A. Not to my knowledge, no.

Q. Okay. Let's go to the next document in the composite. It's Bates No. 406. We're near the end. Just let me know when you're there. Same exhibit.

A. Okay.

Q. It's the same Exhibit 16, Bates No. 406.

A. Okay. What one? I'm sorry.

Q. 406.

A. Got it. Okay.

Q. What is Bates No. 406?

A. Manufactured Property Overview, it looks like it's a -- guidelines for lending to manufactured homes.

Q. Is this document a trade secret of Mutual of Omaha?

A. In this context, I can't tell who -- who prepared this. The way we underwrite a manufactured home would be a trade secret, but I don't know if that's what this is or if this is something else. I can't tell in this context.

Q. Okay. So it sounds like you don't know whether this is a trade secret; is that accurate?

A. I don't know where this -- yeah.

Q. Is this a document that was the subject of secrecy efforts on the part of Mutual?

MS. WALTER: Object to form.

A. I don't know where it came from. I don't know. I don't see the context of it.

Q. Are there damages that Mutual is demanding based on 406?

MS. WALTER: Object to form.

A. Same answer as before. Not -- not specifically.

Q. Let's go to the last one.

MS. WALTER: There's no Bates on this.

MS. KREITER: Correct. I think that's because it was a native Excel, so it's No. 452, Bates 452.

Q. What is this last document in the exhibit?

A. I think this references by investor who needs an attorney opinion letter for a trust.

Q. Is this a Mutual of Omaha trade secret?

A. You know, again, I would say probably not, not in this context anyway.

Q. Let's talk about the P&L statements. You have an understanding that certain P&L statements were sent by certain of the departing employees to Waterstone Mortgage;

correct?
A. Yes.
Q. Do you consider those P&L statements to be trade secrets of Mutual of Omaha?
A. Yes.
Q. Why? And if you can be exhaustive as possible.
A. The information contained in a P&L statement is very damaging if a competitor gets it.
Q. Let's make an exhaustive list. Damaging if a competitor gets it?
A. Yes.
Q. Any other reason?
A. Depends on what tabs were sent. I don't know if -- you know, on the P&Ls, as we reviewed, there's tabs in here that has, you know, nonpersonal information in there, nonpublic information rather. It shows volume, as we discussed, of loan officers that work for us. It shows all staff that work in that area.
It shows who we sell our loans to, what we charge for a processing fee, what we charge for an underwriting fee, what we pay our folks, what -- what we charge for insurance, what we allow for 401(k) polling, what lead resources we use, and what the compensation structure is for the loan officers and managers.
Q. I'm going to show you -- specifically, let's look





at this next exhibit.
(Exhibit No. 17 is marked for identification.)
MS. WALTER: Do you have the Bates for this?
MS. KREITER: I don't know right now, no.
Q. Take a look at Exhibit 17.
A. Okay.
Q. So we came up with a list just now of ten different reasons why you believe that the P&Ls are trade secrets. With respect to this P&L in particular, do you believe that this P&L is a trade secret for all of the reasons that you identified?
MS. WALTER: Object to the form.
Q. Let me ask it a different way. So specific to this P&L, I heard you testify that, "Well, it depends on what tabs might be included on the P&L. I'm not sure." So this is an actual one that I want to look at.
A. Sure.
Q. Are there components of this Exhibit 17 that Mutual contends is a trade secret?
A. Yeah. It appears those things we referenced are in this document.
Q. Okay. Let's talk about -- you said it could show the loan officer volume?
A. Yes.
Q. Do you have evidence that Waterstone -- let's





stop before I get to that question. Where is the loan officer volume in 17?
A. That same tab we talked about the last time.
Q. The YSP tab?
A. Yeah.
Q. Okay. That's good enough. What is your understanding of the use to which Waterstone put the P&L, if you know?
A. Well, I don't know.
MS. WALTER: Object to the form.
THE WITNESS: Oh, I'm sorry.
MS. WALTER: It's okay. Go ahead.
A. I don't know how they used it.
Q. Do you -- does Mutual have a damages claim specific to the P&L statements?
MS. WALTER: Object to the form.
A. I -- I think we're still calculating the damages from this information is my understanding.
Q. So let me give you an example. If, for example, you know, Waterstone used the P&L to undercut pricing and then got loans that it wouldn't have been able to close but for having the confidential information, you could say Waterstone made use of that P&L and it translates to damages that you can quantify?
A. Yeah. I'm sorry.





Q. Do you -- go ahead. Do you have, with respect to the P&L statements, you know, that type of theory, that Waterstone made use of the P&L in some fashion that translates to damages? If so, you know, what are those damages that are derivative of the P&Ls?
MS. WALTER: Object to the form.
A. So I think it goes back to the information contained in here that's so overwhelmingly confidential: borrowers' name, loan amount, YSP on that loan. You could back out what that -- what the rate is, you know, a mortgage person could. So you could then use that information to refinance these borrowers to do whatever it is that you wanted to do. It's the amount -- it's the overwhelmingness of that information that's --
Q. Sure. And I'm trying to get specifically is there a claim for damages based on this? I mean, we talked about, you know, there's no claim for damages based on some of the other documents. And let me give you this scenario in case it's helpful: You know, the formula for Coke, that's the classic, wow, that's a trade secret.
A. Yeah.
Q. So, you know, someone could take the formula for Coke. But if they don't do anything with it and think, "Shoot, I took the formula for Coke, shouldn't have done that," and it's never put to use, I mean, bad that the

information was taken, and maybe you have a claim that the trade secret was misappropriated, but there's not necessarily a harm in a damages claim that flows from it.

So I understand Mutual's position this is a trade secret. It shouldn't have been conveyed. But what I'm trying to understand with specificity today is what dollar demand, if any, is derivative of the transmittal of the P&L statement?

MS. WALTER: Object to form.

A. Yeah, I'm not sure. I'm not comfortable -- I was told by attorneys that we haven't come up --

MS. WALTER: Don't. Attorney-client privilege.

THE WITNESS: I'm sorry. Okay.

A. So I'm not comfortable answering that.

Q. Okay. So, I mean, then I need to make a record of that. So the testimony on behalf of Mutual today at the deposition is you're not comfortable answering whether there's a claim based on damages derivative of the P&L statements? I just want to shut the door on this if that's the case. Is that the case?

A. Repeat yourself one more time.

Q. I need to understand, you know, today is there a claim that Mutual is making derivative of the P&L statements for damages? I totally get we think that this shouldn't have been sent. I get your position that it's a trade

secret. What I don't have an understanding is, does that translate to a demand for damages and that you're claiming today that you can tell me about at the deposition?

MS. WALTER: Object to form.

A. Not that I can tell you about today, but that doesn't mean damages are off-limits in terms of this.

MS. KREITER: I could use just a five-minute break. I think that I'm near the end here.

(A recess was taken.)

MS. KREITER: I have nothing further.

THE WITNESS: Thank you, Jesus.

MS. WALTER: Nothing from me.

(The deposition concluded at 4:53 p.m.)

**REGENCY REPORTING SERVICE, INC.**
201 East Kennedy Boulevard
Suite 875
Tampa, Florida 33602
813-224-0224

June 1, 2023

COURTNEY WALTER, ESQUIRE
CHRIS McCALL, ESQUIRE (Zoom)
Mitchell Sandler LLC
1120 20th Street Northwest
Suite 725
Washington, DC 20036

CASE REFERENCE: MUTUAL OF OMAHA MORTGAGE, INC. vs. WATERSTONE MORTGAGE CORPORATION

Deposition of Jeffrey Gennarelli, Corporate Representative of Mutual of Omaha Mortgage, Inc.

Dear Ms. Walter:

Enclosed is your copy of the deposition taken in the above-styled cause on May 25, 2023, along with a several-lined correction sheet.

Please have your client read your copy of the deposition, make whatever corrections or changes necessary on the lined sheets, indicating page and line numbers, and then sign the signature page. Return only the correction and signature page.

If you have any questions concerning this, please don't hesitate to call.

Very truly yours,

_________________
Melanie Keefe, FPR
Court Reporter

SIGNATURE PAGE/ERRATA SHEET

WITNESS: JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC.

CASE REFERENCE: MUTUAL OF OMAHA MORTGAGE, INC. vs. WATERSTONE MORTGAGE CORPORATION

CASE NUMBER: 8:22-cv-01660-TPB-JSS

DATE: May 25, 2023

After you have read your transcript, please note any errors in transcription on this page. Do not mark on the transcript itself. Please sign and date this sheet as indicated below. If additional lines are required for corrections, attach additional sheets. If no corrections, please indicate "None."

| PAGE | LINE | ERROR OR AMENDMENT | REASON |
|---|---|---|---|
| | | | |

Under penalties of perjury, I declare that I have read the foregoing transcript, and I subscribe to its accuracy, to include the corrections or amendments noted above or hereto attached.

____________________________________
JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC. — DATE