Page 1

1              UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                   TAMPA DIVISION

4    _____

5    MUTUAL OF OMAHA MORTGAGE, INC.,

6          Plaintiff,

7       v.                           Civil Action

8    WATERSTONE MORTGAGE CORPORATION,      No. 22-CV-

9          Defendant.                      01660

10   _____

11    VIDEOTAPED DEPOSITION OF CORPORATE REPRESENTATIVE OF

12       WATERSTONE MORTGAGE CORPORATION - KEVIN ALLEN

13   DATE:          Thursday, August 24, 2023

14   TIME:          11:32 a.m.

15   LOCATION:      Remote Proceeding

16                  833 East Michigan Street, Suite 1800

17                  Milwaukee, WI, US, 53202

18   REPORTED BY:   Shondra Dawson, Notary Public

19   JOB NO.:       6063052

20

21

22

EXHIBIT
F

1 saving the planet here a little bit, the P&L is, like,
2 50, 60 pages, and I didn't want to copy it and do all
3 that stuff.
4        So I will represent to you, and I hope
5 you'll take my word for it, a P&L was actually
6 attached to this. I don't think Ms. Kreiter would
7 disagree with me on that point. So I'm just going to
8 represent that there was an attachment to this that
9 was a P&L. Okay?
10   A   Okay.
11   Q   All right. Now, so this email shows
12 Mr. Hutto sending, if you scroll down, a P&L. It's
13 called December P&L, which I'll represent to you was
14 actually sent by Tampa. And if you look, it's
15 Mr. Smith sending it to his personal email, and then
16 that goes to Mr. Hutto who sends it to Mr. Owen. You
17 see that?
18   A   Yes.
19   Q   Okay. Now, earlier, we looked at the
20 Exhibit 22. Remember that employment agreement --
21   A   Section 5?
22   Q   Point one?

1   A   Yes. Yeah.
2   Q   And I'm not trying to trick you. I'm happy
3 to show it to you if you want to see it again. But
4 I'm trying to speed this along because I don't think
5 you want to be here later than you need to be. So do
6 you recall Section 5.1 saying you can't send over any
7 confidential financial information to the company?
8   A   Something to that extent. Right.
9   Q   Yeah. And you would agree with me a branch
10 P&L would be that kind of information; right?
11   A   Yeah. I mean, in terms of their agreement
12 saying they shouldn't be sending that. If Mutual is
13 stating that -- right. Yeah.
14   Q   But, certainly, from Waterstone's
15 perspective and with respect to its own loan officers,
16 it shouldn't be sending this information to another
17 company; right?
18   A   Yeah. I -- I would agree with you.
19   Q   Okay. Now, does it concern you at all that
20 this information was, in fact, sent to Mr. Owen?
21   A   And concern -- I -- I -- again, that's
22 Dwayne and Chris choosing to send that.

1   Q   So if I showed you there were multiple
2 emails of this being sent, would that be a problem for
3 you?
4   A   And "multiple" being -- and I'm sorry. Just
5 so I'm understanding the context of "multiple" emails.
6   Q   More than one P&L being sent from more than
7 one branch.
8   A   And if you say a concern would, you know,
9 the concern would be in terms of Dwayne and Chris
10 sending if they should not have.
11   Q   Well, but you're getting it too, and you
12 understand that this is information you guys think is
13 confidential for any company; right?
14   A   Well, I --
15       MS. KREITER: Object to the form.
16   A   And I -- we don't -- we don't request the
17 P&Ls.
18   Q   Okay. But if you get them, do you use them
19 anyhow or do you send it back and say, hey, guys, you
20 shouldn't really be sending this to me?
21   A   I -- I -- because I'm the one involved with
22 the numbers and I put a pro forma together. Based on

1 all of our branches having very detailed financials --
2 and, again, we have large ones, small ones, or what
3 have you, we -- we have a very good idea of what
4 expenses are going to look like.
5       My pro forma -- I do a high amount, low
6 amount. I mean, I just hit that thing many different
7 ways. And I state that because I probably, you know,
8 seeing -- because I have financial calls with
9 branches, I probably have seen a thousand -- I feel
10 like are over a thousand of these.
11       So I just state that -- that for us,
12 receiving it is not -- to me, is not part of our
13 decision-making. Again, I don't -- it -- it's rare
14 that we would -- we would not request it, and it's
15 weird somebody is providing it to us.
16   Q   Okay. So this was a rare situation. So
17 then I guess my question's easy then for you. I mean,
18 does it at least concern you that it was sent or no?
19 If it doesn't concern you, tell me it doesn't concern
20 you.
21   A   Well, from the context of Dwayne and Chris,
22 they'd have to live with their agreement. That's all

56 (Pages 218 - 221)

Page 222

1 I'm referring to is it wasn't when we said, hey, we
2 need this, we want this. They sent it. So, again, it
3 was -- I -- I don't know. That's -- so I -- I point
4 more to them and in terms of their obligations or what
5 have you with their current company.
6     Q   All right. So you don't really care about
7 those obligations? That's not your problem?
8         MS. KREITER: Object to the form.
9     A   I'm not indicating that -- to me, the -- the
10 financials were -- were irrelevant because we don't
11 make a decision -- I've got -- I've got information
12 that I can gather and have in a pro forma. That's
13 what we use to make our determination if somebody is
14 viable or that. That's -- that's why I'm answering it
15 that way.
16    Q   Okay. Well, let me ask you this, sir. You
17 would agree with me -- you're familiar somewhat with
18 Regulation Z, generally, the loan officer compensation
19 rule?
20    A   It -- it -- enough, I guess, I'd want you to
21 expand and, you know, wherever we'd want to talk
22 through.

Page 223

1     Q   You have some idea what I'm talking about.
2 I'm not asking about the intricate regulations. Just
3 you know what I'm talking about that rule involves;
4 right?
5     A   And are we talking just LO comp in general?
6     Q   LO comp in general.
7     A   I mean, LO compensation, I'm somewhat
8 familiar. Yeah.
9     Q   Right. And you understand that, like, with
10 the branch -- when you call them expense forecasts or
11 expense model branches --
12    A   Expense management branches. Yeah.
13    Q   Right. There's a reason why they're really
14 not P&Ls anymore is because you can't pay based on the
15 profitability of actual loans. You can't punish them
16 for concessions and pricing exceptions; right? That
17 kind of thing.
18    A   Yeah. A non-producing can be on a straight
19 P&L. Producing manager, right, is the one on the
20 expense management model. Right.
21    Q   You're exactly right. Yes. And pass the
22 regulatory test. So these were producing managers;

Page 224

1 right?
2     A   Yes.
3     Q   Right. So concessions are not something
4 that's publicly available, is it? And pricing
5 exceptions?
6     A   No. They would not be publicly available.
7 Right.
8     Q   And to the extent that information -- I'm
9 not asking whether you do or you didn't. Okay? I'm
10 not saying that. But you would agree with me having
11 that information would at least in theory allow you to
12 finetune and hone a projection because you'd know what
13 their behavior is with respect to pricing exceptions
14 and concessions; right?
15    A   Well, the only -- the only thing I -- I
16 mean, I'd want to add into that though is that
17 companies have different corporate margins. And so I
18 actually go in and we'll talk with somebody, price
19 live loans to find out what is our branch margin in
20 our world.
21        So that's where I back into it because
22 everybody company kind of -- I shouldn't say kind of,

Page 225

1 approaches it different. Do they show full margin?
2 Do they show partial?
3        So the price exception to me on somebody
4 else's financials are truly meaningless, because,
5 again, I'm interested in our world and where they're
6 going to price and where that -- where that branch
7 margin for our world is going to be. And thus, that's
8 my pro forma.
9     Q   But knowing what they're actually going to
10 price, you either could have what they tell you,
11 right, which could be inflated, or you could see
12 actual documents which would actually show what
13 they're actually pricing at; right?
14    A   Well, I think that's -- and -- and I've
15 found over the years -- an example is somebody's
16 company was charging them 100 basis points, for
17 example, against their P&L, and they advised me. So
18 that was radically different. Where was their
19 starting point? Were there going to exceptions?
20        It -- it was trying to get it to an apples
21 to apples, thus why I go to our pricing. I have our
22 court margin built in. I go through a few scenarios

57 (Pages 222 - 225)

Page 230

1    Q   I'm not asking -- but since you think that's
2  confidential, my question is do you not care that he
3  got it or do you wish that he had said, hey, guys, I
4  don't want this information, I don't need it, and you
5  shouldn't send it to me?
6    A   To me, I'd simply say irrelevant in our
7  decision.  So if he had said, hey, I don't need it, he
8  received it, it --it just -- it was irrelevant.  I'm
9  sorry.  I'm trying to answer it.  But that's -- yeah.
10   Q   Okay.  So you wouldn't have done anything
11 different here; right?
12   A   Well, I'm -- I'm building out my pro forma,
13 and so I -- I -- if -- if I'm receiving from something
14 from somebody and it's irrelevant, I would just
15 deleting or what I -- yeah.  And so --
16   Q   And I realize you don't want to answer the
17 question again.  But let me try it a different way.
18 Okay?  You understand, sir, that when you get
19 information you're not supposed to have, whether you
20 use it or not, you recognize the implication is that
21 you still have stuff you're not supposed to have, and
22 it could be used; right?

Page 231

1    A   Sure.  Somebody could use information they
2  received.  Sure.
3    Q   Okay.  And you certainly, and especially if
4  you don't use it and you don't need it, you certainly
5  wouldn't want it in your possession because that could
6  give rise to an implication that really you are using
7  it and you do want it; right?
8        MS. KREITER:  Object to the form.
9    A   And -- and I --
10   Q   I'm not saying you do.  But I'm saying a
11 person could look at it and say, hey, well, you got
12 it, so maybe you did use it after all --
13   A   So if somebody --
14       MS. KREITER:  Object to the form.
15   Q   -- lead to an implication that you did use
16 it because you had it.  That's possible; right?
17       MS. KREITER:  Object to the form.
18   A   And -- and certainly to one path or
19 interpretation, whereas I'm just speaking to what I --
20 because that's where I'm heavily involved, in pro
21 forma.  So I'm speaking to what we do, where we
22 collect information, third-party validated, all that,

Page 232

1  and our due diligence.
2    Q   Okay.  But my question is you do understand
3  that when you get information you're not supposed to
4  have, whether it's true or not -- what's the old
5  saying?  Perception is reality?  You understand that
6  if you get the information and you keep the
7  information, then it could lead to someone inferring
8  that you used it even if you didn't; right?
9        MS. KREITER:  Object to the form.
10   A   If -- if that's what somebody was going to
11 interpret, I can't guess what somebody is going to
12 interpret or not.  I'm just trying to state what --
13 what I did.
14   Q   I understand.  You're right that you can't
15 control what someone interprets; right?
16   A   Right.
17   Q   So you would agree with me because of that,
18 all things being equal, you'd prefer not to have the
19 information, especially since you don't use it; right?
20       MS. KREITER:  Object to the form.
21   A   If I'm not going to use it, and I would go
22 to Dwayne and Chris's -- their choice to send that.

Page 233

1  But if I'm not going to use it, sure.  Yeah.  Don't
2  need to send it.  Sure.
3    Q   Okay.  So in that case, if you weren't going
4  to use it and you would never want that inference to
5  be raised, even more of a reason to say, guys, don't
6  send this to me; right?
7        MS. KREITER:  Object to the form.
8    A   And I -- I can't speak on -- I feel like on
9  behalf of Dustin and I -- I just -- I can't.  It's --
10 yeah.
11   Q   Okay.  Let's go now to Exhibit 30.
12       (Exhibit 30 was marked for
13       identification.)
14       Now, so this an email from Chris Wolf, and
15 you see that's his private email?
16   A   I'm trying to find -- where does the private
17 saying?  I'm sorry.  I'm not seeing that.
18   Q   cwolf@gmail.
19   A   I see.  Yes.  Sent from -- from -- I'm
20 sorry.  You had said from his private email.  Yes.
21 I'm sorry.  Personal email.  Yeah.  Yep.
22   Q   Okay.  And it's dated 4/8; right?

59 (Pages 230 - 233)