```
                                                    Page 1

 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION
 3                      Civil Action No.: 22-CV-01660
 4
      MUTUAL OF OMAHA
 5    MORTGAGE INC.,
 6          Plaintiff,
      v.
 7
      WATERSTONE MORTGAGE
 8    CORPORATION,
 9          Defendant.
      _____/
10
11                      DEPOSITION OF
12                      DWAYNE HUTTO
13                 (Volume I, pages 1 - 171)
14    DATE TAKEN:      June 15, 2023
15    TIME:            9:03 a.m. to 3:57 p.m.
16    PLACE:           Gunster, Yoakley & Stewart, P.A.
                       401 East Jackson Street
17                     Suite 1500
                       Tampa, Florida 33602
18
      TAKEN BY:        The Plaintiff
19
      REPORTED BY:     Victoria White
20                     Court Reporter and Notary Public
21
22
23
24
25
```

EXHIBIT

G

Page 66

1  made the announcement after we made a decision to come.  But
2  I was never told about 250,000 until I had already made the
3  decision to come.
4      Q.  Okay.  I understand that.  Okay.  I think we've
5  covered this but, if you would look at the next --
6      A.  Can I elaborate on that more?  Can I elaborate
7  on the last question a little more?
8      Q.  Sure.
9      A.  It was actually on the golf course and was
10 shocked when he called me and said, you know -- I remember
11 this because I was in a golf tournament -- he said, hey, by
12 the way, you know, that was -- you're going to need money to
13 be afloat.  I just figured that, you know, it was a -- I was
14 going to be hurting for a few months but I never knew about
15 the 250.  That was not in the decision, like I said.
16     Q.  I understand that, but you would agree with me
17 the 250 for the branch -- was to support the branch when it
18 came over, as it actually says in this e-mail, right?
19     A.  To support Chris and I, correct.
20     Q.  Well, let me see --
21     A.  And the branch -- and the branch at the 900 West
22 Granada, Suite 4.
23     Q.  Is that the address of the --
24     A.  The Ormond Beach one, yes, sir.
25     Q.  The Daytona branch for Mutual?

Page 67

1      A.  Yeah, the one Mutual calls Daytona.
2      Q.  Right.
3      A.  They didn't figure it out.
4      Q.  Okay.  Now, I want to go down to the second page
5  of this e-mail.  Can you turn the page with me?
6      A.  Um-hmm.
7      Q.  And it says, by signing this -- that's the third
8  or fourth paragraph, do you see where it starts by signing?
9      A.  Yes, sir.
10     Q.  By signing this offer and accepting employment
11 with Waterstone Mortgage, you affirmatively acknowledge that
12 you are not currently subject to any restrictive covenants
13 from previous employers that would restrict your ability to
14 perform the duties required by this position, including but
15 not limited to, any non-compete clauses; do you see that?
16     A.  Yes, sir.
17     Q.  So I'm asking, do you understand that a
18 restrictive covenant would be a non-solicit?
19     A.  Yes.
20     Q.  So this isn't a true statement, then, is it?
21     A.  I don't understand what you're asking me.
22     Q.  Well, if you were subject to a non-solicit --
23     A.  Um-hmm.
24     Q.  -- right, and -- that would be a restrictive
25 covenant, right?

Page 68

1      A.  Okay.
2      Q.  Okay.  And this says you're not currently
3  subject to any.
4          MS. KREITER:  Object.  That's not what it says.
5      It says any restrictive covenants from previous
6      employers that would restrict your ability to perform
7      duties, and then it goes on.
8  BY MR. KAREN:
9      Q.  Okay.  Well, at this time you didn't -- well,
10 okay, so the point is you didn't -- well, let me ask you:
11 Did you understand this to mean that it was a representation
12 about Waterstone or about a prior employer before
13 Waterstone?
14     A.  I don't remember reading this, to be honest with
15 you.  But it's -- I don't remember even reading it.
16     Q.  Okay.  And no one has talked to you about this
17 and said, hey, you didn't tell us about a non-solicit you
18 had with Waterstone -- I mean with Mutual?  No one at
19 Waterstone said that to you?
20     A.  No, not to my knowledge.
21     Q.  No one said, hey, you didn't tell us this,
22 there's a problem here, right?
23     A.  Not to my knowledge.
24     Q.  Well -- and at the time, just so I'm correct
25 about this -- at the time you signed it, it was April 18th,

Page 69

1  right?
2      A.  Correct.
3      Q.  And Waterstone at that time or April 20th
4  maybe -- I think I was wrong.
5      A.  April 20th.
6      Q.  Okay.  At the time you were still employed by
7  Mutual, right?
8      A.  Correct, until the 26th.
9      Q.  So at the time Mutual wasn't your previous
10 employer, it was your current employer, right?
11     A.  Mutual was my current employer at the time.
12     Q.  Okay.  If you go to the next page and you see
13 your signature below that on the bottom of this page 3,
14 right?
15     A.  Yes, it looks like it.
16     Q.  Okay.  And the first statement says, Waterstone
17 will not request information or assets from your previous
18 employer; do you see where it says that?
19     A.  Yeah, um-hmm.
20     Q.  Now you had sent -- and I can show you these
21 e-mails if you don't remember -- but didn't you send your
22 P&Ls from Mutual to Waterstone at some point?
23     A.  I did.
24     Q.  Okay.  And was that something they requested?
25     A.  No, I think it was something that I just sent

18 (Pages 66 - 69)

Page 70

1 just to -- you know, they're not the only company that I
2 sent it to. I feel like if you're -- if you're interviewing
3 companies, might I say, to bring your business that they
4 need to know. But I didn't think about it at the time. Not
5 the smartest thing to do, I guess. But really, you know, it
6 was sent to multiple companies that I was trying to -- that
7 we were interviewing at the time.
8     Q. So what it says there that Waterstone won't
9 request the information, that's different than them
10 accepting it if you sent it, right?
11    A. Yes, they didn't request it.
12    Q. Okay. They just accepted it when you sent?
13    A. I'm not sure.
14    Q. And then it says the loan's currently in your
15 pipeline. Now when it says the loan's currently in your
16 pipeline, did you mean that as your personal pipeline or the
17 pipeline of your branch? How did you interpret that?
18    A. The pipeline of the branch.
19    Q. Okay. Are property of your former employer. Do
20 you agree that the loans in your pipeline at Mutual were
21 Mutual's property?
22    A. I agree.
23    Q. Okay. And it says, so please ensure they
24 maintain ownership of those files. Do you see where it says
25 that?

Page 71

1    A. And that's what we did, but I agree, yes, sir.
2    Q. And this also applies to loan pre-qualification
3 that haven't moved to the application stage.
4    A. Correct.
5    Q. And you agree that was also Mutual's property,
6 right?
7    A. Correct.
8    Q. Okay. And you, in fact, people in your branch,
9 did in fact send the some loans over to Waterstone before
10 you guys moved over, right?
11    A. I only remember -- we tried to close out, I
12 mean, everything we could. I don't remember the exact
13 number. I know we did 19 million the month before, I want
14 to say we closed 4-, 5 million. I know there was a file
15 that Mutual couldn't do that I sent over, Tariq I believe is
16 the name, but I never knew of any other files that was going
17 to Waterstone.
18        Every loan that could be closed with Mutual was
19 closed in Mutual because I thought I was getting paid on
20 those files, so did my people. It wouldn't make any sense
21 to send over -- first of all, we do a lot of purchases and
22 we have timelines, so when I take a -- you know, I would
23 never take something out of process and try to resubmit it
24 to another bank. That's not fair to Mutual and it wouldn't
25 be fair to our clients neither.

Page 72

1    Q. Okay. But my question is, loans were sent over,
2 weren't they? Loans were sent over from people at your
3 branch to Waterstone while you were still --
4    A. I personally know of one, which was mine. That
5 was turned down by Mutual.
6    Q. Now this doesn't talk about whether a loan was
7 turned down or not, it just says currently in your pipeline
8 and pre-qualifications, right?
9    A. Correct.
10    Q. And when we saw your employment agreement
11 previously it had language that said something to the effect
12 without written permission; do you remember seeing that?
13       MS. KREITER: Are you talking about -- are you
14    talking about the Waterstone employment agreement
15    again?
16       MR. KAREN: Yeah.
17       MS. KREITER: If so, don't answer.
18       MR. KAREN: Okay. Again, I reserve my right to
19    bring him back and re-do this deposition following
20    application to the court and I will seek fees.
21 BY MR. KAREN:
22    Q. Then it says, please refrain from copying or
23 otherwise recording your client's personal information from
24 your previous employer systems, in number two; do you see
25 that?

Page 73

1    A. Yes.
2    Q. Okay. And you did provide information from your
3 clients to Waterstone that was provided to you at Mutual,
4 didn't you?
5    A. From the one client Tariq that was turned down
6 by them I did. I didn't think about it at the time. It
7 was -- you know, me -- my thoughts were this is a turn-down
8 loan, what it really was for, the client mainly, my realtor
9 partner that sent the loan that was a friend of theirs and
10 it was done basically through the portfolio line with
11 Waterstone. Mutual couldn't do that loan.
12    Q. Well, sir, I mean, I'll represent to you and
13 I'll show you documents in a few minutes that show multiple
14 loans, so it's not just that one.
15    A. Like I said, that's the one I know of.
16    Q. Right, I understand that but there were multiple
17 loans. So my question is, that would have been violating
18 number 2, right?
19       MS. KREITER: Object to the form. The witness
20    has testified he knows of one loan.
21       MR. KAREN: I can ask this question. You can
22    answer.
23       THE WITNESS: Yeah, I know of the one loan,
24    Tariq is one --
25 BY MR. KAREN:

19 (Pages 70 - 73)