# **<u>EXHIBIT B</u>**

**Page 1**

```
                              1

 1              IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION
                  CASE NO.: 8:22-cv-01660-TPB-JSS
 3
   MUTUAL OF OMAHA
 4 MORTGAGE, INC.,

 5        Plaintiff,

 6 vs.

 7 WATERSTONE MORTGAGE
   CORPORATION,
 8
          Defendant.
 9 _____/

10

11

12
   DEPOSITION OF:   JEFFREY GENNARELLI, CORPORATE
13                  REPRESENTATIVE OF MUTUAL OF OMAHA
                    MORTGAGE, INC.
14
   TAKEN:           Pursuant to Notice by
15                  Counsel for Defendant

16 DATE:            May 25, 2023

17 TIME:            9:17 a.m. to 4:53 p.m. EST

18 LOCATION:        Hill Ward Henderson
                    101 East Kennedy Boulevard
19                  Suite 3700
                    Tampa, Florida  33602
20
   REPORTED BY:     Melanie Keefe, FPR
21                  Notary Public
                    State of Florida at Large
22

23

24

25

        REGENCY REPORTING SERVICE, INC. (813)224-0224
```

**Page 2**

```
                                                      2
 1 APPEARANCES:    COURTNEY WALTER, ESQUIRE
                   CHRIS McCALL, ESQUIRE (Zoom)
 2                 Mitchell Sandler LLC
                   1120 20th Street Northwest
 3                 Suite 725
                   Washington, DC  20036
 4
                   MARK CARROLL, ESQUIRE
 5                 Mutual of Omaha Mortgage, Inc.
                   100 West 22nd Street
 6                 Suite 101
                   Lombard, Illinois  60148
 7
                        Attorneys for the Plaintiff
 8
                   MARIA L. KREITER, ESQUIRE
 9                 EMMA J. JEWELL, ESQUIRE (Zoom)
                   Godfrey & Kahn, S.C.
10                 833 East Michigan Street
                   Suite 1800
11                 Milwaukee, Wisconsin  53202

12                 CAROLINA Y. BLANCO, ESQUIRE (Zoom)
                   Hill Ward Henderson
13                 101 East Kennedy Boulevard
                   Suite 3700
14                 Tampa, Florida  33602

15                 STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
                   Waterstone Mortgage Corporation
16                 N25W23255 Paul Road
                   Pewaukee, Wisconsin  53072
17
                        Attorneys for the Defendant
18
19 ALSO PRESENT:   Carrie Macsuga

20

21

22

23

24

25

        REGENCY REPORTING SERVICE, INC. (813)224-0224
```

**Page 3**

```
 1          INDEX                        PAGE NUMBER

 2 Examination by Ms. Kreiter               5

 3 Read Letter                            255

 4 Errata Sheet                           256

 5 Reporter's Certificate                 257

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

        REGENCY REPORTING SERVICE, INC. (813)224-0224
```

**Page 4**

```
                                                      4
 1                    E X H I B I T S
```

```
 2 Exhibit    Description                          Page
   1          Amended Notice of Federal Rule         6
 3             30(b)(6) Deposition of Plaintiff
              Mutual of Omaha Mortgage, Inc.
 4 2          LinkedIn for Jeff Gennarelli          11
   3          Plaintiff Mutual of Omaha Mortgage,   16
 5             Inc.'s Fourth Amended Responses and
              Objections to Defendant Waterstone
 6             Mortgage Corporation's First Set of
              Requests for Production of Documents
 7 4          Plaintiff Mutual of Omaha Mortgage,   16
              Inc.'s Second Amended Responses and
 8             Objections to Defendant Waterstone
              Mortgage Corporation's First Set of
 9             Interrogatories
   5          E-Mails, Subject: Letter of Funding   35
10 6          E-Mails, Subject: Resignation         84
   7          MOOM Summary of Corporate Earnings   124
11             Contribution from Tampa and Daytona
              Branches
12 8          Plaintiff Mutual of Omaha Mortgage,  136
              Inc.'s Responses and Objections to
13             Defendant Waterstone Mortgage
              Corporation's Second Set of
14             Interrogatories
   9          MOOM Profit and Loss Statements,     136
15             Payroll Detail, Group Health
              Insurance
16 10         MOOM Profit and Loss Statement for   144
              Tampa
17 11         Independent Auditors' Report and     159
              Consolidated Financial Statements
18             for Mutual of Omaha Mortgage, Inc.,
              for the Years Ended December 31,
19             2022, and 2021
   12         E-Mails, Subject: MOOM Financial     179
20             Performance for June 2022
   13         E-Mails, Subject: Tampa              199
21 14         MOOM 2024 Plan vs. 2023 Plan         202
   15         Glossary of English-Spanish          219
22             Financial Terms
   16         MOOM Buyer Dos and Don'ts            235
23 17         MOOM Profit and Loss Statements,     250
              Payroll Detail, Group Health
24             Insurance, Loans Held for Sale,
              Transaction Listings
25

        REGENCY REPORTING SERVICE, INC. (813)224-0224
```

**5**

1  THEREUPON,

2  JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF

3  OMAHA MORTGAGE, INC.,

4  a witness herein, having been duly sworn, was examined

5  and testified upon his oath as follows:

6  THE WITNESS:  I do.

7  EXAMINATION

8  BY MS. KREITER:

9  Q.  Mr. Gennarelli, state your name and spell it for

10  the record, please.

11  A.  Jeff Gennarelli, G-e-n-n-a-r-e-l-l-i.

12  Q.  Have you had your deposition taken before?

13  A.  I have.

14  Q.  Just a few ground rules that I'm going to go over

15  before we get started.  First, there's a court reporter

16  here.  She's taking down everything that you say, everything

17  that I say.  Because of that, I'm going to have to police

18  myself and make a point of talking slow, waiting until you

19  finish with your answer before I speak, and I'll ask that

20  you do the same.

21  A.  Sure.

22  Q.  In addition, because she's typing down the

23  answers, I need you to give verbal answers, yes, no, et

24  cetera, as opposed to nods of the head, which she can't take

25  down.

REGENCY REPORTING SERVICE, INC. (813)224-0224

**6**

1  And then, finally, if you need a break at any

2  time during the deposition, it's not a, you know, federal

3  investigation here.  Just let me know, and we will take a

4  break.  I would just ask that if there's a question that I

5  have pending to you, answer the question prior to taking a

6  break.  Does that make sense?

7  A.  It does.

8  Q.  If you don't understand a question that I ask

9  you, let me know that.  If you don't let me know, I'm going

10  to assume that you understood the question.  Agreed?

11  A.  Yeah, yes.

12  Q.  Great.  Start with Exhibit 1.  Hand that to the

13  court reporter, please.

14  A.  Then I can look at it?

15  (Exhibit No. 1 is marked for identification.)

16  Q.  Yes, please do.  Exhibit 1 is the notice for this

17  deposition.  You understand that you're testifying today not

18  in your personal capacity but on behalf of the plaintiff in

19  this case, Mutual of Omaha Mortgage; correct?

20  A.  Yes.

21  Q.  My understanding is that you're testifying on

22  behalf of Mutual with respect to Topics 1 through 12 in the

23  deposition notice; correct?  And there's a separate witness

24  tomorrow testifying as to the remaining topics; correct?

25  A.  Yes.  Correct.

REGENCY REPORTING SERVICE, INC. (813)224-0224

**7**

1  Q.  What did you do to prepare for your testimony

2  today?

3  A.  I read over the Complaint.  I looked at some of

4  the e-mails.  There's not a lot of discovery yet, I don't

5  think, but I looked at what I did, looked at the -- that's

6  really -- that's really about it, a couple of conversations

7  with -- with counsel.

8  Q.  You said you looked over e-mails.  What e-mails

9  would those be?

10  A.  E-mails that were in the discovery folder.

11  Q.  Got it.  So was it that somebody shared a

12  discovery folder with you and --

13  A.  Yes.

14  Q.  Okay.  How would you go about identifying that

15  folder that was shared with you in prep for the deposition?

16  A.  I don't understand what you mean.

17  Q.  Did you get a link in an e-mail, or how did the

18  documents come to you?

19  A.  Oh, sure.  Yeah, link and e-mail.  Yeah.

20  Q.  How many e-mails were in this folder available

21  through the link?

22  A.  I mean, not that many.  We -- we didn't do a ton

23  of preparation in that regard.  There's maybe -- I don't

24  know.  I'll say 20, 30 e-mails, something like that.

25  Q.  You say you didn't do much preparation in that

REGENCY REPORTING SERVICE, INC. (813)224-0224

**8**

1  regard.  In that regard with respect to e-mails or in

2  general for the deposition?

3  A.  Yeah, I think in general.  I mean, I think I am

4  going off of just I was around when this happened.

5  Q.  Were there other documents besides the 20 to 30

6  e-mails in the folder that you received?

7  A.  There's a -- I don't know if -- you know, if it

8  was the same e-mail, but there's a spreadsheet that showed

9  calculations of -- for damages, and really that was the

10  majority of it.

11  Q.  Any other spreadsheets that you looked at?

12  A.  Not really, no.

13  Q.  Who sent you the link with the documents to

14  review?

15  A.  Counsel.

16  Q.  Did you take notes as to any of the documents

17  that you reviewed?

18  A.  I did not take -- we had verbal conversations.  I

19  didn't take notes.

20  MS. WALTER:  Object to form that any of this is

21  going to call for any sort of attorney-client

22  privileged conversations.

23  MS. KREITER:  I don't think that's the case.

24  Q.  How long did you spend reviewing the documents

25  that were sent to you?

REGENCY REPORTING SERVICE, INC. (813)224-0224

9

1    A.   A couple days.

2    Q.   A few full days or certain parts --

3    A.   Sporadic throughout the days.

4    Q.   How much total time do you think you spent
5    preparing?

6    A.   Ten hours.

7    Q.   Did you talk to anyone besides counsel in
8    preparation for your testimony today?

9    A.   No.

10   Q.   Aside from the documents that were in the link
11   sent to you, are there any other documents that you
12   unilaterally sought out yourself from other -- you know,
13   from the server or from e-mails?

14   A.   You know, I want to be clear.  I've seen e-mails.
15   Like, you said what did I do to prep.

16   Q.   Correct, just focused on that.

17   A.   But earlier on I saw e-mails also when this first
18   happened, so I -- I can't have my notes -- you know, I can't
19   have the e-mails in front of me.  I don't know what e-mails
20   came from a link and what e-mails I saw prior while we were
21   preparing for this.

22        When we first knew that this happened -- right?
23   -- so if you were to ask me did you -- what e-mail did you
24   see where, I just don't want to be dishonest.  You know,
25   there's a lot of e-mails I looked at before, and there was

10

1    e-mails I looked at now.

2    Q.   Right.  So I'm interested just in the e-mails, if
3    any, outside of the link that you reviewed to the extent
4    that you can remember in preparation for the deposition.

5    A.   Okay.  I mean, I think the link had a ton of
6    e-mails --

7    Q.   Got it.

8    A.   -- in it.  You know, but if you would've asked me
9    how many I looked at, I don't know.

10   Q.   Your current position at Mutual is president of
11   forward mortgage; is that correct?

12   A.   I think my actual title is EVP of production, but
13   I'm also the president of forward mortgage, yes, so it
14   depends on...

15   Q.   EVP of production for Mutual of Omaha or forward?

16   A.   Yeah, EVP of production for Mutual of Omaha
17   Mortgage.

18   Q.   How does forward mortgage relate just
19   structurally to Mutual of Omaha?

20   A.   We're a wholly owned subsidiary in a holding
21   company that's owned by Mutual of Omaha insurance.

22   Q.   And what is reverse?

23   A.   Reverse mortgage is a sister company to us.
24   We're the same subsidiary, so -- and they specialize in --
25   they call it HECMs, home equity for, you know, reverse

11

1    mortgages.  And they have -- I have a peer that runs that.
2    I don't run that company.

3    Q.   Got it.  Sorry.  Is that marked Exhibit 1?  I
4    don't see a number on it.

5    A.   It is.

6    Q.   Okay.  Great.

7         MS. KREITER:  Exhibit 2, please.

8         (Exhibit No. 2 is marked for identification.)

9    Q.   Take a look at Exhibit 2, if you would.

10   A.   Yes.

11   Q.   This is your LinkedIn profile; is that correct?

12   A.   Yes.

13   Q.   Just take a moment.  Is there anything missing
14   from this LinkedIn profile in terms of your experience in
15   the mortgage industry?

16   A.   I don't think so.

17   Q.   You've been in the industry for a while.  Does
18   your experience in the industry include things like
19   recruiting branches?

20   A.   Yes.

21   Q.   Do you recruit branches for Mutual of Omaha?

22   A.   It's not my primary function.

23   Q.   What would you say is your primary function?

24   A.   Running the company, the operations of Mutual of
25   Omaha Mortgage.

12

1    Q.   When was the last time you were involved in
2    recruiting a branch for Mutual of Omaha?

3    A.   Well, I would say -- I don't know -- probably a
4    year -- I mean, what do you mean "involved"?  I guess I'm
5    involved in all -- all recruiting that occurs --

6    Q.   Sure.

7    A.   -- you know, so -- but not my main
8    responsibility, so...

9    Q.   And so is your involvement, you know, you sign
10   off on the hire, or are you involved in the sense that
11   you're meeting with a potential recruit?

12        MS. WALTER:  Object to form.

13        Go ahead.  You can answer.

14   A.   Okay.  It depends what's needed, you know.

15   Q.   When's the last time that you were involved in
16   recruiting in the sense that you were actually meeting with
17   a recruit?

18   A.   Well, we had a branch return for us that had
19   previously left, and so that was probably, oh, six months
20   ago or so.

21   Q.   And you were involved in one-on-one
22   conversations --

23   A.   Yes.

24   Q.   -- in connection with that branch return?

25   A.   Yes.

13

1    Q.   Where is that branch located?

2    A.   The northwest, so in Portland.

3    Q.   Is part of your role analyzing the profitability

4  of branches of Mutual of Omaha?

5    A.   Analyzing our profitability of our branches?

6    Q.   Correct.

7    A.   Yes.

8    Q.   How often do you do that as part of your current

9  role?

10    A.   Monthly at least depending if the branch has

11  issues or not.

12    Q.   What about analyzing profitability on a

13  person-by-person basis, for example, analyzing the

14  profitability of a certain branch manager or a certain loan

15  officer?  Is that part of your duties now?

16    A.   You know, there's other management between maybe

17  me and that.  But generally, yes, still -- I still oversee

18  that.  Yeah.

19    Q.   Did you get certain reports that reveal to you

20  the profitability of certain loan officers and branch

21  managers?

22    A.   I don't get reports on a loan-officer basis

23  necessarily, but I have access to a system that I can

24  generate my own reports that I can pull, see if someone is

25  doing loans or they're not doing loans, you know.

14

1    Q.   What is that system?

2    A.   Encompass.

3    Q.   Does the Encompass system that you're referring

4  to allow you to generate a report as to monthly loan volume

5  for a particular --

6    A.   Sure.

7    Q.   -- loan officer?

8    A.   Yes.

9    Q.   And annual as well?

10    A.   Yes.

11    Q.   What about as opposed to loan volume revenue

12  generated?  Does it show you that metric?

13    A.   Yes.

14    Q.   What about profitability as opposed to just

15  revenue?  Is that metric shown in the Encompass report?

16    A.   Not necessarily, no.

17    Q.   How well are you aware of the relationships

18  between the branch managers that are at issue here, so

19  Dwayne Hutto, Chris Smith, and Chris Wolf?

20         MS. WALTER:  Object to form.

21         Go ahead.

22    A.   Ask me this again.

23    Q.   Sure.  You know, sometimes you have a lot of

24  interaction with colleagues, and you kind of understand the

25  friends, the relationships.  Do you have that type of

15

1  knowledge with respect to the three branch managers that

2  left Mutual of Omaha and joined Waterstone, which is Dwayne

3  Hutto, Chris Smith, and Chris Wolf?

4         MS. WALTER:  Object to form.

5    Q.   Do you understand the question?

6    A.   I do.

7    Q.   Great.

8    A.   I would say that I have some knowledge but not

9  great knowledge, yeah.

10    Q.   Who at Mutual would have the best knowledge of

11  the relationships between the managers?

12    A.   I would -- I would say probably Kiley King or

13  Brian Tomalak, who are their direct supervisors.

14    Q.   Do you have any -- have you had any personal

15  interactions with not the managers but the other loan

16  officers that are at issue in this case who left Mutual and

17  came over to Waterstone?

18    A.   I would say not a ton of interaction with the

19  original loan officers.

20    Q.   Are you able to speak to the relationships

21  between those loan officers and the managers?

22    A.   No.

23    Q.   But you believe that Ms. King and Mr. Tomalak

24  would have that type of knowledge?

25    A.   Better than myself, yeah.  Yeah.

16

1         (Exhibit No. 3 is marked for identification.)

2    Q.   Okay.  Take a look at what we've marked as

3  Deposition Exhibit No. 3.  This is Mutual's responses to

4  Waterstone Mortgage interrogatories.  Did you review this

5  document in preparation for the deposition?

6    A.   I think so.

7    Q.   I'm going to start -- if you would turn to page 5

8  of the document, there's a paragraph 1 that reads "Itemize

9  your damages, including the formula used to calculate those

10  damages."  I'm going to start there.  Do you see that?

11         MS. WALTER:  Sorry, Maria.  Where are we?

12  Page 5?

13         MS. KREITER:  So this should be --

14    A.   Page 5, it says "Produce all documents."

15    Q.   Okay.  Start with that.  Let's switch that out.

16    A.   Do you not want this to be 3?

17    Q.   You know, you can just set it aside.  I'll give

18  you a different one.

19    A.   Okay.

20         MS. KREITER:  You can just make this 4.

21         (Exhibit No. 4 is marked for identification.)

22         MS. WALTER:  Do you have a copy for me, Maria?

23    Q.   So the document -- let me just make sure that we

24  have the right document.  The first page, it says "Plaintiff

25  Mutual of Omaha Mortgage Second Amended Responses and

17

1  Objections to Defendant Waterstone Mortgage Corporation" on
2  the first page there.
3      A.  Yeah.  Okay.
4      Q.  Okay.  And the first sentence says "Pursuant to
5  the Federal Rules of Civil Procedure 26."  Is that what you
6  have there?
7      A.  That is what I have.
8      Q.  Perfect.  Now, if you can turn to page 5, please,
9  paragraph 1, "Itemize your damages."  Are you there?
10     A.  Yes.
11     Q.  So it says "Itemize your damages, including the
12  formula used to calculate those damages."  Do you see that?
13     A.  I do.
14     Q.  This Exhibit 4, is that one of the documents that
15  you reviewed in preparation for the deposition?
16     A.  Yes.
17     Q.  So I have read the request into the record.  Then
18  there's a response.  There's a series of objections.  And
19  then the first bullet point towards the bottom, do you see
20  that?
21     A.  I do.
22     Q.  And you understand that this is a written
23  response to a request for information about the damages
24  sought in this case presented to Mutual and then Mutual's
25  response?  You understand that; correct?

18

1      A.  I do, yes.
2      Q.  The first bullet reads "Lost revenue and profits
3  from loans that were improperly diverted from plaintiff to
4  defendant."  Do you see that?
5      A.  I do.
6      Q.  So I'm going to stop at the first part of that
7  sentence, "Lost revenue and profits."
8      A.  Yes.
9      Q.  Which is Mutual seeking, revenue or profits?
10         MS. WALTER:  Object to the form.
11         Answer.
12     A.  So, I mean, I think this is a great question you
13  brought up because I think that in a lot of these cases we
14  should be seeking gross revenue.
15     Q.  Why is that?
16     A.  Well, because there's fixed costs that go into,
17  you know, the profit that are going to remain, whether we
18  lose these loans or not.  Each individual loan is
19  exponentially more valuable in a gross profit, you know,
20  view.  I mean, I think that gross revenue really is what we
21  should be talking about.  I don't believe we are.  But if it
22  was solely up to me, we'd be talking about gross revenue.
23         That's -- I would use the -- I would use the
24  analogy of a cost of goods sold model where you take the
25  revenue less the commissions would be the number I would

19

1  attach to that, which I think is much more accurate.  We
2  chose to use a different model, which was profit.
3      Q.  So that's what I just -- it sounds like you have
4  one view on what should be sought, and that's a personal
5  view on behalf of Waterstone -- or sorry -- on behalf of
6  Mutual.  What is Mutual seeking?  Is it revenues or is it
7  profits with respect to this category?
8      A.  They're both profit.  One is gross profit.  One
9  is net profit.  So right now we laid out the deal of net
10  profit.  You know, I think gross profit is still on the
11  table.  I'm not -- personally, I haven't taken it off, and I
12  run the company.  So -- but I think the spreadsheet we set
13  was -- was the simplest way we can explain it was net
14  profits.
15     Q.  A few things that I want to clarify there.  So
16  this first bullet point says "Lost revenue and profits from
17  loans that were improperly diverted from plaintiff to
18  defendant."
19     A.  Yeah.
20     Q.  And then it goes on on page 6.  Do you see that?
21     A.  Yes.
22     Q.  And then it lists over 800 Bates numbers over the
23  next few pages.  And then, finally, on page 28, there's a
24  second bullet point.  Do you see that?  Sorry.  On page 27,
25  there's a second bullet point.

20

1      A.  Yes.
2      Q.  And then if you turn to page 28, there's a third
3  bullet point.  Do you see that?
4      A.  I do.
5      Q.  Maybe it will help to just define three different
6  categories of damages, is my understanding, that Mutual is
7  seeking three different categories.  The first is reflected
8  in the first bullet point, "Lost revenue and profits from
9  loans that were improperly diverted," so I'll call that
10  diverted loan damages.
11     A.  Yeah.
12     Q.  The second on page 27, "Profits plaintiff would
13  have made but for defendant's unlawful conduct, which caused
14  plaintiff to have to close its branches in Tampa and Daytona
15  Beach," do you see that?
16     A.  Yeah.
17     Q.  So I'm going to call that the closed branches.
18     A.  Sure.
19     Q.  And then on page 28, "Ill-gotten gains, including
20  compensation paid or advanced by defendant to plaintiff's
21  prior employees" -- and it goes on.  Do you see that on
22  page 28?
23     A.  I do.
24     Q.  So I'm going to call Bucket No. 3 the ill-gotten
25  gains bucket.

21

1    A.    Okay.

2    Q.    For now, I want to just focus on Bucket No. 1,

3  the bucket that is associated with lost revenue and profits

4  from loans that were improperly diverted, so the first

5  bucket --

6    A.    Yes.

7    Q.    So my understanding is that the contention is

8  there were loans that should've closed at Mutual that did

9  not and instead closed at Waterstone with respect to that

10  first bucket?

11    A.    Correct.

12    Q.    I don't see in the written responses, as to the

13  first bucket, any type of number demand.  I do see that when

14  you get to page 27, when you start talking about the second

15  bucket.

16    A.    Yeah.

17    Q.    So for purposes of this deposition --

18    A.    Sure.

19    Q.    -- now is the time when I get to exhaust and find

20  out exactly what damages are sought.

21    A.    Sure.

22    Q.    With respect to the first bucket, what are the

23  damages sought?

24    A.    Well, I think a lot of that has to do with

25  discovery we haven't been provided yet.  We don't know.  We

22

1  haven't looked at Waterstone's books to see what loans have

2  closed.  We only -- how do we know -- we know of a couple of

3  instances of loans that were diverted for sure, but we don't

4  know the totality of loans that were diverted because we

5  don't have access to Waterstone's closed loan report.

6    Q.    Mr. Gennarelli, when was the lawsuit filed?  It

7  was filed in July.

8    A.    Okay.

9    Q.    It's been pending for ten months.

10    A.    Okay.

11    Q.    Has Mutual served discovery on Waterstone?

12    MS. WALTER:  Object to the form.

13    MS. KREITER:  The witness is testifying that he

14  doesn't believe Mutual has had a chance to explore the

15  claims.  I'm following up on that testimony.

16    Q.    Do you know whether Mutual of Omaha has served

17  discovery on Waterstone?

18    MS. WALTER:  Object to the extent it implicates

19  attorney work product.

20    Q.    Go ahead and answer.

21    A.    I'll say I have not seen a closed loan report

22  coming from Waterstone.  If I have seen that, then we can go

23  back and backtrack.

24    Q.    Are you --

25    A.    What I have seen, though --

23

1    Q.    Sorry.  Go ahead.

2    A.    What I have seen were our customers sent to

3  Waterstone to the head underwriter at Waterstone asking if

4  these loans would work by -- by Mutual of Omaha Mortgage

5  employees.  I have seen that.  So I know that there was

6  some.  Do I know the extent of it?  I haven't seen that.

7  And I didn't think I was going to -- I didn't think I was

8  asked to testify to the fact of what Waterstone has.

9    Q.    Well, you're here to testify about the damages,

10  and I heard you say that you haven't been able to calculate

11  damages because discovery has just started.

12    MS. WALTER:  Object to form.

13    Q.    Is that accurate?

14    A.    In my mind, I have not received enough

15  information.  I haven't seen -- I do know this:  Customer

16  information was sent to personal e-mails.  We don't -- we

17  haven't -- we haven't looked at any personal e-mails.

18    Q.    Mr. Gennarelli, are you aware that in the fall of

19  '22 Waterstone produced in discovery a list of the loans

20  that had been closed at the branches within the first three

21  months?  Are you aware of that?

22    MS. WALTER:  Object to form.

23    MS. KREITER:  What's wrong with the form?

24    MS. WALTER:  Maria, carry on.

25    Answer the question.

24

1    MS. KREITER:  What is the objection to the form?

2  Because I'll restate it.

3    MS. WALTER:  I am objecting properly pursuant to

4  how I'm supposed to object.

5    Q.    Do you understand the question, Mr. Gennarelli?

6    A.    I do.

7    Q.    Go ahead and answer.

8    A.    I was aware of a small list that was provided.

9  I'm also aware that we have not looked at personal e-mails.

10  Our customer list was sent numerous times to personal e-mail

11  addresses.  We haven't looked at those e-mails and what

12  happened to that data after it was in the personal e-mail.

13    Q.    When you were preparing to testify on behalf of

14  the company today as to the loans that have improperly

15  transferred to Waterstone, did you go back and look at the

16  list of loans closed at Waterstone that was produced in

17  discovery in the fall?

18    A.    Yes.  But I didn't think it was an all-inclusive

19  list, to be honest with you.

20    Q.    Did you compare that list to the list of loans in

21  the pipeline at Mutual of Omaha?

22    A.    Well, they wouldn't be in the pipeline.

23    Q.    Did you use that list produced by Waterstone back

24  in the fall and try to analyze which of those loans closed

25  at Waterstone you believe should've been closed at Mutual?

25

1          MS. WALTER:  Object to the extent it implicates
2    attorney work product.  He's here as -- he's --
3          MS. KREITER:  He's --
4          MS. WALTER:  He's not the attorney.
5          MS. KREITER:  He's not here as an individual.
6    He's here as a corp rep.
7          MS. WALTER:  I did not say individual.  I said he
8    is not the attorney in the case.
9          MS. KREITER:  I'm entitled to ask what documents
10    and what preparation this witness did to testify about
11    damages for which ten months into the case Mutual has
12    not disclosed any number, so that's the line of my
13    questions.
14          Q.   Do you have a number, Mr. Gennarelli, with
15    respect to this first bucket, the loans that have
16    transferred to Waterstone from Mutual of Omaha?  Have you
17    looked at the loans, and do you have a number that you're
18    ready to present at the deposition today with respect to
19    Bucket 1?
20          A.   I don't have a number with respect to Bucket 1.
21          Q.   Is Mutual seeking damages with respect to
22    Bucket 1?
23          A.   I believe so.
24          Q.   But you're not able to tell me what those damages
25    are?

26

1          A.   Not at this moment.
2          Q.   Has you or anyone at Mutual made an attempt to
3    calculate those damages?
4          A.   I have not.
5          Q.   Has anybody at Mutual?
6          A.   Not that I'm aware of.
7          Q.   And your position is that you're waiting to do
8    more discovery?
9          MS. WALTER:  Object to form.
10          A.   It is.
11          Q.   What more discovery do you need to do?
12          MS. WALTER:  Object to form.
13          A.   Well, I'd like to see the personal e-mails where
14    all of our data was sent to.  That's what I'd really like to
15    know so that I can understand the absolute damage caused by
16    this unbelievable breach of conduct.
17          Q.   Did Mutual of Omaha Mortgage send subpoenas to
18    any of the individuals who have those e-mails?
19          MS. WALTER:  Object to the extent it implicates
20    attorney work product.
21          MS. KREITER:  Work product --
22          MS. WALTER:  Mr. Gennarelli isn't going to be
23    able to answer how discovery is being conducted in the
24    case.  That's my job.
25          MS. KREITER:  The fact that subpoenas have gone

27

1    out is not a privileged question.
2          MS. WALTER:  I didn't -- I said it implicates
3    attorney work product.  I didn't say it was privileged.
4    I'm not instructing him not to answer.
5          Q.   Do you have an understanding --
6          A.   I'm not aware of the subpoenas or not.  I don't
7    know.
8          Q.   So you don't know whether Mutual has made an
9    effort to, for example, subpoena the personal e-mails of any
10    of the individuals that you claim are necessary?
11          A.   I am not aware.
12          Q.   When you were preparing to testify for the
13    deposition, did you have discussions or requests, access to
14    the e-mails that you believe are necessary to calculate
15    Category 1 damages?
16          MS. WALTER:  Object to the extent it implicates
17    attorney work product or goes to attorney-client
18    discussions.
19          Q.   Go ahead.
20          A.   Repeat the question.
21          Q.   Sure.  I hear you testifying that Mutual is
22    unable to calculate damages with respect to Category 1,
23    which we've defined as the loans that have closed at
24    Waterstone due to some unlawful conduct.  And I'm trying to
25    understand your testimony.

28

1          I've heard you say that calculation hasn't been
2    done because you haven't seen personal e-mails, and I've
3    heard you testify that you don't know whether there have
4    been any subpoenas issued by Mutual in an effort to try to
5    get the e-mails.  So now my question is in connection with
6    preparing for this deposition --
7          A.   Yes.
8          Q.   -- did you make any efforts at that point in time
9    to seek out the e-mails that you believe are necessary to
10    testify on the topic noticed?
11          MS. WALTER:  Object to form.
12          A.   I didn't -- I did not.
13          MS. WALTER:  Can we take a ten-minute break?
14          MS. KREITER:  Sure.
15          (A recess was taken.)
16          MS. KREITER:  Can you just read back the last
17    question and last answer, please?
18          (The previous question and answer was read by the
19    reporter.)
20          Q.   (By Ms. Kreiter)  So there may be times during
21    this deposition when I say "you."  You're testifying on
22    behalf of Mutual.  If I say "you" during this deposition,
23    just understand that I mean Mutual collectively as a
24    company; correct or understood?
25          A.   Yes.

29

1    Q.   Would it surprise you if a comparison of the
2    loans that had closed at Waterstone compared to the loans
3    that were in the pipeline of Mutual had been done and that
4    the damages resulting from that analysis was less than
5    $50,000?
6        MS. WALTER:  Object to form.
7    A.   In the three-month period, is that what you're
8    referencing, that --
9    Q.   In that interim period of time.
10   A.   Yes, then it would surprise me and --
11   Q.   What do you think the lost profits are?  Are you
12   able to give a ballpark?
13   A.   For Bucket 1?
14   Q.   For Bucket 1.
15       MS. WALTER:  Object to form.
16   A.   This is something the attorneys worked on, to be
17   perfectly frank, you know.  And I know, you know, it would
18   not surprise me -- if it was just for a three-month period,
19   it would not surprise me.
20   Q.   If it's less than $50,000?
21   A.   For a three-month --
22       MS. WALTER:  Object --
23   A.   -- period.
24   Q.   Correct.  What about for an 18-month period?  Do
25   you have any sense as to what that number is?

30

1        MS. WALTER:  Object to form.
2    A.   On Bucket 1 only?
3    Q.   Bucket 1 only.
4    A.   No, I wouldn't know whether it was for 18 months.
5    Q.   When you say this is something that the attorneys
6    worked on, what do you mean?
7        MS. WALTER:  Object to form.
8    A.   Well --
9        MS. KREITER:  What's the objection?
10       MS. WALTER:  The objection is if it calls for a
11   discussion with counsel, it's privileged.
12       MS. KREITER:  My question was what are the
13   damages sought?  And the witness testified it's
14   something the attorneys worked out.
15   Q.   Is that a correct statement of your position?
16   You believe that the damages sought are something the
17   attorneys worked out with respect to Bucket 1?
18   A.   Yes.
19   Q.   What do you mean by that?
20       MS. WALTER:  Object to form.
21   A.   I don't know.  I don't know what else I can mean
22   by that.
23   Q.   Regardless, on behalf of Mutual, you're not
24   prepared to testify today as to any particular number sought
25   with respect to Bucket 1; correct?

31

1    A.   Not for -- not for Bucket 1.
2    Q.   I'm going to go back to my original question.
3    Bucket 1 talks about lost revenue and profits.  I understand
4    you have a personal view that it should be lost revenue on
5    behalf of Mutual today at the deposition on this topic.
6    Which is it, revenue or profits?
7        MS. WALTER:  Object to form.
8    A.   I'm happy to talk to either one if you'd like.
9    So, you know, again, it's -- generally, it's -- it would be
10   gross profits, not net profits, you know, on cost of goods
11   sold.
12   Q.   So I'm just trying to pin down at this deposition
13   what is sought by Mutual in the case.  The bullet on the
14   bottom of page 5 reads "Lost revenue and profits."  Is it
15   Mutual's contention that it's entitled to both lost revenue
16   and lost profits with respect to Bucket 1?
17   A.   Yes.
18   Q.   Explain that.
19   A.   I just did.  There's -- there's gross revenue.
20   That's, you know, cost of goods sold, and there's the
21   profit.
22   Q.   Okay.  And your position is that Mutual should
23   collect both the revenue and the profits?
24   A.   Yes.
25   Q.   Okay.  Let's play this out so I understand.  With

32

1    respect to a loan that closed, say the revenue -- and I'm
2    just using hypothetical numbers.  The revenue coming in to
3    Mutual from that loan is a hundred grand.  What would be the
4    profits approximately?  Strike that.
5        Let me ask it a different -- assume the profits
6    -- when you take out all the costs, assume the profits are
7    $20,000.  Is it your position that Mutual is seeking both
8    the hundred-thousand-dollar revenue and the $20,000 profits
9    for a total of 120-?
10   A.   Well, if you sell -- if you sell a loan for a
11   hundred thousand dollars, the revenue isn't a hundred
12   thousand dollars; right?  It is -- the revenue of a
13   hundred-thousand-dollar loan, generally speaking, at these
14   branches is going to be about $4,200 after commissions.
15   Q.   I'm concerned about double-dipping.  Does that
16   make sense to you?  And I'm trying to understand, are you
17   counting twice?  So for example, are you counting a hundred
18   thousand dollars as the revenue and then also seeking
19   20,000 --
20   A.   I said a hundred thousand dollars, not the
21   revenue.  You said that was the loan amount.
22   Q.   No.  Wait a minute.  So sorry.  Let's start
23   again.  Assume revenue from a loan -- I just picked that
24   number.  I can pick a smaller number if that's --
25   A.   We're only seeking -- we're only seeking the

33

1  profit.
2      Q.   Okay.  That's what I'm trying to get at.  The
3  profit derived, not the initial revenue without subtracting
4  out any costs?
5      A.   Correct.
6      Q.   Okay.  So lost revenue and lost -- it doesn't say
7  lost profits, but I'm assuming that.  Lost revenue and
8  profits, Mutual is seeking the profits?
9      A.   Yes.
10     Q.   Thank you.  This response, like I said, it's
11  starting on page 5.  There's a narrative response, and then
12  Bates numbers start on page 6 and go all the way through
13  page 26.  Mutual has listed 836 documents here.  Do you see
14  that?  You don't have to count them all.  It will take you
15  some time, but do you see that the Bates numbers listed --
16     A.   Yes.
17     Q.   -- go until page 27?
18     A.   Yes.
19     Q.   I did count them.  It's 836 documents.  How did
20  these 836 documents reveal to Waterstone the damages sought
21  with respect to Category 1?
22         MS. WALTER:  Object to form.
23     A.   I'm not sure how they did.
24     Q.   None of these documents identified by Bates
25  number list a monetary number demand; correct?

REGENCY REPORTING SERVICE, INC. (813)224-0224

34

1      A.   Correct.
2      Q.   Do you have any idea what the documents listed
3  have to do with an itemization of Mutual's damages,
4  including a formula used to calculate the damages?
5      A.   Yes, I believe I do.
6      Q.   What is the connection?
7      A.   Are we still talking about Bucket 1 --
8      Q.   Correct.
9      A.   -- or are we talking about in general?
10     Q.   I'm talking about Bucket 1 because the 836
11  documents are identified with respect to Bucket 1.
12     A.   Okay.
13     Q.   So I need to know how does that relate at all to
14  the request, which was "Itemize your damages, including the
15  formula used to calculate those damages"?  Are there
16  documents within the 836 that contain a formula?
17         MS. WALTER:  Object to the extent that
18     Mr. Gennarelli is not here to testify on every single
19     document that's in response to Interrogatory No. 1.  He
20     is a designated corporate rep to testify to things the
21     corporation knows or reasonably available to it.
22         MS. KREITER:  The corporation is the entity that
23     shows --
24         MS. WALTER:  He is not required to pore over
25     every document that has been produced or that we

REGENCY REPORTING SERVICE, INC. (813)224-0224

35

1  produced in this case.
2          MS. KREITER:  For the record, Mutual is the
3      entity that chose to respond to the discovery request
4      not by proving a number but instead by referencing 836
5      documents, so I'm following up on the disclosures made
6      to date by the company.
7          MS. WALTER:  Objection.
8      Q.   Do you understand that?
9          MS. WALTER:  Objection to the extent it's been
10     asked and answered.  Apology for interrupting.
11         MS. KREITER:  Could you read back my question?
12         (The previous question was read by the reporter.)
13     Q.   Go ahead and answer.
14     A.   I haven't reviewed all those documents, so I am
15  not aware that there are a formula in there.
16         MS. KREITER:  If I could have this next document
17     -- what number are we on?
18         MS. WALTER:  5.
19         (Exhibit No. 5 is marked for identification.)
20         MS. WALTER:  Do you have a copy?  Oh, thank you.
21     Q.   Take a look at Deposition Exhibit No. 5.  These
22  are some of the documents that were identified by Bates
23  number with respect to Bucket 1.  In these documents that
24  are Exhibit 5, is there any formula or damage demand that
25  you can see from the document?

REGENCY REPORTING SERVICE, INC. (813)224-0224

36

1      A.   No.
2      Q.   Do you know whether these documents relate to a
3  loan that closed with Waterstone instead of Mutual?
4      A.   I don't know offhand, no.
5      Q.   What efforts has Mutual made to discern whether
6  the borrower discussed in Exhibit 5 was wrongfully solicited
7  to move its loan to Waterstone?
8          MS. WALTER:  Object to form.
9      A.   Say this one more time.
10     Q.   Yeah.  With respect to the documents in
11  Exhibit 5 --
12     A.   Yes.
13     Q.   -- what efforts has Mutual made to discern
14  whether this borrower was wrongfully solicited to move his
15  or her loan to Waterstone?
16         MS. WALTER:  Before you answer, Jeff, I just want
17     to put on the record a standing objection to the extent
18     that Mr. Gennarelli has not reviewed 836 documents in
19     this case.  I don't want to keep objecting, but that's
20     not the requirement.  That's not what he's required to
21     do.  And so that being said --
22     Q.   I want to go back to the question.  But before I
23  do that, I want to turn back to Exhibit No. 1, please.  And
24  Exhibit 1, again, is the notice for this deposition.
25  Topic 2 -- with respect to Topic No. 2 on Exhibit A, do you

REGENCY REPORTING SERVICE, INC. (813)224-0224

37

1  see the Damages heading?
2      A.   Yes.
3      Q.   And then No. 2, it says "The relationship between
4  Mutual's alleged damages and the documents Mutual designated
5  in its March 10, 2023, amended response to Interrogatory 1,
6  which states 'Itemize your damages, including the formula
7  used to calculate those damages.'"  So it was noticed as a
8  topic that you were to prepare for for this deposition to be
9  in a position to talk about the relationship between the
10  damages sought and the documents that were identified in
11  response to Interrogatory 1.  That's exactly what I'm asking
12  about.
13      A.   Yes.
14      Q.   So I heard counsel say you're under no obligation
15  to review the 836 documents.  What did you do to prepare for
16  Topic No. 2?
17      A.   What was Topic 2?
18      Q.   The one that I just read.
19      A.   Oh.
20      Q.   "The relationship between Mutual's alleged
21  damages and the documents Mutual designated in its March 10,
22  2023, amended response to Interrogatory No. 1," the one that
23  we were talking about, the one for which Mutual designated
24  836 documents.
25      A.   Right.

38

1      Q.   What did you do to prepare for that deposition
2  topic?
3      A.   We looked over -- I looked over e-mails similar
4  to this that shows Dwayne from a Mutual Mortgage e-mail
5  sending a borrower to Waterstone.
6      Q.   Okay.  So I'm trying to understand how 836
7  documents relate to an itemization of damages.  Are you able
8  to tell me that?
9      MS. WALTER:  Object to form.
10      A.   So I think you're asking for a formula, right,
11  for damages on this?  I don't know what you're asking for.
12      Q.   Let me just read the topic and then see if you
13  can answer.  The --
14      A.   What's the value of this customer?  Can you tell
15  me that?  No, I'm asking you.  I'm asking anybody in this
16  room.  Can you tell me the value of this customer?
17      Q.   Well, as the plaintiff in the case, that's why
18  I'm asking you.
19      A.   Yeah.
20      Q.   It's identified as related to --
21      A.   And I'm telling you the value of a customer is
22  much more than some silly calculation.  It's trust.  It's
23  brand.  It's integrity.  This customer reached out because
24  we're Mutual of Omaha and then was steered to Waterstone.
25      Q.   Do you know whether that customer closed a loan

39

1  at Waterstone at all?
2      A.   I don't know --
3      Q.   Do you know whether that customer --
4      A.   -- not off the top of my head.
5      Q.   -- is included in some damage calculation done by
6  Mutual of Omaha?
7      A.   Well, I do know this:  This is -- see this?  This
8  is nonpublic information.  This customer was -- nonpublic
9  information was forwarded from a Mutual of Omaha employee to
10  a Waterstone employee.  That's as bad as it gets.  I've been
11  in this business for a long time.  You rarely see these
12  instances.  I think that's why you're trying to point out
13  some nebulous -- some nebulous formula in terms of the --
14  losing customers, and I think it's much greater than that.
15      We can talk about formulas in terms of Bucket 2.
16  But in Bucket 1, it's much greater than a formula.  It's the
17  actual brand of Mutual of Omaha.  What's the value of that
18  brand?  And here's somebody representing that brand just did
19  just like this to the customer here.  We're going to give it
20  away.  That is unbelievable to me.
21      And we want to argue about a formula, a silly
22  formula?  It's a customer.  It is nonpublic information that
23  we just sent not securely, mind you, willy-nilly through the
24  Internet to Waterstone, and the Waterstone person says "Oh,
25  great.  Fantastic."  And we want a formula.

40

1      Q.   My question to you, do you even know whether this
2  loan closed at Waterstone?
3      A.   It doesn't matter.  It's irrelevant.  It's only
4  relevant to you.  It's not relevant to us.  This is our
5  customer.  This is our public information.  What's relevant
6  to you doesn't matter to me.  What's relevant to me is this
7  customer information and the customer's well-being, not
8  whether some silly loan closed.  That's -- we'll get to that
9  in paragraph 2.  This is a customer.
10      Q.   Mr. Gennarelli --
11      A.   This is, like -- I don't even understand how we
12  can be spending so much time on some silly formula when we
13  have this -- just this unbelievable disregard for any type
14  of ethics whatsoever.
15      MS. KREITER:  Can you read back my question,
16  please?
17      (The previous question was read by the reporter.)
18      Q.   Do you know?  Yes or no?
19      A.   No.
20      Q.   Do you know whether Mutual is counting this loan
21  in its damages in any respect?
22      MS. WALTER:  Object to form.
23      A.   In the damages where?  What damages?  In
24  Bucket 1?
25      Q.   Damages in Bucket 1.

**41**

1    A.   I would say that if we -- if this proceeds to
2  trial, you will see a damage calculation for Bucket 1, and
3  it's not going to be a silly formula.  It's going to be a
4  representational calculation.
5        MS. KREITER:  Can you read back my question,
6  please?
7        (The previous question was read by the reporter.)
8    A.   It is counting this loan as damages, yes.
9    Q.   Okay.  How much is sought based on that loan?
10   A.   We just said there's no damages set yet for
11  Bucket 1.
12   Q.   Mutual didn't retain a damages expert for this
13  case; correct?
14       MS. WALTER:  Object to form.
15   A.   Not to my knowledge, no.
16   Q.   Does Bucket 1 assume that all of the loans closed
17  at Waterstone were improperly solicited?
18       MS. WALTER:  Object to form.
19   A.   Yes.
20   Q.   Why?
21   A.   Well, I think for several reasons.  I mean, I
22  don't know where you want me to start.  Do you want me to
23  start with the person who made a fake e-mail address up that
24  had Mutual Mortgage in the title of the e-mail, or, I
25  mean -- or do you want to start with the -- with the data

REGENCY REPORTING SERVICE, INC. (813)224-0224

**42**

1  that was sent while they were still employed?  I mean, I
2  don't know where you want to go.
3    Q.   Let me ask you this question.  Forget about
4  Bucket 1 globally.
5    A.   Yeah.
6    Q.   Do you know -- do all of the Mutual employees who
7  left and went to Waterstone, do they all have nonsolicits?
8        MS. WALTER:  Object to form.
9    A.   I believe that the sales staff certainly does.  I
10  don't know about every single employee, but I believe that
11  they -- as far as I know, they did.
12   Q.   Do you believe all the managers did?
13   A.   Yes.
14       MS. WALTER:  Object to form.
15   Q.   Has there ever been a legal proceeding in which
16  the enforceability of the Mutual restrictive covenants has
17  been challenged in a court or an arbitrator has found that
18  the covenants are unenforceable for the period of 2018
19  through the present?
20       MS. WALTER:  Object to form.
21   A.   No.
22   Q.   Do you know whether Dwayne Hutto -- sorry.  You
23  might've answered this.  Do you know whether Dwayne Hutto
24  has a customer nonsolicit?
25   A.   He does have a customer nonsolicit.

REGENCY REPORTING SERVICE, INC. (813)224-0224

**43**

1    Q.   Do you know whether Dwayne Hutto has an employee
2  nonsolicit?
3    A.   He does have an employee --
4    Q.   Do you know whether Dwayne Hutto's
5  nonsolicitation agreement is different from that of Chris
6  Wolf?
7    A.   I'm not aware it is different.
8    Q.   In conjunction with your damages analysis, not
9  just Bucket 1, but then globally, I mean, did you do
10  anything to consider whether those agreements were
11  enforceable?
12       MS. WALTER:  Object to form.
13   A.   I did not.
14   Q.   I want to focus on causation as it relates to
15  damages in general, not just Bucket 1 --
16   A.   Okay.
17   Q.   -- but in general.  Is causation something that
18  Mutual considered when it was preparing its damages
19  analysis?
20       MS. WALTER:  Object to form.
21   A.   If you can explain to me what causation means.
22   Q.   Sure.  For example, with respect to the first
23  bucket there -- okay.  Sorry.  Let's go to the second
24  bucket.
25   A.   Okay.

REGENCY REPORTING SERVICE, INC. (813)224-0224

**44**

1    Q.   On page 27 of Exhibit 4 -- it's this one here.
2  Exhibit 4 -- let me just -- and go to page 27.
3    A.   Yes.
4    Q.   Just let me know when you're there.
5    A.   Yes.
6    Q.   Okay.  It says "Profits plaintiff would have made
7  but for defendant's unlawful conduct, which caused plaintiff
8  to have to close its branches in Tampa and Daytona Beach."
9  So there's an allegation that it was Waterstone's unlawful
10  conduct that caused the branches to close.  So I want to
11  focus on causation.  What did Waterstone do that caused the
12  branches to close or caused the loans to close with it
13  rather than with Mutual?  Do you understand causation --
14   A.   I do.
15   Q.   -- in that sense?
16   A.   Are you referring to what -- the causation of the
17  closing of the branches or in general or what -- what --
18   Q.   With respect to any of the damages analysis.
19   A.   Yeah.
20   Q.   Let me ask it this way:  If there was a loan that
21  was in the pipeline at Mutual but it was, you know, Dwayne
22  Hutto's daughter, you can imagine that loan likely
23  would transfer to Waterstone, not because of any kind of
24  wrongdoing by Dwayne or solicitation but just because of the
25  relationship between the borrower and Mr. Hutto.  Does that

REGENCY REPORTING SERVICE, INC. (813)224-0224

45

1 make sense to you?
2       MS. WALTER: Object to form.
3    A.   Your question makes sense, but the result doesn't
4 make sense to me.
5    Q.   That the loan would closed with Waterstone?
6    A.   Right. I've -- I've had -- I've left companies.
7 I leave the entire loan pipeline, you know, where it is.
8    Q.   Sure. But you understand that the borrowers have
9 the election to close the loan with one or the other?
10   A.   Yes, yes, yes.
11   Q.   And in some situations, it may be natural for the
12 borrower to want to close with Waterstone because the
13 relationship with the --
14   A.   I think it's important to understand that the
15 information that Waterstone had in terms of pricing of that
16 loan, in terms of creditworthiness of that loan made it --
17 made it easy to attract the borrower, meaning, like, if I'm
18 competing on a level playing field, the borrower doesn't --
19 I don't know what that borrower is offered vs competitor
20 X.
21       In this case, they knew exactly what the borrower
22 was offered by Mutual, so you could undercut that by a few
23 hundred dollars and get that loan because you have
24 information that generally a competitor wouldn't have.
25   Q.   Does Mutual have evidence that that occurred,
REGENCY REPORTING SERVICE, INC. (813)224-0224

46

1 that pricing was undercut by Waterstone --
2       MS. WALTER: Object to form.
3    Q.   -- based on knowledge of pricing from Mutual?
4       MS. WALTER: Object to form.
5    A.   I have knowledge that our information was sent to
6 Waterstone, and I don't know why else you would send that
7 information unless you were going to use it in that regard.
8 But I guess specifically I couldn't speak to it at this
9 moment.
10   Q.   So my question about causation was just, you
11 know, you're seeking a dollar value.
12   A.   Sure.
13   Q.   And I want to understand was there an attempt to
14 think about causation, meaning --
15   A.   Yes.
16   Q.   -- is this loan attributable to wrongful conduct
17 or some other cause when you did your damages analysis?
18       MS. WALTER: Object to form.
19   Q.   Do you understand the question?
20   A.   I do. I do.
21   Q.   Go ahead and answer.
22   A.   Okay. I think there was definitely discussion of
23 causation; right? There was definitely --
24       MS. WALTER: Object to the extent that he is
25 going into any sort of discussions with -- that are
REGENCY REPORTING SERVICE, INC. (813)224-0224

47

1 protected by attorney-client privilege.
2       MS. KREITER: This is not --
3       MS. WALTER: This is a document that was served
4 by counsel, so --
5       MS. WALTER: I'm asking the witness whether he
6 considered causation.
7       MS. WALTER: He is not here to testify as a
8 damage expert, Maria.
9       MS. KREITER: Courtney, Topic 1 is itemize --
10 tell us what the --
11       MS. WALTER: He's a designated corporate
12 representative. He's answering your questions. He's
13 not a damage expert, though.
14       MS. KREITER: For the record, Topic 1 of the
15 deposition notice was "The damages sought by Mutual,
16 including the calculation and the basis of all such
17 alleged damages."
18   A.   Yeah.
19   Q.   My question --
20   A.   Yes.
21       MS. KREITER: Madam Court Reporter, read back the
22 question. I believe the witness understood the
23 question prior to objection by counsel.
24       (The previous question was read by the reporter.)
25   Q.   Let me start again. I think there was
REGENCY REPORTING SERVICE, INC. (813)224-0224

48

1 interruptions there. So the question was when you --
2    A.   Yes.
3    Q.   -- or Mutual were doing your damages analysis --
4    A.   Yes.
5    Q.   -- did you consider causation with respect to
6 particular borrowers? For example, did all of the borrowers
7 close with Waterstone due to wrongful conduct, or was there
8 perhaps some other cause? Did that analysis of causation
9 with respect to the borrowers occur in conjunction with your
10 damage calculation?
11       MS. WALTER: Object to form.
12   A.   Okay. When you first asked me, you said
13 causation in terms of everything; right? Now you're
14 defining it to just the borrower?
15   Q.   Sure. We'll get to that too. But, you know,
16 with respect to borrowers that may have transferred a loan
17 to Waterstone --
18   A.   Sure.
19   Q.   -- as part of the damages analysis, did Mutual
20 make any efforts to determine what caused the borrower to
21 transfer to Waterstone?
22       MS. WALTER: Object to form.
23   A.   I would say that in my experience when you're
24 sending loans to an underwriting manager and you're still
25 employed here, there is a -- it would be an interesting -- I
REGENCY REPORTING SERVICE, INC. (813)224-0224

49

1 guess there's more at stake for that underwriter to possibly
2 make a good decision in terms of the borrower when they're
3 recruiting this branch.
4          And I don't even understand how you could -- the
5 underwriter, I imagine, would report this as a SAR or
6 whatever the case is because she's getting nonpublic
7 information.  You know, the customer hasn't signed any kind
8 of disclosures with Waterstone.  The disclosures are with
9 Mutual.
10         So -- so the same underwriter manager is looking
11 at loans, and then she is at the same time booking trips to
12 Costa Rica for Dwayne and his family.  I don't -- you know,
13 I think -- I mean, I've only been doing this for 20-some
14 years.  I've never seen an underwriting manager look at
15 loans and then book a trip to Costa Rica.
16         So if you want to talk causation, I mean, it's --
17 you talk to most loan officers.  If they can be this close
18 to an underwriting manager, most companies wouldn't allow
19 it.  There's causation there.
20    Q.   Was causation considered on a loan-by-loan basis
21 when you did the damages analysis?
22         MS. WALTER:  Object to form.
23    A.   I think, yeah, in my mind, it was a -- more in
24 total rather than on a loan-by-loan basis.
25    Q.   Has Mutual asked any of the borrowers what caused
REGENCY REPORTING SERVICE, INC. (813)224-0224

50

1 the borrower not to close with Mutual?
2    A.   No.
3    Q.   You agree a borrower has a right to close its
4 loan with whichever mortgage company it wants; correct?
5    A.   I do.
6    Q.   What evidence besides what you have said already
7 does Mutual have that the loans it's counting for purposes
8 of damages moved to Waterstone due to wrongdoing versus
9 simply the borrower's preference?
10    A.   Well, in my opinion, which this is what it's
11 about, they're all due to wrongdoing because the loan
12 officers worked for Mutual of Omaha.  The wrongdoing
13 occurred when they steered this customer to Waterstone
14 without disclosures.  Waterstone caused this by not saying,
15 "Hang on.  We don't have disclosures in Waterstone's name.
16 Why is my underwriting looking at it?" prior to those
17 disclosures being sent.
18         You have an application -- and maybe Waterstone
19 did send disclosures at the same time as -- and that would
20 really be interesting that -- because who was the loan
21 officer on that file?  And the NMLS, who was -- who was on
22 the loan application?  So, I mean, it's -- there's a lot
23 going on here that, you know --
24    Q.   Does --
25    A.   -- is interesting.
REGENCY REPORTING SERVICE, INC. (813)224-0224

51

1    Q.   Does Mutual have evidence of confidential
2 information being sent to Waterstone to back up all of the
3 loans that are included in its damage analysis?
4    A.   I don't -- again, I'll go back to the private
5 e-mail.  We do have information going to private e-mail
6 accounts, and we also have quite a few e-mails of nonpublic
7 information that went to Waterstone.
8    Q.   Are you able to say what percent of loans that
9 are included in your damages analysis are supported by a
10 taking of confidential information?
11         MS. WALTER:  Object to form.
12    A.   Can I use an analogy?
13    Q.   Answer however you think would be helpful.
14    A.   If a guy robs a bank and on the way out, he sees
15 a dollar laying on the ground in the bank and picks it up,
16 that dollar wasn't -- he didn't rob from the bank, but he
17 still robbed the bank.  So you're kind of -- it's kind of
18 like -- I mean, listen, nonprivate information was sent to
19 both Waterstone and to personal e-mail accounts and to third
20 parties.  You don't have to be a rocket scientist to say
21 there was wrongdoing or causation.
22         And, you know, if you disagree, that's your
23 point, but I've been doing this a really long time.  And I
24 would say that in my opinion, what you just sent me was
25 enough causation to say something is askew here, but --
REGENCY REPORTING SERVICE, INC. (813)224-0224

52

1    Q.   Sure.  And I want to understand the magnitude.
2 That's what I'm talking about.
3    A.   Sure.
4    Q.   I mean, you understand.  Say someone made a
5 decision and sent a borrower application with respect to one
6 loan --
7    A.   Sure.
8    Q.   -- and it closed at Waterstone, but then there's
9 30 more loans, and none of those involve a taking of
10 confidential information.  You wouldn't have damages as to
11 those 30 others absent some other kind of wrongdoing, and so
12 that's what I'm trying to get a sense of.
13    A.   But we don't know -- we saw huge data being sent
14 out; right?  And so -- and those loans were in that data.
15 Now, you know, so I don't know whether, you know -- the
16 wrongdoing occurred by sending that data.
17    Q.   Did Waterstone send the data or the employees?
18    A.   The employees.  Waterstone received data.
19    Q.   Do you know whether Waterstone IT quarantined
20 that data?
21    A.   I do not.
22    Q.   If that's what happened, would that change your
23 mind about Waterstone's liability?
24         MS. WALTER:  Object to form.
25    A.   I don't -- I don't believe so.  I mean, then
REGENCY REPORTING SERVICE, INC. (813)224-0224

53

1  you're just talking about they quarantined it in terms of IT
2  security or in terms of they're never going to do loans for
3  those customers again there. I mean, I don't know what you
4  -- what do you mean by "quarantine"?
5      Q. I mean, I'm trying to understand -- quarantine,
6  take the documents away from the people, the loan
7  officers.
8      A. Okay.
9      Q. And if that happened, would that change your mind
10  about Waterstone's liability?
11         MS. WALTER: Object to form.
12      A. If the loan was started at Mutual and it went to
13  Waterstone before that person was employed, that's what
14  we're talking about; right?
15      Q. Sorry. No, I'm not limiting it to that. I'm
16  trying to understand you've not sued -- you've told me that
17  it's wrongful for the different loan officers and employees
18  to send the information --
19      A. Yeah.
20      Q. -- but you've not sued them. You've sued
21  Waterstone. And you've sought in excess of $4 million from
22  Waterstone. So I'm trying to understand what improper
23  conduct of Waterstone occurred to support in excess of a
24  $4 million --
25      A. Yeah.
REGENCY REPORTING SERVICE, INC. (813)224-0224

54

1      Q. -- damages claim. And I heard you say, "Well, I
2  have evidence of some confidential information being sent by
3  the employees, and that shouldn't have happened." And I'm
4  trying to get an understanding in the first instance of, you
5  know, the magnitude of that. Do you have evidence on behalf
6  of Mutual that confidential information was taken by the
7  employees with respect to all of the loans that support the
8  damages demand in excess of $4 million?
9         MS. WALTER: Object to form.
10      Q. That's the first question. Then I'll go to Phase
11  II.
12      A. I think -- I think what you're saying is the
13  $4 million doesn't have to do with Bucket 1; right? You
14  already made your --
15      Q. Yeah. So let's be clear. You're right. Let's
16  clarify. Let's move to -- the only category of damages, as
17  I understand it, for which Mutual has articulated a damage
18  number, and it's in excess of $4 million.
19         MS. WALTER: Objection. Maria, that's a
20  mischaracterization because we do have numbers in the
21  interrogatory responses for the ill-gotten gains.
22         MS. KREITER: Okay. We'll get to ill-gotten
23  gains.
24      Q. Let's focus on Bucket 2, damages associated with
25  the branches closing, and it's in excess of $4 million. And
REGENCY REPORTING SERVICE, INC. (813)224-0224

55

1  I'm trying to understand with respect to Bucket 2 or
2  Bucket 1, you haven't quantified any damages with respect to
3  Bucket 1. You're not prepared to testify about that. But
4  with respect to Bucket 1 or Bucket 2 -- Bucket 3 is a
5  different thing. We'll put that to the side.
6         I'm trying to understand the alleged unlawful
7  conduct, as I'm hearing from you, is there was borrower
8  information sent and documents that were sent by the
9  employees that shouldn't have been sent. So what I want to
10  know is the documents that were sent, does that relate to,
11  you know, how many borrowers and does it support a
12  $4.4 million demand? Do you understand the question?
13         MS. WALTER: Object to form.
14      A. I do understand your question. But to me, you
15  seem to be mixing up Bucket 1 and Bucket 2. If -- if you
16  want to talk wrongdoing on Bucket 2, that's a different --
17  that's a different conversation; right?
18      Q. Okay. So Bucket 2 doesn't have to do with
19  particular loans. It has to do with branches that closed?
20      A. That's correct.
21      Q. Okay. Bucket 1 --
22      A. And loans as well, but yes. But yeah, but more
23  of the branch closing and the loss of future -- future
24  revenue, right.
25      Q. Because the thinking with respect to Bucket 2 is
REGENCY REPORTING SERVICE, INC. (813)224-0224

56

1  those branches would've stayed open and loans would've
2  continued to close with Mutual, so there's some overlap
3  there; correct?
4      A. Correct.
5      Q. Okay. So with respect to the 4. -- you know,
6  nexus of $4 million demand with respect to Bucket 2, is it
7  the position that there's also confidential information with
8  respect to whatever loans would have closed at Mutual but
9  for the branches closing?
10         MS. WALTER: Object to form.
11      A. That is part of it, I mean, yes. Confidential
12  information was sent, and more than likely that would've
13  been part of the loans that closed in the future, for sure.
14      Q. Sure. But does it support a 4. -- just look what
15  it is --
16      A. Yeah.
17      Q. -- a demand in excess of $4.4 million?
18      A. I don't know if the confidential information
19  does. I think it certainly could be higher than that, but I
20  think that what -- what happened is these folks had
21  restrictive covenants. Waterstone came in and recruited
22  them as a whole, took them to Costa Rica, had them -- had
23  them on Zoom calls while they were still employed at Mutual
24  on the Mutual system.
25         So in my experience, what the causation of that
REGENCY REPORTING SERVICE, INC. (813)224-0224

57

1 would be, they had the employees violate the restrictive
2 covenants. Waterstone enticed them with $750,000 checks and
3 trips to Costa Rica and things like that to leave. That's
4 what I would say is a problem.
5     Q. Let me ask it this way. I think you're trying to
6 answer. I think something is lost in translation here, so
7 let me just ask it a different way. Are you able to testify
8 on behalf of Mutual as to how many loans involved an
9 employee of Mutual sending confidential or borrower
10 information?
11     MS. WALTER: Object to the extent it goes beyond
12     any -- beyond the scope of any of the noticed topics.
13     A. And I --
14     MS. WALTER: Answer.
15     A. Again, it goes back to my whole speech that
16 you're trying to put a dollar amount on confidential
17 information. And, you know, that is a different deal there
18 which you're walking down the path of. I mean, Mutual of
19 Omaha has a brand. It's 112 years old.
20     Someone entrusted an employee of Mutual of Omaha
21 with their information. Their information was then sent to
22 Waterstone, which may or may not have the same brand, or the
23 same customer may -- may not have chosen their information
24 to be released. That's a whole different deal. It's not
25 about the loan in that regard.

58

1     What is about the loan is the fact that --
2 listen, I mean, we can go round and round about this, but
3 I've been in this business long enough to see you can't go
4 in, and you know there's restrictive covenants. And you
5 know how we know there's restrictive covenants? Because
6 they set up little workarounds to be sneaky and to try not
7 to get caught. Everyone agreed to say, "Oh, that was a good
8 idea," except they did get caught. So everyone was aware.
9     If you're -- if what you were saying earlier,
10 that these restrictive covenants weren't enforceable, the
11 folks sure thought they were enforceable because they had
12 set up the e-mails. They had little codes that they built
13 in and tried to work around so people wouldn't know what
14 they were doing. So -- and those e-mails were sent to sales
15 management at Waterstone as well, so Waterstone was aware of
16 that.
17     Q. For how many loans did the employees send
18 confidential information?
19     MS. WALTER: Object.
20     A. Asked and answered, I believe is the objection,
21 but we talked about this.
22     Q. I'm just not clear on it, so I just want a clear
23 record.
24     A. Yeah.
25     Q. For how many loans did the employees send

59

1 confidential information?
2     MS. WALTER: Object.
3     A. I don't know.
4     Q. So confidential information --
5     A. Hundreds of loans.
6     Q. -- it could be taken by an employee. I will tell
7 you employees make decisions sometimes, you know, but then
8 some employees immediately regret it and delete it. And,
9 you know, information was taken, but it was never put to
10 use. Instead, the employee has second thoughts, deletes the
11 information; or the employer, "Alert. Why do you have this?
12 I don't want anything to do with that. You're deleting it,"
13 and it never really gets put to use.
14     So with respect to the information that Mutual
15 contends was confidential or a trade secret or borrower
16 information, does Mutual have evidence that that information
17 was, in fact, put to use by Waterstone? And if so, with
18 respect to how many loans?
19     A. Well, there is evidence that loans closed, as you
20 referenced earlier. The exact amount, you already asked me,
21 and I wasn't aware. But I'm sure counsel is aware of the
22 exact number, but I wasn't aware of it. So --
23     Q. Okay.
24     A. -- according to this deposition, I won't be able
25 to answer that. At trial, I'm sure we'll be able to answer

60

1 that.
2     Q. So to be clear, are you able to tell me at this
3 deposition today on behalf of Mutual as the corporate rep
4 for how many of the loans where confidential information was
5 taken or transmitted -- for how many of those loans was the
6 information actually put to use by Waterstone?
7     MS. WALTER: Object to form.
8     And before you answer that, I just want to put on
9     the record that I object to Topics 9 through 13
10     regarding all evidence insofar as it relates to
11     attorney work product.
12     MS. KREITER: This is Topic 1, what are the
13     damages and how were they calculated? So --
14     MS. WALTER: This is Topics 9 through 12 about
15     how Waterstone used the confidential information.
16     MS. KREITER: Well, it also relates to the
17     statement --
18     MS. WALTER: That's --
19     MS. KREITER: Let me say what I'm going to say,
20     and then you can speak.
21     MS. WALTER: Okay.
22     MS. KREITER: It also relates to the statement in
23     Mutual's written discovery response that there was
24     unlawful conduct by Waterstone that caused the losses.
25     So I'm following up on that. It's Deposition Topics 1

61

1 and 2. And I want to understand from this witness what
2 was factored in for purposes of the damage analysis.
3     Q.   You're telling me that you're looking at loans
4 that transferred to Waterstone, and I'm trying to understand
5 does Mutual have any evidence with respect to any of the
6 loans on which it's claiming that confidential information
7 was transferred and was put to use by Waterstone, for how
8 many loans fall into that category, if you can say?
9          MS. WALTER:  Before he responds, I'm going to
10 object because I waited and I let you say your piece.
11 And I am, again, going to preserve my objection for
12 Topics 9 through 13.  I am not instructing him not to
13 speak, but I am entitled to put that objection on the
14 record.
15          Go ahead, Jeff.
16     A.   I mean, you're asking a -- we don't know the
17 inner workings of Waterstone, so how can we answer that
18 question?  How do we -- how could we ever know?  I mean,
19 it's an impossibility.  There's no way we can know what
20 happens at Waterstone.  We don't know what goes on, what
21 information was used or was not used.  So what you're asking
22 is impossible for me to answer.
23     Q.   Well, we're ten months into the case.  There's
24 discovery that's available.  So do you think --
25     A.   You can't discover someone's conversation.  We

REGENCY REPORTING SERVICE, INC. (813)224-0224

62

1 can't discover -- so someone is going to say, "Oh, we
2 disregarded that loan application that came out, and we took
3 a new loan application."  Okay.  It's -- listen, you're
4 going to say something, but let me finish.  I'm happy to go
5 on the stand in front of a jury or whatever and say the same
6 exact thing because in my experience of over 20 years, that
7 information was used.  That loan would've never got to
8 Waterstone.  How else would the loan have gotten to
9 Waterstone?
10     Q.   For how many --
11     A.   Can you answer me how that loan got to
12 Waterstone?
13     Q.   No.  And how it works at the deposition is I ask
14 you the questions.  You can answer if you can.
15     A.   I know, but I --
16     Q.   For how many borrowers does Mutual have evidence
17 that information was taken and put to use by Waterstone?
18          MS. WALTER:  Objection.  Asked and answered.
19     A.   Every borrower was part of information that was
20 sent in one way or another.  I mean, there's huge databases
21 that were sent.
22     Q.   What evidence does Mutual have that Waterstone
23 took advantage of huge databases of data?
24          MS. WALTER:  Object to form.
25          MS. KREITER:  What's the objection?

REGENCY REPORTING SERVICE, INC. (813)224-0224

63

1          MS. WALTER:  What do you mean by "huge
2 databases"?  Where is that from?
3          MS. KREITER:  From the witness's testimony just
4 now.
5     A.   Yeah, I said we had sent.  I didn't say they
6 received.
7          MS. WALTER:  What's the question?  Ask the
8 question.
9     A.   They had sent databases --
10          MS. KREITER:  Read the question back, please.
11          (The previous question was read by the reporter.)
12     A.   Yes, I don't have any evidence of that right now.
13     Q.   Let's talk for a moment about the category that
14 we haven't talked about, ill-gotten gains.
15     A.   Okay.
16     Q.   If you would turn in Exhibit 4, please, to
17 page 28, there's a bullet that reads "Ill-gotten gains,
18 including compensation paid or advanced by defendant,"
19 meaning Waterstone, "to plaintiff's prior employees in
20 exchange for the unlawful conduct that has caused the
21 closure of two of plaintiff's branches."  Do you see that?
22     A.   I do.
23     Q.   I want to focus on the start of it.  It says
24 "Ill-gotten gains, including compensation paid or advanced
25 by Waterstone," so this is money that Waterstone is paying

REGENCY REPORTING SERVICE, INC. (813)224-0224

64

1 out to the employees; correct?
2     A.   Yes.
3     Q.   It's not money that Waterstone is enjoined.  It's
4 a cost to Waterstone; correct?
5     A.   Correct.
6     Q.   In what sense is money paid out by Waterstone a
7 gain to Waterstone, ill-gotten or otherwise?
8     A.   I think the folks that that money -- got is part
9 of the -- part of the --
10     Q.   Sure.  The employees gained the money, not
11 Waterstone; right?
12     A.   Yeah.
13     Q.   Mutual claims that these ill-gotten gains to
14 Waterstone that actually went to the employees and not
15 Waterstone consists of $500,000 that Waterstone paid to
16 Chris Smith and 250,000 that Waterstone paid to Dwayne Hutto
17 for a total of $750,000; correct?
18     A.   Yes.
19     Q.   Is Mutual seeking $750,000 from Waterstone that
20 it paid to third parties?
21     A.   I -- I believe what -- what the premise is, at
22 least my understanding is, that's the value that Waterstone
23 placed on these two people, and so that's the -- you know,
24 that -- that's how they came up with that number.
25          MS. KREITER:  Can you read my question back,

REGENCY REPORTING SERVICE, INC. (813)224-0224

65

1    please?
2         (The previous question was read by the reporter.)
3    A.   Yes.
4    Q.   What is the contractual or other legal basis upon
5    which Mutual contends Waterstone should have to pay the
6    $750,000 --
7         MS. WALTER:  Object to the form.
8    Q.   -- to Omaha that it has paid to Mr. Hutto and
9    Mr. Smith?
10        MS. WALTER:  Object to form.
11   A.   I'm not a lawyer, and you said contractual, so I
12   want to --
13   Q.   What is the basis, period?
14   A.   The basis they caused them -- Waterstone
15   caused these two folks to violate their -- their restrictive
16   covenants.  And that's the value you assessed on that -- on
17   the value to them, and that's how the value came up with --
18   so --
19   Q.   So it's Mutual's position that $750,000 is a
20   payoff in exchange for soliciting who, customers or other
21   employees?
22        MS. WALTER:  Object to form.
23   A.   I would say both.
24   Q.   No money is paid to Chris Wolf.  Is it your
25   position that Chris Wolf was not involved in any unlawful

66

1    activity?
2         MS. WALTER:  Object to form.
3    A.   No, it is not our -- it is not our assertion.
4    Q.   Why would Mr. Wolf not be compensated?
5         MS. WALTER:  Object to form.
6    Q.   Your position is Waterstone is paying people to
7    solicit clients and employees, $500,000 for one person who
8    engaged in that activity, 250- for another, and then there's
9    a third that did but got no money?
10        MS. WALTER:  What's the question?
11   Q.   Is that your position, that Waterstone was paying
12   for breaches of a solicitation agreement and paid two of the
13   three managers hundreds of thousands of dollars and then
14   paid a third, who did the same thing, nothing?
15        MS. WALTER:  Object to form.
16   A.   Yes.
17   Q.   Chris Smith was alleged to -- Chris Smith was
18   paid double what Dwayne Hutto was paid.  Does that mean in
19   your mind that Chris Smith is engaging in double the
20   solicitation and wrongdoing?
21        MS. WALTER:  Object to form.
22   A.   Well, I think there's double -- double the
23   damages that Chris caused because his branch was larger than
24   Dwayne, and I'm sure that's why you guys paid out more to
25   Chris than Dwayne.

67

1    Q.   So Mutual's explanation for the material
2    different amounts paid to the managers, one manager getting
3    nothing and then one getting double what the other is, that
4    it's consistent with what, the level of wrongdoing or the
5    value of the branch?
6         MS. WALTER:  Object to the form and to the extent
7    you're asking him to testify about what Waterstone was
8    thinking.
9    Q.   Go ahead.
10   A.   Okay.  In all this excitement, I forgot the
11   question.
12   Q.   Sure.  I'm trying to understand why Mutual thinks
13   that this money is tied to wrongdoing.
14        MS. WALTER:  Object to form.
15   Q.   Why does Mutual think this money is tied to
16   wrongdoing at all?
17   A.   Because of the restrictive covenants in place.
18   Chris Smith doesn't originate loans for a living.  The only
19   value he would have is to bring his folks over, which he had
20   restrictive covenants on.  So why would -- why would
21   somebody pay him $500,000 to come over if he doesn't
22   originate loans himself unless it was to bring his team
23   over?
24   Q.   How long does it take to develop a pipeline?
25   When a team transitions, how long will it take to develop a

68

1    new pipeline?
2    A.   Depends on the team, but 30, 60 days, something
3    like that.  Generally, they get paid -- they probably -- the
4    loans close on month two.  Depends, though.  If you're
5    working -- if you're building your pipeline before you
6    leave, which was the case here, it's a little different.
7    Q.   Well, when Mutual recruits a branch --
8    A.   Yes.
9    Q.   -- is there compensation paid to the branch
10   manager or to the new loan officers in recognition of the
11   fact that commissions aren't going to be coming in day one
12   because a pipeline has to be built?
13   A.   Yes.  We've never paid out anything close to this
14   amount, never.
15   Q.   What makes you think that Waterstone's payments
16   here were in exchange for wrongdoing as opposed to those
17   types of payments?
18        MS. WALTER:  Object to form.
19   A.   Twenty-some years of experience says you're not
20   giving a nonproducing person a half a million dollars unless
21   you expect him to bring his group with...
22   Q.   There were loans originated by the departed
23   employees that were in Mutual's pipeline and then closed
24   with Mutual.  Do you have that understanding?
25   A.   Yes.

69

1      Q.   Did Mutual pay commissions on all of those loans
2   to the former employees right away?
3      A.   Yes.
4      Q.   The funds paid with respect to this Bucket 3 to
5   Mr. Hutto and Mr. Smith, allegedly paid to those
6   individuals, according to Mutual, are described in the offer
7   letters produced in discovery as follows:  Terms of your
8   Waterstone-producing branch manager employment agreement
9   will outline the terms of branch expenses and other
10  financial details, including a $500,000 credit provided to
11  the branch financial mode, and it's defined as a branch
12  financial credit.  Did you review the offer letter for
13  Mr. Hutto or Mr. Smith in which this credit is described?
14     A.   Yes.
15     Q.   In preparation for this deposition?
16     A.   Yes.
17     Q.   Did you review the employment agreement that
18  references the credit?
19          MS. WALTER:  Object to the extent this impedes on
20  what our designated corporate rep will be testifying
21  about tomorrow, specifically with respect to Topic
22  No. 18.
23          MS. KREITER:  Well, I'm asking about ill-gotten
24  gains and what this is based on and the basis for the
25  position that this is some kind of a bonus tied to
REGENCY REPORTING SERVICE, INC. (813)224-0224

70

1   wrongdoing as opposed to what it was described in the
2   documents produced.
3          MS. WALTER:  He can answer, but I'm telling --
4   Topic 18 says the circumstances surrounding those three
5   individuals becoming employees of Mutual, including
6   recruitment and onboarding.  And that pertains to any
7   document that they would've signed in their onboarding,
8   which Ms. Theobald will be testifying about tomorrow.
9          MS. KREITER:  Some of the facts can overlay
10  between topics.  That's not a basis to object.
11         MS. WALTER:  I'm entitled to put that on the
12  record.
13         MS. KREITER:  Okay.  There is no basis to object
14  on the grounds that facts go to one person's testimony.
15  They can also go to another.  So I'm asking this
16  witness because it relates to his -- it may also be
17  asked tomorrow, but there's no objection that's valid
18  based on these facts relate to something that also
19  relates to another topic.
20         MS. WALTER:  With all due respect, you're not the
21  judge.  I'm allowed to put it on the record.
22         MS. KREITER:  You did.
23         Read back my question yet again.
24         (The previous question was read by the reporter.)
25     A.   I did not review the employment agreement.
REGENCY REPORTING SERVICE, INC. (813)224-0224

71

1      Q.   Was there a belief on the part of Mutual
2   initially that large bonuses had been paid to certain
3   managers and then later there was a discovery that the
4   bonuses believed to exist weren't quite the amount?
5          MS. WALTER:  Object to form.
6      A.   I believe there was a rumor mill that said
7   something like that, but, I mean, it was -- the rumor was
8   there was a million dollars paid out.  There was 750,000
9   here, so...
10     Q.   What was the origin of that rumor?  Do you know?
11     A.   I really don't know.  I -- I can't tell you.
12     Q.   Okay.  Let's turn to Bucket 2.
13     A.   Okay.
14         MS. WALTER:  What's our -- sorry, Maria.  I don't
15  mean to interrupt.  What's our timing?
16         MS. KREITER:  I've got quite a bit.  I mean, to
17  be honest --
18         MS. WALTER:  No, no, no.  I know you have a bit
19  left in the deposition.  Like, what are you thinking in
20  terms of breaks?  We've been going for about an hour
21  and a half now.
22         MS. KREITER:  I can take a break now before we
23  turn to this category, if that makes sense.
24         MS. WALTER:  Do you want take a quick break, or
25  are you okay?
REGENCY REPORTING SERVICE, INC. (813)224-0224

72

1          THE WITNESS:  I'm okay.
2          MS. WALTER:  Okay.  That's fine.
3          Are you okay?
4          We can keep going.
5      Q.   Okay.  Let's turn to Bucket 2.  I want to start
6   with just a question; again, a concern about
7   double-dipping.  Mutual, with respect to Bucket 2 --
8      A.   Yes.
9      Q.   -- is seeking profits associated with a
10  circumstance of the branch remaining open for 18 months
11  period of time; correct?
12     A.   Yes.
13     Q.   If -- sorry.  If Mutual is awarded the entire
14  demand on Bucket 2, you would agree that Mutual can't also
15  be awarded damages on Bucket 1, which is loans that were
16  allegedly diverted?  That would be double counting; correct?
17         MS. WALTER:  Object to form.
18     A.   So I'm not a lawyer, you know, and I don't
19  understand how the law is.  I think -- I think that wouldn't
20  be double counting -- right? -- because what you're saying
21  is that loans were diverted and closed -- diverted while
22  there were still employees here and then we're saying
23  18 months after they were employees.  So I don't know if it
24  is double counting.  I know what you're saying.  I hear what
25  you're saying, and you just have to be -- look at the time
REGENCY REPORTING SERVICE, INC. (813)224-0224

73

1 frames, you know, very closely.

2    Q.    Sure.  Perhaps it wouldn't be double-dipping if a

3 loan was sent to Waterstone while the individuals are still

4 employed --

5    A.    That's right.

6    Q.    -- and that loan closed at Waterstone before the

7 employees resigned and the branches are closed; correct?

8    A.    Right.

9    Q.    But with respect to any of the loans that would

10 have closed at Waterstone that are counted in Bucket 1 and

11 then you seek damages in Bucket 2 based on the branches

12 staying open and presumably closing loans, that would be

13 double-dipping if the timing was such that the closing took

14 place after the branch --

15        MS. WALTER:  Object to form.

16    A.    Yeah, I'm not comfortable with -- because I don't

17 know what a judge can say or what a -- I don't know the law.

18 I don't -- I don't know.  This seems like a legal question,

19 you know, what damages a judge may award or how he sees fit.

20 I'm not comfortable answering it because I really don't

21 know.

22    Q.    I guess I didn't view it as a legal question.

23 Just factually, what is in Bucket 1, and is there overlap

24 with Bucket 2?  And it seems to me that Bucket 2 assumes

25 loans are closing on a regular basis at Mutual, and those

74

1 branches stay open.

2        Say there's a borrower in the pipeline and it

3 doesn't go to Waterstone because the branch stays open and

4 so it's counted.  So you're counting that loan once.  But

5 then if you have Bucket 1, that same loan, you know, now

6 we're looking at a scenario where the loan transfers to

7 Waterstone and you're counting it there too?

8        MS. WALTER:  Object to form.

9    A.    Yeah, I'm sorry.

10        MS. WALTER:  Answer.

11    A.    I think we're hung up with this -- on Bucket 1

12 with this associating of a value on the -- on the actual

13 closed loans and not necessarily on the larger picture of it

14 all, I think, you know, in my mind.  You asked me my

15 opinion.  In my opinion, Bucket 1 is different than just

16 closed loans.  And Bucket 2, we are simply talking about the

17 revenue generated from closed loans.

18    Q.    Can you say, as you sit here, that there is no

19 double-dipping with respect to Bucket 1 and Bucket 2, or are

20 you uncertain?

21        MS. WALTER:  Object to form.

22    A.    I can say that I am not -- I am not comfortable

23 talking Bucket 1 in terms of revenue per loan.  It's a

24 different -- I think it's a different -- that's part of it,

25 but there's also something else.

75

1    Q.    Okay.  With respect to Bucket 2 --

2    A.    Yes.

3    Q.    -- damages associated with the branches

4 closing --

5    A.    Yes.

6    Q.    -- there's a reference to the branches -- let me

7 just read it again.  "Profits plaintiff would have made but

8 for defendant's unlawful conduct, which caused the branches

9 to close."  Who specifically is Mutual referring to as

10 having engaged in unlawful conduct that caused the branches

11 to close?

12        MS. WALTER:  Object to form.

13    A.    I believe there's a regional manager, Florida

14 regional manager, that works for Waterstone and then an SVP

15 that was sent information to at Waterstone.

16    Q.    Was it Dustin Allen?

17    A.    You know --

18    Q.    You don't know?

19    A.    I mean, Dustin Allen, the name sounds familiar.

20        MS. WALTER:  Owen.

21    Q.    Sorry.  Kevin Allen --

22    A.    Kevin, yeah.

23    Q.    -- and Dustin Owen, is that what you're referring

24 to?

25    A.    I believe so.

76

1    Q.    So it was their unlawful conduct that caused the

2 branches to close?

3        MS. WALTER:  Object to form.

4    A.    I think that's part of it.  I mean, I think there

5 was also the underwriting manager.  There was quite a few

6 people that received information that were part of it.

7    Q.    What did Kevin Allen do to cause the Mutual

8 branches to close?

9    A.    He coordinated an effort to get everyone

10 together, had conversations, organized Dwayne to talk to the

11 underwriting manager, take trips with the underwriting

12 manager, and, you know, organize Zoom calls while they're

13 still employees.  In my experience, that's generally not the

14 right way to do things in terms of when people have

15 restrictive covenants.

16    Q.    What did Dustin Owen do to cause the branches to

17 close?

18    A.    I think similar -- similar efforts.

19    Q.    Okay.

20    A.    They paid $750,000 that caused the branches to

21 close.

22    Q.    Okay.  Is there anything unlawful about

23 Waterstone recruiting Dwayne Hutto in your mind?

24        MS. WALTER:  Object to form.

25        MS. KREITER:  What's the objection?

77

1    MS. WALTER: He is not a lawyer. How is he
2    supposed to know?
3        MS. KREITER: I asked him is there anything
4    unlawful? I'm going off of the written responses of
5    Mutual. I don't know why you put this, but you did,
6    and I'm following up on the position of Mutual. I'm
7    allowed to follow up on your written responses. This
8    alleges unlawful conduct.
9    Q.   I'm asking is there anything unlawful about
10   Waterstone recruiting Dwayne Hutto?
11   A.   I would said that recruiting Dwayne Hutto, had
12   they just recruited Dwayne Hutto as a loan officer and he
13   didn't move customers and he didn't move employees, that's
14   fine. But that wasn't enough for Waterstone; right? I
15   mean, they wanted the whole group --
16   Q.   Is there anything unlawful about Waterstone
17   recruiting Chris Wolf?
18   A.   Again, same answer. If it's one person and
19   they're not encouraged to violate their nonsolicit, then
20   there's nothing wrong with that, but that's not what
21   happened.
22   Q.   Was -- is there anything unlawful about
23   Waterstone recruiting Chris Smith?
24   A.   Same answer. If it was just Chris Smith and you
25   say you want to take this job as RVP or whatever the case is

78

1    and you build your branch up from scratch, fantastic, but
2    that's not what they wanted to do. It's certainly not what
3    you pay $500,000 for.
4    Q.   What evidence do you have that Waterstone
5    encouraged Dwayne Hutto to solicit -- I'm going to call them
6    the downstream employees just for convenience --
7    A.   Yeah.
8    Q.   -- but the employees at the Daytona branch. What
9    evidence do you have that Waterstone encouraged Dwayne Hutto
10   to solicit those employees?
11   A.   Well, there's e-mails that go back and forth
12   setting up calls with Dwayne and Chris and "You call Chris
13   now. We'll get Chris on the phone. That's great news."
14   There's -- there's a decent amount of e-mails that show that
15   this was a really -- a planned coup, so to speak. I mean,
16   there's a decent amount of -- and then there's also -- you
17   know, again, there's $250,000 that says that that would
18   probably be the case.
19   Q.   If Waterstone had simply recruited the managers,
20   Chris Wolf, Chris Smith, and Dwayne Hutto, would that be
21   unlawful?
22   A.   And -- and had them stick to their restrictive
23   covenants, meaning not recruit their folks and not --
24   Q.   Sure.
25   A.   I would say that that would be okay. You have

79

1    every right to -- people can work where they want. What you
2    can't do is you can't encourage them to violate their
3    nonsolicits.
4    Q.   Do you have any evidence on behalf of Mutual that
5    Dwayne Hutto solicited any of the downstream employees?
6    A.   Yes.
7    Q.   What is the evidence?
8    A.   E-mails.
9    Q.   In which Dwayne Hutto says "Come to Waterstone
10   with me" or something that is --
11   A.   Well --
12   Q.   -- with regard to solicitation in Mutual's
13   perspective?
14   A.   I -- I would say yes. Yeah.
15   Q.   What are those?
16   A.   I can't recite the 800 e-mails, but we're sitting
17   here because those e-mails exist. My time is extremely
18   valuable, as is yours, as is everyone else's. And if those
19   e-mails didn't exist, we'd just be on our way, but those
20   e-mails do exist.
21   Q.   Do you -- let me ask it this way: Do you think
22   that it's unlawful for Dwayne Hutto to make an announcement
23   to the downstream employees to the effect of "Wanted to give
24   you a heads-up. I'm leaving and going to Waterstone"? If
25   he says just that, is that unlawful?

80

1    A.   I would say if he does it while he's employed
2    here via his -- yes, it's unlawful. Yes, he should not be
3    making announcements on to his future employment while he's
4    employed with Mutual.
5    Q.   Is that solicitation in your mind, or is it just
6    unlawful because he's still employed?
7    A.   No, it's --
8        MS. WALTER: Object to form.
9    A.   Okay.
10       MS. WALTER: Go ahead.
11   A.   In my mind, it's solicitation; right? It is.
12   Q.   Is it your position that Dwayne Hutto is supposed
13   to give his resignation and then never breathe a word of it
14   to any of the employees?
15       MS. WALTER: Object to form.
16   A.   That's not what I said.
17   Q.   I'm asking, I mean, is that what you contend
18   Dwayne Hutto should've done to avoid solicitation?
19       MS. WALTER: Object to form.
20   A.   Yes, that's what he should've done to avoid
21   solicitation. That's exactly what he should've done.
22   Q.   Mutual's position is that an employee, who is a
23   branch manager, who has worked with employees for maybe a
24   decade, is prohibited from letting them know that he's
25   resigning?

81

1   A.   I think --
2        MS. WALTER:  Object to form.
3   A.   I think he should've made it clear when he let
4   them know that we're all under restrictive covenants, and he
5   should've -- he should've -- that's what I've done every
6   time in my past.  I've made it clear that just because I'm
7   going, you're -- everyone is under restrictive covenants.
8   Q.   Okay.  Same.  Just so we have a complete record,
9   is it your position that Chris Smith and Chris Wolf were not
10  -- it would've been unlawful for them to make a mere
11  announcement?  "I'm leaving and going to Waterstone."
12       MS. WALTER:  Object to form.
13  A.   While they're employed at Mutual of Omaha, yes.
14  Q.   And do you believe that those comments are
15  solicitation, or do you believe it's wrongful because
16  they're still employed?
17  A.   I think it borders solicitation, for sure.  No
18  one just makes a comment for no reason.  Let's be perfectly
19  honest.  You're trying to you, you know -- come on.  We all know
20  what happened, and you know what happened, and it's
21  embarrassing that we're even sitting here and arguing over
22  the fact of what happened.
23  Q.   And do you know whether the downstream employees
24  have followed Dwayne Hutto in the past when there's been a
25  change in his employer?

82

1   A.   I'm sure some have.
2   Q.   Do you understand that it would be really natural
3   and expected that some of the employees due to their
4   relationship with Dwayne Hutto or with Chris Wolf regardless
5   of any kind of solicitation would follow?
6   A.   Eventually.
7   Q.   You do understand that?
8   A.   I do understand eventually that's a possibility.
9   Q.   What evidence does Mutual have that the
10  downstream employees followed Dwayne Hutto and Chris Smith
11  and Chris Wolf because of unlawful conduct by Waterstone?
12  A.   Well, I think that there was enough e-mail
13  traffic saying, you know, that Waterstone had calls with the
14  folks while they're still employed here in group at the
15  direction of, you know, Chris and Dwayne.  So, I mean, I
16  think that there's a lot there.  I mean, you know, we keep
17  glossing over this trip to Costa Rica by the underwriting
18  manager.  I don't think that that's, you know -- I don't
19  think that that's nothing, for sure.
20  Q.   Who is the underwriting manager that you're
21  referring to?
22  A.   It's a Waterstone underwriting manager.  I don't
23  remember her name.
24  Q.   Went to Costa Rica with who?
25  A.   With Dwayne and his wife, and she made all the

83

1   arrangements and was back and forth in e-mail with Dwayne.
2   Q.   Is there anything unlawful about taking a recruit
3   on a trip?
4   A.   I'm not a lawyer.  I don't know.
5   Q.   I mean, is that part of the position of Mutual,
6   that that's wrongful conduct that caused the branches to
7   close?
8   A.   I'm happy to present that in front of a jury.
9   The underwriting manager, the person who makes credit
10  decisions, is taking a salesperson on a trip.  I'm happy to
11  roll that out to people who don't know the business and let
12  them decide whether that smells funny.
13  Q.   You would agree the branch managers themselves
14  have the right absolutely to resign from Mutual?
15  A.   Absolutely they do.
16  Q.   You would agree that the downstream employees
17  have an absolute right to follow the branch managers if
18  that's what they want to do?
19  A.   Yes.  But that's why we don't have a problem with
20  them.  We have a problem with Waterstone.
21  Q.   Has Mutual made any efforts to determine why each
22  of the downstream employees left?
23       MS. WALTER:  Object.  Asked and answered.
24  A.   Yeah.  And I think it's a better question, quite
25  frankly, for Brian Tomalak and Kiley.  They did.

84

1   Q.   I'm asking you.  I mean, has Mutual made any
2   effort to determine why the employees left?
3   A.   We -- we did.
4   Q.   What efforts were made?
5   A.   Brian and Kiley reached out and spoke to several.
6   Q.   What evidence resulted from those conversations,
7   if you know?
8   A.   This lawsuit resulted from those conversations.
9   You know, that's why -- why we sued.
10       MS. KREITER:  This is 6.
11       MS. WALTER:  Yeah.  Thanks.
12       (Exhibit No. 6 is marked for identification.)
13  Q.   Take a look at what we've marked as Deposition
14  Exhibit 6.  And I'm going to have you start at the back of
15  the document.  There's a page number on the bottom,
16  MOM-2924.  Do you see that?
17  A.   I do.
18  Q.   Just to go sequentially here --
19       MS. WALTER:  I'm just going to put on the record
20       that Mr. Gennarelli is not included on any of these
21       e-mails.
22  Q.   The e-mail starts -- it's from Kiera Tully,
23  June 16, 2022.  Do you see that?
24  A.   Yes.
25  Q.   And it's to Mutual HR.  Ms. Tully is an employee

85

1 of the Tampa branch; correct?
2    A.   Yes.
3    Q.   Her signature block says "Business development
4 offer."  What's the role of the Tampa business
5 development --
6    A.   Officer.
7    Q.   -- officer?
8    A.   I'm sure her job is to develop business.
9    Q.   How important is that role to the Tampa branch?
10    A.   I don't think very important, to be honest with
11 you, but...
12    Q.   Have you ever personally interacted with
13 Ms. Tully?
14    A.   I have not.
15    Q.   Ms. Tully writes to Mutual's HR "To whom it may
16 concern, I am fed up with not getting paid correctly as I am
17 still owed 71 hours of pay."
18    A.   Yes.
19    Q.   "For this, among other reasons, I will be
20 resigning from the company."  Do you see that?
21    A.   I do.
22    Q.   Do you agree the tone of this e-mail seems angry
23 or frustrated?
24    A.   I do.
25    Q.   Ms. Tully says the reason she's leaving is Mutual

86

1 has not correctly paid her.  Do you see that?
2    A.   I do.
3    Q.   What evidence does Mutual have that the true
4 reason for the departure was some unlawful conduct by
5 Waterstone versus what Ms. Tully expressed directly?
6        MS. WALTER:  Object to the extent it goes beyond
7        the topics that Mr. Gennarelli was designated to
8        testify on.
9    A.   Well, I'm happy to answer.
10        MS. WALTER:  Go ahead.
11    A.   Chris Smith is her manager.  He sets her pay.  He
12 pays her.  He puts -- he approves the pay.  So why would she
13 be mad at Mutual of Omaha and not Chris Smith, who is her
14 manager?  But she just -- she sent this e-mail as what?  Why
15 do you think she sent this e-mail?
16    Q.   I mean, I'm reading what she says.
17    A.   Why wouldn't she bring it up with Chris Smith?
18    Q.   Is it your position that you think Ms. Tully is
19 lying here?
20    A.   I think that this is an e-mail to cover tracks.
21 That's what I think because there is -- we pay people.
22 There is never -- unless Chris held it or something, but
23 people are paid correctly, so this seems very strange to me.
24    Q.   Is Ms. Tully the business development officer --
25 is that somebody who generates loans for Mutual or not?

87

1    A.   No.
2    Q.   Speculation versus evidence, speculation is I
3 suspect something happened versus --
4    A.   Right.
5    Q.   -- evidence --
6    A.   Yeah.
7    Q.   -- that I have an e-mail or I heard a statement.
8 Is there any evidence that Mr. Smith told Ms. Tully "Send
9 this e-mail and lie about the reason you're leaving"?
10        MS. WALTER:  Object to form.
11    A.   Yeah, not -- not that I've seen in these e-mails,
12 no.
13    Q.   It's just speculation on your part?
14    A.   Well, it's not speculation.  It's that no one
15 would ever direct an e-mail like this tone to someone other
16 than their manager.  I don't understand why that would
17 happen.
18    Q.   Could it be that the employees wanted to follow
19 the branch managers because there were no other Mutual
20 offices in Florida after Tampa closed?
21        MS. WALTER:  Object to form.
22    A.   Well, we did have that office in Tampa.
23    Q.   Sure.
24    A.   Just because Chris left, we didn't have to
25 release the lease to it.  We still had it.

88

1    Q.   So you could've -- Mutual could've maintained
2 that lease and built the --
3    A.   Absolutely.
4    Q.   Did Mutual try to do that?
5    A.   I don't know what Kiley -- Kiley lives in Tampa.
6 He asserted himself, so I don't know what the --
7    Q.   Kiley King?
8    A.   Yeah.  Kiley King, yeah.
9    Q.   Okay.  So do you know, as you sit here right now,
10 did Mutual keep the lease for the office that it had?
11    A.   We -- we -- I believe we allowed them to move
12 that lease eventually after everyone left, yes.
13    Q.   Okay.  And at that point, there weren't any
14 offices of Mutual in Tampa; correct?
15    A.   I don't know if that's true or not.  I really
16 don't because we share offices with -- in fact, I know it's
17 not true.
18    Q.   Did Mutual make any effort to keep any of the
19 employees and let them --
20    A.   Yes.
21    Q.   -- know that --
22    A.   Yes.
23    Q.   -- there would be an office --
24    A.   Yeah.
25    Q.   -- in Florida?

89

1    A.    Yeah.  We have a very large Mutual of Omaha
2    financial planning office in Tampa, very large, that we use
3    space in that as well.
4        Q.    How many of the employees did Mutual make efforts
5    to try to keep?
6        A.    You know, I would think that Brian and Kiley
7    probably reached out to the majority of them.
8        Q.    And none of them were interested?
9        A.    Apparently not.
10       Q.    There were -- you understand that there's certain
11   employees that didn't go over to Waterstone --
12       A.    I do.
13       Q.    -- for whatever reason?
14       A.    Yes.
15       Q.    Did Mutual attempt to make a branch of those
16   employees?
17       A.    Yes, or had conversations, I believe.  And I
18   believe they weren't very large -- very good producers, so
19   maybe the effort wasn't that great.  But again, this was not
20   -- I was not involved in it, so...
21       Q.    Okay.  So let's talk about what it means to lose
22   the branch, then.  I mean, the lease, I mean, is that part
23   of what you consider the branch?
24       A.    No.
25       Q.    No.  Is the branch really the people?

91

1    producing loan officer, you would agree that that loan
2    officer should have his or her production carved out of the
3    damages in Bucket 2; correct?
4        MS. WALTER:  Object to form.
5        A.    Not necessarily.  I think what you're saying is
6    that the spread is generally -- when you're trying to
7    estimate the -- moving forward, this branch generally
8    produces this amount of loans a month.  So a loan officer
9    may come.  A loan officer may go generally.  But in general,
10   this is their production in the course of, you know, several
11   years, and that was the average we used.
12       Q.    How many employees decided not to work for
13   Waterstone or Mutual and instead find some other job?
14       MS. WALTER:  Object to form.
15       A.    And I really don't know who was offered a job
16   from Waterstone or who wasn't.
17       Q.    What about Mutual?  I mean, do you know who was
18   offered a job by Mutual?
19       A.    Not off the top of my head, no.
20       Q.    For the employees that decide, "I don't want to
21   go to Waterstone," you know, can't come to Mutual, or it's
22   not working out, you know, or go to some other employer, is
23   their departure attributable to some unlawful conduct by
24   Waterstone?
25       MS. WALTER:  Object to form.

90

1    A.    The branch is the people and the production that
2    go along with those people, yeah.
3        Q.    With respect to the employees that didn't go over
4    to Waterstone and didn't find a home at Mutual for whatever
5    reason or employees that decided, "Look, I'm going to go to
6    a third party.  I don't want to go Mutual.  I don't want to
7    go to Waterstone" --
8        A.    Sure.
9        Q.    -- those people are part of the branch; correct?
10       A.    Yes.
11       Q.    And those people didn't go over to
12   Waterstone.  Are you -- for purposes of Category 2 damages,
13   are you counting the production of those people?
14       A.    I don't believe so.
15       Q.    How did you go about excluding them from the
16   damages analysis?
17       A.    I don't think there's much production that they
18   had.
19       Q.    There's an individual that went to -- I think his
20   name is Jake.  Apologies.  I don't know his last name.  Do
21   you know who I'm referring to?
22       A.    I don't.
23       Q.    You don't.  Okay.  If there was a producing loan
24   officer that decided not to go to Waterstone and instead
25   went to a different financial institution and that was a

92

1    A.    Well, I think when there's a chaos at a branch
2    when people are leaving and everyone is talking about, you
3    know, what's wrong here so that they can get their money to
4    leave and go somewhere else, that causes certainly
5    disruption and could cause people to -- to leave; right?
6        Q.    You testified earlier that there would be nothing
7    wrongful about Waterstone recruiting Mr. Hutto; correct?
8        A.    Right.
9        Q.    Mr. Hutto was a producing loan officer?
10       A.    Correct.
11       Q.    Did you carve Mr. Hutto's production out of the
12   damages that you're seeking in Bucket 2?
13       A.    No.
14       Q.    Why not?  What was wrongful about Waterstone
15   soliciting Mr. Hutto?
16       A.    They didn't solicit Mr. Hutto.  They solicited
17   the group.
18       Q.    But you're counting his production, and you're
19   saying that his departure was caused by unlawful conduct by
20   Waterstone, and you also said Waterstone is permitted to
21   recruit Mr. Hutto?
22       A.    Yeah.  You said without using these -- I didn't
23   say Waterstone was allowed to take Mr. Hutto to Costa Rica,
24   the underwriting manager.  I also didn't say they were
25   allowed to look at loans ahead of time, take information

93

1  while Mr. Hutto is still an employee.  So let's not act like
2  Waterstone here -- Bank of America, if they wanted to
3  recruit Dwayne Hutto, absolutely we should take that money
4  out, but that's not what happened.  What happened was
5  different than how you're painting the picture.
6      Q.   So is it -- I'm trying to understand here why you
7  are counting Mr. Hutto in the damages analysis.
8      A.   Right.
9      Q.   And is it -- and you're saying that Waterstone
10 could solicit him and could recruit him if it wanted to do
11 that?
12     A.   If they did it in an aboveboard way, but that's
13 not what happened.  So you can't have your cake and eat it
14 too.  You can't take the context of what really happened out
15 of the equation.  That doesn't work.
16     Q.   Are you aware that Mr. Hutto and Mr. Smith were
17 looking to leave Mutual and go somewhere else?  It just
18 happened to be Waterstone?
19     A.   I was not aware of that.  I mean, I think after
20 Dwayne left, we were aware that Chris was probably going to
21 depart.  I know that Brian brought up the fact that they
22 were always -- you know, they were pretty -- they talked a
23 lot to Brian, and there was a comment/conversation with them
24 that this place had this, but they didn't leave ever, so...
25     Q.   There were conversations between Mr. Hutto and
REGENCY REPORTING SERVICE, INC. (813)224-0224

94

1  Mr. Wolf with Kiley King and Brian Tomalak about --
2      A.   I think.  I mean, they were always trying to
3  finagle for a little bit of a better deal here and there but
4  never -- they never left obviously until -- until this,
5  until Waterstone got involved.
6      Q.   Did Mutual ever have a discussion with Mr. Hutto
7  about why he resigned?
8      A.   Brian and Kiley did.
9      Q.   What was the reason?
10     A.   I think you better ask them because it was a
11 conversation, so third party.  I think a lot had to do with
12 a check being written, from my recollection.
13     Q.   Same question for Mr. Smith and Mr. Wolf.  Was
14 there ever a conversation between Mutual and those managers,
15 Mr. Smith and Mr. Wolf --
16     A.   Yes.
17     Q.   -- about why they were leaving?
18     A.   Yes.
19     Q.   Why were they leaving?
20     A.   Well, Chris told Brian it was because of the
21 check and it was too good of a check to pass up.
22     Q.   Which Chris?
23     A.   Smith.
24     Q.   Do you believe that the managers were genuinely
25 unhappy at Mutual of Omaha?
REGENCY REPORTING SERVICE, INC. (813)224-0224

95

1      MS. WALTER:  Object to form.
2      A.   No, I don't believe that.
3      Q.   Did Mutual factor in the cause of the managers'
4  departure when it was considering the damages?
5      MS. WALTER:  Object to form.
6      A.   Yes, I believe so.  I mean, the cause that --
7  yeah, that they left because of -- yeah, were coerced to
8  leave and take their branches.  Yes, that's why we're here.
9  If there was no cause, we wouldn't be here; right?
10     Q.   Did you -- but in your mind, is it, look, we're
11 convinced these managers left because of the payday, or does
12 Mutual believe that there's other considerations?
13     MS. WALTER:  Object to form.
14     A.   Well, I think there's other considerations as
15 well.
16     Q.   If Mr. Hutto and Mr. Wolf had resigned but none
17 of the other branch employees resigned, who would Mutual
18 have put in place as the branch manager?
19     MS. WALTER:  Object to form.
20     A.   I think Kiley King.
21     Q.   Kiley King?
22     A.   Yeah.
23     Q.   Does Mutual have evidence that the employees
24 would've stayed and worked for Kiley King?
25     MS. WALTER:  Object to form.
REGENCY REPORTING SERVICE, INC. (813)224-0224

96

1      A.   No, no evidence.
2      THE WITNESS:  I could use a bio break whenever is
3  convenient --
4      MS. KREITER:  It's a convenient time for me too.
5  Why don't we -- do we want to put a lunch order in now?
6  Take a short break.
7      MS. WALTER:  I'm fine with that.
8      MR. CARROLL:  Yeah.
9      MS. KREITER:  Okay.
10     (A recess was taken.)
11     Q.   (By Ms. Kreiter)  Mr. Gennarelli, are you aware
12 of any complaints or frustrations from the downstream
13 employees about Mutual's underwriting requirement's ability
14 to efficiently close loans, limited loan products, or
15 compensation?
16     A.   Not directly.  I did see an e-mail, I think, that
17 -- in this where they talked about an underwriting situation
18 and actually was -- he was confused.  It was actually
19 overturned by the chief operating officer.  Then he went
20 ahead and told the customer that we couldn't do it at Mutual
21 and should send it to Waterstone, but that is one that I did
22 see.
23     Q.   Did any of those issues come up in the exit
24 interviews that Mutual conducted when the downstream
25 employees left?
REGENCY REPORTING SERVICE, INC. (813)224-0224

97

1    A.    Not that I'm aware of.  And we don't have any
2  overlays -- we have no overlays to agency guidelines.  So
3  our underwriting would be the same as anywhere else.  So
4  this, again -- who knows if this is manufactured or what --
5  what the claim is, but we have no overlays to agency
6  guidelines.
7    Q.    Regardless of whether it was in conjunction with
8  an exit interview or an informal discussion, I mean, is it
9  Mutual's position that none of the downstream employees left
10  because of frustration with the underwriting department and
11  an inability to effectively close loans, limited loan
12  products, or compensation?
13    MS. WALTER:  Object to form.
14    A.    Not to my knowledge.  And, you know, we run a
15  pretty successfully large mortgage company, close loans all
16  the time.
17    Q.    Given your time in the industry, are you aware of
18  other instances where a branch of employees moved together?
19    A.    You mean to us or just in general?
20    Q.    In general in the industry.  I mean, is it common
21  in the industry for branches to move together?
22    A.    I think, generally speaking, it's not necessarily
23  uncommon.  It's just not done this way.  Generally, there's
24  some compensation paid to the company that they're leaving,
25  et cetera, et cetera.  Things are aboveboard.  It certainly

REGENCY REPORTING SERVICE, INC. (813)224-0224

98

1  is not done this way.
2    Q.    You mentioned that about six months ago Mutual
3  recruited a branch back?
4    A.    Yes.
5    Q.    Did the entire branch come to Mutual in that
6  instance?
7    A.    I think a decent amount came back, yes.
8    Q.    Okay.  And do you believe that there was
9  solicitation involved?
10    MS. WALTER:  Object to form.
11    A.    Well, we -- we actually spoke to the company that
12  they were at and let them know that these folks were
13  entertaining coming back and would this be a problem?  And
14  they said no.  So we were very up-front, and we've done this
15  several times, just up front with the company that -- that
16  is -- that is --
17    Q.    How did you know that most of the employees
18  wanted to come?  I mean, it sounds like you approached the
19  employer and said, "Look, most of your employees want to
20  come."  I mean, how did you discern that?
21    A.    Well, they worked for us previously.
22    Q.    Right.
23    A.    Yeah.
24    Q.    Right.  And then they didn't, and they went
25  somewhere else?

REGENCY REPORTING SERVICE, INC. (813)224-0224

99

1    A.    Yeah.
2    Q.    And then you had knowledge that the group, not
3  just one individual, wanted to come back.  How did you have
4  that knowledge?  Were there conversations with the different
5  downstream employees in that instance?
6    MS. WALTER:  Object to form.
7    Go ahead.
8    A.    I believe that there were conversations had by
9  managers at -- the Tampa relationships with -- already at
10  our company, yeah.
11    Q.    Okay.  But there was knowledge while the
12  employees were still working for the other employer that the
13  group wanted to move to Mutual; correct?
14    A.    Correct.
15    Q.    Did the employees that we're talking about here
16  -- I've called them the downstream employees.  They're the
17  employees of the three branches or the two branches, the
18  Paramus, New Jersey; Tampa; and Daytona.  Did those
19  employees follow the managers, Dwayne, Chris, and Chris,
20  when those managers joined Mutual?
21    MS. WALTER:  Object to form.
22    A.    I would say not all of them.  The branches grew
23  since they were here.
24    Q.    Were there some of the employees that followed
25  the branch managers?

REGENCY REPORTING SERVICE, INC. (813)224-0224

100

1    A.    I would say probably, yes.
2    Q.    The employees following the managers to Mutual,
3  did that involve solicitation?
4    MS. WALTER:  Object to form.
5    A.    I believe that -- I'm not -- I'm not sure, but I
6  would say that we certainly didn't take any loans ahead of
7  time.  We certainly didn't solicit -- we certainly didn't
8  encourage anyone to violate their restrictive covenants on
9  their agreements.  That's, I think, a little different.  I
10  know I didn't take anybody to Costa Rica to encourage them
11  to come over.  I do know that, nor do I know we've never
12  written checks like this to entice someone to come over.
13    Q.    I guess, so my question was not about soliciting
14  borrowers.  It was strictly about solicitation of employees.
15    A.    That's what I'm talking about, so that's all I'm
16  talking about, yeah.
17    Q.    So in that instance, when the downstream
18  employees followed Chris Smith, Chris Wolf, and Dwayne Hutto
19  to Mutual in a group, is it Mutual's position that that
20  didn't involve any kind of solicitation of the employees?
21    MS. WALTER:  Object to form.
22    A.    Yeah, I think it's Mutual's assertion that they
23  weren't violating restrictive covenants in their current
24  agreements.  That's the difference here.
25    Q.    Okay.

REGENCY REPORTING SERVICE, INC. (813)224-0224

101

1    A.    We're saying that they violated restrictive
2  covenants in their agreement with Mutual.  We're saying in
3  the past that they didn't have those restrictive covenants
4  that were -- that were -- that needed to be violated in
5  order to move them over.
6    Q.    Okay.  So there were no restrictive covenants in
7  place binding upon the employees when they followed the
8  managers to Mutual; correct?
9    A.    As far as I know, correct.
10    Q.    It's -- I mean, it sounds like in the industry
11  there's some employees that are subject to restrictive
12  covenants and some that are not.  It's not uniform in that
13  this industry everybody has a restrictive covenant; correct?
14    A.    Yes, I think that that probably is correct.
15    Q.    Do you know whether the downstream employees
16  followed Mr. Smith, Mr. Hutto, and Mr. Wolf to BBMC?
17    A.    Some did.  I mean, that's where the relationship
18  started, so some did.
19    Q.    At BBMC?
20    A.    Yes.
21    Q.    When was the acquisition of BBMC by Mutual?
22  2018?
23    A.    I believe December 2018 to the end of December --
24  I think that generally everyone was over in January of 2019.
25    Q.    So there are some downstream employees that
REGENCY REPORTING SERVICE, INC. (813)224-0224

102

1  followed the managers to BBMC and then through the
2  acquisition and then followed the managers again to
3  Waterstone; correct?
4    A.    Yeah, there was an acquisition.  Everyone was --
5  you know, Bridgeview Bank was the owner of BBMC, was paid
6  for those people to leave and -- and go.
7    Q.    Sure.  But it was a new employer, and there were
8  new employment agreements put in place --
9    A.    Yes.
10    Q.    -- at the time of Mutual --
11    A.    But there was no violating of any restrictive
12  covenants because the -- the original company was aware of
13  the -- that there was an acquisition and they agreed to
14  allow those employees to leave and --
15    Q.    But my question isn't necessarily about
16  solicitation here.  I just want to establish how many times
17  have these employees followed the managers?  And I'm hearing
18  that there was one instance when employees followed the
19  managers to BBMC.  Then the downstream employees stuck with
20  the managers through the transition when BBMC was acquired.
21  And now these same employees are following the managers
22  again to Waterstone; correct?
23    A.    Well, I think some employees, yes.
24    Q.    Do you have a sense as to how many of the
25  employees followed the branch managers through those three
REGENCY REPORTING SERVICE, INC. (813)224-0224

103

1  transitions?
2    A.    I don't.
3    Q.    Has Mutual experienced other instances of a
4  branch manager leaving but the branch employees stay at
5  Mutual?
6    A.    Yes.
7    Q.    How many times in your tenure at Mutual has that
8  happened where the branch manager leaves but the branch
9  remains?
10    A.    Yeah, we really don't have a lot of branches that
11  leave, to be perfectly frank, but I can think of -- I can
12  think of three or four cases that that did happen.
13    Q.    Forget about your time at Mutual as a limitation.
14  Over the course of your entire career in the industry, how
15  many times has it been where the branch manager leaves but
16  the downstream employees stay?
17    A.    I think in my career, generally speaking, we
18  don't have this big problem with branches leaving.  So I
19  don't have a wide breadth of this experience, but I would
20  say that at Bridgeview and BBMC, I don't know if we -- if we
21  lost one branch.  We're talking about branches that we don't
22  want to leave -- right? -- I mean, not branches that we may
23  part company with for --
24    Q.    Right.
25    A.    -- production reason; right?  You know, so that's
REGENCY REPORTING SERVICE, INC. (813)224-0224

104

1  a -- that's a different story, but there are definitely
2  several -- several times where we lost a branch manager and
3  we retained the folks, more than several probably in my
4  experience.
5    Q.    How about when Mutual recruits a branch manager?
6  Is it more common for the branch manager to come alone or
7  for downstream employees to come with?
8    A.    I would say generally it's more common in our --
9  in our world where they come alone or with one or two other,
10  like, co-managers perhaps and then build a branch.  We don't
11  -- we don't have, like, these -- you know, we did an
12  acquisition, Keller Williams.  That's different; right?  We
13  -- we acquired the -- the assets of the company.  It's
14  different.
15    Q.    Is it more common in the industry, would you say,
16  for entire branches to move or a single branch manager to
17  move and start anew?
18    A.    I'd say it's probably equal.
19    Q.    Are there any instances in which Mutual loses an
20  entire branch but does not believe that there was any kind
21  of unlawful activity and instead believes the departures
22  were just a function of what I'll call natural attrition?
23  I'll define natural attrition for purposes of this
24  deposition as resignations that an employer really should
25  expect naturally when branch leaders resign but there's no
REGENCY REPORTING SERVICE, INC. (813)224-0224

105

1  wrongdoing.  Do you understand that definition?
2      A.   Yes.
3      Q.   So just in the ordinary course, people are going
4  to follow for whatever reason; correct?
5      A.   Yes.
6      Q.   Are there instances in which Mutual has lost an
7  entire branch and didn't think that there was any wrongdoing
8  but rather just thought this is natural attrition?
9      A.   Yes.
10     Q.   How many times has that happened?
11     A.   Well, the one I'm thinking about is the group
12  that came back, that branch in particular.  I didn't know --
13  I'm not -- I don't know how many times, but that branch in
14  particular, they were very up-front about it, left all their
15  loans here.  There weren't -- you know, left on a good note.
16     Q.   And that does happen, entire branches move as a
17  result of natural attrition as opposed to any kind of
18  wrongdoing.  It's not the only time in this industry, the
19  one that you're mentioning?
20     A.   True.  That's right.
21     Q.   Does Mutual have any internal data about the rate
22  of natural attrition that is typically experienced when
23  there's a branch leader resignation?
24     A.   I don't know.  We can probably get you that, but
25  I don't have it off the top of my head.  Certainly, I can

106

1  tell you just personally we really don't have this attrition
2  problem.  Like, generally speaking, people don't leave.
3      Q.   When Mutual was preparing the damages analysis in
4  this case, did you or anyone else at Mutual look for any
5  kind of industry guidance on natural attrition rates in
6  conjunction with your analysis?
7      A.   Yeah, I think that we discussed our attrition
8  rate but not industry attrition because it's two separate
9  things.  People -- people -- what the industry does is not
10  really relevant to what -- how we perform necessarily.
11     Q.   You said you discussed Mutual's natural attrition
12  rate?
13     A.   Yeah.  It's -- I mean, it's very, very slim, if
14  you talk about a productive individual leaving the company.
15     Q.   Did you factor in natural attrition with respect
16  to the analysis applicable here?
17         MS. WALTER:  Object to form.
18     A.   No.
19     Q.   I want to move from natural attrition kind of on
20  an industrial level to natural attrition that would be
21  specific to the relationships that we're talking about
22  here.  Is it Mutual's contention that every single one of
23  the employees who left, left due to some kind of wrongdoing
24  by Waterstone and that none of the employees left because of
25  natural attrition?

107

1      A.   I think our assertion is that by causing these
2  leaders to encourage them to violate their nonsolicits, it
3  caused everyone to leave, yes.
4      Q.   Okay.  So to be clear, Mutual's position is that
5  none of the employees left due to natural attrition?
6      A.   It's -- yes, that's our assertion, I believe.
7      Q.   You do agree things like personal friendships,
8  how long the employees have worked together, whether the
9  employees have transferred firms together in the past, and
10  other considerations would be relevant to whether natural
11  attrition should be expected as between managers and
12  downstream employees; correct?
13         MS. WALTER:  Object to the form.
14     A.   Yeah, I think we talked about that.  You know, I
15  think, you know, when you encourage the managers to solicit
16  the folks that work for them, this is what happens, so...
17     Q.   So not my question.  My question was just, you
18  know, do you agree with the concept that things like
19  personal friendships, how long employees have worked
20  together, whether the employees have transferred in the
21  past, other considerations similar to that would be relevant
22  to whether natural attrition should be expected?
23         MS. WALTER:  Same objection.
24     A.   I guess I'm just -- this natural attrition is
25  something that is new to me.  I've never heard this phrase.

108

1  I don't know.  I'd have to think about it.  I'm not sure.
2      Q.   So the definition that I assigned to it -- and
3  let me know if this doesn't resonate with you, but it's
4  attrition of employees that should be expected by an
5  employer regardless of -- or not regardless, but without any
6  kind of wrongdoing, so just people leaving in the natural
7  course and following a manager.  That's what I'm saying
8  natural attrition is.  Attrition that doesn't involve any
9  kind of wrongdoing.  So do you understand that definition?
10     A.   I do.
11     Q.   Okay.  So then my question is now -- I mean,
12  there's considerations that are relevant to natural
13  attrition.  I want to understand do you agree with that or
14  not?
15     A.   Sure.
16     Q.   Things like how long have you known the person,
17  friendships, does make it more likely that there's going to
18  be natural attrition?
19     A.   So my problem is I can't take it out of context.
20  That's my whole problem.  If you're talking generically,
21  that's perhaps true, but I can't take it out of context,
22  what occurred here, which is entirely different.
23     Q.   Let me ask it this way:  I mean, assume, for
24  example, that Chris Wolf makes an announcement to the
25  employees, "I'm leaving, and I'm joining Waterstone," and

109

1  then doesn't say a peep. He packs up his stuff and leaves.
2  And the employees initiate contact to Mr. Smith and say,
3  "Where are you going? I'm coming with you. I'm going to
4  follow you to the ends of the earth"?
5      A.   Let me answer this way: What if he said, "The
6  underwriting is so strict here. We can't get anything
7  done," or, "We can't get certain things done. The
8  underwriting there is going to be much better"? What if he
9  said that? I would say that that's more in line with what
10 happened.
11     Q.   So that's where, I think, we're talking about a
12 difference of making a pure announcement and something that
13 is solicitation?
14     A.   Right.
15     Q.   Do you have any evidence on behalf of Mutual that
16 Mr. Smith, Mr. Hutto, or Mr. Wolf --
17     A.   Yeah.
18     Q.   -- made solicitation comments --
19     A.   Yes.
20     Q.   -- versus an announcement?
21     A.   Yes.
22          MS. WALTER: Object to form.
23     Q.   What is that evidence?
24     A.   Well, there's e-mails, and there's conversations
25 that you can see e-mails saying "I'm very excited to leave.

110

1  There seems like there's great, you know -- much better
2  underwriting with" -- whatever the case was. There's a lot
3  of e-mails where folks other than those three individuals
4  are talking about what they learned from having
5  conversations with one of those three individuals.
6      Q.   The downstream employees are saying "I'm excited
7  about the opportunities at Waterstone and the products,
8  their pricing," whatever it is?
9      A.   Right, right.
10     Q.   And so your assumption is, well, the managers
11 must've informed them about those things?
12     A.   Well, I think in one case they actually -- they
13 actually cite the fact that -- I think they said "Chris was
14 on the Teams call, our Teams call, and told us about the --
15 you know, the products at Waterstone. It's very exciting."
16 That was, I think, the e-mail.
17     Q.   Do you know with respect to that Teams meeting
18 that you're talking about, the attendees, are those people
19 who had already said, "Take me with you," or are those
20 people that were undecided?
21          MS. WALTER: Object to form.
22     A.   I think -- I'm sorry. I think in the same e-mail
23 it stated this was exciting news, like, meaning they didn't
24 -- at least how I understood the e-mail, reading, this was
25 -- that this was the first they were hearing of it and they

111

1  were excited about it. That's how I took the e-mail to
2  mean.
3      Q.   But does Mutual -- I mean, you're looking at
4  e-mails, and you're making assumptions. Do you have any
5  evidence gathered in the case about what Mr. Smith,
6  Mr. Hutto, or Mr. Wolf said to the employees?
7          MS. WALTER: Object to form.
8      A.   I mean, the e-mails aren't evidence? So other
9  evidence, are you saying?
10     Q.   Sorry.
11     A.   Yeah.
12     Q.   I heard you say that there are e-mails coming
13 from the downstream employees. I'm now focused on what
14 evidence does Mutual --
15     A.   But they --
16     Q.   -- have as to what was said by the managers?
17     A.   One e-mail I'm referencing, it definitely said
18 that Chris was on the call with the Teams, Chris Wolf, and
19 let them know what was happening, and they're very excited
20 about it. So that would be -- Chris was an employee at the
21 time, and it was a Teams call that was on our system.
22          So yeah, I don't know -- again, we can go through
23 all of the e-mails. And I'm sure if it gets to trial, we're
24 going to do that. But, you know, where there's smoke,
25 there's fire. I'll put it out there.

112

1      Q.   Did you have a conversation with Ms. King or
2  Mr. Tomalak about the natural attrition they would expect
3  with respect to the downstream employees at the branches?
4          MS. WALTER: Object to form.
5      A.   I think it's -- Kiley is a male, so --
6      Q.   Oh, I apologize. Thank you for saying that.
7      A.   That's okay.
8      Q.   Okay. So I guess Mr. King and Mr. Tomalak, the
9  question was did you have a discussion with either of them
10 about the natural attrition they would expect with respect
11 to the downstream employees?
12     A.   I don't think we had that discussion, no.
13     Q.   I think you testified earlier it was Mr. King and
14 Mr. Tomalak that knew the relationships best; correct?
15     A.   Yeah.
16     Q.   Did you talk to anyone else at Mutual in
17 conjunction with the damages analysis about natural
18 attrition and what could be expected given the relationship
19 to these individuals?
20     A.   No.
21     Q.   Let's talk about the Paramus branch. My
22 understanding -- and I don't want to just assume it. I want
23 you to confirm, but the Paramus, New Jersey, branch reports
24 up to Chris Smith in Florida; is that correct?
25     A.   Yeah.

**113**

1  Q.  Did Paramus report to Chris Smith prior to
2  Mutual's acquisition of BBMC?
3  A.  Well, they came much later.  I don't -- I don't
4  -- I really don't know.  They came after Chris was
5  established here at Mutual.  I don't -- I don't -- I really
6  don't know.
7  Q.  Do you know how it came to be that a branch in
8  New Jersey is reporting --
9  A.  Well, I think they --
10  Q.  -- to a branch in Florida?
11  A.  You know, again, I think they all worked at the
12  same company.  Brian, Kiley, Chris, they worked for The
13  Money Store.  They all worked for the same company, Brian
14  Tomalak, Kiley King, Chris, and the group in New Jersey, at
15  least one of them.  They all worked in -- I believe at a --
16  I think it is The Money Store, something --
17  Q.  And they all moved together to BBMC?
18  A.  No, they didn't move together.  They went at
19  separate times.  Chris came -- I don't even know if he had
20  many people that came with him when he came.  But, you know,
21  again, I didn't go back to the BBMC days, you know.
22  Q.  Sure.  Do you know whether Mr. Smith recruited
23  the New Jersey branch to either BBMC or Mutual?
24  A.  I don't know if it was Chris or if it was Brian
25  or what the -- I really don't know.
REGENCY REPORTING SERVICE, INC. (813)224-0224

**114**

1  Q.  Was -- is Chris Smith originally from New Jersey?
2  A.  I know he went to school in Connecticut, but --
3  in Yukon, but I don't know.  Is he from New Jersey?  I know
4  Brian Tomalak lived in New Jersey for quite some time as
5  well, so I don't really know.
6  Q.  Do you know whether Mr. Smith moved from New
7  Jersey to become the Tampa manager?
8  A.  That's not my understanding.  I thought he was
9  already in Tampa, living in Tampa.  I don't -- I don't know.
10  I don't want to be wrong, but it's not my understanding.
11  Q.  If you don't know, just let me know that.
12  A.  It would surprise me.  I thought his kids were
13  here and going to school here and --
14  Q.  Do you know how long the Paramus branch has been
15  reporting up to Mr. Smith?
16  A.  Since they -- since they arrived.  I don't know
17  how long that is, yeah.
18  Q.  A couple of years at least?
19  A.  A couple years, yeah.
20  Q.  How many of the downstream employees were friends
21  with the managers outside of work?
22  MS. WALTER:  Object to form.
23  A.  I really don't know.
24  Q.  How many of the downstream employees worked with
25  the managers more than five years?
REGENCY REPORTING SERVICE, INC. (813)224-0224

**115**

1  A.  Again, I don't know.
2  Q.  How many of the employees worked with the
3  managers more than ten years?
4  A.  I don't know.
5  Q.  How many of the employees have worked with these
6  managers their entire career?
7  A.  I don't know.
8  Q.  Are any of the employees financially reliant on
9  the managers for business generation purposes?
10  MS. WALTER:  Object to form.
11  A.  I'm not sure what that means.  I mean, I don't --
12  explain what you mean by that.
13  Q.  Sure.  Let me ask it a different way.  Do you
14  consider Mr. Hutto a rainmaker?
15  MS. WALTER:  Object to form.
16  A.  I -- I don't know if I'd use the term
17  "rainmaker."  He certainly is a -- he develops -- yeah, I
18  guess if you want to use that term, he's a business
19  development guy, sure.
20  Q.  Were there rankings of the different branches
21  that Mutual had kept based on performance?
22  A.  Like, by volume or --
23  Q.  Yeah.  I'm just trying to get a sense, you know,
24  is -- was Mr. Hutton in the top five of the revenue
25  generators from Mutual, or was he at the bottom of the list?
REGENCY REPORTING SERVICE, INC. (813)224-0224

**116**

1  A.  Top.  He was a top --
2  Q.  Top producer?
3  A.  Top.  One of the top, yeah.  I mean, I don't know
4  what number, but yeah.
5  Q.  What about Mr. Wolf?  Was he a top producer for
6  Mutual?
7  A.  It's the same branch; right?  I mean, it's the
8  same -- they co-managed it all together, so...
9  Q.  So I'm trying to get --
10  A.  But I think Chris was more in operations --
11  right? -- and I think where -- where Dwayne was more on the
12  sales side.
13  Q.  In generating loans?
14  A.  I think generating relationships with perhaps
15  Realtors and --
16  Q.  Do you know, did Dwayne Hutto ever, you know,
17  bring in a loan or a Realtor relationship, and rather than
18  him closing the loan himself, pass it on to one of the
19  downstream employees?
20  A.  Possibly.
21  Q.  So that's what I'm trying to understand.  If you
22  know, Mr. Hutto is passing loans on and giving business and
23  commission opportunities to the downstream employees and he
24  leaves, to me that's a factor that would indicate natural
25  attrition is more likely.  Do you agree?
REGENCY REPORTING SERVICE, INC. (813)224-0224

**117**

1    MS. WALTER:  Object to form.
2    A.  I'm not so sure that -- it's all the loans.  So,
3  I mean, yeah, if this person is getting all their business
4  from Dwayne, possibly, yeah.
5    Q.  They've got to have some money.  And if Dwayne is
6  the one that's filling their place and Dwayne leaves, do you
7  think the natural attrition would be more likely?
8    MS. WALTER:  Object to form.
9    A.  I would say it would be more likely.
10   Q.  Do you know whether the downstream employees had
11 that type of relationship with Mr. Hutto where he was
12 filling some of the -- some or all of their plate?
13   MS. WALTER:  Object to form.
14   A.  Well, the only -- the only way I can answer is I
15 know that Dwayne was -- you know, always -- we called the
16 top performers, you know, an executive club member.  And I
17 don't know many other people on the staff that were
18 executive club members, so I don't know how much business he
19 was passing along.  I just don't -- I really don't know.
20 I'm not familiar with it.
21   Q.  Okay.  But you would agree if you assume those
22 set of facts where Mr. Hutto is not filling just his plate
23 but some of the downstream employees, that could be a
24 consideration that would make natural attrition more likely
25 with respect to those employees?
      REGENCY REPORTING SERVICE, INC. (813)224-0224

**118**

1    A.  I think -- I think it would be, but I also think
2  it would be strange to pass along that much business.  It
3  would be strange, but...
4    Q.  I now want to change from the topic of natural
5  attrition as between the downstream employees and the
6  managers and just talk about the managers themselves, the
7  three managers.  How long has Chris Smith known Dwayne
8  Hutto?
9    A.  I think a long -- I think a long time.  I'm just
10 going with Brian Tomalak because he -- they all worked
11 together, I think.  So I think Brian has known Dwayne a long
12 time as well, so I don't know.  I really don't know.
13   Q.  Do you know whether Chris Smith views Mr. Hutto
14 as a mentor?
15   MS. WALTER:  Object to form.
16   A.  I don't know that.
17   Q.  Do you know whether Chris Smith and Dwayne Hutto
18 are friends?
19   MS. WALTER:  Object to form.
20   A.  I don't know that.
21   Q.  Do you know whether Chris Smith and Dwayne Hutto
22 gather socially outside of work?
23   MS. WALTER:  Object to form.
24   A.  I really don't know that.
25   Q.  Do you know if they vacation together?
      REGENCY REPORTING SERVICE, INC. (813)224-0224

**119**

1    A.  I don't know that.
2    Q.  How would you describe the relationship between
3  Mr. Smith and Mr. Hutto?
4    A.  I really don't have intimate knowledge about
5  their relationship.  I really don't.
6    Q.  The people that would have more knowledge are
7  Mr. King and Mr. Tomalak --
8    A.  Sure.
9    Q.  -- but you didn't talk to them in conjunction
10 with the damages analysis; correct?
11   A.  We did.  We didn't talk about their personal
12 relationship and their vacation habits.  The only vacation I
13 know of is Costa Rica.  That's the only one that's really
14 interesting to me.
15   Q.  So you keep bringing up this Costa Rica trip.
16   A.  Yeah.
17   Q.  I want to just be clear how much you know about
18 this trip.  Who attended the trip?
19   A.  I -- I just know that I just saw the e-mails.  I
20 don't know much about it --
21   Q.  Okay.
22   A.  -- other than an underwriting manager planned the
23 trip.
24   Q.  And you don't know the name of that underwriting
25 manager?
      REGENCY REPORTING SERVICE, INC. (813)224-0224

**120**

1    A.  I -- I mean, it's here somewhere.
2    Q.  And the underwriting manager is the person on the
3  Waterstone side?
4    A.  Yes.
5    Q.  Do you know who attended the trip?
6    MS. WALTER:  Objection.  Asked and answered.
7    A.  Yeah, I know who that e-mail was directed to, and
8  it was to Dwayne and his wife.
9    Q.  So you know an underwriter planned it, but you
10 don't know who any other Waterstone attendees were?
11   MS. WALTER:  Objection.  Asked and answered.
12   A.  I know that the underwriting managers planned to
13 go by the context of the -- of the e-mail.
14   Q.  Okay.  But you can't remember who that was?
15   MS. WALTER:  Objection.
16   A.  Come on.
17   Q.  I'm just trying be clear.
18   A.  Yeah.
19   Q.  I don't -- I'm not trying to be difficult.  I
20 want to --
21   A.  Yeah, you are being difficult, first of all.
22 Second of all, I'm not the one who did anything wrong.
23 Let's be perfectly clear.
24   Q.  Okay.  But you brought this up.
25   A.  I'm getting frustrated because -- I did bring it
      REGENCY REPORTING SERVICE, INC. (813)224-0224

121

1  up because it's -- like, I think we think that this isn't
2  going to be in front of people that don't twist -- if the
3  average person, jurors, see that an underwriting manager
4  takes a potential sales leader on a trip, the average person
5  is going to say, "Hmm, this seems suspicious," especially
6  when they're working at different companies.
7        So, I mean, we can play this game all day long if
8  you'd like, but eventually it's going to go to trial, and
9  the rubber is going to meet the road.  I'm just being
10  honest.  I'm not -- I don't want to waste your time or my
11  time or anybody else's time rehashing the evidence that is
12  going to be presented.
13    Q.   You've told me the underwriter planned it.
14  Dwayne and his wife were on the e-mail.  You don't know who
15  else attended from Waterstone; is that correct?
16    A.   Yeah, I was not there on the trip.
17    Q.   Would there be any financial benefit to, say,
18  Dwayne Hutto or Chris Wolf if Chris Smith also joined
19  Waterstone?
20        MS. WALTER:  Object to form.
21    A.   I don't know.  I don't know.
22    Q.   Are you aware of any financial benefit to Chris
23  Smith if Dwayne Hutto and Chris Wolf's branch also joined
24  Waterstone?
25        MS. WALTER:  Object to form.

REGENCY REPORTING SERVICE, INC. (813)224-0224

122

1    A.   I don't know that.
2    Q.   Were -- how long have Chris Wolf and Dwayne Hutto
3  co-managed their branch?
4    A.   Since they've been here at BBMC together, I
5  believe, yeah.
6    Q.   So they co-managed back to the BBMC days?
7    A.   Yes.
8    Q.   What about before the BBMC days?
9    A.   I don't know.
10    Q.   Do you know how long Chris Wolf has known Dwayne
11  Hutto?
12    A.   I don't know that.
13    Q.   Now I want to talk about -- more about the
14  relationship between Dwayne Hutto and Chris Wolf.  Do you
15  know whether Chris Wolf views Dwayne Hutto as a mentor?
16        MS. WALTER:  Object to form.
17    A.   I don't know that.
18    Q.   Do you know if they're close friends?
19        MS. WALTER:  Object to form.
20    A.   I don't know that.
21    Q.   Do you know if they gather socially or vacation
22  together?
23    A.   I don't know that.
24    Q.   Are you able to describe the relationship between
25  Chris Wolf and Dwayne Hutto other than they're co-managers

REGENCY REPORTING SERVICE, INC. (813)224-0224

123

1  of the branch?
2    A.   No.
3    Q.   Why are they co-managers of the branch?  Did they
4  each bring something different to the table?
5        MS. WALTER:  Object to form.
6    A.   I think that's my understanding, that Dwayne was
7  more on the sales side and Chris was more on the operations
8  side.
9    Q.   Do you think the fact that they -- just as
10  between the two of them, this concept of natural attrition,
11  given that they're both doing different things to manage
12  this branch, the fact that they each play different roles
13  and they've been working together, does the fact that they
14  need each other, does that contribute to natural attrition
15  as between them?
16        MS. WALTER:  Object to form.
17    A.   I never said they need each other.  I said they
18  have different roles.  Chris Leyden is the chief operating
19  officer.  She doesn't need me.  I'm -- I'm more on the sales
20  side.  I don't necessarily need her.  I mean, it's --
21    Q.   Let me ask it a different way.  Do you think that
22  given the different roles that Mr. Hutto and Mr. Wolf played
23  with respect to their branch, if Mr. Hutto announces, "I'm
24  leaving and going to Waterstone," do you think it's likely
25  in the ordinary course without any wrongful solicitation

REGENCY REPORTING SERVICE, INC. (813)224-0224

124

1  that Mr. Wolf would go along?
2        MS. WALTER:  Object to form.
3    A.   I would say it's more likely that they schemed
4  together in this plan.  I mean, I would say that that's more
5  likely than Dwayne making a decision of "Just tell Chris
6  this is what I'm going to do."
7    Q.   Do you have any evidence that Mr. Hutto solicited
8  Mr. Wolf or Mr. Wolf solicited Mr. Hutto?
9    A.   No.
10    Q.   Do you have any evidence that either Mr. Wolf or
11  Mr. Hutto solicited Mr. Smith?
12    A.   Not that I'm aware of, no.
13    Q.   Now just the reverse of that, do you have any
14  evidence that Mr. Smith solicited Mr. Hutto or Mr. Wolf?
15    A.   I don't believe.  I don't know.  I don't think
16  so.
17        MS. KREITER:  Remind me what number we're on.
18        THE COURT REPORTER:  7.
19        (Exhibit No. 7 is marked for identification.)
20    Q.   Take a look at Exhibit 7.  Do you recognize it?
21    A.   I do.
22    Q.   What is Exhibit 7?
23    A.   It's our calculations for damages from the
24  branches leaving.
25    Q.   So this is -- we've been talking about different

REGENCY REPORTING SERVICE, INC. (813)224-0224

125

1  buckets. This is specific to Bucket 2, damages associated
2  with the branches closing; correct?
3      A.  Correct.
4      Q.  And I want to confirm, the persons who prepared
5  Exhibit 7 were you and Bernie Mayle?
6      A.  Bernie Mayle, yeah.
7      Q.  Mr. Mayle was the senior vice president of
8  finance; correct?
9      A.  Correct.
10     Q.  Was there any other person who played a role in
11 the creation of Exhibit 7?
12     A.  I don't believe so.
13     Q.  What role did you play in creating Exhibit 7
14 versus Mr. Mayle?
15     A.  I think we just worked jointly on it. He pulled
16 the data because he had the data, but kind of we just talked
17 about the best way to show the income created by those
18 branches and then, you know, extrapolating out, if they had
19 stayed for 18 months, what that would be. We took a very --
20 we did take a very conservative approach to it, so...
21     Q.  Was there one person doing the drafting and
22 another person commenting, or were you both authors of
23 Exhibit 7?
24     A.  I would say we were kind of both authors of
25 Exhibit 7.

126

1      Q.  Did one of you create the first draft?
2      A.  I think Bernie probably created the first draft,
3  but I was sitting in his office. I mean, he -- if it's on a
4  spreadsheet, he's the one to create it. I'm not a
5  spreadsheet guy.
6      Q.  Got it. So it sounds like there was a meeting
7  between you and Mr. Mayle?
8      A.  Yeah.
9      Q.  And you sat down and worked on the spreadsheet
10 together?
11     A.  Yes.
12     Q.  How long did you spend preparing it?
13     A.  Well, I think a large part of the time we spent
14 was trying to come up with a, you know, fair way to
15 associate the lost revenue. And I really mean fair and be
16 conservative about it because we were hoping for a
17 settlement before this time.
18         So, you know -- so that was the big -- because
19 there's two -- there's two ways we can do this; right? We
20 can do what we did here, which is take those loans and
21 multiply it times the basis points earned by corporate from
22 that volume, average it out monthly, and then show for
23 18 months had they stayed what the expected profit would
24 be.
25         The other the way we can do it is what I

127

1  mentioned earlier, was a cost of goods sold approach. The
2  problem, when you do that approach, you know, you're
3  approaching 17, maybe $18 million, so we didn't think that
4  that was a -- that that number would be not -- not conducive
5  to settle and just move on our way. So we didn't do that.
6  The more I think about it, the more it's probably a truer --
7  truer portrayal of the lost revenue, but this is what we put
8  together.
9      Q.  So my question was just how long did you spend
10 creating the document?
11     A.  I don't know. I didn't have a stopwatch on me.
12     Q.  Did you meet with Mr. Mayle more than once --
13     A.  Yes.
14     Q.  -- to create the document?
15     A.  Yes, yeah.
16     Q.  Ballpark, I mean, can you tell me you worked
17 40 hours on it or, no, closer to five hours or what --
18     A.  You know, I'd say probably 20 hours,
19 conversations back and forth and --
20     Q.  Did you exchange e-mails with Mr. Mayle in
21 conjunction with the analysis you were creating?
22     A.  Our offices are right next to each other, so
23 usually it's -- I walk in his office, but there are probably
24 e-mails.
25     Q.  Did anyone from Mutual ask you to gather those

128

1  e-mails for production in the case?
2          MS. WALTER:  Object to form.
3      A.  I believe --
4          MS. WALTER:  Also object to the extent this
5      encroaches on any attorney-client privileged
6      discussions.
7      A.  I think -- I really don't know. I thought it was
8  done automated. I don't think, like -- they didn't ask us
9  to put e-mails together. It was all done by IT, sorted the
10 e-mails, I believe, is how they did it, but I don't really
11 know.
12     Q.  Were there multiple drafts of Exhibit 7?
13     A.  Probably. Not -- I don't think any of them were
14 very different than -- than this, though, so --
15     Q.  Were there drafts exchanged by e-mail?
16     A.  Not that -- I really don't know because we --
17 there wasn't a lot of them, if there was.
18     Q.  And do you remember if you exchanged drafts or
19 e-mails with anyone besides Mr. Mayle about Exhibit 7?
20     A.  And counsel?
21     Q.  I guess I don't need to know the content of the
22 discussion with counsel. But if you tell me it was counsel,
23 I'll stop with that.
24     A.  I believe we shard it with counsel, yeah.
25     Q.  Anyone else besides counsel and Mr. Mayle?

129

1    A.   Not that I'm aware of.  Not that I can remember.
2    Q.   Do you remember when you first started putting
3  pen to paper to create Exhibit 7?
4    A.   I don't.  I don't know that.
5    Q.   Okay.  Take a look at Exhibit 7, and I just want
6  to get, you know, bearings here.  It's a document entitled
7  Summary of Corporate Earnings, Contribution from Tampa and
8  Daytona Branches.  Do you see that at the top?
9    A.   Yes.
10    Q.   And for purposes of this analysis, any damages
11  associated with the Paramus branch are built into the Tampa
12  branch; correct?
13    A.   Correct.
14    Q.   Let's just walk through each of the columns here
15  starting with the column on the left, Year of Fundings.
16  You've selected 2019 through 2022 year to date; correct?
17    A.   Yes.
18    Q.   Then the next column, Volumes of Loans Funded, so
19  you're looking at the loan volume associated with each of
20  the branches for the year?
21    A.   Right.
22    Q.   And then the next column is Corporate Profits
23  Earned BPS.  Do you see that?
24    A.   Yes.
25    Q.   What is BPS?

REGENCY REPORTING SERVICE, INC. (813)224-0224

130

1    A.   Basis points.
2    Q.   How is -- for example, the first line item under
3  that column is .530.  Do you see that?
4    A.   Yeah.
5    Q.   How is that number calculated?
6    A.   We took our -- the year of 2019.  Okay?  Our
7  financials, Mutual of Omaha, and that was the return of
8  profit was 53 basis points in 2019.
9    Q.   Are you using data, you know, from a P&L and then
10  dividing or what --
11    A.   Financials.  From the financials, yeah, P&Ls.
12  Yeah.
13    Q.   Okay.  Can you tell me which financials --
14    A.   Corporate --
15    Q.   -- and P&Ls --
16    A.   Corporate financials.
17    Q.   So here's the thing:  There were 25 P&Ls that
18  were produced in the case.  I'm trying to understand what
19  the analysis was to understand the math.  How do I know --
20    A.   I think -- are you talking about branch P&Ls?
21    Q.   I'm talking about branch P&Ls.
22    A.   Well, branch P&Ls are really not so relevant.
23  They're really designed for compensation.
24    Q.   Okay.
25    A.   But they don't capture a lot of expense and a lot

REGENCY REPORTING SERVICE, INC. (813)224-0224

131

1  of income -- right? -- because there's income and expenses
2  that occur past the branch.  And so in order to do that, the
3  only way to do -- there's two ways to do it.  The one way --
4  and this is why most people use this way, because it's
5  simpler.  You simply take the cost of goods sold approach,
6  which was -- which you would take the volume, times what you
7  sold the loan for, less commissions.
8    Q.   Sorry.  Can you just go slower?
9    A.   Yeah.
10    Q.   Cost of goods sold, and then you're subtracting
11  out what?
12    A.   Commissions.
13    Q.   Commissions.
14    A.   Yeah.
15    Q.   Subtracting out anything else?
16    A.   No.
17    Q.   So it's just cost of goods sold subtracting out
18  commissions?
19    A.   It's -- well, you -- so it's the revenue
20  generated by the loan at sale minus commissions.
21    Q.   And you said that you were pulling not from
22  branch P&Ls but from some other P&L for this data?
23    A.   That isn't the way we did it.  That's one of the
24  ways, the simpler way to do it.  But like I said, if we
25  would've done the cost of goods sold approach, this number

REGENCY REPORTING SERVICE, INC. (813)224-0224

132

1  would've been almost $19 million.  So we used a, we felt,
2  more conservative approach, which is we took all the fixed
3  expenses that occur on the corporate side --
4    Q.   Okay.  Can you pause there just for a second?
5    A.   Yeah.
6    Q.   All the fixed expenses on the corporate side?
7    A.   Fixed -- all expenses on the corporate side.
8    Q.   Where do those corporate expenses appear, in the
9  branch P&Ls, or some other P&L?
10    A.   Yeah, the financial -- the corporate financials,
11  the corporate income statement on our tax return.
12    Q.   Okay.  So with respect to this analysis,
13  Waterstone served discovery and specifically asked what are
14  the documents that were relied upon to create Exhibit 7?
15    A.   Yeah.
16    Q.   Tax returns and corporate income statements were
17  not identified, which is why I'm kind of struggling to
18  understand the analysis.  You're going to have to help me
19  here.  I need to leave the deposition with a clear
20  understanding of how this was calculated and what documents
21  you relied on.  Are you able to locate those documents?
22  And, I mean, can take a break.  I just need to know.  Do
23  you have the documents that you used to calculate this
24  column --
25    A.   Sure.

REGENCY REPORTING SERVICE, INC. (813)224-0224

133

1    Q.   -- Corporate Profits Earned BPS?
2    A.   Yeah.  All you have to do is look at the -- it's
3  actually public information, I think.  But yeah, you can --
4  we used the corporate P&L.  Did you not ask for -- I mean, I
5  would imagine we sent the corporate P&L.  I don't know.
6         MS. KREITER:  I mean, if you can help me here,
7  Courtney, I don't believe --
8         MS. WALTER:  Where are you referring to?  We did
9  produce tax returns.  We produced tax returns in
10 response to your most recent request for production.
11        MS. KREITER:  Right.  But there's a request for
12 production specific to what documents were relied on to
13 create Exhibit 7 --
14        MS. WALTER:  Can you point me to that?  I'm not
15 being difficult.  I'm genuinely asking.
16        MS. KREITER:  Let's take a five-minute break.
17        (A recess was taken.)
18        MS. KREITER:  So for purposes of the record, we
19 took a break.  My concern was that the documents
20 identified in response to Interrogatory No. 10 lists
21 documents that Mutual relied on to prepare Deposition
22 Exhibit 7.
23        The witness has started testifying that he relied
24 on corporate tax returns and corporate financials that
25 are not identified within the Bates ranges listed by
REGENCY REPORTING SERVICE, INC. (813)224-0224

134

1  Mutual in response to Interrogatory No. 10.
2         We took a short break to try to discern if we can
3  readily access the documents that the witness did rely
4  on.  The witness indicated that tax returns is one of
5  the documents that we could look to for this
6  information.
7    Q.   (By Ms. Kreiter)  And I think that I'll let the
8  witness say on the record -- I mean, if we pull up the tax
9  return, are you able to then testify as to how the Corporate
10 Profits Earned Basis Points in Exhibit 7 were calculated?
11   A.   The tax returns are going to make it more tricky
12 because of the reverse mortgage.  You know, if we used the
13 tax returns, it's going to include the reverse mortgage and
14 this number is going to be significantly higher.  We need to
15 use the corporate P&L, it's called.  That's what we call it.
16 And I find it -- I'm surprised you guys don't have it with
17 all the other P&Ls.
18   Q.   I'm going to --
19   A.   It's a corporate income statement.  And if we
20 looked at the tax returns, it's going to be difficult.
21   Q.   Are you able to readily access it?  I mean, can
22 you send an e-mail and get it e-mailed to you?  I'm just
23 looking to facilitate the deposition.  There's 25 P&Ls.  I
24 just show a Bates number.
25   A.   It's up to the attorneys.
REGENCY REPORTING SERVICE, INC. (813)224-0224

135

1         MS. KREITER:  I don't want to come back and redo
2  this deposition.
3         MS. WALTER:  So what exactly are you asking?
4         MS. KREITER:  I'm asking the witness to provide
5  at the deposition today any documents that he needs to
6  -- in order to testify as to how the Corporate Profits
7  Earned column of Exhibit 7 were calculated.
8         MS. WALTER:  With specificity?  Like, pulling the
9  actual number to do the calculation right here?
10        MS. KREITER:  I need to understand how this was
11 done and what documents were relied on because I do not
12 believe they are the ones listed in response to
13 Interrogatory 10.
14        In addition, I'm going to be asking the witness
15 to identify the P&L statement that he relied on to come
16 up with the figures that are in the second column of
17 Exhibit 7, which is Volume of Loans Funded.  The
18 witness has said that that data came from an internal
19 system.
20   A.   I mean, it came from the P&Ls as well.  Those
21 should -- as long as we're looking at the right P&Ls, it
22 should certainly cross-reference.  Bernie tends to not make
23 mistakes.  He's an Eagle Scout, by the way, really
24 legitimately, not just a Boy Scout, an Eagle Scout.  We can
25 provide the corporate P&L.  I just don't know if -- you
REGENCY REPORTING SERVICE, INC. (813)224-0224

136

1  know, that's up to counsel.  I don't know --
2    Q.   Let me do this.  So for example --
3         MS. KREITER:  Have that marked.
4         (Exhibit No. 8 is marked for identification.)
5         MS. KREITER:  Number 8.
6    Q.   So take a look at Deposition Exhibit No. 8.
7    A.   Okay.
8    Q.   Go to page 5.  It says "Identify" -- this is
9  Interrogatory No. 10.  It says "Identify, as defined above,
10 all documents that Mutual referred to or relied on to
11 prepare Exhibit 1."  Exhibit 1 of this discovery request is
12 the same as Deposition Exhibit 7 that we're using today.
13   A.   Okay.
14   Q.   So we've asked you to identify all of the
15 documents that were relied on, and then there's a series of
16 Bates numbers.  Do you see that?
17   A.   I do.
18   Q.   So MOM-10942, that's a particular P&L.  I'm going
19 to have that marked as well.
20        (Exhibit No. 9 is marked for identification.)
21   Q.   So Deposition Exhibit No. 9 that has just been
22 marked as Bates No. MOM-0010942.  Do you see that, the first
23 page of the document?
24   A.   Yes.
25   Q.   And do you see how that's also one of the
REGENCY REPORTING SERVICE, INC. (813)224-0224

137

1  documents that is listed in response to Interrogatory 10 as
2  one that you relied on to prepare the lost profits analysis?
3  Do you see how the Bates number matches up to what's written
4  there on behalf of Mutual?
5      A.  I do.
6      Q.  So take a look at the document that Mutual
7  identified as one you relied on and explain to me how this
8  document was relied on and how it is reflected in
9  Exhibit 7.
10     A.  This does -- this -- this isn't right.  This P&L
11  here is not right because it shows -- well, hang on.  '19 --
12  no, it's just not right.  Yeah, I don't know why this would
13  be off.  It doesn't make any sense.
14         MS. WALTER:  Can we go off the record for a
15  second?
16         MS. KREITER:  I guess I have a few more questions
17  about this, if you don't mind.
18         MS. WALTER:  Okay.
19     Q.  On the record.  Mr. Gennarelli, so did you or
20  Mr. Mayle rely on what we've now marked Deposition Exhibit 9
21  in conjunction with the lost profits analysis that is
22  Deposition Exhibit 7?
23     A.  I -- I did not rely upon this 9, no.
24     Q.  Do you know why Mutual identified it as one of
25  the documents you relied on?

138

1      A.  I do not know.
2      Q.  I will represent to you that this first Bates
3  range listed for Interrogatory No. 10 that starts with the
4  document you're looking at, Bates 100942, and then it goes
5  on to MOM-11032, that's about 25 different P&Ls.  Are you
6  able, as you sit here today, to let me know which of those
7  25 P&Ls you relied on to create Exhibit 7?
8      A.  We relied upon -- if I looked at them all -- but
9  this volume is off on this P&L for some reason.  I have no
10  idea why, but the volume is off.  I don't know if it was a
11  misprint or something.  You look at it.  It's common sense.
12  In January 2019, unless I'm missing -- this is not
13  extrapolated out?
14     Q.  Do you see the different Bates numbers that are
15  listed in response to Interrogatory No. 10?
16     A.  I'm still going over this.  Hang on one second.
17     Q.  Sure.
18     A.  This -- this P&L is from January 31, 2019.  It's
19  only a one-month P&L.
20     Q.  It's something that Mutual produced and said you
21  relied on, so I can't explain the origin of it.  I'm just
22  trying to understand were we given the information
23  necessary --
24     A.  Well, you just probably -- maybe there -- is
25  there more?  Is there another P&L?

139

1      Q.  There definitely is.  There's about 24 more.  So
2  I need to know which one did you rely on because when I --
3      A.  The full -- full years.  I mean, this is -- this
4  is why -- there's nothing wrong with this P&L other than
5  it's only for the month of January.  And I think the
6  reasoning provided for this was to show the 2018 volume at
7  BBMC.  Probably that's the reason it was -- it was provided.
8      Q.  Okay.  So I'm going to just share my screen.
9      A.  Were you using this to -- as an offage in 2019?
10  Is that the problem?
11     Q.  I don't know what that was used for.  I'm trying
12  to sift through the volume of documents and understand the
13  analysis, and I'm, frankly, not able to do so.
14     A.  Well, you guys had the P&Ls.  They sent you all
15  the P&Ls --
16     Q.  I don't --
17     A.  -- for the branch levels before they -- before
18  they joined the company.
19     Q.  Are you able to -- for example, let me ask you
20  this question:  Volume of Loans Funded, Tampa Volume --
21     A.  Yeah.
22     Q.  -- it says 115,699,761?
23     A.  Yeah.
24     Q.  I do not find that number on any of the -- I
25  mean, we've spent hours, understand, looking through the

140

1  documents that Mutual identified.  None of those documents
2  reference a loan volume of that amount, and I'm trying to
3  understand why and where that number came from.
4      A.  Yeah, I'd have to see the documents you looked
5  at, but we -- there's a closed loan number.  There's funded
6  loans, so make sure you look at funded, not closed.  I don't
7  know.  I don't know what you're looking at.
8      Q.  Well, I looked at all the documents that Mutual
9  identified.
10     A.  Okay.
11     Q.  And it's not there.  Are you able to tell me
12  which of these Bates numbers you relied on?
13     A.  Bates number, no, I don't know what that Bates
14  number is.
15     Q.  How is Waterstone supposed to know what you
16  relied on at this deposition today to come up with the 115-
17  shown as the Tampa volume for 2019?
18         MS. WALTER:  Object to the form.
19     A.  Other than the fact that the P&Ls were sent to
20  you before these folks even left by themselves, you could've
21  cross-referenced those P&Ls because those were accurate.
22     Q.  But those weren't the ones that Mutual has said
23  it looked at.  How would I have known that you looked at
24  those other P&Ls and not the ones that Mutual said it did?
25     A.  I don't know what you're looking at.  I don't

141

1  know what you're seeing.
2      Q.   So my problem is plaintiff, Mutual, has the
3  burden of proof.  It's alleging damages north of $4 million.
4  It has to demonstrate how those damages are calculated --
5      A.   Absolutely.  There's --
6      Q.   Are you able to, at this deposition today, tell
7  me how Mutual came up with the --
8      A.   Yes.
9      Q.   -- 115 --
10     A.   Yeah.
11     Q.   -- million?
12     A.   It was the volume produced by the Tampa office,
13  Tampa combined with Paramus.
14     Q.   But you're not able to tell me what document that
15  comes from?
16     A.   The Tampa -- the Tampa P&L.  This is one-month
17  P&L you showed me.
18     Q.   Sure.  Are you able to tell me which of the
19  documents identified in response to Interrogatory 10 it
20  comes from?
21         MS. WALTER:  Object to the form.
22     A.   Well, I don't -- did you want me to memorize
23  what --
24     Q.   I want Mutual to come to a deposition prepared to
25  testify about its damages.  Did you look at any of these
REGENCY REPORTING SERVICE, INC. (813)224-0224

142

1  documents in preparation for your testimony today?
2         MS. WALTER:  Object to the form.
3      A.   Yes.
4      Q.   How can I get at the document you looked at
5  without spending another 50 hours trying to look at these
6  documents and then finding that it doesn't exist?
7         MS. WALTER:  Object to the form.
8      Q.   Are you able to go on Mutual's system or e-mail
9  Mr. Mayle and find the document that shows --
10     A.   Yes.
11     Q.   -- the loan volume?
12         MS. WALTER:  Object to the form.
13     A.   Yes.
14     Q.   Can you do that if we take a break and e-mail the
15  documents that show these volume numbers?  That would help
16  me a lot.
17         THE WITNESS:  Are you guys okay with this?
18         MS. WALTER:  Can we take ten minutes, please?
19     MS. KREITER:  Yes.
20         MS. WALTER:  I asked that previously.
21         (A recess was taken.)
22         MS. KREITER:  So opposing counsel had asked for a
23  break.  The request that I had posed was that the
24  witness access the documents he used to calculate
25  Exhibit 7 and provide them at the deposition today such
REGENCY REPORTING SERVICE, INC. (813)224-0224

143

1  that he could walk through the calculations.  Is that
2  something that can happen today?  Is Mutual willing to
3  do that?
4         MS. WALTER:  Our position is that we will not be
5  producing additional documents but that the documents
6  referred to in response to Interrogatory No. 10,
7  Mr. Gennarelli will walk you through his calculation
8  and the data that was considered within those
9  documents.
10         And to be clear, Interrogatory No. 10 requests
11  "Identify, as defined above, all documents that Mutual
12  referred to or relied upon to prepare Exhibit 1."  You
13  requested documents.  Waterstone requested documents.
14  Mr. Gennarelli referred -- relied on data within our --
15  within the system.
16         So we did identify the documents that -- the
17  relevant data that was used for Mr. Gennarelli to come
18  up with his calculation, and he is able to testify to
19  that today.
20         MS. KREITER:  A witness that's putting forth
21  damages can't rely on documents in a system or
22  elsewhere that they don't produce in discovery.
23         MS. WALTER:  You can send another request for
24  potential -- for additional data.
25         MS. KREITER:  Why don't we try and see if he can
REGENCY REPORTING SERVICE, INC. (813)224-0224

144

1  walk through it.  I mean, you indicate that he can walk
2  through it with me?
3         MS. WALTER:  Yes.
4         MS. KREITER:  Okay.  Let's do that.
5      Q.   (By Ms. Kreiter)  Let me start with,
6  Mr. Gennarelli, I'm going to put up on my computer screen --
7  and I understand with your counsel that they're amenable to
8  you just looking at my computer for efficiency in the
9  deposition.
10     A.   Sure.
11         MS. KREITER:  Courtney, it's document Bates
12  No. 10964.
13     Q.   So I've got the document up on my screen here.
14     A.   Okay.
15         MS. KREITER:  Can I orally designate this a
16  deposition exhibit?  I can get a hard copy for it.  But
17  just for purposes of the record, I guess I'd like this
18  to be Deposition Exhibit 10.  It's Bates
19  No. MOM-0010964.  It's an Excel spreadsheet.
20         (Exhibit No. 10 is marked for identification.)
21     Q.   Do you recognize this document as a P&L?
22     A.   Yes.
23     Q.   Up in the left-hand corner, it says "Mutual of
24  Omaha Profit and Loss Statement."  This is for the Tampa
25  branch, and it's dated December 31, 2019.  Do you see that?
REGENCY REPORTING SERVICE, INC. (813)224-0224

145

1    A.    Yes.
2    Q.    There's different years in the document.  I'm
3  going to direct you to the column that says "2019 Year to
4  Date."  Do you see that?
5    A.    Yes.
6    Q.    And there's a row that says "Total Loan Volume,"
7  and then the year-to-date total loan volume is 114,750,394.
8  Do you see that?
9    A.    I do.
10   Q.    Yet on Deposition Exhibit 7, the Volume of Loans
11  Funded for 2019 that's listed is not an amount that matches
12  the 114- but rather is 115,699,671.  Do you see that?
13   A.    I do.
14   Q.    I am trying to understand where the data you
15  relied on came from because it doesn't reconcile the
16  year-end P&L for 2019.  Can you explain that?
17   A.    Well, I can -- I can -- I'd prefer if an
18  accountant did it, but there's accruals that happened after
19  the month.  This was presented at month end.  And then
20  subsequent to that, there might've been loans that --
21  mistakes happen; right?  If a loan is funded at a different
22  branch, it was added back to that.  This is -- this is the
23  up-to-date in our system today.  I can say that because
24  that's the data we used, but you're off by -- what is that?
25  -- probably two loans, I would estimate.

REGENCY REPORTING SERVICE, INC. (813)224-0224

146

1    Q.    Has Mutual produced the documents in its system
2  that you relied on to prepare Exhibit 7?
3          MS. WALTER:  Object to the form.
4    A.    I -- I used data, not the documents.
5    Q.    Okay.  When you pull up the data that you were
6  referencing, can you print it out from the system?
7    A.    I would imagine I could.
8    Q.    Okay.  Could you take a screenshot and produce
9  it?
10   A.    Bernie -- I couldn't do it now.
11   Q.    No, I'm not saying now.  I'm just saying in
12  general, can you take a screenshot of it, get it produced to
13  us?
14   A.    Yes.  These numbers didn't come out of thin air.
15   Q.    Sure.
16   A.    These are the updated numbers, yeah.
17   Q.    And you can print it off your system; correct?
18   A.    Yeah.
19         MR. CARROLL:  So --
20         MS. WALTER:  Send another request, Maria.
21         MS. KREITER:  Courtney, this is for documents
22  referred to or relied on.
23         MS. WALTER:  He responded.
24         MS. KREITER:  So he can push print.  I mean, that
25  doesn't -- just because you haven't printed something

REGENCY REPORTING SERVICE, INC. (813)224-0224

147

1  doesn't mean it's not a document that has to be
2  produced in discovery.
3          MS. WALTER:  We don't have to create a document.
4          MS. KREITER:  He's not creating it.  He's pulling
5  it up, and he's pushing print.
6          MS. WALTER:  I'm not getting into this argument.
7    Q.    Is that correct?  Bernie or you pulls up your
8  system, and you can print that document; correct?
9          MS. WALTER:  To be clear, he -- I also think
10         you're misrepresenting his testimony.
11         MS. KREITER:  I'm asking him.
12         MS. WALTER:  He said, "I would imagine."
13         MS. KREITER:  I'm asking him right now.
14         Read my last question back.
15         (The previous question was read by the reporter.)
16   A.    I'm not sure exactly what we can provide to you,
17  but I'm sure there's something that we can give you that
18  shows this number.  It didn't come out of thin air.
19   Q.    Okay.  I will make a request on the record that
20  you produce that document immediately.
21         Is that the same -- I mean, we were talking about
22  loan volume with respect to the year 2019?
23   A.    I'm sorry.  If I just could ask a question, and I
24  don't know if this is inclusive of Paramus or if this may be
25  inclusive of Paramus.  You know what I'm saying?  He

REGENCY REPORTING SERVICE, INC. (813)224-0224

148

1  combined Paramus and Tampa on this sheet, you know, when we
2  did it.  I don't -- that may be the problem, which we can
3  show you, so...
4    Q.    Okay.  But -- so that's the problem.  Today is
5  the day when I need to know and you are to be in a position
6  to walk me through this.  I'm now hearing at the deposition
7  that you cannot and that you're not sure if one of the three
8  branches is included; is that accurate?
9    A.    I'm not sure.  I'm not sure if that's accurate or
10  not.
11   Q.    You don't know whether Paramus is included in
12  Exhibit 7?
13   A.    I know it's included in this number here under
14  Tampa.
15   Q.    When you say "this number," just we've got the
16  reporter --
17   A.    I'm sorry.
18   Q.    You're talking about --
19   A.    The Exhibit 7.
20   Q.    You're not sure if Paramus is included in
21  Exhibit 7?
22   A.    No.  In Exhibit 7, I know it is included.
23   Q.    It is included?
24   A.    Yes.
25   Q.    Okay.

REGENCY REPORTING SERVICE, INC. (813)224-0224

149

1    A.    You referenced a P&L of Tampa, so I'm not sure
2  that that was inclusive of Paramus, and that -- that may be
3  the difference.
4    Q.    I am going to put a request on the record that
5  you ask Mr. Mayle or somebody at your office to print the
6  documents that would allow you to walk me through the
7  volumes of loans funded. 3
8        MS. KREITER:  Ms. Walter, are you amenable to
9    that?
10       MS. WALTER:  No.  I'm objecting to that, Maria.
11   He's -- let me just go on the record and say that you
12   did put in a request for the profit and loss statements
13   for the Paramus branch.  It's Request for Production
14   No. 40, and we identified the P&Ls that corresponded to
15   Paramus -- to those branches.
16       MS. KREITER:  Request No. 40 has nothing to do
17   with your response to Interrogatory 10.
18       MS. WALTER:  Yes, it does.  You're insinuating
19   that we didn't identify the P&Ls that correspond to
20   Paramus, and we did in response to --
21       MS. KREITER:  In 10?
22       MS. WALTER:  In -- it's in there.  The Bates
23   ranges are included in there.
24       MS. KREITER:  Bottom line, I need to how this was
25   calculated.

150

1        MS. WALTER:  He's walking you through that.
2    A.    I can walk you through that.
3    Q.    Can you -- I mean, are you -- it sounds like
4  you're amenable to getting the documents from Mr. Mayle.
5  Your counsel is saying --
6        MS. WALTER:  I'm objecting.  I'm objecting.
7        MS. KREITER:  Okay.  Understand we may need to
8    come back here, and I'm going to move the court for
9    fees.
10       MS. WALTER:  File your motion.
11       MS. KREITER:  Okay.
12   A.    If I may, I can still walk you through the
13  philosophy.  The philosophy --
14   Q.    I want to get whatever mileage I can.  And then
15  if there's an efficient way to avoid bringing you back to
16  Florida, I'll do that, but I -- so let's see what we can --
17   A.    I don't mind walking back either, but --
18   Q.    Let's see what we can get through.  Why don't you
19  explain to me -- you mentioned the philosophy surrounding
20  the Volumes of Loans Funded?
21   A.    Yes.
22   Q.    Walk me through that, please.
23   A.    The philosophy of the loans funded are just that,
24  the loans -- so the Tampa volume would be Tampa and Paramus,
25  and that's the loans -- the volume funded that year.

151

1    Q.    Okay.
2    A.    Okay.  So that's pretty cut and dry.
3    Q.    And they're taken off of -- just to be clear,
4  they're taken off of documents in your system --
5    A.    A system, not documents.
6    Q.    In a system?
7    A.    Yeah.
8    Q.    They're taken off the system --
9    A.    Yeah.
10   Q.    -- and they've not been produced?
11       MS. WALTER:  Object to the characterization of
12   that.
13   A.    I actually think they have been produced but not
14  in the way -- the manner in which you would like them
15  produced is how I understand it.
16   Q.    So this is where I'm struggling.  Where can I --
17  I mean, the point of this deposition is that I get to verify
18  what you did.  Where in the documents are there numbers from
19  which I can verify the volume of loans funded?
20   A.    Do you have Paramus's P&L in there?
21   Q.    I have Tampa.  Is it separate from Tampa?
22   A.    It may be, you know.
23   Q.    I don't have separate P&Ls for Tampa.
24       MS. WALTER:  Maria, we identified those P&Ls
25   correspond also to Paramus and Tampa.

152

1        MS. KREITER:  That's what I'm saying.  That's
2    what I'm saying.  I don't have P&Ls specific to
3    Paramus.  I only have Tampa.
4    Q.    I mean, this is one.  I guess that's what I'm
5  wondering.  What -- so this is a P&L for Tampa in 2019?
6    A.    Right.  Yeah.  Right, right, right.  Yeah.
7    Q.    Okay.  So walk me through what we've virtually
8  marked as Exhibit 10.
9    A.    I want to check.  Do you mind if I just look at
10  one thing?
11   Q.    Go for it.
12   A.    Okay.  So, I mean, the only -- the only thing we
13  used from this document is volume in this exercise.
14   Q.    Okay.
15   A.    I was just trying to see if there was -- in the
16  payroll tab, if there were people from Paramus in there.  I
17  really can't recognize anybody, so I'm not sure.  I don't
18  have the time that they joined.  That was what I was just
19  trying to see.
20   Q.    Sure.  But the volume here doesn't match up?
21   A.    Right, right.  And that's something Bernie is
22  going to have to explain and somebody from accounting is
23  going to have to explain to you why, you know, if there's an
24  accrual or if these accruals are common or if there was
25  misallocation.  You know, you're funding a lot of loans.

153

1  It's very common for a loan to fund and maybe get applied to
2  a different P&L, and then it gets reapplied when we correct
3  it down the road.
4      Q.  Okay.  Are you willing to call Bernie and ask him
5  about this one in particular?  And maybe that will call
6  clarity --
7          MS. WALTER:  Object to that.  You can depose
8  Bernie.
9          MS. KREITER:  He's the corporate rep on this
10  document.
11         MS. WALTER:  He is walking you through exactly
12  how to do this, and he explained the discrepancy.  I
13  don't know what more you want.  You can ask him all the
14  questions about the P&Ls and the calculations.  He's
15  not calling Bernie.
16         MS. KREITER:  Okay.  Look, this is going to be a
17  second deposition of a corporate rep.  Instead of that,
18  why are you opposed to him calling Bernie and taking
19  care of this in about ten minutes?
20         MS. WALTER:  To ask him what exactly?
21         MS. KREITER:  To ask him to educate your
22  corporate rep on why there's a discrepancy in the
23  documents you've identified and the damages --
24         MS. WALTER:  He responded.  He responded to that
25  question.

154

1          MS. KREITER:  He said he didn't know.  He'd have
2  to ask Bernie.
3          MS. WALTER:  Well, he provided an explanation
4  about the accruals.
5      Q.  Do you know that that's the reason for the
6  discrepancy between the 115 million volume and the 114
7  million volume?
8      A.  I know generally that that's what happened, but I
9  don't know for a fact in this case, no.
10     Q.  Okay.  What about with respect to all of the
11  other loan volumes?  Are you able to tell me here at the
12  deposition where these numbers come from and if there's a
13  discrepancy?
14     A.  These numbers are going to be most correct
15  because they are the most recent.  They came out of a system
16  much more recently than when the P&L was created in January
17  or December of 2019.
18     Q.  And you're going to follow your counsel's
19  instruction not to have them printed and produced today at
20  the deposition --
21     A.  Well, I'm going to follow my counsel's
22  instructions, yeah.
23     Q.  What about Corporate Profits Earned BPS, that
24  column that we were talking about?
25     A.  Yeah.

155

1      Q.  We've had a few breaks.
2      A.  Yeah.
3      Q.  Again, I'm just looking for you today at the
4  deposition be able to walk me through, for example, how did
5  you calculate the .530, and what documents did you rely on
6  to do that?
7      A.  Okay.  There's a Richey May tax return in the
8  file.  I'm not an accountant, but that'll have all the
9  information that you would need to calculate this.  We
10  basically took the total profit for Mutual of Omaha Mortgage
11  in 2019 divided by the volume to get a basis point
12  calculation.
13     Q.  Sorry.  You're going to have to go slow.  You
14  took the profit for 2019?
15     A.  Yeah, took the profit for 2019, divided that by
16  the loan volume to get a basis point calculation.
17     Q.  And you said the document that this profit and
18  loan volume came from is what?
19     A.  Well, there's a Richey May document in there.
20  There's several documents --
21     Q.  The audited financial statements?
22     A.  Yeah.
23         MS. KREITER:  Emma, are you able to e-mail those
24  to me?
25         MS. JEWELL:  Yes.  I'll do that now.

156

1      Q.  Is there more -- while she's sending those over
2  to me, is there more explanation before we turn to the
3  documents?
4      A.  Well, you know, again, these Richey May, you
5  know, audited financials are going to be difficult for
6  laypeople like us to understand them, to be honest.  I mean,
7  I -- you can have your accountants look at them.  They can
8  figure it out easily, but I don't know that we can.  I mean,
9  I would go off of our corporate P&L, which I don't know if
10  it wasn't requested or what the case is, but that's how I
11  would -- I understand an income statement.  I don't
12  necessarily understand how they then take the income
13  statement and make this.
14     Q.  So if I pulled up the Richey financial
15  statements, would you be able to walk me through this or
16  not?
17     A.  I don't know.  I don't know.  I -- I don't know.
18     Q.  Okay.
19     A.  It's -- they're complicated, so...
20     Q.  And are you saying that you instead looked at a
21  corporate P&L?
22     A.  I used data, so I pulled data from our system,
23  which goes into all of that.
24     Q.  Got it.
25     A.  That's how I used it, yeah.

157

1    Q.   Is the data that we talked about similar to the
2  system that has the volume of loans funded data, or is it a
3  separate -- I mean, you mentioned corporate P&L --
4    A.   It's an accounting system, yeah.
5    Q.   Okay.  But --
6    A.   When I say "I," I had Bernie -- that's the data
7  he pulled, so we can look at it, yeah.
8    Q.   Got it.  And you said it is a corporate P&L, or
9  is it --
10   A.   Yeah.
11   Q.   -- something in the system?
12   A.   Corporate P&L, but that's in the system, right.
13   Q.   Is that too -- I mean, a corporate P&L, that's a
14 document you can print from the system?
15   A.   Yes.
16       MS. KREITER:  Do you know, Courtney, has the
17   corporate P&L been produced?
18       MS. WALTER:  Did you request that?
19       MS. KREITER:  I requested all documents referred
20   to or relied on.  He says he relied on the corporate
21   P&L.
22       MR. CARROLL:  That's not what he --
23   A.   That's not what I said.  I said I relied on the
24 data that is in -- it's in a lot of places.  It's also on
25 this -- it's also on the Richey May deal, but I can't

158

1  explain the Richey May.  I can explain this sheet to you,
2  what we did, but I can't explain the Richey May deal.  I'm
3  not a CPA.
4    Q.   Okay.  Would that be the same with respect to all
5  of the -- I mean, you've got various years here, '19, '20,
6  '21, '22 year to date.  Would that be true with respect to
7  all of this data under the Corporate Profits Earned BPS?
8    A.   Yes.
9    Q.   It comes from data on a system that has not been
10 produced?
11       MS. WALTER:  Object to the form.
12   A.   Yeah, the monthly P&Ls have been produced, I
13 believe, but...
14   Q.   The corporate P&Ls?
15   A.   The corporate P&Ls is just an aggregate of the
16 monthly P&Ls at the branch level.  I mean, it's...
17   Q.   Right.  So I guess I'm trying to understand are
18 there documents that you can use today to tell me how to
19 calculate this corporate BPS?  I thought the answer was no,
20 but I want to make sure that that's true and not miss the
21 opportunity.
22       MS. WALTER:  Object to the form.
23   A.   I don't know what -- I don't know what's in
24 there.  I don't really know if there's a -- if there's a
25 corporate P&L or if we can use the Richey May documents.  I

159

1  don't know.
2    Q.   Okay.  Well, let's try with the Richey May
3  documents since I have those here.
4       MS. KREITER:  So Bates No. MOM-0011163, let's
5     have that designated Deposition Exhibit 11.
6       (Exhibit No. 11 is marked for identification.)
7    Q.   I'll turn the computer over to you.  Take a look
8  at that, and let me know if there's data within Exhibit 11
9  that you can use to help identify the corporate profits and
10 BPS.
11   A.   So this is for year ending December 31, 2022, and
12 '21, so it wouldn't have '19 in there.
13   Q.   But what about -- I mean, you have the corporate
14 BPS for those other years too, so take a stab at 2021.
15       MS. WALTER:  Object to the form.
16   A.   Yeah, I'm afraid you're going to need an
17 accountant to figure this out.  You see a reverse mortgage
18 combined in here.  We don't want to use that.  It will
19 inflate the numbers, yeah, $700 million reverse
20 mortgage.  Yeah, I'm sorry.  This is not going to be helpful
21 to us.
22   Q.   I appreciate the effort.  Let's turn back to
23 Exhibit 7, please.  The fourth column there, it's Branch
24 Contributions to Corporate Profits.  Do you see that?
25   A.   Yes.

160

1    Q.   This is simply the volume from Column 2 times the
2  corporate profits basis points in Column 3 multiplying --
3    A.   That's correct.  That's correct.
4    Q.   Then off to the right-hand side, there's no
5  column, but there's some percentages, .92 percent associated
6  with Tampa and then .97 percent associated with Daytona.  Do
7  you see that?
8    A.   Yeah.
9    Q.   What are those percentages?
10   A.   That's the accumulative on average.  So if you
11 took the average of those -- those time frames, that was the
12 basis points in corporate profits derived for the branches.
13   Q.   Okay.  So it's the average of Column 3, Corporate
14 Profits Earned BPS?
15   A.   But it's a weighted average, so it takes into
16 account the -- the volumes on the -- on the -- as well.
17   Q.   Got it.  Then let's go down to the bottom right.
18 It says "Tampa Corporate Profit Expectation."  Do you see
19 that?
20   A.   Yes.
21   Q.   So the total that Mutual is demanding related to
22 the Tampa branch inclusive of the Paramus branch is the
23 2,716,040 --
24   A.   Correct.
25   Q.   -- correct?

161

1    A.   Yes.

2    Q.   And then, similarly, with respect to Daytona, the

3  amount that Mutual is seeking with respect to the Bucket 2

4  damages is the 1,723,961.89; correct?

5    A.   That's right.

6    Q.   So a total of about 4.4, a little over 4.4?

7    A.   Yeah.

8    Q.   You have here a date range highlighted.

9  "Expected corporate profit for 18 months," it says "July of

10 '22 through December 31, 2022."  I'm assuming that should be

11 2023?

12   A.   Yes.

13   Q.   And is the starting date -- it just says July.

14 Is it July 1?

15   A.   Yes.

16   Q.   Okay.  With respect to the Corporate Profits

17 Earned BPS, the amounts for 2019, 2020, and 2021 are the

18 same for both Daytona and Tampa, but then you get to 2022,

19 and it's different.  Do you see that?

20   A.   Say -- walk me through that one more time.

21   Q.   Yeah.  So 2019 Tampa, the corporate BPS is .53.

22 And then for Daytona it's also .53?

23   A.   Yeah, because I think they left sooner.

24   Q.   So that's what I'm trying to understand.  It's

25 the same, and then --

162

1    A.   Yeah, because they were there a full year.

2    Q.   Got it.

3    A.   Yeah.  And they -- so we -- so the first quarter

4  of the year that they had left, we earned -- corporate

5  earned more money, and that was the amount that corporate

6  earned.  And then for the full year, the corporate profit

7  dropped to 43 basis points.  Does that make sense?

8    Q.   Okay.  I just wanted to understand --

9    A.   Through June 30th, that is.  The difference

10 between April 30th and June 30th.

11   Q.   With respect to the Daytona branch, you have

12 listed down in the -- let's take the bottom right-hand

13 corner.  You have profit for 42 months.  Do you see that?

14   A.   Yes.

15   Q.   Why is it not 40 months?  You've got three years.

16 That's 36.  And then you've got four months:  January,

17 February, March, April.

18   A.   I think -- I think he just wanted to compare

19 apples to apples, which is 42 months, even though there was,

20 I don't think, any profit there.

21   Q.   So it's not a mistake.  It's intentionally

22 42 months rather than 40?

23   A.   I can do the math.  I don't know if the math

24 works out.  Let me do the math real quick.

25   Q.   Sure.

163

1         MS. KREITER:  I'll just let the record reflect

2  the witness is using presumably a calculator on his

3  phone to check some of the math in Exhibit 7.

4    A.   That's right.  I think he just did it apples to

5  apples, so he used 42 months --

6    Q.   Mutual's position is it's not an error?

7    A.   Yeah.

8    Q.   It's done intentionally?

9    A.   Yeah.

10   Q.   For the -- in the fourth column there, Branch

11 Contributions to Corporate Profits, you can see for Tampa in

12 2019, it's 600,000.  Then it jumps 3,232,144 for 2020.  Do

13 you see that?

14   A.   Yeah.

15   Q.   Is that a record high for the Tampa branch?

16   A.   I think so.

17   Q.   Similarly, for the Daytona branch, it jumps from

18 400,000 to 1.7 million --

19   A.   Yeah.

20   Q.   -- 53?

21        Is that a record high for the Daytona branch?

22   A.   I believe so.

23   Q.   You would agree that 2020 was a record year in

24 terms of volume for Mutual overall?

25   A.   Yeah, yes.  Absolutely.  And 2019 was also

164

1  artificially low because there was a switchover to

2  Bridgeview.  But yes, generally, you're still correct.

3    Q.   In 2020, the pandemic hit.  The housing market

4  went crazy?

5    A.   Right.

6    Q.   And then that anomaly continued into 2021;

7  correct?

8    A.   Yes.

9    Q.   In fact, the volume for Tampa in 2020 is more

10 than five times the prepandemic volume of 2019; correct?

11   A.   Not volume, no.

12   Q.   Sorry.  The -- I'm looking at the Branch

13 Contributions to Corporate Profits column.

14   A.   Yeah, what was your -- what was your question?

15   Q.   The volume for -- sorry.  I'm saying "volume"

16 again, but the amount for Tampa is five times the

17 prepandemic volume of 2019 if you're looking at 2020?

18   A.   Yes.  Correct.

19   Q.   The same for Tampa, not five times?

20   A.   But yes.

21   Q.   But it's multitudes higher in 2020.  You would

22 agree with me that 2020 was a historically anomalous year

23 for the industry?

24   A.   Yes.

25   Q.   Why did you use a date range to calculate damages

165

1  that included a historical anomaly in the market?

2      A.    Well, there was the data we had.  We have to use

3  all the data.  You don't know what the next year is going to

4  bring.  Next year could be a great year as well.  These are

5  purchase-driven folks too.  I mean, they do purchases, you

6  know, heavy refinances.

7          And the other thing is with the arrival of Keller

8  Williams, that relationship, they would've benefited

9  substantially.  I would venture to say if they were still

10 here with the Keller Williams acquisition, that their volume

11 would be near that level again.

12     Q.    The year to date for Tampa in that fourth column

13 of Branch Contributions to Profits is 406,810.  Do you see

14 that?

15     A.    Yes.

16     Q.    If you double that, that would give you a full

17 year because it --

18     A.    Right.

19     Q.    -- so happens that the departure was --

20     A.    That's right.

21     Q.    -- six months into the year?

22     A.    Yeah.

23     Q.    Did you or Mr. Mayle or anyone else at Mutual

24 consider using that most recent time frame as your baseline

25 for estimating the damages?

166

1      A.    I don't know that we considered that.  The one

2  thing we did consider, like I said before, was using the

3  cost of goods sold method.  And I thought that if we

4  would've used the cost of goods sold method, these numbers

5  would've been through the roof, so we chose just an average.

6          And you're not going to -- when you're doing an

7  average, it's going to be an average.  You have to use all

8  the data in front of you.  We don't know what tomorrow

9  brings; right?  Keller Williams arrived this year.  That

10 would've been exponentially valuable having them there.

11     Q.    But somebody had to make a choice as to how far

12 back you were going to go with respect to the data.  And

13 either you --

14     A.    We went back the whole way, the whole time -- we

15 just went back to the history here at Mutual Mortgage.

16     Q.    Do you believe that it's more reliable to use

17 data that includes a historical anomaly than it is to use

18 the most recent data available?

19         MS. WALTER:  Object to the form.

20     A.    Yeah, I think that what you're calling historic

21 anomaly is one person's perception.  We don't know what next

22 year brings or the year after or the year after.

23     Q.    So let me ask you this question.  I want to make

24 sure I'm understanding this.  You looked at historical data

25 going back to 2019 --

167

1      A.    That's right.

2      Q.    -- including the pandemic, which was a high for

3  both of the branches, and then you used that data to project

4  losses associated with the branches if they had stayed open

5  going into the future; correct?

6          MS. WALTER:  Object to the form.

7      A.    I think that's what we -- we average the volume

8  the times that they were here.  That's why if you noticed

9  the lowest -- the lowest really year volume is 2019.  We

10 used that.  We didn't just use 2020.  We didn't just use

11 2021.  We averaged the volume for the time they were here.

12 I can't tell you what the future will bring; right?  I would

13 say if they knew that Keller Williams was coming on, they

14 probably wouldn't have left and they would benefit.  Their

15 volume would be more than this.

16     Q.    So my question is more just to make sure we're

17 aligned on what Bucket 2 represented.  My understanding --

18 but I don't want to assume.  I want to check with you -- is

19 it represents the profits as if the branches would've stayed

20 open for 18 months into the future?

21     A.    That's right.

22     Q.    And to estimate those damages of profits into the

23 future, you looked at retrospective data; correct?

24     A.    Yeah, that's the only data we have.

25     Q.    So it's May 25th of 2023, which includes the date

168

1  range that you're estimating damages.  And I'll go back to

2  Exhibit 7 here.  So the damage range that you're using is

3  July 1, 2022, to December 31, 2023; correct?

4      A.    That's correct.

5      Q.    We're a number of months into that damage period

6  now; correct?

7      A.    Yes.

8      Q.    Is the market now and since July 1, 2022, better

9  or worse than it was in the pandemic?

10         MS. WALTER:  Object to the form.

11     A.    Our -- our -- our volume today is better than it

12 was last year.  Now, is it better than the pandemic?  No.

13 But it's better than it was last year.

14     Q.    Okay.  Has Mutual -- in July of 2022, was Mutual

15 laying off employees?

16     A.    We laid off nonperformers, yes.  I don't know if

17 that was the exact time, but sure.

18     Q.    In July of 2022, was Mutual's profitability

19 consistent with its budgeting and estimates?

20     A.    Well, I think that, you know, we were very

21 negatively impacted by these groups leaving at that time

22 because when you -- each loan that you do is exponentially

23 more valuable, especially when you are dealing with purchase

24 teams.  So we still have all these fixed costs at the

25 corporate level that we have to -- that we have to assume.

169

1  And when this volume leaves, those costs become a much
2  larger percent of the expense.
3      So that's why I keep going back to this -- maybe
4  that's the route we should take, is using the cost of goods
5  sold approach because you take those variables out of it.
6  Each loan -- each additional loan is exponentially more
7  profitable than the last -- right? -- because the first loan
8  pays for all -- you don't make any money; right?  It pays
9  for the expense.  The second one you make a little bit.  The
10  third loan, you make more money, et cetera, et cetera.
11      Q.  Does Mutual look at the profitability at the
12  branch level?
13      A.  Yes.
14      Q.  Were there any profitable Mutual branches in July
15  of 2022?
16      A.  Yes.
17      Q.  How many?
18      A.  I don't know.
19      Q.  Were there a number of Mutual branches that were
20  not profitable in July of 2022?
21      A.  In July of 2022?
22      Q.  Correct.
23      A.  I don't know if there were a number that weren't
24  profitable.  When you -- when you say "branch
25  profitability," how we look at it is just exactly how I

170

1  walked through this; right?  It's taken into account those
2  expenses and revenue occurred at the -- at the corporate
3  level.  So a branch P&L may be negative, but we're still
4  making -- corporate may still be making money from that
5  branch.  Does that make sense?
6      Q.  How about looking at the forward division?
7      A.  Yeah.
8      Q.  I mean, if you just look at the forward division
9  in July of 2022, was the forward division profitable at that
10  time?
11      A.  Well, I know through June we were very
12  profitable.  Through June we were profitable.
13      Q.  What about after June?  July of 2022?  And I ask
14  that because that's when your damage period starts.  So in
15  July of 2022, was forward profitable?
16      A.  I don't know.  I'd have to go back and look.  We
17  -- we ended the year being profitable but not by much, but I
18  know for the first half of the year we were, I believe,
19  20-some million in profit.  And again, I think that shows
20  the damage caused when groups like this leave, purchase
21  groups.  It becomes exponentially more damaged.
22      Q.  What was the rationale for using an 18-month
23  period to calculate the lost profit damages associated with
24  the branches closing?
25      A.  Yeah, I mean, we didn't want to use any -- again,

171

1  we were trying to be reasonable.  You know, I think you can
2  make a case for using longer.  Most of our branches have
3  been here 10, 15 years, so -- at least the core group.  So
4  we could've used longer, but we thought 18 months was a
5  reasonable amount of time.
6      Q.  We talked earlier in the context of the
7  discussion about natural attrition and if the branch
8  managers had simply, you know, said nothing but then the
9  employees obviously learn after the fact the branch manager
10  left, that there may be some employees that go and follow
11  that branch manager due to natural attrition.  And I think
12  your testimony was, yeah, eventually that could happen.  Do
13  you recall that testimony?
14      A.  I do.
15      Q.  Okay.  Do you have any data within Mutual or
16  otherwise that you relied on for purposes of this analysis
17  that says it will take about 18 months for employees to
18  follow a branch manager in the context of natural attrition?
19      MS. WALTER:  I'll object to the form.
20      A.  No, I did not do that.  But what we did do is,
21  you know, we looked at how long branches stay.  And, you
22  know, we talked a little bit about what a branch is, and a
23  branch is -- you know, individuals come and go, but that
24  branch continues to grow.  And I think that that's
25  important.  Even today some of our branches are growing and

172

1  doing well.
2      Q.  Did Mutual have employment contracts with any of
3  the downstream employees that required them to stay on for
4  18 months?
5      A.  No.
6      Q.  Did Mutual have employment contracts with any of
7  the managers that required them to stay for 18 months?
8      A.  No.
9      Q.  What was the rationale for choosing 18 months as
10  opposed to 12 months or 24?
11      MS. WALTER:  Object to the form.
12      A.  You asked me that.  You know, again, it was -- we
13  were trying to be reasonable.
14      Q.  Did you consider other periods of time?
15      MS. WALTER:  Object to the form.
16      A.  We did.
17      Q.  What other periods did you consider?
18      A.  Well, we considered looking at our large
19  branches, so that would be, you know, branches that were
20  similar to these branches.  So you would have a St. Louis,
21  Seven Hills, Columbia, and they stay for, you know,
22  eight years, ten years.  But we didn't think that was
23  necessarily reasonable, so we came up with 18 months.
24      Q.  You understand that the employment contracts in
25  place with the managers, to the extent that there are such

173

1  contracts that have an employee nonsolicit, do you know how
2  long the duration of the nonsolicit is?
3          MS. WALTER:  Object to the form.
4      A.  I believe it's a year generally.
5      Q.  Okay.  Did you consider using a year?
6      A.  No.  We did consider it, but, I mean, that's what
7  we wound up at, no.
8      Q.  So if your testimony is these branch managers
9  solicited the employees and then came and that shouldn't
10  have happened, what's to stop the branch managers from
11  waiting a year and then soliciting the employees and then
12  the employees leaving at that point in time?
13          MS. WALTER:  Object to the form.
14      A.  Repeat the question.
15      Q.  Sure.  I mean, the managers only have a
16  contractual prohibition, to the extent that it's enforceable
17  or even exists.  The ones I've seen are for 12 months.
18      A.  Yes.
19      Q.  So after that 12-month period, Mr. Hutto or
20  Mr. Wolf or Mr. Smith could go to the branch employees and
21  solicit them to leave the branch?
22      A.  Yes.
23      Q.  And that could've happened at the one-year mark.
24  So I'm trying to understand was that -- you know, that
25  situation factored in at all for purposes of your damages

174

1  analysis?
2      A.  Not really.  They also could've still been here.
3  Keller Williams comes into play, and they stay for six or
4  seven years, so we didn't use six or seven years.  We didn't
5  use ten years.  We used 18 months.  I mean, I don't know how
6  much we can, you know --
7      Q.  Do you have any evidence if the downstream
8  employees would have stayed because Keller Williams came in?
9          MS. WALTER:  Object to the form.
10      A.  Well, you're the one who made a statement that
11  said they went with Dwayne because he provided loans.  Where
12  do you think Keller Williams -- one out of every five real
13  estate transactions is Keller Williams signed.  We now are
14  the lender for Keller Williams.  I would imagine that that
15  may be more attractive than the one-offs that Dwayne was
16  handing them.
17      Q.  So again, I want to talk about evidence that
18  Mutual has versus just speculation about what the employees
19  might have thought.  Has Mutual asked any of the employees
20  would they have been motivated to stay knowing that Keller
21  Williams was joining?
22          MS. WALTER:  Object to the form.
23      A.  Not that I'm aware of, no.
24      Q.  Does Mutual have reports that show the monthly
25  volume for all branches?

175

1      A.  What are those reports called?
2      Q.  Well, I think they come in different formats, so
3  there's P&Ls.  There's also, you know, a business
4  intelligence system that you can see the volume by branch,
5  so it's called BI, clever name.
6      Q.  The P&Ls, are those the corporate P&Ls that we've
7  been referencing?
8      A.  Branch-level P&Ls and corporate P&Ls.
9      Q.  Okay.  Do the corporate P&Ls pull together --
10      A.  Yes.
11      Q.  -- the monthly volume for the branches?
12      A.  Yes.
13      Q.  Does it itemize which branch contributes to the
14  total?
15      A.  Yes.
16      Q.  Is there a particular branch that had volume
17  closest to the volume of the Tampa branch?
18      A.  In what year?
19      Q.  Let's just say in 2021.
20      A.  I think you would probably have maybe Columbia;
21  Maryland would be very close, I think.
22      Q.  What about Daytona?  Is there a branch that you
23  would say is comparable to Daytona in terms of revenue, I
24  guess?

176

1      A.  I would say that would be more like a -- more
2  volume than that.  That northwest branch I referenced
3  earlier, very similar.
4      Q.  Okay.  Does Mutual make efforts to assess its
5  performance relative to the industry overall?
6      A.  Yes.
7      Q.  How does it do that?
8      A.  You know, it's done -- that's how they kind of
9  manage me, so I'm not sure exactly how they do it, but I
10  know that they do it.  They can -- I think Richey May has
11  reports that they use.  They also use the MBA reports, but
12  that's how they kind of measure, I think, my performance is
13  how we relate to the industry.
14      Q.  Does Mutual track market trends for loan
15  originations?
16      A.  When you say "track," I don't know if we track
17  it.  We're aware of it.
18      Q.  Okay.  Do you know how Mutual performs in terms
19  of loan originations relative to the market?  I mean, if
20  there's a peak in the market, is there generally a peak for
21  Mutual or is it that there's something different about the
22  business model?
23      A.  There is something relatively unique about the
24  business model, that we have a large amount of consumer
25  direct folks.  So they're not only purchase driven.  So if

177

1    the purchase market suffers, we're able to capture some
2    volume with debt consolidation loans and things like that,
3    so it's a little unique.
4            But generally speaking, if the market is doing
5    well, we do well. If the market is underperforming -- we
6    tend to perform better in the underperforming market than
7    our peers, but we still suffer; right? We're still not
8    doing the same as we were.
9    Q.    Do interest rates have an impact on volume?
10   A.    They have an impact on volume, but they're not
11   the sole driving force, I think.
12   Q.    Were the interest rates generally lower in 2020
13   than in 2023?
14   A.    Yes.
15   Q.    The rates were lower in 2021 than they are in
16   2023; correct?
17   A.    Yes.
18   Q.    Does Mutual have any records that show the
19   interest rates it offered historically and currently for
20   different loan products? Take, for example, a 30-year
21   fixed.
22   A.    Do we have --
23   Q.    Do you have historical records that would show,
24   for example, here's the interest rate that Mutual was
25   offering over periods of time?

178

1    A.    I don't know that we keep that in a record, like,
2    per se. I think we can pull it off of systems. I know
3    we're not allowed to say systems because it's got to be
4    documents for this conversation, but we do use systems --
5    Q.    What systems --
6    A.    -- and data.
7    Q.    -- do you pull those from?
8    A.    You can pull it from Encompass. You can pull
9    from the accounting system. You can pull it from different
10   -- the business intelligence system.
11   Q.    Does Mutual have branches right now that are
12   operating at a loss?
13   A.    Yes.
14   Q.    How many?
15   A.    I believe two.
16   Q.    Were those same branches profitable in 2020 and
17   2021?
18   A.    One of them was, and one of them was not, the ebb
19   and flow.
20   Q.    You would agree the housing market and the
21   mortgage industry has taken a turn for the worse since the
22   branches left Mutual; correct?
23        MS. WALTER: Object to the form.
24   A.    I would say that, yeah, it's more difficult.
25   Yeah.

179

1        MS. KREITER: 12. I don't have another copy of
2    that. Courtney, are you able to look at --
3        MS. WALTER: Yeah.
4        MS. KREITER: So it's Bates No. MOM-1467.
5        MS. WALTER: Just give me a second to pull it up,
6    please.
7        MS. KREITER: Sure.
8        (Exhibit No. 12 is marked for identification.)
9        MS. WALTER: 1467, you said?
10       MS. KREITER: Correct. Just let me know when
11   you're ready.
12       MS. WALTER: Can I take a look at it? Because
13   it's not matching up with what I'm seeing. Oh,
14   14667. Okay. I'm there. Thank you.
15   Q.    I'm going to start on -- there's a couple pages
16   to this document. I'm going to start on the page that's
17   labeled 14667. It should be the first page of the
18   exhibit.
19   A.    Yes.
20   Q.    And specifically, the e-mail that's from Tyler
21   Larsen, that's Mutual's CFO; correct?
22   A.    Correct.
23   Q.    The date of the e-mail is July 12, 2022. Do you
24   see that?
25   A.    I do.

180

1    Q.    So this is just a few days after the July 1st
2    start date of the damages period that Mutual is claiming;
3    correct? Sorry. For the record, maybe you said correct. I
4    just didn't hear it.
5    A.    Oh, you didn't hear me? Yes. Correct.
6    Q.    The e-mail is sent to, it looks like, a Listserv,
7    MOOM Executives, exec@mutualmortgage.com. Do you see that?
8    A.    I do.
9    Q.    Are you one of the Mutual executives included in
10   this Listserv?
11   A.    I am.
12   Q.    Do you remember receiving this e-mail in July of
13   2022?
14   A.    No. But I receive a lot of these e-mails, so
15   okay.
16   Q.    Do these -- are there monthly performance e-mails
17   similar to this that go out to the Mutual executives on a
18   monthly basis?
19   A.    Yes.
20   Q.    And so were there monthly e-mails similar to this
21   over the entirety of the damages period? I realize we're
22   not quite to December yet, but -- so July, August,
23   September, October, November, December of 2022, and then all
24   of 2023, including through April.
25   A.    Yes.

181

1    Q.  I'll ask or request that those be produced.

2        This e-mail is designated "Importance: High."

3 And the Subject line is "MOOM Financial Performance for June

4 of 2022." Do you see that?

5    A.  Yes.

6    Q.  So Mutual's CFO writes "Good afternoon. Attached

7 please find June '22 financial results. See below comments

8 for detail on each division. Overall there continues to be

9 heavy downward pressure on margins on both sides of the

10 business for slightly different reasons." I'm going to

11 pause there. "Heavy downward pressure on margins," does

12 that mean pressure to lower the BPS profitability margin?

13        MS. WALTER:  Object to the form, and

14 Mr. Gennarelli did not send this e-mail.

15    A.  Yeah, I'm -- I'm not sure at what margins he's

16 talking about. I would imagine he's just talking about the

17 gain on sale margins. I could be wrong.

18    Q.  The gain on sale margins, what is that?

19    A.  Like, that's what we sell a loan for.

20    Q.  Okay. Is that different than the BPS in

21 Exhibit 7?

22    A.  It would be different.

23    Q.  Okay. Maybe just explain to me the margins that

24 you sell a loan for --

25    A.  Yeah.

REGENCY REPORTING SERVICE, INC. (813)224-0224

182

1    Q.  -- as opposed to the BPS in Exhibit 7. What is

2 the difference between those two margins? Does Exhibit 7

3 assume you hold the loan?

4    A.  No. No, it has nothing to do with that. This

5 margin in Exhibit 7, that's the profit margin. What I think

6 he's referring to is the margin at time of sale that

7 investors are willing to pay for the loan.

8    Q.  Okay.

9    A.  Two different things.

10    Q.  And then it says "on both sides of the business,"

11 meaning the forward side and the reverse side --

12    A.  Correct.

13    Q.  -- correct?

14    A.  Yeah.

15    Q.  The next sentence talks about forward. And just

16 to be clear, forward is the division for which you're

17 president, and it's the division in which the Tampa and

18 Daytona branches were part of?

19    A.  Yes.

20    Q.  "Forward margins are being compressed due to the

21 recent increase in interest rates, which pushes competitors

22 to lower margins in an effort to capture volume to support

23 their expense structure that has scaled over the past two

24 years." Does that in general mean competitors are lowering

25 their profit margins? They need to increase volume in order

REGENCY REPORTING SERVICE, INC. (813)224-0224

183

1 to support the staff that they've hired on during the

2 pandemic?

3    A.  Yeah.

4        MS. WALTER:  Object to the form.

5    A.  I think it -- yes. And it also points to the --

6 kind of like the theme is the extreme value it is when you

7 lose purchase business like this because then we have fixed

8 costs that are -- interest rates are less likely to affect

9 purchases than they are refinances.

10    Q.  In the 2020 period and 2021 period, I mean, it

11 talks about scaling structures over the past two years. In

12 general in the industry, were mortgage companies hiring

13 more, more employees, more loans to process, the volumes

14 were high?

15    A.  Yeah.

16    Q.  So there's -- and now we have less volume, and so

17 there's a need to cut some of the employees; correct?

18        MS. WALTER:  Object to the form.

19    A.  Generally, I think that's correct, yeah.

20 Nonproducing, nonproductive employees needed to --

21    Q.  And then it says "On the reverse side of the

22 house" -- let me just stop there. Is there any connection

23 between the profitability of the reverse side of the house

24 and the forward side of the house?

25    A.  No. I mean, I don't know what you mean by

REGENCY REPORTING SERVICE, INC. (813)224-0224

184

1 "connection."

2    Q.  Well --

3    A.  It doesn't relate to -- it doesn't relate to our

4 P&L.

5    Q.  That's what I'm looking for.

6    A.  Yeah.

7    Q.  And for example, changes at the reverse side of

8 the house, would that have an impact on Exhibit 7?

9    A.  Correct, it would not.

10    Q.  Okay. Then there's some text that's in all caps

11 and bold. It says "Consolidated June pretax earnings were

12 negative 3.2k," presumably 3.2 thousand?

13        MS. WALTER:  Object to the form.

14    A.  Where are you looking at this? I'm sorry.

15    Q.  Sure. The paragraph that we just went through,

16 I'm now moving down from that.

17    A.  Yes.

18    Q.  There's an all caps, bold statement still on that

19 page 14667, that first page.

20    A.  Yes.

21    Q.  It says "Consolidated June pretax earnings were

22 negative 3.2k." Is that -- I guess what is that? A

23 thousand? A hundred thousand?

24    A.  Yeah, K is thousands, so...

25    Q.  Okay. So there's a loss in terms of June pretax

REGENCY REPORTING SERVICE, INC. (813)224-0224

185

1  earnings?
2      A.  Yes.
3      Q.  And then it says "versus plan of 3.2 million."
4  Do you see that?
5      A.  I do.
6      Q.  What is the plan?
7      A.  The plan is the budget.
8      Q.  Okay.  So the budget was 3.2 million.  Suffice to
9  say the budget has not been met.  And in fact, there's a
10  loss as to pretax earnings?
11      A.  That's correct.
12      Q.  And then it says "on total volume of 353 million
13  versus the plan was 705 million"?
14      A.  Correct.
15      Q.  So volume is not exactly half but close to half
16  of what the plan --
17      A.  Sure.
18      Q.  -- had contemplated?
19      A.  Yes.
20      Q.  It goes on to talk about "Consolidated
21  year-to-date 2022 results."  And again, there it looks at
22  pretax earnings versus the plan down 76 percent.  And then
23  PY is down 89 percent.  What is PY?
24      MS. WALTER:  I'm going to object to this line of
25  questioning to the extent you're asking him to read

REGENCY REPORTING SERVICE, INC. (813)224-0224

186

1  what is included on this e-mail --
2      MS. KREITER:  I'm asking him what PY stands for.
3      MS. WALTER:  -- that he didn't send, mind you --
4  if I can finish.
5      MS. KREITER:  It doesn't mater if he sent it.
6      Q.  Do you know what PY stands for?
7      A.  I -- prior year, I would imagine.
8      Q.  Thank you.  Okay.  Then if you would turn to the
9  next page in the exhibit, Bates No. 14668, it starts with
10  "Forward," the entity of which you're president, and it has
11  your name in parentheticals there, Jeff Gennarelli?
12      A.  Yeah.
13      Q.  This appears to be a statement that you wrote,
14  and the CFO is including it in his report; is that correct?
15      A.  Yeah.
16      Q.  Okay.  So let's walk through what you wrote here
17  in July of 2022 when we're looking at damages from
18  Waterstone.  You say "Progress, although slower than we had
19  hoped, the key to profit is rightsizing the staff" -- does
20  that mean firing staff?
21      A.  It means rightsizing as getting rid of people
22  that are not productive, not performing.
23      Q.  Then you say "as they relate to lead spend and
24  lead conversion."  What is lead spend?
25      A.  That's advertising.

REGENCY REPORTING SERVICE, INC. (813)224-0224

187

1      Q.  Recruiting --
2      A.  No.
3      Q.  -- sales efforts -- sorry.  Not recruiting
4  employees, trying to recruit business development efforts to
5  bring in loans?
6      A.  You want to think about it as advertising.
7      Q.  Okay.  Then you say "lead spend and conversion of
8  leads did not move.  This will be reduced significantly in
9  July with a path toward profit."  Do you see that?
10      A.  Yes.
11      Q.  Was June '22 not profitable?
12      A.  We -- we covered it.  You already said it wasn't
13  profitable.  We read that.
14      Q.  I just want to make sure.  My understanding is it
15  wasn't profitable from this document.  Was July of 2022
16  profitable?
17      MS. WALTER:  Object to the form.
18      A.  I don't remember.  I'd have to look at this.
19      Q.  You say "The continued reduction in nonperformers
20  on the sales side is critical."  So again, reduction in
21  nonperformers, firing employees; correct?
22      MS. WALTER:  Object to the form.
23      A.  I would say, you know, I think it's important to
24  segregate this conversation.  What I'm talking about is
25  folks that worked consumer direct leads.  That's not the

REGENCY REPORTING SERVICE, INC. (813)224-0224

188

1  groups that were Tampa and Daytona, which is really
2  important to the conversation.
3      Tampa and Daytona were self-sourced purchase
4  folks.  They don't have these huge marketing expenses that
5  go along with consumer direct efforts.  So it makes them
6  increasingly more valuable and more profitable in downturns
7  because you don't have to support them with lead purchases,
8  advertising, things like that.  So it's important that we --
9  that we understand that and understand what we're talking
10  about.
11      Q.  "We termed 55 MLOs" -- is that -- I get loan
12  officers.  What's the M, Mutual?
13      A.  Mortgage loan officers.
14      Q.  Mortgage loan officers.  -- "in June with another
15  30 on final write-ups."  What's a final write-up?
16      A.  Warning, written warning.
17      Q.  "The next target is the junior MLO and MLO
18  assistant area.  We feel this is an area we can pick up
19  savings with very little disruption to sales."  Do you see
20  that?
21      A.  Yes.
22      Q.  And then it talks about terminating 18 who were
23  in this role in June.
24      I'm going to skip down to the next paragraph
25  there.  The second sentence says "As the market stabilizes"

REGENCY REPORTING SERVICE, INC. (813)224-0224

189

1   -- what about the market was not stable at this time?
2       A.   Well, you had the second -- the capital markets
3   was very unstable, volatile.  It means that the market was
4   up and down dramatically on a daily basis.  There was not
5   stability.  When I say "market," I mean the capital markets.
6       Q.   And then you go on to say "and we do not see wide
7   swings in the servicing value," et cetera, et cetera.  Then
8   in that last line, you have a phrase that I want to focus
9   on.  "...to be in terms of margin to successfully manage in
10  this downturn."  You agree the market was in a downturn at
11  this period?
12      MS. WALTER:  Object to the form.
13      A.   Yes.
14      Q.   Going down to the next paragraph, the fourth line
15  that starts with "The departing thoughts," do you see that?
16      A.   Yeah.
17      Q.   So third paragraph, fourth sentence, "The
18  departing thoughts" --
19      A.   Yeah.
20      Q.   -- "from the manager of Daytona."
21      A.   Yeah.
22      Q.   Are you referring to Mr. Hutto or Mr. Smith?
23      MS. WALTER:  Object to the form.
24      A.   I don't recall.  I believe it was Mr. Smith, and
25  I was told Brian Tomalak.

190

1       Q.   Or sorry.  So it says "the manager of Daytona,"
2   so that's Mr. Wolf or Mr. Hutto?
3       A.   Maybe that was -- maybe it was Mr. Hutto.
4       Q.   Okay.  "The departing thoughts from the manager
5   of Daytona were directed at the surprisingly little
6   cooperation we had with the insurance company in terms of
7   cross-marketing, et cetera."  Was there, in your mind,
8   little cooperation with the insurance company in terms of
9   cross-marketing?
10      A.   At that time, I would say there was little
11  cooperation, yeah.
12      Q.   Do you believe that that was a genuine concern of
13  the managers?
14      MS. WALTER:  Object to the form.
15      A.   I believe that that's what Dwayne said to Brian
16  Tomalak at the time that he left.
17      Q.   Had you personally heard that from the managers
18  here or other managers?
19      A.   No.
20      Q.   What is the insurance company?
21      A.   I'm sorry?
22      Q.   So sorry.  Let me back up here.  I'll read a
23  little bit more and maybe that gives context.  "We all need
24  to understand this was a big reason our staff stuck with us
25  through the licensing process, the belief we would have some

191

1   benefit to sales of being part of such a great company."
2   Does this refer to the acquisition --
3       MS. WALTER:  Object.
4       Q.   -- and BBMC joining Mutual?
5       MS. WALTER:  Object to the form.
6       A.   I believe it does theoretically, but there was a
7   -- yes, I think that that's what it would it be.
8       Q.   "There is progress being made now, but it is
9   slow."  So what does that mean?  I mean, was there an issue
10  in your mind in terms of the insurance company's
11  cross-marketing efforts?
12      A.   Well, here we didn't have any cross-marketing at
13  BBMC.  So now you go to a large company.  I think people
14  assume there would be more opportunity to cross-market with
15  a large company that has, you know, a $25 million -- a 25
16  million-person database.  It's a slow grind because you have
17  to get compliance to write off on it, et cetera.
18      So I'm sure people's perceptions was that they
19  were going to have a great opportunity to do that, and that
20  didn't come through.  We didn't really push that because we
21  didn't know how -- how effective it would be to cross- --
22  it's going better today than it was back then, but
23  nevertheless --
24      Q.   And back then, this is closer to the time of the
25  departures?

192

1       A.   It is, yes.
2       Q.   You then say "To give some context, we went
3   through the greatest mortgage market in decades" -- meaning
4   the 2020 pandemic?
5       A.   Yeah.
6       Q.   -- "and received less than a hundred referrals in
7   those two years."  So which two years are the greatest
8   mortgage market in decades, '21 and -- sorry -- '20 and '21?
9       A.   Correct.
10      Q.   Okay.  And then I'm going to direct you down to
11  the all caps, bold language following that paragraph again.
12  Now, this is reflective of earnings specific to the forward
13  business unit in the relevant time period; correct?
14      A.   Yes.
15      Q.   "Forward June pretax earnings were negative
16  439,000 versus the plan for that year was to be positive
17  3.2 million"; correct?
18      A.   Correct.
19      Q.   And then on total volume, it's 246 million versus
20  the plan of 619 million.  Would you agree that these are
21  material and adverse deviations from the budget?
22      MS. WALTER:  Object to the form.
23      A.   Yeah.
24      Q.   And then it continues below that with
25  year-to-date 2022 results.  Do you see that?

193

1    A.   I do.

2    Q.   So again, you've got pretax earnings that are
3    down 36 percent and then negative 73 percent compared to the
4    prior year.  Volumes are down as well as pretax earnings;
5    correct?

6    A.   Yes.

7    Q.   And you would -- would you agree with me that the
8    amount of the decrease is significant, down 43 percent, down
9    73 percent?

10    MS. WALTER:  Object to the form.

11    A.   Yeah, I think it's pretax earnings are down
12    36 percent, but yeah.

13    Q.   Right.  But my question was, I mean, you agree
14    these are significant downs in this time period; correct?

15    A.   Sure.

16    MS. WALTER:  Object to the form.

17    Q.   I'm going to direct you to page 14669 in the
18    document.

19    A.   Got it.

20    Q.   Towards the bottom, all caps, it says "Corporate
21    expenses."  Do you see that?

22    A.   Yes.

23    Q.   "Corporate expenses were 1.1 million for June
24    (versus the plan of 2.2 million)."  So you've got --
25    expenses have been cut in half; correct?

194

1    MS. WALTER:  Object to the form.

2    A.   Corporate expenses as it relates to this
3    conversation is different than corporate -- corporate
4    expenses are a very small group of folks that reside in San
5    Diego and are -- they're, like, the CFO, the attorneys are
6    corporate staff.  So it's not really -- there are -- there
7    are costs under folks, not profits under folks
8    necessarily --

9    Q.   It's not related to the branches?

10    A.   It's not related to the branches, no.

11    Q.   Go back to the first page of the exhibit, Bates
12    No. 14667.  We talked about the e-mail from Mr. Larsen to
13    the executives, and then there's a response from Lucas
14    Curtolo at the top of the exhibit.  Do you see that?

15    A.   Yeah.

16    Q.   Lucas Curtolo, he's Mutual's senior vice
17    president of national operations; correct?

18    A.   Yes.

19    Q.   Mr. Curtolo responds to the CFO "Far from good."
20    Do you agree that the financial performance for June of '22
21    was "far from good"?

22    MS. WALTER:  Object to the form and that
23    Mr. Gennarelli is not included on this e-mail.

24    MS. KREITER:  I'm asking if he agrees with the
25    statement.

195

1    A.   I would disagree with that statement because it's
2    -- I knew the market at that time.  I mean, I knew what had
3    happened.  I mean, it's...

4    Q.   And then Mr. Curtolo talks about additional cuts.
5    He says then "90 percent of my focus the last 45 days has
6    been cutting all nonprofitable sales."  Do you see that?

7    A.   Yes.

8    Q.   Cutting nonprofitable sales, I think we talked
9    about this.  I mean, that's terminating people?

10    A.   It is.

11    Q.   How much expense did Mutual save as a result of
12    the branch departures?

13    A.   None.

14    Q.   Why do you say that?  You were paying commissions
15    on these loans.

16    A.   But then that result was profit.

17    Q.   What about other things, the lease?  I mean, you
18    said that the lease belonged to Mutual?

19    A.   Yes.

20    Q.   Okay.  And you saved on the rent payments.
21    There's no office there anymore; correct?

22    A.   But the volume offset that expense.

23    Q.   Okay.  So specifically, the expenses, though,
24    forget whether there's an offset.  I'm just looking at what
25    are the expenses that were saved.  So rent, commissions,

196

1    what else?

2    A.   I don't know.  I just can't function that way.
3    The net -- the -- the there was -- there was income to offset
4    those expenses, so I don't understand what you're saying,
5    like --

6    Q.   Are you able to articulate -- I get that.  I
7    mean, I kind of get net profit and how it works and the
8    revenue, and you take out the expenses.  But I'm just trying
9    to identify here's the revenue.  You're taking out the
10    expense to get to a profit number?

11    A.   Sure.

12    Q.   What is the number that constitutes the expense
13    bucket and what comprises that?

14    MS. WALTER:  Object to the form.

15    A.   Well, the expenses are comprised of rent,
16    payrolls, taxes, insurance.

17    Q.   Do you know how much expense bucket has been
18    saved as a result of these departures?

19    MS. WALTER:  Object to the form.

20    A.   Not enough to make up for loss in income, as you
21    can see.  But no, I don't know off the top of my head.  I
22    don't know.

23    Q.   Are there records that would disclose exactly how
24    much expense has been saved?

25    A.   I think the branch P&Ls would show that.

197

1    Q.   Okay.  Do you have any opinion as to whether
2  these branches now at Waterstone are likely to be profitable
3  or not profitable?
4        MS. WALTER:  Object to the form.
5    A.   Say this one more time.
6    Q.   Yeah.  I'm trying to get an understanding.  Do
7  you have a sense of whether these branches -- now the
8  employees are with Waterstone.  Do you have a sense of
9  whether those branches are likely to be profitable or not?
10       MS. WALTER:  Object to the form.
11   A.   My sense is that they would be profitable because
12  they always tend to run on a profit.  Just like St. Louis,
13  our branches here, our branches remain profitable.
14   Q.   We looked at Exhibit 12, which was the e-mail
15  between the executives and the CFO and the senior VP of
16  operations talking about how there wasn't profitability in
17  June of 2022?
18   A.   Correct.
19   Q.   And do you have an expectation if the branches
20  had stayed at Mutual in June of 2022, would those particular
21  branches be profitable?
22       MS. WALTER:  Object to the form.
23   A.   So the corporate -- just like we talked about
24  earlier, the corporate profit doesn't -- it doesn't
25  translate into the branch profitability.  There's expenses

198

1  on the corporate side.  Like, a big part of that June
2  expense was a write-down on the servicing values.  So, you
3  know, it is -- it is -- you don't know if -- you know, that
4  doesn't impact the branch performance or the branch's
5  ability to be profitable.
6    Q.   Sure.  I guess what I'm trying to understand --
7    A.   I can tell you for sure St. Louis, Seven Hills,
8  Maryland were profitable that month, so branches were
9  profitable.
10   Q.   But overall there's -- I mean, we talked about
11  overall in Exhibit -- sorry -- Exhibit 12 --
12   A.   Right.
13   Q.   -- this is corporate profitability?
14   A.   That's right.
15   Q.   And overall that was way down?
16   A.   Way down.
17   Q.   So do you have evidence to support the claim that
18  if these branches had stayed at Mutual, the corporate
19  profitability in Exhibit 12 would have been such that Mutual
20  would be profitable from a corporate perspective?
21       MS. WALTER:  Object.
22   A.   They would be more profitable, and I think we
23  showed it to a degree.  We would be more profitable.
24   Q.   More profitable, but still operating at a loss?
25   A.   I doubt it because we're at a couple -- there's

199

1  not a huge loss that month.
2    Q.   So we looked at this Exhibit 12 and looked at the
3  plan.  And for example, specific to forward, June pretax
4  earnings were down 439,000 versus a plan of 3.2 million?
5    A.   Right.
6    Q.   Is it Mutual's position that had these branches
7  stayed with Mutual, that delta would've been recovered and
8  Mutual would've been on track with its plan?
9    A.   I don't think we would've been on track with the
10  plan, but it certainly would've helped, yeah.  It takes
11  months to, you know, recover from branches losing and the
12  fixed costs at the corporate level.
13       THE WITNESS:  I do need a bio break, if that's
14  okay.
15       MS. KREITER:  Sure.  Let's take five minutes.
16       (A recess was taken.)
17   Q.   (By Ms. Kreiter)  We had talked about Exhibit 12,
18  which was the e-mail involving the June 2022 performance.
19  Was Bernie Mayle another recipient of that e-mail?
20       MS. WALTER:  Object to the form.
21   A.   I would think he is.  I -- I don't know.
22   Q.   You don't know?
23   A.   Yeah, I don't know.
24       (Exhibit No. 13 is marked for identification.)
25       MS. KREITER:  Remind me the number we're on.

200

1        THE COURT REPORTER:  13.
2    Q.   Take a look at Deposition Exhibit No. 13.
3        MS. WALTER:  Do you have another one?
4        MS. KREITER:  Sorry.
5        MS. WALTER:  Thank you.
6    Q.   And I'm going to start, again, just to go
7  sequentially, on page 14676, the earliest e-mail in the
8  exchange, it's an e-mail from Brian Tomalak dated July 21,
9  2022, to Bernie Mayle, Kiley King, Subject line:  Tampa.
10  Brian writes "Bernie, where did they end up as far as their
11  P&I in June?"  Is that P&L?
12   A.   I would -- yes.
13       MS. WALTER:  Object to the form.  Also, again,
14  Mr. Gennarelli isn't included on these e-mails.
15   Q.   Then the next e-mail up from Mr. Mayle dated
16  July 21, 2022, to Brian Tomalak says "A loss,
17  unfortunately."  Do you see that?
18   A.   Yes.
19   Q.   Did you have discussions with Mr. Mayle when you
20  were creating the damages analysis about the fact that the
21  Tampa branch had been operating at a loss in June of 2022?
22   A.   Well, in June of 2020, they stopped putting loans
23  in because of their planned departure, so it would not be
24  that relevant.  Also, again, this is referring to a branch
25  P&L, not a -- not how it relates to the corporate bottom

201

1  line like we talked about.

2      Q.  Okay.  Did you have any -- sorry.  Let me ask you

3  this question:  Do you know whether the Tampa branch was at

4  a loss with respect to its P&L in May of '22?

5      A.  I don't know off the top of my head.  I would --

6  it's likely that at the branch level it was at a loss.  It's

7  likely.

8      Q.  Okay.  Do you know for what period of time -- I

9  mean, June is at a loss.  It's likely May was at a loss.

10  Are you able to say going back how far you think that Tampa

11  would've been operating at a loss for purposes of its P&L?

12      MS. WALTER:  Object to the form.

13      A.  Well, I think we're fascinated with the branch

14  P&L, and it's not that relevant to the corporate earnings.

15  It's relevant but not that relevant.

16      Q.  Sure.  But my question was just about the timing

17  and the branch P&L.  We can dispute whether it's relevant or

18  not.  I may think it is.  You may dispute that, but I'm just

19  trying to get the facts.  So we know that in June, not

20  profitable.  In May, you said it's likely --

21      A.  I said I don't know.  I don't know.  You said,

22  "Would you be surprised?"  I think is what you said,

23  whatever.  I don't know.

24      Q.  Do you know either way -- for example, February,

25  March, April, do you have any knowledge as to the

202

1  profitability on the branch level for Tampa?

2      A.  Not off the top of my head.

3      Q.  Okay.  Then just to complete the exhibit, the

4  first page says "What's the running total at?"  Mr. Mayle

5  says "Gross loss is running at 33,000."  Is that at the

6  branch level or corporate level --

7      MS. WALTER:  Object to the form.

8      Q.  -- as it relates to Tampa?

9      A.  I would suspect branch level because he wouldn't

10  talk corporate to -- with Brian.

11      Q.  Okay.

12      MS. KREITER:  Have this next exhibit marked

13  Exhibit 14, please.

14      (Exhibit No. 14 is marked for identification.)

15      Q.  Take a look at Exhibit 14.  What is this

16  document?

17      A.  It looks like a budget.

18      Q.  Budget at the branch level or corporate level?

19      A.  It looks like corporate level.

20      Q.  Have you seen this document before?

21      A.  It does not look familiar to me, but I may have.

22      Q.  Are there other documents that you are familiar

23  with that reflect budgeting and projections on the corporate

24  level for Mutual besides this Exhibit 14?

25      A.  Not -- not really.  I think it's just -- I think

203

1  the printing in color is throwing me off, but I'm sure this

2  is what I've seen.

3      Q.  Do you know, is this something that gets updated

4  from time to time by Mutual?

5      A.  I don't know how often it gets updated.  I would

6  imagine, you know, obviously yearly.

7      Q.  I want to talk to you about the damages and

8  certainty.  One, I want you to picture in your mind one end

9  of a spectrum that's speculation and then one end of the

10  spectrum that is absolute a hundred percent certain.  Given

11  the considerations and the assumptions that you built into

12  your damage model, Exhibit 7, where does your damages fall

13  in that spectrum?

14      MS. WALTER:  Object to the form.

15      A.  Ask the question again, one more time.

16      Q.  Sure.  Speculation on one end --

17      A.  Yeah.

18      Q.  -- absolute certainty on the other end, can you

19  say to -- can you say that the damages that you've presented

20  are, for example, to a reasonable degree of certainty?

21      MS. WALTER:  Object to the form.

22      A.  I would say that they're reasonable and possibly

23  on the low side.

24      Q.  Is there an element of speculation associated

25  with the damage calculation, for example, the 18 months?

204

1      MS. WALTER:  Object to the form.

2      A.  I would say that there is an educated assumption

3  made there.

4      Q.  Okay.  Mutual also assumes that all of the

5  employees left due to wrongful contract -- wrongful conduct

6  in that none of the employees left due to natural attrition

7  or other reasons.  Is that based on evidence or speculation?

8      MS. WALTER:  Object to the form.

9      A.  I think there's enough evidence to say that

10  that's an accurate statement.

11      Q.  You assumed for purposes of your damages model

12  that the profitability over the 18 months going from

13  July '22 forward would be consistent with the calculation

14  based on the retrospective data that included a market

15  anomaly.  Is that speculation or reasonably certain?

16      MS. WALTER:  Object to the form.

17      A.  Okay.  But let me answer it this way:  Another

18  anomaly occurred, and we partnered with the largest real

19  estate company in the world.  So how does that figure into

20  it?  We didn't figure that into our assumptions.

21      If you figured that into the assumptions, those

22  numbers would probably be bigger.  They would've taken

23  advantage of that.  They were retail purchase-driven folks.

24  So there's speculation, I guess, on both sides of it, but

25  one came true.  Keller came through.  They would've

205

1  benefited and helped us tremendously in this endeavor.
2      Q.   Okay.  Topic 4 of the deposition notice asks you
3  to be prepared to testify as to the annual loan volume and
4  revenue generated by each of the managers, Mr. Hutto,
5  Mr. Wolf, and Mr. Chris, for 2019, 2020, 2021, and 2022
6  until they resigned.  Starting with Dwayne Hutto, what was
7  his annual loan volume for each of 2019, '20, '21, and '22?
8          MS. WALTER:  Object to the form.
9          MS. KREITER:  What's the objection?
10         MS. WALTER:  Do you want to show him a document?
11         MS. KREITER:  He's the corporate rep.
12         MS. WALTER:  To memorize all of these damages and
13  sit here and testify to them?
14         MS. KREITER:  I want him to look up the
15  information responsive to the topic and be ready to
16  tell me what the answer is.
17         MS. WALTER:  And provide those to a degree of
18  specificity as he sits here and memorizes certain
19  numbers?
20         MS. KREITER:  Or he can bring a document.
21         MS. WALTER:  Or you can show him a document.
22         MS. KREITER:  I don't have it.  I can't find it
23  in the 800 documents that you've been -- designated
24  rather than stating an answer, so I'm asking him at a
25  deposition.

REGENCY REPORTING SERVICE, INC. (813)224-0224

206

1      Q.   What was the annual loan volume for Dwayne Hutto
2  in 2019?
3      A.   I'm not sure off the top of my head.
4      Q.   What was the annual loan volume for Dwayne Hutto
5  in 2020, '21, and '22 until he resigned?
6      A.   I'm not certain.  We do know the branch volumes.
7  That's what we focused on, I think.
8      Q.   Okay.  This is another one where I've asked what
9  are the documents that you can get this information from --
10         MS. WALTER:  You requested that in a discovery
11  request, and we provided responses.  Those were the
12  documents that we have that identify their loan volume.
13         MS. KREITER:  Okay.  So again, let's look at one
14  that you identified as going to be revealing of the
15  information that --
16         MS. WALTER:  Again, Maria, we don't have to
17  create a document in response to your discovery request.
18         MS. KREITER:  I'm going to find out if what you
19  designated has anything to do with this or it's just a
20  big mess that you decided to put in your discovery
21  responses.  So let's start with that activity.
22      Q.   Turn to Deposition Exhibit 9, please.
23      A.   Okay.
24      Q.   This is one of the documents that Mutual
25  identified as one that should reveal the annual loan volume

REGENCY REPORTING SERVICE, INC. (813)224-0224

207

1  and revenue generated by Dwayne Hutto, Chris Wolf, and Chris
2  Smith.
3          MS. WALTER:  Can I have that Bates number,
4  please?
5          MS. KREITER:  It's Exhibit 9, 1094 -- sorry --
6  10942.
7      Q.   Does this --
8          MS. WALTER:  Do these spreadsheets also include
9  the information that's in the tabs that are on the
10  actual Excel spreadsheets?
11         MS. KREITER:  Yeah.
12      Q.   So, Mr. Gennarelli, looking at that document,
13  Deposition Exhibit 9, which has been designated as one
14  that's going to reveal annual loan volume for Mr. Hutto,
15  Mr. Wolf, and Mr. Smith, does it reveal annual loan volume
16  for those individuals?
17         MS. WALTER:  I'm just going to say that this
18  question is a mischaracterization.  That's for one
19  month.  That's not annual.
20         MS. KREITER:  I don't think it has anything to do
21  with any particular person.
22         MS. WALTER:  You can add up the numbers to get
23  the annual loan volume.
24         MS. KREITER:  The witness can explain it, then.
25      A.   Yeah, I don't see where it would show -- you see

REGENCY REPORTING SERVICE, INC. (813)224-0224

208

1  his compensation, but you don't see loan volume.
2      Q.   So I just need to make a record of this.  So
3  Deposition Topic No. 4 reads as follows -- and I'm at
4  Exhibit 1 -- Exhibit A of Exhibit 1, deposition notice --
5  "The annual loan volume and revenue generated by Dwayne
6  Hutto, Chris Wolf, and Chris Smith for 2019, 2020, 2021, and
7  2022 until the time of their departure from Mutual in 2022."
8  What did you do to prepare to testify as to this deposition
9  topic?
10      A.   Well, Chris Smith didn't originate loans --
11  right? -- and neither did --
12      Q.   My question was what did you do to prepare for
13  Topic 4?
14      A.   I'm not sure any of the three originated loans.
15  Dwayne may have, but he -- he may not have, so...
16      Q.   My question was not factually did they originate
17  loans.  What did you do to prepare for Topic No. 4?  If the
18  answer is nothing because you believe they didn't originate
19  it, I need to have that on the record.  If you did
20  something, I need to have whatever it is put on the record.
21      A.   Yeah, I didn't do anything.
22      Q.   And are you able to tell me with respect to any
23  of those years and any of the persons identified in Topic
24  No. 4 what the annual loan volume was and what the revenue
25  generated was?

REGENCY REPORTING SERVICE, INC. (813)224-0224

209

1    MS. WALTER:  Object to the form.
2    A.   No.
3    Q.   What documents would you look to in order to
4  discern the loan volume for each of the managers for the
5  years designated?
6    A.   I would use the data in Encompass.
7    Q.   We talked about before how you have data in a
8  system, but you can print out that data.  Is the data that
9  we're talking about with respect to the annual loan volume
10  data such that you can print out a report?
11    MS. WALTER:  Object to the form.
12    A.   Yes.
13    Q.   Are you willing to have those reports printed
14  right now so that we can talk about them at the deposition
15  today?
16    MS. WALTER:  Object to the form.  I'm not
17    allowing that, Maria.
18    MS. KREITER:  That's what I want on the record.
19    MS. WALTER:  Okay.  That's fine.
20    Q.   Would it be possible for you to make a call and
21  have somebody e-mail those documents over?
22    MS. WALTER:  We're not doing that.  I'm -- we're
23    not doing that.
24    MS. KREITER:  That's what I want on the record.
25    It would take ten minutes.  We can move this along.

REGENCY REPORTING SERVICE, INC. (813)224-0224

210

1  But if you're refusing --
2    MS. WALTER:  Refusing.  Move on.
3    MS. KREITER:  -- I'll bring it to the Court's
4    attention.
5    MS. WALTER:  Move on.
6    Q.   How does Mutual calculate loan volume generated
7  for each of the individuals?  Is it just some designation in
8  Mutual's systems that this particular person originated the
9  loan, or is there a sharing of credit?
10    MS. WALTER:  Object to the form.
11    A.   When you say "sharing of credit," what do you
12  mean by that?
13    Q.   Right.  So we talked earlier how there could be a
14  scenario where Dwayne Hutto brings in a loan because of his
15  relationships, but he doesn't actually bring it to closing.
16  He maybe gives it to a downstream employee.
17    So in that situation when you're looking at
18  Dwayne Hutto's loan volume or the revenue generated
19  associated with Dwayne Hutto, I'm trying understand, you
20  know, would those loans that maybe he passes along to a
21  downstream employee be included in his numbers?
22    A.   Probably not.  They would've been included in the
23  branch numbers, of course, but not his personal numbers.
24  It's the NMLS license number that dictates, I think,
25  where --

REGENCY REPORTING SERVICE, INC. (813)224-0224

211

1    Q.   Okay.  There's no -- for example, a law firm,
2  sometimes there can be sharing of billing credit with
3  respect to a client.  Is there any sharing of credit with
4  respect to loan origination?
5    A.   I don't believe so.
6    Q.   Okay.  Topic No. 5 was "The loans Mutual contends
7  the departed employees under Waterstone closed with
8  Waterstone for which Mutual seeks recourse, including the
9  borrowers associated with the loans, the loan amount, the
10  factual basis for Mutual's claims based on the loans, and
11  the associated damages."
12    I think we talked about this earlier.  Is there
13  anything that you have to add?  Earlier I had asked you are
14  you able to tell me what loans transferred.  Are you able to
15  tell me borrowers?  Do you have that information?
16    MS. WALTER:  Object to the form.
17    A.   I don't have that information.  I was told I
18  couldn't bring notes or anything to the deposition, so I was
19  -- I was expecting you to show me or -- and then I would
20  explain it.  But no, the question is no.
21    Q.   So you were -- did you have documents that you
22  wanted to bring for your testimony?
23    A.   Notes.
24    MS. WALTER:  Object to the form.
25    A.   Notes more than --

REGENCY REPORTING SERVICE, INC. (813)224-0224

212

1    Q.   What types of notes?
2    A.   I don't know.  General notes.
3    Q.   Were you taking and creating notes as you were
4  preparing?  You said you spent ten hours preparing.  Did you
5  take notes while --
6    A.   I didn't take notes because I didn't -- wasn't
7  allowed to bring it in anyway, so...
8    Q.   In addition to taking notes -- do you think
9  taking notes would've aided your testimony?
10    MS. WALTER:  Object to the form.
11    A.   I don't know.
12    Q.   Do you think that bringing in documents that have
13  data responsive to some of these topics would've aided your
14  ability to testify today?
15    MS. WALTER:  Object to the form.
16    A.   Possibly.  I would've been able to tell you the
17  name of the underwriting manager and those other managers
18  that interfered in our business, but...
19    Q.   What about with respect to the damages that we've
20  been talking about?
21    A.   I think we have them on our No. 9.  I think that
22  was the data we were going to talk through.
23    Q.   Did you ask to bring certain documents to the
24  deposition --
25    A.   No.

REGENCY REPORTING SERVICE, INC. (813)224-0224

213

1    Q.   -- today?
2         MS. WALTER:  Object to the form.
3    Q.   Again, I think we covered this in your earlier
4    testimony.  But just so that I'm clear with respect to the
5    deposition topics, one of the topics, 6(a), was "All loans
6    originated by the departed employees while still employed by
7    Mutual of Omaha at the Daytona branch, which closed with
8    Mutual of Omaha on or after April 15, 2022."  Do you
9    understand the topic?
10   A.   Yes.
11   Q.   What did you do to prepare for your testimony as
12   to that topic?
13        MS. WALTER:  Object to the form.
14   A.   I believe you have the P&L that breaks down those
15   loans that closed at that time.  The actual individual loans
16   are in the P&L.  Like, in this P&L example, the individual
17   loans are in there.
18   Q.   Okay.  So these are loans --
19   A.   They're just not associated with an individual
20   loan officer.
21   Q.   Okay.  So the topic asks specifically, though,
22   for loans originated by the departed employees while still
23   employed by Mutual, so loans originated.  Is it correct to
24   say the loan is in the pipeline in some fashion?
25   A.   Yeah, I think that's right.
     REGENCY REPORTING SERVICE, INC. (813)224-0224

214

1    Q.   So this asks about which of the loans that were
2    originated by the employees while they were still working at
3    the Daytona branch, which actually closed with Mutual of
4    Omaha after April 15th?
5    A.   So that would be on the April or May P&L that I
6    believe you have.
7    Q.   Well, the Daytona branch closes in April, so did
8    those loans get closed by another branch?
9    A.   No.  It would've been that branch.
10   Q.   So is there a P&L for -- if there's a loan in the
11   pipeline and the Daytona branch closes --
12   A.   Yes.
13   Q.   -- but the loan is closed at Mutual of Omaha,
14   where would that get recorded?  The Daytona branch
15   originated the loan --
16   A.   Yeah, their P&Ls continue.
17   Q.   After the branch closes?
18   A.   After, just to make sure items like that are
19   accounted for properly.
20   Q.   Okay.  So you do have P&L statements for the
21   Daytona branch, for example, for the May period, June,
22   July --
23   A.   Yeah, I don't know how far after.  I think once
24   the pipeline is gone, I would imagine they stop preparing
25   them.  But generally speaking, it's a period of time.
     REGENCY REPORTING SERVICE, INC. (813)224-0224

215

1    Q.   Okay.  So we could request P&Ls for the Daytona
2    branch after its closure, and that would reveal all of the
3    pipeline loans that were closed?
4    A.   Yes.
5         MS. WALTER:  Object to the form.
6    Q.   What if the loan, you know, is transferred from
7    the Daytona branch over to the Tampa branch and somebody in
8    Tampa is then the person boots on the ground closing the
9    loan?  Would that loan be recorded for Tampa or Daytona?
10   A.   I'm not sure of the logistics there.
11   Q.   Okay.  So the topic is asking you to testify
12   today about the loans originated by the employees while
13   still at Daytona that actually closed with Mutual.  Do you
14   -- are you able to tell me how many loans in the pipeline
15   from Daytona closed with Mutual?
16   A.   Yeah, I mean, right at this second without
17   looking at anything, no, but I could -- we could get you
18   that information, for sure.
19   Q.   Did you look at the P&Ls in advance of today that
20   you're talking about that would allow you to testify about
21   this topic?
22   A.   That specific as far as loans closing then and in
23   the pipeline, I don't -- I don't believe I specifically
24   looked at that.
25   Q.   Okay.  Topic 6(b), it's a two-part same topic but
     REGENCY REPORTING SERVICE, INC. (813)224-0224

216

1    applicable to the Tampa branch.  Did you do anything to
2    prepare for your deposition such that you would be in a
3    position to testify about all of the loans originated by the
4    departed employees at the Tampa branch and the Paramus
5    branch which closed with Mutual after June 15, 2022?  What
6    did you do to prepare for that topic?
7    A.   I mean, it's in the branch P&Ls.
8    Q.   Okay.  It might exist in the P&Ls.  Did you
9    analyze those in preparation for your testimony specific to
10   this topic?
11   A.   What would you like me to tell you about those
12   loans?
13   Q.   I would like you to tell me which loans closed.
14        MS. WALTER:  Object to the form.
15   A.   You want me to memorize the loan numbers --
16   Q.   Or bring a record or tell me it's --
17   A.   It's not my rules --
18        MS. WALTER:  Don't argue with the witness,
19   please.
20   A.   I was told I can't bring a record, so...
21   Q.   Okay.  I can't help the advice that you were
22   given there, but a corporate rep dep, I mean, it sounds like
23   there are records that would've allowed you to testify, but
24   you were told that you couldn't bring those to the
25   deposition.
     REGENCY REPORTING SERVICE, INC. (813)224-0224

217

1    MS. WALTER:  Is there a question?
2    Q.  Is that accurate?
3    A.  I was told that I can't --
4    MS. WALTER:  Object to the extent he's going to
5  disclose any sort of attorney-client privilege.
6    A.  That's a good point, yeah.
7    Q.  Are you willing to get documents that would allow
8  you to give me more information about these loans right now?
9    MS. WALTER:  Object to the form.
10    Q.  It's a request.  Are you willing to get the
11  documents that are going to disclose this information?  We
12  talked about other categories where you said they're
13  accessible, but your counsel says you can't get them.  Is
14  this in that category, or are you willing to go spend five
15  minutes, get the documents that would give me the
16  information I need?
17    MS. WALTER:  The answer is no.
18    MS. KREITER:  And that would be with respect to
19  Topic 6(a) and 6(b); correct?
20    MS. WALTER:  Yes.
21    Q.  I'm going to talk to you now about the
22  allegations in the case that Waterstone has misappropriated
23  trade secrets of Mutual of Omaha.  Did you prepare to
24  testify about the trade secret aspects of the case in
25  preparation for this deposition?
REGENCY REPORTING SERVICE, INC. (813)224-0224

218

1    A.  Yes.
2    Q.  What did you do to prepare?
3    A.  Reviewed e-mails of customer data being sent and
4  e-mails on loan specific issues that was -- that were sent.
5    Q.  Can you recall any specifics about the e-mails?
6    A.  Well, there were e-mails that had all of our
7  policies and procedures that were sent.  There were e-mails
8  that were customer specific far along the process of a loan
9  that was sent -- that were sent.  There was numerous -- many
10  e-mails with what I would consider our information that was
11  sent to various places.
12    Q.  What is your understanding of a trade secret?
13    A.  Well, a trade secret is -- can be customer
14  information, especially the way the customer information is
15  formatted.  It can be the way we -- our policies and
16  procedures, things along those lines.  I think the most
17  valuable thing is a customer.
18    Q.  Are you aware of the volume of trade secrets that
19  Mutual has identified in this case?
20    A.  I know there was quite a bit, but I don't know
21  the exact --
22    Q.  Are you able to tell me anything more about the
23  categories of information that Mutual contends are its trade
24  secrets beyond what you have already said?
25    A.  Not off the top of my head, no.
REGENCY REPORTING SERVICE, INC. (813)224-0224

219

1    Q.  There's been a number of documents that have been
2  identified as Mutual trade secrets that I want to talk to
3  you about and see if you agree that they are trade secrets
4  or not.
5    (Exhibit No. 15 is marked for identification.)
6    MS. WALTER:  Maria, I also want to get on the
7  record that we produced P&Ls through February of 2023,
8  so you have those in your possession.  In addition --
9    MS. KREITER:  For which branch?
10    MS. WALTER:  For all of them.  And in addition,
11  the profit and loss statements, if you look at the YSP
12  Accrual tab, it shows the amount of loans funded per
13  person for that particular month.
14    MS. KREITER:  What is the Bates number?
15    MS. WALTER:  Well, that's true of all of them.
16    MS. KREITER:  What is the Bates number so I have
17  it?
18    MS. WALTER:  I believe it's the one you had
19  designated.  It is 10942.  I'm not entirely sure
20  because I didn't look this closely.
21    MS. KREITER:  So what are you saying is contained
22  on here?
23    MS. WALTER:  Well, I'm telling you what's not
24  contained on here is some of the tabs that are within
25  the spreadsheets.  I'm not seeing that tab for this
REGENCY REPORTING SERVICE, INC. (813)224-0224

220

1  particular spreadsheet when I opened it up in native.
2    MS. KREITER:  What is the tab that you contend is
3  missing?
4    MS. WALTER:  YSP Accrual.  They're missing
5  columns is the problem.  So if you look at page 9, ends
6  at loan program.
7    MS. KREITER:  Let me just get there.
8    A.  It's this document.
9    Q.  I think I've got it here.
10    MS. KREITER:  10942?
11    MS. WALTER:  Right.  So it is included, but
12  that's the information that you're looking for.
13    MS. KREITER:  Okay.  But -- so are you -- I mean,
14  you're now counsel.  Are you saying the -- I want it
15  from the witness.
16    Q.  So we've been looking at Exhibit 9, if you can
17  turn to Exhibit 9.
18    A.  It's not here is her point.  It's on the system
19  because the columns are cut off here.
20    MS. WALTER:  The columns are included.
21    MS. KREITER:  I think I see them on the sheet.
22  Are you saying there's something else that's not --
23    MS. WALTER:  No.  I'm saying I misspoke
24  originally.  It is included on here, but this is the
25  information that you're threatening to file a motion
REGENCY REPORTING SERVICE, INC. (813)224-0224

221

1  against me for.
2      MS. KREITER:  The witness hasn't told me any of
3  that.  I mean, you're telling me that.  I'm happy to
4  get it through the witness.  If you'll give it to me,
5  fine, but I haven't heard it from the witness yet.
6      So counsel is looking at Deposition Exhibit 9.
7  Counsel has indicated the YSP Accrual tab.
8  Q.  What is YSP?  Do you know?
9  A.  Yield spread premium.
10  Q.  Yield spread premium?
11  A.  Yes.
12  Q.  Okay.  I think it's about nine pages in.
13      MS. KREITER:  Courtney, you think this tab is
14  illuminating as to what topic?
15      MS. WALTER:  Number 4.
16      MS. KREITER:  Okay.  Topic 4 is annual loan
17  volume and revenue generated by Dwayne Hutto, Chris
18  Wolf, and Chris Smith.
19      MS. WALTER:  I don't want to get into a
20  back-and-forth, Maria.  So I wanted to get on the
21  record that the information that you're threatening to
22  file a motion against me --
23      MS. KREITER:  I want to get the information.  I
24  tried to get it in discovery.  I'm trying to get it
25  from the witness.  The witness said I could get a

REGENCY REPORTING SERVICE, INC. (813)224-0224

222

1  report and solve this, and you said no.  So I'm -- now
2  you're saying it's in a document.  If I can get the
3  witness to help me out --
4      MS. WALTER:  This is also relevant to 6(a) and
5  (b).
6      MS. KREITER:  Okay.  But I need to hear it not
7  from you, Courtney.  You're the attorney.  You're not
8  the witness being deposed.  You're not the corporate
9  rep.  You're an attorney in the case.  I'd appreciate
10  if you can point the witness, who needs to give the
11  testimony, that's great.  If you can't, we have an
12  issue.
13  A.  I don't know what -- is it not in this group of
14  documents?  Is this different?
15  Q.  (By Ms. Kreiter)  If you don't mind, let me point
16  you to the case that counsel has identified.  Okay.  For
17  identification purposes in the record, we're looking at
18  Deposition Exhibit 9 and we're about eight or nine pages
19  into the exhibit.  At the top left-hand corner, it says
20  "Borrower Loan Number" and then it starts with 17280004366,
21  Borrower Name:  Marrero.  Do you see that?
22      I just want to make sure that we're aligned here
23  and looking at the right page of the exhibit.  There's no
24  Bates numbers per page because this is an Excel
25  document.  At the bottom of the page, it says "Total Funded

REGENCY REPORTING SERVICE, INC. (813)224-0224

223

1  Loans:  14.  2,569,833."  Do you see that on the page you
2  were reviewing?
3  A.  Yes.
4  Q.  Okay.  So your counsel indicated that this page
5  of Exhibit 9 is illuminating as to Deposition Topic 4, which
6  sought the annual loan volume and revenue generated by
7  Dwayne Hutto, Chris Wolf, and Chris Smith for 2019, 2020,
8  2021, and 2022.  Is there information on this page of the
9  exhibit that allows you to testify as to that topic?
10      MS. WALTER:  Object to the form.  That is a
11  mischaracterization of what I said.  I said all of the
12  P&Ls contain that information and can assist you in
13  determining the annual loan volume and revenue
14  generated by these individuals in addition to 6(a) and
15  (b).  My --
16      MS. KREITER:  I want to hear from the witness.
17      MS. WALTER:  -- objection was directly in
18  response to you suggesting that we hadn't produced any
19  responsive documents and that the witness somehow
20  needed to memorize all these numbers for purposes of
21  this deposition.
22      MS. KREITER:  He has to come here and be able to
23  testify.  However he gets it done, that's up to you and
24  your witness, but he's not able to do it at the
25  deposition today.  If this document aids him, I want to

REGENCY REPORTING SERVICE, INC. (813)224-0224

224

1  know about that.
2  Q.  Does this document allow you to testify about the
3  annual loan volume and revenue for the three managers in the
4  years designated in Topic 4?
5  A.  This document would help me tell you that number
6  for January of 2019, but you have to look at subsequent ones
7  after to see.
8  Q.  Okay.  So from a methodology standpoint, you
9  would find this same P&L statement?
10  A.  That's right.
11  Q.  Okay.  And what would you look at on the page
12  that we've been reviewing?  What are you adding up here?
13  A.  So you have -- like, if you just want to start at
14  the Total Funded Loans because you don't want to look at the
15  accrual, it's all inclusive down here.  So you look at the
16  loan number, the borrower's name --
17  Q.  Can you say for the record?  I see you're
18  pointing, but we don't have a record of that.  So help me
19  out.  This is a question specific to Dwayne Hutto.  How do I
20  determine anything about annual loan volume associated --
21  A.  This is for Tampa, so Dwayne wouldn't be on it.
22  This would be Chris Smith.
23  Q.  Chris Smith.  How do I determine any information
24  about annual loan volume and revenue generated by Chris
25  Smith from this document?

REGENCY REPORTING SERVICE, INC. (813)224-0224

225

1    A.   So you would go to the Loan Officer column,
2    search down by Chris Smith.
3    Q.   Okay.
4    A.   Christopher Smith funded one loan, it looks like,
5    Loan 1728004368 for borrower Cossio, funded on 1/30/19 for
6    $299,653,000.
7    Q.   Okay.  So you would go through all of the P&L
8    statements, look at this YSP tab, and then find either
9    Mr. Smith, Mr. Hutto, or Mr. Wolf, add up all of the -- I
10   guess what would it be?  YSP Accrual, is that analogous to
11   revenue or not?
12   A.   YSP is revenue.
13   Q.   Okay.  And is your testimony that all of the P&Ls
14   have a YSP Accrual tab and that's the methodology that you
15   would use to calculate these numbers?
16        MS. WALTER:  Object to the form.
17   A.   Yes.
18   Q.   Is there another report that you could generate
19   on a person-by-person basis rather than looking through --
20        MS. WALTER:  Object to the form.
21   Q.   -- all of the P&L statements?
22   A.   Yes.
23   Q.   What is that?
24   A.   Well, like we said before, it's the Encompass
25   report.  There's a B&I report.  There's all different --

226

1    Q.   Reports that can be run?
2    A.   Yeah.
3         MS. WALTER:  Object to the form.
4    A.   But this is, you know, the accounting behind it.
5    Then you can look at the transactions listing,
6    cross-reference that loan with the actual YSP and the dollar
7    amount associated with it.
8    Q.   Sure.  Let me ask it this way:  So does -- P&L,
9    that's the raw data.  But then there's a report that you can
10   run that rather than going through all the raw data,
11   compiles the raw data, and there's a report that could be
12   generated that has the responsive information?
13        MS. WALTER:  Object to the form.
14   A.   Yes.
15   Q.   Is this sheet of Exhibit 9 that we've been
16   looking at, does that allow you to discern any information
17   relevant to Topics 6(a) and 6(b) that we are talking about?
18   I don't know if you remember which those are.  You can refer
19   back to -- do you have them in mind?
20   A.   No.
21   Q.   Okay.  So 6(a) is "All loans originated by the
22   departed employees while still employed by Mutual of Omaha
23   or the Ormond Beach branch and then closed with Mutual."
24   And then 6(b) was the same but with respect to the Tampa or
25   Paramus branches.  Is this page of Exhibit 9 illuminating as

227

1    to that?
2    A.   Yes.
3    Q.   In what way?
4    A.   It's the ones that closed.
5    Q.   I thought you had indicated that you were
6    uncertain about whether those loans would be booked under
7    the -- for example, for the Daytona branch, the loans that
8    were in the pipeline and closed by, say, the Tampa branch.
9    A.   Well, that's not what you just said.  You just
10   asked me what -- that's not what 6(a) and 6(b) said.  6(a)
11   and 6(b) simply said identify the loans of those three
12   managers, which we can do.
13   Q.   No.  It's the loan that closed after the
14   branches --
15   A.   Oh, we certainly can see -- we can compare the
16   two branches and certainly see them.  What loans closed, the
17   loan officer's name will be there.
18   Q.   Is it -- are you certain or uncertain that the
19   loans that were closed, say, in the pipeline for Daytona
20   would show on the Daytona P&L or on the Tampa P&L?
21   A.   I -- I would be fairly certain that they would
22   close under the Daytona branch P&L, but I'm not a hundred
23   percent.
24   Q.   Okay.  We have been talking before, revisiting
25   this topic of the loans and the different reports that are

228

1    available to Mutual.  We have been talking about the trade
2    secret claims, and I want to get back to that --
3    A.   Sure.
4    Q.   -- topic.  Just get organized for a minute
5    here.  Take a look at Deposition Exhibit 15.  This exhibit
6    is a compilation of different documents that Mutual has
7    identified as its trade secrets in this case.  I want to
8    start with the first document in the compilation.  It's
9    Bates No. 106.  It goes all the way through 182.  It's
10   Consumer Financial Protection Bureau October 2018 report
11   that's titled Glossary of English-Spanish Financial Terms.
12   Do you see that?
13   A.   I do.
14   Q.   This isn't a document that was created by Mutual,
15   was it?
16   A.   It does not appear to be.
17   Q.   Is Mutual in any sense the owner of this CFPB
18   Glossary?
19   A.   Not -- not to my knowledge, no.
20   Q.   Are you aware of whether this document is
21   publicly available?
22   A.   I assume it's publicly available.
23   Q.   Is this document one that Mutual takes measures
24   to keep secret?
25   A.   No.

229

1    Q.   Do all lenders have access to this CFPB
2   publication?
3    A.   Probably.
4    Q.   If you open it up, it consists largely of English
5   words and the Spanish translation.  Do you see that?
6    A.   I do.
7    Q.   You could look up English words and Spanish words
8   on the Internet and get them translated; correct?
9    A.   Yes, yes.
10    Q.   Do you maintain on behalf of Mutual that this
11   document is a trade secret of Mutual of Omaha?
12    A.   No.
13    Q.   Do you know why this document was designated as a
14   Mutual trade secret?
15      MS. WALTER:  Object to the form.
16    A.   I don't know why other than I could imagine this
17   "Confidential" on the front page probably triggered some IT
18   system.
19    Q.   Well, I'll just state for the record the document
20   is labeled Confidential --
21    A.   Oh, you --
22    Q.   -- with the Bates numbering in this case.  Mutual
23   designated it confidential under the protective order.
24   Opposing counsel can correct me if I'm wrong, but that
25   confidential designation was adhered as part of the

230

1   litigation.  Do you know why this document would've been
2   designated by Mutual as a trade secret?
3      MS. WALTER:  Object to the form.
4    A.   No.
5    Q.   Let's go to the next document in the compilation.
6   There's a blue sheet that kind of separates the documents.
7   I think you went a little too far.  Bates No. 209, yep,
8   you're right there.
9    A.   Okay.
10    Q.   So this document is titled at the top -- there's
11   a heading for Factual Data.  Factual Data is a third party
12   that provides consumer credit verification services to
13   lenders.  Are you aware of that?
14    A.   I am.
15    Q.   Is this document in any sense authored by Mutual
16   or owned by Mutual?
17    A.   No.
18    Q.   Does this document have economic value because
19   it's not generally known?
20    A.   I don't believe so.
21    Q.   Does Mutual make efforts to keep this particular
22   document secret in any sense?
23    A.   No.
24    Q.   Is there any language that you can point to on
25   this document that you consider to be trade secret?

231

1    Q.   In fact, this is -- it's written as if this is a
2   document that is given to a borrower.  Do you agree with
3   that?
4    A.   It appears that way.
5    Q.   Do you maintain on behalf of Mutual that this is
6   a trade secret?
7    A.   No.
8    Q.   Do you have any information as to why Mutual
9   designated this document as one of its trade secrets?
10    A.   I don't.
11    Q.   Take a look at the other documents in this
12   compilation.  I'll try to short-circuit it a bit.  The next
13   document in the compilation is Bates numbered MOM-397.  It's
14   a document published by the Department of Defense labeled
15   Fact Sheet.  Do you contend that this is a Mutual of Omaha
16   trade secret?
17    A.   I don't know what this is really, to be honest.
18   I just don't know what it is.
19    Q.   Is it something that's created by Mutual of
20   Omaha?  This is Department of Defense Fact Sheet.
21    A.   It does not appear to be.
22    Q.   What testimony can you provide that would explain
23   how this Document Bates No. 397 is a Mutual of Omaha trade
24   secret?

232

1      MS. WALTER:  Object to the form.
2    A.   None.
3    Q.   You agree it's not a trade secret of Mutual of
4   Omaha?
5    A.   It appears not to be, no.
6    Q.   Let's go to the next one, MOM-448.  Terms and
7   Conditions is the title of the document.  It reads "The
8   account owner named in the account application must read and
9   agree to the terms of the Fidelity Brokerage Retirement
10   Account Customer Agreement," and then it goes on.  To me, it
11   appears that this is a document of Fidelity, not of Mutual.
12   Is this a Mutual of Omaha trade secret?
13    A.   No.  Was this part of another customer
14   information thing or something?  I don't know.  It seems
15   odd.
16    Q.   Did you -- how much time did you spend reviewing
17   the volumes of documents that Mutual has identified as its
18   trade secrets?
19    A.   I really only focused on the customer
20   information, things like that, yeah.
21    Q.   So there's a lot of documents that have been
22   designated as Mutual trade secrets.  It sounds like we're
23   abandoning the claim with respect to the documents that
24   we've talked about so far in Exhibit 15.  And just for
25   completeness, there's one more document in Exhibit 15, the

233

1  last page, BBMC Mortgage, "Need a 2nd Opinion?" Bates number
2  MOM-1205.  Do you see that?
3      A.   Yes.
4      Q.   Is this a Mutual of Omaha trade secret?
5      A.   Well, Mutual of Omaha purchased the -- the assets
6  of BBMC.  This is marketing material created by BBMC, so I
7  don't know.
8      Q.   Sure.  It's marketing material, meaning it's
9  given out to members of the public; correct?
10     A.   Yes.
11     Q.   And is it your position that marketing material
12  widely distributed to members of the public are trade
13  secrets?
14     A.   No.
15     Q.   So is there any document within Deposition
16  Exhibit 15 for which Mutual is not abandoning its position
17  that the documents are trade secrets?
18     A.   No.
19     Q.   I want to go back to the time and effort that you
20  spent preparing to talk about Mutual's alleged trade
21  secrets.  How much time did you spend preparing for those
22  deposition topics?
23          MS. WALTER:  Object to the form.  Asked and
24      answered.
25     A.   Yeah, we talked about this.

234

1      Q.   I think that we talked about your preparation
2  overall.  I want to know specific to the trade secrets and
3  being in a position to identify which of the documents are
4  trade secrets, how much time did you spend on that?
5      A.   Well, again, we talked about it.  I don't know.
6  I spent --
7      Q.   Does it surprise you that Mutual is making claims
8  that the documents in Exhibit 15 are trade secrets?
9          MS. WALTER:  Object to the form.
10     A.   Yeah, I don't know if it would be surprise me if
11  something gets put in when there's a lot of documentation
12  sent.  I don't know.  I'm not a lawyer.  I don't know what a
13  trade secret is or what isn't either, so...
14     Q.   Did you make any efforts in preparation for your
15  testimony to understand what a trade secret is or is not?
16     A.   I did.
17     Q.   What did you do?
18     A.   Discussed it with attorneys, my attorneys.
19     Q.   Okay.  Do you understand that there's a
20  difference between confidential information and something
21  that's a trade secret?
22     A.   I do.
23     Q.   What is the difference between confidential
24  information and a trade secret?
25     A.   Well, in my mind, it's -- so if you take

235

1  confidential information and then you take -- you process
2  that confidential information, like, in the form of a loan,
3  for instance, then that becomes a trade secret because the
4  value of that is immense compared to just customer
5  information, which is confidential, so...
6      Q.   Let's look at another one.
7          (Exhibit No. 16 is marked for identification.)
8      Q.   Exhibit 16 is another composite exhibit
9  consisting of documents that Mutual of Omaha has designated
10  as its trade secrets.  Let's look at the first document,
11  Bates No. 55.  It says "Buyer Dos and Don'ts."  Do you see
12  this?
13     A.   Yes.
14     Q.   What is this document?
15     A.   I believe it's to help the buyer along with the
16  process of purchasing a home.
17     Q.   So it's something given to the buyer?
18     A.   I'm not sure it's given to or discussed.  If it's
19  for the loan officer to discuss it, I'm not sure.
20     Q.   Well, let's take a look at it.  The first one, it
21  says "Dos.  Check your e-mail at least daily.  Most of our
22  communication and documents are sent through e-mail for
23  efficiency and to provide you with a fast and enjoyable
24  process for closing."  Do you believe that that statement is
25  directed to the buyer?

236

1          MS. WALTER:  Object to the form.
2      A.   I -- I don't understand the checks -- the
3  checkbox here.  Like, that almost looks like the loan
4  officer checks that out.  Do we send that?  But I really
5  don't know, so...
6      Q.   Let's look at No. 2.  "Pay all your bills on
7  time.  Be extra careful to keep all the normal bills paid as
8  usual."  That wouldn't be something directed to an employee
9  of Mutual.  It's directed to the buyer; correct?
10     A.   Could it be a script?  I don't know.  It sounds
11  like a script to me.
12     Q.   Have you seen this document before?
13     A.   No.
14     Q.   I want you to tell me all of the reasons that you
15  contend on behalf of Mutual that this document is a trade
16  secret, if you do; or if you think it's not a trade secret
17  and should be in the category that we talked about with the
18  others --
19     A.   Well, I don't think it's in that category because
20  it was produced by Mutual of Omaha, so that's a little
21  different.
22     Q.   Are there R&D efforts and significant monies
23  invested to create Bates No. 55?
24     A.   There's a marketing team.
25     Q.   Specific to this Exhibit, though.

237

1    A.    The marketing team did this?

2    Q.    Sure.  I mean, so do you have information that

3    Mutual of Omaha invested significant time, money, resources,

4    efforts to create this --

5    A.    No.

6    Q.    -- Bates No. 55?

7    MS. WALTER:    Maria, I'd like to also get on the

8    record that you're showing him an attachment to an

9    e-mail, and so I think this line of questioning and the

10    prior is a little taken out of context because you

11    didn't produce the entire family.  You're not showing

12    him the entire family.  You're showing him one

13    attachment.

14    MS. KREITER:    But this is what you identified.

15    If you thought the e-mail and certain attachments were

16    not trade secrets, you should've identified that, but

17    Mutual didn't.  It identified 55, so trying to

18    understand, are these still something that Mutual is

19    going to maintain is a trade secret, or is Mutual

20    changing its mind as to this document?

21    Q.    Is this document something that Mutual keeps

22    under password protection or restricts access to in any

23    fashion?

24    A.    Well, all of our marketing materials are

25    password-protected in our Knowledge Coop.

REGENCY REPORTING SERVICE, INC. (813)224-0224

238

1    Q.    Is there particular language on 55 that you

2    believe is commercially valuable that would harm Mutual if

3    it got into the hands of a competitor?

4    A.    I mean, anytime you come up with a script like

5    this and your competition gets it, they're at an advantage.

6    Q.    Sure.  I mean, are you saying that this is more

7    than confidential and is a trade secret?

8    A.    I don't know.  I've done a lot of mortgages.

9    I've never gotten this from other places, so...

10    Q.    Do you believe this is confidential information

11    or something that rises to the level of a trade secret,

12    No. 55?

13    A.    I'm not sure.

14    Q.    Okay.  Let's go to the next one, 65.  Have you

15    ever seen this document before?  It's Bates No. 65 and then

16    it continues through 74.

17    MS. WALTER:    And for the record, we did identify

18    MOM-0000054 as a trade secret on page 24 of our

19    responses from March 10th of 2023.  And you showed him

20    55, which was an attachment to that e-mail.

21    MS. KREITER:    Right.  You also identified 55.

22    Q.    So 65, are you able to say what this document is?

23    A.    It looks like a procedure.

24    Q.    Is this something that -- I don't see any Mutual

25    of Omaha letterhead.  Do you know whether this was authored

REGENCY REPORTING SERVICE, INC. (813)224-0224

239

1    by an employee of Mutual of Omaha?

2    A.    I don't know other than it does look like our --

3    our procedures.

4    Q.    Is this a document that you can say is subject to

5    secrecy efforts on the part of Mutual?

6    A.    You're showing him what system, SimpleNexus, how that

7    all works, so this is how DocuSign works with SimpleNexus.

8    Q.    I'm going to direct you to page 67 of the

9    document.

10    A.    Yeah.

11    Q.    "Once you have your print and signs, credit LOX,

12    and other items ready for the DocuSign, review your file for

13    additional borrower items needed.  I start at the -- at home

14    page and work through all the pages of the URLA and then

15    check the itemization screen so I can see an estimated cash

16    to close," and then it goes on.  This appears to be authored

17    by an employee, and it's a form of a checklist; correct?

18    MS. WALTER:    Object to the form.

19    A.    It's a form of a policy -- I mean a procedure.

20    Sorry.

21    Q.    What about this do you contend is a trade secret?

22    A.    Well, I think it was valuable enough to send

23    outside of our system; right?  So that -- if it was -- if it

24    was of no value, why would someone send it?

25    Q.    Okay.  Well, value can be confidential

REGENCY REPORTING SERVICE, INC. (813)224-0224

240

1    information, or it can be a trade secret.  Mutual has

2    alleged this is a trade secret.  I'm trying to understand --

3    or something can be just valuable but not even confidential.

4    There can be checklists online, and that's maybe helpful but

5    not confidential.  So I'm trying to understand why Mutual

6    believes that this checklist is not only confidential but

7    somehow a trade secret.

8    A.    I think you're --

9    MS. WALTER:    Object to the form.

10    A.    I'm sorry.  You're calling it a checklist.  It

11    doesn't appear to be a checklist to me.

12    Q.    Well, it's "Loan Partner:  File Kickoff To-Do

13    List and Workflow."

14    MS. WALTER:    Again, I want to object to the

15    extent that the entire family wasn't produced.  You're

16    showing him piecemeal.

17    MS. KREITER:    So what?

18    MS. WALTER:    So it's taken out of context.

19    MS. KREITER:    Then show him the full context, but

20    you designated this document, and you can do that on

21    rebuttal.  But right now this is a document that Mutual

22    designated, and I'm asking him why it's a trade secret.

23    If he says it's not, we'll take it off the list.

24    A.    I mean, the problem is what you captured here is

25    our text stack, and I believe that is a trade secret.

REGENCY REPORTING SERVICE, INC. (813)224-0224

241

1  You're not just talking about how to do one thing. You're
2  showing how the file moves from SimpleNexus through
3  Encompass, through DocuSign. These are all -- this is text
4  stack that is --
5      Q.  Are all employees of Mutual of Omaha subject to a
6  confidentiality agreement?
7          MS. WALTER:  Objection.  Form.
8      A.  Yes.
9      Q.  With respect to this document, you have no idea
10 who created it, however?  You don't know who the author is?
11     A.  What was that?
12     Q.  65.
13     A.  Oh, we're still going -- yeah, I don't -- I don't
14 know.
15     Q.  Is this something that executives within Mutual
16 of Omaha Mortgage would see?
17     A.  I don't know.  I don't know where this -- I don't
18 know where it resided.  I don't know.  I just don't know.
19     Q.  Let's go to the next one.  There's a blue sheet,
20 and then there's two documents, Profit and Loss Statement.
21 It's a blank template.  There's nothing filled in.  Is this
22 a trade secret of Mutual of Omaha?
23         MS. WALTER:  What's the Bates on this one?
24         MS. KREITER:  80.
25     A.  As this stands right here, I would say no.

242

1      Q.  Let's go to the next one, Bates No. 327.  It's a
2  single-page document.  It says "To whom it may concern.  I
3  am writing this letter to explain what the cash-out proceeds
4  from my refinance will be used for."  And then it's
5  completely blank.  Is this a trade secret of Mutual of Omaha
6  Mortgage?
7      A.  I think it's a form that this person didn't want
8  to recreate, and then they --
9      Q.  Is it a trade secret of Mutual of Omaha Mortgage?
10     A.  I would say in this context, it is not a trade
11 secret.
12     Q.  Let's go to the next one, Bates No. 334.  This is
13 a completely blank Uniform Residential Loan Application.  Is
14 this a trade secret of Mutual of Omaha?
15     A.  No.
16     Q.  Let's go to the next document, No. 342.  Just let
17 me know when you're there.
18     A.  I am.
19     Q.  So there's a corporate heading on the top,
20 Appraisal Linx.  Do you see that?
21     A.  I do.
22     Q.  Is this document owned by and authored by a
23 Appraisal Linx or Mutual of Omaha?
24     A.  It's our negotiated terms with Appraisal Linx.
25     Q.  Who owns the document?  Who created it and who

243

1  owns it?
2          MS. WALTER:  Object to form.
3      A.  I don't know who owns it.  I mean, this is -- it
4  was created for us by Appraisal Linx.  But, you know, the
5  problem is, is you have all this information that we
6  negotiated.  So now I can take this and negotiate the same
7  deal and show Appraisal Linx, "Hey, you did this for" -- and
8  now we're at a competitive disadvantage, so, you know --
9      Q.  Do you maintain that Bates No. 342 is a trade
10 secret of Mutual of Omaha?
11     A.  The pricing on this form is specific to Mutual of
12 Omaha negotiated by us, so I believe that's probably why
13 it's in here.
14     Q.  And you believe that this is a trade secret, not
15 just merely confidential?
16     A.  You know, I think that's probably for a jury or a
17 judge to decide.  I don't know.
18     Q.  Well, what do you think on behalf of Mutual
19 today?  Is it confidential, or is it a trade secret?
20         MS. WALTER:  Object to form.
21     A.  I think it depends on the context of it.  I've
22 spent 22 years working with Appraisal Linx to negotiate
23 these prices.
24     Q.  Is there a confidentiality agreement between
25 Mutual of Omaha and Appraisal Linx?

244

1      A.  An NDA, I believe.  Certainly, there was one at
2  one time.
3      Q.  So I want to make sure that I'm clear on the part
4  of this document that you believe -- that you contend is
5  secret and is a trade secret.  It's the pricing?
6      A.  It's the pricing, yeah.
7      Q.  So there's different columns here:  Conventional,
8  Field Review, Desk Review, Final Inspection, Recert. of
9  Value, Rent Schedule, Operating Inc., Additional Upcharges,
10 Estimated Value.  All of that is a trade secret?  Not the
11 headings themselves, but the data --
12     A.  The pricing.  The pricing.
13     Q.  What value would this document be to a
14 competitor?
15         MS. WALTER:  Object to form.
16     A.  So I have a relationship with Appraisal Linx I
17 have had for -- since I've been in the business really.
18 Blake Chiado owns Appraisal Linx.  I negotiated these terms
19 on our behalf.  If a competitor got this document, they
20 could then get the same deal because, you know, it's
21 difficult for Appraisal Linx to say, "Well, no, you haven't
22 known me for 25 years, and so I can't give you the same
23 deal."
24         So now they're going to be -- we're at a
25 competitive advantage because we have negotiated very good

245

1  prices with our appraisal companies.  That is passed along
2  to the consumer, which makes our loans more appealing at
3  times.
4      Q.   So this reflects the pricing negotiated by Mutual
5  with Appraisal Linx, and that applies to all of the
6  different loans for which there's a working relationship?
7      A.   That's right.  And it's negotiated on the
8  customer's behalf because we don't pay it.  The customer
9  pays for this.
10     Q.   Sure.
11     A.   But it's -- the lower we can get these fees,
12 we're at a competitive advantage; right?
13     Q.   So if this were in the hands of an individual
14 loan officer, would it be valuable to that loan officer
15 because the loan officer can then negotiate on a
16 borrower-by-borrower basis, or would it only be valuable to
17 Waterstone, the company, which is the party that's going to
18 negotiate companywide?
19     A.   I think it's -- I think in today's day and age,
20 there are a lot of loan officers that negotiate and use
21 their own appraisal management companies and bring that to
22 the table.  So it's valuable to both.
23     Q.   Do you have any evidence that this document was
24 given to Waterstone?
25     A.   I don't.

246

1      Q.   Do you have any evidence that Waterstone used
2  this document to negotiate with Appraisal Linx or for any
3  other purpose?
4      A.   I don't.
5      Q.   Are there any damages associated with 342 that
6  Mutual is claiming?
7           MS. WALTER:  Object to form.
8      A.   Yeah, we don't -- we don't know what those
9  damages may or may not be.
10     Q.   Well, today here at the deposition, are there any
11 damages that Mutual is claiming that are derivative of 342?
12          MS. WALTER:  Object to form.
13     A.   I don't think I'm comfortable answering that.  We
14 don't -- again, we don't -- I don't even know if they're
15 using this, if they are using it or not, so...
16     Q.   Let's go back to the other document that I think
17 you did not rescind from a trade secret perspective.  It was
18 the Bates No. 65, the File Kickoff To-Do List and Workflow.
19 Do you have any information that this document starting with
20 Bates 65 was in the possession of Waterstone?
21     A.   I don't know.
22     Q.   Is Mutual making a damages claim specific to this
23 Document 65?
24          MS. WALTER:  Object to the form.
25     A.   I'm not sure how that works, the damages.  I'm

247

1  not -- is it a total of all of it?  I think the damages, I
2  think, are more related to the customer aspect of it all and
3  not things like this but in total.
4      Q.   But there's not a dollar amount that you
5  associate and Mutual is demanding that is based on a
6  derivative of 65?
7           MS. WALTER:  Object to form.
8      A.   Not to my knowledge, no.
9      Q.   Okay.  Let's go to the next document in the
10 composite.  It's Bates No. 406.  We're near the end.  Just
11 let me know when you're there.  Same exhibit.
12     A.   Okay.
13     Q.   It's the same Exhibit 16, Bates No. 406.
14     A.   Okay.  What one?  I'm sorry.
15     Q.   406.
16     A.   Got it.  Okay.
17     Q.   What is Bates No. 406?
18     A.   Manufactured Property Overview, it looks like
19 it's a -- guidelines for lending to manufactured homes.
20     Q.   Is this document a trade secret of Mutual of
21 Omaha?
22     A.   In this context, I can't tell who -- who prepared
23 this.  The way we underwrite a manufactured home would be a
24 trade secret, but I don't know if that's what this is or if
25 this is something else.  I can't tell in this context.

248

1      Q.   Okay.  So it sounds like you don't know whether
2  this is a trade secret; is that accurate?
3      A.   I don't know where this -- yeah.
4      Q.   Is this a document that was the subject of
5  secrecy efforts on the part of Mutual?
6           MS. WALTER:  Object to form.
7      A.   I don't know where it came from.  I don't know.
8  I don't see the context of it.
9      Q.   Are there damages that Mutual is demanding based
10 on 406?
11          MS. WALTER:  Object to form.
12     A.   Same answer as before.  Not -- not specifically.
13     Q.   Let's go to the last one.
14          MS. WALTER:  There's no Bates on this.
15          MS. KREITER:  Correct.  I think that's because it
16 was a native Excel, so it's No. 452, Bates 452.
17     Q.   What is this last document in the exhibit?
18     A.   I think this references by investor who needs an
19 attorney opinion letter for a trust.
20     Q.   Is this a Mutual of Omaha trade secret?
21     A.   You know, again, I would say probably not, not in
22 this context anyway.
23     Q.   Let's talk about the P&L statements.  You have an
24 understanding that certain P&L statements were sent by
25 certain of the departing employees to Waterstone Mortgage;

249

1  correct?
2      A.   Yes.
3      Q.   Do you consider those P&L statements to be trade
4  secrets of Mutual of Omaha?
5      A.   Yes.
6      Q.   Why?  And if you can be exhaustive as possible.
7      A.   The information contained in a P&L statement is
8  very damaging if a competitor gets it.
9      Q.   Let's make an exhaustive list.  Damaging if a
10  competitor gets it.
11      A.   Yes.
12      Q.   Any other reason?
13      A.   Depends on what tabs were sent.  I don't know if
14  -- you know, on the P&Ls, as we reviewed, there's tabs in
15  here that has, you know, nonpersonal information in there,
16  nonpublic information rather.  It shows volume, as we
17  discussed, of loan officers that work for us.  It shows all
18  staff that work in that tab.
19          It shows who we sell our loans to, what we charge
20  for a processing fee, what we charge for an underwriting
21  fee, what we pay our folks, what -- what we charge for
22  insurance, what we allow for 401(k) polling, what lead
23  resources we use, and what the compensation structure is for
24  the loan officers and managers.
25      Q.   I'm going to show you -- specifically, let's look
REGENCY REPORTING SERVICE, INC. (813)224-0224

250

1  at this next exhibit.
2          (Exhibit No. 17 is marked for identification.)
3          MS. WALTER:  Do you have the Bates for this?
4          MS. KREITER:  I don't know right now, no.
5      Q.   Take a look at Exhibit 17.
6      A.   Okay.
7      Q.   So we came up with a list just now of ten
8  different reasons why you believe that the P&Ls are trade
9  secrets.  With respect to this P&L in particular, do you
10  believe that this P&L is a trade secret for all of the
11  reasons that you identified?
12          MS. WALTER:  Object to the form.
13      Q.   Let me ask it a different way.  So specific to
14  this P&L, I heard you testify that, "Well, it depends on
15  what tabs might be included on the P&L.  I'm not sure."  So
16  this is an actual one that I want to look at.
17      A.   Sure.
18      Q.   Are there components of this Exhibit 17 that
19  Mutual contends is a trade secret?
20      A.   Yeah.  It appears those things we referenced are
21  in this document.
22      Q.   Okay.  Let's talk about -- you said it could show
23  the loan officer volume?
24      A.   Yes.
25      Q.   Do you have evidence that Waterstone -- let's
REGENCY REPORTING SERVICE, INC. (813)224-0224

251

1  stop before I get to that question.  Where is the loan
2  officer volume in 17?
3      A.   That same tab we talked about the last time.
4      Q.   The YSP tab?
5      A.   Yeah.
6      Q.   Okay.  That's good enough.  What is your
7  understanding of the use to which Waterstone put the P&L, if
8  you know?
9      A.   Well, I don't know.
10          MS. WALTER:  Object to the form.
11          THE WITNESS:  Oh, I'm sorry.
12          MS. WALTER:  It's okay.  Go ahead.
13      A.   I don't know how they used it.
14      Q.   Do you -- does Mutual have a damages claim
15  specific to the P&L statements?
16          MS. WALTER:  Object to the form.
17      A.   I -- I think we're still calculating the damages
18  from this information is my understanding.
19      Q.   So let me give you an example.  If, for example,
20  you know, Waterstone used the P&L to undercut pricing and
21  then got loans that it wouldn't have been able to close but
22  for having the confidential information, you could say
23  Waterstone made use of that P&L and it translates to damages
24  that you can quantify?
25      A.   Yeah.  I'm sorry.
REGENCY REPORTING SERVICE, INC. (813)224-0224

252

1      Q.   Do you -- go ahead.  Do you have, with respect to
2  the P&L statements, you know, that type of theory, that
3  Waterstone made use of the P&L in some fashion that
4  translates to damages?  If so, you know, what are those
5  damages that are derivative of the P&Ls?
6          MS. WALTER:  Object to the form.
7      A.   So I think it goes back to the information
8  contained in here that's so overwhelmingly confidential:
9  borrowers' name, loan amount, YSP on that loan.  You could
10  back out what that -- what the rate is, you know, a mortgage
11  person could.  So you could then use that information to
12  refinance these borrowers to do whatever it is that you
13  wanted to do.  It's the amount -- it's the overwhelmingness
14  of that information that's --
15      Q.   Sure.  And I'm trying to get specifically is
16  there a claim for damages based on this?  I mean, we talked
17  about, you know, there's no claim for damages based on some
18  of the other documents.  And let me give you this scenario
19  in case it's helpful:  You know, the formula for Coke,
20  that's the classic, wow, that's a trade secret.
21      A.   Yeah.
22      Q.   So, you know, someone could take the formula for
23  Coke.  But if they don't do anything with it and think,
24  "Shoot, I took the formula for Coke, shouldn't have done
25  that," and it's never put to use, I mean, bad that the
REGENCY REPORTING SERVICE, INC. (813)224-0224

253

1 information was taken, and maybe you have a claim that the

2 trade secret was misappropriated, but there's not

3 necessarily a harm in a damages claim that flows from it.

4       So I understand Mutual's position this is a trade

5 secret.  It shouldn't have been conveyed.  But what I'm

6 trying to understand with specificity today is what dollar

7 demand, if any, is derivative of the transmittal of the P&L

8 statement?

9       MS. WALTER:  Object to form.

10      A.   Yeah, I'm not sure.  I'm not comfortable -- I was

11 told by attorneys that we haven't come up --

12           MS. WALTER:  Don't.  Attorney-client privilege.

13           THE WITNESS:  I'm sorry.  Okay.

14      A.   So I'm not comfortable answering that.

15      Q.   Okay.  So, I mean, then I need to make a record

16 of that.  So the testimony on behalf of Mutual today at the

17 deposition is you're not comfortable answering whether

18 there's a claim based on damages derivative of the P&L

19 statements?  I just want to shut the door on this if that's

20 the case.  Is that the case?

21      A.   Repeat yourself one more time.

22      Q.   I need to understand, you know, today is there a

23 claim that Mutual is making derivative of the P&L statements

24 for damages?  I totally get we think that this shouldn't

25 have been sent.  I get your position that it's a trade

254

1 secret.  What I don't have an understanding is, does that

2 translate to a demand for damages and that you're claiming

3 today that you can tell me about at the deposition?

4           MS. WALTER:  Object to form.

5      A.   Not that I can tell you about today, but that

6 doesn't mean damages are off-limits in terms of this.

7           MS. KREITER:  I could use just a five-minute

8 break.  I think that I'm near the end here.

9           (A recess was taken.)

10           MS. KREITER:  I have nothing further.

11           THE WITNESS:  Thank you, Jesus.

12           MS. WALTER:  Nothing from me.

13           (The deposition concluded at 4:53 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

255

1                REGENCY REPORTING SERVICE, INC.
2                   201 East Kennedy Boulevard
                            Suite 875
3                       Tampa, Florida 33602
                         813-224-0224
4

5 June 1, 2023

6 COURTNEY WALTER, ESQUIRE
  CHRIS McCALL, ESQUIRE (Zoom)
7 Mitchell Sandler LLC
  1120 20th Street Northwest
8 Suite 725
  Washington, DC  20036
9

10 CASE REFERENCE:  MUTUAL OF OMAHA MORTGAGE, INC. vs.
   WATERSTONE MORTGAGE CORPORATION
11

12 Deposition of Jeffrey Gennarelli, Corporate Representative
   of Mutual of Omaha Mortgage, Inc.

13

14 Dear Ms. Walter:

15 Enclosed is your copy of the deposition taken in the
   above-styled cause on May 25, 2023, along with a
16 several-lined correction sheet.

17 Please have your client read your copy of the deposition,
   make whatever corrections or changes necessary on the lined
18 sheets, indicating page and line numbers, and then sign the
   signature page.  Return only the correction and signature
19 page.

20 If you have any questions concerning this, please don't
   hesitate to call.

21 Very truly yours,

22

23 _____
   Melanie Keefe, FPR
24 Court Reporter

25

256

1            SIGNATURE PAGE/ERRATA SHEET

2 WITNESS:  JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF
  MUTUAL OF OMAHA MORTGAGE, INC.
3
  CASE REFERENCE:  MUTUAL OF OMAHA MORTGAGE, INC. vs.
4 WATERSTONE MORTGAGE CORPORATION

5 CASE NUMBER:  8:22-cv-01660-TPB-JSS

6 DATE:  May 25, 2023

7          After you have read your transcript, please note
  any errors in transcription on this page.  Do not mark on
8 the transcript itself.  Please sign and date this sheet as
  indicated below.  If additional lines are required for
9 corrections, attach additional sheets.  If no corrections,
  please indicate "None."

10 _____

11 PAGE    LINE    ERROR OR AMENDMENT           REASON

12 _____
   _____
13 _____
   _____
14 _____
   _____
15 _____
   _____
16 _____
   _____
17 _____
   _____
18 _____
   _____
19 _____
   _____
20 _____

21          Under penalties of perjury, I declare that I have
   read the foregoing transcript, and I subscribe to its
22 accuracy, to include the corrections or amendments noted
   above or hereto attached.

23 _____    _____
   JEFFREY GENNARELLI,          DATE
24 CORPORATE REPRESENTATIVE
   OF MUTUAL OF OMAHA
25 MORTGAGE, INC.

```
 1                  CERTIFICATE OF REPORTER

 2     STATE OF FLORIDA        )

 3     COUNTY OF HILLSBOROUGH  )

 4

 5         I, Melanie Keefe, Court Reporter, certify that I
       was authorized to and did stenographically report the
 6     deposition of JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE
       OF MUTUAL OF OMAHA MORTGAGE, INC.; that a review of the
 7     transcript was requested; and that the transcript, pages 5
       through 254, inclusive, is a true and complete record of my
 8     stenographic notes.

 9         I further certify that I am not a relative,
       employee, attorney, or counsel of any of the parties, nor am
10     I a relative or employee of any of the parties' attorneys or
       counsel connected with the action, nor am I financially
11     interested in the action.

12     _____

13     Melanie Keefe, FPR
       Court Reporter
14     _____

15                  CERTIFICATE OF OATH

16     STATE OF FLORIDA        )

17     COUNTY OF HILLSBOROUGH  )

18         I, the undersigned authority, certify that
       JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF
19     OMAHA MORTGAGE, INC., personally appeared before me and was
       duly sworn.

20         WITNESS my hand and official seal this 1st day of
       June, 2023.
21

22     _____

23     Melanie Keefe, FPR
       Notary Public
24     State of Florida
       My Commission No.:  HH055410
25     Expires:  December 9, 2024


              REGENCY REPORTING SERVICE, INC. (813)224-0224
```