# EXHIBIT F

Page 1

1          UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF FLORIDA

3              TAMPA DIVISION

4    _____

5    MUTUAL OF OMAHA MORTGAGE, INC.,

6         Plaintiff,

7       v.                              Civil Action

8    WATERSTONE MORTGAGE CORPORATION,      No. 22-CV-

9         Defendant.                       01660

10   _____

11   VIDEOTAPED DEPOSITION OF CORPORATE REPRESENTATIVE OF

12      WATERSTONE MORTGAGE CORPORATION - KEVIN ALLEN

13   DATE:        Thursday, August 24, 2023

14   TIME:        11:32 a.m.

15   LOCATION:    Remote Proceeding

16                833 East Michigan Street, Suite 1800

17                Milwaukee, WI, US, 53202

18   REPORTED BY:  Shondra Dawson, Notary Public

19   JOB NO.:     6063052

20

21

22

Page 2

```
 1        A P P E A R A N C E S
 2 ON BEHALF OF PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.:
 3    ARI KAREN, ESQUIRE (by videoconference)
 4    Mitchell Sandler LLC
 5    1120 20th Street, Northwest
 6    Suite 725
 7    Washington, DC 20036
 8    akaren@mitchellsandler.com
 9    (202) 886-5292
10
11 ON BEHALF OF DEFENDANT WATERSTONE MORTGAGE
12 CORPORATION:
13    MARIA KREITER, ESQUIRE (by videoconference)
14    Godfrey & Khan
15    833 East Michigan Street, Suite 1800
16    Milwaukee, WI 53202
17    mkreiter@gklaw.com
18    (414) 273-5198
19
20
21
22
```

Page 3

```
 1        A P P E A R A N C E S (Cont'd)
 2 ALSO PRESENT:
 3    Glen Fortner, Videographer (by videoconference)
 4    Neil Helsabeck-Ochoa, Paralegal for Ari Karen (by
 5    videoconference)
 6    Mark Carroll, General Counsel for Mutual of Omaha
 7    (by videoconference)
 8    Laurel Thomson, Representative Mutual of Omaha
 9    (by videoconference)
10    Stephanie Ziebell, In House Counsel for
11    Waterstone (by videoconference)
12    Emma Jewell, Co-Counsel for Waterstone (by
13    videoconference)
14
15
16
17
18
19
20
21
22
```

Page 4

```
 1            I N D E X
 2 EXAMINATION:                    PAGE
 3    By Mr. Karen              10
 4
 5 Exhibit 1    Email Elizabeth Spragg to
 6       Chris Wolf            177
 7 Exhibit 2    Email Elizabeth Spragg to
 8       Chris Wolf 4/12       178
 9 Exhibit 9    Email Rich Harkwell to
10       Elizabeth Spragg      326
11 Exhibit 10   Email Melanie Ferrara to Fred
12       Stalls and Elizabeth Spragg   193
13 Exhibit 20   Email Dustin Owen to Chris Wolf
14       3/5               149
15 Exhibit 21   Email Chris Wolf to Dustin Owen
16       1/10              99
17 Exhibit 22   Waterstone Mortgage Producing
18       Manager Agreement     26
19 Exhibit 24   Email from Jen Witon to
20       Chris Smith           202
21 Exhibit 27   Email Michael Irish to
22       Chris Wolf            213
```

Page 5

```
 1            E X H I B I T S (Cont'd)
 2 NO.        DESCRIPTION          PAGE
 3 Exhibit 29   Email Chris Wolf to John
 4       Utsch             161
 5 Exhibit 30   Email Chris Wolf to Ben Davis   233
 6 Exhibit 31   Email Chris Wolf to
 7       Kyrstin Friebis       252
 8 Exhibit 32   Email Michael Smalley      264
 9 Exhibit 33   Email Chris Wolf to
10       Dawson Walker         272
11 Exhibit 35   Email Chris Wolf Hennessey
12       File              292
13 Exhibit 36   Email Chris Wolf to Cody
14       Lamb and Fred Stalls      296
15 Exhibit 38   Email Christy Johnson
16       RE: Castanada         308
17 Exhibit 40   Chris Wolf email to Kyrstin
18       1040 Form             316
19 Exhibit 42   Emails John Utsch to
20       Melanie Pischke Ferrara   164
21 Exhibit 43   Cease and Desist Letter   197
22 Exhibit 47   Chris Wolf Offer Letter    18
```

Page 6

1          E X H I B I T S (Cont'd)
2  NO.         DESCRIPTION            PAGE
3  Exhibit 48    Email Dwyane Hutto to
4          Dustin Owen              217
5  Exhibit 50    Spreadsheet           325
6  Exhibit 51    Second Amended Notice      60
7  Exhibit 52    Email Wolf to Allen 4/14      77
8
9    * not in possession of reporter
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 8

1  from the firm, Veritext.  I'm not related to any party
2  in this action nor am I financially interested in the
3  outcome.
4          If there are any objections to
5  proceeding, please take them at the time of your
6  appearance.  Counsel and all present will now state
7  their appearances and affiliations for the record,
8  beginning with the noticing attorney.
9          MR. KAREN:  Ari Karen for Mitchell
10  Sandler, counsel for Plaintiff Mutual Of Omaha
11  Mortgage.
12          MS. KREITER:  Maria Kreiter, Godfrey &
13  Khan, along with Emma Jewell at Godfrey & Khan on
14  behalf of Waterstone.  Also in the room, Stephanie
15  Ziebell, in-house counsel for Waterstone.
16          Go ahead, Kevin.
17          MR. ALLEN:  Kevin Allen with Waterstone
18  Mortgage.
19          MR. HELSABECK-OCHOA:  I am Nick
20  Helsabeck-Ochoa, paralegal for Mitchell Sandler.
21          MR. CARROLL:  Mark Carroll, general
22  counsel for Plaintiff Mutual Of Omaha Mortgage.

Page 7

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good morning.  We
3  are going on the record at 11:32 a.m., on August 24,
4  2023.  Please note that this deposition is being
5  conducted virtually.
6          Quality of recording depends on the
7  quality of the camera and internet connection of
8  participants.  What is seen from the witness and heard
9  onscreen is what will be recorded.  Audio and video
10  recording will continue to take place unless all
11  parties agree to go off the record.
12          This is Media Unit 1 of the
13  videorecorded deposition of Kevin Allen as a corporate
14  representative of Waterstone Mortgage taken by counsel
15  for plaintiff in the matter of  Mutual Of Omaha
16  Mortgage Inc vs. Waterstone Mortgage Corporation filed
17  in the United States District Court, Middle District
18  of Florida, Case Number  22-CV-01660.
19          This deposition is being conducted
20  remotely using virtual technology.  My name is Glen
21  Fortner, representing Veritext, and I'm the
22  videographer.  The court reporter is Shondra Dawson

Page 9

1          MS. THOMSON:  Laurel Thomson, associate
2  counsel for Mutual Of Omaha Mortgage.
3          THE VIDEOGRAPHER:  Will the court
4  reporter please swear in the witness?  And then
5  counsel may proceed.
6          THE REPORTER:  Good morning.  My name
7  is Shondra Dawson; I'm the reporter assigned by
8  Veritext to take the record of this proceeding.
9          I am a notary authorized to take
10  acknowledgments and administer oaths in the District
11  of Columbia.  Parties agree that I will swear in the
12  witness remotely outside of his or her presence.
13          Additionally, absent an objection on
14  the record before the witness is sworn, all parties
15  and the witness understand and agree that any
16  certified transcript produced from the recording
17  virtually of this proceeding:
18          - is intended for all uses permitted
19            under applicable procedural and
20            evidentiary rules and laws in the
21            same manner as a deposition recorded
22            by stenographic means; and

3 (Pages 6 - 9)

Page 10

1          - shall constitute written stipulation
2          of such.
3          And hearing no objection, I will now
4 swear in the witness.
5          Mr. Allen, will you please raise your
6 right hand?
7 WHEREUPON,
8          KEVIN ALLEN,
9 called as a witness and having been first duly sworn
10 to tell the truth, the whole truth, and nothing but
11 the truth, was examined and testified as follows:
12          THE REPORTER:  Thank you.
13          Mr. Karen, you may proceed.
14          MR. KAREN:  Thank you.
15          EXAMINATION
16 BY MR. KAREN:
17     Q    Good morning, Mr. Allen.  How are you?
18     A    Good.
19     Q    Good.  So before we get started, just want
20 to go over some rules.  First of all, have you ever
21 been deposed before?
22     A    I have.

Page 11

1     Q    Okay.  And can you tell me how many times?
2     A    I believe four or five times that I can
3 recall.
4     Q    Okay.  And have you ever been a witness
5 outside of being deposed -- been a witness at a
6 hearing or a trial?
7     A    I have not.
8     Q    Okay.  So your only experience really with
9 testifying is in those four to five times?
10     A    Yes.
11     Q    Okay.  And could you just briefly, I don't
12 need a long description -- well, why don't we first
13 start this way?  For those four to five times, were
14 they in your personal capacity as an individual or on
15 behalf of a company in a professional setting?
16     A    On behalf of the company.
17     Q    Okay.  And was it with Waterstone?
18     A    It was with Waterstone.  Yes.
19     Q    And what were the cases if you could just
20 tell me very briefly that you testifying on in
21 connection for Waterstone?
22     A    It was one case.  So four to five

Page 12

1 depositions with that one case.
2     Q    You gave four to five depositions in one
3 case?
4     A    Yes, the one I worked with you on.
5     Q    Okay.  All right.  Got it.  Okay.
6     A    Okay.
7     Q    I understand.  So other than that, there's
8 no other scenario?
9     A    No.
10     Q    Okay.  Now, let me just quickly review the
11 rules of depositions you because, you know, it's
12 important that we all kind of understand, you know,
13 starting off.  First of all, I'm going to ask you
14 questions today, and if you answer, I'm going to
15 assume you understood the question and gave me a full
16 and accurate response.  Is that fair?
17     A    Yes.
18     Q    Okay.  And if you want to take a break at
19 any point today, that's fine.  I just ask that if you
20 take the break, you wait until you finish answering my
21 question, and then you can take a break.  All right?
22     A    Okay.

Page 13

1     Q    So don't take a break basically while my
2 question's pending.  Answer it, and then you can take
3 a break.  But whenever you need breaks, that's fine.
4     A    Got it.
5     Q    Okay?  And it's also important especially
6 because we're doing Zoom, nodding head, shaking head,
7 "mm-hmm," "uh-huh," really, really hard for the court
8 reporter to hear or understand.  So if you could just
9 make sure to give an affirmative yes or no, and then
10 answer.  You know, the virtual technology has benefits
11 and drawbacks too.
12     A    Yes.
13     Q    And then, lastly, you know, again, in the
14 normal vernacular of talking to each other, there's
15 times when you're going to know what I'm going to say
16 or know what I'm going to ask.  And, you know, just
17 to, you know, make the conversation go on quickly, you
18 might cut me off as you normally would because you
19 know what I'm going to say and just answer it; right?
20          But because, again, with Zoom and, you know,
21 volume and all that kind of stuff, it's very, very
22 hard for the court reporter if we're talking over each

Page 14

1 other. So it's super important that you let me finish
2 even when you know what I'm going to say -- just until
3 I, you know, finish it off and then you answer, and
4 then I'll try to do the same for you. Okay?
5    A   Got it.
6    Q   All right. So the first thing I kind of
7 wanted to jump to in terms of substance is do you have
8 -- and when I say "you" today, you understand you're
9 testifying on behalf of Waterstone; right?
10    A   Yes.
11    Q   Okay. And so when I say "you," I'll clarify
12 if I'm talking about you individually. But generally,
13 I'll be speaking about Waterstone. Okay?
14    A   Yes.
15    Q   Okay. So does Waterstone have any policies
16 concerning the recruiting of a branch?
17       MS. KREITER: Object to the form.
18    Q   You can answer.
19    A   And -- and I guess I'm not clear on policies
20 to recruiting.
21    Q   Well, okay. Let's back up. Does Waterstone
22 have any written policies regarding recruiting loan

Page 15

1 officers from other companies?
2    A   I don't know of any written policies.
3    Q   Okay. And do you have any oral policies or
4 anything other than a written policy?
5    A   In -- in relation to recruiting, not that
6 I'm aware of.
7    Q   Okay. So a minute ago, the only reason I
8 asked that is -- I asked you do you have any policies
9 concerning the recruiting of loan officers, and you
10 said there were no written policies. That's why I was
11 inquiring is there anything other than a written
12 policy you might've been thinking of.
13    A   Got it.
14    Q   And is there?
15    A   No.
16    Q   Okay. And do they have any policies, I'll
17 guess we'll start in writing, with respect to
18 recruiting of a branch manager?
19    A   No.
20    Q   Okay. And no other form of policies either?
21    A   No.
22    Q   If you can tell me generally -- I don't need

Page 16

1 a specific number, best you can estimate. What
2 percentage of your loan officers that you hire come
3 from other companies as opposed to, you know, getting
4 licensed in sort of their first entry into the
5 mortgage business being at Waterstone?
6    A   Could you repeat the question?
7    Q   Sure. Sure. What percentage of your loan
8 officers come from other companies when they come to
9 Waterstone?
10    A   I -- I feel like the majority of the loan
11 officers would come from other companies.
12    Q   Okay. And when you recruit loan officers,
13 what is it you're looking for?
14    A   Looking for somebody who in our company
15 self-sources their own business, I think somebody
16 that's going to fit within how we do business from
17 ethics, culture, things like that.
18    Q   Got it. But is it fair to say though one of
19 the things, one of the criteria, or of evaluation
20 you'll look at is the volume of business they've
21 generated historically?
22    A   And certainly production. Yes.

Page 17

1    Q   So in other words, a loan officer who
2 averages one loan every three or four months might not
3 be an attractive candidate certainly as opposed to a
4 loan officer that does 10 or 20 or 30 loans a month;
5 right?
6    A   Correct.
7    Q   Now, I asked the question broadly, and I'm
8 going to be more specific. But if you tell my last
9 answer sort of handled the field of questions that I
10 might ask, I'll just move on and save us some time.
11 Okay?
12       So I asked you a second ago if you had any
13 policies regarding the recruiting of loan officers.
14 Do you have any policies -- Waterstone, that is. Does
15 Waterstone have any policies regarding the
16 solicitation of customers when recruiting a loan
17 officer?
18    A   I -- I wouldn't call it a policy, but we
19 certainly have a guideline in our offer letters that
20 would talk to that and speak to that.
21    Q   Got it. And I know what you're referring
22 to. Other than that guideline in your offer letter,

Page 18

1 there's no other written policies; right?
2    A    Correct.
3    Q    Okay.  And how about with respect to the
4 recruiting of other employees that work with a loan
5 officer you're recruiting?  Do you have any written
6 policies relating to that?
7    A    It would be the same.  I wouldn't classify
8 as a written policy, but back to the offer letter and
9 indicating that, yeah, again, within that offer
10 letter, what we would expect.
11    Q    Okay.  And I don't know if it said -- and
12 maybe I was wrong.  Let's go to the offer letter since
13 you mention it.
14        MR. KAREN:  Nick, can you pull up
15 Exhibit 47?
16        (Exhibit 47 was marked for
17        identification.)
18        MR. KAREN:  And just so you're aware,
19 I'm going to be going a little out of order today in
20 exhibits because there's too many to reorder them as
21 one through whatever.  So we'll start at 47 and just
22 kind of have a marking there.

Page 19

1        MR. HELSABECK-OCHOA:  Ari, I'm unable
2 to share my screen to share the exhibit.
3        MR. KAREN:  You're what?
4        MS. KREITER:  I just handed him a hard
5 copy.
6        MR. KAREN:  You're not able to share
7 your screen, Nick?
8        MR. HELSABECK-OCHOA:  That is correct.
9        THE VIDEOGRAPHER:  You should be able
10 to now.  Sorry about that.
11        MR. HELSABECK-OCHOA:  Okay.  All right.
12 I'm able to share the screen here.  Can someone verify
13 that they are able to see my screen?
14        MS. KREITER:  Which number is it again?
15        MR. KAREN:  It's 47.
16 BY MR. KAREN:
17    Q    And Kevin -- Mr. Allen, I'm sorry.  By the
18 way, you can me Art if you want.  Is it okay if I
19 refer to you as Kevin?  Or Mr. Allen is fine.
20 Whichever you prefer.
21    A    I'm -- I'm fine either way.
22        MS. KREITER:  So you have two number

Page 20

1 47s here.  And so --
2        MR. KAREN:  It's the Chris Wolf offer
3 letter.
4        MS. KREITER:  Okay.
5        MR. KAREN:  Sorry about that.  I meant
6 to delete one and put one on.  Must've left them both
7 there.  Are you guys with us?  Are we okay to proceed
8 on 47?
9        MS. KREITER:  Yes.  Well, do you want
10 to take a minute to look at it or are you good, Kevin?
11        THE WITNESS:  Yeah.  I'm good.
12 BY MR. KAREN:
13    Q    Okay.  So I'm showing you what's been marked
14 as Exhibit 47.  Can you identify this document for me,
15 Mr. Allen?
16    A    Yes.  This, let me just make sure I look
17 through it here, is an offer letter for Chris Wolf.
18    Q    Okay.  And if you look on the third page of
19 that offer letter, it appears that there is a document
20 attached to it that says Previous Company Information
21 Disclosure?
22    A    Yes.  I see that.

Page 21

1    Q    Okay.
2        MR. KAREN:  And, Nick, if you go on one
3 page.
4 BY MR. KAREN:
5    Q    Is that a standard -- I'll use the term, is
6 that the guideline I think is what you referred to a
7 few minutes ago as the document you're referring to?
8    A    Yes.
9    Q    Okay.
10        MR. KAREN:  And we'd just like Exhibit
11 47 to be marked for use of this deposition.
12 BY MR. KAREN:
13    Q    Sir, if you go through here, can you tell me
14 -- you mentioned a minute ago when I asked you about
15 the recruiting of other coworkers when you recruit a
16 loan officer, and you mentioned to me that there was
17 something in this exhibit that referenced that as a
18 guideline, and I was wondering if you could point that
19 out for me.
20        MS. KREITER:  Object to the form.
21 Misstates the question.
22    Q    You can go ahead, sir.

6 (Pages 18 - 21)

Page 22

1    A    And could you repeat the question, please?

2    Q    Sure. What in Exhibit 47 pertains to the

3 recruiting of coworkers by a loan officer?

4    A    And I'm not sure I understand in terms of

5 recruiting other loan officers.

6    Q    Okay. Well, let's kind of back up. I asked

7 you do you have any policies when you're hiring a loan

8 officer pertaining to that loan officer you are hiring

9 recruiting coworkers? You understand what I'm talking

10 about there; right?

11    A    I believe so.

12    Q    Okay. So just to be clear. You're

13 recruiting a loan officer. They're still working at

14 Mortgage Company X. Okay? And while they're working

15 at Mortgage Company X, let's say they were recruiting

16 coworkers while they're still there. That's the

17 scenario I'm talking about. Okay?

18    A    Okay.

19    Q    And my question is do you have any policies

20 pertaining to that type of scenario?

21    A    We would expect them to follow whatever

22 their contract is with their company.

Page 23

1    Q    Okay. Now, is that policy in writing

2 anywhere?

3    A    I want to look through this offer letter if

4 I could here, take a moment.

5    Q    Absolutely.

6    A    I do see actually on the bottom of page -- I

7 think it would be 2 on this document, in the last

8 paragraph, "By signing this offer and accepting

9 employment with Waterstone Mortgage, you affirmatively

10 acknowledge that you are now currently subject to any

11 restrictive covenants from previous employers that

12 would restrict your ability to perform the duties

13 required by this position."

14    Q    Okay. "Duties required by the position."

15 But this is a job as a loan officer; right? That's

16 what the offer letter you're referring to is

17 pertaining to, the job as a loan officer; correct?

18    A    Well, this document we're looking at on page

19 1 is a producing sales manager.

20    Q    Okay. But producing sales manager isn't

21 necessarily required as a part of their job to recruit

22 the loan officers they're currently working with at

Page 24

1 their prior employer; right?

2        MS. KREITER: Object to the form.

3    Q    Let me say it again, sir, a different way.

4 You agree that a producing manager can come work for

5 Waterstone and be highly successful for Waterstone and

6 without necessarily recruiting the loan officers that

7 work for them while they're working for them at their

8 current employer; right?

9    A    And -- and I'm sorry. If you could repeat

10 the question again?

11    Q    You would agree that a producing branch

12 manager could perform their job for Waterstone without

13 recruiting their current coworkers at their former

14 employer while they still work there; right?

15    A    And I'll reference we have a wide variety of

16 branches and positions. And, you know, example, a

17 branch that a producing manager may not produce much,

18 and they're more there as support for their people

19 versus somebody who is a producing manager has a team

20 around them and supports their production. So we

21 really support both of those structures.

22    Q    So the point is you could perform your job

Page 25

1 at Waterstone as a branch manager or a sales manager

2 without soliciting your coworkers while you still work

3 with them; right? That's possible.

4        MS. KREITER: Object to the form.

5    A    Well, and -- and I'm kind of confused by the

6 way you're wording it, and I just -- I go to some -- I

7 think of some of our existing branches. But, again,

8 I've got a producing manager. He had three support

9 people that he originates --

10    Q    Right. So that's my point.

11    A    -- and he is successful.

12    Q    That's right. So without recruiting

13 anybody, we're just having a couple people, right, he

14 is able to do his job as a producing sales manager;

15 right?

16    A    He -- he is able to produce and be

17 successful with three support people. Correct.

18    Q    Right. And you could also take a job as a

19 producing manager; after you leave, recruit people;

20 right? You don't have to recruit them on the way out

21 the door. You could leave a company and start

22 producing, and then hire other people to work with

7 (Pages 22 - 25)

Page 26

1 you; right?
2    A   Certainly somebody could produce once
3 they're -- once they begin employment with us.
4    Q   So, and let me ask you another question,
5 sir.  You would agree with me -- have you ever heard
6 of a duty of loyalty?
7    A   Not necessarily.
8    Q   You've never heard that term?
9    A   I've maybe heard, but I -- I guess I'm not
10 sure what definition.
11    Q   Okay.  Well, let's look.
12        MR. KAREN:  Nick, can you bring up
13 Exhibit 22?
14        (Exhibit 22 was marked for
15        identification.)
16 BY MR. KAREN:
17    Q   And, sir, this is a Waterstone Mortgage
18 Producing Manager Sales Agreement.  I think it's also
19 for Chris Wolf.  Do you see that?
20    A   Yes, I do.
21    Q   Okay.  And are you generally familiar with
22 this agreement?

Page 27

1    A   Somewhat.  Not -- not every section of it,
2 but somewhat.
3        MR. KAREN:  If we can go to Section
4 1.4?
5        MS. KREITER:  I'm going to object.  I
6 don't think this is within the scope of the deposition
7 topics.
8 BY MR. KAREN:
9    Q   Sir, could you just read Section 1.4?  Not
10 out loud.  Just to yourself really quickly, and let me
11 know when you're done.
12    A   Oh, okay.  Got it.  I've read through it.
13    Q   Okay.  You understand that one of the key
14 concepts, I think, in that Section 1.4 is that the
15 people who work with you, Chris Smith or Chris Wolf in
16 this case, is only going to work for Waterstone, you
17 know, while its performing services for Waterstone?
18        MS. KREITER:  Same objection.  Not
19 within the deposition topics.
20    Q   Do you see --
21    A   I -- I see it.  It states as he is an
22 employee, he is employed with Waterstone and worked

Page 28

1 for Waterstone.
2    Q   Only; right?
3    A   Yes.
4    Q   Okay.
5        MR. KAREN:  You can put this away.  I
6 don't need to look at this anymore.
7 BY MR. KAREN:
8    Q   My question, sir, is you said you were kind
9 of familiar, I think.  I don't want to, you know,
10 paraphrase.  But I think you said you were somewhat
11 familiar with the concept of a duty of loyalty a few
12 minutes ago?  Remember saying that?
13    A   Sure.
14    Q   Okay.  And for the purpose of this, does
15 this Section 1.4 as you read it consistent with what
16 you're sort of understanding of a duty of loyalty is
17 generally?
18    A   Well, as I read it for the Waterstone
19 Mortgage contract, that's -- I'm reading and it seems
20 very clear to me about the fact they're an employee of
21 ours and they work for us and only Waterstone.
22    Q   Right.  Okay.  And would you think that's a

Page 29

1 fair understanding generally, at least from your
2 perspective, of what a duty of loyalty means?  You're
3 going to work for one company at a time and be loyal
4 to that company when you work for them?
5    A   Well, I'm -- I'm not going to speak on
6 behalf of other companies.  I mean, I look at ours and
7 this is our expectation per our contract.
8    Q   Yes.  Your expectation.  Right.  That's
9 exactly how I wanted to ask.  So using that as the
10 expectation, do you think that it's consistent with
11 that expectation to have somebody that you pay to
12 supervise other loan officers recruiting those loan
13 officers when they're working for you?
14        MS. KREITER:  Object to the form.
15    A   And -- and I guess if you could ask that
16 again, please?
17        MR. KAREN:  Madam Court Reporter, could
18 you please read back my question?
19        THE REPORTER:  Please stand by.
20        (The reporter read the record as
21        requested.)
22        MS. KREITER:  Object to the form.

8 (Pages 26 - 29)

Page 30

1    THE WITNESS: And I would go back to my
2  previous where we have different types of branches.
3  And if a branch -- that's the goal we mutually have is
4  that they're going to be -- they want to recruit and
5  we support that and that's going to be their
6  structure.
7    Or is it back to that example I
8  provided of somebody who's going to originate and
9  simply have some support staff around them?
10 BY MR. KAREN:
11   Q   No, sir. That's not my question. Is it
12 consistent from your perspective as Waterstone that
13 one of your supervisors -- let me restart that
14 question.
15   Is it consistent with your expectations of
16 loyalty that one of your loan officers' supervisors,
17 while working for you and being paid by you, would be
18 recruiting the people they supervise for you for the
19 benefit of another company? Is that scenario
20 consistent with what you see as their duty of loyalty?
21   MS. KREITER: Object to the form.
22   A   So if I'm understanding your question

Page 31

1  correctly, somebody's employed with us --
2    Q   Let's go through this. Okay? Break it
3  down. Someone's employed with you. Okay? Follow me
4  so far?
5    A   Yes.
6    Q   Okay. Their job that they're being paid for
7  by you is to supervise other loan officers.
8    A   Right.
9    Q   Okay? And while they're being paid by
10 Waterstone to supervise its loan officers, they're
11 actually recruiting those loan officers for another
12 company. Do you see that as consistent with the duty
13 of loyalty we just discussed?
14   A   Yeah. I would expect that that would not
15 fall in line with this paragraph.
16   Q   Got it. And can you tell me any reason why
17 Waterstone's expectations would be different from any
18 other mortgage company in this regard?
19   MS. KREITER: Object to the form.
20   A   And -- and I'm sorry. If you could repeat
21 the question?
22   Q   Sure. So you explained to me what

Page 32

1  Waterstone's expectations would be. We just talked
2  about that; right?
3    A   Yes. Yes.
4    Q   So can you explain to me any reason why you
5  think Waterstone's expectations would be different
6  from any other mortgage lender in that regard?
7    A   I -- I certainly -- mortgage companies are
8  different. I feel like I can speak on behalf of our
9  company and our expectation.
10   Q   And I understand. So all I'm asking is if
11 you can -- and if you can't, that's totally fine. You
12 know, so I'm only asking you can you identify anything
13 that would make Waterstone unique in that regard in
14 terms of its expectations of its supervisors?
15   A   And I -- and I would speak to -- to us.
16 That's who I've been with for quite a few years. I
17 would speak to our -- to our expectations.
18   Q   Okay. So you wouldn't be able to identify
19 any reason why those expectations are unique in the
20 mortgage industry?
21   A   I -- I, again, would go back to what our
22 expectation at Waterstone Mortgage is.

Page 33

1    Q   No. I understand that. So I'm asking you
2  is there any reason why you believe or if you believe,
3  better yet, that those expectations are unique?
4    A   I -- I don't know that those are unique to
5  our industry.
6    Q   Okay. Or, I'm sorry. Not the industry.
7  Your company. Are they unique to Waterstone?
8    A   To our company. Right.
9    Q   And do you think Waterstone's expectations
10 in this regard are reasonable?
11   A   Well, we have it in our agreement that's our
12 expectation is that that's -- they're working for us
13 and going to work for us.
14   Q   Now, you know, I didn't ask this, Mr. Allen.
15 Can you tell me real quickly what is your current role
16 with Waterstone?
17   A   Yes. I'm senior vice president of sales.
18   Q   And very, very briefly, if you could just go
19 through how long have you been at Waterstone?
20   A   Just over 12 years.
21   Q   Okay. And what was your first position
22 there? What was the title?

9 (Pages 30 - 33)

Page 34

1    A    I believe national sales manager.

2    Q    Okay.  And is being a senior vice president

3 a promotion over national sales manager or just

4 reorganization of titles?  If you could explain that?

5    A    Yeah.  It was a -- I'm part of the executive

6 team; still am.  I -- I shifted to more focus on

7 prospecting.

8    Q    Got it.  Okay.  And when did that happen?

9    A    That was, I believe, September of 2019.  It

10 was approximately four years ago.

11    Q    Okay.  So you were national director of

12 sales for sounds like about seven years, and then you

13 became a senior VP of sales?

14    A    Yes.  So it was -- yeah.  Maybe just over

15 eight years for the national sales, and then the four

16 years here in this current role.

17    Q    Okay.  Going back to the some of

18 the things we were talking about a few minutes ago, do

19 you have any -- again, I'm sorry about that.  Does

20 Waterstone have any policies pertaining to the

21 solicitation of customers from a loan officer while

22 they are still employed by their company and they're

Page 35

1 intending to come to Waterstone?

2    A    And I -- and I would refer to the offer

3 letter, again, of which that -- that's where we would

4 have language identifying our expectation.

5    Q    Okay.

6        MR. KAREN:  And if, Nick, you can pull

7 up Exhibit 47?

8 BY MR. KAREN:

9    Q    And, Mr. Allen, I believe you said you have

10 those exhibits there?

11    A    Yes.  In paper form likewise.  Yes.

12    Q    Is it easier for you to have them on the

13 screen or just look at them on paper?

14    A    I -- I'm good with onscreen also.

15    Q    Okay.  All right.  We'll do both.

16    A    If that's okay.

17    Q    And, yeah.  Absolutely.  But if you want to

18 refer to paper, that's fine too.  And just let me know

19 when you're ready, sir.

20    A    Okay.  Ready.

21    Q    So if we could go to that page, which is

22 Bates number 5267?  And you'll have to excuse me,

Page 36

1 Mr. Allen.  I've got a little bit of a cough, so I'll

2 try not let that interfere too much.  But I can't help

3 it.

4    A    All right.

5    Q    So if you can look through this, you

6 mentioned that there's some language here that

7 pertains to the solicitation of customers while

8 somebody's coming over Waterstone, transitioning.

9    A    Yes.

10    Q    Okay.  And I think I see this.  That would

11 certainly involve paragraph 1, right, that talks about

12 information or assets from your previous employer?

13    A    Thank you.  Yes.  The number 1 saying we --

14 whoops.  Let me just take a step back here.  Yeah.

15 Stating, "The loans currently in your pipeline are

16 property of your former employer."

17    Q    Okay.  So what this is saying is that -- and

18 I think it also says in the last line, "also applies

19 to loan prequalifications that haven't moved to the

20 application stage."  See where it says that?

21    A    Yes, I do.  On the last line of number 1.

22 Correct.

Page 37

1    Q    So this is essentially company policy.  It

2 says when there's a loan officer transitioning, you

3 know, what's in their pipeline from their prior

4 employer is supposed to be left there and not taken;

5 right?

6    A    And I -- and that -- in terms of the words

7 -- I don't know if necessarily a policy.  But, again,

8 it's our expectation in writing to our candidate or

9 prospect.  Yeah.

10    Q    Right.  Okay.  And what I'm trying to

11 understand from this, it says "The supplies to loan

12 prequalifications that haven't yet moved to

13 application stage."  When you're talking about in this

14 policy -- I'm going to call it a policy, but I

15 recognize that it's not necessarily policy.

16        But we'll call it that without necessarily

17 using the word "policy," if that makes sense, just for

18 our conversation.  Is that okay, Mr. Allen?

19    A    Sure.

20    Q    Or is there a better word you'd like me to

21 call it that is more comfortable for you?

22    A    I -- I use the word "expectation" --

10 (Pages 34 - 37)

Page 38

1  Q   Okay.  "Expectation" is fine.
2  A   Okay.
3  Q   So in this expectation that you've listed,
4  what is considered a prequalification so I understand
5  this expectation?
6  A   I don't feel like we define it here, but I
7  feel like that would be -- that they have a potential
8  customer that they have pulled credit on.
9  Q   Okay.  So what if they have a customer they
10 haven't pulled credit on, but they've been talking to
11 them while they're still at their prior employer?  Is
12 that something you expect them to leave there or do
13 you think that's more of a free game situation?
14 A   I -- I feel like that still is somebody that
15 they have been inquiring and talking about -- that
16 company.  So I feel like that would be part of what I
17 would see here.
18 Q   Okay.  So, essentially, if there's a
19 potential customer that you've been talking to while
20 you work for your former employer, they're supposed to
21 leave it at their former employer?
22 A   That would be the expectation unless that

Page 39

1  customer in the future decides that they want to work
2  with Waterstone.
3  Q   So if that customer were to reach out
4  affirmatively on their own, then that's different.
5  But your expectation is that they won't be soliciting
6  those people?
7  A   Yeah.  Upon somebody announcing -- because
8  they've been working with that customer, I would
9  expect they're going to announce that they have left
10 and upon that or the customer reaching back out, that
11 at that point, that's up the customer, the borrower, I
12 should say, as to who they want to work with.
13 Q   Okay.  All right.  And, obviously, when
14 you're talking about somebody announcing they're
15 leaving, that would apply after the point they've made
16 that announcement, not before, of course; right?
17     MS. KREITER:  Object to the form.
18 A   And -- and if you could ask the question
19 again, please?
20 Q   Yes.  I guess, you know what?  It's kind of
21 a silly question.  Let me just think about this for a
22 second.  Let me ask it this way.  You mentioned that

Page 40

1  when they announced that they're leaving and they tell
2  the customer --
3  A   Yes
4  Q   -- that the customer would then have a
5  choice.  Is that understanding what you just said?
6  A   Yes.
7  Q   Okay.  And I just want to refine that down a
8  little bit.  You're talking about a public
9  announcement; right?  Like, where everybody knows,
10 including their prior employer, that they're not
11 leaving.
12     Not something that is, hey, keep this a
13 secret, but I'm leaving and I don't want my employer
14 to know, but I want you to know so you can come with
15 me.  That's not what you're talking about there;
16 right?
17 A   Certainly it would be upon them telling --
18 and I -- and I'm simply struggling because if they
19 happen to be close friends with the customer.
20     And so I'm very careful not to say in a
21 public announcement because could it be when they know
22 somebody well enough that they're stating, hey, I've

Page 41

1  been working with you, and I'm making this
2  announcement tomorrow, for example.  That -- that's
3  all.  I'm just providing there could be some
4  situations like that.
5  Q   Okay.  With that caveat, I think I
6  understand.  So excluding sort of close relationships
7  where it would be almost strange that they didn't tell
8  somebody slightly in advance of telling their
9  employer, right, generally, what we're talking about a
10 scenario where it's transparent to everybody involved
11 that this person is leaving and they're announcing it
12 to their customers?
13     Am I understanding that generally?
14 A   Yes.
15 Q   Okay.  Got it.  All right.  And just to be
16 clear, there isn't a "written policy" -- I'm using air
17 quotes.  Nobody can take that down, but air quotes.
18 But that's what the place that is recorded is in these
19 expectations that we've been talking about right here
20 in Exhibit 47; right?
21 A   In -- in this offer letter, yes.  This
22 document.

11 (Pages 38 - 41)

1    Q   Okay. Got it. Now, how does it pertain --
2 and let's just keep this up here. It also says in
3 number 2, "Please refrain from copying or otherwise
4 recording your client's personal information from your
5 previous employer systems." Do you see where it says
6 that on number 2?
7    A   I do see that. Yes.
8    Q   Okay. And so, for example, one of those
9 systems would be, like, a loan origination system;
10 right?
11    A   Yeah. That would be an -- yes.
12    Q   Okay. And isn't the loan origination system
13 -- well, I'll ask the question. The loan origination
14 system contains most of the sensitive information for
15 customers, doesn't it?
16    A   Yes. I'm just thinking through in our
17 system. Yes. It would be the -- and you say
18 "sensitive." I guess just making sure I'm on the
19 page, identifying sensitive information, as to what
20 that would be?
21    Q   When I'm talking about "sensitive," I'm
22 talking about sensitive personal information of a

1 customer, Social Security Number; credit score; you
2 might have to access to bank account numbers, things
3 like that.
4    A   Yes. And I was thinking things like Social
5 Security Number. Yes.
6    Q   Okay. And that's going to be the LOS, the
7 loan origination system?
8    A   If that's been taken by the loan officer as
9 part of their, you know, whatever part of the process
10 they're in.
11    Q   That it would be stored in the LOS?
12    A   In the LOS. And I'm thinking again of our
13 system. Yes. It would be in there.
14    Q   I know there a couple different LOS's out
15 there that mortgage companies use. What's the name of
16 Waterstone's LOS?
17    A   We use Encompass. I think that's the name
18 it still goes by these days, if it's ICE Mortgage or
19 whatever. But Encompass I feel like is the name
20 still.
21    Q   And that's a pretty common loan origination
22 system for companies to use. I think it's probably

1 the market leader; wouldn't you agree?
2    A   I'm not sure of market leader, but I feel
3 like anybody coming over, that's typically the system
4 they've been using.
5    Q   Okay. So it's a very common system at a
6 minimum?
7    A   Yes.
8    Q   Okay. And can you tell me what Encompass,
9 other than -- let me ask it this way. What does
10 Encompass do as a loan origination system? If you
11 were to explain an LOS to a layperson, someone who
12 doesn't know anything about mortgages, can you give me
13 a one-minute blurb of what an LOS does?
14    A   To me, it would be housing the borrower's
15 data, documents, all for the purpose of being able to
16 put together that information for somebody to review
17 and find out if it's creditworthy and acceptable to
18 move on to approve for a loan closing.
19    Q   Got it. And after a loan's closed,
20 Encompass also houses information about the closed
21 loans; right?
22    A   Yeah. We would still have that data in

1 Encompass upon, yes, after the loan has closed.
2    Q   Okay. But in addition to the data we're
3 talking about right now, it would also have data about
4 the actual loan that was closed; right? You know, the
5 terms of the loan; you know, if and when it recasts,
6 you know, in terms of the interest rate; interest rate
7 of the loan; the type of loan product, all that would
8 be in there too; right?
9    A   Yes. The closing documents, which would be
10 the note, the security instrument, yeah, things like
11 that that were part of the actual closing. Yes.
12    Q   Okay. And all that is confidential
13 information too, isn't it?
14    A   I -- I don't -- I guess I'm trying to think
15 of customer private information because, for example,
16 the security instrument is a recorded document. So I
17 just think of that one as being available if somebody
18 wanted to search for that --
19    Q   I'm sorry. Let me rephrase my question. I
20 certainly understand there is some public information
21 involved there; right? But there's also a lot of not
22 public information included in Encompass there about

Page 46

1  closed loans; right?
2     A   I -- I think we'd go back to something like
3  the Social Security Number.  Yeah.
4     Q   Okay.  Is the note publicly available?
5     A   I am not sure.  I'm not sure if that is
6  because I think of the security instrument as being
7  the recorded document.
8         So I don't know that the note is available
9  or not -- in terms -- in many -- I feel like you'd
10 have the terms in that security instrument.  I'm not
11 sure what else a note would provide.  But I'm not
12 sure, actually.
13    Q   Okay.  Well, let me ask you this.  I mean,
14 certainly, whether it's public or not, Waterstone
15 would consider that confidential information; right?
16        MS. KREITER:  Object to the form.
17    A   In which -- and -- and I -- I guess, which
18 part of that being confidential?
19    Q   Well, for example, I mean, a list of loan
20 officers; all their closed loans; the names of the
21 customers; their contact information; knowing when
22 they're a refinance; if there's an ARM, when the ARM

Page 47

1  expires; what type of term it was knowing the interest
2  rate, you know, all that stuff could be used very
3  effectively to market, you know, to those customers;
4  right?
5         MS. KREITER:  I'm going to also object
6  that this is outside the scope of the deposition
7  topics.
8     Q   Okay.  You can answer.
9     A   And -- and I would go back to the security
10 instrument because there would -- and I feel like
11 other providers that companies can go purchase
12 information from so there could be information people
13 could go and gather and accumulate to be able to find
14 out, you know, what is the interest rate and, you
15 know, is that, you know, what would they have to hit
16 to be able to refinance them, for example.  What
17 interest rate, I'm sorry.  Yeah.
18    Q   But you said the magic word just a second
19 ago, purchase.  There's a value to that information;
20 right?  In other words, it's not just sitting there on
21 the street for anybody to get.  You'd have to comb
22 through it and get someone to -- you know, you have to

Page 48

1  pay for the acquisition of that information; right?
2         MS. KREITER:  I'm going to object.
3  Outside the scope of the deposition topics.
4     A   And the one document I kind of keep going
5  back to is a security instrument because I don't -- to
6  me, I don't know that that's -- to purchase.  I don't
7  know.  But that would be the one I'm -- if somebody
8  wanted to go search records and do -- do that work, I
9  think they could.
10    Q   Okay.  But generally speaking, if you wanted
11 to find out, tell me all the borrowers that worked
12 with Waterstone that have a 5 percent or more interest
13 rate, there would generally be, unless you had access
14 to that information -- even if you could get it, you'd
15 have to pay for it, generally speaking; right?
16 There's a value to it.
17        MS. KREITER:  Object to the form.
18    A   And I'm -- and I honestly am not familiar
19 enough with what people are purchasing out there for
20 the purpose of, you know, refinancing customers.
21    Q   But I'm simply asking as the national sales
22 director -- or, I'm sorry.  I apologize,  The senior

Page 49

1  VP sales, you do see value in the information about
2  interest rates on loans that you've closed and the
3  contact information for those borrowers, that's
4  valuable to you, isn't it?  It's valuable business
5  information?
6     A   Certainly knowing, yeah, what the customer's
7  interest rate is to know when a possible refinance
8  would be there.  Yes.  There -- there's value to that.
9     Q   Particularly when you have their contact
10 information, right, and you also kind of have some
11 information about their credit score, their income?
12 Again, it could change, but it still has some value?
13        MS. KREITER:  Object to the form, and
14 I'll object outside the topics of the deposition.
15    A   And -- and, again, certainly value, as you
16 stated, you're correct because things can change very
17 quickly with that customer on their credit score or
18 their job or what have you.
19    Q   Yeah.  Okay.  So given that there's some
20 value to that type of information for a mortgage
21 company, what type of guidance do you give loan
22 officers in transition about taking that information

13 (Pages 46 - 49)

Page 50

1 from their prior employer?
2    A    And just to be clear, you're indicating
3 individuals coming over to Waterstone?
4    Q    Yes.
5    A    And -- and I -- I would go back to then this
6 document indicating about refrain from copying or
7 otherwise recording, this number 2, the statement
8 involving "client's personal information from your
9 previous employer systems." That would be our
10 expectation.
11    Q    Right. So your expectation is they're not
12 going to do that; right? They're not going to take
13 any of their prior employer's information -- kind of
14 like the stuff we were talking about, they're going to
15 leave it there; right?
16    A    Yes.
17    Q    Okay. Are these expectations ones that
18 Waterstone takes seriously?
19    A    Yes, we do.
20    Q    Okay. So let me ask you something. At the
21 bottom of this page, it says, "If you are found to be
22 in violation of these guidelines and your previous

Page 51

1 employer consequently takes legal action against you,
2 this may result in changes to your employment status
3 with Waterstone Mortgage." Do you see that?
4    A    I do see that.
5    Q    Okay. Are you aware of any change in the
6 status of Chris Wolf with Waterstone?
7    A    In status being -- and I'm sorry. Just
8 trying to be clear on the -- your question.
9    Q    Well, has Chris Wolf in any way faced
10 disciplinary action in connection with the allegations
11 stated in this case?
12    A    There certainly were conversations with him
13 about the allegations. So, yeah. There -- there were
14 conversations around that.
15    Q    Has his title changed?
16    A    Not that I'm aware of.
17    Q    And has he been demoted in any way?
18    A    Not that I'm aware of.
19    Q    Has he had any pecuniary ramification
20 associated with this?
21        MS. KREITER: Object to the form.
22    A    And -- and in what -- and, I'm sorry. If

Page 52

1 you could just maybe expand on that? I'm not sure I
2 understand the question.
3    Q    Well, what negative consequences happened to
4 him as a result of the allegations in this case?
5    A    Well, I -- I go back to what I stated is
6 that there were conversations with him about, again,
7 the accusations that were made.
8    Q    Well, so there could be conversations. It
9 could be, can you tell me what happened? That's a
10 conversation. Or there could be, you know, a formal
11 reprimand.
12        So has there been anything in writing at all
13 put in his personal file, any kind of reprimand, any
14 type of actual discipline associated with Chris Wolf
15 associated with the allegations made in this case?
16        MS. KREITER: I'm going to object to
17 the extent that this calls for attorney-client
18 conversations.
19    Q    Sir, excluding any attorney-client
20 conversations, has there been any discipline reprimand
21 or formal written document given to him, a warning,
22 anything like that pertaining to the allegations in

Page 53

1 this case?
2    A    I -- I'm not aware of any specific I feel
3 like you're referencing outside of a reminder of the
4 expectations per this document that was provided to
5 him.
6    Q    And would it surprise you if I asked Chris
7 Wolf that information and if he told me that he hadn't
8 been reprimanded or disciplined in any way? Would
9 that surprise you?
10        MS. KREITER: Object to the form.
11    A    I -- I -- without being part of that
12 conversation and the content of that, I -- I don't
13 feel like I can answer that.
14    Q    And there's been no discipline or other
15 reprimand of Chris Smith; right?
16        MS. KREITER: Object to the form.
17    A    And -- and for Chris Smith, a reprimand in
18 relation to what? I -- I guess I'm just --
19    Q    The allegations raised in this case. I'm
20 sorry for not clarifying. The allegations raised in
21 this case. There's been no discipline of him either;
22 right?

14 (Pages 50 - 53)

1    A   Well, I'd go back to them where we would
2  simply -- did they follow what the expectations were
3  per these documents that they sent?
4    Q   Okay.  But I'm asking about discipline.  Has
5  there been any discipline, reprimand, anything like
6  that?
7    A   I mean, certainly, there has been
8  conversations there -- there -- regarding the
9  allegations.
10    Q   I understand there have been conversations.
11  I'm asking about actual discipline.  Has there been
12  actually any discipline?
13         MS. KREITER:  Object to the form.
14    A   And -- and I -- I just keep referring back
15  because I'm not sure in terms of what your definition
16  of discipline is versus saying we have an
17  expectation --
18    Q   Beyond having a conversation, has there been
19  any discipline?  And what I mean by discipline -- and,
20  actually, sir, I mean, your counsel stipulated
21  yesterday that Mr. Smith hasn't been disciplined
22  associated with the allegations in this case.  So

1  you're not going to take back that stipulation you
2  guys made yesterday; are you?
3    A   And did you -- and just to be clear because
4  you -- just for a moment -- did you say has not been
5  disciplined?
6    Q   Has not been disciplined.
7    A   Has not been disciplined.  Yes.  So I -- I'm
8  simply just trying to understand definition of that.
9  But outside of going back to this and saying, hey,
10  this is our expectation, yes, nothing else that I'm
11  aware of.
12    Q   Okay.  And my same question with respect to
13  Dwayne Hutto.  He hasn't been disciplined either; has
14  he?
15         MS. KREITER:  Object to the form.
16    A   And the same answer be this is the
17  expectation of the things that he signed.  Same --
18  same answer.
19    Q   Okay.  And can you advise me if any loan
20  officer who came from Mutual -- I'm going to call it
21  Mutual Mortgage instead of Mutual of Omaha Mortgage;
22  is that okay?

1    A   Sure.
2    Q   Just making it faster.  So of any loan
3  officer that came from Mutual, have any of them been
4  disciplined for any of the allegations raised in this
5  case?
6         MS. KREITER:  Same objection.  Object
7  to the form.
8    A   Again, I'm not aware of any -- any action as
9  you're describing it, any discipline.
10    Q   So what good is it to have a formal
11  expectation if you don't enforce it?
12         MS. KREITER:  Object to the form.
13    Q   I mean, is it a wink-wink, nudge-nudge, you
14  know, we just say it but we don't do it?  So my
15  question is what's the value of a policy if you don't
16  enforce the policy?
17    A   And -- and I'm not clear where it was not
18  enforced.
19    Q   Okay.  We'll get to that a little later.
20    A   Okay.
21    Q   Now, you've been in the mortgage industry
22  how many years, sir?

1    A   Approximately 34 years, I believe.
2    Q   Okay.  And is it fair that you follow the
3  industry closely being in it?  You know the current
4  events, what's going on, sort of industry trends?
5         MS. KREITER:  Object to the form.
6    Q   Is that a fair assumption?  And if not, I
7  mean, just tell me.
8    A   Not -- not necessarily day-to-day.  We rely
9  upon others that share information on the ongoings --
10    Q   Right.  And I'm not suggesting you track it
11  carefully day-by-day.  But are you generally familiar
12  with what's going on in the industry being that you're
13  the senior vice president of sales?
14    A   As it pertains to, yeah, where interest
15  rates are approximately, in a production out in the
16  industry, the challenges these days, yeah.  Yeah.  I
17  mean, that kind of general knowledge.  Sure.
18    Q   Do you follow lawsuits between lenders?
19    A   Not necessarily.
20    Q   Okay.  So are you aware if there've been a
21  lot of lawsuits, right, in the last couple years
22  between lenders relating to recruiting practices?

15 (Pages 54 - 57)

Page 58

1    A   I've seen -- I've seen maybe a few out
2  there.  Nothing specific I can recall.
3    Q   Okay.  And excluding this case, has
4  Waterstone in the last, let's say, five years been
5  party to any lawsuits relating to recruiting
6  practices?
7         MS. KREITER:  Object to the form.
8    A   And -- and in terms of when you identify as
9  in terms of recruiting, I just want to make sure I'm
10  clear on what -- what the question is.  Sorry.
11    Q   Okay.  Well, what do you define as
12  "recruiting"?
13    A   Recruiting from what I do is talking to
14  individuals and providing them reasons as to why they
15  would want to join Waterstone Mortgage.
16    Q   So to make that a little more concise,
17  recruiting you would define as efforts, the intent of
18  which is to result in a loan officer working for one
19  company to come and work for Waterstone?
20    A   Yes.
21    Q   Okay.  So my question is whether Waterstone
22  has in the last five years, let's just say, been party

Page 59

1  to a lawsuit relating to recruiting practices?
2    A   I -- I'm not aware of any related to
3  recruiting practices.
4    Q   Okay.  Are you aware of any that relate to
5  hiring of loan officers from another company or hiring
6  of branch managers from another company?
7    A   And not to the hiring of an individual or
8  the practice of that.
9    Q   Okay.  How about with respect to taking of
10  any information from another mortgage company?
11    A   And -- and you had said within the last five
12  years, yes, we had one lawsuit in the last five years.
13    Q   Okay.  And who were the parties of that
14  lawsuit?
15    A   It was -- and I'm trying to recall.  It was
16  -- it was around five years ago.  And I apologize.
17  I'm drawing a blank on the name of the company.  It
18  was -- so I can remember the individual at our company
19  was Dale Couch, who came over.  But I'm just -- right
20  now, as the name of the company, I'd -- I'd have to
21  back and reference with it being five years ago.
22    Q   Okay.  What court was it in?

Page 60

1    A   It was in Texas.
2    Q   Okay.  And if I asked you that same
3  question, but instead of lawsuit, I said
4  "arbitration," would your answer be any different?
5    A   I don't -- I'm not aware of any -- if you're
6  asking through arbitration, I'm not aware of anything.
7    Q   Okay.  And let me ask you.  Has Waterstone
8  initiated any lawsuits against companies relating
9  their hiring of its loan officers or taking of its
10  information?
11    A   And I am not aware of lawsuits that we have
12  filed.  I'm not aware of -- I'm not aware of that.
13    Q   Now, sir, let me ask something.  You do
14  understand, again, as a corporate designee that there
15  were certain topics that you were supposed to be
16  prepared for today?
17    A   Yes.
18    Q   And let me show you what's been marked as
19  Exhibit 51.
20         (Exhibit 51 was marked for
21          identification.)
22         MR. KAREN:  Nick, could you bring that

Page 61

1  up?
2  BY MR. KAREN:
3    Q   Mr. Allen, have you ever seen this before,
4  this document?
5    A   If you could give me a moment here.
6         MR. KAREN:  And while you're doing
7  that, if we could just have this marked as Exhibit 51
8  to this deposition?
9         THE WITNESS:  Yeah.  And I feel like I
10  -- the deposition topics -- so this does -- and I'm
11  just making sure it's what I had reviewed.  But this
12  does look like a document that I did look at with the
13  topics to cover.
14  BY MR. KAREN:
15    Q   Okay.  And other than looking at this notice
16  -- and please don't share with me as you answer this
17  question any actual conversations you've had with your
18  counsel.  Okay?  So I don't want to know anything the
19  lawyers have you said to you or you have said to them.
20         So without divulging that, if you could
21  explain to me other than looking at this notice what
22  have you done to prepare for today's deposition?

16 (Pages 58 - 61)

Page 62

1    A    Looked at various documents; the forensics
2  report; the findings on files, I think that has been
3  filed.  I don't know if that document's within what
4  we're looking at.  Talked to some individuals that
5  were involved at -- at a variety of different points
6  in time with the -- both with the groups and
7  individuals.
8            MR. KAREN:  Okay.  And if you could
9  turn to Topic 9?
10 BY MR. KAREN:
11   Q    When you get a chance to look at that, let
12 me know.
13   A    Okay.  I see it.
14   Q    Okay.  So my question is -- we'll go through
15 these -- these different ones.  But with the lawsuits,
16 what did you do specifically to prepare for number 9?
17   A    Well, you -- you had stated down in terms
18 of with our legal, so that's why I'm hesitating --
19   Q    Well, you could just say you talked to your
20 lawyer.  That would be fine.  Don't say anything else.
21   A    So talked -- talked to legal.  That is
22 correct.

Page 63

1    Q    Okay.  That's all you did?
2    A    Yes.  On this one, that is correct.
3    Q    Okay.  So other than this case in Texas that
4  you mentioned, there are no other cases that have been
5  brought against Waterstone from your research that
6  pertain to such hiring loan officers from another
7  company, taking information from another company, or
8  taking another company's customers; is that right?
9    A    There was one other outside of five years,
10 because you had earlier just said in the last five
11 years.  So there was one other in 2016.
12   Q    And who did that involve?
13   A    That was First National Bank out of Texas.
14   Q    And what was essentially alleged in the
15 First National Bank case?
16   A    And I'm sorry.  Just missed the beginning of
17 your question there.  Sorry.
18   Q    That's okay.  What was alleged generally in
19 the First National Bank case?
20   A    Alleged that the individual who came over, I
21 believe it was, had solicited a customer.
22   Q    Okay.  And in the case that involved Dale

Page 64

1  Couch, can you tell me what was alleged in that case?
2    A    Yes.  And, in fact, it wasn't Dale named,
3  just to be clear on that.  It was two employees of his
4  or that worked with him, Kelsey and -- and I'm -- last
5  name I would chop up real badly.
6            But it was two individuals.  And that had to
7  do with working with referral partners that they --
8  that they had worked with at the previous company.
9    Q    Okay.  Okay.  And have you, again,
10 Waterstone, received demand letter or cease and desist
11 letters in any cases other than the ones we've
12 mentioned here relating to that same type of conduct?
13   A    And -- and you're saying you're not
14 referring to those two cases I just referenced in 2016
15 --
16   Q    Correct.
17   A    -- and 2018 --
18   Q    I would presume in those cases -- I'm sorry.
19 I didn't mean to cut you off, sir.
20   A    That's okay.
21   Q    I presume in those cases, the ones we just
22 talked about, the two in Texas that you probably

Page 65

1  received demands and correspondence before a lawsuit,
2  so I'm excluding those from this answer.
3            So my question is are there any other
4  scenarios involving recruiting or hiring of loan
5  officers, taking of information, taking of customers
6  where Waterstone has received a cease and desist type
7  of letter or a legal demand associated with those
8  types of actions?
9            MS. KREITER:  I'm going to object that
10 that's beyond the scope of Topic 9.
11   Q    You can answer.
12   A    And I'm not aware of any others that have
13 gone on.
14   Q    And let me ask you a question.  Does
15 Waterstone have something called a "transition team"?
16   A    No.  No.  We -- we don't have an official
17 group called "transition team."
18   Q    Okay.  Well, how about, I'll just ask an
19 unofficial group called "transition team"?  Can you
20 explain how that term is used?
21   A    And I feel like transition/onboarding.  And
22 the -- and just depend on, you know, what does the

Page 66

1 group look like coming on. So that could differ.
2 That's probably why we don't have an official group
3 necessarily. But, yeah. Onboarding/transition.
4    Q    And who's on the onboarding team?
5    A    And -- and just so I'm clear, when you say
6 "onboarding," just making sure I'm clear in kind of
7 definition of what you're -- the question is.
8    Q    Well, okay. You tell me. What does
9 onboarding do?
10    A    And -- and the reason I question back was
11 just it involves so many people and individuals to
12 onboard a -- a person, a number of people, whatever it
13 is. That's where I -- all the way from accounting to
14 set up commission plans to human resources to IT for
15 equipment. It -- it involves a lot of individuals and
16 departments.
17    Q    Okay. So are there specific people whose
18 job is primarily just to onboard loan officers from
19 other companies where that's their primary job?
20    A    I think of, for example, our Encompass
21 trainer who would -- who would train on Encompass.
22 And that could -- and that would be a focus on new

Page 67

1 originators, to introduce them to our version because
2 each version may be different. And he certainly
3 likewise works with existing. But, again, he would
4 primarily be focused on new -- new hires.
5    Q    Okay. So other than that, you don't have
6 onboarding teams?
7    A    And -- and I think of, like, human
8 resources. But, again, human resources is working
9 with existing employees.
10    But then likewise, with offer letters to
11 paperwork as they're joining us, that's where they
12 would be involved in the onboarding. That's, again,
13 where I feel like there's a split, you know, between
14 people who just that's their only focus. So they're
15 going to -- yeah.
16    Q    Well, we're going to go look at some emails
17 today, and here's my question. With respect to
18 individuals who were participating in onboarding, you
19 know, Dwayne Hutto's branch, right, were there some
20 people that were sort of assigned or did it just
21 simply happen de facto or were they assigned to
22 assigned in the onboarding of those branches? Do you

Page 68

1 understand my question?
2    A    I -- I think, and I'll -- and I'll answer it
3 that, you know, some individuals that were more
4 involved would've been, for example, Jen Witon, who's
5 in human resources, generated offer letters, was
6 onsite. Melissa Wagner, also in human resources.
7 Cassidy Duborg, who is in human resources.
8    So the three of them would've been more
9 involved in terms of with that paperwork and onsite.
10 I mentioned --
11    Q    How about -- I'm sorry to cut you off. How
12 about Elizabeth Spragg? I saw a bunch of emails with
13 her.
14    A    And Elizabeth oversees human resources, so
15 is involved. And at some point, then her teams takes
16 that over. So she oversees -- yeah.
17    Q    Now, is Elizabeth Spragg involved in every
18 originator who comes on to Waterstone?
19    A    She is -- she is aware that we have a weekly
20 call with my recruiting team in human resources, and
21 she is on that call. So she would be aware of who's
22 coming on board, and then I feel like determine who

Page 69

1 would handle the onboarding the paperwork for that
2 individual or individuals.
3    Q    Okay. And would she get personally involved
4 in that every time?
5    A    I -- I don't feel like every time she would
6 not be personally involved, other than being aware
7 certainly of who is joining our company and what that
8 looks like. Is it an existing branch? Is it a new
9 location? So she'd be aware of it, but not
10 necessarily personally involved.
11    Q    Is it for common for Waterstone to bring on
12 when it recruits an entire branch all at once?
13    A    And if you could repeat just the first part
14 of that question or the question, please?
15    Q    Is it common when Waterstone is recruiting
16 to recruit an entire branch all at once to come
17 onboard?
18    A    And -- and I don't feel like an entire
19 branch -- if we end up with a new location, that's
20 going to be with a -- the branch manager is who we're
21 going to be talking with in that new location. That
22 combined -- as much as it's going to -- we're going to

18 (Pages 66 - 69)

Page 70

1  be working with individual loan officers being added
2  to existing locations.
3      Q    Okay.  So here's my question.  When you
4  recruit a branch manager at Waterstone, you're
5  recruiting the branch manager and that branch
6  manager's employees, right, by default?
7      A    Well, I -- I'm talking with that branch
8  manager.  I'm -- I'm not recruiting the other
9  employees.  I'm recruiting that manager or that
10  leader.
11      Q    Yes.  I understand.  You're recruiting that
12  manager; right?  But it's within your expectation that
13  they may be bringing some of their employees with
14  them; right?
15      A    Well, it's a -- it's a risk we take that we
16  do not know upon them announcing that they're leaving
17  who may join them, who may decide not join them.
18  That's a risk we take.
19      Q    Well, why are you saying, "It's a risk we
20  take," being Waterstone?  Why is it a risk Waterstone
21  takes?
22      A    Well, it -- it's a risk not knowing who is

Page 71

1  going to decide to likewise join Waterstone.
2      Q    I guess what I'm saying is why is that a
3  risk?  And that's what I'm just confused about.  Is it
4  because -- let me see if I understand this and just
5  tell me if I got this right.
6          So you're talking to a branch manager;
7  right?  And I think you said earlier this could be a
8  person who produces 95 percent of the branch or 2
9  percent of the branch; right?
10      A    Yes.
11      Q    Okay.  And so when you say "risk," if you
12  bring over a person who produced 2 percent of the
13  branch and nobody else comes with them, then you may
14  have overpaid or may have somebody who isn't going to
15  produce.  Like, that's a risk you're talking about;
16  right?  That's an example.
17      A    I think that's a good example.  Correct.
18      Q    Right.  So, and obviously, there's less of a
19  risk if it's somebody who's bringing 95 percent of the
20  branch volume because then whether those people come
21  or not, they're not the producing individuals; right?
22      A    That's correct.  Yes.

Page 72

1      Q    So when we're talking about risk in this
2  context, what we're talking about is the resources,
3  which could be compensation, any other financial
4  investments Waterstone makes that that investment will
5  not match the actual opportunity because what
6  Waterstone gets may not match what was at the other
7  company.
8          Does that make sense if I'm understanding
9  what you're talking about by "risk"?
10          MS. KREITER:  Object to the form.
11      A    I -- I think not only an expectation of what
12  somebody was doing as much as market conditions that
13  we've experienced our whole industry in the last year
14  or year and a half.  So that -- that's also, I think,
15  is another thing I think of risk as in we don't know
16  where that's going and it's, yeah, it's been very
17  challenging, of course.
18      Q    Okay.  Got it.  Got it.  So there's really
19  two parts of the risk.  One is part of the risk of are
20  we getting what was over there that we're evaluating,
21  "there" being the other company, and then how are
22  market conditions going to change and how it will

Page 73

1  affect them.  That's sort of the risk you're talking
2  about; right?
3          MS. KREITER:  Object to the form.
4      A    And -- and I feel like I -- I feel like it's
5  what -- what is the production going to be?  I guess,
6  regardless of the scenario, what is the production
7  going to be?
8      Q    Got it.  Okay.  That makes sense.  All
9  right.  So you said to me a minute ago that when you
10  recruit a branch manager, I think you said you were
11  just recruiting that manager.  You don't necessarily
12  recruit their employees.
13      A    Correct.
14      Q    Okay.  So who does recruit their employees?
15          MS. KREITER:  Object to the form.
16      A    And we -- we do -- there is -- at our
17  company, are you asking?
18      Q    Yeah.  No.  I'm talking about Waterstone.
19  When you recruit -- because let me ask you this.  I
20  was making an assumption.  As senior vice president of
21  sales, part of your job is recruiting; right?
22      A    Yes.

19 (Pages 70 - 73)

Page 74

1   Q   Okay.  And do other people work for you that
2   are recruiters, like, at Waterstone?
3   A   Yes.  I have two individuals that work with
4   me.
5   Q   And who are those people?
6   A   Catherine Mauldin and -- do you want the
7   spelling?
8   Q   No.  That's okay.
9   A   Oh, sorry.  Okay.  And Melissa Masek.
10   Q   And were either of them involved in
11   recruiting Mr. Hutto or Mr. Smith?
12   A   I do not believe so.  I don't believe either
13   one.
14   Q   Okay.  You were involved in that; right?
15   A   I did have direct conversations with Dwayne.
16   Yes.
17   Q   Okay.  And I don't want to get too far off
18   track here.  When Waterstone brings on a branch
19   manager and his employees, since you don't recruit
20   those employees to come over, how do those employees
21   learn of the opportunity to come to Waterstone?
22   A   I would expect it would be upon Dwayne in

Page 75

1   this example announcing that he is going to another
2   company.
3   Q   Okay.  So is it fair to say -- I just want
4   to talk about this generally, and then we'll talk
5   about it with respect to this scenario.  Is it fair to
6   say that you will rely on the branch manager to talk
7   to their subordinate employees about the opportunity
8   to come to Waterstone if and when that branch manager
9   makes the decision to come over?
10       MS. KREITER:  Object to the form.
11   A   And -- and I would just state as I -- that
12   Dwayne would announce he's leaving and would tell his
13   team.  I mean, he would, you know, he's -- they work
14   for him.  So to meet my expectation is he needs to
15   tell them he is leaving.
16   Q   Right.  Well, and technically, you
17   understand they're not employed by Dwayne.  They were
18   employed by Mutual; right?
19   A   Sure.  They were employees of Mutual.
20   Right.
21   Q   Right.  So I understand under his
22   supervision -- I mean, I understand that's what you

Page 76

1   meant.  But just so we're clear, what you were saying
2   in a very normal vernacular like we all use, they were
3   supervised by Dwayne, but employees of Mutual.  You
4   would agree with me; right?
5   A   Yeah.  They were employees of Mutual.
6   Q   Right.  Okay.  So in that scenario, what was
7   happening is you were talking to Dwayne and then
8   letting Dwayne tell the people at his branch that he
9   supervised about the opportunity at Waterstone.
10       MS. KREITER:  Object to the form.
11   Q   Right?
12   A   And -- and my conversations were with
13   Dwayne, and I'm just stating that because I don't --
14   yeah.  My conversations were with him.
15   Q   I understand that.  But, obviously, you knew
16   there was a possibility; right?  And we'll look at
17   documents later that shows this.  That way Dwyane
18   would be bringing over the employees he supervised;
19   right?
20   A   Well, and he certainly at some point needs
21   to tell people that he is -- and announcing that he is
22   leaving.  I mean, so at some point, there's going to

Page 77

1   be a conversation.
2   Q   Well, let's look at Exhibit 52.
3       (Exhibit 52 was marked for
4        identification.)
5       And, sir, I'm going to show you an email.
6       MR. KAREN:  Can you make it a little
7   bit bigger, Nick?
8       THE WITNESS:  That would be great.
9   BY MR. KAREN:
10   Q   Okay.  And that's an email from Chris Wolf
11   to you on April 14th.  Do you see that?
12   A   I do.  Yes.
13   Q   Okay.  And do you recognize this email?
14       MS. KREITER:  Sorry, Ari.  Can I just
15   -- I don't have Exhibit 52 in what you sent over.
16       MR. KAREN:  Oh, you know what?  Because
17   actually, we just added it this morning.  So, sorry.
18   I don't have a written copy of that.
19       MS. KREITER:  Can I just -- copy,
20   Kevin?
21       THE WITNESS:  Yeah --
22       MS. KREITER:  Can you --

Page 78

1      MR. KAREN: Yeah. Sure. Please, take
2  a second. Let me know when you're ready, Maria.
3      MS. KREITER: I'm just going to pull it
4  up from our system. Give me a minute.
5      MS. JEWELL: Could you read the Bates
6  number on that, Ari?
7      MR. KAREN: Yeah. You know, actually,
8  hold on. Maybe I can't. It's WMC006899. Or,
9  actually, the first page is, yeah, 6899.
10      MS. KREITER: Ari, give me just a
11  minute.
12      MR. HELSABECK-OCHOA: This is Nick,
13  Ari's paralegal. Would it be helpful if I emailed it?
14      MS. KREITER: That would be great.
15  Okay. I've got it here, actually. It came up on my
16  end.
17      Do you need it, Kevin? I can send it.
18      THE WITNESS: No. I'm okay with the
19  paper and looking at the version here. Yep. I'm
20  good.
21  BY MR. KAREN:
22      Q    And I won't have tons of questions about

Page 79

1  this. It's just really for evidence. So you
2  recognize this email, sir?
3      A    Yeah. This looks -- been a while ago, but
4  yes. Looks somewhat familiar.
5      MR. KAREN: So we'll just have this
6  marked as Exhibit 52 to this deposition.
7  BY MR. KAREN:
8      Q    And, sir, I wanted to draw your attention to
9  the first line of this email. It says "Hey, Kevin,
10  let us know where we land on the hourly pay." Do you
11  see where it says that?
12      A    I do.
13      Q    Okay. Now, you hadn't spoken to any of the
14  actual loan officers. The only people you've talked
15  to are Dwayne, Chris Smith, and Chris Wolf; right?
16      A    That is correct. Those are the three
17  individuals I spoke with. Yes.
18      Q    Right. And just to be clear, right now,
19  this is what we're talking about with respect to
20  Waterstone in general. Those were the individuals
21  they were recruiting was Chris Wolf, Smith, and
22  Dwayne; right?

Page 80

1      A    Yes. With those three individuals. Yes.
2      Q    Okay. And it says here "Let us know where
3  we land on the hourly pay." Chris Wolf isn't an
4  hourly paid guy, is he?
5      A    No. As a manager, he would not be.
6      Q    Okay. And neither would Mr. Hutto or
7  Mr. Smith; right?
8      A    Correct. As a manager, would not be hourly.
9  That's correct.
10      Q    And so by implication, you obviously know
11  we're talking about the loan officers or other
12  subordinates of theirs when they say "Let us know
13  where we land on the hourly pay; right?
14      A    And I would -- I -- I wanted to look at the
15  bottom of this in terms of if it is loan officers is
16  my assumption. I want to be careful on assumption.
17  But I believe this would be on loan originators.
18      Q    Yeah. I think so too. And, actually, why
19  don't we toe to that next line while we're here
20  because I think it's pretty clear. If you see this
21  line, it says "Commissions" that Nick has just taken
22  us to. You see the line of the paragraph that starts

Page 81

1  "Commissions"?
2      A    Yes.
3      Q    Commissions would only pertain to loan
4  officers; right?
5      A    Yes. You could have bonus for non-
6  originators. But for the most part, commissions would
7  be for loan originators.
8      Q    And it says "Commissions. My understanding
9  is that the tiered structure for everyone." You see
10  the word "everyone"?
11      A    Yes.
12      Q    Okay. So what we're talking about between
13  the commission and the hourly pay is loan originators;
14  right?
15      A    Yes. As -- as I can see on this document.
16  Correct.
17      Q    And they would obviously be loan originators
18  that work for Mr. Smith, Hutto, or Wolf; right?
19      A    It could be individuals that they knew there
20  or it could be individuals that they were -- that were
21  not -- that were employed at a different company.
22      Q    Okay. But let's scroll up now. "And they

21 (Pages 78 - 81)

Page 82

1 asked they would like of no draw, but would like
2 something for the first 60 days maybe." Do you see
3 that?
4    A  I do.
5    Q   Okay.  Now, are you telling me it was your
6 expectation at this point on the 14th that they were
7 not bringing over loan officers with them?
8    A   I would go back to my risk comments and I'll
9 -- that as to who was going to be coming or who was
10 not going to be coming.  Until the day somebody is
11 employed, we don't know.  That's what my --
12    Q   No.  I understand you don't know until
13 they're there.  But my question is you understand that
14 where we're talking about this, there's at least a
15 significant possibility that the individuals we're
16 talking about here, hourly pay and commissions are
17 their current loan officers that work for Mr. Hutto,
18 Smith, and/or Wolf; right?  You understand that
19 possibility, don't you?
20    A   Well, and in this case with Chris Wolf, just
21 because this is the conversation that -- it would be
22 with originators that he works with.

Page 83

1    Q   Right.  That worked for him; right?
2    A   Works with he and Dwayne's team.
3    Q   Right.  So here's my question.  We've
4 already established that obviously someone would need
5 to tell these originators about the opportunity at
6 Waterstone.  And Waterstone's not reaching out to
7 them; right?
8    A   Right.
9    Q   So it would have to be Mr. Smith reaching
10 out to them; right?  Or Smith or Wolf -- in this case,
11 Mr. Wolf most likely; right?
12    A   Certainly, Chris Wolf or Dwayne in this
13 example to announce that they are leaving the company.
14    Q   Okay.  So, and you also understand, don't
15 you, that -- let me actually take a step back.  The
16 managers -- I'm going to use "managers" to include
17 sales managers, producing managers; is that okay?
18    A   Sure.
19    Q   Okay.  So the managers at Waterstone get an
20 override on the production of the individual they
21 supervise, don't they?
22    A   We have different pay structures for our

Page 84

1 managers.
2    Q   But one of those pay structures would
3 include an override based on the production of the
4 people that work for them?
5    A   In -- in our different structures, some get
6 a straight override.  Some are on a financial expense
7 management model.  So there are different models.
8    Q   In the financial expense model, if I
9 understand it from other companies, that's a model
10 where it's kind of like what they used to call a
11 "P&L"; right?
12    A   A financial model.  A profit and loss.  But,
13 yeah.  It's -- expense management is where they have
14 -- they're involved with the financials of the branch.
15    Q   But, ultimately, their compensation is
16 affected by the people who work under them at that
17 branch, whether it's an override, whether it's this
18 P&L financial cost model; right?  The more that people
19 produce to work for them, the more money they make;
20 right?  All things being equal?
21    A   Under the financial model, hard to say in
22 the last year.  And I'm just indicating that because

Page 85

1 that's not necessarily the case in the last -- the
2 past year with the challenging market.
3    Q   Generally speaking though, in a generally
4 normal market, a manager's compensation can be
5 affected by those originators he's supervising or
6 she's supervising; right?
7    A   Certainly.  And -- and I -- yes, to what a
8 normal market.  But I -- yes.  They certainly can
9 benefit from.  Yes.
10    Q   Right.  So we're now having these managers
11 talk to their subordinate employees where they have a
12 financial incentive to bring their most productive
13 employees over with them, don't they?
14    A   I -- certainly, that they -- certainly,
15 they'd like to have people produce it.
16    Q   Right.  So you would have to agree with me
17 it's just logical sense that these managers would have
18 an incentive to bring over their best-producing loan
19 officers that work for them when they're talking to
20 them; wouldn't they?
21    A   Like, they certainly would like to have the
22 production.  Yeah.  It would -- would be a benefit to

22 (Pages 82 - 85)

Page 86

1 them to have production.
2    Q   Right. And it would be a benefit to
3 Waterstone too, right, as we talked about, that risk?
4    A   Certainly for -- yes. We would like to have
5 the production.
6    Q   So in a scenario where that manager, in this
7 case, Mr. Wolf, who's working for another company paid
8 for by that company at that time is announcing to
9 these producing individuals of the opportunity. You
10 follow the scenario I'm laying out for you right now?
11    A   That he is announcing that he is going to
12 another company. Sure.
13    Q   Right. And inviting them to join him;
14 right?
15    A   Well, and I -- and I was not there in terms
16 of those conversations, so I don't know where the
17 invite is. But to me, announcing that they're going
18 to another company. And I -- yeah.
19    Q   So in the case -- what I want to do is now
20 have a conversation about that announcement. Okay?
21 Now, I know you were not in the room.
22    A   Right.

Page 87

1    Q   But you've been in this industry how many
2 years?
3    A   Approximately 34.
4    Q   Okay. You're a short-timer. I'm obviously
5 being totally sarcastic; right?
6    A   Got it.
7    Q   Okay. And you've been working at Waterstone
8 12 years; right?
9    A   Yes.
10    Q   And you've been working in a capacity at
11 Waterstone for most of those 12 years where you've
12 been involved in recruiting; right?
13    A   Involved in sales and recruiting. Yes.
14    Q   Okay. And it's fair, sir, isn't, it, that
15 you could expect that those managers are going to want
16 to bring those employees over. We've already
17 established that; right?
18    A   They certainly want that production.
19    Q   So with your knowledge in this industry and
20 your experience, and understanding the financial
21 incentives at play, do you really, truly, honestly
22 expect that that manager is going to neutrally tell

Page 88

1 them about the job?
2    A   It -- it's my expectation and it's why we do
3 a lot of due diligence up front, and which a big part
4 of that is talking to these individuals and what type
5 of leader they are.
6       Because then if that person is a strong
7 leader, upon them announcing, and somebody is going to
8 follow because they are a strong leader, that is our
9 hope is that -- that would occur because they're a
10 strong leader.
11    Q   I didn't ask your hope. I asked that when
12 these people are taking -- and a transition is a
13 stressful event; right?
14    A   Yes.
15    Q   For everyone; right?
16    A   Yeah.
17    Q   And everyone's taking risks; right?
18    A   Yeah.
19    Q   And I'm just asking you if you think it's
20 reasonable to believe that the manager isn't going to
21 maybe put their thumb on the scale a little bit to
22 encourage people to come with them? Do you really

Page 89

1 think they're going to be totally neutral in that
2 announcement?
3       Or do you think just maybe -- is it
4 reasonably possible, sir, that you think that that,
5 well, they might try to convince people to come over?
6 You realize that's a possibility, don't you?
7    A   Well, and I go back to my comment. If
8 they're a strong leader, they can surely announce
9 they're leaving and somebody is going to be interested
10 in that company and why they're leaving and do they,
11 you know, start asking questions about joining
12 likewise.
13    Q   Okay. I understand that could happen.
14 That's how you're answering this. This could happen
15 if they're a strong leader.
16       I'm asking you though, with your knowledge
17 and experience in this industry, don't you believe
18 it's reasonably possible that in these situations with
19 the incentives and with the risks and knowing what
20 goes on in this industry -- that it's reasonably
21 possible, sitting in your shoes, to know that the
22 manager might make an effort to bring these people

23 (Pages 86 - 89)

Page 90

1 over?

2        Might encourage them?  You know that's
3 possible; don't you?

4    A   And -- and, again, I'm -- I'm answering it
5 as and why -- back to we go through so many
6 conversations with them feeling that they are a strong
7 leader that they are going to -- that people are going
8 to want to follow them.  I just -- yeah.

9    Q   I understand people wanting to follow them.
10 But that's not my question.  People can want to follow
11 you; right?  And in a risk situation where you have a
12 lot to lose and you have the opportunity to put your
13 thumb on the scale, you might do that; right?  That's
14 a reasonable human reaction; isn't it?

15    A   And -- and I -- I'm not -- again, not being
16 there, we expect they're going to follow their
17 existing contract.  And back to then the people
18 wanting to follow, and that's where we get a -- a
19 branch that comes over.  People follow.

20        And if that strong leader is truly that,
21 they stay.  And for the most part, most of these
22 people have stayed.

Page 91

1    Q   Okay.  But here's my question, sir; all
2 right?  I understand if you pick the strong leader and
3 we expect them to do it.  I understand the words
4 you're telling me.

5        But I'm asking you as an experienced person
6 in this industry understanding the incentives and
7 understanding the risk, do you really believe that
8 when this happens, people aren't going to do something
9 to encourage their staff to come over with them to the
10 new company?  As slight as it might be, they're not
11 going to do anything?

12        Here's my question.  You really believe --
13 under oath, subject to penalty of perjury, you really
14 believe they are going to neutrally announce it and
15 make no efforts whatsoever to encourage their people
16 to come wi1th them?  Is that your testimony?

17        MS. KREITER:  I'm going to object.
18 Both asked and answered, and really argumentative.

19    Q   Go ahead.

20    A   And -- and I -- I'm answering the way I am
21 because we are -- we want to be extremely careful in
22 making sure somebody does not run into an issue.

Page 92

1 That's my -- and do other companies do that and press
2 their people?  I'm sure people do.  I'm sure people
3 do.

4        But that's not -- that's not my expectation
5 in any way at all, because if somebody wants to go
6 somewhere else or not join Waterstone, that, to me, is
7 what we want the situation to be versus running into a
8 problem and an issue.

9    Q   But that's not my question, sir.  Do you,
10 Kevin Allen, really believe that in this situation
11 with risk and in this situation with incentive that a
12 manager is truly going to do nothing to encourage
13 their employees to come over with them?  Is that what
14 you believe?  I'm just asking.  You can tell me yes or
15 no.

16    A   I -- I -- in fact, to me, then that's my
17 looking at that individual.  And if they're going to
18 go down a different path and do things that are not
19 ethically correct, I -- then we stop our recruiting
20 process.  That's what we do.  We say no to many
21 people.  So that -- that's -- yes.  That is my honest
22 answer.

Page 93

1    Q   And so when you say "ethically correct," you
2 agree with me if they did try to put their thumb on
3 the scale and they did try to encourage their loan
4 officers to move over with them, that would not be
5 ethically correct; right?  That's what you're
6 referring to; right?

7        MS. KREITER:  Object to the form.

8    A   And -- and if somebody is forcing them and
9 providing them no choice, I'm not sure what example --
10 if they're forcing them to say, hey, you're coming
11 versus saying, hey, you -- you got an option.  I'm
12 leaving.

13        Somebody starts asking questions, say, you
14 have an option.  Just like a customer.  A customer
15 wants, hey, leaving a company, you know, I'm
16 switching, the customer has an option.  Just like an
17 employee at-will has an option as to where they're
18 going to work.

19    Q   Sir, that's not my question.  So you're kind
20 of changing a little bit here now.  So now, you're
21 saying "force them."  But you understand, sir, we
22 don't have indentured servitude in the United States;

24 (Pages 90 - 93)

Page 94

1 right?

2     A    Yeah.  Nobody is forced to work with a

3 company.  Right.

4     Q    Right.  Okay.  So we all know they can't

5 force them to come; right?

6     A    Right.

7     Q    Okay.  So let's take "forced them to come"

8 out, since that's silly since it can't happen.  All

9 right.  So what I'm asking though is, now, you've said

10 if we're dealing with someone who's going to act in a

11 manner that's not ethically correct, so I want to

12 understand that, what you were testifying to.  Okay?

13        Do you believe it is ethically correct when

14 you are a manager for another company paid to

15 supervise the employees of that company, to encourage

16 those employees to go with you to another lender?  Do

17 you think that is ethically correct?

18     A    And not -- not to encourage.  Again, if they

19 announce it and somebody starts asking questions about

20 wanting to join, that's my expectation.

21     Q    And what if, sir -- let me ask you

22 something.  One of the reasons why it's not ethically

Page 95

1 correct is because the other employer doesn't know;

2 right?

3     A    And does not what?  And, I'm sorry.  Just

4 making sure I'm clear on --

5     Q    I understand.  Does not know about what's

6 going on.  In other words, let's talk about

7 Waterstone; right?

8        If Waterstone had a branch, right, and one

9 of its managers walked into you and said, Mr. Allen,

10 I've decided I'm going to leave.  You know, I'd like

11 to take my people with me or make them an offer.  And

12 I understand you can make them offers too.  Then, in a

13 very transparent setting, the employees can consider

14 their options; right?

15     A    If -- if that were the scenario.  Right.

16     Q    Okay.  But then you as Mr. Allen and then

17 Waterstone have no idea that's happening, it's not

18 really a fair situation, is it, right, because

19 person's being recruited to go to another company and

20 you don't get to kind of say your piece about why you

21 should stay; right?

22     A    Well, I -- I would say typically it's not a

Page 96

1 complete shock to us when somebody is leaving.  So I

2 feel like somebody -- if we are doing our -- what we

3 should be doing, either visiting them, talking to

4 them, consistently knowing of the issues they're

5 having.  And if they're starting to raise issues, are

6 we addressing those or not?

7        So if somebody is talking about departing

8 then or saying, hey, I'm leaving, typically that's

9 just not some big surprise for us.  Usually it's been

10 something we've been trying to work through an issue

11 with them.

12     Q    Right.  I understand what you're saying

13 there, and that really wasn't my question.  My

14 question was more of when your branch or the branch

15 employees are being recruited by their supervisor, and

16 you're not even aware of it, right, you're not in a

17 fair position to make those people alternative offers;

18 right?

19     A    Well, we -- we certainly could if our

20 company is strong enough -- in fact, we've had some

21 people who have chosen to stay with us --

22     Q    No.  No.  You could -- right.  Right.  You

Page 97

1 could, but you first have to know about it happening

2 before you could keep them; right?

3     A    Well, I go back to the -- if we're doing

4 what we should be doing and are aware of the issues at

5 a branch, then we would -- should be addressing those

6 -- those items, issues why is somebody contemplating

7 leaving?  And that, again --

8     Q    That's not my question.

9     A    Oh, okay.

10     Q    Okay?  My question is that in order to make

11 a competing offer to a loan officer to stay who works

12 with the branch manager, you have to know that branch

13 manager is actually leaving.

14     A    And -- and you're saying prior to the day

15 that they're telling us?

16     Q    Yeah.  Of course.

17     A    Right.  And I -- I feel like it's -- it's

18 common in our industry that somebody tells somebody

19 they're leaving.  And we've had some people actually

20 stay to close out a pipeline if there's a cordial

21 parting.  Most of them it's going to be they're done

22 that day, so --

25 (Pages 94 - 97)

Page 98

1    Q   Okay.  But my point is that -- you know,
2  I'll come back to this in a minute.  We'll go through
3  some documents.
4        MS. KREITER:  Ari, when you have a
5  chance, let me know when it's a good time for a break.
6        THE WITNESS:  And I was just going to
7  ask, yeah, for a restroom or --
8        MS. KREITER:  Bathroom break?
9        THE WITNESS:  Yeah.
10       MR. KAREN:  Yeah.  This is a fine time
11 now.  It's okay.  We can take a break now.  What do
12 you want?  Five, ten minutes?  What works for you?
13       MS. KREITER:  So our lunch is here.
14 We're an hour behind you, Ari.  Do you want to take a
15 half an hour and just do bathroom break and lunch
16 together?
17       MR. KAREN:  Let's see.  What time is it
18 for me, because my lunch is not here.
19       THE VIDEOGRAPHER:  Just one second.
20 We're going off the record.  The time is 1:17 p.m.
21       (Off the record.)
22       THE VIDEOGRAPHER:  Going back on the

Page 99

1  record.  The time is 1:24 p.m.
2        MR. KAREN:  Nick, can you bring up
3  Exhibit 21, please?
4        (Exhibit 21 was marked for
5         identification.)
6  BY MR. KAREN:
7    Q   Sir, I'm showing you what's being marked as
8  Exhibit 21.  This is an email from Chris Wolf to
9  Dustin Owen.  Do you see that?  It's dated January
10 10th.
11   A   Yes, I do.  On the top, yes.
12   Q   2022?  And if you could turn to the second
13 page of this email at the very bottom, you're going to
14 see it says we're on November 4, 2021,
15 dustinowen@waterstonemortgage wrote -- and then it
16 says, "Hello, Chris.  Please see below for our answers
17 in red."  Do you where it says that on the first line
18 of the page?
19   A   Yes, I do.  Yes.
20   Q   Okay.  Now, were you involved in preparing
21 the answers that he's referring to in red?  And I can
22 show them to you if you want if that helps you.  We're

Page 100

1  scrolling down now so you can see them.
2    A   And if you could pull that a little bit
3  again, that'd be great.
4    Q   Of course.
5    A   Yeah.  Thank you.  And then if you could
6  scroll down, would be -- like, right in there, that'd
7  be great.  And, I'm sorry.  What was the question
8  again related to that?
9    Q   Sure.  Sure.  We can leave this up, but let
10 me ask a better question first.  Can you tell me who
11 Dustin Owen is?
12   A   He is -- his title, regional sales manager.
13 I don't know if he's VP technically.  But he is a
14 regional out of the Florida location.
15   Q   Okay.  And is it their job also to recruit
16 as a regional, I guess it's sales manager or director
17 or something?  Is that part of their job to recruit
18 other branches?
19   A   In -- in our positions vary -- individuals.
20 But Dustin certainly is involved in recruiting.
21   Q   Okay.  So he's not necessarily part of your
22 department, per se, but he also does recruit; is that

Page 101

1  fair to say?
2    A   Correct.  He's part of that Florida region,
3  in fact, really the eastern part of the country.  But
4  more so Florida he focuses on and recruits.  And
5  correct.  Not part of my team.  Technically are
6  reporting up to me.  Right.
7    Q   Got it.  Okay.  So my question then is,
8  Dustin refers in this line that says --
9        MR. KAREN:  You don't have to go back
10 there, Nick.
11 BY MR. KAREN:
12   Q   But he made the statement you saw a minute
13 ago that said "Please see below for our answers in
14 red."  He made that statement "our answers."  I know
15 that you didn't write this.
16       My question is did other people participate
17 with Dustin to the best of your knowledge in writing
18 these answers or were these Dustin's answers on behalf
19 of Waterstone?  I'm just trying to figure out if more
20 people worked together to provide these or they're
21 just what Dustin said, if you know?
22   A   I -- I'd make a -- a strong assumption that

Page 102

1 it would've been if he did not know something, he
2 would've gone to a resource -- that we were providing
3 the -- an accurate answer back to Chris Wolf.
4    Q    Were you aware -- and we can just look at
5 number 2. It's sitting right here, for example. Were
6 you aware -- if you want to read this answer in red,
7 do you recall if you participated in providing, let's
8 just say, this answer? And when I say "you" here, I'm
9 talking about Kevin Allen, to be clear.
10    A    Got it. I don't -- I don't recall that I
11 was involved, you know, specifically to this answer
12 other than it would be my expectation of what -- what
13 we would expect is what it would be. So I -- I don't
14 know that I was, like, involved with the actual email
15 or not.
16    Q    Okay. So you see here where these are
17 questions -- you understand these are questions in
18 black. These are the questions from, I guess, Chris
19 Smith and Dwayne Hutto and Chris Wolf; right? And the
20 answers in red are how Mr. Owen responded. You
21 understand that?
22    A    Yes.

Page 103

1    Q    Okay. So let's look at number 2 since we
2 have it up here. They ask, "Can we send loans over to
3 start and build up a balance of money to fund the
4 transition? This is a big one." You see that where
5 he says that?
6    A    I do see that. Yes.
7    Q    So you understand what he's saying here is
8 we want, while we're still employed at Mutual, to send
9 over some people and send over loans to build up money
10 over at Waterstone to fund our transition? You
11 understand that's what they're asking?
12    A    And I do see, yes, where it says "Can we
13 send loans over to start and build up a balance of
14 money?" I see that.
15    Q    Here's what I'm questioning though. You
16 said to me a minute ago that you wouldn't hire
17 somebody if you thought they were doing something
18 ethically wrong, if they weren't an ethically strong
19 leader. Does this sound like an ethically strong
20 leader to you?
21        MS. KREITER: Object to the form.
22    Q    Somebody who says that I want to be a

Page 104

1 supervisor at this company and while I'm working
2 there, send money over to you to make my transition
3 smooth. Is that your definition of an ethically sound
4 leader?
5        MS. KREITER: Object to the form.
6    A    Unfortunately, in our industry, there are
7 many companies who that this would be their practice.
8 And that's -- I was pleased to see that Dustin
9 responded as we would expect to say, "No. We don't do
10 that. We have money that we want to invest in you,
11 and thus, that's not how we do it."
12        So it's a question many people ask. Many
13 people ask about it, and we are very clear about
14 saying, hey, here's how we do things. Because, again,
15 unfortunately many companies, you know, must promote
16 that because that's a question that comes up
17 frequently.
18    Q    But this isn't a company, sir. This is the
19 ethically strong leader you're talking about or
20 leaders you're talking about. And they ask for you to
21 allow them to start taking money from their current
22 employer and give it to you, effectively.

Page 105

1        And I'm asking you when you were telling me
2 how you only bring over ethically strong leaders, is
3 this the type of ethically strong leader you're
4 talking about?
5    A    And -- and maybe I wasn't clear on where I
6 was going with that. To me, Chris Wolf would not be
7 alone on an individual asking this question. People
8 -- other people who have considered joining because
9 they're used to other companies saying great, let's
10 set this up and get loans over before.
11        So I'm -- so I'm separating that because to
12 me, Chris Wolf is asking the question, "Can we do
13 this?" And Dustin is saying, "No, we're not." So
14 that --
15    Q    Okay. So it doesn't bother you from an
16 ethics perspective in bringing over these quote -- I'm
17 quoting, "ethically strong leaders"?
18        It doesn't bother you that these ethically
19 strong leader asked you to basically steal money from
20 his last employer and give it to you? You had to
21 answer, "No, we don't do that?" That is still within
22 the ambit of the ethically strong leader you hire;

27 (Pages 102 - 105)

1 right?

2        MS. KREITER: Object to the form.

3    A    And I'm glad somebody's asking the question.

4 I'm glad they're asking the question about how does

5 this thing get going and what does this look like?

6 And I'm saying that again because in other -- and I

7 don't know Chris Wolf and his history enough that he

8 experienced other companies that that's what they were

9 a proponent of.

10        I have no idea other than would rather

11 somebody ask the question. And everything else that

12 we talked to him about wasn't as if he was going to do

13 it and not tell us. I guess that, to me, would be

14 different.

15        But I -- yeah. This -- this, to me, was he

16 was asking the questions and we were saying, "Hey,

17 that's not -- not how we do it here." Other companies

18 may do that. That wasn't said. But, again,

19 unfortunately, in our industry, that -- there -- there

20 are others out there that do that.

21    Q    Right. So it's very common in your

22 industry; right?

1    A    It's common being what? I'm sorry. Just

2 making sure I'm clear.

3    Q    You said it's common that companies would

4 allow this type of thing to be done; right?

5    A    Well, not necessarily common. Just that

6 other companies do. That's -- there -- there are

7 companies out there that's -- they want somebody

8 to send stuff over before -- experience.

9    Q    So I want to make sure I understand this

10 then. So it definitely happens in the industry. You

11 see it all the time, right, that people ask questions

12 like this; right? That's what you're telling me?

13    A    People ask and inquire about how, yeah, how

14 a transition is going to work out.

15    Q    Well, this isn't just how is a transition

16 going to work out. This is can I steal money from one

17 company and give it to the other while I'm still

18 working there; right? I mean, this is embezzlement.

19 So they're asking you can I embezzle? And you're

20 saying no, we don't let you embezzle -- which kudos

21 for you. Okay??

22        MS. KREITER: Object to the form.

1    Q    So here's my question. From your

2 perspective of hiring ethically strong leaders, it

3 doesn't disqualify them in your mind that they would

4 ask to do this and say, "This is a big one"? That

5 doesn't disqualify you in your assessment of whether

6 this is an ethically sound leader; right?

7        MS. KREITER: Object to the form.

8    A    And to me, I look at this as transitioning

9 those dollars. That's my focus. And back to it's

10 unfortunate that companies and allow and promote loans

11 -- it's -- it's unfortunate in our industry that even

12 happens.

13        So I feel like are people used to -- and

14 then we immediately say no, that's going to be our

15 investment in dollars for somebody to transition over

16 without as much harm.

17        You had said it earlier there's a lot of

18 chaos and disruption going on, so we try to provide

19 then dollars to eliminate that and say, hey, we don't

20 want to be part of anything that would be bringing

21 loans over earlier.

22    Q    Okay. I understand that. But that's really

1 not my question. When you talked about evaluating and

2 bringing over ethically sound people, I'm simply

3 asking you, Kevin Allen, whether in your assessment of

4 whether somebody is ethically sound, the fact that

5 they would ask a question like that doesn't raise any

6 red flags for you?

7        MS. KREITER: Object to the form.

8    A    And -- and, to me, it would be one part of

9 conversation with Chris Wolf. And my defense of hi is

10 back to the -- what he maybe had experienced

11 previously. And I -- I said before I can't speak to

12 that.

13        But that is other individuals who have made

14 jumps to companies and had that been the promotion of.

15 So trying to separate the fact he's asking, I'm glad

16 he's asking the question and about the money piece

17 right after that because that, to me, is the reason

18 he's asking.

19    Q    Okay. So as I understand it, you read this

20 and you think this is proof that they are ethically

21 sound, that they had asked you can we embezzle? They

22 would ask you that question makes them ethically

28 (Pages 106 - 109)

1 sound? Is that how I understand your answer? Tell me
2 if I got that wrong.
3         MS. KREITER: Object to the form.
4   A   I -- I don't feel that's the way I stated
5 that. I feel like, again, I -- I can't speak to his
6 past and experience in going to different companies.
7 That's the part I can't speak to. I'm -- I'm --
8   Q   I'm not asking you.
9   A   Well, but I think there's an experience --
10 yeah.
11  Q   Sir, please listen to my question. I am not
12 asking you to assess his experience. I am not asking
13 you to justify any. I am simply asking you, in making
14 your assessment that this person is an ethically
15 strong leader, this question in your mind supports the
16 fact that he is an ethically strong leader; right?
17        MS. KREITER: Object to the form.
18  A   And -- and if you could ask the question
19 again because I'm not -- because I have -- yeah. If
20 you could ask the question again. I'm sorry.
21  Q   Okay. You testified earlier that you bring
22 over ethically strong leaders; right?

1   A   Yes.
2   Q   Okay. And so my question is making your
3 assessment that he is an ethically strong leader, this
4 question that he asked you about a transition team
5 supported your inference that he was ethically strong;
6 right? Do you understand my question?
7   A   The -- the fact he's asking the question and
8 having a conversation -- and, to me, I continue to
9 read in the paragraph I think is very, very important.
10 That's where I was going with the money part. There's
11 a concern of money.
12        And, again, each company handles however
13 they do. And ours is saying, hey, we're going to
14 invest in you. And so, yeah. This is how we do it,
15 as Dustin replied back to him.
16  Q   Sir, that is not my question. I'm asking in
17 making your assessment that he was ethically strong,
18 that he was an ethically strong leader, reading this
19 question -- forget about the answer. I'm asking about
20 the question.
21        In asking the question to you, can I take
22 loans from Mutual while I'm there and send them to

1 you, in making your assessment that he was an
2 ethically strong leader, the fact that he asked this
3 question supported your belief that he was an
4 ethically strong leader; right?
5   A   I -- I don't look at one line and one
6 question as then being able to qualify somebody as
7 ethically -- either ethically strong or not. I'm
8 trying to look at the whole picture and conversations.
9        And, again, I'd rather have somebody ask the
10 question. And I am going further in the paragraph
11 because, to me, I think it's important to look at it
12 and understand the why as to why is he asking that
13 question.
14  Q   Okay. But I'm not asking why. I'm asking
15 you, when you look at this, does it tend in your mind
16 looking at this paragraph to support the inference
17 that he's ethically strong or does it diminish the
18 inference that he's ethically strong?
19        I'm asking you, reading what he asked, does
20 it support -- you can read the totality of what he
21 asked. I'm simply asking in reading what we see here,
22 does it support or diminish your assessment of his

1 ethical strength?
2   A   To me, I'm -- I am looking in total and not
3 just this document. It's in conversation. And so I'm
4 -- I'm looking at it as we get to know Chris Wolf to
5 say, hey, is he a -- a good leader, ethically strong,
6 all those things or not?
7        So I still -- I'm stating that because to
8 me, I -- I'd rather somebody ask the question than do
9 otherwise. Not ask the question and make assumptions.
10  Q   Okay. So if I'm understanding your answer
11 correctly, and just tell me if I'm wrong, the fact
12 that he asked the question to you supported your
13 belief that he was an ethically strong leader?
14        MS. KREITER: Object. Asked and
15 answered.
16  Q   That's what I heard. If you tell me I'm
17 wrong, you just tell me I'm wrong.
18        MS. KREITER: It's getting
19 argumentative at this point.
20  A   I -- I just want somebody honest and putting
21 everything and anything out there. I'd rather we're
22 clear on it so there is just no misunderstanding.

29 (Pages 110 - 113)

Page 114

1 When they do ask any question and every question is
2 how we're going to tell them and say, hey, we'd rather
3 have everything out there.
4        And I had mentioned about past. I know you
5 had stated past -- but, to me, past in our industry I
6 think is important because, again, it's unfortunate
7 how many do that and there's many loan officers who
8 think that's -- that's how things go.
9        And we -- and, again, we stop and say no,
10 that's not how we do things here. I can't speak on
11 behalf why other companies think that's acceptable.
12 We don't. So I'd rather somebody ask the question
13 than just not doing that and then, you know, taking
14 actions that we look and go, hey, that did not follow
15 what we expected.
16    Q  I understand that. So, again, if I'm
17 understanding this correctly, the fact that he asked
18 that question supports your assessment of his ethical
19 strength; right?
20        MS. KREITER:  Asked and answered many
21 times. You're trying to --
22        MR. KAREN:  I'd like to get an answer

Page 115

1 -- Maria, I'll ask it 643 times until I get an answer.
2 I haven't got an answer. This is a yes or no
3 question. I'd like a yes or no to the question, or
4 I'll keep going.
5        MS. KREITER:  Well, the witness has
6 answered about five times at this point.
7        MR. KAREN:  That's fine. He has not
8 answered. He has not answered this is a yes or no
9 question.
10 BY MR. KAREN:
11    Q  Did it support your assessment that he was
12 ethically strong when you read paragraph 2? Did it
13 support your assessment, yes or no?
14    A  The fact that he asked the question -- I'm
15 repeating this, and then talking about the cash part
16 of this and why he's asking the question, that --
17 that's great. Again, I applaud him for asking the
18 question.
19    Q  I'm asking for a yes -- I think I know the
20 answer is yes. Is that wrong?
21    A  I don't know -- I don't know how this
22 classifies as an -- I'm just -- we're trying to put

Page 116

1 everything together and somebody -- and, to me, I'm
2 just pleased he's asking the question.
3        MS. KREITER:  The witness has --
4    Q  So you were happy that he asked this?
5        MS. KREITER:  Okay. The witness has
6 answered the question. He doesn't --
7        MR. KAREN:  He hasn't answered the
8 question -- you want to go in front in the judge again
9 and have him tell you again? Do you want to instruct
10 him not to answer?
11        MS. KREITER:  I'm not instructing him
12 not to answer but I think --
13        MR. KAREN:  Then I'm going to keep
14 going. Then I'm going to keep going.
15 BY MR. KAREN:
16    Q  So, Mr. Allen, yes or no --
17        MS. KREITER:  I'm going to put
18 something on the record --
19 BY MR. KAREN:
20    Q  Mr. Allen, yes or no --
21        MS. KREITER:  No. I'm going to put
22 something on the record. I'm going to put --

Page 117

1 BY MR. KAREN:
2    Q  Mr. Allen, yes or no -- Mr. Allen, yes or
3 no?
4        MR. KAREN:  We will take this up all
5 day.
6 BY MR. KAREN:
7    Q  Mr. Allen, yes or no?
8        THE REPORTER:  This is court reporter.
9 At this point we have untranscribable audio.
10        MS. KREITER:  Okay. So, Ari, I'm going
11 to put something on the record and then you can
12 continue or not. But at this point, I think you've
13 asked the witness a number of times. You are
14 insisting he answer --
15        MR. KAREN:  This is not a proper
16 objection, Maria. You're allowed to object to form.
17        MS. KREITER:  Okay. But I --
18        MR. KAREN:  You know, we'll get the
19 judge. Let's get the judge on. I'm going to have a
20 chambers call. Let's go on hold. We'll get chambers
21 call. Get him on the record.
22        Maria, you know that objections -- you

30 (Pages 114 - 117)

Page 118

1 are allowed to object to form. You are not allowed to
2 object to anything else. You are now making speaking
3 objections that are interfering with my deposition.
4 So -- I'm not finished.
5        So if you want to keep doing that, I'll
6 get the judge on the phone and we can determine
7 whether this one is in accordance with the rules, and
8 we can go back. Or I can just get an answer to my
9 question. It's very simple.
10       MS. KREITER: I am going to put on the
11 record that you are insisting on a yes or no answer
12 that you've asked about five times. That's what I'm
13 going to put on the record. Go ahead with your
14 question again.
15       MR. KAREN: All right. And I'm also
16 going to instruct you and warn you to not make
17 speaking objections, because I've been allowing them
18 all day and I've had it. So if they continue, we're
19 just going to stop the deposition, we'll go back to
20 the court, and then we'll resume it.
21       MS. KREITER: I have not -- been making
22 speaking objections all day --

Page 119

1        MR. KAREN: Yes, you have. You're
2 allowed to object to form, Maria. You know the rules.
3        MS. KREITER: Okay. And I've a lodged
4 a few objections to form. I've not make speaking
5 objections that would inform the witness as to his
6 testimony.
7        MR. KAREN: Asked and answered? That's
8 not one of them.
9 BY MR. KAREN:
10    Q    Okay. Mr. Allen, so I'll give you three
11 choices. You could say yes, you could say no, or you
12 can say I didn't find it relevant one way or the
13 other. Okay? So I'm giving you any option you want
14 there. I just want to understand what you're saying.
15       When you read the question that was offered
16 or asked by Mr. Wolf in number 2, did it support an
17 assessment that he was ethically strong, diminish an
18 assessment that he was ethically strong, or did you
19 find it wholly irrelevant to either way?
20       MS. KREITER: Object to the form.
21    A    I -- to me, I -- did not find it relevant,
22 although I don't want to use that term. And I'm

Page 120

1 simply saying that because, again, of the frequency of
2 people in our industry who asked this question.
3        That's why -- that's why I'm not -- is it
4 ethical for somebody to do that? No. I feel like
5 that -- like, no. It's not ethical for somebody to
6 bring loans over. But the fact that somebody's asking
7 because of the unfortunate in our industry, that there
8 are many out there who do accept that, that's why I'm
9 not providing this yes, no, or third bucket.
10       So I don't know. It's not ethical to send
11 loans over prior to, and yet I'd rather somebody's
12 asking questions of us. And if there are four other
13 things that we don't like about the individual -- we
14 just look and we're going to stop the conversation.
15 But we'd rather the question is there, so --
16    Q    Okay. And you agree that if it's unethical
17 for them to bring loans over, right, it's unethical
18 for you to take those loans over too, which is why you
19 have the answer you have there; right?
20    A    Correct. And to our offer letters that
21 state, hey, we do not want you bringing loans over.
22 Yeah. Yep.

Page 121

1    Q    Okay. Now, my next question though is this.
2 And we'll be ready to wrap up for lunch pretty soon,
3 actually. So I know I told you 20 minutes or so.
4 We're probably right there.
5    A    Okay.
6    Q    So we'll wrap up in a second after this. I
7 just want to finish the final question. So you had
8 said to me earlier that when we were talking about
9 managers announcing that they were leaving. Remember
10 that conversation about the manager announcing?
11   A    Yes. Yeah.
12   Q    Now, knowing all the things that go on in
13 this industry that you were just talking about that
14 are unfortunate, you know one of the things that goes
15 on in this industry -- not saying you do it, but you
16 do agree with me that you know one of the things that
17 goes on in this industry are that sometimes people
18 solicit their people before they leave. You know
19 that; right?
20   A    Sure. I'm sure that goes on in our
21 industry.
22   Q    Right. And, again, you would agree with me

31 (Pages 118 - 121)

Page 122

1 that's an unfortunate situation; right?
2   A   That is correct.
3   Q   But knowing that it happens, do you feel
4 that it's unreasonable for Waterstone to put the
5 managers exactly in a scenario to do just that?
6       MS. KREITER:  Object to the form.
7   A   And -- and I'm not sure I understand the
8 question.  So just ask to -- expand on that.
9   Q   We talked about transition, there's a risk.
10 Transition, there is potential financial reward of
11 these people coming on with the manager.  Remember
12 that discussion?
13  A   Yes.
14  Q   Okay.  And, now, we're going to add to this
15 situation that you know lots of times in those
16 situations in this industry, people often take the
17 wrong step and actually solicit their people; right?
18 We know that happens.  It's unfortunate; right?
19  A   Yes.
20  Q   Okay.  And here we've got somebody who
21 apparently, based on this email, has at least
22 experienced those situations; right?

Page 123

1       MS. KREITER:  Object to the form.
2   A   And -- and experience -- just to make sure I
3 understand.  Like, experienced --
4   Q   Let's change that.  It's a fair question.
5   A   Okay.
6   Q   Let's start over here.  So we've got a
7 scenario where there's the incentives.  We've got the
8 risks.  We understand this manager is in a position to
9 potentially do something wrong; right?  Follow me so
10 far?
11  A   Okay.
12  Q   And we're in a situation when that's
13 person's in a position to do something wrong where
14 we're in an industry where sometimes they do stuff
15 wrong; right?  And you're aware that; correct?
16  A   Okay.
17  Q   And yet, despite the fact that you're aware
18 of it, despite the fact that you know of the risk,
19 despite the fact that you're aware of the incentives,
20 Waterstone sets them up time and time and time again
21 as a matter of policy to have those discussions;
22 doesn't it?

Page 124

1       MS. KREITER:  Object to the form.
2   Q   That's your method of doing business; isn't
3 it?
4       MS. KREITER:  Object to the form.
5   A   And when you talk method of -- of that --
6 I'm -- I'm honestly not clear on what you're saying
7 with that.
8   Q   Your method, you told me, was that when
9 you're bringing over a branch manager, you let that
10 branch manager do the talking to their branch to see
11 if their employees want to come over.  That's the way
12 you do it.  You testified that.
13  A   And I -- again, I believe I testified that
14 they announce to their people that they're leaving.
15  Q   Right.  But no one's in that room to confirm
16 how that announcement comes in; right?
17  A   Correct.
18  Q   No one knows if they're saying, hey,
19 everyone, you got to come with me.  It's going to be
20 great.  Hey, everyone, this is the place to be.  This
21 place is terrible.  The place is going to fall apart
22 without me.  No one's to confirm what they say or what

Page 125

1 they do; right?
2   A   Correct.
3   Q   No one's there to ensure that they don't
4 cross that proverbial line; right?
5   A   Correct.
6   Q   And that's true despite the fact that you
7 know people do the wrong things in this industry,
8 despite the fact that you know what the incentives
9 are, and despite the fact that you know that there is
10 risk for them in this transition; right?
11      MS. KREITER:  Object to the form.
12  A   But it would -- but I'm -- but I'm not sure
13 -- I mean, to me, in the industry, I'm not sure how
14 that would work.  Would we -- I wouldn't see us having
15 to send an employee of ours to go advise that person's
16 team, and I'm just almost asking that because I don't
17 understand how somebody is not going to tell their
18 team that they're leaving.
19  Q   Sir, couldn't you say to them, hey, the day
20 after you announce to your company you're leaving, you
21 can call them all you want.  You can say whatever you
22 want.  You can announce.  But don't do it until

Page 126

1 everybody knows what's going on. Couldn't you tell
2 them that? Isn't that possible, sir?
3    A   I'm -- I'm not sure from these people, and I
4 -- the fact of the -- how long some of these people
5 have worked together as to the timing of that and
6 when that is and when that announcement is made.
7       Like, it's normal in the industry that
8 somebody is going to look to their leader and if
9 that's a strong leader, they're going to say, hey,
10 you're -- you're saying you're leaving? I want to go
11 with you.
12    Q   I understand and I'm not necessarily
13 disagreeing with you. But that's not my question. My
14 question is -- I think you asked me a second ago,
15 right, hey, I don't know how else it would be done.
16 Isn't that kind of what you just said to me a minute
17 ago if I understood your statement?
18    A   Well, I had said about somebody being in
19 that room with that individual. I think that was the
20 response to that, that we would not have an employee
21 of ours -- certainly, that would feel like then we're
22 there to recruit the other people.

Page 127

1    Q   But isn't it true, sir, that what's really
2 happening is that the people -- they're being
3 recruited, but they're being recruited by that branch
4 manager while that branch manager is still employed by
5 that other company, being paid that company to
6 supervise? Isn't that really happening, sir?
7       MS. KREITER: Object to the form.
8    Q   Without that company's knowledge? Isn't
9 that what's happening?
10      MS. KREITER: Object to the form.
11    A   And, certainly, somebody could have, you
12 know, shortly prior to leaving have a conversation
13 with somebody. I don't think -- again, that would be
14 abnormal in our industry.
15    Q   Okay. I'm not asking you whether it's
16 abnormal. Okay? But you would agree, sir, just
17 because -- I'm going to use the old adage my mom told
18 me. Just because everybody else jumps off the roof,
19 does that mean you're supposed to do it too?
20      MS. KREITER: Object to the form.
21    A   But -- but I -- I'm referencing, again,
22 these people who have worked with somebody for 5, 10,

Page 128

1 15, 20 years -- again, good friends -- many of these
2 people are. So are they going to advise and then say,
3 hey, I'm starting to look. We've had a problems.
4 They're a leader.
5       And, you know, that -- again, I -- and I say
6 abnormal in the industry, people who have left us
7 would be having a similar dialogue that they're --
8 saying that after they've left to say I -- I left and
9 I resigned yesterday.
10      So I think there's a matter of a few -- I
11 wouldn't expect anything lengthy in time. But that
12 could be, you know, shortly before to prepare somebody
13 because they've got existing loans to work on too.
14    Q   Okay. Well, sir, let me ask this question.
15 To the extent you've got a scenario where loan
16 officers could be encouraged to leave by their
17 manager, right, and, in fact, these managers are
18 telling them and announcing, you understand that
19 there's a real possibility of something going wrong
20 there; right?
21      MS. KREITER: Object to the form.
22    Q   You have to acknowledge there's at least a

Page 129

1 possibility of something going wrong there; right?
2       MS. KREITER: Object to the form.
3    A   And you're saying something being wrong --
4 just, again, I want to make sure I'm understanding.
5 When you say --
6    Q   Encouraging their team to leave with them
7 while they're still employed by somebody else. That's
8 what I'm saying by "wrong." You understand there's
9 something that could happen wrong there; right?
10    A   And -- and in our industry, I certainly am
11 sure there are people are doing things like that.
12 Right.
13    Q   Okay. And you certainly are aware of that;
14 right?
15    A   Well, again, that's -- I go back to our --
16 because I can speak for us. I don't want to make
17 these generalities about us and saying that's why we
18 pick a strong leader, that we feel like somebody's
19 going to announce and somebody's going to go, hey,
20 man, where are you going, and would -- would love to
21 find out more about that and be able to go with you
22 potentially. That's why we do that.

33 (Pages 126 - 129)

Page 130

1    Q   Okay.  One last question, sir.  How many
2  people have you ever disciplined at Waterstone for
3  violating the expectations that you have set forth in
4  Exhibit 47?
5    A   I'm -- I'm not aware of specifics of in
6  terms of our, like, our -- people coming over, you're
7  saying?  I'm sorry.  I should understand the question.
8    Q   No.  Exhibit 47 sets forth certain conduct
9  that we talked about earlier; right?  Remember that?
10    A   Let me make sure I've got it here.  That the
11  -- no.  That's not the contract.  I'm just trying to
12  find it here.
13         MS. KREITER:  Which document is it,
14  Ari?  I know you said the number, what is it?
15    A   Oh, Chris Wolf?
16    Q   Yeah.  It's the one we looked at earlier,
17  the Chris Wolf offer letter, the attachment.
18    A   Offer letter.
19    Q   Information disclosure.  And we talked about
20  expectations.  I think that was your word, Mr. Allen?
21    A   Correct.  Expectations on -- I think the
22  page we are on here -- yeah.  Correct.

Page 131

1    Q   Okay.  So my question is can you identify
2  sitting here today one instance of any employee at
3  Waterstone ever being disciplined for violating these
4  expectations?
5    A   And I'm not aware of any specifics.  I don't
6  know of any specific situation.
7         MR. KAREN:  Okay.  All right.  Why
8  don't we take a break now for lunch if that works?
9         MS. KREITER:  Sure.
10         THE WITNESS:  Okay.
11         MR. KAREN:  Okay.  It's right now,
12  well, 12:56 for you.  You want to just come back at
13  1:30?
14         MS. KREITER:  Sure.
15         THE VIDEOGRAPHER:  Going off the
16  record.  The time is 1:26 p.m. Eastern.
17         (Off the record.)
18         THE VIDEOGRAPHER:  Going back on the
19  record.  The time is 2:36 p.m. Eastern.
20         MR. KAREN:  Thank you.
21  BY MR. KAREN:
22    Q   Mr. Allen, I have a question for you.  We

Page 132

1  were talking about Exhibit 21 before you left, if you
2  recall.  Do you recall that discussion, Mr. Allen?
3         MS. KREITER:  He's looking for the
4  document, Ari.
5    A   The 21, the email from -- with Chris Wolf
6  and Dustin Owen.
7    Q   Yeah.
8    A   Yes.
9    Q   And if you could go back to that page, I
10  guess it's the second page where he said, "Hello,
11  Chris, please see below our answers in red."  What was
12  the date of that email that Dustin Owen sent?  You can
13  see it at the bottom of the page 2064.
14    A   Oh, right there.  I'm sorry.  I'm looking at
15  the paper copy -- so Thursday, November 4th of 2021.
16    Q   So that's the day that he sent this answer
17  that we looked at for a while on number 2; right?
18    A   That's what it -- yep.  Looks like November
19  4th of 2021.  Yep.
20         MR. KAREN:  And, Nick, you can take it
21  into paragraph 2.
22  //

Page 133

1  BY MR. KAREN:
2    Q   And Mr. Owen says, "We need to make sure
3  anything you all do during transition does not violate
4  any current agreement you have with your current
5  employer as it pertains to leads generated and loans
6  in the pipeline."  See where he says that?
7    A   Yes.
8    Q   Okay.  And he doesn't mention anything about
9  taking confidential information there; right?
10    A   I don't see anything on this -- within that
11  one response.  I don't see anything.
12    Q   Okay.  Now, I'm not trying to get cute here,
13  so just answer.  My question is do you think that was
14  an intentional omission?  In other words, he
15  specifically did mention it for a reason or it just
16  wasn't on his mind when he responded?  Do you
17  understand my question?  He didn't --
18    A   I think -- yeah -- yeah.  I'm sorry.
19    Q   Let me restate the question.  Sorry.  I want
20  to get a better question.  Do you think he consciously
21  chose not to mention that or it just obviously may not
22  have been what was on his mind and he was thinking

34 (Pages 130 - 133)

Page 134

1 about when he responded?
2         MS. KREITER: Object to the form.
3     A   And -- and I -- speak on behalf of him, but
4 I don't think there was any intention to eliminate
5 anything there since this was just an email, and not
6 some legal document.
7     Q   Right. Exactly. And I'm not suggesting
8 otherwise.
9     A   Yeah.
10     Q   And you would agree with me the same applies
11 with respect to soliciting current employees; right?
12     A   Yes. And I -- and I just look and I think
13 -- again, I -- just because I'm trying to understand
14 where he -- "it does not violate any current agreement
15 you have with your current employer." I think
16 whatever that would be would cover whatever the
17 current agreement was. Yeah.
18     Q   I mean, the only reason I ask this -- and,
19 again, I totally understand this was not a legal
20 document; right? So I'm not trying to play a game
21 here. It's because "agreement you have with your
22 current employer as it pertains to leads generated in

Page 135

1 loans in the pipeline."
2         So my question to you is that -- speaking on
3 behalf of Waterstone now, here's my question. You're
4 not only interested in them not violating any current
5 agreement with your current employer only as it
6 pertains to leads generated in loans in the pipeline.
7 Waterstone is concerned with them not violating any
8 current agreement with their current employer, period;
9 correct?
10     A   Yeah. I would expect they were going to
11 follow their -- the agreement with their current
12 employer. Yes.
13     Q   Right. And that's your expectation; right?
14     A   Yes.
15     Q   Okay. So the words "as it pertains to leads
16 generated in loans on the pipeline" is not some cute,
17 you know, limitation; right? It's just obviously what
18 was on Mr. Owen's mind when he provided that email.
19 Those were things at the forefront of his mind. Is
20 that a fair assumption?
21     A   Yes. I think, again, just trying to, like
22 we say, we're -- we're agreeing it's an email. I was

Page 136

1 trying to get some things out -- they're answering
2 some of these questions; right?
3     Q   Right. Right. Okay. I got it. I just
4 wanted to make sure I understand that correctly. Now,
5 one thing I wanted to also ask you about was that, you
6 know, we were talking about some of Waterstone's
7 practices.
8         Is it an accurate understanding to say that
9 you do not require managers when they leave to first
10 resign before they tell their branch employees about
11 their intent to resign? Does that question make
12 sense?
13     A   If you could repeat that again, I'd
14 appreciate it.
15     Q   Sure. Not a problem. You don't require
16 branch managers to first announce their resignation to
17 the company before announcing their resignation to
18 their branch employees; do you?
19     A   And I'd have to look at on agreement if
20 there's language there. I'm not aware of that. And
21 then I would expect on, you know, these people having
22 lengthy relationships with people that they're going

Page 137

1 to have conversations and announcing their departure.
2     Q   Okay. And my question is though when I'm
3 talking about this -- and I certainly understand your
4 best friend works there. You're probably going to
5 talk to him; right?
6         But, you know, when we're talking about a
7 general announcement to everyone in your branch,
8 there's no policy requiring branch managers before
9 they make that kind of announcement to tell their
10 company that they work for first; right?
11     A   I'm not aware of any policy, yeah, that they
12 would be required to -- to tell Waterstone first.
13     Q   Okay. I mean, tell me if I'm wrong. I
14 mean, we talked earlier about -- you mentioned
15 something. I think you said, you know, "Somebody
16 doesn't come to work for us until they come to work
17 for us."
18         Something to that effect, like, you know,
19 just because they say they're going to leave doesn't
20 mean they actually come to me. They could decide and
21 change their mind.
22     A   Correct. They could make a decision, you're

35 (Pages 134 - 137)

Page 138

1 right, to not join us. Yes.
2  Q  And I think you had said that's even
3 happened before. And maybe I'm wrong about that.
4  A  I can't recall a situation. I guess
5 depending on timing, you know, was that an offer
6 letter sat for a while. So I'm not sure within the
7 contents of that.
8  Q  Okay. One of the reasons though -- do you
9 agree with me that one of the reasons why branch
10 managers would want to tell their team -- and when I
11 say "their team," their branch, before they announce a
12 resignation is because they want to also make sure
13 that, you know, there's not going to be an uprising,
14 right, about going to this particular company.
15       I mean, that's one of the reasons they'd
16 want to check; right?
17  A  Well, an uprising, I guess I immediately
18 think of existing borrowers and deals they have going
19 on so there isn't disruption with current deals at
20 their current company, as an example.
21  Q  Yeah. I'm sorry. Let me clearer on my
22 question. So, for example, branch manager -- let me

Page 139

1 give you a hypothetical I'm thinking of. Okay?
2  A  Okay.
3  Q  Branch manager goes to his team, you know,
4 he's got a team of ten people, and says, "I'm going to
5 go to XYZ Mortgage.
6       And then three of the people on his team say
7 forget it. We used to work at XYZ Mortgage or we've
8 heard about XYZ Mortgage or we're not going there if
9 you're going to go there. That's a possible thing
10 that could happen; right?
11  A  Sure. Yeah. They could decide to stay
12 where they are. Right.
13  Q  And would you agree that sometimes when
14 you're recruiting a branch manager, they have interest
15 to see what the others who are their most trusted, you
16 know, coworkers or subordinates or colleagues think
17 about them before they come over. Isn't that fair to
18 say that's happened sometimes?
19       MS. KREITER: Object to the form.
20  A  And -- and if you could ask that question
21 again, please?
22  Q  Well, let me be more specific. In this

Page 140

1 case, you met with Mr. Hutto, Mr. Smith, and Mr. Wolf;
2 right?
3  A  Yes. And just being clear, via Zoom -- done
4 in person at all prior. Just making sure I'm
5 accurate.
6  Q  Yes. And "met with," again, I'm including
7 Zoom and that all kind of --
8  A  Yes. Okay.
9  Q  -- we now consider meetings post-COVID.
10  A  Understood. Yep.
11  Q  So in that scenario, you had a couple of a
12 different people's opinions. It wasn't one person who
13 just made a decision and that was it; right?
14  A  Well, I looked at -- at -- well, I looked at
15 Dwayne and Chris Wolf -- I don't know if partners is
16 the right term, but I looked at them as one, you know.
17 In fact, they were very close. They've been together
18 for a long time. And Chris Smith is separate from
19 that. So they were -- to me, they were two separate
20 conversations.
21  Q  Okay. All right. I understand that. But I
22 guess where I was going with it is that it's not

Page 141

1 uncommon when you're recruiting a branch that the
2 branch manager may want you to potentially speak to
3 somebody else; right? So someone else can give an
4 opinion as to going to Waterstone. Is that fair to
5 say?
6       MS. KREITER: Object to the form.
7  A  I'd certainly -- you -- you know, they
8 announce that they're going to another company and
9 somebody has interest in talking to Waterstone, yes.
10 Then that would be part of our recruiting that we
11 would talk to somebody interested in joining
12 Waterstone.
13  Q  No. My question is though you would agree
14 with me that one of the concerns a manager may have in
15 coming over to Waterstone -- and I mean no disrespect
16 to Waterstone when I ask this question. You could
17 insert the name of any mortgage company, so I want to
18 be clear of my question that's it not intended as some
19 type of slight. Okay?
20  A  Yeah.
21  Q  But you would agree with me one concern a
22 branch manager would have in going to a mortgage

36 (Pages 138 - 141)

Page 142

1 company, insert Waterstone if you wish, is that his
2 team would follow him or her; right?
3    A   Yes. They'd have -- yes. If -- you're --
4 you're correct. Who -- who is going to follow; who is
5 not. Right.
6    Q   Right. And, obviously, if people aren't
7 going to follow, that might affect the manager's
8 decision to leave or to come to Waterstone or whatever
9 it might be; right?
10    A   Yeah. And I -- and I guess it would depend
11 on the structure we talked previously, you know, what
12 is the production of that manager in relation to total
13 -- things like that. So I just throw in that kind of
14 caveat to -- to that answer.
15    Q   Okay. And one of the reasons why you would
16 not insist on a manager first announcing his
17 resignation to the company is that when giving a
18 manager an opportunity to sort of test the water the
19 reaction of his staff to leaving; is that fair?
20        MS. KREITER: Object to the form.
21    A   I -- I think the more important timing on
22 that has to do with back to these people working

Page 143

1 together a lengthy period of time, their trust in that
2 leader.
3        And then I -- we had talked here just
4 shortly ago about existing loans. I guess a lot of
5 questions people have -- it's disrupting regardless of
6 them moving or not. It's disrupting their livelihood,
7 I'll say.
8    Q   Which people are we talking about? You're
9 talking about the staff?
10    A   I'm talking about staff. Correct. Yeah.
11 Yes.
12    Q   I understand. So you're not talking about
13 the manager. You're talking about the staff. Okay.
14    A   Yeah.
15    Q   So those are the reasons why you would not
16 expect a manager to first tell his team or her team;
17 right?
18    A   Sorry. If you could repeat. Just making
19 sure I understood timing of that because -- yeah.
20    Q   Okay. Yeah. Let me try to rephrase that
21 question.
22    A   Okay.

Page 144

1    Q   Okay. You would agree with me that the
2 manager's ability to ascertain that his team will come
3 with him or her before announcing their resignation is
4 something that is important to many managers; right?
5        MS. KREITER: Object to the form.
6    A   And I just -- I did miss the last part, "is
7 important to" -- I just missed the last part of that.
8    Q   To many managers. Many managers.
9    A   So it -- it certainly is going to have an
10 impact as we've talked about depending on their setup.
11 Depending on this whole what did they look like
12 because we have all kinds of different versions of
13 branches and how they look and everything else. But
14 certainly is going to have some potential impact on
15 them.
16    Q   So the ability to say to a manager when
17 you're recruiting them, hey, you know, not only will
18 we take you, we'll take your whole team and we'll make
19 sure they're coming with us and we're going to support
20 that is important to management; isn't it?
21    A   And -- and I'm sorry. If you could repeat
22 the question. Sorry.

Page 145

1    Q   Okay. Let me try to rephrase it.
2    A   Okay.
3    Q   I saw some emails, and we can find them
4 later if you want. But I don't think you're going to
5 really disagree with me that when you are recruiting a
6 manager, one of the things that you offer I'll say is
7 the word -- is that you guys have the support to bring
8 them over -- not just them, but their whole team, do a
9 seamless transition; right?
10        And make this, you know, the whole group's
11 going to come and you're going to make it easy for
12 them to do that; right?
13    A   Well, we've certainly got to let somebody
14 know what our capacity is to what can we take on be it
15 production and number of people. So we've got to be
16 prepared for that if, you know, upon an announcement
17 being made, somebody -- we find out the number of
18 people are deciding to make that move.
19    Q   Right. But the point is that that's one of
20 the things you tout to a branch manager like Mr. Hutto
21 that, hey, yeah. Absolutely. We can take your team.
22 We got this. Is that fair to say?

37 (Pages 142 - 145)

Page 146

1    A   Yeah. And I feel like -- and I -- and I
2    simply say number of people because what other
3    recruiting do we have going on? Is it that, hey,
4    we're -- we can take on 30 people at this time? And
5    that could be from underwriting and closing, what can
6    we support?
7         And so just giving that level of detail in
8    the answer because there are -- there are a few
9    different things that would go into that. But we
10   would want to make sure, hey, we can support -- if
11   everybody chooses to come over, I feel like maybe --
12   you know, if everybody's choosing to come over, we can
13   support that or, hey, we're going to have a problem.
14   Q   Right. But the point is in recruiting a
15   manager, it's going to be important for you to be able
16   to tell that manager, yeah. We got you. We can
17   support this.
18   A   Yeah. To be able to say, hey, if somebody
19   has X amount of people that we can if they all choose
20   to come over, that we're able to support them.
21   Q   Yeah. That's going to be important to a
22   manager; right?

Page 147

1    A   Yes. Because otherwise, it's going to
2    create a lot of chaos for them if we cannot support
3    that transition. That is correct.
4    Q   Or if you said you're only allowed to bring
5    half of the people at your branch. Pick five. Leave
6    the other five. Probably wouldn't go so well. Is
7    that fair to say?
8    A   Probably -- probably not, unless there are
9    some underperformers that we say here -- you know,
10   we're saying, hey, this is our standard and this is
11   what we're looking for, so --
12   Q   Right. I understand that. But I'm saying
13   assuming we don't have that situation where they don't
14   want to dump half their team, if you couldn't support
15   their team and the people they wanted to bring, that
16   would be a serious challenge for bringing over a
17   branch manager. You would agree?
18   A   Yeah. I think we would -- we would probably
19   shut the conversation down earlier. In fact, I'd had
20   some recent ones here where I had opportunities and I
21   just looked at the magnitude before even really having
22   much of a conversation, and just said, hey, we can't.

Page 148

1    This is something we'd not be able to do if that
2    person's entire team came over. Yeah.
3    Q   Why wouldn't you just say we're only going
4    to take half your team? Why wouldn't you say that?
5    A   I think if it's a -- shouldn't say I think.
6    If it's a strong leader and they have individuals they
7    feel are going to follow and they've had a long
8    history with them, that they want those to be
9    included, you know, to be able to support those
10   individuals. Yeah.
11   Q   So I guess where I'm going is that when
12   you're recruiting a team and you come to the
13   conclusion we can't support this if all their people
14   come, you realize you want to kind of not waste
15   everyone's time and be upfront with that rather than
16   get down to the end and then tell them that because
17   they're probably not coming anyhow; right?
18   A   I -- I feel like that's the right thing to
19   do. Right.
20   Q   Okay. I understand what you're saying. I
21   just wanted to answer clear.
22   A   Okay.

Page 149

1    Q   All right. So let's go to -- you know, we
2    already established a few minutes ago that Exhibit 21
3    we were looking at was dated November 4th. You
4    remember that?
5    A   Yes. Yep.
6    Q   Okay. So just keep that date in mind if you
7    could as we move on. So, now, we're going to bring up
8    Exhibit 20.
9         (Exhibit 20 was marked for
10        identification.)
11   Mr. Allen, before we get too far into
12   Exhibit 20, I realize you are not, you know, a
13   recipient or a sender in this email correspondence.
14   Have you ever seen it before today?
15   A   Just reading through it here. Yeah. And
16   just based on the age of it, I -- I do not recall
17   seeing this.
18   Q   Okay. So here's my question to you. I'm
19   going to show you what's been marked as Exhibit 20. I
20   realize you were not a recipient. But if you could
21   down to the second paragraph with me, and just read
22   through the first paragraph when you get a sec so

38 (Pages 146 - 149)

Page 150

1 you'll know contextually what we're talking about.
2 You don't have to read it out loud.
3      A   Okay -- read the first myself then?
4      Q   Yeah.  And then we'll go through the second.
5      A   Okay.
6          MS. KREITER:  Why don't you read the
7 first email too, Kevin, just for context?
8          MR. KAREN:  That is the first email.
9          MS. KREITER:  Sorry.  It's a single
10 page.  There's two emails on it.
11         MR. KAREN:  Yes.  I'm asking about the
12 first email.
13         THE WITNESS:  Oh, the -- on the bottom
14 that say, "Hey, Dustin"?
15         MR. KAREN:  Hold on.
16         Maria, you can't tell him what to
17 review.  I mean --
18         MS. KREITER:  What are you asking him
19 to read, Ari?  Just there's two emails.  When you say
20 the first email -- earlier --
21 BY MR. KAREN:
22      Q   Let's start over.  Let's start over.  Let's

Page 151

1 go to the top.  Okay?
2      A   Okay.
3      Q   Second paragraph.  Dustin Owen says, "In the
4 beginning, we will need to knock out employment
5 applications and background checks.  Then we can move
6 on to generating offer letters."  You see where he
7 says that?
8      A   Yes.
9      Q   Okay.  "We then would want to start creating
10 your database by transferring as much over as
11 possible.  We would need to start subbing for an IT
12 equipment."  On and on and on.  But do you see the
13 point where he says, "We would want to start creating
14 your database by transferring as much over as
15 possible"; right?
16     A   I do see that line.  Yes.
17     Q   Okay.  Now, let me ask you, sir.  We saw an
18 email that Dustin Owen wrote a few minutes ago on
19 November 4th.  That was pretty good.  I'd concede it
20 said a lot of the right things.  Do you have a problem
21 with what he wrote here?
22     A   Well, I'm trying to understand the context

Page 152

1 of it.
2      Q   Well, I'll tell you how I interpret it, and
3 let's start here.  I interpret this as transferring
4 over as much information from his current employer as
5 possible.  You agree with me if that's what is
6 intended here, that's problematic; right?
7      A   I would agree that's -- yeah.  That's
8 problematic.  And I'm not, again, trying to interpret
9 what it is he is talking about.
10     Q   Okay.  So when it says "We then would want
11 to start your creating your database by transferring
12 as much over as possible," what do you think he's
13 talking about transferring?
14         MS. KREITER:  Object to the form.
15     Q   If you know.
16     A   And I -- I do not.  I would have to
17 speculate off that.
18     Q   Okay.  And I certainly am not asking you to.
19 But you do agree with me if he was talking about
20 transferring over data from Mutual to Waterstone, that
21 would be problematic; right?
22     A   Yeah.  Based on our expectation that loans

Page 153

1 are not brought over.  Correct.
2      Q   Right.  And your expectation that
3 information's not brought over; right?
4      A   And -- and I'm sorry.  Type of information.
5 So we're talking loans or --
6          MR. KAREN:  Well, let's look to Exhibit
7 20 -- actually, let's start with Exhibit 47.  Can you
8 pull that up -- on the screen there?
9          THE WITNESS:  Is it the Chris Wolf 47?
10 Sorry.  Because there are two 47s.
11 BY MR. KAREN:
12     Q   Sorry.  You can get rid of the 47.  We're
13 not going to use it all day.  So you can seriously
14 throw it away.  I meant to delete that and add this,
15 and I just added this because I'm not very computer
16 savvy.  So I apologize.
17     A   Okay.  No problem.
18     Q   But this is the only 47 we're going to talk
19 about.
20     A   Okay.
21     Q   So going to Exhibit 47, and I think that's
22 up on the screen.

39 (Pages 150 - 153)

Page 154

1      MR. KAREN:  Can you bring up the page
2  we're talking about, Nick?  I think it's the third
3  one.
4  BY MR. KAREN:
5      Q    When we were talking about expectations,
6  sir, where it says "Please refrain from copying or
7  otherwise recording your client's personal
8  information; right?
9      A    Yes.
10     Q    And then number 3, "Please ensure that you
11  do not remove, copy, record, or use any other method
12  to take proprietary company information"?
13     A    Yes.  I see that.
14     Q    Okay.  And it says, number 1, "Waterstone
15  Mortgage will not request information or assets from
16  your previous employer"; right?
17     A    Right.
18     Q    Okay.  So if, in fact, he was asking to
19  transfer information over from Mutual to them, that
20  would not be consistent with these expectations that
21  are listed in the offer letter to Chris Wolf; would
22  it?

Page 155

1      MS. KREITER:  Object to the form.
2      A    And -- and I -- I go back to what it is he
3  is talking about transferring.  That's, you know --
4  being a part of that email.
5      Q    No.  No.  And I'm sorry, sir.  I'm not
6  asking you to tell me what he meant there.  I
7  understand you're not able to do that.
8         What I'm asking you is if, in fact, I'm
9  interpreting it that way, that he's taking information
10  from Mutual to Waterstone, if that was the how I'm
11  reading it correct, that would not be consistent with
12  these expectations?
13     A    To -- correct.  It would not be consistent
14  with what we have here.  Right.
15     Q    And it would certainly send a mixed message
16  to Chris Wolf about the seriousness with which
17  Waterstone takes these expectations if, in fact,
18  Dustin Owen, the guy recruiting him, is violating them
19  himself; right?
20     MS. KREITER:  Object to the form.
21     A    And -- and I feel like we're on, like, a
22  second if.  And I'm sorry, but I'm just stating that

Page 156

1  without, again, what kind of data he's talking about
2  transferring.  That's all.  So, again, I would look
3  and say yes.  If it's not following this, that's --
4  that's not right then.
5      Q    Right.  Okay.  So let's look also at Exhibit
6  22.
7      MR. KAREN:  Can we bring that up?  I
8  think we had that up earlier.  And if we could go to
9  Section 1.8?
10  BY MR. KAREN:
11     Q    And it actually says here -- if you can read
12  this in the 1, 2, 3, fourth line.  Do you see the
13  fourth line that starts with, "Employee represents" at
14  the end of the fourth line?
15     A    Is fourth line -- Confidentiality Agreement?
16  Sorry.  I may be missing the fourth.
17     Q    So it says "Employee represents" --
18     A    Oh, there.  I'm sorry.  Employee was on the
19  -- yeah.  Okay.  "Employee represents and warrants
20  that he or she has not and will not attempt to
21  transfer loans."  Okay.
22     Q    Yeah.  So let's just read it out for the

Page 157

1  record.  It said "Employee represents and warrants
2  that he or she has not and will not attempt to
3  transfer loans or other documentation or information
4  to Company that are property of his or her previous
5  employer."  I read that right; correctly -- correct?
6      A    Yes.  Yeah.  Correct.
7      Q    And, again, if, with that big caveat of the
8  if, because I know you don't understand what he said
9  there.  If I'm interpreting Mr. Wolf's request to
10  transferring for information -- I'm sorry.  I
11  misspoke.
12         Mr. Owen's request to Mr. Wolf to transfer
13  information from Mutual to Waterstone, that would also
14  not be consistent with what you've got in here in
15  Section 1.8; right?
16     A    If -- if we're talking about the loan
17  information --
18     Q    Well, it could be borrower information too;
19  right?
20     A    Well, and the only thing I -- again, because
21  we're trying to interpret, is it -- could it be
22  referral partners?  Could it be referral partners

40 (Pages 154 - 157)

Page 158

1 where they source their business, as an example?
2    Q   Okay. And I'm not necessarily going there.
3 But you would agree with me he didn't mention referral
4 partners in that email we looked at before in Exhibit
5 20; right?
6    A   Well, again, I could interpret it in
7 different ways. But it could certainly be that.
8 Because it's database, so it also doesn't say loan
9 information.
10   Q   Okay. Well, we'll get to that in just a
11 minute. Okay?
12   A   Okay.
13   Q   But, again, I was giving you the caveat if I
14 am interpreting this way. So we're assuming my
15 interpretation is correct. Assuming my -- not
16 correct. I'm sorry. Assuming my interpretation is
17 that he's asking you to send over Mutual's data to
18 Waterstone, that would not be consistent with Section
19 1.8 that we've just read; right?
20   A   Correct. Yes.
21        MR. KAREN: And can you also move to
22 Section 5.1 of this document? And, actually, just so

Page 159

1 it's -- yeah. Protected.
2 BY MR. KAREN:
3    Q   Do you see that? And Section 5.1, sir,
4 talks about --
5        MS. KREITER: Are you on Exhibit 22
6 still?
7        MR. KAREN: Exhibit 22. Yes. I'm
8 sorry.
9        THE WITNESS: Okay.
10 BY MR. KAREN:
11   Q   Section 5.1, sir, that talks about the
12 information that Waterstone considers protected;
13 right?
14   A   Just reading through here just to make sure.
15   Q   Please take your time.
16   A   Yep. So, yes. I see that is as they are an
17 employee with us, and talking about confidential --
18 confidential material. Yes.
19   Q   And one of the things that if you look at
20 some of the stuff that Waterstone considers
21 confidential -- if you look at Bullet Number 1, that
22 says, like, internal personnel and financial

Page 160

1 information of the company?
2    A   I do see that.
3    Q   Okay. And number 2 talks about, I guess,
4 personnel names and contact information of company
5 personnel in number 2?
6    A   Yep. I see that.
7    Q   And if we skip to number 6 on the next page,
8 that would be confidential proprietary information
9 provided to Waterstone by any actual potential
10 customer?
11   A   And I see that likewise. Yep.
12   Q   Okay. So these are things that --
13        MR. KAREN: We can put this aside.
14 BY MR. KAREN:
15   Q   These are things that Waterstone considers
16 confidential and proprietary to it; right?
17   A   Yeah. As it states in this agreement.
18   Q   Yeah. And, again, I kind of asked you this
19 question. Is there anything you're aware of that
20 makes this kind of information confidential or
21 uniquely confidential to Waterstone that wouldn't be
22 equally confidential for other companies in the

Page 161

1 industry?
2        MS. KREITER: Object to the form.
3    A   I'm -- I'm not -- you know, contracts can
4 vary. I'm not familiar with anything unique here.
5    Q   Okay.
6        MR. KAREN: And, Nick, we don't need
7 this up anymore. We can put that to the side. So
8 let's pick up Exhibit 29 if possible.
9        (Exhibit 29 was marked for
10        identification.)
11        MS. KREITER: Nine or 29?
12        MR. KAREN: Twenty-nine.
13        THE WITNESS: Twenty-nine? Okay.
14        MR. KAREN: Actually, hold on. One
15 second -- let's actually pull up -- take that down.
16 I'm sorry. I went to the wrong place. Okay. Yeah.
17 Actually, let's pull up 29. I'm sorry. That'll work.
18 I can go with this. We've got it up already.
19 BY MR. KAREN:
20   Q   Okay. So this is an email, sir -- if you
21 see the top email, it's from John Utsch. Well, and
22 he's sending that to us. We subpoenaed this

41 (Pages 158 - 161)

Page 162

1  information, just so you understand how we have it.
2      A   Okay.
3      Q   And we provided it to you, just so you're
4  following here in these emails.  But where I want to
5  bring your attention is an email from Melanie Pischke
6  Ferrara.  Who is she, by the way?
7      A   I don't know her exact title.  She works in
8  the Winter Park office with Dustin.
9      Q   Okay.  Is she, like, one of Dustin's
10 assistants or something?
11     A   Not an assistant.  I think -- I feel like
12 supports the region variety of ways.
13     Q   Got it.
14     A   Yeah.
15     Q   How long has she been with Waterstone?
16     A   I -- I believe she just hit her -- just over
17 15 years.
18     Q   Okay.  And she hasn't been disciplined for
19 anything in connection with this case; has she?
20     A   I'm not aware of any discipline with her.
21     Q   Okay.  So this is an email from her to Chris
22 Smith.  Do you see this?  Dated May 11th --

Page 163

1      A   Yes.
2      Q   -- at the bottom.  And you understand that
3  Chris Smith at this time was still an employee of
4  Mutual; right?
5      A   Yes.
6      Q   He was actually a manager of that branch;
7  right?  Of his branch?
8      A   Yes.  Yep.
9      Q   Okay.  And she says here -- if you look at
10 the bottom here, "Good morning, Chris.  Below is the
11 suggested Encompass export map for the Completed
12 Loans/Closed Loans folder."  Do you see where it says
13 that?
14     A   I do.
15     Q   Okay.  So she's providing the mapping to
16 Mr. Smith to get that information from Mutual systems;
17 isn't she?
18     A   And I'm sorry.  I'm just seeing if there's
19 something else after this.  Well, it says Encompass
20 export map for Completed Loans/Closed Loans.  So I --
21 yeah.
22     Q   And Mr. Smith's response is, "Not sure how

Page 164

1  difficult it'd be to create a report in Encompass to
2  map the fields to the below, but hopefully it is
3  already exported like the below."  Do you see that?
4      A   I do.
5      Q   You would agree that's at least a
6  potentially troublesome conversation from your
7  perspective given what we've talked about today;
8  right?
9      A   I -- I think within -- in -- well, and,
10 again, exporting, I see that.  Things like that
11 without, again, knowing the full context of what did
12 happen.  Yeah.  It's export information.  Yeah.
13     Q   Now, let's look at Exhibit 42.
14         (Exhibit 42 was marked for
15          identification.)
16         Okay.  And, again, these are emails that we
17 subpoenaed from Mr. Utsch.  So if you go down further
18 now at Exhibit 42, which we'd like to have them marked
19 as an exhibit in this deposition, this is from
20 Mr. Utsch, and this is from his personal Yahoo
21 account.  You see that, dated June 13th?
22     A   Yes.  On the June 13th.  I do see that.

Page 165

1      Q   And you know Mr. Utsch was a loan officer
2  that worked with Mr. Smith; right?
3      A   Yes.  That he works with Chris.
4      Q   Okay.  And this is an email to Melanie, who
5  we talked about before; Jen Wilton [ph], who you
6  mentioned before; Dustin Owen; right?
7      A   Yep.  I see him on here.
8      Q   And copied to Chris Smith at his personal
9  email address.  You see that?
10     A   Yes.
11     Q   And he writes, "Attached is our closed loan
12 list in the field mapping you have requested.  It
13 contains all refinances and purchases closed."  That's
14 a problem; isn't it, sir?
15         MS. KREITER:  Object to the form.
16     A   Again, exporting information -- yeah.
17 That's not what we would expect.
18     Q   Okay.  And so Melanie has been there 15
19 years.  How long has Jen been with Waterstone at this
20 point?
21     A   John, I believe --
22     Q   Jen.  Jen.  I'm sorry.  Not John.  Jen

42 (Pages 162 - 165)

Page 166

1 Wilton [sic].
2    A   Jen Witon, I think she --
3    Q   Witon.  I'm sorry.
4    A   That's okay.  I believe she just hit two --
5 just over two years maybe.
6    Q   Okay.  And Dustin Owen, how long had he been
7 with you guys?
8    A   And he's coming up -- coming up on 15 years.
9    Q   So two of these people have been with your
10 company combined almost 30 years, and no one sees a
11 problem with exporting from Mutual its refinances and
12 purchased closed loan information?  Does that disturb
13 you?
14         MS. KREITER:  Object to the form.
15    A   Well, and I'm -- I'm looking -- trying to
16 piece together -- yeah.  I'm seeing these for the
17 first time, and I'm just -- I'm just --
18    Q   I understand.  But, I mean, I think they're
19 fairly clear and I think you know that.  So tell me,
20 when you see "our closed loan list in the field
21 mapping you have requested.  It contains all
22 refinances and purchases closed."  And it came off of

Page 167

1 Encompass.  That's a problem, isn't it?
2    A   I see that on the -- that's where I was
3 looking back on the previous document.
4    Q   It's a problem; right?
5    A   And, again, I'm just trying to piece
6 together from the previous and the type of information
7 that came over.
8    Q   Well, the type of information is what you
9 guys, and I quote, "requested."  It contains all
10 refinances and purchases closed from Encompass.
11    A   Yes.  I can see that reading this.
12    Q   That's a problem.  That's a problem; isn't
13 it?
14         MS. KREITER:  Object to the form.
15    A   And, again, I'm trying to -- and I --
16 understanding the context of all this and what was
17 done, I can see what see what was requested.  So I'm
18 just trying to understand it.
19    Q   Well, can you tell me what version that you
20 could -- I'd like to hear this, actually.  Can you
21 tell me how you could possibly interpret this as he
22 didn't send the information Waterstone requested for

Page 168

1 all refinances and purchases closed?
2    A   And -- and not indicating in terms of
3 context is that where I see also the realtor and
4 referral partners because so much of what then people
5 had built up over the years is self-source their
6 database of names -- that may -- that may be referral
7 partners or what have you.
8         So that's the context.  I'm assuming this
9 was to go in our client relation manager system that
10 -- yeah.
11    Q   Sir, it was Encompass field mapping, and it
12 said "Attached is our closed loan list."  What do you
13 think a closed loan list includes?  Do you think it
14 includes the names of cars?  Do you think a closed
15 loan list includes the names of all American-
16 manufactured cars?
17    A   No.  It would include the customers who
18 closed the loans.  Right.
19    Q   And their information; right?
20    A   Well, that's where I was looking back on
21 that previous document as to what information it was
22 because --

Page 169

1    Q   Well, it's a closed loan list.  Do you think
2 a closed loan list is going to provide information on
3 the planets in our solar system?
4         MS. KREITER:  Okay.  Object to the form
5 -- argumentative.  I also need you to let the witness
6 complete the question.
7    A   Yeah.  What I was looking at, and by no
8 means saying exporting correct from that, but just
9 customer private information.  Because the client
10 relation manager system where -- where people have
11 their databases, referral partners, past customer
12 would not house customer private information.
13         That's -- where I was trying to look at the
14 info, and you a closed loan.  It does not, to me --
15 and I'm just trying to look at these fields.  But I
16 know our client relation manager system does not have
17 that.  It is all public information.
18    Q   Okay.  But, sir, here's my question.
19 Encompass is not a CRM.  Encompass is an LOS.  You
20 testified under oath to that a minute ago; didn't you?
21    A   Encompass is our loan origination system.
22 Correct.

43 (Pages 166 - 169)

Page 170

1    Q   Okay.  And it was Mutual's too.  And if you
2  go back to Exhibit 29, Melanie writes, "Below is the
3  suggested Encompass export map for the Completed
4  Loans/Closed Loans folder."  Obviously in Encompass.
5    A   Well, it's in there, but I believe -- and
6  I'm not -- I believe that this -- this housed then in
7  a client relation manager system.  That's where I'm
8  referring to that so that -- because that's for pure
9  marketing purposes versus being pulled into Encompass,
10  actually.  That's where I'm differentiating between
11  the two.
12    Q   But what was sent to you "as requested," and
13  I quote, was the closed loan list.  Not a contact list
14  of names.  It says "closed loan list in the field
15  mapping you have requested."  That's what it says;
16  right?
17    A   I see closed loan list.  I was just
18  differentiating between that being that -- and, again,
19  in our client relation manager system, the reason I
20  keep referring to that is information pulled into
21  there does not house any customer private information.
22  That's why I'm referring to that.

Page 171

1    Q   I understand what it's referring to.  My
2  point is what was given to you, according to what it
3  says in this email, is a closed loan list; right?
4  Based on the words of this email?
5    A   Yes.  It says "closed loan list."  Yes.
6    Q   You would agree with me if you took Mutual's
7  closed loan list out of Encompass, that's a problem,
8  isn't it?
9         MS. KREITER:  Object to the form.
10    A   And -- and I wouldn't want to see something
11  exported -- having somebody export something.  I'd
12  want to see as to what then came over.  Simply stating
13  that -- and again, so I -- yep.  I would not want to
14  see something exported.  But I'm -- when you talked
15  about closed loan, I keep referring back to there is
16  no customer private information in there.  So -- a
17  file is pulled over and --
18    Q   Okay.  We're talking different things then.
19  You're talking about GLBA; right?  Gramm.Leach.Bliley.
20  We can debate this point later.  Okay?  I'm not trying
21  to do it with you.
22         Earlier today, you told me there was value.

Page 172

1  We can go back and find the testimony if you want.
2  But you said there was value to the list of your
3  closed loans and having that information about your
4  customers.  You told me that was valuable information
5  for you; right?
6    A   Yeah.  That's valuable to a loan officer who
7  has built that up over the years.  Yeah.
8    Q   And it's valuable to the company, isn't it?
9    A   And to the company that they can produce
10  loans and -- yes.
11    Q   Okay.  And so if you were to take that from
12  one company and give it to another, that would give
13  that another company information that was valuable
14  from a competitor; wouldn't it?
15    A   Well, in that information is the fact that
16  somebody has been building up their database, their
17  referral source over -- could be five different
18  companies.  Typically, people continue to have that.
19  And so their -- their value is saying, hey, they've
20  got a 20 year old database of customer names.
21    Q   Okay.  But that would be their database.
22  And if they maintained it in their world, that's fine.

Page 173

1  But you took this off of Mutual -- you understand that
2  Chris Smith did not own his version -- he didn't have
3  own separate -- version of Encompass; right?
4    A   I -- I don't believe he would have his own
5  version of Encompass.  Right.
6    Q   This would be Mutual's Encompass system;
7  right?
8    A   Yeah.  I'm assuming any loan that they would
9  have done with Mutual would be in Mutual's Encompass
10  version.
11    Q   Okay.  And what we see here is an email
12  that's from Waterstone instructing Mr. Smith or Utsch,
13  whoever it is, a current Mutual employee, and
14  providing them mapping to go into Mutual's Encompass
15  loan origination system and export information on
16  closed loans; right?
17    A   That -- as I read this, it's the export map
18  is what it says.  And I'm simply saying that because I
19  don't know what was exactly pulled over what format.
20  That's all.  I don't see any result of these.  I don't
21  see that.
22    Q   I understand.  But simply asking a current

44 (Pages 170 - 173)

Page 174

1 employee with duties to their employer to use their
2 protected access to go into that employer's loan
3 origination system and pull that and export it and
4 give it to you, that's not consistent with your
5 expectations; is it?
6   A   And as I stated before, I would not want to
7 see this information exported from somebody's system.
8 Yeah.
9   Q   Okay.  All right.  And so, sir, and you
10 would agree with me -- if you could go back to -- what
11 was the date of Melanie's original email?
12       MR. KAREN:  If you could pull up
13 Exhibit 29.  There we go.
14 BY MR. KAREN:
15   Q   May 11th.
16   A   May 11th.  Yeah.
17   Q   If you had a time machine and you could go
18 back to May 11th at 10:24 a.m., before she wrote this
19 email and say stop, you would; wouldn't you?
20   A   I would say we don't want to export out of
21 somebody else's system.  Correct.
22   Q   And so now, when you look back --

Page 175

1       MR. KAREN:  If we can go to Exhibit 20.
2 BY MR. KAREN:
3   Q   And it says -- we looked at this minute ago,
4 "We would then want to start creating your database by
5 transferring as much over as possible."  You
6 understand why I took the interpretation that I took
7 based on those other emails; right?
8       MS. KREITER:  Object to the form.
9   A   And -- and I -- I also saw is I had referred
10 from referral partners -- and I understand you're
11 saying closed loans.  Yes.  And seeing in terms of
12 their identification of closed loans.  And I also saw
13 referral partners on here.
14   Q   Right.  Sir, and you agree with me you can
15 take both confidential information and non-
16 confidential information at the same time; right?
17   A   Yeah.  Somebody could take -- sure.  They
18 could take both.  Sure.
19   Q   Right.  It doesn't make it better than when
20 you took confidential information, you also took non-
21 confidential information; right?  It doesn't sort of
22 even out; right?

Page 176

1   A   I -- I think just exporting onto somebody's
2 else's system.  That's where I go back to that to say,
3 yeah.  That's not something I would expect and would
4 want to see.  Right.
5   Q   Are you disappointed to see that now for the
6 first time?
7   A   And -- and I simply before concluding in any
8 way would want to see what was brought over.  That's
9 all.  I'd want to be fair and to be able to just know
10 what occurred within the whole scene just beyond a
11 couple emails.  That's all.
12   Q   Okay.  I understand.  That's a fair point.
13 But if I'm right and my interpretation is correct,
14 you'd be disappointed; wouldn't you?
15   A   If -- if information was exported from
16 another company's system, yes.  I would not want that
17 to happen.
18   Q   Okay.  Now, do you remember we looked at
19 Exhibit 22?  Let's bring it up, because we've been
20 doing a lot.  I don't want to -- memory game here.  So
21 I don't want to you.  Let's just look at Section 5.1
22 just very, very quickly so we put this in our mind

Page 177

1 before we go to the next document.
2       Do you remember numbers -- just putting this
3 in your head, remember 5.1(a)1 was the internal
4 personal and financial information, and then 2 was
5 company personal names and contact information?
6   A   Yes.
7   Q   And we said that that was information
8 Waterstone considers confidential and it owns and
9 stuff like that; right?
10   A   Yes.
11   Q   Okay.  So let's turn to Exhibit 1.
12       (Exhibit 1 was marked for
13        identification.)
14       This says Ms. Spragg; right?  Ms. Spragg is
15 your chief people and administrative officer; right?
16   A   Yes.
17   Q   Okay.  Let's read what she writes to
18 Mr. Wolf, Chris Wolf, on April 11, 2022.  You
19 understand at that point Mr. Wolf is still an employee
20 of Mutual; right?
21   A   Yes.
22   Q   Okay.  And she writes, "Chris, it was great

Page 178

1 to meet you. I'm excited to start working with you
2 and the group." You see where it says that?
3    A  Yep.
4    Q  And the group obviously pertains to his
5 staff; right?
6    A  And I would assume other potential
7 employees.
8    Q  Okay. And she writes, "Per our
9 conversation, here is a template which I have started
10 to add names and hiring details." So she's asking him
11 to provide the names and asking him to provide hiring
12 details; right?
13    A  Yes.
14    Q  Okay. Now, let's look at Exhibit 2.
15       (Exhibit 2 was marked for
16       identification.)
17    Q  This is dated April 12th. And, actually,
18 let's start at the bottom of Exhibit 2. That's
19 probably easier. So this is an email --
20       MR. KAREN: Keep going down. Keep
21 going up. It's a little bit longer. Okay. Go up a
22 little bit more. Okay. Stop. Go up one more. There

Page 179

1 we go. 742. Okay.
2 BY MR. KAREN:
3    Q  Now, here's Mr. Wolf on April 12th. See
4 this? "Hi, Elizabeth, here is our full roster. Let
5 me know if there is anything else you need?" You see
6 where he writes that?
7    A  I do see that. Yes.
8    Q  Okay. And then if we continue going up the
9 email chain. And that was 8:42 a.m. And then about
10 an hour later, if you see the email dated [sic] 9:54,
11 Ms. Spragg writes, "Thanks for this. I've added some
12 columns for pay and original hire date. Any chance
13 you have access to compensation details that you could
14 share with me?" See where it says that?
15    A  I do see that. Yep.
16    Q  And then above that, Chris says, "Hi,
17 Elizabeth. Spreadsheet attached." See that? "Hi,
18 Elizabeth. Spreadsheet attached"?
19    A  Oh, I'm sorry. Yes. I'm sorry. I was
20 looking in the middle. Yep.
21    Q  Okay. So from these emails, sir, it does
22 appear, you would agree that Ms. Spragg is asking for

Page 180

1 basically an employee roster, compensation details,
2 information like that for Mr. Wolf; right?
3       MS. KREITER: Object to the form.
4    A  And just by reading her email that she's add
5 accounts for pay and original hire dates, access to
6 compensation details. So I'm just reading her email.
7    Q  You agree with me that's what it looks like
8 from the emails?
9    A  And I'm -- what was the question? I just
10 wanted to make sure. That's where I read her sentence
11 there.
12    Q  Yeah. That she was asking Mr. Wolf while an
13 employee of Mutual to provide her information relating
14 to a roster of employees, their compensation
15 information, and it looks like some contact
16 information. Does that seem right to you?
17    A  And I would see in the last sentence is I
18 just wanted to complete hers about liking to get offer
19 letters out, so I'm assuming these are individuals who
20 have decided they'd like to move over to Waterstone.
21 That's just trying to interpret the full context of
22 the conversation.

Page 181

1    Q  Regardless of what they want; right? I
2 mean, well, how would you know? Because it's only
3 April 12th. They didn't come for another two weeks.
4    A  Well, I believe that there were four
5 individuals who I think came on, was it April 14th? I
6 think.
7    Q  But if you look at this email, it said the
8 full roster.
9    A  Well, and, again, I don't know where
10 announcement was made and in terms of who made a
11 decision. And in terms of having the information to
12 provide people appropriate -- in fact, as I look at
13 that and think of how it was -- how they had some
14 employees that did start a couple days after this, I
15 feel like it was having to do with existing pipeline,
16 also making sure people were getting loans done with
17 their current company.
18    Q  So, again, let's go back to Exhibit 22.
19       MR. KAREN: If we could pull that back
20 up? Section 5.1.
21 BY MR. KAREN:
22    Q  Waterstone says internal personnel and

46 (Pages 178 - 181)

Page 182

1 financial information of the company is something it
2 considers confidential; right?
3    A    That's what's written here.
4    Q    Okay.  And number 2, company personnel names
5 and contact information it considers personal; right?
6    A    I see that.  Yes.  I see that.
7    Q    Okay.  And you would agree with me that this
8 is exactly the information Ms. Spragg was asking a
9 current Mutual branch manager to give to her from and
10 about Mutual employees; right?
11         MS. KREITER:  Object to the form.
12    A    And trying to understand the order of that,
13 I'm assuming that was, again, announcement made and
14 people deciding that they wanted to join, and
15 therefore were generating offer letters is what my
16 assumption is.
17    Q    You know what happens when you assume;
18 right?  So let's not assume.  Let's look just based on
19 what we see here.  Based on what we see here, tell me
20 if I'm wrong -- and I'm not asking for explanation.
21 But this is Ms. Scragg asking for the very same
22 information that Waterstone itself considers

Page 183

1 confidential and proprietary; right?
2         MS. KREITER:  Object to the form.
3    A    And -- and outside of -- and I think of
4 where we can go get information likewise on a website
5 of a branch.  And I'm just saying that in terms of we
6 can go gather that information.
7         And, yes.  She asked for names, detailing
8 back to I don't know where announcement was made.
9 People started to make decisions.  So I -- I -- that's
10 where I simply say in the context of the order of
11 that, I don't know I don't know what other
12 conversations she had with Chris.
13    Q    I didn't ask you the context order.  I
14 simply wanted to make sure that I understand this
15 correctly, that Ms. Spragg is asking a then current
16 Mutual manager to get the very same information from
17 Mutual that Waterstone itself says is confidential and
18 proprietary; right?
19         MS. KREITER:  Object to the form.
20    A    And -- and I -- I understand, and I'm not
21 trying to avoid the question.  Just, I mean --
22    Q    It does seem like you are.

Page 184

1    A    Well, I'm certainly not because, again, back
2 to where people are attempting -- I think of people
3 leaving us and that they're trying to handle existing
4 customers.
5         And so, absolutely.  I know people would
6 have with other companies and their leaving are going
7 to have gone through a process.  It just -- it -- I
8 don't know how they avoid that.  And so people leaving
9 us would be a similar thing.  And we want to make sure
10 existing customers are taken care of, is the
11 transition going smoothly?
12         And I just state that -- that, yes.  So in
13 the context she asked for -- back to I say about the
14 timing, announcement made, where people saying great,
15 I'd love an offer letter.  That I feel like she's
16 trying to get information so she can generate offer
17 letters in her team.
18    Q    Okay.  You're giving me an explanation.  And
19 you're absolutely entitled to provide an explanation,
20 but I don't want -- you can give me an explanation in
21 a second.  Just could you answer my question this
22 time?  And I do understand that you don't want to

Page 185

1 answer it, and I get why you don't want to answer it.
2         But here's my question, if you wouldn't mind
3 answering it this time.  Isn't it true, yes or no,
4 that the information she is requesting is information
5 that Waterstone itself deems confidential?
6         MS. KREITER:  Object to the form.
7    A    And I could read this and state about
8 company personnel names and contact information.  Yep,
9 she asked for that.  And to me -- I -- yeah.  She --
10 she asked for that.  Correct.
11         And I simply -- and I simply -- and I know
12 you're not looking for explanation.  But I think it's
13 important that likewise, for these people who had been
14 told about departure wanted to join -- and wanted
15 offer letters.
16    Q    Wait a second.  Wait a second.  You now knew
17 they were told by them?  Do you know they were told
18 them or are you just making that assumption right now?
19    A    I'm -- I don't -- because I don't have the
20 full context, was not in the email or in the
21 conversation because I think there are being different
22 assumptions made here.  So I'm just trying to piece it

47 (Pages 182 - 185)

Page 186

1 together. That's all.
2   Q   Okay. And I'm not asking you. I'm only
3 asking you now -- do you know that these people had
4 been given offers that these people had been told --
5 do you know that at this time?
6   A   I don't know the exact date that an
7 announcement was made. I do not know. Right.
8   Q   So you're making an assumption right now;
9 right?
10   A   An assumption -- and I'm sorry. An
11 assumption to -- I feel like --
12   Q   The explanation that you were providing as
13 to why this might not be as bad as it seems is not
14 based on information you know, but just a helpful
15 assumption at the moment; right?
16   A   I don't know if helpful. I'm just trying
17 to, in the reality of somebody who leaves and joins
18 another company, and be it our people who leave us and
19 go to another company -- that's all I'm trying to do.
20 I'm not -- it's not a convenient one. I'm just trying
21 to piece together how it works and the timing.
22   Q   Well, let's piece some more together. If

Page 187

1 you go back to Exhibit 2, Chris writes -- if you go
2 down further. Do you see this is now April 11th?
3 Tell me when you can see that on our screen.
4   A   This email from Elizabeth to Jen and
5 Melissa?
6   Q   This is on page -- if we could take us to
7 page 743.
8   A   Okay.
9   Q   Okay. And this is an email from Ms. Spragg,
10 and she writes, "Chris," do you see in the middle of
11 -- Jen Wilton [sic]? Do you see that paragraph?
12   A   Yes.
13   Q   In the second paragraph, "As we said on the
14 call, we are happy to have others start this process
15 right away as well. If you do not have personal email
16 addresses on everyone else, they can send an email."
17 So she's actually asking Chris for personal email
18 addresses; right?
19   A   She's asking for that, and I believe along
20 with that -- okay. They could also send an email to
21 us, as I can see, along with saying, hey, do they have
22 a personal or they could send an email, and then we

Page 188

1 would have their personal email at that point.
2   Q   Okay. And that's where if you go right up,
3 Mr. Wolf then provides, "Here is our roster." Right?
4   A   I see that. Yes.
5   Q   So he went and he got the personal email
6 addresses for these individuals; right?
7   A   Well, I -- I would want to see if -- and if
8 you have a document, I don't know. But if there was
9 emails on there -- if all of them or some were on
10 there, some were not. So I don't --
11   Q   We'll get to that in just a second. There's
12 some other documents about this. But my question,
13 sir, is simply whether there's one, five, ten, however
14 many, he's going out, Mr. Wolf, and getting the
15 personal email addresses for his employees who work
16 for him at Mutual while he's working at Mutual to
17 facilitate Waterstone getting them offers; right?
18   A   He -- he's either getting that or directing
19 them to that email that we indicate or Elizabeth
20 indicates if they are interested in or joining
21 Waterstone. That's the way I read that.
22   Q   So she's asking Mr. Wolf to facilitate that

Page 189

1 for her; right?
2   A   Yeah. I -- I guess I'm not -- I'm not real
3 clear where else that would be facilitated.
4   Q   Well, Ms. Spragg could just, as you said,
5 get a phone number for the loan officer off any number
6 of things and give them a cold call and say, hey, this
7 is who I am and, you know, and this who I -- and would
8 you like to come over? And that's one way you could
9 do it; right?
10   A   Certainly -- certainly could.
11   Q   Okay. But instead, what she's doing is
12 using a Mutual employee who's paid by Mutual to
13 supervise Mutual's employees and she's choosing to
14 facilitate obtaining that information, utilizing that
15 manager; right?
16   A   And if -- and that manager being the one who
17 is one of the two leaders, and they have announced and
18 people want to join --
19   Q   You don't know if they have announced yet,
20 sir; do you?
21   A   Well, I -- I guess I don't know that they
22 didn't announce that. So I -- I feel like that

Page 190

1  announced, people are interested, here's the process
2  to do that.
3      Q   So you think this is totally fine and you
4  would do it tomorrow; right?  You see nothing -- I
5  want to make sure.  Speaking on behalf of Waterstone
6  as its corporate designee, I want to make sure I get
7  this testimony incredibly, incredibly clear.  So you
8  think there is nothing wrong with what Ms. Spragg is
9  doing; right?
10     A   And I don't know --
11     Q   I mean, it's great.  It's ideal behavior.
12  It is exactly what she should be doing, and there's no
13  problem with it; right?
14         MS. KREITER:  I'm going to object to
15  the --
16     Q   And she would do it tomorrow and again and
17  again and again and again because you think she's
18  acted perfectly here; right?
19         MS. KREITER:  I'm going to object to
20  the form.  It's also getting really argumentative.
21     A   This is one string of emails.  And, to me,
22  back to we don't know when an announcement was made,

Page 191

1  wasn't made.  This is the process that's beginning.
2  So I don't -- I don't know of what I see here that
3  would be interpreted as being something that would be
4  out of the ordinary in our business.
5      Q   I'm not asking you whether it's out of
6  ordinary.  I'm asking you if it's okay.  I'm sure it's
7  very ordinary for what you do.
8      A   Well, I don't know how --
9      Q   Sir, here's my question.  Here's my
10  question.  From what you're reading, do you see any
11  problem with what Ms. Spragg has done here?
12         MS. KREITER:  Objection.
13     Q   Any problem?  Any problem whatsoever?  Do
14  you think there's anything at all either actually or
15  potentially wrong with it?
16     A   We -- we can always look at how things can
17  be differently, better.  But I don't know within the
18  context of this as to what would've been done
19  differently.  In this context of this, and again, I --
20  I don't know what other emails there were.  There is
21  small string right here.
22         So I -- I don't know where -- timing wasn't

Page 192

1  all that.  So I think that is important.  But I --
2  yeah.  I don't know how -- how else that would be
3  done.
4      Q   So you would have no correction for
5  Ms. Spragg about what she did here?
6         MS. KREITER:  Objection.
7      A   I -- I feel like as I stated, we -- we can
8  always go back and say is there something better we
9  can do -- we can always -- we can always do that.
10     Q   Okay.  Now, I'm not asking whether there's
11  something you could do better.  I'm asking do you have
12  any problem with what you've read here relating to
13  Ms. Spragg getting information from Mr. Wolf to
14  facilitate offers to his employees?
15     A   And -- and I don't.  And as I've stated,
16  based on if people are interested in becoming
17  employees of Waterstone, yeah.  That's -- I don't have
18  an issue.
19     Q   So if there's another mortgage company out
20  there tomorrow in the same exact situation, and
21  Ms. Spragg said, hey, the way I dealt with Chris, is
22  that okay?  Can I do it again?  You'd say yes?

Page 193

1      A   And -- and I'd -- I'd have -- this one -- a
2  couple of emails in the line of I'm -- I'm not sure
3  what else there was in conversations.  I -- I have no
4  idea.  So I --
5      Q   I'm saying based on what you've seen here.
6  I'm only asking you based on what I've shown you.
7      A   So what I see here is somebody announces
8  they're leaving, people are interested in joining us.
9  Yeah.  I don't have an issue with what was done here.
10     Q   So let's go to Exhibit 10.
11         (Exhibit 10 was marked for
12          identification.)
13         MR. KAREN:  And if we go to the very
14  last page of Exhibit 10?  Very last page, I think.
15  Oh, sorry.  I misstated.  Okay.  One from the last.
16  My apologies.  I'm looking at the Melanie Ferrara
17  email sent Friday, June 10th, to Ms. Spragg.
18         And if you could blow that up?  Okay.
19  And we'll start at the bottom.  That's fine.  Can you
20  make that a little larger?
21         THE WITNESS:  That would be great.
22  Thank you.

49 (Pages 190 - 193)

Page 194

1 BY MR. KAREN:

2     Q  So this is an email from Fred Stalls. He

3 was a Mutual employee on June 10th. And he says to

4 Melanie, "Hey, please use my Hotmail as my personal

5 email." See that?

6     A  Yes.

7     Q  Okay.

8         MR. KAREN:  And if you scroll up?

9 BY MR. KAREN:

10     Q  This is an email from Fred again, saying,

11 "Melanie, there are emails being sent to my Mutual for

12 onboarding. Can you please change that so they're not

13 sent there asap?"  Right?

14     A  I see that. Yes.

15     Q  Okay.

16         MR. KAREN:  And if we could go further

17 up? Okay. And stop.

18 BY MR. KAREN:

19     Q  And then Melanie says, "Hey, Elizabeth,

20 please see his request. I'm not sure who's contacting

21 Fred, but he'd like it stopped asap." You see that?

22     A  I do.

Page 195

1     Q  Okay. And then Ms. Spragg, if you go to

2 email above, writes to her team, "Looks like Fred

3 entered a Mutual of Omaha email address in UKG. Can

4 we get that changed right away? I did let Melanie

5 know that it's got there. Let's make sure no one else

6 did the same." You see that?

7     A  And I see that. Yes.

8     Q  So Ms. Spragg is specifically concerned not

9 only with Mr. Stalls' request, but to make sure that

10 there's no emails being sent to their Mutual email

11 addresses; right?

12     A  Correct. But I -- but I would think that's

13 because he wouldn't want Mutual to be aware that he

14 was considering going to another company is the way I

15 would see this.

16     Q  Well, okay. We can talk about that in a

17 second. But if this had been announced, if everybody

18 knew, if it was transparent, why are you trying to

19 keep it secret by sending it to a personal email

20 address?

21     A  Well, if the announcement was done from a

22 Chris Smith, that would not be on July -- I'm sorry,

Page 196

1 on June 13. Would -- I don't believe. I'm trying to

2 think of the exact start date. But they would not

3 have started yet with Waterstone.

4         So he's going through the application

5 process. So that would -- they would not want that

6 going to Mutual's -- this Mutual email.

7     Q  Why not --

8     A  Because Mutual would see -- yeah. Because

9 Mutual would see that he would be applying at

10 Waterstone Mortgage. I mean, I'm just saying that

11 sincerely -- yeah.

12     Q  Yeah. Well, let's talk about that for a

13 second. So here we are; right? Chris Smith is coming

14 over. We know that. A lot of his team is coming

15 over. We know that. What's the harm if Mutual finds

16 out? It's not like -- it's not like Mr. Stalls isn't

17 going to have a job over at Waterstone. His whole

18 branch is coming over.

19     A  Well, I -- I think based on the Ormond Beach

20 group and their experience of when they -- and they

21 tried to -- to finish loans out or whatever and not

22 getting compensated, I think that was probably a fear

Page 197

1 of this group to not getting compensated on loans

2 closed.

3     Q  Okay. But, sir, I just want to make sure

4 I'm understanding this correctly. Waterstone was

5 working with these employees to ensure that Mutual

6 didn't find out what was going on; right?

7     A  Yes.

8     Q  Okay. And, now, let's go to something I

9 think is super important. Let's go to exhibit -- give

10 me one second. Let's go to Exhibit 43.

11         (Exhibit 43 was marked for

12         identification.)

13         Now, those emails, sir, we just looked at

14 were in June; right?

15     A  Yes. For Fred Stalls?

16     Q  Yes.

17     A  Right.

18     Q  And you remember also seeing those emails in

19 June about the transfer of any information? Those

20 were in May and June, remember, from Melanie relating

21 to downloading the closed loan list? Remember those?

22     A  I think with -- I'm just making sure here

50 (Pages 194 - 197)

Page 198

1  got the right document.
2  Q   I was referring to Exhibits 29 and 42.
3  A   Okay. Thank you. Yeah. With Melanie,
4  communication with Chris Smith on May 11th. Yes.
5  Q   Right. And him sending the closed loan
6  list, I think, in June about a month later; right?
7  A   And -- and I -- I don't -- that's -- I had
8  back at that time said I don't know when something was
9  done. I don't know.
10  Q   Okay. All right. Well, we can look at the
11  emails later and it's fine. It's fine.
12  A   Okay.
13  Q   But here's what I want to look at. Now,
14  we're going to look at Exhibit 43. Yes, 43. Have you
15  ever seen this letter before, sir?
16  A   I'm familiar with the cease and desist. And
17  I just say that. That I'm not sure if I've seen this
18  exact letter. But I'm aware of the cease and desist
19  that occurred.
20  Q   Okay. So this is on April 29th. Okay? So
21  on April 29th, Mutual's counsel sends a letter. And
22  in the third paragraph, it says -- and tell me if you

Page 199

1  could follow along with this.
2         MR. KAREN:  And you can blow it up,
3  Nick, so he can see it easier.
4  BY MR. KAREN:
5  Q   "In addition, we have uncovered several
6  emails from several scheme participants containing
7  Mutual's protected confidential information that were
8  forward." Do you see that?
9  A   Yes. I -- I can see what you're reading.
10  Yep.
11  Q   Okay. And then on the second page, it
12  defines what Mutual's confidential information is;
13  right? Pertaining to customers, potential customers;
14  right? You see that?
15  A   I see that paragraph. Yep.
16  Q   Okay. The agreement also prohibits sharing
17  confidential information, including Mutual personnel
18  and contact lists. Do you see that?
19  A   Yes. Or is that that next line in the
20  agreement? Yes. I see that. Yep.
21  Q   So on April 29th, Mutual specifically tells
22  you guys at Waterstone, hey, you can't take this

Page 200

1  information." And yet, in all the emails we just
2  looked at, that's exactly what you're doing; isn't it?
3  A   Are you referring to the Fred Stalls email?
4  Because we just talking about that document.
5  Q   Okay. Let's go through these one by one.
6  We'll be here as long as you want to be here,
7  Mr. Allen.
8  A   No. I'm just trying to confirm which
9  document you're referring to.
10  Q   I know what you're trying to do. I know
11  what you're trying to do, so we'll just do this the
12  hard way. Let's look at Exhibit 29. This is the
13  email, sir, where Melanie asks for the completed loans
14  and closed loans; right?
15  A   Yes.
16  Q   And, certainly, within the cease and desist
17  letter sent on April 29th, this would be what Mutual
18  considers its confidential information; right?
19  A   And I believe -- and I've got the other
20  document I'm looking at. It would be company records
21  pertaining to customers. Yeah. So it has customers
22  on there and completed loans, yeah, on the customers.

Page 201

1  Q   So after Mutual specifically advises
2  Waterstone that it considers this information
3  confidential, essentially 11 days later, Melanie's
4  asking another current employer, a different current
5  employee to go into its Encompass system and export
6  data; right?
7  A   Again, I can see the request that is made on
8  here. I can see the, yeah, conversation.
9  Q   Okay. And then a month later, as we see in
10  Exhibit 45, I believe it is -- hold on. Maybe it was
11  -- sorry. 42. My apologies. That information is
12  apparently provided again after Mutual specifically
13  put Waterstone on notice; right?
14  A   And -- and based on the cease and desist we
15  saw for Chris Wolf?
16  Q   Well, did you think it would be different
17  for Chris Smith? Is that really your explanation?
18  A   No. I'm -- I'm just asking -- just, again,
19  I'm trying to make sure I'm looking at the right
20  document, right time. That's all.
21  Q   Okay. All right. So, am I right?
22  A   So, yeah. I see on Monday, June 13th. And

51 (Pages 198 - 201)

Page 202

1 I had said earlier I would not see things exported
2 from somebody's system. Yeah.
3    Q    Particularly, sir, after they specifically
4 advised you specifically that you're to cease and
5 desist from doing this, and you guys did it again;
6 right?
7    A    I can see the ask on here, and I can read
8 the cease and desist. And like I said, yeah. Would
9 not want to see somebody exporting information. Yeah.
10    Q    Now, in addition, sir -- give me one second.
11        MR. KAREN: You can take that down,
12 Nick. Bear with me just one moment. Sorry about
13 this. Okay. Could we go to Exhibit 24?
14        (Exhibit 24 was marked for
15        identification.)
16 BY MR. KAREN:
17    Q    And, sir, you see this the email, if you go
18 below the transmittals to us, from Jen Wilton [sic],
19 and she's sending it to Chris Smith?
20    A    And it's -- I have the paper version. I
21 don't think it's coming up on the screen though,
22 unless mine's frozen -- oh, there we go.

Page 203

1        MR. KAREN: A little bit up. Okay.
2 Yeah.
3 BY MR. KAREN:
4    Q    "Hi, Chris, I hope you had a nice trip." Do
5 you see where it says that?
6    A    Yes, I do.
7    Q    And then she's sending him the Tampa and New
8 Jersey offer letters for his review; right?
9    A    Yep.
10    Q    Okay. And do you have any problem,
11 especially after the cease and decease descent that
12 Jen Wilton [sic] is preparing for Chris Smith's review
13 offer letters while he's still a manager at Mutual to
14 send to his employees over at Mutual?
15        MS. KREITER: Object to the form.
16    Q    I'm just asking if you have a problem with
17 it.
18    A    If somebody is interested in applying with
19 us, I -- I go back to that. And that -- that's -- I
20 go back to that comment. So I'm not -- yeah.
21    Q    So you don't have any problem with it? I
22 mean, it's okay. I mean, I'm not indicting you one

Page 204

1 way or the other. I'm just asking your position, do
2 you have a problem with it?
3    A    I -- I don't in the context of what she was
4 asking him here.
5    Q    And you don't in the context of a manager
6 working for a different company currently being paid
7 to supervise those employees, you facilitating him
8 making offers to that staff to come to you, you don't
9 have a problem with that?
10        MS. KREITER: Object to the form.
11    A    Well, again, they're -- if they have a
12 choice that they want to join us, then I do not have
13 an issue with that.
14    Q    Well, they always had a choice. I mean, we
15 already decided that there is no such thing as
16 indentured servitude. So they always have a choice;
17 right?
18    A    Right.
19    Q    So what do you mean by "if they have a
20 choice"?
21    A    And what -- what was the original question?
22 I'm sorry.

Page 205

1    Q    So I asked you do you have any problem with
2 it? And you said, "Well, no. As long as the
3 employees have a choice." And my point is employees
4 always have a choice because there's no such thing as
5 indentured servicing; right?
6    A    So I'm not sure how that would be done and
7 completed and the person being able to apply without
8 going through this process.
9    Q    Well, another process would be that the
10 manager just resigns and comes over to Waterstone.
11 And after that, Waterstone on its own reaches out to
12 those people and says, hey, would you like a job here?
13 That would be another way to do it, wouldn't it?
14    A    That -- that could. And as I've talked
15 about a leader and his team, and in terms of somebody,
16 you know, they advise them that they're going to be
17 leaving.
18        And back to the really key on existing loans
19 and versus saying, hey, I'm gone, and somebody
20 shutting them out of the system and making sure stuff
21 is -- we had talked earlier about the chaos that can
22 be created. And I think trying to eliminate that as

52 (Pages 202 - 205)

Page 206

1  they certainly -- I'd expect somebody who's been with
2  people for a while are going to make an announcement
3  -- prior to the day after.
4     Q  I'm really looking forward to you recalling
5  this conversation in a few minutes.  It's going to be
6  special.  Okay?  So just hold those thoughts for a
7  little bit.
8        MS. KREITER:  Okay.  I'm going to
9  object.  We don't need comments like that on the
10  record.  You can ask questions.
11        MR. KAREN:  Okay.  Okay.
12        MS. KREITER:  You're not allowed to
13  just be snarky to the witness.
14  BY MR. KAREN:
15     Q  So, sir, my question is this, going back to
16  what I said is you could've just had him come over,
17  and then told the employees, hey, if you want to come
18  to Waterstone, you know, here's an opportunity; right?
19  That's one way you could do it.  I understand your
20  concern about the customer, okay, what you're saying
21  there.
22     A  Okay.

Page 207

1     Q  But isn't it true, sir, if you did it that
2  way, Mutual would have known about what was going on,
3  and Mutual would've had a chance to compete for these
4  people; right?  Mutual would've had a chance to offer
5  them signing bonuses and everything else to stay;
6  right?
7     A  I think we've been under a similar situation
8  of somebody leaving, and then we have the right to
9  tell our person that we can offer them something, be
10  it a bonus or that we would like them to stay.
11        So we've been under the same situation, and
12  we can go ahead and do that or we can say, hey,
13  they're going with their leader, and that -- that's
14  what they're going to do regardless of our -- have
15  that choice.  Yeah.
16     Q  No.  No.  Right.  But you can only act on
17  that choice if you're aware of it; right?
18     A  Well, being aware could be somebody -- I
19  mean, we've had conversations.  Somebody has called me
20  and said, "Hey, I'm leaving."  And I've said, "Hey,
21  could we have a conversation about that?"
22     Q  I understand, sir.

Page 208

1     A  And we've had conversations over a few day
2  period of time if they had been willing to talk to us
3  about saying, hey, is it -- is it salvageable?  Are
4  there things we can do?  Why are they leaving?  And
5  things like that.  So we've been under that scenario.
6     Q  I understand that.  Okay?  But what I'm
7  saying to you is that's easy when you've got one
8  employee leaving.  When you've got 10 or 11 or 12 or
9  15 leaving all at one time, it's a lot harder;
10  wouldn't you agree?
11     A  Well, we've had those scenarios where it has
12  been a group.  It has been a group and not just one
13  individual.  And we're talking to the -- yeah.  We're
14  talking to that leader because, again, typically their
15  team -- his or her team, has been with that person.
16  And if they're a good leader, they're going to follow
17  them.  That's very normal in our business.
18     Q  Okay.  That's not what I'm saying though.
19  Okay?  I'm asking you if you have one person leave and
20  you can keep the leader, that's fine and that's great.
21  But when you have the whole mass of the branch
22  solicited by your own manager secretly, it's a lot

Page 209

1  harder when you find out a day too late what's
2  happened; right?
3     A  Well, if under a -- a scenario that you're
4  saying somebody is solicited and by their manager -- I
5  don't know.  It depends on a relationship with that
6  branch and those people and if they're going to stay
7  or not.
8        MR. KAREN:  Let's take a five-minute
9  break because this is a good point for a few minutes.
10        THE WITNESS:  That would be great.
11  Just going to ask for a restroom break.
12        MR. KAREN:  Perfect.
13        THE VIDEOGRAPHER:  Going off the
14  record.  The time is 4:06 p.m. Eastern.
15        (Off the record.)
16        THE VIDEOGRAPHER:  Going back on the
17  record.  The time is 4:19 p.m. Eastern.
18        MR. KAREN:  Okay.  Can we have Exhibit
19  21 up?  And if we can go to page 267 -- oh, you're
20  there.  Thanks, Nick.
21  BY MR. KAREN:
22     Q  Mr. Allen --

53 (Pages 206 - 209)

Page 210

1    A   Oh -- sorry.

2         MR. KAREN:  Oh, can we scroll up to

3    number 2?  Sorry.  Thank you.

4    BY MR. KAREN:

5    Q   Mr. Allen, we won't spend too much time on

6    this, but I just wanted to kind of create a timeline

7    for you real quick.  So, remember, I think we said

8    earlier that this email is November 4th.  You remember

9    that?

10    A   Yeah.  I think the original; right?  There

11    were a couple emails on here?

12    Q   Yes.  But the one that we're -- for

13    reference, is the redlining that we see here.  The red

14    response is November 4th.  Remember that?

15    A   Yes.  Yeah.

16    Q   Okay.

17         MR. KAREN:  And if we could go back to

18    that number 2.  Blow it up a little bit more, please.

19    Thank you.

20    BY MR. KAREN:

21    Q   And this is the one where, you know,

22    Mr. Wolf asks, "Hey, you know, can we send over a team

Page 211

1    to start kind of building up loans and that kind of

2    stuff"; right?

3    A   Yeah.  To send loans over that first --

4    yeah.  Send -- yeah.

5    Q   And that's where Mr. --

6    A   Owen.  Yeah.

7    Q   -- Owen, yeah, says, "Hey, you know, we

8    don't want to do anything to violate your agreement."

9    Et cetera.  Et cetera.  Right?  That's his response on

10    November 4th; right?

11    A   Yeah.

12    Q   Okay.

13         MR. KAREN:  Now, what I'd like to do is

14    go to Exhibit 20.  And if we can go down.

15    BY MR. KAREN:

16    Q   This is also Mr. Owen and this is in March

17    of '22.  So, what?  About five months later or so?  Is

18    that -- on the date?

19    A   Yeah.  It's, like, four months or so.

20    Right.

21    Q   Four or five months.  Yeah.  And he asks the

22    word -- go to the word "additionally."  See where it

Page 212

1    says "additionally" right there?  "Additionally, we'd

2    want to determine are you going to try to send over a

3    small team a week to ten days early to get an onboard

4    at first and up and running?"  Do you see where he

5    says that?

6    A   I do.

7    Q   Okay.  So I'm confused about something that

8    maybe you can clarify for me.  In November, Mr. Wolf

9    says, "Hey, we want to, you know, get a small team to

10    come over to start sending loans, right, and get some

11    loans over there."  And Mr. Owen says, "No.  No.  No.

12    Don't do that."  But in March, he says, "Hey, are you

13    going to do that?"

14         MS. KREITER:  Object to the form.

15    Q   Do you see the inconsistency there or are am

16    I seeing something wrong?

17    A   Well, I don't -- I don't feel like I see

18    this being in terms of loans versus having -- he says

19    a small team come over.  So I don't see anything about

20    loan in any way other than some people starting, like,

21    a week to ten days early.

22    Q   Okay.  Well, what they do be doing there --

Page 213

1    well, okay.  Let's go to Exhibit 27.

2         (Exhibit 27 was marked for

3          identification.)

4    A   is that new on here?  I've just -- I've got

5    a new and an old pile.

6    Q   It is.  It is.

7    A   Okay.

8    Q   Now, Michael Irish.  Do you see the email

9    from Michael Irish to Chris Wolf?

10    A   Yes, I do.

11    Q   And he says, "Hey, Chris.  First off, I'm

12    beyond excited for this new endeavor.  I do have two

13    questions I forgot to ask in the team meeting."

14    Right?  So this is April 8th.  Do you see that?

15    A   I do.

16    Q   So it appears that there had been a team

17    meeting where Mr. Wolf explains what's happening to

18    the team; right?

19    A   I just see about the team meeting mentioned

20    here.

21    Q   Okay.  And he asks, "For the personal

22    request" -- do you see the line that says that?  }For

54 (Pages 210 - 213)

Page 214

1 the personal request --
2    A    Yes.
3    Q    -- could I be on the first people to
4 transition over?  I only ask because currently, I do
5 not have any working loans in my pipeline.  But I do
6 have a quite a few preapprovals out that the realtors
7 actively showing their clients."
8        Then he says, "I would hate to have my
9 pipeline pop off within the next 30 days, and then be
10 out of commission was if, in fact, that would be the
11 case."  Right?
12    A    Okay.
13    Q    But, now, you told me earlier today that you
14 considered preapprovals that happened over at Mutual
15 to be Mutual's business that you couldn't take; right?
16    A    Yeah.  Preapprovals are loans that are in
17 the system.  Credit pulls, things like that, that
18 would be in their system.
19    Q    So he says "these preapprovals."  Now, you
20 are aware that Mr. Irish is actually one of the first
21 people transitioned over in that small team of five;
22 right?

Page 215

1    A    I -- I'm assuming he was.  I don't have the
2 exact name, so I'll assume that that's correct.
3    Q    So just so I get this understood.  First,
4 Mr. Owen in November says he can't, you know, send
5 over a team to start emails or to start loans.  Then
6 in March, he asks, "Well, are you going to have a team
7 come over to start onboarding?"  And then who gets
8 sent over is Mr. Irish with all his preapprovals;
9 right?  Do I have the timeline correct?
10    A    And I'm sorry.  If you could just repeat the
11 timeline.  Sorry.  I was just looking at this again.
12 So if you could repeat that.  Sorry.
13    Q    Sure.  It was November with the first email
14 to Owen, March with Owen, Mr. Owen's response, you
15 know, saying, "Hey, are you going to bring over a team
16 to onboard?"  And then, now, we're in April, and what
17 actually happens is Michael Irish gets sent over
18 because he's asking that he doesn't want his
19 preapprovals to be kept at Mutual; right?
20    A    Per -- per this email, he's asking to move
21 over early.  Yeah.
22    Q    Okay.  And the reasoning is problematic,

Page 216

1 right, so that he could take those preapprovals?
2        MS. KREITER:  Object to the form.
3    A    Well, and I -- and I, again, because this is
4 one email.  If he's announcing to his customers, his
5 customers will always have a choice if they are going
6 to stay with Mutual or if they're going to work with
7 him at Waterstone.
8    Q    But not if he has announced -- solicit to
9 the customers; right?
10    A    Yeah.  That's right.  Said if he announces.
11 If he tells them, hey, I've left companies, and up to
12 them if they then decide to say, hey, still want to
13 work with you or, hey, we still want to stay with
14 Mutual.  Who do we talk to?
15    Q    Okay.  But that would require him to not
16 solicit those customers.  The customers would have to,
17 when they learn of him coming over, go over on their
18 own.  He couldn't solicit them because you would
19 expect him to adhere to his non-solicitation
20 obligations for Mutual; right?
21    A    I would feel like he would honor whatever
22 his current contract is and announce to his group of

Page 217

1 people, referral partners, or whatever it is, say,
2 "I've left."  Yeah.
3    Q    Okay.  But you agree if he crossed that line
4 and solicited, that would be a problem?
5        MS. KREITER:  Object to the form.
6    A    And -- and if that's in his -- his agreement
7 that he's soliciting and saying, hey, he shouldn't
8 solicit, then, yeah.  That would be -- that would be
9 wrong.
10    Q    And that's just kind of like what we talked
11 about.  If a manager crossed the line and solicited
12 his people while he was still a manager as opposed to
13 merely announcing; right?
14    A    I think versus announcing that they are
15 leaving.  Yeah.
16        MR. KAREN:  Now, we can go to Exhibit
17 48.
18        (Exhibit 48 was marked for
19        identification.)
20 BY MR. KAREN:
21    Q    Okay.  Now, this is an email from Dwayne
22 Hutto, again, to Mr. Owen.  And, sir, for purposes of

55 (Pages 214 - 217)

Page 218

1 saving the planet here a little bit, the P&L is, like,
2 50, 60 pages, and I didn't want to copy it and do all
3 that stuff.
4        So I will represent to you, and I hope
5 you'll take my word for it, a P&L was actually
6 attached to this. I don't think Ms. Kreiter would
7 disagree with me on that point. So I'm just going to
8 represent that there was an attachment to this that
9 was a P&L. Okay?
10    A    Okay.
11    Q    All right. Now, so this email shows
12 Mr. Hutto sending, if you scroll down, a P&L. It's
13 called December P&L, which I'll represent to you was
14 actually sent by Tampa. And if you look, it's
15 Mr. Smith sending it to his personal email, and then
16 that goes to Mr. Hutto who sends it to Mr. Owen. You
17 see that?
18    A    Yes.
19    Q    Okay. Now, earlier, we looked at the
20 Exhibit 22. Remember that employment agreement --
21    A    Section 5?
22    Q    Point one?

Page 219

1    A    Yes. Yeah.
2    Q    And I'm not trying to trick you. I'm happy
3 to show it to you if you want to see it again. But
4 I'm trying to speed this along because I don't think
5 you want to be here later than you need to be. So do
6 you recall Section 5.1 saying you can't send over any
7 confidential financial information to the company?
8    A    Something to that extent. Right.
9    Q    Yeah. And you would agree with me a branch
10 P&L would be that kind of information; right?
11    A    Yeah. I mean, in terms of their agreement
12 saying they shouldn't be sending that. If Mutual is
13 stating that -- right. Yeah.
14    Q    But, certainly, from Waterstone's
15 perspective and with respect to its own loan officers,
16 it shouldn't be sending this information to another
17 company; right?
18    A    Yeah. I -- I would agree with you.
19    Q    Okay. Now, does it concern you at all that
20 this information was, in fact, sent to Mr. Owen?
21    A    And concern -- I -- I -- again, that's
22 Dwayne and Chris choosing to send that.

Page 220

1    Q    So if I showed you there were multiple
2 emails of this being sent, would that be a problem for
3 you?
4    A    And "multiple" being -- and I'm sorry. Just
5 so I'm understanding the context of "multiple" emails.
6    Q    More than one P&L being sent from more than
7 one branch.
8    A    And if you say a concern would, you know,
9 the concern would be in terms of Dwayne and Chris
10 sending if they should not have.
11    Q    Well, but you're getting it too, and you
12 understand that this is information you guys think is
13 confidential for any company; right?
14    A    Well, I --
15        MS. KREITER: Object to the form.
16    A    And I -- we don't -- we don't request the
17 P&Ls.
18    Q    Okay. But if you get them, do you use them
19 anyhow or do you send it back and say, hey, guys, you
20 shouldn't really be sending this to me?
21    A    I -- I -- because I'm the one involved with
22 the numbers and I put a pro forma together. Based on

Page 221

1 all of our branches having very detailed financials --
2 and, again, we have large ones, small ones, or what
3 have you, we -- we have a very good idea of what
4 expenses are going to look like.
5        My pro forma -- I do a high amount, low
6 amount. I mean, I just hit that thing many different
7 ways. And I state that because I probably, you know,
8 seeing -- because I have financial calls with
9 branches, I probably have seen a thousand -- I feel
10 like are over a thousand of these.
11        So I just state that -- that for us,
12 receiving it is not -- to me, is not part of our
13 decision-making. Again, I don't -- it -- it's rare
14 that we would -- we would not request it, and it's
15 weird somebody is providing it to us.
16    Q    Okay. So this was a rare situation. So
17 then I guess my question's easy then for you. I mean,
18 does it at least concern you that it was sent or no?
19 If it doesn't concern you, tell me it doesn't concern
20 you.
21    A    Well, from the context of Dwayne and Chris,
22 they'd have to live with their agreement. That's all

56 (Pages 218 - 221)

Page 222

1  I'm referring to is it wasn't when we said, hey, we
2  need this, we want this. They sent it. So, again, it
3  was -- I -- I don't know. That's -- so I -- I point
4  more to them and in terms of their obligations or what
5  have you with their current company.
6      Q   All right. So you don't really care about
7  those obligations? That's not your problem?
8          MS. KREITER: Object to the form.
9      A   I'm not indicating that -- to me, the -- the
10  financials were -- were irrelevant because we don't
11  make a decision -- I've got -- I've got information
12  that I can gather and have in a pro forma. That's
13  what we use to make our determination if somebody is
14  viable or that. That's -- that's why I'm answering it
15  that way.
16     Q   Okay. Well, let me ask you this, sir. You
17  would agree with me -- you're familiar somewhat with
18  Regulation Z, generally, the loan officer compensation
19  rule?
20     A   It -- it -- enough, I guess, I'd want you to
21  expand and, you know, wherever we'd want to talk
22  through.

Page 223

1      Q   You have some idea what I'm talking about.
2  I'm not asking about the intricate regulations. Just
3  you know what I'm talking about that rule involves;
4  right?
5      A   And are we talking just LO comp in general?
6      Q   LO comp in general.
7      A   I mean, LO compensation, I'm somewhat
8  familiar. Yeah.
9      Q   Right. And you understand that, like, with
10  the branch -- when you call them expense forecasts or
11  expense model branches --
12     A   Expense management branches. Yeah.
13     Q   Right. There's a reason why they're really
14  not P&Ls anymore is because you can't pay based on the
15  profitability of actual loans. You can't punish them
16  for concessions and pricing exceptions; right? That
17  kind of thing.
18     A   Yeah. A non-producing can be on a straight
19  P&L. Producing manager, right, is the one on the
20  expense management model. Right.
21     Q   You're exactly right. Yes. And pass the
22  regulatory test. So these were producing managers;

Page 224

1  right?
2      A   Yes.
3      Q   Right. So concessions are not something
4  that's publicly available, is it? And pricing
5  exceptions?
6      A   No. They would not be publicly available.
7  Right.
8      Q   And to the extent that information -- I'm
9  not asking whether you do or you didn't. Okay? I'm
10  not saying that. But you would agree with me having
11  that information would at least in theory allow you to
12  finetune and hone a projection because you'd know what
13  their behavior is with respect to pricing exceptions
14  and concessions; right?
15     A   Well, the only -- the only thing I -- I
16  mean, I'd want to add into that though is that
17  companies have different corporate margins. And so I
18  actually go in and we'll talk with somebody, price
19  live loans to find out what is our branch margin in
20  our world.
21         So that's where I back into it because
22  everybody company kind of -- I shouldn't say kind of,

Page 225

1  approaches it different. Do they show full margin?
2  Do they show partial?
3          So the price exception to me on somebody
4  else's financials are truly meaningless, because,
5  again, I'm interested in our world and where they're
6  going to price and where that -- where that branch
7  margin for our world is going to be. And thus, that's
8  my pro forma.
9      Q   But knowing what they're actually going to
10  price, you either could have what they tell you,
11  right, which could be inflated, or you could see
12  actual documents which would actually show what
13  they're actually pricing at; right?
14     A   Well, I think that's -- and -- and I've
15  found over the years -- an example is somebody's
16  company was charging them 100 basis points, for
17  example, against their P&L, and they advised me. So
18  that was radically different. Where was their
19  starting point? Were there going to exceptions?
20         It -- it was trying to get it to an apples
21  to apples, thus why I go to our pricing. I have our
22  court margin built in. I go through a few scenarios

57 (Pages 222 - 225)

Page 226

1  multiple times and say -- and I talk through it with
2  them and say, hey, you know, what rate are you
3  quoting, whatever, and back into them what's the
4  branch margin in our world, which can be very
5  different than another company.
6      Q   No.  No.  I understand that.  But it still
7  ultimately depends upon, regardless of the world
8  they're in, what their behavior patterns are.  Do they
9  give lots of concessions?  Do they get asked for lots
10 of pricing exceptions?  What's their behavior?  What's
11 their product mix; right?
12          You're not going to know the exact product
13 mix, and you've got to -- whether they do a lot of
14 bond loans.  Whether they do -- a lot of reverse
15 mortgages.  Whether they do a lot of FHA.  Whether
16 they do a lot of jumbo conventional.  That's all
17 relevant to the margins you're going to get and the
18 amount of money you're going to make on that branch;
19 right?
20     A   Yeah.  Which we actually have access to a
21 couple different systems, Mortgage Marketing
22 Intelligence.  So we can go in by a loan officer or by

Page 227

1  branch, and that's -- we pay 35 bucks a month, and we
2  can go and look at the production for that loan
3  officer, average loan size, the government mix, the
4  conventional.  It does have all of that data.  It has
5  all the realtors that they've worked.
6          So that -- and then we also have -- Model
7  Match is another system that we use that has even more
8  information beyond that.  So we can go find that mix
9  of business, and we do.  We want to go validate that,
10 and that -- that's part of our due diligence.
11     Q   Okay.  But one thing you can't validate as
12 we discussed before are the pricing exceptions and the
13 concessions.  Because it doesn't matter if you know
14 the product mix if they're actually taking a point off
15 every loan; right?  I mean, if they're selling low
16 constantly, that's something you're not going to learn
17 until they're with you; right?
18     A   Well, and I'll simply go back.  Not trying
19 to avoid the question, but going back because some
20 companies I've found in their world where I'm pricing
21 a loan that might be a 300 basis point branch margin,
22 branch gross margin.  Their world, they might see 375.

Page 228

1  They might be doing exceptions off of that.
2          And so I look and go, our world's 300.
3  That's what it is.  So I -- that's where there are
4  wide differences between companies definitely in these
5  financials.  And that's why -- our world and I say,
6  hey, I want to live in our world because what somebody
7  else is doing is not absolutely an apples to apples.
8      Q   Okay.  But then if this information that you
9  agree that you're not supposed to get, do you know why
10 you got on multiple occasions -- not you personally,
11 but Mr. Owen got on multiple occasions, he never said,
12 hey, guys, we don't need and this we don't want this?
13         MS. KREITER:  Object to the form.
14     Q   And either way, this is information you
15 shouldn't take.  Do you know why?
16         MS. KREITER:  Object to the form.
17     A   I -- I don't know why, again, because I'm
18 the one who is involved putting the pro forma
19 together.  And I don't -- again, I'm doing this --
20 this other information -- due diligence I've referred
21 to.
22     Q   Okay.  But, again, if you can go back to

Page 229

1  March 3rd or March 4th, whatever day it is, and talk
2  to Mr. Owen, you would tell him to tell Mr. Hutto not
3  to send any of this stuff; right?
4          MS. KREITER:  Object to the form.
5      A   And -- and in the context, I -- I guess I
6  feel like in our world, it's irrelevant.  I'm not
7  making light of somebody sending what they shouldn't
8  because their company has their guidelines.
9          But, again, it would be, to me, I've got all
10 my tools that I'm putting together for a decision, or
11 at least for me to take to our group to say, hey, is
12 this viable or not?
13     Q   I understand.  But you're not answering my
14 question.  My question is if you could go back and
15 talk to Mr. Owen before he received this email, would
16 you have told him, hey, you should respond to Dwayne
17 and tell Dwayne not to send this information to us?
18 We don't need it, and we shouldn't be getting it.
19         MS. KREITER:  Object to the form.
20     A   I guess -- I guess Dustin could've done
21 that.  And I just say "I guess" because, again, it
22 just wasn't relevant in our decision.  That's all.

58 (Pages 226 - 229)

Page 230

1    Q   I'm not asking -- but since you think that's
2 confidential, my question is do you not care that he
3 got it or do you wish that he had said, hey, guys, I
4 don't want this information, I don't need it, and you
5 shouldn't send it to me?
6    A   To me, I'd simply say irrelevant in our
7 decision.  So if he had said, hey, I don't need it, he
8 received it, it --it just -- it was irrelevant.  I'm
9 sorry.  I'm trying to answer it.  But that's -- yeah.
10    Q   Okay.  So you wouldn't have done anything
11 different here; right?
12    A   Well, I'm -- I'm building out my pro forma,
13 and so I -- I -- if -- if I'm receiving from something
14 from somebody and it's irrelevant, I would just
15 deleting or what I -- yeah.  And so --
16    Q   And I realize you don't want to answer the
17 question again.  But let me try it a different way.
18 Okay?  You understand, sir, that when you get
19 information you're not supposed to have, whether you
20 use it or not, you recognize the implication is that
21 you still have stuff you're not supposed to have, and
22 it could be used; right?

Page 231

1    A   Sure.  Somebody could use information they
2 received.  Sure.
3    Q   Okay.  And you certainly, and especially if
4 you don't use it and you don't need it, you certainly
5 wouldn't want it in your possession because that could
6 give rise to an implication that really you are using
7 it and you do want it; right?
8       MS. KREITER:  Object to the form.
9    A   And -- and I --
10    Q   I'm not saying you do.  But I'm saying a
11 person could look at it and say, hey, well, you got
12 it, so maybe you did use it after all --
13    A   So if somebody --
14       MS. KREITER:  Object to the form.
15    Q   -- lead to an implication that you did use
16 it because you had it.  That's possible; right?
17       MS. KREITER:  Object to the form.
18    A   And -- and certainly to one path or
19 interpretation, whereas I'm just speaking to what I --
20 because that's where I'm heavily involved, in pro
21 forma.  So I'm speaking to what we do, where we
22 collect information, third-party validated, all that,

Page 232

1 and our due diligence.
2    Q   Okay.  But my question is you do understand
3 that when you get information you're not supposed to
4 have, whether it's true or not -- what's the old
5 saying?  Perception is reality?  You understand that
6 if you get the information and you keep the
7 information, then it could lead to someone inferring
8 that you used it even if you didn't; right?
9       MS. KREITER:  Object to the form.
10    A   If -- if that's what somebody was going to
11 interpret, I can't guess what somebody is going to
12 interpret or not.  I'm just trying to state what --
13 what I did.
14    Q   I understand.  You're right that you can't
15 control what someone interprets; right?
16    A   Right.
17    Q   So you would agree with me because of that,
18 all things being equal, you'd prefer not to have the
19 information, especially since you don't use it; right?
20       MS. KREITER:  Object to the form.
21    A   If I'm not going to use it, and I would go
22 to Dwayne and Chris's -- their choice to send that.

Page 233

1 But if I'm not going to use it, sure.  Yeah.  Don't
2 need to send it.  Sure.
3    Q   Okay.  So in that case, if you weren't going
4 to use it and you would never want that inference to
5 be raised, even more of a reason to say, guys, don't
6 send this to me; right?
7       MS. KREITER:  Object to the form.
8    A   And I -- I can't speak on -- I feel like on
9 behalf of Dustin and I -- I just -- I can't.  It's --
10 yeah.
11    Q   Okay.  Let's go now to Exhibit 30.
12       (Exhibit 30 was marked for
13       identification.)
14       Now, so this an email from Chris Wolf, and
15 you see that's his private email?
16    A   I'm trying to find -- where does the private
17 saying?  I'm sorry.  I'm not seeing that.
18    Q   cwolf@gmail.
19    A   I see.  Yes.  Sent from -- from -- I'm
20 sorry.  You had said from his private email.  Yes.
21 I'm sorry.  Personal email.  Yeah.  Yep.
22    Q   Okay.  And it's dated 4/8; right?

59 (Pages 230 - 233)

Page 234

1   A   Yes.
2   Q   Okay.  And who is Ben Davis?
3   A   Ben works in the Winter Park office.  He
4   originates along with managing -- yeah.  He's a sales
5   manager name.  There's a wide variety of things that
6   he does, but he both helps originators with their
7   deals, knows products really well, things like that.
8   Q   Okay.  Now, here's my question.  At this
9   time, you realize Wolf is still a manager over at
10  Mutual; right?
11  A   Yes.  Correct.
12  Q   Okay.  And we've already talked about how
13  you shouldn't be sending loans over; right?
14  A   Correct.
15  Q   Okay.  And so this is an email on 4/8, and
16  he's sending over, if you look below, he says, "We --
17  a DTI issue.  Just qualify for the house payment."
18  And asks him to look at a loan scenario; right?  You
19  see this?
20  A   Yes.
21  Q   And he's sharing information about the
22  borrower's income; right?

Page 235

1   A   Right.
2   Q   And if you go down further below, he says,
3   "His tax return had a password, and I entered it to
4   upload.  But I guess it needs it again."  So he's
5   sending a tax return to Ben.  Is that what it looks
6   like to you?
7   A   Yeah.  Appears to be.
8   Q   Okay.  And if you look further down in this
9   email chain --
10          MR. KAREN:  Keep going further down.
11  Okay.  Right there.
12  BY MR. KAREN:
13  Q   This is Chris Wolf saying, "I input app and
14  uploaded docs."  So, I guess, he put an applications
15  and uploaded some documents; right?
16  A   I can see in this emails that's what he
17  stated.
18  Q   Okay.  And then he goes -- further down, it
19  says, "Let me know if you want to reach out to him or
20  have me communicate with him.  He is an email guy."
21  Right?
22  A   Okay.

Page 236

1   Q   Okay.  So in this scenario where Chris Wolf
2   as a manager is sending Ben Davis, who works for
3   Waterstone, information on a current loan scenario and
4   providing documents, including, apparently, a tax
5   return, an application, and some other materials,
6   while he's still a Mutual employee.  Do you see that?
7   A   Yes.
8   Q   Okay.  Now, you're familiar with something
9   called the SAFE Act; right?
10  A   Somewhat.  Yeah.
11  Q   Okay.  You know every loan officer as an
12  NMLS I.D.?
13  A   Yeah.  Yeah.
14  Q   Okay.  And on their NMLS I.D., it has to be
15  registered with a particular company; right?
16  A   Right.
17  Q   Okay.  And the reasons they have that is
18  they don't want borrowers confused as to which company
19  a loan officer works with; right?
20  A   Right.
21  Q   Because you talked about chaos; right?  I
22  mean, if I'm over at Mutual and I'm doing a loan for

Page 237

1   Waterstone or I'm at Waterstone talking to a borrower
2   who's really dealing with somebody who they think is
3   Mutual, that's chaos; isn't it?
4   A   Yeah.  I think we don't have the borrower
5   confused, certainly.  Right.
6   Q   Right.  And that's the entire -- well, I
7   don't want to say everything, but at least one of the
8   major parts to the, say, fact, is that the borrowers
9   should at all times know the lender they're dealing
10  with; right?
11  A   Yeah.
12  Q   That should be absolutely clear, no
13  confusion; right?
14  A   Yeah.
15  Q   Okay.  And so when you have somebody working
16  at one company who's got an email address that says
17  that company, and they're talking to the borrower, but
18  then having somebody from another company work with
19  the same loan officer -- you see the confusion that
20  very easily results there; right?
21  A   That it could result in.  Yeah.
22  Q   Yeah.  Okay.  And, furthermore, you also

60 (Pages 234 - 237)

Page 238

1 understand, sir, that there's a real problem, you
2 know, the use of confidential information. You know,
3 in other words, when a borrower provides a tax return,
4 for example, to Borrower A, you understand that's not
5 the company's information. That's the borrower's
6 information; right?
7    A   Yeah. A tax return would be a -- an
8 individual's. Right.
9    Q   Right. And Company A and Loan Officer A
10 don't have any right to just take that and give it to
11 another financial institution. That violated federal
12 law. You're generally familiar with that; right?
13         MS. KREITER: Object to the form.
14    A   And I -- I don't know --
15    Q   And if you're not, you can tell me.
16    A   And I -- and I'm honestly not within the
17 federal law of what -- what is, you know, can be done
18 or not done, the specifics. Yeah.
19    Q   Okay. Would you agree with me that you
20 think it's not appropriate for one institution to take
21 a tax return from a borrower and give it to another
22 institution without that borrower's consent?

Page 239

1    A   Well, certainly, seeing a tax return and how
2 it was sent to make sure it's secure. The reason I'm
3 saying it -- yeah. The reason I'm saying that is that
4 we have individuals working with people at other
5 companies where a loan may not be able to be done at
6 another company.
7       So there may be somebody handing off to
8 another LO saying, hey, we can do it. We have a
9 product. And I'm just throwing that in because that
10 -- as I had talked to Chris Wolf for some scenarios of
11 loans that could not be done -- yeah.
12    Q   But in that situation, when done properly,
13 you wouldn't be sending information via personal email
14 because you agree personal email probably isn't
15 secure; right? So, now, someone's tax return, their
16 Social Security Number on a tax return, their income
17 -- there's a lot of sensitive stuff on a tax return;
18 isn't there?
19    A   And, certainly, as I know on our side of
20 things -- I'm not sure how that's done in trying to
21 avoid anything that's exposed. And, again, I -- I'll
22 fumble around with that, but I feel like we've got a

Page 240

1 lot of things in place at our company to create
2 security.
3       And, again, I don't know enough about the
4 sender. Personally, I don't. But I'm just indicating
5 for us on that receipt -- yeah.
6    Q   I'm not suggesting upon receipt there's a
7 problem at the Waterstone side. But I am simply
8 saying when loan officer takes his own email, takes
9 documents, sends them over to you guys, you see a
10 problem potentially there; don't you?
11         MS. KREITER: Object to the form.
12    A   I -- I feel like if there's been something
13 exposed -- and I'm trying to look at this in terms of
14 order -- yeah.
15    Q   Mr. Allen, if you think everything that
16 we've seen here in this exhibit is totally fine, I
17 have no problem with you telling me, Ari, I see no
18 issues with this whatsoever. Then we can move on if
19 that's how you see it.
20    A   And -- and I'm not indicating that it's --
21 it's absolutely fine. I just don't know where it was
22 -- ended up being uploaded. And in terms of declined

Page 241

1 loan, was the borrower involved with that? Just in --
2 in terms of just seeing these few emails. That's all.
3       So, yeah -- there was exposure to, you know,
4 a Social Security Number, yeah. That's something that
5 I would not want to happen. Absolutely. Would want
6 to secure -- yeah.
7    Q   And you certainly wouldn't want there to be
8 confusion on the borrower's side, right, of who is
9 their loan officer and what company they're working
10 with; right?
11    A   Yeah. From what we talked about before,
12 correct, that they would know who they're working
13 with.
14    Q   Right. And that's certainly confusion that
15 could result in a situation like this one we're
16 seeing; right?
17         MS. KREITER: Object to the form.
18    A   Well, and I'm -- I'm not Chris Wolf had the
19 conversation with that customer. I -- I don't know.
20 And said, hey, there's somebody at another company
21 that can do this. I don't know that.
22    Q   Okay. You don't know that. And let me ask

61 (Pages 238 - 241)

Page 242

1 you something else, sir. You also don't know if it's
2 even true that Mutual couldn't do this loan, do you?
3    A   Well, there would -- there would be no way
4 that I would know if they could or could not do it.
5    Q   Right. Which is kind of the problem, right,
6 because if a loan officer is afraid maybe I won't get
7 paid or maybe whatever or just wants to try to get,
8 you know, a good start at their new company, right, or
9 maybe -- there's a lot of maybes. We'll get to
10 another one in a second.
11        But those could all be incentives to why
12 they might move a loan and say something that isn't
13 quite totally true. And being in this industry as
14 long as you've been, that's something that's possible;
15 right?
16    A   Well, yes, except of looking at -- to me, I
17 looked at a -- it was a report, was it a forensics or
18 an expert report, that was put together on the files
19 that were -- and I believe -- and I want to reference
20 the document. But in Mutual's system and what ended
21 up closing with us, and there were very, very few.
22        And so I simply say that because then I'd

Page 243

1 arrive at if there were just a large number of these,
2 we would've had a large population in there. So to
3 have some that were declined by them would not be
4 unrealistic as I looked -- kind of some of the
5 research I did, it felt like there wasn't some large,
6 large number versus saying, hey, well, there's some
7 loans declined, and I'd have to, you know, believe the
8 person is telling the truth about that.
9        And seeing that there, I believe, were nine
10 loans in that population over a pretty lengthy period
11 of time, told me that could these have been nine loans
12 that Mutual could not have done? Certainly could. I
13 don't know for certain. But, yes. One of those nine
14 could've been done there.
15    Q   So your expectation today, sir, that it's
16 okay to take another company's loan files as long as
17 there's not a lot of those loan files?
18    A   No. I was simply referencing the whole --
19 the question about were these loans that Mutual could
20 not do? That's what I was referencing.
21    Q   Okay. But what I'm referencing is you just
22 mentioned that there were some loans that you found,

Page 244

1 but there weren't a lot of them that Mutual
2 potentially could've done that got sent over to you
3 guys, and you guys closed; right? Isn't that what you
4 just said?
5    A   Yes, and I -- yes. And I believe it's --
6 and I'm sorry. I'm trying to pull it up. It was an
7 expert report. But I think's it's --
8    Q   Yeah. We can get to the expert later.
9 Okay. But that's not my question. Okay? My question
10 is --
11    A   But that's my referencing --
12    Q   I understand. But is your policy -- because
13 I thought your policy was don't send over any loans
14 that are your other company's loans. And, now, what
15 you're telling me is it's fine as long as you don't do
16 it a lot. So I'm just confused.
17        MS. KREITER: Object to the form.
18    Q   I thought the expectation -- just to be
19 clear -- my expectation, or I thought -- not my
20 expectation. I'm sorry. I thought what you said your
21 expectation was that this wouldn't be done, and, now,
22 I'm hearing as long as it's not done a lot, it's okay.

Page 245

1 So maybe --
2        MS. KREITER: Object to the form.
3    Q   -- clear it up for me.
4    A   Sorry. I -- I would like to because I don't
5 feel like that's what I was intending to say or what I
6 did say.
7    Q   Okay. That's why I'm asking.
8    A   To me, I had stated in this expert report
9 seeing that there were nine loans for just under 3
10 million that were part of what was in Mutual's --
11 somehow found in the name in a system. And if we have
12 the document, can reference probably better.
13        And so, no. If those were -- if those
14 could've been done at Mutual, no. One loan shouldn't
15 be. But, to me, I was referencing the whole thing as
16 saying, hey, we're being told some of these loans were
17 not doable at Mutual. There were reasons why.
18        So then when I conclude that potentially
19 were there nine deals in the entire population that
20 were not doable at Mutual and ended up doing at us --
21 our company, that, to me, does not seem unreasonable.
22 It doesn't seem unreasonable in any way.

62 (Pages 242 - 245)

Page 246

1    Q    Okay.  So you're saying there were no deals
2  now.  Now, you're saying there were no deals taken
3  from Mutual based on what you've reviewed?
4    A    And I'm -- I'm simply  with that report
5  talking about loans that were in Mutual's system and
6  identified a wide population of, and nine of those
7  loans closed with Waterstone ultimately.
8        So I'm saying, hey, is it from me being told
9  from Chris Wolf and Chris Smith and Dwayne Hutto to
10  say, hey, loans weren't brought over unless they were
11  things they could not do at Mutual to have only nine
12  loans show up in that list -- makes sense to me to say
13  could there have been nine loans that were not doable
14  at Mutual?
15        And we could do them at our company.  Field
16  felt reasonable.  I hope that makes more sense.
17    Q    Okay.  I understand what you're saying.  So
18  we'll get to that in a minute.  If Chris Smith
19  admitted in his deposition that there were loans that
20  were sent over to Waterstone that could've been done
21  at Mutual, that would be inconsistent with what he
22  told you?

Page 247

1    A    Yeah.  I've not seen -- I've not looked at
2  his entire deposition, so --
3    Q    Okay.  I'd suggest you should.  Now, with
4  respect to this -- again, you don't have any
5  independent basis for knowing Mutual could or couldn't
6  have closed?
7    A    That's correct.  I wouldn't know what they
8  could or could not do.  Right.
9    Q    And you don't know exactly what -- again,
10  going back to this loan officer compensation rule, you
11  understand one of the bases of these rules is that you
12  can't steer customers based on what the loan officer
13  might get paid; right?
14    A    Yeah.  Right.
15    Q    Okay.  And so how does that LO comp rule
16  work if someone would get paid more at Waterstone than
17  they would at Mutual?  Because then they'd have an
18  incentive to steer; right?
19        MS. KREITER:  Object to the form.
20    A    I -- I don't know enough of what the
21  compensation was -- I'm going to say they're -- to
22  Waterstone and it's one specific loan.  And I guess I

Page 248

1  would just go back to, as my understanding of these
2  loans that could not be done.  So I don't feel like
3  there's any steering involved there.
4    Q    But you agree with me the very fact that
5  you'd have a loan officer working at two companies
6  simultaneously, effectively, right, would create that
7  risk of steering; wouldn't it?
8        MS. KREITER:  I'm going to object to
9  the form.  I'm also going to object this doesn't have
10  anything to do with any of the deposition topics.
11        MR. KAREN:  Yes, it does.  It's
12  recruiting and hiring and placing of loans and talking
13  to customers, because I'm going there in one second.
14        THE WITNESS:  I -- I would imagine if
15  somebody was, you know, paid 150 basis points, you
16  know, in one situation and 100 in the other, could
17  that be a potential, sure, in terms of wanting to make
18  more money?  Sure.
19  BY MR. KAREN:
20    Q    Right.  And so my question is in any
21  scenario where you've got a loan officer potentially
22  doing that, there'd have to be some type of disclosure

Page 249

1  or communication to the borrower so they understood
2  the compensation for both companies; right?
3        MS. KREITER:  Object to the form.
4    A    And when you say "both," I would've expected
5  Ben would've been the person in contact with this
6  customer and would've been disclosing appropriately
7  within what he -- under what he would've been offering
8  or providing.
9    Q    So you're assuming that Ben took this loan
10  over and Chris Wolf didn't continue to talk to the
11  customer?
12        MS. KREITER:  Object to the form.
13    A    And that -- that I -- I have -- I do not
14  know.
15    Q    Okay.  All right.  That's fair.  Let me ask
16  you something.  If Chris did continue to talk to this
17  customer using a Mutual NMLS I.D., that would be a
18  problem; wouldn't it?
19        MS. KREITER:  Object to the form.
20    A    Well, I go back to some relationships our
21  originators have with companies where it could be
22  either way.  Somebody knowing somebody can do it at

63 (Pages 246 - 249)

Page 250

1  another company, advising the customer that, making it
2  clear, is it on the phone together because then the
3  customer knows the individual.
4        So they still may want to talk with Chris
5  Wolf. They may still want to just say, hey, yeah, I
6  understand. I'm working with Ben. Chris, I want to
7  still talk to you. So that -- that, to me -- and,
8  again, we have some current relationships people have
9  in that scenario.
10  Q   All right. So if I send this Exhibit 30
11  that we're looking over the CFPB, you have no
12  concerns; right?
13        MS. KREITER: Object to the form.
14  Q   I'm asking. I mean, you can answer.
15  A   I -- I don't --
16        MS. KREITER: Object to the form, and
17  it also has nothing to do with --
18        MR. KAREN: That's it, Maria. That's
19  it.
20        MS. KREITER: Tell the judge that I'm
21  objecting it's not within the deposition topics. I
22  would welcome you telling the judge that and calling

Page 251

1  the judge for something like that. That's a perfect
2  objection. I'm not informing the witness. I'm saying
3  it's not within your topics, and it's not. If you
4  think it is, tell me -- which one is it related to?
5        MR. KAREN: Maria, I'm not listening to
6  you anymore.
7  BY MR. KAREN:
8  Q   Continue, Mr. Allen.
9        MS. KREITER: Okay. My objection
10  stands.
11  A   I don't -- I don't know enough -- I -- I
12  feel like somebody would want more information on
13  this. And did Chris continue to talk to the person?
14  I -- I -- honestly, again, would just --
15  BY MR. KAREN:
16  Q   That was the question I asked you. If Chris
17  continued to talk to the person, and I thought you
18  said it would be fine -- I'm confused.
19  A   Yeah. If the -- if the borrower had said,
20  hey, Chris, I would like to still talk to you, and
21  they're providing that permission and it's helping,
22  you know, provide that borrower with financing, yeah.

Page 252

1  That's I feel like the borrower's choice to keep
2  calling Chris.
3  Q   Now, even though he's no longer working for
4  his employer under the NMLS I.D. that applies to his
5  employer, he has a different -- right?
6        MS. KREITER: Object to the form.
7  A   And to me, it's -- it's not representing in
8  terms of -- in terms of whatever. It could simply
9  just be helping manage that dialogue between the
10  customer and Ben, because Ben's a new individual and
11  saying, hey -- you know, that -- that's my caveat to
12  that.
13  Q   Let's look at Exhibit 31.
14        (Exhibit 31 was marked for
15        identification.)
16        Do you see this email? This is from Chris
17  Wolf to Kyrstin Friebis?
18  A   Yes, I do.
19  Q   Okay. And you know Kyrstin Friebis was one
20  of the loan officers that worked at Mutual that Chris
21  Wolf accepted Dustin Owen's invitation to bring her
22  over; right?

Page 253

1  A   Yes. And I can see that she has a
2  Waterstone Mortgage email here, so I can see she's
3  employed on April 21st with Waterstone.
4  Q   Right. And we talked about earlier how they
5  were supposed to be brought over just to sort of ramp
6  up; right? Not ramp up, but help with getting things
7  settled for the transition; right? That was the idea?
8  A   Yeah. And for Kyrstin having loans that
9  she, you know, customers, new customers that she was
10  going to start putting in the system.
11  Q   Okay. But, again, if these were customer --
12  like, that Chris Wolf was still now over at Mutual;
13  right?
14  A   Correct. On April 21st. Right.
15  Q   Right. And he's sending via private email
16  W2s, a 1003 -- that's a loan application; right?
17  A   Yep.
18  Q   Okay. Which would be a Mutual loan
19  application. A job letter, paystubs, a WVOE -- that's
20  a verification of employment? Am I right?
21  A   Yeah.
22  Q   Okay. And bank statements; right?

64 (Pages 250 - 253)

Page 254

1    A    Yep.
2    Q    All provided to Mutual; right?
3    A    I -- I would assume that if he has them in
4    his possession that they were with Mutual.  Yeah.
5    Q    And that information is taken by Mr. Wolf
6    put in private email that is Gmail, which is not
7    secure; right?
8    A    And I -- I don't know enough on emails.  I'm
9    sorry.  I just -- I don't know enough on emails in the
10   terms of what we capture it and what's going to be
11   secure or not.  I just -- I don't.
12   Q    Okay.  And sending it to Kyrstin to do that
13   loan over at Waterstone; right?
14   A    I'm trying to -- from this very short email,
15   I mean, I'm assuming he's sending it to her for a
16   reason -- again, this is one that cannot be done
17   again.  And part of that -- I don't know.
18   Q    That's interesting.  Okay.  Let me ask you
19   something.  How do you know if a loan can be done
20   until you know the credit score?  Isn't that the first
21   step in any type of origination of a loan is getting
22   the borrower's credit score?

Page 255

1    A    That could be part of what -- certainly is
2    going to be on the decision, yeah, as to what product
3    it might be in or what have you.  Sure.
4    Q    Right.  But one of the first things you do
5    with a customer when you originate a loan is get their
6    credit score.  Because if they have a 320 credit
7    score, it doesn't matter; right?
8    A    Yeah.  That's going to be a poor credit
9    score.  Right.
10   Q    Right.  And, you know, also depending on the
11   types of credit score they have, different rates,
12   different terms supply, and different program supply;
13   right?
14   A    Yeah.
15   Q    So in order to ascertain whether a borrower
16   could or couldn't do a loan, one of the first things
17   you'd have to do is run that credit because that's
18   what you would know what doors are open and doors are
19   shut; right?
20   A    Typically, pulling credit it going to be
21   fairly early in the process.  Right.
22   Q    And in this one, Chris didn't know the

Page 256

1    credit score yet; right?  Because he says, "Let me
2    know the credit score"; right?
3    A    I'm not sure.  And, again, because this is
4    -- well, I'm just saying I'm not sure if he pulled
5    credit earlier --
6    Q    Well, let me ask you --
7    A    -- at -- at Mutual of Ohama.  I don't know
8    that.
9    Q    Okay.  If he asked Kyrstin, "Let me know
10   what credit score is, please, I'm hoping" -- wouldn't
11   that suggest to the average person of at least average
12   intelligence that they hadn't pulled the credit score
13   yet?
14   A    Unless he had pulled one that was expired.
15   I don't -- I don't know.  Which could've been
16   whatever, 120 days old.  I don't know --
17   Q    Okay.  Would you agree that it is as least
18   reasonable?  At least reasonable?  I'm not saying it's
19   100 percent right.  But at least reasonable to look at
20   this and say, yeah, he might not have pulled credit?
21   A    I could say he may not have pulled credit.
22   I could say he may have pulled credit previously.  I

Page 257

1    don't know.
2    Q    I could say a meteor is coming to strike the
3    earth in 30 seconds.  We could say anything.  I'm
4    asking you, sir -- and, again, we'll just, you know --
5    A    But I -- I'm saying --
6    Q    Are you reading this and your assumption --
7    so I want to make sure.  You're reading this as a --
8    you consider yourself a reasonably intelligent
9    individual?
10       MS. KREITER:  Object to the form.
11   Let's ask fact questions here.  You're not going to
12   ask the witness what his intelligence is.  Ask the --
13   BY MR. KAREN:
14   Q    Like, you consider yourself a reasonable
15   person; right?
16   A    Sure.
17   Q    Okay.  So using that reasonable -- are you
18   telling me that you read this, "Let me know of the
19   credit score.  I'm hoping it's 720+."  And being a
20   reasonable person testifying under oath subject to the
21   penalty of perjury, you're telling me your initial
22   reaction to that is, oh, well, he probably knew the

65 (Pages 254 - 257)

Page 258

1 credit score, but it was old? Is that what I --
2          MS. KREITER: Objection. Misstates the
3 testimony.
4     A   I -- I didn't -- and I definitely did not
5 say "probably." I said, "He could have." And I -- I
6 acknowledge saying he may not have. He may not have.
7 He may have -- but this is so limited information.
8          I -- I -- and I'm a big person about asking
9 what and why and, hey, can I have more information
10 versus going, oh, of course, he -- I don't know that.
11 I don't know that.
12     Q   Okay. Well, I'm not asking you that you
13 know. Okay? But you were supposed to educate
14 yourself about this topic today. And this is clearly
15 within the topic, which was the loans sent over to
16 Waterstone.
17          So given that and given that you had the
18 opportunity to talk to Mr. Wolf, okay, did you learn
19 from him that in this particular case that he already
20 knew the credit score?
21     A   I did not talk on every specific file. It
22 was more of a general -- so, and I wouldn't know if

Page 259

1 then -- and Mutual, I feel like they would know if
2 credit was pulled on the Sherwood file. Mutual would
3 have that, I believe, in their system.
4     Q   Okay. Well, sir, my question is this.
5 Okay? Let's just assume that the credit hadn't been
6 pulled based on what's on this email. Okay?
7     A   Okay.
8     Q   All right. So using that assumption, do you
9 find anything here based just on what you see -- I'm
10 just asking whether you think everything is fine based
11 on what you're reading here, or if you have concerns?
12          MS. KREITER: Object to the form.
13     A   And -- and I certainly, first off, in terms
14 of the secure -- being able to send it. And -- and I
15 feel like -- and I -- and what's the assumption we're
16 making? I think we're assuming -- and I'm sorry.
17     Q   That he didn't know the credit score.
18     A   And if somebody had not pulled credit
19 already, yeah. Then I don't -- I don't know in the
20 context of why he would be doing this then. I don't
21 know why.
22     Q   Well, one of the reasons why would be just

Page 260

1 taking loans from one company and giving them to their
2 new employer for whatever reason; right?
3          MS. KREITER: Object to the form.
4     A   Well, and that's when I go back to that
5 report of the population of loans because, to me, to
6 look at -- and I did look at actually some credit pull
7 loans and various reports I think that were provided
8 to you guys. So I did go into files.
9          But to find that these nine loans were the
10 ones of that population, felt like that full summary
11 of that was saying that it was very minimal in the
12 scheme of what these people were producing and what
13 they do produce.
14     Q   Sir, so let me ask you something. The fact
15 that this was information that was given to Mutual --
16 I think you even assumed that earlier yourself, and it
17 was being sent by Chris Wolf while an employee from
18 Mutual to his private, and then sent to Waterstone.
19 Is that problematic based on the expectations that you
20 guys had set forth?
21          MS. KREITER: Object to the form.
22     A   I -- I -- if this were a loan that could not

Page 261

1 be done at Mutual, and I'm simply making that
2 assumption, I still wouldn't want this done in this
3 fashion. I would -- then it would be something of the
4 customer reaching out to Waterstone to see if
5 Waterstone can do it. So, yeah -- was done.
6          But if it wasn't -- couldn't be done at
7 Mutual -- and, again, I don't know that for sure. But
8 back to this population of loans was so small that
9 that -- as I was told that, that's where I looked and
10 -- and said that sounds -- that makes a lot of sense
11 to have it be that small of a population if these are
12 loans that could not be done over there.
13     Q   Okay. So, again, it would be hard to know
14 if you could do a loan if, in fact, as I've asked you
15 to assume -- and I so understand why you don't want to
16 assume it. But let's keep doing that assumption.
17 Because, you see, Mr. Allen, I get to ask the
18 questions, and you have to answer my questions. Okay?
19          So my question is to assume that Mr. Wolf
20 didn't know the credit score. And if he didn't know
21 the credit score, you couldn't know when you sent this
22 if Mutual could've done the loan; right?

1       MS. KREITER: Object to the form.
2       A   I honestly do not know Mutual's guidelines
3  and products enough.  That's -- I -- I don't know,
4  because there are various products that could -- we
5  have a recent product that just came out that is a no
6  FICO score product.
7       So, again, I'm -- that's -- I'm not trying
8  to avoid the question.  There's just so many different
9  things beyond just seeing this email and some
10 documents -- that's all.  Just trying to answer --
11      Q   No.  I know you're not trying to avoid the
12 question.  But let's just assume based on what you
13 told me that you testified truthfully a minute ago
14 that getting the credit score is one of the first
15 things you do to ascertain whether a borrower can do a
16 file or do a loan; right?
17      A   Yeah.  It's early in the process.  Right.
18      Q   Okay.  And you agree with me that's a
19 reasonable assumption; right?
20      A   Yeah.  I think most files would have credit
21 pulled early.  Right.
22      Q   Okay.  And so if this hasn't even been done,

1  which is what I'm asking you to assume here, okay,
2  then we wouldn't know when Mr. Wolf was sending it to
3  Kyrstin whether the file could be done at Mutual;
4  right?
5       MS. KREITER: Object to the form.
6       A   And then -- and to answer your question of
7  assuming, if credit had never been pulled before, then
8  -- then I would want to know more why -- right, this
9  information was sent over.
10      Q   Right.  Okay.  And it would be problematic;
11 right?
12      MS. KREITER: Object to the form.
13      A   Upon having more information, I at that
14 point could determine if that was problematic or not.
15      Q   Based on the assumptions I asked you to
16 make, it would be problematic?
17      MS. KREITER: Object to the form.
18      A   Well, the assumption was on the no credit.
19 I don't know the other documents and the information
20 in the documents.  I -- I don't.
21      Q   Okay.  But sending the confidential
22 information that was provided to Mutual is problematic

1  either way; right?
2       MS. KREITER: Object to the form.
3       A   Yeah.  I -- I would expect it would be, if
4  it was a loan that we were now doing, that it will be
5  coming through our system securely.
6       Q   Let's go to Exhibit 32.
7       (Exhibit 32 was marked for
8       identification.)
9       Now, this is an email to Michael Smalley.
10 Who's Michael Smalley?
11      A   He produces in Florida -- is also a -- I'm
12 looking.  Yeah.  He's a regional vice president.  I
13 don't know his actual title.  So he manages people
14 aligned with originating loans.
15      Q   Okay.  And Chris Wolf sends information to
16 Michael Smalley and he specifically says -- we don't
17 have to assume in this one.  He actually outright
18 says, "I haven't pulled credit yet.  I was going to
19 send over to one of my guys to work on if we can use
20 any of the OT."
21      And he talks about they were going to go
22 with Wells Fargo, so the credit should be good.  And

1  gives conventional loan, et cetera, et cetera, et
2  cetera; right?  You see that?
3       A   Yep.  I do see that.  Yes.
4       Q   And I assume you think this is great too?
5  There's no problem here?
6       MS. KREITER: Object to the form.
7       A   No.  As I look at this, and -- and I don't
8  feel like the other was great.  I see, like, a DTI at
9  52.
10      So, again, I would have questions on this
11 because I don't know Mutual's guidelines, what they
12 allow or not.  And I don't know if that was an
13 immediate, hey, they couldn't do it, or not.  I do not
14 know.  So that's, again, within the short, yeah, small
15 piece of information here.
16      Q   Okay.  If it was within their guidelines,
17 would this be problematic to you?
18      MS. KREITER: Object to the form.
19      A   And -- and then I would have to assume every
20 part of the loan would be within their guidelines.
21 And I -- if I'm assuming every part of and it
22 qualifies at Mutual, yeah, then I don't understand why

67 (Pages 262 - 265)

Page 266

1  Chris would be sending it to Mike.  Yeah.
2      Q    Okay.  Let me ask you something.  Let's take
3  this scenario, and I want you to assume a couple
4  things so I can get some information that I
5  understand.  Okay?
6      A    Okay.
7      Q    Let's just assume -- and I don't care
8  whether it's a loan that can be closed at Mutual or
9  not.  That's not my concern.  Okay?  Let's just assume
10 Waterstone could've closed the loan.  You can even
11 assume if you want if it makes you happy that Mutual
12 could've closed the loan.  Okay?
13     A    Okay.
14     Q    When a loan comes in like this where the
15 originator, I assume is Chris Wolf, is not employed at
16 Waterstone yet and is coming over in some short period
17 of time, who would pull the credit for that borrower?
18     A    It would have to be somebody in our system.
19 So I don't know if that'd be Mike.  He has a team, so
20 it could be somebody on his team that might pull that
21 file.
22     Q    For any of these loans that we've got these

Page 267

1  emails that we're going to talk about, how would we
2  know who that person was?  Could it have been anybody
3  that pulled the file?
4      A    That pulled the credit file?
5      Q    Yeah.  That pulled, yes, the credit file.
6      A    Or pulled credit.  Yeah.  I -- I don't know
7  enough in terms of Mike -- and, again, he has some
8  team members and would have to -- with him understand,
9  like, how does that work?  Who on his team may pull
10 that or are there are three people that might pull
11 that.  Yeah.
12     Q    Okay.  And we'd seen an earlier email with
13 Ben Smalley, remember that?  We saw that email?
14     A    Or Ben Davis.  Ben Davis.
15     Q    Ben Davis.  I'm sorry.
16     A    Yep.  That's okay.
17     Q    And Ben -- it's the same for him?  He has
18 people on his team, and anybody could've pulled
19 credit?
20     A    Yeah.  Potentially.  I -- and I'm just only
21 -- you know they have loan partners or assistants that
22 he -- did he decide to just pull the credit himself?

Page 268

1  So it could've been either or.  Yeah.
2      Q    Okay.  So, well, let me ask you another
3  question.  Now, if a loan had been originated, and
4  Chris Wolf was not there yet, you would agree with me
5  he could possibly have created the initial 1003 to
6  give to the borrower because he doesn't at Waterstone
7  at that time yet; right?
8      A    Correct.  That would have to be done by Mike
9  or, again, one of his team members.  Right.
10     Q    Okay.  And it could be really anyone.  You
11 wouldn't be able to identify who it would be?
12     A    Yes.  Again, it could be a few different
13 people.
14     Q    Okay.  Then Chris comes over.  Would the
15 loan get transferred back to Chris?
16     A    I -- I don't know.  I don't know because
17 that -- yeah.
18     Q    What would the policy generally be?
19     A    Typically, it would stay in the name of that
20 individual -- in, like, Mike Smalley's name.  And then
21 would there potentially be a, you know, some type of
22 commission split based on who did X amount of work on

Page 269

1  that file.
2      Q    Okay.  So it wouldn't ever -- switch on the
3  LO -- I'm sorry.  There wouldn't be a switch on the
4  1003 with the original loan officer?  Once they come
5  on Waterstone, it'd switch again to other team?
6      A    Do you know what?  I -- I believe that
7  typically that would not happen.  And I'm only saying
8  that -- that, you know, could somebody -- and maybe
9  this isn't what you're asking, could start with us,
10 not have their license transfer yet.
11          And so if they're employed with us, and
12 thus, would that go in their name, where would it be
13 in the process?  I think that's maybe where I'm trying
14 to arrive at.  But I feel like for the most part it
15 would stay in the individual's name that had started
16 that file.
17     Q    How would anything be tracked?  Like, you
18 had mentioned that there might be some split of
19 compensation for that loan once the other loan officer
20 came over.  How would that be tracked?  Where would
21 that be tracked?
22     A    There's a split commission form that would

68 (Pages 266 - 269)

Page 270

1 be done that needs to be done in a file if -- if there
2 is a split done. So that would be completed and, you
3 know, a percentage of what each pay was. And I -- I
4 don't know the rest of the form necessarily. But
5 there is a form that's completed in Encompass.
6    Q   Would there typically when a loan officer is
7 in transition and hasn't gotten their NMLS I.D. moved
8 to Waterstone yet, which is kind of the situation
9 we're talking about here, is it typical for there to
10 be a commission split when that loan officer does come
11 over, you know, some short period later and then has
12 their NMLS I.D.?
13    A   Well, I guess it just -- it depends on what
14 the scenario was. Was this one that, again, could not
15 be done where they were currently?
16       And I feel like also a timing of that -- and
17 I'm just saying that, you know, it -- it just would
18 depend on a scenario like that. But I feel like
19 typically that loan -- I feel like typically that
20 loans stays in the individual's name. That's my
21 understanding.
22    Q   Stays in which individual's name?

Page 271

1    A   So, like, Mike, if he's the loan originator,
2 my understanding -- yeah.
3    Q   I think I understood your testimony is that
4 it stays in their name for purposes of the 1003. My
5 question though is does the other loan officer, the
6 transitioning loan officer, get a piece of that
7 compensation eventually when they come over,
8 typically?
9    A   And -- and I -- I would have to look at
10 examples of how that would occur and what that would
11 look like. I --
12    Q   Well, I'm more asking what's your policy?
13 What's the policy and practice there? I mean, that's
14 one of the topics I asked you guys to prepare for, and
15 this was a critical one, actually, because I really
16 have to -- you guys sent me a bunch of spreadsheets.
17 I don't know what I'm looking at. I need to
18 understand it a little bit more.
19       So this is a critical question. What is
20 your policy and practice? Do you pay commissions to
21 the loan officers coming over when they transition and
22 a file starts with someone else's name, do they get a

Page 272

1 split?
2    A   And, to me, if they've done work on that
3 file, I feel like primarily or typically, they would.
4 They would get some -- and that would be using that
5 split commission form.
6    Q   Okay. And is that a difficult form to get
7 ahold of? Like, if I asked you -- I'm not asking you
8 right now. But if I asked you and said, hey, can you
9 send me any split commission forms filled out for
10 these ten people during this 90-day period, is that
11 something that would be hard to get your hands on?
12    A   Yeah. I feel like out of Encompass, that
13 would be -- yeah. Somebody could go in and get that.
14    Q   Shouldn't be too hard; right?
15    A   Yeah. I don't think so.
16    Q   Okay. All right. So let's go to Exhibit
17 33.
18       (Exhibit 33 was marked for
19        identification.)
20       MS. KREITER: Wouldn't you have just a
21 five-minute break there, Ari? When you come to a good
22 place, let me know --

Page 273

1       MR. KAREN: Yeah. I mean, I'm headed
2 down the home stretch. I mean, if you really need a
3 break, we can take a break. But I'm headed down the
4 home stretch here. And if you could hold out for a
5 little bit, we can just get maybe done.
6       MS. KREITER: I just need five minutes.
7 It doesn't have to be this second, but in the next ten
8 minutes, I would welcome it.
9       MR. KAREN: Well, all right. Let me
10 stop with this and then we'll -- but, yeah. Okay.
11       THE VIDEOGRAPHER: Going off the
12 record. The time is --
13       MR. KAREN: No. No. No. Let's stay
14 with this. Stay with this. No. We'll do it after
15 this exhibit.
16 BY MR. KAREN:
17    Q   This is an email from Chris Wolf to Dawson
18 Walker. Do you see Exhibit 33?
19    A   And I'm sorry. I'm just pulling the paper
20 file out also. And, yes. I see it.
21    Q   He says, "Hey, bud, can you get someone on
22 your team going? The rate is unrealistic. Dwayne

Page 274

1 file so we can look at locking next week." Do you see
2 that?
3    A   I do.
4    Q   This is, again, April 22nd, right, while
5 Chris Wolf is still a manager at Mutual; right?
6    A   Yes.
7    Q   And you see a bunch of information,
8 paystubs, appraisals, all being sent through Gmail;
9 right?
10   A   Yes. I see sent from his Gmail. Correct.
11   Q   Okay. And it's got the tax bill. Looks
12 like Wells account numbers or bank statements; a
13 credit PDF; a 1003, which is an application; right?
14   A   Yes.
15   Q   And it ostensibly seems that these would be
16 documents that were provided to or by Mutual; right?
17   A   I -- I'm assuming with Chris having them
18 that he would have received that under, yeah, under
19 Mutual.
20   Q   Okay. So from that perspective, that looks
21 problematic to you. Is that fair to say?
22        MS. KREITER: Object to the form.

Page 275

1    A   And -- and I have a previous statement is I
2 don't know if it was a file that could be -- was an
3 issue doing over there or not. That's my one thing I
4 don't know with this being a very brief email.
5    Q   I get it. But, again, you know, going back
6 to Exhibit 47, the expectations, what the LO
7 agreements say; right? This is a lot of information
8 that was given to Mutual, and it's being taken from
9 Mutual and given to Waterstone. And that's a problem;
10 isn't it?
11        MS. KREITER: Object to the form.
12   A   Well, I -- one of the things we talked
13 about, I don't like seeing it from a personal email.
14 And so that, to me, yeah, I don't like seeing.
15        And, again, but I don't know is this
16 something that was an issue doing over there and one
17 of the files that they talked about being, hey, were
18 these loans they couldn't do, and -- and, well,
19 Waterstone got. That's the one extra -- yeah.
20   Q   I understand the Gmail. That's apparently
21 on its face. But I didn't want to take -- it's going
22 to take a long time. Do you want to go back and read

Page 276

1 Exhibit 47 and Exhibit 22?
2        Do you want to read those again and what
3 they said? Or would you agree with me taking
4 information about a borrower -- Mutual, taking it,
5 sending it to your personal email, and sending it to
6 Waterstone is a problem?
7        MS. KREITER: Object to the form.
8    A   If -- if a file was going to be done at
9 Waterstone because this customer -- decline -- chose
10 to deal with Waterstone, yeah. That is not the method
11 that we would want that done. Yeah.
12   Q   Right. And in any case, it shouldn't be
13 taken straight from Mutual and given to you. If
14 anything were to happen, the borrower should provide
15 that information to you directly; right?
16   A   They would be working with a loan officer at
17 Waterstone, yes, and providing the information through
18 our system. Correct.
19   Q   Right. And there's a right way to do it and
20 there's a wrong way to do it; right?
21   A   Yeah.
22   Q   And this is the wrong way; isn't it?

Page 277

1    A   Yeah. This is not the way I would want to
2 see this done. Correct.
3        MR. KAREN: All right. We can take a
4 quick break.
5        THE VIDEOGRAPHER: Going off the
6 record. The time is 10:29 p.m. Eastern.
7        (Off the record.)
8        THE VIDEOGRAPHER: We're going back on
9 the record. The time is 5:40 p.m. Eastern.
10 BY MR. KAREN:
11   Q   Mr. Allen, we are trying to head down the
12 home stretch here. So, and just remember, it's an
13 hour later for me, so it's worse for me than it is for
14 you.
15   A   Okay.
16   Q   So I have a couple questions for you. I'm
17 going to back to something. Remember we were talking
18 earlier about, you know, the issue of what happened,
19 like -- not the issue. I'm sorry. Let me restate
20 that.
21        We were talking earlier about the scenario
22 where you guys in theory don't have really the

70 (Pages 274 - 277)

Page 278

1 capacity to bring up a whole team and you kind of tell
2 them before they waste their time, hey, this isn't
3 going work? Remember we were talking about that kind
4 of situation?
5    A   Sure.
6    Q   And I think the reason you said is, "I just
7 don't want to waste time because no manager is really
8 going to come over if I can't take the whole team."
9 Right?
10    A   Right.
11    Q   Okay. And the question I have is, you know,
12 I'd asked -- and maybe I didn't ask. Have you
13 considered a situation where you absolutely, you know,
14 prohibit a manager from talking to their team before
15 announcing their resignation to the company? Did I
16 ask you about that?
17    A   I can't recall. But I'm not familiar with a
18 situation like that -- yeah.
19    Q   Okay. And so that's not something you do.
20 And I'm not saying it's -- is it common from your
21 experience in the industry to do that at all?
22    A   And "common," and just so I'm clear. I'm

Page 279

1 sorry. If you could just kind of --
2    Q   That was a terrible question. That's on me.
3 I'm sorry. I apologize.
4    A   All right.
5    Q   You've been in recruiting for a number of
6 years, like, 10, 12 years at least?
7    A   Yeah.
8    Q   And, I mean, before then, I assume it was
9 part of your job even it wasn't an official part of
10 your job?
11    A   And what was that again? I'm sorry. You
12 just cut out with coughing there. Sorry.
13    Q   Sorry. I'm sorry. And it's getting late in
14 the day, so my cough's getting worse.
15    A   Yep.
16    Q   I mean, you've been recruiting for a long
17 time officially as part of your job. Is it fair to
18 assume that even before it was officially part of your
19 job, it was sort of unofficially part of your job
20 recruiting other loan officers and branches?
21    A   Yeah. In my -- my 12 plus years here, would
22 say yeah. That's -- I've been involved in the

Page 280

1 recruiting in some way. Yeah.
2    Q   Okay. And is it common from your experience
3 for companies to require a branch manager to give
4 notice to their current employer first before telling
5 their branch?
6    A   I -- I'm not -- I -- I don't feel like
7 that's a common -- an expectation of companies.
8    Q   Okay. So I'll say it a different way. That
9 is not normally how you've seen it done?
10    A   Correct. And not normally being that they
11 would announce, gone, and then tell their team.
12 Right.
13    Q   Right. And is it fair one of the reasons
14 why I kind of assume is that a branch manager would
15 look at you kind of sideways if you asked them to do
16 that because then they'd be saying, so you want me to
17 announce my resignation before I even know if my
18 team's coming? You know, are you crazy?
19    A   Well, and I think they would look at us
20 sideways because I think their team would look at them
21 sideways to say, hey, wait, you're -- you've left.
22 And, again, they're an entrusted leader. Like, that's

Page 281

1 where they would, you know --
2    Q   It could create awkward situations is what
3 you're saying?
4    A   It -- it could. And then that chaos we
5 talked about before what's going to happen versus
6 having maybe some -- some idea of what may occur with,
7 you know, existing loans, for example.
8    Q   And I assume also at least part of it would
9 be the lack of security that a branch manager would
10 have with, like, what's going to happen? Is everyone
11 going to come with me? Is everyone not going to come
12 with me; right?
13       As opposed to a scenario where they have a
14 little more control and can say, hey, I've talked to
15 everybody. We're all good. Is that fair to say?
16       MS. KREITER: Object to the form.
17    A   And I feel like somebody announcing -- I
18 certainly would hope they would have confidence. And,
19 you know, again, they're a leader and who's going to
20 follow?
21       But, certainly, I would think they would
22 want to know who is going to follow and who's going to

71 (Pages 278 - 281)

Page 282

1 stay or, in fact, go to another company?
2    Q   Right.  Okay.  And so that's one of the
3 benefits of the way it is often done is that the
4 branch manager knows ahead of time as opposed to
5 taking a little more of a risk and finding out later?
6       MS. KREITER:  Object to the form.
7    A   It could be a benefit, along with I just
8 think it's back, the most important is that
9 relationship they have with their team and their
10 trust.  And -- and if they have that, you know, I
11 think that's -- that's probably the biggest one that
12 somebody is aware that they are leaving.
13    Q   But in terms of the trust issue, I mean, if
14 they called at 9:30 a.m. and said, hey, I want to let
15 you know I'm leaving, and then hung up the phone.  And
16 then at a team meeting -- I mean, that probably
17 wouldn't create that much awkwardness; right?  Because
18 it would be simultaneous?
19       MS. KREITER:  Object to the form.
20    A   I -- I think you'd have people and I think
21 you'd have teams that would have some shock going on
22 as to, what are you talking about?  And chaos.  I -- I

Page 283

1 just think it would -- if they were saying, hey, I've
2 just resigned, and had not talked to anybody and
3 announced that prior to.
4    Q   Okay.  I hear your point on that.  I guess
5 my question is, you know, you would agree with me
6 there's a difference between, hey, I'm going to resign
7 tomorrow, right, or I'm going to resign at the end of
8 this week, right, and something that's going on for
9 days or weeks ahead of time?  You would agree with
10 that?
11    A   Yes.  Certainly, I mean, just the number of
12 days in advance and as to when they choose to do that
13 or what's -- yeah.  Sure.  There -- I mean, there's
14 going to be a difference, yeah, on day before versus
15 doing it a week before.  Sure.
16    Q   Right.  And the more time that elapses
17 between when they make the disclosure to their team
18 and they ultimately resign, right, the more
19 opportunity for some type of improper things to
20 happen; right?
21       MS. KREITER:  Object to the form.
22    A   And -- and improper, I'm just making sure

Page 284

1 I'm clear on what improper would be.
2    Q   Solicitation of customers, taking of
3 information, that kind of thing.
4    A   I think versus somebody having 24 hours
5 versus having five days is an example.  Yeah.  But
6 there could be more things potentially that could go
7 on.  Sure.
8    Q   And I assume we understand your point about
9 a manager who, you know, they're close friends and
10 they don't want to say I just resigned and everyone's,
11 like, shocked and awed; right?
12       But they don't need to have weeks ahead of
13 time to avoid that; right?  To avoid sort of a, I
14 already resigned as opposed to waiting weeks before
15 telling their employer -- they don't need to have
16 weeks to avoid that; do they?
17    A   Yeah.  The longer the timeframe, I -- I just
18 -- I feel like it makes it more difficult versus
19 saying, hey, if you're going to move, you're going to
20 move.  Yeah.
21       So the longer the timeframe can just
22 generate just a number of issues.  And if even one

Page 285

1 person in that office announced because they were an
2 extremely close friend, it's going to be hard not to
3 have other people find out.
4    Q   Right.  So, and the longer the time period,
5 you'd also agree, the greater the opportunity for some
6 kind of, let's just call it improper recruiting of
7 staff to go on too; right?
8       MS. KREITER:  Object to the form.
9    A   And I -- and I did miss the past thing.  You
10 said "improper recruiting," and I just kind of missed
11 that.
12    Q   Of staff.
13    A   I -- I would still expect the individual to
14 announce to somebody that I'm leaving or not, and then
15 let that person decide if they're going to pursue
16 that, and ask and inquire and decide, hey, I'd like to
17 apply with this company, you know, to me.  So I don't
18 know if that timeframe really, you know, has any
19 impact there.
20    Q   Okay.  But, I mean, I get your sort of --
21 and I'm not making fun of you when I say this.  It's
22 just the known -- I'm going to use for our discussion

72 (Pages 282 - 285)

Page 286

1 here. Neutral announcement. Does that make sense?
2 So you know what I'm talking about?
3        You're -- conveying a neutral announcement;
4 right? I'm leaving. Come if you want. Stay if you
5 want. Just wanted you to know so you're not
6 surprised; right? Words to that effect.
7    A   Okay.
8    Q   And you would agree that's different from
9 okay, we're going over here. This place sucks. That
10 place is great. Let's get the bandwagon. There are
11 differences; right?
12    A   Yeah. Two different -- absolutely. Two --
13 two different scenarios.
14    Q   And one's the right way, one's the wrong
15 way; right?
16    A   Yeah.
17    Q   Okay. So, again, you've recruited. You've
18 been in this industry a long time. You know that
19 there are people out there that do it the wrong way;
20 right?
21    A   Yeah. I'm -- I'm certain people do it the
22 wrong way. Certain people do. Yeah.

Page 287

1    Q   And I'm saying this somewhat facetiously, so
2 please don't take -- it's not meant as an insult at
3 all. I mean, you agree you're not a perfect judge of
4 character? I'm not saying you're a bad judge of
5 character. But, like, nobody's a perfect judge of
6 character; right?
7    A   I -- I guess to define "perfect," I'd have
8 to ask my wife maybe. I'm sorry.
9    Q   Fair enough. It's, like, look. It's, like,
10 hiring people; right? I mean, I always say to people
11 when you hire someone, it's a 50/50 shot; right? You
12 never know because you're taking this person. You
13 don't know them that well. You've met them a limited
14 number of times under scenarios where they're trying
15 to be on their best behavior; right?
16    A   Yeah. Certainly, everybody we hire is not
17 going to make it or be at our company who knows how
18 far down the road. Absolutely. Yeah.
19    Q   And so, I mean, you recognize there's at
20 least a risk, right, that when you take on a branch
21 and you don't require that they tell -- I'm not saying
22 that there's good reasons or not. Okay?

Page 288

1        But -- but there is a risk that when you
2 bring somebody on and you allow them to recruit -- not
3 recruit, announce to their team, that there's at least
4 a risk that they're going to do something wrong that
5 you don't necessarily approve of; right?
6    A   Yeah. We certainly, as we talked earlier,
7 we are not there. So we wouldn't -- I'm not there to
8 watch and view what's going on. Right.
9    Q   Right. And so I guess my question is, I
10 mean, look. All things being equal, as a mortgage
11 bank, you like to avoid risk; right?
12    A   Yep.
13    Q   Okay. Risk is not a good thing. Risk is a
14 bad thing; right?
15    A   Right.
16    Q   Okay. And all things being equal, you like
17 to -- I assume. I going to make this assumption. You
18 like to avoid lawsuits.
19    A   Absolutely. I would agree.
20    Q   Unless you're having a great time today.
21 I'm totally kidding.
22    A   Understood. Yep. Avoid lawsuits. Yeah.

Page 289

1    Q   Okay. So you must realize that there is
2 some risk in sort of the model that you're working in
3 with the way you're hiring these branches that if
4 somebody does something wrong, that could lead to
5 lawsuit eventually like it has here. There's some
6 risk of that the way you're doing it; right?
7    A   Yeah. We can't control the other company
8 and what their decision is to, right, file a lawsuit
9 or what have you. Right.
10    Q   Or totally control what the branch -- again,
11 you can mitigate by telling the guys, hey, don't do
12 these things. But, ultimately, if they do these
13 things, you can't control what happens; right?
14    A   We -- we are not with individuals at all
15 times.
16    Q   Right. So my question is knowing that
17 there's some risk they way you do it, can you explain
18 to me why you do it that way?
19    A   And when you say doing it that way --
20    Q   That was a bad question. I'm sorry.
21    A   It's okay.
22    Q   It's late in the day. So given the risk we

73 (Pages 286 - 289)

Page 290

1 sort of talked about with somebody doing something
2 wrong and lawsuits in a scenario where you leave it up
3 to the branch manager to tell their team; right?
4    A   Right.
5    Q   Why do you do it that way as opposed to a
6 way that might be safer?
7    A   I -- I go back to you -- I think your
8 statement is saying, hey, would somebody look at them
9 sideways or would they look at us sideways?  And who
10 is it we would be able to recruit because our industry
11 -- just goes back to the norm, the flow, that
12 conversation.
13        And then I look at that we have had very few
14 issues.  So I think I look at the results of what
15 we've had, and they've been very minimal.  And so I
16 feel like us attempting to do all the right things
17 tells us that, that we've had very few issues.
18    Q   Okay.  All right.  So, okay.  By the way, do
19 you know if anyone ever actually asked to see
20 Mr. Hutto's or Smith's or Wolf's employment
21 agreements?
22    A   I'm not aware -- I'm sorry.  I'm -- yeah,

Page 291

1 I'm not aware of anybody asking to see them.  So I'm
2 not aware of somebody did or did not.
3    Q   Okay.  But you're not aware of anyone asking
4 before they came over?
5    A   I'm not aware.  Right.
6    Q   All right.  Are you aware of anyone
7 interviewing any of the -- prior to the lawsuit or
8 talking to any of the Waterstone -- I'm sorry, Mutual
9 employees when they came over if they were solicited
10 or just announced the opportunity to come over?  Do
11 you know if anybody ever talked and asked them those
12 questions?
13        MS. KREITER:  Object.  Attorney-client
14 privilege.
15        MR. KAREN:  That's fair.  Excluding any
16 conversations.  I was asking this before the lawsuit
17 was filed.  So, actually, you're right.  That still
18 could be privileged.
19 BY MR. KAREN:
20    Q   Excluding any communications between
21 attorneys that you're aware of, okay, did Waterstone
22 on its own without any counsel ever take any steps to

Page 292

1 kind of ascertain whether these employees were simply
2 announced the opportunity to come over or actually
3 recruited by their managers?
4    A   And -- and I'm not aware of any conversation
5 anybody had.
6    Q   All right.  Let's go to Exhibit 35.
7        (Exhibit 35 was marked for
8        identification.)
9        Do you see this email?  This is 3/29/2022?
10   A   Yes, I do.
11   Q   Okay.  And this is something called the
12 Hennessey File.  It's Chris Wolf, again, from his
13 private email address sending over a file, and he
14 writes, "Dwayne asked me to send you this file."
15       And there is a HOA rider, a credit report, a
16 1003, a divorce decree.  Obviously document -- no, I
17 shouldn't say obviously.  Appears to be documents that
18 would've been provided to Mutual; right?
19   A   I'm assuming Chris collected them, right, as
20 he was employed with them.  Right.
21   Q   Okay.  And just to kind of speed things
22 along, you know, we've talked about a right way and

Page 293

1 wrong thing.  Send over a file, this would be the
2 wrong way; right?
3        MS. KREITER:  Object to the form.
4    A   I'd prefer for whatever reason it was, be it
5 a customer choice, decline, whatever it might be that
6 Mike Smalley was the one who would've taken a loan
7 application and secured those documents.  Yeah.
8    Q   Right.  And, again, one of the reasons being
9 that you've got the confidential information.  And
10 you've got a loan officer talking to a borrower that
11 isn't licensed with Waterstone.  I mean, there's some
12 problems there; right?
13       MS. KREITER:  Object to the form.
14   A   And -- and, again, not knowing is this one
15 of somebody's, example, a good friend and they've
16 talked to them, and, again, they can't do it or for
17 whatever reason.  That's -- that's just throwing that
18 in.  But back to then, yeah, Mike, to me, should've
19 been involved in taking the application and getting
20 the information through our secure portal.
21   Q   Because you agree beyond all these federal
22 laws and stuff -- we talked about some of them, you

74 (Pages 290 - 293)

1 know, you've got to be, I mean, if you're not licensed
2 as an originator with Waterstone, you're really not
3 allowed to talk to borrowers about loan terms; right?
4     A    Yeah.  My understanding is that it would --n
5 unless somebody is on the phone with permission and
6 saying, hey, I've got this other person and they want
7 the individual on the line with them.  But otherwise,
8 yeah, you would not be, to me, independently, right,
9 having a conversation talking terms.
10    Q    Right.  So even Chris Wolf is a licensed
11 originator with Mutual, if he gets on the phone with
12 Hennessey and starts talking to Hennessey about
13 Waterstone's loan terms, that's not okay because he
14 doesn't have a license with Waterstone; right?
15    A    Yeah.  And I'm not sure how he would know
16 what our -- our terms -- that's where I say where Mike
17 would be the one that would need to have that
18 information or provide that, if it went that far, if
19 he went on ahead with this.
20    Q    But I guess my question is, I mean, we'd
21 hope that the borrower at least knew before sending
22 over this information to Waterstone that he was doing

1 it and wasn't just on his own sending their
2 information; right?  I mean, I assume you would hope
3 that occurred?
4     A    Yeah.  That there would be a conversation
5 explaining, right, if there was a reason or, again,
6 was it somebody very tight?  Was it family?  I -- for
7 whatever reason, yeah.  I'd still want that to come
8 through our portal and through Mike.  Yeah.
9     Q    I'm sorry.  You're missing my question here
10 for a second.  What I'm asking is that -- and I think
11 you're going to agree with me, as opposed to a
12 scenario where you call the borrower and say, hey,
13 borrower, hey, Mr. Hennessey or Ms. Hennessey, I don't
14 think I can do this loan, so I'm going to send you to
15 this guy named Mike at Waterstone.  That's one way;
16 right?
17    A    Okay.
18    Q    There's an entirely different set of
19 problems that are much more concerning, I would
20 assume, from your perspective.  If Chris Wolf never
21 tells Ms. Hennessey and simply on his own unilaterally
22 sends her information to Mr. Smalley; right?

1     A    Yeah.  I feel like without permission --
2 without permission from -- and I don't know what
3 conversations there were.  So without permission to
4 send it.  And I go back to this.  To me, I'd rather
5 see these documents coming through our system anyway.
6     Q    I get it.  But you would agree with me, I
7 mean, there's one set of problems if he sends it this
8 way and the borrower knows what's happening as opposed
9 to the borrower doesn't know where their stuff is
10 being sent.  Like, that's an entirely different kind
11 of more problem --
12    A    Certainly.  If the borrower was unaware of
13 another company, right, that is, you know, looking at
14 the file.  Right.
15    Q    Right.  I mean, that would be a pretty bad
16 situation.
17    A    Yep.
18    Q    So, okay.  Let's go to Exhibit 36.
19         (Exhibit 36 was marked for
20          identification.)
21         Now, in this one, I'm showing you, sir,
22 what's been marked as Exhibit 36, this is an email

1 dated June 9th.  You will be relieved, I'm sure, to
2 see that Chris Wolf has a Waterstone Mortgage email at
3 this point in time.
4     A    I see that.
5     Q    And he's getting an email from Cody Lamb and
6 Fred Stalls who are Mutual Mortgage.  Do you see that?
7     A    Yes.  I see their emails from Mutual
8 Mortgage.  Yeah.
9     Q    And there's a file named -- well, I
10 shouldn't say file.  It's RE:  McIntosh.  And if you
11 go down to the email from Fred Stalls on, let's see,
12 June 8th.  Okay?  The day before?
13         MS. KREITER:  Ari.  Ari.  Can you just
14 give me a minute?  Sorry.  I'm having trouble with my
15 computer.  The Adobe's frozen.  Let me see if I can
16 close it and try again here.  Okay.  Now, I shut down
17 and now I'm going to try to reopen.  But what document
18 are you on here so I can --
19         MR. KAREN:  Thirty-six.  We're not
20 going to be in this document very long --
21         MS. KREITER:  Okay.  It's open.  Thank
22 you.

Page 298

1  BY MR. KAREN:
2      Q   Okay.  So, and you see where on June 8th,
3  Mr. Stalls tells Cody Lamb, "This is Chris's email,"
4  referring to Chris Wolf at Waterstone.  "Please send
5  over docs when you get a chance."  See that?
6      A   I do see that.  Yes.
7      Q   So he's saying, "Please send over docs,"
8  which I presume would be from Mutual to Mr. Wolf;
9  right?
10     A   I -- I'm not sure only -- I'm just trying to
11 look at this.  Seeing it for the first time.  Yeah.  I
12 -- I don't know what has happened with Mutual or not
13 up to this point.  Just being honest with that, I
14 don't know.
15     Q   I'm simply saying that's what it looks like.
16 He's asking to send over docs.
17     A   Yeah.  And I -- I just don't know if that
18 was collected in their system.  How -- how -- that's
19 my only question.  I don't know what -- to what
20 content and what docs they're talking about.
21     Q   Okay.  Well, he says four sets of --
22 questions; right?

Page 299

1      A   Yeah.
2      Q   Now, my question is, this is after you guys
3  received the cease and desist letter.  Remember we saw
4  that on April 29th?
5      A   Yes.
6      Q   Okay.  So, I mean, it's after April 29th,
7  and, I mean, doesn't it concern you even after that
8  point that this is still going on?
9          MS. KREITER:  Object to the form.
10     A   Yeah.  I -- I don't know.  Again, scenario
11 is that a customer who -- that they were leaving, hey,
12 I want to move it.  Is this how I'd want to see it
13 done?  No.  Absolutely not.  In terms of emails being
14 done.
15     Q   Particularly after getting a cease and
16 desist order --
17     A   With a cease and desist order -- without --
18 I mean, to me, it would be still be right if somebody
19 is choosing whatever it is that it's being, you know,
20 the loan being done by the Waterstone Mortgage
21 employee.  Yeah.
22     Q   When you guys -- and I want to make sure

Page 300

1  that I ask these questions without -- okay.  Do not
2  reveal to me anything an attorney may have said to
3  you.  Okay?  I want to make sure I understand that.
4  All my questions are excluding information that was
5  provided to you by counsel.  Okay?
6      A   Oh, okay.
7      Q   All right?  When you guys got the cease and
8  desist order back on April 29th, were you made aware
9  of it?
10     A   Yes.
11     Q   Okay.  And were you made aware of it shortly
12 after you guys received it?
13     A   Yes.
14     Q   And, again, excluding those conversations,
15 what were you told?
16         MS. KREITER:  I guess I'm going to
17 object at this point.  I think this is privileged,
18 Ari.
19     Q   Okay.  Well, again, I'm excluding any -- if
20 the only communications you had were with counsel
21 present, then Maria is right.  You can't answer.
22 Ms. Kreiter's right.  You can't answer.

Page 301

1          So my question is simply are there any
2  conversations you had following Waterstone's receipt
3  of the April 29th cease and desist letter, were there
4  any conversations you had where counsel was not
5  present?
6      A   No, I did not.
7      Q   Okay.  And were there any communications you
8  made to others where counsel was not present relating
9  to that cease and desist order?
10     A   And I can't recall any conversation without
11 legal that I was involved with.
12     Q   Including one where you were communicating
13 to others; right?
14     A   Correct.  Correct.
15     Q   So every conversation which you were
16 involved either as receiving information or conveying
17 information, legal counsel was involved after the
18 29th?
19     A   That -- from what I recall, correct.  That
20 is correct.
21     Q   Okay.  Let's see.  Now, one thing we talked
22 about --

76 (Pages 298 - 301)

1        MR. KAREN:  And we can put this email
2  away.
3  BY MR. KAREN:
4     Q   We talked a few minutes ago about, hey, you
5  know, it's one situation if the borrowers -- I mean,
6  it may not be perfect and everything and all that
7  stuff if the borrowers know it's coming.  But it's
8  even more concerning to you if the borrower didn't
9  know.  Remember that conversation a few minutes ago?
10    A   Yeah.  Yes.
11    Q   So what proof, if any, did Waterstone get
12 from borrowers to ensure that they were aware their
13 information was being sent over when it was being sent
14 over by Mutual's employees?
15    A   And I'm trying to think of any document that
16 would be in there.  And just where a customer has
17 their choice of where they're going, because I don't
18 know if that's your question.
19    Q   Or not even just choice.  But, you know,
20 just a confirmation of it's good with you for me to
21 send this to Waterstone.  You know, something that
22 conveys knowledge of what's happening.  What proof did

1  you get?
2     A   And that I -- I'm not familiar if there are
3  documents in the files stating that.  I'm not familiar
4  with if that is the case in -- in that loan file.  So
5  I don't know if there information in there to that
6  effect or not.  I don't know.
7     Q   And I'm asking for any these loan files
8  we've looked at.  Are you aware of any type of consent
9  that Waterstone got indicating borrowers knew that
10 Mutual's employees were sending that information?
11    A   I'm not aware of anything.  No.
12    Q   Okay.  And do you guys, as a matter of
13 policy, have any form like that when a loan officer is
14 transitioning and information could theoretically be
15 sent from one to the next?  Do you have any kind of
16 form that you provide to borrowers to ensure they are
17 aware of what's happening?
18    A   And I'm not -- we certainly could, but I'm
19 just not right now recalling anything we have.
20    Q   How about do you have any instructions or
21 guidelines to loan officers when they were
22 transitioning about, you know, other than the stuff

1  we've talked about today, you know, that you need to
2  get borrower consent if there's a loan you can't work
3  on, you know, something like that?
4        Are there any policies you're aware of that
5  say that other than the guidelines we looked at or
6  expectations today?
7     A   I -- I think, certainly, I think through
8  conversation.  I mean, outside of, right, the offer
9  letter that we referred to a few times, right, and our
10 expectations.  But I think through conversation, if
11 somebody were asking and what is it and saying, hey,
12 making sure they're getting prior authorization.
13 Right.
14    Q   Right.  But I'm saying there's no written
15 policies or written forms you're aware of that can be
16 used?
17    A   I'm not aware of a written policy.  Right.
18    Q   And not aware of a written form that goes to
19 the borrower; right?
20    A   Correct.  I'm not aware of that.
21    Q   And in terms of the communications that loan
22 officers have to borrowers when they're transitioning,

1  do you have any sort of written statements that
2  they're supposed to give or not give, anything like
3  that, or you just leave it up to the loan officers?
4     A   I -- I'm not familiar with anything in
5  writing outside of -- and I'm feeling like there could
6  be something in their welcome packet.  I'm just not
7  familiar.
8        And I'll put that level of detail outside of
9  conversation and clearly make sure that it is
10 announced.  And I would go back to that offer letter
11 and just saying, hey, the expectation is -- is -- I'd
12 -- I'd refer back to that.  But I -- I don't know.  We
13 may have something else.  I don't know.
14    Q   Okay.  But I mean, between the trust that
15 you have that a manager's not going to step over the
16 line with, you know, their employees, the trust that
17 loan officers won't step over the line with the
18 customers.  You're putting a lot of faith in these
19 other people; aren't you?
20        MS. KREITER:  Object to the form.
21    A   I mean, I -- I have no reason to believe
22 that they're not going to have the conversation with

77 (Pages 302 - 305)

Page 306

1 the borrower, for example, or announcing, hey, I'm
2 leaving.  And a customer says, hey, I want to come
3 with you, so --
4    Q   No.  I'm not saying they're not having the
5 conversation.  But I'm saying they're not having the
6 wrong conversation; right?  That is, hey, you need to
7 come with me.  It's going to be terrible here.  They
8 won't be able to do your loan.  You know, you guys
9 have hundreds of loan officers; right?
10    A   Yeah.  We have around 200 or so.
11    Q   Okay.  And every year -- I don't know what
12 the general turnover is in the industry.  But this is
13 an industry that has a high turnover year-to-year on
14 loan officers generally.  Not something at Waterstone.
15 It's just a general industry thing; right?
16    A   Like, a -- well, it depends.  Yeah.
17 Certainly, last year and a half, it's been higher in
18 the industry.  Right.
19    Q   Right.  And, again, year-to-year, I don't
20 know.  I think the MBA says it's, like, 30 percent.
21 Something like that.
22    A   Somewhere around 25 to 30 percent.  Yeah.

Page 307

1    Q   But for your typical industry, that's a high
2 turnover rate, you know?  So I guess my point is so
3 you have 200 loan officers.  If you're average --
4 maybe you're better than average.  But if you're
5 average, you're probably changing 50 than a year.
6    A   And -- and I feel like we have historically
7 been well -- a lot better than average.  So whatever
8 that number is.  And, certainly, people could be going
9 for -- we talked earlier, lack of production.  I'm
10 just saying that, but that could occur outside of a
11 producer who's leading that we would like to have
12 retained.  Yeah.
13    Q   Right.  And, again, I'm not suggesting this
14 is good people you're devastated are leaving; right?
15 I mean --
16    A   Right.
17    Q   -- just some people don't work out; right?
18 I mean, it's just the sales now.
19    A   Right.
20    Q   So my question is though with all those
21 people sort of going through every year and having as
22 many loan officers -- and people coming on a lot from

Page 308

1 other companies, you know, that's a lot of opportunity
2 for something to go wrong in terms of conversation;
3 right?
4    A   Well, certainly, I -- we can't be on each of
5 those phone calls.  Same -- same with an announcement
6 made by that manager we referred to earlier, you know,
7 that we're not -- we're not there in person could
8 create a different issue.  So we're not going to be on
9 the phone.  So, yes.  We're not on the phone to listen
10 to that conversation.
11    Q   Right.  But you could have written policies
12 and you could have written statements that say these
13 are the things you're allowed to say and things you're
14 not allowed to say; right?
15    A   And -- and that, I don't know if we do or
16 not.  That's one I'm -- I'm not certain.
17    Q   But, at least, sitting here today, you're
18 not aware of any?
19    A   I'm not aware of it.  We -- we may still
20 have something, but I'm not aware of it.
21    Q   Let's go to -- by the way, also going back
22 to this exhibit.  Let's go to Exhibit 38.

Page 309

1        (Exhibit 38 was marked for
2         identification.)
3        Before we go to this, let me ask you
4 something.  Are you aware, Mr. Allen, of any specific
5 conversation that was ever provided to Chris Wolf
6 where he said, look.  You can speak neutrally to these
7 employees, but you can't say anything other than they
8 have an opportunity .  You're not allowed to encourage
9 them.  You're not allowed to do anything.
10        Are you personally aware of any conversation
11 that was ever had with Mr. Wolf like that?
12    A   Personally, I had never had a conversation
13 with Chris Wolf as to that extent.
14    Q   And are you aware personally of somebody
15 else having that conversation?
16    A   Oh, and I'm not aware of what other
17 conversations, right, others would have with Chris.
18 Right.
19    Q   Okay.  Okay.  And that same question would
20 go for Dwayne Hutto and for Chris Smith.
21    A   Yes.  Yeah.  Same for both of them.
22 Correct.

78 (Pages 306 - 309)

Page 310

1    Q    Same answer?
2    A    Yes.  Same answer.  I'm sorry.
3    Q    All right.  And what maybe -- no.  No.  I'm
4  sorry.  We're not quite at the last document.  But
5  we're getting there.  Okay.  Exhibit 38, can you look
6  at that?
7    A    Yep.  I have it.  Oh, and you can drop your
8  camera?  I do look at --
9    Q    Oh, sorry.  Yeah.  Yeah.  Yeah.  I'm sorry.
10  I apologize.
11    A    Oh, that's okay.
12    Q    I stand up.  I sit down.  It's, like, yeah.
13  Okay.
14    A    Because I could see the -- yeah.
15    Q    Oh, no.  No.  No.
16    A    Hearing's not the best.
17    Q    Sorry.
18    A    It's okay.
19    Q    All right.  So Exhibit 38.  This is an email
20  from Chris Wolf.  It's to Dawson and to -- who's
21  Christy Johnson?
22    A    That name does look familiar, so I don't --

Page 311

1  I don't know.
2    Q    Okay.  And the subject is Castanada.
3    A    I can see that.
4    Q    Oh, okay.  It looks like Christy was at this
5  time also a Waterstone employee, I mean, a Mutual
6  employee, because the email says, "Hey, Dawson, here's
7  the CO refi of Dwayne's.  Christy and I have been
8  working on it for several months."
9        Now, again, you would agree with me, sir, a
10  loan that was being worked on at Mutual for several
11  months is certainly a Mutual loan and Mutual's
12  property; right?
13    A    Yeah.  It certainly looks like it was at
14  Mutual.  Right.
15    Q    Okay.  Then it continues, "We got rescored
16  up to a 710, and were able to get it run through UAS."
17  That means "automatic underwriting"; right?
18    A    Or automated underwriting system.
19    Q    Right.  That's a Fannie Mae; right?
20    A    Yeah.  It's DU or LP.  Yeah.  Two systems,
21  yeah, for Fannie or Freddie.  Right.
22    Q    So they're both considered an AUS?

Page 312

1    A    Yeah.
2    Q    And so if they say, we were able to get it
3  run through AUS, that would be a loan that could be
4  approved through Fannie through one of their
5  underwriting systems?
6    A    Certainly, it could come out like that, and
7  then the question is underwriting and from that point,
8  are they good with that or not?
9    Q    Okay.  So he then writes, "If you or Maria,"
10  and he's writing to Dawson Walker, "can get this one
11  going and send to Cameron to LP."  What's LP?  Loan
12  processing?
13    A    Yeah.  Or a loan partner.  I'm not sure.
14  "Send to Cameron to LP."  So I'm -- oh, that could be
15  loan prospector, actually, on the -- I mentioned
16  Freddie and Fannie Mae.  That's Freddie Mac's version
17  as loan prospector.
18    Q    Got it.  "Tried to pull credit today.  Since
19  the rescore just came back, score should be the same.
20  The appraisal I'm sending is four months old, so we're
21  hoping to get with Brian to see if we can get a new
22  one with more value since we're capped at 75 LTVP per

Page 313

1  AUS."  Do you see that?
2    A    I see that.  Yes.
3    Q    Okay.  And then he attaches a bunch of stuff
4  in that email; right?  There's a bunch of stuff.
5    A    Yeah.  I see a number of, like, PDFs I see
6  on the attachment line.  Yeah.
7    Q    W2s, transcripts, IRS, income worksheets,
8  bunch of information; right?
9    A    Yes.
10    Q    Okay.  Looking at the totality of this, this
11  is, again, one that is not being done the right way;
12  wouldn't you agree?
13    A    Yeah.  I would not want to see documents
14  sent over in this fashion and from a private -- or his
15  personal email, I should say.  Right.
16    Q    And certainly not document that were
17  obviously from the text of this provided to a
18  different lender; right?
19    A    Yes.  Correct.  Yep.
20    Q    And they're being taking from that lender
21  and sent to Waterstone; right?
22    A    It looks like he is sending them over.

79 (Pages 310 - 313)

Page 314

1 Right.
2   Q   Yeah. And here, is there anything in the
3 text -- of this paragraph which suggest to you this is
4 a loan that couldn't be done by Mutual?
5   A   Nothing other than what I had said about the
6 AUS if it's an approved. Companies have overlays.
7 They have interpretation. So that's the only thing I
8 would not be able to speak on behalf of company until
9 -- ready.
10   Q   Yeah. I'm just asking you is there anything
11 in this -- like, there was another email we saw
12 earlier where you said something -- I think it was,
13 like, DTI was high and you said that could be a
14 problem. Is there anything you see here that jumps
15 out that says this could be a problem?
16   A   Kind of very -- very minimal information
17 like DTI and things like that are not on here. So
18 based on it's a 75 LTV -- rescore at 710. So there's
19 nothing I see on here, right, that makes this unique.
20 Right.
21   Q   Okay. So, I mean, is it fair to say this
22 one that was sent by Chris Wolf, private email, 4/19,

Page 315

1 is concerning to you?
2   A   Well, the only question I'd want to ask in
3 pursuing this was the customer advised of, hey,
4 moving, and did they decide they wanted to do the loan
5 with Waterstone? And, again, the method done, to me,
6 is not right concerning the documents, and it
7 should've been started by a Waterstone loan officer.
8   Q   And, additionally, sir, wouldn't you agree
9 -- this is only 4/19. They shouldn't calling there or
10 talking to their clients a week before they leave and
11 saying, move the loan over to Waterstone; right?
12   A   And -- and I know we've made some, you know,
13 because -- information, assumptions. Again, I don't
14 know if this is a close friend, a family member. I
15 don't know that. That's -- it would be my -- yeah.
16   Q   Putting that aside, you would agree with me
17 that is not a communication that should be happening a
18 week before they leave Mutual to be talking to
19 borrowers and telling borrowers, "I'm leaving"?
20   A   If -- if I'm assuming it's not a close
21 friend, a family member in those few assumptions,
22 yeah. Then I don't understand why this would've been

Page 316

1 sent. Right.
2   Q   Let's go to Exhibit 40.
3       (Exhibit 40 was marked for
4       identification.)
5       And I might be lying to right now, but I
6 think this is the last document. But I reserve my
7 right to not be truthful at this point, so --
8   A   A single page?
9   Q   Yeah. It's short.
10   A   Okay.
11   Q   And there's nothing there. It just says
12 Chris Wolf and there's almost nothing on this page.
13   A   Okay. That's -- I thought I was missing
14 something. Okay.
15   Q   Okay. So this is another email, sir. This
16 was sent 4/20 by Chris Wolf, private email, to
17 Kyrstin, who was one of the people who came over on
18 the transition team?
19   A   Yes. Which looks like or I should say is a
20 Waterstone employee at that time. Right.
21   Q   Yeah. Right. And is sending a 1040 form?
22   A   Looks like in that attachment, right, it was

Page 317

1 a 1040 form. Right.
2   Q   Again, you know, any reason you can think of
3 why Kyrstin wouldn't just reach out to her client if
4 this was, in fact, her client and just say, hey, you
5 know, Mr. and Mrs. Tyson, can you send me your 1040
6 again?
7   A   Yeah. I -- I don't know. Yep. And we're
8 agreeing very limited information. But I don't --
9 yeah -- not -- I would expect -- I'd expect it to be
10 taken by a Waterstone employee and come through our
11 portal. Right.
12   Q   Again, not the way you would like to see it
13 done; right?
14   A   Yeah. Correct.
15   Q   All right. Let me see what else I've got.
16 As a matter of course, when you bring over employers
17 from another -- when employees are transitioning, loan
18 officers, do you ask to see or have anyone to ask to
19 look at their prior employer agreements with their
20 prior employer?
21   A   I'm not -- I'm not aware of -- I mean, I
22 certainly don't and I'm not aware of our company --

80 (Pages 314 - 317)

Page 318

1  that that's part of our process to get their existing
2  agreement.
3      Q    So when you ask them to sign those documents
4  saying, hey, you know, I'm taking anything, doing
5  anything, you know, that breaks an agreement, you
6  don't do anything to verify that; right?
7      A    Well, we're -- yes. We're having them sign
8  be it the -- I think we're referencing the offer
9  letter and saying, hey, yep. Here are the -- this is
10  what we expect from you as an employee. Right.
11      Q    Right. Okay. But you don't do anything to
12  verify that. You just tell them the expectations and
13  sort of hope they're going to follow them?
14      A    Well, we certainly -- I -- I feel like in
15  part of looking at what happened, we had our examples
16  were some documents that was in the forensic report.
17  I said that our individual saw some documents coming
18  over and stopped that.
19          So I just mention that because -- I don't
20  know if related to your question. But then seeing
21  that, it's, like, we've got things in place to make
22  sure as much as we can stopping documents being, you

Page 319

1  know, sent over or what have you.
2      Q    Well, that was after they were -- I mean,
3  that forensic report reflected that documents received
4  in December were quarantined in April or May. So
5  they'd been on your system for about four months.
6          MS. KREITER: Object to the form.
7      A    I -- I thought my understanding was that it
8  was before we received the cease and desist, that our
9  individual saw documents being loaded in April on -- I
10  think it was, like, April 28th. It was definitely
11  before the cease and desist.
12          And it was seen happening and he stopped and
13  shut that down. So, no. From when I read that and my
14  understanding is it was exactly at that time.
15      Q    Okay. So we've seen a lot of documents
16  today that weren't talked about on that expert report.
17  Encompass, fields; right? I mean, you don't want to
18  go all over them. You've seen them today; right?
19      A    I've seen other, yeah, other documents. And
20  back to some of these to go, hey, it should've come
21  through our portal versus being sent over the -- a --
22  a personal email. Right.

Page 320

1      Q    So while I understand somebody may have done
2  it because it was done a certain way, there's some
3  other stuff here. So my point is, sir, on a typical
4  day-to-day basis, beyond telling people your
5  expectations, what, if anything, do you to confirm
6  they're following those expectations?
7      A    I -- I -- back to signing the agreement,
8  this is what our expectation is. I feel like our -
9  that the piece in that forensic -- documentation. I
10  think if we found any, you know, found anything else,
11  we would talk to that individual and talk about, hey,
12  what the proper way would be.
13          So I'm not aware of anything else in that is
14  involved in that area. So, now, on a personal front,
15  I'm not aware of anything else. And there could be
16  some other things out there that I'm not aware of.
17      Q    Okay. And the reason the forensic file
18  triggered, I mean, was not necessarily because you
19  were just checking to see if information was found to
20  be suspicious, and that's what was triggered?
21      A    From reading that forensic report, I'm not
22  an IT expert. From what I could tell, it was things

Page 321

1  that we would see that -- that are abnormal or however
2  it would be. We'd bring in a document without looking
3  at. But something that just wasn't right.
4          So I feel like our IT department's always
5  doing things like that to make sure as much as we can
6  control and do and not have things, you know,
7  documents brought over in our system, as an example.
8  I think that was an example of that.
9      Q    Okay. Well, but, again, obviously, we've
10  seen a lot of other documents that weren't reflected
11  there; right? And what I'm really talking about is
12  the conversations with employees, former coworkers,
13  the conversations with customers.
14          I recognize that you give them that
15  expectation. But beyond giving them that expectation,
16  there's nothing really you do to follow up to ensure
17  that that expectation is being met?
18          MS. KREITER: Object to the form.
19      Q    Right?
20      A    I'm -- I'm not aware of, right, any customer
21  contact, for example, to say, hey, did you, you know,
22  how was this communicated to you in terms of a choice

81 (Pages 318 - 321)

Page 322

1  of a company?
2     Q    And you're not aware of anyone ever being
3  disciplined for violating these expectations, I think
4  you said earlier; right?
5          MS. KREITER:  Object to the form.
6     A    And -- and I feel like going back to that
7  would just be conversations depending on the situation
8  with employees.
9     Q    And when additional loans come over to
10 Waterstone, whether they should or shouldn't have been
11 there because somebody did or didn't have a proper
12 conversation, the money that Waterstone earns from
13 those loans is the same as any money on any other
14 loan; isn't it?
15         MS. KREITER:  Object to the form.
16    A    Well, our -- our loans -- we would -- and I
17 think you had referred earlier, be it a FHA loan or a
18 conventional loan or a jumbo, could be a different
19 amount we receive.  But we're -- we hope we're
20 receiving revenue on a loan that closes, certainly --
21 we're doing for this for.  Yeah.
22    Q    But you agree with me that dollars are

Page 323

1  dollars; right?  Money is money?
2     A    Money is money.
3     Q    Okay?  And, I mean, I'm asking some really
4  hard questions -- 6:30.  I'm sorry.  We're almost
5  done.  I'm done.  I'm sorry.
6          So, I mean, money is money; right?  And the
7  point is that when Waterstone earns money on a loan,
8  Waterstone earns that money even if something was done
9  wrong to get that loan ton Waterstone; right?
10    A    And -- and, certainly, we're going to get
11 revenue on a loan as it closes.  I mean, we could have
12 an issue on a buyback or -- purchase.  Certainly,
13 those things could occur.
14         Maybe not in the context of your question,
15 but yes.  We're going -- a loan closes, we hope that
16 if we've done things right, we're making -- we're
17 getting revenue on that to offset our expenses.
18         MR. KAREN:  All right.  Give me five
19 minutes if we could just take a quick break.  I might
20 be done.  So just give me five minutes.
21         THE VIDEOGRAPHER:  Going off the
22 record.  The time is 6:31 p.m. Eastern.

Page 324

1          (Off the record.)
2          THE VIDEOGRAPHER:  Going back on the
3  record.  The time is 6:38 p.m. Eastern.
4  BY MR. KAREN:
5     Q    Mr. Allen, I'm going to give you a little
6  bad news, but I did lie to you slightly.  But only
7  slightly.  We only have a couple more minutes left, I
8  think.  So, but I do have a couple more questions for
9  you.
10         MR. KAREN:  Nick, if you could please
11 pull up -- I think this is Exhibit 51.
12         MR. KAREN:  It should be, like, a
13 spreadsheet.
14         MS. KREITER:  Ari, I have 51 as the
15 Second Amended Deposition Notice.
16         MR. KAREN:  Oh, Nick, what is that
17 spreadsheet I sent to you?  I'm sorry.  I don't have
18 the number on it.  Maybe it's 50?  There's the four
19 pages from the spreadsheet?
20         MR. HELSABECK-OCHOA:  That's correct.
21 It's exhibit 50 -- I'll pull that up momentarily.
22 //

Page 325

1          (Exhibit 50 was marked for
2          identification.)
3          MR. KAREN:  All right.  So if you can
4  make that a little bigger?
5  BY MR. KAREN:
6     Q    Mr. Allen, so I've got a really interesting
7  question for you if you're ready for it.
8     A    Okay.
9     Q    What is this?
10    A    These are -- I believe the end of April on
11 all credit pulls by our entire company.  And the
12 borrower name is the name in Column D.  We have a loan
13 number.  And then on the Column G, User, that's the
14 individual at our company that pulled the credit.
15    Q    Got you.  Okay.  So this is all of
16 Waterstone during this time period?
17    A    This is all of Waterstone.  That is correct.
18    Q    And it's credit pulls?
19    A    It is credit pulls.  Yeah.  It's credit
20 pull.  Yeah.
21    Q    Okay.  Same thing as credit inquiry, just so
22 I'm making --

82 (Pages 322 - 325)

Page 326

1    A   I -- I -- you know, I see, like, Row 18,
2    $10.  So I don't know if that ends up being some
3    supplemental -- I'm not familiar with that.  But I
4    feel like the $31 is a credit pull.  Sixty-two is a --
5    you know, would be a borrower or co-borrower, I'm
6    assuming.
7    Q   Okay.  But it's credit --
8    A   Credit.  Yeah.
9    Q   Okay.  Well, we're done with that.  I told
10   you they wouldn't be too long.
11   A   Okay.
12        MR. KAREN:  And then, Nick, if you
13   could bring up Exhibit 9?
14        (Exhibit 9 was marked for
15        identification.)
16 BY MR. KAREN:
17   Q   And this is a chain of emails, and I'm going
18   to give you a little bit of explanation of that.
19   Pretty short question.
20        MR. KAREN:  And, actually, why don't
21   you go down to the second email here from Elizabeth?
22   Okay.

Page 327

1 BY MR. KAREN:
2    Q   So in this email, Mr. Allen, she's --
3    Ms. Spragg, that is, is talking about where you guys
4    were going to do -- and I think you're on this email,
5    where you guys were going to do the location for the
6    onboarding for Christmas Branch.  Does this sound
7    familiar at all?
8    A   Yes, it does.
9    Q   And she says at the end of it, "We can still
10   revert back to the hotel easily."  Do you see that?
11   A   I do see that.  Yes.
12   Q   Where did the onboarding take place?
13   A   I believe it was done in -- in the Christmas
14   location office.
15   Q   Okay.  And that was using Mutual's internet
16   access or network access; right?
17   A   I -- I don't know on that date if that had
18   been converted over or not.  I don't know in terms of
19   what, you know, what internet access it was or who it
20   was through.
21   Q   I mean, this is probably about a week before
22   they left.  Well, let me ask you.  Why didn't you do

Page 328

1 it at the hotel if it would've been easy to revert
2 back?
3    A   Because from what I recall on this was that
4 Chris Smith had -- I believe had the lease and had the
5 lease with Mutual.  And then upon the training
6 would've been done after people were employed, that's
7 where I stated that, you know, was it our internet
8 access?  Was it switched over?  I don't know how
9 quickly that happens.
10   Q   Okay.  So your understanding is the training
11 and the orientation happened after they had resigned?
12   A   I -- I believe so, and I -- I believe that
13 that was the case.
14   Q   Okay.  Would you agree that it would not
15 have been appropriate to do that at Mutual's offices
16 if they had not resigned yet using Mutual's internet
17 access?
18   A   Yeah.  I feel like if it was prior to
19 somebody's departure, yeah, that would not be
20 appropriate.
21        MR. KAREN:  That's all I had.  So I'm
22 done with my questions, sir.  And thank you for your

Page 329

1 time.  And I apologize for the circumstances, but good
2 seeing you again.
3        THE WITNESS:  All right.  Thank you.
4        MS. KREITER:  Nothing from me.  Thank
5 you.
6        MR. KAREN:  Have a good night,
7 everyone.
8        THE VIDEOGRAPHER:  Okay.  This marks
9 the end of the deposition of Kevin Allen as a
10 corporate representative of Waterstone Mortgage.
11 We're going to off the record at 6:44 p.m. Eastern.
12        (Signature waived.)
13        (Whereupon, at 6:44 p.m., the
14        proceeding was concluded.)
15
16
17
18
19
20
21
22

83 (Pages 326 - 329)

Page 330

```
1        CERTIFICATE OF DEPOSITION OFFICER
2        I, SHONDRA DAWSON, the officer before whom
3   the foregoing proceedings were taken, do hereby
4   certify that any witness(es) in the foregoing
5   proceedings, prior to testifying, were duly sworn;
6   that the proceedings were recorded by me and
7   thereafter reduced to typewriting by a qualified
8   transcriptionist; that said digital audio recording of
9   said proceedings are a true and accurate record to the
10  best of my knowledge, skills, and ability; that I am
11  neither counsel for, related to, nor employed by any
12  of the parties to the action in which this was taken;
13  and, further, that I am not a relative or employee of
14  any counsel or attorney employed by the parties
15  hereto, nor financially or otherwise interested in the
16  outcome of this action.

                    Shondra Dawson
17                  SHONDRA DAWSON
18              Notary Public in and for the
19                District of Columbia
20
21
22
```

Page 331

```
1        CERTIFICATE OF TRANSCRIBER
2        I, LAURA JONES, do hereby certify that this
3   transcript was prepared from the digital audio
4   recording of the foregoing proceeding, that said
5   transcript is a true and accurate record of the
6   proceedings to the best of my knowledge, skills, and
7   ability; that I am neither counsel for, related to,
8   nor employed by any of the parties to the action in
9   which this was taken; and, further, that I am not a
10  relative or employee of any counsel or attorney
11  employed by the parties hereto, nor financially or
12  otherwise interested in tl

13              Laura M Jones

14
15                  LAURA JONES
16
17
18
19
20
21
22
```

84 (Pages 330 - 331)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.