# **<u>EXHIBIT G</u>**

Page 1

1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION
3                          Civil Action No.: 22-CV-01660
4
      MUTUAL OF OMAHA
5     MORTGAGE INC.,
6             Plaintiff,
      v.
7
      WATERSTONE MORTGAGE
8     CORPORATION,
9             Defendant.
      _____/
10
11                          DEPOSITION OF
12                          DWAYNE HUTTO
13                   (Volume I, pages 1 - 171)
14    DATE TAKEN:       June 15, 2023
15    TIME:             9:03 a.m. to 3:57 p.m.
16    PLACE:            Gunster, Yoakley & Stewart, P.A.
                        401 East Jackson Street
17                      Suite 1500
                        Tampa, Florida 33602
18
      TAKEN BY:         The Plaintiff
19
      REPORTED BY:      Victoria White
20                      Court Reporter and Notary Public
21
22
23
24
25

Page 2

1 A P P E A R A N C E S :
2 ARI KAREN, ESQUIRE
   COURTNEY WALTER, ESQUIRE (Via Zoom)
3 MARK CARROL, ESQUIRE
   OF: MITCHELL SANDLER, LLC
4     1120 20th Street N.W.
       Suite 725
5     Washington, D.C. 20036
       202.886.5265
6     Akaren@mitchellsanders.com
7     APPEARING ON BEHALF OF THE PLAINTIFF MUTUAL OF
       OMAHA MORTGAGE, INC.
8
   MARIA L. KREITER, ESQUIRE
9 OF: GODFREY & KAHN
       833 East Michigan Street
10    Suite 1800
       Milwaukee, Wisconsin 53202
11    414.287.9466
       Mkreiter@gklaw.com
12
   STEPHANIE ZIEBELL, ESQUIRE (Via Zoom)
13 GENERAL COUNSEL WATERSTONE MORTGAGE CORPORATION
14    APPEARING ON BEHALF OF THE DEFENDANT WATERSTONE
       MORTGAGE CORPORATION
15
16 ALSO PRESENT:
17 Rob Williams - Videographer
18
19
20
21
22
23
24
25

Page 3

1
2                INDEX OF PROCEEDINGS
                        VOLUME I
3 Witness                                          Page
   DWAYNE HUTTO
4     Direct Examination by Mr. Karen          5
5
          PLAINTIFF'S INDEX OF EXHIBITS
6                     VOLUME I
7 Exhibit        Description             Marked
8 Exhibit 1      Waterstone Mortgage        9
                 Corporation Producing Branch
9                Manager Employment Agreement
10 Exhibit 2     E-mail from Michael Smalley  37
                 Dated August 14, 2019
11
   Exhibit 3     Dustin Owen E-mail dated     39
12               October 8, 2021
13 Exhibit 4     Dustin Owen E-mail dated     45
                 January 31, 2022
14
   Exhibit 5     Waterstone April 20, 2022    61
15               E-mail
16 Exhibit 6     February 17, 2022 E-mail     82
                 (December P&I)
17
   Exhibit 7     Employee Offer Letter        100
18               Date/Resignation Letter Date
                 Document
19
   Exhibit 8     April 27, 2022 E-mail        107
20
   Exhibit 9     January 10, 2022 E-mail from  119
21               Chris Wolf
22 Exhibit 10    March 3, 2022 E-mail         146
23 Exhibit 11    March 29, 2022 E-mail        151
24 Exhibit 12    April 8, 2022 E-mail         155
                 (Today's Call)
25
   Exhibit 13    April 8, 2022 E-mail         165

Page 4

1
2                P R O C E E D I N G S
3                      * * * * *
4        THE VIDEOGRAPHER:  Good morning.  We're going on
5 the record at 9:03 a.m. on June 15, 2023.  This is
6 media unit one of the video-recorded deposition of
7 Dwayne Hutto in the matter of Mutual of Omaha
8 Mortgage Incorporated versus Waterstone Mortgage
9 Corporation, civil action number 22-CV01660.  The
10 location of the deposition is 401 East Jackson
11 Street, Suite 1500, Tampa, Florida 33602.
12       My name is Rob Williams representing Veritext
13 and I'm the videographer.  The court reporter is
14 Victoria White from Veritext.  Counsel and all
15 present, including remotely, will now state their
16 appearances and affiliations for the record beginning
17 with the noticing attorney.
18       MR. KAREN:  Ari Karen with Mitchell Sandler on
19 behalf of Mutual of Omaha.
20       MS. KREITER:  Maria Kreiter, Godfrey & Khan, on
21 behalf of defendant Waterstone.
22       MS. WALTER:  Courtney Walter on behalf of
23 plaintiff Mutual of Omaha.
24       MS. KREITER:  And then go ahead, Stephanie.
25       MS. ZIEBELL:  Yeah, Stephanie Ziebell on behalf

Page 5

1 of Waterstone Mortgage.  I also have a paralegal
2 intern here, Mary Curry.
3        THE VIDEOGRAPHER:  Okay.  Will the court
4 reporter please swear in the witness.
5        THE COURT REPORTER:  Raise your right hand,
6 please.  Do you swear or affirm the testimony you
7 will give in this matter will be the truth, the whole
8 truth, and nothing but the truth?
9        THE WITNESS:  Yes, ma'am.
10       THE COURT REPORTER:  Thank you.
11               DWAYNE HUTTO,
12 having first been duly sworn, was examined and testified as
13 follows:
14               DIRECT EXAMINATION
15 BY MR. KAREN:
16    Q.  Good morning, Mr. Hutto, how are you?
17    A.  Good morning.  How are you doing?
18    Q.  I want to go over some rules of deposition just
19 so we understand how this works.  Just really quickly.  Have
20 you ever been deposed before?
21    A.  No.
22    Q.  Okay.  Have you ever been a witness in a case
23 before?
24    A.  No --
25    Q.  Okay.

Page 6

1    A.  -- no, sir.
2    Q.  This is your first time?
3    A.  Yes, sir.
4    Q.  All right.  So one of the things -- we just kind
5  of did this, it's really important as we talk today, I know
6  in our common vernacular, right, and talking back and forth,
7  we often interrupt one other when we know what the other
8  person is going to say.  It's really important today, even
9  when you know what I'm going to ask you, not to cut me off
10  because it's really hard for the court reporter --
11    A.  I understand.
12    Q.  -- to -- exactly like that just happened.
13    A.  Sorry.
14    Q.  I know.  I know it's hard, it's hard for me,
15  too, but if you could just really try to do that, it's much
16  easier for the court reporter and it will actually get us
17  out of here faster because I don't kind of have to repeat
18  the question, because it's really important for the record
19  that we create that my whole question gets out there.  So if
20  you could just try to remember that.  I'll try to do the
21  same for you when you answer, but if you could try to be
22  conscious of that.
23        The other thing is not to nod and shake your
24  head.  You're great because right now you're giving me all
25  the examples of stuff not to do, sorry.  So it's very

Page 7

1  important not to say um-hmm, uh-huh; very hard again for her
2  to take that down on the record.  Also shaking or nodding
3  your head, very hard for her to take down on the record,
4  verbal response.  So if you could just try to keep that in
5  mind as well.
6        Additionally, as we go through today, if I ask
7  you a question, if there's something you don't understand,
8  if you didn't hear it, please stop me and I'll go back and
9  do that for you.  But if you answer, I'm going assume that
10  you heard my question, you understood my question and you're
11  giving me a fully truthful answer; is that fair?
12    A.  Yes.
13    Q.  Okay.  Great.  Also, if you need breaks today,
14  that's fine, just not while a question's pending.  So if you
15  do have to take a break, you have to go to the bathroom or
16  whatever, just let us know, but just wait until you finish
17  your answer to my question and then you can take whatever
18  break you need, okay?
19    A.  Okay.
20    Q.  First question, since you -- you came to
21  Waterstone April 26th of 2022; is that right?
22    A.  Correct.
23    Q.  Okay.  That was your first official day here,
24  right?
25    A.  Yes.

Page 8

1    Q.  Or not here, I'm sorry, your first official day
2  at Waterstone, correct?
3    A.  Correct.
4    Q.  Since that time have you been disciplined by
5  Waterstone?
6    A.  No.
7    Q.  Okay.  Had any verbal or written reprimands?
8    A.  No, sir.
9    Q.  Have your job duties changed in terms of what
10  you were supposed to be doing to what you're doing now?
11    A.  No, sir.
12    Q.  Have you been notified that you might have to --
13  have they made any claim against you for indemnification,
14  that is Waterstone?
15    A.  Not to my knowledge.
16    Q.  Have you been told that in any way you breached
17  your agreements with Waterstone?
18    A.  No.
19    Q.  Without counsel present -- I just want to make
20  sure that's the preface to this question, okay, I don't want
21  to ask -- I'm not asking you anything that you said in front
22  of or heard from an attorney, okay, Ms. Ziebell or I'm
23  sorry --
24        MS. KREITER:  Kreiter.
25  BY MR. KAREN:

Page 9

1    Q.  -- Ms. Kreiter, thank you.  So I don't want to
2  ask you any question about that, okay, just to be clear.  So
3  I don't want you to share any of that information with me.
4        Have you spoken outside the presence of counsel
5  to anyone at Waterstone about the allegations in this case?
6    A.  No.
7    Q.  Has anyone told you in any way, again, outside
8  the presence of counsel, that you did anything wrong in this
9  case from Waterstone's perspective?
10    A.  No.
11        MR. KAREN:  I'm going to show you what I'll mark
12  as Exhibit 1.
13        (Plaintiff's Exhibit No. 1 was marked for
14        identification.)
15  BY MR. KAREN:
16    Q.  Mr. Hutto, do you see one, two, three lines
17  down, this appears to be an employment agreement between
18  yourself and Waterstone Mortgage?
19    A.  Correct.
20    Q.  Do you recall signing an agreement, sitting here
21  today, with Waterstone?
22    A.  I believe so.  I mean, that's pretty bad, but,
23  yeah, I believe I do.
24    Q.  And if you look to the back page, this appears
25  to be like a DocuSign record and it gives the dates when

Page 10

1  different things were sent and when it was completed; do you
2  see that?
3      A.  Yes.
4      Q.  Using your best recollection, does this look
5  accurate in terms of that you signed this agreement and when
6  you signed this agreement?
7      A.  It does.
8      Q.  Is this the first employment agreement you've
9  ever signed?
10      A.  No, sir.
11      Q.  Did you sign an employment agreement with Mutual
12  of Omaha?
13      A.  I believe so.
14      Q.  And I wanted to go through a couple of things in
15  this agreement.  If you can turn to page 16 and if you look
16  about halfway down in bold there's a B, a little B and a
17  little 1, it says 250 basis points for eligible loan; do you
18  see where it says that?
19      A.  Um-hmm.  Yes, sir.
20      Q.  And so tell me if I understand this correctly or
21  correct me if I'm wrong, what that means, if I understand
22  this, is that for every loan that comes in the branch that
23  you manage, you essentially get 250 basis points credited to
24  the branch; is that right?
25      A.  Yes, credited to the branch P&L.

Page 11

1      Q.  Okay.  And then are various expenses deducted
2  from that?
3      A.  Yes, sir.
4      Q.  And then what's left over you get?
5      A.  Correct, if I want to take it at that time.
6      Q.  Okay.  But at some point in time you can take
7  it?
8      A.  Correct.
9      Q.  Is there a limitation in how long you can leave
10  it there in the branch?
11      A.  Not to my knowledge.
12      Q.  Okay.  But that -- from your perspective
13  anything that's left over is your money?
14      A.  Yes.
15      Q.  Okay.  If -- let me ask this -- let's just say
16  you have money that you've built up in the branch, you left
17  it there a couple of months and then you have a loss, does
18  the loss take away that money that's in the branch?
19      A.  Correct.
20      Q.  Okay.  So you can sort of just leave this money
21  in the branch, kind of as almost like an operating account
22  and then you can pull from it when you want the income; is
23  that a fair understanding?
24      A.  Correct, when you feel comfortable, yes.
25      Q.  And if you can tell me just generally, I don't

Page 12

1  need every single detail, what are the expenses that go
2  against the branch?
3      A.  That would be impossible, there's a lot.  Paper,
4  rent, it's a long list.
5      Q.  Basically everything that goes into operating
6  the branch --
7      A.  Everything --
8      Q.  Again, please --
9      A.  Marketing and everything.  Sorry.
10      Q.  I'm only trying to make this go faster for both
11  of us, because I'm sure --
12      A.  Perfect.
13      Q.  -- you have better things to do today than this.
14      Okay.  So I think I understand.  Now, how did
15  that compare -- was that a similar model -- strike that.
16      Was that a similar model to what -- to how you
17  were compensated at Mutual?
18      MS. KREITER:  Object to the form.
19      MR. KAREN:  You can answer.
20      THE WITNESS:  Is a similar model the way -- did
21  you say on the P&L?
22  BY MR. KAREN:
23      Q.  Okay.  You're calling it -- let me say it this
24  way just for clarity:  When you say P&L you're referring to
25  the way you're compensated now, correct?

Page 13

1      A.  Correct.
2      Q.  Okay.  So were you compensated on a P&L
3  matter -- were you compensated in a P&L manner at Mutual?
4      A.  Correct.
5      Q.  Okay.  And the 250 basis points that you receive
6  now is credited on the branch; did you receive the same
7  amount at Mutual?
8      A.  Correct.  To my knowledge.
9      Q.  Is there any difference in the expenses that are
10  counted against that 250 basis points here versus Mutual?
11      A.  I'd have to go back and look at the P&L and
12  match them up.
13      Q.  Okay.  Is it fair to say that when you received
14  an offer from Waterstone it was essentially matching the
15  compensation you received at Mutual?
16      MS. KREITER:  Object to the form.
17      MR. KAREN:  You can answer.
18      THE WITNESS:  Yeah, that's not correct.
19  BY MR. KAREN:
20      Q.  Okay.  Can you tell me how it differed?
21      A.  I would have to go back and match up the P&Ls to
22  see how it differed with the pay.
23      Q.  Okay.  But you -- did you see this as an
24  increase in pay or an advantage in the way you were paid at
25  Waterstone versus Mutual?

4 (Pages 10 - 13)

Page 14

1    A.  I did not see it either way.  I wasn't looking
2 at pay when I went to make a move, if I chose, the company I
3 chose.
4    Q.  All right.  All I'm trying to clarify, sir,
5 you -- as I said, I asked you the question of was your
6 compensation essentially the same rate.
7    A.  Very close.  I would have to look and make sure.
8 Just being honest, I'd have to go back and look at Mutual's
9 last agreement I signed.
10    Q.  Okay.  That's fair.  But you're not aware of any
11 distinction in the compensation model sitting here today?
12    A.  Not to my knowledge.
13    Q.  Okay.  Now if you can also look at page 2 of
14 this agreement and you see three little I's and it
15 states recruiting.  These are the duties, right, in the
16 section 1.3?
17    A.  Correct.
18    Q.  And then there's a little three I's and it says
19 recruiting staff for the branch?
20    A.  Correct.
21    Q.  Is that in fact one of your duties?
22    A.  Correct.
23    Q.  And then if you look at Roman numeral 6 a couple
24 of lines down, it says assisting company's management in the
25 development of successful group of employees; do you see

Page 15

1 that?
2    A.  Correct, yes.
3    Q.  Is that one of your duties?
4    A.  Yes.
5    Q.  And if you could go to the next page we're going
6 to go to section 1.4.  If you look in the second line, tell
7 me if you see this sentence that says, employee shall assist
8 and work for only company and no other employee, lender,
9 broker or entity?
10    A.  I see it.
11    Q.  Okay.  Do you think that's reasonable?
12    MS. KREITER:  Object to the form.
13    MR. KAREN:  You can answer.
14    THE WITNESS:  Yes.
15 BY MR. KAREN:
16    Q.  And that was -- is it fair to say that was your
17 expectation when you came to Waterstone that you would abide
18 by that provision?
19    A.  Yes.
20    Q.  Okay.  If you look further down -- actually skip
21 that.  Now you can turn to page 5.  On page 5 if you look at
22 section 1.8 and it says, without limiting any obligations of
23 employee, employee represents and warrants to the company at
24 all times during employment as follows, and it has a number
25 of representations; do you see that?

Page 16

1    A.  Yes.
2    Q.  Okay.  And the first one says that employee's
3 employment with the company will not violate or conflict
4 with any obligations employee owes to any individual or
5 entity, including without limitation obligations arising out
6 of or relating to any non-compete, non-disclosure or
7 non-solicitation or confidentiality provisions; do you see
8 where it says that?
9    A.  Yes.
10    Q.  Do you think that's a reasonable request?
11    MS. KREITER:  Object to the form.
12    THE WITNESS:  Yes.
13 BY MR. KAREN:
14    Q.  Okay.  And have you been notified in any way
15 that you violated section 1.8 of this agreement?
16    A.  No.
17    Q.  It also says, one of the other -- Roman numeral
18 little 2, it says, any prior -- that employee's employment
19 will not violate any prior employer or employment; do you
20 see where it says that?
21    A.  I do not.
22    Q.  Roman numeral 2, any prior employer or
23 employment?
24    A.  Yes.
25    Q.  Okay.  And then it continues, employee

Page 17

1 represents and warrants that he or she has not and will not
2 attempt to transfer loans or other documentation or
3 information to the company that are the property of his or
4 her previous employer; do you see that?
5    A.  Yes.
6    Q.  Okay.  And it continues on, except in the event
7 employee has obtained prior written -- I'm sorry, prior
8 written consent from the customers whose information is
9 being transferred and from his or her previous employer; do
10 you see that?
11    A.  Yes.
12    Q.  Okay.  And, again, no one has in any way
13 reprimanded you or disciplined you for violating section
14 1.8, have they?
15    A.  With Waterstone?
16    Q.  With Waterstone.
17    A.  No.
18    Q.  And I presume nobody else has reprimanded or
19 disciplined you either, right, for section 1.8?
20    A.  Not to my knowledge.
21    Q.  One question I just wanted to go back to.  On
22 the -- we saw that compensation P&L model you referred to.
23    A.  Yes, sir.
24    Q.  Do you recall that a minute ago?
25    A.  Yes, sir.

5 (Pages 14 - 17)

Page 18

1    Q.  The money that's -- okay.  Let's just take a
2 step back.
3         You originate loans for Waterstone or I should
4 say -- strike that.
5         People in your branch originate loans for
6 Waterstone, right?
7    A.  Correct.
8    Q.  You don't actually originate loans?
9    A.  I do.
10    Q.  You do?  You do.  Okay.  So you're a producing
11 manager?
12    A.  Correct.
13    Q.  But you don't get paid on personal production;
14 is that right?
15    A.  Correct.
16    Q.  Okay.  So all you get is the override less those
17 costs we talked about?
18    A.  Exactly.
19    Q.  But you do produce loans yourself?
20    A.  I do.
21    Q.  And when you and your branch originate loans,
22 you guys make money, right, for originating them?
23 Commissions?
24    A.  Correct.
25    Q.  Overrides, right?

Page 19

1    A.  Correct.
2    Q.  And is it fair to say at least the goal is that
3 Waterstone makes money on those loans, too?
4    A.  Correct.
5    Q.  And, I mean, that's -- tell me if I'm wrong, for
6 bank -- mortgage bank with Waterstone, it primarily makes
7 money off of those loans by selling them service release
8 premiums; is that right?
9         MS. KREITER:  Sorry, the videographer is
10    indicating that Mark Carrol is joining or wanting to
11    be admitted.
12         THE WITNESS:  Sorry, can you repeat the
13    question?
14         MR. KAREN:  Sure.  I mean, it was a long one.
15 BY MR. KAREN:
16    Q.  So if you could explain the business a little
17 bit to me, okay.  When a mortgage bank -- how long have you
18 been in mortgage banking by the way?
19    A.  Since 2004.
20    Q.  Okay.  And I should have --
21    A.  I was out for a period of five years or so.
22    Q.  Okay.  And so since 2009 pretty much
23 consistently you've been in mortgage banking?
24    A.  2004 to approximately, I don't remember the
25 dates, 2010, 2011 to 2016, 2017.

Page 20

1    Q.  So you were out of --
2    A.  That was a gap in between there.
3    Q.  Okay.
4    A.  I worked for Humana --
5    Q.  Got it.
6    A.  -- at that time.
7    Q.  And then since 2016 you've been back in mortgage
8 banking --
9    A.  Approximately 2016, 2017.
10    Q.  Where did you work prior to Mutual of Omaha?
11    A.  I was going to school and bartending.
12    Q.  Did you work for a company called Synergy One?
13    A.  Yes.
14    Q.  What was Synergy One?
15    A.  I'm trying to think.  I can't remember, it was
16 Synergy One doing business as.  I can't remember.  I've been
17 at multiple mortgage companies, five, six, seven, with the
18 same group with Chris Smith, but they were, you know, they
19 buy one out or we transferred to a different company.
20    Q.  Okay.
21    A.  I would have to think about it with that.
22    Q.  Okay.
23    A.  Synergy One was doing business as somebody.  I
24 don't remember.
25    Q.  But that was a different lender, yes?

Page 21

1    A.  That was before, that was after 2004.
2    Q.  Yes.  Yes.  Let's go backwards.
3    A.  That was a different lender.
4    Q.  Okay.  And that was the lender you worked with
5 prior to Mutual, right?
6    A.  Yes.
7    Q.  Okay.  Do you know if Synergy One was acquired
8 by Mutual or did you guys --
9    A.  There we go, Synergy, yes.  I believe Synergy
10 One and Mutual were together might I say.  I don't remember
11 the relationship.
12    Q.  Okay.  And who did you work with prior to
13 Synergy One, was that when you were bartendering?
14    A.  That was Humana.
15    Q.  That was Humana, okay.
16    A.  Um-hmm.
17    Q.  Why did you leave the industry to go work for
18 Humana?
19    A.  At the time it was I just had two small kids, I
20 was driving to Lake Mary, the market was crashing at the
21 time, it just -- stressful, not making money and said I had
22 to spend more time with family so I'll go do something else.
23    Q.  And that was, you said, I think around 2011?
24    A.  I think that's somewhere around there.  Yes, I
25 don't remember the exact date.

6 (Pages 18 - 21)

Page 22

1    Q.    And that was right around the time when all of
2 those foreclosures were really hitting Florida bad, right?
3    A.    Correct.
4    Q.    So the Florida market was not great?
5    A.    Correct.
6    Q.    Okay.  I understand.  What caused you to jump
7 back into the industry?
8    A.    I was talking to Chris Smith, who I've always
9 worked with previous, asked how he was doing and he was
10 doing well so I decided to get back in.
11    Q.    How do you know Chris, by the way, originally?
12    A.    He was my boss at Ameriquest.  He was my
13 regional manager when I was a branch manager --
14    Q.    What years?
15    A.    -- with Ameriquest and that was 2004.
16    Q.    And that was when you --
17    A.    2006.
18    Q.    And that's when you first got into the industry?
19    A.    Yeah, I was a loan officer first and then I got
20 promoted to branch manager, correct.
21    Q.    So he was essentially your first boss in the
22 industry?
23    A.    Well, he was my -- he was my second.  I mean,
24 Rich Williams was my boss and he took over for the regional
25 manager, at the time was Mario Demarin (phonetic), he took

Page 23

1 over for him.
2    Q.    Got it.  Okay.  And you guys have kind of just
3 stayed together ever since, for the most part?
4    A.    Correct.
5    Q.    Okay.
6    A.    He's one of my good friends.
7    Q.    Were you guys friends outside of or prior to
8 working at Ameriquest?
9    A.    Ameriquest was more business.  I mean, we
10 became -- when I left Ameriquest, him and I, he brought me
11 into Florida -- I was always in Florida but wanted me to
12 open Lake Mary and then we became friends and we've worked
13 together at every place since.
14    Q.    Right.  My question is, did you know Mr. Smith
15 prior to working at Ameriquest --
16    A.    I did not, I'm sorry.  I did not.
17    Q.    No, that's okay.  And just again, sir, it
18 doesn't bother me at all, but I'm just trying to make this
19 easy for the court reporter.  Just try to let me finish my
20 question, if that's okay.
21         All right.  So let's now turn back or let me
22 change direction for a minute.  So you bring in loans and
23 the goal is that from those loans in the mortgage banking
24 business, Waterstone takes those loans and sells them,
25 right?

Page 24

1    A.    To my knowledge.
2    Q.    Okay.  Or services them?
3    A.    Correct.
4    Q.    Okay.  And Waterstone then makes money off the
5 sale or services of those loans, yes?
6    A.    To my knowledge.
7    Q.    Or at least that's the goal?
8    A.    That's the goal.
9    Q.    So every loan you bring to Waterstone is
10 essentially an opportunity for Waterstone to make money; is
11 that fair to say?
12         MS. KREITER:  Object to the form.
13         THE WITNESS:  I would think so.
14 BY MR. KAREN:
15    Q.    And that's certainly your goal, is to bring as
16 many loans as possible to Waterstone, right?
17    A.    To give as good as customer service as possible
18 and do as, you know, obviously have a -- you know, a
19 producing branch that can support my family is the goal.
20    Q.    Well --
21    A.    I mean, that's the real goal.
22    Q.    The real goal is to make money, right?
23    A.    Exactly, yeah.
24    Q.    We all have that goal.  But I'm asking from a
25 corporate perspective, is it fair to say that the goal for

Page 25

1 you is to maximize your volume with performing loans?
2    A.    That's my goal, that's correct, that makes
3 money.
4    Q.    For you and the company, yes?
5    A.    Correct.
6    Q.    All right.  Now I want to go back to this
7 employment agreement where it says article 5, it's on page
8 9.  And is it fair to say -- well, strike that.
9         If you read section 5.1(a) and if you could just
10 read that first paragraph to yourself, I'm going to ask you
11 some specific questions about it.
12    A.    Okay.
13    Q.    Okay.  So if you go midway down, this defines
14 what Waterstone thinks is confidential, right?
15    A.    Correct.
16    Q.    And the first thing -- the second thing it
17 mentioned, the second little bullet point here it says
18 essentially anything's confidential that gives the company a
19 competitive business advantage; do you see where it says
20 that?
21    A.    Yes.
22    Q.    And then it continues, or opportunity of
23 obtaining such advantage or disclosure of which would be
24 detrimental to the interest of the company; do you see where
25 it says that?

Page 26

1    A.  Yes.
2    Q.  Do you think that's a reasonable definition of
3 confidentiality from your perspective?
4        MS. KREITER:  Object to the form.
5        MR. KAREN:  You can answer.
6        THE WITNESS:  Yes.
7 BY MR. KAREN:
8    Q.  Okay.  And let me ask you something:  Is there
9 anything that is unique about Waterstone as a mortgage bank
10 that makes the information it considers confidential
11 different from the information another company -- another
12 similar company would consider confidential?
13    A.  No.
14    Q.  Okay.  So the information that's confidential at
15 the Waterstone should kind of be the same as the information
16 that's confidential at Mutual, right?
17        MS. KREITER:  Object to the form.
18        MR. KAREN:  You can answer.
19        THE WITNESS:  Correct.
20 BY MR. KAREN:
21    Q.  And as we continue on this -- in this paragraph,
22 Roman numeral 3, little three says, information that is
23 designated as confidential material by the company is known
24 by the employee to be confidential or for all relevant
25 circumstances should be considered confidential; do you see

Page 27

1 where it says that?
2    A.  Where are we at?
3    Q.  Roman numeral 3.
4    A.  I do.
5    Q.  Okay.  And, again, you don't have any problem
6 with that definition, that seems reasonable to you?
7    A.  Yes.
8    Q.  Okay.  And if you continue on, sir, then there's
9 a bunch of little -- another set of Roman numerals defining
10 information that's confidential, it starts with little Roman
11 numeral 1, it says, internal, personal and financial
12 information; do you see that?
13    A.  Um-hmm.
14    Q.  Yes?
15    A.  Yes.
16    Q.  Okay.  And would you agree that's also a
17 reasonable definition of concluding this information is
18 confidential?
19        MS. KREITER:  I'm going to object to the form.
20    In addition, to the extent that you're asking the
21    witness for his opinion on reasonableness as a lay
22    person, that is not the same as reasonableness from a
23    legal perspective or enforceability analysis.
24        MR. KAREN:  Okay.  You can go ahead and answer.
25        THE WITNESS:  Repeat the question?

Page 28

1 BY MR. KAREN:
2    Q.  Where it says in terms of confidentiality, it
3 say information that's confidential includes internal,
4 personal and financial of the company, purchasing and
5 internal cost and revenue information, internal service and
6 operational manuals; do you see that?
7    A.  Yes.
8    Q.  Okay.  And do you have any problems, do you
9 think that shouldn't be considered confidential personally
10 from your perspective?
11        MS. KREITER:  Object to the form.
12        THE WITNESS:  No.
13 BY MR. KAREN:
14    Q.  And then it says, number 6, if you look down,
15 confidential and proprietary information provided to the
16 company by any actual or potential customer or other third
17 party; do you see where it says that?
18    A.  Yes.
19    Q.  And you would agree with me, again, that that
20 should be considered confidential, right?
21        MS. KREITER:  Object to the form.
22        THE WITNESS:  Right.
23 BY MR. KAREN:
24    Q.  Now these provisions in section 5.1, did you
25 draft them with Waterstone or did Waterstone just give this

Page 29

1 to you and you didn't have a problem with it and signed it,
2 if you understand my question?
3    A.  Yeah, I signed it, but I didn't draft it.
4    Q.  So this wasn't something you guys negotiated
5 back and forth and changed the words on, right?
6    A.  No.
7    Q.  They just gave it to you?  And, again, if you
8 didn't agree with something you would tell them, right?
9    A.  Yes, if I read it.
10    Q.  And then I'd like you to turn to page 12 and if
11 you could go to section 6.6.  I'm going to read this bullet
12 to you, it says indemnification; do you see where I'm
13 pointing, sir?
14    A.  Yes, sir.
15    Q.  Okay.  To the extent permitted under applicable
16 law employee hereby agrees to indemnify and defend company
17 and its principals for any and all attorneys' fees, costs of
18 prudent settlement, judgments, fines, or damages incurred by
19 company as a result of employee's breach of the terms of
20 this agreement; did you follow along with me on that?
21    A.  Yes.
22    Q.  Okay.  And, again, I think you answered this
23 question, so I just want to make sure, I don't know if I
24 asked:  No one has indicated to you that you may have an
25 obligation to indemnify Waterstone for the allegations in

8 (Pages 26 - 29)

1 this lawsuit, right?
2     A.  Not to my knowledge.
3     Q.  No one's suggested that to you?
4     A.  Not to my knowledge.
5         MS. ZIEBELL:  Ari, can we take a quick break?
6 Maria, is that okay?  Can we take a quick break.
7         MS. KREITER:  Sure.
8         THE VIDEOGRAPHER:  Is that all right, sir?
9 Going off the record.  The time is 9:34.
10            (Off the record.)
11        THE VIDEOGRAPHER:  We're back on the record.
12 The time is 9:56.
13        MS. KREITER:  So I need to put on the record,
14 during the break Ms. Ziebell alerted me to the fact
15 that Ari Karen, the attorney representing Mutual in
16 this case was previously representing Waterstone.  In
17 fact, Mr. Karen was lead counsel for Waterstone for
18 nearly 10 years in a case that involved employment
19 practices.  That representation required Mr. Karen to
20 be in close communication with Waterstone leadership
21 and branch managers regarding employment matters.
22        Importantly, that representation included
23 drafting the Waterstone employment agreement that is
24 now marked as Deposition Exhibit No. 1.  Waterstone
25 objects to the entire line of questioning by Mr.

1 Karen of this witness or any other witness due to a
2 clear conflict of interest by opposing counsel.  The
3 work-product of opposing counsel for its former
4 client Waterstone is now being used at a deposition
5 in which Waterstone is the adversary.  We ask that
6 opposing counsel refrain from any questioning of the
7 witness based on his work-product, namely, the
8 Waterstone employment agreement.
9         MR. KAREN:  Okay.  Well, let me respond to that.
10 That agreement is nothing I drafted.  What I drafted
11 for Waterstone was in 20 -- over ten years ago.  That
12 is not the same agreement.  I have -- you could
13 compare any agreement I drafted, I don't have that
14 language in there.  It doesn't look like anything
15 I've ever drafted.  So that's just simply wrong.
16        I realize you guys know how bad that just, but
17 if you had any concern about this alleged conflict of
18 interest, I have been noticed in this case for, I
19 don't know how long.  I have been -- you knew I was
20 taking this deposition and to try to raise this now
21 is, frankly, desperate.
22        So you can make whatever objections you want and
23 we'll have the court rule on it, but if you think
24 there's a conflict of interest, you should get the
25 judge on right now, because I'm going to ask whatever

1 I feel like asking.
2         MS. KREITER:  I do think there's a conflict of
3 interest.  You may dispute this is your agreement
4 that is contested.  So for purposes of this
5 deposition, which I did not understand that you were
6 taking, but, regardless, this is the first time that
7 a Waterstone agreement drafted by you from
8 Waterstone's perspective --
9         MR. KAREN:  It isn't drafted by me.
10        MS. KREITER:  -- let me finish for the record --
11 our position is that it is drafted by you.  If you
12 want to do a comparison later and illustrate that
13 it's materially different, so be it.  My
14 understanding right now is that Exhibit 1 put into
15 evidence by you was drafted by you.  So I'm not going
16 to permit questioning of the witness --
17        MR. KAREN:  Let's get the judge on the phone.
18        MS. KREITER:  -- about Exhibit 1.
19        MR. KAREN:  Let's get the judge on the phone
20 right now.
21        MS. KREITER:  You should call him.  Because I
22 agree, this is not something where I want to waive
23 the conflict.  If you drafted this agreement and were
24 in communication with Waterstone managers --
25        MR. KAREN:  It's just simply not true.

1         MS. KREITER:  Then I think you do need to raise
2 it to the judge --
3         MR. KAREN:  I don't think I need to raise it to
4 the judge.  You're the one who makes an objection.  I
5 get to ask my questions.  If you want to file a
6 motion, you file a motion.
7         MS. KREITER:  I'm going to instruct the witness
8 not to answer any questions about Exhibit 1 at this
9 deposition.
10        MR. KAREN:  Well, fortunately I'm pretty much
11 done with it anyhow.  But notwithstanding, you know,
12 we are going to have this issue tomorrow, so we
13 should discuss now because I plan on asking those
14 questions tomorrow.
15        MS. KREITER:  I will similarly object and
16 instruct the witness not to answer questions based on
17 Exhibit 1 tomorrow.
18        MR. KAREN:  Then we should probably talk
19 offline, we don't have to do this right now.
20        MS. KREITER:  I --
21        MR. KAREN:  Just hear me out for one second,
22 okay, before you object.  I am suggesting maybe we
23 talk about tomorrow because I really don't want to
24 come down, take a deposition, have to come down and
25 do the deposition again, and I'm sure you can

9 (Pages 30 - 33)

Page 34

1  appreciate that.
2       So what I'm saying is, if this is going to be an
3  issue let's -- we don't have to do it now, we can go
4  offline afterwards and have a discussion and figure
5  this out, but we should probably do that before
6  tomorrow's deposition starts because I don't want to
7  have to bring people back and I don't want to fly
8  back down here for that. I'm sure you can appreciate
9  that.
10       MS. KREITER: I can appreciate that. I'm
11  willing to have further discussions, but if you feel
12  that you need to move to compel the testimony and you
13  feel you need to contact the court, I think that that
14  should be probably done by you, because I am not
15  allowing this witness to, you know, to provide
16  testimony at the deposition.
17       Our position is that it is a conflict of
18  interest and I don't want it waived by way of
19  questioning at the deposition today.
20       MR. KAREN: I understand your objection. As I
21  said, I think it's a moot point anyhow because I'm
22  done with that exhibit. So we can move on, I'm not
23  going to fight about something today that -- there's
24  nothing to fight about because I already asked my
25  questions, but not withstanding we can move forward.

Page 35

1       Mr. Hutto, I just want to go on the record -- we
2  took a -- I would also suggest and may I add that I
3  was making these questions for a good 30 minutes,
4  that was almost the entirety of my first 30 minutes
5  of depositions and not once did I hear that
6  objection. So in terms of it not being waived, I
7  think ship sailed. But, again, we'll go on with
8  that. We'll --
9       MS. KREITER: I will put on the record that
10  Ms. Ziebell alerted me to the representation, the
11  scope of it during the break. I think that we raised
12  the issue as promptly as possible and my position on
13  behalf of Waterstone stands.
14       MR. KAREN: Okay.
15  BY MR. KAREN:
16    Q.  All right. Now, in terms of -- and, Mr. Hutto,
17  I just want to say for the record, we went off record at
18  9:36 and you guys came back at 9:56, and the court reporter
19  can confirm that. So after about 30 minutes of questioning
20  we had about a 20-minute break. And my question is that
21  during that period of time -- I don't want anything other
22  than a yes or no on this question, okay -- did you guys
23  discuss the subject of your testimony?
24       MS. KREITER: We discussed the matters that I
25  just put on the record.

Page 36

1       MR. KAREN: This is a question for Mr. Hutto,
2  not for you.
3       Mr. Hutto, could you answer, please.
4       THE WITNESS: No.
5  BY MR. KAREN:
6    Q.  What did you do to prepare for today? And,
7  again, I don't want anything said to your -- between you and
8  the lawyers, okay?
9    A.  Not a lot.
10    Q.  Tell me what you did do.
11    A.  I met with her for approximately two hours maybe
12  yesterday.
13    Q.  And her being?
14    A.  I'm sorry, My attorney.
15    Q.  Maria?
16    A.  Yes, correct.
17       MR. KAREN: And, I'm sorry to call you Maria, if
18  that's okay. I'm not a last name person. So if
19  that's all right. I don't want to do --
20       MS. KREITER: That's fine.
21       MR. KAREN: -- anything to disrespect you. And
22  you can call me Ari, by the way.
23  BY MR. KAREN:
24    Q.  So did you review any documents?
25    A.  A few.

Page 37

1    Q.  What documents were they?
2    A.  I don't -- I don't remember.
3    Q.  Did you review your Waterstone employment
4  agreement?
5    A.  No.
6    Q.  All right. So let me ask you this, sir: If you
7  could take me back to sort of the beginning of when you
8  started thinking about coming over to Waterstone. Why don't
9  I do it this way, let me start Exhibit 3 [sic].
10       So when you've had a chance to look at that,
11  sir, let me know.
12    A.  I'm done.
13       (Plaintiff's Exhibit No. 2 was marked for
14  identification.)
15  BY MR. KAREN:
16    Q.  Okay. So this is an e-mail from Mike Smalley to
17  you at Mutual Mortgage and it's dated August 14, 2019.
18    A.  Correct.
19    Q.  Do you see that? First of all, do you recall --
20    A.  I do not.
21    Q.  Again, I'm sorry, I'm not trying to give you a
22  hard time, it's for the benefit of the court reporter.
23    A.  Sorry.
24    Q.  Yeah, no, no problem. Just let me, again,
25  finish, I'll try to do the same to you. And trust me, I'm

10 (Pages 34 - 37)

Page 38

1 sure I'll interrupt you at some point today, too, so it's
2 fair game.
3        The question for you is, I didn't see a
4 response, do you know if you responded to this e-mail?
5        A.  I usually don't.  I get a lot of them.
6        Q.  Okay.  I don't want to put words in your mouth,
7 you just tell me if I'm right.  Well, let me ask you this
8 way:  Did you begin talking to Waterstone about joining
9 Waterstone sometime around August or September of 2019?
10       A.  No, never.
11       Q.  Is this fair to say this was a
12 solicitation and you just sort of ignored it?  Let's not use
13 the word solicitation.  Strike that question.
14       Is it fair to say that -- well, you tell me, did
15 you respond to this e-mail?
16       A.  Not to my knowledge.  I usually don't.  I get a
17 lot of these, people recruiting, because of my personal
18 numbers and our branch numbers, phone calls, texts, e-mails.
19       MR. KAREN:  Exhibit 4.
20       THE COURT REPORTER:  I think that one is 3.
21 That was 2.
22       MR. KAREN:  That was 2, sorry, you're right.  So
23 this will be Exhibit 3.  If you can just take a quick
24 look at this, sir.  I'm not going to ask you about
25 the whole aspect of actually this e-mail, so...

Page 39

1        THE WITNESS:  I'm done.
2        (Plaintiff's Exhibit No. 3 was marked for
3        identification.)
4 BY MR. KAREN:
5        Q.  So this is an e-mail from Dustin Owen at
6 Waterstone to you, right, on your personal e-mail address,
7 right?
8        A.  Um-hmm.
9        Q.  Okay.  And that is your personal e-mail Dwayne
10 at Dwayne.Hutto@yahoo.com?
11       A.  Correct.
12       Q.  Do you have any other personal e-mail addresses?
13       A.  No. Not to my knowledge.
14       Q.  And this is dated October 8, 2021?
15       A.  Correct.
16       Q.  Okay.  And is that around the time -- before or
17 after you started talking to Waterstone in this instance
18 about it potentially joining?
19       A.  Yeah, we -- whenever I went, I was looking about
20 a year before I left Mutual, which I basically told
21 everybody, Brian Kiley (phonetic) all the way up to Jeff
22 Generalie (phonetic), that we're not happy.  So I met with
23 multiple, multiple, companies.  Actually there was a few
24 above Waterstone that was on the list at this time.  But,
25 yes, obviously I've reached out to them at some point here.

Page 40

1        Q.  Okay.  But my question is, is this around the
2 time you began talking to them?
3        A.  Correct, with multiple other companies, yes.
4        Q.  Yes, but I'm specifically --
5        A.  Yes.
6        Q.  -- I'm not asking about those companies, I'm
7 asking about Waterstone specifically.  Is this around the
8 time you started speaking to Waterstone?
9        A.  Correct.
10       Q.  Okay.  And is it fair to say this probably
11 wasn't the first conversation, because they already had your
12 personal e-mail address, you must have discussed something
13 with Dwayne [sic] prior to this e-mail; is that fair to say?
14       A.  I must have had a conversation with them,
15 correct.
16       Q.  Do you know, was this the first e-mail or
17 written communication you had with Waterstone prior to --
18 well, in regard to potentially moving over at this time?
19       A.  I don't remember if it was the first.
20       Q.  Okay.  In the first part of this e-mail Dustin
21 Owen writes to you, Dwayne, in case you are not enjoying
22 yourself or your buddy's yacht.  Do you know what he's
23 referring to there?
24       A.  My best friend owns At Last, a yacht.
25       Q.  At Last, is that the name of the yacht?

Page 41

1        A.  Correct.
2        Q.  Okay.  Is it like some famous yacht or something
3 or --
4        A.  Yes, it's just a big yacht.
5        Q.  How big is it, just out of curiosity?
6        A.  A hundred fifty foot.
7        Q.  Oh, that's a nice -- that's a nice yacht.  I'm a
8 boating person myself, so I'm impressed.
9        Okay.  And I guess you had had a prior
10 conversation with Dwayne -- I'm sorry, you're Dwayne -- with
11 Dustin and said, hey, I'm going to be on At Last or
12 something to that effect prior to this e-mail, right?
13       A.  I must have.  I don't remember the conversation,
14 but, yes.
15       Q.  And that's how he would have received your
16 personal e-mail because your personal e-mail isn't publicly
17 known; is that fair to say?
18       A.  Yes, sir.
19       Q.  Do you know why he e-mailed you at your private
20 e-mail versus the Mutual e-mail?
21       A.  I'm not sure.  I'm assuming I gave him my
22 personal e-mail.
23       Q.  Okay.  And is it fair to say these types of
24 conversations you prefer on your private e-mail than your
25 work e-mail?

11 (Pages 38 - 41)

Page 42

1    A.   Yes.
2    Q.   And that's -- I mean, I'm not blaming you, but
3  when people look for jobs they don't really necessarily want
4  their employer to know the details about it; is that fair to
5  say?
6    A.   Yes, I would think, yes.
7    Q.   And that's why you would have utilized your
8  private e-mail or told him to use your private e-mail and
9  not e-mail you at Mutual; is that fair to --
10   A.   I don't remember what I was thinking at the
11  time.
12   Q.   Is that a reasonable assumption from your
13  perspective?
14   A.   Yes.
15   Q.   Okay.  And they sent you some, I'll call them
16  promotional materials about Waterstone; is that a fair
17  characterization?
18   A.   It looks like material just basically showing
19  their process.  So if you want to call that promotional, I
20  guess.
21   Q.   Information about Waterstone?
22   A.   Correct.
23   Q.   Okay.  Do you recall reading that information?
24   A.   I do not.  And knowing me, I probably didn't.
25   Q.   Well, I guess what about those initial

Page 43

1  communications or conversations led you to want to continue
2  talking with Waterstone?
3    A.   We were looking for somewhere to go.  Like I
4  said, for at least a period of a year and we were just
5  narrowing it down and meeting with multiple banks, so...
6    Q.   I mean, do you recall something specifically --
7  like, in other words, you ultimately went to Waterstone and
8  not these other banks obviously, right?
9    A.   Um-hmm, correct.
10   Q.   Okay.  So what led you to continue the
11  conversations with Waterstone as opposed to some of those
12  other institutions, if you remember?
13   A.   I believe because Waterstone had a presence
14  already in our area.  So, you know, they already had a Port
15  Orange office, a lot of realtors.  I actually checked with
16  my realtors -- realtor partners more than I -- I put more
17  weight into them before I make a move.  We spent a lot of
18  money on marketing so I don't want to make the wrong move
19  when I change all my buses and things of that nature around
20  town.
21   Q.   Your buses?
22   A.   We have marketing buses I pay for for, you know,
23  that has Waterstone or actually had Mutual of Omaha all over
24  town on them.
25   Q.   Okay.  Let me make sure I clarify and

Page 44

1  understand.  This may sound like a stupid question.
2    A.   No, it's okay.
3    Q.   When you say marketing buses, do they ride
4  around marketing you guys or is there just like a banner on
5  a bus?
6    A.   It's a Voltran wrap on a bus.  Just a -- big
7  pictures of our team and, you know, just basically --
8    Q.   Okay.
9    A.   -- marketing Mutual of Omaha at the time for all
10  those years.
11   Q.   Basically a billboard on a bus?
12   A.   Correct.
13   Q.   Okay.  I know that's a rude --
14   A.   Yes, you're right, though.
15   Q.   All right.  Let me show you another Exhibit.
16  One of the things I should ask you about this -- never mind,
17  that's all.
18   A.   To elaborate on my question, if you don't mind,
19  though, to elaborate on the previous question, if you don't
20  mind, the Waterstone presence and then me asking what I did
21  with the few companies that we narrowed it down to, I went
22  to all my realtor partners and basically checked with them
23  for -- to see if they had any problem.  Like I said, because
24  when you make a move, you don't want to make the wrong move
25  and end up in the same position I was with Mutual and not

Page 45

1  having good customer service.
2        MR. KAREN:  This will be Exhibit 4; is that
3    right?
4        THE COURT REPORTER:  Yes.
5        (Plaintiff's Exhibit No. 4 was marked for
6    identification.)
7  BY MR. KAREN:
8    Q.   So this is an e-mail from you, Exhibit 4,
9  from -- I'm sorry, from Dustin Owen to you and Chris Wolf
10  and then some other people are copied.  And the e-mail says,
11  thank you for your time last week.  Every time we sit
12  together -- sit down together, we can't help to walk away
13  more confident than before that your mission and our support
14  could not be a better match.  There are many synergies, et
15  cetera, et cetera, right?  And then it continues -- and so I
16  want to first ask you about this:  This reflects time last
17  week; do you see that in the first sentence?
18   A.   First sentence, oh, yeah, thank you for your
19  time last week, correct.
20   Q.   Is it fair to say that you had met with them or
21  had a phone conversation with the Waterstone people a week
22  prior?
23   A.   Correct.
24   Q.   Okay.  Was that in person or by phone or Zoom?
25   A.   Probably Zoom.

12 (Pages 42 - 45)

Page 46

Q. Okay. And who would have been on that Zoom other than you and Chris?
A. I believe David Holbrook and Mike Smalley, to my knowledge.
Q. Okay. Now, by the way, this is the first time we see Chris Wolf's name; do you see that?
A. Um-hmm.
Q. Up at the top it says Chris Wolf.
A. Um-hmm.
Q. And it also has his personal e-mail address, right?
A. Correct.
Q. And your personal e-mail address?
A. Correct.
Q. And when did you tell -- well, first of all, who is Chris Wolf?
A. Chris Wolf is someone that we would work together back in 2003, '4, '5 at Ameriquest. He sat next to me as we were producers, became one of my best friends. Whenever we -- whenever I decided to get back in the mortgage industry, he was also in insurance like myself. I called him to help me basically and he manages the Ormond office.
Q. All right. So let me -- is he a branch manager?
A. Correct, yes, sir.

Page 47

Q. And are you a branch manager?
A. Yes, sir. Go ahead.
Q. No, please elaborate. If I'm getting this wrong, you know better than I do, so I want to hear your information.
A. Yeah, we're both in the Ormond office and we're based out of the Ormond office both the branch managers. I also help in Port Orange, too. There's a Port Orange office.
Q. Okay. Is that Chris Smitty's office?
A. No.
Q. Okay. And Chris Smitty, Chris Smith, I think his name --
A. Correct.
Q. Sorry, I'm reading the e-mails.
So what office does Chris Smith --
A. He's in Tampa.
Q. Okay. So at the time at Mutual you oversaw the Daytona office, correct?
A. The Ormond Beach office, correct.
Q. Which --
A. Yeah, yeah, Ormond Beach, that's correct.
Q. Which I think at Mutual it was referred to as the Daytona branch?
A. Correct.

Page 48

Q. Okay. And Chris Wolf, what branch did he oversee?
A. He was in there with us also.
Q. Is it fair to say that you're like co-branch managers?
A. If you want to say that.
Q. I mean, do you see it as him reporting to you and he's like your second in command?
A. Correct.
Q. All right. So you're in charge of the branch and he sort of assists you in that?
A. Correct.
Q. Okay. Is that still the way it works?
A. Yes.
Q. Okay. So is it fair to say generally that Chris Wolf follows your instructions and executes on your strategies?
A. I wouldn't say that.
Q. Okay. How would you -- how would you explain your professional relationship?
A. I would say that we both put our opinions in and I respect him a lot and respect his opinion a lot.
Q. Okay. Does he unilaterally act without your knowledge normally in significant matters?
A. Not normally and neither do I. I ask him also.

Page 49

Q. So it fair to say that you act in concert together?
A. Correct.
Q. Or at least generally?
A. Yes, sir.
Q. And certainly on important matters?
A. Correct.
Q. And this would have been -- the move to Waterstone would have been one of those important matters; wouldn't you agree?
A. Correct.
Q. So the things that you guys did, you were doing in concert together?
A. Correct.
Q. Okay. Now, when did you first tell Chris Wolf about Waterstone?
A. We discussed everything together.
Q. Understood, but I'm asking you if you could give me -- so let's use this -- we saw an e-mail in 2019, right, that I think you said you didn't respond to?
A. Yeah, it had no bearing on any of my -- I didn't even remember the e-mail.
Q. No, no, I totally understand that. Totally understand that. I'm just drawing this as a comparison. So I'm presuming, since you didn't respond or really think of

Page 50

1  it or recall it, you probably never talked to Chris Wolf
2  about it?
3      A.  No, he gets e-mails like I do.
4      Q.  Right.  So that was just --
5      A.  It's nothing we discuss.
6      Q.  Right.  Here it's clear, because he's on the
7  e-mail with you, that at some point you guys, you and Chris
8  Wolf, discussed Waterstone; that's a fair assessment, right?
9      A.  Correct.
10     Q.  And it would have been prior to this e-mail, of
11 course, right?
12     A.  Correct, that's several months before.  I don't
13 remember the exact.  I mean, we were looking a year plus
14 before to make a move.
15     Q.  Okay.  And I understand that, all I'm trying to
16 find out from you is if you can recall based on his e-mail
17 and the e-mail we saw -- maybe try to do it this way.  In
18 that the e-mail we saw about the boat a second ago that was in
19 October, had you spoken -- do you know if you had spoken to
20 Chris Wolf at that time about Waterstone?
21     A.  I had.  I had.
22     Q.  Okay --
23     A.  We didn't talk or meet -- I didn't mean to cut
24 you off -- we didn't talk or meet without both of us.
25     Q.  So back in October -- well, let me ask you this:

Page 51

1  Did you go to Chris Wolf or did Chris Wolf go to you to talk
2  about Waterstone?
3      A.  I don't remember.  I know on multiple occasions
4  he basically said realtors aren't happy, title companies
5  aren't happy, we're missing closings.  He was at a golf
6  tournament, title company told him that our closing
7  department is the worst in town, we're awful.  And we said
8  we have to do something.  I remember sitting with him over a
9  cocktail talking about it.
10     Q.  Okay.  And I understand that.  What I'm trying
11 to find out is when did you -- let me ask you this:  Did he
12 go to you and say, hey, how about Waterstone or did you go
13 to him and say how about Waterstone?
14     A.  I don't remember.
15     Q.  Okay.  From the e-mails that I've seen, and you
16 can tell me if I'm wrong, it looks like the initial contacts
17 with Waterstone were with you?
18     A.  I don't remember, but I don't think so.  I think
19 we were both -- both on any of the calls and it's -- once
20 again, we contacted -- we contacted pretty much anyone in
21 the area that our realtor partners liked that gave them good
22 customer service and our title companies liked.  So we would
23 rather have presence in the area than like we did with
24 Mutual and come out of the blue with somebody somebody's
25 never heard of, Mutual of Omaha Mortgage.

Page 52

1      Q.  So are you saying this change happened with
2  you and -- you and Chris initially reaching out --
3      A.  Correct.
4      Q.  -- to Waterstone?
5      A.  Correct.
6      Q.  And that would have been you and Chris Wolf
7  together?
8      A.  Correct.
9      Q.  And if you look further down in this e-mail it
10 says, last paragraph or second-to-the-last paragraph, by the
11 way we really appreciate the introduction to Smitty.  That
12 is Chris Smith; is that fair?
13     A.  Correct.
14     Q.  He's a good dude, we now know why you speak so
15 highly of him.
16     A.  Um-hmm.
17     Q.  Okay.  So it's fair to say based on this, you
18 told them to -- well, you introduced them to Chris Smith?
19     A.  Correct.
20     Q.  Okay.  And obviously you said nice things about
21 Chris Smith to Waterstone?
22     A.  Yeah, we -- Tim and I are basically are like
23 Chris Wolf, we all -- I've been with him on every mortgage
24 job I've ever had.
25     Q.  Okay.

Page 53

1      A.  We go together wherever we go.
2      Q.  So you and Chris Wolf call up Waterstone and
3  say, hey, I want to talk to you guys, it might be a good
4  partnership here, right?
5      A.  Well, yeah.  Yeah, we basically said we want to
6  find out more about your company.
7      Q.  Right.  And then you had a conversation
8  with Waterstone and then at some point after that first
9  conversation you said, hey, you should talk to Chris Smith?
10     A.  I had been talking to Chris Smith the whole
11 time.
12     Q.  Okay.  But in other words, vis-a-vis Waterstone
13 you would have told Waterstone you should talk to Chris
14 Smith?
15     A.  Yes.  I would have told them, out of Tampa.  You
16 know, like I said, we're a partnership team.  I don't go
17 anywhere without him, he don't go anywhere without me.
18     Q.  Okay.  Now you mentioned a few minutes ago
19 another branch, Orange?
20     A.  Port Orange.
21     Q.  Port Orange.
22     A.  Yeah, it's a newer branch that was previously
23 Waterstone and those guys retired and we took it over.
24     Q.  Okay.  Did you know coming in to Waterstone that
25 you were going to take over that branch?

14 (Pages 50 - 53)

1    A.  No.
2    Q.  That's something that happened after the fact?
3    A.  Yes, sir.
4    Q.  Okay.  And is that a benefit to you that you
5  have now another branch to oversee?
6    A.  It's small.  It's -- I don't look at it as that.
7  We don't have a lot of walk-in traffic.  A lot our things
8  come from referrals.  It's another expense, might I say.
9  But so far it hasn't been a benefit, might I say.
10    Q.  You're --
11    A.  Numbers-wise it hasn't been a benefit.
12    Q.  Okay.  But it's your hope that it will be one
13 day?
14    A.  It's my hope it will be one day.
15    Q.  Now you and Chris Smith and Chris Wolf, am I
16 wrong, really not you -- strike that.
17        At Mutual of -- at Mutual, I'm just going to
18 call it Mutual --
19    A.  That's fine.
20    Q.  Is that all right, we know what we're talking
21 about?
22    A.  Yes, sir.
23    Q.  Okay.  At Mutual you had the Daytona and the
24 Tampa branch, right?
25    A.  Yes.  Yes, Daytona and Tampa, that's what Mutual

1  calls it.
2    Q.  And were there any other branches in Florida, as
3  you recall, for Mutual?
4    A.  No.
5    Q.  Okay.  So you and -- well, Chris Smith managed
6  the Tampa branch?
7    A.  Correct.
8    Q.  And you and Chris Wolf managed the Daytona
9  branch?
10    A.  Correct, it was for -- yes, correct.
11    Q.  And were there any other managers of those
12 branches than just the three of you guys?
13    A.  Just us three.
14    Q.  Does -- do you know if Chris Smith has a, like a
15 co-manager like you do?
16    A.  I apologize, yes, he has John Utsch, U-T-S-C-H.
17    Q.  Did he have John Utsch back when you were at
18 Mutual?
19    A.  Yes.
20    Q.  So the four of you guys essentially controlled
21 all of Florida for Mutual?
22    A.  Correct.
23    Q.  Okay.  Why was it important for you -- would you
24 have gone -- if you could answer this, if you can't you
25 can't, you know.  Would you have gone to Waterstone if Chris

1  Smith objected and said I don't want to go?
2    A.  It would have been tough.  Probably not, but I
3  don't know.
4    Q.  Okay.  And is that because you guys see
5  yourselves better as a team than working against each other
6  as competitors?
7    A.  Yeah, I mean, it's someone I look up to, someone
8  that has been a mentor to me and it's someone that I, you
9  know, ask a lot of questions.  We didn't get a lot of
10 support from higher-ups at Mutual with Brian Tomalak and
11 Kylie Keene (phonetic), they hardly ever answered their
12 phone.  They kind of worked from home, might I say, if they
13 worked.  So I basically called him for any -- you know, he
14 was kind of like a mentor slash best friend also.
15    Q.  Okay.  But from a professional -- I mean, is it
16 fair to say you would not -- what's the old saying?  I'm
17 going to make a saying and tell me if it's right.  The sum
18 of all parts is better than the whole.  Do you know what I'm
19 talking about when I say that?
20    A.  Kind of sort of, but, yeah --
21        MS. KREITER:  Object to the form.
22        THE WITNESS:  Yeah.
23 BY MR. KAREN:
24    Q.  You understood what I was saying, right?
25    A.  We've always been together, put it that way.

1    Q.  And so you think professionally your combined
2  efforts are beneficial over being separate and working
3  separately for one another?
4        MS. KREITER:  Object to the form.
5        THE WITNESS:  I wouldn't say that.  I feel more
6        comfortable with him being at the company I'm at.
7  BY MR. KAREN:
8    Q.  Okay.  Do you think if you guys did separate
9  he'd be a formidable competitor to you?
10    A.  No.
11    Q.  Okay.  And why is that, because you're in
12 different geographic locations?
13    A.  Correct.
14    Q.  Okay.  But it certainly would reinforce your
15 presence in Florida to be together; would you agree?
16    A.  I don't think we look at it that way.  We -- it
17 really just comes down to customer service and closing out
18 loans on time.  I do a lot of purchases, keeping realtors
19 happy, keeping clients are the most important thing, happy,
20 and making sure they close on time.
21    Q.  But you do realize by your branches leaving,
22 that that would eliminate a lot of Mutual's business in
23 Florida?
24    A.  I didn't think about it that time.  I wasn't
25 worried about Mutual.  I had reached out to them multiple

15 (Pages 54 - 57)

Page 58

1  times for several years about the problem. Mutual is --
2  they are, might I say, I don't know the percentage, but
3  probably 90 percent refinance. They have big refinance call
4  centers. That's the oil that runs the machine. And I felt
5  like at the time I purchased business because I was top in
6  purchased business was put on the wayside and it was
7  affecting our customers was mainly my main concern.
8          I actually had a moving truck several times with
9  people from up north sitting in front of my branch and
10  Mutual couldn't close the loan on time, so they had to go
11  stay in hotels and that was my final straw.
12      Q.  Now, when -- before you introduced Waterstone to
13  Chris Smith, did you have a conversation with him and say,
14  hey, someone from Waterstone is going to call you or how did
15  you do that introduction, I guess is my question?
16      A.  I don't remember, I talk to Chris every day so I
17  don't remember.
18      Q.  So you don't know if you told Waterstone first
19  about Chris Smith and then -- here, listen to my question,
20  ok?  So you don't recall if you first told Waterstone about
21  Chris Smith and then Chris Smith about Waterstone or vice
22  versa; is that fair?
23      A.  I would have talked to Chris first.
24      Q.  Okay.  So you talked to Chris, told him about
25  Waterstone and then you introduced Waterstone to Chris?

Page 59

1      A.  Yeah, that would have been the way it was.  I
2  talked to Chris about multiple banks.
3      Q.  Okay.  Now, during the process of moving or
4  meeting with Waterstone, do you believe you were truthful at
5  all times with Waterstone?
6      A.  I believe so, yes.
7      Q.  So you don't recall any affirmative
8  misrepresentations to Waterstone during that process that
9  you made?
10      A.  I do not recall.
11      Q.  Okay.  And did Waterstone ever ask you if you
12  had an employment agreement with Mutual?
13      A.  I do not recall.
14      Q.  Do you know if you showed them -- showed
15  Waterstone your employment agreement with Mutual?
16      A.  Not to my knowledge.
17      Q.  So sitting here today, you can't recall
18  Waterstone asking you to see their -- again, sir, please let
19  me finish.  So sitting here today you don't recall
20  Waterstone asking to ever see your employment agreement with
21  Mutual?
22      A.  I do not.
23      Q.  And you don't even recall Waterstone asking if
24  you had an employment agreement with Mutual, right?
25      A.  I don't recall, I'm sure they probably did but I

Page 60

1  don't remember.
2      Q.  Okay.  So I just want to -- I'm not trying to --
3  I just want to make sure I understand.  You're pretty sure
4  they asked you, hey, do you have an employment agreement but
5  you don't recall at all them asking to see it?
6          MS. KREITER:  Object to the form.  Misstates the
7  testimony.
8          MR. KAREN:  You can answer.
9          THE WITNESS:  Yeah, I don't remember.  I don't
10  recall.
11          MR. KAREN:  Okay.
12          THE WITNESS:  Yeah, I've said it three times, I
13  don't -- I don't recall.
14  BY MR. KAREN:
15      Q.  Okay.  If Waterstone had asked you to see your
16  employment agreement, you would have -- with Mutual, you
17  would have sent it to them?
18      A.  If I could have found it, I would have sent it
19  to them.
20      Q.  And how would you have sent it?  Would you have
21  walked over and handed it or would you have sent it by
22  e-mail?
23          MS. KREITER:  Object to the form.
24          THE WITNESS:  I mean, I don't know at that time.
25  It depends on -- I wouldn't have walked over because

Page 61

1      that's a long walk from Daytona to Orlando, but I
2      would have had to e-mail it to them.  So, yes, that's
3      the way I would have had to do it if I would have,
4      you know, if they would have asked.
5          MR. KAREN:  Let me show you what's been
6      marked -- what I would like to have marked as
7      Exhibit 5.  Just take a quick look at this if you
8      could.
9          (Plaintiff's Exhibit No. 5 was marked for
10      identification.)
11  BY MR. KAREN:
12      Q.  Are you ready to proceed, sir, or are you still
13  reading?
14      A.  No, I'm ready.
15      Q.  All right.  So this is a letter that
16  Waterstone -- it says e-mail, this is an e-mail that
17  Waterstone sent to you; is that fair to say?
18      A.  I don't see the e-mail thing on there --
19      Q.  Well, I only refer to it because it says Dwayne
20  Hutto via e-mail at the top.
21      A.  Got you.  Okay.  Yeah.  Yes.
22      Q.  Do you see that?
23      A.  Yes, sir.
24      Q.  So I'm assuming it was sent to you via e-mail --
25      A.  Yes, sir.

16 (Pages 58 - 61)

Page 62

1    Q.  -- fair assumption?
2    A.  Um-hmm.
3    Q.  And on the bottom of this document it's dated
4  April 20, 2022 and it seems to be a -- either it's a
5  signature or an electronic signature; do you see that?
6    A.  Correct.
7    Q.  And is that yours?
8    A.  Yes, it looks like it, correct.
9    Q.  Do you know if that's an electronic signature or
10  if that's a -- it looks to be electronic if you look at the
11  back.
12    A.  It looks electronic.
13    Q.  And it's dated April 20th, right?
14    A.  Correct.
15    Q.  And is this a document that you did receive,
16  execute and return to Waterstone?
17    A.  Correct, it looks like it, yes.
18    Q.  And I wanted to point out to you, again, the
19  date of this is April 18th on the letter and it indicates
20  that you were going to receive one, two, three, fourth
21  paragraph, a $250,000 credit provided to your branch?
22    A.  Correct.  I believe that was for up and running.
23  We had quite a bit of bad months, might I say.  So it wasn't
24  money that was coming in my pocket, it was money pretty much
25  to keep us afloat through the change.

Page 63

1    Q.  And who is us?
2    A.  Me, basically, I mean --
3    Q.  I mean, well --
4    A.  Chris Wolf at the other side, but it's basically
5  me.  Keep water -- myself, my branch.
6    Q.  Okay.  Let's just clarify because I want to make
7  sure we get the right --
8    A.  Keep my branch up, up and running through the
9  change.
10    Q.  Okay.  So I'll just restate it to make sure I'm
11  clear about it, okay?
12    A.  Um-hmm.
13    Q.  So what we're talking about is here is $250,000
14  to bring your branch over and support your branch the first
15  couple of months?
16    A.  Correct.  We needed it because Mutual didn't pay
17  any of our people for seven -- six, seven, eight months, so
18  then I ended up using that money to pay the employees for
19  the month.  I believe we did right at 19 million the month
20  before so there was a quite a bit of money owed.
21    Q.  And this money, again, went to the branch P&L,
22  the 250,000?
23    A.  Correct.
24    Q.  Is it fair to say that all times you were
25  talking to Waterstone, you were talking to Waterstone about

Page 64

1  you coming over with your branch?
2    A.  At all times, no.  I was talking to multiple
3  banks, but, yes, I talked to them about it.
4    Q.  Let me rephrase the question.  At all times you
5  were talking to Waterstone, the understanding that you
6  had -- strike that.
7        At all times in your discussions with
8  Waterstone, those discussions surrounded you coming over
9  with your branch?
10    A.  Correct.
11    Q.  It was never just you alone?
12    A.  Well, no, it was me coming.  I hadn't told my
13  branch.  I was leaving no matter what.  Chris Wolf and I had
14  made the decision that we were leaving.  So, you know, I
15  hadn't made the announcement to my branch yet.  You know, I
16  did that later.
17    Q.  I understand that but I'm only asking in regard
18  to your conversation with Waterstone, the conversations that
19  you had with Waterstone surrounding you and Chris Wolf
20  leaving with your branch.
21    A.  Leaving with us, too, and my branch because it's
22  in my -- it's in my name.
23    Q.  Okay.  And is it fair to say, sir, that you
24  consider the branch -- I mean, you've used it a couple of
25  times so you just tell me -- but you consider the branch

Page 65

1  sort of yours?
2    A.  Not really.  I mean, it's -- I have a personal
3  guarantee for the payment on it so I consider it that, you
4  know, that I'm responsible for paying the bill.  But,
5  obviously, you know, the people that work with me, it's
6  their decision.  So Chris Wolf and I made the decision that
7  we're going together, but we leave that to them to make the
8  decision what's best for them and their families.
9    Q.  Sure.  I understand that.  But when you left
10  there wasn't going -- when you and Chris Wolf and Chris
11  Smith left, there wasn't really going to be a Mutual branch
12  left anyway at any point, right, because you were taking
13  everything; isn't that true?
14    A.  No, no, there wasn't going to be.  A lot of
15  those people that worked remote for Mutual, there's no
16  branches in the states, so they could always stay with
17  Mutual if they wanted.  I believe a few of them did and they
18  were fired by Mutual.
19    Q.  And, again, I just want to go back to the point
20  that when you were talking to Waterstone, those discussions
21  pretty early on centered around you bringing your branch
22  over and that's what the 250,000 was for?
23    A.  Never found about the 250,000 until the very
24  end.  Never knew anything -- that it was even going to be a
25  thing.  But really it was Chris Wolf and I, that was -- we

17 (Pages 62 - 65)

Page 66

1 made the announcement after we made a decision to come. But
2 I was never told about 250,000 until I had already made the
3 decision to come.
4    Q. Okay. I understand that. Okay. I think we've
5 covered this but, if you would look at the next --
6    A. Can I elaborate on that more? Can I elaborate
7 on the last question a little more?
8    Q. Sure.
9    A. It was actually on the golf course and was
10 shocked when he called me and said, you know -- I remember
11 this because I was in a golf tournament -- he said, hey, by
12 the way, you know, that was -- you're going to need money to
13 be afloat. I just figured that, you know, it was a -- I was
14 going to be hurting for a few months but I never knew about
15 the 250. That was not in the decision, like I said.
16    Q. I understand that, but you would agree with me
17 the 250 for the branch -- was to support the branch when it
18 came over, as it actually says in this e-mail, right?
19    A. To support Chris and I, correct.
20    Q. Well, let me see --
21    A. And the branch -- and the branch at the 900 West
22 Granada, Suite 4.
23    Q. Is that the address of the --
24    A. The Ormond Beach one, yes, sir.
25    Q. The Daytona branch for Mutual?

Page 67

1    A. Yeah, the one Mutual calls Daytona.
2    Q. Right.
3    A. They didn't figure it out.
4    Q. Okay. Now, I want to go down to the second page
5 of this e-mail. Can you turn the page with me?
6    A. Um-hmm.
7    Q. And it says, by signing this -- that's the third
8 or fourth paragraph, do you see where it starts by signing?
9    A. Yes, sir.
10    Q. By signing this offer and accepting employment
11 with Waterstone Mortgage, you affirmatively acknowledge that
12 you are not currently subject to any restrictive covenants
13 from previous employers that would restrict your ability to
14 perform the duties required by this position, including but
15 not limited to, any non-compete clauses; do you see that?
16    A. Yes, sir.
17    Q. So I'm asking, do you understand that a
18 restrictive covenant would be a non-solicit?
19    A. Yes.
20    Q. So this isn't a true statement, then, is it?
21    A. I don't understand what you're asking me.
22    Q. Well, if you were subject to a non-solicit --
23    A. Um-hmm.
24    Q. -- right, and -- that would be a restrictive
25 covenant, right?

Page 68

1    A. Okay.
2    Q. Okay. And this says you're not currently
3 subject to any.
4    MS. KREITER: Object. That's not what it says.
5 It says any restrictive covenants from previous
6 employers that would restrict your ability to perform
7 duties, and then it goes on.
8 BY MR. KAREN:
9    Q. Okay. Well, at this time you didn't -- well,
10 okay, so the point is you didn't -- well, let me ask you:
11 Did you understand this to mean that it was a representation
12 about Waterstone or about a prior employer before
13 Waterstone?
14    A. I don't remember reading this, to be honest with
15 you. But it's -- I don't remember even reading it.
16    Q. Okay. And no one has talked to you about this
17 and said, hey, you didn't tell us about a non-solicit you
18 had with Waterstone -- I mean with Mutual? No one at
19 Waterstone said that to you?
20    A. No, not to my knowledge.
21    Q. No one said, hey, you didn't tell us this,
22 there's a problem here, right?
23    A. Not to my knowledge.
24    Q. Well -- and at the time, just so I'm correct
25 about this -- at the time you signed it, it was April 18th,

Page 69

1 right?
2    A. Correct.
3    Q. And Waterstone at that time or April 20th
4 maybe -- I think I was wrong.
5    A. April 20th.
6    Q. Okay. At the time you were still employed by
7 Mutual, right?
8    A. Correct, until the 26th.
9    Q. So at the time Mutual wasn't your previous
10 employer, it was your current employer, right?
11    A. Mutual was my current employer at the time.
12    Q. Okay. If you go to the next page and you see
13 your signature below that on the bottom of this page 3,
14 right?
15    A. Yes, it looks like it.
16    Q. Okay. And the first statement says, Waterstone
17 will not request information or assets from your previous
18 employer; do you see where it says that?
19    A. Yeah, um-hmm.
20    Q. Now you had sent -- and I can show you these
21 e-mails if you don't remember -- but didn't you send your
22 P&Ls from Mutual to Waterstone at some point?
23    A. I did.
24    Q. Okay. And was that something they requested?
25    A. No, I think it was something that I just sent

18 (Pages 66 - 69)

Page 70

1  just to -- you know, they're not the only company that I
2  sent it to. I feel like if you're -- if you're interviewing
3  companies, might I say, to bring your business that they
4  need to know. But I didn't think about it at the time. Not
5  the smartest thing to do, I guess. But really, you know, it
6  was sent to multiple companies that I was trying to -- that
7  we were interviewing at the time.
8      Q.  So what it says there that Waterstone won't
9  request the information, that's different than them
10 accepting it if you sent it, right?
11     A.  Yes, they didn't request it.
12     Q.  Okay. They just accepted it when you sent?
13     A.  I'm not sure.
14     Q.  And then it says the loan's currently in your
15 pipeline. Now when it says the loan's currently in your
16 pipeline, did you mean that as your personal pipeline or the
17 pipeline of your branch? How did you interpret that?
18     A.  The pipeline of the branch.
19     Q.  Okay. Are property of your former employer. Do
20 you agree that the loans in your pipeline at Mutual were
21 Mutual's property?
22     A.  I agree.
23     Q.  Okay. And it says, so please ensure they
24 maintain ownership of those files. Do you see where it says
25 that?

Page 71

1      A.  And that's what we did, but I agree, yes, sir.
2      Q.  And this also applies to loan pre-qualification
3  that haven't moved to the application stage.
4      A.  Correct.
5      Q.  And you agree that was also Mutual's property,
6  right?
7      A.  Correct.
8      Q.  Okay. And you, in fact, people in your branch,
9  did in fact send the some loans over to Waterstone before
10 you guys moved over, right?
11     A.  I only remember -- we tried to close out, I
12 mean, everything we could. I don't remember the exact
13 number. I know we did 19 million the month before, I want
14 to say we closed 4-, 5 million. I know there was a file
15 that Mutual couldn't do that I sent over, Tariq I believe is
16 the name, but I never knew of any other files that was going
17 to Waterstone.
18         Every loan that could be closed with Mutual was
19 closed in Mutual because I thought I was getting paid on
20 those files, so did my people. It wouldn't make any sense
21 to send over -- first of all, we do a lot of purchases and
22 we have timelines, so when I take a -- you know, I would
23 never take something out of process and try to resubmit it
24 to another bank. That's not fair to Mutual and it wouldn't
25 be fair to our clients neither.

Page 72

1      Q.  Okay. But my question is, loans were sent over,
2  weren't they? Loans were sent over from people at your
3  branch to Waterstone while you were still --
4      A.  I personally know of one, which was mine. That
5  was turned down by Mutual.
6      Q.  Now this doesn't talk about whether a loan was
7  turned down or not, it just says currently in your pipeline
8  and pre-qualifications, right?
9      A.  Correct.
10     Q.  And when we saw your employment agreement
11 previously it had language that said something to the effect
12 without written permission; do you remember seeing that?
13     MS. KREITER:  Are you talking about -- are you
14     talking about the Waterstone employment agreement
15     again?
16     MR. KAREN:  Yeah.
17     MS. KREITER:  If so, don't answer.
18     MR. KAREN:  Okay. Again, I reserve my right to
19     bring him back and re-do this deposition following
20     application to the court and I will seek fees.
21 BY MR. KAREN:
22     Q.  Then it says, please refrain from copying or
23 otherwise recording your client's personal information from
24 your previous employer systems, in number two; do you see
25 that?

Page 73

1      A.  Yes.
2      Q.  Okay. And you did provide information from your
3  clients to Waterstone that was provided to you at Mutual,
4  didn't you?
5      A.  From the one client Tariq that was turned down
6  by them I did. I didn't think about it at the time. It
7  was -- you know, me -- my thoughts were this is a turn-down
8  loan, what it really was for, the client mainly, my realtor
9  partner that sent the loan that was a friend of theirs and
10 it was done basically through the portfolio line with
11 Waterstone. Mutual couldn't do that loan.
12     Q.  Well, sir, I mean, I'll represent to you and
13 I'll show you documents in a few minutes that show multiple
14 loans, so it's not just that one.
15     A.  Like I said, that's the one I know of.
16     Q.  Right, I understand that but there were multiple
17 loans. So my question is, that would have been violating
18 number 2, right?
19     MS. KREITER:  Object to the form. The witness
20     has testified he knows of one loan.
21     MR. KAREN:  I can ask this question. You can
22     answer.
23     THE WITNESS:  Yeah, I know of the one loan,
24     Tariq is one --
25 BY MR. KAREN:

19 (Pages 70 - 73)

Page 74

1    Q.  Okay.  But if there were multiple loans that you
2  sent, then that would violate number 2, right?
3        MS. KREITER:  Object to the form.
4        MR. KAREN:  You can answer.
5        THE WITNESS:  If I sent a loan, it was because
6    Mutual could not close the loan.
7  BY MR. KAREN:
8    Q.  Okay.  But, again, whether Mutual closed the
9  loan or not, this is about the information provided to
10 Waterstone?
11   A.  Yes.
12   Q.  I'm sorry, provided to Mutual?
13   A.  Yes.
14   Q.  So you agree with me that you didn't have to
15 send the information from Mutual, you could have the client
16 resubmit all the information to Waterstone, right?
17   A.  Correct.  I could have, I didn't think about it
18 at the time.
19   Q.  Okay.  But the point is, if in fact loans,
20 regardless of whether they could be closed or not, and the
21 information from customers was sent from Mutual to
22 Waterstone, that would violate number 2, right?
23       MS. KREITER:  Object to the form.
24       THE WITNESS:  Correct, I didn't think about it
25    at the time.

Page 75

1  BY MR. KAREN:
2    Q.  I understand.  But Waterstone would know when
3  you were sending information, right, the people at
4  Waterstone that worked for Waterstone -- just let me finish
5  the question -- would know when you were sending over files
6  from Mutual that it was in violation of number 2, right?
7        MR. KAREN:  Object to the form.
8        THE WITNESS:  I don't know.  I don't know what
9    Waterstone was knowing at the time.  I made, once
10   again, it was going to the customer service and
11   someone that was under a contract so they could close
12   on their loan.
13 BY MR. KAREN:
14   Q.  Sir, I understand what you're saying, I'm just
15 simply asking you, though.  If I e-mail you information and
16 it says from Mitchell Sandler to you, right?  And you get
17 that, you know it's coming from Mitchell Sandler, it's a
18 pretty reasonable assessment isn't it?
19       MS. KREITER:  You can answer that question but
20   you're asking him whether he knows --
21       MR. KAREN:  Stop the talking objections.  You
22   know what --
23       MS. KREITER:  -- whether if somebody else knew
24   that it was a violation.
25       MR. KAREN:  -- Courtney, let's get the judge on

Page 76

1  the phone.  This has just gone on long enough,
2  speaking objections.  We need to take a break and get
3  the court on the phone.  Do you want to -- you know
4  how these rules work, Maria.  I'm not going to play
5  these games with you, you and I have done this enough
6  times, and you know what will happen to you if I get
7  a federal judge on the line and I give him this
8  transcript, so just cut it out.
9        MS. KREITER:  I do know what will happen.  I
10   have lodged very simple form objections --
11       MR. KAREN:  No, you have done some but now
12   you're going --
13       MS. KREITER:  You've --
14       MR. KAREN:  -- and speaking, so stop the
15   speaking objections.
16       MS. KREITER:  I'm going to respond without
17   interruption.  You've asked this witness many
18   different times a compound question, he's tried to
19   answer many different times.  You're asking him
20   whether loans that's he's testified he is unaware of
21   violate --
22       MR. KAREN:  That's not my question.
23       MS. KREITER:  -- a contract provision and what
24   people at Waterstone think about that.  If you feel
25   that you need to call the judge about that, so be it.

Page 77

1  I will have the transcript read back in full and we
2  can have the judge decide --
3        MR. KAREN:  But it's not about that.
4        MS. KREITER:  -- I'm not behaving
5  inappropriately.  The vast --
6        MR. KAREN:  Yes, you are.
7        MS. KREITER:  -- the majority of my objections
8  have been I object to the form and nothing further.
9        MR. KAREN:  And I don't -- stop that.  But I
10 mean, I've listened to you come very close to,
11 frankly, defaming me today, very close, and, in fact,
12 I think you've crossed that line, okay?
13       MS. KREITER:  Okay.  Disputed.
14       MR. KAREN:  You can dispute everything you want,
15 there's a transcript and I'm glad because I can't
16 wait, I'm literally dying to get in front of a court
17 on this because you guys are going to look so
18 freaking bad when this is over.  I'm dying to show
19 that to the court.
20       MS. KREITER:  I will --
21       MR. KAREN:  The fact that you guys did that
22 knowing -- you're going to sit here and tell me,
23 Maria, I really can't believe this, you are a very
24 experienced, very good lawyer and for you to tell me
25 that you thought it was absolutely implausible that

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 78

1    I'd ask him about his employment agreement at
2    Waterstone in this type of deposition is, I'm sorry,
3    it's laughable. On top of that, for you to say you
4    didn't know I was taking the deposition, we had to
5    reschedule this because of some issues with my
6    daughter and what I needed to -- some stuff I needed
7    to do, which you knew about, which Courtney sent in
8    e-mails. So you guys knew both of those. So let's
9    just stop the games and get this deposition done,
10   okay?
11       MS. KREITER: I'm not playing any games, I
12   didn't know that you were taking the deposition. I
13   didn't know that you were going to use the Waterstone
14   agreement that you drafted at the deposition.
15       MR. KAREN: You -- okay. Well, again, you can
16   explain it to the judge, I think that's incredible,
17   as in not credible.
18   BY MR. KAREN:
19   Q. Mr. Hutto, I'd like you to go down to
20   paragraph -- second to the bottom where it says if you are
21   found.
22   A. Got you.
23   Q. Do you see where it says if you are found?
24   A. Correct.
25   Q. If you are found to be in violation of these

Page 79

1    guidelines and your previous employee [sic] consequently
2    takes legal action against you, this may result in changes
3    to your employment status with Waterstone, right? Do you
4    see where it says that?
5    A. Correct.
6    Q. Okay. And you know legal action has been taken
7    here, right?
8    A. Um-hmm.
9    Q. Yes?
10   A. Yes, sir.
11   Q. Okay. And there has been no changes to your
12   employment status with Waterstone, right?
13   A. No, sir.
14   Q. And, no, being that I'm correct about that,
15   right?
16   A. Correct.
17   Q. Okay. One thing I also wanted to ask you about
18   this, sir, when you made -- going back to the paragraph that
19   starts with by signing this offer, on page 724, can you put
20   that in front of you?
21   A. 724, all right.
22   Q. And where it says you affirmatively acknowledge
23   you are not currently subject; do you see where it says
24   that?
25       MS. KREITER: I'm sorry, where are you?

Page 80

1       MR. KAREN: At the third paragraph, it says by
2    signing this offer.
3       THE WITNESS: Yeah, I got it.
4    BY MR. KAREN:
5    Q. You there?
6    A. Yeah, I got it. Yes, sir.
7    Q. And this was April 18th, April 20th, I think,
8    right?
9    A. 20th, yes, sir.
10   Q. And you had already advised Waterstone at this
11   point that you had an employment agreement with Mutual, I
12   think you said, right?
13   A. I don't remember.
14       THE VIDEOGRAPHER: Can we go off the record for
15   ten seconds?
16       MR. KAREN: Yeah.
17       THE VIDEOGRAPHER: This is the end of media one.
18   We're going off the record at 10:54.
19       (Off the record.)
20       THE VIDEOGRAPHER: This is the beginning of
21   media number two. We're back on the record at 10:54.
22   BY MR. KAREN:
23   Q. And, sir, I don't think I asked this exact
24   question; if I did, I apologize. But if Waterstone had in
25   fact asked if you had an employment agreement with Mutual,

Page 81

1    you would have told them the truth that you did, right?
2    A. Correct.
3    Q. And I think you said this again, but you just
4    don't recall -- hold on, let me finish the question -- you
5    just don't recall if they asked to see it, right?
6    A. I do not recall, no, sir.
7    Q. If you -- if they would have asked, you would
8    have sent it?
9    A. Yes, sir. I would have had to find it but I
10   would have sent it to them.
11   Q. I mean, if you can answer, you know, that's
12   fine. But would you have sent it from your private e-mail
13   or would you have sent it from your Waterstone e-mail -- I
14   mean from your Mutual e-mail?
15   A. I don't know. I've obviously sent stuff from my
16   Mutual e-mail before so who knows with me.
17   Q. Okay. Would there have been any other e-mail
18   address you would have sent it from?
19   A. It would only have been Mutual or the one that
20   we were using in the past, my previous,
21   Dwayne.Hutto@yahoo.com.
22       MR. KAREN: Give me a second, I'm just going
23   through things to streamline this for you.
24       THE WITNESS: Okay.
25   BY MR. KAREN:

21 (Pages 78 - 81)

Page 82

1    Q.   Sir, I'm showing you an e-mail that appears you
2  sent to Mr. Owen, I think that's Dustin Owen at Waterstone
3  on -- it looks like February 17th; do you see that?
4    A.   Yes, sir.
5        MR. KAREN:   And I will represent to you and to
6  counsel, this is not the complete P&L -- the complete
7  P&L is like 50 pages and I just was going to ask
8  about the first couple, so I hope there's no problem
9  with that.
10       MS. KREITER:   I can understand saving on the
11 volume.
12       MR. KAREN:   Yeah, to -- you know -- plus I had
13 to carry it here, so, you know.
14       (Plaintiff's Exhibit No. 6 was marked for
15 identification.)
16 BY MR. KAREN:
17   Q.   All right.  So this e-mail says Dwayne Hutto
18 exchange, exchange administrative group, I don't know what
19 all that stuff means.  Do you know what this --
20   A.   I don't know what that means.  Sorry, I didn't
21 mean to cut you off.
22   Q.   You're killing me on the interruptions.
23   A.   Sorry.  I'm sorry.
24   Q.   I'm just giving you a hard time, it's fine.
25 It's fine.  I usually do that to people, so turnabout is

Page 83

1  fair play.
2        So you don't know if this was your personal or
3  your professional or your Mutual e-mail, right?
4    A.   I don't.
5    Q.   Okay.  That's fine.  But the date is right,
6  February 17th?
7    A.   Yes, sir.
8    Q.   Okay.  And this was your P&L from the Daytona
9  branch of Mutual; is that correct?
10   A.   Yes, it looks like it, yes.
11   Q.   If you could turn the page I want to ask you
12 about some things.  Let me first ask you if you know -- I
13 know you're not a lawyer, but how much you -- just tell me
14 how much you know about this question I'm asking you.  You
15 know there are rules about how loan officers and branch
16 managers get compensation when placed under Dodd Frank; are
17 you aware of that?
18   A.   I am not.
19   Q.   So you don't have any knowledge of the things
20 you can or can't do in terms of compensation legally in the
21 mortgage business?
22   A.   I do not.  I leave that up to legal that's doing
23 the P&L.
24   Q.   Okay.
25   A.   With Mutual or Waterstone.

Page 84

1    Q.   You just saved yourself about ten minutes of
2  questions, so congratulations.
3    A.   Perfect, I like that.
4    Q.   All right.  So I just want to go down the line
5  of a couple of these P&L items.  You know, again, this is --
6  it says on the top left corner Mutual of Omaha profit and
7  loss statement.
8    A.   The first page?
9    Q.   The first page, is that right?
10   A.   Yes, sir.
11   Q.   And that's accurate, this is Mutual of Omaha
12 property, right?
13   A.   Yes, sir, yes --
14   Q.   Now -- I'm sorry, see I just did it to you.  And
15 if you go down, there's loan production income and there's
16 some columns underneath that; do you see those columns and
17 some statements underneath loan production income?
18   A.   Yes.
19   Q.   And one says gain or loss on sale of mortgage
20 loans?
21   A.   Correct.
22   Q.   What is a gain or a loss in the sale of mortgage
23 loan?
24   A.   To my knowledge, once again, I don't -- I'm not
25 involved in selling off of the loans; to my knowledge, it

Page 85

1  is -- if there's a profit or if, you know, the company is
2  losing money on the loan.
3    Q.   Okay.  So it's kind of like -- yeah, it's kind
4  of like profit on the loan?
5    A.   I would think so, yes.
6    Q.   Loosely stated.  And, again, that's not going to
7  be -- that's not public information; would you agree with
8  me?
9    A.   I don't know.  I'd have to go through it and see
10 what's public and what's not on it, but...
11   Q.   Do you have any reason to believe it's public?
12   A.   I don't know.  I'd have to go through every page
13 and some of it could be public, I'm not sure.
14   Q.   Okay.  And then it goes down to borrower
15 credits; do you see four down?
16   A.   Yes, sir.
17   Q.   And that reflects the amount of credits that the
18 branch is given to customers of the branch, right?
19   A.   Correct.
20   Q.   Okay?  And that's certainly -- and that's an
21 aggregate, the amount of total credits given to customers
22 who do loans with your branch, right?
23   A.   Correct.
24   Q.   And that certainly would not be a publicly
25 available figure, you would agree with me?

22 (Pages 82 - 85)

Page 86

1    A.  Yes, I would agree with that.  I wouldn't think
2  so.
3    Q.  And then another one down, the next one down is
4  tolerance cures; do you see where it says that?
5    A.  Correct.
6    Q.  I'm going to try this and you tell me if it's
7  right, okay?  A tolerance cure is when there's a problem on
8  a loan because something -- there might have been a mistake
9  on the loan and then you have to fix it because the
10  information provided to the borrower wasn't within a range
11  of accuracy; is that right?
12    A.  That is not correct, but I don't know the exact
13  term.  You would have to go to Chris Wolf for that.
14    Q.  Okay.  Can you tell me what you -- you're in the
15  industry so you probably know better than me.  How do you
16  explain tolerance cures, as best you can?
17    A.  I don't.  I don't, I'm just being honest.  I can
18  Google it on the next break if you want.
19    Q.  No.  No --
20    A.  I'm just being honest.
21    Q.  No, no, I understand that.  Listen, I only ask
22  you this --
23    A.  That's what Chris Wolf is for.
24    Q.  Okay.  So you're telling me you really have,
25  like, no idea of what a tolerance cure is?

Page 87

1    A.  Yeah, no, I don't.
2    Q.  Okay.  All right.  But would you agree with me
3  that it's not publicly available information?
4    A.  I would not think so.
5    Q.  Okay.  Do tolerance cures occur on most loans?
6    A.  To my knowledge, I would have to go back and
7  look.
8    Q.  Okay.  So you just have absolutely --
9    A.  I really don't know.
10    Q.  Okay.  All right.  Then you keep going down to
11  overtime and that's the aggregate amount of overtime work at
12  your branch, under salary and benefits?
13    A.  Correct.
14    Q.  And, again, that's not going to be a
15  publicly available figure, right?
16    A.  I wouldn't think so, no, sir.
17    Q.  And let's continue now to one, two pages, three
18  pages later and this -- the first thing you should see is
19  depreciation expense.  Just to make sure we're on the right
20  page.
21    A.  Where are we at?  Which page are we, I'm sorry?
22    Q.  I think it's page --
23    A.  3?
24    Q.  1, 2, 3, 4, 5.
25    A.  5, okay.

Page 88

1    Q.  And the first line you should see is
2  depreciation expense.  Let me know if you're on that page.
3    A.  Yes, sir.
4    Q.  Okay.  And if you go down that, you're going to
5  see something called lead expense.
6    A.  Correct.
7    Q.  What is that?
8    A.  Lead expense is what we pay for myself, the P&L,
9  the branch, it's Zillow, Realtor.com, any type of leads that
10  are being bought for the branch for realtor partners, things
11  of that nature.
12    Q.  So if I understand this correctly, you might
13  partner with a realtor and buy X dollars of leads with that
14  realtor of potential customers who are interested?
15    A.  Correct, we're allowed to buy up to 50 percent.
16  If it's 2,000 we pay a thousand, they pay a thousand.
17    Q.  Okay.  But the lead expense is what this is
18  reflecting is those co-purchasing of potential leads?
19    A.  Correct.
20    Q.  Again, that's not going to be publicly available
21  information, right?
22    A.  I would not think so.
23    Q.  And then if you go down further, you see
24  something that says early payoff expense; do you see that?
25    A.  Go ahead, keep going, I know what it is.

Page 89

1    Q.  That's under loan related expenses.
2    A.  Got it, yes.
3    Q.  All right.  And that gives you -- an early
4  payoff is when a loan pays off very soon after it was taken
5  out?
6    A.  After six month -- six-month period, before the
7  six-month period you get an EPO.
8    Q.  Okay.  And what that means is that the company
9  who -- the mortgage bank that you work for essentially loses
10  the commission it received or the gain on the sale it
11  received from that loan if the loan pays off too early?
12    A.  Correct.  The mortgage company, to my knowledge,
13  the mortgage company.  I know the branch does and the loan
14  officer does.
15    Q.  And that's -- I think -- I mean, it makes some
16  sense because the whole nature of this business is selling
17  loans for the ability to receive future income and interest
18  and if that loan pays off too quickly the company that buys
19  the loan never got the interest, right?
20    A.  Correct.  The branch gets a penalty, the branch
21  pays back the commission and then the loan officer pays back
22  their commission.  To my knowledge that's the way it works.
23    Q.  Okay.  But that's what that line reflects?
24    A.  Yes, sir.
25    Q.  And, again, that's not going to be publicly

23 (Pages 86 - 89)

Page 90

1 available, right?

2   A.  I would not think so.

3   Q.  Okay.  And if you go two more down there's loan

4 repurchase expense; do you see where it says that?

5   A.  Yes, sir.

6   Q.  And just tell me again if I have this correctly.

7 Loan repurchase is when somebody who bought a loan from your

8 mortgage company comes back and for some reason and says

9 something was done wrong on this loan and you have to buy it

10 back because your company did something wrong in its

11 origination?

12   A.  I'm not as familiar with that as the EPO, to be

13 honest.

14   Q.  Okay.  Can you tell me -- just from your

15 knowledge of industry when a repurchase happens?  I'm just

16 trying to get some sense of it.

17   A.  I don't know.  I really don't.  The EPO I'm very

18 familiar with; the loan repurchase, it sounds bad, but I

19 don't know a lot about it.  I should have kept a better P&L

20 obviously or looked at it a little more in depth, but, no.

21   Q.  And again, I'm not suggesting this is bad or

22 good about your branch, I'm just trying to understand --

23   A.  Well, I'm being honest.  I really don't.  The

24 loan repurchase I'm not sure.

25   Q.  Okay.  So you don't -- you don't know -- do you

Page 91

1 even know what a repurchase is?

2   A.  I know the way it sounds but I don't know what

3 it is.

4   Q.  Do your best for me since you have --

5   A.  Repurchase I'm assuming that you've got to buy

6 the loan -- you've got to repurchase the loan back, which to

7 me would be the same as an early -- an EPO.

8   Q.  Okay.  All right.  But, again, that's not going

9 to be publicly available number, right?

10   A.  I wouldn't think so.

11   Q.  And you would agree that in assessing a branch,

12 right, as a prospective employer, this kind of information

13 is useful to assess it's profitability, right?

14   MS. KREITER:  Object to the form.

15   THE WITNESS:  I would think so.

16 BY MR. KAREN:

17   Q.  Okay.  Because obviously if you had a branch

18 with tons of repurchases and tons of early payoffs and tons

19 of tolerance cures, those would all be things that you would

20 want to know before you brought them on, right?

21   A.  I would think so.  It's -- that wasn't something

22 I was thinking about or I've never brought on branches.

23 But, me, I would look at the volume and their customer

24 service score, if I was in their shoes, but...

25   Q.  But if you were trying to figure out what to pay

Page 92

1 somebody -- you talk -- you hire loan officers, right?

2   A.  Correct.

3   Q.  And if you hired loan officers, how do you

4 figure out what you pay a loan officer?

5   A.  It's the same with everyone.

6   Q.  I'm sorry, I don't understand.

7   A.  I said, we've had set in the branch the same, we

8 don't pay one different than the other, it's a tier system

9 that we have.

10   Q.  Okay.  But if you had, for example, you were

11 hiring for a loan officer and you knew in particular one

12 officer had lots of loans get repurchased and a lots of

13 loans have early -- let me finish my question.  If you knew

14 that information, that would affect your hiring decision,

15 right?

16   A.  If I knew, but I would never ask.  So that's a

17 question I've never asked.

18   Q.  I understand.  I'm only asking if you had that

19 information, that would be very useful for you, wouldn't it?

20   A.  Yes.

21   Q.  Okay.  But usually you don't have that

22 information, right?

23   MS. KREITER:  Object to the form.

24   THE WITNESS:  No.

25 BY MR. KAREN:

Page 93

1   Q.  But here Waterstone did have that information

2 about your branch because you provided it to them, right?

3   A.  Correct, yes, I did provide it to them.

4   Q.  Now, you mentioned leads.

5   A.  Yes, sir.

6   Q.  Do you remember mentioning leads?

7   A.  Yes.

8   Q.  Why did you purchase leads?

9   A.  Something that we've always done, that we

10 purchase leads.  We have realtors, a lot of our realtor

11 partners are good friends, we go in to help them out, they

12 send us business and, you know, it's kind of a weighted

13 system, the way I've set the system up.

14   Q.  But, like, when you get a lead to -- pick like

15 whichever one you're most familiar with.

16   A.  Referral.

17   Q.  It's called referral?

18   A.  Yeah, I get a referral from a previous customer.

19   Q.  Okay.  Well, I'm talking about purchase leads.

20   A.  Purchase leads.  You get a referral from a, you

21 know, a realtor refers you.

22   Q.  No, no, no, I'm sorry, let me start this over.

23 When you buy a lead, because you don't by a referral lead,

24 do you?

25   A.  You buy leads for the realtors.

24 (Pages 90 - 93)

Page 94

1    Q.  Okay.  But when you buy those leads, right, what
2  information is in the lead you buy?
3    A.  I would have to go back and look at them, but
4  for them it's -- the number -- someone reaching out for
5  address, name, phone number, usually e-mail address.  To my
6  knowledge, that's about it.  And then they put in some notes
7  about they're interested in the property or, you know,
8  whatever's in the notes.
9    Q.  Okay.  Is the credit score a part of the lead?
10    A.  Credit score is a part of some leads, it's not
11  on the ones that I buy.
12    Q.  Okay.  On the ones you buy -- but the ones you
13  buy don't have the credit score?
14    A.  Correct --
15    Q.  And the --
16    A.  But I know it's on some.
17    Q.  Okay.  On the ones that have a credit score
18  enabled.  Do they cost more than the ones that don't have
19  the credit score?
20    A.  I'm not sure.  I don't remember.  Yeah, I'm not
21  sure.
22    Q.  Okay.  Do you have any, like, account
23  information, income information when you buy a lead?
24    A.  Some of them you do have income information on.
25    Q.  But not the ones you buy?

Page 95

1    A.  Not the ones I buy.  Zillow leads and the
2  Realtor.com, they do not.
3    Q.  So is it fair to say just all you're really
4  getting in the leads that you buy is contact information?
5    A.  Correct.
6    Q.  And obviously they're worth something, right, or
7  you wouldn't pay for them?
8    A.  Correct.
9    Q.  But you would agree with me if you had a credit
10  score and you knew ahead of time someone had a 300 credit
11  versus 800 credit, that would be valuable information,
12  wouldn't it?
13    MS. KREITER:  Object to the form.
14    THE WITNESS:  Not really for me.  A lead's a
15    lead.  I call them, pull the credit.  I don't go by
16    off of -- I wouldn't trust, might I say, what someone
17    tells me their credit score is.
18  BY MR. KAREN:
19    Q.  Well, what is the conversion -- do you know the
20  conversation rate on the leads that you buy?
21    A.  I do not.
22    Q.  Okay.  What I'd like to do is just kind of
23  understand how the practice of a loan works, okay?
24    So you get these leads, right, what's the first
25  thing you do?

Page 96

1    A.  I send them out to my loan officers to follow up
2  the call.
3    Q.  Okay.
4    A.  They also call -- a lot of times it's a live
5  transfer to a realtor that's on the line or the realtor
6  calls them also.
7    Q.  Okay.  But the idea -- the first thing is having
8  a communication of some form with that potential customer?
9    A.  Correct.
10    Q.  Okay.  And do all the customers move on to the
11  next step beyond that?
12    A.  No.
13    Q.  Why might they -- I'll use the term fall out, is
14  that a fair term, you understand what I mean by that?
15    A.  Yes, it's a term that's used.  I mean, a lot of
16  times, especially right now in this market in Florida
17  there's a lot of cash buyers, so the realtor, you know,
18  still profits from it, the mortgage or the loan officer
19  doesn't.  Sometimes people, you know, change their minds,
20  sometimes people don't have the credit score.
21    Sometimes, like with Tariq, he was
22  self-employed, owned 7-Elevens, writes everything off, you
23  know, doesn't -- wants to buy a million-dollar house but
24  don't want to pay taxes so he claims 20,000 on his tax
25  returns.  Some of the reasons it falls off.

Page 97

1    Q.  So there are a lot of reasons it can fall off --
2    A.  Correct.
3    Q.  -- from credit score to income to --
4    A.  Lots.
5    Q.  -- to desire?
6    A.  Correct.
7    Q.  Sometimes you would call somebody up on one of
8  these Zillow leads and they're like, oh, yeah, I was just
9  looking.
10    A.  Correct.
11    Q.  Right, window shopping, as they say?
12    A.  Yes.
13    Q.  So what percentage do you know fall out, if you
14  can tell me, from just sort of that initial conversation?
15    A.  A lot.  If I had to guess, 90 percent.
16    Q.  Oh, really, that high?  So a lot.
17    A.  80 to 90, I would guess.
18    Q.  Okay.  And then you go to kind of the next step
19  after that.  What is the next step for that 10 to 20 percent
20  that make it through that kind of first cut?
21    A.  It's -- you put them in process and, you know,
22  they send their income documents in.  It basically goes into
23  processing with a loan partner.
24    Q.  But they first have to be buying a house, right?
25  Because, in other words, you could be looking at a house and

25 (Pages 94 - 97)

Page 98

1 not actually get your house?
2     A.  Correct.  We try to make sure they're good in
3 the beginning and make sure that they qualify before they
4 actually go under contract.  And sometimes we do get stuck
5 with a loan that someone else has put under contract and we
6 have to try to -- you know, and then they move over to us
7 and then we have to run with the ball, might I say, use that
8 phrase.
9     Q.  So when you were saying 10 to 20 percent a
10 minute ago, were you saying 10 to 20 percent then go to the
11 pre-qualification stage or 10 to 20 percent pass
12 pre-qualification?
13     A.  I was saying 10 to 20 percent actually pull --
14 actually probably I would say probably 10 to 20 percent.
15 This is just a number I'm throwing out.
16     Q.  I know.
17     A.  Zillow leads there's a lot of cash buyers.
18 There's a lot of people that are just on there.  I mean, she
19 goes, she's moving to Florida, she types in Florida, I want
20 to see this house.  Well, guess what, Zillow wants your
21 information, you're now a lead.  I mean, your husband is not
22 even going to let you buy this million-dollar house, you
23 just wanted to see it, you know what I mean?  So that's the
24 BS we deal with.
25     Q.  Yeah, I'm sure.  So what -- all I'm trying to

Page 99

1 find out is what percent -- when you said 10 to
2 20 percent -- and I know that's just a round number, I'm not
3 holding you to that, I'm just trying to understand, does
4 that 10 to 20 percent actually go to thinking about
5 pre-qualification or --
6     A.  Go into credit pulls.
7     Q.  Go into credit pulls, okay.  And then that's
8 another place people could fall through; is that correct?
9     A.  Correct.
10     Q.  Okay.  And so how many of that -- of the 10 to
11 20 percent, how many of them actually get through the credit
12 pull stage to, hey, someone ready, willing able to buy?
13     A.  I would say approximately 5 percent.
14     Q.  5 of the 10 to 20?
15     A.  I would say 5 percent of the whole.
16     Q.  5 percent of the whole, okay.  So you buy a lead
17 and 5 percent of those leads you get actually turn into a
18 live fish, if you will?
19     A.  Correct.
20     Q.  And then even from those 5 percent do you have
21 some fall through at that stage?
22     A.  Sometimes, we try not to.
23     Q.  What percentage of that, of the 5 percent --
24     A.  I would say 5 percent close.  That was really
25 what I was referring to.

Page 100

1     Q.  Okay.  All right.  So you've kind of cut this
2 all the way through.  So what you're saying out of the --
3 all of those Zillow leads and stuff you buy, each loan has
4 about a 5 percent chance of actually becoming a loan?
5     A.  I'd say approximately.
6     Q.  Okay.  And is it fair to say that aggregately
7 when you have these leads you buy, a lot of work goes into
8 getting to that 5 percent through that; is that fair to say?
9     A.  Correct.
10     Q.  And a lot of time?
11     A.  Yes, correct.
12     Q.  So if you could have a person who was ready,
13 willing able to buy at stage one and you absolutely
14 100 percent know it, that's more valuable than a Zillow
15 lead, isn't it?
16     A.  Yes, it would be.
17     Q.  Give one moment.  Let me ask you to take a look
18 at another document here.  And, sir, I'm going to --
19         MS. KREITER:  This is Exhibit 7?
20         MR. KAREN:  Yes.
21         (Plaintiff's Exhibit No. 7 was marked for
22         identification.)
23 BY MR. KAREN:
24     Q.  And, sir, as you look at this I'm going to
25 represent to you this is not a document that was produced in

Page 101

1 discovery, I just want you to understand what it is.  We
2 looked at documents in this case and have created a summary
3 of who we think the employees are, when they got an offer
4 from Waterstone and the resignation dates of those
5 employees, okay?  So this is not a document you guys
6 prepared, it's a document we prepared, okay?
7     A.  Okay.
8     Q.  I just don't want you to be confused about that.
9         Now if you look -- can you look on here and tell
10 me, best you can, I mean I understand it off memory.  On the
11 Daytona branch does this -- looking at this here, do you see
12 anybody that we have indicated that was part of the Daytona
13 branch that wasn't part of the Daytona branch, if you
14 understand my question?
15         MS. KREITER:  I'm sorry, are you asking that --
16         was part of the Daytona branch at Mutual or that came
17         to Waterstone?
18         MR. KAREN:  I'm sorry.  That's a fair objection.
19 BY MR. KAREN:
20     Q.  Sir, what I'm asking is for the people who --
21 all right, let me try it this way.  So you see in the
22 left-hand column there is names of employees?
23     A.  Um-hmm.
24     Q.  And in the second column it says branch?
25     A.  Um-hmm.

26 (Pages 98 - 101)

1    Q.   And this branch, just so you understand, I'm
2  reflecting the Mutual branch name.
3    A.   Okay, so moving from Mutual to Waterstone.
4    Q.   Yes.  And all I'm asking you right now is, is
5  there anybody that we've listed as Daytona on this for
6  Daytona Mutual that was not Daytona Mutual?
7    A.   No.  No.
8    Q.   Okay.  So it looks like the chart is right with
9  respect to its statements as to who was in Daytona?
10   A.   If this it Daytona Mutual people, yes.  A few of
11 these didn't come to Waterstone.
12   Q.   Okay.  Can you tell me who didn't come to
13 Waterstone, if you remember?
14   A.   Gosh, yeah, if I can remember.
15   Q.   Or just which outside of you.
16   A.   I believe Daniel Zeeman, Robin Williams, Sandra
17 Viscomi.  Those are the ones that jump out.  I mean, I'll
18 have to go through this and really think.
19   Q.   And I think some of those sends does not say --
20 did not send resignation e-mail?
21   A.   I don't see that part.
22   Q.   Just a couple of them --
23   A.   Oh, I do.  Yeah, okay.  I do see it now.
24   Q.   Now I have one question also.  For these people,
25 it looks like a lot of them left on April 26, 2022 for those

1  people who have listed as Daytona.  I think, in fact, it's
2  all of them with two exceptions.  Am I right that pretty
3  much everybody moved over the same day you did?
4    A.   Well, I think it was at least three, but I know
5  that some stayed behind.
6    Q.   Okay.  Well, there were also two that I saw left
7  early before you and that was -- if you look at the line
8  Krystin Friebis.
9    A.   Um-hmm.
10   Q.   And it has her resignation date as 4/15.
11   A.   Okay.
12   Q.   And if you look at Holley Cameron [sic], her
13 resignation date is also 4/15?
14   A.   Cameron Holley, yes.  Yes, he left early, too,
15 yes.
16   Q.   Okay.  So is it fair to say both Krystin and
17 Cameron left and went to Waterstone before you did?
18   A.   Correct.
19   Q.   Okay.  Who was Krystin Friebis?
20   A.   She's a loan officer.
21   Q.   Is she --
22   A.   Mortgage banker.
23   Q.   I'm sorry?
24   A.   Mortgage banker.  I'm sorry.  I think that's the
25 way Mutual lists it as.  Same thing.

1    Q.   I understand, yeah.  So she was not an LOA or an
2  assistant, she was an actual LO?
3    A.   Yes, sir.
4    Q.   And Holley Cameron --
5    A.   Cameron Holley.
6    Q.   Or it's Cameron Holley, I see it.
7    A.   Cameron Holley is a LOA and he's also a loan
8  officer, too.
9    Q.   Who was he a loan LOA to?
10   A.   To myself.  Basically myself and Tatiana at the
11 time.
12   Q.   Do you know why they moved over -- well, they
13 moved over before you guys did, right?
14   A.   They did.
15   Q.   Okay.  And you obviously knew they were doing
16 that?
17   A.   I did.
18   Q.   And you gave them permission to do that?
19   A.   I didn't -- yes -- we had discuss -- yes, I did
20 give them permission because -- but we had a discussion
21 previous when we did one-on-ones when we were leaving and we
22 announced that we were leaving.  They said that
23 they wanted to come so -- and they were ready to leave.
24 There was a few other people in here that were already
25 thinking about leaving and going to other companies.

1    Q.   Okay.  Well, Holley Cameron -- I'm sorry,
2  Cameron Holley as an LOA, I mean he probably got -- I
3  assume -- LOAs usually make money off of the person they
4  work for, right?
5    A.   They get a little small portion of the loan that
6  they process and send through and then he also does loans
7  himself, too.
8    Q.   Okay.  Do you know what percentage of income
9  comes from the loans he does versus --
10   A.   I don't.  I'd have to look at his agreement.
11   Q.   Is it fair to say that a decent amount of his
12 compensation comes from loans you do?
13   A.   Yes.
14   Q.   Okay.  So why did Cameron Holley move over when
15 you were still at Mutual, why did he move over to
16 Waterstone?
17   A.   You know, at the time we were trying to close
18 out, you know, our pipeline.  The main thing was we had a
19 huge month that month, that was 19 million, we were making
20 sure that, you know, we got the customer service.  They were
21 ready to leave.  They were ready leave early.
22       There was a few people -- there's one name
23 that's not on here I just lost a few weeks before was Jake
24 Lowe, which was my top producer.  He left and went to Modern
25 Mortgage because he wasn't happy with the service he was

Page 106

1 getting. And there was a few other ones, Dawson Walker
2 a few other ones that were getting ready to leave, which
3 basically solidified our answer that me and Chris were
4 already done and leaving.
5    Q.   Great. But, I mean, if Cameron Holley was
6 making a decent amount of his income based off your
7 production he probably wasn't going anywhere, was he?
8    A.   It was his choice.
9    Q.   But one of the benefits of him going over there
10 is that he would be able to facilitate files you guys
11 transferred over, right, that's why he would move?
12    MS. KREITER: Object to the form.
13    THE WITNESS: You would have to ask him. I
14    don't -- I mean, it was his choice.
15 BY MR. KAREN:
16    Q.   Okay. I understand. Ultimately you couldn't
17 force him but that was one of the reasons you wanted him to
18 move, right, is so that he could go over there and
19 facilitate getting things set up and started for you, right?
20    A.   No. No.
21    THE WITNESS: Can I grab that water?
22    MS. KREITER: Yes.
23    THE WITNESS: Thank you. Appreciate it.
24 BY MR. KAREN:
25    Q.   And Krystin Friebis was one of the loan officers

Page 107

1 that worked for you?
2    A.   Correct.
3    Q.   And she was one of the loan officers that went
4 to Waterstone ahead of you, right?
5    A.   Correct. If the date -- I'm not looking at her
6 date but if you say so, yes.
7    Q.   Who was Ellie Briones?
8    A.   I have no idea. Where's that at?
9    Q.   I'm just asking if you know the name. She
10 didn't work for you over at Mutual, did she?
11    A.   No, not to my knowledge anyway.
12    MR. KAREN: What exhibit number are we up to?
13    THE COURT REPORTER: 8.
14    MR. KAREN: 8.
15    (Plaintiff's Exhibit No. 8 was marked for
16    identification.)
17 BY MR. KAREN:
18    Q.   Sir, I want to go through this e-mail. I
19 understand you're not on this e-mail, but I wanted to just
20 go ahead and ask you some questions about it, okay?
21    A.   Um-hmm.
22    Q.   So I want to read from the bottom up. This is
23 an e-mail from Ellie Briones and it says
24 Elliemutualmortgage@gmail.com, right? Do you see that?
25    A.   I do.

Page 108

1    Q.   And it's to Chris Wolf, who was your co-branch
2 manager, right?
3    A.   Correct.
4    Q.   And also to Krystin, who you just told me had
5 gone over before you guys, right?
6    A.   Yeah, correct.
7    Q.   And the date of this e-mail is April 27th,
8 that's the day after you resigned, right?
9    A.   Correct.
10    Q.   And Ellie writes to this group of people, hi,
11 accomplished task for this day. Contacted Dwayne's -- that
12 would be you, right?
13    A.   Yes.
14    Q.   Past clients, got one potential referral for
15 financing. Provided Dwayne's phone number and she will
16 contact him directly once she's ready.
17    A.   Correct.
18    Q.   Do you see that? Now how would Ellie have
19 gotten the information for all of your past clients?
20    A.   I think I --
21    MS. KREITER: Object to form.
22    THE WITNESS: I think I know who this is now.
23    It's someone Chris had hired that was working -- I
24    didn't know about this e-mail, but someone Chris had
25    hired that was calling our past clients and she

Page 109

1    worked underneath Chris Wolf.
2    MR. KAREN: Okay.
3    THE WITNESS: I'm not sure if she knew that --
4    she didn't come with us obviously, but I'm not sure
5    she knew that we had already left at the time.
6 BY MR. KAREN:
7    Q.   Okay. But my question, sir, is, is that she had
8 the information to contact your past clients and this was on
9 April 27th; how did she get that?
10    A.   I'm not sure.
11    Q.   Well, she would have had to get it from someone
12 like yourself, right, because --
13    A.   No, not from me.
14    Q.   Well, somebody on your team?
15    A.   I would think so.
16    Q.   Okay. So someone on your team would have had to
17 get her all of the information on your past clients and she
18 would have had to reach out to all of them, right?
19    A.   Correct. I don't know when she got this
20 information, but correct, yes.
21    Q.   Well, at least by 5:08 the day after you
22 resigned, she had already contacted all of them and had
23 enough time to get a potential referral, right?
24    A.   Correct, it looks that way.
25    Q.   And the information on who your past clients are

28 (Pages 106 - 109)

Page 110

1  are information that would have been Mutual information,
2  right?
3      MS. KREITER:  Object to the form.
4      THE WITNESS:  Yeah.  I mean, if it's the day
5    after, but once again I'm not -- I wasn't aware of
6    this.  I don't know anything about it.
7  BY MR. KAREN:
8      Q.  And here's the thing I also wanted to ask you.
9  Ellie Briones is using an e-mail that says
10 Elliemutualmortgage@gmail, right?
11     A.  I didn't -- yeah, I see that.
12     Q.  Okay.  Now of all e-mail addresses you could
13 possibly think of in the world, why do you think she would
14 have created the e-mail address Elliemutualmortage@gmail?
15     MS. KREITER:  Object to the form.
16     THE WITNESS:  I'm not sure.  You would have to
17   ask her.
18 BY MR. KAREN:
19     Q.  Well, you agree, sir, that somebody looking at
20 their e-mail really quickly, right, as we all do -- let's go
21 back.
22         When you get an e-mail, okay, and you see the
23 e-mail address, you don't sit here and study it carefully,
24 do you?  You just kind of flash and you look at it and you
25 move on; isn't that kind of how you look at things?

Page 111

1      MS. KREITER:  Object to the form.
2      THE WITNESS:  I try to study it if it's one
3    e-mail like this, but...
4  BY MR. KAREN:
5      Q.  I'm sorry.
6      A.  If it's an e-mail like this I try to study it,
7  but, yes, I can see what you're saying.
8      Q.  Okay.  What I'm saying is, you could see where
9  somebody would think, oh this is coming from Mutual Mortgage
10 because it sells Elliemutualmortgage, right?
11     MS. KREITER:  Object to the form.
12     THE WITNESS:  I could see, yes.
13 BY MR. KAREN:
14     Q.  And you could see where it would be very
15 confusing to a potential customer who was contacting them,
16 right?
17     MS. KREITER:  Object to the form.
18     THE WITNESS:  I can't speak on what the customer
19   would feel like, no.
20 BY MR. KAREN:
21     Q.  I'm not asking -- I'm asking you if you would
22 agree with me that it could be confusing?
23     MS. KREITER:  Object to the form.  Asked and
24   answered.
25     THE WITNESS:  Yeah, I couldn't speak for who's

Page 112

1    reading the e-mail.
2  BY MR. KAREN:
3      Q.  Would it be potentially confusing to you?
4      A.  It depends on whether -- the way I look at that
5  e-mail.
6      Q.  It could be?
7      A.  It could be.
8      Q.  And of all the e-mail addresses that you could
9  think of in the world, any possible number of permutations,
10 it just happens to be out of those trillions of
11 possibilities she uses Mutual mortgage; do you see that?
12     A.  I see that.
13     Q.  Does that disturb you a little bit sitting here
14 today?
15     MS. KREITER:  Object to the form.
16     THE WITNESS:  I didn't know about the e-mail,
17   so...
18 BY MR. KAREN:
19     Q.  Sir, I understand you didn't know about it,
20 obviously Chris Wolf did.  So my question to you is, does
21 that disturb you sitting here today?
22     MS. KREITER:  Object to the form.
23     THE WITNESS:  No.
24 BY MR. KAREN:
25     Q.  Okay.  So you would do this tomorrow?  You would

Page 113

1  do the same thing?  I just want to make sure I understand
2  this correctly --
3      A.  It doesn't --
4      Q.  If it doesn't disturb you, would you think that
5  this would be a good thing for you to maybe yourself
6  tomorrow create a Dwaynemutualmortgage@gmail and start
7  sending that to customers while you work for Waterstone?  Do
8  you think that would be a proper thing to do?
9      MS. KREITER:  Object to the form.
10     THE WITNESS:  No.
11 BY MR. KAREN:
12     Q.  So you would agree this is not really a proper
13 thing to do, right?
14     MS. KREITER:  Object to the form.
15     THE WITNESS:  I agree.
16 BY MR. KAREN:
17     Q.  Now, how did Krystin, who now is at
18 Waterstone -- see Krystin who left previously.  If you
19 look -- and you could scroll up; do you see that?
20     A.  Um-hmm.
21     Q.  When Ellie using Ellie@mutualmortgage@gmail
22 [sic] tells Krystin that she's got in touch with all of your
23 clients using that e-mail and gives what she did, what's
24 Krystin's response?
25     A.  Woo hoo.  Nice work again.

1    Q.   Again?
2    A.   Um-hmm.
3    Q.   And Krystin at this time was -- had been working
4 for Waterstone for a couple of weeks, right?
5    A.   Correct.
6    Q.   We don't see a response like, oh, my God, what
7 are you talking about?  Did you use that e-mail address, do
8 we?
9    A.   I do not.
10    Q.   We hear woo hoo, nice work, right?
11    A.   Correct.
12    Q.   Were you copied on any of these e-mails from
13 Elliemutualmortgage@gmail?
14    A.   Not to my knowledge.  I don't remember.
15    Q.   Did you ever talk to -- I mean, you told me
16 Chris Wolf and you were usually in sync about stuff?
17    A.   Correct.
18    Q.   Okay.  That you did important things together,
19 right?
20    A.   Correct.
21    Q.   And reaching out to your clients would be an
22 important thing, wouldn't it, to all of your clients?
23    A.   Correct.
24    Q.   Okay.  So is it fair to say maybe you were aware
25 this was happening?

1    A.   I don't remember it.  Yeah, I'm just being
2 honest.  I don't remember.  I know that he did have -- and
3 it might have been multiple people that he had hired to call
4 our database but I don't remember giving permission or any
5 of that stuff.  I mean, it's something that is pretty normal
6 in the mortgage industry to have someone follow up.  When
7 you're a top producer and you do a lot of loans, you don't
8 have to time to go through and follow up and things of that
9 nature.
10    Q.   Okay.  But Ellie was working for you guys for
11 the benefit of doing this transition to Waterstone, right?
12        MS. KREITER:  Object to the form.
13        THE WITNESS:  No.
14 BY MR. KAREN:
15    Q.   Well, I mean, you guys somewhere -- someone had
16 hired her to reach out to your clients, right?
17    A.   Yeah, she had worked for us for months, though,
18 to my knowledge.  Once again, you'd have to ask Chris.
19    Q.   She had worked for you for months?  I'm sorry,
20 I'm confused.
21    A.   To my knowledge, she had worked with us
22 previous.  Once again, I'm not sure.
23    Q.   Okay.  But she didn't work for you at Mutual?
24    A.   She didn't work for me.  I mean, once again you
25 would have to ask Chris, I'm not sure.

1    Q.   Sir, I'm not trying to trap you, I'm confused.
2    A.   I'm confused, too, because once again I don't
3 know.
4    Q.   Let's back up for one second.  You said Ellie
5 had worked for you -- did you say Ellie had worked for you
6 for months?
7    A.   I'm not sure, you would have to ask Chris.
8    Q.   Okay.
9    A.   He's the one that handles that.  I don't put
10 that in play, might I say.
11    Q.   Okay.  But at the time, what she was doing was
12 facilitating your transition to Waterstone, would you agree?
13        MS. KREITER:  Object to the form.
14        THE WITNESS:  I would not agree.
15 BY MR. KAREN:
16    Q.   You don't think contacting all of your leads
17 while Krystin is at Waterstone to get them to give you --
18 send loans or talk to you about loans at Waterstone was
19 performing services for the benefit of Waterstone?
20        MS. KREITER:  Object to the form.
21        THE WITNESS:  I do not.  I think it was from
22     previous, but that's just my opinion.
23 BY MR. KAREN:
24    Q.   From previous what?
25    A.   From previous from when we were at Mutual.  It

1 wasn't benefiting those 11 or 12 days of her calling all of
2 that.  You know, that's...
3    Q.   But she was e-mailing Krystin at Waterstone.
4    A.   Correct.
5    Q.   Right, and she was e-mailing Chris and Chris
6 was -- still had a Mutual Mortgage e-mail but he was already
7 at Waterstone because April 27th you had already all
8 resigned and gone there?
9    A.   Yeah, but his e-mails would have been turned
10 off, so.  I'm thinking -- I would think Mutual turned his
11 e-mail off so she must have not have knew.
12    Q.   Okay.  But the point was, she was sending it to
13 Krystin at Waterstone?
14    A.   I see that.
15    Q.   And it was sent to all you guys while you were
16 at Waterstone, right?
17    A.   Yeah, I don't see my name, but, yes.
18    Q.   And there's no reason you would have had
19 somebody while you were at Mutual Mortgage reach out
20 within -- I mean, in other words, if you could have reached
21 out with an e-mail address that said Ellie whatever her name
22 at Mutualmortgage.com as opposed to a Gmail, you would have
23 used that address, right?
24        MS. KREITER:  Object to the form.  Completely
25     lack of foundation.

1    THE WITNESS: I can't speak for her. I mean,
2 once again, I'm not familiar with this person --
3 BY MR. KAREN:
4    Q. No, no, no, sir, that's not my question. I'm
5 asking you --
6    A. Um-hmm.
7    Q. -- if you had the option of sending an e-mail to
8 all of your customers, is it fair to say that it would be
9 your preference to use an e-mail, if you had the option,
10 that's at ABC@Mutualmortgage.com, as opposed to
11 ABCmutualmortgage@gmail.com?
12    A. That's what I would do.
13    Q. Right. You would use the actual true e-mail
14 address of the company, right?
15    A. Correct.
16    MR. KAREN: Can we take a break for just a few
17 minutes? This will be a good place for me. I don't
18 know where we are lunchtime-wise. I'm not --
19    THE VIDEOGRAPHER: Going off the record. The
20 time is 11:37.
21    (Off the record.)
22    THE VIDEOGRAPHER: We're back on the record.
23 The time is 11:54.
24    MR. KAREN: Sir, I am showing you an e-mail, I'm
25 going to call Exhibit 9, I believe.

1    (Plaintiff's Exhibit No. 9 was marked for
2    identification.)
3 BY MR. KAREN:
4    Q. So on this e-mail it says -- this is an e-mail
5 dated January 10th; do you see that?
6    A. Yes, sir.
7    Q. And there's a list of questions -- actually, if
8 we actually could go back to the third page and we're going
9 to actually go up from that.
10    A. Okay.
11    Q. Do you see an e-mail -- tell me when you get to
12 that -- an e-mail dated November 3rd?
13    A. Hold on.
14    Q. Keep going back. I think it's right there.
15    A. Oh, yeah.
16    MS. KREITER: I'm sorry, can you just say the
17    page number?
18    MR. KAREN: Oh, yeah. That would probably be
19    easier. 6266.
20    THE WITNESS: Yep, got it.
21 BY MR. KAREN:
22    Q. And so this -- I realize again you're not on
23 this one, but it does mention you. It says Chris -- it's an
24 e-mail from Chris Wolf to Dustin, it's dated November 3rd
25 and it says follow-up from meeting with Chris and Dwayne.

1 And that's you, right?
2    A. Correct.
3    Q. And then he says, Hi, Dustin. It was a pleasure
4 meeting with you, Dave and Ben yesterday. Here are some
5 questions from Chris in Tampa.
6    A. Um-hmm.
7    Q. My first question is, were you in this meeting
8 that I guess was November 2nd?
9    A. I'm assuming.
10    Q. Okay. It would have been abnormal for Chris
11 Wolf to have met them without you?
12    A. Correct.
13    Q. Okay. Do you know if Chris in Tampa was with
14 you? If Chris Smith was with you?
15    A. I don't remember, but I don't -- I don't
16 remember. I don't believe so on this one.
17    Q. Okay. So your best recollection is that it was
18 Chris Wolf, you, Dave who, Holbrook?
19    A. Holbrook, yes, sir.
20    Q. And what's Dave Holbrook's position at
21 Waterstone?
22    A. Gosh.
23    Q. If you know --
24    A. Regional manager or something, regional
25 underwriting manager. I'd have to look at his title.

1    Q. And Ben, who's Ben?
2    A. Ben, he's the manager -- one of the managers of
3 Winter Park.
4    Q. Winter Park is another branch in Florida?
5    A. Of Waterstone, yes, sir.
6    Q. Do either you or Chris report to Ben?
7    A. No.
8    Q. Okay. So is it fair to say like on the
9 hierarchy Ben is the same as you and Chris?
10    A. Correct, similar, yeah.
11    Q. And what's Ben's last name, if you remember?
12    A. Gosh, I knew you were going to ask me that.
13    Q. He'll come up later. It's fine.
14    A. That's pretty bad.
15    Q. Davis maybe?
16    A. Maybe.
17    Q. That's okay. I'm sure there's an e-mail later,
18 we'll figure it out.
19    A. Yeah --
20    Q. No, that's okay. So what do you recall about
21 that meeting that happened on November 2nd?
22    A. I don't recall really. I mean, like I said, I
23 had multiple meetings with multiple companies. I don't
24 remember what was all talked about. I know that what we
25 were looking for in the companies, but I don't remember what

Page 122

1 we discussed.
2    Q. Okay. So nothing jumps out to you --
3    A. It doesn't.
4    Q. -- about that meeting --
5    A. It doesn't, no.
6    Q. -- about that meeting as being significant,
7 anything like that?
8    A. No, sir.
9    Q. Okay. Obviously you were discussing -- the
10 topic was discussing -- you know, potential transition of
11 your branch over to Waterstone?
12    A. Correct.
13    Q. Okay.
14    A. I think we actually ended -- remember this was
15 the end of the year so we were meeting with multiple
16 companies in Orlando then.
17    Q. Okay. Now, there's a list -- it says, here are
18 some questions from Chris in Tampa and some others I had.
19 Now do you recall --
20    A. I saw that.
21    Q. -- do you recall discussing with Chris this list
22 of questions, you know, in terms of, hey, ask this, or, hey,
23 ask that or you should find out?
24    A. I don't remember. Me and Chris Wolf and Chris
25 Smith, which I call Smitty, had multiple conversations on

Page 123

1 different questions we were looking for, from not only
2 Waterstone, but from multiple companies we were considering.
3    Q. Just -- is it fair to say that you guys kind of
4 had a list of questions that collectively you agreed on and
5 then sent --
6    A. I --
7    Q. -- just wait for me to finish -- and then sent
8 to multiple companies or were these styled specifically
9 Waterstone?
10    A. This was -- I can't speak on this because I
11 don't know what Smitty was doing here, but I was not
12 involved in this question that I remember.
13    Q. Okay. So these questions came from Chris Smith,
14 not from you?
15    A. Correct. It looks like they were coming from
16 Chris Smith, correct.
17    Q. Okay. And, again, I understand we're doing this
18 off your best memory but let's try to go through one. If
19 you go to the next page, this is number two, transition
20 team. And Chris Wolf writes, can we send loans over to
21 start building up a balance of money to fund transition.
22 This is a big one. I am not and I am sure Dwayne is not
23 writing a check to them for 200,000 to fund the first
24 60 days or so of fixed costs.
25      So, first of all, my question is, you are

Page 124

1 referenced here, do you recall -- does that help you recall
2 one way --
3    A. No --
4    Q. -- or the other participating --
5    A. -- I don't remember that conversation.
6    Q. Just let me finish the -- I know, I know it's
7 hard, and you're in sales so you're particularly bad at
8 this, right?
9      So this is a big one -- okay. So my question
10 was are you -- does this refresh your recollection as to
11 whether you were engaged in any way in developing this
12 question?
13    A. No.
14    Q. Okay. Thank you. And I do want to ask you,
15 though, do you understand the concern that's being expressed
16 here by building up sort of a pipeline to fund transition?
17 Do you understand the concern on that, the point that's
18 being made?
19    A. I did -- I do understand, yeah.
20    Q. And can you explain that to me what that concern
21 is?
22    A. I don't know what he was thinking. I mean, once
23 again, I wasn't involved in this e-mail. It's --
24    Q. No, no, that's not my question. You said you
25 understood what it meant to buy -- why you would want to

Page 125

1 build up a pipeline as a part of a transition plan.
2    A. Yeah, I'm not sure. I can't speak on his for
3 writing that because, you know...
4    Q. I'm not asking you for your why, I'm asking you
5 generally. Why would somebody want to -- being a branch
6 manager, why would somebody want to build up a pipeline as
7 part of a transition?
8    MS. KREITER: Object to the form.
9    THE WITNESS: Once again, I can't speak on that.
10 I mean, it's -- if you go back and look and pull
11 Waterstone's P&L, which I'm sure y'all have, you'll
12 see that we didn't have a big pipeline coming over,
13 if you know what I mean. Our numbers were pretty bad
14 for the first four to six months, really bad.
15    MR. KAREN: Okay.
16    THE WITNESS: So if we're leaving -- you know, I
17 left Mutual doing -- you can look at Mutual's P&L,
18 last month I did 19 or 19.5 million and then rolled
19 over and did another 4 to 5, I want to say 4 to 5
20 million, don't quote that. The previous month to
21 that would have been, my thinking, that would have
22 been -- if I was trying to do that my pipeline, that
23 5 million.
24 BY MR. KAREN:
25    Q. Okay. But let me ask you this: Then it looks

32 (Pages 122 - 125)

Page 126

1 like there's answers in red below, you can see it by the
2 different font or boldface, if you will. Do you see where
3 it says we need to make sure?
4     A. Yeah, let me read it. Yes.
5     Q. Okay. And I just want to pay attention to this
6 first sentence. It says, we need to make sure anything you
7 all do during transition does not violate any current
8 agreement you have with your current employment, right?
9     A. Yeah, I read that.
10     Q. So my question is, what did Waterstone do to
11 ensure that you didn't violate anything with your current
12 employer, which would have been Mutual when you came over?
13         MS. KREITER: Object to the form.
14         THE WITNESS: I don't know. Like I stated
15     before, I don't remember them getting our agreement.
16     I don't ever remember going and looking for it and
17     looking it down.
18     MR. KAREN: Okay.
19         THE WITNESS: Because I would have had to hunt
20     it for sure because I'm not very organized.
21 BY MR. KAREN:
22     Q. Got it. I understand completely. Okay. Now,
23 do you know why there would have been concern about you or
24 Chris writing a check for hundreds of thousands of dollars
25 in the transition?

Page 127

1     A. I do not. Yeah -- yeah, I do not.
2     Q. And it says here -- it says -- it says, so just
3 the Tampa branch alone we're talking over 500,000 in cash
4 burn in a few months give or take; do you see where it says
5 that?
6         MS. KREITER: I'm sorry, did you move pages?
7         MR. KAREN: No, no, just right above that, the
8     same place.
9         MS. KREITER: Okay. Thank you.
10         MR. KAREN: No problem.
11         THE WITNESS: Yes, I do, I read that.
12 BY MR. KAREN:
13     Q. Now, I believe Chris Smith's bonus was $500,000
14 when he came over; is that right?
15     A. I have no idea.
16     Q. You don't know, okay.
17     A. No.
18     Q. Did you and Chris Smith discuss the answers to
19 these questions at any point?
20     A. No. I didn't know he got 500 or I would have
21 been mad.
22     Q. So now you're not friends anymore.
23     A. Exactly.
24     Q. I'm just joking. So did you and Chris Wolf
25 discuss the answers to these questions --

Page 128

1     A. We did not. To my knowledge. Once again, I
2 don't remember reading this or going through this.
3     Q. Okay. Well -- and not even just reading it, I
4 mean, do you recall discussing anything like this?
5     A. I do not.
6     Q. And your bonus was -- how much of a bonus did
7 you get?
8         MS. KREITER: Object to the form.
9 BY MR. KAREN:
10     Q. How much of a bonus did you get from Waterstone
11 when you moved your branch over to Waterstone from Mutual?
12         MS. KREITER: Object to the form, bonus.
13         THE WITNESS: Yeah, because it wasn't a bonus.
14     Yeah, I mean, it wasn't something that -- they put on
15     my P&L 250 for startup expenses, but it wasn't
16     something that I could go in there and snatch 250
17     out, might I say, and go blow it --
18 BY MR. KAREN:
19     Q. Okay. So it was put in your branch P&L?
20     A. Correct. I found out about that after, yes.
21     Q. And I just want to be clear about this. So I
22 know I've used the term bonus, just so we're all clear so
23 I'm not using that to suggest anything.
24     A. I understand, yeah.
25     Q. What would you call that $250,000, just so we

Page 129

1 use a term you're comfortable with?
2     A. I would say for startup expenses.
3     Q. Okay. So -- and was it 250 or 275?
4     A. I think 250, I would have to go back and look.
5     Q. Okay. But that was --
6     A. But I know it wasn't 500 like Smitty's I just
7 found out.
8     Q. But -- so he's buying beers tonight?
9     A. Yeah, absolutely.
10     Q. All right. So the 2 -- we'll call it startup
11 money?
12     A. Correct.
13     Q. Is that a fair term?
14     A. That's the way I look at it. I mean, it's tough
15 to start off with a bad month, which you can go back and
16 that we had. You don't want to go in the hole already out
17 of the bat, so.
18     Q. And what would it mean if you did -- I guess
19 here's what I'm confused about and maybe you can help me out
20 with this.
21     A. Um-hmm.
22     Q. Okay. So Waterstone puts $250,000 in your P&L
23 to fund the branch coming over and all those branch expenses
24 the first couple of months, right?
25     A. Yeah, and part of it was paid, I don't remember

33 (Pages 126 - 129)

Page 130

1  the number, I want to say 80,000 or something, 70, 80,000
2  for loans that were not paid by Mutual.
3      Q.  Okay.  Well, then, you wouldn't have known when
4  they put that 250 in whether loans were going to be paid by
5  Mutual or not, right, because that money was in before you
6  left?
7      A.  I would not have at the time.  I thought the
8  whole time that I was going to be paid.  You know, I thought
9  I was going to be on all of this and I thought all the -- we
10  were always told that the employee contracts Mutual always
11  said we have to pay, which I totally agree with, when they
12  sign a contract you have to pay them, but, you know...
13     Q.  Okay.  But going back to my question, my
14  question, was on the 250, that was paid before anybody knew
15  who at Mutual got paid --
16     A.  Correct.  Yes, sir, correct.
17     Q.  So that was -- and I think you called it startup
18  money for the branch?
19     A.  Correct, yes, sir.
20     Q.  And so here's what I'm confused about.
21     A.  Um-hmm.
22     Q.  You could either put startup money in, right, or
23  the branch would just go negative, right?
24     A.  Yes.
25     Q.  So they could essentially give the branch credit

Page 131

1  and say, we understand you're transitioning, we understand
2  you guys are going to have problems so you can go in the
3  hole X-hundred thousand dollars, we don't really care?
4      A.  I guess they could have did that, yeah.
5      Q.  Okay.  What's the distinction?  What's the
6  difference?
7      A.  How do you -- what do you mean?
8      Q.  Well, I'm trying to understand why put 250,000
9  in as opposed to saying, well, you spend as much as you need
10  to spend until you get to this point it's not going to be a
11  problem; what's the difference in those two scenarios?
12     A.  Well, it was no difference in me coming over,
13  because like I stated before I was coming no matter what
14  because I made the decision.  I didn't know about the 250
15  until I had already made the decision.  So the difference
16  was it helped us out and I was very appreciative when I
17  found out.
18     Q.  Okay.  But what I'm getting at -- okay, you said
19  it helped us out.  How did it help you out?
20     A.  Well, I mean, it helped us, like I said when
21  Mutual didn't pay the people, that helped, rather than me
22  having to take care of -- well, initially -- I still took
23  care of it because it was in the P&L, might I say.  But,
24  yes, it helped us with expenses and startup cost as we call
25  it.

Page 132

1      Q.  But again, you pull money out of the branch as
2  the branch has a profit; is that fair to say?
3      A.  As the branch has a profit, correct, not if it's
4  startup money when we're not doing loans and not making
5  money.
6      Q.  Okay.  But if you started negative, right, and
7  250 in the hole, you would have to earn $250,000 before you
8  could, in theory, take any money, right?
9      A.  Correct.
10     Q.  And so by starting positive it prevented you
11  from being in that hole, right?
12     A.  It did, but I'd been in the hole for the last
13  year since I moved, to be honest.  So I would just be in a
14  bigger hole.
15     Q.  Okay.  But the point is, it did benefit because
16  as opposed to being a quarter-million in the hole, you
17  weren't?
18     A.  Yes.  When I get my next check I'm going to get
19  that check faster, for sure, whenever it comes.  The bonus,
20  whenever I take a check, yes.
21     Q.  Got it.  Sir, when you talk to Chris Smith and
22  Chris Wolf, you guys talk by e-mail?
23     A.  E-mail, phone.  I mean, yeah, I mean, it's -- we
24  do --
25     Q.  Again --

Page 133

1      A.  Mostly over the phone, I'm not a big e-mail guy.
2      Q.  Do you guys text each other?
3      A.  Yeah, from time to time.  I'm more of a
4  pick-the-phone-up kind of guy and call.
5      Q.  But is it fair you do occasionally text with
6  these guys?
7      A.  Yeah, I would say that.
8      Q.  How about other members of your branch?
9  Employees of your branch, do you ever text them?
10     A.  Sometimes, yeah, we text, too.
11     Q.  And that would have been true today as well as
12  true when you were at Mutual?
13     A.  Correct.
14     Q.  And you have a lot of conversations or some
15  conversations, I would use, I don't want say a lot, but you
16  had conversations during this transition time with the
17  people at Waterstone, right?
18     A.  Yes.
19     Q.  Okay.  And you guys -- I saw you e-mailed,
20  right?
21     A.  I'm sorry, say that again.
22     Q.  You e-mailed each other?  You saw that before?
23     A.  Yes.  Yes.
24     Q.  And you used both your personal e-mail and your
25  work e-mail?

34 (Pages 130 - 133)

Page 134

1    A.  Correct.
2    Q.  And did you did you guys talk on the phone?
3    A.  Yes, a few times, yes.
4    Q.  Okay.  And you met in person?
5    A.  Correct.
6    Q.  How many times do you think you guys met in
7  person with Waterstone?
8    A.  A guess, maybe three or four.
9    Q.  Okay.
10    A.  I met -- like I said, I met with multiples banks
11  multiple times.  There's a couple more banks I met with a
12  lot more than I met with Waterstone, FBC, a few of them.
13    Q.  Okay.  But a handful of times; fair to say?
14    A.  Yeah, a handful of times.
15    Q.  And did you guys -- did you ever text with guys
16  at Waterstone?
17    A.  Yes, probably.  I don't recall, but probably.
18    Q.  What kind of phone do you have?  Do you have the
19  same phone now that you had when you were at Mutual?
20    A.  Yes.
21    Q.  What kind of phone is that?
22    A.  iPhone.
23    Q.  iPhone.  And we saw some e-mails, private
24  e-mails between you and Chris Wolf and Waterstone; did you
25  ever use your private e-mail for communicating with other

Page 135

1  people in your branch?
2    A.  I'm not sure.  I'm sure but I'm not positive on
3  that.
4    Q.  Possibly?
5    A.  But, I mean, a lot of people in my branch I've
6  trained them, we're all good friends, I've coached their
7  kids in baseball.  Daytona is very small so I'm buddies with
8  a lot of them.  So, you know, they were previous realtors --
9  my team leaders are previous realtors, they use me as a
10  lender and said they were ready to get out.  I trained them
11  and now they're two team leaders but we've been friends for
12  20 years.
13    Q.  So it's possible --
14    A.  Yes.  I mean, I write them, call them, go out
15  and have drinks with them, all that, the same thing,
16  multiple years before they even worked with Mutual or
17  Waterstone, so.
18    Q.  So that's possible, too?
19    A.  Yes, correct.  It's a little different than
20  Tampa and the larger cities, you know, it's just a small
21  town.
22    Q.  Got you.  Let's move up in this e-mail now.  We
23  started on November 3rd.  And if you go up or backwards to
24  page 64, you'll see an e-mail from Chris Wolf, November 9th;
25  do you see that?

Page 136

1    A.  Yes, sir.
2    Q.  And it's to Dustin Owen.
3    A.  Um-hmm.
4    Q.  And, again, the same subject, follow-up for
5  meeting with Chris and Dwayne.  And he writes -- Chris Wolf
6  writes, thank you for getting back to me so quickly.  I
7  forwarded everything over to Chris Smith in Tampa and we
8  will discuss.  That's probably the discussion you would have
9  participated in, too, right?
10    A.  I don't recall this particular discussion, but
11  I'm not saying that I didn't.  I mean, Chris -- Chris Wolf
12  is also -- not as good a friend with Chris Smith but they
13  became really good friends over the years.  So they have
14  conversations, we have conversations, me and Chris have
15  conversations.  We don't jump on a lot of three-way calls,
16  might I say.  It's kind of like you talking to your buddies,
17  you know, you're not going to, let's three-way in.  Women do
18  that but not us men.
19      MR. KAREN:  Be careful.  Be careful.  I'm not
20    saying a word, okay?  I -- for the record, I did not
21    say that.
22  BY MR. KAREN:
23    Q.  But you just don't remember any kind of
24  discussion?
25    A.  I don't.  Yeah, I really don't.

Page 137

1    Q.  And then if we keep going up -- well, actually
2  let me ask you:  Do you know why Chris Smith wouldn't have
3  been copied on this or why it was Chris Wolf forwarding
4  information?
5      MS. KREITER:  Object to the form.
6      THE WITNESS:  Where am I at again?
7  BY MR. KAREN:
8    Q.  So, in other words, you see -- sorry, I confused
9  you.  You see on Tuesday, November 9th, Chris Wolf says, I
10  forwarded everything over to Chris Smith.
11    A.  Yeah, I don't know why he wouldn't have been.  I
12  don't know.
13    Q.  Do you know why Chris Wolf would have been
14  forwarding information as opposed to Chris Smith just
15  directly involved in it?
16    A.  I do not.
17    Q.  Okay.  When you first talked about the
18  possibility of Waterstone --
19      (Brief interruption.)
20  BY MR. KAREN:
21    Q.  Okay.  When you first talked to Chris Smith
22  about the possibility of going over to Waterstone, that was
23  sometime obviously prior to November 3rd in that e-mail
24  communication we saw, right?
25    A.  Um-hmm.

35 (Pages 134 - 137)

Page 138

1    Q.  I mean, is it fair to say you had positive
2  things to say about Waterstone from your first kind of
3  initial meetings?
4    A.  I wasn't sure at the time, they wasn't the top
5  of my list, no.  I mean, it's -- I think back then we
6  were -- we didn't want to make the wrong decision.
7    Q.  Right, but I guess what I'm saying is if you
8  would have gone to Chris Smith and been like, dude, this
9  place, no way, Chris Smith probably wouldn't have spoken to
10 Waterstone?
11       MS. KREITER:  Object to the form.
12 BY MR. KAREN:
13    Q.  Is that a fair statement?
14    A.  Yeah, I'm not sure.  Because at the time I
15 wasn't for sure that he was going to come but we go
16 everywhere together.  But, no, I can't answer that for him.
17    Q.  So is it fair to say you had relatively -- you
18 didn't say anything negative about Waterstone, right?
19    A.  Not to my knowledge I don't remember saying
20 anything negative.
21    Q.  Now if we could go up to page 263 and this is
22 another e-mail from Chris Wolf.  Now, it's dated
23 January 10th and it's saying subject is following up from
24 meeting with Chris and Dwayne.  And it says, hey, Dustin, I
25 hope you had a great holiday.  Dwayne and I have talked and

Page 139

1  we are looking to set up another meeting with you.
2         So now this is January.  And it says, he should
3  be -- that would be -- you reaching out tomorrow to set
4  something up.
5    A.  Correct.
6    Q.  And I guess my first question is, do you recall
7  setting up that meeting?  Do you recall setting up that
8  meeting?
9    A.  I do not.
10    Q.  Do you recall the discussions that you and Chris
11 Wolf had had about Waterstone?
12    A.  I don't recall that -- I don't recall the exact
13 discussions.  You know, it's -- we had our -- the things we
14 liked and the few things we didn't like at the time, to my
15 knowledge.  But, no, I don't remember the discussion.
16    Q.  What didn't you guys like?
17    A.  There was a few things.  Just a few things
18 that -- pricing and different things that we had concerns
19 about.
20    Q.  Okay.  What did you like?
21    A.  You know, I liked what my realtor partners told
22 me and the people that have used Waterstone in the past was
23 really -- that was a deciding factor on anywhere that I
24 decided to go was who was going to give me the best customer
25 service options for my client.

Page 140

1    Q.  At this point was it fair to say you were
2  zeroing in potentially Waterstone as a --
3    A.  I wouldn't say so.  I would think we were
4  still -- I mean, with the timeline, that can let you know
5  that we were still actively looking.
6    Q.  But it's fair to say you were starting to focus
7  in a little bit on Waterstone?
8       MS. KREITER:  Object to the form.  Asked and
9  answered.
10       THE WITNESS:  We were still actively looking,
11       that's why there's probably a two-month gap because
12       we were meeting with banks weekly, weekly and
13       biweekly looking to move.
14 BY MR. KAREN:
15    Q.  Okay.  And who is we?
16    A.  Chris Wolf and I.
17    Q.  Okay.  And so why wasn't Chris Smith in this?
18    A.  He was involved, he was involved on a few but I
19 can't speak for -- because I don't remember exactly the ones
20 that he was in.  But, you know, and then me and him talk, so
21 we talk on the phone daily, so.
22    Q.  Did he -- is it a fair characterization to say
23 that you guys were kind of doing the first cut for Chris
24 Smith?
25       MS. KREITER:  Object to the form.

Page 141

1       THE WITNESS:  No, not really.  I wouldn't say
2       that.  I mean, it was just he pretty much knew that
3       he was coming.  He wasn't happy -- I wasn't -- we
4       wasn't happy so he knew that we were coming together
5       pretty much.
6  BY MR. KAREN:
7    Q.  Yeah, but what I'm asking is, it seems like you
8  guys met with a lot more banks, you and Chris Wolf, than
9  Chris Smith did?
10    A.  Yeah, I think we -- to my knowledge, I don't
11 know who else Chris met with, Smith, but I know that me and
12 Chris met with lot.
13    Q.  Right, but --
14    A.  Eight or ten probably.
15    Q.  Right, but it seems like -- and, again, you tell
16 me if I'm wrong about this, that you guys were sort of doing
17 the kind of initial evaluation and then reporting back to
18 Chris Smith; is that a fair statement?
19       MS. KREITER:  Object to the form.  Asked and
20       answered.
21       THE WITNESS:  Yeah, I wouldn't say that.  No, I
22       mean, once again, I respect his opinion, he's like a
23       mentor, I joke around and call him dad sometimes, my
24       dad's passed away and he's older than me so I bust --
25       you know, I mess with him about that.  But, no,

36 (Pages 138 - 141)

Page 142

1    it's --
2        MR. KAREN: Good catch, by the way.
3        THE WITNESS: Huh?
4        MR. KAREN: Good catch.
5    BY MR. KAREN:
6        Q. So I guess so, then, how come you met -- it
7    seems like you met with all these other companies and then
8    reported to Chris without Chris being in those initial
9    meetings, why was that?
10       MS. KREITER: Object to the form.
11       THE WITNESS: It was because I -- like I said, I
12       talked to him about a lot of stuff, so it's --
13       especially when it comes to business.
14   BY MR. KAREN:
15       Q. Well, I understand you guys talk a lot, what I'm
16   trying to find is why did you guys do a lot of these initial
17   meetings and why was it -- why did you do a lot of these
18   initial meetings?
19       A. I don't remember why he wasn't there. I don't
20   remember if he had stuff going on. I just don't remember
21   why he wasn't there.
22       Q. Did Chris Smith -- well, was Chris Smith -- how
23   many other banks did you say you met with, about eight to
24   ten?
25       A. It's a ballpark figure, yeah.

Page 143

1        Q. And out those eight to ten, how many did Chris
2    Smith go to those initial meetings?
3        A. I don't remember.
4        Q. Would it be fewer than half?
5        A. Yes.
6        Q. Fewer than two?
7        A. I don't remember. I'd have to sit down and
8    think about it. I don't want to stick my foot in my mouth.
9        Q. Do you recall if he went to any of those initial
10   meetings?
11       A. Yes, I recall that he did.
12       Q. Do you remember which initial meeting he went
13   to?
14       A. Correct, yes, I do.
15       Q. And which one was that?
16       A. I believe it was FBC.
17       Q. And I think FBC he had a personal contact,
18   right?
19       A. No. We knew a guy through -- Chris Wolf knew a
20   guy that was -- that he knew from previous college.
21       Q. That Chris Wolf knew?
22       A. Correct, Chris Wolf, not Chris Smith.
23       Q. Okay. And I thought you said FBC was the one
24   that he was most interested in initially?
25       A. We had a lot of interest in FBC, correct.

Page 144

1        Q. Oh, so that was probably the one you guys at the
2    beginning of your search collectively kind of ranked number
3    one?
4        A. Yeah, probably, yeah, I'd say that.
5        Q. Okay. So he went to that one but you can't
6    recall any others he went to?
7        A. No, I'd have to sit down and think about it, no.
8        Q. And it's fair to say he was interested in FBC
9    you even went to meet with FBC, he was interested in FBC?
10       A. Chris Smith?
11       Q. Yes.
12       A. Once again, it was the Chris Wolf that had the
13   contact there. You know, I knew a little bit about FBC from
14   the realtor partners and the people that's used FBC in the
15   past --
16       Q. And was --
17       A. -- and that puts a lot of weight with me. It
18   was really, you know, when I started talking to realtors
19   that have used FBC they had positive things to say.
20       Q. How come you guys ended up not going to FBC?
21       A. I didn't think it was the right fit at the time
22   and they were going through some stuff at the time that we
23   found out about.
24       Q. Okay. Now if you continue on this e-mail we're
25   looking at Dustin Owen write to -- I can't see who he was

Page 145

1    writing to. He says, yes, David, Mike and I are very
2    interested in continuing our talks with you and Dwayne; do
3    you see that?
4        A. We're still on the same page?
5        Q. Yeah, this is Tuesday November 9th --
6        A. Yeah, I see it. I got you.
7        Q. And he says, additionally, I look forward to
8    meeting Chris Smith and learning about his operations and
9    business goals. Okay. So at this point, this is November
10   9th, they had not met with Chris Smith yet?
11       A. Correct.
12       Q. Okay. You had introduced them but they had
13   actually not met and they were, I guess, setting something
14   up?
15       MS. KREITER: Object to the form.
16       THE WITNESS: It looks like it.
17   BY MR. KAREN:
18       Q. Now, did you talk to Chris Smith after he met
19   with Waterstone?
20       A. I'm sure I did.
21       Q. Were you at that initial meeting between Chris
22   Smith and Waterstone?
23       A. I'm sure I was. Yes, I believe I was.
24       Q. Okay. Do you know when that was?
25       A. I do not.

37 (Pages 142 - 145)

Page 146

1    Q.  It's fair to say it would have been after
2 November 9th?
3    A.  Correct, yes, sir.
4    Q.  Okay.  Was it before the new year?
5    A.  I really don't remember.  I really don't.
6    Q.  Do you remember whether it was warm or cold
7 out --
8    A.  I know it's always warm in Florida.
9       MR. KAREN:  That's all right.  That's totally on
10 me.  Bad question.  You could object to that now if
11 you want, Maria.
12       All right.  If you can look at -- what are we up
13 to, 10?  I just wrote on the copy, 10.
14       (Plaintiff's Exhibit No. 10 was marked for
15 identification.)
16 BY MR. KAREN:
17    Q.  This is going to be a little difficult because
18 my copy looks a little bit different than your copy, so I
19 won't be able to direct you as well and I apologize for
20 that.  But if you look at the first page, do you have an
21 e-mail that shows March 3, e-mail at 10:53 a.m.?
22    A.  No, I've got 10:58 --
23    Q.  Go back until you see it.
24    A.  Yeah, I do have that.  At the middle -- I've got
25 you in the middle of the page.

Page 147

1    Q.  And that's an e-mail from you and it looks like
2 sending to it Dustin Owen at Waterstone?
3    A.  Correct.
4    Q.  And what you're sending as the attachment is the
5 Tampa P&L?
6    A.  Where do we see Tampa because I don't remember
7 it?
8    Q.  Attachment.  Actually, go to like the third
9 page --
10    A.  Okay, because it's not showing --
11    Q.  -- just look back because I think it's the third
12 page where you see it or fourth page.
13    A.  Let me -- March 3rd, okay.
14    Q.  Does it say attachment Tampa P&L?
15    A.  It says December P&L, it's got his picture so --
16 yes, got you, up top, yeah.
17    Q.  So it's fair to say that on March 3rd you were
18 sending the Tampa P&L over to Dustin Owen at Waterstone?
19    A.  It looks like that, yes.
20    Q.  Okay.  Why were you sending as opposed to Chris?
21    A.  I'm not sure.  I don't recall, to be honest --
22    Q.  And that would have been Chris Smith?
23    A.  Chris Smith, yes, correct.  I don't recall why
24 I'm the one sent it.
25    Q.  And if you scroll down you're going to see that

Page 148

1 it looks like you sent it -- it looks like you sent, it says
2 from Dwayne Hutto -- below that, from DwayneHutto@yahoo to
3 DwayneHutto@MutualMortgage; do you see that?  Scroll down to
4 the middle of the page.
5    A.  Yes.
6    Q.  And if you scroll down further, it says from
7 ChrisSmith@Mutual to -- and I think that's Chris Smith's
8 personal e-mail, right?
9    A.  Correct.
10    Q.  So -- and right above that it says March 2,
11 6:31 p.m. Chris Smith and it has his personal e-mail wrote;
12 do you see where it says that?
13    A.  I see the March 2nd, 2022, yeah, I see his
14 personal e-mail.
15    Q.  So it's fair to say that Chris Smith forwarded
16 this from his Mutual Mortgage e-mail, private e-mail, and
17 then sent it from private e-mail to your private e-mail and
18 then you sent it from your Waterstone over to -- I'm sorry,
19 from your Mutual Mortgage over to your Waterstone -- over to
20 Dustin Owen at Waterstone?
21    A.  Yes, it looks that way.  We looked at -- we have
22 to look at one of those P&Ls.  You know, he still helps me
23 with mine to this day.  So, I mean, it's -- but I don't
24 recall why I actually sent that.  I don't know why he didn't
25 do it.

Page 149

1    Q.  Yeah, that's my question, you don't know why he
2 sent it to you to send?
3    A.  I do not.
4    Q.  Do you know why he used personal e-mail to send
5 it to you, as opposed to just forwarding it to you on
6 Mutual?
7    A.  I do not.
8    Q.  Is it possible he just didn't want that to be
9 traceable?
10    A.  You would have to ask him.
11    Q.  But this is an example where you guys were using
12 your personal e-mail to communicate on this stuff?
13    A.  Correct.
14    Q.  Okay.  And the Tampa P&L is going to have the
15 same kind of the information as the Daytona information --
16 as the Daytona P&L but it will just be pertaining to Tampa
17 as opposed to Daytona, right?
18       MS. KREITER:  Object to the form.
19       THE WITNESS:  No, I'd have to go side by side
20    and see what he has on his P&L.
21 BY MR. KAREN:
22    Q.  Okay.  Any reason you think they'd be different?
23    A.  Yes, there's a lot of reasons.  I mean, it's
24 different things -- I don't know how they set up his P&L.  I
25 don't -- you know, his whole branch was set up different

Page 150

1 than mine so, you know, it's different.
2     Q.  You just don't know?
3     A.  I don't know.  Yeah, I don't know.  I've read
4 line by line, but it could be different.
5     Q.  But it's fair to say that you were sort of, in
6 this example, facilitating the transfer of information over
7 to Waterstone from the Tampa branch, right?
8         MS. KREITER:  Object to the form.
9         THE WITNESS:  It looks like that I sent his P&L
10     to Dustin.
11 BY MR. KAREN:
12     Q.  And you wouldn't have done that without Chris
13 Smith's knowledge, right?
14     A.  No.
15     Q.  Is that correct?
16     A.  Correct.
17     Q.  So you were sort of just doing it for him to
18 help him out?
19     A.  I'm not sure.  I don't remember, but, you know,
20 it looks like I sent it.
21     Q.  And that would have been, though, to help Chris
22 Smith out and get the information over to Waterstone, right?
23         MS. KREITER:  Object to the form.
24         THE WITNESS:  I mean, I sent the e-mail.
25 BY MR. KAREN:

Page 151

1     Q.  Right.  And he knew you were sending the e-mail?
2     A.  He knew I was sending the e-mail.
3     Q.  Do you recall any conversations before you sent
4 it over relating to sending the P&L to Waterstone?
5     A.  I don't remember, no.
6     Q.  And no conversations -- I'm referring to with
7 Chris Smith.
8     A.  Chris Smith, I don't remember.
9     Q.  Sir, I'm showing you an e-mail from a Melissa
10 Ferenc at Waterstone and you're one of the recipients; do
11 you see that?
12     A.  No, it looks like my wife was.
13         (Plaintiff's Exhibit No. 11 was marked for
14     identification.)
15 BY MR. KAREN:
16     Q.  Oh, okay, I was wondering -- I was just about to
17 ask you that.  It's NHutto.
18     A.  Yeah.
19     Q.  So your wife works for you or worked -- does she
20 work for you?
21     A.  She works -- yeah, she works with me.
22     Q.  Yeah, I should have --
23     A.  I wouldn't say that.
24     Q.  Yeah, you're not going to say that.  Just let me
25 rephrase.

Page 152

1     Does your wife work with you currently --
2     A.  Yes.
3     Q.  -- at Waterstone?
4     A.  She does, yes.
5     Q.  Okay.  And did she work with you at Mutual
6 Mortgage?
7     A.  She did, yes.
8     Q.  And so these were e-mails sent to your wife
9 about a trip to Costa Rica, right?
10     A.  Yeah, they take a -- Chris Bevan, her brother,
11 my wife's brother, is best friends with Melissa, they've
12 been friends for years.  They take a trip every year, like
13 with them and their friends.  It's not a trip I go on, it's
14 not my thing, bouncing around from airbnb to airbnb.  But,
15 yeah, they took a Costa Rica trip, they took, I want to say
16 Europe the year before and Japan the year before.  They do a
17 yearly trip together.
18     Q.  Okay.  So this trip to -- is it just a
19 coincident this is Waterstone Mortgage in March of -- 29,
20 2022?
21     A.  Absolutely.  I mean, it's -- yeah, I had no
22 interest -- once again, it's, you know, it's her brother's
23 best friend.  So it's -- they take a trip yearly.  I had
24 no -- Waterstone was not top of mind at that time, might I
25 say, something that her and I didn't discuss.

Page 153

1     Q.  Okay.  So you did not go to Costa Rica in March
2 or April?
3     A.  Absolutely not.  I have my passport in my
4 pocket, because I lost my license, but, no, absolutely not.
5     Q.  Okay.  And so this is not in any way related to
6 the transition --
7     A.  No --
8     Q.  -- of the branches?
9     A.  Absolutely in no way.  Absolutely not.
10     Q.  And as far as you know, no one else from
11 Waterstone went on this trip?
12     A.  As far as I know.  They have their same little
13 group that does it every year.  So she's -- Melissa's
14 actually come to my house for Thanksgiving probably eight or
15 ten years in a row.  Before I -- was there five years before
16 I even knew she worked in the mortgage industry.
17     So I didn't -- she's best friends with her
18 brother, she goes home -- back up North for Christmas and
19 she would come to our house for Thanksgiving.  So that's how
20 good of friends they are.  But, yeah, it has nothing to --
21 that was something that was not even top of mind back then.
22 And she had nothing to do with my decision anyway because
23 underwriting cannot recruit us, it's going to take more than
24 that.
25     Q.  Okay.  All right.  But in other words, is that

39 (Pages 150 - 153)

Page 154

1 what Melissa Ferenc does, she's an underwriter?
2    A. No, no, no, Melissa's an underwriter, yes, my
3 wife isn't, no.
4    Q. Okay. That's what I asked, Melissa's an
5 underwriter?
6    A. Yes, sir.
7    Q. All right. But just so -- you're just telling
8 me had nothing at all to do with anything --
9    A. 100 percent, no.
10    Q. -- we're talking about today?
11    A. Absolutely not.
12    Q. Now, when did you guys decide to tell your
13 branch and everybody in your branch about moving over to
14 Waterstone?
15    A. I don't remember the date. I mean, we made a --
16 me and Chris talked about it and we did one-on-ones and we
17 basically announced that we were going to be leaving, that,
18 you know, that we had -- we had one-on-ones with basically
19 our team stating that we were going to be leaving for
20 Waterstone.
21    Q. So you had the one-on-ones and then you had a
22 team call, right?
23    A. No, not to my knowledge. I don't remember a
24 team call. Not that I remember.
25    Q. All right. Sir, I'm showing you an e-mail from

Page 155

1 Chris Wolf sent April 8th at 10:21 p.m., and it says, please
2 do not -- and it looks like the two is -- it looks like
3 everybody is bcc'd probably. But it says, please do not
4 discuss what we talked about on today's call with anyone
5 outside of your families. We are still finalizing details.
6    A. Yeah, I don't remember being on this call. This
7 would have had -- this would had to have been after the
8 one-on-ones and whoever said it -- they were wanting to come
9 with us. But, yeah, I don't -- and I don't remember being
10 on this call.
11    (Plaintiff's Exhibit No. 12 was marked for
12    identification.)
13 BY MR. KAREN:
14    Q. Okay. But -- so by April 8th you had had
15 one-on-ones --
16    A. Correct.
17    Q. -- with your people?
18    A. We did a few weeks before.
19    Q. And then on April 8th you had a team call and I
20 guess discussed this with people, right?
21    A. It looks like Chris Wolf did, yeah.
22    Q. And Chris Wolf, again, you guys work in sync
23 together, he wouldn't have done that without your approval?
24    MS. KREITER: Object to the form.
25    THE WITNESS: Yeah, I don't know. I don't know

Page 156

1 about that. Once again, it's just more of -- he does
2 a lot of stuff without my approval. I don't mean --
3 he don't need to ask me, put it that way. I trust --
4 you know, he runs our branches very well. He's very
5 smart, way smarter than I am. So he's the brains.
6 So, no, I wouldn't say that at all. I don't remember
7 being on this call but I was traveling a lot, as you
8 can see with the yacht in the Bahamas and all that,
9 so I was going -- I had been traveling a lot for the
10 past year. So he does do stuff without me, put it
11 that way.
12 BY MR. KAREN:
13    Q. But generally speaking, the idea of a call like
14 this would not have been something you would have objected
15 to?
16    A. It would have been a call I would remember but I
17 don't remember.
18    Q. But he says don't discuss what we talked about
19 today, right?
20    A. I'm reading that, yeah.
21    Q. Okay. So as of April 8th, this was still a
22 secret?
23    A. I mean, it looks like that. You know, it looks
24 like the way the e-mail is reading. I don't think it's a
25 secret to us or to anyone who was wanting to come with us.

Page 157

1    Q. Right, but it would have been a secret to the
2 leadership at Mutual?
3    A. Correct.
4    Q. How come?
5    A. Well, I mean, that's -- the way that it had been
6 with Mutual previous, I don't think that -- you know, I
7 wasn't very happy with Mutual the way that everything was
8 going, might I say, with missing closings and different
9 things. They knew I wasn't happy. I expressed it to
10 every -- multiple people for several years.
11    So, once again, I didn't want to leave Mutual.
12 I don't want to go change ten bus wraps and tell everybody
13 how great Mutual is and then just all of a sudden leave and
14 have to go back and face all these people that have
15 sponsored events for us, head guys. But, you know, we
16 wanted to stay at Mutual, it's just that Mutual didn't want
17 us there or they would have gave us good customer service.
18    Q. Okay. My question is, was why it's still a
19 secret?
20    A. I don't know at the time what I was thinking.
21 No, I don't know.
22    Q. Well, you would agree with me, if something's
23 secret it's because you don't want somebody to know, right?
24    A. Generally, yeah.
25    Q. Okay. So it's fair to say you didn't want -- at

40 (Pages 154 - 157)

Page 158

1 this time, you didn't want Mutual to know, right?
2     A.  I guess you could say that.
3     Q.  Okay.  And my question is, is it fair to say
4 that the reason why is because you weren't ready to make a
5 transition at that point, right?
6     A.  Correct.
7     Q.  And in addition, you didn't want them
8 potentially being in a position to talk to your people and
9 sort of compete with you while you were setting this up --
10     A.  That was never a concern of mine at all.  The
11 main thing was with my clients and customer service.  When
12 you've got a pipe with, you know, 25 -- it would have been
13 25 million dollars-plus on it, the last thing you want to
14 do, you want to make sure that 25 million-plus gets closed
15 on time.  So --
16     Q.  Well, but --
17     A.  And I can't trust Mutual to put us out and take
18 over those files and do that because it would not have
19 happened.
20     Q.  But my point is, though, you would agree with me
21 Mutual has for regulatory, legal, other reasons, obviously
22 obligations to those customers; you would agree, right?
23     A.  I guess, yeah.
24     Q.  I mean, so they can't say they're mad at you and
25 so forgot you borrower, we're not going to help you because

Page 159

1 he's leaving?
2     A.  It happened.  It happened with the three, four,
3 five million I told you.  There was multiple closings missed
4 and I was getting screamed at by realtors with people losing
5 homes, people losing deposits, it happened.
6     Q.  Well, maybe that sort of could have been because
7 Mutual was surprised they didn't know you guys were leaving?
8     A.  Well, that's Mutual.  Mutual has underwriters,
9 they had people to take these files over.
10     Q.  Sir, I guess what I'm asking though is, wouldn't
11 you agree that a transparent transition where everybody
12 knows what's happening is far likely to interfere with the
13 borrower closing than when, snap, 3 or 20-something people
14 all of a sudden leave at once?  You don't think --
15     A.  I would not agree.
16     Q.  So you think it's better to keep it a secret,
17 not have everybody know about it --
18     A.  In this situation, yeah.
19     Q.  Okay.  All right.  So you're telling me that --
20 just make sure I understand this -- your testimony is that
21 the reason you didn't tell Mutual that you were leaving and
22 you kept it a secret was to help the borrowers?
23     A.  To help my clients, my reputation and Mutual's
24 reputation.
25     Q.  So you kept it a secret from Mutual to help

Page 160

1 them?
2     A.  I don't know if I would call it a secret.  I
3 didn't tell them. I mean, I didn't offer the information
4 up. I wanted my clients to close on time with my realtor
5 partners and to protect my reputation, get the customers in
6 their home, and also in my -- in the way I look at it is
7 Mutual of Omaha should be happy also because we're closing
8 the loans on time, they got 19 million dollars in business
9 and then they got another three to five million the next
10 month.
11     Q.  You think Mutual of Omaha should be happy
12 because for months you were soliciting their employees under
13 your supervision --
14     MS. KREITER:  Object to the form.
15 BY MR. KAREN:
16     Q.  -- and not telling them about it?
17     A.  I was not --
18     MS. KREITER:  Object to the form.
19     THE WITNESS:  I was never doing that.
20 BY MR. KAREN:
21     Q.  Sir, you met with them one-on-one.  You met with
22 your employees, didn't you just tell me a few minutes ago
23 you met with those employees one-on-one?
24     A.  Yes, sir.
25     Q.  You met with those employees one-on-one when

Page 161

1 Mutual didn't know you were leaving at that time, right?
2     A.  Correct.
3     Q.  And you did that and you did it, as per this
4 e-mail, and you tried to keep it secret from your Mutual,
5 didn't you?
6     A.  Well, what you said is I'd been recruiting --
7 I'd been sending clients.  Well, 19 or 19.5, whatever the
8 number is, you can look at the P&L, was our second largest
9 month ever.  So I would have been pushing clients, how would
10 we have our second largest month ever --
11     Q.  I said employee, I didn't say --
12     A.  Oh, on recruiting employees, no, I --
13     Q.  Well, you had these one-on-ones with employees,
14 didn't you?  You just said that a few minutes ago?
15     A.  We did, to announce that we were leaving.  They
16 had an option.  Several stayed behind.  They were fired, by
17 the way -- several stayed behind.  But we --
18     Q.  Right.  But while you were --
19     MS. KREITER:  Let him finish.
20 BY MR. KAREN:
21     Q.  While you were meeting with them, these were
22 people that you supervised and were paid to supervise by
23 Mutual Mortgage, right?
24     A.  Correct.
25     Q.  And while you were paid to supervise them from

41 (Pages 158 - 161)

Page 162

1 Mutual Mortgage, isn't it true that you were inviting them
2 to come join you at another company?
3    A. That is not true.
4    Q. You didn't invite them?
5    A. No, sir.
6    Q. You didn't give them the option --
7    A. I made an announcement --
8    Q. You made an announcement and you gave them the
9 opportunity to come with you, right?
10       MS. KREITER: I want to say --
11       MR. KAREN: Right?
12       MS. KREITER: Mr. Karen --
13       MR. KAREN: Right?
14       MS. KREITER: You have to let the witness
15 answer.
16       MR. KAREN: I'm letting him answer. Right?
17       THE WITNESS: I made an announcement that we
18    were leaving. It was their option for them and their
19    families. Once again, like I said, a lot of them are
20    our good friends. The first thing they said is I'm
21    coming with you. Almost all of them said we're
22    coming with you.
23       That doesn't -- that was never us trying to get
24    them to leave. That was us making an announcement.
25    I was leaving, I didn't care who came. I didn't care

Page 163

1 if Chris Wolf came. I was leaving because I was done
2 when that U-Haul was sitting in front of my office
3 with a family in it and Mutual wasn't closing them on
4 time, that's when I was done.
5 BY MR. KAREN:
6    Q. Sir, the entire time you testified earlier the
7 discussions you had with Waterstone from the beginning were
8 bringing your branch, wasn't it?
9    A. That is not correct.
10    Q. That's not what you said under oath earlier
11 today?
12    A. I said that -- I said that that branch is in my
13 name, but I was not -- I never said I'm bringing my branch,
14 never.
15    Q. You didn't testify to that?
16    A. Not to my knowledge, I don't remember saying
17 that. We can go back and look at it if you want.
18    Q. No, we don't need to, it's there.
19       All right. And so I just want to make sure that
20 I got this straight. You are employed by Mutual at this
21 time, right, as of April 8th, right?
22    A. Correct.
23    Q. You are meeting one-on-one without Mutual's
24 knowledge --
25    A. Correct.

Page 164

1    Q. -- with the employees that you are paid to
2 supervise, correct?
3    A. I do one-on-ones every month, yes.
4    Q. Is that correct?
5    A. Correct.
6    Q. And during these meetings you are giving them
7 the option to join you at Waterstone, correct?
8       MS. KREITER: Object to the form.
9       THE WITNESS: I'm telling them that I'm leaving.
10 BY MR. KAREN:
11    Q. And you are giving them an option to join you,
12 yes?
13    A. Well, I'm telling them that I'm leaving. I'm
14 announcing that I'm leaving.
15    Q. Did you give them the option to join you?
16    A. I don't recall exactly how every conversation
17 went, to be honest with you.
18    Q. Are there some conversations that you didn't
19 give them the option to join? I'm leaving, you're staying
20 here?
21    A. I would have to think about that.
22    Q. Well, did you ever tell them you're staying
23 here --
24    A. I know a few people stayed behind.
25    Q. Okay. That's not my question. My question

Page 165

1 is --
2    A. I don't remember.
3    Q. I understand people have the choice because you
4 can't force anyone to do anything, right?
5    A. Correct.
6    Q. But the fact is you gave them a choice, didn't
7 you?
8    A. I don't remember. I don't remember how the
9 conversations went.
10    Q. So this is an e-mail dated April 28th, again, I
11 know you're not on this. It's from Maria De Sevilla to
12 Dawson Walker; do you see that?
13    A. Um-hmm, yes, I do.
14       (Plaintiff's Exhibit No. 13 was marked for
15    identification.)
16 BY MR. KAREN:
17    Q. Okay. And by the way, we could put this down
18 for one second. The people that you spoke to who you gave
19 the option of joining Waterstone involved -- included
20 Krystin, who we talked about, left about a week before you,
21 right?
22       MS. KREITER: Object to form, misstates
23    testimony.
24       THE WITNESS: I don't remember.
25 BY MR. KAREN:

42 (Pages 162 - 165)

Page 166

1    Q.  Well, you don't -- Krystin did leave before you,
2  right?
3    A.  Correct, yeah.
4    Q.  And your LOA, Cameron, left before you, right?
5    A.  Correct.
6    Q.  And those are people that you don't recall if
7  you gave them the option to join?
8    A.  Well, I mean, I must have if they left, but I
9  don't recall our conversation.
10    Q.  And do you think it's just a coincidence that
11  all of these -- that the entire rest of your branch left on
12  the same exact day as you?
13    A.  Well, I mean, if they wanted to come and I
14  announced it and they say I'm coming with you, then, hey.  I
15  mean, once again, I don't recall our conversation.  I made
16  the announcement, the ball was in their court, whether they
17  wanted to come or not.
18    Q.  Okay.  But the announcement gave them that
19  option, didn't it?
20    A.  I'm not sure.  I don't remember the
21  conversation.
22    Q.  You don't know if it did?
23    A.  I don't know.
24    Q.  Okay.  And isn't it true, sir, that all of these
25  conversations occurred while you were still an employee paid

Page 167

1  to supervise these people for Mutual's behalf?
2    A.  Correct.
3    Q.  Do you know what a fiduciary duty is?
4    A.  No, I don't.
5    Q.  Did you know that -- did you know that -- did
6  you know if you had a duty of loyalty to your employer at
7  Mutual?
8    A.  I would think so.
9    Q.  Do you think that you met that duty of loyalty
10  while being paid by them to supervise their employees,
11  giving them the option to join another company?
12    A.  I didn't give them an option that I remember
13  saying.
14    Q.  So they just had epiphanies and immediately
15  said, oh, we want to come with you?
16    A.  I don't remember.  I don't know what they were
17  thinking, but obviously they wanted to leave because I
18  didn't push them to leave, nor do I remember giving them an
19  option.  I remember making an announcement.
20    Q.  Right, but they hadn't left until you made that
21  announcement, had they?  They left when you gave them that
22  option, didn't they?
23    MS. KREITER:  Can you just watch --
24    THE WITNESS:  I didn't give them an option.
25    MS. KREITER:  Can you please watch your tone.

Page 168

1    THE WITNESS:  Once again, I didn't give them an
2    option.
3  BY MR. KAREN:
4    Q.  But they hadn't left until whatever you want to
5  call it you did, they didn't leave before that, did they?
6    A.  They left after our one-on-one meetings and then
7  when they left you've got the dates.
8    MR. KAREN:  I'll just -- can you read back my
9    question?  I'd like an answer to the question asked.
10    (Record read.)
11    THE WITNESS:  They didn't leave before what?
12  BY MR. KAREN:
13    Q.  They didn't leave, they hadn't left until you,
14  quote, announced you were leaving, right?
15    A.  That is correct.  They left after the
16  announcement, that is correct.
17    Q.  Okay.  And they just happened to leave and go to
18  the company you were joining, right?
19    A.  That's where they went, yes.
20    Q.  And they left on the exact same day you left,
21  right?
22    A.  I believe the majority of them did.  I can't go
23  through everyone's dates, but...
24    Q.  Except for your LOA who left before you, right?
25    A.  Cameron, yeah, I had multiple LOAs, but, yes, I

Page 169

1  have three.
2    Q.  Now let's look at this e-mail.  This e-mail from
3  Maria De Sevilla to Dustin Owen says -- and this is on April
4  8th, 9:20 a.m., okay, the last e-mail if you recall was
5  10:00 p.m., right?
6    A.  I don't know.  I don't recall it, I'd have to go
7  back and look.
8    Q.  That's fine.  So it says, I'm sure you know, and
9  just in case you don't know, I will move over with you next
10  week.  Chris was on our team call and spoke to me, Mike,
11  Sunshine and Beatrice about the move.  Right?  Oh, my God, I
12  so want us to develop those builder relationships and become
13  a preferred lender.  I'm totally up for going out and
14  talking to the builders and earning their business.
15    A.  Yeah, I wasn't on this call, once again.  I mean
16  it's -- I don't remember being on the call.  I don't think I
17  was.  What she's referring to is they -- Mutual, I'd always
18  asked them to get a construction product and they didn't
19  have one, nor did they -- they always said they're working
20  on it for five years, because I have buddies that are
21  builders and they were always working on it --
22    Q.  So when Chris made the announcement on this team
23  call, he obviously said things that made these people
24  excited, right?
25    A.  I'm not sure, I wasn't on it.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 170

1    Q.  Does it seem like that from this e-mail to you?
2    A.  I don't know how it seems, I wasn't on the call,
3 so.
4    Q.  But again, this would be a call that -- let me
5 go one e-mail below -- I know you've got to shut off, we'll
6 stop after this.  This is an e-mail, if you look down,
7 Thursday, April 7th, 4:36 p.m. and it says -- you see, Chris
8 debriefed me on Waterstone today?
9        MS. KREITER:  I'm sorry, you're on the second --
10       MR. KAREN:  First page at the bottom.
11       THE WITNESS:  I don't see that.
12       MR. KAREN:  Maybe it's the second page on the
13 printout.
14       THE WITNESS:  Oh, yeah.
15       MR. KAREN:  Yeah, it's on the second page.
16 BY MR. KAREN:
17    Q.  Do you see that?  And it says, I remain excited.
18 Yay.  It's on the second page --
19    A.  That was my question for GVS the other day.
20 Very exciting stuff, that's what I've got.
21    Q.  Okay.  Maria De Sevilla --
22    A.  Oh, Maria, I thought you said -- okay.  Yeah, I
23 do see it, I'm sorry, I apologize.
24    Q.  So Chris has an e-mail, Maria gets excited -- or
25 Chris has a meeting about Waterstone and Maria is all

Page 171

1 excited after that meeting, right?
2    A.  Um-hmm.
3    Q.  It looks like she was given more than just an
4 announcement, it looks like there was a little bit of a
5 sales process, doesn't it?
6        MS. KREITER:  Objection to form.
7        THE WITNESS:  I'm not sure.  I wasn't in that
8 meeting.
9        MR. KAREN:  All right.  You can switch.
10       THE VIDEOGRAPHER:  This is the end of media
11 number two.  We're going off the record.  The time is
12 12:54.
13           (Off the record.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

1           CERTIFICATE OF OATH
2
3 STATE OF FLORIDA
  COUNTY OF HILLSBOROUGH
4
5    I, Victoria White, Notary Public, State of Florida, do
6 hereby certify that DWAYNE HUTTO appeared personally before
7 me and was duly sworn.
8    WITNESS my hand and official seal this 15th day of June,
9 2023.
10
11
12
13
14
15
16
17
18
19       Victoria T. White, Court Reporter
          Notary Public, State of Florida
20        Notary Commission No. HH 341493
          Commission Expires:  02/05/2027
21
22
23
24
25

Page 173

1           CERTIFICATE OF REPORTER
2 STATE OF FLORIDA
  COUNTY OF HILLSBOROUGH
3
4    I, Victoria White, Stenograph Shorthand Reporter, and
5 Notary Public, do hereby certify that I was authorized to
6 and did stenographically report the foregoing deposition of
7 DWAYNE HUTTO; that the review of the transcript was not
8 requested; and that the foregoing Pages 4 through 264,
9 inclusive, are a true and complete record of my stenographic
10 notes.
11    I further certify that I am not a relative or employee
12 of any of the parties, nor am I a relative or counsel
13 connected with the parties' attorneys or counsel connected
14 with the action, nor am I financially interested in the
15 outcome of the action.
16    DATED this 29th day of June, 2023.
17
18
19
20
21
22
23       Victoria T. White, Court Reporter
          Notary Public, State of Florida
24        Notary Commission No. HH 341493
          Commission Expires:  02/05/2027
25

44 (Pages 170 - 173)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 172

1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                        TAMPA DIVISION
3                        Civil Action No.: 22-CV-01660
4
    MUTUAL OF OMAHA
5   MORTGAGE INC.,
6            Plaintiff,
    v.
7
    WATERSTONE MORTGAGE
8   CORPORATION,
9            Defendant.
    _____/
10
11                      DEPOSITION OF
12                      DWAYNE HUTTO
13              (Volume II, pages 172 - 266)
14  DATE TAKEN:        June 15, 2023
15  TIME:              9:03 a.m. to 3:57 p.m.
16  PLACE:             Gunster, Yoakley & Stewart, P.A.
                       401 East Jackson Street
17                     Suite 1500
                       Tampa, Florida 33602
18
    TAKEN BY:          The Plaintiff
19
    REPORTED BY:       Victoria White
20                     Court Reporter and Notary Public
21
22
23
24
25

Page 173

```
1 A P P E A R A N C E S :
2  ARI KAREN, ESQUIRE
      COURTNEY WALTER, ESQUIRE (Via Zoom)
3  MARK CARROL, ESQUIRE
      OF: MITCHELL SANDLER, LLC
4      1120 20th Street N.W.
          Suite 725
5          Washington, D.C. 20036
              202.886.5265
6          Akren@mitchellsanders.com
7      APPEARING ON BEHALF OF THE PLAINTIFF MUTUAL OF
          OMAHA MORTGAGE, INC.
8
      MARIA L. KREITER, ESQUIRE
9  OF: GODFREY KAHN
          833 East Michigan Street
10      Suite 1800
          Milwaukee, Wisconsin 53202
11      414.287.9466
          Mkreiter@gklaw.com
12
      STEPHANIE ZIEBELL, ESQUIRE (Via Zoom)
13  GENERAL COUNSEL WATERSTONE MORTGAGE CORPORATION
14      APPEARING ON BEHALF OF THE DEFENDANT WATERSTONE
          MORTGAGE CORPORATION
15
16  ALSO PRESENT:
17  Rob Williams - Videographer
18
19
20
21
22
23
24
25
```

Page 174

```
1
2              INDEX OF PROCEEDINGS
                      VOLUME II
3  Witness                              Page
      DWAYNE HUTTO
4      Continued Direct Examination by Mr. Karen      176
5  CERTIFICATE OF OATH                  265
6  CERTIFICATE OF REPORTER              266
7
          PLAINTIFF'S INDEX OF EXHIBITS
8                  VOLUME II
                    (Attached.)
9
      Exhibit      Description              Marked
10
      Exhibit 14    April 8, 2022 E-mail          178
11
      Exhibit 15    April 18, 2022 E-mail         183
12
      Exhibit 16    April 17, 2022 E-mail         192
13
      Exhibit 17    March 29, 2022 E-mail         199
14                  (Hennessey)
15  Exhibit 18    March 29, 2022 E-mail (Hennessey    199
                    File)
16
      Exhibit 19    April 13, 2022 E-mail (Hennessey   209
17                  Title Docs)
18  Exhibit 20    April 19, 2022 E-mail String      213
19  Exhibit 21    April 15, 2022 E-mail          214
20  Exhibit 22    April 6, 2022 E-mail          216
21  Exhibit 23    April 24, 2022 E-mail String      218
22  Exhibit 24    April 22, 2022 E-mail with       219
                    Attachments
23
      Exhibit 25    May 25, 2022 E-mail String      221
24
      Exhibit 26    June 9, 2022 E-mail           226
25
      Exhibit 27    Godfrey Kahn Expert Report      233
```

Page 175

```
1
      Exhibit 28    Mutual of Omaha Mortgage Loan      248
2                  Originator Employment Agreement
3              S T I P U L A T I O N S
4      It is hereby stipulated and agreed by and between counsel
5  for the respective parties and the deponent that the reading and
6  signing of the deposition be waived.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 176

```
1              P R O C E E D I N G S
2      (Proceedings continued from Volume I.)
3      THE VIDEOGRAPHER:  We're back on the record the
4  time is 1:37.
5              EXAMINATION
6  BY MR. KAREN:
7  Q.  Mr. Hutto, I have a question for you.
8  A.  Yes, sir.
9  Q.  When you were leaving Mutual I wanted to ask you
10  what devices you had.  And what I mean by it, computer
11  devices.  You had a cell phone, right?
12  A.  Yeah, only a cell phone and whatever computer
13  they -- which I would have gave that back to them.
14  Q.  Okay.  And you didn't have iPads or anything --
15  A.  I don't use an iPad.
16  Q.  So you're just a cell phone guy?
17  A.  I'm a cell phone -- pretty basic.
18  Q.  Okay.  And then I assume you got a computer at
19  Waterstone?
20  A.  I did, yes sir.
21  Q.  Okay.  And you just have one cell phone, right?
22  A.  Correct.
23  Q.  Okay.  And do you ever use any of your wife's
24  computer devices?
25  A.  No, never.
```

2 (Pages 173 - 176)

Page 177

1    Q.  If you open up -- let me ask this:  If you open
2  up -- let's say you have your Waterstone computer?
3    A.  Um-hmm.
4    Q.  You can go on the internet?
5    A.  Yeah.
6    Q.  Okay.
7    A.  I mean, it blocks a lot of the websites.  You
8  can put a sports bet in.  I've tried that before.
9    Q.  Got you.  No FanDuel, right?
10    A.  Yeah.
11    Q.  And if, like, you wanted to pull up your
12  personal e-mail, can you pull up a personal e-mail for, like
13  Yahoo e-mail?
14    A.  I don't -- I'm not for sure on this but I don't
15  think so.
16    Q.  Okay.
17    A.  I think it blocks that, too.
18    Q.  Okay.
19    A.  I'm not for sure on that but I think it does.
20    Q.  Okay.  All right.
21    A.  Generally, everything that goes in my personal I
22  use on my phone.
23    Q.  I was --
24    A.  It's the apps on my phone.  I don't have a home
25  computer.  I mean --

Page 178

1    Q.  Even if --
2    A.  My wife has one but I don't use it, no.
3    Q.  Got it.  So you're just pretty much a phone guy?
4    A.  Correct.  I would never get on my computer if it
5  was up to me.
6    Q.  Got you.  Let me show you another e-mail here,
7  we'll call this --
8        MR. KAREN:  I think we're up to 13; is that
9  right?
10        THE COURT REPORTER:  14.
11        MS. KREITER:  14.
12        MR. KAREN:  Just let me know when you take a
13  look.
14        THE WITNESS:  Yes, sir.  Okay.
15        (Plaintiff's Exhibit No. 14 was marked for
16  identification.)
17  BY MR. KAREN:
18    Q.  First of all, who is Michael Irish?
19    A.  He works -- he worked with Mutual and now works
20  for Waterstone also.
21    Q.  Loan officer?
22    A.  Yes, sir.
23    Q.  Okay.  And this is April 8th again, 9:36 a.m.
24  This probably would have been -- he mentions, first off, I
25  am beyond excited for this new endeavor.  I do have two

Page 179

1  questions I forgot to ask on the team meeting.  Do you see
2  where he says that?
3    A.  Yes.
4    Q.  So that indicates that this meeting would have
5  happened on April 28th sometime and was probably before 9:36
6  a.m.?
7    A.  9:36 a.m., correct.
8    Q.  And again, you were not -- you don't recall
9  being on that meeting?
10    A.  I wasn't on the team call.
11    Q.  Are you on most team calls?
12    A.  Not really.  I mean, unless it's something
13  pressing that Chris wants me on, he does -- I'm on some of
14  the one-on-ones now we do.  Ever since COVID we do a lot of
15  Zoom.  But, you know, I was on a few of our one-on-ones that
16  we just had this past week, but he did a lot of them
17  himself.
18    Q.  Now, I mean, obviously this was a big
19  announcement, but I guess -- you had announced this -- you
20  said you had had one-on-ones with a lot of the people
21  already, right?
22    A.  Well, we did one-on-ones previous to this.  So,
23  I mean, it was -- you know, when we made our announcement
24  that Chris and I were leaving, we did one-on-ones, correct.
25    Q.  Okay.  I guess what I'm confused about is, you

Page 180

1  had previously said you did these one-on-one meetings and
2  then there was obviously a team meeting?
3    A.  Not team, probably -- I think he's referring to
4  that team call.  We didn't at that time -- and once again,
5  I'm probably -- I'm assuming I'm out of town on this thing,
6  but I mean, I was back and forth then, I was going on a lot
7  of Bahamas trips, might I say, because his boat was out
8  there before he sold it.  So --
9    Q.  Are we talking about At Last?
10    A.  That's what we're talking about.  Any time he
11  made a phone call I was going, put it that way --
12    Q.  I can totally understand.
13    A.  -- I'm not saying no, but I'm assuming that I
14  was out of town.  I don't know.  I would have to look that
15  up.  But this is probably a team call because we don't do
16  many team meetings, might I say.  Not ever since COVID, and
17  now everybody is all about Zoom.  So it's hard to get people
18  to come in the office anymore.
19    Q.  Got you.  I guess what I'm -- did you do -- let
20  me restate this.  So you did team meetings before this
21  team -- strike that.
22        You did one-on-one meetings with LOs before the
23  team call?
24    A.  Yes.
25    Q.  Okay.

3 (Pages 177 - 180)

Page 181

1    A.  I know it was before the 8th.
2    Q.  Okay.  And my question is, did you do them with
3  all of the staff?  Before you answer, the reason I'm asking
4  that is if you look at this e-mail --
5    A.  Um-hmm.
6    Q.  -- it looks like, you know, and maybe I'm
7  assuming, but I'm beyond excited, they're asking questions,
8  so it would suggest to me they didn't know this was coming,
9  or at least Mr. Irish didn't.
10    A.  Well, it says, a couple of questions I forgot to
11  ask while on the call.
12    Q.  Yeah.
13    A.  But, yeah, to my knowledge, we did one with
14  every employee.  I mean, it's -- my thing was it's a big
15  decision because the branch is in my name, they have
16  families, I'm going to let people know.
17    Q.  Right.  No, I understand that.  I guess what
18  I'm -- my question simply was, to the best of your
19  knowledge, no one found out for the first time on the 8th?
20    A.  No, not to my knowledge at all.
21    Q.  Okay.  Is there anything they learned maybe
22  about the timing that they weren't aware of before?
23    A.  To my knowledge, no.
24    Q.  Okay.  When did you guys decide that the time
25  was going to be on or around the 26th?

Page 182

1    A.  It's -- really just went back to -- I was
2  trying -- we had a really big pipeline, I was trying to make
3  sure that what happened with the last three or four million
4  didn't happen with that 19 million.  So it really came down
5  to customer service making -- helping the clients close and
6  that was basically it.
7    Q.  Yeah, and I'm sorry, sir, I wasn't asking why, I
8  was asking just when did you decide on that day?
9    A.  I don't know the date.  I mean, I don't remember
10  what date we decided to make the move, I mean, or, you know,
11  why that date was chosen, I don't.
12    Q.  I guess what I'm trying to find out is, how long
13  had you been kind of knowing it was going to be the 26th?
14  Was that something you decided a week before, two weeks
15  before --
16    A.  I don't remember if we knew that it was going to
17  be the 26th.  It would have been somewhere in March,
18  probably the end of March to the beginning of April, would
19  have been when I'm thinking when we decided that I'm
20  leaving, you know, me and Chris.  We had already discussed
21  that but I don't remember the date.
22    Q.  Okay.  Now, do you know why -- again, I know you
23  weren't on this e-mail, he asks, Michael Irish, can I be one
24  of the first people to transition over; do you know why he
25  asked for approval or made that -- or asked for that

Page 183

1  request, in other words, as opposed to just saying, well,
2  I'm leaving on this day?
3    A.  I do not.  You'd have to ask him.
4    Q.  Sir, I'm showing you what's been marked as
5  Exhibit 15 and this the -- it's a meeting request; do you
6  see that?
7    A.  Yes.
8       (Plaintiff's Exhibit No. 15 was marked for
9  identification.)
10  BY MR. KAREN:
11    Q.  And it comes from Dustin Owen over at
12  Waterstone.  And you're on that as well as a number of
13  people from Waterstone; do you see that?
14    A.  I do.
15    Q.  Okay.  And the meeting title is on-board package
16  review.
17    A.  Okay.
18    Q.  Do you recall this meeting?
19    A.  Not --
20    Q.  Or it looks like a Zoom.
21    A.  Not -- yeah, I don't -- I mean, it's just a -- I
22  don't recall -- no, I don't recall what was said on the
23  call.
24    Q.  Well, it -- was the subject a review of your
25  on-board package or a review of other people's on-board

Page 184

1  package or multiple on-board packages of multiple people; do
2  you remember that?
3    A.  Yeah, it looks like it was addressed to me, so
4  this probably would have been about my on-board package, I'm
5  assuming, but I don't --
6    Q.  You just don't remember?
7    A.  I don't remember, no, sir.
8    Q.  At what point -- how did you guys come to decide
9  on the packages for your staff?
10    A.  That would be -- that's not -- I wasn't involved
11  in that.  That would have been -- that would be something
12  Chris would have been involved in or actually probably I
13  would think Waterstone would have been involved in it.  I
14  mean, I don't take people's applications when I'm -- you
15  know, for Waterstone.  So they have -- the same Mutual, they
16  have an on-boarding team, so I'm assuming that they would
17  have been the ones that handled that.
18    Q.  Well, I guess so -- I mean, in other words
19  when -- when people were given offers -- and I'm just
20  talking about your team members, how did you know what they
21  were going to be?
22    A.  I did not.
23    Q.  Was Chris Wolf involved in that?
24    A.  Yeah.  I mean, once again, yeah, I mean, it
25  would have been -- it would have been Chris that would have

4 (Pages 181 - 184)

Page 185

1 been involved in the offer. He more handles that stuff, I'm
2 out running around and running events, things of that
3 nature.
4    Q. Okay --
5    A. But, yeah, I don't remember. I can tell you
6 that anybody that came over with us, whether it was somebody
7 we hired new that came from Waterstone or previous people
8 that wanted to come, everything stayed the same on their
9 offers as it would have been with Mutual.
10    Q. Okay. So --
11    A. We didn't change our pay, might I say.
12    Q. Okay. Now, we can go back -- and I apologize,
13 the Michael Irish e-mail a second ago, Exhibit 14.
14    A. Yes, sir.
15    Q. And if you look, continue down the e-mail, he
16 says, a couple of questions, will we still be on a draw or
17 would this be a hundred percent commission? Is there health
18 insurance? So had you got -- when had you guys made those
19 decisions?
20    A. This is April 8th. Everything was the same.
21 Obviously, there's health insurance, you have to have health
22 insurance with a bank and we are always a hundred percent
23 commission. So I don't know, I mean, that's -- that was
24 even with Mutual. I mean, if you're not an LOA or you're
25 not an hourly employee, then you're receiving commission.

Page 186

1    Q. Okay. But did they get a base salary at Mutual?
2    A. No, they did not.
3    Q. So --
4    A. Well, I mean, it depends on who it is but, you
5 know, the salespeople, no.
6    Q. Okay. And did they get a base salary over at
7 Waterstone?
8    A. No.
9    Q. So in both cases they were a hundred percent
10 commission?
11    A. Correct. Everything is exactly the same on
12 both, to my knowledge. I don't -- unless I'm missing some
13 little small detail --
14    Q. I understand. I understand.
15    A. Yes, so it's exactly the same, to my knowledge.
16    Q. Okay. And were the basis points payable the
17 same way? In other words --
18    A. The basis points are exactly the same.
19    Q. Okay. So the move over was effectively -- it
20 was an even move, right? You didn't get more basis points
21 or anything else, you just kept everything the same?
22    A. It was even, every aspect, except getting a lot
23 better customer service.
24    Q. Okay.
25    A. And being with a better company, in my opinion.

Page 187

1    Q. All right. So how did Waterstone know what to
2 set that compensation at?
3    A. I told them the way that we were previously set
4 up and the way that anybody that would be coming on new,
5 which we brought on some new people that was not with Mutual
6 and anybody decided to join, you know, our team, would be
7 the way it's always been since day one, from five, six years
8 ago when we started.
9    Q. Okay. Did you bring on a number of people when
10 you first, like, literally when you first started with
11 Waterstone?
12    A. A few. Yeah, a few right after -- it was a few
13 people that came on with Waterstone. I don't remember the
14 exact days, I just know the Gilberts and some people came on
15 after.
16    Q. And why did they come on after?
17    A. They came on because mortgage banks are going
18 out of business right now, so. Union Home Mortgage went out
19 of business in Daytona.
20    Q. I'm sorry, you said right now?
21    A. Union Home Mortgage --
22    Q. No, no, no, let me stop you. I'm sorry, I'm not
23 trying to cut you off.
24    A. You're good.
25    Q. What I'm confused about is you said Union Home

Page 188

1 Mortgage is going out of business and you said right now,
2 but I'm not asking you about present day, I'm asking you
3 about --
4    A. Yeah, well, that's what I mean about right now,
5 I was talking about back then. The market was starting to
6 fade and companies, you know, around that time, Union Home
7 Mortgage that Rachel Gilbert ran went out of business and
8 they came to us, a couple of their top producers and wanted
9 to work for us.
10    Q. Got it. Okay.
11    A. It had nothing to do with Mutual or Waterstone
12 thing at all it's just --
13    Q. Timing --
14    A. -- they wanted a good place to work.
15    Q. Okay. Now when these offers were presented
16 to -- who presented the offers to the employees at your
17 branch?
18    A. I don't know. I'm assuming on-boarding time and
19 Chris might have been involved but I don't know who
20 submitted them.
21    Q. Now when you had advised the employees at these
22 meetings -- at these one-on-one meetings of your
23 announcement, was anybody from Waterstone there to tell the
24 employees, hey, you've got an option to work for us?
25    A. No.

5 (Pages 185 - 188)

Page 189

1    Q.    So Waterstone sort of left that to you, right,
2    to tell them about it and see if they wanted to come over?
3    A.    Yeah, I didn't discuss that with Waterstone.    It
4    was, you know, it was just really, you know, I let them know
5    that I was coming over so they had the option.    I wasn't --
6    I wasn't worried, might I say, we've been together for years
7    and like I said, they're some of my best friends, several
8    are my neighbors, next-door neighbors work for me and work
9    for us as a team.    I never say for me, I try not to.    But,
10   yeah, I kind of had a good feeling they would want to come
11   because we're good friends and just like, you know, the same
12   way it would be with you.    But, yeah, Waterstone we never
13   discussed what I need to tell them or not.
14   Q.    Okay.    And that's my question, Waterstone left
15   this part of the process up to you?
16   A.    Correct.
17   Q.    Now I think we covered this before; your
18   compensation in large part is based on the production of the
19   people who work in your branch, right?
20   A.    Correct, I also do quite a bit myself.
21   Q.    That's what I was getting at.    What percent of
22   the production -- I know it changes month by month, but on
23   average what do you think, what percentage do you do
24   yourself?
25   A.    Now or back then?    It's different now --

Page 190

1    Q.    Okay.    Let's ask back then.
2    A.    Back then, I was averaging let's say three
3    million to four million.    I want to say our branch was 10 to
4    12, 13, somewhere in there.
5    Q.    So you were doing maybe 25 percent?
6    A.    25, I'd say 25 to 30 percent, correct.
7    Q.    And now?
8    A.    Now we're around two million and we're doing
9    more volume.    You know, we're doing -- last three months we
10   did 16, 17 so now you can do the math, it's like 20 percent.
11   Q.    I can't do that math.
12   A.    17.5 percent.
13   Q.    That's why you're in mortgage banking and I'm a
14   lawyer.
15        Who are your biggest producers?    I'm sorry, at
16   the time you made the move who were you biggest producers?
17   A.    At the time we made the move I had just lost
18   Jay, which I told you was a top producer.    He even beat me
19   most of the time.    And then after that, it was myself, Chris
20   Wolf, Dawson Walker, which is a team leader and my neighbor
21   and Tatiana Geraldo, which is also -- both of them were the
22   realtors I told you about that came on and we trained.
23        That would be the -- probably the four, five --
24   Jake was gone by then, that would have been the top four.
25   Q.    And what percentage of the branch did you

Page 191

1    guys go --
2    A.    I would say 65 percent.
3    Q.    80/20 rule kind of thing?
4    A.    Maybe.    Like 70/30, somewhere in there.    I'd
5    have to go back and look.
6    Q.    Now were you worried about, you know, somebody
7    like a Tatiana objecting to the move?
8    A.    I mean, you always wonder, but at the time, like
9    I said, we're so close.    I mean, I've known her for
10   20-something years since I was in college.    Same with
11   Dawson, I coached his kid forever, he's my next door
12   neighbor now.    I know that a lot of people are frustrated
13   and they -- I know that Dawson had talked about leaving if
14   we didn't -- I mean, you know, and Jake had moved and he had
15   just lost several, several deals and a big realtor.    So
16   Dawson had discussed with me about leaving if something
17   didn't change, put it that way.
18   Q.    Okay.    So I'm just trying to get an answer.    I
19   mean, is it fair to say that even if you kind of think,
20   well, a person I think will come with me but you're always a
21   little bit worried until it actually happens; is that fair
22   to say?
23   A.    Possibly.    Yeah, I was going either way.    I
24   didn't care.    I mean, you know, either way, if it was just
25   me I can still produce so I can still make a check.

Page 192

1    Q.    Look at this e-mail and I'm only going to ask
2    you a little bit about the first part of this, sir.    Where
3    it says -- this is an e-mail dated April 17, 5:23, p.m. from
4    Dustin Owen at Waterstone over to you and Dwayne; do you see
5    that?
6    A.    I do, yes.
7        (Plaintiff's Exhibit No. 16 was marked for
8    identification.)
9    BY MR. KAREN:
10   Q.    And it says, I felt like day one went as well as
11   it could.    I really enjoyed being in your office.    You folks
12   are great people.    They are going to fit in nicely with our
13   group.    Do you know what he was referring to when he said
14   "day one?"
15   A.    What's the date again, the 17th?    I'm assuming
16   he was referring to Krystin and Cameron's day one.
17   Q.    I see.    Okay.    Now he says, I really enjoyed
18   being in your office.    Did Dustin Owen come down to the
19   office?
20   A.    Yeah, he popped in.    I do remember him popping
21   in.    He wasn't there long.    He didn't work out of the office
22   but I do remember him popping in.
23   Q.    Okay.    And this was still a Mutual office on
24   that date --
25   A.    Correct, yeah.

6 (Pages 189 - 192)

Page 193

1    Q.  Okay.  So he comes in and --
2    A.  The lease is underneath my name, Mutual leases
3 it from me.
4    Q.  Right.  Okay.  But it was still under --
5    A.  Correct.
6    Q.  -- Mutual had a lease at the time?
7    A.  Correct.
8    Q.  And it says, your folks are great people.  It's
9 fair to see he met a bunch of your loan officers that day?
10    A.  No.  I mean, it would have only been -- I mean,
11 it would have only have been those two that he's talking
12 about.  I mean, it would have been Krystin and Cameron would
13 have been the two he would have been talking about.
14    Q.  He wouldn't have come over and met --
15    A.  No, absolutely not.
16    Q.  -- the rest of the people?  Why is that?
17    A.  Because I just know that we didn't ever have
18 that meeting.  Like I said, me trying to get my people in
19 the office when some of them work in South Florida and, you
20 know, all over, just trying to get them in even for a
21 luncheon, you know, a lunch, free lunch, it's hard to get
22 them all together.  So that wouldn't have been the case.
23    Q.  Would it have been easier, though, like, hey,
24 this guy from Waterstone is going to be here day one, you
25 know, everybody be in the office?  I mean, do you recall

Page 194

1 anything like that?
2    A.  Absolutely not.  Not to my knowledge, no.  Yeah,
3 it's -- he popped in, I was there.  Me and Chris are there
4 a lot, but they -- most of the loan officers work from home or
5 in the field and that's kind of their job.  You know, we
6 don't police them.  The way I look at it, if they're sitting
7 in the office they're not getting business.
8    Q.  I mean, you weren't surprised.  I mean, he
9 didn't come in as a total surprise.
10    A.  I don't -- I don't remember, to be honest.
11    Q.  I mean, but he wouldn't have driven over there
12 on the hope that you would be there; is that fair to say?
13    A.  There's another Waterstone office over there in
14 Port Orange at the time, so I don't remember how -- when he
15 came, but I know that there's another Port Orange -- there's
16 a Port Orange office that was with those other two guys.
17    Q.  So, I mean, are you saying this was just the --
18 literally a pop-in where you didn't even --
19    A.  I'm saying it could have been but I don't
20 remember.
21    Q.  You just don't remember --
22    A.  I don't remember scheduling a date to meet.  You
23 know, I wouldn't meet him because I've already met him
24 multiple times, you know, so.
25    Q.  He says, we did not get a chance to dig into

Page 195

1 this as much as -- as promised.  Did you guys talk at all
2 about -- what did you guys talk about when he came over --
3    A.  I don't -- I don't remember.  I remember
4 actually -- I remember I was with Ty (phonetic) at that
5 time, we had just gotten back from somewhere -- which was
6 the best friend I told you about -- and him and Dustin
7 talked in my office the majority of the time talked about
8 apartments.  And Ty owns apartments and hotels and Dustin
9 owns stuff.  That's the main thing I do remember.  And now,
10 actually as you're -- as I'm talking to you, that just came
11 back to me.  So I know it wasn't -- know there wasn't a
12 bunch of people there because Ty and I had just got to the
13 office and I know --
14    Q.  Who's Ty?
15    A.  Ty's my best friend that owns that boat that I
16 was telling you about.  But I just remember that now, that
17 came -- because him and Ty sat there and talked forever, so.
18    Q.  Okay.  And Ty does not work for -- did not work
19 for Mutual?
20    A.  No, he's just a good friend of mine.  He lives
21 right there in Ormond.
22    Q.  So he just happened to be -- Ty happened to be
23 in the office --
24    A.  He happened to be with me coming in -- coming in
25 to the office, yeah.

Page 196

1    Q.  Okay.  And do you know why he was talking
2 with -- are Dustin and Ty friends?
3    A.  No, no, they were talking business.  Dustin owns
4 properties and Ty's a big -- owns hotels and apartments.  I
5 don't remember.  I didn't sit there and listen to them
6 because I didn't want -- you know, I got other stuff to do
7 besides listening to apartment complex babble.
8    Q.  Got it, okay.  And now that you remember that
9 meeting, can you tell me who was around, other than the
10 people you've mentioned --
11    A.  I know Chris and I was there, I don't remember
12 any other employees being there.  Like I said, it's very
13 rarely do we all get together, very rarely unless it's --
14 and we haven't done even a training in a long time.
15    Q.  When you said in the e-mail, you know, you
16 people are going to fit or your people are going to fit in
17 well, you think he was just referring to --
18        MS. KREITER:  Object to the form.
19        THE WITNESS:  Correct.
20 BY MR. KAREN:
21    Q.  -- the two people who had already moved over?
22    A.  That's correct.  I mean, that's -- I mean
23 that's -- if they were there and he said day one went really
24 well, I'm assuming he's referring to those two.
25    Q.  Okay.  But they did start on the 15th, didn't

7 (Pages 193 - 196)

Page 197

1 they?
2    A. I thought you said the 16th.
3    Q. Maybe it's the 16th.
4    A. Yeah, I think the 16th, that's the -- I don't
5 know, maybe it was the 15th. I thought you said the 16th.
6 So they would have started on the 16th and that e-mail was
7 on the 17th.
8    Q. Okay. And at this point, as far as you know,
9 Mutual was not aware of the impending departures, right?
10    A. No, not to my knowledge. I mean, like I said,
11 again, I had multiple conversations with
12 Collie (phonetic) -- if you deposition him, y'all can ask
13 him -- but multiple conversations letting him know that I
14 was not happy and I was leaving at some point. So they
15 knew. They knew that it was coming, so...
16    Q. Again, but that would have been you, not
17 necessarily --
18    A. That would not be me announcing it to Mutual,
19 correct, but I did let the higher-ups know that I was
20 looking and I would be leaving soon.
21    Q. Okay. But that would also would be you, not
22 necessarily the whole branch?
23    A. Correct, yeah. Yeah, I never discussed the
24 whole branch. I discussed how unhappy I am with my personal
25 clients.

Page 198

1    Q. I'm sorry, just give me a moment. Now, you had
2 mentioned to me an e-mail -- or an e-mail, sorry -- a loan
3 called Tariq?
4    A. Yeah, it was a loan Tariq did, ended up moving
5 over by our neighborhood. He owns 7-Elevens and it was a
6 turn-down. It was one that we couldn't do at Mutual, it was
7 because of his tax returns. I forgot how to spell it,
8 T-A-R-I-Q or K.
9    Q. Okay. We'll get to that in a second.
10    A. Yeah, that's it.
11    Q. Sir, I'm showing you an e-mail dated March 29th
12 from you to Zeke Waterman and Chris Wolf and you ask, can
13 you guys forward the full file to Mike Smalley at
14 Waterstone, they can get it done, and the subject is
15 Hennessey.
16    A. Correct. He's one of my other really good
17 friends, he's going through a divorce with Kim Hennessey.
18 And at the time this was -- he came to me trying -- she's
19 buying a house in Lake Mary, she doesn't work, he has a lot
20 of money, she doesn't work.
21    And it would have been the same thing as a
22 Tariq, Waterstone has what's called an asset loan through
23 their Portfolio, Mutual doesn't have Portfolio. And it was
24 called an asset loan. Basically if you have five million in
25 the bank and you have excellent credit, then they would do

Page 199

1 the loan. They ended up paying cash instead because they
2 didn't like the interest rate.
3    (Plaintiff's Exhibit No. 17 was marked for
4 identification.)
5 BY MR. KAREN:
6    Q. But you did ask him to forward the Hennessey
7 file over?
8    A. I did, yeah. That was a walk -- that was a
9 walked-in file. I'm not even sure if that was ever even
10 input in the Mutual system, but that was a good friend of
11 mine.
12    MR. KAREN: What's the exhibit number we're up
13 to?
14    THE COURT REPORTER: 18.
15    (Plaintiff's Exhibit No. 18 was marked for
16 identification.)
17 BY MR. KAREN:
18    Q. Sir, I'm showing you the Hennessey file.
19    A. Um-hmm.
20    Q. Would you agree that includes her driver's
21 licence?
22    A. Correct.
23    Q. Okay. That was provided to Mutual, correct?
24    A. Well, I would have to look. I don't know if she
25 walked it in or a file -- like I said, we're really good

Page 200

1 friends. Her and my wife are like that, so it's -- I'm not
2 sure if it was ever put in the Mutual system, to be honest
3 with you. I would have to go back and look.
4    Q. Well, let's go to page 1189.
5    A. Yeah, at 12:04 it doesn't look like Mutual's
6 application, this was like another bank that was trying to
7 do their loan.
8    Q. Let's -- if you could go to 1189.
9    A. Okay. 1189.
10    MS. KREITER: Well, do you want to take a minute
11 and just look at the document?
12    THE WITNESS: Okay.
13    MR. KAREN: Now, I'm not going to go through
14 every page of this. I mean --
15    THE WITNESS: I've only got an 1188. 1188 goes
16 to 1204.
17    MS. KREITER: Yeah, I will say for the record it
18 doesn't look like -- I don't know if this was a
19 compilation.
20    MR. KAREN: No, I don't know why it's not the
21 same copy that I've got.
22    THE WITNESS: Well, I got 1188 --
23    MS. KREITER: I've got -- I got a thick -- I
24 don't know, so I have 1185 to 1188 and then it goes
25 to 1204.

8 (Pages 197 - 200)

Page 201

1    THE WITNESS: Yeah, mine's exactly like yours.
2    MR. KAREN: Great.
3    MS. KREITER: I think they put two inadvertently
4  together?
5    MR. KAREN: No, I'm looking at the same. I
6  don't understand. Can I see the exhibit, please?
7    MS. KREITER: Sure.
8    MR. KAREN: Well, let me just put it this way, I
9  don't know why this document is in there. I can make
10  copies of this or just -- I can make it another
11  exhibit, how do you want to do it?
12    MS. KREITER: That's fine, so long as it's --
13  are you going to change the one that is 18?
14    MR. KAREN: You know what --
15    THE WITNESS: What are you looking at and I can
16  tell you? Is it factual data? I have it back here
17  in the back.
18    MR. KAREN: You have it --
19    THE WITNESS: Factual data, the credit report.
20    MR. KAREN: Yeah, you have that?
21    THE WITNESS: Yeah, I've got it. I've got it,
22  it's -- you know what, it is 1189, it's just not in
23  the right order. So if you go -- Maria, if you go to
24  1211, 1211 goes to 1119.
25    MR. KAREN: All right. Something must have

Page 202

1  happened in the copying obviously.
2    MS. KREITER: Oh, you're right. Okay. So we're
3  on 1189 now?
4    MR. KAREN: Yes. Yes.
5    MS. KREITER: Okay.
6    THE WITNESS: Yeah, it was...
7  BY MR. KAREN:
8    Q.  So, I don't have a lot to ask about this, but I
9  just wanted to -- the factual data, is this a credit report?
10    A.  It is, yes.
11    Q.  Okay. And who does it reflect --
12    A.  It is. We did pull the credit with them.
13    Q.  And when you say "we," it's Mutual of Omaha
14  Mortgage?
15    A.  Yes, it's myself, but, yeah, I would have pulled
16  it through Mutual, correct.
17    Q.  And so that was one of those documents attached
18  that was sent over to Michael Smalley?
19    A.  The credit --
20    Q.  Based on this --
21    A.  -- the credit report, I'm not sure which
22  documents were sent but I didn't send them, but --
23    Q.  If you look at page 1185 --
24    A.  Yes, sir.
25    Q.  -- you see that's from Chris Wolf, right, to

Page 203

1  Michael Smalley?
2    A.  Correct.
3    Q.  And --
4    A.  Dwayne asked me to send you this file, correct,
5  I read that.
6    Q.  And it's copied to you at your personal e-mail
7  address?
8    A.  Correct.
9    Q.  And then it has the attachments and it says,
10  Hennessey XML --
11    A.  Um-hmm.
12    Q.  -- credit report, if you look the third one down
13  listed, credit report pdf; do you see that?
14    A.  The third one down on the credit report?
15    Q.  No, no. If you look -- it says Hennessey.xml?
16    A.  Got you. Yeah, no, I see it.
17    Q.  Dl.pdf; HOA.rider --
18    A.  Got you, okay.
19    Q.  -- credit report.pdf --
20    A.  Yeah.
21    Q.  -- 1003.pdf; contract; do you see all that
22  stuff?
23    A.  Yes, sir.
24    Q.  Okay. And then the credit report is attached is
25  a Mutual of Omaha credit report, correct?

Page 204

1    A.  That is correct. Yeah, I see that.
2    Q.  And so it looks like this information -- at
3  least the credit report -- came from Mutual of Omaha; is
4  that right?
5    A.  That is correct. I pulled credit on her with
6  Mutual of Omaha it looks like, correct.
7    Q.  And if you look at the -- at least it's on my
8  1204, and I don't know if it's yours, but --
9    A.  Um-hmm.
10    Q.  -- uniform residential loan application.
11    A.  Um-hmm.
12    Q.  On the first top left it says 17340517568 and it
13  has lender loan number universal loan identifier.
14    A.  Yeah, this doesn't look like our application by
15  the way it prints out. Let me go back and let me do some
16  research here. But, anyway, go ahead and continue.
17    Q.  Well, I guess that was my question, whose lender
18  loan number -- well, actually, if you go to the last page
19  1210.
20    A.  Okay.
21    Q.  It says loan originator or organization --
22    MS. KREITER: Sorry, are you --
23    MR. KAREN: Sorry. No, I'm --
24    THE WITNESS: So it was, okay, yes, so they
25  didn't print it out. It just looks like a different

9 (Pages 201 - 204)

Page 205

1  format for whoever printed this out. I don't
2  remember Mutual's looking like this, that's why it
3  threw me for a loop.
4  BY MR. KAREN:
5      Q.  On problem. But it does say the loan originator
6  or organization is Mutual of Omaha --
7      A.  Correct.
8      Q.  -- Mortgage?
9      A.  Yeah. This loan was one -- if you look at the
10 monthly income of 287 a month, she was buying a 1.5
11 million-dollar house, so she didn't qualify. So she had to
12 go do an asset loan. An asset loan we don't have at Mutual.
13 Once again, it would have been a turndown. And then Betty's
14 mom basically said, we don't like the interest rate, I'll
15 buy it cash and that was it.
16     Q.  Well, let me go back to something in this. Why
17 was it sent to Mike Smalley?
18     A.  I'm not sure. I wasn't the one that sent it. I
19 mean, I might have told him Smalley. But Smalley is the one
20 that, you know, if I'm going to send them -- he still does
21 loans, David and Dustin don't do as much, but it would have
22 been me trying to help her out to get a house.
23     Q.  Okay. So my question is, though, so with these
24 loans that were sent over before you started whose name --
25 who's listed as the originator?

Page 206

1      A.  I was listed as the originator on this one and
2  I'm assuming on the other one, too --
3      Q.  But --
4      A.  -- if it was in our system. I don't remember if
5  Tariq was either.
6      Q.  Yeah, but you couldn't have -- I mean, your loan
7  originator license was still, at this point, with Mutual, so
8  you couldn't have been the originator?
9      A.  Well, this was a Mutual of Omaha application.
10 When it went to pull it over there, then it would had to
11 have been Smalley or whoever was taking that loan over.
12     Q.  Right. And that's --
13     A.  The main thing was is the loan didn't close, the
14 main thing was helping the customer out and getting it done.
15     Q.  I understand. That's not what I'm asking,
16 though. What I'm trying to find out is, if a loan was
17 opened at Waterstone while you were still at Mutual, whose
18 name was put on that as an originator?
19     A.  I'm not sure.
20     Q.  Who would have made that decision?
21     A.  I'm not sure, it wouldn't have been me because I
22 wasn't employed yet.
23     Q.  Right, I understand that. It would have been
24 somebody at Waterstone to make that decision?
25     A.  Correct, yes.

Page 207

1      Q.  And do you know who at Waterstone made that
2  decision --
3      A.  I do not.
4      Q.  Were these loans ultimately switched into your
5  name when you arrived?
6      A.  No.
7      Q.  So there would have been a different
8  originator -- and tell me if I'm wrong, Waterstone could
9  never actually use, in a file, Mutual of Omaha's credit
10 report?
11     A.  Correct.
12     Q.  So the credit report would have to be pulled
13 again?
14     A.  Correct.
15     Q.  And so somebody over at Waterstone would have to
16 pull that credit?
17     A.  I don't know if they did. I mean, though, I
18 found out that not long after this that they were paying
19 cash, they didn't like the -- I'm not sure is what I'm
20 telling you.
21     Q.  Right. My question, though, is assume someone
22 did pull credit --
23     A.  Um-hmm.
24     Q.  -- okay. Do you know who that would have been?
25     A.  I do not.

Page 208

1      Q.  Okay. Were there --
2      A.  I was not loan originator on Tariq, if you go
3  back and look. I mean, it was -- I don't remember who it
4  was but I know it wasn't me and I would not have been the
5  loan originator on this one because by then it was a
6  paying-cash-done-deal, it never closed.
7      Q.  I'm just trying to find out generally when files
8  went over before you guys got there, who was pulling the
9  credit and who was being listed as the originator?
10     A.  I don't remember. And as you see, Chris is the
11 one who sent it. I don't remember who was pulling credit
12 and there wasn't many. So you're looking at two of them. I
13 actually forgot about this one. Tariq, I know was not in my
14 name when we sent it. It was loans that could not be closed
15 at Mutual.
16     Q.  And this was never even put into underwriting at
17 Mutual, was it?
18     A.  Sorry, say it again. We wouldn't --
19     Q.  This loan was never put into underwriting --
20     A.  -- we wouldn't put it into underwriting with
21 $200 in income, not on a 1.5. They don't qualify.
22     Q.  Sir, I'm showing you an e-mail that you sent on
23 April 13th to Mike Smalley relating to Kimberley Hennessey,
24 right?
25     A.  It looks like it, yes.

10 (Pages 205 - 208)

Page 209

1      (Plaintiff's Exhibit No. 19 was marked for
2   identification.)
3   BY MR. KAREN:
4      Q.   And it says title docs; do you see that?
5      A.   Correct.  That would have been something that
6   came from Kim or her title company at the time, because she
7   had tried this with multiple banks.  So, yeah, I do have
8   her -- Kirsten...
9      Q.   So this appears that Kirsten Fitzwilliam at
10  Stewart Title was sending something to you that you
11  forwarded to Mr. Smalley, right?
12     A.   Correct.  It would have been from -- yes, from
13  her and per Kim Hennessey's permission.
14     Q.   Sure.  I understood that.  But my question is,
15  you said the loan never closed and -- I mean, when you're
16  dealing with title docs you're pretty far into the process,
17  aren't you?
18     A.   No, that's not the way it worked there, because
19  that right there was taken on by other lenders at the time.
20  So I was the one that -- I don't know why -- they were going
21  through a divorce, I don't know why they would use me in the
22  first place, but I was the last outlet, probably I say,
23  probably because she didn't want me to know her business
24  maybe, whatever.
25     Q.   Okay.  But what I'm saying is, this is two weeks

Page 210

1   after March 29th, this is now April -- April, sorry.  But,
2   well, it looks like you sent it April 13th, it was sent to
3   April 7th by Kristen Fitzwilliam at Stewart Title indicating
4   that they were working on the title documents for a loan;
5   isn't that what it looks like?
6      A.   Yeah, I mean, that title request would have been
7   from a previous company, though.  I mean, it looks like that
8   actually is the title docs, so it would have already been
9   requested previously.  And they also request title in cash
10  deals, no matter what the loan -- no matter what they were
11  either paying cash or they were going to get a mortgage, so.
12  I'm not the one that requested -- you won't see any e-mail
13  with us requesting title docs on this file.
14     Q.   Okay.  But they were sent to you and then you
15  forwarded them over to Mike Smalley?
16     A.   Correct, we were the last -- we were the
17  savior -- we were the last chance for them because they had
18  been turned down by other people.  And long story short, I
19  saw why they were turned down because she don't claim any
20  income and whatever on her business -- you see what she
21  claimed, she's self-employed, she owns a
22  Hawaiian-Tropic-type company, it's something else but it
23  ended up being $260 a month with all of her write-offs.
24     Q.   So -- but my question is, sir, if there was no
25  loan, why were title docs being sent to you?

Page 211

1      A.   She would have forwarded the title docs to me,
2   probably, if I could have gotten the file done but I
3   couldn't get the file done.  I could have gotten it done
4   probably at Waterstone and never hit, you know, underwriting
5   there, but they didn't like the interest rate.  Waterstone,
6   once again, has the same as the Tariq product where you
7   don't have to file your -- you don't have to file net
8   income, you can close off of assets.
9      Q.   Okay.  We're kind of getting sideways.  What I'm
10  asking you is in a -- the first thing you do on a loan, tell
11  me if I'm wrong, title documents come later in the process,
12  right?
13     A.   Later in the process for my branch, correct.
14     Q.   Okay.  So why would you be getting documents for
15  a loan that wasn't happening?
16     A.   Because she probably forwarded me the title
17  docs, the wife told.  I mean, the wife told Krystin to
18  forward me the titles docs, I forwarded them out in case we
19  could get the loan done.  I don't remember, to be honest
20  with you.  Long story short is the loan didn't happen,
21  Mutual couldn't do it but I don't remember at the time how I
22  received the title docs.
23     Q.   Okay.  But why would there even be title docs if
24  there was no loan, that's what I'm confused --
25     A.   Because other banks would have ordered it.

Page 212

1      Q.   Before the loan was even approved?
2      A.   Other banks would have ordered it.  There's a
3   lot of knucklehead banks out there that think they can get
4   stuff done and then they order it.  You know, she owns a
5   business but once you get the tax returns, they didn't go
6   through the tax returns and they ordered it.  We didn't
7   order it.
8          But some banks -- banks work different, some
9   banks order everything right upfront; me, I look at it why
10  waste the title company's time.
11     Q.   Okay.  So you're saying you never ordered this
12  and this just got --
13     A.   To my knowledge I did not order title docs on
14  this file.
15     Q.   Is it possible somebody at Waterstone did?
16     A.   I highly doubt it, but it could be possible but
17  I highly doubt it.
18     Q.   And -- but you're saying you know absolutely
19  that Waterstone never did this loan?
20     A.   I know for a fact Waterstone did not do this
21  loan.
22     Q.   And so this Shirley Agudelo at Waterstone
23  e-mailing you on the 22nd and sending an e-mail to your
24  personal e-mail; do you see that?
25     A.   Correct, from Tariq, correct.

11 (Pages 209 - 212)

Page 213

1    (Plaintiff's Exhibit No. 20 was marked for
2    identification.)
3 BY MR. KAREN:
4    Q. And this is the Tariq one you were mentioning a
5 minute ago?
6    A. Correct.
7    Q. And she says on April 19th, I'm working on
8 submitting this file to our underwriting team, don't see
9 enough assets.
10    A. Okay.
11    Q. Okay. Is it fair to say that he had -- provide
12 additional information, additional -- to be able to show the
13 assets necessary to qualify?
14    A. Probably, yes.
15    Q. And the reason why you're saying this was sent
16 over to Waterstone because they had a loan product that
17 you're claiming that Mutual did not have?
18    A. Yeah, he does, and he writes everything off,
19 like my friend's wife that owns a business.
20    Q. Does Mutual -- can Mutual broker out a loan like
21 that?
22    A. No, not to my knowledge, no. They don't have
23 Portfolio.
24    Q. So this is also on the Tariq loan.
25    A. It is Davis, by the way, Ben.

Page 214

1    (Plaintiff's Exhibit No. 21 was marked for
2    identification.)
3 BY MR. KAREN:
4    Q. Yes, Ben Davis. Yes, we knew that was an
5 outstanding one from -- took my first question away from me.
6    So my question is, do you know why this was sent
7 to Ben Davis?
8    A. Yeah, from what I remember he's the one that --
9 the loan went in his name and he's the one that worked on
10 this loan to close them.
11    Q. Okay. So that was actually my question: So Ben
12 Davis is the one who would have been listed as the
13 originator?
14    A. Correct.
15    Q. And would he have been paid as the originator on
16 this loan?
17    A. Correct.
18    Q. And would he have been the one who pulled the
19 credit on this loan?
20    A. Correct. Yeah, if -- to my knowledge, it would
21 have been in his name.
22    Q. Okay. And -- so is it fair to say that you sent
23 loans -- whether they closed or not, I'm not asking that,
24 but you're aware that Ben Davis and Mike Smalley both had
25 loans that you sent to them?

Page 215

1    A. Correct, to -- yeah, that is correct.
2    Q. Okay. And the one loan we talked about you said
3 did close but this one would have closed --
4    A. This one closed --
5    Q. And would you have gotten --
6    A. -- that one didn't.
7    Q. -- overrides on this?
8    A. No, I did not.
9    Q. So the money just would have been with Ben Davis
10 and Waterstone, that's it?
11    A. That is correct. I actually discussed that with
12 Waterstone. I wasn't very happy about it, believe me. But
13 it's neither here nor there --
14    Q. What were the nature of those discussions?
15    A. I mean, we closed it after but, I mean, we
16 didn't move it into my name, it was in his name, so he's --
17 Ben is the one that closed the loan. I don't remember the
18 whole nature of discussions. It might have been something
19 I'm thinking in my mind.
20    But, you know, once again, it's done about the
21 money with me, it's about customer service to the clients
22 and the realtors, that's my most important thing.
23    Q. Okay. So but we know that at least one loan
24 that you sent over would have been done in Ben's name?
25    A. Correct, Tariq.

Page 216

1    Q. So this is an e-mail Chris Wolf sends. I
2 realize you're not on it, but this is on April 6th and
3 Mr. Wolf states to Dustin Owen, Mike Smalley and Ben Davis
4 over at Waterstone that I want -- writes -- I wanted to see
5 the best way to send any files to you right now. Chris
6 Smith and Dwayne have another call to finalize things, et
7 cetera, et cetera. So my question is, he's asking, I guess
8 here, who do we send them to, right? He does, he says who
9 should I send them to.
10    A. Yeah, it looks that way.
11    (Plaintiff's Exhibit No. 22 was marked for
12    identification.)
13 BY MR. KAREN:
14    Q. Is that how you guys decided to send those to
15 Smalley and Davis?
16    A. No, I didn't -- I didn't -- I wasn't involved on
17 this, but, you know, the two that I sent are right there and
18 I wasn't involved on the e-mail.
19    Q. Okay. Well --
20    A. But I mean --
21    Q. -- do you know -- did you ever have a
22 conversation with Chris Wolf about where files got sent?
23    A. I did not.
24    Q. So -- and I guess my question is, though, you
25 sent -- we saw two examples, one, where you sent to Smalley

Page 217

1 and one where you sent to Davis, right?
2   A.  Um-hmm.
3   Q.  How did you know where to send those?
4   A.  At the time I don't remember how I found out.  I
5 knew that I had the loans, I must have found out that I sent
6 it to Smalley or Ben or Smalley told me to send it to Ben, I
7 don't remember that conversation.
8   Q.  Okay.  I definitely saw a response to this
9 e-mail; do you know if a response was ever sent?
10   A.  I do not.  Yeah, I'm not included on it.  It
11 does say in there I have some files that we cannot do I
12 wanted to send over.  So that's files that couldn't be
13 closed at Mutual, it looks like anyway.
14   Q.  So you don't know what the -- I mean, was there
15 a plan as to who files would be sent to?
16   A.  No, there was not a plan that I was involved in.
17   Q.  But that would be something I'd have to ask
18 Chris Wolf?
19   A.  Yes, Chris and whoever's on that e-mail.
20   Q.  And you don't recall what -- who it was that you
21 were supposed to send files to?
22   A.  I do not.
23   Q.  Sir, I'm showing you another e-mail, this is
24 from you to Stephanie Renick; who is Stephanie Renick?
25   A.  She's a realtor at Realty Pros next door.

Page 218

1     (Plaintiff's Exhibit No. 23 was marked for
2   identification.)
3 BY MR. KAREN:
4   Q.  And it looks like Ms. Renick had sent you an
5 e-mail forwarding something from Mr. Tariq, it says a letter
6 of funding.  And your response is, awesome, I wish I could
7 use it.
8   A.  I don't remember what that's in regards to.
9   Q.  That's what I was going to ask you.
10   A.  I don't remember what it would have been.  He
11 must have been asking for -- it might have been a letter of
12 funding for more assets maybe, because they were asking for
13 assets because this was a loan where we didn't need income
14 docs because we couldn't use them, we needed more assets.
15 So the only thing I'm thinking is maybe he got funded off of
16 one of his other investments.
17     The only reason we would have -- that we were
18 able to get this done even at Waterstone was because of all
19 the money he had.
20   Q.  And you said -- and, again, if you don't
21 remember, you don't remember -- just to see if it helps you,
22 you say, you wish we could use it?
23   A.  I don't remember what it was in regards to --
24 document I was looking at at the time, I don't.
25   Q.  Sir, this is an e-mail sent from Chris Wolf to

Page 219

1 Dawson Walker.  You saw this name before.  And this is a new
2 file called buyers Lea/Brad.
3   A.  Yeah, they're my neighbors --
4   Q.  -- Lea slash Brad.
5   A.  -- they're another one of my neighbors on
6 Merryvale Lane.  That's where I live, Merryvale Lane.
7     (Plaintiff's Exhibit No. 24 was marked for
8   identification.)
9 BY MR. KAREN:
10   Q.  And this is April 22nd; do you see this?
11   A.  I do, sir.
12     (Plaintiff's Exhibit No. 24 was marked for
13   identification.)
14 BY MR. KAREN:
15   Q.  Okay.  And you can see from the -- again, I
16 saved some paper here but you can see all the attachments,
17 credit, pay stubs --
18   A.  Yeah, I see that.
19   Q.  -- W-2s; do you see all that?
20   A.  Um-hmm.
21   Q.  And that would have all been information
22 provided in connection with the loan, right?
23   A.  Correct, yeah, that would have been provided to
24 me.
25   Q.  Okay.  And my question is, though, was this a

Page 220

1 loan that Waterstone -- that Mutual couldn't do?
2   A.  No, not to my knowledge.
3   Q.  Okay.  And this says, hey, bud, can you or
4 someone on your team get this one going?  So you were
5 sending this one to Waterstone while you were -- Chris was
6 sending this to Waterstone while you were still employed at
7 Mutual, right?
8   A.  Yeah, I wasn't on this e-mail, so, I mean -- I
9 don't -- I've never seen this e-mail, it was Dawson.
10   Q.  But Chris wouldn't have sent, you know, one of
11 your files without your knowledge, would he?
12   A.  I mean, once again, we don't -- if I was in town
13 at that time we don't -- he runs a branch just like I'm a
14 loan officer.  I wouldn't know what he would have done.
15   Q.  Okay.  If you would have been there and known
16 about it, would you have said, hey, no way, put this through
17 Mutual?
18   A.  If I could get it done it would have went
19 through Mutual.  We closed another four or five million
20 before they ended up backing out on this property.  They
21 didn't even close on the property.
22   Q.  It says, hey, bud, can you or someone get this
23 going to your team?  That rate is unrealistic, Dwayne file,
24 so we can look at locking next week.  Input 5.25 for now.
25 Do you know what he was talking about the rate being

13 (Pages 217 - 220)

Page 221

1 unrealistic?
2     A. I do not. I read that also. I do not.
3     Q. But you just have no idea what he's talking
4 about here?
5     A. I don't know what he's talking about rate
6 unrealistic. I'm not sure if he's saying on Waterstone side
7 or Mutual side. I mean, I thought the rates were similar
8 for both the companies so I don't -- I can't speak for him.
9     Q. Okay. And I -- look, and I know --
10     A. If anything, Mutual's rates are better. So I
11 mean the -- I'm just being honest, I can't speak for him.
12     Q. Okay. Okay. Do you know where Wolf would have
13 gotten these files, the pay stubs, the credit report, the
14 W-2s, those probably would have been from Mutual, right?
15     A. Probably. I mean, once again, I would be
16 speculating, but knowing Mr. Byers, which is my neighbor and
17 I fish with him, he's a country boy, I doubt he knows how to
18 use a computer so he probably brought them in, but...
19     Q. Now, sir, this is an e-mail; again, you're not
20 on this. Who is Luke Van Dame?
21     A. I don't remember. I don't know, I'm trying to
22 read this e-mail.
23       (Plaintiff's Exhibit No. 25 was marked for
24   identification.)
25 BY MR. KAREN:

Page 222

1     Q. Does --
2     A. It looks like he was working out of the Tampa
3 branch at the time.
4     Q. Right.
5     A. Yeah, I don't remember this file. I don't
6 remember this, even speaking with Lucas.
7     Q. Okay. But he sends Rick Palmer at Palmer
8 Electrical Contracting and basically it refers him to you,
9 right?
10     A. It looks that way. I don't remember speaking
11 with him, though.
12     Q. And this was May 25, 2022, right?
13     A. Yes, sir, and that's the date --
14     Q. You were now an employee at Waterstone, right?
15     A. Yes, sir.
16     Q. And Mr. Van Dame was still over at Mutual
17 Mortgage in Tampa, right?
18     A. I'm assuming, yes, sir.
19     Q. And he indicates to the borrower that there's a
20 problem getting the loan approved at Mutual and sends it
21 to -- and tells him he should call you at Waterstone, right?
22     A. Correct. I don't remember speaking with him.
23 It looks like from the top of the e-mail, it looks like he's
24 self-employed. Again, I'm assuming, once again it's
25 assumption, that it's probably the same problem because

Page 223

1 electrical -- self-employed electrical people will write
2 everything off, too.
3     Q. Okay. But you're -- again, you're assuming
4 that, right?
5     A. Correct, I'm assuming that.
6     Q. And if I had the loan file I could show you that
7 in fact Waterstone could have closed -- I'm sorry, Mutual
8 could have closed this loan?
9       MR. KAREN: Object to the form.
10       THE WITNESS: But, yeah, I wouldn't --
11 BY MR. KAREN:
12     Q. You wouldn't know one way or the other?
13     A. No, sir.
14     Q. Okay. And you would agree with me that it's
15 possible that a loan officer, you know, may be worried about
16 getting paid or not paid when they make a move, they might
17 switch a loan over to their other company; you're aware of
18 that, right?
19     A. Yeah, possibly. I wasn't when mine -- and I
20 didn't do that in my branch, as the numbers -- as you see
21 our numbers.
22     Q. Although we did see that Brea (phonetic) loan a
23 few minutes ago, that might have happened.
24     A. Which one?
25     Q. The Brea.

Page 224

1     A. Yeah, but it didn't close. I fish with him,
2 he's right across the street. I'm 6633 Merryvale, he's
3 6630.
4     Q. Now on this loan -- when a loan officer says,
5 hey, we couldn't get it done, that's really an underwriter's
6 call, isn't it?
7     A. Not necessarily. I mean, we don't submit files
8 to the underwriter until it's -- you have to go through tax
9 returns with self-employed people, we don't waste the
10 underwriter's time. We make sure we get the approval.
11 That's the main concern when you get with somebody that's
12 self-employed and you don't have an outlet for them, you
13 have to turn them down because people don't like to pay
14 taxes and they write everything off.
15     Q. Right. But in this loan he was saying it had
16 nothing to do with him being self-employed if you see this
17 e-mail he says because there was a business loan that was
18 late and he said, this appears to be company-specific
19 guideline.
20     A. Yeah, I didn't read all the way down in that and
21 I'm not familiar with this loan. I don't remember this
22 loan.
23     Q. So my question, who does -- how many loans were
24 sent over from Tampa --
25     A. I have no idea.

14 (Pages 221 - 224)

Page 225

1   Q. Just let me finish the question.
2       How many loans were sent over from Tampa to your
3   branch while the Mutual Tampa people had not yet
4   transitioned?
5   A. I have no idea.
6   Q. Would those net loans -- to the extent they were
7   transferred -- been transferred back to the loan officers in
8   Tampa?
9   A. I have no idea. I don't run Tampa. That's not
10  my --
11  Q. No, no, no, but if a loan was referred from
12  Mutual Tampa to Daytona Waterstone, who would have been the
13  person responsible for -- did you have like an appointed
14  person to do that?
15  A. I do not.
16  Q. Do you know who would have taken those files and
17  pulled the application or pulled the credit or done any of
18  those things?
19  A. I do not. I know that Chris Smith wouldn't
20  have allowed it if it was a loan we could have done through
21  Mutual because I know him well.
22  Q. Okay. But to the extent that happened, who
23  at -- who at Waterstone would have pulled the credit on that
24  file?
25  A. I don't know. The time that I sent it, I mean,

Page 226

1   it looks like it went to Smalley or Ben Davis. I can't
2   speak for Tampa or this certain file, you know.
3   Q. So you don't remember anything -- do you even
4   know if this loan closed one way or the other?
5   A. I do not. Don't even -- I think I would
6   remember Lucas Van Dame but I don't remember the name.
7   Q. Is it possible it was started and closed under
8   Lucas' name?
9   A. I don't know.
10  Q. That's something that would be in Waterstone's
11  systems, right?
12  A. I don't know.
13  Q. Well, if it was a loan Waterstone did and pulled
14  credit on, certainly there would be a record of that, right?
15  A. Yeah, if it was sent over to them you would
16  think they would have the record, correct.
17  Q. Yeah. Okay. And so this e-mail from Chris Wolf
18  to Cody Lamb; do you see that?
19  A. Correct, yes I do.
20  Q. Dated June 9th?
21  A. Um-hmm.
22  Q. And that was before the Tampa branch -- just
23  before the Tampa branch had transitioned over to Waterstone?
24  A. I'm not sure of the date that they did.
25      (Plaintiff's Exhibit No. 26 was marked for

Page 227

1   identification.)
2   BY MR. KAREN:
3   Q. If I can tell you just for the record, to keep
4   things moving quickly --
5   A. Sure.
6   Q. -- I think it was June 15th --
7   A. Correct.
8   Q. -- does that sound fair?
9   A. Yes, if you say so.
10  Q. So this -- assuming I'm correct about this, this
11  would have been before Tampa transitioned over?
12  A. That is correct, if June 15th's the date,
13  correct.
14  Q. Okay. And the subject is McIntosh, right?
15  A. Yes.
16  Q. Do you know why Cody Lamb and Fred Stalls would
17  be sending over the McIntosh loan to you guys?
18  A. I have no idea, I'm not on this e-mail.
19  Q. Okay. Is this something, though, you would have
20  talked to Chris Wolf about?
21  A. No, I don't remember it. So, yeah, I mean, not
22  to my knowledge.
23  Q. Did you and Chris ever have a discussion about
24  loans coming over from Tampa?
25  A. We did not.

Page 228

1   Q. Okay. So you're telling me it's possible that
2   Chris Wolf just took these loans in from Tampa even if they
3   could have been closed at Mutual?
4   A. I'm not sure. I can't speak for Chris.
5   Q. Is that something -- I mean, but did you guys
6   kind of have a discussion, you and Chris --
7   A. We did not.
8   Q. Just let me finish the question. Did you and
9   Chris ever have a discussion about, hey, listen, you know,
10  we can't take loans from Tampa, they've got to close them
11  there; did you guys have any discussion about that, one way
12  or the other?
13  A. I mean, it's -- I don't remember the exact
14  discussion but I know that our intention was to close
15  everything we possibly could at Mutual of Omaha, which, once
16  again, goes to the reason why that we were -- that was the
17  second best month ever, if they go through the P&L or
18  whoever looks through this stuff for you guys.
19  Q. Okay. But I'm asking you, the question is: Did
20  you guys have a discussion about --
21  A. The answer is I don't remember that discussion,
22  but it would have been -- if I would have knew about it I
23  wouldn't put up with it, put it that way, but I don't
24  believe that happened, so, no.
25  Q. Okay. Do you think Chris would have done it

15 (Pages 225 - 228)

Page 229

1  sort of behind your back?
2      A.  I can't speak for Chris.
3      MS. KREITER:  Object to the form.
4  BY MR. KAREN:
5      Q.  Well, I'm just asking you, like --
6      A.  I can't speak for him.  I wouldn't think so --
7      Q.  Sir, just let me ask again.  I know you know the
8  end, okay.  I'm not trying to trap you --
9      A.  Sorry.
10      Q.  -- I'm just trying to get my question out --
11      A.  Yes, sir.
12      Q.  -- so I've got to keep the record.  Okay.  So,
13  just go through the process with me.
14      A.  Sorry, yes, sir.  Yes, sir.
15      Q.  I totally understand, I know it's hard.
16      But -- so my question is, is this something you
17  think Chris would have done --
18      A.  I do not.
19      Q.  -- without talking to you?
20      MS. KREITER:  Object to the form.
21      THE WITNESS:  I don't know.  I don't know.  I
22  can't speak for Chris.
23      MS. KREITER:  Is now a good time for just a
24  ten-minute break?
25      MR. KAREN:  Yeah, that's fine.  We're also

Page 230

1  starting to wind down.  We're not going to be too --
2      MS. KREITER:  Okay.  I mean --
3      MR. KAREN:  No, no, no, I'm not that close --
4      MS. KREITER:  -- if you've got only ten more
5  minutes then I won't take a ten-minute break --
6      MR. KAREN:  No, no, no, I'm not that close.
7      THE VIDEOGRAPHER:  This is the end of media
8  number three.  We're going off the record at 2:43.
9          (Off the record.)
10      THE VIDEOGRAPHER:  This is the beginning of
11  media four.  We're going on the record.  The time is
12  3:06.
13  BY MR. KAREN:
14      Q.  Sir --
15      A.  Yes, sir.
16      Q.  -- you're aware that the Daytona branch left as
17  a whole on or about April 26th, right?
18      A.  Yeah, the majority of them did.
19      Q.  Yeah, and a couple of people left before?
20      A.  Yes, sir.
21      Q.  And the Tampa office left in June, right?
22      A.  Yes, sir.
23      Q.  Again, mostly on the same day?
24      A.  Okay.
25      Q.  Now did you know when you left in April that the

Page 231

1  Tampa branch was coming a couple months later --
2      A.  I did not know for sure, no.
3      Q.  Did you see it as a possibility if Chris Smith
4  was going to stay at Mutual even though you had transitioned
5  over?
6      A.  I thought it was a possibility.
7      Q.  Okay.
8      A.  I know that we usually go together but I
9  couldn't speak for him and I thought it was, it could be a
10  possibility.
11      Q.  So as of April 26th Chris Smith had not made up
12  his mind to go to Waterstone?
13      A.  No, sir.  Not to my knowledge, no.  I'm just
14  telling you what I know.
15      Q.  Based on your discussions?
16      A.  Based on our discussions he was not for sure.
17      Q.  Okay.  Was he considering any other banks?
18      A.  I'm not sure what he was thinking.  I mean,
19  really I just know that we've never -- I've never worked
20  without him, so that would have been unusual.
21      Q.  All right.
22      A.  But I don't know what he was thinking.
23      Q.  Well, you guys obviously, you said you talk
24  every day?
25      A.  We talk a lot.

Page 232

1      Q.  And this obviously would have been a subject of
2  conversation, I presume --
3      A.  Yeah, yeah, he wasn't -- he wasn't -- from what
4  I remember of the discussions, he wasn't -- he hadn't made
5  his mind up yet, from what I remember.
6      Q.  Okay.  And from those discussions was his mind
7  potentially to stay at Mutual or go to a third bank or, I
8  mean, what were the considerations?
9      A.  It wasn't discussed about a third bank, I'm not
10  sure.  I mean, I really don't remember what all banks he had
11  met with, too.  But I would think that if he was going to
12  leave he would have came with me but I'm not saying that for
13  sure that I know.  You'd have to ask him tomorrow.
14      Q.  Do you know from your conversations when he
15  finally decided to say yes a hundred percent I'm coming?
16      A.  I don't remember the day, I really don't.
17      Q.  Okay.  So it's fair to say when you came over
18  you were not sure that Chris Smith was going to come over --
19      A.  I wasn't for sure.
20      Q.  But you did want him to come, yes?
21      A.  Yeah.  I mean, I always want to work with him.
22      Q.  So what, if anything, did you do after you were
23  at Waterstone to encourage him to come?
24      MS. KREITER:  Object to the form.
25      THE WITNESS:  I don't remember doing anything

16 (Pages 229 - 232)

1  to -- like I said, he's a -- I don't think I can
2  persuade him anyway.  He's a grown man, he's older
3  than I am.
4 BY MR. KAREN:
5      Q.  Sir, I'm showing you an expert report that's
6  been filed in this case by Waterstone.
7      A.  Okay.
8         (Plaintiff's Exhibit No. 27 was marked for
9      identification.)
10 BY MR. KAREN:
11     Q.  I presume you probably have not seen this
12  before?
13     A.  I don't remember it, no.
14     Q.  Okay.  If you want to take a minute and look
15  through it, I'm not going to ask you too many questions, I
16  really only have a couple, but if you want to take a second
17  and look through this I have some questions for you.
18        MS. KREITER:  Well -- so the document is -- the
19     report is five pages long.  I guess if the witness
20     hasn't seen it I would want him to take some time
21     here.  So review the whole thing, I mean, read the
22     whole thing.
23        THE WITNESS:  Okay.
24        MR. KAREN:  Yeah, and if you would, really
25     concentrate on paragraph 13.

1         MS. KREITER:  No, I mean, if he's going to be
2      asked about an expert report he's never seen I want
3      him to read the full --
4         MR. KAREN:  Okay.  I was trying to help and tell
5      him exactly where I'm going to ask him questions
6      about, which I would think would facilitate and help
7      what we're doing, as opposed to saying read the whole
8      document and study it.  So read it and study it as
9      much as you want, but specifically I'm going to be
10     asking you about paragraph 13.
11        So, Counsel, if you think I'm somehow
12     undermining your instructions, I'm actually
13     facilitating them.
14 BY MR. KAREN:
15     Q.  You ready, sir?
16     A.  Yes, sir.
17     Q.  Okay.  So I want to direct your paragraph -- to
18  paragraph 13.
19     A.  Yes, sir.
20     Q.  And it says, there's a -- the last part of
21  paragraph 13 it says, the vast majority of the alleged trade
22  secrets were sent to nine personal or third-party accounts
23  and not to any Waterstone e-mail account.  Those accounts
24  were -- and you see you're listed first.
25     A.  Okay.

1      Q.  So what information from Mutual did you send to
2  your personal e-mail?
3      A.  I don't recall.  The term trade secret, I'm not
4  familiar with neither.  Can you elaborate on that?
5      Q.  But you sent some information --
6      A.  I did.
7      Q.  -- to that Mutual --
8      A.  I did, correct, from the Tariq and obviously the
9  Hennessey file, too, that came up.
10     Q.  Okay.  And that's all you're telling me?
11     A.  That's all that I remember.
12     Q.  Okay.  But if we looked at -- you haven't
13  deleted any of your e-mails, your personal e-mails, right,
14  since this case started?
15        MS. KREITER:  Well, I'll object --
16        THE WITNESS:  Well, I mean, we received the --
17     we received the -- whatever it was, what I signed, I
18     signed the cease and desist, so to my knowledge I
19     went in there and would have care of anything out of
20     there.
21 BY MR. KAREN:
22     Q.  What do you mean taken care of anything --
23     A.  Would have deleted it.  Would have got rid of
24  it for sure, yeah.
25     Q.  So you deleted things that were in your e-mail

1  that --
2      A.  I believe so, yeah.  I mean, I believe so, when
3  the cease and desist came out.
4      Q.  And what exactly did you delete?
5      A.  I don't remember.  I don't remember.
6      Q.  But that's also information you -- was it
7  possible that's the information that was used to contact all
8  those people by that woman Ellie?
9         MS. KREITER:  Object to the form.
10        THE WITNESS:  No, I mean, that's a virtual
11     assistant.  That's, once again, it's -- she was
12     wasn't -- I had no knowledge of that.
13 BY MR. KAREN:
14     Q.  Okay.  Did anybody tell you and/or ask you to
15  preserve documents in this case, to not to delete or get rid
16  of anything?
17     A.  To preserve?  Not -- no, sir, not to my
18  knowledge.
19     Q.  Other than the alleged trade secrets, if there
20  were communications back and forth between you and
21  Waterstone and loan officers at your branch, would you have
22  deleted those?
23     A.  If they were -- repeat the question?
24     Q.  Would you have deleted any e-mails between you
25  that reflect communications between you and Waterstone?

17 (Pages 233 - 236)

Page 237

1    A.   I would have deleted -- I would have deleted the
2   documents before I signed that agreement or at least I would
3   have went through my e-mail to check and see if I've -- I
4   mean, it's -- that would have been the intention, yes.
5    Q.   Okay.  But what I'm saying, other than those
6   documents would you have deleted anything?
7    A.   I don't think so.  I mean...
8    Q.   So if there are just general communications
9   between you and Chris Wolf or Chris Smith, those wouldn't
10  have been deleted?
11   A.   I don't think I would have, no.
12   Q.   So those should still be in your e-mail?
13   A.   Possibly, if I didn't delete them.
14   Q.   Okay.  But you did understand at one point you
15  had a duty in this case to not delete information, right?
16   A.   Once again, it would have been personal
17  documents, it would have been the customer's documents, if
18  it's -- I mean, it's -- I don't know.  I don't recall.  I
19  don't work a lot on my personal e-mail, you know.
20   Q.   Okay.  Who is -- why would you have sent
21  information to your personal e-mail in the first place?
22   A.   I don't -- I don't recall which ones I did.  I
23  mean, there's ones here that you have.  I'm not sure if
24  Tariq or the other one was sent to my personal or not.
25   Q.   Okay.  What other information -- you're telling

Page 238

1   me that's the only things you would have downloaded --
2    A.   To my knowledge, yes.  I forgot about the
3   Hennessey file until you brought it up.
4    Q.   Right.
5    A.   I remembered Tariq and I forgot about the Byers
6   file, too, which didn't close, Hennessey didn't close, it
7   was cash.  But I had forgot about them until you brought it
8   up.
9    Q.   Okay.  And I understand you can't necessarily
10  remember everything --
11   A.   I have a lot of files in my own personal life.
12  My brain goes all the time.
13   Q.   Right.  But like you could have marketing files,
14  would those have potentially been sent?
15   A.   I'm not sure.
16   Q.   How about contact information?
17   A.   I'm not sure.
18   Q.   Information on loans?
19   A.   I'm not sure.
20   Q.   So you have no recollection of what --
21   A.   Correct.
22   Q.   And you didn't preserve any screenshots or
23  anything like that when you deleted information --
24   A.   Not to my knowledge, no, I don't believe so.
25  I'm not sure.

Page 239

1    Q.   Who is Lori Hutchcraft?
2    A.   Lori, she's an LOA.
3    Q.   Who does she work for?
4    A.   She works on Chris -- mostly Chris Wolf's files
5   and a few other loan officers in the branch.
6    Q.   And she was at the Daytona branch?
7    A.   That is correct.
8    Q.   Do you know whose e-mail is wolfstarf1@hotmail?
9    A.   I do not.
10   Q.   Do you know whose e-mail is aliyah20887?
11   A.   I do not.
12   Q.   Who's Stacy Flannagan?
13   A.   Stacy Flannagan is an Angel Oak rep or an Angel
14  Oak broker.
15   Q.   Who's Andrea Cuberman?
16   A.   Say the name again.
17   Q.   Andrea Cuberman.
18   A.   I have no clue.  No idea.
19   Q.   Steve Emenger?
20   A.   I have no idea.
21   Q.   Alex Trejido, Trejo?
22   A.   No idea.
23   Q.   Those are not people who are -- that you --
24   A.   I do not recognize any of the names you
25  mentioned besides Stacy Flannagan.

Page 240

1    Q.   Now this indicates, if you look at paragraph 7
2   of this report, it says, recognizing the potential issue.
3   Mr. Howard immediately removed access to the files that the
4   new hires uploaded to their One Drive accounts which
5   contained any reference to Mutual of Omaha; do you see that?
6    A.   I do, sir.
7    Q.   Okay.  Now my question is, those e-mails you saw
8   or those -- the documents on those loans --
9    A.   Yes, sir.
10   Q.   -- we talked about, you would have had no reason
11  to upload them to the One Drive -- jut let me finish my
12  question, okay -- no reason to upload to the One Drive
13  because they had been e-mailed over to Waterstone before you
14  had ever joined?
15   A.   I couldn't tell you to how to get on One Drive.
16  I couldn't get on it right now if you wanted me to.
17   Q.   Okay.  But my point is that those documents and
18  those materials, right, Mr. Howard didn't -- Mr. Howard
19  didn't have access to your personal e-mail, right?
20   A.   To my knowledge, no.
21   Q.   Okay.  And so what this whole report is talking
22  about, you understand, is not what you had in your e-mail,
23  it's what had been uploaded into Waterstone systems, right?
24   A.   It would not have been uploaded by me because I
25  don't know how to upload to One Drive.

18 (Pages 237 - 240)

Page 241

1    Q.   Okay.  But according to this document, there
2  were things uploaded from your system onto the One Drive.
3    A.   Yeah --
4        MS. KREITER:  Object to the form.  Misstates the
5  document.
6  BY MR. KAREN:
7    Q.   So my question is, there would have been no
8  reason to have documents uploaded -- hold on just a
9  moment -- if they had already been e-mailed over prior to
10  you joining, right?
11        MS. KREITER:  Object to the form.
12        THE WITNESS:  Yeah, I guess.  I don't remember.
13  I don't know how to upload to One Drive, that's a
14  fact.  So I couldn't get into One Drive if you begged
15  me to.
16        MR. KAREN:  Okay.
17        THE WITNESS:  So, once again, I don't know --
18  have any knowledge of me uploading anything to One
19  Drive.
20  BY MR. KAREN:
21    Q.   Okay.  Would your LOA, would somebody else who
22  works with you --
23    A.   It would have had to be somebody else because it
24  definitely wasn't me.
25    Q.   Okay.  Well, who else who works with you could

Page 242

1  have done that?
2    A.   From my personal e-mail?
3    Q.   Yeah.
4    A.   I'm not sure.  I can't answer the question
5  because I'm not sure.
6    Q.   Okay.  And they could have obviously been
7  uploaded onto your personal e-mail into another file, right?
8    A.   I guess it's possible but I wouldn't know,
9  because, like I said, I don't know how to get on One Drive
10  and don't -- don't remember anybody asking me to upload
11  anything to One Drive and it's -- that does not come to
12  my -- it wouldn't come to mind when I was moving the Tariq
13  file that we couldn't do the Hennessey, I don't think
14  that -- well, I mean, you can probably check -- about those
15  were on One Drive and if so I didn't upload them, so.
16    Q.   Right.  But what I'm getting at is those files
17  were sent to Waterstone before you ever got to
18  Waterstone as we saw in these --
19    A.   Correct, that's correct.
20    Q.   So there would have been no reason to upload any
21  of those files because they were already here?
22    A.   Correct.  To my knowledge.  Once again, I don't
23  know anything about anything being uploaded.
24    Q.   But what I'm asking is forget One Drive for a
25  second because I don't know how Waterstone's systems are

Page 243

1  configured and --
2    A.   And neither do I myself, that's it.
3    Q.   And so I don't know if it's automatic, I don't
4  know, but I know there was an upload to Waterstone
5  somewhere.  And so what I'm asking is there was some stuff
6  that was sent to your e-mail that was uploaded.
7        MS. KREITER:  Object to the form.
8        THE WITNESS:  Okay.
9  BY MR. KAREN:
10    Q.   Okay.  And it wouldn't make sense that it was
11  information that had already been e-mailed because there
12  would be no reason to upload it, right?
13        MS. KREITER:  Object to the form.
14        THE WITNESS:  Yeah, if you say so.  Once again,
15  I don't -- I don't have any knowledge of me
16  uploading.  I know I didn't upload it and I don't
17  have any knowledge of anyone else uploading anything
18  from my e-mail.
19  BY MR. KAREN:
20    Q.   Okay.  Then, do you know why it says the vast
21  majority of alleged trade secrets were sent to nine personal
22  or third-party accounts, those accounts were, and then yours
23  is listed?
24    A.   I do not know that.
25    Q.   Did you ever talk to Maria Kreiter?

Page 244

1    A.   To who?
2    Q.   The woman who wrote this report.
3    A.   I do not.
4        MS. KREITER:  That's -- I'm Maria.
5        MR. KAREN:  I'm sorry, that's you.  I'm sorry,
6  I'm sorry, I'm sorry.  To --
7        THE WITNESS:  Yeah, I did not speak -- I don't
8  remember speaking with Maria on this.
9  BY MR. KAREN:
10    Q.   No, no, no, no, no, I'm sorry, I'm sorry, that
11  was a bad question, I was working too quickly.  From Brett
12  Creasy -- did you ever talk Mr. Brett Creasy?
13    A.   To my knowledge, no.
14    Q.   You don't recall it?
15    A.   I don't recall it.
16    Q.   So you just don't have any recollection to
17  assist what he's talking about -- wait, let me finish my
18  question -- when he's saying that there was alleged trade
19  secret information on your personal e-mail uploaded to
20  Waterstone?
21        MS. KREITER:  Object to the form.  That's not
22  what the report says.
23        MR. KAREN:  That's okay, you can answer.
24        THE WITNESS:  I do not.  Not to my knowledge.
25        MS. KREITER:  Where are you reading when it says

19 (Pages 241 - 244)

Page 245

1    information from an e-mail were uploaded to One
2    Drive?
3        MR. KAREN: Maria, I don't think -- it's my
4    deposition. If you want to try to get --
5        MS. KREITER: But you're misstating the
6    document.
7        MR. KAREN: I don't think that I am.
8        MS. KREITER: Well, then, where are you looking?
9        MR. KAREN: Well, I'm done and I'm moving on and
10   I don't think I've got to answer you.
11       MS. KREITER: All right. Are you looking at
12   paragraph 13 because that doesn't talk about One
13   Drive.
14       MR. KAREN: Maria, I'm done.
15       MS. KREITER: Okay. Well, I want it on the
16   record, then, that if you're talking about uploading
17   to the One Drive an e-mail --
18       MR. KAREN: You want to go on the record -- you
19   know what, we're almost done. We were almost done,
20   but you know what I've had enough of this. So,
21   Courtney, will you get the Court on the phone?
22       MS. WALTER: No problem.
23       MR. KAREN: Okay. Let's get the judge on the
24   phone.
25       THE VIDEOGRAPHER: Do you want to stay on the

Page 246

1    record?
2        MR. KAREN: Yes.
3    I literally had one document left.
4        MS. KREITER: If she gets the judge on the
5    phone, why don't you raise the issue about the
6    conflict as long as we have him?
7        MR. KAREN: Sure.
8        THE WITNESS: Am I allowed to be on this, while
9    we're doing --
10       MS. KREITER: Why don't you just wait.
11       THE WITNESS: Wait, okay.
12       MS. WALTER: I'm on hold with the judge's
13   chambers so just give me a second one -- to figure
14   out.
15       Okay. Both the district judge and magistrate
16   are not available right now, so everyone needs to
17   just make their objection on the record and file a
18   motion if you feel the need to do so.
19       MR. KAREN: Okay. All right. Thank you,
20   Courtney.
21       MS. KREITER: So I guess in light of that
22   direction I will put on the record, Mr. Karen was
23   asking a fact witness questions about an e-forensic
24   expert report that the witness testified he has never
25   seen before. The line of inquiry was related to the

Page 247

1    interaction between the witness' e-mail account and a
2    One Drive system, that the witness testified he has
3    never used before.
4        I believe that Mr. Karen was misstating the
5    content of the expert report and I stated as such on
6    the record. Mr. Karen took issue with me pointing
7    that out. I asked Mr. Karen to point out where in
8    the expert report there's discussion by the expert of
9    the One Drive and this witness and the e-mails and
10   Mr. Karen refused to do so.
11       MR. KAREN: And I would simply say that it was
12   during the deposition highly inappropriate -- she can
13   make her objection, it can be stated, and for her to
14   start questioning me, which the record reflects she's
15   doing during the deposition, is highly improper,
16   particularly in front of a witness, because she's
17   suggesting answers. And we all know that if I was
18   somehow misrepresenting or not clearly stating the
19   question or anything of that nature, any of the
20   information that I would have obtained would be
21   fairly pointless. So any objection she would have
22   made resolved the issue and there was no need for
23   speaking objections to waste everyone's time.
24       So between the continuous speaking objections
25   that have been made today that I've tolerated and her

Page 248

1    improper instructions on baseless grounds that I
2    think border on defamatory, I've sort of had enough
3    of the -- this type of conduct ongoing in this
4    deposition.
5        MS. KREITER: Okay. I will just say I dispute
6    Mr. Karen's characterizations. I believe that I've
7    defended the deposition in the ordinary course.
8        MR. KAREN: Okay. Let's move forward.
9        No objections to me asking about Mutual of Omaha
10   Mortgage's loan officer agreement, right?
11       MS. KREITER: No.
12   BY MR. KAREN:
13       Q. Mr. Hutto, I'm showing you what's been marked as
14   Exhibit --
15       THE COURT REPORTER: 28.
16       MR. KAREN: 20?
17       THE COURT REPORTER: 28.
18       MR. KAREN: 28.
19       (Plaintiff's Exhibit No. 28 was marked for
20   identification.)
21   BY MR. KAREN:
22       Q. Do you recognize this document?
23       A. Yes, sir, it looks like an agreement with Mutual
24   and Synergy One. There's that Synergy One which you think I
25   would have known.

20 (Pages 245 - 248)

Page 249

1    Q. Well, at the top it says Mutual of Omaha
2 Mortgage --
3    A. Correct, yes, sir.
4    Q. Okay. And these are your signatures on each of
5 the pages; is that right?
6    A. Yeah, it looks like an eSignature.
7    Q. And it looks like it was dates -- if you look on
8 the back, 12/6/2018?
9    A. That is correct off of the top --
10    Q. If you look at the last page.
11    A. Yes, yes, sir.
12    Q. And I just wanted to go through this very
13 quickly with you. If you look at number 5, if you go down.
14    A. Okay.
15    Q. It says, you agree to work diligently and apply
16 your best efforts to originate mortgage loans, to solicit
17 new customers and otherwise promote the business of the
18 company; do you see that?
19    A. Yes, sir.
20    Q. Now, in the weeks leading up to your departure,
21 you know, April, let's say April of 2018, you were talking
22 to loan officers about the possibility of them coming over
23 to Waterstone, right?
24    MS. KREITER: Object to the form.
25    THE WITNESS: When was the date? When did you

Page 250

1 say I was talking to them?
2 BY MR. KAREN:
3    Q. In and around April of 2022.
4    A. In and around --
5    Q. Or maybe it was 2021, I'm sorry.
6    A. Yes, if they expressed interest I discussed it.
7    Q. Okay. And that would not have been promoting
8 the business of Mutual, would it?
9    A. At the time if I discussed it with them they
10 were just -- they were wanting to come and I was leaving.
11    Q. But my question is, would that have been -- in
12 your idea, is that your idea of promoting the business of
13 the company?
14    A. No, sir.
15    Q. If you go look at paragraph 9.
16    A. Paragraph which one, I'm sorry?
17    Q. 9. Section 9.1 says, as a loan originator for
18 the company, you acknowledge that you have a general duty of
19 loyalty to the company and you would agree to devote your
20 entire productive time, ability and attention to the
21 business of the company and will not render any loan
22 origination services to any other person or entity. Do you
23 see where it says that?
24    A. Yes, sir.
25    Q. When you were -- well, let's take the first part

Page 251

1 of this: Your entire productive time, ability and attention
2 to the business of the company. In and around April of --
3 March and April of 2021, is it fair to say you were using
4 your productive time, ability and attention, at least in
5 part, to set up your branch over at Waterstone?
6    MS. KREITER: Object to the form.
7    THE WITNESS: Yeah, you could say that.
8 BY MR. KAREN:
9    Q. And Waterstone was certainly aware of that,
10 right?
11    A. I don't know if they were aware of it. I didn't
12 bring it up to them. I was working with multiple banks.
13    Q. But at some point you -- at some point when you
14 made the decision to go to Waterstone --
15    A. Yes, sir.
16    Q. -- you guys were setting stuff up together,
17 right?
18    A. Yes, you could say that, I guess.
19    Q. Let's go to section 15 of this agreement. Tell
20 me when you're there, sir.
21    A. Yes, sir, I'm there.
22    Q. Section 15.1, you agree not to recruit, hire,
23 consult or assist any other person or entity in identifying,
24 contacting, recruiting or hiring company employees; do you
25 see where it says that?

Page 252

1    A. Yes, sir.
2    Q. Okay. Now, you did identify Chris Smith for
3 Waterstone, didn't you?
4    A. I wouldn't say that. I mean, it's we were -- we
5 were in, you know, like I said before, we're together as,
6 you know, me and Chris Wolf and Chris Smith discussing these
7 together.
8    Q. Well, but we saw e-mails before where you
9 introduced them to Chris Smith, right?
10    A. Yeah, you could say that. Because we had -- I
11 talked about Chris from day one when talking to any company
12 we would, you know, his name would always come up.
13    Q. Okay. But in this case, again, we saw e-mails
14 before where you introduced him, right?
15    A. Yes, sir.
16    Q. And you would agree, sir, also that the first
17 time, you know, it's correct that when you announced that
18 you were leaving and talked to your employees on one-on-one
19 at the branch, that was the first time they had heard of the
20 possibility of going over to Waterstone, right?
21    A. To my knowledge that was the first time that
22 they had -- you know, when we did the one-on-ones we
23 announced that we were going to be leaving.
24    Q. And when people said, hey, I might be interested
25 in coming with you or I want to come with you or words to

21 (Pages 249 - 252)

Page 253

1 that effect, you would tell Waterstone, right?
2     A.  No.  No, no, I wouldn't call them and tell
3 Waterstone.  I mean, that was -- the main thing was us, once
4 again, was me, me and me getting things set up for myself
5 and Chris.  And then the really main thing was clients
6 closing on time, you know, saving reputation, clients
7 getting in their home and saving Mutual's reputation at the
8 time.
9     Q.  What I'm asking is -- okay, so work with me
10 here.  You're talking to an employee one-on-one, right, and
11 the day is call it April of 2021.
12     A.  Um-hmm.
13     Q.  And you're -- and somebody says, hey, I want to
14 come with you.
15     A.  Um-hmm.
16     Q.  Following me so far?
17     A.  Um-hmm.
18     Q.  And my question is, what happens next?  Did
19 they -- did you tell them to call Waterstone?
20     A.  I don't remember how the process went.  I really
21 don't.  I don't know remember how it was --
22     Q.  But you would agree you somehow facilitated
23 that; is that a fair statement?
24         MS. KREITER:  Object to the form.
25         THE WITNESS:  Yeah, I don't remember how it was

Page 254

1 set up.  I knew that I was leaving, I knew they
2 wanted to come and then at some point they contacted
3 on-boarding, I'm assuming -- you know, I'm assuming.
4 Once again, I don't remember the whole exact process
5 that that went down.
6 BY MR. KAREN:
7     Q.  Okay.  So you --
8     A.  Chris Wolf might have a better, you know, maybe
9 he can answer that question better.
10     Q.  So you just really weren't involved in that is
11 what you're telling me?
12     A.  I was not.
13     Q.  Okay.  But you were involved in telling them
14 about the fact that you were leaving and if they had an
15 interest they could do what they wanted?
16     A.  Yeah, I mean, I don't know if that's -- I made
17 an announcement that I'm leaving.
18     Q.  Okay.
19     A.  I don't know about the other second statement.
20         MS. WALTER:  Ari, to be clear, you were saying
21 2021, I think you meant 2022.
22         MR. KAREN:  Thank you.  Yes, 2022.
23         THE WITNESS:  Sorry, I didn't catch it either.
24         MR. KAREN:  I think we both understand.
25 BY MR. KAREN:

Page 255

1     Q.  Now, do you know if those employees reached out
2 to Waterstone or you don't know one way or the other?
3     A.  I do not.  I do not know.
4     Q.  You left that up to Chris Wolf?
5     A.  At the time it was, yeah, a lot of that was
6 taken care of by Chris, and, you know, as far as I know
7 whether they wanted to come or not.
8     Q.  Okay.
9     A.  Nobody was ever solicited or recruited, pitched.
10 I mean, like I said again, we're a close group.  We're like
11 a family, so it's not nothing that I recruited or solicited.
12     Q.  Well, I mean, you told them, right, that you
13 were leaving.
14     A.  Told them I was leaving, correct.
15     Q.  And you gave them the option to come if they
16 wanted to, right?
17     A.  Yeah, I guess you could say that.  I mean,
18 it's -- they made their choice.
19     Q.  Right.  It's a free country, I get that.
20     A.  Of course, yeah.
21     Q.  And you kept it secret from Mutual while that
22 was all going on?
23     A.  I did not notify Mutual until later on down the
24 line, correct.
25     Q.  Right.  So you keep it secret from Mutual?

Page 256

1     A.  Yes, sir.
2     Q.  And do you think that that was in Mutual's
3 interest for you to do that?
4     A.  I wasn't worried about Mutual's interest at the
5 time, I was worried about the clients.
6     Q.  Now it says further on that -- go down to
7 paragraph 15.2, the company, it says, you will have access
8 to trade secrets, its products -- and the last -- second
9 line is, products, its pricing, its pricing methodology, its
10 customers, its employees and strategic business partners and
11 its methods of doing business.  This information, including
12 confidential records and data pertaining to the company's
13 customers and the relationship between the customers and the
14 company's loan originators and account representatives is
15 considered secret and is disclosed to you in confidence; do
16 you see that?
17     A.  I do.
18     Q.  Okay.  And we've seen some records where private
19 records of customers were in fact sent to Mutual --
20     A.  Yeah --
21     Q.  -- to --
22     A.  -- referrals and friends of mine mostly --
23     Q.  Okay.
24     A.  -- I don't remember every example, pretty much,
25 yeah.

22 (Pages 253 - 256)

Page 257

1    Q.  And I realize they may have been your friends, I
2  realize they may have been your --
3    A.  I understand.
4    Q.  -- contacts --
5    A.  I understand, yeah.
6    Q.  -- but that was still information that was sent
7  to Mutual, right?
8    A.  That is correct, of loans that Mutual could not
9  close.
10    Q.  But, nonetheless, it was Mutual's confidential
11  information --
12    A.  Correct.  Correct.
13    Q.  -- and that information was shared with
14  Waterstone, right?
15    A.  Correct.
16    Q.  And then if you will go to 16.2 -- I'm
17  sorry, 17.2.  Okay.  Actually, let me move past that one.  I
18  want to go back to something, if you can tell me this.
19  Do you know how -- Waterstone ultimately sent offers to
20  employees -- many of the employees at your branch, right?
21    A.  Correct.
22    Q.  And you guys, is it fair to say you coordinated
23  with the people at your branch to decide what day you were
24  all resigning?
25    A.  I did not.  I did not make that -- well, I mean,

Page 258

1  it might have been Chris and I when we made -- yeah, on the
2  26th that could have been -- I did not coordinate the
3  packages and things of that nature.
4    Q.  No, no, no --
5    A.  The date, yes.
6    Q.  -- and I'm sorry if my question --
7    A.  Yeah, sorry about that.  Yes, I did.  Me and
8  Chris were involved in the date that we were leaving, they
9  had the option to come.
10    Q.  I understand that, but everybody didn't, you
11  agree with me, just have an epiphany that, oh, the 26th
12  sounds good, that's a date that you select to come over, if
13  they were coming over?
14    A.  Correct.
15    Q.  Okay.  And we saw some e-mail where some people
16  came over sooner and that was a discussion that you had with
17  them and it was a mutual decision?
18    A.  Correct, I think two people came over early.
19    Q.  Yeah, but that was, again, a mutual decision you
20  guys --
21    A.  Yeah, I'm sure it was discussed.  I don't
22  remember the conversation but I'm sure it was discussed.
23    MR. KAREN:  Okay.  Let me take maybe five
24  minutes or so and I think might be done.  Just give
25  me a couple of minutes and I'm just going to read a

Page 259

1  couple of notes.
2    THE VIDEOGRAPHER:  Going off the record.  The
3  time is 3:43.
4    (Off the record.)
5    THE VIDEOGRAPHER:  We're back on the record.
6  The time is 3:53.
7    MR. KAREN:  Mr. Hutto, I just have a couple more
8  questions and we'll be done.
9    THE WITNESS:  No problem.
10 BY MR. KAREN:
11    Q.  I want to kind of drill back into these
12  one-on-one meetings that you had.
13    A.  Okay.
14    Q.  And I realize they're all going to be a little
15  different --
16    A.  Correct.
17    Q.  -- so I just wanted to ask you generally; is
18  that fair?
19    A.  Yes.
20    Q.  Okay.  So when you have a one-on-one meeting and
21  it would be you and the loan officer or would it be you and
22  Chris and the loan officer?
23    A.  It would be me and Chris Wolf and the loan
24  officer, correct.
25    Q.  Okay.  How long would those meetings take?

Page 260

1    A.  I don't remember.  It usually depends.  You
2  know, you've got some people that have a lot of questions,
3  you know, and you've got some that just is kind of like me,
4  go with the flow, you know.  So it really depends on, I
5  would say all one-on-ones really depends on who you're
6  one-on-oneing, might I say.
7    Q.  Okay.  So some of them they had a lot of
8  questions and stuff?
9    A.  Correct.  And that's on any one-on-one.  We do
10  them monthly.
11    Q.  Right, but I'm -- to be clear --
12    A.  But, yes.
13    Q.  -- I'm specifically referring to the issue
14  about --
15    A.  Yes, sir.
16    Q.  -- coming to Waterstone?
17    A.  Yes, sir.  They would have been -- it would have
18  been depending on which person we were talking to.
19    Q.  Some would have said, hey, count me in, and some
20  might have had reservations?
21    A.  Yeah, I would say that.  I mean, I never really
22  pitched them on the count me in.  I kind of in the back of
23  my mind I figured you know your friends and your people,
24  but, you know, I was trying not to cross that line also.  I
25  mean, that's just my opinion.

23 (Pages 257 - 260)

Page 261

1    Q.  I'm sorry, you said that you were trying to
2  cross that --
3    A.  I was just trying to make an announcement to
4  them basically is what I'm saying.  We wasn't trying to get
5  into them yet.  The main thing is we were letting them know
6  that we had made the decision that Chris and I were leaving.
7    Q.  Okay.  But I guess what I'm saying is, in those
8  announcements when they have questions, right, you're going
9  to answer those questions?
10    A.  Correct.
11    Q.  Okay.  And is it fair to say in answering those
12  questions -- I mean, you wanted these people to come with
13  you, didn't you -- didn't you?
14    A.  Yeah, the majority of them, yeah.
15    Q.  Okay.  So, obviously, as a natural human being
16  you would have generally positive responses, right?
17    A.  I would say naturally.  Yeah, if they asked me a
18  question I answered to, my knowledge.  I can't go through
19  every one of those things and try to remember, I can't
20  remember what happened last week half the time.  But, yes,
21  if they asked me a question I would have answered their
22  question.  That's just -- I mean, once again, they're
23  friends, colleagues for years.  So, yes, I think I did what
24  anybody else would have done.
25    Q.  Okay.  And you believed it was in your best

Page 262

1  interest to go to Waterstone, right?
2    A.  I do.
3    Q.  Okay.
4    A.  I would have went anywhere.
5    Q.  And you believed it was in their best interest;
6  isn't that fair?  And that was one of the reasons you
7  went --
8    A.  Yeah, I believe --
9    Q.  -- because you thought it would be --
10    A.  Absolutely, yes.
11    Q.  Okay.  And you would have conveyed that to them
12  if they asked, right?
13    A.  If they asked me that question, you know, I
14  probably -- well, I don't think that question that I ever
15  remember was asked.  But if they asked that, I don't know if
16  I would speak on what's in their best behalf.  I think that
17  we have enough examples with all of my people of loans that
18  have went wrong.  But I don't remember, I just can't talk
19  about what would have been, you know what I mean --
20    Q.  Okay.
21    A.  -- because I don't know.
22    Q.  But it's fair to say that since you -- you know,
23  every time when we as people have conversations -- I use the
24  word our own biases affect the way we answer, right?  And so
25  if you think something's good or something's bad, it's

Page 263

1  obviously going to shade the way you answer; wouldn't you
2  agree?
3    A.  Correct.
4    Q.  Okay.  And you're in sales so you're especially
5  like that and you're good.
6    A.  I don't know if I'm too salesy but go ahead.
7    Q.  No, I'm not too salesy but you're -- and that's
8  your sales tactic, right?
9      But, I mean, so that would have sort of been
10  part of those conversations, too; wouldn't you agree?
11    A.  I don't remember that conversation, but, yes, I
12  would agree that that could have been, yes.
13      MR. KAREN:  Okay.  That's all I have.
14      MS. KREITER:  Great.  Thank you.
15      THE WITNESS:  Thank you, guys.
16      MR. KAREN:  Thank you, sir, I appreciate it.  I
17  apologize for the circumstances.
18      THE WITNESS:  You're okay.
19      THE VIDEOGRAPHER:  We are off the record at
20  3:57.  And this concludes today's testimony given by
21  Dwayne Hutto.  The total number of media used was
22  four and will be retained by Veritext.
23      (Video record concluded at 3:57 p.m.)
24      THE COURT REPORTER:  Did you need this
25  transcribed?

Page 264

1      MR. KAREN:  Yes, please.
2      THE COURT REPORTER:  And did you need a copy?
3      MS. KREITER:  Yeah, if I could have condensed
4  pdf with the exhibits attached.
5      (The deposition concluded at 3:57 p.m.)

24 (Pages 261 - 264)

Page 265

```
 1            CERTIFICATE OF OATH
 2
 3 STATE OF FLORIDA
   COUNTY OF HILLSBOROUGH
 4
 5     I, Victoria White, Notary Public, State of Florida, do
 6 hereby certify that DWAYNE HUTTO appeared personally before
 7 me and was duly sworn.
 8     WITNESS my hand and official seal this 15th day of June,
 9 2023.
10
11
12
13
14
15
16
17
18        Victoria White
19        Victoria T. White, Court Reporter
          Notary Public, State of Florida
20        Notary Commission No. HH 341493
          Commission Expires:  02/05/2027
21
22
23
24
25
```

Page 266

```
 1            CERTIFICATE OF REPORTER
 2 STATE OF FLORIDA
   COUNTY OF HILLSBOROUGH
 3
 4     I, Victoria White, Stenograph Shorthand Reporter, and
 5 Notary Public, do hereby certify that I was authorized to
 6 and did stenographically report the foregoing deposition of
 7 DWAYNE HUTTO; that the review of the transcript was not
 8 requested; and that the foregoing Pages 4 through 264,
 9 inclusive, are a true and complete record of my stenographic
10 notes.
11     I further certify that I am not a relative or employee
12 of any of the parties, nor am I a relative or counsel
13 connected with the parties' attorneys or counsel connected
14 with the action, nor am I financially interested in the
15 outcome of the action.
16     DATED this 29th day of June, 2023.
17
18
19
20
21
22        Victoria White
23        Victoria T. White, Court Reporter
          Notary Public, State of Florida
24        Notary Commission No. HH 341493
          Commission Expires:  02/05/2027
25
```

25 (Pages 265 - 266)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.