UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., | ) <br> ) Civil Action No. 22-CV-01660 <br> ) <br> ) **PLAINTIFF MUTUAL OF OMAHA** <br> ) **MORTGAGE, INC.'S RESPONSE IN** <br> ) **OPPOSITION TO WATERSTONE** <br> ) **MORTGAGE CORPORATION'S** <br> ) **MOTION FOR SUMMARY JUDGMENT** <br> ) **ON MUTUAL'S TRADE SECRET** <br> ) **CLAIMS** <br> ) |
| Plaintiff, | |
| v. | |
| WATERSTONE MORTGAGE CORPORATION, | |
| Defendant. | |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual") hereby files this Corrected Response in Opposition to Defendant Waterstone Mortgage Corporation's ("Defendant" or "Waterstone") Motion for Summary Judgment on Mutual's Trade Secret Claims ("Motion").[1] In support thereof, Plaintiff states as follows:

## INTRODUCTION

This case is the textbook example of the misappropriation of a competitor's trade secrets in an effort to destroy its business. The record evidence shows that at Waterstone's direction, Mutual's Former Employees utilized password and other access incidental to their then-current employment at Mutual to send trade secrets

---

[1] Mutual is resubmitting this corrected version of its brief as Mutual's counsel inadvertently filed the wrong version of the brief and omitted a document to Exhibit A. Mutual respectfully requests that this Court deem this version as filed.

1

directly to Waterstone, and the actions were the prelude to Waterstone's scheme to abscond with the entirety of Mutual's Florida operations. Waterstone instructed the Former Employees to download "as much information as possible" from Mutual's password-protected system. The deposition testimony corroborates dozens of e-mails demonstrating Waterstone's motion for summary judgment is baseless.

Waterstone's argument that "several" of the documents identified as trade secrets do not qualify as such, ignores that a large amount of the documents *are* trade secrets. And the fact that Waterstone does not try to argue otherwise demonstrates its Motion is baseless. To demonstrate the baseless nature of this Motion, Mutual has categorized its protected trade secrets into four categories: (1) Mutual's Qualified Business Opportunities/Customer Lists; (2) Financial Performance; (3) Employee Compensation/Personnel Information; and (4) Templates/Processes, which are supported as protected trade secrets. *See* **Exhibit A**.[2]

Finally, Waterstone's reliance on its expert witness in an attempt to argue that Waterstone never used Mutual's trade secrets is misplaced. Waterstone's expert witness never physically analyzed Waterstone's system himself. But more importantly, it never analyzed nor attempted to quarantine the personal emails of Former Employees who – acting as Waterstone's agents and with Waterstone's full

---

[2] Exhibit A consists of two spreadsheets, both of which will be served upon Waterstone's counsel as amended discovery responses, specifically response to Interrogatory Number 8 and Request for Production Number 15.

knowledge and permission – used their personal emails to misappropriate and use Mutual's trade secrets. In fact, Waterstone's expert witness is unable to say with full certainty that Waterstone did not, in fact, use these trade secrets. Because the record evidence shows that Waterstone was the but for cause of Mutual's damages, Mutual is entitled to pursue its lost profit damages. Accordingly, Waterstone's Motion must be denied.

## RESPONSE TO WATERSTONE'S STATEMENT OF MATERIAL UNDISPUTED FACTS

Pursuant to Fed. R. Civ. P. 56(c), Mutual responds to Defendant's Statement of Material Undisputed Facts as follows:[3]

1. Admit.

2. Deny. The citation does not support the fact, and the fact is disputed. *See* D.E. 37 ("Am. Compl.") ¶¶ 3, 25, 35-42, 43-65.

3. Admit in part; denied in part. Admit that the Amended Complaint contains allegations that Mutual employees sent "policies and procedures," "templates," "forms," and other "confidential documents" from their Mutual Mortgage email addresses to their personal email accounts and deny that these are "broad allegations." Am. Compl. ¶¶ 40-42.

---

[3] For brevity, the factual paragraphs are not repeated within this opposition.

4. Admit in part; denied in part. Admit that Mutual sued Waterstone and Mutual's former employees took Mutual's trade secrets at Waterstone's request. Denied to the extent this fact is a mischaracterization of the lawsuit.

5. Object on the grounds that this fact is not material to any claim.

6. Object on the grounds that this fact is not material to any claim.

7. Object on the grounds that this fact is not material to any claim.

8. Object on the grounds that this fact is not material to any claim.

9. Object on the grounds that this fact is not material to any claim.

10. Object on the grounds that this fact is not material to any claim.

11. Denied to the extent that Waterstone's counsel's questioning of Mr. Gennarelli on this topic is inadmissible and calls for a legal conclusion. Ex. B, Gennarelli Dep. 228:5-25-248:22. Further, during this deposition, Mutual's counsel objected on the grounds that Waterstone's counsel refused to show Mr. Gennarelli the full family of attachments and only showed him piecemeal documents, which resulted in the questioning being taken out of context. *Id.* at 237:7-13. Mr. Gennarelli also testified that all of Mutual's marketing materials are password-protected in Mutual's system. *Id.* at 237:24-25.

12. Admit in part; denied in part. Admit that Waterstone's expert witness's report speaks for itself. Denied to the extent that Mr. Creasey conducted any search

of Waterstone's system. *See* Ex. C, Creasey Dep. 58:7-12; 58:18-20; 63:2-8. 103:4-9; 105:10-16.

13. Denied for the same reasons set forth in paragraph 12. Further, Mr. Creasey was not retained by Waterstone to opine on what constitutes a trade secret. Ex. C, Creasey Dep. 135:5-7.

14. Deny. Mutual objects to and denies paragraph 14 on the grounds that the fact is inadmissible because it calls for a legal conclusion. Mr. Creasey testified that it was only through "dumb luck" that Waterstone became aware of the fact that Mutual's documents existed on Waterstone's system because Mr. Wolf loaded Mutual's documents into his OneDrive on April 27 at 10:34 p.m. Ex. C, Creasey Dep. 69:12-20. This triggered a malware alert. *Id.* at 80:15-17. The following morning the alert triggered—ten hours later—Mr. Howard began an investigation of the malware alert. Ex. C, Creasey Dep. 78:1-7; 83:9-14. It was at that point that Mr. Howard realized it was "unusual" for a new hire to have a "bunch of stuff" from Mutual in his OneDrive because he had just been hired, which he recognized as "being a potential problem." Ex. C, Creasey Dep. 97:5-19.

15. Deny. Ten hours after being notified of a potential security threat, Mr. Howard then looked into other "new hires for a similar potential issue[,]" but Mr. Creasey did not know who those new hires were. Ex. C, Creasey Dep. 103:4-9. As Mr. Creasey recognized, "generally as a person involved in information security

5

you have some sense of, you know, materials from a prior employer showing up at your place of work could, you know, lead to issues, legal issues." *Id.* 102:13-18.

16.     Deny because the evidence does not support the fact asserted as Mr. Creasy does not have knowledge of this.  Mr. Creasey did not know whose OneDrive accounts Mr. Howard searched.  Ex. C, Creasey Dep. 103:4-9.  Mr. Creasey also did not know whether Mr. Howard's investigation would have included all of Mutual's Former Employees who joined Mutual.  Ex. C, Creasey Dep. 105:10-16.  Mr. Creasey was not aware of whether Waterstone conducted any analysis of whether the documents within their possession qualified as confidential information such that e-mails should be quarantined.  *Id.* at 127:13-18.

17.     Deny because the evidence does not support the fact asserted as Mr. Creasey does not have knowledge of this.  Mr. Howard's investigation resulted in five new hires' OneDrives being quarantined, but Mr. Creasey did not know offhand whose they were.  Ex. C, Creasey Dep. 108:16-20.  Further Mr. Creasey is not able to confirm what Waterstone did with those documents that Mr. Creasey identified after Waterstone received them.  Ex. C, Creasey Dep. 145:11-21; 146:1-7.  In fact, Mr. Creasey explicitly testified that he was unable to opine on whether Waterstone used the e-mails in any capacity.  Ex. C, Creasey Dep. 146:12-15.  Mr. Creasey even admitted that it was possible that Mutual's Former Employees still

had Mutual documents in their possession even after they transferred to Waterstone. Ex. C, Creasey Dep. 156:7-11.

18.  Admit that Mutual sent Waterstone multiple cease-and-desist letters on April 29, 2022.

19.  Deny because the evidence does not support the fact asserted as Mr. Creasey does not have knowledge of this. Mr. Creasey did not speak with the individuals who signed the certifications. Ex. C, Creasey Dep. 128:17-18. Mr. Creasey did not speak with any of Mutual's Former Employees. *Id.* at 155:17-20. In fact, he admitted that it is possible Mutual's Former Employees still had Mutual's documents in their possession. *Id.* at 156:7-11.

20.  Deny for the same reasons set forth in paragraph 11.

21.  Deny for the same reasons set forth in paragraph 11.

22.  Admit that Waterstone requested Mutual's Profit & Loss Statements, and Mutual's Former Employees sent those to Waterstone. On November 3, 2021, Christopher Wolf ("Wolf") e-mailed Dustin Owen ("Owen"), who at the time was Waterstone's Regional Vice President – Southeast, asking questions "from Chris [Smith] in Tampa and some others had [sic][.]" Ex. D, WMC006263-WMC006271. In there, Wolf asked "can we send loans over to start and build up a balance of money to fund transition." *Id.* at WMC006267. On February 17, 2022, Mutual's Former Employee, Dwayne Hutto ("Mr. Hutto") sent an e-mail from his

7

Mutual e-mail address to Dustin Owen at Waterstone, attaching a copy of Mutual's December 31, 2021 Profit and Loss ("P&L") Statement for the Daytona Branch (Ex. E, MOM-0000038). Owen confirmed receipt of this e-mail. *Id.* Waterstone knew this was a piece of internal confidential financial information that should not be sent from another company because it was not publicly available and was valuable for evaluating the profitability of a branch and its employees and facilitating the calculation of potential offers. Ex. F, Allen Dep. 219:2-18; 223:13-22; 224:1-22; 225:1-8; Ex. G, Deposition of Dwayne Hutto 88:20-22, 89:22-90:1-2. Despite knowing that it should not have this information, Waterstone never asked the Departed Employees to stop sending this information. Ex. F, Allen Dep. 229:13-22; 230:16-22, 230:1-2. Rather, on March 3, 2022, Hutto e-mailed the Tampa P&L for December 2021 to his personal e-mail address. Ex. H, MOM-0000027-28. Using his personal e-mail address, Hutto again forwarded the P&L to Owen. *Id.* Owen responded to this e-mail stating, "Received. Thank you. I have sent this off to Kevin Allen ("Allen"), Waterstone's Senior Vice President of Sales. Ex. I, MOM-0000035; Ex. F, Allen Dep. 33:17. On March 5, 2022, Owen wrote an e-mail to Wolf stating, "We then would want to start creating your database by transferring as much over as possible." Ex. J, WMC008400; Ex. F, Allen Dep. 151:9-16. This "database" relates to Encompass, which is a loan origination system that contains customers' sensitive information pertaining to interest rates on loans

that a lender has closed, the type of loan product, as well as the contact and detailed personal financial information of its borrowers. Ex. F, Allen Dep. 42:12-20; 169:18-22. Sensitive information includes customers' personal information, Social Security numbers, credit scores, and bank account numbers. *Id.* at 42:21-22; 43:1-5; 48:21-22-49:1-8. Waterstone knows this information is confidential proprietary information belonging to Mutual. Ex. F, Allen Dep. 160:18-22; 161:1-4. Waterstone agreed that it is "problematic" if Owen intended to mean that Wolf should transfer over as much information from his current employer as possible. Ex. F, Allen Dep. 50:11-16; 152:2-9, 18-22; 153:1; 155:5-14; 171:6-17.

23. Admit in part; denied in part. Admit that Mutual is unable to identify the loans that closed at Waterstone because that information is within Waterstone's possession. *See* D.E. 100 ¶¶ 13-15. Denied to the extent that there is evidence that Waterstone diverted approximately 46 loans from Mutual to Waterstone. *Id.* ¶ 14.

24. Deny. Mr. Gennarelli testified during his deposition that there was a lot of value associated with the P&L Statement, but that Mutual was still calculating damages from this misappropriation at the time of his testimony. Ex. B, Gennarelli Dep. 251:14-25-253:14. Waterstone's own employees had admitted that this information was "valuable." Ex. K, Christopher Wolf Deposition, 128:3-12.

25. Deny.

26. Deny. Waterstone's own management participated in and encouraged in improperly obtaining Mutual's confidential information and trade secrets. *See, e.g.,* Ex. L, MOM-0001284, WMC006389-WMC006391, WMC007335. Waterstone did nothing to stop Mutual's Former Employees from sending Mutual's information to Waterstone and instead repeatedly received and used the information. Ex. F, Allen Dep. 275:5-19; 277:1-2. To the contrary, Waterstone continued to encourage, assist, and facilitate the theft of trade secrets as it would assist in financing the Branch transition. *See, e.g.,* Ex. N, WMC005267; Ex. F, Allen Dep. 37:1-9; 38:3-22-39:1-2.

27. Deny. In his deposition, Chris Wolf testified that Waterstone instructed him download "as much as possible" from Mutual's password-protected loan origination system. Ex. K, Wolf Dep. 176:6-10. This included information pertaining to borrower names, loan amounts, borrower credit scores, loan types, and contact information for prior and current Mutual customers. *Id.* Waterstone admits this information was valuable. *Id.* On May 11, 2022, a Mutual employee who joined Waterstone, sent an e-mail to Smith providing a "suggested Encompass export map for the 'Completed Loans' folder." Ex. M, MOM-0015236; Ex. F, Allen Dep. 165:1-3. Waterstone knows that the information within Encompass, particularly as it relates to interest rates on closed loans and the contact information for those borrowers, contains confidential valuable business information. In

response, on June 13, 2022, a loan officer at Mutual responded, providing a "closed loan list" in the field mapping that Waterstone requested from Encompass. Waterstone knew that this would include private information about customers who closed loans at Mutual and further admitted that it would be problematic for someone to have exported Mutual's closed loan list out of Encompass. As further examples, Mr. Wolf sent Waterstone several pieces of borrower information *See* Ex. O, Compilation of E-mails, and Waterstone's own management even participated in and encouraged this activity. Waterstone was aware that these requests were improper. *See, e.g.,* Ex. L, MOM0001284, WMC006389-WMC006391, WMC007335. And from February through the end of April 2022, on at least 20 occasions, Wolf emailed personal financial data including borrowers' income, assets, tax returns, account balances, credit scores, social security numbers and other similar materials entrusted to Mutual, by emailing it first to his prior email and then to Waterstone. *See* Ex. O, Compilation of E-mails. Waterstone also admitted these were improper.

  28. Denied for the reasons set forth in paragraph 27.

  29. Denied for the same reasons set forth in paragraph 22.

  30. Denied for the same reasons set forth in paragraph 22.

## LEGAL STANDARD

Summary judgment is not appropriate where there are genuine disputes as to any material fact. Fed. R. Civ. P. 56(a). It is the movant's burden to demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). To do so, Defendant must show that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Indeed, the moving party bears "the responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## ARGUMENT

### I. MUTUAL CAN IDENTIFY FOUR CATEGORIES OF TRADE SECRETS MISAPPROPRIATED BY WATERSTONE.

A misappropriation of trade secrets claim[4] is sufficient if there is proof that (1) the defendant misappropriated (2) the plaintiff's trade secret. *Compulife*

---

[4] Mutual asserts two claims for misappropriation of trade secrets—one under the Defend Trade Secrets Act, 18 U.S.C. § 1836 ("DTSA") and one under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.002 ("FUTSA"). For purposes of this Motion, the Court may analyze both claims together given their substantive similarities. *See, e.g., Humanitary Med. Ctr., Inc. v. Africa*, Case No. 8:23-cv-1792-WJF-TGW, 2023 WL 8779956, at *2 (M.D. Fla. Dec. 19, 2023).

*Software Inc. v. Newman*, 959 F.3d 1288, 1310, 1311 n.13 (11th Cir. 2020). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'" *Id.* at 1311. A trade secret is misappropriated by *use* if it is used "without express or implied consent" and an individual "[u]sed improper means to acquire knowledge of the trade secret[.]" *Id.* (citing Fla. Stat. § 688.002(2)(b)).

Although there are a large number of documents containing trade secrets that were misappropriated by Waterstone, they generally fall within four categories: (1) Mutual's Qualified Business Opportunities/Customer Lists; (2) Financial Performance; (3) Employee Compensation and Personnel Information; and (4) Templates/Processes. Each of these categories qualifies as a trade secret, and there are innumerable instances of Waterstone misappropriating these materials. First, Mutual's Qualified Business Opportunities/Customer Lists include the identification of clients that had been qualified as both able and willing to proceed with a loan – something that in and of itself Waterstone deemed "valuable." RSOF ¶¶ 22-26. It also includes the private borrower information supporting and facilitating the theft of those business opportunities that were intended strictly for Mutual's benefit and use. *See, e.g., Marine Turbo Eng'g Ltd. v. Turbocharger Servs. Worldwide, LLC*, 2011 WL 6754058, at *9 (S.D. Fla. Dec. 22, 2011) ("Customer lists and related information may constitute protectable trade secrets under Florida law."); *Sethscot*

13

*Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996). A second category includes Mutual's employee compensation and personnel information. This information is nonpublic and carries value because in the hands of a competitor, it provides an advantage in formulating effective incentives to join its company. *See, e.g., DynCorp Int'l v. AAR Airlift Grp., Inc.*, 664 F. App'x 844, 849 (11th Cir. 2016). A third category includes data on financial performance that provided nonpublic information to enable Waterstone to better value the branch and develop pricing and compensation formula to ensure profitability of the transition. *See, e.g., Pinnacle Agri. Distribution, Inc. v. Mayo Fertilizer*, Case No. 1:17-CV-029 (LAG), 2019 WL 13095501, at *12 (M.D. Ga. Mar. 29, 2019). The final category of documents involves Mutual's templates and processes that were misappropriated to effectuate a smooth and seamless transition from Mutual to Waterstone. *See, e.g., VAS Aero Servs., LLC v. Arroyo*, 860 F. Supp. 2d 1349 (S.D. Fla. 2012).

Moreover, Waterstone used the information to facilitate the theft of the Florida Operations. Emails demonstrate that Waterstone sent over a "transition team" that it used to funnel trade secrets to Waterstone to build up a pipeline of business before the Florida Branches would transition. RSOF ¶ 22. The diversion of these business opportunities was utilized to (i) fund the branch transitions; and (ii) create a seamless transition for loan officers so that they would not lose their current business prospects, customer leads and marketing resources when they left

Mutual. Indeed, in advance of the Branch Operations' transition, volumes of private customer data, customer lists, marketing lists, and qualified business opportunities were transferred. RSOF ¶¶ 22-26.

## II. THE FACT THE CERTAIN MATERIALS MAY NOT CONSTITUTE TRADE SECRETS IS NOT FATAL TO MUTUAL'S CLAIMS.

During discovery, Mutual identified nearly a thousand documents that may have constituted confidential information and trade secrets. Waterstone myopically argues that simply because *some* of the documents may not contain trade secrets, this somehow entitles it to judgment on these claims. But this logic ignores that there are still a large number of e-mails *directly transmitted* to Waterstone containing protected trade secrets in one of the four categories addressed herein.

At a minimum, the determination of whether information qualifies as a trade secret is a highly factual question better suited for resolution by a jury after consideration of the surrounding circumstances. *See Capital Asset Research Corp. v. Finnegan*, 160 F.3d 683, 686 n.2 (11th Cir. 1998); *Camp Creek Hospitality, Inc. v. Sheraton Franch. Corp.*, 139 F.3d 1396, 1410-11 (11th Cir. 1998); *see also Restatement of Law, Third*, Unfair Competition, § 39 cmt. D ("It is not possible to state the precise criteria for determining the existence of a trade secret. The status of information claimed as a trade secret must be ascertained through a comparative evaluation of all the relevant factors, including the value, secrecy, and definiteness of the information as well as the nature of the defendant's misconduct.").

By way of example, there is almost no dispute that Waterstone sending a request for completed loan information qualifies as an improper use for a protected trade secret. Waterstone requested that Mutual's then Manager use his password protected access to download "as much information as possible" from Mutual's loan origination system. RSOF ¶¶ 22-26. It asked another then current Manager to provide compensation details and private contact information for branch employees. *Id.* He provided that information.[5] As further examples, Mr. Wolf sent Waterstone several pieces of borrower information, and Waterstone's own management even participated in and encouraged this activity. *Id.* Additionally, as Mr. Wolf admitted it was not merely the information itself – but the fact that it identified qualified borrowers who were prepared to engage in the loan process and actually obtain a loan that was valuable.

### III. WATERSTONE'S ALLEGED QUARANTINE WAS INSUFFICIENT AND UNTIMELY AND DID NOT PREVENT THE THEFT AND MISAPPROPRIATION OF TRADE SECRETS.

Waterstone's contention that Mutual cannot prove misappropriation of Mutual's trade secrets because its expert witness confirmed that the "vast majority" of Mutual's trade secrets were never sent to Waterstone is directly contradicted by record evidence. Waterstone's expert witness admitted that his analysis only

---

[5] At the January 30, 2024 hearing before the Court, the Court inquired into the "best-case example" of a trade secret, and undersigned counsel referenced this example. Hearing Trans. at 45:14-23. In questioning Waterstone's counsel, the Court seemingly acknowledged Mutual's position stating, "[t]he map sounds like a trade secret. Right?" Trans. at 47:17-18.

16

included the time period up to April 2022 and not beyond that. RSOF ¶¶ 14-17. Mutual's Former Employees sent confidential information and trade secrets to Waterstone after this time period. Mr. Creasy does not know what actions Waterstone undertook to determine whether information was confidential as defined in Mr. Carroll's cease-and-desist letter. And in fact, Mr. Creasy was not even the individual who physically reviewed Waterstone's facilities or computer systems.

## IV. WATERSTONE'S MISAPPROPRIATION OF TRADE SECRETS SERVED AS THE PROXIMATE CAUSE OF MUTUAL'S DAMAGES.

Mutual is not required to prove the specific injury from each and every misappropriated trade secret. In this Circuit, "[i]t has long been the position that 'where the secret has not been destroyed and where the plaintiff is unable to prove specific injury' the accepted approach to computing damages 'is to measure the value of the secret to the defendant.'" *Hurry Family Revocable Trust v. Frankel*, Case No. 8:18-cv-2869-CEH-CPT, 2022 WL 3156202, at *11 (M.D. Fla. Aug. 8, 2022). Though Waterstone engaged in multiple tortious acts, the gateway through which its wrongful conduct was enabled was the misappropriation of Mutual's trade secrets. The conspiracy to steal Mutual Florida Operations began with the concept of diverting identified qualified customers to Waterstone. Mr. Smith requested that he be able to send over a transition team to build up a pipeline of customers that he clearly thought would be critical to any successful transition. And ultimately, Waterstone did just this. It invited the former employees to send over a transition

team and in connection therewith, misappropriate "as much as possible" in terms of trade secrets. RSOF ¶¶ 22-26. It utilized the transition team and the utilization of private email to divert dozens of qualified leads and enable to transfer of private borrower information so that loan officers could transition without loss of their pipeline. *Id.* Additionally, Waterstone's use of Mutual's personnel information and P&L Statements allowed Waterstone access to information that was not otherwise publicly available to recruit loan officers and develop financial and compensation models that would lure over Mutual Florida's employees without compromising Waterstone's eventual profitability. *Id.*

Further, Mutual's Former Employees specifically stated that a critical element in the theft of Mutual Florida's operations was the seamless transition of the branches. And Waterstone's focus on taking customers, customer lists, and prequalified customers was obviously critical to that transition. Indeed, had Waterstone not taken this information, it is highly unlikely that a group of employees whose compensation was premised on commission would have left Mutual without customer lists or the pipeline of customers needed to fund any transition and/or seamless move their business. The mere prospect of losing existing deals, their marketing databases, information about past customers and then-present opportunities would have precluded the wholesale "seamless" transition. The prospect of needing to develop new customer and marketing databases free of

18

Mutual's trade secrets would have undermined Waterstone's plans. The very fact that Waterstone allowed the Former Employees to hire a third party to begin using Mutual's trade secrets to begin setting up appointments with potential clients (using Mutual's likeness) *before and in anticipation of the transition* demonstrates the critical role this information played in the transition. The fact Waterstone specifically told the Former Employees to take "as much information as possible" from Mutual's password protected databases precludes any argument that this information as not critical to Waterstone's plan. As such – consistent with the very plan from its outset – Waterstone's theft of the financials, qualified customers, customer information, and customer lists were critical and necessary predicate to the illegal actions that followed. It follows then that because Waterstone acted as the "but for" of Mutual's damages, Mutual is entitled to pursue its lost profit damages. *See, e.g.,* 18 U.S.C. § 1836(b)(3)(B)(i)(I); Fla. Stat. § 688.004(1); *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 646 (Fla. 4th DCA 2012).

V. **IT IS A QUESTION FOR THE JURY AS TO WHETHER MUTUAL'S PROFIT AND LOSS STATEMENTS QUALIFY AS A PROTECTED TRADE SECRET.**

There is no question that Mutual's Former Employees, specifically Dwayne Hutto, sent himself and Waterstone multiple e-mails containing Mutual's P&L Statements on multiple occasions. The P&Ls contained information which is not publicly available, including pricing and internal financials. RSOF ¶¶ 22-26. Courts

19

have repeatedly refused to enter summary judgment in favor of defendants under similar scenarios because profit and loss statements qualify as trade secrets such that they are protected and liability may imposed for their misappropriation. *See, e.g., Jim Hawk Truck-Trailers of Sioux Falls, Inc. v. Crossroads Trailer Sales & Serv., Inc.*, 655 F. Supp. 3d 825, 848 (D.S.D. 2023).

Dated:    Washington, D.C.
          April 2, 2024

MITCHELL SANDLER PLLC

By: */s/ Ari Karen*

Ari Karen (admitted *pro hac vice*)
Christopher L. McCall (admitted *pro hac vice*)
Courtney E. Walter
1120 20th Street NW, Suite 725
Washington, D.C. 20036
Email:  akaren@mitchellsandler.com
Email:  cmccall@mitchellsandler.com
Email:  cwalter@mitchellsandler.com
Telephone: (202) 886-5292

GUNSTER, YOAKLEY & STEWART, P.A.

John A. Schifino
Florida Bar No. 0072321
401 East Jackson Street, Suite 1500
Tampa, Florida 33602
Primary email:  jschifino@gunster.com
Secondary email: eservice@gunster.com
Telephone: (813) 739-6962

*Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc.*