# <u>EXHIBIT C</u>

Page 1

1                UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION
3      MUTUAL OF OMAHA MORTGAGE,      *
       INC.,                         *
4                                    *
            Plaintiff,               *
5                                    * CIVIL ACTION NO.:
         vs.                         * 22-CV-01660
6                                    *
       WATERSTONE MORTGAGE           *
7      CORPORATION,                  *
                                     *
8            Defendant.              *
                      - - - - - - - - -
9
10           Deposition of BRETT CREASY, taken
11     remotely via Veritext Virtual Zoom, with
12     simultaneous videotape recording, on Wednesday,
13     July 26, 2023, beginning at 9:05 a.m., in
14     Pittsburgh, Pennsylvania, before Ilana E. Johnston,
15     Notary Public.
16
17
18
19
20     Reported by:
21     Ilana E. Johnston (via Zoom)

Page 2

1  APPEARANCES:

2

3  On behalf of Plaintiff Mutual of Omaha Mortgage,

4  Inc. (via Zoom):

5      COURTNEY E. WALTER, ESQUIRE

6      Mitchell Sandler, LLC

7      1120 20th Street, NW, Suite 725

8      Washington, DC 20036

9      202-886-5292 (voice)

10     cwalter@mitchellsandler.com

11

12 On behalf of Defendant Waterstone Mortgage

13 Corporation (via Zoom):

14     MARIA L. KREITER, ESQUIRE

15     Godfrey & Kahn, SC

16     833 East Michigan Street, Suite 1800

17     Milwaukee, Wisconsin 53202

18     414-273-3500 (voice)

19     414-273-5198 (fax)

20     mkreiter@gklaw.com

21

Page 3

1  ALSO PRESENT: (via Zoom)

2      Laurel Thomsen, Associate General

3        Counsel, Mutual of Omaha Mortgage, Inc.

4      Adam Cares, Litigation Specialist,

5        Godfrey & Kahn, SC

6      Hayley Rich, Summer Associate,

7        Godfrey & Kahn, SC

8      Ryan Heathcock, Videographer

9

10

11

12

13

14

15

16

17

18

19

20

21

Page 4

1           I N D E X   O F   W I T N E S S E S

2

3  Witness                          Page

4  BRETT CREASY

5  BY MS. WALTER                        8

6  BY MS. KREITER                     162

7

8           I N D E X   O F   E X H I B I T S

9

10 Creasy

11 Exhibits                         Page

12 Exhibit 1   Report of Brett Creasy      9

13 Exhibit 2   E-mails Bates stamped      131

14     MOM-0000238 and MOM-0000239

15     -------------------------

16

17

18

19

20

21

Page 5

1           T H E   P R O C E E D I N G S

2        - - - - - - - - - - - - -

3      THE VIDEOGRAPHER:  Good morning.  We are

4  going on the record at 9:05 a.m. Eastern on July

5  the 26th, 2023.  Please note that this deposition

6  is being conducted virtually.  The quality of the

7  recording depends on the quality of the camera and

8  Internet connection of the participants.  What is

9  seen from the witness and heard on the screen is

10 what will be recorded.  Audio and video recording

11 will continue to take place unless all parties

12 agree to go off the record.

13     And so this begins media unit No. 1 in

14 the video recorded deposition of Brett Creasy taken

15 by counsel for the plaintiff, in the matter of

16 Mutual of Omaha Mortgage, Incorporated versus

17 Waterstone Mortgage Corporation.  This case has

18 been filed in the United States District Court,

19 Middle District of Florida, Tampa Division.  The

20 case number is 22-CV-01660.

21     My name is Ryan Heathcock, representing

2 (Pages 2 - 5)

Page 6

1  Veritext Legal Solutions, and I am the
2  videographer.  Our court reporter today is
3  Ms. Ilana Johnston, and she is also representing
4  Veritext Legal Solutions.  I am not related to any
5  party in this action, nor am I financially
6  interested in the outcome.
7        If there are any objections to
8  proceeding, please state them at the time of your
9  appearance.  Counsel and all present, will you now
10  state your appearances and affiliations for the
11  record, beginning with the noticing attorney?
12        MS. WALTER:  Good morning.  This is
13  Courtney Walter on behalf of the plaintiff, Mutual
14  of Omaha Mortgage, Inc., from the law firm Mitchell
15  Sandler, and I'm joined here with Laurel Thomsen on
16  behalf of Mutual of Omaha.
17        MS. KREITER:  Good morning.  Maria
18  Kreiter from the Godfrey & Kahn law firm.  I
19  represent the defendant Waterstone.  Joining me on
20  the deposition today, we have Hayley Rich, who's a
21  summer associate at my law firm, as well as Adam

Page 7

1  Cares, who's a litigation specialist at my law
2  firm.
3        THE VIDEOGRAPHER:  At this time will the
4  court reporter please swear in our witness?
5        THE REPORTER:  The attorneys
6  participating in this deposition acknowledge that I
7  am not physically present in the deposition room
8  and that I will be reporting the deposition
9  remotely.
10        They further acknowledge that, in lieu
11  of an oath administered in person, I will
12  administer the oath remotely.
13        The parties further agree that if the
14  witness is testifying from a state where I am not a
15  Notary that the witness may be sworn in by an
16  out-of-state Notary.
17        If any party has an objection to this
18  manner of reporting, please state it now.
19        (No response.)
20        THE REPORTER:  Hearing none, we can
21  proceed.

Page 8

1        BRETT CREASY,
2        being first duly sworn to tell the
3  truth, the whole truth, and nothing but the truth,
4  testified as follows:
5        THE REPORTER:  Okay.  Thank you.
6        THE VIDEOGRAPHER:  Counsel, you may
7  proceed.
8        MS. WALTER:  Thank you.
9        EXAMINATION BY MS. WALTER:
10  Q.  Good morning, Mr. Creasy.
11  A.  Good morning.
12  Q.  Thank you for being here today.  As I
13  mentioned earlier, my name is Courtney Walter, and
14  I'm here on behalf of the plaintiff with Mitchell
15  Sandler, LLC.
16        Can you please state and spell your full
17  name for the record please?
18  A.  Sure.  It's Brett Creasy, B-r-e-t-t
19  C-r-e-a-s-y.
20  Q.  Mr. Creasy, have you been deposed
21  before?

Page 9

1  A.  I have.
2  Q.  I sent your counsel about a half hour
3  ago some premarked exhibits.  Did you happen to
4  receive those?
5  A.  I did, yeah, just about 10, 20 minutes
6  ago.
7        MS. WALTER:  Okay.  So before we get
8  started, I'm happy to show exhibits via Screen
9  Share.  And, Maria, I'm not sure if you have a
10  preference.  If you'd like me to do that as well,
11  I'm happy to do so or if it would be faster or more
12  efficient to just have the witness review in front
13  of him.
14        MS. KREITER:  I guess you can do Screen
15  Share, Courtney.  That could help.
16        MS. WALTER:  Okay.  Okay.
17        (Whereupon, Creasy Deposition Exhibit 1,
18  Report of Brett Creasy, marked.)
19  Q.  Mr. Creasy, I'm going to go ahead and
20  show you what's been premarked as Exhibit 1.  Give
21  me a second to pull it up.  Let me zoom out so --

Page 10

1  can everyone see that?

2          MS. KREITER:  Yes.

3      A.  Yep.

4      Q.  Okay.  Mr. Creasy, do you recognize

5  this?

6      A.  Yes.  It looks to be my report.

7      Q.  Okay.  So turning to Exhibit A of your

8  report, which I believe is your CV; is that

9  correct?

10      A.  Correct.

11      Q.  There is a section titled Live

12  Testimony.  Do you see this?

13      A.  Yep.

14      Q.  Under it it looks as though you provided

15  live testimony approximately 40 times.  Is that

16  accurate?

17      A.  That sounds about right.

18      Q.  So live testimony, as I'm sure you're

19  aware, can be a few different things.  How many

20  times have you been deposed?

21      A.  I would say that it's probably 75

Page 11

1  percent or so of the items on the list.

2      Q.  Okay.  So it's safe to say you're

3  familiar with taking a deposition and the ground

4  rules of a deposition.

5      A.  Yes.

6      Q.  Okay.  So before we get started, I just

7  want to go over a few of them particularly.  I know

8  you're familiar, but since we're in a remote

9  format, I'd like to just review a few things with

10  you.

11          First, you understand that you're,

12  you're under oath this morning, and so everything

13  you say you have attested it will be provided

14  accurate -- you will be providing accurate

15  testimony, correct?

16      A.  Correct.

17      Q.  And whatever we say today will be taken

18  down by a court reporter.  We're also joined here

19  with a videographer.  But notwithstanding that we

20  have a videographer here, please be sure to answer

21  any questions using words so the court reporter can

Page 12

1  accurately transcribe and keep an accurate record.

2  So no nodding of the head, but I know this is

3  something that you're probably very familiar with.

4          Given that we're in a remote environment

5  and I have very bad luck with technical issues as a

6  millennial, if there are -- if you experience any

7  technical difficulties or if I get frozen or you're

8  frozen, just let me know or your counsel know, and

9  we'll, you know, try, try and address the situation

10  as soon as possible.  I can restate the question.

11  We can read back from the court reporter, whatever

12  we need.

13          So I, as I mentioned earlier, I sent

14  some premarked exhibits.  I'm happy to share the

15  screen so you can -- so we can review them at the

16  same time.  Take as much time as you need to review

17  them.  This isn't a marathon.  I'm sure you have

18  better things to do today.  But I'm here to take as

19  much time as you need to review.  And if you have

20  any questions about them, I'm happy to answer them

21  and work through it together.

Page 13

1          Of course, we'll aim to take a break

2  every 90 minutes or so, give or take.  If you need

3  a break before then, feel free to let me know.  All

4  I ask is that if we're in the middle of the

5  question that you -- a question you provide an

6  answer before we take a break.

7          And since we're in a virtual format, I

8  don't anticipate this as a problem, but don't --

9  please don't look to your attorney for answers or

10  text messages or whatnot.  Provide the answers to

11  the questions as you understand them.  And if you

12  don't understand the question, I'm happy to

13  rephrase it so that you do.

14          And lastly and most importantly, please

15  wait for my question to finish before answering it.

16  I will do my best to not interrupt you.  And all I

17  do is ask -- all I ask of you is the same.  And, of

18  course, your counsel may object to any and all

19  questions that I have, but unless she instructs you

20  to specifically not answer a question, you still

21  need to answer it.

4 (Pages 10 - 13)

Page 14

1      Do you understand all of that?
2      A.  I do.
3      Q.  Okay.  Any questions before we get
4   started?
5      A.  Not on my end.
6      Q.  Okay.  Sir, you have been retained as an
7   expert witness by Waterstone Mortgage Corporation
8   in this case, correct?
9      A.  Correct.
10     Q.  When were you first approached by
11  Waterstone or Waterstone's counsel with respect to
12  your role as an expert witness?
13     A.  So first conversation and engagement was
14  probably in September of '22.
15     Q.  Now, when you say engagement, what do
16  you mean?
17     A.  So anytime, you know, my company is
18  engaged, we have an engagement letter that lays out
19  the scope of what we understand our, our role to
20  be.
21     Q.  Did you have any preliminary

Page 15

1   conversations before you were formally engaged?
2      A.  I'm sure there was probably a phone
3   call.
4      Q.  Who was, who was that phone call with?
5      A.  I don't recall the phone call, but I
6   would believe it would be with Maria Kreiter who's
7   present today.
8      Q.  And you said you were formally retained
9   in September 2022, correct?
10     A.  Correct.
11     Q.  Okay.  Before being retained in this
12  case, did you ever work with Waterstone?
13     A.  I have not.
14     Q.  How about Waterstone's outside counsel,
15  Ms. Kreiter?
16     A.  Yes, I believe maybe one or two other
17  times.
18     Q.  And what was the extent of your prior
19  engagement with Ms. Kreiter?
20     A.  Can you maybe define what you mean by
21  extent?

Page 16

1      Q.  Sure.  What was your role?  How did
2   you work -- what was the nature of your work with
3   Ms. Kreiter?
4      A.  Sure.  So it would have been in probably
5   some similar fashion.  I vaguely recall a prior
6   case in which my firm was engaged to do forensic
7   analysis of devices of a departed employee.
8      Q.  So you were retained on behalf of the
9   employer?
10     A.  Correct.
11     Q.  How was that case resolved?
12     A.  Specifically, I'm not sure I know if it
13  was -- I'm assuming it was settled in some manner.
14  I don't know what the official capacity was though.
15     Q.  Okay.  Were you deposed in that case?
16     A.  No.
17     Q.  Did you provide an expert report?
18     A.  No.
19     Q.  Were you a consultant?
20     A.  Yes.
21     Q.  So you said one or two times.  Well,

Page 17

1   first of all, going back to that case, do you
2   recall where that case was filed?
3      A.  I do not.
4      Q.  And can you give me an approximate time
5   period for when that case was?
6      A.  It probably would have been 2021 or
7   2022, maybe early '22.
8      Q.  Is that case listed on your CV?
9      A.  I don't believe so.  If you could scroll
10  down.  If it -- no, it wouldn't be because I wasn't
11  deposed or testified live, so no.
12     Q.  And you said there were one or two
13  times.  Do you remember -- do you recall a second
14  engagement?
15     A.  I don't.  I was just sort of thinking
16  out loud.
17     Q.  Outside of Ms. Kreiter, have you worked
18  with anyone else at her law firm Godfrey Kahn?
19     A.  In connection, Adam Cares, who's also
20  here today.
21     Q.  And what was the nature of your work

Page 18

1  with Mr. Cares?
2     A.  Mr. Cares is -- I don't want to butcher
3  his actual title, but he's litigation support or
4  some sort of technical support for the attorneys at
5  Godfrey.
6     Q.  Okay.  And what was the nature of your
7  work with Mr. Cares?
8     A.  So it would be more of the day-to-day
9  logistics, I guess, in, in doing the work.
10    Q.  Doing the work for what?
11    A.  Well, I think your question originated
12 with the prior work, so, you know, getting
13 documents and files back and forth, you know,
14 organizing calls perhaps with, you know, people at
15 Godfrey or clients or third-parties, you know, any
16 of that kind of day-to-day stuff, I'll call it.
17    Q.  Okay.  So to be clear, your work with
18 Mr. Cares related to the case you worked with
19 Ms. Kreiter on.
20    A.  Correct.
21    Q.  It wasn't a separate engagement.

Page 19

1     A.  Correct.
2     Q.  Okay.  Understood.  You mentioned your
3  first conversation related to this case with
4  Ms. Kreiter was in September 2022.  Do you
5  remember -- do you recall what that conversation
6  was about?
7     A.  No.  Quite frankly, I don't remember the
8  conversation.  I just know there would have had to
9  have been one in order for us to be engaged in
10 September of '22.
11    Q.  After your first conversation that you
12 don't remember, did Ms. Kreiter send you an e-mail
13 about this case?
14    A.  I do not know.
15    Q.  Did Ms. Kreiter send you any documents
16 related to this case?
17    A.  At some point, yes.
18    Q.  What were those documents?
19    A.  I believe the complaint.
20    Q.  Anything -- any other documents?
21    A.  Not that I recall offhand, no.

Page 20

1     Q.  Mr. Creasy, what is your -- is it --
2  it's Creasy, right?
3     A.  Correct, you got it.
4     Q.  Okay.  What is your hourly rate?
5     A.  It's $400 an hour.
6     Q.  Are you compensated based on whether
7  Waterstone prevails in this action?
8     A.  I am not.
9     Q.  How many hours did you spend drafting
10 the report that's marked as Exhibit 1?
11    A.  Off the top of my head, I'm not sure.  I
12 would imagine it took me a day or two.
13    Q.  A day or two of 24 hours, of 8 hours
14 each?
15    A.  Yeah, probably, you know, call it 8 to
16 16 hours, but to be honest I'm mildly guessing
17 there.
18    Q.  Do you have invoices that would show
19 that?
20    A.  Not directly.  So our invoices would
21 identify work being done on a case but not

Page 21

1  specifically, you know, X amount of time, you know,
2  specific to drafting a report.
3     Q.  Okay.  So you said you spent
4  approximately 8 to 16 hours or -- 8 to 16 hours on
5  the report.  Can you give an approximate for how
6  many hours you've spent on this case all together?
7     A.  I can give an approximate if you want me
8  to guess.
9     Q.  Sure.
10    A.  I would say it's probably north of 50
11 hours, maybe not north of 100, but I'm guessing.
12    Q.  Okay.  So just generally speaking, and
13 we'll come back to this later, but generally
14 speaking, aside from drafting the report, what
15 would the remainder of those 50 -- approximately 50
16 hours, I'm not holding you to that, what would
17 those hours entail?
18    A.  So the work leading up to the report,
19 everything that was sort of described in the
20 report.
21    Q.  Okay.  And you said that there -- your

6 (Pages 18 - 21)

Page 22

1  company did issue a formal engagement letter,
2  correct?
3      A.  Correct.
4      Q.  And you have not yet issued invoices to
5  Waterstone?
6      A.  We have, yes.
7      MS. WALTER:  Okay.  Maria, a similar
8  request that you had with us with respect to our
9  expert, we'd ask for the production of the
10  engagement letter and invoices to date.
11     MS. KREITER:  I'll take it under
12  consideration, Courtney.  I think there's a
13  difference between your rebuttal expert produced
14  two weeks before the close of the case without an
15  opportunity for discovery and Mr. Creasy's report
16  disclosed back on June 5th.
17     Q.  Okay.  Mr. Creasy, what did you do to
18  prepare for your deposition today?
19     A.  I reviewed my report, spoke to counsel
20  Monday, looked through, you know, the attachments
21  to the report, et cetera.

Page 23

1      Q.  How much time did you spend preparing
2  for today?
3      A.  In total, probably three hours or so.
4      Q.  And you said you met with counsel on
5  Monday?
6      A.  Yes.  Well, a phone call.
7      Q.  Who specifically was on the phone call?
8      A.  Ms. Kreiter, Mr. Cares, and then another
9  attorney from Godfrey.  Her name is Emma Jewell.
10     Q.  Did you meet with anyone at Waterstone
11  itself?
12     A.  No.
13     Q.  And you said you reviewed documents.
14  What documents were those?
15     A.  So my report, the other documents
16  referenced in my report.  You know, I skimmed
17  through the complaint, for example, parts of the
18  Mutual of Omaha interrog responses, but basically
19  the material covered in my report.
20     Q.  Okay.  So just turning to -- this is
21  what you're referring to, Exhibit B?  Those are the

Page 24

1  documents that are referenced in your report that
2  you would have reviewed?
3      A.  Yes.  And I don't know that I reviewed
4  all of them, but I was sort of flipping through my
5  report.
6      Q.  Did you review anything besides your
7  report and the documents identified on Exhibit B
8  that you relied upon in drafting your report in
9  preparation for today's deposition?
10     A.  Yes.  I looked at the amended
11  complaint --
12     Q.  Okay.
13     A.  -- which I don't believe is identified
14  here.
15     Q.  Okay.  Okay.  Let's turn back to Exhibit
16  A of your report, which you testified earlier is
17  your CV.  Is this a true and accurate copy of your
18  CV?
19     A.  Yes, certainly at the time that I
20  prepared the report it was.
21     Q.  Okay.  Are there any --

Page 25

1      A.  I might have made updates to it since
2  then but --
3      Q.  I'm sorry.  Can you repeat that back?
4      A.  Sure.  I said I may have made updates to
5  it since then.  So, for example, I testified, you
6  know, a week or two ago in another case that
7  wouldn't be on here.
8      Q.  Okay.  Understood.  Anything else really
9  notable, change of company, any --
10     A.  No.
11     Q.  Okay.  Okay.  I just want to walk
12  through your background right now and generally go
13  through your CV.  Where are you from?
14     A.  I live in Pittsburgh, Pennsylvania.
15     Q.  Okay.  I'm from Philadelphia, so I'm
16  familiar with Pennsylvania.  I went to Penn State.
17     Okay.  Let's focus on your education
18  here for a second.  So can you just walk me through
19  your educational background?
20     A.  Sure.  In effect I graduated from high
21  school in '99.  I worked, you know, kind of

Page 26

1  full-time for a couple years, started going to
2  school in 2001, as you can kind of see there at the
3  bottom of the list. That was at what was then
4  called Pittsburgh Technical Institute, now
5  Pittsburgh Technical College, to get some
6  certificates and certifications in various IT and
7  IT security sort of disciplines. So I spent, you
8  know, nights and weekends doing that while working.
9       And then in 2006, 2007 I attended Villa
10  Nova remotely for various certificates in project
11  management while working full-time at an IT shop
12  and then went back and finished my bachelor's at
13  Capella University, which is what you can see
14  there, again, doing that nights and weekends while
15  working full-time. And then I completed another
16  certificate, which is like a small business type
17  certificate, if you will, in 2015 at University of
18  Pittsburgh.
19      Q. Okay. So you answered exactly what I
20  was going to ask. I noticed some of the dates with
21  your education overlapped with your professional

Page 27

1  background. So you were working full-time the
2  entire time you were going to school; is that
3  right?
4       A. That's right.
5       Q. Okay. And a bachelor's degree is your
6  highest level of education; is that accurate?
7       A. Yes, from a formal educational
8  standpoint, yes.
9       Q. Okay. Fair enough. And can you just
10  describe for me the University of Pittsburgh's
11  Innovation Institute and what your position there
12  as an entrepreneurial fellow was?
13      A. Sure. So they would describe it
14  probably as like a mini M.B.A. basically. It's a
15  12-month program effectively where basically each
16  month or so you go through a different category,
17  discipline, if you will, about running a business.
18  So you'll cover finance for a period, HR type
19  things, sales, legal. So it's just a lot of
20  different components about running a business.
21      Q. Okay. I'm curious just what drove you

Page 28

1  to apply to that program.
2       A. Well, at the time I was a minority owner
3  of bit-x-bit.
4       Q. Did you -- was this a competitive
5  program or did you just, you know, pay the fee and
6  you were, you were admitted to attend?
7       A. I'm not sure what their admission
8  process is. You know, I applied to it. You know,
9  other folks at my company had previously attended
10  it and, you know, spoke highly of it. So in your
11  question of is it competitive, I mean, are you
12  competing for positions, I don't know.
13      Q. You answered it. That's fine.
14      A. Okay.
15      Q. Was this program geared to any sort of
16  specific subject matter or was it general, and I
17  think you had answered this, general business
18  running classes?
19      A. Yeah, I would say the latter. So again,
20  there would be a specialist brought in from the
21  outside, you know, for example, an attorney from a

Page 29

1  law firm to talk about legal matters that, you
2  know, small businesses should be aware of and then
3  an expert in sales processes to cover, you know,
4  strategies for, you know, performing sales or
5  marketing and things of that nature.
6       Q. Okay. Let's turn to your prior work
7  experience. So can you just walk me through,
8  similar to what we just did with education, if you
9  can just walk me through your positions and maybe
10  give a little light as to the transition between
11  the different positions and how you landed where
12  you are.
13      A. Sure. So the first one listed there,
14  CA, Inc., formerly Computer Associates, was what
15  I'll call my first real IT job. So CA has a lot of
16  different, I'll call it business lines, but where I
17  was in their sort of security group.
18      So I would install and troubleshoot
19  various security products for businesses around the
20  world. If somebody had a virus infection or, you
21  know, some issue with phishing e-mails or spam or,

8 (Pages 26 - 29)

1  you know, whatever it may be, some sort of, you

2  know, security threat, so to speak, I would help

3  them implement technology and use that to, you

4  know, help secure their business.

5      From there I left and went to Scott

6  Consulting Resources. I was placed at UPMC, which

7  is University of Pittsburgh Medical Center, a

8  pretty large medical health care provider in the

9  area, and did what I would call more traditional IT

10  security work dealing with fire walls and other,

11  you know, penetration testing, so meaning, you

12  know, breaking into our own systems in order to

13  figure out where the holes are and help plug them.

14      So I would help, you know, different

15  business units within the health care organization

16  to do that and further secure their environment.

17  UPMC hired me full-time, so there's a transition

18  there. I basically did the same sort of work, you

19  know, a wide variety of different security

20  subdisciplines, if you will, I worked on.

21      And while at UPMC, I then started

1  part-time at bit-x-bit. Bit-x-bit was founded in

2  the spring of '07 by an attorney and another

3  technologist. And then I joined later that fall

4  initially part-time. So I was working full-time at

5  UPMC, part-time at bit-x-bit and going to school

6  all at the same time.

7      Q. I thought so. I was going to ask you

8  that.

9      A. Yeah, yeah.

10      Q. Okay.

11      A. I had a wife and small children, so I

12  didn't sleep much. And, you know, so did sort of

13  the split thing there for a while, UPMC and

14  bit-x-bit. Bit-x-bit was mostly nights and

15  weekends at that time and then transitioned

16  full-time to bit-x-bit in '09 and have been there

17  since and have in effect worked my way up, so to

18  speak.

19      I started as an analyst, you know, doing

20  typical forensic, you know, data collections and

21  analysis and reporting and then have worked my way

1  up. I'm now the majority owner of the company and

2  the president.

3      Q. Okay. Got it. Just going back to CA,

4  Inc., you're listed here as a support engineer.

5  Are you a certified or licensed engineer?

6      A. Can you say the last part again? A

7  certified what?

8      Q. Your position at CA, Inc. is listed as

9  support engineer. Are you a certified or licensed

10  engineer?

11      A. Not in the traditional sense. That's

12  just the name of the position at the company.

13      Q. Okay. Understood. So let's focus on

14  bit-x-bit a little bit more. I'm sorry. Talk to

15  me generally about what your company does.

16      A. Sure. So bit-x-bit has, I'll call it,

17  two primary pillars of work, but there's some

18  subsections to that. The two primary are digital

19  forensics, so, you know, investigative work, so to

20  speak, with electronic data, and then e-discovery

21  would be the other one. So that would be the more

1  kind of traditional gathering of documents, helping

2  attorneys, you know, get it in a review platform,

3  review it, produce it, et cetera.

4      Q. What is -- okay. Sorry. What is the

5  percentage divide between those pillars that you

6  just identified in terms of the work at your

7  company?

8      A. It fluctuates. It's pretty close to

9  being 50-50. I would say, you know, in terms of

10  the hours and dollars, and dollars involved,

11  probably maybe closer to 60-40 e-discovery versus

12  forensics.

13      Q. And when you say forensics, does that

14  also include litigation type work or are you

15  identifying e-discovery as the litigation work?

16      A. So it can be both. Forensics is really

17  the investigative work. So if you need to know who

18  did what when and how, that's forensics, right? So

19  we can look at a phone, a computer and determine

20  when something was deleted, if somebody copied

21  something, you know, where somebody was at a

Page 34

1  particular time using location data, that sort of
2  analysis.  It may or may not be for litigation
3  though.  It could just be sort of an investigation
4  that leads to litigation or maybe it doesn't.
5       Q.  Okay.  And what percent -- so where is
6  your work concentrated in, I guess, in speaking in
7  terms of those two pillars?
8       A.  Almost entirely in forensics.
9       Q.  And would you describe your work in this
10  case as being entirely in forensics or would you
11  also say there was some e-discovery work?
12       A.  Yeah, in forensics.
13       Q.  Okay.  What percentage of your work
14  generally, approximate, I'm not holding you to
15  this, what percentage of your work is related to
16  the expert services that you provided in this case?
17       A.  So when you say you, you mean me
18  personally, right?
19       Q.  Correct, yes.
20       A.  So to tie the type of work that I'm
21  doing here to the type of work I normally do, I

Page 35

1  would say, you know, it's probably 70 percent plus
2  this sort of thing is what I do mostly other than
3  run the business and that sort of thing.
4       Q.  Okay.  And when you say this sort of
5  thing, you mean provide expert reports and testify
6  at trial or testify, I guess, in trial or
7  arbitration?
8       A.  Yeah, so the -- anything from collecting
9  data to analyzing that data, you know, writing
10  reports, testifying live, you know, whatever it may
11  be.
12       Q.  Okay.  Are you able to provide an
13  estimate for how much you make on an annual basis
14  as an expert testifying and providing opinions like
15  those in this case?
16       A.  It's not really broken down that way.  I
17  mean, I get paid a salary, so it doesn't -- you
18  know, what I do doesn't really matter --
19       Q.  Okay.  I understand.
20       A.  -- from that standpoint.
21       Q.  That's fine.  And so you said 70 percent

Page 36

1  of your work is in forensics of this nature.  What
2  percentage of your work, if you had to say, is
3  devoted to being retained by a plaintiff versus a
4  defendant?
5       A.  I would say it's pretty close.  I'm
6  slightly shooting from the hip here, but I would
7  say it's pretty close to being 50-50.  We get hired
8  by plaintiffs, by defendants, sometimes as a
9  neutral.  Sometimes the court tells an attorney to
10  hire us and, you know, kind of split our work among
11  the parties.  So it sort of the runs the gamut, but
12  I would say it's pretty evenly split.
13       Q.  Do you represent individuals or do you
14  largely represent companies?
15       A.  Mostly companies, but we do represent
16  individuals as well or work on behalf of
17  individuals.
18       Q.  So in your description of bit-x-bit you
19  also state that you've personally performed
20  hundreds of examinations for cases involving
21  employment, class action, unauthorized use of

Page 37

1  computer systems.  That's -- with respect to your
2  employment cases specifically, do you typically
3  represent the employer or the employee?
4       A.  Again, it's split.  I mean, if it's
5  tilted one way or the other, it's probably slightly
6  tilted on the plaintiff's side because, you know, a
7  lot of companies will engage us to sort of
8  investigate something going on, and then that may
9  not lead anywhere, you know, from a legal
10  standpoint.  So it probably tilts on the side of
11  the employer.
12       Q.  And with respect to your employment
13  cases, employment is a pretty broad category.  When
14  you say you typically represent the plaintiff, are
15  we talking about cases similar to the claims and
16  facts at issue in this case or other sort -- or are
17  you describing other sorts of employment cases?
18       A.  Sort of this type of case in as a
19  category of employment cases at large, although, I
20  mean, I know there may be other things going on in
21  this case, but sort of my, my lens of it is a trade

Page 38

1 secrets case. That is a large portion of the,
2 quote unquote, employment type cases that we do.
3 But, you know, there are other, again, quote
4 unquote, employment cases, you know, harassment
5 cases, things of that nature. You know, you might
6 consider a whistleblower claim as sort of an
7 employment case, those sort of things.
8     Q. Okay. You just said that you know there
9 may be other things going on in this case. How do
10 you know that?
11     A. I mean, the complaint.
12     Q. And how did you -- you also said that
13 your lens of this case is a trade secrets case.
14 How do you know that?
15     A. I mean, that's what we were effectively
16 hired to do, and that's sort of our, I would call
17 it general specialty, if you will.
18     Q. In your words what were --
19     A. We don't provide legal advice. I'm not
20 going to, you know, obviously, get involved in
21 those sort of pebbles.

Page 39

1     Q. Sure. You said what you were hired to
2 do. In your own words, what were you hired to do?
3     A. Basically help evaluate, you know, what
4 transpired here, Waterstone's sort of initial
5 response to that and, you know, identification of
6 the identified alleged trade secrets.
7     Q. Okay. And I think you just answered
8 this question, but just to confirm, you have
9 provided services in the context -- you have
10 previously provided services in the context of a
11 misappropriation of trade secrets case before.
12     A. In general?
13     Q. Yes.
14     A. Yeah, probably hundreds of times, if not
15 a thousand plus.
16     Q. Okay. Going back to your live testimony
17 section that we discussed earlier, previously I
18 counted 40, give or take. I'm not good at math. I
19 am pretty good at counting, but I think -- so does
20 40 cases, I guess plus one that you -- that may
21 have been included, approximately is that -- does

Page 40

1 that sound accurate to you?
2     A. Yes, whatever is on this list and if
3 it's a plus one, I can only think of one since
4 June, that should be right, yes.
5     Q. Okay. How many of these cases
6 approximately involved you providing testimony at
7 trial?
8     A. I would say maybe, I don't know, five.
9     Q. How about arbitration?
10     A. Maybe, I don't know, one or two, three
11 maybe.
12     Q. And I asked this. We didn't really nail
13 down a number. But I said how many cases involved
14 testimony at deposition, and you said
15 approximately, I think you said 70 percent. Does
16 that sound right?
17     A. Yeah, I would say most are depositions.
18 It may be higher than 70.
19     Q. Okay. I'm not doing the math. I can
20 promise you that.
21         How many of these cases are labor and

Page 41

1 employment disputes approximately?
2     A. I would say most of them.
3     Q. How many of these cases involve you
4 testifying for the plaintiff approximately?
5     A. Number-wise, I don't know. Again, I
6 would say most probably.
7     Q. In any of these cases, just focused on
8 the live testimony, has a party ever moved to
9 exclude your testimony, whether that's in Federal
10 Court on a Daubert motion or otherwise?
11     A. Not to my knowledge, no.
12     Q. A party has never moved to exclude your
13 testimony.
14     A. I don't know if they've moved to, but
15 they haven't done it successfully to my knowledge.
16     Q. Okay. That gets to my next question.
17 Has your expert testimony ever been stricken
18 before?
19     A. No.
20     Q. No or not to your knowledge?
21     A. I guess I'd have to say not to my

11 (Pages 38 - 41)

Page 42

1    knowledge. I would assume if it was, then I would
2    be told that but --
3        Q. And to be clear, you don't know whether
4    a party has ever moved to exclude your testimony?
5        A. Sitting here right now, no. I'm not
6    even sure exactly what that means other than they
7    would probably file a motion or something to
8    exclude it and have a fight about it. I don't
9    know.
10        Q. Okay.
11        A. But I've never been asked to go testify
12    and then been told you can't.
13        Q. Okay. You have a section in here titled
14    Select Certifications. So I'm going to be a lawyer
15    and hyper -- and focus on the word select. Is it
16    fair to say that there's other certifications that
17    you haven't selected for your CV that aren't listed
18    here?
19        A. Yes. Whether or not they're all still
20    technically active or not I'm not sure because I
21    don't follow them or care about them, I guess.

Page 43

1        Q. To be clear, you mean that the other
2    certifications that aren't included here.
3        A. Correct. For example, I am or was a
4    Microsoft Certified Professional. It's a
5    certification for Microsoft. It was probably one
6    of the first certifications that I got in the early
7    2000s. You know, I didn't -- it's sort of like a
8    basic certification that I didn't feel, you know,
9    rises to the level of what needs to be on a CV
10    so --
11        Q. Okay.
12        A. -- the ones on my CV are more focused
13    around security and cryptics.
14        Q. Okay. And these three certifications,
15    are they active?
16        A. Yes.
17        Q. And the same question for your Select
18    Speaking Engagements. So I note that there aren't
19    specific speaking engagements here. It seems like
20    you identified the professional group events
21    instead. Can you provide an estimate of how many

Page 44

1    speaking engagements you've given over the years?
2        A. A couple hundred in total. So what I've
3    listed here basically are the places as you've
4    noted. So, for example, every year, sometimes
5    multiple times a year, I'm asked to go speak at
6    Duquesne University's Law School or University
7    Pittsburgh's Law School or the Cyril Wecht
8    Institute and so on and so forth.
9        So I'll do those sort of, you know,
10    repeatedly year after year. And then, you know, to
11    be broad about it, you know, I go do speaking
12    engagements, if you will, at conferences, at law
13    firms, at businesses to talk about, you know,
14    security and forensics, so, you know, if I do that,
15    I don't know, 5 to 20 times a year for, you know, a
16    decade plus.
17        Q. Do you frequently provide commentary to
18    the media?
19        A. I wouldn't say frequently, but I've been
20    interviewed a couple times by news outlets and
21    things like that.

Page 45

1        Q. Do you have a marketing team at your
2    company?
3        A. Not officially, no.
4        Q. What do you mean officially?
5        A. Well, I'm sort of part of the marketing
6    company, as is my business partner and CEO. We
7    don't have a marketing person, so to speak.
8        Q. Okay. And would your -- as you were
9    describing your speaking engagements previously,
10    that you sometimes attend conferences, law firms,
11    businesses 5 to 20 times a year, is it fair to say
12    that would also include any sorts of presentations,
13    maybe panel presentations?
14        A. Yes.
15        Q. Okay.
16        A. Yep, sure. Yeah, it might be me
17    individually. It might be me with somebody else
18    from my company. It might be sort of a panel
19    setup, as you said, where it's me and, you know,
20    multiple different people from different
21    organizations, sure.

12 (Pages 42 - 45)

1    Q.   Are there any conferences that you or
2  others in your company attend on a yearly basis?
3    A.   Yes and no.  So, you know, a common one
4  that we'll take part in is called Bench-Bar.  It's
5  put on by the Allegheny County Bar Association,
6  which is our local, you know, bar here.  It has
7  about 6,000 members or so.  It's one of their large
8  yearly events where, you know, a couple hundred
9  folks attend.
10         There's another one in Washington
11  County, Pennsylvania, which is much much smaller,
12  that usually somebody will attend.  Myself or other
13  members of my forensics team might attend the SANS
14  conferences.  So that's a, basically a training
15  organization that puts on, you know, conferences
16  and training sessions and things like that.
17         BSides is another sort of information
18  security conference that we, you know, pretty
19  frequently attend.  ISSA, which is International
20  Systems Security Association, I think, also puts
21  on, again, you know, conferences that we'll attend.

1  Those are the ones that are coming to mind.
2    Q.   Okay.  Going back to published articles,
3  I noticed here that you've listed two for the
4  Allegheny County Bar Association Lawyers Journals.
5  Have you published any other articles besides those
6  two?
7    A.   Nothing that I would consider articles.
8  You know, I help or might entirely write kind of
9  blog posts on our website or, you know, help draft
10  blog posts that somebody else in my company, you
11  know, assisted in writing, but nothing that was,
12  you know, published outside of our own website,
13  I'll call it.
14    Q.   Okay.  Do you frequently use social
15  media for your company?
16    A.   I personally don't at all.  Our company
17  uses social media, but I wouldn't say, you know,
18  frequently.  We're not, you know -- again, we don't
19  have a marketing person, so our administrative
20  person at the office, you know, does some posts on
21  LinkedIn and things like that that talk about, you

1  know, speaking engagements and sort of what's in
2  the news, that sort of thing.
3    Q.   Sure.  Do you maintain any sort of
4  license for your profession?
5    A.   License, no.  That doesn't really exist.
6  There's, you know, certifications that, you know,
7  play a part in background, but there's no license.
8    Q.   Have you ever been the subject of any
9  disciplinary action?
10    A.   Nope.
11    Q.   Let's turn to the first page of your
12  report.  First, who drafted this report?
13    A.   I did.
14    Q.   Did you have any assistance in drafting
15  it?
16    A.   No.  I mean, I've had follow-up
17  conversations with counsel about it, but I'm the
18  author of it, writer of it, so to speak.
19    Q.   Okay.  No one else from your company
20  reviewed it?
21    A.   I don't think so.

1    Q.   Okay.  So you just said you had
2  follow-up with counsel regarding it.  Before we get
3  there, did you prepare any drafts of this report?
4    A.   Yes, there would have been a draft
5  before the final.
6    Q.   How many?
7    A.   One, maybe two.
8    Q.   And what did you do with the -- let's
9  start with the first draft.  What did you do with
10  that draft after it was complete?
11    A.   Well, I would have shared it with
12  counsel.
13    Q.   How would you have shared it with her,
14  with them?
15    A.   Probably, again, I'm mildly guessing
16  here, either via e-mail or on a Zoom.
17    Q.   Why did you share it with them?
18    A.   To get their thoughts, feedback.
19    Q.   Did they provide any thoughts or
20  feedback?
21    A.   Sure.

13 (Pages 46 - 49)

Page 50

1    Q.   What were those?

2    A.   I don't recall specifically.

3    Q.   Did they ever provide edits to your

4    report?

5    A.   I don't know if we would have talked

6    about it and edited something at the time.  But if

7    what you're getting at, did somebody write my

8    report for me and tell me what to say, no.

9    Q.   No, that's not what the question was.

10   The question was did they ever provide edits to the

11   report that you drafted?

12   A.   I don't know.  Again, we talked about

13   it.  I would have edited it.

14   Q.   Do you recall who was on a call that you

15   would have had with them?

16   A.   Yes.  It would have been Ms. Kreiter,

17   probably Mr. Cares.

18   Q.   Was anyone from Waterstone on that call?

19   A.   No.

20   Q.   Did you ever share any drafts of the

21   report with Waterstone?

Page 51

1    A.   No.

2    Q.   Do you know if Waterstone's counsel ever

3    shared it with Waterstone?

4    A.   I do not.

5    Q.   Approximately when would the draft have

6    been complete?

7    A.   Probably, you know, right before the

8    beginning of June.

9    Q.   So you were retained in September of

10   2022 and a draft of the report wasn't complete

11   until May of 2023; is that correct?

12   A.   Yes.  I mean, we were retained in

13   September of '22 but largely didn't really do

14   anything until, I don't remember the exact timing

15   of this, but I believe there was a motion by

16   defendants to, I think, have the trade secrets

17   identified sometime in the spring of '23.  And so

18   once that all kind of wrapped up, that's when

19   really my work began.

20   Q.   Okay.  How much did your report change

21   from the draft that you had to the final June 5th

Page 52

1    version?

2    A.   Very little.

3    MS. KREITER:  Pardon me.  I'll just

4    object to the extent that you're asking questions

5    that are not consistent with Rule 26.

6    MS. WALTER:  Maria, I understand that

7    you and I conduct depositions differently, but I am

8    not going to have speaking objections throughout

9    this entire depo.  So please make your objection.

10   We can address it after the fact, but I'm not

11   arguing with you throughout this entire deposition.

12   MS. KREITER:  Okay.  Well, I didn't

13   argue with you.  In fact, I've not objected at all

14   until this point.  I didn't lodge a speaking

15   objection that informs the witness.  I simply

16   objected to your questions under Rule 26.

17   MS. WALTER:  Okay.  Understood.  Thanks.

18   Q.   Now, you mentioned earlier that

19   Waterstone's counsel reached out to you about

20   expert witness services.  What exactly did

21   Waterstone ask you to do?

Page 53

1    A.   Just so we're clear, Waterstone directly

2    didn't ask me or bit-x-bit to do anything, but

3    through their counsel, you know, again, what I

4    should have described as the scope of the work, I

5    don't know that it started as a, you know, we want

6    to retain you as an expert to do X or even that it

7    was contemplated that I would need to write a

8    report or testify at the time.

9    You know, generally when we're engaged,

10   you know, it's to help figure some sort of, you

11   know, technical, some folks call it, you know,

12   e-forensic type thing out.  So that would have been

13   the sort of basis of it or start of it then.

14   Q.   So earlier you described Waterstone's

15   counsel first reached out, and then it seems like

16   there's a time period before the formal engagement

17   letter is signed.  Is that correct?

18   A.   Yes.  Again, I don't know if that was a

19   couple days or a week or what but --

20   Q.   Sure.  What sorts of consideration, not

21   just with respect to this particular case, but when

14 (Pages 50 - 53)

Page 54

1  you first speak with a party about a potential --
2  potentially engaging your services, what sorts of
3  considerations do you have in determining whether
4  or not to issue a formal engagement letter?
5      A.  So if we do any work, we always issue a
6  formal engagement letter.  I mean, that's what lays
7  out, you know, sort of the scope, as we understand
8  it, when we start and, you know, our rates and, you
9  know, those sort of things.  So we don't do any
10  work without an engagement.
11      Q.  Besides the documents identified on
12  Exhibit B, did Waterstone or its counsel send you
13  any other documents?
14      A.  I mean, I received this morning, of
15  course, the exhibit materials that you sent over.
16  The folks at Godfrey would have been the source, I
17  think, of everything that I listed in my report.
18  Any other documents that they would have provided,
19  nothing that I can think of.
20      Q.  Okay.  And to be fair, you did testify
21  earlier that you've reviewed a copy of the amended

Page 55

1  complaint.
2      A.  Correct.
3      Q.  Correct?
4      A.  Yes.
5      Q.  Did Waterstone's counsel describe the
6  facts of this case to you?
7      A.  At some point during the phone call, I
8  would say likely, yes.
9      Q.  Okay.  What is your understanding of the
10  facts of the case?
11      A.  Broadly speaking, that there were a
12  number of employees of Mutual that left Mutual's
13  employment and went to Waterstone, you know, that
14  there are allegations of theft or misappropriation
15  of trade secrets.  That's sort of, I would say, my
16  high level recap, if I will.
17      Q.  Do you have any opinion as to wrongdoing
18  in this case?
19      A.  No.
20      Q.  Do you have any opinion as to liability
21  in this case?

Page 56

1      A.  Nope.
2      Q.  Do you have any opinion as to damages in
3  this case?
4      A.  No.
5      Q.  Okay.  Did Waterstone's counsel ask you
6  to make any assumptions before conducting your
7  forensic analysis?
8      A.  No.
9      Q.  Were there any limitations that
10  Waterstone's counsel asked that you make in
11  conducting your forensic analysis?
12      A.  No.
13      Q.  Okay.  Starting -- let's focus on --
14  we're just -- I'll try to make this as easy as
15  possible.  We're just going to go paragraph by
16  paragraph.
17          So section A.1. states that you were
18  engaged to, as I view it, two things, to assist in
19  the forensic identification of certain files
20  allegedly belonging to Mutual within the computer
21  systems of Waterstone, and, 2, to opine on the

Page 57

1  reasonableness of Waterstone's efforts.  Is that
2  accurate?
3      A.  I would say so.
4      Q.  Okay.  Let's focus on the first part of
5  that.  So bit-x-bit was engaged to assist in the
6  forensic identification of certain files.  What are
7  those files?
8      A.  Those are the electronic files that
9  Mutual of Omaha produced that it had identified as
10  its trade secrets, I believe, in its interrogatory
11  responses.
12      Q.  Okay.  So here you're not referring to
13  any sort of physical files.
14      A.  No.  Physical -- no, electronic.
15      Q.  Okay.  And you state that you were
16  engaged to assist with this forensic identification
17  within the computer systems of Waterstone.  What
18  are those computer systems?
19      A.  So Waterstone uses Microsoft 365
20  services.  So the, I'll call it the core storage
21  system, if you will, for electronic files,

15 (Pages 54 - 57)

Page 58

1  documents, if you will, is what's called OneDrive.

2  So it's a document storage repository. That would

3  be the kind of core piece of that.

4      Q.  Do you describe these systems anywhere

5  in your report?

6      A.  Not in detail, no.

7      Q.  Did you ever yourself analyze

8  Waterstone's computer systems?

9          MS. KREITER:  Object to the form.

10     A.  Yeah, I mean, did I physically go there

11 or log in and review them or something to that

12 effect?  No.

13     Q.  Is there some other way you analyzed the

14 computer systems?

15     A.  Yeah, so I had searches conducted at my

16 direction using some of the parameters that I've

17 described in the report here.

18     Q.  Who conducted those searches?

19     A.  Mr. Howard, who's their IT security

20 person.

21     Q.  But you yourself never conducted those

Page 59

1  searches.

2      A.  Correct.

3      Q.  Did, did you watch Mr. Howard as he

4  conducted these searches?

5      A.  Generally, no.  I think, you know, I

6  might have been on a call with him or a Zoom with

7  him at one point where he conducted a search or

8  two, but I didn't sit there every time he conducted

9  a search, no.

10     Q.  And I think you mentioned this, but just

11 to be clear, did you ever go to Waterstone's

12 physical location?

13     A.  I did not, no.

14     Q.  Is it fair to say everything contained

15 within this report was conducted remotely?

16     A.  Sure.

17     Q.  And so you described Microsoft 365

18 services within Waterstone's computer systems.  Are

19 you aware of any other software within Waterstone's

20 computer systems?

21     A.  Yes, they do have a sort of archival

Page 60

1  system as well, the name of which I'm blanking on

2  right now, but it's -- you know, I would describe

3  it as sort of an archiving system.

4      Q.  And can you just, in laymen's terms,

5  just describe what you mean by an archival system?

6      A.  Sure.  So in effect those sort of

7  systems are geared to be sort of like a fail-safe,

8  backup mechanism, if you will, in a way where, you

9  know, data can reside as like a secondary source so

10 that things, you know, aren't lost.

11     Q.  And you don't know the name of this

12 archival system.

13     A.  I did at one point, but I don't remember

14 it right this second, no.

15     Q.  Do you know how this archival system

16 interacts with Microsoft 365?

17     A.  Yes.  Microsoft 365 is a source of its

18 data, so to speak.  Think of it as like an overlay.

19     Q.  For purposes of this report, did you

20 analyze or inspect Waterstone's archival system?

21     A.  So that was part of the system that was

Page 61

1  used to conduct the searches, yes.

2      Q.  But you yourself never analyzed or

3  inspected the archival system.

4      A.  Correct.  I didn't, you know, physically

5  go there and log into whatever their interface is

6  or anything like that.

7      Q.  So the only way you know that this

8  archival system exists is through Waterstone's

9  point of contact, which, I presume, is Mr. Howard;

10 is that correct?

11     A.  Correct.

12     Q.  Okay.  Going to the second part of the

13 first sentence, that you were also engaged to opine

14 on the reasonableness of Waterstone's efforts, can

15 you clarify and elaborate for me what you mean by

16 Waterstone's efforts here?

17     A.  Sure.  So in effect, when, you know, the

18 issues in this case sort of unfolded in what, April

19 of '22, I believe, you know, what did Waterstone

20 kind of do about it basically.  So, as I mentioned

21 earlier, you know, I've been involved in quite a

16 (Pages 58 - 61)

Page 62

1    lot of cases involving, you know, allegations
2    about, you know, theft of information, we'll call
3    it, both on the plaintiff and defendant side, so
4    I've seen a lot of, you know, what companies and
5    individuals do when those sort of issues are
6    raised.  You know, one party says to the other hey,
7    we think you took X, Y and Z.  So it's really
8    about, you know, Waterstone's overall kind of
9    approach to what transpired then.
10       Q.  In your role as an expert witness in
11   cases similar to this, do you typically yourself
12   inspect and analyze the computer systems that might
13   be at issue?
14       A.  That does happen.  It depends on the
15   case.
16       Q.  Why didn't you do that here?
17       A.  I mean, off the top of my head, I don't
18   recall.  It probably wasn't necessary given the
19   remote nature and capabilities.
20       Q.  But you don't recall whether you were
21   actually watching Mr. Howard conduct these

Page 63

1    searches, correct?
2        A.  I know I didn't watch him conduct all of
3    the searches that were performed.  I do have a
4    vague recollection of being on, you know, some Zoom
5    calls with him, and I feel like I saw the interface
6    and the results of some of the archival searches
7    that we were conducting, but I didn't sit there,
8    you know, each and every time.
9        Q.  Okay.  Now, you state to opine on the
10   reasonableness of Waterstone's efforts.  We talked
11   about Waterstone's efforts.  Mr. Creasy, your
12   website states because we are a digital forensics
13   and e-discovery consulting company, we do not
14   provide legal advice.  Is that correct?
15       A.  That is correct.
16       Q.  Do you have any legal training?
17       A.  No.
18       Q.  Did you go to law school?
19       A.  Nope.
20       Q.  Are you a licensed attorney?
21       A.  I am not.

Page 64

1        Q.  In your opinion, what does
2    reasonableness of Waterstone's efforts mean to you?
3        A.  So it's a balance of, as I sort of
4    described, my experience of what I've seen over,
5    you know, hundreds of these types of cases and
6    what, you know, companies or individuals do to sort
7    of deal with it, so to speak --
8        Q.  To deal with what?
9        A.  -- from a technical end.  So, you know,
10   as I sort of describe in the report here, you know,
11   we've got a situation where materials were
12   identified and, you know, the company, Waterstone
13   in this instance, sort of jumped into action to get
14   a handle on, you know, what existed, get their arms
15   around it, attempt to quarantine that material, you
16   know, not, you know, make any judgments of what is
17   or is not Mutual's material, right?  That's not my
18   role, but just sort of what steps did they take in,
19   you know, in comparison to what others do that I've
20   seen.
21       Q.  Is there any sort of authority that you

Page 65

1    rely on to ascertain the reasonableness of
2    Waterstone's efforts?
3        A.  No, I wouldn't say so.
4        Q.  Did you yourself do any independent work
5    to learn about the facts in this case?
6        MS. KREITER:  Object to the form.
7        A.  Yeah, I mean, not outside of, you know,
8    reviewing the documents that I mentioned.
9        Q.  So the last sentence here states this
10   report and my opinions and conclusions contained
11   herein are based on my understanding of the issues
12   and facts and the information available to me.
13       So you state all of that -- that your
14   opinions and conclusions are based on the
15   information available to you, but you would agree
16   that there might be other issues or facts or
17   information that were not made available to you,
18   correct?
19       A.  I mean, are there things outside of my
20   scope, so to speak?  Sure, could be.  I don't know.
21       Q.  Okay.  Moving down to section D focusing

17 (Pages 62 - 65)

Page 66

1  on Waterstone's efforts, you start by saying you
2  had a conference call with Scott Howard, who is
3  Waterstone's IT Security Manager, on
4  September 28th, 2022. Who is Scott Howard?
5      A. Waterstone's IT Security Manager.
6      Q. How do you know him?
7      A. Through phone calls that were conducted
8  between Mr. Howard, myself and, you know, folks
9  from Godfrey.
10     Q. How many phone calls?
11     A. Offhand, I'm not sure exactly. I would
12  say maybe a dozen or so.
13     Q. And what would happen on these phone
14  calls?
15     MS. KREITER: Object to the form.
16     A. We would talk about, you know, kind of
17  their IT setup, Mr. Howard's initial, you know,
18  efforts when this was all uncovered, the searches
19  that, you know, I worked with him to have
20  conducted.
21     Q. How long would these phone calls work

Page 67

1  approx -- or excuse me. Strike that.
2         How long would these phone calls last
3  approximately?
4      A. I would say anywhere from 30 minutes to,
5  you know, hour, hour and a half, something like
6  that.
7      Q. Did you ever meet Mr. Howard in person?
8      A. Physically, no, just via, you know,
9  video calls.
10     Q. Before this case, had you previously
11  known him?
12     A. No.
13     Q. Did you ever e-mail with Mr. Howard?
14     A. Yes.
15     Q. How many times approximately?
16     A. Offhand, again, maybe half a dozen,
17  dozen.
18     Q. Did Mr. Howard ever send you screenshots
19  of the searches?
20     A. I don't believe so.
21     Q. What was the general nature of these

Page 68

1  e-mails between you and Mr. Howard?
2      A. Going from memory here, probably
3  logistical items, you know, setting up calls, that
4  sort of thing.
5      Q. Would you tell Mr. Howard what to do?
6      A. Yes, in effect. I don't know that, you
7  know, those e-mails would have really gone directly
8  to Mr. Howard or I might have e-mailed him and
9  copied somebody from Godfrey or, you know, sent it
10  along to Godfrey, something like that.
11     Q. Okay. So you state here that the
12  conference call was conducted to discuss the steps
13  Waterstone undertook to address the concerns that
14  Mutual's confidential information may reside in
15  Waterstone's computer systems.
16        In your own words, what do you mean by
17  confidential information?
18     A. So that's effectively the trade secret
19  documents that were identified in the interrogatory
20  responses.
21     Q. Okay. So as you describe confidential

Page 69

1  information in your report, you're defining it
2  limited to the trade secrets that were identified
3  in Mutual's response to Waterstone's
4  interrogatories; is that right?
5      A. Yeah, that would be the focus, I would
6  say. I mean, the conversation, you know, was, I
7  guess, broader than that in a sense initially.
8      Q. Describe what you mean by that.
9      A. Sorry.
10     Q. Describe what you mean by that in that
11  that conversation was broader.
12     A. Sure. So it was really, you know,
13  basically I wanted to understand sort of what was
14  done, right? As I sort of lay out in the, you
15  know, following paragraphs here, basically if you
16  want to call it by dumb luck, a virus alert
17  triggered when Mr. Wolf, you know, loaded documents
18  into his OneDrive and Mr. Howard investigated that,
19  which led to him finding materials that appeared to
20  be Mutual of Omaha's documents.
21        What specific category they fell under

Page 70

1  in terms of, you know, if you want to splice them
2  into buckets of trade secrets or confidential
3  information or substantive information, you know, I
4  don't know specifically, you know, how or what
5  Mutual's thoughts are on how that's organized, but
6  the conversation was sort of around that, you know,
7  kind of overall, you know, kind of cause and effect
8  there with the alert, his work, what was found and
9  what was done about it.
10      Q.  So you mentioned earlier you're not a
11  lawyer, so I'm not going to hold you to this, but
12  there is a difference between confidential
13  information and trade secrets.  And so I want to
14  identify the scope of your engagement in terms of
15  identifying whether you were retained as an expert
16  to opine on the location of confidential
17  information or trade secrets or both.
18      A.  Sure.
19      Q.  So can you clarify for me the scope of
20  your engagement here?
21      A.  Yes, I'll certainly try.  So again, this

Page 71

1  conversation was really around the broader
2  category, as we'll call it, right?  Because
3  there's, you know, stuff, I guess you would call
4  it, maybe confidential information that doesn't
5  rise to the level of a trade secret.  But my,
6  really my engagement, my focus was around those
7  trade secrets documents that were identified.
8      Q.  Okay.  Understood.  Thank you for that
9  clarification.
10          So your opinions are solely focused on
11  the identification of the trade secrets; is that
12  correct?
13      A.  As it relates to sort of my work and
14  back and forth with Mr. Howard, yes.  It's the
15  documents that were identified by Mutual that, you
16  know, the files names, the hash values, et cetera,
17  yes.
18      Q.  So is it fair -- is it a fair
19  characterization to say that, and we'll go through
20  these in more detail, but is it a fair
21  characterization to say that the information

Page 72

1  contained within paragraphs 5 through 11 is all --
2  was all provided to you by Mr. Howard?
3      A.  Let me think about that as I'm just
4  scrolling through here.
5          MS. KREITER:  5 through 11 you said,
6  Courtney?
7          MS. WALTER:  Yes.
8      A.  Yeah, I would say so for the most part.
9  It was sort of a combination of Mr. Howard and the
10  folks at Godfrey on joint conference calls, so it
11  was sort of open conversation, if you will.
12      Q.  Okay.  But none of the information
13  contained within paragraphs 5 through 11 relates to
14  your own personal independent understanding of the
15  situation, correct?
16          MS. KREITER:  Objection to the form.
17      A.  I would say they kind of bleed together.
18  I mean, this is my understanding of what was
19  described to me on, you know, phone calls and me
20  reading the documents and those sort of things.
21      Q.  Sure.  So it's your understanding, but

Page 73

1  you yourself did not experience anything within
2  paragraphs 5 through 11 firsthand.
3      A.  Correct, yeah.  I wasn't involved in the
4  spring of '22.
5      Q.  Okay.  Turning to paragraph 5, just
6  breaking this down, Waterstone's IT security
7  system, what do you mean by Waterstone's IT
8  security system?
9      A.  So as part of that Microsoft environment
10  there's sort of an antivirus, anti-malware kind of
11  component to it that will alert if something
12  malicious is identified.  So it's all kind of part
13  of that.
14      Q.  Do you describe this IT security system
15  anywhere in your report?
16      A.  Not outside of mentioning it here, no.
17      Q.  Okay.  Do you know how Waterstone's IT
18  security system detects a malware alert?
19          MS. KREITER:  Object to the form.
20      A.  I know how IT security systems in
21  general and Microsoft's and others detect a malware

1    alert, yes.
2        Q.  Okay.  Can you describe that for me
3    please?
4        A.  Sure.  So there's a variety of
5    mechanisms.  One is malware is sort of a -- you
6    know, comes in many different forms.  Once it's
7    been identified some place in the world by some
8    security provider, it's basically -- you can think
9    of it as being logged and identified and known as a
10   threat.
11       You know, similar to the natural world
12   where, you know, a physical virus is identified,
13   malware is sort of, you know, an IT virus, if you
14   will, sometimes.  So there are unique
15   characteristics and identifiers found in files that
16   are used as a triggering mechanism.
17       Sometimes that's done through like an
18   MD5 hash, for example, which, you know, is used in
19   litigation and other purposes too.  It could be
20   behavioral.  So if something happens on a computer
21   system and that behavior breaks the norms of

1    operation, that could trigger an alert.
2        An example there would be like a
3    ransomware event, so a bunch of files are suddenly
4    being read in quick succession and then encrypted.
5    That's more of a behavioral thing.  You know, it
6    could be something as simple as a known bad file
7    name.  So there's a lot of different kind of
8    layering components that kind of all play together
9    to help try to protect a system from things like
10   malware.
11       Q.  And so malware has varying levels of
12   severity, is that accurate --
13       A.  Sure.
14       Q.  -- potentially?
15       And at what point does the severity of
16   the malware become apparent?
17       A.  I mean --
18       MS. KREITER:  Object to form.
19       A.  -- that depends on each unique
20   situation, I would say.  I mean, as a general
21   matter, you know, security systems don't care if

1    it's, quote unquote, low severity or high severity.
2    You know, they're going to identify it regardless.
3    You know, what might be a severe impact to you
4    might be different for me if we have different
5    businesses, right?
6        Q.  Sure.
7        A.  So it's sort of situational, I guess.
8        Q.  Okay.  So Waterstone's IT security
9    system sent an alert regarding possible malware
10   detection within Waterstone's Microsoft OneDrive
11   environment involving Chris Wolf's account.
12       Do you know what -- which of Chris
13   Wolf's accounts this sentence is referring to?
14       A.  Sure, yeah.  It's his Waterstone
15   Microsoft 365 account.  That's --
16       Q.  Is that his work e-mail account for
17   Waterstone?
18       A.  Correct, yes.
19       Q.  Does Waterstone's IT security system
20   have any ability to detect malware that may be
21   located within an individual's personal e-mail

1    account that was accessed on Waterstone's computer
2    systems?
3        A.  I would say in general that's not
4    possible with the exception that if that malware
5    under your scenario, you know, resides in the
6    personal account and is accessed, if that access
7    triggers some sort of download or communication
8    between the personal account and the work
9    environment, then yes, it could trigger there.
10       Q.  Okay.  And just understanding the, I
11   guess, scope of Waterstone's Microsoft OneDrive
12   environment, so if I'm on Waterstone's computer
13   system and my Gmail account is in a web browser,
14   it's my personal e-mail account, Micro -- or excuse
15   me, Waterstone's Microsoft OneDrive has no ability
16   to detect what's going on within my personal e-mail
17   account unless I download those documents onto
18   Waterstone's computer systems; is that correct?
19       MS. KREITER:  Object to the form.
20       A.  I would say that's generally a good
21   synopsis, yes.

20 (Pages 74 - 77)

Page 78

1    Q.  Okay.  So then the following morning at
2  April 28th -- on April 28th, 2022, Mr. Howard
3  investigated the malware alerts via incident
4  tickets.  So let's go down to Exhibit C1 and C2 of
5  your report.  Let me know when you're there or if
6  you're looking at it on the computer.
7    A.  Yep, yeah, I see it here with you.
8    Q.  Okay.  Who provided these incident
9  reports to you?
10    A.  Mr. Howard or it may have gone through
11  Godfrey, but they're from Mr. Howard.
12    Q.  Do you see where it says Run Date and
13  Time at the top?
14    A.  Yes.
15    Q.  What do you understand that to mean?
16    A.  That's when the report was printed here.
17    Q.  Okay.  And so that date would have been
18  March 1st, 2023, correct?
19    A.  Correct.
20    Q.  Okay.  And then if we go down here to
21  where it says Opened, the second column, first

Page 79

1  box --
2    A.  I can see your cursor, yeah.
3    Q.  Okay.  So April 28th, 2022 at 8:12 a.m.;
4  is that accurate?  Is that your understanding?
5    A.  Yes.
6    Q.  Okay.  And what do you understand Opened
7  to mean there?
8    A.  That's when Mr. Howard began his work on
9  this incident.
10    Q.  So essentially maybe opened an incident
11  report; is that right?
12    A.  Yes, like a, you know, hey, I'm logging
13  that I'm looking into this and starting the work,
14  so to speak.
15    Q.  Okay.  And are you able to describe for
16  me generally what the rest of this first page
17  means?
18    A.  I mean, a lot of it looks like sort of
19  canned form type stuff, right, so it's -- this is
20  all part of a tracking system, if you will, from
21  like an IT standpoint.  You know, a lot of IT

Page 80

1  departments work out of tickets, as they're called,
2  so you do -- you repair a printer.  There's a
3  ticket about the repair of the printer.  You, you
4  know, fix someone's forgotten password.  There's a
5  ticket about that.  You investigate a malware
6  alert.  There's a ticket about that.  So these are
7  sort of like organizational tracking mechanisms, I
8  would call them, generally.
9    Q.  Okay.  Going to the next page, page 2,
10  this looks to me like an e-mail from Microsoft
11  Cloud App security to Scott Howard, Brian
12  Wesselhoff and Matt Stensberg, all at Waterstone,
13  on Wednesday, April 27th, 2022 at 10:34 p.m.  Is
14  that your understanding of that as well?
15    A.  Yes.  So this would be that, what I just
16  sort of described as the initial triggering
17  mechanism.
18    Q.  Okay.  So when the computer system,
19  generally speaking, recognizes some sort of malware
20  disruption, and if I'm using the wrong vernacular
21  please let me know, how quickly are e-mails like

Page 81

1  this typically sent?
2    A.  I would say typically probably within
3  seconds or minutes of the event, so to speak.
4    Q.  Okay.  How often, again, it doesn't have
5  to be specific to Waterstone here, but generally,
6  in your experience, dealing with this type of
7  software, so to speak, how often is this software
8  conducting searches for malware?
9    A.  It's instantaneous generally.
10    Q.  Okay.  So 24/7 the malware is -- the
11  searches are constantly?
12    A.  They usually are, yeah.
13    Q.  Okay.  So this would have -- this e-mail
14  arguably presumably would have notified Waterstone
15  that there was some sort of detection of malware,
16  correct?
17    A.  Correct.
18    Q.  Okay.  Defender for -- it states here
19  Defender for Cloud Apps recently detected
20  suspicious activity in your organization by cwolf@
21  waterstonemortgage.com in Microsoft OneDrive for

21 (Pages 78 - 81)

Page 82

1    Business.
2           And it's your understanding that cwolf@
3    waterstonemortgage.com is Chris Wolf's e-mail
4    address, right?
5           A.   Correct.
6           Q.   Okay.   Moving down here to the next page
7    on page 3 -- hold on one second.   Okay.   At the
8    bottom of the page, it states Created, Time
9    Worked -- so the box at the bottom states Time
10   Worked, User, Created, Task.   And so Scott Howard
11   is the user for both rows, and then it states
12   created April 28th, 2022 8:36 a.m., and below it it
13   says April 28th, 2022 8:35.
14          So for purposes of this conversation,
15   we're talking this was created, this -- let me ask
16   you this.   What is your understanding about what
17   was created on April 28th, 2022 around 8:36 a.m.?
18          A.   Mr. Howard's ticket and his entries to
19   the ticket.
20          Q.   Okay.   Is it fair to say that Mr. Howard
21   began to investigate this malware disruption at

Page 83

1    8:35, 8:36 on April 28th, 2022?
2           A.   Yes.
3           Q.   So the time difference between when
4    Waterstone first received notification -- excuse
5    me.   Let me back up.
6           Is there a difference in your world
7    between saying a notification and an alert?
8           A.   I think that's pretty interchangeable.
9           Q.   Okay.   So the time difference between
10   when Waterstone first received an alert on
11   April 27th and when Mr. Howard began an
12   investigation into this alert was roughly ten
13   hours; is that correct?
14          A.   Yes, that sounds about right.
15          Q.   And earlier you stated that when an
16   e-mail like the one we previously identified is
17   sent to Waterstone or another company, the malware
18   identified is already known as a threat, right?
19          A.   Yes or it's at least believed to be a
20   threat.
21          Q.   Okay.   And from your perspective and in

Page 84

1    your experience, what typically happens when a
2    company receives an alert such as the one I
3    previously identified?
4           A.   Ideally somebody investigates it.
5    Typically what happens, unfortunately, a lot of
6    companies don't do much about it.
7           Q.   Okay.   And so how fast ideally should
8    that investigation take place?
9           A.   That will depend on each company's
10   situation, their capabilities.   It's going to vary
11   drastically on each situation.
12          Q.   Will it vary in terms of days or minutes
13   or hours or what?
14          A.   Sure, or sometimes, unfortunately,
15   never.
16          Q.   You would agree with me that malware,
17   once it's identified in a computer system, can
18   begin to cause problems to a server immediately,
19   correct?
20          A.   It depends on how it got there and sort
21   of what the triggering alert or event was.   The

Page 85

1    fact that malware is found in a file or a document
2    or attached to an e-mail or, you know, viewed on a
3    website or something like that doesn't actually
4    mean that anything bad is happening.   You know,
5    generally the way the systems are set up is it
6    identifies the bad thing and it blocks it if it's
7    trying to then do something.
8           So if you copy a malicious file, say, to
9    your computer through some mechanism, whatever it
10   is, unless you then purposefully execute that
11   malicious file, it's not going to do anything.
12   It's sitting there.   It would be like having a, I
13   don't know, a virus in a Petri dish in a container
14   and sticking it on your desk, right?   Unless you
15   smash it open, it's not actually going to cause you
16   a problem.
17          So it just depends.   If the alert came
18   because, you know, a bad actor phished you, got
19   your log-in credentials, logged in as you and then
20   started a ransomware encrypting event, that's
21   different, right, than something actively bad is

22 (Pages 82 - 85)

Page 86

1  actually happening.  And so, you know, there's sort
2  of two ends of the spectrum there that I just
3  described, but, you know, that's sort of what
4  you're dealing with when you talk about, you know,
5  generally malware alerts, events, that sort of
6  thing.
7      Q.  But is it fair to say that you don't
8  know the extent to which the malware is causing
9  problems until an investigation begins?
10     A.  I would say generally that's probably
11 accurate unless you can, you know -- it depends
12 what you mean by investigation, I guess.  I mean,
13 you could see an alert and, you know, look at it
14 for a couple seconds and realize that it was
15 blocked, and then so what, right?  There's probably
16 no, quote unquote, investigation into it.
17     Q.  So --
18         MS. KREITER:  Courtney --
19         MS. WALTER:  Yeah.
20         MS. KREITER:  -- when you have a chance,
21 if we could take just a short break --

Page 87

1          MS. WALTER:  Okay.
2          MS. KREITER:  -- when you get to a
3  stopping point.
4          MS. WALTER:  Sure, probably another five
5  minutes or so.
6      Q.  Going back to what I said earlier, there
7  was a ten-hour lapse between the malware
8  notification and Mr. Howard beginning his
9  investigation, correct?
10     A.  Yes.
11     Q.  So in your opinion, is that a reasonable
12 amount of time for a company to wait to begin an
13 investigation into the malware disruption?
14     A.  It can be, sure.
15     Q.  You're aware that Waterstone's a
16 mortgage company, correct?
17     A.  Yes.
18     Q.  And as a result, mortgage -- or
19 Waterstone as a mortgage company likely hosts the
20 personal data of its customers, correct?
21     A.  Sure.

Page 88

1      Q.  And that a potential malware incident
2  may expose this data to being compromised by a
3  third-party, correct?
4      A.  It would depend.
5      Q.  When is a company required to report a
6  malware incident to regulators?
7      A.  You would probably have to ask an
8  attorney that who specializes in breach
9  notification.
10     Q.  Are you aware of whether or not
11 Waterstone reported this malware incident to
12 regulators?
13     A.  I am not, and I don't know that this
14 would qualify as actually being an incident.
15 Companies receive --
16     Q.  What would you in your words -- go
17 ahead.
18     A.  Go ahead.
19     Q.  In your words, what would an incident be
20 defined as?
21     A.  So a confirmed problem essentially.  So

Page 89

1  I do a good bit of work in this space, and by this
2  space I mean hacking events, which include
3  sometimes malware.  You know, as stated before, you
4  know, I don't have legal training or I'm not an
5  attorney, but from my perspective on the technical
6  side, as a general matter, companies receive
7  potentially thousands of events like this every
8  day.  It might come from their fire wall.  It might
9  come from their e-mail or document storage system
10 like this.
11         And so depending on the company, they,
12 you know, may investigate ones that rise to a
13 certain level.  That depends on the company's
14 policies and procedures.  Generally speaking, if
15 that is investigated and found that an actual
16 compromise didn't happen, meaning, you know, the
17 malware that was alerted didn't steal data or it
18 didn't allow a bad actor remote access to a system
19 or it didn't do a whole bunch of things that would
20 show that, you know, a confirmed security event
21 actually occurred, then in my experience generally

Page 90

1   there isn't sort of breach notifications, right?
2       So it's a gray line, so to speak, that
3   depending on the situation companies may engage
4   outside counsel to help evaluate and determine what
5   they need to do or not, but as a general matter,
6   you know, do companies go through that effort every
7   time they get an alert like this? Not a chance.
8       Q. Sure. So you mentioned that companies
9   had their own policies and procedures related to
10  these sorts of incidents and, you know, determined
11  whether they've reached the level that a more
12  thorough investigation is necessary. What are
13  Waterstone's policies and procedures related to
14  such incidents?
15      A. I'm not aware of what their security
16  policies are.
17      Q. Mr. Howard never described to you their
18  policies and procedures in his investigation of
19  determining whether or not this reached to the
20  level of, I guess, a higher security incident?
21      A. No, we didn't discuss that.

Page 91

1       Q. Did you ever ask Mr. Howard why it took
2   ten hours to investigate this incident?
3       A. Nope.
4       Q. Are you aware of whether Waterstone
5   notified the impacted individuals who are
6   referenced in the quarantined e-mails that their
7   information had become compromised?
8       A. I am not, and I'm not aware that it says
9   anything about information being compromised.
10      Q. Okay. Going down to the second incident
11  report or what I perceive to be the second incident
12  report, can you let me know or identify for me what
13  the differences are between these two incident
14  reports?
15      A. Sure. They --
16      MS. KREITER: Courtney, I'm sorry, but
17  can we just take a break?
18      MS. WALTER: He has to answer my
19  question.
20      MS. KREITER: That's fine. After this
21  can we take a break? I'm just -- I personally need

Page 92

1   a break.
2       MS. WALTER: Sure.
3       A. Sure. So in sum, I would say they're
4   two alerts that are sort of back to back. They
5   identify two different files and potential pieces
6   of malware. If you scroll down a little bit, you
7   can see the actual file that's identified. Stop
8   right there, I think. Yep. So you can see where
9   it's FakeClient.exe. That's the actual file name.
10  The prior one was like vlmscd.exe or something like
11  that.
12      MS. WALTER: Okay. Okay. We can take a
13  break. How long do you need, Maria?
14      MS. KREITER: Just five minutes.
15      MS. WALTER: Okay.
16      THE VIDEOGRAPHER: The time is 10:43
17  a.m. Eastern. We are now off the record.
18      (Recess.)
19      THE VIDEOGRAPHER: This is the beginning
20  of media unit No. 2 in the video recorded
21  deposition of Mr. Brett Creasy. The time is 10:50

Page 93

1   a.m. Eastern. We're now back on the record.
2   Counsel, you may proceed.
3       MS. WALTER: Thank you.
4       Q. Okay. Going back to Exhibit 1, which is
5   identified as your report, we just finished
6   discussing the two incident reports. Let's move on
7   to paragraph 6. So to be clear, actually, were
8   there two malware incidents or was there one based
9   on your understanding?
10      A. There are sort of two triggering events,
11  same time period.
12      Q. Same e-mail address as well, correct?
13      A. Yes, the same account but two different,
14  you know, in a technicality, two different
15  potential malware files.
16      Q. Okay. Two potential malware files
17  identified in the same e-mail account, correct?
18      A. Correct, which generated two different
19  alert e-mails.
20      Q. Okay. At the same time.
21      A. Roughly, yes.

24 (Pages 90 - 93)

Page 94

1    Q.   And would you -- I guess this is all
2   relayed to you by Mr. Howard, but would -- since
3   the notifica -- since the alerts were sent on
4   April 27th, is that triggered immediately by at
5   that point in time the two files being sent to
6   Mr. Wolf's e-mail account?
7    A.   So I believe it's actually that files
8   were saved into Mr. Wolf's OneDrive account, which
9   it's sort of the same thing. It's the same
10  underlying account name, but OneDrive is document
11  storage. It's not e-mails.
12   Q.   Okay. I guess I'm just trying to
13  understand. If I'm saving these files onto my
14  OneDrive account, immediately upon saving them and
15  Microsoft detects that there's potential malware,
16  is that, is that temporally accurate? So as soon
17  as I upload them to Microsoft OneDrive, then that
18  e-mail alert is being sent.
19   A.   I would say that's generally correct,
20  yes.
21   Q.   Okay.

Page 95

1    A.   I don't know if there's a delay between,
2   you know, how long it takes Microsoft to scan it
3   and --
4    Q.   Sure.
5    A.   -- if it's minutes or whatever for it to
6   send an e-mail, but as a general matter, yes, what
7   you described I would say is accurate.
8    Q.   Okay. Paragraph 6, although the initial
9   alert by Microsoft was due to a potential malware,
10  which was remediated, I take it remediated is a
11  term of art. So can you put in your -- describe in
12  your own words what it means to remediate?
13   A.   Sure. In effect dealt with it. You
14  know, like I mentioned before, if a security system
15  is alerting the fact that malware may exist in a
16  file, it's generally because it knows it and it's
17  blocked it, right? The malware that's more
18  problematic, generally speaking, is the one that
19  you don't get the alert for. So if you have an
20  alert and you look at that alert and go, quote
21  unquote, investigate it, it's probably already

Page 96

1   taken care of by the system itself.
2    Q.   By the system. Okay. And that
3   remediation process, how are you aware of that
4   remediation process described in paragraph 6?
5    A.   Just through my conversation with
6   Mr. Howard.
7    Q.   Okay. Not through your own independent
8   analysis.
9    A.   Correct, no. We were not engaged in a
10  security perspective in this case.
11   Q.   Okay. So Mr. Howard observed that
12  Mr. Wolf's OneDrive contained a large number of
13  files. Do you know how many files that was?
14   A.   Not specifically, no.
15   Q.   Which was unusual as Mr. Wolf was a new
16  hire. Did you ever personally observe these files
17  described in paragraph 6?
18       MS. KREITER: Object to the form.
19   A.   No, I didn't. Again, I wasn't involved
20  at that time, and I did not go log into Mr. Wolf's
21  account or something like that.

Page 97

1    Q.   Okay. I guess bigger picture, why is
2   Mr. Howard's depiction of what happened here on
3   April 27th and April 28th important to your
4   ultimate opinions?
5    A.   So at the start of this I would sort of
6   classify it as a little bit of dumb luck perhaps
7   that a malware event or potential malware event was
8   triggered, which caused Mr. Howard to look at the
9   account in question. When he did that, he realized
10  that, you know, there was in his estimation a bunch
11  of stuff in there, which was unusual for a new hire
12  to have because they're new.
13       So as being a new person, you probably
14  don't have, you know, much by way of documents.
15  And in looking at that, that's when he uncovered
16  that there appeared to be stuff there from Mutual
17  of Omaha, and that triggered his kind of response,
18  if you will, to do something about it because he
19  recognized that as being a potential problem.
20       So big big picture, as it relates to
21  kind of my lens on all of this, is, you know,

25 (Pages 94 - 97)

Page 98

1    Mr. Howard, Waterstone sort of got lucky in the
2    sense that, you know, the malware event triggered,
3    and then by Mr. Howard's, you know, good work he
4    sort of sprung into action to then, you know, take
5    things one step further and deal with the, at the
6    time, what was sort of the ancillary issue to the
7    malware alert, which is this other, you know,
8    bucket of files that appeared to have been Mutual
9    of Omaha files and ultimately quarantined them so
10    that Mr. Wolf didn't have access to them.
11        Q.  Okay.  So, Mr. Creasy, you were retained
12    in this case as an expert witness to opine on the
13    reasonableness of Waterstone's, I guess,
14    disposition of Mutual's confidential information
15    and trade secrets, correct?
16        A.  Yes, I'd say that's part of it.
17        Q.  Sure.  And so what is your ultimate
18    opinion on that?
19        A.  That they did a better than average job,
20    aboveboard job of dealing with that.
21        Q.  Okay.  And so far twice in this

Page 99

1    deposition you've referred to Waterstone's dumb
2    luck, right?
3        A.  Well, the malware alert is sort of dumb
4    luck, sure.
5        Q.  Okay.  But but for that malware alert,
6    what facts are you aware of that Waterstone would
7    have become aware that Mutual of Omaha's
8    confidential information resided on its computer
9    systems?
10        MS. KREITER:  Object to the form.
11        A.  I would say probably the cease-and-
12    desist letters that came a day later or two days.
13        Q.  Okay.  We'll talk about that in a
14    second.
15        So you said earlier that Mr. Howard
16    observed that Mr. Wolf's folder contained a large
17    number of files, which was unusual as Mr. Wolf was
18    a new hire.  How was Mr. Howard aware that Mr. Wolf
19    was a new hire?
20        A.  This is sort of my interpretation of it,
21    but he's, you know, IT, IT security.  He probably

Page 100

1    knows when there's new accounts being created and
2    that sort of thing.
3        Q.  How long did his invest -- did
4    Mr. Howard's investigation into this security alert
5    last?
6        A.  Into the security alert itself, I
7    believe it was, at least according to what he
8    logged in this ticketing system, roughly 30 minutes
9    or so, specific to the malware, not to the, you
10    know, other things that he uncovered.
11        Q.  Okay.  So in paragraph 6 I assume that's
12    what you're referring to as the other things that
13    he uncovered, which is that Mr. Wolf's folder
14    contained a large number of other files; is that
15    correct?
16        A.  Correct.
17        Q.  Okay.  So do you know how long this --
18    the events described in paragraph 6, how long that
19    took place?
20        A.  I don't --
21        Q.  Okay.

Page 101

1        A.  -- specifically.
2        Q.  And do you know how Mr. Howard was aware
3    that the files originated from Mr. Wolf's prior
4    employment, Mutual of Omaha?
5        A.  I'm going from memory here a little bit,
6    but I believe it's because some of them literally
7    said Mutual of Omaha on them.
8        Q.  Did Mr. Howard assume that those
9    documents -- that other documents that didn't
10    contain Mutual of Omaha's folder, did he assume
11    that -- strike that.
12        Are you aware of anyone else besides
13    Mr. Howard who assisted him with his investigation
14    described in paragraph 6?
15        A.  Not specifically.  I know he described
16    that he spoke with in-house counsel, but I don't
17    know what the back and forth and, you know, kind of
18    logistics were.
19        Q.  Are you personally aware of any policies
20    or procedures that Waterstone has related to IT's
21    location of documents related to a competitor on

26 (Pages 98 - 101)

1  its IT security system?

2      A. I'm not aware of specific policies, no.

3      Q. Did Mr. Howard ever speak to you about

4  any sorts of policies and procedures related to

5  that?

6      A. No.

7      Q. Okay. Paragraph 7, recognizing the

8  potential issue, what is the potential issue that

9  Mr. Howard recognized?

10     A. That there were files that appeared to

11 be, you know, from a prior employer and that could

12 be a problem.

13     Q. Why would that be a problem?

14     A. Well, I think generally as a person

15 involved in information security you have some

16 sense of, you know, materials from a prior employer

17 showing up at your place of work could, you know,

18 lead to issues, legal issues.

19     Q. So then recognizing that potential legal

20 issue, Mr. Howard removed access to the files that

21 the new hires uploaded to their OneDrive accounts.

1      Now, I'm a bit confused here because

2  paragraphs 5 and 6 describe one new hire. So who

3  are the new hires described in paragraph 7, plural?

4      A. Sure. So again, sort of Mr. Wolf's

5  account triggering event, if you will, started

6  Mr. Howard down that path realizing that, you know,

7  there may be stuff here from a prior employer and

8  then he broadened his scope to look at the other

9  new hires for a similar issue.

10     Q. And who were those new issues?

11     A. Those new hires -- I don't remember all

12 of their names off the top of my head, but I could

13 identify them if I did not do so here somewhere.

14     Q. Okay. And did Mr. Howard himself

15 identify who those new hires were?

16     A. Yes.

17     Q. And can you define for me, not the

18 names, but what those new hires are? So, for

19 example, you would agree with me that if Chris Wolf

20 started on April 27th, which is the day this

21 triggered, there could have been other new hires

1  that same day, right? So how then did Mr. Howard

2  identify and define who the new hires were such

3  that he was removing access to their files?

4      A. My understanding is it's the folks who

5  came over to Waterstone from Mutual.

6      Q. Are you aware -- so you are aware that

7  individuals came from Mutual to Waterstone,

8  correct, generally speaking?

9      A. Yes.

10     Q. And when -- what is your understanding

11 about when those individuals joined Waterstone from

12 Mutual?

13     A. I would say it was over a period of a

14 couple weeks, months.

15     Q. And what are those weeks or months from

16 your understanding.

17     A. I want to say it was probably February

18 to April of '22.

19     Q. Okay.

20     A. I'm trying to think of complaint related

21 items that I have in the back of my brain

1  somewhere.

2      Q. Okay. But would it change your analysis

3  at all if you were aware that other individuals

4  came from Mutual and joined Waterstone after April

5  of 2022?

6      A. No, I don't think so.

7      Q. Okay. But for purposes of paragraphs 5

8  through 11 we're really only focused on the April

9  2022 time period; is that accurate?

10     A. I -- that's certainly when it started,

11 so to speak. I don't know off the top of my head

12 if, you know, if, for example, I'm making this up,

13 a hypothetical, I guess, if somebody joined after

14 April of '22, as you said, say May or something,

15 would that individual have been included in what

16 Mr. Howard did. I don't know offhand for sure.

17     Q. Okay. So you don't know how long

18 Mr. Howard's involvement in this -- for purposes of

19 your report, you don't know the time period that

20 Mr. Howard was involved, correct?

21     A. Correct. Do I know if he did this, you

Page 106

1    know, for two or three days at the end of April and
2    then moved on or did he do it, you know, over the
3    course of a couple weeks?  I don't know.
4        Q.   Okay.  But going back to what I focused
5    on earlier or what we're focusing on right now,
6    which is paragraphs 5 through 11, there's nothing
7    in here to suggest to me that Mr. Howard's
8    involvement extended beyond April of 2022, and if
9    there is from your perspective, then I would ask
10   you to please point that out in paragraphs 5
11   through 11.
12       A.   Yeah, I don't know specifically the
13   dates, if it was the end of April into May, when it
14   ended.  I don't have a, you know, end date, so to
15   speak, of his involvement in what's described here.
16       Q.   Okay.  Now, walk me -- so we don't know
17   how new hires is defined in paragraph 7 and -- but
18   we do describe -- or you do describe that
19   Mr. Howard immediately removed access to the files.
20   Walk me through how Mr. Howard removed access to
21   the files.

Page 107

1        A.   So once he went through that sort of,
2    you know, searching investigative aspect of
3    identifying the materials, he then moved it into a
4    different secured OneDrive folder that they didn't
5    have access to.
6        Q.   Okay, but that's not described here,
7    right?
8        A.   Not in the words that I just used, no.
9        Q.   And what is that secured folder?  Can
10   you elaborate on that?
11       A.   I don't know the specific name of it,
12   but think of it as a bucket or an area that, you
13   know, is under Mr. Howard's control, not the
14   individuals involved here.
15       Q.   And so did Mr. Howard remove access to
16   all of the new hires' files all together or did he
17   remove access to the files only that contained, as
18   you describe here, borrower documents, personal
19   identifying information, loans in progress, et
20   cetera?
21       A.   That described set.

Page 108

1        Q.   Okay.  And is it your understanding that
2    Mr. Howard himself made that determination?
3        A.   It's my understanding that he directly
4    looked at the files himself.  Whether he got
5    guidance from anybody else I don't know.
6        Q.   Okay.  So, but there is -- you would
7    agree with me then that there is a potential that
8    there were other documents that were still
9    available to the new hires that Mr. Howard had not
10   removed, correct?
11       A.   There is a potential that other files
12   could still exist, sure.
13       Q.   Okay.  Other files belonging to Mutual,
14   correct?
15       A.   Other files of any sort, sure.
16       Q.   Now, you say here that this resulted in
17   data from five new hires' OneDrive being
18   quarantined.  And you offhand don't know who those
19   five new hires are, correct?
20       A.   Not off the top of my head to rattle
21   their names off, but I have them somewhere.

Page 109

1        Q.   Are their names described anywhere in
2    the report?
3        A.   If I can -- I don't know if you want to
4    scroll through or I can look at my report.
5        Q.   Whatever is easier.
6        A.   Yeah.  They may be.  I don't recall
7    explicitly calling them out, but it doesn't mean
8    their names aren't elsewhere.  I just don't know if
9    I would recognize it.  If you want to just, I
10   guess, scroll down a little bit, I'll just see if I
11   see anything that reminds me.  Yeah, I'm not sure
12   offhand.
13       Q.   Okay.  So you don't even really know
14   whether these new hires actually came from Mutual
15   of Omaha.
16       A.   Yeah, no, that is my understanding that
17   they -- that this subject body are all folks who
18   came from Mutual.
19       Q.   That's your understanding, but you don't
20   know firsthand.
21       MS. KREITER:  Object to the form.

28 (Pages 106 - 109)

Page 110

1    A.  Sure, I mean, my understanding is always
2    from court documents and, you know, what has been
3    told to me so --
4        Q.  Okay.  Now, you mentioned here that this
5    resulted in data from the five new hires' OneDrive
6    accounts being quarantined.  What do you mean by
7    quarantined?
8        A.  So that's what I sort of described
9    earlier, basically taking that OneDrive data and
10   sticking it into a new secured OneDrive folder
11   under Mr. Howard's control.
12       Q.  Okay.  I am not a computer person
13   admittedly, so I need a little bit more
14   understanding for the functionality of quarantining
15   data.
16       A.  Sure.
17       Q.  So Mr. Howard -- or I'll just keep this
18   general.  The IT person takes this data that they
19   identified as containing potentially problematic
20   files.  They put them into a secure area.
21       A.  Yes.

Page 111

1        Q.  Does that secure area -- do other
2    e-mails from those identified five individuals
3    further populate into that quarantined data or is
4    it just that set of data that remains in that
5    secure area?
6        A.  It would just be that set of data that
7    remains in that secured area unless, you know,
8    somebody affirmatively adds stuff to it.
9        Q.  Okay.  So Chris Wolf's data was -- or
10   the two problematic files that were identified, I
11   guess, they -- Mr. Howard took that and put that
12   aside so he no longer had access to those two
13   files; is that correct?
14       A.  Well, the two files, I think, if we're
15   talking about the malware files, were probably
16   deleted by the system.
17       Q.  Okay.
18       A.  So the quarantined data would be the
19   borrower documents and the other things described
20   here that Mr. Howard would have moved out of
21   Mr. Wolf's account and into his secured folder.

Page 112

1        Q.  Okay.  But not just Mr. Wolf, right?
2    We're talking about --
3        A.  Correct, and four others.
4        Q.  -- the five new hires.
5        A.  Yeah.
6        Q.  Is that the five new hires in addition
7    to Mr. Wolf or is that five new hires including
8    Mr. Wolf?
9        A.  Five new hires including Mr. Wolf.
10       Q.  Okay.  And so you don't know how many
11   files were within that quarantined data.
12       A.  Offhand, no, like to sit here right now,
13   but I could get a count of them because I have
14   them.
15       Q.  Okay.
16       A.  That was the subject of what I've
17   described in the report of the data searches.
18       Q.  Okay.  We'll get there.  So what happens
19   with that data?  It just stays in a secure area
20   until further notice?  Is it deleted?  What happens
21   to it?

Page 113

1        A.  Yeah, it just sits there until further
2    notice.
3        Q.  Okay.  And what could potentially happen
4    to it?
5        A.  I guess whatever your mind could think
6    of.  I mean, it's going to sit there unless
7    somebody, you know, makes a decision to go delete
8    it or --
9        Q.  Okay.  So you could delete it, right?
10   You could --
11       A.  Yep.
12       Q.  -- remove it entirely from the IT
13   system?
14       A.  Sure.
15       Q.  Could you return it to Mutual of Omaha?
16       A.  Sure.
17       Q.  And then potentially delete it after
18   that?
19       A.  Sure.
20       Q.  Are you aware of whether Waterstone did
21   that in this case?

29 (Pages 110 - 113)

Page 114

1      A.  I'm not aware of that, no.
2      Q.  Okay.  So for purposes of the
3  quarantined data, I know I'm really hammering on
4  this spot, but I just want to make sure I
5  understand, it's just that data from those five
6  hires that were identified as containing borrower
7  documents, personal identifying information, loans
8  in progress, that is just in a secure system and
9  there's no other information that's being defined
10  as quarantined data throughout your report, right?
11  Because you describe here in paragraph 7 that
12  quarantined data is that data from the five new
13  hires.  So I just want to make sure we're clear
14  that that's the finite universe of data that was
15  quarantined.
16      MS. KREITER:  Object to the form.
17      A.  Yes, yes.
18      Q.  Okay.  And do you know the date for when
19  that data was quarantined?
20      A.  No, not offhand.
21      Q.  Okay.

Page 115

1      A.  I suspect it was sort of a rolling
2  process though.
3      Q.  Let me ask you this question.  In your
4  experience, is there anything about this
5  investigation to date that you would have -- or
6  about Mr. Howard's investigation to date that you
7  would have done differently?
8      MS. KREITER:  Object to the form.
9      A.  Not that I can think of right this
10  second.  I mean, I'm not in Mr. Howard's role, so
11  again, I don't know what his, you know, normal
12  processes are, but no, not offhand, no.
13      Q.  And you're opining about the
14  reasonableness of Waterstone's identification of
15  potentially confidential information in this case,
16  right?
17      A.  Yes.
18      Q.  But you're not aware of any policies and
19  procedures that Waterstone has to determine whether
20  or not they abided by their own policies and
21  procedures in identifying this information,

Page 116

1  correct?
2      A.  I am not.
3      Q.  Okay.  Now, paragraph 8 states while
4  this effort was underway, Waterstone received
5  multiple cease-and-desist letters on April 29th,
6  2022.  So let's go -- you attach an example.  Did
7  you personally review all of these cease-and-desist
8  letters?
9      A.  Yes, I mean, I scrolled through them.  I
10  read them in general, yes.
11      Q.  Okay.  We're not going to go one by one,
12  but you would agree generally speaking all of the
13  letters were -- all of the cease-and-desist letters
14  were generally the same.
15      A.  Yes, I would say so.
16      Q.  Okay.  Going to Exhibit D, this is a
17  letter from Mark Carroll with Mutual of Omaha.  And
18  this example here is to Diana Jacobs dated
19  April 29th, 2022.
20      A.  Correct.
21      Q.  Okay.  And here -- if you need to take a

Page 117

1  minute to review it, that's fine.  I'm not going
2  line by line here, but I do want to focus on page
3  2, the definition of confidential information
4  includes or, excuse me, Mutual's Agreement defines
5  Confidential Information to include the Company's
6  records pertaining to customers, potential
7  customers, mortgage loan terms and related
8  information.  Do you see that?
9      A.  I do, yes.
10      Q.  Is there anything you disagree with
11  regarding that definition?
12      A.  I mean, it's not my definition, so I
13  don't know I could disagree with it, I guess.
14      Q.  Right, but it's fairly straightforward,
15  right?  You would agree?
16      MS. KREITER:  Object to the form.
17      A.  Yeah, I mean, other than I don't know
18  what related information means, but sure.
19      Q.  Okay.  Let's go back to paragraph 9.
20  Okay.  As part of Waterstone's remediation
21  efforts -- so I thought earlier you stated that

30 (Pages 114 - 117)

1  Waterstone had remediated the two alerts by the IT
2  system immediately, I guess, disallowing them on
3  the system.
4        So what are the ongoing Water -- what
5  are Waterstone's ongoing remediation efforts that
6  are described in 9?
7        MS. KREITER:  Object to the form.
8     A.  So that's probably a little confusing or
9  conflating, my use of the word remediation there.
10    Q.  Sure.
11    A.  The first instance was really about the
12 potential malware, quote unquote, remediation and
13 dealing with that.  This is more about Mr. Howard's
14 efforts of identifying and addressing the potential
15 Mutual of Omaha documents, so sort of two
16 different, quote unquote, remediations if that
17 makes sense.
18    Q.  Okay.  So to be fair, the malware
19 incident was remediated in your perspective, and
20 then their cease-and-desist letters arrived, and so
21 additional remediation efforts were occurring at

1  that time from Waterstone's respective.
2     A.  Yes, for a different purpose basically,
3  right.  One is sort of a security event.  The other
4  is more of like a, you know, potential legal
5  dispute event if you want to call it that.
6     Q.  Okay.  So Mr. Howard then conducted
7  searches of Waterstone's e-mail environment for any
8  e-mails sent from former employees into Waterstone
9  via their Mutual of Omaha e-mail accounts or known
10 personal e-mail addresses.  So how did Mr. Howard
11 conduct those searches?
12    A.  So that was using the Mutual of Omaha,
13 I'll call it domain, and then the personal e-mail
14 addresses that were known for the individuals
15 themselves --
16    Q.  Okay.
17    A.  -- which was the --
18    Q.  That were known by whom?
19    A.  I believe sort of Mutual collectively.
20    Q.  And how did, I mean, going back to my
21 question because I don't think I really understand

1  the answer, so how did he search -- so I understand
2  what he searched, but how did these searches -- how
3  were they conducted?
4     A.  So that's using in part that archival
5  system.  It gives you the ability to search across
6  all of this data in sort of one fell swoop.
7     Q.  And you don't know what that archival
8  system is, right?
9     A.  Not by name.  I could probably dig it up
10 but --
11    Q.  Are all archival systems the same?
12    A.  No.  I mean, they have a lot of similar
13 functions but --
14    Q.  Do they have different capabilities?
15    A.  Yeah, they can.
16    Q.  Are some better than others?
17    A.  Sure.
18    Q.  Some are more accurate than others?
19    A.  More, I guess, options than accurate and
20 how easy to use perhaps.
21    Q.  Okay.  Did Mr. Howard's searches

1  include -- what, what, what exactly was Mr. Howard
2  searching for?  Let me ask that.
3     A.  So it's basically the e-mail addresses
4  against all of the e-mails.  So if your personal
5  e-mail address is courtneywalter@gmail.com, you
6  know, it's going to be a search against all of the
7  e-mails for courtneywalter@gmail.com to see if
8  anything is identified.
9     Q.  Were the personal e-mail accounts
10 voluntarily provided by the employees?
11    A.  That would be my understanding, yes, but
12 I wasn't involved in the makeup of that.
13    Q.  Okay.  So I have two e-mail accounts,
14 for example.  I have a Gmail account and I have a
15 Penn State account that I still have after all of
16 these years.  So if I -- if my employer asks me to
17 provide my personal e-mail and I only provide my
18 courtney.e.walter@gmail, then it's fair to say my
19 employer isn't going to know to search my Penn
20 State e-mail account; is that right?
21    A.  Sure, unless the employer independently

31 (Pages 118 - 121)

Page 122

1  knows that you have it because, right, you
2  communicated with them on it or something to that
3  effect.
4      Q.  Okay.  And you don't know how Mutual --
5  or excuse me.  You don't know how Waterstone
6  gathered personal e-mail accounts, do you?
7      A.  Not specifically, no.
8      Q.  Okay.  And then Mr. Howard quarantined
9  those e-mails in addition to the aforementioned
10 OneDrive files.  So what e-mails did he quarantine?
11     A.  So it's not so much -- those e-mails
12 aren't really -- my use of quarantine there
13 probably isn't good.  But they are able to be moved
14 out of the mailboxes much like the OneDrive data is
15 because of the way their IT system is set up.  So
16 it's more of like a, you know, identification or
17 gathering of those e-mails that resulted from his
18 searches.
19     Q.  Can you, can you explain that a little
20 bit further?
21     A.  So there's -- basically their IT system

Page 123

1  has a function whereby, you know, it's part of, I
2  think, that archival system, that if you've got,
3  you know, say, e-mail in your normal mailbox, I
4  don't know if you use Outlook or something like
5  that --
6      Q.  Uh-huh.
7      A.  -- to access your e-mail and you delete
8  it or, you know, it's otherwise, you know, lost, so
9  to speak, you still have access to it because of
10 the archival system.  You could, you could as a
11 user always go back and get it.  So that, that sort
12 of environment, that setup, exists at Waterstone.
13 So sort of the -- my overall description here is
14 that, you know, he identified that stuff, gathered
15 it up, but in terms of like cutting, from a
16 technical standpoint, cutting access to those
17 e-mails that he found isn't really possible.
18     Q.  Okay.  So if I'm Chris Wolf and my
19 Mutual Mortgage e-mails, Mutual of Omaha Mortgage
20 e-mails were, I don't want to say quarantined
21 because it sounds like it's different usage here,

Page 124

1  but if they were archived, I would still have
2  access to those e-mails, right?
3      A.  Correct, yes.
4      Q.  Okay.  So functionally then why did
5  Mr. Howard archive those e-mails?
6      MS. KREITER:  Object to the form.
7      A.  To gather them, right, so you have to
8  like group them together and have a body of
9  documents, I guess.
10     Q.  Why did he do that?
11     A.  Probably to provide them to maybe
12 in-house and outside counsel.
13     Q.  Okay.  And you don't know the date on
14 which he conducted these searches, right, described
15 in paragraph 9?
16     A.  Not specifically.  My understanding is
17 it was sort of a rolling process.
18     Q.  And you don't know when he archived
19 those e-mails described in paragraph 9.
20     A.  No, I don't have specific dates, right.
21     Q.  But I just want to be clear.  With the

Page 125

1  archival process we're talking about in paragraph
2  9, is that similar in the sense that -- is that
3  similar in the sense to quarantining, as you
4  described in paragraph 7, where Mr. Howard would
5  have had to take those e-mails, put them in the
6  archive and that's the finite universe of e-mails
7  that's in the archive or will any further doc --
8  any further e-mails with Mutual of Omaha on them be
9  populated into that archive system?
10     A.  I believe it's the former, so it's the
11 body of what he took and put there.  That is my
12 understanding of what occurred.
13     Q.  Okay.
14     A.  Could there exist a capability to have
15 like a rule in place that any further e-mails
16 coming in that meet that same criteria could also
17 be put in there?  That's probably possible,
18 although logically it wouldn't make a whole lot of
19 sense because the individuals are now gone from
20 Mutual of Omaha, so there shouldn't be the ability
21 for new things to come in.

32 (Pages 122 - 125)

Page 126

1    Q.  Okay.  And you're not aware of any such

2    implementation in this investigation, are you?

3    A.  No.

4    Q.  Okay.  And in paragraph 9 where we're

5    talking about any e-mails, you have a qualifier in

6    paragraph 7 related to any e-mails containing

7    borrower documents, personal identifying

8    information, loans in progress, et cetera.

9        Does that qualification also apply to

10   paragraph 9 or does paragraph 9 pertain to any

11   e-mails sent from the former employees into

12   Waterstone?

13   A.  The latter, if there's any --

14   Q.  Okay.

15   A.  -- if there's not a qualifier, so to

16   speak.

17   Q.  Okay.  And do you know how many e-mails

18   there were in -- there are -- that were archived as

19   identified in paragraph 9?

20   A.  Not offhand, no.

21   Q.  Okay.  Let's go back to the cease-and-

Page 127

1    desist letters described in paragraph, or, excuse

2    me, Exhibit 10 or D.  I'm sorry.  Second paragraph

3    from the bottom of the second page here, it states

4    Mutual demands that you return all Confidential

5    Information in your possession and any information

6    you may have supplied to third parties.

7        What effort did Waterstone undertake to

8    determine whether the information was confidential

9    as defined in Mr. Carroll's cease-and-desist

10   letter?

11   A.  Offhand, I'm not sure what that analysis

12   would have been.

13   Q.  Do you know if Waterstone did conduct

14   any sort of determination of whether their -- the

15   documents within their possession qualified as

16   confidential information as defined under

17   Mr. Carroll's cease-and-desist letter?

18   A.  No, I'm not aware of that.

19   Q.  Okay.  Did Waterstone, in fact, return

20   any of those quarantined e-mails to Mutual?

21   A.  I'm not sure.  I was not involved in

Page 128

1    that process.

2    Q.  Did Waterstone inform Mutual that any of

3    those e-mails were quarantined?

4    A.  Again, I'm not sure.

5    Q.  Did Waterstone inform Mutual that any of

6    those e-mails were archived as you described

7    earlier?

8    A.  Again, I don't know.

9    Q.  Okay.  Going back to paragraph 11, so

10   then we -- then you describe that Waterstone

11   required its employees who were the target of

12   Mutual's cease-and-desist letters to sign

13   certifications that included affirmations as set

14   forth in paragraph 11.

15       Did you review these certifications?

16   A.  Yes.

17   Q.  Did you speak with the individuals who

18   signed these certifications?

19   A.  I did not.

20   Q.  Did you personally identify or

21   independently verify that the employees who signed

Page 129

1    those certifications actually cooperated with

2    Waterstone's investigations into Mutual of Omaha's

3    allegations within the cease-and-desist letters?

4    A.  Only to the extent that I had

5    conversations with Mutual's counsel.

6    Q.  Okay.  And so I won't go -- it sounds

7    like you did not do anything to independently

8    verify the individual employee's affirmations

9    contained within paragraph 11, correct?

10   A.  I would say correct.  If by that you

11   mean did I, you know, log into Christopher Wolf's,

12   you know, personal e-mail account or something to

13   that effect and, you know, sort of check to see if

14   what he stated is true, no, I didn't do that.

15   Q.  Okay.  Let's go to your summary of

16   opinions on page 2 of your report.  Are any of the

17   opinions set forth in paragraph C.3., are any of

18   those applicable to Waterstone's efforts as

19   described in paragraphs 4 through 11?

20       MS. KREITER:  Object to the form.

21   A.  Yeah, I'd say it's sort of the -- my

Page 130

1  opinion of the -- a recap of the sum of all of
2  those events described in paragraphs 4 through 11.
3      Q. Can you elaborate? Can you state that
4  another way for me please?
5      A. Sure. So, in effect, in speaking with
6  Mr. Howard, in looking at the data available to me,
7  in speaking with, you know, counsel for Mutual, so
8  that the sum of those things that I've described in
9  paragraphs 4 through 11 and comparing that in my
10  experience of sort of seeing the story unfold, you
11  know, hundreds of other times, in effect my opinion
12  is that Mutual, you know, did a good job of jumping
13  into action and doing something about the fact that
14  it may possess materials originating from Mutual of
15  Omaha.
16      Q. Because of dumb luck, right?
17      A. Well, I could say because of -- you
18  know, that was part of -- the security event was
19  part of the triggering event, but it was really,
20  you know, Mr. Howard's efforts and whether there's
21  policies and procedures that forced him to do that

Page 131

1  or if that's just his own, you know, security
2  training or whatever, I don't know. But they
3  jumped into action and did something about it which
4  is --
5      Q. Okay.
6      A. -- more than most do.
7      (Whereupon, Creasy Deposition Exhibit 2,
8  e-mails Bates stamped MOM-0000238 and MOM-0000239,
9  marked.)
10      Q. So I'm going to go to what's been marked
11  as Exhibit 2 and pull that up. Let me just stop
12  this for a second. Okay. Have you ever seen this
13  e-mail before?
14      A. I saw it this morning.
15      Q. Let me put it that way. Before today
16  had you seen this?
17      A. No.
18      Q. Okay. So this is an e-mail that's been
19  produced in this case. It's marked MOM0000238.
20  Take a second if you need to look at it. If you
21  already looked at it this morning, I'm not quizzing

Page 132

1  you on what's happening here. I just want to ask
2  you a few questions.
3      So what you describe in paragraphs 4
4  through 11, the only dates I see there are in
5  April. Now, I recognize you said the remediation
6  efforts were ongoing and you can't for me identify
7  the end date for that, correct?
8      A. Correct.
9      Q. So this e-mail is sent from Chris Wolf
10  at his waterstonemortgage.com e-mail account dated
11  Thursday, June 9th, to Cody Lamb and Fred Stalls at
12  their mutualmortgage.com. Moving down -- sorry.
13  That was the most recent e-mail, but if we're
14  looking at the prior e-mail, which is June 8th from
15  Fred Stalls to Cody Lamb, that's dated June 8th, as
16  I stated, and sent cc'd to Chris Wolf at
17  Waterstone.
18      Now, would this information have been
19  subject to Mr. Howard's quarantine or archival as
20  described in your report in paragraphs 7 and 9?
21      A. I don't know.

Page 133

1      Q. Okay. So you would agree then that what
2  you've described in 7 and 9 as the archival and
3  quarantine process, you don't know if additional
4  e-mails containing confidential information sent
5  after Mr. Howard quarantined or archived those
6  information would have also been subject to archive
7  or quarantine?
8      A. I don't know for certain, no.
9      Q. Okay. All right. Starting on section
10  E, Supplemental Search Efforts, paragraph 13, so
11  you reviewed the list of Bates numbers. What is
12  this list?
13      A. That's described here in 13?
14      Q. Uh-huh, yes.
15      A. So that would be the documents
16  identified in Mutual of Omaha's interrogatory
17  responses related to its identified alleged trade
18  secrets, as I sort of call out here.
19      Q. Okay. Who provided you with that list?
20      A. I probably got that court document from
21  counsel for Mutual.

34 (Pages 130 - 133)

Page 134

1    Q.  Okay.  Are you -- did you have any
2    conversations with counsel about that list?
3       A.  I probably had a phone call with them
4    about it, sure.
5       Q.  What did counsel tell you about this
6    list?
7       A.  Specifically I don't know.  I mean, I'm
8    sure it was about the fact that that document
9    identified the trade secrets.
10      Q.  Okay.  In your own words, describe for
11   me what you did with this list.  I read your
12   report.  I have a general understanding.  But just
13   in your own words, I don't want to say dumb down,
14   but in laymen's terms can you describe for me what
15   you did with that list?
16      A.  Sure.  So the list identifies the Bates
17   numbers of the documents.  As I recall, it breaks
18   it down into different sort of categories of
19   documents, if you will.  I took that information,
20   along with an electronic copy of those documents
21   and an electronic copy of the metadata of those

Page 135

1    documents that I understand plaintiff produced to
2    defendants in this matter, and compiled that in
3    order to conduct the searches that are described
4    here.
5       Q.  Okay.  Are you here to opine on what
6    qualifies as a trade secret?
7       A.  No.
8       Q.  Do you have any opinion -- what is your
9    understanding of what a trade secret is?
10      A.  Generally I would say there is a legally
11   protected body of information that could be
12   designated as a trade secret because loss of it
13   could, you know, prove detrimental to the company
14   and provide a, you know, a competitive advantage to
15   somebody else.
16          And so, you know, a company or an
17   individual can identify whatever they want as a
18   trade secret.  Ultimately a court will have to
19   decide whether or not it is a trade secret.  And I
20   guess that would kind of sum of it.
21      Q.  Okay.  Great.  So you would agree with

Page 136

1    me then that a trade secret is open to
2    interpretation.
3       A.  Sure.
4          MS. KREITER:  Object to form.
5          THE WITNESS:  Sorry.
6       Q.  So your, just to focus on the scope of
7    your engagement, which I think we're on the same
8    page, but your engagement here is simply to
9    determine where those trade secrets that were
10   identified by plaintiff in response to defendant's
11   interrogatory requests were sent electronically.
12   Is that right?
13      A.  Yeah, where they exist, where they were
14   saved, yeah.
15      Q.  Okay.  Where they -- okay.  I think that
16   there might be a difference there.  So where they
17   exist, where they were saved, where they were sent,
18   is it all of the above?  Is it one of the above?
19   If there's something more specific, I'd ask for
20   you please describe that.
21      A.  No, I'd say all of the above.

Page 137

1       Q.  Okay.
2       A.  Where are they basically.
3       Q.  Is there a temporal limitation to the
4    scope of your engagement in terms of determining
5    where they were sent?
6       A.  Sure, in the sense that temporally it's
7    only going to be at the time or before when I did
8    the work to do that.
9       Q.  Okay.
10      A.  If something new happens today as we're
11   talking, you know, obviously, we wouldn't have any
12   knowledge of that.
13      Q.  Okay.  Sorry for interrupting you.  But
14   let me ask you another, another way.  Were you
15   simply asked in this case to determine where the
16   trade secrets were sent between point A and point B
17   or were you asked to determine where the trade
18   secrets ultimately wound up?
19          MS. KREITER:  Object to the form.
20      A.  I would say it was more B.
21      Q.  Okay.  Okay.  So you state in the next

35 (Pages 134 - 137)

1   sentence, and I think this is -- this might be what
2   we're going to -- what I was getting towards, so
3   you might be able to understand what I'm saying
4   easier but -- so you state the vast majority, which
5   in your mind is how many?
6       A.   Nearly all.
7       Q.   And how many trade secrets were at issue
8   in your report, in your analysis?
9       A.   186.
10      Q.   Okay.  So all 186 were sent?
11      A.   So maybe it might help if I explain --
12      Q.   Yeah, please.
13      A.   -- how we got here.
14      Q.   Okay.
15      A.   So the alleged trade secrets that were
16  identified by plaintiff included in metadata those
17  trade secrets, including the e-mails, the sender
18  recipients, the dates and times, all of that type
19  of information.  I looked into that information and
20  boiled it down to see okay, where, where did it go
21  from and to.  And the result of that is most of

1   that information, everything but three, it appears,
2   according to paragraph 14 --
3       Q.   Uh-huh.
4       A.   -- went to the accounts and individuals
5   identified in paragraph 13.
6       Q.   Okay.  Can I interrupt you there for one
7   second just to --
8       A.   Sure.
9       Q.   -- put a point on that?  So they were
10  sent to these e-mail accounts.  I understand that.
11  Where are they coming from?
12      A.   Mutual of Omaha.
13      Q.   Mutual of Omaha e-mail accounts.
14      A.   Correct.
15      Q.   Okay.  Go ahead.
16      A.   I think I'm done describing what I was
17  intending to at that point.
18      Q.   And so how then did Waterstone have
19  access to these e-mail accounts identified in
20  paragraph 13, a through i?
21      A.   I don't know that Waterstone has access

1   to the e-mail accounts of 13, a through i outside
2   of, you know, counsel interviewing and engaging in
3   whatever efforts they took with the individuals.
4   But my analysis here was based off of what Mutual
5   of Omaha provided in its production.
6       Q.   Okay.  So let me take a step back
7   actually.  I think I'm -- there's a little
8   confusion in the way the report is set up.  So the
9   first section of this report focuses on
10  Waterstone's computer systems and the investigation
11  that Mr. Howard did on the investi -- on
12  Waterstone's computer systems, correct?
13      A.   Yes.
14      Q.   And so for this part you don't need to
15  look at their compute -- or your testimony is that
16  you don't need to look at their computer systems to
17  determine where the trade secrets were sent.
18          MS. KREITER:  Object to the form.
19      A.   That's just not what I'm describing
20  here.  So what's being described here is, you know,
21  where did this stuff start from and where did it

1   go, right?  That's a known starting point because
2   the metadata has already been supplied by Mutual.
3       Q.   Okay.  So that's what I'm asking.  So
4   you, you don't need to look at Waterstone's IT
5   computer system to review the metadata that was
6   produced in this case, correct?
7           MS. KREITER:  Object to the form.
8       A.   Correct.
9       Q.   Okay.  And so do you have a list of who
10  at Mutual of Mortgage or, excuse me, who at Mutual
11  of Omaha Mortgage would have sent the vast majority
12  of the alleged trade secrets to these nine personal
13  or third-party accounts?
14      A.   I could develop said list.
15      Q.   But you weren't asked to do so.
16      A.   No.
17      Q.   Okay.  Okay.  So then in paragraph 14
18  you state only three alleged trade secrets e-mails
19  were sent to Waterstone.  And your engagement here,
20  as I understand it and as I think you stated a few
21  times, is to testify about e-mails that were sent

36 (Pages 138 - 141)

Page 142

1  containing trade secrets which we've identified to
2  Waterstone, correct?
3       MS. KREITER: Object to the form.
4       A. Correct.
5       Q. And so based off 14 or paragraph 14 and
6  my interpretation of paragraph 14, you can confirm
7  that e-mails were sent from Mutual of Omaha
8  Mortgage to Waterstone containing alleged trade
9  secrets, right?
10      A. Yes, and those are the ones that are
11 identified in the last sentence there.
12      Q. Okay. And are you here -- are you
13 able -- strike that.
14      Were you asked to determine what
15 Mr. Smalley or Mr. Owen did with those e-mails
16 after receiving them from Mutual of Omaha?
17      MS. KREITER: Object to the form.
18      A. Yes, that has since been done.
19      Q. Okay. And describe for me what was
20 done.
21      MS. KREITER: Object to the form.

Page 143

1       A. Basically a search for those same
2  materials against all of Waterstone's computer
3  systems, the e-mail system.
4       Q. Can you elaborate on that please?
5       A. Sure. So, you know, those particular
6  e-mails and the documents attached to them, using
7  that same sort of umbrella archival system search
8  capability, searched all of the e-mails of
9  Waterstone.
10      Q. What was that search?
11      MS. KREITER: Object to the form.
12      A. So that would be like -- I don't know
13 off the top of my head. Like take one of these
14 documents --
15      Q. Documents being one of the three alleged
16 trade secret e-mails that were sent to Waterstone?
17      A. Yep, yep.
18      Q. Okay.
19      A. Or anything attached to them and search
20 for them, you know, by name across or -- you know,
21 probably by name across the e-mail system.

Page 144

1       Q. Okay. So then describe for me what you
2  did with paragraph 14 that you mentioned you have
3  since conducted a search there.
4       MS. KREITER: Object to the form.
5       A. So paragraph 14 is really a result of
6  the analysis of the documents that had been
7  produced, right, that came from Mutual of Omaha to
8  Waterstone and just the identification of those.
9  The search that we were just discussing was
10 subsequent to that.
11      Q. Okay. And so describe for me that
12 subsequent search.
13      A. That's, that's what I did just describe.
14 So taking these materials identified in 14 and then
15 searching for them more broadly against all of
16 Waterstone's e-mails.
17      Q. Okay. And where -- so going back to my
18 question, my question was you confirmed for me that
19 three trade secret e-mails were sent to Waterstone,
20 specifically Mike Smalley and Dustin Owen. I asked
21 you if you were asked to conduct an additional

Page 145

1  search to determine what Mr. Smalley and Mr. Owen
2  did with those three alleged trade secret e-mails.
3       A. Yes.
4       Q. Okay. And what did you do?
5       A. I took those same items, the names of
6  them --
7       Q. Uh-huh.
8       A. -- and searched for them against
9  Waterstone's e-mail systems to see if they showed
10 up anywhere else.
11      Q. Okay. So if I'm Mike Smalley and I
12 receive an e-mail containing the alleged trade, the
13 alleged trade secret --
14      A. Yep.
15      Q. -- and I change the subject line and I
16 change the body of the e-mail and I forward it
17 to -- and I change, let's just say I change the
18 file name as well and I forward it to you, would
19 your search have caught that?
20      A. If you changed all of those components,
21 no.

37 (Pages 142 - 145)

Page 146

1    Q.  Okay.  So you don't know sitting here
2  exactly what Mr. Smalley or Mr. Owen did with those
3  e-mails that they received.
4         MS. KREITER:  Object to the form.
5    A.  No, I don't know all of -- you know, I
6  did not investigate every possibility of what they
7  could have done.
8    Q.  Okay.  Did you conduct any search to
9  determine whether Mr. Smalley or Mr. Owen opened
10  those documents?
11    A.  No.
12    Q.  Did you conduct any -- do you have any
13  opinion as to whether Mr. Smalley or Mr. Owen used
14  those e-mails in any capacity?
15    A.  No.
16    Q.  And to your knowledge, were those
17  e-mails containing the trade secrets ever
18  quarantined by Mutual?
19    A.  My knowledge, I don't know.
20    Q.  Were those e-mails ever archived by
21  Mutual, or excuse me, by Waterstone?

Page 147

1    A.  Again, don't know.
2    Q.  And so what exactly is your opinion
3  related to the trade secrets e-mails that were sent
4  to Waterstone?
5         MS. KREITER:  Object to the form.
6    A.  I mean, I don't know that I have an
7  opinion articulated at this point.  I mean, right
8  now I would say it's limited to the fact that yes,
9  some of the documents that were identified as
10  alleged trade secrets went from Mutual of Omaha
11  into Waterstone at the two individuals' accounts.
12    Q.  Okay.  So, but you testified earlier
13  that you're not a lawyer and so you don't have any
14  opinion on whether sending one trade secret e-mail
15  that was, in fact, used by Waterstone would impose
16  liability on Waterstone, correct?
17    A.  I have no idea.
18    Q.  Okay.  And going back to what I asked
19  you in paragraph 14 related to your subsequent
20  search related to the e-mails that were located in
21  Mike Smalley and Dustin Owen's e-mail accounts, you

Page 148

1  don't describe that subsequent search here, right?
2    A.  Correct.
3    Q.  Okay.  Why not?
4    A.  It wasn't complete at the time.
5    Q.  Okay.  Paragraph 15, I am just going to
6  ask you to put in your own terms what is going on
7  with paragraph 15 related to the MD5 hash values
8  and the file names because that's beyond my pay
9  grade.  So in your own words what exactly was your
10  analysis here?
11         MS. KREITER:  Object to the form.
12    A.  Sure.  So in effect I used, you know,
13  common data elements, if you will, about the
14  alleged trade secret documents that had been
15  identified, that being their names and then their
16  MD5 hash values, which an MD5 hash value is
17  basically a digital fingerprint of a document.
18         So if you get a hash match, so to speak,
19  between two different documents, you can have a
20  high degree of confidence knowing that they are, in
21  fact, the same exact thing.  So a hash is used for

Page 149

1  duplicating data and all sorts of things.  But in
2  sort of this world, it's a good mechanism to try to
3  find specific documents.  Right?
4         So I took those elements of all of the
5  identified trade secrets, the names and the hash
6  values and then used that to search all of the,
7  quote unquote, quarantined data, so all of that
8  stuff that Mr. Howard had taken out of the
9  individuals' OneDrive accounts and put into his
10  secured OneDrive account, to see of that data is
11  any of it the alleged trade secrets.  And the
12  result of that is what I've described here, you
13  know, moving in from paragraph 15 into 16.  And I
14  don't remember if there's a 17.
15    Q.  Okay.  So I'm happy you brought up the
16  quarantined data that was identified by Mr. Howard
17  because I was going to ask about that.  So the
18  second line you say I searched the quarantined data
19  for any matches.
20         Earlier in your report, quarantined data
21  in paragraph 7, and I can scroll up if that's

38 (Pages 146 - 149)

1    easier, quarantined data is defined -- I'm sorry.

2    You defined quarantined data as the data that was

3    quarantined from five new hires' OneDrive accounts,

4    correct?

5        A.  Correct.

6        Q.  Okay.  So you essentially only searched

7    the data related to these five new hires' OneDrive

8    accounts to determine whether trade secrets were

9    contained within those accounts.

10       A.  Yes.

11       Q.  Okay.  Are you aware that approximately

12   60 employees left Mutual of Omaha and joined

13   Waterstone?

14       MS. KREITER:  Object to the form.

15       A.  I wasn't aware of the exact number, but

16   I knew it was, you know, a few dozen folks.

17       Q.  Okay.  So is it your testimony that you

18   did not search the remaining employees' data that

19   had not been quarantined for the alleged trade

20   secrets being sent and received?

21       MS. KREITER:  Object to the form.

1        A.  Yes, that would be correct.

2        Q.  Okay.  Okay.  Going back to your --

3    let's just focus on your opinions at this point.

4    So opinion 1, you opine that only a small number of

5    documents that contain the trade secrets were ever

6    put on Waterstone's OneDrive.

7            So aside from basic mathematics, what

8    authority do you rely on that assists you in

9    reaching that conclusion?

10       MS. KREITER:  Object to the form.

11       A.  I'm not sure I really follow your

12   question, if you wouldn't mind stating it again.

13       Q.  Okay.  Let me, let me back up.  So this

14   section is described as Summary of Opinions.

15   Unless I'm mistaken, I don't see what exactly your

16   opinion is, and I don't see it contained within

17   your report.  So help me by just stating what your

18   opinion or opinions are in this case.

19       MS. KREITER:  Object to the form.

20   Separate than what he's stated here, Courtney?

21       MS. WALTER:  Maria.  You can answer,

1    Mr. Creasy.

2        A.  Right.  I would say sitting here today,

3    my opinions are what I have laid out here in 3.a.

4    through d. as it relates to the documents at issue

5    and Waterstone's efforts.

6        Q.  Okay.  So again, going back to my

7    question, aside from basic mathematics and counting

8    the documents that were put on Waterstone's

9    OneDrive --

10       A.  Uh-huh.

11       Q.  -- what legal authority do you rely on

12   to come to the conclusion in subsection 3.a.?  Or

13   excuse me, not legal authority.  What authority do

14   you rely on?

15       A.  Okay.  I don't know that there's any

16   authority.  It is just --

17       Q.  It's just a fact, right?

18       A.  Sort of a fact.  It's, you know,

19   basically the analysis of what was done.

20       Q.  Okay.  So any nonforensic expert would

21   be able to make that observation, correct?

1        A.  I don't know about that but maybe.

2        Q.  Okay.  Did you ever search the personal

3    e-mail inboxes for any of Mutual's former employees

4    who joined Waterstone?

5        A.  No.

6        Q.  Did you ever conduct an analysis into

7    whether a former employee of Mutual accessed their

8    personal inbox while at Waterstone such that the

9    information would have never transferred to

10   Waterstone's OneDrive?

11       A.  I did not investigate whether any of the

12   employees accessed their personal accounts period.

13       Q.  Is that possible?

14       A.  I don't know.  It could be blocked.  It

15   might be possible.  I don't know.

16       Q.  Okay.  You -- I mean, I'm going to call

17   it an opinion because that seems to be what is

18   conveyed to me, but section C.3.b., Waterstone

19   quarantined potential Mutual of Omaha files

20   immediately upon learning such information may have

21   been present within its computer systems even

Page 154

1  before a cease-and-desist letter was received.
2       You would agree with me that the
3  quarantining that you're referring to for purposes
4  of this opinion refers to five e-mail inboxes,
5  correct?
6       A. Five OneDrive accounts, but yes.
7       Q. Okay. Fair enough. And your summary of
8  opinion in subsection b. relates to what you
9  learned from Mr. Howard, correct?
10      A. Yes, primarily Mr. Howard and, you know,
11 the documents that we discussed.
12      Q. And what authority do you rely upon that
13 assists you in reaching that conclusion?
14      MS. KREITER: Object to the form.
15      A. I don't know that there's an authority
16 on that. It's just sort of a fact as I know it
17 that occurred.
18      Q. Okay. Fair enough. And you, again,
19 just to be clear, you don't know the applicable
20 time period for when the quarantine was first
21 implemented, correct?

Page 155

1       A. I mean, it was first started, you know,
2  April 28th, I believe, is when that first started.
3  When it ended I don't know.
4       Q. Okay. And then opinion 3, you state
5  that Waterstone undertook additional efforts with
6  respect to Mutual's alleged trade secrets,
7  including having the former Mutual employees delete
8  any Mutual documents in their personal possession.
9       Can you please point to me where in your
10 report you state or describe that the former
11 employees deleted any of the documents in their
12 personal possession?
13      A. So it's sort of a sum of, I believe,
14 paragraph 10 and then the certification that they
15 supplied in which counsel for Mutual interviewed
16 them and, you know, assisted in that process.
17      Q. Okay. But we -- you testified earlier
18 that you did not interview any -- you yourself have
19 not spoken to any of the former employees, right?
20      A. Correct, I did not speak to them.
21      Q. And so you do not have your own personal

Page 156

1  knowledge about whether these Mutual employees
2  deleted any of the Mutual documents in their
3  possession.
4       A. Correct. I did not shoulder search
5  somebody as they, you know, deleted documents from
6  their OneDrive.
7       Q. And so it is, it is possible that
8  Waterstone -- that these former Mutual employees
9  still have personal -- still have Mutual documents
10 in their possession, correct?
11      A. Is it possible? Sure.
12      Q. And what authority do you rely upon to
13 reach the conclusion in that paragraph?
14      MS. KREITER: Object to the form.
15      A. Again, I'm not sure I continue to follow
16 what you mean by authority, but it's just my -- the
17 information available to me based on conversations
18 that I had with counsel, Waterstone's IT Security
19 Manager and the documents that we've been talking
20 about is the, quote unquote, authority.
21      Q. Okay. So it's a fact as you stated

Page 157

1  earlier, right?
2       MS. KREITER: Object to the form.
3       Q. It's conveyed to you as a fact, let me
4  put it that way, because you didn't any
5  independent investigation into it.
6       MS. KREITER: Object to the form.
7       A. Again, I'm not sure of the specific way
8  you're describing it in our language, but it's what
9  information I know of and my opinion of the sum of
10 all that information.
11      Q. Okay. And then you state that the
12 efforts to protect against possession or use of
13 Mutual's alleged trade secrets were reasonable in
14 light of the facts known.
15      How did you reach that conclusion?
16      A. Again, it's sort of the sum result
17 analysis of all of the stuff that we've been
18 talking about and my experience in seeing these
19 sort of cases.
20      Q. Okay. So earlier you testified or I
21 informed you that there is potentially 60 employees

40 (Pages 154 - 157)

1  who left Mutual of Omaha and joined Waterstone, and
2  you testified, and we've discussed, that
3  Mr. Howard's quarantined data related to five of
4  those individuals and your analysis for whether
5  trade secrets were sent to Waterstone only focused
6  on those five e-mail accounts and not the remaining
7  55.
8          So how then do you reach the conclusion
9  that Waterstone's efforts to protect against any of
10  Mutual's alleged trade secrets are reasonable in
11  light of the fact known when you haven't
12  investigated 55 e-mail accounts?
13         MS. KREITER:  Object to the form, also
14  misstates the testimony.
15         A.  So to sort of, I guess, unpack or rewind
16  that a little bit, the starting point of this,
17  right, again, is that initial triggering event,
18  Mr. Howard's investigation, finding documents,
19  looking at, if it's 60 people, then I'll take your
20  word for it that it's 60 people, accounts,
21  identifying anything that appeared to be, quote

1  unquote, Mutual of Omaha documents, quarantining
2  that.
3          The result of that is five of those 60
4  people had such material.  And then additional
5  searches have since been conducted to help try to
6  find whether or not any of the materials, like the
7  examples identified, I think, in paragraph 14, you
8  know, went anywhere else, so to speak.
9          But 3.d. here is about, you know, what
10  did Waterstone do when this issue arose, meaning
11  when Mr. Howard, you know, realized that there may
12  have been Water -- I apologize, Mutual of Omaha
13  data in Waterstone's system and then the cease-and-
14  desist letters came in, what did they do about it,
15  was it reasonable based on what they knew at the
16  time, which was April of 2022.
17         And my opinion on that is it was
18  reasonable.  They took efforts to try to get their
19  arms around things that may have been Mutual of
20  Omaha's information and, to the extent that they
21  could, take it out of possession of those involved

1  individuals, so that, you know, action was being
2  taken.
3          Compared to many cases that I see, that
4  was some good effort, some good work by the folks
5  at Waterstone compared to the baseline of what I
6  see in these cases.
7          Q.  Okay.  So I'm aware, I see a lot of
8  cases, I can say whether or not something is
9  reasonable based on what I've seen.  But you, sir,
10  are an expert witness and are seeking to be
11  qualified as such.  So what then informs your
12  conclusion as to the reasonableness of the facts
13  presented in this case outside of comparing this to
14  other cases that you've been involved with?
15         A.  I mean, that is it.  So, again, I've
16  seen what companies do and don't do when things
17  like this arise, and taking action before you're
18  even notified by the potential plaintiff is, you
19  know, I'm being a little silly here, but one in a
20  million.  Like that just doesn't happen.
21         Q.  But it happens because of dumb luck,

1  right?
2          MS. KREITER:  Object to the form.
3          A.  Again, you know, did the malware alert,
4  you know, set Mr. Howard off on his work?  Yes.
5          Q.  Okay.
6          A.  Could he have stopped right there and
7  done nothing else?  Yes.  And based on my
8  experience, that is usually what happens.
9          Q.  Okay.  So in your report you state that
10  you reserve the right to amend before trial, right
11  to amend your report before trial.  Are you aware
12  of any facts as you sit here today that would
13  require you to amend your report?
14         A.  As I sit here right now, no.
15         MS. WALTER:  Okay.  I have nothing
16  further.
17         MS. KREITER:  Okay.  I guess I'd like to
18  just take a short break, Courtney, and look at some
19  of my notes.
20         MS. WALTER:  Okay.
21         THE VIDEOGRAPHER:  Okay.  The time is

41 (Pages 158 - 161)

Page 162

1    12:12 p.m. Eastern.  We are now off the record.
2         (Recess.)
3         THE VIDEOGRAPHER:  The time is 12:17
4    p.m. Eastern.  We are now back on the record.
5    Counsel, you may proceed.
6         EXAMINATION BY MS. KREITER:
7    Q.  Mr. Creasy, I just want to be really
8    clear because I think there was some confusion in
9    the discussion with Ms. Walter about the scope of
10   your efforts, the five recruits that ultimately had
11   data on the OneDrive, the e-mail searching efforts.
12   I don't want there to be any ambiguity as to the
13   scope of what you did.
14        With respect to the quarantined data,
15   you quarantined data -- did the quarantined data,
16   as you understood it, as to five Mutual employees
17   that came over to Waterstone, do you understand
18   whether Mr. Howard looked at OneDrive data for more
19   than five employees?
20   A.  Yes.  Again, my, my understanding is
21   that he looked at all of the folks that came over

Page 163

1    from Mutual to Waterstone.  So if it was 60 folks
2    or so, as Ms. Walter identified, then the result of
3    that was that five of them had data that was
4    quarantined.
5    Q.  Got it.  And then with respect to the
6    trade secrets that were identified by Mutual, did
7    you look for all of the trade secrets, as Mutual
8    alleges them, in both the OneDrive and Waterstone
9    e-mail systems?
10   A.  So, again, it's the 186 alleged trade
11   secrets that were identified were searched for
12   using the criteria that I mentioned there against
13   all of the e-mail of Waterstone.  I'm not 100
14   percent sure that search would have touched all of
15   the OneDrives.
16   Q.  Okay.  But as to the e-mail searching,
17   your efforts were not limited to the five employees
18   or the recruits of any particular branch.  It was
19   all of Waterstone, correct?
20   A.  Correct.
21   Q.  And the scope of the search ran was all

Page 164

1    of the 186 trade secrets identified by Mutual,
2    correct?
3    A.  Correct.
4         MS. KREITER:  Okay.  I don't have
5    anything further.
6         MS. WALTER:  Thank you, Mr. Creasy.
7         THE VIDEOGRAPHER:  If there are no more
8    questions, this will conclude today's testimony as
9    given by Mr. Brett Creasy.  The time is 12:19 p.m.
10   Eastern.  We're now going off the record.  The
11   total number of media units today used was two, and
12   they will be retained by Veritext Legal Solutions.
13   Thank you all very much for your time today.  We're
14   off the record.
15        MS. KREITER:  Thank you.
16        MS. WALTER:  Thank you.
17        THE WITNESS:  Thanks, everyone.
18        THE VIDEOGRAPHER:  Before you go, before
19   you go, anyone here ordering copies of the
20   transcript and/or video today?
21        MS. WALTER:  We'd like a copy of the

Page 165

1    transcript please.
2         MS. KREITER:  I don't need the video
3    right now, maybe in the future, but I would like a
4    condensed PDF of the transcript with the exhibits
5    attached.
6         (Examination concluded -- 12:19 p.m.)
7         --------------------
8
9
10
11
12
13
14
15
16
17
18
19
20
21

42 (Pages 162 - 165)

Page 166

CERTIFICATE OF DEPONENT

1
2
3    I hereby certify that I have read and
4  examined the foregoing transcript, and the same is
5  a true and accurate record of the testimony given
6  by me.
7    Any additions or corrections that I feel
8  are necessary, I will attach on a separate sheet of
9  paper to the original transcript.
10
11
12
13
14
15    _____
16    BRETT CREASY
17
18
19
20
21

Page 168

1  Maria Kreiter, Esq.
2  mkreiter@gklaw.com
3            August 9, 2023
4  RE:   Mutual Of Omaha Mortgage, Inc. v. Waterstone Mortgage
5  7/26/2023, Brett Creasey (#6017013)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-midatlantic@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22    Yours,
23    Veritext Legal Solutions
24
25

Page 167

1  STATE OF MARYLAND SS:
2    I, ILANA E. JOHNSTON, a Notary Public of
3  the State of Maryland, do hereby certify that the
4  within named, personally appeared before me at the
5  time and place herein set out, and after having
6  been duly sworn by me, was interrogated by counsel.
7    I further certify that the examination
8  was recorded stenographically by me and this
9  transcript is a true record of the proceedings.
10    I further certify that the stipulations
11  contained herein were entered into by counsel in my
12  presence.
13    I further certify that I am not of
14  counsel to any of the parties nor an employee of
15  counsel nor related to any of the parties nor in
16  any way interested in the outcome of this action.
17    As witness my hand and notarial seal
18  this 9th day of August, 2023.
19  My commission expires    Ilana Johnston
20  December 16, 2024    Notary Public
21

Page 169

1  Mutual Of Omaha Mortgage, Inc. v. Waterstone Mortgage Corporation
2  Brett Creasey (#6017013)
3     E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____  _____
24  Brett Creasey          Date
25

43 (Pages 166 - 169)

Page 170

1  Mutual Of Omaha Mortgage, Inc. v. Waterstone Mortgage Corporation

2  Brett Creasey (#6017013)

3      ACKNOWLEDGEMENT OF DEPONENT

4    I, Brett Creasey, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  Brett Creasey          Date

13  *If notary is required

14      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15      _____ DAY OF _____, 20___.

16

17

18      _____

19      NOTARY PUBLIC

20

21

22

23

24

25

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.