# **<u>EXHIBIT K</u>**

Page 1

1               UNITED STATES DISTRICT COURT

2                MIDDLE DISTRICT OF FLORIDA

3                      TAMPA DIVISION

4    _____

5    MUTUAL OF OMAHA MORTGAGE, INC.,

6            Plaintiff,

7        v.                        Civil Action No.

8    WATERSTONE MORTGAGE CORPORATION,   22-CV-01660

9            Defendant.

10   _____

11              VIDEOTAPED DEPOSITION OF

12                  CHRISTOPHER WOLF

13   DATE:          Tuesday, July 25, 2023

14   TIME:          9:03 a.m.

15   LOCATION:    Remote Proceeding

16                Ormond Beach, FL

17   REPORTED BY:  Timothy Guevara, Notary Public

18   JOB NO.:       6016993

19

20

21

22

Page 2

```
1        A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.:
3     ARI KAREN, ESQUIRE (by videoconference)
4     Mitchell Sandler LLC
5     1120 20th Street N.W., Suite 725
6     Washington, DC 20036
7     cmccall@mitchellsandler.com
8     202-886-5292
9
10  ON BEHALF OF DEFENDANT WATERSTONE MORTGAGE
11  CORPORATION:
12    MARIA KREITER, ESQUIRE (by videoconference)
13    Godfrey & Kahn, S.C.
14    833 E Michigan Street, Suite 1800
15    Milwaukee, WI 53202
16    mkreiter@gklaw.com
17    414-287-9466
18
19
20
21
22
```

Page 3

```
1        A P P E A R A N C E S (Cont'd)
2   ALSO PRESENT:
3     Jennifer Erickson, Assistant to Plaintiff Counsel
4     (by videoconference)
5     Laurel Thomsen, Esquire, Mutual of Omaha In-House
6     Counsel (by videoconference)
7     Ryan Heathcock, Videographer (by videoconference)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 4

```
1            I N D E X
2   EXAMINATION:                    PAGE
3     By Mr. Karen              9
4
5          E X H I B I T S
6   NO.      DESCRIPTION              PAGE
7   Exhibit 2    Email From Michael Irish, 4/8/2022  70
8   Exhibit 3    Email From Chris Wolf, 4/8/2022   68
9   Exhibit 4    Email To Nathan Dahlin, 6/14/2022 147
10  Exhibit 5    Email From Maria De Sevilla,
11      4/8/2022              81
12  Exhibit 9    Email To Cody Lamb, 6/9/2022    141
13  Exhibit 12   Email To Michael Smalley,
14      4/20/2022             143
15  Exhibit 13   Compilation Of Emails Regarding
16      Loans                100
17  Exhibit 14   Email To Dwayne Hutto, 4/19/2022  150
18  Exhibit 16   Email To Ben Davis, 4/8/2022    180
19  Exhibit 18   Email To Kyrstin Friebis,
20      4/21/2022             169
21  Exhibit 19   Email To Elizabeth Spragg,
22      4/11-4/12/12/2022          43
```

Page 5

```
1          E X H I B I T S (Cont'd)
2   Exhibit 20   Email To Elizabeth Spragg,
3      4/14/2022             58
4   Exhibit 21   Email To Ben Davis, 4/7/2022    96
5   Exhibit 22   Email To Dustin Owen, 11/3/2021   23
6   Exhibit 24   Email From Amy Stierwalt,
7      4/18/2022             178
8   Exhibit 26   Email From Dustin Owen, 3/5/2022  171
9   Exhibit 28   Email To Kyrstin Friebis,
10      4/25/2022             162
11  Exhibit 29   Email To Ellie Briones, 4/21/2022 165
12  Exhibit 30   Subpoena To Produce Documents    186
13  Exhibit 31   Mutual of Omaha Protective
14      Agreement             90
15
16      D O C U M E N T S   R E Q U E S T E D
17  NO.      DESCRIPTION              PAGE
18  1        Invoices For Virtual Assistant   161
19
20
21
22
```

2 (Pages 2 - 5)

Page 6

1           P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Good morning.  We
3  are going on the record at 9:03 a.m., Eastern.  And
4  today's date is July the 25th, 2023.  Please note that
5  this deposition is being conducted virtually.  The
6  quality of the recording depends on the quality of the
7  camera and internet connection of the participants.
8  What is seen from the witness and heard on the screen
9  is what will be recorded.  Audio and video recording
10 will continue to take place unless all parties agree
11 to go off the record.
12           And so now, this begins media unit
13 number 1 in the video recorded deposition of
14 Mr. Christopher Wolf, taken by counsel for the
15 plaintiff in the matter of Mutual of Omaha Mortgage,
16 Incorporated vs. Waterstone Mortgage Corporation.
17 This case has been filed in the United States District
18 Court, Middle District of Florida, Tampa Division.
19 The case number is 22-CV-01660.
20           My name is Ryan Heathcock, representing
21 Veritext Legal Solutions, and I am the videographer.
22 Our court reporter today is Mr. Timothy Guevara, also

Page 7

1  representing Veritext Legal Solutions.  I am not
2  related to any party in this action, nor am I
3  financially interested in the outcome.  If there are
4  any objections to proceeding, please state them at the
5  time of your appearance.  Counsel and all present,
6  including us remotely, would you now please state your
7  appearances and affiliations for the record beginning
8  with the noticing attorney.
9           MR. KAREN:  Ari Karen, from Mitchell
10 Sandler, on behalf of the plaintiff, Mutual Mortgage
11 of Omaha.  Or Mutual of Omaha Mortgage, sorry.
12           MS. KREITER:  Is there someone else
13 from your firm, Ari?
14           MR. KAREN:  Yes.  Jennifer Erickson, my
15 assistant, will be on as well.
16           MS. ERICKSON:  Jennifer Erickson,
17 assistant to Ari Karen.  I'll be sharing the exhibits.
18           MS. KREITER:  And then Maria Kreiter,
19 Godfrey & Kahn, on behalf of Waterstone.
20           MR. WOLF:  Christopher Wolf, Waterstone
21 Mortgage.
22           THE VIDEOGRAPHER:  At this time, will

Page 8

1  the court reporter please swear in the witness?
2           THE REPORTER:  Good morning.  My name
3  is Timothy Guevara; I am a notary authorized to take
4  acknowledgments and administer oaths.  Parties agree
5  that I will swear in the witness remotely outside of
6  his presence.
7           Additionally, absent an objection on
8  the record before the witness is sworn, all parties
9  and the witness understand and agree that any
10 certified transcript produced from the recording
11 virtually of this proceeding:
12           - is intended for all uses permitted
13                under applicable procedural and
14                evidentiary rules and laws in the
15                same manner as a deposition recorded
16                by stenographic means; and
17           - shall constitute written stipulation
18                of such.
19           Hearing no objection throughout this
20 introduction, I will now swear in the witness.
21           Mr. Wolf, will you please raise your
22 right hand?

Page 9

1  WHEREUPON,
2           CHRISTOPHER WOLF,
3  called as a witness and having been first duly sworn
4  to tell the truth, the whole truth, and nothing but
5  the truth, was examined and testified as follows:
6           THE REPORTER:  All right.  Thank you.
7  We can begin.
8           EXAMINATION
9  BY MR. KAREN:
10    Q  Good morning, Mr. Wolf.  How are you?
11    A  Good, thank you.
12    Q  So have you ever taken a deposition before?
13    A  I have not.
14    Q  Okay.  Have you ever been a witness in a
15 case, in some kind of court proceeding before?
16    A  I have not.
17    Q  Okay.  Let me explain to you kind of how
18 this works.  I'm going to ask you questions today, and
19 then you're going to answer them.  Now, when you
20 answer them, if you answer them, I'm going to assume
21 you're giving me a truthful and a full and an accurate
22 response; is that a fair assumption?

3 (Pages 6 - 9)

Page 10

1    A   Yes.
2    Q   Okay.  And when I ask you questions, you
3  know, what happens when we talk to each other in the
4  normal world, a lot of times when one person knows
5  what the other person's going to say, you kind of
6  nicely interrupt them or cut them off and finish the
7  thought so they don't have to go through the trouble
8  of finishing the question; you know what I mean?
9    A   Mm-hmm.  Yeah.
10    Q   Okay.  So it's important we don't do that
11  here.  Even when you know what I'm going to say,
12  please let me finish the question.  And I'll try to do
13  the same with the answer.  The reason it's really
14  important is because when two people are speaking, the
15  court reporter has to take everything down, obviously
16  doesn't have four hands and can't do that; right?  So
17  when we speak over each other, it creates a big
18  problem.  So it's super important, even when you know
19  what I'm going to say, let me finish my question and
20  then you can answer it; all right?
21    A   Okay.
22    Q   The other thing is if you can, avoid doing

Page 11

1  "mm-hmm" "uh-huh" shaking your head or nodding your
2  head.  Again, court reporter's got to take that down,
3  so we need a yes or no on an answer, not a "uh-huh,
4  uh-huh. right, because it's too hard to hear; is that
5  okay?
6    A   Okay.
7    Q   All right.  And if you have a question, if
8  you want to take a break, that's fine.  You just can't
9  do it while the question's pending; you've got to
10  answer my question and then you can take a break.  And
11  if there's something you don't understand about my
12  question, please feel free to ask me to clarify; okay?
13    A   Okay.
14    Q   All right.  So tell me first about, you
15  know, before you worked for Mutual of Omaha Mortgage,
16  which I'm just going to call it Mutual today; if
17  that's okay?
18    A   Yes.
19    Q   So when I say Mutual, you know what I'm
20  talking about?
21    A   Yes.
22    Q   All right.  So before you worked for Mutual,

Page 12

1  where did you work?
2    A   Let's see, before Mutual, trying to
3  remember.  I worked in the insurance business for a
4  little bit.  Yeah, I was an independent insurance
5  broker.
6    Q   Is that how you met Mr. Hutto?
7    A   I met him previously to that.  We were
8  working in the mortgage business several years before
9  that.
10    Q   Okay.  Where was that?
11    A   We started Ameriquest in 2003.
12    Q   Okay.  And then when he went into insurance,
13  you followed him?
14    A   No, we went separate ways.  Different
15  insurance companies.
16    Q   Okay.  Was it a coincidence that you both
17  went into insurance?
18    A   Yes.
19    Q   Okay.  Did you remain in touch during those
20  years, where you both in insurance?
21    A   We did.
22    Q   Okay.  Do you consider yourself a friend of

Page 13

1  Mr. Hutto?
2    A   I do.
3    Q   Okay.  And what made you go back into the
4  mortgage business?
5    A   Dwayne had called me and asked me to come
6  help him run a mortgage branch, and I decided it was
7  time to get back into the mortgage business.  So I
8  liked the idea, so I agreed.
9    Q   Okay.  And where was that?  What company?
10    A   That was with American Bankshares, I believe
11  was the company name at the time.
12    Q   Okay.  And how long did you work there with
13  Mr. Hutto?
14    A   I don't recall the timeline of that.
15    Q   Okay.  At some point, did you leave American
16  Bankshares?
17    A   We transitioned over to BBMC Mortgage.
18    Q   Did BBMC acquire American Bankshares?
19    A   No.
20    Q   When you say you transitioned, could you
21  explain what you mean by that?
22    A   We had an opportunity to go to a different

4 (Pages 10 - 13)

Page 14

1  bank, so that's what we did.
2      Q.  Okay.  When you say "we" who are you
3  referring to?
4      A.  Dwayne and I.
5      Q.  Okay.  Did anybody else accompany you when
6  you went over to BBMC?
7      A.  At the time it was just us.
8      Q.  And when you say "us" you're referring to
9  you and Mr. Hutto?
10     A.  Right.  We didn't have any employees at the
11 time.
12     Q.  Okay.  And so then you worked for BBMC, and
13 at some point BBMC sold its mortgage division; is that
14 correct?
15     A.  Yes.  They were acquired by Mutual of Omaha.
16     Q.  Okay.  And that's how you became a Mutual
17 employee?
18     A.  Correct.
19     Q.  Okay.  And when did you -- and I'm referring
20 to you and Mr. Hutto -- begin hiring employees at your
21 branch?
22     A.  I don't remember the timeline of when we

Page 15

1  started hiring people.
2      Q.  Okay.  But it was sometime while you were at
3  BBMC and/or Mutual?
4      A.  Yes.
5      Q.  Okay.  And so you built the branch during
6  that period of time?
7      A.  We did.
8      Q.  Okay.  And how many employees approximately
9  were at -- what was the name of your branch, instead
10 of me referring to as "the branch"?  Where were you
11 guys located?
12     A.  We were in -- we started in Daytona Beach,
13 and then we moved to this office in Ormond.
14     Q.  Ormond?  Okay.  And I think it was referred
15 at Mutual as the Daytona branch; is that correct?
16 Even though it was located in Ormond?
17     A.  Correct, yeah.  It was just easier for
18 everyone to call it Daytona or Daytona Beach.
19     Q.  Okay.  Is it okay if I call it Daytona, too,
20 during today's deposition?
21     A.  Yeah, that's fine.
22     Q.  Okay.  So how many employees did you have at

Page 16

1  Daytona at the time that everybody left to go to
2  Waterstone?  Approximately?
3      A.  I'm not sure the exact number.  12, maybe.
4      Q.  Okay.  Somewhere between 10 and 20?
5      A.  Yeah.
6      Q.  Okay.  Now, when did you first hear about
7  the opportunity at Waterstone?
8      A.  I don't remember the timeline of when we
9  were starting to switch things around.
10     Q.  Can you give me an approximation?  Would it
11 have been fall of 2021, spring of -- well, you left
12 spring of 2022; right?
13     A.  Correct.
14     Q.  It was April 26th, I think was the day; is
15 that right?
16     A.  I don't remember the exact date.
17     Q.  Sounds about right?
18     A.  Sounds about right.
19     Q.  Okay.  How long were you talking to
20 Waterstone for?  Would it have been four years, three
21 years?  Can you give me an approximation of that?
22 Mr. Wolf, you froze.

Page 17

1          MR. KAREN:  Can anybody hear me?
2  Maria, can you hear me?
3          MS. KREITER:  I hear you, Ari.  Chris,
4  I think you froze for a minute.
5          THE WITNESS:  Okay.  Am I back?
6          MS. KREITER:  Ari, do you want to maybe
7  just ask the question again?  I don't know if he heard
8  it.
9          MR. KAREN:  Yes.
10 BY MR. KAREN:
11     Q.  The last question I'd asked you was, how
12 many years had you been talking to Waterstone before
13 you guys left?  Was it three years, four years, one
14 year?  Can you approximate that for me?
15         MR. KAREN:  He's frozen again.
16         THE VIDEOGRAPHER:  Would you like for
17 me to go off the record -- would you like for us to go
18 off the record meanwhile we fix tech issues?
19         MR. KAREN:  Yes, I guess.  This isn't
20 working, obviously.
21         THE VIDEOGRAPHER:  Okay.  The time is
22 -- the time is 9:14 a.m.  We are going off the record.

5 (Pages 14 - 17)

Page 18

1    (Off the record.)
2    THE VIDEOGRAPHER:  The time is 9:14
3    a.m., Eastern.  We are now back on the record.
4    Counsel, you may proceed.
5    BY MR. KAREN:
6    Q    Thank you.  Mr. Wolf, how long were you
7    talking to Waterstone before you guys made the switch?
8    A    I don't recall an actual timeline.  I'm not
9    sure.  I know we'd been unhappy for some time, but I
10   don't have an exact date or anything.
11   Q    Okay.  Would it have been eight years?
12   A    No, less.
13   Q    Would it have been five years or less?
14   A    Probably less.
15   Q    Would it have been three years or less?
16   A    I'm not sure.
17   Q    So it was somewhere around three years you
18   were talking to Waterstone?  That's your best
19   recollection sitting here today?
20   A    Maybe less, yeah.  I can't pin down an
21   actual timeline.
22   Q    Okay.  Well, I'm just trying to get an idea.

Page 19

1    Would it have been less than two years?
2    A    I don't know.
3    Q    Does two years sound about right?
4    A    I'm not sure.
5    Q    Sir, do you have a problem with your memory?
6    A    No.
7    Q    Okay.  So you're going to tell me that
8    testifying under oath, subject to penalty of perjury,
9    that you can't recall whether it was less or more than
10   two years that you were talking to Waterstone Mortgage
11   about making a switch to the company?
12   A    Yeah.  I can't recall the exact times.
13   Q    I'm not asking for the exact times.  I'm not
14   asking for exact date.  What I'm asking you for, was
15   it more or less than two years that you were talking
16   to Waterstone, thinking about a switch?
17   A    Yeah, I'm sorry.  I don't remember.
18   Q    You don't remember that?
19   A    No.
20   Q    Okay.  Well, did Mr. Hutto first introduce
21   you to the idea of going to Waterstone?
22   A    I don't remember if it was just him.  I know

Page 20

1    we'd been talking to them.  I'm not -- I don't
2    remember who exactly made contact with them.  I think
3    he was the first one to start talking to them and --
4    and brought me into the discussions.
5    Q    So Mr. Hutto brought you into the
6    discussions?
7    A    Mm-hmm.
8    Q    Okay.  And why did he do that, if you know?
9    A    Because we're business partners.  We'd both
10   been kind of contemplating leaving and, you know,
11   we're kind of a team, so it's decisions we kind of
12   make together.
13   Q    Okay.  So when he spoke to you about the
14   possibility of Waterstone, had he already talked to
15   Waterstone?
16   A    He said let's go -- I believe he said let's
17   go meet with them and see.  He hadn't made a decision;
18   he was just kind of putting feelers out, and I was
19   doing the same.
20   Q    Okay.  So he indicated to you, let's go meet
21   with them, which suggests he had already had a
22   conversation with them; is that fair to say?

Page 21

1    MS. KREITER:  Object to the form.
2    THE WITNESS:  He -- he didn't --
3    BY MR. KAREN:
4    Q    You can answer.  Mr. Wolf, you can answer
5    your question.
6    A    Yeah -- yeah, I'm not sure if he'd had
7    conversations.  I don't know.
8    Q    Well, to have a meeting, when you say,
9    exercising common sense, you wouldn't just walk to an
10   office, knock on a door, and say "Hi, I'd like to meet
11   with you."  Generally, there would have been some set
12   up for that meeting; right?
13   A    Yeah, I would think so.
14   Q    Okay.  And you would think that would mean
15   that he'd had some level of conversation with them
16   before you had that meeting, because somebody would
17   need to set it up; right?
18   A    Yes.
19   Q    Right.  He's not a seer; he couldn't have
20   known that they were going to have a meeting and just
21   showed up at the office at the right time.  There'd
22   have to be a conversation; wouldn't you agree?

6 (Pages 18 - 21)

Page 22

1    A   Yeah.  He would have to set -- call somebody
2  to set up a meeting.
3    Q   Where was your meeting?
4    A   I believe we went over to the Winter Park
5  office.
6    Q   Okay.  And that was the first time you met
7  with anybody at Waterstone?
8    A   Correct.
9    Q   And who did you meet with at Waterstone?
10    A   First meeting, I believe it was Dave
11  Holbrook, Dustin Owen.  I think Mike Smalley was
12  there.
13    Q   Okay.  And when approximately was that
14  meeting?
15    A   I don't remember.
16    Q   Would it have been in the last two years?
17    A   Yeah, I would think so.  Sometime in the
18  last few years.
19    Q   Okay.  And do you remember the month?  Was
20  it in the fall, spring?
21    A   Yeah, I don't remember.
22        MR. KAREN:  Okay.  Let me show you

Page 23

1  Exhibit -- Jennifer, you can pull up Exhibit 22.
2        (Exhibit 22 was marked for
3        identification.)
4  BY MR. KAREN:
5    Q   Do you see Exhibit 22 on that page, sir?
6    A   I do.
7    Q   Okay.  And you see the top, it's an email
8  from you to Dustin Owen.  See that?
9    A   Yes.
10        MS. KREITER:  So Chris, just with the
11  exhibits -- so for the record I forwarded your email,
12  Ari, over to Mr. Wolf.  I would just ask you to take a
13  look at it, I just want -- by virtue of the format,
14  we've got just part of the first page shown.  Just
15  take a look at the -- the full --
16        MR. KAREN:  No, I think the -- I think
17  the whole page is showing.  At least on my screen, but
18  --
19        MS. KREITER:  Okay.  It looks cut off
20  on mine, but that may be a function of -- just look at
21  the full exhibit, if you would, Chris.
22  //

Page 24

1  BY MR. KAREN:
2    Q   You do see that, right, Mr. Wolf?  On your
3  screen?
4    A   I do.
5    Q   Okay.
6    A   The first page, yeah.
7    Q   Okay.  Yes, and we'll go to the second page
8  -- I think all my questions are going to relate to
9  this page anyhow.  And this is -- there's an email
10  that says, it looks like cwolf011@gmail; is that your
11  personal email address?
12    A   It is.
13    Q   Okay.  And so the date of this email is
14  11/3/2021; see that?
15    A   I do.
16    Q   Okay.  And does that give you some
17  recollection, based on this email, as to when you
18  first met with Waterstone?
19    A   Yeah.  It looks like we had a meeting around
20  that date.
21    Q   Okay.  And now, was that the first meeting
22  you had had?

Page 25

1    A   I don't remember.
2    Q   Okay.  Well, would this email have been sent
3  years after you first met them, or a fairly short time
4  after you first met them?
5    A   I would think a short time after.
6    Q   Okay.  So it's reasonable to believe that
7  that meeting referred to a few minutes ago was within
8  a few months of this email dated November 3, 2021;
9  right?
10        MS. KREITER:  Object to the form.
11  BY MR. KAREN:
12    Q   You can answer.
13    A   Yes, I would believe so.
14    Q   Okay.  Now, I noticed you used your personal
15  email address at the top.  Why didn't you use your --
16  you had an email address with Mutual; didn't you?
17    A   I did.
18    Q   Why didn't you use your Mutual email?
19    A   I don't remember.
20    Q   Is it possible that because you worked at
21  Mutual, you didn't want them to know you were looking
22  at another company?

Page 26

1    A   Yeah, it would have been a distraction, I
2   would think.
3    Q   What do you mean, "a distraction"?  I'm
4   sorry; I'm not understanding.  Distraction from what?
5    A   From us, you know, we were doing our best to
6   close loans over there.  So it would have been a
7   distraction.
8    Q   If Mutual had known that you guys were
9   looking?
10    A   Yeah.  We were doing our best to close loans
11   there so that was our -- our main focus.
12    Q   So you didn't want Mutual knowing what you
13   were doing; right?
14    A   No, probably not.
15    Q   Okay.  So there's a follow up -- and I'm
16   sorry, I skipped over something -- what did you
17   discuss at that first meeting we talked about a few
18   minutes ago?
19    A   I don't remember the meeting.  It was a
20   while ago.
21    Q   Okay.  Do you remember high level, the topic
22   of discussion?

Page 27

1    A   I guess the opportunity.  Their ability to
2   close loans.  We were very unhappy with Mutual at the
3   time.  We were having a lot of issues getting loans
4   closed.  A lot of issues with their closing department
5   and their funding department, the overlays they had,
6   so it was really a struggle to close loans at Mutual.
7   So if -- if Waterstone could do a better job, that
8   might be some -- an opportunity to explore.
9    Q   Okay.  Now, going back to this email, and
10   I'm going to point down to -- do you need to take a
11   look at it?  Do you want to take a look at it real
12   fast, or you want me to just ask questions?  I'll
13   leave it up to you.
14    A   Yeah, you can just ask questions.
15    Q   Okay.  I want to go to number one.  It says:
16   "Can we get a pricing engine to play with and need to
17   know if it is raw pricing or what they bake into that
18   they keep.  For example, do we see 3 percent on
19   conventional or FHA, is that with their bps already in
20   there or do we take out?"  Do you see where it says
21   that?
22    A   Yes.

Page 28

1    Q   Okay.  And my question is, when you say "we"
2   who are you talking about?
3    A   That question was from Chris Smith in Tampa,
4   so I'm not sure.  Most of these are from him, as you
5   can see.  These are questions from Chris in Tampa, so
6   a lot of these, I can't comment to.
7    Q   Okay.  So is it fair to say Chris gave you
8   questions, you copied the questions -- Chris Smith.
9   I'm going to call him Smith so we're easy, because I'm
10   dealing with two Chrises here.  So Smith gave you
11   questions.  You cut and paste them into this email and
12   sent them?
13    A   Correct.
14    Q   Did anyone else give you questions?
15    A   I don't believe so.
16    Q   Now, Chris Smith at this time met with
17   Waterstone; do you know?
18    A   I don't recall if he had met with them or
19   not.
20    Q   Okay.  Do you know why you were acting as
21   the go-between for Chris Smith?
22        MS. KREITER:  Object to the form.

Page 29

1   BY MR. KAREN:
2    Q   You can answer.
3    A   He was also considering making a move as
4   well, and he had questions about these things in this
5   email.  These are some of the things he -- he'd wanted
6   to find out.
7    Q   No, no.  I understand that.  My question is,
8   but why were you talking to them for him?  Why wasn't
9   he just talking to them?
10    A   I'm not sure.
11    Q   Well, you were the one that decided to send
12   emails or messages on behalf.  You don't know why you
13   did that?
14    A   I can't speculate on that.
15    Q   Well, do you typically act as a messenger
16   service?
17        MS. KREITER:  Object to the form.
18   BY MR. KAREN:
19    Q   You can answer.  Sir, any time she objects,
20   you can still answer unless she instructs you not to
21   answer; okay?
22    A   I don't know what you mean by messenger

8 (Pages 26 - 29)

Page 30

1  service. I don't understand the question.
2      Q   Well, you were conveying questions from one
3  other person. You were acting in the capacity where
4  someone gave you questions, you took those questions
5  and then you asked those questions on behalf of
6  Mr. Smith to Waterstone. And then I presume they gave
7  you answers and you sent them back to Chris Smith;
8  right?
9      A   Yes.
10     Q   Okay. Do you typically engage in that type
11 of behavior, where you get questions from one person,
12 then go to another person, get the answers from that
13 person, and then go back to the first person? Is that
14 a typical thing that you do?
15         MS. KREITER: Object to the form.
16         THE WITNESS: Outside of this instance,
17 I can't comment on that.
18 BY MR. KAREN:
19     Q   What do you mean, you can't comment? Is the
20 answer that you typically don't do it outside of this
21 instance?
22     A   I don't know.

Page 31

1      Q   You don't know if you typically do
2  something? Do you brush your teeth every day?
3      A   Yes.
4      Q   Okay. So you know you brush your teeth
5  every day; right?
6      A   Yes.
7      Q   Do you drink water every day?
8      A   Yes.
9      Q   Okay. So my question is, do you do
10 something like this every day?
11     A   I would say no.
12     Q   Okay. Is it something you frequently do?
13     A   I would say no.
14     Q   Okay. So we established that it's not
15 something that you frequently do, act as a go-between
16 between two other people in their communication;
17 right? Didn't we just establish that?
18         MS. KREITER: Object to the form.
19         THE WITNESS: Not typically.
20 BY MR. KAREN:
21     Q   Okay. So why did you do it here?
22     A   I'm not sure.

Page 32

1      Q   Well, is it possible because you were
2  wanting to facilitate this Waterstone solicitation of
3  Mr. Smith to join their company? Is that possibly
4  why?
5          MS. KREITER: Object to the form.
6          THE WITNESS: No, there was no
7  solicitation. We'd -- all three of us had been in
8  talks with different companies, so this was not any
9  form of solicitation.
10 BY MR. KAREN:
11     Q   Okay. Well, we can argue about what it is,
12 but you wanted to facilitate the communications
13 between Waterstone and Mr. Smith. That's what you
14 were doing here; right?
15     A   We were all communicating in -- with
16 Waterstone in some form or another, yes.
17     Q   Well, apparently Mr. Smith was going through
18 you for the communications. And that's what I'm
19 trying to find out; why?
20     A   To streamline things. He had questions and
21 he wanted to get some answers, so I emailed them over
22 to Dustin.

Page 33

1      Q   Sir, wouldn't streamlining things be the two
2  people directly communicating to each other? Isn't
3  that a more efficient means of communications than
4  through a third party?
5          MS. KREITER: Object to the form.
6  BY MR. KAREN:
7      Q   You could answer.
8      A   Possibly.
9      Q   Okay. So why didn't you just do that, if
10 you were trying to streamline?
11     A   I'm not sure.
12     Q   Truth is, sir, you were trying to assist
13 Waterstone in getting Chris Smith to come over there;
14 right?
15         MS. KREITER: Object to the form.
16         THE WITNESS: No. We weren't
17 soliciting him. We were all in talks together.
18 BY MR. KAREN:
19     Q   But you were facilitating the
20 communications. That's what you were doing right
21 here; weren't you?
22     A   Yeah, I was facilitating with an email with

9 (Pages 30 - 33)

Page 34

1    some questions.
2        Q   Okay.  Now, let's go into this.  Number two
3    says "Transition team."  Do you see where I'm talking
4    about that?
5        A   Yes.
6        Q   Okay.  And it says "Can we send loans over
7    to start and build up a balance of money to fund a
8    transition."  Do you see where it says that?
9        A   Yes.
10       Q   Okay.  And tell me if I'm misunderstanding,
11   that what that means is, that while you're with
12   Waterstone, you'd have some people go over -- I'm
13   sorry, strike that.  I made a mistake.  While you were
14   at Mutual, you would have a little -- you would send
15   some people over or send loans over to Waterstone to
16   build up a balance of money on loans that Waterstone
17   would close while you were still at Mutual; right?
18       A   That was a question by Chris Smith, so I
19   can't comment on that.
20       Q   Is that your understanding of this question?
21       A   Again, that was -- Chris Smith asked that,
22   so I'm not sure it's my place to comment on what he's

Page 35

1    asking.
2        Q   Sir, I'm not asking about your place to
3    comment.  I'm asking what was your -- you wrote this
4    email; right?
5        A   I copied and pasted some questions from
6    Chris Smith.  So these are not my questions.
7        Q   Okay.  But in order to facilitate the
8    communications, you'd have to have some understanding
9    of what you were asking and the answers; wouldn't you?
10       A   Not necessarily.  I copied and pasted some
11   questions from him and sent those.
12       Q   Okay.  I'm asking you, though: is it a fair
13   understanding, am I understanding this correctly --
14   fairly, and just tell me if I'm wrong or right -- that
15   what he's talking about is while being at Mutual,
16   starting to send over loans to Waterstone to "fund the
17   transition."  Is that a fair understanding and reading
18   of that question?
19       A   I mean, that's Chris Smith's question.  I'm
20   not really sure how to answer that.
21       Q   How do you interpret it?
22       A   I don't know if it's for me to interpret.  I

Page 36

1    mean, that's Chris's question.
2        Q   Sir, if it's a deposition, and if I ask you
3    to interpret, you can interpret it.  So please
4    interpret it.
5        A   Yeah.  He's commenting on his salaries,
6    leads, yeah, a way to --
7        Q   Sir, that's not my question.  Asking about
8    the first line.  And I will serve this to be clear.  I
9    will take your deposition until Thursday to get this
10   question answered.  So if you want to try to evade it,
11   go on and evade it, but I won't stop until I get the
12   answer I want; okay?
13       A   I just don't like to put it on people --
14   other people's words.  I mean --
15       Q   Sir, I don't care what you like.  I want
16   answers.  You're in a deposition under oath in a court
17   proceeding.  So what you like is actually completely
18   irrelevant.  It's what I ask.  So I'm asking this
19   question, and I'd like an answer.  "Transition team -
20   can we send loans over to start and build up a balance
21   of money to fund transition?"  What is your
22   understanding of that question?

Page 37

1        A   That he wants to build up a balance to fund
2    the transition for 60 days and fixed costs.
3        Q   Okay.  And that would be sending over loans
4    from Mutual, because that's where you were employed,
5    to Waterstone; wouldn't it?
6        A   Seems like that's something he was looking
7    to do.
8        Q   Okay.  Great.  Now, do you know why he would
9    need to fund transition?
10       A   Looks like because he had salaries, rent,
11   lead costs.
12       Q   Okay.  And let me ask you this question: you
13   ran a branch for Mutual; right?
14       A   Yes.
15       Q   And you run a branch now for Waterstone;
16   right?
17       A   Yes.
18       Q   Okay.  As a branch manager, is it fair to
19   say you are managing what I think is called a P&L?
20       A   Yes.
21       Q   Okay.  There you are.  All right.  And you
22   manage a P&L, you're paying for salaries -- and maybe

10 (Pages 34 - 37)

Page 38

1  not you -- but you're managing a payroll, you're
2  managing marketing expenses, you're managing all the
3  expenses, and then the money flowing in; is that fair
4  to say?
5      A   Yes.
6      Q   Okay.  And you have experience?  How long
7  were you managing a branch for Mutual before you left?
8      A   Four or five years.
9      Q   Okay.  So this isn't a -- this is something
10 you've done for a little while?
11     A   Yes.
12     Q   You're relatively experienced and good at
13 it?
14     A   I'm okay with the P&L.  I -- I manage more
15 sales and operations, but I've -- I've got some --
16 some minor experience in the P&L.  Mainly Dwayne and
17 -- and Chris Smith are the ones that manage that more.
18     Q   Okay.  So when you transition from one
19 company to another -- by the way, are you licensed
20 with NMLS?
21     A   Yes.
22     Q   What is NMLS, by the way, for the record?

Page 39

1      A   1626538.
2      Q   No, no, sir, I'm sorry.  Not your number,
3  just what does -- it's Nationwide Mortgage Licensing
4  System; right?
5      A   Yes.
6      Q   Okay.  And you have to license yourself with
7  an entity for that system; correct?
8      A   Correct.
9      Q   And you're only allowed to be licensed with
10 one entity at a time; correct?
11     A   Correct.
12     Q   Okay.  And that's so consumers aren't
13 confused with where you work; right?
14     A   Right.
15     Q   Okay.  Because it's really important that
16 the consumer know who they're dealing with; you would
17 agree with me?
18     A   Yes.
19     Q   Okay.  And that's the whole point, or at
20 least one of the points of the NMLS, with your license
21 number, so that somebody can look you up and clearly
22 know who you're affiliated with; is that fair to say?

Page 40

1      A   Yes.
2      Q   Okay.  And when you move companies, you've
3  got to move your NMLS license; right?
4      A   Yes.
5      Q   And is that an immediate thing, or does that
6  take a little time sometimes?
7      A   I believe it's immediate.  I think you can
8  go online and do that right away.
9      Q   Okay.  And it transfers automatically right
10 away?
11     A   Not sure the logistics of it, but I know you
12 go online and change over whatever you need to.
13     Q   Okay.  And let me ask you another question:
14 have you ever heard the term "pipeline" in the
15 mortgage industry?
16     A   Yes.
17     Q   What does that refer to?
18     A   It's the loans you have working in process.
19     Q   Okay.  And is it fair to say you have to
20 build up a pipeline before you can close loans?
21     A   Yes.
22     Q   Okay.  And so if you leave a job and you go

Page 41

1  to another job and you don't start to build up a
2  pipeline before, when you start at that new job you
3  have no pipeline; right?
4      A   Yes.
5      Q   And if you have no pipeline, how many loans
6  are you going to close for a while?
7      A   Might be zero in the first month, probably.
8      Q   Right.  Because it takes about how long to
9  close a loan, typically, you know?
10     A   Usually 30 days.
11     Q   Do you think that it's longer than 30?  I
12 mean, I've heard that it's generally around 45 days;
13 what is your experience?
14     A   Usually about 30.  It's pretty standard in
15 our -- our business.
16     Q   Is that a refinance or a purchase, or does
17 it not matter?
18     A   It doesn't matter.  Both are about 30 days.
19     Q   Okay.  So in other words, if you come to a
20 company and you have no loans in your pipeline, it's
21 going to be -- you've got to build that pipeline.  And
22 so it's going to take time to start closing loans

11 (Pages 38 - 41)

Page 42

1    again; right?
2        A    We can get them going pretty quickly.  I
3    mean, if you get contracts in and send them through
4    processing, you could close things in 30 days, 45
5    days, you know.
6        Q    No, no.  I understand that; I'm just saying
7    that is it a fair statement that, if you come to a
8    company with zero pipeline, it's going to take
9    yourself -- to get back up to the level you were at
10   before, it's going to take some period of time to
11   build that pipeline up, start closing loans, and
12   having a lot of loans closed; is that a fair
13   statement?
14       A    Yeah, it could.
15       Q    Okay.  And one of the benefits of if you
16   have a transition team, is that that pipeline doesn't
17   start at zero.  You can build the pipeline before you
18   get there; right?
19       A    In theory, you could.
20       Q    Okay.  And that would be taking loans that
21   might otherwise go to the company you're at and
22   sending them to the new company; right?

Page 43

1        A    If you wanted to, you could.  We didn't do
2    that.
3        Q    Okay.  We'll get to that later.  And that's
4    part of what we're talking about in this email here;
5    isn't it?
6        A    That's what it looks like Chris Smith is
7    asking.
8        Q    And you were facilitating that
9    communication; right?
10       A    Yeah, that was from my email address.
11           MR. KAREN:  I think we can put Exhibit
12   22 away.  Let's go to another email, Exhibit 19, if we
13   could pull that up.
14           (Exhibit 19 was marked for
15           identification.)
16   BY MR. KAREN:
17       Q    All right.  Who was Elizabeth Spragg?
18       A    I think she was in human resources.
19       Q    Okay.  And for who?
20       A    For Waterstone.
21       Q    Okay.  And on April 12th, you were still an
22   employee of Mutual; weren't you?

Page 44

1        A    Yes.
2        Q    And you write to her in this email dated
3    October [sic] 12th; again, it's from your private
4    email address?
5        A    It is.
6        Q    Okay.  Again, it's something that's what --
7    because what, you didn't want Mutual to know?
8        A    Yes.
9        Q    Okay.  And you're writing: "Hi, Elizabeth.
10   Spreadsheet attached."  Do you see where it says that?
11       A    Yes.
12       Q    What spreadsheet was she referring to?  Were
13   you referring to?
14       A    It was a list of the employees that decided
15   they wanted to come over to Waterstone.
16       Q    Okay.  So how do you know that they had
17   decided to come over to Waterstone?
18       A    We announced that we were leaving to go to
19   Waterstone, and they're -- a lot of our loan officers
20   and employees said they wanted to come with us.
21       Q    And so that announcement had to be prior to
22   April 12th?

Page 45

1        A    Yes.
2        Q    Okay.  And how long prior to April 12th was
3    that announcement?
4        A    I don't remember.
5        Q    Was it a year?
6        A    No, not that far out.
7        Q    Okay.  Was it six months?
8        A    I don't remember.
9        Q    So maybe around six months?  You had been
10   there for about six months and had that discussion
11   about six months before?
12           MS. KREITER:  Object to the form.
13           THE WITNESS:  Yeah, I don't think it
14   was that far out.  It was pretty sudden.  We moved
15   pretty quickly, because we didn't want to have any
16   distractions.  Everybody was closing loans, so we
17   didn't want to take away from anybody's productivity
18   with Mutual.
19   BY MR. KAREN:
20       Q    So would you say it had been within 30 days
21   then?  Within 60 days?
22       A    I'm not sure.

12 (Pages 42 - 45)

Page 46

1   Q   Okay.  So you're pretty sure it was less
2   than six months?
3   A   Yes.
4   Q   Would you say it was less than five months?
5   A   Yes.
6   Q   Would you say it was less than four months?
7   A   Yes.
8   Q   Would you say it's less than three months?
9   A   Yes.
10  Q   Would you say it's less than two months old?
11  A   Yes.  Probably, yeah.
12  Q   Would you say it was less than one month?
13  A   I can't say for sure.
14  Q   Okay.  So it was somewhere between zero days
15  and a month before that you would have talked to the
16  employees and told them you were leaving?
17  A   Yes.
18  Q   Okay.  And so now what you're doing is,
19  you're sending -- so you announced to the employees
20  that you were leaving, and then you sent their
21  information to Waterstone; is that right?
22  A   Yes.

Page 47

1   Q   And what information would have been on that
2   spreadsheet?
3   A   I believe it was their name, email.
4   Q   Phone number?
5   A   Phone number, yeah.  Just basic information
6   for -- for the HR people.
7   Q   So contact information?
8   A   Yes.  I believe so.
9   Q   And -- I'm sorry to have interrupted.  I
10  apologize.
11  A   That's okay.
12  Q   So would that have been their personal email
13  and personal phone number?
14  A   Yes.
15  Q   And again, you were doing this, facilitating
16  those conversations and communications with Mutual's
17  employees; right?
18  A   Yes.  The ones that decided to -- they
19  wanted to come over with us.
20  Q   Okay.  After you spoke to them about it?
21  A   After we announced we were leaving, yes.
22  They -- they let us know they wanted to come with us.

Page 48

1   Q   Okay.  And that's April 12th?
2   A   Yeah, it looks like April 12th at 8:15 p.m.
3   Q   Okay.  Now, it says here that "Jake Lowe is
4   not transitioning with us."  How did you know that?
5   He told you?
6   A   He did.  He originally wanted to come with
7   us, and then was offered an opportunity with another
8   lender.
9   Q   Okay.  Was he a big producer?
10  A   He was.
11  Q   Now, on the second paragraph, you say: "Let
12  me know if you have any questions.  I'm not sure how
13  the File Contacts work in your Encompass."  Do you see
14  where it says that?
15  A   Yes.
16  Q   Was this an Encompass file that you had
17  utilized to send to her?
18  A   No, it was a Excel sheet that I created on
19  my own.
20  Q   Here's my question: Encompass is a loan
21  origination system; right?
22  A   Yes.

Page 49

1   Q   Why would a spreadsheet with employees need
2   to go into Encompass?
3   A   So Diana and Chris D. are operations people.
4   So File Contacts is a section where we put in
5   operations people to designate them to a file.  So my
6   question was, I'm not sure how when we tag them in
7   loans, how you want to identify them.  So that -- that
8   would be moving forward later on.
9   Q   I understand.  Okay.  Got it.  And if we
10  could go to the next page of this email.  And it says:
11  "Chris, thanks for this.  I have added some columns
12  for pay and original hire date."  And that's
13  Ms. Spragg talking to you.  "Any chance you have
14  access to compensation details that you could share
15  with me?  I would like to get offer letters put
16  together for everyone."  Do you see that?
17  A   Yes.
18  Q   Do you recall whether you were able to get
19  that information for her?
20  A   I sent her what the new compensation would
21  be for how we were going to structure it at
22  Waterstone.  It was different than the one we had at

13 (Pages 46 - 49)

1 Mutual, so I sent her over what we were going to start
2 for the compensation at Waterstone.
3     Q   How did it differ? How did you change the
4 compensation?
5     A   We had a tier structure, and a different
6 aces [ph] point. It was very similar to Mutual's, but
7 it was different as well, something that Dwayne and I
8 had decided on. People had different types of
9 structures with Mutual and we decided to do something
10 different with Waterstone.
11     Q   Would the affect have been to reduce the
12 compensation to the employees moving over?
13     A   I don't know if it was more or less. I
14 think it was similar but I don't -- I don't recall
15 what -- what the Mutual one was.
16     Q   Well, is it fair to say that they at least
17 would have the potential to make more if they closed
18 more loans at Waterstone, based on what you put
19 together?
20     A   I don't know if it'd be more or less. I
21 can't comment on that. I didn't really consider that.
22 It was just we were going to take on a different form

1 that Waterstone had -- had kind of had.
2     Q   Okay. Well, when she says "access to
3 compensation details" if it was a Waterstone
4 compensation detail, if it was a Waterstone pay plan,
5 why would she need access to it? She was already at
6 Waterstone; right?
7     A   Yeah, I'm not sure why she worded it that --
8 that way. We -- we kind of set up our own
9 compensation structure similar to Waterstone but a
10 little different. We have a tier system. Most of
11 their branches use kind of a flat rate one. So we
12 kind of created our own, so I sent her the
13 compensation details on what Dwayne and I created.
14     Q   Do you know why Dwayne would have testified
15 and said that you set the compensation the same?
16     A   It would -- the same as far as the tier
17 system, yeah. Because we use a tier system that's
18 kind of unique, that a lot of branches don't, so he's
19 probably referring to the tier system that we use.
20     Q   So the tier system was the tier system you
21 had in place at Mutual?
22     A   We also did a tier system at Mutual.

1     Q   Okay. And so you tweaked the tier system at
2 Mutual when you made the move over to Waterstone?
3     A   Yes.
4     Q   Okay. And how did you tweak it? What did
5 you do to it?
6     A   I don't remember how we specifically changed
7 it. I think we made it more uniform, because at
8 Mutual, different people had different pay scales and
9 things. So we kind of made it all the same.
10     Q   Okay. So really what you did is, you had
11 different tier systems in place at your branch at
12 Mutual simultaneously for different people, and what
13 you did is, you took those tier systems and you made
14 one tier system for everyone?
15         MS. KREITER: Object to the form.
16 BY MR. KAREN:
17     Q   Is that right?
18     A   Yeah, we made a more uniform tier system.
19     Q   Now, if you continue on to the next page in
20 the document, WMC0679, or 0769, sorry, it says -- and
21 this is, again, April 12th: "Hi, Elizabeth. Here is
22 our full roster." What roster are you referring to

1 there?
2     A   The employees that were coming over with us,
3 our loan officers and operations people.
4     Q   Okay. And this email's at 8:42 a.m.; right?
5 And the prior email that we saw, that we started with,
6 was at 8:15 p.m. -- so it's fair to say, like with
7 emails, we're looking up a string and it's later and
8 later. This one's 8:42.
9         MR. KAREN: If you could go up,
10 Jennifer?
11 BY MR. KAREN:
12     Q   The next email's 9:54, so we're going later
13 in time, right, as we read these emails; correct?
14     A   Correct.
15     Q   Okay. So if I understand the first email,
16 at least we're looking at right now, was at 8:45 where
17 you gave her the full roster. She comes back at 9:54
18 and says "Can you give me the compensation details";
19 right? Is that correct? I'm reading that correctly?
20     A   Yes.
21     Q   And then you respond to this email attaching
22 a spreadsheet with that information; right?

Page 54

1    A    Correct.

2    Q    Okay. Now, can we go to the next email,
3    which is going to be dated April 11th. This is on
4    0770.

5        MS. KREITER: Sorry, a different
6    exhibit, Ari? Are you --

7        MR. KAREN: No. Same page. I'm sorry,
8    same page. So that's it. It's the same exhibit; it's
9    just the next page.

10        MS. KREITER: Okay.

11        MR. KAREN: And I think it's up on the
12    screen right there.

13    BY MR. KAREN:

14    Q    Do you see that, sir?

15    A    Yes.

16    Q    Okay. And this email's on April 11th, the
17    day before, at 6:45 p.m.; right?

18    A    Yes.

19    Q    Okay. So we're continuing earlier back in
20    the string. And it's an email from Ms. Spragg to you
21    saying "Chris, Melissa Wagner and Jen Wilton from the
22    HR team will begin calling the five names that you

Page 55

1    gave us first thing in the morning." Do you see that?

2    A    Yes.

3    Q    So I assume the morning she was talking
4    about, that morning, April 11th; is that a fair
5    assumption?

6    A    Yes.

7    Q    Okay. And who were those five names?

8    A    Dawson Walker, Mike Irish, Cameron Holley,
9    Kyrstin Friebis, and I think Maria De Sevilla.

10    Q    And how were these five people chosen to
11    come over before you guys did?

12    A    Well, Dawson was, you know, one of our more
13    experienced loan officers, and I thought he'd be a
14    good leader to go over. Cameron had more of an
15    operations background, and then the other three
16    volunteered.

17    Q    Okay. And so do you remember the email we
18    looked about before, talking about a transition team?
19    That Chris Smith wrote?

20    A    Yes.

21    Q    This is kind of what we're talking about,
22    this little transition team here; right?

Page 56

1        MS. KREITER: Object to the form.

2        THE WITNESS: They came over first just
3    to kind of start the process, the HR stuff, get a feel
4    for the company. We didn't want to flip everybody
5    over at the same time and leave Mutual in a lurch. We
6    all wanted to still close loans there, so we had some
7    people go over first to kind of make it a more smooth
8    transition and make sure we were still closing loans
9    at Mutual.

10    BY MR. KAREN:

11    Q    Right. But that's a transition team; isn't
12    it?

13        MS. KREITER: Object to the form.

14        THE WITNESS: That's not really what we
15    called it. It was just the people that went over
16    first. We didn't really call it anything.

17    BY MR. KAREN:

18    Q    Okay. I'm asking you now, would you agree
19    that that is a transition team? They were over there
20    to facilitate a transition; right?

21        MS. KREITER: Object to the form.

22        THE WITNESS: That's what we called

Page 57

1    them or thought of -- we never even thought of that
2    word, to call it that.

3    BY MR. KAREN:

4    Q    All right. Now continuing on in this email
5    it says, or she says: "As we said on the call, we're
6    happy to have others start this process right away as
7    well. If you do not have personal email addresses on
8    everyone else, they can send an email to
9    HR@waterstone," and she gives you that information;
10    right?

11    A    Yes.

12    Q    Did you facilitate and tell the individuals
13    that, you know, the personal email addresses, on how
14    to connect with Waterstone?

15    A    I believe the ones that went over, we had
16    their emails.

17    Q    So you didn't need to do that, because you
18    had given them all the personal email addresses?

19    A    Yes. That was part of that spreadsheet I
20    sent to Elizabeth.

21    Q    Okay. And, you know, at this point, they
22    had not individually spoken to Waterstone? These were

Page 58

1 still conversations you were facilitating; right?

2    A  Yeah. Yeah, because they hadn't contacted

3 Melissa and Jen yet for their onboarding.

4         MR. KAREN: We can put this exhibit

5 away, I think. Okay. Can we pull up Exhibit 20?

6         (Exhibit 20 was marked for

7         identification.)

8         MS. KREITER: What number was that,

9 Ari?

10        MR. KAREN: Twenty.

11       MS. KREITER: Twenty. Okay.

12 BY MR. KAREN:

13    Q  Let me know when you see that on your

14 screen, sir.

15    A  Yes, I can see it.

16    Q  Okay. And this is an email dated the 14th,

17 and if you recall the prior strings of emails were the

18 11th and 12th; do you remember that?

19    A  Yes.

20    Q  Okay. And here it says -- you're writing to

21 Ms. Spragg, and again you're using your personal email

22 address?

Page 59

1    A  Yes.

2    Q  Okay. Again, that's because you didn't want

3 Mutual to know; right?

4    A  We didn't want a distraction. We wanted to

5 still be focusing on closing loans.

6    Q  So you didn't want Mutual to know?

7    A  No.

8    Q  Okay. And then you go, and we read down.

9 It says: "Hi, Elizabeth, I think I forgot to add the

10 minimum max comp per loan. It's 500 and max 8000."

11 Do you see that?

12    A  Yes.

13    Q  And you're referring to -- tell me if I'm

14 right about this -- a commission structure where, no

15 matter what the loan is, they'll make at least $500,

16 and no matter what the loan is, they won't make more

17 than $8000. That's min and max; right?

18    A  Correct.

19    Q  Was that the min and max you had in place

20 over at Mutual?

21    A  I don't remember. I never went back and

22 looked at the compensation agreements. This is

Page 60

1 something we were doing with Waterstone moving

2 forward.

3    Q  Okay. So you don't recall if you changed it

4 from what you had -- I'm not asking for all the

5 compensation agreements, but in other words, do you

6 recall if you changed it from the min and the max you

7 had in place at Mutual?

8    A  I don't remember. Again I -- I didn't go

9 back and look at the compensation agreements, so I

10 don't -- I don't know if it was the same or not.

11    Q  Okay. Well, I guess my question, sir, is

12 then, you've got all these, you know, loan officers.

13 And I mean, it is fair, sir, you wanted them to join

14 you at the new company; didn't you? You didn't want

15 to start over with no people; right?

16    A  I was happy they came over, yeah.

17 Obviously. We're like a family here. I mean, we've

18 gone through a lot together, and, you know, I -- yeah,

19 definitely wanted to come over. If they didn't want

20 to, that's their choice. But we're a really

21 tight-knit group, so I was happy that most of them

22 came over.

Page 61

1    Q  Right. But it, in other words, it's fair to

2 say you wanted them to come, and you would have

3 structured the compensation in a way that would not

4 have dissuaded or disincentivized them to come; isn't

5 that fair?

6         MS. KREITER: Object to the form.

7         THE WITNESS: I can't comment on that.

8 I don't -- I don't know what the compensation

9 difference were, if there was one at all. It wasn't

10 in my thought to try to make it more or anything like

11 that, if that's what you're getting at. That's not

12 where my head was at. I just wanted a fair

13 compensation plan for them. I don't know if it was

14 more or less than what was at Mutual.

15 BY MR. KAREN:

16    Q  Okay. All right. So you're sitting there

17 and you're deciding before you talk to the employees

18 that you're going to make a move over to Waterstone.

19 And you want them to come with you ultimately; is that

20 a fair statement? Was that your state of mind?

21    A  Yeah, obviously I'd like for them to come,

22 if that's what they wanted to do.

16 (Pages 58 - 61)

Page 62

1    Q   Okay.  And in order to want them to come,
2   you understand money is important to people?
3    A   Yes.
4    Q   And you understand particularly when you're
5   working at a job how much you make is important;
6   right?
7    A   Yes.
8    Q   And if you're thinking of switching jobs,
9   and one company is going to pay you a lot less than
10  the other company, you're less likely to make a move;
11  right?
12   A   Yes.
13   Q   So is it fair to say -- and that's a big,
14  big, big factor in people taking a job; isn't it?
15       MS. KREITER:  Object to the form.
16       THE WITNESS:  Yes.
17  BY MR. KAREN:
18   Q   Okay.  And you're aware of that at the time;
19  right?
20   A   It had not crossed my mind at the time, no.
21   Q   So you're going to tell me -- I want to make
22  sure I understand this, that you're testifying under

Page 63

1   oath and I want to make sure that you're telling me
2   that.  So you're sitting there, you want these
3   employees to join you over at Waterstone, and it never
4   crossed your mind as to whether they were going to
5   make more or less in the transition over?  That's
6   something you just never considered?
7        MS. KREITER:  Object to the form.
8        THE WITNESS:  I did not.  I didn't
9   consider that.  Our main reason to move was so we
10  could close more loans, and they had more products.
11  So in the long run, they were going to make more money
12  by having more loan products to sell.  So that was all
13  that entered my mind as far as making more money.  It
14  never occurred to me to compare the comp plans or do
15  anything like that.  We still had this tier system,
16  and it was fair, so that's all that entered my mind.
17  I never thought of -- to compare them or tell them
18  it's going to be more money per loan or anything like
19  that.  It wasn't like that.
20  BY MR. KAREN:
21   Q   I'm not asking if you were trying to pay
22  them more money, but you were trying to pay them at

Page 64

1   least around the same; right?  You didn't want them to
2   make less; did you?
3    A   No, of course not.
4    Q   Okay.  So you would have at least considered
5   what they were making now to make sure that they were
6   going to make at least about the same when you went
7   over to the new company; right?
8        MS. KREITER:  Object to the form.
9   Asked and answered as well.
10  BY MR. KAREN:
11   Q   You can answer the question.
12   A   I'm not sure how to answer that, no.
13   Q   Why not?
14   A   I don't really understand your question.
15   Q   Okay.  Well, let me ask you something.  In
16  order to be -- for people to not -- you didn't want to
17  dissuade people from coming over; right?  Do you
18  understand the word, what dissuade means?
19   A   I do.  I'm just confused as to the line of
20  question -- I don't understand what the -- the
21  question is.  Like, yeah --
22   Q   You didn't want to make people unhappy and

Page 65

1   not want to come over; correct?
2    A   Correct.
3    Q   You didn't want to do things that would make
4   people say, wow, I don't want to go there; right?
5    A   No, I wanted to have a fair compensation
6   plan in place.
7    Q   Okay.  And fair would be relative with what
8   they were getting paid currently; right?
9    A   Yeah.
10       MS. KREITER:  Object to the form.
11  Asked and answered.
12  BY MR. KAREN:
13   Q   You answered yes; correct?  You answered
14  yes, I think?
15   A   Yes.
16   Q   Okay.  All right.  So that would have
17  required some consideration.  I'm not saying you
18  necessarily went and looked at their comp plans, but
19  it would require some consideration of what they were
20  getting paid to know that it was fair; wouldn't it?
21   A   Yes.
22       MR. KAREN:  So that's fine.  We can

17 (Pages 62 - 65)

Page 66

1　move off this exhibit. Can we now go to Exhibit 3?
2　　　　THE REPORTER: Counsel, my apologies.
3　Just for clarity of the record, the prior three
4　exhibits are being marked for the record; correct?
5　It's just the verbiage, what was used was kind of,
6　like, it was just reference or something?
7　　　　MR. KAREN: Yes, they are being marked.
8　　　　THE REPORTER: Okay.
9　　　　MS. KREITER: Ari, with Exhibit 3, I
10　don't see a Bates number. Has this been produced
11　previously?
12　　　　MR. KAREN: There's a Bates number on
13　mine. It's MOM0233. Maybe it cut off when you were
14　--
15　　　　MS. KREITER: That could be. What is
16　the Bates number?
17　　　　MR. KAREN: Hold on. That's not
18　Exhibit 3. I don't know what that is. Jennifer,
19　Exhibit 3 is supposed to be MOM0233. Can you find
20　that, Jennifer?
21　　　　MS. ERICKSON: Working on it. Hang on
22　one second.

Page 67

1　　　　MR. KAREN: I don't know what that
2　other -- that's not my Exhibit 3, so I'm not sure what
3　we're dealing with there. Could we go off the record
4　for a minute?
5　　　　MS. KREITER: Sure.
6　　　　THE VIDEOGRAPHER: Just one moment.
7　The time is 10:04 a.m.; we are now off the record.
8　　　　(Off the record.)
9　　　　THE VIDEOGRAPHER: This is the
10　beginning of media unit number 2 in the video recorded
11　deposition of Mr. Christopher Wolf. The time is 10:14
12　a.m., Eastern. We are now back on the record.
13　Counsel, you may proceed.
14　　　　MR. KAREN: Thank you. And I think we
15　just have a quick introduction.
16　　　　MS. THOMSEN: Laurel Thomsen, in-house
17　counsel for Mutual of Omaha Mortgage attending.
18　　　　MR. KAREN: All right. So we will pick
19　up now. So if we can pick up on Exhibit -- this is
20　Exhibit 3 -- if we could, and this will be marked for
21　the deposition.
22　//

Page 68

1　　　　(Exhibit 3 was marked for
2　　　　identification.)
3　BY MR. KAREN:
4　　Q　Sir, do you recognize this email? It's from
5　you, dated April 8th?
6　　A　Yes.
7　　Q　Okay. And this is an email, it says:
8　"Please do not discuss -- " well, the subject is
9　"Today's Call"; see that?
10　　A　Yes.
11　　Q　And it says: "Please do not discuss what we
12　talked about on today's call with anyone outside of
13　your families. We are still finalizing details." Do
14　you see what that says?
15　　A　Yes.
16　　Q　Okay. And what you were referring to was,
17　you discussed on that call the opportunity to move to
18　Waterstone; correct?
19　　A　Yes, that looks like it would have been the
20　day that we announced that we were going to -- that
21　Dwayne and I were going to go to Waterstone.
22　　Q　Okay. You said Dwight, or is it Dwayne? Or

Page 69

1　is that --
2　　A　Dwayne.
3　　Q　Dwayne, okay. Did I misunderstand you, or
4　did you use the name Dwight?
5　　A　No, Dwayne.
6　　Q　Dwayne, okay. All right. So I see the
7　"To:" is blank. Do you know why it's blank?
8　　A　I'm not sure.
9　　Q　Okay. But you would have sent this to all
10　of your team members?
11　　A　Yes.
12　　Q　Okay. And why did you not want them to
13　discuss what they talked about except for anybody with
14　their families?
15　　A　We didn't want a distraction. We didn't
16　want them to get sidetracked from closing loans or our
17　realtor partners to know. It was hard enough to close
18　loans at Mutual, so we didn't want any kind of
19　disruption until we had things finalized.
20　　Q　And you didn't want Mutual to know either;
21　right?
22　　A　No.

18 (Pages 66 - 69)

Page 70

1    Q   In other words, I am right?  When you say
2   "no" you're agreeing with me; correct?
3    A   Correct.
4        MR. KAREN:  Okay.  Now, let's go to
5   Exhibit 2, please.  And this is an email, and just for
6   the record, can you put Exhibit 2 back up really
7   quick, Jennifer?  I'm sorry.  3, I mean.  3.  Okay.
8   So this is Friday, April 8th, as of 10:21 p.m.  Okay.
9   And I want to go back if you could, to now Exhibit 3.
10  I'm sorry.  The Exhibit 2.  I'm messing these up; I
11  apologize.  Thank you, Jennifer.
12  BY MR. KAREN:
13   Q   So do you see this is an email from Michael
14  Irish to you; do you see that?
15   A   Yes.
16   Q   Okay.  And this is at 9:36 a.m. on April
17  8th?
18   A   Yes.
19        MR. KAREN:  Okay.  And so again, if
20  we'd like to mark Exhibit 2 for the record, please?
21        (Exhibit 2 was marked for
22        identification.)

Page 71

1   BY MR. KAREN:
2    Q   Now, in this email, he's saying "Hey, Chris,
3   first of all -- first off, I am excited for this new
4   endeavor."  So sir, I know that you had had that team
5   call and that was an email that you wrote at 10:36
6   p.m.  It's fair to say that you had the actual call
7   much earlier in the day; is that right?
8    A   Yes.
9    Q   So you have the email -- and this was 9:36
10  a.m., so you would have had the team call prior to the
11  email that we have as Exhibit 2; right?
12   A   Yes.
13   Q   Okay.  And then later that night, you remind
14  everybody "Hey, don't talk about this"; right?
15   A   Yes.
16   Q   And that's what we saw on Exhibit 3 a minute
17  ago; correct?
18   A   Yes.
19   Q   Okay.  So now we're back to Exhibit 2, and
20  it says "Hey, Chris, first off, I am beyond excited
21  for this new endeavor."  So here's my question.  Do
22  you know what time in the morning, given this is 9:36

Page 72

1   a.m., you would have had the team call?
2    A   I would say probably 9 a.m., I think, we
3   would have had it.
4    Q   Okay.  So this is right after the team call?
5    A   Yes.
6    Q   Okay.  So you have the team call and you
7   present the opportunity to go to Waterstone; right?
8    A   Yeah, we announced that we were going to
9   Waterstone, and some people were already excited.
10  They said they wanted to come with us.  So yeah, we
11  announced we were coming and some of the people said
12  that they wanted to come -- come with us, right there
13  on the call.
14   Q   Okay.  And none of these people as far as
15  you know had actually talked to Waterstone prior;
16  right?
17   A   Correct.
18   Q   Okay.  And you're saying without knowing
19  anything about Waterstone, they were immediately
20  excited?
21   A   Correct.  Yeah, like I said, we're like a
22  family.  They -- they really enjoy working here, and

Page 73

1   some of them just wanted to come with us right away.
2    Q   And when you presented it, did you present
3   the opportunity as, like, "Hey, I've got bad news.
4   We're leaving, you know, and we have to go to
5   Waterstone, you know, it's not that great a place,
6   but, you know, that's what we're going to do."  Did
7   you present it like that?
8        MS. KREITER:  Object to the form.
9   BY MR. KAREN:
10   Q   You can answer.
11   A   I don't remember the -- how I presented it.
12  I just let them know that Dwayne and I were going to
13  look at going to Waterstone.
14   Q   Okay.  So but I'm asking, you wanted the
15  employees to come with you, yes?  We've already
16  established that; correct?
17   A   Of course.
18   Q   Okay.  So is it fair you would not have
19  presented it in a negative light, as something that
20  you were unhappy about; right?
21   A   I wouldn't think so, no.
22   Q   Okay.  If anything, you would present it in

19 (Pages 70 - 73)

Page 74

1  the positive light.  This is a good thing; right?
2         MS. KREITER:  Object to the form.
3  BY MR. KAREN:
4     Q   Is that true, sir?
5     A   Yes, I probably would have.
6     Q   Okay.  And in response to your positive
7  presentations of this, a few minutes after you have
8  this meeting, the first email we see here is from Mike
9  Irish, who says "I am beyond excited for this new
10  endeavor."  I'm understanding that correctly; aren't
11  I?
12    A   Yes.
13    Q   All right.  And I want to draw your
14  attention to the second line here, where he says "I do
15  have quite a few pre-approvals out that realtors are
16  actively showing their clients."  Do you see that?
17    A   Yes.
18    Q   Okay.  Now, would you agree, that's a
19  business opportunity, when there's a pre-approval you
20  have?  That's an opportunity to potentially get a
21  mortgage?
22    A   Potentially.  It's somebody who we've looked

Page 75

1  at their file and they're qualified.  Sometimes they
2  go under contract in a week; sometimes it's a year.
3  So it's -- it's all, you know, not necessarily, but it
4  could be.
5     Q   Right.  But in other words, one of the big
6  thresholds, if you will, where you lose loans is in
7  people who are not qualifying; is that fair to say?
8     A   Right, yeah.  Obviously there are people we
9  talk to that don't qualify.
10    Q   Okay.  So this is somebody who's qualified
11  and who's actually looking for a house; right?
12    A   Yes.  Looks like -- looks like it.
13    Q   And you've already connected with them, and
14  they've already given you enough information for you
15  to make a pre-approval; right?
16    A   Yes.
17    Q   And what factors are considered in giving a
18  pre-approval?
19    A   We would look at their credit, their debt to
20  income, their assets.  Various factors like that.
21    Q   So in a pre-approval, have you actually --
22  have they just told you the assets, or have they

Page 76

1  actually given you documents to establish those?
2     A   Ideally, we have their documents, their --
3  their income.  Sometimes if they just say, "I'm this
4  salary or this hourly and I work 40 hours,"  sometimes
5  we don't always ask for their, you know, pay stubs and
6  things up front.  So it just, it varies, it depends.
7     Q   Okay.  But you at least have their credit
8  score?
9     A   Yes.
10    Q   Okay.  And then is it fair to say some --
11  usually there'd be some representation or some
12  information to confirm their income and savings and
13  that kind of thing?
14    A   Yes, we usually like that.  Again, not
15  always.  But yeah, we -- we like to have that
16  information.
17    Q   And that's important, because if you're
18  giving a pre-approval to a realtor partner and then,
19  you know, you go around and they find the house and
20  they do all the work to get a contract, and then you
21  turn around and say, "Hey, this person's not
22  qualified," your realtor partner is not going to be

Page 77

1  very happy with you; is that a fair statement?
2     A   Yes, yes.
3     Q   So when you give a pre-approval, you're not
4  only obviously trying to get a client, you're also
5  trying to -- I'll use the word protect, but maybe
6  that's the wrong word -- but protect the realtor in a
7  way; isn't that fair?
8     A   Yes.
9     Q   And you guys work with a lot of realtor
10  partners, don't you?
11    A   We do.
12    Q   And realtor partners are pretty important to
13  you, aren't they?
14    A   They are.
15    Q   Okay.  So when you give a pre-approval,
16  you're trying to really give a fair -- I mean, it's a
17  pretty serious decision on your part; would you agree?
18         MS. KREITER:  Object to the form.
19         THE WITNESS:  Yes.
20  BY MR. KAREN:
21    Q   So he writes "I do have quite a few pre-
22  approvals out that the realtors are actively showing

Page 78

1  their clients." And then it continues on to the end
2  of that line "I would hate to have my pipeline pop off
3  within the next 30 days and then be out of
4  commissions, if that, in fact, would be the case." Do
5  you see where it says that?
6      A   Yes.
7      Q   Okay. And so what he's saying is that he
8  doesn't want these business opportunities to end up at
9  Mutual. He wants to take them to Waterstone; right?
10     A   That appears like what he's getting at.
11     Q   Okay. And in fact, sir, he was transferred
12 early to Waterstone; wasn't he?
13     A   He was part of the first few people that
14 went over, yes.
15     Q   And so that would facilitate his request to
16 take business opportunities that existed while he was
17 at Mutual and start them over at Waterstone; right?
18         MS. KREITER: Object to the form.
19         THE WITNESS: Yes.
20 BY MR. KAREN:
21     Q   Okay. Now, he also asked a couple of
22 questions, and he says: "I forgot to ask while on the

Page 79

1  call and may also be too early in the process to
2  answer. Will we still be on a draw or would this be
3  100 percent commission?" And then "Is there health
4  insurance?" Do you see that?
5      A   Yes.
6      Q   So he wasn't at this time in communication
7  with Waterstone whatsoever, even about the benefits or
8  compensation he'd be offered. He was relying on you
9  to tell them what that would be; right?
10     A   Yes.
11     Q   Okay. And so you again were facilitating --
12 this is another example of you facilitating
13 conversations and communications?
14     A   Yes.
15     Q   Now, it also says here -- he says at the
16 very end "Thanks for your insight and your continued
17 efforts to ensure we all succeed together." Do you
18 see where he says that?
19     A   Yes.
20     Q   Do you know what he meant by "we all succeed
21 together"?
22     A   I'm not sure. I've done a lot of work in

Page 80

1  putting together different programs to help them
2  gather leads, because Mutual didn't really help us get
3  any leads. We had to build our own relationships and
4  bring the leads in ourselves. So there were certain
5  things I put into place to try to help them facilitate
6  gathering leads or clients or realtor partners. So I,
7  you know, that seems like something he -- he meant by
8  that. Because I kind of helped the whole team, you
9  know, get better as loan officers.
10     Q   Right. But you don't think he was referring
11 to this call when he's saying, and the way you
12 explained the transition, you don't think he's
13 referring to that when he says "efforts to ensure we
14 all succeed together"?
15         MS. KREITER: Object to the form.
16 Calls for speculation.
17 BY MR. KAREN:
18     Q   He sent the email to you. How did you
19 understand it, sir?
20     A   I don't know what he meant by that. I don't
21 remember that part of it, so yeah. I don't -- I don't
22 know what he meant by that.

Page 81

1      Q   Okay. But in other words, I want to make
2  sure I'm understanding correctly. You have this call
3  announcing this opportunity and his response
4  immediately after this call is to say "hey, thanks for
5  your efforts that we all succeed together." Am I
6  understanding that correctly?
7      A   Yeah. He seemed excited. I'm not sure what
8  he meant by that.
9      Q   Well, when "we all succeed," is he referring
10 to the branch?
11     A   The -- the people that were coming over to
12 Waterstone.
13     Q   The branch; right?
14     A   Yes.
15         MR. KAREN: Okay. So let's go to
16 Exhibit 5. And this is an email I'd like to mark
17 Exhibit 5 for the record, please.
18         (Exhibit 5 was marked for
19          identification.)
20 BY MR. KAREN:
21     Q   So this is a email from Maria De Sevilla to
22 you -- I'm sorry, this is to Dawson Walker. I

21 (Pages 78 - 81)

Page 82

1   apologize. I understand you're not on this email.
2   Okay, so I'm just going to mention a couple of things
3   here and ask you about them; okay?
4         All right. So the first line says "I'm sure
5   you know and just in case you don't, I will move over
6   with you next week." And then she writes, and this is
7   what I wanted you to focus on: "Chris was on our team
8   call and spoke to me, Mike, Sunshine and Beatrice
9   about the move. Oh my god," or "OMG." And then she
10  continues on to talk about their developments. Were
11  they also on that team call that morning, these
12  individuals?
13      A   Yes, they were.
14      Q   Okay. And this is 9:20. How long was that
15  call?
16      A   I don't think it was very long.
17      Q   Okay. And so at this point, none of these
18  people, again, had talked to Waterstone. You had just
19  told them about the opportunity?
20      A   Yes.
21      Q   Okay. And so we saw the last email was "I'm
22  incredibly excited," and then the next reaction you

Page 83

1   see here is: "Chris was on the team, spoke to me,
2   Mike, Sunshine, Beatrice, about the move, exclamation
3   point, OMG, exclamation point." That's the reaction
4   you got from Maria De Sevilla from your conversation
5   with her; right?
6       A   Yes.
7       Q   Okay. And then here's what I want to -- go
8   further down and I want to stop at the email dated
9   Thursday, April 7th. So this is again from Maria De
10  Sevilla to Dawson Walker, and she says in this email
11  in the second line: "Chris debriefed me on Waterstone
12  today. I remain excited yet." Do you see that?
13      A   Yes.
14      Q   So is this the first time you talked to
15  Ms. Sevilla about -- or De Sevilla about Waterstone?
16      A   Yeah, I talked to a few of the loan officers
17  before that Friday call to announce to them we were
18  leaving. Just a few of them, so yeah, that's probably
19  what she was talking about. And then I announced,
20  yeah, on the -- on the Friday call.
21      Q   Why did you talk to certain loan officers
22  individually before the call?

Page 84

1       A   I talked to Dawson mainly, because he was
2   one of our sales managers, just to let him know, kind
3   of get a feel for if he'd want to go with us. And
4   then we talked about it with a few other people, just
5   to kind of let them know what we were doing. So, and
6   then we just made a, you know, a formal announcement
7   on the Friday call.
8       Q   Well, how did you select who you spoke to
9   individually beforehand?
10      A   Mainly people on Dawson's team.
11      Q   Is that because you would consider them as
12  the group that would be leaving early?
13      A   Some of them were. Some of them were. But
14  not all of them.
15      Q   Okay. And some of them you picked yourself
16  as deciding who you wanted to leave with you; right?
17  I understand there were some volunteers, but there
18  were also ones that you said, I want you to leave
19  early; correct?
20      A   Yeah, well, Dawson had volunteered and --
21  and Cameron. They -- mainly all of them volunteered,
22  yeah.

Page 85

1       Q   Now, I want to ask you something: these
2   people have jobs; is that fair? These people at your
3   branch?
4       A   They have jobs? Is that --
5       Q   They have jobs, right? These were jobs for
6   them that they needed? They weren't working at Mutual
7   for fun; were they?
8       A   No.
9       Q   They needed income to support their
10  families; right?
11      A   Yes. That's why people have jobs.
12      Q   Right. And would a natural reaction when
13  the leader of your group, who's pretty critical to
14  your income, is about to leave, be at least some
15  question of nervousness, what's going to happen?
16          MS. KREITER: Object to the form.
17          THE WITNESS: I'm not sure.
18  BY MR. KAREN:
19      Q   Well, do you think that's one of the
20  reactions we might have is somebody neutrally came in
21  and said, hey, you know, we're the leaders of your
22  branch; we're leaving?

22 (Pages 82 - 85)

Page 86

1        MS. KREITER:  Same objection.

2    BY MR. KAREN:

3      Q   Don't you think that would be a natural

4    reaction, that somebody might say, "Wow, I'm really

5    worried -- is my job safe?"

6        MS. KREITER:  Same objection.

7    BY MR. KAREN:

8      Q   You can answer.

9      A   It could be.

10     Q   Okay.  But that's not what we see here.  We

11   see "yay," "I remain excited, yes."  Do you see that?

12     A   Yes.

13     Q   So when you talked to employees about this

14   opportunity, their reactions are to say after your

15   discussions in which you want them to come with you,

16   their reactions say "I'm excited, yes".  They're not

17   concerned at all; are they?

18     A   They're not, because we had a lot of issues

19   with Mutual, so by us announcing we were going to

20   another company, they were willing to go, because they

21   were frustrated with Mutual of Omaha and how we had

22   problems with the closing department and closing loans

Page 87

1    and other things, so they were excited to -- to go to

2    a place that they thought might be a good opportunity.

3      Q   And the reason they thought it might be a

4    good opportunity is because you presented it that way;

5    isn't that right?

6        MS. KREITER:  Object to the form.

7    BY MR. KAREN:

8      Q   You presented it as an opportunity, sir,

9    where you wouldn't have those alleged challenges

10   anymore; didn't you?

11       MS. KREITER:  Object to the form.

12       THE WITNESS:  They were very frustrated

13   with Mutual of Omaha, for sure.  So, you know, us

14   saying that we were going somewhere else, they -- they

15   wanted to come with us.

16   BY MR. KAREN:

17     Q   So if you would have said, "Hi, we're going

18   to a garbage dump; would you come with me?" you think

19   they would have come?

20       MS. KREITER:  Object to the form.

21   BY MR. KAREN:

22     Q   Sir, isn't it true that when you presented

Page 88

1    this opportunity, you presented this opportunity as

2    one that would be a positive change for them and for

3    you; right?

4      A   I don't remember how I presented it.

5      Q   Well, is that a reasonable assumption that

6    you would have presented it as a positive change

7    rather than a negative change for them?  Given that

8    you wanted them to come with you?

9        MS. KREITER:  Object to the form.

10   BY MR. KAREN:

11     Q   You can answer.

12     A   I would have.  I know everybody was very

13   frustrated with Mutual, so the opportunity would have

14   looked good, yes.

15     Q   And that's how you would have presented it;

16   right?  Because you believed it; right?

17     A   Yeah.  Again, we were frustrated with

18   Mutual, so it was -- seemed like a good opportunity.

19     Q   Okay.  And that's what you explained to them

20   when you gave them -- when you talked to them; right?

21     A   Yeah.  We announced Dwayne and I were

22   leaving and they wanted to come with us if they could.

Page 89

1      Q   But sir, you did more than that.  You just

2    told me a second ago you presented it as a potential

3    positive change for them; didn't you?

4      A   Yes.

5        MS. KREITER:  Object to the form.

6    Also, argumentative.

7        MR. KAREN:  Okay.  He answered, so --

8    did you get that on the record, Tim?

9        THE REPORTER:  No.  Can I please have

10   that repeated?  I think there was a little bit of

11   cross talk.

12   BY MR. KAREN:

13     Q   Yeah.  What was your answer, Mr. Wolf?  You

14   said yes; right?

15     A   Yes.

16     Q   And again, nobody from Waterstone at this

17   point in time had been in touch with any of these

18   employees; right?

19     A   Not to my knowledge.

20     Q   Okay.  So Waterstone was relying on you to

21   convey your messages to them; right?

22     A   Yes.  I was assisting in the transition.

23 (Pages 86 - 89)

Page 90

1    Q   Okay.  And Waterstone knew you were talking
2  to these employees; right?
3    A   Yes.
4    Q   Okay.  And they knew at the time you were
5  the branch manager?
6    A   Yes.
7        MR. KAREN:  If we could pull up Exhibit
8  31.
9        (Exhibit 31 was marked for
10       identification.)
11 BY MR. KAREN:
12   Q   Sir, I'm showing you what's going to be
13 marked as Exhibit 31.  This is a protective agreement;
14 do you see this?
15   A   Yes.
16   Q   Okay.  And if you could turn to the last
17 page?  And it has the employee name, Chris Wolf, and
18 then a signature -- or not a signature, it has an
19 employee named Chris Wolf there.  It looks like an
20 electronic signature; do you see that?
21   A   Yes.
22   Q   Okay.  And it has the date, 12/30/2020?

Page 91

1    A   Yes.
2    Q   Okay.  And is it fair, sir, that this is the
3  copy of an agreement that you electronically signed
4  with Mutual?
5    A   It looks like it, yes.
6    Q   Okay.  And I wanted to ask you, if we can
7  get to page three of the agreement.  Four of the
8  agreement; I'm sorry.
9        MR. KAREN:  And I don't know if you can
10 make this bigger, Jennifer, if you can scroll into
11 section 3.3 and make that larger?  Move it over a
12 little bit, please?
13 BY MR. KAREN:
14   Q   Right.  Okay.  And, sir, I want to bring
15 your attention, this says "Non-solicitation and
16 non-inducement of employees"; do you see where it says
17 that?
18   A   Yes.
19   Q   And it says "During the restricted period,
20 employees shall not directly or indirectly solicit,
21 recruit, encourage, or assist others in soliciting,
22 recruit, encourage, any company employees or former

Page 92

1  employees"; do you see where it says that?
2    A   Yes.
3    Q   And then under section B, and then there's a
4  section C; okay?  And section C writes "Provide or
5  pass along to any person or entity the name, contact,
6  or background information about any employees or
7  former employees."  Now, remember, sir -- do you see
8  where it says that?
9    A   Yes.
10   Q   Okay.  Now, remember that there was that
11 spreadsheet we talked about earlier, when you were
12 going back and forth with Elizabeth Spragg?
13   A   Yes.
14   Q   Okay.  That violated section C; didn't it?
15   A   Well, they'd already agreed to come over to
16 Waterstone, so I was helping with the transition.
17   Q   They had already agreed meaning -- well, but
18 that's not what -- it doesn't say anything about
19 already agreed, it says "Employees or former
20 employees" and that you will not provide or pass along
21 to any person or entity the name, contact, and/or
22 other information about them.  But you did in fact

Page 93

1  pass that information on; didn't you?
2    A   I did after they'd verbally agreed to
3  transition with us.
4    Q   Does anything here say about there's an
5  exception for people who've verbally agreed?  Do you
6  see an exception for that?
7    A   In -- in D, it says regarding potential
8  jobs.  They'd -- they'd agreed to come over with us
9  after we announced it.
10   Q   Sir, that's not my question.  You did pass
11 along information to Waterstone; right?
12   A   Yeah, I gave their names and phone numbers
13 and emails to assist with the transition after they
14 agreed to come over with us.
15   Q   And in that agreement was after you spoke to
16 them while you were still their branch manager at
17 Mutual, and told them positively about an opportunity
18 at Waterstone; right?
19   A   We announced we were going to Waterstone,
20 and they agreed that they wanted to come with us.
21   Q   An announcement you asked them, and you
22 intended to keep secret from Mutual while you were

Page 94

1  still employed with Mutual; right?
2      A   Yeah.  We didn't want any distractions, so
3  we didn't want Mutual to know.
4      Q   And then D, as you had said "Provide or pass
5  along to employees or former employees any information
6  regarding potential jobs."  Do you see where it says
7  that?
8      A   Yes.
9      Q   And that's exactly what you did; didn't you?
10     A   They had already agreed to onboard, so it
11  wasn't a potential --
12     Q   Well, let's examine this.  Are they seers?
13  Do you know if they have ESP and they can read minds?
14         MS. KREITER:  Object to the form.
15  BY MR. KAREN:
16     Q   Do you, sir?  I'd like to know.  Do you
17  think that they have the ability to read minds?
18     A   Who's that?
19     Q   Your employees.
20     A   No.
21     Q   How did they learn of the opportunity at
22  Waterstone?

Page 95

1      A   We announced that we were going to
2  Waterstone.
3      Q   So let's see.  Did you provide information
4  regarding potential jobs or entities or persons for
5  which to work?  Did you provide or pass along to
6  employees or former employees any information
7  regarding potential jobs?  You just admitted you did
8  that; didn't you?
9          MS. KREITER:  Object to the form.
10         THE WITNESS:  Yeah.  We announced we
11  were going to Waterstone.
12  BY MR. KAREN:
13     Q   And that violates section D; doesn't it?
14         MS. KREITER:  Object to the form.
15         THE WITNESS:  I'm not sure if it does.
16  BY MR. KAREN:
17     Q   Sir, did you read this agreement before you
18  engaged in the activities we've discussed today?
19     A   Not thoroughly enough.  I didn't really.
20     Q   Okay.  And did Waterstone ever ask you for
21  this document?
22     A   No, they did not.

Page 96

1      Q   Okay.  And you didn't provide it to them;
2  did you?
3      A   No, I didn't.
4          MR. KAREN:  Let's put 31 aside.  We may
5  come back to that later.  Let's go to Exhibit 15.
6  Actually, hang on one second.  We might not.  No, we
7  can skip that, actually.  Sir, I'd like to draw your
8  attention now to Exhibit 21.
9          (Exhibit 21 was marked for
10          identification.)
11  BY MR. KAREN:
12     Q   Sir, I'm showing you what's been marked, or
13  what I have marked as Exhibit 21 as an exhibit to this
14  deposition.  And this is an email from you to Ben
15  Davis; do you see that?
16     A   Yes.
17     Q   And it's dated April 7th; do you see that?
18     A   Yes.
19     Q   Okay.  You were still a branch manager over
20  at Mutual; right?
21     A   Yes.
22     Q   Okay.  And I'd like to scroll to the second

Page 97

1  page -- third page, I'm sorry.  And you send an email,
2  you write: "Good morning, I wanted to see the best way
3  to send any files to you right now.  I know Chris
4  Smith and Dwayne have another call tomorrow to
5  hopefully finalize things."  Do you see where it says
6  that?
7      A   Yes.
8      Q   Okay.  Now, here's my question to you: what
9  was the relevance of the fact that they were
10  finalizing things with Waterstone when you asked about
11  sending files?  Were those two thoughts connected in
12  some way in your mind?
13     A   Not that I remember.  I'm not sure what --
14  what they were finalizing at that point.
15     Q   Well, right, because you were already
16  talking to the employees; we saw that before.  They
17  wouldn't have been finalizing anything.  I mean, you
18  agree with me, you wouldn't have been still finalizing
19  details and telling all your employees and getting
20  offer letters; right?
21     A   Right.
22         MS. KREITER:  Object to the form.

25 (Pages 94 - 97)

Page 98

BY MR. KAREN:

1  Q    So at this point, they really weren't
2  finalizing things; things were finalized; isn't that
3  fair to say?
4     MS. KREITER:  Object to the form.
5     THE WITNESS:  Yeah, I'm not sure what
6  that was referring to in that sentence.
7  BY MR. KAREN:
8  Q    Okay.  You wrote that, though; didn't you?
9     MR. KAREN:  If you go up one page --
10  Jennifer, can you scroll up so you can get the --
11     THE WITNESS:  Yeah, it looks like that
12  was from my email.
13  BY MR. KAREN:
14  Q    Yeah, just look so we can confirm; I don't
15  want to surprise you with anything, so yeah.  So
16  again, that's your private email; right?
17  A    Yes.
18  Q    Okay.  And so from your private email,
19  you're writing to Dustin Owen and to Mike Smalley over
20  at Waterstone.  And this is April 6th, actually, so
21  it's the day before you tell the employees.

Page 99

1     But you don't know what you meant by
2  finalizing things?
3  A    I don't.  No, I don't recall what that --
4  what that was referring to.
5  Q    And that's probably not really accurate when
6  you think about it, because things were finalized by
7  that point.  You were already talking to people;
8  right?
9     MS. KREITER:  Object to the form.
10     THE WITNESS:  Right.
11     MR. KAREN:  Okay.  Okay.  Let's
12  continue on.  You can go up a page.  So at this first
13  page, now, we're looking at an email, scroll down --
14  scroll up.  I'm sorry, the first page.  Thank you.
15  And can you scroll down where it says, Wednesday,
16  April 6th, at 1:39 p.m.?  Perfect.
17  BY MR. KAREN:
18  Q    And so you write him, and you're still a
19  branch manager at Mutual at this point; right?
20  A    Yes.
21  Q    And Ben Davis obviously knew that; right?
22  A    Yes.

Page 100

1  Q    And when you say, "Hey, I want to send you
2  some files," his response, if I understand this, says,
3  "I can help out with these files,"; right?
4  A    Yes.  Those were turn-downs by Mutual, so I
5  was going to send those to Ben to see if he could do
6  them.
7     MR. KAREN:  Let's go to Exhibit 13.
8     (Exhibit 13 was marked for
9     identification.)
10  BY MR. KAREN:
11  Q    Sir, I'm going to show you Exhibit 13, and I
12  want you to understand what we're looking at.  This is
13  a number of emails that are not necessarily in a
14  string.  These are just about different loans, and
15  I've put them together as one exhibit for ease.  But I
16  want to make sure you understand Exhibit 13 is not
17  intended to reflect a string of connected emails; do
18  you understand that?
19  A    I do.
20  Q    Okay.  So we're just going to sort of go
21  through these.  And we're going to have this marked as
22  Exhibit 13 for the record.

Page 101

1     So the first email that we see here is an
2  email from you, dated 4/21/2022; do you see that?
3  A    Yes.
4  Q    And that's to Kyrstin Friebis?
5  A    Yes.
6  Q    Did Kyrstin previously work with you at
7  Mutual?
8  A    She did.
9  Q    Okay.  And was this one of the employees you
10  had transition over early?
11  A    Yes.
12  Q    Okay.  And so you're emailing -- and this
13  is, again, your private email?
14  A    Yes.
15  Q    And you're emailing Kyrstin while you're
16  still a branch manager about something called the
17  Sherwood file; right?
18  A    Looks that way, yes.
19  Q    Okay.  And here we've got in the
20  attachments, it says "2021 W-2, 2020 W-2s, 1003."
21  What is a 1003?
22  A    It's the loan application.

Page 102

1    Q   Okay.  That would have been the loan
2    application they filled out for Mutual; right?
3    A   Yes.
4    Q   Okay.  And the W-2s and the paystubs, this
5    is all information they gave to Mutual; correct?
6    A   That they gave to me, yes, when I worked at
7    Mutual.
8    Q   Yes.  So they gave to Mutual; right?
9    A   Yes.
10   Q   Okay.  And you're sending all that
11   information to Ms. Friebis at Waterstone; right?
12   A   Looks that way, yes.
13   Q   And what you say there is: "They are doing a
14   7/6 ARM at 4.75.  Let me know what the credit score
15   is, please.  I'm hoping it's 720 plus."  Had you not
16   even pulled their credit at Waterstone -- I'm sorry,
17   Mutual, at this point?
18   A   I'm not sure.  It looks like I hadn't.
19   Q   Well, and you wouldn't have pulled -- I
20   mean, let me make sure we're clear.  You agree with
21   me, sir, when you pull someone's credit at different
22   institutions, it potentially can lower their credit;

Page 103

1    right?
2    A   Yes.
3    Q   Okay.  And so for a borrower, where
4    obviously you're hoping their credit score is a
5    certain credit score, that's the last thing you would
6    have done is pull it at two different institutions?
7    Because if it lowered it, it could cause their rate to
8    change or even their viability for a loan; couldn't
9    it?
10   A   Yes.
11   Q   Okay.  And that's why you wouldn't have
12   pulled it at Mutual.  You would have pulled it only at
13   Waterstone; right?
14   A   Yes.
15   Q   And sir, is it true if you don't know their
16   credit score, you don't know if they could qualify?
17   A   Yes.
18   Q   Okay.  So sir, this person, you just told me
19   a second ago that you would have sent over loans that
20   had been turned down; isn't that what you just
21   testified one second ago under oath?
22   A   The two loans that I referred to in Ben's

Page 104

1    email were turn-downs by -- that Mutual couldn't do.
2    So that's --
3    Q   Okay.  But you didn't refer in your last
4    answer to loans.  You said -- and we can have it
5    played back if you want -- isn't it true you testified
6    under oath subject to the penalty of perjury that you
7    would have only sent over loans that you couldn't get
8    done over at Mutual?
9    A   I did not say that.  I was referring to
10   Exhibit 21, when you asked about the loans I sent to
11   Ben.  I said those were turn-downs.
12   Q   Okay.  Well, either way, let's go to this
13   loan.  This wouldn't have been a turn-down; would it?
14   A   Doesn't look like it, unless we were trying
15   to do a portfolio loan where we couldn't match the
16   rate that they were being offered.  That's the only
17   thing I can think of.  But yeah, it wasn't -- yeah, it
18   --
19   Q   You wouldn't even know if you could match
20   the rate, because you didn't even know the credit
21   score yet; right?
22   A   No.

Page 105

1    Q   I'm correct, aren't I?  You can't know the
2    rate unless you know the credit score; right?
3    A   If they had sent us a loan estimate from
4    another bank and then we wouldn't be able to match
5    that rate with Mutual, I could have sent that over and
6    done a -- you know, see if that's something that
7    Waterstone could have done on their portfolio line.
8    Because they had much lower rates on the portfolio
9    loans.
10   Q   Sir, do you see any mention of that in this
11   email?
12   A   No.
13   Q   Okay.  So all we know in this email based on
14   what you wrote is that you didn't even know the credit
15   score yet, and you were sending the loan over to
16   Kyrstin at Waterstone while you were branch manager at
17   Mutual; right?
18   A   Yes.
19   Q   Okay.  And you were taking information that
20   had been provided to Mutual by a customer, private
21   information, and sending that to Waterstone too;
22   right?

27 (Pages 102 - 105)

Page 106

1    A   Yes.

2    Q   Now, sir -- and at this point, Kyrstin

3    Friebis is a Waterstone employee; correct?

4    A   Yes.

5    Q   Because you had sent her over early; right?

6    A   Correct.  She volunteered to go over early.

7    Q   Did she volunteer after you asked her or

8    before?

9        MS. KREITER:  Object to the form.

10       THE WITNESS:  She -- she volunteered

11   when we made the announcement.  She was one of the

12   people that volunteered to go over.

13   BY MR. KAREN:

14   Q   Now, did you ask for volunteers to go over?

15   A   Yes.

16   Q   Okay.  Now, let's go to the next page of

17   this.  This is another email from you, dated 4/20, to

18   Kyrstin Friebis.  Do you see that?

19   A   Yes.

20   Q   And this subject is "Columbis."

21       MS. KREITER:  Ari, sorry, what is the

22   Bates number of this one?  I just --

Page 107

1        MR. KAREN:  Sure.  02417.

2        MS. KREITER:  Okay.

3        MR. KAREN:  I'm sorry; 02147.  Are we

4    good, Maria?

5        MS. KREITER:  Yes.  Yes.

6    BY MR. KAREN:

7    Q   And the subject is "Columbis."  Do you see

8    that, sir?

9    A   Yes.

10   Q   Is it fair to assume that's the name of a

11   borrower?

12   A   That is fair.

13   Q   Okay.  And below we see some annuity

14   statement, a passport, SSA letter, first pension

15   check.  That's information that would have been sent

16   to Mutual?

17   A   Yes.

18   Q   Okay.  And you're sending again from your

19   private email?

20   A   Yes.

21   Q   And that's because you didn't want Mutual to

22   know you were doing this; right?  It'd be a

Page 108

1    distraction; right?

2    A   Yes.

3    Q   And then you say in this 02147, this email

4    here, you say: "Credit did not have scores.  Said they

5    were all frozen."  What does that mean?

6    A   Some people put a -- a freeze on their

7    credit profiles, so you can't pull through scores

8    without them unlocking them or unfreezing them.

9    Q   Oh, like, an identity theft kind of

10   protection thing?

11   A   Yes, sir.  Exactly.

12   Q   Okay.  So again, on this loan, you don't

13   know what their credit was; right?

14   A   No.

15   Q   So you couldn't have known whether Mutual

16   would have been able to give them a loan; right?

17   A   No.

18   Q   No, I'm correct; is that correct?

19   A   Correct.

20   Q   Okay.  Now, sir, were these -- let me back

21   up for a second.  Were you considered a producing

22   manager?

Page 109

1    A   Yes.

2    Q   Okay.  What does that mean to you?

3    A   It means I also originate loans as well as

4    manage the branch.

5    Q   Okay.  And my question is, were these loans

6    that were your originations, or the originations of

7    another employee at the branch?

8    A   Sherwood, I don't recall.  Columbis was one

9    of Kyrstin's clients.

10   Q   Okay.  Why would you have been facilitating

11   the transition of information for one of Kyrstin's

12   clients?

13   A   Because it was her client and she was at

14   Waterstone.  She originated that client on her own,

15   with no help from -- from Mutual.

16   Q   Do you know who was even logged into

17   Mutual's pipeline to -- was it in her pipeline at

18   Mutual?

19   A   I don't remember.

20   Q   But it would have been a loan that at least

21   had started at Mutual, and that's why you had to send

22   the information over her to Waterstone; right?

28 (Pages 106 - 109)

Page 110

1    A   Yes, it would have been an application that
2   originated there.
3            MR. KAREN:  Okay.  Now, let's go to the
4   next page.  And now I'm looking at WMC4430.  Can you
5   scroll down, Jennifer, just for a second, so Maria can
6   see that Bates number?  Thank you.  And you can scroll
7   back up now.
8   BY MR. KAREN:
9    Q   And sir, this is an email dated 4/13, and
10  this is to Ben Davis.  And it says "Manufactured home
11  with ADU; Kemp appraisal."  Do you see where it says
12  that?
13   A   Yes.
14   Q   And again you sent this while you were
15  branch manager from your personal email; right?
16   A   Yes.
17   Q   Okay.  And is the appraisal -- that's
18  something that happens pretty late in the loan
19  process; doesn't it?
20   A   Usually within a couple weeks of us
21  submitting it.  Usually a week or so with us
22  submitting it into processing.

Page 111

1    Q   Right, but in other words, if you were to
2   talk through the loan process, I assume one of the
3   first things is pulling credit; right?
4    A   Right.
5    Q   And then they do an application, and you get
6   information about their credit worthiness; is that
7   right?
8    A   Yes.
9    Q   And after you do get that information, then
10  you go to appraisal, because you don't want to spend
11  the money on appraisal until you know that they
12  actually could do the loan; is that fair to say?
13   A   We do them simultaneously, so we'll get the
14  contract in and submit it into processing, and they'll
15  order the appraisal at the same time as they send it
16  in to underwriting.
17   Q   Okay.  But then when you actually get the
18  appraisal, it's a couple weeks later?
19   A   Usually, yes.
20   Q   Okay.  And so this is something obviously
21  that's been pending at least for some time, and you
22  ask Mr. Davis whether -- and you wouldn't -- strike

Page 112

1   all that.  I'm sorry; let me start over.
2            You wouldn't order an appraisal for a loan
3   that you knew you had no chance of doing; right?
4    A   Right.  It looks like we got the appraisal
5   back and there was an accessory unit on the
6   manufactured home, which there was an overlay by
7   Mutual, so they did not allow that type of property.
8   So that's why I was asking Mr. Davis if they allowed
9   it at Waterstone.  So this is a loan Mutual could not
10  do.
11   Q   Okay.  Let's go to the next page.  And this
12  is an email from Shirley Agudelo, and again, this is
13  Bates number 05502.  And the subject is "Crawford,
14  Jordan" or Jordan Crawford.  Do you see that?
15   A   Yes, sir.
16   Q   It's a title commitment?
17   A   Yes.
18   Q   Okay.  And again, you're still branch
19  manager at this time?
20   A   Yes.
21   Q   Okay.  And Waterstone's using your private
22  email; right?

Page 113

1    A   Yes.
2    Q   And do you think Waterstone understood you
3   were using your private email so there would be no
4   distractions?
5            MS. KREITER:  Object to the form.
6   Calls for speculation.
7   BY MR. KAREN:
8    Q   You could answer.
9    A   Yes.  This was another loan that Mutual said
10  they couldn't do.  He was a basketball player in
11  Turkey, and they didn't like the -- the way his
12  contract was, so they turned this down.  So I sent it
13  to Waterstone.
14   Q   Let's go to the next page, WMC6193.  This is
15  an email from you, this time using your Mutual, no
16  longer Gmail, to Mike Smalley.  And it's a loan
17  referral.  And you say "Here's a construction lead."
18  Do you see that?
19   A   Yes.
20   Q   Did Mutual do construction loans?
21   A   They did not.  They had no construction
22  products, so that's why I sent that over.

29 (Pages 110 - 113)

Page 114

1    Q   Let's go to the next page.  And this is
2   WMC6205.  And this is an email from you, dated 4/21,
3   to Michael Irish; do you see that?
4    A   Yes.
5    Q   Okay.  And again, and the borrower name
6   appears to be Julie Rose; is that a fair assumption,
7   what Julie Rose means?
8    A   Yes.  Yes.
9    Q   Okay.  And you were still branch manager of
10  Mutual at this time?
11   A   Yes.
12   Q   Okay.  And you say to him "let me know when
13  you review credit and give me a call so we can
14  discuss."  Do you see that?
15   A   Yes.
16   Q   Okay.  And so you hadn't pulled credit yet?
17   A   No.
18   Q   Okay.  And below that, you wrote in the
19  email: "Thanks.  They are looking to do a conventional
20  purchase."  That's a very standard loan, a
21  conventional loan?
22   A   Yes.

Page 115

1    Q   And 20 percent down, that's a very standard
2   amount of downpayment; isn't it?
3    A   Yes.
4    Q   Nothing exotic there; right?
5    A   No.
6    Q   Let's go to the next page.  And this is
7   WMC6206.  And this is dated 4/27.  Now, sir, were you
8   already at Waterstone at this point?
9    A   Yes.
10   Q   Okay.  Do you know why you were still using
11  your private email?
12   A   I don't know why I would have sent that from
13  my private email, no.
14   Q   Well, it says "Danielle McCormick
15  pre-approval."  Do you see that?
16   A   Yeah.
17   Q   Okay.  And is it fair to say that this was a
18  pre-approval from Mutual that you probably sent to
19  your private email and then forwarded to Michael
20  Irish; right?
21       MS. KREITER:  Object to the form.
22       THE WITNESS:  I'm not sure.

Page 116

1   BY MR. KAREN:
2    Q   Well, do you know why else you would have
3   written -- well, okay.  Let's go through this.  You
4   were still at Mutual on the 26th; right?
5    A   No.  I think we had gone to Waterstone on
6   the 26th.
7    Q   Okay.  All right.  Let's go to the next
8   page.  And this is WMC01763.  Again, this is from your
9   private email?  Dated 4/22, while you were still at
10  Mutual?
11   A   Yes.
12   Q   Yes?  And this is to Dawson Walker.  He was
13  one of your former employees at Mutual?
14   A   Yes.
15   Q   And you had him transition to Waterstone;
16  right?
17   A   Yes.
18   Q   And here this is the "Byers, Lea/Brad"; do
19  you see that?
20   A   Yes.
21   Q   By the way, was this one of your borrowers,
22  sir, or was it -- when I say your borrowers, was it

Page 117

1   your production or someone else's production?
2    A   It was -- it was not, that was not my -- my
3   buyer.
4    Q   Whose was it?
5    A   Looks like it was Dwayne's.
6    Q   Why would you be sending a prior for Dwayne
7   to Dawson Walker?
8    A   I'm not sure.
9    Q   You don't know?
10   A   I don't remember --
11   Q   Well, do you make it a habit to take
12  Dwayne's originations and send them to other
13  companies?  Is that something you typically do?
14   A   No, it's not.
15   Q   Okay.  Well, and you can't recall, and you
16  can't envision or think about why you might have done
17  that?
18   A   I don't remember that file.  It wasn't mine,
19  so I don't -- I don't have any recollection of that
20  one.
21   Q   Well, I'm not asking about the file, I'm
22  asking you, why would you have taken one of Dwayne's

30 (Pages 114 - 117)

Page 118

1  originations -- well, strike that. You wouldn't have
2  done this without Dwayne's approval; right?
3      A  No.
4      Q  Okay. So he would have known you were doing
5  it?
6      A  Yes.
7      Q  Why wouldn't he have just sent it himself?
8      A  I'm not sure.
9      Q  Do you know why you keep ending up as the
10  go-between for communications between employees,
11  between other people, between loan files? Why are you
12  the go-between, Mr. Wolf?
13          MS. KREITER: Object to the form.
14          THE WITNESS: I'm not sure.
15  BY MR. KAREN:
16      Q  You didn't think about that ever?
17      A  No, not really.
18          MS. KREITER: Object to the form.
19  BY MR. KAREN:
20      Q  Now, this is an email -- and again, you
21  attached authorization for appraisals, credit,
22  paystubs, a lot of information that was provided to

Page 119

1  Mutual; right?
2      A  There's some, yes.
3      Q  Okay. And you sent that over to Waterstone;
4  right?
5      A  Yes.
6      Q  And you write "Hey, bud, can you or someone
7  on your team get this going?" That means start the
8  loan; is that right?
9      A  Right.
10      Q  Let's go to the next page. Actually, we can
11  skip that one. Well, no, let's keep this page.
12          Sir, this is another email, WMC0854; do you
13  see that?
14      A  Yeah. Tariq, that was a turn-down by
15  Mutual, so we had to send it to Waterstone.
16      Q  Right, but you're taking all that, the 1040s
17  and the 1120 and all those documents, those were
18  provided to Mutual and you're sending them to
19  Waterstone; right?
20      A  Yeah. They were provided to Dwayne.
21      Q  Okay. Let's go to the next page. WMC1685.
22  This is an email dated 4/20; do you see that?

Page 120

1      A  Yes.
2      Q  Came from your personal email; do you see
3  that?
4      A  Yes.
5      Q  Okay. And it's D'Ettore docs; do you see
6  that?
7      A  Yes.
8      Q  And you're sending to Kyrstin Friebis,
9  basically a DL, an SSC, a DD214, and a COE; right?
10      A  Yes.
11      Q  And those are all borrower-related documents
12  that are provided to Mutual?
13      A  Yes, they were given to Kyrstin.
14      Q  At Mutual; right?
15      A  Yes.
16      Q  And you sent them to Waterstone; right?
17      A  Yes.
18      Q  Why were you the go-between?
19          MS. KREITER: Object to form.
20          THE WITNESS: Again, I'm not sure.
21  BY MR. KAREN:
22      Q  Well, Ms. Friebis didn't have access to

Page 121

1  Mutual's systems anymore; right?
2      A  Correct.
3      Q  And these are documents that would have been
4  kept in Mutual's Encompass; right? Its loan
5  origination system?
6      A  Yes.
7      Q  Okay. And so you went into Mutual's loan
8  origination system, took these documents, downloaded
9  them, and sent them to Kyrstin at another mortgage
10  company; am I understanding that correctly?
11      A  I'm not sure where I got them from, but
12  yeah, it looks like I sent those documents.
13      Q  Okay. And you would have gotten those
14  documents off of Encompass; right? Because that's
15  where they would typically be stored?
16      A  Typically, yes.
17      Q  Let's go to WMC1648. And this is an email
18  from you with your private email; right? Sending to,
19  again, Kyrstin, on 4/20, documents about Gipson; do
20  you see that?
21      A  Yes.
22      Q  Was this another Kyrstin loan?

31 (Pages 118 - 121)

1    A   Yes.

2    Q   Okay.  And so again, these are documents

3  that are attachments, bank statements, borrower

4  information, paystubs, looks like bank statements, all

5  that would have been provided to the borrower to

6  Mutual?

7    A   Yes.  These are all potential clients; they

8  weren't actually active loans.  But yes.

9    Q   Okay.  So you're taking for these potential

10  clients that were at Mutual.  And these are documents

11  that would have been stored in Encompass typically?

12    A   Typically, yes.

13    Q   Okay.  To get in Encompass, do you need a

14  password?

15    A   Yes.

16    Q   Why is that?

17    A   For security purposes?

18    Q   Well, why would there be security purposes?

19    A   Everybody has their own login to make sure

20  you know who's going in Encompass.

21    Q   Why do you need to know who's going into

22  Encompass?

1    A   See who's working on files.

2    Q   Well, is there sensitive information in

3  Encompass?

4    A   Yes.

5    Q   And that's why you can't just have anybody

6  walking the street go get into it; right?

7    A   Correct.

8    Q   Okay.  And you know that?  You know that's

9  protected information; isn't it?

10    A   Yes.

11    Q   It has to be kept safe; right?

12    A   Yeah.  There's certain sensitive

13  information, like social security numbers and things

14  like that, yes, that's in there.

15    Q   And the stuff that people have in the bank

16  statements, things like that?  Personal information;

17  right?

18    A   Some -- some of it is.  Some of it's

19  sensitive information, yeah.

20    Q   But you would agree how much money you have

21  in a bank account is not something people typically go

22  around sharing to random people on the street; right?

1    A   Right.

2    Q   Most people would consider that pretty

3  sensitive; wouldn't they?

4    A   I guess.  I -- I wouldn't call that

5  sensitive information, but --

6    Q   Certainly confidential, wouldn't you agree?

7    A   Sure.  Confidential.

8    Q   And when they're sending to your bank,

9  they're trusting you and that bank to keep that

10  information safe; aren't they?

11    A   Yes.

12    Q   Okay.  Your realtors would be pretty upset

13  if they found out that you were just sharing

14  borrowers' bank account balances with randoms;

15  wouldn't they?

16       MS. KREITER:  Object to the form.

17       THE WITNESS:  I -- I don't know if they

18  would or not.

19  BY MR. KAREN:

20    Q   You think it would be a good idea to start

21  publishing your borrowers' bank account information on

22  the internet?

1    A   We were sending the documents to someone who

2  could get the loan done.  I think they'd be okay with

3  it.

4       MR. KAREN:  Motion to strike.  That

5  wasn't my question.

6  BY MR. KAREN:

7    Q   My question, which I'd like answered, was do

8  you think it would be positive for your business if

9  you took borrowers' bank account balances and put it

10  on your Facebook page?

11    A   Yeah, obviously that wouldn't be right.

12    Q   Okay.  Because the information's

13  confidential; right?

14    A   Right.

15    Q   And it's provided to you with the

16  understanding you're going to keep it safe and you're

17  not going to share it, except to the extent necessary;

18  right?

19    A   Right.

20    Q   Okay.  And so now, you would also agree with

21  me sir, when doing a loan, is it fair to say that one

22  of the -- as you sort of get into the loan process,

Page 126

1  there are places where the loan can, for lack of a
2  term, fall out?
3      A   Yes.
4      Q   Okay.  And you know what I mean by fall out,
5  just so we're talking the same language?  That means
6  somebody decides not to proceed forward; right?
7      A   That could be one of the reasons, yes.
8      Q   Right.  But when I refer to fall out, what
9  I'm saying, is they fall out because for whatever
10  reason they're not going to move forward on the loan.
11  That's what I'm referring to as a fall out; is that
12  fair?
13      A   Yes.
14      Q   Okay.  So one of the areas which you agree
15  that people fall out is at the point of the credit
16  score; right?  Because they just might not give you
17  that access to your credit; is that a place where you
18  could have a fall out?
19      A   Yes.
20      Q   And another place you could have a fall out
21  is when you say, "Hey, go and give me all the
22  documents, you know, that I need to do this loan."

Page 127

1  That's another place when you fall out; right?
2      A   Yes, if they didn't agree to provide the
3  documents you need, correct.
4      Q   And some people, people don't want to, you
5  know, they're not serious or, you know, they don't
6  want to go through a hassle of getting all the stuff.
7  That's another fall out place of the loan; right?
8      A   Yes.
9      Q   Okay.  So when you get the borrower to
10  provide the credit score and all that information,
11  that's getting sort of also their buy in to the loan
12  process; right?
13      A   Yes.
14      Q   And their buy in with you to the loan
15  process; correct?
16      A   Yes.
17      Q   So merely having that information is
18  valuable to you in regard to the loan process, because
19  you've gone through and gotten that borrower's buy in;
20  right?
21      A   Yes.
22      Q   And you further qualify that business

Page 128

1  opportunity; right?
2      A   Right.
3      Q   And so that loan at that point is much more
4  valuable to you, just having all that information than
5  some random, you know, person out there that might buy
6  a house; isn't it?
7      A   Yes.
8      Q   So just knowing that identity of that
9  person, who's willing to give that all to you, and
10  willing to go forward that far, just in and of itself,
11  that's valuable; isn't it?
12      A   True.
13      Q   And you're providing that to Waterstone, to
14  Kyrstin over there; aren't you?
15      A   I'm providing the documents from her client
16  to her.  But she -- she'd already gained that trust
17  and respect.  And we were trying to make it easier on
18  them, on the clients, not having to provide all that
19  information again and go find those documents.
20      Q   But you were also, by virtue of sending all
21  this information, making it easier for Waterstone to
22  close the mortgage; right?

Page 129

1      MS. KREITER:  Object to the form.
2      THE WITNESS:  I was making it easier on
3  the client, on Kyrstin's clients, so they didn't have
4  to dig up all those documents again.
5  BY MR. KAREN:
6      Q   But they also could have just closed the
7  loan at Mutual; couldn't they?  That would have made
8  it easier, too.
9      A   These were applications.  They weren't
10  actual loans yet.  They were just pre-qualified
11  people.
12      Q   Sir, that's not my question.  My question
13  is, they could have just stayed at Mutual; couldn't
14  they?  And then they wouldn't have had to provide the
15  documents twice; right?
16      A   Well, their loan officer wasn't there.  The
17  person they trust to close the loan wasn't there
18  anymore.  They decided to -- they wanted to stay with
19  Kyrstin.
20      Q   They could have just -- my question is --
21  they could have closed that loan at Mutual and just
22  left all the documents there; right?

33 (Pages 126 - 129)

Page 130

1 A If they had a contract and went under
2 contract, they could have technically closed at
3 Mutual. But these were Kyrstin's clients. These were
4 not clients that Mutual had created in any way. These
5 were people that Kyrstin had gotten referrals for.
6 Q Kyrstin worked for Mutual at the time;
7 right?
8 A Yes.
9 Q Did Kyrstin have the ability to make loans
10 herself? Did she have secondary market investors that
11 she could send loans to, and did she have an ability
12 to actually send them hundreds of thousands of dollars
13 to buy the house?
14 A No.
15 Q Okay. Was she approved as a lender herself
16 under NMLS?
17 A Not as a lender, no.
18 Q Okay. So she actually couldn't have done
19 the loan herself; could she? She was just a loan
20 officer. Mutual was the one making the loan; right?
21 A Yes.
22 Q But you never gave Mutual that opportunity;

Page 131

1 did you?
2      MS. KREITER: Object to the form.
3      THE WITNESS: No.
4 BY MR. KAREN:
5 Q Okay. Let's go to WMC1378. This is dated
6 4/26. Is that -- I do want to be clear, sir -- is
7 that your first day at Waterstone?
8 A Yes.
9 Q Okay. But you're still using your personal
10 email address; right?
11 A Yes.
12 Q Is that because -- and this is relating to
13 borrower Sam Brown?
14 A Yes.
15 Q And these are documents, paystubs, there's
16 1003, there's W-2s, there's credit. Is that
17 information that would have been Mutual information, a
18 1003?
19 A Yes.
20 Q Okay. And that the only reason you'd be
21 sending that through your private email, that's
22 because you originally either downloaded it or sent it

Page 132

1 to your private email when you were at Mutual; right?
2 A Yes.
3 Q Let's go to the next. This is an email from
4 you again, using your private email. This is dated
5 4/19, and you're sending these to Dawson Walker. Do
6 you see that? At Waterstone?
7 A Yes.
8 Q Who's Kristie Johnson?
9 A She was an operations person with us.
10 Q Why were you sending it to her private
11 email?
12 A I don't remember. I know she had worked
13 with this client quite a bit, but I'm not sure why
14 other than that.
15 Q And you're sending a lot of, again, W-2s,
16 1040 tax returns, IRS payoffs, a lot of personal,
17 private information?
18 A Yeah, looks like it, yes.
19 Q Okay. And that would have been information
20 provided to Mutual; right?
21 A Yes, provided to us while we were at Mutual.
22 Q And the date is 4/19, so you were still

Page 133

1 branch manager at Mutual at that time?
2 A Yes.
3 Q Okay. And you write "Hi, Dawson, here is a
4 CO refi of Dwayne's." Again, Dwayne would have known
5 you were doing this; right?
6 A Yes.
7 Q You know why you were the go-between?
8      MS. KREITER: Object to the form.
9      THE WITNESS: I mean, Dwayne was not
10 good with email and things like that, so I probably
11 was helping him out.
12 BY MR. KAREN:
13 Q Dwayne didn't know how to use -- did I just
14 hear that right? Dwayne didn't know how to use email?
15 That's your answer?
16 A I said he was not very good with email, so I
17 was helping him.
18 Q Okay. Do you think Dwayne would -- so what
19 do you mean, he's not very good? He doesn't know how
20 to attach things? He doesn't know how to send emails?
21 A Yeah, I was helping him out with this
22 client, get this -- getting the documents to Dawson.

34 (Pages 130 - 133)

Page 134

1    Q    No, no. Answer my questions, sir. Does he
2  not know how to attach things? What do you mean,
3  he's not good with email? He doesn't know how to hit
4  send?
5    A    He's just not very good with technology, so
6  I helped him out with this.
7    Q    Sir, I'm not good with technology either,
8  but it's not technology to type in an -- let's
9  consider what we do when we send an email; okay? I
10  want to go through this with you. Because I'm
11  confused; I need some clarity. When you send an
12  email, you type in a name, you type in a message, and
13  you hit send; right?
14    A    Right.
15    Q    How much technical skill does it require to
16  send an email?
17    A    Not much, I guess.
18    MS. KREITER: Object to the form.
19  BY MR. KAREN:
20    Q    So you're telling me he lacked the ability
21  and wasn't very good at typing in a name, typing in a
22  message, and hitting send? Is that your testimony

Page 135

1  under oath, that he had problems doing that?
2    A    I was just commenting that he wasn't very
3  good at getting documents and sending emails, so
4  that's why I was helping him.
5    Q    Well, what I'm trying to understand is that
6  you said he had a technological issue. And I'm trying
7  to understand the technological issue that you
8  testified to under oath concerning his ability to hit
9  send and his ability to click attach. So I'm trying
10  to figure out where the challenge was there. Could
11  you help me?
12    A    I wish I could. You'd have to talk to
13  Dwayne. I -- I just helped him out with a couple of
14  these files, getting the documents over.
15    Q    All right. So let's look at what you wrote
16  while you were helping Mr. Hutto with his email
17  challenges. You write "Kristie I have been working on
18  it for several -- Kristie and I have been working on
19  it for several months now, actually, like, a year,
20  LOL." So is this your email, or is this Dwayne's
21  email?
22    A    Yeah, this is mine. I'd been helping

Page 136

1  Kristie with this file. I'd hit several challenges,
2  been turned down a couple times by Mutual. We were
3  trying to rescore his credit, as you see in the next
4  sentence.
5    Q    That's right, I do. It says: "If you and
6  Maria can get this one going and send to Cameron to
7  LP. Try to pull credit today, since the rescore just
8  came back, scores should be the same." Do you see
9  where it says that?
10    A    Yes.
11    Q    So you had gone through a rescore, and
12  according to that rescore, the credit scores had come
13  up to where the person now was potentially eligible to
14  do a loan; right?
15    A    It looks that way.
16    Q    Okay. And then you continue on "The
17  appraisal I'm sending over is four months old, so
18  we're going to get with Brian to see if we can get a
19  new one with more value, since we're capped at 75 LTV
20  per AUS." What is AUS?
21    A    Automated underwriting system.
22    Q    And that's an automated underwriting system

Page 137

1  that goes through Fannie Mae; isn't it?
2    A    Yeah, Fannie Mae or Freddie Mac.
3    Q    Right. And Fannie Mae or Freddie Mac,
4  that's not Waterstone, that's Fannie Mae or Freddie
5  Mac; right?
6    A    Yes.
7    Q    And that's not Mutual either? That's just
8  Fannie Mae or Freddie Mac's guidelines for doing a
9  loan; right?
10    A    Right.
11    Q    Okay. That doesn't include any overlays
12  from anybody else, that's just Fannie Mae and Freddie
13  Mac pure and simple; isn't it?
14    A    Yes.
15    Q    Okay. And you're sending this to them to
16  see if -- to Dawson and to Kristie -- to see if you
17  could do this loan over at Mutual; right? I'm sorry,
18  at Waterstone; right?
19    A    Yes.
20    Q    And you're sending all that borrower
21  information that's provided to Mutual; right?
22    A    Yes.

35 (Pages 134 - 137)

Page 138

1    Q    And you're using your private email; right?
2    A    Yes.
3    Q    And Kristie's private email; right?
4    A    Yes.
5    Q    Sir, are your private emails encrypted?
6    A    I'm not sure.
7    Q    Well, what security protocols would protect
8    this type of sensitive information in your private
9    Gmail account?
10   A    I don't know.
11   Q    So it's entirely possible there are none;
12   right?
13   A    I'm not sure.
14   Q    You never did any checking; did you?
15   A    No, I'm not an IT technician.  I wouldn't
16   know.
17   Q    Let's go to the next email, WMC1297.  And
18   this is again, sending from you from your private
19   email; right?
20   A    Yes.
21   Q    And the date is 4/20/2022?
22   A    Yes.

Page 139

1    Q    You're sending to Kyrstin again?
2    A    Yes.
3    Q    And you're sending paystubs and 1003s
4    provided to Mutual; right?
5    A    Yes.
6    Q    And it's about a borrower named Tasha Ryan;
7    right?
8    A    Right.
9            MR. KAREN:  Let's go to -- I don't
10   think there's anything else -- I think we can be done
11   with this exhibit now.
12           MS. KREITER:  Ari, is now a good time
13   for kind of a midmorning break?
14           MR. KAREN:  Yes.  I will say, I do not
15   think I'm going to be more than -- give me one second,
16   Maria.
17           MS. KREITER:  Sure.
18           MR. KAREN:  This isn't going to be a
19   really long deposition.  I think we're going to wrap
20   up within the hour, so if we can not do lunch, I think
21   we'll get through this.  But I don't have a problem
22   with a break right now.  So you want to take, like --

Page 140

1            MS. KREITER:  If you -- I guess I'll
2    ask Chris, I mean, with the understanding it's
3    approximately an hour, do you want to keep going or
4    take a short break?
5            THE WITNESS:  I'm fine to keep going,
6    if you want.
7            MS. KREITER:  Okay.  I could just use,
8    nevertheless, like, a two-minute break, Ari, just to
9    --
10           MR. KAREN:  Yes.  No, no, no problem.
11   Yes.  You want to take five minutes or something?
12   That's fine.
13           THE WITNESS:  Yes.
14           MS. KREITER:  Sure.  Okay, great.
15           THE VIDEOGRAPHER:  The time is 11:27
16   a.m.; we are now off the record.
17           (Off the record.)
18           THE VIDEOGRAPHER:  This is the
19   beginning of media unit number 3 in the video recorded
20   deposition of Mr. Christopher Wolf.  The time is 11:40
21   a.m., Eastern.  We are now back on the record.
22   Counsel you may proceed.

Page 141

1            MR. KAREN:  Thank you.  Could we bring
2    up Exhibit 9 please, Jennifer?
3            (Exhibit 9 was marked for
4            identification.)
5    BY MR. KAREN:
6    Q    Sir, this is an email that we've marked as
7    Exhibit 9.  You're now at Waterstone; right?
8    A    Yes.
9    Q    Okay.  So you were an employee of Waterstone
10   and a branch manager for Waterstone at this point?
11   A    Yes.
12   Q    Cody Lamb and Fred Stalls were not at the --
13   they didn't work at the Daytona branch for Mutual; did
14   they?
15   A    No.  They were in Tampa.
16   Q    Okay.  And so at this time on June 9,
17   they're still at Tampa; right?
18   A    Yes, it looks like it.
19   Q    Okay.  And this is a loan, some documents
20   serving a loan, it sounds like, they were sending you
21   on a file called Mcintosh?
22   A    Yeah, it appears so.

36 (Pages 138 - 141)

Page 142

1    Q   Do you know why you were acting as the
2  go-between on this?
3        MS. KREITER:  Object to the form.
4  BY MR. KAREN:
5    Q   Let me rephrase that.  Actually, let me
6  rephrase that.  Obviously, Cody and Fred could
7  probably send these emails to anybody over at
8  Waterstone, I'd presume; right?
9    A   I'm not sure.  I don't -- I don't remember
10  this file or anything about it.
11    Q   Okay.  All right.  My question is, but why
12  would they have been emailing -- do you know why they
13  would have been emailing you of all people at
14  Waterstone the information about this loan?
15    A   I don't remember.
16    Q   Were you designated as a person, like, a
17  point person, to send or receive files?
18    A   No.  Not that I know of.
19    Q   So you don't know why, instead of sending it
20  to Dwayne or to any other employee, they would have
21  sent it to you?  You have no idea why that of all
22  people, they sent it to you?

Page 143

1        MS. KREITER:  Objection.  Asked and
2  answered.
3  BY MR. KAREN:
4    Q   You could answer.
5    A   I -- I don't know.
6    Q   Did you ever ask?  I mean, did you ever go,
7  like, "Hey, why are you sending this to me?"  Did you
8  ever ask them why they sent these to you?
9    A   I don't remember about this one.
10    Q   I'm asking generally.  Do you know why --
11  because in some other files, I could show you were
12  people were sending you loans.  And my question is,
13  why were they sending them to you over and over again?
14        MS. KREITER:  Objection.  Asked and
15  answered.
16        THE WITNESS:  Yeah, I'm not sure.
17        MR. KAREN:  Okay.  Let's go to Exhibit
18  12.  Okay, this is an exhibit, so we're going to have
19  it marked as Exhibit 12 in this deposition.
20        (Exhibit 12 was marked for
21          identification.)
22  //

Page 144

1  BY MR. KAREN:
2    Q   And this is an email, again, from you to
3  Michael Smalley over at Waterstone.  And it's dated
4  4/20/2022; do you see that?
5    A   Yes.
6    Q   You were using your private email again;
7  right?
8    A   Looks like it.
9    Q   And you were still a branch manager over at
10  Mutual; right?
11    A   Yes.
12    Q   Okay.  And in this loan, you said "I haven't
13  pulled credit yet."  Do you see where you say that?
14    A   Yes.
15    Q   Okay.  So you didn't know whether this
16  person could qualify or not at Mutual, because you
17  hadn't pulled the credit; correct?
18    A   Looks like there's an issue with the income,
19  with the overtime.  We hadn't pulled credit, but it
20  looked like something maybe Mutual wouldn't allow,
21  because the overtime with the gap.  So we were sending
22  it over to see if an underwriter could --

Page 145

1    Q   Okay.  Well, let me ask you: this is a
2  conventional loan, do you see where it says that?
3    A   Yes.
4    Q   Okay.  And conventional loans are usually
5  written through Fannie Mae or Freddie Mac; aren't
6  they?
7    A   They are, but this looks like there was an
8  issue with the gap in overtime, which Mutual was very
9  strict on.  So it was something we probably ran by an
10  underwriter, and they said no.
11    Q   Okay.  Well me ask you something, sir:
12  the underwriting guidelines for Fannie Mae and Freddie
13  Mac deal with overtime.  Under their guidelines, it's
14  specific how you calculate it and when you calculate
15  it.  They have very specific underlying guidelines at
16  Fannie and Freddie; don't they?
17    A   There is, but when there's a gap, a lot of
18  times it's underwriter discretion, and that was a big
19  issue we had at Mutual, was a lot of the underwriters
20  used a lot of discretion and -- and were turning down
21  loans.
22    Q   And what is "gap"?

37 (Pages 142 - 145)

Page 146

1    A   It means either he had a job gap, or there
2  was some type of in the middle, where they didn't have
3  overtime.  Typically they switch jobs a couple times,
4  and maybe had a job in the middle that -- that didn't
5  have overtime.  Then they went back to a job that had
6  overtime.
7    Q   Okay.  You don't know for -- it doesn't say
8  in here that you had given this to somebody, an
9  underwriter over at Mutual; right?
10    A   It doesn't specifically say that in here,
11  no.
12    Q   Okay.  And if you would have given it to an
13  underwriter, wouldn't you have -- I mean, the first
14  part in a loan application is, you pull credit; right?
15    A   Typically, yes.
16    Q   And the reason you would do that is because,
17  if this person's credit is 500, it doesn't matter
18  about the overtime; correct?
19    A   Typically, we would pull credit first, yes.
20  But I'm looking at this job history, and it says
21  there's a gap.  And so we probably wanted to put it in
22  front of an underwriter to see if we could even have

Page 147

1  it approved, knowing Mutual wouldn't approve this.
2        MR. KAREN:  Let's go to Exhibit 4.
3  This is being marked as Exhibit 4.
4        (Exhibit 4 was marked for
5        identification.)
6  BY MR. KAREN:
7    Q   And this is an email that you're sending to
8  a Nathan Dahlin over at Gmail.  First of all, who's
9  Nathan Dahlin?
10    A   Nathan Dahlin.  I believe he is a loan
11  officer in Tampa.
12    Q   Okay.  And you're writing:  "Hey, Nathan, I'm
13  not sure if Chris spoke with you yet, but it doesn't
14  look like we'll be able to get what you all need done
15  here.  I think he's going to keep them at Mutual."  Do
16  you see that?
17    A   Yes.
18    Q   So this is an email obviously that could
19  have been done at Mutual, because you're telling him
20  to keep the borrower there; right?
21    A   Yeah, I don't remember this specific file.
22    Q   Sir, I'm asking you to -- you don't have to

Page 148

1  remember the file.  Are there any words in the email
2  that you typed that you don't understand?  Let's read
3  them again together.  "I think he's going to keep them
4  at Mutual."  Would you keep them at Mutual if Mutual
5  couldn't close the loan?  Would that make any level of
6  sense for you to say that?
7    A   No.
8    Q   So this is one where the loan officer at
9  Tampa is emailing you again at Waterstone about a loan
10  that could be closed at Mutual; right?  Right?
11    A   Yeah, that's what it looks like.
12    Q   Okay.  And you don't write back to him,
13  "Hey, no, you've got to close Mutual loans at Mutual."
14  You actually looked like you explored the possibility
15  of getting it done at Waterstone; didn't you?
16    A   Yeah.  Again, I don't recall this file, what
17  we were trying to do.  They might have had a portfolio
18  product they were trying to get a better rate on.
19  Yeah, I don't remember the file exactly, why -- why
20  they'd sent it to us --
21    Q   Do you know why, again, you're the
22  go-between?  Of all the people they could have sent it

Page 149

1  to, why they chose to send it to you?
2    A   Again, I don't know.  You've asked that
3  question, like, 100 times.  So I don't know why you
4  keep asking that.  I'm giving you the same answer.
5    Q   Well, no, it's not the same question,
6  because they're different people.  But you're right,
7  like, 100 times, people consistently send loans to you
8  and ask you to facilitate information.  So --
9    A   And again, I -- I don't know why.
10    Q   Are you a kind of person where people
11  randomly in the street go up and say, "Hey, I know I
12  don't know you, but will you tell that person standing
13  over there that they're wearing a blue shirt?"  Is
14  that something that typically happens to you?  Do you
15  just have, like, a face that people say, "Oh, he's a
16  nice guy, he'll transition the information for me."
17  Is that kind of the way things work?
18        MS. KREITER:  Object to the form.
19        THE WITNESS:  Again, you've asked the
20  same question over and over, and I'm -- I don't know
21  how else to answer it.
22  //

38 (Pages 146 - 149)

Page 150

BY MR. KAREN:

1  Q   I agree, I have, and my question is:
2  notwithstanding how many different times and different
3  people sent information to you, you have absolutely no
4  idea why they would have done that as opposed to
5  anybody else; right?
6  A   Correct. I do not know.
7  MR. KAREN: Okay. All right. We can
8  move to the next. All right. Let's go to Exhibit 14.
9  Okay, sir. I'm showing you an email from you. We'll
10  have it marked as Exhibit 14 for the deposition.
11  (Exhibit 14 was marked for
12  identification.)
13  BY MR. KAREN:
14  Q   Do you see this email from you to Dwayne
15  Hutto?
16  A   Yes.
17  Q   And this is April 19th?
18  A   Yes.
19  Q   Okay. And if you scroll down, keep
20  scrolling down, please. Okay. You see the beginning
21  of this email chain is from Ellie Briones to you,

Page 151

1  Kyrstin Friebis, and a woman named Tatiana Giraldo.
2  First of all, who's Tatiana Giraldo?
3  A   She is a loan officer here.
4  Q   Okay. And who is Ellie Briones?
5  A   She was a third-party virtual assistant we
6  were using to make some phone calls to our past
7  database to try to get referrals.
8  Q   And what past database was that? Is that,
9  like, customers? Can you explain what that database
10  is?
11  A   Yeah, past -- past customers, yeah. Closed
12  clients, calling them to see if they have anybody they
13  know that might want to do a loan.
14  Q   And where did you keep that information
15  stored?
16  A   Let's see. With her --
17  Q   No, not with her. I'm sorry; let me clarify
18  my question, sir. I'm sorry to cut you off. Before
19  you gave it to her, where was that information stored?
20  Was it, like, in a CRM or something?
21  A   Correct, yeah. We had our database we got
22  out of Encompass and put into a CRM, so she could make

Page 152

1  phone calls for us.
2  Q   Okay. So you took it out of Mutual's CRM
3  and put it into some other database so that she could
4  make phone calls off of it?
5  A   Correct, yeah.
6  Q   Okay. And what was the CRM you put it into?
7  A   I don't remember the name of the one she
8  used off the top of my head --
9  Q   Okay.
10  A   -- I can't think of the name of it.
11  Q   Do you know how big the database, like, how
12  many hundreds of names it was? I assume it was large?
13  A   Yeah, I don't remember the exact number?
14  Q   Would it have been hundreds, or thousands
15  even?
16  A   Yeah, probably hundreds. Yeah.
17  Q   Okay. And what information would have been
18  in there about the borrowers? I assume all their
19  contact information?
20  A   Yeah, basic name, phone number, email,
21  address.
22  Q   How about the type of loan they did in the

Page 153

1  past or when they did a loan? Would that have been in
2  there?
3  A   I don't think that was part of the database
4  that we -- we --
5  Q   Okay. Okay. So she uses this email,
6  elliemutualmortgage@gmail; do you see that?
7  A   Yes.
8  Q   Now, your email is cwolf@mutualmortgage;
9  right?
10  A   Right.
11  Q   And you see the similarities there; right?
12  A   Yeah, we'd actually told her to change that,
13  and she changed it, I think, to elliemortgages@gmail,
14  so I'm not sure why she sent it out of that -- that
15  mail, but we -- we did tell her to change it. She
16  can't have Mutual in it since she's not a -- a actual
17  employee of Mutual.
18  Q   Well, there she did, didn't she?
19  A   Yes, she did.
20  Q   Okay. And so she's still using that email
21  address; right?
22  A   I think she did that one instance, but

39 (Pages 150 - 153)

Page 154

1  again, we told her to change it. And most of the
2  emails came from a different email. So I don't know
3  if that was an error that day.
4      Q   Well, you didn't say -- let's look, do you
5  see anywhere in this email where you complain, "Hey,
6  what are you doing, you're still using this email
7  address?"
8      A   No, I didn't -- I didn't notice she used
9  that email address.
10     Q   And the reason you didn't notice is because
11 it really creates confusion, doesn't it, for people
12 reading it; right? Has the possibility to, doesn't
13 it?
14     A   I mean, it's a Gmail account, so I don't see
15 why it would, but --
16     Q   Okay. Again, we're going to stop here for a
17 second, try to examine this.
18     A   Mm-hmm.
19     Q   Do you consider yourself a reasonably
20 intelligent individual?
21         MS. KREITER: Object to the form.
22         THE WITNESS: I do.

Page 155

1  BY MR. KAREN:
2      Q   Okay. And you're telling me as a reasonably
3  intelligent individual, that you can't see how
4  somebody using an email that says
5  "elliemutualmortgage@gmail" versus
6  "cwolf@mutualmortgage,. you can't see how somebody
7  could -- when looking at an email and an email coming
8  in fast, get confused and think that she might be with
9  Mutual Mortgage? You can't ascertain or understand as
10 a reasonably intelligent individual where that
11 confusion could come in an email?
12         MS. KREITER: Object to the form.
13 BY MR. KAREN:
14     Q   Is that your testimony?
15     A   I would see it's from a Gmail account, and
16 --
17     Q   Then why did you ask her to change it, sir?
18     A   I -- we did -- again, we did, and she did
19 change it, but --
20     Q   No, no. That's not my question. No, no. I
21 want you to answer my question. If you couldn't
22 detect the possibility of confusion, why did you ask

Page 156

1  her to change it?
2      A   Her manager at the VA company actually asked
3  her to change it --
4      Q   So when you testified and you said you asked
5  her to change it, that wasn't true? The company asked
6  her to change it?
7      A   Right. When I said "we" I meant, like, as a
8  group, the -- the manager asked her to change it.
9  Like, she'd been asked to change it. I guess I should
10 have worded it differently. She was asked to change
11 it and --
12     Q   So now -- hold on, hold on. "We" the
13 pronoun "we" is now referring to a manager at a
14 different company that asked her to change it without
15 you? You're considering yourself in the "we"? Do I
16 understand that correctly?
17     A   Right. I misspoke when I said "we," I meant
18 us as a group, meaning her manager asked her to change
19 it.
20     Q   Well, it wasn't a group, it was her manager;
21 right?
22     A   Specifically, yes, that person.

Page 157

1      Q   Okay. And he made that decision. You
2  didn't; right?
3      A   Right.
4      Q   And the reason he wanted her to change it is
5  simply because he saw that it could create confusion
6  with Mutual Mortgage; couldn't it?
7          MS. KREITER: Object to the form.
8  Calls for speculation.
9          THE WITNESS: Yes, I would say that's
10 why he asked her to change it, right.
11 BY MR. KAREN:
12     Q   So some other person out there could see the
13 possibility, sir -- strike that. You're a licensed
14 loan officer; right?
15     A   Yes.
16     Q   How do you think NMLS would react to a
17 non-employee being instructed by you to take that name
18 and use it as an email address and send it to
19 borrowers?
20         MS. KREITER: Object to the form.
21 BY MR. KAREN:
22     Q   How do you think they'd react to that?

40 (Pages 154 - 157)

Page 158

1    MS. KREITER: Object to the form.
2    THE WITNESS: I'm not sure. I don't
3  work for NMLS.
4  BY MR. KAREN:
5    Q   Would you like to find out? Should I call
6  NMLS and send them these emails and ask them? What do
7  you think they'd say?
8    MS. KREITER: Okay. I'm going to
9  object. This is getting really argumentative.
10    MR. KAREN: This is getting really
11  ridiculous. Do you think it's funny, Mr. Wolf? I
12  mean, do you think --
13    THE WITNESS: I think -- think they --
14    MR. KAREN: -- it's something we should
15  do? Should we send this to NMLS and see what they
16  would say?
17    MS. KREITER: Okay. But I'm just going
18  to say, you're not asking the witness a question.
19  You're threatening to call NMLS. What is the
20  question?
21  BY MR. KAREN:
22    Q   The question is, if I did call NMLS and ask

Page 159

1  them to evaluate this and whether your contact using
2  this person was appropriate, would you be comfortable
3  with that position?
4    MS. KREITER: Object to the form.
5    THE WITNESS: I don't know. I don't
6  know what they would say.
7  BY MR. KAREN:
8    Q   So the reason she stopped using this because
9  of the risk of consumer confusion; correct?
10    MS. KREITER: Object to the form.
11    Calls for speculation.
12  BY MR. KAREN:
13    Q   You can answer.
14    A   Yeah, I believe that's why he asked her to
15  change it. That would make sense to me, if he thought
16  there was confusion there.
17    Q   Okay. All right. Now, let's go and look at
18  this. What was the name of the company she worked
19  for?
20    A   I can't remember. Yeah, I don't remember
21  the name.
22    Q   Did you pay for it?

Page 160

1    A   Yes. Yeah, it was a monthly service.
2    Q   Okay. And when did you first contract with
3  them as a monthly service?
4    A   Sometime in the beginning of 2001. I'm
5  sorry, 2021.
6    Q   Okay. And was this because of when you
7  realized you might be making a transition?
8    A   No, it had nothing to do with transition.
9  It was something we started doing, having a virtual
10  assistant reach out to some of our past clients to try
11  to get referrals. It was a new sales tactic that we
12  were trying, just a few of us, to try to gain more
13  referrals from our current client database. It didn't
14  have anything to do with -- with the transition.
15    Q   Why wouldn't you have just hired this person
16  over at Mutual and had them do it with a real Mutual
17  email address?
18    A   Just through a third-party service, they're
19  based in the Philippines. So it wasn't anybody that
20  would be eligible to be employed.
21    Q   Why wouldn't you just hire somebody here? I
22  mean, what was the reason for hiring somebody on the

Page 161

1  third-party service in the Philippines?
2    A   Because of the cost.
3    Q   Okay. So you would be able to identify -- I
4  mean, you had bills, I presume?
5    A   Yes.
6    Q   You would be able to find out who the
7  company was and who this individual was and how you
8  contracted with them?
9    A   Yeah, I have invoices.
10    MR. KAREN: Okay. Well, Maria, I'm
11  going to request that we get copy of those invoices.
12  I can follow up in an email later, but --
13    MS. KREITER: Yes. I'll take it under
14  consideration.
15    MR. KAREN: Okay.
16  BY MR. KAREN:
17    Q   Now, if you continue on in this email, do
18  you know if Mutual was aware you were doing this?
19    MS. KREITER: Object to the --
20    THE WITNESS: I -- yeah, I'm not sure.
21  BY MR. KAREN:
22    Q   Did you tell them?

41 (Pages 158 - 161)

Page 162

1    A   No.
2    Q   Is that because you didn't need any
3   distractions?
4    A   Mutual did very little to get us any type of
5   leads, so it was left to us at a branch level to try
6   to generate referrals, referral partners, leads, and
7   this is one of the things we were using to try to
8   generate leads.
9         MR. KAREN:  Okay.  Can we get Exhibit
10  28?
11        (Exhibit 28 was marked for
12        identification.)
13  BY MR. KAREN:
14   Q   And this is dated 4/25; do you see that?
15   A   Yes.
16   Q   And let's see.  You write to Kyrstin
17  "Perfect.  Do you see that?  "I figured you were on
18  top of it, but I had an email to remind me to check on
19  that.  Chris Wolf."  That's you; right?
20   A   Yes.
21   Q   Okay.  And if you scroll down to the very
22  beginning, that's an email from Kyrstin, and she

Page 163

1   writes: "I guess we should have Ellie set up a new
2   email address?  She is currently using
3   elliemutualmortgage@gmail."  Do you see that?
4    A   Yes.
5    Q   And at that time, Kyrstin's already at
6   Waterstone; isn't she?
7    A   Yes.
8    Q   So Ellie is feeding you leads or feeding
9   Kyrstin leads at Waterstone, using an Ellie Mutual
10  Mortgage email address; right?
11   A   Yeah, it looks like she's still trying to
12  use that email.
13   Q   And those leads are off of a database that
14  originated at Mutual; right?
15   A   The database was clients that we originated
16  on our own.  Mutual had nothing to do with getting us
17  any leads or business.
18   Q   It was on Mutual's Encompass; wasn't it?
19   A   It was clients -- some of -- some of them
20  were clients we closed at Mutual, yes.  Some prior.
21   Q   Was it on a database that was contained, as
22  you testified previously under oath, from Mutual's

Page 164

1   Encompass?  Yes or no?
2    A   Yes, some of the database was pulled from
3   Encompass.
4    Q   So let's go through this.  We have a
5   database both from Mutual's Encompass, that a woman
6   that you hired outside of Mutual's knowledge is using
7   Mutual Mortgage in her email and feeding to Kyrstin at
8   Waterstone leads?  I understand that correctly; don't
9   I?
10   A   I don't see where she's feeding her leads
11  here.
12   Q   Well, she was creating leads, wasn't she?
13   A   I don't see any leads --
14   Q   Ellie's job was to get leads; wasn't it?
15   A   That was her job.  We let her go because she
16  wasn't doing it very well.  I don't see any leads here
17  that -- that are being shown.
18   Q   But Kyrstin was at Waterstone at this point;
19  wasn't she?
20   A   Yes, she was at Waterstone.
21   Q   And if there were leads, Kyrstin would have
22  been one of the people to get them; right?

Page 165

1    A   It depends on whose database she was
2   calling.
3         THE REPORTER:  My apologies.  Just want
4   to verify; was that an objection, Counsel?
5         MS. KREITER:  Yes.  I objected to the
6   form.
7         THE REPORTER:  Thank you.  My
8   apologies.  Want to make sure we capture it on the
9   record.
10        MR. KAREN:  Let's go to Exhibit 29.
11        (Exhibit 29 was marked for
12        identification.)
13  BY MR. KAREN:
14   Q   Okay.  Now, this is an email, we're showing
15  as Exhibit 29.  This is an email dated 4/21/22, from
16  you to Ellie; do you see that?
17   A   Yes.
18   Q   Now, remember, sir, a minute ago that you
19  had told me that in an email that was dated 4/19, she
20  had been told to change her email by her supervisor;
21  remember that testimony?
22   A   Yes.

42 (Pages 162 - 165)

Page 166

1   Q   Okay.  And this is an email, you're writing
2   to her now, so you had to type in her email address.
3   And what's the email address that you typed in?
4   A   Yeah, it looks like it auto did the -- the
5   Ellie Mutual Mortgage one.
6   Q   So you sent it to Ellie Mutual Mortgage;
7   right?  Right?
8   A   Looks like I did here, yes.
9   Q   And that's an email address that somebody
10  from her company had specifically already told you she
11  could change because it was creating consumer
12  confusion; right?
13          MS. KREITER:  Object to the form.
14  Misstates the testimony as well.
15          MR. KAREN:  That's fine.
16  BY MR. KAREN:
17  Q   Sir?  Right?
18  A   Yes, she'd been told to change it.  Looks
19  like she --
20  Q   So you're maintaining that, and you're
21  copying it, am I right, to Kyrstin at Waterstone here;
22  right?

Page 167

1   A   Right, it looks like that email went to that
2   other email address.
3   Q   And what do you write to Kyrstn?  What did
4   you write in your email?  Can you read it?
5   A   "I spoke with Mike Irish this morning.  HE
6   wanted to see if he could do some calls to set
7   appointments for him as well.  He was going to get
8   with Kyrstin on that.  You can do his calls before
9   Dwayne's when they get you that information."
10  Q   All right.  Michael Irish was at Waterstone
11  at this point; wasn't he?
12  A   Yes.
13  Q   So here you're having Ellie, emailing her
14  with a mutualmortgage@gmail email address, to set up
15  calls for Michael Irish, who's at Waterstone; right?
16  A   Right.  Again, she was calling people so the
17  -- you keep harping on this email address.  I'm not
18  sure how relevant -- I mean, you guys are the
19  attorneys, you can decide if it's relevant, but she
20  was making phone calls; she wasn't emailing people.
21  But yes, that --
22  Q   Well, why would she have, of all email

Page 168

1   addresses, a Ellie Mutual Mortgage, if she wasn't
2   emailing borrowers?
3   A   I'm not sure.  I'm the -- maybe that's what
4   she used for certain clients, because they had
5   multiple clients.  So they each had different email
6   addresses for the different clients they were
7   servicing.
8   Q   You don't know which email she sent where;
9   do you?
10  A   I'm sorry, I don't understand the question.
11  Q   You don't know when she emailed borrowers;
12  do you?
13  A   I don't.  Her main objective was to make
14  phone calls.
15  Q   Then if her main objective was phone calls,
16  then her email address wouldn't matter at all; right?
17  No one would see it?
18  A   Right.
19  Q   So why would she go through the trouble of
20  creating an email address that would look like Mutual
21  Mortgage?  That wouldn't make sense; would it?
22          MS. KREITER:  Object to the form.

Page 169

1   Calls for speculation.  You can answer.
2           THE WITNESS:  Yeah, I'm not -- yeah,
3   I'm not sure.
4   BY MR. KAREN:
5   Q   And there'd be no real risk of consumer
6   confusion, which we talked about earlier, if she
7   wasn't sending emails to consumers; would there?
8   A   I'm not sure.  I would think not.
9           MR. KAREN:  Sir, I'm going to show you
10  Exhibit 18.  Will you pull that up, Jennifer?
11          (Exhibit 18 was marked for
12          identification.)
13          THE REPORTER:  Just to confirm,
14  Counsel, the prior two exhibits, Exhibit 28 and 29,
15  are marked for today's deposition?
16          MR. KAREN:  Yes.
17  BY MR. KAREN:
18  Q   So I'm showing you, sir, Exhibit 18.
19  A   Yes.
20  Q   What is "Thor's Hammer - Focus 40"?
21  A   It's a list of realtors that we would call
22  to try to get coffee appointments to develop a -- a

43 (Pages 166 - 169)

Page 170

1  relationship with them to send referrals.

2    Q   Okay.  And the document that's attached,

3  "Kyrstin Funded 04112022" that's an Encompass file;

4  isn't it?

5    A   No, it's an Excel file.

6    Q   An Excel file, but it would have come from

7  Encompass, the Funded, that looks like "2022 Funded"

8  loans?

9    A   It would, yeah.  It'd be a list of her

10  clients.

11    Q   And if it came off Encompass, it would also

12  have loan information about it; couldn't it?

13    A   It would have been no confidential

14  information.  It would have been name, phone number,

15  email address, probably address, so we could reach out

16  and give that to Ellie or call them ourselves to get

17  referrals.

18    Q   But, sir, it could also contain, if it came

19  off Encompass, it could contain the loan amount;

20  couldn't it?

21    A   It could possibly, yes.

22    Q   It might include the date of the closing?

Page 171

1    A   It could.

2    Q   Okay.  It could include the property

3  address?

4    A   Correct, yeah.  It would have the -- it

5  would have their address, yeah.

6    Q   Could it have the type of loan?

7    A   Possibly, yes.  It could have.

8    Q   Could it have the credit score?

9    A   Possibly.

10    Q   And this, again, you sent from your personal

11  email?

12    A   Yes, it looks like it.

13    Q   And you did it while you were still branch

14  manager at Mutual; right?

15    A   Yes.

16      MR. KAREN:  All right.  Let's go to

17  Exhibit 26.

18      (Exhibit 26 was marked for

19      identification.)

20      THE WITNESS:  Yeah, again, those are

21  clients we developed through personal relationships,

22  and they were self-sourced.  So we didn't view that as

Page 172

1  the property of Mutual.

2  BY MR. KAREN:

3    Q   Well, I understand, sir, what you didn't

4  view it as, but those were loans that were funded --

5  who funded those loans, sir?

6    A   They were funded at Mutual.

7    Q   Was your name on the loan document?  Does it

8  say Chris Wolf as the lender?

9    A   Not as the lender, no.

10    Q   Okay.  Who was the lender on all those

11  loans?

12    A   Mutual.

13    Q   Okay.  So they would have been Mutual

14  clients too, wouldn't they have?

15    A   They closed with Mutual, but again, these

16  are clients we developed through personal

17  relationships.  Mutual did nothing to help us generate

18  that business.

19    Q   Let me ask you something: if there's a

20  problem from a licensing perspective and the CFPB has

21  an issue with the loan, do they call you or do they

22  call the licensed lender?

Page 173

1    A   I'm not familiar with that process.

2    Q   Uh-huh.  Clearly.  Who was the lender on

3  those loans, sir?

4    A   Mutual.

5    Q   Who serviced the loans, do you know?

6    A   I think they were using Dovenmuehle at the

7  time.

8    Q   As a sub-servicer?

9    A   Yes.

10    Q   Okay.  So Mutual serviced loans, and they

11  used Dovenmuehle -- I always get that wrong --

12  Dovenmuehle to service the loans for them; right?

13    A   Correct.

14    Q   So they were Mutual customers at the time;

15  weren't they?  Mutual was servicing their loans?

16    A   Dovenmuehle was servicing the loans, but --

17    Q   On behalf of Mutual?

18    A   Correct.  Unless they were sold off to

19  another lender.

20    Q   And who would have made that decision?

21    A   A secondary marketing team.

22    Q   At what company?

44 (Pages 170 - 173)

Page 174

1    A   At Mutual.

2    Q   All right. Let's go to Exhibit 26 here.

3  Now, this is an email from Dustin Owen. And Dustin is

4  at Waterstone; right?

5    A   Yes.

6    Q   Okay. What's the date?

7    A   March 5, 2022.

8    Q   Okay. And what was Dustin's role over at

9  Mutual [sic], his position?

10   A   A regional vice president.

11   Q   Okay. Is that fairly high-ranking, as far

12  as you know?

13   A   Yes, I believe so.

14   Q   Okay. And this is in March of 2022. And

15  the subject is "Next steps and timeline." Do you see

16  that?

17   A   Yes.

18   Q   And you were discussing a timeline of a

19  transition for the branch to come over to Waterstone;

20  right?

21   A   Yes.

22   Q   And he writes in the second paragraph "In

Page 175

1  the beginning, we will need to knock out employment

2  applications and background checks." Do you see where

3  it says that?

4    A   Yes.

5    Q   And he was referring to the branch

6  employees; right?

7    A   Yes, it looks like it.

8    Q   Okay. And then he says "Then we can move on

9  to generating offer letters." Again, he's talking

10  about the branch; right? The branch employees, I

11  should say?

12   A   Yes.

13   Q   Okay. And then he says "We then would want

14  to start creating your database by transferring as

15  much over as possible." Do you see where it says

16  that?

17   A   Yes.

18   Q   And what are you talking about transferring

19  over?

20   A   Our client list, the names, phone numbers,

21  addresses, so we could stay in touch with them.

22   Q   And that was information that would have

Page 176

1  been on Mutual's Encompass; right? In part, at least?

2    A   In part.

3    Q   Okay. And so he's asking you to do that

4  from Waterstone; right?

5    A   Just that we'd want to start creating it.

6    Q   By transferring over as much as possible.

7  My question is, he's at -- you know what, he's at

8  Waterstone asking you to do this; right?

9    A   Yeah, he's saying if we -- if we want to

10  transfer a database.

11   Q   Well, he says "We would then want to start

12  creating." He doesn't ask you if you want to do it.

13  He's saying we would then want to start doing that;

14  doesn't he? Is that what it says?

15   A   I'm reading. Yeah, if we had a database to

16  bring over, then we would want -- they'd want to start

17  creating it by transferring it.

18   Q   And the "we" here is you and Waterstone;

19  right?

20   A   I mean, he says "we." I don't know who he's

21  specifically referring to, but --

22   Q   Who did you think he was talking about "we"?

Page 177

1    A   Yeah, "we." So him and the transition team

2  --

3    Q   Okay.

4    A   -- that would helping us in --

5    Q   And -- okay. The transition team from

6  Waterstone; right?

7    A   Right.

8    Q   Okay. And then he writes down, you see the

9  paragraph that says "additionally"?

10   A   Yes.

11   Q   Do you see where it says "Additionally, we'd

12  want to determine are you going to send over a small

13  team a week to 10 days early to get on board first and

14  up and running, or are you going just to rip the

15  Band-Aid off and dive in headfirst?" Do you see where

16  it says that?

17   A   Yes.

18   Q   Okay. And that's what you ended up deciding

19  to do, by sending over Kyrstin and Mike Irish and some

20  of those other people; right?

21   A   Right. We wanted to make sure we didn't

22  leave Mutual in a lurch and we were still able to

45 (Pages 174 - 177)

Page 178

1  close loans and not make it a total disaster for
2  Mutual.
3      Q   That was considerate of you.  Do you know
4  why Dwayne or Chris were not copied on this email?
5          MS. KREITER:  Object to the form.
6  BY MR. KAREN:
7      Q   No, I said, do you know?
8      A   I -- I don't know.
9          MR. KAREN:  Exhibit 24, could we pull
10  that up?  Now, this is an email -- by the way, that
11  last email -- oh, never mind.  You know what, that's
12  okay.  Let's just go to this email.
13          (Exhibit 24 was marked for
14          identification.)
15  BY MR. KAREN:
16     Q   And this is dated April 18th; right?
17     A   Yes.
18     Q   And this is between you and Dwayne, using
19  your private email addresses?
20     A   Yes.
21     Q   Okay.  And you're going through a list of
22  things here, a list of different accounts that you

Page 179

1  would switch over to Waterstone; right?
2      A   Correct.
3      Q   Why would you switch over the accounts?
4          MS. KREITER:  Object to the form.
5          THE WITNESS:  I'm not sure.  I think
6  the --
7  BY MR. KAREN:
8      Q   Well, let me ask you -- sorry.  Go ahead.
9      A   Yeah, I'm sorry.  Looks like the billing
10  addresses needed to be changed to corporate, so the
11  invoices would be paid.
12     Q   But in other words, you were using the same
13  accounts, you were still using DocuSign, Staples, the
14  same cleaning service, the same water machines; right?
15  You were trying to keep everything the same; right?
16     A   Yeah, it appears so.  And then just changing
17  over the billing information.
18     Q   And the reason you wanted to do that, tell
19  me if I'm wrong, is you really wanted to try to create
20  as much of a seamless transition as possible; correct?
21     A   Correct.
22          MR. KAREN:  Let's go to the next

Page 180

1  exhibit, going to be Exhibit 16.  And we'd like this
2  marked as well for the deposition.
3          (Exhibit 16 was marked for
4          identification.)
5  BY MR. KAREN:
6      Q   And this is again from your private email
7  address, dated April 8th; right?
8      A   Yes.
9      Q   And it's to Ben Davis over at Waterstone?
10     A   Yes.
11     Q   Okay.  So you and Ben are going back and
12  forth, and can we go to the next page, please?  All
13  right.  I want to start with the email dated Friday,
14  April 8, 2022, at 9:18 a.m.  And this is Ben, writing
15  to you.  Do you see he says "Chris" -- gets messed up
16  there in the email -- "I am trying to retrieve the
17  docs you uploaded, but says password is required.
18  What is the password?"  Do you see where it says that?
19     A   Yes.
20     Q   And what system was he referring to there?
21     A   I'm not sure.  Let me see.
22     Q   Where would documents be uploaded when you

Page 181

1  were working at Mutual?
2      A   That would -- yeah --
3      Q   At Mutual, when a borrower gave you
4  documents, where did they upload them?
5      A   To Encompass.  This looks like he's
6  retrieving -- they -- they have a system called
7  Element at Waterstone, so I think he's trying to get
8  them from there and needed a --
9      Q   Well let me -- I'm sorry, I thought you were
10  done.  Finish, please.
11     A   Oh, yeah.  Looks like he's trying to open
12  the -- I uploaded them to, let's see -- he's just
13  trying to open them, it looks like.
14     Q   Well, where did you upload them to?
15     A   -- password to upload -- I don't know if I
16  emailed these to him.
17     Q   Well, let me ask you, what was the password
18  then as written, 294927943?  What password is that?
19     A   Looks like for -- looks like for the tax
20  returns.
21     Q   Well, that's -- you don't know what password
22  that is, for what system that's a password to?

46 (Pages 178 - 181)

Page 182

1     MS. KREITER: I believe he answered.
2     THE WITNESS: Yeah, the tax returns are
3  password-protected, so that was the password to open
4  the tax returns.
5  BY MR. KAREN:
6     Q   Well, what system was he talking about to
7  retrieve? Because that's not what his right email
8  says.
9     A   Waterstone has a system called Element, so I
10  believe I uploaded them into there.
11     Q   But wouldn't the borrower upload the
12  documents, or would the borrower hand them to you or
13  send them to you and then upload them?
14     A   Yeah, he would have emailed them to me.
15     Q   Was 294927943 your password to Encompass
16  over at Mutual?
17     A   No, it was not. That was the password to
18  open this client's tax returns.
19     Q   Would you have provided anybody at
20  Waterstone your password to Encompass over at Mutual?
21     A   No, they wouldn't be able to access the
22  Encompass at Mutual from another company.

Page 183

1     Q   And I'd like to show you, sir -- well,
2  actually hold off on that one second.
3     Sir, did you receive a subpoena recently?
4     A   Yes.
5     Q   Okay. And did you produce any documents in
6  response to that subpoena?
7     A   I didn't have any to produce at the time.
8  All the documents that we'd had were turned over to
9  Waterstone legal and deleted, and then we signed a --
10  a document stating we'd turned everything over that we
11  had, so I didn't have anything to produce. So I
12  emailed the person on the subpoena and let them know.
13     Q   Okay. Let me ask you one question: when you
14  turned over those documents, did you send them
15  forwarded by email, did you print them out, copy them,
16  hand them over? How did you turn them over?
17     A   There was a secure link they sent us to
18  upload them to.
19     Q   When you uploaded them, did you print them
20  out first or did you send the electronic documents
21  over?
22     A   No, we didn't print anything. It was all --

Page 184

1     Q   So everything would have been forwarded?
2     A   It would -- there were -- there was a link
3  that we were sent, so we uploaded the documents into
4  that -- that link, that secure link from our -- from
5  legal. And then we deleted the documents off our
6  computers.
7     Q   Okay. But if you uploaded the documents,
8  then you would have had to make a digital image of
9  them; right?
10     A   We didn't have any paper copies, if that's
11  what you're asking. We just sent the electronic
12  versions.
13     Q   What I'm trying to get at is this: when you
14  forwarded -- in email, you understand that's something
15  called metadata.
16     A   Okay.
17     Q   Are you aware of that?
18     A   I'm not.
19     Q   Who instructed you to delete the emails?
20     A   The Waterstone legal team, once we uploaded
21  all the documents and emails, we were said -- told to
22  delete them, and then we signed a certification that

Page 185

1  we no longer had possession of the documents, and that
2  everything was turned over.
3     Q   Now, what documents did you have, other than
4  emails?
5     A   The, you know, tax returns, the -- W-2s,
6  things like that. Things you saw in the previous
7  emails. So all those were uploaded and deleted.
8     Q   Now, did you ever talk to Dwayne or --
9  Dwayne is a good friend of yours. I assume you guys
10  text message each other sometimes?
11     A   Dwayne and I?
12     Q   Yes.
13     A   Yes.
14     Q   Okay. And did you ever do text exchange
15  with Chris Smith?
16     A   Yes.
17     Q   Okay. How about other employees at your
18  branch?
19     A   Occasionally, yeah. I would think so.
20     Q   Okay. And would you ever have texted with
21  people over at Waterstone while you were kind of going
22  through this transition process?

47 (Pages 182 - 185)

Page 186

1    A   I don't remember if we texted at all.  I
2  can't remember.
3    Q   All right.  Now, when you turned over those
4  emails, you didn't turn over text messages; did you?
5    A   No.  That wasn't part of the request.
6        MR. KAREN:  Then can we put up Exhibit
7  30, please?  Let's mark this as Exhibit 30, please,
8  and can you go to Schedule A -- well, actually it's
9  the first page.
10       (Exhibit 30 was marked for
11       identification.)
12  BY MR. KAREN:
13   Q   This is the subpoena we mentioned a minute
14  ago, sir?
15   A   Okay.
16   Q   Does that look it to you?
17   A   Yes.
18   Q   Okay.  And if you go to Schedule A on the
19  last page?  And I will direct your attention to number
20  two and number four; do you see those?
21   A   Yes.
22   Q   Those ask for text messages, not emails; do

Page 187

1  you see that?
2    A   Yes.
3    Q   Okay.  So I understand that you wrote to
4  somebody and said, "Hey, I don't have any emails or
5  other documents."  How about text messages?  Did you
6  search for those?
7    A   I don't have access.  I got a new phone a
8  few months ago, so I don't have access to the -- the
9  text messages from that period.
10   Q   Sir, when you get a new phone, your text
11  messages upload.  I've researched this pretty
12  carefully.  So just because you have a new phone,
13  doesn't mean your text messages go away.  When you put
14  your new phone on, they upload from the cloud.  What
15  kind of phone do you have?
16   A   I have an Android Samsung.  I think it asks
17  you how many months you want to -- to transition over,
18  and I think it was only, like, three or six was the
19  longest you could do.  From what I remember.
20   Q   Do you still have that old phone?
21   A   No, I turned it in.  If -- you -- I traded
22  it in.

Page 188

1        MR. KAREN:  Okay.  Give me two minutes;
2  I don't know if I have anything else.  Actually, no, I
3  don't have anything else.  We can conclude.
4        MS. KREITER:  Nothing from me, thank
5  you.
6        MR. KAREN:  Thank you, Mr. Wolf.  I
7  appreciate your time today.
8        THE WITNESS:  Thank you.
9        THE REPORTER:  This is the court
10  reporter, just, I want to confirm -- will the witness
11  be reading and signing?
12       MS. KREITER:  Yes, please.
13       THE REPORTER:  All right.  And for --
14  and for transcript orders, Mr. Karen, will you be
15  ordering the transcript?
16       MR. KAREN:  We will.
17       THE REPORTER:  Your preference is a
18  digital e-transcript or a physical copy?  Physical
19  transcript.
20       MR. KAREN:  What do you mean by digital
21  E?  I mean, I'm fine with it being email.
22       THE REPORTER:  Yeah, like, the E-

Page 189

1  transcript, like, the PDF transcript, the text file
2  transcript.
3        MR. KAREN:  PDF is fine.  Yeah, PDFs
4  are fine.
5        THE REPORTER:  Okay.  And for you,
6  Ms. Kreiter?
7        MS. KREITER:  If you could provide a
8  condensed PDF with the exhibits attached?
9        MR. KAREN:  Yes, I would like exhibits
10  attached as well, and if you could just connect with
11  Jennifer.  She's on the line here, she can get you
12  those exhibits.
13       THE REPORTER:  Okay.
14       THE VIDEOGRAPHER:  If there are --
15  excuse me, if there are no more questions, I want to
16  conclude today's testimony that's given by
17  Mr. Christopher Wolf by going off the record.  So at
18  this time, it is 12:32 p.m., Eastern.  We're now going
19  off the record.  There have been a total number of
20  three media units used today, and they will be
21  retained by Veritext.
22       (Signature reserved.)

Page 190

```
1        (Whereupon, at 12:32 p.m., the
2        proceeding was concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 192

```
1        CERTIFICATE OF TRANSCRIBER
2        I, JACQUELYN SYLVAN, do hereby certify that
3    this transcript was prepared from the digital audio
4    recording of the foregoing proceeding, that said
5    transcript is a true and accurate record of the
6    proceedings to the best of my knowledge, skills, and
7    ability; that I am neither counsel for, related to,
8    nor employed by any of the parties to the action in
9    which this was taken; and, further, that I am not a
10   relative or employee of any counsel or attorney
11   employed by the parties hereto, nor financially or
12   otherwise interested in the outcome of this action.
13
14
15        JACQUELYN SYLVAN
16
17
18
19
20
21
22
```

Page 191

```
1        CERTIFICATE OF DEPOSITION OFFICER
2        I, TIMOTHY GUEVARA, the officer before whom
3    the foregoing proceedings were taken, do hereby
4    certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action
17        TIMOTHY GUEVARA
18        Notary Public in and for the
19        District of Columbia
20
21   [X] Review of the transcript was requested.
22
```

Page 193

```
1  1 Maria Kreiter, Esq.
2  2 mkreiter@gklaw.com
3  3        August 9, 2023
4  4 RE:  Mutual Of Omaha Mortgage Inc. v. Waterstone Mortgage
        Corporation
5  5    7/25/2023, Christopher Wolf (#6016993)
6  6    The above-referenced transcript is available for
7  7 review.
8  8    Within the applicable timeframe, the witness should
9  9 read the testimony to verify its accuracy. If there are
10 10 any changes, the witness should note those with the
11 11 reason, on the attached Errata Sheet.
12 12   The witness should sign the Acknowledgment of
13 13 Deponent and Errata and return to the deposing attorney.
14 14 Copies should be sent to all counsel, and to Veritext at
15 15 cs-midatlantic@veritext.com.
16 16
17 17 Return completed errata within 30 days from
18 18 receipt of testimony.
19 19  If the witness fails to do so within the time
20 20 allotted, the transcript may be used as if signed.
21 21
22 22        Yours,
23 23        Veritext Legal Solutions
24 24
25 25
```

49 (Pages 190 - 193)

Page 194

1  Mutual Of Omaha Mortgage Inc. v. Waterstone Mortgage Corporation

2  Christopher Wolf (#6016993)

3         E R R A T A  S H E E T

4  PAGE_____ LINE_____ CHANGE_____

5  _____

6  REASON_____

7  PAGE_____ LINE_____ CHANGE_____

8  _____

9  REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____  _____

24  Christopher Wolf                    Date

25

Page 195

1  Mutual Of Omaha Mortgage Inc. v. Waterstone Mortgage Corporation

2  Christopher Wolf (#6016993)

3         ACKNOWLEDGEMENT OF DEPONENT

4     I, Christopher Wolf, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____  _____

12  Christopher Wolf                    Date

13  *If notary is required

14         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15         _____ DAY OF _____, 20___.

16

17

18         _____

19         NOTARY PUBLIC

20

21

22

23

24

25

50 (Pages 194 - 195)

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.