IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC.<br><br>Plaintiff,<br><br>v.<br><br>WATERSTONE MORTGAGE CORPORATION,<br><br>Defendant. | CASE NO. 8:22-cv-01660-TPB-UAM |

## WATERSTONE'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO DAMAGES

### I. INTRODUCTION

Mutual's damages have been a moving target since this case began – first estimated around $250,000, then $4.4 million, and then upwards of $28 million over 10 years. Yet, the *only* lost profit demand Mutual disclosed in discovery was for $4,440,002.42 over an 18-month duration. Setting aside whether an 18-month time frame is supported by the evidence (it is not), Mutual cannot seek lost profits beyond 18 months at trial because it never disclosed a longer duration in discovery, which closed in July. The recent, unilateral "stipulation" Mutual filed on March 22, 2024 claiming it will calculate damages based on a duration of up to 30 months was never disclosed and cannot be hoisted upon Waterstone on the eve of trial.

Further, Judge Barber's March 29, 2024 decision that Mutual cannot include profits attributable to its former branch managers or the Paramus branch employees

1

in its lost profit damages translates to Mutual seeking a *maximum* of $2,093,535. Waterstone seeks an order memorializing that amount so there is no ambiguity at trial.

II.     RELEVANT BACKGROUND

**A. Mutual Projects Lost Profit Damages Over 18 Months.**

In response to Waterstone's very first interrogatory, calling for an itemization of damages "including the formula used to calculate those damages," Mutual articulated three categories of damages: (1) unquantified lost profits based on loans allegedly diverted to Waterstone ("diverted loan damages"); (2) $4,440,002.42 in profits the branches would have made if they had stayed affiliated with Mutual for an 18-month period from June 30, 2022 to December 31, 2023 ("lost profit damages"); and (3) $750,000 in "ill-gotten gains" based on money Waterstone paid ("ill-gotten gains damages"). (Exhibit 1, Mutual's Third Amended Responses and Objections to Waterstone's First Set of Interrogatories at Mutual's Resp. to Interrog. 1.) Mutual made no effort to quantify its diverted loan damages (*see* Exhibit 2 (Gennarelli Dep. Tr.) 21:22-28:12, 30:23-31:1) and has since stipulated to the dismissal of the alleged ill-gotten gains damages. (DE 76.)

Mutual's deadline to submit expert disclosures was March 1, 2023. (DE 34, ¶ 2.) Mutual made the strategic choice not to retain a damages expert to support any of its alleged damages. Instead, to support its lost profit damages, Mutual produced an analysis prepared by Jeff Gennarelli, the President of its Forward Mortgage Division, and presented Gennarelli as its Federal Rule 30(b)(6) witness on various topics

2

including damages. Gennarelli's analysis is a single page spreadsheet that calculates future profits for the Tampa and Daytona branches over an 18-month period of July 1, 2022 through December 31, 2023. (*See* DE 72-4.) Pursuant to Gennarelli's calculations, Mutual claims it would have enjoyed $4,440,002.42 if its Daytona, Tampa, and Paramus branches would have continued operating through December 31, 2023. (*See id.*; *see also* Ex. 2 (Gennarelli Dep. Tr.) 167:16-21.)

### B. Mutual Fails To Produce Evidence To Support An 18-Month Demand.

Mutual has not provided any evidentiary basis for an 18-month projection. While each of the managers is alleged to have an employee non-solicit, it is for 12 months, not 18 months. (*See, e.g.*, DE 132-3.) When asked specifically if Mutual had reason to assume the branch employees would have stayed with Mutual for 18 months, Gennarelli could only speculate: "[w]e now are the lender for Keller Williams. I would imagine that that may be more attractive…". (*See, e.g,* Ex. 2 (Gennarelli Dep. Tr.) 174:10-23.) But Mutual did not ask any of the employees if Keller Williams would have motivated them to stay with Mutual. (*Id.*) And, as Judge Barber acknowledged at the January 30, 2024 summary judgment hearing, such "self-serving[]" testimony from Mutual regarding Keller Williams is not enough to overcome the speculative nature of the damages. (Exhibit 3 (January 30, 2024 Motion Hearing Transcript) 37:2-13.)

Gennarelli also admitted Mutual has no evidence the branch employees would have continued working for a different manager at Mutual for any duration. (Ex. 2 (Gennarelli Dep. Tr.) 95:16-96:1 (Q: "Does Mutual have evidence that the

3

employees would've stayed and worked for Kiley King? […] A: "No, no evidence.") The employees themselves indicate they were not going to stay at Mutual and, in fact, a number had been looking for alternate employment for many months. (*See e.g.,* Smith Decl. (DE 104-8) ¶ 13; Hutto Decl. (DE 104-9) ¶ 7; Utsch Decl. (DE 104-10) ¶ 2; Wolf Decl. (DE 104-11) ¶ 3; Walker (DE 104-12) ¶ 14; Lowe Decl. (DE 104-13) ¶ 7.)

The *only* employee or representative disclosed in Mutual's Rule 26 disclosures is Chris Leyden, Mutual's Chief Operating Officer. (DE 105-01.) But Leyden admitted she has no knowledge of Mutual's damages and never discussed damages with anyone at Mutual. (*See* Exhibit 4 (Leyden Dep. Tr.) 74:19-21 ("Q: Do you have knowledge of the damages that are sought by Mutual in this case? A: No."); 75:9-16.) Mutual, therefore, has no witnesses who can speak to its damages at trial besides Gennarelli.

On summary judgment, Mutual tried to introduce an affidavit from its in-house counsel, Mark Carroll, to support its claim that the branches would have continued with Mutual. Carroll claimed that the branches Mutual retained for over 12 months have, on average, stayed with Mutual for approximately 51 months. (DE 100 at 25.) This Court struck the affidavit, ruling that evidence is not to be considered for purposes of summary judgment, or at trial without affording Waterstone additional discovery, because neither Carroll nor the data he relied on were ever disclosed in discovery. (DE 128.) Regardless, the data supports Waterstone's position because the Tampa and Ormond Beach branches had already

been with Mutual longer than the 51-month average when the employees resigned. (DE 104-1 at ¶ 6.) That the branches would have continued to exceed Mutual's average has no evidentiary support, is pure speculation, and is contradicted by the employees themselves. In fact, Gennarelli testified that it would be unreasonable to assume the branches would stay for years to come and, for that reason, Mutual selected 18 months:

> Well, we considered looking at our large branches so that would be, you know, branches that were similar to these branches. So you would have a St. Louis, Seven Hills, Columbia, and they stay for, you know eight years, ten years. **But we didn't think that was necessarily reasonable, so we came up with 18 months.**

(Ex. 2 (Gennarelli Dep. Tr.) 172:18-23 (emphasis added).)

### C. Waterstone's Damages Expert Responds to the Only Damages Model Disclosed by Mutual: the 18-month Gennarelli Analysis.

Waterstone timely retained Steven Oscher as its damages expert to opine on Mutual's damages, which extrapolate damages out 18-months after the employees left the branches. (*See* Exhibit 5, June 5, 2023 Expert Report of Steven Oscher, "Oscher Report.") With respect to the lost profit damages, Oscher concluded that (1) the demand reflected in Gennarelli's Analysis cannot be verified or tested because Gennarelli was unable to identify the documents supporting his calculations (*id.* at 10.); (2) the Gennarelli Analysis was based on unsupported assumptions including that the branches would have remained open for 18 months despite none of the employees having any contractual obligation to remain employed by Mutual for any set period of time (*id.*); (3) the loan volumes produced by the branch managers

5

should not have been included in Gennarelli's calculation (*id.* at 10-11); and (4) Gennarelli's projections were based on data from 2020-2021, a historically anomalous period in the mortgage lending industry triggered by the COVID-19 pandemic that is not representative of the current market. (*Id.* at 11-12.)

### D. Mutual Introduces New Damages Models Projecting Future Lost Profits Over 10 Years.

On July 14, 2023, Mutual disclosed a purported "rebuttal" expert who, for the first time, asserted that Mutual's lost profit damages are "approximately $28 million" over a ten-year period. (*See* Exhibit 6, July 14, 2023 Expert Report of Candice Rosevear, "Rosevear Report" at 5). Outside of a footnote citing to a dataset used by Oscher, the Rosevear Report does not mention the Oscher Report and ignores Mutual's prior damages model entirely, omitting reference to the $4.4 million-dollar demand, the 18-month period, and Gennarelli's calculations. Instead, the Rosevear Report outlines two brand new methods for calculating lost profits. (*Id.* at 6.) The first, a "peer" model, looks at monthly sales for Mutual's St. Louis and Maryland branches to predict loan sales for the former Daytona and Tampa branches. (*Id.* at 8.) The second, an "MBA-Based Model," uses quarterly MBA data to predict future sales for Tampa and Daytona. (*Id.* at 9.) Neither methodology was used by Gennarelli, and therefore, neither was reviewed by Oscher.[1]

---

[1] Waterstone moved to strike Rosevear and her report as improper rebuttal on July 26, 2023 (DE 84), but the motion was denied the next day without full briefing. (DE 86.) Waterstone reserves its right to appeal the Court's order.

6

Discovery closed in July 2023. Mutual never amended its discovery responses or supplemented its initial disclosures to reflect a damage demand other than the 18-month Gennarelli Analysis. Given that an 18-month period was the only duration ever disclosed by Mutual, Waterstone requested that Mutual provide estimated lost profit damages using Rosevear's models for an 18-month time frame. Using Rosevear's MBA-Based and Peer-Based Models, Mutual estimates lost profit damages over 18 months as $2.43 million or $2.65 million, respectively. (*See* Exhibit 7 (MOM-0015944).)

### E. Waterstone Moves To Exclude Mutual's Expert Testimony On Damages.

On February 6, 2024, Waterstone moved to exclude the testimony of both Gennarelli and Rosevear because each projected damages for widely divergent time periods (18 months and *up to* ten years, respectively) with no evidence to support those time periods. (DE 132.) At a minimum, Waterstone argued that Mutual should not be permitted to seek lost profit damages based on loan volume and profits attributable to the former branch managers or the Paramus branch as there was absolutely no wrongdoing associated with the departure of either the managers or Paramus.

While Waterstone's motion was pending, but after the briefing was complete, Mutual unilaterally filed a stipulation stating that it would not seek lost profit damages for a period beyond 30 months. (DE 144.) Mutual did not provide any basis or explanation for the new 30-month duration. Waterstone's counsel requested that

Mutual state what a 30-month lost profit demand equates to, given the inconsistency in Mutual's calculations. (See Exhibit 8.) Mutual's counsel confirmed on March 22, 2024 that lost profit damages over 30 months equate to $4.15 million or $4.37 million using Rosevear's MBA-Based Model and Peer-Based Model, respectively. (*Id.*)

### F. Judge Barber Rules That Lost Profit Damages Must Carve Out The Managers And Paramus, And Finds That Mutual Lacks Evidence To Support A Duration Of Lost Profit Damages.

On March 29, 2024, Judge Barber granted Waterstone's motion in part, agreeing with Waterstone that there is no basis to seek lost profit damages attributable to the branch managers or the Paramus branch and that any damages must carve out profits derivative of the managers and Paramus. (DE 146.)

Judge Barber further concluded that the opinions of both Gennarelli and Rosevear "are suspect because they do not identify any evidentiary support for the time duration included in their opinions." (*Id.* at 9.) Judge Barber noted that Mutual has not identified any evidence Gennarelli or Rosevear could rely upon to establish a time component. (*Id.* at 10.) Nonetheless, "[i]n an abundance of caution" and considering Mutual's 30-month stipulation, Judge Barber did not eliminate the lost profits claim entirely, but warned that if, after presenting its case-in-chief, Mutual has not provided evidence to support a time component for its damage models then Mutual will not be permitted to present its claim for lost profits to the jury. (*Id.* at 10-11.)

8

### III. ARGUMENT

**A. Lost Profit Damages Should Be Limited To 18 Months.**

The Court should exclude any evidence related to lost profit damages for any duration greater than 18 months because that is the only duration Mutual identified in discovery. If Mutual intended to seek some other duration of lost profit damages beyond 18 months (e.g., 30 months), it had an obligation to amend its discovery responses and supplement its initial disclosures. *See* Fed. R. Civ. P. 26(e) (a party has a continuing duty to "supplement or correct its [Rule 26] disclosure or [discovery] response… if the party learns that in some material respect the disclosure or response is incomplete or incorrect"). Where a party fails to supplement or correct its responses to provide accurate information, the party is not allowed to present that information at trial. Fed. R. Civ. P. 37; *see, e.g.*, *In re Mirabilis Ventures, Inc.*, No. 6:09-CV-271-ORL-31, 2011 WL 3236027, at *5 (M.D. Fla. July 28, 2011) (citing *Mee Industries v. Dow Chemical Co.,* 608 F.3d 1202, 1221–22 (11th Cir. 2010)) ("Where a party fails to properly identify a category of damages or to provide the calculations underlying it, it is within the court's discretion to exclude evidence relating to those damages.")

Mutual responded to Waterstone's very first interrogatory, calling for an itemization of damages, stating that it was seeking lost profit damages over an 18-month time frame. Mutual has never amended or supplemented that discovery response. Mutual did not identify any lost profit damage calculation in its Rule 26

9

initial disclosures and it has never supplemented those disclosures. The Court should thus limit the lost profit damages Mutual can seek at trial to 18 months.

While Mutual disclosed Rosevear's "rebuttal" expert report estimating damages anywhere between $0 and $28 million for a time period *up to* 10 years, Rosevear does not state what duration of damages is sought by Mutual: she simply provides a tool for estimating damages over a duration Mutual needs to select (up to 10 years). Mutual *never* indicated that it would be seeking damages for 30 months until it unilaterally filed the stipulation on March 22, 2024 — nearly eight months after the close of discovery and after the parties finished briefing the *Daubert* motion Judge Barber requested. Waterstone has had no opportunity to pursue discovery related to a purported 30-month duration that was not the duration Gennarelli presented as Mutual's corporate representative or a duration presented by any other Mutual witness, or by Mutual itself. Nor does Mutual have the ability to inject a new witness to support the 30-month duration because Leyden is the only witness Mutual disclosed and she testified she has no knowledge of the damages sought.

As such, the Court should limit the lost profit damages Mutual can seek at trial to 18 months, which, with the necessary carve outs directed by Judge Barber, translates to a maximum damage award of approximately $1.2 million based on calculations prepared by Waterstone's damages expert, Steve Oscher. (*See* Exhibit 9.)

initial disclosures and it has never supplemented those disclosures. The Court should thus limit the lost profit damages Mutual can seek at trial to 18 months.

While Mutual disclosed Rosevear's "rebuttal" expert report estimating damages anywhere between $0 and $28 million for a time period *up to* 10 years, Rosevear does not state what duration of damages is sought by Mutual: she simply provides a tool for estimating damages over a duration Mutual needs to select (up to 10 years). Mutual *never* indicated that it would be seeking damages for 30 months until it unilaterally filed the stipulation on March 22, 2024 — nearly eight months after the close of discovery and after the parties finished briefing the *Daubert* motion Judge Barber requested. Waterstone has had no opportunity to pursue discovery related to a purported 30-month duration that was not the duration Gennarelli presented as Mutual's corporate representative or a duration presented by any other Mutual witness, or by Mutual itself. Nor does Mutual have the ability to inject a new witness to support the 30-month duration because Leyden is the only witness Mutual disclosed and she testified she has no knowledge of the damages sought.

As such, the Court should limit the lost profit damages Mutual can seek at trial to 18 months, which, with the necessary carve outs directed by Judge Barber, translates to a maximum damage award of approximately $1.2 million based on calculations prepared by Waterstone's damages expert, Steve Oscher. (*See* Exhibit 9.)

### B. Mutual Is Limited to Evidence Disclosed in Discovery to Support its 18-Month Duration.

Judge Barber held that Mutual has not identified any evidence to support *any* duration of lost profit damages:

> There certainly might be evidence in the case that Gennarelli and Rosevear could rely upon, beyond their own speculative opinions, to establish a time component. **However, it is not clear that Plaintiff has identified any such evidence on this specific point.** The durational aspect of lost profits is not simply a question of fact for the jury – there must be *some evidence* to create an issue of fact for the jury to determine.

DE 146 at 10 (bold emphasis added). Mutual is limited to presenting evidence at trial that was disclosed in discovery – none of which supports any duration of lost profit damages. *See, e.g.*, *Brown v. Vivint Solar, Inc.*, No. 818CV2838T24JSS, 2020 WL 5016898, at *2 (M.D. Fla. Aug. 25, 2020) (excluding evidence plaintiff intended to use at trial because it was not disclosed in discovery). Allowing Mutual to introduce new evidence at trial in support of a damages duration would contravene not only the Federal Rules, *see* Fed. R. Civ. P. 37, but also the longstanding public policy of state and federal courts against trial by ambush. *E.g.*, *Bostick v. State Farm Mut. Auto. Ins. Co.*, 2017 WL 4518665, at *2 (M.D. Fla. Oct. 10, 2017) (explaining the "concept of trial by ambush has long ago fallen into desuetude in both state and federal courts," and excluding evidence that was not timely disclosed before trial).

While the Federal Rules and case law requiring timely disclosure of evidence are well-established, given that Mutual's damages and purported evidence have continued to change months past the discovery deadline, including by way of the

11

March 22, 2024 stipulation attempting to inject a new 30-month duration, Waterstone seeks a ruling in advance of trial that Mutual is not permitted to introduce new evidence for the first time at trial to support its 18-month duration, which Gennarelli testified was selected by him because a longer 10 year duration would be unreasonable.

### C. Mutual's Lost Profit Damages Cannot Exceed $2,093,535.

Even if this Court allows Mutual to seek lost profit damages beyond the 18 months disclosed in discovery, Mutual—by its own stipulation—cannot seek lost profit damages beyond 30 months. Including the carve outs ordered by Judge Barber, this translates to a maximum damage award of $2,093,535. *See* Exhibit 9. While Waterstone maintains that Mutual's lost profit damages (if any) are far less than this number, it is necessary that the parties align on the amount and calculation surrounding Mutual's maximum potential lost profit damages to avoid confusion.

### IV. CONCLUSION

For the reasons set forth above, Waterstone requests that the Court grant its motion *in limine*.

Dated:  April 26, 2024.

                                                  */s/ Maria L. Kreiter*
Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
carolina.blanco@hwhlaw.com

scott.mclaren@hwhlaw.com

Maria Kreiter (admitted pro hac vice)
Emma Jewell (admitted pro hac vice)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*

13

## LOCAL RULE 3.01(G) CERTIFICATION

Pursuant to Local Rule 3.01(g), counsel for Waterstone certifies they have conferred in good faith with opposing counsel concerning the issues presented in this Motion. Specifically, Waterstone's counsel spoke with Mutual's counsel on April 18, 2024 regarding the grounds for the Motion. Mutual indicated it does not agree to the relief sought in this Motion.

Dated:  April 26, 2024.

      /s/ *Maria L. Kreiter*
Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
carolina.blanco@hwhlaw.com
scott.mclaren@hwhlaw.com

Maria Kreiter (admitted pro hac vice)
Emma Jewell (admitted pro hac vice)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*