## Page 1

```
          IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                    TAMPA DIVISION
            CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

      Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

      Defendant.
_____/


DEPOSITION OF:   JEFFREY GENNARELLI, CORPORATE
                 REPRESENTATIVE OF MUTUAL OF OMAHA
                 MORTGAGE, INC.

TAKEN:           Pursuant to Notice by
                 Counsel for Defendant

DATE:            May 25, 2023

TIME:            9:17 a.m. to 4:53 p.m. EST

LOCATION:        Hill Ward Henderson
                 101 East Kennedy Boulevard
                 Suite 3700
                 Tampa, Florida  33602

REPORTED BY:     Melanie Keefe, FPR
                 Notary Public
                 State of Florida at Large


         REGENCY REPORTING SERVICE, INC. (813)224-0224
```

## Page 2

```
APPEARANCES:   COURTNEY WALTER, ESQUIRE
               CHRIS McCALL, ESQUIRE (Zoom)
               Mitchell Sandler LLC
               1120 20th Street Northwest
               Suite 725
               Washington, DC  20036

               MARK CARROLL, ESQUIRE
               Mutual of Omaha Mortgage, Inc.
               100 West 22nd Street
               Suite 101
               Lombard, Illinois  60148

                    Attorneys for the Plaintiff

               MARIA L. KREITER, ESQUIRE
               EMMA J. JEWELL, ESQUIRE (Zoom)
               Godfrey & Kahn, S.C.
               833 East Michigan Street
               Suite 1800
               Milwaukee, Wisconsin  53202

               CAROLINA Y. BLANCO, ESQUIRE (Zoom)
               Hill Ward Henderson
               101 East Kennedy Boulevard
               Suite 3700
               Tampa, Florida  33602

               STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
               Waterstone Mortgage Corporation
               N25W23255 Paul Road
                  Pewaukee, Wisconsin  53072

                    Attorneys for the Defendant

ALSO PRESENT:  Carrie Macsuga
```

## Page 3

| INDEX | PAGE NUMBER |
|---|---|
| Examination by Ms. Kreiter | 5 |
| Read Letter | 255 |
| Errata Sheet | 256 |
| Reporter's Certificate | 257 |

## Page 4

E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

EXHIBIT 2

21

1  A. Okay.
2  Q. For now, I want to just focus on Bucket No. 1,
3  the bucket that is associated with lost revenue and profits
4  from loans that were improperly diverted, so the first
5  bucket --
6  A. Yes.
7  Q. So my understanding is that the contention is
8  there were loans that should've closed at Mutual that did
9  not and instead closed at Waterstone with respect to that
10 first bucket?
11 A. Correct.
12 Q. I don't see in the written responses, as to the
13 first bucket, any type of number demand. I do see that when
14 you get to page 27, when you start talking about the second
15 bucket.
16 A. Yeah.
17 Q. So for purposes of this deposition --
18 A. Sure.
19 Q. -- now is the time when I get to exhaust and find
20 out exactly what damages are sought.
21 A. Sure.
22 Q. With respect to the first bucket, what are the
23 damages sought?
24 A. Well, I think a lot of that has to do with
25 discovery we haven't been provided yet. We don't know. We

REGENCY REPORTING SERVICE, INC. (813)224-0224

22

1  haven't looked at Waterstone's books to see what loans have
2  closed. We only -- how do we know -- we know of a couple of
3  instances of loans that were diverted for sure, but we don't
4  know the totality of the loans that were diverted because we
5  don't have access to Waterstone's closed loan report.
6  Q. Mr. Gennarelli, when was the lawsuit filed? It
7  was filed in July.
8  A. Okay.
9  Q. It's been pending for ten months.
10 A. Okay.
11 Q. Has Mutual served discovery on Waterstone?
12    MS. WALTER: Object to the form.
13    MS. KREITER: The witness is testifying that he
14    doesn't believe Mutual has had a chance to explore the
15    claims. I'm following up on that testimony.
16 Q. Do you know whether Mutual of Omaha has served
17 discovery on Waterstone?
18    MS. WALTER: Object to the extent it implicates
19    attorney work product.
20 Q. Go ahead and answer.
21 A. I'll say I have not seen a closed loan report
22 coming from Waterstone. If I have seen that, then we can go
23 back and backtrack.
24 Q. Are you --
25 A. What I have seen, though --

REGENCY REPORTING SERVICE, INC. (813)224-0224

23

1  Q. Sorry. Go ahead.
2  A. What I have seen were our customers sent to
3  Waterstone to the head underwriter at Waterstone asking if
4  these loans would work by -- by Mutual of Omaha Mortgage
5  employees. I have seen that. So I know that there was
6  some. Do I know the extent of it? I haven't seen that.
7  And I didn't think I was going to -- I didn't think I was
8  asked to testify to the fact of what Waterstone has.
9  Q. Well, you're here to testify about the damages,
10 and I heard you say that you haven't been able to calculate
11 damages because discovery has just started.
12    MS. WALTER: Object to form.
13 Q. Is that accurate?
14 A. In my mind, I have not received enough
15 information. I haven't seen -- I do know this: Customer
16 information was sent to personal e-mails. We don't -- we
17 haven't -- we haven't looked at any personal e-mails.
18 Q. Mr. Gennarelli, are you aware that in the fall of
19 '22 Waterstone produced in discovery a list of the loans
20 that had been closed at the branches within the first three
21 months? Are you aware of that?
22    MS. WALTER: Object to form.
23    MS. KREITER: What's wrong with the form?
24    MS. WALTER: Maria, carry on.
25    Answer the question.

REGENCY REPORTING SERVICE, INC. (813)224-0224

24

1     MS. KREITER: What is the objection to the form?
2     Because I'll restate it.
3     MS. WALTER: I am objecting properly pursuant to
4     how I'm supposed to object.
5  Q. Do you understand the question, Mr. Gennarelli?
6  A. I do.
7  Q. Go ahead and answer.
8  A. I was aware of a small list that was provided.
9  I'm also aware that we have not looked at personal e-mails.
10 Our customer list was sent numerous times to personal e-mail
11 addresses. We haven't looked at those e-mails and what
12 happened to that data after it was in the personal e-mail.
13 Q. When you were preparing to testify on behalf of
14 the company today as to the loans that have improperly
15 transferred to Waterstone, did you go back and look at the
16 list of loans closed at Waterstone that was produced in
17 discovery in the fall?
18 A. Yes. But I didn't think it was an all-inclusive
19 list, to be honest with you.
20 Q. Did you compare that list to the list of loans in
21 the pipeline at Mutual of Omaha?
22 A. Well, they wouldn't be in the pipeline.
23 Q. Did you use that list produced by Waterstone back
24 in the fall and try to analyze which of those loans closed
25 at Waterstone you believe should've been closed at Mutual?

REGENCY REPORTING SERVICE, INC. (813)224-0224

25

1  MS. WALTER: Object to the extent it implicates
2  attorney work product. He's here as -- he's --
3  MS. KREITER: He's --
4  MS. WALTER: He's not the attorney.
5  MS. KREITER: He's not here as an individual.
6  He's here as a corp rep.
7  MS. WALTER: I did not say individual. I said he
8  is not the attorney in the case.
9  MS. KREITER: I'm entitled to ask what documents
10 and what preparation this witness did to testify about
11 damages for which ten months into the case Mutual has
12 not disclosed any number, so that's the line of my
13 questions.
14 Q. Do you have a number, Mr. Gennarelli, with
15 respect to this first bucket, the loans that have
16 transferred to Waterstone from Mutual of Omaha? Have you
17 looked at the loans, and do you have a number that you're
18 ready to present at the deposition today with respect to
19 Bucket 1?
20 A. I don't have a number with respect to Bucket 1.
21 Q. Is Mutual seeking damages with respect to
22 Bucket 1?
23 A. I believe so.
24 Q. But you're not able to tell me what those damages
25 are?

26

1  A. Not at this moment.
2  Q. Has you or anyone at Mutual made an attempt to
3  calculate those damages?
4  A. I have not.
5  Q. Has anybody at Mutual?
6  A. Not that I'm aware of.
7  Q. And your position is that you're waiting to do
8  more discovery?
9  MS. WALTER: Object to form.
10 A. It is.
11 Q. What more discovery do you need to do?
12 MS. WALTER: Object to form.
13 A. Well, I'd like to see the personal e-mails where
14 all of our data was sent to. That's what I'd really like to
15 know so that I can understand the absolute damage caused by
16 this unbelievable breach of conduct.
17 Q. Did Mutual of Omaha Mortgage send subpoenas to
18 any of the individuals who have those e-mails?
19 MS. WALTER: Object to the extent it implicates
20 attorney work product.
21 MS. KREITER: Work product --
22 MS. WALTER: Mr. Gennarelli isn't going to be
23 able to answer how discovery is being conducted in the
24 case. That's my job.
25 MS. KREITER: The fact that subpoenas have gone

27

1  out is not a privileged question.
2  MS. WALTER: I didn't -- I said it implicates
3  attorney work product. I didn't say it was privileged.
4  I'm not instructing him not to answer.
5  Q. Do you have an understanding --
6  A. I'm not aware of the subpoenas or not. I don't
7  know.
8  Q. So you don't know whether Mutual has made an
9  effort to, for example, subpoena the personal e-mails of any
10 of the individuals that you claim are necessary?
11 A. I am not aware.
12 Q. When you were preparing to testify for the
13 deposition, did you have discussions or requests, access to
14 the e-mails that you believe are necessary to calculate
15 Category 1 damages?
16 MS. WALTER: Object to the extent it implicates
17 attorney work product or goes to attorney-client
18 discussions.
19 Q. Go ahead.
20 A. Repeat the question.
21 Q. Sure. I hear you testifying that Mutual is
22 unable to calculate damages with respect to Category 1,
23 which we've defined as the loans that have closed at
24 Waterstone due to some unlawful conduct. And I'm trying to
25 understand your testimony.

28

1  I've heard you say that calculation hasn't been
2  done because you haven't seen personal e-mails, and I've
3  heard you testify that you don't know whether there have
4  been any subpoenas issued by Mutual in an effort to try to
5  get the e-mails. So now my question is in connection with
6  preparing for this deposition --
7  A. Yes.
8  Q. -- did you make any efforts at that point in time
9  to seek out the e-mails that you believe are necessary to
10 testify on the topic noticed?
11 MS. WALTER: Object to form.
12 A. I didn't -- I did not.
13 MS. WALTER: Can we take a ten-minute break?
14 MS. KREITER: Sure.
15 (A recess was taken.)
16 MS. KREITER: Can you just read back the last
17 question and last answer, please?
18 (The previous question and answer was read by the
19 reporter.)
20 Q. (By Ms. Kreiter) So there may be times during
21 this deposition when I say "you." You're testifying on
22 behalf of Mutual. If I say "you" during this deposition,
23 just understand that I mean Mutual collectively as a
24 company; correct or understood?
25 A. Yes.

29

1  Q. Would it surprise you if a comparison of the
2  loans that had closed at Waterstone compared to the loans
3  that were in the pipeline of Mutual had been done and that
4  the damages resulting from that analysis was less than
5  $50,000?
6       MS. WALTER: Object to form.
7  A. In the three-month period, is that what you're
8  referencing, that --
9  Q. In that interim period of time.
10 A. Yes, then it would surprise me and --
11 Q. What do you think the lost profits are? Are you
12 able to give a ballpark?
13 A. For Bucket 1?
14 Q. For Bucket 1.
15      MS. WALTER: Object to form.
16 A. This is something the attorneys worked on, to be
17 perfectly frank, you know. And I know, you know, it would
18 not surprise me -- if it was just for a three-month period,
19 it would not surprise me.
20 Q. If it's less than $50,000?
21 A. For a three-month --
22      MS. WALTER: Object --
23 A. -- period.
24 Q. Correct. What about for an 18-month period? Do
25 you have any sense as to what that number is?

30

1       MS. WALTER: Object to form.
2  A. On Bucket 1 only?
3  Q. Bucket 1 only.
4  A. No, I wouldn't know whether it was for 18 months.
5  Q. When you say this is something that the attorneys
6  worked on, what do you mean?
7       MS. WALTER: Object to form.
8  A. Well --
9       MS. KREITER: What's the objection?
10      MS. WALTER: The objection is if it calls for a
11      discussion with counsel, it's privileged.
12      MS. KREITER: My question was what are the
13      damages sought? And the witness testified it's
14      something the attorneys worked out.
15 Q. Is that a correct statement of your position?
16 You believe that the damages sought are something the
17 attorneys worked out with respect to Bucket 1?
18 A. Yes.
19 Q. What do you mean by that?
20      MS. WALTER: Object to form.
21 A. I don't know. I don't know what else I can mean
22 by that.
23 Q. Regardless, on behalf of Mutual, you're not
24 prepared to testify today as to any particular number sought
25 with respect to Bucket 1; correct?

31

1  A. Not for -- not for Bucket 1.
2  Q. I'm going to go back to my original question.
3  Bucket 1 talks about lost revenue and profits. I understand
4  you have a personal view that it should be lost revenue on
5  behalf of Mutual today at the deposition on this topic.
6  Which is it, revenue or profits?
7       MS. WALTER: Object to form.
8  A. I'm happy to talk to either one if you'd like.
9  So, you know, again, it's -- generally, it's -- it would be
10 gross profits, not net profits, you know, on cost of goods
11 sold.
12 Q. So I'm just trying to pin down at this deposition
13 what is sought by Mutual in the case. The bullet on the
14 bottom of page 5 reads "Lost revenue and profits." Is it
15 Mutual's contention that it's entitled to both lost revenue
16 and lost profits with respect to Bucket 1?
17 A. Yes.
18 Q. Explain that.
19 A. I just did. There's -- there's gross revenue.
20 That's, you know, cost of goods sold, and there's the
21 profit.
22 Q. Okay. And your position is that Mutual should
23 collect both the revenue and the profits?
24 A. Yes.
25 Q. Okay. Let's play this out so I understand. With

32

1  respect to a loan that closed, say the revenue -- and I'm
2  just using hypothetical numbers. The revenue coming in to
3  Mutual from that loan is a hundred grand. What would be the
4  profits approximately? Strike that.
5       Let me ask it a different -- assume the profits
6  -- when you take out all the costs, assume the profits are
7  $20,000. Is it your position that Mutual is seeking both
8  the hundred-thousand-dollar revenue and the $20,000 profits
9  for a total of 120-?
10 A. Well, if you sell -- if you sell a loan for a
11 hundred thousand dollars, the revenue isn't a hundred
12 thousand dollars; right? It is -- the revenue of a
13 hundred-thousand-dollar loan, generally speaking, at these
14 branches is going to be about $4,200 after commissions.
15 Q. I'm concerned about double-dipping. Does that
16 make sense to you? And I'm trying to understand, are you
17 counting twice? So for example, are you counting a hundred
18 thousand dollars as the revenue and then also seeking
19 20,000 --
20 A. I said a hundred thousand dollars, not the
21 revenue. You said that was the loan amount.
22 Q. No. Wait a minute. So sorry. Let's start
23 again. Assume revenue from a loan -- I just picked that
24 number. I can pick a smaller number if that's --
25 A. We're only seeking -- we're only seeking the

93

1 while Mr. Hutto is still an employee. So let's not act like
2 Waterstone here -- Bank of America, if they wanted to
3 recruit Dwayne Hutto, absolutely we should take that money
4 out, but that's not what happened. What happened was
5 different than how you're painting the picture.
6    Q.  So is it -- I'm trying to understand here why you
7 are counting Mr. Hutto in the damages analysis.
8    A.  Right.
9    Q.  And is it -- and you're saying that Waterstone
10 could solicit him and could recruit him if it wanted to do
11 that?
12   A.  If they did it in an aboveboard way, but that's
13 not what happened. So you can't have your cake and eat it
14 too. You can't take the context of what really happened out
15 of the equation. That doesn't work.
16   Q.  Are you aware that Mr. Hutto and Mr. Smith were
17 looking to leave Mutual and go somewhere else? It just
18 happened to be Waterstone?
19   A.  I was not aware of that. I mean, I think after
20 Dwayne left, we were aware that Chris was probably going to
21 depart. I know that Brian brought up the fact that they
22 were always -- you know, they were pretty -- they talked a
23 lot to Brian, and there was a comment/conversation with them
24 that this place had this, but they didn't leave ever, so...
25   Q.  There were conversations between Mr. Hutto and
REGENCY REPORTING SERVICE, INC. (813)224-0224

94

1 Mr. Wolf with Kiley King and Brian Tomalak about --
2    A.  I think. I mean, they were always trying to
3 finagle for a little bit of a better deal here and there but
4 never -- they never left obviously until -- until this,
5 until Waterstone got involved.
6    Q.  Did Mutual ever have a discussion with Mr. Hutto
7 about why he resigned?
8    A.  Brian and Kiley did.
9    Q.  What was the reason?
10   A.  I think you better ask them because it was a
11 conversation, so third party. I think a lot had to do with
12 a check being written, from my recollection.
13   Q.  Same question for Mr. Smith and Mr. Wolf. Was
14 there ever a conversation between Mutual and those managers,
15 Mr. Smith and Mr. Wolf --
16   A.  Yes.
17   Q.  -- about why they were leaving?
18   A.  Yes.
19   Q.  Why were they leaving?
20   A.  Well, Chris told Brian it was because of the
21 check and it was too good of a check to pass up.
22   Q.  Which Chris?
23   A.  Smith.
24   Q.  Do you believe that the managers were genuinely
25 unhappy at Mutual of Omaha?
REGENCY REPORTING SERVICE, INC. (813)224-0224

95

1       MS. WALTER: Object to form.
2    A.  No, I don't believe that.
3    Q.  Did Mutual factor in the cause of the managers'
4 departure when it was considering the damages?
5       MS. WALTER: Object to form.
6    A.  Yes, I believe so. I mean, the cause that --
7 yeah, that they left because of -- yeah, were coerced to
8 leave and take their branches. Yes, that's why we're here.
9 If there was no cause, we wouldn't be here; right?
10   Q.  Did you -- but in your mind, is it, look, we're
11 convinced these managers left because of the payday, or does
12 Mutual believe that there's other considerations?
13      MS. WALTER: Object to form.
14   A.  Well, I think there's other considerations as
15 well.
16   Q.  If Mr. Hutto and Mr. Wolf had resigned but none
17 of the other branch employees resigned, who would Mutual
18 have put in place as the branch manager?
19      MS. WALTER: Object to form.
20   A.  I think Kiley King.
21   Q.  Kiley King?
22   A.  Yeah.
23   Q.  Does Mutual have evidence that the employees
24 would've stayed and worked for Kiley King?
25      MS. WALTER: Object to form.
REGENCY REPORTING SERVICE, INC. (813)224-0224

96

1    A.  No, no evidence.
2       THE WITNESS: I could use a bio break whenever is
3 convenient --
4       MS. KREITER: It's a convenient time for me too.
5 Why don't we -- do we want to put a lunch order in now?
6 Take a short break.
7       MS. WALTER: I'm fine with that.
8       MR. CARROLL: Yeah.
9       MS. KREITER: Okay.
10      (A recess was taken.)
11   Q.  (By Ms. Kreiter) Mr. Gennarelli, are you aware
12 of any complaints or frustrations by the downstream
13 employees about Mutual's underwriting requirement's ability
14 to efficiently close loans, limited loan products, or
15 compensation?
16   A.  Not directly. I did see an e-mail, I think, that
17 -- in this where they talked about an underwriting situation
18 and actually was -- he was confused. It was actually
19 overturned by the chief operating officer. Then he went
20 ahead and told the customer that we couldn't do it at Mutual
21 and should send it to Waterstone, but that is one that I did
22 see.
23   Q.  Did any of those issues come up in the exit
24 interviews that Mutual conducted when the downstream
25 employees left?
REGENCY REPORTING SERVICE, INC. (813)224-0224

165

1  that included a historical anomaly in the market?
2      A.   Well, there was the data we had.  We have to use
3  all the data.  You don't know what the next year is going to
4  bring.  Next year could be a great year as well.  These are
5  purchase-driven folks too.  I mean, they do purchases, you
6  know, heavy refinances.
7           And the other thing is with the arrival of Keller
8  Williams, that relationship, they would've benefited
9  substantially.  I would venture to say if they were still
10 here with the Keller Williams acquisition, that their volume
11 would be near that level again.
12     Q.   The year to date for Tampa in that fourth column
13 of Branch Contributions to Profits is 406,810.  Do you see
14 that?
15     A.   Yes.
16     Q.   If you double that, that would give you a full
17 year because it --
18     A.   Right.
19     Q.   -- so happens that the departure was --
20     A.   That's right.
21     Q.   -- six months into the year?
22     A.   Yeah.
23     Q.   Did you or Mr. Mayle or anyone else at Mutual
24 consider using that most recent time frame as your baseline
25 for estimating the damages?

166

1      A.   I don't know that we considered that.  The one
2  thing we did consider, like I said before, was using the
3  cost of goods sold method.  And I thought that if we
4  would've used the cost of goods sold method, these numbers
5  would've been through the roof, so we chose just an average.
6           And you're not going to -- when you're doing an
7  average, it's going to be an average.  You have to use all
8  the data in front of you.  We don't know what tomorrow
9  brings; right?  Keller Williams arrived this year.  That
10 would've been exponentially valuable having them there.
11     Q.   But somebody had to make a choice as to how far
12 back you were going to go with respect to the data.  And
13 either you --
14     A.   We went back the whole way, the whole time -- we
15 just went back to the history here at Mutual Mortgage.
16     Q.   Do you believe that it's more reliable to use
17 data that includes a historical anomaly than it is to use
18 the most recent data available?
19          MS. WALTER:  Object to the form.
20     A.   Yeah, I think that what you're calling historic
21 anomaly is one person's perception.  We don't know what next
22 year brings or the year after or the year after.
23     Q.   So let me ask you this question.  I want to make
24 sure I'm understanding this.  You looked at historical data
25 going back to 2019 --

167

1      A.   That's right.
2      Q.   -- including the pandemic, which was a high for
3  both of the branches, and then you used that data to project
4  losses associated with the branches if they had stayed open
5  going into the future; correct?
6           MS. WALTER:  Object to the form.
7      A.   I think that's what we -- we average the volume
8  the times that they were here.  That's why if you noticed
9  the lowest -- the lowest really year volume is 2019.  We
10 used that.  We didn't just use 2020.  We didn't just use
11 2021.  We averaged the volume for the time they were here.
12 I can't tell you what the future will bring; right?  I would
13 say if they knew that Keller Williams was coming on, they
14 probably wouldn't have left and they would benefit.  Their
15 volume would be more than this.
16     Q.   So my question is more just to make sure we're
17 aligned on what Bucket 2 represented.  My understanding --
18 but I don't want to assume.  I want to check with you -- is
19 it represents the profits as if the branches would've stayed
20 open for 18 months into the future?
21     A.   That's right.
22     Q.   And to estimate those damages of profits into the
23 future, you looked at retrospective data; correct?
24     A.   Yeah, that's the only data we have.
25     Q.   So it's May 25th of 2023, which includes the date

168

1  range that you're estimating damages.  And I'll go back to
2  Exhibit 7 here.  So the damage range that you're using is
3  July 1, 2022, to December 31, 2023; correct?
4      A.   That's correct.
5      Q.   We're a number of months into that damage period
6  now; correct?
7      A.   Yes.
8      Q.   Is the market now and since July 1, 2022, better
9  or worse than it was in the pandemic?
10          MS. WALTER:  Object to the form.
11     A.   Our -- our -- our volume today is better than it
12 was last year.  Now, is it better than the pandemic?  No.
13 But it's better than it was last year.
14     Q.   Okay.  Has Mutual -- in July of 2022, was Mutual
15 laying off employees?
16     A.   We laid off nonperformers, yes.  I don't know if
17 that was the exact time, but sure.
18     Q.   In July of 2022, was Mutual's profitability
19 consistent with its budgeting and estimates?
20     A.   Well, I think that, you know, we were very
21 negatively impacted by these groups leaving at that time
22 because when you -- each loan that you do is exponentially
23 more valuable, especially when you are dealing with purchase
24 teams.  So we still have all these fixed costs at the
25 corporate level that we have to -- that we have to assume.

169

1  And when this volume leaves, those costs become a much
2  larger percent of the expense.
3      So that's why I keep going back to this -- maybe
4  that's the route we should take, is using the cost of goods
5  sold approach because you take those variables out of it.
6  Each loan -- each additional loan is exponentially more
7  profitable than the last -- right? -- because the first loan
8  pays for all -- you don't make any money; right?  It pays
9  for the expense.  The second one you make a little bit.  The
10 third loan, you make more money, et cetera, et cetera.
11     Q.  Does Mutual look at the profitability at the
12 branch level?
13     A.  Yes.
14     Q.  Were there any profitable Mutual branches in July
15 of 2022?
16     A.  Yes.
17     Q.  How many?
18     A.  I don't know.
19     Q.  Were there a number of Mutual branches that were
20 not profitable in July of 2022?
21     A.  In July of 2022?
22     Q.  Correct.
23     A.  I don't know if there were a number that weren't
24 profitable.  When you -- when you say "branch
25 profitability," how we look at it is just exactly how I
           REGENCY REPORTING SERVICE, INC. (813)224-0224

170

1  walked through this; right?  It's taken into account those
2  expenses and revenue occurred at the -- at the corporate
3  level.  So a branch P&L may be negative, but we're still
4  making -- corporate may still be making money from that
5  branch.  Does that make sense?
6      Q.  How about looking at the forward division?
7      A.  Yeah.
8      Q.  I mean, if you just look at the forward division
9  in July of 2022, was the forward division profitable at that
10 time?
11     A.  Well, I know through June we were very
12 profitable.  Through June we were profitable.
13     Q.  What about after June?  July of 2022?  And I ask
14 that because that's when your damage period starts.  So in
15 July of 2022, was forward profitable?
16     A.  I don't know.  I'd have to go back and look.  We
17 -- we ended the year being profitable but not by much, but I
18 know for the first half of the year we were, I believe,
19 20-some million in profit.  And again, I think that shows
20 the damage caused when groups like this leave, purchase
21 groups.  It becomes exponentially more damaged.
22     Q.  What was the rationale for using an 18-month
23 period to calculate the lost profit damages associated with
24 the branches closing?
25     A.  Yeah, I mean, we didn't want to use any -- again,
           REGENCY REPORTING SERVICE, INC. (813)224-0224

171

1  we were trying to be reasonable.  You know, I think you can
2  make a case for using longer.  Most of our branches have
3  been here 10, 15 years, so -- at least the core group.  So
4  we could've used longer, but we thought 18 months was a
5  reasonable amount of time.
6      Q.  We talked earlier in the context of the
7  discussion about natural attrition and if the branch
8  managers had simply, you know, said nothing but then the
9  employees obviously learn after the fact the branch manager
10 left, that there may be some employees that go and follow
11 that branch manager due to natural attrition.  And I think
12 your testimony was, yeah, eventually that could happen.  Do
13 you recall that testimony?
14     A.  I do.
15     Q.  Okay.  Do you have any data within Mutual or
16 otherwise that you relied on for purposes of this analysis
17 that says it will take about 18 months for employees to
18 follow a branch manager in the context of natural attrition?
19         MS. WALTER:  I'll object to the form.
20     A.  No, I did not do that.  But what we did do is,
21 you know, we looked at how long branches stay.  And, you
22 know, we talked a little bit about what a branch is, and a
23 branch is -- you know, individuals come and go, but that
24 branch continues to grow.  And I think that that's
25 important.  Even today some of our branches are growing and
           REGENCY REPORTING SERVICE, INC. (813)224-0224

172

1  doing well.
2      Q.  Did Mutual have employment contracts with any of
3  the downstream employees that required them to stay on for
4  18 months?
5      A.  No.
6      Q.  Did Mutual have employment contracts with any of
7  the managers that required them to stay for 18 months?
8      A.  No.
9      Q.  What was the rationale for choosing 18 months as
10 opposed to 12 months or 24?
11         MS. WALTER:  Object to the form.
12     A.  You asked me that.  You know, again, it was -- we
13 were trying to be reasonable.
14     Q.  Did you consider other periods of time?
15         MS. WALTER:  Object to the form.
16     A.  We did.
17     Q.  What other periods did you consider?
18     A.  Well, we considered looking at our large
19 branches, so that would be, you know, branches that were
20 similar to these branches.  So you would have a St. Louis,
21 Seven Hills, Columbia, and they stay for, you know,
22 eight years, ten years.  But we didn't think that was
23 necessarily reasonable, so we came up with 18 months.
24     Q.  You understand that the employment contracts in
25 place with the managers, to the extent that there are such
           REGENCY REPORTING SERVICE, INC. (813)224-0224

173

1  contracts that have an employee nonsolicit, do you know how
2  long the duration of the nonsolicit is?
3      MS. WALTER: Object to the form.
4   A. I believe it's a year generally.
5   Q. Okay. Did you consider using a year?
6   A. No. We did consider it, but, I mean, that's what
7  we wound up at, no.
8   Q. So if your testimony is these branch managers
9  solicited the employees and then came and that shouldn't
10 have happened, what's to stop the branch managers from
11 waiting a year and then soliciting the employees and then
12 the employees leaving at that point in time?
13     MS. WALTER: Object to the form.
14  A. Repeat the question.
15  Q. Sure. I mean, the managers only have a
16 contractual prohibition, to the extent that it's enforceable
17 or even exists. The ones I've seen are for 12 months.
18  A. Yes.
19  Q. So after that 12-month period, Mr. Hutto or
20 Mr. Wolf or Mr. Smith could go to the branch employees and
21 solicit them to leave the branch?
22  A. Yes.
23  Q. And that could've happened at the one-year mark.
24 So I'm trying to understand was that -- you know, that
25 situation factored in at all for purposes of your damages

REGENCY REPORTING SERVICE, INC. (813)224-0224

174

1  analysis?
2   A. Not really. They also could've still been here.
3  Keller Williams comes into play, and they stay for six or
4  seven years, so we didn't use six or seven years. We didn't
5  use ten years. We used 18 months. I mean, I don't know how
6  much we can, you know --
7   Q. Do you have any evidence if the downstream
8  employees would have stayed because Keller Williams came in?
9      MS. WALTER: Object to the form.
10  A. Well, you're the one who made a statement that
11 said they went with Dwayne because he provided loans. Where
12 do you think Keller Williams -- one out of every five real
13 estate transactions is Keller Williams signed. We now are
14 the lender for Keller Williams. I would imagine that that
15 may be more attractive than the one-offs that Dwayne was
16 handing them.
17  Q. So again, I want to talk about evidence that
18 Mutual has versus just speculation about what the employees
19 might have thought. Has Mutual asked any of the employees
20 would they have been motivated to stay knowing that Keller
21 Williams was joining?
22     MS. WALTER: Object to the form.
23  A. Not that I'm aware of, no.
24  Q. Does Mutual have reports that show the monthly
25 volume for all branches?

REGENCY REPORTING SERVICE, INC. (813)224-0224

175

1   A. Yes.
2   Q. What are those reports called?
3   A. Well, I think they come in different formats, so
4  there's P&Ls. There's also, you know, a business
5  intelligence system that you can see the volume by branch,
6  so it's called BI, clever name.
7   Q. The P&Ls, are those the corporate P&Ls that we've
8  been referencing?
9   A. Branch-level P&Ls and corporate P&Ls.
10  Q. Okay. Do the corporate P&Ls pull together --
11  A. Yes.
12  Q. -- the monthly volume for the branches?
13  A. Yes.
14  Q. Does it itemize which branch contributes to the
15 total?
16  A. Yes.
17  Q. Is there a particular branch that had volume
18 closest to the volume of the Tampa branch?
19  A. In what year?
20  Q. Let's just say in 2021.
21  A. I think you would probably have maybe Columbia;
22 Maryland would be very close, I think.
23  Q. What about Daytona? Is there a branch that you
24 would say is comparable to Daytona in terms of revenue, I
25 guess?

REGENCY REPORTING SERVICE, INC. (813)224-0224

176

1   A. I would say that would be more like a -- more
2  volume than that. That northwest branch I referenced
3  earlier, very similar.
4   Q. Okay. Does Mutual make efforts to assess its
5  performance relative to the industry overall?
6   A. Yes.
7   Q. How does it do that?
8   A. You know, it's done -- that's how they kind of
9  manage me, so I'm not sure exactly how they do it, but I
10 know that they do it. They can -- I think Richey May has
11 reports that they use. They also use the MBA reports, but
12 that's how they kind of measure, I think, my performance is
13 how we relate to the industry.
14  Q. Does Mutual track market trends for loan
15 originations?
16  A. When you say "track," I don't know if we track
17 it. We're aware of it.
18  Q. Okay. Do you know how Mutual performs in terms
19 of loan originations relative to the market? I mean, if
20 there's a peak in the market, is there generally a peak for
21 Mutual or is it that there's something different about the
22 business model?
23  A. There is something relatively unique about the
24 business model, that we have a large amount of consumer
25 direct folks. So they're not only purchase driven. So if

REGENCY REPORTING SERVICE, INC. (813)224-0224