# **EXHIBIT A**

```
                                                                 1

                    IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
                            TAMPA DIVISION
                    CASE NO.: 8:22-cv-01660-TPB-JSS

     MUTUAL OF OMAHA
     MORTGAGE, INC.,

          Plaintiff,

     vs.

     WATERSTONE MORTGAGE
     CORPORATION,

          Defendant.
     _____/



     DEPOSITION OF:         **JEFFREY GENNARELLI, CORPORATE**
                            **REPRESENTATIVE OF MUTUAL OF OMAHA**
                            **MORTGAGE, INC.**

     TAKEN:                 Pursuant to Notice by
                            Counsel for Defendant

     DATE:                  May 25, 2023

     TIME:                  9:17 a.m. to 4:53 p.m. EST

     LOCATION:              Hill Ward Henderson
                            101 East Kennedy Boulevard
                            Suite 3700
                            Tampa, Florida  33602

     REPORTED BY:           Melanie Keefe, FPR
                            Notary Public
                            State of Florida at Large
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

```
 1     APPEARANCES:      COURTNEY WALTER, ESQUIRE
                         CHRIS McCALL, ESQUIRE (Zoom)
 2                       Mitchell Sandler LLC
                         1120 20th Street Northwest
 3                       Suite 725
                         Washington, DC  20036
 4
                         MARK CARROLL, ESQUIRE
 5                       Mutual of Omaha Mortgage, Inc.
                         100 West 22nd Street
 6                       Suite 101
                         Lombard, Illinois  60148
 7
                              Attorneys for the Plaintiff
 8
                         MARIA L. KREITER, ESQUIRE
 9                       EMMA J. JEWELL, ESQUIRE (Zoom)
                         Godfrey & Kahn, S.C.
10                       833 East Michigan Street
                         Suite 1800
11                       Milwaukee, Wisconsin  53202

12                       CAROLINA Y. BLANCO, ESQUIRE (Zoom)
                         Hill Ward Henderson
13                       101 East Kennedy Boulevard
                         Suite 3700
14                       Tampa, Florida  33602

15                       STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
                         Waterstone Mortgage Corporation
16                       N25W23255 Paul Road
                         Pewaukee, Wisconsin  53072
17
                              Attorneys for the Defendant
18
19     ALSO PRESENT:     Carrie Macsuga

20

21

22

23

24

25

                   REGENCY REPORTING SERVICE, INC. (813)224-0224
```

3

| | INDEX | PAGE NUMBER |
|---|---|---|
| 1 | | |
| 2 | Examination by Ms. Kreiter | 5 |
| 3 | Read Letter | 255 |
| 4 | Errata Sheet | 256 |
| 5 | Reporter's Certificate | 257 |

4

1                              E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

125

1  buckets.  This is specific to Bucket 2, damages associated
2  with the branches closing; correct?
3       A.   Correct.
4       Q.   And I want to confirm, the persons who prepared
5  Exhibit 7 were you and Bernie Mayle?
6       A.   Bernie Mayle, yeah.
7       Q.   Mr. Mayle was the senior vice president of
8  finance; correct?
9       A.   Correct.
10      Q.   Was there any other person who played a role in
11 the creation of Exhibit 7?
12      A.   I don't believe so.
13      Q.   What role did you play in creating Exhibit 7
14 versus Mr. Mayle?
15      A.   I think we just worked jointly on it.  He pulled
16 the data because he had the data, but kind of we just talked
17 about the best way to show the income created by those
18 branches and then, you know, extrapolating out, if they had
19 stayed for 18 months, what that would be.  We took a very --
20 we did take a very conservative approach to it, so...
21      Q.   Was there one person doing the drafting and
22 another person commenting, or were you both authors of
23 Exhibit 7?
24      A.   I would say we were kind of both authors of
25 Exhibit 7.

126

1       Q.   Did one of you create the first draft?

2       A.   I think Bernie probably created the first draft,
3 but I was sitting in his office. I mean, he -- if it's on a
4 spreadsheet, he's the one to create it. I'm not a
5 spreadsheet guy.

6       Q.   Got it. So it sounds like there was a meeting
7 between you and Mr. Mayle?

8       A.   Yeah.

9       Q.   And you sat down and worked on the spreadsheet
10 together?

11       A.   Yes.

12       Q.   How long did you spend preparing it?

13       A.   Well, I think a large part of the time we spent
14 was trying to come up with a, you know, fair way to
15 associate the lost revenue. And I really mean fair and be
16 conservative about it because we were hoping for a
17 settlement before this time.

18       So, you know -- so that was the big -- because
19 there's two -- there's two ways we can do this; right? We
20 can do what we did here, which is take those loans and
21 multiply it times the basis points earned by corporate from
22 that volume, average it out monthly, and then show for
23 18 months had they stayed what the expected profit would
24 be.

25       The other the way we can do it is what I

REGENCY REPORTING SERVICE, INC. (813)224-0224

131

1    of income -- right? -- because there's income and expenses
2    that occur past the branch.  And so in order to do that, the
3    only way to do -- there's two ways to do it.  The one way --
4    and this is why most people use this way, because it's
5    simpler.  You simply take the cost of goods sold approach,
6    which was -- which you would take the volume, times what you
7    sold the loan for, less commissions.
8         Q.   Sorry.  Can you just go slower?
9         A.   Yeah.
10        Q.   Cost of goods sold, and then you're subtracting
11   out what?
12        A.   Commissions.
13        Q.   Commissions.
14        A.   Yeah.
15        Q.   Subtracting out anything else?
16        A.   No.
17        Q.   So it's just cost of goods sold subtracting out
18   commissions?
19        A.   It's -- well, you -- so it's the revenue
20   generated by the loan at sale minus commissions.
21        Q.   And you said that you were pulling not from
22   branch P&Ls but from some other P&L for this data?
23        A.   That isn't the way we did it.  That's one of the
24   ways, the simpler way to do it.  But like I said, if we
25   would've done the cost of goods sold approach, this number

132

1   would've been almost $19 million.  So we used a, we felt,
2   more conservative approach, which is we took all the fixed
3   expenses that occur on the corporate side --
4          Q.   Okay.  Can you pause there just for a second?
5          A.   Yeah.
6          Q.   All the fixed expenses on the corporate side?
7          A.   Fixed -- all expenses on the corporate side.
8          Q.   Where do those corporate expenses appear, in the
9   branch P&Ls, or some other P&L?
10         A.   Yeah, the financial -- the corporate financials,
11  the corporate income statement on our tax return.
12         Q.   Okay.  So with respect to this analysis,
13  Waterstone served discovery and specifically asked what are
14  the documents that were relied upon to create Exhibit 7?
15         A.   Yeah.
16         Q.   Tax returns and corporate income statements were
17  not identified, which is why I'm kind of struggling to
18  understand the analysis.  You're going to have to help me
19  here.  I need to leave the deposition with a clear
20  understanding of how this was calculated and what documents
21  you relied on.  Are you able to locate those documents?
22  And, I mean, we can take a break.  I just need to know.  Do
23  you have the documents that you used to calculate this
24  column --
25         A.   Sure.

174

1 analysis?

2     A.   Not really.  They also could've still been here.
3 Keller Williams comes into play, and they stay for six or
4 seven years, so we didn't use six or seven years.  We didn't
5 use ten years.  We used 18 months.  I mean, I don't know how
6 much we can, you know --

7     Q.   Do you have any evidence if the downstream
8 employees would have stayed because Keller Williams came in?

9         MS. WALTER:  Object to the form.

10     A.   Well, you're the one who made a statement that
11 said they went with Dwayne because he provided loans.  Where
12 do you think Keller Williams -- one out of every five real
13 estate transactions is Keller Williams signed.  We now are
14 the lender for Keller Williams.  I would imagine that that
15 may be more attractive than the one-offs that Dwayne was
16 handing them.

17     Q.   So again, I want to talk about evidence that
18 Mutual has versus just speculation about what the employees
19 might have thought.  Has Mutual asked any of the employees
20 would they have been motivated to stay knowing that Keller
21 Williams was joining?

22         MS. WALTER:  Object to the form.

23     A.   Not that I'm aware of, no.

24     Q.   Does Mutual have reports that show the monthly
25 volume for all branches?

REGENCY REPORTING SERVICE, INC. (813)224-0224

257

CERTIFICATE OF REPORTER

STATE OF FLORIDA         )

COUNTY OF HILLSBOROUGH   )

I, Melanie Keefe, Court Reporter, certify that I was authorized to and did stenographically report the deposition of JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC.; that a review of the transcript was requested; and that the transcript, pages 5 through 254, inclusive, is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

*s/ Melanie Keefe*
Melanie Keefe, FPR
Court Reporter

---

CERTIFICATE OF OATH

STATE OF FLORIDA         )

COUNTY OF HILLSBOROUGH   )

I, the undersigned authority, certify that JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF OMAHA MORTGAGE, INC., personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 1st day of June, 2023.

*s/ Melanie Keefe*
Melanie Keefe, FPR
Notary Public
State of Florida
My Commission No.: HH055410
Expires: December 9, 2024

[Notary Seal: MELANIE KEEFE, Commission # HH 055410, Expires December 9, 2024, Bonded Thru Budget Notary Services]

REGENCY REPORTING SERVICE, INC. (813)224-0224