# EXHIBIT 1

```
                                              Page 1

 1            IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                     TAMPA DIVISION

 3
     MUTUAL OF OMAHA MORTGAGE, INC.)
 4                               )
          Plaintiff;             )
 5                               )
                                 )
 6       -vs-                    ) 8:22-cv-01660-TPB-JSS
                                 )
 7                               )
     WATERSTONE MORTGAGE         )
 8   CORPORATION,                )
                                 )
 9        Defendant.             )
                                 )
10   ----------------------------)

11

12               REPORT OF PROCEEDINGS from the

13   deposition of CANDICE ROSEVEAR, taken by Paul W.

14   O'Connor, a CSR within and for the State of Illinois,

15   pursuant to the provisions of the Federal Code of

16   Civil Procedure and Rules of the Supreme Court thereof

17   pertaining to the taking of depositions, at 111 East

18   Wacker Drive, Suite 2600, Chicago, Illinois, 60601,

19   commencing at 9:00 a.m. on July 20, 2023.

20

21

22

23

24
```

Page 2

1   APPEARANCES:
2
3       MITCHELL SANDLER, by
        MS. COURTNEY WALTER
4       1120 20th Street, NW, Suite 725
        Washington, DC, 20036
5       Cwalter@mitchellsandler.com.com
            Appearing on behalf of the Plaintiff;
6
7       GODFREY KAHN, SC, by
        MS. MARIA KREITER
8       833 East Michigan Street, Suite 1800
        Milwaukee, Wisconsin, 53202
9       Mkreiter@gklaw.com
            Appeared on behalf of the Defendant.
10
11
12   ALSO PRESENT: (Via Videoconference)
13       EMMA JEWEL
14       CARRIE MACSUJA
15       MARK McCARROLL
16
17
18
19
20
21
22
23
24

Page 3

1           I N D E X
2
3   WITNESS                PAGE
4   CANDICE ROSEVEAR
5   Exam by Ms. Kreiter        4
6
7
8
9
    EXHIBITS:
10
    Gennarelli Exhibit 7        23
11  Deposition Exhibit 30       37 (Rosevear report)
    Tomalak Exhibit 24          59
12  Tomalak Exhibit 22          65
    Deposition Exhibit 31       79 (Oscher report)
13  Gennarelli Exhibit 14       115
    Gennarelli Exhibit 12       121
14
15
16
17
18
19
20
21
22
23
24

Page 4

1       (Witness sworn)
2       MS. KREITER:  Miss Rosevear, state your full name,
3   spell your last name for the record.
4       THE WITNESS:  Candice Leann Rosevear,
5   R-O-S-E-V-E-A-R.
6           CANICE ROSEVEAR,
7   called as a witness herein, having been first duly
8   sworn, was examined upon oral interrogatories and
9   testified as follows:
10          EXAMINATION
11      By Ms. Kreiter:
12      Q.  I want to start by just getting a baseline for
13  the opinions that you rendered.  You understand that
14  Mutual of Omaha, the plaintiff in this case, identified
15  three categories of damages, correct?
16      A.  According to the Oscher Report, that is my
17  understanding, yes.
18      Q.  I want to get an understanding what did you
19  opine on, what did you not opine on.  So Category 1
20  damages, is what we've been referring to as diverted loan
21  damages.  Previously Mutual had not calculated a damages
22  demand associated with the diverted loans Category 1
23  damages.
24          My understanding is that was not part of

Page 5

1   your analysis, is that correct?
2       A.  That is correct.
3       Q.  Then Category 3 damages are the ill-gotten
4   gains damages of 750,000.  Is that your understanding?
5       A.  I recall that number, yes.
6       Q.  Did you opine at all on the ill-gotten gains
7   damages asserted by Mutual?
8       A.  No.
9       Q.  Which leaves Category 2 damages.  Damages
10  associated with the branches closing rather than staying
11  open into some point in the future.
12          Your opinion is exclusively related to the
13  Category 2 damages, correct?
14      A.  That's correct.
15      Q.  You didn't do any analysis and you're not going
16  to express any opinions with respect to Mutual's trade
17  secret misappropriations claims, correct?
18      A.  Correct.
19      Q.  Did you review or opine on the expert witness
20  report prepared by Brett Creasy?
21      A.  I believe I reviewed that.  It was part of the
22  packet with the Oscher Report, so.
23      Q.  Are you again, I just want to understand are we
24  talking about something or not talking about something.

2 (Pages 2 - 5)

Page 6

1    Did you analyze the Creasy report in
2 conjunction with the damages that you're doing or was it
3 something that just happened to be provided to you along
4 with the Oscher Report?
5    A.  I did not review that with respect to my
6 damages report.
7    Q.  So you're not going to opine about the forensic
8 issues, what may or may not be a trade secret, what was
9 on Waterstone's systems or any of the other topics that
10 were addressed by Mr. Creasy, correct?
11    A.  Correct.
12    Q.  With respect to the Category 2 damages, you
13 understand that Mutual previously put forth a damage
14 demand of approximately 4.4 million.  Correct?
15    A.  That is my recollection.
16    Q.  Who prepared the Category 2 damages analysis
17 for Mutual previously, the 4.4 million?
18    A.  I believe it's in the interrogatories,
19 paragraph three of my report.  Where I cite exactly where
20 that came from.  So but I believe that was prepared by
21 somebody at Mutual of Omaha Mortgage.
22    Q.  My question is are you able to tell me the
23 person or persons at Mutual of Omaha that prepared the
24 Category 2 $4.4 million damages analysis?

Page 7

1    A.  I believe that was Jeff.
2    Q.  Jeff who?
3    A.  Gennarelli I believe.
4    Q.  Did anybody else work on that damages analysis
5 with Mr. Gennarelli?
6    MS. WALTER:  Object to form.
7    THE WITNESS:  A  I don't know.
8    MS. KREITER:  Q  Mutual of Omaha was previously
9 asserting approximately 4.4 million.
10    Your report concludes that the estimated
11 damages are approximately 28 million, is that correct?
12    A.  That's correct.
13    Q.  So different numbers I'm just trying to
14 understand, did you analyze Mr. Gennarelli's analysis and
15 determine you wanted to go in a different direction or
16 what is the connection between your analysis and
17 Mr. Gennarelli's analysis?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A  My analysis --
20    MS. KREITER:  Q  Let me state it again.
21    So there's a -- in general, what is the
22 difference between your analysis and Mr. Gennarelli's
23 analysis?
24    A.  I didn't conduct a comparison.

Page 8

1    Q.  Of the two analyses?
2    A.  Correct.
3    Q.  Is it your understanding that Mutual is
4 pursuing the 4.4 million that Mr. Gennarelli calculated
5 or the 28 million that you've now calculated?
6    MS. WALTER:  Object to form.
7    THE WITNESS:  A  I don't know.
8    MS. KREITER:  Q  Going back to your analysis
9 versus what you assumed.  You assumed liability for
10 purposes of your damages analysis, is that correct?
11    A.  That's correct.
12    MS. WALTER:  Object to form.
13    MS. KREITER:  Q  When were you retained by Mutual?
14    THE WITNESS:  A  I don't have the exact date.  I
15 can get that for you.  I want to say estimated date
16 sometime before June 1st.
17    Q.  Before June 1st?
18    A.  I'm guessing at this point, but.
19    Q.  The Oscher Report was issued on June 5th.
20    At the time that you were engaged, did the
21 Oscher Report already come out?
22    A.  I believe it was after.  If I can get the exact
23 date for you I'd prefer to answer after I look at my
24 notes.

Page 9

1    Q.  Your report indicates that you're charging
2 Mutual of Omaha $500 an hour, is that correct?
3    A.  That's correct.
4    Q.  Is there a difference in your rate for purposes
5 of deposition testimony versus work preparing the report?
6    A.  No.
7    Q.  What is the total fees that you've charged to
8 Mutual of Omaha to date?
9    A.  I don't have that.  I can get that though.
10    It looks like it's actually late June, but
11 I can't find it, the engagement letter on my cell. phone.
12 So.  That didn't quite work out.
13    Q.  Okay.  Back on the record.  We had a brief
14 discussion off the record, you were looking to find the
15 dates you were engaged.  You indicated you couldn't
16 locate it on your phone but it may have been later in
17 June?
18    A.  Yes.
19    Q.  I'll just ask during a break, you can again
20 check the date, let me know.
21    A.  Okay.
22    Q.  We were talking about the fees you charged
23 Mutual of Omaha to date.  You indicated you couldn't
24 remember the total fees.

Page 10

1    Are you able to estimate for me any --
2 5,000, 50,000, just give me a ballpark where you're at?
3    A.  It would be a guess at this point.  I haven't
4 looked at our invoice.
5    Q.  How many invoices have you sent, do you know?
6    A.  I don't know that we sent any yet.
7    MS. KREITER:  I will put a request on the record
8 for production of invoices and the engagement letter.
9    Q.  Were you engaged by Mutual of Omaha, the
10 entity, or by counsel for Mutual of Omaha?
11    A.  I believe by both entities.
12    Q.  Both the law firm and the plaintiff?
13    A.  Yes.
14    Q.  Have you previously been engaged by Mutual of
15 Omaha or any of its affiliates?
16    A.  No.
17    Q.  Have you previously been engaged by Mutual of
18 Omaha's counsel in this case, Mitchell Sandler firm?
19    A.  On other matters?
20    Q.  Correct.
21    A.  Not this firm in particular.
22    Q.  Meaning not the DC office?
23    A.  Well one of the partners at the firm I worked
24 with in the past.

Page 11

1    Q.  Who is that?
2    A.  Ari.
3    Q.  On which matter did you work with Ari; Ari
4 Karen?
5    A.  Ari Karen.  This was several years ago on the
6 American Bank case, which is on my CV.  2019 I believe.
7    Q.  What was Mr. Karen's role in that case?
8    A.  He was a partner on that case, co-counsel.
9    Q.  Which party did Mr. Karen represent in the
10 American Bank case?
11    A.  I believe that was American Bank.  I have to
12 check.  It was several years ago.
13    Q.  Was he representing plaintiff or defendant?
14    A.  I believe it was the bank.
15    Q.  The plaintiff.  What type of case was it?
16    A.  That was a wage an hour case.
17    Q.  It was the plaintiff was the bank in a wage an
18 hour case?
19    A.  No, I believe it was defendants.
20    Q.  So Mr. Karen represented the bank as did you
21 for a wage an hour case where presumably a class of
22 employees were pursuing wage an hour claims against the
23 bank?
24    A.  Well I didn't represent the bank, I was hired

Page 12

1 by Ari to do a damages calculation.  I was the expert
2 economist in that case.
3    Q.  Did you end up testifying?
4    A.  I did not provide oral deposition testimony,
5 no.  I provided an expert report.
6    Q.  How many times have you testified at trial?
7    A.  Trial, no trial testimony.  Arbitration
8 testimony, yes.  I don't know if that counts.
9    Q.  How many times did you testify at arbitration?
10    A.  Once.
11    Q.  Is it just the one engagement with Mr. Karen or
12 did you have multiple engagements with Mr. Karen?
13    A.  One engagement with Mr. Karen for American
14 Bank.  And then now this one.
15    Q.  The American Bank case, that's a case that you
16 tout on your website, it's in your CV.
17    Is that one of the larger cases that
18 you've handled?
19    MS. WALTER:  Object to form.
20    THE WITNESS:  A  I don't know where it falls.  You
21 know in terms of size.  You mean number of pages of
22 report or damages or the class period.  I think I would
23 want clarification on what you mean by large.
24    But, you know, I've issued several expert

Page 13

1 reports, it's hard for me to really recall.  I would
2 guess it's probably somewhere in the middle of the
3 distribution in terms of damages and, you know, some of
4 the issues, class period, class length.
5    Q.  Why is it that that case in particular is
6 touted on your website versus other cases?
7    A.  What do you mean by touted on the website?
8    Q.  Is a case that you list.  I didn't see other
9 cases listed on your website.
10    Why did you select that one?
11    A.  I don't remember if I selected that personally.
12 Could you show me?  Is it on my CV?
13    Q.  Are you unaware of that case being listed on
14 your website profile?
15    MS. WALTER:  Object to form.
16    THE WITNESS:  A  It's on my CV.  My CV is on the
17 website so therefore, I am not surprised.
18    MS. KREITER:  Q  Okay.  But you have no idea why
19 that case was listed either on our CV or on your website
20 versus any other?
21    MS. WALTER:  Asked and answered, also you might
22 have a more --
23    MS. KREITER:  I think she testified she's aware
24 they are on the website.

Page 14

1    Q.  What drove the inclusion of that case on the
2 website?
3    THE WITNESS:  A  Could you show me what you're
4 referring to, because my knowledge is that it's on my CV
5 and CV includes a lot of information, including my
6 research, my public speaking engagements, my numerous
7 expert reports.
8    Q.  Do you know whether the cases listed on the
9 website other than via the CV?
10    MS. WALTER:  Object to form.
11    THE WITNESS:  A  I don't know.
12    MS. KREITER:  Q  Then let's talk about -- but
13 you're confident it's listed in your CV, correct?
14    MS. WALTER:  Object to form.
15    THE WITNESS:  A  Could I have a copy of my report,
16 please?  That I requested at the beginning of this?
17    MS. KREITER:  Q  I guess the question is about
18 what's on your CV and if you know or not.
19        Do you know whether the case is listed on
20 your CV?
21    MS. WALTER:  Maria, first of all, I'm going to
22 object.  She asked for a copy of her CV.  This isn't a
23 guessing game.
24    MS. KREITER:  You can answer.

Page 15

1    THE WITNESS:  A  I believe it is.  I'd like to see
2 the copy.
3    MS. KREITER:  Q  Do you know why that case would
4 be included on the CV and not any others -- strike that.
5    MS. WALTER:  Object to form.
6    MS. KREITER:  Q  Do you know -- forget about
7 whether there's any other cases listed.  Why was that
8 case selected for the CV?
9    THE WITNESS:  A  My CV should reflect my expert
10 reports.  American Bank is a case that I issued an expert
11 report in so therefore, I expect that that case would be
12 listed on my CV in reverse chronological order.
13    Q.  But it's not a case that you provided
14 deposition testimony or trial testimony, it's simply one
15 where you issued a report.  Is that correct?
16    MS. WALTER:  Asked and answered.
17    THE WITNESS:  A  That's correct.
18    MS. KREITER:  Q  Do you have all of the other
19 cases in the last few years in which you've issued a
20 report on the CV?
21    A.  Yes.  If there is omission that's unintended.
22    Q.  You state in your report I have been
23 responsible for building, managing and analyzing large
24 and complex multidimensional databases on some of the

Page 16

1 highest profile cases including AMD v Intel.
2        I guess would you consider the American
3 Bank case similarly a high profile case?
4    MS. WALTER:  Object to form.
5    THE WITNESS:  A  I don't know.  That footnote is
6 in reference to data and the complexities of the data in
7 that case.  So it's hard for me to really compare these
8 two cases by that measure.
9    MS. KREITER:  Q  Is Mr. Karen the person that
10 reached out to you with respect to this engagement?
11    A.  I believe it was Courtney and Mr. Karen.
12    Q.  Both of them?
13    A.  Yes, I believe they were on -- yes, both
14 involved.
15    Q.  Did you discuss your analysis with Jeff
16 Gennarelli?
17    A.  Yes.
18    Q.  Did you discuss your analysis with Bernie
19 Mayle?
20    A.  Yes.
21    Q.  What was the ilk of your discussions with
22 Mr. Gennarelli?
23    A.  I presented my exhibits and walked through my
24 approach to the damages analysis.

Page 17

1    Q.  Was it a situation where you were showing what
2 you had put forth at the end of your analysis, here's
3 what I am going to present; or was it discussions with
4 Mr. Gennarelli during the course of you preparing your
5 report?
6    MS. WALTER:  Object to form.
7    THE WITNESS:  A  We spoke before I finalized my
8 approach as well as after I had my analysis complete.
9    MS. KREITER:  Q  Was Mr. Gennarelli somebody that
10 you relied on for data that influenced the report?
11    MS. WALTER:  Object to form.
12    THE WITNESS:  A  I made data requests.
13    MS. KREITER:  Q  To Mr. Gennarelli?
14    A.  To Mutual of Omaha Mortgage.
15    Q.  My question was about Mr. Gennarelli.
16        Did you make data requests to him in
17 particular or you made request to Mutual and how does
18 Mr. Gennarelli play into that?
19    MS. WALTER:  Object to form.
20    THE WITNESS:  A  So there are a number of people
21 involved in that communication.  Jeff Gennarelli was
22 copied I believe on those correspondence.
23        I don't know exactly what happened once my
24 request got to Mutual of Omaha Mortgage, who handled and

5 (Pages 14 - 17)

Page 18

1 prepared the data I needed, but I had specific requests
2 that I sent to Courtney and then Courtney sent it to
3 whomever was the appropriate party to send the data back
4 to me.
5         MS. KREITER: Q  Do you know whether
6 Mr. Gennarelli himself supplied data that you relied on
7 in conjunction with the report?
8     A.  He may have.
9     Q.  But you don't know one way or another?
10    A.  I don't know.
11    Q.  How many times did you personally speak with
12 Mr. Gennarelli?
13    A.  I think he was on two conference calls.
14    Q.  How many times did you personally speak with
15 Bernie Mayle?
16    A.  I believe Bernie was present on both calls as
17 well.
18    Q.  During the discussion on two calls -- you
19 mentioned you had discussions with Mr. Gennarelli in
20 which you walked through the exhibits and then you said
21 that there was -- is that the subject of one of the
22 calls?
23        MS. WALTER: Object to form.
24        MS. KREITER: Let me start again.  I want to go

Page 19

1 through both of the calls you had with Mr. Gennarelli.
2 And Mr. Mayle.  Let's talk about the first call.
3     Q.  At what point in the process was the first
4 call?
5        THE WITNESS: A  Fairly early on.  Maybe a week
6 into my engagement.
7     Q.  Was the purpose of the call for you to elicit
8 information from them that would drive your report
9 findings?
10        MS. WALTER: Object to form.
11        MS. KREITER: Q  Or was it presenting to them what
12 you had already done at that point?
13        MS. WALTER: Same objection.
14        THE WITNESS: A  I was presenting what I had done
15 up to that point.  I had the call to request additional
16 data.
17        MS. KREITER: Q  What additional data did you
18 request?
19    A.  I was curious about the peer branches at Mutual
20 of Omaha Mortgage that had remained in operation
21 following the closure of the Daytona and Tampa branches.
22    Q.  What were you curious about?
23    A.  The loan volume.
24    Q.  What specifically?

Page 20

1     A.  Of the monthly loan volume at Maryland and
2 Saint Louis.
3     Q.  Okay.  Just what are the numbers on those
4 branches or how do they compare to the other branches,
5 what was the ilk of the questions?
6        MS. WALTER: Object to form.
7        THE WITNESS: A  Monthly loan volume in dollars.
8        MS. KREITER: Q  Other than asking about monthly
9 loan volume in dollars with respect to Saint Louis and
10 Maryland, what else if any questions did you ask about
11 those branches?
12    A.  I wanted to understand if, what their product
13 mix was, get a good handle on the type of branch they
14 are, how long they had been in existence up to that
15 point.  For example.
16    Q.  Anything else that was the subject matter of
17 that first call?
18    A.  That's the gist of it.
19    Q.  There was a second call that you had with
20 Mr. Gennarelli and Mr. Mayle?
21    A.  Yes.
22    Q.  What was the topic of that call?
23    A.  That was a little bit farther along in my
24 analysis when I had prepared exhibits.  Same exhibits

Page 21

1 that I include in my report.  And the purpose of that
2 call was for me to present my exhibits to the group.
3     Q.  Did Mr. Gennarelli or Mr. Mayle suggest changes
4 to any of the exhibits?
5     A.  No.
6     Q.  Did anyone else from Mutual suggest changes to
7 any of the exhibits?
8     A.  No.
9     Q.  What about counsel for Mutual?
10    A.  No.
11    Q.  Was there anyone else from Mutual that you
12 spoke with in conjunction with your analysis besides
13 Mr. Gennarelli and Mr. Mayle?
14    A.  I believe we had a virtual meeting, Zoom or
15 Teams, and there were other parties.  I don't recall the
16 names of those on the call.
17        I believe Mark McCarroll attended.  Of
18 course Courtney.  There maybe another person on the call.
19 I don't remember who it was.
20    Q.  Were you aware at the time of your discussions
21 with Mr. Gennarelli and Mr. Mayle they had prepared a
22 lost profit analysis or did you find that out later?
23        MS. WALTER: Object to form.
24        THE WITNESS: A  I was aware.

Page 22

1    MS. KREITER:  Q  Did you ask them why it was that
2 you weren't analyzing the prior analysis Mutual had
3 performed?
4    MS. WALTER:  Object to form.
5    THE WITNESS:  A  No.
6    MS. KREITER:  Q  Did you wonder why am I not
7 looking at the 4.4 million analysis Mutual has already
8 presented in the case?
9    A.  Did I wonder.  Can you repeat the question?
10    (Record read as requested)
11    A.  I'm certainly aware that this number had been
12 presented.  I didn't analyze that number or spend time
13 thinking about that number in particular.  I did my own
14 independent analysis.
15    Q.  If Mutual of Omaha had already presented the
16 $4.4 million demand with respect to the Category 2 branch
17 damages, why was there a need to do a new analysis?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A  I don't know.
20    MS. KREITER:  Q  Did you ask why, did you ask that
21 question to Mutual, why am I re-doing the analysis of
22 Mr. Gennarelli and Mr. Mayle?
23    MS. WALTER:  Object to form, mischaracterizes
24 testimony.

Page 23

1    THE WITNESS:  A  No, I did not ask that question.
2    MS. KREITER:  Q  Do you agree that the work that
3 you did -- strike that.
4    Did you attempt to determine whether the
5 estimate by Mr. Gennarelli is accurate?
6    MS. WALTER:  Object to form.
7    THE WITNESS:  A  No.
8    MS. KREITER:  Q  You had no discussions with
9 Mr. Gennarelli or Mr. Mayle about the prior analysis that
10 they performed, correct?
11    A.  That's not correct.
12    Q.  What discussions did you have about the prior
13 work that was performed and the demand for 4.4 million
14 with Mr. Gennarelli and Mr. Mayle?
15    A.  They explained the documents to me in a general
16 sense.
17    Q.  What documents?
18    A.  The documents underlying their interrogatory
19 response.
20    MS. KREITER:  Show you what we previously marked at
21 a deposition.  Gennarelli Exhibit No. 7.
22    Q.  Have you seen this document before?
23    A.  Yes, I have.
24    Q.  Did you attempt to determine whether the

Page 24

1 estimates set forth in Gennarelli Exhibit No. 7 is
2 accurate?
3    MS. WALTER:  Asked and answered.
4    THE WITNESS:  A  No.
5    MS. KREITER:  Q  Did you speak with Jeff
6 Gennarelli or Bernie Mayle about Deposition Exhibit
7 Gennarelli 7?
8    MS. WALTER:  Asked and answered.
9    MS. KREITER:  It's not.  She said she talked with
10 them about documents.
11    Q.  Is this one of the documents that you spoke
12 with Mr. Gennarelli and Mr. Mayle about?
13    THE WITNESS:  A  This is what I was referring to,
14 yes.
15    Q.  Tell me about that conversation?
16    A.  As I previously mentioned, it was a general
17 conversation telling me what this document is.  I believe
18 this is the document used to get to the 4.4 million.
19    I don't see that total here though.  But I
20 believe that would be the sum of the two values here.
21    Q.  Okay.  So they were presenting this to you to
22 tell you this is the prior model that Mutual put forth,
23 something of that ilk?
24    MS. WALTER:  Objection.

Page 25

1    THE WITNESS:  A  General statements of that,
2 that's correct.
3    MS. KREITER:  Q  The analysis that you did, does
4 it rely upon the same, any of the same data that was
5 relied upon in Deposition Exhibit Gennarelli 7?
6    MS. WALTER:  Object to form.
7    MS. KREITER:  If you know.
8    THE WITNESS:  A  I didn't analyze this in depth.
9 But just looking at the title of volume of loans funded,
10 that is something I certainly considered from a different
11 data source as fully cited in my expert report.
12    Q.  Do you know what period of time
13 damages were extrapolated out for with respect to -- this
14 Deposition Exhibit Gennarelli 7, for ease of reference I
15 will call it the Gennarelli Category 2 model.
16    What period of time did Mr. Gennarelli
17 use?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A  I would need to study this, but.
20    MS. KREITER:  Q  You don't know right now?
21    A.  I see profit for 42 months.  And profit for
22 18 months.
23    Q.  Do you know?
24    A.  Not just by sitting here.  I would want to dig

Page 26

1 into the underlying data to give you the exact correct
2 answer.
3     Q.  Did you have any discussions with
4 Mr. Gennarelli or Mr. Mayle about the term used with
5 respect to the Gennarelli model?
6     MS. WALTER:  Object to form.
7     THE WITNESS:  A  Can you clarify what you mean by
8 term.
9     MS. KREITER:  Q  Sure.  The amount of time over
10 which damages are projected?
11    A.  You're referring to the $4.4 million figure?
12    Q.  Correct.  Let's define for purposes of this
13 deposition.  So when I am referring to the Category 2
14 damages previously presented by Mutual, in which Mutual
15 seeks approximately $4.4 million in damages, for ease of
16 reference I'm going to refer to that as the Gennarelli
17 Model for this deposition.  It's the model that's
18 reflected in Gennarelli Deposition Exhibit 7.
19 Understood?
20    A.  Okay.
21    Q.  With respect to the Gennarelli Model of
22 damages.  Did you have any discussions with
23 Mr. Gennarelli or Mr. Mayle about the duration of time
24 over which they calculated lost profits in order to come

Page 27

1 to the $4.4 million demand?
2     A.  I believe it's 18 months.  But I believe that
3 was discussed generally and I recall reading that in the
4 documents I reviewed.
5     Q.  Why didn't you use 18 months?
6     A.  That's not what my model is measuring.
7     Q.  Is it the case you're retained to independently
8 calculate damages, not to support the Gennarelli Model?
9     A.  Correct.
10    Q.  The Gennarelli Model concludes that Mutual has
11 lost profits associated with the Tampa branch are
12 2.7 million.  And that the damages -- and some change.
13 And the damages for the Daytona branch are 1.7 million.
14 Are you aware of that -- I will note for the record the
15 witness is reviewing Gennarelli Deposition Exhibit No. 7.
16        Were you aware of that without looking at
17 the exhibit?
18    A.  The exact breakdown of the 4.4 million, I was
19 not aware.  But from memory.
20    Q.  Okay.  But in general you had a sense that
21 there was approximately 2.7 million, not the exact
22 number, associated with Daytona, and 1.7 with the other
23 branch?
24    MS. WALTER:  Object to form.

Page 28

1     THE WITNESS:  A  I think I may have had, yeah, a
2 general understanding, but not the exact numbers in my
3 mind.
4     MS. KREITER:  Q  Does it concern you that Mutual
5 previously presented damages of 4.4 million and now your
6 report is asserting damages of 28 million?
7     MS. WALTER:  Objection.
8     THE WITNESS:  A  No.
9     MS. KREITER:  Q  Do you agree that's a big delta?
10    A.  Well I don't know what you mean by a big delta.
11    Q.  The difference between -- do you agree there's
12 a meaningful difference between 4.4 million and 28
13 million?
14    MS. WALTER:  Object to form.
15    THE WITNESS:  A  They are different numbers.
16    MS. KREITER:  Q  Sure.
17    A.  Certainly.
18    Q.  Your demand is about 4 to 5 times bigger than
19 the prior demand, correct?
20    MS. WALTER:  Object to form.  She never said it was
21 a demand.
22    MS. KREITER:  Q  Your lost profit estimates of 28
23 million is about 4 to 5 times bigger than Mutual's prior
24 demand, correct?

Page 29

1     MS. WALTER:  Object to form.
2     THE WITNESS:  A  My damages calculation is based
3 on a damages analysis I prepared.  And that yields a
4 figure that is larger than what was presented earlier.
5     MS. KREITER:  Q  Sure.
6     A.  Yes.
7     Q.  Do you agree it's materially larger?
8     MS. WALTER:  Object to form.
9     THE WITNESS:  A  Materially is a difficult thing
10 for me to agree to.  Because materially is subjective.
11 We can talk about if it's larger, yes.
12    MS. KREITER:  Q  Is it your testimony that a
13 demand that's more than four times larger, $24 million
14 larger, that's not a material difference to you?
15    MS. WALTER:  Object to form.
16    THE WITNESS:  A  I wouldn't use the word material.
17    MS. KREITER:  Q  How would you describe the delta
18 between those numbers?
19    MS. WALTER:  Object to form.
20    THE WITNESS:  A  I would use numbers to describe
21 it.  $24 million larger.
22    MS. KREITER:  Q  Did it concern you at all that
23 Mr. Gennarelli and Mr. Mayle had put forth a damages
24 analysis of 4.4 million and you went off on your own and

Page 30

1 did an analysis but it's larger than theirs?
2     MS. WALTER: Object to form. Please watch your
3 tone, Maria.
4     THE WITNESS: Can you repeat the question.
5     (Record read as requested)
6     THE WITNESS: A It does not concern me.
7     MS. KREITER: Q Did you have any discussions with
8 anyone at Mutual about why there was a multimillion
9 difference between the Gennarelli Model and your
10 $28 million estimate?
11     A. No.
12     Q. In your report you indicate I calculate the
13 present value of lost profits at the Mutual of Omaha
14 Tampa and Daytona branches using standard valuation
15 methods.
16         If Mutual had hired you back in the Winter
17 of '22 or Spring of '23, could you have done the same
18 analysis at that time?
19     MS. WALTER: Object to form.
20     THE WITNESS: A The damages would be slightly
21 different because I'm using data as of I believe May and
22 June. So I wouldn't have that data available to me at
23 that time. But in terms of the framework, the way I
24 would approach the problem would be the same.

Page 31

1     MS. KREITER: Q Okay. You could perform the same
2 analysis, you would just have to use the data available
3 at whatever time you were hired, correct?
4     A. Correct.
5     Q. Did Mutual say why it chose to hire you as a
6 rebuttal expert rather than as its opening expert?
7     MS. WALTER: Object to form.
8     THE WITNESS: A No.
9     MS. KREITER: Q Did Mr. Gennarelli, Mr. Mayle or
10 anyone at Mutual ever have discussions with you about
11 concerns related to the Gennarelli Model?
12     MS. WALTER: Object to form.
13     MS. KREITER: Strike that, let me rephrase.
14     Q. Did Mr. Gennarelli, Mr. Mayle or anyone at
15 Mutual ever express concern about the viability of the
16 Gennarelli Model to you?
17     MS. WALTER: Objection.
18     THE WITNESS: A Not that I recall, no.
19     MS. KREITER: Q Is the intent of your report to
20 replace the damages model that Mr. Gennarelli and
21 Mr. Mayle did?
22     MS. WALTER: Object to form.
23     THE WITNESS: A My report is an independent
24 analysis. And I am very clear in my report what the

Page 32

1 scope of the report is and how I approach the problem.
2 How it's used is a legal question.
3     MS. KREITER: Q It's completely independent of
4 the prior model, correct?
5     A. My model is, yes.
6     Q. You state in your report you reserve the right
7 to amend the report to reflect new information that
8 becomes available, including in discovery or from court
9 rulings, correct?
10     A. Yes.
11     Q. Are you continuing to work on the engagement
12 right now other than attendance at the deposition?
13     A. No.
14     Q. Do you have any outstanding requests for
15 information to Mutual at this time?
16     A. No.
17     Q. The report indicates that you were to calculate
18 lost profits resulting from closure of the branches and
19 express the amount in present value terms.
20         What assumptions were you instructed to
21 make with respect to that damages?
22     MS. WALTER: Object to form, it assumes facts not
23 in evidence.
24     MS. KREITER: Calculation.

Page 33

1     THE WITNESS: A I reviewed the complaint. And
2 assumption I rely on is that closure of the branches is
3 direct result of defendants' action. That's an implicit
4 assumption.
5     MS. KREITER: Q Did you do anything to vet the
6 reasonableness of the assumption that wrongdoing by
7 Waterstone caused the branches to close?
8     THE WITNESS: Can you repeat that question.
9         (Record read as requested)
10     THE WITNESS: A Yes, I thought about the issues.
11 The actions. And whether or not they were reasonable.
12     MS. KREITER: Q So to exhaust this. I heard you
13 testify that the -- you thought about the issues and the
14 actions to see if you felt they were reasonable.
15         What issues did you think about?
16     A. I'm thinking about the employees that left, the
17 timing, how many employees left alongside the three main
18 employees listed in the complaint. And the timing of
19 their departure.
20     Q. These are thoughts that you had yourself.
21         Did you speak about these thoughts with
22 Mutual, did you try to vet the facts of the case with
23 anyone at Mutual?
24     MS. WALTER: Object to form.

Page 34

1    THE WITNESS:  A  I read the complaint, talked
2  about it generally.  And thought about it.  That's part
3  of my setting up my damages analysis is understanding the
4  timing of when the employees left, how many left, and
5  what the impact on the branches was of their departure.
6    MS. KREITER:  Q  Who did you talk about it with?
7    A.  Courtney.
8    Q.  Counsel for Mutual?
9    A.  Counsel, yes.
10    Q.  Did you talk about the facts of the case with
11  anyone at Mutual as opposed to counsel for Mutual?
12    A.  These facts I'm sure came up in the conference
13  calls that I mentioned earlier, where other parties were
14  present.
15    Q.  You indicated that you also thought about the
16  actions taken, is that correct?
17    A.  Yes.
18    Q.  Action taken by who?
19    A.  The -- I believe I was referring to the act of
20  leaving in concert.  So they would be the actions taken
21  by the three employees listed in the complaint along with
22  their staff.
23    Q.  So is it that understanding a large number of
24  employees left at the same time?

Page 35

1    MS. WALTER:  Object to form.
2    THE WITNESS:  A  A large number left at the same
3  time.
4    MS. KREITER:  Q  Why do you believe that that
5  indicates Waterstone has committed wrongdoing?
6    MS. WALTER:  Object to form.
7    THE WITNESS:  A  I want to be very clear about
8  where my opinion starts in my expert report.  And in
9  paragraph two, I lay out exactly what I was, my model
10  does or what my assumptions are.
11    And again as I testified earlier, one of
12  the underlying assumptions is that these two branches
13  closed as a result of defendants' actions.  And I believe
14  I cite to the complaint in paragraph two.
15    Q.  I understand that.  So I want to be clear.
16    Your opinion assumes wrongdoing and
17  liability by Waterstone, correct?
18    A.  My opinion is calculating lost profits under
19  that assumption.
20    MS. KREITER:  So read back my question.
21    (Record read as requested)
22    MS. KREITER:  Answer that question.
23    THE WITNESS:  A  It assumes like I say in my
24  report, that the branches close as a result of

Page 36

1  defendants' actions.  Calling that wrongdoing is a word
2  that I would not use in that context.
3    MS. KREITER:  Q  You're assuming Waterstone's
4  liability for purposes of your report?
5    MS. WALTER:  Object to form, asked and answered and
6  the report speaks for itself, which you still not yet
7  provided her with.
8    THE WITNESS:  A  Correct.
9    MS. KREITER:  Q  So there was an objection there,
10  I want to make sure we have a clear record now.
11    My question to you was your damages model
12  assumed liability of Waterstone, it's not something that
13  you independently analyzed other than reading the
14  complaint, you're assuming that?
15    A.  Again I believe that's a legal question.  The
16  way this is phrased.  I'm very clear what my report is
17  doing.  And where my opinion starts.
18    And again, as paragraph two states, the
19  underlying assumption is that the branches closed as a
20  result of defendants' actions.
21    Q.  You've been referencing --
22    A.  It's paragraph two.
23    MS. KREITER:  Let's mark this.
24

Page 37

1    (Exhibit No. 30 marked for
2    identification)
3    THE WITNESS:  Yes.
4    MS. KREITER:  Turn to paragraph two, please.  The
5  last sentence in paragraph two says it is my
6  understanding that the lost profits and lost business
7  associated with the closure of the Tampa and Daytona
8  branches was a direct result of defendant's actions.
9    Q.  Do you see that?
10    THE WITNESS:  A  Yes.
11    Q.  So I'm trying to understand, did you assume
12  that it was -- strike that.
13    Who are the defendants that you're
14  referencing in paragraph two?
15    A.  Waterstone.
16    Q.  Defendants plural, is there somebody else that
17  you're referencing there?
18    MS. WALTER:  Object to form.
19    MS. KREITER:  What's wrong with the form.
20    MS. WALTER:  She cites to the complaint so if you'd
21  like to provide her with the complaint, that would be
22  great as well.
23    MS. KREITER:  Her report says defendants' actions,
24  plural.  I heard you say Waterstone.

10 (Pages 34 - 37)

Page 38

1    Q.  Are you referring to somebody else?
2        THE WITNESS:  A  Waterstone would be I believe the
3  legal defendants here.  Defendants' plural, as it relates
4  to the analysis, I'm also considering individuals that,
5  the officers that left and the large staff that followed.
6    Q.  If you're acting on the assumption that the
7  lost profits and business associated with the closure of
8  the branches was the result of Waterstone's actions, why
9  do you assume that?
10        MS. WALTER:  Object to form.
11        THE WITNESS:  A  That's a core component of this
12  case.
13        MS. KREITER:  Sure.  I'm trying to understand is
14  that something that you analyzed or did you assume it for
15  purposes of your report.  I understood at the outset you
16  assumed it.  But I want, now I'm not clear based on your
17  testimony.
18        If it's not something that you assumed, I
19  want to understand what are the steps you did to analyze
20  whether Waterstone caused the damages, Waterstone's
21  liability and exhaust that analysis.  If you did it.  If
22  you did not do it, I want to dispositively make that
23  clear on the record.
24        MS. WALTER:  Object to form.  What's the question.

Page 39

1        MS. KREITER:  Q  Did you assume Waterstone's
2  liability for purposes of this damages analysis?
3        MS. WALTER:  Asked and answered.
4        THE WITNESS:  A  Yes.
5        MS. KREITER:  Q  Did you do anything besides read
6  the complaint to test the reasonableness of that
7  assumption regarding Waterstone's liability?
8        MS. WALTER:  Object to form.
9        THE WITNESS:  A  I believe we covered this earlier
10  in my testimony.  And this was related to my thinking
11  about how to design the model.
12        So I read the complaint, general
13  conversation, thought about the impact of the loss of all
14  of these employees at one time would have on the
15  operations of business.
16        MS. KREITER:  Q  It's not illegal to recruit
17  though, you understand that, correct?
18        MS. WALTER:  Object to form.
19        THE WITNESS:  A  That I don't know.
20        MS. KREITER:  Q  So what is it precisely that
21  Waterstone did wrong in your mind?
22        MS. WALTER:  Object to form.
23        THE WITNESS:  A  That's outside the scope of my
24  report.

Page 40

1        MS. KREITER:  Q  Why didn't you analyze the
2  ill-gotten gains damages?
3        MS. WALTER:  Object to form.
4        THE WITNESS:  A  That was bucket three I believe.
5        MS. KREITER:  Q  Correct.
6    A.  I was not asked to analyze that.
7    Q.  Do you agree Waterstone paying a branch credit
8  is an expense, not a gain to Waterstone?
9        MS. WALTER:  Object to form.
10        THE WITNESS:  A  I don't have an opinion.  I did
11  not analyze that.
12        MS. KREITER:  Q  Did you have a discussion with
13  anyone at Mutual about why the scope of your report
14  didn't cover all three of the buckets of damages that
15  Mutual was presenting?
16        MS. WALTER:  Object to form.
17        THE WITNESS:  A  A general discussion.  I needed
18  to define my engagement.
19        MS. KREITER:  Q  But you weren't curious about why
20  you were focusing on bucket two as opposed to the other
21  buckets?
22    A.  I don't believe my curiosity did matter at that
23  point.
24    Q.  Do you know has anyone at Mutual at this point

Page 41

1  attempted to calculate the bucket one diverted loan
2  damages?
3    A.  I would have to review the amended responses
4  here, Mutual's second amended responses.
5    Q.  Just I want to be clear because there's been
6  times now that you're looking at your report.
7        If you need to reference your report, I
8  would just ask that you state that and then we will look
9  at that time exactly where you're looking.
10        Without looking at your report, do you
11  know whether Mutual has done any additional analysis of
12  the Category 1 damages?
13    A.  Off the top of my head I do not know.
14    Q.  Turn to Appendix A of your report if you will.
15    A.  I'm there.
16    Q.  Specifically page four of Appendix A.
17    A.  Okay.
18    Q.  There's a heading on page four, defendant
19  expert's production and it lists about a page and a half
20  of documents.
21        Do you see that starting on page four
22  going over onto page five?
23    A.  Yes.
24    Q.  What are these documents?

11 (Pages 38 - 41)

Page 42

1    A. These I believe are the loan data that
2 defendant's expert relied on.
3    Q. With respect to the Category 1 damages,
4 correct?
5    A. I believe so, that's my understanding, yes.
6    Q. So if you were not analyzing Category 1
7 damages, why did you list the damages as ones that you
8 considered?
9    A. Do you mean these documents?
10    Q. Yes, the documents that are listed on page four
11 and going onto page five. I just again, my understanding
12 was that you didn't do any work with respect to
13 Category 1. Yet I see that you've listed a bunch of
14 documents related to the Category 1 damages as ones that
15 you have considered.
16       Why are these documents listed in your
17 reports as having been considered?
18    A. They were provided to me by counsel. I briefly
19 reviewed them. And decided that they weren't within the
20 scope of my report and what I was asked to calculate.
21    Q. Okay. So these documents listed under
22 defendant expert production, they have nothing to do with
23 the $28 million that you ultimately estimate, correct?
24    A. Correct.

Page 43

1    Q. With respect to your $28 million estimate,
2 you're assuming that the branches would have stayed open
3 till 2031, is that correct?
4    A. Part of the analysis runs through 2031, yes.
5    Q. Why did you select 2031?
6    A. That is a ten-year window, that I have included
7 in my discounted cash flow analysis.
8    Q. Why did you select a 10-year window?
9    A. To present my model annually through ten years.
10    Q. Why didn't you consider two years, 5 years, a
11 different number --
12    MS. WALTER: Object to form.
13    MS. KREITER: -- of years?
14    THE WITNESS: A My model is set up to calculate
15 lost profits in each year through 2031 and beyond. So
16 the model is clear I believe in Exhibit 7 and 8 what
17 those values are.
18    MS. KREITER: Q So my question is how did you
19 land on ten years. You could have said 30 years. I'm
20 trying to understand why is it 10.
21    A. It's standard in DCF modeling to use 10 years.
22 Gives us a nice view of what the cash flows look like, if
23 anything is changing over time. And how the impact of
24 the discount rate affects the numbers, cash flow coming

Page 44

1 back.
2       The goal of that exhibit is to express the
3 cash flows in present value terms. So I find that giving
4 a 10-year window has served that functional purpose.
5 There's no, you know, reason for using 10 years
6 specifically as a cutoff point in terms of the branch
7 closures analysis.
8    Q. So if I'm understanding your testimony, it's a
9 standard with respect to this particular form of
10 modeling, it's not a number selected specific to these
11 particular branches, is that accurate?
12    A. That's correct.
13    Q. You would apply 10 years if you had another
14 case -- strike that. Let me ask it this way.
15       Have you applied this same methodology in
16 other cases?
17    A. Yes.
18    Q. Have you used a 10-year duration in all of
19 those cases?
20    A. I don't believe in all of the cases. I might
21 look at seven years.
22       If I have, if I need to model changes that
23 I know of that are going to happen at some point in the
24 time horizon, I might go out a few more years. I have

Page 45

1 the flexibility to model the DCF, to set up the DCF
2 according to the facts and the issues I'm looking at.
3    Q. Did you consider using an 18 months duration
4 like Mr. Gennarelli did in his model?
5    A. No.
6    Q. Why not?
7    A. 18 months is something Mr. Gennarelli chose.
8 My model does not consider that time frame. I don't
9 understand fully why 18 months is selected.
10    Q. Did you consider a 12-month duration consistent
11 with the 12-month non solicit?
12    MS. WALTER: Object to form.
13    THE WITNESS: A No.
14    MS. KREITER: Q Why not?
15    A. That wouldn't apply here.
16    Q. Why not?
17    A. Because I'm measuring lost profits in the
18 branch, not to an individual employee.
19    Q. Do you understand that the branch managers had
20 a 12-month non solicit?
21    MS. WALTER: Object to form.
22    THE WITNESS: A Yes.
23    MS. KREITER: Q What certainty do you have that
24 any of the employees would have stayed beyond 12 months

12 (Pages 42 - 45)

Page 46

1 if the managers could have solicited them after that
2 period of time?
3      MS. WALTER: Object to form.
4      THE WITNESS: A  I don't know how that would play
5 out.
6      MS. KREITER: Q  Did you consider whether the
7 duration of 2031 was reasonable in light of the 12 months
8 non solicit?
9      MS. WALTER: Object to form.
10      THE WITNESS: A  Yes.
11      MS. KREITER: Q  You obviously came to the
12 conclusion that using a 10-year duration was appropriate
13 despite a 12-month non solicit.  Why?
14    A.  Well to be clear, my model is estimating lost
15 profit for every year through 2031 and beyond.  So I want
16 to clear that up so we are talking about the same thing.
17         And so with that in mind, can you ask your
18 question again.
19    Q.  Did you consider whether the employees might
20 leave after a year because managers were able to solicit
21 them after a year?
22    A.  I thought about that.
23    Q.  In what way?
24    A.  It doesn't impact my model.

Page 47

1    Q.  Why do you say that?
2    A.  Well, the report clearly explains what I'm
3 measuring.  It's the lost profit from these branches.
4         If an employee decides to leave and the
5 branch is still in existence, my model is estimating the
6 lost profits to the branch.  Whether or not there's
7 turnover, it could be, turnover is common over the course
8 of this branch's existence before this event, of this
9 lawsuit.  So what my model is measuring is lost profit to
10 the branch.
11    Q.  What happens if the managers solicit all of the
12 branch employees and they all leave?
13      MS. WALTER: Object to form.
14      MS. KREITER: Q  What's left of the branch?
15      THE WITNESS: A  I think we have seen what happens
16 when something like this, when all of the employees
17 leave.
18    Q.  Sure.  Understood.  I mean the branch is
19 closed.  Mutual's position is that the branch closures
20 occurred because the managers solicited, correct?
21      MS. WALTER: Object to form.
22      THE WITNESS: A  I don't recall.
23      MS. KREITER: Q  Okay.  Do you know why the
24 employees left?

Page 48

1    A.  I do not know.
2    Q.  Okay.  Do you know what claims Mutual is
3 pursuing in the case?
4    A.  I would have to review the complaint.
5    Q.  You don't know right now without looking at the
6 complaint?
7    A.  I know generally.
8    Q.  What generally do you know about the claims
9 Mutual is pursuing?
10    A.  That this is a legal issue, I don't want to use
11 the wrong legal word.
12         My understanding generally is that
13 defendant's actions led to the closure of these branches.
14 So they are pursuing damages related to that.
15    Q.  Do you have an understanding that it was the
16 managers who allegedly solicit the employees?
17      MS. WALTER: Object to form.
18      THE WITNESS: A  I believe that's described in the
19 complaint.
20      MS. KREITER: Q  I'm asking for your
21 understanding.
22    A.  I don't recall without reviewing the complaint.
23    Q.  Did any of the Tampa, Daytona, Paramus
24 employees have an employment contract that required them

Page 49

1 to continue working for Mutual for a year, 18 months,
2 10 years or any other duration?
3      MS. WALTER: Object to form.
4      THE WITNESS: A  I don't know.
5      MS. KREITER: Q  That wasn't something you
6 considered?
7    A.  Considered the non solicit as we discussed
8 generally as it would or would not relate to how I would
9 approach this valuation problem.  So in that context I
10 have considered these issues.
11    Q.  Did you consider whether the employees having a
12 at will relationship versus a contractual term with
13 respect to your analysis?
14    A.  Yes.
15    Q.  In what fashion?
16    A.  As I've described.  So I considered all of
17 these issues when designing my model and found this issue
18 of modeling lost profits to the branches to be separate
19 from an individual employee decision.
20    Q.  Is your model divorced from whether any of the
21 managers stay or go at the branches?
22      MS. WALTER: Object to form.
23      THE WITNESS: Please repeat.
24         (Record read as requested).

Page 50

1    THE WITNESS: A  The model is looking at the
2 branch as a whole, not at these individual managers.
3    MS. KREITER: Q  Let me ask it this way. Cut
4 through some of this.
5       Is it that your model assumes the
6 employees are going to stay into the future, but not -- I
7 will stop there.
8       Does your model assume that the employees
9 are going to stay at the branches into the future?
10    MS. WALTER: Object to form.
11    THE WITNESS: A  No. It assumes that the branches
12 will remain in operation.
13    MS. KREITER: Q  What happens if head of the
14 branch who is generating a lot of loans leaves?
15    MS. WALTER: Object to form.
16    MS. KREITER: Q  How would that impact your model?
17    THE WITNESS: A  It would not impact the model.
18    Q.  Why not?
19    A.  The model is estimating what the loan volume
20 would be if operations continued into the future as they
21 had.  And assuming that under this hypothetical, that
22 you're proposing, there would be an employee who left.
23       There's still a branch in existence that's
24 a Mutual of Omaha Mortgage branch.  Which they can

Page 51

1 replenish their talent because they still have a branch
2 that's in existence.  It's theirs.  They have a chance to
3 rebuild, to hire another employee to maintain the
4 relationships that they have with realtors, whomever is
5 sending loans their way.
6    Q.  I think I understand.  So your model -- let's
7 maybe put some facts to it.
8       Do you understand Dwayne Hutto is one of
9 the managers at issue in the case?
10    A.  That name sounds very familiar.
11    Q.  So I want you to assume that Dwayne Hutto is
12 manager of the Daytona branch.  And Mr. Hutto resigned.
13 With those assumptions in mind.
14       You're saying that your model is not
15 impacted because the model assumes that another employee
16 is going to fill the void left by Dwayne Hutto and
17 provide loan volume similar to the volume supplied or
18 derived by Mr. Hutto, correct?
19    MS. WALTER: Object to form.
20    THE WITNESS: A  I haven't modeled individual
21 performance.  Again, what the model does is it assumes
22 that the branch will continue to operate as it had in the
23 past, going forward.
24       How the company restructures itself to

Page 52

1 keep the loan volumes or profit margin or market share is
2 something that is implied in the model, that's not
3 necessarily analyzed directly.
4    MS. KREITER: Q  Understood.  So the model assumes
5 that the loan volume is going to be continuing into the
6 future consistent with what it had in the past,
7 regardless of whether the employees are there or not, the
8 particular employees?
9    A.  To be clear, looking at the historical loan
10 volumes, there could be employees that come and go during
11 that time period.  So we have this period of time where
12 we observe loan volume for the branch, not broken down by
13 individuals but for this particular branch.
14       So this is a regional, it has market
15 share, there's competitive factors that are taken into
16 account as well as things that occur in the normal course
17 of business with people leaving, being hired, with
18 acquisitions, things that might happen over the course of
19 business is already included in this historical data that
20 we all have access to.
21       My model assumes that going forward in
22 time after April '22, that these loan volumes remain
23 relative to what they had been before.
24    Q.  If Mr. Smith and Mr. Hutto, the managers of the

Page 53

1 branches resign, and they hold the lease for the branch
2 offices, how would those offices possibly stay open until
3 2031?
4    A.  Again this is a hypothetical situation.
5 Different from what happened in reality.
6    Q.  Let me stop you there.
7       Do you have an understanding as to who
8 controls the leases for the offices?
9    A.  My understanding is that the branch managers
10 operate independently.  So I don't know, but I believe
11 that the branch managers are handling that.
12    Q.  When you say the branches continue, what in
13 your mind is the branch that is continuing?
14    A.  So I think you're asking me to define a branch
15 of Mutual of Omaha Mortgage.  So let's just talk about
16 the Tampa branch.
17       I understand that the Tampa branch
18 consists of several employees, it's 1 of 2 Florida
19 branches.  That's a Mutual of Omaha branch.  So the
20 branch has market share, the branch has the Mutual of
21 Omaha name behind it.  The branch has an established
22 presence.  The branch is an entity in itself and within
23 it there are employees that work there.
24       Does that answer your question?

Page 54

1    Q.  I wanted to make sure you finished.
2        So in your mind, the branch are things
3  like the name, the market share, the established
4  presence, not necessarily the employees, is that
5  accurate?
6    A.  That's not what I said.
7    Q.  Okay, then maybe I didn't follow.
8        I understood you to say in response to my
9  question, when you say the branch is continuing, what is
10  continuing?
11        I understand you're saying it's the loan
12  volume that's going to continue.  Is the branch the loan
13  volume?
14    A.  The branch generates the loan volume.
15    Q.  What is the branch in your mind, tell me in an
16  exhaustive way all of the things that you believe
17  constitute the branch?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  Could I have my prior answer read
20  back?
21    MS. KREITER:  I don't think that the prior
22  discussion was clear.  I want a clear record.
23    Q.  What in your mind is the branch that you're
24  assuming will continue into 2031?

Page 55

1    THE WITNESS:  A  Okay.  I believe I already
2  enumerated.
3    Q.  Tell me again so we have a clear record.
4        I want an exhaustive list of the things
5  that you believe constitute the branch that will continue
6  until 2031 for purposes of your analysis?
7    A.  Sure.  So the branch again includes, it has a
8  presence and a market share in Florida.  Tampa in
9  particular is 1 of 2 in Florida.
10        So this branch is significant in terms of
11  the Mutual of Omaha presence.  The branch has a brand
12  identity, a very strong brand identity.  It has the name
13  of an established bank.  The Mutual of Omaha company
14  behind it.  So that's another element.
15        The employees that work within that branch
16  are a part of the branch.  Whatever mix of employees
17  exist over time.  Those are the big items that come to
18  mind as I sit here.
19    Q.  Anything else?
20    A.  As I sit here I think that covers the big
21  issues on how I would define the branch.
22    Q.  So what leads you to believe that the
23  employees, which are one of the components of the branch,
24  will remain at Mutual until 2031?

Page 56

1    MS. WALTER:  Object to form.
2    THE WITNESS:  A  So I understand from, that other
3  Mutual of Omaha branches have lasted 5 to 10 years is
4  what I recall reading in prior deposition testimony.  And
5  there are branches still in existence that haven't been
6  closed, but could live on with the Mutual of Omaha brand.
7    MS. KREITER:  Q  Is it your testimony that the
8  employees at the branches can be easily replenished by
9  Mutual of Omaha?
10    MS. WALTER:  Object to form.
11    THE WITNESS:  A  I don't know.
12    MS. KREITER:  Q  You just testified about branches
13  with Mutual having longevity, is that correct?
14    A.  Yes.
15    Q.  Do you know -- that was in general, that wasn't
16  specific to the Tampa and Daytona branches, correct?
17    A.  That's correct.
18    Q.  How long had the Tampa branch been in place at
19  Mutual prior to those employees transitioning to
20  Waterstone?
21    A.  As far as I understand, I have data going back
22  to 2019.
23    Q.  The branch left in '22, so that branch had been
24  with Mutual not for 10 years, correct?

Page 57

1    A.  That's correct.
2    Q.  When did the Daytona branch get formed?
3    A.  I don't have the exact date.  Again, I have
4  data for Daytona going back to 2019.
5    Q.  Do you know whether either of the Daytona or
6  Tampa branches were in operation before those branches
7  joined Mutual?
8    A.  They may have been.  I don't recall.
9    Q.  Did Mutual have an office in Tampa prior to
10  Chris Smith joining Mutual?
11    MS. WALTER:  Object to form.
12    THE WITNESS:  A  I don't recall.
13    MS. KREITER:  Q  Did Mutual have an office in
14  Daytona prior to Dwayne Hutto becoming an employee?
15    MS. WALTER:  Same objection.
16    THE WITNESS:  A  I don't recall.
17    MS. KREITER:  Q  Do you know whether any of the
18  employees that were working at the Daytona and Tampa
19  branches had worked with Mr. Hutto and Mr. Smith prior to
20  the time that the employees were working for Mutual?
21    A.  I don't recall.
22    Q.  Did you consider longevity specific to these
23  branches or did you just consider the longevity of Mutual
24  branches?

Page 58

1    A.  I considered both.
2    Q.  What was it about the longevity of these
3 branches that led you to think that a 10-year duration
4 was appropriate?
5    A.  A few things.  One being that the two branches
6 are the only branches that Mutual of Omaha has in
7 Florida.  Another is -- specific to these branches, would
8 be the acquisition of Keller Williams and how that could
9 affect the longevity of the branches in Florida.
10    Q.  How much business has Keller Williams generated
11 for Florida?
12    A.  I have not looked at that.
13    Q.  What is the longest period of time that either
14 of the managers for the Daytona or the Tampa branch have
15 stayed with a particular employer?
16    MS. WALTER:  Object to form.
17    THE WITNESS:  A  I don't know.
18    MS. KREITER:  Q  Did you consider whether it was
19 likely for the particular managers here, Dwayne Hutto and
20 Chris Smith, whether those individuals would have stayed
21 with Mutual until 2031?
22    MS. WALTER:  Object to form.
23    THE WITNESS:  A  I considered that it's a
24 possibility.

Page 59

1    MS. KREITER:  Q  Do you know when Mr. Smith joined
2 on Mutual?
3    A.  I don't know that date.
4    Q.  Do you know when Mr. Hutto joined Mutual?
5    A.  No.
6    MS. KREITER:  Take a look at what we previously
7 marked as Deposition Exhibit 24.  Exhibit 24 is the NMLS
8 Consumer Access reports for Dwayne Hutto.
9    Q.  Do you see that?
10    A.  Melvin Dwayne Hutto.
11    Q.  Correct?
12    A.  Yes.
13    Q.  Do you see the portion of the report that lays
14 out Mr. Hutto's employment history?  There's a subheading
15 labeled in bold Employment.
16    Do you see that on the first page?
17    A.  I'm looking for it.
18    Q.  Bolded words that say Dwayne Hutto at the top,
19 then the next bolded subhead is employment.  Then there's
20 a chart that has from, to, employer, position, city.
21    Do you see that?
22    A.  Oh, I see, authorized to represent Waterstone.
23 Okay.  I'm there.
24    Q.  Let's go back to '97.  Mr. Hutto is working at

Page 60

1 Red Lobster as a bartender from '97 to 2002.
2    Do you see that?
3    A.  Yes.
4    Q.  So I'm not going to get into months, going to
5 do some rough justice with these numbers, but '97 to
6 2002, approximately five years?
7    A.  Okay.
8    Q.  But that's not in the mortgage industry?
9    A.  Red Lobster is not.
10    Q.  No.  He's 2002 to 2005 at Ameriquest for three
11 years, do you see that?
12    A.  Yes.
13    Q.  Then he's at Guaranteed Mortgage for four
14 years.  2005 to 2009.  The Money Store for one year, 2009
15 to 2010.  Proficio for one year, 2010 to 2011.
16    So from '97 to 2011, Mr. Hutto has never
17 been at an employer for 10 years.  Correct?
18    A.  That's correct.
19    Q.  In fact, the longest job that he had was the
20 bartender at Red Lobster, correct?
21    A.  I believe that is true.
22    Q.  Sure.  Let's keep going.  His next job is 2011
23 to 2017.  Humana.  He's working as an insurance sales
24 agent.  Do you see that?

Page 61

1    A.  Yes.
2    Q.  So approximately six years.  That's the longest
3 one that we have got so far, correct?
4    A.  July 2011 to June 2017, yes.
5    Q.  I'm doing, I'm ignoring the months, just
6 looking at the years.  Then next, Synergy One Lending,
7 2018 to 2019.  So one year.  2018 to 2022, Mutual of
8 Omaha Mortgage.  Three years.
9    Do you see that?
10    A.  So his first, yes, it's November of 2018 to be
11 clear.
12    Q.  Correct.
13    A.  Okay.
14    Q.  So Mr. Hutto has never stayed at an employer in
15 the mortgage industry for 10 years.
16    In fact, the longest Mr. Hutto has stayed
17 at a particular employer in the mortgage industry is four
18 years, correct, approximately?
19    A.  What about the Proficio, sorry.
20    Q.  I believe it's Guaranteed?
21    A.  Guaranteed.  Four years.  Okay.
22    Q.  Were you aware that Mr. Hutto has never stayed
23 at an employer in the mortgage industry for more than
24 four years?

Page 62

1    A.  No.
2    Q.  Would that bear on your opinion that the
3  damages should be projected out 10 years?
4    A.  No.
5    MS. WALTER:  Can we take a break whenever there's a
6  good time.
7    MS. KREITER:  Sure.  Let's do one more exhibit.
8  Take a look at what we have previously marked as
9  Deposition Exhibit 22.
10    THE WITNESS:  Okay.
11    MS. KREITER:  Exhibit 22 is similarly an NMLS
12  Consumer Access report with respect to Chris Smith.
13    Q.  Do you see that?
14    THE WITNESS:  A  Yes.  This is marked.
15    Q.  Switch it with you.  Thank you.  So similar
16  line of questions with respect to Mr. Smith.
17    Again his employment history going back to
18  1998, so just over 25 years.  He's had a slew of
19  employers, correct?
20    A.  He has, yes.
21    Q.  Take a look at it.  Do you see any employers
22  where Mr. Smith stayed for 10 years?
23    A.  I don't believe so.
24    Q.  Are there any facts you're aware of that would

Page 63

1  lead you to believe Mr. Smith would have remained at
2  Mutual for 10 years?
3    A.  I don't know whether he would have remained at
4  Mutual.
5    Q.  Because your analysis didn't consider whether
6  these particular employees would have stayed or not,
7  correct?
8    A.  His employment history has no impact on my
9  damages model.
10    Q.  Sure.  And that would be the case for
11  Mr. Smith, Mr. Hutto; you're not looking at the
12  likelihood that any of the employees would stay over a
13  period of time, you're assuming the employees do or that
14  Mutual replaces them with another employee that has
15  similar volume, correct?
16    A.  I'm assuming the branch continues in a similar
17  way that it had.
18    Q.  Well but the branch continuing in a similar way
19  that it had, we talked about the branch and its employees
20  and its market share.  I mean market share and the
21  building, that's not what's generating the loans.
22    The employees, the people working there,
23  those are what, those are who are generating loans,
24  correct?

Page 64

1    MS. WALTER:  Object to form.
2    THE WITNESS:  A  Employees are part of that
3  equation certainly.
4    MS. KREITER:  Q  Sure.  The building, the walls
5  don't generate loans, it's the people who are in the
6  building doing the work, source customers, meeting with
7  real estate agents, correct?
8    A.  I disagree with that characterization.
9    Q.  Do you think it's something other than the
10  people that are generating loans?
11    A.  Yes.  I listed earlier I also believed that the
12  Mutual of Omaha brand and the relationships that the
13  company has established with those that would send loans
14  their way also matters.
15    Q.  Okay.  So in this case the employees leave, why
16  couldn't Mutual just leverage its brand and recalculate
17  those offices?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A  I mean this is again, I didn't
20  analyze this hypothetical world.
21    MS. KREITER:  Q  Sure.  I'm trying to get to the
22  reasonableness of your assumption that the loan volume
23  would have, could have continued into 2031?
24    A.  Uh-huh.

Page 65

1    Q.  Is it correct that that assumption, I think I
2  understand it but that assumption doesn't depend on these
3  employees staying or going?
4    A.  It does depend on the employees staying such
5  that there's a branch in existence.  The way the
6  employees left all at one time resulted in the closure of
7  of the branch, two branches.
8    Q.  Did you consider what portion of the branch
9  revenue was attributable to Mr. Smith or Mr. Hutto?
10    A.  No.
11    Q.  Did you consider what portion of the branch
12  revenue was attributable to any particular employee?
13    A.  No.
14    Q.  Do you have an understanding that it was highly
15  likely Mr. Hutto and Mr. Smith would leave Mutual
16  regardless whether they went to Waterstone or a different
17  employer?
18    A.  I don't have an understanding of that.
19    Q.  Going back to Tomalak Deposition Exhibit
20  No. 22.  Look at the employment history again.
21    Is there any employer in which Mr. Smith
22  has remained employed for 10 years?
23    MS. WALTER:  Asked and answered.
24    THE WITNESS:  A  No.

17 (Pages 62 - 65)

Page 66

1    MS. KREITER: In fact his longest is Proficio at
2 five years.
3    MS. WALTER: Is that a question?
4    THE WITNESS: Okay.
5    MS. KREITER: Q Do you agree?
6    THE WITNESS: A Roughly five years, yes.
7    Q. Certain employers for example Intercontinental
8 Mortgage, Mr. Smith was only employed for four months
9 from April 2007 to August of 2007. Correct?
10    A. Yes.
11    Q. Do you have reason to believe that Mr. Smith is
12 one of the employees that would likely be long term with
13 Mutual like some of the others, like the other branches
14 you mentioned?
15    A. That's certainly a possibility.
16    Q. Even with him jumping around in the manner that
17 he has --
18    A. Sure.
19    Q. -- depicted in Exhibit 22?
20    A. Yes. Especially given his, the stage of his
21 career and a lot of this employment history is when he
22 was much younger and it looks like doing, potentially
23 building up his career.
24    So there's several things that could go

Page 67

1 into his decision on whether he remains in one place.
2    Q. So do you have an understanding as to why he
3 left?
4    A. Why he left who?
5    Q. Mutual. Do you have an understanding as to why
6 Mr. Smith resigned from Mutual?
7    A. I don't know why he left.
8    Q. You don't know why any of the employees
9 resigned from Mutual?
10    A. No, I don't know.
11    MS. WALTER: Take a break now?
12    MS. KREITER: Yeah, now's a good time.
13       (Short recess taken)
14    MS. KREITER: Q Did you determine how many of the
15 branches at Mutual don't make it past five years or
16 10 years?
17    THE WITNESS: A No, I did not look at that
18 specifically.
19    Q. What is the source of your belief that branches
20 remain at Mutual for up to 10 years?
21    A. That's not how I would characterize my belief.
22    Q. How would you characterize it?
23    A. These branches could last as long as Mutual of
24 Omaha lasts. They could last into perpetuity.

Page 68

1    Q. I thought that you had testified earlier that
2 your belief was that Mutual enjoyed longevity with
3 respect to these branches and other branches have lasted
4 5 to 10 years. Is that accurate?
5    A. I have read that, yes.
6    Q. Where did you read that?
7    A. I read that in the testimony of, Gennarelli
8 testimony I believe. And that was discussed on phone
9 calls as well.
10    Q. So did you investigate whether there are any
11 outliers at Mutual branches that do not last 5 to
12 10 years?
13    A. I didn't investigate the details of that, but,
14 no, I did not.
15    Q. Did Mutual provide you with any documents to
16 support its claim that branches tend to remain for 5 to
17 10 years or longer?
18    A. No documents.
19    Q. Who at Mutual told you that branches at Mutual
20 tend to remain 5 to 10 years or longer?
21    MS. WALTER: Asked and answered.
22    THE WITNESS: So do I have to answer again?
23    MS. KREITER: Yes.
24       (Record read as requested)

Page 69

1    THE WITNESS: A I believe this was on a
2 conference call with many individuals at Mutual. So it
3 would have been that second call. And the individuals on
4 that call we listed. I don't recall exactly who said
5 that from that group.
6    MS. KREITER: Q Did you do anything to
7 independently verify what you were told by the persons at
8 Mutual on the call and what you saw in the deposition
9 testimony regarding the longevity, the idea it's common
10 for branches to remain 5 to 10 years or more at Mutual?
11    A. No.
12    Q. Is it common in the mortgage industry for loan
13 officers to move together to a new employer?
14    A. I don't know.
15    Q. Has Mutual had entire branches leave in the
16 past, besides the ones we are talking about here?
17    A. I don't know.
18    Q. Are you aware that Mutual as recent as May of
19 2023 had an entire branch leave?
20    A. I'm not aware.
21    Q. Are you aware of how many branches have left
22 Mutual in the last 10 years?
23    A. No.
24    Q. Is it your assumption that whenever an entire

Page 70

1 branch leaves, there must have been wrongdoing or
2 liability, or is that not part of your opinion?
3    MS. WALTER: Object to form.
4    THE WITNESS: A  That's not something I looked
5 into.
6    MS. KREITER: Q  Did you research expected rates
7 of employee attrition when there's a change in branch
8 leadership?
9    A.  I did not.
10    Q.  Are you able to say what the expected attrition
11 rate is in the mortgage industry when there's a change in
12 leadership?
13    A.  As I sit here right now, I can't.
14    Q.  Do you agree that natural attrition should be
15 factored into the damages?
16    A.  To the extent it affects those operations
17 historically, that's something I would take into account.
18    Q.  Did you take natural attrition into account
19 with respect to your analysis here?
20    A.  Some level of attrition is embedded in the
21 numbers, yes.
22    Q.  Meaning what?
23    A.  Well to the extent that the history of data
24 that I have includes any natural attrition, then that

Page 71

1 would be carried forward as well.
2    Q.  Can you tell me a percentage or an amount, some
3 kind of metric of natural attrition you factored in?
4    A.  I haven't disentangled that from the model.
5    Q.  Is it your assumption that natural attrition
6 has occurred over the period of time 2019 to 2022 and
7 therefore, is that the manner in which you're saying that
8 natural attrition is built into your model?
9    A.  To the extent that there were any new hires or
10 departures during that time period, that is captured by
11 the model.
12    Q.  Do you know whether there were any resignations
13 in the 2019 to 2022 time period for either the Tampa,
14 Daytona or Paramus branches?
15    A.  Prior to those listed in the complaint?
16    Q.  Correct.  Over the time period in which you're
17 looking back at the retroactive data and my understanding
18 of your testimony is that you're assuming natural
19 attrition is built into that data, is that correct?
20    A.  That's correct.
21    Q.  Now I want to understand are you assuming that
22 or do you know for a fact; do you know whether in fact
23 over the 2019 to 2022 time period, did employees resign
24 from the branches that we are talking about?

Page 72

1    A.  I don't know if they -- what the specifics are,
2 but if there were any departures or new hires, that would
3 be picked up by the model.  I don't have the specifics of
4 those employment changes.
5    Q.  How do you know if attrition is built into your
6 model if you don't know whether any attrition actually
7 occurred during the 2019 to 22 time period?
8    A.  Because the model is reflecting overall loan
9 volume.  So what that's reflecting is anything going on
10 operationally within the branch at the time.
11    Q.  I'm focusing on people, I mean people coming
12 and going.
13       You would agree whether somebody stays or
14 resigns impact the loan volume, correct?
15    A.  It could.
16    Q.  Are you able to tell me during that 2019 to '22
17 time period, you're assuming that natural attrition is
18 factored in but you don't know one way or the other
19 whether employees actually resigned during that period,
20 correct?
21    A.  That's correct.
22    Q.  Do you agree with the notion the branch
23 managers, they have the right to resign from Mutual, they
24 are at will employees, correct?

Page 73

1    A.  That's my understanding.
2    Q.  Are you aware of any employees at these
3 branches that had some other arrangement besides an at
4 will employment arrangement?
5    A.  Not that I'm aware of.
6    Q.  If the managers of the branches resigned, but
7 the other employees did not, who would Mutual have put in
8 place to manage these branches?
9    MS. WALTER: Object to form.
10    THE WITNESS: A  I don't know.
11    MS. KREITER: Q  Do you have any reason to believe
12 that a successor manager would have accepted the
13 position?
14    A.  Again I don't know.
15    Q.  Do you have any reason to believe that the
16 employees would have stayed working for Mutual if the
17 managers left and a replacement manager had been put in
18 place?
19    MS. WALTER: Object to form.
20    THE WITNESS: A  I don't know.
21    MS. KREITER: Q  Did Mutual conduct exit
22 interviews or otherwise ask the employees why they
23 resigned?
24    A.  I am not sure.

19 (Pages 70 - 73)

Page 74

1    Q.  Did you consider whether the employees simply
2  wanted to follow the branch manager because there were no
3  other Mutual offices operating in Florida at the time?
4    A.  I don't know.
5    Q.  Do you agree the strength of a personal and
6  professional relationship between a manager and an
7  employee might bear on whether the employee follows the
8  manager who resigns?
9    MS. WALTER:  Object to form.
10    THE WITNESS:  A  That could be one of several
11  factors, I don't know.
12    MS. KREITER:  Q  There would be other factors that
13  might make it natural for an employee to resign and
14  follow their manager, correct, it's not just the
15  relationship?
16    MS. WALTER:  Object to the form.
17    THE WITNESS:  A  It could be possible.
18    MS. KREITER:  Q  Did your analysis make any
19  attempt to get at the reason for the employees following
20  the managers?
21    A.  No.
22    Q.  Did you make any assessment of whether the
23  managers were subject to an enforceable non solicit?
24    MS. WALTER:  Object to form.

Page 75

1    MS. KREITER:  What's wrong with the form.
2    MS. WALTER:  Enforceable?  That's a legal question.
3    MS. KREITER:  I am asking if she analyzed that
4  issue.
5    MS. WALTER:  Enforceable is open to interpretation.
6    MS. KREITER:  Q  Did you do any analysis with
7  respect to whether the agreements were enforceable or
8  not, and specifically the non solicits?
9    THE WITNESS:  A  No.
10    Q.  Do you know whether all of the Mutual managers
11  even have a non solicit?
12    A.  That may have been covered in the complaint.
13    Q.  Not asking what's in the complaint.
14      Do you know whether all of the Mutual
15  managers have non solicits?
16    A.  I don't know if all of them do.
17    Q.  Would your damages estimate change if one or
18  more of the non solicitation agreements is deemed
19  unenforceable by the court?
20    MS. WALTER:  Object to form.
21    MS. KREITER:  What's wrong with form.
22    MS. WALTER:  Again these are legal questions.
23    MS. KREITER:  It's a hypothetical.
24    Q.  If the court holds that the non solicitation

Page 76

1  agreements are unenforceable, does that impact your
2  damages model, yes or no?
3    THE WITNESS:  A  No.
4    Q.  Explain why not?
5    A.  My damages model is estimating lost profits
6  generated by the branches, not by these individuals.
7    Q.  You indicated that you reviewed Mr. Oscher's
8  Report, correct?
9    A.  Yes.
10    Q.  Mr. Oscher comments that Mutual's damages
11  analysis could have excluded the loans originated by the
12  managers, but Mutual chose not to carve out any of the
13  manager's volume when it presented the Gennarelli
14  $4.4 million analysis, correct?
15    A.  Uh-huh.
16    Q.  Does your estimate carve out any loan volume
17  derivative of the branch managers?
18    MS. WALTER:  I'm going to go on the record and
19  object to the line of questioning, to the extent that
20  Miss Rosevear has already testified she was not hired in
21  a capacity to redo Mr. Gennarelli's work.  So to the
22  extent you're asking her to --
23    MS. KREITER:  I'm not.
24    MS. WALTER:  Let me finish.  So to the extent

Page 77

1  you're asking her to opine on what was or was not
2  considered in his analysis, she already testified to
3  that.
4      So you can ask your questions and she can
5  answer, but I'm just going to object to that, Maria.
6    MS. KREITER:  I'm going to tell you, Courtney, your
7  objections are totally improper.  I'm asking what this
8  witness did.
9      My question was does your estimate carve
10  out any loan volume derivative of the management.
11  There's nothing inappropriate about that question,
12  period.
13    MS. WALTER:  Sure.
14    MS. KREITER:  Frankly you've been objecting right
15  and left, it's interrupting the deposition.  It's
16  11:02 --
17    MS. WALTER:  Show me where I can't object.  I'm
18  allowed to object.  You don't have to tell me.
19    MS. KREITER:  This deposition, it's 11:00, we are
20  not going to finish at this rate if you keep objecting to
21  my questions such as does your estimate carve out any
22  loan volume derivative of the managers, we are going to
23  have to continue a second day.
24    MS. WALTER:  Do you know why it's taking so long?

Page 78

1 You keep asking why I'm objecting. Let me object as I am
2 allowed to do and we will continue to carry on. You turn
3 to me and ask me what my objection is.
4      MS. KREITER: Sure, because I'll rephrase it. If I
5 agree with your objection I --
6      MS. WALTER: You're not the judge. We go through
7 this every deposition.
8      MS. KREITER: We do.
9      MS. WALTER: You don't have to say overruled or
10 sustained. I'll make my objection on the record and we
11 can carry on.
12      MS. KREITER: We can. And I have an opportunity
13 to -- again, I'm going to ask you again, start again.
14 Because of the objection.
15      MS. WALTER: Also not going to be bullied into not
16 putting an objection on the record because you're
17 dissatisfied with it.
18      MS. KREITER: I have not done anything to bully
19 you. I commented you made a large number of objections
20 to questions I think are completely appropriate.
21      MS. WALTER: You think that and I think they are
22 objectionable. This is part of the adversarial process.
23 I'm going to continue objecting to questions I deem
24 improper and if you have a problem with that, we can deal

Page 79

1 with it later.
2      MS. KREITER: We might. Okay. So again I'm going
3 to start over. Again with this line of questions.
4      Mr. Oscher comments that Mutual's damages
5 analysis could have excluded loans originated by the
6 branch managers.
7      Q.  Do you have that understanding?
8      THE WITNESS: A  I believe I recall reading that
9 in the Oscher Report.
10      Q.  Do you understand that Mr. Oscher took issue
11 with the fact that Mutual did not carve out any of the
12 manager's volume with respect to the Gennarelli analysis?
13      A.  I don't know if he took issue. He pointed out
14 I recall.
15      Q.  Does your damages estimate carve out any loan
16 volume derivative of the managers?
17      A.  No.
18      Q.  Mr. Oscher criticized Mutual's damages analysis
19 because it projected lost profits by looking at
20 historical loan volume data dating back to 2019,
21 including 2020 and 2021, which were highly anomalous
22 years in the mortgage industry.
23      Do you have that understanding?
24      A.  I recall that generally. I don't know, I don't

Page 80

1 have the report in front of me but I do recall that note.
2      Q.  Is your damages model also based on historical
3 loan volume data that includes '20 and 2021?
4      A.  My projections do not include that time period.
5      Q.  Not your projections, the data you used to
6 calculate the projections, did you include 2020 and 2021.
7 I understand you're not projecting damages for that time
8 period that's in the past?
9      A.  No, my model would only consider loan volumes
10 in 2022 and beyond.
11      Q.  Did you look at historical loan volume data?
12      A.  Yes.
13      Q.  Did that historical loan volume data include
14 2020 and 2021?
15      A.  Yes.
16      Q.  Would you agree that the mortgage industry has
17 taken a turn for the worse since the Tampa, Daytona and
18 Paramus branches have left Mutual?
19      MS. WALTER: Object to form.
20      THE WITNESS: Define what you mean by that, please,
21 so I can answer.
22      MS. KREITER: Q  Do you believe that for example
23 in terms of let's just look at it under on a revenue
24 basis. Do you think that revenue to Mutual associated

Page 81

1 with these branches was better in 2021 versus 2022?
2      THE WITNESS: A  May I look at a chart I prepared
3 in my report?
4      Q.  Sure. Just point out where you're looking,
5 please.
6      A.  Let's look at Exhibit 1, please.
7      Q.  So Exhibit 1 of your expert witness report.
8 Which is Deposition Exhibit 30.
9      A.  I would actually like to look at Exhibit 4
10 instead. Which has the same data as well as MBA data.
11      Q.  For purposes of the record, Exhibit 4 is titled
12 Mutual of Omaha Mortgage quarterly loan sales for Tampa
13 and Daytona branches, and MBA originations.
14      You were referencing Exhibit 4 for what
15 purpose?
16      A.  To answer your prior question on how the
17 mortgage industry has evolved over time.
18      Q.  Sure.
19      Q.  If you don't mind asking the question again, I
20 will be able to answer it now.
21      Q.  Sure. I was trying to get a sense of whether
22 the time periods of 2020 and 2021 in your mind, how did
23 those time periods compare to the period of 2022?
24      A.  Yes. From Exhibit 4, let's look at the gray

Page 82

1 line, which is the MBA total mortgage originations.
2       We do see as no surprise that in 2020 and
3 2021, the gray line is higher, looks like on a quarterly
4 basis at about 1.2. And by the time we get to 2022, I'd
5 say about 60 percent on a quarterly basis what it had
6 been before. So.
7   Q. Why do you believe that loan volume in 2020
8 when you can see in your chart in Exhibit 4 for example,
9 that peaks gets to almost, gets over 70 million for the
10 MBA, why is that time period representative of future
11 time periods, if you believe that it is?
12   A. I don't believe that that would necessarily be
13 representative of future time periods on its own.
14   Q. Explain that a little bit more, please.
15   A. Sure. So when an economist does a forecasting
16 exercise, we want to look at as much historical data as
17 we have here. 2019 to 2022. And consider any other
18 factors that could influence the loan volume.
19       What we can do as forecasters is take
20 those periods out of consideration. Look at periods
21 that are not affected by whatever we think is going on.
22 Could be related to the pandemic, interest rates,
23 whatever is sort of going on we know that would affect
24 numbers.

Page 83

1       So what I can do is I can prepare my
2 forecasts without letting my forecast be tainted by some
3 of these other affects that no longer are affecting the
4 numbers.
5   Q. Did you do anything to carve out the period of
6 2020, 2021 where we have these anomalous peaks?
7   A. Yes.
8   Q. What did you do?
9   A. Those peaks are not included in my forecast.
10   Q. What is the time period you took out?
11   A. I didn't take anything out per se.
12       My forecasts are based on the last months
13 of available data, which is 2022 Spring when we are
14 looking at quarterly data, I believe it's Q1, 2022.
15       When we are looking at the monthly data, I
16 believe it's the last full month of revenue, which would
17 be I believe April. Have to look back at my report to
18 give you an exact date.
19   Q. Now I'm confused. I understood your testimony
20 to be that you did factor in the 2020 and 2021 time
21 period. And the date associated with that. Now I am
22 hearing maybe you didn't. Which is it?
23   A. I consider all the data. Based on my analysis
24 of the data, I decide how I'm going to construct my

Page 84

1 forecasting.
2   Q. So did you make a decision that 2020 and 2021
3 should be carved out because it was not representative
4 and instead reflected an anomalous period in the
5 industry?
6   A. I recognize that that is a, the pandemic period
7 and I don't base my forecasts on that.
8   Q. Do you think it would be inappropriate to base
9 forecasts on that anomalous period of 2020 to 2021?
10   A. It depends on the application.
11   Q. Do you know whether Mr. Gennarelli factored in
12 that 2020 to 2021 period in his analysis?
13   A. I don't recall exactly. You can look back at
14 the exhibit you handed me earlier and see. But again, I
15 didn't look closely at the underlying assumptions of that
16 analysis.
17   Q. Are there any, is there any modeling that
18 you're aware of that is recognized in the industry that
19 would permit the inclusion of anomalous data such as 2020
20 and 2021?
21   A. It depends. I have seen econometric models
22 developed that do include periods of time that might
23 deviate from the average, which is how I'm defining an
24 anomaly.

Page 85

1   Q. What are those models?
2   A. Think of an example. It would be you can
3 imagine a regression analysis. Trying to think of a
4 simple example. Where you might have quite a bit of rich
5 data that's useful information to what we are trying to
6 understand. Maybe it's a projection level. We
7 understand that there's a time period in the data that
8 may not be representative of the norm.
9       There's several things we can do. In
10 econometric terms, call it adding a dummy variable to the
11 data. So we can remove the affects of it while still
12 keeping the data and creating a model around it. So
13 there's many ways that economists would approach a
14 problem like that.
15       When we are talking about you can imagine
16 securities fraud, where we have disclosure of new
17 information. We might not want to include the stock
18 price reaction on that day, so there's ways to remove
19 that from the analysis.
20   Q. Do you know whether Mr. Gennarelli in his model
21 was performing the type of regression analysis for doing
22 any of the steps you talk about that are industry
23 recognized where anomalous periods are included in the
24 database?

Page 86

1    A.  To the extent he's conducting an average, it's
2  possible that the average would take into account some of
3  these affects.  So that the impact of we will call it the
4  pandemic period, might not come through in numbers.
5          It depends again on the magnitude of the
6  data at that time period.  And if his approach properly
7  took that into account, it's possible but I haven't
8  looked at it.
9    Q.  That's what I'm trying to understand.
10         Do you have reason to believe he was
11 applying these statistical methods that are statistically
12 recognized when Mr. Gennarelli did his analysis, which
13 you understand does include that anomalous period,
14 correct?
15   A.  I did not look closely at his analysis.
16   Q.  Is it that your forecasts are based on a
17 one-month period of data?
18   A.  No.
19   Q.  I want to make sure I'm clear on the duration
20 of data that you factored in when you calculated your
21 projections and came up with the $28 million.  I thought
22 I heard you testify you looked only at a one-month period
23 in 2022.  Is that accurate?
24   A.  So I have run two separate models here.  One

Page 87

1  based on the monthly frequency and another one based on
2  quarterly frequency.
3          To be very clear, I look at all of the
4  data that's in front of me when I decide how to prepare
5  my forecast.  So the way that -- and I explain this in my
6  report how my model is executed.
7          So in the monthly analysis I look at the
8  last full month of data as a starting point for my
9  projection.  But also what's encompassed in all of that
10 is the fact that I have in front of me the historical
11 data, I see where that last month lies.
12         And if we look at the orange bar on
13 Exhibit 4, we see where that is relative to this pandemic
14 period, it's well below it.  You see where it's relative
15 to 2019.  So the forecasting is more involved than simply
16 picking one month and going from there.  I make a
17 judgment call based on my statistical analysis of the
18 historical data.
19   Q.  The math you did, did it just factor in one
20 month or a longer period of time?
21   A.  For the monthly model I looked at the last
22 month of available data.
23   Q.  When you say monthly model, I understood you to
24 have your peer model and then I guess I thought of it as

Page 88

1  the MBA model.
2          When you say the monthly model, is it one
3  of those two?
4    A.  That's the peer model.
5    Q.  The peer model is the monthly?
6    A.  Yes.
7    Q.  I want to make sure terminology.
8    A.  The quarterly frequency model is the MBA data.
9    Q.  With respect to the peer model, which is a
10 monthly analysis, the data set you used to conduct the
11 math and extrapolate out to 2031 was the one month,
12 correct?
13   A.  That's the starting point for the forecast.
14 But my forecasting decision and modeling considers all
15 the data in front of me, from 2019 through the closure of
16 the branches.
17   Q.  Whether you consider it, you may consider it
18 and decide I considered it and I'm not using it for
19 purposes of doing the math.
20         Did you consider it and then also
21 implement it when you were doing the math?
22   A.  I consider it, I look at how it compares to the
23 historical data.  So it's more than simply using one
24 month.

Page 89

1    Q.  Your report has a number of exhibits.  Then
2  there's much discussion about you running a model and
3  performing calculations.
4          It appears to me that modeling, none of
5  that modeling is depicted in that exhibit.  Is there a
6  spread sheet or database in which you're actually doing
7  the math and the modeling?
8    A.  Yes.
9    Q.  What is that document -- I don't know what to
10 say, document, database, how would you describe where the
11 actual math is performed?
12   A.  That is performed in Excel.
13   Q.  Is it a single spread sheet or multiple for
14 this case?
15   A.  For this case it was a single spread sheet.
16   MS. KREITER:  Courtney, was that produced?
17   MS. WALTER:  Yes.
18   THE WITNESS:  I sent it over.
19   MS. WALTER:  Anything she relied on and considered
20 has been produced.
21   MS. KREITER:  Was that in the production you gave
22 me on Tuesday?
23   MS. WALTER:  Correct.
24   MS. KREITER:  Are you able to tell me, Courtney,

Page 90

1  what -- I want to look at it with her.  Do you know what
2  Bates number it is?
3      MS. WALTER:  If we take a minute I can figure it
4  out.  Can you point to where in your report that would
5  be, that spread?
6      MS. KREITER:  She's asking you to look at the
7  appendix of your report.
8      THE WITNESS:  I don't believe my exhibit -- it's
9  the native, right.  Could we go off the record?
10     MS. KREITER:  I want this on the record, please.
11     Q.  So I mean is there a document in your appendix
12  that references the Excel spread sheets?
13     THE WITNESS:  A  My model?
14     Q.  Yes.
15     A.  No, it's not listed in Appendix A.  But I
16  understand it was produced.
17     MS. KREITER:  So in this case -- do you know, can
18  you just e-mail, can you e-mail it to me that one
19  document, please.
20     MS. WALTER:  If it's not in Appendix A, I don't
21  know what spread sheet it would have been.
22     THE WITNESS:  Okay.  I sent it as -- yeah.  Maybe
23  we can look later.
24     MS. WALTER:  Okay.

Page 91

1      THE WITNESS:  Or now if you want to go off the
2  record.
3      MS. KREITER:  Why don't we with that on the record,
4  I will say we are going to take a break so the witness
5  and opposing counsel can check whether the Excel spread
6  sheet that contains the actual math supportive of the
7  exhibits in the report has been produced.  If so, point
8  me to where that would be.  If not, you may tell me now.
9  Take a short break.
10     (Short recess)
11     MS. KREITER:  Back on the record, please.
12     MS. WALTER:  We produced it.  You want the Bates
13  number or I can send you the native file.
14     MS. KREITER:  If you have it in native just.
15     MS. WALTER:  It will be faster.
16     MS. KREITER:  So opposing counsel has just e-mailed
17  the spread sheet we've been referencing.  This was the
18  spread sheet produced on Tuesday night, correct?
19     MS. WALTER:  Correct.
20     MS. KREITER:  Q  Are there particular portions of
21  the spread sheets that contain the monthly analysis?
22     THE WITNESS:  A  Yes.
23     MS. KREITER:  Okay.
24     MS. WALTER:  Can I go on the record real quick.

Page 92

1  Bates number is MOM0014778 produced in native.
2      MS. KREITER:  Let's stick on the monthly peer
3  analysis you did.  I'm still -- apologies, but I'm not
4  particularly clear.
5      Q.  When you did your analysis within the Excel
6  spread sheet that is Bates number 14778, with respect to
7  the peer model did you include data for 2020 and '21 or
8  not?
9      THE WITNESS:  A  The data is included in the
10  spread sheet.  I consider all the data when I perform my
11  forecast.  My forecast is based off the last full month
12  of data.  That's a starting point for the forecast after
13  considering the historical data.
14     Q.  So I understand you might have more data, for
15  completeness you're including it in your spread sheet.
16         But for purposes of doing the actual math
17  that constitutes the calculated projections, you're not
18  including that 2020 and 2021 data in your math, is that
19  accurate?
20     A.  I include it in my consideration of what to
21  use, just want to be really clear, I'm considering
22  everything that's in front of me.
23     Q.  Sure, I understand that.  My question is
24  exclusively to the math.  The numbers that you're

Page 93

1  inputting to drive the projection.
2         That does not include 2020 and 2021,
3  correct?
4      A.  Correct.
5      Q.  Rather it includes May of 2022 or what month?
6      A.  I believe April.
7      Q.  April of 2022?
8      A.  Uh-huh.  May I look at my report actually and
9  give you the exact month?
10     Q.  Please.
11     A.  Yeah, I start from April 2022.  Apply the
12  19 percent decline to that figure.
13     Q.  Can you say where you're looking?
14     A.  Paragraph 23.  That describes my model in quite
15  detail.
16     Q.  Paragraph 23, pick up where you're explaining
17  based on that paragraph and I stopped to get the
18  location.
19     A.  Yeah.  To answer your question on where the
20  forecast begins it's the last full month of loan sales,
21  which I've noted as April 2022.
22     Q.  Do you believe that one month is representative
23  of the loan volume or branch performance?
24     A.  In this instance, that month is representative

Page 94

1 of the level that the branch is at during that time
2 relative to the other branches that are included in my
3 forecast. That's an important distinction. Because I'm
4 comparing apples to apples across the peers.
5        As I said before, that month also is in
6 line with what we see in the historical data.
7    Q.  So turn to Exhibit 3 of your report, please.
8    A.  I'm there.
9    Q.  Exhibit 3 is the graph that you included
10 related to the peer-based month to month analysis,
11 correct?
12    A.  Yes.
13    Q.  Looking at the Daytona branch, there's two big
14 spikes for Daytona. One was in 2021 in around the April
15 time period, do you see that?
16    A.  Yes.
17    Q.  And then there's another spike, the second
18 highest in the history of the branch is in April of 2022
19 period. Do you see that?
20    A.  I need to know exactly what that data is. If
21 it's March 2022. April 2022 would be the last
22 observation in the solid orange line.
23    Q.  Sorry, so it's --
24    A.  It's not the peak you're referring to.

Page 95

1    Q.  It's between 10 and 15 million, you're saying
2 that relates to the April 1st date?
3    A.  Based on this yes, but I want to look at my
4 native model that was just e-mailed over to you and we
5 can get the exact number.
6        THE WITNESS: Why don't you do that. I will give
7 you my laptop, Courtney, if you want to give the witness.
8        MS. WALTER: I don't have it pulled up so if you
9 have it pulled up.
10        THE WITNESS: I can come over there.
11        MS. KREITER: That would be great.
12        THE WITNESS: Yeah. That's easier. All right. Go
13 to the, that's the right tab. So the actuals are here in
14 column T through H. Let's look at Daytona is the one
15 you're interested in.
16        MS. KREITER: Yes.
17        THE WITNESS: Scroll down.
18        MS. KREITER: Q  You look at the native spread
19 sheet, let me know when -- the question is what is the
20 volume for April of 2022 for Daytona?
21        THE WITNESS: A  It is 13.05 million.
22    Q.  For the April '22 period that drove the peer
23 analysis?
24    A.  Correct. Which is not the peak.

Page 96

1    Q.  What is the volume for the April '22 period for
2 the Tampa branch?
3    A.  16.7.
4        MS. WALTER: Can you identify in the Excel spread
5 sheet which box the row of columns.
6        THE WITNESS: For Daytona it's E42. For Tampa it's
7 D42.
8        MS. KREITER: As long as I have you here, working
9 with the native version of your spread sheet, I saw a
10 comment in your report that this is a model that you can
11 use different durations of time. You can look at from
12 2022 to 2026 was one of the examples you gave.
13    Q.  Do you recall that example?
14        THE WITNESS: A  I'd have to see where that is in
15 the report.
16    Q.  Why don't you grab your report, please.
17    A.  Okay.
18    Q.  Turn to footnote 35. For purposes of the
19 record says the model is flexible, I believe here you're
20 referring to the peer model or the MBA model?
21    A.  All of them.
22    Q.  So your methods are flexible to other damages
23 time frames. It allows for the calculation of damages
24 through any year up to 2031 using the results from

Page 97

1 Exhibit 7A to 7B (sic)?
2    A.  Uh-huh.
3    Q.  For example the peer-based model suggests that
4 damages from lost profits over the 2022 to 2026 time
5 frame is 3.8 million for Tampa, for the Tampa branch, and
6 3.66 million for the Daytona branch, for 7.54 total.
7        Do you see that?
8    A.  Yes. I do.
9    Q.  My takeaway from that footnote is you have a
10 model that you could say here are the damages at a
11 particular point in time or you can carve out a window.
12 Is that correct?
13    A.  No. That footnote is referencing the exhibits
14 that I prepared. In particular exhibits 7A through 8B.
15 Which can be used as I describe in the footnote to
16 calculate damages through any year on this table.
17    Q.  Can you use your live model, Bates numbered
18 0014778, can you use that to look up what the damages
19 would be under your methodology but with a one-year
20 period of time?
21    A.  Beginning in which point in time?
22    Q.  Beginning 2022, with the --
23    A.  January?
24    Q.  When the branches leave in 2022 through 2023.

Page 98

1 So one-year period.
2    A.  Through end of 2023?
3    Q.  I guess I'm looking at can you calibrate it by
4 months.  So for example could you tell me what would the
5 damages be for the period of Daytona leaves in April, so
6 May of '22 to May of '23.
7          Are you able to tell me that?
8    A.  I can give you the numbers through the end of
9 year from my exhibits.  But in terms of using this to
10 calculate any more precise numbers than what's presented
11 here in Exhibit 7A through B, I would need time to do
12 that.
13    Q.  So is your 7A and B, let's go there.  7A.
14          For example, are you able to tell me
15 looking at 7A what the damages would be with a one year
16 period of time?
17          I mean I heard you just say maybe I can't
18 do it May to May, but I can do it May of '22 through the
19 end of '23.
20          So is that accurate?
21    A.  So yeah, the data in the DCF exhibits which are
22 7A through 8B are done through the end of each year.  So
23 I can't get as precise as you're asking me to.
24          The model can if we really had the time

Page 99

1 and I could sit down and do it right and check it and all
2 of that.  That's certainly possible.  But from this
3 exhibit, we can give you number through say the end of
4 2023.
5    Q.  You can tell me just to be clear, you could
6 tell me based on 7A of your report the damages estimate
7 if you used the different duration not out to 2031, but
8 rather through the duration of December 31, 2023.
9          Is that accurate?
10    A.  That's right.
11    Q.  What is the lost profits associated with the
12 Daytona branch if you used that duration of, that
13 duration ending at December 31, 2023?
14    A.  2023?  Footnote 35 describes how to do this.
15          And so the way that this could be done
16 through 2023 is that the row called present value, PV,
17 free cash flows to the firm?
18    Q.  I see it.
19    A.  Gives you discounted value of the profit figure
20 after taxes.  So you can add the .46 and the .87.
21    Q.  Now you lost me.  I'm looking at 7A.
22    A.  You asked for Daytona so you need to turn to
23 Exhibit 7B.
24    Q.  Continue.

Page 100

1    A.  So do you see that row present value of free
2 cash flow?
3    Q.  I do.
4    A.  The sum of .46, .87 gets you the present value
5 of free cash flows to the end of 2023.
6    Q.  So you would add the -- let's just do that.
7    MS. WALTER:  For the record, Miss Kreiter is using
8 her phone to calculate figures.
9    MS. KREITER:  I'm an attorney, I am using my
10 calculator.  I'm an attorney not -- so .46 plus .87 is
11 1.33.  Correct?
12    MS. WALTER:  You need a calculator?
13    THE WITNESS:  A  Yeah, I prefer to have one.  To
14 follow along if we are going to keep going with
15 calculations.  Also this doesn't take into account any
16 rounding.  To be clear.  .46 plus .87 is 1.33.
17    MS. KREITER:  Q  So this was in conjunction with
18 trying to understand what the damages would be not using
19 the full duration, but rather to the end of '23.
20          What would you do next?
21    A.  That's it.
22    Q.  So the damages are 1.33 million?
23    A.  That's correct.  Just through the end of 2023,
24 the present value for the Daytona branch.  We haven't

Page 101

1 done the Tampa branch.
2    Q.  Let's go back and do that, please.
3          Would you again turning to Exhibit 7A to
4 calculate the damages under your model, but with a
5 duration ending in December 31, 2023.
6          You would add the present value .38 for
7 '22 and the present value .95 for '23?
8    A.  Yes.
9    Q.  What does that come out to?
10    A.  1.33.
11    Q.  Are they for both of the branches it's
12 1.33 million?
13    A.  For Tampa, the two together I believe is 2.66,
14 adding up the four figures we just went over.
15    Q.  So Tampa is 1.33 and Daytona is --
16    A.  1.33.
17    Q.  Both of them are the same?
18    A.  Uh-huh, coincidentally, yes.
19    Q.  So 2.66 million total?
20    A.  Yes.
21    Q.  It's roughly 2 million less than in the
22 Gennarelli Model, correct?
23    A.  I don't remember what his exact number was, 4.4
24 perhaps.

Page 102

1    Q.  4.4 and change?
2    A.  So yeah, about 1.7.
3    Q.  Difference between your model with the same
4  duration and his model, correct?
5    A.  I don't know if it's the same duration.  If
6  it's covering the same time frame.  I don't recall.
7        I didn't really dig into his model like I
8  said.
9    Q.  If you assume his model also goes through the
10  end of '23, then it's the same duration but you have got
11  a delta between the two where you're saying the total
12  would be 2.66 and he's saying 4.4 and change?
13    MS. WALTER:  Object to form.
14    THE WITNESS:  A  But the difference between 4.4
15  and 2.66 is yes, about 1.74.
16    MS. KREITER: Q  Do you believe that 1.74 million
17  is a material difference?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A  Again I would describe this in
20  terms of dollars, not whether or not it's material.
21    MS. KREITER: Q  What number would make you say
22  this is material, maybe not 1.7, is there a number where
23  you would say look, I agree that's a material difference?
24    A.  Usually not how I would describe numbers to be

Page 103

1  completely fair.  If I have a number in front of me, I
2  describe it in terms of either in dollar values or you
3  can use a multiple.  80 percent more or whatever the
4  number is.
5    Q.  So let's look at what is the percentage
6  difference then between those two numbers.
7    A.  His is 4.4.
8    Q.  Correct.
9    A.  Looks like about 40 percent, the difference is
10  about 40 percent.
11    Q.  You're not willing to say that's material or
12  not, that's not how you would characterize the numbers?
13    A.  I'm not willing to say whether or not it's
14  material, correct.
15    Q.  You think it's nominal?
16    MS. WALTER:  Object to form.
17    THE WITNESS:  A  Again, I'm not willing to
18  describe it in those terms.
19    MS. KREITER: Q  Is there a way you could use your
20  Exhibit 7A and 7B to come up with a one year number?
21        So to be clear, that same methodology you
22  used, I want to shorten the term from 18 months to 12.
23  Is there a way you can do that?
24    A.  Not with precision, no.

Page 104

1    Q.  Is there a way you can do it with something
2  less than precision but maybe -- strike that.
3        How would you do it if you were to go
4  about changing the duration to one year?
5    A.  I would look at my spread sheet.
6    Q.  Bates number 14778.
7    A.  And do a calculation over the time period of
8  interest.
9    Q.  Are you able to tell me specifically what in
10  14778 you would show me, the tab or show me what you
11  would look to?
12    A.  It's the tab we were just looking at.
13    Q.  Why don't you come back and point it out to me.
14    A.  MON-loan volume.
15    Q.  Is this a matter of changing a number or is it
16  no, this would take me ten hours?
17    A.  It would take time and I need to have it
18  audited.
19    Q.  Suffice to say it's going to be less than 2.6?
20    MS. WALTER:  Object to form.
21    THE WITNESS:  A  If you're looking at a time
22  period within the time period we just went over, it will
23  yes, it will be less because we do have volume in all
24  months.

Page 105

1    MS. KREITER:  You indicated that you read the
2  deposition transcript for Jeff Gennarelli.
3    Q.  Did you read any other deposition transcripts?
4    A.  I do not believe so.
5    Q.  Are you aware of which Mutual representatives
6  have been deposed?
7    A.  No.
8    Q.  Did you read the deposition transcript of Brian
9  Tomalak or Kiley King?
10    A.  No.
11    Q.  Did you ask to see any additional deposition
12  transcripts?
13    A.  No.
14    Q.  Do you know who Brian Tomalak and Kiley King
15  are?
16    A.  No.
17    Q.  Do you know who Chris Layden is?
18    A.  No.
19    Q.  We talked about whether the math that you
20  ultimately used to project the estimates in the peer
21  model included the 2020 and 2021 time period.  I think
22  the answer is no, you maybe considered it but you
23  ultimately did the math based on the April '22 period.
24        What about the MBA methodology, does that

27 (Pages 102 - 105)

Page 106

1 methodology factor in the 2020 and 2021 time period?
2    A.  It does not.  It's very similar to the monthly
3 peer-based model.  But MBA data is expressed quarterly,
4 so I have done the data analysis quarterly.
5    Q.  So was there a particular quarter that you used
6 to do the math to then project the damages out into the
7 future, akin to you used April '22.
8       Is there a particular quarter you used for
9 the MBA model?
10    A.  Yes.
11    Q.  What is that quarter?
12    A.  I will have to look at my report.
13    Q.  Great.
14    A.  Paragraph 26.
15    Q.  Okay, I'm at paragraph 26.
16    A.  Quarter 1-2022.
17    Q.  Why did you select that quarter?
18    A.  The last quarter of full loan sales.
19    Q.  We looked earlier at the two peaks with respect
20 to the Daytona branch?
21    MS. WALTER:  You referring to this exhibit?
22    MS. KREITER:  Q  We were looking at Exhibit 3 when
23 we were looking at those peaks?
24    THE WITNESS:  A  Those are monthly.

Page 107

1    Q.  The MBA model factor in the performance of
2 these particular branches or is it separate?
3    A.  I don't think I understand the question.
4    Q.  Sure.  Maybe let's start with which of the
5 exhibits reflects the MBA model approach?
6    A.  Exhibit 4, Exhibit 5 would be a good place to
7 start for those two.
8    Q.  You said you looked at the last or you looked
9 at Q1 of 2022?
10    A.  Correct.
11    Q.  In Q1 of 2022, isn't it the case that the
12 Daytona branch was having a peak in its performance?
13    A.  If you look at Exhibit 5, Q1 2022 is the last
14 data point on that line, so it's not the peak.
15    Q.  Okay.  Maybe I'm confused about when this peak
16 occurs.  Is that -- there's two peaks for Daytona.
17       When does the first peak occur and when
18 does the second peak occur?
19    A.  Looks like there's a peak at Q4 2021.  And Q1
20 2021.  For Daytona, the orange line.
21    Q.  So that second peak relates back to Q4 of 2021,
22 not Q1 of 2022, correct?
23    A.  Correct.
24    Q.  Is there anything from the data that you

Page 108

1 gathered regarding the volume of loans closing at these
2 branches that would indicate the employees were not
3 making efforts to close loans for Mutual prior to their
4 resignation?
5    A.  I didn't evaluate that.
6    Q.  The Daytona branch employees resigned in April
7 of 2022.  Correct?
8    A.  I don't know what the exact resignation date
9 is.  But the complaint mentions April 2022 as when the
10 departures began.
11    Q.  Is there anything about the -- so the volume in
12 April of 2022 for the Daytona branch was 13.5 million.
13       Is that low for the Daytona branch?
14    A.  Lower than the prior month, so it's possible
15 that my model is conservative because I'm not capturing a
16 portion of the latter part of the month after the
17 employees had departed.
18    Q.  But there's also a peak in 2021 and then it
19 drops off in April 2021 time period, correct, looking at
20 Exhibit 3 now.  You see there's a peak?
21    A.  Yeah, I see a peak.
22    Q.  Then after that peak it drops off.  Generally
23 the spring time period that occurs in Spring of 2022 as
24 well, correct?

Page 109

1    A.  Yes.  There's two data points that appear to be
2 peaks that we observe in that data.  But we observe other
3 springs and so.  Yeah.
4    Q.  Why did you choose to exclude 2020 and 2021
5 from your analysis?
6    A.  I consider those time periods.  My analysis
7 again is based off of the monthly data based of off
8 April 2022 and the quarterly model is based off of Q1
9 2022, but under both models I do consider the full
10 history of data.
11    Q.  I'm not asking about things you considered.
12 I'm asking about your calculation now.  I want to make
13 sure that we are clear about that.
14       I understand you have the data.  But do
15 you believe that it would be appropriate to do the math,
16 estimate lost profits based on data from anomalous years?
17    A.  It depends on how the model is structured.
18 Earlier in the deposition I gave an example of using a
19 regression analysis in applying a dummy variable in the
20 model to try to account for those issues.
21    Q.  Okay.  But you don't have any evidence to
22 indicate that the Gennarelli Model does a regression
23 analysis or uses dummy variables, correct?
24    MS. WALTER:  Object to form.

28 (Pages 106 - 109)

Page 110

1     THE WITNESS:  A  I haven't looked at that model in
2  detail.
3     MS. KREITER:  Q  So I asked you if you have reason
4  to believe that he does.  Sounds look you don't know
5  either way?
6     A.  No, no.
7     Q.  Did you factor in to your analysis the earnings
8  of the Forward Division that housed the branches at
9  issue?
10    A.  To clarify, are you talking about branch
11  earnings?
12    Q.  Let me ask it this way:  Are you aware that the
13  Forward Division of Mutual of Omaha during the June 2022
14  period became unprofitable?
15    A.  I believe so, yes.
16    Q.  Did you review any documents related to the
17  financial performance of the Forward Division over the
18  period of time between June of 2022 through the present?
19    A.  I recall a few documents on it, yes.
20    Q.  In general was the Forward Division profits
21  improving or decreasing during the let's say July '22
22  through the present time period?
23    A.  I don't recall, but that's after the closure of
24  these two branches.  So it's possible that that could

Page 111

1  have an impact.
2     Q.  Did you have any discussion with anyone at
3  Mutual about whether Mutual on the corporate level is
4  more profitable now than it was in prior years, namely
5  2020 and 2021?
6     A.  Don't recall the analysis at the corporate
7  level at that detail.
8     Q.  Are you aware that Mutual was, at the corporate
9  level was not meeting its budget expectation for year
10  2022 or 2023?
11    A.  That sounds like generally what I recall, but I
12  didn't look to -- I can't recall the details of that.
13    Q.  Would it surprise you to learn that Mutual at
14  the corporate level was performing in a way that was
15  negative to its budget for the time period that I've
16  referenced, June 2022 to the present?
17    A.  I wouldn't necessarily be surprised to see
18  after the closure of the two branches and over the course
19  of business operations fall into deficit relative to
20  budget and sometimes better than budget, so I wouldn't be
21  surprised per se.
22    Q.  Well the branches leave in 2022.  So for 2023
23  it's known that the branches aren't going to be part of
24  Mutual.  Correct?

Page 112

1     A.  Correct.
2     Q.  Do you have an understanding how Mutual at the
3  corporate level has performed relative to its 2023 budget
4  when it was known that the branches would not be part of
5  the company?
6     A.  I think I would want to look closely at that
7  because sometimes depends on the date that the
8  projections were made.  If the date of the projection was
9  prior to the branch closure, that certainly matters.
10  Even though we are talking about a year that's well into
11  the future.
12       So I don't think I have enough information
13  to answer that question.
14    Q.  Well goes to the scope of your diligence.
15       Did you do any diligence in terms of the
16  profitability of Mutual of Omaha as a corporate entity in
17  conjunction with your damages model and if so, what did
18  you do?
19    MS. WALTER:  Object to form.
20    THE WITNESS:  A  I reviewed the corporate
21  documents I recall.
22    MS. KREITER:  Q  What corporate documents are you
23  talking about?
24    A.  I recall the forecast e-mail that I believe was

Page 113

1  referenced in the deposition.  But again, this is outside
2  the scope of what I was asked to do.
3     Q.  But that's what I'm trying to get at.  I'm
4  trying to understand the level of diligence you did and
5  all the steps you undertook in conjunction with your
6  analysis.  If you tell me that considering the
7  profitability of Mutual as a corporation was not part of
8  it, so be it.  But I want to make sure that's on the
9  record if that's the case.
10       Is that the case?
11    A.  Like I said, I have seen the profitability
12  forecasts and I have read about them in the deposition
13  transcript that I reviewed and e-mails that were
14  presented as exhibits to that deposition.  And those are
15  irrelevant to my model.
16    Q.  Why do you say that?
17    A.  Because I'm looking at the profit from Daytona
18  and Tampa branches only.  So I don't have, it's not
19  within my scope of my project to look at all of the
20  branches to determine the extent to which each
21  contributes to the bottom line of Mutual of Omaha
22  Mortgage as a corporation.
23    Q.  So in addition to looking at documents that
24  were referenced in conjunction with depositions, did you

Page 114

1  do anything else to vet the profitability of Mutual as a
2  corporation?
3      A.  I don't think I would call it vetting the
4  profitability.  But I reviewed the tax returns, statutory
5  financials that are listed in Appendix A.  I can't recite
6  exactly what the numbers are, but I did review them.
7      Q.  On a corporate level are Mutual's profits
8  trending up or down for 2023?
9      A.  I don't recall.  I don't recall.  I'd have to
10  look.
11      Q.  What about for the second half of 2022 on a
12  corporate level, were Mutual's profits trending up or
13  down?
14      MS. WALTER:  Object to form.
15      THE WITNESS:  A  I don't recall.
16      MS. KREITER:  Q  Is that something that you looked
17  at?
18      A.  Yes, like I said.
19      Q.  But you can't say either way?
20      A.  Well --
21      MS. WALTER:  Object to form.
22      THE WITNESS:  A  I can't off of memory.  I can
23  look back and tell you.  The bottom line as it relates to
24  my analysis is that that doesn't matter.

Page 115

1      MS. KREITER:  Q  The corporate profitability of
2  Mutual doesn't matter for purposes of your analysis?
3      A.  To my analysis, it would not -- no, it does
4  not.
5      Q.  Okay.  You mentioned that you looked at some
6  documents that were referenced in prior depositions.
7  Take a look at Gennarelli Exhibit 14, please.
8      Is that one of the documents that you have
9  previously analyzed?
10      A.  Yes, I have seen this.
11      Q.  You said you have seen it.
12      Is it something that you studied or it was just
13  something given to you?
14      A.  I recall looking at this as well as it
15  obviously being produced, given to me.
16      Q.  Let's take for example do you see the column
17  that says Forward Division.  The second column from the
18  left in blue?
19      A.  Yes.
20      Q.  Then so June year to date 2022 forecast, total
21  revenue 151 million.  You see that?
22      A.  In the Forward Division?
23      Q.  Correct?
24      A.  For total revenue?

Page 116

1      Q.  Correct.
2      A.  151, yes.
3      Q.  Then for 2023 it's 134.583 million.
4      Do you see that?
5      A.  Yes.
6      Q.  Do you know whether the reality is that the
7  plan for 2023 with respect to the Forward Division, do
8  you know whether the revenue has actually risen to the
9  level of 134 million?
10      A.  At the corporate level, I don't know, no.
11      Q.  When you say you analyzed Gennarelli
12  Exhibit 14, in what manner did you analyze it?
13      A.  I looked at it.
14      Q.  Did you do anything besides look at it?
15      A.  I didn't use this beyond thinking about it and
16  looking at it here.
17      Q.  How many branches are in the Forward Division
18  of Mutual?
19      A.  Are you trying to look at Exhibit 14, do you
20  know how many forward branches there are?
21      Q.  How many branches are in the Forward Division
22  of Mutual?
23      A.  I know that it's -- I don't know the exact
24  number.  Obviously it's greater than four because I

Page 117

1  looked at four forward branches, the data.  The, I
2  believe it's in the few dozen.  I don't know the exact
3  number.
4      Q.  What percentage of Mutual's forward business
5  did the Tampa branch make up?
6      MS. WALTER:  Object to form.
7      THE WITNESS:  A  I would need to do the
8  calculations but top of my head, I believe that the two
9  together are somewhere around nine percent.  I can do the
10  calculation if we need to.
11      MS. KREITER:  Q  I think you indicated that the
12  corporate level profitability of Mutual doesn't bear on
13  your analysis, is that accurate?
14      A.  So whether it's profitable relative to
15  expectations does not.
16      Q.  Did you use corporate level information when
17  you were determining the weighted average cost of
18  capital?
19      A.  Yes.
20      Q.  What corporate level information did you use
21  for that weighted average cost of capital determination?
22      A.  So I used several sources of data that are
23  publicly available, at least available through
24  subscription; Bloomberg.  That wasn't actually produced

Page 118

1  by Mutual of Omaha.
2      Q.  So I want to be clear.  Your weighted average
3  cost of capital determination was based on data specific
4  to Mutual or industry data?
5      A.  It's Mutual of Omaha Mortgage weighted average
6  cost of capital that I calculated using various sources
7  as described in detail in my report.
8      Q.  Okay.  I understand you're trying to get at a
9  weighted average cost of capital that could be applied in
10  this case where Mutual is the plaintiff.
11          But did you use any information specific
12  to Mutual in order to determine what the weighted average
13  cost of capital should be?
14      A.  So do you mind if I look through that section
15  of my report, I can give you specifics.
16          So page 12, it's a complicated answer, I
17  can't just give you a one-word answer.
18      MS. KREITER:  Could you just read back the
19  question.  So we have it top in mind.
20      (Record read as requested)
21      THE WITNESS:  A  I'm refreshing myself on the
22  exact sources.  Footnote six to my Exhibit 10, I'm using
23  the effective tax rate for Mutual of Omaha Mortgage.
24      MS. KREITER:  Q  Okay.  Exhibit 10, footnote six.

Page 119

1  I guess my question is it sounds like you used the
2  information specific to Mutual corporate for purposes of
3  the weighted average cost of capital.
4          Why didn't you use information specific to
5  the branches for that purpose?
6      A.  I am measuring the profits generated from the
7  branches that go to Mutual of Omaha Mortgage.  So the
8  appropriate discount rate to use is the Mutual of Omaha
9  Mortgage WACC rate.
10      Q.  Do you agree that -- I mean the branches are
11  run by the managers.  You comment in your report that
12  they are fairly independent.  They cover their own costs.
13          Was the branches being run at the branch
14  level not the corporate, do you view the branches as
15  essentially a small business within Mutual?
16      A.  I don't know that I would characterize it as a
17  small business within Mutual.
18      Q.  Whose business do you think these branches are,
19  is it the business of the managers who are running the
20  branches or is it the business of Mutual?
21      A.  I think that they are both, the answer is both
22  to a different degree.
23      Q.  Let me ask you this question:  Why did you
24  decide to use a business evaluation method to estimate

Page 120

1  the lost profits in this case?
2      A.  Well I'm valuing the lost profits from the
3  closure of the business.  So.
4      Q.  In what manner -- or strike that.
5          Why do you think the branches are a
6  business that belongs to Mutual of Omaha?
7      A.  These are Mutual of Omaha branches.  I don't
8  quite understand.
9      Q.  Did Mutual of Omaha do anything to bring the
10  branch employees besides the managers into the
11  corporation?
12      A.  I don't have the answer to that.
13      Q.  Is anybody from Mutual corporate actually
14  bringing customers into the branches?
15      A.  I don't know.
16      Q.  I want you to assume that Mr. Smith has been
17  working with a number of the employees in his branch for
18  a number of years.  Even before he and the other
19  employees were employees of Mutual.
20          Does that change whether you view this
21  business that you're evaluating as a business of Mutual
22  versus a business of Mr. Smith?
23      A.  No.
24      Q.  Do you understand that Mr. Smith and Mr. Hutto

Page 121

1  control the leases for the office space?
2      MS. WALTER:  Objection.
3      THE WITNESS:  A  I believe I recall seeing that,
4  yes.
5      MS. KREITER:  Q  How long has Mr. Hutto been
6  working with the individuals at the Daytona branch in
7  that same office space?
8      A.  I don't know.  I can look back at his
9  employment history to get the date.
10      Q.  Do you know whether he was working at that
11  branch location with those same people prior to being
12  employed at Mutual?
13      A.  I don't know.  I don't know the answer to that.
14      Q.  If you assume that Mr. Smith was working at the
15  Tampa office location with the same people for the last
16  10 years, does that change your view about whether this
17  is Mutual's business or his business?
18      A.  Not for the purpose of this analysis, no it
19  does not.
20      Q.  I want you to take a look at what we previously
21  marked as Gennarelli Exhibit 12, please.
22          Did you review this document prior to
23  today?
24      A.  I have seen this document, yes.

31 (Pages 118 - 121)

Page 122

1  Q.  What is it?

2  A.  It's an e-mail that I believe was produced in

3 the Gennarelli deposition.

4  Q.  The information contained in Gennarelli

5 Deposition Exhibit 12 and specifically the information

6 related to the pretax earnings and the year-to-date

7 earnings associated with the Forward Division, did you

8 factor in any of this data into your analysis?

9  A.  This appears to be corporate level information.

10 And oh, yeah.  They reference that two good groups left

11 over the past 45 days, Tampa and Daytona.

12  I believe it is corporate level

13 information with reference to the two branches as being a

14 negative for corporate.  Other than that, it didn't

15 factor into my analysis, no.

16  Q.  I had directed you specifically to the Forward

17 Division earnings information.

18  Did any of the information in Exhibit 12

19 factor into your analysis in any way?

20  A.  So my review here, I believe all of this is

21 corporate level information.  Exception of the two

22 sentences on Tampa and Daytona.  So with the exception of

23 that, I did not factor into my analysis.

24  Q.  Are you using corporate level information for

Page 123

1 the weighted average cost of capital but not corporate

2 level information for other purposes?

3  A.  I'm using information about the capital

4 structure.

5  Q.  At the corporate level though?

6  A.  Yes.

7  Q.  But for purposes of projecting the volume, you

8 did not use any information relative to the corporate

9 level performance?

10  A.  That's correct.

11  Q.  Why is it that you look at the branch level for

12 one and corporate level for another purpose?

13  A.  The projections are based off of branch level

14 projections and the free cash flow estimated from the

15 lost profits model is at the branch level as well.

16  Q.  Are you able to explain the difference between

17 the 4.4 million that Gennarelli presented and the 28

18 million that you are estimating?

19  A.  Can you repeat the question, please.

20  Q.  Are you able to explain the difference between

21 Gennarelli's model which resulted in a demand of

22 4.4 million, and your estimate at 28 million?

23  A.  They are very different as far as I can see.  I

24 don't know what --

Page 124

1  Q.  When you say very different, in what ways are

2 the analyses very different?

3  A.  I'm using a forecasting model based off of peer

4 branches as well as off of national MBA data.  I don't

5 believe that was relied upon in the other model.

6  Q.  Any other differences?

7  A.  I believe I'm -- look back.

8  I believe this estimate is conducted for

9 an 18-month window.

10  Q.  Which?

11  A.  The 4.4 million.  Just looking back at

12 Exhibit 7 here.

13  Q.  So the Gennarelli Model is different from yours

14 in that it used, finish your thought.

15  A.  This is based off of an 18-month window,

16 July 2022 to December 31, 2022.

17  Q.  Is it accurate to say your analysis has nothing

18 to do with the Gennarelli analysis, correct?

19  A.  That's correct.  My analysis is an independent

20 analysis.

21  Q.  You indicated that you were retained sometime

22 in the June time frame.

23  When did you actually start doing work on

24 the matter?

Page 125

1  A.  Within a few days.

2  MS. KREITER:  I could use a two-minute break.

3  (Lunch recess)

4  MS. KREITER:  Q  Did you write the report for this

5 Exhibit 30 yourself or did others in your office assist

6 with authoring the report?

7  THE WITNESS:  A  I wrote the report and others

8 reviewed it and added at my direction.

9  Q.  Who are the others?

10  A.  Jeremy Marmer.

11  Q.  Spell?

12  A.  M-A-R-M-E-R, and Gabriel Ratliff,

13 R-A-T-L-I-F-F.

14  Q.  Start with Mr. Marmer.  Is Mr. Marmer junior to

15 you or senior to you?

16  A.  I suppose he's junior to me.

17  Q.  What about Mr. Ratliff?

18  A.  Yes.

19  Q.  Yes he's junior to you?

20  A.  Yes, in title.

21  Q.  How much time approximately did Mr. Ratliff put

22 in in the report?

23  A.  I don't know, I need to look back at the

24 invoices.  So I'd say my estimate is somewhere around

Page 126

1  20 hours or so.
2      Q.  What about Mr. Marmer?
3      A.  Probably quite a bit less than that.
4      Q.  Do you have an estimate of how many hours you
5  put into the report?
6      A.  I don't.  I want to say somewhere maybe 40 -- I
7  don't recall but I can find out.
8      Q.  Okay.  So you indicated that you had had the
9  report reviewed by Mr. Ratliff and Mr. Marmer in some
10 fashion?
11     A.  Yes.
12     Q.  Why were you having them review the report?
13     A.  Review and add citations, things that I would
14 need assistance with.
15     Q.  Did Mr. Marmer have a different role than
16 Mr. Ratliff?
17     A.  Yeah, I think different tasks, yeah.
18     Q.  What was the different tasks?
19     A.  Jeremy looked at my model, he reviewed the
20 model.
21     Q.  Who did?
22     A.  Jeremy Marmer, Mr. Marmer.  He reviewed the
23 model, he reviewed some specific citations in the
24 complaint.

Page 127

1          I believe he gave my report just a review
2  to make sure that the exhibits line up with the,
3  reference to the exhibit lines up with the exhibit
4  itself.  Some clerical work like that he helped with.
5          And Gabriel Ratliff helped with the
6  modeling as well he helped me at my direction gather
7  information about the WACC rate, the discount rate.
8  Helped with the gathering the tax information that I
9  requested.
10     Q.  Anyone else besides the three of you who worked
11 on the report?
12     A.  It's just the three of us primarily.  There may
13 have been another research analyst who did some audits of
14 the data as well.
15     Q.  Did any of you do any independent research as
16 to whether it was the brand -- we talked earlier about
17 what is the branch.  You said it's part of the brand and
18 reputation of Mutual of Omaha and part of the employees.
19          Did you or anyone on the team that was
20 preparing the report do any independent research as to
21 whether it was the brand that drive the revenue over time
22 versus the employees that drive the revenue?
23     A.  No.
24     Q.  Why not?

Page 128

1      A.  Well that's not something that I was, within
2  the scope of my analysis to look at the brand value.
3  That's a different analysis.
4      Q.  I mean I understood you to say I'm assuming
5  that this loan volume and production is going to continue
6  into the future and that's independent of whether these
7  particular employees stay.
8          Trying to understand why you think that
9  and what is the driving force behind the revenue if it's
10 not the employees.
11     A.  So the branches remaining open compared to the
12 branches being closed is the first thing that I
13 considered.
14     Q.  Stop right there.  What do you mean the
15 branches staying open?
16     A.  The branch remaining open.
17     Q.  The physical location?
18     A.  Yes, with some of the employees there or all of
19 the employees there.
20     Q.  Is it your testimony that the revenue stream is
21 going to continue at a consistent pace regardless of the
22 composition of the employees at the branch?
23     A.  Yes.
24     Q.  Did you do any research to validate whether

Page 129

1  that was a reasonable assumption?
2      MS. WALTER:  Object to form.
3      THE WITNESS:  A  Yes, we looked at branch
4  longevity and considered the market in Florida and looked
5  at loan projections and considered all those facts
6  together.
7      MS. KREITER:  Q  Did you consider whether there
8  are particular employees at each of the branches that are
9  large volume producers?
10     A.  Yeah.  We talked about that.  And I believe in
11 the Oscher Report, he estimates what portion of loan
12 volume each of those managers is sort of responsible for.
13     Q.  So I want you to assume for example that
14 50 percent of the Daytona volume is driven by Dwayne
15 Hutto.
16     A.  Okay.
17     Q.  If Dwayne Hutto decides to leave the branch, do
18 you have reason to believe that Mutual could easily get
19 another employee to fill Dwayne Hutto's volume?
20     MS. WALTER:  Object to form.
21     THE WITNESS:  A  I don't have the answer to
22 whether they could hire, who they would hire.
23     MS. KREITER:  Q  Did you consider that as a risk
24 factor when you were doing your damages analysis, the

33 (Pages 126 - 129)

Page 130

1  possibility that the loan volume is specific to
2  particular employees?
3      A.  We considered that, yes, I considered that.
4      Q.  Did you factor it in from a risk perspective?
5      A.  I'm not quite sure I understand what you mean
6  from a risk perspective.
7      Q.  Sure.  I'm trying to understand you're assuming
8  that the loan volume is the same even if Dwayne Hutto
9  quits.  Is that correct?
10     A.  Well it's more complicated than that.  I'm not
11 assuming that it's a, that the loan volume is going to
12 stay at a consistent level.
13         My loan volume tracks downward for several
14 months and quarters over this projection period relative
15 to what we observe from the other branches and from the
16 MBA data.  So looking at loan production, I'm not
17 assuming that the levels remain the same.
18     Q.  Do you attribute the loan production to the
19 people or to other components of Mutual?
20     A.  It's to the branch.  I attribute it to the
21 branch.
22     Q.  This again goes back to how we define a branch.
23 Is the branch the people and what part of the branch is
24 driving the revenue.

Page 131

1          If you have a empty building with no
2  people in it, you're not going to have any revenue,
3  agreed?
4      MS. WALTER:  Object to form.
5      THE WITNESS:  A  Yes, and when everybody at the
6  branch leaves you no longer have a branch.
7      MS. KREITER:  Q  Right.  What facts are you
8  relying on to assume that the employees of the branch are
9  going to stay at the branch for any period of time?
10     A.  So looking at individual employee, again it
11 doesn't factor into my model.  But if you were to -- if
12 you're asking me if I can predict which employees will
13 stay or leave and when they will leave, I can't predict
14 that.
15     Q.  Are you able to say to a reasonable degree of
16 certainty that the employees at the Tampa and Daytona
17 branches would have stayed with Mutual for any particular
18 amount of time?
19     MS. WALTER:  Object to form.
20     THE WITNESS:  A  I don't have an opinion on that.
21 I can't get inside their minds on that type of decision.
22     MS. KREITER:  Q  So no?
23 A.  Correct.
24     Q.  You stated in paragraph three of your report

Page 132

1  and you're referencing Steve Oscher's report, you state
2  second, he opines that no valuation is possible regarding
3  the closing branch offices.
4      A.  Okay.
5      Q.  I want to know what in Mr. Oscher's report
6  supports that statement.  Before we get to his report, I
7  want to make sure I understand your statement he opines
8  that no valuation is possible regarding the closing of
9  the branches.
10         Is it your belief that the Oscher Report
11 concludes no valuation is possible regarding the closing
12 of the branch offices?
13     A.  That's how his report is set up, yes.
14     Q.  I want you to point me to the words in
15 Mr. Oscher's report in which he states lost profits and
16 lost business associated with the closure of the Tampa
17 and Daytona branches -- sorry, I'm in the wrong place.
18         Point me to the words in Mr. Oscher's
19 report in which he opines that no valuation is possible
20 regarding the closing of the branch offices?
21     A.  So my first observation is that it's implied.
22 He doesn't offer a damage valuation in this report.
23     Q.  Correct.  He doesn't offer one but where does
24 he say that no valuation is possible?

Page 133

1      A.  That's just my first observation.
2      Q.  It's not stated in his report?
3      MS. WALTER:  She's answering the question.
4      THE WITNESS:  If I could have just a moment to
5  review his report, the section.
6      MS. KREITER:  Sure.
7      THE WITNESS:  A  He says that the data, page ten,
8  the demand reflected cannot, he says that it's
9  unsupported and cannot be verified or tested.  He says he
10 can't.
11     MS. KREITER:  Q  You're on page ten?
12     A.  Yes, the first full paragraph starts with the
13 word without.  Without the supporting documentation
14 relied upon by Mutual, the demand reflected in the
15 document ending in 3484 is unsupported and cannot be
16 verified or tested.
17         So he said that -- here that he can't do
18 this analysis based on the absence of data.
19     Q.  Well he's referring to the demand reflected in
20 Mutual of Omaha Bates number 3484.
21         Do you know what that document is?
22     A.  Is that the document that we went over earlier
23 today?
24     Q.  I'm asking you do you know what it is?

Page 134

1  A. I don't know. I think it might be Exhibit 7 we
2 went over today.
3  Q. The Gennarelli Model?
4  A. Yeah, I will continue reading here.
5     Gives a lot of arguments for not
6 calculating damages, including this next paragraph he's
7 talking about the non solicit agreement.
8  Q. Sure. Does he say anywhere that no valuation
9 is possible regarding the closed branch offices?
10  A. He says the Gennarelli Model is unsupported.
11 And cannot be verified and tested.
12  Q. There's a difference in my mind between the
13 Gennarelli Model is insufficient and nobody could ever do
14 this.
15  MS. WALTER: Object to form.
16  THE WITNESS: A It's implied in this section. He
17 doesn't say this verbatim, which is why I don't have it
18 in quotes in my report.
19     But he says that the data cannot be
20 verified or tested. He gives a lot of reasons for not
21 calculating damages, including that suggesting that the
22 volumes attributable to the managers shouldn't be
23 considered, that there's non solicit periods.
24  MS. KREITER: Q Do you understand that Mr. Oscher

Page 135

1 analyzed the Gennarelli damages model?
2  A. Yes.
3  Q. You did not analyze the Gennarelli damages
4 model so how is your opinion -- let me start a different
5 way.
6     In what manner does your report rebut
7 portions of the Oscher Report, which is focused on the
8 Gennarelli Model?
9  MS. WALTER: Object to form.
10  THE WITNESS: A It is answering, it's answering
11 the same question that Oscher is focused on in his
12 report.
13  MS. KREITER: Q What question is that, I'm not
14 clear.
15  A. The evaluation of these two branches.
16  Q. But Mr. Oscher doesn't try to value the
17 branches, he simply says the Gennarelli Model is
18 insufficient?
19  A. Uh-huh.
20  Q. Agreed?
21  A. Well he's talking about the, he says a lot of
22 things.
23  Q. So tell me what language in the Oscher Report
24 do you believe that your report rebuts?

Page 136

1  MS. WALTER: Object to form.
2  MS. KREITER: Let the record reflect the witness is
3 paging through the Oscher Report.
4  THE WITNESS: A So my report rebuts damages
5 Category 2 of the Oscher Report.
6  MS. KREITER: My question, I want to make sure
7 you're answering my question and not something else.
8  Q. My question was where is the language in the
9 Oscher Report that your analysis rebuts?
10  MS. WALTER: Object to form, she's answering that.
11  THE WITNESS: A Yes. My report rebuts damages
12 Category 2, the closing of the branch offices in Tampa
13 and Daytona. Implied in the Oscher Report is that there
14 are no damages here that he presents.
15  MS. KREITER: Q Does who present?
16  A. He does not present damages.
17  Q. Mr. Oscher doesn't present damages, correct?
18  A. He's implying, he gives a whole host of reasons
19 for why calculating damages would be wrong.
20  Q. Where are the words you're talking about
21 because he's not talking about in my mind an
22 impossibility in general, he's talking about the damages
23 presented by Gennarelli and he's commenting that they are
24 unsupported.

Page 137

1     Are there words in the Oscher Report in
2 which he says nobody can ever possibly calculate damages?
3  MS. WALTER: Object to form.
4  MS. KREITER: Q For the branch closing?
5  THE WITNESS: A He ends his section to damages --
6  Q. Where are you?
7  A. Page 12. Just by comparing forecast.
8  Q. Specifically where are you?
9  A. Page 12, the chart. He just kind of ends the
10 section pointing out that the forecast is -- he's
11 implying it's incorrect because look, it's a departure
12 from this MBA forecast.
13     So my report directly rebuts this by using
14 the same data even to present a forecast for Mutual
15 that's based on the MBA data.
16  Q. Is there any other manner in which you believe
17 that your report rebuts statements by Mr. Oscher besides
18 the paragraph that you've identified and the chart on
19 page 12 where Mr. Oscher is talking about the MBA data?
20  A. Yeah. He makes several statements for example
21 on page ten.
22  Q. Where are you?
23  A. The last paragraph. Mutual's inclusion of
24 volumes of loans attributable to the branch managers is

Page 138

1  without foundation, et cetera.
2      Q.  Stop there.  Mutual's inclusion of volumes of
3  loans attributable to the three branch managers Dwayne
4  Hutto, Chris Smith and Christopher Wolf, collectively the
5  branch managers, who left Mutual to work for Waterstone,
6  is without foundation as Mr. Gennarelli acknowledged
7  there's nothing unlawful about Waterstone recruiting
8  branch managers.
9          In what manner does your report rebut that
10 paragraph?
11     A.  The next paragraph, let's read that, too.
12     Q.  To the extent the trier of fact determines that
13 the defendant's recruitment of Messrs. Hutto, Smith and
14 Wolf should be considered, the loan volumes produced by
15 these three branch managers should not be included in the
16 damage calculation.
17     A.  My model directly rebuts that because I'm
18 including all of the loan volume in my consideration of
19 the model.  And again, Oscher stops there.  He doesn't go
20 forward and put out a number.  Had he, I could be able to
21 tell you exactly what his number is compared to mine.
22         What he's doing is building up his case
23 and then not providing any number.  That doesn't mean
24 that I can't calculate the number and make these

Page 139

1  assumptions that directly rebut his implied analysis
2  here.
3      Q.  So it's an implied analysis?
4      A.  This is the way that he's phrased this, to the
5  extent that the loan volumes produced by these branch
6  managers should not be included in the damages
7  calculation.
8      Q.  Did Mr. Oscher calculate any amount of damages
9  with respect to Category 2?
10     MS. WALTER:  Object to form.
11     THE WITNESS:  Does he calculate damages.  Let me
12 review.  I believe the answer is no.
13     MS. KREITER:  Let the record reflect the witness is
14 now paging through Mr. Oscher's report.
15     THE WITNESS:  A  I was reading carefully
16 footnote 10 to make sure there's no damages calculation
17 that snuck in.
18         He says that Oscher used Mutual's Category
19 No. 2 methodology to estimate what Mutual might claim if
20 it had calculated damages for Category 1.  But does not
21 credit Mutual's Category 2 methodology.
22         Not quite sure what he means by that.  But
23 I don't believe that's a damages estimate for damages
24 Category 2.  I want to be careful and read this again,

Page 140

1  which is why I am taking a moment to do so.  So I can
2  answer your question.
3      Q.  Footnote 10 relates to a portion of the report
4  prior to the subheading that kicks off discussion of
5  damage Category 2.
6          Do you see that?
7      A.  Yes.  It references damages Category 2
8  methodology.  Seems like he's using it for 1 but not
9  for 2.  Again there's a lot of evidence where he gives a
10 lot of reasons for not calculating damages, for damages
11 Category 2, which is totally rebutted by my report.
12     Q.  My question was did Mr. Oscher calculate
13 damages for Category 2, yes or no?
14     A.  He does not say that he calculates them in
15 damages Category 2, that section.  I just wanted to make
16 sure the footnotes aren't hiding something.
17     Q.  Do you believe the footnotes are hiding a
18 calculation of damages Category 2 by Mr. Oscher?
19     MS. WALTER:  Object to form.
20     THE WITNESS:  Not on my review.  I just wanted
21 to read footnote 10 very carefully.
22     MS. KREITER:  Let's talk about your analysis that
23 is the peer month to month analysis.
24         My understanding is that you identified

Page 141

1  two branch offices at Mutual, Saint Louis branch and
2  Maryland branch, and you believe those branches are peer
3  branches representative of the Tampa and Daytona
4  branches.
5      Q.  Is that accurate?
6      A.  They have structural and data coverage
7  resemblance to Tampa and Daytona.  As I describe in
8  footnote 20.
9      Q.  I'm just trying to understand, get a baseline
10 here.  The branches you identified as peer branches for
11 purposes of your Category 2 damages analysis is the Saint
12 Louis and Maryland branches, correct?
13     A.  Those are the two branches I'm using, yes.
14     Q.  Why did you believe that the Saint Louis and
15 the Maryland branches were peer branches that should be
16 used in your analysis?
17     A.  Because they exhibit similarities to Tampa and
18 Daytona in terms of their structural and data coverage.
19         So to be, to add more to that, all four
20 branches operate under the P&L model.  Meaning that MOM
21 charges them a portion of loan sales, they otherwise
22 operate independently in other aspects.
23         Also importantly for my modeling, all four
24 of these branches had productivity and loan volume

Page 142

1 production over the full time period 2019 to 2022. That
2 was important for my extrapolation model.
3    Q.  So if I'm understanding, there's two criteria
4 that you use to identify these peer branches; one is
5 structural similarity, both of the Saint Louis and
6 Maryland branches use the P&L model, and then they had
7 productivity over that same time period, correct?
8    A.  Yeah, similar mix of loans, forward loans.
9    Q.  How common is it for a branch office of Mutual
10 to operate using a P&L model?
11       MS. WALTER:  Object to form.
12       THE WITNESS:  A  I believe it's fairly common.  I
13 think this maybe came up in a call, maybe about
14 50 percent of the branches are operating under that
15 model.
16    MS. KREITER:  Q  Again you might have said, but
17 how many branches does Mutual have?
18    A.  I don't have the answer to that.  I don't know
19 the exact number.
20    Q.  Is it more than ten?
21    A.  Yes.
22    Q.  Is it more than 50?
23    A.  I don't know.  It could be close to that
24 number.

Page 143

1    Q.  Assume for purposes of this discussion, I won't
2 hold you to it, assume it's 50.
3       So approximately 50 percent, that's 25 of
4 the branches have a P&L model, 25 don't?
5    A.  Uh-huh.
6    Q.  That's still a large number of branches.
7       So then you narrowed it down from that
8 group that were operating on a P&L model based on whether
9 they were in operation during the 2019 to '22 time
10 period?
11    A.  Yeah, that's a key component.
12    Q.  How many of the branches out of the world of
13 Mutual branches that exist, satisfy both of those
14 criteria?
15    A.  I don't know.  But it would be less than sort
16 of this 25 number that we are working with.  Because we
17 would need to have data ideally from the 2019 to 2022
18 period.  So the branches would need to be in existence
19 for that entire time so it could be -- potentially all 25
20 satisfy that requirement, but I don't believe that's the
21 case.
22       I didn't evaluate all of the branches.  I
23 do a supplemental model using MBA data to cross check
24 whether this peer set is appropriate.  That's how I

Page 144

1 tested the robustness of my model.
2    Q.  Did you ask Mutual to give you a list of the
3 branches that satisfy both criteria, P&L model plus
4 productivity during the 2019 to '22 time period?
5    A.  I asked for peer branches that were in
6 existence of the time period that had forward loan sales.
7    Q.  Not my question.  Did you ask for any
8 documentation from Mutual as to the branches at Mutual
9 that satisfy both criteria?
10    A.  I don't recall exactly how I structured the
11 question.
12    Q.  How did you determine -- there's presumably
13 this candidate, a pool of candidates as to which branches
14 are going to be the peers.  And they have to satisfy the
15 two criteria.
16       I mean you would agree there's more than
17 two branches at Mutual that satisfies the criteria you've
18 identified, P&L statement and in operation from 2019,
19 correct?
20    A.  I don't know if there are.
21    Q.  Did you ask Mutual how many branches would
22 satisfy the criteria such that you could understand what
23 your options were in terms of identifying a pool or
24 sorry, identifying a peer?

Page 145

1    A.  Uh-huh.  We talked about what I needed in terms
2 of data coverage, whether they're forward loans, and I
3 asked for branches that are as similar in structure to
4 Tampa and Daytona that they could find and provide data
5 for.
6    Q.  Not my question.  I mean I understand there
7 were two primary criteria.  In operation 2019 to '22.
8 And then P&L structure.
9       Did you ever ask Mutual to provide a list
10 of branches that satisfy those two criteria?
11    A.  Those aren't all the criteria.
12    Q.  Answer the question.
13    A.  No, I didn't ask for a full list.
14    Q.  In addition to those two criteria, let's get an
15 exhaustive list.  So I have got one P&L.  Number two in
16 operation, 2019 to 2022.
17       What other criteria were you considering
18 when identifying peer branches?
19    A.  So in operation through present.
20    Q.  2019 through present?
21    A.  Yes.
22    Q.  Okay.  Those it?
23    A.  The third thing would be the mix of loan sales.
24 We want to make sure we are getting forward loans here to

37 (Pages 142 - 145)

Page 146

1 create this forecast.
2    Q.   What do you mean by getting forward loans?
3    A.   A branch that focuses mostly on forward loans.
4    Q.   What is a forward loan?
5    A.   So like a new regular loan that you might take
6 out a 30-year mortgage.
7    Q.   A purchase loan?
8    A.   That would be one, or refinance.  Compared to a
9 reverse mortgage.
10    Q.   So there's two sides of the business; there's
11 the reverse side of Mutual and then there's the Forward
12 Division, which includes branches that do both refinance
13 and purchase loans, correct?
14    A.   Yes.
15    Q.   So are you saying you wanted to make sure that
16 you were excluding any branches that are on the reverse
17 side of the business?
18    A.   I want only the forward, so yes.  Apples to
19 apples.
20    Q.   Did you analyze whether the focus of the
21 business was refinance loans versus purchase loans?
22    A.   No.
23    Q.   Do you know whether the Daytona branch focused
24 primarily on purchase loans versus refinance?

Page 147

1    A.   I don't know the exact mix.  That could have
2 very well changed over this time period.
3    Q.   I'm not asking for the exact mix.
4        Do you know whether Daytona focused more
5 so on purchase versus refinance?
6    A.   I don't have the answer.  And I believe it
7 changed over time.
8    Q.   Do you know whether the Tampa branch focused
9 more on purchase versus refinance?
10    A.   Same answer applies there.
11    Q.   When you were identifying peer groups, did you
12 make an effort to distinguish between branches focused on
13 refinance versus branches focused on purchase, within the
14 Forward Division?
15    A.   My request is that the peer branches that were
16 provided to me have a similar mix in terms of forward,
17 refinance and original loans.
18    Q.   You said you made a request.  To who?
19    A.   Mutual of Omaha Mortgage.
20    Q.   Who?
21    A.   Again I request everything through Courtney and
22 then she would forward that on to folks at Mutual of
23 Omaha Mortgage, Jeff and the others that we listed
24 earlier.

Page 148

1    Q.   So you identify to Mutual that you wanted to
2 identify branches within the Forward Division that had a
3 similar mix of purchase and refinance production?
4    A.   Uh-huh.  Yes.
5    Q.   Then were you told that the two branches were
6 Maryland and Saint Louis or did you get a filtered pool
7 from which you then select peers?
8    A.   I was given those two branches.
9    Q.   Did you do anything to check whether in fact
10 the mix between refinance and purchase of the peer
11 branches, Saint Louis and Maryland, was similar to the
12 product mix of the Tampa and Daytona branches?
13    A.   Not directly, but I did evaluate correlations
14 between all the data series, including the MBA data
15 series.
16    Q.   Separate from the MBA, I'm focused now on how
17 did you decide that these were the peers that you were
18 going to use.  And I have heard about the criteria that
19 you wanted.  I understand that Mutual identified Saint
20 Louis and Maryland.
21        I now want to focus on what did you do if
22 anything to scrutinize whether those two branches met the
23 criteria that you were asking about.
24        So with that context in mind, did you ask

Page 149

1 to see a product mix for the Maryland and Saint Louis,
2 Daytona and Tampa branches in terms of refinance versus
3 purchase?
4    A.   So to answer the first question, what did I do
5 to scrutinize the data.
6    Q.   That's not my question.  My question was did
7 you ask for documents that would show you the product mix
8 purchase and refinance for the four different branches?
9    A.   No.
10    Q.   Did you orally -- forget about getting it in
11 paper format.
12        Did you orally ask anyone at Mutual or its
13 counsel to tell you what the product mix was as to those
14 four branches between refinance and purchase?
15    A.   They confirmed they were similar, but I don't
16 have the exact mix over time.
17    Q.   Did they give you any data orally or in writing
18 or did they just tell you these are similar?
19    A.   This was I believe over a phone conversation,
20 the second phone conversation.
21    Q.   Not my question.  I want to know did they tell
22 you or give you data, did anyone convey numbers to you
23 whether in paper or orally that support the conclusion
24 that the mix of loan sales at these branches is similar

Page 150

1 with respect to refinance and purchase?
2     A.  So again I didn't get mix information.  But I
3 got confirmation verbally that the branches are similar
4 in terms of mix.
5     Q.  From who?
6     A.  The folks at Mutual of Omaha Mortgage, Jeff,
7 whoever was on the second call.  So it would be Jeff, I
8 think Mark was there.  I can't recall the other parties.
9 There were a few others.
10    Q.  How long has the Saint Louis branch been with
11 Mutual?
12    A.  I don't know, but I know that it's at least
13 since 2019.
14    Q.  Let's go back, I want to just make sure I
15 exhaust the list of criteria that you were using to
16 identify the peers.  I have three things on my list.
17 It's profit and lost structure, in operation from 2019 to
18 the present and it has to have a mix of loans between
19 purchase and refinance that is similar to the Tampa and
20 Daytona branches.
21        What other criteria if any did you
22 consider when selecting a peer branch?
23    A.  Those are the criteria I considered.
24    Q.  Nothing else?

Page 151

1     A.  No.
2     Q.  Okay, good.  Putting that aside.
3        Did you ask Mutual whether there were
4 other branches besides Saint Louis and Maryland that also
5 satisfied those three criteria?
6     A.  I believe I asked that question in my initial
7 request.
8     Q.  What was the answer?
9     A.  I think they sent me the two that were the best
10 situated under those three.  I don't know if they, if
11 there are others that are similar to these peers.
12        But I assume that, you know, if they were
13 we could, they would have provided the data for them.
14    Q.  In what manner did you check to ensure that the
15 Saint Louis and Maryland branches had a similar mix of
16 purchase and refinance loans to the Daytona and Tampa
17 branches?
18    A.  Well, I looked -- beyond the verbal
19 confirmation?
20    Q.  Correct.  Beyond Mutual just telling you these
21 are the ones?
22    A.  Sure.  Which they have a deep understanding of
23 the branches and so beyond that, I evaluated the loans
24 statistically, visually by looking at the charts that I

Page 152

1 prepared.
2     Q.  Show me exactly what you're talking about?
3     A.  Sure.  I believe Exhibit 2 has all four time
4 series.
5     Q.  Your report Exhibit 2?
6     A.  Yes.
7     Q.  Where does Exhibit 2, and specific to my
8 question is related to your criteria about the mix
9 between purchase and refinance.
10        Where on Exhibit 2 does it vet whether
11 there's similarities in terms of purchase and refinance
12 amongst these four?
13    A.  I'm looking at the correlation and how the
14 levels change over time as one way to determine if this
15 is a reasonable peer.  And therefore has a similar mix.
16    Q.  My question is specific to purchase and
17 refinance.
18        What on Exhibit 2 tells you that these
19 four branches have a similar mix with respect to purchase
20 and refinance loans?
21    A.  There's nothing that explicitly breaks out the
22 mix again.  That's not something that I had, I don't have
23 that data.
24    Q.  That's what I'm trying to understand.

Page 153

1        Is there anything where you aside from
2 relying on what Mutual told you, did you do any analysis
3 yourself to understand whether the mix of refinance
4 versus purchase loans amongst these four branches was
5 similar?
6     A.  I've done several robustness checks on this
7 peer set to test the reasonableness of the peers.
8        So beyond the verbal confirmation that the
9 mix is similar, there's nothing that I analyzed in terms
10 of mix of these four.
11    Q.  Specific to the mix question.
12    A.  There's no data that I analyzed that -- I
13 wasn't able to do that.
14    Q.  I mean do you understand Mutual would have
15 records that show the mix of volume between refinance and
16 purchase loans?
17    A.  Sure, sure.
18    Q.  That's something you could have asked for but
19 you didn't?
20    A.  It's something that I didn't need for the
21 model.
22    Q.  How do you know that there's not other branches
23 of Mutual that also satisfy the criteria of having a
24 similar mix, having productivity during the relevant time

Page 154

1 period and a P&L model?
2    A.  That is what I understand from conversation.
3    Q.  You're taking Mutual's word for it?
4    A.  Yes, I mean.
5    Q.  Take a look at Exhibit 2, please.
6    A.  Okay.
7    Q.  Of your report.  So Exhibit 2 shows the
8 productivity of the four branches over time, correct?
9    A.  Yes.
10    Q.  You have got the Saint Louis branch.
11        Is there any point in time where the
12 production of the Daytona branch or the Tampa branch
13 intersects with the production of the Saint Louis branch?
14    A.  I don't know what you mean by intersect.
15    Q.  Do the lines on your graph cross?
16    A.  They do not cross.  These are different levels.
17    Q.  What's the high for the Saint Louis branch?
18    A.  These are different levels.  So the high is
19 about above 100 million I think for the Saint Louis line.
20 It's a larger branch.
21    Q.  Sure.  I mean Saint Louis is over 100 million,
22 over -- there's multiple peaks that are over 100 million,
23 correct?
24    A.  Yep, that's true.

Page 155

1    Q.  For the Daytona branch, the all-time high is
2 one time over 20 million.  Correct?
3    A.  That's correct.
4    Q.  Does it concern you that the volume of those
5 two branches were so different?
6    A.  No, it does not.
7    Q.  Why not?
8    A.  I'm looking at changes, monthly changes.
9        So I'm not looking at levels, I'm looking
10 at relative changes.  So from one month to the next, by
11 what percentage does the volume change.  That's really
12 important to me.  Because that allows me to capture
13 downturns.
14    Q.  Did you ask Mutual if there were any branches
15 that would satisfy your criteria that also had a more
16 similar loan volume to the Daytona and Tampa branches?
17    A.  No.
18    Q.  Similarly, the loan volume for the Tampa branch
19 never even gets close to 40 million, correct?
20    A.  Correct.
21    Q.  The volume for the Maryland branch and the
22 Saint Louis branch are regularly over 40 million.
23 Correct?
24    A.  That is correct.

Page 156

1    Q.  Do you know how many branches at Mutual satisfy
2 your three criteria and also have a lower volume than
3 Maryland and Saint Louis?
4    A.  No.
5    MS. WALTER:  Asked and answered.
6    MS. KREITER:  Q  Do you consider the Tampa and
7 Daytona branches to be peer branches?
8    THE WITNESS:  A  Peers with each other?
9    Q.  Yes.
10    A.  They have a lot of similarities, yes.
11    Q.  So yes, they are peers?
12    A.  I'd consider them peers under this definition.
13    Q.  In terms of volume, do you know whether the
14 Saint Louis branch is the number one performing branch at
15 Mutual?
16    A.  I don't know.
17    Q.  Do you know whether the Maryland branch is
18 within the top five performing branches at Mutual?
19    A.  I don't know.
20    Q.  Do you know how the Daytona and Tampa branches
21 rank in terms of production at Mutual?
22    A.  I don't know.
23    Q.  Would it concern you if you're using Saint
24 Louis as a peer but it's the top producing branch in the

Page 157

1 entire company?
2    A.  No.
3    Q.  Would it concern you if there's branches from a
4 production standpoint that are more similar to Tampa and
5 Daytona that you have not been considering as a peer?
6    A.  No.
7    Q.  How many employees are at the Saint Louis
8 branch?
9    A.  I don't have that number.
10    Q.  What do you know about the Saint Louis branch?
11    A.  I understand the characteristics that I have
12 described about it being a P&L branch.  That it has a
13 similar mix of forward only loans.  And that it was in
14 existence at least from 2019 through present.
15    Q.  So you know that it satisfies your criteria.
16        Do you know anything else about the
17 branch?
18    A.  It's in Saint Louis.
19    Q.  Anything else?
20    A.  That's it.
21    Q.  You don't know how many employees are there?
22    A.  No.
23    Q.  Do you know anything about the managers at that
24 branch?

Page 158

1    A.   No.
2    Q.   Do you know how long that branch has been at
3  Mutual prior to 2019?
4    A.   No.
5    Q.   Do you know -- you're not able to tell me what
6  the approximate split is at that branch between refinance
7  and purchase?
8    A.   No, not right now.
9    Q.   How many employees were at the Tampa and
10  Daytona branches?
11    A.   The number 60 is in my mind from the complaint.
12  I don't know if that includes both branches, so I don't
13  have an exact number.
14    Q.   What about the Paramus branch in New Jersey,
15  how many employees at that branch?
16    A.   I don't have the exact number but I believe
17  it's a smaller branch.
18    Q.   So size of employees was not one of the
19  criteria that you considered, you could have a small
20  branch in New Jersey and a peer branch is going to be the
21  top branch of Saint Louis, correct?
22    A.   That's correct.
23    Q.   Is there a difference, a material difference in
24  your mind from a operations standpoint between the needs

Page 159

1  of branches that focus on purchase loans versus refinance
2  loans?
3    MS. WALTER:  Object to form.
4    THE WITNESS:  Can you ask that question again.
5        (Record read as requested).
6    THE WITNESS:  A   No.
7    MS. KREITER:  Q   Is there a difference in your
8  mind with respect to the likelihood that employees are
9  going to remain with Mutual depending on whether the
10  branch focuses on refinance versus purchase loans?
11    A.   Not that I'm aware of.
12    Q.   Did you ask any questions about whether there's
13  a difference in terms of retention of employees, natural
14  attrition between refinance focused branches and purchase
15  focused branches?
16    A.   We didn't have that discussion, no.
17    Q.   Would it be easier to replace an employee from
18  a branch focused on refinance or purchase?
19    MS. WALTER:  Object to form.
20    THE WITNESS:  A   I don't know.
21    MS. KREITER:  Q   Do you know how the employee
22  retention -- strike that.
23        Did you look at natural attrition from an
24  employee standpoint, rates specific to the Maryland and

Page 160

1  Saint Louis branches and determine if they have better
2  attrition and retention rates compared to the Tampa
3  branch?
4    A.   No I did not.
5    Q.   What documents did you review to select the two
6  offices, Maryland and Saint Louis as peers?
7    A.   Their loan production volumes.
8    Q.   You reviewed the production?
9    A.   Yes.
10    Q.   Is there any other document?
11    A.   No.
12    Q.   But I think you indicated production wasn't a
13  concern because you were comfortable selecting a branch
14  with a very high production versus low production.
15        Is that accurate?
16    A.   No.
17    MS. WALTER:  Object to form.
18    MS. KREITER:  Maybe let me ask it this way:
19    Q.   You looked at loan production documents in
20  conjunction with selecting these two offices.  Is that
21  simply in relation to the productivity criteria, were
22  they open during the relevant time?
23    THE WITNESS:  A   I'm not following that.
24    Q.   I'm trying to understand.

Page 161

1        I understand you had a discussion with
2  Mutual about what branches satisfy the criteria.  In
3  addition to the discussion, is there any other documents
4  that you reviewed, is there any document period that you
5  reviewed to select these two offices as the peer groups?
6    MS. WALTER:  Asked and answered.
7    THE WITNESS:  A   Nothing beyond the loan volume
8  data that I reviewed.
9    MS. KREITER:  Q   I'm trying to understand how does
10  that loan volume data get factored in by you in
11  conjunction with selecting these branches?
12    A.   I could see visually it satisfied the criteria
13  of historical data.
14    Q.   Meaning it was open 2019 through the present?
15    A.   Yeah.  And I could evaluate the correlations as
16  well between those to justify their use as a peer to be
17  used in my forecasting model.
18    Q.   When you say I could see the correlations and
19  justify, what does that mean?
20    A.   I calculate the correlations and in particular
21  I look at the correlation of changes.  So not levels, not
22  100 million or 40 million, but I look at how they change
23  relatively every month.
24        I run a correlation there to see if

41 (Pages 158 - 161)

Page 162

1 there's a relationship between the four branches in terms
2 of how productivity changes. So this would capture for
3 example if you turn to a time period that has less
4 mortgage demand, all of the branches would decline. And
5 that would show up as I high positive correlation.
6         Likewise if it's a period. Mid 2020 or
7 '21, when they are all increasing, you will see them sort
8 of have this high positive correlation. So that's what
9 I'm looking for to establish a basis to use these peers
10 in my forecasting model.
11    Q.   The correlation analysis you just referenced,
12 is that included in the spread sheet that we've been
13 looking at earlier, Bates 14778 that I had pulled up on
14 my computer?
15    A.   That should be easily calculated over the data
16 that's there, yes. I don't know if the correlations are
17 actually in that spread sheet, but it's easy to calculate
18 that.
19    Q.   I mean did you, is there a document that
20 reflects your correlation analysis separate from this
21 spread sheet?
22    A.   No, no.
23    Q.   Is it just something you did it on a
24 calculator?

Page 163

1    A.   Yeah, exactly. I could do it by selecting
2 cells in Excel and it tells me the answer. I don't
3 necessarily print it, but I'm evaluating all of these
4 things when I'm doing the model.
5         There's a lot that goes into modeling,
6 complex process.
7    Q.   You did not do any correlation analysis with
8 respect to any other peer candidates besides Maryland and
9 Saint Louis, correct?
10    A.   That's correct. With the exception of the MBA
11 data, which is if we can consider that a national data
12 point. But not a Mutual of Omaha branch.
13    Q.   Do you know in the industry in general, the
14 criteria you used related to needs to be a P&L model?
15         Do you know how common it is for mortgage
16 loan officers to operate under P&L methods?
17    A.   Outside of Mutual of Omaha, I don't have the
18 answer.
19    Q.   Do you know whether all of the branches at
20 Waterstone operate on a P&L model?
21    A.   I don't know.
22    Q.   You indicate in your report that loan officers
23 begin to leave the Daytona branch in April of 2022 and
24 the branch is closed as a result of those departures a

Page 164

1 few months later.
2         Why do the loan officer departures mean
3 the branches have to close?
4         MS. WALTER: Object to form.
5         THE WITNESS: A  My understanding is that all of
6 the employees left at the same time and the branches
7 closed as a result.
8         MS. KREITER: Q  But why not -- can Mutual have
9 leverage other office space?
10         MS. WALTER: Object to form.
11         THE WITNESS: A  I don't know.
12         MS. KREITER: I'm trying to understand if employees
13 are not, employees can come and go, that doesn't impact
14 your model. The idea is an employee might leave, Mutual
15 is going to replenish that employee with another one.
16 Here all of the employees resigned.
17    Q.   Did you consider whether Mutual could have just
18 leveraged its brand, repurposed an office space or rented
19 an office space, hired new people? Why does the
20 resignation of these branch employees mean that the
21 branch has to close?
22         MS. WALTER: Object to form.
23         THE WITNESS: A  I mean here it's a resignation of
24 everybody all at once. This isn't a natural attrition

Page 165

1 that we would expect to observe industrywide. This is a
2 one-time event that resulted in the closure of the
3 branches, the branches no longer exist.
4         There's other affects that happen as a
5 result of this. Reputation affects, things like that
6 that would impact things going forward after something as
7 large as all of the employees departing at once.
8    Q.   Okay. So on some level the number of employees
9 that resigned does have an impact on loan volume because
10 if enough employees resign, there's no volume?
11    A.   Well there's no branch.
12    Q.   Correct. I guess I'm still struggling a little
13 bit to understand.
14         Do you believe that loan volume is driven
15 by employees or by something else?
16         MS. WALTER: Objection, asked and answered.
17         THE WITNESS: A  I think I would say just
18 following your question here, a functioning branch is,
19 needs to be in place.
20         MS. KREITER: Your report, you state from June of
21 2023 forward, I apply a 2.6 per anum interest rate to
22 calculate predicted loan sales through the end of 2031.
23    Q.   When you say you applied a two percent per anum
24 interest rate, to what did you apply that rate?

1      MS. WALTER:  2.6 percent.
2      MS. KREITER:  Q   2.6 percent.  To what did you
3  apply that rate?
4      THE WITNESS:  A   To the end of my predicted
5  values.  So for the monthly data, I have monthly peer
6  data up to a certain point.  I believe it was May 2023.
7          And for my MBA data I have data, I believe
8  projections to the end of Q4 2023.  So from that point
9  after I take those levels of dollar projections and I
10  apply a conservative inflation rate to capture the time
11  value of money.
12     Q.   Did you consider any other rates besides 2.6?
13     A.   I did.  I considered using a more recent CPI
14  measure, which is more than double the 2.6.  I decided to
15  use an average, which is less than what the current rates
16  are.
17     Q.   Is the 2.6 a figure that you calculated or is
18  that an industry standard?
19     A.   Using CPI over a 10-year period is common.  I
20  calculated that using the most recent data available.
21  Because the data is always being updated every quarter,
22  month, the frequency depends based on the site you visit.
23  So it has to be calculated but it's very common to use
24  averages.

1      Q.   Would 2.6 apply irrespective of the type of
2  business that's at issue?
3      A.   To the application trying to capture the time
4  value of money, yes.  How does the value of this dollar,
5  how is it going to change if inflation is at this rate is
6  essentially what that's helping us understand.
7      Q.   I'm trying to understand, is there anything
8  company specific.  I calculated this 2.6 because the case
9  involves Mutual of Omaha as opposed to I would use 2.7 in
10  the next case, depending on the parties there?
11     A.   No.
12     Q.   It would be 2.6 across the board?
13     A.   Yes, it's a US company, yeah.
14     Q.   So it's a industry standard, it's not specific
15  to facts in this case?
16     A.   It's a common tool used by financial economists
17  to calculate time value of money, yes.
18     MS. WALTER:  Take five minutes whenever you want
19  to?
20     MS. KREITER:  Sure.
21         (Short recess taken)
22     MS. KREITER:  Q   Do you believe you used a
23  conservative inflation rate to capture the current value
24  of money?

1      THE WITNESS:  A   Yes.
2      Q.   Explain why you believe that's the case?
3      A.   Just given the current environment, inflation
4  rates are very high and we have very little indication
5  that's going to change.
6      Q.   Did you consider using a different rate over
7  time versus using the 2.6 for the entire period until the
8  end of 2031?
9      A.   No.
10     Q.   Did you change your risk factor over the
11  projection period?
12     Q.   Can you explain risk factor.
13     Q.   I guess asking it this way:  Why did you
14  believe that the 2.6 would be applicable for the entire
15  10-year duration?
16     A.   Well all that's capturing is how the value of
17  the dollar changes over time.
18         Historically the value of a dollar has
19  increased over time if you look at the hundred-year
20  history of the CPI.  It's always, there's a increase that
21  needs to be captured.
22         Otherwise if I don't account for
23  inflation, a dollar 10 years from now, if it's just a
24  single dollar, is actually worthless.  If I don't

1  increase that amount by the proper inflation.
2      Q.   Then turning to your discounted cash flow
3  analysis?
4      A.   Yes.
5      Q.   Sorry.  One more question before we turn to
6  that.  Do you agree that the longer your projections go
7  out in time, the higher the risk?
8      A.   I don't know what you mean by risk.
9      Q.   Okay.  The risk that your projections are
10  accurate or inaccurate?
11     MS. WALTER:  Object to form.  Are you able to
12  answer with that definition of risk?
13     MS. KREITER:  Do you understand the question?
14     THE WITNESS:  Can you ask again?
15     MS. KREITER:  Q   The question is do you agree the
16  longer you're making projections out over time, as a
17  general matter the longer you're projecting out there's
18  more risk of inaccuracy?
19     MS. WALTER:  Object to form.
20     THE WITNESS:  A   It's possible that loan volumes
21  could be higher or lower and the longer that you go out
22  in time, you know, you have, that's certainly possible in
23  any projection model, yes.
24     MS. KREITER:  So turning to this discounted cash

Page 170

1  flow analysis.  You say I applied a corporate profit
2  apportionment factor to each of the branch's projected
3  loan sales over the damages time frame.
4      Q.  Let me just ask you in general, who at Mutual
5  provided you with the corporate profit apportionment
6  factor that you used?
7      A.  I don't know who it was.  That was provided me
8  early on.  With several other documents, so.
9      Q.  Did you do any diligence to check the validity
10  of the corporate profit apportionment factor?
11     A.  I looked at the underlying data which is at the
12  loan level, and I understand how they are applying the
13  BPS to corporate is the column heading.
14         I understand that relates to the type of
15  loan and can vary, depending on the type of loan whether
16  conventional or jumbo or FHA or VA loan.  And there's a
17  table that they apply to calculate what the BPS to
18  corporate is and that spread sheet provides the average
19  over -- for Tampa and Daytona over the time period of
20  interest.
21     Q.  My understanding is the corporate profit
22  apportionment you used is 75.3 basis points for Tampa and
23  89 for Daytona, is that correct?
24     A.  One moment while I find the page.

Page 171

1          For 2022, the model relies on the 2022
2  actual corporate margin of 75.3 BPS for Tampa and 89 BPS
3  for Daytona.
4      Q.  You're reading from your report?
5      A.  Yes.
6      Q.  How do those basis points translate to dollars,
7  if they do?
8      A.  They translate to dollars on, in my DCF
9  analysis.  So if you turn to Exhibit 7A.
10         You will see the .75 is reflected on the
11  2022 figure.  And EBIT is calculated at .75 times the
12  branch loan sales of 68.95 million.
13     Q.  Where is the 75.3 in 7A you're looking at?
14     A.  It is in income to Mutual of Omaha, percentage.
15     Q.  .75?
16     A.  It's rounded, but it's the same value.
17     Q.  I am asking a general matter, is there a rule
18  of thumb one basis points equals a thousand dollars or is
19  that not apples to oranges?
20     A.  It depends on the volume.  So it's a percentage
21  term.  Taken as a percentage of the loan sales.
22     Q.  Okay.  So I mean in general the basis points
23  attributable to the corporate profit on the Tampa branch
24  is higher than for the Daytona branch, correct?

Page 172

1      A.  It's higher for Daytona than it is for Tampa.
2      Q.  Right.  Sorry.  89 for Daytona, then 75.3 for
3  Tampa.  Do you know, that number is reflective of the
4  money that Mutual corporate is making off the various
5  loans that go with those branches, correct?
6      A.  That's correct.
7      Q.  Do you know whether the managers were upset
8  about the amount of profit that Mutual was taking off of
9  the loans that they closed?
10     A.  I don't know.
11     Q.  You don't know if one of the reasons the branch
12  managers left was because they were running the branches,
13  doing all the work and Mutual was taking all the profit?
14     MS. WALTER:  Object to form.
15     THE WITNESS:  A  Yeah, I don't know.
16     MS. KREITER:  Q  Does the -- I'm going to try to
17  simplify it so I don't have to keep saying corporate
18  profit apportionment factor.  Is it the profit margin
19  that goes to corporate on the loan --
20     A.  We can use that, that's fine.
21     Q.  So the profit margin, would you, does that
22  change over time?
23         So your damages are out to 2031.  Does
24  that profit margin change?

Page 173

1      A.  In my model I am using the average over the
2  historical data, which goes from 2019 to 2022.  The
3  average is actually I believe below the 2019 margin.  So
4  I use that from 2023 forward.
5      Q.  Do you know whether Gennarelli used a variable
6  corporate profit margin in his analysis?
7      A.  He may have used another similar variable that
8  includes more factors, like the mandatory margin and
9  underwriting fees.  I am not completely sure but I have
10  seen those additional data.
11     Q.  Do you know what Mr. Gennarelli, do you know
12  how Mr. Gennarelli calculated his corporate profit
13  margin?
14     A.  No.
15     Q.  Do you have any discussions with Mr. Gennarelli
16  about the appropriate corporate profit margin to use when
17  projecting lost profits in the future?
18     A.  We talked about that on the group call.
19     Q.  What did you talk about?
20     A.  I had questions about the business and I needed
21  to understand the structure, the P&L model and how the
22  profits are calculated.  So we had a conversation about
23  that.
24     Q.  Tell me as clearly as you can, how does the

44 (Pages 170 - 173)

Page 174

1 profit margin that you used differ from the profit margin
2 Mr. Gennarelli used?
3     A.  I don't know.  I didn't analyze his work.
4     Q.  I thought I heard you say though you think he
5 considered different criteria than you or different data
6 than you?
7     A.  Yeah.  I know there's a mandatory margin
8 underwriting fee that is not reflected in this BPS to
9 corporate.  And so my model is conservative by that
10 measure.
11         Again, I didn't analyze his work carefully
12 enough to have an opinion on what it includes, but I know
13 that mine doesn't and possible that if he is looking at
14 those other variables that he included those, but again I
15 did not do a full analysis of his work.
16     Q.  Okay.  Are you able to say whether the
17 corporate profit margin he used changed over time?
18     MS. WALTER:  Object to form.
19     THE WITNESS:  A  I believe it did based on the
20 exhibit you handed me.  Yes.  It looks like 2019 and
21 2020, 2021 and 2022 are all different.
22     MS. KREITER:  Q  You're taking a look at the
23 Gennarelli Exhibit No. 7?
24     A.  Yes.

Page 175

1     Q.  Let's take a look at that.
2         The corporate profit margin relied upon by
3 Mr. Gennarelli is represented I believe, but I will ask
4 you to confirm in the column of the spread sheet labeled
5 corporate profits earned BPS?
6     A.  Uh-huh.
7     Q.  Is that your understanding?
8     A.  Yes, that's what I'm looking at.
9     Q.  Did you attempt to discern why there's a
10 difference between your use of the 75.3 basis points for
11 Tampa and Mr. Gennarelli's use of the corporate margin
12 numbers that he has listed in Exhibit 7,
13 specifically .53, 1.47?
14     A.  Looks like on average he's using 92 BPS.  I'm
15 looking at the exhibits.
16         I don't know why we have differences.
17 Because again I haven't analyzed this, the underlying
18 data.  I don't know where the data comes from.
19     Q.  As a rebuttal expert for Mutual of Omaha who's
20 presenting lost profits, you did not feel obligated to do
21 any diligence to understand how your model differed from
22 Mr. Gennarelli's model or discussed those assumptions and
23 considerations with him?
24     A.  No, my task is to conduct an independent

Page 176

1 analysis, that's not influenced by prior models.
2     Q.  You say I understand Mutual receives corporate
3 margin off the top and branches cover their own expenses.
4 And you say I fully understand that each branch is
5 managed independently by a branch manager.
6         Do you recall that?
7     A.  I think I said fully.
8     MS. WALTER:  Can you point us to where.
9     THE WITNESS:  I further understand.
10     MS. KREITER:  You're referring to your report.  I'm
11 also interested in separate from what is in your report,
12 and without you looking back at it what are your
13 opinions.
14     Q.  So I mean, do you have an understanding that
15 the branches are managed independently by a branch
16 manager?
17     MS. WALTER:  To be clear, that was not how you
18 phrased it initially.  And also case law is pretty clear
19 this isn't a memory test.  She's allowed to look at her
20 report.
21     MS. KREITER:  Q  So again my question is your
22 opinion, is it that the branches are managed
23 independently by a branch manager?
24         Are you looking at your report?  In this

Page 177

1 case I'm going to ask you testify based on your opinions
2 not within --
3     MS. WALTER:  Her opinions are in the report, Maria.
4 There's nothing improper about her looking at her report.
5     MS. KREITER:  Q  Okay.  Do you believe that the
6 branches are independently managed by a branch manager,
7 yes or no?
8     THE WITNESS:  A  Yes.
9     Q.  Is it your understanding that the branches
10 cover all of their own expenses?
11     A.  I believe so, yes.
12     Q.  Do you know whether Mutual sources any
13 customers to the branches?
14     A.  I don't know.
15     Q.  How did you determine the corporate profit
16 apportionment factor or the profit margin that you
17 applied?
18     A.  I evaluated the data set that calculates that
19 for every loan at the two branches.
20     Q.  Sorry, a data set that calculates it?
21     A.  It's an Excel data set.
22     Q.  Is it part of that same spread sheet we looked
23 at earlier?
24     A.  It's cited in my report.  It's different from

Page 178

1 my model. It's called, it's in footnote 28. Corporate
2 margin 2019 to 2022. It's called YSP-corporate margin
3 calculation, 1728, 1734.
4        That is the loan level data set that
5 applies the BPS to corporate value that I described
6 earlier.
7    Q.  So is the corporate margin something you
8 calculated or is derivative of the records that are cited
9 here in footnote 28?
10   A.  It's calculated in the document that I cite in
11 footnote 28.
12   Q.  Calculated by you or by Mutual?
13   A.  By Mutual.  And I can see the calculation.
14   Q.  Did you do anything to check Mutual's profit
15 margin?
16   A.  I checked the calculations were done correctly
17 in that document.
18   Q.  Okay.  So essentially you looked at the cells
19 and looked at the formulas that was in the Mutual Excel
20 spread sheet and understood the methodology?
21   A.  Yes.
22   Q.  Can you just walk me through how did you
23 determine the weighted average cost of capital?
24   A.  Yes.  So if we turn to Section D of my report,

Page 179

1 which is on page 12.  The way I do this is I apply two
2 methods to determine the cost of equity.  One is the
3 buildup method I described in my report, and the other is
4 the cap end method.  So I can describe those if you'd
5 like, but it's detailed fully in my report.
6    Q.  I guess I'd like you to tell me what are the
7 inputs you used when you were determining the weighted
8 average cost of capital?
9    A.  So for a weighted average cost of capital we
10 look at the cost of equity and cost of debt.  And it's
11 the average across those two measures.
12       So the cost of equity requires looking at
13 things like risk free rate, industry risk premium, side
14 premium.  Different factors that I describe here.
15       And the, to determine the cost of debt, we
16 look at -- excuse me, my throat is dry all of a sudden.
17       For the cost of debt, I look at a
18 different source.  You know, based on the debt
19 instruments I could find.  And the weighted average cost
20 of capital is just what it sounds like, it's a weighted
21 average of the equity and debt component.
22   Q.  Did you look at the debt and equity that the
23 branches had versus Mutual's corporate?
24   A.  No.

Page 180

1    Q.  With respect to the Mutual discount rate, what
2 inputs did you use to determine the discount rate?
3    A.  Which inputs?
4    Q.  Correct.
5    A.  I looked at the cost of equity, which is the
6 risk free rate.  This is all on page 12 by the way, the
7 equity.
8    Q.  I don't need you to read the report, but can
9 you tell me the inputs you used?
10   A.  I'm telling you, yes.  The equity risk premium.
11 The industry risk premium and the size premium.  That's
12 my cost of the equity.
13       Cap end is a little bit different because
14 it relies on something called a beta, which is the
15 relationship between industry variables and how you, the
16 ERP changes with respect to that.  So slightly different
17 measure.
18       And what I'd like to do is as I did with
19 my projections, I did it two ways to test for robustness.
20 So here I am doing cap end in the buildup to calculate
21 the equity side of this calculation and then I take the
22 average.  And for the debt I'm looking to the instruments
23 and do the weighted average across those analyses.
24   Q.  With respect to the discount rate, did you

Page 181

1 consider any company specific risk factors?
2    A.  Yes.
3    Q.  What are they?
4    A.  I would look at -- this would all be reflected
5 in the cost of equity.  And also on both sides of this
6 equation in the cost of debt.
7        So the combination, the weighted average
8 of these two measures give me, gives me that number.
9    Q.  So company specific related to Mutual in
10 particular, not just the industry in general, are there
11 things that you considered with respect to Mutual and the
12 facts of this case that bore on the discount rate that
13 you applied?
14   A.  Yes.  The facts of the case would not enter
15 into Mutual of Omaha Mortgage's eq. rate, to be clear.
16   Q.  What was the actual company specific risk
17 amount you used?
18   A.  I'm looking back at my report.
19   Q.  Do you know without looking at the report what
20 the company specific risk amounts were you factored in?
21   A.  That's a too detailed of a question for me to
22 do off the top of my head.  But I can give you an answer
23 by looking at Exhibit 10 and 11.  Company specific data
24 shows up in Exhibit 12.

Page 182

1  Q.  Let's go through each of them.  Tell me in
2  Exhibit 10 where is the company specific risk factor data
3  that you considered?
4      A.  Which exhibits.
5      Q.  I want to look at all of them you identified.
6  I thought you said 10?
7      A.  Yeah, the discount factor exhibits start at
8  Exhibit 9, so all of these are meant to reflect -- this
9  is the cost of equity for Mutual of Omaha Mortgage.  So
10  this is the best that we can do with the available data.
11          And I can go through sort of what the
12  method is in terms of your question you're asking what
13  Mutual of Omaha specific data did I rely on.  And that
14  shows up first in Exhibit 12, the surplus notes.
15      Q.  Okay.  I'm on Exhibit 12 the surplus notes.
16          Where are you in the footnotes you're
17  saying?
18      A.  You can see the notes I look at.  So we have
19  got this, this is a composite from Kroll as well as
20  Mutual of Omaha surplus notes, as of June 15th.  Getting
21  the note yield, which gives us information about the debt
22  component of WACC.  So.
23      Q.  Did you consider for example length of time
24  that a business has been operating, things like that?

Page 183

1      A.  So the length of time that it's been operating
2  is going to be reflected in these figures.  But not
3  explicitly.  We don't have that as like an input to my
4  buildup model.
5      Q.  Have you ever set forth when you're doing
6  modeling, company specific risk factors in a separate
7  line item that is specific to the facts at issue?
8      A.  I think industry risk would usually capture
9  that.  If there's something about a particular company we
10  might consider that.
11      Q.  To be clear I'm not talking about industry
12  risk.  I'm talking about company specific risk factors.
13          So not something applicable to all of the
14  mortgage lenders, but something specific to Mutual of
15  Omaha or the facts of this case?
16      A.  Uh-huh.  It can be considered, yes.
17      Q.  Did you consider any company specific or fact
18  specific risk factors?
19      A.  To the extent that they deviate from industry
20  averages, I did not.  We are using the cost of equity and
21  buildup approach here.
22      Q.  You mentioned the surplus note yield references
23  in Exhibit 12.
24          What do those have to do with the branches

Page 184

1  that we are talking about in this case?
2      A.  So again I'm not looking at a branch WACC rate,
3  I am looking at the discount rate that would be required
4  for Mutual of Omaha Mortgage.  They have nothing to do
5  with the branches.
6      Q.  That's what I'm --
7      A.  To the extent that the branches are individual,
8  many, one of many components that feed up to Mutual of
9  Omaha Mortgage.  So that's not the purpose of a WACC
10  rate.  I don't need a WACC rate for these individual
11  branches.
12          So I just want to be really clear that we
13  are, what's being measured here.
14      Q.  Sure.  But for purposes of Exhibit 12, the
15  focus is not at the branch level, it's on the corporate
16  level?
17      A.  Yes, as is the WACC.
18      MS. WALTER:  Asked and answered.
19      MS. KREITER:  Q  Were the two branches in question
20  susceptible to risk such as lack of management depth,
21  other things that are branch specific?
22      MS. WALTER:  Object to form.
23      THE WITNESS:  A  I don't know the answer to that.
24      MS. KREITER:  Q  Do you believe that lack of

Page 185

1  having management at the branches, is that an issue
2  that's relevant to this case in your opinion?
3      MS. WALTER:  Object to form.
4      THE WITNESS:  A  After they left the branches?
5      MS. KREITER:  Q  Just in general.  I mean is that
6  a significant risk in this case.  We have got managers
7  that are departing and going to Waterstone.
8          My understanding is Mutual contends that
9  those managers shouldn't have solicited the branch
10  employees, but there's managers that want to resign.
11          So whether those managers solicit or not
12  they are leaving.  Was lack of management depth an issue
13  and a risk factor you considered?
14      MS. WALTER:  Objection.
15      THE WITNESS:  A  No.  Not directly, no.
16      MS. KREITER:  Q  Let me take a short break.
17          (Short recess taken)
18      MS. KREITER:  Q  Have you ever been excluded from
19  a case?
20      THE WITNESS:  A  No.
21      Q.  Have you ever been the subject of a Daubert
22  motion?
23      A.  Not that I'm aware of.  Maybe it was attempted
24  but nothing went.

Page 186

1  Q.  How many cases are you working on right now?
2  A.  I would say approximately three, including this
3 one.
4  Q.  Of the cases that you're working on right now,
5 how many of them are in the employment context?
6  A.  Two.
7  Q.  Including this one?
8  A.  Yes.
9  Q.  What's the subject matter of the other case?
10  A.  The other one is a similar valuation case.  But
11 it's outside of employment.
12  Q.  Who are the parties to that case?
13  A.  I can't disclose that.
14  Q.  You said it's a similar valuation case.  In
15 what manner is it similar?
16  A.  It's similar in that it involves valuation
17 techniques.  It's different in that it's not really a
18 labor case.
19  Q.  How much of the work that you handle is in the
20 context of employment?
21  A.  In terms of my litigation work, I would say
22 75 percent.
23  Q.  How much of your work is in the FLSA class
24 action realm?

Page 187

1  A.  Maybe about 25 percent or so.
2  Q.  Are you able to tell me generally within the
3 employment context what's the other 50 percent?
4  A.  That would be a race discrimination, PAGA.
5  Q.  Sorry, what?
6  A.  PAGA cases in California.
7  Q.  What is PAGA?
8  A.  PAGA.  Attorney general's act.  Trying to
9 remember what the P stands for.  I should know.  But
10 right now I don't.  Some portion of my casework is under
11 that law.  And that's similar to other wage an hour
12 cases.
13      But a large portion of my work in labor is
14 in discrimination, and then the other portion is just in
15 financial valuation.
16  Q.  Any of the prior cases you worked on, have you
17 ever previously estimated lost profits in the case of an
18 employee departure dispute based on the model that
19 assumes the business stays open and operating?
20  MS. WALTER:  Object to form.
21  THE WITNESS:  A  I have in the litigation context,
22 but those were not reports that were issued in -- the
23 litigation basically there was a settlement.  But I have
24 done several analyses very similar to this.

Page 188

1  MS. KREITER:  Q  Where there's an assumption that
2 even though the employees have resigned, for damages
3 purposes we are going to assume the employees continued
4 working?
5  A.  That, yes, similar to that.
6  Q.  How many times have you done that same type of
7 model?
8  A.  The model I have used many times.  Not
9 necessarily on an employment departure, but on the
10 continuation of profits after an action stops, yes.
11  Q.  I should have asked it differently.
12      Specific to this situation where employees
13 resign and you calculate lost profits into the future as
14 if those employees still remain with their former
15 employer, not maybe the particular model and math you did
16 here but maybe just a theory, that lost profits can be
17 calculated based on employees remaining with their
18 employer for a period of time when in reality they are
19 not?
20  A.  Yeah.  Are you asking the number of times I
21 have done that?
22  Q.  Yes.
23  A.  I would say two instances come to mind where
24 it's a loss of a part of the business or something sort

Page 189

1 of analogous to this, but the same tools would be applied
2 but kind of different facts.
3  Q.  With either of those cases did you issue
4 reports?
5  A.  Memos for the mediator, I issued memos.  So
6 they look very similar to this kind of report, but.
7  Q.  If you took a look at your report, on page 16,
8 you close your report and say I declare under penalty of
9 perjury of the laws of the United States that the
10 foregoing is true and correct.
11      You see that?
12  A.  Yes.
13  Q.  Why did you put that in the report?
14  A.  That's standard for my expert report.
15  Q.  You put that language in all your reports?
16  A.  I don't know if I use United States in all of
17 them.  Because there was something where in state court I
18 used different language.  But yes, the general statement
19 appears in my expert report.
20  Q.  Okay.  What are you declaring under penalty of
21 perjury is true in this report?
22  A.  That everything.
23  Q.  You're assuming liability.  I guess I'm trying
24 to understand what are you swearing correct?

Page 190

1   A.  My, everything that I've described in my
2   report.
3   Q.  Apologies, I think we talked about whether you
4   testified at trial.  What about deposition, have you
5   testified at deposition before this?
6   A.  Yes.
7   Q.  How many times?
8   A.  Three, this is my third.
9   Q.  The cases where you've been deposed before,
10  have those been in the employment context?
11  A.  Yes.  Delta was.  Gold Standard was also an
12  employment case, yes.
13  Q.  What about the third?
14  A.  Mutual of Omaha.
15  Q.  This one here?
16  A.  Yes.
17  Q.  This 1 and 2 times previously.  When
18  approximately, not a memory test but the Delta case where
19  you were deposed, when was your deposition?
20  A.  Maybe about a year ago.  It's in my CV the
21  exact date.
22  Q.  Was that case in state court or federal court?
23  A.  Federal, Atlanta.
24  Q.  The Gold Standard case, when was your

Page 191

1   deposition?
2   A.  That's farther back in time so I do need to
3   look at my CV.  May 14, 2021.  That was also in the US
4   District Court, Northern District of Illinois.
5   Q.  Did both of those cases settle or are they
6   still pending?
7   A.  I don't know.  I don't have the answer.  I
8   think Delta is still ongoing, because I might have to
9   testify.  I don't know.
10  Q.  Is Delta listed on this?
11  A.  Yes, the second, my deposition is the second
12  item, page three of my CV.
13  Q.  Okay.  I see it.  What licenses or
14  certifications do you hold in the State of Illinois if
15  any?
16  A.  Licenses, none.
17  Q.  What about certifications?
18  A.  Beyond my formal education?
19  Q.  Correct.
20  A.  None.
21  Q.  Is there any governing body that would be
22  overseeing the work that you do, regulatory body?
23  A.  I don't believe so.
24  Q.  Have you ever held any licenses in the State of

Page 192

1   Illinois?
2   A.  No.
3   Q.  Have you ever held any certifications in the
4   State of Illinois?
5   A.  I don't think so.
6   Q.  Are you a CPA?
7   A.  No.
8   Q.  Do you have an accounting background?
9   A.  Yes.
10  Q.  What is your -- tell me about your education?
11  A.  I have an MBA from the University of Chicago
12  with focus in economics, finance and econometrics and
13  statistics.  The last two are one.
14  Q.  Tell me about your work history, please?
15  A.  Sure.  So I have been employed as an expert
16  economist and consultant for over 15 years now.  I
17  started with the firm called Chicago Partners.  And then
18  I moved over to Navigant Economics.  And I took a break
19  to go back to school and then once I graduated, I joined
20  Global Economics Group.
21  Q.  So you've been doing litigation expert support
22  for about 15 years?
23  A.  Yes.
24  Q.  But this is your third deposition?

Page 193

1   A.  Yes.
2   Q.  Is your business comprised 100 percent of
3   expert witness work or do you do multiple things?
4   A.  I do other things.
5   Q.  What are the other things you do?
6   A.  I do expert consulting.
7   Q.  Sorry, separate from expert witness work.
8       For example some CPA's might keep their
9   day job and they're CPA by day, but then they have expert
10  engagements on the side.  I'm trying to understand are
11  you a full-time expert witness or are you doing other
12  things that are new compensation besides serving as an
13  expert?
14  A.  Right.  I think part, I was answering part of
15  that is outside of the context of litigation I do expert
16  economist work.  So I guess we can call that consulting.
17  Outside of the context of litigation.  I do research for
18  Knight Foundation.
19  Q.  What is the Knight Foundation?
20  A.  The John S and James L Knight Foundation is a
21  philanthropic institution based out of Miami that is
22  focused on journalism and the arts.  They have taken on a
23  project that required some data analysis and that's where
24  I come in.

49 (Pages 190 - 193)

Page 194

1   Q.   Are there professional organizations that you
2   belong to?
3   A.   No.
4   Q.   We talked about licenses or certifications.
5   Sounds like you don't have any in the State of Illinois.
6       Do you have any licenses or certifications
7   in any state?
8   A.   No.
9   Q.   Would you say that you more often represent
10  plaintiffs in litigation or defendants in litigation?
11  A.   It's a pretty even mix I would say.
12  Q.   The case that you mentioned earlier in which
13  Mr. Karen retained you as an expert, I just want to be
14  clear, you were retained on behalf of plaintiffs in a
15  class action or defendants in a class action?
16  A.   I have to go back to my notes because I can't
17  recall.
18  Q.   How long ago was that case?
19  A.   It was several years ago and I have done so
20  many reports since then, it's really just lost
21  unfortunately.  But I can certainly easily get that
22  information for you.  I think it was 2018, so, a lot has
23  happened since then.
24      MS. KREITER:  I think I requested this earlier, but

Page 195

1   I will just since we are at the end here.  I will request
2   your engagement letter and your invoices, please.
3       THE WITNESS:  Okay, yeah.
4       MS. KREITER:  That's all that I have.
5       MS. WALTER:  Nothing for me.
6
7
8           (Whereupon, proceedings were
9           adjourned in this deposition)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 196

1   STATE OF ILLINOIS   )
                        ) SS
2   COUNTY OF COOK      )
3
4       I, PAUL W. O'CONNOR, do hereby certify
5   that I reported in machine shorthand and via real time
6   transcription the testimony taken at the deposition of
7   CANDICE ROSEVEAR on July 20, 2023; and that this
8   transcript is a true and accurate transcription of my
9   machine shorthand notes so taken to the best of my
10  ability, and contains all of the proceedings given at
11  said deposition.
12
13
14
15
16      Paul W O'Connor, CSR
        License No. 084.002955
17
18
19
20
21
22
23
24

Brown & Jones Reporting            414-224-9533
A Veritext Company              www.veritext.com