```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF FLORIDA
                          TAMPA DIVISION


       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
       MUTUAL OF OMAHA MORTGAGE INC. *
                                     *    Case No. 8:22-cv-1660
       vs.                           *
                                     *    May 17, 2024
       WATERSTONE MORTGAGE           *
       CORPORATION                   *
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

## MOTION HEARING

Heard via Zoom Videoconferencing
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
May 17, 2024


## BEFORE THE HONORABLE ANTHONY E. PORCELLI

## UNITED STATES MAGISTRATE JUDGE


Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
                                U.S. District Court Reporter
                                Middle District of Florida
                                Tampa Division
                                801 N. Florida Avenue
                                Tampa, FL  33602
                                813.301.5207
                                tana_hess@flmd.uscourts.gov


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE PLAINTIFF:

          Ari Karen
          Mitchell Sandler, PLLC
          1120 20th Street, NW
          Suite 725
          Washington, DC 20036
          202.886.5260
          akaren@mitchellsandler.com

          Arielle Stephenson
          Mitchell Sandler, PLLC
          1120 20th Street, NW
          Suite 725
          Washington, DC 20036
          424.731.5645
          astephenson@mitchellsandler.com

          Aron Raskas
          Gunster
          600 Brickell Avenue
          Suite 3500
          Miami, FL  33131
          305.376.6009
          araskas@gunster.com

          Daniel Paul Dietrich
          Gunster, Yoakley & Stewart, PA
          401 E. Jackson Street
          Suite 1500
          Tampa, FL  33602
          813.228.9080
          ddietrich@gunster.com

          Gregory Lathrop Pierson
          Gunster, Yoakley & Stewart, PA
          401 E. Jackson Street
          Suite 1500
          Tampa, FL  33602
          813.228.9080
          gpierson@gunster.com

APPEARANCES:

FOR THE DEFENDANT:

        Maria L. Kreiter
        Godfrey & Kahn, S.C.
        833 East Michigan Street
        Suite 1800
        Milwaukee, WI  53202
        414.287.9466
        mkreiter@gklaw.com

        Carolina Yvonne Blanco
        Hill Ward Henderson, PA
        101 E. Kennedy Blvd.
        Suite 3700
        Tampa, FL  33602
        813.221.3900
        carolina.blanco@hwhlaw.com

        Emma J. Jewell
        Godfrey and Kahn, S.C.
        833 East Michigan Street
        Suite 1800
        Milwaukee, WI  53202
        414.287.9528
        ejewell@gklaw.com

        Scott A. McLaren
        Hill Ward Henderson, PA
        101 E. Kennedy Blvd.
        Suite 3700
        Tampa, FL  33602
        813.221.3900
        smclaren@hwhlaw.com

        Xavier O. Jenkins
        Godfrey & Kahn, S.C.
        833 East Michigan Street
        Suite 1800
        Milwaukee, WI  53202
        414.287.9511
        xjenkins@gklaw.com

|  |  |  |
|---|---|---|
| 10:04AM | 1 | **THE COURT:** All right. Good morning. Let's call the |
| 10:04AM | 2 | case, please. |
| 10:04AM | 3 | **COURTROOM DEPUTY:** All right. Good morning again, |
| 10:04AM | 4 | everybody. This is Mutual of Omaha Mortgage versus WaterStone |
| 10:04AM | 5 | Mortgage Corporation, case number 8:22-cv-1660-UAM. |
| 10:04AM | 6 | **THE COURT:** Okay. Good morning. Let me have counsel |
| 10:04AM | 7 | state your appearance, for the record starting with plaintiff. |
| 10:04AM | 8 | **MR. KAREN:** Good morning, Your Honor. Ari Karen on |
| 10:04AM | 9 | behalf of Mutual. |
| 10:04AM | 10 | **THE COURT:** Good morning. |
| 10:04AM | 11 | **MS. STEPHENSON:** Arielle Stephenson. Good morning, |
| 10:05AM | 12 | Your Honor, also on behalf of Mutual. |
| 10:05AM | 13 | **THE COURT:** Good morning. |
| 10:05AM | 14 | **MR. DIETRICH:** Good morning, Your Honor. Dan |
| 10:05AM | 15 | Dietrich also on behalf of Mutual of Omaha. |
| 10:05AM | 16 | **THE COURT:** Good morning. |
| 10:05AM | 17 | **MR. PIERSON:** Good morning, Your Honor. Greg Pierson |
| 10:05AM | 18 | also on behalf of Mutual. |
| 10:05AM | 19 | **THE COURT:** Thank you. Good morning. |
| 10:05AM | 20 | All right. For WaterStone? |
| 10:05AM | 21 | **MS. KREITER:** Good morning, Your Honor. Maria |
| 10:05AM | 22 | Kreiter, Emma Jewell, and Xavier Jenkins from Godfrey & Kahn on |
| 10:05AM | 23 | behalf of WaterStone. Also on the line for WaterStone, we have |
| 10:05AM | 24 | Stephanie Ziebell, who is the WaterStone general counsel, and |
| 10:05AM | 25 | then Scott and Carolina. |

10:05AM    1          **THE COURT:**  All right.  Good morning.

10:05AM    2          **MR. MCLAREN:**  Good morning, Your Honor.  Scott

10:05AM    3  McLaren and Carolina Blanco here on behalf of the defendant as

10:05AM    4  well.

10:05AM    5          **THE COURT:**  Okay.  Thank you all for your time.

10:05AM    6              Let me just be very blunt.  This is not my

10:05AM    7  preference to be doing this, given the substantive matters that

10:05AM    8  are before the Court, by Zoom, but that's what we're going to

10:05AM    9  do.  So what I intend to do is to take up the pending motions,

10:05AM   10  and then we'll talk about where we're at as far as trial.

10:05AM   11              So I want to start with the summary judgment and

10:06AM   12  ask the plaintiffs, whoever is making the argument, what are

10:06AM   13  the documents that are now at issue?  Are we talking about the

10:06AM   14  remaining that were last supplemented as far as the 39

10:06AM   15  documents for trade secrets, or are there going to be items

10:06AM   16  that are beyond that?

10:06AM   17          **MR. KAREN:**  Your Honor, just to be clear, you said

10:06AM   18  making argument with respect to -- it is the defendant's

10:06AM   19  motion.  I'm happy to speak to that point, but I just --

10:06AM   20          **THE COURT:**  Mr. Karen, I understand that.  My

10:06AM   21  question is to you.  What are the -- what is at issue regarding

10:06AM   22  the trade secrets?

10:06AM   23          **MR. KAREN:**  There are really three categories of

10:06AM   24  trade secrets at issue in this case.  The first category

10:06AM   25  involves --

| | | |
|---|---|---|
| 10:06AM | 1 | **THE COURT:**  Okay.  I want to be very blunt.  How many |
| 10:06AM | 2 | documents?  Is it the 39 that was last supplemented, or is it |
| 10:06AM | 3 | more than that? |
| 10:06AM | 4 | **MR. KAREN:**  I would have to -- I would have to look, |
| 10:06AM | 5 | Your Honor, to give you an exact answer.  The reason I say that |
| 10:06AM | 6 | is what we really did is these are the examples of the one |
| 10:07AM | 7 | trade secret.  So for -- if I can be clear about this, so I |
| 10:07AM | 8 | could explain why there is some clarity I would need to provide |
| 10:07AM | 9 | to you.  There are multiple examples of one type of trade |
| 10:07AM | 10 | secret, and that trade secret would be, for example, the |
| 10:07AM | 11 | combination of information about a customer and that group |
| 10:07AM | 12 | of -- those groups of documents relating to that customer that |
| 10:07AM | 13 | identifies the customer's ability, willingness, desire, and |
| 10:07AM | 14 | readiness to go forward on a transaction, and that information |
| 10:07AM | 15 | is unique, and it would have only have been in Mutual's |
| 10:07AM | 16 | possession.  So that would be pertaining to one loan, but we |
| 10:07AM | 17 | may have numerous loans of that.  I believe there are probably |
| 10:07AM | 18 | about 40 to 45 sets of documents. |
| 10:07AM | 19 | And, again, it's not one document.  It's not |
| 10:07AM | 20 | like a W2 statement, and that's why I'm trying to get clarity |
| 10:07AM | 21 | and I want to make sure I answer correctly.  For example, it's |
| 10:07AM | 22 | not just a borrower's W2.  It's the borrower's W2, their |
| 10:07AM | 23 | application for a loan, and any and all supporting documents |
| 10:07AM | 24 | that may have been provided with respect to that loan.  That |
| 10:08AM | 25 | combination of documents uniquely provided to Mutual is a trade |

| | | |
|---|---|---|
| 10:08AM | 1 | secret. |
| 10:08AM | 2 | Now, that identical trade secret may exist with |
| 10:08AM | 3 | multiple other loans, so to get the exact number of documents, |
| 10:08AM | 4 | I would just have to look at that exhibit list.  I don't have |
| 10:08AM | 5 | that right in front of me at this moment, but I would be able |
| 10:08AM | 6 | to tell you that would be, for example, multiple examples of |
| 10:08AM | 7 | different loans with that combination of documentation for that |
| 10:08AM | 8 | one classification.  So that would be one group, and I don't -- |

THE COURT: Let me interrupt you there.  The Court had previously ordered that the trade secrets be identified by Bates stamps, as I understand it, on the record.  Then after that occurred, there was approximately one hundred and I think it was 89 documents that were Bates stamped and identified.

MR. KAREN: That is correct.

THE COURT: Then as I understand it based upon the reply, that has since been supplemented to include now approximately 39.  There is nothing in the record that helps me establish any -- whether there's an issue of fact as to any of the elements as to what is or is not a trade secret.  Your response is simply just arguing that this is a fact-intensive inquiry and therefore should go to the jury, but it's incumbent upon you to establish initially that there is a fact in issue that is left for the jury; that is, there is a material issue of fact.  You've not addressed any document in any way to establish that, and that's what I'm trying to understand is

10:09AM  1    what items -- it could be multiple documents.  It could be

10:09AM  2    whatever you're asserting, but it's still unclear to me on this

10:09AM  3    record what is the universe of trade secrets that are at issue

10:09AM  4    and where is there any record that I could rely upon to say

10:09AM  5    that there is an issue of fact as to whether there are trade

10:09AM  6    secrets or not?

10:09AM  7            MR. KAREN:  So, Your Honor I believe to address the

10:09AM  8    two points -- and that's what I'm saying.  I think the first

10:09AM  9    issue with respect to trade secrets and what those issues

10:09AM  10   are -- and I do believe there are points in the record I'll be

10:09AM  11   able to point you to.  But, for example, as you know, the trade

10:10AM  12   secrets relate to -- and whether there is a trade secret is

10:10AM  13   whether it was valuable information that was uniquely valuable

10:10AM  14   to my client and then whether that was misappropriated.  There

10:10AM  15   is evidence in the record that we have cited to in those

10:10AM  16   statements of fact, that we believe are statements of fact,

10:10AM  17   22 -- and you have the depositions, Your Honor -- where, for

10:10AM  18   example, Exhibit F in Mr. Allen's deposition on page 49 where

10:10AM  19   Mr. Allen, who is the corporate representative of WaterStone,

10:10AM  20   admits that this information is valuable.  I asked him those

10:10AM  21   questions, and he said yes, in fact, that combination of

10:10AM  22   information is valuable, and that's one classification of the

10:10AM  23   trade secrets I'm talking about, these groups of documents

10:10AM  24   related to very specific borrowers, related to specific loans

10:10AM  25   that indicated they were ready, willing, and able to perform

| | | |
|---|---|---|
| 10:10AM | 1 | and move forward with the loan and qualified, more importantly, |
| 10:10AM | 2 | to move forward with the loan.  So that's one item of trade |
| 10:10AM | 3 | secrets that I do think there is support in the record for. |
| 10:10AM | 4 | The second area is customer lists.  They |
| 10:11AM | 5 | downloaded customer lists.  Again, we've got examples of that |
| 10:11AM | 6 | both in the documents provided to you in response to the Motion |
| 10:11AM | 7 | for Summary Judgment as well as in the deposition transcript. |
| 10:11AM | 8 | Exhibit G, Mr. Hutto's deposition transcript, on |
| 10:11AM | 9 | page 95 of that, which was provided to the Court, that Exhibit |
| 10:11AM | 10 | G provides that -- it indicates that these groups of |
| 10:11AM | 11 | information were effectively high value leads, if you will, and |
| 10:11AM | 12 | even low value leads, leads that just contained information as |
| 10:11AM | 13 | to contact information, some of whom might be interested in a |
| 10:11AM | 14 | loan.  They paid for that.  WaterStone -- I'm sorry, Mutual |
| 10:11AM | 15 | paid for that.  Mr. Hutto paid for that, and Mr. Hutto would |
| 10:11AM | 16 | pay for that.  And the information provided in these groups of |
| 10:11AM | 17 | documents were far more extensive to what they would pay for |
| 10:11AM | 18 | for a loan.  And, again, it was information that only Mutual |
| 10:11AM | 19 | had, so it would be considered a trade secret. |
| 10:11AM | 20 | Additionally, again, as I said, there were |
| 10:11AM | 21 | customer lists, lists that identified every customer that had |
| 10:12AM | 22 | ever done business with Mutual, information on their loan, when |
| 10:12AM | 23 | their loan would modify, and that was all obtained by |
| 10:12AM | 24 | WaterStone, and even WaterStone's own documents indicate those |
| 10:12AM | 25 | materials are confidential trade secrets. |

10:12AM  1    And then we've got the use of those, which is
10:12AM  2    demonstrated, if nothing else, by the fact that 45 loans were
10:12AM  3    actually closed by WaterStone.
10:12AM  4    So I think when it comes down to the
10:12AM  5    customer-related documents -- and really what we're talking
10:12AM  6    about, again, are those groups of documents related to specific
10:12AM  7    borrowers demonstrating their ability, willingness to proceed
10:12AM  8    with the loan that far exceeds the value of the lead.  The fact
10:12AM  9    that these documents were in password-protected systems that
10:12AM  10   the defendants utilized their passwords to access and obtain
10:12AM  11   and provide to WaterStone, those are -- as well as the customer
10:12AM  12   lists, those are all trade secrets.
10:12AM  13   One other form of trade secret, Your Honor, are
10:12AM  14   profit and loss statements.  And, again, I asked Mr. --
10:13AM  15   Mr. Hutto if he agreed that that information would be very
10:13AM  16   valuable.  That's in Exhibit G to the motion.  That's on
10:13AM  17   page 92 of his transcript.  It was also non-public information
10:13AM  18   on those P&L statements which Mr. Allen also agreed with when I
10:13AM  19   asked him those questions in his deposition, and that's in
10:13AM  20   Exhibit F at page 224, also provided to the Court.
10:13AM  21   So I think there is information as to these
10:13AM  22   three categories of trade secrets, and while I'm sorry for
10:13AM  23   hesitating to tell you the exact number of documents because
10:13AM  24   these in some cases are compilations of documents that only
10:13AM  25   because of their grouping together become a trade secret, if

10:13AM  1   you will, and because of the fact they were delivered.  That's

10:13AM  2   my hesitation where I want to be clear and provide you that

10:13AM  3   information, but that information has been provided in

10:13AM  4   discovery, and, you know, I would be able to tell you that.  I

10:13AM  5   just want to make sure I give the right exact number.

10:13AM  6        THE COURT:  So what is going to be at issue?  Is it

10:13AM  7   going to be the 186 documents that were originally briefed, or

10:14AM  8   is it going to be the 39 documents that were later supplemented

10:14AM  9   or a combination of that?

10:14AM  10        MR. KAREN:  A combination.  We are going -- we have

10:14AM  11   already pared that down in preparation for the exhibit lists --

10:14AM  12   or the list of exhibits that we have been working on.  We have

10:14AM  13   already pared that down because I want to present this in a

10:14AM  14   meaningful way to the jury.  And that was actually a question I

10:14AM  15   was going to ask Your Honor, on how to best present it.  This

10:14AM  16   may not be the appropriate time for that.

10:14AM  17        But, for example, what I would propose -- just

10:14AM  18   to answer your question, so -- from a perspective of

10:14AM  19   manageability, is we intended to produce an email.  That email

10:14AM  20   would contain all of the documents attached.  That would be one

10:14AM  21   trade secret, and provide that to the jury, irrespective of

10:14AM  22   whether it was three documents attached by the borrower or 15

10:14AM  23   documents attached.  We're going to have examples of that.

10:14AM  24   That would be one example of one trade secret, and we would

10:14AM  25   have that for each one of the trade secrets as well as I

| | | |
|---|---|---|
| 10:14AM | 1 | believe it is two customer lists that were transacted -- I'm |
| 10:15AM | 2 | sorry, three customer lists that were provided, and -- or |
| 10:15AM | 3 | taken, I should say, and then two, I believe it is, profit and |
| 10:15AM | 4 | loss statements. |
| 10:15AM | 5 | So we'd have two profit and loss statements, we |
| 10:15AM | 6 | would have three customer lists that were downloaded, and we |
| 10:15AM | 7 | would have approximately 30 examples of these combinations of |
| 10:15AM | 8 | documents from borrowers that would be in as trade secrets.  We |
| 10:15AM | 9 | did pare down that list of 180.  There were additional |
| 10:15AM | 10 | materials and documents that were in there.  We are taking many |
| 10:15AM | 11 | of those out.  I think it would simply cloud the Court in |
| 10:15AM | 12 | handling the case and the collateral -- I believe they are |
| 10:15AM | 13 | trade secrets, but they're not frankly the most compelling |
| 10:15AM | 14 | trade secrets, and we're taking those out. |
| 10:15AM | 15 | So really what we're going to be talking about |
| 10:15AM | 16 | is customers' willingness and ability to go forward with loans |
| 10:15AM | 17 | as demonstrated on these documents, the customer lists that |
| 10:16AM | 18 | were downloaded off of password-protected systems, and then |
| 10:16AM | 19 | finally P&L statements. |
| 10:16AM | 20 | THE COURT:  And are those items included in the |
| 10:16AM | 21 | supplemental that was provided post the close of discovery with |
| 10:16AM | 22 | the 39 alleged trade secrets? |
| 10:16AM | 23 | MR. KAREN:  Everything is in there, yes, Your Honor. |
| 10:16AM | 24 | THE COURT:  Why were those disclosed at such a late |
| 10:16AM | 25 | time without leave of Court? |

| | | |
|---|---|---|
| 10:16AM | 1 | **MR. KAREN:**  Some of them, Your Honor, were obtained |
| 10:16AM | 2 | through the course of discovery at various times.  Many of |
| 10:16AM | 3 | these documents we did not have in possession when we first |
| 10:16AM | 4 | answered those interrogatories.  These were obtained throughout |
| 10:16AM | 5 | the process of discovery.  There were even, you know, documents |
| 10:16AM | 6 | that were produced -- and I do not at all blame opposing |
| 10:16AM | 7 | counsel for this.  I want to make sure I understand this.  We |
| 10:16AM | 8 | had a sequence of productions and discovery that went on |
| 10:16AM | 9 | throughout the discovery period, some of which were at the very |
| 10:16AM | 10 | end of discovery, and some of -- and some of these documents |
| 10:16AM | 11 | were produced then.  So it would be a compilation of those |
| 10:16AM | 12 | reasons that -- just these were not documents we always had in |
| 10:17AM | 13 | our possession. |
| 10:17AM | 14 | **THE COURT:**  And these documents could not have been |
| 10:17AM | 15 | identified previously for a reason when Judge Sneed entered the |
| 10:17AM | 16 | order that Bates stamps be identified for purposes of the trade |
| 10:17AM | 17 | secrets? |
| 10:17AM | 18 | **MR. KAREN:**  No, Your Honor, we didn't have them.  For |
| 10:17AM | 19 | example, I would tell you one of the trade secrets in |
| 10:17AM | 20 | particular I recall we received actually on -- after the close |
| 10:17AM | 21 | of discovery.  It was to -- because we had to subpoena the |
| 10:17AM | 22 | individuals, not just -- well, not the defendant, but |
| 10:17AM | 23 | third-party individuals, some of the officers that left, |
| 10:17AM | 24 | because they sent to their personal emails.  So there was a |
| 10:17AM | 25 | trade secret, for example, we learned of well after the close |

|  |  |  |
|---|---|---|
| 10:17AM | 1 | of discovery because we got it from I believe it was John |
| 10:17AM | 2 | Utsch. I may be mispronouncing his name, but we only received |
| 10:17AM | 3 | that from his -- I think it was his Gmail or Yahoo or personal |
| 10:18AM | 4 | email account when we subpoenaed that. |
| 10:18AM | 5 | So this was done through I will say probably 20 |
| 10:18AM | 6 | different subpoenas to third parties, and that's how we |
| 10:18AM | 7 | obtained a lot of this information, and that's why we couldn't |
| 10:18AM | 8 | supplement it sooner. |
| 10:18AM | 9 | THE COURT: Ms. Kreiter, are you making the argument? |
| 10:18AM | 10 | MS. KREITER: Yes, I am, Your Honor. |
| 10:18AM | 11 | I guess I don't know where to start. This is a |
| 10:18AM | 12 | 2022 case. It is now 2024, two weeks from trial, and I'm first |
| 10:18AM | 13 | learning the factual basis for the vast majority of the claims. |
| 10:18AM | 14 | I could not more vigorously dispute what |
| 10:18AM | 15 | Mr. Karen has said. I think the most helpful way to sort |
| 10:18AM | 16 | through this issue is by reference to WaterStone's efforts to |
| 10:18AM | 17 | triage the 39 documents that were identified as trade secrets |
| 10:18AM | 18 | in the midst of briefing months after the close of discovery. |
| 10:18AM | 19 | That's docket 159, Exhibit 2. We've essentially taken in very |
| 10:18AM | 20 | short order 39 documents that were disclosed as trade secrets. |
| 10:19AM | 21 | Six of those were timely disclosed. Five of the six that were |
| 10:19AM | 22 | timely disclosed relate to the P&L statements. The sixth |
| 10:19AM | 23 | document is an email that it is certainly not apparent why that |
| 10:19AM | 24 | would be a trade secret. It's an email between employees |
| 10:19AM | 25 | talking about somebody potentially wanting to join WaterStone. |

10:19AM 1          I cannot possible triage the other 36.  I've

10:19AM 2    taken a corporate rep dep on the issue of trade secrets.  These

10:19AM 3    were not the subject of that because they had not been

10:19AM 4    disclosed.  Mr. Aaron is -- or Mr. Karen is absolutely wrong

10:19AM 5    about when he had these documents.  If you look at the

10:19AM 6    production date, which is a column that WaterStone added to its

10:19AM 7    spreadsheet trying to give context to these very belated

10:19AM 8    disclosed documents, you can see there's a date of production

10:19AM 9    column.  So, you know, some of them were produced in 2022 of

10:20AM 10   that six that were timely disclosed.

10:20AM 11         THE COURT:  Looks like the majority of them.

10:20AM 12         MS. KREITER:  The majority of them.  There are two

10:20AM 13   documents, Your Honor, that were produced after the close of

10:20AM 14   discovery, you know, but frankly, the fact that the plaintiff

10:20AM 15   waited until the very last minute to serve third-party

10:20AM 16   discovery, that's not on WaterStone.

10:20AM 17         And also frankly, the two documents that were

10:20AM 18   produced by third parties after the close of discovery, you

10:20AM 19   will see the production date is August 9th.  I did not get any

10:20AM 20   kind of amended response to the discovery saying, "We're

10:20AM 21   claiming these two -- sorry, you know, we know it's August, but

10:20AM 22   here's two more."  And frankly, you know, we're coming up on

10:20AM 23   almost a year from that.

10:20AM 24         So I don't -- there is no excuse for failure to

10:20AM 25   disclose whatever Mr. Karen is claiming as a potential trade

| | | |
|---|---|---|
| 10:21 AM | 1 | secret.  I cannot triage hundreds of documents to understand |
| 10:21 AM | 2 | what he is talking about.  I cannot triage 36 new trade secrets |
| 10:21 AM | 3 | at this point in time. |
| 10:21 AM | 4 | We -- |
| 10:21 AM | 5 | THE COURT:  Let me interrupt you there.  Mr. Karen, |
| 10:21 AM | 6 | what is being referred to for the record, this is document -- |
| 10:21 AM | 7 | this is the reply, document 159, Exhibit 2, which is |
| 10:21 AM | 8 | identifying the alleged 39 new supplemented disclosed trade |
| 10:21 AM | 9 | secrets.  And there is a column of date of production, and as I |
| 10:21 AM | 10 | read it, all but one, two, three, four documents on the first |
| 10:21 AM | 11 | page, excluding those four documents, everything else was |
| 10:21 AM | 12 | allegedly produced in 2022, either in -- it looks like either |
| 10:21 AM | 13 | October or November or 2022.  The remaining four documents, one |
| 10:21 AM | 14 | was produced on January 6th allegedly of 2023, two were |
| 10:21 AM | 15 | produced on August 9th of 2023, and then the fourth on |
| 10:22 AM | 16 | December 8th of 2023. |
| 10:22 AM | 17 | Do you dispute that production? |
| 10:22 AM | 18 | MR. KAREN:  Your Honor, I do not dispute that |
| 10:22 AM | 19 | production.  What I would suggest, if I may -- and this goes |
| 10:22 AM | 20 | back to my point -- this is no surprise as to WaterStone.  We |
| 10:22 AM | 21 | articulated very early on exactly what we believed the trade |
| 10:22 AM | 22 | secrets were.  Then we had to go through these productions. |
| 10:22 AM | 23 | They were extremely voluminous.  We went through all of them, |
| 10:22 AM | 24 | and then we found specific examples of those trade secrets, but |
| 10:22 AM | 25 | these are not new things. |

| | | |
|---|---|---|
| 10:22AM | 1 | For example, let's just take the doc -- there's |
| 10:22AM | 2 | a document Bates stamped WMC-01024, and it has a number of |
| 10:22AM | 3 | attachments.  There actually is one attachment referencing a |
| 10:22AM | 4 | borrower.  Now, that document -- |
| 10:23AM | 5 | THE COURT:  Give me the description of the document |
| 10:23AM | 6 | so I can know what we're referencing. |
| 10:23AM | 7 | MR. KAREN:  Sure.  The description is "Blank email |
| 10:23AM | 8 | from former manager at Gmail to WaterStone employee containing |
| 10:23AM | 9 | one attachment.  The subject line references a borrower.  The |
| 10:23AM | 10 | attachment is not identified as a trade secret." |
| 10:23AM | 11 | That's -- that was -- so -- |
| 10:23AM | 12 | THE COURT:  It's the second row on the second page of |
| 10:23AM | 13 | Exhibit 159-2? |
| 10:23AM | 14 | MR. KAREN:  No, it is the -- it is on the page 2 of |
| 10:23AM | 15 | that document, and it's on the fourth line. |
| 10:23AM | 16 | THE COURT:  All right. |
| 10:23AM | 17 | MR. KAREN:  So, for instance, Your Honor, that is not |
| 10:23AM | 18 | a new allegation in the case.  That goes back to what we |
| 10:23AM | 19 | actually put in our complaint.  We said all along that the |
| 10:23AM | 20 | things that they did is they took borrower data, they sent that |
| 10:23AM | 21 | borrower data in those examples of loans and loans in the |
| 10:24AM | 22 | pipeline and loans in process, and they sent them to and |
| 10:24AM | 23 | provided them to WaterStone.  That was our allegation in the |
| 10:24AM | 24 | complaint from the very, very beginning.  So this claimed |
| 10:24AM | 25 | surprise is not a surprise.  It is something that has been in |

10:24AM 1    the case from literally day one.  These are additional

10:24AM 2    examples --

10:24AM 3         THE COURT:  Mr. Karen, you know very well, though,

10:24AM 4    the rules of discovery are there for a reason, and so if there

10:24AM 5    was notice of this document, then the 30(b)(6) witness could

10:24AM 6    have been deposed on this very document.  And if it was

10:24AM 7    disclosed in October of 2022, I'm still not hearing what's the

10:24AM 8    excuse for neglect as to why it was not previously identified

10:24AM 9    when ordered by Court to identify the trade secrets at issue by

10:24AM 10   Bates stamp?

10:24AM 11        MR. KAREN:  Your Honor, we did identify many, many of

10:24AM 12   the exhibits.  The fact that some of these slipped through, you

10:24AM 13   know, I apologize.  Again, these productions were enormous, so

10:24AM 14   it took significant time to go through all of them.  And at the

10:24AM 15   time we had the information available, that's what was

10:25AM 16   supplemented.  This is information we discovered later.  There

10:25AM 17   was just -- there were so many documents produced, we couldn't

10:25AM 18   go through all of them, and these were things we discovered

10:25AM 19   later.

10:25AM 20             As for that point, though, about the discovery

10:25AM 21   and the depositions of the 30(b)(6), it's not like Ms. Kreiter

10:25AM 22   asked about any of these types of documents that she did know

10:25AM 23   about, other examples which she did have and chose -- she just

10:25AM 24   didn't ask about them.  It wasn't a scenario where she asked

10:25AM 25   about them and the witness said, "I don't know what you're

| | | |
|---|---|---|
| 10:25AM | 1 | talking about."  She asked about some very specific categories |
| 10:25AM | 2 | of the documents that were not any of the documents that we're |
| 10:25AM | 3 | talking about now. |
| 10:25AM | 4 | So, you know, this is a -- I would say this is |
| 10:25AM | 5 | not prejudicial to WaterStone.  They knew these questions were |
| 10:25AM | 6 | at issue, and while I apologize that not every example of this |
| 10:25AM | 7 | was produced, it was what we had and what we had access to and |
| 10:25AM | 8 | were able to uncover from the voluminous documents that were |
| 10:25AM | 9 | produced. |
| 10:25AM | 10 | So, I mean, there was thousands and thousands of |
| 10:25AM | 11 | documents that were produced that we had to search through. |
| 10:26AM | 12 | And as far as we could get through, that's what we did, and |
| 10:26AM | 13 | that's what we produced.  I apologize these were done a little |
| 10:26AM | 14 | bit later than would have been preferred, but WaterStone -- |
| 10:26AM | 15 | this is not new.  This is not surprising to WaterStone. |
| 10:26AM | 16 | WaterStone knows what this case is about, and it was about the |
| 10:26AM | 17 | theft of these loans and loans in the pipeline. |
| 10:26AM | 18 | And, Your Honor, 45 loans closed at WaterStone |
| 10:26AM | 19 | that started at Mutual.  These are not surprises.  They've |
| 10:26AM | 20 | known about this from before we even filed this case. |
| 10:26AM | 21 | THE COURT:  So if there's 45 loans that are at issue, |
| 10:26AM | 22 | are any of these documents of late production related to those |
| 10:26AM | 23 | 45 loans? |
| 10:26AM | 24 | MR. KAREN:  Some of them are, Your Honor.  Some of |
| 10:26AM | 25 | them are. |

| | | |
|---|---|---|
| 10:26AM | 1 | **THE COURT:** If you were aware of that, why didn't you |
| 10:26AM | 2 | search for these specific documents to disclose in discovery? |
| 10:26AM | 3 | **MR. KAREN:** We didn't even have the list of 45 loans |
| 10:26AM | 4 | that closed there until the very, very end of discovery.  We |
| 10:26AM | 5 | never even found out exactly what the amounts were.  So there |
| 10:26AM | 6 | were 45 loans that we had -- and then we had to match it up. |
| 10:27AM | 7 | So, if I may, Your Honor, this has not been easy discovery. |
| 10:27AM | 8 | There's origination reports that Mutual has that address every |
| 10:27AM | 9 | single loan and every single application anybody has made when |
| 10:27AM | 10 | it's just seeking a credit report.  We had to take that.  We |
| 10:27AM | 11 | had to match that when we finally got the list of loans that |
| 10:27AM | 12 | were closed over at -- or originated, I should say, over at |
| 10:27AM | 13 | WaterStone.  I don't even know -- I don't think we even got a |
| 10:27AM | 14 | closed loan list.  I think we got an originated list.  So we |
| 10:27AM | 15 | had to match our documents, our materials against their |
| 10:27AM | 16 | materials to find matches.  We weren't able to do that until |
| 10:27AM | 17 | the very, very end of discovery.  That's when we got documents |
| 10:27AM | 18 | from them, which, again, I'm not blaming WaterStone for that. |
| 10:27AM | 19 | That's when we received the materials because we weren't able |
| 10:27AM | 20 | to match it from anything else that we received. |
| 10:27AM | 21 | So this was a course of going through |
| 10:27AM | 22 | laboriously tens of thousands of documents to then identify the |
| 10:27AM | 23 | materials that we could only do when we matched thousands and |
| 10:27AM | 24 | thousands of names to their thousands of names on, you know, |
| 10:27AM | 25 | extensive spreadsheets.  If you think about every loan within |

10:28AM  1    a -- I think it was a -- and I may be mistaken, but I believe

10:28AM  2    it was a 45- to 60-day period that we asked for, and we got

10:28AM  3    that, and we had to compare that to a similar period of time,

10:28AM  4    finding every single loan.  It's needle in haystacks time.

10:28AM  5    That's what we were dealing with to do this.  That's not -- I'm

10:28AM  6    not complaining that's WaterStone's fault.  That's just the

10:28AM  7    nature of the beast, which is what we had to do to identify

10:28AM  8    those loans, which we weren't able to do during discovery

10:28AM  9    because we didn't have all the information, let alone the time.

10:28AM  10            So we're dealing with a case of thousands and

10:28AM  11   thousands and thousands of documents where we have to literally

10:28AM  12   find individual emails and thousands and thousands of lists of

10:28AM  13   documents to find one name with an address and then compare it

10:28AM  14   to one name with an address throughout these extensive lists.

10:28AM  15   This is not easy stuff to do.

10:28AM  16            But the reality is, Your Honor, it's not also a

10:28AM  17   surprise to WaterStone because they knew what we were looking

10:29AM  18   for, knew what this case was about, and they've known it since

10:29AM  19   day one in the complaint.  There's no prejudice to them here.

10:29AM  20        **THE COURT:**  All right.  Ms. Kreiter, do you have any

10:29AM  21   other arguments you want to make as to your motion?

10:29AM  22        **MS. KREITER:**  I do.  I mean, first, I'll just correct

10:29AM  23   a number of things that Mr. Karen said.

10:29AM  24            It's absolutely false that he didn't have this

10:29AM  25   information.  WaterStone in response to the first set of

| | |
|---|---|
| 10:29AM | 1 |
| 10:29AM | 2 |
| 10:29AM | 3 |
| 10:29AM | 4 |
| 10:29AM | 5 |

discovery in the fall of '22 produced a list of the loans that has closed.  WaterStone unilaterally, without any request from Mutual, supplemented the list of closed loans either in June or July of 2023.  All of the things that Mr. Karen talked about could have been done well before the close of discovery.

It is absolutely not true that 45 loans closed at WaterStone that were originated at Mutual.  There's just nothing in the record to that effect.

I will also say that this discussion is illustrative of the problem.  I hired an e-forensic expert to analyze what I thought were the purported trade secrets.  It cost a lot of money.  I can't have a moving target.  We should be talking about at best the six documents that were identified as trade secrets in discovery and nothing else.  If we look at those documents, we're talking about P&L statements and one email.

Summary judgment is absolutely appropriate for the reason that there is a moving target as to what the trade secrets are.

With respect to the documents that have been properly disclosed as trade secrets, as Your Honor noted, there are elements to that claim.  There are no affidavits presented from Mr. Karen explaining why those elements are not -- the time to do that is summary judgment, not on the stand at trial.

I think that when I think about that grounds for

| | |
|---|---|
| 10:30AM | 1 |
| 10:30AM | 2 |
| 10:31AM | 3 |
| 10:31AM | 4 |
| 10:31AM | 5 |

dismissing the trade secret claims, I actually think that the WaterStone special verdict -- which is essentially the Eleventh Circuit special verdict for trade secrets claims -- is really helpful because it lays out here are all of the things that Mr. Karen is going to have to show at trial. Is this document property of Mutual? Is it generally known? Property means all of it. We don't have any evidence as to any of those documents, as to any of those claims, and Mr. Karen is proposing that we present something to the jury -- I'm not sure what it is -- and he has come forward with nothing to satisfy Mutual's burden of proof on these claims. It's a burden of proof issue that has not been met or attempted.

Even assuming those two dispositive things aside -- the lack of disclosure, the lack of any effort to satisfy the burden of proof -- let's talk about damages. I don't have anything that indicates -- for example, the one email that is something separate from the P&Ls, is there a royalty associated with that document? Is there actual damages associated with that document? I don't fathom how that could possibly be, but Mr. Karen hasn't articulated that if that's going to be their position.

Even with respect to the P&L statements, which was a document that -- I think you saw, as I filed my motion, you know, I did understand that Mutual was claiming the P&Ls are a trade secret. I thought that was worthy of debate. I

| | | |
|---|---|---|
| 10:32AM | 1 | don't anymore because there's been no effort to establish the |
| 10:32AM | 2 | elements even as to that P&L.  And if you look up the |
| 10:32AM | 3 | deposition testimony of the Mutual corporate representative |
| 10:32AM | 4 | that we put forth in support of our motion, the corporate rep |
| 10:32AM | 5 | testifies, "I don't have any damages that I'm able to tell you |
| 10:32AM | 6 | about today flowing from that P&L."  So there are no royalties. |
| 10:32AM | 7 | We don't have to guess at that.  The corporate rep testified to |
| 10:32AM | 8 | that effect.  And he does say, "You know, that doesn't mean |
| 10:33AM | 9 | it's out of bounds.  Maybe we'll fix it later."  I can attest |
| 10:33AM | 10 | you can't fix later.  The corporate rep should know, but even |
| 10:33AM | 11 | if you could, it wasn't fixed later.  There is no supplemental |
| 10:33AM | 12 | discovery response, and I did ask about, "What are the damages |
| 10:33AM | 13 | that you're seeking?  Itemize them and provide a formula." |
| 10:33AM | 14 | There was never any supplementation explaining how a P&L is |
| 10:33AM | 15 | worth whatever amount Mr. Karen is going to claim. |
| 10:33AM | 16 | So the Court should deny the motion based on |
| 10:33AM | 17 | failure to adhere to discovery, focus on the six documents that |
| 10:33AM | 18 | were disclosed in discovery, five of which related to P&Ls. |
| 10:33AM | 19 | Deny the motion because there's no attempt to meet the burden |
| 10:33AM | 20 | of proof -- |
| 10:33AM | 21 | THE COURT:  I'm assuming you're asking me to grant |
| 10:33AM | 22 | the motion. |
| 10:33AM | 23 | MS. KREITER:  Sorry.  Thank you, Your Honor.  Asking |
| 10:33AM | 24 | the Court to grant the motion for any of those three reasons |
| 10:33AM | 25 | and all of them. |

|  |  |  |
|--|--|--|
| 10:33AM | 1 | **MR. KAREN:**  If I could speak to -- |
| 10:33AM | 2 | **THE COURT:**  All right.  Mr. Karen, if you can respond |
| 10:33AM | 3 | about the damages issue. |
| 10:34AM | 4 | **MR. KAREN:**  Yes.  Thank you.  And I do want to |
| 10:34AM | 5 | correct something I did slightly misspeak about.  When I said |
| 10:34AM | 6 | closed loans, it was originated loans.  I thought I corrected |
| 10:34AM | 7 | that when I was talking, but in case I didn't, I want to |
| 10:34AM | 8 | clarify because that's not correct.  Closed loans, she's |
| 10:34AM | 9 | absolutely right.  It was loans originated.  There were 45 |
| 10:34AM | 10 | loans originated.  I just wanted to make sure I clarify that |
| 10:34AM | 11 | for the record because I think I did misspeak on that point. |
| 10:34AM | 12 | Having said that, to address the question of |
| 10:34AM | 13 | damages, the issue with damages, our claim is not for |
| 10:34AM | 14 | royalties.  I want to be very clear.  Our claim is that there |
| 10:34AM | 15 | were a number of illegal improper acts taken in concert to |
| 10:34AM | 16 | result in a seamless transition of this entire operation, the |
| 10:34AM | 17 | liftout.  Part of that liftout was enabled by this theft of our |
| 10:34AM | 18 | trade secrets.  So, for example, when Mr. Utsch or Utsch -- |
| 10:34AM | 19 | which is, again, a document that was identified after the close |
| 10:34AM | 20 | of discovery in the third-party subpoenas.  Mr. Utsch provides |
| 10:34AM | 21 | a mapping of all of our closed loans.  He goes on the password, |
| 10:35AM | 22 | and at WaterStone -- you have this exhibit, Your Honor.  They |
| 10:35AM | 23 | provide that information to WaterStone that shows all of our |
| 10:35AM | 24 | closed loans of our Encompass loan origination system, and |
| 10:35AM | 25 | WaterStone provided them a mapping to take it.  So they take |

| | | |
|---|---|---|
| 10:35AM | 1 | that information. |
| 10:35AM | 2 | Now, where we suggest the damages occurred -- as |
| 10:35AM | 3 | Your Honor well knows, damages in a trademark case involve not |
| 10:35AM | 4 | just royalties, they can involve actual damages.  And we |
| 10:35AM | 5 | believe part of the actual damages in this case -- and we can |
| 10:35AM | 6 | make this argument to the jury, Your Honor, and if the jury |
| 10:35AM | 7 | agrees, then they agree, and if not, they don't.  But the |
| 10:35AM | 8 | reality, what we think, is that the point of this liftout was |
| 10:35AM | 9 | to create a seamless transition.  We pick the whole operation |
| 10:35AM | 10 | up, trade secrets and all, and you move it over to WaterStone. |
| 10:35AM | 11 | So on April 16th, it's at -- I'm sorry, April 26th, it's at |
| 10:35AM | 12 | Mutual, and April 27th, it's at WaterStone, trade secrets and |
| 10:35AM | 13 | all. |
| 10:35AM | 14 | Now, for commissioned sales people, people who |
| 10:35AM | 15 | are relying on that information to go and get more clients -- |
| 10:36AM | 16 | and we see examples of that.  It's been provided to Your Honor |
| 10:36AM | 17 | in the deposition transcripts, so forth, where they go through |
| 10:36AM | 18 | extensive efforts to utilize this information, get new |
| 10:36AM | 19 | customers to bring customers in, to actually create a pipeline |
| 10:36AM | 20 | of business before they start there.  They actually sent over a |
| 10:36AM | 21 | transition team ahead of time to do that, and they were doing |
| 10:36AM | 22 | that all to take these documents so when they landed, they |
| 10:36AM | 23 | landed hot and they had money in their coffers to fund the |
| 10:36AM | 24 | transition.  There's actually emails -- and we provided them to |
| 10:36AM | 25 | Your Honor in response to the summary judgment -- where there's |

10:36AM 1   a discussion about sending over a transition team two weeks
10:36AM 2   ahead of time and sending over loans so that they get a
10:36AM 3   pipeline started and so that they could fund the transition.
10:36AM 4   They usually -- use the words "fund the transition."  That was
10:36AM 5   all part of this effort to seamlessly lift out the branch,
10:36AM 6   which is a substantial factor in the theft of the branch
10:36AM 7   because our assertion is that had they not, had they not been
10:37AM 8   able to utilize these trade secrets, had they not had access to
10:37AM 9   them, these people would not have moved over so quickly.
10:37AM 10          And that is our theory of the case which I
10:37AM 11  believe would support actual damages under trademark, because
10:37AM 12  we're saying that had they not stolen these trade secrets, they
10:37AM 13  wouldn't have been able to fund the transition, which I believe
10:37AM 14  they said even in the exhibit was something that was necessary,
10:37AM 15  that they wouldn't have done without -- that they would not
10:37AM 16  have -- they -- moved over unless they could actually fund the
10:37AM 17  transition.  And that combined with the other actions is what
10:37AM 18  allowed them to lift out the branch.  This is a substantial
10:37AM 19  factor in it, because but for the theft of trade secrets, they
10:37AM 20  wouldn't have moved.  They wouldn't have left all of that
10:37AM 21  information they had at Mutual.  It was only because they took
10:37AM 22  it, and they could take it, and because WaterStone enabled it
10:37AM 23  that allowed them to actually steal this branch.  Otherwise
10:37AM 24  they wouldn't have.
10:37AM 25          We believe that's a viable argument.  It's

10:38AM 1  actual damages which are allowed under trade secrets law, and
10:38AM 2  the jury can make that determination.
10:38AM 3         THE COURT:  And the actual damages is going to be the
10:38AM 4  lost profits that you're looking to assert?
10:38AM 5         MR. KAREN:  Yes, Your Honor, exactly.  We are not --
10:38AM 6  I want to be very clear, we are not seeking damages on the 45
10:38AM 7  loans.  We are not seeking royalties.  We are saying this
10:38AM 8  was -- the only damage we're seeking in this case is the lost
10:38AM 9  profits, and we believe these were a substantial factor
10:38AM 10  resulting in the lost profits, because but for the theft of
10:38AM 11  trade secrets, they would not have been successful when they
10:38AM 12  left the branch.
10:38AM 13         THE COURT:  All right.  Well, we might as well get to
10:38AM 14  the heart of that because that seems to be the true fundamental
10:38AM 15  issue that's at stake for the parties, and despite the
10:38AM 16  arguments to the contrary that are in the responses to the
10:38AM 17  various motions where everyone seems to begin that I should not
10:38AM 18  revisit Judge Barber's order, but yet each party then moves in
10:38AM 19  a way asking me to revisit Judge Barber's order, and so that's
10:39AM 20  what we're going to do.  For the record, Judge Barber entered
10:39AM 21  an order prior to the consent at document 146 in relation to
10:39AM 22  damages.  There is a Motion for Reconsideration at document
10:39AM 23  number 164 with a response at document 189.  And for the
10:39AM 24  record, this is plaintiff's Motion for Reconsideration.  At
10:39AM 25  document number 166 is WaterStone's Motion in Limine related to

10:39AM 1 damages, and there's a response to that at document number 176.

10:39AM 2 At docket number 170 is WaterStone's Motion in Limine related

10:39AM 3 to whether -- is it Rosevear?  Am I saying that right or

10:39AM 4 Rosevear?

10:39AM 5         **MR. KAREN:**  Rosevear, Your Honor.

10:39AM 6         **THE COURT:**  Rosevear.  That the expert witness

10:39AM 7 Rosevear not be allowed to testify in the case in chief of

10:39AM 8 plaintiff and only as a rebuttal witness.

10:39AM 9         These are all related, so we're going to take

10:40AM 10 them together and allow you to make any arguments you want, but

10:40AM 11 I have some questions to start with.

10:40AM 12         And it starts with fundamentally, I still think

10:40AM 13 although -- I think Judge Barber's order, to be blunt, is very

10:40AM 14 clear.  There has to be something of evidence that comes in

10:40AM 15 play in relation to the time period, and I am still curious as

10:40AM 16 to the 30 months, as to how that is being identified, why it's

10:40AM 17 being identified, and what is going to be the evidentiary

10:40AM 18 support for it?

10:40AM 19         **MR. KAREN:**  Thank you, Your Honor.  Before we start,

10:40AM 20 I also, if I may, want to apologize to Your Honor and to the

10:40AM 21 other individuals here.  I know it was my scheduling

10:40AM 22 difficulties these last two days because of a family event that

10:40AM 23 created us having to do this by Zoom.  I apologize to everyone

10:40AM 24 if it was not -- it is not ideal.  I recognize that.  It was

10:40AM 25 just something I could not control, so I do want to apologize,

10:41AM    1    just take this opportunity, and I am sorry for that.

10:41AM    2            THE COURT:  There's no apology necessary, and I

10:41AM    3    certainly would not want you to miss that, and I don't know if

10:41AM    4    you knew the schedule in advance or not, but we could have

10:41AM    5    scheduled this on another day when I had my calendar open more,

10:41AM    6    but I had no choice but to leave you on this time period and do

10:41AM    7    it by Zoom.

10:41AM    8            MR. KAREN:  Yeah, there were some changes in that,

10:41AM    9    Your Honor.  We don't have to necessarily go through all of it,

10:41AM   10    but the bottom line is because we had always done it as Zoom

10:41AM   11    and I always thought it was going to be Zoom, it wasn't a

10:41AM   12    problem, and then when it became in person, it was a problem.

10:41AM   13    So it was that sort of change that created the issue.  Again,

10:41AM   14    either way, it is my problem, and I apologize to everyone for

10:41AM   15    that, so please accept that apology.

10:41AM   16            THE COURT:  Yes.  And, again, no need to apologize.

10:41AM   17    I'm glad you were able to make it.

10:41AM   18            MR. KAREN:  Thank you, Your Honor.  Going to the

10:41AM   19    issue of the 30 months, your question, the evidentiary -- just

10:41AM   20    so you understand how we got to the 30 months, Judge Barber was

10:41AM   21    very emphatic with us in a number of hearings during the course

10:41AM   22    of this case that while we took the position that we believe

10:42AM   23    Florida law allows us, as long as we can establish the

10:42AM   24    causation, to -- then the jury can, as long as they have a

10:42AM   25    basis, come up with a decision -- a lost profit time period,

| | | |
|---|---|---|
| 10:42AM | 1 | and that was always our position, that Florida law didn't allow |
| 10:42AM | 2 | this to be taken away from the jury before they had the |
| 10:42AM | 3 | opportunity to present the evidence, and we maintained that |
| 10:42AM | 4 | throughout this case.  But at Judge Barber's -- I'll use the |
| 10:42AM | 5 | word "urgings," you know, he was very clear that he was |
| 10:42AM | 6 | uncomfortable, and so we wanted to make this a little bit |
| 10:42AM | 7 | easier, and also frankly, Your Honor, facilitate potential |
| 10:42AM | 8 | settlement discussions.  And so at his urging that we decided |
| 10:42AM | 9 | to really, you know, limit this case on our own unilaterally, |
| 10:42AM | 10 | if you will, to 30 months, because we believe that was really |
| 10:42AM | 11 | the period of time we intended to argue.  So we made that |
| 10:42AM | 12 | decision, and that's why we used 30 months. |
| 10:42AM | 13 | Now, the reason we used 30 months, Your Honor, |
| 10:42AM | 14 | is because there is evidence if you look at the MLS data -- and |
| 10:43AM | 15 | just so we're clear -- and I don't want to tell Your Honor |
| 10:43AM | 16 | anything you already know, but not everybody knows the details |
| 10:43AM | 17 | about mortgage lending, so I'll go into it -- |
| 10:43AM | 18 | THE COURT:  Let me explain as I understand it, and we |
| 10:43AM | 19 | may be able to cut through this.  What I'm appreciating is |
| 10:43AM | 20 | you're going to introduce evidence that an office that was in |
| 10:43AM | 21 | existence at least two years would have been in existence |
| 10:43AM | 22 | somewheres up of six years; is that correct?  And you're going |
| 10:43AM | 23 | to use that evidence to demonstrate that this office -- these |
| 10:43AM | 24 | offices would have existed for at least another period of 30 |
| 10:43AM | 25 | months? |

10:43AM  1        MR. KAREN:  Essentially what we are going to do is

10:43AM  2   show the average of certain -- of how long a branch would have

10:43AM  3   stayed and has stayed and does stay with us over a certain time

10:43AM  4   period, obviously excluding branches that just came on because

10:43AM  5   they haven't had the time to, you know -- rightly, if you will.

10:43AM  6   And so we were going to take that, and that provides one piece

10:43AM  7   of evidence, one, just one -- there's more -- piece of evidence

10:43AM  8   to say, "Well, here's the evidence."  Something Judge Barber

10:44AM  9   mentioned, the average is just that.  Some are longer.  Some

10:44AM 10   are shorter.  You're not beholding to the average.

10:44AM 11        And one of the things we think would also -- in

10:44AM 12   addition to the 30 months that is -- essentially 34 months is

10:44AM 13   the average.  We cut it to 30, but in addition to that, we have

10:44AM 14   the business arrangement that happened, and that happened

10:44AM 15   within the year period of the solicitation restrictions, and

10:44AM 16   within that year of the date that they left, that the branches

10:44AM 17   were lifted out and that their one-year solicitation period

10:44AM 18   would have ended, Mutual engaged in a transaction with Keller

10:44AM 19   Williams and acquired Keller Williams Real Estate, Florida, and

10:44AM 20   because of that now it provides a source of -- an ongoing

10:44AM 21   source of loans for loan officers.

10:44AM 22        Loan officers' principal area, especially in

10:44AM 23   purchase transactions, is for realtors.  It makes sense.

10:44AM 24   That's where they were to find their clients.  And so by

10:44AM 25   acquiring Keller Williams, we created something of extreme

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
| 10:45AM | 1  | value, and that has allowed us to attract new operations that |
| 10:45AM | 2  | we're starting to bring in there slowly.  It's taken some time. |
| 10:45AM | 3  | But the point is had we provided and said -- to this group of |
| 10:45AM | 4  | loan officers who make their money on commission saying, "Here. |
| 10:45AM | 5  | Here are your best possible referral sources, and now we're |
| 10:45AM | 6  | combining them in a company for you so they're going to be -- |
| 10:45AM | 7  | we're going to have unique access that nobody else has," we |
| 10:45AM | 8  | believe that they would have stayed, and we think the jury can |
| 10:45AM | 9  | make that conclusion.  Not just the average.  They could have |
| 10:45AM | 10 | stayed longer.  Again, I'm not saying we're seeking more than |
| 10:45AM | 11 | 30 months.  We're not.  We're sticking to that, but the point |
| 10:45AM | 12 | is that not only do we have an average, which is the average |
| 10:45AM | 13 | for the company nationwide -- |
| 10:45AM | 14 | THE COURT:  I'm curious, though, this is in relation |
| 10:45AM | 15 | to the other motions that have been filed.  If the Keller |
| 10:45AM | 16 | Williams transaction is relevant to assert your argument that |
| 10:45AM | 17 | you believe they would have stayed, then why would it not be |
| 10:45AM | 18 | relevant to allow testimony regarding job satisfaction then?  I |
| 10:45AM | 19 | mean, these seem to be all speculative as to whether people |
| 10:46AM | 20 | would stay or not. |
| 10:46AM | 21 | MR. KAREN:  Well, I think it's a different level of |
| 10:46AM | 22 | speculation, if you will.  And I don't think -- let me rephrase |
| 10:46AM | 23 | that, Your Honor.  I don't think one is speculative, |
| 10:46AM | 24 | respectfully, okay?  In one case, you're saying without any |
| 10:46AM | 25 | contemporaneous evidence -- and I think that's the critical |

10:46AM 1    thing here.  If there was contemporaneous evidence of a lack of

10:46AM 2    job satisfaction, people making complaints and saying, "Hey, I

10:46AM 3    don't like my supervisor," or, "This is really bad," or, "This

10:46AM 4    is this problem," if they had produced that, then I would not

10:46AM 5    necessarily be making this motion.

10:46AM 6            I just actually tried a very similar case, Your

10:46AM 7    Honor, when I was on the other side of the case, but in that

10:46AM 8    case, we had significant contemporaneous evidence, tons of

10:46AM 9    emails showing complaints by people before anything happened.

10:46AM 10   Here there's none of that.  And so for somebody to come and

10:46AM 11   say, "Well, I didn't like that, and I would have done this

10:46AM 12   because I was unhappy about that," you could say whatever you

10:46AM 13   want.  There's no way to cross them.  There's no way to address

10:47AM 14   that, and I think it's patently unfair because really anybody

10:47AM 15   could come and say, "This was a terrible company.  They were

10:47AM 16   mean, and they beat us with sticks every day."  You could say

10:47AM 17   whatever you want.  That's sheer speculation when there's

10:47AM 18   absolutely no contemporaneous evidence of that at the time, no

10:47AM 19   complaints, nothing.

10:47AM 20           And so I think to allow them to go and testify,

10:47AM 21   produce folks an open door to provide any narrative you want

10:47AM 22   after the fact, I think that would be cross because there's no

10:47AM 23   proof of it and just says what I would have done had these

10:47AM 24   things happened.

10:47AM 25           Now, take that and juxtapose that about what I'm

10:47AM 1    saying.  What I'm saying, and I believe there is going to be

10:47AM 2    testimony -- I know there is going to be testimony from people

10:47AM 3    at Mutual explaining why realtors are important business

10:47AM 4    referral partners for loan officers and the symbiotic

10:47AM 5    relationship between them.  That's not speculation.  That's

10:47AM 6    discussing for people who are in the industry and do this every

10:47AM 7    day and have done this every day for 30 years where loan

10:48AM 8    officers get their business and the importance of those

10:48AM 9    relationships to loan officers.  That's what they're going to

10:48AM 10   testify to.

10:48AM 11           Now, can a jury take that information and then

10:48AM 12   conclude based on the average and say, "Yeah, we think they --

10:48AM 13   this is how long they would have stayed"?  We think that's

10:48AM 14   permissible when causation is established, which we believe be

10:48AM 15   it will be and Judge Barber believed it would be.

10:48AM 16           And so I don't think respectfully that's

10:48AM 17   speculation.  Those are facts that can be testified to that a

10:48AM 18   jury can utilize to render a conclusion.  That's one set.

10:48AM 19           And when you juxtapose that against people who

10:48AM 20   come up with no contemporaneous evidence to say, "Oh, yeah.

10:48AM 21   Well, I would have done this," or, "I would have done that, and

10:48AM 22   how much I hated them being there," I think we really get into

10:48AM 23   a scenario where a jury could be prejudiced by any number of

10:48AM 24   narratives that really amount to character evidence that's

10:48AM 25   inadmissible.

| | | |
|---|---|---|
| 10:48AM | 1 | **THE COURT:** Let me ask you this question, though. If |
| 10:49AM | 2 | there was no alleged misappropriation of trade secrets and we |
| 10:49AM | 3 | were just dealing with the non-solicitation, would you still be |
| 10:49AM | 4 | in a position to be arguing 30 months of damages? |
| 10:49AM | 5 | **MR. KAREN:** Yes. |
| 10:49AM | 6 | **THE COURT:** Why? |
| 10:49AM | 7 | **MR. KAREN:** Because the whole point of this case is |
| 10:49AM | 8 | that they engaged in a number of different activities and |
| 10:49AM | 9 | actions that -- |
| 10:49AM | 10 | **THE COURT:** What I'm asking you is if the activity |
| 10:49AM | 11 | and action just simply was using former employees to solicit |
| 10:49AM | 12 | the remainder of the offices to do what you call the liftout, |
| 10:49AM | 13 | and that is -- that was only what's at issue, not the |
| 10:49AM | 14 | misappropriation of trade secrets. And the reason why I ask |
| 10:49AM | 15 | that question is it seems to me if the term of the |
| 10:49AM | 16 | non-solicitation is defined by contract, why would damages go |
| 10:49AM | 17 | beyond the term that prohibits the non-solicitation? |
| 10:50AM | 18 | **MR. KAREN:** Because, Your Honor, it wasn't just a |
| 10:50AM | 19 | violation of the -- this was a breach of fiduciary duty, right? |
| 10:50AM | 20 | And it was not just a non-solicitation period. In other words, |
| 10:50AM | 21 | they -- while employed by us, utilizing their supervisory |
| 10:50AM | 22 | responsibilities, they were entrusted by my client to supervise |
| 10:50AM | 23 | these people, and as a result of that, they utilized that |
| 10:50AM | 24 | supervisory trust to then solicit the branch as an entire |
| 10:50AM | 25 | whole. Now, it's one thing when you -- and, in fact, Your |

| | | |
|---|---|---|
| 10:50AM | 1 | Honor, there's testimony -- and it's been provided in the |
| 10:50AM | 2 | deposition exhibits given to you -- that WaterStone did this |
| 10:50AM | 3 | intentionally and the individuals did this intentionally.  And |
| 10:50AM | 4 | the reason they did this intentionally is because Mr. Hutto and |
| 10:50AM | 5 | Mr. Smith and Mr. Wolf got paid based on the people and the |
| 10:51AM | 6 | production of the people who worked underneath them.  And if |
| 10:51AM | 7 | those people had not been unwilling -- or had been unwilling to |
| 10:51AM | 8 | leave, they would not have left, and if they -- and WaterStone |
| 10:51AM | 9 | did not want to take the chance when it developed an economic |
| 10:51AM | 10 | model, and nor did these individuals want to take a chance when |
| 10:51AM | 11 | they developed an economic model that they would move over and |
| 10:51AM | 12 | then start to pick people off.  That is one way they could have |
| 10:51AM | 13 | done it, and if that is what they had done, I don't even know |
| 10:51AM | 14 | if we would have been here.  But that's not what they did. |
| 10:51AM | 15 | They did it the wrong way.  They utilized an existing branch |
| 10:51AM | 16 | manager and branch managers to in a whole solicit their entire |
| 10:51AM | 17 | staff in one fell swoop, and that allowed an economic model to |
| 10:51AM | 18 | be made that but for these wrongful acts would not necessarily |
| 10:51AM | 19 | have occurred.  So if -- |
| 10:51AM | 20 | **THE COURT:**  But my question simply stands then.  If |
| 10:51AM | 21 | they were prohibited from the solicitation for a period of 12 |
| 10:51AM | 22 | months or 24 months -- as an example of 24 months, then in the |
| 10:52AM | 23 | 25th month, they could have done everything that you are |
| 10:52AM | 24 | asserting as illegal activity.  So they could have did the |
| 10:52AM | 25 | liftout in its entirety on the 25th month, and there would be |

| | |
|---|---|
| 10:52AM | 1 |

no damages that could be sought in the 25th month.  So if we're

focused solely just on non-solicitation, that's my question.

Excluding the trade secrets, how is it you could assert damages

beyond the term of the non-solicitation periods?

        MR. KAREN:  Your Honor, if I may propose a rhetorical

to answer your question, and it's obviously rhetorical.  If

somebody stole a necklace, and they came back and said, "Well,

I could have paid for it," does that excuse the theft?  Of

course not.  Nobody would agree with that.  So the fact that

they could have done this lawfully, that's not relevant, with

all due respect.

        THE COURT:  No, no, no.  We're talking about a

causation for damages, and if the damages are limited within a

period -- not liability.  So yes, the theft is a theft, and the

solicitation a solicitation.  But the solicitation could not

occur during a certain period of time, and if damages resulted

from that solicitation when it should not have occurred, it

seems to me that damages can't go past when the solicitation

would have been lawful.  And that's what I'm asking you, is how

would you argue -- for example, if the non-solicitation period

was a limit of 24 months, how do you argue you were damaged for

an additional six months beyond that prohibition of 24 months?

        MR. KAREN:  Because if they had not lifted out the

branch, Your Honor, in the beginning by their unlawful

activity, they wouldn't have left in the first place.  In other

10:53AM  1    words, if they could not have taken their branch as a whole --
10:53AM  2    and there's testimony in the record to support this.
10:53AM  3    WaterStone's Kevin Allen specifically said -- I asked him, "Why
10:53AM  4    didn't you just hire them," and do exactly what Your Honor
10:53AM  5    suggested?  And he said, "Because they would have looked at me
10:53AM  6    sideways.  They would have looked at me sideways because that's
10:54AM  7    just -- no one -- they wouldn't have left," effectively is what
10:54AM  8    his testimony was.  And so that's my point.  If they hadn't
10:54AM  9    done it unlawfully, the necklace never would have been stolen.
10:54AM  10   So then to say, "Okay.  Well, what would have happened if you
10:54AM  11   would have done that correctly, and then we're only going to
10:54AM  12   limit damages to that point," ignores the fact that the damage
10:54AM  13   never would have occurred in the first place if you hadn't done
10:54AM  14   it the wrong way.  And so then you can't turn around and say,
10:54AM  15   "Well, I'm limiting damages by the right way if you had done it
10:54AM  16   the right way," what might have happened if they had done it
10:54AM  17   the right way.  That's equivalent, Your Honor, I think, to --
10:54AM  18   because I don't believe it's just an issue of causation.  I
10:54AM  19   believe it's an issue of excusing the unlawful activity by
10:54AM  20   simply saying, "Well, okay.  So I'm going to give you what --
10:54AM  21   the limit of your punishment is what could have happened if you
10:54AM  22   would have done it the right way."  That's not how --
10:54AM  23   respectfully how it should work.
10:54AM  24            They never would have gotten this branch in the
10:54AM  25   first place if they hadn't engaged in those unlawful

10:55AM   1    activities.  So to limit damages by how they could have given

10:55AM   2    it first assumes they would have been able to do it, which is I

10:55AM   3    think an assumption --

10:55AM   4            THE COURT:  Mr. Karen, what I'm suggesting is they

10:55AM   5    could have done it all on the 25th month and gotten the branch

10:55AM   6    there, and there would be no damages.  Done everything that

10:55AM   7    you're asserting as the liability for WaterStone, on the 25th

10:55AM   8    month they could have done the exact same conduct, and there

10:55AM   9    would have been no violation.

10:55AM  10            MR. KAREN:  That may be true, but number 1, I think,

10:55AM  11    Your Honor, that would -- that would essentially reward their

10:55AM  12    bad behavior.  That's number 1, because that also assumes they

10:55AM  13    would have been able to.  What would have happened 24 months

10:55AM  14    later, we don't know.  Keller Williams could have come in

10:55AM  15    there, and everybody could have been happy.  We could have had

10:55AM  16    the opportunity to raise salaries.  We could have had the

10:55AM  17    opportunity to offer bonuses.  They left in one fell swoop

10:55AM  18    literally in the dead of the night.  We had no chance to

10:56AM  19    compete, and that's the real issue here.

10:56AM  20            If, Your Honor, they had waited two years and we

10:56AM  21    had advanced notice of that, we could have done any number of

10:56AM  22    things knowing it was coming to prepare and to counter it.

10:56AM  23    Yes, could they have solicited?  Absolutely.  No question at

10:56AM  24    the end of that period.  Would they have been successful?  No

10:56AM  25    one will know because they didn't do it the right way.  They

| | | |
|---|---|---|
| 10:56AM | 1 | shouldn't get the benefit of that assumption, that they would |
| 10:56AM | 2 | have been successful, because it ignores the fact that Mutual |
| 10:56AM | 3 | would have had two years to prepare, and that's why you have |
| 10:56AM | 4 | these non-solicitation provisions, to give a prior employer a |
| 10:56AM | 5 | period of time to prepare knowing what's coming.  That's the |
| 10:56AM | 6 | whole benefit.  And to -- and that benefit was taken from us. |
| 10:56AM | 7 | So they shouldn't get the benefit of assuming |
| 10:56AM | 8 | what would have happened in two years when we didn't have the |
| 10:56AM | 9 | benefit to compete. |
| 10:56AM | 10 | THE COURT:  All right.  Well, I'll come back to that |
| 10:56AM | 11 | and tell you what I'm thinking here at the end, but I want to |
| 10:56AM | 12 | get to your motion at document number 164.  This is problematic |
| 10:57AM | 13 | because there's a separate motion that I'm not even sure how |
| 10:57AM | 14 | you could be prepared for to argue, and I'm a little |
| 10:57AM | 15 | disappointed, Ms. Kreiter, that such a substantive motion, one, |
| 10:57AM | 16 | was filed as a Motion in Limine on the eve of our hearing today |
| 10:57AM | 17 | because it seems to me that would have been more appropriate |
| 10:57AM | 18 | related to -- related to the Hutto and Smith argument on a |
| 10:57AM | 19 | summary judgment rather than a Motion in Limine, and that is a |
| 10:57AM | 20 | substantive issue, one, that I'm not going to require Mr. Karen |
| 10:57AM | 21 | to respond to today because he's going to have to be able to |
| 10:57AM | 22 | respond to it in a written pleading, and I need consider it, |
| 10:57AM | 23 | but nonetheless, it plays in some part to what I'm about to ask |
| 10:57AM | 24 | now, which is you are asking me to reconsider, Mr. Karen, Judge |
| 10:57AM | 25 | Barber's order to allow damages to flow from the managers |

10:57AM 1    themselves, and I think Judge Barber's order is very clear.

10:58AM 2    It's a matter of what the managers themselves could have done.

10:58AM 3    So simply stated, if the facts demonstrate that the

10:58AM 4    solicitation was done by the managers of other employees, then

10:58AM 5    they would be in violation of their agreements, and so it would

10:58AM 6    be damages related to the solicitation of other employees, not

10:58AM 7    to the managers themselves.  But if it was, for example, a

10:58AM 8    manager who solicited another manager, and as I understand it,

10:58AM 9    the argument to be made is that -- is it Hutto?  Am I saying

10:58AM 10   that correctly?

10:58AM 11              MS. KREITER:  I believe so, Your Honor.

10:58AM 12              THE COURT:  That Mr. Hutto solicited Mr. Wolf and

10:58AM 13   Mr. Smith, then it would be damages that could be considered as

10:58AM 14   to the departure of Mr. Smith and Mr. Wolf.  Now, I realize

10:58AM 15   there's now going to be an argument as to whether Mr. Hutto was

10:58AM 16   prevented from doing that now under California law, but

10:59AM 17   nonetheless, that seems to me to be appropriate.

10:59AM 18              So, Ms. Kreiter, explain to me why I should not

10:59AM 19   allow, independent of your substantive motion, that if the

10:59AM 20   evidence demonstrates that someone violated their

10:59AM 21   non-solicitation, that damages could be represented by the

10:59AM 22   departure of those who were solicited?

10:59AM 23              MS. KREITER:  I guess I will just say, Your Honor,

10:59AM 24   there's a challenge to revisiting all of the factual evidence.

10:59AM 25   I do not believe that the evidence Mr. Karen is saying exists,

10:59AM   1   really does exist.  The argument as to Mr. Hutto and did he

10:59AM   2   solicit the others, that was never raised before.  So, I mean,

10:59AM   3   frankly, what was presented to Judge Barber was an admission

10:59AM   4   from the opposition that you know, "No, we absolutely should

10:59AM   5   not count the damages associated with the managers."  For me to

10:59AM   6   really address that argument, I mean, I would need to go back,

11:00AM   7   vet the facts, present new almost summary judgment argument,

11:00AM   8   you know, on that issue.

11:00AM   9            The undisputed evidence as I know it is that all

11:00AM  10   four of the managers were searching for jobs.  They were

11:00AM  11   entertaining other employers.  WaterStone was not the first;

11:00AM  12   that they had applied at a number of other firms.  There's

11:00AM  13   deposition testimony to that effect; that the managers

11:00AM  14   absolutely were leaving.  They just happened to pick

11:00AM  15   WaterStone.  So I don't -- I think in the evidence that was

11:00AM  16   presented to Judge Barber, it just factually doesn't support

11:00AM  17   what Mr. Karen is saying.  And I think that Judge Barber

11:00AM  18   considered the factual evidence that was put before him, and I

11:00AM  19   guess that's what I will say about that.

11:00AM  20            It's something that would cause me to want to

11:00AM  21   redo the briefing on that issue in a manner that I think would

11:00AM  22   redo some of the factual evidence presented to Judge Barber.

11:01AM  23            Does that answer the question?

11:01AM  24   **THE COURT:**  Your argument is not that it would be

11:01AM  25   inappropriate to allow that if the evidence demonstrated, but

| 11:01AM | 1 | just simply you believe the facts will not demonstrate that? |

11:01AM  1  just simply you believe the facts will not demonstrate that?

11:01AM  2      MS. KREITER:  I don't think the facts demonstrate

11:01AM  3  that, but it's also a road that we've already been down, and

11:01AM  4  Judge Barber presumably considered the evidence before him and

11:01AM  5  was not persuaded as to that, or Mutual didn't present --

11:01AM  6      THE COURT:  But as I understand it, that evidence was

11:01AM  7  not presented to Judge Barber, and if that is evidence within

11:01AM  8  this case, it seems to me it would be relevant for purposes of

11:01AM  9  a consideration of damages.

11:01AM  10      MS. KREITER:  Yeah.  I guess I'm just struggling a

11:01AM  11  little bit, Your Honor, to kind of go back and rewrite history

11:01AM  12  here.  It kind of -- an argument was made without factual

11:01AM  13  support.  WaterStone in turn did put forth factual support, so,

11:01AM  14  you know, I think that the decision was made based on the

11:01AM  15  evidence presented.  This new argument about Hutto and that the

11:01AM  16  damages should be limited to just him, that argument was

11:02AM  17  absolutely never made.

11:02AM  18      THE COURT:  All right.  Mr. Karen?

11:02AM  19      MR. KAREN:  Well, I do think that argument was made,

11:02AM  20  Your Honor.  I think even a broader argument was made than

11:02AM  21  that.  I mean, the point here is that -- and I agree with this

11:02AM  22  point.  If, in fact, they left on their own accord and they

11:02AM  23  left lawfully without engaging in any wrongful activity, then

11:02AM  24  obviously the loans that they could take as at will employees

11:02AM  25  we can't claim as damages because obviously there's no causal

11:02 AM 1   relationship between the wrongful activity.

11:02 AM 2               Now, here, though, I think -- and this was a

11:02 AM 3   point we continued to make, is that once WaterStone engaged a

11:02 AM 4   number of wrongful activities -- and as I said, had they not

11:02 AM 5   engaged in those wrongful activities, none of the people,

11:02 AM 6   Mr. Hutto or anybody else, would have left.  That's our claim,

11:02 AM 7   and we believe that a jury is entitled to consider that.  If a

11:02 AM 8   jury is, in fact, considering that case, the case that says --

11:02 AM 9               THE COURT:  Well, I'm going to stop you right there

11:02 AM 10  on that argument.  Whoever was the first, there will be no

11:03 AM 11  damages consideration because WaterStone soliciting any one

11:03 AM 12  individual is not in any way a violation.  WaterStone could

11:03 AM 13  have solicited anyone they wanted independently.  They could

11:03 AM 14  have gone to every employee, as I understand the record, and

11:03 AM 15  solicited each individual employee to hire them.  What your

11:03 AM 16  theory is, they went to the managers, solicited them, who then

11:03 AM 17  in turn solicited their employees at the Mutual of Omaha

11:03 AM 18  offices.  That's the violation.  They have a contract of

11:03 AM 19  non-solicitation for a period of either one or -- one year or

11:03 AM 20  two years, as I understand it, depending on the employee.

11:03 AM 21              So as you asserted in your motion, that if

11:03 AM 22  Dwayne Hutto was the original person solicited who then in turn

11:03 AM 23  solicited others, damages related to Dwayne Hutto's departure

11:03 AM 24  would not be probative to the issue.  It would be those that

11:03 AM 25  flowed from his solicitation, and so that is clear to me.

11:04AM  1            So what is at issue then is who are the other

11:04AM  2   individuals that fell?  So if it's domino effect, as you're

11:04AM  3   arguing, I'll allow it and consider that and allow that to be

11:04AM  4   considered by damages.  But as to the first individual, and at

11:04AM  5   least as you've asserted in the motion, if it's Dwayne Hutto, I

11:04AM  6   don't see how it's relevant for consideration of damages as to

11:04AM  7   his departure.

11:04AM  8            So if you want to make a record as to why I

11:04AM  9   still should consider that, but as you've even argued in your

11:04AM 10   motion, it seems to be in conflict with the argument.

11:04AM 11            MR. KAREN:  Again, I understand where you are on

11:04AM 12   this, Your Honor, but I would like to make a record and just

11:04AM 13   say my peace, if you would allow me briefly.

11:04AM 14            THE COURT:  Please.

11:04AM 15            MR. KAREN:  The issue is -- and I think you've

11:04AM 16   identified it -- the wrongful conduct.  Did the wrongful

11:04AM 17   conduct predate?  And here is -- I'll make this, again, as a

11:04AM 18   rhetorical question.

11:04AM 19            THE COURT:  Okay.  I understand that wrongful

11:04AM 20   conduct.  What -- what's it wrongful in violation of?

11:04AM 21            MR. KAREN:  So, for example, if we can prove that

11:05AM 22   Dwayne Hutto would not have left himself if he had not been

11:05AM 23   able to take his branch with him -- and I believe we provided

11:05AM 24   evidence that we can argue to a jury that they can or cannot

11:05AM 25   make that conclusion.  We should leave that to the jury,

11:05AM 1    because if the jury concludes that Mr. Hutto would not have

11:05AM 2    left without his entire branch and WaterStone would not have

11:05AM 3    hired him without his entire branch and that discussion at all

11:05AM 4    times was only about the entire branch being moved, then the

11:05AM 5    wrongful conduct is inherent in the first act because there was

11:05AM 6    no separate act.  Mr. Hutto -- if Mr. Hutto had left for

11:05AM 7    WaterStone, done.  He leaves.  He walks across the street.

11:05AM 8    Comes to WaterStone.  The next day, in violation of whatever

11:05AM 9    else he does, he then solicits, and then everybody comes with

11:05AM 10   him.  I would fully agree with the concept, fully agree that

11:05AM 11   Mr. Hutto cannot -- his production cannot be a damage because

11:05AM 12   that had left.  But if the facts were that Mr. Hutto would not

11:06AM 13   have left, none of these individuals would have left, and in

11:06AM 14   fact the only reason they did is because they were promised,

11:06AM 15   "Hey, steal the whole branch.  We'll do it all at once," what

11:06AM 16   then -- then you can't divorce the damages associated with

11:06AM 17   their production from the wrongful activity because you can't

11:06AM 18   assume that had it not been wrongful --

11:06AM 19           THE COURT:  But explain to me, what is the wrongful

11:06AM 20   activity?  Put it in terms of the contract, because that's what

11:06AM 21   you have to demonstrate, tortious interference with the

11:06AM 22   contract.  So what is the wrongful activity at issue for

11:06AM 23   Mr. Hutto?

11:06AM 24           MR. KAREN:  Well, there's a couple, Your Honor.

11:06AM 25   First, even outside the contract, there's the breach of

11:06AM 1    fiduciary duty which did exist as a manager.  That's one.

11:06AM 2              Two, within his contract there are provisions

11:06AM 3    relating to -- and even if you don't -- you know, again, we

11:06AM 4    believe that the trade secrets case should stay in, but even if

11:06AM 5    hypothetically you kept that out, there's no question that was

11:06AM 6    confidential information.  There's no question he took that

11:06AM 7    confidential information.  It's information that WaterStone

11:07AM 8    agrees is confidential even in their own documents.  There's a

11:07AM 9    long record in that in Mr. Allen's testimony and the

11:07AM 10   documentation provided.  So he stole all of that confidential

11:07AM 11   information when he left, and he took that.  So that's one

11:07AM 12   wrongful piece of activity.

11:07AM 13             There's demonstration in the record of them

11:07AM 14   hiring somebody to actually funnel that to a third party who

11:07AM 15   then started making these loans and these leads so that they

11:07AM 16   could do this seamless liftout.  These are all wrongful actions

11:07AM 17   that contributed to Mr. Hutto's departure.

11:07AM 18             So those activities along with the fact that he

11:07AM 19   solicited staff -- Mr. Allen testified, Your Honor, at length.

11:07AM 20   He said at length that it is a risk to bring over somebody

11:07AM 21   without the entire branch because they don't know what

11:07AM 22   production you'll get, and when they provide an economic model

11:07AM 23   and they provide the compensation of individuals to come over,

11:07AM 24   one of the things they're considering, actually the biggest

11:07AM 25   thing they're considering, is how much production are we going

| | | |
|---|---|---|
| 11:07AM | 1 | to get from this group that we're paying for?  Well, it's one |
| 11:08AM | 2 | thing to make that offer knowing for certain you have the |
| 11:08AM | 3 | entire group in one fell swoop.  It's a very different |
| 11:08AM | 4 | situation if you have to take the risk that, "I'm going to make |
| 11:08AM | 5 | this investment, and then maybe some of them might come over." |
| 11:08AM | 6 | They never had to do the "maybe some might," because they did |
| 11:08AM | 7 | it unlawfully at the inception by taking this branch from |
| 11:08AM | 8 | its -- all in one fell swoop, having the managers breach their |
| 11:08AM | 9 | fiduciary duty, having the managers steal confidential |
| 11:08AM | 10 | information and send it over.  This was all done in concert, |
| 11:08AM | 11 | and they admitted this, Your Honor.  They admitted their goal |
| 11:08AM | 12 | was a seamless transition because it was critical to what they |
| 11:08AM | 13 | were trying to do. |
| 11:08AM | 14 | So to use Ms. Kreiter's statement about |
| 11:08AM | 15 | unwriting history, that's what they're asking to do here is |
| 11:08AM | 16 | unwrite history and how might it have been done okay. |
| 11:08AM | 17 | Respectfully, I don't think they get to do that.  I think we |
| 11:08AM | 18 | have to take it as it comes.  As it comes, they took everything |
| 11:09AM | 19 | at once.  They stole everything at once, and they shouldn't |
| 11:09AM | 20 | get -- |
| 11:09AM | 21 | THE COURT:  Explain to me then -- I don't necessarily |
| 11:09AM | 22 | understand the distinction.  What is the relevancy of |
| 11:09AM | 23 | Hutto's -- damages related to Hutto if in the end you're |
| 11:09AM | 24 | asserting Hutto's conduct of solicitation and theft and |
| 11:09AM | 25 | misappropriation of trade secrets essentially shut down that |

11:09AM 1    office and with this liftout, that the damages then present --

11:09AM 2    prevented future profits for that office?  What is the

11:09AM 3    relationship of Hutto's book of business in connection with

11:09AM 4    that?

11:09AM 5           MR. KAREN:  Because unlike a scenario, Your Honor,

11:09AM 6    where Hutto left and did that lawfully and you can segregate

11:09AM 7    the lawful activity -- him leaving, no question about it, and

11:09AM 8    the loans that he would have produced -- from everything else,

11:09AM 9    I think in that case they're absolutely right.  I believe Judge

11:09AM 10   Barber would have been absolutely right.  In this case, you

11:09AM 11   can't segregate or separate because it was all done at once,

11:10AM 12   and you can't say respectfully that, "Well, if he had left

11:10AM 13   lawfully then, of course, Mutual wouldn't be entitled to

11:10AM 14   those," because he didn't leave lawfully.  Everything was done

11:10AM 15   in one fell swoop unlawfully, and therefore the question is if

11:10AM 16   there's unlawful behavior and that unlawful behavior causes

11:10AM 17   damages and there's an argument for causation, which is what

11:10AM 18   we're arguing here, if that -- if that unlawful activity which

11:10AM 19   occurred here and the result of that activity was the departure

11:10AM 20   of the entire branch, inclusive in that entire branch would be

11:10AM 21   Mr. Hutto's profits for the profits driven by his work.  The

11:10AM 22   fact that he could have done this lawfully, that he could have

11:10AM 23   moved, that may be true, but they don't get that assumption

11:10AM 24   when they engaged in the unlawful activity in the first place.

11:10AM 25   And that unlawful activity caused all of these damages.

|          |    |                                                                                  |
|----------|----|----------------------------------------------------------------------------------|
| 11:10AM  | 1  | **THE COURT:** All right. You want to make any argument                           |
| 11:10AM  | 2  | as to the New Jersey office beyond what's in your pleading?                       |
| 11:11AM  | 3  | **MR. KAREN:** I would be restating what is in my                                 |
| 11:11AM  | 4  | pleading, Your Honor. I -- I will just so it's clear, if                          |
| 11:11AM  | 5  | that's okay, very, very briefly; just that, you know, Mr. Smith                   |
| 11:11AM  | 6  | managed this branch. You know, Mr. Smith leaves. The branch                       |
| 11:11AM  | 7  | follows him. I don't think there's any giant leap the jury has                   |
| 11:11AM  | 8  | to make there about what occurred and what happened here. So I                   |
| 11:11AM  | 9  | think it just follows from the theory of this case that that                     |
| 11:11AM  | 10 | should be considered by the jury.                                                |
| 11:11AM  | 11 | **THE COURT:** All right. Ms. Kreiter, you want to                                |
| 11:11AM  | 12 | respond to any of those arguments?                                               |
| 11:11AM  | 13 | **MS. KREITER:** Just real quick, Your Honor. I                                   |
| 11:11AM  | 14 | don't -- here's what's missing. Mr. Karen did not point to any                   |
| 11:11AM  | 15 | evidence in the record indicating that Dwayne Hutto solicited                    |
| 11:11AM  | 16 | the other managers. It was not presented today. It was not                       |
| 11:11AM  | 17 | presented to Judge Barber.                                                        |
| 11:11AM  | 18 | In addition, Mr. Karen did not explain at all if                                  |
| 11:11AM  | 19 | he had such evidence, why did he not bring it to Judge Barber's                  |
| 11:11AM  | 20 | attention?                                                                        |
| 11:11AM  | 21 | I want to address a few things that -- since the                                 |
| 11:12AM  | 22 | Court may have been interested in, you talked about the damages                  |
| 11:12AM  | 23 | and, you know, shouldn't they be limited to a year. That was                     |
| 11:12AM  | 24 | something that the parties addressed. There is helpful case                      |
| 11:12AM  | 25 | law on point. I think the most helpful case is the <u>Office</u>                 |

| | | |
|---|---|---|
| 11:12AM | 1 | <u>Depot v. Arnold</u> case, which is a Southern District of Florida |
| 11:12AM | 2 | case.  The case is 2017 Westlaw 117 -- |
| 11:12AM | 3 | **THE COURT:**  Well, let me just tell everybody and end |
| 11:12AM | 4 | the surprise.  What I'm intending to do with that is as I see |
| 11:12AM | 5 | it, the plaintiff's position simply is you look at the |
| 11:12AM | 6 | combination of the solicitation as well as the misappropriation |
| 11:12AM | 7 | for Counts 1 and 2, and in consideration of that, if there is |
| 11:12AM | 8 | causation that establishes that the theft of trade secrets or |
| 11:12AM | 9 | misappropriation of trade secrets also was substantially the |
| 11:12AM | 10 | cause of the closure of the offices and as has been argued here |
| 11:13AM | 11 | in the plaintiff's theory, that they would not have been able |
| 11:13AM | 12 | to accomplish this liftout but for the obtaining of the trade |
| 11:13AM | 13 | secrets at issue, then I think that opens the door beyond the |
| 11:13AM | 14 | limitation of the solicitation agreements. |
| 11:13AM | 15 | So it seems to me the verdict form that I'm |
| 11:13AM | 16 | contemplating at issue here is allowing that for Counts 1 and 2 |
| 11:13AM | 17 | and then limiting the damages to the solicitation agreements |
| 11:13AM | 18 | for Count 3, but there has to be some type of causation found |
| 11:13AM | 19 | by the jury that it was the collective, with this trade |
| 11:13AM | 20 | secrets, that allowed for that.  So that's what I'm |
| 11:13AM | 21 | contemplating because I would agree that the solicitation could |
| 11:13AM | 22 | have occurred after the term of the various agreements.  And so |
| 11:13AM | 23 | that is one thing that I'm contemplating on how to instruct the |
| 11:13AM | 24 | jury. |
| 11:13AM | 25 | But -- I interrupted your argument, but I wanted |

| | |
|---|---|
| 11:13AM | 1 |

that to be clear as to where I'm looking to go forward with
this in the case.

        MS. KREITER:  I guess the other points that I think I
want to be clear about, I heard Mr. Ari -- or Mr. Karen talk
about Keller Williams.  Just so that the Court is aware, that
was something raised to Judge Barber and he rejected.  It's not
in his opinion, but it's in the record at docket 131 at
page 37.  There's discussion about that, and Judge Barber
states something to the effect of, you know, "Look, the fact
that there was this Keller Williams' acquisition, that doesn't
get you beyond the speculation.  The theme of the case has been
what damages does the plaintiff have that are something besides
speculation?"

        With respect to this 30 months, you know, to me
it's kind of the same thing that we talked about before.  This
is trial by ambush.  I'm hearing about 30 months for the first
time in March.  I don't view Judge Barber's decision as
blessing 30 months or anything like that.  I think that --

        THE COURT:  Nor rejecting it.

        MS. KREITER:  Nor rejecting it.

        THE COURT:  Judge Barber's decision is, "We'll see
what happens at trial as to what the evidence is."

        MS. KREITER:  I think -- I agree with the Court in
that regard.  There's kind of a stipulation filed after the
briefing, and he says, "I'm not going to dismiss the claim in

11:15AM 1    full," but I don't think that he blesses the 30 months, which

11:15AM 2    is why I didn't view WaterStone's motion as one for

11:15AM 3    reconsideration.

11:15AM 4            But I think even if this case were still before

11:15AM 5    Judge Barber, I would want to know who is saying 30 months?

11:15AM 6    I've never heard that ever in the case prior to this

11:15AM 7    stipulation being filed.  I see things filed now, you know,

11:15AM 8    something -- a filing on March 10th with a spreadsheet that

11:15AM 9    says, "Well, this is a summary of their voluminous records."

11:15AM 10   Who is the person that crafted that?  Who is the witness that's

11:15AM 11   going to say 30 months?  I've not deposed anybody on this new

11:15AM 12   analysis.  There's not something in the public record where you

11:15AM 13   can go to a website and find this.  This is, again, kind of a

11:16AM 14   springing damages analysis that I'm finding out about in May.

11:16AM 15           And I can't have 30 months because I don't know

11:16AM 16   anything about that theory.  I don't have a chance to depose

11:16AM 17   anybody about that theory.  I don't have a chance to work with

11:16AM 18   my expert about attacking that theory.

11:16AM 19           I can work with what was presented in discovery,

11:16AM 20   which was 18 months, and that was the point of bringing my

11:16AM 21   motion.  Just what are we doing here with the damages in this

11:16AM 22   case?  And I think it's got to tie back to something that I've

11:16AM 23   had adequate notice to prepare for in advance of the trial.

11:16AM 24           I want to be clear that no person from Mutual

11:16AM 25   has ever said 30 months.  And, frankly, it's up to 30 months.

| | |
|---|---|
| 11:16AM | 1 |
| 11:16AM | 2 |
| 11:16AM | 3 |
| 11:16AM | 4 |

1   I still don't know, you know, exactly what the duration is that
2   is being sought, but it's clear there is a robust analysis that
3   has been done by somebody, and I don't think it's fair for any
4   of that to go before the jury period.
5              I don't want a trial by ambush, and I fear that
6   that's what is -- exactly what is happening here.
7          THE COURT:  Well, if you're planning on arguing -- I
8   can just tell you right now I am not revisiting the New Jersey
9   office, and Judge Barber's order will stand as to that.
10         MS. KREITER:  Okay.  And as to the managers, I don't
11  know that I have more to say.  I just -- again, I feel like all
12  of this argument is new.  It was not presented.  I know what
13  WaterStone presented.  I don't -- I just don't have anything
14  from Mr. Karen.
15             So I think the time to do that would have been
16  back at a time when the parties were briefing these issues, and
17  I will say, as we said in our brief, these issues weren't, you
18  know, sprung on to Judge Barber.  We've been really addressing
19  these damages issues since July of last year.
20             So I don't -- you know, I did not feel that
21  there's any new evidence that would constitute grounds for
22  reconsidering Judge Barber's decision.  I did not view
23  WaterStone's motion as seeking any type of reconsideration, but
24  more in the category of I am still trying to get my arms around
25  this case.  What is the demand from plaintiffs?  I frankly have

<table>
<tr><td>11:18AM</td><td>1</td><td>never had a case going to trial where plaintiff has not said,</td></tr>
</table>

11:18AM  1  never had a case going to trial where plaintiff has not said,

11:18AM  2  "These are the damages that I am seeking."

11:18AM  3      THE COURT:  I guess I'm not sure I understand why

11:18AM  4  you're arguing that.  If Judge Barber expressly identifies this

11:18AM  5  30-month stipulation and then expressly states he's not going

11:18AM  6  to prohibit in the case in chief evidence related to

11:18AM  7  recognizing there has to be some basis in fact for a temporal

11:18AM  8  period, but he's not going to prohibit initially the lost

11:18AM  9  profits damages, but that he will consider after the case in

11:18AM  10  chief whether that needs to be revisited, but yet you are now

11:18AM  11  asking me to limit it just to 18 months, which seems to be also

11:18AM  12  asking me to reconsider what Judge Barber ordered.

11:19AM  13      MS. KREITER:  I guess I will say, I think there's a

11:19AM  14  lack of clarity because, for example, there are two damages

11:19AM  15  witnesses.  One sets forth the tool.  "Here's how I'm going to

11:19AM  16  measure damages."  You've got to insert some kind of duration.

11:19AM  17  And then there's got to be a duration that comes from somebody.

11:19AM  18  Other than emails from counsel, when you take, for example,

11:19AM  19  30 months or 18 months or 12 months, whatever duration you're

11:19AM  20  going to take, and plug it into the tool that Rosevear

11:19AM  21  presents, some number pops out.  I don't know what that number

11:19AM  22  is without knowing the duration, so until I knew that

11:19AM  23  plaintiffs were seeking 30 months, I had no knowledge as to

11:19AM  24  what the damages demand is going to be.

11:19AM  25      Once I had the carve-outs from Judge Barber and

| | | |
|---|---|---|
| 11:19AM | 1 | the 30-month disclosure post-briefing, you know, that was the |
| 11:20AM | 2 | first time that you could then say, "okay. I'm going to take |
| 11:20AM | 3 | the tool and the numbers and come up with what is the demand |
| 11:20AM | 4 | made by plaintiffs." |
| 11:20AM | 5 | So it is not -- without springing new demands |
| 11:20AM | 6 | and evidence on WaterStone at trial, I need to know what is the |
| 11:20AM | 7 | duration. I've never deposed anybody about 30 months. I |
| 11:20AM | 8 | don't -- I've not talked to Rosevear about why 30 months equals |
| 11:20AM | 9 | X number because that was never part of the story. |
| 11:20AM | 10 | So my motion, I think, regardless of what |
| 11:20AM | 11 | carve-outs the Court implements -- |
| 11:20AM | 12 | THE COURT: Well, to be clear, when you say your |
| 11:20AM | 13 | motion, I think there's two different motions at issue because |
| 11:20AM | 14 | 170 is also asking the Court not to allow Rosevear to testify |
| 11:20AM | 15 | in the case in chief. |
| 11:20AM | 16 | MS. KREITER: Yeah. |
| 11:20AM | 17 | THE COURT: So your Motion in Limine as to the |
| 11:20AM | 18 | damages is 166 where you're asking me to limit to the |
| 11:21AM | 19 | 18 months. |
| 11:21AM | 20 | MS. KREITER: Correct. And I'm talking about the |
| 11:21AM | 21 | motion 166. Just clarifying, I think whether it's -- for |
| 11:21AM | 22 | example, the Paramus branch. If we're just carving out the |
| 11:21AM | 23 | Paramus branch, what does -- you know, the term carve-out, what |
| 11:21AM | 24 | does that equate to in terms of a number? I want to know that |
| 11:21AM | 25 | in advance of the trial. |

| 11:21AM | 1 | My damages expert, Steve Oscher, may say, "Look, |
|---|---|---|

11:21AM   1          My damages expert, Steve Oscher, may say, "Look,

11:21AM   2   that number is not right."  I was trying to get transparency as

11:21AM   3   to what does Judge Barber's categorical rulings mean in terms

11:21AM   4   of numbers?  Somebody has got to do that, and it should be done

11:21AM   5   in advance of trial.  I was clear that we have Steve Oscher,

11:21AM   6   our damages expert, do the math.  Could he have done it sooner?

11:21AM   7   No, he couldn't have.  I mean, we didn't have any knowledge of

11:21AM   8   the 30 months, and I note that Mutual hasn't come forward and

11:21AM   9   said, "No, that's the wrong number.  Here's what Rosevear

11:21AM  10   thinks it is."

11:21AM  11          So part of my motion that is docket 166 is let's

11:21AM  12   translate this so that everyone knows what are the damages

11:22AM  13   being sought, and then frankly I will be in a position to work

11:22AM  14   with my expert, you know, about that.

11:22AM  15          What I won't be able to do is equip my expert to

11:22AM  16   understand why are we talking about 30 months?  Because that's

11:22AM  17   where you get, for example, docket 176-2, which is apparently

11:22AM  18   the support for the 30 months.  That's brand new, and frankly,

11:22AM  19   where is the Bates number on that document?  It just says,

11:22AM  20   "This is something Mutual intends to use.  It's a summary of

11:22AM  21   voluminous records."  I don't have any of the underlying

11:22AM  22   records.  I mean, I don't know who is the witness that's going

11:22AM  23   to put this forward?  I don't know anything about this.

11:22AM  24          Frankly, if I had this 30-month duration

11:22AM  25   disclosed in discovery, I would have changed the scope of

|   |   |
|---|---|
| 11:22 AM | 1 |

Mr. Oscher's report.  If I had had it, you know, any time

sooner than two weeks before trial, I would have changed the

scope of what Mr. Oscher is doing.

So my motion is just as a practical matter, I

can't talk about 30 months.  I don't know anything about it.  I

could depose somebody.  I don't know who that would be, and I

don't know when I'm going to do that.  I would want to get all

of the documents that support Exhibit 2.  I would want to have

time to study that.  I would want Steve Oscher to take a look

at that.  I don't want Steve Oscher doing it at trial for the

first time.

So it's really a practicality.  30 months isn't

viable.

**THE COURT:**  I understand.  What's the response to

that?

**MR. KAREN:**  Your Honor, I will try to be brief, but

throughout this case, we have taken the position that the Court

never ruled against us on, to be clear, that we have the

ability to provide a jury with a means of determining on their

own based on the evidence that was presented how long the lost

profits should be calculated for, and we did not need to

provide them a 30 months or five years; that we could provide

them a model, and the jury could in their determination and

discretion upon hearing the evidence make a calculation based

on --

11:24 AM  1          THE COURT:  When you say throughout this case, what
11:24 AM  2    was your initial disclosure of damages, and what was your
11:24 AM  3    continuing disclosure of damages?
11:24 AM  4          MR. KAREN:  We had a 10-year model.  We had a 10-year
11:24 AM  5    model of damages which I believe read up to -- I believe the
11:24 AM  6    number was $28 million.  We voluntarily because --
11:24 AM  7          THE COURT:  Maybe I misunderstood that because I --
11:24 AM  8    as I understood the argument being made by Ms. Kreiter, the
11:24 AM  9    10-year model did not come in until Rosevear's calculation;
11:24 AM  10   that the original disclosure had always been the 18 months
11:24 AM  11   based upon the 30(b)(6) representations.
11:24 AM  12         MR. KAREN:  Well, that wasn't actually really
11:25 AM  13   correct, if I may.  What was actually exactly testified to by
11:25 AM  14   Mr. Gennarelli was saying, "Conservatively I think it's
11:25 AM  15   18 months," and his testimony continues -- no stop sentence,
11:25 AM  16   continuing with sentence, "I really think you could go on for
11:25 AM  17   six or seven years, but if I was going to be reasonable sitting
11:25 AM  18   here today and" -- not -- "reasonable" was not his word.  "If I
11:25 AM  19   was going to be conservative."  Thank you, Arielle.
11:25 AM  20   "Conservative, that's what I would say, but if you really ask
11:25 AM  21   me, I think it was six or seven years."  That's his testimony.
11:25 AM  22   No one ever said, "It's just 18 months."  What he said -- and
11:25 AM  23   he actually said in his deposition, he said, "And we did that
11:25 AM  24   for purposes of settlement."  That's exactly what
11:25 AM  25   Mr. Gennarelli testified to in his 30(b)(6).  So I think --

|          |    |                                                                     |
|----------|----|---------------------------------------------------------------------|
| 11:25 AM | 1  | **THE COURT:**  So then why was Rosevear not disclosed              |
| 11:25 AM | 2  | initially as an expert rather than a rebuttal expert?               |
| 11:25 AM | 3  | **MR. KAREN:**  Your Honor, at some point in the case we            |
| 11:25 AM | 4  | made that determination because we were not aware at the time      |
| 11:25 AM | 5  | of our deadline that they were going to be putting in an           |
| 11:26 AM | 6  | expert.  At that time that we learned that, we retained            |
| 11:26 AM | 7  | Ms. Rosevear.                                                        |
| 11:26 AM | 8  | Mr. Gennarelli could testify, you know, as a                       |
| 11:26 AM | 9  | witness himself and provide the evidentiary basis for our          |
| 11:26 AM | 10 | damages.  Ms. Rosevear, we believed, was a prudent add to the     |
| 11:26 AM | 11 | case when we realized they were going to have their own expert    |
| 11:26 AM | 12 | to address that.                                                    |
| 11:26 AM | 13 | So, you know, frankly, Your Honor, and I don't                     |
| 11:26 AM | 14 | want to -- there's a big part of me that says I'm fine with        |
| 11:26 AM | 15 | Ms. Rosevear testifying as the last witness in this case on        |
| 11:26 AM | 16 | rebuttal.  There's strategically a lot of benefits, as I'm sure   |
| 11:26 AM | 17 | you can appreciate, for us doing that.  However, I think          |
| 11:26 AM | 18 | ultimately what's -- what's easiest for the jury and I think      |
| 11:26 AM | 19 | fastest for the Court is that she testify in our case in chief.    |
| 11:26 AM | 20 | Now, I also don't believe there's any harm whatsoever to          |
| 11:26 AM | 21 | WaterStone on that.  They've known forever.  In fact, there was  |
| 11:26 AM | 22 | a hearing where Judge Barber asked Ms. Kreiter, "How long did     |
| 11:27 AM | 23 | you depose Ms. Rosevear?"  She said, "Six hours."  And he says, |
| 11:27 AM | 24 | "That's a long time."  And she says, "Yes."  And he says        |
| 11:27 AM | 25 | well -- Judge Barber said, well -- he even said it.  "If you     |

| | |
|---|---|
| 11:27AM | 1 |

11:27AM 1    want to take another deposition, you can."

11:27AM 2            **THE COURT:**  If I can, Mr. Karen, let me interrupt

11:27AM 3    you.  The big issue as raised by Ms. Kreiter is she has no idea

11:27AM 4    who will being testifying as to the 30 months, nor did she have

11:27AM 5    the ability to even depose that person prior to trial.  So her

11:27AM 6    concern is now anybody who goes forward with this now 30-month

11:27AM 7    theory, she'll be ambushed at trial without having the ability

11:27AM 8    to know exactly what is the theory for the 30 months in advance

11:27AM 9    of trial.

11:27AM 10           **MR. KAREN:**  Yes, and I can speak to that, Your Honor.

11:27AM 11   I'm sorry for getting sidetracked.  To address that point, from

11:27AM 12   the beginning of this case, we sought 10 years.  We voluntarily

11:27AM 13   reduced it down to 30 months.  We could have gone forward --

11:27AM 14   because the Court never ruled against us -- on 10 years.  I

11:27AM 15   mean, if they want this -- and I'm not saying this to be a

11:28AM 16   smart aleck, but if they think that's unfair for some reason,

11:28AM 17   for us to voluntarily reduce the amount of time that we're

11:28AM 18   seeking damages from 10 years to 30 months, then we can

11:28AM 19   withdraw the stipulation and just go back to the 10-year model

11:28AM 20   and present our evidence as we were planning to do, which the

11:28AM 21   Court never struck any of that.

11:28AM 22               We were trying to streamline this case.  We were

11:28AM 23   trying to make it cleaner and clearer.  So if that has somehow

11:28AM 24   created confusion -- which I don't understand how it does

11:28AM 25   because, again, what we have been arguing throughout this case

| | | |
|---|---|---|
| 11:28AM | 1 | for well over a year, before Ms. Rosevear was testifying, when |
| 11:28AM | 2 | Ms. Kreiter and WaterStone had every opportunity to take as |
| 11:28AM | 3 | much discovery as they wanted on that point, on our model, |
| 11:28AM | 4 | throughout that entire period throughout this case, they even |
| 11:28AM | 5 | operated on 10 years.  Our voluntary unilateral diminishment of |
| 11:28AM | 6 | the damages we seek now is being considered unfair surprise. |
| 11:28AM | 7 | And, Your Honor, there's really -- it's really |
| 11:28AM | 8 | not that complicated.  I think I've made it clear exactly what |
| 11:29AM | 9 | we're doing here.  We're taking the average.  We're utilizing |
| 11:29AM | 10 | that average based on MLS data.  It's publicly available data. |
| 11:29AM | 11 | It's data that WaterStone uses in its business every single |
| 11:29AM | 12 | day.  It's very familiar, probably far more familiar than I. |
| 11:29AM | 13 | Mr. Oscher doesn't have to start commenting on 30 months.  It |
| 11:29AM | 14 | is what it is. |
| 11:29AM | 15 | And so that's what we're putting forth as |
| 11:29AM | 16 | damages.  There's no unfair surprise, and if the Court feels |
| 11:29AM | 17 | there's such unfair surprise for us going from 10 years to |
| 11:29AM | 18 | 30 months, then we'll withdraw the stipulation, and we'll go on |
| 11:29AM | 19 | a 10-year theory.  We could still do that. |
| 11:29AM | 20 | But I don't think that Mutual should be punished |
| 11:29AM | 21 | because the judge -- because Judge Barber encouraged us |
| 11:29AM | 22 | strongly to kind of streamline this case, to make it clearer, |
| 11:29AM | 23 | to facilitate settlement discussions.  That's why we did -- |
| 11:29AM | 24 | THE COURT:  Well, encouraging you to do it and it |
| 11:29AM | 25 | actually happening may be two different things.  As I sit here |

| | | |
|---|---|---|
| 11:29AM | 1 | with all these substantive motions on the eve of trial, I |
| 11:29AM | 2 | wouldn't say we streamlined anything. |
| 11:29AM | 3 | So here's what we're going to do. |
| 11:30AM | 4 | MS. KREITER:  Your Honor, if I -- |
| 11:30AM | 5 | THE COURT:  Hold on. |
| 11:30AM | 6 | MS. KREITER:  There was one last point I wanted -- |
| 11:30AM | 7 | THE COURT:  Here's what we're going to do.  One |
| 11:30AM | 8 | moment. |
| 11:30AM | 9 | MS. KREITER:  I'm sorry. |
| 11:30AM | 10 | THE COURT:  I'm denying the Motion for Summary |
| 11:30AM | 11 | Judgment at document number 137, and I'm denying it without |
| 11:30AM | 12 | prejudice. |
| 11:30AM | 13 | I am going to direct that the plaintiff disclose |
| 11:30AM | 14 | by exhibits what are the confidential slash -- let me rephrase |
| 11:30AM | 15 | that.  What are the trade secrets that are at issue for |
| 11:30AM | 16 | Counts 1 and 2? |
| 11:30AM | 17 | Once that is done, I will schedule a hearing, |
| 11:30AM | 18 | and we're going to revisit whether any of those should be |
| 11:30AM | 19 | considered or if there is lack of evidence in the record to |
| 11:30AM | 20 | support whether there's an issue of fact as to any of those |
| 11:30AM | 21 | that are being identified as exhibits trade secrets. |
| 11:30AM | 22 | As for document number 164, I will grant it to |
| 11:30AM | 23 | this extent only.  I will allow the admissibility of evidence |
| 11:30AM | 24 | as to the solicitation of other managers and the consideration |
| 11:31AM | 25 | of whether that should be incorporated into the damages |

11:31AM  1    calculation.  So, in other words, if, as alleged, Mr. Hutto was

11:31AM  2    solicited and he then solicited others, the others can be

11:31AM  3    considered within the damage calculation if the facts prove and

11:31AM  4    bear that out.

11:31AM  5              As to documents number 166 and 170, I'm denying

11:31AM  6    those motions, but what I am going to do is -- and if I'm not

11:31AM  7    clear, what is happening is I'm taking you off my trial

11:31AM  8    calendar, and we are going to set a schedule to get this

11:31AM  9    accomplished, and then you'll be put right back on the trial

11:31AM  10   calendar.

11:31AM  11             But I am going to direct that the plaintiff

11:31AM  12   identify who will be testifying as to the damage calculation

11:31AM  13   and that a deposition can occur of that individual.  So if it's

11:32AM  14   Rosevear and it's going to be the same calculation for

11:32AM  15   30 months, then that -- so be it, and then that will be -- the

11:32AM  16   ability will be able to have a deposition of Rosevear as to how

11:32AM  17   that 30 months has been calculated.

11:32AM  18             As I stated earlier, in my consideration of the

11:32AM  19   instructions and the verdict form, plaintiff is making an

11:32AM  20   argument that in sum and total -- that is, the combination of

11:32AM  21   the misappropriation of trade secrets and the solicitation of

11:32AM  22   employees to essentially close out the offices -- is the

11:32AM  23   causation of damages.  However, if a jury disagrees that there

11:32AM  24   was no substantial damage done by any alleged misappropriation

11:32AM  25   of trade secrets and that all that was done was the

| | |
|---|---|
| 11:32AM | 1 |
| 11:33AM | 2 |
| 11:33AM | 3 |
| 11:33AM | 4 |
| 11:33AM | 5 |
| 11:33AM | 6 |
| 11:33AM | 7 |
| 11:33AM | 8 |
| 11:33AM | 9 |
| 11:33AM | 10 |
| 11:33AM | 11 |
| 11:33AM | 12 |
| 11:33AM | 13 |
| 11:33AM | 14 |
| 11:34AM | 15 |
| 11:34AM | 16 |
| 11:34AM | 17 |
| 11:34AM | 18 |
| 11:34AM | 19 |
| 11:34AM | 20 |
| 11:34AM | 21 |
| 11:34AM | 22 |
| 11:34AM | 23 |
| 11:34AM | 24 |
| 11:34AM | 25 |

1  solicitation of employees, then I find there should be a limit

2  on those damages by the terms of those employee agreements.  So

3  it is my intent that I am going to instruct and craft a verdict

4  form to identify that distinction.

5          Judge Barber's order stands as to the ability,

6  though, given the stipulation of 30 months, to go forward with

7  that damage calculation under that theory that it was in total

8  the solicitation of the employees, including the theft of the

9  misappropriation of funds.  And that is something that a jury

10  can consider in Count 1 and 2 in that regard; that the theft

11  of -- or excuse me, the misappropriation of the trade secrets,

12  that it was that combination and was so substantial led to the

13  closure of the offices and the resulting lost profits.

14          All right.  So the first thing is I want a

15  supplemental report presented as to this theory of damages for

16  the 30 months with the identification of the expert.

17          So how much time, Mr. Karen, will you need to

18  have that presented?

19          MR. KAREN:  May I confer with my colleague for one

20  moment, Your Honor?

21          THE COURT:  Sure.

22          MR. KAREN:  Thank you, Your Honor.

23                    (Pause.)

24          MR. KAREN:  Your Honor, without speaking to my expert

25  because I don't know her availability, I'm going to say two

| | |
|---|---|
| 11:34AM | 1 |

weeks.  I do think that be fair to Ms. Kreiter, I believe it
will probably be two people, one person from the company to
explain the 30-month duration and then Ms. Rosevear to adapt
that to her model.  So we'll be happy to do both and endeavor
to do that within two weeks.  I would only ask some leave of
Court if I have to call my expert after this hearing --

          THE COURT:  Okay.  Here's what we'll do.  I think
that would be very difficult to make that estimation today.
I'll direct you all meet and confer to come up with a
scheduling to include when you think we could get back for
purposes of trial.  And to be very blunt, it's my intent to do
this as quick as the parties are able to do it, to get you back
on trial.

          However, I do think document number 190 is a
substantial motion that could also impact the damage
calculations as well, and that is something that needs to be
decided by the Court.

          And so it would be my intent to take that up as
soon as the response has been briefed and to bring you back to
present any additional arguments you want so I can give you a
ruling on that to provide better direction as to whether that
will be an issue in the case because, as I see it, particularly
as to my ruling on the damages, if particular Mr. Hutto was not
operating under an enforceable contract, that could have a
significant impact upon the case.  And so that's something that

| | | |
|---|---|---|
| 11:36AM | 1 | I think needs to be -- an opportunity to be presented so the |
| 11:36AM | 2 | plaintiff can brief that and respond to the motion, and then |
| 11:36AM | 3 | I'll hear argument so I can make a determination as to that |
| 11:36AM | 4 | issue.  And so I will -- |
| 11:36AM | 5 | MR. KAREN:  Your Honor -- I'm sorry. |
| 11:36AM | 6 | THE COURT:  -- schedule that now, and then you could |
| 11:36AM | 7 | use your dates after that as to when you think you can |
| 11:36AM | 8 | accomplish the expert disclosure and then deposition, and we |
| 11:36AM | 9 | can get back for scheduling of trial.  So give me one moment. |
| 11:37AM | 10 | Why don't we do it, since I know we're all wide |
| 11:37AM | 11 | open on that schedule, the Tuesday, June 4th?  And we can do it |
| 11:37AM | 12 | at 10:00, and we could also do it by Zoom since it's just the |
| 11:37AM | 13 | one motion.  Does that work for everyone? |
| 11:37AM | 14 | MS. KREITER:  Your Honor, just to be clear, this is a |
| 11:37AM | 15 | hearing on -- |
| 11:37AM | 16 | THE COURT:  Document number 190, which is |
| 11:37AM | 17 | WaterStone's Motion in Limine -- |
| 11:37AM | 18 | MS. KREITER:  Got it. |
| 11:37AM | 19 | THE COURT:  -- as to the enforceability of the |
| 11:37AM | 20 | contracts for Mr. Hutto and Smith. |
| 11:37AM | 21 | MS. KREITER:  Sure.  That works for me. |
| 11:37AM | 22 | MR. KAREN:  That's fine with me, Your Honor.  Just |
| 11:37AM | 23 | clarification of when would you like your responsive brief |
| 11:37AM | 24 | filed by? |
| 11:37AM | 25 | THE COURT:  Well, by scheduling it then, that gives |

| | | |
|---|---|---|
| 11:37AM | 1 | you the full time to respond under the rules. |
| 11:37AM | 2 | MR. KAREN:  Okay. |
| 11:37AM | 3 | THE COURT:  You can file it just within the time |
| 11:37AM | 4 | period as allowed. |
| 11:37AM | 5 | MR. KAREN:  Thank you, Your Honor. |
| 11:37AM | 6 | THE COURT:  All right.  And what we'll do then as |
| 11:38AM | 7 | well, if you all will meet and confer before then to give me |
| 11:38AM | 8 | the dates you'd like going forward from there, to include when |
| 11:38AM | 9 | you would want to go back to trial because it seems to me the |
| 11:38AM | 10 | next step after that, once you've disclosed both the expert and |
| 11:38AM | 11 | your documents for trade secrets, I will then have a hearing as |
| 11:38AM | 12 | to the trade secrets, and if there's any other additional |
| 11:38AM | 13 | issues to be identified as a result of the testimony of the |
| 11:38AM | 14 | expert, I'll hear whether that's necessary or not.  But then |
| 11:38AM | 15 | after that, we'll get you back on schedule for trial, and I can |
| 11:38AM | 16 | make a ruling as to whether there's -- alleged trade secrets |
| 11:38AM | 17 | should go to a jury or not once I understand what they are and |
| 11:38AM | 18 | hear argument as to them. |
| 11:38AM | 19 | So I could do that and schedule -- we could go |
| 11:38AM | 20 | scheduling forward after you've had the time to meet and confer |
| 11:38AM | 21 | as to those issues, and we'll do that on the 4th as well. |
| 11:38AM | 22 | What I'm asking you to do, though, is from that |
| 11:38AM | 23 | period sequence out how much time you will have and need to |
| 11:39AM | 24 | discuss the trade secrets, as to whether there's going to be |
| 11:39AM | 25 | any disputes for me, when you would want to have a hearing on |

11:39AM  1    those trade secrets, and then discuss the sequencing of the

11:39AM  2    disclosure of the experts, and then the deposition of the

11:39AM  3    experts, and then when you would want trial to then go forward

11:39AM  4    after that.

11:39AM  5            MS. KREITER:  Understood.  Your Honor, just to be

11:39AM  6    clear -- and I could talk with Mr. Karen about this -- I may

11:39AM  7    want to have an amended expert witness report by Mr. Oscher.

11:39AM  8    Depending on what I see, I will want discovery, but we can work

11:39AM  9    those things out.  I just want to be clear on the record, it

11:39AM 10    may be more robust than getting some disclosures from them and

11:39AM 11    taking one deposition.

11:39AM 12            THE COURT:  Well, and I will leave that to you all.

11:39AM 13    If you have agreement as to that, that's fine.  If there's a

11:39AM 14    disagreement, then I will hear that argument on the 4th and

11:39AM 15    decide whether there will be additional discovery based upon

11:39AM 16    what I've ordered already.

11:39AM 17            MS. KREITER:  Sure.

11:39AM 18            MR. KAREN:  Thank you, Your Honor.

11:39AM 19            THE COURT:  All right.  Mr. Karen, any questions

11:39AM 20    about that?

11:39AM 21            MR. KAREN:  The only question is I have is the trade

11:39AM 22    secret exhibit, if you will.  That would be disclosed by this

11:40AM 23    Friday; is that correct, Your Honor?  That's what you were

11:40AM 24    ordering, when the exhibits would have otherwise been done?

11:40AM 25            THE COURT:  Is there any reason why you would need

11:40AM  1    more time?  Because that's what I had previously ordered.

11:40AM  2            MR. KAREN:  No, I believe we can do that.  I just

11:40AM  3    wanted to make sure I was understanding the order.

11:40AM  4            THE COURT:  Yes.

11:40AM  5            MS. KREITER:  I guess I will just say if we're

11:40AM  6    talking about the trial exhibits, I suspect that will

11:40AM  7    substantially change, depending on what the trade secrets are.

11:40AM  8    I guess I would propose we could set a date for that once we

11:40AM  9    know when the trial is.

11:40AM 10            THE COURT:  Well, no.  They have trial exhibits that

11:40AM 11    they were intending to use with their trade secrets, and so

11:40AM 12    they could give you those by identification so you know exactly

11:40AM 13    what items are being identified as trade secrets, whether that

11:40AM 14    changes later.

11:40AM 15            MS. KREITER:  Oh, right.

11:40AM 16            THE COURT:  And they were ordered previously to have

11:40AM 17    that done by this Friday for purposes of exhibits, and so

11:40AM 18    that's what I'm stating, is whatever exhibits relate to trade

11:40AM 19    secrets, they can be identified for you that way, and then

11:41AM 20    whatever disputes you have, I'll take those up on another day.

11:41AM 21            MS. KREITER:  Okay.  Understood, a one-way street.  I

11:41AM 22    was just concerned about committing WaterStone to that.

11:41AM 23            THE COURT:  Okay.  Mr. Karen, anything else?

11:41AM 24            MR. KAREN:  No.  Thank you, Your Honor.

11:41AM 25            THE COURT:  It gives me no pleasure to take you off

| | | |
|---|---|---|
| 11:41AM | 1 | the trial calendar because I know you all want finality as to |
| 11:41AM | 2 | this, but I'm hoping to provide you some guidance for a number |
| 11:41AM | 3 | of things:  One, as to what I'm thinking for purposes of |
| 11:41AM | 4 | damages because I know that is a big issue for you, which as |
| 11:41AM | 5 | you go forward, you may want to revisit then your positions and |
| 11:41AM | 6 | see if there's a need for further discussions as to whether |
| 11:41AM | 7 | there can be a compromise, but if not, then I think these are |
| 11:41AM | 8 | important issues given -- and I want to be clear about this. |
| 11:41AM | 9 | The reason why I'm doing this is because although there is a |
| 11:41AM | 10 | disagreement as to what has been identified as damages, I'm |
| 11:41AM | 11 | satisfied that plaintiff has properly asserted a theory of |
| 11:41AM | 12 | damages throughout case.  That theory has been limited by Judge |
| 11:41AM | 13 | Barber's order, but the order itself provided more clarity, but |
| 11:42AM | 14 | it also leaves the defense at a position of vulnerability to |
| 11:42AM | 15 | not exactly know what and how that is going to be calculated as |
| 11:42AM | 16 | to a theory of damages.  So I find it appropriate to give the |
| 11:42AM | 17 | defense the opportunity to explore that in a deposition, so |
| 11:42AM | 18 | that is why I'm continuing the trial. |
| 11:42AM | 19 |                 Okay.  Anything else, Mr. Karen? |
| 11:42AM | 20 |             MR. KAREN:  No.  Thank you, Your Honor. |
| 11:42AM | 21 |             THE COURT:  Ms. Kreiter, anything else? |
| 11:42AM | 22 |             MS. KREITER:  No.  Thank you. |
| 11:42AM | 23 |             THE COURT:  Okay.  I appreciate you all.  The |
| 11:42AM | 24 | pleadings were very helpful and very informative, and I'm sorry |
| 11:42AM | 25 | we had to proceed this way, but, Mr. Karen, I'm glad you could |

11:42AM 1    make it to the graduation, and I thought it went as -- smooth

11:42AM 2    regardless by presenting by Zoom, which is why I'm happy to do

11:42AM 3    it again on the docket number 190.

11:42AM 4            All right.  Thank you all for your time.  We'll

11:42AM 5    see you all on the 4th.  I'll get out an order memorializing

11:42AM 6    what I've stated so you understand exactly how to go forward.

11:43AM 7    Thank you.

11:43AM 8                    (End of proceedings.)

11:43AM 9            * * * * * * * * * * * * * * * * * * * *

11:43AM 10              UNITED STATES DISTRICT COURT

11:43AM 11              MIDDLE DISTRICT OF FLORIDA

11:43AM 12

11:43AM 13              REPORTER TRANSCRIPT CERTIFICATE

11:43AM 14       I, Tana J. Hess, Official Court Reporter for the United
States District Court, Middle District of Florida, certify,
11:43AM 15   pursuant to Section 753, Title 28, United States Code, that the
foregoing is a true and correct transcription of the
11:43AM 16   stenographic notes taken by the undersigned in the
above-entitled matter (Pages 1 through 73 inclusive) and that
11:43AM 17   the transcript page format is in conformance with the
regulations of the Judicial Conference of the United States of
11:43AM 18   America.

11:43AM 19

11:43AM 20

11:43AM 21       _____

11:43AM 22       Tana J. Hess, CRR, RMR, FCRR
Official Court Reporter
11:43AM 23       United States District Court
Middle District of Florida
11:43AM 24       Tampa Division
Date:  May 19, 2024
11:43AM 25