1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

    Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

    Defendant.

_____/

DEPOSITION OF:    KATHERINE THEOBALD, CORPORATE
    REPRESENTATIVE OF MUTUAL OF OMAHA,
    INC.

TAKEN:    Pursuant to Notice by
    Counsel for Defendant

DATE:    May 26, 2023

TIME:    9:02 a.m. to 2:23 p.m.

LOCATION:    Hill Ward Henderson
    101 East Kennedy Boulevard
    Suite 3700
    Tampa, Florida  33602

REPORTED BY:    Melanie Keefe, FPR
    Notary Public
    State of Florida at Large

REGENCY REPORTING SERVICE, INC. (813)224-0224

---

2

APPEARANCES:    COURTNEY WALTER, ESQUIRE
    CHRIS McCALL, ESQUIRE (Zoom)
    Mitchell Sandler LLC
    1120 20th Street Northwest
    Suite 725
    Washington, DC  20036

    MARK CARROLL, ESQUIRE
    Mutual of Omaha Mortgage, Inc.
    100 West 22nd Street
    Suite 101
    Lombard, Illinois  60148

    Attorneys for the Plaintiff

    MARIA L. KREITER, ESQUIRE
    Godfrey & Kahn, S.C.
    833 East Michigan Street
    Suite 1800
    Milwaukee, Wisconsin  53202

    CAROLINA Y. BLANCO, ESQUIRE (Zoom)
    Hill Ward Henderson
    101 East Kennedy Boulevard
    Suite 3700
    Tampa, Florida  33602

    STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
    Waterstone Mortgage Corporation
    N25W23255 Paul Road
    Pewaukee, Wisconsin  53072

    Attorneys for the Defendant

REGENCY REPORTING SERVICE, INC. (813)224-0224

---

3

INDEX    PAGE NUMBER

Examination by Ms. Kreiter    5

Read Letter    144

Errata Sheet    145

Reporter's Certificate    146

REGENCY REPORTING SERVICE, INC. (813)224-0224

---

4

(Exhibit numbers continued from the previous deposition.)

E X H I B I T S

| Exhibit | Description | Page |
| --- | --- | --- |
| 18 | First Amended Complaint, Demand for Jury Trial | 20 |
| 19 | 5/2/23 Letter, Subject: Second Meet and Confer | 129 |

**EXHIBIT 1**

REGENCY REPORTING SERVICE, INC. (813)224-0224

69

1  been part of the evidence. I haven't seen or been able to
2  memorize all of the discovery materials. But to more
3  directly answer your question, I do not have that example
4  that I can bring forward.
5      Q.  And your understanding is that Mr. Carroll may
6  have additional examples?
7      A.  I'm not saying that he does. I just don't want
8  to exclude --
9      Q.  He --
10     A.  -- the potential of that.
11     Q.  Got it. What does Mutual do when it's recruiting
12 new employees to protect against the new employees taking
13 information from their former employer?
14     A.  So, you know, as a company, you know, we do not
15 rely on taking borrower data from other companies. We
16 actually have -- in our employment agreements, we have
17 onboarding acknowledgment and sign off through the
18 employment agreement that any access to confidential
19 information or borrower information that they may have had
20 made available to them through their prior employer, that if
21 it's considered confidential or by a policy or a contract is
22 not something that they're able to disclose outside of their
23 prior employer, that they agree that they will abide to that
24 when they come on board. So it's part of our employment
25 agreement process.

REGENCY REPORTING SERVICE, INC. (813)224-0224

70

1      Q.  Is there anything else that Mutual does to
2  prevent employees from taking information from their former
3  employer besides what you've talked about? I'm just looking
4  to exhaust --
5      A.  Um-hmm. I mean, that -- we, to a certain degree,
6  have to -- you know, as far as, you know, an employee -- an
7  employee can't, you know, enter or start originating a loan
8  with us until they're licensed with us. And so, you know,
9  they -- they can't access our systems to be able to do
10 origination activity until they are employed with us and
11 employed and licensed for the state that the loan is being
12 originated from.
13         And they have to be active with us at that point
14 of, you know, RESPA being triggered. So there is also --
15 just systemically, you know, they can't just enter and start
16 doing origination activity into our system prior to being
17 officially licensed with us.
18     Q.  Anything else?
19     A.  And then, I mean, just -- this is not so much for
20 the incoming employees but also just we have a process in
21 place for an employee who -- when they leave, if they're
22 commission eligible, we have a period of time where we will
23 keep the loan data, but we will continue to pay those loan
24 originators on the loans if they fund within a 30-day
25 window.

REGENCY REPORTING SERVICE, INC. (813)224-0224

71

1          And so, you know, we do also try through our
2  policies to not have a reason for an employee who is leaving
3  the organization also to feel the need that they would need
4  to take loan data with them. But yes, for the onboarding
5  experience, it's primarily, you know, that we are asking
6  them to acknowledge that they are abiding to following their
7  prior employer contract.
8      Q.  Anything else?
9      A.  No.
10     Q.  Have you reviewed the offer letters and
11 employment agreements that were presented by Waterstone to
12 the employees?
13     A.  No, I have not.
14     Q.  Do you know whether Waterstone too has
15 prohibitions in those agreements that warn and prohibit the
16 employees from taking borrower and other confidential
17 information from a prior employer?
18         MS. WALTER: Object to the form.
19     A.  I'm not familiar with what's in their documents.
20     Q.  Do you -- and I -- here, again, I mean Mutual.
21     A.  Yes.
22     Q.  Does Mutual have any evidence that there were
23 employees of Mutual accessing Waterstone's systems prior to
24 the employees being licensed and active with Waterstone?
25         MS. WALTER: Object to the form.

REGENCY REPORTING SERVICE, INC. (813)224-0224

72

1      A.  I don't have an awareness of that.
2      Q.  Do you have any knowledge of Waterstone's policy
3  on paying commissions? I understood your testimony to be
4  we're going to pay commissions on loans that are closed.
5  That will incentivize the loan officers to keep the loans
6  with Mutual, and there's no need to take borrower
7  information, do you know whether Waterstone has a similar
8  commission policy?
9          MS. WALTER: Object to the form.
10     A.  I do not know what their policies are.
11     Q.  Do you know anything about the efforts that
12 Waterstone made to ensure that the employees not make use of
13 the borrower data that they sent through personal e-mails?
14     A.  No, I'm not aware of Waterstone communicating
15 with them around that. Again, I'm aware of Waterstone
16 directly receiving borrower data.
17     Q.  Specific to the ones where it goes to a personal
18 e-mail --
19     A.  Right. No.
20     Q.  I mean, I understand -- and I'm putting that into
21 a separate category --
22     A.  Yes.
23     Q.  -- where's there's an actual Waterstone person on
24 the e-mail. Mutual's contention is there's this other
25 bucket of a large quantity of e-mails that go to a personal

REGENCY REPORTING SERVICE, INC. (813)224-0224

101

1  I'm not sure if they have other extenuating, you know,
2  relationship of any kind.
3      Q.   What about the relationship between Dwayne Hutto
4  and Chris Wolf?  Are you able to speak to their
5  relationship?
6      A.   Only from the work capacity of, you know, Dwayne
7  was in a branch manager position and Chris Wolf was in a
8  sales manager position with Dwayne as a manager.
9      Q.   So your understanding is that Dwayne Hutto and
10 Chris Wolf were co-managers of the Daytona branch, but they
11 each played different roles?
12     A.   Yeah.  I mean, Dwayne's title was branch manager.
13 Chris's title was a sales manager, but both held a
14 leadership position in the branch.
15     Q.   We talked earlier in the deposition about
16 Mutual's practice of paying loan officers commissions on
17 loans that they closed and how that's a policy of Mutual in
18 order to incentivize employees not to take borrower
19 information; is that accurate?
20     A.   That's -- that is our policy, and I'm not sure
21 that's the sole -- you know, I didn't develop that policy to
22 know all of the intent behind it, but certainly it's, I
23 think, likely somewhat expected or standard in the industry
24 to not necessarily just cut them off from any payment of any
25 loan in all stages, you know, to -- to have some kind of

102

1  process in place to close out their pipeline appropriately.
2      Q.   And the payment timing is generally within
3  30 days?
4      A.   No.  So it's not the payment timing.  It's when
5  the loans -- which -- which it defines which loans are
6  eligible to receive commission for.  So when an employee
7  who's commission eligible, their employment ends for any
8  reason, from their date of termination, there's a 30-day
9  window where if any loan funds that was tied to them when
10 they were employed, that's what they'll be compensated for
11 or eligible to be compensated for.
12     Q.   Okay.  I think I understand but just to play it
13 out, if one of the Daytona employees resigned on April 15th,
14 Mutual would start looking at whether there's loans
15 originated by that employee that closed prior to May 15th or
16 that 30-day window --
17     A.   Um-hmm, right.
18     Q.   -- perhaps inclusive of the 15th, and the
19 employee would be entitled to commissions on any loans
20 closed within the 30-day window?
21     A.   That's right.  And I don't know if you said
22 closed.  There's some -- just for semantics, any loan that
23 funds by that date, we -- our system will go by a date that
24 the loan funded.
25     Q.   Is there a difference between a loan closing and

103

1  a loan funding?
2      A.   I think very little, but just for --
3      Q.   Terminology?
4      A.   Yeah.
5      Q.   In the ordinary course when there's no
6  resignation, what is the timing for a payout on commissions?
7      A.   So our normal schedule, whether active or termed,
8  that's kind of our standard for commissions, is any loans
9  that fund from the first -- so we have, to take it back, two
10 pay dates a month, the 15th of the month and the last day of
11 the month.  Those dates shift a little when it's on a
12 weekend, when it's on a holiday, but that's the semimonthly
13 payroll.
14         And so we pay commission on loans that fund from
15 the 1st through the 15th, typically on the last check of
16 that month.  And then loans that fund from the 16th through
17 the end of that month are typically paid on the 15th of the
18 following month.  So that schedule or that flow is typically
19 continued when someone ends employment.
20     Q.   Did Mutual pay all of the departed employees'
21 commissions on loans closed within that 30-day window that
22 we talked about?
23     A.   We have paid all commissions that -- that they
24 were owed funded through that 30-day window.
25     Q.   When did Mutual make that payment?

104

1      A.   So some of the payments were not made until
2  December of 2022.  There were five employees that had
3  commissions that were included in those payments that were
4  made in December.
5      Q.   Which are those employees?
6      A.   So Chris Wolf is one of them.  He received a
7  payment at the end of December for any commissions -- there
8  were eight loans he was still eligible for that fell within
9  that eligibility period, so he had eight loans paid to
10 him.  Dawson Walker also had five loans paid to
11 him.  Tatiana Giraldo had -- I forget the number of loans.
12 She received about 15,000 in commission.
13         Cameron Holley, he played kind of a dual role for
14 us.  Sometimes he supported a loan as a loan officer
15 assistant and sometimes as a loan originator.  He was also
16 licensed.  He had one loan owed to him about $2,200 that he
17 received or gross.
18         And then the last person who we paid out was John
19 Thomas Knight, and he had about -- his -- he had two loans
20 paid to him.  It resulted in about $144 for him or 147,
21 something like that.  Even though it was two loans, you
22 know, following his comp agreement, he had some draw balance
23 that was taken into account in the final calculation just
24 like when he was active.
25         Chris Wolf and Dawson Walker were both eligible

105

1  for an override.  And an override is essentially where they
2  are eligible to receive some compensation that's calculated
3  on the volume of loans, you know, over the course of a given
4  month for the team that they were responsible for, so for
5  the branch.  And so the payment timing for overrides is a
6  little bit -- follows a little bit different flow than
7  commissions.
8      Q.  Can you pause there just for a minute?
9      A.  Um-hmm.
10     Q.  The payment to Mr. Walker and Mr. Wolf in
11 December of 2022, are you saying that that payment was
12 exclusively the override payment --
13     A.  So --
14     Q.  -- or a combination of --
15     A.  A combination.  So all five of those individuals,
16 what I just mentioned, were -- they all received commission
17 for personal production, but -- but Chris Wolf and Dawson
18 Walker additionally received override payments on those same
19 pay dates, all made whole at the same time.
20     Q.  And I think you were starting to talk about the
21 timing for override payments being different than the timing
22 for commissions?
23     A.  Right.  So --
24     Q.  Go on and explain that, please.
25     A.  The -- the normal pay schedule for overrides is

106

1  -- it's a look back at a month of production from the team,
2  a month of, you know, the funded volume for the team that
3  they're responsible for.  So for example, all the loans that
4  closed this month, an override would calculate and get paid
5  at the end of next month.  So there's -- it's the end of the
6  month following the month of production that it's being
7  calculated for.
8      Q.  So the Tampa branch, for example, exited in June
9  of 2022.  Why was there a delay in the payment for the
10 commissions and the override until December of '22?
11     A.  So actually, the -- all of the individuals who
12 had some form of delay in the payroll timing were all
13 aligned to Daytona, not to the Tampa branch.  So they left
14 in April.
15         And so as far as why there was a delay in
16 payment, any payment timing decisions, since it was at that
17 point kind of handed over in a sense from HR to partnering
18 with Mark Carroll and legal counsel, I'm not privy to -- you
19 know, those discussions would've been between Mark and
20 payroll giving any support for the payroll team on how to
21 handle that.
22     Q.  Were you copied on any e-mails between
23 Mr. Carroll and the payroll team relevant to the issue of
24 commissions to the former employees?
25     A.  Not that I recall.

107

1      Q.  How do you know it was Mr. Carroll and the
2  payroll team that handled that issue?
3      A.  You know, just -- it was not a decision that the
4  HR team made.  Any discussion around that I just know took
5  place between, you know, Mark and payroll.  I don't have a
6  direct e-mail that I'm thinking of or referencing or if it
7  was even an e-mail, but I just know at the stage of where we
8  were at with investigating what was happening, you know,
9  with the Daytona branch departure, that any decisions around
10 that would've been in the jurisdiction of Mark.
11     Q.  Is it Mutual's position that Chris Smith and all
12 of the employees of the Tampa branch were paid commissions
13 on a timely basis in accordance with the ordinary course
14 30-day policy that we've talked about?
15     A.  Yeah, I'm not aware of any delays for
16 Tampa.  There were a few that I was personally involved in,
17 questions from two Tampa employees after they left with
18 questions about each of them one specific loan, and it
19 wasn't anything tied to a company decision to choose not to
20 -- to delay or not pay them on those loans.  It had to do
21 with, you know, going back and forth a bit on the -- for
22 example, one of them was Ingrid Ruiz.  She's saying she
23 supported that -- a loan that she brought to question, but
24 she wasn't tied in our system to it.  Nobody had ever added
25 her to that loan in the system, so we had no way of knowing

108

1  to pay it.  We did ultimately make both of those inquiries
2  that came to me whole, but it wasn't at all similar to the
3  Daytona delay.
4      Q.  Separate from the five employees of the Daytona
5  branch that you had just identified, Chris Wolf, Dawson
6  Walker, Tatiana, Cameron, and John Knight, are there other
7  employees of the Daytona branch that did not receive their
8  commissions in accordance with the ordinary course payment
9  schedule for a departing employee?
10     A.  Commissions, no.  Everyone was paid out their
11 commissions that they were owed.  You know, that was
12 resolved at the point that we made those payments to that
13 group.  There's the one other payment in question was Dwayne
14 and his profit pay, which is a different type of pay, was
15 the one other type of payment that had a form of delay to
16 it.
17     Q.  Tell me about the profit payment to Mr. Hutto.
18     A.  So profit pay, I don't have the details of how
19 profit pay is -- the breakdown or see how the breakdown gets
20 calculated.  That's done by our finance team by each
21 payroll, but the timing for profit pay is very similar to
22 overrides in that you -- you look at the -- the data through
23 the prior month.  And if there is a profit, it's usually,
24 you know, kind of a running cumulative profit that it's
25 based on.  If there is a profit to get paid, it gets paid on

1  the second check of the following month as kind of that
2  standard timing.
3      Q.  Okay.  The profit payment to Mr. Hutto, was that
4  the payment made in May of 2023?
5      A.  Yes.  Yes, it was --
6      Q.  For $60,000?
7      A.  That was the net.  The gross payment was 104,000,
8  and I don't know the full dollar amount past that.
9      Q.  Why was that payment not made until May of 2023?
10     A.  Again, any timing decisions or handling with any
11  of the incentive pay for -- associated with Daytona, like I
12  said, is all kind of in the jurisdiction of what Mark -- any
13  connection Mark would've had partnering with our payroll
14  team.
15     Q.  But in the ordinary course, that profit payment
16  would be made using the, you know, month lookback schedule
17  that we talked about; correct?
18     A.  Right.
19     Q.  So with Mr. Hutto exiting approximately the end
20  of April, his profit payment in the ordinary course would've
21  been paid, I guess, when?  The end of May?
22     A.  Yes, for -- so --
23     Q.  And to be clear, the end of May 2022?
24     A.  Of 2022, yes.  So that would've been, as an
25  example, March paid at the end of April, April paid at the

1  end of May, et cetera.  But with an employee who has profit
2  pay, which we don't -- it's not as common.  Profit pay is
3  not as common as a compensation setup.  It is for our more
4  higher level managers as a potential type of incentive.
5  Profit gets paid on what is calculated through the last
6  month that they were fully employed with us, so they need to
7  be active the full month.
8      Q.  With Mutual holding Mr. Hutto's profit pay for
9  nearly a year, did the profit payment made in May of 2023
10  include any interest to account for the year in which Mutual
11  was holding that money?
12     A.  I didn't see the breakdown of that profit, but
13  not that I'm aware of.
14     Q.  Are you privy to any correspondence in which
15  Waterstone was making demands that the employees be paid
16  their compensation inclusive of their commissions in full?
17     A.  No.  The -- the only possible example to that
18  that I can think of is Chris Smith, who was already at
19  Waterstone, and those two employees that I mentioned who had
20  questioned why they hadn't been paid on a loan, but they
21  were administrative logistical reasons.
22     Q.  Are you aware of a number of the departed
23  employees getting calls from other Mutual employees who had
24  stayed on in which the Mutual employees who had stayed on
25  were seeking help in getting loans closed for Mutual?

1      MS. WALTER:  Object to form.
2      A.  No.
3      Q.  Did you understand the question?
4      A.  I did.
5      Q.  Are you aware that after the filing of the
6  lawsuit, employees of Mutual were still reaching out to the
7  Waterstone employees for assistance with closing loans?
8      MS. WALTER:  Object to form.
9      A.  No, I was not aware.
10     Q.  Are you aware of Waterstone having to send Mutual
11  a letter in which it asked that given that Mutual had made
12  the decision to sue, to not pay out all of the compensation,
13  that Mutual should probably stop having its employees reach
14  out for help from the now Waterstone employees?
15     MS. WALTER:  Object to form.
16     A.  I was not aware.
17     Q.  I think you said this, but I just want to be
18  clear.  You don't have any information that you're able to
19  testify to today about the reason for delaying the profit
20  payment to Mr. Hutto until May of 2023 nor the delay in
21  paying the five Daytona employees until December of 2022; is
22  that correct?
23     A.  Correct.
24     Q.  And you're not in a position to testify about
25  that timing because it was a decision made by Mark Carroll

1  and the legal team?
2      A.  Well, I don't know if he made a decision about
3  it, but I know any dialogue that would've happened around
4  that for our payroll team would have come from Mark.  Again,
5  I don't know any specific conversations or e-mails that --
6  that I'm aware of or that I can think of about delaying pay.
7  So -- but no, I -- I can't speak to specifics around the
8  handling of that.
9      Q.  One of the topics for which Waterstone has
10  noticed this deposition is the adequacy of Mutual's efforts
11  to search for and produce responsive documents and to
12  provide complete discovery responses.  Are you aware that
13  that's a topic within the notice?
14     A.  Well, I know in the deposition topics there's a
15  question around -- or a topic around completeness of
16  discovery.  I don't recall exactly how it's worded.
17     Q.  Correct.  And that's a topic for which you're
18  designated to testify; correct?
19     A.  Um-hmm.
20     Q.  Did Mutual make any efforts to gather, review,
21  and produce the e-mails that Mr. Carroll or others at Mutual
22  had concerning the topic of the commissions and other
23  compensation to the former employees?
24     MS. WALTER:  Object.
25     A.  I'm going to have you repeat that one more time.

113

1    MS. KREITER: I'll ask the reporter to read the
2    question back, please.
3         (The previous question was read by the reporter.)
4    A.   I would -- I don't know all the specifics of
5    every single element that went into the collection for
6    discovery.  You know, I would imagine that if there's an
7    e-mail dialogue with a former employee specifically about
8    compensation, that that may have been part of that, but I
9    can't -- I'm not aware of specific examples speaking to
10   payment timing of compensation, like I said.
11   Q.   Do you know whether Mutual made an effort to
12   gather and review Mr. Carroll's e-mails on the topic of
13   commissions?
14   MS. WALTER: Object to form.
15   A.   I don't know that, no.
16   Q.   What contract or other documents govern Mutual's
17   payment of commissions to the former employees?
18   A.   That's mostly captured in what's called an LO
19   addendum.  So when someone who has some type of commission
20   eligibility, they sign an offer letter, which is more so in
21   that part of the offer just capturing, you know, how an
22   hourly rate would work, maybe other details, if there's a
23   bonus, if there's -- you know, it captures some compensation
24   details.
25        But an LO addendum is a document tied with --

114

1    sent at the same time with an offer letter that goes over
2    the nature of the compensation, how their commissions will
3    be paid, so based on the type of loan, what are the basis
4    points.  It's where it references, you know, a definition of
5    what is a basis point.  It's where it references the 30- --
6    we'll compensate on loans that fund within the 30-day
7    window.  So that particular document, that LO addendum,
8    contains a lot of information about how commissions are
9    paid.
10   Q.   What about with respect to the branch managers,
11   for example, Mr. Hutto?  Is there a contract or other
12   document that governs his compensation besides the LO
13   addendum?
14   A.   So he -- his compensation, I believe, is captured
15   in an offer letter format.  So there is a section within the
16   offer letter following the information about his base salary
17   that he would -- of the profit pay that he would receive.
18   Q.   Okay.  So he -- I just want to be clear.  He
19   would also still have an LO addendum that governs
20   commissions.  It's just that any additional compensation
21   such as the profit payment would be in the offer letter?
22   A.   I did look at this, and I'm trying recall if he
23   specifically has an LO addendum.  He might -- might not
24   because he was not a -- brought on to produce individually.
25   He was brought on as a branch manager to manage the group,

115

1    and so his only form of incentive pay besides the salary is
2    the profit pay.  So he may not have that addendum format
3    tied to him because it's very structured around commission.
4    Q.   Did Mutual pay Mr. Hutto commissions on loans?
5    A.   I had reviewed his comp.  Not that I'm -- not
6    that I recall.  I think all of his -- over his course of
7    employment with Mutual of Omaha Mortgage was base salary and
8    profit pay, and he may at some point have received some form
9    of a bonus but not personal production.
10   Q.   Let's move on to Chris Wolf.  What documents
11   govern the commissions or other compensation due to
12   Mr. Wolf?
13   A.   He does have an LO addendum.
14   Q.   Is there other compensation that Mr. Wolf enjoyed
15   at Mutual besides commissions governed by the LO addendum?
16   A.   No.  He was a combination of base salary
17   commission on personal production and a calculation on
18   override for the branch.
19   Q.   Did Mr. Hutto get a branch override payment?
20   A.   No.  He got profit instead.
21   Q.   Okay.  So just, again, completeness here, I want
22   to make sure we're aligned.  Hutto gets base salary and
23   profit payments.  Mr. Wolf gets commissions pursuant to the
24   loan addendum, a base salary, and an override?
25   A.   Right.

116

1    Q.   Anything else for those two individuals in terms
2    of compensation?
3    A.   Not as part of their standard compensation unless
4    they at some point may have received, again, some form of a
5    bonus or something along those lines but certainly not
6    anything that was a large part of their compensation over
7    the years.
8    Q.   Got it.  Just to close the loop, what about
9    Mr. Smith?
10   A.   Chris Smith was set up to receive base salary and
11   profit pay.  I'm trying to make sure that I'm not
12   overlooking if he had any period during his employment he
13   received an override.  But to my recollection, he was set up
14   similarly to Dwayne in that it was focused on -- his comp
15   was giving him base salary profit pay.  He -- actually, I
16   think the reason I'm questioning is I do believe he actually
17   had some form of an override as well.  Sorry.  I should --
18   trying to remember with everything that I looked at.
19   Q.   With respect to the five Daytona employees that
20   we talked about, Dawson Walker --
21   A.   Um-hmm.
22   Q.   -- it sounds like he received override pay plus
23   commissions?
24   A.   Yes.
25   Q.   Was there any other form of compensation for

117

1    Mr. Walker?
2        A.   He also would've had some form of a base rate of
3    pay, but I don't know -- I don't recall if he had just a
4    base salary or even if it was an hourly rate, but he
5    would've had some form of, you know, standard base pay and
6    -- and then commission and override eligibility.
7        Q.   And then Tatiana?
8        A.   Tatiana was a loan originator who was commission
9    eligible.  She -- you know, I -- I did not look over her
10   full comp history, so I'm -- I really don't feel comfortable
11   confirming if there was any other type of pay that she ever
12   did receive.  I'm not aware.  I know she was eligible for
13   commissions for her own personal production.
14       Q.   Cameron Holley and John Knight, are they
15   commissions only?
16       A.   John Knight is hourly pay, which is -- John
17   Knight is hourly pay treated as a draw but then paid
18   commissions, eligible for commissions.  Cameron Holley was
19   in -- kind of served a couple functions, so he was a loan
20   officer assistant, but there's a bonus attached to and then
21   also commission if he did happen to fund a loan and
22   originate a loan personally.
23       Q.   So you indicated that, for example, with respect
24   to Mr. Hutto, the profit pay would be set forth in the offer
25   letter.  Where there's other forms such as compensation, the
     REGENCY REPORTING SERVICE, INC. (813)224-0224

118

1    overrides or bonuses, is there a separate agreement for
2    those types of compensation or is that likewise contained in
3    the offer letter?
4        A.   It's going to be some combination of an offer
5    letter and an addendum.  Not everyone receives an addendum.
6    If there's a loan off -- so Cameron Holley, as an example,
7    if the only role that he served was an LOA, an assistant
8    that got a bonus, he wouldn't have had an LO addendum
9    because that's focused around commission pay.  But because
10   he also was able to originate, he had an LO addendum as --
11   as well as the offer letter.
12            Overrides, particularly if it's like Chris Wolf
13   or Dawson Walker who are able to produce but also are
14   managing a team and have an override, they also would, for
15   sure, have an LO addendum.  The override details may be
16   captured in that addendum versus the offer letter.  It's
17   going to be, you know, captured between the two documents.
18       Q.   Is there a report that Mutual is able to run that
19   would show the commissions paid to the departed employees
20   since their resignation?
21       A.   Our payroll system, we can confirm what payments
22   -- you know, gross payments were made and what type of
23   payments they were.
24       Q.   Is there a particular name to that report?
25       A.   Well, we use ADP.  There's -- in -- in my -- when
     REGENCY REPORTING SERVICE, INC. (813)224-0224

119

1    I run it, I believe it's called a gross earnings report,
2    something along those lines, and you can put a date range
3    in.
4        Q.   Does the report have details that show the
5    commission paid and what loan it is tied to?
6        A.   No.  It's just the end result of the gross
7    commission or override or profit.
8        Q.   But it does show the timing of the payments?
9        A.   Yes.  It shows -- it could show pay dates.
10       Q.   And I think my question to you was about a report
11   reflective of commissions, but the report that you're
12   referring to that can be run in ADP, that captures not just
13   commissions but also profit payments and overrides?
14       A.   It's people's paychecks.  It's, you know, their
15   earnings.
16       Q.   Does the report decipher between override
17   payments and commission payments?
18       A.   Yes.  So if you were looking at Chris Wolf's pay
19   statements, for example, you would see a distinction between
20   commission and override.
21       Q.   If you would, take a look at -- you can put that
22   one to the side.  Take a look at what we marked yesterday as
23   Deposition Exhibit No. 3, please.
24       A.   Okay.
25       Q.   So for purposes of the record and to acquaint you
     REGENCY REPORTING SERVICE, INC. (813)224-0224

120

1    with the exhibit, Exhibit 3 is Plaintiff Mutual of Omaha's
2    Fourth Amended Responses and Objections to Defendant
3    Waterstone Mortgage Corporation's First Set of Request for
4    Production of Documents.  Do you see that on the first page
5    there?
6        A.   Yes.
7        Q.   If you could turn to page 24 of the document.
8        A.   Okay.
9        Q.   And actually, before we get to that, I mean, if
10   you just kind of page through this document, you can see,
11   for example, there's pages upon pages of the document in
12   which Mutual is laying out what we call in litigation Bates
13   numbers, but it's numbering that shows documents produced.
14       A.   You're referencing this type of --
15       Q.   Correct.  You see on page 7 there, you know,
16   there's a series of numbers.  And there's a lot of pages
17   that are consumed within Exhibit 3 with different
18   identification of documents using that numbering; correct?
19       A.   Yes, I can see that.
20       Q.   Are you aware that Waterstone filed a motion to
21   compel production -- sorry -- a motion to compel discovery
22   against Mutual in the case, and as a result of that motion,
23   the court ordered that Mutual identify the responsive
24   documents by Bates number?
25            MS. WALTER:  Object to form.
     REGENCY REPORTING SERVICE, INC. (813)224-0224