# EXHIBIT B

Page 1

1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                           TAMPA DIVISION
3                           Civil Action No.: 22-CV-01660
4
     MUTUAL OF OMAHA
5    MORTGAGE INC.,
6            Plaintiff,
     v.
7
     WATERSTONE MORTGAGE
8    CORPORATION,
9            Defendant.
     _____/
10
11                         DEPOSITION OF
12                          DWAYNE HUTTO
13                   (Volume I, pages 1 - 171)
14   DATE TAKEN:      June 15, 2023
15   TIME:            9:03 a.m. to 3:57 p.m.
16   PLACE:           Gunster, Yoakley & Stewart, P.A.
                      401 East Jackson Street
17                    Suite 1500
                      Tampa, Florida 33602
18
     TAKEN BY:        The Plaintiff
19
     REPORTED BY:     Victoria White
20                    Court Reporter and Notary Public
21
22
23
24
25

Page 98

1 not actually get your house?
2     A.  Correct.  We try to make sure they're good in
3 the beginning and make sure that they qualify before they
4 actually go under contract.  And sometimes we do get stuck
5 with a loan that someone else has put under contract and we
6 have to try to -- you know, and then they move over to us
7 and then we have to run with the ball, might I say, use that
8 phrase.
9     Q.  So when you were saying 10 to 20 percent a
10 minute ago, were you saying 10 to 20 percent then go to the
11 pre-qualification stage or 10 to 20 percent pass
12 pre-qualification?
13     A.  I was saying 10 to 20 percent actually pull --
14 actually probably I would say probably 10 to 20 percent.
15 This is just a number I'm throwing out.
16     Q.  I know.
17     A.  Zillow leads there's a lot of cash buyers.
18 There's a lot of people that are just on there.  I mean, she
19 goes, she's moving to Florida, she types in Florida, I want
20 to see this house.  Well, guess what, Zillow wants your
21 information, you're now a lead.  I mean, your husband is not
22 even going to let you buy this million-dollar house, you
23 just wanted to see it, you know what I mean?  So that's the
24 BS we deal with.
25     Q.  Yeah, I'm sure.  So what -- all I'm trying to

Page 99

1 find out is what percent -- when you said 10 to
2 20 percent -- and I know that's just a round number, I'm not
3 holding you to that, I'm just trying to understand, does
4 that 10 to 20 percent actually go to thinking about
5 pre-qualification or --
6     A.  Go into credit pulls.
7     Q.  Go into credit pulls, okay.  And then that's
8 another place people could fall through; is that correct?
9     A.  Correct.
10     Q.  Okay.  And so how many of that -- of the 10 to
11 20 percent, how many of them actually get through the credit
12 pull stage to, hey, someone ready, willing able to buy?
13     A.  I would say approximately 5 percent.
14     Q.  5 of the 10 to 20?
15     A.  I would say 5 percent of the whole.
16     Q.  5 percent of the whole, okay.  So you buy a lead
17 and 5 percent of those leads you get actually turn into a
18 live fish, if you will?
19     A.  Correct.
20     Q.  And then even from those 5 percent do you have
21 some fall through at that stage?
22     A.  Sometimes, we try not to.
23     Q.  What percentage of that, of the 5 percent --
24     A.  I would say 5 percent close.  That was really
25 what I was referring to.

Page 100

1     Q.  Okay.  All right.  So you've kind of cut this
2 all the way through.  So what you're saying out of the --
3 all of those Zillow leads and stuff you buy, each loan has
4 about a 5 percent chance of actually becoming a loan?
5     A.  I'd say approximately.
6     Q.  Okay.  And is it fair to say that aggregately
7 when you have these leads you buy, a lot of work goes into
8 getting to that 5 percent through that; is that fair to say?
9     A.  Correct.
10     Q.  And a lot of time?
11     A.  Yes, correct.
12     Q.  So if you could have a person who was ready,
13 willing able to buy at stage one and you absolutely
14 100 percent know it, that's more valuable than a Zillow
15 lead, isn't it?
16     A.  Yes, it would be.
17     Q.  Give one moment.  Let me ask you to take a look
18 at another document here.  And, sir, I'm going to --
19         MS. KREITER:  This is Exhibit 7?
20         MR. KAREN:  Yes.
21         (Plaintiff's Exhibit No. 7 was marked for
22     identification.)
23 BY MR. KAREN:
24     Q.  And, sir, as you look at this I'm going to
25 represent to you this is not a document that was produced in

Page 101

1 discovery, I just want you to understand what it is.  We
2 looked at documents in this case and have created a summary
3 of who we think the employees are, when they got an offer
4 from Waterstone and the resignation dates of those
5 employees, okay?  So this is not a document you guys
6 prepared, it's a document we prepared, okay?
7     A.  Okay.
8     Q.  I just don't want you to be confused about that.
9         Now if you look -- can you look on here and tell
10 me, best you can, I mean I understand if off memory.  On the
11 Daytona branch does this -- looking at this here, do you see
12 anybody that we have indicated that was part of the Daytona
13 branch that wasn't part of the Daytona branch, if you
14 understand my question?
15         MS. KREITER:  I'm sorry, are you asking that --
16     was part of the Daytona branch at Mutual or that came
17     to Waterstone?
18         MR. KAREN:  I'm sorry.  That's a fair objection.
19 BY MR. KAREN:
20     Q.  Sir, what I'm asking is for the people who --
21 all right, let me try it this way.  So you see in the
22 left-hand column there is names of employees?
23     A.  Um-hmm.
24     Q.  And in the second column it says branch?
25     A.  Um-hmm.

26 (Pages 98 - 101)