IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
MUTUAL OF OMAHA MORTGAGE INC. \*
                              \*     Case No. 8:22-cv-1660
vs.                           \*
                              \*     June 4, 2024
WATERSTONE MORTGAGE           \*
CORPORATION                   \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*



MOTION HEARING

Heard via Zoom Videoconferencing
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
June 4, 2024


BEFORE THE HONORABLE ANTHONY E. PORCELLI

UNITED STATES MAGISTRATE JUDGE




Official Court Reporter:        Tana J. Hess, CRR, FCRR, RMR
                                U.S. District Court Reporter
                                Middle District of Florida
                                Tampa Division
                                801 N. Florida Avenue
                                Tampa, FL  33602
                                813.301.5207
                                tana_hess@flmd.uscourts.gov


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:


FOR THE PLAINTIFF:

          Ari Karen
          Mitchell Sandler, PLLC
          1120 20th Street, NW
          Suite 725
          Washington, DC 20036
          202.886.5260
          akaren@mitchellsandler.com

          Arielle Stephenson
          Mitchell Sandler, PLLC
          1120 20th Street, NW
          Suite 725
          Washington, DC 20036
          424.731.5645
          astephenson@mitchellsandler.com

          Daniel Paul Dietrich
          Gunster, Yoakley & Stewart, PA
          401 E. Jackson Street
          Suite 1500
          Tampa, FL  33602
          813.228.9080
          ddietrich@gunster.com

          Gregory Lathrop Pierson
          Gunster, Yoakley & Stewart, PA
          401 E. Jackson Street
          Suite 1500
          Tampa, FL  33602
          813.228.9080
          gpierson@gunster.com

FOR THE DEFENDANT:

          Maria L. Kreiter
          Godfrey & Kahn, S.C.
          833 East Michigan Street
          Suite 1800
          Milwaukee, WI  53202
          414.287.9466
          mkreiter@gklaw.com

APPEARANCES:

FOR THE DEFENDANT:

        Carolina Yvonne Blanco
        Hill Ward Henderson, PA
        101 E. Kennedy Blvd.
        Suite 3700
        Tampa, FL  33602
        813.221.3900
        carolina.blanco@hwhlaw.com

        Emma J. Jewell
        Godfrey and Kahn, S.C.
        833 East Michigan Street
        Suite 1800
        Milwaukee, WI  53202
        414.287.9528
        ejewell@gklaw.com

        Scott A. McLaren
        Hill Ward Henderson, PA
        101 E. Kennedy Blvd.
        Suite 3700
        Tampa, FL  33602
        813.221.3900
        smclaren@hwhlaw.com

10:00AM 1          **THE COURT:** All right. Let's call the case, please.

10:00AM 2          **COURTROOM DEPUTY:** The Court calls case number

10:01AM 3 8:22-CV-1660-UAM. This is Mutual of Omaha Mortgage, plaintiff,

10:01AM 4 versus WaterStone Mortgage.

10:01AM 5          Counsel, please state your appearance, starting

10:01AM 6 with counsel for the plaintiff.

10:01AM 7          **MR. KAREN:** Ari Karen on behalf of the plaintiff.

10:01AM 8          **MS. STEPHENSON:** Arielle Stephenson, also on behalf

10:01AM 9 of the plaintiff.

10:01AM 10          **MR. DIETRICH:** Dan Dietrich on behalf of the

10:01AM 11 plaintiff.

10:01AM 12          **MR. PIERSON:** Greg Pierson on behalf of the

10:01AM 13 plaintiff.

10:01AM 14          **THE COURT:** For the defense?

10:01AM 15          **MS. KREITER:** Good morning. Maria Kreiter and Emma

10:01AM 16 Jewell from Godfrey & Kahn, along with Stephanie Ziebell,

10:01AM 17 WaterStone's general counsel, and then Scott McLaren and

10:01AM 18 Carolina Blanco from the Hill Ward Henderson firm.

10:01AM 19          **THE COURT:** Okay. Thank you all for your time this

10:01AM 20 morning. As you know, I scheduled the hearing based upon

10:01AM 21 documents number 188 and 190. The response to 188 is filed at

10:01AM 22 document 198. The response to 190 is document 199.

10:01AM 23          I'll also note the Court is aware of the recent

10:02AM 24 pleadings that were filed yesterday, and I'll talk about that

10:02AM 25 afterwards.

| | | |
|---|---|---|
| 10:02AM | 1 | Okay.  Let's start with document number 188, |
| 10:02AM | 2 | which is plaintiff's Motion to Exclude certain evidence related |
| 10:02AM | 3 | to job satisfaction about former employees as well as evidence |
| 10:02AM | 4 | of any prior breach of contract by Mutual. |
| 10:02AM | 5 | Who's going to be arguing the motion? |
| 10:02AM | 6 | **MR. KAREN:**  I will, Your Honor.  Ari Karen. |
| 10:02AM | 7 | **THE COURT:**  All right.  Mr. Karen? |
| 10:02AM | 8 | **MR. KAREN:**  Thank you, Your Honor.  I'll be succinct, |
| 10:02AM | 9 | Your Honor.  I think it is laid out in our brief, but |
| 10:02AM | 10 | essentially I think, you know, it is -- this case is not about |
| 10:02AM | 11 | why the employees left.  They may theoretically have had very |
| 10:02AM | 12 | good reasons why they left, and nothing said they couldn't |
| 10:02AM | 13 | leave at all for any reason, so that's not what the case is |
| 10:02AM | 14 | about.  The case is about how they left.  So if they were to |
| 10:02AM | 15 | come in and now be able to start talking about why, it's not |
| 10:02AM | 16 | largely relevant.  Even if it's true, even if, you know, as |
| 10:02AM | 17 | they claim Mutual couldn't close loans, couldn't do this right, |
| 10:03AM | 18 | couldn't do that right, even if all that's true and they had |
| 10:03AM | 19 | every reason in the world to leave, it wouldn't -- that |
| 10:03AM | 20 | wouldn't be relevant because the issue is how they left. |
| 10:03AM | 21 | Now, they may argue that well, wouldn't that go |
| 10:03AM | 22 | to evidence about what would happen after the fact, what they |
| 10:03AM | 23 | did after the fact?  You know, would they have stayed?  Well, |
| 10:03AM | 24 | again, Your Honor, I don't think -- you know, to have somebody |
| 10:03AM | 25 | come in and speculate and then say, "Well, this is what I would |

| | |
|---|---|
| 10:03AM | 1 |

have done," I really question the relevance of that.  You know,

hindsight, as they say --

        THE COURT:  Well, it seems to be you're questioning

the credibility of it, not the relevance, whether it's truly

credible or not.  I mean, if it's taken as true, it seems to

have some relevance as to whether, given your theory of

damages, they would have stuck around for a period of

30 months.

        MR. KAREN:  I certainly can see the argument for

that, Your Honor.  I guess my point, though, is that once the

wrongful action has occurred, what they would have done I don't

think then becomes relevant.  So that's really the perspective

that we have on it.  I think nothing before what they would

have done -- and here's the other thing, Your Honor.  You know,

there's a degree of saying if there was -- if there was some

evidence associated with it -- which I understand, Your Honor,

goes to the credibility of it, right?  If there was some

contemporaneous evidence, email saying, "Wow, I've got to get

out of here," that I think I would look at very differently,

because then you could say -- but now it just allows them to

line up and take potshots with no basis whatsoever for what I

would have done and say what they would have done but for the

illegal and unlawful act.  So from that perspective, you know,

we don't believe it's relevant and admissible.

        I can move to the next, but obviously --

| | | |
|---|---|---|
| 10:04AM | 1 | THE COURT:  Go ahead. |
| 10:04AM | 2 | MR. KAREN:  Thank you, Your Honor.  So the next |
| 10:04AM | 3 | point -- and I think this is -- this was really where you have |
| 10:04AM | 4 | a true concern about the prejudicial nature.  So to -- let's |
| 10:04AM | 5 | put the issues in sequence here.  They -- based on the |
| 10:04AM | 6 | allegations in the complaint, they breached their fiduciary |
| 10:04AM | 7 | duties.  They solicit.  They take the information, et cetera, |
| 10:04AM | 8 | et cetera.  I know you're aware of those allegations.  And then |
| 10:05AM | 9 | after that at some point, it's claimed after these events |
| 10:05AM | 10 | occurred that Mutual did not pay some of the employees on time |
| 10:05AM | 11 | and/or may not have paid some of the employees based on, you |
| 10:05AM | 12 | know, there's a faithful servant doctrine.  There's no |
| 10:05AM | 13 | counterclaim for this in this case, and to be clear, this is a |
| 10:05AM | 14 | claim against WaterStone, not against these other individuals |
| 10:05AM | 15 | at this time.  So what -- whether Mutual paid them or not or if |
| 10:05AM | 16 | they delayed payment is simply prejudicial.  It would not be an |
| 10:05AM | 17 | anticipatory breach because, again, all these things happened |
| 10:05AM | 18 | after the alleged wrongful conduct, not before.  So, in other |
| 10:05AM | 19 | words, of the alleged non-payment -- which, again, we would |
| 10:05AM | 20 | take issue with, but assuming for the sake of argument it |
| 10:05AM | 21 | occurred, that alleged non-payment happened long after all of |
| 10:05AM | 22 | the events in question occurred in this case that we've |
| 10:05AM | 23 | complained of.  So it would never excuse those events. |
| 10:05AM | 24 | So really what they're trying to do is bootstrap |
| 10:05AM | 25 | to go in front of the jury respectfully and try to say well, |

| | |
|---|---|
| 10:06AM | 1 |

we're a bad company because we don't pay our employees.  That's

not really accurate.  And as the Court knows, there is a

faithful service doctrine, and I think to now start getting

into whether the faithful servant doctrine applies and do this

in front of a jury I think is prejudicial and raises just a

specter of highly irrelevant information coming into play when

the fact of the matter, it could never legally excuse what

occurred here because it happened subsequent to the events in

question here.

       THE COURT:  All right.  Thank you, Mr. Karen.

          All right.  Who is going to be doing the

argument in response?

       MS. KREITER:  I am, Your Honor.

       THE COURT:  All right.  Ms. Kreiter, let's start with

there.  Do you dispute whether the alleged breach by Mutual of

Omaha -- that is, the non-payment -- occurred prior to or after

the alleged conduct here that is the solicitation and the

misappropriation of trade secrets?

       MS. KREITER:  I think I agree in part.  You know, I

agree that the non-payment of commissions occurred after the

employees exited the business.  Why I say in part, I'm not

certain at this point the scope of the plaintiff's allegations

frankly of wrongdoing, when it occurred, by who.  That's a

pretty broad topic, including that we have branches that moved

at different periods of time.  So the Daytona branch moves

10:07AM 1 first.  Then there's a period of time, and then later the Tampa

10:07AM 2 branch moves.  I mean, I don't really have a clear

10:07AM 3 understanding of the timing of the alleged wrongdoing.

10:07AM 4 I have heard plaintiff say that there's alleged

10:07AM 5 wrongdoing in that interim period, especially when it relates

10:07AM 6 to solicitation.  For example, the allegations that Mr. Hutto,

10:07AM 7 who's the manager of Daytona, during that interim may have

10:07AM 8 solicited the branch managers of Tampa.  So in that regard, I

10:07AM 9 would answer your question no.  I will just say that the facts

10:08AM 10 and the allegations in my mind are still evolving here.  So

10:08AM 11 maybe I'll amend my answer to no given the moving target nature

10:08AM 12 and the gap in the timing here.

10:08AM 13 THE COURT:  All right.  Well, here's what we're going

10:08AM 14 to do as to document number 188 as to the alleged breach by the

10:08AM 15 non-payment of commissions.  I'm going to grant the Motion in

10:08AM 16 Limine without prejudice.  In other words, Ms. Kreiter, at the

10:08AM 17 trial, if you feel evidence demonstrates that there was a

10:08AM 18 triggering event breach by Mutual prior to the alleged

10:08AM 19 unlawful -- or illegal conduct, I'll revisit the order.

10:08AM 20 As to the request to exclude certain evidence

10:08AM 21 related to the employees' job satisfaction, I'm denying that

10:08AM 22 without prejudice.  I think that is something I have to assess

10:08AM 23 during the trial when I hear the testimony by the employees

10:08AM 24 themselves.  As I stated, at a minimum, I think it could be

10:08AM 25 relevant to a damages assertion, but to be clear, what I'm

10:09AM  1   also -- and I agree with Ms. Kreiter -- what I'm uncertain of

10:09AM  2   is which employees we're talking about and which job

10:09AM  3   dissatisfaction we're talking about and if their job

10:09AM  4   dissatisfaction is truly relevant or not.  And so I'll have to

10:09AM  5   make that assessment as an evidentiary issue at trial.

10:09AM  6           The one thing I will note is based on my review

10:09AM  7   of the pleadings, there is clearly certain employees -- and I'm

10:09AM  8   neglecting to remember the name of the one employee that's in

10:09AM  9   the pleading that the allegations are they left prior to any of

10:09AM  10  the former managers leaving.  If that is the case -- I think

10:09AM  11  it's Mr. Lowe.  So if Mr. Lowe left prior to any of the former

10:09AM  12  managers, then I don't see the relevance of any -- of his job

10:09AM  13  dissatisfaction.  But, again, I'll assess that at trial and

10:09AM  14  hear what the arguments are.

10:09AM  15          So to be clear, as to the first half of the

10:09AM  16  motion, I'm denying it without prejudice.  Mr. Karen, you could

10:10AM  17  raise objections to the evidence as it comes in, and I'll

10:10AM  18  assess it, but as to the second half of the motion, I'm

10:10AM  19  granting it without prejudice, and, Ms. Kreiter, if you think

10:10AM  20  the evidence now is different than what we are aware of right

10:10AM  21  now, then I'll reconsider any further argument.

10:10AM  22          Okay.  Let's move on to number 190.  This is the

10:10AM  23  motion by WaterStone in limine to exclude evidence related to

10:10AM  24  Mr. Hutto and Mr. Smith regarding solicitation.  Ms. Kreiter,

10:10AM  25  are you arguing this as well?

| | | |
|---|---|---|
| 10:10AM | 1 | **MS. KREITER:** I am, Your Honor. I just want to make |
| 10:10AM | 2 | one additional point for the record related to the idea of a |
| 10:10AM | 3 | material breach. |
| 10:10AM | 4 | There's allegations in the case by the plaintiff |
| 10:10AM | 5 | that with respect to the trade secret claims, there was willful |
| 10:10AM | 6 | and malicious conduct. I think that the idea that Mutual did |
| 10:10AM | 7 | not pay commissions to the employees is also evidence that we |
| 10:10AM | 8 | would use at the trial to oppose those claims that there was |
| 10:11AM | 9 | some willfulness, malicious intent, specifically as it relates |
| 10:11AM | 10 | to diverted loans. I'll play this out. |
| 10:11AM | 11 | The employees leave Mutual. Their testimony is |
| 10:11AM | 12 | going to be, "We expected to be paid commissions on the loans. |
| 10:11AM | 13 | We had no intent to divert those loans;" that there's no basis |
| 10:11AM | 14 | at all for the claim that somebody was acting willful or |
| 10:11AM | 15 | malicious. |
| 10:11AM | 16 | On top of that, Mutual doesn't pay the employees |
| 10:11AM | 17 | their commissions. Despite being stiffed by Mutual, the |
| 10:11AM | 18 | employees nevertheless are helping Mutual triage to close loans |
| 10:11AM | 19 | that are left behind. They are taking calls from Mutual |
| 10:11AM | 20 | employees who are scrambling to get loans closed. I think the |
| 10:11AM | 21 | notion that the employees, despite getting stiffed by Mutual, |
| 10:11AM | 22 | not getting paid their commissions is directly relevant to |
| 10:11AM | 23 | plaintiff's assertion that no, these people were willful, |
| 10:11AM | 24 | malicious, trying to take every loan that they could to |
| 10:12AM | 25 | WaterStone. So I think that it's relevant for that additional |

10:12AM  1   purpose, and I just wanted to make sure that that was in the

10:12AM  2   record as well.

10:12AM  3          THE COURT:  What's the response to that?

10:12AM  4          MR. KAREN:  Your Honor, the majority -- not just the

10:12AM  5   majority.  I believe all of the solicitations we're talking

10:12AM  6   about occurred before they were even -- they were -- before

10:12AM  7   they had even left Mutual.  So, in other words, we have email

10:12AM  8   after email, there's 20 something emails containing borrower

10:12AM  9   information that they're sending over to WaterStone while they

10:12AM  10  are still employed at Mutual.  And they continue to send those

10:12AM  11  over, diverting loans ad nauseam.  So how could that possibly

10:12AM  12  be excused by commissions that may have been due on loans that

10:12AM  13  never closed because they diverted them to WaterStone?  But

10:12AM  14  even if somehow they had closed at Mutual, that would have

10:12AM  15  occurred what 30, 60 days later?  So I simply disagree with the

10:13AM  16  factual characterization provided to you.

10:13AM  17         THE COURT:  All right.  My ruling doesn't change.

10:13AM  18  I'm going to wait to hear what the evidence comes out, and I

10:13AM  19  can revisit it.  Ms. Kreiter, I understand your argument as to

10:13AM  20  the relevancy, but we'll wait and see what the evidence plays

10:13AM  21  out, and then I'll make that assessment upon the trial.

10:13AM  22         Okay.  Ms. Kreiter, are you going to be arguing

10:13AM  23  document 199?

10:13AM  24         MS. KREITER:  I am, Your Honor.

10:13AM  25         THE COURT:  Excuse me, 190.

| | | |
|---|---|---|
| 10:13AM | 1 | **MS. KREITER:**  Yes, WaterStone's Motion in Limine. |
| 10:13AM | 2 | So, you know, here's some -- here's the roadmap for a decision |
| 10:13AM | 3 | on this one.  First, it's not disputed by Mutual that if |
| 10:13AM | 4 | California law applies, these agreements aren't enforceable. |
| 10:13AM | 5 | Instead, Mutual's argument is there should be a choice of law |
| 10:13AM | 6 | analysis, and then Florida law comes out on top, and when |
| 10:13AM | 7 | Florida law is applied, then these agreements survive. |
| 10:13AM | 8 | There is no occasion to be talking about Florida |
| 10:13AM | 9 | law here.  The law is pretty clear that the choice of law |
| 10:14AM | 10 | designated by the parties prevails unless there's some |
| 10:14AM | 11 | important public policy considerations that are going to trump |
| 10:14AM | 12 | that. |
| 10:14AM | 13 | Mutual is the employer here, a California |
| 10:14AM | 14 | company.  There's no case law cited by Mutual, or frankly that |
| 10:14AM | 15 | I'm aware of, that says the public policy of Florida should be |
| 10:14AM | 16 | enjoyed by some out-of-state litigant.  The only Florida |
| 10:14AM | 17 | residents here are Dwayne Hutto and Chris Smith.  They don't |
| 10:14AM | 18 | need protections of Florida public policy.  The contract as |
| 10:14AM | 19 | written is unenforceable.  That ends the analysis as to their |
| 10:14AM | 20 | interests. |
| 10:14AM | 21 | The argument about conflict of laws and whether |
| 10:14AM | 22 | they trump one state or another, that comes into play when you |
| 10:14AM | 23 | have an employee of a particular state where the employer has |
| 10:14AM | 24 | tried to skirt the forum law and selected something else, and |
| 10:14AM | 25 | the public policy of the resident employee should be considered |

| | |
|---|---|
| 10:15AM | 1 |
| 10:15AM | 2 |

and potentially eviscerate the written choice of law of the
employer.  We don't have any of that here.

I think that frankly one of the cases that is
most helpful and lays this out is a case that was cited by
Mutual.  It's the <u>Punzi</u> case, 601 So.2d 599.  That case says
essentially just what I said; that look, the default is the
choice of law set forth in the contract.  You can potentially
consider conflict of laws and adopting some other state's law
if there's conflicting public policy.  And in that case, it was
a choice between Illinois law and Florida law.  The employee
was located in Florida.  The contract said Illinois law.  The
Court recognized look, there's a meaningful difference between
Illinois and Florida, but nevertheless said look, this Florida
employee does not need protections of Florida law.  The
contract as written should be enforced, and based on that
logic, the Court said that the TRO that had been entered
shouldn't have been entered, and the case is reversed and
remanded.

So I will note that there is not one case cited
by Mutual that involves a Court invalidating a foreign state
choice of law provision based on Florida restrictive covenant
law --

THE COURT:  Well, you're not asking me to invalidate
it.  You filed this as a Motion in Limine, not a Summary
Judgment, which is then my question.  Even if your argument is

10:16AM   1   correct, what is your response that the evidence is nonetheless

10:16AM   2   still admissible related to the disloyal acts of the employees,

10:16AM   3   former employees?

10:16AM   4         MS. KREITER:  I think that the evidence could be

10:16AM   5   admissible as to the fourth cause of action.  Married with this

10:16AM   6   motion is really our request as to the special verdict and the

10:17AM   7   jury form.  I think as to the tortious interference claim,

10:17AM   8   there has to be specifics presented to the jury that a finding

10:17AM   9   based on Mr. Smith or Mr. Hutto isn't permissible as to the

10:17AM  10   tortious interference claim.

10:17AM  11         I also think --

10:17AM  12         THE COURT:  The pleadings are closed.  The very

10:17AM  13   argument you're making about the discovery being closed, you

10:17AM  14   are now at the eve of trial looking to file a summary judgment

10:17AM  15   in the form of a Motion in Limine.  And so it seems to me the

10:17AM  16   Motion in Limine is a matter of whether the evidence should be

10:17AM  17   limited or not, not the substantive issue that we're alleging

10:17AM  18   regarding whether the contract is enforceable under California

10:17AM  19   law.  You could have chose to raise that issue earlier, which

10:17AM  20   would have framed the pleadings going forward in anticipation

10:17AM  21   of the Court's pretrial hearing.

10:17AM  22         MS. KREITER:  You know, I guess I did not view it in

10:17AM  23   that fashion because I was viewing it as not something that

10:17AM  24   would be claimed dispositive, even as to the tortious

10:17AM  25   interference claim.  Mutual could succeed as to that claim to

10:18AM 1   the extent that it convinces the jury as to Mr. Wolf.  So that

10:18AM 2   is why I didn't view it as dispositive, but rather limiting as

10:18AM 3   to one of the claims, Your Honor.

10:18AM 4        THE COURT:  All right.  What's the response?

10:18AM 5        MR. KAREN:  Your Honor, first in the _Punzi_ case, I'm

10:18AM 6   going to quote from that case.  It states, "When contracting

10:18AM 7   parties indicate in the contract their intention as to the

10:18AM 8   governing law, any dispute under the contract will be governed

10:18AM 9   by such law" -- here's the important part -- "as long as it's

10:18AM 10  not against the public policy of the forum state."  There is

10:18AM 11  nothing about if the employee raises it or the employer raises

10:18AM 12  it.  It's just -- it doesn't talk about that.  It's not getting

10:18AM 13  into that.  That's the statement of the case, and I'm quoting

10:18AM 14  directly from the opinion.

10:18AM 15       Now, here's -- and that's what's at issue here.

10:18AM 16  It's Florida law that does control.  The fact of the matter,

10:18AM 17  Florida law -- and the statute is 542.12, I believe, and that

10:19AM 18  statute provides very clearly what the public policy is.  And

10:19AM 19  California and Florida have opposite policy considerations.

10:19AM 20  California is concerned much more about the employee.

10:19AM 21  Florida's public policy, however, is actually much more about

10:19AM 22  the employer.  So with respect to that, it's clearly the

10:19AM 23  Florida interest that -- and I think we've cited this in our

10:19AM 24  briefs -- that the -- the reliability of an employer on their

10:19AM 25  contractual protections that indicate they can provide

10:19AM 1    confidential information, access to employees, et cetera, et

10:19AM 2    cetera, that's been announced case after case after case as an

10:19AM 3    important interest of the state of Florida as defined and set

10:19AM 4    forth in its statutes.  And as such you can no more come in

10:19AM 5    here and say -- Mr. Hutto could no more come and say, "Well, we

10:19AM 6    think the minimum wage because California law applies is $15 an

10:20AM 7    hour, and so you have to pay me $15 an hour because I work

10:20AM 8    in -- even though I work in Florida because that's what's

10:20AM 9    provided in my contract."  You could no more make that argument

10:20AM 10    than you could make this argument respectfully.  So I think

10:20AM 11    that California law does not apply.

10:20AM 12            But on the other points that Your Honor has

10:20AM 13    identified, I completely agree.  I think the motion is belated,

10:20AM 14    but even more importantly, I think what we're talking about

10:20AM 15    here is something that -- you know, we're talking about

10:20AM 16    limiting instructions, and we're now -- we don't even have a

10:20AM 17    trial date at this point.  I think it's premature.  In other

10:20AM 18    words, I think Your Honor can allow the information to come in.

10:20AM 19    If at the end of the case you feel there's a basis for that in

10:20AM 20    some way, well maybe we'll take it up then.  But clearly, this

10:20AM 21    is going to be relevant to the breach of fiduciary duty, to the

10:20AM 22    claims of tortious interference, to the claims for breach of

10:20AM 23    contract because trade secret or not, you know, this was

10:20AM 24    certainly confidential information of ours that they took.  So

10:21AM 25    there's multiple bases where it's relevant.  I think it's

| | | |
|---|---|---|
| 10:21AM | 1 | inherent in this case, and what they're really trying to do |
| 10:21AM | 2 | ultimately is sanitize the case out of salient facts.  They |
| 10:21AM | 3 | shouldn't be permitted to do it. |
| 10:21AM | 4 | If at the end of discovery -- I'm sorry.  If at |
| 10:21AM | 5 | the end of trial, you believe some limiting discussion is |
| 10:21AM | 6 | warranted, then we can take it up at that time.  So I just |
| 10:21AM | 7 | don't think it's a proper motion at this time, Your Honor. |
| 10:21AM | 8 | THE COURT:  All right.  Ms. Kreiter, any response? |
| 10:21AM | 9 | MS. KREITER:  I mean, I think, yeah.  Look, if |
| 10:21AM | 10 | there's a dispute about how this was raised, the fact of the |
| 10:21AM | 11 | matter is this is a legal issue I think needs to be decided. |
| 10:21AM | 12 | THE COURT:  Well, even putting that aside, how do I |
| 10:21AM | 13 | reconcile the Punzi case where it expressly states, "when |
| 10:21AM | 14 | contracting parties indicate in the contract their intention as |
| 10:21AM | 15 | to the governing law, any dispute under the contract would be |
| 10:21AM | 16 | governed by such law, as long as it is not against the public |
| 10:21AM | 17 | policy of the forum state." |
| 10:21AM | 18 | MS. KREITER:  I think you would -- |
| 10:21AM | 19 | THE COURT:  Doesn't seem to draw any nuance about |
| 10:21AM | 20 | what you're arguing.  It's just very clear.  If it's contrary |
| 10:21AM | 21 | to Florida's public policy, then Florida's public policy will |
| 10:22AM | 22 | prevail. |
| 10:22AM | 23 | MS. KREITER:  I guess I would say the next paragraph |
| 10:22AM | 24 | of that decision, Your Honor, says specifically, "Although the |
| 10:22AM | 25 | law of Florida and the law of Illinois differ as to what |

| | | |
|---|---|---|
| 10:22AM | 1 | constitutes a protectable interest, neither the restrictive |
| 10:22AM | 2 | covenant nor the law of Illinois is repugnant to the public |
| 10:22AM | 3 | policy of Florida." |
| 10:22AM | 4 | And then it goes on, "In fact, Illinois law in |
| 10:22AM | 5 | this case works to the advantage Punzi, a Florida citizen.  We |
| 10:22AM | 6 | therefore will apply Illinois law to this case." |
| 10:22AM | 7 | So that's the part of the decision that is |
| 10:22AM | 8 | directly on point with what I am saying.  There is no need for |
| 10:22AM | 9 | public policy protections for Mutual, a foreign employer that |
| 10:22AM | 10 | has selected California law for some of its employees. |
| 10:22AM | 11 | THE COURT:  But the argument is, and to be clear, |
| 10:22AM | 12 | what Punzi states is the proper inquiry for the Court is to |
| 10:22AM | 13 | ascertain whether the foreign's state's law is harmonious in |
| 10:22AM | 14 | spirit with Florida's public policy.  Do you dispute that it's |
| 10:23AM | 15 | not, that it's clearly -- California law clearly favors the |
| 10:23AM | 16 | employee, and Florida law clearly favors the employer? |
| 10:23AM | 17 | MS. KREITER:  I think as applied, the public policy |
| 10:23AM | 18 | considerations don't come into play here because of the |
| 10:23AM | 19 | location of the two parties and who's trying to enforce choice |
| 10:23AM | 20 | of law and who's not.  So the public policy can exist, but that |
| 10:23AM | 21 | should not be considered in a vacuum.  It should be how does |
| 10:23AM | 22 | the public policy apply to the litigants in this case? |
| 10:23AM | 23 | THE COURT:  I understand, but I disagree, so I'm |
| 10:23AM | 24 | going to deny the Motion in Limine.  I'll enter a written order |
| 10:23AM | 25 | finding that I do find primarily the issue of public policy |

10:23AM 1    prevails here and that Florida public policy is not harmonious

10:23AM 2    with California law, and so I'll deny the Motion in Limine as

10:23AM 3    framed.

10:23AM 4            Okay.  Those are the two matters.  I know that

10:23AM 5    the recent pleadings you've indicated that you've not come to

10:23AM 6    an agreement, and there are additional disputes regarding what

10:23AM 7    the Court previously ordered as to what shall be disclosed

10:24AM 8    going forward with the trade secrets, and so in that regard

10:24AM 9    I'll note the parties have filed additional pleadings.  At

10:24AM 10   document 200 is WaterStone's objection to the disclosure of

10:24AM 11   new, inconsistent facts 11 months after the close of discovery

10:24AM 12   and on the eve of trial.  And the document number 201 is

10:24AM 13   plaintiff response to WaterStone's objection.

10:24AM 14           All right.  We're not going to get deep into

10:24AM 15   this today, but I do have a couple of questions.  The first

10:24AM 16   question is for you, Mr. Karen.  Do you dispute what is at

10:24AM 17   least being argued in the objection?  Are there new documents

10:24AM 18   that are now being disclosed for the first time?  And by

10:24AM 19   documents, I want to be clear about the terminology.  I'm not

10:24AM 20   talking about trade secrets.  I'm just talking about new

10:24AM 21   records, new documents that are being disclosed for the first

10:24AM 22   time and that were not previously disclosed in any way in this

10:24AM 23   litigation?

10:24AM 24           **MR. KAREN:**  Not at all, Your Honor.  I can show you

10:24AM 25   the Bates stamps on those documents that reflect that they

| | | |
|---|---|---|
| 10:25AM | 1 | were, in fact, produced.  Many were produced by WaterStone. |
| 10:25AM | 2 | Many were produced by us.  But absolutely these are not new |
| 10:25AM | 3 | documents.  In fact, the majority -- I won't say the majority. |
| 10:25AM | 4 | Many, many of the documents were discussed as exhibits in |
| 10:25AM | 5 | depositions. |
| 10:25AM | 6 | THE COURT:  So, Ms. Kreiter, then obviously that |
| 10:25AM | 7 | seems to be something that is of clear contention because as I |
| 10:25AM | 8 | understood your pleading, you disagree with that. |
| 10:25AM | 9 | MS. KREITER:  Judge, produced in discovery versus |
| 10:25AM | 10 | identified as trade secrets.  I will just tell you we need to |
| 10:25AM | 11 | stop talking about generalities.  "I disclosed loans," or, "I |
| 10:25AM | 12 | talked about loans in my amended complaint."  I will refer the |
| 10:25AM | 13 | Court to Exhibit 2 to our filing.  If you just look at, for |
| 10:25AM | 14 | example, Exhibit 2, I think that's a nice example.  I don't |
| 10:25AM | 15 | care whether Mr. Karen labels this Calle loan trade secret |
| 10:25AM | 16 | something that's a loan opportunity or the documents.  There's |
| 10:25AM | 17 | 24 documents there that were not identified before the close of |
| 10:26AM | 18 | discovery as trade secrets.  And in addition, none of those |
| 10:26AM | 19 | documents but for one were even identified in the course of |
| 10:26AM | 20 | summary judgment.  These are documents identified as trade |
| 10:26AM | 21 | secrets days ago. |
| 10:26AM | 22 | And I will tell you that on the 22 exhibits |
| 10:26AM | 23 | Mutual identified as its purported trade secrets, 14 of those |
| 10:26AM | 24 | consist of documents that were never disclosed in discovery. |
| 10:26AM | 25 | So I don't -- you know, I read Mr. Karen's pleading as, "Well, |

| | | |
|---|---|---|
| 10:26AM | 1 | we're talking about the concept of loans."  None of it was |
| 10:26AM | 2 | disclosed as to the vast majority of these documents.  Were |
| 10:26AM | 3 | they produced in discovery?  Sure.  But, frankly, that makes it |
| 10:26AM | 4 | worse. |
| 10:26AM | 5 | Exhibit 2, all of the documents were produced in |
| 10:26AM | 6 | October of '22 by WaterStone.  So, you know, we're nearly two |
| 10:26AM | 7 | years later.  I can't and I shouldn't be made to triage this |
| 10:26AM | 8 | volume of new documents, open up discovery, redo my e-forensic |
| 10:26AM | 9 | analysis.  None of that should be occurring. |
| 10:27AM | 10 | Mr. Karen identified -- however he's compiling |
| 10:27AM | 11 | these documents to make them look less, the fact of the matter |
| 10:27AM | 12 | is 216 of them were not disclosed.  And I can't redo the case. |
| 10:27AM | 13 | I want the case to get going and go to trial.  It's just that |
| 10:27AM | 14 | his proposal that all of this just be permitted because he |
| 10:27AM | 15 | disclosed it in April is not -- I don't know what to do with |
| 10:27AM | 16 | that.  I can't go to trial. |
| 10:27AM | 17 | He said, "Well, you know, look.  Kreiter |
| 10:27AM | 18 | proposed a trial in June, and she knew this was out there." |
| 10:27AM | 19 | You know what?  I guess I was counting on the Federal Rules |
| 10:27AM | 20 | being enforced.  We have a -- we had a dispositive motion on |
| 10:27AM | 21 | trade secrets.  I can't go back to step one of the analysis and |
| 10:27AM | 22 | talk about what are the trade secrets?  Frankly, even now I |
| 10:27AM | 23 | don't know in particular because Mr. Karen is saying, "Well, |
| 10:27AM | 24 | it's some of these documents, not all of them." |
| 10:28AM | 25 | The fact of the matter is discovery is done.  I |

| | | |
|---|---|---|
| 10:28AM | 1 | can't have yet another redo where, you know, this scheduling is |
| 10:28AM | 2 | going to entail now we've got to do discovery and new experts |
| 10:28AM | 3 | and all this other stuff.  Discovery is closed.  I haven't |
| 10:28AM | 4 | heard one peep from Mr. Karen ever about why -- for example, |
| 10:28AM | 5 | Exhibit Number 2 with documents disclosed in October of '22, |
| 10:28AM | 6 | why those weren't identified as trade secrets.  And I can't fix |
| 10:28AM | 7 | it now.  It's too late.  It's too expensive.  It's completely |
| 10:28AM | 8 | divorced from the Federal Rules and the Court's multiple |
| 10:28AM | 9 | orders. |
| 10:28AM | 10 | I can say more on that, and frankly I have a lot |
| 10:28AM | 11 | more to say about the damages because that part is even worse |
| 10:28AM | 12 | frankly.  I mean, the idea that -- |
| 10:28AM | 13 | THE COURT:  Well, before we get down there, just so I |
| 10:28AM | 14 | understand Exhibit Number 2, what you're saying is 216 of the |
| 10:28AM | 15 | 284 were not disclosed in July 31st before the close of |
| 10:28AM | 16 | discovery, and Judge Sneed had entered an order directing |
| 10:29AM | 17 | plaintiff to identify by Bates stamp trade secrets; is that |
| 10:29AM | 18 | accurate? |
| 10:29AM | 19 | MS. KREITER:  Correct. |
| 10:29AM | 20 | THE COURT:  Now, in April of 2024, are any of these |
| 10:29AM | 21 | 284 documents identified? |
| 10:29AM | 22 | MS. KREITER:  Yes, there is a portion of them that |
| 10:29AM | 23 | were identified in April.  That would be -- well, so I guess I |
| 10:29AM | 24 | sliced it and diced it differently.  89 of the documents were |
| 10:29AM | 25 | never disclosed at any point, either in April or in July or -- |

10:29AM 1          THE COURT:  Right.

10:29AM 2          MS. KREITER:  Those were just disclosed in May.

10:29AM 3  There are 68 documents that were timely disclosed in discovery.

10:29AM 4  That's not what this is about.

10:29AM 5          THE COURT:  So then the remainder is what you're

10:29AM 6  saying was not disclosed until April of 2024?

10:29AM 7          MS. KREITER:  Right, April or May.  Again, that is

10:29AM 8  what is making it entirely unmanageable, to talk about renewing

10:30AM 9  my motion for summary judgment.  I haven't -- I mean, I

10:30AM 10  haven't --

10:30AM 11          THE COURT:  All right.

10:30AM 12          MS. KREITER:  -- the discovery.

10:30AM 13          THE COURT:  All right.  Response to that?

10:30AM 14          MR. KAREN:  Your Honor, and perhaps we can get

10:30AM 15  through this with some clarification because I want to explain

10:30AM 16  to you what I did and where maybe this could -- we could find

10:30AM 17  some middle ground.

10:30AM 18          We -- everything in terms of the trade secrets

10:30AM 19  that we offered here was disclosed on April 1st, with one

10:30AM 20  exception, and --

10:30AM 21          THE COURT:  Why do you think the April 1st is a date

10:30AM 22  that saves you, despite the close of discovery in Judge Sneed's

10:30AM 23  order?

10:30AM 24          MR. KAREN:  Two things.  I think, Your Honor, for the

10:30AM 25  most part we did discuss this the other day, and I think we

|        |    |                                                                              |
|--------|----|------------------------------------------------------------------------------|
| 10:30AM | 1  | went through all of those just to put those together.  But                   |
| 10:30AM | 2  | putting that aside, because I do think we're kind of rearguing                |
| 10:30AM | 3  | what we discussed last time, you know, if you look at Federal                 |
| 10:30AM | 4  | Rules of Procedure 2016, it actually says there's no obligation               |
| 10:30AM | 5  | to provide supplemental directive information that has                         |
| 10:30AM | 6  | otherwise been made known to the parties in writing or during                 |
| 10:30AM | 7  | the discovery process.                                                        |
| 10:30AM | 8  |                 Now, we asked --                                              |
| 10:31AM | 9  |         THE COURT:  Despite Judge Sneed's order, though.                      |
| 10:31AM | 10 | Judge Sneed's order is very clear you were to identify by Bates                |
| 10:31AM | 11 | stamps the trade secret documents at issue.                                   |
| 10:31AM | 12 |         MR. KAREN:  And they -- we produced, Your Honor, and                   |
| 10:31AM | 13 | identified what we could.  Additional information was                          |
| 10:31AM | 14 | discovered later, and throughout the course of discovery, we                   |
| 10:31AM | 15 | updated it as we discovered it.  At that time --                              |
| 10:31AM | 16 |         THE COURT:  I'm going to interrupt you, because                        |
| 10:31AM | 17 | here's what we're going to do.  We're not going to resolve this               |
| 10:31AM | 18 | today.  I'm going to bring you all in so I can look at the                     |
| 10:31AM | 19 | documents themselves, and what you need to present to me is --                 |
| 10:31AM | 20 | of these documents -- and I don't know what is being asserted                  |
| 10:31AM | 21 | here to include 89 documents that were never disclosed.  You                   |
| 10:31AM | 22 | may want to revisit that.  But as the remaining ones that were                 |
| 10:31AM | 23 | disclosed April 1st, which you're going to have to establish                   |
| 10:31AM | 24 | for good cause why they were not disclosed for me to consider                  |
| 10:31AM | 25 | allowing them to go forward in this case, and I will tell you                  |

| | | |
|---|---|---|
| 10:31AM | 1 | it's going to be an uphill battle to demonstrate that given |
| 10:31AM | 2 | Judge Sneed's order.  So you're going to have to be in a |
| 10:31AM | 3 | position to explain to me why you could not identify these |
| 10:31AM | 4 | documents despite the disclosure of them throughout the period |
| 10:32AM | 5 | of discovery. |
| 10:32AM | 6 | MR. KAREN:  Your Honor, could I ask for clarification |
| 10:32AM | 7 | of one point? |
| 10:32AM | 8 | THE COURT:  Sure. |
| 10:32AM | 9 | MR. KAREN:  Might make it easier.  Some of the |
| 10:32AM | 10 | documents that we added were -- I did that because you had |
| 10:32AM | 11 | indicated provide to the other -- to WaterStone the documents |
| 10:32AM | 12 | as they would be in an exhibit.  So I included things, for |
| 10:32AM | 13 | example, emails that may have been -- not have a trade secret, |
| 10:32AM | 14 | but they would provide that here sent to me this day.  I've got |
| 10:32AM | 15 | a receipt, so you could see the chain, so to speak.  Those are |
| 10:32AM | 16 | some -- many of the emails that I think Ms. Kreiter is talking |
| 10:32AM | 17 | about being added -- |
| 10:32AM | 18 | THE COURT:  If you're not asserting those documents |
| 10:32AM | 19 | to be trade secrets, but rather just context of the trade |
| 10:32AM | 20 | secret, that's fine.  But if you're asserting documents as |
| 10:32AM | 21 | trade secrets that should have been identified per Judge |
| 10:32AM | 22 | Sneed's order, that's a different issue. |
| 10:32AM | 23 | MR. KAREN:  To get clarity, when we produce those or |
| 10:32AM | 24 | when we provide sort of the documents, should we refine our |
| 10:32AM | 25 | identification that you had asked for last time excluding those |

10:32AM  1    materials?  And the only reason I included them is I didn't

10:33AM  2    want it to be indicated that we were not going to use them as

10:33AM  3    exhibits for other purposes in the case.  So as long as we're

10:33AM  4    not excluding our ability to use them as exhibits, I can pare

10:33AM  5    this down further.  That's what I was worried about.

10:33AM  6          THE COURT:  Well, I understand, Mr. Karen.  I

10:33AM  7    appreciate you doing that.  But to be abundantly clear, what

10:33AM  8    we're trying to get to is just what is the universe of trade

10:33AM  9    secrets that are at issue for Ms. Kreiter in defending the

10:33AM  10   litigation?  So however you want to identify specifically,

10:33AM  11   which to be very blunt, it should have been already done based

10:33AM  12   on Judge Sneed's order by Bates stamp.  What I was trying to

10:33AM  13   accomplish is just simply by ease of reference to an exhibit,

10:33AM  14   but if you're including additional materials that you are not

10:33AM  15   asserting to be trade secrets, then you need to clarify that

10:33AM  16   for Ms. Kreiter so she's without question clear on what is

10:33AM  17   being alleged to be a trade secret in this case and what is

10:33AM  18   not.

10:33AM  19         MR. KAREN:  We will make that clarification.

10:33AM  20         THE COURT:  All right.  So then what I'll do then is

10:33AM  21   I'm going to schedule a hearing on this, but direct that you

10:33AM  22   all meet and confer after you make that clarification, and if

10:34AM  23   there's still further issue, then I'm going to bring you down

10:34AM  24   so I can look at the documents themselves and hear any

10:34AM  25   additional argument.

| | |
|---|---|
| 10:34AM | 1 |

                    Explain to me then, Mr. Karen, as to this issue

regarding damages.  Are you looking to supplement your damage

expert to include a different theory of damages?

          MR. KAREN:  No, not a different theory at all, Your

Honor.  Just to be clear, our damage expert does calculations,

but doesn't necessarily and certainly can't provide the factual

underpinnings for those calculations.  So what we had talked

about last time was we were going to have her report be updated

to reflect the Court's prior rulings with respect to the

exclusion of certain information in those damages and inclusion

of others, so we would just simply update it for that, update

it to reflect the 30 months so it was very clear what that was.

And then we were additionally going to provide Mr. Gennarelli

who had previously testified so that Ms. Kreiter could ask

additional questions about 30-month stipulation and where that

comes into.  That's all we were suggesting doing, which is what

I thought we agreed upon last time.

                    So that's the only -- there are no new facts.  I

think just so -- to be clear, Ms. Kreiter asked me in

conversations, "Are you saying that he's -- is that going to be

a new fact?"  And, you know, I hope you can appreciate where

I'm coming from, Your Honor.  There's going to be questions and

answers.  If there's a new question asked that wasn't asked,

then there's a new answer, which I obviously can't predict

today.  I can't state a different answer won't be provided or

| | | |
|---|---|---|
| 10:35AM | 1 | will be provided, not even knowing what the question is. So |
| 10:35AM | 2 | the point I'm getting to is I can't simply say a new fact, but |
| 10:35AM | 3 | is it a new theory of damages? No, absolutely not. Could a |
| 10:35AM | 4 | new fact emerge through questioning that hadn't been discussed |
| 10:35AM | 5 | before? Possibly. I can't say it wouldn't, and that's all I |
| 10:35AM | 6 | was saying to Ms. Kreiter. But there's no new theory of |
| 10:35AM | 7 | damages here. The theory is the exact same theory. |
| 10:35AM | 8 | And I want to be clear. You know, I can read |
| 10:35AM | 9 | you the deposition transcript from the deposition she's talking |
| 10:35AM | 10 | about. And if you wouldn't mind, Your Honor, I would like |
| 10:36AM | 11 | to -- |
| 10:36AM | 12 | THE COURT: You can in a moment, but I do have a |
| 10:36AM | 13 | question. Explain to me though, as I understand the expert -- |
| 10:36AM | 14 | who is going to opine the 30-month value, the expert or the |
| 10:36AM | 15 | 30(b)(6) witness? |
| 10:36AM | 16 | MR. KAREN: The 30(b)(6) witness will talk about a |
| 10:36AM | 17 | 30-month duration, and the expert -- I'm sorry, yes, the |
| 10:36AM | 18 | 30(b)(6) witness will talk about the expert -- sorry, Your |
| 10:36AM | 19 | Honor. |
| 10:36AM | 20 | The 30(b)(6) witness will talk about the |
| 10:36AM | 21 | duration of expected employment. The expert will just do the |
| 10:36AM | 22 | physical calculation -- not physical, but the mathematical |
| 10:36AM | 23 | calculation based on, again, Your Honor's recent rulings, to |
| 10:36AM | 24 | update for that, as well as the 30 months so there's clarity. |
| 10:36AM | 25 | I think the 30 months had already figured in to what we had |

10:36AM   1   provided before, but certainly we will update it to reflect the

10:36AM   2   calculations excluding Mr. Hutto, I believe, and excluding

10:37AM   3   Paramus.

10:37AM   4          THE COURT:  All right.  Ms. Kreiter?

10:37AM   5          MS. KREITER:  He's absolutely talking about someone

10:37AM   6   new.  That's why he needs a corporate rep.  The expert alone is

10:37AM   7   not going to do this.  What he is proposing is that Mutual come

10:37AM   8   forward with a brand new corporate rep who's going to talk

10:37AM   9   about what is typical at Mutual, why 30 months is acceptable,

10:37AM  10   what -- I mean, my understanding is what's typical in the

10:37AM  11   industry.  That was never disclosed in discovery period.  I

10:37AM  12   spent two days deposing their corporate rep on multiple

10:37AM  13   damages.  I never heard anything about this.  He is trying to

10:37AM  14   absolutely inject new facts into the case.  If he weren't, I

10:37AM  15   wouldn't be hearing about any 30(b)(6) corporate

10:37AM  16   representative.

10:37AM  17          That's the problem, Your Honor.  I can't redo

10:37AM  18   all of this.  I have a damages expert.  I might need an

10:37AM  19   industry expert.  It's just -- it is reopening discovery in the

10:37AM  20   most material of ways.  We've already had Mutual getting a

10:37AM  21   number of redos as to its damages, including allowing Mutual to

10:38AM  22   have a rebuttal expert two weeks before the close of discovery

10:38AM  23   where we see the damages change from 4.5 million to then it's

10:38AM  24   up to 28 million.  We started this case with Mutual's counsel

10:38AM  25   telling the Court that damages were approximately 250,000.  It

10:38AM  1    has been all over the map, and I can't have another change.

10:38AM  2    Discovery is closed, and I just -- the rules have to mean

10:38AM  3    something here.  This case has to get going, and it can't

10:38AM  4    restart now with a new damages theory.

10:38AM  5              If Ms. Rosevear can, you know, calculate

10:38AM  6    30 months of damages, so be it, but it's got to be by evidence

10:38AM  7    that is in the record, in discovery.  It wasn't that I didn't

10:38AM  8    ask about this.  I spent two days asking about this.  It was

10:38AM  9    never mentioned.

10:38AM  10             He is asking for yet another redo that's going

10:38AM  11   to put us back months if the Court countenances it.  The Court

10:38AM  12   should not countenance this.  This case has to get to trial.

10:39AM  13        **THE COURT:**  All right.  Let me interrupt you.

10:39AM  14   Mr. Karen, the whole reason why I allowed the additional

10:39AM  15   discovery is because of the failure to disclose Ms. Rosevear in

10:39AM  16   your case in chief rather than as a rebuttal.  This is not an

10:39AM  17   opportunity then to insert additional facts in order for her to

10:39AM  18   rely upon to form her opinion.  The opinion has been formed, so

10:39AM  19   it seems to me it's unnecessary to have a 30(b)(6) witness.

10:39AM  20   What is the purpose of the 30(b)(6) witness?

10:39AM  21        **MR. KAREN:**  Yes.  I think, Your Honor, what we're

10:39AM  22   talking about here is we submitted a stipulation.  I want to

10:39AM  23   try to go back how we got here, because I think that's

10:39AM  24   important.

10:39AM  25             We submitted a stipulation at Judge Barber's

10:39AM  1    urging, as Judge Barber had already ruled on summary judgment

10:39AM  2    on this exact issue and said that we would be able to go

10:39AM  3    forward and present evidence, but that by the close of evidence

10:39AM  4    we had to have some basis articulated as to why we would have

10:39AM  5    30 months.  That's what the ruling was, and that's how we came

10:39AM  6    in.

10:39AM  7              Then Ms. Kreiter, WaterStone, filed a motion and

10:39AM  8    said you should strike the 30 months, and that's how we got

10:40AM  9    back up to it.  So I think that bears recognition because

10:40AM  10   that's kind of how we got here.  I mean, look.  If it's going

10:40AM  11   to come down to it, then what I would suggest, we go to

10:40AM  12   trial -- we tried to be useful.  We tried to be reasonable.  We

10:40AM  13   tried to listen the Judge Barber's urgings, and so --

10:40AM  14             THE COURT:  If I can interrupt you one moment just to

10:40AM  15   be clear.  I seem to recall the basis for the 30 months,

10:40AM  16   though, was testimony that's already been provided about the

10:40AM  17   anticipation of offices that have been existing for a certain

10:40AM  18   period of time to continue on for at least a period of

10:40AM  19   30 months.

10:40AM  20             MR. KAREN:  Yes.

10:40AM  21             THE COURT:  So is that not in the record already?

10:40AM  22             MR. KAREN:  I think to some extent it is.  I mean,

10:40AM  23   but maybe -- this is why I was going to read from the

10:40AM  24   deposition transcript so you could hear it.

10:40AM  25             THE COURT:  All right.

| | | |
|---|---|---|
| 10:40AM | 1 | **MR. KAREN:** Question:  "How long did you spend |
| 10:40AM | 2 | preparing it?"  Answer:  "Well, I think a large part of the |
| 10:40AM | 3 | time we spent was trying to come up, you know, a fair way to |
| 10:41AM | 4 | associate the lost revenue, and I really mean fair and be |
| 10:41AM | 5 | conservative about it because we were hoping for a settlement |
| 10:41AM | 6 | before this time.  So, you know, so that was the big -- because |
| 10:41AM | 7 | there's two -- there's two ways we could do this, right?  We |
| 10:41AM | 8 | could do what we did here, which is to take those loans and |
| 10:41AM | 9 | multiply it times the basis points earned by corporate from |
| 10:41AM | 10 | that volume, average it out, and then show for 18 months they |
| 10:41AM | 11 | had stayed.  The other way we mentioned earlier was the cost of |
| 10:41AM | 12 | goods sold, and when you do that approach, you know, you're |
| 10:41AM | 13 | talking about 17, 18 million." |
| 10:41AM | 14 | It continues on, if I may to page -- then |
| 10:41AM | 15 | there's another question.  "What was the rationale for using |
| 10:41AM | 16 | the 18-month period to calculate the lost profit damages |
| 10:41AM | 17 | associated with the branches closing?"  "Yeah, I mean, we |
| 10:41AM | 18 | didn't want to use -- again, we were trying to be reasonable. |
| 10:41AM | 19 | You know, I think you could make a case for using longer.  Most |
| 10:41AM | 20 | of our branches have been here 10, 15 years or so.  So -- at |
| 10:41AM | 21 | least the core group.  So we could have used longer, but we |
| 10:41AM | 22 | thought 18 months was a reasonable amount of time." |
| 10:41AM | 23 | Then further on it goes.  Question is, "And that |
| 10:42AM | 24 | could have happened at the one-year mark.  So I'm trying to |
| 10:42AM | 25 | understand was that -- you know, that situation factored in at |

10:42AM  1   all for purposes of your damages?"  Answer:  "Not really.  They

10:42AM  2   also could still be here.  Keller Williams comes into play, and

10:42AM  3   they stay for six or seven years, so we didn't use six or seven

10:42AM  4   years.  We didn't use ten years.  We used 18 months.  I mean, I

10:42AM  5   don't know how much we can, you know" -- and he gets cut off,

10:42AM  6   and they continue on other things.

10:42AM  7            So this is what we're talking about right here.

10:42AM  8   Now, I can't say that if questions are -- I wanted to make the

10:42AM  9   witness available.  Ms. Kreiter indicated she didn't think it

10:42AM 10   was fair that we now have the stipulation it was going to be

10:42AM 11   30 months.  So, again, trying to be reasonable, make sure

10:42AM 12   there's no questions about, you know, anybody trying to pull

10:42AM 13   any wool over anyone's eyes, we said, "We'll make him available

10:42AM 14   yet again.  You can ask the same questions."  This is what the

10:42AM 15   testimony is going to be.

10:42AM 16            So will they probably drill down more, a little

10:42AM 17   bit more about why 30 months?  Yes, but -- I would expect

10:43AM 18   Ms. Kreiter will do that, but I don't know what the questions

10:43AM 19   are going to be, and I don't know what the answers are going to

10:43AM 20   be, so I'm hesitant to say they're going to be exactly in line

10:43AM 21   with this.  I obviously can't say that.

10:43AM 22            What I am saying is that there's not going to be

10:43AM 23   a new theory.  What we're talking about is what we were talking

10:43AM 24   about in this deposition, and they will continue to talk about

10:43AM 25   it.  We simply said, and I think the position is and our

10:43AM   1    position is, Your Honor, that under Florida law, we are

10:43AM   2    entitled to go in front of the jury, and if we want to argue

10:43AM   3    for 10 years of damages, and the jury based upon causation can

10:43AM   4    make the determination.  We voluntarily said we won't do that

10:43AM   5    because we're trying to facilitate this case and streamline it,

10:43AM   6    but we shouldn't be punished for that.

10:43AM   7            And so if she -- and Ms. Kreiter and WaterStone

10:43AM   8    now want to take a deposition and ask a corporate designee

10:43AM   9    about these questions and get more clarification, we'll allow

10:43AM   10   it again, but there's no new theory here.  This is what they

10:43AM   11   were talking about before, and this is what, if they want, they

10:43AM   12   can talk about again.

10:43AM   13       **THE COURT:**  All right.  Thank you.  And what I

10:43AM   14   understand is Ms. Kreiter does not want to reopen the

10:43AM   15   deposition as to the 30(b)(6) witness.  I mean, you've made the

10:44AM   16   witness available, and as I understand it, she's not looking to

10:44AM   17   avail herself of that, and so we're not going to go down that

10:44AM   18   path.

10:44AM   19            What I previously ordered, given that I'm going

10:44AM   20   to allow Ms. Rosevear to testify in plaintiff's case in chief,

10:44AM   21   is the opportunity for an examination of Ms. Rosevear on that

10:44AM   22   theory of damages for the 30 months, and if Ms. Kreiter wants

10:44AM   23   to avail herself to that, she may go forward.  But outside of

10:44AM   24   that, if there's no need from her perspective to reopen the

10:44AM   25   30(b)(6) deposition, then we're not going to reopen it.

| | | |
|---|---|---|
| 10:44AM | 1 | Ms. Kreiter, any concerns to proceeding in that |
| 10:44AM | 2 | way? |
| 10:44AM | 3 | **MS. KREITER:**  Yeah, I guess I want to be clear.  The |
| 10:44AM | 4 | testimony that Mr. Karen just read was the corporate rep |
| 10:44AM | 5 | talking about why 18 months is appropriate. |
| 10:44AM | 6 | **THE COURT:**  Well, that's something certainly you |
| 10:44AM | 7 | could argue at trial, examine the witness at trial, and then |
| 10:44AM | 8 | certainly make an argument to the jury, but whatever Mr. Karen |
| 10:44AM | 9 | thinks the witness will testify to at trial is a separate |
| 10:44AM | 10 | matter than reopening the deposition. |
| 10:44AM | 11 | **MS. KREITER:**  I think, though, Your Honor, I don't |
| 10:44AM | 12 | want trial by ambush where because this was never disclosed |
| 10:45AM | 13 | that Mutual was seeking 30 months -- and remember, Judge Barber |
| 10:45AM | 14 | didn't know that there was no supporting testimony for the |
| 10:45AM | 15 | 30 months.  He got -- he saw a stipulation, had no context for |
| 10:45AM | 16 | any of that.  I don't want to have a witness at trial get up on |
| 10:45AM | 17 | the stand and talk about, "Here's my analysis as to why 30 |
| 10:45AM | 18 | months is reasonable.  Here's my opinions on that," and I hear |
| 10:45AM | 19 | about it the first time at trial.  That's where the rub is. |
| 10:45AM | 20 | So I guess I want clarity.  Is the Court saying |
| 10:45AM | 21 | that Mutual cannot put a witness on the stand to introduce an |
| 10:45AM | 22 | analysis supportive of the 30 months?  If so, that's where I |
| 10:45AM | 23 | could say look, I would serve discovery.  I would potentially |
| 10:45AM | 24 | depose leadership at Mutual's branches that, you know, they're |
| 10:45AM | 25 | saying this branch would have stayed on, and it's typical for |

10:45AM   1   Mutual.  I want to depose the leadership of those branches.  I
10:45AM   2   would serve additional discovery.  I may hire an industry
10:45AM   3   expert.  I can't do any of that, and if my choices are either
10:45AM   4   trial by ambush where they are going to put this theory forward
10:45AM   5   at trial, you know, then I think I need to do all that.  I
10:46AM   6   don't want to because of the time, expense, and discovery
10:46AM   7   rules.

10:46AM   8           THE COURT:  Well, it seems to me we need to start
10:46AM   9   with Ms. Rosevear and find out exactly how she's coming to her
10:46AM  10   opinion as to 30 months and what she is relying upon, and if
10:46AM  11   there's nothing in the record that she relied upon, then that's
10:46AM  12   the answer, but if she is asserting there's something that she
10:46AM  13   relied upon to form that opinion you feel that was not
10:46AM  14   previously disclosed, then I'll hear you as to that matter.

10:46AM  15           But I'm not going to reopen -- so to be clear,
10:46AM  16   we're not going to reopen it to allow the opportunity to
10:46AM  17   present additional facts for that purpose.  It's either in the
10:46AM  18   record or not.  And so that's what we're going to do going
10:46AM  19   forward.

10:46AM  20           So this is not a trial by ambush.  It's a matter
10:46AM  21   of whether -- and I don't know the answer to that.
10:46AM  22   Ms. Rosevear -- and as I just understood Mr. Karen's argument,
10:46AM  23   he was arguing that, "We could have gone up to 10 years."  So I
10:46AM  24   suspect that's what Ms. Rosevear is going to testify to; that
10:46AM  25   based upon the information she's been provided, she just cut it

<table>
<tr><td>10:46AM</td><td>1</td><td>off at 30 months, but I don't know.</td></tr>
</table>

10:46AM 1   off at 30 months, but I don't know.

10:46AM 2          So we're going to start with Ms. Rosevear first,

10:46AM 3   and then if you think there's additional concerns after that

10:47AM 4   testimony, then I'll hear you as to that.

10:47AM 5          MS. KREITER:  Okay.  That addresses my concern.

10:47AM 6          MR. KAREN:  Your Honor, I just want to, again for the

10:47AM 7   record so it's clear, go into this, because, again, you heard

10:47AM 8   the testimony just now.  There was no statement they said,

10:47AM 9   "Well, we think 18 months is a reasonable estimate."  They

10:47AM 10  said, "We think we could go as high as 10 years."  What I

10:47AM 11  don't -- what I want to make sure is if our witness comes in

10:47AM 12  and says, "Yes, you know at that point in time I thought

10:47AM 13  18 months was reasonable, but, you know, based on this, that,

10:47AM 14  and the other thing and the fact that we had said it could be

10:47AM 15  10 years, we think 30 months."  I mean, we didn't say that

10:47AM 16  there was a measurement done.  He said, "For settlement

10:47AM 17  purposes" -- those were the words he used -- "we thought that

10:47AM 18  18 months was reasonable."  So I want to make sure that my

10:47AM 19  witness isn't locked into something more than what he actually

10:47AM 20  testified to.

10:47AM 21          I certainly understand that Ms. Kreiter can

10:47AM 22  cross-examination Mr. Gennarelli, the 30(b)(6) witness, and

10:47AM 23  say, "Well, didn't you think 18 months was reasonable today,

10:47AM 24  and why do you think 30 months is reasonable tomorrow?"  But in

10:47AM 25  no way should he be precluded in his testimony from talking and

10:48AM 1   answering questions -- I mean, it is often that at trial, while

10:48AM 2   we're not talking about trial by ambush, the testimony --

10:48AM 3       THE COURT:  Mr. Karen, as clearly articulated by

10:48AM 4   Judge Barber's order is it can't be just mere speculation, and

10:48AM 5   that's the whole fundamental issue that was identified.  What

10:48AM 6   is the -- where is it grounded in fact for 30 months?  So I

10:48AM 7   don't know what the answer to that is, and I've yet to hear it.

10:48AM 8   If it's just arbitrarily, "We thought 18 months was reasonable,

10:48AM 9   but now we're saying 30 months," it's got to be more than that.

10:48AM 10      And so what is the fact that Ms. Rosevear relied

10:48AM 11  upon in order to say damages at 30 months should be calculated

10:48AM 12  this way and why 30 months is the number?

10:48AM 13      MR. KAREN:  And I guess, Your Honor, here's where I'm

10:48AM 14  struggling with that.  Mr. Gennarelli can provide -- he

10:48AM 15  provided answers to questions, and if a question wasn't asked,

10:48AM 16  then there may be an answer that was not provided, if that

10:49AM 17  makes sense.  And so I want to make sure because in most

10:49AM 18  cases -- and I think this is what Judge Barber was

10:49AM 19  contemplating-- you know, you testify at trial.  Somebody

10:49AM 20  testifies.  You cross-examine them, or you don't.  Obviously if

10:49AM 21  it's a completely different theory of the case, that's

10:49AM 22  something different.  But, for example, we had provided -- one

10:49AM 23  of the things we had already provided, and this was provided

10:49AM 24  prior to -- it was Judge Sneed who said we could actually use

10:49AM 25  the information.  It was the affidavit where we provided NMLS

| | | |
|---|---|---|
| 10:49AM | 1 | data, for example, and that shows the duration of certain |
| 10:49AM | 2 | branches, how long they last and what the averages were. |
| 10:49AM | 3 | That's a large part of what I'm sure Mr. Gennarelli will be |
| 10:49AM | 4 | talking about. |
| 10:49AM | 5 | So, I mean, that information is out there.  Was |
| 10:49AM | 6 | that something she asked about in his deposition?  No, it was |
| 10:49AM | 7 | not.  So are we going to be precluded, even though Judge Sneed |
| 10:49AM | 8 | had said that information could come in and Judge Barber seemed |
| 10:49AM | 9 | to indicate as well that it could come in?  So that's what I'm |
| 10:49AM | 10 | concerned about.  I mean, some of that NMLS data we are going |
| 10:49AM | 11 | to use. |
| 10:49AM | 12 | THE COURT:  Well, that will be what Ms. Rosevear will |
| 10:50AM | 13 | have to testify to, and if Ms. Kreiter feels she's relied upon |
| 10:50AM | 14 | facts that were not fully disclosed, I'm sure I'll hear about |
| 10:50AM | 15 | it, but at first we're going to go one step at a time, allow |
| 10:50AM | 16 | the opportunity for an examination of Ms. Rosevear to find out |
| 10:50AM | 17 | exactly what her opinion is grounded in, and then we'll take it |
| 10:50AM | 18 | the next step from there. |
| 10:50AM | 19 | All right.  So what I'd like to do is schedule |
| 10:50AM | 20 | for a hearing then -- how much time do you need to meet and |
| 10:50AM | 21 | confer as to the trade secrets then, Mr. Karen? |
| 10:50AM | 22 | MR. KAREN:  I think with Your Honor's instructions |
| 10:50AM | 23 | today, we could revise our list and provide it to counsel |
| 10:50AM | 24 | within seven days.  Is that reasonable, Arielle?  Within seven |
| 10:50AM | 25 | days we could provide it to counsel. |

10:50AM  1          I do want to apologize.  I have pre-existing

10:50AM  2   plans to be out of town from the 14th to the 28th, but after

10:50AM  3   that, obviously I'm good.

10:51AM  4          MS. KREITER:  If I could make a suggestion, Your

10:51AM  5   Honor.

10:51AM  6          THE COURT:  Yes.

10:51AM  7          MS. KREITER:  I propose that we send Mr. Karen a

10:51AM  8   native version of Exhibit 2 because I want to make sure that

10:51AM  9   nothing is lost in translation.  Exhibit 2 to our filing, which

10:51AM 10   is -- so it's docket 200-2.  I mean, that's a chart of all the

10:51AM 11   documents that we're talking about with the date of disclosure,

10:51AM 12   whether WaterStone contends it was previously identified.  I

10:51AM 13   propose that Mr. Karen add a column to that and make abundantly

10:51AM 14   clear which documents he is talking about are trade secrets.

10:51AM 15   And then if I understand the Court, you know, look, if he

10:51AM 16   narrows it substantially, maybe there's no issue.  My

10:51AM 17   understanding is that he would then have the burden to

10:51AM 18   establish cause as to any of the documents he's claiming are

10:51AM 19   trade secrets that have not been timely produced.  I think that

10:52AM 20   that would avoid the chance of further ambiguity and, frankly,

10:52AM 21   facilitate the questions -- the analysis.

10:52AM 22          So I guess I would ask if Mr. Karen could within

10:52AM 23   seven days, or whatever date is reasonable, annotate that chart

10:52AM 24   so that we have transparency, and then -- and I guess it seems

10:52AM 25   like there should be a second date by which Mr. Karen will

| | | |
|---|---|---|
| 10:52 AM | 1 | articulate his position as to cause, and I could respond to |
| 10:52 AM | 2 | that.  But without knowing which he's going to proceed on in |
| 10:52 AM | 3 | his argument, it seems to me that's the proper sequence. |
| 10:52 AM | 4 | THE COURT:  Mr. Karen, what do you think of that? |
| 10:52 AM | 5 | MR. KAREN:  May I just look at that Exhibit 2 again |
| 10:52 AM | 6 | for a moment, Your Honor? |
| 10:52 AM | 7 | THE COURT:  Sure.  Take your time. |
| 10:52 AM | 8 | MR. KAREN:  Thank you, Your Honor. |
| 10:53 AM | 9 | (Pause.) |
| 10:53 AM | 10 | MR. KAREN:  Your Honor, I don't know if that's going |
| 10:53 AM | 11 | to work based on the layout and the way Exhibit 2 is.  I do |
| 10:53 AM | 12 | believe Ms. Kreiter and I could offline and come up with a way |
| 10:53 AM | 13 | to do this that, you know, we could agree upon.  I don't know |
| 10:53 AM | 14 | that Exhibit 2 exactly does it for me, but I think there is a |
| 10:53 AM | 15 | way we could probably get to the same point. |
| 10:53 AM | 16 | THE COURT:  All right.  Can we could it by July -- |
| 10:53 AM | 17 | excuse me, by June 13th? |
| 10:53 AM | 18 | MR. KAREN:  In terms of meet and confer or actually |
| 10:53 AM | 19 | produce?  I think the answer is both actually, Your Honor.  I |
| 10:53 AM | 20 | don't think it's going to take us very long once we come to |
| 10:53 AM | 21 | agreement on this.  So as long as Ms. Kreiter and I can speak |
| 10:53 AM | 22 | in the next couple of days -- I'm not sure of her schedule, |
| 10:53 AM | 23 | hopefully we can -- then I think we could do that by the 13th. |
| 10:54 AM | 24 | THE COURT:  Ms. Kreiter? |
| 10:54 AM | 25 | MS. KREITER:  That's fine.  I will make myself |

10:54AM 1    available.

10:54AM 2              THE COURT:  All right.  We're going to schedule a

10:54AM 3    hearing for 10:00 on June 13th.  I'll send out the notice then.

10:54AM 4    If this becomes moot, then just contact my chambers, and we'll

10:54AM 5    cancel the hearing.

10:54AM 6              Okay.  Ms. Kreiter, what I plan on doing then is

10:54AM 7    allowing you to go forward with the deposition.  I want you to

10:54AM 8    also be prepared to tell me then the schedule going forward as

10:54AM 9    to when that's going to be accomplished on the 13th, and then

10:54AM 10   we can get -- start talking about getting us back on a trial

10:54AM 11   date.

10:54AM 12             MR. KAREN:  Your Honor, could I ask one thing?

10:54AM 13             THE COURT:  Yes, Mr. Karen.

10:54AM 14             MR. KAREN:  And I'm sorry again for the scheduling

10:54AM 15   issue.  My flight is an international flight that leaves first

10:54AM 16   thing in the morning of the 14th.  Is there any way we could do

10:54AM 17   this by Zoom, just because I'd be concerned with thunderstorms.

10:54AM 18   If I get stuck, I can't get back in time.  Or do it the 12th or

10:55AM 19   the 11th or some other sooner day?

10:55AM 20             THE COURT:  We could do it by Zoom if you can ship me

10:55AM 21   the documents so I have physical copies of the documents in

10:55AM 22   advance of the hearing.

10:55AM 23             MR. KAREN:  Okay.  That would be no problem.

10:55AM 24             THE COURT:  Any objection to that by anyone?

10:55AM 25             MS. KREITER:  That's fine.

10:55AM  1          **MR. KAREN:**  Thank you, Your Honor.  I appreciate

10:55AM  2   that.

10:55AM  3          **THE COURT:**  Okay.  So we'll go forward.  We'll send

10:55AM  4   out the notice for Thursday, June 13th, at 10:00.  And then if

10:55AM  5   you can get me the documents in advance of the hearing so I

10:55AM  6   have them, if we're going to go forward with any disputed

10:55AM  7   documents.

10:55AM  8          Okay.  And at that time I'd like to hear what

10:55AM  9   we're doing as far as when the deposition of Ms. Rosevear is

10:55AM  10  going to occur, and then from there where we could get back on

10:55AM  11  a trial docket.

10:55AM  12         Okay.  Anything else we should take up today,

10:55AM  13  Mr. Karen?

10:55AM  14         **MR. KAREN:**  Not from the plaintiff, Your Honor.

10:55AM  15         **THE COURT:**  All right.  Ms. Kreiter, anything else?

10:55AM  16         **MS. KREITER:**  No.  Thank you.

10:55AM  17         **THE COURT:**  Okay.  Thanks to everyone for your time.

10:55AM  18  We'll be adjourned.

10:55AM  19              (End of proceedings.)

20

21

22

23

24

25

```
 1              * * * * * * * * * * * * * * * * * * * *

 2                     UNITED STATES DISTRICT COURT

 3                     MIDDLE DISTRICT OF FLORIDA

 4

 5                  REPORTER TRANSCRIPT CERTIFICATE

 6          I, Tana J. Hess, Official Court Reporter for the United
         States District Court, Middle District of Florida, certify,
 7       pursuant to Section 753, Title 28, United States Code, that the
         foregoing is a true and correct transcription of the
 8       stenographic notes taken by the undersigned in the
         above-entitled matter (Pages 1 through 45 inclusive) and that
 9       the transcript page format is in conformance with the
         regulations of the Judicial Conference of the United States of
10       America.

11

12

13       _____

14       Tana J. Hess, CRR, RMR, FCRR
         Official Court Reporter
15       United States District Court
         Middle District of Florida
16       Tampa Division
         Date:  June 7, 2024
17

18

19

20

21

22

23

24

25
```

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida