```
 1            IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                      TAMPA DIVISION
 3
    MUTUAL OF OMAHA MORTGAGE, INC.)
 4                                 )
          Plaintiff;               )
 5                                 )
                                   )
 6      -vs-                       ) 8:22-cv-01660-TPB-JSS
                                   )
 7                                 )
    WATERSTONE MORTGAGE            )
 8  CORPORATION,                   )
                                   )
 9       Defendant.                )
                                   )
10  -------------------------------)
11
12              REPORT OF PROCEEDINGS from the
13  deposition of CANDICE ROSEVEAR, taken by Paul W.
14  O'Connor, a CSR within and for the State of Illinois,
15  pursuant to the provisions of the Federal Code of
16  Civil Procedure and Rules of the Supreme Court thereof
17  pertaining to the taking of depositions, at 111 East
18  Wacker Drive, Suite 2600, Chicago, Illinois, 60601,
19  commencing at 9:00 a.m. on July 20, 2023.
20
21
22
23
24
```

EXHIBIT 2

Page 2

1  APPEARANCES:
2
3      MITCHELL SANDLER, by
         MS. COURTNEY WALTER
4        1120 20th Street, NW, Suite 725
         Washington, DC, 20036
5        Cwalter@mitchellsandler.com.com
             Appearing on behalf of the Plaintiff;
6
7      GODFREY KAHN, SC, by
         MS. MARIA KREITER
8        833 East Michigan Street, Suite 1800
         Milwaukee, Wisconsin, 53202
9        Mkreiter@gklaw.com
             Appeared on behalf of the Defendant.
10
11
12  ALSO PRESENT: (Via Videoconference)
13      EMMA JEWEL
14      CARRIE MACSUJA
15      MARK McCARROLL

Page 3

1          I N D E X
2
3  WITNESS              PAGE
4  CANDICE ROSEVEAR
5  Exam by Ms. Kreiter       4
6
7
8
9
   EXHIBITS:
10
   Gennarelli Exhibit 7      23
11 Deposition Exhibit 30     37 (Rosevear report)
   Tomalak Exhibit 24        59
12 Tomalak Exhibit 22        65
   Deposition Exhibit 31     79 (Oscher report)
13 Gennarelli Exhibit 14     115
   Gennarelli Exhibit 12     121

Page 4

1      (Witness sworn)
2      MS. KREITER:  Miss Rosevear, state your full name,
3  spell your last name for the record.
4      THE WITNESS:  Candice Leann Rosevear,
5  R-O-S-E-V-E-A-R.
6           CANICE ROSEVEAR,
7  called as a witness herein, having been first duly
8  sworn, was examined upon oral interrogatories and
9  testified as follows:
10           EXAMINATION
11      By Ms. Kreiter:
12     Q.  I want to start by just getting a baseline for
13  the opinions that you rendered.  You understand that
14  Mutual of Omaha, the plaintiff in this case, identified
15  three categories of damages, correct?
16     A.  According to the Oscher Report, that is my
17  understanding, yes.
18     Q.  I want to get an understanding what did you
19  opine on, what did you not opine on.  So Category 1
20  damages, is what we've been referring to as diverted loan
21  damages.  Previously Mutual had not calculated a damages
22  demand associated with the diverted loans Category 1
23  damages.
24        My understanding is that was not part of

Page 5

1  your analysis, is that correct?
2     A.  That is correct.
3     Q.  Then Category 3 damages are the ill-gotten
4  gains damages of 750,000.  Is that your understanding?
5     A.  I recall that number, yes.
6     Q.  Did you opine at all on the ill-gotten gains
7  damages asserted by Mutual?
8     A.  No.
9     Q.  Which leaves Category 2 damages.  Damages
10  associated with the branches closing rather than staying
11  open into some point in the future.
12        Your opinion is exclusively related to the
13  Category 2 damages, correct?
14     A.  That's correct.
15     Q.  You didn't do any analysis and you're not going
16  to express any opinions with respect to Mutual's trade
17  secret misappropriations claims, correct?
18     A.  Correct.
19     Q.  Did you review or opine on the expert witness
20  report prepared by Brett Creasy?
21     A.  I believe I reviewed that.  It was part of the
22  packet with the Oscher Report, so.
23     Q.  Are you again, I just want to understand are we
24  talking about something or not talking about something.

Page 22

1    MS. KREITER:  Q   Did you ask them why it was that
2  you weren't analyzing the prior analysis Mutual had
3  performed?
4    MS. WALTER:  Object to form.
5    THE WITNESS:  A   No.
6    MS. KREITER:  Q   Did you wonder why am I not
7  looking at the 4.4 million analysis Mutual has already
8  presented in the case?
9    A.  Did I wonder.  Can you repeat the question?
10        (Record read as requested)
11    A.  I'm certainly aware that this number had been
12  presented.  I didn't analyze that number or spend time
13  thinking about that number in particular.  I did my own
14  independent analysis.
15    Q.  If Mutual of Omaha had already presented the
16  $4.4 million demand with respect to the Category 2 branch
17  damages, why was there a need to do a new analysis?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A   I don't know.
20    MS. KREITER:  Q   Did you ask why, did you ask that
21  question to Mutual, why am I re-doing the analysis of
22  Mr. Gennarelli and Mr. Mayle?
23    MS. WALTER:  Object to form, mischaracterizes
24  testimony.

Page 23

1    THE WITNESS:  A   No, I did not ask that question.
2    MS. KREITER:  Q   Do you agree that the work that
3  you did -- strike that.
4        Did you attempt to determine whether the
5  estimate by Mr. Gennarelli is accurate?
6    MS. WALTER:  Object to form.
7    THE WITNESS:  A   No.
8    MS. KREITER:  Q   You had no discussions with
9  Mr. Gennarelli or Mr. Mayle about the prior analysis that
10  they performed, correct?
11    A.  That's not correct.
12    Q.  What discussions did you have about the prior
13  work that was performed and the demand for 4.4 million
14  with Mr. Gennarelli and Mr. Mayle?
15    A.  They explained the documents to me in a general
16  sense.
17    Q.  What documents?
18    A.  The documents underlying their interrogatory
19  response.
20    MS. KREITER:  Show you what we previously marked at
21  a deposition.  Gennarelli Exhibit No. 7.
22    Q.  Have you seen this document before?
23    A.  Yes, I have.
24    Q.  Did you attempt to determine whether the

Page 24

1  estimates set forth in Gennarelli Exhibit No. 7 is
2  accurate?
3    MS. WALTER:  Asked and answered.
4    THE WITNESS:  A   No.
5    MS. KREITER:  Q   Did you speak with Jeff
6  Gennarelli or Bernie Mayle about Deposition Exhibit
7  Gennarelli 7?
8    MS. WALTER:  Asked and answered.
9    MS. KREITER:  It's not.  She said she talked with
10  them about documents.
11    Q.  Is this one of the documents that you spoke
12  with Mr. Gennarelli and Mr. Mayle about?
13    THE WITNESS:  A   This is what I was referring to,
14  yes.
15    Q.  Tell me about that conversation?
16    A.  As I previously mentioned, it was a general
17  conversation telling me what this document is.  I believe
18  this is the document used to get to the 4.4 million.
19        I don't see that total here though.  But I
20  believe that would be the sum of the two values here.
21    Q.  Okay.  So they were presenting this to you to
22  tell you this is the prior model that Mutual put forth,
23  something of that ilk?
24    MS. WALTER:  Objection.

Page 25

1    THE WITNESS:  A   General statements of that,
2  that's correct.
3    MS. KREITER:  Q   The analysis that you did, does
4  it rely upon the same, any of the same data that was
5  relied upon in Deposition Exhibit Gennarelli 7?
6    MS. WALTER:  Object to form.
7    MS. KREITER:  If you know.
8    THE WITNESS:  A   I didn't analyze this in depth.
9  But just looking at the title of volume of loans funded,
10  that is something I certainly considered from a different
11  data source as fully cited in my expert report.
12    MS. KREITER:  Q   Do you know what period of time
13  damages were extrapolated out for with respect to -- this
14  Deposition Exhibit Gennarelli 7, for ease of reference I
15  will call it the Gennarelli Category 2 model.
16        What period of time did Mr. Gennarelli
17  use?
18    MS. WALTER:  Object to form.
19    THE WITNESS:  A   I would need to study this, but.
20    MS. KREITER:  Q   You don't know right now?
21    A.  I see profit for 42 months.  And profit for
22  18 months.
23    Q.  Do you know?
24    A.  Not just by sitting here.  I would want to dig

Page 26

1  into the underlying data to give you the exact correct
2  answer.
3      Q.  Did you have any discussions with
4  Mr. Gennarelli or Mr. Mayle about the term used with
5  respect to the Gennarelli model?
6          MS. WALTER:  Object to form.
7          THE WITNESS:  A  Can you clarify what you mean by
8  term.
9          MS. KREITER:  Q  Sure.  The amount of time over
10 which damages are projected?
11     A.  You're referring to the $4.4 million figure?
12     Q.  Correct.  Let's define for purposes of this
13 deposition.  So when I am referring to the Category 2
14 damages previously presented by Mutual, in which Mutual
15 seeks approximately $4.4 million in damages, for ease of
16 reference I'm going to refer to that as the Gennarelli
17 Model for this deposition.  It's the model that's
18 reflected in Gennarelli Deposition Exhibit 7.
19 Understood?
20     A.  Okay.
21     Q.  With respect to the Gennarelli Model of
22 damages.  Did you have any discussions with
23 Mr. Gennarelli or Mr. Mayle about the duration of time
24 over which they calculated lost profits in order to come

Page 27

1  to the $4.4 million demand?
2      A.  I believe it's 18 months.  But I believe that
3  was discussed generally and I recall reading that in the
4  documents I reviewed.
5      Q.  Why didn't you use 18 months?
6      A.  That's not what my model is measuring.
7      Q.  Is it the case you're retained to independently
8  calculate damages, not to support the Gennarelli Model?
9      A.  Correct.
10     Q.  The Gennarelli Model concludes that Mutual has
11 lost profits associated with the Tampa branch are
12 2.7 million.  And that the damages -- and some change.
13 And the damages for the Daytona branch are 1.7 million.
14 Are you aware of that -- I will note for the record the
15 witness is reviewing Gennarelli Deposition Exhibit No. 7.
16         Were you aware of that without looking at
17 the exhibit?
18     A.  The exact breakdown of the 4.4 million, I was
19 not aware.  But from memory.
20     Q.  Okay.  But in general you had a sense that
21 there was approximately 2.7 million, not the exact
22 number, associated with Daytona, and 1.7 with the other
23 branch?
24         MS. WALTER:  Object to form.

Page 28

1          THE WITNESS:  A  I think I may have had, yeah, a
2  general understanding, but not the exact numbers in my
3  mind.
4          MS. KREITER:  Q  Does it concern you that Mutual
5  previously presented damages of 4.4 million and now your
6  report is asserting damages of 28 million?
7          MS. WALTER:  Objection.
8          THE WITNESS:  A  No.
9          MS. KREITER:  Q  Do you agree that's a big delta?
10     A.  Well I don't know what you mean by a big delta.
11     Q.  The difference between -- do you agree there's
12 a meaningful difference between 4.4 million and 28
13 million?
14         MS. WALTER:  Object to form.
15         THE WITNESS:  A  They are different numbers.
16         MS. KREITER:  Q  Sure.
17     A.  Certainly.
18     Q.  Your demand is about 4 to 5 times bigger than
19 the prior demand, correct?
20         MS. WALTER:  Object to form.  She never said it was
21 a demand.
22         MS. KREITER:  Q  Your lost profit estimates of 28
23 million is about 4 to 5 times bigger than Mutual's prior
24 demand, correct?

Page 29

1          MS. WALTER:  Object to form.
2          THE WITNESS:  A  My damages calculation is based
3  on a damages analysis I prepared.  And that yields a
4  figure that is larger than what was presented earlier.
5          MS. KREITER:  Q  Sure.
6      A.  Yes.
7      Q.  Do you agree it's materially larger?
8          MS. WALTER:  Object to form.
9          THE WITNESS:  A  Materially is a difficult thing
10 for me to agree to.  Because materially is subjective.
11 We can talk about if it's larger, yes.
12         MS. KREITER:  Q  Is it your testimony that a
13 demand that's more than four times larger, $24 million
14 larger, that's not a material difference to you?
15         MS. WALTER:  Object to form.
16         THE WITNESS:  A  I wouldn't use the word material.
17         MS. KREITER:  Q  How would you describe the delta
18 between those numbers?
19         MS. WALTER:  Object to form.
20         THE WITNESS:  A  I would use numbers to describe
21 it.  $24 million larger.
22         MS. KREITER:  Q  Did it concern you at all that
23 Mr. Gennarelli and Mr. Mayle had put forth a damages
24 analysis of 4.4 million and you went off on your own and

Page 42

1  A. These I believe are the loan data that
2 defendant's expert relied on.
3  Q. With respect to the Category 1 damages,
4 correct?
5  A. I believe so, that's my understanding, yes.
6  Q. So if you were not analyzing Category 1
7 damages, why did you list the damages as ones that you
8 considered?
9  A. Do you mean these documents?
10  Q. Yes, the documents that are listed on page four
11 and going onto page five. I just again, my understanding
12 was that you didn't do any work with respect to
13 Category 1. Yet I see that you've listed a bunch of
14 documents related to the Category 1 damages as ones that
15 you have considered.
16      Why are these documents listed in your
17 reports as having been considered?
18  A. They were provided to me by counsel. I briefly
19 reviewed them. And decided that they weren't within the
20 scope of my report and what I was asked to calculate.
21  Q. Okay. So these documents listed under
22 defendant expert production, they have nothing to do with
23 the $28 million that you ultimately estimate, correct?
24  A. Correct.

Page 43

1  Q. With respect to your $28 million estimate,
2 you're assuming that the branches would have stayed open
3 till 2031, is that correct?
4  A. Part of the analysis runs through 2031, yes.
5  Q. Why did you select 2031?
6  A. That is a ten-year window, that I have included
7 in my discounted cash flow analysis.
8  Q. Why did you select a 10-year window?
9  A. To present my model annually through ten years.
10  Q. Why didn't you consider two years, 5 years, a
11 different number --
12     MS. WALTER: Object to form.
13     MS. KREITER: -- of years?
14     THE WITNESS: A My model is set up to calculate
15 lost profits in each year through 2031 and beyond. So
16 the model is clear I believe in Exhibit 7 and 8 what
17 those values are.
18     MS. KREITER: Q So my question is how did you
19 land on ten years. You could have said 30 years. I'm
20 trying to understand why is it 10.
21  A. It's standard in DCF modeling to use 10 years.
22 Gives us a nice view of what the cash flows look like, if
23 anything is changing over time. And how the impact of
24 the discount rate affects the numbers, cash flow coming

Page 44

1 back.
2     The goal of that exhibit is to express the
3 cash flows in present value terms. So I find that giving
4 a 10-year window has served that functional purpose.
5 There's no, you know, reason for using 10 years
6 specifically as a cutoff point in terms of the branch
7 closures analysis.
8  Q. So if I'm understanding your testimony, it's a
9 standard with respect to this particular form of
10 modeling, it's not a number selected specific to these
11 particular branches, is that accurate?
12  A. That's correct.
13  Q. You would apply 10 years if you had another
14 case -- strike that. Let me ask it this way.
15     Have you applied this same methodology in
16 other cases?
17  A. Yes.
18  Q. Have you used a 10-year duration in all of
19 those cases?
20  A. I don't believe in all of the cases. I might
21 look at seven years.
22     If I have, if I need to model changes that
23 I know of that are going to happen at some point in the
24 time horizon, I might go out a few more years. I have

Page 45

1 the flexibility to model the DCF, to set up the DCF
2 according to the facts and the issues I'm looking at.
3  Q. Did you consider using an 18 months duration
4 like Mr. Gennarelli did in his model?
5  A. No.
6  Q. Why not?
7  A. 18 months is something Mr. Gennarelli chose.
8 My model does not consider that time frame. I don't
9 understand fully why 18 months is selected.
10  Q. Did you consider a 12-month duration consistent
11 with the 12-month non solicit?
12     MS. WALTER: Object to form.
13     THE WITNESS: A No.
14     MS. KREITER: Q Why not?
15  A. That wouldn't apply here.
16  Q. Why not?
17  A. Because I'm measuring lost profits in the
18 branch, not to an individual employee.
19  Q. Do you understand that the branch managers had
20 a 12-month non solicit?
21     MS. WALTER: Object to form.
22     THE WITNESS: A Yes.
23     MS. KREITER: Q What certainty do you have that
24 any of the employees would have stayed beyond 12 months

12 (Pages 42 - 45)

Page 46

1  if the managers could have solicited them after that
2  period of time?
3      MS. WALTER: Object to form.
4      THE WITNESS: A  I don't know how that would play
5  out.
6      MS. KREITER: Q  Did you consider whether the
7  duration of 2031 was reasonable in light of the 12 months
8  non solicit?
9      MS. WALTER: Object to form.
10     THE WITNESS: A  Yes.
11     MS. KREITER: Q  You obviously came to the
12 conclusion that using a 10-year duration was appropriate
13 despite a 12-month non solicit. Why?
14   A.  Well to be clear, my model is estimating lost
15 profit for every year through 2031 and beyond. So I want
16 to clear that up so we are talking about the same thing.
17         And so with that in mind, can you ask your
18 question again.
19   Q.  Did you consider whether the employees might
20 leave after a year because managers were able to solicit
21 them after a year?
22   A.  I thought about that.
23   Q.  In what way?
24   A.  It doesn't impact my model.

Page 47

1   Q.  Why do you say that?
2   A.  Well, the report clearly explains what I'm
3  measuring. It's the lost profit from these branches.
4         If an employee decides to leave and the
5  branch is still in existence, my model is estimating the
6  lost profits to the branch. Whether or not there's
7  turnover, it could be, turnover is common over the course
8  of this branch's existence before this event, of this
9  lawsuit. So what my model is measuring is lost profit to
10 the branch.
11   Q.  What happens if the managers solicit all of the
12 branch employees and they all leave?
13     MS. WALTER: Object to form.
14     MS. KREITER: Q  What's left of the branch?
15     THE WITNESS: A  I think we have seen what happens
16 when something like this, when all of the employees
17 leave.
18   Q.  Sure. Understood. I mean the branch is
19 closed. Mutual's position is that the branch closures
20 occurred because the managers solicited, correct?
21     MS. WALTER: Object to form.
22     THE WITNESS: A  I don't recall.
23     MS. KREITER: Q  Okay. Do you know why the
24 employees left?

Page 48

1   A.  I do not know.
2   Q.  Okay. Do you know what claims Mutual is
3  pursuing in the case?
4   A.  I would have to review the complaint.
5   Q.  You don't know right now without looking at the
6  complaint?
7   A.  I know generally.
8   Q.  What generally do you know about the claims
9  Mutual is pursuing?
10   A.  That this is a legal issue, I don't want to use
11 the wrong legal word.
12         My understanding generally is that
13 defendant's actions led to the closure of these branches.
14 So they are pursuing damages related to that.
15   Q.  Do you have an understanding that it was the
16 managers who allegedly solicit the employees?
17     MS. WALTER: Object to form.
18     THE WITNESS: A  I believe that's described in the
19 complaint.
20     MS. KREITER: Q  I'm asking for your
21 understanding.
22   A.  I don't recall without reviewing the complaint.
23   Q.  Did any of the Tampa, Daytona, Paramus
24 employees have an employment contract that required them

Page 49

1  to continue working for Mutual for a year, 18 months,
2  10 years or any other duration?
3      MS. WALTER: Object to form.
4      THE WITNESS: A  I don't know.
5      MS. KREITER: Q  That wasn't something you
6  considered?
7   A.  Considered the non solicit as we discussed
8  generally as it would or would not relate to how I would
9  approach this valuation problem. So in that context I
10 have considered these issues.
11   Q.  Did you consider whether the employees having a
12 at will relationship versus a contractual term with
13 respect to your analysis?
14   A.  Yes.
15   Q.  In what fashion?
16   A.  As I've described. So I considered all of
17 these issues when designing my model and found this issue
18 of modeling lost profits to the branches to be separate
19 from an individual employee decision.
20   Q.  Is your model divorced from whether any of the
21 managers stay or go at the branches?
22     MS. WALTER: Object to form.
23     THE WITNESS: Please repeat.
24         (Record read as requested).

Page 50

1    THE WITNESS: A   The model is looking at the
2 branch as a whole, not at these individual managers.
3        MS. KREITER: Q   Let me ask it this way.  Cut
4 through some of this.
5           Is it that your model assumes the
6 employees are going to stay into the future, but not -- I
7 will stop there.
8           Does your model assume that the employees
9 are going to stay at the branches into the future?
10       MS. WALTER:  Object to form.
11       THE WITNESS: A   No.  It assumes that the branches
12 will remain in operation.
13       MS. KREITER: Q   What happens if head of the
14 branch who is generating a lot of loans leaves?
15       MS. WALTER:  Object to form.
16       MS. KREITER: Q   How would that impact your model?
17       THE WITNESS: A   It would not impact the model.
18    Q.  Why not?
19    A.  The model is estimating what the loan volume
20 would be if operations continued into the future as they
21 had.  And assuming that under this hypothetical, that
22 you're proposing, there would be an employee who left.
23           There's still a branch in existence that's
24 a Mutual of Omaha Mortgage branch.  Which they can

Page 51

1 replenish their talent because they still have a branch
2 that's in existence.  It's theirs.  They have a chance to
3 rebuild, to hire another employee to maintain the
4 relationships that they have with realtors, whomever is
5 sending loans their way.
6    Q.  I think I understand.  So your model -- let's
7 maybe put some facts to it.
8           Do you understand Dwayne Hutto is one of
9 the managers at issue in the case?
10    A.  That name sounds very familiar.
11    Q.  So I want you to assume that Dwayne Hutto is
12 manager of the Daytona branch.  And Mr. Hutto resigned.
13 With those assumptions in mind.
14           You're saying that your model is not
15 impacted because the model assumes that another employee
16 is going to fill the void left by Dwayne Hutto and
17 provide loan volume similar to the volume supplied or
18 derived by Mr. Hutto, correct?
19       MS. WALTER:  Object to form.
20       THE WITNESS: A   I haven't modeled individual
21 performance.  Again, what the model does is it assumes
22 that the branch will continue to operate as it had in the
23 past, going forward.
24           How the company restructures itself to

Page 52

1 keep the loan volumes or profit margin or market share is
2 something that is implied in the model, that's not
3 necessarily analyzed directly.
4        MS. KREITER: Q   Understood.  So the model assumes
5 that the loan volume is going to be continuing into the
6 future consistent with what it had in the past,
7 regardless of whether the employees are there or not, the
8 particular employees?
9    A.  To be clear, looking at the historical loan
10 volumes, there could be employees that come and go during
11 that time period.  So we have this period of time where
12 we observe loan volume for the branch, not broken down by
13 individuals but for this particular branch.
14           So this is a regional, it has market
15 share, there's competitive factors that are taken into
16 account as well as things that occur in the normal course
17 of business with people leaving, being hired, with
18 acquisitions, things that might happen over the course of
19 business is already included in this historical data that
20 we all have access to.
21           My model assumes that going forward in
22 time after April '22, that these loan volumes remain
23 relative to what they had been before.
24    Q.  If Mr. Smith and Mr. Hutto, the managers of the

Page 53

1 branches resign, and they hold the lease for the branch
2 offices, how would those offices possibly stay open until
3 2031?
4    A.  Again this is a hypothetical situation.
5 Different from what happened in reality.
6    Q.  Let me stop you there.
7           Do you have an understanding as to who
8 controls the leases for the offices?
9    A.  My understanding is that the branch managers
10 operate independently.  So I don't know, but I believe
11 that the branch managers are handling that.
12    Q.  When you say the branches continue, what in
13 your mind is the branch that is continuing?
14    A.  So I think you're asking me to define a branch
15 of Mutual of Omaha Mortgage.  So let's just talk about
16 the Tampa branch.
17           I understand that the Tampa branch
18 consists of several employees, it's 1 of 2 Florida
19 branches.  That's a Mutual of Omaha branch.  So the
20 branch has market share, the branch has the Mutual of
21 Omaha name behind it.  The branch has an established
22 presence.  The branch is an entity in itself and within
23 it there are employees that work there.
24           Does that answer your question?

14 (Pages 50 - 53)

Page 54

1  Q. I wanted to make sure you finished.
2     So in your mind, the branch are things
3  like the name, the market share, the established
4  presence, not necessarily the employees, is that
5  accurate?
6  A. That's not what I said.
7  Q. Okay, then maybe I didn't follow.
8     I understood you to say in response to my
9  question, when you say the branch is continuing, what is
10 continuing?
11    I understand you're saying it's the loan
12 volume that's going to continue. Is the branch the loan
13 volume?
14 A. The branch generates the loan volume.
15 Q. What is the branch in your mind, tell me in an
16 exhaustive way all of the things that you believe
17 constitute the branch?
18    MS. WALTER: Object to form.
19    THE WITNESS: Could I have my prior answer read
20 back?
21    MS. KREITER: I don't think that the prior
22 discussion was clear. I want a clear record.
23 Q. What in your mind is the branch that you're
24 assuming will continue into 2031?

Page 55

1     THE WITNESS: A  Okay. I believe I already
2  enumerated.
3  Q. Tell me again so we have a clear record.
4     I want an exhaustive list of the things
5  that you believe constitute the branch that will continue
6  until 2031 for purposes of your analysis?
7  A. Sure. So the branch again includes, it has a
8  presence and a market share in Florida. Tampa in
9  particular is 1 of 2 in Florida.
10    So this branch is significant in terms of
11 the Mutual of Omaha presence. The branch has a brand
12 identity, a very strong brand identity. It has the name
13 of an established bank. The Mutual of Omaha company
14 behind it. So that's another element.
15    The employees that work within that branch
16 are a part of the branch. Whatever mix of employees
17 exist over time. Those are the big items that come to
18 mind as I sit here.
19 Q. Anything else?
20 A. As I sit here I think that covers the big
21 issues on how I would define the branch.
22 Q. So what leads you to believe that the
23 employees, which are one of the components of the branch,
24 will remain at Mutual until 2031?

Page 56

1     MS. WALTER: Object to form.
2     THE WITNESS: A  So I understand from, that other
3  Mutual of Omaha branches have lasted 5 to 10 years is
4  what I recall reading in prior deposition testimony. And
5  there are branches still in existence that haven't been
6  closed, but could live on with the Mutual of Omaha brand.
7     MS. KREITER: Q  Is it your testimony that the
8  employees at the branches can be easily replenished by
9  Mutual of Omaha?
10    MS. WALTER: Object to form.
11    THE WITNESS: A  I don't know.
12    MS. KREITER: Q  You just testified about branches
13 with Mutual having longevity, is that correct?
14 A. Yes.
15 Q. Do you know -- that was in general, that wasn't
16 specific to the Tampa and Daytona branches, correct?
17 A. That's correct.
18 Q. How long had the Tampa branch been in place at
19 Mutual prior to those employees transitioning to
20 Waterstone?
21 A. As far as I understand, I have data going back
22 to 2019.
23 Q. The branch left in '22, so that branch had been
24 with Mutual not for 10 years, correct?

Page 57

1  A. That's correct.
2  Q. When did the Daytona branch get formed?
3  A. I don't have the exact date. Again, I have
4  data for Daytona going back to 2019.
5  Q. Do you know whether either of the Daytona or
6  Tampa branches were in operation before those branches
7  joined Mutual?
8  A. They may have been. I don't recall.
9  Q. Did Mutual have an office in Tampa prior to
10 Chris Smith joining Mutual?
11    MS. WALTER: Object to form.
12    THE WITNESS: A  I don't recall.
13    MS. KREITER: Q  Did Mutual have an office in
14 Daytona prior to Dwayne Hutto becoming an employee?
15    MS. WALTER: Same objection.
16    THE WITNESS: A  I don't recall.
17    MS. KREITER: Q  Do you know whether any of the
18 employees that were working at the Daytona and Tampa
19 branches had worked with Mr. Hutto and Mr. Smith prior to
20 the time that the employees were working for Mutual?
21 A. I don't recall.
22 Q. Did you consider longevity specific to these
23 branches or did you just consider the longevity of Mutual
24 branches?

Page 58

1  A. I considered both.
2  Q. What was it about the longevity of these
3  branches that led you to think that a 10-year duration
4  was appropriate?
5  A. A few things. One being that the two branches
6  are the only branches that Mutual of Omaha has in
7  Florida. Another is -- specific to these branches, would
8  be the acquisition of Keller Williams and how that could
9  affect the longevity of the branches in Florida.
10 Q. How much business has Keller Williams generated
11 for Florida?
12 A. I have not looked at that.
13 Q. What is the longest period of time that either
14 of the managers for the Daytona or the Tampa branch have
15 stayed with a particular employer?
16     MS. WALTER: Object to form.
17     THE WITNESS: A  I don't know.
18     MS. KREITER: Q  Did you consider whether it was
19 likely for the particular managers here, Dwayne Hutto and
20 Chris Smith, whether those individuals would have stayed
21 with Mutual until 2031?
22     MS. WALTER: Object to form.
23     THE WITNESS: A  I considered that it's a
24 possibility.

Page 59

1     MS. KREITER: Q  Do you know when Mr. Smith joined
2  on Mutual?
3  A. I don't know that date.
4  Q. Do you know when Mr. Hutto joined Mutual?
5  A. No.
6     MS. KREITER: Take a look at what we previously
7  marked as Deposition Exhibit 24. Exhibit 24 is the NMLS
8  Consumer Access reports for Dwayne Hutto.
9  Q. Do you see that?
10 A. Melvin Dwayne Hutto.
11 Q. Correct?
12 A. Yes.
13 Q. Do you see the portion of the report that lays
14 out Mr. Hutto's employment history? There's a subheading
15 labeled in bold Employment.
16     Do you see that on the first page?
17 A. I'm looking for it.
18 Q. Bolded words that say Dwayne Hutto at the top,
19 then the next bolded subhead is employment. Then there's
20 a chart that has from, to, employer, position, city.
21     Do you see that?
22 A. Oh, I see, authorized to represent Waterstone.
23 Okay. I'm there.
24 Q. Let's go back to '97. Mr. Hutto is working at

Page 60

1  Red Lobster as a bartender from '97 to 2002.
2     Do you see that?
3  A. Yes.
4  Q. So I'm not going to get into months, going to
5  do some rough justice with these numbers, but '97 to
6  2002, approximately five years?
7  A. Okay.
8  Q. But that's not in the mortgage industry?
9  A. Red Lobster is not.
10 Q. No. He's 2002 to 2005 at Ameriquest for three
11 years, do you see that?
12 A. Yes.
13 Q. Then he's at Guaranteed Mortgage for four
14 years. 2005 to 2009. The Money Store for one year, 2009
15 to 2010. Proficio for one year, 2010 to 2011.
16    So from '97 to 2011, Mr. Hutto has never
17 been at an employer for 10 years. Correct?
18 A. That's correct.
19 Q. In fact, the longest job that he had was the
20 bartender at Red Lobster, correct?
21 A. I believe that is true.
22 Q. Sure. Let's keep going. His next job is 2011
23 to 2017. Humana. He's working as an insurance sales
24 agent. Do you see that?

Page 61

1  A. Yes.
2  Q. So approximately six years. That's the longest
3  one that we have got so far, correct?
4  A. July 2011 to June 2017, yes.
5  Q. I'm doing, I'm ignoring the months, just
6  looking at the years. Then next, Synergy One Lending,
7  2018 to 2019. So one year. 2018 to 2022, Mutual of
8  Omaha Mortgage. Three years.
9     Do you see that?
10 A. So his first, yes, it's November of 2018 to be
11 clear.
12 Q. Correct.
13 A. Okay.
14 Q. So Mr. Hutto has never stayed at an employer in
15 the mortgage industry for 10 years.
16    In fact, the longest Mr. Hutto has stayed
17 at a particular employer in the mortgage industry is four
18 years, correct, approximately?
19 A. What about the Proficio, sorry.
20 Q. I believe it's Guaranteed?
21 A. Guaranteed. Four years. Okay.
22 Q. Were you aware that Mr. Hutto has never stayed
23 at an employer in the mortgage industry for more than
24 four years?

16 (Pages 58 - 61)

Page 62

    1    A.  No.
    2    Q.  Would that bear on your opinion that the
    3  damages should be projected out 10 years?
    4    A.  No.
    5      MS. WALTER:  Can we take a break whenever there's a
    6  good time.
    7      MS. KREITER:  Sure.  Let's do one more exhibit.
    8  Take a look at what we have previously marked as
    9  Deposition Exhibit 22.
   10      THE WITNESS:  Okay.
   11      MS. KREITER:  Exhibit 22 is similarly an NMLS
   12  Consumer Access report with respect to Chris Smith.
   13    Q.  Do you see that?
   14      THE WITNESS:  A  Yes.  This is marked.
   15    Q.  Switch it with you.  Thank you.  So similar
   16  line of questions with respect to Mr. Smith.
   17      Again his employment history going back to
   18  1998, so just over 25 years.  He's had a slew of
   19  employers, correct?
   20    A.  He has, yes.
   21    Q.  Take a look at it.  Do you see any employers
   22  where Mr. Smith stayed for 10 years?
   23    A.  I don't believe so.
   24    Q.  Are there any facts you're aware of that would

Page 63

    1  lead you to believe Mr. Smith would have remained at
    2  Mutual for 10 years?
    3    A.  I don't know whether he would have remained at
    4  Mutual.
    5    Q.  Because your analysis didn't consider whether
    6  these particular employees would have stayed or not,
    7  correct?
    8    A.  His employment history has no impact on my
    9  damages model.
   10    Q.  Sure.  And that would be the case for
   11  Mr. Smith, Mr. Hutto; you're not looking at the
   12  likelihood that any of the employees would stay over a
   13  period of time, you're assuming the employees do or that
   14  Mutual replaces them with another employee that has
   15  similar volume, correct?
   16    A.  I'm assuming the branch continues in a similar
   17  way that it had.
   18    Q.  Well but the branch continuing in a similar way
   19  that it had, we talked about the branch and its employees
   20  and its market share.  I mean market share and the
   21  building, that's not what's generating the loans.
   22      The employees, the people working there,
   23  those are what, those are who are generating loans,
   24  correct?

Page 64

    1      MS. WALTER:  Object to form.
    2      THE WITNESS:  A  Employees are part of that
    3  equation certainly.
    4      MS. KREITER:  Q  Sure.  The building, the walls
    5  don't generate loans, it's the people who are in the
    6  building doing the work, source customers, meeting with
    7  real estate agents, correct?
    8    A.  I disagree with that characterization.
    9    Q.  Do you think it's something other than the
   10  people that are generating loans?
   11    A.  Yes.  I listed earlier I also believed that the
   12  Mutual of Omaha brand and the relationships that the
   13  company has established with those that would send loans
   14  their way also matters.
   15    Q.  Okay.  So in this case the employees leave, why
   16  couldn't Mutual just leverage its brand and recalculate
   17  those offices?
   18      MS. WALTER:  Object to form.
   19      THE WITNESS:  A  I mean this is again, I didn't
   20  analyze this hypothetical world.
   21      MS. KREITER:  Q  Sure.  I'm trying to get to the
   22  reasonableness of your assumption that the loan volume
   23  would have, could have continued into 2031?
   24    A.  Uh-huh.

Page 65

    1    Q.  Is it correct that that assumption, I think I
    2  understand it but that assumption doesn't depend on these
    3  employees staying or going?
    4    A.  It does depend on the employees staying such
    5  that there's a branch in existence.  The way the
    6  employees left all at one time resulted in the closure of
    7  of the branch, two branches.
    8    Q.  Did you consider what portion of the branch
    9  revenue was attributable to Mr. Smith or Mr. Hutto?
   10    A.  No.
   11    Q.  Did you consider what portion of the branch
   12  revenue was attributable to any particular employee?
   13    A.  No.
   14    Q.  Do you have an understanding that it was highly
   15  likely Mr. Hutto and Mr. Smith would leave Mutual
   16  regardless whether they went to Waterstone or a different
   17  employer?
   18    A.  I don't have an understanding of that.
   19    Q.  Going back to Tomalak Deposition Exhibit
   20  No. 22.  Look at the employment history again.
   21      Is there any employer in which Mr. Smith
   22  has remained employed for 10 years?
   23      MS. WALTER:  Asked and answered.
   24      THE WITNESS:  A  No.

17 (Pages 62 - 65)

Page 66

```
 1      MS. KREITER:  In fact his longest is Proficio at
 2   five years.
 3      MS. WALTER:  Is that a question?
 4      THE WITNESS:  Okay.
 5      MS. KREITER:  Q   Do you agree?
 6      THE WITNESS:  A   Roughly five years, yes.
 7      Q.  Certain employers for example Intercontinental
 8   Mortgage, Mr. Smith was only employed for four months
 9   from April 2007 to August of 2007.  Correct?
10      A.  Yes.
11      Q.  Do you have reason to believe that Mr. Smith is
12   one of the employees that would likely be long term with
13   Mutual like some of the others, like the other branches
14   you mentioned?
15      A.  That's certainly a possibility.
16      Q.  Even with him jumping around in the manner that
17   he has --
18      A.  Sure.
19      Q.  -- depicted in Exhibit 22?
20      A.  Yes.  Especially given his, the stage of his
21   career and a lot of this employment history is when he
22   was much younger and it looks like doing, potentially
23   building up his career.
24          So there's several things that could go
```

Page 67

```
 1   into his decision on whether he remains in one place.
 2      Q.  So do you have an understanding as to why he
 3   left?
 4      A.  Why he left who?
 5      Q.  Mutual.  Do you have an understanding as to why
 6   Mr. Smith resigned from Mutual?
 7      A.  I don't know why he left.
 8      Q.  You don't know why any of the employees
 9   resigned from Mutual?
10      A.  No, I don't know.
11      MS. WALTER:  Take a break now?
12      MS. KREITER:  Yeah, now's a good time.
13          (Short recess taken)
14      MS. KREITER:  Q   Did you determine how many of the
15   branches at Mutual don't make it past five years or
16   10 years?
17      THE WITNESS:  A   No, I did not look at that
18   specifically.
19      Q.  What is the source of your belief that branches
20   remain at Mutual for up to 10 years?
21      A.  That's not how I would characterize my belief.
22      Q.  How would you characterize it?
23      A.  These branches could last as long as Mutual of
24   Omaha lasts.  They could last into perpetuity.
```

Page 68

```
 1      Q.  I thought that you had testified earlier that
 2   your belief was that Mutual enjoyed longevity with
 3   respect to these branches and other branches have lasted
 4   5 to 10 years.  Is that accurate?
 5      A.  I have read that, yes.
 6      Q.  Where did you read that?
 7      A.  I read that in the testimony of, Gennarelli
 8   testimony I believe.  And that was discussed on phone
 9   calls as well.
10      Q.  So did you investigate whether there are any
11   outliers at Mutual branches that do not last 5 to
12   10 years?
13      A.  I didn't investigate the details of that, but,
14   no, I did not.
15      Q.  Did Mutual provide you with any documents to
16   support its claim that branches tend to remain for 5 to
17   10 years or longer?
18      A.  No documents.
19      Q.  Who at Mutual told you that branches at Mutual
20   tend to remain 5 to 10 years or longer?
21      MS. WALTER:  Asked and answered.
22      THE WITNESS:  So do I have to answer again?
23      MS. KREITER:  Yes.
24          (Record read as requested)
```

Page 69

```
 1      THE WITNESS:  A   I believe this was on a
 2   conference call with many individuals at Mutual.  So it
 3   would have been that second call.  And the individuals on
 4   that call we listed.  I don't recall exactly who said
 5   that from that group.
 6      MS. KREITER:  Q   Did you do anything to
 7   independently verify what you were told by the persons at
 8   Mutual on the call and what you saw in the deposition
 9   testimony regarding the longevity, the idea it's common
10   for branches to remain 5 to 10 years or more at Mutual?
11      A.  No.
12      Q.  Is it common in the mortgage industry for loan
13   officers to move together to a new employer?
14      A.  I don't know.
15      Q.  Has Mutual had entire branches leave in the
16   past, besides the ones we are talking about here?
17      A.  I don't know.
18      Q.  Are you aware that Mutual as recent as May of
19   2023 had an entire branch leave?
20      A.  I'm not aware.
21      Q.  Are you aware of how many branches have left
22   Mutual in the last 10 years?
23      A.  No.
24      Q.  Is it your assumption that whenever an entire
```

18 (Pages 66 - 69)

| | |
|---|---|
| Page 114 | Page 116 |

Page 114

```
 1  do anything else to vet the profitability of Mutual as a
 2  corporation?
 3     A.  I don't think I would call it vetting the
 4  profitability.  But I reviewed the tax returns, statutory
 5  financials that are listed in Appendix A.  I can't recite
 6  exactly what the numbers are, but I did review them.
 7     Q.  On a corporate level are Mutual's profits
 8  trending up or down for 2023?
 9     A.  I don't recall.  I don't recall.  I'd have to
10  look.
11     Q.  What about for the second half of 2022 on a
12  corporate level, were Mutual's profits trending up or
13  down?
14        MS. WALTER:  Object to form.
15        THE WITNESS:  A   I don't recall.
16        MS. KREITER:  Q   Is that something that you looked
17  at?
18     A.  Yes, like I said.
19     Q.  But you can't say either way?
20     A.  Well --
21        MS. WALTER:  Object to form.
22        THE WITNESS:  A   I can't off of memory.  I can
23  look back and tell you.  The bottom line as it relates to
24  my analysis is that that doesn't matter.
```

Page 116

```
 1     Q.  Correct.
 2     A.  151, yes.
 3     Q.  Then for 2023 it's 134.583 million.
 4         Do you see that?
 5     A.  Yes.
 6     Q.  Do you know whether the reality is that the
 7  plan for 2023 with respect to the Forward Division, do
 8  you know whether the revenue has actually risen to the
 9  level of 134 million?
10     A.  At the corporate level, I don't know, no.
11     Q.  When you say you analyzed Gennarelli
12  Exhibit 14, in what manner did you analyze it?
13     A.  I looked at it.
14     Q.  Did you do anything besides look at it?
15     A.  I didn't use this beyond thinking about it and
16  looking at it here.
17     Q.  How many branches are in the Forward Division
18  of Mutual?
19     A.  Are you trying to look at Exhibit 14, do you
20  know the answer?  How many forward branches there are?
21     Q.  How many branches are in the Forward Division
22  of Mutual?
23     A.  I know that it's -- I don't know the exact
24  number.  Obviously it's greater than four because I
```

Page 115

```
 1        MS. KREITER:  Q   The corporate profitability of
 2  Mutual doesn't matter for purposes of your analysis?
 3     A.  To my analysis, it would not -- no, it does
 4  not.
 5     Q.  Okay.  You mentioned that you looked at some
 6  documents that were referenced in prior depositions.
 7  Take a look at Gennarelli Exhibit 14, please.
 8         Is that one of the documents that you have
 9  previously analyzed?
10     A.  Yes, I have seen this.
11     Q.  You said you have seen it.
12         Is it something you studied or it was just
13  something given to you?
14     A.  I recall looking at this as well as it
15  obviously being produced, given to me.
16     Q.  Let's take for example do you see the column
17  that says Forward Division.  The second column from the
18  left in blue?
19     A.  Yes.
20     Q.  Then so June year to date 2022 forecast, total
21  revenue 151 million.  You see that?
22     A.  In the Forward Division?
23     Q.  Correct?
24     A.  For total revenue?
```

Page 117

```
 1  looked at four forward branches, the data.  The, I
 2  believe it's in the few dozen.  I don't know the exact
 3  number.
 4     Q.  What percentage of Mutual's forward business
 5  did the Tampa branch make up?
 6        MS. WALTER:  Object to form.
 7        THE WITNESS:  A   I would need to do the
 8  calculations but top of my head, I believe that the two
 9  together are somewhere around nine percent.  I can do the
10  calculation if we need to.
11        MS. KREITER:  Q   I think you indicated that the
12  corporate level profitability of Mutual doesn't bear on
13  your analysis, is that accurate?
14     A.  So whether it's profitable relative to
15  expectations does not.
16     Q.  Did you use corporate level information when
17  you were determining the weighted average cost of
18  capital?
19     A.  Yes.
20     Q.  What corporate level information did you use
21  for that weighted average cost of capital determination?
22     A.  So I used several sources of data that are
23  publicly available, at least available through
24  subscription; Bloomberg.  That wasn't actually produced
```

|  |  |
|---|---|
| Page 130<br>1 possibility that the loan volume is specific to<br>2 particular employees?<br>3  A.  We considered that, yes, I considered that.<br>4  Q.  Did you factor it in from a risk perspective?<br>5  A.  I'm not quite sure I understand what you mean<br>6 from a risk perspective.<br>7  Q.  Sure.  I'm trying to understand you're assuming<br>8 that the loan volume is the same even if Dwayne Hutto<br>9 quits.  Is that correct?<br>10  A.  Well it's more complicated than that.  I'm not<br>11 assuming that it's a, that the loan volume is going to<br>12 stay at a consistent level.<br>13      My loan volume tracks downward for several<br>14 months and quarters over this projection period relative<br>15 to what we observe from the other branches and from the<br>16 MBA data.  So looking at loan production, I'm not<br>17 assuming that the levels remain the same.<br>18  Q.  Do you attribute the loan production to the<br>19 people or to other components of Mutual?<br>20  A.  It's to the branch.  I attribute it to the<br>21 branch.<br>22  Q.  This again goes back to how we define a branch.<br>23 Is the branch the people and what part of the branch is<br>24 driving the revenue. | Page 132<br>1 and you're referencing Steve Oscher's report, you state<br>2 second, he opines that no valuation is possible regarding<br>3 the closing branch offices.<br>4  A.  Okay.<br>5  Q.  I want to know what in Mr. Oscher's report<br>6 supports that statement.  Before we get to his report, I<br>7 want to make sure I understand your statement he opines<br>8 that no valuation is possible regarding the closing of<br>9 the branches.<br>10      Is it your belief that the Oscher Report<br>11 concludes no valuation is possible regarding the closing<br>12 of the branch offices?<br>13  A.  That's how his report is set up, yes.<br>14  Q.  I want you to point me to the words in<br>15 Mr. Oscher's report in which he states lost profits and<br>16 lost business associated with the closure of the Tampa<br>17 and Daytona branches -- sorry, I'm in the wrong place.<br>18      Point me to the words in Mr. Oscher's<br>19 report in which he opines that no valuation is possible<br>20 regarding the closing of the branch offices?<br>21  A.  So my first observation is that it's implied.<br>22 He doesn't offer a damage valuation in this report.<br>23  Q.  Correct.  He doesn't offer one but where does<br>24 he say that no valuation is possible? |
| Page 131<br>1      If you have a empty building with no<br>2 people in it, you're not going to have any revenue,<br>3 agreed?<br>4      MS. WALTER:  Object to form.<br>5      THE WITNESS:  A  Yes, and when everybody at the<br>6 branch leaves you no longer have a branch.<br>7      MS. KREITER:  Q  Right.  What facts are you<br>8 relying on to assume that the employees of the branch are<br>9 going to stay at the branch for any period of time?<br>10  A.  So looking at individual employee, again it<br>11 doesn't factor into my model.  But if you were to -- if<br>12 you're asking me if I can predict which employees will<br>13 stay or leave and when they will leave, I can't predict<br>14 that.<br>15  Q.  Are you able to say to a reasonable degree of<br>16 certainty that the employees at the Tampa and Daytona<br>17 branches would have stayed with Mutual for any particular<br>18 amount of time?<br>19      MS. WALTER:  Object to form.<br>20      THE WITNESS:  A  I don't have an opinion on that.<br>21 I can't get inside their minds on that type of decision.<br>22      MS. KREITER:  Q  So no?<br>23  A.  Correct.<br>24  Q.  You stated in paragraph three of your report | Page 133<br>1  A.  That's just my first observation.<br>2  Q.  It's not stated in his report?<br>3      MS. WALTER:  She's answering the question.<br>4      THE WITNESS:  If I could have just a moment to<br>5 review his report, the section.<br>6      MS. KREITER:  Sure.<br>7      THE WITNESS:  A  He says that the data, page ten,<br>8 the demand reflected cannot, he says that it's<br>9 unsupported and cannot be verified or tested.  He says he<br>10 can't.<br>11      MS. KREITER:  Q  You're on page ten?<br>12  A.  Yes, the first full paragraph starts with the<br>13 word without.  Without the supporting documentation<br>14 relied upon by Mutual, the demand reflected in the<br>15 document ending in 3484 is unsupported and cannot be<br>16 verified or tested.<br>17      So he said that -- here that he can't do<br>18 this analysis based on the absence of data.<br>19  Q.  Well he's referring to the demand reflected in<br>20 Mutual of Omaha Bates number 3484.<br>21      Do you know what that document is?<br>22  A.  Is that the document that we went over earlier<br>23 today?<br>24  Q.  I'm asking you do you know what it is? |