# <u>EXHIBIT A</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
_____
                               )
MUTUAL OF OMAHA MORTGAGE, INC., )
                               )
          Plaintiff,           )
                               )
v.                             )   Case No.:  8:22-CV-1660
                               )
WATERSTONE MORTGAGE CORPORATION,)
                               )
          Defendant.           )
_____)
```

**MOTION PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**January 30, 2024**
**9:45 a.m. to 11:35 a.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          COURTNEY E. WALTER, ESQUIRE
                                Mitchell Sandler LLC
                                1120 20th Street NW
                                Suite 725
                                Washington, DC 20036

**FOR THE DEFENDANT:**          MARIA L. KREITER, ESQUIRE
                                CAROLINA Y. BLANCO, ESQUIRE
                                Godfrey & Kahn, SC
                                833 East Michigan Street
                                Suite 1800
                                Milwaukee, Wisconsin 53202

(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

1     (Call to Order of the Court at 9:45 a.m.)

2          **THE COURT:**  Good morning, everybody.  Nice to see

3     you-all again.  We've got a couple things going on.  Two cases

4     noticed at the same time, Mutual of Omaha versus Waterstone and

5     Simmons versus USI.  Mutual of Omaha is 22-CV-1660.  Simmons is

6     23-CV-201.

7          I'm not going to create too much of a free-for-all

8     here and have a room full of lawyers on all the cases talk all

9     the time.  But I do think it's helpful for all of the lawyers

10    in these cases to listen to all this and give some input at

11    some point, because we're dealing with very similar legal

12    theories, and I'm wrestling with some similar issues.  There's

13    some different issues, and there's some differences in the

14    cases.  They're not identical factually, and all of the issues

15    are not identical, but there's plenty of overlap.

16         And one thing I may or may not do -- I'm thinking

17    about -- I'm not a fan of long orders.  I don't write long

18    orders, but maybe in one of these cases or both, I might want

19    to write something a little longer on this damages subject,

20    because I've been studying it, my law clerks have been studying

21    it.  I've asked you-all to study it.  And we still don't have

22    great bright-line law, despite the fact that I guess the

23    Florida Supreme Court wrote an opinion in the 1930s about

24    selling or farming peas.  I'm not sure that gets us all the way

25    to where we need to be.  But, nonetheless, we'll see where we

1    go on this.

2            So the first one we're going to talk about is Mutual

3    of Omaha versus Waterstone.  So go ahead and introduce yourself

4    whoever representing the plaintiff on this one and the defense

5    so we have everybody's name for the court reporter.

6            **MS. WALTER:**  Good morning, Your Honor.  Courtney

7    Walter on behalf of the plaintiff.

8            **MS. KREITER:**  Good morning, Your Honor.  Maria

9    Kreiter at Godfrey & Kahn, along with Carolina --

10           **MS. BLANCO:**  Blanco.

11           **MS. KREITER:**  Blanco.

12           **MS. BLANCO:**  Hill, Ward, Henderson.

13           **MS. KREITER:**  On behalf of Defendant Waterstone.

14           **THE COURT:**  Carolina or Carolina?

15           **MS. BLANCO:**  Carolina, Your Honor.

16           **THE COURT:**  All right.  Very good.

17           When we talk in the other case, the lawyers can

18   introduce themselves there as well.  So in this Mutual of Omaha

19   case, am I right that the people involved in this thing, it's

20   residential mortgages that they were out there generating.  Is

21   that -- that's generally right?

22           **MS. WALTER:**  Yes, Your Honor.

23           **THE COURT:**  Okay.  So we have three individuals who

24   were working for Mutual of Omaha generating residential

25   mortgages who then go over to Waterstone.  And let's just focus

1    for a second now.  These three individuals, I had their names

2    at some point.  Hutto.  Who's the other one?

3         **MS. KREITER:**  Chris Smith and Chris Wolf, Your Honor.

4         **THE COURT:**  Right.  Hutto, Smith, and Wolf.

5         **MS. KREITER:**  There is one additional manager, John

6    Utsch, U-t-s-c-h.

7         **THE COURT:**  I thought in their latest briefing they

8    had it down to three.

9         **MS. WALTER:**  That's right, Your Honor.

10        **THE COURT:**  All right.  So in any event, these three

11   people kind of go over to the competition, if you will, and

12   they -- the three people had a contract that said -- remind me

13   now, this is important in both of these cases exactly what the

14   contract said.

15        They were allowed to go elsewhere, but they weren't

16   allowed to use confidential information for two years or

17   solicit clients for one year.  Is that right?

18        **MS. WALTER:**  That's accurate, Your Honor.

19        **THE COURT:**  Okay.  And so what happens is, they go to

20   the competition.  They're alleged to have done that.  But the

21   plaintiff doesn't sue them at all.  Only sues the new company,

22   Waterstone, for four different things, federal trade secrets,

23   state trade secret, tortious interference, and then aiding and

24   abetting breach of fiduciary duty.  There's no breach of

25   contract per se in the case because the contracts were between

UNITED STATES DISTRICT COURT

1    Mutual of Omaha and the individuals.  The individuals didn't

2    get sued.  So here we are.

3          The question is, what are the damages that are

4    recoverable in this?  And a common theme in both of these cases

5    is that the plaintiffs have a very expansive view of damages.

6    The defendants want them to be very narrow, perhaps limited by

7    the term of the contract involved in the case.

8          And so I wanted to try to provide some clarity on

9    both cases with the hope that maybe you could get it settled if

10   you were closer on whatever the recoverable damages may be, and

11   your clients would understand, yes, their exposure is maybe the

12   big number or maybe not.  I don't know if I can do that.  But

13   that's my goal.  I wasn't particularly wild about some of the

14   latest filings from -- I guess it's Mutual of Omaha saying you

15   can't do that, oh, you can't do that, you can't do that.  I can

16   definitely do it.

17         Now, when I said file a summary judgment motion, I

18   could have just as easily said just give me a stack of cases.

19   I was really just looking for both sides to give me the law on

20   it.  And, you know, I'll do it procedurally in a way that I can

21   do it if I'm going to do it at all.  There's many ways I could

22   do it.  I could do it through Daubert, which the next case is

23   presenting it really both ways.  There's a summary judgment

24   motion in the next case, and then there's Daubert, and I could

25   do it, you know, when we get to jury instructions.  You know,

 1    there's a lot of ways.

 2              So I don't know what I'm going to do, but I know I

 3    can, and I'll figure out the correct procedural way to do when

 4    we get there.  So that's kind of the background.

 5              So where to start.  Let's start with this question.

 6    Is there anybody arguing that the term of these contracts

 7    operates as an automatic cap on damages as opposed to perhaps

 8    one factor you would look at in determining whether a damage

 9    theory is speculative, if it goes beyond it.  Is there anybody

10    that found any bright line -- the damages are cut off by the

11    term of the contract?  Did you find anything like that?

12              **MS. WALTER:**  No, Judge.

13              **THE COURT:**  Did you find anything like that?

14              **MS. KREITER:**  I think the closest is the Office Depot

15    case that we cited.

16              **THE COURT:**  Yeah.  That's one out of

17    Judge Middlebrooks down in southern West Palm.

18              **MS. KREITER:**  Southern District of Florida, 2017.

19              **THE COURT:**  Yeah.  And that's presented in the form

20    of a Daubert motions, and basically he goes through -- he's a

21    very experienced judge.  I don't know if you have dealt with

22    him.  But his opinion doesn't really have much law in there

23    anywhere.  It's just -- I mean, that's one case, one set of

24    facts, and so I read it, but I'm not sure that that gets us

25    very far.  That's the closest I would say anybody's come in

1    both of these cases to finding anything, really, that would say

2    that.

3            So I think, and I'll invite anyone to correct me if

4    I'm wrong on this, that that -- it is not so, that the term of

5    a noncompete is a bright-line cutoff.  It's one factor that we

6    have to look at where the real inquiry ends up being, you know,

7    is this damage theory, whatever it may be, speculative, too

8    speculative to go to the jury?  Right?

9            **MS. KREITER:**  I would agree to that, although I think

10   that the two concepts go hand in hand.

11           **THE COURT:**  Yeah.  I'm saying it's something to look

12   at.  It's something to look at.  It's a factor.  But it would

13   be nice if that was just a bright-line rule and we could all

14   say, okay, here's what it is.  And I'm sure your clients might

15   be thinking in those terms.

16           But when I started this, it kind of sounded right to

17   me after thinking about it for about three seconds.  But as I

18   looked at the law, it just doesn't pan out that way.  All

19   right.  So at least we've made progress in that way.

20           So let's -- let's now drill into this.  Oh, something

21   else that we need to talk about, and really in both cases, and

22   we have to, I think, focus on pretty carefully when trying to

23   figure out whether these damage theories are speculative is a

24   causation piece in this.  You know, and maybe I'm not going to

25   be able to make any real hard and fast rulings in either of

1    these cases because it may be too dependent on the specific

2    facts, but let me just -- and I know I'm talking a lot.  So I'm

3    just trying to let you know where I am intellectually on this,

4    and then you can help me -- or persuade me to go out your way,

5    however that may be.

6            We've got the idea that -- okay.  Let's use this for

7    an example.  The theory in Mutual of Omaha is sort of a total

8    destruction of the business kind of idea by stealing the

9    employees, more so than the accounts.  I mean, it's more about

10   the employee issue.  We'll call it employee piracy since we

11   just had Gasparilla here in Tampa.  All right.  It's a big

12   pirate thing.  It's kind of an employee piracy case.  The idea

13   is that, well, because of that, the whole business was

14   destroyed.

15           All right.  Now, there is some discussion of ways of

16   valuing total destruction of business, and there's even a jury

17   instruction on that in the Florida standard instructions.  But

18   that's kind of the idea there.

19           Well, what if the only, let's say -- let's say the

20   jury only determines that there was a theft of a trade secret,

21   and the theft was one -- is related to one customer.

22   Somebody -- one of these people when they went from Mutual of

23   Omaha to Waterstone, they forwarded an e-mail, like they

24   weren't supposed to, and that got a customer that should have

25   been Mutual of Omaha's customer.  But that's the only thing the

1    jury thinks happened here that went wrong.

2            That does not lead the total destruction of business

3    kind of damages.  So a lot of this is really dependent on what

4    the facts of the case end up being to support certain damage

5    requests.  Of course, we don't know that right now.  And you

6    both will have spins on, you know, what happened.

7            But -- so I don't know how far we can get without

8    having the facts more distilled, but that's just something to

9    flag.  And that's in both cases.  That's in both cases.

10            And then there's an additional challenge, I just want

11    to flag in the Mutual of Omaha case that's not in the other

12    case, and that is there's a whole parade of horribles that

13    you -- did you write the briefs on this?

14            **MS. WALTER:**  I assisted, Your Honor, yes.

15            **THE COURT:**  You did?

16            **MS. WALTER:**  Yes.

17            **THE COURT:**  Okay.  There's a whole parade of

18    horribles in one of these briefs of oh, you know, they did

19    this, they did that.  Hutto did this.  You know, he did all

20    these terrible things.  But they're not the defendant.  The

21    defendant is the company.

22            So there's this additional ambiguity associated with

23    what can you hook the company for, because, factually, it's

24    very possible that these guys were doing a lot of this stuff

25    completely on their own, but Waterstone was very happy to take

1   the benefit of it.  And how much did Waterstone know?  How much

2   did they mastermind, if you will?  And how much can you hook

3   Waterstone for the actions of these individuals who you didn't

4   sue?

5          They don't have the problem in the next case as much.

6   I mean, there may be some of that, but they've sued the

7   individuals and the company.  So that's another little

8   complicating factor out there that we have to kind of look at.

9          So thank you for listening.  Why don't you go ahead

10  and make the case for the damages theory that you're going with

11  here, being legally permissible, not speculative.  And I've

12  read your brief.  But go ahead and tell me what you think you

13  are allowed to do and what the factual connection is to these

14  causes of action.

15          **MS. WALTER:**  Sure.  I'll start with, you know,

16  Florida law complicates the question of damages a little bit

17  because necessarily there needs to be a consideration about

18  causation.  And Your Honor ordered us to move solely for

19  damages.  So it was difficult for us to sort of parse that out

20  without discussing causation.  And, of course, I think

21  Waterstone points this out in their brief, each claim has,

22  obviously, different elements, so it was difficult to discuss

23  causation.

24          **THE COURT:**  It may be.  It may be the only thing

25  we're able to accomplish is to say, guess what, they're wrong

UNITED STATES DISTRICT COURT

1   about trying to cap the damages at the term of the agreement,

2   and that's all we can accomplish, but I get it.

3       **MS. WALTER:**  Well, should I stop there then?

4   Because, yes, Your Honor, based off the more narrow question

5   that you posed at the most recent case management conference, I

6   searched high and low for many hours in state and federal case

7   law to find a case where a court necessarily capped it at

8   whatever the term of the non-solicit was.

9       I think, importantly, in our -- in our case, we're

10  not only dealing with a non-solicit.  We're dealing with a lot

11  of actions taken by Waterstone both before the employees left

12  and after.

13      I mean, I think, importantly, for the time line here,

14  there was action and conduct taken by Waterstone before the

15  branch managers and the branch left Mutual of Omaha.  And this

16  wasn't just about soliciting employees.  It was sending

17  customer information, which is very well documented.  I don't

18  think I need to go into that discussion.

19      There was personnel information sent over.  In fact,

20  Waterstone employee said, hey, here's the spreadsheet that we

21  want you to input this information in to do that and send it to

22  us.  And they did.  So this information -- this conduct was

23  very much directed by Waterstone.

24      Now, going specifically to the question of damages,

25  sitting here, sure, would I like to ask for ten years?  Yes.

1    But the expert witness in this particular case, for us, she's

2    not saying we are demanding ten years based on this evidence.

3    She's simply saying my model allows for ten years.

4        **THE COURT:**  I get that.  I get that this, in one way,

5    could be very helpful.  Because you could basically do -- I

6    don't know if you know how to do Excel.  I'm not saying I'm an

7    expert, but I know a little bit.  You can put a number in and

8    then it spits out a result from a formula, and then change the

9    number.  You could say to the jury, look, if you think a

10   reasonable time is this and the number, so I think that type of

11   analysis is helpful.

12       But go ahead.

13       **MS. WALTER:**  And I think, importantly, that marries

14   up with what Florida law requires, which is some standard and

15   some ability to allow the expert witness to provide a

16   mathematical calculation for the jury to easily apply when they

17   go back into the jury room and deliberate and identify the

18   reasonable amount with -- and it's not absolute certainty.  I

19   understand Waterstone wants us to come here and say, I want

20   five years valued at $5 million, but that's just not what

21   Florida law requires, and we have the evidence to support

22   varying amounts.  And it comes down to a jury question.

23       And sitting here asking you to believe our expert

24   witness or Jeff Gennarelli or our corporate representative

25   requires a weighing of the witness's credibility, which, in our

1    mind, is a factual question for the jury to resolve.

2         **THE COURT:**  So this is the little intellectual game

3    we all had to play in law school.

4         **MS. WALTER:**  Sure.

5         **THE COURT:**  Let's suppose that your number is a

6    hundred years.  Is that speculative?

7         **MS. WALTER:**  It depends on the evidence that's

8    adduced at the trial, Your Honor.

9         **THE COURT:**  Okay.  What evidence could possibly be in

10   this case that would lead to a hundred years?

11        **MS. WALTER:**  I don't know, sitting here, that I would

12   ask for a hundred years, because, sure, I don't, sitting here,

13   have the evidence to support a hundred years.

14        **THE COURT:**  All right.  So what's my next question

15   going to be?

16        **MS. WALTER:**  What evidence do I have?

17        **THE COURT:**  99, 98, 97?  At which point is the --

18   where does the number become not a jury question -- and this is

19   the -- this is the elephant in the room in both cases, I think.

20   At what point is the number not a jury question, valid jury

21   question, because it's just too speculative?

22        **MS. WALTER:**  And that's -- that's a good point, Your

23   Honor.  I think, importantly, it's -- we should focus on where

24   we're situated.  So we're at a motion for summary judgment.

25   We've moved for summary judgment.  Defendant has not moved for

UNITED STATES DISTRICT COURT

1    summary judgment.  We have not had the opportunity to provide

2    evidence -- it -- to support our burden, because it's not our

3    burden.  We're not asking the Court to grant us five years of

4    damages.

5            **THE COURT:**  But what you're doing, you're responding

6    to my question with -- and I'm not trying to give you a hard

7    time.  But you're diverting answering the question by giving a

8    procedural answer that essentially says, well, this is not the

9    time to figure that out.  That time will come.  All right.

10   That time will come wherever it comes procedurally.  And I

11   agree with you.  This may be not exactly the way to present it.

12   But we're just talking -- uh-oh.  Let's see what happens with

13   this.

14           (Discussion off the record.)

15           **THE COURT:**  Okay.  So at some point in the case, we

16   have to confront this issue of what is too speculative, and

17   that intersects with this idea there has to be, quote, some

18   standard.  So what is the standard in the lost profits that

19   you're asking for?  What would you say it is, or what would

20   your expert say it is?

21           **MS. WALTER:**  So it is the -- her -- she has two

22   models, but both sort of corroborate each other.  She looks at

23   the historical sales -- loan sales and projects that moving

24   forward, would be the most succinct way to put that.

25           **THE COURT:**  But the people -- your people didn't have

1    noncompetes.  They were allowed to quit whenever they wanted.

2    They just weren't allowed to take confidential information to

3    the competition or solicit for one year.  But they didn't --

4    they were allowed to -- you know, to walk away and go work

5    across the street for the competitor and solicit other

6    business.

7           And one thing that's, I think, worth noting here,

8    these people, the salespeople in your case, were always

9    generating new people, new residential people for new loans as

10   opposed to the other case where there's this course of dealing

11   and they're maintaining existing customers, and it's a -- I

12   mean, it's not really a big part of your case to say that the

13   people go to the competition and are not allowed to contact

14   former customers because most of us don't have multiple

15   residential loans.  We buy a house and live there for a while.

16          So the only thing that they weren't allowed to do,

17   really, practically speaking, was usually confidential

18   information.  So how does your model account for the idea that

19   what was actionable wasn't them leaving, which they could do at

20   any time, what's actionable is what they did, allegedly,

21   with -- really, what Waterstone did with the information that

22   they improperly conveyed or used.  How does your model --

23   doesn't your model assume that they would still be working

24   there?

25          **MS. WALTER:**  Not just the three individuals, but the

UNITED STATES DISTRICT COURT

1    entirety of the branches, yes, correct.

2              **THE COURT:**  So develop that a little bit more me.

3              **MS. WALTER:**  Sure.  So our theory is not based on

4    individual at-will employees.  It's based on the fact that

5    there's testimony in the record that these three individuals

6    would not have left without the entirety of their branches.

7    They knew and Waterstone knew that the way to get and recruit

8    these three individuals would be to allow for the entirety of

9    the branch.

10             Waterstone's corporate representative testified to

11   the fact they were aware that they needed to check and ensure

12   that Waterstone could support the entire branches before the

13   three individuals came to Waterstone.  They knew that they were

14   getting the entire branches.  It's not -- we're not focused on

15   these -- solely on these three individuals.  It's the fact that

16   Waterstone knew they would need to support the entire branches.

17   And I think, Your Honor, this is directly relevant to our

18   aiding and abetting breach of fiduciary duty claim.

19             **THE COURT:**  Okay.  Just a second.  Let me write this

20   down.

21             So is there anything that would be actionable if the

22   three lead people left?  All the other people are employees at

23   will.  They're allowed to leave.  They're allowed to do

24   anything.  I mean, they can't do a theft of trade secrets and

25   stuff like that.  But in terms of contracts, what would

1    happen -- well, what's actionable about the people -- the rest

2    of the team, if you will, the administrative people?  What's

3    actionable about that?

4            **MS. WALTER:**  I think I understand the question, Your

5    Honor.

6            **THE COURT:**  I'm not sure I phrased it very well, but

7    I think you know what I mean.

8            **MS. WALTER:**  I think I know what you're getting at.

9    If only those three individuals left and not the entire

10   branches, how would this be different?

11           **THE COURT:**  Right.  The money that your client would

12   have lost would have been -- they still would have lost because

13   the three people were the ones that were generating the

14   money -- or the clients, I thought.

15           But go ahead.

16           **MS. WALTER:**  So I respectfully disagree with that.  I

17   think we -- I don't think you can parse out those three

18   individuals for purposes of our current model.  Now, if only

19   those three individuals left and the entire branch remained at

20   Mutual, I think our damages would look differently.  But

21   because our -- the three branches left, our damage model is

22   projecting what those historical loans sales for the entirety

23   of those branches looks like.  So if those three individuals

24   left, then, yes, maybe I do agree with you that we only look at

25   the amounts that they were generating.  But we can't divorce

1    that for purposes of our current position.

2         **THE COURT:**  Let's stick with that and keep talking

3    about that, because it's in this case somehow or another.

4         So if the three people left and didn't breach any

5    contracts by bringing a team over, what would -- what would

6    the -- the remaining people could have generated business on

7    their own?  I mean, it's -- and so what -- and maybe this

8    doesn't even have anything to do with the damages model, but

9    I'm -- I have a feeling we're going to hear in this case, if it

10   goes forward, that these people are all going to say, we were

11   going to follow Hutto, Smith, and Wolf, because if we didn't --

12   I mean, I always am plugging in law firm analogies.

13        It's like if you're an associate and the partner

14   that's giving you all the work goes and, well, he or she wants

15   you to go with them, you can say no, but then you have to ask

16   yourself, well, what am I going to do for legal work, because I

17   don't have any of my own clients.

18        Is that what we have here?

19        **MS. WALTER:**  I think -- I understand the analogy, I

20   think it speaks even louder to the role that Hutto, Smith, and

21   Wolf played in this, in knowing they had the power to bring the

22   branch with them, that they knew when they said, I'm leaving,

23   that these people were going with them.

24        **THE COURT:**  Did they factually -- did they, do you

25   have the -- we'll call them the producers, because that's the

1    word in the other case.  Maybe it's in this one too.  Do you

2    have evidence that the producers were out there encouraging

3    their team to leave, or what's the evidence show on that?

4        **MS. WALTER:**  So there is evidence that there was an

5    internal call that took place with Mr. Wolf in particular, with

6    his branch, where there's an e-mail afterwards that says, Don't

7    speak with anyone outside of your families about what we

8    discussed on this call until it's final.

9        So there is discussion that -- there is evidence to

10   support the fact that the three producers, if you will, made

11   this announcement to their employees, knowing very well that

12   their hands were tied, and these people had families, and if

13   they didn't go with them, they weren't going have a job,

14   potentially, or there was at least unknown there.

15       **THE COURT:**  And what's the connection to Waterstone

16   on that?

17       **MS. WALTER:**  Well, there is evidence that Waterstone

18   began reaching out to Mr. Wolf, Mr. Hutto, and Mr. Smith as

19   early as October to 2021.

20       **THE COURT:**  Yeah.  Is there evidence -- I was getting

21   a little off the point.  Is there evidence that Waterstone told

22   them to do it, knew that they did it, or can Waterstone say,

23   oh, well, you know, we told them, you know, you should follow

24   all of your contractual obligations because we are, you know,

25   an above-board company, and, you know, if you're off doing

1    things like this and breaching your contract, well, we don't

2    countenance that sort of thing?  Can they say something like

3    that in this case with a straight face, or do you have evidence

4    that they were involved more deeply than just circumstantially?

5         **MS. WALTER:**  We do have evidence they were involved

6    more deeply, Your Honor.

7         **THE COURT:**  What?

8         **MS. WALTER:**  Sure.  So Mr. Wolf in November 2021

9    e-mailed Dustin Owen at Waterstone, who is an agent of

10   Waterstone, to ask whether he could start to send over loans to

11   build up a transition fund.

12        Waterstone responded by saying we need to make sure

13   you do nothing that violates the terms of your agreement.  The

14   three individuals then began e-mailing profit-and-loss

15   statements to themselves, which they then forwarded, which

16   Waterstone responded by saying, Received.

17        Mr. Owen wrote an e-mail to Mr. Wolf stating that we

18   want to start transferring over as much information as

19   possible.

20        So the e-mails are abundant.  I won't go through all

21   of them.  But even so, we send a cease-and-desist letter in

22   April of 2022.  After the cease-and-desist letter, we still

23   have e-mails from Waterstone providing an export map for the

24   completed loans folder, then Mutual's former employees then

25   providing that information, and then a subsequent branch

UNITED STATES DISTRICT COURT

```
 1    transitioned over to Waterstone.

 2             So even after we sent cease-and-desist letters, the

 3    transfer of confidential personal information was still going

 4    on before the second and third branches transitioned from

 5    Mutual to Waterstone.

 6             THE COURT:  Okay.  So let's move back now to the

 7    damages piece.  That's helpful.  Thank you.  So there is --

 8    your expert picks ten years because of why?  Or is there a some

 9    basis, or whatever the law exactly says, a yardstick on some

10    basis?  Where does that number come from?

11             MS. WALTER:  I think there is no rhyme or reason,

12    Your Honor, to put it bluntly.

13             THE COURT:  Let's pursue this this way a little bit.

14             Turn on the Elmo, please.

15             So if we do a trial in this case, the jury

16    instructions could look something like this.  I think this gets

17    us kind of into the heart of these things.  So that's the

18    Florida standard jury instruction.  Go all the way down just a

19    little more.  There.  It's out of the Florida standard

20    instructions, not Eleventh Circuit instructions.  And this

21    is -- oh, by the way, you had somewhere in your brief about,

22    well, this is a California noncompete.  It's probably not

23    enforceable.  I don't think that argument has any legs.  I'm

24    not telling you it doesn't for sure.  But the Florida law on

25    interference is a contract or business relationship.  So even
```

1    unenforceable contracts or nonconsummated contracts can give

2    rise to an interference claim, I think.  So before you make

3    that argument about -- and spend a lot of pages saying how bad

4    California law and, you know, these are completely

5    nonenforceable, my take, at least for now, is you can interfere

6    with a business relationship, even if the contract is

7    unenforceable.  So that's just a side note.

8            So this is what the instruction might look like if

9    you go to the -- kind of the bottom of that second paragraph,

10   Waterstone must have known of the existence of a contractual

11   relationship, and it must have either intended to cause the

12   breach of the relationship or acted knowing that its actions

13   were likely to cause -- so that's what I was touching on

14   before.  All right?

15           So let's suppose you cross that bridge and you've got

16   evidence on that.

17           Put up the next instruction.  That's just the rest --

18   next page after that.

19           This is 408.11, tortious interference damages.  Okay.

20   If you find for Mutual of Omaha, you should consider the

21   following elements of damages.  Well, what might that be?

22           Your answer is lost profits.  Right?

23           **MS. WALTER:**  Correct.

24           **THE COURT:**  Okay.  Let's see what the lost profit

25   instruction says.  Go down.  More.  There you go.

UNITED STATES DISTRICT COURT

1          504.3, to be entitled to recover lost profits, Mutual

2     of Omaha must prove both.  Waterstone's actions caused.  There

3     would be a lot of fights over that.  Mutual of Omaha can

4     establish the amount of its lost profits with reasonable

5     certainty.  What does reasonable certainty mean?

6          I didn't make any of this up.  This is in the

7     instruction, the standard instruction.  I just plugged in the

8     names of the parties.

9          Lost profits, reasonable certainty, it must prove

10    that a reasonable person would be satisfied that the amount of

11    lost profits which it may be entitled to recover is not simply

12    the result of speculation or guessing.

13         All right.  Query, where did the ten years come from?

14    Is that speculating or guessing?  Instead, Mutual of Omaha must

15    prove that there's some standard by which the amount of lost

16    profits may be established.  Then Mutual of Omaha does not have

17    to be able to prove that amount can be calculated with

18    mathematical precision as long as there's a reasonable basis.

19         Okay.  So my question to you is, there must prove

20    that there is, quote, some standard.  If you don't have that,

21    if you can't say some standard, then isn't the whole thing out?

22         **MS. WALTER:**  Sure, Your Honor.  I think, to take a

23    step back, the expert in our case provides the standard, but

24    the question of how many years we're entitled to is an

25    evidentiary question that the jury will decide based on the

UNITED STATES DISTRICT COURT

1  evidence we provide.  Now, we have evidence that -- or we

2  will -- it's complicated by a discovery issue that came up, and

3  Magistrate Judge Sneed ruled on last week, but we have evidence

4  that the average amount of time that a branch would stay at

5  Mutual is 51 months.  Further, we have testimony that our

6  turnover was very low and 80 percent of the branches have

7  remained at Mutual of Omaha since their inception.

8          **THE COURT:**  Let's talk really in detail about that.

9          Thank you, Sonya.  Thank you, Sonya.

10          Tell me what -- because that was in your briefs, and

11  I don't know, really, what that means.  The average branch

12  stays with Mutual of Omaha.  What is -- that means the

13  people -- I mean, branch is a building, but the group of

14  people, or what is a branch?

15          **MS. WALTER:**  I don't think it's just the group of

16  people.  It's the actual function and operations of a

17  particular branch with the people included in it.  But the

18  operations that take place at that particular physical location

19  and generate revenue that were particularly focused on.

20          **THE COURT:**  So would this be like a storefront or

21  something like that?  Is there -- I don't remember seeing that,

22  but I'm not looking for a mortgage either.  Is it like an

23  office that has people in it and they stay around for 51 months

24  on average and then they go away?

25          **MS. WALTER:**  Correct.  And I think what is conflated

UNITED STATES DISTRICT COURT

```
 1   a little bit in the opposition is looking at the individuals.
 2   And we're not looking at the individuals.  We're looking at the
 3   store front, for lack of better words.
 4           THE COURT:  Okay.  And when it goes away, does it go
 5   away to another company?  Do people just decide they don't like
 6   doing this job anymore?  It's bought out by somebody else?
 7   What does that mean, if you know?  I mean --
 8           MS. WALTER:  Sure.  I mean, it transfers to a
 9   different lender, I guess.
10           THE COURT:  And do they pay for it?  That's -- I
11   mean, if these things -- if these, quote, branches are bought
12   and sold, then that would be a really good number, and that's
13   kind of what's being argued in the next case in a way.  But do
14   we know?
15           Do you guys know?  Do you know anything about this?
16           MS. KREITER:  In terms of whether they're bought and
17   sold?
18           THE COURT:  Yeah.
19           MS. KREITER:  Hypothetically, that could happen.  As
20   a function of reality, I do not think that it does.  I think
21   the industry is very transient.  It's pretty common for
22   managers to come and go to different employers.  In fact, these
23   managers were at a different organization.  They traveled
24   together to Mutual.  Now they're just leaving Mutual.
25           THE COURT:  That's what I was going to get at before.
```

1    Is that how this works?  And so the average -- what that data

2    piece means is that the average amount of time that these

3    people are likely to stay at any one particular company --

4    well, Mutual's number is 51 months.  Right?  That's the amount

5    of time that people stay with them that are in this business.

6           **PLAINTIFF ATTORNEY:**  I would say the branch, not the

7    individual people.  The branch as a whole, not what the average

8    amount that an individual employee would stay at Mutual.

9           **THE COURT:**  Okay.  What do you do with her argument

10   that these people who are over the 51 months, which way does

11   that cut for you?

12          **MS. WALTER:**  Well, I -- again, our number is focused

13   on the average.  So even though there may be less, there's also

14   a greater shot that there was more.  80 percent of the branches

15   that have begun at Mutual have remained there.

16          So, again, this is a -- and on top of that, we --

17   Mutual of Omaha recently acquired Keller Williams, which is

18   another source of referrals for -- and that's record

19   evidence -- another source of referrals for the individuals who

20   would have been at the branches and potentially could have been

21   another sell to have these employees remain at Mutual.

22          **THE COURT:**  Okay.  So back to the legal question.

23   The, quote, some standard is what?

24          **MS. WALTER:**  The some standard is looking at Ms. --

25   at our expert witness's models, how long would these branches

1    have remained at Mutual of Omaha without Waterstone intervening

2    and encouraging and soliciting this wrongful conduct by its --

3    by the former employees at Mutual?

4        **THE COURT:**  And the some standard is -- how do

5    they -- how does she get to ten from that 51 months?

6        **MS. WALTER:**  So I think, importantly, her standard --

7    her models allow for up to ten years.  We are not seeking ten

8    years.  That's really important, and I really want to focus on

9    that.  Waterstone continues to argue, well, they went from one

10   year to ten years.  That's not true.  We are not -- I will

11   represent to you, Judge, that we do not -- sitting here, I am

12   not aware of any evidence to support ten years, but her model

13   allows for a jury to award up to ten years.

14        If Your Honor, sitting here today, says, I'm

15   cutting -- I'm not allowing ten years, I'm allowing nine, well,

16   again, I think it's a slippery slope, because now we're

17   engaging in a factual consideration.

18        **THE COURT:**  Right.

19        **MS. WALTER:**  But it's important for me to emphasize

20   that we're not seeking ten years in damages.

21        **THE COURT:**  Yeah.  And all I'm trying to figure out

22   is where in the world is the line on what's speculative versus,

23   I mean, what you just said and where does that line go?

24        Okay.  This is helpful.  Let's just take a

25   five-minute break, restroom purposes, and then we'll come back

 1    and continue.  All right.  Thank you.

 2        (Recess from 10:29 a.m. to 10:44 a.m.)

 3            **THE COURT:**  Okay.  Keep going here.

 4            Sonya, put this up for me.

 5            One more -- this is a case I'm going to put up.  This

 6    is my last -- you're going to be off the hot seat here in a

 7    second.

 8            **MS. WALTER:**  Okay.  Thank you, Judge.

 9            **THE COURT:**  This is this case called Whitby.  I think

10    it's out of the Fourth DCA.  What does it say at the top?  It's

11    really little.  Fourth DCA.  See that arrow there?  Decision to

12    calculate -- make it bigger, please.

13            The decision to calculate lost profits for five years

14    was arbitrary.  And it goes through the questioning, and

15    basically that's how it comes out.  And the expert just picked

16    a certain number of years without any basis and that got turned

17    over -- overturned on appeal.  And I think that's what the law

18    basically is, is that the -- you can take it down now, Sonya.

19    Thank you, Sonya.  That the expert can't just pick a number.

20    All right.  You agree with me about that?

21            **MS. WALTER:**  I would need -- so does the model allow

22    for five years or was the expert saying --

23            **THE COURT:**  No.  The expert said five years.  You

24    just said we're not asking for ten.  But at some point, you're

25    going to ask for something.  And this expert just said, well,

UNITED STATES DISTRICT COURT

1    I'll go with five without any connection to anything.  And I

2    think that's why that got overturned.

3            So at some point, you've got to have some connection

4    to something.  You can't just pick a number.  I agree with what

5    you're saying, that the experts' methodology is like a

6    computer.  And if you plug in one year, it's this number, five

7    years this number, ten years, which is helpful.  I get it.  But

8    the question is, what number are you going to ask for, and do

9    you have a factual basis for it?

10           So let me go over to this side now.  You don't have

11   to answer that.  Because I think I have the answer, but maybe

12   I'm wrong.  Why can't she, with this expert -- I mean, I don't

13   know what this latest data you're fighting about is, but if

14   it's something like here's the average duration of these

15   branches, and it's actual data about how long these branches

16   stay with -- with a company, why can't she just have the

17   expert -- you know, the expert looks at that?  The expert

18   doesn't pick that number.  But the information is put before

19   the jury that we know that there's a few -- what was the

20   number?  Five point --

21           **MS. WALTER:**  Fifty-one months.

22           **THE COURT:**  Fifty-one months is the average.  Okay.

23   But we have -- some are 60, some are ten years, some are ten

24   minutes, and there's this range of duration, and simply have

25   the lawyer make an argument, you know, call a witness, somebody

1    from the client that says, look, this Tampa branch and this

2    Daytona branch were kind of like our Houston branches that went

3    for, you know, eight years.  All right.  And then you come back

4    and say, oh, no, that's more like the Los Angeles branch that

5    was gone after 24 months, so their 51 months is really more

6    than they really should have expected.

7         Isn't that type of an analysis and conversation some

8    standard, and isn't that a valid lost-profits analysis?  And

9    then all the expert does is link up a math equation to the

10   duration that is fairly determined from facts versus just, oh,

11   we're going say five years?

12        **MS. KREITER:**  I would agree with you to the extent

13   that 51 months was telling of anything.  For example, if these

14   branches had only been with Mutual two months, and then there

15   was evidence that the branches stayed for 51 months, the jury

16   wouldn't have to just guess how long the branches are going to

17   say.  They could say, well, look, 51 minus two months, we have

18   a reason to think these branches would have been around another

19   49 months, plug that in.

20        So, really, two obstacles with that evidence being

21   sufficient.  One, these branches have already stayed 51 months.

22   So the jury upon hearing, okay, 51 months is the average, but

23   these branches already stayed 51 months, so how much longer

24   would these branches would have beat the average?  There's no

25   evidence of that.

1         **THE COURT:** Well, that's the -- I mean, Mutual of

2 Omaha probably has some business person that manages these

3 things that could say -- I mean, I think I'm repeating myself,

4 but, I mean, if I'm the Mutual of Omaha person that knows about

5 this, why couldn't I say, look, these Tampa branches, we

6 expected them to go for nine years, not 51 months, nine years,

7 because everything -- all the demographics, they're operating

8 in the community with a lot of residential sales, just like

9 our -- what's another hot area in Texas? I said Houston. Like

10 our Houston, Texas branch, because it's the same, whatever they

11 would say, same type of community, it's growth, people are

12 moving to Texas and Florida, fleeing places like Milwaukee and

13 places like that. And so that's why we thought that this --

14 these branches but for the insidious conduct of the bad guys,

15 they would have gone for eight or nine years. And maybe the

16 jury doesn't agree with that.

17         You come back and say, wait a minute, this isn't like

18 Houston, Texas that would have gone for nine years. This is

19 like Miami that was gone in 30 seconds. And then the jury can

20 make that kind of a call.

21         You also have on the other side of the equation the

22 rest of that instruction that says it doesn't have to be

23 mathematical certainty, all that type of stuff. Just has to

24 be, quote, some standard.

25         **MS. KREITER:** A few problems with that. First, let

1    me close the loop on this 51 months.  So that -- that was

2    stricken by Judge Sneed.  So, you know, that can't be

3    considered on summary judgment, per the ruling last week.

4         **THE COURT:**  Well, I don't -- I haven't read her

5    ruling, but I'll tell you this, that's not binding on me, if

6    I'm making a decision to exclude experts myself or whatever.

7    And so that -- I don't know what she decided and how she

8    decided it, but don't get too caught up on that.

9         Although Judge Sneed, any day now, if Chuck Schumer

10   would just call a hearing, will be voted and be a district

11   judge.  So then even less reason to go along with her.

12        But go ahead.

13        **MS. KREITER:**  I think a couple things.  Understood.

14   I just wanted to make sure that her ruling --

15        **THE COURT:**  She's going to Orlando, by the way,

16   Mr. Cannella.  That's where Judge Sneed is going.  It's a fact.

17        **MR. CANNELLA:**  We've heard that, Your Honor.  It's

18   good news for us.

19        **THE COURT:**  Go ahead.

20        **MS. KREITER:**  I think -- so put the 51 months aside.

21   I think, regardless, there's problems with that.  It doesn't

22   give the jury an anchor to make a decision on.  In addition,

23   that type of evidence existed in the Office Depot case.  The

24   court said, Look, it doesn't really overcome the speculative

25   nature of the situation created by the non-solicit.

 1          But if you put that aside, I think Your Honor's

 2   question was about, well, can't you have somebody at trial

 3   talking about some other evidence related to longevity of the

 4   branches and making some analogies?

 5          You know, there, Your Honor, look, this is summary

 6   judgment.  I mean, they haven't put forth that evidence.  So

 7   we've been talking about these damages since July.  Remember,

 8   that initially the damage discussion began with Waterstone

 9   seeking to exclude Gennarelli.  Then the Court ordered let's

10   focus on damages and have this briefing.  It's framed by Mutual

11   as summary judgment.  That's the summary judgment, put-up,

12   shut-up moment of the case.  If there was such evidence that

13   Mutual planned to put forth at trial, this would be the time to

14   present that evidence to the Court.

15          **THE COURT:**  Okay.  But -- so are you agreeing with me

16   that if something like that, that would be the type of thing

17   they would have to be able to do to get over this hurdle, not

18   that specifically, but something like that to get over this

19   hurdle of, quote, some standard?

20          **MS. KREITER:**  You would have to have something -- I

21   think that there's layers of speculation built into the

22   hypothetical that we've been talking about.  For example, what

23   Mutual could have done to get the evidence sufficient would be,

24   for example, you know, depose these individuals, depose the

25   people that moved.  Ask them what was your -- was there a

1   thought by you that you would have stayed with Mutual long

2   term.  Leverage that evidence from the person themselves, the

3   particular loan officer.

4        That evidence was not something that Mutual chose to

5   pursue.  So in your -- in the Court's hypothetical about what

6   evidence Mutual may have, first of all, it's evidence they

7   don't have at this stage in the case.  But second of all,

8   that's still evidence by someone at Mutual divorced from the

9   facts of the case and divorced from, you know, evidence that

10  Mutual could have sought, but did not.

11       **THE COURT:**  Yeah.  She's telling me they were

12  fighting about because some ruling just happened.  But, I mean,

13  what's that about?

14       **MS. KREITER:**  So I guess I'm not totally sure what

15  opposing counsel had in mind.  But Judge Sneed's ruling was for

16  purposes of summary judgment, the Carroll affidavit, which is

17  the affidavit that sets forth the 51 months, that that is

18  stricken for purposes of summary judgment.

19       Judge Sneed did rule that potentially at trial,

20  those -- that evidence could be considered if it is the subject

21  of further discovery.

22       My position is, you know, it's stricken for purposes

23  of summary judgment.  But even if Judge Sneed hadn't ruled that

24  way, it doesn't matter, because it's not something that gives

25  the jury a hook upon which they can base their decision.

UNITED STATES DISTRICT COURT

1          **THE COURT:**  Wait a minute.  I don't agree with you.

2     I don't agree with you.  If that evidence was out there that

3     these branches, you know, have certain time durations, why in

4     the world is that not a hook for -- to make an argument that

5     this whatever number it would be --

6          **MS. KREITER:**  Because they've stayed 51 months

7     already.  So it's not --

8          **THE COURT:**  So -- all right.  I mean, what -- were

9     your grades in college and law school higher than a C?

10         **MS. KREITER:**  Yes.

11         **THE COURT:**  Mine were.  I mean, we got higher than

12    the average.  I mean, and so why is an average the limit?  Why

13    wouldn't that be a fact question?  Is this a C student or is

14    this a D student?  You may have that argument.  I mean, Florida

15    is crazy with all this stuff.  It may be that the real truth of

16    it is Florida has huge turnover.  I don't know.

17         **MS. KREITER:**  I think there has to be evidence from

18    Mutual, the party with the burden of proof.

19         Look, it can be a jury question.  But it's got to be

20    a jury question that's framed by the Court and the evidence

21    that the parties have put forth.  I haven't heard from

22    Ms. Walter what evidence Mutual is going to put forth that

23    gives the jury a hook.  I mean, I don't have an affidavit from

24    someone at Mutual that says, you know, we've done an analysis

25    of these branches and they're analogous to these other

UNITED STATES DISTRICT COURT

1    branches.  That evidence does not exist, period.

2          **THE COURT:**  Okay.  Well, that's a fair point.  I get

3    it.  So what do you think about this conversation?

4          **MS. WALTER:**  Well, first, the expert witness in both

5    of her models, she considered two data sets.  She considered

6    similarly situated two branches at Mutual of Omaha.  So she

7    looked at St. Louis and she looked at Maryland, and she

8    considered their historical sales amounts.  And she

9    projected -- because the Tampa and Daytona were analogous to

10   these two peer branches.  She came up with her model.

11          Then she looked at another data set from national

12   data for the Mortgage Bankers Association, which is also, mind

13   you, the same data set that their expert witness relied on.

14   And the two data sets were similar.  So the amount -- so she

15   did this to just create a robust analysis to say, hey, I'm

16   looking at Mutual peer branches, and just to be sure, I'm going

17   to compare that with the national --

18          **THE COURT:**  Just a second.  I may have misunderstood

19   that.  But that doesn't answer the time -- we're talking about

20   the time duration.  That's the profitability number from one of

21   these branches.  But how far in the future you get to project

22   at the time piece is what we're talking about.  Does she --

23   that's not part of that.

24          **MS. WALTER:**  No, Your Honor.  Correct.  So I just

25   fundamentally disagree with Waterstone's counsel that we don't

UNITED STATES DISTRICT COURT

1   have any evidence to support beyond -- that these branches

2   would have continued.  We recently -- and there is deposition

3   testimony that we've acquired Keller Williams, which is a

4   source of referrals, and would have potentially increased

5   revenue for these branches making it more appealing for the

6   individual employees to stay into the future.

7        **THE COURT:**  Well, okay.  So somebody from your client

8   says, just very self-servingly, oh, no, you know, this would

9   have gone on into the future but for the fact that they left.

10  And, therefore, I think it's -- could have been ten years.  I

11  mean, I don't think that's enough to get over the speculative

12  thing.  But the data actually from -- where did this 51 months

13  data piece come from?

14       **MS. WALTER:**  It's publicly available information,

15  Your Honor.

16       **THE COURT:**  Okay.

17       **MS. KREITER:**  I dispute that.  I don't know if now is

18  the time you want to hear about that.

19       **THE COURT:**  No, I don't.  But that type of thing, to

20  me, is really a -- I think that is a hook if you have

21  information about Mutual of Omaha's or Waterstone's or, you

22  know, the idea of how long these branches typically stay open,

23  that that would be something.  In any event -- all right.

24       So do you -- what else -- what other problems do you

25  have with this lost profit?  I mean, you agree you can get lost

UNITED STATES DISTRICT COURT

1  profits for tortious interference.  You can't dispute that.

2  What are the other problems that you have, other than the time,

3  just picking a number, which I understand.  And she says that's

4  not a real number, by the way.  But what her real number is, we

5  don't know, but go ahead.

6         **MS. KREITER:**  Yeah.  So I think -- and just to close

7  the loop on this one, so that the Court has some framework.  If

8  the Court limited damages to one year, using Rosevear's number,

9  it would be 1.5 million to 1.6 million is the damages range.

10         So if you put this dispute about whether there is

11  evidence that Mutual has brought forth to take this out of

12  speculation, which we don't think that there is, we think it's

13  shooting darts and asking the jury to essentially be a runaway

14  jury, if you put this issue aside, the other issue that we have

15  with damages, first, the managers.  So we believe that there

16  should be exclusion by the Court for the damages that are

17  associated with the branch managers.

18         The claim that Mutual has is not, Waterstone, you're

19  prohibited from soliciting the managers.  I think everybody

20  agrees that's lawful.  You can solicit managers, inclusive of

21  the Mutual witnesses say you can solicit the managers.

22         The alleged wrongdoing is kind of what happens next?

23  What do these managers do?  Do they coordinate with Waterstone

24  to move the entire branch?  So regardless of what damages

25  are -- regardless of the time frame that's used, you have to

1  carve out the managers, because there is no alleged wrongdoing

2  associated with the managers.

3        I will tell you that that -- you know, if you carved

4  out the lost profits associated with the managers, looking at

5  just one year, you know, that's about $500,000 that you would

6  carve out.  So if you want to use Rosevear's ten-year analysis

7  and there's some ability for that to get legs -- I don't think

8  there is -- but she's got to carve out the managers.  There's

9  just no allegations of wrongdoing vis-a-vis those persons.  So

10 that's one additional way that we could trim the case in a way

11 that I think is very reasonable.

12        Another issue -- so I guess I'll answer any questions

13 on that.  But just to lay out the agenda of the various issues

14 that we have.  The other exclusion that I think is necessary

15 and appropriate at this stage in the case, carve out the

16 damages associated with the Paramus, New Jersey branch.

17        **THE COURT:**  Are we still fighting about that?

18        **MS. WALTER:**  Your Honor, we have explained this to

19 opposing counsel multiple times.  Tampa and Paramus operated

20 through Mr. Smith.  There is -- we have tried.  There is no

21 divorcing the profit-and-loss statements for Tampa and Paramus.

22 They're operated on the same profit-and-loss statement.

23        **MS. KREITER:**  They have different managers, Your

24 Honor.  I mean, yes, they may have kept books together.  But

25 the Paramus branch doesn't move at the same time as the Tampa

1    branch.  Rather, the undisputed testimony is the Tampa branch

2    exits.  There's a period of time in which Mutual is talking

3    with the managers of the Paramus branch.  The managers of the

4    Paramus branch are not Mr. Smith, Mr. Hutto -- sorry,

5    Mr. Hutto, Smith, and Wolf.  They have separate managers.

6    There's discussions between Mutual about keeping that branch,

7    what would it look like if an independent P&L is set up.

8            And, frankly, there's just no evidence of wrongdoing

9    vis-a-vis the Paramus branch.  It simply decided to follow

10   Mr. Smith and join the Tampa branch.  But there's no -- there's

11   no evidence of wrongdoing vis-a-vis that branch.  So it would

12   carve about $200,000 off of the damages, and that could be

13   extrapolated over whatever duration the damages are sought.

14   That would be about the one-year amount.

15           **THE COURT:**  This is a minor point.  I don't want to

16   spend time on that right now.

17           **MS. KREITER:**  Sure.

18           **THE COURT:**  But let's go back.  Let me ask you about

19   this interference claim that you've got.  And I had the jury

20   instruction up there before.  The argument here is that your

21   client interfered in the employment agreement between Mutual

22   and these people, and the part of the employment agreement that

23   they interfered with is soliciting other employees.  All right.

24   And so assuming there's evidence that they did that, what

25   damages do you think are fairly recoverable from that act?

1    **MS. KREITER:** I do not understand Mutual to be

2    seeking separate damages on a claim-by-claim basis.

3    **THE COURT:** I know. I'm asking you, because it helps

4    understand what's going on.

5    **MS. KREITER:** I think it's got to be one year, Your

6    Honor, because the contract that is at issue is a

7    non-solicitation of employee's provision that lasts for one

8    year. So what did Mutual expect to get out of it? It's that

9    it could prevent the poaching of employees for one year, not

10   longer than that.

11   **THE COURT:** Well, I understand that. But if -- if

12   the breach -- I mean, this is -- it gets into, you know,

13   theories of consequential damages and stuff like that. But if

14   the breach itself -- I get it they could have done it a year

15   later. But when they did do it and it was a breach, is it --

16   and it -- suppose these were unique people that couldn't be

17   replaced and things like that, why would you -- now, I know

18   those aren't these facts. But as a legal matter, why does it

19   automatically cut off at one year if it in fact destroyed the

20   business and they couldn't hire anybody else?

21   **MS. KREITER:** I guess I would say I disagree with

22   Ms. Walter who says the branch -- I guess it's the people who

23   are prohibited from being solicited. I can't frankly divorce a

24   branch from the people. The people are what generate the

25   revenues, not the brick-and-mortar structure.

1    **THE COURT:**  Well, right.  I mean, factually, this

2    might not work for them.  But, legally, if -- I could see a

3    scenario where the amount of damages goes beyond a year.  I

4    mean, this gets back to the original thing which you've been

5    saying all along.  And the more we talk about it, I think the

6    less correct you are becoming in my understanding of things.

7    Now, again, there may not be a factual basis for it.

8    But if the consequential damages flows from this -- now, you

9    know, what's the benefit -- maybe we're just talking about

10   first-year contract law and different types of damages, you

11   know, benefit of the bargain, consequential damages, et cetera,

12   et cetera, but I don't -- I don't agree that it's one year.

13   **MS. KREITER:**  I think that goes back to, Your Honor,

14   Mutual, as the plaintiff with the burden of proof, has to come

15   forward with evidence how long would I have expected to keep

16   those employees.  I think we are coming back to the same issue.

17   **THE COURT:**  Yeah.  I agree with that.  I agree with

18   that.

19   So let me look here.  Now, what do we have in this

20   case?  The other part of that that's kind of kicking around in

21   here, talk to me a little bit about your claim for aiding and

22   abetting breaches of fiduciary duty.  What do you think you

23   have on that?

24   What would be the damages flowing from that?  In a

25   perfect world, according to you, what would the damages be?

```
 1    What is it, and what are the damages?
 2            MS. KREITER:  I think, Your Honor, it's the same
 3    thing.  Because the facts that support the aiding and abetting
 4    breach of fiduciary duty claim are the solicitation of
 5    employees and the alleged loss of the branches, so I think all
 6    of these claims center around the same activity.
 7            We're not talking about diverted loans anymore.
 8    We're talking about diverted people, which gets back to the
 9    non-solicitation of employees provision.  And as plaintiff, at
10    this stage in the case, what evidence does Mutual have that can
11    supply the Court with a way to ration the case and frame it for
12    the jury?  And I'm not seeing any evidence.  That's the crux to
13    the issue as to all of the damage claims, as to all of the --
14    as to all of the damages arguments related to all four of the
15    claims.
16            THE COURT:  Back to you now.  Is there -- what is
17    this aiding and abetting claim?  Does this get you anything
18    different?  Does it cover other things?  Does it give you
19    different damages?
20            MS. WALTER:  It does not give us different damages.
21    I agree with Waterstone's counsel that our damages are the same
22    for each claim.  I've done research under Florida law to
23    confirm that that's -- that the lost profits are available
24    under each of the claims.
25            I will say that I disagree fundamentally with
```

1    Waterstone's counsel that this is just about diverted

2    employees.  That's just not true.  It's diverted employees.

3    It's diverted loans.  It's diverted customer and personnel

4    information.  So I think all of that activity, which is all

5    directed by --

6            **THE COURT:**  I think -- maybe I'm just guessing.  But

7    I think they're fine paying you for the customers.  I think

8    they think that was their plan, maybe, is that, yeah, if we did

9    this and we got sued, we'll pay for, you know, a couple of

10   these loans.  What is that number, a hundred grand, something

11   like that?

12           **MS. WALTER:**  I don't disagree with that, Your Honor.

13           **THE COURT:**  And so that's -- that's what they want

14   the case to be, because that was probably what they envisioned.

15   You're wanting to make it bigger, which is exactly what's

16   happening in the next case.  And that's fine.  That's your job

17   to do.  And it's my job to figure out what's the law allows and

18   try to give you some guidance on that so you can get it settled

19   or not.

20           But -- so this aiding and abetting breach of

21   fiduciary duty doesn't give you any damage different damages.

22   Is it picking up any additional conduct?  I guess it's -- I

23   guess it's in a way helping to hook the company since you

24   haven't sued the individuals maybe?

25           **MS. WALTER:**  That's correct.

UNITED STATES DISTRICT COURT

1          **THE COURT:**  Aiding and abetting the breach of the

2    employee's fiduciary duties?

3          **MS. WALTER:**  Correct.

4          **THE COURT:**  But other than that, what about the trade

5    secrets?  Does one of those give you attorney fees?

6          **MS. WALTER:**  Yes, Your Honor.

7          **THE COURT:**  And is there anything really

8    significant -- I mean, is there some big trade secret that's

9    going to get a lot of attention, or is it just like customer

10   lists and stuff like that that we're hearing about?  Any --

11         **MS. WALTER:**  I think the latter is accurate.

12         **THE COURT:**  Okay.

13         **MS. WALTER:**  And there's also treble damages.

14         **THE COURT:**  Aha.  So one of these -- so if a jury

15   were to believe that -- give me an example.  Give me a -- not a

16   best-case example.  Just give me kind of a possible example of

17   a trade secret that you think is pretty clean, was taken, and

18   what the damages would be from that.

19         **MS. WALTER:**  I mean, sending over the one e-mail

20   where Waterstone contacted Mutual and said, Here's the export

21   map, upload the completed loan information, and that was

22   completed, I think is a trade secret that we would put before a

23   jury and seek damages for that.

24         **THE COURT:**  Export map?

25         **MS. WALTER:**  It's essentially, my understanding is

 1   it's like a spreadsheet.  Like, here's our spreadsheet, here's

 2   our template.  Put the information in it and send it back to

 3   us.  And that was completed at Waterstone's direction to a

 4   Mutual employee who eventually moved over to Waterstone.

 5              **THE COURT:**  And so that was a bunch of residential

 6   loans that would have closed with Waterstone instead of with

 7   Mutual of Omaha?

 8              **MS. WALTER:**  Yes, Your Honor.

 9              **THE COURT:**  And what's the dollars associated with

10   that?

11              **MS. WALTER:**  As I sit here today, I can't provide you

12   with that.  I don't know that.

13              **THE COURT:**  Times three if you win that claim.

14   Right?

15              **MS. WALTER:**  Yes, Your Honor.

16              **THE COURT:**  And you get attorney fees?

17              **MS. WALTER:**  Yes.  That's my understanding.

18              **THE COURT:**  And it would be pretty hard to separate

19   out the attorney fees associated with that claim versus all of

20   this other stuff.  So you probably have a pretty big attorney

21   fee number.

22              **MS. WALTER:**  Sure.  Yes.

23              **THE COURT:**  Right.  I'm just talking through this so

24   we understand where we are in terms of getting the case

25   settled.  Because, to me, it sounds like -- it sounds like

                  UNITED STATES DISTRICT COURT

1    you've got some stuff factually that seems pretty clean, but

2    not all of it.  But at least enough to get in front of a jury

3    and from that.  Now, is the case never going to see the light

4    of day, you don't think?

5            **MS. KREITER:**  I mean, I just don't --

6            **THE COURT:**  I look forward to seeing that.  I look

7    forward to your summary judgment briefing that will get rid of

8    the case altogether.

9            **MS. KREITER:**  I would -- I mean, I will tell you I

10    don't think the case can be disposed of in full.

11            **THE COURT:**  Good.

12            **MS. KREITER:**  I think, frankly, the only claim that

13    Mutual needs is Claim 4, aiding and abetting breach of

14    fiduciary duty.  The trade-secret claim -- I will just give

15    some context.  Mutual identified 301 trade secrets.  I mean,

16    they're not trade secrets.

17            **THE COURT:**  The map sounds like a trade secret.

18    Right?

19            **MS. KREITER:**  I will say we could dispute that.

20    Regardless of that dispute, it's about diverted loans, which

21    the damage models here have nothing to do with diverted loans.

22    Rosevear, the expert, doesn't deal with that.

23            **THE COURT:**  I know.  I moved off of that.  I

24    understand.  I was just getting into some other things.

25            Okay.  All right.  I forgot to tell y'all, we'll have

UNITED STATES DISTRICT COURT

1    to break at about 11:35, because I have to go to the dentist,

2    but it's just a cleaning.  It's a cleaning.  But that's the

3    game plan.

4            Now, let me look at one other thing here.  Remind me

5    now.  You've teed this up.  What is your motion on your side of

6    things?

7            **MS. KREITER:**  Well, Your Honor will remember, the

8    idea was to table the issue of damages.  We had filed the

9    motion in limine.  I believe Your Honor said I don't care what

10   you label it, motion in limine, summary judgment.  They filed

11   the summary judgment motion.  We responded with the damages

12   issues.  So it's framed as a motion for summary judgment on

13   damages.  You could frame it as motion in limine.  But it's --

14   regardless of the label, it's looking to frame the case on the

15   damages issue.

16           **THE COURT:**  Right.  Exactly.  And so that's what I

17   wanted to talk about where we go from here based on the way

18   it's teed up.  I mean, there's a lot of ways I could approach

19   it.  I could approach it with, you know, you've said, well,

20   they haven't filed a summary judgment.

21           I mean, when somebody files a summary judgment

22   motion, the judge, if given notice, can take into account and

23   do a summary judgment.  And so I might do something like that.

24   I might treat it as a motion in limine.  But I don't want

25   people whining and complaining that they haven't had an

UNITED STATES DISTRICT COURT

1    opportunity to give their input in some way because of the

2    procedural presentation of this thing.

3            So do you have any thoughts on that?  Do you have

4    any -- you want me to say, oh, it's a summary judgment motion,

5    you can't do summary judgment, denied.  But then, okay, I've

6    got a motion in limine that I can deal with.  Didn't you try a

7    motion in limine and they complained about that?

8            **MS. KREITER:**  I filed a motion in limine.  Initially,

9    the damages were $4.5 million.  Gennarelli was their expert.  I

10   filed a motion in limine on Gennarelli.  The Court did not rule

11   on that.  Said raise it again at another time.  I think,

12   frankly, it got wrapped up into this motion.

13           **THE COURT:**  That's what I was trying to clean up.

14   That's what I was trying to clean up.

15           **MS. KREITER:**  Right.  For what it's worth, Your

16   Honor, I will just say, in my mind, the way to advance the

17   case, if we had a ruling on some of these damages issues --

18   we've tried mediation.  We were not successful.  Frankly, if we

19   had framework from the Court --

20           **THE COURT:**  That's what I've been trying to do.

21           **MS. KREITER:**  I would welcome if -- you know, if we

22   could have some time where we get a ruling from the Court on

23   these damages issues.  If, for example, the Court rules it's

24   one year, now, I know I've got a case less than 2 million, I

25   would want some time to revisit settlement.  I assume Mutual

UNITED STATES DISTRICT COURT

1    would too.  Or if it goes the other way, I think it would

2    benefit to have some framework.

3         **THE COURT:**  That's exactly what I'm trying to do.

4    We're on the same page.  I just want to clean it up so I don't

5    get complaints and whining about, well, you know, procedurally

6    this wasn't the way to do it, blah, blah, blah.

7         **MS. KREITER:**  Yeah.  I would welcome that.  I mean, I

8    think depending on when the Court estimates it may rule, if we

9    could have -- I think we also contemplated additional summary

10   judgment motions in the case.  Right now, we've got a pretrial

11   coming up in March.

12        **THE COURT:**  Don't worry about dates.  I'm talking

13   about -- how do you think this should be done?

14        **MS. WALTER:**  I mean, I hear Your Honor loud and

15   clear, recognizing that you frankly can do whatever you want.

16        **THE COURT:**  Not whatever I want.  But I can find a

17   way to do it procedurally correctly.  I don't want to -- I

18   don't want to get obstacles from you-all on that.  I just want

19   to do it in a way we're all on the same page, so win, lose, or

20   draw, we don't complain about procedural stuff.

21        **MS. WALTER:**  I think from our perspective, we are

22   very focused on the narrow legal question, which is what Your

23   Honor brought up at the two case management conferences.

24        **THE COURT:**  Right.

25        **MS. WALTER:**  Here, this conversation was helpful,

UNITED STATES DISTRICT COURT

1    because it sounds like you understand the evidence we're

2    putting forth in support of our position.  You know, if there

3    are evidentiary issues that we should dig in, drill into deeper

4    because you're not convinced that that's reasoned evidence,

5    then I would ask an opportunity to respond to that.  But --

6    yeah, I --

7            **MS. KREITER:**  Could we have, for example, say, 30

8    days from when the Court rules, try to get a second mediation

9    with Mr. Griffin, come back here for a status conference after

10   that?

11           **THE COURT:**  Yeah.  Yeah.  That's fine.  That's a good

12   game plan.  Was Chris Griffin your mediator?

13           **MS. KREITER:**  Yes, Your Honor.

14           **THE COURT:**  Okay.  But I'm ready to make some rulings

15   on this stuff, which I think will be helpful for you.  But I

16   just -- like I keep saying, I want to do it in a way that

17   everyone agrees with is procedurally acceptable to them so that

18   we don't -- I mean, they complained when you did your motion in

19   limine, and I said, fine, we'll do it as a summary judgment.

20   They're complaining about that now.

21           So I want to figure out how to do it so that we don't

22   have people complaining, but I'm not hearing any suggestions.

23   I think you want to, but you just couldn't help yourself.

24           **MS. WALTER:**  No.  I don't -- I think my concern is,

25   you know, if our expert witness's model gets thrown out and

1    it's not truly teed up as a Daubert motion, that gives me

2    concern.  But, no, I don't have any other suggestion.  I think

3    we're fine where we are right now.

4         **THE COURT:**  Okay.  If we do it as a Daubert motion,

5    the only thing that's different is you're going to tell me the

6    law on Daubert, which I know about, because everybody files

7    Daubert motions in every case on every expert.

8         **MS. WALTER:**  Some of the issues, frankly, even

9    considering Office Depot, are kind of similar.  It's

10   speculation.  So, you know, I'm not going to kick and scream

11   too much, because it's --

12        **THE COURT:**  That's the next case.  That's how they've

13   done it.  They've done it as a Daubert, part of it.  Part of it

14   is a summary judgment.  They've done it both ways.

15        **MS. KREITER:**  And that maybe, Your Honor -- depending

16   on the ruling, that would inform what we think is the most

17   efficient next step.  I guess I'll stand by my suggestion for a

18   time to talk about settlement after your ruling, recognize we

19   want to move the case along.  I'm concerned about the April 1,

20   you know, potential trial.

21        **THE COURT:**  We'll see.  We'll see.  Let me just visit

22   with my law clerks real quick, and I'll tell you what we're

23   going to do on this case.  All right.  And if you guys want to

24   stay around for the other one, it might benefit you to hear

25   what I'm going to talk to them about, because it has a lot of

UNITED STATES DISTRICT COURT

```
 1    overlap.

 2            MS. KREITER:  Sure.

 3            THE COURT:  All right.  Just see you in five minutes.

 4         (Recess from 11:23 a.m. to 11:31 a.m.)

 5            THE COURT:  Okay.  I think we've got a game plan now.

 6    Wait till they come in.

 7            Anything else you want to mention?

 8            MS. WALTER:  No, Your Honor.

 9            THE COURT:  Good.

10            MS. KREITER:  No.

11            THE COURT:  All right.  Okay.  So what we're going to

12    do, just to clean this up, so we don't have any confusion,

13    procedurally, unnecessary confusion -- is that motion in limine

14    already denied?  Did I already deny that?

15            MS. KREITER:  The prior one, you denied it without

16    prejudice, Your Honor.

17            THE COURT:  Okay.  Good.  We're just trying to

18    address the issue in some way, shape, or form.  So what I'll

19    say on this motion for summary judgment, thank you for filing

20    it.  That's what I wanted you to do.  That's denied without

21    prejudice.  Refile it as Daubert.  Do it within seven days.

22    And no additional information is necessary.  Just call it a

23    Daubert motion and incorporate by reference arguments made and

24    just refer to the document number.  Whatever it's called,

25    Document 46, or whatever it may be.  You don't have to say any
```

1    more than that.

2         You can respond in seven days.  We'll put this in an

3    endorsed order.  You can respond in seven days and incorporate

4    by reference stuff you've already said.  If there's anything

5    new you think you need to say, I caution you not to repeat the

6    same stuff.  But if anybody finds anything new, that's okay.

7    But we don't need, you know, additional repetition of what

8    we've already talked about.  This has basically been the

9    hearing on that anyway.

10        And then I'll try to get you an order pretty quickly

11   on that, letting you know how that lost profits language theory

12   is going to work out.  Then you can mediate with Chris Griffin.

13   Then you can do summary judgments on the rest of the case if

14   you don't get the rest of the case worked out.  We'll put that

15   all in an endorsed order, giving you some time frames for that.

16        As for the April trial date, I think you've got to

17   keep that going for now.  I will tell you there are numerous

18   criminal cases in April, numerous criminal cases.  So we'll see

19   what happens with that.

20        Good?  Game plan?

21        **MS. KREITER:**  Are we keeping the March pretrial

22   conference then?

23        **THE COURT:**  I'll have to take a look and see.  Just

24   say yes for now.  But depending on how all this plays out, I'm

25   not sure.  We'll address that.

1    **MS. KREITER:** Just point of clarification, we've been

2    talking a lot about Rosevear at this hearing. There is

3    Gennarelli. He's not mentioned at all. I'm, frankly, vague as

4    to is he in the case or not? My motion back in July was on

5    Gennarelli.

6         **THE COURT:** Remind me how they work together.

7         **MS. KREITER:** So they don't at all, Your Honor.

8    Gennarelli was the expert witness that Mutual disclosed by its

9    deadline. I then hired Steve Oscher who analyzes Gennarelli.

10   Rosevear is the rebuttal expert. So Gennarelli says

11   4.5 million. I moved in limine. You said I'm going to deny it

12   without prejudice, raise it later. Then, with two weeks left

13   before the close of discovery, Mutual announces a rebuttal

14   expert, Rosevear, who says it's 28 million.

15        **THE COURT:** But the problem we're dealing with here

16   is the idea of the, quote, some standard for lost profits and

17   the time duration. Is that in both of these experts?

18        **MS. KREITER:** It is. It's a matter of degree. So

19   Gennarelli --

20        **THE COURT:** Then do it on both of them then.

21        **MS. KREITER:** Okay. Great.

22        **THE COURT:** We're just trying to answer a legal

23   question. Thank you for catching that and bringing that up.

24   Do it on both of them.

25        **MS. WALTER:** Just to be clear, Your Honor, we are the

```
 1   only ones who moved for summary judgment.  So defendants never
 2   had a summary judgment motion.
 3           THE COURT:  I know it.  We cleared that up.  I just
 4   said this is denied without prejudice, because I was just
 5   trying to come up with some vehicle to have the conversation we
 6   had.
 7           MS. WALTER:  Sure.
 8           THE COURT:  So you can file another summary judgment
 9   motion if you think you want to on other stuff later, but it's
10   a step-by-step process.  Nobody is losing any rights to file
11   any summary judgment motions.  They did it in their case.  I
12   told them to do it.  They can do more than one.  It's fine.
13           Okay?  Good?
14           MS. KREITER:  Thank you.
15           MS. WALTER:  Thank you, Your Honor.
16       (Proceedings adjourned at 11:35 a.m.)
17
18
19
20
21
22
23
24
25
```

UNITED STATES DISTRICT COURT

1                          **CERTIFICATE OF REPORTER**

2     STATE OF FLORIDA

3     COUNTY OF HILLSBOROUGH

4               I, Rebekah M. Lockwood, RDR, CRR, do hereby certify

5     that I was authorized to and did stenographically report the

6     foregoing proceedings; and that the foregoing pages constitute

7     a true and complete computer-aided transcription of my original

8     stenographic notes to the best of my knowledge, skill, and

9     ability.

10          I further certify that I am not a relative, employee,

11    attorney, or counsel of any of the parties, nor am I a relative

12    or employee of any of the parties' attorneys or counsel

13    connected with the action, nor am I financially interested in

14    the action.

15          IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16    Hillsborough County, Florida, this 2nd day of February 2024.

17

18

19

20

21    REBEKAH M. LOCKWOOD, RDR, CRR
      Official Court Reporter
22    United States District Court
      Middle District of Florida
23

24

25