# <u>EXHIBIT B</u>

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF FLORIDA
                              TAMPA DIVISION


        * * * * * * * * * * * * * * * *
        MUTUAL OF OMAHA MORTGAGE INC.  *
                                       *    Case No. 8:22-cv-1660
        vs.                            *
                                       *    May 17, 2024
        WATERSTONE MORTGAGE            *
        CORPORATION                    *
        * * * * * * * * * * * * * * * *
```

<u>MOTION HEARING</u>

Heard via Zoom Videoconferencing
Sam M. Gibbons United States Courthouse
801 N. Florida Avenue
Tampa, FL
May 17, 2024

<u>BEFORE THE HONORABLE ANTHONY E. PORCELLI</u>

<u>UNITED STATES MAGISTRATE JUDGE</u>

```
Official Court Reporter:       Tana J. Hess, CRR, FCRR, RMR
                               U.S. District Court Reporter
                               Middle District of Florida
                               Tampa Division
                               801 N. Florida Avenue
                               Tampa, FL  33602
                               813.301.5207
                               tana_hess@flmd.uscourts.gov
```

Proceedings recorded by mechanical stenography using
computer-aided transcription software.

APPEARANCES:

FOR THE PLAINTIFF:

            Ari Karen
            Mitchell Sandler, PLLC
            1120 20th Street, NW
            Suite 725
            Washington, DC 20036
            202.886.5260
            akaren@mitchellsandler.com

            Arielle Stephenson
            Mitchell Sandler, PLLC
            1120 20th Street, NW
            Suite 725
            Washington, DC 20036
            424.731.5645
            astephenson@mitchellsandler.com

            Aron Raskas
            Gunster
            600 Brickell Avenue
            Suite 3500
            Miami, FL  33131
            305.376.6009
            araskas@gunster.com

            Daniel Paul Dietrich
            Gunster, Yoakley & Stewart, PA
            401 E. Jackson Street
            Suite 1500
            Tampa, FL  33602
            813.228.9080
            ddietrich@gunster.com

            Gregory Lathrop Pierson
            Gunster, Yoakley & Stewart, PA
            401 E. Jackson Street
            Suite 1500
            Tampa, FL  33602
            813.228.9080
            gpierson@gunster.com

APPEARANCES:

FOR THE DEFENDANT:

      Maria L. Kreiter
      Godfrey & Kahn, S.C.
      833 East Michigan Street
      Suite 1800
      Milwaukee, WI   53202
      414.287.9466
      mkreiter@gklaw.com

      Carolina Yvonne Blanco
      Hill Ward Henderson, PA
      101 E. Kennedy Blvd.
      Suite 3700
      Tampa, FL   33602
      813.221.3900
      carolina.blanco@hwhlaw.com

      Emma J. Jewell
      Godfrey and Kahn, S.C.
      833 East Michigan Street
      Suite 1800
      Milwaukee, WI   53202
      414.287.9528
      ejewell@gklaw.com

      Scott A. McLaren
      Hill Ward Henderson, PA
      101 E. Kennedy Blvd.
      Suite 3700
      Tampa, FL   33602
      813.221.3900
      smclaren@hwhlaw.com

      Xavier O. Jenkins
      Godfrey & Kahn, S.C.
      833 East Michigan Street
      Suite 1800
      Milwaukee, WI   53202
      414.287.9511
      xjenkins@gklaw.com

| | | |
|---|---|---|
| 10:04AM | 1 | THE COURT:  All right.  Good morning.  Let's call the |
| 10:04AM | 2 | case, please. |
| 10:04AM | 3 | COURTROOM DEPUTY:  All right.  Good morning again, |
| 10:04AM | 4 | everybody.  This is Mutual of Omaha Mortgage versus WaterStone |
| 10:04AM | 5 | Mortgage Corporation, case number 8:22-cv-1660-UAM. |
| 10:04AM | 6 | THE COURT:  Okay.  Good morning.  Let me have counsel |
| 10:04AM | 7 | state your appearance, for the record starting with plaintiff. |
| 10:04AM | 8 | MR. KAREN:  Good morning, Your Honor.  Ari Karen on |
| 10:04AM | 9 | behalf of Mutual. |
| 10:04AM | 10 | THE COURT:  Good morning. |
| 10:04AM | 11 | MS. STEPHENSON:  Arielle Stephenson.  Good morning, |
| 10:05AM | 12 | Your Honor, also on behalf of Mutual. |
| 10:05AM | 13 | THE COURT:  Good morning. |
| 10:05AM | 14 | MR. DIETRICH:  Good morning, Your Honor.  Dan |
| 10:05AM | 15 | Dietrich also on behalf of Mutual of Omaha. |
| 10:05AM | 16 | THE COURT:  Good morning. |
| 10:05AM | 17 | MR. PIERSON:  Good morning, Your Honor.  Greg Pierson |
| 10:05AM | 18 | also on behalf of Mutual. |
| 10:05AM | 19 | THE COURT:  Thank you.  Good morning. |
| 10:05AM | 20 | All right.  For WaterStone? |
| 10:05AM | 21 | MS. KREITER:  Good morning, Your Honor.  Maria |
| 10:05AM | 22 | Kreiter, Emma Jewell, and Xavier Jenkins from Godfrey & Kahn on |
| 10:05AM | 23 | behalf of WaterStone.  Also on the line for WaterStone, we have |
| 10:05AM | 24 | Stephanie Ziebell, who is the WaterStone general counsel, and |
| 10:05AM | 25 | then Scott and Carolina. |

| | | |
|---|---|---|
| 10:05 AM | 1 | THE COURT:  All right.  Good morning. |
| 10:05 AM | 2 | MR. MCLAREN:  Good morning, Your Honor.  Scott |
| 10:05 AM | 3 | McLaren and Carolina Blanco here on behalf of the defendant as |
| 10:05 AM | 4 | well. |
| 10:05 AM | 5 | THE COURT:  Okay.  Thank you all for your time. |
| 10:05 AM | 6 | Let me just be very blunt.  This is not my |
| 10:05 AM | 7 | preference to be doing this, given the substantive matters that |
| 10:05 AM | 8 | are before the Court, by Zoom, but that's what we're going to |
| 10:05 AM | 9 | do.  So what I intend to do is to take up the pending motions, |
| 10:05 AM | 10 | and then we'll talk about where we're at as far as trial. |
| 10:05 AM | 11 | So I want to start with the summary judgment and |
| 10:06 AM | 12 | ask the plaintiffs, whoever is making the argument, what are |
| 10:06 AM | 13 | the documents that are now at issue?  Are we talking about the |
| 10:06 AM | 14 | remaining that were last supplemented as far as the 39 |
| 10:06 AM | 15 | documents for trade secrets, or are there going to be items |
| 10:06 AM | 16 | that are beyond that? |
| 10:06 AM | 17 | MR. KAREN:  Your Honor, just to be clear, you said |
| 10:06 AM | 18 | making argument with respect to -- it is the defendant's |
| 10:06 AM | 19 | motion.  I'm happy to speak to that point, but I just -- |
| 10:06 AM | 20 | THE COURT:  Mr. Karen, I understand that.  My |
| 10:06 AM | 21 | question is to you.  What are the -- what is at issue regarding |
| 10:06 AM | 22 | the trade secrets? |
| 10:06 AM | 23 | MR. KAREN:  There are really three categories of |
| 10:06 AM | 24 | trade secrets at issue in this case.  The first category |
| 10:06 AM | 25 | involves -- |

| | |
|---|---|
| 10:06AM | 1 |
| 10:06AM | 2 |
| 10:06AM | 3 |
| 10:06AM | 4 |

        THE COURT:  Okay.  I want to be very blunt.  How many
documents?  Is it the 39 that was last supplemented, or is it
more than that?

        MR. KAREN:  I would have to -- I would have to look,
Your Honor, to give you an exact answer.  The reason I say that
is what we really did is these are the examples of the one
trade secret.  So for -- if I can be clear about this, so I
could explain why there is some clarity I would need to provide
to you.  There are multiple examples of one type of trade
secret, and that trade secret would be, for example, the
combination of information about a customer and that group
of -- those groups of documents relating to that customer that
identifies the customer's ability, willingness, desire, and
readiness to go forward on a transaction, and that information
is unique, and it would have only have been in Mutual's
possession.  So that would be pertaining to one loan, but we
may have numerous loans of that.  I believe there are probably
about 40 to 45 sets of documents.

        And, again, it's not one document.  It's not
like a W2 statement, and that's why I'm trying to get clarity
and I want to make sure I answer correctly.  For example, it's
not just a borrower's W2.  It's the borrower's W2, their
application for a loan, and any and all supporting documents
that may have been provided with respect to that loan.  That
combination of documents uniquely provided to Mutual is a trade

| | |
|---|---|
| 10:08AM | 1 |

secret.

Now, that identical trade secret may exist with
multiple other loans, so to get the exact number of documents,
I would just have to look at that exhibit list.  I don't have
that right in front of me at this moment, but I would be able
to tell you that would be, for example, multiple examples of
different loans with that combination of documentation for that
one classification.  So that would be one group, and I don't --

THE COURT:  Let me interrupt you there.  The Court
had previously ordered that the trade secrets be identified by
Bates stamps, as I understand it, on the record.  Then after
that occurred, there was approximately one hundred and I think
it was 89 documents that were Bates stamped and identified.

MR. KAREN:  That is correct.

THE COURT:  Then as I understand it based upon the
reply, that has since been supplemented to include now
approximately 39.  There is nothing in the record that helps me
establish any -- whether there's an issue of fact as to any of
the elements as to what is or is not a trade secret.  Your
response is simply just arguing that this is a fact-intensive
inquiry and therefore should go to the jury, but it's incumbent
upon you to establish initially that there is a fact in issue
that is left for the jury; that is, there is a material issue
of fact.  You've not addressed any document in any way to
establish that, and that's what I'm trying to understand is

| | | |
|---|---|---|
| 10:09AM | 1 | what items -- it could be multiple documents.  It could be |
| 10:09AM | 2 | whatever you're asserting, but it's still unclear to me on this |
| 10:09AM | 3 | record what is the universe of trade secrets that are at issue |
| 10:09AM | 4 | and where is there any record that I could rely upon to say |
| 10:09AM | 5 | that there is an issue of fact as to whether there are trade |
| 10:09AM | 6 | secrets or not? |
| 10:09AM | 7 | MR. KAREN:  So, Your Honor I believe to address the |
| 10:09AM | 8 | two points -- and that's what I'm saying.  I think the first |
| 10:09AM | 9 | issue with respect to trade secrets and what those issues |
| 10:09AM | 10 | are -- and I do believe there are points in the record I'll be |
| 10:09AM | 11 | able to point you to.  But, for example, as you know, the trade |
| 10:10AM | 12 | secrets relate to -- and whether there is a trade secret is |
| 10:10AM | 13 | whether it was valuable information that was uniquely valuable |
| 10:10AM | 14 | to my client and then whether that was misappropriated.  There |
| 10:10AM | 15 | is evidence in the record that we have cited to in those |
| 10:10AM | 16 | statements of fact, that we believe are statements of fact, |
| 10:10AM | 17 | 22 -- and you have the depositions, Your Honor -- where, for |
| 10:10AM | 18 | example, Exhibit F in Mr. Allen's deposition on page 49 where |
| 10:10AM | 19 | Mr. Allen, who is the corporate representative of WaterStone, |
| 10:10AM | 20 | admits that this information is valuable.  I asked him those |
| 10:10AM | 21 | questions, and he said yes, in fact, that combination of |
| 10:10AM | 22 | information is valuable, and that's one classification of the |
| 10:10AM | 23 | trade secrets I'm talking about, these groups of documents |
| 10:10AM | 24 | related to very specific borrowers, related to specific loans |
| 10:10AM | 25 | that indicated they were ready, willing, and able to perform |

|  |  |  |
|---|---|---|
| 10:10 AM | 1 | and move forward with the loan and qualified, more importantly, |
| 10:10 AM | 2 | to move forward with the loan.  So that's one item of trade |
| 10:10 AM | 3 | secrets that I do think there is support in the record for. |
| 10:10 AM | 4 | The second area is customer lists.  They |
| 10:11 AM | 5 | downloaded customer lists.  Again, we've got examples of that |
| 10:11 AM | 6 | both in the documents provided to you in response to the Motion |
| 10:11 AM | 7 | for Summary Judgment as well as in the deposition transcript. |
| 10:11 AM | 8 | Exhibit G, Mr. Hutto's deposition transcript, on |
| 10:11 AM | 9 | page 95 of that, which was provided to the Court, that Exhibit |
| 10:11 AM | 10 | G provides that -- it indicates that these groups of |
| 10:11 AM | 11 | information were effectively high value leads, if you will, and |
| 10:11 AM | 12 | even low value leads, leads that just contained information as |
| 10:11 AM | 13 | to contact information, some of whom might be interested in a |
| 10:11 AM | 14 | loan.  They paid for that.  WaterStone -- I'm sorry, Mutual |
| 10:11 AM | 15 | paid for that.  Mr. Hutto paid for that, and Mr. Hutto would |
| 10:11 AM | 16 | pay for that.  And the information provided in these groups of |
| 10:11 AM | 17 | documents were far more extensive to what they would pay for |
| 10:11 AM | 18 | for a loan.  And, again, it was information that only Mutual |
| 10:11 AM | 19 | had, so it would be considered a trade secret. |
| 10:11 AM | 20 | Additionally, again, as I said, there were |
| 10:11 AM | 21 | customer lists, lists that identified every customer that had |
| 10:12 AM | 22 | ever done business with Mutual, information on their loan, when |
| 10:12 AM | 23 | their loan would modify, and that was all obtained by |
| 10:12 AM | 24 | WaterStone, and even WaterStone's own documents indicate those |
| 10:12 AM | 25 | materials are confidential trade secrets. |

10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM

1          And then we've got the use of those, which is

2    demonstrated, if nothing else, by the fact that 45 loans were

3    actually closed by WaterStone.

4          So I think when it comes down to the

5    customer-related documents -- and really what we're talking

6    about, again, are those groups of documents related to specific

7    borrowers demonstrating their ability, willingness to proceed

8    with the loan that far exceeds the value of the lead.  The fact

9    that these documents were in password-protected systems that

10   the defendants utilized their passwords to access and obtain

11   and provide to WaterStone, those are -- as well as the customer

12   lists, those are all trade secrets.

13          One other form of trade secret, Your Honor, are

14   profit and loss statements.  And, again, I asked Mr. --

15   Mr. Hutto if he agreed that that information would be very

16   valuable.  That's in Exhibit G to the motion.  That's on

17   page 92 of his transcript.  It was also non-public information

18   on those P&L statements which Mr. Allen also agreed with when I

19   asked him those questions in his deposition, and that's in

20   Exhibit F at page 224, also provided to the Court.

21          So I think there is information as to these

22   three categories of trade secrets, and while I'm sorry for

23   hesitating to tell you the exact number of documents because

24   these in some cases are compilations of documents that only

25   because of their grouping together become a trade secret, if

| | |
|---|---|
| 10:13AM | 1 |

you will, and because of the fact they were delivered.  That's
my hesitation where I want to be clear and provide you that
information, but that information has been provided in
discovery, and, you know, I would be able to tell you that.  I
just want to make sure I give the right exact number.

THE COURT:  So what is going to be at issue?  Is it
going to be the 186 documents that were originally briefed, or
is it going to be the 39 documents that were later supplemented
or a combination of that?

MR. KAREN:  A combination.  We are going -- we have
already pared that down in preparation for the exhibit lists --
or the list of exhibits that we have been working on.  We have
already pared that down because I want to present this in a
meaningful way to the jury.  And that was actually a question I
was going to ask Your Honor, on how to best present it.  This
may not be the appropriate time for that.

But, for example, what I would propose -- just
to answer your question, so -- from a perspective of
manageability, is we intended to produce an email.  That email
would contain all of the documents attached.  That would be one
trade secret, and provide that to the jury, irrespective of
whether it was three documents attached by the borrower or 15
documents attached.  We're going to have examples of that.
That would be one example of one trade secret, and we would
have that for each one of the trade secrets as well as I

10:14AM 1  believe it is two customer lists that were transacted -- I'm

10:15AM 2  sorry, three customer lists that were provided, and -- or

10:15AM 3  taken, I should say, and then two, I believe it is, profit and

10:15AM 4  loss statements.

10:15AM 5          So we'd have two profit and loss statements, we

10:15AM 6  would have three customer lists that were downloaded, and we

10:15AM 7  would have approximately 30 examples of these combinations of

10:15AM 8  documents from borrowers that would be in as trade secrets.  We

10:15AM 9  did pare down that list of 180.  There were additional

10:15AM 10 materials and documents that were in there.  We are taking many

10:15AM 11 of those out.  I think it would simply cloud the Court in

10:15AM 12 handling the case and the collateral -- I believe they are

10:15AM 13 trade secrets, but they're not frankly the most compelling

10:15AM 14 trade secrets, and we're taking those out.

10:15AM 15         So really what we're going to be talking about

10:15AM 16 is customers' willingness and ability to go forward with loans

10:15AM 17 as demonstrated on these documents, the customer lists that

10:16AM 18 were downloaded off of password-protected systems, and then

10:16AM 19 finally P&L statements.

10:16AM 20         THE COURT:  And are those items included in the

10:16AM 21 supplemental that was provided post the close of discovery with

10:16AM 22 the 39 alleged trade secrets?

10:16AM 23         MR. KAREN:  Everything is in there, yes, Your Honor.

10:16AM 24         THE COURT:  Why were those disclosed at such a late

10:16AM 25 time without leave of Court?

| | | |
|---|---|---|
| 10:16AM | 1 | MR. KAREN:  Some of them, Your Honor, were obtained |
| 10:16AM | 2 | through the course of discovery at various times.  Many of |
| 10:16AM | 3 | these documents we did not have in possession when we first |
| 10:16AM | 4 | answered those interrogatories.  These were obtained throughout |
| 10:16AM | 5 | the process of discovery.  There were even, you know, documents |
| 10:16AM | 6 | that were produced -- and I do not at all blame opposing |
| 10:16AM | 7 | counsel for this.  I want to make sure I understand this.  We |
| 10:16AM | 8 | had a sequence of productions and discovery that went on |
| 10:16AM | 9 | throughout the discovery period, some of which were at the very |
| 10:16AM | 10 | end of discovery, and some of -- and some of these documents |
| 10:16AM | 11 | were produced then.  So it would be a compilation of those |
| 10:16AM | 12 | reasons that -- just these were not documents we always had in |
| 10:17AM | 13 | our possession. |
| 10:17AM | 14 | THE COURT:  And these documents could not have been |
| 10:17AM | 15 | identified previously for a reason when Judge Sneed entered the |
| 10:17AM | 16 | order that Bates stamps be identified for purposes of the trade |
| 10:17AM | 17 | secrets? |
| 10:17AM | 18 | MR. KAREN:  No, Your Honor, we didn't have them.  For |
| 10:17AM | 19 | example, I would tell you one of the trade secrets in |
| 10:17AM | 20 | particular I recall we received actually on -- after the close |
| 10:17AM | 21 | of discovery.  It was to -- because we had to subpoena the |
| 10:17AM | 22 | individuals, not just -- well, not the defendant, but |
| 10:17AM | 23 | third-party individuals, some of the officers that left, |
| 10:17AM | 24 | because they sent to their personal emails.  So there was a |
| 10:17AM | 25 | trade secret, for example, we learned of well after the close |

| | | |
|---|---|---|
| 10:17AM | 1 | of discovery because we got it from I believe it was John |
| 10:17AM | 2 | Utsch.  I may be mispronouncing his name, but we only received |
| 10:17AM | 3 | that from his -- I think it was his Gmail or Yahoo or personal |
| 10:18AM | 4 | email account when we subpoenaed that. |
| 10:18AM | 5 | So this was done through I will say probably 20 |
| 10:18AM | 6 | different subpoenas to third parties, and that's how we |
| 10:18AM | 7 | obtained a lot of this information, and that's why we couldn't |
| 10:18AM | 8 | supplement it sooner. |
| 10:18AM | 9 | THE COURT:  Ms. Kreiter, are you making the argument? |
| 10:18AM | 10 | MS. KREITER:  Yes, I am, Your Honor. |
| 10:18AM | 11 | I guess I don't know where to start.  This is a |
| 10:18AM | 12 | 2022 case.  It is now 2024, two weeks from trial, and I'm first |
| 10:18AM | 13 | learning the factual basis for the vast majority of the claims. |
| 10:18AM | 14 | I could not more vigorously dispute what |
| 10:18AM | 15 | Mr. Karen has said.  I think the most helpful way to sort |
| 10:18AM | 16 | through this issue is by reference to WaterStone's efforts to |
| 10:18AM | 17 | triage the 39 documents that were identified as trade secrets |
| 10:18AM | 18 | in the midst of briefing months after the close of discovery. |
| 10:18AM | 19 | That's docket 159, Exhibit 2.  We've essentially taken in very |
| 10:18AM | 20 | short order 39 documents that were disclosed as trade secrets. |
| 10:19AM | 21 | Six of those were timely disclosed.  Five of the six that were |
| 10:19AM | 22 | timely disclosed relate to the P&L statements.  The sixth |
| 10:19AM | 23 | document is an email that it is certainly not apparent why that |
| 10:19AM | 24 | would be a trade secret.  It's an email between employees |
| 10:19AM | 25 | talking about somebody potentially wanting to join WaterStone. |

| | |
|---|---|
| 10:19AM | 1 |
| 10:19AM | 2 |
| 10:19AM | 3 |
| 10:19AM | 4 |
| 10:19AM | 5 |
| 10:19AM | 6 |
| 10:19AM | 7 |
| 10:19AM | 8 |
| 10:19AM | 9 |
| 10:20AM | 10 |

1    I cannot possible triage the other 36.  I've
2    taken a corporate rep dep on the issue of trade secrets.  These
3    were not the subject of that because they had not been
4    disclosed.  Mr. Aaron is -- or Mr. Karen is absolutely wrong
5    about when he had these documents.  If you look at the
6    production date, which is a column that WaterStone added to its
7    spreadsheet trying to give context to these very belated
8    disclosed documents, you can see there's a date of production
9    column.  So, you know, some of them were produced in 2022 of
10    that six that were timely disclosed.

11            THE COURT:  Looks like the majority of them.

12            MS. KREITER:  The majority of them.  There are two
13    documents, Your Honor, that were produced after the close of
14    discovery, you know, but frankly, the fact that the plaintiff
15    waited until the very last minute to serve third-party
16    discovery, that's not on WaterStone.

17            And also frankly, the two documents that were
18    produced by third parties after the close of discovery, you
19    will see the production date is August 9th.  I did not get any
20    kind of amended response to the discovery saying, "We're
21    claiming these two -- sorry, you know, we know it's August, but
22    here's two more."  And frankly, you know, we're coming up on
23    almost a year from that.

24            So I don't -- there is no excuse for failure to
25    disclose whatever Mr. Karen is claiming as a potential trade

|       |    |
|-------|----|
| 10:21AM | 1 |

secret.  I cannot triage hundreds of documents to understand
what he is talking about.  I cannot triage 36 new trade secrets
at this point in time.

          We --

          THE COURT:  Let me interrupt you there.  Mr. Karen,
what is being referred to for the record, this is document --
this is the reply, document 159, Exhibit 2, which is
identifying the alleged 39 new supplemented disclosed trade
secrets.  And there is a column of date of production, and as I
read it, all but one, two, three, four documents on the first
page, excluding those four documents, everything else was
allegedly produced in 2022, either in -- it looks like either
October or November or 2022.  The remaining four documents, one
was produced on January 6th allegedly of 2023, two were
produced on August 9th of 2023, and then the fourth on
December 8th of 2023.

          Do you dispute that production?

          MR. KAREN:  Your Honor, I do not dispute that
production.  What I would suggest, if I may -- and this goes
back to my point -- this is no surprise as to WaterStone.  We
articulated very early on exactly what we believed the trade
secrets were.  Then we had to go through these productions.
They were extremely voluminous.  We went through all of them,
and then we found specific examples of those trade secrets, but
these are not new things.

| | | |
|---|---|---|
| 10:22 AM | 1 | For example, let's just take the doc -- there's |
| 10:22 AM | 2 | a document Bates stamped WMC-01024, and it has a number of |
| 10:22 AM | 3 | attachments.  There actually is one attachment referencing a |
| 10:22 AM | 4 | borrower.  Now, that document -- |
| 10:23 AM | 5 | THE COURT:  Give me the description of the document |
| 10:23 AM | 6 | so I can know what we're referencing. |
| 10:23 AM | 7 | MR. KAREN:  Sure.  The description is "Blank email |
| 10:23 AM | 8 | from former manager at Gmail to WaterStone employee containing |
| 10:23 AM | 9 | one attachment.  The subject line references a borrower.  The |
| 10:23 AM | 10 | attachment is not identified as a trade secret." |
| 10:23 AM | 11 | That's -- that was -- so -- |
| 10:23 AM | 12 | THE COURT:  It's the second row on the second page of |
| 10:23 AM | 13 | Exhibit 159-2? |
| 10:23 AM | 14 | MR. KAREN:  No, it is the -- it is on the page 2 of |
| 10:23 AM | 15 | that document, and it's on the fourth line. |
| 10:23 AM | 16 | THE COURT:  All right. |
| 10:23 AM | 17 | MR. KAREN:  So, for instance, Your Honor, that is not |
| 10:23 AM | 18 | a new allegation in the case.  That goes back to what we |
| 10:23 AM | 19 | actually put in our complaint.  We said all along that the |
| 10:23 AM | 20 | things that they did is they took borrower data, they sent that |
| 10:23 AM | 21 | borrower data in those examples of loans and loans in the |
| 10:24 AM | 22 | pipeline and loans in process, and they sent them to and |
| 10:24 AM | 23 | provided them to WaterStone.  That was our allegation in the |
| 10:24 AM | 24 | complaint from the very, very beginning.  So this claimed |
| 10:24 AM | 25 | surprise is not a surprise.  It is something that has been in |

| | | |
|---|---|---|
| 10:24AM | 1 | the case from literally day one.  These are additional |
| 10:24AM | 2 | examples -- |
| 10:24AM | 3 | THE COURT:  Mr. Karen, you know very well, though, |
| 10:24AM | 4 | the rules of discovery are there for a reason, and so if there |
| 10:24AM | 5 | was notice of this document, then the 30(b)(6) witness could |
| 10:24AM | 6 | have been deposed on this very document.  And if it was |
| 10:24AM | 7 | disclosed in October of 2022, I'm still not hearing what's the |
| 10:24AM | 8 | excuse for neglect as to why it was not previously identified |
| 10:24AM | 9 | when ordered by Court to identify the trade secrets at issue by |
| 10:24AM | 10 | Bates stamp? |
| 10:24AM | 11 | MR. KAREN:  Your Honor, we did identify many, many of |
| 10:24AM | 12 | the exhibits.  The fact that some of these slipped through, you |
| 10:24AM | 13 | know, I apologize.  Again, these productions were enormous, so |
| 10:24AM | 14 | it took significant time to go through all of them.  And at the |
| 10:24AM | 15 | time we had the information available, that's what was |
| 10:25AM | 16 | supplemented.  This is information we discovered later.  There |
| 10:25AM | 17 | was just -- there were so many documents produced, we couldn't |
| 10:25AM | 18 | go through all of them, and these were things we discovered |
| 10:25AM | 19 | later. |
| 10:25AM | 20 | As for that point, though, about the discovery |
| 10:25AM | 21 | and the depositions of the 30(b)(6), it's not like Ms. Kreiter |
| 10:25AM | 22 | asked about any of these types of documents that she did know |
| 10:25AM | 23 | about, other examples which she did have and chose -- she just |
| 10:25AM | 24 | didn't ask about them.  It wasn't a scenario where she asked |
| 10:25AM | 25 | about them and the witness said, "I don't know what you're |

10:25AM  1   talking about."  She asked about some very specific categories

10:25AM  2   of the documents that were not any of the documents that we're

10:25AM  3   talking about now.

10:25AM  4           So, you know, this is a -- I would say this is

10:25AM  5   not prejudicial to WaterStone.  They knew these questions were

10:25AM  6   at issue, and while I apologize that not every example of this

10:25AM  7   was produced, it was what we had and what we had access to and

10:25AM  8   were able to uncover from the voluminous documents that were

10:25AM  9   produced.

10:25AM  10          So, I mean, there was thousands and thousands of

10:25AM  11  documents that were produced that we had to search through.

10:26AM  12  And as far as we could get through, that's what we did, and

10:26AM  13  that's what we produced.  I apologize these were done a little

10:26AM  14  bit later than would have been preferred, but WaterStone --

10:26AM  15  this is not new.  This is not surprising to WaterStone.

10:26AM  16  WaterStone knows what this case is about, and it was about the

10:26AM  17  theft of these loans and loans in the pipeline.

10:26AM  18          And, Your Honor, 45 loans closed at WaterStone

10:26AM  19  that started at Mutual.  These are not surprises.  They've

10:26AM  20  known about this from before we even filed this case.

10:26AM  21          THE COURT:  So if there's 45 loans that are at issue,

10:26AM  22  are any of these documents of late production related to those

10:26AM  23  45 loans?

10:26AM  24          MR. KAREN:  Some of them are, Your Honor.  Some of

10:26AM  25  them are.

|          |    |                                                                       |
|----------|----|-----------------------------------------------------------------------|
| 10:26AM  | 1  | THE COURT:  If you were aware of that, why didn't you |
| 10:26AM  | 2  | search for these specific documents to disclose in discovery? |
| 10:26AM  | 3  | MR. KAREN:  We didn't even have the list of 45 loans |
| 10:26AM  | 4  | that closed there until the very, very end of discovery.  We |
| 10:26AM  | 5  | never even found out exactly what the amounts were.  So there |
| 10:26AM  | 6  | were 45 loans that we had -- and then we had to match it up. |
| 10:27AM  | 7  | So, if I may, Your Honor, this has not been easy discovery. |
| 10:27AM  | 8  | There's origination reports that Mutual has that address every |
| 10:27AM  | 9  | single loan and every single application anybody has made when |
| 10:27AM  | 10 | it's just seeking a credit report.  We had to take that.  We |
| 10:27AM  | 11 | had to match that when we finally got the list of loans that |
| 10:27AM  | 12 | were closed over at -- or originated, I should say, over at |
| 10:27AM  | 13 | WaterStone.  I don't even know -- I don't think we even got a |
| 10:27AM  | 14 | closed loan list.  I think we got an originated list.  So we |
| 10:27AM  | 15 | had to match our documents, our materials against their |
| 10:27AM  | 16 | materials to find matches.  We weren't able to do that until |
| 10:27AM  | 17 | the very, very end of discovery.  That's when we got documents |
| 10:27AM  | 18 | from them, which, again, I'm not blaming WaterStone for that. |
| 10:27AM  | 19 | That's when we received the materials because we weren't able |
| 10:27AM  | 20 | to match it from anything else that we received. |
| 10:27AM  | 21 | So this was a course of going through |
| 10:27AM  | 22 | laboriously tens of thousands of documents to then identify the |
| 10:27AM  | 23 | materials that we could only do when we matched thousands and |
| 10:27AM  | 24 | thousands of names to their thousands of names on, you know, |
| 10:27AM  | 25 | extensive spreadsheets.  If you think about every loan within |

| | | |
|---|---|---|
| 10:28AM | 1 | a -- I think it was a -- and I may be mistaken, but I believe |
| 10:28AM | 2 | it was a 45- to 60-day period that we asked for, and we got |
| 10:28AM | 3 | that, and we had to compare that to a similar period of time, |
| 10:28AM | 4 | finding every single loan.  It's needle in haystacks time. |
| 10:28AM | 5 | That's what we were dealing with to do this.  That's not -- I'm |
| 10:28AM | 6 | not complaining that's WaterStone's fault.  That's just the |
| 10:28AM | 7 | nature of the beast, which is what we had to do to identify |
| 10:28AM | 8 | those loans, which we weren't able to do during discovery |
| 10:28AM | 9 | because we didn't have all the information, let alone the time. |
| 10:28AM | 10 | So we're dealing with a case of thousands and |
| 10:28AM | 11 | thousands and thousands of documents where we have to literally |
| 10:28AM | 12 | find individual emails and thousands and thousands of lists of |
| 10:28AM | 13 | documents to find one name with an address and then compare it |
| 10:28AM | 14 | to one name with an address throughout these extensive lists. |
| 10:28AM | 15 | This is not easy stuff to do. |
| 10:28AM | 16 | But the reality is, Your Honor, it's not also a |
| 10:28AM | 17 | surprise to WaterStone because they knew what we were looking |
| 10:29AM | 18 | for, knew what this case was about, and they've known it since |
| 10:29AM | 19 | day one in the complaint.  There's no prejudice to them here. |
| 10:29AM | 20 | THE COURT:  All right.  Ms. Kreiter, do you have any |
| 10:29AM | 21 | other arguments you want to make as to your motion? |
| 10:29AM | 22 | MS. KREITER:  I do.  I mean, first, I'll just correct |
| 10:29AM | 23 | a number of things that Mr. Karen said. |
| 10:29AM | 24 | It's absolutely false that he didn't have this |
| 10:29AM | 25 | information.  WaterStone in response to the first set of |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 10:29AM  | 1  | discovery in the fall of '22 produced a list of the loans that |
| 10:29AM  | 2  | has closed.  WaterStone unilaterally, without any request from |
| 10:29AM  | 3  | Mutual, supplemented the list of closed loans either in June or |
| 10:29AM  | 4  | July of 2023.  All of the things that Mr. Karen talked about |
| 10:29AM  | 5  | could have been done well before the close of discovery. |
| 10:29AM  | 6  | It is absolutely not true that 45 loans closed |
| 10:29AM  | 7  | at WaterStone that were originated at Mutual.  There's just |
| 10:29AM  | 8  | nothing in the record to that effect. |
| 10:29AM  | 9  | I will also say that this discussion is |
| 10:29AM  | 10 | illustrative of the problem.  I hired an e-forensic expert to |
| 10:29AM  | 11 | analyze what I thought were the purported trade secrets.  It |
| 10:30AM  | 12 | cost a lot of money.  I can't have a moving target.  We should |
| 10:30AM  | 13 | be talking about at best the six documents that were identified |
| 10:30AM  | 14 | as trade secrets in discovery and nothing else.  If we look at |
| 10:30AM  | 15 | those documents, we're talking about P&L statements and one |
| 10:30AM  | 16 | email. |
| 10:30AM  | 17 | Summary judgment is absolutely appropriate for |
| 10:30AM  | 18 | the reason that there is a moving target as to what the trade |
| 10:30AM  | 19 | secrets are. |
| 10:30AM  | 20 | With respect to the documents that have been |
| 10:30AM  | 21 | properly disclosed as trade secrets, as Your Honor noted, there |
| 10:30AM  | 22 | are elements to that claim.  There are no affidavits presented |
| 10:30AM  | 23 | from Mr. Karen explaining why those elements are not -- the |
| 10:30AM  | 24 | time to do that is summary judgment, not on the stand at trial. |
| 10:30AM  | 25 | I think that when I think about that grounds for |

| | | |
|---|---|---|
| 10:30AM | 1 | dismissing the trade secret claims, I actually think that the |
| 10:30AM | 2 | WaterStone special verdict -- which is essentially the Eleventh |
| 10:31AM | 3 | Circuit special verdict for trade secrets claims -- is really |
| 10:31AM | 4 | helpful because it lays out here are all of the things that |
| 10:31AM | 5 | Mr. Karen is going to have to show at trial.  Is this document |
| 10:31AM | 6 | property of Mutual?  Is it generally known?  Property means all |
| 10:31AM | 7 | of it.  We don't have any evidence as to any of those |
| 10:31AM | 8 | documents, as to any of those claims, and Mr. Karen is |
| 10:31AM | 9 | proposing that we present something to the jury -- I'm not sure |
| 10:31AM | 10 | what it is -- and he has come forward with nothing to satisfy |
| 10:31AM | 11 | Mutual's burden of proof on these claims.  It's a burden of |
| 10:31AM | 12 | proof issue that has not been met or attempted. |
| 10:31AM | 13 | Even assuming those two dispositive things |
| 10:31AM | 14 | aside -- the lack of disclosure, the lack of any effort to |
| 10:31AM | 15 | satisfy the burden of proof -- let's talk about damages.  I |
| 10:31AM | 16 | don't have anything that indicates -- for example, the one |
| 10:31AM | 17 | email that is something separate from the P&Ls, is there a |
| 10:32AM | 18 | royalty associated with that document?  Is there actual damages |
| 10:32AM | 19 | associated with that document?  I don't fathom how that could |
| 10:32AM | 20 | possibly be, but Mr. Karen hasn't articulated that if that's |
| 10:32AM | 21 | going to be their position. |
| 10:32AM | 22 | Even with respect to the P&L statements, which |
| 10:32AM | 23 | was a document that -- I think you saw, as I filed my motion, |
| 10:32AM | 24 | you know, I did understand that Mutual was claiming the P&Ls |
| 10:32AM | 25 | are a trade secret.  I thought that was worthy of debate.  I |

10:32AM  1   don't anymore because there's been no effort to establish the
10:32AM  2   elements even as to that P&L.  And if you look up the
10:32AM  3   deposition testimony of the Mutual corporate representative
10:32AM  4   that we put forth in support of our motion, the corporate rep
10:32AM  5   testifies, "I don't have any damages that I'm able to tell you
10:32AM  6   about today flowing from that P&L."  So there are no royalties.
10:32AM  7   We don't have to guess at that.  The corporate rep testified to
10:32AM  8   that effect.  And he does say, "You know, that doesn't mean
10:33AM  9   it's out of bounds.  Maybe we'll fix it later."  I can attest
10:33AM 10   you can't fix later.  The corporate rep should know, but even
10:33AM 11   if you could, it wasn't fixed later.  There is no supplemental
10:33AM 12   discovery response, and I did ask about, "What are the damages
10:33AM 13   that you're seeking?  Itemize them and provide a formula."
10:33AM 14   There was never any supplementation explaining how a P&L is
10:33AM 15   worth whatever amount Mr. Karen is going to claim.
10:33AM 16            So the Court should deny the motion based on
10:33AM 17   failure to adhere to discovery, focus on the six documents that
10:33AM 18   were disclosed in discovery, five of which related to P&Ls.
10:33AM 19   Deny the motion because there's no attempt to meet the burden
10:33AM 20   of proof --
10:33AM 21            THE COURT:  I'm assuming you're asking me to grant
10:33AM 22   the motion.
10:33AM 23            MS. KREITER:  Sorry.  Thank you, Your Honor.  Asking
10:33AM 24   the Court to grant the motion for any of those three reasons
10:33AM 25   and all of them.

| | | |
|---|---|---|
| 10:33AM | 1 | MR. KAREN:  If I could speak to -- |
| 10:33AM | 2 | THE COURT:  All right.  Mr. Karen, if you can respond |
| 10:33AM | 3 | about the damages issue. |
| 10:34AM | 4 | MR. KAREN:  Yes.  Thank you.  And I do want to |
| 10:34AM | 5 | correct something I did slightly misspeak about.  When I said |
| 10:34AM | 6 | closed loans, it was originated loans.  I thought I corrected |
| 10:34AM | 7 | that when I was talking, but in case I didn't, I want to |
| 10:34AM | 8 | clarify because that's not correct.  Closed loans, she's |
| 10:34AM | 9 | absolutely right.  It was loans originated.  There were 45 |
| 10:34AM | 10 | loans originated.  I just wanted to make sure I clarify that |
| 10:34AM | 11 | for the record because I think I did misspeak on that point. |
| 10:34AM | 12 | Having said that, to address the question of |
| 10:34AM | 13 | damages, the issue with damages, our claim is not for |
| 10:34AM | 14 | royalties.  I want to be very clear.  Our claim is that there |
| 10:34AM | 15 | were a number of illegal improper acts taken in concert to |
| 10:34AM | 16 | result in a seamless transition of this entire operation, the |
| 10:34AM | 17 | liftout.  Part of that liftout was enabled by this theft of our |
| 10:34AM | 18 | trade secrets.  So, for example, when Mr. Utsch or Utsch -- |
| 10:34AM | 19 | which is, again, a document that was identified after the close |
| 10:34AM | 20 | of discovery in the third-party subpoenas.  Mr. Utsch provides |
| 10:34AM | 21 | a mapping of all of our closed loans.  He goes on the password, |
| 10:35AM | 22 | and at WaterStone -- you have this exhibit, Your Honor.  They |
| 10:35AM | 23 | provide that information to WaterStone that shows all of our |
| 10:35AM | 24 | closed loans of our Encompass loan origination system, and |
| 10:35AM | 25 | WaterStone provided them a mapping to take it.  So they take |

| | | |
|---|---|---|
| 10:35AM | 1 | that information. |
| 10:35AM | 2 | Now, where we suggest the damages occurred -- as |
| 10:35AM | 3 | Your Honor well knows, damages in a trademark case involve not |
| 10:35AM | 4 | just royalties, they can involve actual damages.  And we |
| 10:35AM | 5 | believe part of the actual damages in this case -- and we can |
| 10:35AM | 6 | make this argument to the jury, Your Honor, and if the jury |
| 10:35AM | 7 | agrees, then they agree, and if not, they don't.  But the |
| 10:35AM | 8 | reality, what we think, is that the point of this liftout was |
| 10:35AM | 9 | to create a seamless transition.  We pick the whole operation |
| 10:35AM | 10 | up, trade secrets and all, and you move it over to WaterStone. |
| 10:35AM | 11 | So on April 16th, it's at -- I'm sorry, April 26th, it's at |
| 10:35AM | 12 | Mutual, and April 27th, it's at WaterStone, trade secrets and |
| 10:35AM | 13 | all. |
| 10:35AM | 14 | Now, for commissioned sales people, people who |
| 10:35AM | 15 | are relying on that information to go and get more clients -- |
| 10:36AM | 16 | and we see examples of that.  It's been provided to Your Honor |
| 10:36AM | 17 | in the deposition transcripts, so forth, where they go through |
| 10:36AM | 18 | extensive efforts to utilize this information, get new |
| 10:36AM | 19 | customers to bring customers in, to actually create a pipeline |
| 10:36AM | 20 | of business before they start there.  They actually sent over a |
| 10:36AM | 21 | transition team ahead of time to do that, and they were doing |
| 10:36AM | 22 | that all to take these documents so when they landed, they |
| 10:36AM | 23 | landed hot and they had money in their coffers to fund the |
| 10:36AM | 24 | transition.  There's actually emails -- and we provided them to |
| 10:36AM | 25 | Your Honor in response to the summary judgment -- where there's |

| | | |
|---|---|---|
| 10:36AM | 1 | a discussion about sending over a transition team two weeks |
| 10:36AM | 2 | ahead of time and sending over loans so that they get a |
| 10:36AM | 3 | pipeline started and so that they could fund the transition. |
| 10:36AM | 4 | They usually -- use the words "fund the transition."  That was |
| 10:36AM | 5 | all part of this effort to seamlessly lift out the branch, |
| 10:36AM | 6 | which is a substantial factor in the theft of the branch |
| 10:36AM | 7 | because our assertion is that had they not, had they not been |
| 10:37AM | 8 | able to utilize these trade secrets, had they not had access to |
| 10:37AM | 9 | them, these people would not have moved over so quickly. |
| 10:37AM | 10 | And that is our theory of the case which I |
| 10:37AM | 11 | believe would support actual damages under trademark, because |
| 10:37AM | 12 | we're saying that had they not stolen these trade secrets, they |
| 10:37AM | 13 | wouldn't have been able to fund the transition, which I believe |
| 10:37AM | 14 | they said even in the exhibit was something that was necessary, |
| 10:37AM | 15 | that they wouldn't have done without -- that they would not |
| 10:37AM | 16 | have -- they -- moved over unless they could actually fund the |
| 10:37AM | 17 | transition.  And that combined with the other actions is what |
| 10:37AM | 18 | allowed them to lift out the branch.  This is a substantial |
| 10:37AM | 19 | factor in it, because but for the theft of trade secrets, they |
| 10:37AM | 20 | wouldn't have moved.  They wouldn't have left all of that |
| 10:37AM | 21 | information they had at Mutual.  It was only because they took |
| 10:37AM | 22 | it, and they could take it, and because WaterStone enabled it |
| 10:37AM | 23 | that allowed them to actually steal this branch.  Otherwise |
| 10:37AM | 24 | they wouldn't have. |
| 10:37AM | 25 | We believe that's a viable argument.  It's |

| | |
|---|---|
| 10:38AM | 1 |

actual damages which are allowed under trade secrets law, and

the jury can make that determination.

        THE COURT:  And the actual damages is going to be the

lost profits that you're looking to assert?

        MR. KAREN:  Yes, Your Honor, exactly.  We are not --

I want to be very clear, we are not seeking damages on the 45

loans.  We are not seeking royalties.  We are saying this

was -- the only damage we're seeking in this case is the lost

profits, and we believe these were a substantial factor

resulting in the lost profits, because but for the theft of

trade secrets, they would not have been successful when they

left the branch.

        THE COURT:  All right.  Well, we might as well get to

the heart of that because that seems to be the true fundamental

issue that's at stake for the parties, and despite the

arguments to the contrary that are in the responses to the

various motions where everyone seems to begin that I should not

revisit Judge Barber's order, but yet each party then moves in

a way asking me to revisit Judge Barber's order, and so that's

what we're going to do.  For the record, Judge Barber entered

an order prior to the consent at document 146 in relation to

damages.  There is a Motion for Reconsideration at document

number 164 with a response at document 189.  And for the

record, this is plaintiff's Motion for Reconsideration.  At

document number 166 is WaterStone's Motion in Limine related to

| | | |
|---|---|---|
| 10:39AM | 1 | damages, and there's a response to that at document number 176. |
| 10:39AM | 2 | At docket number 170 is WaterStone's Motion in Limine related |
| 10:39AM | 3 | to whether -- is it Rosevear?  Am I saying that right or |
| 10:39AM | 4 | Rosevear? |
| 10:39AM | 5 | MR. KAREN:  Rosevear, Your Honor. |
| 10:39AM | 6 | THE COURT:  Rosevear.  That the expert witness |
| 10:39AM | 7 | Rosevear not be allowed to testify in the case in chief of |
| 10:39AM | 8 | plaintiff and only as a rebuttal witness. |
| 10:39AM | 9 | These are all related, so we're going to take |
| 10:40AM | 10 | them together and allow you to make any arguments you want, but |
| 10:40AM | 11 | I have some questions to start with. |
| 10:40AM | 12 | And it starts with fundamentally, I still think |
| 10:40AM | 13 | although -- I think Judge Barber's order, to be blunt, is very |
| 10:40AM | 14 | clear.  There has to be something of evidence that comes in |
| 10:40AM | 15 | play in relation to the time period, and I am still curious as |
| 10:40AM | 16 | to the 30 months, as to how that is being identified, why it's |
| 10:40AM | 17 | being identified, and what is going to be the evidentiary |
| 10:40AM | 18 | support for it? |
| 10:40AM | 19 | MR. KAREN:  Thank you, Your Honor.  Before we start, |
| 10:40AM | 20 | I also, if I may, want to apologize to Your Honor and to the |
| 10:40AM | 21 | other individuals here.  I know it was my scheduling |
| 10:40AM | 22 | difficulties these last two days because of a family event that |
| 10:40AM | 23 | created us having to do this by Zoom.  I apologize to everyone |
| 10:40AM | 24 | if it was not -- it is not ideal.  I recognize that.  It was |
| 10:40AM | 25 | just something I could not control, so I do want to apologize, |

| | |
|---|---|
| 10:41AM | 1 |

just take this opportunity, and I am sorry for that.

THE COURT:  There's no apology necessary, and I certainly would not want you to miss that, and I don't know if you knew the schedule in advance or not, but we could have scheduled this on another day when I had my calendar open more, but I had no choice but to leave you on this time period and do it by Zoom.

MR. KAREN:  Yeah, there were some changes in that, Your Honor.  We don't have to necessarily go through all of it, but the bottom line is because we had always done it as Zoom and I always thought it was going to be Zoom, it wasn't a problem, and then when it became in person, it was a problem.  So it was that sort of change that created the issue.  Again, either way, it is my problem, and I apologize to everyone for that, so please accept that apology.

THE COURT:  Yes.  And, again, no need to apologize. I'm glad you were able to make it.

MR. KAREN:  Thank you, Your Honor.  Going to the issue of the 30 months, your question, the evidentiary -- just so you understand how we got to the 30 months, Judge Barber was very emphatic with us in a number of hearings during the course of this case that while we took the position that we believe Florida law allows us, as long as we can establish the causation, to -- then the jury can, as long as they have a basis, come up with a decision -- a lost profit time period,

| | |
|---|---|
| 10:42AM | 1 |
| 10:42AM | 2 |

and that was always our position, that Florida law didn't allow
this to be taken away from the jury before they had the
opportunity to present the evidence, and we maintained that
throughout this case.  But at Judge Barber's -- I'll use the
word "urgings," you know, he was very clear that he was
uncomfortable, and so we wanted to make this a little bit
easier, and also frankly, Your Honor, facilitate potential
settlement discussions.  And so at his urging that we decided
to really, you know, limit this case on our own unilaterally,
if you will, to 30 months, because we believe that was really
the period of time we intended to argue.  So we made that
decision, and that's why we used 30 months.

        Now, the reason we used 30 months, Your Honor,
is because there is evidence if you look at the MLS data -- and
just so we're clear -- and I don't want to tell Your Honor
anything you already know, but not everybody knows the details
about mortgage lending, so I'll go into it --

        THE COURT:  Let me explain as I understand it, and we
may be able to cut through this.  What I'm appreciating is
you're going to introduce evidence that an office that was in
existence at least two years would have been in existence
somewheres up of six years; is that correct?  And you're going
to use that evidence to demonstrate that this office -- these
offices would have existed for at least another period of 30
months?

| | |
|---|---|
| 10:43AM | 1 |
| 10:43AM | 2 |
| 10:43AM | 3 |
| 10:43AM | 4 |
| 10:43AM | 5 |
| 10:43AM | 6 |
| 10:43AM | 7 |
| 10:43AM | 8 |
| 10:44AM | 9 |
| 10:44AM | 10 |

        MR. KAREN:  Essentially what we are going to do is
show the average of certain -- of how long a branch would have
stayed and has stayed and does stay with us over a certain time
period, obviously excluding branches that just came on because
they haven't had the time to, you know -- rightly, if you will.
And so we were going to take that, and that provides one piece
of evidence, one, just one -- there's more -- piece of evidence
to say, "Well, here's the evidence."  Something Judge Barber
mentioned, the average is just that.  Some are longer.  Some
are shorter.  You're not beholding to the average.

        And one of the things we think would also -- in
addition to the 30 months that is -- essentially 34 months is
the average.  We cut it to 30, but in addition to that, we have
the business arrangement that happened, and that happened
within the year period of the solicitation restrictions, and
within that year of the date that they left, that the branches
were lifted out and that their one-year solicitation period
would have ended, Mutual engaged in a transaction with Keller
Williams and acquired Keller Williams Real Estate, Florida, and
because of that now it provides a source of -- an ongoing
source of loans for loan officers.

        Loan officers' principal area, especially in
purchase transactions, is for realtors.  It makes sense.
That's where they were to find their clients.  And so by
acquiring Keller Williams, we created something of extreme

| | | |
|---|---|---|
| 10:45AM | 1 | value, and that has allowed us to attract new operations that |
| 10:45AM | 2 | we're starting to bring in there slowly.  It's taken some time. |
| 10:45AM | 3 | But the point is had we provided and said -- to this group of |
| 10:45AM | 4 | loan officers who make their money on commission saying, "Here. |
| 10:45AM | 5 | Here are your best possible referral sources, and now we're |
| 10:45AM | 6 | combining them in a company for you so they're going to be -- |
| 10:45AM | 7 | we're going to have unique access that nobody else has," we |
| 10:45AM | 8 | believe that they would have stayed, and we think the jury can |
| 10:45AM | 9 | make that conclusion.  Not just the average.  They could have |
| 10:45AM | 10 | stayed longer.  Again, I'm not saying we're seeking more than |
| 10:45AM | 11 | 30 months.  We're not.  We're sticking to that, but the point |
| 10:45AM | 12 | is that not only do we have an average, which is the average |
| 10:45AM | 13 | for the company nationwide -- |
| 10:45AM | 14 | THE COURT:  I'm curious, though, this is in relation |
| 10:45AM | 15 | to the other motions that have been filed.  If the Keller |
| 10:45AM | 16 | Williams transaction is relevant to assert your argument that |
| 10:45AM | 17 | you believe they would have stayed, then why would it not be |
| 10:45AM | 18 | relevant to allow testimony regarding job satisfaction then?  I |
| 10:45AM | 19 | mean, these seem to be all speculative as to whether people |
| 10:46AM | 20 | would stay or not. |
| 10:46AM | 21 | MR. KAREN:  Well, I think it's a different level of |
| 10:46AM | 22 | speculation, if you will.  And I don't think -- let me rephrase |
| 10:46AM | 23 | that, Your Honor.  I don't think one is speculative, |
| 10:46AM | 24 | respectfully, okay?  In one case, you're saying without any |
| 10:46AM | 25 | contemporaneous evidence -- and I think that's the critical |

|            |    |
|------------|----|
| 10:46AM | 1 | thing here.  If there was contemporaneous evidence of a lack of |
| 10:46AM | 2 | job satisfaction, people making complaints and saying, "Hey, I |
| 10:46AM | 3 | don't like my supervisor," or, "This is really bad," or, "This |
| 10:46AM | 4 | is this problem," if they had produced that, then I would not |
| 10:46AM | 5 | necessarily be making this motion. |
| 10:46AM | 6 | I just actually tried a very similar case, Your |
| 10:46AM | 7 | Honor, when I was on the other side of the case, but in that |
| 10:46AM | 8 | case, we had significant contemporaneous evidence, tons of |
| 10:46AM | 9 | emails showing complaints by people before anything happened. |
| 10:46AM | 10 | Here there's none of that.  And so for somebody to come and |
| 10:46AM | 11 | say, "Well, I didn't like that, and I would have done this |
| 10:46AM | 12 | because I was unhappy about that," you could say whatever you |
| 10:46AM | 13 | want.  There's no way to cross them.  There's no way to address |
| 10:47AM | 14 | that, and I think it's patently unfair because really anybody |
| 10:47AM | 15 | could come and say, "This was a terrible company.  They were |
| 10:47AM | 16 | mean, and they beat us with sticks every day."  You could say |
| 10:47AM | 17 | whatever you want.  That's sheer speculation when there's |
| 10:47AM | 18 | absolutely no contemporaneous evidence of that at the time, no |
| 10:47AM | 19 | complaints, nothing. |
| 10:47AM | 20 | And so I think to allow them to go and testify, |
| 10:47AM | 21 | produce folks an open door to provide any narrative you want |
| 10:47AM | 22 | after the fact, I think that would be cross because there's no |
| 10:47AM | 23 | proof of it and just says what I would have done had these |
| 10:47AM | 24 | things happened. |
| 10:47AM | 25 | Now, take that and juxtapose that about what I'm |

10:47AM 1   saying.  What I'm saying, and I believe there is going to be
10:47AM 2   testimony -- I know there is going to be testimony from people
10:47AM 3   at Mutual explaining why realtors are important business
10:47AM 4   referral partners for loan officers and the symbiotic
10:47AM 5   relationship between them.  That's not speculation.  That's
10:47AM 6   discussing for people who are in the industry and do this every
10:47AM 7   day and have done this every day for 30 years where loan
10:48AM 8   officers get their business and the importance of those
10:48AM 9   relationships to loan officers.  That's what they're going to
10:48AM 10  testify to.

10:48AM 11          Now, can a jury take that information and then
10:48AM 12  conclude based on the average and say, "Yeah, we think they --
10:48AM 13  this is how long they would have stayed"?  We think that's
10:48AM 14  permissible when causation is established, which we believe be
10:48AM 15  it will be and Judge Barber believed it would be.

10:48AM 16          And so I don't think respectfully that's
10:48AM 17  speculation.  Those are facts that can be testified to that a
10:48AM 18  jury can utilize to render a conclusion.  That's one set.

10:48AM 19          And when you juxtapose that against people who
10:48AM 20  come up with no contemporaneous evidence to say, "Oh, yeah.
10:48AM 21  Well, I would have done this," or, "I would have done that, and
10:48AM 22  how much I hated them being there," I think we really get into
10:48AM 23  a scenario where a jury could be prejudiced by any number of
10:48AM 24  narratives that really amount to character evidence that's
10:48AM 25  inadmissible.

| | |
|---|---|
| 10:48AM | 1 |
| 10:49AM | 2 |
| 10:49AM | 3 |
| 10:49AM | 4 |

THE COURT:  Let me ask you this question, though.  If there was no alleged misappropriation of trade secrets and we were just dealing with the non-solicitation, would you still be in a position to be arguing 30 months of damages?

MR. KAREN:  Yes.

THE COURT:  Why?

MR. KAREN:  Because the whole point of this case is that they engaged in a number of different activities and actions that --

THE COURT:  What I'm asking you is if the activity and action just simply was using former employees to solicit the remainder of the offices to do what you call the liftout, and that is -- that was only what's at issue, not the misappropriation of trade secrets.  And the reason why I ask that question is it seems to me if the term of the non-solicitation is defined by contract, why would damages go beyond the term that prohibits the non-solicitation?

MR. KAREN:  Because, Your Honor, it wasn't just a violation of the -- this was a breach of fiduciary duty, right? And it was not just a non-solicitation period.  In other words, they -- while employed by us, utilizing their supervisory responsibilities, they were entrusted by my client to supervise these people, and as a result of that, they utilized that supervisory trust to then solicit the branch as an entire whole.  Now, it's one thing when you -- and, in fact, Your

10:50AM 1  Honor, there's testimony -- and it's been provided in the
10:50AM 2  deposition exhibits given to you -- that WaterStone did this
10:50AM 3  intentionally and the individuals did this intentionally.  And
10:50AM 4  the reason they did this intentionally is because Mr. Hutto and
10:50AM 5  Mr. Smith and Mr. Wolf got paid based on the people and the
10:51AM 6  production of the people who worked underneath them.  And if
10:51AM 7  those people had not been unwilling -- or had been unwilling to
10:51AM 8  leave, they would not have left, and if they -- and WaterStone
10:51AM 9  did not want to take the chance when it developed an economic
10:51AM 10 model, and nor did these individuals want to take a chance when
10:51AM 11 they developed an economic model that they would move over and
10:51AM 12 then start to pick people off.  That is one way they could have
10:51AM 13 done it, and if that is what they had done, I don't even know
10:51AM 14 if we would have been here.  But that's not what they did.
10:51AM 15 They did it the wrong way.  They utilized an existing branch
10:51AM 16 manager and branch managers to in a whole solicit their entire
10:51AM 17 staff in one fell swoop, and that allowed an economic model to
10:51AM 18 be made that but for these wrongful acts would not necessarily
10:51AM 19 have occurred.  So if --
10:51AM 20         THE COURT:  But my question simply stands then.  If
10:51AM 21 they were prohibited from the solicitation for a period of 12
10:51AM 22 months or 24 months -- as an example of 24 months, then in the
10:52AM 23 25th month, they could have done everything that you are
10:52AM 24 asserting as illegal activity.  So they could have did the
10:52AM 25 liftout in its entirety on the 25th month, and there would be

| | | |
|---|---|---|
| 10:52AM | 1 | no damages that could be sought in the 25th month.  So if we're |
| 10:52AM | 2 | focused solely just on non-solicitation, that's my question. |
| 10:52AM | 3 | Excluding the trade secrets, how is it you could assert damages |
| 10:52AM | 4 | beyond the term of the non-solicitation periods? |
| 10:52AM | 5 | MR. KAREN:  Your Honor, if I may propose a rhetorical |
| 10:52AM | 6 | to answer your question, and it's obviously rhetorical.  If |
| 10:52AM | 7 | somebody stole a necklace, and they came back and said, "Well, |
| 10:52AM | 8 | I could have paid for it," does that excuse the theft?  Of |
| 10:52AM | 9 | course not.  Nobody would agree with that.  So the fact that |
| 10:52AM | 10 | they could have done this lawfully, that's not relevant, with |
| 10:52AM | 11 | all due respect. |
| 10:52AM | 12 | THE COURT:  No, no, no.  We're talking about a |
| 10:52AM | 13 | causation for damages, and if the damages are limited within a |
| 10:52AM | 14 | period -- not liability.  So yes, the theft is a theft, and the |
| 10:53AM | 15 | solicitation a solicitation.  But the solicitation could not |
| 10:53AM | 16 | occur during a certain period of time, and if damages resulted |
| 10:53AM | 17 | from that solicitation when it should not have occurred, it |
| 10:53AM | 18 | seems to me that damages can't go past when the solicitation |
| 10:53AM | 19 | would have been lawful.  And that's what I'm asking you, is how |
| 10:53AM | 20 | would you argue -- for example, if the non-solicitation period |
| 10:53AM | 21 | was a limit of 24 months, how do you argue you were damaged for |
| 10:53AM | 22 | an additional six months beyond that prohibition of 24 months? |
| 10:53AM | 23 | MR. KAREN:  Because if they had not lifted out the |
| 10:53AM | 24 | branch, Your Honor, in the beginning by their unlawful |
| 10:53AM | 25 | activity, they wouldn't have left in the first place.  In other |

|   |   |
|---|---|
| 10:53AM | 1 |
| 10:53AM | 2 |
| 10:53AM | 3 |
| 10:53AM | 4 |
| 10:53AM | 5 |
| 10:53AM | 6 |
| 10:54AM | 7 |
| 10:54AM | 8 |
| 10:54AM | 9 |
| 10:54AM | 10 |
| 10:54AM | 11 |
| 10:54AM | 12 |
| 10:54AM | 13 |
| 10:54AM | 14 |
| 10:54AM | 15 |
| 10:54AM | 16 |
| 10:54AM | 17 |
| 10:54AM | 18 |
| 10:54AM | 19 |
| 10:54AM | 20 |
| 10:54AM | 21 |
| 10:54AM | 22 |
| 10:54AM | 23 |
| 10:54AM | 24 |
| 10:54AM | 25 |

words, if they could not have taken their branch as a whole --
and there's testimony in the record to support this.
WaterStone's Kevin Allen specifically said -- I asked him, "Why
didn't you just hire them," and do exactly what Your Honor
suggested?  And he said, "Because they would have looked at me
sideways.  They would have looked at me sideways because that's
just -- no one -- they wouldn't have left," effectively is what
his testimony was.  And so that's my point.  If they hadn't
done it unlawfully, the necklace never would have been stolen.
So then to say, "Okay.  Well, what would have happened if you
would have done that correctly, and then we're only going to
limit damages to that point," ignores the fact that the damage
never would have occurred in the first place if you hadn't done
it the wrong way.  And so then you can't turn around and say,
"Well, I'm limiting damages by the right way if you had done it
the right way," what might have happened if they had done it
the right way.  That's equivalent, Your Honor, I think, to --
because I don't believe it's just an issue of causation.  I
believe it's an issue of excusing the unlawful activity by
simply saying, "Well, okay.  So I'm going to give you what --
the limit of your punishment is what could have happened if you
would have done it the right way."  That's not how --
respectfully how it should work.

        They never would have gotten this branch in the
first place if they hadn't engaged in those unlawful

10:55AM  1    activities.  So to limit damages by how they could have given

10:55AM  2    it first assumes they would have been able to do it, which is I

10:55AM  3    think an assumption --

10:55AM  4              THE COURT:  Mr. Karen, what I'm suggesting is they

10:55AM  5    could have done it all on the 25th month and gotten the branch

10:55AM  6    there, and there would be no damages.  Done everything that

10:55AM  7    you're asserting as the liability for WaterStone, on the 25th

10:55AM  8    month they could have done the exact same conduct, and there

10:55AM  9    would have been no violation.

10:55AM  10             MR. KAREN:  That may be true, but number 1, I think,

10:55AM  11   Your Honor, that would -- that would essentially reward their

10:55AM  12   bad behavior.  That's number 1, because that also assumes they

10:55AM  13   would have been able to.  What would have happened 24 months

10:55AM  14   later, we don't know.  Keller Williams could have come in

10:55AM  15   there, and everybody could have been happy.  We could have had

10:55AM  16   the opportunity to raise salaries.  We could have had the

10:55AM  17   opportunity to offer bonuses.  They left in one fell swoop

10:55AM  18   literally in the dead of the night.  We had no chance to

10:56AM  19   compete, and that's the real issue here.

10:56AM  20             If, Your Honor, they had waited two years and we

10:56AM  21   had advanced notice of that, we could have done any number of

10:56AM  22   things knowing it was coming to prepare and to counter it.

10:56AM  23   Yes, could they have solicited?  Absolutely.  No question at

10:56AM  24   the end of that period.  Would they have been successful?  No

10:56AM  25   one will know because they didn't do it the right way.  They

| | |
|---|---|
| 10:56AM | 1 |
| 10:56AM | 2 |
| 10:56AM | 3 |
| 10:56AM | 4 |
| 10:56AM | 5 |
| 10:56AM | 6 |
| 10:56AM | 7 |
| 10:56AM | 8 |
| 10:56AM | 9 |
| 10:56AM | 10 |
| 10:56AM | 11 |
| 10:56AM | 12 |
| 10:57AM | 13 |
| 10:57AM | 14 |
| 10:57AM | 15 |
| 10:57AM | 16 |
| 10:57AM | 17 |
| 10:57AM | 18 |
| 10:57AM | 19 |
| 10:57AM | 20 |
| 10:57AM | 21 |
| 10:57AM | 22 |
| 10:57AM | 23 |
| 10:57AM | 24 |
| 10:57AM | 25 |

shouldn't get the benefit of that assumption, that they would have been successful, because it ignores the fact that Mutual would have had two years to prepare, and that's why you have these non-solicitation provisions, to give a prior employer a period of time to prepare knowing what's coming.  That's the whole benefit.  And to -- and that benefit was taken from us.

So they shouldn't get the benefit of assuming what would have happened in two years when we didn't have the benefit to compete.

THE COURT:  All right.  Well, I'll come back to that and tell you what I'm thinking here at the end, but I want to get to your motion at document number 164.  This is problematic because there's a separate motion that I'm not even sure how you could be prepared for to argue, and I'm a little disappointed, Ms. Kreiter, that such a substantive motion, one, was filed as a Motion in Limine on the eve of our hearing today because it seems to me that would have been more appropriate related to -- related to the Hutto and Smith argument on a summary judgment rather than a Motion in Limine, and that is a substantive issue, one, that I'm not going to require Mr. Karen to respond to today because he's going to have to be able to respond to it in a written pleading, and I need consider it, but nonetheless, it plays in some part to what I'm about to ask now, which is you are asking me to reconsider, Mr. Karen, Judge Barber's order to allow damages to flow from the managers

| | |
|---|---|
| 10:57AM | 1 |
| 10:58AM | 2 |
| 10:58AM | 3 |
| 10:58AM | 4 |
| 10:58AM | 5 |
| 10:58AM | 6 |
| 10:58AM | 7 |
| 10:58AM | 8 |
| 10:58AM | 9 |
| 10:58AM | 10 |

1  themselves, and I think Judge Barber's order is very clear.

2  It's a matter of what the managers themselves could have done.

3  So simply stated, if the facts demonstrate that the

4  solicitation was done by the managers of other employees, then

5  they would be in violation of their agreements, and so it would

6  be damages related to the solicitation of other employees, not

7  to the managers themselves.  But if it was, for example, a

8  manager who solicited another manager, and as I understand it,

9  the argument to be made is that -- is it Hutto?  Am I saying

10  that correctly?

11          MS. KREITER:  I believe so, Your Honor.

12          THE COURT:  That Mr. Hutto solicited Mr. Wolf and

13  Mr. Smith, then it would be damages that could be considered as

14  to the departure of Mr. Smith and Mr. Wolf.  Now, I realize

15  there's now going to be an argument as to whether Mr. Hutto was

16  prevented from doing that now under California law, but

17  nonetheless, that seems to me to be appropriate.

18          So, Ms. Kreiter, explain to me why I should not

19  allow, independent of your substantive motion, that if the

20  evidence demonstrates that someone violated their

21  non-solicitation, that damages could be represented by the

22  departure of those who were solicited?

23          MS. KREITER:  I guess I will just say, Your Honor,

24  there's a challenge to revisiting all of the factual evidence.

25  I do not believe that the evidence Mr. Karen is saying exists,

| | | |
|---|---|---|
| 10:59AM | 1 | really does exist.  The argument as to Mr. Hutto and did he |
| 10:59AM | 2 | solicit the others, that was never raised before.  So, I mean, |
| 10:59AM | 3 | frankly, what was presented to Judge Barber was an admission |
| 10:59AM | 4 | from the opposition that you know, "No, we absolutely should |
| 10:59AM | 5 | not count the damages associated with the managers."  For me to |
| 10:59AM | 6 | really address that argument, I mean, I would need to go back, |
| 11:00AM | 7 | vet the facts, present new almost summary judgment argument, |
| 11:00AM | 8 | you know, on that issue. |
| 11:00AM | 9 | The undisputed evidence as I know it is that all |
| 11:00AM | 10 | four of the managers were searching for jobs.  They were |
| 11:00AM | 11 | entertaining other employers.  WaterStone was not the first; |
| 11:00AM | 12 | that they had applied at a number of other firms.  There's |
| 11:00AM | 13 | deposition testimony to that effect; that the managers |
| 11:00AM | 14 | absolutely were leaving.  They just happened to pick |
| 11:00AM | 15 | WaterStone.  So I don't -- I think in the evidence that was |
| 11:00AM | 16 | presented to Judge Barber, it just factually doesn't support |
| 11:00AM | 17 | what Mr. Karen is saying.  And I think that Judge Barber |
| 11:00AM | 18 | considered the factual evidence that was put before him, and I |
| 11:00AM | 19 | guess that's what I will say about that. |
| 11:00AM | 20 | It's something that would cause me to want to |
| 11:00AM | 21 | redo the briefing on that issue in a manner that I think would |
| 11:00AM | 22 | redo some of the factual evidence presented to Judge Barber. |
| 11:01AM | 23 | Does that answer the question? |
| 11:01AM | 24 | THE COURT:  Your argument is not that it would be |
| 11:01AM | 25 | inappropriate to allow that if the evidence demonstrated, but |

| | |
|---|---|
| 11:01AM | 1 |

just simply you believe the facts will not demonstrate that?

MS. KREITER:  I don't think the facts demonstrate that, but it's also a road that we've already been down, and Judge Barber presumably considered the evidence before him and was not persuaded as to that, or Mutual didn't present --

THE COURT:  But as I understand it, that evidence was not presented to Judge Barber, and if that is evidence within this case, it seems to me it would be relevant for purposes of a consideration of damages.

MS. KREITER:  Yeah.  I guess I'm just struggling a little bit, Your Honor, to kind of go back and rewrite history here.  It kind of -- an argument was made without factual support.  WaterStone in turn did put forth factual support, so, you know, I think that the decision was made based on the evidence presented.  This new argument about Hutto and that the damages should be limited to just him, that argument was absolutely never made.

THE COURT:  All right.  Mr. Karen?

MR. KAREN:  Well, I do think that argument was made, Your Honor.  I think even a broader argument was made than that.  I mean, the point here is that -- and I agree with this point.  If, in fact, they left on their own accord and they left lawfully without engaging in any wrongful activity, then obviously the loans that they could take as at will employees we can't claim as damages because obviously there's no causal

11:02 AM  1   relationship between the wrongful activity.

11:02 AM  2              Now, here, though, I think -- and this was a

11:02 AM  3   point we continued to make, is that once WaterStone engaged a

11:02 AM  4   number of wrongful activities -- and as I said, had they not

11:02 AM  5   engaged in those wrongful activities, none of the people,

11:02 AM  6   Mr. Hutto or anybody else, would have left.  That's our claim,

11:02 AM  7   and we believe that a jury is entitled to consider that.  If a

11:02 AM  8   jury is, in fact, considering that case, the case that says --

11:02 AM  9              THE COURT:  Well, I'm going to stop you right there

11:02 AM  10  on that argument.  Whoever was the first, there will be no

11:03 AM  11  damages consideration because WaterStone soliciting any one

11:03 AM  12  individual is not in any way a violation.  WaterStone could

11:03 AM  13  have solicited anyone they wanted independently.  They could

11:03 AM  14  have gone to every employee, as I understand the record, and

11:03 AM  15  solicited each individual employee to hire them.  What your

11:03 AM  16  theory is, they went to the managers, solicited them, who then

11:03 AM  17  in turn solicited their employees at the Mutual of Omaha

11:03 AM  18  offices.  That's the violation.  They have a contract of

11:03 AM  19  non-solicitation for a period of either one or -- one year or

11:03 AM  20  two years, as I understand it, depending on the employee.

11:03 AM  21             So as you asserted in your motion, that if

11:03 AM  22  Dwayne Hutto was the original person solicited who then in turn

11:03 AM  23  solicited others, damages related to Dwayne Hutto's departure

11:03 AM  24  would not be probative to the issue.  It would be those that

11:03 AM  25  flowed from his solicitation, and so that is clear to me.

| | |
|---|---|
| 11:04AM | 1 |
| 11:04AM | 2 |
| 11:04AM | 3 |

So what is at issue then is who are the other individuals that fell?  So if it's domino effect, as you're arguing, I'll allow it and consider that and allow that to be considered by damages.  But as to the first individual, and at least as you've asserted in the motion, if it's Dwayne Hutto, I don't see how it's relevant for consideration of damages as to his departure.

So if you want to make a record as to why I still should consider that, but as you've even argued in your motion, it seems to be in conflict with the argument.

MR. KAREN:  Again, I understand where you are on this, Your Honor, but I would like to make a record and just say my peace, if you would allow me briefly.

THE COURT:  Please.

MR. KAREN:  The issue is -- and I think you've identified it -- the wrongful conduct.  Did the wrongful conduct predate?  And here is -- I'll make this, again, as a rhetorical question.

THE COURT:  Okay.  I understand that wrongful conduct.  What -- what's it wrongful in violation of?

MR. KAREN:  So, for example, if we can prove that Dwayne Hutto would not have left himself if he had not been able to take his branch with him -- and I believe we provided evidence that we can argue to a jury that they can or cannot make that conclusion.  We should leave that to the jury,

|   |   |
|---|---|
| 11:05AM | 1 |
| 11:05AM | 2 |
| 11:05AM | 3 |
| 11:05AM | 4 |
| 11:05AM | 5 |

because if the jury concludes that Mr. Hutto would not have
left without his entire branch and WaterStone would not have
hired him without his entire branch and that discussion at all
times was only about the entire branch being moved, then the
wrongful conduct is inherent in the first act because there was
no separate act.  Mr. Hutto -- if Mr. Hutto had left for
WaterStone, done.  He leaves.  He walks across the street.
Comes to WaterStone.  The next day, in violation of whatever
else he does, he then solicits, and then everybody comes with
him.  I would fully agree with the concept, fully agree that
Mr. Hutto cannot -- his production cannot be a damage because
that had left.  But if the facts were that Mr. Hutto would not
have left, none of these individuals would have left, and in
fact the only reason they did is because they were promised,
"Hey, steal the whole branch.  We'll do it all at once," what
then -- then you can't divorce the damages associated with
their production from the wrongful activity because you can't
assume that had it not been wrongful --

THE COURT:  But explain to me, what is the wrongful
activity?  Put it in terms of the contract, because that's what
you have to demonstrate, tortious interference with the
contract.  So what is the wrongful activity at issue for
Mr. Hutto?

MR. KAREN:  Well, there's a couple, Your Honor.
First, even outside the contract, there's the breach of

11:06AM  1   fiduciary duty which did exist as a manager.  That's one.

11:06AM  2               Two, within his contract there are provisions

11:06AM  3   relating to -- and even if you don't -- you know, again, we

11:06AM  4   believe that the trade secrets case should stay in, but even if

11:06AM  5   hypothetically you kept that out, there's no question that was

11:06AM  6   confidential information.  There's no question he took that

11:06AM  7   confidential information.  It's information that WaterStone

11:07AM  8   agrees is confidential even in their own documents.  There's a

11:07AM  9   long record in that in Mr. Allen's testimony and the

11:07AM 10   documentation provided.  So he stole all of that confidential

11:07AM 11   information when he left, and he took that.  So that's one

11:07AM 12   wrongful piece of activity.

11:07AM 13               There's demonstration in the record of them

11:07AM 14   hiring somebody to actually funnel that to a third party who

11:07AM 15   then started making these loans and these leads so that they

11:07AM 16   could do this seamless liftout.  These are all wrongful actions

11:07AM 17   that contributed to Mr. Hutto's departure.

11:07AM 18               So those activities along with the fact that he

11:07AM 19   solicited staff -- Mr. Allen testified, Your Honor, at length.

11:07AM 20   He said at length that it is a risk to bring over somebody

11:07AM 21   without the entire branch because they don't know what

11:07AM 22   production you'll get, and when they provide an economic model

11:07AM 23   and they provide the compensation of individuals to come over,

11:07AM 24   one of the things they're considering, actually the biggest

11:07AM 25   thing they're considering, is how much production are we going

| | |
|---|---|
| 11:07AM | 1 |
| 11:08AM | 2 |
| 11:08AM | 3 |
| 11:08AM | 4 |

to get from this group that we're paying for?  Well, it's one thing to make that offer knowing for certain you have the entire group in one fell swoop.  It's a very different situation if you have to take the risk that, "I'm going to make this investment, and then maybe some of them might come over." They never had to do the "maybe some might," because they did it unlawfully at the inception by taking this branch from its -- all in one fell swoop, having the managers breach their fiduciary duty, having the managers steal confidential information and send it over.  This was all done in concert, and they admitted this, Your Honor.  They admitted their goal was a seamless transition because it was critical to what they were trying to do.

So to use Ms. Kreiter's statement about unwriting history, that's what they're asking to do here is unwrite history and how might it have been done okay. Respectfully, I don't think they get to do that.  I think we have to take it as it comes.  As it comes, they took everything at once.  They stole everything at once, and they shouldn't get --

THE COURT:  Explain to me then -- I don't necessarily understand the distinction.  What is the relevancy of Hutto's -- damages related to Hutto if in the end you're asserting Hutto's conduct of solicitation and theft and misappropriation of trade secrets essentially shut down that

| | |
|---|---|
| 11:09AM | 1 |

office and with this liftout, that the damages then present --
prevented future profits for that office?  What is the
relationship of Hutto's book of business in connection with
that?

        MR. KAREN:  Because unlike a scenario, Your Honor,
where Hutto left and did that lawfully and you can segregate
the lawful activity -- him leaving, no question about it, and
the loans that he would have produced -- from everything else,
I think in that case they're absolutely right.  I believe Judge
Barber would have been absolutely right.  In this case, you
can't segregate or separate because it was all done at once,
and you can't say respectfully that, "Well, if he had left
lawfully then, of course, Mutual wouldn't be entitled to
those," because he didn't leave lawfully.  Everything was done
in one fell swoop unlawfully, and therefore the question is if
there's unlawful behavior and that unlawful behavior causes
damages and there's an argument for causation, which is what
we're arguing here, if that -- if that unlawful activity which
occurred here and the result of that activity was the departure
of the entire branch, inclusive in that entire branch would be
Mr. Hutto's profits for the profits driven by his work.  The
fact that he could have done this lawfully, that he could have
moved, that may be true, but they don't get that assumption
when they engaged in the unlawful activity in the first place.
And that unlawful activity caused all of these damages.

| | | |
|---|---|---|
| 11:10AM | 1 | THE COURT:  All right.  You want to make any argument |
| 11:10AM | 2 | as to the New Jersey office beyond what's in your pleading? |
| 11:11AM | 3 | MR. KAREN:  I would be restating what is in my |
| 11:11AM | 4 | pleading, Your Honor.  I -- I will just so it's clear, if |
| 11:11AM | 5 | that's okay, very, very briefly; just that, you know, Mr. Smith |
| 11:11AM | 6 | managed this branch.  You know, Mr. Smith leaves.  The branch |
| 11:11AM | 7 | follows him.  I don't think there's any giant leap the jury has |
| 11:11AM | 8 | to make there about what occurred and what happened here.  So I |
| 11:11AM | 9 | think it just follows from the theory of this case that that |
| 11:11AM | 10 | should be considered by the jury. |
| 11:11AM | 11 | THE COURT:  All right.  Ms. Kreiter, you want to |
| 11:11AM | 12 | respond to any of those arguments? |
| 11:11AM | 13 | MS. KREITER:  Just real quick, Your Honor.  I |
| 11:11AM | 14 | don't -- here's what's missing.  Mr. Karen did not point to any |
| 11:11AM | 15 | evidence in the record indicating that Dwayne Hutto solicited |
| 11:11AM | 16 | the other managers.  It was not presented today.  It was not |
| 11:11AM | 17 | presented to Judge Barber. |
| 11:11AM | 18 | In addition, Mr. Karen did not explain at all if |
| 11:11AM | 19 | he had such evidence, why did he not bring it to Judge Barber's |
| 11:11AM | 20 | attention? |
| 11:11AM | 21 | I want to address a few things that -- since the |
| 11:12AM | 22 | Court may have been interested in, you talked about the damages |
| 11:12AM | 23 | and, you know, shouldn't they be limited to a year.  That was |
| 11:12AM | 24 | something that the parties addressed.  There is helpful case |
| 11:12AM | 25 | law on point.  I think the most helpful case is the <u>Office</u> |

| | |
|---|---|
| 11:12AM | 1 |
| 11:12AM | 2 |
| 11:12AM | 3 |
| 11:12AM | 4 |
| 11:12AM | 5 |
| 11:12AM | 6 |
| 11:12AM | 7 |
| 11:12AM | 8 |
| 11:12AM | 9 |
| 11:12AM | 10 |
| 11:13AM | 11 |
| 11:13AM | 12 |
| 11:13AM | 13 |
| 11:13AM | 14 |
| 11:13AM | 15 |
| 11:13AM | 16 |
| 11:13AM | 17 |
| 11:13AM | 18 |
| 11:13AM | 19 |
| 11:13AM | 20 |
| 11:13AM | 21 |
| 11:13AM | 22 |
| 11:13AM | 23 |
| 11:13AM | 24 |
| 11:13AM | 25 |

<u>Depot v. Arnold</u> case, which is a Southern District of Florida case. The case is 2017 Westlaw 117 --

THE COURT: Well, let me just tell everybody and end the surprise. What I'm intending to do with that is as I see it, the plaintiff's position simply is you look at the combination of the solicitation as well as the misappropriation for Counts 1 and 2, and in consideration of that, if there is causation that establishes that the theft of trade secrets or misappropriation of trade secrets also was substantially the cause of the closure of the offices and as has been argued here in the plaintiff's theory, that they would not have been able to accomplish this liftout but for the obtaining of the trade secrets at issue, then I think that opens the door beyond the limitation of the solicitation agreements.

So it seems to me the verdict form that I'm contemplating at issue here is allowing that for Counts 1 and 2 and then limiting the damages to the solicitation agreements for Count 3, but there has to be some type of causation found by the jury that it was the collective, with this trade secrets, that allowed for that. So that's what I'm contemplating because I would agree that the solicitation could have occurred after the term of the various agreements. And so that is one thing that I'm contemplating on how to instruct the jury.

But -- I interrupted your argument, but I wanted

| | |
|---|---|
| 11:13AM | 1 |
| 11:14AM | 2 |

that to be clear as to where I'm looking to go forward with
this in the case.

MS. KREITER:  I guess the other points that I think I
want to be clear about, I heard Mr. Ari -- or Mr. Karen talk
about Keller Williams.  Just so that the Court is aware, that
was something raised to Judge Barber and he rejected.  It's not
in his opinion, but it's in the record at docket 131 at
page 37.  There's discussion about that, and Judge Barber
states something to the effect of, you know, "Look, the fact
that there was this Keller Williams' acquisition, that doesn't
get you beyond the speculation.  The theme of the case has been
what damages does the plaintiff have that are something besides
speculation?"

With respect to this 30 months, you know, to me
it's kind of the same thing that we talked about before.  This
is trial by ambush.  I'm hearing about 30 months for the first
time in March.  I don't view Judge Barber's decision as
blessing 30 months or anything like that.  I think that --

THE COURT:  Nor rejecting it.

MS. KREITER:  Nor rejecting it.

THE COURT:  Judge Barber's decision is, "We'll see
what happens at trial as to what the evidence is."

MS. KREITER:  I think -- I agree with the Court in
that regard.  There's kind of a stipulation filed after the
briefing, and he says, "I'm not going to dismiss the claim in

11:15AM   1   full," but I don't think that he blesses the 30 months, which

11:15AM   2   is why I didn't view WaterStone's motion as one for

11:15AM   3   reconsideration.

11:15AM   4            But I think even if this case were still before

11:15AM   5   Judge Barber, I would want to know who is saying 30 months?

11:15AM   6   I've never heard that ever in the case prior to this

11:15AM   7   stipulation being filed.  I see things filed now, you know,

11:15AM   8   something -- a filing on March 10th with a spreadsheet that

11:15AM   9   says, "Well, this is a summary of their voluminous records."

11:15AM  10   Who is the person that crafted that?  Who is the witness that's

11:15AM  11   going to say 30 months?  I've not deposed anybody on this new

11:15AM  12   analysis.  There's not something in the public record where you

11:15AM  13   can go to a website and find this.  This is, again, kind of a

11:16AM  14   springing damages analysis that I'm finding out about in May.

11:16AM  15            And I can't have 30 months because I don't know

11:16AM  16   anything about that theory.  I don't have a chance to depose

11:16AM  17   anybody about that theory.  I don't have a chance to work with

11:16AM  18   my expert about attacking that theory.

11:16AM  19            I can work with what was presented in discovery,

11:16AM  20   which was 18 months, and that was the point of bringing my

11:16AM  21   motion.  Just what are we doing here with the damages in this

11:16AM  22   case?  And I think it's got to tie back to something that I've

11:16AM  23   had adequate notice to prepare for in advance of the trial.

11:16AM  24            I want to be clear that no person from Mutual

11:16AM  25   has ever said 30 months.  And, frankly, it's up to 30 months.

|       |    |
|-------|----|
| 11:16 AM | 1 |
| 11:16 AM | 2 |
| 11:16 AM | 3 |
| 11:16 AM | 4 |
| 11:17 AM | 5 |
| 11:17 AM | 6 |
| 11:17 AM | 7 |
| 11:17 AM | 8 |
| 11:17 AM | 9 |
| 11:17 AM | 10 |

1  I still don't know, you know, exactly what the duration is that
2  is being sought, but it's clear there is a robust analysis that
3  has been done by somebody, and I don't think it's fair for any
4  of that to go before the jury period.
5           I don't want a trial by ambush, and I fear that
6  that's what is -- exactly what is happening here.
7       THE COURT:  Well, if you're planning on arguing -- I
8  can just tell you right now I am not revisiting the New Jersey
9  office, and Judge Barber's order will stand as to that.
10      MS. KREITER:  Okay.  And as to the managers, I don't
11 know that I have more to say.  I just -- again, I feel like all
12 of this argument is new.  It was not presented.  I know what
13 WaterStone presented.  I don't -- I just don't have anything
14 from Mr. Karen.
15          So I think the time to do that would have been
16 back at a time when the parties were briefing these issues, and
17 I will say, as we said in our brief, these issues weren't, you
18 know, sprung on to Judge Barber.  We've been really addressing
19 these damages issues since July of last year.
20          So I don't -- you know, I did not feel that
21 there's any new evidence that would constitute grounds for
22 reconsidering Judge Barber's decision.  I did not view
23 WaterStone's motion as seeking any type of reconsideration, but
24 more in the category of I am still trying to get my arms around
25 this case.  What is the demand from plaintiffs?  I frankly have

11:18AM 1    never had a case going to trial where plaintiff has not said,

11:18AM 2    "These are the damages that I am seeking."

11:18AM 3         THE COURT:  I guess I'm not sure I understand why

11:18AM 4    you're arguing that.  If Judge Barber expressly identifies this

11:18AM 5    30-month stipulation and then expressly states he's not going

11:18AM 6    to prohibit in the case in chief evidence related to

11:18AM 7    recognizing there has to be some basis in fact for a temporal

11:18AM 8    period, but he's not going to prohibit initially the lost

11:18AM 9    profits damages, but that he will consider after the case in

11:18AM 10   chief whether that needs to be revisited, but yet you are now

11:18AM 11   asking me to limit it just to 18 months, which seems to be also

11:18AM 12   asking me to reconsider what Judge Barber ordered.

11:19AM 13        MS. KREITER:  I guess I will say, I think there's a

11:19AM 14   lack of clarity because, for example, there are two damages

11:19AM 15   witnesses.  One sets forth the tool.  "Here's how I'm going to

11:19AM 16   measure damages."  You've got to insert some kind of duration.

11:19AM 17   And then there's got to be a duration that comes from somebody.

11:19AM 18   Other than emails from counsel, when you take, for example,

11:19AM 19   30 months or 18 months or 12 months, whatever duration you're

11:19AM 20   going to take, and plug it into the tool that Rosevear

11:19AM 21   presents, some number pops out.  I don't know what that number

11:19AM 22   is without knowing the duration, so until I knew that

11:19AM 23   plaintiffs were seeking 30 months, I had no knowledge as to

11:19AM 24   what the damages demand is going to be.

11:19AM 25             Once I had the carve-outs from Judge Barber and

11:19AM  1    the 30-month disclosure post-briefing, you know, that was the

11:20AM  2    first time that you could then say, "okay.  I'm going to take

11:20AM  3    the tool and the numbers and come up with what is the demand

11:20AM  4    made by plaintiffs."

11:20AM  5              So it is not -- without springing new demands

11:20AM  6    and evidence on WaterStone at trial, I need to know what is the

11:20AM  7    duration.  I've never deposed anybody about 30 months.  I

11:20AM  8    don't -- I've not talked to Rosevear about why 30 months equals

11:20AM  9    X number because that was never part of the story.

11:20AM  10             So my motion, I think, regardless of what

11:20AM  11   carve-outs the Court implements --

11:20AM  12             THE COURT:  Well, to be clear, when you say your

11:20AM  13   motion, I think there's two different motions at issue because

11:20AM  14   170 is also asking the Court not to allow Rosevear to testify

11:20AM  15   in the case in chief.

11:20AM  16             MS. KREITER:  Yeah.

11:20AM  17             THE COURT:  So your Motion in Limine as to the

11:20AM  18   damages is 166 where you're asking me to limit to the

11:21AM  19   18 months.

11:21AM  20             MS. KREITER:  Correct.  And I'm talking about the

11:21AM  21   motion 166.  Just clarifying, I think whether it's -- for

11:21AM  22   example, the Paramus branch.  If we're just carving out the

11:21AM  23   Paramus branch, what does -- you know, the term carve-out, what

11:21AM  24   does that equate to in terms of a number?  I want to know that

11:21AM  25   in advance of the trial.

11:21AM   1              My damages expert, Steve Oscher, may say, "Look,
11:21AM   2      that number is not right."  I was trying to get transparency as
11:21AM   3      to what does Judge Barber's categorical rulings mean in terms
11:21AM   4      of numbers?  Somebody has got to do that, and it should be done
11:21AM   5      in advance of trial.  I was clear that we have Steve Oscher,
11:21AM   6      our damages expert, do the math.  Could he have done it sooner?
11:21AM   7      No, he couldn't have.  I mean, we didn't have any knowledge of
11:21AM   8      the 30 months, and I note that Mutual hasn't come forward and
11:21AM   9      said, "No, that's the wrong number.  Here's what Rosevear
11:21AM  10      thinks it is."
11:21AM  11              So part of my motion that is docket 166 is let's
11:21AM  12      translate this so that everyone knows what are the damages
11:22AM  13      being sought, and then frankly I will be in a position to work
11:22AM  14      with my expert, you know, about that.
11:22AM  15              What I won't be able to do is equip my expert to
11:22AM  16      understand why are we talking about 30 months?  Because that's
11:22AM  17      where you get, for example, docket 176-2, which is apparently
11:22AM  18      the support for the 30 months.  That's brand new, and frankly,
11:22AM  19      where is the Bates number on that document?  It just says,
11:22AM  20      "This is something Mutual intends to use.  It's a summary of
11:22AM  21      voluminous records."  I don't have any of the underlying
11:22AM  22      records.  I mean, I don't know who is the witness that's going
11:22AM  23      to put this forward?  I don't know anything about this.
11:22AM  24              Frankly, if I had this 30-month duration
11:22AM  25      disclosed in discovery, I would have changed the scope of

| | |
|---|---|
| 11:22AM | 1 |
| 11:23AM | 2 |
| 11:23AM | 3 |
| 11:23AM | 4 |
| 11:23AM | 5 |
| 11:23AM | 6 |
| 11:23AM | 7 |
| 11:23AM | 8 |
| 11:23AM | 9 |
| 11:23AM | 10 |
| 11:23AM | 11 |
| 11:23AM | 12 |
| 11:23AM | 13 |
| 11:23AM | 14 |
| 11:23AM | 15 |
| 11:23AM | 16 |
| 11:23AM | 17 |
| 11:23AM | 18 |
| 11:23AM | 19 |
| 11:24AM | 20 |
| 11:24AM | 21 |
| 11:24AM | 22 |
| 11:24AM | 23 |
| 11:24AM | 24 |
| 11:24AM | 25 |

Mr. Oscher's report.  If I had had it, you know, any time sooner than two weeks before trial, I would have changed the scope of what Mr. Oscher is doing.

So my motion is just as a practical matter, I can't talk about 30 months.  I don't know anything about it.  I could depose somebody.  I don't know who that would be, and I don't know when I'm going to do that.  I would want to get all of the documents that support Exhibit 2.  I would want to have time to study that.  I would want Steve Oscher to take a look at that.  I don't want Steve Oscher doing it at trial for the first time.

So it's really a practicality.  30 months isn't viable.

THE COURT:  I understand.  What's the response to that?

MR. KAREN:  Your Honor, I will try to be brief, but throughout this case, we have taken the position that the Court never ruled against us on, to be clear, that we have the ability to provide a jury with a means of determining on their own based on the evidence that was presented how long the lost profits should be calculated for, and we did not need to provide them a 30 months or five years; that we could provide them a model, and the jury could in their determination and discretion upon hearing the evidence make a calculation based on --

| | | |
|---|---|---|
| 11:24AM | 1 | THE COURT:  When you say throughout this case, what |
| 11:24AM | 2 | was your initial disclosure of damages, and what was your |
| 11:24AM | 3 | continuing disclosure of damages? |
| 11:24AM | 4 | MR. KAREN:  We had a 10-year model.  We had a 10-year |
| 11:24AM | 5 | model of damages which I believe read up to -- I believe the |
| 11:24AM | 6 | number was $28 million.  We voluntarily because -- |
| 11:24AM | 7 | THE COURT:  Maybe I misunderstood that because I -- |
| 11:24AM | 8 | as I understood the argument being made by Ms. Kreiter, the |
| 11:24AM | 9 | 10-year model did not come in until Rosevear's calculation; |
| 11:24AM | 10 | that the original disclosure had always been the 18 months |
| 11:24AM | 11 | based upon the 30(b)(6) representations. |
| 11:24AM | 12 | MR. KAREN:  Well, that wasn't actually really |
| 11:25AM | 13 | correct, if I may.  What was actually exactly testified to by |
| 11:25AM | 14 | Mr. Gennarelli was saying, "Conservatively I think it's |
| 11:25AM | 15 | 18 months," and his testimony continues -- no stop sentence, |
| 11:25AM | 16 | continuing with sentence, "I really think you could go on for |
| 11:25AM | 17 | six or seven years, but if I was going to be reasonable sitting |
| 11:25AM | 18 | here today and" -- not -- "reasonable" was not his word.  "If I |
| 11:25AM | 19 | was going to be conservative."  Thank you, Arielle. |
| 11:25AM | 20 | "Conservative, that's what I would say, but if you really ask |
| 11:25AM | 21 | me, I think it was six or seven years."  That's his testimony. |
| 11:25AM | 22 | No one ever said, "It's just 18 months."  What he said -- and |
| 11:25AM | 23 | he actually said in his deposition, he said, "And we did that |
| 11:25AM | 24 | for purposes of settlement."  That's exactly what |
| 11:25AM | 25 | Mr. Gennarelli testified to in his 30(b)(6).  So I think -- |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 11:25AM | 1  | THE COURT:  So then why was Rosevear not disclosed |
| 11:25AM | 2  | initially as an expert rather than a rebuttal expert? |
| 11:25AM | 3  | MR. KAREN:  Your Honor, at some point in the case we |
| 11:25AM | 4  | made that determination because we were not aware at the time |
| 11:25AM | 5  | of our deadline that they were going to be putting in an |
| 11:26AM | 6  | expert.  At that time that we learned that, we retained |
| 11:26AM | 7  | Ms. Rosevear. |
| 11:26AM | 8  | Mr. Gennarelli could testify, you know, as a |
| 11:26AM | 9  | witness himself and provide the evidentiary basis for our |
| 11:26AM | 10 | damages.  Ms. Rosevear, we believed, was a prudent add to the |
| 11:26AM | 11 | case when we realized they were going to have their own expert |
| 11:26AM | 12 | to address that. |
| 11:26AM | 13 | So, you know, frankly, Your Honor, and I don't |
| 11:26AM | 14 | want to -- there's a big part of me that says I'm fine with |
| 11:26AM | 15 | Ms. Rosevear testifying as the last witness in this case on |
| 11:26AM | 16 | rebuttal.  There's strategically a lot of benefits, as I'm sure |
| 11:26AM | 17 | you can appreciate, for us doing that.  However, I think |
| 11:26AM | 18 | ultimately what's -- what's easiest for the jury and I think |
| 11:26AM | 19 | fastest for the Court is that she testify in our case in chief. |
| 11:26AM | 20 | Now, I also don't believe there's any harm whatsoever to |
| 11:26AM | 21 | WaterStone on that.  They've known forever.  In fact, there was |
| 11:26AM | 22 | a hearing where Judge Barber asked Ms. Kreiter, "How long did |
| 11:27AM | 23 | you depose Ms. Rosevear?"  She said, "Six hours."  And he says, |
| 11:27AM | 24 | "That's a long time."  And she says, "Yes."  And he says |
| 11:27AM | 25 | well -- Judge Barber said, well -- he even said it.  "If you |

11:27AM 1    want to take another deposition, you can."

11:27AM 2            THE COURT:  If I can, Mr. Karen, let me interrupt

11:27AM 3    you.  The big issue as raised by Ms. Kreiter is she has no idea

11:27AM 4    who will being testifying as to the 30 months, nor did she have

11:27AM 5    the ability to even depose that person prior to trial.  So her

11:27AM 6    concern is now anybody who goes forward with this now 30-month

11:27AM 7    theory, she'll be ambushed at trial without having the ability

11:27AM 8    to know exactly what is the theory for the 30 months in advance

11:27AM 9    of trial.

11:27AM 10           MR. KAREN:  Yes, and I can speak to that, Your Honor.

11:27AM 11   I'm sorry for getting sidetracked.  To address that point, from

11:27AM 12   the beginning of this case, we sought 10 years.  We voluntarily

11:27AM 13   reduced it down to 30 months.  We could have gone forward --

11:27AM 14   because the Court never ruled against us -- on 10 years.  I

11:27AM 15   mean, if they want this -- and I'm not saying this to be a

11:28AM 16   smart aleck, but if they think that's unfair for some reason,

11:28AM 17   for us to voluntarily reduce the amount of time that we're

11:28AM 18   seeking damages from 10 years to 30 months, then we can

11:28AM 19   withdraw the stipulation and just go back to the 10-year model

11:28AM 20   and present our evidence as we were planning to do, which the

11:28AM 21   Court never struck any of that.

11:28AM 22           We were trying to streamline this case.  We were

11:28AM 23   trying to make it cleaner and clearer.  So if that has somehow

11:28AM 24   created confusion -- which I don't understand how it does

11:28AM 25   because, again, what we have been arguing throughout this case

| | |
|---|---|
| 11:28AM | 1 |

for well over a year, before Ms. Rosevear was testifying, when

Ms. Kreiter and WaterStone had every opportunity to take as

much discovery as they wanted on that point, on our model,

throughout that entire period throughout this case, they even

operated on 10 years.  Our voluntary unilateral diminishment of

the damages we seek now is being considered unfair surprise.

And, Your Honor, there's really -- it's really

not that complicated.  I think I've made it clear exactly what

we're doing here.  We're taking the average.  We're utilizing

that average based on MLS data.  It's publicly available data.

It's data that WaterStone uses in its business every single

day.  It's very familiar, probably far more familiar than I.

Mr. Oscher doesn't have to start commenting on 30 months.  It

is what it is.

And so that's what we're putting forth as

damages.  There's no unfair surprise, and if the Court feels

there's such unfair surprise for us going from 10 years to

30 months, then we'll withdraw the stipulation, and we'll go on

a 10-year theory.  We could still do that.

But I don't think that Mutual should be punished

because the judge -- because Judge Barber encouraged us

strongly to kind of streamline this case, to make it clearer,

to facilitate settlement discussions.  That's why we did --

THE COURT:  Well, encouraging you to do it and it

actually happening may be two different things.  As I sit here

|  |  |  |
|---|---|---|
| 11:29AM | 1 | with all these substantive motions on the eve of trial, I |
| 11:29AM | 2 | wouldn't say we streamlined anything. |
| 11:29AM | 3 | So here's what we're going to do. |
| 11:30AM | 4 | MS. KREITER:  Your Honor, if I -- |
| 11:30AM | 5 | THE COURT:  Hold on. |
| 11:30AM | 6 | MS. KREITER:  There was one last point I wanted -- |
| 11:30AM | 7 | THE COURT:  Here's what we're going to do.  One |
| 11:30AM | 8 | moment. |
| 11:30AM | 9 | MS. KREITER:  I'm sorry. |
| 11:30AM | 10 | THE COURT:  I'm denying the Motion for Summary |
| 11:30AM | 11 | Judgment at document number 137, and I'm denying it without |
| 11:30AM | 12 | prejudice. |
| 11:30AM | 13 | I am going to direct that the plaintiff disclose |
| 11:30AM | 14 | by exhibits what are the confidential slash -- let me rephrase |
| 11:30AM | 15 | that.  What are the trade secrets that are at issue for |
| 11:30AM | 16 | Counts 1 and 2? |
| 11:30AM | 17 | Once that is done, I will schedule a hearing, |
| 11:30AM | 18 | and we're going to revisit whether any of those should be |
| 11:30AM | 19 | considered or if there is lack of evidence in the record to |
| 11:30AM | 20 | support whether there's an issue of fact as to any of those |
| 11:30AM | 21 | that are being identified as exhibits trade secrets. |
| 11:30AM | 22 | As for document number 164, I will grant it to |
| 11:30AM | 23 | this extent only.  I will allow the admissibility of evidence |
| 11:30AM | 24 | as to the solicitation of other managers and the consideration |
| 11:31AM | 25 | of whether that should be incorporated into the damages |

11:31AM  1  calculation.  So, in other words, if, as alleged, Mr. Hutto was

11:31AM  2  solicited and he then solicited others, the others can be

11:31AM  3  considered within the damage calculation if the facts prove and

11:31AM  4  bear that out.

11:31AM  5      As to documents number 166 and 170, I'm denying

11:31AM  6  those motions, but what I am going to do is -- and if I'm not

11:31AM  7  clear, what is happening is I'm taking you off my trial

11:31AM  8  calendar, and we are going to set a schedule to get this

11:31AM  9  accomplished, and then you'll be put right back on the trial

11:31AM  10  calendar.

11:31AM  11      But I am going to direct that the plaintiff

11:31AM  12  identify who will be testifying as to the damage calculation

11:31AM  13  and that a deposition can occur of that individual.  So if it's

11:32AM  14  Rosevear and it's going to be the same calculation for

11:32AM  15  30 months, then that -- so be it, and then that will be -- the

11:32AM  16  ability will be able to have a deposition of Rosevear as to how

11:32AM  17  that 30 months has been calculated.

11:32AM  18      As I stated earlier, in my consideration of the

11:32AM  19  instructions and the verdict form, plaintiff is making an

11:32AM  20  argument that in sum and total -- that is, the combination of

11:32AM  21  the misappropriation of trade secrets and the solicitation of

11:32AM  22  employees to essentially close out the offices -- is the

11:32AM  23  causation of damages.  However, if a jury disagrees that there

11:32AM  24  was no substantial damage done by any alleged misappropriation

11:32AM  25  of trade secrets and that all that was done was the

|          |    |                                                                                      |
|----------|----|--------------------------------------------------------------------------------------|
| 11:32AM  | 1  | solicitation of employees, then I find there should be a limit                       |
| 11:33AM  | 2  | on those damages by the terms of those employee agreements.  So                      |
| 11:33AM  | 3  | it is my intent that I am going to instruct and craft a verdict                      |
| 11:33AM  | 4  | form to identify that distinction.                                                   |
| 11:33AM  | 5  | Judge Barber's order stands as to the ability,                                       |
| 11:33AM  | 6  | though, given the stipulation of 30 months, to go forward with                       |
| 11:33AM  | 7  | that damage calculation under that theory that it was in total                       |
| 11:33AM  | 8  | the solicitation of the employees, including the theft of the                        |
| 11:33AM  | 9  | misappropriation of funds.  And that is something that a jury                        |
| 11:33AM  | 10 | can consider in Count 1 and 2 in that regard; that the theft                         |
| 11:33AM  | 11 | of -- or excuse me, the misappropriation of the trade secrets,                       |
| 11:33AM  | 12 | that it was that combination and was so substantial led to the                       |
| 11:33AM  | 13 | closure of the offices and the resulting lost profits.                               |
| 11:33AM  | 14 | All right.  So the first thing is I want a                                           |
| 11:34AM  | 15 | supplemental report presented as to this theory of damages for                       |
| 11:34AM  | 16 | the 30 months with the identification of the expert.                                 |
| 11:34AM  | 17 | So how much time, Mr. Karen, will you need to                                        |
| 11:34AM  | 18 | have that presented?                                                                 |
| 11:34AM  | 19 | MR. KAREN:  May I confer with my colleague for one                                   |
| 11:34AM  | 20 | moment, Your Honor?                                                                   |
| 11:34AM  | 21 | THE COURT:  Sure.                                                                     |
| 11:34AM  | 22 | MR. KAREN:  Thank you, Your Honor.                                                    |
| 11:34AM  | 23 | (Pause.)                                                                              |
| 11:34AM  | 24 | MR. KAREN:  Your Honor, without speaking to my expert                                |
| 11:34AM  | 25 | because I don't know her availability, I'm going to say two                          |

11:34AM 1    weeks.  I do think that be fair to Ms. Kreiter, I believe it

11:34AM 2    will probably be two people, one person from the company to

11:34AM 3    explain the 30-month duration and then Ms. Rosevear to adapt

11:34AM 4    that to her model.  So we'll be happy to do both and endeavor

11:34AM 5    to do that within two weeks.  I would only ask some leave of

11:34AM 6    Court if I have to call my expert after this hearing --

11:34AM 7            THE COURT:  Okay.  Here's what we'll do.  I think

11:34AM 8    that would be very difficult to make that estimation today.

11:35AM 9    I'll direct you all meet and confer to come up with a

11:35AM 10   scheduling to include when you think we could get back for

11:35AM 11   purposes of trial.  And to be very blunt, it's my intent to do

11:35AM 12   this as quick as the parties are able to do it, to get you back

11:35AM 13   on trial.

11:35AM 14           However, I do think document number 190 is a

11:35AM 15   substantial motion that could also impact the damage

11:35AM 16   calculations as well, and that is something that needs to be

11:35AM 17   decided by the Court.

11:35AM 18           And so it would be my intent to take that up as

11:35AM 19   soon as the response has been briefed and to bring you back to

11:35AM 20   present any additional arguments you want so I can give you a

11:35AM 21   ruling on that to provide better direction as to whether that

11:35AM 22   will be an issue in the case because, as I see it, particularly

11:35AM 23   as to my ruling on the damages, if particular Mr. Hutto was not

11:35AM 24   operating under an enforceable contract, that could have a

11:36AM 25   significant impact upon the case.  And so that's something that

| | | |
|---|---|---|
| 11:36AM | 1 | I think needs to be -- an opportunity to be presented so the |
| 11:36AM | 2 | plaintiff can brief that and respond to the motion, and then |
| 11:36AM | 3 | I'll hear argument so I can make a determination as to that |
| 11:36AM | 4 | issue.  And so I will -- |
| 11:36AM | 5 | MR. KAREN:  Your Honor -- I'm sorry. |
| 11:36AM | 6 | THE COURT:  -- schedule that now, and then you could |
| 11:36AM | 7 | use your dates after that as to when you think you can |
| 11:36AM | 8 | accomplish the expert disclosure and then deposition, and we |
| 11:36AM | 9 | can get back for scheduling of trial.  So give me one moment. |
| 11:37AM | 10 | Why don't we do it, since I know we're all wide |
| 11:37AM | 11 | open on that schedule, the Tuesday, June 4th?  And we can do it |
| 11:37AM | 12 | at 10:00, and we could also do it by Zoom since it's just the |
| 11:37AM | 13 | one motion.  Does that work for everyone? |
| 11:37AM | 14 | MS. KREITER:  Your Honor, just to be clear, this is a |
| 11:37AM | 15 | hearing on -- |
| 11:37AM | 16 | THE COURT:  Document number 190, which is |
| 11:37AM | 17 | WaterStone's Motion in Limine -- |
| 11:37AM | 18 | MS. KREITER:  Got it. |
| 11:37AM | 19 | THE COURT:  -- as to the enforceability of the |
| 11:37AM | 20 | contracts for Mr. Hutto and Smith. |
| 11:37AM | 21 | MS. KREITER:  Sure.  That works for me. |
| 11:37AM | 22 | MR. KAREN:  That's fine with me, Your Honor.  Just |
| 11:37AM | 23 | clarification of when would you like your responsive brief |
| 11:37AM | 24 | filed by? |
| 11:37AM | 25 | THE COURT:  Well, by scheduling it then, that gives |

11:37AM   1    you the full time to respond under the rules.

11:37AM   2              MR. KAREN:  Okay.

11:37AM   3              THE COURT:  You can file it just within the time

11:37AM   4    period as allowed.

11:37AM   5              MR. KAREN:  Thank you, Your Honor.

11:37AM   6              THE COURT:  All right.  And what we'll do then as

11:38AM   7    well, if you all will meet and confer before then to give me

11:38AM   8    the dates you'd like going forward from there, to include when

11:38AM   9    you would want to go back to trial because it seems to me the

11:38AM  10    next step after that, once you've disclosed both the expert and

11:38AM  11    your documents for trade secrets, I will then have a hearing as

11:38AM  12    to the trade secrets, and if there's any other additional

11:38AM  13    issues to be identified as a result of the testimony of the

11:38AM  14    expert, I'll hear whether that's necessary or not.  But then

11:38AM  15    after that, we'll get you back on schedule for trial, and I can

11:38AM  16    make a ruling as to whether there's -- alleged trade secrets

11:38AM  17    should go to a jury or not once I understand what they are and

11:38AM  18    hear argument as to them.

11:38AM  19              So I could do that and schedule -- we could go

11:38AM  20    scheduling forward after you've had the time to meet and confer

11:38AM  21    as to those issues, and we'll do that on the 4th as well.

11:38AM  22              What I'm asking you to do, though, is from that

11:38AM  23    period sequence out how much time you will have and need to

11:39AM  24    discuss the trade secrets, as to whether there's going to be

11:39AM  25    any disputes for me, when you would want to have a hearing on

11:39AM 1    those trade secrets, and then discuss the sequencing of the

11:39AM 2    disclosure of the experts, and then the deposition of the

11:39AM 3    experts, and then when you would want trial to then go forward

11:39AM 4    after that.

11:39AM 5            MS. KREITER:  Understood.  Your Honor, just to be

11:39AM 6    clear -- and I could talk with Mr. Karen about this -- I may

11:39AM 7    want to have an amended expert witness report by Mr. Oscher.

11:39AM 8    Depending on what I see, I will want discovery, but we can work

11:39AM 9    those things out.  I just want to be clear on the record, it

11:39AM 10   may be more robust than getting some disclosures from them and

11:39AM 11   taking one deposition.

11:39AM 12           THE COURT:  Well, and I will leave that to you all.

11:39AM 13   If you have agreement as to that, that's fine.  If there's a

11:39AM 14   disagreement, then I will hear that argument on the 4th and

11:39AM 15   decide whether there will be additional discovery based upon

11:39AM 16   what I've ordered already.

11:39AM 17           MS. KREITER:  Sure.

11:39AM 18           MR. KAREN:  Thank you, Your Honor.

11:39AM 19           THE COURT:  All right.  Mr. Karen, any questions

11:39AM 20   about that?

11:39AM 21           MR. KAREN:  The only question is I have is the trade

11:39AM 22   secret exhibit, if you will.  That would be disclosed by this

11:40AM 23   Friday; is that correct, Your Honor?  That's what you were

11:40AM 24   ordering, when the exhibits would have otherwise been done?

11:40AM 25           THE COURT:  Is there any reason why you would need

11:40AM  1    more time?  Because that's what I had previously ordered.

11:40AM  2                MR. KAREN:  No, I believe we can do that.  I just

11:40AM  3    wanted to make sure I was understanding the order.

11:40AM  4                THE COURT:  Yes.

11:40AM  5                MS. KREITER:  I guess I will just say if we're

11:40AM  6    talking about the trial exhibits, I suspect that will

11:40AM  7    substantially change, depending on what the trade secrets are.

11:40AM  8    I guess I would propose we could set a date for that once we

11:40AM  9    know when the trial is.

11:40AM  10               THE COURT:  Well, no.  They have trial exhibits that

11:40AM  11   they were intending to use with their trade secrets, and so

11:40AM  12   they could give you those by identification so you know exactly

11:40AM  13   what items are being identified as trade secrets, whether that

11:40AM  14   changes later.

11:40AM  15               MS. KREITER:  Oh, right.

11:40AM  16               THE COURT:  And they were ordered previously to have

11:40AM  17   that done by this Friday for purposes of exhibits, and so

11:40AM  18   that's what I'm stating, is whatever exhibits relate to trade

11:40AM  19   secrets, they can be identified for you that way, and then

11:41AM  20   whatever disputes you have, I'll take those up on another day.

11:41AM  21               MS. KREITER:  Okay.  Understood, a one-way street.  I

11:41AM  22   was just concerned about committing WaterStone to that.

11:41AM  23               THE COURT:  Okay.  Mr. Karen, anything else?

11:41AM  24               MR. KAREN:  No.  Thank you, Your Honor.

11:41AM  25               THE COURT:  It gives me no pleasure to take you off

| | |
|---|---|
| 11:41AM | 1 |
| 11:41AM | 2 |
| 11:41AM | 3 |

the trial calendar because I know you all want finality as to
this, but I'm hoping to provide you some guidance for a number
of things:  One, as to what I'm thinking for purposes of
damages because I know that is a big issue for you, which as
you go forward, you may want to revisit then your positions and
see if there's a need for further discussions as to whether
there can be a compromise, but if not, then I think these are
important issues given -- and I want to be clear about this.
The reason why I'm doing this is because although there is a
disagreement as to what has been identified as damages, I'm
satisfied that plaintiff has properly asserted a theory of
damages throughout case.  That theory has been limited by Judge
Barber's order, but the order itself provided more clarity, but
it also leaves the defense at a position of vulnerability to
not exactly know what and how that is going to be calculated as
to a theory of damages.  So I find it appropriate to give the
defense the opportunity to explore that in a deposition, so
that is why I'm continuing the trial.

                    Okay.  Anything else, Mr. Karen?

              MR. KAREN:  No.  Thank you, Your Honor.

              THE COURT:  Ms. Kreiter, anything else?

              MS. KREITER:  No.  Thank you.

              THE COURT:  Okay.  I appreciate you all.  The
pleadings were very helpful and very informative, and I'm sorry
we had to proceed this way, but, Mr. Karen, I'm glad you could

| | | |
|---|---|---|
| 11:42AM | 1 | make it to the graduation, and I thought it went as -- smooth |
| 11:42AM | 2 | regardless by presenting by Zoom, which is why I'm happy to do |
| 11:42AM | 3 | it again on the docket number 190. |
| 11:42AM | 4 | All right.  Thank you all for your time.  We'll |
| 11:42AM | 5 | see you all on the 4th.  I'll get out an order memorializing |
| 11:42AM | 6 | what I've stated so you understand exactly how to go forward. |
| 11:43AM | 7 | Thank you. |
| 11:43AM | 8 | (End of proceedings.) |
| 11:43AM | 9 | * * * * * * * * * * * * * * * * * * * * * |
| 11:43AM | 10 | UNITED STATES DISTRICT COURT |
| 11:43AM | 11 | MIDDLE DISTRICT OF FLORIDA |
| 11:43AM | 12 | |
| 11:43AM | 13 | REPORTER TRANSCRIPT CERTIFICATE |
| 11:43AM | 14 | I, Tana J. Hess, Official Court Reporter for the United States District Court, Middle District of Florida, certify, |
| 11:43AM | 15 | pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcription of the |
| 11:43AM | 16 | stenographic notes taken by the undersigned in the above-entitled matter (Pages 1 through 73 inclusive) and that |
| 11:43AM | 17 | the transcript page format is in conformance with the regulations of the Judicial Conference of the United States of |
| 11:43AM | 18 | America. |
| 11:43AM | 19 | |
| 11:43AM | 20 | |
| 11:43AM | 21 | _____ |
| 11:43AM | 22 | Tana J. Hess, CRR, RMR, FCRR Official Court Reporter |
| 11:43AM | 23 | United States District Court Middle District of Florida |
| 11:43AM | 24 | Tampa Division Date:  May 19, 2024 |
| 11:43AM | 25 | |