# **<u>EXHIBIT C</u>**

```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF FLORIDA
                            TAMPA DIVISION


        * * * * * * * * * * * * * * * *
        MUTUAL OF OMAHA MORTGAGE INC. *
                                      *      Case No. 8:22-cv-1660
        vs.                           *
                                      *      June 4, 2024
        WATERSTONE MORTGAGE           *
        CORPORATION                   *
        * * * * * * * * * * * * * * * *




                            MOTION HEARING

                   Heard via Zoom Videoconferencing
                Sam M. Gibbons United States Courthouse
                         801 N. Florida Avenue
                              Tampa, FL
                             June 4, 2024


               BEFORE THE HONORABLE ANTHONY E. PORCELLI

                   UNITED STATES MAGISTRATE JUDGE




        Official Court Reporter:    Tana J. Hess, CRR, FCRR, RMR
                                    U.S. District Court Reporter
                                    Middle District of Florida
                                    Tampa Division
                                    801 N. Florida Avenue
                                    Tampa, FL  33602
                                    813.301.5207
                                    tana_hess@flmd.uscourts.gov

        Proceedings recorded by mechanical stenography using
        computer-aided transcription software.
```

APPEARANCES:


FOR THE PLAINTIFF:

           Ari Karen
           Mitchell Sandler, PLLC
           1120 20th Street, NW
           Suite 725
           Washington, DC 20036
           202.886.5260
           akaren@mitchellsandler.com

           Arielle Stephenson
           Mitchell Sandler, PLLC
           1120 20th Street, NW
           Suite 725
           Washington, DC 20036
           424.731.5645
           astephenson@mitchellsandler.com

           Daniel Paul Dietrich
           Gunster, Yoakley & Stewart, PA
           401 E. Jackson Street
           Suite 1500
           Tampa, FL  33602
           813.228.9080
           ddietrich@gunster.com

           Gregory Lathrop Pierson
           Gunster, Yoakley & Stewart, PA
           401 E. Jackson Street
           Suite 1500
           Tampa, FL  33602
           813.228.9080
           gpierson@gunster.com

FOR THE DEFENDANT:

           Maria L. Kreiter
           Godfrey & Kahn, S.C.
           833 East Michigan Street
           Suite 1800
           Milwaukee, WI  53202
           414.287.9466
           mkreiter@gklaw.com

APPEARANCES:

FOR THE DEFENDANT:

        Carolina Yvonne Blanco
        Hill Ward Henderson, PA
        101 E. Kennedy Blvd.
        Suite 3700
        Tampa, FL  33602
        813.221.3900
        carolina.blanco@hwhlaw.com

        Emma J. Jewell
        Godfrey and Kahn, S.C.
        833 East Michigan Street
        Suite 1800
        Milwaukee, WI  53202
        414.287.9528
        ejewell@gklaw.com

        Scott A. McLaren
        Hill Ward Henderson, PA
        101 E. Kennedy Blvd.
        Suite 3700
        Tampa, FL  33602
        813.221.3900
        smclaren@hwhlaw.com

| | |
|---|---|
| 10:00AM | 1 |
| 10:00AM | 2 |
| 10:01AM | 3 |
| 10:01AM | 4 |
| 10:01AM | 5 |

THE COURT:  All right.  Let's call the case, please.

COURTROOM DEPUTY:  The Court calls case number 8:22-CV-1660-UAM.  This is Mutual of Omaha Mortgage, plaintiff, versus WaterStone Mortgage.

Counsel, please state your appearance, starting with counsel for the plaintiff.

MR. KAREN:  Ari Karen on behalf of the plaintiff.

MS. STEPHENSON:  Arielle Stephenson, also on behalf of the plaintiff.

MR. DIETRICH:  Dan Dietrich on behalf of the plaintiff.

MR. PIERSON:  Greg Pierson on behalf of the plaintiff.

THE COURT:  For the defense?

MS. KREITER:  Good morning.  Maria Kreiter and Emma Jewell from Godfrey & Kahn, along with Stephanie Ziebell, WaterStone's general counsel, and then Scott McLaren and Carolina Blanco from the Hill Ward Henderson firm.

THE COURT:  Okay.  Thank you all for your time this morning.  As you know, I scheduled the hearing based upon documents number 188 and 190.  The response to 188 is filed at document 198.  The response to 190 is document 199.

I'll also note the Court is aware of the recent pleadings that were filed yesterday, and I'll talk about that afterwards.

| | |
|---|---|
| 10:02 AM | 1 |
| 10:02 AM | 2 |
| 10:02 AM | 3 |
| 10:02 AM | 4 |
| 10:02 AM | 5 |
| 10:02 AM | 6 |
| 10:02 AM | 7 |
| 10:02 AM | 8 |
| 10:02 AM | 9 |
| 10:02 AM | 10 |
| 10:02 AM | 11 |
| 10:02 AM | 12 |
| 10:02 AM | 13 |
| 10:02 AM | 14 |
| 10:02 AM | 15 |
| 10:02 AM | 16 |
| 10:02 AM | 17 |
| 10:03 AM | 18 |
| 10:03 AM | 19 |
| 10:03 AM | 20 |
| 10:03 AM | 21 |
| 10:03 AM | 22 |
| 10:03 AM | 23 |
| 10:03 AM | 24 |
| 10:03 AM | 25 |

1  Okay.  Let's start with document number 188,
2  which is plaintiff's Motion to Exclude certain evidence related
3  to job satisfaction about former employees as well as evidence
4  of any prior breach of contract by Mutual.
5  Who's going to be arguing the motion?
6  MR. KAREN:  I will, Your Honor.  Ari Karen.
7  THE COURT:  All right.  Mr. Karen?
8  MR. KAREN:  Thank you, Your Honor.  I'll be succinct,
9  Your Honor.  I think it is laid out in our brief, but
10  essentially I think, you know, it is -- this case is not about
11  why the employees left.  They may theoretically have had very
12  good reasons why they left, and nothing said they couldn't
13  leave at all for any reason, so that's not what the case is
14  about.  The case is about how they left.  So if they were to
15  come in and now be able to start talking about why, it's not
16  largely relevant.  Even if it's true, even if, you know, as
17  they claim Mutual couldn't close loans, couldn't do this right,
18  couldn't do that right, even if all that's true and they had
19  every reason in the world to leave, it wouldn't -- that
20  wouldn't be relevant because the issue is how they left.
21  Now, they may argue that well, wouldn't that go
22  to evidence about what would happen after the fact, what they
23  did after the fact?  You know, would they have stayed?  Well,
24  again, Your Honor, I don't think -- you know, to have somebody
25  come in and speculate and then say, "Well, this is what I would

| | | |
|---|---|---|
| 10:03AM | 1 | have done," I really question the relevance of that.  You know, |
| 10:03AM | 2 | hindsight, as they say -- |
| 10:03AM | 3 | THE COURT:  Well, it seems to be you're questioning |
| 10:03AM | 4 | the credibility of it, not the relevance, whether it's truly |
| 10:03AM | 5 | credible or not.  I mean, if it's taken as true, it seems to |
| 10:03AM | 6 | have some relevance as to whether, given your theory of |
| 10:03AM | 7 | damages, they would have stuck around for a period of |
| 10:03AM | 8 | 30 months. |
| 10:03AM | 9 | MR. KAREN:  I certainly can see the argument for |
| 10:03AM | 10 | that, Your Honor.  I guess my point, though, is that once the |
| 10:03AM | 11 | wrongful action has occurred, what they would have done I don't |
| 10:03AM | 12 | think then becomes relevant.  So that's really the perspective |
| 10:03AM | 13 | that we have on it.  I think nothing before what they would |
| 10:04AM | 14 | have done -- and here's the other thing, Your Honor.  You know, |
| 10:04AM | 15 | there's a degree of saying if there was -- if there was some |
| 10:04AM | 16 | evidence associated with it -- which I understand, Your Honor, |
| 10:04AM | 17 | goes to the credibility of it, right?  If there was some |
| 10:04AM | 18 | contemporaneous evidence, email saying, "Wow, I've got to get |
| 10:04AM | 19 | out of here," that I think I would look at very differently, |
| 10:04AM | 20 | because then you could say -- but now it just allows them to |
| 10:04AM | 21 | line up and take potshots with no basis whatsoever for what I |
| 10:04AM | 22 | would have done and say what they would have done but for the |
| 10:04AM | 23 | illegal and unlawful act.  So from that perspective, you know, |
| 10:04AM | 24 | we don't believe it's relevant and admissible. |
| 10:04AM | 25 | I can move to the next, but obviously -- |

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 10:04AM  | 1  | THE COURT:  Go ahead.                                              |
| 10:04AM  | 2  | MR. KAREN:  Thank you, Your Honor.  So the next                   |
| 10:04AM  | 3  | point -- and I think this is -- this was really where you have    |
| 10:04AM  | 4  | a true concern about the prejudicial nature.  So to -- let's      |
| 10:04AM  | 5  | put the issues in sequence here.  They -- based on the            |
| 10:04AM  | 6  | allegations in the complaint, they breached their fiduciary       |
| 10:04AM  | 7  | duties.  They solicit.  They take the information, et cetera,      |
| 10:05AM  | 8  | et cetera.  I know you're aware of those allegations.  And then   |
| 10:05AM  | 9  | after that at some point, it's claimed after these events         |
| 10:05AM  | 10 | occurred that Mutual did not pay some of the employees on time    |
| 10:05AM  | 11 | and/or may not have paid some of the employees based on, you      |
| 10:05AM  | 12 | know, there's a faithful servant doctrine.  There's no            |
| 10:05AM  | 13 | counterclaim for this in this case, and to be clear, this is a    |
| 10:05AM  | 14 | claim against WaterStone, not against these other individuals     |
| 10:05AM  | 15 | at this time.  So what -- whether Mutual paid them or not or if   |
| 10:05AM  | 16 | they delayed payment is simply prejudicial.  It would not be an   |
| 10:05AM  | 17 | anticipatory breach because, again, all these things happened     |
| 10:05AM  | 18 | after the alleged wrongful conduct, not before.  So, in other     |
| 10:05AM  | 19 | words, of the alleged non-payment -- which, again, we would       |
| 10:05AM  | 20 | take issue with, but assuming for the sake of argument it         |
| 10:05AM  | 21 | occurred, that alleged non-payment happened long after all of     |
| 10:05AM  | 22 | the events in question occurred in this case that we've           |
| 10:05AM  | 23 | complained of.  So it would never excuse those events.            |
| 10:05AM  | 24 | So really what they're trying to do is bootstrap    |
| 10:05AM  | 25 | to go in front of the jury respectfully and try to say well,      |

10:06AM    1    we're a bad company because we don't pay our employees.  That's

10:06AM    2    not really accurate.  And as the Court knows, there is a

10:06AM    3    faithful service doctrine, and I think to now start getting

10:06AM    4    into whether the faithful servant doctrine applies and do this

10:06AM    5    in front of a jury I think is prejudicial and raises just a

10:06AM    6    specter of highly irrelevant information coming into play when

10:06AM    7    the fact of the matter, it could never legally excuse what

10:06AM    8    occurred here because it happened subsequent to the events in

10:06AM    9    question here.

10:06AM   10         THE COURT:  All right.  Thank you, Mr. Karen.

10:06AM   11              All right.  Who is going to be doing the

10:06AM   12    argument in response?

10:06AM   13         MS. KREITER:  I am, Your Honor.

10:06AM   14         THE COURT:  All right.  Ms. Kreiter, let's start with

10:06AM   15    there.  Do you dispute whether the alleged breach by Mutual of

10:06AM   16    Omaha -- that is, the non-payment -- occurred prior to or after

10:06AM   17    the alleged conduct here that is the solicitation and the

10:06AM   18    misappropriation of trade secrets?

10:06AM   19         MS. KREITER:  I think I agree in part.  You know, I

10:06AM   20    agree that the non-payment of commissions occurred after the

10:07AM   21    employees exited the business.  Why I say in part, I'm not

10:07AM   22    certain at this point the scope of the plaintiff's allegations

10:07AM   23    frankly of wrongdoing, when it occurred, by who.  That's a

10:07AM   24    pretty broad topic, including that we have branches that moved

10:07AM   25    at different periods of time.  So the Daytona branch moves

10:07AM  1    first.  Then there's a period of time, and then later the Tampa

10:07AM  2    branch moves.  I mean, I don't really have a clear

10:07AM  3    understanding of the timing of the alleged wrongdoing.

10:07AM  4              I have heard plaintiff say that there's alleged

10:07AM  5    wrongdoing in that interim period, especially when it relates

10:07AM  6    to solicitation.  For example, the allegations that Mr. Hutto,

10:07AM  7    who's the manager of Daytona, during that interim may have

10:07AM  8    solicited the branch managers of Tampa.  So in that regard, I

10:07AM  9    would answer your question no.  I will just say that the facts

10:08AM  10   and the allegations in my mind are still evolving here.  So

10:08AM  11   maybe I'll amend my answer to no given the moving target nature

10:08AM  12   and the gap in the timing here.

10:08AM  13        THE COURT:  All right.  Well, here's what we're going

10:08AM  14   to do as to document number 188 as to the alleged breach by the

10:08AM  15   non-payment of commissions.  I'm going to grant the Motion in

10:08AM  16   Limine without prejudice.  In other words, Ms. Kreiter, at the

10:08AM  17   trial, if you feel evidence demonstrates that there was a

10:08AM  18   triggering event breach by Mutual prior to the alleged

10:08AM  19   unlawful -- or illegal conduct, I'll revisit the order.

10:08AM  20              As to the request to exclude certain evidence

10:08AM  21   related to the employees' job satisfaction, I'm denying that

10:08AM  22   without prejudice.  I think that is something I have to assess

10:08AM  23   during the trial when I hear the testimony by the employees

10:08AM  24   themselves.  As I stated, at a minimum, I think it could be

10:08AM  25   relevant to a damages assertion, but to be clear, what I'm

10:09AM  1    also -- and I agree with Ms. Kreiter -- what I'm uncertain of

10:09AM  2    is which employees we're talking about and which job

10:09AM  3    dissatisfaction we're talking about and if their job

10:09AM  4    dissatisfaction is truly relevant or not.  And so I'll have to

10:09AM  5    make that assessment as an evidentiary issue at trial.

10:09AM  6            The one thing I will note is based on my review

10:09AM  7    of the pleadings, there is clearly certain employees -- and I'm

10:09AM  8    neglecting to remember the name of the one employee that's in

10:09AM  9    the pleading that the allegations are they left prior to any of

10:09AM 10    the former managers leaving.  If that is the case -- I think

10:09AM 11    it's Mr. Lowe.  So if Mr. Lowe left prior to any of the former

10:09AM 12    managers, then I don't see the relevance of any -- of his job

10:09AM 13    dissatisfaction.  But, again, I'll assess that at trial and

10:09AM 14    hear what the arguments are.

10:09AM 15            So to be clear, as to the first half of the

10:09AM 16    motion, I'm denying it without prejudice.  Mr. Karen, you could

10:10AM 17    raise objections to the evidence as it comes in, and I'll

10:10AM 18    assess it, but as to the second half of the motion, I'm

10:10AM 19    granting it without prejudice, and, Ms. Kreiter, if you think

10:10AM 20    the evidence now is different than what we are aware of right

10:10AM 21    now, then I'll reconsider any further argument.

10:10AM 22            Okay.  Let's move on to number 190.  This is the

10:10AM 23    motion by WaterStone in limine to exclude evidence related to

10:10AM 24    Mr. Hutto and Mr. Smith regarding solicitation.  Ms. Kreiter,

10:10AM 25    are you arguing this as well?

10:10 AM   1        MS. KREITER:  I am, Your Honor.  I just want to make

10:10 AM   2   one additional point for the record related to the idea of a

10:10 AM   3   material breach.

10:10 AM   4            There's allegations in the case by the plaintiff

10:10 AM   5   that with respect to the trade secret claims, there was willful

10:10 AM   6   and malicious conduct.  I think that the idea that Mutual did

10:10 AM   7   not pay commissions to the employees is also evidence that we

10:10 AM   8   would use at the trial to oppose those claims that there was

10:11 AM   9   some willfulness, malicious intent, specifically as it relates

10:11 AM  10   to diverted loans.  I'll play this out.

10:11 AM  11            The employees leave Mutual.  Their testimony is

10:11 AM  12   going to be, "We expected to be paid commissions on the loans.

10:11 AM  13   We had no intent to divert those loans;" that there's no basis

10:11 AM  14   at all for the claim that somebody was acting willful or

10:11 AM  15   malicious.

10:11 AM  16            On top of that, Mutual doesn't pay the employees

10:11 AM  17   their commissions.  Despite being stiffed by Mutual, the

10:11 AM  18   employees nevertheless are helping Mutual triage to close loans

10:11 AM  19   that are left behind.  They are taking calls from Mutual

10:11 AM  20   employees who are scrambling to get loans closed.  I think the

10:11 AM  21   notion that the employees, despite getting stiffed by Mutual,

10:11 AM  22   not getting paid their commissions is directly relevant to

10:11 AM  23   plaintiff's assertion that no, these people were willful,

10:11 AM  24   malicious, trying to take every loan that they could to

10:12 AM  25   WaterStone.  So I think that it's relevant for that additional

10:12AM  1    purpose, and I just wanted to make sure that that was in the
10:12AM  2    record as well.
10:12AM  3              THE COURT:  What's the response to that?
10:12AM  4              MR. KAREN:  Your Honor, the majority -- not just the
10:12AM  5    majority.  I believe all of the solicitations we're talking
10:12AM  6    about occurred before they were even -- they were -- before
10:12AM  7    they had even left Mutual.  So, in other words, we have email
10:12AM  8    after email, there's 20 something emails containing borrower
10:12AM  9    information that they're sending over to WaterStone while they
10:12AM  10   are still employed at Mutual.  And they continue to send those
10:12AM  11   over, diverting loans ad nauseam.  So how could that possibly
10:12AM  12   be excused by commissions that may have been due on loans that
10:12AM  13   never closed because they diverted them to WaterStone?  But
10:12AM  14   even if somehow they had closed at Mutual, that would have
10:12AM  15   occurred what 30, 60 days later?  So I simply disagree with the
10:13AM  16   factual characterization provided to you.
10:13AM  17             THE COURT:  All right.  My ruling doesn't change.
10:13AM  18   I'm going to wait to hear what the evidence comes out, and I
10:13AM  19   can revisit it.  Ms. Kreiter, I understand your argument as to
10:13AM  20   the relevancy, but we'll wait and see what the evidence plays
10:13AM  21   out, and then I'll make that assessment upon the trial.
10:13AM  22             Okay.  Ms. Kreiter, are you going to be arguing
10:13AM  23   document 199?
10:13AM  24             MS. KREITER:  I am, Your Honor.
10:13AM  25             THE COURT:  Excuse me, 190.

10:13AM  1    MS. KREITER:  Yes, WaterStone's Motion in Limine.

10:13AM  2   So, you know, here's some -- here's the roadmap for a decision

10:13AM  3   on this one.  First, it's not disputed by Mutual that if

10:13AM  4   California law applies, these agreements aren't enforceable.

10:13AM  5   Instead, Mutual's argument is there should be a choice of law

10:13AM  6   analysis, and then Florida law comes out on top, and when

10:13AM  7   Florida law is applied, then these agreements survive.

10:13AM  8         There is no occasion to be talking about Florida

10:13AM  9   law here.  The law is pretty clear that the choice of law

10:14AM 10   designated by the parties prevails unless there's some

10:14AM 11   important public policy considerations that are going to trump

10:14AM 12   that.

10:14AM 13         Mutual is the employer here, a California

10:14AM 14   company.  There's no case law cited by Mutual, or frankly that

10:14AM 15   I'm aware of, that says the public policy of Florida should be

10:14AM 16   enjoyed by some out-of-state litigant.  The only Florida

10:14AM 17   residents here are Dwayne Hutto and Chris Smith.  They don't

10:14AM 18   need protections of Florida public policy.  The contract as

10:14AM 19   written is unenforceable.  That ends the analysis as to their

10:14AM 20   interests.

10:14AM 21         The argument about conflict of laws and whether

10:14AM 22   they trump one state or another, that comes into play when you

10:14AM 23   have an employee of a particular state where the employer has

10:14AM 24   tried to skirt the forum law and selected something else, and

10:14AM 25   the public policy of the resident employee should be considered

| | |
|---|---|
| 10:15AM | 1 |
| 10:15AM | 2 |
| 10:15AM | 3 |

and potentially eviscerate the written choice of law of the
employer.  We don't have any of that here.

I think that frankly one of the cases that is
most helpful and lays this out is a case that was cited by
Mutual.  It's the <u>Punzi</u> case, 601 So.2d 599.  That case says
essentially just what I said; that look, the default is the
choice of law set forth in the contract.  You can potentially
consider conflict of laws and adopting some other state's law
if there's conflicting public policy.  And in that case, it was
a choice between Illinois law and Florida law.  The employee
was located in Florida.  The contract said Illinois law.  The
Court recognized look, there's a meaningful difference between
Illinois and Florida, but nevertheless said look, this Florida
employee does not need protections of Florida law.  The
contract as written should be enforced, and based on that
logic, the Court said that the TRO that had been entered
shouldn't have been entered, and the case is reversed and
remanded.

So I will note that there is not one case cited
by Mutual that involves a Court invalidating a foreign state
choice of law provision based on Florida restrictive covenant
law --

THE COURT:  Well, you're not asking me to invalidate
it.  You filed this as a Motion in Limine, not a Summary
Judgment, which is then my question.  Even if your argument is

10:16AM  1    correct, what is your response that the evidence is nonetheless

10:16AM  2    still admissible related to the disloyal acts of the employees,

10:16AM  3    former employees?

10:16AM  4         MS. KREITER:  I think that the evidence could be

10:16AM  5    admissible as to the fourth cause of action.  Married with this

10:16AM  6    motion is really our request as to the special verdict and the

10:17AM  7    jury form.  I think as to the tortious interference claim,

10:17AM  8    there has to be specifics presented to the jury that a finding

10:17AM  9    based on Mr. Smith or Mr. Hutto isn't permissible as to the

10:17AM 10    tortious interference claim.

10:17AM 11         I also think --

10:17AM 12         THE COURT:  The pleadings are closed.  The very

10:17AM 13    argument you're making about the discovery being closed, you

10:17AM 14    are now at the eve of trial looking to file a summary judgment

10:17AM 15    in the form of a Motion in Limine.  And so it seems to me the

10:17AM 16    Motion in Limine is a matter of whether the evidence should be

10:17AM 17    limited or not, not the substantive issue that we're alleging

10:17AM 18    regarding whether the contract is enforceable under California

10:17AM 19    law.  You could have chose to raise that issue earlier, which

10:17AM 20    would have framed the pleadings going forward in anticipation

10:17AM 21    of the Court's pretrial hearing.

10:17AM 22         MS. KREITER:  You know, I guess I did not view it in

10:17AM 23    that fashion because I was viewing it as not something that

10:17AM 24    would be claimed dispositive, even as to the tortious

10:17AM 25    interference claim.  Mutual could succeed as to that claim to

10:18AM     1     the extent that it convinces the jury as to Mr. Wolf.  So that

10:18AM     2     is why I didn't view it as dispositive, but rather limiting as

10:18AM     3     to one of the claims, Your Honor.

10:18AM     4              THE COURT:  All right.  What's the response?

10:18AM     5              MR. KAREN:  Your Honor, first in the <u>Punzi</u> case, I'm

10:18AM     6     going to quote from that case.  It states, "when contracting

10:18AM     7     parties indicate in the contract their intention as to the

10:18AM     8     governing law, any dispute under the contract will be governed

10:18AM     9     by such law" -- here's the important part -- "as long as it's

10:18AM    10     not against the public policy of the forum state."  There is

10:18AM    11     nothing about if the employee raises it or the employer raises

10:18AM    12     it.  It's just -- it doesn't talk about that.  It's not getting

10:18AM    13     into that.  That's the statement of the case, and I'm quoting

10:18AM    14     directly from the opinion.

10:18AM    15              Now, here's -- and that's what's at issue here.

10:18AM    16     It's Florida law that does control.  The fact of the matter,

10:18AM    17     Florida law -- and the statute is 542.12, I believe, and that

10:19AM    18     statute provides very clearly what the public policy is.  And

10:19AM    19     California and Florida have opposite policy considerations.

10:19AM    20     California is concerned much more about the employee.

10:19AM    21     Florida's public policy, however, is actually much more about

10:19AM    22     the employer.  So with respect to that, it's clearly the

10:19AM    23     Florida interest that -- and I think we've cited this in our

10:19AM    24     briefs -- that the -- the reliability of an employer on their

10:19AM    25     contractual protections that indicate they can provide

| | | |
|---|---|---|
| 10:19 AM | 1 | confidential information, access to employees, et cetera, et |
| 10:19 AM | 2 | cetera, that's been announced case after case after case as an |
| 10:19 AM | 3 | important interest of the state of Florida as defined and set |
| 10:19 AM | 4 | forth in its statutes.  And as such you can no more come in |
| 10:19 AM | 5 | here and say -- Mr. Hutto could no more come and say, "Well, we |
| 10:19 AM | 6 | think the minimum wage because California law applies is $15 an |
| 10:20 AM | 7 | hour, and so you have to pay me $15 an hour because I work |
| 10:20 AM | 8 | in -- even though I work in Florida because that's what's |
| 10:20 AM | 9 | provided in my contract."  You could no more make that argument |
| 10:20 AM | 10 | than you could make this argument respectfully.  So I think |
| 10:20 AM | 11 | that California law does not apply. |
| 10:20 AM | 12 | But on the other points that Your Honor has |
| 10:20 AM | 13 | identified, I completely agree.  I think the motion is belated, |
| 10:20 AM | 14 | but even more importantly, I think what we're talking about |
| 10:20 AM | 15 | here is something that -- you know, we're talking about |
| 10:20 AM | 16 | limiting instructions, and we're now -- we don't even have a |
| 10:20 AM | 17 | trial date at this point.  I think it's premature.  In other |
| 10:20 AM | 18 | words, I think Your Honor can allow the information to come in. |
| 10:20 AM | 19 | If at the end of the case you feel there's a basis for that in |
| 10:20 AM | 20 | some way, well maybe we'll take it up then.  But clearly, this |
| 10:20 AM | 21 | is going to be relevant to the breach of fiduciary duty, to the |
| 10:20 AM | 22 | claims of tortious interference, to the claims for breach of |
| 10:20 AM | 23 | contract because trade secret or not, you know, this was |
| 10:20 AM | 24 | certainly confidential information of ours that they took.  So |
| 10:21 AM | 25 | there's multiple bases where it's relevant.  I think it's |

| | | |
|---|---|---|
| 10:21AM | 1 | inherent in this case, and what they're really trying to do |
| 10:21AM | 2 | ultimately is sanitize the case out of salient facts.  They |
| 10:21AM | 3 | shouldn't be permitted to do it. |
| 10:21AM | 4 | If at the end of discovery -- I'm sorry.  If at |
| 10:21AM | 5 | the end of trial, you believe some limiting discussion is |
| 10:21AM | 6 | warranted, then we can take it up at that time.  So I just |
| 10:21AM | 7 | don't think it's a proper motion at this time, Your Honor. |
| 10:21AM | 8 | THE COURT:  All right.  Ms. Kreiter, any response? |
| 10:21AM | 9 | MS. KREITER:  I mean, I think, yeah.  Look, if |
| 10:21AM | 10 | there's a dispute about how this was raised, the fact of the |
| 10:21AM | 11 | matter is this is a legal issue I think needs to be decided. |
| 10:21AM | 12 | THE COURT:  Well, even putting that aside, how do I |
| 10:21AM | 13 | reconcile the Punzi case where it expressly states, "when |
| 10:21AM | 14 | contracting parties indicate in the contract their intention as |
| 10:21AM | 15 | to the governing law, any dispute under the contract would be |
| 10:21AM | 16 | governed by such law, as long as it is not against the public |
| 10:21AM | 17 | policy of the forum state." |
| 10:21AM | 18 | MS. KREITER:  I think you would -- |
| 10:21AM | 19 | THE COURT:  Doesn't seem to draw any nuance about |
| 10:21AM | 20 | what you're arguing.  It's just very clear.  If it's contrary |
| 10:21AM | 21 | to Florida's public policy, then Florida's public policy will |
| 10:22AM | 22 | prevail. |
| 10:22AM | 23 | MS. KREITER:  I guess I would say the next paragraph |
| 10:22AM | 24 | of that decision, Your Honor, says specifically, "Although the |
| 10:22AM | 25 | law of Florida and the law of Illinois differ as to what |

10:22AM  1   constitutes a protectable interest, neither the restrictive

10:22AM  2   covenant nor the law of Illinois is repugnant to the public

10:22AM  3   policy of Florida."

10:22AM  4           And then it goes on, "In fact, Illinois law in

10:22AM  5   this case works to the advantage Punzi, a Florida citizen.  We

10:22AM  6   therefore will apply Illinois law to this case."

10:22AM  7           So that's the part of the decision that is

10:22AM  8   directly on point with what I am saying.  There is no need for

10:22AM  9   public policy protections for Mutual, a foreign employer that

10:22AM 10   has selected California law for some of its employees.

10:22AM 11           THE COURT:  But the argument is, and to be clear,

10:22AM 12   what Punzi states is the proper inquiry for the Court is to

10:22AM 13   ascertain whether the foreign's state's law is harmonious in

10:22AM 14   spirit with Florida's public policy.  Do you dispute that it's

10:23AM 15   not, that it's clearly -- California law clearly favors the

10:23AM 16   employee, and Florida law clearly favors the employer?

10:23AM 17           MS. KREITER:  I think as applied, the public policy

10:23AM 18   considerations don't come into play here because of the

10:23AM 19   location of the two parties and who's trying to enforce choice

10:23AM 20   of law and who's not.  So the public policy can exist, but that

10:23AM 21   should not be considered in a vacuum.  It should be how does

10:23AM 22   the public policy apply to the litigants in this case?

10:23AM 23           THE COURT:  I understand, but I disagree, so I'm

10:23AM 24   going to deny the Motion in Limine.  I'll enter a written order

10:23AM 25   finding that I do find primarily the issue of public policy

| | | |
|---|---|---|
| 10:23AM | 1 | prevails here and that Florida public policy is not harmonious |
| 10:23AM | 2 | with California law, and so I'll deny the Motion in Limine as |
| 10:23AM | 3 | framed. |
| 10:23AM | 4 | Okay.  Those are the two matters.  I know that |
| 10:23AM | 5 | the recent pleadings you've indicated that you've not come to |
| 10:23AM | 6 | an agreement, and there are additional disputes regarding what |
| 10:23AM | 7 | the Court previously ordered as to what shall be disclosed |
| 10:24AM | 8 | going forward with the trade secrets, and so in that regard |
| 10:24AM | 9 | I'll note the parties have filed additional pleadings.  At |
| 10:24AM | 10 | document 200 is WaterStone's objection to the disclosure of |
| 10:24AM | 11 | new, inconsistent facts 11 months after the close of discovery |
| 10:24AM | 12 | and on the eve of trial.  And the document number 201 is |
| 10:24AM | 13 | plaintiff response to WaterStone's objection. |
| 10:24AM | 14 | All right.  We're not going to get deep into |
| 10:24AM | 15 | this today, but I do have a couple of questions.  The first |
| 10:24AM | 16 | question is for you, Mr. Karen.  Do you dispute what is at |
| 10:24AM | 17 | least being argued in the objection?  Are there new documents |
| 10:24AM | 18 | that are now being disclosed for the first time?  And by |
| 10:24AM | 19 | documents, I want to be clear about the terminology.  I'm not |
| 10:24AM | 20 | talking about trade secrets.  I'm just talking about new |
| 10:24AM | 21 | records, new documents that are being disclosed for the first |
| 10:24AM | 22 | time and that were not previously disclosed in any way in this |
| 10:24AM | 23 | litigation? |
| 10:24AM | 24 | MR. KAREN:  Not at all, Your Honor.  I can show you |
| 10:24AM | 25 | the Bates stamps on those documents that reflect that they |

| | | |
|---|---|---|
| 10:25AM | 1 | were, in fact, produced.  Many were produced by WaterStone. |
| 10:25AM | 2 | Many were produced by us.  But absolutely these are not new |
| 10:25AM | 3 | documents.  In fact, the majority -- I won't say the majority. |
| 10:25AM | 4 | Many, many of the documents were discussed as exhibits in |
| 10:25AM | 5 | depositions. |
| 10:25AM | 6 | THE COURT:  So, Ms. Kreiter, then obviously that |
| 10:25AM | 7 | seems to be something that is of clear contention because as I |
| 10:25AM | 8 | understood your pleading, you disagree with that. |
| 10:25AM | 9 | MS. KREITER:  Judge, produced in discovery versus |
| 10:25AM | 10 | identified as trade secrets.  I will just tell you we need to |
| 10:25AM | 11 | stop talking about generalities.  "I disclosed loans," or, "I |
| 10:25AM | 12 | talked about loans in my amended complaint."  I will refer the |
| 10:25AM | 13 | Court to Exhibit 2 to our filing.  If you just look at, for |
| 10:25AM | 14 | example, Exhibit 2, I think that's a nice example.  I don't |
| 10:25AM | 15 | care whether Mr. Karen labels this Calle loan trade secret |
| 10:25AM | 16 | something that's a loan opportunity or the documents.  There's |
| 10:25AM | 17 | 24 documents there that were not identified before the close of |
| 10:26AM | 18 | discovery as trade secrets.  And in addition, none of those |
| 10:26AM | 19 | documents but for one were even identified in the course of |
| 10:26AM | 20 | summary judgment.  These are documents identified as trade |
| 10:26AM | 21 | secrets days ago. |
| 10:26AM | 22 | And I will tell you that on the 22 exhibits |
| 10:26AM | 23 | Mutual identified as its purported trade secrets, 14 of those |
| 10:26AM | 24 | consist of documents that were never disclosed in discovery. |
| 10:26AM | 25 | So I don't -- you know, I read Mr. Karen's pleading as, "Well, |

| | | |
|---|---|---|
| 10:26AM | 1 | we're talking about the concept of loans."  None of it was |
| 10:26AM | 2 | disclosed as to the vast majority of these documents.  Were |
| 10:26AM | 3 | they produced in discovery?  Sure.  But, frankly, that makes it |
| 10:26AM | 4 | worse. |
| 10:26AM | 5 | Exhibit 2, all of the documents were produced in |
| 10:26AM | 6 | October of '22 by WaterStone.  So, you know, we're nearly two |
| 10:26AM | 7 | years later.  I can't and I shouldn't be made to triage this |
| 10:26AM | 8 | volume of new documents, open up discovery, redo my e-forensic |
| 10:26AM | 9 | analysis.  None of that should be occurring. |
| 10:27AM | 10 | Mr. Karen identified -- however he's compiling |
| 10:27AM | 11 | these documents to make them look less, the fact of the matter |
| 10:27AM | 12 | is 216 of them were not disclosed.  And I can't redo the case. |
| 10:27AM | 13 | I want the case to get going and go to trial.  It's just that |
| 10:27AM | 14 | his proposal that all of this just be permitted because he |
| 10:27AM | 15 | disclosed it in April is not -- I don't know what to do with |
| 10:27AM | 16 | that.  I can't go to trial. |
| 10:27AM | 17 | He said, "Well, you know, look.  Kreiter |
| 10:27AM | 18 | proposed a trial in June, and she knew this was out there." |
| 10:27AM | 19 | You know what?  I guess I was counting on the Federal Rules |
| 10:27AM | 20 | being enforced.  We have a -- we had a dispositive motion on |
| 10:27AM | 21 | trade secrets.  I can't go back to step one of the analysis and |
| 10:27AM | 22 | talk about what are the trade secrets?  Frankly, even now I |
| 10:27AM | 23 | don't know in particular because Mr. Karen is saying, "Well, |
| 10:27AM | 24 | it's some of these documents, not all of them." |
| 10:28AM | 25 | The fact of the matter is discovery is done.  I |

10:28AM  1    can't have yet another redo where, you know, this scheduling is
10:28AM  2    going to entail now we've got to do discovery and new experts
10:28AM  3    and all this other stuff.  Discovery is closed.  I haven't
10:28AM  4    heard one peep from Mr. Karen ever about why -- for example,
10:28AM  5    Exhibit Number 2 with documents disclosed in October of '22,
10:28AM  6    why those weren't identified as trade secrets.  And I can't fix
10:28AM  7    it now.  It's too late.  It's too expensive.  It's completely
10:28AM  8    divorced from the Federal Rules and the Court's multiple
10:28AM  9    orders.
10:28AM  10             I can say more on that, and frankly I have a lot
10:28AM  11   more to say about the damages because that part is even worse
10:28AM  12   frankly.  I mean, the idea that --
10:28AM  13             THE COURT:  Well, before we get down there, just so I
10:28AM  14   understand Exhibit Number 2, what you're saying is 216 of the
10:28AM  15   284 were not disclosed in July 31st before the close of
10:28AM  16   discovery, and Judge Sneed had entered an order directing
10:29AM  17   plaintiff to identify by Bates stamp trade secrets; is that
10:29AM  18   accurate?
10:29AM  19             MS. KREITER:  Correct.
10:29AM  20             THE COURT:  Now, in April of 2024, are any of these
10:29AM  21   284 documents identified?
10:29AM  22             MS. KREITER:  Yes, there is a portion of them that
10:29AM  23   were identified in April.  That would be -- well, so I guess I
10:29AM  24   sliced it and diced it differently.  89 of the documents were
10:29AM  25   never disclosed at any point, either in April or in July or --

| | | |
|---|---|---|
| 10:29AM | 1 | THE COURT:  Right. |
| 10:29AM | 2 | MS. KREITER:  Those were just disclosed in May. |
| 10:29AM | 3 | There are 68 documents that were timely disclosed in discovery. |
| 10:29AM | 4 | That's not what this is about. |
| 10:29AM | 5 | THE COURT:  So then the remainder is what you're |
| 10:29AM | 6 | saying was not disclosed until April of 2024? |
| 10:29AM | 7 | MS. KREITER:  Right, April or May.  Again, that is |
| 10:29AM | 8 | what is making it entirely unmanageable, to talk about renewing |
| 10:30AM | 9 | my motion for summary judgment.  I haven't -- I mean, I |
| 10:30AM | 10 | haven't -- |
| 10:30AM | 11 | THE COURT:  All right. |
| 10:30AM | 12 | MS. KREITER:  -- the discovery. |
| 10:30AM | 13 | THE COURT:  All right.  Response to that? |
| 10:30AM | 14 | MR. KAREN:  Your Honor, and perhaps we can get |
| 10:30AM | 15 | through this with some clarification because I want to explain |
| 10:30AM | 16 | to you what I did and where maybe this could -- we could find |
| 10:30AM | 17 | some middle ground. |
| 10:30AM | 18 | We -- everything in terms of the trade secrets |
| 10:30AM | 19 | that we offered here was disclosed on April 1st, with one |
| 10:30AM | 20 | exception, and -- |
| 10:30AM | 21 | THE COURT:  Why do you think the April 1st is a date |
| 10:30AM | 22 | that saves you, despite the close of discovery in Judge Sneed's |
| 10:30AM | 23 | order? |
| 10:30AM | 24 | MR. KAREN:  Two things.  I think, Your Honor, for the |
| 10:30AM | 25 | most part we did discuss this the other day, and I think we |

| | |
|---|---|
| 10:30AM | 1 |
| 10:30AM | 2 |
| 10:30AM | 3 |
| 10:30AM | 4 |
| 10:30AM | 5 |
| 10:30AM | 6 |
| 10:30AM | 7 |
| 10:30AM | 8 |
| 10:31AM | 9 |
| 10:31AM | 10 |
| 10:31AM | 11 |
| 10:31AM | 12 |
| 10:31AM | 13 |
| 10:31AM | 14 |
| 10:31AM | 15 |
| 10:31AM | 16 |
| 10:31AM | 17 |
| 10:31AM | 18 |
| 10:31AM | 19 |
| 10:31AM | 20 |
| 10:31AM | 21 |
| 10:31AM | 22 |
| 10:31AM | 23 |
| 10:31AM | 24 |
| 10:31AM | 25 |

1   went through all of those just to put those together.  But
2   putting that aside, because I do think we're kind of rearguing
3   what we discussed last time, you know, if you look at Federal
4   Rules of Procedure 2016, it actually says there's no obligation
5   to provide supplemental directive information that has
6   otherwise been made known to the parties in writing or during
7   the discovery process.
8                    Now, we asked --
9            THE COURT:  Despite Judge Sneed's order, though.
10  Judge Sneed's order is very clear you were to identify by Bates
11  stamps the trade secret documents at issue.
12           MR. KAREN:  And they -- we produced, Your Honor, and
13  identified what we could.  Additional information was
14  discovered later, and throughout the course of discovery, we
15  updated it as we discovered it.  At that time --
16           THE COURT:  I'm going to interrupt you, because
17  here's what we're going to do.  We're not going to resolve this
18  today.  I'm going to bring you all in so I can look at the
19  documents themselves, and what you need to present to me is --
20  of these documents -- and I don't know what is being asserted
21  here to include 89 documents that were never disclosed.  You
22  may want to revisit that.  But as the remaining ones that were
23  disclosed April 1st, which you're going to have to establish
24  for good cause why they were not disclosed for me to consider
25  allowing them to go forward in this case, and I will tell you

| | | |
|---|---|---|
| 10:31AM | 1 | it's going to be an uphill battle to demonstrate that given |
| 10:31AM | 2 | Judge Sneed's order.  So you're going to have to be in a |
| 10:31AM | 3 | position to explain to me why you could not identify these |
| 10:31AM | 4 | documents despite the disclosure of them throughout the period |
| 10:32AM | 5 | of discovery. |
| 10:32AM | 6 | MR. KAREN:  Your Honor, could I ask for clarification |
| 10:32AM | 7 | of one point? |
| 10:32AM | 8 | THE COURT:  Sure. |
| 10:32AM | 9 | MR. KAREN:  Might make it easier.  Some of the |
| 10:32AM | 10 | documents that we added were -- I did that because you had |
| 10:32AM | 11 | indicated provide to the other -- to WaterStone the documents |
| 10:32AM | 12 | as they would be in an exhibit.  So I included things, for |
| 10:32AM | 13 | example, emails that may have been -- not have a trade secret, |
| 10:32AM | 14 | but they would provide that here sent to me this day.  I've got |
| 10:32AM | 15 | a receipt, so you could see the chain, so to speak.  Those are |
| 10:32AM | 16 | some -- many of the emails that I think Ms. Kreiter is talking |
| 10:32AM | 17 | about being added -- |
| 10:32AM | 18 | THE COURT:  If you're not asserting those documents |
| 10:32AM | 19 | to be trade secrets, but rather just context of the trade |
| 10:32AM | 20 | secret, that's fine.  But if you're asserting documents as |
| 10:32AM | 21 | trade secrets that should have been identified per Judge |
| 10:32AM | 22 | Sneed's order, that's a different issue. |
| 10:32AM | 23 | MR. KAREN:  To get clarity, when we produce those or |
| 10:32AM | 24 | when we provide sort of the documents, should we refine our |
| 10:32AM | 25 | identification that you had asked for last time excluding those |

| | |
|---|---|
| 10:32AM | 1 |
| 10:33AM | 2 |
| 10:33AM | 3 |
| 10:33AM | 4 |
| 10:33AM | 5 |
| 10:33AM | 6 |
| 10:33AM | 7 |
| 10:33AM | 8 |
| 10:33AM | 9 |
| 10:33AM | 10 |
| 10:33AM | 11 |
| 10:33AM | 12 |
| 10:33AM | 13 |
| 10:33AM | 14 |
| 10:33AM | 15 |
| 10:33AM | 16 |
| 10:33AM | 17 |
| 10:33AM | 18 |
| 10:33AM | 19 |
| 10:33AM | 20 |
| 10:33AM | 21 |
| 10:33AM | 22 |
| 10:34AM | 23 |
| 10:34AM | 24 |
| 10:34AM | 25 |

materials?  And the only reason I included them is I didn't want it to be indicated that we were not going to use them as exhibits for other purposes in the case.  So as long as we're not excluding our ability to use them as exhibits, I can pare this down further.  That's what I was worried about.

THE COURT:  Well, I understand, Mr. Karen.  I appreciate you doing that.  But to be abundantly clear, what we're trying to get to is just what is the universe of trade secrets that are at issue for Ms. Kreiter in defending the litigation?  So however you want to identify specifically, which to be very blunt, it should have been already done based on Judge Sneed's order by Bates stamp.  What I was trying to accomplish is just simply by ease of reference to an exhibit, but if you're including additional materials that you are not asserting to be trade secrets, then you need to clarify that for Ms. Kreiter so she's without question clear on what is being alleged to be a trade secret in this case and what is not.

MR. KAREN:  We will make that clarification.

THE COURT:  All right.  So then what I'll do then is I'm going to schedule a hearing on this, but direct that you all meet and confer after you make that clarification, and if there's still further issue, then I'm going to bring you down so I can look at the documents themselves and hear any additional argument.

10:34AM  1           Explain to me then, Mr. Karen, as to this issue
10:34AM  2  regarding damages.  Are you looking to supplement your damage
10:34AM  3  expert to include a different theory of damages?
10:34AM  4           MR. KAREN:  No, not a different theory at all, Your
10:34AM  5  Honor.  Just to be clear, our damage expert does calculations,
10:34AM  6  but doesn't necessarily and certainly can't provide the factual
10:34AM  7  underpinnings for those calculations.  So what we had talked
10:34AM  8  about last time was we were going to have her report be updated
10:34AM  9  to reflect the Court's prior rulings with respect to the
10:34AM 10  exclusion of certain information in those damages and inclusion
10:34AM 11  of others, so we would just simply update it for that, update
10:34AM 12  it to reflect the 30 months so it was very clear what that was.
10:34AM 13  And then we were additionally going to provide Mr. Gennarelli
10:34AM 14  who had previously testified so that Ms. Kreiter could ask
10:35AM 15  additional questions about 30-month stipulation and where that
10:35AM 16  comes into.  That's all we were suggesting doing, which is what
10:35AM 17  I thought we agreed upon last time.
10:35AM 18           So that's the only -- there are no new facts.  I
10:35AM 19  think just so -- to be clear, Ms. Kreiter asked me in
10:35AM 20  conversations, "Are you saying that he's -- is that going to be
10:35AM 21  a new fact?"  And, you know, I hope you can appreciate where
10:35AM 22  I'm coming from, Your Honor.  There's going to be questions and
10:35AM 23  answers.  If there's a new question asked that wasn't asked,
10:35AM 24  then there's a new answer, which I obviously can't predict
10:35AM 25  today.  I can't state a different answer won't be provided or

Tana J. Hess, CRR, RMR, FCRR
U.S. District Court Reporter
Middle District of Florida

10:35AM    1    will be provided, not even knowing what the question is.  So

10:35AM    2    the point I'm getting to is I can't simply say a new fact, but

10:35AM    3    is it a new theory of damages?  No, absolutely not.  Could a

10:35AM    4    new fact emerge through questioning that hadn't been discussed

10:35AM    5    before?  Possibly.  I can't say it wouldn't, and that's all I

10:35AM    6    was saying to Ms. Kreiter.  But there's no new theory of

10:35AM    7    damages here.  The theory is the exact same theory.

10:35AM    8                    And I want to be clear.  You know, I can read

10:35AM    9    you the deposition transcript from the deposition she's talking

10:35AM   10    about.  And if you wouldn't mind, Your Honor, I would like

10:36AM   11    to --

10:36AM   12            THE COURT:  You can in a moment, but I do have a

10:36AM   13    question.  Explain to me though, as I understand the expert --

10:36AM   14    who is going to opine the 30-month value, the expert or the

10:36AM   15    30(b)(6) witness?

10:36AM   16            MR. KAREN:  The 30(b)(6) witness will talk about a

10:36AM   17    30-month duration, and the expert -- I'm sorry, yes, the

10:36AM   18    30(b)(6) witness will talk about the expert -- sorry, Your

10:36AM   19    Honor.

10:36AM   20                    The 30(b)(6) witness will talk about the

10:36AM   21    duration of expected employment.  The expert will just do the

10:36AM   22    physical calculation -- not physical, but the mathematical

10:36AM   23    calculation based on, again, Your Honor's recent rulings, to

10:36AM   24    update for that, as well as the 30 months so there's clarity.

10:36AM   25    I think the 30 months had already figured in to what we had

|  |  |  |
|---|---|---|
| 10:36AM | 1 | provided before, but certainly we will update it to reflect the |
| 10:36AM | 2 | calculations excluding Mr. Hutto, I believe, and excluding |
| 10:37AM | 3 | Paramus. |
| 10:37AM | 4 | THE COURT:  All right.  Ms. Kreiter? |
| 10:37AM | 5 | MS. KREITER:  He's absolutely talking about someone |
| 10:37AM | 6 | new.  That's why he needs a corporate rep.  The expert alone is |
| 10:37AM | 7 | not going to do this.  What he is proposing is that Mutual come |
| 10:37AM | 8 | forward with a brand new corporate rep who's going to talk |
| 10:37AM | 9 | about what is typical at Mutual, why 30 months is acceptable, |
| 10:37AM | 10 | what -- I mean, my understanding is what's typical in the |
| 10:37AM | 11 | industry.  That was never disclosed in discovery period.  I |
| 10:37AM | 12 | spent two days deposing their corporate rep on multiple |
| 10:37AM | 13 | damages.  I never heard anything about this.  He is trying to |
| 10:37AM | 14 | absolutely inject new facts into the case.  If he weren't, I |
| 10:37AM | 15 | wouldn't be hearing about any 30(b)(6) corporate |
| 10:37AM | 16 | representative. |
| 10:37AM | 17 | That's the problem, Your Honor.  I can't redo |
| 10:37AM | 18 | all of this.  I have a damages expert.  I might need an |
| 10:37AM | 19 | industry expert.  It's just -- it is reopening discovery in the |
| 10:37AM | 20 | most material of ways.  We've already had Mutual getting a |
| 10:37AM | 21 | number of redos as to its damages, including allowing Mutual to |
| 10:38AM | 22 | have a rebuttal expert two weeks before the close of discovery |
| 10:38AM | 23 | where we see the damages change from 4.5 million to then it's |
| 10:38AM | 24 | up to 28 million.  We started this case with Mutual's counsel |
| 10:38AM | 25 | telling the Court that damages were approximately 250,000.  It |

|        |    |                                                              |
|--------|----|--------------------------------------------------------------|
| 10:38AM | 1  | has been all over the map, and I can't have another change. |
| 10:38AM | 2  | Discovery is closed, and I just -- the rules have to mean |
| 10:38AM | 3  | something here.  This case has to get going, and it can't |
| 10:38AM | 4  | restart now with a new damages theory. |
| 10:38AM | 5  |                      If Ms. Rosevear can, you know, calculate |
| 10:38AM | 6  | 30 months of damages, so be it, but it's got to be by evidence |
| 10:38AM | 7  | that is in the record, in discovery.  It wasn't that I didn't |
| 10:38AM | 8  | ask about this.  I spent two days asking about this.  It was |
| 10:38AM | 9  | never mentioned. |
| 10:38AM | 10 |                      He is asking for yet another redo that's going |
| 10:38AM | 11 | to put us back months if the Court countenances it.  The Court |
| 10:38AM | 12 | should not countenance this.  This case has to get to trial. |
| 10:39AM | 13 |           THE COURT:  All right.  Let me interrupt you. |
| 10:39AM | 14 | Mr. Karen, the whole reason why I allowed the additional |
| 10:39AM | 15 | discovery is because of the failure to disclose Ms. Rosevear in |
| 10:39AM | 16 | your case in chief rather than as a rebuttal.  This is not an |
| 10:39AM | 17 | opportunity then to insert additional facts in order for her to |
| 10:39AM | 18 | rely upon to form her opinion.  The opinion has been formed, so |
| 10:39AM | 19 | it seems to me it's unnecessary to have a 30(b)(6) witness. |
| 10:39AM | 20 | What is the purpose of the 30(b)(6) witness? |
| 10:39AM | 21 |           MR. KAREN:  Yes.  I think, Your Honor, what we're |
| 10:39AM | 22 | talking about here is we submitted a stipulation.  I want to |
| 10:39AM | 23 | try to go back how we got here, because I think that's |
| 10:39AM | 24 | important. |
| 10:39AM | 25 |                      We submitted a stipulation at Judge Barber's |

| | | |
|---|---|---|
| 10:39AM | 1 | urging, as Judge Barber had already ruled on summary judgment |
| 10:39AM | 2 | on this exact issue and said that we would be able to go |
| 10:39AM | 3 | forward and present evidence, but that by the close of evidence |
| 10:39AM | 4 | we had to have some basis articulated as to why we would have |
| 10:39AM | 5 | 30 months.  That's what the ruling was, and that's how we came |
| 10:39AM | 6 | in. |
| 10:39AM | 7 | Then Ms. Kreiter, WaterStone, filed a motion and |
| 10:39AM | 8 | said you should strike the 30 months, and that's how we got |
| 10:40AM | 9 | back up to it.  So I think that bears recognition because |
| 10:40AM | 10 | that's kind of how we got here.  I mean, look.  If it's going |
| 10:40AM | 11 | to come down to it, then what I would suggest, we go to |
| 10:40AM | 12 | trial -- we tried to be useful.  We tried to be reasonable.  We |
| 10:40AM | 13 | tried to listen the Judge Barber's urgings, and so -- |
| 10:40AM | 14 | THE COURT:  If I can interrupt you one moment just to |
| 10:40AM | 15 | be clear.  I seem to recall the basis for the 30 months, |
| 10:40AM | 16 | though, was testimony that's already been provided about the |
| 10:40AM | 17 | anticipation of offices that have been existing for a certain |
| 10:40AM | 18 | period of time to continue on for at least a period of |
| 10:40AM | 19 | 30 months. |
| 10:40AM | 20 | MR. KAREN:  Yes. |
| 10:40AM | 21 | THE COURT:  So is that not in the record already? |
| 10:40AM | 22 | MR. KAREN:  I think to some extent it is.  I mean, |
| 10:40AM | 23 | but maybe -- this is why I was going to read from the |
| 10:40AM | 24 | deposition transcript so you could hear it. |
| 10:40AM | 25 | THE COURT:  All right. |

10:40AM 1        MR. KAREN:  Question:  "How long did you spend

10:40AM 2    preparing it?"  Answer:  "Well, I think a large part of the

10:40AM 3    time we spent was trying to come up, you know, a fair way to

10:41AM 4    associate the lost revenue, and I really mean fair and be

10:41AM 5    conservative about it because we were hoping for a settlement

10:41AM 6    before this time.  So, you know, so that was the big -- because

10:41AM 7    there's two -- there's two ways we could do this, right?  We

10:41AM 8    could do what we did here, which is to take those loans and

10:41AM 9    multiply it times the basis points earned by corporate from

10:41AM 10   that volume, average it out, and then show for 18 months they

10:41AM 11   had stayed.  The other way we mentioned earlier was the cost of

10:41AM 12   goods sold, and when you do that approach, you know, you're

10:41AM 13   talking about 17, 18 million."

10:41AM 14         It continues on, if I may to page -- then

10:41AM 15   there's another question.  "What was the rationale for using

10:41AM 16   the 18-month period to calculate the lost profit damages

10:41AM 17   associated with the branches closing?"  "Yeah, I mean, we

10:41AM 18   didn't want to use -- again, we were trying to be reasonable.

10:41AM 19   You know, I think you could make a case for using longer.  Most

10:41AM 20   of our branches have been here 10, 15 years or so.  So -- at

10:41AM 21   least the core group.  So we could have used longer, but we

10:41AM 22   thought 18 months was a reasonable amount of time."

10:41AM 23         Then further on it goes.  Question is, "And that

10:42AM 24   could have happened at the one-year mark.  So I'm trying to

10:42AM 25   understand was that -- you know, that situation factored in at

10:42AM  1  all for purposes of your damages?"  Answer:  "Not really.  They
10:42AM  2  also could still be here.  Keller Williams comes into play, and
10:42AM  3  they stay for six or seven years, so we didn't use six or seven
10:42AM  4  years.  We didn't use ten years.  We used 18 months.  I mean, I
10:42AM  5  don't know how much we can, you know" -- and he gets cut off,
10:42AM  6  and they continue on other things.
10:42AM  7          So this is what we're talking about right here.
10:42AM  8  Now, I can't say that if questions are -- I wanted to make the
10:42AM  9  witness available.  Ms. Kreiter indicated she didn't think it
10:42AM  10  was fair that we now have the stipulation it was going to be
10:42AM  11  30 months.  So, again, trying to be reasonable, make sure
10:42AM  12  there's no questions about, you know, anybody trying to pull
10:42AM  13  any wool over anyone's eyes, we said, "We'll make him available
10:42AM  14  yet again.  You can ask the same questions."  This is what the
10:42AM  15  testimony is going to be.
10:42AM  16          So will they probably drill down more, a little
10:42AM  17  bit more about why 30 months?  Yes, but -- I would expect
10:43AM  18  Ms. Kreiter will do that, but I don't know what the questions
10:43AM  19  are going to be, and I don't know what the answers are going to
10:43AM  20  be, so I'm hesitant to say they're going to be exactly in line
10:43AM  21  with this.  I obviously can't say that.
10:43AM  22          What I am saying is that there's not going to be
10:43AM  23  a new theory.  What we're talking about is what we were talking
10:43AM  24  about in this deposition, and they will continue to talk about
10:43AM  25  it.  We simply said, and I think the position is and our

10:43AM 1  position is, Your Honor, that under Florida law, we are
10:43AM 2  entitled to go in front of the jury, and if we want to argue
10:43AM 3  for 10 years of damages, and the jury based upon causation can
10:43AM 4  make the determination.  We voluntarily said we won't do that
10:43AM 5  because we're trying to facilitate this case and streamline it,
10:43AM 6  but we shouldn't be punished for that.
10:43AM 7          And so if she -- and Ms. Kreiter and WaterStone
10:43AM 8  now want to take a deposition and ask a corporate designee
10:43AM 9  about these questions and get more clarification, we'll allow
10:43AM 10 it again, but there's no new theory here.  This is what they
10:43AM 11 were talking about before, and this is what, if they want, they
10:43AM 12 can talk about again.
10:43AM 13         THE COURT:  All right.  Thank you.  And what I
10:43AM 14 understand is Ms. Kreiter does not want to reopen the
10:43AM 15 deposition as to the 30(b)(6) witness.  I mean, you've made the
10:44AM 16 witness available, and as I understand it, she's not looking to
10:44AM 17 avail herself of that, and so we're not going to go down that
10:44AM 18 path.
10:44AM 19         What I previously ordered, given that I'm going
10:44AM 20 to allow Ms. Rosevear to testify in plaintiff's case in chief,
10:44AM 21 is the opportunity for an examination of Ms. Rosevear on that
10:44AM 22 theory of damages for the 30 months, and if Ms. Kreiter wants
10:44AM 23 to avail herself to that, she may go forward.  But outside of
10:44AM 24 that, if there's no need from her perspective to reopen the
10:44AM 25 30(b)(6) deposition, then we're not going to reopen it.

| | |
|---|---|
| 10:44AM | 1 |
| 10:44AM | 2 |
| 10:44AM | 3 |
| 10:44AM | 4 |
| 10:44AM | 5 |
| 10:44AM | 6 |
| 10:44AM | 7 |
| 10:44AM | 8 |
| 10:44AM | 9 |
| 10:44AM | 10 |
| 10:44AM | 11 |
| 10:44AM | 12 |
| 10:45AM | 13 |
| 10:45AM | 14 |
| 10:45AM | 15 |
| 10:45AM | 16 |
| 10:45AM | 17 |
| 10:45AM | 18 |
| 10:45AM | 19 |
| 10:45AM | 20 |
| 10:45AM | 21 |
| 10:45AM | 22 |
| 10:45AM | 23 |
| 10:45AM | 24 |
| 10:45AM | 25 |

1    Ms. Kreiter, any concerns to proceeding in that
2  way?
3    MS. KREITER:  Yeah, I guess I want to be clear.  The
4  testimony that Mr. Karen just read was the corporate rep
5  talking about why 18 months is appropriate.
6    THE COURT:  Well, that's something certainly you
7  could argue at trial, examine the witness at trial, and then
8  certainly make an argument to the jury, but whatever Mr. Karen
9  thinks the witness will testify to at trial is a separate
10  matter than reopening the deposition.
11    MS. KREITER:  I think, though, Your Honor, I don't
12  want trial by ambush where because this was never disclosed
13  that Mutual was seeking 30 months -- and remember, Judge Barber
14  didn't know that there was no supporting testimony for the
15  30 months.  He got -- he saw a stipulation, had no context for
16  any of that.  I don't want to have a witness at trial get up on
17  the stand and talk about, "Here's my analysis as to why 30
18  months is reasonable.  Here's my opinions on that," and I hear
19  about it the first time at trial.  That's where the rub is.
20    So I guess I want clarity.  Is the Court saying
21  that Mutual cannot put a witness on the stand to introduce an
22  analysis supportive of the 30 months?  If so, that's where I
23  could say look, I would serve discovery.  I would potentially
24  depose leadership at Mutual's branches that, you know, they're
25  saying this branch would have stayed on, and it's typical for

| | | |
|---|---|---|
| 10:45AM | 1 | Mutual.  I want to depose the leadership of those branches.  I |
| 10:45AM | 2 | would serve additional discovery.  I may hire an industry |
| 10:45AM | 3 | expert.  I can't do any of that, and if my choices are either |
| 10:45AM | 4 | trial by ambush where they are going to put this theory forward |
| 10:45AM | 5 | at trial, you know, then I think I need to do all that.  I |
| 10:46AM | 6 | don't want to because of the time, expense, and discovery |
| 10:46AM | 7 | rules. |
| 10:46AM | 8 | THE COURT:  Well, it seems to me we need to start |
| 10:46AM | 9 | with Ms. Rosevear and find out exactly how she's coming to her |
| 10:46AM | 10 | opinion as to 30 months and what she is relying upon, and if |
| 10:46AM | 11 | there's nothing in the record that she relied upon, then that's |
| 10:46AM | 12 | the answer, but if she is asserting there's something that she |
| 10:46AM | 13 | relied upon to form that opinion you feel that was not |
| 10:46AM | 14 | previously disclosed, then I'll hear you as to that matter. |
| 10:46AM | 15 | But I'm not going to reopen -- so to be clear, |
| 10:46AM | 16 | we're not going to reopen it to allow the opportunity to |
| 10:46AM | 17 | present additional facts for that purpose.  It's either in the |
| 10:46AM | 18 | record or not.  And so that's what we're going to do going |
| 10:46AM | 19 | forward. |
| 10:46AM | 20 | So this is not a trial by ambush.  It's a matter |
| 10:46AM | 21 | of whether -- and I don't know the answer to that. |
| 10:46AM | 22 | Ms. Rosevear -- and as I just understood Mr. Karen's argument, |
| 10:46AM | 23 | he was arguing that, "We could have gone up to 10 years."  So I |
| 10:46AM | 24 | suspect that's what Ms. Rosevear is going to testify to; that |
| 10:46AM | 25 | based upon the information she's been provided, she just cut it |

|  |  |  |
|---|---|---|
| 10:46AM | 1 | off at 30 months, but I don't know. |
| 10:46AM | 2 | So we're going to start with Ms. Rosevear first, |
| 10:46AM | 3 | and then if you think there's additional concerns after that |
| 10:47AM | 4 | testimony, then I'll hear you as to that. |
| 10:47AM | 5 | MS. KREITER:  Okay.  That addresses my concern. |
| 10:47AM | 6 | MR. KAREN:  Your Honor, I just want to, again for the |
| 10:47AM | 7 | record so it's clear, go into this, because, again, you heard |
| 10:47AM | 8 | the testimony just now.  There was no statement they said, |
| 10:47AM | 9 | "Well, we think 18 months is a reasonable estimate."  They |
| 10:47AM | 10 | said, "We think we could go as high as 10 years."  What I |
| 10:47AM | 11 | don't -- what I want to make sure is if our witness comes in |
| 10:47AM | 12 | and says, "Yes, you know at that point in time I thought |
| 10:47AM | 13 | 18 months was reasonable, but, you know, based on this, that, |
| 10:47AM | 14 | and the other thing and the fact that we had said it could be |
| 10:47AM | 15 | 10 years, we think 30 months."  I mean, we didn't say that |
| 10:47AM | 16 | there was a measurement done.  He said, "For settlement |
| 10:47AM | 17 | purposes" -- those were the words he used -- "we thought that |
| 10:47AM | 18 | 18 months was reasonable."  So I want to make sure that my |
| 10:47AM | 19 | witness isn't locked into something more than what he actually |
| 10:47AM | 20 | testified to. |
| 10:47AM | 21 | I certainly understand that Ms. Kreiter can |
| 10:47AM | 22 | cross-examination Mr. Gennarelli, the 30(b)(6) witness, and |
| 10:47AM | 23 | say, "Well, didn't you think 18 months was reasonable today, |
| 10:47AM | 24 | and why do you think 30 months is reasonable tomorrow?"  But in |
| 10:47AM | 25 | no way should he be precluded in his testimony from talking and |

| | |
|---|---|
| 10:48AM | 1 |
| 10:48AM | 2 |

10:48AM  1  answering questions -- I mean, it is often that at trial, while
10:48AM  2  we're not talking about trial by ambush, the testimony --
10:48AM  3      THE COURT:  Mr. Karen, as clearly articulated by
10:48AM  4  Judge Barber's order is it can't be just mere speculation, and
10:48AM  5  that's the whole fundamental issue that was identified.  What
10:48AM  6  is the -- where is it grounded in fact for 30 months?  So I
10:48AM  7  don't know what the answer to that is, and I've yet to hear it.
10:48AM  8  If it's just arbitrarily, "We thought 18 months was reasonable,
10:48AM  9  but now we're saying 30 months," it's got to be more than that.
10:48AM  10      And so what is the fact that Ms. Rosevear relied
10:48AM  11 upon in order to say damages at 30 months should be calculated
10:48AM  12 this way and why 30 months is the number?
10:48AM  13      MR. KAREN:  And I guess, Your Honor, here's where I'm
10:48AM  14 struggling with that.  Mr. Gennarelli can provide -- he
10:48AM  15 provided answers to questions, and if a question wasn't asked,
10:48AM  16 then there may be an answer that was not provided, if that
10:49AM  17 makes sense.  And so I want to make sure because in most
10:49AM  18 cases -- and I think this is what Judge Barber was
10:49AM  19 contemplating-- you know, you testify at trial.  Somebody
10:49AM  20 testifies.  You cross-examine them, or you don't.  Obviously if
10:49AM  21 it's a completely different theory of the case, that's
10:49AM  22 something different.  But, for example, we had provided -- one
10:49AM  23 of the things we had already provided, and this was provided
10:49AM  24 prior to -- it was Judge Sneed who said we could actually use
10:49AM  25 the information.  It was the affidavit where we provided NMLS

| | |
|---|---|
| 10:49AM | 1 |
| 10:49AM | 2 |

data, for example, and that shows the duration of certain
branches, how long they last and what the averages were.
That's a large part of what I'm sure Mr. Gennarelli will be
talking about.

So, I mean, that information is out there.  Was
that something she asked about in his deposition?  No, it was
not.  So are we going to be precluded, even though Judge Sneed
had said that information could come in and Judge Barber seemed
to indicate as well that it could come in?  So that's what I'm
concerned about.  I mean, some of that NMLS data we are going
to use.

THE COURT:  Well, that will be what Ms. Rosevear will
have to testify to, and if Ms. Kreiter feels she's relied upon
facts that were not fully disclosed, I'm sure I'll hear about
it, but at first we're going to go one step at a time, allow
the opportunity for an examination of Ms. Rosevear to find out
exactly what her opinion is grounded in, and then we'll take it
the next step from there.

All right.  So what I'd like to do is schedule
for a hearing then -- how much time do you need to meet and
confer as to the trade secrets then, Mr. Karen?

MR. KAREN:  I think with Your Honor's instructions
today, we could revise our list and provide it to counsel
within seven days.  Is that reasonable, Arielle?  Within seven
days we could provide it to counsel.

|          |     |                                                                      |
|----------|-----|----------------------------------------------------------------------|
| 10:50AM  | 1   | I do want to apologize.  I have pre-existing                         |
| 10:50AM  | 2   | plans to be out of town from the 14th to the 28th, but after         |
| 10:50AM  | 3   | that, obviously I'm good.                                            |
| 10:51AM  | 4   | MS. KREITER:  If I could make a suggestion, Your                     |
| 10:51AM  | 5   | Honor.                                                               |
| 10:51AM  | 6   | THE COURT:  Yes.                                                     |
| 10:51AM  | 7   | MS. KREITER:  I propose that we send Mr. Karen a                     |
| 10:51AM  | 8   | native version of Exhibit 2 because I want to make sure that         |
| 10:51AM  | 9   | nothing is lost in translation.  Exhibit 2 to our filing, which      |
| 10:51AM  | 10  | is -- so it's docket 200-2.  I mean, that's a chart of all the       |
| 10:51AM  | 11  | documents that we're talking about with the date of disclosure,      |
| 10:51AM  | 12  | whether WaterStone contends it was previously identified.  I         |
| 10:51AM  | 13  | propose that Mr. Karen add a column to that and make abundantly      |
| 10:51AM  | 14  | clear which documents he is talking about are trade secrets.         |
| 10:51AM  | 15  | And then if I understand the Court, you know, look, if he            |
| 10:51AM  | 16  | narrows it substantially, maybe there's no issue.  My                |
| 10:51AM  | 17  | understanding is that he would then have the burden to               |
| 10:51AM  | 18  | establish cause as to any of the documents he's claiming are         |
| 10:51AM  | 19  | trade secrets that have not been timely produced.  I think that      |
| 10:52AM  | 20  | that would avoid the chance of further ambiguity and, frankly,       |
| 10:52AM  | 21  | facilitate the questions -- the analysis.                            |
| 10:52AM  | 22  | So I guess I would ask if Mr. Karen could within       |
| 10:52AM  | 23  | seven days, or whatever date is reasonable, annotate that chart      |
| 10:52AM  | 24  | so that we have transparency, and then -- and I guess it seems       |
| 10:52AM  | 25  | like there should be a second date by which Mr. Karen will           |

| | | |
|---|---|---|
| 10:52AM | 1 | articulate his position as to cause, and I could respond to |
| 10:52AM | 2 | that.  But without knowing which he's going to proceed on in |
| 10:52AM | 3 | his argument, it seems to me that's the proper sequence. |
| 10:52AM | 4 | THE COURT:  Mr. Karen, what do you think of that? |
| 10:52AM | 5 | MR. KAREN:  May I just look at that Exhibit 2 again |
| 10:52AM | 6 | for a moment, Your Honor? |
| 10:52AM | 7 | THE COURT:  Sure.  Take your time. |
| 10:52AM | 8 | MR. KAREN:  Thank you, Your Honor. |
| 10:53AM | 9 | (Pause.) |
| 10:53AM | 10 | MR. KAREN:  Your Honor, I don't know if that's going |
| 10:53AM | 11 | to work based on the layout and the way Exhibit 2 is.  I do |
| 10:53AM | 12 | believe Ms. Kreiter and I could offline and come up with a way |
| 10:53AM | 13 | to do this that, you know, we could agree upon.  I don't know |
| 10:53AM | 14 | that Exhibit 2 exactly does it for me, but I think there is a |
| 10:53AM | 15 | way we could probably get to the same point. |
| 10:53AM | 16 | THE COURT:  All right.  Can we could it by July -- |
| 10:53AM | 17 | excuse me, by June 13th? |
| 10:53AM | 18 | MR. KAREN:  In terms of meet and confer or actually |
| 10:53AM | 19 | produce?  I think the answer is both actually, Your Honor.  I |
| 10:53AM | 20 | don't think it's going to take us very long once we come to |
| 10:53AM | 21 | agreement on this.  So as long as Ms. Kreiter and I can speak |
| 10:53AM | 22 | in the next couple of days -- I'm not sure of her schedule, |
| 10:53AM | 23 | hopefully we can -- then I think we could do that by the 13th. |
| 10:54AM | 24 | THE COURT:  Ms. Kreiter? |
| 10:54AM | 25 | MS. KREITER:  That's fine.  I will make myself |

```
10:54AM    1   available.

10:54AM    2          THE COURT:  All right.  We're going to schedule a

10:54AM    3   hearing for 10:00 on June 13th.  I'll send out the notice then.

10:54AM    4   If this becomes moot, then just contact my chambers, and we'll

10:54AM    5   cancel the hearing.

10:54AM    6          Okay.  Ms. Kreiter, what I plan on doing then is

10:54AM    7   allowing you to go forward with the deposition.  I want you to

10:54AM    8   also be prepared to tell me then the schedule going forward as

10:54AM    9   to when that's going to be accomplished on the 13th, and then

10:54AM   10   we can get -- start talking about getting us back on a trial

10:54AM   11   date.

10:54AM   12          MR. KAREN:  Your Honor, could I ask one thing?

10:54AM   13          THE COURT:  Yes, Mr. Karen.

10:54AM   14          MR. KAREN:  And I'm sorry again for the scheduling

10:54AM   15   issue.  My flight is an international flight that leaves first

10:54AM   16   thing in the morning of the 14th.  Is there any way we could do

10:54AM   17   this by Zoom, just because I'd be concerned with thunderstorms.

10:54AM   18   If I get stuck, I can't get back in time.  Or do it the 12th or

10:55AM   19   the 11th or some other sooner day?

10:55AM   20          THE COURT:  We could do it by Zoom if you can ship me

10:55AM   21   the documents so I have physical copies of the documents in

10:55AM   22   advance of the hearing.

10:55AM   23          MR. KAREN:  Okay.  That would be no problem.

10:55AM   24          THE COURT:  Any objection to that by anyone?

10:55AM   25          MS. KREITER:  That's fine.
```

10:55AM  1          MR. KAREN:  Thank you, Your Honor.  I appreciate

10:55AM  2     that.

10:55AM  3          THE COURT:  Okay.  So we'll go forward.  We'll send

10:55AM  4     out the notice for Thursday, June 13th, at 10:00.  And then if

10:55AM  5     you can get me the documents in advance of the hearing so I

10:55AM  6     have them, if we're going to go forward with any disputed

10:55AM  7     documents.

10:55AM  8          Okay.  And at that time I'd like to hear what

10:55AM  9     we're doing as far as when the deposition of Ms. Rosevear is

10:55AM  10    going to occur, and then from there where we could get back on

10:55AM  11    a trial docket.

10:55AM  12         Okay.  Anything else we should take up today,

10:55AM  13    Mr. Karen?

10:55AM  14         MR. KAREN:  Not from the plaintiff, Your Honor.

10:55AM  15         THE COURT:  All right.  Ms. Kreiter, anything else?

10:55AM  16         MS. KREITER:  No.  Thank you.

10:55AM  17         THE COURT:  Okay.  Thanks to everyone for your time.

10:55AM  18    We'll be adjourned.

10:55AM  19                    (End of proceedings.)

         20

         21

         22

         23

         24

         25

                      Tana J. Hess, CRR, RMR, FCRR
                      U.S. District Court Reporter
                      Middle District of Florida

```
 1              *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 2                      UNITED STATES DISTRICT COURT

 3                      MIDDLE DISTRICT OF FLORIDA

 4

 5                      REPORTER TRANSCRIPT CERTIFICATE

 6          I, Tana J. Hess, Official Court Reporter for the United
        States District Court, Middle District of Florida, certify,
 7      pursuant to Section 753, Title 28, United States Code, that the
        foregoing is a true and correct transcription of the
 8      stenographic notes taken by the undersigned in the
        above-entitled matter (Pages 1 through 45 inclusive) and that
 9      the transcript page format is in conformance with the
        regulations of the Judicial Conference of the United States of
10      America.

11

12

13      _____

14      Tana J. Hess, CRR, RMR, FCRR
        Official Court Reporter
15      United States District Court
        Middle District of Florida
16      Tampa Division
        Date:   June 7, 2024
17

18

19

20

21

22

23

24

25
```