# **EXHIBIT D**

1

2

3

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

4    MUTUAL OF OMAHA MORTGAGE, INC.    )
                                      )
5                       Plaintiff,    )
                                      )
6              vs.                    ) Case No.
                                      )
7    WATERSTONE MORTGAGE CORPORATION, ) 8:22-cv-1660
                                      )
8                       Defendant.    )

9

10

**STATUS CONFERENCE - ZOOM**

11

12    Sam M. Gibbons United States Courthouse
          801 North Florida Avenue

13          Tampa, Florida  33602
              June 13, 2024
                10:00 a.m.

14

15    BEFORE THE HONORABLE ANTHONY E. PORCELLI

16          UNITED STATES MAGISTRATE JUDGE

17

18    SHARON A. MILLER, CSR, RPR, CRR, RMR
          Federal Official Court Reporter

19    Sam M. Gibbons United States Courthouse
          801 North Florida Avenue, Room 13A

20          Tampa, Florida  33602
          sharon_miller@flmd.uscourts.gov

21              813.301.5041

22

23

24    Proceedings recorded by digital recording via Zoom
      Transcript produced by computer-assisted transcription

25

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1                          **APPEARANCES**

2    PRESENT ON BEHALF OF THE PLAINTIFF:

3
                      MR. ARI KAREN, ESQ.
4                     MS. AIRELLE STEPHENSON, ESQ.
                      Mitchell Sandler, PLLC
5                     1120 29th Street, NW, Suite 725
                      Washington, DC  20036
6                     (202)886-5260

7                     GUNSTER
                      MR. ARON RASKAS, ESQ.
8                     600 Brickell Avenue, Suite 3500
                      Miami, FL  33131
9                     (305)376-6009

10                    GUNSTER, YOAKLEY & STEWART, P.A.
                      MR. GREGORY LATHROP PIERSON
11                    401 E. Jackson Street, Suite 1500
                      Tampa, FL  33602
12                     (813)228-9080

13                    MR. MARK CARROLL, ESQ.
                      Mutual of Omaha Mortage
14                    1 E 22nd Street, Suite 401
                      Lombard, Il  60148
15                     (630)432-6400

16   PRESENT ON BEHALF OF THE DEFENDANT:

17                    MS. MARIA L. KREITER, ESQ
                      MS. EMMA JEWELL, ESQ.
18                    Godfrey & Kahn, S.C.
                      833 East Michigan Street,  Suite 1800
19                    Milwaukee, WI 53202
                      (414)287-9466

20

21

22

23

24

25                    (appearances continued)

     UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    ON BEHALF OF THE DEFENDANT:

2

3                     MS. CAROLINA YVONNE BLANCO, ESQ.
                      MR. SCOTT A. McLAREN, ESQ.
4                     101 E. Kennedy Boulevard, Suite 3700
                      P.O. BOX 2231
5                     Tampa, FL 33602
                      (813)221-3900
6

7                     MS. STEPHANIE ZIEBELL, ESQ.
                      Waterstone Mortgage Corporation
8                     11200 W. Plank Court
                      Wauwatosa, WI  53226
9                     (414)761-1000

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    (Court in session at 10:00 a.m.)

2            THE COURT:  All right.  Good morning.  Call the case

3    for the record.

4            COURTROOM DEPUTY CLERK:  Yes.  Good morning again,

5    everybody.  This is Mutual of Omaha Mortgage versus Waterstone

6    8:22-cr-1660-UAM.

7            THE COURT:  Again, good morning.  Let me have

8    Counsel state your appearance starting with plaintiff.

9            MR. KAREN:  Good morning.  Ari Karen on behalf of

10   the Plaintiff Mutual of Omaha Mortgage.

11           MS. STEPHENSON:  Arielle Stephenson also on behalf

12   of the Plaintiff Mutual of Omaha Mortage.

13           MR. PIERSON:  Greg Pierson on behalf of plaintiff.

14   Good morning.

15           THE COURT:  Good morning.

16           MR. CARROLL:  Good morning, Your Honor.  Mark

17   Carroll.  I am general counsel for Mutual of Omaha.

18           THE COURT:  Good morning.  All right.  For the

19   defense?

20           MS. KREITER:  Maria Kreiter and Emma Jewel on behalf

21   of Waterstone along with Carolina Blanco and Scott McLaren,

22   Hill Ward Henderson firm along with Stephanie Ziebell, our

23   general counsel on behalf of Waterstone.

24           THE COURT:  Good morning to everyone.  I scheduled

25   this matter based upon the issue related to the alleged trade

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    secrets.  I've been provided three binders detailing the

2    exhibits themselves, and I've reviewed documents No. 206 and

3    207 that were filed this week.

4         All right.  Mr. Karen, why don't we start with you.

5    In essence, it appears you are trying to make an argument for

6    good cause for disclosure related to trade secrets, so I'll

7    hear you related to your argument.

8         MR. KAREN:  To clarify, I don't think there was late

9    disclosure and I mean that respectfully but I want to really

10   address what really happened here, and I think we really have

11   a case of one false narrative being based and premised on

12   another.  And I think the last one was the assertion that

13   somehow we were making up these excuses in the filing last

14   minute by Waterstone.

15        Ms. Kreiter knows I didn't file my appearance in

16   this case until after all of this occurred.  I wasn't there.

17   I wasn't at the hearing.  I wasn't at any of those.

18        To the extent I did not completely, accurately

19   explain out all the details, I apologize for that.  Again, I

20   wasn't there.  But what happened, Your Honor, you asked me a

21   very, very pointed and fair, by the way, question at our last

22   hearing.  And so I went back and I looked into this carefully

23   trying to figure out why wasn't -- why wasn't this information

24   disclosed at the time.  And the first thing that jumped out to

25   me was that -- and if you look at all of our responses, all

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   they said it was our documents, not a single Waterstone, and
2   then look at Waterstone's responses, and the same thing in
3   reverse.

4           So I went to Mr. McCall who prepared these and asked
5   a very pointed question to him.  Why wasn't there a single
6   Waterstone document mentioned in our response?  And he looked
7   at me inquisitively and said what are you talking about, that
8   was never what we were discussing, it was always -- and he
9   pointed me to something that I frankly overlooked when I read
10  it but was our response on page 83 to the interrogatory -- the
11  amended response to the interrogatory where he says subject to
12  me waiving the objections set forth herein, et cetera, et
13  cetera, plaintiff has provided the Bates numbers at which
14  plaintiff has produced documents regarding the trade secrets.

15          And then I went back and I looked at the hearing,
16  Your Honor.  And I looked at the transcript of the hearing,
17  and I'm going to point you to page 31 of the hearing, and this
18  is in response by the Court.  And the court states, Judge
19  Sneed, "I do think it's a good practice to go ahead and
20  indicate with respect to the documents that you're producing
21  which documents relates to which request.  Now, you know,
22  alternatively, what you could have done is identified each of
23  the documents that you're producing in response to the Request
24  for Production, but just saying that all the documents have
25  been produced gives no information about which documents have

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    been produced that relate to the request."

2            That was the discussion, and that's what Mr. McCall

3    did, and I don't think there was any error there.

4            Now, when we got -- when I got involved in the case

5    and many, many months passed by, and I saw Ms. Kreiter's

6    motion for summary judgment, I immediately jumped to the

7    conclusion that something had not been supplemented.  I think

8    it was normal just as Your Honor I think to some extent did.

9            And I continued to act in that accordance until I

10   went back to Mr. McCall last week after your question to me

11   and read what had happened.  And I think that's one premise

12   here that's important that we clarify what actually occurred.

13           The next thing that I think is very important is we

14   talked about is what really -- what are the exhibits and what

15   is billed?

16           We've been hearing all along, hundreds and hundreds

17   of new documents being produced -- or not produced --

18   identified.  It's not that, Your Honor.  Look at the documents

19   we've sent to you, and I'm glad Your Honor has them in front

20   of you now.  Because I think when you look that you can see

21   that, you know, when we have -- for example, I'm going to

22   point out exhibit -- what's the Exhibit No. 11?

23           MS. STEPHENSON:  Eleven.

24           MR. KAREN:  The trade secret Exhibit 11.

25           MS. STEPHENSON:  I could share my screen if that

1    would be helpful, or if you'd like to pull it up, Your Honor.

2            MR. KAREN:  Why don't you share your screen.

3            MS. STEPHENSON:  I can put it up.

4            THE COURT:  Are you sharing your screen?

5            MS. STEPHENSON:  I need permission to do it.  It's

6    blocking me.

7            THE COURT:  One moment.  All right.

8            MR. KAREN:  If you look at trade secret 11, Your

9    Honor, you'll notice there are a number of, I think, 10, 12

10   documents attached.

11           Now, no one is claiming that the W-2 for 2011 and

12   the W-2 for 2020 is independently a trade secret.  The issue

13   is, and I went through this at great lengths with multiple

14   representatives of Waterstone, that the issue is not what's in

15   the W-2.

16           No one cares what Mr. Tariq's income was in 2020 or

17   '19 or 2021.  What's in those documents doesn't matter.  What

18   I went through Waterstone, and this is identified in our

19   Complaint, Your Honor, all the way back to the very beginning

20   of this case is that it's the identification of an individual

21   who has gone through multiple, if you will, events in the life

22   cycle of a loan where those loans typically fall out at

23   different points, the credit score, submitting an application,

24   and as you go through and provide more and more documentation,

25   you get further along in the process.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1              Identifying somebody whose ready, willing, able and

2    committed and invested in that process is where the value is.

3              So the trade secret is Mr. Tariq.  It's who he is,

4    knowing that he's this invested in the process.  That's the

5    trade secret.

6              You know, the fact that we have a 2021 MCT PNL,

7    other than the fact that we have it, there's really not that

8    much to it, and that's why, you know, when the Defendant

9    claims all these documents, it's really not true.  You don't

10   need anything more than this cover page.  We don't really need

11   to see what's in the W-2 from 2020 or '19 to 21.  That's not

12   what's important.  It's the fact that we've identified

13   Mr. Tariq as somebody this far invested in the process that he

14   provided all these documents.

15             So when you look at it from that perspective, we're

16   not talking about 248 new documents.  We're talking about

17   seven of these types of borrowers who were identified

18   initially in response to the first amended discovery, and then

19   there's approximately 15 more that have been identified,

20   again, exactly the same thing, you know, completely analogous,

21   borrower opportunities and we got those from Waterstone

22   documents, which, again, I think I've explained why those were

23   not identified in the first place.

24             But the idea that somehow we've got all these new

25   documents, and what are we going to do, is really not that

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    realistic, Your Honor.  I don't think it's very accurate.  I

2    think it's a dramatization to a related argument to get rid of

3    important evidence in the case that the plaintiff should be

4    able to utilize.

5        THE COURT:  Mr. Karen, are you then saying that the

6    records relate to 22 prospective borrowers then, 7 originally

7    identified and 15 additional ones?

8        MR. KAREN:  I believe that is the number, Your

9    Honor.  I can clarify exactly.  I think it is 14 or 15, I

10   think.  It's 15; right?

11       MS. STEPHENSON:  Uhm.

12       MR. KAREN:  If I counted corrected, Your Honor.

13       MS. STEPHENSON:  It's 22.  Five are customer lists

14   but 17 are borrowers.  Yes, 17 are borrowers.

15       MR. KAREN:  Seven of them were disclosed already.

16       MS. STEPHENSON:  Five borrowers were disclosed

17   already.  Two of them --

18       MR. KAREN:  Five borrowers disclosed and there's

19   another 12 borrowers essentially and then there's two customer

20   lists.

21       THE COURT:  And each of the borrowers is a separate

22   composite exhibit?  So, for example, Mr. Tariq is Exhibit

23   No. 11?  Is that what you're indicated?

24       MR. KAREN:  Yes, Your Honor, all the documents.

25       And my point is that you don't really need an expert

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   or anybody to go through and say what was on the 2021 MCT PNL

2   or the 2020 .pdf.  That's not our point of the trade secret.

3   We're not claiming that it is.

4          What we're claiming is the identification of

5   Mr. Tariq who willing, able and invested in this process this

6   far demonstrates somebody who's ready, willing and able.

7   That's the value.  The value is Mr. Tariq's information, his

8   identity, if you will.  It's not what's in his 2021 W-2.

9   That's extremely secondary.  It's a fact that's provided.

10          The last point, Your Honor, I want to make again is,

11   you know, this is not new information.  Many of these

12   documents including the 12 I'm referring to that are, quote

13   unquote, new, Waterstone identified these before we filed our

14   complaint.  Their expert went in and they quarantined

15   information when we sent them a cease and desist file, so I

16   have a query, if you will.

17          If you didn't know their import why did you

18   quarantine in the first place?  Waterstone is not just some

19   random company out there.  They are a mortgage company too.

20   They understand --

21          I asked their representatives, multiple

22   representatives these questions about why these were valuable

23   and there's testimony about them that I think we've provided.

24   The fact of the matter is they knew before we ever filed a

25   complaint what these were and why they were valuable and

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   that's why they selected themselves to quarantine them.

2          So for those to come back and say, oh, my God, this

3   isn't fair, we didn't know, we didn't understand.  They did

4   this.  They selected these documents, quarantined 40,000, and

5   if there's any question about it in our Complaint, we erased

6   it and they --

7          THE COURT:  Let me if I can draw attention because I

8   want to make sure I understand.  The argument that Waterstone

9   is making that there is a total now of 184 alleged trade

10  secrets, 53 of which were identified in discovery prior to

11  July 31st, 2023, and then 112 were produced in October of 2022

12  by Waterstone, I don't need to go further in the breakdown.

13         What I am asking is then the 184 alleged trade

14  secrets, can I assume that is encompassed within that number

15  of 184, 22 of the alleged trade secret,s are these composite

16  exhibits that relate to the potential borrowers, and then

17  there are other alleged trade secrets, or how can we classify

18  what is encompassed within the 184 alleged trade secrets.

19         MR. KAREN:  Thank you, Your Honor.  Yes.  My

20  position is the 184 is merely a dramatization to your point

21  that what it really talks about is roughly I believe 17

22  borrowers that's identified as ready, willing and able to

23  proceed.  There are 2 I believe PNL, which we provided, and

24  then the remainder which is 5 are 5 customer lists from 5

25  different individuals, and those are all of the trade secrets

1    we are alleging.  It's roughly 25 documents; right?

2              MS. STEPHENSON:  It's 17 borrowers, 2 PNLs and 3

3    customer lists which total 22.

4              MR. KAREN:  I'm sorry.  I managed --

5              THE COURT:  The categories of the trade secrets are

6    17 customers.

7              MR. KAREN:  Yes.

8              THE COURT:  The two PNLs and then the customer list.

9              MR. KAREN:  All right.  Ms. Kreiter?

10             MS. KREITER:  Your Honor, you know, I heard

11   Mr. Karen talk about what somebody thought, what somebody's

12   interpretation.  Judge Sneed's order is clear.  They are

13   identified by Bates number all of the alleged trade secrets.

14             Let's back up.  This starts with Waterstone serving

15   an interrogatory.  That's pretty clear.  Waterstone's

16   interrogatory identify with particularity all trade secrets

17   that Mutual of Omaha relies upon to defend its Trade Secrets

18   Act and Florida Trade Secret Acts claim and any other claim

19   pursued in this case.

20             We didn't get a -- we got a response from Mutual

21   that said something to the affect of "see our document

22   production."  Okay.  We moved to compel.  We can't just see

23   your document production.  We need to know what documents you

24   are talking about because we intend to hire an E-forensic

25   expert.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          So that was known to Judge Sneed.  It was something

2     that was talked about in the briefing and at the hearing that

3     was seen because we had some recruited employees that without

4     Waterstone's knowledge sent loan documents, other documents to

5     a personal email.

6          We wanted to determine through an E-forensic expert

7     which of the alleged trade secrets had anything to do with

8     Waterstone versus something to do with an employee,

9     unbeknownst to Waterstone sending documents.

10         So we were clear with Judge Sneed that we needed the

11    documents identified by Bates number.  We didn't say we just

12    want the ones that are produced by Mutual that was never

13    discussed.

14         Judge Sneed's order doesn't say, Mutual, produce the

15    ones with your Bates number on it, ignore anything produced by

16    Waterstone.  It was represented to Judge Sneed at the hearing

17    that, you know, Judge, we've already produced in discovery all

18    documents that are trade secrets that we are relying on.  That

19    was the statement of Mutual's Counsel to Judge Sneed.  You can

20    see it at pages 20 and 21 of the transcript.

21         You know, we could not have been more clear.  We

22    served an interrogatory serving a particular area as to what

23    the trade secrets were.  Judge Sneed ordered they be

24    identified.

25         If Mr. McCall or Mr. Karen thought something else

1    that was something subjectively sought by them, it was never

2    disclosed.  Their interrogatory response doesn't say we are

3    now identifying trade secrets.  It was some Bates numbered

4    documents only produced by Mutual and not anything produced by

5    Waterstone.

6          If the representations to the Court had changed

7    after the hearing and Mutual was no longer relying on only

8    Mutual-produced documents, then the response should have been

9    supplemented in accordance with Judge Sneed's orders.

10         I will also say the rubber needs to meet the road

11   here.  This excuse about I didn't understand Judge Sneed's

12   order to require Mutual to identify trade secrets based on

13   documents produced by Waterstone or supplement is, I mean,

14   frankly it's not an excuse.

15         If you look at the documents they are talking about,

16   and I thought it was important to attach as Exhibit 1 to our

17   filing yesterday, so it's docket number 207 Exhibit 1, that is

18   the Mutual chart of their trade secret.

19         You don't have to go farther than the first example

20   Exhibit 1.  Okay.  So this is a date of production January of

21   23.  This is before the hearing before Judge Sneed.  So these

22   documents are Mutual documents.  They were produced in

23   discovery before the Sneed hearing.

24         Counsel for Mutual represented to Judge Sneed all of

25   the trade secrets we're going to rely on in the case that's

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

 1    been produced.  When are they disclosed as trade secrets, not

 2    until April.  I don't particularly matter -- their suit does

 3    not matter, period, with respect to all of the documents that

 4    are compiled to create Exhibit 1.  They've made no effort to

 5    establish good cause.

 6            So I just -- I mean I really can't help this idea

 7    that Judge Sneed's order should be interpreted differently

 8    than what it says.  This has never come up.  It wasn't in the

 9    written responses.  It was never said by anyone.  And,

10    frankly, it makes no sense.

11            Waterstone did not serve an interrogatory that said

12    give me partial disclosure of your trade secrets.  I only want

13    the ones that are Bates numbered by Mutual and somehow

14    produced in discovery.  We asked comprehensively what are your

15    alleged trade secrets so we can defend two pretty serious

16    claims that allow -- that include allegations of punitive

17    damages.

18            So I just -- I don't have any of it.  I think that

19    there's been no showing of cause.  The case law requires that

20    to establish cause there has to be a showing that the party

21    was not able to adhere to the schedule despite the party's

22    diligence.

23            I haven't heard -- I haven't heard, for example, on

24    Exhibit 1 anything that Mr. Karen has said or anything in the

25    prior hearings or any of the briefing that would excuse

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   Exhibit 1 or any other document that was produced in discovery

2   prior to the March 1 hearing before Judge Sneed.

3          I would encourage the Court look at the date of

4   production column.  All of the documents were produced before

5   the Judge Sneed hearing, so if Counsel did represent to Judge

6   Sneed all of the trade secrets had been produced in discovery,

7   maybe that was the case.

8          THE COURT:  If I can interrupt you, this is

9   nonetheless significant because there is a production of these

10  documents.  What is at issue is your concern is that they were

11  not identified as trade secrets, so I understand the late

12  disclosure, but what I also need you to argue is given the

13  understanding of is what is the prejudice?  As I look at each

14  of the categories, let's break those down and explain to me

15  how you see there is prejudice.

16         So, for example, if we're just talking about the

17  identity of prospective buyers, a total of 17 prospective

18  buyers, what is the prejudice for the identity of each of

19  those buyers?

20         Then separate from that, the PNL statements and then

21  the customer list, and so explain to me what is the prejudice

22  now knowing exactly what we're talking about as far as the

23  universal trade secrets and those broad categories?

24         MS. KREITER:  Sure.  Let' talk about that.  The

25  prejudice is my E-forensic expert hasn't looked at these

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    documents.  I am going to have him redo his entire analysis.

2    I am going to have to pay fees associated with that.  I've

3    already supposed -- deposed their corporate representative

4    about why do you believe the voluminous amount of documents

5    disclosed in discovery are trade secrets.  We're kind of at

6    the threshold issue here, Judge, identifying the trade

7    secrets.

8              THE COURT:  Before we get into the documents, my

9    question was specific:  The identity of the prospective

10   buyers, what's the prejudice as to that; in other words, that

11   the allegation is that these individuals were known to the

12   former employees who then shared that with Waterstone that

13   these are individuals who are ready as prospective buyers.

14             MS. KREITER:  I think there's an assumption built in

15   there that the individuals did share the information with

16   Waterstone.  I don't know that that's the case.

17             THE COURT:  That's a separate issue.  That's their

18   allegation.  Whether the facts bear that out, my question

19   simply is the identity.  Because then my next question is what

20   is the significance of the records themselves and why they're

21   necessary and that will be for Mr. Karen.

22             But my first question to you is:  What's the

23   prejudice as far as the identity of the 17 prospective buyers?

24             MS. KREITER:  If it's injected into the case now

25   that we have trade secrets based on the identity of a

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    borrower, I would still want to do additional discovery as to

2    that.  What were the secrecy efforts?  Did the loan even close

3    at Waterstone?  I think a lot of this is probably moot because

4    I don't know that many of these did.  But I would need to have

5    a fact investigation.  Frankly, what was -- what was the back

6    story associated with that loan?  I haven't done that.

7         So, for example, what if the borrower directed the

8    employee, look, Mutual has denied my loan, I would like to

9    close it at Waterstone as a result of that, please send my

10   loan file.  Then there's no trade secret misappropriation.

11        I haven't investigated that with respect to borrower

12   identity that have not been disclosed.

13        THE COURT:  What's the response to that?

14        MR. KAREN:  Your Honor, first of all, there were

15   already examples of this provided to them originally, and we

16   went through depositions.  We went through every one of these

17   borrowers.  I asked Waterstone's employees, now Waterstone's

18   employees, about these specific -- these loans.  They went

19   through them.  We discussed these exact issues at deposition.

20   We've gone through them at deposition.

21        There's ones they claim that they couldn't have

22   closed.  You know, we go back and forth.  We discussed these

23   openly at depositions, multiple depositions.  Kevin Allen,

24   Duane Hutto, Chris Smith, Chris Wolf.  I mean we went through

25   these, all of these exact examples before, so we've already

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    done that.

2    And what I would say, Your Honor, is any other

3    forensic investigation, I think that was an important word

4    that Ms. Kreiter used.  If she wants to go back and talk to

5    her client and, you know, get more information and hit us with

6    it at trial, she's more than welcome to do it.

7    As per her expert, I'm going to go this far, Your

8    Honor, to demonstrate my confidence level that how there's

9    nothing new is here.  If they want to amend their expert

10   report, I have no objection to that and I will waive any

11   deposition.  And the reason I'm willing to do say that is I

12   know there's nothing new here.

13   THE COURT:  Ms. Kreiter?

14   MS. KREITER:  Yes.  I mean what he's talking about,

15   waive the deposition of our E-forensic expert.  We're talking

16   about a pretty robust analysis here.  We're talking about -- I

17   mean, if I had to think about what would be necessary in order

18   to open up the case, have all of these documents into the case

19   as alleged trade secrets and/or the identity of the borrower,

20   we're talking about months, Your Honor.  I would want my

21   E-forensic expert --

22   THE COURT:  Well, as I understand his argument is

23   that each one of these loans, that is, as I understand that

24   representation, each of the 17 prospective buyers, there was

25   examination during all the depositions.  So the identity of

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  the potential borrowers was not something that was not known

2  during the discovery phase of the case.

3         MS. KREITER:  I could not more vigorously dispute

4  what he's saying.  If he, for example, asked one of the

5  managers, I'll just pick one, you know, Mr. Wolf, what about

6  the Thompson loan.  That's Mr. Karen asking Mr. Wolf about one

7  of these loans.

8         It was never at that deposition or any other time on

9  my radar as, look, Mutual is claiming this loan is a trade

10  secret such that I vetted it with Mr. Wolf in advance of his

11  deposition or did anything to depose anybody from Mutual or

12  any third-party about the loan.

13         A passing question at deposition is not the

14  equivalent of putting the other side on notice of an alleged

15  trade secret claim.

16         MR. KAREN:  Your Honor, if I could respond briefly.

17         THE COURT:  Yes.

18         MR. KAREN:  I'm going to read from her Complaint.

19  "When a consumer applies for a loan of Mutual Mortgage, the

20  consumer provides Mutual Mortgage with a wide variety of

21  personal and confidential information including Social

22  Security numbers, dates of birth, contact information,

23  sensitive credit history, wage statements, bank account

24  numbers, mortgage amounts, tax trends and all the financial

25  information that is necessary to facilitate a home loan.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          This type of information has independent economic

2     value because it enables and facilitates the preparation of

3     loan application and also separates those borrowers ready,

4     willing and able to proceed with the loan application from

5     those that are not able and willing to proceed." That's our

6     Complaint.

7          So to say that they were not on notice when I bring

8     up one of the loans that we claim was taken or that is argued

9     in the information and ask about that exact line of

10    questioning, does this have value, and they say yes, it does,

11    how do they say that they're surprised? I am sorry. I think

12    that's vague.

13         If there was any question about it, it was erased at

14    the Complaint. It was erased when I went exhibit by exhibit,

15    loan by loan. I did it with Mr. Wolf. I did it with

16    Mr. Allen. I did with Mr. Hutto and Mr. Smith. And over and

17    over and over again I did this. So I don't understand how

18    they could never -- it could never have been on their radar.

19         THE COURT: Ms. Kreiter.

20         MS. KREITER: With due respect, if he really is

21    taking the position, look, the only thing that's a trade

22    secret is the identification of, for example, Mr. Thompson,

23    how about an interrogatory response that says the identity of

24    Mr. Thompson is a trade secret? That could have been

25    presented in response to our discovery. It could have been

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    presented to Judge Sneed.  They've never taken that position

2    and I haven't heard one reason why.

3           THE COURT:  All right.  What is the reason for that?

4    Because it certainly -- I understand your argument as to the

5    Bates numbers, but that doesn't answer why you didn't

6    supplement the discovery request as to the interrogatory.

7           MR. KAREN:  I think if you look at the transcripts,

8    Your Honor, the discussion was about the Bates numbers, and

9    there were categorical explanations provided originally, and

10   they said those weren't sufficient, so when the interrogatory

11   was provided, we explained that this is the type of

12   information that we claimed as a trade secret.

13          Now, at that time, I will acknowledge -- and not

14   saying every single one of these loan opportunities was

15   identified, but the dispute then between Counsel that arose

16   and, again, I was not involved in this, but the dispute that I

17   understood arose -- and I looked back at emails and some

18   history to have a high level of confidence on this was they

19   said, well, with respect to the documents that you guys have

20   produced you haven't told us what is what, and that's how we

21   got down this road.

22          So it was just something that never came up in any

23   of these discussions.  The issue always censored in on you

24   need to identify with respect to the documents you have

25   produced, and that everything then transpired from that point,

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    so, you know, that just got lost in the conversation or never

2    really arose in the conversation.  That's not what it was

3    about.

4           THE COURT:  I still don't understand that argument

5    because that's completely separate and independent of the

6    obligations under the discovery and the supplement discovery.

7    That has nothing to do with Judge Sneed's order or anything

8    else.

9           The interrogatory is very clear.  So my question is

10   then why was the discovery not supplemented at any stage to

11   identify the additional documents?

12          MR. KAREN:  Well, Your Honor, we did supplement

13   discovery.  I will say it was after the close of discovery, we

14   did supplement it --

15          THE COURT:  After the close of discovery and after a

16   summary judgment was filed.

17          MR. KAREN:  Your Honor, but I will go back to:

18   There was an objection to that discovery request, and that's

19   the point I'm trying to make.  There was an objection, and you

20   may disagree with the objection, and I think that's a

21   different point in time, but there was an objection lodged,

22   and subject to the objection this is what was agreed to have

23   been done.

24          Now, if they had a problem with that objection, the

25   time was to talk to Judge Sneed about it at that time or some

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    point in discovery and that never happened.  So when taking

2    over this case, and I looked at it, and I see, okay, there's

3    an objection, that's where we -- that's where things stood.

4            There was an objection.  Subject to and without

5    waiving the objections, we're now going to identify the Bates

6    numbers which plaintiff has produced documents --

7            THE COURT:  But I'm still not following your

8    argument.  You think the fact that there's an objection allows

9    you to withhold what you later believed to be trade secrets

10   and then identify them at a later date after the close of

11   discovery?

12           MR. KAREN:  Your Honor, I don't believe it's a

13   question of withholding, because I don't think we withheld.  I

14   think we explained in great detail with respect to these.

15           And, again, Your Honor, this category -- these are

16   not new trade secrets.  We have already six loans or six

17   borrowers -- I'm sorry, five, five borrowers, I believe we

18   already identified.  These are just additional samples.  This

19   isn't any new trade secret.  I need --

20           THE COURT:  I understand.

21           MR. KAREN:  I --

22           THE COURT:  Hold on.  You identified five borrowers.

23   Then if you've identified more, the simple question then is

24   why at an earlier stage before the close of discovery was

25   response to Interrogatory No. 8 supplemented?

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          MR. KAREN:  Because at this point in time we

2    believed the answer was the supplementation.  It was relating

3    to the documents we had produced, and these were not documents

4    we had produced.

5          But I would also submit, Your Honor, that even if

6    you believe that that is not a valid explanation, you know,

7    under the applicable Federal Rules, the duty to supplement,

8    while it is there, but the question then is the significance

9    of the prejudice and how much the parties is not on notice.

10          Here, these documents were utilized in multiple

11    depositions over and over again, and we discussed them with

12    respect to trade secrets.  We discussed them with respect to

13    the value.  We discussed why these loans would or wouldn't

14    have been going forward.  There were claims on some of these,

15    like the Tariq loan, for example.  Mr. Hutto explains that the

16    Tariq loan never would have closed because he was a foreign

17    national, and I could probably go through with enough memory

18    on a bunch of these.

19          There was one another loan called I believe

20    Henderson, and they said that was a loan that couldn't have

21    closed because it was an unwarrantable condominium, and we

22    went through each one of these loans, and repeatedly they

23    discussed why this loan wouldn't have closed or why that loan

24    wouldn't have closed or whether they didn't have an answer why

25    it wouldn't have closed.

1          We went through that laborious exercise document by

2     document by document.  There's simply no prejudice, and then

3     there's no prejudice even if the duty to supplement had not

4     been fully accomplished perfectly as might be the case in

5     certain circumstances.  The courts don't exclude that

6     evidence.

7          And here, Your Honor, if there's anything they need

8     to do, and I really question whether there is, because I don't

9     know why the Tariq loan would be different from another loan

10    with another opportunity.

11         But, again, these documents, Your Honor, these are

12    the same documents they themselves quarantined before we even

13    filed our lawsuit.  They knew what they were looking at before

14    we even filed the lawsuit, so to say that they're prejudiced,

15    I think, Your Honor, is just not accurate.

16         THE COURT:  Ms. Kreiter, as to the five -- I'm

17    assuming that is accurate, that you are aware of at least five

18    identities of borrowers?  Do you dispute that?

19         MS. KREITER:  At least five, Your Honor.  I mean I

20    wouldn't be aware of any of the documents associated with any

21    borrowers other than those produced in -- you know, produced

22    by -- produced and disclosed by the plaintiff in discovery.  I

23    guess I haven't looked at which there are.

24         I would say the prejudice is no matter what

25    Mr. Karen asked witnesses, I deposed the corporate rep of

1    Mutual for two days, and I didn't have notice of these loans,
2    so I was not in a position to ask questions about that.
3             So I guess I want to make sure I'm responded to your
4    question, Your Honor.
5             THE COURT:  Well, my -- the reason my question is
6    that.  If you're aware of five, what was your examination
7    related to the identities of those five potential borrowers,
8    and why would it be different as to these others?
9             MS. KREITER:  I'm not sure that I was aware of five
10   I guess is what I'm saying.  I would have to -- I would have
11   to cross-reference that with the chart, I guess being guided
12   by the Mutual chart that is now Exhibit 1 to our filing.
13            MR. KAREN:  Can I speak to one point, Your Honor?
14            THE COURT:  Let me ask my question, Mr. Karen.
15   You're saying that there was at least notice on the
16   disclosures based upon the Bates stamps in response to Judge
17   Sneed's order of the identity of five borrowers and the
18   records relating to those five borrowers?  Is that accurate?
19            MR. KAREN:  That is accurate, Your Honor.
20            THE COURT:  All right.  Go ahead.  What was your
21   point?
22            MR. KAREN:  I want to say this is what's also
23   important in the question about asking the corporate
24   representative.  Mutual's corporate representative is not
25   going to have knowledge about those five loans because the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  individuals that are going to have the knowledge are the loan

2  officers that worked with those borrowers.  Right?  They had

3  direct personal knowledge that we don't even have access to

4  anymore because they're gone.

5        But, you know, Mr. Wolf when he was sending the

6  documents to his personal email and then from his personal

7  email to Kristen Freibis, for example, that was Kristen's

8  client before she left Waterstone -- or before she left

9  Mutual.

10        She's going to have the information.  Mr. Wolf is

11  going to have the information.  That's why they were able to

12  in great detail go through and explain to me loan by loan when

13  I asked them what was going on with those borrowers and why

14  certain borrowers would or wouldn't be, you know, able to have

15  been closed at Mutual, they were able to explain that and

16  articulate that because it was their clients.

17        We're never going to be in as good as position as

18  them to explain it.  And frankly, Your Honor, if we go to

19  trial and, you know, they have other explanations, I'll have

20  to deal with that when I have to deal with that.  But I don't

21  think they're in any disadvantage.  They have the information.

22  We don't.

23        MS. KREITER:  Your Honor, just one thing I will say.

24  This idea that now Mutual's trade secrets are somehow the

25  identity of a handful of borrowers, that was never disclosed.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    I mean that is a new concept.

2          If you look at their response to Interrogatory 8,

3    and specifically I'm looking at docket number 206, 206,

4    Exhibit A on page 83 is their response, it doesn't say we are

5    relying on the identity of any borrowers.  It says something

6    similar.  The trade secrets at issue for this case, the trade

7    secrets at issue in the case as described in the Complaint and

8    we're providing these Bates numbers, and then they list a

9    bunch of documents.

10          I did not require Mutual to respond to an

11    interrogatory by --

12          THE COURT:  I'm reading the one that reads "borrower

13    documents and information including sensitive financial

14    information, Social Security numbers, pay stubs, tax returns,

15    documents which have been produced by plaintiff at the

16    following Bates numbers."

17          MS. KREITER:  Right.  So I mean I think they set in

18    motion a review of trade secrets on a document-by-document

19    basis.  I mean they responded by referencing documents.

20    That's why we're talking about this.  It doesn't say here

21    anywhere that we are not relying on certain documents, but

22    it's been called a concept of a ready, willing borrower.

23          I mean it doesn't say that here.  I wouldn't have

24    been on notice to ask the corporate representative about

25    Mr. Thompson or the concept that it's the identity of a person

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    here.  And which one?  I mean I think that that's important.

2    I find that Mr. Karen is talking about generalities.

3              The Federal Rules allow me to not have that, and to

4    pin down Mutual what is the basis for your claims with

5    particularity, I did that here.  I shouldn't be subject to

6    this moving target position.

7              THE COURT:  Mr. Karen, anything else?

8              MR. KAREN:  I don't think it's a moving target.

9    We've been outright about this from the very beginning and I

10   feel like we can't win here.  First we are general and then

11   she files a motion for sanctions, well, I want you to be

12   specific and I want you to say specific Bates numbers.  And

13   now I'm hearing, well, all you gave me was specific Bates

14   numbers and you weren't general now.  Except that we started

15   this back in the Complaint, and if you reference the Complaint

16   and our response as well as in our interrogatories, we

17   specified borrower's document information, and I think Your

18   Honor just cited that.  So we gave general.  We gave specific.

19   I don't know what more we could do.

20             I mean I guess you're right, we could have been a

21   little better and potentially supplemented a little bit

22   earlier with more information.  I'll concede that point.

23   Okay?

24             But I think with respect to whether there's any

25   prejudice, there isn't any.  They know what this case is

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    about.  They knew what this case was about before it started

2    because they had to identify these documents when they

3    quarantine them before we even filed our Complaint.

4            THE COURT:  Ms. Kreiter, are you making any argument

5    as to the PNL and the customer list?

6            MS. KREITER:  I don't think the customer list was

7    timely disclosed, so, yes, I did have knowledge of the PNL.

8            THE COURT:  So the customers lists were not timely

9    disclosed?

10           MS. KREITER:  Correct.

11           THE COURT:  All right.  Mr. Karen.

12           MR. KAREN:  What are the customer lists at issue?

13   Specifically, we learned only upon the response to a

14   third-party subpoena that I believe came in either two days

15   after the close of discovery or two days before, and then we

16   provided them probably a week later.

17           So, you know, at the time that Waterstone took its

18   depositions or any of these depositions frankly were taken, we

19   didn't have access to those customer lists.  We got it

20   actually right before Kevin Allen's deposition, I was able to

21   ask him, but I didn't even have it until that deposition.

22           At that deposition, Mr. Allen in his Rule 30(b)(6),

23   it was produced before.  We asked Mr. Allen about it.  We went

24   into great lengths about it.  We discussed it.  And I didn't

25   even have that document when we were talking about this

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  interrogatory and this document request and the amendment

2  supplement, we didn't have it then.  We got it well after I

3  got involved in the case, at the very, very close of

4  discovery.

5          THE COURT:  Is that the only one that is at issue?

6          MR. KAREN:  I believe there's two others that may

7  be.  I know at least one -- I mean at least I think two of the

8  customer lists were disclosed before, originally.  I think two

9  were subsequently disclosed, and then there was one, like I

10  said, the Encompass, I call it the Encompass one that talks

11  about the (unintelligible) store (unintelligible) system.

12  That was the one that was produced to us late, not by

13  Waterstone, by the way.  I want to be clear.  I'm not accusing

14  anybody of a late disclosure, the way it happened in

15  discovery, the database.

16          THE COURT:  The second two you referenced, when were

17  they disclosed?

18          MR. KAREN:  They were on the January -- I'm sorry,

19  not January.

20          MS. STEPHENSON:  One second, Your Honor.

21          MR. KAREN:  One moment, Your Honor.  I'll tell you

22  exactly.

23   (Brief pause.)

24          MR. KAREN:  So, Your Honor, I'm sorry, I should have

25  checked with Ms. Stephenson because I misstated something to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   you.

2          So how many customer lists?  Three customer lists

3   were disclosed in response to the --

4          MS. STEPHENSON:  Can I speak?  I'm sorry.

5          THE COURT:  Yes.

6          MS. STEPHENSON:  There are three customer lists that

7   we're talking about.  One was disclosed in response to a

8   motion for summary judgment.  The other is the one that

9   Mr. Karen was talking about where there was the subpoena that

10  was not received until the close of discovery.  And then

11  there's one more where there's three different customer lists

12  sent in the same email, and that's Exhibit 20, and all of

13  those documents were disclosed back at the original time of

14  the amendment to the discovery response, so that would be

15  March 10th of 2023.

16         THE COURT:  All right.  So one group timely

17  disclosed.  You're saying a second one was disclosed at

18  summary judgment?

19         MS. STEPHENSON:  Supplemented in response to summary

20  judgment.  That was the basis of disclosure, yes.

21         MR. KAREN:  Just to be clear, Your Honor, I think

22  actually two were at the date of summary judgment.  One of

23  those two relates to the Encompass document that we got at the

24  very end of discovery.

25         MS. STEPHENSON:  Right.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          THE COURT:  And why was the other one not disclosed

2    earlier?

3          MR. KAREN:  Again, Your Honor, that was a Waterstone

4    document.  It was not a document we had which goes back to the

5    original misunderstanding or understanding correctly,

6    whichever it may be, that we talked about previously.

7          THE COURT:  All right.

8          MS. KREITER:  Your Honor?

9          THE COURT:  Yes.

10         MS. KREITER:  Can we talk about specifics here?  I

11   mean I heard Mr. Karen say there was one document produced by

12   a third-party, so that's Exhibit 19.  I will also say why was

13   that document produced late?  Because Mutual waited until the

14   very end of discovery to serve third-party subpoenas.

15         Further, that document, if you look at our Exhibit

16   1, it was produced in August, August 9th of 2023.  We are many

17   months after that.  There's no good cause for first

18   identifying that one in response to a summary judgment motion

19   eight months later.

20         We would be in a different position on that one if

21   Mr. Karen had frankly supplemented his discovery in August or

22   filed a motion to amend the scheduling order and demonstrate

23   good cause in August, but we're not in that situation.  It's

24   now nearly a year later.  So I think there is prejudice as to

25   that one.

1        As to the ones that were timely disclosed, that's

2   not the subject of my motion.  I mean if they were timely

3   disclosed, I'm not objecting to that.  This motion is strictly

4   limited to the ones that were not.

5        THE COURT:  So, Ms. Kreiter, let me just ask you

6   this question.  As to your arguments regarding prejudice, if I

7   simply allow the reopen of the 30(b)(6) deponent so that you

8   may examine as to these additional prospective buyers and

9   these other customer lists, then what is remaining as to any

10  issues of prejudice?

11       MS. KREITER:  Judge, I will say, Your Honor, this is

12  a new concept.  If I had known, I wouldn't have dumped

13  thousands of dollars into an E-forensic expert looking at all

14  these documents, but I already did.  I wouldn't have spent all

15  of the time I did on the corporate --

16       THE COURT:  You need to explain that to me why that

17  would be different.  You did so anyways to demonstrate that

18  you were walling off these documents and they weren't used.

19  Why would that be any different regardless as to whether

20  you're going to examine as to prospective buyers or not.

21       MS. KREITER:  I guess I think that it's both.  I

22  mean, I think that if it's a borrower and this information and

23  the identity of the borrower vis-a-vis the documents that are

24  going to be presented to the jury as trade secrets, I would

25  want to investigate those documents.

1          THE COURT:  Well, okay.  That still doesn't answer

2     my question as to what you meant by the E-forensics and

3     spending the money on the E-forensics.  I wasn't following

4     that argument.

5          MS. KREITER:  Right.  I guess, you know, we spent a

6     lot of money already on an E-forensic expert because I was

7     told that 186 documents are trade secrets.  I was not told as

8     to the identity of a certain borrower.  I was transparent

9     about what we were going to do.  I retained somebody to do a

10    very expensive and time-intensive exercise.

11         If the theory was actually none of those documents

12    matter, we're just telling you it's the identity of a

13    borrower, I don't know whether I would have incurred that

14    expense, but I already did.  And, frankly, I'm still not

15    really clear whether Mr. Karen is saying he is proceeding with

16    the theory about the borrower.  Is this document based or not?

17         I hear him say at the hearing today it's not really

18    document based, but then I also have him identifying a large

19    number of documents as trade secrets, so I don't think he can

20    have it both ways.

21         If it's not document-based he should just be

22    consenting to my motion as to all of these documents that were

23    produced and not identified.

24         If it just related to this theory that there were

25    these borrowers out there in the world and it's the chance of

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    an opportunity, I am going to have additional fees vetting

2    that, not limited to just a corporate rep deposition, because,

3    frankly, I may have additional attorney fees associated with

4    our own internal investigation.  I may frankly call some of

5    these borrowers.  I would need to serve additional discovery

6    on Mutual.

7            If, for example, a borrower loan was rejected at

8    Mutual and it was not disclosed as a trade secret, I probably

9    did not serve discovery on Mutual seeking all of the emails

10   associated with that borrower file.

11           I would want to do that because it may come to

12   fruition that, you know, look, this borrower was rejected by

13   Mutual.  I may depose some individuals associated with that.

14           It just -- it opens up Pandora's Box, however you

15   slice it, even if it's limited to just the identity of the

16   borrower.  I'm going to have to do substantially more given

17   what's at stake in terms of the trade secret claims for which

18   plaintiffs are seeking punitive damages.  It's not just

19   something that I can take lightly and resolve by way of a

20   simple corporate rep dep.

21           THE COURT:  Mr. Karen?

22           MR. KAREN:  Why didn't she do that with respect to

23   the five borrowers she knew about?  I think this is Pandora's

24   Box.  She said it.  She's arguing Pandora's Box.

25           THE COURT:  Well, then the same question is why

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   can't we just focus on the five borrowers?

2            MR. KAREN:  Because --

3            THE COURT:  Why do we need to add 12 more?

4            MR. KAREN:  That goes to the gravity of what's going

5   on here.  They're going to turn and say, well, it was only

6   five borrowers.  Well, it was 12 more, and then it's the

7   customers --

8            THE COURT:  Mr. Karen, if it's only five borrowers,

9   then the door is wide open.

10           MR. KAREN:  I'm sorry?

11           THE COURT:  If they say there was only five

12  borrowers, then that certainly opens the door at that point,

13  but the question is why is it at some point not just

14  cumulative?  What is the need that -- you know, where are we

15  drawing the line?  If we have five borrowers, what's the

16  significance of the additional ones?  You certainly could

17  present testimony that there were others and, similar, we

18  don't need all these records.

19           MR. KAREN:  Because I think, Your Honor, our

20  argument in this case is that if that -- the totality of their

21  conduct led to the lift out of this branch, and I don't know

22  how you can observe and evaluate the totality of conduct

23  without its totality, so to speak.  And so looking at 17

24  examples -- Your Honor, I do understand your point.  There's

25  is eventually a law of diminishing returns.  I get that.  But

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    I think that, first of all, you know, if we were going to

2    stipulate that this occurred, right, that that, for example,

3    borrower of these loan opportunities were identified and we

4    didn't want to go into numbers, we just said that occurred and

5    we would stipulate to that, then maybe I wouldn't necessarily

6    need to go into 17 different examples.  Right?  Maybe five

7    would be enough, but I don't think that's what's going to

8    happen here.

9           More importantly, though, Your Honor, I want to go

10   over to what you discussed about all these other -- you know,

11   what could have happened had this loan could have or would

12   have.  You know, again, they're going to be able to provide

13   this testimony from their loan officers -- and they have

14   already -- that will explain this loan occurred with -- you

15   know, and this is why this loan didn't go forward.

16          But some of these, for example, Your Honor -- and

17   it's clear on the face of it, and, again, we have deposition

18   testimony about it.  One of the loans, for example -- I'm

19   sorry, I can't remember the name -- that loan, they sent it

20   over and the borrower hadn't even pulled credit yet.  And I

21   asked Mr. Wolf, how can you tell me this loan wouldn't have

22   gone forward if you hadn't pulled credit.  Isn't that one of

23   the first things you have to do, and he answered yes.  And

24   then I answered then and said you don't really know whether

25   this loan would have closed or not.  You just know that it was

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    an opportunity to send to Waterstone that was Mutual's.  Why

2    didn't -- he essentially admitted to that point.

3            What I'm getting at is, yeah, there are some

4    different similar circumstances of these loans, but we're not

5    getting into -- I mean they can easily say we didn't close

6    with our company either, and we didn't close them because we

7    couldn't.  And the reality is whether Waterstone could close a

8    loan or Mutual could close a loan, there's going to be

9    testimony to this too, Your Honor.

10           Lenders have essentially many of the same standards

11   to write to.  Some lenders have different products slightly

12   than others.  You could get into that a little bit.  We don't

13   have to go through (unintelligible) writing these files.

14   That's just not realistic.  It's not necessary, and that would

15   be getting way down into the weeds in a place we don't need to

16   go.

17           We're simply saying that whether it was a loan that

18   closed or not, that's a trade secret that is valuable to us

19   and you guys took it.  And I think whether there's 5 or 10 or

20   15, I do think it's relevant when evaluating the totality of

21   the conduct and so I think we should be able to provide that

22   information as we go through this case.

23           And, again, the parade of horribles argument, Your

24   Honor, I don't think it's backed up.

25           All they have to do to address that fully is to have

1    their loan officer who is in a much better position than we

2    were in explaining why they don't think that loan went

3    forward.  They did that already at their depositions.  They

4    can do it at trial again.  You don't need to do it underwrite

5    a file to assess that.

6         THE COURT:  All right.  Anything else, Ms. Kreiter?

7         MS. KREITER:  I'll just say, Your Honor, there's

8    been a violation of Judge Sneed's order.  There's been a

9    failure to supplement discovery.  It's been many months.

10        I understand Mr. Karen wants to pile on.  The time

11   to do that would be in accordance with the discovery rules

12   that hadn't happened, period.

13        THE COURT:  All right.  I would agree at least at

14   that level that there is definitely -- as I see it, I can make

15   the finding that there was a failure to comply with Judge

16   Sneed's order.  I'll at least accept at face value the

17   argument regarding the misunderstanding as to identify the

18   Bates stamps, but what there is a failure of is to timely

19   supplement the discovery in response to Interrogatory No. 8.

20        I have not heard anything on the record that

21   demonstrates the excusable neglect for that.  It's not that

22   it's that information was not provided.  This is as to the

23   identification of it.

24        But what is also equally of import to me is that the

25   documents have been disclosed.  The allegations in the

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Complaint, as I see them, are very clear as to what they were

2    alleging related to potential buyers as potential trade

3    secrets.  So it's not as if this information on the underlying

4    potential buyers is somehow information that was never known

5    at any stage of the litigation until after discovery.

6            To the contrary, these documents have been exchanged

7    in the discovery.  They just were not properly identified in

8    response as a supplement to Interrogatory No. 8.

9            As to the prejudice, I am hesitant to find that as

10   Ms. Kreiter's arguing that there's such a substantial

11   prejudice that she's arguing.  With that said, though, I think

12   any prejudice that there may be can be cured by the continuing

13   deposition as to these additional items of the plaintiff's

14   30(b)(6) deponent, and I'm going to allow that to occur before

15   we go forward, recognizing that the plaintiff failed to

16   supplement to specifically identify these matters that are

17   being identified for these additional potential borrowers,

18   that is, 17 potential borrowers, as well as what I find to be

19   an untimely disclosure of the one customer list for summary

20   judgment.  The other one I do find that it is excusable

21   neglect because it just simply was not received from a

22   third-party production, and once it was, it was disclosed.

23           So whatever prejudice exists there I find I can cure

24   that by allowing the depositions of the 30(b)(6) deponent so

25   that you have the opportunity to examine.

1          I also agree with Mr. Karen that any other

2     information certainly could be gathered by the former

3     employees who probably are the individuals that have the most

4     intimate knowledge related to these allegations, and so they

5     also can be -- inquiry can be made as to those individuals.

6          So that's how we're going to remedy this problem.

7     But I'm going to deny the request to exclude the documents.

8     Rather, I'm going to allow you to continue the deposition as

9     to these matters.  It's very clear, and let me be very clear

10    about this.  There will be no additional documents added at

11    this point.  This is it.  So we've got the 17 borrowers, the

12    customer lists and the PNL, so let's talk about timing

13    sequence going forward then.

14          Ms. Kreiter, how much time do you want to accomplish

15    that?

16          MS. KREITER:  Your Honor, I guess I will have to say

17    I have to dispute respectfully the idea that all I need is the

18    depositions of their corporate rep, because, for example, I

19    mean if he's proceeding with these claims and saying that

20    these documents are reflective of the trade secrets, I want to

21    know did they ever hit Waterstone's server or not?  If the

22    answer is --

23          THE COURT:  To be clear, what he is saying is the

24    identity and the representations of the documents reflecting

25    that they were prospective borrowers that have gone through

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  the system up to a certain point.  The documents themselves
2  are in no way trade secrets as I understood the position
3  taken.
4          MS. KREITER:  Sure.  But then I guess is Mr. Karen
5  stipulating that any of the documents that he's relying on are
6  not, in fact, trade secrets and he's taking a different theory
7  and saying it's the borrower's identities?  I guess that's
8  where I am struggling.
9          THE COURT:  Let's be clear about that then,
10 Mr. Karen.
11         MR. KAREN:  I'm saying it's the documents and the
12 contents of the documents themselves.  I'm not suggesting that
13 they're trade secrets.  These are the borrowers; however --
14 and this is where the documents are relevant -- those
15 documents irrespective of their contents, the delivery of
16 those documents to Mutual --
17         MS. STEPHENSON:  No.
18         MR. KAREN:  -- to Mutual demonstrated the borrowers'
19 investments, ready, willing and able ability to go forward
20 with the loan, and so I want to be very clear.  I think the
21 documents remain relevant to demonstrating that borrowers'
22 investment, but to be very clear, the trade secret at issue is
23 the identity of that borrowers' willingness and ability to
24 move forward.
25         THE COURT:  That's how I understood it.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Ms. Kreiter, what's your concern?

2            MS. KREITER:  I don't know why I have a spreadsheet

3    that lists a lot of documents as trade secrets.  And, frankly,

4    again, to put concrete to it, say it's Mr. Thompson.  I

5    don't -- you know, look.  This is two years later.  I don't

6    think that it's realistic for my only defense to be I'm going

7    to depose their corporate rep with no document request or

8    their emails related to Mr. Thompson in advance of that

9    deposition and instead have to go to Mr. Wolf two years later

10   and say to him what do you remember about this loan if he

11   remembers.

12           Meanwhile, there could be documents on the Mutual

13   server that made clear Mutual rejected the Thompson loan, and

14   so I would want to do discovery to get all of those emails

15   from Mutual in advance of any kind of corporate rep

16   depositions about this loan, that that would be one thing.

17           Two, if it turns out that, you know, look, there was

18   no disclosure to Waterstone of the Thompson loan because all

19   of the documents in Exhibit 1 are from Chris Wolf to a Chris

20   Wolf personal email and Waterstone just has nothing to do with

21   this, I want to be able to have him to say that.

22           How do I know that?  I may not be able to discern

23   that from the face of the documents, but if I had my

24   E-forensic expert or Waterstone's IT team to look at the

25   server and understand did any of these documents that are

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  associated with the Thompson loan even enter Waterstone's

2  system?  If the answer is no, that is a really helpful

3  defense.  If the answer is yes, I think the fact investigation

4  continues.

5         Okay.  Was it quarantined by Waterstone's IT?  If

6  the answer to that is yes, but I have to look at that.  I

7  don't want to be --

8         THE COURT:  Did I misunderstand that these are

9  documents that Waterstone produced; that these are the

10 documents that were quarantined?  I thought that's what

11 Mr. Karen stated.

12        MS. KREITER:  I think that was misleading.

13 Factually what happened, Your Honor, is there's recruits from

14 the first office to come over, that Waterstone's IT doesn't

15 alert his documents put on our system.  *That's weird.  We've*

16 *got new employees.  Why should there be documents from the new*

17 *employees on, for example, day two of their employment?*

18        Waterstone's IT did not do any kind of investigation

19 about are these things that Mutual might claim is a trade

20 secret?  That's where it's misleading.  Waterstone's IT simply

21 said I don't care what it is, we don't want to get into any of

22 this, we're going to quarantine these documents.  So there was

23 no --

24        THE COURT:  Okay.  So then you have that information

25 that you can present.  I don't understand your argument as to

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    why you need further --

2           MS. STEPHENSON:  Yea --

3           THE COURT:  -- exploration of that.  If the whole

4    batch of documents was quarantined as you stated, then that's

5    something that could be presented on any of these documents.

6           MS. KREITER:  It's just -- it's going to take my

7    E-forensic expert a lot of time and effort with this volume to

8    look at that -- to go back now, you know, two years later.

9           THE COURT:  I don't understand how your E-forensic

10   expert who has already done the analysis distinguished the

11   whole entire batch of documents, which is what again includes

12   these documents that we're talking about separating out each

13   of these 17.  What is the distinction there --

14          MS. STEPHENSON:  Your Honor --

15          THE COURT:  -- the expert can simply say I can

16   identify that these never made it onto our servers and we

17   quarantined them all and they were not used by anyone other

18   than Mr. Wolf, then what's the need to go further than that?

19          MS. KREITER:  Yeah.  So his self-assert was limited

20   to the documents identified as trade secrets by Mutual, so at

21   the time they identified 186 documents.  He then with the

22   benefit of, okay, I've got my list, I'm going to compare that

23   to what's on the servers.  The problem now is we're doubling

24   the list all of these new documents that he has never traced.

25          THE COURT:  Okay.  So you're saying your expert,

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1  your E-forensic expert just looked at the Bates stamped

2  documents that were originally identified to trace those

3  documents and no other documents?

4       MS. KREITER:  Correct.  And that's why it was so

5  important that I understand the clarity what the documents

6  were.  Judge Sneed agreed with that and said give her the

7  Bates numbers so that the E-forensic expert can do his

8  analysis and now I'm redoing that with far more documents, and

9  they're brand new.

10      He's not looked at -- anything that wasn't

11 disclosed, he's not looked at.  And, frankly, it's not an easy

12 exercise, okay, were they on the server.  If they were on the

13 server, did they get -- you know, he's going to have to follow

14 the footprints in the sand as to where these brand new in

15 excess of -- you know, just in excess of 100 new documents

16 are, and I don't want to do that exercise.  I don't feel like

17 I should.  It's significant in time.  It's a significant

18 expense, and it doesn't seem to be proportional.

19      The prejudice, the time, the cost, how much it's

20 going to delay the trial is not -- I don't see why we should

21 be doing it in light of the pretty clear discovery and the

22 order of the Court, but even if you're going to go down that

23 road, I think the prejudice to Waterstone in terms of time,

24 expense, redoing all of this is substantial compared to what

25 I'm hearing Mr. Karen say he just wants to get more context.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          THE COURT:  Mr. Karen, any response?

2          MR. KAREN:  Yes, Your Honor.  Number one, many of

3     these documents in terms of this, again, argument actually

4     have emails that say to (unintelligible) at Waterstone

5     Mortgage.  I'm not going to say every single one of them, but

6     the majority.  There's no analysis.

7          You look at the document on its face, it says to

8     somebody at Waterstone.  That's the majority of these

9     documents.  Not all of them, may have been a couple of them

10    that we don't know that were there, but the rest say to

11    Waterstone.  It's on its face.

12         But I'm going to look to their expert report.  It

13    says as part of Waterstone's remediation efforts, Mr. Howard

14    also conducted searches of Waterstone's email environment for

15    any emails sent from the former Mutual employees into

16    Waterstone, either Mutual of Omaha email accounts or known

17    personal email accounts.

18         Mr. Howard quarantined those emails in addition to

19    the afore-mentioned One Drive files.  He already did it.

20    These are exactly the documents that they quarantined, and

21    those are exactly the documents we're using, that they

22    produced.

23         THE COURT:  Ms. Kreiter?

24         MS. KREITER:  Yeah.  I mean I just -- I don't know

25    how else to say it.  I think he's mischaracterizing.  Our

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   E-forensic expert looked at the documents that were identified

2   as trade secrets.  Mr. Howard and the Waterstone IT person,

3   he's not the E-forensic expert.

4           Our E-forensic expert focused exclusively on the

5   documents that were identified as trade secrets.  And then,

6   frankly, further than that from his analysis I asked, okay,

7   now we're narrowing the world of documents we're talking

8   about, right?  I then with the benefit of the E-forensic

9   report asked questions to the corporate representative about

10  the ones that were identified as trade secrets and actually

11  hit Waterstone's server.

12          I was trying to narrow from 186 documents down to a

13  manageable set, ask pointed questions to the corporate rep as

14  to the ones I knew actually hit the server as opposed to being

15  somewhere out in space and having nothing to do with

16  Waterstone, are these trade secrets, and went through a slew

17  of documents that yes is no and was able to ask questions

18  related to the elements of the trade secret.

19          I haven't done any of that with respect to these new

20  documents, and it's just -- it's going to be laborious.  It's

21  going to be time-intensive, but it is warranted if he's going

22  to seek punitive damages.

23          I have my arms around the ones that were identified

24  in terms of discovery.  Whether the Court -- I think the Court

25  should grant the renewed motion, but whether it does or not

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    with respect to those, I am prepared with an E-forensic

2    expert.  I'm prepared with corporate rep deposition

3    transcripts to put on full display why this is not a trade

4    secret.

5            And, frankly, I will also say I don't want to lose

6    sight of the fact that Mutual has stipulated.  We're talking

7    about these customer loans.  Mutual has stipulated and is not

8    seeking damages with regard to diverted loans.  That was a

9    stipulation that was put on file by the parties in May.

10           So I think that this is just an effort by Mr. Karen

11   to pile on in a way that is prejudicial, costly and

12   unnecessary.

13           THE COURT:  Mr. Karen, that is a very valid point

14   and I neglected to reconsider that.  Why then the

15   significance, again, back to my original question, 5 to 17

16   particularly since these are not even related to any damage

17   calculation?  It's just simply the trade secrets.  And if

18   you've got five that have already been produced and vetted

19   through discovery, why do we need the additional ones?

20           You could provide testimony that these are examples

21   of customers and then sign this inclusive list of all the

22   customers, so what's the distinction?

23           MR. KAREN:  Well, I do want to distinguish one

24   particular document, Your Honor, which we're talking about

25   which is the Encompass trade secret.  That to me is very

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    important because that involves going into --

2            THE COURT:  I'm talking about the identity of the

3    borrowers, not --

4            MR. KAREN:  So we're clear, thank you, Your Honor.

5    With respect to the identity of the borrowers, first of all,

6    again, it's the totality of what they've done, and that's

7    what's going to be asked the jury, is this the conduct in its

8    totality such that it would result in the events that

9    occurred.  But to the extent that there's issues of punitive

10   damages, things like that, I think you have to look at the

11   totality of the conduct, so to simply, you know, say, well,

12   there's only five, you know --

13           THE COURT:  Well, that's not what is going to be

14   said is that five is a representative sample of five.  You

15   could -- I mean, you have argued over and over again the

16   essence of it is, your theory of the case is, it was simply

17   just a list out.  The entire business operation of Mutual of

18   Omaha was stolen out from underneath Mutual of Omaha and sent

19   over to Waterstone.

20           So whether the example of five potential borrowers

21   that were in the system is an example of that as

22   representative of the entire what was in the system, why do

23   you need the additional ones that were not previously

24   disclosed?

25           MR. KAREN:  Because, Your Honor, then what they're

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    likely going to say, and I've already seen this in the

2    deposition previous; right?  Well, you couldn't have closed

3    that one and you couldn't have closed that one and you

4    couldn't have closed that one.  But there are others where

5    they have essentially admitted, well, yeah, maybe we could

6    have.

7         There's one actually that we've identified where in

8    the email chain the -- they say, oh, you better send this one

9    back to Mutual.  We can't close it here in Waterstone.

10        So knowing what their explanation is going to be

11   with these five compared to knowing that there are others that

12   they will not be able to make those explanations, that goes

13   exactly to the point I'm making and, again, there's no

14   additional prejudice here.  I really have to -- I really

15   struggle with that assertion but.

16        THE COURT:  But isn't that part of Ms. Kreiter's

17   argument that she knew about the five and that they are able

18   to defend the five because they were aware of it but now

19   you're asking her to defend additional ones that were not

20   vetted in discovery?

21        MR. KAREN:  Well, I think they were vetted, Your

22   Honor.  We went through in discovery and we went through in

23   depositions with all of these and we've heard the answers

24   relating to that.  So it isn't going to be a question of you

25   need vet documents to do any of these thing.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1          And, Your Honor, to that point, Mr. -- bear with me

2     one second, Your Honor.

3          MS. STEPHENSON:  Yes.

4          THE COURT:  While you are doing that, the question

5     that I have is why do you need the documents?  If it's just a

6     matter of, well, what about Mr. Tariq?  Was he not ready to be

7     in a position to be a borrower?  That could have been closed

8     at Mutual of Omaha, could it not?  Why do you need these

9     additional documents to demonstrate that?

10         MR. KAREN:  Because I think with some of them

11    there's simply no argument whether they could or they couldn't

12    have been, and I think it goes to the degree.

13         For example, there was one loan where they told the

14    borrower, no, we can't close this loan for you.  We're not

15    going to be able to do it for you at Mutual.

16         They sent the borrower from Mutual an email from the

17    loan officer at Mutual, and this is even -- they said we're

18    not going to be able to close this loan at Mutual for you, you

19    need to go to Waterstone.  We could have closed that loan.

20         So, you know, going back through, there are

21    distinctions with respect to some of these loans, so I think

22    to cut us off and give them the ability to say, well, there

23    were just these 5 and I understand they may not be able to say

24    that, but to be able to only have to explain 5 when there's

25    17, and some of them they can't explain, that materially

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    prejudices us with respect to documents and materials that

2    they took and they knew they had before we even started this

3    case with respect to an expert who knew exactly what's he's

4    looking for.

5          Your Honor, I would just like to point out what he

6    said again.  Their expert report, what I read about Mr. Howard

7    was in their expert report, so to kind of disassociate

8    Mr. Howard I think is unfair when obviously that was something

9    that Mr. Howard worked with their expert and provided their

10    expert information which he actually included in his report.

11          Let me just add to what their expert stated in their

12    report.  Additional efforts have been taken regarding

13    Waterstone's potential possession of Mutual of Omaha's alleged

14    trade secrets including those below.  And then he says,

15    talking about, I reviewed the Bates numbers and associated

16    meta data and then he goes through all the other stuff he did.

17          That was additional.  That was in addition to what

18    Mr. Howard did and in addition to what he talked to Mr. Howard

19    about.

20          Your Honor, there's really no question.  It's an

21    email.  I would see Ms. Kreiter's maybe her point if there was

22    an email that was never sent to Waterstone.  Right?  But if

23    you have an email from Chris Wolf and in a personal email chat

24    sending that to Kristen Friebis at Waterstone or whoever it

25    might be at Waterstone, there is no question that it was at

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    Waterstone.  It was sent there.  And they were acting, again,

2    as we've alleged, Your Honor, they were at all times acting as

3    Waterstone's agents in doing that.

4         I don't really think that there is a viable,

5    legitimate argument and a prejudice here on their part.  On

6    our part, it could be highly prejudicial depending on the way

7    the evidence comes out at trial.

8         Your Honor, if we get to trial and you think at some

9    point we're being, you know, duplicative and you believe that,

10   you know, we're piling on and it's no longer relevant,

11   obviously you have the right to cut us off at that point, but

12   I think that's when the decision should be made, Your Honor,

13   not now.

14        THE COURT:  All right.

15        Ms. Kreiter, my ruling is going to stand in the

16   sense that I'll allow you to meet and confer with Mr. Karen

17   and you can decide what additional discovery you think is

18   necessary.

19        I'm not going to limit you to the 30(b)(6).  I'll

20   allow you if you think they're necessary, but I'm not going to

21   exclude these documents.  I do find that they were disclosed

22   in the discovery.  They just were not specifically identified,

23   but more importantly, we're going to try the case on the

24   merits of what's on the record.  I'm not going to limit the

25   ability to represent the case by the plaintiffs simply because

1    there was a failing by Bates stamp number to identify what was

2    alleged in the Complaint.

3            I'm satisfied that their allegations in the

4    Complaint is sufficient notice as to what they are alleging as

5    to trade secrets.  Whether that should have been done earlier

6    or not is -- can be continued to be debated, but this case is

7    going to be tried on the merits of it rather than the

8    procedural default and failure to identify by Bates stamp the

9    trade secret.

10           So I am going to deny your motion, but I'm going to

11   give you the opportunity to cure whatever prejudice you think

12   there is.  If that delays it, that delays it.

13           As I stated, I will keep pushing so that I can get

14   you on trial when you're ready to go to trial, but if you

15   think you need more than the 30(b)(6) deposition, then you

16   could decide what is necessary as to the additional

17   identification of potential borrowers and the related

18   documents.

19           But I am also satisfied that the documents

20   themselves are not trade secrets, and what has been

21   represented on the record, it is the contents of those

22   documents that show the intent of -- well, the identity of the

23   borrowers and their intent to go forward with the loan.

24           So for the record, I am denying the request to

25   exclude these documents.  I will direct the parties meet and

1   confer, to talk about then what is needed for additional

2   discovery.  I'm going to set a status conference so that I can

3   find out what you've decided and put us back on its calendar

4   after you've decided what is necessary for that additional

5   discovery so we can move forward.

6           So, Ms. Kreiter, how much time do you want to be

7   able to think about this and then confer with Mr. Karen?

8           MS. KREITER:  I want to move this along, Your Honor.

9   I would say I would want to do -- a week to think about.  I

10  will also say I would like the opportunity to file a motion

11  for fees, because I will tell you we've now triaged handfuls

12  of robust lists in conjunction with discovery and otherwise.

13  It's cost a lot, and it's going to cost a lot.  There has been

14  a violation of the order.

15          THE COURT:  Well, I'll save you the time.  I will

16  consider that motion, but we're not going to put it on the

17  front end and get bogged down by collateral matters.

18          MS. KREITER:  Certainly.

19          THE COURT:  So what we will do is I will preserve

20  your right to raise the matter as to the fee shift as to any

21  additional costs imposed upon the additional discovery, and I

22  will tell you that may certainly be meritorious being that

23  part of the reason we're doing this is because the failure to

24  supplement the discovery.

25          So I'm not going to prejudice you.  You certainly

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1    can raise that, but let's not get bogged down in a collateral

2    matter at this time.  Let's get focused on getting the

3    discovery done and then I will take that up at a later date.

4         MS. KREITER:  Related to discovery, Your Honor, I

5    think Mr. Karen indicated at the pretrial conference he

6    thought he could have an amendment of Ms. Rosevear's report

7    within two weeks.  That came and went.  Mr. Karen indicated

8    June 14th he would have a report for me.  Mr. Karen then

9    indicated that he does not have a report ready and he won't

10   have it until the end of June.

11        I just -- you know, that's kind of the other

12   pressing issue here.  You know, I can represent to the Court

13   that if there is new facts in that report, I'm going to

14   promptly move to strike, and I think the Court is probably

15   anticipating that, but I don't want a moving target as to this

16   amended report.

17        I anticipate portions of the report may address

18   things like the carve-out for Paramus.  I guess I need that

19   report.  I need it a date certain.  I don't think it should

20   have taken a month and a half already, but I wanted to mention

21   that.

22        THE COURT:  Mr. Karen, what's going on with the

23   report?

24        MR. KAREN:  Your Honor, the report, Ms. Rosevear was

25   involved in another -- is involved in another case which has

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1   delayed her more than she anticipated.

2           The other aspect of it though, Your Honor, is she

3   would have had the report relating to Paramus and everything

4   else by the 14th.  Unfortunately because -- not unfortunately,

5   but you had also asked that she address the 30 months, so she

6   had to add that in and she couldn't get it done until the

7   14th, so because I'm leaving today or, I'm sorry, tomorrow

8   morning and I'm obviously lead Counsel, I need to see this

9   document, so as soon as I get back from that from the

10  pre-existing vacation, I'm going to have it produced.  It's

11  going to be done while I'm gone, but where I'm going, I don't

12  have any access to wifi or anything else, so I simply won't be

13  able to look at it until I get back.  I get back the 27th.

14          She probably could get it done the 21st, but, you

15  know, I hope you could understand as lead counsel I want to

16  review an expert report before giving it to the other side

17  before knowing what's in there.  It's only a seven-day delay

18  for Ms. Rosevear.  Because of my pre-existing absence, that's

19  why I said the 28th.

20          THE COURT:  I'm going to direct the report be

21  disclosed by the 28th.  I'm going to set a status conference

22  for, let's do, July 2nd at 3:00 o'clock.  Does that work for

23  everyone?

24          MS. KREITER:  That's fine.

25          MR. KAREN:  Yes, Your Honor.

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1            THE COURT:  We'll do it by Zoom.  You may not be in

2    a position, Ms. Kreiter, but don't feel obligated, but to

3    raise whatever issues that there are in the report.  If I need

4    to set another hearing to give you time to make any argument,

5    I'll do that.  But if you are, we'll take it up then, but

6    otherwise don't feel obligated that you have to have all your

7    argument prepared by the 2nd since you're only getting the

8    report no later than Friday the 28th.

9            MS. KREITER:  Understood.

10           THE COURT:  Okay.  Anything else that we should take

11   up today?  But all I'm anticipating then on that status is

12   that now that the remaining discovery related to these

13   additional 17 individuals in the customer list that you both

14   have decided what you need and the timing and sequencing of

15   that so that we can put this back on the calendar after that

16   discovery is complete.  All right.  Anything else we need to

17   take up today?

18           MS. KREITER:  Not for Waterstone.

19           MR. KAREN:  No.

20           THE COURT:  Thank you all for your time.  We'll be

21   adjourned.

22           MR. KAREN:  Thank you, Your Honor.

23   (Court adjourned at 11:20 a.m.)

24

25

UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION

1

2

3    UNITED STATES DISTRICT COURT  )

4                                  )

5    MIDDLE DISTRICT OF FLORIDA    )

6

7            I, SHARON A. MILLER, Official Court Reporter for the

8    United States District Court, Middle District of Florida, do

9    hereby certify that pursuant to Section 753, Title 28, United

10   States Code that the foregoing is a true and correct

11   transcript of the stenographic notes taken by computer-aided

12   transcription taken in the above-entitled cause by the

13   undersigned and that the transcript format is in conformance

14   with the regulations of the Judicial conference of the United

15   States.

16   /S/Sharon A. Miller, CSR, RPR, CRR, RMR

17   Official Court Reporter

18

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ FLMD ~ TAMPA DIVISION