IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC.<br><br>    Plaintiff,<br><br>v.<br><br>WATERSTONE MORTGAGE CORPORATION,<br><br>    Defendant. | CASE NO. 8:22-cv-01660-UAM |

**WATERSTONE MORTGAGE CORPORATION'S PETITION FOR FEES DUE TO MUTUAL'S FAILURE TO ADHERE TO THE FEDERAL RULES AND THE COURT'S ORDERS AS TO ITS TRADE SECRET CLAIMS**

  Mutual caused Waterstone to unnecessarily incur at least **$144,977** in fees by identifying 186 alleged trade secrets and then changing course and alleging entirely new trade secrets eight months after the close of discovery, and after Waterstone moved for summary judgment. Mutual has no excuse for its lengthy delay and disregard for the Federal Rules and this Court's orders, including the Order that Mutual identify its alleged trade secrets by bates-number. At this point, Waterstone's many months of time and effort are moot, and it needlessly incurred fees associated with, at a minimum: (i) an e-forensic expert who vetted the 186 prior alleged trade secrets; (ii) deposing Mutual's corporate representative about the alleged trade secrets; and (iii) moving for summary judgment on the trade secrets Mutual relied upon during the entire case; and (iv) analyzing Mutual's multiple, untimely iterations of its alleged trade secrets. After Waterstone put the vulnerabilities in Mutual's position on full

2

display via discovery and its motion for summary judgment, Mutual was given extraordinary leave to abandon the 186 documents it relied on the entire case and to claim new alleged trade secrets. While the Court allowed a Mutual a redo over Waterstone's strenuous objection, and to Waterstone's significant prejudice — including causing the June trial to have to be rescheduled — the Court also permitted Waterstone to file a fees petition. A full award is imperative given the substantive disadvantage to Waterstone caused by allowing Mutual to change course after having the benefit of seeing Waterstone's defense. The Court should award Waterstone the full **$144,977** sought.

I.   Mutual Has Changed its Trade Secret Theory At Least Five Times

    *a. Mutual Initially Identifies 186 Documents As Its Trade Secrets*

The parties have litigated Mutual's shifting trade secrets theory for more than two years. In October 2022, Waterstone served a written discovery request on Mutual requiring it to "[i]dentify with particularity *all* trade secrets" that Mutual alleged to be a trade secret misappropriated by Waterstone. (D.E. 137-1, Waterstone's First Set of Interrogatories to Mutual at Interrog. No. 8.) When Mutual objected to the request and refused to identify any specific documents, Waterstone was forced to move the Court to compel identification of Mutual's alleged trade secrets by bates-number. (D.E. 137-2, Mutual's Responses and Objections to Waterstone's First Set of Interrogatories at Resp. to Interrog. No. 8; D.E. 42, Waterstone's Motion to Compel.) The Court granted Waterstone's motion to compel on March 1, 2023, and ordered Mutual to identify all documents it alleged were

3

trade secrets by bates-number **on or before March 10, 2023**. (D.E. 52 at 2, ¶ 4.) Mutual then amended its responses to Waterstone's Interrogatory No. 8 and identified 186 specific documents, by bates-number, that it purported to be "all" of its alleged trade secrets. (D.E. 137-3, Mutual's Second Amended Responses and Objections to Waterstone's First Set of Interrogatories).

Waterstone then spent the entirety of the next year litigating with the understanding that the 186 documents identified by Mutual in March 2023 were the trade secrets that Mutual would rely on. Waterstone took and defended numerous depositions, engaged in expert discovery, and significant motion practice, all with the understanding that Mutual's trade secrets were the 186 documents it had identified pursuant to the Court's disclosure order. Discovery closed on July 31, 2023. Mutual never amended its disclosure of alleged trade secrets, nor indicate it intended to do so.

    b. *After Waterstone Moves for Summary Judgment, Mutual Changes its Alleged Trade Secrets*

Waterstone moved for summary judgment on Mutual's trade secrets claims on February 29, 2024 based on the 186 alleged trade secrets Mutual identified in March of 2023. (D.E. 137.) In response, Mutual purported to identify **639** documents as its alleged trade secrets, more than a year after being ordered by the Court to identify *all* its trade secrets and more than 8 months after the close of discovery. (D.E. 150-1.) Of the 639 documents Mutual now claimed as trade secrets, 478 of them had not previously been identified as an alleged trade secret by Mutual. A day later, on April

4

2, 2024, Mutual filed a "corrected" response brief including yet another new spreadsheet identifying its alleged trade secrets. (D.E. 151.) Then, two days later, on April 4, 2024, without seeking leave to amend its responses after discovery had long closed, Mutual served "amended" discovery responses to Waterstone's October 2022 discovery requests. (D.E. 159-1.) Instead of the 639 documents it identified three days earlier, Mutual identified 39 documents as its alleged trade secrets. Mutual had never previously identified 33 of those 39 trade secrets in discovery.

    c. *After the Parties' Final Pre-Trial Conference, Mutual Changes its Trade Secrets Three More Times*

Trial was set to begin on June 3, 2024. (D.E. 156.) On May 17, 2024, at the parties' final pre-trial conference, the Court heard argument on Waterstone's motion for summary judgment on Mutual's trade secrets claims. The Court asked Mutual to identify the documents it was claiming as trade secrets, but Mutual could not do so – despite having changed its list of trade secrets three times since April:

> **The Court**: Okay. I want to be very blunt. How many documents? Is it the 39 that was last supplemented, or is it more than that?
>
> **Mr. Karen**: I would have to – I would have to look, Your Honor, to give you an exact answer.

(D.E. 195, Transcript of May 17, 2024 Motion Hearing at 6:1-5.)

No exact answer was ever provided during the hearing. The Court again tried to ask Mutual to identify the documents it was claiming as its trade secrets, before Mutual revealed that it was planning on, *yet again*, revising its list of alleged trade

5

secrets without leave of Court or any explanation for its egregious delay in violation of the Rules of Discovery and the Court's orders:

> **The Court**: So what is going to be at issue? Is it going to be the 186 documents that were originally briefed, or is it going to be the 39 documents that were later supplemented or a combination of that?
>
> **Mr. Karen**: A combination. We are going – we have already pared that down in preparation for the exhibit lists – or the list of exhibits that we have been working on. We have already pared that down because I want to present this in a meaningful way to the jury.

(*Id.* at 11:6-14.)

Because Mutual could not even identify what documents it was claiming as its alleged trade secrets, the Court ordered Mutual to do so by May 24, 2024 so that Waterstone would "know exactly what items are being identified as trade secrets." (*Id.* at 71:10-14; D.E. 197, ¶ 1.) On May 24, 2024, Mutual produced a spreadsheet changing its list of alleged trade secrets *again* – now identifying a list of 29 "exhibits," consisting of 342 documents, as its list of alleged trade secrets. Then, on May 30, 2024, Mutual produced a "Revised Identification of Trade Secrets" now claiming that 22 exhibits, rather than 29, and consisting of 284 documents, rather than 342, was its newest list of alleged trade secrets. (D.E. 200-1.) Waterstone moved to exclude these newly identified trade secrets on the basis that 216 of those 284 documents had never been identified as Mutual's alleged trade secrets before the close of discovery. (D.E. 200.) The Court denied Waterstone's motion to exclude those documents, allowing Mutual to proceed on its trade secret claims with the list of alleged trade secrets it produced on June 7, 2024. (D.E. 209.)

## II. Mutual's Moving Target Has Forced Waterstone to Incur Hundreds of Thousands of Dollars in Unnecessary Attorneys' Fees

Waterstone first spent more than a year – and more than *a hundred thousand dollars* – litigating Mutual's trade secrets claims with the understanding that the 186 documents Mutual identified in March 2023 were indeed Mutual's full and final identification of the documents its trade secrets claims were based on. (Declaration of Maria L. Kreiter ("Kreiter Decl."), ¶ 3.) Relying on Mutual's March 2023 discovery responses, among other things, Waterstone: (1) hired an e-forensic expert to analyze and draft a report based on the 186 alleged trade secrets; (2) deposed Mutual's corporate representative, and other witnesses, regarding those alleged trade secrets; and (3) moved for summary judgment on those trade secrets. (*Id.*, ¶ 4.) At no point in discovery did Mutual amend its discovery responses to identify any other documents as its trade secrets. (*Id.*, ¶ 5.) Only until *after* Waterstone's motion for summary judgment – *eight months after the close of discovery* – did Mutual purport to change its list of alleged trade secrets.

Since then, each time Mutual has moved its trade secret "target," Waterstone has been forced to re-do work it has already done, unnecessarily incurring significant attorney's fees and costs to vet and analyze Mutual's newest iterations of its alleged trade secrets. After Mutual purported to amend its list three times in April 2024, Waterstone incurred significant attorney's fees to review and analyze Mutual's new list in preparation for a June trial. (*Id.*, ¶ 6.) Then, when Mutual amended its list three more times after the parties' final pre-trial conference, Waterstone was forced

7

to incur more fees to, yet again, vet Mutual's most recent, belated versions of its alleged trade secrets. (*Id.*, ¶ 7.) And, since Mutual has been allowed to proceed on its most recent list of trade secrets, Waterstone has had to prepare additional written discovery focused on the most recent list of trade secrets, review documents produced in response to that written discovery, and conduct another deposition of Mutual's corporate representative focused on this list of trade secrets. (*Id.*, ¶ 8.)

Through no fault of its own, Waterstone has needlessly spent at least **$144,977** on attorney's fees and costs defending trade secrets misappropriation allegations that Mutual abandoned in favor of alternate alleged trade secrets informed by Waterstone's legal arguments. (*Id.*, ¶ 9.) The work Waterstone is doing now to analyze Mutual's alleged trade secrets – *redoing* – is the work it would have done from the beginning had Mutual timely disclosed its trade secrets in discovery, as it should have done back in March of 2023. As set forth in Waterstone's June 12, 2024 submission, there is no reason why any of these documents could not have been identified before the close of discovery– all but 1 of the documents Mutual now alleges as a trade secret were produced before the close of the discovery. (D.E. 207 at 4.)[1] And the one document *not* disclosed by the end of the discovery was produced *by Mutual*, just 9 days after discovery closed. (*Id.*)

---

[1] Mutual is also responsible for the timing of the production of the one document produced after the close of discovery because it waited to serve third-party subpoenas until June 27, 2023—approximately 30 days before the July 31, 2023 discovery close.

8

## III. Awarding Attorney's Fees Under Fed. R. Civ. P. 37 is Warranted

This Court has already found that Mutual failed to timely supplement its response to Waterstone's Interrogatory No. 8, and preserved Waterstone's right to bring this motion for fees. (D.E. 209, Court's June 13, 2024 Minute Entry) ("Court finds plaintiff failed to timely supplement discovery as to interrogatory #8. … Court preserves Defendant's right for a fees motion, at a later date."). Mutual's disregard for the rules of discovery make an award of attorney's fees and costs appropriate under Rule 37(c)(1) of the Federal Rules of Civil Procedure. Under Rule 37(c)(1), the Court may award "the reasonable expenses, including attorney's fees, caused by the failure" to provide or supplement information required under Rule 26(a) or (e), "unless the failure was substantially justified or harmless." After Mutual disclosed its initial list of alleged trade secrets on March 10, 2023, Mutual had a continuing obligation under Rule 26(e) to supplement or amend its response to that interrogatory *during discovery*. Fed. R. Civ. P. 26(e)(1)(A) (a party "***must*** supplement or correct" discovery responses "***in a timely manner*** if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing"). Mutual's April "amendment" of its earlier response to Waterstone's Interrogatory No. 8, and its subsequent multiple revisions of its alleged trade secrets, were far from timely – Mutual amended its discovery responses more than eight months after the close of discovery, after Waterstone had moved for summary judgment on the very trade secrets it then

9

amended, and just two months before trial was set to begin. Mutual's failure to timely supplement its responses, as held by this Court, permits an award of attorney's fees under Rule 37(c)(1). And, at the parties' hearings on Mutual's trade secrets claims, Mutual has not established that its failure to supplement was substantially justified or harmless. "The burden of establishing that a failure to disclose [under Rule 37(c)(1)] was substantially justified or harmless rests on the nondisclosing party." *GeoVera Specialty Ins. Co. v. Miller*, No. 2:23-CV-292-SPC-NPM, 2024 WL 3518092, at *2 (M.D. Fla. July 24, 2024) (quoting *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009)). Mutual has not, and cannot, explain why its newest list of alleged trade secrets were not timely disclosed.

Despite being obligated by Rule 26(e) to timely supplement its responses to Waterstone's Interrogatory No. 8, Mutual did not supplement its list of alleged trade secrets until more than *a year* after being compelled by the Court to do so, more than *8 months* after the close of discovery, *after* Waterstone had filed a motion for summary judgment, and *two months* before trial. Mutual has no good excuse for why it waited so long, and, at the parties' subsequent hearings before the Court on these trade secret issues, Mutual has been unable to articulate any substantial justification or good cause for its delay. Accordingly, Waterstone should be awarded the **$144,977** in attorneys' fees and costs it would not have had to incur had Mutual complied with its discovery obligations and timely disclosed its alleged trade secrets, as Waterstone asked it to do two years ago.

**IV.     Waterstone's Fees and Costs are Reasonable**

The fees incurred by Waterstone in vetting Mutual's alleged trade secrets, before Mutual dramatically changed positions, are reasonable and should be awarded in full. Fed. R. Civ. P. 37(c)(1) (courts may order "payment of the *reasonable* expenses, including attorney's fees, caused by the failure"; emphasis added). Waterstone spent more than a year defending against Mutual's trade secrets claims which were based on the alleged 186 trade secrets Mutual identified in discovery. Waterstone's defense included primarily: (1) discovery, including document review time, deposition preparation, and the taking and defending of depositions related to Mutual's alleged trade secrets; (2) motion practice, including Waterstone's previous motion to compel Mutual to identify its trade secrets and Waterstone's motion for summary judgment on Mutual's trade secrets claims; and (3) expert discovery.

*a.  Time Entries Directly Relate to Mutual's Trade Secrets Claims*

The following Godfrey & Kahn timekeepers billed time to defend Mutual's trade secret claims:

**Summary of Hours Billed Directly Related to Mutual's Alleged Trade Secrets**

| Timekeeper | Experience Level | 2022 Hourly Rate | 2023 Hourly Rate | 2024 Hourly Rate | Hours Billed | Total Fees |
|---|---|---|---|---|---|---|
| Xavier Jenkins | Third Year Associate | $340 | $390 | $430 | 14.2 | $6,058 |
| Emma Jewell | Fifth Year Associate | $380 | $430 | $470 | 52.8 | $24,668 |

11

| Maria L. Kreiter | Shareholder | $570 | $600 | $650 | 47.3 | $29,760 |
|---|---|---|---|---|---|---|
| Adam Cares | E-Discovery Manager/Litigation Support | $340 | $355 | $375 | 81.1 | $29,570.50 |
| | | | | **Total**: | **195.4** | **$90,056.50** |

(Kreiter Decl., ¶ 12; Ex. A.) A general summary of each timekeeper's specific involvement, which is detailed in Exhibit A to the simultaneously filed Kreiter Declaration, is as follows:

- **Maria L. Kreiter**. Shareholder Maria Kreiter is lead defense counsel. Ms. Kreiter's role in this case largely related to review, revision, and oversight of tasks delegated to associates. However, Ms. Kreiter has also had a central role in drafting and reviewing discovery materials, taking, and defending depositions, and leading the strategic analysis of Waterstone's defense of Mutual's trade secrets claims. (*Id*. ¶ 10(a).)

- **Xavier Jenkins**. Associate Xavier Jenkins is an associate attorney who began working on this case in August 2022. From August 2022, through March 2023, Mr. Jenkins assisted Ms. Kreiter on the case, primarily relating to Waterstone's discovery efforts, including drafting discovery and document review. Mr. Jenkins went on family leave in March 2023, at which time Emma Jewell assumed his role in the case. Then, in May 2024, Mr. Jenkins resumed working on the case in anticipation of Ms. Jewell's own family leave and the case proceeding to trial in June 2024. Mr. Jenkins was particularly equipped to assume Ms. Jewell's role because of

12

his familiarity with the facts of the case, having been involved at the beginning of the litigation. (*Id.* at (b).)

- **Emma Jewell**. Emma Jewell assumed Mr. Jenkins' role when Mr. Jenkins went on family leave in March 2023. Following that time, Ms. Jewell performed most of the work related to Waterstone's defense against Mutual's trade secrets claims, taking a lead role in terms of fact and expert discovery, motion briefing, and all other aspects of the case, for the majority of its pendency. Ms. Jewell went on family leave beginning in July 2024, after which Mr. Jenkins assumed her role. (*Id.* at (c).)

- **Adam Cares**. Mr. Cares is the E-Discovery Manager for the Litigation Group at Godfrey & Kahn. Mr. Cares has been involved in this case since its inception, assisting with all manners of the discovery process, and, specific to this petition, the discovery efforts Waterstone undertook with respect to Mutual's alleged trade secrets. Mr. Cares has been involved in e-discovery and litigation support work at Godfrey & Kahn for 22 years, and his expertise and skillset were particularly necessary in helping to analyze Mutual's shifting theories of what documents constituted its alleged trade secrets and related discovery. (*Id.* at (d).)

    b. *Block Billed Time Entries Include Tasks Related to Mutual's Alleged Trade Secrets*

Those same timekeepers also billed an additional $56,505 in fees to Waterstone for tasks related to the trade secrets, but for which the time entries include other, unrelated tasks, i.e., "block billing"[2]:

**Summary of Block Billed Hours Relating to Mutual's Alleged Trade Secrets**

| Timekeeper | Hours Billed | Total Fees |
|---|---|---|
| Emma Jewell | 48.9 | $22,419 |
| Maria L. Kreiter | 44.7 | $27,625 |
| Adam Cares | 18.2 | $6,461 |
| Total: | 111.8 | $56,505 |

(*Id.*, ¶ 14; Ex. B.) Waterstone seeks **$34,095.50** of the **$56,505** block billed total. The fees sought were incurred because of Mutual's trade secret related discovery violations and Waterstone has reduced the block billed entries accordingly.[3] Specifically, Waterstone reduced the block billed entries by **$22,409.50**, or roughly 40% to account for tasks unrelated to Mutual's alleged trade secrets. (*Id.* ¶ 15; Ex. B.) To arrive at a reasonable fee for the block billed entries, Waterstone's counsel went through each and made a reasonable deduction for unrelated tasks. (*Id.*, ¶ 16.) For

---

[2] "'Block billing' occurs when an attorney lists all the day's tasks on a case in a single entry, without separately identifying the time spent on each task." *Ceres Env't Servs., Inc. v. Colonel McCrary Trucking, LLC*, 476 F. App'x 198, 203 (11th Cir. 2012).

[3] Block billed entries may be awarded as long as the time sought is compensable. *Wyndham Vacation Ownership, Inc. v. Slattery, Sobel & Decamp*, LLP, No. 6:19-CV-1908-WWB-EJK, 2022 WL 8217011, at *6 (M.D. Fla. July 22, 2022), *report and recommendation adopted*, No. 6:19-CV-1908-WWB-EJK, 2022 WL 4285897 (M.D. Fla. Sept. 16, 2022), *reconsideration denied*, No. 6:19-CV-1908-WWB-EJK, 2023 WL 2039378 (M.D. Fla. Jan. 27, 2023) (refusing to exclude block billing entries from computation of fees where block billed entries were "compensable," that is, not "clerical" or "excessive"). None of the block billed entries calculated in this amount are clerical or excessive. (Kreiter Decl., ¶ 17.)

time spent on general-but-related tasks, for example, "Prepare for the Mutual of Omaha Rule 30(b)(6) deposition," the time associated with that entry was reduced by one-half (50%), as Mutual's trade secrets claims are one-half of its total causes of action (2 of 4), and it can therefore reasonably be assumed that half of the time spent on such general tasks were devoted to vetting and analyzing Mutual's trade secrets claims. (*Id.*) For other block billed entries with multiple, distinct tasks, the total time billed for that entry was reduced by an amount reasonably estimated to be associated with the unrelated task(s). (*Id.*; Ex. B (unrelated tasks represented in red, strikethrough text).)

Based on reductions this Court has applied to similar fee petitions seeking fees that include block billed time entries, Waterstone's proposed reduction of 40% of the block billed entries is more than reasonable. *See*, *e.g.*, *Ratner v. UNATION, Inc.*, No. 8:18-CV-3037-T-24AAS, 2019 WL 4738138, at *1 (M.D. Fla. Sept. 27, 2019) (reducing hours by 30% to account for block billing entries in request for fees brought under Rule 37); *McBride v. Legacy Components, LLC*, No. 8:15-cv-1983-17TGW, 2018 WL 4381181, at *3 (M.D. Fla. Aug. 30, 2018) (reducing hours by 35%); *Schofield v. Suraj Properties, Inc.*, No. 8:18-cv-31-T-WFJ-JSS, 2019 WL 3944439, at *3 (M.D. Fla. Aug. 21, 2019) (reducing by 25%).

    c. *Waterstone's Attorney's Fees: $124,152*

The hourly rates, and the work performed by Godfrey & Kahn timekeepers, in defending Waterstone against Mutual's trade secret claims, are reasonable and within market rates for a firm of Godfrey & Kahn's size and experience. (*Id.*, ¶ 11.)

15

As an initial matter, all fees sought have been paid in full by Waterstone (*id.*), which supports reasonableness.

In addition, Mutual has, at times, claimed tens of millions of dollars in damages, including treble damages and attorney's fees based on the trade secret misappropriation claims. Thus Waterstone sought counsel with enough size and sophistication to vigorously defend itself against Mutual's trade secret claims. (*Id.*, ¶ 12.)

In total, from October 2022 through April 2024, Godfrey & Kahn, S.C. billed, and Waterstone seeks reimbursement for the following amounts:

(1) 195.4 hours and **$90,056.50** to defend against Mutual's trade secrets claims; and

(2) 68.5 hours and **$34,095.50** derivative of "block billed" time entries for which Waterstone has apportioned the compensable amounts related to the trade secret claims (the block billed entries from which the amount sought was derived from 115.9 hours of block billed entries that totaled **$56,505**). (*Id.*, ¶¶ 13-16; Exs. A and B.) Thus, the total sought in attorney's fees is **$124,152**. (*Id.*)

All such fees relate to vetting, analyzing, and defending Waterstone against Mutual's alleged trade secrets before it belated changed its alleged trade secrets in violation of the Federal Rules and the Court's Orders. (*Id.*, ¶ 18.) Had Mutual identified what it now considers its trade secrets prior to the close of discovery, as was required, Waterstone would not have had to incur these fees. (*Id.*, ¶ 19.) All fees

16

related to Waterstone's defense against Mutual's trade secrets claims, prior to April 2024, have been paid. (*Id.*, ¶ 11.) Waterstone's fees are reasonable, and it should be awarded the entirety of the **$124,152** in attorneys' fees it incurred.

### d. *Waterstone's E-Forensic Expert Witness Fees: $20,825*

Waterstone also seeks reimbursement of the reasonable fees and costs it incurred in hiring an e-forensic expert to analyze the 186 allege trade secrets Mutual identified. Brett Creasy and his firm, bit-x-bit, were engaged by Waterstone, through Godfrey & Kahn, in September 2022. (*Id.*, ¶ 20.) Through June 2024, Mr. Creasy and bit-x-bit performed **63.25** hours of work, at an average rate of **$329.25** per hour, at a total cost to Waterstone of **$20,825**. (*Id.*, ¶ 21.) All the work performed by Mr. Creasy and bit-x-bit was directly related to analyzing the 186 alleged trade secrets Mutual had disclosed. (*Id.*, ¶ 22.) Mr. Creasy investigated whether the trade secrets Mutual's trade secrets claim relied were ever even put on Waterstone's servers. (*Id.*, ¶ 23.) Most of the trade secrets were not. (*Id.*) Rather, the employees leaving Mutual took the data without Waterstone's knowledge, instruction, or participation. (*Id.*) The employees sent the data, for example, to a personal email account without Waterstone having anything to do with those actions. If the case had proceeded to trial based on the trade secrets cited, Waterstone was in a position to expose the ridiculous nature of Mutual's claims since it had nothing to do with the vast majority of the documents relied upon and could prove just that through Mr. Creasy's analysis and testimony. However, because Mr. Creasy's engagement was specific to the 186

17

alleged trade secrets Mutual identified in discovery – which it no longer claims to be its alleged trade secrets – Mr. Creasy's engagement was a complete waste. (*Id.*, ¶ 24.) The fees Waterstone paid to Mr. Creasy (**$20,825**), and the attorneys' fees it has paid (**$124,152**), all of which were incurred in direct relation to Mutual's previously claimed list of alleged trade secrets, total **$144,977**.

    e. *Waterstone's Has Not Sought All Fees and Costs it is Entitled to Recover*

In assessing the reasonableness of the fees sought, it should be noted that Waterstone has not sought all compensable fees. For example, the Petition also does not seek fees incurred by all Godfrey & Kahn attorneys and paralegals that defended the trade secret claims involving the 186 documents Mutual relied upon for years. Instead, Waterstone has sought only the fees associated with efforts by the lead associate and shareholder on the case. Also, the fees sought do not include any time billed to Waterstone by its local counsel, the Hill Ward Henderson firm. (*Id.*, ¶ 25.)

Waterstone also does not seek the fees incurred in preparing this Petition, though Waterstone would also be justified in seeking those fees. *Env't Mfg. Sols., LLC v. Peach State Labs, Inc.*, 274 F. Supp. 3d 1298, 1319 (M.D. Fla. 2017) (allowing party bringing motion for fees related to discovery violations under Rule 37 to seek fees associated with preparing the motion for fees).

Further, Waterstone leveraged Machaella Moore, a Legal Executive Assistant, who is a talented, aspiring paralegal enrolled in Louisiana State University's Paralegal Studies Certificate Program. (Kreiter Decl. ¶ 26.) Ms. Moore has spent countless hours vetting and analyzing Mutual's alleged trade secrets, and did not bill

18

her time. (*Id.*, ¶ 27.) Ms. Moore's skills and work product are on par with Godfrey & Kahn's paralegals, and thus utilizing Ms. Moore saved thousands on fees. (*Id.*, ¶ 28.) As but one example, Ms. Moore spent hours putting together a detailed spreadsheet analyzing Mutual's changing position on its alleged trade secrets that Waterstone ultimately submitted in connection with its June 3, 2024 motion to exclude Mutual's newest iteration of its alleged trade secrets. (*Id.*, ¶ 29; D.E. 200-2.)

## CONCLUSION

For the reasons set forth in this Petition, the Declaration of Maria L. Kreiter, and the other proceedings and documents filed in this case, the Court should grant Waterstone's Petition and award Waterstone **$144,977** in fees and costs.

Dated: September 27th, 2024.

*s/Maria L. Kreiter*
Maria Kreiter (admitted pro hac vice)
Emma Jewell (admitted pro hac vice)
Xavier Jenkins (admitted pro hac vice)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com
xjenkins@gklaw.com

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)

carolina.blanco@hwhlaw.com
scott.mclaren@hwhlaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*

20