# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> WATERSTONE MORTGAGE CORPORATION, <br><br> Defendant. | Case No. 8:22-cv-01660-AEP <br><br> **PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.'S RESPONSE IN OPPOSITION TO WATERSTONE MORTGAGE CORPORATION'S PETITION FOR FEES** |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual") hereby files this Response in Opposition to Defendant Waterstone Mortgage Corporation's ("Defendant" or "Waterstone") Petition for Fees ("Petition") (ECF No. 228). In support thereof, Plaintiff states as follows:

## INTRODUCTION

Mutual's trade secrets were discussed transparently and openly beginning with its Complaint and throughout extensive depositions and discovery in the case. Long before the close of discovery, Waterstone was aware of the nature of the trade secret claims and that its forensic defense was insufficient. The Complaint and depositions demonstrated confidential and proprietary information uniquely available to Mutual was absconded by Waterstone after the alleged quarantine, which formed its initial defense. Moreover, Judge Barber clearly advised Waterstone that the premise of its quarantine defense – which ignored the fact that Waterstone employees continued to

1

have access to alleged trade secrets even after the quarantine – had a "bad smell."[1] Waterstone's decision to ignore the obvious warning signs that its defense had holes does not justify shifting the cost of its failed defense strategy to Mutual.

## FACTUAL BACKGROUND

Mutual's trade secrets have always included borrower identities, and Waterstone has known this since the outset of the case. *See* Compl., ECF No. 1 at ¶¶ 3, 37-44. The operative Complaint specifically charged Waterstone with obtaining sensitive financial information that "has independent economic value because [] it enables and facilitates the preparation of a loan application. It also separates those borrowers ready, willing, and able to proceed with a loan application from those that are not able or willing to proceed." Am. Compl., ECF No. 37, at ¶ 44. It also advised that "Consumers provide this highly sensitive, private, and confidential information with the understanding Mutual Mortgage will protect it" and that Mutual "does not release, share, or disclose such confidential information" because a competitor could "divert" those customers. *Id.* at ¶¶ 45-47. Your Honor observed, "I'm satisfied that their allegations in the Complaint is sufficient notice as to what they are alleging as to trade secrets." June 13, 2024 Hr'g Tr., ECF No. 209 at 57:24-58:3-5 (a copy of the transcript was filed as ECF No. 218).

In fact, this information was apparent before the Complaint was filed. On or before April 29, 2022, Waterstone quarantined an unknown number of files "that

---

[1] July 27, 2023 Hr'g Tr., ECF No. 101 at 38:12-19, attached as Exhibit A.

appeared to contain borrower documents" and "Mutual of Omaha information ... sent from the former Mutual employees into Waterstone via their Mutual of Omaha email accounts or known personal email accounts." *See* Report of Brian Creasy, ECF No. 137-5 at ¶ 7-9; *see also* Def's MSJ, ECF No. 137 at ¶¶ 17-18. That information – which Waterstone's own expert identified as "Mutual's alleged trade secrets"[2] – would necessarily have included 14 of the 22 trade secrets that Mutual has identified in this case, since the information was sent to Waterstone before April 29, 2022.[3] A chart of the trade secret exhibits and the email transmission date, date of interrogatory disclosure, and usage at depositions is attached as Exhibit B (hereinafter "Ex. B"). Tellingly, in Mr. Creasy's report dated June 5, 2023, he refers to this quarantined information as "Mutual's alleged trade secrets." Report of Brian Creasy, ECF No. 137-5 at ¶ at ¶¶ 3(a), 7-9. So, if Mr. Creasy was able to identify the borrower documents sent to Waterstone prior to April 29, 2022 – which represent 14 of the 22 trade secrets at issue – prior to the lawsuit and by June 5, 2023, understood they were "Mutual's

---

[2] The use of the terminology here is significant because Mr. Creasy uses a defined term "the Alleged Trade Secrets" to describe the 186 documents listed on Interrogatory 8. Report of Brian Creasy, ECF No. 137-5 at ¶ 13. Otherwise, he uses the undefined description of Mutual's alleged trade secrets to describe materials that were quarantined because they "contained any reference to Mutual of Omaha or any document that appeared to contain borrower documents." *Id.* at ¶¶ 3, 7, 13.

[3] The 14 trade secret exhibits transmitted before April 29, 2022 are Exhibits 3-11, 14, 16, 18, and 21-22. Ex. B at column entitled "Email Transmission Date." The remaining 8 trade secrets (Exhibits 1-2, 12-13, 15, 17, 19-20) were transmitted after Waterstone's quarantine. Mutual highlighted these 8 trade secrets in its Amended Responses to Waterstone's Interrogatories following Judge Sneed's Order and also in multiple depositions. Ex. B at columns entitled "Date of Interrogatory Disclosure" and "Usage in Depositions." Indeed, all of the 8 trade secrets were timely disclosed and/or used in depositions excluding the Thompson Loan Trade Secret. *See* Ex. B at row 1. However, the identity of the Thompson borrower was not a material inaccuracy, nor did it change the scope of discovery, particularly in light of the fact that numerous other borrower identities were provided to Waterstone, reflecting the same behavior – Waterstone forwarding emails and borrower documents.

3

alleged trade secrets," query as to how the trade secrets remained a mystery to Waterstone and its counsel through discovery. In reality, Waterstone knew from the outset of this case – if not before – exactly what "Mutual's alleged trade secrets" included.

### I.     The Motion to Compel Related to Documents Produced by Mutual.

As discovery commenced, Mutual answered Interrogatory 8, which sought information about Mutual's trade secrets. Mutual responded by referencing the Complaint and *"*documents being produced by Plaintiff on a rolling basis." *See* Pltf's Resps. to Def's Interrogatories, ECF No. 43-2, at No. 8. Unsatisfied with this explanation, Waterstone filed a motion to compel. During the hearing on the motion to compel and in consideration of the answer provided by Mutual, Judge Sneed framed the issue as whether Mutual needed to specify the documents *it produced* that correspond to Interrogatory No. 8:

> Judge Sneed to Mutual: "I do think it will be helpful for you to go ahead and provide those Bates numbers for all of the -- that correspond to the -- the responses that you provided to the interrogatory requests, especially where you said. 'look to the documents that *I produced* for the answer.'"
>
> Judge Sneed to Waterstone: "you all should undertake that procedure as well. So let's – let's – you know, and you don't need to produce the documents again, you sort of – you can really just amend your production and then provide those Bates numbers on the defense side as well."

March 30, 2023, Hr'g Tr., ECF No. 61 at 13:8-12, 33:34-34:3 (emphasis added).

In response to Judge Sneed's subsequent Order, ECF No. 52, Mutual clarified

4

for each category of trade secrets that "Plaintiff has provided the Bates numbers at which Plaintiff has produced documents regarding the trade secret[.]" Pltf.'s Am. Resps. to Def's Interrogatories, ECF No. 206-1 at p. 83-84. Mutual repeated *seven* times – for each category of trade secrets – that it was identifying only Bates numbers that had "been produced by Plaintiff." *See id.* at p. 83-88. Waterstone did the same – amending its responses and only citing Bates numbers of documents it produced. Def's Am. Responses to Pltf.'s Interrogatories, ECF No. 206-2 at Nos. 1-8, 10. Following Mutual's supplement, Waterstone never objected to or in any way disagreed with this limitation. Thus, it was apparent that both parties understood Judge Sneed's Order as compelling only the identification of the documents Mutual produced.

## II. Mutual Identified Trade Secrets Throughout Discovery and Could Not Have Supplemented Before the Close of Discovery.

As discovery continued and Mutual reviewed Waterstone's document productions, Mutual deposed several Waterstone employees and its corporate representative to ascertain potential explanations for Waterstone's access and utilization of information about Mutual's clients.

Mutual asked at depositions about nearly every single borrower that is at issue in Waterstone's Petition, as reflected by Ex. B. Indeed, 17 out of 22 trade secret exhibits[4] were discussed and used as exhibits at depositions.[5] And the questioning was

---

[4] The 17 exhibits used and discussed at a deposition include Exhibits 2-11, 14, 16-19, 21-22. Ex. B at column entitled "Usage in Depositions."

[5] Of the remaining 5 trade secret exhibits that were not exhibits to depositions (Exhibit 1, 12-13, 15, and 20), 4 were disclosed to Waterstone when Mutual amended its interrogatory responses in response to Judge Sneed's Order. Ex. B at column entitled "Date of Interrogatory Disclosure."

obvious that it related to trade secrets, discussing the valuable nature of the information, how it was accessed, that it was sensitive, and the unique value attached to the fact it was exclusively in Mutual's control. *See e.g.*, Chris Wolf Tr. at 119:21-120:17, 123:2-19 (admitting Encompass and borrower information is sensitive and that he sent borrower documents provided to Mutual to Waterstone);[6] Dwayne Hutto Tr. at 256:18-257:15[7] (admitting borrowers' records provided to Mutual were "Mutual's confidential information" and shared with Waterstone); Chris Smith Tr. at 203:1-24 (answering why Mutual employees were sending information about the McIntosh borrower[8] to Chris Wolf at Waterstone).[9] Throughout the depositions, the nature of Mutual's questioning made it abundantly clear that these reflected trade secrets.[10]

For example, Mutual asked Waterstone's 30(b)(6) representative about the "Hennessey" loan and the documents reflecting that Waterstone employee Chris Wolf forwarded sensitive documents provided by the borrower to Mutual. Mr. Allen confirmed that this "is the wrong way" to send over a file. *See* Kevin Allen Tr. at 292:11-293:7. Mr. Allen was also asked about loan opportunities, including 6 of the

---

[6] Attached as Exhibit C.

[7] Attached as Exhibit D.

[8] The exhibit used in the deposition is one of the documents in Mutual's trial exhibits entitled "McIntosh Loan Trade Secret".

[9] Attached as Exhibit E.

[10] *See* Chris Wolf Tr. at 128:8-12 (acknowledging borrower identity is valuable); Kevin Allen Tr. at 172:2-10 (same); *see also* Kevin Allen Tr. at 49:1-18, attached as Exhibit F (acknowledging that borrower-provided information is uniquely valuable because it is unknown and unavailable to other companies), 234:15-236:7 (acknowledging information was password protected); Chris Wolf Tr. at 122:13-124:7 (acknowledging information is password-protected), 100-143 (reviewing the circumstances of how 13 of Mutual's trade secrets were obtained, sent, and their value).

6

borrower trade secrets. *See* Ex. B at column entitled "Usage in Depositions" (reflecting Mr. Allen was asked about the Tyson, Hennessy, Byers, Castaneda, Tariq, and McIntosh borrowers). Mutual also asked Mr. Wolf about "D'Ettore" documents, who confirmed that the documents were "all borrower-related documents that are provided to Mutual" and admitted that the document "would have been kept in Mutual's Encompass [which is its] loan origination system." Chris Wolf Tr. at 120:5-121:6. And Mutual used these documents in the context of establishing the elements needed to prove trade secret status:

> Q: So just knowing that identity of that person, who's willing to give that all to you, and willing to go forward that far, just in and of itself, that's valuable; isn't it?
> A: True.
> Chris Wolf Tr. at 128:8-12.
> ***
> Q: But you said there was value to the list of your closed loans and having that information about your customers. You told me that was valuable information for you; right?
> A: Yeah. That's valuable to a loan officer who has built that up over the years. Yeah.
> Q: And it's valuable to the company, isn't it?
> A: And to the company that they can produce loans and -- yes.
> Kevin Allen Tr. at 172:2-10.

*See also* Chris Wolf Tr. at 100-143 (reviewing 20 pages of exhibits reflecting 13 of the loan opportunity trade secrets discussed during the deposition).

It was only days before the discovery cut-off that Mutual could depose Waterstone's corporate designee, Kevin Allen. When asked about a closed loan list

7

exported from Encompass at Waterstone's instruction in and around June of 2022[11], after admitting that the information was valuable, Mr. Allen testified, "I would not want to see this information exported from somebody's system." Kevin Allen Tr. at 172-174. Mr. Allen further acknowledged the problematic nature of Waterstone exporting this information from Mutual particularly after it received cease-and-desist letters and was on notice of the theft of confidential and proprietary information: "I can see the ask on [the June 13, 2022 Email] and I can read the cease and desist. And like I said, yeah. Would not want to see somebody exporting information." *Id.* at 200:16 – 202:9; *see also* June 13, 2022 Email. Critically, this theft of information occurred after the alleged quarantine of information, as reflected by a June 13, 2022 Email. *Compare* Report of Brian Creasy, ECF No. 137-5 at ¶ 7-9 (quarantine on or before April 29, 2022) *with* June 13, 2022 Email.

By that time, it was abundantly clear to Mr. Allen that Waterstone took password-protected, valuable, and sensitive information from Waterstone, after Waterstone had allegedly quarantined other stolen information. Kevin Allen Tr. at 42:8-43:13, 49:1-50:19, 172:2-10, 173:22-174:8 (acknowledging that Encompass contained sensitive data that was commercially valuable, password-protected, and should not have been exported). Additionally, Waterstone knew the names and had been shown and asked questions about virtually all of the loan opportunities and trade secrets at issue in this case. Thus, Mutual clearly disclosed the existence of the trade

---

[11] June 13, 2022 Email attached as Exhibit G.

secrets and had no further duty to supplement.

### III. Waterstone Had Notice That Its E-Discovery Expert Would Not Sufficiently Rebut Mutual's Trade Secret Claims.

Kevin Allen's admissions that Waterstone took valuable, password-protected customer lists after it had allegedly quarantined other Mutual "alleged trade secrets" is not the first time Waterstone was on notice that its "quarantine defense" was deficient. Indeed, Mr. Creasy knew this as well, as reflected by his comment that most of "Mutual's alleged trade secrets" were not quarantined before April 29, 2022. *See* Report of Brian Creasy, ECF No. 137-5 at ¶¶ 3a, 14-16. And, to the extent that Waterstone contends that either its quarantine negated the theft of trade secrets and/or no trade secrets could be actionable unless they were specifically found on Waterstone's systems, Judge Barber advised Waterstone of that defense's shortcomings. Indeed, when Waterstone argued to Judge Barber that it quarantined the "alleged trade secrets" but failed to explain how the information was still accessible in its employees' private email accounts,[12] Judge Barber's response was telling:

> THE COURT [speaking to Waterstone's Counsel]: […] So when you go on the defense side and try to say what you said, and then the truth ends up being something like that,

---

[12] During his deposition in June of 2023, Mr. Creasy admitted Waterstone "has no ability to detect" whether an employee is accessing their personal email account in a web browser on Waterstone's computers, and what they are viewing within their personal email. *See* Brian Creasy Tr. at 77:12-21, attached as Exhibit H. And, the efforts to quarantine only impacted five accounts, while approximately 60 people ultimately left Mutual to join Waterstone. *Compare id.* at 150:2-5 (quarantine of five accounts) *with* Am. Compl., ECF No. 37 at ¶ 1 (alleging over 60 departed employees). This is critical since the documentary evidence – always available to Waterstone as it produced such information– demonstrated the materials were sent to and/or from private email accounts. *See e.g.*, Pltf's Trade Secrets: Ex. 2 at WMC005904-08, Ex. 3 at WMC002147, Ex. 4 at WMC001024, Ex. 6 at WMC001763. The email transmissions are attached as composite Exhibit I. Only the email transmission is attached and not the underlying sensitive documents attached to the emails.

> then it looks very conspiratorial. Looks very conspiratorial. Now, if you take one piece of information, that is factually true, but it has a bad smell to it. It has a bad smell to it.

July 27, 2023 Hr'g Tr., ECF No. 101 at 38:12-19. Thus, Waterstone should not have been surprised that its quarantine defense failed. It overlooked the allegations in the Complaint that reflected documents were actually received by Waterstone after the alleged quarantine,[13] the impact of Kevin Allen's and Chris Wolf's admissions concerning those materials, and Judge Barber's pointed comments about the defense having "a bad smell to it."

## ARGUMENT

### I. There is No Basis for a Sanction Under Rule 37(b) Because the Court's Order Pertained Only to Documents Produced by Mutual.

Sanctions are awarded under Rule 37 for violation of a court order. Fed. R. Civ. P. 37(b)(2) ("[if] a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders" including payment of attorney's fees and expenses). Rule 37 provides that an award of fees for violation of a court order is not proper if "the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

Mutual did not violate Judge Sneed's discovery order because Mutual complied with that Order. Contextually, the issue arose because Mutual's interrogatory

---

[13] In fact, the Complaint provided examples of diverted loan opportunities occurring in May and June 2022, after Creasy's quarantine on April 28, 2022. Ex. F at 154: 18-155:3 (quarantine occurred around April 28, 2022); Am. Compl., ECF No. 37 at ¶ 53, 57-64 (identifying loan opportunity diverted by Lucas Van Dame on May 25, 2022 and multiple loan opportunities diverted on June 8, 2022 by Fred Stalls).

10

response, in addition to providing descriptions of the categories of trade secrets at issue, stated "the answers to this Interrogatory can be ascertained from documents being *produced by Plaintiff* on a rolling basis." Pltf's Resp. to Def's Interrogatories, ECF No. 43-2 at No. 8 (emphasis added). At the hearing in response to Waterstone's Motion to Compel, Judge Sneed discussed ordering supplementation of the "Bates numbers for all of the -- that correspond to the -- responses that you provided to the interrogatory requests, especially where you said 'look to the documents that *I produced* for the answer.'" March 30, 2023, Hr'g Tr., ECF No. 61 at 13:8-12 (emphasis added).

Consistent with that understanding, Mutual amended its interrogatory responses to state: "for each such trade secret, Plaintiff has provided the Bates numbers *at which Plaintiff has produced documents* regarding the trade secret[.]" Pltf.'s Am. Resps. to Def's Interrogatories, ECF No. 206-1 at p. 83. (emphasis added). Notably, Waterstone never objected that Mutual's supplemental answers were expressly limited to identifying the documents it had produced. Accordingly, there is no violation of Judge Sneed's order, and as a result, no basis for sanctions.

To the extent there is any doubt about the text of Judge Sneed's order, given the extensive context and discussion at the hearing, Mutual's understanding was reasonable and substantially justified. *See Griffin v. United States*, No. 3:19-cv-441-MMH-PDB, 2021 WL 4947180, at *15 (M.D. Fla. June 25, 2021) ("Substantially justified" means "reasonable people could differ as to the appropriateness of the contested action.") (citations omitted). Therefore, even if there was a misunderstanding of Judge Sneed's order, it was substantially justified. As such, there

11

is no basis for awarding fees.

## II. There Is No Basis for Sanctions Under Rule 26(e) Because Mutual Utilized the Documents Throughout Discovery.

Under Rule 26, a party who has responded to an interrogatory must supplement its response if "the party learns that in some material respect the disclosure or response is incomplete or incorrect, *and* if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e) (emphasis added). The advisory committee's notes clarify that "[t]here is, however, no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process[.]"). Fed. R. Civ. P. 26(e) Advisory Committee Notes to 1993 Amendments[14]. In addition, "courts in this District have determined that a party need not amend their interrogatory responses when corrected information was made known to a party during discovery and, specifically, during a witness' deposition." *Simmons v. Ford Motor Co.*, No. 18-CV-81558-RAR, 2022 WL 221644, at *2 (S.D. Fla. Jan. 24, 2022) (citations omitted). FRCP 26(e)(1) is thus not construed "in a manner that puts form over substance." *V5 Techs. v. Switch*, Ltd., 334 F.R.D. 615, 617 (D. Nev. 2020) (citations omitted); *see also Bankston v. Kan. City S. Ry.*, No. 03 Civ. 577 (CN), 2005 WL 8155221, at *4 (M.D. La. Oct. 17, 2005) ("[T]he duty to supplement imposed by 26(e) should not require form over substance."). "[T]he analytical threshold for

---

[14] *See also* 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2049.1 ("there is no need as a matter of form to submit a supplemental disclosure to include information already revealed by a witness in a deposition or otherwise through formal discovery.")

12

determining whether there has been a disclosure violation is whether the opposing party had meaningful notice to prepare its case." *V5 Techs.*, 334 F.R.D. at 617.

Mutual's use of the trade secrets throughout discovery negates any possible sanction. Mutual asked in depositions about all but five borrowers that it designated as its 17 borrower trade secret exhibits.[15] Four of the five remaining borrowers[16] were timely disclosed. *See* Ex. B at column entitled "Date of Interrogatory Disclosure." Therefore, Mutual did not need to supplement its interrogatory response because the information "was made known to a party during discovery and, specifically, during a witness' deposition." *Simmons*, 2022 WL 221644, at *2. The extensiveness and frequency in which the loan opportunities were discussed in the context of trade secrets reflects that Waterstone "had meaningful notice to prepare its case," making sanctions inappropriate. *See V5 Techs.*, 334 F.R.D. at 617.[17] The open and transparent discussion of these trade secrets negates Waterstone's attempt to apply form over substance to the duty to supplement, which is prohibited. *V5 Techs.*, 334 F.R.D. at 617 (refusing to construe the duty to supplement "in a manner that puts form over substance.").

---

[15] The borrowers were: Calle, Columbis, Tyson, Hennessy, Byers, Ryan, Brown, Gipson, Castaneda, Tariq, Kemp, D'Ettore, and McIntosh. *See* Ex. B at column entitled "Usage in Depositions."

[16] The remaining borrowers are Thompson, Kugleman, Trejo, and A. Smith. As set forth in note 2 *supra*, while Thompson was not disclosed, its inadvertent omission was immaterial as it was merely another example of the same type of trade secret the Waterstone had misappropriated.

[17] Even if the Court believes Mutual should have supplemented discovery, sanctions would not be appropriate if Mutual's failure was substantially justified. *See* Fed. R. Civ. P. 37(b)(2)(C); *Griffin*, 2021 WL 4947180 at *15 (to avoid sanctions, the rule-breaking party must show substantial justification or harmlessness.) As set forth, substantially justified means "reasonable people could differ as to the appropriateness of the contested action." *Id.* (citations omitted). Here, any failure was substantially justified because reasonable minds could disagree as to whether Mutual's duty to supplement was triggered given the extensive usage of trade secret documents at multiple depositions.

### III. Waterstone Should Have Realized During Discovery that its E-Forensic Expert Was Never in A Position to Rebut Mutual's Trade Secrets.

Because of the obvious nature of Mutual's questioning and use of the documents during discovery, Waterstone knew its quarantine defense was insufficient because it did not extend to the personal email accounts where the information remained[18] nor did it account for materials that Waterstone took after the quarantine, as discussed in depth with Mr. Allen. In fact, though Mr. Creasy opines that Waterstone quarantined "alleged trade secrets" around April 29, 2022, the Complaint identifies at least 9 examples of diverted loan opportunities occurring in May and June 2022 – all *after* the quarantine in April 2022. Brian Creasy Tr. at 154:18-155:3; Am. Compl., ECF No. 37 at ¶¶ 53, 57-64.[19]

Mutual discussed with Waterstone's corporate designee the June 13, 2022, Email, wherein Waterstone specifically instructs a Mutual manager to export sensitive data and customer lists kept in Mutual's password-protected Loan Origination System:

> Q: So after Mutual specifically advises Waterstone that it considers this information confidential, essentially 11 days later, Melanie's asking another current employer, a different current employee to go into its Encompass system and export data; right?
> A: Again, I can see the request that is made on here. I can see the, yeah, conversation. […].

---

[18] *See* Creasy Tr. at 77:12-21 (admitting Waterstone "has no ability to detect" whether an employee is accessing their personal email account in a web browser on Waterstone's computers, and what they are viewing within their personal email.). The efforts to quarantine only impacted five accounts, while approximately 60 people ultimately left Mutual to join Waterstone. *Compare* Creasy Tr. at 150:2-5 (agreeing "quarantined data" only impacted data "from five new hires' OneDrive accounts") *with* Am. Compl., ECF No. 37 at ¶ 1 (alleging over 60 departed employees).

[19] *See also* Creasy Tr. at 133:1-8 (he is unaware of whether "additional e-mails containing confidential information sent after Mr. Howard quarantined or archived those information would have also been subject to archive or quarantine.").

> ***
> Q: And he writes, 'Attached is our closed loan list in the field mapping you have requested. It contains all refinances and purchases closed.' That's a problem; isn't it, sir?
> [objection interposed]
> A: Again, exporting information -- yeah. That's not what we would expect.

Kevin Allen Tr. at 201:1-8, 202:8-9, 165:11-17; s*ee also id.* at 45:21-46:3 (agreeing "there's also a lot of not public information included in Encompass there about closed loans"); *see also id.* at 49:1-8 (agreeing there is value "in the information about interest rates on loans that you've closed and the contact information for those borrowers[.]"). This June 13, 2022 Email and testimony alone demonstrate that the alleged quarantine never could have extinguished the trade secret claims. Waterstone simply cannot feign surprise that it no longer has a trade secret defense based solely on Mr. Creasy's testimony. That reality was obvious based on the Complaint, deposition questioning reflecting that the information remained in emails, deposition questioning that showed the information had already been used by the time it was quarantined, and trade secrets improperly obtained after the quarantine occurred. Judge Barber himself identified the error and advised Waterstone: "[i]t has a bad smell to it." July 27, 2023 Hr'g Tr., ECF No. 101 at 38:12-19. Waterstone's refusal to acknowledge the obvious does not entitle it to shift the cost of attempting to belatedly revitalize its defense onto Mutual.

## IV. Any Failure to Supplement Was Harmless Because Waterstone Incurred the Expenses Before Any Alleged Duty to Supplement Arose.

An action is harmless when "there is no prejudice to the opposing party." *See In re Terazosin*, No. 99-MDL-1317-(ALL CASES) SEITZ/KLEIN, 2005 WL 5955699, at

*8 (S.D. Fla. July 13, 2005) (citing *Ellison v. Windt*, No. 6:99-CV-1268-ORLKRS, 2001 WL 118617, at *2 (M.D. Fla. Jan. 24, 2001)). Sanctions are "intended to prevent unfair prejudice to the litigants and to insure the integrity of the discovery process." *Gratton v. Great Am. Commc'ns*, 178 F.3d 1373, 1374 (11th Cir. 1999). Here, there is no prejudice because Waterstone incurred all the costs it seeks before Mutual could have arguably supplemented its Response to Interrogatory 8.

"A duty to supplement responses also arises when a response is no longer true and failing to amend it amounts to concealment." *See Freeman v. Minnesota Min. & Mfg. Co.*, 675 F. Supp. 877, 888 (D. Del. 1987); *see also Mitnor Corp. v. Club Condos.*, 339 F.R.D. 312, 316 (N.D. Fla. 2021) ("Depositions [] help [] determine [] whether the relevant deponents will suffice to establish or disprove elements of claims or defenses."). Since Mutual was unable to ask about these materials until taking the depositions at the close of discovery, that is the earliest it could have supplemented.[20]

By that time, however, nearly all of the costs Waterstone seeks had already been incurred. Waterstone identified Mr. Creasy as an expert and produced his report in June of 2023. He was deposed on June 26, 2023. Brian Creasy Tr. at 1. In addition, the costs of all of the attorney-time prior to the close of discovery were already incurred and would not have changed if Mutual supplemented after the depositions confirmed additional trade secrets at issue. Thus, even a supplement near the close of discovery

---

[20] Of course, by that time, as set forth above, the information was clearly known by Waterstone as reflected by the testimony of its witnesses, corporate designee, and forensic expert who were literally shown and asked about the information which Mr. Creasy literally identified as Mutual's "alleged trade secrets."

16

would not have avoided most of the fees Waterstone seeks.

In addition, the costs associated with Waterstone's motion for summary judgment cannot be the fault of Mutual because Waterstone – as described above – should have realized its trade secret defense was utterly deficient. It did not address the fact that – as Judge Barber noted – the trade secrets remained in the former employees' private emails, and that additional materials that Kevin Allen "would not want to see … exported" were knowingly requested and received by Waterstone after it received the cease-and-desist following the quarantine. *See* July 27, 2023 Hr'g Tr., ECF No. 101 at 38:12-19; Kevin Allen Tr. at 171:13-14. Even Mr. Creasy realized that most of Mutual's "alleged trade secrets" were outside the scope of the quarantine. *See* Report of Brian Creasy, ECF No. 137-5 at ¶ 15-16 (stating only 11 out of 186 documents were subject to the quarantine). Put another way, Waterstone was aware during discovery that months after the quarantine, its Regional Support Manager (Melanie Ferrara), Human Resources Specialist (Jen Witon), and Regional Vice President (Dustin Owen) requested that then-currently employed Mutual Managers use their password access to export sensitive data that Waterstone knew was valuable off of Mutual's loan origination system. *See* June 13, 2022 Email. Under such circumstances, how can Waterstone legitimately claim that it believed the alleged quarantine was a complete defense to Mutual's trade secret claim?

The only remaining costs pertain to the review of the trade secrets exhibits Mutual intended to use at trial. As the Court is aware, because the identification of trade secrets coincided with the preparation of the pre-trial statement, Mutal identified

17

all its exhibits simultaneously with the identification of the trade secrets. As is customary, parties often amend and rework the exhibits in connection with preparing pre-trial. Indeed, the amendments, which took place within 17 days,[21] were a part of the normal pre-trial process to narrow exhibits, meet and confer with counsel about agreeable methods for presentation of evidence, and thus were attributable to trial preparation – not belated disclosure. To seek costs for time reviewing pretrial disclosures and exhibit lists, which are required in every case, is improper.

At bottom, Waterstone's request for fees disregards important context in a procedurally complicated case, feigns ignorance to Mutual's consistent explanation of its trade secrets and Waterstone's awareness of the evidence in this case, and seeks costs that it would have incurred regardless of any alleged belated supplementation. Sanctions are not appropriate under such circumstances and Waterstone's request should be denied in its entirety.

### V. Waterstone Has Failed to Carry Its Burden for Costs by Omitting Any Evidence of Mr. Creasy's Costs.

The costs Waterstone seeks associated with Mr. Creasy cannot be awarded because Waterstone has provided no invoice, accounting, or proof of his expenses or time. Where a party fails to provide "invoices, diaries, checklists, bills, or any other type of hourly breakdown" but only provides the "gross totals listed in [a] declaration"

---

[21] Mutual submitted its identification of trade secrets exhibits on May 24, 2024, pursuant to the Court's instruction. After meet-and-confer efforts with opposing counsel, Mutual narrowed the list further on its own accord seven days later on May 30, 2024. One final list was provided on June 10, 2024, due to the Court's instruction to only identify trade secrets and not supporting exhibits.

18

sanctions are not proper. *4DD Holdings, LLC v. United States*, 153 Fed. Cl. 371, 376-77 (2021) (a party "ought not to be forced to pay an enormous sum without any assurance that the work was in fact billed and paid for."); *see also Aviva USA Corp. v. Vazirani*, No. CV 11-0369-PHX-JAT, 2013 U.S. Dist. LEXIS 116328, at *18 (D. Ariz. Aug. 16, 2013) (party cannot recover "undocumented" fees for consulting service because "no invoice or documentation is provided" which prevents "the Court from determining whether these fees are reasonable.").

Waterstone omitted any invoices or other accounting of Mr. Creasy's time, which prevents Mutual and the Court from "determining whether these fees are reasonable." *Id*. This is magnified by the fact that Mr. Creasy admitted in deposition that his invoices exist and that his invoices do not break down how much time is assigned to each task. Brian Creasy Tr. at 20:10-21:2 ("our invoices would identify work being done on a case but not specifically, you know, X amount of time, you know, specific to drafting a report."). Indeed, the record with respect to Mr. Creasy's time and hours is extremely unclear, with him stating under oath he was "mildly guessing" as to how many hours he spent drafting his five-page report. Therefore, an award of costs for his report and time spent is unwarranted because it is entirely unsubstantiated.

## CONCLUSION

For the reasons set forth above, the Court should deny the Petition in its entirety.


Dated: October 21, 2024

MITCHELL SANDLER PLLC

By: /s/ Ari Karen

| | |
|---|---|
| Ari Karen (admitted *pro hac vice*) | GUNSTER, YOAKLEY & STEWART, P.A. |
| Christopher McCall (admitted *pro hac vice*) | |
| Courtney Walter, FL Bar No. 106228 | John Schifino, FL Bar No. 0072321 |
| Arielle Stephenson (admitted *pro hac vice*) | Daniel Dietrich, FL Bar No. 934461 |
| 1120 20th Street NW, Suite 725 | Gregory Pierson, FL Bar No. 123905 |
| Washington, D.C. 20036 | 401 East Jackson Street, Suite 1500 |
| akaren@mitchellsandler.com | Tampa, Florida 33602 |
| cmccall@mitchellsandler.com | jschifino@gunster.com |
| cwalter@mitchellsandler.com | ddietrich@gunster.com |
| astephenson@mitchellsandler.com | gpierson@gunster.com |
| Telephone: (202) 886-5292 | Telephone: (813) 228-9080 |

*Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc.*

## CERTIFICATE OF SERVICE

I certify that on October 21, 2024, a true and correct copy of the foregoing was filed with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

/s/ Ari Karen
Ari Karen