# <u>EXHIBIT A</u>

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF FLORIDA
                      TAMPA DIVISION
_____
                                )
MUTUAL OF OMAHA                 )
MORTGAGE, INC.,                 )
                                )
          Plaintiff,            )
                                )
v.                              )  Case No.:  8:22-CV-1660
                                )
WATERSTONE MORTGAGE             )
CORPORATION,                    )
                                )
          Defendant.            )
_____)
```

**MOTION PROCEEDINGS**
**BEFORE THE HONORABLE THOMAS P. BARBER**

**July 27, 2023**
**10:09 a.m. to 11:25 a.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**           ARI KAREN, ESQUIRE
                                 Mitchell Sandler LLC
                                 1120 20th Street NW
                                 Suite 725
                                 Washington, DC 20036


**FOR THE DEFENDANT:**           MARIA L. KREITER, ESQUIRE
                                 Godfrey & Kahn, SC
                                 833 East Michigan Street
                                 Suite 1800
                                 Milwaukee, Wisconsin 53202

                                 CAROLINA Y. BLANCO, ESQUIRE
                                 Hill Ward Henderson
                                 3700 Bank of America Plaza
                                 101 East Kennedy Boulevard
                                 Tampa, Florida 33602


**ALSO PRESENT:**                MARK CARROLL
                                 STEPHANIE ZIEBELL

(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

```
 1        (Call to Order of the Court at 10:09 a.m.)
 2             THE COURT:  Morning, everybody.  Welcome to court.
 3   This is Case Number 22-CV-1660.  Go ahead and introduce
 4   yourselves, starting with the plaintiff's side of things.
 5             MR. KAREN:  Good morning, Your Honor.  Ari Karen on
 6   behalf of Mutual of Omaha Mortgage.
 7             THE COURT:  Put the mic to your face.  No standing,
 8   please.
 9             MR. KAREN:  Good morning, Your Honor.  Ari Karen on
10   behalf of Mutual of Omaha Mortgage and with me is Mark Carroll.
11             MR. CARROLL:  I'm the general counsel of Mutual of
12   Omaha Mortgage.
13             THE COURT:  Good.  I'm glad you're here.
14             MS. KREITER:  Good morning, Your Honor.  Maria
15   Kreiter from Godfrey & Kahn.  With me is Carolina Blanco from
16   the Hill Ward Henderson firm and Stephanie Ziebell.
17             THE COURT:  Good.  You guys are going to talk to
18   Chris Griffin this afternoon.  Right?
19             MS. KREITER:  Correct.
20             THE COURT:  Let me -- I talked to y'all back at the
21   beginning of this case and tried to convey to you that I do
22   things differently, and I thought I didn't need to keep a close
23   eye on this thing, that you guys kind of were going to be able
24   to get it figured out.  And I regret not being more involved,
25   because now I see things like -- and I was -- somebody called
```

UNITED STATES DISTRICT COURT

1    my office to address this, and I wasn't here.  I think I was on
2    vacation.  But, you know, fighting in a deposition with
3    instructions not to answer, which, you know, there's a great
4    legal term for that, no bueno.  All right.  I know you're going
5    to see Judge Sneed on that.  I don't even remember which side
6    was the one doing it.  But that's kind of small-time stuff that
7    I would not expect to see in a case like this.

8          Be that as it may, Judge Sneed can sort all that out.
9    Maybe she won't have to, because you can settle the case.  How
10   in the world do you settle a case when one side says it's a
11   42-million-dollar case, and the other side -- what's the
12   defense value of the case?  Give me a real number, not a
13   posturing thing.  I know you're going to mediate and you'll
14   have to do a bunch of posturing in a mediation.  But what's the
15   defense value in the case?

16        **MS. KREITER:**  Our expert witness, best-case scenario
17   with respect to the loans that transferred from WaterStone to
18   mutual, at max, $60,000.

19        **THE COURT:**  Okay.  Well, that's ridiculous, and so is
20   42 million, in my opinion.  That's just my opinion.  All right.
21   So you can talk to Chris about that, and maybe he can get you
22   figured out.

23        So somebody filed -- somebody filed -- I guess it's
24   the defense is attacking the damages in terms -- calculations
25   with a motion in limine.  Right?

1            **MS. KREITER:**  Correct.

2            **THE COURT:**  And that's theoretically what we're here

3    to do today, Document 72 -- or, no, excuse me.  Yeah.  That's

4    the right document.  Right?  72?

5            **MS. KREITER:**  Correct.

6            **THE COURT:**  Is that the right one?  Motion in limine

7    to exclude plaintiff's category two and category three damages.

8    And the response is, oh, outrageous, not provided for in the

9    Rules of Civil Procedure, discovery hasn't closed, you know,

10   it's citing a bunch of case law and everything like that.  All

11   perfectly correct.  Congratulations.  But totally wrong.

12   Because it's a great vehicle to get in front of me to get a

13   sense of is this -- is 42 -- or 28-million-dollar case or is it

14   a 60,000-dollar case.  So thank you for filing this.  All

15   right.  I'm going to end up denying it without prejudice, I'll

16   tell you right now.  Nothing is going to happen.

17           But now you're in front of the judge, and we can talk

18   turkey a little bit and try to get a feel for what this case is

19   all about.  I thought I said at the beginning, you know, we

20   could set case management conferences.  I have not communicated

21   well with you or any of the lawyers.  I haven't.  It's my

22   fault.

23           I know when you file these motions, including the

24   response with 126 pages of attachments, you're doing exactly

25   what you're supposed to do, what you were trained to do.  This

1    is how we practice in federal court.  I tried to say at the

2    beginning, if there's something I can help you resolve, we can

3    talk about, just set a status conference, and we'll talk a

4    little bit about it.

5            So that's what we're going to do now.  We're going to

6    talk about the damages.  What are the real numbers?  How is

7    this all going to go?  We didn't need all these filings and all

8    this fighting back and forth over it.

9            So we have Steve Oscher on this side and then -- who

10   says 60,000?

11           **MS. KREITER:**  Yeah.  So to be clear, Your Honor, that

12   was with respect to the category one damages, looking at loans

13   that have transferred.

14           The motion that we filed is related to another

15   category of damages.  This -- that category of damages is,

16   let's assume that the branches stayed open, what profits would

17   be derived from those branches if they stayed open.

18           So there's kind of three buckets of damages.

19   Mr. Oscher estimated 60,000, really, related to diverted loans.

20   So when I say, you know, what does the defendant think of the

21   case, that was really looking at that category one damages,

22   diverted loans.

23           The motion is about category two damages, the 4.4.

24           **THE COURT:**  I get it.  Motion is denied without

25   prejudice.  I'm not making any rulings today, but I want to

1    continue the conversation.

2         **MS. KREITER:**  I just don't want -- when Your Honor

3    asks, you know, the case value, that is, you know, on the

4    assumption that we don't believe in the category two damages.

5    Category three damages, 750 in ill-gotten gains that has been

6    abandoned, the Court has a stipulation for granting of the

7    motion with respect to those.  I just -- I don't want the Court

8    to be left with the impression that the defendants are only

9    valuing the case at 60,000.

10        **THE COURT:**  Good.  Good.

11        **MS. KREITER:**  So, you know, in our mind, the damages

12   have evolved quite a bit.  You'll remember back in the fall,

13   when we were here on the motion to dismiss, we heard from

14   counsel from Mutual that the damages were 250.  Then we

15   heard --

16        **THE COURT:**  Which I said you can't use that against

17   anybody.  It's just a nonposturing conversation.  My only issue

18   with that is I would treat a case of $200,000 differently than

19   28 million.  That's why I said I'll see you in nine months and

20   basically left you alone, because I thought it was a low-dollar

21   case.  I'm not going to waste your time, make you bill clients

22   for coming in to court every couple of months just to see

23   what's going on in the case when there's only $200,000 at

24   stake.  So I left you alone, and then it evolved into a

25   28-million-dollar case.  So go ahead.

UNITED STATES DISTRICT COURT

1       **MS. KREITER:**  It did.  So it's -- I mean, that's the

2  concern here.  Plaintiffs have their expert witness disclosure

3  deadline March 1.  We didn't get any expert report.  We heard

4  for the first time that the damages are -- sorry, we knew that

5  the damages were 4.4.  We heard for the first time about

6  ill-gotten-gains damages.  To this day, plaintiffs have not

7  articulated any damages with respect to diverted loans.  So in

8  my mind, the case is about this category two, $4.4 million in

9  damages.

10       Then on July 14th, we get a rebuttal expert report

11  from the plaintiffs with an expert that is not rebutting

12  anything that Mr. Oscher said.  Frankly, Mr. Oscher analyzes

13  the three categories of damages that we had.  That was what the

14  plaintiff put forth.  That's the exclusive focus of

15  Mr. Oscher's report and his opinions.

16       On the 14th, we get a, quote, unquote, rebuttal

17  expert who's now saying I estimate the damages at 28 million.

18  To get to that number, the damages expert is calculating

19  damages out over a ten-year period of time, whereas

20  Mr. Gennarelli, who did the damages that are the subject of

21  motion in limine, used an 18-month period of time.

22       So we've gone from -- and I appreciate the comments

23  about not binding at the outset of the case, but appreciate

24  from WaterStone's perspective, it's been defending a case for a

25  year now.  We hear zero, then we hear 4.4, then we hear an

1    additional 750, then we're back to 4.4, and then it's 28.

2            And for that reason, we filed a motion to strike the

3    rebuttal expert for reasons that you'll see in our filing

4    yesterday.  But it's essentially a brand-new analysis.  The

5    damages analysis expert testified at deposition last week that

6    she didn't have any -- she didn't really look at the

7    4.4-million analysis.  She intentionally started fresh.

8            **MR. KAREN:**  Your Honor, I didn't think we were here

9    on argument on their motion they just filed.  And I'm sorry to

10   interrupt, but this has gone on, and I haven't --

11           **THE COURT:**  Well, that's too bad you interrupt,

12   because I might have just said that motion was denied --

13           **MR. KAREN:**  I'm sorry, Your Honor.

14           **THE COURT:**  -- and the expert could be in the case,

15   but I didn't say that since you interrupted me.

16           **MR. KAREN:**  I apologize, Your Honor.

17           **THE COURT:**  So just let her keep going.  Go ahead.

18           **MS. KREITER:**  So it just -- what is the case value?

19   I don't -- it's very hard for us to put a case value.

20           **THE COURT:**  I totally agree with you.  That's why --

21           **MS. KREITER:**  A moving target.

22           **THE COURT:**  -- I'm glad we're here.  That's why I'm

23   giving them a hard time about, you know, oh, you can't do this,

24   you can't do that.

25            I mean, give me a break.  I mean, we have the clients

UNITED STATES DISTRICT COURT

1  in the room.  Right?  If we can't get on the same page, close

2  to the same page about what the case is worth, there's no way

3  you can settle the case.  You can keep litigating the case for

4  a couple more years, spend a whole bunch of money on attorneys'

5  fees, then get down to a real discussion about what the value

6  of the case is, if you tee it up in a way that it can only be

7  really dealt with in a summary judgment motion after the close

8  of discovery, after we, you know, do whatever we're going to do

9  with this new expert, and go and, you know, do back and forth,

10  fighting over depos and thing likes that, which, to me, those

11  depos should have occurred right at the beginning of the case.

12          And I'll tell you what we could have done had I been

13  more involved, I would have said depose -- is it three or four

14  people are the main bad guys here, so to speak?  I'm using my

15  own terms.  How many?

16          **MR. KAREN:**  Two.

17          **THE COURT:**  Two bad guys.  Okay.  I would have said

18  do a one-hour depo on these two bad guys, let's get their

19  e-mails, and let's see exactly what really happened, and we'd

20  figure that out right at the beginning.  But you did it in a

21  way that we're all trained to do it, we've got to have all the

22  discovery, we've got to have all the documents.  And then --

23  which is fine.  And now we find out a year into the case what's

24  really going on.  Now all the e-mails are out there and now we

25  see what really happened.  Okay?

1    So what I want to do now is I want to talk about what

2    the discovery has shown has happened here, okay, and then I

3    want to link in the causes of action that are in the case.

4    By the way, I took three or four causes of action

5    away at the beginning and kind of sidelined them so that I --

6    you could, you know, get to the bottom of this thing and not

7    get bogged down in a bunch of pleading wars over possibly

8    unnecessary causes of action.  Those are still out there.  I

9    didn't dismiss those with prejudice.  I mean, maybe the

10   plaintiffs want to put those back in the case.  I hope not.

11   But if they want to, I might have to let them do it.  We'll

12   talk about that.  All right?

13   But let's talk about where we are.  So it's

14   pretty -- I mean, I haven't looked at all these e-mails.  They

15   were attached in here somewhere.  But let me ask the plaintiff,

16   articulate for me, if you were doing a trial right now in, you

17   know, three minutes or less, the absolute parade of horrors

18   that is undisputed from the e-mails.

19   **MR. KAREN:**  Thank you, Your Honor.

20   And I just want to clarify one point.  I understand

21   what the damages analysis is.  And I'm not saying either that

22   we are valuing the case that we should get in some type of

23   compromise at 28 million.  It's nowhere near there.  So I do

24   want to be very clear that while I realize what the numbers, I

25   think, theoretically could be, that is not necessarily the

1    number that we seek in effect, if that makes sense.  I just

2    wanted to be clear so you didn't have the wrong impression.

3              **THE COURT:**  Good.

4              **MR. KAREN:**  To the extent, to answer your question,

5    Your Honor, they took everything, including the toilet paper.

6              **THE COURT:**  Just a second.  Just a second.  Let me

7    make one other point.  And this is one where I invite -- I

8    invite input.  Okay.  There's no noncompete.  Mutual of Omaha

9    did not have a noncompete with any of these people.  Right?

10             By the way, this is the third case like this that I

11   have pending all at the same time.  All involve lawyers from

12   the Hill Ward Henderson law firm, but I don't know that any of

13   them talk to each other about it.  And there are three

14   different cases, and they present differently.  They all

15   present differently.  And I think the lawyers from that firm

16   are not all on the defense side.  I think they're on the

17   plaintiff's side, I think, if I'm remembering correctly.

18             In any event, so I have a bunch of these cases.  So

19   my mind is in this area of the law.  So there's no noncompete

20   with these -- what do you want to call them?

21             **MR. KAREN:**  Managers.

22             **THE COURT:**  Yeah.  The other case they call them

23   producers.  But we'll call them -- it's the same idea.  These

24   are the people that kind of control the clients, yeah?

25             **MR. KAREN:**  If I may, Your Honor.  There's actually a

UNITED STATES DISTRICT COURT

1  distinction here.  It goes to your question.  I don't want to

2  cut off your question, but just so you're clear, these were the

3  managers of the branches.  They supervised the employees for

4  us.  And they took not only their customers, they took the

5  entire operations for the entire state.

6           **THE COURT:**  I get it.

7           **MR. KAREN:**  So I think there's a distinction.  While

8  they were, if I may, and please stop me, I do recognize there's

9  not a noncompete.  But for months while they were working for

10  us and we were paying them quite a bit of money, they were

11  actually working with WaterStone, soliciting our people, taking

12  our confidential information.

13           **THE COURT:**  I get it.  I get it.

14           **MR. KAREN:**  There's e-mails showing them transferring

15  it.

16           **THE COURT:**  Hear me out.

17           **MR. KAREN:**  Yes, Your Honor.

18           **THE COURT:**  I understand.  I get all that.  Okay.  So

19  there's not a noncompete.  So they're allowed to go work for

20  the other side.  There's also not an agreement that says if you

21  go to work for the competition, you're not allowed to work on

22  any of the customers or the accounts that you had when you were

23  working for us.  That's out there in some of these cases.

24           What there is, I think, is an agreement that says

25  you're not allowed to use confidential information -- or maybe

1    that's just a trade-secret count, but you're not allowed to

2    take employees or solicit employees.  Right?

3           **MR. KAREN:**  Your Honor, there was a nonsolicit of

4    customers.  There was also a nonsolicit of employees.  But to

5    me, to be clear, the problem we have here in this case is not

6    that they -- they could have done this the right way.  They

7    could have left, and notwithstanding the agreements, we would

8    have contractual.

9           **THE COURT:**  Just listen.  Okay.  Just listen.  I get

10   it.  That's exactly what I was going to say.  So there is a

11   right way that they could have completely taken all of your

12   client's business.

13          **MR. KAREN:**  I don't know if they could -- I mean,

14   theoretically, yes.  Would it practically have happened?  I

15   doubt it, because we would have a chance -- I don't want to

16   interrupt Your Honor.

17          **THE COURT:**  No, but that's right.  So there is a way

18   that they could have gotten all of this business legally -- or

19   most of this business legally.  Now, I get from the client's

20   idea, oh, they stole our business, they took us out of

21   business.  Well, it's a capitalist country.  All right?  And

22   there's something called competition.  And there's a way that

23   they could have done it.  As outrageous as it may be, as high

24   of a dollar loss that may have occurred, if you don't have a

25   noncompete -- even if you had one, they can only be for a year

UNITED STATES DISTRICT COURT

```
 1   or two, I mean, they can't be forever -- there is a way that
 2   all of this business could be gone.  All right.
 3          So my challenge here is, and I think your challenge
 4   is also linking up the, I'll say, unlawful activities to that
 5   complete loss of business.  In other words, what did these
 6   unlawful activities -- what damages did it actually cause
 7   versus, oh, we lost everything, which could happen totally
 8   legally.  All right?  So this is where we are in this case, is
 9   linking up the causes of action that are in the case to what
10   are the recoverable damages for those causes of action.
11          For example, theft of trade secrets.  Suppose you
12   have some very specific trade secrets that are identified, and
13   that's pretty clear factually.  That does not mean
14   automatically, oh, our entire business that was lost, we get to
15   recover every dollar of that.  Okay.  There has to be some
16   relationships in there.  And to me, that's what this case has
17   gotten down to.  That's why I'm happy that we're here talking
18   about it so that we can all kind of get a little bit closer and
19   then maybe come up with an analysis.
20          But I asked you at the beginning, and I think this is
21   very important from your side of things, give me the parade of
22   horribles, the short version that these -- you said that
23   they -- it's undisputed they were getting a paycheck from your
24   client, they were doing stuff for them.  Right?
25          MR. KAREN:  Yes.  Not just doing stuff, Your Honor.
```

UNITED STATES DISTRICT COURT

1    And so, first, they accessed Encompass.  That's the loan

2    origination software.  That's where the proprietary information

3    is, borrower information, private information, Social Security

4    numbers, everything nobody ever wants.  They took it, and they

5    took it for all of the customers, and while they were working

6    for us, sending it to Mutual.  They sent over a transition team

7    so that they could start putting that information, calling

8    those customers.  They actually hired somebody to use a Mutual

9    of Omaha spoofed e-mail.

10            **THE COURT:**  Who is they?

11        **MR. KAREN:**  WaterStone and the branch managers they

12   were working in concert with.  So they used a spoofed e-mail to

13   start reaching out to those customers with what appeared to be

14   a Mutual of Omaha e-mail address to get them to start setting

15   up appointments.  We have this in e-mails.  They not only

16   started taking the information.  They started -- they sent over

17   a group of people ahead of time to start diverting loans to

18   them.  There's dozens of loans.  I don't know how many yet,

19   because we just got some discovery the other day that's going

20   to identify that.

21            But nonetheless -- and in the other thing they did is

22   they talked about seed money to start other branches.  So they

23   used those -- those diverted loans as the seed money to start

24   up the branch.  Then they gave all of the personnel information

25   and the private information of all of the employees that worked

1  for them, and they provided it to them to facilitate them.

2  Again, our employees at WaterStone's instruction to solicit

3  these individuals, have these individuals move over.

4      And while I do understand Your Honor's comments, and

5  I fully appreciate that this is a capitalist country, and that

6  eventually that business may have moved, but to compare this as

7  a situation when you take our confidential information, all of

8  it, all of the stuff off of an Encompass loan origination

9  software, when they send it to their private e-mails, and then

10  from their private e-mails, they send it to WaterStone.

11  WaterStone accepts it.  WaterStone accepts loan after loan

12  after loan after loan while they're working for us.  WaterStone

13  sends information to the branch managers to facilitate the

14  solicitation of a mass number of employees who they were paid

15  by us to supervise.  They take everything on one fell swoop

16  down to switching over every vendor account, everything.

17      So to compare this, Your Honor, to the situation --

18  and this is where I think the causation comes in.  This isn't a

19  scenario where they went across the street, they opened up shop

20  and said, "If you want to come, call me."  This a situation

21  where -- and I'll reference Mr. Hutto.  He's one of the branch

22  managers who is in concert with WaterStone.  What he testified

23  to was that their employees that worked for him didn't really

24  have a choice.  They had to come with them.  That's his

25  testimony.

```
 1          So this is not a scenario where people really,
 2   frankly, exercised free will and came over.  Yes, to some
 3   extent, they did.  But they gutted the entire operations of
 4   Florida while they were working with us.  And so those
 5   employees really didn't have a choice.  They had to go over to
 6   WaterStone.
 7          And so when you look at the scenario of what could
 8   have happened, if they would have done it the right way -- and,
 9   Your Honor, by the way, there's a ton of evidence they
10   intentionally concealed this from us and kept it secret, and
11   they did it knowingly.  WaterStone knew they were doing it
12   secretly.
13          THE COURT:  Have you figured out who on the
14   WaterStone side of things was masterminding this?
15          MR. KAREN:  I think there was -- there were a couple
16   of people.  I don't know the direct mastermind, but there's a
17   couple of actors.
18          THE COURT:  It seems like the parade of horribles you
19   just talked about couldn't have occurred completely
20   independently of, you know, it just all happened.  I mean,
21   somebody had to who'd been talk -- because, remember, you've
22   sued WaterStone, not these people.
23          And so I'm sure that WaterStone will say, look, we
24   didn't tell these people when they were getting a paycheck from
25   Mutual of Omaha to do all this stuff that they did.
```

UNITED STATES DISTRICT COURT

| 1 | **MR. KAREN:**  Your Honor. |

1    **MR. KAREN:**  Your Honor.

2    **THE COURT:**  What's the evidence on that?

3    **MR. KAREN:**  E-mails where they're telling them to do

4    it.

5    **THE COURT:**  They did.

6    **MR. KAREN:**  Yeah.  There's an e-mail that says -- I

7    can visualize it right now.  It says this is about -- this is

8    in March.  I think they left in April.  And they literally say,

9    please start transferring over all the data.  They instruct

10   them to do it.

11   **THE COURT:**  Okay.

12   **MR. KAREN:**  There's HR, a woman named Elizabeth

13   Spragg, this is a month before they leave, telling them to have

14   the meetings with the employees, give me your private e-mail

15   addresses.  They told them to send over a transition team to

16   facilitate this.  They got volunteers -- while they still

17   worked for us, had volunteers come over early.  So some people

18   quit Mutual, went over there early, and then they started

19   sending the information and the loans to them.  That's when

20   they set up somebody they hired with the spoofed e-mail to

21   contact borrowers.

22        So WaterStone knew every aspect of this.  They were

23   inherently involved in it.  It could never have happened

24   without them.

25        And, Your Honor, I think it's something that's very

interesting.  I don't want to get into the other motions that

you've referred.  But one of the reasons we were upset that the

questioning got cut off is they had a lot of information

that -- or not information, a lot of contractual agreements

where they had these managers signed that said you're not going

to do the following things, and if you do the following things,

there's going to be terrible consequences.  And all those

things related to the stuff that was actually going on.  So I

think this was a wink, wink, nudge, nudge.  Right?  No, no,

you're not supposed to do it.

Here's the thing.  If these managers were really

acting on their own and they signed an agreement that said, you

know, if I do any of these terrible things, such as solicit my

employees and steal confidential information, I do any of this

stuff, then I can be fired, and I can be demoted, and I can be

forced to indemnify the legal fees -- and here's the

interesting thing.  We all know what's happened.  The e-mails

are out there.  There's no question.  What he testified to

before they stopped any questioning was, no, I signed all this

stuff, but no one said a word to me about it.  Everything is

fine.  They're happy with me.

**THE COURT:**  Okay.

**MR. KAREN:**  So I think you go to an issue of, well,

ratification, which is real here.  So I think that, frankly,

WaterStone knew exactly what they were doing.  They knew it was

1  wrong because they had them sign these documents saying I'm not
2  allowed to do this stuff.  And then we've got e-mails showing
3  they just went ahead and did it.

4        **THE COURT:**  Okay.  Now, that's a parade of horribles.
5  That sounds like a pretty good case.  And I'm sure there's
6  another side to all of that.  But that's the plaintiff's case.
7  That's what will be put out there.

8        The question now is, with the causes of action that
9  are in the case, misappropriation of trade secrets, you've got
10 to link all that parade of horribles to some misappropriation
11 of trade secrets.  You've got -- it has to be rather specific.
12 You've also got an interference with employment contracts.  It
13 is not the case -- and then there's aiding and abetting breach
14 of fiduciary duty.  It is not the case that if you establish
15 all of the elements of any of these causes of action, that you
16 automatically get as damages the price of losing the business
17 in the state of Florida.

18       You've got to link the losses or -- it's the
19 causation point.  You've got do that.  And at some point -- I
20 don't know.  I haven't thought about this deeply enough, and
21 it's not really teed up this way yet.  But I haven't thought
22 deeply enough to say, is that going to ultimately be a jury
23 question or not.  It might be.  I don't know.  It might be.
24 I'm not trying to suggest one answer or not on that.  It all
25 depends.

1          Let me ask you from your side of the case, what do
2    you think about that?  Does this ultimately go to a jury under
3    the idea that all of this parade of horribles under these
4    causes of action that are in the case are legitimately flowing
5    from those, you know, bad acts or whatever you want to call
6    them, and the jury would have to determine, you know, duty,
7    breach, cause -- well, it's not a breach of contract, but
8    there's going to be a causal connection in all of these causes
9    of action to the damages.
10          What -- what do you think?  Is that a jury question,
11   the whole thing?
12          **MS. KREITER:**  I do not see how it can be.  Let's use
13   the trade secret misappropriations to kind of illustrate why
14   that's the case.  We don't dispute the employees made some bad
15   decisions and took borrower documents.  Did those documents get
16   put to use and do they support a trade secret claim.  We've
17   vetted the trade secrets that are alleged by the plaintiff.
18   They identify 186 documents that are their trade secrets.  Much
19   of those are borrower documents.  Here's the loan application
20   for a particular loan.
21          But the plaintiffs are not talking about any damages
22   flowing from diverted loans at this point.  I mean, they've not
23   specified any damages.  So we could fight about -- and I heard
24   Mr. Karen say, well, WaterStone instructed that.  I mean, they
25   dispute it, but at the end of the day, from a deficiency

1    standpoint, I don't think any of that matters.  They don't have

2    any damaged associated with diverted loans.

3           So then let's look at, besides borrower documents,

4    what are the alleged trade secrets?  There is a P&L statement

5    that is sent directly to someone at WaterStone.  To me, that's

6    what we should be talking about in terms of the trade secret

7    misappropriation claims.  We can fight about whether that's a

8    trade secret or not.

9           But with respect to that P&L, there was deposition

10   testimony by the mutual corporate rep.  You know, assume that

11   something is a trade secret, formula for Coke, for example.

12   You could take that, and that would be a bad misappropriation

13   of trade secrets.  But if you have remorse about it, shred it,

14   never put it to use, perhaps there's no damages.

15          **THE COURT:**  Well, that's exactly what I'm talking

16   about.  That's exactly what I'm talking about.  There has to be

17   a link between the cause of action and the damages.

18          **MS. KREITER:**  So with respect to the P&Ls

19   specifically, Your Honor, deposition testimony by the Mutual

20   corporate representative was me asking him, are you claiming

21   damages flowing from this P&L statement and the transmittal of

22   it to WaterStone?  The answer was no, not right now, maybe I'll

23   do that later.

24          We've got two days left in discovery.  I don't have

25   any damages associated with the transmittal of the P&L.  So

```
 1   that is one -- those are two of the claims that I would move

 2   for summary judgment on, because I don't think that there's any

 3   actionable trade secrets left in the case at this point in

 4   time.

 5          THE COURT:  What about tortious interference?  Is

 6   it -- is this how tortious interference works?  WaterStone knew

 7   that these managers had a no-employee-solicitation agreement,

 8   and they facilitated that breach, and the damages flowing from

 9   that are all of the employees going over to -- all of the

10   employees that did go to WaterStone, some did not, but all the

11   ones that did, and as a consequence, all of the business, so

12   they can get -- can they get close to the number that they're

13   talking about because of that interference?

14          MS. KREITER:  I don't think so.  There's a lot of

15   reasons why.  I'll try to talk about the ones that are more

16   clean and dispositive.

17          First, let's talk about, you know, I heard; from

18   Mr. Karen there's two managers here that are engaged in

19   wrongdoing.  I believe he's going to say that the two managers

20   are Chris Smith and Dwayne Hutto.  Yes.  They do have

21   nonsolicits.  The governing law of those nonsolicits is

22   California, which those are unenforceable.

23          THE COURT:  I haven't looked at that.

24          MS. KREITER:  So -- but that's one of the motions

25   that I would be filing on summary judgment.  And then if you
```

1   take those agreements out of the mix, what do you have left

2   with respect to the tortious interference claim?  You could

3   perhaps say it's based on the sharing of confidential

4   information, but that's not what the category two damages, the

5   4.4, that's not what that's based on.  That leans into, you

6   know, these branches close because there was solicitation of

7   our employees.  So, you know, you've got to have a link to

8   that bucket of damages, which is the only thing left in the

9   case at this point with no articulation of damages on diverted

10  loans.

11          **THE COURT:**  Just a second.  You lost me for a second.

12  Go back, because here's what -- and, again, I'm not trying to

13  be critical or mean.  I'm just trying to be matter of fact and

14  practical, because I really -- I'm cheap.  I hate to see

15  clients spending a lot of money on cases because the lawyers

16  are off, you know, basically litigating against each other on

17  something that doesn't really end up mattering, but they

18  convince themselves that it does.  So that's why I'm trying to

19  focus you-all on what I think is going to matter.

20          So let's go back one step.  Suppose these

21  nonsolicitation agreements are enforceable.  Okay.  Again, my

22  question, the fact that this solicitation seems to have

23  occurred indisputably.  There's a bunch of e-mails.  One

24  question -- the other two cases I've done, there were lawyers

25  involved.  Everybody kind of lawyered up.  It was very well

1    planned out.  These guys were out there on their own doing

2    this?  I mean, what do you know about that?

3              **MR. KAREN:**  I'm sorry, Your Honor.  If you could --

4              **THE COURT:**  The bad guys, they're just out there,

5    they figured this out all on their own, nobody talked to a

6    lawyer, they just did it?

7              **MR. KAREN:**  Obviously, I don't know if they spoke to

8    lawyers or not.  To -- I'll give you my opinion, and I don't

9    have facts.  This goes to what was going on in their minds, and

10   I won't know that.  My impression is that these individuals

11   believed, for whatever reason, that that was their business,

12   not our business.

13             **THE COURT:**  Exactly.

14             **MR. KAREN:**  And they acted accordingly, whether

15   there's true or not.

16             **THE COURT:**  That mental state is in all three of the

17   cases I have.  It's their customers, it's not -- and that's the

18   way they think, and practically it's true, because when they

19   move, the customers move.  Legally, the employers, be it Mutual

20   of Omaha or the other employers, they want to contractual

21   change that and say no, no, no, no, no, you're our employee,

22   and all of these customers are our customers, and we want to,

23   you know, separate the client from the -- we'll say the

24   salesperson.  And they try to do that, and there's legal ways,

25   and it's -- you know, sometimes it works and sometimes it

UNITED STATES DISTRICT COURT

```
 1    doesn't.  I get it.  It's just like lawyers when they leave a
 2    law firm, it's their clients, not the firm's clients.  And we
 3    have that battle, you know, as lawyers.
 4              MR. KAREN:  And, Your Honor, if I may say, if this
 5    was -- I don't want to speak for my client about a theoretical
 6    hypothetical that doesn't exist here.  Right?  But I think our
 7    position would be quite different if all we were talking about
 8    were the clients.  They took everything.  And they did it in a
 9    way that we never had a chance to fight.  We never had a chance
10    to fight for this business.
11              THE COURT:  I get it.
12              MR. KAREN:  And that is what really, I think, at the
13    core is what our case is about.  It's about the surreptitious
14    nature of what they did, the wrongful activity which they
15    engaged.
16              THE COURT:  We're going to come to that.  We're going
17    to come to that.  Let me go back over here.  If these are
18    enforceable contracts, all right, and there's pretty clear
19    evidence out there that the -- that they were -- that
20    WaterStone was involved in facilitating those breaches and
21    that's an interference claim.
22              Could the recoverable damages be very, very broad if
23    there's a causal link between soliciting the employees to come
24    to WaterStone and that's the -- that's what actually -- I know
25    you've made it the point, and it may be true, and I don't know
```

1   how we figure this out, that those clients were all going to

2   come with the managers.  They control the clients.  They're the

3   rainmaking partners in the law firm analogy.  Right?

4        So that may be true.  I don't know.  But maybe it

5   would be the case that had the employees not all been

6   solicited, that they would have had an infrastructure in place,

7   and they would have been able to keep some of that business.

8        Now, they think they could have kept the business.  I

9   have this in the other two.  They think, oh, of course we could

10   have kept the business.  The salespeople, they were my clients,

11   they were coming with me no matter what.  It doesn't matter if

12   the employees stayed or not.  I understand all that.

13        But is there not an argument to be made in the case

14   that the interference in that nonsolicitation of employee

15   contract, if it's enforceable, has a big damages number

16   associated with it?

17   **MS. KREITER:**  So I obviously dispute a bunch of the

18   liability and solicitation.  But I understand Your Honor to be

19   saying assume that you -- you know, Kreiter, you sink like the

20   titanic, and you lose on solicitation, and you lose on

21   WaterStone's role in it.  To be clear, all of those things are

22   disputed.  You know, you could have a damages model.  And

23   that's, frankly, what brings us to the motion we have.

24        I mean, you could have a damages model that's

25   tailored and reasonable and based in facts.  What would that

1    entail?  I think it has to entail a -- you know, a time period

2    that makes sense, not just a we're projecting damages over --

3    the rebuttal expert says ten years.  This Gennarelli with the

4    4.4 says it's 18 months.  You have to have a rationale for what

5    you're doing that's based on the facts.

6           To me, 12 months is what we should be looking at.

7    That's the term of the nonsolicit.  That's the only duration

8    that could possibly make sense to estimate damages, because the

9    truth is, those managers could have solicited after a year.  I

10   don't know how you're picking 18 months.  For what reason?  Why

11   not 12 months?

12           **THE COURT:**  I see that.  By the way, we hit this at

13   the beginning, and I brushed over this.  I don't have a good

14   understanding of it.  Were they allowed to solicit customers,

15   but not employees?

16           **MS. KREITER:**  There was -- no.  There was a customer

17   and an employee nonsolicit.  So, I mean, I don't -- I can spend

18   a lot of time talking about the customers.  But, again, I don't

19   think it's in the case.  There's no damages associated with the

20   customers.

21           So I think you could have a viable damages model.

22   It's just here, the plaintiffs don't.  One of the primary

23   problems with the damages model is that, you know, if looking

24   at lost profits, what if we imagine the branches stayed open

25   for 18 months into the future.  And the projections for that

 1  calculation are based on retroactive data.

 2        **THE COURT:**  Let me talk about that for a second.  I

 3  haven't read their report from their economist on this on how

 4  that all goes.  To me, that jumped off the page as wait a

 5  minute, we all know this mortgage world is a very dynamic

 6  thing, and you've accused them of basically picking the

 7  best-case-scenario-in-our-lifetime numbers.  And then using

 8  that, when reality is, you know, with interest rates going up,

 9  people aren't doing mortgages anymore, et cetera, et cetera,

10  et cetera.  And so that point, I think, from your side, look,

11  very strong.  But what is their expert doing with that at that

12  point?

13        **MS. KREITER:**  She abandons it.  She says, yeah, those

14  are anomalous.  You shouldn't use that type of thing.  I'm

15  looking at the last month of production, so looking at April of

16  2022 and projecting out.

17        By the way, Your Honor, I deposed their rebuttal

18  expert last week.  The question posed to her was use an

19  18-month time period.  Your methodology, 18 months, what are

20  the damages, 2.6.

21        **THE COURT:**  Okay.

22        **MS. KREITER:**  So it's 40 percent off, so I --

23        **THE COURT:**  He knows that.  He was at the depo.  He

24  knows that.  Go ahead.

25        **MS. KREITER:**  You know, in terms of your question at

1    the outset, Your Honor, how do we cover up these damages in a

2    more reasonable way?  I can dispute the 2.6, but I'm not

3    talking about 28 million.  That's not going to get us anywhere.

4    If you take the 2.6, I would say, to be productive in the case,

5    you've got to take the 2.6, chop it down to a year.  Then

6    you've got to take out with respect to Daytona, for example --

7    and it so happens that the 2.6 is 1.33 for each branch.

8            **THE COURT:**  Okay.

9            **MS. KREITER:**  Again, I'm not crediting this model at

10   all.  I don't want to give that impression.  But I took the

11   Court's comments, I want a more productive number than the 28

12   and I don't want to talk about 60,000.

13           **THE COURT:**  I get it.  I think your thinking is

14   right.

15           **MS. KREITER:**  So --

16           **THE COURT:**  Just a second.  Let me interrupt you now

17   and throw something else into the mix here.  So your thinking

18   is -- you're going the right way with this.

19           Here's the part that, I don't know, I think is really

20   undervalued in these cases, really undervalued, because so few

21   trials occur.  So few trials occur.  The only people doing

22   trials are judges.  I mean, in terms of the lawyers, I do a lot

23   more trials than any of the lawyers I see do, especially with

24   COVID when no one was doing trials.

25           And the thing that is just regularly, regularly,

1  regularly I'll say -- I'll say undervalued, but I don't mean in

2  a monetary way, are witnesses, how witnesses present and how

3  facts play.

4        What I'm hearing -- I haven't heard a lot from your

5  side on this, but what I'm hearing from them is a really

6  offensive situation.  All right?  And it was driven -- I mean,

7  I would guess, it was driven by my friend I mentioned at our

8  last hearing, Mr. Green.

9        In other words, these managers saw an opportunity

10  where they could make a lot more money, and so they took

11  advantage of it, and seems like they didn't play exactly by the

12  rules.  And that's going to look really bad.  And I know you

13  have a spin, oh, it's not so bad, but if it ends up being as

14  bad as he said it is, then you're really -- and there's a

15  damages theory that can get to the big number, which is what

16  we're talking about right now.

17        If there's -- if that damages theory can stay in the

18  case, under facts like this, that could be a big number from a

19  jury, because a jury is probably not going to like the sound of

20  somebody who's getting a paycheck from company A, setting up

21  stuff for company B.  And you've got to live with those

22  e-mails.  Right?  I mean, they are what they are.  I don't

23  know.  I haven't read them all.  But they are what they are.

24        What do you think?

25        **MS. KREITER:**  I don't -- I guess I will just say,

1   there's a lot of e-mail traffic by the employees.  I a

2   thousand percent dispute WaterStone's role in that.  The one

3   topic that involves WaterStone is the P&Ls.  There's not, for

4   example, instructions from the WaterStone home office saying,

5   you know, here's what you're going to tell the employees to

6   recruit them.  It's just -- that's not the facts.

7        **THE COURT:**  Well, I wondered from the very beginning

8   why they weren't suing the individuals.  I guess if they don't

9   win this case, what would stop them from going back and suing

10  the individuals.  Maybe they want two bites at the apple.

11       But -- so you're saying that, oh, this parade of

12  horribles is -- be that as it may, you know, WaterStone really

13  wasn't a big part of it.  Right?  I mean, that's -- don't hold

14  us -- don't hold us accountable for these rogue employees that

15  we're still employing, and he just said have -- made them sign

16  contracts, say don't do any of this stuff.  So then the

17  question would be, okay, this is pretty bad.  Are you -- did

18  you guys fire them, or, I mean, I don't know exactly what

19  happened between WaterStone and these people.

20       **MS. KREITER:**  Again, not to get off on a tangent, but

21  I'll preview with you these document issues.  WaterStone's IT

22  department finds out about it, same day quarantines the data,

23  takes it out of the employee's custody.  We then hire a

24  e-forensic expert to understand what happened with these

25  documents.  Were they put to use?  The answer is no.

UNITED STATES DISTRICT COURT

 1          **MR. KAREN:**  Your Honor --

 2          **MS. KREITER:**  There's a lot more to the story.  I'm

 3    just trying to give a preview of it.  I don't -- in terms of

 4    solicitation, there's not been any evidence of solicitation.

 5    In our view, yes, the branch managers --

 6          **THE COURT:**  Of customers, or employees?  When you

 7    said solicitation, what do you mean?

 8          **MS. KREITER:**  Of either.  Of either, frankly.  I

 9    mean, I think in our mind there's a dispute about, you know, do

10    you recognize the distinction between an announcement I'm

11    leaving, end stop, and I'm leaving, I'm going to WaterStone.

12    I'm -- you know, it's a great place to work.  We're going to

13    get loans closed.  So a bucket of solicitation by the managers.

14    And do the managers do that, or do they just say, look, we've

15    worked together for a long time, I wanted to give you a

16    heads-up I'm leaving.  Our position is it's the former.

17    There's not solicitation.

18          And, frankly, there was a deposition on Monday of a

19    gentleman who's a branch employee at Daytona, Dawson Walker.

20    His story is, look, I was a failing real estate agent.  I knew

21    Dwayne, the head of the branch.  He brought me in.  He trained

22    me as a loan officer.  I live in the house that Dwayne built.

23    So when Dwayne tells me I'm leaving and going to WaterStone, do

24    I want to go back and be a failing Realtor?  I'm going with

25    Dwayne.

1        The idea that these employees didn't have free will

2 is just not -- and there's no e-mails in the case in which

3 somebody says please come over to WaterStone with me or

4 anything that could be deemed solicitation. You'll see in the

5 complaint, Your Honor, that there's e-mails from the employees

6 in Daytona saying, yay, let's go to WaterStone, I'm so excited.

7 But there hasn't been one speck of evidence that there was

8 anything other than announcement or that WaterStone

9 orchestrated any of this.

10        I mean, WaterStone is recruiting Dwayne. And, you

11 know, frankly, that's permissible. Doesn't instruct Dwayne how

12 to carry it out, who's coming over when. There's not -- you

13 know, in terms of is this going to look bad, is there some

14 malicious facts, the employees at Daytona -- so there's two

15 branches that come over. Daytona comes first. The employees

16 come in two waves.

17        The point of doing it in two waves was not let's

18 bring all the loans over that we can as fast as we can. It's

19 frankly we think we're going to get paid commissions by Mutual.

20 We're having trouble closing loans in the ordinary course.

21 Let's not have everybody leave at once or we're not going to

22 get those loans closed. Frankly, we want to close the loans

23 for Mutual. We think we're going to get our commissions.

24        Talk about bad facts. What happens is Mutual doesn't

25 pay the commissions. These people bust their hump trying to

1  get the loans closed, have it triaged intentionally to do so,

2  and then they're not paid the commissions until eight months

3  later.

4  **THE COURT:** Just a second. I mean, we're getting a

5  little in the weeds, which is fine. It's fine. But let's

6  go -- let's focus out and big picture it a little bit. These

7  what I'm calling the bad guys, their depos have been taken.

8  Are they video depos?

9  **MS. KREITER:** Correct.

10  **THE COURT:** Well, I don't want to go too far outside

11  of my official role, but I'd love to watch those video depos,

12  and I'd love to see how they play as witnesses. I suggest you

13  guys do that. All right. Because if these seem like, you

14  know, I'll say, slick sales guys that are too clever by half,

15  if that's the impression that they get, juries are going sniff

16  that out. If it seems like they're, you know, trying to do the

17  right thing and trying to play by the rules and getting, oh, I

18  don't know, hard timed, by, you know, an employer that wasn't

19  paying them enough anyway and they deserve to lose their

20  services, then that's different.

21  **MS. KREITER:** I think from a -- again, I don't --

22  what about the employees themselves? There has been only one

23  deposition of any of the employees. It was Mr. Walker on

24  Monday.

25  **THE COURT:** Yeah, I don't --

UNITED STATES DISTRICT COURT

1       **MS. KREITER:** Those employees are going to have a lot

2 of credibility in my mind and say, look, here's why I came.

3       **THE COURT:** I agree with you about that, except

4 the -- that's why I wanted to focus in on what are these causes

5 of action. If it's a -- if it's a interference in -- well,

6 what is it that WaterStone -- what cause of action captures the

7 employees in terms of WaterStone?

8       **MS. KREITER:** I believe it's three and four, tortious

9 interference with a contract. So the nonsolicit. Assuming

10 it's enforceable. Assuming there was solicitation and assuming

11 WaterStone even knew about the nonsolicit, which it didn't,

12 that's undisputed.

13       **THE COURT:** Okay. Let's just stick with that. So

14 then what happens is with every one of these employees, they

15 get to -- they get to say, they get to say I was going anyway,

16 because I didn't have any job here. If I had stayed here -- I

17 mean, I use the analogy of an associate in a law firm who's a

18 hundred percent dependent on a partner for their legal work.

19 When the partner goes across the street to the other law firm,

20 they don't have any hours to bill now. So that employee gets

21 to say I was going with -- what are -- give me a name of one.

22       **MS. KREITER:** Dwayne Hutto with Daytona.

23       **THE COURT:** I was going with Dwayne no matter what,

24 because he's how I got my work.

25       **MS. KREITER:** Sure.

1      **THE COURT:**  But for -- but for Dwayne, I had nothing.

2   I mean, each one of them gets to say that to raise a causal --

3   a causal argument.  No?

4      **MS. KREITER:**  Correct.  That's where there's no proof

5   that Mutual has to the contrary, because they haven't done any

6   discovery as to any of the branch employees other than

7   Mr. Dawson Walker on Monday.  So I don't -- you know, I will

8   also say to the Court, you know, the facts are there were a few

9   employees that stayed behind.  Mutual fired them.

10      **MR. KAREN:**  Your Honor, I've been quiet, and I --

11      **THE COURT:**  I know it's hard, but go ahead.

12      **MR. KAREN:**  I want to just briefly speak to one

13   point.  Because I think it demonstrates the deep flaw in their

14   reasoning here.

15      **THE COURT:**  Deep.

16      **MR. KAREN:**  Deep.

17      **THE COURT:**  I don't know if it's deep, but go ahead.

18      **MR. KAREN:**  I think it is, Your Honor.  And Your

19   Honor noted it about how these cases go.  I've had the

20   opportunity to try a couple.  And, really, the two that went to

21   verdict, we got remittiturs on both because the juries came

22   back much higher than we even asked.

23      **THE COURT:**  Which could happen here, too, if you

24   overplay your hand and it goes to trial.

25      **MR. KAREN:**  So here's an example of where I think

UNITED STATES DISTRICT COURT

1  they're going to get in trouble.  They talk about, oh, we

2  didn't take the confidential information.  We secluded it in

3  our IT systems, and then we turned it off and then we sent it

4  over.  Except it was all sent to the employees' own personal

5  e-mail addresses, and the employees then sent it to their

6  transition team over at WaterStone by e-mail, and then they all

7  imported it in WaterStone's loan origination system.

8         So, yeah, when they sent the mass file over, that may

9  have happened.  But what they did is they just sent it piece by

10  piece by piece by piece over and over and over again

11  and imported it that way.

12         **THE COURT:**  All right.  Thank you for bringing that

13  up.  Let's talk about that, for example.  Okay.  Let's suppose

14  that that -- something like that happened.  All right?  So when

15  you go on the defense side and try to say what you said, and

16  then the truth ends up being something like that, then it looks

17  very conspiratorial.  Looks very conspiratorial.  Now, if you

18  take one piece of information, that is factually true, but it

19  has a bad smell to it.  It has a bad smell to it.

20         I'll tell you -- try to move the ball forward a

21  little bit.  What I see in a lot of cases is I see lawyers,

22  when they have really good facts, overplay the damages.

23  Because they're, aha, I finally have some really good facts.

24  I'm going to take this to the bank.  It sounds like you've done

25  that twice and the judge had to take it away at the end.  All

```
 1   right.  So I see that.

 2          Okay.  So that's something that I'm going to have my

 3   eye on in this case.  But my question for you-all is, are we

 4   close enough now in understanding reality to settle the case or

 5   are you going to say, oh, I need more discovery, and we need to

 6   do this and we need to do that?  I mean, seems like most of the

 7   stuff that's going to matter is on the table or no?

 8          MR. KAREN:  Yeah.  And, Your Honor, I want to be

 9   clear so you don't think we are overplaying our hand.  Again, I

10   know what our damages numbers are.  As you know, as advocates,

11   we have to create, frankly, as we all know, the biggest

12   theoretical number that you can get.  That's our job.

13          But I do want to be clear about my comment about the

14   remittitur.  In both of the cases, they came back with more

15   than we asked for.  That's why they got remitted.  So we asked

16   for a million, and they came back at two.  So I just was

17   pointing out the correctness of Your Honor's statement.

18          But I do fully understand what you're saying about

19   overplaying hands.  I have tried to be conscious of that.

20   Obviously, we're having a mediation today, and I can't

21   necessarily, I'm sure you can appreciate, advocate or explain

22   to you what our thinking is.

23          THE COURT:  No.  Chris Griffin is a smart guy.  He's

24   done business cases for 30 years.  He'll be able to get you

25   where you need to go.
```

1        I'm just wanting to make sure that you're not wasting

2  your time talking to Chris because somebody says, oh, I need

3  all this -- you know, I didn't get this e-mail.  Because

4  everyone convinces themselves that when they don't get every

5  piece of information in discovery, that that's the key thing

6  and, oh, boy, we can't settle the case.

7        Are you good?  Because I just heard all this back and

8  forth over somebody didn't get documents, depos being

9  terminated.  I mean, what are your thoughts?

10      **MS. KREITER:**  I have -- tomorrow, they owe me

11  discovery responses on a very narrow issue.  I'm talking

12  documents related to one particular loan.  I'm done otherwise.

13  Mutual asked for seven depositions in July, including one of

14  the persons that Mutual told you back in the fall was the most

15  important person to depose.  That person was deposed Tuesday.

16  So I'm done.

17        That being said, if Your Honor is saying this is now

18  a 28-million-dollar case --

19      **THE COURT:**  I'm not saying -- I'm not saying

20  anything.  What -- I don't really know.  What I know is this,

21  what I know is this much, all right, that the damages have to

22  be connected to the causes of action that have been pled.  All

23  right?  They must be connected.

24        It is not just, to use your example, aha, you stole a

25  trade secret, and you said it was a formula for Coke, and you

```
 1    put it in a vault and didn't use it or whatever.  But let's
 2    just say you stole a trade secret and you got a couple
 3    customers from it.  Aha, gotcha.  Therefore, we get damages for
 4    everything else that happened.  All right.  That's the piece
 5    that I wonder about.  All right?
 6            Because I know Mutual of Omaha thinks their business
 7    was totally stolen and their damages should be the full value
 8    of that business.  All right?  That's how business people
 9    think.  All right?
10            I'm saying the law is narrower than that, and the law
11    may not allow them to get everything that they think justice
12    could give them that has to be linked to the particular causes
13    of action that are pled.
14            MS. KREITER:  Sure.  I will say --
15            THE COURT:  That's all I can say for now.
16            MS. KREITER:  In the spirit of how do we carve this
17    up and make it more -- I agree with you on the loans.  Even
18    assuming that there's loans that inappropriately were
19    transferred or whatever, we'll pay -- I think WaterStone -- I
20    don't want to say too much about settlement, but, you know, we
21    would pay loans that were transferred -- let's not get into
22    whether it was appropriate, not appropriate, or not.
23            Just what is the dollar value of that?  And that's
24    where I've really been struggling.  Plaintiffs have never said.
25    They've never said to this day.
```

1          Our expert tried to do a calculation, best-case

2     scenario, it comes down to under 20 loans, Your Honor.  We

3     would pay that.  I mean, we would pay that today.  And I don't

4     think we should be talking about loans that came over and

5     borrower documents or any of that.

6          **THE COURT:**  What about the employees that -- were

7     they actually solicited or is this some kind of circumstantial

8     solicitation?  You've got good evidence that these so-called

9     bad guys -- that's my term.  I'm not saying they're bad guys.

10    I just -- it's easier for me to use labels.

11         **MS. KREITER:**  Sure.

12         **THE COURT:**  You have evidence that they actually

13    solicited.  Right?

14         **MR. KAREN:**  We have an e-mail, Your Honor, that says

15    please don't tell anybody about the meeting we all had this

16    morning.

17         **THE COURT:**  Okay.  There.  All right.  So what about

18    the value of the employees' solicitation thing?  How do you

19    value that?  I'm not looking for a number.  I'm looking for a

20    concept.

21         **MS. KREITER:**  I think they're -- like I said, I don't

22    think that the Gennarelli matter is workable, period, for all

23    the reasons in the motion.  I just don't.  I mean, you can't

24    kind of put your head in the sand about reality and then come

25    up with this number.

1    So, you know, if Mutual had a rebuttal expert -- and,
2    again, I don't want to count that expert, but if we get back to
3    the discussion that I thought Your Honor was finding
4    productive, if you take, you know, the damages model that
5    doesn't count the anomalous 2020, and you look at that -- I
6    mean, their expert told me at deposition it's 2.6 for 18
7    months.  I think you chop that down to a year, rough justice,
8    and it's 1.3 each branch.  So rough justice, 1.5 million.

9    If you assume everything is correct about their
10   rebuttal expert's model, then we're talking about 1.5 million,
11   and you're assuming a year duration.  If you then -- okay.  And
12   it's 50/50 per branch.  I think you have to take out of
13   Daytona -- the branch manager at Daytona is responsible for
14   about half the production, Mr. Hutto.  So I would chop Daytona
15   in half.

16   I mean, if WaterStone is just recruiting Mr. Hutto,
17   you can't count his production.  That doesn't have anything to
18   do with whether Mr. Hutto then solicits somebody else.  It's
19   just fair competition.  We're recruiting Mr. Hutto.  So,
20   frankly, take out his production.  That's half.  So I would cut
21   Daytona in half.

22   I think you have to look at Tampa completely
23   differently.  There's not really taking of information or loans
24   or telling people in advance.  Daytona, they all leave on the
25   same day.  So I think you have to treat that one very

UNITED STATES DISTRICT COURT

1    differently.

2            I would be -- you know, it's just hard to understand

3    when Mr. Karen says we've got all this evidence of

4    solicitation.  You know, an e-mail that says don't tell people

5    about this is not solicitation.  It may be, you know, we don't

6    want the cat getting out of the bag, but it's not solicitation.

7            **THE COURT:**  Okay.  Good luck going in front of a jury

8    with that, because they're going to be like, oh, you're right.

9    It's not.  It's worse.

10           **MS. KREITER:**  Well, I mean --

11           **THE COURT:**  It's secret.  It's games.

12           **MS. KREITER:**  I think folks will understand when they

13   applied for their job, they may use their personal e-mail and

14   not their work e-mail, that there is some level of secrecy

15   about it.  I don't know that all level of secrecy is, you know,

16   necessarily malicious.  I think if anybody has applied for

17   their job, if I was leaving my law firm, I don't know that I'd

18   use any Godfrey & Kahn e-mail address to send out my resume.

19           **THE COURT:**  Well, I understand.  I understand.  If

20   that were all --

21           **MS. KREITER:**  Frankly, if we want to talk about --

22   you know, assume that's viewed that way.  That's in the context

23   of Daytona.  So let's talk about that.  1.5 and then divide it

24   by two is 750 for Daytona, then divide that by half, you have

25   to take out the branch manager.  So we're talking about, you

1    know, 325.

2              **THE COURT:**  Well, I think --

3              **MS. KREITER:**  I could work with that.

4              **THE COURT:**  We're heading from the right direction,

5    because I'm not hearing from the defense side of the case that

6    they think this is, you know, oh, these people were all just

7    out there.  We have, you know, no financial responsibility.

8    And we're -- you know, we want to go to trial.  Because they

9    probably have done a valuation -- let's talk about litigation

10   costs for a second now.

11             You guys -- I don't know if the clients have gotten

12   any kind of litigation budget or whatever in terms of what it

13   would cost to try a case like this, especially if we get into

14   bringing in some of these employees and stuff like that.

15             So there's a number out there that I would just

16   encourage the clients, make sure you talk to your lawyer about

17   what the real number is in terms of what it costs to do a

18   trial.  I'm easy to get along with.  I don't make them jump

19   through the hoops that some of my colleagues do.  But still, it

20   takes time.  I would not allow this to be a particularly long

21   trial.  I'd make it, you know, a week, maybe a little longer

22   than that.

23             But make sure when you go into the mediation, you

24   know what it costs to get one of those things done, even on the

25   cheap, because I'm cheap.  That's an important fact.

 1          So what else can we talk about here to try to move

 2     the ball forward?  I'll be very clear on this.  I do not know,

 3     as I sit here today, whether the -- these damage -- the big --

 4     I'll call it the big damage theory gets to a jury or not.  It

 5     very well may on a causation thing.  I just don't know yet.

 6     I'm not trying to hint one way or the other I've made up my

 7     mind about that.  All right.  But I certainly haven't made up

 8     my mind that it's not and I'm going to take it away, like

 9     you've kind of suggested in your motion here.  I'm not there.

10     I might be.  I just don't know yet.  So that's out there.

11          But if it does, if that -- if the big damages theory

12     can get to the jury, then you've got to think about the facts.

13     You got to think about how do these people play in court kind

14     of thing.

15          Now, what do we do with these causes of action I took

16     out of the case at the beginning?  Do you want to try to put

17     those back in, or are you okay staying where you are?

18          **MR. KAREN:**  Obviously, I do want to have a

19     conversation with my client before I -- but I think right now

20     we're probably staying where we are.  I don't think -- I think

21     we have what we need.  I think we could probably add them back

22     in, but, you know, candidly, Your Honor, we're -- I know we'll

23     deal with a lot of motions practice over that.  So we'll get

24     sidetracked, and that wouldn't be my preference.  I would like

25     the opportunity to confirm with my client, because I didn't do

1    that beforehand.  But I think that we'll probably stay with

2    what we've got.  I just don't want to be bound by that per se.

3          THE COURT:  That's fine.  You're going to -- how long

4    is it going to take to finish these depos if Judge Sneed lets

5    you finish the depos?  That's quick?

6          MR. KAREN:  Fairly quick, Your Honor.  The only

7    reason we couldn't do one is because I had a child-care issue

8    come up.  I couldn't do the dates.  There's nothing I could do

9    about it.  As soon as they're really ready.  I think the real

10   issue is that -- is the availability of their people.  I mean,

11   if their people are available in a week or two, we can get it

12   done in a week or two.  It shouldn't take very long.  It's just

13   two depositions.

14          I think one of the issues is their expert isn't

15   available for a significant period of time.  She's away.  But

16   in other words, we're not asking, just to be clear, to keep

17   discovery open ad nauseam.  We're just wanting to take those

18   two depositions.

19          THE COURT:  Okay.

20          MS. KREITER:  Your Honor, it's a timing issue.  So to

21   be clear, there was requests for seven depositions in July.  We

22   had a set schedule.  I'm not unsympathetic to Mr. Karen's

23   child-care situation, but I also don't want to be briefing

24   summary judgment while our WaterStone rep and the damages

25   expert, who, in my mind, are two of the most important

1    depositions, you know, are being deposed the week before.

2           So I think I've offered some dates with respect to

3    the WaterStone rep who was set for the 31st.  It's the very

4    last day of discovery.  Mr. Karen then indicated he can't do

5    that date anymore.  Similarly, Steve Oscher was to be deposed

6    tomorrow.  Mr. Karen indicated he can't do that anymore.

7           You know, frankly, to accommodate seven depositions

8    in July, I've got other cases.  I had to move a mediation in

9    New York to August.  Mr. Oscher has a two-week vacation in

10   August.  I'm really concerned about, you know, doing key

11   depositions while I'm also drafting dispositive motions.  And

12   that was my opposition to it.

13          I'm all for accommodating, but it's got to be done

14   kind of early August.  And that's what I'm struggling with.  I

15   just don't have a date in August that we could do the expert

16   deposition until August 18th due to Mr. Oscher's vacation and

17   then him coming back and having obligations.

18          **THE COURT:**  You guys can talk to Judge Sneed and get

19   that figured out.

20          **MS. KREITER:**  Sure.

21          **THE COURT:**  One other thing I wanted to ask about.  I

22   think it was on the response from the plaintiffs.  I got this

23   Exhibit E, and it has all of these red Xs on it.  What is this?

24          **MR. KAREN:**  Your Honor, I think that's an issue with

25   the printout when -- I don't know.  I actually wasn't the one

 1    who actually did the physical filing of this.  I assume that's

 2    something that did not get -- did not get -- didn't open

 3    correctly.  It's an e-mail issue, I believe, a technical --

 4         **THE COURT:**  A bunch of exhibits that have red Xs.  Do

 5    you have red Xs on yours?

 6         **MR. KAREN:**  I think it's attachments, Your Honor.

 7         **THE COURT:**  Yeah.  This is document --

 8         **MS. KREITER:**  I do have some.

 9         **THE COURT:**  -- 77.  Did you bring that to court,

10    Document 77, Exhibit E?

11         **MS. KREITER:**  Yes, I have it, and it shows the same

12    as what you're showing, Your Honor.

13         **THE COURT:**  Okay.  I didn't know if that was some

14    attempt of keeping stuff confidential, which is really dumb.

15    If you file confidential stuff with red Xs and want the judge

16    to look at it, because I can't.

17         **MR. KAREN:**  No.  That, I can assure you, that was not

18    the case, Your Honor.  Some of it also, some of the information

19    that got sent over to us, is not openable.  It's not really

20    that important, frankly, because it may be some borrower

21    information.  But it just -- you know, when you do these

22    document exchanges through the document platforms, sometimes

23    that's what happens.  I think that's what it is.

24         **THE COURT:**  All right.  So let me just kind of close

25    this down here, because we've been going a while.  I think -- I

UNITED STATES DISTRICT COURT

1    hope it's been productive.  Maybe not.  At least it has been

2    for me.

3           So this existing motion, we'll put in an endorsed

4    order.  What is it?  Document 72, this motion in limine is

5    denied without prejudice.  These issues are going to come up

6    later if the case doesn't settle.  We'll deal with them in the

7    due course.

8           Is there anything else that I could -- we could talk

9    about while we're all here?  We're all busy, have other cases,

10   I get.  Is there anything else we can talk about while we're in

11   the same room here that might help get this thing resolved?

12          **MS. KREITER:**  So with respect to the motion, I want

13   to be clear, the scope of the motion was initially twofold.

14   The 4.4, category two damages, and then there was a category

15   three --

16          **THE COURT:**  That's out.  That's out.  That's --

17          **MS. KREITER:**  Okay.

18          **THE COURT:**  That's not in the case.  Right?

19          **MR. KAREN:**  Correct, Your Honor.

20          **MS. KREITER:**  I don't know that the Court -- we

21   submitted a stipulation that's dismissed with prejudice.  I

22   don't know that that's --

23          **THE COURT:**  What's dismissed, the damages theory is

24   dismissed?

25          **MS. KREITER:**  Yes, the motion is granted, and that

1    those damages are out of the case.

2        **THE COURT:**  Okay.  Those damages are out of the case.

3    But what's not out of the case probably is if it's a trial is

4    the fact that your client paid these people a bunch of money to

5    come over.

6        **MS. KREITER:**  We would welcome that, frankly, because

7    it's to disincentivize the transfer of loans.  You don't need

8    to move any loans.  You're going to be okay.  So we agree that

9    the facts should come in.  That was part of the stipulation.

10       **THE COURT:**  Okay.  Any other conversations?

11       Clients, what are you thinking?  You want to talk to

12   me at all, or, no, you're just being very quiet?  Nothing?

13   Nothing?

14       **MR. KAREN:**  Feel free.

15       **MR. CARROLL:**  Thank you, Your Honor.  You know,

16   sitting here, we came down here with the intent to settle this

17   case today.  So I appreciate your comments today, and there is

18   a lot of distance between us.  But Mutual is not pie in the

19   sky.  We want to settle this case.  So I appreciate your

20   comments.  And, hopefully, we'll go home with some good news.

21       **THE COURT:**  Well, here's the reason.  I mean, what

22   I'm about to say is fact.  Well over 99 percent of all civil

23   cases settle.  What used to frustrate me as a lawyer was, you

24   know, when we started the case, we had 98 percent of what we

25   had when we settled it three years later.  But we worked on it,

1  we drove each other crazy, we sent nasty e-mails, we filed

2  motions, we charged the clients a bunch of money, but, you

3  know, it wasn't that different of a case two or three years

4  later.

5          But we just -- and it wasn't -- here's what it's not.

6  Maybe you -- as clients you view it differently, and I'd love

7  to have that conversation off the record at some point.  I

8  don't think it is the lawyers deliberately running the clock so

9  they can make more money.  There's some lawyers that do that,

10 yes.  Most of them don't.  But it's just this is -- this is the

11 culture.  You know, she filed this motion in limine.  He had to

12 come back and file the 127 -- because we think we have to do

13 these things, and everyone kind of gets sucked into this vortex

14 of things they have to do.  And, oh, well, this person said

15 this, and they're wrong, so I'm going to do that, and that's

16 just the civil litigation world.  The lawyers are doing exactly

17 what they're supposed to do.  They're doing what they're

18 trained to do.

19         That's the world I was trained in.  I personally

20 don't think it works.  And I think, like I told you at the

21 beginning, we need to do more in the beginning of the cases to

22 get it -- get it done.  If we know 99 percent are going to

23 settle, the math tells us, let's do it.  Let's do it.  And do

24 it sooner before we spent a bunch of money.

25         So that's my frustration is I just see -- and I was

 1    going to be starting -- this afternoon I had a pretrial on a

 2    week and a half trial that was going to be a trial.  It's not.

 3    It's not.  We just got at five o'clock yesterday, somebody

 4    filed a bankruptcy.  It's not going to be a trial.  Okay.  You

 5    know, that's just what happens.  The cases just don't get

 6    tried.  They get settled, which isn't bad.  It's just a shame

 7    when they settle after so much money has been spent.

 8            So thank you.  Anything good, bad, ugly?  You haven't

 9    said anything.

10          **MS. BLANCO:**  I have not, Judge.

11          **THE COURT:**  Well, say something, because he said

12    something.  Everybody said something on that side.

13          **MS. BLANCO:**  This has been a wonderful hour.  I've

14    learned a lot.  So thank you.

15          **THE COURT:**  All right.  There you go.  Are you from

16    Hill Ward?

17          **MS. BLANCO:**  I am.  I'm new partner at Hill Ward

18    Henderson.

19        (Discussion off the record.)

20          **THE COURT:**  Good luck with Chris Griffin.  Like I

21    said, Chris has been around a long time.  Chris knows business

22    litigation well.  Chris is a really nice guy.  He's probably

23    not going to lean on you too hard.  But I think he can get this

24    settled.  I think he can get this settled without having to

25    lean on you.  So good luck with that.

UNITED STATES DISTRICT COURT

1          **MS. KREITER:**  Can I ask, Your Honor?  I just want to

2    be clear.  The motion being dismissed without prejudice and the

3    idea that the Court might deal with it later, I don't want to

4    refile it and have that -- is there a time when you would

5    like --

6          **THE COURT:**  No, whenever you want to.  Whenever you

7    want to.  I'm not telling you what -- if you refile that same

8    thing and just change the title to motion for summary judgment

9    or something like that and it says exactly the same thing, then

10   I'll deal with it at that time.

11         **MS. KREITER:**  Okay.

12         **THE COURT:**  I mean, I think it's helpful to have done

13   it the way you've done it now, because it's given us an

14   opportunity to talk through these things and try to get some

15   clarity on what we're dealing with.  It's good to have the

16   clients in the room for it.  I think it's been a good exercise.

17   But you can file the exact same thing again later if you need

18   to.

19         **MS. KREITER:**  Sure.  And then I guess it would be

20   helpful to me to get a hearing on the motion to strike the

21   rebuttal expert.  It just -- in my mind, that's -- if the Court

22   is going to strike that rebuttal expert, meaning it's not true

23   rebuttal, I won't have to deal with a Daubert motion later.  I

24   don't -- I mean, I don't feel comfortable having $28 million

25   injected into the case.

1     **THE COURT:**  I agree with you.  I was getting ready to

2     deny your motion to strike before I was interrupted in the

3     middle of my denial.  That's denied.  Enter an endorsed order

4     on that.  That's denied.  This expert is helpful in the case, I

5     think.  You already deposed her.  Right?

6     **MS. KREITER:**  I did depose her.  I will tell you, I

7     don't -- look, she's a rebuttal expert.  If there's chance of

8     $28 million coming in, I may not call Mr. Oscher, because I

9     don't -- you know, I don't know that there's an occasion -- so

10    I guess I will just say that, you know, strategically, then

11    it's the 4.4 million, and I'll have to make a decision about

12    whether I call Mr. Oscher.  I think that could -- you know,

13    that could drive whether there's a deposition of Mr. Oscher

14    that's necessary.

15    **THE COURT:**  Steve is a very good witness.  I've

16    worked with Mr. Oscher for a long time.  And he can -- I mean,

17    I don't want to tell you how to do the case.  I think it would

18    be a very helpful exercise to depose Mr. Oscher and you-all get

19    in and see what he's saying, because he usually is pretty

20    balanced.  I haven't seen anything from him that was like way

21    out there crazy.  So that's just a suggestion.

22    **MS. KREITER:**  Sure.  I guess I will just say I may

23    want an advanced ruling from the Court on, you know, if

24    plaintiffs are going to attempt to not bring the rebuttal

25    expert as their opening expert, I don't want that.  And I want

1    to be able to inform my client, you know, with the assurance

2    that we're talking about rebuttal versus opening expert.  So I

3    maybe just preview that, because I anticipate further motion

4    practice on the rebuttal expert.

5         **THE COURT:**  Could be.  I don't know that it -- I'm

6    not totally following why it really matters ultimately, but I

7    think this expert, whatever her name is, is in the case now.

8    And maybe you like her in the case.  Maybe you'll like having

9    her go up there and say it's a 28-million-dollar case.  Maybe

10   that undermines her credibility.  I don't know.  I mean, you

11   got to think about all these things.  So we'll see.

12        What else?

13        **MR. KAREN:**  Nothing other than my apology for

14   interrupting you earlier, Your Honor.

15        **THE COURT:**  I'm just teasing you.  It's fine.

16        Okay.  Good luck.  And do we have a future court date

17   on this thing?

18        **THE LAW CLERK:**  Status next month.

19        **THE COURT:**  When?  I'm probably going to want to see

20   you next month and find out where we are on all this stuff.  If

21   you settle it, then you don't have to come back next month, but

22   there's a lot in play in this thing.  I want to keep my finger

23   on it.  So come back next month, August 23rd.  Okay.  Gracias.

24        (Proceedings adjourned at 11:25 a.m.)

25

UNITED STATES DISTRICT COURT

1                           **CERTIFICATE OF REPORTER**

2       STATE OF FLORIDA

3       COUNTY OF HILLSBOROUGH

4                   I, Rebekah M. Lockwood, RDR, CRR, do hereby certify

5       that I was authorized to and did stenographically report the

6       foregoing proceedings; and that the foregoing pages constitute

7       a true and complete computer-aided transcription of my original

8       stenographic notes to the best of my knowledge, skill, and

9       ability.

10          I further certify that I am not a relative, employee,

11      attorney, or counsel of any of the parties, nor am I a relative

12      or employee of any of the parties' attorneys or counsel

13      connected with the action, nor am I financially interested in

14      the action.

15          IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16      Hillsborough County, Florida, this 31st day of October 2023.

17

18

19

20

21      REBEKAH M. LOCKWOOD, RDR, CRR
        Official Court Reporter
22      United States District Court
        Middle District of Florida

23

24

25