# <u>EXHIBIT C</u>

Page 1

1              UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                    TAMPA DIVISION

4     _____

5     MUTUAL OF OMAHA MORTGAGE, INC.,

6            Plaintiff,

7        v.                          Civil Action No.

8     WATERSTONE MORTGAGE CORPORATION,   22-CV-01660

9            Defendant.

10    _____

11              VIDEOTAPED DEPOSITION OF

12                  CHRISTOPHER WOLF

13    DATE:        Tuesday, July 25, 2023

14    TIME:        9:03 a.m.

15    LOCATION:    Remote Proceeding

16                 Ormond Beach, FL

17    REPORTED BY: Timothy Guevara, Notary Public

18    JOB NO.:     6016993

19

20

21

22

Page 2

 1                  A P P E A R A N C E S

 2      ON BEHALF OF PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.:

 3          ARI KAREN, ESQUIRE (by videoconference)

 4          Mitchell Sandler LLC

 5          1120 20th Street N.W., Suite 725

 6          Washington, DC 20036

 7          cmccall@mitchellsandler.com

 8          202-886-5292

 9

10      ON BEHALF OF DEFENDANT WATERSTONE MORTGAGE

11      CORPORATION:

12          MARIA KREITER, ESQUIRE (by videoconference)

13          Godfrey & Kahn, S.C.

14          833 E Michigan Street, Suite 1800

15          Milwaukee, WI 53202

16          mkreiter@gklaw.com

17          414-287-9466

18

19

20

21

22

Page 3

1                   A P P E A R A N C E S (Cont'd)

2       ALSO PRESENT:

3            Jennifer Erickson, Assistant to Plaintiff Counsel

4            (by videoconference)

5            Laurel Thomsen, Esquire, Mutual of Omaha In-House

6            Counsel (by videoconference)

7            Ryan Heathcock, Videographer (by videoconference)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 100

```
 1        Q    And when you say, "Hey, I want to send you
 2   some files," his response, if I understand this, says,
 3   "I can help out with these files,"; right?
 4        A    Yes.  Those were turn-downs by Mutual, so I
 5   was going to send those to Ben to see if he could do
 6   them.
 7                  MR. KAREN:  Let's go to Exhibit 13.
 8                  (Exhibit 13 was marked for
 9                   identification.)
10   BY MR. KAREN:
11        Q    Sir, I'm going to show you Exhibit 13, and I
12   want you to understand what we're looking at.  This is
13   a number of emails that are not necessarily in a
14   string.  These are just about different loans, and
15   I've put them together as one exhibit for ease.  But I
16   want to make sure you understand Exhibit 13 is not
17   intended to reflect a string of connected emails; do
18   you understand that?
19        A    I do.
20        Q    Okay.  So we're just going to sort of go
21   through these.  And we're going to have this marked as
22   Exhibit 13 for the record.
```

Page 101

1           So the first email that we see here is an

2     email from you, dated 4/21/2022; do you see that?

3           A    Yes.

4           Q    And that's to Kyrstin Friebis?

5           A    Yes.

6           Q    Did Kyrstin previously work with you at

7     Mutual?

8           A    She did.

9           Q    Okay.  And was this one of the employees you

10    had transition over early?

11          A    Yes.

12          Q    Okay.  And so you're emailing -- and this

13    is, again, your private email?

14          A    Yes.

15          Q    And you're emailing Kyrstin while you're

16    still a branch manager about something called the

17    Sherwood file; right?

18          A    Looks that way, yes.

19          Q    Okay.  And here we've got in the

20    attachments, it says "2021 W-2, 2020 W-2s, 1003."

21    What is a 1003?

22          A    It's the loan application.

1      Q    Okay.  That would have been the loan

2    application they filled out for Mutual; right?

3      A    Yes.

4      Q    Okay.  And the W-2s and the paystubs, this

5    is all information they gave to Mutual; correct?

6      A    That they gave to me, yes, when I worked at

7    Mutual.

8      Q    Yes.  So they gave to Mutual; right?

9      A    Yes.

10      Q    Okay.  And you're sending all that

11    information to Ms. Friebis at Waterstone; right?

12      A    Looks that way, yes.

13      Q    And what you say there is: "They are doing a

14    7/6 ARM at 4.75.  Let me know what the credit score

15    is, please.  I'm hoping it's 720 plus."  Had you not

16    even pulled their credit at Waterstone -- I'm sorry,

17    Mutual, at this point?

18      A    I'm not sure.  It looks like I hadn't.

19      Q    Well, and you wouldn't have pulled -- I

20    mean, let me make sure we're clear.  You agree with

21    me, sir, when you pull someone's credit at different

22    institutions, it potentially can lower their credit;

1    right?

2         A    Yes.

3         Q    Okay.  And so for a borrower, where

4    obviously you're hoping their credit score is a

5    certain credit score, that's the last thing you would

6    have done is pull it at two different institutions?

7    Because if it lowered it, it could cause their rate to

8    change or even their viability for a loan; couldn't

9    it?

10        A    Yes.

11        Q    Okay.  And that's why you wouldn't have

12   pulled it at Mutual.  You would have pulled it only at

13   Waterstone; right?

14        A    Yes.

15        Q    And sir, is it true if you don't know their

16   credit score, you don't know if they could qualify?

17        A    Yes.

18        Q    Okay.  So sir, this person, you just told me

19   a second ago that you would have sent over loans that

20   had been turned down; isn't that what you just

21   testified one second ago under oath?

22        A    The two loans that I referred to in Ben's

Page 104

1    email were turn-downs by -- that Mutual couldn't do.

2    So that's --

3         Q    Okay.  But you didn't refer in your last

4    answer to loans.  You said -- and we can have it

5    played back if you want -- isn't it true you testified

6    under oath subject to the penalty of perjury that you

7    would have only sent over loans that you couldn't get

8    done over at Mutual?

9         A    I did not say that.  I was referring to

10   Exhibit 21, when you asked about the loans I sent to

11   Ben.  I said those were turn-downs.

12        Q    Okay.  Well, either way, let's go to this

13   loan.  This wouldn't have been a turn-down; would it?

14        A    Doesn't look like it, unless we were trying

15   to do a portfolio loan where we couldn't match the

16   rate that they were being offered.  That's the only

17   thing I can think of.  But yeah, it wasn't -- yeah, it

18   --

19        Q    You wouldn't even know if you could match

20   the rate, because you didn't even know the credit

21   score yet; right?

22        A    No.

```
                                                    Page 105

  1         Q    I'm correct, aren't I?  You can't know the

  2    rate unless you know the credit score; right?

  3         A    If they had sent us a loan estimate from

  4    another bank and then we wouldn't be able to match

  5    that rate with Mutual, I could have sent that over and

  6    done a -- you know, see if that's something that

  7    Waterstone could have done on their portfolio line.

  8    Because they had much lower rates on the portfolio

  9    loans.

 10         Q    Sir, do you see any mention of that in this

 11    email?

 12         A    No.

 13         Q    Okay.  So all we know in this email based on

 14    what you wrote is that you didn't even know the credit

 15    score yet, and you were sending the loan over to

 16    Kyrstin at Waterstone while you were branch manager at

 17    Mutual; right?

 18         A    Yes.

 19         Q    Okay.  And you were taking information that

 20    had been provided to Mutual by a customer, private

 21    information, and sending that to Waterstone too;

 22    right?
```

Page 106

1          A    Yes.

2          Q    Now, sir -- and at this point, Kyrstin

3    Friebis is a Waterstone employee; correct?

4          A    Yes.

5          Q    Because you had sent her over early; right?

6          A    Correct.  She volunteered to go over early.

7          Q    Did she volunteer after you asked her or

8    before?

9               MS. KREITER:  Object to the form.

10               THE WITNESS:  She -- she volunteered

11    when we made the announcement.  She was one of the

12    people that volunteered to go over.

13    BY MR. KAREN:

14          Q    Now, did you ask for volunteers to go over?

15          A    Yes.

16          Q    Okay.  Now, let's go to the next page of

17    this.  This is another email from you, dated 4/20, to

18    Kyrstin Friebis.  Do you see that?

19          A    Yes.

20          Q    And this subject is "Columbis."

21               MS. KREITER:  Ari, sorry, what is the

22    Bates number of this one?  I just --

Page 107

1                    MR. KAREN:  Sure.  02417.

2                    MS. KREITER:  Okay.

3                    MR. KAREN:  I'm sorry; 02147.  Are we

4      good, Maria?

5                    MS. KREITER:  Yes.  Yes.

6      BY MR. KAREN:

7           Q    And the subject is "Columbis."  Do you see

8      that, sir?

9           A    Yes.

10          Q    Is it fair to assume that's the name of a

11     borrower?

12          A    That is fair.

13          Q    Okay.  And below we see some annuity

14     statement, a passport, SSA letter, first pension

15     check.  That's information that would have been sent

16     to Mutual?

17          A    Yes.

18          Q    Okay.  And you're sending again from your

19     private email?

20          A    Yes.

21          Q    And that's because you didn't want Mutual to

22     know you were doing this; right?  It'd be a

Page 108

1    distraction; right?

2        A    Yes.

3        Q    And then you say in this 02147, this email

4    here, you say: "Credit did not have scores.  Said they

5    were all frozen."  What does that mean?

6        A    Some people put a -- a freeze on their

7    credit profiles, so you can't pull through scores

8    without them unlocking them or unfreezing them.

9        Q    Oh, like, an identity theft kind of

10   protection thing?

11       A    Yes, sir.  Exactly.

12       Q    Okay.  So again, on this loan, you don't

13   know what their credit was; right?

14       A    No.

15       Q    So you couldn't have known whether Mutual

16   would have been able to give them a loan; right?

17       A    No.

18       Q    No, I'm correct; is that correct?

19       A    Correct.

20       Q    Okay.  Now, sir, were these -- let me back

21   up for a second.  Were you considered a producing

22   manager?

1          A    Yes.

2          Q    Okay.  What does that mean to you?

3          A    It means I also originate loans as well as

4     manage the branch.

5          Q    Okay.  And my question is, were these loans

6     that were your originations, or the originations of

7     another employee at the branch?

8          A    Sherwood, I don't recall.  Columbis was one

9     of Kyrstin's clients.

10         Q    Okay.  Why would you have been facilitating

11    the transition of information for one of Kyrstin's

12    clients?

13         A    Because it was her client and she was at

14    Waterstone.  She originated that client on her own,

15    with no help from -- from Mutual.

16         Q    Do you know who was even logged into

17    Mutual's pipeline to -- was it in her pipeline at

18    Mutual?

19         A    I don't remember.

20         Q    But it would have been a loan that at least

21    had started at Mutual, and that's why you had to send

22    the information over her to Waterstone; right?

Page 110

1      A    Yes, it would have been an application that

2    originated there.

3                   MR. KAREN:  Okay.  Now, let's go to the

4    next page.  And now I'm looking at WMC4430.  Can you

5    scroll down, Jennifer, just for a second, so Maria can

6    see that Bates number?  Thank you.  And you can scroll

7    back up now.

8    BY MR. KAREN:

9      Q    And sir, this is an email dated 4/13, and

10   this is to Ben Davis.  And it says "Manufactured home

11   with ADU; Kemp appraisal."  Do you see where it says

12   that?

13     A    Yes.

14     Q    And again you sent this while you were

15   branch manager from your personal email; right?

16     A    Yes.

17     Q    Okay.  And is the appraisal -- that's

18   something that happens pretty late in the loan

19   process; doesn't it?

20     A    Usually within a couple weeks of us

21   submitting it.  Usually a week or so with us

22   submitting it into processing.

Page 111

1      Q    Right, but in other words, if you were to

2  talk through the loan process, I assume one of the

3  first things is pulling credit; right?

4      A    Right.

5      Q    And then they do an application, and you get

6  information about their credit worthiness; is that

7  right?

8      A    Yes.

9      Q    And after you do get that information, then

10 you go to appraisal, because you don't want to spend

11 the money on appraisal until you know that they

12 actually could do the loan; is that fair to say?

13     A    We do them simultaneously, so we'll get the

14 contract in and submit it into processing, and they'll

15 order the appraisal at the same time as they send it

16 in to underwriting.

17     Q    Okay.  But then when you actually get the

18 appraisal, it's a couple weeks later?

19     A    Usually, yes.

20     Q    Okay.  And so this is something obviously

21 that's been pending at least for some time, and you

22 ask Mr. Davis whether -- and you wouldn't -- strike

                                                    Page 112

1       all that.  I'm sorry; let me start over.

2               You wouldn't order an appraisal for a loan

3       that you knew you had no chance of doing; right?

4           A    Right.  It looks like we got the appraisal

5       back and there was an accessory unit on the

6       manufactured home, which there was an overlay by

7       Mutual, so they did not allow that type of property.

8       So that's why I was asking Mr. Davis if they allowed

9       it at Waterstone.  So this is a loan Mutual could not

10      do.

11          Q    Okay.  Let's go to the next page.  And this

12      is an email from Shirley Agudelo, and again, this is

13      Bates number 05502.  And the subject is "Crawford,

14      Jordan" or Jordan Crawford.  Do you see that?

15          A    Yes, sir.

16          Q    It's a title commitment?

17          A    Yes.

18          Q    Okay.  And again, you're still branch

19      manager at this time?

20          A    Yes.

21          Q    Okay.  And Waterstone's using your private

22      email; right?

1          A     Yes.

2          Q     And do you think Waterstone understood you

3     were using your private email so there would be no

4     distractions?

5                    MS. KREITER:  Object to the form.

6     Calls for speculation.

7     BY MR. KAREN:

8          Q     You could answer.

9          A     Yes.  This was another loan that Mutual said

10    they couldn't do.  He was a basketball player in

11    Turkey, and they didn't like the -- the way his

12    contract was, so they turned this down.  So I sent it

13    to Waterstone.

14         Q     Let's go to the next page, WMC6193.  This is

15    an email from you, this time using your Mutual, no

16    longer Gmail, to Mike Smalley.  And it's a loan

17    referral.  And you say "Here's a construction lead."

18    Do you see that?

19         A     Yes.

20         Q     Did Mutual do construction loans?

21         A     They did not.  They had no construction

22    products, so that's why I sent that over.

Page 114

1          Q    Let's go to the next page.  And this is

2     WMC6205.  And this is an email from you, dated 4/21,

3     to Michael Irish; do you see that?

4          A    Yes.

5          Q    Okay.  And again, and the borrower name

6     appears to be Julie Rose; is that a fair assumption,

7     what Julie Rose means?

8          A    Yes.  Yes.

9          Q    Okay.  And you were still branch manager of

10    Mutual at this time?

11         A    Yes.

12         Q    Okay.  And you say to him "let me know when

13    you review credit and give me a call so we can

14    discuss."  Do you see that?

15         A    Yes.

16         Q    Okay.  And so you hadn't pulled credit yet?

17         A    No.

18         Q    Okay.  And below that, you wrote in the

19    email: "Thanks.  They are looking to do a conventional

20    purchase."  That's a very standard loan, a

21    conventional loan?

22         A    Yes.

1      Q    And 20 percent down, that's a very standard

2   amount of downpayment; isn't it?

3      A    Yes.

4      Q    Nothing exotic there; right?

5      A    No.

6      Q    Let's go to the next page.  And this is

7   WMC6206.  And this is dated 4/27.  Now, sir, were you

8   already at Waterstone at this point?

9      A    Yes.

10      Q    Okay.  Do you know why you were still using

11   your private email?

12      A    I don't know why I would have sent that from

13   my private email, no.

14      Q    Well, it says "Danielle McCormick

15   pre-approval."  Do you see that?

16      A    Yeah.

17      Q    Okay.  And is it fair to say that this was a

18   pre-approval from Mutual that you probably sent to

19   your private email and then forwarded to Michael

20   Irish; right?

21              MS. KREITER:  Object to the form.

22              THE WITNESS:  I'm not sure.

```
 1   BY MR. KAREN:

 2        Q    Well, do you know why else you would have

 3   written -- well, okay.  Let's go through this.  You

 4   were still at Mutual on the 26th; right?

 5        A    No.  I think we had gone to Waterstone on

 6   the 26th.

 7        Q    Okay.  All right.  Let's go to the next

 8   page.  And this is WMC01763.  Again, this is from your

 9   private email?  Dated 4/22, while you were still at

10   Mutual?

11        A    Yes.

12        Q    Yes?  And this is to Dawson Walker.  He was

13   one of your former employees at Mutual?

14        A    Yes.

15        Q    And you had him transition to Waterstone;

16   right?

17        A    Yes.

18        Q    And here this is the "Byers, Lea/Brad"; do

19   you see that?

20        A    Yes.

21        Q    By the way, was this one of your borrowers,

22   sir, or was it -- when I say your borrowers, was it
```

Page 117

```
 1     your production or someone else's production?
 2          A     It was -- it was not, that was not my -- my
 3     buyer.
 4          Q     Whose was it?
 5          A     Looks like it was Dwayne's.
 6          Q     Why would you be sending a prior for Dwayne
 7     to Dawson Walker?
 8          A     I'm not sure.
 9          Q     You don't know?
10          A     I don't remember --
11          Q     Well, do you make it a habit to take
12     Dwayne's originations and send them to other
13     companies?  Is that something you typically do?
14          A     No, it's not.
15          Q     Okay.  Well, and you can't recall, and you
16     can't envision or think about why you might have done
17     that?
18          A     I don't remember that file.  It wasn't mine,
19     so I don't -- I don't have any recollection of that
20     one.
21          Q     Well, I'm not asking about the file, I'm
22     asking you, why would you have taken one of Dwayne's
```

Page 118

1    originations -- well, strike that.  You wouldn't have

2    done this without Dwayne's approval; right?

3         A    No.

4         Q    Okay.  So he would have known you were doing

5    it?

6         A    Yes.

7         Q    Why wouldn't he have just sent it himself?

8         A    I'm not sure.

9         Q    Do you know why you keep ending up as the

10   go-between for communications between employees,

11   between other people, between loan files?  Why are you

12   the go-between, Mr. Wolf?

13              MS. KREITER:  Object to the form.

14              THE WITNESS:  I'm not sure.

15   BY MR. KAREN:

16        Q    You didn't think about that ever?

17        A    No, not really.

18              MS. KREITER:  Object to the form.

19   BY MR. KAREN:

20        Q    Now, this is an email -- and again, you

21   attached authorization for appraisals, credit,

22   paystubs, a lot of information that was provided to

Page 119

```
 1    Mutual; right?

 2         A    There's some, yes.

 3         Q    Okay.  And you sent that over to Waterstone;

 4    right?

 5         A    Yes.

 6         Q    And you write "Hey, bud, can you or someone

 7    on your team get this going?"  That means start the

 8    loan; is that right?

 9         A    Right.

10         Q    Let's go to the next page.  Actually, we can

11    skip that one.  Well, no, let's keep this page.

12              Sir, this is another email, WMC0854; do you

13    see that?

14         A    Yeah.  Tariq, that was a turn-down by

15    Mutual, so we had to send it to Waterstone.

16         Q    Right, but you're taking all that, the 1040s

17    and the 1120 and all those documents, those were

18    provided to Mutual and you're sending them to

19    Waterstone; right?

20         A    Yeah.  They were provided to Dwayne.

21         Q    Okay.  Let's go to the next page.  WMC1685.

22    This is an email dated 4/20; do you see that?
```

1        A    Yes.

2        Q    Came from your personal email; do you see

3    that?

4        A    Yes.

5        Q    Okay.  And it's D'Ettore docs; do you see

6    that?

7        A    Yes.

8        Q    And you're sending to Kyrstin Friebis,

9    basically a DL, an SSC, a DD214, and a COE; right?

10        A    Yes.

11        Q    And those are all borrower-related documents

12    that are provided to Mutual?

13        A    Yes, they were given to Kyrstin.

14        Q    At Mutual; right?

15        A    Yes.

16        Q    And you sent them to Waterstone; right?

17        A    Yes.

18        Q    Why were you the go-between?

19             MS. KREITER:  Object to form.

20             THE WITNESS:  Again, I'm not sure.

21    BY MR. KAREN:

22        Q    Well, Ms. Friebis didn't have access to

Page 121

```
 1    Mutual's systems anymore; right?

 2         A    Correct.

 3         Q    And these are documents that would have been

 4    kept in Mutual's Encompass; right?  Its loan

 5    origination system?

 6         A    Yes.

 7         Q    Okay.  And so you went into Mutual's loan

 8    origination system, took these documents, downloaded

 9    them, and sent them to Kyrstin at another mortgage

10    company; am I understanding that correctly?

11         A    I'm not sure where I got them from, but

12    yeah, it looks like I sent those documents.

13         Q    Okay.  And you would have gotten those

14    documents off of Encompass; right?  Because that's

15    where they would typically be stored?

16         A    Typically, yes.

17         Q    Let's go to WMC1648.  And this is an email

18    from you with your private email; right?  Sending to,

19    again, Kyrstin, on 4/20, documents about Gipson; do

20    you see that?

21         A    Yes.

22         Q    Was this another Kyrstin loan?
```

Page 122

1          A     Yes.

2          Q     Okay.  And so again, these are documents

3     that are attachments, bank statements, borrower

4     information, paystubs, looks like bank statements, all

5     that would have been provided to the borrower to

6     Mutual?

7          A     Yes.  These are all potential clients; they

8     weren't actually active loans.  But yes.

9          Q     Okay.  So you're taking for these potential

10    clients that were at Mutual.  And these are documents

11    that would have been stored in Encompass typically?

12         A     Typically, yes.

13         Q     Okay.  To get in Encompass, do you need a

14    password?

15         A     Yes.

16         Q     Why is that?

17         A     For security purposes?

18         Q     Well, why would there be security purposes?

19         A     Everybody has their own login to make sure

20    you know who's going in Encompass.

21         Q     Why do you need to know who's going into

22    Encompass?

Page 123

1          A     See who's working on files.

2          Q     Well, is there sensitive information in

3    Encompass?

4          A     Yes.

5          Q     And that's why you can't just have anybody

6    walking the street go get into it; right?

7          A     Correct.

8          Q     Okay.  And you know that?  You know that's

9    protected information; isn't it?

10         A     Yes.

11         Q     It has to be kept safe; right?

12         A     Yeah.  There's certain sensitive

13   information, like social security numbers and things

14   like that, yes, that's in there.

15         Q     And the stuff that people have in the bank

16   statements, things like that?  Personal information;

17   right?

18         A     Some -- some of it is.  Some of it's

19   sensitive information, yeah.

20         Q     But you would agree how much money you have

21   in a bank account is not something people typically go

22   around sharing to random people on the street; right?

Page 124

1    A    Right.

2    Q    Most people would consider that pretty

3    sensitive; wouldn't they?

4    A    I guess.  I -- I wouldn't call that

5    sensitive information, but --

6    Q    Certainly confidential, wouldn't you agree?

7    A    Sure.  Confidential.

8    Q    And when they're sending to your bank,

9    they're trusting you and that bank to keep that

10   information safe; aren't they?

11   A    Yes.

12   Q    Okay.  Your realtors would be pretty upset

13   if they found out that you were just sharing

14   borrowers' bank account balances with randoms;

15   wouldn't they?

16            MS. KREITER:  Object to the form.

17            THE WITNESS:  I -- I don't know if they

18   would or not.

19   BY MR. KAREN:

20   Q    You think it would be a good idea to start

21   publishing your borrowers' bank account information on

22   the internet?

```
                                            Page 125

 1        A    We were sending the documents to someone who

 2   could get the loan done.  I think they'd be okay with

 3   it.

 4                 MR. KAREN:  Motion to strike.  That

 5   wasn't my question.

 6   BY MR. KAREN:

 7        Q    My question, which I'd like answered, was do

 8   you think it would be positive for your business if

 9   you took borrowers' bank account balances and put it

10   on your Facebook page?

11        A    Yeah, obviously that wouldn't be right.

12        Q    Okay.  Because the information's

13   confidential; right?

14        A    Right.

15        Q    And it's provided to you with the

16   understanding you're going to keep it safe and you're

17   not going to share it, except to the extent necessary;

18   right?

19        A    Right.

20        Q    Okay.  And so now, you would also agree with

21   me sir, when doing a loan, is it fair to say that one

22   of the -- as you sort of get into the loan process,
```

Page 126

1    there are places where the loan can, for lack of a

2    term, fall out?

3          A    Yes.

4          Q    Okay.  And you know what I mean by fall out,

5    just so we're talking the same language?  That means

6    somebody decides not to proceed forward; right?

7          A    That could be one of the reasons, yes.

8          Q    Right.  But when I refer to fall out, what

9    I'm saying, is they fall out because for whatever

10   reason they're not going to move forward on the loan.

11   That's what I'm referring to as a fall out; is that

12   fair?

13         A    Yes.

14         Q    Okay.  So one of the areas which you agree

15   that people fall out is at the point of the credit

16   score; right?  Because they just might not give you

17   that access to your credit; is that a place where you

18   could have a fall out?

19         A    Yes.

20         Q    And another place you could have a fall out

21   is when you say, "Hey, go and give me all the

22   documents, you know, that I need to do this loan."

Page 127

1    That's another place when you fall out; right?

2        A    Yes, if they didn't agree to provide the

3    documents you need, correct.

4        Q    And some people, people don't want to, you

5    know, they're not serious or, you know, they don't

6    want to go through a hassle of getting all the stuff.

7    That's another fall out place of the loan; right?

8        A    Yes.

9        Q    Okay.  So when you get the borrower to

10   provide the credit score and all that information,

11   that's getting sort of also their buy in to the loan

12   process; right?

13       A    Yes.

14       Q    And their buy in with you to the loan

15   process; correct?

16       A    Yes.

17       Q    So merely having that information is

18   valuable to you in regard to the loan process, because

19   you've gone through and gotten that borrower's buy in;

20   right?

21       A    Yes.

22       Q    And you further qualify that business

Page 128

1      opportunity; right?

2          A    Right.

3          Q    And so that loan at that point is much more

4      valuable to you, just having all that information than

5      some random, you know, person out there that might buy

6      a house; isn't it?

7          A    Yes.

8          Q    So just knowing that identity of that

9      person, who's willing to give that all to you, and

10     willing to go forward that far, just in and of itself,

11     that's valuable; isn't it?

12         A    True.

13         Q    And you're providing that to Waterstone, to

14     Kyrstin over there; aren't you?

15         A    I'm providing the documents from her client

16     to her.  But she -- she'd already gained that trust

17     and respect.  And we were trying to make it easier on

18     them, on the clients, not having to provide all that

19     information again and go find those documents.

20         Q    But you were also, by virtue of sending all

21     this information, making it easier for Waterstone to

22     close the mortgage; right?

Page 129

1          MS. KREITER:  Object to the form.

2          THE WITNESS:  I was making it easier on

3    the client, on Kyrstin's clients, so they didn't have

4    to dig up all those documents again.

5    BY MR. KAREN:

6       Q    But they also could have just closed the

7    loan at Mutual; couldn't they?  That would have made

8    it easier, too.

9       A    These were applications.  They weren't

10   actual loans yet.  They were just pre-qualified

11   people.

12      Q    Sir, that's not my question.  My question

13   is, they could have just stayed at Mutual; couldn't

14   they?  And then they wouldn't have had to provide the

15   documents twice; right?

16      A    Well, their loan officer wasn't there.  The

17   person they trust to close the loan wasn't there

18   anymore.  They decided to -- they wanted to stay with

19   Kyrstin.

20      Q    They could have just -- my question is --

21   they could have closed that loan at Mutual and just

22   left all the documents there; right?

1      A    If they had a contract and went under

2   contract, they could have technically closed at

3   Mutual.  But these were Kyrstin's clients.  These were

4   not clients that Mutual had created in any way.  These

5   were people that Kyrstin had gotten referrals for.

6      Q    Kyrstin worked for Mutual at the time;

7   right?

8      A    Yes.

9      Q    Did Kyrstin have the ability to make loans

10  herself?  Did she have secondary market investors that

11  she could send loans to, and did she have an ability

12  to actually send them hundreds of thousands of dollars

13  to buy the house?

14     A    No.

15     Q    Okay.  Was she approved as a lender herself

16  under NMLS?

17     A    Not as a lender, no.

18     Q    Okay.  So she actually couldn't have done

19  the loan herself; could she?  She was just a loan

20  officer.  Mutual was the one making the loan; right?

21     A    Yes.

22     Q    But you never gave Mutual that opportunity;

                                                        Page 131

 1     did you?

 2                    MS. KREITER:  Object to the form.

 3                    THE WITNESS:  No.

 4     BY MR. KAREN:

 5          Q    Okay.  Let's go to WMC1378.  This is dated

 6     4/26.  Is that -- I do want to be clear, sir -- is

 7     that your first day at Waterstone?

 8          A    Yes.

 9          Q    Okay.  But you're still using your personal

10     email address; right?

11          A    Yes.

12          Q    Is that because -- and this is relating to

13     borrower Sam Brown?

14          A    Yes.

15          Q    And these are documents, paystubs, there's

16     1003, there's W-2s, there's credit.  Is that

17     information that would have been Mutual information, a

18     1003?

19          A    Yes.

20          Q    Okay.  And that the only reason you'd be

21     sending that through your private email, that's

22     because you originally either downloaded it or sent it

```
                                                      Page 132
  1    to your private email when you were at Mutual; right?

  2         A    Yes.

  3         Q    Let's go to the next.  This is an email from

  4    you again, using your private email.  This is dated

  5    4/19, and you're sending these to Dawson Walker.  Do

  6    you see that?  At Waterstone?

  7         A    Yes.

  8         Q    Who's Kristie Johnson?

  9         A    She was an operations person with us.

 10         Q    Why were you sending it to her private

 11    email?

 12         A    I don't remember.  I know she had worked

 13    with this client quite a bit, but I'm not sure why

 14    other than that.

 15         Q    And you're sending a lot of, again, W-2s,

 16    1040 tax returns, IRS payoffs, a lot of personal,

 17    private information?

 18         A    Yeah, looks like it, yes.

 19         Q    Okay.  And that would have been information

 20    provided to Mutual; right?

 21         A    Yes, provided to us while we were at Mutual.

 22         Q    And the date is 4/19, so you were still
```

Page 133

1    branch manager at Mutual at that time?

2         A    Yes.

3         Q    Okay.  And you write "Hi, Dawson, here is a

4    CO refi of Dwayne's."  Again, Dwayne would have known

5    you were doing this; right?

6         A    Yes.

7         Q    You know why you were the go-between?

8                   MS. KREITER:  Object to the form.

9                   THE WITNESS:  I mean, Dwayne was not

10   good with email and things like that, so I probably

11   was helping him out.

12   BY MR. KAREN:

13        Q    Dwayne didn't know how to use -- did I just

14   hear that right?  Dwayne didn't know how to use email?

15   That's your answer?

16        A    I said he was not very good with email, so I

17   was helping him.

18        Q    Okay.  Do you think Dwayne would -- so what

19   do you mean, he's not very good?  He doesn't know how

20   to attach things?  He doesn't know how to send emails?

21        A    Yeah, I was helping him out with this

22   client, get this -- getting the documents to Dawson.

Page 134

1      Q    No, no.  Answer my questions, sir.  Does he

2   not know how to attach things?   What do you mean,

3   he's not good with email?  He doesn't know how to hit

4   send?

5      A    He's just not very good with technology, so

6   I helped him out with this.

7      Q    Sir, I'm not good with technology either,

8   but it's not technology to type in an -- let's

9   consider what we do when we send an email; okay?  I

10  want to go through this with you.  Because I'm

11  confused; I need some clarity.  When you send an

12  email, you type in a name, you type in a message, and

13  you hit send; right?

14     A    Right.

15     Q    How much technical skill does it require to

16  send an email?

17     A    Not much, I guess.

18              MS. KREITER:  Object to the form.

19  BY MR. KAREN:

20     Q    So you're telling me he lacked the ability

21  and wasn't very good at typing in a name, typing in a

22  message, and hitting send?  Is that your testimony

Page 135

1   under oath, that he had problems doing that?

2       A    I was just commenting that he wasn't very

3   good at getting documents and sending emails, so

4   that's why I was helping him.

5       Q    Well, what I'm trying to understand is that

6   you said he had a technological issue.  And I'm trying

7   to understand the technological issue that you

8   testified to under oath concerning his ability to hit

9   send and his ability to click attach.  So I'm trying

10  to figure out where the challenge was there.  Could

11  you help me?

12      A    I wish I could.  You'd have to talk to

13  Dwayne.  I -- I just helped him out with a couple of

14  these files, getting the documents over.

15      Q    All right.  So let's look at what you wrote

16  while you were helping Mr. Hutto with his email

17  challenges.  You write "Kristie I have been working on

18  it for several -- Kristie and I have been working on

19  it for several months now, actually, like, a year,

20  LOL."  So is this your email, or is this Dwayne's

21  email?

22      A    Yeah, this is mine.  I'd been helping

Page 136

1    Kristie with this file.  I'd hit several challenges,

2    been turned down a couple times by Mutual.  We were

3    trying to rescore his credit, as you see in the next

4    sentence.

5         Q    That's right, I do.  It says: "If you and

6    Maria can get this one going and send to Cameron to

7    LP.  Try to pull credit today, since the rescore just

8    came back, scores should be the same."  Do you see

9    where it says that?

10        A    Yes.

11        Q    So you had gone through a rescore, and

12   according to that rescore, the credit scores had come

13   up to where the person now was potentially eligible to

14   do a loan; right?

15        A    It looks that way.

16        Q    Okay.  And then you continue on "The

17   appraisal I'm sending over is four months old, so

18   we're going to get with Brian to see if we can get a

19   new one with more value, since we're capped at 75 LTV

20   per AUS."  What is AUS?

21        A    Automated underwriting system.

22        Q    And that's an automated underwriting system

1    that goes through Fannie Mae; isn't it?

2         A    Yeah, Fannie Mae or Freddie Mac.

3         Q    Right.  And Fannie Mae or Freddie Mac,

4    that's not Waterstone, that's Fannie Mae or Freddie

5    Mac; right?

6         A    Yes.

7         Q    And that's not Mutual either?  That's just

8    Fannie Mae or Freddie Mac's guidelines for doing a

9    loan; right?

10        A    Right.

11        Q    Okay.  That doesn't include any overlays

12   from anybody else, that's just Fannie Mae and Freddie

13   Mac pure and simple; isn't it?

14        A    Yes.

15        Q    Okay.  And you're sending this to them to

16   see if -- to Dawson and to Kristie -- to see if you

17   could do this loan over at Mutual; right?  I'm sorry,

18   at Waterstone; right?

19        A    Yes.

20        Q    And you're sending all that borrower

21   information that's provided to Mutual; right?

22        A    Yes.

Page 138

1      Q    And you're using your private email; right?

2      A    Yes.

3      Q    And Kristie's private email; right?

4      A    Yes.

5      Q    Sir, are your private emails encrypted?

6      A    I'm not sure.

7      Q    Well, what security protocols would protect

8    this type of sensitive information in your private

9    Gmail account?

10     A    I don't know.

11     Q    So it's entirely possible there are none;

12   right?

13     A    I'm not sure.

14     Q    You never did any checking; did you?

15     A    No, I'm not an IT technician.  I wouldn't

16   know.

17     Q    Let's go to the next email, WMC1297.  And

18   this is again, sending from you from your private

19   email; right?

20     A    Yes.

21     Q    And the date is 4/20/2022?

22     A    Yes.

Page 139

1        Q    You're sending to Kyrstin again?

2        A    Yes.

3        Q    And you're sending paystubs and 1003s

4    provided to Mutual; right?

5        A    Yes.

6        Q    And it's about a borrower named Tasha Ryan;

7    right?

8        A    Right.

9             MR. KAREN:  Let's go to -- I don't

10   think there's anything else -- I think we can be done

11   with this exhibit now.

12             MS. KREITER:  Ari, is now a good time

13   for kind of a midmorning break?

14             MR. KAREN:  Yes.  I will say, I do not

15   think I'm going to be more than -- give me one second,

16   Maria.

17             MS. KREITER:  Sure.

18             MR. KAREN:  This isn't going to be a

19   really long deposition.  I think we're going to wrap

20   up within the hour, so if we can not do lunch, I think

21   we'll get through this.  But I don't have a problem

22   with a break right now.  So you want to take, like --

```
                                              Page 140

 1                      MS. KREITER:  If you -- I guess I'll

 2       ask Chris, I mean, with the understanding it's

 3       approximately an hour, do you want to keep going or

 4       take a short break?

 5                      THE WITNESS:  I'm fine to keep going,

 6       if you want.

 7                      MS. KREITER:  Okay.  I could just use,

 8       nevertheless, like, a two-minute break, Ari, just to

 9       --

10                      MR. KAREN:  Yes.  No, no, no problem.

11       Yes.  You want to take five minutes or something?

12       That's fine.

13                      THE WITNESS:  Yes.

14                      MS. KREITER:  Sure.  Okay, great.

15                      THE VIDEOGRAPHER:  The time is 11:27

16       a.m.; we are now off the record.

17                      (Off the record.)

18                      THE VIDEOGRAPHER:  This is the

19       beginning of media unit number 3 in the video recorded

20       deposition of Mr. Christopher Wolf.  The time is 11:40

21       a.m., Eastern.  We are now back on the record.

22       Counsel you may proceed.
```

Page 141

1                    MR. KAREN:  Thank you.  Could we bring

2        up Exhibit 9 please, Jennifer?

3                         (Exhibit 9 was marked for

4                         identification.)

5        BY MR. KAREN:

6             Q    Sir, this is an email that we've marked as

7        Exhibit 9.  You're now at Waterstone; right?

8             A    Yes.

9             Q    Okay.  So you were an employee of Waterstone

10       and a branch manager for Waterstone at this point?

11            A    Yes.

12            Q    Cody Lamb and Fred Stalls were not at the --

13       they didn't work at the Daytona branch for Mutual; did

14       they?

15            A    No.  They were in Tampa.

16            Q    Okay.  And so at this time on June 9,

17       they're still at Tampa; right?

18            A    Yes, it looks like it.

19            Q    Okay.  And this is a loan, some documents

20       serving a loan, it sounds like, they were sending you

21       on a file called Mcintosh?

22            A    Yeah, it appears so.

Page 142

```
 1        Q    Do you know why you were acting as the
 2   go-between on this?
 3              MS. KREITER:  Object to the form.
 4   BY MR. KAREN:
 5        Q    Let me rephrase that.  Actually, let me
 6   rephrase that.  Obviously, Cody and Fred could
 7   probably send these emails to anybody over at
 8   Waterstone, I'd presume; right?
 9        A    I'm not sure.  I don't -- I don't remember
10   this file or anything about it.
11        Q    Okay.  All right.  My question is, but why
12   would they have been emailing -- do you know why they
13   would have been emailing you of all people at
14   Waterstone the information about this loan?
15        A    I don't remember.
16        Q    Were you designated as a person, like, a
17   point person, to send or receive files?
18        A    No.  Not that I know of.
19        Q    So you don't know why, instead of sending it
20   to Dwayne or to any other employee, they would have
21   sent it to you?  You have no idea why that of all
22   people, they sent it to you?
```

```
                                              Page 143
 1                  MS. KREITER:  Objection.  Asked and

 2      answered.

 3      BY MR. KAREN:

 4           Q     You could answer.

 5           A     I -- I don't know.

 6           Q     Did you ever ask?  I mean, did you ever go,

 7      like, "Hey, why are you sending this to me?"  Did you

 8      ever ask them why they sent these to you?

 9           A     I don't remember about this one.

10           Q     I'm asking generally.  Do you know why --

11      because in some other files, I could show you were

12      people were sending you loans.  And my question is,

13      why were they sending them to you over and over again?

14                  MS. KREITER:  Objection.  Asked and

15      answered.

16                  THE WITNESS:  Yeah, I'm not sure.

17                  MR. KAREN:  Okay.  Let's go to Exhibit

18      12.  Okay, this is an exhibit, so we're going to have

19      it marked as Exhibit 12 in this deposition.

20                  (Exhibit 12 was marked for

21                   identification.)

22      //
```