# **EXHIBIT F**

Page 1

1            UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF FLORIDA

3                   TAMPA DIVISION

4    _____

5    MUTUAL OF OMAHA MORTGAGE, INC.,

6          Plaintiff,

7       v.                              Civil Action

8    WATERSTONE MORTGAGE CORPORATION,       No. 22-CV-

9          Defendant.                        01660

10   _____

11    VIDEOTAPED DEPOSITION OF CORPORATE REPRESENTATIVE OF

12       WATERSTONE MORTGAGE CORPORATION - KEVIN ALLEN

13   DATE:          Thursday, August 24, 2023

14   TIME:          11:32 a.m.

15   LOCATION:      Remote Proceeding

16                  833 East Michigan Street, Suite 1800

17                  Milwaukee, WI, US, 53202

18   REPORTED BY:   Shondra Dawson, Notary Public

19   JOB NO.:       6063052

20

21

22

Page 2

```
 1              A P P E A R A N C E S

 2   ON BEHALF OF PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.:

 3        ARI KAREN, ESQUIRE (by videoconference)

 4        Mitchell Sandler LLC

 5        1120 20th Street, Northwest

 6        Suite 725

 7        Washington, DC 20036

 8        akaren@mitchellsandler.com

 9        (202) 886-5292

10

11   ON BEHALF OF DEFENDANT WATERSTONE MORTGAGE

12   CORPORATION:

13        MARIA KREITER, ESQUIRE (by videoconference)

14        Godfrey & Khan

15        833 East Michigan Street, Suite 1800

16        Milwaukee, WI 53202

17        mkreiter@gklaw.com

18        (414) 273-5198

19

20

21

22
```

Page 3

1           A P P E A R A N C E S (Cont'd)

2   ALSO PRESENT:

3       Glen Fortner, Videographer (by videoconference)

4       Neil Helsabeck-Ochoa, Paralegal for Ari Karen (by

5       videoconference)

6       Mark Carroll, General Counsel for Mutual of Omaha

7       (by videoconference)

8       Laurel Thomson, Representative Mutual of Omaha

9       (by videoconference)

10      Stephanie Ziebell, In House Counsel for

11      Waterstone (by videoconference)

12      Emma Jewell, Co-Counsel for Waterstone (by

13      videoconference)

14

15

16

17

18

19

20

21

22

Page 42

```
 1        Q     Okay.  Got it.  Now, how does it pertain --
 2   and let's just keep this up here.  It also says in
 3   number 2, "Please refrain from copying or otherwise
 4   recording your client's personal information from your
 5   previous employer systems."  Do you see where it says
 6   that on number 2?
 7        A     I do see that.  Yes.
 8        Q     Okay.  And so, for example, one of those
 9   systems would be, like, a loan origination system;
10   right?
11        A     Yeah.  That would be an -- yes.
12        Q     Okay.  And isn't the loan origination system
13   -- well, I'll ask the question.  The loan origination
14   system contains most of the sensitive information for
15   customers, doesn't it?
16        A     Yes.  I'm just thinking through in our
17   system.  Yes.  It would be the -- and you say
18   "sensitive."  I guess just making sure I'm on the
19   page, identifying sensitive information, as to what
20   that would be?
21        Q     When I'm talking about "sensitive," I'm
22   talking about sensitive personal information of a
```

Page 43

1    customer, Social Security Number; credit score; you

2    might have to access to bank account numbers, things

3    like that.

4         A    Yes.  And I was thinking things like Social

5    Security Number.  Yes.

6         Q    Okay.  And that's going to be the LOS, the

7    loan origination system?

8         A    If that's been taken by the loan officer as

9    part of their, you know, whatever part of the process

10   they're in.

11        Q    That it would be stored in the LOS?

12        A    In the LOS.  And I'm thinking again of our

13   system.  Yes.  It would be in there.

14        Q    I know there a couple different LOS's out

15   there that mortgage companies use.  What's the name of

16   Waterstone's LOS?

17        A    We use Encompass.  I think that's the name

18   it still goes by these days, if it's ICE Mortgage or

19   whatever.  But Encompass I feel like is the name

20   still.

21        Q    And that's a pretty common loan origination

22   system for companies to use.  I think it's probably

Page 45

1    Encompass upon, yes, after the loan has closed.

2        Q    Okay.  But in addition to the data we're

3    talking about right now, it would also have data about

4    the actual loan that was closed; right?  You know, the

5    terms of the loan; you know, if and when it recasts,

6    you know, in terms of the interest rate; interest rate

7    of the loan; the type of loan product, all that would

8    be in there too; right?

9        A    Yes.  The closing documents, which would be

10   the note, the security instrument, yeah, things like

11   that that were part of the actual closing.  Yes.

12       Q    Okay.  And all that is confidential

13   information too, isn't it?

14       A    I -- I don't -- I guess I'm trying to think

15   of customer private information because, for example,

16   the security instrument is a recorded document.  So I

17   just think of that one as being available if somebody

18   wanted to search for that --

19       Q    I'm sorry.  Let me rephrase my question.  I

20   certainly understand there is some public information

21   involved there; right?  But there's also a lot of not

22   public information included in Encompass there about

Page 46

1    closed loans; right?

2        A    I -- I think we'd go back to something like

3    the Social Security Number.  Yeah.

4        Q    Okay.  Is the note publicly available?

5        A    I am not sure.  I'm not sure if that is

6    because I think of the security instrument as being

7    the recorded document.

8            So I don't know that the note is available

9    or not -- in terms -- in many -- I feel like you'd

10   have the terms in that security instrument.  I'm not

11   sure what else a note would provide.  But I'm not

12   sure, actually.

13       Q    Okay.  Well, let me ask you this.  I mean,

14   certainly, whether it's public or not, Waterstone

15   would consider that confidential information; right?

16                MS. KREITER:  Object to the form.

17       A    In which -- and -- and I -- I guess, which

18   part of that being confidential?

19       Q    Well, for example, I mean, a list of loan

20   officers; all their closed loans; the names of the

21   customers; their contact information; knowing when

22   they're a refinance; if there's an ARM, when the ARM

Page 49

1   VP sales, you do see value in the information about

2   interest rates on loans that you've closed and the

3   contact information for those borrowers, that's

4   valuable to you, isn't it?  It's valuable business

5   information?

6        A    Certainly knowing, yeah, what the customer's

7   interest rate is to know when a possible refinance

8   would be there.  Yes.  There -- there's value to that.

9        Q    Particularly when you have their contact

10  information, right, and you also kind of have some

11  information about their credit score, their income?

12  Again, it could change, but it still has some value?

13             MS. KREITER:  Object to the form, and

14  I'll object outside the topics of the deposition.

15       A    And -- and, again, certainly value, as you

16  stated, you're correct because things can change very

17  quickly with that customer on their credit score or

18  their job or what have you.

19       Q    Yeah.  Okay.  So given that there's some

20  value to that type of information for a mortgage

21  company, what type of guidance do you give loan

22  officers in transition about taking that information

Page 165

1      Q     And you know Mr. Utsch was a loan officer

2   that worked with Mr. Smith; right?

3      A     Yes.  That he works with Chris.

4      Q     Okay.  And this is an email to Melanie, who

5   we talked about before; Jen Wilton [ph], who you

6   mentioned before; Dustin Owen; right?

7      A     Yep.  I see him on here.

8      Q     And copied to Chris Smith at his personal

9   email address.  You see that?

10      A     Yes.

11      Q     And he writes, "Attached is our closed loan

12   list in the field mapping you have requested.  It

13   contains all refinances and purchases closed."  That's

14   a problem; isn't it, sir?

15               MS. KREITER:  Object to the form.

16      A     Again, exporting information -- yeah.

17   That's not what we would expect.

18      Q     Okay.  And so Melanie has been there 15

19   years.  How long has Jen been with Waterstone at this

20   point?

21      A     John, I believe --

22      Q     Jen.  Jen.  I'm sorry.  Not John.  Jen

1    Q    I understand what it's referring to.  My

2   point is what was given to you, according to what it

3   says in this email, is a closed loan list; right?

4   Based on the words of this email?

5    A    Yes.  It says "closed loan list."  Yes.

6    Q    You would agree with me if you took Mutual's

7   closed loan list out of Encompass, that's a problem,

8   isn't it?

9            MS. KREITER:  Object to the form.

10   A    And -- and I wouldn't want to see something

11  exported -- having somebody export something.  I'd

12  want to see as to what then came over.  Simply stating

13  that -- and again, so I -- yep.  I would not want to

14  see something exported.  But I'm -- when you talked

15  about closed loan, I keep referring back to there is

16  no customer private information in there.  So -- a

17  file is pulled over and --

18   Q    Okay.  We're talking different things then.

19  You're talking about GLBA; right?  Gramm.Leach.Bliley.

20  We can debate this point later.  Okay?  I'm not trying

21  to do it with you.

22            Earlier today, you told me there was value.

Page 172

1    We can go back and find the testimony if you want.

2    But you said there was value to the list of your

3    closed loans and having that information about your

4    customers.  You told me that was valuable information

5    for you; right?

6        A    Yeah.  That's valuable to a loan officer who

7    has built that up over the years.  Yeah.

8        Q    And it's valuable to the company, isn't it?

9        A    And to the company that they can produce

10   loans and -- yes.

11       Q    Okay.  And so if you were to take that from

12   one company and give it to another, that would give

13   that another company information that was valuable

14   from a competitor; wouldn't it?

15       A    Well, in that information is the fact that

16   somebody has been building up their database, their

17   referral source over -- could be five different

18   companies.  Typically, people continue to have that.

19   And so their -- their value is saying, hey, they've

20   got a 20 year old database of customer names.

21       Q    Okay.  But that would be their database.

22   And if they maintained it in their world, that's fine.

1    But you took this off of Mutual -- you understand that
2    Chris Smith did not own his version -- he didn't have
3    own separate -- version of Encompass; right?
4        A    I -- I don't believe he would have his own
5    version of Encompass.  Right.
6        Q    This would be Mutual's Encompass system;
7    right?
8        A    Yeah.  I'm assuming any loan that they would
9    have done with Mutual would be in Mutual's Encompass
10   version.
11       Q    Okay.  And what we see here is an email
12   that's from Waterstone instructing Mr. Smith or Utsch,
13   whoever it is, a current Mutual employee, and
14   providing them mapping to go into Mutual's Encompass
15   loan origination system and export information on
16   closed loans; right?
17       A    That -- as I read this, it's the export map
18   is what it says.  And I'm simply saying that because I
19   don't know what was exactly pulled over what format.
20   That's all.  I don't see any result of these.  I don't
21   see that.
22       Q    I understand.  But simply asking a current

Page 174

1   employee with duties to their employer to use their

2   protected access to go into that employer's loan

3   origination system and pull that and export it and

4   give it to you, that's not consistent with your

5   expectations; is it?

6        A    And as I stated before, I would not want to

7   see this information exported from somebody's system.

8   Yeah.

9        Q    Okay.  All right.  And so, sir, and you

10  would agree with me -- if you could go back to -- what

11  was the date of Melanie's original email?

12                  MR. KAREN:  If you could pull up

13  Exhibit 29.  There we go.

14  BY MR. KAREN:

15       Q    May 11th.

16       A    May 11th.  Yeah.

17       Q    If you had a time machine and you could go

18  back to May 11th at 10:24 a.m., before she wrote this

19  email and say stop, you would; wouldn't you?

20       A    I would say we don't want to export out of

21  somebody else's system.  Correct.

22       Q    And so now, when you look back --

Page 200

1    information."  And yet, in all the emails we just

2    looked at, that's exactly what you're doing; isn't it?

3        A    Are you referring to the Fred Stalls email?

4    Because we just talking about that document.

5        Q    Okay.  Let's go through these one by one.

6    We'll be here as long as you want to be here,

7    Mr. Allen.

8        A    No.  I'm just trying to confirm which

9    document you're referring to.

10       Q    I know what you're trying to do.  I know

11   what you're trying to do, so we'll just do this the

12   hard way.  Let's look at Exhibit 29.  This is the

13   email, sir, where Melanie asks for the completed loans

14   and closed loans; right?

15       A    Yes.

16       Q    And, certainly, within the cease and desist

17   letter sent on April 29th, this would be what Mutual

18   considers its confidential information; right?

19       A    And I believe -- and I've got the other

20   document I'm looking at.  It would be company records

21   pertaining to customers.  Yeah.  So it has customers

22   on there and completed loans, yeah, on the customers.

1      Q     So after Mutual specifically advises

2   Waterstone that it considers this information

3   confidential, essentially 11 days later, Melanie's

4   asking another current employer, a different current

5   employee to go into its Encompass system and export

6   data; right?

7      A     Again, I can see the request that is made on

8   here.  I can see the, yeah, conversation.

9      Q     Okay.  And then a month later, as we see in

10  Exhibit 45, I believe it is -- hold on.  Maybe it was

11  -- sorry.  42.  My apologies.  That information is

12  apparently provided again after Mutual specifically

13  put Waterstone on notice; right?

14     A     And -- and based on the cease and desist we

15  saw for Chris Wolf?

16     Q     Well, did you think it would be different

17  for Chris Smith?  Is that really your explanation?

18     A     No.  I'm -- I'm just asking -- just, again,

19  I'm trying to make sure I'm looking at the right

20  document, right time.  That's all.

21     Q     Okay.  All right.  So, am I right?

22     A     So, yeah.  I see on Monday, June 13th.  And

Page 202

1    I had said earlier I would not see things exported

2    from somebody's system.  Yeah.

3        Q    Particularly, sir, after they specifically

4    advised you specifically that you're to cease and

5    desist from doing this, and you guys did it again;

6    right?

7        A    I can see the ask on here, and I can read

8    the cease and desist.  And like I said, yeah.  Would

9    not want to see somebody exporting information.  Yeah.

10       Q    Now, in addition, sir -- give me one second.

11            MR. KAREN:  You can take that down,

12   Nick.  Bear with me just one moment.  Sorry about

13   this.  Okay.  Could we go to Exhibit 24?

14            (Exhibit 24 was marked for

15            identification.)

16   BY MR. KAREN:

17       Q    And, sir, you see this the email, if you go

18   below the transmittals to us, from Jen Wilton [sic],

19   and she's sending it to Chris Smith?

20       A    And it's -- I have the paper version.  I

21   don't think it's coming up on the screen though,

22   unless mine's frozen -- oh, there we go.

1      A    Yes.

2      Q    Okay.  And who is Ben Davis?

3      A    Ben works in the Winter Park office.  He

4  originates along with managing -- yeah.  He's a sales

5  manager name.  There's a wide variety of things that

6  he does, but he both helps originators with their

7  deals, knows products really well, things like that.

8      Q    Okay.  Now, here's my question.  At this

9  time, you realize Wolf is still a manager over at

10 Mutual; right?

11     A    Yes.  Correct.

12     Q    Okay.  And we've already talked about how

13 you shouldn't be sending loans over; right?

14     A    Correct.

15     Q    Okay.  And so this is an email on 4/8, and

16 he's sending over, if you look below, he says, "We --

17 a DTI issue.  Just qualify for the house payment."

18 And asks him to look at a loan scenario; right?  You

19 see this?

20     A    Yes.

21     Q    And he's sharing information about the

22 borrower's income; right?

1        A    Right.

2        Q    And if you go down further below, he says,

3    "His tax return had a password, and I entered it to

4    upload.  But I guess it needs it again."  So he's

5    sending a tax return to Ben.  Is that what it looks

6    like to you?

7        A    Yeah.  Appears to be.

8        Q    Okay.  And if you look further down in this

9    email chain --

10             MR. KAREN:  Keep going further down.

11   Okay.  Right there.

12   BY MR. KAREN:

13       Q    This is Chris Wolf saying, "I input app and

14   uploaded docs."  So, I guess, he put an applications

15   and uploaded some documents; right?

16       A    I can see in this emails that's what he

17   stated.

18       Q    Okay.  And then he goes -- further down, it

19   says, "Let me know if you want to reach out to him or

20   have me communicate with him.  He is an email guy."

21   Right?

22       A    Okay.

Page 236

1      Q    Okay.  So in this scenario where Chris Wolf

2   as a manager is sending Ben Davis, who works for

3   Waterstone, information on a current loan scenario and

4   providing documents, including, apparently, a tax

5   return, an application, and some other materials,

6   while he's still a Mutual employee.  Do you see that?

7      A    Yes.

8      Q    Okay.  Now, you're familiar with something

9   called the SAFE Act; right?

10     A    Somewhat.  Yeah.

11     Q    Okay.  You know every loan officer as an

12  NMLS I.D.?

13     A    Yeah.  Yeah.

14     Q    Okay.  And on their NMLS I.D., it has to be

15  registered with a particular company; right?

16     A    Right.

17     Q    Okay.  And the reasons they have that is

18  they don't want borrowers confused as to which company

19  a loan officer works with; right?

20     A    Right.

21     Q    Because you talked about chaos; right?  I

22  mean, if I'm over at Mutual and I'm doing a loan for

Page 292

1    kind of ascertain whether these employees were simply

2    announced the opportunity to come over or actually

3    recruited by their managers?

4        A    And -- and I'm not aware of any conversation

5    anybody had.

6        Q    All right.  Let's go to Exhibit 35.

7            (Exhibit 35 was marked for

8            identification.)

9            Do you see this email?  This is 3/29/2022?

10       A    Yes, I do.

11       Q    Okay.  And this is something called the

12   Hennessey File.  It's Chris Wolf, again, from his

13   private email address sending over a file, and he

14   writes, "Dwayne asked me to send you this file."

15           And there is a HOA rider, a credit report, a

16   1003, a divorce decree.  Obviously document -- no, I

17   shouldn't say obviously.  Appears to be documents that

18   would've been provided to Mutual; right?

19       A    I'm assuming Chris collected them, right, as

20   he was employed with them.  Right.

21       Q    Okay.  And just to kind of speed things

22   along, you know, we've talked about a right way and

Page 293

1   wrong thing.  Send over a file, this would be the

2   wrong way; right?

3                    MS. KREITER:  Object to the form.

4        A     I'd prefer for whatever reason it was, be it

5   a customer choice, decline, whatever it might be that

6   Mike Smalley was the one who would've taken a loan

7   application and secured those documents.  Yeah.

8        Q     Right.  And, again, one of the reasons being

9   that you've got the confidential information.  And

10  you've got a loan officer talking to a borrower that

11  isn't licensed with Waterstone.  I mean, there's some

12  problems there; right?

13                   MS. KREITER:  Object to the form.

14       A     And -- and, again, not knowing is this one

15  of somebody's, example, a good friend and they've

16  talked to them, and, again, they can't do it or for

17  whatever reason.  That's -- that's just throwing that

18  in.  But back to then, yeah, Mike, to me, should've

19  been involved in taking the application and getting

20  the information through our secure portal.

21       Q     Because you agree beyond all these federal

22  laws and stuff -- we talked about some of them, you