# **EXHIBIT H**

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., | * * * |
| Plaintiff, | * |
| vs. | * CIVIL ACTION NO.: * 22-CV-01660 * |
| WATERSTONE MORTGAGE CORPORATION, | * * * |
| Defendant. | * |

- - - - - - - - -

Deposition of BRETT CREASY, taken remotely via Veritext Virtual Zoom, with simultaneous videotape recording, on Wednesday, July 26, 2023, beginning at 9:05 a.m., in Pittsburgh, Pennsylvania, before Ilana E. Johnston, Notary Public.

Reported by:
Ilana E. Johnston (via Zoom)

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

1   APPEARANCES:

2

3   On behalf of Plaintiff Mutual of Omaha Mortgage,

4   Inc. (via Zoom):

5          COURTNEY E. WALTER, ESQUIRE

6          Mitchell Sandler, LLC

7          1120 20th Street, NW, Suite 725

8          Washington, DC 20036

9          202-886-5292 (voice)

10         cwalter@mitchellsandler.com

11

12  On behalf of Defendant Waterstone Mortgage

13  Corporation (via Zoom):

14         MARIA L. KREITER, ESQUIRE

15         Godfrey & Kahn, SC

16         833 East Michigan Street, Suite 1800

17         Milwaukee, Wisconsin 53202

18         414-273-3500 (voice)

19         414-273-5198 (fax)

20         mkreiter@gklaw.com

21

```
 1        ALSO PRESENT: (via Zoom)
 2              Laurel Thomsen, Associate General
 3                 Counsel, Mutual of Omaha Mortgage, Inc.
 4              Adam Cares, Litigation Specialist,
 5                 Godfrey & Kahn, SC
 6              Hayley Rich, Summer Associate,
 7                 Godfrey & Kahn, SC
 8              Ryan Heathcock, Videographer
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

```
 1            I N D E X   O F   W I T N E S S E S
 2
 3      Witness                                           Page
 4      BRETT CREASY
 5      BY MS. WALTER                                       8
 6      BY MS. KREITER                                    162
 7
 8              I N D E X   O F   E X H I B I T S
 9
10      Creasy
11      Exhibits                                         Page
12      Exhibit 1    Report of Brett Creasy                9
13      Exhibit 2    E-mails Bates stamped              131
14                   MOM-0000238 and MOM-0000239
15                   --------------------------
16
17
18
19
20
21
```

Page 20

1   Q.   Mr. Creasy, what is your -- is it --
2   it's Creasy, right?
3   A.   Correct, you got it.
4   Q.   Okay.  What is your hourly rate?
5   A.   It's $400 an hour.
6   Q.   Are you compensated based on whether
7   Waterstone prevails in this action?
8   A.   I am not.
9   Q.   How many hours did you spend drafting
10  the report that's marked as Exhibit 1?
11  A.   Off the top of my head, I'm not sure.  I
12  would imagine it took me a day or two.
13  Q.   A day or two of 24 hours, of 8 hours
14  each?
15  A.   Yeah, probably, you know, call it 8 to
16  16 hours, but to be honest I'm mildly guessing
17  there.
18  Q.   Do you have invoices that would show
19  that?
20  A.   Not directly.  So our invoices would
21  identify work being done on a case but not

1     specifically, you know, X amount of time, you know,
2     specific to drafting a report.
3          Q.   Okay.  So you said you spent
4     approximately 8 to 16 hours or -- 8 to 16 hours on
5     the report.  Can you give an approximate for how
6     many hours you've spent on this case all together?
7          A.   I can give an approximate if you want me
8     to guess.
9          Q.   Sure.
10         A.   I would say it's probably north of 50
11    hours, maybe not north of 100, but I'm guessing.
12         Q.   Okay.  So just generally speaking, and
13    we'll come back to this later, but generally
14    speaking, aside from drafting the report, what
15    would the remainder of those 50 -- approximately 50
16    hours, I'm not holding you to that, what would
17    those hours entail?
18         A.   So the work leading up to the report,
19    everything that was sort of described in the
20    report.
21         Q.   Okay.  And you said that there -- your

Page 77

1  account that was accessed on Waterstone's computer
2  systems?
3        A.   I would say in general that's not
4  possible with the exception that if that malware
5  under your scenario, you know, resides in the
6  personal account and is accessed, if that access
7  triggers some sort of download or communication
8  between the personal account and the work
9  environment, then yes, it could trigger there.
10       Q.   Okay.  And just understanding the, I
11 guess, scope of Waterstone's Microsoft OneDrive
12 environment, so if I'm on Waterstone's computer
13 system and my Gmail account is in a web browser,
14 it's my personal e-mail account, Micro -- or excuse
15 me, Waterstone's Microsoft OneDrive has no ability
16 to detect what's going on within my personal e-mail
17 account unless I download those documents onto
18 Waterstone's computer systems; is that correct?
19           MS. KREITER:  Object to the form.
20       A.   I would say that's generally a good
21 synopsis, yes.

Page 133

1    Q.  Okay.  So you would agree then that what
2 you've described in 7 and 9 as the archival and
3 quarantine process, you don't know if additional
4 e-mails containing confidential information sent
5 after Mr. Howard quarantined or archived those
6 information would have also been subject to archive
7 or quarantine.
8    A.  I don't know for certain, no.
9    Q.  Okay.  All right.  Starting on section
10 E, Supplemental Search Efforts, paragraph 13, so
11 you reviewed the list of Bates numbers.  What is
12 this list?
13    A.  That's described here in 13?
14    Q.  Uh-huh, yes.
15    A.  So that would be the documents
16 identified in Mutual of Omaha's interrogatory
17 responses related to its identified alleged trade
18 secrets, as I sort of call out here.
19    Q.  Okay.  Who provided you with that list?
20    A.  I probably got that court document from
21 counsel for Mutual.

Page 150

1  easier, quarantined data is defined -- I'm sorry.
2  You defined quarantined data as the data that was
3  quarantined from five new hires' OneDrive accounts,
4  correct?
5       A.   Correct.
6       Q.   Okay.  So you essentially only searched
7  the data related to these five new hires' OneDrive
8  accounts to determine whether trade secrets were
9  contained within those accounts.
10      A.   Yes.
11      Q.   Okay.  Are you aware that approximately
12 60 employees left Mutual of Omaha and joined
13 Waterstone?
14           MS. KREITER:  Object to the form.
15      A.   I wasn't aware of the exact number, but
16 I knew it was, you know, a few dozen folks.
17      Q.   Okay.  So is it your testimony that you
18 did not search the remaining employees' data that
19 had not been quarantined for the alleged trade
20 secrets being sent and received?
21           MS. KREITER:  Object to the form.

Page 154

1    before a cease-and-desist letter was received.
2           You would agree with me that the
3    quarantining that you're referring to for purposes
4    of this opinion refers to five e-mail inboxes,
5    correct?
6        A.   Five OneDrive accounts, but yes.
7        Q.   Okay.  Fair enough.  And your summary of
8    opinion in subsection b. relates to what you
9    learned from Mr. Howard, correct?
10       A.   Yes, primarily Mr. Howard and, you know,
11   the documents that we discussed.
12       Q.   And what authority do you rely upon that
13   assists you in reaching that conclusion?
14           MS. KREITER:  Object to the form.
15       A.   I don't know that there's an authority
16   on that.  It's just sort of a fact as I know it
17   that occurred.
18       Q.   Okay.  Fair enough.  And you, again,
19   just to be clear, you don't know the applicable
20   time period for when the quarantine was first
21   implemented, correct?

Page 155

1  A. I mean, it was first started, you know,
2  April 28th, I believe, is when that first started.
3  When it ended I don't know.
4  Q. Okay. And then opinion 3, you state
5  that Waterstone undertook additional efforts with
6  respect to Mutual's alleged trade secrets,
7  including having the former Mutual employees delete
8  any Mutual documents in their personal possession.
9  Can you please point to me where in your
10  report you state or describe that the former
11  employees deleted any of the documents in their
12  personal possession?
13  A. So it's sort of a sum of, I believe,
14  paragraph 10 and then the certification that they
15  supplied in which counsel for Mutual interviewed
16  them and, you know, assisted in that process.
17  Q. Okay. But we -- you testified earlier
18  that you did not interview any -- you yourself have
19  not spoken to any of the former employees, right?
20  A. Correct, I did not speak to them.
21  Q. And so you do not have your own personal