## Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MUTUAL OF OMAHA MORTGAGE, INC.

    Plaintiff,

Vs.    CASE NO: 8:22-cv-01660-TPB-JSS

WATERSTONE MORTGAGE CORPORATION,

    Defendant.
_____/

DEPOSITION OF:  **KILEY KING**

TAKEN:  Pursuant to Notice by Counsel for Defendant

DATE:  June 23, 2023

TIME:  1:20 p.m. to 3:30 p.m.

STENOGRAPHICALLY REPORTED BY:  CHERE J. BARTON, FPR

LOCATION:  Hill Ward Henderson, P.A.
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602

REGENCY REPORTING SERVICE, INC. (813) 224-0224

## Page 2

APPEARANCES:

COURTNEY WALTER, ESQUIRE
Mitchell Sandler LLC
1120 20th Street Northwest
Suite 725
Washington, DC 20036

MARK CARROLL, ESQUIRE (Zoom)
Mutual of Omaha Mortgage, Inc.
100 West 22nd Street
Suite 101
Lombard, Illinois 60148

    Appeared for Plaintiff

MARIA L. KREITER, ESQUIRE (pro hac vice)
Godfrey & Kahn, S.C.
833 East Michigan Street
Suite 1800
Milwaukee, WI 53202

STEPHANIE C. ZIEBELL, ESQUIRE (Zoom)
Waterstone Mortgage Corporation
N25W23255 Paul Road
Pewaukee, Wisconsin 53072

    Appeared for Defendant

REGENCY REPORTING SERVICE, INC. (813) 224-0224

## Page 3

I N D E X

                          Page

EXAMINATION BY MS. KREITER    5

CERTIFICATE OF OATH    103

CERTIFICATE OF REPORTER    104

READ & SIGN LETTER TO WITNESS    105

ERRATA SHEET (forwarded upon completion)    106

REGENCY REPORTING SERVICE, INC. (813) 224-0224

## Page 4

INDEX OF EXHIBITS

                          Page

Defendant's Exhibit No. 29    5
(NMLS Consumer Access
Kiley David King)

Defendant's Exhibit No. 23    61
**(PREVIOUSLY MARKED)**

Defendant's Exhibit No. 7    89
**(PREVIOUSLY MARKED)**

REGENCY REPORTING SERVICE, INC. (813) 224-0224

EXHIBIT F

## Page 89

1  Q. (By Ms. Kreiter) So you have no information
2  about the borrower loans but yet you conclude that they
3  were wrongfully transferred?
4  A. Yes.
5  Q. Why?
6  A. Because that's my conclusion.
7  Q. Do you have any facts that support the conclusion
8  besides what we've talked about today?
9  A. Not that I can think of right now but I probably
10 will.
11 Q. Aside from your conclusion that Waterstone
12 improperly poached employees and took borrower
13 information, is there any other action on the part of
14 Waterstone that you believe is wrongful?
15     MS. WALTER: Objection.
16 A. Not that I can think of right now.
17 Q. (By Ms. Kreiter) Were you at all involved in
18 calculating the damages that Mutual is claiming in this
19 case?
20 A. Personally, no.
21 Q. Do you know who was involved in those efforts?
22 A. No.
23 Q. Take a look at what we've previously marked as
24 deposition Exhibit 7, please. There's two page to the
25 exhibit. The first page has a Bates number MOM-0003484,

## Page 90

1  and then the second page has some analysis on it. Have
2  you seen Exhibit 7 before?
3  A. I cannot see this. I cannot even make out a
4  single thing on it.
5  Q. Okay. I can show it to you on my computer as
6  well. I'll slide my computer over here. Okay. I'm
7  going to show you on my computer it's a two-page
8  document. Do you see in the bottom right-hand corner
9  it's 3484?
10 A. Uh-huh.
11 Q. And do you see the same Bates number on Exhibit
12 7; correct?
13 A. Uh-huh.
14 Q. I'm going to scroll down to the second page, it's
15 more clear on my computer, do you see the spreadsheet on
16 my computer?
17 A. Uh-huh.
18 Q. The column on the left is Year of Funding titled
19 Mutual of Omaha Mortgage Summary of Corporate Earnings,
20 Contributions from Tampa and Daytona Branches. Do you
21 see that?
22 A. Uh-huh.
23 Q. Have you ever seen this second page?
24 A. No.
25 Q. Do you have any knowledge of the confidential

## Page 91

1  information or trade secrets that Mutual is relying on
2  in this case?
3  A. No.
4  Q. You didn't have any role in identifying
5  confidential information or trade secrets?
6  A. What?
7  Q. You didn't have any role in identifying
8  confidential information --
9  A. No.
10 Q. -- or trade secrets --
11 A. No.
12 Q. -- in connection with this case?
13 A. No.
14 Q. With respect to the branches that are at issue
15 who was responsible for going out and identifying
16 realtor partners?
17 A. Dwayne probably.
18 Q. And then Chris Smith for the Tampa branch?
19 A. Yeah. Like I said, they're two different
20 branches, but if they're realtor partners, yeah.
21 Q. Okay. Identifying realtor partners wasn't part
22 of your role?
23 A. No.
24 Q. What about hiring LOs, was that something that
25 was within the jurisdiction of Dwayne Hutto and Chris

## Page 92

1  Smith?
2  A. I helped them board a lot their employees.
3  Q. Did Mr. Smith or Mr. Hutto ever express a desire
4  to bring on an LO and then you or Mr. Tomalak or someone
5  else at Mutual vetoed?
6     MS. WALTER: Objection.
7  A. I don't know if we necessarily vetoed or had
8  conversations as to why or what or -- you know.
9  Q. I mean, you would agree that Mr. Smith and Mr.
10 Hutto had discretion to the employees that would be
11 coming into their branches; correct?
12 A. Ultimately, yeah.
13 Q. And I think we talked about the lease at the
14 Daytona office, but both of the leases for Tampa and
15 Daytona, those were in the name of Mr. Hutto, Mr. Smith
16 or an LLC they controlled; correct?
17 A. I don't know if Dwayne's was or not. Chris's
18 wasn't, and then I think it changed, and I think
19 initially it was under our name, under BBMC's name.
20 Q. Let's talk about the time period in 2022 before
21 the branches departed. In 2022 the lease for the
22 Daytona office was in either Dwayne's name or an LLC
23 that Dwayne Hutto controlled; correct?
24 A. I don't know.
25 Q. With respect to the Tampa office the lease was in