Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
 3
 4   MUTUAL OF OMAHA
     MORTGAGE, INC.,
 5
 6      Plaintiff,
 7
     vs.                              CASE NO.:  8:22-cv-01660
 8
 9   WATERSTONE MORTGAGE
     CORPORATION,
10
11      Defendant.
12
     _____
13
14
15            DEPOSITION OF CHRISTINE M. LEYDEN
         (As Designated Corporate Representative of Plaintiff)
16
17
18          DATE TAKEN:     Monday, August 19, 2024
19          TIME:           9:05 a.m. to 2:40 p.m.
20          PLACE:          Hill, Ward & Henderson, P.A.
                            101 East Kennedy Boulevard
21                          Suite 3700
                            Tampa, Florida
22
            TAKEN BEFORE:   SHARON A. HARBITZ
23                          Notary Public, State of Florida
                            Commission No. HH 396554
24                          Expires:  7/15/27
25
```

EXHIBIT B

| Page 26 | Page 28 |
|---|---|
| 1  Q.  So with respect to D'Ettore, that was a loan that was<br>2 approved by Mutual.<br>3      Do you have an understanding as to why that loan did<br>4 not close at Mutual?<br>5  A.  I don't know.  I would have to look at the file.<br>6  Q.  Do you have an understanding as to why any of these<br>7 borrowers -- strike that.<br>8      Did any of these borrowers close loans at Mutual?<br>9  A.  I don't believe so, but I'm not certain.<br>10  Q.  Did you look at that before the deposition today?<br>11  A.  To see if they closed maybe a different loan, or these<br>12 specific loan numbers?<br>13  Q.  These specific loans.<br>14  A.  I don't believe that any of the loans closed.<br>15  Q.  Are you able to say whether any of these borrowers<br>16 closed loans with Waterstone?<br>17  A.  I'm not sure.  I don't know.<br>18  Q.  Does Mutual have any evidence that somebody at<br>19 Waterstone asked one of the former Mutual employees to transfer<br>20 over the Brown loan?<br>21  A.  I don't know exactly what information was sent over<br>22 from Encompass, so I can't say that it was or wasn't.<br>23  Q.  I'm not asking about Encompass information now.  Let's<br>24 move away from that temporarily.  My question is with respect to<br>25 the Brown loan. | 1      Does Mutual have any evidence that Waterstone also<br>2 asked the employees to transfer actual loans and borrowers from<br>3 Mutual to Waterstone?<br>4      MS. THOMAS:  Object to form.<br>5  A.  In my mind, asking for a pipeline is the same thing as<br>6 asking for a loan.  So did they say "send over the Brown file"?<br>7 No.<br>8      But if they said "send over your pipeline," then I<br>9 would think that the Brown loan would be included in that.<br>10 BY MS. KREITER:<br>11  Q.  Are you aware of anyone asking that the Brown loan<br>12 file be sent from Mutual to Waterstone?<br>13  A.  Brown specifically, no.<br>14  Q.  **What about any of these?  Are you aware of any**<br>15 **evidence that somebody at Waterstone asked that these particular**<br>16 **borrower files be sent from Mutual to Waterstone?**<br>17  A.  **Specifically, no.**<br>18  Q.  With respect to the three loans, response to<br>19 Interrogatory No. 28 indicates that the loan was denied.  So<br>20 that would be Castaneda, Kemp, and Ryan.<br>21      Focusing on those three, why is Mutual claiming that<br>22 loans denied are trade secrets?<br>23  A.  Because there's still a potential for an opportunity<br>24 for a loan.  Loans can be denied for a number of reasons and are<br>25 very often resuscitated, for lack of a better word. |

| Page 27 | Page 29 |
|---|---|
| 1      Did anybody at Waterstone ask one of the former<br>2 employees to try to transfer over the Brown loan from Mutual to<br>3 Waterstone?<br>4  A.  I believe I saw an email that said "get your databases<br>5 over here," which would include loans in process.  So specific<br>6 to the Brown loan, no, but an overreaching email saying "we want<br>7 your databases and pipelines," yes.<br>8  Q.  Okay.  Divorce closed loan databases and information,<br>9 and I want you to focus on the actual loan opportunity now.<br>10  A.  But a database is not only closed loans.  There's also<br>11 a database of opportunities that's another -- that's why I can't<br>12 really divorce them, but -- so if they asked for loans in the<br>13 pipeline, then, yes, Brown would probably had been included in<br>14 that; or if they asked for "your database of potential<br>15 customers," then, yes, Brown was probably included on that, but<br>16 I don't -- I can't say with 100 percent certainty that it was.<br>17  Q.  Did you see any emails indicating that a Waterstone<br>18 representative had communicated to a Mutual employee the goal of<br>19 transferring loans from Mutual to Waterstone?<br>20  A.  Loans specifically, no, but I saw database and<br>21 pipeline.<br>22  Q.  Sure.  And that's what I'm trying to just distinguish.<br>23 I understand you loud and clear there were requests by<br>24 Waterstone to transfer data and databases related to the<br>25 borrowers. | 1      A loan could be denied because there's an issue with<br>2 the property, and then the borrower goes and takes care of those<br>3 issues, and then it's qualified.<br>4      It could be a situation where there's not sufficient<br>5 assets, and the borrower can get a gift from a family member,<br>6 and then there are sufficient assets.<br>7      And it could just be a situation where they maybe<br>8 don't have enough time on the job, but in a couple of months,<br>9 they will.<br>10      So there's still definitely -- we have all of the<br>11 information to move forward with that loan.  It's just at the<br>12 current time it doesn't necessarily qualify, but that doesn't<br>13 mean that there's not a potential later on.<br>14  Q.  Why was the Kemp loan denied?<br>15  A.  I don't recall.  I'm not certain.  I think that Kemp<br>16 was denied because of a credit score, but I'm not 100 percent<br>17 certain.<br>18      And I think Ryan was due to property.  It was a<br>19 single-wide.  I could have them mixed up, though.<br>20  Q.  That the Ryan loan was denied because of?<br>21  A.  It was a single-wide manufactured home, and it didn't<br>22 qualify because of the property.<br>23  Q.  Do you agree that it's the loan officer who has the<br>24 best relationship with the particular borrower?<br>25  A.  Not always. |

Page 74

1  MS. KREITER: -- but I -- it wasn't intended to be.
2  MS. THOMAS: Okay. Yes. Thank you.
3  MS. KREITER: Okay. I'll just put on the record we
4  may need to continue the deposition in light of the
5  witness' testimony about her lack of familiarity with
6  Exhibit 4.
7  MS. THOMAS: And if I may, I think Exhibit 4, maybe
8  she might -- this page, but the exhibits that -- that's why
9  I was trying to ask for the clarification, for my own sake.
10  She is prepared to talk about the exhibits.
11  MS. KREITER: Okay. But I think I need to understand
12  why are certain documents a trade secret versus not, and it
13  sounds like the witness is not able to tell me that.
14 BY MS. KREITER:
15  Q. Are you able to tell me why certain documents --
16  A. I don't know what these ones are that are listed as
17 accompanying exhibits.
18 BY MS. KREITER:
19  Q. And you're not able to tell me why certain documents
20 are a trade secret versus accompanying exhibit?
21  A. Not without looking at it in detail.
22  Q. Was there anyone at Mutual involved in identifying the
23 alleged trade secrets besides counsel?
24  MS. THOMAS: Object to form.
25  A. I'm not sure.

Page 75

1 BY MS. KREITER:
2  Q. Do you know whether Mr. Gennarelli was involved?
3  A. I don't know.
4  Q. Do you know whether Mr. Mayle was involved?
5  A. I don't know.
6  Q. You were not involved?
7  A. No.
8  Q. What damages has Mutual suffered as a result of the
9 Thompson loan trade secret?
10  MS. THOMAS: Object to form.
11  A. I can't put a dollar amount on a specific loan file
12 for damages. It's the information in its entirety.
13 BY MS. KREITER:
14  Q. Okay. What damages has Mutual suffered with respect
15 to the Calle loan trade secret?
16  A. Same answer.
17  MS. THOMAS: Object to form.
18 BY MS. KREITER:
19  Q. What damages has Mutual suffered with respect to the
20 Columbis loan trade secret?
21  MS. THOMAS: Objection to form.
22  A. Same answer.
23 BY MS. KREITER:
24  Q. And do you know whether Calle, Thompson, or Columbis
25 closed at Waterstone?

Page 76

1  A. I don't know.
2  Q. Do you know whether these loans would have closed at
3 Mutual but for the sending of the Encompass database?
4  A. I don't know that, but I don't know that -- it's also
5 not about the specific loan. It's about Mutual's reputation and
6 our protection of privacy. It's about all of the information
7 that was taken in its entirety.
8  Q. What damages has Mutual suffered because of the Tyson
9 loan trade secret?
10  MS. THOMAS: Object to form.
11  A. Again, it goes to the entirety of the information, not
12 a specific loan file.
13 BY MS. KREITER:
14  Q. Are you able to say what specific dollar amount of
15 damages Mutual has suffered because of the Tyson loan trade
16 secret?
17  A. It's not about a specific loan, so, no.
18  Q. No. And you're not able to tell me the dollar amount
19 of damages associated with each of these loans, not just Tyson,
20 correct?
21  MS. THOMAS: Object to form.
22  A. Specifically, no, not by themselves.
23 BY MS. KREITER:
24  Q. Why were these handful of loans as picked as trade
25 secrets as opposed to any other loan?

Page 77

1  A. Because I believe this information was transferred
2 over to Waterstone.
3  Q. What if the borrower says "send my loan file over to
4 Waterstone. That's what I want," is that still misappropriation
5 of trade secrets in your mind?
6  A. Yes.
7  Q. Does the borrower have a right to ask that his or her
8 loan application be sent to a different lender?
9  A. They have a right to apply with a different lender.
10 They don't have a right to ask that their application be sent
11 over.
12  Q. Who owns the borrower loan application?
13  A. Mutual of Omaha.
14  Q. And the borrower has no ownership interest in that
15 application?
16  A. I don't believe so.
17  Q. Does the borrower have an ownership interest in the
18 information input on the loan information?
19  A. It's their information. They can share that
20 information with whoever they wish, but they can't take it from
21 us.
22  Q. Sure. If a borrower made a request to Mutual for his
23 or her loan application, would that request be denied?
24  A. It would be sent to them, not to someone else.
25  Q. Sure. So the borrower has a right to their loan

### Page 90

1 perspective?
2   A. Yes.
3   Q. Going back to Deposition Exhibit No. 7, do you know
4 whether that was part of a Mutual loan file?
5   A. I would say -- I would assume, yes, but, no, I don't
6 know specifically.
7   Q. What about Deposition Exhibit No. 6, is that part of a
8 Mutual loan file?
9   A. Again, I would assume so, but I don't know
10 specifically.
11   Q. Take a look at Deposition Exhibit 10, please.
12 Deposition Exhibit 10 is a court pleading captioned "Final
13 Judgment of Dissolution of Marriage," and you see a file stamped
14 date December 1, 2021.
15       Do you see that?
16   A. Yes.
17   Q. Does Mutual contend that Deposition Exhibit 10 is its
18 trade secret?
19   A. I would contend that it is a trade secret in
20 conjunction with the rest of the loan file.
21   Q. Do you contend that Exhibit 10 was part of a loan file
22 belonging to Mutual?
23   A. I would assume so.
24   Q. Do you know whether it is or not?
25   A. I don't know why else we would have it, but not a

### Page 91

1 hundred percent certainty. I could look it up.
2   Q. And you would agree that the borrower has an ownership
3 interest in Exhibit 10, correct?
4   A. Yes.
5   Q. And you would agree that court filings are public
6 record and not secret at all, correct?
7   A. Correct.
8       MS. KREITER: I could use just a short break, if
9 that's okay with you.
10      MS. THOMAS: Sure.
11      (There was a brief recess.)
12 BY MS. KREITER:
13   Q. Could Waterstone have simply reached out to the
14 borrowers and obtained their driver's license, other information
15 necessary to close a loan at Waterstone?
16   A. They could have, but they wouldn't have known that
17 this borrower was willing and able to go with -- to submit a
18 loan application without being employed by Mutual first.
19   Q. How do you know that?
20   A. Because they worked there when the borrower applied.
21   Q. Okay. But how do you know that it wasn't a case where
22 the employees resigned from Mutual and the borrower says "I'd
23 like to go to Waterstone"?
24   A. We had the borrowers' application processed, the ones
25 we're referring to, at Mutual. So I don't think that it's -- it

### Page 92

1 seems -- there's hundreds of -- or at least thousands of
2 mortgage companies.
3       I'm not sure if you think the borrower just randomly
4 selected Waterstone out of all of those mortgage companies.
5       Is that what you're saying?
6   Q. Yeah. I mean, like, what if the borrower is a friend
7 of Dwayne Hutto and says "I want to close my loan with Dwayne"?
8   A. Then they should have applied with Waterstone and
9 taken the information from Mutual.
10   Q. Do you know whether the borrower said "look, I want to
11 close with Waterstone. Send my loan file"?
12   A. Doesn't matter if they said that. It's Mutual's loan
13 file. They would have to re-upload their information into
14 Waterstone.
15   Q. Do you know whether these borrowers did in fact
16 re-upload their information at Waterstone?
17   A. I don't.
18   Q. And to be clear, Mutual doesn't have any evidence of
19 either way whether the former employees actually used these
20 borrower files, uploaded them, and processed the loans at
21 Waterstone based on information provided to Mutual, correct?
22      MS. THOMAS: Object to form.
23   A. Other than the fact that they left, I don't know that.
24 BY MS. KREITER:
25   Q. That who left?

### Page 93

1   A. The employees. The branches left, and I don't know
2 that they would have if they didn't have access to their
3 database.
4   Q. No. I'm talking about the borrowers, not the
5 employees.
6       Do you know one way or another whether the employees
7 submitted loan applications at Waterstone?
8       MS. THOMAS: Object to form. You said "employees."
9       MS. KREITER: Thank you.
10 BY MS. KREITER:
11   Q. Do you know one way or another whether the borrowers
12 submitted loan applications at Waterstone?
13   A. I don't.
14   Q. Do you know one way or another whether Waterstone's IT
15 department quarantined some of the borrower information that was
16 sent from Mutual?
17      MS. THOMAS: Object to form.
18   A. I don't know that.
19 BY MS. KREITER:
20   Q. Would it matter to you from a perspective of the trade
21 secret misappropriation claims whether Waterstone used any of
22 the borrower files?
23      MS. THOMAS: Object to form.
24   A. No.
25          * * * * *

Page 130

1  A. Correct.
2  Q. Okay. So then the response to Interrogatory 26
3  identifies the loans closed by the particular loan officers that
4  are associated with trade secret misappropriation, correct?
5  A. Correct.
6  Q. Do you have reason to believe that Cherrie Smith
7  engaged in trade secret misappropriation?
8  A. Not to my knowledge. I don't know.
9  Q. Why is Mutual claiming that the Thompson loan supports
10 its trade secret claims if its current employee was the point of
11 contact for that loan?
12      MS. THOMAS: Object to form.
13 A. Well, because I don't think that it was the employee
14 that misappropriated the information. I think it was still
15 Mutual's trade secret that was given to someone else. I don't
16 think Cherrie had anything to do with it.
17 BY MS. KREITER:
18 Q. Is Cherrie the person that submitted the loan
19 information to Waterstone?
20 A. I don't believe so.
21 Q. Who did?
22 A. I don't know who did. I don't know how they got the
23 information. I don't know if it was from the Encompass data or
24 if it was from one of the other loan officers that took that
25 information. I don't know. There is no evidence that it was

Page 131

1  Cherrie.
2  Q. Do you know whether Ms. Smith sought to join
3  Waterstone?
4  A. I don't know.
5  Q. Do you know why Ms. Smith remained at Mutual when a
6  number of other employees did not?
7  A. I don't.
8  Q. Sorry. You might have said, but maybe I'm not clear.
9  I just want to ask again.
10     Is it Mutual's position that Ms. Smith engaged in
11 trade secret misappropriation?
12 A. I don't believe she did.
13 Q. Okay. In response to Interrogatory No. 26, you can
14 see the loans that were closed by each individual in different
15 years.
16     Do you see that?
17 A. Yes.
18 Q. Ms. Smith, doing quite well in 2020, she's got 65
19 loans. 2021, another good year, 48 loans. 2022, three loans.
20     Do you think that that drop in production by Ms. Smith
21 is associated with the departure of the branches?
22 A. I don't know.
23 Q. Do you believe that the drop in production for any of
24 these loan officers is due to their departure from Mutual?
25     MS. THOMAS: Object to form.

Page 132

1  A. I don't know.
2  BY MS. KREITER:
3  Q. Who is Adam Wenner?
4     (The court reporter requested repetition.)
5  BY MS. KREITER:
6  Q. W-E-N-N-E-R. He's a associated with the Mcintosh
7  loan.
8  A. I don't know him personally. I don't know what his
9  position was.
10 Q. Is he still working for Mutual?
11 A. I don't believe so, but I don't know for sure.
12 Q. So he's designated as the loan officer, but then if
13 you look at the response to Interrogatory 26, Mr. Wenner has
14 never closed a loan going back to 2019, correct?
15 A. Looks like that.
16 Q. Is it Mutual's position that Mr. Wenner engaged in
17 trade secret misappropriation?
18     MS. THOMAS: Object to form.
19 A. I don't know.
20 BY MS. KREITER:
21 Q. Did Fred Stalls engage in trade secret
22 misappropriation with respect to the Kugelman loan?
23     MS. THOMAS: Object to form.
24 A. I don't know.
25            * * * * *

Page 133

1  BY MS. KREITER:
2  Q. Did Krystin Friebis engage in trade secret
3  misappropriation with respect to the Ryan loan?
4     MS. THOMAS: Object to form.
5  A. I don't know.
6  BY MS. KREITER:
7  Q. Did Mr. Hutto or Ms. Johnson engage in trade secret
8  misappropriation with respect to the Tariq loan?
9     MS. THOMAS: Form.
10 A. I don't know about the specific loan, no.
11 BY MS. KREITER:
12 Q. With respect to any of the borrowers listed, do you
13 have reason to believe that the loan officer listed engaged in
14 trade secret misappropriation?
15     MS. THOMAS: Form.
16 A. I mean, I know that I saw emails from Chris Wolf
17 saying that he was going to transfer over data. I don't know
18 what data was sent, so it could be. But other than that, I
19 don't have any specific knowledge of anyone else.
20 BY MS. KREITER:
21 Q. Okay. So, for example, William Henry, Jr., who is
22 listed as a loan officer and associated with the Tyson loan, do
23 you believe that Mr. Henry engaged in trade secret
24 misappropriation?
25     MS. THOMAS: Form.

|  | Page 134 |
|---|---|
| 1 | A. Personally maybe not. I don't know. |
| 2 | BY MS. KREITER: |
| 3 | Q. Do you know any of the loan officers or other |
| 4 | personnel listed in response to Interrogatory 25? |
| 5 | A. What do you mean? |
| 6 | Q. Yeah, I'll clarify. Michael Irish, have you ever met |
| 7 | him? |
| 8 | A. Not sure. |
| 9 | Q. Which of the loan officers and other personnel listed |
| 10 | in response to Interrogatory 25 have you personally met? |
| 11 | A. I've met Dwayne Hutto, Brian Tomalak, Chris Wolf, |
| 12 | Cherrie Smith. And I may have met others that I don't recall, |
| 13 | but those are the ones I know I've met. |
| 14 | Q. So Mutual is not claiming that these persons engaged |
| 15 | in trade secret misappropriation? |
| 16 | MS. THOMAS: Form. |
| 17 | A. Not personally. |
| 18 | BY MS. KREITER: |
| 19 | Q. But it was Waterstone that engaged in trade secret |
| 20 | misappropriation with respect to all of these borrowers? |
| 21 | A. I believe so, with the loan officer. |
| 22 | Q. Well, which loan officer? For example -- |
| 23 | A. Well, I don't have specifics, because it's not about a |
| 24 | specific loan file. It's about all of the information that was |
| 25 | sent -- requested from and sent to Waterstone. |

|  | Page 135 |
|---|---|
| 1 | I think it's hard to pinpoint a specific loan file |
| 2 | when there was a multitude of information that was sent over |
| 3 | requested by Waterstone and sent to Waterstone. |
| 4 | And if they didn't have that information, these people |
| 5 | wouldn't have left. So I don't -- I'm struggling with a |
| 6 | specific loan file. |
| 7 | Can I say for a fact here before you that Adam Wenner |
| 8 | sent information personally? No. |
| 9 | But I know that Waterstone asked for information, and |
| 10 | it was sent. And if they didn't have access to that information |
| 11 | that likely these people wouldn't have left, and they left. |
| 12 | Q. Okay. You've said a couple times at the deposition |
| 13 | that you believe the employees left because they knew they were |
| 14 | going to take their closed loan database. Is that accurate? |
| 15 | A. I believe so, yeah. |
| 16 | Q. Let's talk about the timing. I mean, do you know |
| 17 | whether the employees decided to leave Mutual before or after |
| 18 | the Encompass data was sent to Waterstone? |
| 19 | A. I don't know, but I do know that based on an email |
| 20 | that I read that the data was important to them, the loan files. |
| 21 | It said "this is a big one. Got to get this information over." |
| 22 | Q. And that's the email that we -- |
| 23 | A. Talked about earlier, yes. |
| 24 | Q. Okay. And you've had a chance to look at that email. |
| 25 | Who are the parties to that email? |

|  | Page 136 |
|---|---|
| 1 | A. I didn't memorize it. It's in there, but I believe |
| 2 | Chris Wolf was involved. |
| 3 | Q. Okay. So what does Chris Wolf's departure have |
| 4 | anything to do with Michael Irish, for example? |
| 5 | A. Well, I think Chris Wolf was the one who was on the |
| 6 | email communicating with Waterstone, who was requesting the |
| 7 | information. |
| 8 | So I think it was everyone's information. I don't |
| 9 | think it was specific to Chris Wolf's information. |
| 10 | Q. Forget about Dwayne Hutto and Chris Wolf and |
| 11 | Chris Smith, the managers. So put them to the side for a |
| 12 | minute. |
| 13 | With respect to the branch -- the downstream branch |
| 14 | employees -- I'm just looking for a way to categorize them -- |
| 15 | the employees that reported up to those three managers, I mean, |
| 16 | do you have reason to believe that those employees were aware |
| 17 | that the Encompass information was going to be sent to |
| 18 | Waterstone? |
| 19 | MS. THOMAS: Object to form. |
| 20 | A. I'd have to review the emails, but I believe that they |
| 21 | knew that their files were going to get moved over. |
| 22 | BY MS. KREITER: |
| 23 | Q. When you say "their files," I want to be clear. The |
| 24 | Encompass loan database, I mean, do you believe that -- |
| 25 | A. Or borrower information that they had in their |

|  | Page 137 |
|---|---|
| 1 | possession while employed by Mutual. |
| 2 | Q. You believe that all the branch employees knew that? |
| 3 | A. I don't know if all of them knew it. I would believe |
| 4 | that some of them knew it, yes. |
| 5 | Q. Okay. Let's talk about Mr. Irish. Do you have |
| 6 | evidence that Mr. Irish knew the Encompass loan information was |
| 7 | being sent to Waterstone? |
| 8 | MS. THOMAS: Form. |
| 9 | A. I don't know if he knew that the Encompass and the |
| 10 | loan information was being mapped over to Waterstone. |
| 11 | BY MS. KREITER: |
| 12 | Q. Do you know if Mr. Irish decided to go to Waterstone |
| 13 | before or after he learned that the -- |
| 14 | A. I don't know that. |
| 15 | Q. -- Encompass information was sent? |
| 16 | A. I don't know. I just know he left after the |
| 17 | information was sent. |
| 18 | Q. Sure. So I guess that's what I'm trying to |
| 19 | understand. |
| 20 | Is there actually evidence, or is it an assumption on |
| 21 | the part of Mutual that this Encompass data relates to the |
| 22 | departure of the branches, or is it an assumption on the part of |
| 23 | Mutual? |
| 24 | MS. THOMAS: Form. |
| 25 | * * * * * |

35 (Pages 134 - 137)