## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MUTUAL OF OMAHA
MORTGAGE, INC.,

        Plaintiff,               CASE NO.: 8:22-cv-1660-AEP

v.

WATERSTONE MORTGAGE
CORPORATION,

        Defendant.

_____

## <u>JOINT PRE-TRIAL STATEMENT</u>

Pursuant to Local Rule 3.06 and the Court's Case Management and Scheduling Order (D.E. 34), Plaintiff, Mutual of Omaha Mortgage, Inc. ("Plaintiff" Or "Mutual"), and Defendant, Waterstone Mortgage Corporation ("Defendant" or "Waterstone") (together with Mutual, "the Parties"), respectfully submit this Joint Pretrial Statement (the "Statement") regarding the jury trial scheduled to commence March 10, 2025.

Given the pending motions before this Court, the parties respectively reserve their rights to make such amendments and file this pre-trial without waiver to amendments or positions that may be adopted, modified, or included based upon such rulings by this Court. It is further agreed that the parties may propose

modifications to this Statement, and the attached exhibits, for good cause and subject to the Court's approval.

## I.   STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(a)(1), and 1367(a). The Parties do not contest this Court's jurisdiction.

## II.   CONCISE STATEMENT OF THE NATURE OF THE ACTION

This case is based on the departure of two of Mutual's branch offices in Tampa and Daytona, Florida. The former employees and their branch managers left Mutual and joined Waterstone, with a group of employees leaving Mutual's Daytona Branch on April 15, 2022, additional employees, including the Branch Managers, leaving the Daytona Branch on April 26, 2022 and additional employees, including the Branch Managers leaving the Tampa Branch on June 15, 2022. Mutual brought suit against Waterstone in July, 2022 alleging that in concert with and acting through Mutual's Branch Managers in Daytona and Tampa, Waterstone engaged in unlawful actions including misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 (Claim I), misappropriation of trade secrets under the Florida Trade Secrets Act (Claim II), tortious interference with contract (Claim III), and aiding and abetting breach of fiduciary duty (Claim IV).

Waterstone denies any wrongdoing and denies Mutual has established its alleged damages. Waterstone alleges it was free to recruit and hire the Branch

Managers, as well as the additional at-will employees that moved with the Branch Managers and sought employment with Waterstone.

### III.  CONTENTIONS OF THE PARTIES

#### A. Plaintiff's Statement of its Position

Mutual seeks to hold Waterstone liable for its orchestrated scheme that resulted in the total destruction of Mutual's business operations in the State of Florida ("Mutual Florida").  Waterstone facilitated, assisted and encouraged three of Mutual's then-branch managers—Christopher Smith, Dwayne Hutto, and Christopher Wolf (collectively, the "Departed Managers")—to utilize their access to Mutual's proprietary information and the position of trust and authority over the employees they supervised to lift-out the entirety of Mutual Florida Operations to Waterstone. The theft of the Florida Operations was possible due to the wrongful acts of the Departed Managers – which Waterstone facilitated, incentivized, and encouraged to move all aspects of the operation – staff, confidential information, trade secrets, and management simultaneously and seamlessly allowing business to continue virtually uninterrupted, avoiding the typical risks and challenges associated with any typical job change. Moreover, by diverting loans and information, Waterstone avoided significant barriers to job changes in a commissioned sales environment because employees would not lose a pipeline of pending loans and would not lose access to customer lists that would facilitate the procurement of future

3

customers. The diversion of business opportunities and the misappropriation of trade secrets were used to fund and to facilitate the seamless transition of the business and eliminate naturally barriers to job changes for commissioned staff reliant on Mutual's trade secrets for continued business opportunities. All of this was done in a premeditated fashion, with full awareness of and complete indifference to the wrongful nature of the Departed Managers' conduct. All of these wrongful actions aided, abetted, and adopted by Waterstone facilitated the theft of Mutual's Florida Operations that would not have occurred but for the combination of these tortious and wrongful activities. As a result Mutual is entitled to lost profits from the Branches, punitive damages, attorney's fees, and/or exemplary damages under the Defend Trade Secrets Act and Florida Uniform Trade Secrets, as well as pre and post-judgment interest.

## B. Defendant's Statement of its Position

Waterstone hired the branch managers of Mutual's Daytona and Tampa offices who were unhappy at Mutual and had been vetting several alternate employers for months due to Mutual's inability to timely close loans; inadequate products, support, and resources; frustrations related to the compensation taken on their production by Mutual's regional managers; and frustration with Mutual's leadership. They were treated poorly and losing customers. They did not see a future at Mutual.

The resignations had nothing to do with any alleged trade secret misappropriation. The managers did provide a customer list to Waterstone but that was after the managers decided to resign. And, the managers did not view the lists as inappropriate to provide because the network listed is the fruit of their own efforts. In addition, the names and other information of any use are publicly available and could be easily recreated. In fact, when the managers left Waterstone, they did not have any list but yet still resigned. There again, the customer list was not a causal consideration.

The same is true with respect to Mutual's claims based on profit and lost statement transmittal and the transmittal of select borrower documents. The correspondence was exchanged but it had no bearing on whether the branches would stay or leave: the information was entirely irrelevant. Mutual resorts to claims of mind reading and will have only unsupported speculation — not evidence — in its case-in-chief upon which to base its trade secret claims that Mutual now tries to hoist into the spotlight.

Further, when the managers resigned, most of the branch employees they have worked with for years followed the managers to Waterstone. This is natural because the branches have moved together in the past—including to Mutual—and the managers have positive personal and professional relationships with the

employees who work for them. The desire to follow the managers has nothing to do with any alleged wrongdoing by Waterstone.

In addition, the managers have operated from the Daytona and Tampa offices for years. They hold the lease for the office space, cover all expenses, and independently run the branches. Most branch employees have no personal relationship with Mutual's leadership. While the managers affiliated with Mutual for a time, they had the right to affiliate with a different lender. Doing so does not mean that Waterstone engaged in wrongdoing. It simply means employees saw the benefit of changing employers, as they have done a number of times in the past.

Mutual took no discovery as to the branch employees to understand the reasons they resigned. Mutual's corporate representative testified at length about the transient nature of the mortgage industry, admitting that it is not uncommon for an entire branch of employees to transition to another company and that, in fact, the same employees in this case had previously followed their branch managers to Mutual. Yet, Mutual made no effort to understand the manager-employee relationship or to ask the employees why they resigned.

The branch employees, including top producers, will testify they left Mutual for a host of reasons including their personal friendships and relationships with the branch managers as well as an adverse view of a future at Mutual. One top producer even resigned shortly *before* the managers disclosed their departure

6

because the employee was frustrated with Mutual's inability to timely close loans. Mutual unquestionably caused the employee's departure, not the managers or Waterstone.

## IV.   **LIST OF EXHIBITS**

Pursuant to the Court's December 16, 2024 e-mail to counsel, the Parties will file their exhibits lists in CMECF by March 5, 2025, and provide a USB thumb drive containing the pre-marked exhibits.

The Parties stipulate to the authenticity of exhibits to the extent a document was produced in discovery. There is no need for a records custodian to establish facts necessary for admission. By this stipulation, the parties do not waive other objections to admissibility.

## V.   **LIST OF WITNESSES**

Pursuant to the Court's December 16, 2024 e-mail to counsel, the Parties will file their respective fact and expert witness lists in CMECF by March 5, 2025.

The Parties agree to treat the opposing party's employees or representatives as adverse witnesses for purposes of cross-examination. The Parties have agreed that to the extent one party elects to call an employee or former employee of the opposing party that is represented by the opposing party's counsel, the party calling the witness may utilize leading questions. The Parties also agree to make all properly named witnesses employed by the parties available to the other side for testimony

without the need for trial subpoenas or trial depositions, including out of state party employees.

Counsel shall use best efforts to provide notice of the witnesses expected to testify at least one day in advance of the witnesses' testimony.

## VI.    THE TYPE AND AMOUNT OF MONETARY DAMAGES

### A. Plaintiff's Position

For each of the four claims at issue in Plaintiff's Amended Complaint, Plaintiff intends to seek its lost profit damages of approximately $3.40-3.51 million dollars associated with the closure of Mutual Florida's operations as a result of Waterstone's wrongdoing.[1]

With respect to Plaintiff's misappropriation claims, Plaintiff also intends to seek exemplary damages as to all of the misappropriation claims for which Defendant is found liable. If a jury were to find Plaintiff successful on at least *one* of its twenty-two trade secrets for which Mutual claims Waterstone misappropriated, Plaintiff will potentially be entitled to approximately $6.8 to $7 million in damages under the exemplary damages provisions of the Defend Trade Secrets Act and Florida Uniform Trade Secrets Act. In addition, Mutual has a claim for punitive

---

[1] Mutual's damages expert, Ms. Candice Rosevear is supplementing with updated damages figures to reflect actual data, which may slightly alter the numbers presented in this Section VI.

damages arising out the intentional and negligent conduct of Waterstone for its willful and malicious misappropriation of trade secrets.

Plaintiff also seeks pre-and-post-judgment interest, costs and attorneys' fees.

**B. Defendant's Position**

      a. <u>*Lost Profit Damages Based on Branch Departures*</u>.

Mutual has not suffered any loss. The branches were temporarily with Waterstone but have now all left for third party lenders. During the short time the branches affiliated with Waterstone, they were not profitable. This was so industry wide. Profits peaked across the market in 2020 with the COVID-19 pandemic and continued in 2021. That changed by late 2022 when the branches went to Waterstone due to the changing interest rate environment. Losses across the market continued in 2024 through the time when the branches ultimately left Waterstone. The only way Mutual can claim any damages is by its expert, Candice Rosevear, relying on data from the COVID-19 boom rather than (i) actual loans volume closed at Waterstone during the time Mutual contends the branches would have remained with it and (ii) actual profit margins. Rosevear also claims the branches would have stayed with Mutual for 30 additional months: they did not even stay with Waterstone where the managers were happy for 30 months, let alone Mutual where they were vocal about their displeasure and actively looking for a new lender to affiliate with for many months. Mutual's own projections indicate margins of 28 basis points and 14

basis points for 2022 and 2023, with its fact witnesses admitting those expected profits never came to fruition. Reality was much worse. The entire industry was losing money on every loan in late 2022 and 2023—not generating a profit on each loan as Mutual claims. Divorced from reality, Rosevear uses 77.9 and 91.3 basis points and attempts to create damages that do not exist. As such, Mutual's maximum lost profit damages are far less than the $3.40-3.51million claimed by Rosevear. Judge Barber's March 29, 2024 decision that Mutual cannot include profits attributable to its former branch managers or the Paramus branch employees in its lost profit damages translates to Mutual seeking a *maximum* of $1,614,605. Even this figure assumes profits would have been generated: all data indicates that is not the case: the damages are zero. Waterstone is the one with losses because it carried the branches during the time they were losing money, not generating profits.

Further, Judge Barber held Mutual has not identified any evidence to support any duration of lost profit damages:

> In their lost profits analyses, both Gennarelli and Rosevear [Mutual's damages witnesses] appear to assume that the Tampa and Daytona branches would have otherwise continued operating into perpetuity but for Defendant's alleged misconduct. Neither Gennarelli nor Rosevear point to an objective factor or reason for the time periods over which they projected future lost profits – 18 months and 10 years, respectively.

> Although both Gennarelli and Rosevear appear to be qualified to render damages opinions, their opinions are suspect because they do not identify any evidentiary support for the time duration included in their opinions.

\*\*\*

> There certainly might be evidence in the case that Gennarelli and Rosevear could rely upon, beyond their own speculative opinions, to establish a time component. **However, it is not clear that Plaintiff has identified any such evidence on this specific point.** The durational aspect of lost profits is not simply a question of fact for the jury – there must be some evidence to create an issue of fact for the jury to determine.

DE 146 at 9-10 (bold emphasis added). Judge Barber further held that "if after presenting its case-in-chief, Plaintiff has not provided 'some standard' for the time duration component of its future lost profits damage models, the Court will, pursuant to Fed. R. Civ. P. 50, eliminate this claim from the case and not permit Plaintiff to ask the jury for an award of future lost profits as a measure of damages." (*Id*. 10-11.) Mutual produced no evidence to satisfy the Court's requirement and, as such, Waterstone expects a directed verdict on lost profit damages. This Court, the Honorable Judge Porcelli presiding, too held that Mutual is not allowed to present new facts supportive of a 30-month duration:

> "…so to be clear, we're not going to reopen it to allow the opportunity to present additional facts for that purpose. It's either in the record or not."

(DE 226 at 3.) When Mutual tried to introduce new evidence going to duration in its expert's supplemental damages report, the Court struck it from the report. (*Id*.)

Waterstone anticipates Mutual will try to introduce new evidence to support a damage duration at trial through witnesses never previously known to Waterstone as having such evidence. Waterstone has filed a motion *in limine* in this regard and

11

believes a directed verdict is inevitable, if lost profit damages are not excluded entirely (they should be).

        b.  *Trade Secret Misappropriation Damages*

Mutual's claim that it is entitled to millions due to trade secret misappropriation and treble damages is baseless. To recover the alleged lost profits based on branch departures, Mutual would need to establish that the lost profit damages would not have occurred but for the alleged trade secret misappropriation, which it cannot do. Lost profit damages are non-existent for the reasons stated above. But even if they did exist, Mutual can only receive damages caused by the alleged misappropriation. The alleged taking of profit and loss statements, certain borrower documents, and customer lists are not what caused the branches to leave. Mutual is not seeking royalty or unjust enrichment damage and so it is going to have to attempt to make a tortured argument that damages suffered because of the branch departures are somehow tied to its alleged trade secrets. No evidence supports that conclusion. Mutual also cannot establish willful and malicious misappropriation of trade secrets such that exemplary damages are even available. The persons involved were looking to resign from a job they did not find sustainable. No one was attempting to harm Mutual or act willfully or maliciously.

## VII.    DEPOSITION DESIGNATIONS

The Parties do not anticipate using deposition designations at trial, other than for purposes of impeachment, but reserve the right to designate deposition testimony in good faith if necessary and with advance notice to the non-designating party.

## VIII.    CONCISE STATEMENT OF EACH ADMITTED FACT

1.    Mutual is a residential mortgage lender and a Delaware corporation with its principal place of business at 3131 Camino Del Rio North, Suite 1100, San Diego, California, 92108.

2.    Waterstone is a residential mortgage lender with its principal place of business at N25W23255 Paul Road, Pewaukee, Wisconsin, 53072.

3.    Mutual previously operated branches located in Tampa and Daytona, Florida, and Paramus, New Jersey.

4.    From December 2018 until April 2022, Dwayne Hutto served as the branch manager of Mutual's Daytona Branch.

5.    From December 2018 until April 2022, Christopher Wolf served as the co-branch manager of Mutual's Daytona Branch.

6.    From December 2018 until June 2022, Christopher Smith served as the branch manager of Mutual's Tampa and Paramus branches.

7.    From December 2018 until June 2022, John Utsch served as the co-branch manager of Mutual's Tampa and Paramus branches.

8.      On April 15, 2022, a group of employees resigned from Mutual to accept employment with Waterstone.

9.      On the evening of April 26, 2022, additional employees of Mutual, including Mr. Wolf and Mr. Hutto, resigned from Mutual and then joined Waterstone.

10.     On the evening of June 15, 2022, another group of employees of Mutual, including Mr. Smith and Mr. Utsch, resigned and joined Waterstone.

11.     During their employment, each of the Departed Managers were subject to a written employment agreement ("Employment Agreements") with Mutual.

12.     The Employment Agreements contained (i) loan originator duties; (ii) standards of conduct; (iii) policies; (iv) employees' duty of loyalty and certain prohibitions; (v) clauses pertaining to the non-solicitation of employees and customers; and (vi) prohibitions against the sharing of Mutual's confidential information and trade secrets.

## IX.    CONCISE STATEMENT OF EACH AGREED PRINCIPLE OF LAW

### Principles of Law Applicable to The Trade Secret Misappropriation Claims

a) To establish trade secret misappropriation under the DTSA and the FUTSA, Mutual must prove: (1) it possessed a trade secret, and (2) the trade secret was misappropriated.

b) Information is considered a "trade secret" if it (a) is the subject of reasonable measures to maintain its secrecy, and (b) derives independent economic value from not being generally known or readily

ascertainable by proper means by other persons who can obtain economic value from the disclosure or use of such information.

c) A party establishes "misappropriation" under the DTSA and FUTSA if it proves (1) acquisition of a trade secret by someone who knows or has reason to know the trade secret was acquired by improper means; (2) disclosure of a trade secret without the owner's consent; or (3) use of the trade secret without the owner's consent.

d) To recover damages, Mutual must prove that its lost profit damages were caused by the alleged trade secret misappropriation.

## Principles of Law Applicable to the Tortious Interference with Contract Claim

a) In Florida, the elements of tortious interference with a contractual relationship are: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach.

## Principles of Law Applicable to the Aiding and Abetting Breach of Fiduciary Duty Claim

a) To prove such a claim under Florida law, a plaintiff must establish (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this fiduciary duty; (3) knowledge of the breach by the alleged aider and abettor; and (4) the aider and abettor's substantial assistance or encouragement of wrongdoing.

## Principles of Law Applicable to All Claims (*Proposed by Mutual only*)

a) In order to establish that someone was an acting within the scope of their agency, the Plaintiff must show that (1) the agent was performing the kind of activity they were directed to perform; (2) the activity was being performed substantially within the time and space limits of their

agency; and (3) the performance of the activity was motivated, at least in part, to further the principal's interests. *(Proposed by Mutual only)* [2]

b) If an agent acts to serve his or her own interest as well as the principal, as long as there is an intent to serve principal's interests, the agent acts within the scope of his agency with the company. This is so even if the agent's intent to serve his own interest is greater than his intent to serve the company's interests. *(Proposed by Mutual only)*

c) A corporation is legally responsible for any act or omission approved by the corporation. A corporation may subsequently ratify its agent's act, even if originally unauthorized if the Plaintiff shows that the corporation either expressly approved the act or engaged in conduct that is consistent with approving the act; and had full knowledge of all material facts. *(Proposed by Mutual only)*

## Principles of Law Applicable to Damages

a) To recover damages in contract or tort, a plaintiff must prove the defendant's actions proximately caused the alleged damage and provide some standard by which the amount of damages may be adequately determined.

b) Under Florida law, damages in tort are aimed at "restor[ing] the injured party to the position it would have been in had the wrong not been committed." (*Proposed by Waterstone*, quoting J. Barber, D.E. 146 at 7 (collecting cases)).

c) Lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty.

d) The plaintiff does not need to show the precise amount of damages so long as the trier of fact can arrive at an intelligent estimate without

---

[2] The Parties agree that the principles and issues listed in Sections IX and X, respectively, are not exhaustive and do not encompass *every* principle or issue that may be applicable to this case. The Parties have noted where a principle or issue is proposed by one party only, without waiving any rights to raise additional principles of law or issues of fact at trial.

speculation or conjecture. (*Proposed by Mutual*.)

e) "[C]ourts have rejected lost profit damages models as speculative when there is no objective factual basis for the time duration component." (*Proposed by Waterstone*, quoting J. Barber, D.E. 146 at 9-10 (collecting cases)).

f) If the trade secret is willfully and maliciously misappropriated, an award of up to two (2) times the amount of compensatory damages is appropriate. (*Proposed by Mutual*.)

g) Willful and malicious, while not defined in the DTSA or FUTSA, means the complained of behavior is "knowing or reckless." *Highland Consulting Grp., Inc. v. Soule*, No. 19-CV-81636-RLR/BER, 2024 WL 776792, at *7 (S.D. Fla. Feb. 8, 2024) ("Although neither the DTSA nor the FUTSA define the terms willful and malicious, "[i]n the civil context, statutes that require 'willful' behavior are generally interpreted to permit a finding of liability when the complained of behavior is 'knowing or reckless.'") *(Proposed by Mutual.)*

h) Willful and malicious covers behavior that is motivated by spite or ill will and disregards the rights of another with knowledge of probable injury. *See Am. Sales Corp. v. Adventure Travel, Inc.*, 862 F. Supp. 1476, 1480-81 (E.D. Va. 1994). The factual findings that have been held to justify exemplary damages have involved "calculated, deliberate and reprehensible" conduct, misrepresentation, and attempts to cover up theft of documents. *See Sperry Rand Corp. v. A-T-O Inc.*, 447 F.2d 1387, 1394 (4th Cir. 1971) An award of exemplary damages is subject to constitutional due process limitations. *See Epic Sys. Corp v. Tata Consultancy Svcs., Ltd.*, 908 F.3d 1117 (7th Cir. 2020). *(Proposed by Waterstone)*

i) Punitive damages are proper where the defendant was personally guilty of intentional misconduct or gross negligence, based on clear and convincing evidence. "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that

the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct. (*Proposed by Mutual*.)

## X.    CONCISE STATEMENT OF EACH ISSUE OF FACT WITHOUT INCORPORATING ANOTHER PAPER

### Issues of Fact Regarding the Trade Secret Misappropriation Claims

a) Did Mutual possess information that satisfies all elements required for status as a trade secret:

   i. Was the information Mutual's property? *(Proposed by Waterstone)*

   ii. Is the information not generally known to another who can obtain economic value from the disclosure or use of the information?

   iii. Is the information not readily discoverable through proper means?

   iv. Does the information derive independent economic value, actual or potential, form not being known to, and not being readily ascertainable through proper means by, another who can obtain economic value from the disclosure or use of the information?

   v. Has Mutual has taken reasonable steps to keep its alleged trade secrets secret?

b) Do Mutual's trade secrets relate to a product or service used in, or intended for use in, interstate or foreign commerce? (*Proposed by Waterstone*.)

c) Did Waterstone misappropriate Mutual's trade secrets (which turns on the below questions of fact):

   i. Did Waterstone acquire, disclose, or use the Mutual's trade secrets without Mutual's consent?

ii. Did Waterstone know, or should Waterstone have known, that Mutual's alleged trade secrets were (i) derived from or through a third person who used improper means to acquire the trade secret; (ii) acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of the trade secret; or (iii) derived from or through a third person under a duty to maintain the secrecy of or limit the use of the trade secrets?

d) Was Mutual harmed as a result of Waterstone's misappropriation of the alleged trade secrets? *(Proposed by Waterstone)*

e) What amount of damages should Waterstone pay as compensation for the damages proximately caused by Waterstone for the misappropriation of Mutual's trade secrets. *(Proposed by Mutual)*

f) If the Court decides exemplary damages should go to the jury: Was Waterstone's misappropriation of Mutual's trade secrets willful and malicious? (*Proposed by Waterstone*.)

g) Did Waterstone willfully or maliciously misappropriate any of Mutual's trade secrets which can be satisfied by finding the conduct was knowing or reckless? (*Proposed by Mutual*.)

## **Issues of Fact Regarding the Tortious Interference with Contract Claim**

a) Did Mutual have enforceable contracts with the Departed Managers?

b) Did Waterstone have knowledge of Mutual's contracts with the Departed Managers and/or Former Employees?

c) Did Waterstone intentionally interfere with Mutual's rights under its contracts with the Departed Managers and/or Former Employees?

i. Did Waterstone act unjustifiably in interfering with Mutual's contracts? (*Proposed by Waterstone*.)

  ii. Was Waterstone's interference justified or privileged? (*Proposed by Waterstone*.)

 d) Did Waterstone's interference cause Mutual to lose profits?

  iii. Has Mutual established the amount of lost profits with reasonable certainty? (*Proposed by Waterstone*.)

  iv. What amount of lost profits, if any, did Mutual prove to a reasonable degree of certainty were caused by Waterstone's interference? (*Proposed by Waterstone*.)

 e) Did Waterstone act with intentional misconduct or gross negligence? (*Proposed by Mutual*.)

## Issues of Fact Regarding the Aiding and Abetting Breach of Fiduciary Duty Claim

 a) Did the Departed Managers owe fiduciary duties to Mutual?

 b) Did the Departed Managers breach fiduciary duties owed to Mutual?

 c) Did Waterstone have knowledge of the Departed Managers' breaches of fiduciary duties?

 d) Did Waterstone substantially assist or encourage the Departed Managers in breaching their fiduciary duties?

 e) Did Waterstone's aiding and abetting a breach of fiduciary duty cause Mutual to lose profits?

 f) Did Waterstone act with intentional misconduct or gross negligence? (*Proposed by Mutual*.)

 g) Did Mutual establish lost profits with reasonable certainty? (*Proposed by Waterstone*.)

     h)  What amount of lost profit, if any, did Mutual prove to a reasonable degree of certainty were caused by Waterstone's aiding and abetting a breach of fiduciary duty? (*Proposed by Waterstone*.)

### Issues of Fact Applicable to All Claims (***Proposed by Mutual***)

a)  Were the Departed Managers acting for the benefit of Waterstone when they engaged in the conduct complained of? *(Proposed by Mutual)*

b)  Did Waterstone subsequently ratify the acts of the Departed Managers by condoning their wrongful conduct? *(Proposed by Mutual)*

## XI.  CONCISE STATEMENT OF EACH ISSUE OF LAW WITHOUT INCORPORATING ANOTHER PAPER

The parties have noted in Section IX where principles of law are proposed by one party only. The parties anticipate the Court will resolve some issues of law by way of the pending and contemplated motions in Section XII.

## XII.  A LIST OF EACH PENDING MOTION OR OTHER UNRESOLVED ISSUE

The following Motions brought by Mutual remain unresolved:

- Mutual's *Motion in Limine* to Exclude Evidence Regarding Chris Smith's Provision of Information to BBMC While at Reliant Bank (filed concurrently);

- Mutual's *Motion in Limine* to Exclude Evidence of Mutual's Purported Failure to Mitigate Damages (filed concurrently).

- Mutual's *Motion in Limine* to Exclude Testimony of John Bone Asserting That in Order for Mutual To Prevail On Its Trade Secrets Claims, The Trade Secret Misappropriation Must Be The Sole Cause Of Mutual's Damages (filed concurrently).

The following Motions brought by Waterstone remain unresolved:

- Waterstone's Amended Motion *In Limine* to Exclude Lost Profit Damages and Any New Evidence as to the Duration of Lost Profit Damages. (D.E. 258.)

- Waterstone's Renewed Motion for Partial Summary Judgment on Mutual's Trade Secret Claims (Borrower Document Trade Secrets Only). (D.E. 256.)

- Waterstone's Motion *In Limine* to Exclude the Gennarelli Damages Analysis. (D.E. 257.)

## XIII.    STATEMENT OF THE USEFULNESS OF FURTHER SETTLEMENT DISCUSSIONS

The Parties have engaged in settlement discussions and agree to continue to do so in good faith.

## XIV.    SIGNATURES OF TRIAL COUNSEL

In preparing this final pretrial statement, I have aimed for the just, speedy, and inexpensive resolution of this action.

Dated:      February 13, 2025

MITCHELL SANDLER PLLC

*/s/ Ari Karen*
Ari Karen (*pro hac vice*)
Christopher L. McCall (*pro hac vice*)
Courtney E. Walter, FL Bar # 106228
Arielle Stephenson (*pro hac vice*)
2020 K Street N.W., Suite 760
Washington, D.C. 20006
akaren@mitchellsandler.com
cmccall@mitchellsandler.com
cwalter@mitchellsandler.com
astephenson@mitchellsandler.com
(202) 886-5292

GUNSTER, YOAKLEY & STEWART, P.A.
John A. Schifino, FL Bar # 0072321
Daniel P. Dietrich, FL Bar # 934461
Gregory L. Pierson, FL Bar # 123905
401 East Jackson Street, Suite 1500
Tampa, Florida 33602
jschifino@gunster.com
ddietrich@gunster.com
gpierson@gunster.com
Telephone: (813) 228-9080
*Attorneys for Plaintiff Mutual of Omaha*
*Mortgage, Inc*

GODFREY & KAHN, S.C.

*/s/Maria L. Kreiter*
Maria Kreiter (*pro hac vice*)
Emma Jewell (*pro hac vice*)
Xavier Jenkins (*pro hac vice* pending)
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
mkreiter@gklaw.com
ejewell@gklaw.com
xjenkins@gklaw.com
(414) 287-9466

HILL, WARD & HENDERSON, P.A.
Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
carolina.blanco@hwhlaw.com
scott.mclaren@hwhlaw.com
(813) 221-3900

*Attorneys for Defendant Waterstone*
*Mortgage Corporation*

32503202.3

23