# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> WATERSTONE MORTGAGE CORPORATION, <br><br> Defendant. | Case No. 8:22-cv-01660-AEP <br><br> **PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.'S RESPONSE IN OPPOSITION TO WATERSTONE MORTGAGE CORPORATION'S MOTION *IN LIMINE* TO EXCLUDE LOST PROFIT DAMAGES AND ANY NEW EVIDENCE AS TO THE DURATION OF LOST PROFIT DAMAGES** |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual") hereby files this Response in Opposition to Defendant Waterstone Mortgage Corporation's ("Defendant" or "Waterstone") Motion *in Limine* to Exclude Lost Profit Damages and Any New Evidence as to the Duration of Lost Profit Damages, ECF No. 258 ("Motion"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

This Court has held, not once, but *twice*, that Mutual is entitled to proceed to trial with the evidence in the record supporting a 30-month damages period. In an exercise of cherry-picking facts and events, Waterstone asks this Court to accept a distorted reality that ignores the relevant facts that have evolved as this case progressed. Mutual's evidence is based on a record that demonstrates irrefutable facts of what is now in the past – that since 2018, the subject branches were two of only three branches that voluntarily left Mutual's forward retail division and that since the

1

filing of this action only one other Branch has left the division – and it returned. So, for the 30 months since the complaint was filed in July 2022, of the 101 Branches, only the subject branches left Mutual. These facts – which reflect the present reality – cannot and should not be ignored or suppressed. Waterstone cannot deflect responsibility for egregious and wrongful activity by avoiding what is now reality: that out of nearly 100 branches, the only branches that left its forward retail division since 2022 are not coincidentally the ones that were subject to Waterstone's unlawful conduct.

## FACTUAL BACKGROUND

### I. This Court Has Held *Twice* That Mutual May Proceed at Trial with Evidence of Lost Profits Damages Up to 30 Months.

Prior to the Motion, Waterstone has argued twice that Mutual's lost profits damages must be excluded from the case. And twice, Waterstone has lost this argument. The first instance occurred on February 6, 2024, when Waterstone moved to Exclude or Limit Plaintiff's Expert Testimony on Damages (ECF No. 132) after the Court denied Mutual's summary judgment motion on damages. *See* ECF No. 100, 104, 130. In the February 6 Motion, Waterstone argued that "Mutual has no evidence that its branches would have stayed open or that the dozens of employees […] would have continued working for Mutual [.]" ECF 132 at 4. On March 29, 2024, the Court ruled, among other things, that although Mutual's economic model produced on or about July 14, 2023, sought damages up to ten years, its stipulation to seek only 30 months of damages[1] would be permitted. ECF No. 146 at 10. Judge Barber ruled:

---

[1] The stipulation was filed on March 22, 2024. ECF No. 144

> In an abundance of caution, and considering the recent stipulation regarding damages, *the Court will not eliminate Plaintiff's future lost profits claim from the case at this time*. However, if after presenting its case-in-chief, Plaintiff has not provided "some standard" for the time duration component of its future lost profits damage models the Court will, pursuant to Fed. R. Civ. P. 50, eliminate this claim from the case and not permit Plaintiff to ask the jury for an award of future lost profits as a measure of damages.

ECF No. 146 at 10.

Again, on April 26, 2024, Waterstone moved to exclude Mutual's damages evidence – seeking to limit the damages period to only 18 months (ECF No. 166). The parties presented extensive argument about damages and the Court recognized that Waterstone was really asking for reconsideration of Judge Barber's March 29 order:

> If Judge Barber expressly identifies this 30-month stipulation and then expressly states he's not going to prohibit in the case in chief evidence related to recognizing there has to be some basis in fact for a temporal period, but he's not going to prohibit initially the lost profits damages, but that he will consider after the case in chief whether that needs to be revisited, but yet you are now asking me to limit it just to 18 months, which seems to be also asking me to reconsider what Judge Barber ordered.

May 17, 2024 Hearing Tr., ECF No. 195 at 56:4-12. The Court clearly ruled:

> "***Judge Barber's order stands*** as to the ability, though, given the stipulation of 30 months, to go forward with that damage calculation under that theory that it was in total the solicitation of the employees, including the […] misappropriation of the trade secrets, that it was that combination and was so substantial led to the closure of the offices and the resulting lost profits.

May 17, 2024 Hearing Tr., ECF No. 195 at 66:5-13 (emphasis added), ECF No. 197 at ¶ 3. Waterstone's repackaged Motion attempts to reargue what was already decided

3

*twice* before. This third attempt should be rejected out of hand.

## II. Mutual's Witnesses Were Properly Disclosed and Deposed.

Waterstone's initial disclosures at the outset of the case included Jeff Gennarelli, Kiley King, and Christine Leyden. Def's Initial Disclosures at ¶ 1, ECF No. 115-5. Mutual also disclosed Ms. Leyden in its initial disclosures in October 2022. Pltf's Initial Disclosures, ECF No. 258-1 at p.4, ¶ 1. As the case progressed, Mutual timely disclosed Mr. Gennarelli as a 30(b)(6) witness to address topics related to damages and duration. Gennarelli Dep. Tr. at 6:16-25;[2] Def's 30(b)(6) Dep. Notice ¶¶ 1-13.[3] Ms. Theobald was also timely disclosed as a 30(b)(6) witness to discuss the breach of employment agreements, Mutual's practices and commissions, and discovery efforts. Theobald Dep. Tr. at 7:10-19;[4] Ex. B at ¶¶ 13-20. Between May 25 and June 23, 2023, each of these Mutual employees were deposed.

## III. Factual Evidence in the Record Supports Lost Profits For 30 Months.

### A. Evidence Disclosed in Discovery Provides Sufficient Support for Mutual's Damages Period.

*1. Mutual's Witnesses Testified to Branch Duration and Attrition.*

At Mr. Gennarelli's deposition, he discussed his then-estimated damages calculation of 18 months and explained that this was a conservative approach in the hopes of reaching settlement. Ex. A at 125:19-20, 126:15-16, 132:1-2. Mr. Gennarelli also explained that Mutual's acquisition of Keller Williams – "the world's largest real

---

[2] The excerpts of all cited portions of Mr. Gennarelli's Deposition Transcript are attached as Ex. A.
[3] Attached as Ex. B.
[4] The excerpts of all cited portions of Ms. Theobald's Deposition Transcript are attached as Ex. C.

4

estate franchise by agent count"[5] - would have caused the branches to stay for a much longer period, up to six or seven years, considering one out of every five real estate transactions involved Keller Williams. Ex. A at 174:2-5, 12-14. In response to questions about branch duration and attrition, Mr. Gennarelli explained:

> Q. How many times in your tenure at Mutual has that happened where the branch manager leaves but the branch remains?
> A. Yeah, we really don't have a lot of branches that leave, to be perfectly frank, but I can think of -- I can think of three or four cases that that did happen.
> Q. Forget about your time at Mutual as a limitation. Over the course of your entire career in the industry, how many times has it been where the branch manager leaves but the downstream employees stay?
> A. I think in my career, generally speaking, we don't have this big problem with branches leaving. So I don't have a wide breadth of this experience, but I would say that at Bridgeview and BBMC, I don't know if we -- if we lost one branch.
> ***
> Q. Does Mutual have any internal data about the rate of natural attrition that is typically experienced when there's a branch leader resignation?
> A. I don't know. We can probably get you that, but I don't have it off the top of my head. Certainly, I can tell you just personally we really don't have this attrition problem. Like, generally speaking, people don't leave.
> ***
> Most of our branches have been here 10, 15 years, so -- at least the core group.

Ex. A at 103:7-21; 105:24-106:2; 171:1-3."[6] Similar questions and answers were also

---

[5]KELLER WILLIAMS REALTY, INC., *Mutual of Omaha Mortgage Announces Strategic Acquisition of Keller Mortgage* (Feb. 20, 2023), (https://kwri.kw.com/press/mutual-of-omaha-mortgage-announces-strategic-acquisition-of-keller-mortgage/.
[6] *See also* Ex. A. at 172:20-22 ("So you would have a St. Louis, Seven Hills, Columbia, and they stay for, you know, eight years, ten years.")

provided by Ms. Leyden and Ms. Theobald. Ms. Leyden stated that after the Tampa branch left, she is only aware of branches that were involuntarily "let go" of "based on performance[.]" Leyden Dep. Tr. at 96:25-97:5.[7] Ms. Theobald stated that the Daytona and Tampa departures were "outside the norm." Ex. C at 33:20-23. Mr. King was not asked any questions about duration or branch turnover.

### 2. Discovery Showed That Mutual Has a Very High Branch Retention Rate.

In August 2023, Waterstone propounded an interrogatory asking Mutual to "[i]dentify all former branches in Mutual of Omaha's Forward Division that left Mutual of Omaha between January 1, 2013, through the present." Pltf's Resps. & Objs. to Def's Third Set of Rogs, at Rog. 13.[8] Mutual responded by listing the five branches that had left since 2018, the time frame for which it had records: (1) Tampa; (2) Daytona; (3) Paramus; (4) Northwest Region; and (5) S1 Lending. *Id.*[9] Today, that response is accurate and does not require any supplement.

Also in August 2023, Waterstone served Requests for Production with the Interrogatories asking for "documents supporting your responses to Interrogatories 12, 13, 14, and 15." Pltf Resps. and Objs. to Def's Fifth RPD, at RPD No. 48.[10] Mutual responded by identifying all the branch Profit and Loss statements, which provides a listing of the Mutual branches from 2018 to 2023, as well as two spreadsheets

---

[7] The excerpts of all cited portions of Ms. Leyden's Deposition Transcript are attached as Ex. D. Ms. Leyden also testified that Mutual branches "have limited turnover. For the most part, they stay." Motion at 3 (citing Leyden Dep. Tr. at 99:11-15).
[8] Attached as Ex. E.
[9] Mutual noted in its responses that the Northwest Region branch left on 12/2021 and then returned 10/2022 and that the S1 Lending was divested by Agreement. Ex. E at Rog. 13.
[10] Attached as Ex. F.

documenting employee departures and branch closures. *Id.*

Consistent with the testimony of Mutual's witnesses, the document productions and interrogatories reveal that since 2018, only 5 branches have left the forward division out of approximately 101 branches.[11] This means that only 5 percent of branches have voluntarily resigned from Mutual in the last seven years, based on the discovery produced in this case. Further, the branch closures spreadsheet reflects that only 5 branches have an employee termination reason listed as "branch closure" from the same period, 2018 to 2023.[12] Excluding the branches that left in this case (Tampa, Daytona), only 2 branches out of roughly 99 have an employee termination reason listed as "branch closure."[13] This would encompass terminations for performance resulting in the closure of the branch, not simply voluntary resignations from Mutual. And, since the filing of this case, of the 99 branches (excluding Tampa and Daytona) the discovery reveals not a single branch voluntarily left Mutual's forward retail division, consistent with Leyden's testimony.[14] The overwhelming statistical probabilities alone support a 30-month duration, though additional record evidence exists in support of the requested damages period.

### 3. The Structure and Agreements Created a Barrier to Branch-Wide Departure.

---

[11] A summary of voluminous records of all the branches, indicated by their Profit and Loss statements, is attached as Ex. G with a column for whether or not that branch departed. *See also* Ex. E at Rog. 13 (Interrogatory Responses); Ex. F at RPD 48 (Responses to Requests for Production).
[12] Excel depicting employee's termination, sorted to only depict those with a termination reason of "Branch Closure" produced at MOM-0015731, is attached as Ex. O. To avoid filing the document under seal, Mutual has redacted all other information except the Columns pertinent to the argument in this brief.
[13] *Id.*
[14] Ex. E at Rog 13 (no branches left after Tampa, Daytona, and Paramus); Ex. D at 96:25-97:5.

Managers leading the branches are dependent on their loan officers, and thus are unwilling to move companies if they "can't take the whole team." *See* Kevin Allen Dep. Tr. at 87:14-18 (Managers "certainly want [their employees'] production."); 278:6-10;[15] Chris Wolf Dep. Tr. at 73:14-17 (testifying he wants employees to come with him); [16] Chris Smith Dep. Tr. at 46:18-47:16; 48:5-10, 48:18-50:1 (loan officers are important to volume); [17] Dwayne Hutto Dep. Tr. at 10:20-25.[18] Thus, the Managers would not want to leave Mutual unless they knew their team was coming with them – which they would have to announce. *See* Ex. H at 75:11-15; 280:13-22.

The applicable employment agreements ("Employment Agreements") prohibit solicitation of employees for either a one- or two-year period after leaving Mutual.[19] Thus, the Employment Agreements necessarily create a barrier to leaving Mutual because they prohibit a manager from recruiting their team to leave with them – at financial risk to the manager because they will lose the teams' production. A manager who adheres to the Employment Agreements will be forced to take a gamble on whether their team, and therefore that potential financial compensation, will leave with them. Thus, the structure of the branch compensation combined with the

---

[15] The excerpts of all cited portions of Mr. Allen's Deposition Transcript are attached as Ex. H.
[16] The excerpts of all cited portions of Mr. Wolf's Deposition Transcript are attached as Ex. I.
[17] The excerpts of all cited portions of Mr. Smith's Deposition Transcript are attached as Ex. J.
[18] The excerpts of all cited portions of Mr. Hutto's Deposition Transcript are attached as Ex. K.
[19] The Protective Agreement, signed by approximately forty-three (43) employees, including Manager Chris Wolf, includes a one-year non-solicitation provision of employees. ECF No. 176-4 at ¶¶ 3.1-3.3. The Loan Originator Employment Agreement, signed by Dwayne Hutto and Chris Smith, includes a one-year non-solicitation of employees. § 15.1. Mr. Hutto's Loan Originator Employment Agreement is attached as Ex. L. Another agreement, entitled the Confidentiality and Non-Solicit Agreement, was signed by approximately twelve (12) loan officers, and includes a two-year non-solicitation provision of both employees. ECF No. 176-3 at ¶ 3. ECF No. 176-3.

8

Employment Agreements creates a powerful bond to Mutual, explaining the statistical improbability of voluntary branch resignations absent Waterstone's chicanery.

4. *Mutual's Acquisition of Keller Williams Supports That Branch Retention.*

Moreover, as Mr. Gennarelli testified in his deposition, Mutual acquired Keller Williams in 2023, within one year of the Florida Branches departure from Mutual.[20] This acquisition therefore occurred prior to the earliest period of non-solicitation contained in the employment agreements signed by the Departed Managers and Employees.[21] In addition, discovery revealed that Mutual added 4 forward branches in Florida since the acquisition of Keller Williams, buttressing Mr. Gennarelli's testimony that branches would have stayed because of this important acquisition.[22] The increase in branches following the acquisition of Keller Williams reflects that branches in Florida were not leaving Mutual – but rather flocking to Mutual, supporting the testimony that branches rarely leave and that the Keller Williams acquisition would reinforce the likelihood of branch retention. .

As shown, there is a multitude of evidence for a jury to rely upon to award Mutual damages of 30 months. Mutual has an incredibly high retention rate, agreements that preclude branch-wide departures, and engaged in a successful real-

---

[20] Ex. A at 166:9 ("Keller Williams arrived this year."); *See also* https://kwri.kw.com/press/mutual-of-omaha-mortgage-announces-strategic-acquisition-of-keller-mortgage/ (acquisition in Feb. 2023).
[21] *See* fn. 19, *supra*.
[22] Spreadsheet of branches in Florida from 2018, produced at MOM-0034511, attached as Ex. M. Only one tab of the spreadsheet is attached as Ex. M. The branches added after the Keller acquisition in February 2023 were: Boca Raton, Pensacola, St. Petersburg, and Weston. To avoid filing the document under seal, Mutual has redacted two columns for lease date and lease notes which are non-public and not pertinent to the argument in this brief.

estate partnership that caused branches to join – not leave – Mutual.

### B. The Branches Time at Waterstone Became Known After Discovery, Near When Mutual Narrowed Its Damages to 30 Months.

On March 22, 2024, Mutual filed a stipulation providing that it would not seek damages beyond 30 months. ECF No. 144. Such stipulation was premised on facts that evolved *after* the depositions of Mr. Gennarelli, Ms. Leyden, Ms. Theobald, and Mr. King. At the time of Mr. Gennarelli's deposition, the Florida Branches had only been at Waterstone for 11-13 months.[23] However, at the time of Mutual's stipulation limiting the duration to 30 months, it had been approximately 21-23 months since the branches left Mutual and went to Waterstone.

In August and September 2024, 27-28 months after leaving Mutual, the Daytona and Tampa Branches left Waterstone one month apart, just as they left Mutual in late April and June 2022.[24] And when the Daytona and Tampa branches left Waterstone, the employees of said branches resigned *en masse* on the same day and

---

[23] Mr. Gennarelli's deposition took place in May 2023, and the branches left in April 2022 (Daytona) and June 2022 (Tampa), respectively.

[24] The Daytona Branch resigned from Mutual on April 26, 2022 and joined Waterstone that same day. Joint Pre-Trial Statement, ECF No. 259 at Section II. In August 2024, the Daytona Branch left Waterstone for CMG Mortgage. *See e.g.*, Chris Wolf NMLS, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/1626538 (worked at Waterstone Ormond Beach location from 4/2022 to 8/2024); Dwayne Hutto NMLS, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/110495 (worked at Waterstone Ormond Beach location from 4/2022 to 8/2024). Accordingly, the Daytona Branch remained at Waterstone for 28 months. Similarly, the Tampa branch left Mutual on June 15, 2022 and joined Waterstone that same day. Joint Pre-Trial Statement, ECF No. 259 at Section II. In September 2024, the Tampa branch left Waterstone for CMG Mortgage. *See* Chris Smith NMLS, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/69879 (worked at Waterstone Tampa location from 06/2022 to 09/2024). Therefore, the Tampa Branch remained with Waterstone for 27 months.

maintained access to confidential information of Waterstone.[25]

Today, it has been more than 30 months and still, the Tampa and Daytona branches are one of only a few branches that have left to leave Mutual in its 100-plus branch division, and the only branches in that division which voluntarily departed since the filing of this case. Thus, the record evidence and the testimony of multiple employees deposed in this case, confirm the empirical data contained in the record showing that 95 percent of Mutual's branches remain at the company, that the branch compensation structure and legal agreements explain the relative longevity, and that the acquisition of Keller Williams would have further created incentives to remain. Accordingly, there is more than sufficient evidence in the record to support the damages sought by Mutual in this case.

## **LEGAL STANDARD**

"In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010). The movant must demonstrate that the evidence is inadmissible. *Gonzalez*, 718 F. Supp. 2d at 1345. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, Nos. 06-MD-1769,

---

[25] *See* Emails showing Waterstone provided the Managers and employees with client databases after they left Waterstone (WMC014685, WMC014687, WMC014689), attached as composite Ex. N. While the documents are marked "Confidential" Mutual conferred with Waterstone, who does not object to their inclusion as an Exhibit, given that the actual databases are not publicly filed.

07-CV-15733, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). Likewise, "[i]n light of the preliminary or preemptive nature of motions in limine, 'any party may seek reconsideration at trial in light of the evidence actually presented [.]'" *Fall v. Curran*, No. 3:19-cv-609-J-39TBT, 2021 WL 1969443, at *1 (M.D. Fla. Jan. 19, 2021).

## ARGUMENT

I. **This Court Has Already Denied Two Requests to Eliminate Mutual's Lost Profit Damages, Which Is the Precedent of This Case.**

Waterstone cannot circumvent the rulings of this case, which permits Mutual to proceed to trial with the evidence of 30 months of lost profits. Mutual narrowed its damages period to a maximum of 30 months to streamline the case following urgings from Judge Barber. Prior to Mutual's stipulation, the duration was up to ten years, and the jury could select any time period supported by the evidence. With that stipulation on file for 11 months, Waterstone now unfairly cherry picks the record to argue that "[n]o Mutual witness proposed a 30-month duration during discovery." Motion at p. 1. Waterstone fails to recognize that Mutual can revoke its stipulation and revert to the jury selecting a time period of up to 10 years.

Mutual's filing of a stipulation to voluntarily reduce its damages, at the Court's request to streamline the case, cannot be used against Mutual to eliminate its damages. *Turner v. Ga. Sec'y of State*, No. 5:10-CV-187(MTT), 2011 WL 4454934, at *1 (M.D. Ga. Sep. 23, 2011) (permitting an amendment *increasing* the amount of damages sought because no demonstrable prejudice to the defendants). Though it is correct that Mutual previously advocated a longer position, that does not mean no evidence exists to

12

support the stipulated time period. Indeed, Waterstone has unsuccessfully objected to Mutual's lost profits at least two times: in February and April of 2024, and this Court has already twice held that Mutual can present its evidence at trial.

II. **The Evidence in The Record Would Allow the Jury to Find "Some Standard" for Awarding 30 Months of Lost Profits Damages.**

**A. The Bar is Low: Under Florida Law, Lost Profits Are Awarded if there is "Some Standard" for the Amount.**

The jury will decide the appropriate duration of lost profits, which require a party to show "1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989). The defendant's actions do not need to be the sole cause of the damages sought; rather, they must be a "substantial factor" in causing the lost profits. *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 678 (Fla. DCA 1991). Any difficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as it is clear that substantial (rather than merely nominal) damages were suffered as a result of the wrong, and the competent evidence is sufficient to satisfy the mind of a prudent, impartial person as to the amount. *James Crystal Licenses, LLC v. Infinity Radio, Inc.*, 43 So. 3d 68, 74 (Fla. 4th DCA 2010). This Court has confirmed that this is the proper legal standard applicable to lost profits.[26]

There is substantial record evidence, including discovery responses, documents

---

[26] Order from Judge Barber, ECF 146 at p. 11.

produced, deposition testimony, and the simple passage of time that each provide "some standard" for the jury to conclude that a 30-months duration is appropriate.

### B. There Are Multiple Bases to Support 30 Months of Damages, Which in Their Totality, Exceed the Low Standard for Awarding Lost Profits.

*1. Mutual's High Branch Retention Rate and The Length of Time the Departed Branches Stayed at Waterstone Support 30 Months of Damages.*

Based on the record evidence, from 2018 through today only 5 percent of the branches voluntarily leave Mutual, including the Tampa, Daytona, and Paramus branches. Excluding the branches at issue (Tampa, Paramus, Daytona), the number is even smaller: 2 out of 99, or roughly 2 percent have left. Further, since these branches at issue left, no other branch voluntarily resigned from Mutual. This record evidence reflects robust retention, and it is entirely consistent with testimony provided by Mr. Gennarelli, Ms. Leyden, and Ms. Theobald that branches do not typically leave. A jury could certainly take a maximum 5 percent departure rate calculated over a 5 year period of time and find that if not for the unlawful conduct Mutual alleges, these branches would have remained at Mutual for 30 months. Even more, a jury could consider that every other branch in the forward division has remained at Mutual through the date of trial – not a single branch has left via voluntary departure in the intervening 30 months. Alone, that is sufficient evidence for a jury to find that the branches would have remained at Mutual but for Waterstone's wrongful conduct.

In addition, the departed branches in this case – Mutual's Daytona and Tampa Branches - remained with Waterstone for 28 and 27 months respectively. This evidence is not a secret – it is known to both Waterstone and Mutual, and publicly

14

available on the NMLS.[27] Waterstone seeks to preclude any witness or evidence unless it in discovery it uttered the magic phrase "30 months." But, this evidence of damages is not a forward looking projection. Rather, this evidence of duration is based upon a reflection of what is now in the past. In other words, Mutual's evidence is not a forecast or theory – it is a reflection of data and information that are now present inarguable facts. And to the extent those facts now exist – but did not exist at the outset of this case -- Waterstone's motion is completely misplaced. Based on what actually happened following their departure from Mutual, a jury can conclude that a duration of at least 27 months is appropriate. At the time of Mr. Gennarelli's deposition, there was no stipulation limiting the damages period to 30 months, and the branches had at that time only been at Waterstone for 11 or 13 months. It is entirely appropriate for Mr. Gennarelli to supplement his testimony in light of facts that could not have possibly been known at the time he testified.

    2. *The Branch Structure and Agreements Precluded Branch-Wide Departure.*

The deposition testimony of Waterstone's corporate representative, Kevin Allen, and branch managers Chris Wolf, Dwayne Hutto, and Chris Smith reflects that managers were dependent on their loan officers for their production and would be

---

[27] The Branch Managers NMLS pages confirm that they worked at Waterstone for the duration stated. *See e.g.*, Chris Wolf NMLS, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/1626538 (worked at Waterstone Ormond Breach location from 4/2022 to 8/2024); Dwayne Hutto NMLS, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/110495 (worked at Waterstone Ormond Breach location from 4/2022 to 8/2024);Chris Smith NMLS, https://www.nmlsconsumeraccess.org/EntityDetails.aspx/INDIVIDUAL/69879 (worked at Waterstone Tampa location from 06/2022 to 09/2024).

unwilling to move mortgage companies if their team would not follow. *See* Ex. H at 87:14-18; 278:6-10.; Ex. I at 73:14-17; Ex. J at 46:18-47:16; 48:5-10, 18-50; Ex. K at 10:20-25. Mr. Allen also testified that the employees would look at their manager "sideways" if they announced their resignation prior to notifying their team. *See* Ex. H at 280:13-22. In fact, Waterstone testified that it expected Dwayne Hutto to announce to his team he was leaving. Ex. H at 75:11-15. Thus, the structure of the branches inherently created a barrier to departure – everyone would have to agree to leave and follow the managers in order for a move to another company to be viable.

And, the applicable Employment Agreements had provisions supporting that structure – which prohibited the solicitation of employees and customers for one to two years after leaving Mutual.[28] Thus, the Employment Agreements prevented the Former Managers from soliciting the employees, meaning they would have to leave without any confirmation that their team was coming with them. Given the managers' unwillingness to do that, due to the financial risk associated with leaving behind their teams' production, it explains the retention data set forth above. Waterstone's decision to encourage the Managers to lift out their teams in violation of their legal obligations explains why these branches are an outlier from the robust retention rate at Mutual.

### 3. The Acquisition of Keller Williams Provides Added Support for 30 Months.

Mutual's acquisition of Keller Williams in February of 2023 provides additional evidence supporting that the subject branches would not have left Mutual. Mr.

---

[28] *See* fn. 19, *supra*.

16

Gennarelli testified to the impact of the Keller Williams acquisition in May of 2023, stating that one in five real estate transactions in the United States involved Keller Williams and emphasizing the impact it would have on a loan officer and branch manager tasked with selling mortgage loans. Ex. A at 132-4, 174:2-5. Mr. Gennarelli will explain the somewhat obvious to the jury: that real estate agents are a source of business and that they are a main referral source for loan officers. Importantly, the departed employees would have been able to consider this critical relationship before being subject to improper solicitation and interference. Mr. Gennarelli estimated that "Keller Williams comes into play, and they stay for six or seven years[.]" Ex. A at 174:2-4. Indeed, discovery showed that Mutual added 4 branches in Florida following the Keller Williams acquisition.[29] Ultimately, the jury will decide whether the arrival of Keller Williams would have caused the branches to leave or the duration to increase.

### III. The Motion Is Unnecessary and Seeks to Impose Artificial Barriers to Testimony at Trial.

**A. There Is No Basis to Strike Any Witnesses, Who Were All Deposed.**

Mutual's witnesses were all included in either Waterstone or Mutual's initial disclosures served at the outset of the case, and each was deposed before the close of discovery. Cases confirm that where the relevance of a witness was known, "there is no basis to strike" a witness even if they were not on that party's initial disclosures. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885, 2021 WL 9031166, at *2, 4 (N.D. Fla. Nov. 15, 2021); *see also Geico Cas. Co. v. Beauford*, No. 8:05-cv-697-

---

[29] *See* fn. 22, *supra*.

T-24EAJ, 2007 WL 2412974, at *3 (M.D. Fla. Aug. 21, 2007) (witness allowed to testify even though he was not listed in initial disclosures because he was referenced in court documents and thus the movant was not "unfairly prejudiced" and had "notice and knowledge" of the witness "before discovery closed").

Moreover, this Circuit has not decided whether Rule 26(a) requires corporate parties to identify potential 30(b)(6) designees, such as Mr. Gennarelli and Ms. Theobald. *Barron v. EverBank*, No. 1:16-CV-04595-AT-CCB, 2019 WL 1495305, at *3 (N.D. Ga. Feb. 7, 2019); *Hayes v. Deluxe Mfg. Ops. LLC*, No. 1:16-cv-02056-RWS-RGV, 2018 WL 1461690, at *3 (N.D. Ga. Jan. 9, 2018); *see also Hooks*, 2016 WL 5415134, at *8 (finding authority on "both sides of this issue" and holding failure to disclose was substantially justified due to inconsistent case law). Here, there is no harm: Waterstone deposed Mr. Gennarelli, Mr. King, and Ms. Theobald before discovery closed.

### B. Relief *in Limine* Cannot Be Used to Enforce the Federal Rules of Evidence Regarding Cross Examination and Impeachment at Trial.

"Relief *in limine* […] is not an appropriate vehicle for enforcing rules of trial." *See Morgan v. Orlando Health, Inc.*, No. 6:17-CV-1972-CEM-GJK, 2021 WL 12100347, at *11 (M.D. Fla. Dec. 8, 2021) (denying in part motion *in limine* because "the Court expects the parties to adhere to the Federal Rules of Evidence during the course of the litigation and finds it unnecessary to issue orders directing them to follow the Rules"); *see also Rogers v. Fiesta Rest. Grp., Inc.*, No. 15-24073-CIV, 2016 WL 7644789, at *1 (S.D. Fla. July 8, 2016) (denying motion *in limine* as "unnecessary" because the relief is already provided by federal rules); *Nextplat Corp. v. Seifert*, No. 1:21-CV-22436, 2024

18

WL 4236077, at *6 (S.D. Fla. Sept. 19, 2024) (denying motion *in limine* relief because the relief requested "would essentially be a reaffirmation of trial rules").

Here, there are rules to ensure recourse for any unfair surprise at trial. The Federal Rules of Evidence ("FRE") provide that a witness is subject to cross examination, and further, that if a witness testifies inconsistently, the witness may be impeached with a prior inconsistent statement. *See* FRE 611(b); 613. Moreover, if an exhibit is not listed on a party's exhibit list submitted to the Court for trial, an objection may be raised to prevent such evidence from being used at trial. *See generally* Pre-Trial Order, ECF No. 278. Thus, to the extent there is any concern that Mutual will assert "new" theories with Mr. Gennarelli or otherwise, relief *in limine* is entirely improper as there is already a procedure in the FRE to cross examine, impeach, and exclude evidence absent from the pretrial order. *See Morgan*, 2021 WL 12100347, at *11.

### C. The Court Should Decline to Adopt any Exclusionary Rule That Is Not Afforded by the Rules of Evidence.

The FRE contains no rule preventing a witness from testifying to something they were *not* asked previously at a deposition. Nor does the FRE prevent a witness from testifying as to factual developments that occur after their deposition, even if those facts impact or change their prior testimony. Indeed, such a rule would preclude consideration of relevant factual developments of which the witness could not have known at the time of their deposition. Mr. Gennarelli was deposed in May 2023, 13 months after the Daytona branch departed from Mutual to Waterstone. He could not have known at that time whether they would have stayed at Waterstone for 30 months.

Rather, he testified to information in his knowledge: that he felt at that time 18 months was a conservative estimate for settlement, and that branches do not leave, often staying for many years. There is no rule, nor should the court adopt one, that prohibits a witness from testifying to facts now known that could not have previously been known, particularly when that testimony is supported by factual evidence produced in discovery confirming the undisputed basis for the testimony.

## CONCLUSION

For the reasons set forth above, the Court should deny the Motion in its entirety.

Dated: February 26, 2025

By: */s/ Ari Karen*
Ari Karen (*pro hac vice*)
Arielle Stephenson (*pro hac vice*)
**MITCHELL SANDLER PLLC**
2020 K St NW, Suite 760
Washington, D.C. 20006
akaren@mitchellsandler.com
astephenson@mitchellsandler.com
Telephone: (202) 886-5292

Daniel P. Dietrich (FL Bar No. 934461)
Gregory L. Pierson (FL Bar No. 123905)
**GUNSTER, YOAKLEY & STEWART, P.A.**
401 East Jackson Street, Suite 1500
Tampa, Florida 33602
ddietrich@gunster.com
gpierson@gunster.com
Telephone: (813) 228-9080

*Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc*

## CERTIFICATE OF SERVICE

I certify that on February 26, 2025, a true and correct copy of the foregoing was filed with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

*/s/ Ari Karen*
Ari Karen