# **EXHIBIT A**

1

```
                IN THE UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                           TAMPA DIVISION
                  CASE NO.: 8:22-cv-01660-TPB-JSS

MUTUAL OF OMAHA
MORTGAGE, INC.,

     Plaintiff,

vs.

WATERSTONE MORTGAGE
CORPORATION,

     Defendant.
_____/


DEPOSITION OF:        JEFFREY GENNARELLI, CORPORATE
                      REPRESENTATIVE OF MUTUAL OF OMAHA
                      MORTGAGE, INC.

TAKEN:                Pursuant to Notice by
                      Counsel for Defendant

DATE:                 May 25, 2023

TIME:                 9:17 a.m. to 4:53 p.m. EST

LOCATION:             Hill Ward Henderson
                      101 East Kennedy Boulevard
                      Suite 3700
                      Tampa, Florida  33602

REPORTED BY:          Melanie Keefe, FPR
                      Notary Public
                      State of Florida at Large
```

REGENCY REPORTING SERVICE, INC. (813)224-0224

6

1         And then, finally, if you need a break at any
2 time during the deposition, it's not a, you know, federal
3 investigation here.  Just let me know, and we will take a
4 break.  I would just ask that if there's a question that I
5 have pending to you, answer the question prior to taking a
6 break.  Does that make sense?
7     A.   It does.
8     Q.   If you don't understand a question that I ask
9 you, let me know that.  If you don't let me know, I'm going
10 to assume that you understood the question.  Agreed?
11     A.   Yeah, yes.
12     Q.   Great.  Start with Exhibit 1.  Hand that to the
13 court reporter, please.
14     A.   Then I can look at it?
15        (Exhibit No. 1 is marked for identification.)
16     Q.   Yes, please do.  Exhibit 1 is the notice for this
17 deposition.  You understand that you're testifying today not
18 in your personal capacity but on behalf of the plaintiff in
19 this case, Mutual of Omaha Mortgage; correct?
20     A.   Yes.
21     Q.   My understanding is that you're testifying on
22 behalf of Mutual with respect to Topics 1 through 12 in the
23 deposition notice; correct?  And there's a separate witness
24 tomorrow testifying as to the remaining topics; correct?
25     A.   Yes.  Correct.

103

1  transitions?
2      A.   I don't.
3      Q.   Has Mutual experienced other instances of a
4  branch manager leaving but the branch employees stay at
5  Mutual?
6      A.   Yes.
7      Q.   How many times in your tenure at Mutual has that
8  happened where the branch manager leaves but the branch
9  remains?
10     A.   Yeah, we really don't have a lot of branches that
11 leave, to be perfectly frank, but I can think of -- I can
12 think of three or four cases that that did happen.
13     Q.   Forget about your time at Mutual as a limitation.
14 Over the course of your entire career in the industry, how
15 many times has it been where the branch manager leaves but
16 the downstream employees stay?
17     A.   I think in my career, generally speaking, we
18 don't have this big problem with branches leaving.  So I
19 don't have a wide breadth of this experience, but I would
20 say that at Bridgeview and BBMC, I don't know if we -- if we
21 lost one branch.  We're talking about branches that we don't
22 want to lose -- right? -- I mean, not branches that we may
23 part company with for --
24     Q.   Right.
25     A.   -- production reason; right?  You know, so that's

REGENCY REPORTING SERVICE, INC. (813)224-0224

105

1  wrongdoing.  Do you understand that definition?
2      A.   Yes.
3      Q.   So just in the ordinary course, people are going
4  to follow for whatever reason; correct?
5      A.   Yes.
6      Q.   Are there instances in which Mutual has lost an
7  entire branch and didn't think that there was any wrongdoing
8  but rather just thought this is natural attrition?
9      A.   Yes.
10     Q.   How many times has that happened?
11     A.   Well, the one I'm thinking about is the group
12 that came back, that branch in particular.  I didn't know --
13 I'm not -- I don't know how many times, but that branch in
14 particular, they were very up-front about it, left all their
15 loans here.  There weren't -- you know, left on a good note.
16     Q.   And that does happen, entire branches move as a
17 result of natural attrition as opposed to any kind of
18 wrongdoing.  It's not the only time in this industry, the
19 one that you're mentioning?
20     A.   True.  That's right.
21     Q.   Does Mutual have any internal data about the rate
22 of natural attrition that is typically experienced when
23 there's a branch leader resignation?
24     A.   I don't know.  We can probably get you that, but
25 I don't have it off the top of my head.  Certainly, I can

REGENCY REPORTING SERVICE, INC. (813)224-0224

106

1       tell you just personally we really don't have this attrition

2       problem.  Like, generally speaking, people don't leave.

3              Q.    When Mutual was preparing the damages analysis in

4       this case, did you or anyone else at Mutual look for any

5       kind of industry guidance on natural attrition rates in

6       conjunction with your analysis?

7              A.    Yeah, I think that we discussed our attrition

8       rate but not industry attrition because it's two separate

9       things.  People -- people -- what the industry does is not

10      really relevant to what -- how we perform necessarily.

11             Q.    You said you discussed Mutual's natural attrition

12      rate?

13             A.    Yeah.  It's -- I mean, it's very, very slim, if

14      you talk about a productive individual leaving the company.

15             Q.    Did you factor in natural attrition with respect

16      to the analysis applicable here?

17                   MS. WALTER:  Object to form.

18             A.    No.

19             Q.    I want to move from natural attrition kind of on

20      an industrial level to natural attrition that would be

21      specific to the relationships that we're talking about

22      here.  Is it Mutual's contention that every single one of

23      the employees who left, left due to some kind of wrongdoing

24      by Waterstone and that none of the employees left because of

25      natural attrition?

125

1   buckets.  This is specific to Bucket 2, damages associated
2   with the branches closing; correct?
3         A.    Correct.
4         Q.    And I want to confirm, the persons who prepared
5   Exhibit 7 were you and Bernie Mayle?
6         A.    Bernie Mayle, yeah.
7         Q.    Mr. Mayle was the senior vice president of
8   finance; correct?
9         A.    Correct.
10        Q.    Was there any other person who played a role in
11  the creation of Exhibit 7?
12        A.    I don't believe so.
13        Q.    What role did you play in creating Exhibit 7
14  versus Mr. Mayle?
15        A.    I think we just worked jointly on it.  He pulled
16  the data because he had the data, but kind of we just talked
17  about the best way to show the income created by those
18  branches and then, you know, extrapolating out, if they had
19  stayed for 18 months, what that would be.  We took a very --
20  we did take a very conservative approach to it, so...
21        Q.    Was there one person doing the drafting and
22  another person commenting, or were you both authors of
23  Exhibit 7?
24        A.    I would say we were kind of both authors of
25  Exhibit 7.

126

1    Q.   Did one of you create the first draft?
2    A.   I think Bernie probably created the first draft,
3  but I was sitting in his office.  I mean, he -- if it's on a
4  spreadsheet, he's the one to create it.  I'm not a
5  spreadsheet guy.
6    Q.   Got it.  So it sounds like there was a meeting
7  between you and Mr. Mayle?
8    A.   Yeah.
9    Q.   And you sat down and worked on the spreadsheet
10 together?
11   A.   Yes.
12   Q.   How long did you spend preparing it?
13   A.   Well, I think a large part of the time we spent
14 was trying to come up with a, you know, fair way to
15 associate the lost revenue.  And I really mean fair and be
16 conservative about it because we were hoping for a
17 settlement before this time.
18        So, you know -- so that was the big -- because
19 there's two -- there's two ways we can do this; right?  We
20 can do what we did here, which is take those loans and
21 multiply it times the basis points earned by corporate from
22 that volume, average it out monthly, and then show for
23 18 months had they stayed what the expected profit would
24 be.
25        The other the way we can do it is what I

132

1    would've been almost $19 million.  So we used a, we felt,
2    more conservative approach, which is we took all the fixed
3    expenses that occur on the corporate side --
4         Q.   Okay.  Can you pause there just for a second?
5         A.   Yeah.
6         Q.   All the fixed expenses on the corporate side?
7         A.   Fixed -- all expenses on the corporate side.
8         Q.   Where do those corporate expenses appear, in the
9    branch P&Ls, or some other P&L?
10        A.   Yeah, the financial -- the corporate financials,
11   the corporate income statement on our tax return.
12        Q.   Okay.  So with respect to this analysis,
13   Waterstone served discovery and specifically asked what are
14   the documents that were relied upon to create Exhibit 7?
15        A.   Yeah.
16        Q.   Tax returns and corporate income statements were
17   not identified, which is why I'm kind of struggling to
18   understand the analysis.  You're going to have to help me
19   here.  I need to leave the deposition with a clear
20   understanding of how this was calculated and what documents
21   you relied on.  Are you able to locate those documents?
22   And, I mean, we can take a break.  I just need to know.  Do
23   you have the documents that you used to calculate this
24   column --
25        A.   Sure.

166

1    A.   I don't know that we considered that.  The one
2    thing we did consider, like I said before, was using the
3    cost of goods sold method.  And I thought that if we
4    would've used the cost of goods sold method, these numbers
5    would've been through the roof, so we chose just an average.
6         And you're not going to -- when you're doing an
7    average, it's going to be an average.  You have to use all
8    the data in front of you.  We don't know what tomorrow
9    brings; right?  Keller Williams arrived this year.  That
10   would've been exponentially valuable having them there.
11   Q.   But somebody had to make a choice as to how far
12   back you were going to go with respect to the data.  And
13   either you --
14   A.   We went back the whole way, the whole time -- we
15   just went back to the history here at Mutual Mortgage.
16   Q.   Do you believe that it's more reliable to use
17   data that includes a historical anomaly than it is to use
18   the most recent data available?
19        MS. WALTER:  Object to the form.
20   A.   Yeah, I think that what you're calling historic
21   anomaly is one person's perception.  We don't know what next
22   year brings or the year after or the year after.
23   Q.   So let me ask you this question.  I want to make
24   sure I'm understanding this.  You looked at historical data
25   going back to 2019 --

REGENCY REPORTING SERVICE, INC. (813)224-0224

171

1       we were trying to be reasonable.  You know, I think you can
2       make a case for using longer.  Most of our branches have
3       been here 10, 15 years, so -- at least the core group.  So
4       we could've used longer, but we thought 18 months was a
5       reasonable amount of time.
6            Q.   We talked earlier in the context of the
7       discussion about natural attrition and if the branch
8       managers had simply, you know, said nothing but then the
9       employees obviously learn after the fact the branch manager
10      left, that there may be some employees that go and follow
11      that branch manager due to natural attrition.  And I think
12      your testimony was, yeah, eventually that could happen.  Do
13      you recall that testimony?
14           A.   I do.
15           Q.   Okay.  Do you have any data within Mutual or
16      otherwise that you relied on for purposes of this analysis
17      that says it will take about 18 months for employees to
18      follow a branch manager in the context of natural attrition?
19              MS. WALTER:  I'll object to the form.
20           A.   No, I did not do that.  But what we did do is,
21      you know, we looked at how long branches stay.  And, you
22      know, we talked a little bit about what a branch is, and a
23      branch is -- you know, individuals come and go, but that
24      branch continues to grow.  And I think that that's
25      important.  Even today some of our branches are growing and

172

1    doing well.
2         Q.   Did Mutual have employment contracts with any of
3    the downstream employees that required them to stay on for
4    18 months?
5         A.   No.
6         Q.   Did Mutual have employment contracts with any of
7    the managers that required them to stay for 18 months?
8         A.   No.
9         Q.   What was the rationale for choosing 18 months as
10   opposed to 12 months or 24?
11             MS. WALTER:  Object to the form.
12        A.   You asked me that.  You know, again, it was -- we
13   were trying to be reasonable.
14        Q.   Did you consider other periods of time?
15             MS. WALTER:  Object to the form.
16        A.   We did.
17        Q.   What other periods did you consider?
18        A.   Well, we considered looking at our large
19   branches, so that would be, you know, branches that were
20   similar to these branches.  So you would have a St. Louis,
21   Seven Hills, Columbia, and they stay for, you know,
22   eight years, ten years.  But we didn't think that was
23   necessarily reasonable, so we came up with 18 months.
24        Q.   You understand that the employment contracts in
25   place with the managers, to the extent that there are such

174

1   analysis?
2       A.   Not really.  They also could've still been here.
3   Keller Williams comes into play, and they stay for six or
4   seven years, so we didn't use six or seven years.  We didn't
5   use ten years.  We used 18 months.  I mean, I don't know how
6   much we can, you know --
7       Q.   Do you have any evidence if the downstream
8   employees would have stayed because Keller Williams came in?
9            MS. WALTER:  Object to the form.
10      A.   Well, you're the one who made a statement that
11  said they went with Dwayne because he provided loans.  Where
12  do you think Keller Williams -- one out of every five real
13  estate transactions is Keller Williams signed.  We now are
14  the lender for Keller Williams.  I would imagine that that
15  may be more attractive than the one-offs that Dwayne was
16  handing them.
17      Q.   So again, I want to talk about evidence that
18  Mutual has versus just speculation about what the employees
19  might have thought.  Has Mutual asked any of the employees
20  would they have been motivated to stay knowing that Keller
21  Williams was joining?
22           MS. WALTER:  Object to the form.
23      A.   Not that I'm aware of, no.
24      Q.   Does Mutual have reports that show the monthly
25  volume for all branches?

REGENCY REPORTING SERVICE, INC. (813)224-0224