# **EXHIBIT J**

Page 1

```
 1                UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
                    CASE NO.:  22-CV-01660
 3
 4
         MUTUAL OF OMAHA MORTGAGE, INC.,
 5
                         Plaintiff,
 6       vs.
 7       WATERSTONE MORTGAGE CORPORATION,
 8                       Defendant.
         _____/
 9
10
11                 VIDEOTAPED DEPOSITION OF
12                    CHRISTOPHER SMITH
13
14
                      Pages 1 through 206
15
16                  Friday, June 16, 2023
                    9:07 a.m. - 12:45 p.m.
17
18           Gunster Yoakley & Stewart, P.A.
            401 East Jackson Street, Suite 1500
19                  Tampa, Florida 33602
20
21
22
23
24            Stenographically Reported By:
25            Denise Sankary, RPR, RMR, CRR
```

Page 46

1  Q.  Well, I mean, if people are all of a
2  sudden going to learn you're leaving, I mean,
3  maybe -- I mean, you would agree you want people to
4  follow you, don't you?
5  A.  They can do what they -- do what they want
6  to do.
7  Q.  It's a free country, right?
8  A.  Correct, yep.
9  Q.  No one can force you, right?  So we all
10 know that, right?
11 A.  Yep.
12 Q.  No one can -- you must come with me --
13 A.  Right, sure.
14 Q.  It doesn't work like that.
15 A.  Yep.
16 Q.  So -- but my question is what your
17 preference was.  I mean, here's what -- here's --
18     Let me ask it this way:  You get more
19 money by having more volume, right?
20 A.  Correct.
21 Q.  And you have -- at least some of your loan
22 officers are pretty important to that volume at this
23 point in time, right?
24 A.  Yes.
25 Q.  Okay.  So all things being equal, you

Page 47

1  prefer them to come with you than to stay behind at
2  Mutual or go to another company, right?
3       A.   Well, the way I would answer that question
4  is, seven years ago, I -- there was probably one --
5  no, there was probably two or three loan officers
6  that worked for me that -- back then.  So I'm good
7  at recruiting, hiring, training, and getting
8  production from loan officers.  If they decided to
9  come with me, that would be great.  If they didn't,
10 I'll hire more and train more and get more volume
11 from them.
12      Q.   Okay.  But again, you have to go and find
13 them, right?
14      A.   Yep.
15      Q.   Find a new loan officer, that takes time,
16 right?  Yes?
17      A.   Sometimes.  I mean, sometimes people -- a
18 lot of people know a lot of people, so sometimes
19 people come find you.
20      Q.   Okay.
21      A.   But it could take some time, yes, to hire
22 more loan officers.
23      Q.   You would agree that, all things being
24 equal, not -- and that not everybody is going to
25 work, right?  I mean, hiring decisions are -- maybe

```
 1   they're better than 50/50 for you, but I know, at
 2   least for me, like sometimes it works and sometimes
 3   it doesn't, right?
 4        A.   Yep.
 5        Q.   Okay.  So when you have something and it
 6   works, that's valuable to everybody, isn't it?
 7        A.   Yes.
 8        Q.   Okay.  And so all things being equal,
 9   you'd rather keep your team together, wouldn't you?
10        A.   If that's what they wanted, yes.
11        Q.   Well, again, if that's what they didn't
12   want, then there's really nothing --
13        A.   Yeah.
14        Q.   -- you could do about it.
15        A.   Correct.
16        Q.   Right.
17        A.   Yep.
18        Q.   So -- but I'm asking you from your
19   perspective here.  So from your perspective it's
20   true that you wanted them to come with you.
21        A.   It a loan officer decided to resign and
22   join us at WaterStone, that would not have been a
23   bad thing.
24        Q.   It would actually have been a good thing.
25        A.   Correct.  Well --
```

Page 49

1       Q.    Okay.
2       A.    -- it's the opposite of not being a bad
3    thing.  It's a good thing, right.
4       Q.    Right.  But you're not agnostic about it.
5    Let's be honest, I mean, you -- your preference is
6    they come with you.
7             I mean, you're testifying under oath here,
8    sir.  You do --
9       A.    Yeah.
10      Q.    -- realize -- I mean, you're going -- are
11   you going to seriously tell me you didn't have a
12   preference that they come with you, these people who
13   you -- your income was based off them.
14      A.    Well, my income is based off of whoever I
15   hire and train and get to produce.  But if I have
16   people that are loyal to me and look up to me and
17   they decided to come with me, then yes, that would
18   not be a bad thing.
19      Q.    Okay.  It would be --
20      A.    It would be a good thing.
21      Q.    Yes, it would be your preference --
22      A.    Correct.
23      Q.    -- that happened --
24      A.    Yes, yes.
25      Q.    -- isn't that true?

Page 50

1    A.    Yes.
2    Q.    Okay.  So given that it would be your
3 preference, my question is, you said what would be
4 the point, I would think if it's your preference
5 that they come with you, the point is that having
6 that advanced communication would increase the
7 likelihood they would come.
8          MS. KREITER:  Object to the form.
9    A.    Well, I think that in our industry, in our
10 world, giving -- telling someone, I'm leaving, and
11 our leader is moving to another company creates
12 uncertainty, creates questions.  Loose lips sink
13 ships.  So to me, I don't think there's any
14 advantage of telling them weeks ahead of time or who
15 I'm talking to.  I don't believe there's any
16 advantage of that in any way, shape or form --
17 MR. KAREN:
18   Q.    Okay.
19   A.    -- because then they might start looking
20 at other companies.
21   Q.    Or if -- or Mutual might find out, right?
22   A.    Correct.
23   Q.    Okay. So -- and so it's fair to say you
24 didn't necessarily want Mutual to know about this,
25 did you, not in advance?