IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC.<br><br>  Plaintiff,<br><br>v.<br><br>WATERSTONE MORTGAGE CORPORATION,<br><br>  Defendant. | CASE NO. 8:22-cv-01660-UAM |

**DEFENDANT WATERSTONE MORTGAGE CORPORATION'S RESPONSE TO PLAINTIFF MUTUAL OF OMAHA MORTGAGE'S MOTION *IN LIMINE* RELATING TO CHRIS SMITH'S DEPARTURE FROM RELIANT BANK**

Recruitment of Tampa manager Chris Smith from his prior employer, Reliant Bank, involved Mutual's leadership asking Smith to share information about Reliant's pricing metrics, branch data, and borrower information. Mutual now intends to present witnesses at trial who were directly involved in this recruitment to testify about Waterstone's alleged misconduct. Waterstone should be allowed to present evidence at trial about those witnesses' recruitment of Smith because provides undercuts Mutual's allegations all branch and borrower is confidential and/or a trade secret, bears on the credibility of Mutual's witnesses, explains why Smith felt information about the Tampa branch was acceptable to share with Waterstone, and is relevant to the propriety of Mutual's claims for punitive and exemplary damages. Mutual's motion should be denied in its entirety.

1

I.  **FACTS**

   a. **Mutual's leadership elicits pricing and borrower information from Smith; coordinates with Smith to have the Tampa employees transition away from Reliant; and has Smith transfer borrowers away from Reliant.**

Chris Smith is one of the former Mutual branch managers accused of wrongdoing. (*See* Mutual's Mot. in Limine (Dkt. 260, at 1) ("The scheme included three of Mutual's branch managers, including Chris Smith, conspiring with Waterstone to unlawfully 'steal the entirety of Mutual's Florida operations.'").) Smith managed the former Mutual branch located in Tampa. (Declaration of Christopher Smith ("Smith Decl."), ¶ 1.) Prior to working for Mutual, Smith and his Tampa branch worked for Reliant Bank, a competitor to Mutual. (*Id.*, ¶ 4.)

In 2016, while Smith and his branch were still employed with Reliant, Mutual's then-predecessor BBMC, led by Brian Tomalak and Kiley King, began actively recruiting Smith. (*Id.*, ¶ 4.) As part of this effort, BBMC: (1) requested that Smith input and share information from Reliant's pricing engine; (2) sought non-public data about Reliant's expenses, employees, and production metrics; (3) encouraged Smith to refer potential Reliant borrowers to BBMC—which later closed at BBMC; and (4) coordinated with Smith to get his Reliant branch employees to submit applications to BBMC. (*Id.* ¶¶ 4-6 and Exhibit 1.)

While Smith could have remained at Reliant, he ultimately decided to join BBMC because he considered Tomalak and King to be friends. (*Id.*, ¶¶ 11-12.) After Smith joined BBMC, Tomalak and King were his branches' regional managers, and

2

remained in that role when Smith's branch left Mutual for Waterstone in 2022. (*Id.*, ¶ 8.) Tomalak and King will testify at the upcoming trial. So too will Christine Leyden and Jeff Gennarelli, who were also in leadership positions at BBMC when Smith and his Tampa branch joined BBMC. (*Id.*, ¶ 9.) BBMC later became Mutual. *See* Tomalak Dep Tr., attached as Exhibit A, at 74:7-18; and King Dep. Tr., attached as Exhibit B, at 55:3-8. These same witnesses are expected to testify for Mutual that it was improper for Smith to share branch data with Waterstone and that potential borrower information — much of which is publicly available or ascertainable — is the exclusive property of Waterstone, is not to be shared, and is a Mutual trade secret. Indeed, Mutual's trade secret misappropriation claims are based on the sharing of profit & loss statements, borrower documents, and customer lists. Smith will testify he had no reason to think the information shared with Waterstone was a trade secret given that the same leaders at Mutual asked him for the various disclosures set forth in Exhibit 1 to his Declaration. (*See* Smith Decl. ¶ 9 and Ex. 1.)

### b. Mutual's Cooperation Agreement Has Nothing to do with Smith.

Mutual recently filed a "Mutual Cooperation Agreement" between BBMC and Reliant Bank, D.E. 275-1, in support of its motion and presumably claims the agreement shows Reliant agreed to release certain employees transitioning to BBMC from their restrictive covenants. Mutual will presumably also contend this agreement justifies Tomalak's and King's actions during Smith's Tampa branch's Reliant Bank transition. It does not. (Smith Decl. ¶ 10.) This agreement has nothing to do with Smith. (*Id.*) The agreement relates to other Reliant employees located at select Reliant

3

Bank branches in Illinois, Ohio, Tennessee, and Kentucky, as noted in the agreement recitals. (*Id.*; *see also* D.E. 275-1 at Whereas Cl. 1.) Smith's branch was in Tampa, as was Smith. (Smith Decl. ¶ 10.) Tellingly, the recitals also state that the agreement applies to only "certain of the personnel from the aforementioned Reliant offices" which are listed on Exhibit A of the agreement. (*Id.; see* D.E. 275-1 at Whereas Cl. 2.) Mutual omitted Exhibit A from its filing. (*See* D.E. 275-1.) The exhibit would not have listed Smith because, again, this agreement has nothing to do with Smith or his transition from Reliant to BBMC. (Smith Decl. ¶ 10.) Smith could have stayed at Reliant, which was a BBMC competitor. (*Id*. ¶ 11.) Smith simply chose to transition my Tampa branch so that he could work with Tomalak and King, who he viewed as his friends at the time. *Id*. ¶ 12.

II.    **ARGUMENT**

    a.  **Evidence Of Smith's Recruitment by Mutual's Leadership Is Highly Relevant.**

Evidence surrounding Mutual's recruitment of Smith from Reliant is relevant because the jury will undoubtedly want to hear why Smith was comfortable sharing the Tampa branch profit and loss statement and certain borrower information with Waterstone when transitioning away from Mutual. Smith should be able to explain that he did not consider his disclosures be inappropriate, or violative of any law or agreement, or that Mutual's leadership would take issue with the disclosures. Smith should be allowed to talk about the full extent of his historical relationship with Mutual and its trial witnesses, including the beginning, when Tomalak and King recruited him

4

and asked for a slew of disclosures about Smith's pricing, branch, employees, and borrowers. Further, Mutual's leadership had Smith transferring loans over while Smith still worked for Reliant. And, Mutual's leadership asked for information about the employees in Smith's branch and asked Smith to facilitate the employees' application process. Waterstone will use that testimony at trial to contextualize the conduct at issue and argue Smith did not consider his and the other Tampa employees' conduct as constituting trade secret misappropriation or any tort. By presenting the jury with this context, Waterstone can demonstrate that the actions taken by the employees in departing from Mutual for Waterstone were not unlawful, extraordinary, or malicious, but rather were more conservative than Mutual's leadership's own recruitment practices.

This evidence also goes directly to the credibility of key Mutual witnesses Brian Tomalak, Christine Leyden, and Jeff Gennarelli, all of whom are expected to testify at trial for Mutual. These witnesses were not only involved in Smith's recruitment from Reliant and have knowledge of Mutual's recruitment practices but are also the primary individuals now accusing those same employees and Waterstone of wrongdoing. They will testify that Waterstone's recruitment of Mutual employees constituted trade secret misappropriation, tortious interference, and a breach of the employees' fiduciary duties to Mutual. Waterstone should be allowed to confront those witnesses with evidence of their own prior recruiting practices, as that evidence can be used to directly impeach their credibility at trial when they testify that Waterstone or the employees' conduct was unlawful or theft of trade secrets.

5

Waterstone should be allowed to present that evidence, which will allow the jury to fully evaluate the reliability of their testimony.

      **b. The evidence is also highly relevant to the issue of Mutual's claim for punitive damages.**

Mutual intends to seek punitive damages at trial. (*See* Joint Pretrial Stmt. (D.E 259) at 4, 8-9; Mutual's Prop. Verdict Form (D.E. 264) at ¶¶ 5 – 8.) To have punitive damages awarded by the jury, Mutual must prove that Waterstone's actions were "willful and malicious," or that Waterstone was guilty of "intentional misconduct" or "gross negligence." (Joint Pretrial Stmt. (D.E. 259) at 16 – 18.) To counter this narrative, Waterstone must be allowed to show that the actions Mutual now condemns were not done willfully, maliciously, or intentionally; rather, the employees transitioning to Waterstone considered this to be appropriate based on Mutual's own recruitment practices. This evidence provides necessary context to rebut the notion of exceptional or egregious misconduct, allowing the jury to fully assess the state of mind and intent of the employees involved. Should the jury hear only Mutual's selective narrative, it may improperly conclude that Waterstone's actions were egregious or exceptional. Waterstone should be allowed to present that testimony so that it can tell both sides of the story.

      **c. The Evidence Is Not Confusing Or Unfairly Prejudicial**.

Federal Rule of Evidence 403 permits exclusion of evidence only when the potential for prejudice "substantially" outweighs its probative value. *See* Fed. R. Evid. 403. Here, the relevance of the evidence surrounding Mutual's recruitment of Smith

6

to core issues of Mutual's recruitment practices, witness credibility, and punitive damages far outweighs any speculative prejudice claimed by Mutual. Mutual argues that the presentation of such evidence to the jury would unfairly prejudice Mutual and confuse the issues in the case because "the events that took place in 2016 involv[ed] a completely different lender" and discussion of Mutual's own similar wrongdoing would "become intertwined with the clearly delineated issues in this action." (Mutual's Mot. in Limine, D.E. 260 at 6.) Mutual's concerns are unfounded.

While Mutual attempts to distance itself from BBMC, referring to BBMC as a "completely different lender," Mutual's own employees have testified that the two are one in the same:

> **Q**: So Mr. Smith is writing to you from his personal e-mail account, you're an employee of BBMC which ultimately becomes Mutual of Omaha; correct?
> **A**: Okay.
> **Q**: That's correct, BBMC becomes Mutual of Omaha?
> **A**: Yes.
> …
> **A**: Well, not becomes – I don't – but, yeah, we moved there.
> **Q**: BBMC is a predecessor to Mutual of Omaha; correct?
> **A**: Yes.

Tomalak Dep Tr., attached as Exhibit A, at 74:7-18.

> **Q**: You were working for BBMC when Mr. Smith was considering coming over from Reliant to BBMC; correct?
> **A**: I believe, yes.
> **Q**: And, of course, BBMC ultimately becomes Mutual of Omaha; correct?
> **A**: Yep.

King Dep. Tr., attached as Exhibit B, at 55:3-8.

Mutual argues that BBMC and Mutual are different entities, when they are not. Mutual's own employees consider them to be one in the same. Whether Mutual "became" BBMC, or whether BBMC was Mutual's "predecessor" does not matter—the jury can easily understand that the relevant conduct occurred under the same persons who were in leadership positions at Mutual, regardless of the corporate name.

Nor will this evidence confuse the jury. The timeline and factual context are straightforward: Waterstone will argue at trial that the branch managers and employees could not have had the requisite intent or mindset required to show misappropriation of trade secrets or any other tortious conduct because the very same behavior on which those claims are based had been encouraged by Mutual in the past. The jury will be able to follow the timeline relating to Smith's departure from Reliant to Mutual in 2016, and then from Mutual to Waterstone in 2022.

Mutual's speculative arguments about confusion and prejudice are even less so because Mutual intends to call to testify at trial the very witnesses who were involved with Smith's departure from Reliant. Mutual can fully develop its arguments and version of events through testimony from those witnesses. For example, those witnesses can explain to the jury why they feel actions taken with respect to Smith's recruitment from Reliant were somehow different from what Waterstone is alleged to have done, or why the actions of BBMC should not be attributed to Mutual. There can be no prejudice when Mutual will have every opportunity to present its version of events to the jury.

> **d. The "Mutual Cooperation Agreement" Filed By Mutual Did Not Apply To Smith Or His Branch In Tampa And Is Intentionally Misleading.**

After Mutual filed its motion, it then filed a "Mutual Cooperation Agreement" between Reliant Bank and BBMC Mortgage in support of its motion, which purports to have been signed on March 29, 2016. (D.E. 275-1.) In an apparent attempt to excuse Mutual's behavior with respect to Smith and his Reliant branch in 2016, Mutual argues the agreement is "relevant" because it "reflects that there was an agreement between Reliant and BBMC to 'cooperate in a smooth transition of employees and customers' and permitting the transfer of loans with authorization of the borrower." (*Id.*) Mutual claims this demonstrates "distinguishable circumstances from the case at bar" and thus supports the relief sought in its motion. This agreement is far from relevant—in fact, it is intentionally misleading. As the Agreement filed by Mutual makes explicitly clear, its application was limited to certain Reliant branches located in Illinois, Ohio, Tennessee, and Kentucky. Mutual is well aware that the Reliant branch that Smith managed at the time he was recruited by BBMC/Mutual was located in Tampa, Florida. Accordingly, this agreement had absolutely *nothing* to do with Smith or his Tampa branch. (Smith Decl. ¶ 10.) Conspicuously missing from Mutual's filing is the "Exhibit A" referenced in the agreement that would have listed all of the then-Reliant employees that it applied to. Mutual did not file that Exhibit A because it would not have included Smith. (*Id.*) Moreover, all of the evidence in the record surrounding Smith's transition from BBMC to Mutual pre-dated the signing of this agreement. (*See* Smith Decl. Exhibit 1.) The communications at issue between Smith, Tomalak, and

9

King, took place in early-March 2016—weeks before this agreement was ever signed. The fact that this agreement was later entered into and has nothing to do with Smith whatsoever does not make Mutual's prior actions any less relevant and provides no excuse or grounds for exclusion.

## **CONCLUSION**

Evidence of Mutual's recruitment of Smith from Reliant is not merely relevant; it is essential to Waterstone's defense and to ensure that the jury receives a complete and accurate narrative. For these reasons, Waterstone respectfully requests that the Court deny Mutual's motion in its entirety.

Dated: February 27, 2025.

*s/Maria L. Kreiter*
Maria Kreiter (admitted *pro hac vice*)
Emma Jewell (admitted *pro hac vice*)
Xavier O. Jenkins (admitted *pro hac vice*)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com
xjenkins@gklaw.com

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
carolina.blanco@hwhlaw.com
scott.mclaren@hwhlaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*