# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> WATERSTONE MORTGAGE CORPORATION, <br><br> Defendant. | Case No. 8:22-cv-01660-AEP <br><br> **PLAINTIFF MUTUAL OF OMAHA MORTGAGE, INC.'S RESPONSE IN OPPOSITION TO WATERSTONE MORTGAGE CORPORATION'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON MUTUAL'S TRADE SECRET MISAPPROPRIATION CLAIMS (BORROWER DOCUMENT TRADE SECRETS ONLY)** |

Plaintiff Mutual of Omaha Mortgage, Inc. ("Plaintiff" or "Mutual") hereby files this Response in Opposition to Defendant Waterstone Mortgage Corporation's ("Defendant" or "Waterstone") Renewed Motion for Partial Summary Judgment on Mutual's Trade Secret Misappropriation Claims (Borrower Document Trade Secrets Only), ECF No. 256 ("Motion"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

This Court has already held that Mutual may proceed with its trade secrets claim at trial. Waterstone cannot and does not argue that the uncontroverted sensitive loan opportunities are not trade secrets, but rather it attempts to argue once again that there is no causation. Not only is causation a matter for the jury to decide, but Waterstone's repackaged argument is blind to the reality that Mutual has put forth substantial evidence that Defendant's goal was always to have a seamless transition, a

1

critical and explicit component of which was the transition of loan opportunities to fund the branch transition. After being told that a transition team was a "big one" specifically so that the Managers Chris Wolf, Dwayne Hutto, and Chris Smith ("Managers") could build up a pipeline to fund the transition, minimize the ramp-up period, and allow the pipeline of borrowers to remain intact, Waterstone gave the green light to hire a transition team and begin "transferring as much over as possible." Waterstone never distinguished between the type of information that should be sent over – it wanted it all – and ultimately received and accepted Mutual's customer information, customer lists, and profit and loss statements. In their own words, the former Mutual Managers openly state that but for the transition of this loan information, they would not have been willing to "fund" the transition. And beyond this, transitioning the loan opportunities avoided potential objections of the team of loan officers who would not want their loans to "pop off" and lose them moving to Waterstone. Indeed, Waterstone admits that given the import these teams had on the Managers' compensation, ensuring the complete transition was essential to its recruiting strategy. Mutual has put forth substantial evidence of a causal connection between the borrower information and the theft of the Tampa and Daytona branches, and the jury is entitled to evaluate this evidence in its totality.

## FACTUAL BACKGROUND

I. **This Court Previously Denied Summary Judgment to Waterstone Based on Its Same Arguments About Diverted Loan Opportunities.**

Waterstone filed its first trade secrets motion for summary judgment in February 2024, in which it made causation arguments. *See, e.g.*, ECF No. 137 at 10-11 (arguing no "identified harm based on the alleged trade secrets" and no damage demand based on diverted loans). In response, Mutual laid out the substantial evidence of causation, including that (1) identified qualified customers were diverted to Waterstone as part of a "transition" team to build a pipeline of customers; (2) the borrower information was sent to avoid the loss of the pipeline and financially support the transition; and (3) the absence of this information would have precluded a seamless transition necessary to allow the Branches to pick up and move companies in unison. Mutual Opposition, ECF No. 151 at 17-18.

During oral argument, Waterstone focused on causation, arguing (as a basis to grant summary judgment) that Mutual is not seeking damages related to the diverted loans. June 13, 2024 Hearing Tr., ECF No. 209 at 52:5-9 ("Mutual has stipulated and is not seeking damages with regard to diverted loans. That was a stipulation that was put on file by the parties in May."). The Court initially considered this argument "a very valid point" and then asked, "Why then the significance, again, back to my original question, 5 to 17 [borrowers] particularly since these are not even related to any damage calculation? It's just simply the trade secrets." *Id.* at 52:13-17. Mutual explained that if not for all the pieces of the lift-out, the branches would not have left.

3

The Court, fully aware of Mutual's 17 borrower opportunities and the stipulation regarding damages, denied Waterstone's Motion. *See* Order, ECF No. 197; *see also* June 13, 2024 Hearing Tr., ECF No. 209 at 57:15-58:12. ("Ms. Kreiter, my ruling is going to stand […] I am going to deny your motion[.]"

## II.   The Borrower Opportunities Were a "Big One" in Enabling the Lift-Out.

Waterstone's Motion is focused only on causation. It is not about whether the 17 borrower opportunities qualify as a trade secret, because substantial record evidence establishes that the borrower opportunities belonged to Mutual and had value, regardless of whether a loan was closed. Indeed, Waterstone's counsel admitted to this Court that they do not have a defense to the 17 borrower opportunity trade secrets. September 30, 2024, Hearing Tr., ECF No. 248 at 7:24-8:1 ("I definitely do have to start over with what is the defense to the trade secret claim, because the primary defense that I have is just gone."). But while the "renewed" Motion focuses only on causation, the evidence demonstrates that the borrower opportunities were central to the illegal lift-out of Mutual's Tampa and Daytona branches ("Branches").

### A. The Managers' Own Statements Create Sufficient Evidence of Causation.

The Court need look no farther than a November 3, 2021 email wherein the former Mutual Managers explicitly state that the ability to transfer loan opportunities was "a big one" in their consideration of whether move to Waterstone, because they were unwilling to fund the transition. In one of the initial conversations between the

Managers and Waterstone, the former Managers collectively write to Waterstone's Regional Vice President - Southeast, Dustin Owen:

> can we send loans over to start and build up a balance of money to fund [the] transition. *This is a big one. I am not and I am sure Dwayne is not writing a check to them for $200,0000 to fund the first 60 days or so of fixed costs.*

Email from C. Wolf to D. Owen 11/3/2021 at WMC006266 (emphasis added), attached as **Ex. A**.[1] And, Waterstone shortly thereafter allowed the managers to do this. Notwithstanding the self-serving response in that November email, Waterstone in March of 2022 ultimately encouraged the loan officers to "send over a small team" to get "up and running," who would build their loan pipeline while also asking for the former Managers to "transfer[] as much over as possible." Email from D. Owen to C. Wolf 3/5/2022 at WMC006622, attached as **Ex. B.**

As instructed by Waterstone, the employees and Managers sent a transition team (**Ex. B** at WMC006622) and a plethora of borrower documents, information, and data belonging to Mutual to their personal emails and/or straight to Waterstone email accounts.[2]

---

[1] Out of an abundance of caution, Mutual is redacting other portions of the email that do not pertain to this motion which discuss information concerning Waterstone's compensation and products.

[2] On April 20, 2022, Krystin Friebis accepts through her Waterstone email, documents of borrower "Ryan" sent from Chris Wolf (through his personal Gmail account). Borrower documents included: Paystubs, Form 1003 Uniform Residential Loan Application, Florida driver's license, Social Security Card, W-2s, credit report history. *See* Mutual Trade Secret Exhibit 7 at WMC001297, attached as **Ex. C**. On April 22, 2022, Chris Wolf provides via email to Dawson Walker (Waterstone Producing Sales Manager) documents of Mutual borrowers, the "Byers." Documents included Credit Card authorization, Form 1003 Uniform Residential Loan Application, Credit History, Paystubs for both borrowers, W-2s, Bank Statements, Social Security Card, and Drivers Licenses, etc. Mutual Trade Secret Exhibit 6 at WMC001763, attached as **Ex. D**.

5

Simply put, the express statements and actions preclude summary judgment. The Managers explicitly asked to send over loan opportunities to fund their transition and clearly intimated they were unwilling to join Waterstone unless this was permitted. A few months later, Waterstone agreed and permitted and encouraged this behavior. In and of itself, that is enough to allow the jury to consider the issue of causation. Had Waterstone not facilitated this behavior, based on the explicit words of the former managers, they would likely not have joined Waterstone. [3]

### B. There is No Basis to Distinguish the Loan Opportunities from Other Trade Secrets.

The goal of the lift-out was simple: Waterstone and the Managers "really wanted to try to create as much of a seamless transition as possible."[4] Kevin Allen, Waterstone's Corporate Representative, testified that Waterstone provides "an investment in dollars for somebody to transition over without as much harm" and that

---

[3] The fact that Waterstone only closed two borrowers out of the multitude that were diverted is a red herring. Substantial evidence in discovery showed there is value to loans regardless of whether they ultimately close because the loan officer can work with the borrower to improve credit and make the loan application viable. *See* Chris Leyden Dep. Tr. at 28:23-29:13, attached as **Ex. E** ("Loans can be denied for a number of reasons and are very often resuscitated[.] "we have all of the information to move forward with that loan. It's just at the current time it doesn't necessarily qualify, but that doesn't mean that there's not a potential later on.") Indeed, a borrower committed to a loan is substantially more valuable than leads that many managers purchase, where the borrower's appetite is unknown. *See* Chris Wolf Dep. Tr. at 126:14-128:12, attached as **Ex. F**; Dwayne Hutto Dep. Tr. at 95:1-8, 97:7-17, 100:1-16, attached as **Ex. G**. Moreover, the perception that the loans had value and were transitioned fueled the belief that they would fund the branch during the transition and prevented loan opportunities from being lost. Thus, like many things in life, the perception here that the opportunities were seamlessly transferring is more critical to the lift out than the fact of whether they ultimately closed.

[4] *See* **Ex. F** at 179:18-21 (Q. "you really wanted to try to create as much of a seamless transition as possible; correct? A Correct."); 56:6-8 ("we had some people go over first to kind of make it a more smooth transition [.]").

Waterstone touts its ability to assist with a seamless transition. *See* Kevin Allen Dep. Tr. at 108:14-16; 145:3-146:1, attached as **Ex. H**.

Part of this seamless transition was the transference of Mutual Trade Secrets to allow its loan officers and Managers to continue soliciting the same borrowers for loans. This took the form of stealing customer databases,[5] some of which were stolen days after certifying to Mutual that such information had been destroyed.[6] It also took the form of mining those databases for loans during the transition period using a spoofed Mutual email address.[7] And the final – and perhaps most important element – of this misappropriation was the borrower opportunities themselves. Indeed, with respect to these opportunities, the Managers specifically called out that they were a "big one" because they were "not writing a check" to fund the transition. *See* **Ex. A** at WMC006267. To segregate these particular trade secrets from the others makes no sense whatsoever. These loan opportunities were the most direct and immediate chances at the diversion of revenue and were simply part of a broader and more elaborate plan to steal all of Mutual's relevant customer data. To evaluate that

---

[5] Mutual Trade Secret Exhibit 18 at WMC001450 (email attaching "Kyrstin Funded 04112022" which is a closed loan database), attached as **Ex. I**; Mutual Trade Secret Exhibit 19 at WMC005539 ("attached is our closed loan list in the field mapping you have requested. It contains all refinances and purchases closed."), attached as **Ex. J** (remainder of email not relevant, and thus redacted); Mutual Trade Secret Exhibit 20 at MOM-001175 (attaching "Customer address list", "email list-closed loans bbmc", "email list – prospects", "email list closed loans" and "email list1-50"), attached as **Ex. K**.

[6] Mutual Trade Secret Exhibits 19 and 20 were taken on June 13, 2022 (**Ex. J** at WMC005539) and June 10, 2022 (**Ex. K** at MOM-001175). The certifications were emailed to Mutual on June 3, 2022. *See* Email, ECF No. 115-2.

[7] Email from E. Briones to C. Wolf, K. Friebis, and T. Giraldo at MOM-0014130, attached as **Ex. L** ("Contacted Dwayne's past clients[…].") (borrower information redacted).

7

misappropriation without the element that the former Branch Managers specifically demanded, and which represented the most immediate return in terms of actual sales, would be wholly nonsensical. Though it is obvious why Waterstone wants to avoid the introduction of this evidence, it would be clearly erroneous to do so.

### C. The Theft of the Borrower Data Was Critical to a Seamless Transition.

To effectuate a seamless transition, the Managers needed to take their entire team with them in one fell swoop. Anything that interfered with the Managers being able to move these teams would threaten the success of the lift-out. Indeed, the Managers confirmed that taking their team was critical to their decision to leave Mutual for Waterstone. *See* **Ex. H** at 278:6-10 (agreeing "no manager is really going to come over if [they] can't take the whole team."); **Ex. F** at 73:14-17 (testifying he wants employees to come with him); Chris Smith Dep. Tr. at 46:18-47:16; 48:5-10, attached as **Ex. M** (would rather keep team together). Otherwise, the manager loses significant income from the downstream production (that is, the loans closed by their loan officers). **Ex. M** at 48:5-10, 48:18-50:1 ("my income is based off of whoever I hire and train and get to produce"); **Ex. G** at 10:20-25 (paid based on loans to branch); **Ex. H** at 87:14-18 (Managers "certainly want [their employees'] production."). Therefore, anything that impacted the loan officers' decision to leave directly threatened the entire lift-out itself.

Of course, loan officers – who are paid on commission – would at least hesitate to make a move if they perceived it as creating a risk that they would lose loans in the

8

process. Where loan officers are paid on commission for each closed loan – and their managers generate income from the downstream production of those loan officers – disruption happens when loans are lost in transition. *See* **Ex. G** at 185:20-186:11 (loan officers were paid on commission); 189:17-20 (agreeing compensation "in large part is based on the production of the people who work in your branch"). For example, one loan officer, Michael Irish asks manager Chris Wolf, "could I be one of the first people to transition over?" because "I would hate to have my pipeline pop off within the next 30 days and then be out of my commissions[.]". *See* Email from M. Irish to C. Wolf 4/8/2022 at MOM-0002173, attached as **Ex. N**. Mr. Irish – who was permitted to transfer over in advance – exemplifies the concern that would have arisen had Waterstone not allowed the Mutual loan officers to divert opportunities through a transition team. Accordingly, the evidence of the diversion and misappropriation of the loan opportunities cannot be excluded from this litigation, irrespective of whether the loans closed. After all, it was the perception of the loan officers and managers that opportunities would transfer that is far more important in this case because it mooted loan officers' hesitation in switching from Mutual to Waterstone.

## **LEGAL STANDARD**

Summary judgment is not appropriate where there are genuine disputes as to any material fact. Fed. R. Civ. P. 56(a). It is the movant's burden to demonstrate that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). To do so, the Defendant

must show that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Indeed, the moving party bears "the responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).[8]

## ARGUMENT

### I. The Court's Prior Ruling in This Case Held Mutual Has Shown Causation Between the Diverted Loan Opportunities and The Branch Lift-Outs.

Waterstone presents again its previously insufficient causation arguments to seek a different result. The Court heard Waterstone's arguments regarding a lack of causation and found that there was a sufficient tie between the trade secrets and the lost profits damages Mutual seeks. Nothing has changed since the Court's ruling on June 13, 2024. But while Waterstone now admits that it has no defense to the trade secrets claims,[9] it attempts to avoid liability for its theft with an inartful repackaging of its causation argument. Here, the evidence in the record, including admissions and communications of the Managers and Waterstone, and the actual events that

---

[8] Waterstone entirely fails to carry its burden at summary judgment. Nowhere in Waterstone's Motion does it even attempt to discuss how it has shown there is no genuine dispute of material fact and apply that standard to the evidence it submitted.

[9] Rightly so, as Mutual clearly established the elements of trade secret protection in discovery. *See e.g.*, fn 5.

transpired following those communications, create a question of fact for the jury, and therefore, summary judgment should not be granted.

## II. Mutual Has Established Causation, Creating, at a Minimum, a Jury Question.

### A. Under Florida Law, Mutual Must Only Prove Proximate Causation, Which Is Typically Left to the Jury.

For causation to be satisfied, the defendant's actions do not need to be the sole cause of the damages sought; rather, they must be a "substantial factor" in causing the lost profits. *Cedar Hills Props. Corp. v. E. Fed. Corp.*, 575 So. 2d 673, 678 (Fla. 1st DCA 1991). Any difficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as it is clear that substantial (rather than merely nominal) damages were suffered as a result of the wrong, and the competent evidence is sufficient to satisfy the mind of a prudent, impartial person as to the amount. *James Crystal Licenses, LLC v. Infinity Radio, Inc.*, 43 So. 3d 68, 74 (Fla. 4th DCA 2010). This analysis is the same for misappropriation of trade secrets. *See, e.g., ChromaDex, Inc. v. Elysium Health, Inc.*, 2019 WL 7166056, at *1 (C.D. Cal. 2019) (internal citation omitted) ("Damages are caused by trade secret theft if the trade secret theft was a 'substantial factor' in causing the damages."); *Univ. of Miss. Med. Ctr. v. Sullivan*, No. 3:19-CV-459-CWR-LGI, 2022 WL 304835, at *3 (S.D. Miss. Feb. 1, 2022) ("traditional tort principles" including "proximate cause" apply to DTSA misappropriation claims).

Causation analysis is usually left to the jury to decide. *Advantor Sys. Corp. v. DRS*

*Tech. Servs.*, 678 F. App'x 839, 850-51 (11th Cir. 2017) ("we find [plaintiff]'s theory of causation logical and conclude that the question whether [plaintiff]'s loss of business was, in fact, caused by [defendant]'s conduct should be put to a factfinder."); *XTec, Inc. v. Hembree Consulting Servs.*, 183 F. Supp. 3d 1245, 1261 ("denying judgment as a matter of law because the jury needed to analyze causation"); *Armor Corr. Health Servs. v. Teal*, No. 19-cv-24656-BLOOM, 2021 WL 5834245, at *14 (S.D. Fla. Dec. 8, 2021) (citations omitted) (denying summary judgment on causation because there was both direct and circumstantial evidence and therefore "it is for the jury to decide[.]").

### B. The Borrower Information Was Necessary to Facilitate the Seamless Transition, Which Cannot Be Separated from The Rest of the Stolen Trade Secrets.

Mutual has established that the information related to the diverted borrowers was necessary to a seamless transition, satisfying Florida law on causation. The Court need only look to the statements of the Managers and Waterstone representatives to find that there is sufficient evidence of causation.

Mutual's Former Employees specifically stated that a critical element in their decision to leave Mutual was allowing for a quick ramp-up period to fund the branch transition. It was a "big one" because, without it, the Managers had no intention of "writing a check" to fund the cost of the ramp-up period. *See* **Ex. A** at WMC006267. So, to avoid that obvious obstacle to recruiting the branches, Waterstone hired a transition team of former Mutual loan officers in advance of the lift-out to allow the loan officers at Mutual to start building a pipeline of Mutual loans at Waterstone. *See*

12

Ex. B at WMC006622; *see also* **Ex. N**. Beyond funding the transition, this prevented loan officers from losing deals which was a priority for loan officers like Michael Irish. *See* **Ex. N**. Indeed, Waterstone and the former Managers focused on taking loan opportunities, customer lists, and prequalified customers, confirming that such activity was critical to that transition. Whether it was the diversion of the Daytona Branch customer lists,[10] the misappropriation of the Tampa customer databases only days after certifying to Mutual that such information had been destroyed,[11] or the diversion of leads using spoofed email addresses accessing Mutual's database,[12] a focal point of the lift-out was taking all the information Mutual used to generate customers. And, the most critical of that information which presented the most likely immediate revenue, were the borrower opportunities. Thus, to evaluate this theft of trade secrets without consideration of the borrower opportunities is the equivalent of taking the nucleus out of the cell. This is particularly true where it was part of a larger plan to seamlessly transition the entire branch, something that simply could not happen if the commissioned salespeople and managers dependent on this information to generate deals, had been forced to leave without it. *See* **Ex. F** at 179:18-21. The mere prospect of losing existing deals and information about current and past customers and then-present opportunities would have precluded the wholesale "seamless" transition.

---

[10] *See* fn 5, *supra*.

[11] *See* fn 5-6, *supra*.

[12] *See* fn 7, *supra*.

13

The fact Waterstone specifically told the Former Employees to take as much information as possible from Mutual about their customers precludes any argument that this information was not critical to Waterstone's plan. *See* **Ex. B** at WMC006622. Waterstone's Motion attempts to artificially distinguish between the 17 loan opportunities and the remaining trade secrets needed to facilitate the seamless transition. The information was all taken by the same people, at the same time, and with the same goal. To divorce the loan opportunities from the remainder of the information is wholly illogical. A jury is entitled to consider whether the loan opportunities - along with the other Mutual trade secrets – were a proximate cause of the lift-out. At a minimum, any doubt as to causation means the question must go to a jury, and summary judgment is inappropriate.

### C. The Self-Serving Declarations Do Not Meet the High Standard for Summary Judgment and are Refuted by Substantial Evidence.

It is for the jury to compare the evidence of employees' contemporaneous conduct to the Managers' self-serving, after-the-fact declarations and decide the weight of each. But as these declarations are a clear attempt to contradict the direct evidence, it is abundantly clear that the issue is not appropriate for summary judgment. *Matrix Health Grp. v. Sowersby*, No. 18-61310-CIV, 2019 WL 4929917, at *7 (S.D. Fla. Oct. 7, 2019) (denying summary judgment on trade secret claim because, among other things, the defendant's argument "turn[ed] on his testimony that he compiled this data 'on his own'—that … he simply kept all of this information stored somewhere in the recesses of his prodigious memory," because credibility determinations are the function of a

14

jury, and "on this issue (if not others), a jury may well disbelieve [the defendant's] account").

## CONCLUSION

For the reasons set forth above, the Court should deny the Motion in its entirety.

Dated: March 3, 2025

By: /s/ Ari Karen
Ari Karen (*pro hac vice*)
Arielle Stephenson (*pro hac vice*)
**MITCHELL SANDLER PLLC**
2020 K St NW, Suite 760
Washington, D.C. 20006
akaren@mitchellsandler.com
astephenson@mitchellsandler.com
Telephone: (202) 886-5292

Daniel P. Dietrich (FL Bar No. 934461)
Gregory L. Pierson (FL Bar No. 123905)
**GUNSTER, YOAKLEY & STEWART, P.A.**
401 East Jackson Street, Suite 1500
Tampa, Florida 33602
ddietrich@gunster.com
gpierson@gunster.com
Telephone: (813) 228-9080

*Attorneys for Plaintiff Mutual of Omaha Mortgage, Inc*

## CERTIFICATE OF SERVICE

I certify that on March 3, 2025, a true and correct copy of the foregoing was filed with the Court via CM/ECF which will send a notice of electronic filing to the parties of record.

/s/ Ari Karen
Ari Karen