# **EXHIBIT G**

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
Civil Action No.: 22-CV-01660

MUTUAL OF OMAHA
MORTGAGE INC.,
      Plaintiff,
v.

WATERSTONE MORTGAGE
CORPORATION,
      Defendant.
_____/

DEPOSITION OF
DWAYNE HUTTO
(Volume I, pages 1 - 171)

DATE TAKEN:     June 15, 2023
TIME:           9:03 a.m. to 3:57 p.m.
PLACE:          Gunster, Yoakley & Stewart, P.A.
                  401 East Jackson Street
                  Suite 1500
                  Tampa, Florida 33602

TAKEN BY:      The Plaintiff

REPORTED BY:   Victoria White
                  Court Reporter and Notary Public

Page 10

1  different things were sent and when it was completed; do you
2  see that?
3      A.   Yes.
4      Q.   Using your best recollection, does this look
5  accurate in terms of that you signed this agreement and when
6  you signed this agreement?
7      A.   It does.
8      Q.   Is this the first employment agreement you've
9  ever signed?
10     A.   No, sir.
11     Q.   Did you sign an employment agreement with Mutual
12 of Omaha?
13     A.   I believe so.
14     Q.   And I wanted to go through a couple of things in
15 this agreement.  If you can turn to page 16 and if you look
16 about halfway down in bold there's a B, a little B and a
17 little 1, it says 250 basis points for eligible loan; do you
18 see where it says that?
19     A.   Um-hmm.  Yes, sir.
20     Q.   And so tell me if I understand this correctly or
21 correct me if I'm wrong, what that means, if I understand
22 this, is that for every loan that comes in the branch that
23 you manage, you essentially get 250 basis points credited to
24 the branch; is that right?
25     A.   Yes, credited to the branch P&L.

Page 95

1     A.   Not the ones I buy.  Zillow leads and the
2  Realtor.com, they do not.
3     Q.   So is it fair to say just all you're really
4  getting in the leads that you buy is contact information?
5     A.   Correct.
6     Q.   And obviously they're worth something, right, or
7  you wouldn't pay for them?
8     A.   Correct.
9     Q.   But you would agree with me if you had a credit
10 score and you knew ahead of time someone had a 300 credit
11 versus 800 credit, that would be valuable information,
12 wouldn't it?
13          MS. KREITER:  Object to the form.
14          THE WITNESS:  Not really for me.  A lead's a
15      lead.  I call them, pull the credit.  I don't go by
16      off of -- I wouldn't trust, might I say, what someone
17      tells me their credit score is.
18 BY MR. KAREN:
19    Q.   Well, what is the conversion -- do you know the
20 conversation rate on the leads that you buy?
21    A.   I do not.
22    Q.   Okay.  What I'd like to do is just kind of
23 understand how the practice of a loan works, okay?
24          So you get these leads, right, what's the first
25 thing you do?

1  Q. So there are a lot of reasons it can fall off --
2  A. Correct.
3  Q. -- from credit score to income to --
4  A. Lots.
5  Q. -- to desire?
6  A. Correct.
7  Q. Sometimes you would call somebody up on one of
8  these Zillow leads and they're like, oh, yeah, I was just
9  looking.
10 A. Correct.
11 Q. Right, window shopping, as they say?
12 A. Yes.
13 Q. So what percentage do you know fall out, if you
14 can tell me, from just sort of that initial conversation?
15 A. A lot. If I had to guess, 90 percent.
16 Q. Oh, really, that high? So a lot.
17 A. 80 to 90, I would guess.
18 Q. Okay. And then you go to kind of the next step
19 after that. What is the next step for that 10 to 20 percent
20 that make it through that kind of first cut?
21 A. It's -- you put them in process and, you know,
22 they send their income documents in. It basically goes into
23 processing with a loan partner.
24 Q. But they first have to be buying a house, right?
25 Because, in other words, you could be looking at a house and

Page 100

1  Q. Okay. All right. So you've kind of cut this
2  all the way through. So what you're saying out of the --
3  all of those Zillow leads and stuff you buy, each loan has
4  about a 5 percent chance of actually becoming a loan?
5  A. I'd say approximately.
6  Q. Okay. And is it fair to say that aggregately
7  when you have these leads you buy, a lot of work goes into
8  getting to that 5 percent through that; is that fair to say?
9  A. Correct.
10 Q. And a lot of time?
11 A. Yes, correct.
12 Q. So if you could have a person who was ready,
13 willing able to buy at stage one and you absolutely
14 100 percent know it, that's more valuable than a Zillow
15 lead, isn't it?
16 A. Yes, it would be.
17 Q. Give one moment. Let me ask you to take a look
18 at another document here. And, sir, I'm going to --
19        MS. KREITER: This is Exhibit 7?
20        MR. KAREN: Yes.
21        (Plaintiff's Exhibit No. 7 was marked for
22        identification.)
23 BY MR. KAREN:
24 Q. And, sir, as you look at this I'm going to
25 represent to you this is not a document that was produced in

Page 172

```
 1                UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION
 3                       Civil Action No.: 22-CV-01660
 4
     MUTUAL OF OMAHA
 5   MORTGAGE INC.,
 6        Plaintiff,
     v.
 7
     WATERSTONE MORTGAGE
 8   CORPORATION,
 9        Defendant.
     _____/
10
11                       DEPOSITION OF
12                        DWAYNE HUTTO
13              (Volume II, pages 172 - 266)
14   DATE TAKEN:     June 15, 2023
15   TIME:           9:03 a.m. to 3:57 p.m.
16   PLACE:          Gunster, Yoakley & Stewart, P.A.
                     401 East Jackson Street
17                   Suite 1500
                     Tampa, Florida 33602
18
     TAKEN BY:       The Plaintiff
19
     REPORTED BY:    Victoria White
20                   Court Reporter and Notary Public
21
22
23
24
25
```

1   been involved in the offer.  He more handles that stuff, I'm
2   out running around and running events, things of that
3   nature.
4           Q.   Okay --
5           A.   But, yeah, I don't remember.  I can tell you
6   that anybody that came over with us, whether it was somebody
7   we hired new that came from Waterstone or previous people
8   that wanted to come, everything stayed the same on their
9   offers as it would have been with Mutual.
10          Q.   Okay.  So --
11          A.   We didn't change our pay, might I say.
12          Q.   Okay.  Now, we can go back -- and I apologize,
13  the Michael Irish e-mail a second ago, Exhibit 14.
14          A.   Yes, sir.
15          Q.   And if you look, continue down the e-mail, he
16  says, a couple of questions, will we still be on a draw or
17  would this be a hundred percent commission?  Is there health
18  insurance?  So had you got -- when had you guys made those
19  decisions?
20          A.   This is April 8th.  Everything was the same.
21  Obviously, there's health insurance, you have to have health
22  insurance with a bank and we are always a hundred percent
23  commission.  So I don't know, I mean, that's -- that was
24  even with Mutual.  I mean, if you're not an LOA or you're
25  not an hourly employee, then you're receiving commission.

1  Q.  Okay.  But did they get a base salary at Mutual?
2  A.  No, they did not.
3  Q.  So --
4  A.  Well, I mean, it depends on who it is but, you
5  know, the salespeople, no.
6  Q.  Okay.  And did they get a base salary over at
7  Waterstone?
8  A.  No.
9  Q.  So in both cases they were a hundred percent
10 commission?
11 A.  Correct.  Everything is exactly the same on
12 both, to my knowledge.  I don't -- unless I'm missing some
13 little small detail --
14 Q.  I understand.  I understand.
15 A.  Yes, so it's exactly the same, to my knowledge.
16 Q.  Okay.  And were the basis points payable the
17 same way?  In other words --
18 A.  The basis points are exactly the same.
19 Q.  Okay.  So the move over was effectively -- it
20 was an even move, right?  You didn't get more basis points
21 or anything else, you just kept everything the same?
22 A.  It was even, every aspect, except getting a lot
23 better customer service.
24 Q.  Okay.
25 A.  And being with a better company, in my opinion.

```
 1        Q.   So Waterstone sort of left that to you, right,
 2   to tell them about it and see if they wanted to come over?
 3        A.   Yeah, I didn't discuss that with Waterstone.  It
 4   was, you know, it was just really, you know, I let them know
 5   that I was coming over so they had the option.  I wasn't --
 6   I wasn't worried, might I say, we've been together for years
 7   and like I said, they're some of my best friends, several
 8   are my neighbors, next-door neighbors work for me and work
 9   for us as a team.  I never say for me, I try not to.  But,
10   yeah, I kind of had a good feeling they would want to come
11   because we're good friends and just like, you know, the same
12   way it would be with you.  But, yeah, Waterstone we never
13   discussed what I need to tell them or not.
14        Q.   Okay.  And that's my question, Waterstone left
15   this part of the process up to you?
16        A.   Correct.
17        Q.   Now I think we covered this before; your
18   compensation in large part is based on the production of the
19   people who work in your branch, right?
20        A.   Correct, I also do quite a bit myself.
21        Q.   That's what I was getting at.  What percent of
22   the production -- I know it changes month by month, but on
23   average what do you think, what percentage do you do
24   yourself?
25        A.   Now or back then?  It's different now --
```