# **<u>EXHIBIT A</u>**

1

1    IN THE UNITED STATES DISTRICT COURT
         MIDDLE DISTRICT OF FLORIDA
2                TAMPA DIVISION
        CASE NO.: 8:22-cv-01660-TPB-JSS

3

MUTUAL OF OMAHA
4    MORTGAGE, INC.,

5        Plaintiff,

6    vs.

7    WATERSTONE MORTGAGE
     CORPORATION,

8

        Defendant.
9    _____/

10

11

12

     DEPOSITION OF:          **JEFFREY GENNARELLI, CORPORATE**
13                           **REPRESENTATIVE OF MUTUAL OF OMAHA**
                             **MORTGAGE, INC.**
14

     TAKEN:                  Pursuant to Notice by
15                           Counsel for Defendant

16   DATE:                   May 25, 2023

17   TIME:                   9:17 a.m. to 4:53 p.m. EST

18   LOCATION:               Hill Ward Henderson
                             101 East Kennedy Boulevard
19                           Suite 3700
                             Tampa, Florida  33602

20

     REPORTED BY:            Melanie Keefe, FPR
21                           Notary Public
                             State of Florida at Large

22

23

24

25

—————REGENCY REPORTING SERVICE, INC. (813)224-0224—————

2

```
 1    APPEARANCES:      COURTNEY WALTER, ESQUIRE
                        CHRIS McCALL, ESQUIRE (Zoom)
 2                      Mitchell Sandler LLC
                        1120 20th Street Northwest
 3                      Suite 725
                        Washington, DC  20036
 4
                        MARK CARROLL, ESQUIRE
 5                      Mutual of Omaha Mortgage, Inc.
                        100 West 22nd Street
 6                      Suite 101
                        Lombard, Illinois  60148
 7
                            Attorneys for the Plaintiff
 8
                        MARIA L. KREITER, ESQUIRE
 9                      EMMA J. JEWELL, ESQUIRE (Zoom)
                        Godfrey & Kahn, S.C.
10                      833 East Michigan Street
                        Suite 1800
11                      Milwaukee, Wisconsin  53202

12                      CAROLINA Y. BLANCO, ESQUIRE (Zoom)
                        Hill Ward Henderson
13                      101 East Kennedy Boulevard
                        Suite 3700
14                      Tampa, Florida  33602

15                      STEPHANIE CATHERINE ZIEBELL, ESQUIRE (Zoom)
                        Waterstone Mortgage Corporation
16                      N25W23255 Paul Road
                        Pewaukee, Wisconsin  53072
17
                            Attorneys for the Defendant
18

19    ALSO PRESENT:   Carrie Macsuga

20

21

22

23

24

25
```

3

| 1 | INDEX | PAGE NUMBER |
|---|---|---|
| 2 | Examination by Ms. Kreiter | 5 |
| 3 | Read Letter | 255 |
| 4 | Errata Sheet | 256 |
| 5 | Reporter's Certificate | 257 |

4

1                                      E X H I B I T S

| Exhibit | Description | Page |
|---|---|---|
| 1 | Amended Notice of Federal Rule 30(b)(6) Deposition of Plaintiff Mutual of Omaha Mortgage, Inc. | 6 |
| 2 | LinkedIn for Jeff Gennarelli | 11 |
| 3 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Fourth Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Requests for Production of Documents | 16 |
| 4 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Second Amended Responses and Objections to Defendant Waterstone Mortgage Corporation's First Set of Interrogatories | 16 |
| 5 | E-Mails, Subject: Letter of Funding | 35 |
| 6 | E-Mails, Subject: Resignation | 84 |
| 7 | MOOM Summary of Corporate Earnings Contribution from Tampa and Daytona Branches | 124 |
| 8 | Plaintiff Mutual of Omaha Mortgage, Inc.'s Responses and Objections to Defendant Waterstone Mortgage Corporation's Second Set of Interrogatories | 136 |
| 9 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance | 136 |
| 10 | MOOM Profit and Loss Statement for Tampa | 144 |
| 11 | Independent Auditors' Report and Consolidated Financial Statements for Mutual of Omaha Mortgage, Inc., for the Years Ended December 31, 2022, and 2021 | 159 |
| 12 | E-Mails, Subject: MOOM Financial Performance for June 2022 | 179 |
| 13 | E-Mails, Subject: Tampa | 199 |
| 14 | MOOM 2024 Plan vs. 2023 Plan | 202 |
| 15 | Glossary of English-Spanish Financial Terms | 219 |
| 16 | MOOM Buyer Dos and Don'ts | 235 |
| 17 | MOOM Profit and Loss Statements, Payroll Detail, Group Health Insurance, Loans Held for Sale, Transaction Listings | 250 |

5

1    THEREUPON,

2      JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF

3                      OMAHA MORTGAGE, INC.,

4        a witness herein, having been duly sworn, was examined

5    and testified upon his oath as follows:

6                      THE WITNESS:  I do.

7                          EXAMINATION

8    BY MS. KREITER:

9        Q.   Mr. Gennarelli, state your name and spell it for

10   the record, please.

11       A.   Jeff Gennarelli, G-e-n-n-a-r-e-l-l-i.

12       Q.   Have you had your deposition taken before?

13       A.   I have.

14       Q.   Just a few ground rules that I'm going to go over

15   before we get started.  First, there's a court reporter

16   here.  She's taking down everything that you say, everything

17   that I say.  Because of that, I'm going to have to police

18   myself and make a point of talking slow, waiting until you

19   finish with your answer before I speak, and I'll ask that

20   you do the same.

21       A.   Sure.

22       Q.   In addition, because she's typing down the

23   answers, I need you to give verbal answers, yes, no, et

24   cetera, as opposed to nods of the head, which she can't take

25   down.

6

1          And then, finally, if you need a break at any

2    time during the deposition, it's not a, you know, federal

3    investigation here.  Just let me know, and we will take a

4    break.  I would just ask that if there's a question that I

5    have pending to you, answer the question prior to taking a

6    break.  Does that make sense?

7          A.   It does.

8          Q.   If you don't understand a question that I ask

9    you, let me know that.  If you don't let me know, I'm going

10   to assume that you understood the question.  Agreed?

11         A.   Yeah, yes.

12         Q.   Great.  Start with Exhibit 1.  Hand that to the

13   court reporter, please.

14         A.   Then I can look at it?

15              (Exhibit No. 1 is marked for identification.)

16         Q.   Yes, please do.  Exhibit 1 is the notice for this

17   deposition.  You understand that you're testifying today not

18   in your personal capacity but on behalf of the plaintiff in

19   this case, Mutual of Omaha Mortgage; correct?

20         A.   Yes.

21         Q.   My understanding is that you're testifying on

22   behalf of Mutual with respect to Topics 1 through 12 in the

23   deposition notice; correct?  And there's a separate witness

24   tomorrow testifying as to the remaining topics; correct?

25         A.   Yes.  Correct.

7

1          Q.    What did you do to prepare for your testimony

2    today?

3          A.    I read over the Complaint.  I looked at some of

4    the e-mails.  There's not a lot of discovery yet, I don't

5    think, but I looked at what I did, looked at the -- that's

6    really -- that's really about it, a couple of conversations

7    with -- with counsel.

8          Q.    You said you looked over e-mails.  What e-mails

9    would those be?

10         A.    E-mails that were in the discovery folder.

11         Q.    Got it.  So was it that somebody shared a

12    discovery folder with you and --

13         A.    Yes.

14         Q.    Okay.  How would you go about identifying that

15    folder that was shared with you in prep for the deposition?

16         A.    I don't understand what you mean.

17         Q.    Did you get a link in an e-mail, or how did the

18    documents come to you?

19         A.    Oh, sure.  Yeah, link and e-mail.  Yeah.

20         Q.    How many e-mails were in this folder available

21    through the link?

22         A.    I mean, not that many.  We -- we didn't do a ton

23    of preparation in that regard.  There's maybe -- I don't

24    know.  I'll say 20, 30 e-mails, something like that.

25         Q.    You say you didn't do much preparation in that

8

1    regard.  In that regard with respect to e-mails or in

2    general for the deposition?

3         A.    Yeah, I think in general.  I mean, I think I am

4    going off of just I was around when this happened.

5         Q.    Were there other documents besides the 20 to 30

6    e-mails in the folder that you received?

7         A.    There's a -- I don't know if -- you know, if it

8    was the same e-mail, but there's a spreadsheet that showed

9    calculations of -- for damages, and really that was the

10   majority of it.

11        Q.    Any other spreadsheets that you looked at?

12        A.    Not really, no.

13        Q.    Who sent you the link with the documents to

14   review?

15        A.    Counsel.

16        Q.    Did you take notes as to any of the documents

17   that you reviewed?

18        A.    I did not take -- we had verbal conversations.  I

19   didn't take notes.

20             MS. WALTER:  Object to form that any of this is

21        going to call for any sort of attorney-client

22        privileged conversations.

23             MS. KREITER:  I don't think that's the case.

24        Q.    How long did you spend reviewing the documents

25   that were sent to you?

9

```
 1          A.    A couple days.

 2          Q.    A few full days or certain parts --

 3          A.    Sporadic throughout the days.

 4          Q.    How much total time do you think you spent

 5     preparing?

 6          A.    Ten hours.

 7          Q.    Did you talk to anyone besides counsel in

 8     preparation for your testimony today?

 9          A.    No.

10          Q.    Aside from the documents that were in the link

11     sent to you, are there any other documents that you

12     unilaterally sought out yourself from other -- you know,

13     from the server or from e-mails?

14          A.    You know, I want to be clear.  I've seen e-mails.

15     Like, you said what did I do to prep.

16          Q.    Correct, just focused on that.

17          A.    But earlier on I saw e-mails also when this first

18     happened, so I -- I can't have my notes -- you know, I can't

19     have the e-mails in front of me.  I don't know what e-mails

20     came from a link and what e-mails I saw prior while we were

21     preparing for this.

22                When we first knew that this happened -- right?

23     -- so if you were to ask me did you -- what e-mail did you

24     see where, I just don't want to be dishonest.  You know,

25     there's a lot of e-mails I looked at before, and there was
```

10

1    e-mails I looked at now.

2        Q.   Right.  So I'm interested just in the e-mails, if

3    any, outside of the link that you reviewed to the extent

4    that you can remember in preparation for the deposition.

5        A.   Okay.  I mean, I think the link had a ton of

6    e-mails --

7        Q.   Got it.

8        A.   -- in it.  You know, but if you would've asked me

9    how many I looked at, I don't know.

10       Q.   Your current position at Mutual is president of

11   forward mortgage; is that correct?

12       A.   I think my actual title is EVP of production, but

13   I'm also the president of forward mortgage, yes, so it

14   depends on...

15       Q.   EVP of production for Mutual of Omaha or forward?

16       A.   Yeah, EVP of production for Mutual of Omaha

17   Mortgage.

18       Q.   How does forward mortgage relate just

19   structurally to Mutual of Omaha?

20       A.   We're a wholly owned subsidiary in a holding

21   company that's owned by Mutual of Omaha insurance.

22       Q.   And what is reverse?

23       A.   Reverse mortgage is a sister company to us.

24   We're the same subsidiary, so -- and they specialize in --

25   they call it HECMs, home equity for, you know, reverse

11

1      mortgages.  And they have -- I have a peer that runs that.

2      I don't run that company.

3            Q.   Got it.  Sorry.  Is that marked Exhibit 1?  I

4      don't see a number on it.

5            A.   It is.

6            Q.   Okay.  Great.

7                 MS. KREITER:  Exhibit 2, please.

8                 (Exhibit No. 2 is marked for identification.)

9            Q.   Take a look at Exhibit 2, if you would.

10           A.   Yes.

11           Q.   This is your LinkedIn profile; is that correct?

12           A.   Yes.

13           Q.   Just take a moment.  Is there anything missing

14     from this LinkedIn profile in terms of your experience in

15     the mortgage industry?

16           A.   I don't think so.

17           Q.   You've been in the industry for a while.  Does

18     your experience in the industry include things like

19     recruiting branches?

20           A.   Yes.

21           Q.   Do you recruit branches for Mutual of Omaha?

22           A.   It's not my primary function.

23           Q.   What would you say is your primary function?

24           A.   Running the company, the operations of Mutual of

25     Omaha Mortgage.

12

1          Q.   When was the last time you were involved in

2     recruiting a branch for Mutual of Omaha?

3          A.   Well, I would say -- I don't know -- probably a

4     year -- I mean, what do you mean "involved"?  I guess I'm

5     involved in all -- all recruiting that occurs --

6          Q.   Sure.

7          A.   -- you know, so -- but not my main

8     responsibility, so...

9          Q.   And so is your involvement, you know, you sign

10     off on the hire, or are you involved in the sense that

11     you're meeting with a potential recruit?

12               MS. WALTER:  Object to form.

13               Go ahead.  You can answer.

14          A.   Okay.  It depends what's needed, you know.

15          Q.   When's the last time that you were involved in

16     recruiting in the sense that you were actually meeting with

17     a recruit?

18          A.   Well, we had a branch return for us that had

19     previously left, and so that was probably, oh, six months

20     ago or so.

21          Q.   And you were involved in one-on-one

22     conversations --

23          A.   Yes.

24          Q.   -- in connection with that branch return?

25          A.   Yes.

13

1          Q.    Where is that branch located?

2          A.    The northwest, so in Portland.

3          Q.    Is part of your role analyzing the profitability

4     of branches of Mutual of Omaha?

5          A.    Analyzing our profitability of our branches?

6          Q.    Correct.

7          A.    Yes.

8          Q.    How often do you do that as part of your current

9     role?

10         A.    Monthly at least depending if the branch has

11    issues or not.

12         Q.    What about analyzing profitability on a

13    person-by-person basis, for example, analyzing the

14    profitability of a certain branch manager or a certain loan

15    officer?  Is that part of your duties now?

16         A.    You know, there's other management between maybe

17    me and that.  But generally, yes, still -- I still oversee

18    that.  Yeah.

19         Q.    Did you get certain reports that reveal to you

20    the profitability of certain loan officers and branch

21    managers?

22         A.    I don't get reports on a loan-officer basis

23    necessarily, but I have access to a system that I can

24    generate my own reports that I can pull, see if someone is

25    doing loans or they're not doing loans, you know.

14

1          Q.    What is that system?

2          A.    Encompass.

3          Q.    Does the Encompass system that you're referring

4    to allow you to generate a report as to monthly loan volume

5    for a particular --

6          A.    Sure.

7          Q.    -- loan officer?

8          A.    Yes.

9          Q.    And annual as well?

10         A.    Yes.

11         Q.    What about as opposed to loan volume revenue

12   generated?  Does it show you that metric?

13         A.    Yes.

14         Q.    What about profitability as opposed to just

15   revenue?  Is that metric shown in the Encompass report?

16         A.    Not necessarily, no.

17         Q.    How well are you aware of the relationships

18   between the branch managers that are at issue here, so

19   Dwayne Hutto, Chris Smith, and Chris Wolf?

20               MS. WALTER:  Object to form.

21               Go ahead.

22         A.    Ask me this again.

23         Q.    Sure.  You know, sometimes you have a lot of

24   interaction with colleagues, and you kind of understand the

25   friends, the relationships.  Do you have that type of

15

1    knowledge with respect to the three branch managers that

2    left Mutual of Omaha and joined Waterstone, which is Dwayne

3    Hutto, Chris Smith, and Chris Wolf?

4            MS. WALTER:  Object to form.

5        Q.    Do you understand the question?

6        A.    I do.

7        Q.    Great.

8        A.    I would say that I have some knowledge but not

9    great knowledge, yeah.

10        Q.    Who at Mutual would have the best knowledge of

11    the relationships between the managers?

12        A.    I would -- I would say probably Kiley King or

13    Brian Tomalak, who are their direct supervisors.

14        Q.    Do you have any -- have you had any personal

15    interactions with not the managers but the other loan

16    officers that are at issue in this case who left Mutual and

17    came over to Waterstone?

18        A.    I would say not a ton of interaction with the

19    original loan officers.

20        Q.    Are you able to speak to the relationships

21    between those loan officers and the managers?

22        A.    No.

23        Q.    But you believe that Ms. King and Mr. Tomalak

24    would have that type of knowledge?

25        A.    Better than myself, yeah.  Yeah.

16

1              (Exhibit No. 3 is marked for identification.)

2         Q.   Okay.  Take a look at what we've marked as

3    Deposition Exhibit No. 3.  This is Mutual's responses to

4    Waterstone Mortgage interrogatories.  Did you review this

5    document in preparation for the deposition?

6         A.   I think so.

7         Q.   I'm going to start -- if you would turn to page 5

8    of the document, there's a paragraph 1 that reads "Itemize

9    your damages, including the formula used to calculate those

10   damages."  I'm going to start there.  Do you see that?

11             MS. WALTER:  Sorry, Maria.  Where are we?

12        Page 5?

13             MS. KREITER:  So this should be --

14        A.   Page 5, it says "Produce all documents."

15        Q.   Okay.  Start with that.  Let's switch that out.

16        A.   Do you not want this to be 3?

17        Q.   You know, you can just set it aside.  I'll give

18   you a different one.

19        A.   Okay.

20             MS. KREITER:  You can just make this 4.

21             (Exhibit No. 4 is marked for identification.)

22             MS. WALTER:  Do you have a copy for me, Maria?

23        Q.   So the document -- let me just make sure that we

24   have the right document.  The first page, it says "Plaintiff

25   Mutual of Omaha Mortgage Second Amended Responses and

17

1    Objections to Defendant Waterstone Mortgage Corporation" on

2    the first page there.

3         A.    Yeah.  Okay.

4         Q.    Okay.  And the first sentence says "Pursuant to

5    the Federal Rules of Civil Procedure 26."  Is that what you

6    have there?

7         A.    That is what I have.

8         Q.    Perfect.  Now, if you can turn to page 5, please,

9    paragraph 1, "Itemize your damages."  Are you there?

10        A.    Yes.

11        Q.    So it says "Itemize your damages, including the

12   formula used to calculate those damages."  Do you see that?

13        A.    I do.

14        Q.    This Exhibit 4, is that one of the documents that

15   you reviewed in preparation for the deposition?

16        A.    Yes.

17        Q.    So I have read the request into the record.  Then

18   there's a response.  There's a series of objections.  And

19   then the first bullet point towards the bottom, do you see

20   that?

21        A.    I do.

22        Q.    And you understand that this is a written

23   response to a request for information about the damages

24   sought in this case presented to Mutual and then Mutual's

25   response?  You understand that; correct?

18

1      A.    I do, yes.

2      Q.    The first bullet reads "Lost revenue and profits

3   from loans that were improperly diverted from plaintiff to

4   defendant."  Do you see that?

5      A.    I do.

6      Q.    So I'm going to stop at the first part of that

7   sentence, "Lost revenue and profits."

8      A.    Yes.

9      Q.    Which is Mutual seeking, revenue or profits?

10          MS. WALTER:  Object to the form.

11          Answer.

12      A.    So, I mean, I think this is a great question you

13   brought up because I think that in a lot of these cases we

14   should be seeking gross revenue.

15      Q.    Why is that?

16      A.    Well, because there's fixed costs that go into,

17   you know, the profit that are going to remain, whether we

18   lose these loans or not.  Each individual loan is

19   exponentially more valuable in a gross profit, you know,

20   view.  I mean, I think that gross revenue really is what we

21   should be talking about.  I don't believe we are.  But if it

22   was solely up to me, we'd be talking about gross revenue.

23          That's -- I would use the -- I would use the

24   analogy of a cost of goods sold model where you take the

25   revenue less the commissions would be the number I would

19

1      attach to that, which I think is much more accurate.  We

2      chose to use a different model, which was profit.

3          Q.   So that's what I just -- it sounds like you have

4      one view on what should be sought, and that's a personal

5      view on behalf of Waterstone -- or sorry -- on behalf of

6      Mutual.  What is Mutual seeking?  Is it revenues or is it

7      profits with respect to this category?

8          A.   They're both profit.  One is gross profit.  One

9      is net profit.  So right now we laid out the deal of net

10     profit.  You know, I think gross profit is still on the

11     table.  I'm not -- personally, I haven't taken it off, and I

12     run the company.  So -- but I think the spreadsheet we set

13     was -- was the simplest way we can explain it was net

14     profits.

15         Q.   A few things that I want to clarify there.  So

16     this first bullet point says "Lost revenue and profits from

17     loans that were improperly diverted from plaintiff to

18     defendant."

19         A.   Yeah.

20         Q.   And then it goes on on page 6.  Do you see that?

21         A.   Yes.

22         Q.   And then it lists over 800 Bates numbers over the

23     next few pages.  And then, finally, on page 28, there's a

24     second bullet point.  Do you see that?  Sorry.  On page 27,

25     there's a second bullet point.

20

1    A.    Yes.

2    Q.    And then if you turn to page 28, there's a third

3    bullet point.  Do you see that?

4    A.    I do.

5    Q.    Maybe it will help to just define three different

6    categories of damages, is my understanding, that Mutual is

7    seeking three different categories.  The first is reflected

8    in the first bullet point, "Lost revenue and profits from

9    loans that were improperly diverted," so I'll call that

10    diverted loan damages.

11    A.    Yeah.

12    Q.    The second on page 27, "Profits plaintiff would

13    have made but for defendant's unlawful conduct, which caused

14    plaintiff to have to close its branches in Tampa and Daytona

15    Beach," do you see that?

16    A.    Yeah.

17    Q.    So I'm going to call that the closed branches.

18    A.    Sure.

19    Q.    And then on page 28, "Ill-gotten gains, including

20    compensation paid or advanced by defendant to plaintiff's

21    prior employees" -- and it goes on.  Do you see that on

22    page 28?

23    A.    I do.

24    Q.    So I'm going to call Bucket No. 3 the ill-gotten

25    gains bucket.

REGENCY REPORTING SERVICE, INC. (813)224-0224

21

1          A.    Okay.

2          Q.    For now, I want to just focus on Bucket No. 1,

3    the bucket that is associated with lost revenue and profits

4    from loans that were improperly diverted, so the first

5    bucket --

6          A.    Yes.

7          Q.    So my understanding is that the contention is

8    there were loans that should've closed at Mutual that did

9    not and instead closed at Waterstone with respect to that

10   first bucket?

11         A.    Correct.

12         Q.    I don't see in the written responses, as to the

13   first bucket, any type of number demand.  I do see that when

14   you get to page 27, when you start talking about the second

15   bucket.

16         A.    Yeah.

17         Q.    So for purposes of this deposition --

18         A.    Sure.

19         Q.    -- now is the time when I get to exhaust and find

20   out exactly what damages are sought.

21         A.    Sure.

22         Q.    With respect to the first bucket, what are the

23   damages sought?

24         A.    Well, I think a lot of that has to do with

25   discovery we haven't been provided yet.  We don't know.  We

22

```
 1    haven't looked at Waterstone's books to see what loans have
 2    closed.  We only -- how do we know -- we know of a couple of
 3    instances of loans that were diverted for sure, but we don't
 4    know the totality of the loans that were diverted because we
 5    don't have access to Waterstone's closed loan report.
 6         Q.   Mr. Gennarelli, when was the lawsuit filed?  It
 7    was filed in July.
 8         A.   Okay.
 9         Q.   It's been pending for ten months.
10         A.   Okay.
11         Q.   Has Mutual served discovery on Waterstone?
12              MS. WALTER:  Object to the form.
13              MS. KREITER:  The witness is testifying that he
14         doesn't believe Mutual has had a chance to explore the
15         claims.  I'm following up on that testimony.
16         Q.   Do you know whether Mutual of Omaha has served
17    discovery on Waterstone?
18              MS. WALTER:  Object to the extent it implicates
19         attorney work product.
20         Q.   Go ahead and answer.
21         A.   I'll say I have not seen a closed loan report
22    coming from Waterstone.  If I have seen that, then we can go
23    back and backtrack.
24         Q.   Are you --
25         A.   What I have seen, though --
```

23

1      Q.    Sorry.  Go ahead.

2      A.    What I have seen were our customers sent to

3 Waterstone to the head underwriter at Waterstone asking if

4 these loans would work by -- by Mutual of Omaha Mortgage

5 employees.  I have seen that.  So I know that there was

6 some.  Do I know the extent of it?  I haven't seen that.

7 And I didn't think I was going to -- I didn't think I was

8 asked to testify to the fact of what Waterstone has.

9      Q.    Well, you're here to testify about the damages,

10 and I heard you say that you haven't been able to calculate

11 damages because discovery has just started.

12           MS. WALTER:  Object to form.

13      Q.    Is that accurate?

14      A.    In my mind, I have not received enough

15 information.  I haven't seen -- I do know this:  Customer

16 information was sent to personal e-mails.  We don't -- we

17 haven't -- we haven't looked at any personal e-mails.

18      Q.    Mr. Gennarelli, are you aware that in the fall of

19 '22 Waterstone produced in discovery a list of the loans

20 that had been closed at the branches within the first three

21 months?  Are you aware of that?

22           MS. WALTER:  Object to form.

23           MS. KREITER:  What's wrong with the form?

24           MS. WALTER:  Maria, carry on.

25           Answer the question.

24

1          MS. KREITER:  What is the objection to the form?

2     Because I'll restate it.

3          MS. WALTER:  I am objecting properly pursuant to

4     how I'm supposed to object.

5     Q.    Do you understand the question, Mr. Gennarelli?

6     A.    I do.

7     Q.    Go ahead and answer.

8     A.    I was aware of a small list that was provided.

9     I'm also aware that we have not looked at personal e-mails.

10    Our customer list was sent numerous times to personal e-mail

11    addresses.  We haven't looked at those e-mails and what

12    happened to that data after it was in the personal e-mail.

13    Q.    When you were preparing to testify on behalf of

14    the company today as to the loans that have improperly

15    transferred to Waterstone, did you go back and look at the

16    list of loans closed at Waterstone that was produced in

17    discovery in the fall?

18    A.    Yes.  But I didn't think it was an all-inclusive

19    list, to be honest with you.

20    Q.    Did you compare that list to the list of loans in

21    the pipeline at Mutual of Omaha?

22    A.    Well, they wouldn't be in the pipeline.

23    Q.    Did you use that list produced by Waterstone back

24    in the fall and try to analyze which of those loans closed

25    at Waterstone you believe should've been closed at Mutual?

25

1            MS. WALTER:  Object to the extent it implicates

2       attorney work product.  He's here as -- he's --

3            MS. KREITER:  He's --

4            MS. WALTER:  He's not the attorney.

5            MS. KREITER:  He's not here as an individual.

6       He's here as a corp rep.

7            MS. WALTER:  I did not say individual.  I said he

8       is not the attorney in the case.

9            MS. KREITER:  I'm entitled to ask what documents

10      and what preparation this witness did to testify about

11      damages for which ten months into the case Mutual has

12      not disclosed any number, so that's the line of my

13      questions.

14      Q.   Do you have a number, Mr. Gennarelli, with

15   respect to this first bucket, the loans that have

16   transferred to Waterstone from Mutual of Omaha?  Have you

17   looked at the loans, and do you have a number that you're

18   ready to present at the deposition today with respect to

19   Bucket 1?

20      A.   I don't have a number with respect to Bucket 1.

21      Q.   Is Mutual seeking damages with respect to

22   Bucket 1?

23      A.   I believe so.

24      Q.   But you're not able to tell me what those damages

25   are?

26

1          A.    Not at this moment.

2          Q.    Has you or anyone at Mutual made an attempt to

3     calculate those damages?

4          A.    I have not.

5          Q.    Has anybody at Mutual?

6          A.    Not that I'm aware of.

7          Q.    And your position is that you're waiting to do

8     more discovery?

9                MS. WALTER:  Object to form.

10         A.    It is.

11         Q.    What more discovery do you need to do?

12               MS. WALTER:  Object to form.

13         A.    Well, I'd like to see the personal e-mails where

14    all of our data was sent to.  That's what I'd really like to

15    know so that I can understand the absolute damage caused by

16    this unbelievable breach of conduct.

17         Q.    Did Mutual of Omaha Mortgage send subpoenas to

18    any of the individuals who have those e-mails?

19               MS. WALTER:  Object to the extent it implicates

20          attorney work product.

21               MS. KREITER:  Work product --

22               MS. WALTER:  Mr. Gennarelli isn't going to be

23          able to answer how discovery is being conducted in the

24          case.  That's my job.

25               MS. KREITER:  The fact that subpoenas have gone

27

1          out is not a privileged question.

2               MS. WALTER:  I didn't -- I said it implicates

3          attorney work product.  I didn't say it was privileged.

4          I'm not instructing him not to answer.

5          Q.   Do you have an understanding --

6          A.   I'm not aware of the subpoenas or not.  I don't

7     know.

8          Q.   So you don't know whether Mutual has made an

9     effort to, for example, subpoena the personal e-mails of any

10    of the individuals that you claim are necessary?

11         A.   I am not aware.

12         Q.   When you were preparing to testify for the

13    deposition, did you have discussions or requests, access to

14    the e-mails that you believe are necessary to calculate

15    Category 1 damages?

16              MS. WALTER:  Object to the extent it implicates

17         attorney work product or goes to attorney-client

18         discussions.

19         Q.   Go ahead.

20         A.   Repeat the question.

21         Q.   Sure.  I hear you testifying that Mutual is

22    unable to calculate damages with respect to Category 1,

23    which we've defined as the loans that have closed at

24    Waterstone due to some unlawful conduct.  And I'm trying to

25    understand your testimony.

28

1              I've heard you say that calculation hasn't been

2       done because you haven't seen personal e-mails, and I've

3       heard you testify that you don't know whether there have

4       been any subpoenas issued by Mutual in an effort to try to

5       get the e-mails.  So now my question is in connection with

6       preparing for this deposition --

7              A.    Yes.

8              Q.    -- did you make any efforts at that point in time

9       to seek out the e-mails that you believe are necessary to

10      testify on the topic noticed?

11              MS. WALTER:  Object to form.

12              A.    I didn't -- I did not.

13              MS. WALTER:  Can we take a ten-minute break?

14              MS. KREITER:  Sure.

15              (A recess was taken.)

16              MS. KREITER:  Can you just read back the last

17      question and last answer, please?

18              (The previous question and answer was read by the

19      reporter.)

20              Q.    (By Ms. Kreiter)  So there may be times during

21      this deposition when I say "you."  You're testifying on

22      behalf of Mutual.  If I say "you" during this deposition,

23      just understand that I mean Mutual collectively as a

24      company; correct or understood?

25              A.    Yes.

29

1          Q.   Would it surprise you if a comparison of the

2     loans that had closed at Waterstone compared to the loans

3     that were in the pipeline of Mutual had been done and that

4     the damages resulting from that analysis was less than

5     $50,000?

6               MS. WALTER:  Object to form.

7          A.   In the three-month period, is that what you're

8     referencing, that --

9          Q.   In that interim period of time.

10         A.   Yes, then it would surprise me and --

11         Q.   What do you think the lost profits are?  Are you

12     able to give a ballpark?

13         A.   For Bucket 1?

14         Q.   For Bucket 1.

15              MS. WALTER:  Object to form.

16         A.   This is something the attorneys worked on, to be

17     perfectly frank, you know.  And I know, you know, it would

18     not surprise me -- if it was just for a three-month period,

19     it would not surprise me.

20         Q.   If it's less than $50,000?

21         A.   For a three-month --

22              MS. WALTER:  Object --

23         A.   -- period.

24         Q.   Correct.  What about for an 18-month period?  Do

25     you have any sense as to what that number is?

30

1          MS. WALTER:  Object to form.

2     A.    On Bucket 1 only?

3     Q.    Bucket 1 only.

4     A.    No, I wouldn't know whether it was for 18 months.

5     Q.    When you say this is something that the attorneys

6   worked on, what do you mean?

7          MS. WALTER:  Object to form.

8     A.    Well --

9          MS. KREITER:  What's the objection?

10         MS. WALTER:  The objection is if it calls for a

11       discussion with counsel, it's privileged.

12         MS. KREITER:  My question was what are the

13       damages sought?  And the witness testified it's

14       something the attorneys worked out.

15    Q.    Is that a correct statement of your position?

16  You believe that the damages sought are something the

17  attorneys worked out with respect to Bucket 1?

18    A.    Yes.

19    Q.    What do you mean by that?

20         MS. WALTER:  Object to form.

21    A.    I don't know.  I don't know what else I can mean

22  by that.

23    Q.    Regardless, on behalf of Mutual, you're not

24  prepared to testify today as to any particular number sought

25  with respect to Bucket 1; correct?

31

1          A.    Not for -- not for Bucket 1.

2          Q.    I'm going to go back to my original question.

3     Bucket 1 talks about lost revenue and profits.  I understand

4     you have a personal view that it should be lost revenue on

5     behalf of Mutual today at the deposition on this topic.

6     Which is it, revenue or profits?

7               MS. WALTER:  Object to form.

8          A.    I'm happy to talk to either one if you'd like.

9     So, you know, again, it's -- generally, it's -- it would be

10    gross profits, not net profits, you know, on cost of goods

11    sold.

12         Q.    So I'm just trying to pin down at this deposition

13    what is sought by Mutual in the case.  The bullet on the

14    bottom of page 5 reads "Lost revenue and profits."  Is it

15    Mutual's contention that it's entitled to both lost revenue

16    and lost profits with respect to Bucket 1?

17         A.    Yes.

18         Q.    Explain that.

19         A.    I just did.  There's -- there's gross revenue.

20    That's, you know, cost of goods sold, and there's the

21    profit.

22         Q.    Okay.  And your position is that Mutual should

23    collect both the revenue and the profits?

24         A.    Yes.

25         Q.    Okay.  Let's play this out so I understand.  With

32

1    respect to a loan that closed, say the revenue -- and I'm

2    just using hypothetical numbers.  The revenue coming in to

3    Mutual from that loan is a hundred grand.  What would be the

4    profits approximately?  Strike that.

5            Let me ask it a different -- assume the profits

6    -- when you take out all the costs, assume the profits are

7    $20,000.  Is it your position that Mutual is seeking both

8    the hundred-thousand-dollar revenue and the $20,000 profits

9    for a total of 120-?

10   A.    Well, if you sell -- if you sell a loan for a

11   hundred thousand dollars, the revenue isn't a hundred

12   thousand dollars; right?  It is -- the revenue of a

13   hundred-thousand-dollar loan, generally speaking, at these

14   branches is going to be about $4,200 after commissions.

15   Q.    I'm concerned about double-dipping.  Does that

16   make sense to you?  And I'm trying to understand, are you

17   counting twice?  So for example, are you counting a hundred

18   thousand dollars as the revenue and then also seeking

19   20,000 --

20   A.    I said a hundred thousand dollars, not the

21   revenue.  You said that was the loan amount.

22   Q.    No.  Wait a minute.  So sorry.  Let's start

23   again.  Assume revenue from a loan -- I just picked that

24   number.  I can pick a smaller number if that's --

25   A.    We're only seeking -- we're only seeking the

33

1    profit.

2        Q.   Okay.  That's what I'm trying to get at.  The

3    profit derived, not the initial revenue without subtracting

4    out any costs?

5        A.   Correct.

6        Q.   Okay.  So lost revenue and lost -- it doesn't say

7    lost profits, but I'm assuming that.  Lost revenue and

8    profits, Mutual is seeking the profits?

9        A.   Yes.

10        Q.   Thank you.  This response, like I said, it's

11    starting on page 5.  There's a narrative response, and then

12    Bates numbers start on page 6 and go all the way through

13    page 26.  Mutual has listed 836 documents here.  Do you see

14    that?  You don't have to count them all.  It will take you

15    some time, but do you see that the Bates numbers listed --

16        A.   Yes.

17        Q.   -- go until page 27?

18        A.   Yes.

19        Q.   I did count them.  It's 836 documents.  How did

20    these 836 documents reveal to Waterstone the damages sought

21    with respect to Category 1?

22        MS. WALTER:  Object to form.

23        A.   I'm not sure how they did.

24        Q.   None of these documents identified by Bates

25    number list a monetary number demand; correct?

34

1          A.    Correct.

2          Q.    Do you have any idea what the documents listed

3     have to do with an itemization of Mutual's damages,

4     including a formula used to calculate the damages?

5          A.    Yes, I believe I do.

6          Q.    What is the connection?

7          A.    Are we still talking about Bucket 1 --

8          Q.    Correct.

9          A.    -- or are we talking about in general?

10         Q.    I'm talking about Bucket 1 because the 836

11    documents are identified with respect to Bucket 1.

12         A.    Okay.

13         Q.    So I need to know how does that relate at all to

14    the request, which was "Itemize your damages, including the

15    formula used to calculate those damages"?  Are there

16    documents within the 836 that contain a formula?

17              MS. WALTER:  Object to the extent that

18         Mr. Gennarelli is not here to testify on every single

19         document that's in response to Interrogatory No. 1.  He

20         is a designated corporate rep to testify to things the

21         corporation knows or reasonably available to it.

22              MS. KREITER:  The corporation is the entity that

23         shows --

24              MS. WALTER:  He is not required to pore over

25         every document that has been produced or that we

35

1    produced in this case.

2         MS. KREITER:  For the record, Mutual is the

3    entity that chose to respond to the discovery request

4    not by proving a number but instead by referencing 836

5    documents, so I'm following up on the disclosures made

6    to date by the company.

7         MS. WALTER:  Objection.

8    Q.   Do you understand that?

9         MS. WALTER:  Objection to the extent it's been

10   asked and answered.  Apology for interrupting.

11        MS. KREITER:  Could you read back my question?

12        (The previous question was read by the reporter.)

13   Q.   Go ahead and answer.

14   A.   I haven't reviewed all those documents, so I am

15   not aware that there are a formula in there.

16        MS. KREITER:  If I could have this next document

17        -- what number are we on?

18        MS. WALTER:  5.

19        (Exhibit No. 5 is marked for identification.)

20        MS. WALTER:  Do you have a copy?  Oh, thank you.

21   Q.   Take a look at Deposition Exhibit No. 5.  These

22   are some of the documents that were identified by Bates

23   number with respect to Bucket 1.  In these documents that

24   are Exhibit 5, is there any formula or damage demand that

25   you can see from the document?

36

```
 1          A.    No.

 2          Q.    Do you know whether these documents relate to a

 3    loan that closed with Waterstone instead of Mutual?

 4          A.    I don't know offhand, no.

 5          Q.    What efforts has Mutual made to discern whether

 6    the borrower discussed in Exhibit 5 was wrongfully solicited

 7    to move its loan to Waterstone?

 8                MS. WALTER:  Object to form.

 9          A.    Say this one more time.

10          Q.    Yeah.  With respect to the documents in

11    Exhibit 5 --

12          A.    Yes.

13          Q.    -- what efforts has Mutual made to discern

14    whether this borrower was wrongfully solicited to move his

15    or her loan to Waterstone?

16                MS. WALTER:  Before you answer, Jeff, I just want

17          to put on the record a standing objection to the extent

18          that Mr. Gennarelli has not reviewed 836 documents in

19          this case.  I don't want to keep objecting, but that's

20          not the requirement.  That's not what he's required to

21          do.  And so that being said --

22          Q.    I want to go back to the question.  But before I

23    do that, I want to turn back to Exhibit No. 1, please.  And

24    Exhibit 1, again, is the notice for this deposition.

25    Topic 2 -- with respect to Topic No. 2 on Exhibit A, do you
```

37

1       see the Damages heading?

2           A.   Yes.

3           Q.   And then No. 2, it says "The relationship between

4       Mutual's alleged damages and the documents Mutual designated

5       in its March 10, 2023, amended response to Interrogatory 1,

6       which states 'Itemize your damages, including the formula

7       used to calculate those damages.'"  So it was noticed as a

8       topic that you were to prepare for for this deposition to be

9       in a position to talk about the relationship between the

10      damages sought and the documents that were identified in

11      response to Interrogatory 1.  That's exactly what I'm asking

12      about.

13          A.   Yes.

14          Q.   So I heard counsel say you're under no obligation

15      to review the 836 documents.  What did you do to prepare for

16      Topic No. 2?

17          A.   What was Topic 2?

18          Q.   The one that I just read.

19          A.   Oh.

20          Q.   "The relationship between Mutual's alleged

21      damages and the documents Mutual designated in its March 10,

22      2023, amended response to Interrogatory No. 1," the one that

23      we were talking about, the one for which Mutual designated

24      836 documents.

25          A.   Right.

38

1          Q.   What did you do to prepare for that deposition

2     topic?

3          A.   We looked over -- I looked over e-mails similar

4     to this that shows Dwayne from a Mutual Mortgage e-mail

5     sending a borrower to Waterstone.

6          Q.   Okay.  So I'm trying to understand how 836

7     documents relate to an itemization of damages.  Are you able

8     to tell me that?

9               MS. WALTER:  Object to form.

10         A.   So I think you're asking for a formula, right,

11    for damages on this?  I don't know what you're asking for.

12         Q.   Let me just read the topic and then see if you

13    can answer.  The --

14         A.   What's the value of this customer?  Can you tell

15    me that?  No, I'm asking you.  I'm asking anybody in this

16    room.  Can you tell me the value of this customer?

17         Q.   Well, as the plaintiff in the case, that's why

18    I'm asking you.

19         A.   Yeah.

20         Q.   It's identified as related to --

21         A.   And I'm telling you the value of a customer is

22    much more than some silly calculation.  It's trust.  It's

23    brand.  It's integrity.  This customer reached out because

24    we're Mutual of Omaha and then was steered to Waterstone.

25         Q.   Do you know whether that customer closed a loan

39

1    at Waterstone at all?

2         A.   I don't know --

3         Q.   Do you know whether that customer --

4         A.   -- not off the top of my head.

5         Q.   -- is included in some damage calculation done by

6    Mutual of Omaha?

7         A.   Well, I do know this:  This is -- see this?  This

8    is nonpublic information.  This customer was -- nonpublic

9    information was forwarded from a Mutual of Omaha employee to

10   a Waterstone employee.  That's as bad as it gets.  I've been

11   in this business for a long time.  You rarely see these

12   instances.  I think that's why you're trying to point out

13   some nebulous -- some nebulous formula in terms of the --

14   losing customers, and I think it's much greater than that.

15        We can talk about formulas in terms of Bucket 2.

16   But in Bucket 1, it's much greater than a formula.  It's the

17   actual brand of Mutual of Omaha.  What's the value of that

18   brand?  And here's somebody representing that brand just did

19   just like this to the customer here.  We're going to give it

20   away.  That is unbelievable to me.

21        And we want to argue about a formula, a silly

22   formula?  It's a customer.  It is nonpublic information that

23   we just sent not securely, mind you, willy-nilly through the

24   Internet to Waterstone, and the Waterstone person says "Oh,

25   great.  Fantastic."  And we want a formula.

40

1          Q.   My question to you, do you even know whether this

2     loan closed at Waterstone?

3          A.   It doesn't matter.  It's irrelevant.  It's only

4     relevant to you.  It's not relevant to us.  This is our

5     customer.  This is our public information.  What's relevant

6     to you doesn't matter to me.  What's relevant to me is this

7     customer information and the customer's well-being, not

8     whether some silly loan closed.  That's -- we'll get to that

9     in paragraph 2.  This is a customer.

10         Q.   Mr. Gennarelli --

11         A.   This is, like -- I don't even understand how we

12    can be spending so much time on some silly formula when we

13    have this -- just this unbelievable disregard for any type

14    of ethics whatsoever.

15              MS. KREITER:  Can you read back my question,

16         please?

17              (The previous question was read by the reporter.)

18         Q.   Do you know?  Yes or no?

19         A.   No.

20         Q.   Do you know whether Mutual is counting this loan

21    in its damages in any respect?

22              MS. WALTER:  Object to form.

23         A.   In the damages where?  What damages?  In

24    Bucket 1?

25         Q.   Damages in Bucket 1.

41

1    A.    I would say that if we -- if this proceeds to

2    trial, you will see a damage calculation for Bucket 1, and

3    it's not going to be a silly formula.  It's going to be a

4    representational calculation.

5         MS. KREITER:  Can you read back my question,

6    please?

7         (The previous question was read by the reporter.)

8    A.    It is counting this loan as damages, yes.

9    Q.    Okay.  How much is sought based on that loan?

10   A.    We just said there's no damages set yet for

11   Bucket 1.

12   Q.    Mutual didn't retain a damages expert for this

13   case; correct?

14        MS. WALTER:  Object to form.

15   A.    Not to my knowledge, no.

16   Q.    Does Bucket 1 assume that all of the loans closed

17   at Waterstone were improperly solicited?

18        MS. WALTER:  Object to form.

19   A.    Yes.

20   Q.    Why?

21   A.    Well, I think for several reasons.  I mean, I

22   don't know where you want me to start.  Do you want me to

23   start with the person who made a fake e-mail address up that

24   had Mutual Mortgage in the title of the e-mail, or, I

25   mean -- or do you want to start with the -- with the data

42

1    that was sent while they were still employed?  I mean, I

2    don't know where you want to go.

3        Q.   Let me ask you this question.  Forget about

4    Bucket 1 globally.

5        A.   Yeah.

6        Q.   Do you know -- do all of the Mutual employees who

7    left and went to Waterstone, do they all have nonsolicits?

8             MS. WALTER:  Object to form.

9        A.   I believe that the sales staff certainly does.  I

10   don't know about every single employee, but I believe that

11   they -- as far as I know, they did.

12       Q.   Do you believe all the managers did?

13       A.   Yes.

14            MS. WALTER:  Object to form.

15       Q.   Has there ever been a legal proceeding in which

16   the enforceability of the Mutual restrictive covenants has

17   been challenged in a court or an arbitrator has found that

18   the covenants are unenforceable for the period of 2018

19   through the present?

20            MS. WALTER:  Object to form.

21       A.   No.

22       Q.   Do you know whether Dwayne Hutto -- sorry.  You

23   might've answered this.  Do you know whether Dwayne Hutto

24   has a customer nonsolicit?

25       A.   He does have a customer nonsolicit.

43

```
 1          Q.    Do you know whether Dwayne Hutto has an employee

 2    nonsolicit?

 3          A.    He does have an employee --

 4          Q.    Do you know whether Dwayne Hutto's

 5    nonsolicitation agreement is different from that of Chris

 6    Wolf?

 7          A.    I'm not aware it is different.

 8          Q.    In conjunction with your damages analysis, not

 9    just Bucket 1, but then globally, I mean, did you do

10    anything to consider whether those agreements were

11    enforceable?

12          MS. WALTER:  Object to form.

13          A.    I did not.

14          Q.    I want to focus on causation as it relates to

15    damages in general, not just Bucket 1 --

16          A.    Okay.

17          Q.    -- but in general.  Is causation something that

18    Mutual considered when it was preparing its damages

19    analysis?

20          MS. WALTER:  Object to form.

21          A.    If you can explain to me what causation means.

22          Q.    Sure.  For example, with respect to the first

23    bucket there -- okay.  Sorry.  Let's go to the second

24    bucket.

25          A.    Okay.
```

44

1          Q.   On page 27 of Exhibit 4 -- it's this one here.
2     Exhibit 4 -- let me just -- and go to page 27.
3          A.   Yes.
4          Q.   Just let me know when you're there.
5          A.   Yes.
6          Q.   Okay.  It says "Profits plaintiff would have made
7     but for defendant's unlawful conduct, which caused plaintiff
8     to have to close its branches in Tampa and Daytona Beach."
9     So there's an allegation that it was Waterstone's unlawful
10    conduct that caused the branches to close.  So I want to
11    focus on causation.  What did Waterstone do that caused the
12    branches to close or caused the loans to close with it
13    rather than with Mutual?  Do you understand causation --
14         A.   I do.
15         Q.   -- in that sense?
16         A.   Are you referring to what -- the causation of the
17    closing of the branches or in general or what -- what --
18         Q.   With respect to any of the damages analysis.
19         A.   Yeah.
20         Q.   Let me ask it this way:  If there was a loan that
21    was in the pipeline at Mutual but it was, you know, Dwayne
22    Hutto's daughter, you can imagine that that loan likely
23    would transfer to Waterstone, not because of any kind of
24    wrongdoing by Dwayne or solicitation but just because of the
25    relationship between the borrower and Mr. Hutto.  Does that

45

1       make sense to you?

2               MS. WALTER:  Object to form.

3       A.      Your question makes sense, but the result doesn't

4       make sense to me.

5       Q.      That the loan would closed with Waterstone?

6       A.      Right.  I've -- I've had -- I've left companies.

7       I leave the entire loan pipeline, you know, where it is.

8       Q.      Sure.  But you understand that the borrowers have

9       the election to close the loan with one or the other?

10      A.      Yes, yes, yes.

11      Q.      And in some situations, it may be natural for the

12      borrower to want to close with Waterstone because the

13      relationship with the --

14      A.      I think it's important to understand that the

15      information that Waterstone had in terms of pricing of that

16      loan, in terms of creditworthiness of that loan made it --

17      made it easy to attract the borrower, meaning, like, if I'm

18      competing on a level playing field, the borrower doesn't --

19      I don't know what that borrower is offered by competitor

20      X.

21              In this case, they knew exactly what the borrower

22      was offered by Mutual, so you could undercut that by a few

23      hundred dollars and get that loan because you have

24      information that generally a competitor wouldn't have.

25      Q.      Does Mutual have evidence that that occurred,

46

1      that pricing was undercut by Waterstone --

2                  MS. WALTER:  Object to form.

3           Q.    -- based on knowledge of pricing from Mutual?

4                  MS. WALTER:  Object to form.

5           A.    I have knowledge that our information was sent to

6      Waterstone, and I don't know why else you would send that

7      information unless you were going to use it in that regard.

8      But I guess specifically I couldn't speak to it at this

9      moment.

10          Q.    So my question about causation was just, you

11     know, you're seeking a dollar value.

12          A.    Sure.

13          Q.    And I want to understand was there an attempt to

14     think about causation, meaning --

15          A.    Yes.

16          Q.    -- is this loan attributable to wrongful conduct

17     or some other cause when you did your damages analysis?

18                 MS. WALTER:  Object to form.

19          Q.    Do you understand the question?

20          A.    I do.  I do.

21          Q.    Go ahead and answer.

22          A.    Okay.  I think there was definitely discussion of

23     causation; right?  There was definitely --

24                 MS. WALTER:  Object to the extent that he is

25          going into any sort of discussions with -- that are

47

1          protected by attorney-client privilege.

2               MS. KREITER:  This is not --

3               MS. WALTER:  This is a document that was served

4          by counsel, so --

5               MS. KREITER:  I'm asking the witness whether he

6          considered causation.

7               MS. WALTER:  He is not here to testify as a

8          damage expert, Maria.

9               MS. KREITER:  Courtney, Topic 1 is itemize --

10         tell us what the --

11              MS. WALTER:  He's a designated corporate

12         representative.  He's answering your questions.  He's

13         not a damage expert, though.

14              MS. KREITER:  For the record, Topic 1 of the

15         deposition notice was "The damages sought by Mutual,

16         including the calculation and the basis of all such

17         alleged damages."

18         A.   Yeah.

19         Q.   My question --

20         A.   Yes.

21              MS. KREITER:  Madam Court Reporter, read back the

22         question.  I believe the witness understood the

23         question prior to objection by counsel.

24              (The previous question was read by the reporter.)

25         Q.   Let me start again.  I think there was

48

1    interruptions there.  So the question was when you --

2        A.    Yes.

3        Q.    -- or Mutual were doing your damages analysis --

4        A.    Yes.

5        Q.    -- did you consider causation with respect to

6    particular borrowers?  For example, did all of the borrowers

7    close with Waterstone due to wrongful conduct, or was there

8    perhaps some other cause?  Did that analysis of causation

9    with respect to the borrowers occur in conjunction with your

10   damage calculation?

11            MS. WALTER:  Object to form.

12       A.    Okay.  When you first asked me, you said

13   causation in terms of everything; right?  Now you're

14   defining it to just the borrower?

15       Q.    Sure.  We'll get to that too.  But, you know,

16   with respect to borrowers that may have transferred a loan

17   to Waterstone --

18       A.    Sure.

19       Q.    -- as part of the damages analysis, did Mutual

20   make any efforts to determine what caused the borrower to

21   transfer to Waterstone?

22            MS. WALTER:  Object to form.

23       A.    I would say that in my experience when you're

24   sending loans to an underwriting manager and you're still

25   employed here, there is a -- it would be an interesting -- I

49

1    guess there's more at stake for that underwriter to possibly

2    make a good decision in terms of the borrower when they're

3    recruiting this branch.

4            And I don't even understand how you could -- the

5    underwriter, I imagine, would report this as a SAR or

6    whatever the case is because she's getting nonpublic

7    information.  You know, the customer hasn't signed any kind

8    of disclosures with Waterstone.  The disclosures are with

9    Mutual.

10           So -- so the same underwriter manager is looking

11   at loans, and then she is at the same time booking trips to

12   Costa Rica for Dwayne and his family.  I don't -- you know,

13   I think -- I mean, I've only been doing this for 20-some

14   years.  I've never seen an underwriting manager look at

15   loans and then book a trip to Costa Rica.

16           So if you want to talk causation, I mean, it's --

17   you talk to most loan officers.  If they can be this close

18   to an underwriting manager, most companies wouldn't allow

19   it.  There's causation there.

20       Q.   Was causation considered on a loan-by-loan basis

21   when you did the damages analysis?

22           MS. WALTER:  Object to form.

23       A.   I think, yeah, in my mind, it was a -- more in

24   total rather than on a loan-by-loan basis.

25       Q.   Has Mutual asked any of the borrowers what caused

50

1     the borrower not to close with Mutual?

2          A.    No.

3          Q.    You agree a borrower has a right to close its

4     loan with whichever mortgage company it wants; correct?

5          A.    I do.

6          Q.    What evidence besides what you have said already

7     does Mutual have that the loans it's counting for purposes

8     of damages moved to Waterstone due to wrongdoing versus

9     simply the borrower's preference?

10         A.    Well, in my opinion, which this is what it's

11    about, they're all due to wrongdoing because the loan

12    officers worked for Mutual of Omaha.  The wrongdoing

13    occurred when they steered this customer to Waterstone

14    without disclosures.  Waterstone caused this by not saying,

15    "Hang on.  We don't have disclosures in Waterstone's name.

16    Why is my underwriting looking at it?" prior to those

17    disclosures being sent.

18               You have an application -- and maybe Waterstone

19    did send disclosures at the same time as -- and that would

20    really be interesting that -- because who was the loan

21    officer on that file?  And the NMLS, who was -- who was on

22    the loan application?  So, I mean, it's -- there's a lot

23    going on here that, you know --

24         Q.    Does --

25         A.    -- is interesting.

51

1          Q.    Does Mutual have evidence of confidential

2     information being sent to Waterstone to back up all of the

3     loans that are included in its damage analysis?

4          A.    I don't -- again, I'll go back to the private

5     e-mail.  We do have information going to private e-mail

6     accounts, and we also have quite a few e-mails of nonpublic

7     information that went to Waterstone.

8          Q.    Are you able to say what percent of loans that

9     are included in your damages analysis are supported by a

10    taking of confidential information?

11              MS. WALTER:  Object to form.

12         A.    Can I use an analogy?

13         Q.    Answer however you think would be helpful.

14         A.    If a guy robs a bank and on the way out, he sees

15    a dollar laying on the ground in the bank and picks it up,

16    that dollar wasn't -- he didn't rob from the bank, but he

17    still robbed the bank.  So you're kind of -- it's kind of

18    like -- I mean, listen, nonprivate information was sent to

19    both Waterstone and to personal e-mail accounts and to third

20    parties.  You don't have to be a rocket scientist to say

21    there was wrongdoing or causation.

22              And, you know, if you disagree, that's your

23    point, but I've been doing this a really long time.  And I

24    would say that in my opinion, what you just sent me was

25    enough causation to say something is askew here, but --

52

1          Q.    Sure.  And I want to understand the magnitude.

2     That's what I'm talking about.

3          A.    Sure.

4          Q.    I mean, you understand.  Say someone made a

5     decision and sent a borrower application with respect to one

6     loan --

7          A.    Sure.

8          Q.    -- and it closed at Waterstone, but then there's

9     30 more loans, and none of those involve a taking of

10    confidential information.  You wouldn't have damages as to

11    those 30 others absent some other kind of wrongdoing, and so

12    that's what I'm trying to get a sense of.

13         A.    But we don't know -- we saw huge data being sent

14    out; right?  And so -- and those loans were in that data.

15    Now, you know, so I don't know whether, you know -- the

16    wrongdoing occurred by sending that data.

17         Q.    Did Waterstone send the data or the employees?

18         A.    The employees.  Waterstone received data.

19         Q.    Do you know whether Waterstone IT quarantined

20    that data?

21         A.    I do not.

22         Q.    If that's what happened, would that change your

23    mind about Waterstone's liability?

24               MS. WALTER:  Object to form.

25         A.    I don't -- I don't believe so.  I mean, then

REGENCY REPORTING SERVICE, INC. (813)224-0224

53

1    you're just talking about they quarantined it in terms of IT

2    security or in terms of they're never going to do loans for

3    those customers again there.  I mean, I don't know what you

4    -- what do you mean by "quarantine"?

5        Q.   I mean, I'm trying to understand -- quarantine,

6    take the documents away from the people, the loan

7    officers.

8        A.   Okay.

9        Q.   And if that happened, would that change your mind

10   about Waterstone's liability?

11            MS. WALTER:  Object to form.

12       A.   If the loan was started at Mutual and it went to

13   Waterstone before that person was employed, that's what

14   we're talking about; right?

15       Q.   Sorry.  No, I'm not limiting it to that.  I'm

16   trying to understand you've not sued -- you've told me that

17   it's wrongful for the different loan officers and employees

18   to send the information --

19       A.   Yeah.

20       Q.   -- but you've not sued them.  You've sued

21   Waterstone.  And you've sought in excess of $4 million from

22   Waterstone.  So I'm trying to understand what improper

23   conduct of Waterstone occurred to support in excess of a

24   $4 million --

25       A.   Yeah.

54

1          Q.    -- damages claim.  And I heard you say, "Well, I

2     have evidence of some confidential information being sent by

3     the employees, and that shouldn't have happened."  And I'm

4     trying to get an understanding in the first instance of, you

5     know, the magnitude of that.  Do you have evidence on behalf

6     of Mutual that confidential information was taken by the

7     employees with respect to all of the loans that support the

8     damages demand in excess of $4 million?

9               MS. WALTER:  Object to form.

10         Q.    That's the first question.  Then I'll go to Phase

11    II.

12         A.    I think -- I think what you're saying is the

13    $4 million doesn't have to do with Bucket 1; right?  You

14    already made your --

15         Q.    Yeah.  So let's be clear.  You're right.  Let's

16    clarify.  Let's move to -- the only category of damages, as

17    I understand it, for which Mutual has articulated a damage

18    number, and it's in excess of $4 million.

19              MS. WALTER:  Objection.  Maria, that's a

20         mischaracterization because we do have numbers in the

21         interrogatory responses for the ill-gotten gains.

22              MS. KREITER:  Okay.  We'll get to ill-gotten

23         gains.

24         Q.    Let's focus on Bucket 2, damages associated with

25    the branches closing, and it's in excess of $4 million.  And

55

1    I'm trying to understand with respect to Bucket 2 or

2    Bucket 1, you haven't quantified any damages with respect to

3    Bucket 1.  You're not prepared to testify about that.  But

4    with respect to Bucket 1 or Bucket 2 -- Bucket 3 is a

5    different thing.  We'll put that to the side.

6            I'm trying to understand the alleged unlawful

7    conduct, as I'm hearing from you, is there was borrower

8    information sent and documents that were sent by the

9    employees that shouldn't have been sent.  So what I want to

10   know is the documents that were sent, does that relate to,

11   you know, how many borrowers and does it support a

12   $4.4 million demand?  Do you understand the question?

13           MS. WALTER:  Object to form.

14       A.   I do understand your question.  But to me, you

15   seem to be mixing up Bucket 1 and Bucket 2.  If -- if you

16   want to talk wrongdoing on Bucket 2, that's a different --

17   that's a different conversation; right?

18       Q.   Okay.  So Bucket 2 doesn't have to do with

19   particular loans.  It has to do with branches that closed?

20       A.   That's correct.

21       Q.   Okay.  Bucket 1 --

22       A.   And loans as well, but yes.  But yeah, but more

23   of the branch closing and the loss of future -- future

24   revenue, right.

25       Q.   Because the thinking with respect to Bucket 2 is

56

1      those branches would've stayed open and loans would've

2      continued to close with Mutual, so there's some overlap

3      there; correct?

4          A.   Correct.

5          Q.   Okay.  So with respect to the 4. -- you know,

6      nexus of $4 million demand with respect to Bucket 2, is it

7      the position that there's also confidential information with

8      respect to whatever loans would have closed at Mutual but

9      for the branches closing?

10              MS. WALTER:  Object to form.

11         A.   That is part of it, I mean, yes.  Confidential

12     information was sent, and more than likely that would've

13     been part of the loans that closed in the future, for sure.

14         Q.   Sure.  But does it support a 4. -- just look what

15     it is --

16         A.   Yeah.

17         Q.   -- a demand in excess of $4.4 million?

18         A.   I don't know if the confidential information

19     does.  I think it certainly could be higher than that, but I

20     think that what -- what happened is these folks had

21     restrictive covenants.  Waterstone came in and recruited

22     them as a whole, took them to Costa Rica, had them -- had

23     them on Zoom calls while they were still employed at Mutual

24     on the Mutual system.

25              So in my experience, what the causation of that

57

1    would be, they had the employees violate the restrictive

2    covenants.  Waterstone enticed them with $750,000 checks and

3    trips to Costa Rica and things like that to leave.  That's

4    what I would say is a problem.

5        Q.    Let me ask it this way.  I think you're trying to

6    answer.  I think something is lost in translation here, so

7    let me just ask it a different way.  Are you able to testify

8    on behalf of Mutual as to how many loans involved an

9    employee of Mutual sending confidential or borrower

10   information?

11           MS. WALTER:  Object to the extent it goes beyond

12       any -- beyond the scope of any of the noticed topics.

13       A.    And I --

14           MS. WALTER:  Answer.

15       A.    Again, it goes back to my whole speech that

16   you're trying to put a dollar amount on confidential

17   information.  And, you know, that is a different deal there

18   which you're walking down the path of.  I mean, Mutual of

19   Omaha has a brand.  It's 112 years old.

20           Someone entrusted an employee of Mutual of Omaha

21   with their information.  Their information was then sent to

22   Waterstone, which may or may not have the same brand, or the

23   same customer may -- may not have chosen their information

24   to be released.  That's a whole different deal.  It's not

25   about the loan in that regard.

58

```
 1              What is about the loan is the fact that --

 2      listen, I mean, we can go round and round about this, but

 3      I've been in this business long enough to see you can't go

 4      in, and you know there's restrictive covenants.  And you

 5      know how we know there's restrictive covenants?  Because

 6      they set up little workarounds to be sneaky and to try not

 7      to get caught.  Everyone agreed to say, "Oh, that was a good

 8      idea," except they did get caught.  So everyone was aware.

 9              If you're -- if what you were saying earlier,

10      that these restrictive covenants weren't enforceable, the

11      folks sure thought they were enforceable because they had

12      set up the e-mails.  They had little codes that they built

13      in and tried to work around so people wouldn't know what

14      they were doing.  So -- and those e-mails were sent to sales

15      management at Waterstone as well, so Waterstone was aware of

16      that.

17         Q.   For how many loans did the employees send

18      confidential information?

19              MS. WALTER:  Object.

20         A.   Asked and answered, I believe is the objection,

21      but we talked about this.

22         Q.   I'm just not clear on it, so I just want a clear

23      record.

24         A.   Yeah.

25         Q.   For how many loans did the employees send
```

59

1       confidential information?

2               MS. WALTER:  Object.

3       A.    I don't know.

4       Q.    So confidential information --

5       A.    Hundreds of loans.

6       Q.    -- it could be taken by an employee.  I will tell

7       you employees make decisions sometimes, you know, but then

8       some employees immediately regret it and delete it.  And,

9       you know, information was taken, but it was never put to

10      use.  Instead, the employee has second thoughts, deletes the

11      information; or the employer, "Alert.  Why do you have this?

12      I don't want anything to do with that.  You're deleting it,"

13      and it never really gets put to use.

14              So with respect to the information that Mutual

15      contends was confidential or a trade secret or borrower

16      information, does Mutual have evidence that that information

17      was, in fact, put to use by Waterstone?  And if so, with

18      respect to how many loans?

19      A.    Well, there is evidence that loans closed, as you

20      referenced earlier.  The exact amount, you already asked me,

21      and I wasn't aware.  But I'm sure counsel is aware of the

22      exact number, but I wasn't aware of it.  So --

23      Q.    Okay.

24      A.    -- according to this deposition, I won't be able

25      to answer that.  At trial, I'm sure we'll be able to answer

60

1    that.

2         Q.   So to be clear, are you able to tell me at this

3    deposition today on behalf of Mutual as the corporate rep

4    for how many of the loans where confidential information was

5    taken or transmitted -- for how many of those loans was the

6    information actually put to use by Waterstone?

7              MS. WALTER:  Object to form.

8              And before you answer that, I just want to put on

9         the record that I did object to Topics 9 through 13

10        regarding all evidence insofar as it relates to

11        attorney work product.

12             MS. KREITER:  This is Topic 1, what are the

13        damages and how were they calculated?  So --

14             MS. WALTER:  This is Topics 9 through 12 about

15        how Waterstone used the confidential information.

16             MS. KREITER:  Well, it also relates to the

17        statement --

18             MS. WALTER:  That's --

19             MS. KREITER:  Let me say what I'm going to say,

20        and then you can speak.

21             MS. WALTER:  Okay.

22             MS. KREITER:  It also relates to the statement in

23        Mutual's written discovery response that there was

24        unlawful conduct by Waterstone that caused the losses.

25        So I'm following up on that.  It's Deposition Topics 1

61

```
 1          and 2.  And I want to understand from this witness what

 2          was factored in for purposes of the damage analysis.

 3          Q.   You're telling me that you're looking at loans

 4     that transferred to Waterstone, and I'm trying to understand

 5     does Mutual have any evidence with respect to any of the

 6     loans on which it's claiming that confidential information

 7     was transferred and was put to use by Waterstone, for how

 8     many loans fall into that category, if you can say?

 9          MS. WALTER:  Before he responds, I'm going to

10          object because I waited and I let you say your piece.

11          And I am, again, going to preserve my objection for

12          Topics 9 through 13.  I am not instructing him not to

13          speak, but I am entitled to put that objection on the

14          record.

15          Go ahead, Jeff.

16          A.   I mean, you're asking a -- we don't know the

17     inner workings of Waterstone, so how can we answer that

18     question?  How do we -- how could we ever know?  I mean,

19     it's an impossibility.  There's no way we can know what

20     happens at Waterstone.  We don't know what goes on, what

21     information was used or was not used.  So what you're asking

22     is impossible for me to answer.

23          Q.   Well, we're ten months into the case.  There's

24     discovery that's available.  So do you think --

25          A.   You can't discover someone's conversation.  We
```

62

1      can't discover -- so someone is going to say, "Oh, we

2      disregarded that loan application that came out, and we took

3      a new loan application."  Okay.  It's -- listen, you're

4      going to say something, but let me finish.  I'm happy to go

5      on the stand in front of a jury or whatever and say the same

6      exact thing because in my experience of over 20 years, that

7      information was used.  That loan would've never got to

8      Waterstone.  How else would the loan have gotten to

9      Waterstone?

10          Q.    For how many --

11          A.    Can you answer me how that loan got to

12     Waterstone?

13          Q.    No.  And how it works at the deposition is I ask

14     you the questions.  You can answer if you can.

15          A.    I know, but I --

16          Q.    For how many borrowers does Mutual have evidence

17     that information was taken and put to use by Waterstone?

18               MS. WALTER:  Objection.  Asked and answered.

19          A.    Every borrower was part of information that was

20     sent in one way or another.  I mean, there's huge databases

21     that were sent.

22          Q.    What evidence does Mutual have that Waterstone

23     took advantage of huge databases of data?

24               MS. WALTER:  Object to form.

25               MS. KREITER:  What's the objection?

63

```
1                MS. WALTER:  What do you mean by "huge

2         databases"?  Where is that from?

3                MS. KREITER:  From the witness's testimony just

4         now.

5         A.   Yeah, I said we had sent.  I didn't say they

6    received.

7                MS. WALTER:  What's the question?  Ask the

8         question.

9         A.   They had sent databases --

10               MS. KREITER:  Read the question back, please.

11               (The previous question was read by the reporter.)

12        A.   Yes, I don't have any evidence of that right now.

13        Q.   Let's talk for a moment about the category that

14   we haven't talked about, ill-gotten gains.

15        A.   Okay.

16        Q.   If you would turn in Exhibit 4, please, to

17   page 28, there's a bullet that reads "Ill-gotten gains,

18   including compensation paid or advanced by defendant,"

19   meaning Waterstone, "to plaintiff's prior employees in

20   exchange for the unlawful conduct that has caused the

21   closure of two of plaintiff's branches."  Do you see that?

22        A.   I do.

23        Q.   I want to focus on the start of it.  It says

24   "Ill-gotten gains, including compensation paid or advanced

25   by Waterstone," so this is money that Waterstone is paying
```

64

1      out to the employees; correct?

2          A.   Yes.

3          Q.   It's not money that Waterstone is enjoined.  It's

4      a cost to Waterstone; correct?

5          A.   Correct.

6          Q.   In what sense is money paid out by Waterstone a

7      gain to Waterstone, ill-gotten or otherwise?

8          A.   I think the folks that that money -- got is part

9      of the -- is part of the --

10         Q.   Sure.  The employees gained the money, not

11     Waterstone; right?

12         A.   Yeah.

13         Q.   Mutual claims that these ill-gotten gains to

14     Waterstone that actually went to the employees and not

15     Waterstone consists of $500,000 that Waterstone paid to

16     Chris Smith and 250,000 that Waterstone paid to Dwayne Hutto

17     for a total of $750,000; correct?

18         A.   Yes.

19         Q.   Is Mutual seeking $750,000 from Waterstone that

20     it paid to third parties?

21         A.   I -- I believe what -- what the premise is, at

22     least my understanding is, that's the value that Waterstone

23     placed on these two people, and so that's the -- you know,

24     that -- that's how they came up with that number.

25              MS. KREITER:  Can you read my question back,

65

1        please?

2              (The previous question was read by the reporter.)

3        A.    Yes.

4        Q.    What is the contractual or other legal basis upon

5    which Mutual contends Waterstone should have to pay the

6    $750,000 --

7              MS. WALTER:  Object to the form.

8        Q.    -- to Omaha that it has paid to Mr. Hutto and

9    Mr. Smith?

10              MS. WALTER:  Object to form.

11        A.    I'm not a lawyer, and you said contractual, so I

12    want to --

13        Q.    What is the basis, period?

14        A.    The basis is they caused them -- Waterstone

15    caused these two folks to violate their -- their restrictive

16    covenants.  And that's the value you assessed on that -- on

17    the value to them, and that's how the value came up with --

18    so --

19        Q.    So it's Mutual's position that $750,000 is a

20    payoff in exchange for soliciting who, customers or other

21    employees?

22              MS. WALTER:  Object to form.

23        A.    I would say both.

24        Q.    No money is paid to Chris Wolf.  Is it your

25    position that Chris Wolf was not involved in any unlawful

66

1    activity?

2           MS. WALTER:  Object to form.

3       A.    No, it is not our -- it is not our assertion.

4       Q.    Why would Mr. Wolf not be compensated?

5           MS. WALTER:  Object to form.

6       Q.    Your position is Waterstone is paying people to

7    solicit clients and employees, $500,000 for one person who

8    engaged in that activity, 250- for another, and then there's

9    a third that did but got no money?

10          MS. WALTER:  What's the question?

11      Q.    Is that your position, that Waterstone was paying

12   for breaches of a solicitation agreement and paid two of the

13   three managers hundreds of thousands of dollars and then

14   paid a third, who did the same thing, nothing?

15          MS. WALTER:  Object to form.

16      A.    Yes.

17      Q.    Chris Smith was alleged to -- Chris Smith was

18   paid double what Dwayne Hutto was paid.  Does that mean in

19   your mind that Chris Smith is engaging in double the

20   solicitation and wrongdoing?

21          MS. WALTER:  Object to form.

22      A.    Well, I think there's double -- double the

23   damages that Chris caused because his branch was larger than

24   Dwayne, and I'm sure that's why you guys paid out more to

25   Chris than Dwayne.

67

1          Q.   So Mutual's explanation for the material

2    different amounts paid to the managers, one manager getting

3    nothing and then one getting double what the other is, that

4    it's consistent with what, the level of wrongdoing or the

5    value of the branch?

6               MS. WALTER:  Object to the form and to the extent

7          you're asking him to testify about what Waterstone was

8          thinking.

9          Q.   Go ahead.

10         A.   Okay.  In all this excitement, I forgot the

11   question.

12         Q.   Sure.  I'm trying to understand why Mutual thinks

13   that this money is tied to wrongdoing.

14              MS. WALTER:  Object to form.

15         Q.   Why does Mutual think this money is tied to

16   wrongdoing at all?

17         A.   Because of the restrictive covenants in place.

18   Chris Smith doesn't originate loans for a living.  The only

19   value he would have is to bring his folks over, which he had

20   restrictive covenants on.  So why would -- why would

21   somebody pay him $500,000 to come over if he doesn't

22   originate loans himself unless it was to bring his team

23   over?

24         Q.   How long does it take to develop a pipeline?

25   When a team transitions, how long will it take to develop a

68

1     new pipeline?

2          A.    Depends on the team, but 30, 60 days, something

3     like that.  Generally, they get paid -- they probably -- the

4     loans close on month two.  Depends, though.  If you're

5     working -- if you're building your pipeline before you

6     leave, which was the case here, it's a little different.

7          Q.    Well, when Mutual recruits a branch --

8          A.    Yes.

9          Q.    -- is there compensation paid to the branch

10    manager or to the new loan officers in recognition of the

11    fact that commissions aren't going to be coming in day one

12    because a pipeline has to be built?

13         A.    Yes.  We've never paid out anything close to this

14    amount, never.

15         Q.    What makes you think that Waterstone's payments

16    here were in exchange for wrongdoing as opposed to those

17    types of payments?

18              MS. WALTER:  Object to form.

19         A.    Twenty-some years of experience says you're not

20    giving a nonproducing person a half a million dollars unless

21    you expect him to bring his group with...

22         Q.    There were loans originated by the departed

23    employees that were in Mutual's pipeline and then closed

24    with Mutual.  Do you have that understanding?

25         A.    Yes.

69

1          Q.    Did Mutual pay commissions on all of those loans

2     to the former employees right away?

3          A.    Yes.

4          Q.    The funds paid with respect to this Bucket 3 to

5     Mr. Hutto and Mr. Smith, allegedly paid to those

6     individuals, according to Mutual, are described in the offer

7     letters produced in discovery as follows:  Terms of your

8     Waterstone-producing branch manager employment agreement

9     will outline the terms of branch expenses and other

10    financial details, including a $500,000 credit provided to

11    the branch financial mode, and it's defined as a branch

12    financial credit.  Did you review the offer letter for

13    Mr. Hutto or Mr. Smith in which this credit is described?

14         A.    Yes.

15         Q.    In preparation for this deposition?

16         A.    Yes.

17         Q.    Did you review the employment agreement that

18    references the credit?

19              MS. WALTER:  Object to the extent this impedes on

20         what our designated corporate rep will be testifying

21         about tomorrow, specifically with respect to Topic

22         No. 18.

23              MS. KREITER:  Well, I'm asking about ill-gotten

24         gains and what this is based on and the basis for the

25         position that this is some kind of a bonus tied to

REGENCY REPORTING SERVICE, INC. (813)224-0224

70

1    wrongdoing as opposed to what it was described in the

2    documents produced.

3        MS. WALTER:  He can answer, but I'm telling --

4    Topic 18 says the circumstances surrounding those three

5    individuals becoming employees of Mutual, including

6    recruitment and onboarding.  And that pertains to any

7    document that they would've signed in their onboarding,

8    which Ms. Theobald will be testifying about tomorrow.

9        MS. KREITER:  Some of the facts can overlay

10   between topics.  That's not a basis to object.

11       MS. WALTER:  I'm entitled to put that on the

12   record.

13       MS. KREITER:  Okay.  There is no basis to object

14   on the grounds that facts go to one person's testimony.

15   They can also go to another.  So I'm asking this

16   witness because it relates to his -- it may also be

17   asked tomorrow, but there's no objection that's valid

18   based on these facts relate to something that also

19   relates to another topic.

20       MS. WALTER:  With all due respect, you're not the

21   judge.  I'm allowed to put it on the record.

22       MS. KREITER:  You did.

23       Read back my question yet again.

24       (The previous question was read by the reporter.)

25   A.    I did not review the employment agreement.

REGENCY REPORTING SERVICE, INC. (813)224-0224

71

1      Q.   Was there a belief on the part of Mutual

2   initially that large bonuses had been paid to certain

3   managers and then later there was a discovery that the

4   bonuses believed to exist weren't quite the amount?

5           MS. WALTER:  Object to form.

6      A.   I believe there was a rumor mill that said

7   something like that, but, I mean, it was -- the rumor was

8   there was a million dollars paid out.  There was 750,000

9   here, so...

10     Q.   What was the origin of that rumor?  Do you know?

11     A.   I really don't know.  I -- I can't tell you.

12     Q.   Okay.  Let's turn to Bucket 2.

13     A.   Okay.

14          MS. WALTER:  What's our -- sorry, Maria.  I don't

15          mean to interrupt.  What's our timing?

16          MS. KREITER:  I've got quite a bit.  I mean, to

17          be honest --

18          MS. WALTER:  No, no, no.  I know you have a bit

19          left in the deposition.  Like, what are you thinking in

20          terms of breaks?  We've been going for about an hour

21          and a half now.

22          MS. KREITER:  I can take a break now before we

23          turn to this category, if that makes sense.

24          MS. WALTER:  Do you want take a quick break, or

25          are you okay?

72

```
 1                    THE WITNESS:  I'm okay.

 2                    MS. WALTER:  Okay.  That's fine.

 3                    Are you okay?

 4                    We can keep going.

 5          Q.    Okay.  Let's turn to Bucket 2.  I want to start

 6     with just a question; again, a concern about

 7     double-dipping.  Mutual, with respect to Bucket 2 --

 8          A.    Yes.

 9          Q.    -- is seeking profits associated with a

10     circumstance of the branch remaining open for 18 months

11     period of time; correct?

12          A.    Yes.

13          Q.    If -- sorry.  If Mutual is awarded the entire

14     demand on Bucket 2, you would agree that Mutual can't also

15     be awarded damages on Bucket 1, which is loans that were

16     allegedly diverted?  That would be double counting; correct?

17                    MS. WALTER:  Object to form.

18          A.    So I'm not a lawyer, you know, and I don't

19     understand how the law is.  I think -- I think that wouldn't

20     be double counting -- right? -- because what you're saying

21     is that loans were diverted and closed -- diverted while

22     there were still employees here and then we're saying

23     18 months after they were employees.  So I don't know if it

24     is double counting.  I know what you're saying.  I hear what

25     you're saying, and you just have to be -- look at the time
```

73

1    frames, you know, very closely.

2        Q.    Sure.  Perhaps it wouldn't be double-dipping if a

3    loan was sent to Waterstone while the individuals are still

4    employed --

5        A.    That's right.

6        Q.    -- and that loan closed at Waterstone before the

7    employees resigned and the branches are closed; correct?

8        A.    Right.

9        Q.    But with respect to any of the loans that would

10   have closed at Waterstone that are counted in Bucket 1 and

11   then you seek damages in Bucket 2 based on the branches

12   staying open and presumably closing loans, that would be

13   double-dipping if the timing was such that the closing took

14   place after the branch --

15            MS. WALTER:  Object to form.

16       A.    Yeah, I'm not comfortable with -- because I don't

17   know what a judge can say or what a -- I don't know the law.

18   I don't -- I don't know.  This seems like a legal question,

19   you know, what damages a judge may award or how he sees fit.

20   I'm not comfortable answering it because I really don't

21   know.

22       Q.    I guess I didn't view it as a legal question.

23   Just factually, what is in Bucket 1, and is there overlap

24   with Bucket 2?  And it seems to me that Bucket 2 assumes

25   loans are closing on a regular basis at Mutual, and those

74

1    branches stay open.

2          Say there's a borrower in the pipeline and it

3    doesn't go to Waterstone because the branch stays open and

4    so it's counted, so you're counting that loan once.  But

5    then if you have Bucket 1, that same loan, you know, now

6    we're looking at a scenario where the loan transfers to

7    Waterstone and you're counting it there too?

8          MS. WALTER:  Object to form.

9          A.    Yeah, I'm sorry.

10          MS. WALTER:  Answer.

11          A.    I think we're hung up with this -- on Bucket 1

12    with this associating of a value on the -- on the actual

13    closed loans and not necessarily on the larger picture of it

14    all, I think, you know, in my mind.  You asked me my

15    opinion.  In my opinion, Bucket 1 is different than just

16    closed loans.  And Bucket 2, we are simply talking about the

17    revenue generated from closed loans.

18          Q.    Can you say, as you sit here, that there is no

19    double-dipping with respect to Bucket 1 and Bucket 2, or are

20    you uncertain?

21          MS. WALTER:  Object to form.

22          A.    I can say that I am not -- I am not comfortable

23    talking Bucket 1 in terms of revenue per loan.  It's a

24    different -- I think it's a different -- that's part of it,

25    but there's also something else.

75

1          Q.   Okay.  With respect to Bucket 2 --

2          A.   Yes.

3          Q.   -- damages associated with the branches

4     closing --

5          A.   Yes.

6          Q.   -- there's a reference to the branches -- let me

7     just read it again.  "Profits plaintiff would have made but

8     for defendant's unlawful conduct, which caused the branches

9     to close."  Who specifically is Mutual referring to as

10    having engaged in unlawful conduct that caused the branches

11    to close?

12              MS. WALTER:  Object to form.

13         A.   I believe there's a regional manager, Florida

14    regional manager, that works for Waterstone and then an SVP

15    that was sent information to at Waterstone.

16         Q.   Was it Dustin Allen?

17         A.   You know --

18         Q.   You don't know?

19         A.   I mean, Dustin Allen, the name sounds familiar.

20              MS. WALTER:  Owen.

21         Q.   Sorry.  Kevin Allen --

22         A.   Kevin, yeah.

23         Q.   -- and Dustin Owen, is that what you're referring

24    to?

25         A.   I believe so.

76

1          Q.   So it was their unlawful conduct that caused the

2     branches to close?

3               MS. WALTER:  Object to form.

4          A.   I think that's part of it.  I mean, I think there

5     was also the underwriting manager.  There was quite a few

6     people that received information that were part of it.

7          Q.   What did Kevin Allen do to cause the Mutual

8     branches to close?

9          A.   He coordinated an effort to get everyone

10    together, had conversations, organized Dwayne to talk to the

11    underwriting manager, take trips with the underwriting

12    manager, and, you know, organize Zoom calls while they're

13    still employees.  In my experience, that's generally not the

14    right way to do things in terms of when people have

15    restrictive covenants.

16         Q.   What did Dustin Owen do to cause the branches to

17    close?

18         A.   I think similar -- similar efforts.

19         Q.   Okay.

20         A.   They paid $750,000 that caused the branches to

21    close.

22         Q.   Okay.  Is there anything unlawful about

23    Waterstone recruiting Dwayne Hutto in your mind?

24              MS. WALTER:  Object to form.

25              MS. KREITER:  What's the objection?

77

1              MS. WALTER:  He is not a lawyer.  How is he

2         supposed to know?

3              MS. KREITER:  I asked him is there anything

4         unlawful?  I'm going off of the written responses of

5         Mutual.  I don't know why you put this, but you did,

6         and I'm following up on the position of Mutual.  I'm

7         allowed to follow up on your written responses.  This

8         alleges unlawful conduct.

9         Q.   I'm asking is there anything unlawful about

10    Waterstone recruiting Dwayne Hutto?

11         A.   I would said that recruiting Dwayne Hutto, had

12    they just recruited Dwayne Hutto as a loan officer and he

13    didn't move customers and he didn't move employees, that's

14    fine.  But that wasn't enough for Waterstone; right?  I

15    mean, they wanted the whole group --

16         Q.   Is there anything unlawful about Waterstone

17    recruiting Chris Wolf?

18         A.   Again, same answer.  If it's one person and

19    they're not encouraged to violate their nonsolicit, then

20    there's nothing wrong with that, but that's not what

21    happened.

22         Q.   Was -- is there anything unlawful about

23    Waterstone recruiting Chris Smith?

24         A.   Same answer.  If it was just Chris Smith and you

25    say you want to take this job as RVP or whatever the case is

78

1    and you build your branch up from scratch, fantastic, but

2    that's not what they wanted to do.  It's certainly not what

3    you pay $500,000 for.

4        Q.    What evidence do you have that Waterstone

5    encouraged Dwayne Hutto to solicit -- I'm going to call them

6    the downstream employees just for convenience --

7        A.    Yeah.

8        Q.    -- but the employees at the Daytona branch.  What

9    evidence do you have that Waterstone encouraged Dwayne Hutto

10   to solicit those employees?

11       A.    Well, there's e-mails that go back and forth

12   setting up calls with Dwayne and Chris and "You call Chris

13   now.  We'll get Chris on the phone.  That's great news."

14   There's -- there's a decent amount of e-mails that show that

15   this was a really -- a planned coup, so to speak.  I mean,

16   there's a decent amount of -- and then there's also -- you

17   know, again, there's $250,000 that says that that would

18   probably be the case.

19       Q.    If Waterstone had simply recruited the managers,

20   Chris Wolf, Chris Smith, and Dwayne Hutto, would that be

21   unlawful?

22       A.    And -- and had them stick to their restrictive

23   covenants, meaning not recruit their folks and not --

24       Q.    Sure.

25       A.    I would say that that would be okay.  You have

79

1      every right to -- people can work where they want.  What you

2      can't do is you can't encourage them to violate their

3      nonsolicits.

4          Q.   Do you have any evidence on behalf of Mutual that

5      Dwayne Hutto solicited any of the downstream employees?

6          A.   Yes.

7          Q.   What is the evidence?

8          A.   E-mails.

9          Q.   In which Dwayne Hutto says "Come to Waterstone

10     with me" or something that is --

11         A.   Well --

12         Q.   -- with regard to solicitation in Mutual's

13     perspective?

14         A.   I -- I would say yes.  Yeah.

15         Q.   What are those?

16         A.   I can't recite the 800 e-mails, but we're sitting

17     here because those e-mails exist.  My time is extremely

18     valuable, as is yours, as is everyone else's.  And if those

19     e-mails didn't exist, we'd just be on our way, but those

20     e-mails do exist.

21         Q.   Do you -- let me ask it this way:  Do you think

22     that it's unlawful for Dwayne Hutto to make an announcement

23     to the downstream employees to the effect of "Wanted to give

24     you a heads-up.  I'm leaving and going to Waterstone"?  If

25     he says just that, is that unlawful?

80

1          A.    I would say if he does it while he's employed

2     here via his -- yes, it's unlawful.  Yes, he should not be

3     making announcements on to his future employment while he's

4     employed with Mutual.

5          Q.    Is that solicitation in your mind, or is it just

6     unlawful because he's still employed?

7          A.    No, it's --

8                MS. WALTER:  Object to form.

9          A.    Okay.

10               MS. WALTER:  Go ahead.

11         A.    In my mind, it's solicitation; right?  It is.

12         Q.    Is it your position that Dwayne Hutto is supposed

13    to give his resignation and then never breathe a word of it

14    to any of the employees?

15               MS. WALTER:  Object to form.

16         A.    That's not what I said.

17         Q.    I'm asking, I mean, is that what you contend

18    Dwayne Hutto should've done to avoid solicitation?

19               MS. WALTER:  Object to form.

20         A.    Yes, that's what he should've done to avoid

21    solicitation.  That's exactly what he should've done.

22         Q.    Mutual's position is that an employee, who is a

23    branch manager, who has worked with employees for maybe a

24    decade, is prohibited from letting them know that he's

25    resigning?

81

1          A.    I think --

2                MS. WALTER:  Object to form.

3          A.    I think he should've made it clear when he let

4     them know that we're all under restrictive covenants, and he

5     should've -- he should've -- that's what I've done every

6     time in my past.  I've made it clear that just because I'm

7     going, you're -- everyone is under restrictive covenants.

8          Q.    Okay.  Same.  Just so we have a complete record,

9     is it your position that Chris Smith and Chris Wolf were not

10    -- it would've been unlawful for them to make a mere

11    announcement?  "I'm leaving and going to Waterstone."

12               MS. WALTER:  Object to form.

13         A.    While they're employed at Mutual of Omaha, yes.

14         Q.    And do you believe that those comments are

15    solicitation, or do you believe it's wrongful because

16    they're still employed?

17         A.    I think it borders solicitation, for sure.  No

18    one just makes a comment for no reason.  Let's be perfectly

19    honest.  You're trying to, you know -- come on.  We all know

20    what happened, and you know what happened, and it's

21    embarrassing that we're even sitting here and arguing over

22    the fact of what happened.

23         Q.    And do you know whether the downstream employees

24    have followed Dwayne Hutto in the past when there's been a

25    change in his employer?

82

1          A.    I'm sure some have.

2          Q.    Do you understand that it would be really natural

3     and expected that some of the employees due to their

4     relationship with Dwayne Hutto or with Chris Wolf regardless

5     of any kind of solicitation would follow?

6          A.    Eventually.

7          Q.    You do understand that?

8          A.    I do understand eventually that's a possibility.

9          Q.    What evidence does Mutual have that the

10    downstream employees followed Dwayne Hutto and Chris Smith

11    and Chris Wolf because of unlawful conduct by Waterstone?

12         A.    Well, I think that there was enough e-mail

13    traffic saying, you know, that Waterstone had calls with the

14    folks while they're still employed here in group at the

15    direction of, you know, Chris and Dwayne.  So, I mean, I

16    think that there's a lot there.  I mean, you know, we keep

17    glossing over this trip to Costa Rica by the underwriting

18    manager.  I don't think that that's, you know -- I don't

19    think that that's nothing, for sure.

20         Q.    Who is the underwriting manager that you're

21    referring to?

22         A.    It's a Waterstone underwriting manager.  I don't

23    remember her name.

24         Q.    Went to Costa Rica with who?

25         A.    With Dwayne and his wife, and she made all the

83

1    arrangements and was back and forth in e-mail with Dwayne.

2         Q.   Is there anything unlawful about taking a recruit

3    on a trip?

4         A.   I'm not a lawyer.  I don't know.

5         Q.   I mean, is that part of the position of Mutual,

6    that that's wrongful conduct that caused the branches to

7    close?

8         A.   I'm happy to present that in front of a jury.

9    The underwriting manager, the person who makes credit

10   decisions, is taking a salesperson on a trip.  I'm happy to

11   roll that out to people who don't know the business and let

12   them decide whether that smells funny.

13        Q.   You would agree the branch managers themselves

14   have the right absolutely to resign from Mutual?

15        A.   Absolutely they do.

16        Q.   You would agree that the downstream employees

17   have an absolute right to follow the branch managers if

18   that's what they want to do?

19        A.   Yes.  But that's why we don't have a problem with

20   them.  We have a problem with Waterstone.

21        Q.   Has Mutual made any efforts to determine why each

22   of the downstream employees left?

23             MS. WALTER:  Object.  Asked and answered.

24        A.   Yeah.  And I think it's a better question, quite

25   frankly, for Brian Tomalak and Kiley.  They did.

84

1          Q.    I'm asking you.   I mean, has Mutual made any

2     effort to determine why the employees left?

3          A.    We -- we did.

4          Q.    What efforts were made?

5          A.    Brian and Kiley reached out and spoke to several.

6          Q.    What evidence resulted from those conversations,

7     if you know?

8          A.    This lawsuit resulted from those conversations.

9     You know, that's why -- why we sued.

10              MS. KREITER:   This is 6.

11              MS. WALTER:   Yeah.   Thanks.

12              (Exhibit No. 6 is marked for identification.)

13          Q.    Take a look at what we've marked as Deposition

14     Exhibit 6.  And I'm going to have you start at the back of

15     the document.   There's a page number on the bottom,

16     MOM-2924.  Do you see that?

17          A.    I do.

18          Q.    Just to go sequentially here --

19              MS. WALTER:   I'm just going to put on the record

20          that Mr. Gennarelli is not included on any of these

21          e-mails.

22          Q.    The e-mail starts -- it's from Kiera Tully,

23     June 16, 2022.  Do you see that?

24          A.    Yes.

25          Q.    And it's to Mutual HR.  Ms. Tully is an employee

85

1    of the Tampa branch; correct?

2         A.   Yes.

3         Q.   Her signature block says "Business development

4    offer."  What's the role of the Tampa business

5    development --

6         A.   Officer.

7         Q.   -- officer?

8         A.   I'm sure her job is to develop business.

9         Q.   How important is that role to the Tampa branch?

10        A.   I don't think very important, to be honest with

11   you, but...

12        Q.   Have you ever personally interacted with

13   Ms. Tully?

14        A.   I have not.

15        Q.   Ms. Tully writes to Mutual's HR "To whom it may

16   concern, I am fed up with not getting paid correctly as I am

17   still owed 71 hours of pay."

18        A.   Yes.

19        Q.   "For this, among other reasons, I will be

20   resigning from the company."  Do you see that?

21        A.   I do.

22        Q.   Do you agree the tone of this e-mail seems angry

23   or frustrated?

24        A.   I do.

25        Q.   Ms. Tully says the reason she's leaving is Mutual

86

1      has not correctly paid her.  Do you see that?

2          A.    I do.

3          Q.    What evidence does Mutual have that the true

4      reason for the departure was some unlawful conduct by

5      Waterstone versus what Ms. Tully expressed directly?

6              MS. WALTER:  Object to the extent it goes beyond

7          the topics that Mr. Gennarelli was designated to

8          testify on.

9          A.    Well, I'm happy to answer.

10             MS. WALTER:  Go ahead.

11         A.    Chris Smith is her manager.  He sets her pay.  He

12     pays her.  He puts -- he approves the pay.  So why would she

13     be mad at Mutual of Omaha and not Chris Smith, who is her

14     manager?  But she just -- she sent this e-mail as what?  Why

15     do you think she sent this e-mail?

16         Q.    I mean, I'm reading what she says.

17         A.    Why wouldn't she bring it up with Chris Smith?

18         Q.    Is it your position that you think Ms. Tully is

19     lying here?

20         A.    I think that this is an e-mail to cover tracks.

21     That's what I think because there is -- we pay people.

22     There is never -- unless Chris held it or something, but

23     people are paid correctly, so this seems very strange to me.

24         Q.    Is Ms. Tully the business development officer --

25     is that somebody who generates loans for Mutual or not?

87

1          A.    No.

2          Q.    Speculation versus evidence, speculation is I

3     suspect something happened versus --

4          A.    Right.

5          Q.    -- evidence --

6          A.    Yeah.

7          Q.    -- that I have an e-mail or I heard a statement.

8     Is there any evidence that Mr. Smith told Ms. Tully "Send

9     this e-mail and lie about the reason you're leaving"?

10              MS. WALTER:  Object to form.

11         A.    Yeah, not -- not that I've seen in these e-mails,

12    no.

13         Q.    It's just speculation on your part?

14         A.    Well, it's not speculation.  It's that no one

15    would ever direct an e-mail like this tone to someone other

16    than their manager.  I don't understand why that would

17    happen.

18         Q.    Could it be that the employees wanted to follow

19    the branch managers because there were no other Mutual

20    offices in Florida after Tampa closed?

21              MS. WALTER:  Object to form.

22         A.    Well, we did have that office in Tampa.

23         Q.    Sure.

24         A.    Just because Chris left, we didn't have to

25    release the lease to it.  We still had it.

88

1          Q.    So you could've -- Mutual could've maintained

2     that lease and built the --

3          A.    Absolutely.

4          Q.    Did Mutual try to do that?

5          A.    I don't know what Kiley -- Kiley lives in Tampa.

6     He asserted himself, so I don't know what the --

7          Q.    Kiley King?

8          A.    Yeah.  Kiley King, yeah.

9          Q.    Okay.  So do you know, as you sit here right now,

10    did Mutual keep the lease for the office that it had?

11         A.    We -- we -- I believe we allowed them to move

12    that lease eventually after everyone left, yes.

13         Q.    Okay.  And at that point, there weren't any

14    offices of Mutual in Tampa; correct?

15         A.    I don't know if that's true or not.  I really

16    don't because we share offices with -- in fact, I know it's

17    not true.

18         Q.    Did Mutual make any effort to keep any of the

19    employees and let them --

20         A.    Yes.

21         Q.    -- know that --

22         A.    Yes.

23         Q.    -- there would be an office --

24         A.    Yeah.

25         Q.    -- in Florida?

89

1          A.     Yeah.  We have a very large Mutual of Omaha

2     financial planning office in Tampa, very large, that we use

3     space in that as well.

4          Q.     How many of the employees did Mutual make efforts

5     to try to keep?

6          A.     You know, I would think that Brian and Kiley

7     probably reached out to the majority of them.

8          Q.     And none of them were interested?

9          A.     Apparently not.

10          Q.     There were -- you understand that there's certain

11     employees that didn't go over to Waterstone --

12          A.     I do.

13          Q.     -- for whatever reason?

14          A.     Yes.

15          Q.     Did Mutual attempt to make a branch of those

16     employees?

17          A.     Yes, or had conversations, I believe.  And I

18     believe they weren't very large -- very good producers, so

19     maybe the effort wasn't that great.  But again, this was not

20     -- I was not involved in it, so...

21          Q.     Okay.  So let's talk about what it means to lose

22     the branch, then.  I mean, the lease, I mean, is that part

23     of what you consider the branch?

24          A.     No.

25          Q.     No.  Is the branch really the people?

90

1          A.    The branch is the people and the production that

2    go along with those people, yeah.

3          Q.    With respect to the employees that didn't go over

4    to Waterstone and didn't find a home at Mutual for whatever

5    reason or employees that decided, "Look, I'm going to go to

6    a third party.  I don't want to go Mutual.  I don't want to

7    go to Waterstone" --

8          A.    Sure.

9          Q.    -- those people are part of the branch; correct?

10         A.    Yes.

11         Q.    And those people didn't go over to

12   Waterstone.  Are you -- for purposes of Category 2 damages,

13   are you counting the production of those people?

14         A.    I don't believe so.

15         Q.    How did you go about excluding them from the

16   damages analysis?

17         A.    I don't think there's much production that they

18   had.

19         Q.    There's an individual that went to -- I think his

20   name is Jake.  Apologies.  I don't know his last name.  Do

21   you know who I'm referring to?

22         A.    I don't.

23         Q.    You don't.  Okay.  If there was a producing loan

24   officer that decided not to go to Waterstone and instead

25   went to a different financial institution and that was a

91

1    producing loan officer, you would agree that that loan

2    officer should have his or her production carved out of the

3    damages in Bucket 2; correct?

4         MS. WALTER:  Object to form.

5         A.    Not necessarily.  I think what you're saying is

6    that the spread is generally -- when you're trying to

7    estimate the -- moving forward, this branch generally

8    produces this amount of loans a month.  So a loan officer

9    may come.  A loan officer may go generally.  But in general,

10   this is their production in the course of, you know, several

11   years, and that was the average we used.

12        Q.    How many employees decided not to work for

13   Waterstone or Mutual and instead find some other job?

14        MS. WALTER:  Object to form.

15        A.    And I really don't know who was offered a job

16   from Waterstone or who wasn't.

17        Q.    What about Mutual?  I mean, do you know who was

18   offered a job by Mutual?

19        A.    Not off the top of my head, no.

20        Q.    For the employees that decide, "I don't want to

21   go to Waterstone," you know, can't come to Mutual, or it's

22   not working out, you know, or go to some other employer, is

23   their departure attributable to some unlawful conduct by

24   Waterstone?

25        MS. WALTER:  Object to form.

92

1          A.    Well, I think when there's a chaos at a branch

2     when people are leaving and everyone is talking about, you

3     know, what's wrong here so that they can get their money to

4     leave and go somewhere else, that causes certainly

5     disruption and could cause people to -- to leave; right?

6          Q.    You testified earlier that there would be nothing

7     wrongful about Waterstone recruiting Mr. Hutto; correct?

8          A.    Right.

9          Q.    Mr. Hutto was a producing loan officer?

10          A.    Correct.

11          Q.    Did you carve Mr. Hutto's production out of the

12     damages that you're seeking in Bucket 2?

13          A.    No.

14          Q.    Why not?  What was wrongful about Waterstone

15     soliciting Mr. Hutto?

16          A.    They didn't solicit Mr. Hutto.  They solicited

17     the group.

18          Q.    But you're counting his production, and you're

19     saying that his departure was caused by unlawful conduct by

20     Waterstone, and you also said Waterstone is permitted to

21     recruit Mr. Hutto?

22          A.    Yeah.  You said without using these -- I didn't

23     say Waterstone was allowed to take Mr. Hutto to Costa Rica,

24     the underwriting manager.  I also didn't say they were

25     allowed to look at loans ahead of time, take information

93

1    while Mr. Hutto is still an employee.  So let's not act like

2    Waterstone here -- Bank of America, if they wanted to

3    recruit Dwayne Hutto, absolutely we should take that money

4    out, but that's not what happened.  What happened was

5    different than how you're painting the picture.

6        Q.    So is it -- I'm trying to understand here why you

7    are counting Mr. Hutto in the damages analysis.

8        A.    Right.

9        Q.    And is it -- and you're saying that Waterstone

10   could solicit him and could recruit him if it wanted to do

11   that?

12       A.    If they did it in an aboveboard way, but that's

13   not what happened.  So you can't have your cake and eat it

14   too.  You can't take the context of what really happened out

15   of the equation.  That doesn't work.

16       Q.    Are you aware that Mr. Hutto and Mr. Smith were

17   looking to leave Mutual and go somewhere else?  It just

18   happened to be Waterstone?

19       A.    I was not aware of that.  I mean, I think after

20   Dwayne left, we were aware that Chris was probably going to

21   depart.  I know that Brian brought up the fact that they

22   were always -- you know, they were pretty -- they talked a

23   lot to Brian, and there was a comment/conversation with them

24   that this place had this, but they didn't leave ever, so...

25       Q.    There were conversations between Mr. Hutto and

94

1      Mr. Wolf with Kiley King and Brian Tomalak about --

2          A.   I think.  I mean, they were always trying to

3      finagle for a little bit of a better deal here and there but

4      never -- they never left obviously until -- until this,

5      until Waterstone got involved.

6          Q.   Did Mutual ever have a discussion with Mr. Hutto

7      about why he resigned?

8          A.   Brian and Kiley did.

9          Q.   What was the reason?

10         A.   I think you better ask them because it was a

11     conversation, so third party.  I think a lot had to do with

12     a check being written, from my recollection.

13         Q.   Same question for Mr. Smith and Mr. Wolf.  Was

14     there ever a conversation between Mutual and those managers,

15     Mr. Smith and Mr. Wolf --

16         A.   Yes.

17         Q.   -- about why they were leaving?

18         A.   Yes.

19         Q.   Why were they leaving?

20         A.   Well, Chris told Brian it was because of the

21     check and it was too good of a check to pass up.

22         Q.   Which Chris?

23         A.   Smith.

24         Q.   Do you believe that the managers were genuinely

25     unhappy at Mutual of Omaha?

95

1              MS. WALTER:  Object to form.

2        A.   No, I don't believe that.

3        Q.   Did Mutual factor in the cause of the managers'

4   departure when it was considering the damages?

5              MS. WALTER:  Object to form.

6        A.   Yes, I believe so.  I mean, the cause that --

7   yeah, that they left because of -- yeah, were coerced to

8   leave and take their branches.  Yes, that's why we're here.

9   If there was no cause, we wouldn't be here; right?

10       Q.   Did you -- but in your mind, is it, look, we're

11  convinced these managers left because of the payday, or does

12  Mutual believe that there's other considerations?

13             MS. WALTER:  Object to form.

14       A.   Well, I think there's other considerations as

15  well.

16       Q.   If Mr. Hutto and Mr. Wolf had resigned but none

17  of the other branch employees resigned, who would Mutual

18  have put in place as the branch manager?

19             MS. WALTER:  Object to form.

20       A.   I think Kiley King.

21       Q.   Kiley King?

22       A.   Yeah.

23       Q.   Does Mutual have evidence that the employees

24  would've stayed and worked for Kiley King?

25             MS. WALTER:  Object to form.

—REGENCY REPORTING SERVICE, INC. (813)224-0224—

96

1          A.    No, no evidence.

2                THE WITNESS:  I could use a bio break whenever is

3     convenient --

4                MS. KREITER:  It's a convenient time for me too.

5          Why don't we -- do we want to put a lunch order in now?

6          Take a short break.

7                MS. WALTER:  I'm fine with that.

8                MR. CARROLL:  Yeah.

9                MS. KREITER:  Okay.

10               (A recess was taken.)

11         Q.    (By Ms. Kreiter)  Mr. Gennarelli, are you aware

12    of any complaints or frustrations by the downstream

13    employees about Mutual's underwriting requirement's ability

14    to efficiently close loans, limited loan products, or

15    compensation?

16         A.    Not directly.  I did see an e-mail, I think, that

17    -- in this where they talked about an underwriting situation

18    and actually was -- he was confused.  It was actually

19    overturned by the chief operating officer.  Then he went

20    ahead and told the customer that we couldn't do it at Mutual

21    and should send it to Waterstone, but that is one that I did

22    see.

23         Q.    Did any of those issues come up in the exit

24    interviews that Mutual conducted when the downstream

25    employees left?

97

1      A.    Not that I'm aware of.  And we don't have any

2    overlays -- we have no overlays to agency guidelines.  So

3    our underwriting would be the same as anywhere else.  So

4    this, again -- who knows if this is manufactured or what --

5    what the claim is, but we have no overlays to agency

6    guidelines.

7      Q.    Regardless of whether it was in conjunction with

8    an exit interview or an informal discussion, I mean, is it

9    Mutual's position that none of the downstream employees left

10   because of frustration with the underwriting department and

11   an inability to effectively close loans, limited loan

12   products, or compensation?

13            MS. WALTER:  Object to form.

14     A.    Not to my knowledge.  And, you know, we run a

15   pretty successfully large mortgage company, close loans all

16   the time.

17     Q.    Given your time in the industry, are you aware of

18   other instances where a branch of employees moved together?

19     A.    You mean to us or just in general?

20     Q.    In general in the industry.  I mean, is it common

21   in the industry for branches to move together?

22     A.    I think, generally speaking, it's not necessarily

23   uncommon.  It's just not done this way.  Generally, there's

24   some compensation paid to the company that they're leaving,

25   et cetera, et cetera.  Things are aboveboard.  It certainly

98

1     is not done this way.

2          Q.   You mentioned that about six months ago Mutual

3     recruited a branch back?

4          A.   Yes.

5          Q.   Did the entire branch come to Mutual in that

6     instance?

7          A.   I think a decent amount came back, yes.

8          Q.   Okay.  And do you believe that there was

9     solicitation involved?

10              MS. WALTER:  Object to form.

11         A.   Well, we -- we actually spoke to the company that

12    they were at and let them know that these folks were

13    entertaining coming back and would this be a problem?  And

14    they said no.  So we were very up-front, and we've done this

15    several times, just up front with the company that -- that

16    is -- that is --

17         Q.   How did you know that most of the employees

18    wanted to come?  I mean, it sounds like you approached the

19    employer and said, "Look, most of your employees want to

20    come."  I mean, how did you discern that?

21         A.   Well, they worked for us previously.

22         Q.   Right.

23         A.   Yeah.

24         Q.   Right.  And then they didn't, and they went

25    somewhere else?

99

1          A.    Yeah.

2          Q.    And then you had knowledge that the group, not

3     just one individual, wanted to come back.  How did you have

4     that knowledge?  Were there conversations with the different

5     downstream employees in that instance?

6                MS. WALTER:  Object to form.

7                Go ahead.

8          A.    I believe that there were conversations had by

9     managers at -- the Tampa relationships with -- already at

10    our company, yeah.

11         Q.    Okay.  But there was knowledge while the

12    employees were still working for the other employer that the

13    group wanted to move to Mutual; correct?

14         A.    Correct.

15         Q.    Did the employees that we're talking about here

16    -- I've called them the downstream employees.  They're the

17    employees of the three branches or the two branches, the

18    Paramus, New Jersey; Tampa; and Daytona.  Did those

19    employees follow the managers, Dwayne, Chris, and Chris,

20    when those managers joined Mutual?

21               MS. WALTER:  Object to form.

22         A.    I would say not all of them.  The branches grew

23    since they were here.

24         Q.    Were there some of the employees that followed

25    the branch managers?

100

1          A.    I would say probably, yes.

2          Q.    The employees following the managers to Mutual,

3     did that involve solicitation?

4                MS. WALTER:  Object to form.

5          A.    I believe that -- I'm not -- I'm not sure, but I

6     would say that we certainly didn't take any loans ahead of

7     time.  We certainly didn't solicit -- we certainly didn't

8     encourage anyone to violate their restrictive covenants on

9     their agreements.  That's, I think, a little different.  I

10    know I didn't take anybody to Costa Rica to encourage them

11    to come over.  I do know that, nor do I know we've never

12    written checks like this to entice someone to come over.

13         Q.    I guess, so my question was not about soliciting

14    borrowers.  It was strictly about solicitation of employees.

15         A.    That's what I'm talking about, so that's all I'm

16    talking about, yeah.

17         Q.    So in that instance, when the downstream

18    employees followed Chris Smith, Chris Wolf, and Dwayne Hutto

19    to Mutual in a group, is it Mutual's position that that

20    didn't involve any kind of solicitation of the employees?

21                MS. WALTER:  Object to form.

22         A.    Yeah, I think it's Mutual's assertion that they

23    weren't violating restrictive covenants in their current

24    agreements.  That's the difference here.

25         Q.    Okay.

101

1     A.    We're saying that they violated restrictive

2    covenants in their agreement with Mutual.  We're saying in

3    the past that they didn't have those restrictive covenants

4    that were -- that were -- that needed to be violated in

5    order to move them over.

6     Q.    Okay.  So there were no restrictive covenants in

7    place binding upon the employees when they followed the

8    managers to Mutual; correct?

9     A.    As far as I know, correct.

10     Q.    It's -- I mean, it sounds like in the industry

11    there's some employees that are subject to restrictive

12    covenants and some that are not.  It's not uniform that in

13    this industry everybody has a restrictive covenant; correct?

14     A.    Yes, I think that that probably is correct.

15     Q.    Do you know whether the downstream employees

16    followed Mr. Smith, Mr. Hutto, and Mr. Wolf to BBMC?

17     A.    Some did.  I mean, that's where the relationship

18    started, so some did.

19     Q.    At BBMC?

20     A.    Yes.

21     Q.    When was the acquisition of BBMC by Mutual?

22    2018?

23     A.    I believe December 2018 to the end of December --

24    I think that generally everyone was over in January of 2019.

25     Q.    So there are some downstream employees that

102

1    followed the managers to BBMC and then through the

2    acquisition and then followed the managers again to

3    Waterstone; correct?

4        A.   Yeah, there was an acquisition.  Everyone was --

5    you know, Bridgeview Bank was the owner of BBMC, was paid

6    for those people to leave and -- and go.

7        Q.   Sure.  But it was a new employer, and there were

8    new employment agreements put in place --

9        A.   Yes.

10       Q.   -- at the time of Mutual --

11       A.   But there was no violating of any restrictive

12   covenants because the -- the original company was aware of

13   the -- that there was an acquisition and they agreed to

14   allow those employees to leave and --

15       Q.   But my question isn't necessarily about

16   solicitation here.  I just want to establish how many times

17   have these employees followed the managers?  And I'm hearing

18   that there was one instance when employees followed the

19   managers to BBMC.  Then the downstream employees stuck with

20   the managers through the transition when BBMC was acquired.

21   And now these same employees are following the managers

22   again to Waterstone; correct?

23       A.   Well, I think some employees, yes.

24       Q.   Do you have a sense as to how many of the

25   employees followed the branch managers through those three

103

1    transitions?

2        A.   I don't.

3        Q.   Has Mutual experienced other instances of a

4    branch manager leaving but the branch employees stay at

5    Mutual?

6        A.   Yes.

7        Q.   How many times in your tenure at Mutual has that

8    happened where the branch manager leaves but the branch

9    remains?

10       A.   Yeah, we really don't have a lot of branches that

11    leave, to be perfectly frank, but I can think of -- I can

12    think of three or four cases that that did happen.

13       Q.   Forget about your time at Mutual as a limitation.

14    Over the course of your entire career in the industry, how

15    many times has it been where the branch manager leaves but

16    the downstream employees stay?

17       A.   I think in my career, generally speaking, we

18    don't have this big problem with branches leaving.  So I

19    don't have a wide breadth of this experience, but I would

20    say that at Bridgeview and BBMC, I don't know if we -- if we

21    lost one branch.  We're talking about branches that we don't

22    want to lose -- right? -- I mean, not branches that we may

23    part company with for --

24       Q.   Right.

25       A.   -- production reason; right?  You know, so that's

104

1    a -- that's a different story, but there are definitely

2    several -- several times where we lost a branch manager and

3    we retained the folks, more than several probably in my

4    experience.

5        Q.    How about when Mutual recruits a branch manager?

6    Is it more common for the branch manager to come alone or

7    for downstream employees to come with?

8        A.    I would say generally it's more common in our --

9    in our world where they come alone or with one or two other,

10    like, co-managers perhaps and then build a branch.  We don't

11    -- we don't have, like, these -- you know, we did an

12    acquisition, Keller Williams.  That's different; right?  We

13    -- we acquired the -- the assets of the company.  It's

14    different.

15        Q.    Is it more common in the industry, would you say,

16    for entire branches to move or a single branch manager to

17    move and start anew?

18        A.    I'd say it's probably equal.

19        Q.    Are there any instances in which Mutual loses an

20    entire branch but does not believe that there was any kind

21    of unlawful activity and instead believes the departures

22    were just a function of what I'll call natural attrition?

23    I'll define natural attrition for purposes of this

24    deposition as resignations that an employer really should

25    expect naturally when branch leaders resign but there's no

105

1        wrongdoing.  Do you understand that definition?

2            A.   Yes.

3            Q.   So just in the ordinary course, people are going

4        to follow for whatever reason; correct?

5            A.   Yes.

6            Q.   Are there instances in which Mutual has lost an

7        entire branch and didn't think that there was any wrongdoing

8        but rather just thought this is natural attrition?

9            A.   Yes.

10           Q.   How many times has that happened?

11           A.   Well, the one I'm thinking about is the group

12       that came back, that branch in particular.  I didn't know --

13       I'm not -- I don't know how many times, but that branch in

14       particular, they were very up-front about it, left all their

15       loans here.  There weren't -- you know, left on a good note.

16           Q.   And that does happen, entire branches move as a

17       result of natural attrition as opposed to any kind of

18       wrongdoing.  It's not the only time in this industry, the

19       one that you're mentioning?

20           A.   True.  That's right.

21           Q.   Does Mutual have any internal data about the rate

22       of natural attrition that is typically experienced when

23       there's a branch leader resignation?

24           A.    I don't know.  We can probably get you that, but

25       I don't have it off the top of my head.  Certainly, I can

106

1   tell you just personally we really don't have this attrition

2   problem.  Like, generally speaking, people don't leave.

3       Q.   When Mutual was preparing the damages analysis in

4   this case, did you or anyone else at Mutual look for any

5   kind of industry guidance on natural attrition rates in

6   conjunction with your analysis?

7       A.   Yeah, I think that we discussed our attrition

8   rate but not industry attrition because it's two separate

9   things.  People -- people -- what the industry does is not

10   really relevant to what -- how we perform necessarily.

11       Q.   You said you discussed Mutual's natural attrition

12   rate?

13       A.   Yeah.  It's -- I mean, it's very, very slim, if

14   you talk about a productive individual leaving the company.

15       Q.   Did you factor in natural attrition with respect

16   to the analysis applicable here?

17           MS. WALTER:  Object to form.

18       A.   No.

19       Q.   I want to move from natural attrition kind of on

20   an industrial level to natural attrition that would be

21   specific to the relationships that we're talking about

22   here.  Is it Mutual's contention that every single one of

23   the employees who left, left due to some kind of wrongdoing

24   by Waterstone and that none of the employees left because of

25   natural attrition?

107

1          A.    I think our assertion is that by causing these

2    leaders to encourage them to violate their nonsolicits, it

3    caused everyone to leave, yes.

4          Q.    Okay.  So to be clear, Mutual's position is that

5    none of the employees left due to natural attrition?

6          A.    It's -- yes, that's our assertion, I believe.

7          Q.    You do agree things like personal friendships,

8    how long the employees have worked together, whether the

9    employees have transferred firms together in the past, and

10   other considerations would be relevant to whether natural

11   attrition should be expected as between managers and

12   downstream employees; correct?

13          MS. WALTER:  Object to the form.

14          A.    Yeah, I think we talked about that.  You know, I

15   think, you know, when you encourage the managers to solicit

16   the folks that work for them, this is what happens, so...

17          Q.    So not my question.  My question was just, you

18   know, do you agree with the concept that things like

19   personal friendships, how long employees have worked

20   together, whether the employees have transferred in the

21   past, other considerations similar to that would be relevant

22   to whether natural attrition should be expected?

23          MS. WALTER:  Same objection.

24          A.    I guess I'm just -- this natural attrition is

25   something that is new to me.  I've never heard this phrase.

108

1    I don't know.  I'd have to think about it.  I'm not sure.

2        Q.    So the definition that I assigned to it -- and

3    let me know if this doesn't resonate with you, but it's

4    attrition of employees that should be expected by an

5    employer regardless of -- or not regardless, but without any

6    kind of wrongdoing, so just people leaving in the natural

7    course and following a manager.  That's what I'm saying

8    natural attrition is.  Attrition that doesn't involve any

9    kind of wrongdoing.  So do you understand that definition?

10       A.    I do.

11       Q.    Okay.  So then my question is now -- I mean,

12   there's considerations that are relevant to natural

13   attrition.  I want to understand do you agree with that or

14   not?

15       A.    Sure.

16       Q.    Things like how long have you known the person,

17   friendships, does make it more likely that there's going to

18   be natural attrition?

19       A.    So my problem is I can't take it out of context.

20   That's my whole problem.  If you're talking generically,

21   that's perhaps true, but I can't take it out of context,

22   what occurred here, which is entirely different.

23       Q.    Let me ask it this way:  I mean, assume, for

24   example, that Chris Wolf makes an announcement to the

25   employees, "I'm leaving, and I'm joining Waterstone," and

109

1    then doesn't say a peep.  He packs up his stuff and leaves.

2    And the employees initiate contact to Mr. Smith and say,

3    "Where are you going?  I'm coming with you.  I'm going to

4    follow you to the ends of the earth"?

5         A.    Let me answer this way:  What if he said, "The

6    underwriting is so strict here.  We can't get anything

7    done," or, "We can't get certain things done.  The

8    underwriting there is going to be much better"?  What if he

9    said that?  I would say that that's more in line with what

10   happened.

11        Q.    So that's where, I think, we're talking about a

12   difference of making a pure announcement and something that

13   is solicitation?

14        A.    Right.

15        Q.    Do you have any evidence on behalf of Mutual that

16   Mr. Smith, Mr. Hutto, or Mr. Wolf --

17        A.    Yeah.

18        Q.    -- made solicitation comments --

19        A.    Yes.

20        Q.    -- versus an announcement?

21        A.    Yes.

22              MS. WALTER:  Object to form.

23        Q.    What is that evidence?

24        A.    Well, there's e-mails, and there's conversations

25   that you can see e-mails saying "I'm very excited to leave.

110

1    There seems like there's great, you know -- much better

2    underwriting with" -- whatever the case was.  There's a lot

3    of e-mails where folks other than those three individuals

4    are talking about what they learned from having

5    conversations with one of those three individuals.

6         Q.   The downstream employees are saying "I'm excited

7    about the opportunities at Waterstone and the products,

8    their pricing," whatever it is?

9         A.   Right, right.

10        Q.   And so your assumption is, well, the managers

11   must've informed them about those things?

12        A.   Well, I think in one case they actually -- they

13   actually cite the fact that -- I think they said "Chris was

14   on the Teams call, our Teams call, and told us about the --

15   you know, the products at Waterstone.  It's very exciting."

16   That was, I think, the e-mail.

17        Q.   Do you know with respect to that Teams meeting

18   that you're talking about, the attendees, are those people

19   who had already said, "Take me with you," or are those

20   people that were undecided?

21             MS. WALTER:  Object to form.

22        A.   I think -- I'm sorry.  I think in the same e-mail

23   it stated this was exciting news, like, meaning they didn't

24   -- at least how I understood the e-mail, reading, this was

25   -- that this was the first they were hearing of it and they

111

1      were excited about it.  That's how I took the e-mail to

2      mean.

3           Q.   But does Mutual -- I mean, you're looking at

4      e-mails, and you're making assumptions.  Do you have any

5      evidence gathered in the case about what Mr. Smith,

6      Mr. Hutto, or Mr. Wolf said to the employees?

7                MS. WALTER:  Object to form.

8           A.   I mean, the e-mails aren't evidence?  So other

9      evidence, are you saying?

10          Q.   Sorry.

11          A.   Yeah.

12          Q.   I heard you say that there are e-mails coming

13     from the downstream employees.  I'm now focused on what

14     evidence does Mutual --

15          A.   But they --

16          Q.   -- have as to what was said by the managers?

17          A.   One e-mail I'm referencing, it definitely said

18     that Chris was on the call with the Teams, Chris Wolf, and

19     let them know what was happening, and they're very excited

20     about it.  So that would be -- Chris was an employee at the

21     time, and it was a Teams call that was on our system.

22               So yeah, I don't know -- again, we can go through

23     all of the e-mails.  And I'm sure if it gets to trial, we're

24     going to do that.  But, you know, where there's smoke,

25     there's fire.  I'll put it out there.

112

1      Q.   Did you have a conversation with Ms. King or

2   Mr. Tomalak about the natural attrition they would expect

3   with respect to the downstream employees at the branches?

4           MS. WALTER:  Object to form.

5      A.   I think it's -- Kiley is a male, so --

6      Q.   Oh, I apologize.  Thank you for saying that.

7      A.   That's okay.

8      Q.   Okay.  So I guess Mr. King and Mr. Tomalak, the

9   question was did you have a discussion with either of them

10   about the natural attrition they would expect with respect

11   to the downstream employees?

12      A.   I don't think we had that discussion, no.

13      Q.   I think you testified earlier it was Mr. King and

14   Mr. Tomalak that knew the relationships best; correct?

15      A.   Yeah.

16      Q.   Did you talk to anyone else at Mutual in

17   conjunction with the damages analysis about natural

18   attrition and what could be expected given the relationship

19   to these individuals?

20      A.   No.

21      Q.   Let's talk about the Paramus branch.  My

22   understanding -- and I don't want to just assume it.  I want

23   you to confirm, but the Paramus, New Jersey, branch reports

24   up to Chris Smith in Florida; is that correct?

25      A.   Yeah.

113

1          Q.    Did Paramus report to Chris Smith prior to

2     Mutual's acquisition of BBMC?

3          A.    Well, they came much later.  I don't -- I don't

4     -- I really don't know.  They came after Chris was

5     established here at Mutual.  I don't -- I don't -- I really

6     don't know.

7          Q.    Do you know how it came to be that a branch in

8     New Jersey is reporting --

9          A.    Well, I think they --

10         Q.    -- to a branch in Florida?

11         A.    You know, again, I think they all worked at the

12    same company.  Brian, Kiley, Chris, they worked for The

13    Money Store.  They all worked for the same company, Brian

14    Tomalak, Kiley King, Chris, and the group in New Jersey, at

15    least one of them.  They all worked in -- I believe at a --

16    I think it is The Money Store, something --

17         Q.    And they all moved together to BBMC?

18         A.    No, they didn't move together.  They went at

19    separate times.  Chris came -- I don't even know if he had

20    many people that came with him when he came.  But, you know,

21    again, I didn't go back to the BBMC days, you know.

22         Q.    Sure.  Do you know whether Mr. Smith recruited

23    the New Jersey branch to either BBMC or Mutual?

24         A.    I don't know if it was Chris or if it was Brian

25    or what the -- I really don't know.

114

1          Q.   Was -- is Chris Smith originally from New Jersey?

2          A.   I know he went to school in Connecticut, but --

3     in Yukon, but I don't know.  Is he from New Jersey?  I know

4     Brian Tomalak lived in New Jersey for quite some time as

5     well, so I don't really know.

6          Q.   Do you know whether Mr. Smith moved from New

7     Jersey to become the Tampa manager?

8          A.   That's not my understanding.  I thought he was

9     already in Tampa, living in Tampa.  I don't -- I don't know.

10    I don't want to be wrong, but it's not my understanding.

11         Q.   If you don't know, just let me know that.

12         A.   It would surprise me.  I thought his kids were

13    here and going to school here and --

14         Q.   Do you know how long the Paramus branch has been

15    reporting up to Mr. Smith?

16         A.   Since they -- since they arrived.  I don't know

17    how long that is, yeah.

18         Q.   A couple of years at least?

19         A.   A couple years, yeah.

20         Q.   How many of the downstream employees were friends

21    with the managers outside of work?

22              MS. WALTER:  Object to form.

23         A.   I really don't know.

24         Q.   How many of the downstream employees worked with

25    the managers more than five years?

115

1          A.   Again, I don't know.

2          Q.   How many of the employees worked with the

3    managers more than ten years?

4          A.   I don't know.

5          Q.   How many of the employees have worked with these

6    managers their entire career?

7          A.   I don't know.

8          Q.   Are any of the employees financially reliant on

9    the managers for business generation purposes?

10              MS. WALTER:  Object to form.

11         A.   I'm not sure what that means.  I mean, I don't --

12    explain what you mean by that.

13         Q.   Sure.  Let me ask it a different way.  Do you

14    consider Mr. Hutto a rainmaker?

15              MS. WALTER:  Object to form.

16         A.   I -- I don't know if I'd use the term

17    "rainmaker."  He certainly is a -- he develops -- yeah, I

18    guess if you want to use that term, he's a business

19    development guy, sure.

20         Q.   Were there rankings of the different branches

21    that Mutual had kept based on performance?

22         A.   Like, by volume or --

23         Q.   Yeah.  I'm just trying to get a sense, you know,

24    is -- was Mr. Hutton in the top five of the revenue

25    generators from Mutual, or was he at the bottom of the list?

116

1          A.    Top.  He was a top --

2          Q.    Top producer?

3          A.    Top.  One of the top, yeah.  I mean, I don't know

4     what number, but yeah.

5          Q.    What about Mr. Wolf?  Was he a top producer for

6     Mutual?

7          A.    It's the same branch; right?  I mean, it's the

8     same -- they co-managed it all together, so...

9          Q.    So I'm trying to get --

10         A.    But I think Chris was more in operations --

11    right? -- and I think where -- where Dwayne was more on the

12    sales side.

13         Q.    In generating loans?

14         A.    I think generating relationships with perhaps

15    Realtors and --

16         Q.    Do you know, did Dwayne Hutto ever, you know,

17    bring in a loan or a Realtor relationship, and rather than

18    him closing the loan himself, pass it on to one of the

19    downstream employees?

20         A.    Possibly.

21         Q.    So that's what I'm trying to understand.  If, you

22    know, Mr. Hutto is passing loans on and giving business and

23    commission opportunities to the downstream employees and he

24    leaves, to me that's a factor that would indicate natural

25    attrition is more likely.  Do you agree?

117

1              MS. WALTER:  Object to form.

2        A.    I'm not so sure that -- it's all the loans.  So,

3    I mean, yeah, if this person is getting all their business

4    from Dwayne, possibly, yeah.

5        Q.    They've got to have some money.  And if Dwayne is

6    the one that's filling their place and Dwayne leaves, do you

7    think the natural attrition would be more likely?

8              MS. WALTER:  Object to form.

9        A.    I would say it would be more likely.

10       Q.    Do you know whether the downstream employees had

11   that type of relationship with Mr. Hutto where he was

12   filling some of the -- some or all of their plate?

13             MS. WALTER:  Object to form.

14       A.    Well, the only -- the only way I can answer is I

15   know that Dwayne was -- you know, always -- we called the

16   top performers, you know, an executive club member.  And I

17   don't know many other people on the staff that were

18   executive club members, so I don't know how much business he

19   was passing along.  I just don't -- I really don't know.

20   I'm not familiar with it.

21       Q.    Okay.  But you would agree if you assume those

22   set of facts where Mr. Hutto is not filling just his plate

23   but some of the downstream employees, that could be a

24   consideration that would make natural attrition more likely

25   with respect to those employees?

118

1          A.    I think -- I think it would be, but I also think

2     it would be strange to pass along that much business.  It

3     would be strange, but...

4          Q.    I now want to change from the topic of natural

5     attrition as between the downstream employees and the

6     managers and just talk about the managers themselves, the

7     three managers.  How long has Chris Smith known Dwayne

8     Hutto?

9          A.    I think a long -- I think a long time.  I'm just

10    going with Brian Tomalak because he -- they all worked

11    together, I think.  So I think Brian has known Dwayne a long

12    time as well, so I don't know.  I really don't know.

13         Q.    Do you know whether Chris Smith views Mr. Hutto

14    as a mentor?

15              MS. WALTER:  Object to form.

16         A.    I don't know that.

17         Q.    Do you know whether Chris Smith and Dwayne Hutto

18    are friends?

19              MS. WALTER:  Object to form.

20         A.    I don't know that.

21         Q.    Do you know whether Chris Smith and Dwayne Hutto

22    gather socially outside of work?

23              MS. WALTER:  Object to form.

24         A.    I really don't know that.

25         Q.    Do you know if they vacation together?

119

1          A.    I don't know that.

2          Q.    How would you describe the relationship between

3     Mr. Smith and Mr. Hutto?

4          A.    I really don't have intimate knowledge about

5     their relationship.  I really don't.

6          Q.    The people that would have more knowledge are

7     Mr. King and Mr. Tomalak --

8          A.    Sure.

9          Q.    -- but you didn't talk to them in conjunction

10    with the damages analysis; correct?

11         A.    We did.  We didn't talk about their personal

12    relationship and their vacation habits.  The only vacation I

13    know of is Costa Rica.  That's the only one that's really

14    interesting to me.

15         Q.    So you keep bringing up this Costa Rica trip.

16         A.    Yeah.

17         Q.    I want to just be clear how much you know about

18    this trip.  Who attended the trip?

19         A.    I -- I just know that I just saw the e-mails.  I

20    don't know much about it --

21         Q.    Okay.

22         A.    -- other than an underwriting manager planned the

23    trip.

24         Q.    And you don't know the name of that underwriting

25    manager?

1          A.    I -- I mean, it's here somewhere.

2          Q.    And the underwriting manager is the person on the

3    Waterstone side?

4          A.    Yes.

5          Q.    Do you know who attended the trip?

6                MS. WALTER:  Objection.  Asked and answered.

7          A.    Yeah, I know who that e-mail was directed to, and

8    it was to Dwayne and his wife.

9          Q.    So you know an underwriter planned it, but you

10   don't know who any other Waterstone attendees were?

11               MS. WALTER:  Objection.  Asked and answered.

12         A.    I know that the underwriting managers planned to

13   go by the context of the -- of the e-mail.

14         Q.    Okay.  But you can't remember who that was?

15               MS. WALTER:  Objection.

16         A.    Come on.

17         Q.    I'm just trying be clear.

18         A.    Yeah.

19         Q.    I don't -- I'm not trying to be difficult.  I

20   want to --

21         A.    Yeah, you are being difficult, first of all.

22   Second of all, I'm not the one who did anything wrong.

23   Let's be perfectly clear.

24         Q.    Okay.  But you brought this up.

25         A.    I'm getting frustrated because -- I did bring it

121

1    up because it's -- like, I think we think that this isn't

2    going to be in front of people that don't twist -- if the

3    average person, jurors, see that an underwriting manager

4    takes a potential sales leader on a trip, the average person

5    is going to say, "Hmm, this seems suspicious," especially

6    when they're working at different companies.

7              So, I mean, we can play this game all day long if

8    you'd like, but eventually it's going to go to trial, and

9    the rubber is going to meet the road.  I'm just being

10   honest.  I'm not -- I don't want to waste your time or my

11   time or anybody else's time rehashing the evidence that is

12   going to be presented.

13        Q.   You've told me the underwriter planned it.

14   Dwayne and his wife were on the e-mail.  You don't know who

15   else attended from Waterstone; is that correct?

16        A.   Yeah, I was not there on the trip.

17        Q.   Would there be any financial benefit to, say,

18   Dwayne Hutto or Chris Wolf if Chris Smith also joined

19   Waterstone?

20             MS. WALTER:  Object to form.

21        A.   I don't know.  I don't know.

22        Q.   Are you aware of any financial benefit to Chris

23   Smith if Dwayne Hutto and Chris Wolf's branch also joined

24   Waterstone?

25             MS. WALTER:  Object to form.

122

1          A.    I don't know that.

2          Q.    Were -- how long have Chris Wolf and Dwayne Hutto

3     co-managed their branch?

4          A.    Since they've been here at BBMC together, I

5     believe, yeah.

6          Q.    So they co-managed back to the BBMC days?

7          A.    Yes.

8          Q.    What about before the BBMC days?

9          A.    I don't know.

10          Q.    Do you know how long Chris Wolf has known Dwayne

11     Hutto?

12          A.    I don't know that.

13          Q.    Now I want to talk about -- more about the

14     relationship between Dwayne Hutto and Chris Wolf.  Do you

15     know whether Chris Wolf views Dwayne Hutto as a mentor?

16               MS. WALTER:  Object to form.

17          A.    I don't know that.

18          Q.    Do you know if they're close friends?

19               MS. WALTER:  Object to form.

20          A.    I don't know that.

21          Q.    Do you know if they gather socially or vacation

22     together?

23          A.    I don't know that.

24          Q.    Are you able to describe the relationship between

25     Chris Wolf and Dwayne Hutto other than they're co-managers

123

1      of the branch?

2          A.    No.

3          Q.    Why are they co-managers of the branch?  Did they

4      each bring something different to the table?

5              MS. WALTER:  Object to form.

6          A.    I think that's my understanding, that Dwayne was

7      more on the sales side and Chris was more on the operations

8      side.

9          Q.    Do you think the fact that they -- just as

10     between the two of them, this concept of natural attrition,

11     given that they're both doing different things to manage

12     this branch, the fact that they each play different roles

13     and they've been working together, does the fact that they

14     need each other, does that contribute to natural attrition

15     as between them?

16             MS. WALTER:  Object to form.

17         A.    I never said they need each other.  I said they

18     have different roles.  Chris Leyden is the chief operating

19     officer.  She doesn't need me.  I'm -- I'm more on the sales

20     side.  I don't necessarily need her.  I mean, it's --

21         Q.    Let me ask it a different way.  Do you think that

22     given the different roles that Mr. Hutto and Mr. Wolf played

23     with respect to their branch, if Mr. Hutto announces, "I'm

24     leaving and going to Waterstone," do you think it's likely

25     in the ordinary course without any wrongful solicitation

124

1      that Mr. Wolf would go along?

2              MS. WALTER:  Object to form.

3          A.   I would say it's more likely that they schemed

4      together in this plan.  I mean, I would say that that's more

5      likely than Dwayne making a decision of "Just tell Chris

6      this is what I'm going to do."

7          Q.   Do you have any evidence that Mr. Hutto solicited

8      Mr. Wolf or Mr. Wolf solicited Mr. Hutto?

9          A.   No.

10         Q.   Do you have any evidence that either Mr. Wolf or

11     Mr. Hutto solicited Mr. Smith?

12         A.   Not that I'm aware of, no.

13         Q.   Now just the reverse of that, do you have any

14     evidence that Mr. Smith solicited Mr. Hutto or Mr. Wolf?

15         A.   I don't believe.  I don't know.  I don't think

16     so.

17             MS. KREITER:  Remind me what number we're on.

18             THE COURT REPORTER:  7.

19             (Exhibit No. 7 is marked for identification.)

20         Q.   Take a look at Exhibit 7.  Do you recognize it?

21         A.   I do.

22         Q.   What is Exhibit 7?

23         A.   It's our calculations for damages from the

24     branches leaving.

25         Q.   So this is -- we've been talking about different

1    buckets.  This is specific to Bucket 2, damages associated

2    with the branches closing; correct?

3         A.   Correct.

4         Q.   And I want to confirm, the persons who prepared

5    Exhibit 7 were you and Bernie Mayle?

6         A.   Bernie Mayle, yeah.

7         Q.   Mr. Mayle was the senior vice president of

8    finance; correct?

9         A.   Correct.

10        Q.   Was there any other person who played a role in

11   the creation of Exhibit 7?

12        A.   I don't believe so.

13        Q.   What role did you play in creating Exhibit 7

14   versus Mr. Mayle?

15        A.   I think we just worked jointly on it.  He pulled

16   the data because he had the data, but kind of we just talked

17   about the best way to show the income created by those

18   branches and then, you know, extrapolating out, if they had

19   stayed for 18 months, what that would be.  We took a very --

20   we did take a very conservative approach to it, so...

21        Q.   Was there one person doing the drafting and

22   another person commenting, or were you both authors of

23   Exhibit 7?

24        A.   I would say we were kind of both authors of

25   Exhibit 7.

126

1        Q.   Did one of you create the first draft?

2        A.   I think Bernie probably created the first draft,

3   but I was sitting in his office.  I mean, he -- if it's on a

4   spreadsheet, he's the one to create it.  I'm not a

5   spreadsheet guy.

6        Q.   Got it.  So it sounds like there was a meeting

7   between you and Mr. Mayle?

8        A.   Yeah.

9        Q.   And you sat down and worked on the spreadsheet

10  together?

11       A.   Yes.

12       Q.   How long did you spend preparing it?

13       A.   Well, I think a large part of the time we spent

14  was trying to come up with a, you know, fair way to

15  associate the lost revenue.  And I really mean fair and be

16  conservative about it because we were hoping for a

17  settlement before this time.

18            So, you know -- so that was the big -- because

19  there's two -- there's two ways we can do this; right?  We

20  can do what we did here, which is take those loans and

21  multiply it times the basis points earned by corporate from

22  that volume, average it out monthly, and then show for

23  18 months had they stayed what the expected profit would

24  be.

25            The other the way we can do it is what I

127

1    mentioned earlier, was a cost of goods sold approach.  The

2    problem, when you do that approach, you know, you're

3    approaching 17, maybe $18 million, so we didn't think that

4    that was a -- that that number would be not -- not conducive

5    to settle and just move on our way.  So we didn't do that.

6    The more I think about it, the more it's probably a truer --

7    truer portrayal of the lost revenue, but this is what we put

8    together.

9        Q.    So my question was just how long did you spend

10   creating the document?

11       A.    I don't know.  I didn't have a stopwatch on me.

12       Q.    Did you meet with Mr. Mayle more than once --

13       A.    Yes.

14       Q.    -- to create the document?

15       A.    Yes, yeah.

16       Q.    Ballpark, I mean, can you tell me you worked

17   40 hours on it or, no, closer to five hours or what --

18       A.    You know, I'd say probably 20 hours,

19   conversations back and forth and --

20       Q.    Did you exchange e-mails with Mr. Mayle in

21   conjunction with the analysis you were creating?

22       A.    Our offices are right next to each other, so

23   usually it's -- I walk in his office, but there are probably

24   e-mails.

25       Q.    Did anyone from Mutual ask you to gather those

128

1    e-mails for production in the case?

2              MS. WALTER:  Object to form.

3        A.    I believe --

4              MS. WALTER:  Also object to the extent this

5        encroaches on any attorney-client privileged

6        discussions.

7        A.    I think -- I really don't know.  I thought it was

8    done automated.  I don't think, like -- they didn't ask us

9    to put e-mails together.  It was all done by IT, sorted the

10   e-mails, I believe, is how they did it, but I don't really

11   know.

12       Q.    Were there multiple drafts of Exhibit 7?

13       A.    Probably.  Not -- I don't think any of them were

14   very different than -- than this, though, so --

15       Q.    Were there drafts exchanged by e-mail?

16       A.    Not that -- I really don't know because we --

17   there wasn't a lot of them, if there was.

18       Q.    And do you remember if you exchanged drafts or

19   e-mails with anyone besides Mr. Mayle about Exhibit 7?

20       A.    And counsel?

21       Q.    I guess I don't need to know the content of the

22   discussion with counsel.  But if you tell me it was counsel,

23   I'll stop with that.

24       A.    I believe we shard it with counsel, yeah.

25       Q.    Anyone else besides counsel and Mr. Mayle?

129

1        A.    Not that I'm aware of.  Not that I can remember.

2        Q.    Do you remember when you first started putting

3   pen to paper to create Exhibit 7?

4        A.    I don't.  I don't know that.

5        Q.    Okay.  Take a look at Exhibit 7, and I just want

6   to get, you know, bearings here.  It's a document entitled

7   Summary of Corporate Earnings, Contribution from Tampa and

8   Daytona Branches.  Do you see that at the top?

9        A.    Yes.

10       Q.    And for purposes of this analysis, any damages

11  associated with the Paramus branch are built into the Tampa

12  branch; correct?

13       A.    Correct.

14       Q.    Let's just walk through each of the columns here

15  starting with the column on the left, Year of Fundings.

16  You've selected 2019 through 2022 year to date; correct?

17       A.    Yes.

18       Q.    Then the next column, Volumes of Loans Funded, so

19  you're looking at the loan volume associated with each of

20  the branches for the year?

21       A.    Right.

22       Q.    And then the next column is Corporate Profits

23  Earned BPS.  Do you see that?

24       A.    Yes.

25       Q.    What is BPS?

130

1          A.   Basis points.

2          Q.   How is -- for example, the first line item under

3     that column is .530.  Do you see that?

4          A.   Yeah.

5          Q.   How is that number calculated?

6          A.   We took our -- the year of 2019.  Okay?  Our

7     financials, Mutual of Omaha, and that was the return of

8     profit was 53 basis points in 2019.

9          Q.   Are you using data, you know, from a P&L and then

10    dividing or what --

11         A.   Financials.  From the financials, yeah, P&Ls.

12    Yeah.

13         Q.   Okay.  Can you tell me which financials --

14         A.   Corporate --

15         Q.   -- and P&Ls --

16         A.   Corporate financials.

17         Q.   So here's the thing:  There were 25 P&Ls that

18    were produced in the case.  I'm trying to understand what

19    the analysis was to understand the math.  How do I know --

20         A.   I think -- are you talking about branch P&Ls?

21         Q.   I'm talking about branch P&Ls.

22         A.   Well, branch P&Ls are really not so relevant.

23    They're really designed for compensation.

24         Q.   Okay.

25         A.   But they don't capture a lot of expense and a lot

REGENCY REPORTING SERVICE, INC. (813)224-0224

131

1    of income -- right? -- because there's income and expenses

2    that occur past the branch.  And so in order to do that, the

3    only way to do -- there's two ways to do it.  The one way --

4    and this is why most people use this way, because it's

5    simpler.  You simply take the cost of goods sold approach,

6    which was -- which you would take the volume, times what you

7    sold the loan for, less commissions.

8        Q.   Sorry.  Can you just go slower?

9        A.   Yeah.

10       Q.   Cost of goods sold, and then you're subtracting

11   out what?

12       A.   Commissions.

13       Q.   Commissions.

14       A.   Yeah.

15       Q.   Subtracting out anything else?

16       A.   No.

17       Q.   So it's just cost of goods sold subtracting out

18   commissions?

19       A.   It's -- well, you -- so it's the revenue

20   generated by the loan at sale minus commissions.

21       Q.   And you said that you were pulling not from

22   branch P&Ls but from some other P&L for this data?

23       A.   That isn't the way we did it.  That's one of the

24   ways, the simpler way to do it.  But like I said, if we

25   would've done the cost of goods sold approach, this number

132

1    would've been almost $19 million.  So we used a, we felt,

2    more conservative approach, which is we took all the fixed

3    expenses that occur on the corporate side --

4         Q.    Okay.  Can you pause there just for a second?

5         A.    Yeah.

6         Q.    All the fixed expenses on the corporate side?

7         A.    Fixed -- all expenses on the corporate side.

8         Q.    Where do those corporate expenses appear, in the

9    branch P&Ls, or some other P&L?

10        A.    Yeah, the financial -- the corporate financials,

11   the corporate income statement on our tax return.

12        Q.    Okay.  So with respect to this analysis,

13   Waterstone served discovery and specifically asked what are

14   the documents that were relied upon to create Exhibit 7?

15        A.    Yeah.

16        Q.    Tax returns and corporate income statements were

17   not identified, which is why I'm kind of struggling to

18   understand the analysis.  You're going to have to help me

19   here.  I need to leave the deposition with a clear

20   understanding of how this was calculated and what documents

21   you relied on.  Are you able to locate those documents?

22   And, I mean, we can take a break.  I just need to know.  Do

23   you have the documents that you used to calculate this

24   column --

25        A.    Sure.

133

1          Q.    -- Corporate Profits Earned BPS?

2          A.    Yeah.  All you have to do is look at the -- it's

3    actually public information, I think.  But yeah, you can --

4    we used the corporate P&L.  Did you not ask for -- I mean, I

5    would imagine we sent the corporate P&L.  I don't know.

6               MS. KREITER:  I mean, if you can help me here,

7          Courtney, I don't believe --

8               MS. WALTER:  Where are you referring to?  We did

9          produce tax returns.  We produced tax returns in

10         response to your most recent request for production.

11              MS. KREITER:  Right.  But there's a request for

12         production specific to what documents were relied on to

13         create Exhibit 7 --

14              MS. WALTER:  Can you point me to that?  I'm not

15         being difficult.  I'm genuinely asking.

16              MS. KREITER:  Let's take a five-minute break.

17              (A recess was taken.)

18              MS. KREITER:  So for purposes of the record, we

19         took a break.  My concern was that the documents

20         identified in response to Interrogatory No. 10 lists

21         documents that Mutual relied on to prepare Deposition

22         Exhibit 7.

23              The witness has started testifying that he relied

24         on corporate tax returns and corporate financials that

25         are not identified within the Bates ranges listed by

134

1         Mutual in response to Interrogatory No. 10.

2              We took a short break to try to discern if we can

3         readily access the documents that the witness did rely

4         on.  The witness indicated that tax returns is one of

5         the documents that we could look to for this

6         information.

7         Q.   (By Ms. Kreiter)  And I think that I'll let the

8    witness say on the record -- I mean, if we pull up the tax

9    return, are you able to then testify as to how the Corporate

10   Profits Earned Basis Points in Exhibit 7 were calculated?

11        A.   The tax returns are going to make it more tricky

12   because of the reverse mortgage.  You know, if we used the

13   tax returns, it's going to include the reverse mortgage and

14   this number is going to be significantly higher.  We need to

15   use the corporate P&L, it's called.  That's what we call it.

16   And I find it -- I'm surprised you guys don't have it with

17   all the other P&Ls.

18        Q.   I'm going to --

19        A.   It's a corporate income statement.  And if we

20   looked at the tax returns, it's going to be difficult.

21        Q.   Are you able to readily access it?  I mean, can

22   you send an e-mail and get it e-mailed to you?  I'm just

23   looking to facilitate the deposition.  There's 25 P&Ls.  I

24   just show a Bates number.

25        A.   It's up to the attorneys.

135

1           MS. KREITER:  I don't want to come back and redo

2      this deposition.

3           MS. WALTER:  So what exactly are you asking?

4           MS. KREITER:  I'm asking the witness to provide

5      at the deposition today any documents that he needs to

6      -- in order to testify as to how the Corporate Profits

7      Earned column of Exhibit 7 were calculated.

8           MS. WALTER:  With specificity?  Like, pulling the

9      actual number to do the calculation right here?

10          MS. KREITER:  I need to understand how this was

11     done and what documents were relied on because I do not

12     believe they are the ones listed in response to

13     Interrogatory 10.

14          In addition, I'm going to be asking the witness

15     to identify the P&L statement that he relied on to come

16     up with the figures that are in the second column of

17     Exhibit 7, which is Volume of Loans Funded.  The

18     witness has said that that data came from an internal

19     system.

20     A.   I mean, it came from the P&Ls as well.  Those

21     should -- as long as we're looking at the right P&Ls, it

22     should certainly cross-reference.  Bernie tends to not make

23     mistakes.  He's an Eagle Scout, by the way, really

24     legitimately, not just a Boy Scout, an Eagle Scout.  We can

25     provide the corporate P&L.  I just don't know if -- you

136

1    know, that's up to counsel.  I don't know --

2        Q.   Let me do this.  So for example --

3            MS. KREITER:  Have that marked.

4            (Exhibit No. 8 is marked for identification.)

5            MS. KREITER:  Number 8.

6        Q.   So take a look at Deposition Exhibit No. 8.

7        A.   Okay.

8        Q.   Go to page 5.  It says "Identify" -- this is

9    Interrogatory No. 10.  It says "Identify, as defined above,

10   all documents that Mutual referred to or relied on to

11   prepare Exhibit 1."  Exhibit 1 of this discovery request is

12   the same as Deposition Exhibit 7 that we're using today.

13       A.   Okay.

14       Q.   So we've asked you to identify all of the

15   documents that were relied on, and then there's a series of

16   Bates numbers.  Do you see that?

17       A.   I do.

18       Q.   So MOM-10942, that's a particular P&L.  I'm going

19   to have that marked as well.

20           (Exhibit No. 9 is marked for identification.)

21       Q.   So Deposition Exhibit No. 9 that has just been

22   marked is Bates No. MOM-0010942.  Do you see that, the first

23   page of the document?

24       A.   Yes.

25       Q.   And do you see how that's also one of the

137

1    documents that is listed in response to Interrogatory 10 as

2    one that you relied on to prepare the lost profits analysis?

3    Do you see how the Bates number matches up to what's written

4    there on behalf of Mutual?

5        A.    I do.

6        Q.    So take a look at the document that Mutual

7    identified as one you relied on and explain to me how this

8    document was relied on and how it is reflected in

9    Exhibit 7.

10        A.    This does -- this -- this isn't right.  This P&L

11   here is not right because it shows -- well, hang on.  '19 --

12   no, it's just not right.  Yeah, I don't know why this would

13   be off.  It doesn't make any sense.

14            MS. WALTER:  Can we go off the record for a

15        second?

16            MS. KREITER:  I guess I have a few more questions

17        about this, if you don't mind.

18            MS. WALTER:  Okay.

19        Q.    On the record.  Mr. Gennarelli, so did you or

20   Mr. Mayle rely on what we've now marked Deposition Exhibit 9

21   in conjunction with the lost profits analysis that is

22   Deposition Exhibit 7?

23        A.    I -- I did not rely upon this 9, no.

24        Q.    Do you know why Mutual identified it as one of

25   the documents you relied on?

138

1          A.    I do not know.

2          Q.    I will represent to you that this first Bates

3     range listed for Interrogatory No. 10 that starts with the

4     document you're looking at, Bates 100942, and then it goes

5     on to MOM-11032, that's about 25 different P&Ls.  Are you

6     able, as you sit here today, to let me know which of those

7     25 P&Ls you relied on to create Exhibit 7?

8          A.    We relied upon -- if I looked at them all -- but

9     this volume is off on this P&L for some reason.  I have no

10    idea why, but the volume is off.  I don't know if it was a

11    misprint or something.  You look at it.  It's common sense.

12    In January 2019, unless I'm missing -- this is not

13    extrapolated out?

14         Q.    Do you see the different Bates numbers that are

15    listed in response to Interrogatory No. 10?

16         A.    I'm still going over this.  Hang on one second.

17         Q.    Sure.

18         A.    This -- this P&L is from January 31, 2019.  It's

19    only a one-month P&L.

20         Q.    It's something that Mutual produced and said you

21    relied on, so I can't explain the origin of it.  I'm just

22    trying to understand were we given the information

23    necessary --

24         A.    Well, you just probably -- maybe there -- is

25    there more?  Is there another P&L?

139

1          Q.    There definitely is.  There's about 24 more.  So

2     I need to know which one did you rely on because when I --

3          A.    The full -- full years.  I mean, this is -- this

4     is why -- there's nothing wrong with this P&L other than

5     it's only for the month of January.  And I think the

6     reasoning provided for this was to show the 2018 volume at

7     BBMC.  Probably that's the reason it was -- it was provided.

8          Q.    Okay.  So I'm going to just share my screen.

9          A.    Were you using this to -- as an offage in 2019?

10    Is that the problem?

11         Q.    I don't know what that was used for.  I'm trying

12    to sift through the volume of documents and understand the

13    analysis, and I'm, frankly, not able to do so.

14         A.    Well, you guys had the P&Ls.  They sent you all

15    the P&Ls --

16         Q.    I don't --

17         A.    -- for the branch levels before they -- before

18    they joined the company.

19         Q.    Are you able to -- for example, let me ask you

20    this question:  Volume of Loans Funded, Tampa Volume --

21         A.    Yeah.

22         Q.    -- it says 115,699,761?

23         A.    Yeah.

24         Q.    I do not find that number on any of the -- I

25    mean, we've spent hours, understand, looking through the

140

1    documents that Mutual identified.  None of those documents

2    reference a loan volume of that amount, and I'm trying to

3    understand why and where that number came from.

4         A.    Yeah, I'd have to see the documents you looked

5    at, but we -- there's a closed loan number.  There's funded

6    loans, so make sure you look at funded, not closed.  I don't

7    know.  I don't know what you're looking at.

8         Q.    Well, I looked at all the documents that Mutual

9    identified.

10        A.    Okay.

11        Q.    And it's not there.  Are you able to tell me

12   which of these Bates numbers you relied on?

13        A.    Bates number, no, I don't know what that Bates

14   number is.

15        Q.    How is Waterstone supposed to know what you

16   relied on at this deposition today to come up with the 115-

17   shown as the Tampa volume for 2019?

18             MS. WALTER:  Object to the form.

19        A.    Other than the fact that the P&Ls were sent to

20   you before these folks even left by themselves, you could've

21   cross-referenced those P&Ls because those were accurate.

22        Q.    But those weren't the ones that Mutual has said

23   it looked at.  How would I have known that you looked at

24   those other P&Ls and not the ones that Mutual said it did?

25        A.    I don't know what you're looking at.  I don't

141

1    know what you're seeing.

2        Q.    So my problem is plaintiff, Mutual, has the

3    burden of proof.  It's alleging damages north of $4 million.

4    It has to demonstrate how those damages are calculated --

5        A.    Absolutely.  There's --

6        Q.    Are you able to, at this deposition today, tell

7    me how Mutual came up with the --

8        A.    Yes.

9        Q.    -- 115 --

10       A.    Yeah.

11       Q.    -- million?

12       A.    It was the volume produced by the Tampa office,

13   Tampa combined with Paramus.

14       Q.    But you're not able to tell me what document that

15   comes from?

16       A.    The Tampa -- the Tampa P&L.  This is one-month

17   P&L you showed me.

18       Q.    Sure.  Are you able to tell me which of the

19   documents identified in response to Interrogatory 10 it

20   comes from?

21           MS. WALTER:  Object to the form.

22       A.    Well, I don't -- did you want me to memorize

23   what --

24       Q.    I want Mutual to come to a deposition prepared to

25   testify about its damages.  Did you look at any of these

142

1    documents in preparation for your testimony today?

2            MS. WALTER:  Object to the form.

3    A.    Yes.

4    Q.    How can I get at the document you looked at

5    without spending another 50 hours trying to look at these

6    documents and then finding that it doesn't exist?

7            MS. WALTER:  Object to the form.

8    Q.    Are you able to go on Mutual's system or e-mail

9    Mr. Mayle and find the document that shows --

10   A.    Yes.

11   Q.    -- the loan volume?

12           MS. WALTER:  Object to the form.

13   A.    Yes.

14   Q.    Can you do that if we take a break and e-mail the

15   documents that show these volume numbers?  That would help

16   me a lot.

17           THE WITNESS:  Are you guys okay with this?

18           MS. WALTER:  Can we take ten minutes, please?

19           MS. KREITER:  Yes.

20           MS. WALTER:  I asked that previously.

21           (A recess was taken.)

22           MS. KREITER:  So opposing counsel had asked for a

23           break.  The request that I had posed was that the

24           witness access the documents he used to calculate

25           Exhibit 7 and provide them at the deposition today such

REGENCY REPORTING SERVICE, INC. (813)224-0224

143

1     that he could walk through the calculations.  Is that

2     something that can happen today?  Is Mutual willing to

3     do that?

4          MS. WALTER:  Our position is that we will not be

5     producing additional documents but that the documents

6     referred to in response to Interrogatory No. 10,

7     Mr. Gennarelli will walk you through his calculation

8     and the data that was considered within those

9     documents.

10          And to be clear, Interrogatory No. 10 requests

11     "Identify, as defined above, all documents that Mutual

12     referred to or relied upon to prepare Exhibit 1."  You

13     requested documents.  Waterstone requested documents.

14     Mr. Gennarelli referred -- relied on data within our --

15     within the system.

16          So we did identify the documents that -- the

17     relevant data that was used for Mr. Gennarelli to come

18     up with his calculation, and he is able to testify to

19     that today.

20          MS. KREITER:  A witness that's putting forth

21     damages can't rely on documents in a system or

22     elsewhere that they don't produce in discovery.

23          MS. WALTER:  You can send another request for

24     potential -- for additional data.

25          MS. KREITER:  Why don't we try and see if he can

144

1          walk through it.  I mean, you indicate that he can walk

2          through it with me?

3                MS. WALTER:  Yes.

4                MS. KREITER:  Okay.  Let's do that.

5          Q.   (By Ms. Kreiter)  Let me start with,

6    Mr. Gennarelli, I'm going to put up on my computer screen --

7    and I understand with your counsel that they're amenable to

8    you just looking at my computer for efficiency in the

9    deposition.

10         A.   Sure.

11               MS. KREITER:  Courtney, it's document Bates

12         No. 10964.

13         Q.   So I've got the document up on my screen here.

14         A.   Okay.

15               MS. KREITER:  Can I orally designate this a

16         deposition exhibit?  I can get a hard copy for it.  But

17         just for purposes of the record, I guess I'd like this

18         to be Deposition Exhibit 10.  It's Bates

19         No. MOM-0010964.  It's an Excel spreadsheet.

20               (Exhibit No. 10 is marked for identification.)

21         Q.   Do you recognize this document as a P&L?

22         A.   Yes.

23         Q.   Up in the left-hand corner, it says "Mutual of

24    Omaha Profit and Loss Statement."  This is for the Tampa

25    branch, and it's dated December 31, 2019.  Do you see that?

145

1      A.   Yes.

2      Q.   There's different years in the document.  I'm

3 going to direct you to the column that says "2019 Year to

4 Date."  Do you see that?

5      A.   Yes.

6      Q.   And there's a row that says "Total Loan Volume,"

7 and then the year-to-date total loan volume is 114,750,394.

8 Do you see that?

9      A.   I do.

10      Q.   Yet on Deposition Exhibit 7, the Volume of Loans

11 Funded for 2019 that's listed is not an amount that matches

12 the 114- but rather is 115,699,671.  Do you see that?

13      A.   I do.

14      Q.   I am trying to understand where the data you

15 relied on came from because it doesn't reconcile the

16 year-end P&L for 2019.  Can you explain that?

17      A.   Well, I can -- I can -- I'd prefer if an

18 accountant did it, but there's accruals that happened after

19 the month.  This was presented at month end.  And then

20 subsequent to that, there might've been loans that --

21 mistakes happen; right?  If a loan is funded at a different

22 branch, it was added back to that.  This is -- this is the

23 up-to-date in our system today.  I can say that because

24 that's the data we used, but you're off by -- what is that?

25 -- probably two loans, I would estimate.

146

1      Q.   Has Mutual produced the documents in its system

2   that you relied on to prepare Exhibit 7?

3           MS. WALTER:  Object to the form.

4      A.   I -- I used data, not the documents.

5      Q.   Okay.  When you pull up the data that you were

6   referencing, can you print it out from the system?

7      A.   I would imagine I could.

8      Q.   Okay.  Could you take a screenshot and produce

9   it?

10     A.   Bernie -- I couldn't do it now.

11     Q.   No, I'm not saying now.  I'm just saying in

12  general, can you take a screenshot of it, get it produced to

13  us?

14     A.   Yes.  These numbers didn't come out of thin air.

15     Q.   Sure.

16     A.   These are the updated numbers, yeah.

17     Q.   And you can print it off your system; correct?

18     A.   Yeah.

19          MR. CARROLL:  So --

20          MS. WALTER:  Send another request, Maria.

21          MS. KREITER:  Courtney, this is for documents

22       referred to or relied on.

23          MS. WALTER:  He responded.

24          MS. KREITER:  So he can push print.  I mean, that

25       doesn't -- just because you haven't printed something

REGENCY REPORTING SERVICE, INC. (813)224-0224

147

1          doesn't mean it's not a document that has to be

2          produced in discovery.

3               MS. WALTER:  We don't have to create a document.

4               MS. KREITER:  He's not creating it.  He's pulling

5          it up, and he's pushing print.

6               MS. WALTER:  I'm not getting into this argument.

7          Q.   Is that correct?  Bernie or you pulls up your

8     system, and you can print that document; correct?

9               MS. WALTER:  To be clear, he -- I also think

10         you're misrepresenting his testimony.

11              MS. KREITER:  I'm asking him.

12              MS. WALTER:  He said, "I would imagine."

13              MS. KREITER:  I'm asking him right now.

14              Read my last question back.

15              (The previous question was read by the reporter.)

16         A.   I'm not sure exactly what we can provide to you,

17    but I'm sure there's something that we can give you that

18    shows this number.  It didn't come out of thin air.

19         Q.   Okay.  I will make a request on the record that

20    you produce that document immediately.

21              Is that the same -- I mean, we were talking about

22    loan volume with respect to the year 2019?

23         A.   I'm sorry.  If I just could ask a question, and I

24    don't know if this is inclusive of Paramus or if this may be

25    inclusive of Paramus.  You know what I'm saying?  He

148

1    combined Paramus and Tampa on this sheet, you know, when we

2    did it. I don't -- that may be the problem, which we can

3    show you, so...

4         Q.   Okay. But -- so that's the problem. Today is

5    the day when I need to know and you are to be in a position

6    to walk me through this. I'm now hearing at the deposition

7    that you cannot and that you're not sure if one of the three

8    branches is included; is that accurate?

9         A.   I'm not sure. I'm not sure if that's accurate or

10   not.

11        Q.   You don't know whether Paramus is included in

12   Exhibit 7?

13        A.   I know it's included in this number here under

14   Tampa.

15        Q.   When you say "this number," just we've got the

16   reporter --

17        A.   I'm sorry.

18        Q.   You're talking about --

19        A.   The Exhibit 7.

20        Q.   You're not sure if Paramus is included in

21   Exhibit 7?

22        A.   No. In Exhibit 7, I know it is included.

23        Q.   It is included?

24        A.   Yes.

25        Q.   Okay.

149

1          A.    You referenced a P&L of Tampa, so I'm not sure

2    that that was inclusive of Paramus, and that -- that may be

3    the difference.

4          Q.    I am going to put a request on the record that

5    you ask Mr. Mayle or somebody at your office to print the

6    documents that would allow you to walk me through the

7    volumes of loans funded.  3

8               MS. KREITER:  Ms. Walter, are you amenable to

9          that?

10              MS. WALTER:  No.  I'm objecting to that, Maria.

11         He's -- let me just go on the record and say that you

12         did put in a request for the profit and loss statements

13         for the Paramus branch.  It's Request for Production

14         No. 40, and we identified the P&Ls that corresponded to

15         Paramus -- to those branches.

16              MS. KREITER:  Request No. 40 has nothing to do

17         with your response to Interrogatory 10.

18              MS. WALTER:  Yes, it does.  You're insinuating

19         that we didn't identify the P&Ls that correspond to

20         Paramus, and we did in response to --

21              MS. KREITER:  In 10?

22              MS. WALTER:  In -- it's in there.  The Bates

23         ranges are included in there.

24              MS. KREITER:  Bottom line, I need to how this was

25         calculated.

150

1           MS. WALTER:  He's walking you through that.

2        A.    I can walk you through that.

3        Q.    Can you -- I mean, are you -- it sounds like

4    you're amenable to getting the documents from Mr. Mayle.

5    Your counsel is saying --

6           MS. WALTER:  I'm objecting.  I'm objecting.

7           MS. KREITER:  Okay.  Understand we may need to

8        come back here, and I'm going to move the court for

9        fees.

10          MS. WALTER:  File your motion.

11          MS. KREITER:  Okay.

12       A.    If I may, I can still walk you through the

13   philosophy.  The philosophy --

14       Q.    I want to get whatever mileage I can.  And then

15   if there's an efficient way to avoid bringing you back to

16   Florida, I'll do that, but I -- so let's see what we can --

17       A.    I don't mind coming back either, but --

18       Q.    Let's see what we can get through.  Why don't you

19   explain to me -- you mentioned the philosophy surrounding

20   the Volumes of Loans Funded?

21       A.    Yes.

22       Q.    Walk me through that, please.

23       A.    The philosophy of the loans funded are just that,

24   the loans -- so the Tampa volume would be Tampa and Paramus,

25   and that's the loans -- the volume funded that year.

151

1        Q.    Okay.

2        A.    Okay.  So that's pretty cut and dry.

3        Q.    And they're taken off of -- just to be clear,

4    they're taken off of documents in your system --

5        A.    A system, not documents.

6        Q.    In a system?

7        A.    Yeah.

8        Q.    They're taken off of the system --

9        A.    Yeah.

10        Q.    -- and they've not been produced?

11             MS. WALTER:  Object to the characterization of

12        that.

13        A.    I actually think they have been produced but not

14    in the way -- the manner in which you would like them

15    produced is how I understand it.

16        Q.    So this is where I'm struggling.  Where can I --

17    I mean, the point of this deposition is that I get to verify

18    what you did.  Where in the documents are there numbers from

19    which I can verify the volume of loans funded?

20        A.    Do you have Paramus's P&L in there?

21        Q.    I have Tampa.  Is it separate from Tampa?

22        A.    It may be, you know.

23        Q.    I don't have separate P&Ls for Tampa.

24             MS. WALTER:  Maria, we identified those P&Ls

25        correspond also to Paramus and Tampa.

REGENCY REPORTING SERVICE, INC. (813)224-0224

152

```
 1              MS. KREITER:  That's what I'm saying.  That's

 2         what I'm saying.  I don't have P&Ls specific to

 3         Paramus.  I only have Tampa.

 4         Q.   I mean, this is one.  I guess that's what I'm

 5    wondering.  What -- so this is a P&L for Tampa in 2019?

 6         A.   Right.  Yeah.  Right, right, right.  Yeah.

 7         Q.   Okay.  So walk me through what we've virtually

 8    marked as Exhibit 10.

 9         A.   I want to check.  Do you mind if I just look at

10    one thing?

11         Q.   Go for it.

12         A.   Okay.  So, I mean, the only -- the only thing we

13    used from this document is volume in this exercise.

14         Q.   Okay.

15         A.   I was just trying to see if there was -- in the

16    payroll tab, if there were people from Paramus in there.  I

17    really can't recognize anybody, so I'm not sure.  I don't

18    have the time that they joined.  That was what I was just

19    trying to see.

20         Q.   Sure.  But the volume here doesn't match up?

21         A.   Right, right.  And that's something Bernie is

22    going to have to explain and somebody from accounting is

23    going to have to explain to you why, you know, if there's an

24    accrual or if these accruals are common or if there was

25    misallocation.  You know, you're funding a lot of loans.
```

153

1    It's very common for a loan to fund and maybe get applied to

2    a different P&L, and then it gets reapplied when we correct

3    it down the road.

4        Q.   Okay.  Are you willing to call Bernie and ask him

5    about this one in particular?  And maybe that will call

6    clarity --

7            MS. WALTER:  Object to that.  You can depose

8        Bernie.

9            MS. KREITER:  He's the corporate rep on this

10       document.

11           MS. WALTER:  He is walking you through exactly

12       how to do this, and he explained the discrepancy.  I

13       don't know what more you want.  You can ask him all the

14       questions about the P&Ls and the calculations.  He's

15       not calling Bernie.

16           MS. KREITER:  Okay.  Look, this is going to be a

17       second deposition of a corporate rep.  Instead of that,

18       why are you opposed to him calling Bernie and taking

19       care of this in about ten minutes?

20           MS. WALTER:  To ask him what exactly?

21           MS. KREITER:  To ask him to educate your

22       corporate rep on why there's a discrepancy in the

23       documents you've identified and the damages --

24           MS. WALTER:  He responded.  He responded to that

25       question.

154

1          MS. KREITER:  He said he didn't know.  He'd have

2      to ask Bernie.

3          MS. WALTER:  Well, he provided an explanation

4      about the accruals.

5      Q.    Do you know that that's the reason for the

6  discrepancy between the 115 million volume and the 114

7  million volume?

8      A.    I know generally that that's what happened, but I

9  don't know for a fact in this case, no.

10      Q.    Okay.  What about with respect to all of the

11  other loan volumes?  Are you able to tell me here at the

12  deposition where these numbers come from and if there's a

13  discrepancy?

14      A.    These numbers are going to be most correct

15  because they are the most recent.  They came out of a system

16  much more recently than when the P&L was created in January

17  or December of 2019.

18      Q.    And you're going to follow your counsel's

19  instruction not to have them printed and produced today at

20  the deposition --

21      A.    Well, I'm going to follow my counsel's

22  instructions, yeah.

23      Q.    What about Corporate Profits Earned BPS, that

24  column that we were talking about?

25      A.    Yeah.

155

1          Q.    We've had a few breaks.

2          A.    Yeah.

3          Q.    Again, I'm just looking for you today at the

4    deposition be able to walk me through, for example, how did

5    you calculate the .530, and what documents did you rely on

6    to do that?

7          A.    Okay.  There's a Richey May tax return in the

8    file.  I'm not an accountant, but that'll have all the

9    information that you would need to calculate this.  We

10   basically took the total profit for Mutual of Omaha Mortgage

11   in 2019 divided by the volume to get a basis point

12   calculation.

13         Q.    Sorry.  You're going to have to go slow.  You

14   took the profit for 2019?

15         A.    Yeah, took the profit for 2019, divided that by

16   the loan volume to get a basis point calculation.

17         Q.    And you said the document that this profit and

18   loan volume came from is what?

19         A.    Well, there's a Richey May document in there.

20   There's several documents --

21         Q.    The audited financial statements?

22         A.    Yeah.

23              MS. KREITER:  Emma, are you able to e-mail those

24         to me?

25              MS. JEWELL:  Yes.  I'll do that now.

156

1         Q.   Is there more -- while she's sending those over

2    to me, is there more explanation before we turn to the

3    documents?

4         A.   Well, you know, again, these Richey May, you

5    know, audited financials are going to be difficult for

6    laypeople like us to understand them, to be honest.  I mean,

7    I -- you can have your accountants look at them.  They can

8    figure it out easily, but I don't know that we can.  I mean,

9    I would go off of our corporate P&L, which I don't know if

10   it wasn't requested or what the case is, but that's how I

11   would -- I understand an income statement.  I don't

12   necessarily understand how they then take the income

13   statement and make this.

14        Q.   So if I pulled up the Richey financial

15   statements, would you be able to walk me through this or

16   not?

17        A.   I don't know.  I don't know.  I -- I don't know.

18        Q.   Okay.

19        A.   It's -- they're complicated, so...

20        Q.   And are you saying that you instead looked at a

21   corporate P&L?

22        A.   I used data, so I pulled data from our system,

23   which goes into all of that.

24        Q.   Got it.

25        A.   That's how I used it, yeah.

157

1          Q.    Is the data that we talked about similar to the

2    system that has the volume of loans funded data, or is it a

3    separate -- I mean, you mentioned corporate P&L --

4          A.    It's an accounting system, yeah.

5          Q.    Okay.  But --

6          A.    When I say "I," I had Bernie -- that's the data

7    he pulled, so we can look at it, yeah.

8          Q.    Got it.  And you said it is a corporate P&L, or

9    is it --

10         A.    Yeah.

11         Q.    -- something in the system?

12         A.    Corporate P&L, but that's in the system, right.

13         Q.    Is that too -- I mean, a corporate P&L, that's a

14   document you can print from the system?

15         A.    Yes.

16               MS. KREITER:  Do you know, Courtney, has the

17         corporate P&L been produced?

18               MS. WALTER:  Did you request that?

19               MS. KREITER:  I requested all documents referred

20         to or relied on.  He says he relied on the corporate

21         P&L.

22               MR. CARROLL:  That's not what he --

23         A.    That's not what I said.  I said I relied on the

24   data that is in -- it's in a lot of places.  It's also on

25   this -- it's also on the Richey May deal, but I can't

158

1    explain the Richey May.  I can explain this sheet to you,

2    what we did, but I can't explain the Richey May deal.  I'm

3    not a CPA.

4         Q.   Okay.  Would that be the same with respect to all

5    of the -- I mean, you've got various years here, '19, '20,

6    '21, '22 year to date.  Would that be true with respect to

7    all of this data under the Corporate Profits Earned BPS?

8         A.   Yes.

9         Q.   It comes from data on a system that has not been

10   produced?

11             MS. WALTER:  Object to the form.

12        A.   Yeah, the monthly P&Ls have been produced, I

13   believe, but...

14        Q.   The corporate P&Ls?

15        A.   The corporate P&Ls is just an aggregate of the

16   monthly P&Ls at the branch level.  I mean, it's...

17        Q.   Right.  So I guess I'm trying to understand are

18   there documents that you can use today to tell me how to

19   calculate this corporate BPS?  I thought the answer was no,

20   but I want to make sure that that's true and not miss the

21   opportunity.

22             MS. WALTER:  Object to the form.

23        A.   I don't know what -- I don't know what's in

24   there.  I don't really know if there's a -- if there's a

25   corporate P&L or if we can use the Richey May documents.  I

159

1      don't know.

2           Q.   Okay.  Well, let's try with the Richey May

3      documents since I have those here.

4                MS. KREITER:  So Bates No. MOM-0011163, let's

5           have that designated Deposition Exhibit 11.

6                (Exhibit No. 11 is marked for identification.)

7           Q.   I'll turn the computer over to you.  Take a look

8      at that, and let me know if there's data within Exhibit 11

9      that you can use to help identify the corporate profits and

10     BPS.

11          A.   So this is for year ending December 31, 2022, and

12     '21, so it wouldn't have '19 in there.

13          Q.   But what about -- I mean, you have the corporate

14     BPS for those other years too, so take a stab at 2021.

15               MS. WALTER:  Object to the form.

16          A.   Yeah, I'm afraid you're going to need an

17     accountant to figure this out.  You see a reverse mortgage

18     combined in here.  We don't want to use that.  It will

19     inflate the numbers, yeah, $700 million reverse

20     mortgage.  Yeah, I'm sorry.  This is not going to be helpful

21     to us.

22          Q.   I appreciate the effort.  Let's turn back to

23     Exhibit 7, please.  The fourth column there, it's Branch

24     Contributions to Corporate Profits.  Do you see that?

25          A.   Yes.

160

1          Q.    This is simply the volume from Column 2 times the

2     corporate profits basis points in Column 3 multiplying --

3          A.    That's correct.  That's correct.

4          Q.    Then off to the right-hand side, there's no

5     column, but there's some percentages, .92 percent associated

6     with Tampa and then .97 percent associated with Daytona.  Do

7     you see that?

8          A.    Yeah.

9          Q.    What are those percentages?

10         A.    That's the accumulative on average.  So if you

11    took the average of those -- those time frames, that was the

12    basis points in corporate profits derived for the branches.

13         Q.    Okay.  So it's the average of Column 3, Corporate

14    Profits Earned BPS?

15         A.    But it's a weighted average, so it takes into

16    account the -- the volumes on the -- on the -- as well.

17         Q.    Got it.  Then let's go down to the bottom right.

18    It says "Tampa Corporate Profit Expectation."  Do you see

19    that?

20         A.    Yes.

21         Q.    So the total that Mutual is demanding related to

22    the Tampa branch inclusive of the Paramus branch is the

23    2,716,040 --

24         A.    Correct.

25         Q.    -- correct?

161

1          A.   Yes.

2          Q.   And then, similarly, with respect to Daytona, the

3     amount that Mutual is seeking with respect to the Bucket 2

4     damages is the 1,723,961.89; correct?

5          A.   That's right.

6          Q.   So a total of about 4.4, a little over 4.4?

7          A.   Yeah.

8          Q.   You have here a date range highlighted.

9     "Expected corporate profit for 18 months," it says "July of

10    '22 through December 31, 2022."  I'm assuming that should be

11    2023?

12         A.   Yes.

13         Q.   And is the starting date -- it just says July.

14    Is it July 1?

15         A.   Yes.

16         Q.   Okay.  With respect to the Corporate Profits

17    Earned BPS, the amounts for 2019, 2020, and 2021 are the

18    same for both Daytona and Tampa, but then you get to 2022,

19    and it's different.  Do you see that?

20         A.   Say -- walk me through that one more time.

21         Q.   Yeah.  So 2019 Tampa, the corporate BPS is .53.

22    And then for Daytona it's also .53?

23         A.   Yeah, because I think they left sooner.

24         Q.   So that's what I'm trying to understand.  It's

25    the same, and then --

162

1          A.    Yeah, because they were there a full year.

2          Q.    Got it.

3          A.    Yeah.  And they -- so we -- so the first quarter

4     of the year that they had left, we earned -- corporate

5     earned more money, and that was the amount that corporate

6     earned.  And then for the full year, the corporate profit

7     dropped to 43 basis points.  Does that make sense?

8          Q.    Okay.  I just wanted to understand --

9          A.    Through June 30th, that is.  The difference

10    between April 30th and June 30th.

11         Q.    With respect to the Daytona branch, you have

12    listed down in the -- let's take the bottom right-hand

13    corner.  You have profit for 42 months.  Do you see that?

14         A.    Yes.

15         Q.    Why is it not 40 months?  You've got three years.

16    That's 36.  And then you've got four months:  January,

17    February, March, April.

18         A.    I think -- I think he just wanted to compare

19    apples to apples, which is 42 months, even though there was,

20    I don't think, any profit there.

21         Q.    So it's not a mistake.  It's intentionally

22    42 months rather than 40?

23         A.    I can do the math.  I don't know if the math

24    works out.  Let me do the math real quick.

25         Q.    Sure.

163

1              MS. KREITER:  I'll just let the record reflect

2          the witness is using presumably a calculator on his

3          phone to check some of the math in Exhibit 7.

4          A.    That's right.  I think he just did it apples to

5    apples, so he used 42 months --

6          Q.    Mutual's position is it's not an error?

7          A.    Yeah.

8          Q.    It's done intentionally?

9          A.    Yeah.

10         Q.    For the -- in the fourth column there, Branch

11   Contributions to Corporate Profits, you can see for Tampa in

12   2019, it's 600,000.  Then it jumps 3,232,144 for 2020.  Do

13   you see that?

14         A.    Yes.

15         Q.    Is that a record high for the Tampa branch?

16         A.    I think so.

17         Q.    Similarly, for the Daytona branch, it jumps from

18   400,000 to 1.7 million --

19         A.    Yes.

20         Q.    -- 53?

21              Is that a record high for the Daytona branch?

22         A.    I believe so.

23         Q.    You would agree that 2020 was a record year in

24   terms of volume for Mutual overall?

25         A.    Yeah, yes.  Absolutely.  And 2019 was also

164

1    artificially low because there was a switchover to

2    Bridgeview.  But yes, generally, you're still correct.

3        Q.   In 2020, the pandemic hit.  The housing market

4    went crazy?

5        A.   Right.

6        Q.   And then that anomaly continued into 2021;

7    correct?

8        A.   Yes.

9        Q.   In fact, the volume for Tampa in 2020 is more

10    than five times the prepandemic volume of 2019; correct?

11        A.   Not volume, no.

12        Q.   Sorry.  The -- I'm looking at the Branch

13    Contributions to Corporate Profits column.

14        A.   Yeah, what was your -- what was your question?

15        Q.   The volume for -- sorry.  I'm saying "volume"

16    again, but the amount for Tampa is five times the

17    prepandemic volume of 2019 if you're looking at 2020?

18        A.   Yes.  Correct.

19        Q.   The same for Tampa, not five times?

20        A.   But yes.

21        Q.   But it's multitudes higher in 2020.  You would

22    agree with me that 2020 was a historically anomalous year

23    for the industry?

24        A.   Yes.

25        Q.   Why did you use a date range to calculate damages

165

1      that included a historical anomaly in the market?

2         A.   Well, there was the data we had.  We have to use

3      all the data.  You don't know what the next year is going to

4      bring.  Next year could be a great year as well.  These are

5      purchase-driven folks too.  I mean, they do purchases, you

6      know, heavy refinances.

7              And the other thing is with the arrival of Keller

8      Williams, that relationship, they would've benefited

9      substantially.  I would venture to say if they were still

10     here with the Keller Williams acquisition, that their volume

11     would be near that level again.

12        Q.   The year to date for Tampa in that fourth column

13     of Branch Contributions to Profits is 406,810.  Do you see

14     that?

15        A.   Yes.

16        Q.   If you double that, that would give you a full

17     year because it --

18        A.   Right.

19        Q.   -- so happens that the departure was --

20        A.   That's right.

21        Q.   -- six months into the year?

22        A.   Yeah.

23        Q.   Did you or Mr. Mayle or anyone else at Mutual

24     consider using that most recent time frame as your baseline

25     for estimating the damages?

166

1      A.    I don't know that we considered that.  The one

2  thing we did consider, like I said before, was using the

3  cost of goods sold method.  And I thought that if we

4  would've used the cost of goods sold method, these numbers

5  would've been through the roof, so we chose just an average.

6           And you're not going to -- when you're doing an

7  average, it's going to be an average.  You have to use all

8  the data in front of you.  We don't know what tomorrow

9  brings; right?  Keller Williams arrived this year.  That

10  would've been exponentially valuable having them there.

11      Q.    But somebody had to make a choice as to how far

12  back you were going to go with respect to the data.  And

13  either you --

14      A.    We went back the whole way, the whole time -- we

15  just went back to the history here at Mutual Mortgage.

16      Q.    Do you believe that it's more reliable to use

17  data that includes a historical anomaly than it is to use

18  the most recent data available?

19           MS. WALTER:  Object to the form.

20      A.    Yeah, I think that what you're calling historic

21  anomaly is one person's perception.  We don't know what next

22  year brings or the year after or the year after.

23      Q.    So let me ask you this question.  I want to make

24  sure I'm understanding this.  You looked at historical data

25  going back to 2019 --

167

1          A.   That's right.

2          Q.   -- including the pandemic, which was a high for

3     both of the branches, and then you used that data to project

4     losses associated with the branches if they had stayed open

5     going into the future; correct?

6               MS. WALTER:  Object to the form.

7          A.   I think that's what we -- we average the volume

8     the times that they were here.  That's why if you noticed

9     the lowest -- the lowest really year volume is 2019.  We

10    used that.  We didn't just use 2020.  We didn't just use

11    2021.  We averaged the volume for the time they were here.

12    I can't tell you what the future will bring; right?  I would

13    say if they knew that Keller Williams was coming on, they

14    probably wouldn't have left and they would benefit.  Their

15    volume would be more than this.

16         Q.   So my question is more just to make sure we're

17    aligned on what Bucket 2 represented.  My understanding --

18    but I don't want to assume.  I want to check with you -- is

19    it represents the profits as if the branches would've stayed

20    open for 18 months into the future?

21         A.   That's right.

22         Q.   And to estimate those damages of profits into the

23    future, you looked at retrospective data; correct?

24         A.   Yeah, that's the only data we have.

25         Q.   So it's May 25th of 2023, which includes the date

168

1    range that you're estimating damages.  And I'll go back to

2    Exhibit 7 here.  So the damage range that you're using is

3    July 1, 2022, to December 31, 2023; correct?

4         A.    That's correct.

5         Q.    We're a number of months into that damage period

6    now; correct?

7         A.    Yes.

8         Q.    Is the market now and since July 1, 2022, better

9    or worse than it was in the pandemic?

10              MS. WALTER:  Object to the form.

11        A.    Our -- our -- our volume today is better than it

12   was last year.  Now, is it better than the pandemic?  No.

13   But it's better than it was last year.

14        Q.    Okay.  Has Mutual -- in July of 2022, was Mutual

15   laying off employees?

16        A.    We laid off nonperformers, yes.  I don't know if

17   that was the exact time, but sure.

18        Q.    In July of 2022, was Mutual's profitability

19   consistent with its budgeting and estimates?

20        A.    Well, I think that, you know, we were very

21   negatively impacted by these groups leaving at that time

22   because when you -- each loan that you do is exponentially

23   more valuable, especially when you are dealing with purchase

24   teams.  So we still have all these fixed costs at the

25   corporate level that we have to -- that we have to assume.

169

1    And when this volume leaves, those costs become a much

2    larger percent of the expense.

3         So that's why I keep going back to this -- maybe

4    that's the route we should take, is using the cost of goods

5    sold approach because you take those variables out of it.

6    Each loan -- each additional loan is exponentially more

7    profitable than the last -- right? -- because the first loan

8    pays for all -- you don't make any money; right?  It pays

9    for the expense.  The second one you make a little bit.  The

10   third loan, you make more money, et cetera, et cetera.

11        Q.    Does Mutual look at the profitability at the

12   branch level?

13        A.    Yes.

14        Q.    Were there any profitable Mutual branches in July

15   of 2022?

16        A.    Yes.

17        Q.    How many?

18        A.    I don't know.

19        Q.    Were there a number of Mutual branches that were

20   not profitable in July of 2022?

21        A.    In July of 2022?

22        Q.    Correct.

23        A.    I don't know if there were a number that weren't

24   profitable.  When you -- when you say "branch

25   profitability," how we look at it is just exactly how I

170

1    walked through this; right?  It's taken into account those

2    expenses and revenue occurred at the -- at the corporate

3    level.  So a branch P&L may be negative, but we're still

4    making -- corporate may still be making money from that

5    branch.  Does that make sense?

6         Q.    How about looking at the forward division?

7         A.    Yeah.

8         Q.    I mean, if you just look at the forward division

9    in July of 2022, was the forward division profitable at that

10   time?

11        A.    Well, I know through June we were very

12   profitable.  Through June we were profitable.

13        Q.    What about after June?  July of 2022?  And I ask

14   that because that's when your damage period starts.  So in

15   July of 2022, was forward profitable?

16        A.    I don't know.  I'd have to go back and look.  We

17   -- we ended the year being profitable but not by much, but I

18   know for the first half of the year we were, I believe,

19   20-some million in profit.  And again, I think that shows

20   the damage caused when groups like this leave, purchase

21   groups.  It becomes exponentially more damaged.

22        Q.    What was the rationale for using an 18-month

23   period to calculate the lost profit damages associated with

24   the branches closing?

25        A.    Yeah, I mean, we didn't want to use any -- again,

171

1    we were trying to be reasonable.  You know, I think you can

2    make a case for using longer.  Most of our branches have

3    been here 10, 15 years, so -- at least the core group.  So

4    we could've used longer, but we thought 18 months was a

5    reasonable amount of time.

6        Q.   We talked earlier in the context of the

7    discussion about natural attrition and if the branch

8    managers had simply, you know, said nothing but then the

9    employees obviously learn after the fact the branch manager

10   left, that there may be some employees that go and follow

11   that branch manager due to natural attrition.  And I think

12   your testimony was, yeah, eventually that could happen.  Do

13   you recall that testimony?

14       A.   I do.

15       Q.   Okay.  Do you have any data within Mutual or

16   otherwise that you relied on for purposes of this analysis

17   that says it will take about 18 months for employees to

18   follow a branch manager in the context of natural attrition?

19           MS. WALTER:  I'll object to the form.

20       A.   No, I did not do that.  But what we did do is,

21   you know, we looked at how long branches stay.  And, you

22   know, we talked a little bit about what a branch is, and a

23   branch is -- you know, individuals come and go, but that

24   branch continues to grow.  And I think that that's

25   important.  Even today some of our branches are growing and

172

1    doing well.

2         Q.    Did Mutual have employment contracts with any of

3    the downstream employees that required them to stay on for

4    18 months?

5         A.    No.

6         Q.    Did Mutual have employment contracts with any of

7    the managers that required them to stay for 18 months?

8         A.    No.

9         Q.    What was the rationale for choosing 18 months as

10   opposed to 12 months or 24?

11             MS. WALTER:  Object to the form.

12        A.    You asked me that.  You know, again, it was -- we

13   were trying to be reasonable.

14        Q.    Did you consider other periods of time?

15             MS. WALTER:  Object to the form.

16        A.    We did.

17        Q.    What other periods did you consider?

18        A.    Well, we considered looking at our large

19   branches, so that would be, you know, branches that were

20   similar to these branches.  So you would have a St. Louis,

21   Seven Hills, Columbia, and they stay for, you know,

22   eight years, ten years.  But we didn't think that was

23   necessarily reasonable, so we came up with 18 months.

24        Q.    You understand that the employment contracts in

25   place with the managers, to the extent that there are such

173

1    contracts that have an employee nonsolicit, do you know how

2    long the duration of the nonsolicit is?

3         MS. WALTER:  Object to the form.

4    A.    I believe it's a year generally.

5    Q.    Okay.  Did you consider using a year?

6    A.    No.  We did consider it, but, I mean, that's what

7    we wound up at, no.

8    Q.    So if your testimony is these branch managers

9    solicited the employees and then came and that shouldn't

10   have happened, what's to stop the branch managers from

11   waiting a year and then soliciting the employees and then

12   the employees leaving at that point in time?

13        MS. WALTER:  Object to the form.

14   A.    Repeat the question.

15   Q.    Sure.  I mean, the managers only have a

16   contractual prohibition, to the extent that it's enforceable

17   or even exists.  The ones I've seen are for 12 months.

18   A.    Yes.

19   Q.    So after that 12-month period, Mr. Hutto or

20   Mr. Wolf or Mr. Smith could go to the branch employees and

21   solicit them to leave the branch?

22   A.    Yes.

23   Q.    And that could've happened at the one-year mark.

24   So I'm trying to understand was that -- you know, that

25   situation factored in at all for purposes of your damages

—REGENCY REPORTING SERVICE, INC. (813)224-0224—

174

1    analysis?

2         A.    Not really.  They also could've still been here.

3    Keller Williams comes into play, and they stay for six or

4    seven years, so we didn't use six or seven years.  We didn't

5    use ten years.  We used 18 months.  I mean, I don't know how

6    much we can, you know --

7         Q.    Do you have any evidence if the downstream

8    employees would have stayed because Keller Williams came in?

9              MS. WALTER:  Object to the form.

10        A.    Well, you're the one who made a statement that

11   said they went with Dwayne because he provided loans.  Where

12   do you think Keller Williams -- one out of every five real

13   estate transactions is Keller Williams signed.  We now are

14   the lender for Keller Williams.  I would imagine that that

15   may be more attractive than the one-offs that Dwayne was

16   handing them.

17        Q.    So again, I want to talk about evidence that

18   Mutual has versus just speculation about what the employees

19   might have thought.  Has Mutual asked any of the employees

20   would they have been motivated to stay knowing that Keller

21   Williams was joining?

22             MS. WALTER:  Object to the form.

23        A.    Not that I'm aware of, no.

24        Q.    Does Mutual have reports that show the monthly

25   volume for all branches?

175

1       A.   Yes.

2       Q.   What are those reports called?

3       A.   Well, I think they come in different formats, so

4    there's P&Ls.  There's also, you know, a business

5    intelligence system that you can see the volume by branch,

6    so it's called BI, clever name.

7       Q.   The P&Ls, are those the corporate P&Ls that we've

8    been referencing?

9       A.   Branch-level P&Ls and corporate P&Ls.

10      Q.   Okay.  Do the corporate P&Ls pull together --

11      A.   Yes.

12      Q.   -- the monthly volume for the branches?

13      A.   Yes.

14      Q.   Does it itemize which branch contributes to the

15   total?

16      A.   Yes.

17      Q.   Is there a particular branch that had volume

18   closest to the volume of the Tampa branch?

19      A.   In what year?

20      Q.   Let's just say in 2021.

21      A.    I think you would probably have maybe Columbia;

22   Maryland would be very close, I think.

23      Q.   What about Daytona?  Is there a branch that you

24   would say is comparable to Daytona in terms of revenue, I

25   guess?

176

1          A.    I would say that would be more like a -- more

2     volume than that.  That northwest branch I referenced

3     earlier, very similar.

4          Q.    Okay.  Does Mutual make efforts to assess its

5     performance relative to the industry overall?

6          A.    Yes.

7          Q.    How does it do that?

8          A.    You know, it's done -- that's how they kind of

9     manage me, so I'm not sure exactly how they do it, but I

10    know that they do it.  They can -- I think Richey May has

11    reports that they use.  They also use the MBA reports, but

12    that's how they kind of measure, I think, my performance is

13    how we relate to the industry.

14         Q.    Does Mutual track market trends for loan

15    originations?

16         A.    When you say "track," I don't know if we track

17    it.  We're aware of it.

18         Q.    Okay.  Do you know how Mutual performs in terms

19    of loan originations relative to the market?  I mean, if

20    there's a peak in the market, is there generally a peak for

21    Mutual or is it that there's something different about the

22    business model?

23         A.    There is something relatively unique about the

24    business model, that we have a large amount of consumer

25    direct folks.  So they're not only purchase driven.  So if

177

1    the purchase market suffers, we're able to capture some

2    volume with debt consolidation loans and things like that,

3    so it's a little unique.

4           But generally speaking, if the market is doing

5    well, we do well.  If the market is underperforming -- we

6    tend to perform better in the underperforming market than

7    our peers, but we still suffer; right?  We're still not

8    doing the same as we were.

9        Q.    Do interest rates have an impact on volume?

10       A.    They have an impact on volume, but they're not

11   the sole driving force, I think.

12       Q.    Were the interest rates generally lower in 2020

13   than in 2023?

14       A.    Yes.

15       Q.    The rates were lower in 2021 than they are in

16   2023; correct?

17       A.    Yes.

18       Q.    Does Mutual have any records that show the

19   interest rates it offered historically and currently for

20   different loan products?  Take, for example, a 30-year

21   fixed.

22       A.    Do we have --

23       Q.    Do you have historical records that would show,

24   for example, here's the interest rate that Mutual was

25   offering over periods of time?

178

1          A.   I don't know that we keep that in a record, like,

2     per se.  I think we can pull it off of systems.  I know

3     we're not allowed to say systems because it's got to be

4     documents for this conversation, but we do use systems --

5          Q.   What systems --

6          A.   -- and data.

7          Q.   -- do you pull those from?

8          A.   You can pull it from Encompass.  You can pull

9     from the accounting system.  You can pull it from different

10    -- the business intelligence system.

11         Q.   Does Mutual have branches right now that are

12    operating at a loss?

13         A.   Yes.

14         Q.   How many?

15         A.   I believe two.

16         Q.   Were those same branches profitable in 2020 and

17    2021?

18         A.   One of them was, and one of them was not, the ebb

19    and flow.

20         Q.   You would agree the housing market and the

21    mortgage industry has taken a turn for the worse since the

22    branches left Mutual; correct?

23              MS. WALTER:  Object to the form.

24         A.   I would say that, yeah, it's more difficult.

25    Yeah.

179

1              MS. KREITER:  12.  I don't have another copy of

2         that.  Courtney, are you able to look at --

3              MS. WALTER:  Yeah.

4              MS. KREITER:  So it's Bates No. MOM-1467.

5              MS. WALTER:  Just give me a second to pull it up,

6         please.

7              MS. KREITER:  Sure.

8              (Exhibit No. 12 is marked for identification.)

9              MS. WALTER:  1467, you said?

10             MS. KREITER:  Correct.  Just let me know when

11        you're ready.

12             MS. WALTER:  Can I take a look at it?  Because

13        it's not matching up with what I'm seeing.  Oh,

14        14667.  Okay.  I'm there.  Thank you.

15        Q.   I'm going to start on -- there's a couple pages

16   to this document.  I'm going to start on the page that's

17   labeled 14667.  It should be the first page of the

18   exhibit.

19        A.   Yes.

20        Q.   And specifically, the e-mail that's from Tyler

21   Larsen, that's Mutual's CFO; correct?

22        A.   Correct.

23        Q.   The date of the e-mail is July 12, 2022.  Do you

24   see that?

25        A.   I do.

—————————REGENCY REPORTING SERVICE, INC. (813)224-0224—————————

180

1          Q.    So this is just a few days after the July 1st

2     start date of the damages period that Mutual is claiming;

3     correct?  Sorry.  For the record, maybe you said correct.  I

4     just didn't hear it.

5          A.    Oh, you didn't hear me?  Yes.  Correct.

6          Q.    The e-mail is sent to, it looks like, a Listserv,

7     MOOM Executives, exec@mutualmortgage.com.  Do you see that?

8          A.    I do.

9          Q.    Are you one of the Mutual executives included in

10    this Listserv?

11         A.    I am.

12         Q.    Do you remember receiving this e-mail in July of

13    2022?

14         A.    No.  But I receive a lot of these e-mails, so

15    okay.

16         Q.    Do these -- are there monthly performance e-mails

17    similar to this that go out to the Mutual executives on a

18    monthly basis?

19         A.    Yes.

20         Q.    And so were there monthly e-mails similar to this

21    over the entirety of the damages period?  I realize we're

22    not quite to December yet, but -- so July, August,

23    September, October, November, December of 2022, and then all

24    of 2023, including through April.

25         A.    Yes.

181

1          Q.    I'll ask or request that those be produced.

2          This e-mail is designated "Importance:  High."

3    And the Subject line is "MOOM Financial Performance for June

4    of 2022."  Do you see that?

5          A.    Yes.

6          Q.    So Mutual's CFO writes "Good afternoon.  Attached

7    please find June '22 financial results.  See below comments

8    for detail on each division.  Overall there continues to be

9    heavy downward pressure on margins on both sides of the

10   business for slightly different reasons."  I'm going to

11   pause there.  "Heavy downward pressure on margins," does

12   that mean pressure to lower the BPS profitability margin?

13         MS. WALTER:  Object to the form, and

14   Mr. Gennarelli did not send this e-mail.

15         A.    Yeah, I'm -- I'm not sure at what margins he's

16   talking about.  I would imagine he's just talking about the

17   gain on sale margins.  I could be wrong.

18         Q.    The gain on sale margins, what is that?

19         A.    Like, that's what we sell a loan for.

20         Q.    Okay.  Is that different than the BPS in

21   Exhibit 7?

22         A.    It would be different.

23         Q.    Okay.  Maybe just explain to me the margins that

24   you sell a loan for --

25         A.    Yeah.

182

1          Q.     -- as opposed to the BPS in Exhibit 7.  What is

2     the difference between those two margins?  Does Exhibit 7

3     assume you hold the loan?

4          A.     No.  No, it has nothing to do with that.  This

5     margin in Exhibit 7, that's the profit margin.  What I think

6     he's referring to is the margin at time of sale that

7     investors are willing to pay for the loan.

8          Q.     Okay.

9          A.     Two different things.

10         Q.     And then it says "on both sides of the business,"

11    meaning the forward side and the reverse side --

12         A.     Correct.

13         Q.     -- correct?

14         A.     Yeah.

15         Q.     The next sentence talks about forward.  And just

16    to be clear, forward is the division for which you're

17    president, and it's the division in which the Tampa and

18    Daytona branches were part of?

19         A.     Yes.

20         Q.     "Forward margins are being compressed due to the

21    recent increase in interest rates, which pushes competitors

22    to lower margins in an effort to capture volume to support

23    their expense structure that has scaled over the past two

24    years."  Does that in general mean competitors are lowering

25    their profit margins?  They need to increase volume in order

183

1     to support the staff that they've hired on during the

2     pandemic?

3          A.    Yeah.

4               MS. WALTER:  Object to the form.

5          A.    I think it -- yes.  And it also points to the --

6     kind of like the theme is the extreme value it is when you

7     lose purchase business like this because then we have fixed

8     costs that are -- interest rates are less likely to affect

9     purchases than they are refinances.

10         Q.    In the 2020 period and 2021 period, I mean, it

11    talks about scaling structures over the past two years.  In

12    general in the industry, were mortgage companies hiring

13    more, more employees, more loans to process, the volumes

14    were high?

15         A.    Yeah.

16         Q.    So there's -- and now we have less volume, and so

17    there's a need to cut some of the employees; correct?

18               MS. WALTER:  Object to the form.

19         A.    Generally, I think that's correct, yeah.

20    Nonproducing, nonproductive employees needed to --

21         Q.    And then it says "On the reverse side of the

22    house" -- let me just stop there.  Is there any connection

23    between the profitability of the reverse side of the house

24    and the forward side of the house?

25         A.    No.  I mean, I don't know what you mean by

184

1  "connection."

2    Q. Well --

3    A. It doesn't relate to -- it doesn't relate to our

4  P&L.

5    Q. That's what I'm looking for.

6    A. Yeah.

7    Q. And for example, changes at the reverse side of

8  the house, would that have an impact on Exhibit 7?

9    A. Correct, it would not.

10    Q. Okay.  Then there's some text that's in all caps

11  and bold.  It says "Consolidated June pretax earnings were

12  negative 3.2k," presumably 3.2 thousand?

13    MS. WALTER:  Object to the form.

14    A. Where are you looking at this?  I'm sorry.

15    Q. Sure.  The paragraph that we just went through,

16  I'm now moving down from that.

17    A. Yes.

18    Q. There's an all caps, bold statement still on that

19  page 14667, that first page.

20    A. Yes.

21    Q. It says "Consolidated June pretax earnings were

22  negative 3.2k."  Is that -- I guess what is that?  A

23  thousand?  A hundred thousand?

24    A. Yeah, K is thousands, so...

25    Q. Okay.  So there's a loss in terms of June pretax

185

1      earnings?

2          A.    Yes.

3          Q.    And then it says "versus plan of 3.2 million."

4      Do you see that?

5          A.    I do.

6          Q.    What is the plan?

7          A.    The plan is the budget.

8          Q.    Okay.  So the budget was 3.2 million.  Suffice to

9      say the budget has not been met.  And in fact, there's a

10     loss as to pretax earnings?

11         A.    That's correct.

12         Q.    And then it says "on total volume of 353 million

13     versus the plan was 705 million"?

14         A.    Correct.

15         Q.    So volume is not exactly half but close to half

16     of what the plan --

17         A.    Sure.

18         Q.    -- had contemplated?

19         A.    Yes.

20         Q.    It goes on to talk about "Consolidated

21     year-to-date 2022 results."  And again, there it looks at

22     pretax earnings versus the plan down 76 percent.  And then

23     PY is down 89 percent.  What is PY?

24              MS. WALTER:  I'm going to object to this line of

25         questioning to the extent you're asking him to read

186

1          what is included on this e-mail --

2              MS. KREITER:  I'm asking him what PY stands for.

3              MS. WALTER:  -- that he didn't send, mind you --

4          if I can finish.

5              MS. KREITER:  It doesn't mater if he sent it.

6          Q.   Do you know what PY stands for?

7          A.   I -- prior year, I would imagine.

8          Q.   Thank you.  Okay.  Then if you would turn to the

9      next page in the exhibit, Bates No. 14668, it starts with

10     "Forward," the entity of which you're president, and it has

11     your name in parentheticals there, Jeff Gennarelli?

12         A.   Yeah.

13         Q.   This appears to be a statement that you wrote,

14     and the CFO is including it in his report; is that correct?

15         A.   Yeah.

16         Q.   Okay.  So let's walk through what you wrote here

17     in July of 2022 when we're looking at damages from

18     Waterstone.  You say "Progress, although slower than we had

19     hoped, the key to profit is rightsizing the staff" -- does

20     that mean firing staff?

21         A.   It means rightsizing as getting rid of people

22     that are not productive, not performing.

23         Q.   Then you say "as they relate to lead spend and

24     lead conversion."  What is lead spend?

25         A.   That's advertising.

187

1          Q.    Recruiting --

2          A.    No.

3          Q.    -- sales efforts -- sorry.  Not recruiting

4     employees, trying to recruit business development efforts to

5     bring in loans?

6          A.    You want to think about it as advertising.

7          Q.    Okay.  Then you say "lead spend and conversion of

8     leads did not move.  This will be reduced significantly in

9     July with a path toward profit."  Do you see that?

10         A.    Yes.

11         Q.    Was June '22 not profitable?

12         A.    We -- we covered it.  You already said it wasn't

13    profitable.  We read that.

14         Q.    I just want to make sure.  My understanding is it

15    wasn't profitable from this document.  Was July of 2022

16    profitable?

17              MS. WALTER:  Object to the form.

18         A.    I don't remember.  I'd have to look at this.

19         Q.    You say "The continued reduction in nonperformers

20    on the sales side is critical."  So again, reduction in

21    nonperformers, firing employees; correct?

22              MS. WALTER:  Object to the form.

23         A.    I would say, you know, I think it's important to

24    segregate this conversation.  What I'm talking about is

25    folks that worked consumer direct leads.  That's not the

188

1    groups that were Tampa and Daytona, which is really

2    important to the conversation.

3            Tampa and Daytona were self-sourced purchase

4    folks.  They don't have these huge marketing expenses that

5    go along with consumer direct efforts.  So it makes them

6    increasingly more valuable and more profitable in downturns

7    because you don't have to support them with lead purchases,

8    advertising, things like that.  So it's important that we --

9    that we understand that and understand what we're talking

10   about.

11       Q.   "We termed 55 MLOs" -- is that -- I get loan

12   officers.  What's the M, Mutual?

13       A.   Mortgage loan officers.

14       Q.   Mortgage loan officers.  -- "in June with another

15   30 on final write-ups."  What's a final write-up?

16       A.   Warning, written warning.

17       Q.   "The next target is the junior MLO and MLO

18   assistant area.  We feel this is an area we can pick up

19   savings with very little disruption to sales."  Do you see

20   that?

21       A.   Yes.

22       Q.   And then it talks about terminating 18 who were

23   in this role in June.

24            I'm going to skip down to the next paragraph

25   there.  The second sentence says "As the market stabilizes"

189

1    -- what about the market was not stable at this time?

2         A.    Well, you had the second -- the capital markets

3    was very unstable, volatile.  It means that the market was

4    up and down dramatically on a daily basis.  There was not

5    stability.  When I say "market," I mean the capital markets.

6         Q.    And then you go on to say "and we do not see wide

7    swings in the servicing value," et cetera, et cetera.  Then

8    in that last line, you have a phrase that I want to focus

9    on.  "...to be in terms of margin to successfully manage in

10   this downturn."  You agree the market was in a downturn at

11   this period?

12              MS. WALTER:  Object to the form.

13        A.    Yes.

14        Q.    Going down to the next paragraph, the fourth line

15   that starts with "The departing thoughts," do you see that?

16        A.    Yeah.

17        Q.    So third paragraph, fourth sentence, "The

18   departing thoughts" --

19        A.    Yeah.

20        Q.    -- "from the manager of Daytona."

21        A.    Yeah.

22        Q.    Are you referring to Mr. Hutto or Mr. Smith?

23              MS. WALTER:  Object to the form.

24        A.    I don't recall.  I believe it was Mr. Smith, and

25   I was told Brian Tomalak.

190

```
 1          Q.   Or sorry.  So it says "the manager of Daytona,"

 2     so that's Mr. Wolf or Mr. Hutto?

 3          A.   Maybe that was -- maybe it was Mr. Hutto.

 4          Q.   Okay.  "The departing thoughts from the manager

 5     of Daytona were directed at the surprisingly little

 6     cooperation we had with the insurance company in terms of

 7     cross-marketing, et cetera."  Was there, in your mind,

 8     little cooperation with the insurance company in terms of

 9     cross-marketing?

10          A.   At that time, I would say there was little

11     cooperation, yeah.

12          Q.   Do you believe that that was a genuine concern of

13     the managers?

14               MS. WALTER:  Object to the form.

15          A.   I believe that that's what Dwayne said to Brian

16     Tomalak at the time that he left.

17          Q.   Had you personally heard that from the managers

18     here or other managers?

19          A.   No.

20          Q.   What is the insurance company?

21          A.   I'm sorry?

22          Q.   So sorry.  Let me back up here.  I'll read a

23     little bit more and maybe that gives context.  "We all need

24     to understand this was a big reason our staff stuck with us

25     through the licensing process, the belief we would have some
```

191

1    benefit to sales of being part of such a great company."

2    Does this refer to the acquisition --

3            MS. WALTER:  Object.

4        Q.    -- and BBMC joining Mutual?

5            MS. WALTER:  Object to the form.

6        A.    I believe it does theoretically, but there was a

7    -- yes, I think that that's what would it be.

8        Q.    "There is progress being made now, but it is

9    slow."  So what does that mean?  I mean, was there an issue

10    in your mind in terms of the insurance company's

11    cross-marketing efforts?

12        A.    Well, here we didn't have any cross-marketing at

13    BBMC.  So now you go to a large company.  I think people

14    assume there would be more opportunity to cross-market with

15    a large company that has, you know, a $25 million -- a 25

16    million-person database.  It's a slow grind because you have

17    to get compliance to write off on it, et cetera.

18            So I'm sure people's perceptions was that they

19    were going to have a great opportunity to do that, and that

20    didn't come through.  We didn't really push that because we

21    didn't know how -- how effective it would be to cross- --

22    it's going better today than it was back then, but

23    nevertheless...

24        Q.    And back then, this is closer to the time of the

25    departures?

192

1          A.   It is, yes.

2          Q.   You then say "To give some context, we went

3     through the greatest mortgage market in decades" -- meaning

4     the 2020 pandemic?

5          A.   Yeah.

6          Q.   -- "and received less than a hundred referrals in

7     those two years."  So which two years are the greatest

8     mortgage market in decades, '21 and -- sorry -- '20 and '21?

9          A.   Correct.

10         Q.   Okay.  And then I'm going to direct you down to

11    the all caps, bold language following that paragraph again.

12    Now, this is reflective of earnings specific to the forward

13    business unit in the relevant time period; correct?

14         A.   Yes.

15         Q.   "Forward June pretax earnings were negative

16    439,000 versus the plan for that year was to be positive

17    3.2 million"; correct?

18         A.   Correct.

19         Q.   And then on total volume, it's 246 million versus

20    the plan of 619 million.  Would you agree that these are

21    material and adverse deviations from the budget?

22              MS. WALTER:  Object to the form.

23         A.   Yeah.

24         Q.   And then it continues below that with

25    year-to-date 2022 results.  Do you see that?

193

1          A.   I do.

2          Q.   So again, you've got pretax earnings that are

3     down 36 percent and then negative 73 percent compared to the

4     prior year.  Volumes are down as well as pretax earnings;

5     correct?

6          A.   Yes.

7          Q.   And you would -- would you agree with me that the

8     amount of the decrease is significant, down 43 percent, down

9     73 percent?

10          MS. WALTER:  Object to the form.

11          A.   Yeah, I think it's pretax earnings are down

12     36 percent, but yeah.

13          Q.   Right.  But my question was, I mean, you agree

14     these are significant downs in this time period; correct?

15          A.   Sure.

16          MS. WALTER:  Object to the form.

17          Q.   I'm going to direct you to page 14669 in the

18     document.

19          A.   Got it.

20          Q.   Towards the bottom, all caps, it says "Corporate

21     expenses."  Do you see that?

22          A.   Yes.

23          Q.   "Corporate expenses were 1.1 million for June

24     (versus the plan of 2.2 million)."  So you've got --

25     expenses have been cut in half; correct?

194

1              MS. WALTER:  Object to the form.

2         A.   Corporate expenses as it relates to this

3    conversation is different than corporate -- corporate

4    expenses are a very small group of folks that reside in San

5    Diego and are -- they're, like, the CFO, the attorneys are

6    corporate staff.  So it's not really -- there are -- there

7    are costs under folks, not profits under folks

8    necessarily --

9         Q.   It's not related to the branches?

10        A.   It's not related to the branches, no.

11        Q.   Go back to the first page of the exhibit, Bates

12   No. 14667.  We talked about the e-mail from Mr. Larsen to

13   the executives, and then there's a response from Lucas

14   Curtolo at the top of the exhibit.  Do you see that?

15        A.   Yeah.

16        Q.   Lucas Curtolo, he's Mutual's senior vice

17   president of national operations; correct?

18        A.   Yes.

19        Q.   Mr. Curtolo responds to the CFO "Far from good."

20   Do you agree that the financial performance for June of '22

21   was "far from good"?

22              MS. WALTER:  Object to the form and that

23         Mr. Gennarelli is not included on this e-mail.

24              MS. KREITER:  I'm asking if he agrees with the

25         statement.

195

1         A.    I would disagree with that statement because it's

2    -- I knew the market at that time.  I mean, I knew what had

3    happened.  I mean, it's...

4         Q.    And then Mr. Curtolo talks about additional cuts.

5    He says then "90 percent of my focus the last 45 days has

6    been cutting all nonprofitable sales."  Do you see that?

7         A.    Yes.

8         Q.    Cutting nonprofitable sales, I think we talked

9    about this.  I mean, that's terminating people?

10        A.    It is.

11        Q.    How much expense did Mutual save as a result of

12   the branch departures?

13        A.    None.

14        Q.    Why do you say that?  You were paying commissions

15   on these loans.

16        A.    But then that result was profit.

17        Q.    What about other things, the lease?  I mean, you

18   said that the lease belonged to Mutual?

19        A.    Yes.

20        Q.    Okay.  And you saved on the rent payments.

21   There's no office there anymore; correct?

22        A.    But the volume offset that expense.

23        Q.    Okay.  So specifically, the expenses, though,

24   forget whether there's an offset.  I'm just looking at what

25   are the expenses that were saved.  So rent, commissions,

196

1    what else?

2         A.   I don't know.  I just can't function that way.

3    The net -- the -- there was -- there was income to offset

4    those expenses, so I don't understand what you're saying,

5    like --

6         Q.   Are you able to articulate -- I get that.  I

7    mean, I kind of get net profit and how it works and the

8    revenue, and you take out the expenses.  But I'm just trying

9    to identify here's the revenue.  You're taking out the

10   expense to get to a profit number?

11        A.   Sure.

12        Q.   What is the number that constitutes the expense

13   bucket and what comprises that?

14             MS. WALTER:  Object to the form.

15        A.   Well, the expenses are comprised of rent,

16   payrolls, taxes, insurance.

17        Q.   Do you know how much expense bucket has been

18   saved as a result of these departures?

19             MS. WALTER:  Object to the form.

20        A.   Not enough to make up for loss in income, as you

21   can see.  But no, I don't know off the top of my head.  I

22   don't know.

23        Q.   Are there records that would disclose exactly how

24   much expense has been saved?

25        A.   I think the branch P&Ls would show that.

197

1     Q.    Okay.  Do you have any opinion as to whether

2     these branches now at Waterstone are likely to be profitable

3     or not profitable?

4             MS. WALTER:  Object to the form.

5     A.    Say this one more time.

6     Q.    Yeah.  I'm trying to get an understanding.  Do

7     you have a sense of whether these branches -- now the

8     employees are with Waterstone.  Do you have a sense of

9     whether those branches are likely to be profitable or not?

10            MS. WALTER:  Object to the form.

11    A.    My sense is that they would be profitable because

12    they always tend to run on a profit.  Just like St. Louis,

13    our branches here, our branches remain profitable.

14    Q.    We looked at Exhibit 12, which was the e-mail

15    between the executives and the CFO and the senior VP of

16    operations talking about how there wasn't profitability in

17    June of 2022?

18    A.    Correct.

19    Q.    And do you have an expectation if the branches

20    had stayed at Mutual in June of 2022, would those particular

21    branches be profitable?

22            MS. WALTER:  Object to the form.

23    A.    So the corporate -- just like we talked about

24    earlier, the corporate profit doesn't -- it doesn't

25    translate into the branch profitability.  There's expenses

198

1    on the corporate side.  Like, a big part of that June

2    expense was a write-down on the servicing values.  So, you

3    know, it is -- it is -- you don't know if -- you know, that

4    doesn't impact the branch performance or the branch's

5    ability to be profitable.

6         Q.   Sure.  I guess what I'm trying to understand --

7         A.   I can tell you for sure St. Louis, Seven Hills,

8    Maryland were profitable that month, so branches were

9    profitable.

10        Q.   But overall there's -- I mean, we talked about

11   overall in Exhibit -- sorry -- Exhibit 12 --

12        A.   Right.

13        Q.   -- this is corporate profitability?

14        A.   That's right.

15        Q.   And overall that was way down?

16        A.   Way down.

17        Q.   So do you have evidence to support the claim that

18   if these branches had stayed at Mutual, the corporate

19   profitability in Exhibit 12 would have been such that Mutual

20   would be profitable from a corporate perspective?

21             MS. WALTER:  Object.

22        A.   They would be more profitable, and I think we

23   showed it to a degree.  We would be more profitable.

24        Q.   More profitable, but still operating at a loss?

25        A.   I doubt it because we're at a couple -- there's

REGENCY REPORTING SERVICE, INC. (813)224-0224

199

1    not a huge loss that month.

2        Q.    So we looked at this Exhibit 12 and looked at the

3    plan.  And for example, specific to forward, June pretax

4    earnings were down 439,000 versus a plan of 3.2 million?

5        A.    Right.

6        Q.    Is it Mutual's position that had these branches

7    stayed with Mutual, that delta would've been recovered and

8    Mutual would've been on track with its plan?

9        A.    I don't think we would've been on track with the

10   plan, but it certainly would've helped, yeah.  It takes

11   months to, you know, recover from branches losing and the

12   fixed costs at the corporate level.

13            THE WITNESS:  I do need a bio break, if that's

14        okay.

15            MS. KREITER:  Sure.  Let's take five minutes.

16            (A recess was taken.)

17       Q.    (By Ms. Kreiter)  We had talked about Exhibit 12,

18   which was the e-mail involving the June 2022 performance.

19   Was Bernie Mayle another recipient of that e-mail?

20            MS. WALTER:  Object to the form.

21       A.    I would think he is.  I -- I don't know.

22       Q.    You don't know?

23       A.    Yeah, I don't know.

24            (Exhibit No. 13 is marked for identification.)

25            MS. KREITER:  Remind me the number we're on.

200

```
 1            THE COURT REPORTER:  13.

 2        Q.    Take a look at Deposition Exhibit No. 13.

 3            MS. WALTER:  Do you have another one?

 4            MS. KREITER:  Sorry.

 5            MS. WALTER:  Thank you.

 6        Q.    And I'm going to start, again, just to go

 7    sequentially, on page 14676, the earliest e-mail in the

 8    exchange, it's an e-mail from Brian Tomalak dated July 21,

 9    2022, to Bernie Mayle, Kiley King, Subject line:  Tampa.

10    Brian writes "Bernie, where did they end up as far as their

11    P&I in June?"  Is that P&L?

12        A.    I would -- yes.

13            MS. WALTER:  Object to the form.  Also, again,

14        Mr. Gennarelli isn't included on these e-mails.

15        Q.    Then the next e-mail up from Mr. Mayle dated

16    July 21, 2022, to Brian Tomalak says "A loss,

17    unfortunately."  Do you see that?

18        A.    Yes.

19        Q.    Did you have discussions with Mr. Mayle when you

20    were creating the damages analysis about the fact that the

21    Tampa branch had been operating at a loss in June of 2022?

22        A.    Well, in June of 2020, they stopped putting loans

23    in because of their planned departure, so it would not be

24    that relevant.  Also, again, this is referring to a branch

25    P&L, not a -- not how it relates to the corporate bottom
```

201

1    line like we talked about.

2        Q.   Okay.  Did you have any -- sorry.  Let me ask you

3    this question:  Do you know whether the Tampa branch was at

4    a loss with respect to its P&L in May of '22?

5        A.   I don't know off the top of my head.  I would --

6    it's likely that at the branch level it was at a loss.  It's

7    likely.

8        Q.   Okay.  Do you know for what period of time -- I

9    mean, June is at a loss.  It's likely May was at a loss.

10   Are you able to say going back how far you think that Tampa

11   would've been operating at a loss for purposes of its P&L?

12            MS. WALTER:  Object to the form.

13       A.   Well, I think we're fascinated with the branch

14   P&L, and it's not that relevant to the corporate earnings.

15   It's relevant but not that relevant.

16       Q.   Sure.  But my question was just about the timing

17   and the branch P&L.  We can dispute whether it's relevant or

18   not.  I may think it is.  You may dispute that, but I'm just

19   trying to get the facts.  So we know that in June, not

20   profitable.  In May, you said it's likely --

21       A.   I said I don't know.  I don't know.  You said,

22   "Would you be surprised?"  I think is what you said,

23   whatever.  I don't know.

24       Q.   Do you know either way -- for example, February,

25   March, April, do you have any knowledge as to the

202

1          profitability on the branch level for Tampa?

2                  A.    Not off the top of my head.

3                  Q.    Okay.  Then just to complete the exhibit, the

4          first page says "What's the running total at?"  Mr. Mayle

5          says "Gross loss is running at 33,000."  Is that at the

6          branch level or corporate level --

7                        MS. WALTER:  Object to the form.

8                  Q.    -- as it relates to Tampa?

9                  A.    I would suspect branch level because he wouldn't

10         talk corporate to -- with Brian.

11                 Q.    Okay.

12                       MS. KREITER:  Have this next exhibit marked

13                 Exhibit 14, please.

14                       (Exhibit No. 14 is marked for identification.)

15                 Q.    Take a look at Exhibit 14.  What is this

16         document?

17                 A.    It looks like a budget.

18                 Q.    Budget at the branch level or corporate level?

19                 A.    It looks like corporate level.

20                 Q.    Have you seen this document before?

21                 A.    It does not look familiar to me, but I may have.

22                 Q.    Are there other documents that you are familiar

23         with that reflect budgeting and projections on the corporate

24         level for Mutual besides this Exhibit 14?

25                 A.    Not -- not really.  I think it's just -- I think

203

1        the printing in color is throwing me off, but I'm sure this

2        is what I've seen.

3            Q.    Do you know, is this something that gets updated

4        from time to time by Mutual?

5            A.    I don't know how often it gets updated.  I would

6        imagine, you know, obviously yearly.

7            Q.    I want to talk to you about the damages and

8        certainty.  One, I want you to picture in your mind one end

9        of a spectrum that's speculation and then one end of the

10       spectrum that is absolute a hundred percent certain.  Given

11       the considerations and the assumptions that you built into

12       your damage model, Exhibit 7, where does your damages fall

13       in that spectrum?

14               MS. WALTER:  Object to the form.

15           A.    Ask the question again, one more time.

16           Q.    Sure.  Speculation on one end --

17           A.    Yeah.

18           Q.    -- absolute certainty on the other end, can you

19       say to -- can you say that the damages that you've presented

20       are, for example, to a reasonable degree of certainty?

21               MS. WALTER:  Object to the form.

22           A.    I would say that they're reasonable and possibly

23       on the low side.

24           Q.    Is there an element of speculation associated

25       with the damage calculation, for example, the 18 months?

204

1                MS. WALTER:  Object to the form.

2          A.    I would say that there is an educated assumption

3     made there.

4          Q.    Okay.  Mutual also assumes that all of the

5     employees left due to wrongful contract -- wrongful conduct

6     in that none of the employees left due to natural attrition

7     or other reasons.  Is that based on evidence or speculation?

8                MS. WALTER:  Object to the form.

9          A.    I think there's enough evidence to say that

10    that's an accurate statement.

11         Q.    You assumed for purposes of your damages model

12    that the profitability over the 18 months going from

13    July '22 forward would be consistent with the calculation

14    based on the retrospective data that included a market

15    anomaly.  Is that speculation or reasonably certain?

16               MS. WALTER:  Object to the form.

17         A.    Okay.  But let me answer it this way:  Another

18    anomaly occurred, and we partnered with the largest real

19    estate company in the world.  So how does that figure into

20    it?  We didn't figure that into our assumptions.

21               If you figured that into the assumptions, those

22    numbers would probably be bigger.  They would've taken

23    advantage of that.  They were retail purchase-driven folks.

24    So there's speculation, I guess, on both sides of it, but

25    one came true.  Keller came through.  They would've

205

1    benefited and helped us tremendously in this endeavor.

2         Q.   Okay.  Topic 4 of the deposition notice asks you

3    to be prepared to testify as to the annual loan volume and

4    revenue generated by each of the managers, Mr. Hutto,

5    Mr. Wolf, and Mr. Chris, for 2019, 2020, 2021, and 2022

6    until they resigned.  Starting with Dwayne Hutto, what was

7    his annual loan volume for each of 2019, '20, '21, and '22?

8              MS. WALTER:  Object to the form.

9              MS. KREITER:  What's the objection?

10             MS. WALTER:  Do you want to show him a document?

11             MS. KREITER:  He's the corporate rep.

12             MS. WALTER:  To memorize all of these damages and

13        sit here and testify to them?

14             MS. KREITER:  I want him to look up the

15        information responsive to the topic and be ready to

16        tell me what the answer is.

17             MS. WALTER:  And provide those to a degree of

18        specificity as he sits here and memorizes certain

19        numbers?

20             MS. KREITER:  Or he can bring a document.

21             MS. WALTER:  Or you can show him a document.

22             MS. KREITER:  I don't have it.  I can't find it

23        in the 800 documents that you've been -- designated

24        rather than stating an answer, so I'm asking him at a

25        deposition.

206

1        Q.   What was the annual loan volume for Dwayne Hutto

2   in 2019?

3        A.   I'm not sure off the top of my head.

4        Q.   What was the annual loan volume for Dwayne Hutto

5   in 2020, '21, and '22 until he resigned?

6        A.   I'm not certain.  We do know the branch volumes.

7   That's what we focused on, I think.

8        Q.   Okay.  This is another one where I've asked what

9   are the documents that you can get this information from --

10            MS. WALTER:  You requested that in a discovery

11       request, and we provided responses.  Those were the

12       documents that we have that identify their loan volume.

13            MS. KREITER:  Okay.  So again, let's look at one

14       that you identified as going to be revealing of the

15       information that --

16            MS. WALTER:  Again, Maria, we don't have to

17       create a document in response to your document request.

18            MS. KREITER:  I'm going to find out if what you

19       designated has anything to do with this or it's just a

20       big mess that you decided to put in your discovery

21       responses.  So let's start with that activity.

22       Q.   Turn to Deposition Exhibit 9, please.

23       A.   Okay.

24       Q.   This is one of the documents that Mutual

25   identified as one that should reveal the annual loan volume

REGENCY REPORTING SERVICE, INC. (813)224-0224

207

1    and revenue generated by Dwayne Hutto, Chris Wolf, and Chris

2    Smith.

3            MS. WALTER:  Can I have that Bates number,

4        please?

5            MS. KREITER:  It's Exhibit 9, 1094 -- sorry --

6        10942.

7    Q.    Does this --

8            MS. WALTER:  Do these spreadsheets also include

9        the information that's in the tabs that are on the

10       actual Excel spreadsheets?

11           MS. KREITER:  Yeah.

12   Q.    So, Mr. Gennarelli, looking at that document,

13   Deposition Exhibit 9, which has been designated as one

14   that's going to reveal annual loan volume for Mr. Hutto,

15   Mr. Wolf, and Mr. Smith, does it reveal annual loan volume

16   for those individuals?

17           MS. WALTER:  I'm just going to say that this

18       question is a mischaracterization.  That's for one

19       month.  That's not annual.

20           MS. KREITER:  I don't think it has anything to do

21       with any particular person.

22           MS. WALTER:  You can add up the numbers to get

23       the annual loan volume.

24           MS. KREITER:  The witness can explain it, then.

25   A.    Yeah, I don't see where it would show -- you see

208

1    his compensation, but you don't see loan volume.

2        Q.   So I just need to make a record of this.  So

3    Deposition Topic No. 4 reads as follows -- and I'm at

4    Exhibit 1 -- Exhibit A of Exhibit 1, deposition notice --

5    "The annual loan volume and revenue generated by Dwayne

6    Hutto, Chris Wolf, and Chris Smith for 2019, 2020, 2021, and

7    2022 until the time of their departure from Mutual in 2022."

8    What did you do to prepare to testify as to this deposition

9    topic?

10        A.   Well, Chris Smith didn't originate loans --

11    right? -- and neither did --

12        Q.   My question was what did you do to prepare for

13    Topic 4?

14        A.   I'm not sure any of the three originated loans.

15    Dwayne may have, but he -- he may not have, so...

16        Q.   My question was not factually did they originate

17    loans.  What did you do to prepare for Topic No. 4?  If the

18    answer is nothing because you believe they didn't originate

19    it, I need to have that on the record.  If you did

20    something, I need to have whatever it is put on the record.

21        A.   Yeah, I didn't do anything.

22        Q.   And are you able to tell me with respect to any

23    of those years and any of the persons identified in Topic

24    No. 4 what the annual loan volume was and what the revenue

25    generated was?

209

1                      MS. WALTER:  Object to the form.

2          A.    No.

3          Q.    What documents would you look to in order to

4    discern the loan volume for each of the managers for the

5    years designated?

6          A.    I would use the data in Encompass.

7          Q.    We talked about before how you have data in a

8    system, but you can print out that data.  Is the data that

9    we're talking about with respect to the annual loan volume

10   data such that you can print out a report?

11                     MS. WALTER:  Object to the form.

12         A.    Yes.

13         Q.    Are you willing to have those reports printed

14   right now so that we can talk about them at the deposition

15   today?

16                     MS. WALTER:  Object to the form.  I'm not

17              allowing that, Maria.

18                     MS. KREITER:  That's what I want on the record.

19                     MS. WALTER:  Okay.  That's fine.

20         Q.    Would it be possible for you to make a call and

21   have somebody e-mail those documents over?

22                     MS. WALTER:  We're not doing that.  I'm -- we're

23              not doing that.

24                     MS. KREITER:  That's what I want on the record.

25              It would take ten minutes.  We can move this along.

210

 1          But if you're refusing --

 2               MS. WALTER:  Refusing.  Move on.

 3               MS. KREITER:  -- I'll bring it to the Court's

 4          attention.

 5               MS. WALTER:  Move on.

 6          Q.   How does Mutual calculate loan volume generated

 7     for each of the individuals?  Is it just some designation in

 8     Mutual's systems that this particular person originated the

 9     loan, or is there a sharing of credit?

10               MS. WALTER:  Object to the form.

11          A.   When you say "sharing of credit," what do you

12     mean by that?

13          Q.   Right.  So we talked earlier how there could be a

14     scenario where Dwayne Hutto brings in a loan because of his

15     relationships, but he doesn't actually bring it to closing.

16     He maybe gives it to a downstream employee.

17               So in that situation when you're looking at

18     Dwayne Hutto's loan volume or the revenue generated

19     associated with Dwayne Hutto, I'm trying understand, you

20     know, would those loans that maybe he passes along to a

21     downstream employee be included in his numbers?

22          A.   Probably not.  They would've been included in the

23     branch numbers, of course, but not his personal numbers.

24     It's the NMLS license number that dictates, I think,

25     where --

211

1      Q.   Okay.  There's no -- for example, a law firm,

2   sometimes there can be sharing of billing credit with

3   respect to a client.  Is there any sharing of credit with

4   respect to loan origination?

5      A.   I don't believe so.

6      Q.   Okay.  Topic No. 5 was "The loans Mutual contends

7   the departed employees under Waterstone closed with

8   Waterstone for which Mutual seeks recourse, including the

9   borrowers associated with the loans, the loan amount, the

10   factual basis for Mutual's claims based on the loans, and

11   the associated damages."

12          I think we talked about this earlier.  Is there

13   anything that you have to add?  Earlier I had asked you are

14   you able to tell me what loans transferred.  Are you able to

15   tell me borrowers?  Do you have that information?

16          MS. WALTER:  Object to the form.

17      A.   I don't have that information.  I was told I

18   couldn't bring notes or anything to the deposition, so I was

19   -- I was expecting you to show me or -- and then I would

20   explain it.  But no, the question is no.

21      Q.   So you were -- did you have documents that you

22   wanted to bring for your testimony?

23      A.   Notes.

24          MS. WALTER:  Object to the form.

25      A.   Notes more than --

212

1       Q.   What types of notes?

2       A.   I don't know.  General notes.

3       Q.   Were you taking and creating notes as you were

4   preparing?  You said you spent ten hours preparing.  Did you

5   take notes while --

6       A.   I didn't take notes because I didn't -- wasn't

7   allowed to bring it in anyway, so...

8       Q.   In addition to taking notes -- do you think

9   taking notes would've aided your testimony?

10          MS. WALTER:  Object to the form.

11      A.   I don't know.

12      Q.   Do you think that bringing in documents that have

13  data responsive to some of these topics would've aided your

14  ability to testify today?

15          MS. WALTER:  Object to the form.

16      A.   Possibly.  I would've been able to tell you the

17  name of the underwriting manager and those other managers

18  that interfered in our business, but...

19      Q.   What about with respect to the damages that we've

20  been talking about?

21      A.   I think we have them on our No. 9.  I think that

22  was the data we were going to talk through.

23      Q.   Did you ask to bring certain documents to the

24  deposition --

25      A.   No.

213

```
 1          Q.    -- today?
 2          MS. WALTER:  Object to the form.
 3          Q.    Again, I think we covered this in your earlier
 4    testimony.  But just so that I'm clear with respect to the
 5    deposition topics, one of the topics, 6(a), was "All loans
 6    originated by the departed employees while still employed by
 7    Mutual of Omaha at the Daytona branch, which closed with
 8    Mutual of Omaha on or after April 15, 2022."  Do you
 9    understand the topic?
10          A.    Yes.
11          Q.    What did you do to prepare for your testimony as
12    to that topic?
13          MS. WALTER:  Object to the form.
14          A.    I believe you have the P&L that breaks down those
15    loans that closed at that time.  The actual individual loans
16    are in the P&L.  Like, in this P&L example, the individual
17    loans are in there.
18          Q.    Okay.  So these are loans --
19          A.    They're just not associated with an individual
20    loan officer.
21          Q.    Okay.  So the topic asks specifically, though,
22    for loans originated by the departed employees while still
23    employed by Mutual, so loans originated.  Is it correct to
24    say the loan is in the pipeline in some fashion?
25          A.    Yeah, I think that's right.
```

214

1          Q.    So this asks about which of the loans that were

2     originated by the employees while they were still working at

3     the Daytona branch, which actually closed with Mutual of

4     Omaha after April 15th?

5          A.    So that would be on the April or May P&L that I

6     believe you have.

7          Q.    Well, the Daytona branch closes in April, so did

8     those loans get closed by another branch?

9          A.    No.  It would've been that branch.

10         Q.    So is there a P&L for -- if there's a loan in the

11    pipeline and the Daytona branch closes --

12         A.    Yes.

13         Q.    -- but the loan is closed at Mutual of Omaha,

14    where would that get recorded?  The Daytona branch

15    originated the loan --

16         A.    Yeah, their P&Ls continue.

17         Q.    After the branch closes?

18         A.    After, just to make sure items like that are

19    accounted for properly.

20         Q.    Okay.  So you do have P&L statements for the

21    Daytona branch, for example, for the May period, June,

22    July --

23         A.    Yeah, I don't know how far after.  I think once

24    the pipeline is gone, I would imagine they stop preparing

25    them.  But generally speaking, it's a period of time.

215

1          Q.    Okay.  So we could request P&Ls for the Daytona

2     branch after its closure, and that would reveal all of the

3     pipeline loans that were closed?

4          A.    Yes.

5                MS. WALTER:  Object to the form.

6          Q.    What if the loan, you know, is transferred from

7     the Daytona branch over to the Tampa branch and somebody in

8     Tampa is then the person boots on the ground closing the

9     loan?  Would that loan be recorded for Tampa or Daytona?

10         A.    I'm not sure of the logistics there.

11         Q.    Okay.  So the topic is asking you to testify

12    today about the loans originated by the employees while

13    still at Daytona that actually closed with Mutual.  Do you

14    -- are you able to tell me how many loans in the pipeline

15    from Daytona closed with Mutual?

16         A.    Yeah, I mean, right at this second without

17    looking at anything, no, but I could -- we could get you

18    that information, for sure.

19         Q.    Did you look at the P&Ls in advance of today that

20    you're talking about that would allow you to testify about

21    this topic?

22         A.    That specific as far as loans closing then and in

23    the pipeline, I don't -- I don't believe I specifically

24    looked at that.

25         Q.    Okay.  Topic 6(b), it's a two-part same topic but

216

1      applicable to the Tampa branch.  Did you do anything to

2      prepare for your deposition such that you would be in a

3      position to testify about all of the loans originated by the

4      departed employees at the Tampa branch and the Paramus

5      branch which closed with Mutual after June 15, 2022?  What

6      did you do to prepare for that topic?

7             A.    I mean, it's in the branch P&Ls.

8             Q.    Okay.  It might exist in the P&Ls.  Did you

9      analyze those in preparation for your testimony specific to

10     this topic?

11            A.    What would you like me to tell you about those

12     loans?

13            Q.    I would like you to tell me which loans closed.

14            MS. WALTER:  Object to the form.

15            A.    You want me to memorize the loan numbers --

16            Q.    Or bring a record or tell me it's --

17            A.    It's not my rules --

18            MS. WALTER:  Don't argue with the witness,

19     please.

20            A.    I was told I can't bring a record, so...

21            Q.    Okay.  I can't help the advice that you were

22     given there, but a corporate rep dep, I mean, it sounds like

23     there are records that would've allowed you to testify, but

24     you were told that you couldn't bring those to the

25     deposition.

217

1              MS. WALTER:  Is there a question?

2         Q.   Is that accurate?

3         A.   I was told that I can't --

4              MS. WALTER:  Object to the extent he's going to

5         disclose any sort of attorney-client privilege.

6         A.   That's a good point, yeah.

7         Q.   Are you willing to get documents that would allow

8    you to give me more information about these loans right now?

9              MS. WALTER:  Object to the form.

10        Q.   It's a request.  Are you willing to get the

11   documents that are going to disclose this information?  We

12   talked about other categories where you said they're

13   accessible, but your counsel says you can't get them.  Is

14   this in that category, or are you willing to go spend five

15   minutes, get the documents that would give me the

16   information I need?

17             MS. WALTER:  The answer is no.

18             MS. KREITER:  And that would be with respect to

19        Topic 6(a) and 6(b); correct?

20             MS. WALTER:  Yes.

21        Q.   I'm going to talk to you now about the

22   allegations in the case that Waterstone has misappropriated

23   trade secrets of Mutual of Omaha.  Did you prepare to

24   testify about the trade secret aspects of the case in

25   preparation for this deposition?

218

1      A.    Yes.

2      Q.    What did you do to prepare?

3      A.    Reviewed e-mails of customer data being sent and

4   e-mails on loan specific issues that was -- that were sent.

5      Q.    Can you recall any specifics about the e-mails?

6      A.    Well, there were e-mails that had all of our

7   policies and procedures that were sent.  There were e-mails

8   that were customer specific far along the process of a loan

9   that was sent -- that were sent.  There was numerous -- many

10  e-mails with what I would consider our information that was

11  sent to various places.

12     Q.    What is your understanding of a trade secret?

13     A.    Well, a trade secret is -- can be customer

14  information, especially the way the customer information is

15  formatted.  It can be the way we -- our policies and

16  procedures, things along those lines.  I think the most

17  valuable thing is a customer.

18     Q.    Are you aware of the volume of trade secrets that

19  Mutual has identified in this case?

20     A.    I know there was quite a bit, but I don't know

21  the exact --

22     Q.    Are you able to tell me anything more about the

23  categories of information that Mutual contends are its trade

24  secrets beyond what you have already said?

25     A.    Not off the top of my head, no.

219

1          Q.    There's been a number of documents that have been

2     identified as Mutual trade secrets that I want to talk to

3     you about and see if you agree that they are trade secrets

4     or not.

5                (Exhibit No. 15 is marked for identification.)

6                MS. WALTER:  Maria, I also want to get on the

7           record that we produced P&Ls through February of 2023,

8           so you have those in your possession.  In addition --

9                MS. KREITER:  For which branch?

10               MS. WALTER:  For all of them.  And in addition,

11          the profit and loss statements, if you look at the YSP

12          Accrual tab, it shows the amount of loans funded per

13          person for that particular month.

14               MS. KREITER:  What is the Bates number?

15               MS. WALTER:  Well, that's true of all of them.

16               MS. KREITER:  What is the Bates number so I have

17          it?

18               MS. WALTER:  I believe it's the one you had

19          designated.  It is 10942.  I'm not entirely sure

20          because I didn't look this closely.

21               MS. KREITER:  So what are you saying is contained

22          on here?

23               MS. WALTER:  Well, I'm telling you what's not

24          contained on here is some of the tabs that are within

25          the spreadsheets.  I'm not seeing that tab for this

220

1          particular spreadsheet when I opened it up in native.

2                  MS. KREITER:  What is the tab that you contend is

3          missing?

4                  MS. WALTER:  YSP Accrual.  They're missing

5          columns is the problem.  So if you look at page 9, ends

6          at loan program.

7                  MS. KREITER:  Let me just get there.

8          A.    It's this document.

9          Q.    I think I've got it here.

10                 MS. KREITER:  10942?

11                 MS. WALTER:  Right.  So it is included, but

12         that's the information that you're looking for.

13                 MS. KREITER:  Okay.  But -- so are you -- I mean,

14         you're now counsel.  Are you saying the -- I want it

15         from the witness.

16         Q.    So we've been looking at Exhibit 9, if you can

17    turn to Exhibit 9.

18         A.    It's not here is her point.  It's on the system

19    because the columns are cut off here.

20                 MS. WALTER:  The columns are included.

21                 MS. KREITER:  I think I see them on the sheet.

22         Are you saying there's something else that's not --

23                 MS. WALTER:  No.  I'm saying I misspoke

24         originally.  It is included on here, but this is the

25         information that you're threatening to file a motion

221

1      against me for.

2         MS. KREITER:  The witness hasn't told me any of

3      that.  I mean, you're telling me that.  I'm happy to

4      get it through the witness.  If you'll give it to me,

5      fine, but I haven't heard it from the witness yet.

6         So counsel is looking at Deposition Exhibit 9.

7      Counsel has indicated the YSP Accrual tab.

8      Q.   What is YSP?  Do you know?

9      A.   Yield spread premium.

10     Q.   Yield spread premium?

11     A.   Yes.

12     Q.   Okay.  I think it's about nine pages in.

13         MS. KREITER:  Courtney, you think this tab is

14     illuminating as to what topic?

15         MS. WALTER:  Number 4.

16         MS. KREITER:  Okay.  Topic 4 is annual loan

17     volume and revenue generated by Dwayne Hutto, Chris

18     Wolf, and Chris Smith.

19         MS. WALTER:  I don't want to get into a

20     back-and-forth, Maria.  So I wanted to get on the

21     record that the information that you're threatening to

22     file a motion against me --

23         MS. KREITER:  I want to get the information.  I

24     tried to get it in discovery.  I'm trying to get it

25     from the witness.  The witness said I could get a

222

1    report and solve this, and you said no.  So I'm -- now

2    you're saying it's in a document.  If I can get the

3    witness to help me out --

4         MS. WALTER:  This is also relevant to 6(a) and

5    (b).

6         MS. KREITER:  Okay.  But I need to hear it not

7    from you, Courtney.  You're the attorney.  You're not

8    the witness being deposed.  You're not the corporate

9    rep.  You're an attorney in the case.  I'd appreciate

10   if you can point the witness, who needs to give the

11   testimony, that's great.  If you can't, we have an

12   issue.

13        A.   I don't know what -- is it not in this group of

14   documents?  Is this different?

15        Q.   (By Ms. Kreiter)  If you don't mind, let me point

16   you to the case that counsel has identified.  Okay.  For

17   identification purposes in the record, we're looking at

18   Deposition Exhibit 9 and we're about eight or nine pages

19   into the exhibit.  At the top left-hand corner, it says

20   "Borrower Loan Number" and then it starts with 17280004366,

21   Borrower Name:  Marrero.  Do you see that?

22             I just want to make sure that we're aligned here

23   and looking at the right page of the exhibit.  There's no

24   Bates numbers per page because this is an Excel

25   document.  At the bottom of the page, it says "Total Funded

223

1     Loans:  14.  2,569,833."  Do you see that on the page you

2     were reviewing?

3          A.    Yes.

4          Q.    Okay.  So your counsel indicated that this page

5     of Exhibit 9 is illuminating as to Deposition Topic 4, which

6     sought the annual loan volume and revenue generated by

7     Dwayne Hutto, Chris Wolf, and Chris Smith for 2019, 2020,

8     2021, and 2022.  Is there information on this page of the

9     exhibit that allows you to testify as to that topic?

10          MS. WALTER:  Object to the form.  That is a

11          mischaracterization of what I said.  I said all of the

12          P&Ls contain that information and can assist you in

13          determining the annual loan volume and revenue

14          generated by these individuals in addition to 6(a) and

15          (b).  My --

16          MS. KREITER:  I want to hear from the witness.

17          MS. WALTER:  -- objection was directly in

18          response to you suggesting that we hadn't produced any

19          responsive documents and that the witness somehow

20          needed to memorize all these numbers for purposes of

21          this deposition.

22          MS. KREITER:  He has to come here and be able to

23          testify.  However he gets it done, that's up to you and

24          your witness, but he's not able to do it at the

25          deposition today.  If this document aids him, I want to

REGENCY REPORTING SERVICE, INC. (813)224-0224

224

1          know about that.

2          Q.    Does this document allow you to testify about the

3    annual loan volume and revenue for the three managers in the

4    years designated in Topic 4?

5          A.    This document would help me tell you that number

6    for January of 2019, but you have to look at subsequent ones

7    after to see.

8          Q.    Okay.  So from a methodology standpoint, you

9    would find this same P&L statement?

10          A.    That's right.

11          Q.    Okay.  And what would you look at on the page

12    that we've been reviewing?  What are you adding up here?

13          A.    So you have -- like, if you just want to start at

14    the Total Funded Loans because you don't want to look at the

15    accrual, it's all inclusive down here.  So you look at the

16    loan number, the borrower's name --

17          Q.    Can you say for the record?  I see you're

18    pointing, but we don't have a record of that.  So help me

19    out.  This is a question specific to Dwayne Hutto.  How do I

20    determine anything about annual loan volume associated --

21          A.    This is for Tampa, so Dwayne wouldn't be on it.

22    This would be Chris Smith.

23          Q.    Chris Smith.  How do I determine any information

24    about annual loan volume and revenue generated by Chris

25    Smith from this document?

225

1          A.    So you would go to the Loan Officer column,

2     search down by Chris Smith.

3          Q.    Okay.

4          A.    Christopher Smith funded one loan, it looks like,

5     Loan 1728004368 for borrower Cossio, funded on 1/30/19 for

6     $299,653,000.

7          Q.    Okay.  So you would go through all of the P&L

8     statements, look at this YSP tab, and then find either

9     Mr. Smith, Mr. Hutto, or Mr. Wolf, add up all of the -- I

10    guess what would it be?  YSP Accrual, is that analogous to

11    revenue or not?

12         A.    YSP is revenue.

13         Q.    Okay.  And is your testimony that all of the P&Ls

14    have a YSP Accrual tab and that's the methodology that you

15    would use to calculate these numbers?

16               MS. WALTER:  Object to the form.

17         A.    Yes.

18         Q.    Is there another report that you could generate

19    on a person-by-person basis rather than looking through --

20               MS. WALTER:  Object to the form.

21         Q.    -- all of the P&L statements?

22         A.    Yes.

23         Q.    What is that?

24         A.    Well, like we said before, it's the Encompass

25    report.  There's a B&I report.  There's all different --

226

1          Q.    Reports that can be run?

2          A.    Yeah.

3                MS. WALTER:  Object to the form.

4          A.    But this is, you know, the accounting behind it.

5     Then you can look at the transactions listing,

6     cross-reference that loan with the actual YSP and the dollar

7     amount associated with it.

8          Q.    Sure.  Let me ask it this way:  So does -- P&L,

9     that's the raw data.  But then there's a report that you can

10    run that rather than going through all the raw data,

11    compiles the raw data, and there's a report that could be

12    generated that has the responsive information?

13               MS. WALTER:  Object to the form.

14         A.    Yes.

15         Q.    Is this sheet of Exhibit 9 that we've been

16    looking at, does that allow you to discern any information

17    relevant to Topics 6(a) and 6(b) that we were talking about?

18    I don't know if you remember which those are.  You can refer

19    back to -- do you have them in mind?

20         A.    No.

21         Q.    Okay.  So 6(a) is "All loans originated by the

22    departed employees while still employed by Mutual of Omaha

23    or the Ormond Beach branch and then closed with Mutual."

24    And then 6(b) was the same but with respect to the Tampa or

25    Paramus branches.  Is this page of Exhibit 9 illuminating as

227

1      to that?

2              A.    Yes.

3              Q.    In what way?

4              A.    It's the ones that closed.

5              Q.    I thought you had indicated that you were

6      uncertain about whether those loans would be booked under

7      the -- for example, for the Daytona branch, the loans that

8      were in the pipeline and closed by, say, the Tampa branch.

9              A.    Well, that's not what you just said.  You just

10     asked me what -- that's not what 6(a) and 6(b) said.  6(a)

11     and 6(b) simply said identify the loans of those three

12     managers, which we can do.

13             Q.    No.  It's the loan that closed after the

14     branches --

15             A.    Oh, we certainly can see -- we can compare the

16     two branches and certainly see them.  What loans closed, the

17     loan officer's name will be there.

18             Q.    Is it -- are you certain or uncertain that the

19     loans that were closed, say, in the pipeline for Daytona

20     would show on the Daytona P&L or on the Tampa P&L?

21             A.    I -- I would be fairly certain that they would

22     close under the Daytona branch P&L, but I'm not a hundred

23     percent.

24             Q.    Okay.  We have been talking before, revisiting

25     this topic of the loans and the different reports that are

228

1      available to Mutual.  We have been talking about the trade

2      secret claims, and I want to get back to that --

3           A.   Sure.

4           Q.   -- topic.  Just get organized for a minute

5      here.  Take a look at Deposition Exhibit 15.  This exhibit

6      is a compilation of different documents that Mutual has

7      identified as its trade secrets in this case.  I want to

8      start with the first document in the compilation.  It's

9      Bates No. 106.  It goes all the way through 182.  It's a

10     Consumer Financial Protection Bureau October 2018 report

11     that's titled Glossary of English-Spanish Financial Terms.

12     Do you see that?

13          A.   I do.

14          Q.   This isn't a document that was created by Mutual,

15     was it?

16          A.   It does not appear to be.

17          Q.   Is Mutual in any sense the owner of this CFPB

18     Glossary?

19          A.   Not -- not to my knowledge, no.

20          Q.   Are you aware of whether this document is

21     publicly available?

22          A.   I assume it's publicly available.

23          Q.   Is this document one that Mutual takes measures

24     to keep secret?

25          A.   No.

229

1          Q.    Do all lenders have access to this CFPB

2    publication?

3          A.    Probably.

4          Q.    If you open it up, it consists largely of English

5    words and the Spanish translation.  Do you see that?

6          A.    I do.

7          Q.    You could look up English words and Spanish words

8    on the Internet and get them translated; correct?

9          A.    Yes, yes.

10         Q.    Do you maintain on behalf of Mutual that this

11   document is a trade secret of Mutual of Omaha?

12         A.    No.

13         Q.    Do you know why this document was designated as a

14   Mutual trade secret?

15              MS. WALTER:  Object to the form.

16         A.    I don't know why other than I could imagine this

17   "Confidential" on the front page probably triggered some IT

18   system.

19         Q.    Well, I'll just state for the record the document

20   is labeled Confidential --

21         A.    Oh, you --

22         Q.    -- with the Bates numbering in this case.  Mutual

23   designated it confidential under the protective order.

24   Opposing counsel can correct me if I'm wrong, but that

25   confidential designation was adhered as part of the

230

```
 1    litigation.  Do you know why this document would've been

 2    designated by Mutual as a trade secret?

 3              MS. WALTER:  Object to the form.

 4         A.   No.

 5         Q.   Let's go to the next document in the compilation.

 6    There's a blue sheet that kind of separates the documents.

 7    I think you went a little too far.  Bates No. 209, yep,

 8    you're right there.

 9         A.   Okay.

10         Q.   So this document is titled at the top -- there's

11    a heading for Factual Data.  Factual Data is a third party

12    that provides consumer credit verification services to

13    lenders.  Are you aware of that?

14         A.   I am.

15         Q.   Is this document in any sense authored by Mutual

16    or owned by Mutual?

17         A.   No.

18         Q.   Does this document have economic value because

19    it's not generally known?

20         A.   I don't believe so.

21         Q.   Does Mutual make efforts to keep this particular

22    document secret in any sense?

23         A.   No.

24         Q.   Is there any language that you can point to on

25    this document that you consider to be trade secret?
```

231

1      A.   No.

2      Q.   In fact, this is -- it's written as if this is a

3  document that is given to a borrower.  Do you agree with

4  that?

5      A.   It appears that way.

6      Q.   Do you maintain on behalf of Mutual that this is

7  a trade secret?

8      A.   No.

9      Q.   Do you have any information as to why Mutual

10  designated this document as one of its trade secrets?

11      A.   I don't.

12      Q.   Take a look at the other documents in this

13  compilation.  I'll try to short-circuit it a bit.  The next

14  document in the compilation is Bates numbered MOM-397.  It's

15  a document published by the Department of Defense labeled

16  Fact Sheet.  Do you contend that this is a Mutual of Omaha

17  trade secret?

18      A.   I don't know what this is really, to be honest.

19  I just don't know what it is.

20      Q.   Is it something that's created by Mutual of

21  Omaha?  This is Department of Defense Fact Sheet.

22      A.   It does not appear to be.

23      Q.   What testimony can you provide that would explain

24  how this Document Bates No. 397 is a Mutual of Omaha trade

25  secret?

232

```
1              MS. WALTER:  Object to the form.
2         A.    None.
3         Q.    You agree it's not a trade secret of Mutual of
4    Omaha?
5         A.    It appears not to be, no.
6         Q.    Let's go to the next one, MOM-448.  Terms and
7    Conditions is the title of the document.  It reads "The
8    account owner named in the account application must read and
9    agree to the terms of the Fidelity Brokerage Retirement
10   Account Customer Agreement," and then it goes on.  To me, it
11   appears that this is a document of Fidelity, not of Mutual.
12   Is this a Mutual of Omaha trade secret?
13        A.    No.  Was this part of another customer
14   information thing or something?  I don't know.  It seems
15   odd.
16        Q.    Did you -- how much time did you spend reviewing
17   the volumes of documents that Mutual has identified as its
18   trade secrets?
19        A.    I really only focused on the customer
20   information, things like that, yeah.
21        Q.    So there's a lot of documents that have been
22   designated as Mutual trade secrets.  It sounds like we're
23   abandoning the claim with respect to the documents that
24   we've talked about so far in Exhibit 15.  And just for
25   completeness, there's one more document in Exhibit 15, the
```

233

1    last page, BBMC Mortgage, "Need a 2nd Opinion?" Bates number

2    MOM-1205.  Do you see that?

3         A.    Yes.

4         Q.    Is this a Mutual of Omaha trade secret?

5         A.    Well, Mutual of Omaha purchased the -- the assets

6    of BBMC.  This is marketing material created by BBMC, so I

7    don't know.

8         Q.    Sure.  It's marketing material, meaning it's

9    given out to members of the public; correct?

10        A.    Yes.

11        Q.    And is it your position that marketing material

12   widely distributed to members of the public are trade

13   secrets?

14        A.    No.

15        Q.    So is there any document within Deposition

16   Exhibit 15 for which Mutual is not abandoning its position

17   that the documents are trade secrets?

18        A.    No.

19        Q.    I want to go back to the time and effort that you

20   spent preparing to talk about Mutual's alleged trade

21   secrets.  How much time did you spend preparing for those

22   deposition topics?

23             MS. WALTER:  Object to the form.  Asked and

24        answered.

25        A.    Yeah, we talked about this.

234

1        Q.   I think that we talked about your preparation

2   overall.  I want to know specific to the trade secrets and

3   being in a position to identify which of the documents are

4   trade secrets, how much time did you spend on that?

5        A.   Well, again, we talked about it.  I don't know.

6   I spent --

7        Q.   Does it surprise you that Mutual is making claims

8   that the documents in Exhibit 15 are trade secrets?

9             MS. WALTER:  Object to the form.

10       A.   Yeah, I don't know if it would be surprise me if

11  something gets put in when there's a lot of documentation

12  sent.  I don't know.  I'm not a lawyer.  I don't know what a

13  trade secret is or what isn't either, so...

14       Q.   Did you make any efforts in preparation for your

15  testimony to understand what a trade secret is or is not?

16       A.   I did.

17       Q.   What did you do?

18       A.   Discussed it with attorneys, my attorneys.

19       Q.   Okay.  Do you understand that there's a

20  difference between confidential information and something

21  that's a trade secret?

22       A.   I do.

23       Q.   What is the difference between confidential

24  information and a trade secret?

25       A.   Well, in my mind, it's -- so if you take

235

```
 1          confidential information and then you take -- you process

 2          that confidential information, like, in the form of a loan,

 3          for instance, then that becomes a trade secret because the

 4          value of that is immense compared to just customer

 5          information, which is confidential, so...

 6              Q.   Let's look at another one.

 7                   (Exhibit No. 16 is marked for identification.)

 8              Q.   Exhibit 16 is another composite exhibit

 9          consisting of documents that Mutual of Omaha has designated

10          as its trade secrets.  Let's look at the first document,

11          Bates No. 55.  It says "Buyer Dos and Don'ts."  Do you see

12          this?

13              A.   Yes.

14              Q.   What is this document?

15              A.   I believe it's to help the buyer along with the

16          process of purchasing a home.

17              Q.   So it's something given to the buyer?

18              A.   I'm not sure it's given to or discussed.  If it's

19          for the loan officer to discuss it, I'm not sure.

20              Q.   Well, let's take a look at it.  The first one, it

21          says "Dos.  Check your e-mail at least daily.  Most of our

22          communication and documents are sent through e-mail for

23          efficiency and to provide you with a fast and enjoyable

24          process for closing."  Do you believe that that statement is

25          directed to the buyer?
```

236

1          MS. WALTER:  Object to the form.

2      A.   I -- I don't understand the checks -- the

3   checkbox here.  Like, that almost looks like the loan

4   officer checks that out.  Do we send that?  But I really

5   don't know, so...

6      Q.   Let's look at No. 2.  "Pay all your bills on

7   time.  Be extra careful to keep all the normal bills paid as

8   usual."  That wouldn't be something directed to an employee

9   of Mutual.  It's directed to the buyer; correct?

10     A.   Could it be a script?  I don't know.  It sounds

11  like a script to me.

12     Q.   Have you seen this document before?

13     A.   No.

14     Q.   I want you to tell me all of the reasons that you

15  contend on behalf of Mutual that this document is a trade

16  secret, if you do; or if you think it's not a trade secret

17  and should be in the category that we talked about with the

18  others --

19     A.   Well, I don't think it's in that category because

20  it was produced by Mutual of Omaha, so that's a little

21  different.

22     Q.   Are there R&D efforts and significant monies

23  invested to create Bates No. 55?

24     A.   There's a marketing team.

25     Q.   Specific to this Exhibit, though.

237

1          A.    The marketing team did this?

2          Q.    Sure.  I mean, so do you have information that

3     Mutual of Omaha invested significant time, money, resources,

4     efforts to create this --

5          A.    No.

6          Q.    -- Bates No. 55?

7          MS. WALTER:  Maria, I'd like to also get on the

8          record that you're showing him an attachment to an

9          e-mail, and so I think this line of questioning and the

10         prior is a little taken out of context because you

11         didn't produce the entire family.  You're not showing

12         him the entire family.  You're showing him one

13         attachment.

14         MS. KREITER:  But this is what you identified.

15         If you thought the e-mail and certain attachments were

16         not trade secrets, you should've identified that, but

17         Mutual didn't.  It identified 55, so trying to

18         understand, are these still something that Mutual is

19         going to maintain is a trade secret, or is Mutual

20         changing its mind as to this document?

21         Q.    Is this document something that Mutual keeps

22    under password protection or restricts access to in any

23    fashion?

24         A.    Well, all of our marketing materials are

25    password-protected in our Knowledge Coop.

—————REGENCY REPORTING SERVICE, INC.  (813)224-0224—————

238

1          Q.    Is there particular language on 55 that you

2     believe is commercially valuable that would harm Mutual if

3     it got into the hands of a competitor?

4          A.    I mean, anytime you come up with a script like

5     this and your competition gets it, they're at an advantage.

6          Q.    Sure.  I mean, are you saying that this is more

7     than confidential and is a trade secret?

8          A.    I don't know.  I've done a lot of mortgages.

9     I've never gotten this from other places, so...

10          Q.    Do you believe this is confidential information

11     or something that rises to the level of a trade secret,

12     No. 55?

13          A.    I'm not sure.

14          Q.    Okay.  Let's go to the next one, 65.  Have you

15     ever seen this document before?  It's Bates No. 65 and then

16     it continues through 74.

17               MS. WALTER:  And for the record, we did identify

18               MOM-0000054 as a trade secret on page 24 of our

19               responses from March 10th of 2023.  And you showed him

20               55, which was an attachment to that e-mail.

21               MS. KREITER:  Right.  You also identified 55.

22          Q.    So 65, are you able to say what this document is?

23          A.    It looks like a procedure.

24          Q.    Is this something that -- I don't see any Mutual

25     of Omaha letterhead.  Do you know whether this was authored

239

1    by an employee of Mutual of Omaha?

2        A.   I don't know other than it does look like our --

3    our procedures.

4        Q.   Is this a document that you can say is subject to

5    secrecy efforts on the part of Mutual?

6        A.   You're showing what system, SimpleNexus, how that

7    all works, so this is how DocuSign works with SimpleNexus.

8        Q.   I'm going to direct you to page 67 of the

9    document.

10        A.   Yeah.

11        Q.   "Once you have your print and signs, credit LOX,

12    and other items ready for the DocuSign, review your file for

13    additional borrower items needed.  I start at the -- at home

14    page and work through all the pages of the URLA and then

15    check the itemization screen so I can see an estimated cash

16    to close," and then it goes on.  This appears to be authored

17    by an employee, and it's a form of a checklist; correct?

18             MS. WALTER:  Object to the form.

19        A.   It's a form of a policy -- I mean a procedure.

20    Sorry.

21        Q.   What about this do you contend is a trade secret?

22        A.   Well, I think it was valuable enough to send

23    outside of our system; right?  So that -- if it was -- if it

24    was of no value, why would someone send it?

25        Q.   Okay.  Well, value can be confidential

240

1    information, or it can be a trade secret.  Mutual has

2    alleged this is a trade secret.  I'm trying to understand --

3    or something can be just valuable but not even confidential.

4    There can be checklists online, and that's maybe helpful but

5    not confidential.  So I'm trying to understand why Mutual

6    believes that this checklist is not only confidential but is

7    somehow a trade secret.

8         A.    I think you're --

9              MS. WALTER:  Object to the form.

10         A.    I'm sorry.  You're calling it a checklist.  It

11    doesn't appear to be a checklist to me.

12         Q.    Well, it's "Loan Partner:  File Kickoff To-Do

13    List and Workflow."

14              MS. WALTER:  Again, I want to object to the

15              extent that the entire family wasn't produced.  You're

16              showing him piecemeal.

17              MS. KREITER:  So what?

18              MS. WALTER:  So it's taken out of context.

19              MS. KREITER:  Then show him the full context, but

20              you designated this document, and you can do that on

21              rebuttal.  But right now this is a document that Mutual

22              designated, and I'm asking him why it's a trade secret.

23              If he says it's not, we'll take it off the list.

24         A.    I mean, the problem is what you captured here is

25    our text stack, and I believe that is a trade secret.

241

1    You're not just talking about how to do one thing.  You're

2    showing how the file moves from SimpleNexus through

3    Encompass, through DocuSign.  These are all -- this is text

4    stack that is --

5        Q.   Are all employees of Mutual of Omaha subject to a

6    confidentiality agreement?

7             MS. WALTER:  Objection.  Form.

8        A.   Yes.

9        Q.   With respect to this document, you have no idea

10   who created it, however?  You don't know who the author is?

11       A.   What was that?

12       Q.   65.

13       A.   Oh, we're still going -- yeah, I don't -- I don't

14   know.

15       Q.   Is this something that executives within Mutual

16   of Omaha Mortgage would see?

17       A.    I don't know.  I don't know where this -- I don't

18   know where it resided.  I don't know.  I just don't know.

19       Q.    Let's go to the next one.  There's a blue sheet,

20   and then there's two documents, Profit and Loss Statement.

21   It's a blank template.  There's nothing filled in.  Is this

22   a trade secret of Mutual of Omaha?

23             MS. WALTER:  What's the Bates on this one?

24             MS. KREITER:  80.

25       A.    As this stands right here, I would say no.

242

1      Q.   Let's go to the next one, Bates No. 327.  It's a

2   single-page document.  It says "To whom it may concern.  I

3   am writing this letter to explain what the cash-out proceeds

4   from my refinance will be used for."  And then it's

5   completely blank.  Is this a trade secret of Mutual of Omaha

6   Mortgage?

7      A.   I think it's a form that this person didn't want

8   to recreate, and then they --

9      Q.   Is it a trade secret of Mutual of Omaha Mortgage?

10      A.   I would say in this context, it is not a trade

11   secret.

12      Q.   Let's go to the next one, Bates No. 334.  This is

13   a completely blank Uniform Residential Loan Application.  Is

14   this a trade secret of Mutual of Omaha?

15      A.   No.

16      Q.   Let's go to the next document, No. 342.  Just let

17   me know when you're there.

18      A.   I am.

19      Q.   So there's a corporate heading on the top,

20   Appraisal Linx.  Do you see that?

21      A.   I do.

22      Q.   Is this document owned by and authored by a

23   Appraisal Linx or Mutual of Omaha?

24      A.   It's our negotiated terms with Appraisal Linx.

25      Q.   Who owns the document?  Who created it and who

243

1   owns it?

2           MS. WALTER:  Object to form.

3       A.   I don't know who owns it.  I mean, this is -- it

4   was created for us by Appraisal Linx.  But, you know, the

5   problem is, is you have all this information that we

6   negotiated.  So now I can take this and negotiate the same

7   deal and show Appraisal Linx, "Hey, you did this for" -- and

8   now we're at a competitive disadvantage, so, you know --

9       Q.   Do you maintain that Bates No. 342 is a trade

10  secret of Mutual of Omaha?

11      A.   The pricing on this form is specific to Mutual of

12  Omaha negotiated by us, so I believe that's probably why

13  it's in here.

14      Q.   And you believe that this is a trade secret, not

15  just merely confidential?

16      A.   You know, I think that's probably for a jury or a

17  judge to decide.  I don't know.

18      Q.   Well, what do you think on behalf of Mutual

19  today?  Is it confidential, or is it a trade secret?

20          MS. WALTER:  Object to form.

21      A.   I think it depends on the context of it.  I've

22  spent 22 years working with Appraisal Linx to negotiate

23  these prices.

24      Q.   Is there a confidentiality agreement between

25  Mutual of Omaha and Appraisal Linx?

244

1          A.    An NDA, I believe.  Certainly, there was one at

2     one time.

3          Q.    So I want to make sure that I'm clear on the part

4     of this document that you believe -- that you contend is

5     secret and is a trade secret.  It's the pricing?

6          A.    It's the pricing, yeah.

7          Q.    So there's different columns here:  Conventional,

8     Field Review, Desk Review, Final Inspection, Recert. of

9     Value, Rent Schedule, Operating Inc., Additional Upcharges,

10    Estimated Value.  All of that is a trade secret?  Not the

11    headings themselves, but the data --

12         A.    The pricing.  The pricing.

13         Q.    What value would this document be to a

14    competitor?

15              MS. WALTER:  Object to form.

16         A.    So I have a relationship with Appraisal Linx I

17    have had for -- since I've been in the business really.

18    Blake Chiado owns Appraisal Linx.  I negotiated these terms

19    on our behalf.  If a competitor got this document, they

20    could then get the same deal because, you know, it's

21    difficult for Appraisal Linx to say, "Well, no, you haven't

22    known me for 25 years, and so I can't give you the same

23    deal."

24              So now they're going to be -- we're at a

25    competitive advantage because we have negotiated very good

245

1    prices with our appraisal companies.  That is passed along

2    to the consumer, which makes our loans more appealing at

3    times.

4        Q.    So this reflects the pricing negotiated by Mutual

5    with Appraisal Linx, and that applies to all of the

6    different loans for which there's a working relationship?

7        A.    That's right.  And it's negotiated on the

8    customer's behalf because we don't pay it.  The customer

9    pays for this.

10       Q.    Sure.

11       A.    But it's -- the lower we can get these fees,

12   we're at a competitive advantage; right?

13       Q.    So if this were in the hands of an individual

14   loan officer, would it be valuable to that loan officer

15   because the loan officer can then negotiate on a

16   borrower-by-borrower basis, or would it only be valuable to

17   Waterstone, the company, which is the party that's going to

18   negotiate companywide?

19       A.    I think it's -- I think in today's day and age,

20   there are a lot of loan officers that negotiate and use

21   their own appraisal management companies and bring that to

22   the table.  So it's valuable to both.

23       Q.    Do you have any evidence that this document was

24   given to Waterstone?

25       A.    I don't.

246

1          Q.   Do you have any evidence that Waterstone used

2     this document to negotiate with Appraisal Linx or for any

3     other purpose?

4          A.   I don't.

5          Q.   Are there any damages associated with 342 that

6     Mutual is claiming?

7               MS. WALTER:  Object to form.

8          A.   Yeah, we don't -- we don't know what those

9     damages may or may not be.

10         Q.   Well, today here at the deposition, are there any

11    damages that Mutual is claiming that are derivative of 342?

12              MS. WALTER:  Object to form.

13         A.   I don't think I'm comfortable answering that.  We

14    don't -- again, we don't -- I don't even know if they're

15    using this, if they are using it or not, so...

16         Q.   Let's go back to the other document that I think

17    you did not rescind from a trade secret perspective.  It was

18    the Bates No. 65, the File Kickoff To-Do List and Workflow.

19    Do you have any information that this document starting with

20    Bates 65 was in the possession of Waterstone?

21         A.   I don't know.

22         Q.   Is Mutual making a damages claim specific to this

23    Document 65?

24              MS. WALTER:  Object to the form.

25         A.   I'm not sure how that works, the damages.  I'm

247

1    not -- is it a total of all of it?  I think the damages, I

2    think, are more related to the customer aspect of it all and

3    not things like this but in total.

4        Q.   But there's not a dollar amount that you

5    associate and Mutual is demanding that is based on a

6    derivative of 65?

7             MS. WALTER:  Object to form.

8        A.   Not to my knowledge, no.

9        Q.   Okay.  Let's go to the next document in the

10   composite.  It's Bates No. 406.  We're near the end.  Just

11   let me know when you're there.  Same exhibit.

12       A.   Okay.

13       Q.   It's the same Exhibit 16, Bates No. 406.

14       A.   Okay.  What one?  I'm sorry.

15       Q.   406.

16       A.   Got it.  Okay.

17       Q.   What is Bates No. 406?

18       A.   Manufactured Property Overview, it looks like

19   it's a -- guidelines for lending to manufactured homes.

20       Q.   Is this document a trade secret of Mutual of

21   Omaha?

22       A.   In this context, I can't tell who -- who prepared

23   this.  The way we underwrite a manufactured home would be a

24   trade secret, but I don't know if that's what this is or if

25   this is something else.  I can't tell in this context.

248

1          Q.   Okay.  So it sounds like you don't know whether

2     this is a trade secret; is that accurate?

3          A.   I don't know where this -- yeah.

4          Q.   Is this a document that was the subject of

5     secrecy efforts on the part of Mutual?

6               MS. WALTER:  Object to form.

7          A.   I don't know where it came from.  I don't know.

8     I don't see the context of it.

9          Q.   Are there damages that Mutual is demanding based

10    on 406?

11              MS. WALTER:  Object to form.

12         A.   Same answer as before.  Not -- not specifically.

13         Q.   Let's go to the last one.

14              MS. WALTER:  There's no Bates on this.

15              MS. KREITER:  Correct.  I think that's because it

16         was a native Excel, so it's No. 452, Bates 452.

17         Q.   What is this last document in the exhibit?

18         A.   I think this references by investor who needs an

19    attorney opinion letter for a trust.

20         Q.   Is this a Mutual of Omaha trade secret?

21         A.   You know, again, I would say probably not, not in

22    this context anyway.

23         Q.   Let's talk about the P&L statements.  You have an

24    understanding that certain P&L statements were sent by

25    certain of the departing employees to Waterstone Mortgage;

249

1      correct?

2          A.   Yes.

3          Q.   Do you consider those P&L statements to be trade

4      secrets of Mutual of Omaha?

5          A.   Yes.

6          Q.   Why?  And if you can be exhaustive as possible.

7          A.   The information contained in a P&L statement is

8      very damaging if a competitor gets it.

9          Q.   Let's make an exhaustive list.  Damaging if a

10     competitor gets it?

11         A.   Yes.

12         Q.   Any other reason?

13         A.   Depends on what tabs were sent.  I don't know if

14     -- you know, on the P&Ls, as we reviewed, there's tabs in

15     here that has, you know, nonpersonal information in there,

16     nonpublic information rather.  It shows volume, as we

17     discussed, of loan officers that work for us.  It shows all

18     staff that work in that area.

19              It shows who we sell our loans to, what we charge

20     for a processing fee, what we charge for an underwriting

21     fee, what we pay our folks, what -- what we charge for

22     insurance, what we allow for 401(k) polling, what lead

23     resources we use, and what the compensation structure is for

24     the loan officers and managers.

25         Q.   I'm going to show you -- specifically, let's look

250

1    at this next exhibit.

2              (Exhibit No. 17 is marked for identification.)

3              MS. WALTER:  Do you have the Bates for this?

4              MS. KREITER:  I don't know right now, no.

5    Q.    Take a look at Exhibit 17.

6    A.    Okay.

7    Q.    So we came up with a list just now of ten

8    different reasons why you believe that the P&Ls are trade

9    secrets.  With respect to this P&L in particular, do you

10   believe that this P&L is a trade secret for all of the

11   reasons that you identified?

12             MS. WALTER:  Object to the form.

13   Q.    Let me ask it a different way.  So specific to

14   this P&L, I heard you testify that, "Well, it depends on

15   what tabs might be included on the P&L.  I'm not sure."  So

16   this is an actual one that I want to look at.

17   A.    Sure.

18   Q.    Are there components of this Exhibit 17 that

19   Mutual contends is a trade secret?

20   A.    Yeah.  It appears those things we referenced are

21   in this document.

22   Q.    Okay.  Let's talk about -- you said it could show

23   the loan officer volume?

24   A.    Yes.

25   Q.    Do you have evidence that Waterstone -- let's

251

1    stop before I get to that question.  Where is the loan

2    officer volume in 17?

3        A.    That same tab we talked about the last time.

4        Q.    The YSP tab?

5        A.    Yeah.

6        Q.    Okay.  That's good enough.  What is your

7    understanding of the use to which Waterstone put the P&L, if

8    you know?

9        A.    Well, I don't know.

10            MS. WALTER:  Object to the form.

11            THE WITNESS:  Oh, I'm sorry.

12            MS. WALTER:  It's okay.  Go ahead.

13        A.    I don't know how they used it.

14        Q.    Do you -- does Mutual have a damages claim

15    specific to the P&L statements?

16            MS. WALTER:  Object to the form.

17        A.    I -- I think we're still calculating the damages

18    from this information is my understanding.

19        Q.    So let me give you an example.  If, for example,

20    you know, Waterstone used the P&L to undercut pricing and

21    then got loans that it wouldn't have been able to close but

22    for having the confidential information, you could say

23    Waterstone made use of that P&L and it translates to damages

24    that you can quantify?

25        A.    Yeah.  I'm sorry.

252

1        Q.    Do you -- go ahead.  Do you have, with respect to

2    the P&L statements, you know, that type of theory, that

3    Waterstone made use of the P&L in some fashion that

4    translates to damages?  If so, you know, what are those

5    damages that are derivative of the P&Ls?

6              MS. WALTER:  Object to the form.

7        A.    So I think it goes back to the information

8    contained in here that's so overwhelmingly confidential:

9    borrowers' name, loan amount, YSP on that loan.  You could

10   back out what that -- what the rate is, you know, a mortgage

11   person could.  So you could then use that information to

12   refinance these borrowers to do whatever it is that you

13   wanted to do.  It's the amount -- it's the overwhelmingness

14   of that information that's --

15       Q.    Sure.  And I'm trying to get specifically is

16   there a claim for damages based on this?  I mean, we talked

17   about, you know, there's no claim for damages based on some

18   of the other documents.  And let me give you this scenario

19   in case it's helpful:  You know, the formula for Coke,

20   that's the classic, wow, that's a trade secret.

21       A.    Yeah.

22       Q.    So, you know, someone could take the formula for

23   Coke.  But if they don't do anything with it and think,

24   "Shoot, I took the formula for Coke, shouldn't have done

25   that," and it's never put to use, I mean, bad that the

253

1    information was taken, and maybe you have a claim that the

2    trade secret was misappropriated, but there's not

3    necessarily a harm in a damages claim that flows from it.

4            So I understand Mutual's position this is a trade

5    secret.  It shouldn't have been conveyed.  But what I'm

6    trying to understand with specificity today is what dollar

7    demand, if any, is derivative of the transmittal of the P&L

8    statement?

9            MS. WALTER:  Object to form.

10   A.    Yeah, I'm not sure.  I'm not comfortable -- I was

11   told by attorneys that we haven't come up --

12           MS. WALTER:  Don't.  Attorney-client privilege.

13           THE WITNESS:  I'm sorry.  Okay.

14   A.    So I'm not comfortable answering that.

15   Q.    Okay.  So, I mean, then I need to make a record

16   of that.  So the testimony on behalf of Mutual today at the

17   deposition is you're not comfortable answering whether

18   there's a claim based on damages derivative of the P&L

19   statements?  I just want to shut the door on this if that's

20   the case.  Is that the case?

21   A.    Repeat yourself one more time.

22   Q.    I need to understand, you know, today is there a

23   claim that Mutual is making derivative of the P&L statements

24   for damages?  I totally get we think that this shouldn't

25   have been sent.  I get your position that it's a trade

254

1     secret.  What I don't have an understanding is, does that

2     translate to a demand for damages and that you're claiming

3     today that you can tell me about at the deposition?

4              MS. WALTER:  Object to form.

5          A.    Not that I can tell you about today, but that

6     doesn't mean damages are off-limits in terms of this.

7              MS. KREITER:  I could use just a five-minute

8          break.  I think that I'm near the end here.

9              (A recess was taken.)

10             MS. KREITER:  I have nothing further.

11             THE WITNESS:  Thank you, Jesus.

12             MS. WALTER:  Nothing from me.

13             (The deposition concluded at 4:53 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

255

**REGENCY REPORTING SERVICE, INC.**
201 East Kennedy Boulevard
Suite 875
Tampa, Florida 33602
813-224-0224

June 1, 2023

COURTNEY WALTER, ESQUIRE
CHRIS McCALL, ESQUIRE (Zoom)
Mitchell Sandler LLC
1120 20th Street Northwest
Suite 725
Washington, DC  20036


CASE REFERENCE:  MUTUAL OF OMAHA MORTGAGE, INC. vs.
WATERSTONE MORTGAGE CORPORATION


Deposition of Jeffrey Gennarelli, Corporate Representative
of Mutual of Omaha Mortgage, Inc.


Dear Ms. Walter:

Enclosed is your copy of the deposition taken in the
above-styled cause on May 25, 2023, along with a
several-lined correction sheet.

Please have your client read your copy of the deposition,
make whatever corrections or changes necessary on the lined
sheets, indicating page and line numbers, and then sign the
signature page.  Return only the correction and signature
page.

If you have any questions concerning this, please don't
hesitate to call.

Very truly yours,


_s/ Melanie Keefe_
Melanie Keefe, FPR
Court Reporter

256

1                    SIGNATURE PAGE/ERRATA SHEET

2    WITNESS:  JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF
     MUTUAL OF OMAHA MORTGAGE, INC.

3
     CASE REFERENCE:  MUTUAL OF OMAHA MORTGAGE, INC. vs.
4    WATERSTONE MORTGAGE CORPORATION

5    CASE NUMBER:  8:22-cv-01660-TPB-JSS

6    DATE:  May 25, 2023

7            After you have read your transcript, please note
     any errors in transcription on this page.  Do not mark on
8    the transcript itself.  Please sign and date this sheet as
     indicated below.  If additional lines are required for
9    corrections, attach additional sheets.  If no corrections,
     please indicate "None."

10

11   _____

     PAGE      LINE      ERROR OR AMENDMENT          REASON
12
     _____
13   _____
     _____
14   _____
     _____
15   _____
     _____
16   _____
     _____
17   _____
     _____
18   _____
     _____
19   _____
     _____
20   _____

21           Under penalties of perjury, I declare that I have
     read the foregoing transcript, and I subscribe to its
     accuracy, to include the corrections or amendments noted
22   above or hereto attached.

23           _____
             JEFFREY GENNARELLI,              DATE
24           CORPORATE REPRESENTATIVE
             OF MUTUAL OF OMAHA
25           MORTGAGE, INC.

        ——REGENCY REPORTING SERVICE, INC. (813)224-0224——

257

1                          CERTIFICATE OF REPORTER

2        STATE OF FLORIDA              )

3        COUNTY OF HILLSBOROUGH        )

4

5                I, Melanie Keefe, Court Reporter, certify that I
     was authorized to and did stenographically report the
6    deposition of JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE
     OF MUTUAL OF OMAHA MORTGAGE, INC.; that a review of the
7    transcript was requested; and that the transcript, pages 5
     through 254, inclusive, is a true and complete record of my
8    stenographic notes.

9                I further certify that I am not a relative,
     employee, attorney, or counsel of any of the parties, nor am
10   I a relative or employee of any of the parties' attorneys or
     counsel connected with the action, nor am I financially
11   interested in the action.

12               _s/ Melanie Keefe_____
                 Melanie Keefe, FPR
13               Court Reporter

14   _____

                           CERTIFICATE OF OATH
15
         STATE OF FLORIDA              )
16
         COUNTY OF HILLSBOROUGH        )
17
                 I, the undersigned authority, certify that
18   JEFFREY GENNARELLI, CORPORATE REPRESENTATIVE OF MUTUAL OF
     OMAHA MORTGAGE, INC., personally appeared before me and was
19   duly sworn.

20               WITNESS my hand and official seal this 1st day of
     June, 2023.
21                                             MELANIE KEEFE
                                          Commission # HH 055410
                                          Expires December 9, 2024
                                          Bonded Thru Budget Notary Services
22               _s/ Melanie Keefe_____
                 Melanie Keefe, FPR
23               Notary Public
                 State of Florida
24               My Commission No.:  HH055410
                 Expires:  December 9, 2024

25

─────────REGENCY REPORTING SERVICE, INC. (813)224-0224─────────

## $

**$18** [1] - 127:3
**$19** [1] - 132:1
**$20,000** [2] - 32:7, 32:8
**$25** [1] - 191:15
**$250,000** [1] - 78:17
**$299,653,000** [1] - 225:6
**$4,200** [1] - 32:14
**$50,000** [2] - 29:5, 29:20
**$500,000** [5] - 64:15, 66:7, 67:21, 69:10, 78:3
**$700** [1] - 159:19
**$750,000** [6] - 57:2, 64:17, 64:19, 65:6, 65:19, 76:20

## '

**'19** [3] - 137:11, 158:5, 159:12
**'20** [3] - 158:5, 192:8, 205:7
**'21** [6] - 158:6, 159:12, 192:8, 205:7, 206:5
**'22** [10] - 23:19, 158:6, 161:10, 181:7, 187:11, 194:20, 201:4, 204:13, 205:7, 206:5
**'Itemize** [1] - 37:6

## 1

**1** [70] - 4:2, 6:12, 6:15, 6:16, 6:22, 11:3, 16:8, 17:9, 21:2, 25:19, 25:20, 25:22, 27:15, 27:22, 29:13, 29:14, 30:2, 30:3, 30:17, 30:25, 31:1, 31:3, 31:16, 33:21, 34:7, 34:10, 34:11, 34:19, 35:23, 36:23, 36:24, 37:5, 37:11, 37:22, 39:16, 40:24, 40:25, 41:2, 41:11, 41:16, 42:4, 43:9, 43:15, 47:9, 47:14, 54:13, 55:2, 55:3, 55:4, 55:15, 55:21, 60:12, 60:25, 72:15, 73:10, 73:23, 74:5, 74:11, 74:15, 74:19,

74:23, 136:11, 143:12, 161:14, 168:3, 168:8, 208:4, 255:4
**1,723,961.89** [1] - 161:4
**1.1** [1] - 193:23
**1.7** [1] - 163:18
**1/30/19** [1] - 225:5
**10** [19] - 4:16, 37:5, 37:21, 133:20, 134:1, 135:13, 136:9, 137:1, 138:3, 138:15, 141:19, 143:6, 143:10, 144:18, 144:20, 149:17, 149:21, 152:8, 171:3
**100** [1] - 2:5
**100942** [1] - 138:4
**101** [3] - 1:18, 2:6, 2:13
**106** [1] - 228:9
**1094** [1] - 207:5
**10942** [3] - 207:6, 219:19, 220:10
**10964** [1] - 144:12
**10th** [1] - 238:19
**11** [5] - 4:4, 4:17, 159:5, 159:6, 159:8
**112** [1] - 57:19
**1120** [2] - 2:2, 255:7
**114** [2] - 145:12, 154:6
**114,750,394** [1] - 145:7
**115** [3] - 140:16, 141:9, 154:6
**115,699,671** [1] - 145:12
**115,699,761** [1] - 139:22
**12** [13] - 4:19, 6:22, 60:14, 172:10, 173:17, 179:1, 179:8, 179:23, 197:14, 198:11, 198:19, 199:2, 199:17
**12-month** [1] - 173:19
**120** [1] - 32:9
**124** [1] - 4:10
**13** [6] - 4:20, 60:9, 61:12, 199:24, 200:1, 200:2
**136** [2] - 4:12, 4:14
**14** [6] - 4:21, 202:13, 202:14, 202:15, 202:24, 223:1
**144** [1] - 4:16
**14667** [4] - 179:14,

179:17, 184:19, 194:12
**14668** [1] - 186:9
**14669** [1] - 193:17
**1467** [1] - 179:9
**14676** [1] - 200:7
**15** [10] - 4:21, 171:3, 213:8, 216:5, 219:5, 228:5, 232:24, 232:25, 233:16, 234:8
**159** [1] - 4:17
**15th** [1] - 214:4
**16** [7] - 4:4, 4:7, 4:22, 84:23, 235:7, 235:8, 247:13
**17** [6] - 4:23, 127:3, 250:2, 250:5, 250:18, 251:2
**17280004366** [1] - 222:20
**1728004368** [1] - 225:5
**179** [1] - 4:19
**18** [19] - 30:4, 69:22, 70:4, 72:10, 72:23, 125:19, 126:23, 161:9, 167:20, 171:4, 171:17, 172:4, 172:7, 172:9, 172:23, 174:5, 188:22, 203:25, 204:12
**18-month** [2] - 29:24, 170:22
**1800** [1] - 2:10
**182** [1] - 228:9
**199** [1] - 4:20
**1st** [2] - 180:1, 257:20

## 2

**2** [38] - 4:4, 11:7, 11:8, 11:9, 36:25, 37:3, 37:16, 37:17, 39:15, 40:9, 54:24, 55:1, 55:4, 55:15, 55:16, 55:18, 55:25, 56:6, 61:1, 71:12, 72:5, 72:7, 72:14, 73:11, 73:24, 74:16, 74:19, 75:1, 90:12, 91:3, 92:12, 125:1, 160:1, 161:3, 167:17, 236:6
**2,569,833** [1] - 223:1
**2,716,040** [1] - 160:23
**2.2** [1] - 193:24
**20** [4] - 7:24, 8:5, 62:6, 127:18

**20,000** [1] - 32:19
**20-some** [2] - 49:13, 170:19
**20036** [2] - 2:3, 255:8
**201** [1] - 255:1
**2018** [5] - 42:18, 101:22, 101:23, 139:6, 228:10
**2019** [32] - 101:24, 129:16, 130:6, 130:8, 138:12, 138:18, 139:9, 140:17, 144:25, 145:3, 145:11, 145:16, 147:22, 152:5, 154:17, 155:11, 155:14, 155:15, 161:17, 161:21, 163:12, 163:25, 164:10, 164:17, 166:25, 167:9, 205:5, 205:7, 206:2, 208:6, 223:7, 224:6
**202** [1] - 4:21
**2020** [18] - 161:17, 163:12, 163:23, 164:3, 164:9, 164:17, 164:21, 164:22, 167:10, 177:12, 178:16, 183:10, 192:4, 200:22, 205:5, 206:5, 208:6, 223:7
**2021** [12] - 4:19, 159:14, 161:17, 164:6, 167:11, 175:20, 177:15, 178:17, 183:10, 205:5, 208:6, 223:8
**2022** [37] - 4:19, 4:20, 84:23, 129:16, 159:11, 161:10, 161:18, 168:3, 168:8, 168:14, 168:18, 169:15, 169:20, 169:21, 170:9, 170:13, 170:15, 179:23, 180:13, 180:23, 181:4, 185:21, 186:17, 187:15, 192:25, 197:17, 197:20, 199:18, 200:9, 200:16, 200:21, 205:5, 208:7, 213:8, 216:5, 223:8
**2023** [16] - 1:16, 4:21, 37:5, 37:22, 161:11,

167:25, 168:3, 177:13, 177:16, 180:24, 219:7, 238:19, 255:4, 255:15, 256:6, 257:20
**2024** [2] - 4:21, 257:24
**209** [1] - 230:7
**20th** [2] - 2:2, 255:7
**21** [2] - 200:8, 200:16
**219** [1] - 4:21
**22** [1] - 243:22
**22nd** [1] - 2:5
**235** [1] - 4:22
**24** [3] - 139:1, 172:10, 238:18
**246** [1] - 192:19
**25** [9] - 11:6, 130:17, 134:23, 138:5, 138:7, 191:15, 244:22, 255:15, 256:6
**250** [2] - 4:23, 66:8
**250,000** [1] - 64:16
**254** [1] - 257:7
**255** [1] - 3:3
**256** [1] - 3:4
**257** [1] - 3:3
**25th** [1] - 167:25
**26** [2] - 17:5, 33:13
**27** [6] - 19:24, 20:12, 21:14, 33:17, 44:1, 44:2
**28** [5] - 19:23, 20:2, 20:19, 20:22, 63:17
**2nd** [1] - 233:1

## 3

**3** [10] - 4:4, 16:1, 16:3, 16:16, 20:24, 55:4, 69:4, 149:7, 160:2, 160:13
**3,232,144** [1] - 163:12
**3.2** [5] - 184:12, 185:3, 185:8, 192:17, 199:4
**3.2k** [2] - 184:12, 184:22
**30** [6] - 7:24, 8:5, 52:9, 52:11, 68:2, 188:15
**30(b)(6** [1] - 4:3
**30-year** [1] - 177:20
**30th** [3] - 162:9, 162:10
**31** [6] - 4:18, 138:18, 144:25, 159:11, 161:10, 168:3
**327** [1] - 242:1
**33,000** [1] - 202:5

**334** [1] - 242:12
**33602** [3] - 1:19, 2:14, 255:2
**342** [4] - 242:16, 243:9, 246:5, 246:11
**35** [1] - 4:9
**353** [1] - 185:12
**36** [3] - 162:16, 193:3, 193:12
**3700** [2] - 1:19, 2:13
**397** [1] - 231:24

### 4

**4** [26] - 4:7, 16:20, 16:21, 17:14, 44:1, 44:2, 53:21, 53:24, 54:8, 54:13, 54:18, 54:25, 56:5, 56:6, 56:14, 63:16, 141:3, 205:2, 208:3, 208:13, 208:17, 208:24, 221:15, 221:16, 223:5, 224:4
**4.4** [3] - 55:12, 56:17, 161:6
**40** [5] - 127:17, 149:14, 149:16, 162:15, 162:22
**400,000** [1] - 163:18
**401(k** [1] - 249:22
**406** [5] - 247:10, 247:13, 247:15, 247:17, 248:10
**406,810** [1] - 165:13
**42** [4] - 162:13, 162:19, 162:22, 163:5
**43** [2] - 162:7, 193:8
**439,000** [2] - 192:16, 199:4
**45** [1] - 195:5
**452** [2] - 248:16
**4:53** [2] - 1:17, 254:13

### 5

**5** [17] - 3:2, 4:9, 16:7, 16:12, 16:14, 17:8, 31:14, 33:11, 35:18, 35:19, 35:21, 35:24, 36:6, 36:11, 136:8, 211:6, 257:7
**50** [1] - 142:5
**53** [4] - 130:8, 161:21, 161:22, 163:20
**530** [2] - 130:3, 155:7
**53072** [1] - 2:16
**53202** [1] - 2:11

### 55

**55** [9] - 188:11, 235:11, 236:23, 237:6, 237:17, 238:1, 238:12, 238:20, 238:21

### 6

**6** [7] - 4:2, 4:10, 19:20, 33:12, 84:10, 84:12, 84:14
**6(a** [8] - 213:5, 217:19, 222:4, 223:14, 226:17, 226:21, 227:10
**6(b** [6] - 215:25, 217:19, 226:17, 226:24, 227:10, 227:11
**60** [1] - 68:2
**600,000** [1] - 163:12
**60148** [1] - 2:6
**619** [1] - 192:20
**65** [8] - 238:14, 238:15, 238:22, 241:12, 246:18, 246:20, 246:23, 247:6
**67** [1] - 239:8

### 7

**7** [40] - 4:10, 124:18, 124:19, 124:20, 124:22, 125:5, 125:11, 125:13, 125:23, 125:25, 128:12, 128:19, 129:3, 129:5, 132:14, 133:13, 133:22, 134:10, 135:7, 135:17, 136:12, 137:9, 137:22, 138:7, 142:25, 145:10, 146:2, 148:12, 148:19, 148:21, 148:22, 159:23, 163:3, 168:2, 181:21, 182:1, 182:2, 182:5, 184:8, 203:12
**705** [1] - 185:13
**71** [1] - 85:17
**725** [2] - 2:3, 255:7
**73** [2] - 193:3, 193:9
**74** [1] - 238:16
**750,000** [1] - 71:8
**76** [1] - 185:22

### 8

**8** [4] - 4:12, 136:4, 136:5, 136:6
**80** [1] - 241:24
**800** [3] - 19:22, 79:16, 205:23
**813-224-0224** [1] - 255:3
**833** [1] - 2:10
**836** [10] - 33:13, 33:19, 33:20, 34:10, 34:16, 35:4, 36:18, 37:15, 37:24, 38:6
**84** [1] - 4:10
**875** [1] - 255:2
**89** [1] - 185:23
**8:22-cv-01660-TPB-JSS** [2] - 1:2, 256:5

### 9

**9** [21] - 4:14, 60:9, 60:14, 61:12, 136:20, 136:21, 137:20, 137:23, 206:22, 207:5, 207:13, 212:21, 220:5, 220:16, 220:17, 221:6, 222:18, 223:5, 226:15, 226:25, 257:24
**90** [1] - 195:5
**92** [1] - 160:5
**97** [1] - 160:6
**9:17** [1] - 1:17

### A

**a.m** [1] - 1:17
**abandoning** [2] - 232:23, 233:16
**ability** [3] - 96:13, 198:5, 212:14
**able** [42] - 15:20, 23:10, 25:24, 26:23, 29:12, 38:7, 51:8, 57:7, 59:24, 59:25, 60:2, 122:24, 132:21, 134:9, 134:21, 138:6, 139:13, 139:19, 140:11, 141:6, 141:14, 141:18, 142:8, 143:18, 154:11, 155:4, 155:23, 156:15,

177:1, 179:2, 196:6, 201:10, 208:22, 211:14, 212:16, 215:14, 218:22, 223:22, 223:24, 238:22, 251:21
**above-styled** [1] - 255:15
**aboveboard** [2] - 93:12, 97:25
**absent** [1] - 52:11
**absolute** [4] - 26:15, 83:17, 203:10, 203:18
**absolutely** [3] - 83:14, 93:3, 163:25
**Absolutely** [3] - 83:15, 88:3, 141:5
**access** [8] - 13:23, 22:5, 27:13, 134:3, 134:21, 142:24, 229:1, 237:22
**accessible** [1] - 217:13
**according** [2] - 59:24, 69:6
**Account** [1] - 232:10
**account** [4] - 160:16, 170:1, 232:8
**accountant** [3] - 145:18, 155:8, 159:17
**accountants** [1] - 156:7
**accounted** [1] - 214:19
**accounting** [4] - 152:22, 157:4, 178:9, 226:4
**accounts** [2] - 51:6, 51:19
**Accrual** [5] - 219:12, 220:4, 221:7, 225:10, 225:14
**accrual** [2] - 152:24, 224:15
**accruals** [3] - 145:18, 152:24, 154:4
**accumulative** [1] - 160:10
**accuracy** [1] - 256:21
**accurate** [8] - 19:1, 23:13, 140:21, 148:8, 148:9, 204:10, 217:2, 248:2
**acquired** [2] - 102:20, 104:13
**acquisition** [5] - 101:21, 102:2, 102:4, 102:13,

104:12, 113:2, 165:10, 191:2
**act** [1] - 93:1
**action** [2] - 257:10, 257:11
**activity** [4] - 66:1, 66:8, 104:21, 206:21
**actual** [8] - 10:12, 39:17, 74:12, 135:9, 207:10, 213:15, 226:6, 250:16
**add** [3] - 207:22, 211:13, 225:9
**added** [1] - 145:22
**adding** [1] - 224:12
**addition** [6] - 5:22, 135:14, 212:8, 219:8, 219:10, 223:14
**Additional** [1] - 244:9
**additional** [7] - 143:5, 143:24, 169:6, 195:4, 239:13, 256:8, 256:9
**address** [1] - 41:23
**addresses** [1] - 24:11
**adhered** [1] - 229:25
**advance** [1] - 215:19
**advanced** [3] - 20:20, 63:18, 63:24
**advantage** [5] - 62:23, 204:23, 238:5, 244:25, 245:12
**adverse** [1] - 192:21
**advertising** [3] - 186:25, 187:6, 188:8
**advice** [1] - 216:21
**affect** [1] - 183:8
**afraid** [1] - 159:16
**afternoon** [1] - 181:6
**age** [1] - 245:19
**agency** [2] - 97:2, 97:5
**aggregate** [1] - 158:15
**ago** [2] - 12:20, 98:2
**agree** [23] - 50:3, 72:14, 83:13, 83:16, 85:22, 91:1, 107:7, 107:18, 108:13, 116:25, 117:21, 163:23, 164:22, 178:20, 189:10, 192:20, 193:7, 193:13, 194:20, 219:3, 231:3, 232:3, 232:9
**agreed** [3] - 6:10, 58:7, 102:13
**Agreement** [1] - 232:10
**agreement** [8] - 43:5,

3

66:12, 69:8, 69:17, 70:25, 101:2, 241:6, 243:24
**agreements** [4] - 43:10, 100:9, 100:24, 102:8
**agrees** [1] - 194:24
**ahead** [18] - 12:13, 14:21, 22:20, 23:1, 24:7, 27:19, 35:13, 46:21, 61:15, 67:9, 80:10, 86:10, 92:25, 96:20, 99:7, 100:6, 251:12, 252:1
**aided** [2] - 212:9, 212:13
**aids** [1] - 223:25
**air** [2] - 146:14, 147:18
**Alert** [1] - 59:11
**aligned** [2] - 167:17, 222:22
**all-inclusive** [1] - 24:18
**allegation** [1] - 44:9
**allegations** [1] - 217:22
**alleged** [7] - 37:4, 37:20, 47:17, 55:6, 66:17, 233:20, 240:2
**allegedly** [2] - 69:5, 72:16
**alleges** [1] - 77:8
**alleging** [1] - 141:3
**Allen** [4] - 75:16, 75:19, 75:21, 76:7
**allow** [9] - 14:4, 49:18, 102:14, 149:6, 215:20, 217:7, 224:2, 226:16, 249:22
**allowed** [8] - 70:21, 77:7, 88:11, 92:23, 92:25, 178:3, 212:7, 216:23
**allowing** [1] - 209:17
**allows** [1] - 223:9
**almost** [2] - 132:1, 236:3
**alone** [2] - 104:6, 104:9
**ALSO** [1] - 2:19
**amenable** [3] - 144:7, 149:8, 150:4
**Amended** [4] - 4:2, 4:5, 4:7, 16:25
**amended** [2] - 37:5, 37:22
**AMENDMENT** [1] - 256:11
**amendments** [1] -

256:21
**America** [1] - 93:2
**amount** [23] - 32:21, 57:16, 59:20, 68:14, 71:4, 78:14, 78:16, 91:8, 98:7, 140:2, 145:11, 161:3, 162:5, 164:16, 171:5, 176:24, 193:8, 211:9, 219:12, 226:7, 247:4, 252:9, 252:13
**amounts** [2] - 67:2, 161:17
**analogous** [1] - 225:10
**analogy** [2] - 18:24, 51:12
**analysis** [30] - 29:4, 43:8, 43:19, 44:18, 46:17, 48:3, 48:8, 48:19, 49:21, 51:3, 51:9, 61:2, 90:16, 93:7, 106:3, 106:6, 106:16, 112:17, 119:10, 127:21, 129:10, 130:19, 132:12, 132:18, 137:2, 137:21, 139:13, 171:16, 174:1, 200:20
**analyze** [2] - 24:24, 216:9
**analyzing** [4] - 13:3, 13:5, 13:12, 13:13
**anew** [1] - 104:17
**angry** [1] - 85:22
**announcement** [5] - 79:22, 81:11, 108:24, 109:12, 109:20
**announcements** [1] - 80:3
**announces** [1] - 123:23
**annual** [19] - 14:9, 205:3, 205:7, 206:1, 206:4, 206:25, 207:14, 207:15, 207:19, 207:23, 208:5, 208:24, 209:9, 221:16, 223:6, 223:13, 224:3, 224:20, 224:24
**anomalous** [1] - 164:22
**anomaly** [6] - 164:6, 165:1, 166:17, 166:21, 204:15,

204:18
**answer** [39] - 5:19, 6:5, 12:13, 18:11, 22:20, 23:25, 24:7, 26:23, 27:4, 28:17, 28:18, 35:13, 36:16, 38:13, 46:21, 51:13, 57:6, 57:14, 59:25, 60:8, 61:17, 61:22, 62:11, 62:14, 70:3, 74:10, 77:18, 77:24, 86:9, 109:5, 117:14, 158:19, 204:17, 205:16, 205:24, 208:18, 217:17, 248:12
**answered** [8] - 35:10, 42:23, 58:20, 62:18, 83:23, 120:6, 120:11, 233:24
**answering** [5] - 47:12, 73:20, 246:13, 253:14, 253:17
**answers** [2] - 5:23
**anytime** [1] - 238:4
**anyway** [2] - 212:7, 248:22
**apologies** [1] - 90:20
**apologize** [1] - 112:6
**apology** [1] - 35:10
**appealing** [1] - 245:2
**appear** [4] - 132:8, 228:16, 231:22, 240:11
**APPEARANCES** [1] - 2:1
**appeared** [1] - 257:18
**apples** [4] - 162:19, 163:4, 163:5
**applicable** [2] - 106:16, 216:1
**Application** [1] - 242:13
**application** [6] - 50:18, 50:22, 52:5, 62:2, 62:3, 232:8
**applied** [1] - 153:1
**applies** [1] - 245:5
**Appraisal** [12] - 242:20, 242:23, 242:24, 243:4, 243:7, 243:22, 243:25, 244:16, 244:18, 244:21, 245:5, 246:2
**appraisal** [2] - 245:1, 245:21
**appreciate** [2] - 159:22, 222:9
**approach** [7] - 125:20,

127:1, 127:2, 131:5, 131:25, 132:2, 169:5
**approached** [1] - 98:18
**approaching** [1] - 127:3
**approves** [1] - 86:12
**April** [8] - 162:10, 162:17, 180:24, 201:25, 213:8, 214:4, 214:5, 214:7
**arbitrator** [1] - 42:17
**area** [3] - 188:18, 249:18
**argue** [2] - 39:21, 216:18
**arguing** [1] - 81:21
**argument** [1] - 88:6
**arrangements** [1] - 83:1
**arrival** [1] - 165:7
**arrived** [2] - 114:16, 166:9
**articulate** [1] - 196:6
**articulated** [1] - 54:17
**artificially** [1] - 164:1
**aside** [2] - 9:10, 16:17
**askew** [1] - 51:25
**aspect** [1] - 247:2
**aspects** [1] - 217:24
**asserted** [1] - 88:6
**assertion** [4] - 66:3, 100:22, 107:1, 107:6
**assess** [1] - 176:4
**assessed** [1] - 65:16
**assets** [2] - 104:13, 233:5
**assigned** [1] - 108:2
**assist** [1] - 223:12
**assistant** [1] - 188:18
**associate** [2] - 126:15, 247:5
**associated** [19] - 21:3, 54:24, 72:9, 75:3, 125:1, 129:11, 129:19, 160:5, 160:6, 167:4, 170:23, 203:24, 210:19, 211:9, 211:11, 213:19, 224:20, 226:7, 246:5
**associating** [1] - 74:12
**assume** [13] - 6:10, 32:5, 32:6, 32:23, 41:16, 108:23, 112:22, 117:21, 167:18, 168:25, 182:3, 191:14, 228:22

**assumed** [1] - 204:11
**assumes** [2] - 73:24, 204:4
**assuming** [2] - 33:7, 161:10
**assumption** [2] - 110:10, 204:2
**assumptions** [4] - 111:4, 203:11, 204:20, 204:21
**attach** [2] - 19:1, 256:9
**attached** [2] - 181:6, 256:22
**attachment** [3] - 237:8, 237:13, 238:20
**attachments** [1] - 237:15
**attempt** [3] - 26:2, 46:13, 89:15
**attended** [3] - 119:18, 120:5, 121:15
**attendees** [2] - 110:18, 120:10
**attention** [1] - 210:4
**attorney** [18] - 8:21, 22:19, 25:2, 25:4, 25:8, 26:20, 27:3, 27:17, 47:1, 60:11, 128:5, 217:5, 222:7, 222:9, 248:19, 253:12, 257:9
**attorney-client** [6] - 8:21, 27:17, 47:1, 128:5, 217:5, 253:12
**attorneys** [10] - 29:16, 30:5, 30:14, 30:17, 134:25, 194:5, 234:18, 253:11, 257:10
**Attorneys** [2] - 2:7, 2:17
**attract** [1] - 45:17
**attractive** [1] - 174:15
**attributable** [2] - 46:16, 91:23
**attrition** [36] - 104:22, 104:23, 105:8, 105:17, 105:22, 106:1, 106:6, 106:7, 106:8, 106:11, 106:15, 106:19, 106:20, 106:25, 107:5, 107:11, 107:22, 107:24, 108:4, 108:8, 108:13, 108:18, 112:2, 112:10, 112:18, 116:25,

4

117:7, 117:24,
118:5, 123:10,
123:14, 171:7,
171:11, 171:18,
204:6
**audited** [2] - 155:21,
156:5
**Auditors'** [1] - 4:17
**August** [1] - 180:22
**author** [1] - 241:10
**authored** [4] - 230:15,
238:25, 239:16,
242:22
**authority** [1] - 257:17
**authorized** [1] - 257:5
**authors** [2] - 125:22,
125:24
**automated** [1] - 128:8
**available** [7] - 7:20,
34:21, 61:24,
166:18, 228:1,
228:21, 228:22
**average** [12] - 91:11,
121:3, 121:4,
126:22, 160:10,
160:11, 160:13,
160:15, 166:5,
166:7, 167:7
**averaged** [1] - 167:11
**avoid** [3] - 80:18,
80:20, 150:15
**award** [1] - 73:19
**awarded** [2] - 72:13,
72:15
**aware** [30] - 14:17,
23:18, 23:21, 24:8,
24:9, 26:6, 27:6,
27:11, 35:15, 43:7,
58:8, 58:15, 59:21,
59:22, 93:16, 93:19,
93:20, 96:11, 97:1,
97:17, 102:12,
121:22, 124:12,
129:1, 174:23,
176:17, 218:18,
228:20, 230:13

**B**

**B&I** [1] - 225:25
**b)** [2] - 222:5, 223:15
**back-and-forth** [1] -
221:20
**backtrack** [1] - 22:23
**bad** [2] - 39:10, 252:25
**ballpark** [2] - 29:12,
127:16
**bank** [4] - 51:14,
51:15, 51:16, 51:17

**Bank** [2] - 93:2, 102:5
**based** [14] - 41:9,
46:3, 69:24, 70:18,
73:11, 115:21,
204:7, 204:14,
211:10, 247:5,
248:9, 252:16,
252:17, 253:18
**baseline** [1] - 165:24
**Basis** [1] - 134:10
**basis** [25] - 13:13,
13:22, 47:16, 49:20,
49:24, 65:4, 65:13,
65:14, 69:24, 70:10,
70:13, 73:25,
126:21, 130:1,
130:8, 155:11,
155:16, 160:2,
160:12, 162:7,
180:18, 189:4,
211:10, 225:19,
245:16
**Bates** [49] - 19:22,
33:12, 33:15, 33:24,
35:22, 133:25,
134:24, 136:16,
136:22, 137:3,
138:2, 138:4,
138:14, 140:12,
140:13, 144:11,
144:18, 149:22,
159:4, 179:4, 186:9,
194:11, 207:3,
219:14, 219:16,
222:24, 228:9,
229:22, 230:7,
231:14, 231:24,
233:1, 235:11,
236:23, 237:6,
238:15, 241:23,
242:1, 242:12,
243:9, 246:18,
246:20, 247:10,
247:13, 247:17,
248:14, 248:16,
250:3
**BBMC** [21] - 101:16,
101:19, 101:21,
102:1, 102:5,
102:19, 102:20,
103:20, 113:2,
113:17, 113:21,
113:23, 122:4,
122:6, 122:8, 139:7,
191:4, 191:13,
233:1, 233:6
**Beach** [3] - 20:15,
44:8, 226:23
**bearings** [1] - 129:6
**become** [2] - 114:7,

169:1
**becomes** [2] - 170:21,
235:3
**becoming** [1] - 70:5
**behalf** [21] - 6:18,
6:22, 19:5, 24:13,
28:22, 30:23, 31:5,
54:5, 57:8, 60:3,
79:4, 109:15, 137:4,
229:10, 231:6,
236:15, 243:18,
244:19, 245:8,
253:16
**behind** [1] - 226:4
**belief** [2] - 71:1,
190:25
**believes** [2] - 104:21,
240:6
**belonged** [1] - 195:18
**below** [3] - 181:7,
192:24, 256:8
**benefit** [4] - 121:17,
121:22, 167:14,
191:1
**benefited** [2] - 165:8,
205:1
**Bernie** [16] - 125:5,
125:6, 126:2,
135:22, 146:10,
147:7, 152:21,
153:4, 153:8,
153:15, 153:18,
154:2, 157:6,
199:19, 200:9,
200:10
**best** [3] - 15:10,
112:14, 125:17
**better** [12] - 15:25,
83:24, 94:3, 94:10,
109:8, 110:1, 168:8,
168:11, 168:12,
168:13, 177:6,
191:22
**between** [27] - 13:16,
14:18, 15:11, 15:21,
37:3, 37:9, 37:20,
44:25, 70:10, 93:25,
94:14, 107:11,
118:5, 119:2,
122:14, 122:24,
123:10, 123:15,
126:7, 154:6,
162:10, 182:2,
183:23, 197:15,
234:20, 234:23,
243:24
**beyond** [4] - 57:11,
57:12, 86:6, 218:24
**BI** [1] - 175:6
**big** [5] - 103:18,

126:18, 190:24,
198:1, 206:20
**bigger** [1] - 204:22
**billing** [1] - 211:2
**bills** [2] - 236:6, 236:7
**binding** [1] - 101:7
**bio** [2] - 96:2, 199:13
**bit** [8] - 71:16, 71:18,
94:3, 169:9, 171:22,
190:23, 218:20,
231:13
**Blake** [1] - 244:18
**BLANCO** [1] - 2:12
**blank** [3] - 241:21,
242:5, 242:13
**block** [1] - 85:3
**blue** [2] - 230:6,
241:19
**bold** [3] - 184:11,
184:18, 192:11
**bonus** [1] - 69:25
**bonuses** [2] - 71:2,
71:4
**book** [1] - 49:15
**booked** [1] - 227:6
**booking** [1] - 49:11
**books** [1] - 22:1
**boots** [1] - 215:8
**borders** [1] - 81:17
**Borrower** [2] - 222:20,
222:21
**borrower** [25] - 36:6,
36:14, 38:5, 44:25,
45:12, 45:17, 45:18,
45:19, 45:21, 48:14,
48:20, 49:2, 50:1,
50:3, 52:5, 55:7,
57:9, 59:15, 62:19,
74:2, 225:5, 231:3,
239:13, 245:16
**borrower's** [2] - 50:9,
224:16
**borrower-by-
borrower** [1] -
245:16
**borrowers** [12] - 45:8,
48:6, 48:9, 48:16,
49:25, 55:11, 62:16,
100:14, 211:9,
211:15, 252:12
**borrowers'** [1] - 252:9
**bottom** [10] - 17:19,
31:14, 84:15,
115:25, 149:24,
160:17, 162:12,
193:20, 200:25,
222:25
**Boulevard** [3] - 1:18,
2:13, 255:1
**Boy** [1] - 135:24

**BPS** [14] - 129:23,
129:25, 133:1,
154:23, 158:7,
158:19, 159:10,
159:14, 160:14,
161:17, 161:21,
181:12, 181:20,
182:1
**branch** [153] - 12:2,
12:18, 12:24, 13:1,
13:10, 13:14, 13:20,
14:18, 15:1, 49:3,
55:23, 66:23, 67:5,
68:7, 68:9, 69:8,
69:9, 69:11, 72:10,
73:14, 74:3, 78:1,
78:8, 80:23, 83:13,
83:17, 85:1, 85:9,
87:19, 89:15, 89:22,
89:23, 89:25, 90:1,
90:9, 91:7, 92:1,
95:17, 95:18, 97:18,
98:3, 98:5, 99:25,
102:25, 103:4,
103:8, 103:15,
103:21, 104:2,
104:5, 104:6,
104:10, 104:16,
104:20, 104:25,
105:7, 105:12,
105:13, 105:23,
112:21, 112:23,
113:7, 113:10,
113:23, 114:14,
116:7, 121:23,
122:3, 123:1, 123:3,
123:12, 123:23,
129:11, 129:12,
130:20, 130:21,
130:22, 131:2,
131:22, 132:9,
139:17, 144:25,
145:22, 149:13,
158:16, 160:22,
162:11, 163:15,
163:17, 163:21,
169:12, 169:24,
170:3, 170:5, 171:7,
171:9, 171:11,
171:18, 171:22,
171:23, 171:24,
173:7, 173:10,
173:20, 173:21,
175:5, 175:9,
175:14, 175:17,
175:18, 175:23,
176:2, 195:12,
196:25, 197:25,
198:4, 200:21,
200:24, 201:3,
201:6, 201:13,

201:17, 202:1,
202:6, 202:9,
202:18, 206:6,
210:23, 213:7,
214:3, 214:7, 214:8,
214:9, 214:11,
214:14, 214:17,
214:21, 215:2,
215:7, 216:1, 216:4,
216:5, 216:7, 219:9,
226:23, 227:7,
227:8, 227:22
**Branch** [4] - 159:23,
163:10, 164:12,
165:13
**branch's** [1] - 198:4
**branch-level** [1] -
175:9
**branches** [83] - 11:19,
11:21, 13:4, 13:5,
20:14, 20:17, 23:20,
32:14, 44:8, 44:10,
44:12, 44:17, 54:25,
55:19, 56:1, 56:9,
63:21, 73:7, 73:11,
74:1, 75:3, 75:6,
75:8, 75:10, 76:2,
76:8, 76:16, 76:20,
83:6, 95:8, 97:21,
99:17, 99:22,
103:10, 103:18,
103:21, 103:22,
104:16, 105:16,
112:3, 115:20,
124:24, 125:2,
125:18, 129:20,
148:8, 149:15,
160:12, 167:3,
167:4, 167:19,
169:14, 169:19,
170:24, 171:2,
171:21, 171:25,
172:19, 172:20,
174:25, 175:12,
178:11, 178:16,
178:22, 182:18,
194:9, 194:10,
197:2, 197:7, 197:9,
197:13, 197:19,
197:21, 198:8,
198:18, 199:6,
199:11, 226:25,
227:14, 227:16
**Branches** [2] - 4:11,
129:8
**brand** [6] - 38:23,
39:17, 39:18, 57:19,
57:22
**breach** [1] - 26:16
**breaches** [1] - 66:12

**breadth** [1] - 103:19
**break** [16] - 6:1, 6:4,
6:6, 28:13, 71:22,
71:24, 96:2, 96:6,
132:22, 133:16,
133:19, 134:2,
142:14, 142:23,
199:13, 254:8
**breaks** [3] - 71:20,
155:1, 213:14
**breathe** [1] - 80:13
**Brian** [21] - 15:13,
83:25, 84:5, 89:6,
93:21, 93:23, 94:1,
94:8, 94:20, 113:12,
113:13, 113:24,
114:4, 118:10,
118:11, 189:25,
190:15, 200:8,
200:10, 200:16,
202:10
**Bridgeview** [3] -
102:5, 103:20, 164:2
**bring** [21] - 67:19,
67:22, 68:21, 86:17,
116:17, 120:25,
123:4, 165:4,
167:12, 187:5,
205:20, 210:3,
210:15, 211:18,
211:22, 212:7,
212:23, 216:16,
216:20, 216:24,
245:21
**bringing** [3] - 119:15,
150:15, 212:12
**brings** [3] - 166:9,
166:22, 210:14
**Brokerage** [1] - 232:9
**brought** [3] - 18:13,
93:21, 120:24
**Bucket** [67] - 20:24,
21:2, 25:19, 25:20,
25:22, 29:13, 29:14,
30:2, 30:3, 30:17,
30:25, 31:1, 31:3,
31:16, 34:7, 34:10,
34:11, 35:23, 39:15,
39:16, 40:24, 40:25,
41:2, 41:11, 41:16,
42:4, 43:9, 43:15,
54:13, 54:24, 55:1,
55:2, 55:3, 55:4,
55:15, 55:16, 55:18,
55:21, 55:25, 56:6,
69:4, 71:12, 72:5,
72:7, 72:14, 72:15,
73:10, 73:11, 73:23,
73:24, 74:5, 74:11,
74:15, 74:16, 74:19,

74:23, 75:1, 91:3,
92:12, 125:1, 161:3,
167:17
**bucket** [12] - 20:25,
21:3, 21:5, 21:10,
21:13, 21:15, 21:22,
25:15, 43:23, 43:24,
196:13, 196:17
**buckets** [1] - 125:1
**budget** [6] - 185:7,
185:8, 185:9,
192:21, 202:17,
202:18
**budgeting** [2] -
168:19, 202:23
**build** [2] - 78:1,
104:10
**building** [1] - 68:5
**built** [5] - 58:12,
68:12, 88:2, 129:11,
129:17
**bullet** [9] - 17:19,
18:2, 19:16, 19:24,
19:25, 20:3, 20:8,
31:13, 63:17
**burden** [1] - 141:3
**Bureau** [1] - 228:10
**business** [23] - 39:11,
58:3, 83:11, 85:4,
85:8, 86:24, 115:9,
115:18, 116:22,
117:3, 117:18,
118:2, 175:4,
176:22, 176:24,
178:10, 181:10,
182:10, 183:7,
187:4, 192:13,
212:18, 244:17
**Business** [1] - 85:3
**but..** [4] - 85:11,
118:3, 158:13,
212:18
**buyer** [4] - 235:15,
235:17, 235:25,
236:9
**Buyer** [2] - 4:22,
235:11
**BY** [2] - 1:20, 5:8

## C

**cake** [1] - 93:13
**calculate** [18] - 16:9,
17:12, 23:10, 26:3,
27:14, 27:22, 34:4,
34:15, 37:7, 132:23,
142:24, 155:5,
155:9, 158:19,
164:25, 170:23,

210:6, 225:15
**calculated** [7] - 60:13,
130:5, 132:20,
134:10, 135:7,
141:4, 149:25
**calculating** [1] -
251:17
**calculation** [14] - 28:1,
38:22, 39:5, 41:2,
41:4, 47:16, 48:10,
135:9, 143:7,
143:18, 155:12,
155:16, 203:25,
204:13
**calculations** [4] - 8:9,
124:23, 143:1,
153:14
**calculator** [1] - 163:2
**cannot** [1] - 148:7
**capacity** [1] - 6:18
**capital** [2] - 189:2,
189:5
**caps** [4] - 184:10,
184:18, 192:11,
193:20
**capture** [3] - 130:25,
177:1, 182:22
**captured** [1] - 240:24
**care** [1] - 153:19
**career** [3] - 103:14,
103:17, 115:6
**careful** [1] - 236:7
**CAROLINA** [1] - 2:12
**Carrie** [1] - 2:19
**CARROLL** [4] - 2:4,
96:8, 146:19, 157:22
**carry** [1] - 23:24
**carve** [1] - 92:11
**carved** [1] - 91:2
**CASE** [4] - 1:2, 255:9,
256:3, 256:5
**case** [37] - 6:19, 8:23,
15:16, 17:24, 25:8,
25:11, 26:24, 31:13,
35:1, 36:19, 38:17,
41:13, 45:21, 49:6,
61:23, 68:6, 77:25,
78:18, 106:4, 110:2,
110:12, 111:5,
128:1, 130:18,
154:9, 156:10,
171:2, 217:22,
217:24, 218:19,
222:9, 222:16,
228:7, 229:22,
252:19, 253:20
**cases** [2] - 18:13,
103:12
**cash** [2] - 239:15,
242:3

**cash-out** [1] - 242:3
**categories** [4] - 20:6,
20:7, 217:12, 218:23
**Category** [4] - 27:15,
27:22, 33:21, 90:12
**category** [8] - 19:7,
54:16, 61:8, 63:13,
71:23, 217:14,
236:17, 236:19
**CATHERINE** [1] - 2:15
**caught** [2] - 58:7, 58:8
**causation** [19] - 43:14,
43:17, 43:21, 44:11,
44:13, 44:16, 46:10,
46:14, 46:23, 47:6,
48:5, 48:8, 48:13,
49:16, 49:19, 49:20,
51:21, 51:25, 56:25
**caused** [22] - 20:13,
26:15, 44:7, 44:10,
44:11, 44:12, 48:20,
49:25, 50:14, 60:24,
63:20, 65:14, 65:15,
66:23, 75:8, 75:10,
76:1, 76:20, 83:6,
92:19, 107:3, 170:20
**causes** [1] - 92:4
**causing** [1] - 107:1
**certain** [18] - 9:2,
13:14, 13:19, 13:20,
71:2, 89:10, 109:7,
203:10, 204:15,
205:18, 206:6,
212:23, 227:18,
227:21, 237:15,
248:24, 248:25
**certainly** [15] - 42:9,
56:19, 78:2, 92:4,
97:25, 100:6, 100:7,
105:25, 115:17,
135:22, 199:10,
227:15, 227:16,
244:1
**certainty** [3] - 203:8,
203:18, 203:20
**CERTIFICATE** [2] -
257:1, 257:14
**Certificate** [1] - 3:5
**certify** [3] - 257:5,
257:9, 257:17
**cetera** [9] - 5:24,
97:25, 169:10,
189:7, 190:7, 191:17
**CFO** [6] - 179:21,
181:6, 186:14,
194:5, 194:19,
197:15
**CFPB** [2] - 228:17,
229:1
**challenged** [1] - 42:17

6

chance [1] - 22:14
change [4] - 52:22,
53:9, 81:25, 118:4
changes [2] - 184:7,
255:17
changing [1] - 237:20
chaos [1] - 92:1
characterization [1] -
151:11
charge [3] - 249:19,
249:20, 249:21
check [8] - 94:12,
94:21, 152:9, 163:3,
167:18, 235:21,
239:15
checkbox [1] - 236:3
checklist [4] - 239:17,
240:6, 240:10,
240:11
checklists [1] - 240:4
checks [4] - 57:2,
100:12, 236:2, 236:4
Chiado [1] - 244:18
chief [2] - 96:19,
123:18
choice [1] - 166:11
choosing [1] - 172:9
chose [3] - 19:2, 35:3,
166:5
chosen [1] - 57:23
Chris [84] - 14:19,
15:3, 43:5, 64:16,
65:24, 65:25, 66:17,
66:19, 66:23, 66:25,
67:18, 77:17, 77:23,
77:24, 78:12, 78:13,
78:20, 81:9, 82:4,
82:10, 82:15, 82:15,
86:11, 86:13, 86:17,
86:22, 87:24, 93:20,
94:20, 94:22, 99:19,
100:18, 108:24,
110:13, 111:18,
111:20, 112:24,
113:1, 113:4,
113:12, 113:14,
113:19, 113:24,
114:1, 116:10,
118:7, 118:13,
118:17, 118:21,
121:18, 121:22,
121:23, 122:2,
122:10, 122:14,
122:15, 122:25,
123:7, 123:18,
124:5, 205:5, 207:1,
208:6, 208:10,
221:17, 221:18,
223:7, 224:22,
224:23, 224:24,

225:2
CHRIS [2] - 2:1, 255:6
Christopher [1] -
225:4
circuit [1] - 231:13
circumstance [1] -
72:10
circumstances [1] -
70:4
cite [1] - 110:13
Civil [1] - 17:5
claim [13] - 27:10,
54:1, 97:5, 198:17,
232:23, 246:22,
251:14, 252:16,
252:17, 253:1,
253:3, 253:18,
253:23
claiming [5] - 61:6,
180:2, 246:6,
246:11, 254:2
claims [5] - 22:15,
64:13, 211:10,
228:2, 234:7
clarify [2] - 19:15,
54:16
clarity [1] - 153:6
classic [1] - 252:20
clear [18] - 9:14,
54:15, 58:22, 60:2,
81:3, 81:6, 107:4,
119:17, 120:17,
120:23, 132:19,
143:10, 147:9,
151:3, 182:16,
213:4, 244:3
clever [1] - 175:6
client [8] - 8:21, 27:17,
47:1, 128:5, 211:3,
217:5, 253:12,
255:16
clients [1] - 66:7
close [30] - 20:14,
44:8, 44:10, 44:12,
45:9, 45:12, 48:7,
49:17, 50:1, 50:3,
56:2, 68:4, 68:13,
75:9, 75:11, 76:2,
76:8, 76:17, 76:21,
83:7, 96:14, 97:11,
97:15, 122:18,
175:22, 185:15,
227:22, 239:16,
251:21
closed [52] - 20:17,
21:8, 21:9, 22:2,
22:5, 22:21, 23:20,
24:16, 24:24, 24:25,
27:23, 29:2, 32:1,
36:3, 38:25, 40:2,

40:8, 41:16, 45:5,
52:8, 55:19, 56:8,
56:13, 59:19, 68:23,
72:21, 73:6, 73:7,
73:10, 74:13, 74:16,
74:17, 87:20, 140:5,
140:6, 211:7, 213:7,
213:15, 214:3,
214:8, 214:13,
215:3, 215:13,
215:15, 216:5,
216:13, 226:23,
227:4, 227:8,
227:13, 227:16,
227:19
closely [2] - 73:1,
219:20
closer [2] - 127:17,
191:24
closes [3] - 214:7,
214:11, 214:17
closest [1] - 175:18
closing [15] - 44:17,
54:25, 55:23, 56:9,
73:12, 73:13, 73:25,
75:4, 116:18, 125:2,
170:24, 210:15,
215:8, 215:22,
235:24
closure [2] - 63:21,
215:2
club [2] - 117:16,
117:18
co [6] - 104:10, 116:8,
122:3, 122:6,
122:25, 123:3
co-managed [3] -
116:8, 122:3, 122:6
co-managers [3] -
104:10, 122:25,
123:3
codes [1] - 58:12
coerced [1] - 95:7
Coke [3] - 252:19,
252:23, 252:24
colleagues [1] - 14:24
collect [1] - 31:23
collectively [1] - 28:23
color [1] - 203:1
Columbia [4] - 172:21,
175:21
Column [3] - 160:1,
160:2, 160:13
column [15] - 129:15,
129:18, 129:22,
130:3, 132:24,
135:7, 135:16,
145:3, 154:24,
159:23, 160:5,
163:10, 164:13,

165:12, 225:1
columns [5] - 129:14,
220:5, 220:19,
220:20, 244:7
combined [3] -
141:13, 148:1,
159:18
comfortable [7] -
73:16, 73:20, 74:22,
246:13, 253:10,
253:14, 253:17
coming [8] - 22:22,
32:2, 68:11, 98:13,
109:3, 111:12,
150:17, 167:13
comment [1] - 81:18
comment/
conversation [1] -
93:23
commenting [1] -
125:22
comments [3] - 81:14,
109:18, 181:7
commercially [1] -
238:2
commission [1] -
116:23
Commission [1] -
257:24
commissions [11] -
18:25, 32:14, 68:11,
69:1, 131:7, 131:12,
131:13, 131:18,
131:20, 195:14,
195:25
common [7] - 97:20,
104:6, 104:8,
104:15, 138:11,
152:24, 153:1
communication [1] -
235:22
companies [6] - 45:6,
49:18, 121:6,
183:12, 245:1,
245:21
company [30] - 10:21,
10:23, 11:2, 11:24,
19:12, 24:14, 28:24,
35:6, 50:4, 85:20,
97:15, 97:24, 98:11,
98:15, 99:10,
102:12, 103:23,
104:13, 106:14,
113:12, 113:13,
139:18, 190:6,
190:8, 190:20,
191:1, 191:13,
191:15, 204:19,
245:17
company's [1] -

191:10
companywide [1] -
245:18
comparable [1] -
175:24
compare [3] - 24:20,
162:18, 227:15
compared [3] - 29:2,
193:3, 235:4
comparison [1] - 29:1
compensated [1] -
66:4
compensation [10] -
20:20, 63:18, 63:24,
68:9, 96:15, 97:12,
97:24, 130:23,
208:1, 249:23
competing [1] - 45:18
competition [1] -
238:5
competitive [3] -
243:8, 244:25,
245:12
competitor [7] -
45:19, 45:24, 238:3,
244:14, 244:19,
249:8, 249:10
competitors [2] -
182:21, 182:24
compilation [5] -
228:6, 228:8, 230:5,
231:13, 231:14
compiles [1] - 226:11
Complaint [1] - 7:3
complaints [1] - 96:12
complete [2] - 81:8,
202:3, 257:7
completely [2] -
242:5, 242:13
completeness [1] -
232:25
compliance [1] -
191:17
complicated [1] -
156:19
components [1] -
250:18
composite [2] - 235:8,
247:10
compressed [1] -
182:20
comprised [1] -
196:15
comprises [1] -
196:13
computer [3] - 144:6,
144:8, 159:7
concept [2] - 107:18,
123:10
concern [5] - 72:6,

85:16, 133:19,
190:12, 242:2
**concerned** [1] - 32:15
**concerning** [1] -
255:19
**concluded** [1] -
254:13
**Conditions** [1] - 232:7
**conducive** [1] - 127:4
**conduct** [21] - 20:13,
26:16, 27:24, 44:7,
44:10, 46:16, 48:7,
53:23, 55:7, 60:24,
63:20, 75:8, 75:10,
76:1, 77:8, 82:11,
83:6, 86:4, 91:23,
92:19, 204:5
**conducted** [2] - 26:23,
96:24
**confidential** [34] -
51:1, 51:10, 52:10,
54:2, 54:6, 56:7,
56:11, 56:18, 57:9,
57:16, 58:18, 59:1,
59:4, 59:15, 60:4,
60:15, 61:6, 229:23,
229:25, 234:20,
234:23, 235:1,
235:2, 235:5, 238:7,
238:10, 239:25,
240:3, 240:5, 240:6,
243:15, 243:19,
251:22, 252:8
**Confidential** [2] -
229:17, 229:20
**confidentiality** [2] -
241:6, 243:24
**confirm** [2] - 112:23,
125:4
**confused** [1] - 96:18
**conjunction** [8] - 43:8,
48:9, 97:7, 106:6,
112:17, 119:9,
127:21, 137:21
**connected** [1] -
257:10
**Connecticut** [1] -
114:2
**connection** [5] -
12:24, 28:5, 34:6,
183:22, 184:1
**conservative** [3] -
125:20, 126:16,
132:2
**consider** [13] - 43:10,
48:5, 89:23, 115:14,
165:24, 166:2,
172:14, 172:17,
173:5, 173:6,
218:10, 230:25,

249:3
**consideration** [1] -
117:24
**considerations** [6] -
95:12, 95:14,
107:10, 107:21,
108:12, 203:11
**considered** [6] -
43:18, 47:6, 49:20,
143:8, 166:1, 172:18
**considering** [1] - 95:4
**consistent** [3] - 67:4,
168:19, 204:13
**consisting** [1] - 235:9
**consists** [2] - 64:15,
229:4
**Consolidated** [4] -
4:17, 184:11,
184:21, 185:20
**consolidation** [1] -
177:2
**constitutes** [1] -
196:12
**consumer** [5] -
176:24, 187:25,
188:5, 230:12, 245:2
**Consumer** [1] -
228:10
**contact** [1] - 109:2
**contain** [2] - 34:16,
223:12
**contained** [4] -
219:21, 219:24,
249:7, 252:8
**contemplated** [1] -
185:18
**contend** [6] - 80:17,
220:2, 231:16,
236:15, 239:21,
244:4
**contends** [5] - 59:15,
65:5, 211:6, 218:23,
250:19
**content** [1] - 128:21
**contention** [3] - 21:7,
31:15, 106:22
**context** [17] - 93:14,
108:19, 108:21,
120:13, 171:6,
171:18, 190:23,
192:2, 237:10,
240:18, 240:19,
242:10, 243:21,
247:22, 247:25,
248:8, 248:22
**continue** [1] - 214:16
**continued** [3] - 56:2,
164:6, 187:19
**continues** [4] -
171:24, 181:8,

192:24, 238:16
**contract** [1] - 204:5
**contracts** [4] - 172:2,
172:6, 172:24, 173:1
**contractual** [3] - 65:4,
65:11, 173:16
**contribute** [1] -
123:14
**contributes** [1] -
175:14
**Contribution** [2] -
4:11, 129:7
**Contributions** [4] -
159:24, 163:11,
164:13, 165:13
**convenience** [1] -
78:6
**convenient** [2] - 96:3,
96:4
**conventional** [1] -
244:7
**conversation** [9] -
55:17, 61:25, 94:11,
94:14, 112:1, 178:4,
187:24, 188:2, 194:3
**conversations** [14] -
7:6, 8:18, 8:22,
12:22, 76:10, 84:6,
84:8, 89:17, 93:25,
99:4, 99:8, 109:24,
110:5, 127:19
**conversion** [2] -
186:24, 187:7
**conveyed** [1] - 253:5
**convinced** [1] - 95:11
**Coop** [1] - 237:25
**cooperation** [3] -
190:6, 190:8, 190:11
**coordinated** [1] - 76:9
**copy** [6] - 16:22,
35:20, 144:16,
179:1, 255:14,
255:16
**core** [1] - 171:3
**corner** [3] - 144:23,
162:13, 222:19
**corp** [1] - 25:6
**CORPORATE** [6] -
1:12, 5:2, 256:2,
256:24, 257:6,
257:18
**corporate** [74] - 34:20,
47:11, 60:3, 69:20,
126:21, 130:14,
130:16, 132:3,
132:6, 132:7, 132:8,
132:10, 132:11,
132:16, 133:4,
133:5, 133:24,
134:15, 134:19,

135:25, 153:9,
153:17, 153:22,
156:9, 156:21,
157:3, 157:8,
157:12, 157:13,
157:17, 157:20,
158:14, 158:15,
158:19, 158:25,
159:9, 159:13,
160:2, 160:12,
161:9, 161:21,
162:4, 162:5, 162:6,
168:25, 170:2,
170:4, 175:7, 175:9,
175:10, 193:23,
194:2, 194:3, 194:6,
197:23, 197:24,
198:1, 198:13,
198:18, 198:20,
199:12, 200:25,
201:14, 202:6,
202:10, 202:18,
202:19, 202:23,
205:11, 216:22,
222:8, 242:19
**Corporate** [16] - 4:10,
129:7, 129:22,
133:1, 134:9, 135:6,
154:23, 158:7,
159:24, 160:13,
160:18, 161:16,
163:11, 164:13,
193:20, 255:11
**Corporation** [2] -
2:15, 17:1
**CORPORATION** [3] -
1:7, 255:10, 256:4
**corporation** [2] -
34:21, 34:22
**Corporation's** [3] -
4:6, 4:8, 4:13
**Correct** [14] - 21:11,
33:5, 34:1, 64:5,
99:14, 125:9,
129:13, 160:24,
179:22, 184:9,
185:14, 192:9,
192:18, 197:18
**correct** [99] - 6:19,
6:23, 6:24, 6:25,
9:16, 10:11, 11:11,
13:6, 17:25, 28:24,
29:24, 30:15, 30:25,
33:25, 34:8, 41:13,
50:4, 55:20, 56:3,
56:4, 64:1, 64:4,
64:17, 72:11, 72:16,
73:7, 85:1, 88:14,
90:9, 91:3, 92:7,
92:10, 99:13, 101:8,

101:9, 101:13,
101:14, 102:3,
102:22, 105:4,
107:12, 112:14,
112:24, 119:10,
121:15, 125:2,
125:3, 125:8,
129:12, 129:16,
146:17, 147:7,
147:8, 153:2,
154:14, 160:3,
160:25, 161:4,
164:2, 164:7,
164:10, 164:18,
167:5, 167:23,
168:3, 168:4, 168:6,
169:22, 177:16,
178:22, 179:10,
179:21, 180:3,
180:5, 182:12,
182:13, 183:17,
183:19, 185:11,
186:14, 187:21,
192:13, 192:17,
193:5, 193:14,
193:25, 194:17,
195:21, 213:23,
217:19, 229:8,
229:24, 233:9,
236:9, 239:17,
248:15, 249:1
**correction** [2] -
255:15, 255:18
**corrections** [4] -
255:17, 256:9,
256:21
**correctly** [3] - 85:16,
86:1, 86:23
**correspond** [2] -
149:19, 151:25
**corresponded** [1] -
149:14
**Cossio** [1] - 225:5
**cost** [12] - 18:24,
31:10, 31:20, 64:4,
127:1, 131:5,
131:10, 131:17,
131:25, 166:3,
166:4, 169:4
**Costa** [10] - 49:12,
49:15, 56:22, 57:3,
82:17, 82:24, 92:23,
100:10, 119:13,
119:15
**costs** [8] - 18:16, 32:6,
33:4, 168:24, 169:1,
183:8, 194:7, 199:12
**could've** [6] - 88:1,
140:20, 171:4,
173:23, 174:2

**counsel** [26] - 7:7, 8:15, 9:7, 30:11, 37:14, 47:4, 47:23, 59:21, 128:20, 128:22, 128:24, 128:25, 136:1, 142:22, 144:7, 150:5, 217:13, 220:14, 221:6, 221:7, 222:16, 223:4, 229:24, 257:9, 257:10
**Counsel** [1] - 1:15
**counsel's** [2] - 154:18, 154:21
**count** [2] - 33:14, 33:19
**counted** [2] - 73:10, 74:4
**counting** [13] - 32:17, 40:20, 41:8, 50:7, 72:16, 72:20, 72:24, 74:4, 74:7, 90:13, 92:18, 93:7
**COUNTY** [2] - 257:3, 257:16
**coup** [1] - 78:15
**couple** [7] - 7:6, 9:1, 22:2, 114:18, 114:19, 179:15, 198:25
**course** [6] - 91:10, 103:14, 105:3, 108:7, 123:25, 210:23
**Court** [4] - 47:21, 255:24, 257:5, 257:13
**COURT** [3] - 1:1, 124:18, 200:1
**court** [4] - 5:15, 6:13, 42:17, 150:8
**Court's** [1] - 210:3
**COURTNEY** [2] - 2:1, 255:5
**Courtney** [8] - 47:9, 133:7, 144:11, 146:21, 157:16, 179:2, 221:13, 222:7
**covenant** [1] - 101:13
**covenants** [21] - 42:16, 42:18, 56:21, 57:2, 58:4, 58:5, 58:10, 65:16, 67:17, 67:20, 76:15, 78:23, 81:4, 81:7, 100:8, 100:23, 101:2, 101:3, 101:6, 101:12, 102:12
**cover** [1] - 86:20

**covered** [2] - 187:12, 213:3
**CPA** [1] - 158:3
**crazy** [1] - 164:4
**create** [11] - 126:1, 126:4, 127:14, 129:3, 132:14, 133:13, 138:7, 147:3, 206:17, 236:23, 237:4
**created** [2] - 125:17, 126:2, 154:16, 228:14, 231:20, 233:6, 241:10, 242:25, 243:4
**creating** [6] - 125:13, 127:10, 127:21, 147:4, 200:20, 212:3
**creation** [1] - 125:11
**credit** [11] - 69:10, 69:12, 69:13, 69:18, 83:9, 210:9, 210:11, 211:2, 211:3, 230:12, 239:11
**creditworthiness** [1] - 45:16
**critical** [1] - 187:20
**cross** [9] - 135:22, 140:21, 190:7, 190:9, 191:11, 191:12, 191:14, 191:21, 226:6
**cross-market** [1] - 191:14
**cross-marketing** [4] - 190:7, 190:9, 191:11, 191:12
**cross-reference** [2] - 135:22, 226:6
**cross-referenced** [1] - 140:21
**current** [3] - 10:10, 13:8, 100:23
**Curtolo** [4] - 194:14, 194:16, 194:19, 195:4
**Customer** [1] - 232:10
**customer** [30] - 23:15, 24:10, 38:14, 38:16, 38:21, 38:23, 38:25, 39:3, 39:8, 39:19, 39:22, 40:5, 40:7, 40:9, 42:24, 42:25, 49:7, 50:13, 57:23, 96:20, 218:3, 218:8, 218:13, 218:14, 218:17, 232:13, 232:19, 235:4, 245:8, 247:2
**customer's** [2] - 40:7,

245:8
**customers** [5] - 23:2, 39:14, 53:3, 65:20, 77:13
**cut** [4] - 151:2, 183:17, 193:25, 220:19
**cuts** [1] - 195:4
**cutting** [2] - 195:6, 195:8

### D

**daily** [2] - 189:4, 235:21
**damage** [16] - 26:15, 35:24, 39:5, 41:2, 47:8, 47:13, 48:10, 51:3, 54:17, 61:2, 168:2, 168:5, 170:14, 170:20, 203:12, 203:25
**damaged** [1] - 170:21
**damages** [119] - 8:9, 16:9, 16:10, 17:9, 17:11, 17:12, 17:23, 20:6, 20:10, 21:20, 21:23, 23:9, 23:11, 25:11, 25:21, 25:24, 26:3, 27:15, 27:22, 29:4, 30:13, 30:16, 33:20, 34:3, 34:4, 34:14, 34:15, 37:4, 37:6, 37:7, 37:10, 37:21, 38:7, 38:11, 40:21, 40:23, 40:25, 41:8, 41:10, 41:12, 43:8, 43:15, 43:18, 44:18, 46:17, 47:15, 47:17, 48:3, 48:19, 49:21, 50:8, 51:9, 52:10, 54:1, 54:8, 54:16, 54:24, 55:2, 60:13, 66:23, 72:15, 73:11, 73:19, 75:3, 90:12, 90:16, 91:3, 92:12, 93:7, 95:4, 106:3, 112:17, 119:10, 124:23, 125:1, 129:10, 141:3, 141:4, 141:25, 143:21, 153:23, 161:4, 164:25, 165:25, 167:22, 168:1, 170:23, 173:25, 180:2, 180:21, 186:17, 200:20, 203:7, 203:12, 203:19, 204:11, 205:12, 211:11,

212:19, 246:5, 246:9, 246:11, 246:22, 246:25, 247:1, 248:9, 251:14, 251:17, 251:23, 252:4, 252:5, 252:16, 252:17, 253:3, 253:18, 253:24, 254:2, 254:6
**Damages** [1] - 37:1
**damaging** [2] - 249:8, 249:9
**data** [58] - 24:12, 26:14, 41:25, 52:13, 52:14, 52:16, 52:17, 52:18, 52:20, 62:23, 105:21, 125:16, 130:9, 131:22, 135:18, 143:8, 143:14, 143:17, 143:24, 145:14, 145:24, 146:4, 146:5, 156:22, 157:1, 157:2, 157:6, 157:24, 158:7, 158:9, 159:8, 165:2, 165:3, 166:8, 166:12, 166:17, 166:18, 166:24, 167:3, 167:23, 167:24, 171:15, 178:6, 204:14, 209:6, 209:7, 209:8, 209:10, 212:13, 212:22, 218:3, 226:9, 226:10, 226:11, 244:11
**Data** [2] - 230:11
**database** [1] - 191:16
**databases** [4] - 62:20, 62:23, 63:2, 63:9
**Date** [1] - 145:4
**date** [15] - 35:6, 129:16, 145:7, 145:23, 158:6, 161:8, 161:13, 164:25, 165:12, 167:25, 179:23, 180:2, 185:21, 192:25, 256:8
**DATE** [3] - 1:16, 256:6, 256:23
**dated** [3] - 144:25, 200:8, 200:15
**daughter** [1] - 44:22
**days** [9] - 9:1, 9:2, 9:3, 68:2, 113:21, 122:6, 122:8, 180:1, 195:5
**Daytona** [36] - 4:11,

20:14, 44:8, 78:8, 99:18, 129:8, 160:6, 161:2, 161:18, 161:22, 162:11, 163:17, 163:21, 175:23, 175:24, 182:18, 188:1, 188:3, 189:20, 190:1, 190:5, 213:7, 214:3, 214:7, 214:11, 214:14, 214:21, 215:1, 215:7, 215:9, 215:13, 215:15, 227:7, 227:19, 227:20, 227:22
**DC** [2] - 2:3, 255:8
**deal** [9] - 19:9, 57:17, 57:24, 94:3, 157:25, 158:2, 243:7, 244:20, 244:23
**dealing** [1] - 168:23
**Dear** [1] - 255:13
**debt** [1] - 177:2
**decade** [1] - 80:24
**decades** [2] - 192:3, 192:8
**December** [11] - 4:18, 101:23, 144:25, 154:17, 159:11, 161:10, 168:3, 180:22, 180:23, 257:24
**decent** [3] - 78:14, 78:16, 98:7
**decide** [3] - 83:12, 91:20, 243:17
**decided** [4] - 90:5, 90:24, 91:12, 206:20
**decision** [3] - 49:2, 52:5, 124:5
**decisions** [2] - 59:7, 83:10
**declare** [1] - 256:20
**decrease** [1] - 193:8
**defendant** [4] - 18:4, 19:18, 20:20, 63:18
**Defendant** [7] - 1:8, 1:15, 2:17, 4:5, 4:8, 4:13, 17:1
**defendant's** [3] - 20:13, 44:7, 75:8
**Defense** [2] - 231:15, 231:21
**define** [2] - 20:5, 104:23
**defined** [4] - 27:23, 69:11, 136:9, 143:11
**defining** [1] - 48:14
**definitely** [5] - 46:22,

46:23, 104:1,
111:17, 139:1
**definition** [3] - 105:1,
108:2, 108:9
**degree** [3] - 198:23,
203:20, 205:17
**delete** [1] - 59:8
**deletes** [1] - 59:10
**deleting** [1] - 59:12
**delta** [1] - 199:7
**demand** [10] - 21:13,
33:25, 35:24, 54:8,
55:12, 56:6, 56:17,
72:14, 253:7, 254:2
**demanding** [3] -
160:21, 247:5, 248:9
**demonstrate** [1] -
141:4
**dep** [1] - 216:22
**depart** [1] - 93:21
**departed** [6] - 68:22,
211:7, 213:6,
213:22, 216:4,
226:22
**departing** [4] - 189:15,
189:18, 190:4,
248:25
**Department** [2] -
231:15, 231:21
**department** [1] - 97:10
**departure** [7] - 86:4,
91:23, 92:19, 95:4,
165:19, 200:23,
208:7
**departures** [4] -
104:21, 191:25,
195:12, 196:18
**depose** [1] - 153:7
**deposed** [1] - 222:8
**DEPOSITION** [1] -
1:12
**Deposition** [24] - 4:3,
16:3, 35:21, 60:25,
84:13, 133:21,
136:6, 136:12,
136:21, 137:20,
137:22, 144:18,
145:10, 159:5,
200:2, 206:22,
207:13, 208:3,
221:6, 222:18,
223:5, 228:5,
233:15, 255:11
**deposition** [64] - 5:12,
6:2, 6:17, 6:23, 7:15,
8:2, 10:4, 16:5,
17:15, 21:17, 25:18,
27:13, 28:6, 28:21,
28:22, 31:5, 31:12,
36:24, 37:8, 38:1,

47:15, 59:24, 60:3,
62:13, 69:15, 71:19,
104:24, 132:19,
134:23, 135:2,
135:5, 140:16,
141:6, 141:24,
142:25, 144:9,
144:16, 148:6,
151:17, 153:17,
154:12, 154:20,
155:4, 205:2,
205:25, 208:4,
208:8, 209:14,
211:18, 212:24,
213:5, 216:2,
216:25, 217:25,
223:21, 223:25,
233:22, 246:10,
253:17, 254:3,
254:13, 255:14,
255:16, 257:6
**derivative** [6] -
246:11, 247:6,
252:5, 253:7,
253:18, 253:23
**derived** [2] - 33:3,
160:12
**describe** [2] - 119:2,
122:24
**described** [3] - 69:6,
69:13, 70:1
**Description** [1] - 4:2
**designate** [1] - 144:15
**designated** [23] -
34:20, 37:4, 37:21,
37:23, 47:11, 69:20,
86:7, 159:5, 181:2,
205:23, 206:19,
207:13, 209:5,
219:19, 224:4,
229:13, 229:23,
230:2, 231:10,
232:22, 235:9,
240:20, 240:22
**designation** [2] -
210:7, 229:25
**designed** [1] - 130:23
**Desk** [1] - 244:8
**Detail** [2] - 4:15, 4:23
**detail** [1] - 181:8
**details** [1] - 69:10
**determine** [5] - 48:20,
83:21, 84:2, 224:20,
224:23
**determining** [1] -
223:13
**develop** [3] - 67:24,
67:25, 85:8
**development** [5] -
85:3, 85:5, 86:24,

115:19, 187:4
**develops** [1] - 115:17
**deviations** [1] -
192:21
**dictates** [1] - 210:24
**Diego** [1] - 194:5
**difference** [7] -
100:24, 109:12,
149:3, 162:9, 182:2,
234:20, 234:23
**different** [62] - 16:18,
19:2, 20:5, 20:7,
32:5, 43:5, 43:7,
53:17, 55:5, 55:16,
55:17, 57:7, 57:17,
57:24, 67:2, 68:6,
74:15, 74:24, 90:25,
93:5, 99:4, 100:9,
104:1, 104:12,
104:14, 108:22,
115:13, 115:20,
121:6, 123:4,
123:11, 123:12,
123:18, 123:21,
123:22, 124:25,
128:14, 138:5,
138:14, 145:2,
145:21, 153:2,
161:19, 175:3,
176:21, 177:20,
178:9, 181:10,
181:20, 181:22,
182:9, 194:3,
222:14, 225:25,
227:25, 228:6,
236:21, 244:7,
245:6, 250:8, 250:13
**difficult** [7] - 120:19,
120:21, 133:15,
134:20, 156:5,
178:24, 244:21
**dipping** [5] - 32:15,
72:7, 73:2, 73:13,
74:19
**direct** [5] - 15:13,
87:15, 145:3,
176:25, 187:25,
188:5, 192:10,
193:17, 239:8
**directed** [5] - 120:7,
190:5, 235:25,
236:8, 236:9
**direction** [1] - 82:15
**directly** [3] - 86:5,
96:16, 223:17
**disadvantage** [1] -
243:8
**disagree** [2] - 51:22,
195:1
**discern** [6] - 36:5,

36:13, 98:20, 134:2,
209:4, 226:16
**disclose** [3] - 196:23,
217:5, 217:11
**disclosed** [1] - 25:12
**disclosures** [7] - 35:5,
49:8, 50:14, 50:15,
50:17, 50:19
**discover** [2] - 61:25,
62:1
**discovery** [24] - 7:4,
7:10, 7:12, 21:25,
22:11, 22:17, 23:11,
23:19, 24:17, 26:8,
26:11, 26:23, 35:3,
60:23, 61:24, 69:7,
71:3, 132:13,
136:11, 143:22,
147:2, 206:10,
206:20, 221:24
**discrepancy** [4] -
153:12, 153:22,
154:6, 154:13
**discuss** [1] - 235:19
**discussed** [6] - 36:6,
106:7, 106:11,
234:18, 235:18,
249:17
**discussion** [8] -
30:11, 46:22, 94:6,
97:8, 112:9, 112:12,
128:22, 171:7
**discussions** [5] -
27:13, 27:18, 46:25,
128:6, 200:19
**dishonest** [1] - 9:24
**dispute** [2] - 201:17,
201:18
**disregard** [1] - 40:13
**disregarded** [1] - 62:2
**disruption** [2] - 92:5,
188:19
**distributed** [1] -
233:12
**DISTRICT** [2] - 1:1, 1:1
**diverted** [10] - 18:3,
19:17, 20:9, 20:10,
21:4, 22:3, 22:4,
72:16, 72:21
**divided** [2] - 155:11,
155:15
**dividing** [1] - 130:10
**DIVISION** [1] - 1:2
**division** [6] - 170:6,
170:8, 170:9, 181:8,
182:16, 182:17
**document** [103] - 16:5,
16:8, 16:23, 16:24,
34:19, 34:25, 35:16,
35:25, 47:3, 70:7,

84:15, 127:10,
127:14, 129:6,
136:23, 137:6,
137:8, 138:4,
141:14, 142:4,
142:9, 144:11,
144:13, 144:21,
145:2, 147:1, 147:3,
147:8, 147:20,
152:13, 153:10,
155:17, 155:19,
157:14, 179:16,
187:15, 193:18,
202:16, 202:20,
205:10, 205:20,
205:21, 206:17,
207:12, 220:8,
222:2, 222:25,
223:25, 224:2,
224:5, 224:25,
228:8, 228:14,
228:20, 228:23,
229:11, 229:13,
229:19, 230:1,
230:5, 230:10,
230:15, 230:18,
230:22, 230:25,
231:3, 231:10,
231:14, 231:15,
232:7, 232:11,
232:25, 233:15,
235:10, 235:14,
236:12, 236:15,
237:20, 237:21,
238:15, 238:22,
239:4, 239:9,
240:20, 240:21,
241:9, 242:2,
242:16, 242:22,
242:25, 244:4,
244:13, 244:19,
245:23, 246:2,
246:16, 246:19,
247:9, 247:20,
248:4, 248:17,
250:21
**Document** [2] -
231:24, 246:23
**documentation** [1] -
234:11
**documents** [113] -
7:18, 8:5, 8:13, 8:16,
8:24, 9:10, 9:11,
16:14, 17:14, 25:9,
33:13, 33:19, 33:20,
33:24, 34:2, 34:11,
34:16, 35:5, 35:14,
35:22, 35:23, 36:2,
36:10, 36:18, 37:4,
37:10, 37:15, 37:21,
37:24, 38:7, 53:6,

10

55:8, 55:10, 70:2, 132:14, 132:20, 132:21, 132:23, 133:12, 133:19, 133:21, 134:3, 134:5, 135:5, 135:11, 136:10, 136:15, 137:1, 137:25, 139:12, 140:1, 140:4, 140:8, 141:19, 142:1, 142:6, 142:15, 142:24, 143:5, 143:9, 143:11, 143:13, 143:16, 143:21, 146:1, 146:4, 146:21, 149:6, 150:4, 151:4, 151:5, 151:18, 153:23, 155:5, 155:20, 156:3, 157:19, 158:18, 158:25, 159:3, 178:4, 202:22, 205:23, 206:9, 206:12, 206:24, 209:3, 209:21, 211:21, 212:12, 212:23, 217:7, 217:11, 217:15, 219:1, 222:14, 223:19, 228:6, 230:6, 231:12, 232:17, 232:21, 232:23, 233:17, 234:3, 234:8, 235:9, 235:22, 241:20, 252:18
**Documents** [1] - 4:6
**DocuSign** [3] - 239:7, 239:12, 241:3
**dollar** [9] - 32:8, 32:13, 46:11, 51:15, 51:16, 57:16, 226:6, 247:4, 253:6
**dollars** [8] - 32:11, 32:12, 32:18, 32:20, 45:23, 66:13, 68:20, 71:8
**Don'ts** [2] - 4:22, 235:11
**done** [21] - 28:2, 29:3, 39:5, 80:18, 80:20, 80:21, 81:5, 97:23, 98:1, 98:14, 109:7, 128:8, 128:9, 131:25, 135:11, 163:8, 176:8, 223:23, 238:8, 252:24

**door** [1] - 253:19
**Dos** [3] - 4:22, 235:11, 235:21
**double** [14] - 32:15, 66:18, 66:19, 66:22, 67:3, 72:7, 72:16, 72:20, 72:24, 73:2, 73:13, 74:19, 165:16
**double-dipping** [5] - 32:15, 72:7, 73:2, 73:13, 74:19
**doubt** [1] - 198:25
**down** [28] - 5:16, 5:22, 5:25, 31:12, 57:18, 126:9, 153:3, 160:17, 162:12, 184:16, 185:22, 185:23, 188:24, 189:4, 189:14, 192:10, 193:3, 193:4, 193:8, 193:11, 198:2, 198:15, 198:16, 199:4, 213:14, 224:15, 225:2
**downs** [1] - 193:14
**downstream** [34] - 78:6, 79:5, 79:23, 81:23, 82:10, 83:16, 83:22, 96:12, 96:24, 97:9, 99:5, 99:16, 100:17, 101:15, 101:25, 102:19, 103:16, 104:7, 107:12, 110:6, 111:13, 112:3, 112:11, 114:20, 114:24, 116:19, 116:23, 117:10, 117:23, 118:5, 172:3, 174:7, 210:16, 210:21
**downturn** [2] - 189:10
**downturns** [1] - 188:6
**downward** [2] - 181:9, 181:11
**draft** [2] - 126:1, 126:2
**drafting** [1] - 125:21
**drafts** [3] - 128:12, 128:15, 128:18
**dramatically** [1] - 189:4
**driven** [3] - 165:5, 176:25, 204:23
**driving** [1] - 177:11
**dropped** [1] - 162:7
**dry** [1] - 151:2
**due** [12] - 27:24, 48:7, 50:8, 50:11, 70:20, 82:3, 106:23, 107:5,

171:11, 182:20, 204:5, 204:6
**duly** [2] - 5:4, 257:19
**duration** [1] - 173:2
**during** [4] - 6:2, 28:20, 28:22, 183:1
**Dustin** [4] - 75:16, 75:19, 75:23, 76:16
**duties** [1] - 13:15
**Dwayne** [75] - 14:19, 15:2, 38:4, 42:22, 42:23, 43:1, 43:4, 44:21, 44:24, 49:12, 64:16, 66:18, 66:24, 66:25, 76:10, 76:23, 77:10, 77:11, 77:12, 78:5, 78:9, 78:12, 78:20, 79:5, 79:9, 79:22, 80:12, 80:18, 81:24, 82:4, 82:10, 82:15, 82:25, 83:1, 93:3, 93:20, 99:19, 100:18, 116:11, 116:16, 117:4, 117:5, 117:6, 117:15, 118:7, 118:11, 118:17, 118:21, 120:8, 121:14, 121:18, 121:23, 122:2, 122:10, 122:14, 122:15, 122:25, 123:6, 124:5, 174:11, 174:15, 190:15, 205:6, 206:1, 206:4, 207:1, 208:5, 208:15, 210:14, 210:18, 210:19, 221:17, 223:7, 224:19, 224:21

# E

**e-mail** [57] - 7:17, 7:19, 8:8, 9:23, 24:10, 24:12, 38:4, 41:23, 41:24, 51:5, 51:19, 82:12, 83:1, 84:22, 85:22, 86:14, 86:15, 86:20, 87:7, 87:9, 87:15, 96:16, 110:16, 110:22, 110:24, 111:1, 111:17, 120:7, 120:13, 121:14, 128:15, 134:22, 142:8, 142:14, 155:23, 179:20, 179:23, 180:6,

180:12, 181:2, 181:14, 186:1, 194:12, 194:23, 197:14, 199:18, 199:19, 200:7, 200:8, 200:15, 209:21, 235:21, 235:22, 237:9, 237:15, 238:20
**e-mailed** [1] - 134:22
**e-mails** [66] - 7:4, 7:8, 7:10, 7:20, 7:24, 8:1, 8:6, 9:13, 9:14, 9:17, 9:19, 9:20, 9:25, 10:1, 10:2, 10:6, 23:16, 23:17, 24:9, 24:11, 26:13, 26:18, 27:9, 27:14, 28:2, 28:5, 28:9, 38:3, 51:6, 58:12, 58:14, 78:11, 78:14, 79:8, 79:16, 79:17, 79:19, 79:20, 84:21, 87:11, 109:24, 109:25, 110:3, 111:4, 111:8, 111:12, 111:23, 119:19, 127:20, 127:24, 128:1, 128:9, 128:10, 128:19, 180:14, 180:16, 180:20, 200:14, 218:3, 218:4, 218:5, 218:6, 218:7, 218:10
**E-Mails** [4] - 4:9, 4:10, 4:19, 4:20
**Eagle** [2] - 135:23, 135:24
**earliest** [1] - 200:7
**earned** [4] - 126:21, 162:4, 162:5, 162:6
**Earned** [8] - 129:23, 133:1, 134:10, 135:7, 154:23, 158:7, 160:14, 161:17
**earnings** [12] - 184:11, 184:21, 185:1, 185:10, 185:22, 192:12, 192:15, 193:2, 193:4, 193:11, 199:4, 201:14
**Earnings** [2] - 4:10, 129:7
**earth** [1] - 109:4
**easily** [1] - 156:8
**East** [4] - 1:18, 2:10, 2:13, 255:1
**easy** [1] - 45:17

**eat** [1] - 93:13
**ebb** [1] - 178:18
**economic** [1] - 230:18
**educate** [1] - 153:21
**educated** [1] - 204:2
**effect** [1] - 79:23
**effective** [1] - 191:21
**effectively** [1] - 97:11
**efficiency** [2] - 144:8, 235:23
**efficient** [1] - 150:15
**efficiently** [1] - 96:14
**effort** [9] - 27:9, 28:4, 76:9, 84:2, 88:18, 89:19, 159:22, 182:22, 233:19
**efforts** [19] - 28:8, 36:5, 36:13, 48:20, 76:18, 83:21, 84:4, 89:4, 176:4, 187:3, 187:4, 188:5, 191:11, 230:21, 234:14, 236:22, 237:4, 239:5, 248:5
**eight** [2] - 172:22, 222:18
**either** [9] - 31:8, 112:9, 113:23, 124:10, 150:17, 166:13, 201:24, 225:8, 234:13
**election** [1] - 45:9
**element** [1] - 203:24
**elsewhere** [1] - 143:22
**embarrassing** [1] - 81:21
**EMMA** [1] - 2:9
**Emma** [1] - 155:23
**employed** [14] - 42:1, 48:25, 53:13, 56:23, 73:4, 80:1, 80:4, 80:6, 81:13, 81:16, 82:14, 213:6, 213:23, 226:22
**employee** [21] - 39:9, 39:10, 42:10, 43:1, 43:3, 57:9, 57:20, 59:6, 59:10, 80:22, 84:25, 93:1, 111:20, 173:1, 210:16, 210:21, 236:8, 239:1, 239:17, 257:9, 257:10
**employees** [139] - 20:21, 23:5, 42:6, 52:17, 52:18, 53:17, 54:3, 54:7, 55:9, 57:1, 58:17, 58:25, 59:7, 59:8, 63:19, 64:1, 64:10, 64:14,

65:21, 66:7, 68:23, 69:2, 70:5, 72:22, 72:23, 73:7, 76:13, 77:13, 78:6, 78:8, 78:10, 79:5, 79:23, 80:14, 80:23, 81:23, 82:3, 82:10, 83:16, 83:22, 84:2, 87:18, 88:19, 89:4, 89:11, 89:16, 90:3, 90:5, 91:12, 91:20, 95:17, 95:23, 96:13, 96:25, 97:9, 97:18, 98:17, 98:19, 99:5, 99:12, 99:15, 99:16, 99:17, 99:19, 99:24, 100:2, 100:14, 100:18, 100:20, 101:7, 101:11, 101:15, 101:25, 102:14, 102:17, 102:18, 102:19, 102:21, 102:23, 102:25, 103:4, 103:16, 104:7, 106:23, 106:24, 107:5, 107:8, 107:9, 107:12, 107:19, 107:20, 108:4, 108:25, 109:2, 110:6, 111:6, 111:13, 112:3, 112:11, 114:20, 114:24, 115:2, 115:5, 115:8, 116:19, 116:23, 117:10, 117:23, 117:25, 118:5, 168:15, 171:9, 171:10, 171:17, 172:3, 173:9, 173:11, 173:12, 173:20, 174:8, 174:18, 174:19, 183:13, 183:17, 183:20, 187:4, 187:21, 197:8, 204:5, 204:6, 211:7, 213:6, 213:22, 214:2, 215:12, 216:4, 226:22, 241:5, 248:25

**employer** [8] - 59:11, 81:25, 91:22, 98:19, 99:12, 102:7, 104:24, 108:5

**employment** [8] - 69:8, 69:17, 70:25, 80:3, 102:8, 172:2, 172:6, 172:24

**Enclosed** [1] - 255:14

**encompass** [1] - 14:2
**Encompass** [6] - 14:3, 14:15, 178:8, 209:6, 225:24, 241:3
**encourage** [5] - 79:2, 100:8, 100:10, 107:2, 107:15
**encouraged** [3] - 77:19, 78:5, 78:9
**encroaches** [1] - 128:5
**end** [10] - 101:23, 145:16, 145:19, 200:10, 203:8, 203:9, 203:16, 203:18, 247:10, 254:8
**endeavor** [1] - 205:1
**ended** [1] - 170:17
**Ended** [1] - 4:18
**ending** [1] - 159:11
**ends** [2] - 109:4, 220:5
**enforceability** [1] - 42:16
**enforceable** [4] - 43:11, 58:10, 58:11, 173:16
**engaged** [2] - 66:8, 75:10
**engaging** [1] - 66:19
**English** [4] - 4:21, 228:11, 229:4, 229:7
**English-Spanish** [2] - 4:21, 228:11
**enjoined** [1] - 64:3
**enjoyable** [1] - 235:23
**entertaining** [1] - 98:13
**entice** [1] - 100:12
**enticed** [1] - 57:2
**entire** [4] - 45:7, 72:13, 98:5, 103:14, 104:16, 104:20, 105:7, 105:16, 115:6, 237:11, 237:12, 240:15
**entirely** [2] - 108:22, 219:19
**entirety** [1] - 180:21
**entitled** [5] - 25:9, 31:15, 61:13, 70:11, 129:6
**entity** [3] - 34:22, 35:3, 186:10
**entrusted** [1] - 57:20
**equal** [1] - 104:18
**equation** [1] - 93:15
**equity** [1] - 10:25
**Errata** [1] - 3:4
**ERROR** [1] - 256:11

**error** [1] - 163:6
**errors** [1] - 256:7
**especially** [3] - 121:5, 168:23, 218:14
**ESQUIRE** [9] - 2:1, 2:1, 2:4, 2:8, 2:9, 2:12, 2:15, 255:5, 255:6
**EST** [1] - 1:17
**establish** [1] - 102:16
**established** [1] - 113:5
**estate** [2] - 174:13, 204:19
**estimate** [3] - 91:7, 145:25, 167:22
**Estimated** [1] - 244:10
**estimated** [1] - 239:15
**estimates** [1] - 168:19
**estimating** [2] - 165:25, 168:1
**et** [9] - 5:23, 97:25, 169:10, 189:7, 190:7, 191:17
**ethics** [1] - 40:14
**eventually** [5] - 82:6, 82:8, 88:12, 121:8, 171:12
**evidence** [42] - 45:25, 50:6, 51:1, 54:2, 54:5, 59:16, 59:19, 60:10, 61:5, 62:16, 62:22, 63:12, 78:4, 78:9, 79:4, 79:7, 82:9, 84:6, 86:3, 87:2, 87:5, 87:8, 95:23, 96:1, 109:15, 109:23, 111:5, 111:8, 111:9, 111:14, 121:11, 124:7, 124:10, 124:14, 174:7, 174:17, 198:17, 204:7, 204:9, 245:23, 246:1, 250:25
**EVP** [3] - 10:12, 10:15, 10:16
**exact** [5] - 59:20, 59:22, 62:6, 168:17, 218:21
**exactly** [12] - 21:20, 37:11, 45:21, 80:21, 135:3, 147:16, 153:11, 153:20, 169:25, 176:9, 185:15, 196:23
**EXAMINATION** [1] - 5:7
**Examination** [1] - 3:2

**examined** [1] - 5:4
**example** [23] - 13:13, 27:9, 32:17, 43:22, 48:6, 108:24, 130:2, 136:2, 139:19, 155:4, 177:20, 177:24, 184:7, 199:3, 201:24, 203:20, 203:25, 211:1, 213:16, 214:21, 227:7, 251:19
**Excel** [4] - 146:19, 207:10, 222:24, 248:16
**except** [1] - 58:8
**excess** [6] - 53:21, 53:23, 54:8, 54:18, 54:25, 56:17
**exchange** [5] - 63:20, 65:20, 68:16, 127:20, 200:8
**exchanged** [2] - 128:15, 128:18
**excited** [4] - 109:25, 110:6, 111:1, 111:19
**excitement** [1] - 67:10
**exciting** [2] - 110:15, 110:23
**excluding** [1] - 90:15
**exec@ mutualmortgage. com** [1] - 180:7
**executive** [2] - 117:16, 117:18
**Executives** [1] - 180:7
**executives** [5] - 180:9, 180:17, 194:13, 197:15, 241:15
**exercise** [1] - 152:13
**exhaust** [1] - 21:19
**exhaustive** [2] - 249:6, 249:9
**exhibit** [15] - 144:16, 179:18, 186:9, 194:11, 194:14, 202:3, 202:12, 222:19, 222:23, 223:9, 228:5, 235:8, 247:11, 248:17, 250:1
**Exhibit** [116] - 4:2, 6:12, 6:15, 6:16, 11:3, 11:7, 11:8, 11:9, 16:1, 16:3, 16:21, 17:14, 35:19, 35:21, 35:24, 36:6, 36:11, 36:23, 36:24, 36:25, 44:1, 44:2, 63:16, 84:12, 84:14,

124:19, 124:20, 124:22, 125:5, 125:11, 125:13, 125:23, 125:25, 128:12, 128:19, 129:3, 129:5, 132:14, 133:13, 133:22, 134:10, 135:7, 135:17, 136:4, 136:6, 136:11, 136:12, 136:20, 136:21, 137:9, 137:20, 137:22, 138:7, 142:25, 143:12, 144:18, 144:20, 145:10, 146:2, 148:12, 148:19, 148:21, 148:22, 152:8, 159:5, 159:6, 159:8, 159:23, 163:3, 168:2, 179:8, 181:21, 182:1, 182:2, 182:5, 184:8, 197:14, 198:11, 198:19, 199:2, 199:17, 199:24, 200:2, 202:13, 202:14, 202:15, 202:24, 203:12, 206:22, 207:5, 207:13, 208:4, 219:5, 220:16, 220:17, 221:6, 222:18, 223:5, 226:15, 226:25, 228:5, 232:24, 232:25, 233:16, 234:8, 235:7, 235:8, 236:25, 247:13, 250:2, 250:5, 250:18
**exist** [6] - 71:4, 79:17, 79:19, 79:20, 142:6, 216:8
**exists** [1] - 173:17
**exit** [2] - 96:23, 97:8
**expect** [4] - 68:21, 104:25, 112:2, 112:10
**expectation** [1] - 197:19
**Expectation** [1] - 160:18
**expected** [7] - 82:3, 107:11, 107:22, 108:4, 112:18, 126:23, 161:9
**expecting** [1] - 211:19
**expense** [1] - 130:25, 169:2, 169:9,

182:23, 195:11,
195:22, 196:10,
196:12, 196:17,
196:24, 198:2
**expenses** [19] - 69:9,
131:1, 132:3, 132:6,
132:7, 132:8, 170:2,
188:4, 193:21,
193:23, 193:25,
194:2, 194:4,
195:23, 195:25,
196:4, 196:8,
196:15, 197:25
**experience** [9] -
11:14, 11:18, 48:23,
56:25, 62:6, 68:19,
76:13, 103:19, 104:4
**experienced** [2] -
103:3, 105:22
**expert** [3] - 41:12,
47:8, 47:13
**Expires** [1] - 257:24
**explain** [8] - 19:13,
31:18, 43:21,
115:12, 137:7,
138:21, 145:16,
150:19, 152:22,
152:23, 158:1,
158:2, 181:23,
207:24, 211:20,
231:23, 242:3
**explained** [1] - 153:12
**explanation** [3] - 67:1,
154:3, 156:2
**explore** [1] - 22:14
**exponentially** [5] -
18:19, 166:10,
168:22, 169:6,
170:21
**expressed** [1] - 86:5
**extent** [20] - 10:3,
22:18, 23:6, 25:1,
26:19, 27:16, 34:17,
35:9, 36:17, 46:24,
57:11, 67:6, 69:19,
86:6, 128:4, 172:25,
173:16, 185:25,
217:4, 240:15
**extra** [1] - 236:7
**extrapolated** [1] -
138:13
**extrapolating** [1] -
125:18
**extreme** [1] - 183:6
**extremely** [1] - 79:17

---

**F**

---

**facilitate** [1] - 134:23

**fact** [19] - 23:8, 26:25,
58:1, 59:17, 68:11,
81:22, 88:16, 93:21,
110:13, 123:9,
123:12, 123:13,
140:19, 154:9,
164:9, 171:9, 185:9,
200:20, 231:2
**Fact** [2] - 231:16,
231:21
**factor** [1] - 95:3,
106:15, 116:24
**factored** [2] - 61:2,
173:25
**facts** [5] - 70:9, 70:14,
70:18, 117:22,
201:19
**Factual** [1] - 230:11
**factual** [2] - 211:10,
230:11
**factually** [2] - 73:23,
208:16
**fair** [2] - 126:14,
126:15
**fairly** [1] - 227:21
**fake** [1] - 41:23
**fall** [5] - 23:18, 24:17,
24:24, 61:8, 203:12
**familiar** [4] - 75:19,
117:20, 202:21,
202:22
**family** [4] - 49:12,
237:11, 237:12,
240:15
**fantastic** [2] - 39:25,
78:1
**Far** [1] - 194:19
**far** [11] - 42:11, 101:9,
166:11, 194:21,
200:10, 201:10,
214:23, 215:22,
218:8, 230:7, 232:24
**fascinated** [1] -
201:13
**fashion** [3] - 213:24,
237:23, 252:3
**fast** [1] - 235:23
**February** [3] - 162:17,
201:24, 219:7
**fed** [1] - 85:16
**Federal** [2] - 4:2, 17:5
**federal** [1] - 6:2
**fee** [2] - 249:20,
249:21
**fees** [2] - 150:9,
245:11
**felt** [1] - 132:1
**few** [10] - 5:14, 9:2,
19:15, 19:23, 45:22,
51:6, 76:5, 137:16,

155:1, 180:1
**Fidelity** [2] - 232:9,
232:11
**field** [1] - 45:18
**Field** [1] - 244:8
**figure** [4] - 156:8,
159:17, 204:19,
204:20
**figured** [1] - 204:21
**figures** [1] - 135:16
**file** [8] - 50:21, 150:10,
155:8, 220:25,
221:22, 239:12,
240:12, 241:2
**File** [1] - 246:18
**filed** [2] - 22:6, 22:7
**filled** [1] - 241:21
**filling** [3] - 117:6,
117:12, 117:22
**finagle** [1] - 94:3
**Final** [1] - 244:8
**final** [2] - 188:15
**finally** [2] - 6:1, 19:23
**finance** [1] - 125:8
**financial** [12] - 69:10,
69:11, 69:12, 89:2,
90:25, 121:17,
121:22, 132:10,
155:21, 156:14,
181:7, 194:20
**Financial** [6] - 4:17,
4:19, 4:22, 181:3,
228:10, 228:11
**financially** [2] - 115:8,
257:10
**financials** [8] - 130:7,
130:11, 130:13,
130:16, 132:10,
133:24, 156:5
**fine** [5] - 72:2, 77:14,
96:7, 209:19, 221:5
**finish** [3] - 5:19, 62:4,
186:4
**fire** [1] - 111:25
**firing** [2] - 186:20,
187:21
**firm** [1] - 211:1
**firms** [1] - 107:9
**first** [40] - 5:15, 9:17,
9:22, 16:24, 17:2,
17:4, 17:19, 18:2,
18:6, 19:16, 20:7,
20:8, 21:4, 21:10,
21:13, 21:22, 23:20,
25:15, 43:22, 48:12,
54:4, 54:10, 110:25,
120:21, 126:1,
126:2, 129:2, 130:2,
136:22, 138:2,
162:3, 169:7,

170:18, 179:17,
184:19, 194:11,
202:4, 228:8,
235:10, 235:20
**First** [2] - 4:6, 4:8
**fit** [1] - 73:19
**five** [11] - 114:25,
115:24, 127:17,
133:16, 164:10,
164:16, 164:19,
174:12, 199:15,
217:14, 254:7
**five-minute** [2] -
133:16, 254:7
**fixed** [8] - 18:16,
132:2, 132:6, 132:7,
168:24, 177:21,
183:7, 199:12
**FLORIDA** [3] - 1:1,
257:2, 257:15
**Florida** [11] - 1:19,
1:21, 2:14, 75:13,
87:20, 88:25,
112:24, 113:10,
150:16, 255:2,
257:23
**flow** [1] - 178:19
**flows** [1] - 253:3
**focus** [7] - 21:2,
43:14, 44:11, 54:24,
63:23, 189:8, 195:5
**focused** [4] - 9:16,
111:13, 206:7,
232:19
**folder** [5] - 7:10, 7:12,
7:15, 7:20, 8:6
**folks** [21] - 56:20,
58:11, 64:8, 65:15,
67:19, 78:23, 82:14,
98:12, 104:3,
107:16, 110:3,
140:20, 165:5,
176:25, 187:25,
188:4, 194:4, 194:7,
204:23, 249:21
**follow** [11] - 77:7,
82:5, 83:17, 87:18,
99:19, 105:4, 109:4,
154:18, 154:21,
171:10, 171:18
**followed** [11] - 81:24,
82:10, 99:24,
100:18, 101:7,
101:16, 102:1,
102:2, 102:17,
102:18, 102:25
**following** [8] - 22:15,
35:5, 60:25, 77:6,
100:2, 102:21,
108:7, 192:11

**follows** [3] - 5:5, 69:7,
208:3
**force** [1] - 177:11
**foregoing** [1] - 256:21
**forget** [3] - 42:3,
103:13, 195:24
**forgot** [1] - 67:10
**form** [204] - 8:20,
12:12, 14:20, 15:4,
18:10, 22:12, 23:12,
23:22, 23:23, 24:1,
26:9, 26:12, 28:11,
29:6, 29:15, 30:1,
30:7, 30:20, 31:7,
33:22, 36:8, 38:9,
40:22, 41:14, 41:18,
42:8, 42:14, 42:20,
43:12, 43:20, 45:2,
46:2, 46:4, 46:18,
48:11, 48:22, 49:22,
51:11, 52:24, 53:11,
54:9, 55:13, 56:10,
60:7, 62:24, 65:7,
65:10, 65:22, 66:2,
66:5, 66:15, 66:21,
67:6, 67:14, 68:18,
71:5, 72:17, 73:15,
74:8, 74:21, 75:12,
76:3, 76:24, 80:8,
80:15, 80:19, 81:2,
81:12, 87:10, 87:21,
91:4, 91:14, 91:25,
95:1, 95:5, 95:15,
95:19, 95:25, 97:13,
98:10, 99:6, 99:21,
100:4, 100:21,
106:17, 107:13,
109:22, 110:21,
111:7, 112:4,
114:22, 115:10,
115:15, 117:1,
117:8, 117:13,
118:15, 118:19,
118:23, 121:20,
121:25, 122:16,
122:19, 123:5,
123:16, 124:2,
128:2, 140:18,
141:21, 142:2,
142:7, 142:12,
146:3, 158:11,
158:22, 159:15,
166:19, 167:6,
168:10, 171:19,
172:11, 172:15,
173:3, 173:13,
174:9, 174:22,
178:23, 181:13,
183:4, 183:18,
184:13, 187:17,

187:22, 189:12,
189:23, 190:14,
191:5, 192:22,
193:10, 193:16,
194:1, 194:22,
196:14, 196:19,
197:4, 197:10,
197:22, 199:20,
200:13, 201:12,
202:7, 203:14,
203:21, 204:1,
204:8, 204:16,
205:8, 209:1,
209:11, 209:16,
210:10, 211:16,
211:24, 212:10,
212:15, 213:2,
213:13, 215:5,
216:14, 217:9,
223:10, 225:16,
225:20, 226:3,
226:13, 229:15,
230:3, 232:1,
233:23, 234:9,
235:2, 236:1,
239:17, 239:18,
239:19, 240:9,
241:7, 242:7, 243:2,
243:11, 243:20,
244:15, 246:7,
246:12, 246:24,
247:7, 248:6,
248:11, 250:12,
251:10, 251:16,
252:6, 253:9, 254:4
**formats** [1] - 175:3
**formatted** [1] - 218:15
**former** [1] - 69:2
**formula** [19] - 16:9,
17:12, 34:4, 34:15,
34:16, 35:15, 35:24,
37:6, 38:10, 39:13,
39:16, 39:21, 39:22,
39:25, 40:12, 41:3,
252:19, 252:22,
252:24
**formulas** [1] - 39:15
**forth** [5] - 78:11, 83:1,
127:19, 143:20,
221:20
**Forward** [1] - 186:10
**forward** [18] - 10:11,
10:13, 10:15, 10:18,
91:7, 170:6, 170:8,
170:9, 170:15,
182:11, 182:15,
182:16, 182:20,
183:24, 192:12,
192:15, 199:3,
204:13

**forwarded** [1] - 39:9
**four** [2] - 103:12,
162:16
**fourth** [5] - 159:23,
163:10, 165:12,
189:14, 189:17
**Fourth** [1] - 4:5
**FPR** [4] - 1:20, 255:23,
257:12, 257:22
**frame** [1] - 165:24
**frames** [2] - 73:1,
160:11
**frank** [2] - 29:17,
103:11
**frankly** [2] - 83:25,
139:13
**friends** [4] - 14:25,
114:20, 118:18,
122:18
**friendships** [3] -
107:7, 107:19,
108:17
**front** [9] - 9:19, 62:5,
83:8, 98:14, 98:15,
105:14, 121:2,
166:8, 229:17
**frustrated** [2] - 85:23,
120:25
**frustration** [1] - 97:10
**frustrations** [1] -
96:12
**full** [7] - 9:2, 139:3,
162:1, 162:6,
165:16, 240:19
**function** [4] - 11:22,
11:23, 104:22, 196:2
**fund** [1] - 153:1
**funded** [11] - 140:5,
140:6, 145:21,
149:7, 150:23,
150:25, 151:19,
157:2, 219:12,
225:4, 225:5
**Funded** [7] - 129:18,
135:17, 139:20,
145:11, 150:20,
222:25, 224:14
**funding** [1] - 152:25
**Funding** [1] - 4:9
**Fundings** [1] - 129:15
**funds** [1] - 69:4
**funny** [1] - 83:12
**future** [8] - 55:23,
56:13, 80:3, 167:5,
167:12, 167:20,
167:23

## G

**G-e-n-n-a-r-e-l-l-i** [1] -
5:11
**gain** [3] - 64:7, 181:17,
181:18
**gained** [1] - 64:10
**gains** [9] - 20:19,
20:25, 54:21, 54:23,
63:14, 63:17, 63:24,
64:13, 69:24
**game** [1] - 121:7
**gather** [3] - 118:22,
122:21, 127:25
**gathered** [1] - 111:5
**general** [13] - 8:2, 8:3,
34:9, 43:15, 43:17,
44:17, 91:9, 97:19,
97:20, 146:12,
182:24, 183:12,
212:2
**generally** [24] - 13:17,
31:9, 32:13, 45:24,
68:3, 76:13, 91:6,
91:7, 91:9, 97:22,
97:23, 101:24,
103:17, 104:8,
106:2, 154:8, 164:2,
173:4, 176:20,
177:4, 177:12,
183:19, 214:25,
230:19
**generate** [3] - 13:24,
14:4, 225:18
**generated** [14] -
14:12, 74:17,
131:20, 205:4,
207:1, 208:5,
208:25, 210:6,
210:18, 221:17,
223:6, 223:14,
226:12, 226:12
**generates** [1] - 86:25
**generating** [2] -
116:13, 116:14
**generation** [1] - 115:9
**generators** [1] -
115:25
**generically** [1] -
108:20
**Gennarelli** [25] - 4:4,
5:9, 5:11, 22:6,
23:18, 24:5, 25:14,
26:22, 34:18, 36:18,
40:10, 84:20, 86:7,
96:11, 137:19,
143:7, 143:14,
143:17, 144:6,
181:14, 186:11,

194:23, 200:14,
207:12, 255:11
**GENNARELLI** [6] -
1:12, 5:2, 256:2,
256:23, 257:6,
257:18
**genuine** [1] - 190:12
**genuinely** [2] - 94:24,
133:15
**given** [12] - 97:17,
112:18, 123:11,
123:22, 138:22,
203:10, 216:22,
231:3, 233:9,
235:17, 235:18,
245:24
**globally** [2] - 42:4,
43:9
**Glossary** [3] - 4:21,
228:11, 228:18
**glossing** [1] - 82:17
**Godfrey** [1] - 2:9
**goods** [11] - 18:24,
31:10, 31:20, 127:1,
131:5, 131:10,
131:17, 131:25,
166:3, 166:4, 169:4
**grand** [1] - 32:3
**great** [13] - 6:12, 11:6,
15:7, 15:9, 18:12,
39:25, 78:13, 89:19,
110:1, 165:4, 191:1,
191:19, 222:11
**greater** [2] - 39:14,
39:16
**greatest** [2] - 192:3,
192:7
**grew** [1] - 99:22
**grind** [1] - 191:16
**Gross** [1] - 202:5
**gross** [8] - 18:14,
18:19, 18:20, 18:22,
19:8, 19:10, 31:10,
31:19
**ground** [3] - 5:14,
51:15, 215:8
**grounds** [1] - 70:14
**group** [12] - 68:21,
77:15, 82:14, 92:17,
99:2, 99:13, 100:19,
105:11, 113:14,
171:3, 194:4, 222:13
**Group** [2] - 4:15, 4:23
**groups** [4] - 168:21,
170:20, 170:21,
188:1
**grow** [1] - 171:24
**growing** [1] - 171:25
**guess** [18] - 12:4,
46:8, 49:1, 73:22,

100:13, 107:24,
112:8, 115:18,
128:21, 137:16,
144:17, 152:4,
158:17, 175:25,
184:22, 198:6,
204:24, 225:10
**guidance** [1] - 106:5
**guidelines** [3] - 97:2,
97:6, 247:19
**guy** [3] - 51:14,
115:19, 126:5
**guys** [4] - 66:24,
134:16, 139:14,
142:17

## H

**habits** [1] - 119:12
**half** [6] - 68:20, 71:21,
170:18, 185:15,
193:25
**hand** [6] - 6:12,
144:23, 160:4,
162:12, 222:19,
257:20
**handing** [1] - 174:16
**hands** [2] - 238:3,
245:13
**Hang** [1] - 50:15
**hang** [2] - 137:11,
138:16
**happy** [6] - 31:8, 62:4,
83:8, 83:10, 86:9,
221:3
**hard** [1] - 144:16
**harm** [2] - 238:2,
253:3
**head** [10] - 5:24, 23:3,
39:4, 91:19, 105:25,
196:21, 201:5,
202:2, 206:3, 218:25
**heading** [3] - 37:1,
230:11, 242:19
**headings** [1] - 244:11
**heads** [1] - 79:24
**heads-up** [1] - 79:24
**Health** [2] - 4:15, 4:23
**hear** [6] - 27:21,
72:24, 180:4, 180:5,
222:6, 223:16
**heard** [11] - 23:10,
28:1, 28:3, 37:14,
54:1, 87:7, 107:25,
111:12, 190:17,
221:5, 250:14
**hearing** [4] - 55:7,
102:17, 110:25,
148:6

14

**heavy** [3] - 165:6, 181:9, 181:11
**HECMs** [1] - 10:25
**Held** [1] - 4:24
**held** [1] - 86:22
**help** [10] - 20:5, 132:18, 133:6, 142:15, 159:9, 216:21, 222:3, 224:5, 224:18, 235:15
**helped** [2] - 199:10, 205:1
**helpful** [4] - 51:13, 159:20, 240:4, 252:19
**Henderson** [2] - 1:18, 2:12
**herein** [1] - 5:4
**hereto** [1] - 256:22
**hesitate** [1] - 255:20
**HH055410** [1] - 257:24
**high** [5] - 163:15, 163:21, 167:2, 181:2, 183:14
**higher** [3] - 56:19, 134:14, 164:21
**highlighted** [1] - 161:8
**Hill** [2] - 1:18, 2:12
**Hills** [2] - 172:21, 198:7
**HILLSBOROUGH** [2] - 257:3, 257:16
**himself** [3] - 67:22, 88:6, 116:18
**hire** [1] - 12:10
**hired** [1] - 183:1
**hiring** [1] - 183:12
**historic** [1] - 166:20
**historical** [4] - 165:1, 166:17, 166:24, 177:23
**historically** [2] - 164:22, 177:19
**history** [1] - 166:15
**hit** [1] - 164:3
**Hmm** [1] - 121:5
**hold** [1] - 182:3
**holding** [1] - 10:20
**home** [5] - 10:25, 90:4, 235:16, 239:13, 247:23
**homes** [1] - 247:19
**honest** [7] - 24:19, 71:17, 81:19, 85:10, 121:10, 156:6, 231:18
**hoped** [1] - 186:10
**hoping** [1] - 126:16
**hour** [1] - 71:20

**hours** [8] - 9:6, 85:17, 127:17, 127:18, 139:25, 142:5, 212:4
**house** [4] - 183:22, 183:23, 183:24, 184:8
**housing** [2] - 164:3, 178:20
**HR** [2] - 84:25, 85:15
**huge** [6] - 52:13, 62:20, 62:23, 63:1, 188:4, 199:1
**hundred** [12] - 32:3, 32:8, 32:11, 32:13, 32:17, 32:20, 45:23, 146:23, 192:6, 203:10, 227:22
**hundred-thousand-dollar** [2] - 32:8, 32:13
**hundreds** [2] - 59:5, 66:13
**hung** [1] - 74:11
**Hutto** [83] - 14:19, 15:3, 42:22, 42:23, 43:1, 44:25, 64:16, 65:8, 66:18, 69:5, 69:13, 76:23, 77:10, 77:11, 77:12, 78:5, 78:9, 78:20, 79:5, 79:9, 79:22, 80:12, 80:18, 81:24, 82:4, 82:10, 92:7, 92:9, 92:15, 92:16, 92:21, 92:23, 93:1, 93:3, 93:7, 93:16, 93:25, 94:6, 95:16, 100:18, 101:16, 109:16, 111:6, 115:14, 116:16, 116:22, 117:11, 117:22, 118:8, 118:13, 118:17, 118:21, 119:3, 121:18, 121:23, 122:2, 122:11, 122:14, 122:15, 122:25, 123:22, 123:23, 124:7, 124:8, 124:11, 124:14, 173:19, 189:22, 190:2, 190:3, 205:4, 205:6, 206:1, 206:4, 207:1, 207:14, 208:6, 210:14, 210:19, 221:17, 223:7, 224:19, 225:9
**Hutto's** [4] - 43:4, 44:22, 92:11, 210:18
**Hutton** [1] - 115:24

**hypothetical** [1] - 32:2

**I**

**idea** [4] - 34:2, 58:8, 138:10, 241:9
**identification** [18] - 6:15, 11:8, 16:1, 16:21, 35:19, 84:12, 124:19, 136:4, 136:20, 144:20, 159:6, 179:8, 199:24, 202:14, 219:5, 222:17, 235:7, 250:2
**identified** [29] - 33:24, 34:11, 35:22, 37:10, 38:20, 132:17, 133:20, 133:25, 137:7, 137:24, 140:1, 140:9, 141:19, 149:14, 151:24, 153:23, 206:14, 206:25, 208:23, 218:19, 219:2, 222:16, 228:7, 232:17, 237:14, 237:16, 237:17, 238:21, 250:11
**Identify** [3] - 136:8, 136:9, 143:11
**identify** [10] - 135:15, 136:14, 143:16, 149:19, 159:9, 196:9, 206:12, 227:11, 234:3, 238:17
**identifying** [1] - 7:14
**II** [1] - 54:11
**III** [3] - 20:19, 63:17, 63:24
**ill** [7] - 20:24, 54:21, 54:22, 63:14, 64:7, 64:13, 69:23
**ill-gotten** [3] - 20:19, 63:17, 63:24
**ill-gotten** [7] - 20:24, 54:21, 54:22, 63:14, 64:7, 64:13, 69:23
**Illinois** [1] - 2:6
**illuminating** [3] - 221:14, 223:5, 226:25
**imagine** [11] - 44:22, 49:5, 133:5, 146:7, 147:12, 174:14, 181:16, 186:7, 203:6, 214:24, 229:16

**immediately** [2] - 59:8, 147:20
**immense** [1] - 235:4
**impact** [4] - 177:9, 177:10, 184:8, 198:4
**impacted** [1] - 168:21
**impedes** [1] - 69:19
**implicates** [5] - 22:18, 25:1, 26:19, 27:2, 27:16
**Importance** [1] - 181:2
**important** [7] - 45:14, 85:9, 85:10, 171:25, 187:23, 188:2, 188:8
**impossibility** [1] - 61:19
**impossible** [1] - 61:22
**improper** [1] - 53:22
**improperly** [6] - 18:3, 19:17, 20:9, 21:4, 24:14, 41:17
**IN** [1] - 1:1
**inability** [1] - 97:11
**Inc** [5] - 2:5, 4:3, 4:18, 244:9, 255:12
**INC** [10] - 1:4, 1:13, 5:3, 255:1, 255:9, 256:2, 256:3, 256:25, 257:6, 257:18
**Inc.'s** [3] - 4:5, 4:7, 4:12
**include** [4] - 11:18, 134:13, 207:8, 256:21
**included** [23] - 39:5, 51:3, 51:9, 84:20, 148:8, 148:11, 148:13, 148:20, 148:22, 148:23, 149:23, 165:1, 180:9, 186:1, 194:23, 200:14, 204:14, 210:21, 210:22, 220:11, 220:20, 220:24, 250:15
**includes** [2] - 166:17, 167:25
**including** [15] - 16:9, 17:11, 20:19, 34:4, 34:14, 37:6, 47:16, 63:18, 63:24, 69:10, 70:5, 167:2, 180:24, 186:14, 211:8
**inclusive** [7] - 24:18, 147:24, 147:25, 149:2, 160:22, 224:15, 257:7
**income** [10] - 125:17,

131:1, 132:11, 132:16, 134:19, 156:11, 156:12, 196:3, 196:20
**increase** [2] - 182:21, 182:25
**increasingly** [1] - 188:6
**Independent** [1] - 4:17
**INDEX** [1] - 3:1
**indicate** [2] - 116:24, 144:1, 256:9
**indicated** [3] - 134:4, 221:7, 223:4, 227:5, 256:8
**indicating** [1] - 255:17
**individual** [10] - 18:18, 25:5, 25:7, 90:19, 99:3, 106:14, 213:15, 213:16, 213:19, 245:13
**individuals** [12] - 26:18, 27:10, 69:6, 70:5, 73:3, 110:3, 110:5, 112:19, 171:23, 207:16, 210:7, 223:14
**industrial** [1] - 106:20
**industry** [19] - 11:15, 11:17, 11:18, 97:17, 97:20, 97:21, 101:10, 101:13, 103:14, 104:15, 105:18, 106:5, 106:8, 106:9, 164:23, 176:5, 176:13, 178:21, 183:12
**inflate** [1] - 159:19
**informal** [1] - 97:8
**information** [99] - 17:23, 23:15, 23:16, 39:8, 39:9, 39:22, 40:5, 40:7, 45:15, 45:24, 46:5, 46:7, 49:7, 51:2, 51:5, 51:7, 51:10, 51:18, 52:10, 53:18, 54:2, 54:6, 55:8, 56:7, 56:12, 56:18, 57:10, 57:17, 57:21, 57:23, 58:18, 59:1, 59:4, 59:9, 59:11, 59:14, 59:16, 60:4, 60:6, 60:15, 61:6, 61:21, 62:7, 62:17, 62:19, 75:15, 76:6, 92:25, 133:3, 134:6, 138:22, 155:9, 205:15, 206:9,

206:15, 207:9, 211:15, 211:17, 215:18, 217:8, 217:11, 217:16, 218:10, 218:14, 218:23, 220:12, 220:25, 221:21, 221:23, 223:8, 223:12, 224:23, 226:12, 226:16, 231:9, 232:14, 232:20, 234:20, 234:24, 235:1, 235:2, 235:5, 237:2, 238:10, 240:1, 243:5, 246:19, 249:7, 249:15, 249:16, 251:18, 251:22, 252:7, 252:11, 252:14, 253:1
**informed** [1] - 110:11
**initial** [1] - 33:3
**initiate** [1] - 109:2
**inner** [1] - 61:17
**insinuating** [1] - 149:18
**insofar** [1] - 60:10
**Inspection** [1] - 244:8
**instance** [6] - 54:4, 98:6, 99:5, 100:17, 102:18, 235:3
**instances** [6] - 22:3, 39:12, 97:18, 103:3, 104:19, 105:6
**instead** [9] - 21:9, 35:4, 36:3, 59:10, 90:24, 91:13, 104:21, 153:17, 156:20
**institution** [1] - 90:25
**instructing** [2] - 27:4, 61:12
**instruction** [1] - 154:19
**instructions** [1] - 154:22
**Insurance** [2] - 4:15, 4:24
**insurance** [7] - 10:21, 190:6, 190:8, 190:20, 191:10, 196:16, 249:22
**integrity** [1] - 38:23
**intelligence** [2] - 175:5, 178:10
**intentionally** [2] - 162:21, 163:8
**interacted** [1] - 85:12
**interaction** [2] - 14:24,

15:18
**interactions** [1] - 15:15
**interest** [6] - 177:9, 177:12, 177:19, 177:24, 182:21, 183:8
**interested** [3] - 10:2, 89:8, 257:11
**interesting** [4] - 48:25, 50:20, 50:25, 119:14
**interfered** [1] - 212:18
**interim** [1] - 29:9
**internal** [2] - 105:21, 135:18
**Internet** [2] - 39:24, 229:8
**interrogatories** [1] - 16:4
**Interrogatories** [2] - 4:9, 4:14
**Interrogatory** [15] - 34:19, 37:5, 37:11, 37:22, 133:20, 134:1, 135:13, 136:9, 137:1, 138:3, 138:15, 141:19, 143:6, 143:10, 149:17
**interrogatory** [1] - 54:21
**interrupt** [1] - 71:15
**interrupting** [1] - 35:10
**interruptions** [1] - 48:1
**interview** [1] - 97:8
**interviews** [1] - 96:24
**intimate** [1] - 119:4
**invested** [2] - 236:23, 237:3
**investigation** [1] - 6:3
**investor** [1] - 248:18
**investors** [1] - 182:7
**involve** [4] - 52:9, 100:3, 100:20, 108:8
**involved** [11] - 12:1, 12:4, 12:5, 12:10, 12:15, 12:21, 57:8, 65:25, 89:20, 94:5, 98:9
**involvement** [1] - 12:9
**involving** [1] - 199:18
**irrelevant** [1] - 40:3
**issue** [4] - 14:18, 15:16, 191:9, 222:12
**issued** [1] - 28:4
**issues** [3] - 13:11, 96:23, 218:4
**IT** [4] - 52:19, 53:1,

128:9, 229:17
**it's..** [2] - 158:16, 195:3
**item** [1] - 130:2
**itemization** [3] - 34:3, 38:7, 239:15
**Itemize** [4] - 16:8, 17:9, 17:11, 34:14
**itemize** [2] - 47:9, 175:14
**items** [3] - 214:18, 239:12, 239:13
**itself** [1] - 256:8

## J

**Jake** [1] - 90:20
**January** [7] - 101:24, 138:12, 138:18, 139:5, 154:16, 162:16, 224:6
**Jeff** [5] - 4:4, 5:11, 36:16, 61:15, 186:11
**Jeffrey** [1] - 255:11
**JEFFREY** [6] - 1:12, 5:2, 256:2, 256:23, 257:6, 257:18
**Jersey** [9] - 99:18, 112:23, 113:8, 113:14, 113:23, 114:1, 114:3, 114:4, 114:7
**Jesus** [1] - 254:11
**JEWELL** [2] - 2:9, 155:25
**job** [6] - 26:24, 77:25, 85:8, 91:13, 91:15, 91:18
**joined** [6] - 15:2, 99:20, 121:18, 121:23, 139:18, 152:18
**joining** [3] - 108:25, 174:21, 191:4
**jointly** [1] - 125:15
**judge** [4] - 70:21, 73:17, 73:19, 243:17
**July** [25] - 22:7, 161:9, 161:13, 161:14, 168:3, 168:8, 168:14, 168:18, 169:14, 169:20, 169:21, 170:9, 170:13, 170:15, 179:23, 180:1, 180:12, 180:22, 186:17, 187:9, 187:15, 200:8, 200:16, 204:13,

214:22
**jumps** [2] - 163:12, 163:17
**June** [32] - 4:20, 84:23, 162:9, 162:10, 170:11, 170:12, 170:13, 181:3, 181:7, 184:11, 184:21, 184:25, 187:11, 188:14, 188:23, 192:15, 193:23, 194:20, 197:17, 197:20, 198:1, 199:3, 199:18, 200:11, 200:21, 200:22, 201:9, 201:19, 214:21, 216:5, 255:4, 257:20
**junior** [1] - 188:17
**jurors** [1] - 121:3
**jury** [3] - 62:5, 83:8, 243:16

## K

**Kahn** [1] - 2:9
**Keefe** [5] - 1:20, 255:23, 257:5, 257:12, 257:22
**keep** [12] - 36:19, 72:4, 82:16, 88:10, 88:18, 89:5, 119:15, 169:3, 178:1, 228:24, 230:21, 236:7
**keeps** [1] - 237:21
**Keller** [12] - 104:12, 165:7, 165:10, 166:9, 167:13, 174:3, 174:8, 174:12, 174:13, 174:14, 174:20, 204:25
**Kennedy** [3] - 1:18, 2:13, 255:1
**kept** [1] - 115:21
**Kevin** [3] - 75:21, 75:22, 76:7
**key** [1] - 186:19
**Kickoff** [2] - 240:12, 246:18
**kids** [1] - 114:12
**Kiera** [1] - 84:22
**Kiley** [17] - 15:12, 83:25, 84:5, 88:5, 88:7, 88:8, 89:6, 94:1, 94:8, 95:20, 95:21, 95:24, 112:5,

113:12, 113:14, 200:9
**kind** [24] - 14:24, 44:23, 49:7, 51:17, 52:11, 69:25, 82:5, 100:20, 104:20, 105:17, 106:5, 106:19, 106:23, 108:6, 108:9, 125:16, 125:24, 132:17, 176:8, 176:12, 183:6, 196:7, 230:6
**King** [13] - 15:12, 88:7, 88:8, 94:1, 95:20, 95:21, 95:24, 112:1, 112:8, 112:13, 113:14, 119:7, 200:9
**king** [1] - 15:23
**knowing** [1] - 174:20
**Knowledge** [1] - 237:25
**knowledge** [17] - 15:1, 15:8, 15:9, 15:10, 15:24, 41:15, 46:3, 46:5, 97:14, 99:2, 99:4, 99:11, 119:4, 119:6, 201:25, 228:19, 247:8
**known** [7] - 108:16, 118:7, 118:11, 122:10, 140:23, 230:19, 244:22
**knows** [2] - 34:21, 97:4
**KREITER** [139] - 2:8, 5:8, 8:23, 11:7, 16:13, 16:20, 22:13, 23:23, 24:1, 25:3, 25:5, 25:9, 26:21, 26:25, 28:14, 28:16, 30:9, 30:12, 34:22, 35:2, 35:11, 35:16, 40:15, 41:5, 47:2, 47:5, 47:9, 47:14, 47:21, 54:22, 60:12, 60:16, 60:19, 60:22, 62:25, 63:3, 63:10, 64:25, 69:23, 70:9, 70:13, 70:22, 71:16, 71:22, 76:25, 77:3, 84:10, 96:4, 96:9, 124:17, 133:6, 133:11, 133:16, 133:18, 135:1, 135:4, 135:10, 136:3, 136:5, 137:16, 142:19, 142:22, 143:20, 143:25, 144:4,

**144:**11, 144:15, 146:21, 146:24, 147:4, 147:11, 147:13, 149:8, 149:16, 149:21, 149:24, 150:7, 150:11, 152:1, 153:9, 153:16, 153:21, 154:1, 155:23, 157:16, 157:19, 159:4, 163:1, 179:1, 179:4, 179:7, 179:10, 186:2, 186:5, 194:24, 199:15, 199:25, 200:4, 202:12, 205:9, 205:11, 205:14, 205:20, 205:22, 206:13, 206:18, 207:5, 207:11, 207:20, 207:24, 209:18, 209:24, 210:3, 217:18, 219:9, 219:14, 219:16, 219:21, 220:2, 220:7, 220:10, 220:13, 220:21, 221:2, 221:13, 221:16, 221:23, 222:6, 223:16, 223:22, 237:14, 238:21, 240:17, 240:19, 241:24, 248:15, 250:4, 254:7, 254:10

**Kreiter** [7] - 3:2, 28:20, 96:11, 134:7, 144:5, 199:17, 222:15

## L

**labeled** [3] - 179:17, 229:20, 231:15
**laid** [2] - 19:9, 168:16
**language** [3] - 192:11, 230:24, 238:1
**large** [10] - 71:2, 89:1, 89:2, 89:18, 97:15, 126:13, 172:18, 176:24, 191:13, 191:15
**Large** [1] - 1:21
**largely** [1] - 229:4
**larger** [3] - 66:23, 74:13, 169:2
**largest** [1] - 204:18
**Larsen** [2] - 179:21, 194:12

**last** [15] - 12:1, 12:15, 28:16, 28:17, 90:20, 147:14, 168:12, 168:13, 169:7, 189:8, 195:5, 233:1, 248:13, 248:17, 251:3
**law** [3] - 72:19, 73:17, 211:1
**lawsuit** [2] - 22:6, 84:8
**lawyer** [5] - 65:11, 72:18, 77:1, 83:4, 234:12
**laying** [2] - 51:15, 168:15
**laypeople** [1] - 156:6
**lead** [6] - 186:23, 186:24, 187:7, 188:7, 249:22
**leader** [2] - 105:23, 121:4
**leaders** [2] - 104:25, 107:2
**leads** [2] - 187:8, 187:25
**learn** [1] - 171:9
**learned** [1] - 110:4
**lease** [7] - 87:25, 88:2, 88:10, 88:12, 89:22, 195:17, 195:18
**least** [7] - 13:10, 64:22, 110:24, 113:15, 114:18, 171:3, 235:21
**leave** [17] - 45:7, 57:3, 68:6, 92:4, 92:5, 93:17, 93:24, 95:8, 102:6, 102:14, 103:11, 106:2, 107:3, 109:25, 132:19, 170:20, 173:21
**leaves** [6] - 103:8, 103:15, 109:1, 116:24, 117:6, 169:1
**leaving** [17] - 79:24, 81:11, 85:25, 87:9, 92:2, 94:17, 94:19, 97:24, 103:4, 103:18, 106:14, 108:6, 108:25, 123:24, 124:24, 168:21, 173:12
**left** [34] - 12:19, 15:2, 15:16, 42:7, 45:6, 71:19, 83:22, 84:2, 87:24, 88:12, 93:20, 94:4, 95:7, 95:11, 96:25, 97:9, 105:14, 105:15, 106:23,

106:24, 107:5, 129:15, 140:20, 144:23, 161:23, 162:4, 167:14, 171:10, 178:22, 190:16, 204:5, 204:6, 222:19
**left-hand** [2] - 144:23, 222:19
**legal** [4] - 42:15, 65:4, 73:18, 73:22
**legitimately** [1] - 135:24
**lender** [1] - 174:14
**lenders** [2] - 229:1, 230:13
**lending** [1] - 247:19
**less** [7] - 18:25, 29:4, 29:20, 131:7, 183:8, 183:16, 192:6
**Letter** [2] - 3:3, 4:9
**letter** [3] - 69:12, 242:3, 248:19
**letterhead** [1] - 238:25
**letters** [1] - 69:7
**letting** [1] - 80:24
**level** [20] - 45:18, 67:4, 106:20, 158:16, 165:11, 168:25, 169:12, 170:3, 175:9, 199:12, 201:6, 202:1, 202:6, 202:9, 202:18, 202:19, 202:24, 238:11
**levels** [1] - 139:17
**Leyden** [1] - 123:18
**liability** [2] - 52:23, 53:10
**license** [1] - 210:24
**licensing** [1] - 190:25
**lie** [1] - 87:9
**likely** [17] - 44:22, 56:12, 108:17, 116:25, 117:7, 117:9, 117:24, 123:24, 124:3, 124:5, 183:8, 197:2, 197:9, 201:6, 201:7, 201:9, 201:20
**limitation** [1] - 103:13
**limited** [2] - 96:14, 97:11
**limiting** [1] - 53:15
**limits** [1] - 254:6
**line** [12] - 25:12, 109:9, 130:2, 149:24, 181:3, 185:24, 189:8, 189:14, 200:9,

201:1, 237:9, 255:17
**LINE** [1] - 256:11
**lined** [2] - 255:15, 255:17
**lines** [2] - 218:16, 256:8
**link** [8] - 7:17, 7:19, 7:21, 8:13, 9:10, 9:20, 10:3, 10:5
**LinkedIn** [3] - 4:4, 11:11, 11:14
**Linx** [12] - 242:20, 242:23, 242:24, 243:4, 243:7, 243:22, 243:25, 244:16, 244:18, 244:21, 244:21, 245:5, 246:2
**list** [13] - 23:19, 24:8, 24:10, 24:16, 24:19, 24:20, 24:23, 33:25, 115:25, 240:23, 249:9, 250:7
**List** [2] - 240:13, 246:18
**listed** [10] - 33:13, 33:15, 34:2, 133:25, 135:12, 137:1, 138:3, 138:15, 145:11, 162:12
**listen** [3] - 51:18, 58:2, 62:3
**listing** [1] - 226:5
**Listings** [1] - 4:24
**lists** [2] - 19:22, 133:20
**Listserv** [2] - 180:6, 180:10
**litigation** [1] - 230:1
**lived** [1] - 114:4
**lives** [1] - 88:5
**living** [2] - 67:18, 114:9
**LLC** [2] - 2:2, 255:6
**loan** [160] - 13:14, 13:20, 13:22, 14:4, 14:7, 14:11, 15:15, 15:19, 15:21, 18:18, 20:10, 22:5, 22:21, 32:1, 32:3, 32:10, 32:13, 32:21, 32:23, 36:3, 36:7, 36:15, 38:25, 40:2, 40:8, 40:20, 41:8, 41:9, 44:20, 44:22, 45:5, 45:7, 45:9, 45:16, 45:23, 46:16, 48:16, 49:17, 49:20, 49:24, 50:4, 50:11, 50:20, 50:22, 52:6, 53:6, 53:12, 53:17, 57:25,

58:1, 62:2, 62:3, 62:7, 62:8, 62:11, 68:10, 73:3, 73:6, 74:4, 74:5, 74:6, 74:23, 77:12, 90:23, 91:1, 91:8, 91:9, 92:9, 96:14, 97:11, 116:17, 116:18, 129:19, 131:7, 131:20, 140:2, 140:5, 142:11, 145:7, 145:21, 147:22, 153:1, 154:11, 155:16, 155:18, 168:22, 169:6, 169:7, 169:10, 176:14, 176:19, 177:20, 181:19, 181:24, 182:3, 182:7, 188:11, 188:13, 188:14, 205:3, 205:7, 206:1, 206:4, 206:12, 206:25, 207:14, 207:15, 207:23, 208:1, 208:5, 208:24, 209:4, 209:9, 210:6, 210:9, 210:14, 210:18, 211:4, 211:9, 213:20, 213:24, 214:10, 214:13, 214:15, 215:6, 215:9, 216:15, 218:4, 218:8, 220:6, 221:16, 223:6, 223:13, 224:3, 224:16, 224:20, 224:24, 225:4, 226:6, 227:13, 227:17, 235:2, 235:19, 236:3, 245:14, 245:15, 245:20, 249:17, 249:24, 250:23, 251:1, 252:9
**Loan** [6] - 145:6, 222:20, 225:1, 225:5, 240:12, 242:13
**loan-by-loan** [2] - 49:20, 49:24
**loan-officer** [1] - 13:22
**Loans** [8] - 4:24, 129:18, 135:17, 139:20, 145:10, 150:20, 223:1, 224:14

**loans** [128] - 13:25,
18:3, 18:18, 19:17,
20:9, 21:4, 21:8,
22:1, 22:3, 22:4,
23:4, 23:19, 24:14,
24:16, 24:20, 24:24,
25:15, 25:17, 27:23,
29:2, 41:16, 44:12,
48:24, 49:11, 49:15,
50:7, 51:3, 51:8,
52:9, 52:14, 53:2,
54:7, 55:19, 55:22,
56:1, 56:8, 56:13,
57:8, 58:17, 58:25,
59:5, 59:18, 59:19,
60:4, 60:5, 61:3,
61:6, 61:8, 67:18,
67:22, 68:4, 68:22,
69:1, 72:15, 72:21,
73:9, 73:12, 73:25,
74:13, 74:16, 74:17,
86:25, 91:8, 92:25,
96:14, 97:11, 97:15,
100:6, 105:15,
116:13, 116:22,
117:2, 126:20,
140:6, 145:20,
145:25, 149:7,
150:23, 150:24,
150:25, 151:19,
152:25, 157:2,
174:11, 177:2,
183:13, 187:5,
195:15, 200:22,
208:10, 208:14,
208:17, 210:20,
211:6, 211:9,
211:10, 211:14,
213:5, 213:15,
213:17, 213:18,
213:22, 213:23,
214:1, 214:8, 215:3,
215:12, 215:14,
215:22, 216:3,
216:12, 216:13,
217:8, 219:12,
226:21, 227:6,
227:7, 227:11,
227:16, 227:19,
227:25, 245:2,
245:6, 249:19,
251:21
**locate** [1] - 132:21
**located** [1] - 13:1
**LOCATION** [1] - 1:18
**logistics** [1] - 215:10
**Lombard** [1] - 2:6
**look** [61] - 6:14, 11:9,
16:2, 24:15, 35:21,
49:14, 56:14, 72:25,

84:13, 92:25, 95:10,
106:4, 124:20,
129:5, 133:2, 134:5,
136:6, 137:6,
138:11, 140:6,
141:25, 142:5,
152:9, 153:16,
156:7, 157:7, 159:7,
169:11, 169:25,
170:8, 170:16,
179:2, 179:12,
187:18, 200:2,
202:15, 202:21,
205:14, 206:13,
209:3, 215:19,
219:11, 219:20,
220:5, 224:6,
224:11, 224:14,
224:15, 225:8,
226:5, 228:5, 229:7,
231:12, 235:6,
235:10, 235:20,
236:6, 239:2,
249:25, 250:5,
250:16
**Look** [2] - 90:5, 98:19
**looked** [30] - 7:3, 7:5,
7:8, 8:11, 9:25, 10:1,
10:9, 22:1, 23:17,
24:9, 24:11, 25:17,
38:3, 134:20, 138:8,
140:4, 140:8,
140:23, 142:4,
156:20, 166:24,
167:23, 171:21,
197:14, 199:2,
215:24
**looking** [33] - 49:10,
50:16, 61:3, 74:6,
93:17, 111:3,
129:19, 134:23,
135:21, 138:4,
139:25, 140:7,
140:25, 144:8,
155:3, 164:12,
164:17, 170:6,
172:18, 184:5,
184:14, 186:17,
195:24, 207:12,
210:17, 215:17,
220:12, 220:16,
221:6, 222:17,
222:23, 225:19,
226:16
**looks** [8] - 180:6,
185:21, 202:17,
202:19, 225:4,
236:3, 238:23,
247:18
**lose** [4] - 18:18, 89:21,

103:22, 183:7
**loses** [1] - 104:19
**losing** [2] - 39:14,
199:11
**loss** [17] - 55:23,
149:12, 178:12,
184:25, 185:10,
196:20, 198:24,
199:1, 200:16,
200:21, 201:4,
201:6, 201:9,
201:11, 202:5,
219:11
**Loss** [5] - 4:14, 4:16,
4:23, 144:24, 241:20
**losses** [2] - 60:24,
167:4
**lost** [19] - 21:3, 29:11,
31:3, 31:4, 31:15,
31:16, 33:6, 33:7,
57:6, 103:21, 104:2,
105:6, 126:15,
127:7, 137:2,
137:21, 170:23
**Lost** [5] - 18:2, 18:7,
19:16, 20:8, 31:14
**Louis** [3] - 172:20,
197:12, 198:7
**low** [2] - 164:1, 203:23
**lower** [5] - 177:12,
177:15, 181:12,
182:22, 245:11
**lowering** [1] - 182:24
**lowest** [2] - 167:9
**LOX** [1] - 239:11
**Lucas** [2] - 194:13,
194:16
**lunch** [1] - 96:5
**lying** [1] - 86:19

**M**

**Macsuga** [1] - 2:19
**mad** [1] - 86:13
**madam** [1] - 47:21
**magnitude** [2] - 52:1,
54:5
**mail** [57] - 7:17, 7:19,
8:8, 9:23, 24:10,
24:12, 38:4, 41:23,
41:24, 51:5, 51:19,
82:12, 83:1, 84:22,
85:22, 86:14, 86:15,
86:20, 87:7, 87:9,
87:15, 96:16,
110:16, 110:22,
110:24, 111:1,
111:17, 120:7,
120:13, 121:14,

128:15, 134:22,
142:8, 142:14,
155:23, 179:20,
179:23, 180:6,
180:12, 181:2,
181:14, 186:1,
194:12, 194:23,
197:14, 199:18,
199:19, 200:7,
200:8, 200:15,
209:21, 235:21,
235:22, 237:9,
237:15, 238:20
**mailed** [1] - 134:22
**Mails** [4] - 4:9, 4:10,
4:19, 4:20
**mails** [66] - 7:4, 7:8,
7:10, 7:20, 7:24, 8:1,
8:6, 9:13, 9:14, 9:17,
9:19, 9:20, 9:25,
10:1, 10:2, 10:6,
23:16, 23:17, 24:9,
24:11, 26:13, 26:18,
27:9, 27:14, 28:2,
28:5, 28:9, 38:3,
51:6, 58:12, 58:14,
78:11, 78:14, 79:8,
79:16, 79:17, 79:19,
79:20, 84:21, 87:11,
109:24, 109:25,
110:3, 111:4, 111:8,
111:12, 111:23,
119:19, 127:20,
127:24, 128:1,
128:9, 128:10,
128:19, 180:14,
180:16, 180:20,
200:14, 218:3,
218:4, 218:5, 218:6,
218:7, 218:10
**main** [1] - 12:7
**maintain** [4] - 229:10,
231:6, 237:19, 243:9
**maintained** [1] - 88:1
**majority** [2] - 8:10,
89:7
**male** [1] - 112:5
**manage** [3] - 123:11,
176:9, 189:9
**managed** [3] - 116:8,
122:3, 122:6
**management** [3] -
13:16, 58:15, 245:21
**manager** [43] - 13:14,
48:24, 49:10, 49:14,
49:18, 67:2, 68:10,
69:8, 75:13, 75:14,
76:5, 76:11, 76:12,
80:23, 82:18, 82:20,
82:22, 83:9, 86:11,

86:14, 87:16, 92:24,
95:18, 103:4, 103:8,
103:15, 104:2,
104:5, 104:6,
104:16, 108:7,
114:7, 119:22,
119:25, 120:2,
121:3, 171:9,
171:11, 171:18,
189:20, 190:1,
190:4, 212:17
**managers** [61] - 13:21,
14:18, 15:1, 15:11,
15:15, 15:21, 42:12,
66:13, 67:2, 71:3,
78:19, 83:13, 83:17,
87:19, 94:14, 94:24,
95:11, 99:9, 99:19,
99:20, 99:25, 100:2,
101:8, 102:1, 102:2,
102:17, 102:19,
102:20, 102:21,
102:25, 104:10,
107:11, 107:15,
110:10, 111:16,
114:21, 114:25,
115:3, 115:6, 115:9,
118:6, 118:7,
120:12, 122:25,
123:3, 171:8, 172:7,
172:25, 173:8,
173:10, 173:15,
190:13, 190:17,
190:18, 205:4,
209:4, 212:17,
224:3, 227:12,
249:24
**managers'** [1] - 95:3
**manner** [1] - 151:14
**manufactured** [3] -
97:4, 247:19, 247:23
**Manufactured** [1] -
247:18
**March** [5] - 37:5,
37:21, 162:17,
201:25, 238:19
**margin** [5] - 181:12,
182:5, 182:6, 189:9
**margins** [10] - 181:9,
181:11, 181:15,
181:17, 181:18,
181:23, 182:2,
182:20, 182:22,
182:25
**Maria** [14] - 16:11,
16:22, 23:24, 47:8,
54:19, 71:14,
146:20, 149:10,
151:24, 206:16,
209:17, 219:6,

221:20, 237:7
**MARIA** [1] - 2:8
**mark** [2] - 173:23, 256:7
**MARK** [1] - 2:4
**marked** [26] - 6:15, 11:3, 11:8, 16:1, 16:2, 16:21, 35:19, 84:12, 84:13, 124:19, 136:3, 136:4, 136:19, 136:20, 136:22, 137:20, 144:20, 152:8, 159:6, 179:8, 199:24, 202:12, 202:14, 219:5, 235:7, 250:2
**market** [21] - 164:3, 165:1, 168:8, 176:14, 176:19, 176:20, 177:1, 177:4, 177:5, 177:6, 178:20, 188:25, 189:1, 189:3, 189:5, 189:10, 191:14, 192:3, 192:8, 195:2, 204:14
**marketing** [11] - 188:4, 190:7, 190:9, 191:11, 191:12, 233:6, 233:8, 233:11, 236:24, 237:1, 237:24
**markets** [2] - 189:2, 189:5
**Marrero** [1] - 222:21
**Maryland** [2] - 175:22, 198:8
**match** [1] - 152:20
**matches** [2] - 137:3, 145:11
**matching** [1] - 179:13
**mater** [1] - 186:5
**material** [5] - 67:1, 192:21, 233:6, 233:8, 233:11
**materials** [1] - 237:24
**math** [5] - 130:19, 162:23, 162:24, 163:3
**matter** [2] - 40:3, 40:6
**Mayle** [19] - 125:5, 125:6, 125:7, 125:14, 126:7, 127:12, 127:20, 128:19, 128:25, 137:20, 142:9, 149:5, 150:4, 165:23, 199:19, 200:9, 200:15,

200:19, 202:4
**MBA** [1] - 176:11
**McCALL** [2] - 2:1, 255:6
**mean** [141] - 7:16, 7:22, 8:3, 10:5, 12:4, 18:12, 18:20, 28:23, 30:6, 30:19, 30:21, 41:21, 41:25, 42:1, 43:9, 49:13, 49:16, 50:22, 51:18, 52:4, 52:25, 53:3, 53:4, 53:5, 56:11, 57:18, 58:2, 61:16, 61:18, 62:20, 63:1, 66:18, 71:7, 71:15, 71:16, 75:19, 76:4, 77:15, 78:15, 80:17, 82:15, 82:16, 83:5, 84:1, 86:16, 89:22, 91:17, 93:19, 94:2, 95:6, 97:8, 97:19, 97:20, 98:18, 98:20, 101:10, 101:17, 103:22, 106:13, 108:11, 108:23, 111:2, 111:3, 111:8, 115:11, 115:12, 116:3, 116:7, 117:3, 120:1, 121:7, 123:20, 124:4, 126:3, 126:15, 127:16, 132:22, 133:4, 133:6, 134:8, 134:21, 135:20, 139:3, 139:25, 144:1, 146:24, 147:1, 147:21, 150:3, 151:17, 152:4, 152:12, 156:6, 156:8, 157:3, 157:13, 158:5, 158:16, 159:13, 165:5, 170:8, 170:25, 173:6, 173:15, 174:5, 176:19, 181:12, 182:24, 183:10, 183:25, 186:20, 189:5, 191:9, 193:13, 195:2, 195:3, 195:9, 195:17, 196:7, 198:10, 201:9, 210:12, 215:16, 216:7, 216:22, 220:13, 221:3, 237:2, 238:4, 238:6, 239:19, 240:24, 243:3, 252:16, 252:25, 253:15,

254:6
**meaning** [8] - 45:17, 46:14, 63:19, 78:23, 110:23, 182:11, 192:3, 233:8
**means** [5] - 43:21, 89:21, 115:11, 186:21, 189:3
**measure** [1] - 176:12
**measures** [1] - 228:23
**meet** [2] - 121:9, 127:12
**meeting** [4] - 42:11, 12:16, 110:17, 126:6
**Melanie** [5] - 1:20, 255:23, 257:5, 257:12, 257:22
**member** [1] - 117:16
**members** [3] - 117:18, 233:9, 233:12
**memorize** [4] - 141:22, 205:12, 216:15, 223:20
**memorizes** [1] - 205:18
**mentioned** [4] - 98:2, 127:1, 150:19, 157:3
**mentioning** [1] - 105:19
**mentor** [2] - 118:14, 122:15
**mere** [1] - 81:10
**merely** [1] - 243:15
**mess** [1] - 206:20
**met** [1] - 185:9
**method** [2] - 166:3, 166:4
**methodology** [2] - 224:8, 225:14
**metric** [2] - 14:12, 14:15
**Michigan** [1] - 2:10
**MIDDLE** [1] - 1:1
**might** [3] - 174:19, 216:8, 250:15
**might've** [2] - 42:23, 145:20
**mileage** [1] - 150:14
**mill** [1] - 71:6
**million** [31] - 53:21, 53:24, 54:8, 54:13, 54:18, 54:25, 55:12, 56:6, 56:17, 68:20, 71:8, 127:3, 132:1, 141:3, 141:11, 154:6, 154:7, 159:19, 163:18, 170:19, 185:3, 185:8, 185:12, 185:13, 191:15,

191:16, 192:17, 192:19, 192:20, 193:23, 199:4
**million)** [1] - 193:24
**million-person** [1] - 191:16
**Milwaukee** [1] - 2:11
**mind** [22] - 23:14, 39:23, 49:23, 52:23, 53:9, 66:19, 74:14, 76:23, 80:5, 80:11, 95:10, 137:17, 150:17, 152:9, 186:3, 190:7, 191:10, 203:8, 222:15, 226:19, 234:25, 237:20
**minus** [1] - 131:20
**minute** [5] - 28:13, 32:22, 133:16, 228:4, 254:7
**minutes** [5] - 142:18, 153:19, 199:15, 209:25, 217:15
**misallocation** [1] - 152:25
**misappropriated** [2] - 217:22, 253:2
**mischaracterization** [3] - 54:20, 207:18, 223:11
**misprint** [1] - 138:11
**misrepresenting** [1] - 147:10
**miss** [1] - 158:20
**missing** [4] - 11:13, 138:12, 220:3, 220:4
**misspoke** [1] - 220:23
**mistake** [1] - 162:21
**mistakes** [2] - 135:23, 145:21
**Mitchell** [2] - 2:2, 255:6
**mixing** [1] - 55:15
**MLO** [2] - 188:17
**MLOs** [1] - 188:11
**mode** [1] - 69:11
**model** [6] - 18:24, 19:2, 176:22, 176:24, 203:12, 204:11
**MOM-0000054** [1] - 238:18
**MOM-0010942** [1] - 136:22
**MOM-0010964** [1] - 144:19
**MOM-0011163** [1] - 159:4
**MOM-10942** [1] -

136:18
**MOM-11032** [1] - 138:5
**MOM-1205** [1] - 233:2
**MOM-1467** [1] - 179:4
**MOM-2924** [1] - 84:16
**MOM-397** [1] - 231:14
**MOM-448** [1] - 232:6
**moment** [4] - 11:13, 26:1, 46:9, 63:13
**monetary** [1] - 33:25
**money** [17] - 63:25, 64:3, 64:6, 64:8, 64:10, 65:24, 66:9, 67:13, 67:15, 92:3, 93:3, 117:5, 162:5, 169:8, 169:10, 170:4, 237:3
**Money** [2] - 113:13, 113:16
**monies** [1] - 236:22
**month** [14] - 29:7, 29:18, 29:21, 68:4, 91:8, 138:19, 139:5, 141:16, 145:19, 198:8, 199:1, 207:19, 219:13
**monthly** [10] - 13:10, 14:4, 126:22, 158:12, 158:16, 174:24, 175:12, 180:16, 180:18, 180:20
**months** [33] - 12:19, 22:9, 23:21, 25:11, 30:4, 61:23, 72:10, 72:23, 98:2, 125:19, 126:23, 161:9, 162:13, 162:15, 162:16, 162:19, 162:22, 163:5, 165:21, 167:20, 168:5, 171:4, 171:17, 172:4, 172:7, 172:9, 172:10, 172:23, 173:17, 174:5, 199:11, 203:25, 204:12
**MOOM** [9] - 4:10, 4:14, 4:16, 4:19, 4:21, 4:22, 4:23, 180:7, 181:3
**Mortgage** [28] - 2:5, 2:15, 4:3, 4:4, 4:6, 4:7, 4:8, 4:12, 4:13, 4:18, 6:19, 10:17, 11:25, 16:4, 16:25, 17:1, 23:4, 26:17, 38:4, 41:24, 155:10,

166:15, 233:1,
241:16, 242:6,
242:9, 248:25,
255:12
**mortgage** [18] - 10:11,
10:13, 10:18, 10:23,
11:15, 50:4, 97:15,
134:12, 134:13,
159:17, 159:20,
178:21, 183:12,
188:13, 188:14,
192:3, 192:8, 252:10
**MORTGAGE** [12] -
1:4, 1:7, 1:13, 5:3,
255:9, 255:10,
256:2, 256:3, 256:4,
256:25, 257:6,
257:18
**mortgages** [2] - 11:1,
238:8
**most** [13] - 49:17,
49:18, 98:17, 98:19,
131:4, 133:10,
154:14, 154:15,
165:24, 166:18,
171:2, 218:16,
235:21
**motion** [3] - 150:10,
220:25, 221:22
**motivated** [1] - 174:20
**move** [20] - 36:7,
36:14, 54:16, 77:13,
88:11, 97:21, 99:13,
101:5, 104:16,
104:17, 105:16,
106:19, 113:18,
127:5, 150:8, 187:8,
209:25, 210:2, 210:5
**moved** [4] - 50:8,
97:18, 113:17, 114:6
**moves** [1] - 241:2
**moving** [2] - 91:7,
184:16
**MR** [3] - 96:8, 146:19,
157:22
**MS** [481] - 5:8, 8:20,
8:23, 11:7, 12:12,
14:20, 15:4, 16:11,
16:13, 16:20, 16:22,
18:10, 22:12, 22:13,
22:18, 23:12, 23:22,
23:23, 23:24, 24:1,
24:3, 25:1, 25:3,
25:4, 25:5, 25:7,
25:9, 26:9, 26:12,
26:19, 26:21, 26:22,
26:25, 27:2, 27:16,
28:11, 28:13, 28:14,
28:16, 29:6, 29:15,
29:22, 30:1, 30:7,

30:9, 30:10, 30:12,
30:20, 31:7, 33:22,
34:17, 34:22, 34:24,
35:2, 35:7, 35:9,
35:11, 35:16, 35:18,
35:20, 36:8, 36:16,
38:9, 40:15, 40:22,
41:5, 41:14, 41:18,
42:8, 42:14, 42:20,
43:12, 43:20, 45:2,
46:2, 46:4, 46:18,
46:24, 47:2, 47:3,
47:5, 47:7, 47:9,
47:11, 47:14, 47:21,
48:11, 48:22, 49:22,
51:11, 52:24, 53:11,
54:9, 54:19, 54:22,
55:13, 56:10, 57:11,
57:14, 58:19, 59:2,
60:7, 60:12, 60:14,
60:16, 60:18, 60:19,
60:21, 60:22, 61:9,
62:18, 62:24, 62:25,
63:1, 63:3, 63:7,
63:10, 64:25, 65:7,
65:10, 65:22, 66:2,
66:5, 66:10, 66:15,
66:21, 67:6, 67:14,
68:18, 69:19, 69:23,
70:3, 70:9, 70:11,
70:13, 70:20, 70:22,
71:5, 71:14, 71:16,
71:18, 71:22, 71:24,
72:2, 72:17, 73:15,
74:8, 74:10, 74:21,
75:12, 75:20, 76:3,
76:24, 76:25, 77:1,
77:3, 80:8, 80:10,
80:15, 80:19, 81:2,
81:12, 83:23, 84:10,
84:11, 84:19, 86:6,
86:10, 87:10, 87:21,
91:4, 91:14, 91:25,
95:1, 95:5, 95:13,
95:19, 95:25, 96:4,
96:7, 96:9, 97:13,
98:10, 99:6, 99:21,
100:4, 100:21,
106:17, 107:13,
107:23, 109:22,
110:21, 111:7,
112:4, 114:22,
115:10, 115:15,
117:1, 117:8,
117:13, 118:15,
118:19, 118:23,
120:6, 120:11,
120:15, 121:20,
121:25, 122:16,
122:19, 123:5,
123:16, 124:2,

124:17, 128:2,
128:4, 133:6, 133:8,
133:11, 133:14,
133:16, 133:18,
135:1, 135:3, 135:4,
135:8, 135:10,
136:3, 136:5,
137:14, 137:16,
137:18, 140:18,
141:21, 142:2,
142:7, 142:12,
142:18, 142:19,
142:20, 142:22,
143:4, 143:20,
143:23, 143:25,
144:3, 144:4,
144:11, 144:15,
146:3, 146:20,
146:21, 146:23,
146:24, 147:3,
147:4, 147:6, 147:9,
147:11, 147:12,
147:13, 149:8,
149:10, 149:16,
149:18, 149:21,
149:22, 149:24,
150:1, 150:6, 150:7,
150:10, 150:11,
151:11, 151:24,
152:1, 153:7, 153:9,
153:11, 153:16,
153:20, 153:21,
153:24, 154:1,
154:3, 155:23,
155:25, 157:16,
157:18, 157:19,
158:11, 158:22,
159:4, 159:15,
163:1, 166:19,
167:6, 168:10,
171:19, 172:11,
172:15, 173:3,
173:13, 174:9,
174:22, 178:23,
179:1, 179:3, 179:4,
179:5, 179:7, 179:9,
179:10, 179:12,
181:13, 183:4,
183:18, 184:13,
185:24, 186:2,
186:3, 186:5,
187:17, 187:22,
189:12, 189:23,
190:14, 191:3,
191:5, 192:22,
193:10, 193:16,
194:1, 194:22,
194:24, 196:14,
196:19, 197:4,
197:10, 197:22,
198:21, 199:15,

199:20, 199:25,
200:3, 200:4, 200:5,
200:13, 201:12,
202:7, 202:12,
203:14, 203:21,
204:1, 204:8,
204:16, 205:8,
205:9, 205:10,
205:11, 205:12,
205:14, 205:17,
205:20, 205:21,
205:22, 206:10,
206:13, 206:16,
206:18, 207:3,
207:5, 207:8,
207:11, 207:17,
207:20, 207:22,
207:24, 209:1,
209:11, 209:16,
209:18, 209:19,
209:22, 209:24,
210:2, 210:3, 210:5,
210:10, 211:16,
211:24, 212:10,
212:15, 213:2,
213:13, 215:5,
216:14, 216:18,
217:1, 217:4, 217:9,
217:17, 217:18,
217:20, 219:6,
219:9, 219:10,
219:14, 219:15,
219:16, 219:18,
219:21, 219:23,
220:2, 220:4, 220:7,
220:10, 220:11,
220:13, 220:20,
220:21, 220:23,
221:2, 221:13,
221:15, 221:16,
221:19, 221:23,
222:4, 222:6,
223:10, 223:16,
223:17, 223:22,
225:16, 225:20,
226:3, 226:13,
229:15, 230:3,
232:1, 233:23,
234:9, 236:1, 237:7,
237:14, 238:17,
238:21, 239:18,
240:9, 240:14,
240:17, 240:18,
240:19, 241:7,
241:23, 241:24,
243:2, 243:20,
244:15, 246:7,
246:12, 246:24,
247:7, 248:6,
248:11, 248:14,
248:15, 250:3,

250:4, 250:12,
251:10, 251:12,
251:16, 252:6,
253:9, 253:12,
254:4, 254:7,
254:10, 254:12
**multiple** [1] - 128:12
**multiply** [1] - 126:21
**multiplying** [1] - 160:2
**multitudes** [1] -
164:21
**must** [1] - 232:8
**must've** [1] - 110:11
**Mutual** [336] - 2:5, 4:3,
4:4, 4:7, 4:12, 4:18,
6:19, 6:22, 10:10,
10:15, 10:16, 10:19,
10:21, 11:21, 11:24,
12:2, 13:4, 15:2,
15:10, 15:16, 16:25,
17:24, 18:9, 19:6,
20:6, 21:8, 22:11,
22:14, 22:16, 23:4,
24:21, 24:25, 25:11,
25:16, 25:21, 26:2,
26:5, 26:17, 27:8,
27:21, 28:4, 28:22,
28:23, 29:3, 30:23,
31:5, 31:13, 31:22,
32:3, 32:7, 33:8,
33:13, 35:2, 36:3,
36:5, 36:13, 37:4,
37:21, 37:23, 38:4,
38:24, 39:6, 39:9,
39:17, 40:20, 41:12,
41:24, 42:6, 42:16,
43:18, 44:13, 44:21,
45:22, 45:25, 46:3,
47:15, 48:3, 48:19,
49:9, 49:25, 50:1,
50:7, 50:12, 51:1,
53:12, 54:6, 54:17,
56:2, 56:8, 56:23,
56:24, 57:8, 57:9,
57:18, 57:20, 59:14,
59:16, 60:3, 61:5,
62:16, 62:22, 64:13,
64:19, 65:5, 67:12,
67:15, 68:7, 68:24,
69:1, 69:6, 70:5,
71:1, 72:7, 72:13,
72:14, 73:25, 75:9,
76:7, 77:5, 77:6,
79:4, 80:4, 81:13,
82:9, 83:5, 83:14,
83:21, 84:1, 84:25,
85:25, 86:3, 86:13,
86:25, 87:19, 88:1,
88:4, 88:10, 88:14,
88:18, 89:1, 89:4,

89:15, 90:4, 90:6,
91:13, 91:17, 91:18,
91:21, 93:17, 94:6,
94:14, 94:25, 95:3,
95:12, 95:17, 95:23,
96:20, 96:24, 98:2,
98:5, 99:13, 99:20,
100:2, 100:19,
101:2, 101:8,
101:21, 102:10,
103:3, 103:5, 103:7,
103:13, 104:5,
104:19, 105:6,
105:21, 106:3,
106:4, 109:15,
111:3, 111:14,
112:16, 113:5,
113:23, 115:21,
115:25, 116:6,
127:25, 130:7,
133:21, 134:1,
136:10, 137:4,
137:6, 137:24,
138:20, 140:1,
140:8, 140:22,
140:24, 141:2,
141:7, 141:24,
143:2, 143:11,
144:23, 146:1,
155:10, 160:21,
161:3, 163:24,
165:23, 166:15,
168:14, 169:11,
169:14, 169:19,
171:15, 172:2,
172:6, 174:18,
174:19, 174:24,
176:4, 176:14,
176:18, 176:21,
177:18, 177:24,
178:11, 178:22,
180:2, 180:9,
180:17, 188:12,
191:4, 195:11,
195:18, 197:20,
198:18, 198:19,
199:7, 199:8,
202:24, 203:4,
204:4, 206:24,
208:7, 210:6, 211:6,
211:8, 213:7, 213:8,
213:23, 214:3,
214:13, 215:13,
215:15, 216:5,
217:23, 218:19,
218:23, 219:2,
226:22, 226:23,
228:1, 228:6,
228:14, 228:17,
228:23, 229:10,
229:11, 229:14,

229:22, 230:2,
230:15, 230:16,
230:21, 231:6,
231:9, 231:16,
231:20, 231:24,
232:3, 232:11,
232:12, 232:17,
232:22, 233:4,
233:5, 233:16,
234:7, 235:9, 236:9,
236:15, 236:20,
237:3, 237:17,
237:18, 237:19,
237:21, 238:2,
238:24, 239:1,
239:5, 240:1, 240:5,
240:21, 241:5,
241:15, 241:22,
242:5, 242:9,
242:14, 242:23,
243:10, 243:11,
243:18, 243:25,
245:4, 246:6,
246:11, 246:22,
247:5, 247:20,
248:5, 248:9,
248:20, 249:4,
250:19, 251:14,
253:16, 253:23,
255:12
**MUTUAL** [9] - 1:3,
1:13, 5:2, 255:9,
256:2, 256:3,
256:24, 257:6,
257:18
**Mutual's** [32] - 16:3,
17:24, 31:15, 34:3,
37:4, 37:20, 60:23,
65:19, 67:1, 68:23,
79:12, 80:22, 85:15,
96:13, 97:9, 100:19,
100:22, 106:11,
106:22, 107:4,
113:2, 142:8, 163:6,
168:18, 179:21,
181:6, 194:16,
199:6, 210:8,
211:10, 233:20,
253:4

## N

**N25W23255** [1] - 2:16
**Name** [1] - 222:21
**name** [13] - 5:9, 50:15,
75:19, 82:23, 90:20,
119:24, 175:6,
186:11, 212:17,
224:16, 227:17,
252:9

**named** [1] - 232:8
**narrative** [1] - 33:11
**national** [1] - 194:17
**native** [2] - 220:1,
248:16
**natural** [34] - 45:11,
82:2, 104:22,
104:23, 105:8,
105:17, 105:22,
106:5, 106:11,
106:15, 106:19,
106:20, 106:25,
107:5, 107:10,
107:22, 107:24,
108:6, 108:8,
108:12, 108:18,
112:2, 112:10,
112:17, 116:24,
117:7, 117:24,
118:4, 123:10,
123:14, 171:7,
171:11, 171:18,
204:6
**naturally** [1] - 104:25
**NDA** [1] - 244:1
**near** [3] - 165:11,
247:10, 254:8
**nebulous** [2] - 39:13
**necessarily** [12] -
13:23, 14:16, 74:13,
91:5, 97:22, 102:15,
106:10, 123:20,
156:12, 172:23,
194:8, 253:3
**necessary** [5] - 27:10,
27:14, 28:9, 138:23,
255:17
**need** [30] - 5:23, 6:1,
26:11, 34:13,
123:14, 123:17,
123:19, 123:20,
128:21, 132:19,
132:22, 134:14,
135:10, 139:2,
148:5, 149:24,
150:7, 155:9,
159:16, 182:25,
183:17, 190:23,
199:13, 208:2,
208:19, 208:20,
217:16, 222:6,
253:15, 253:22
**Need** [1] - 233:1
**needed** [5] - 12:14,
101:4, 183:20,
223:20, 239:13
**needs** [3] - 135:5,
222:10, 248:18
**negative** [5] - 170:3,
184:12, 184:22,

192:15, 193:3
**negatively** [1] - 168:21
**negotiate** [6] - 243:6,
243:22, 245:15,
245:18, 245:20,
246:2
**negotiated** [7] -
242:24, 243:6,
243:12, 244:18,
244:25, 245:4, 245:7
**net** [6] - 19:9, 19:13,
31:10, 196:3, 196:7
**never** [16] - 49:14,
53:2, 59:9, 59:13,
62:7, 68:13, 68:14,
80:13, 86:22, 94:4,
100:11, 107:25,
123:17, 238:9,
252:25
**nevertheless..** [1] -
191:23
**new** [6] - 62:3, 68:1,
68:10, 102:7, 102:8,
107:25
**New** [9] - 99:18,
112:23, 113:8,
113:14, 113:23,
114:1, 114:3, 114:4,
114:6
**news** [2] - 78:13,
110:23
**next** [25] - 19:23,
35:16, 127:22,
129:18, 129:22,
165:3, 165:4,
166:21, 182:15,
186:9, 188:17,
188:24, 189:14,
200:15, 202:12,
230:5, 231:13,
232:6, 238:14,
241:19, 242:1,
242:12, 242:16,
247:9, 250:1
**nexus** [1] - 56:6
**nilly** [1] - 39:23
**nine** [2] - 221:12,
222:18
**NMLS** [2] - 50:21,
210:24
**NO** [1] - 1:2
**None** [1] - 256:9
**none** [11] - 33:24,
52:9, 89:8, 95:16,
97:9, 106:24, 107:5,
140:1, 195:13,
204:6, 232:2
**nonperformers** [3] -
168:16, 187:19,
187:21

**nonpersonal** [1] -
249:15
**nonprivate** [1] - 51:18
**nonproducing** [2] -
68:20, 183:20
**nonproductive** [1] -
183:20
**nonprofitable** [2] -
195:6, 195:8
**nonpublic** [6] - 39:8,
39:22, 49:6, 51:6,
249:16
**nonsolicit** [6] - 42:24,
42:25, 43:2, 77:19,
173:1, 173:2
**nonsolicitation** [1] -
43:5
**nonsolicits** [3] - 42:7,
79:3, 107:2
**normal** [1] - 236:7
**north** [1] - 141:3
**Northwest** [2] - 2:2,
255:7
**northwest** [2] - 13:2,
176:2
**Notary** [2] - 1:21,
257:23
**note** [2] - 105:15,
256:7
**noted** [1] - 256:21
**notes** [14] - 8:16, 8:19,
9:18, 211:18,
211:23, 211:25,
212:1, 212:2, 212:3,
212:5, 212:6, 212:8,
212:9, 257:8
**nothing** [13] - 66:14,
67:3, 77:20, 82:19,
92:6, 139:4, 149:16,
171:8, 182:4,
208:18, 241:21,
254:10, 254:12
**notice** [6] - 6:16, 6:23,
36:24, 47:15, 205:2,
208:4
**Notice** [2] - 1:14, 4:2
**noticed** [4] - 28:10,
37:7, 57:12, 167:8
**November** [1] - 180:23
**Number** [1] - 222:20
**NUMBER** [2] - 3:1,
256:5
**number** [53] - 11:4,
18:25, 21:13, 25:12,
25:14, 25:17, 25:20,
29:25, 30:24, 32:24,
33:25, 35:4, 35:17,
35:23, 54:18, 59:22,
64:24, 84:15, 116:4,
124:17, 127:4,

130:5, 131:25,
134:14, 134:24,
135:9, 136:5, 137:3,
139:24, 140:3,
140:5, 140:13,
140:14, 147:18,
148:13, 148:15,
168:5, 169:19,
169:23, 196:10,
196:12, 199:25,
207:3, 210:24,
219:1, 219:14,
219:16, 221:15,
224:5, 224:16, 233:1
**numbered** [1] - 231:14
**numbering** [1] -
229:22
**numbers** [27] - 19:22,
32:2, 33:12, 33:15,
54:20, 136:16,
138:14, 140:12,
142:15, 146:14,
146:16, 151:18,
154:12, 154:14,
159:19, 166:4,
204:22, 205:19,
207:22, 210:21,
210:23, 216:15,
222:24, 223:20,
225:15, 255:17
**numerous** [2] - 24:10,
218:9

## O

**OATH** [1] - 257:14
**oath** [1] - 5:5
**object** [222] - 8:20,
12:12, 14:20, 15:4,
18:10, 22:12, 22:18,
23:12, 23:22, 24:4,
25:1, 26:9, 26:12,
26:19, 27:16, 28:11,
29:6, 29:15, 29:22,
30:1, 30:7, 30:20,
31:7, 33:22, 34:17,
36:8, 38:9, 40:22,
41:14, 41:18, 42:8,
42:14, 42:20, 43:12,
43:20, 45:2, 46:2,
46:4, 46:18, 46:24,
48:11, 48:22, 49:22,
51:11, 52:24, 53:11,
54:9, 55:13, 56:10,
57:11, 58:19, 59:2,
60:7, 60:9, 61:10,
62:24, 65:7, 65:10,
65:22, 66:2, 66:5,
66:15, 66:21, 67:6,
67:14, 68:18, 69:19,

70:10, 70:13, 71:5,
72:17, 73:15, 74:8,
74:21, 75:12, 76:3,
76:24, 80:8, 80:15,
80:19, 81:2, 81:12,
83:23, 86:6, 87:10,
87:21, 91:4, 91:14,
91:25, 95:1, 95:5,
95:13, 95:19, 95:25,
97:13, 98:10, 99:6,
99:21, 100:4,
100:21, 106:17,
107:13, 109:22,
110:21, 111:7,
112:4, 114:22,
115:10, 115:15,
117:1, 117:8,
117:13, 118:15,
118:19, 118:23,
121:20, 121:25,
122:16, 122:19,
123:5, 123:16,
124:2, 128:2, 128:4,
140:18, 141:21,
142:2, 142:7,
142:12, 146:3,
151:11, 153:7,
158:11, 158:22,
159:15, 166:19,
167:6, 168:10,
171:19, 172:11,
172:15, 173:3,
173:13, 174:9,
174:22, 178:23,
181:13, 183:4,
183:18, 184:13,
185:24, 187:17,
187:22, 189:12,
189:23, 190:14,
191:3, 191:5,
192:22, 193:10,
193:16, 194:1,
194:22, 196:14,
196:19, 197:4,
197:10, 197:22,
198:21, 199:20,
200:13, 201:12,
202:7, 203:14,
203:21, 204:1,
204:8, 204:16,
205:8, 209:1,
209:11, 209:16,
210:10, 211:16,
211:24, 212:10,
212:15, 213:2,
213:13, 215:5,
216:14, 217:4,
217:9, 223:10,
225:16, 225:20,
226:3, 226:13,
229:15, 230:3,

232:1, 233:23,
234:9, 236:1,
239:18, 240:9,
240:14, 243:2,
243:20, 244:15,
246:7, 246:12,
246:24, 247:7,
248:6, 248:11,
250:12, 251:10,
251:16, 252:6,
253:9, 254:4
**objecting** [5] - 24:3,
36:19, 149:10, 150:6
**objection** [22] - 24:1,
30:9, 30:10, 35:7,
35:9, 36:17, 47:23,
54:19, 58:20, 61:11,
61:13, 62:18, 62:25,
70:17, 76:25,
107:23, 120:6,
120:11, 120:15,
205:9, 223:17, 241:7
**Objections** [4] - 4:5,
4:8, 4:12, 17:1
**objections** [1] - 17:18
**obligation** [1] - 37:14
**obviously** [3] - 94:4,
171:9, 203:6
**occur** [3] - 48:9,
131:2, 132:3
**occurred** [7] - 45:25,
50:13, 52:16, 53:23,
108:22, 170:2,
204:18
**occurs** [1] - 12:5
**October** [2] - 180:23,
228:10
**odd** [1] - 232:15
**OF** [23] - 1:1, 1:3,
1:12, 1:13, 5:2,
255:9, 256:2, 256:2,
256:3, 256:24,
257:1, 257:2, 257:3,
257:6, 257:14,
257:15, 257:16,
257:18
**off-limits** [1] - 254:6
**offage** [1] - 139:9
**offer** [3] - 69:6, 69:12,
85:4
**offered** [5] - 45:19,
45:22, 91:15, 91:18,
177:19
**offering** [1] - 177:25
**offhand** [1] - 36:4
**office** [9] - 87:22,
88:10, 88:23, 89:2,
126:3, 127:23,
141:12, 149:5,
195:21

**officer** [24] - 13:15,
13:22, 14:7, 50:21,
77:12, 85:6, 85:7,
86:24, 90:24, 91:1,
91:2, 91:8, 91:9,
92:9, 96:19, 123:19,
213:20, 235:19,
236:4, 245:14,
245:15, 250:23,
251:2
**Officer** [1] - 225:1
**officer's** [1] - 227:17
**officers** [15] - 13:20,
15:16, 15:19, 15:21,
49:17, 50:12, 53:7,
53:17, 68:10,
188:12, 188:13,
188:14, 245:20,
249:17, 249:24
**offices** [4] - 87:20,
88:14, 88:16, 127:22
**official** [1] - 257:20
**offs** [1] - 174:15
**offset** [3] - 195:22,
195:24, 196:3
**often** [2] - 13:8, 203:5
**old** [1] - 57:19
**OMAHA** [1] - 1:3, 1:13,
5:3, 255:9, 256:2,
256:3, 256:24,
257:6, 257:18
**Omaha** [70] - 2:5, 4:3,
4:4, 4:7, 4:12, 4:18,
6:19, 10:15, 10:16,
10:19, 10:21, 11:21,
11:25, 12:2, 13:4,
15:2, 16:25, 22:16,
23:4, 24:21, 25:16,
26:17, 38:24, 39:6,
39:9, 39:17, 50:12,
57:19, 57:20, 65:8,
81:13, 86:13, 89:1,
94:25, 130:7,
144:24, 155:10,
213:7, 213:8, 214:4,
214:13, 217:23,
226:22, 229:11,
231:16, 231:21,
231:24, 232:4,
232:12, 233:4,
233:5, 235:9,
236:20, 237:3,
238:25, 239:1,
241:5, 241:16,
241:22, 242:5,
242:9, 242:14,
242:23, 243:10,
243:12, 243:25,
247:21, 248:20,
249:4, 255:12

**on..** [1] - 10:14
**onboarding** [2] - 70:6,
70:7
**once** [4] - 74:4,
127:12, 214:23,
239:11
**one** [106] - 12:21,
16:18, 17:14, 19:4,
19:8, 31:8, 36:9,
37:18, 37:22, 37:23,
44:1, 45:9, 52:5,
62:20, 66:7, 67:2,
67:3, 68:11, 70:14,
77:18, 81:18, 87:14,
96:21, 99:3, 102:18,
103:21, 104:9,
105:11, 105:19,
106:22, 110:5,
110:12, 111:17,
113:15, 116:3,
116:18, 117:6,
119:13, 120:22,
125:21, 126:1,
126:4, 131:3,
131:23, 134:4,
136:25, 137:2,
137:7, 137:24,
138:16, 138:19,
139:2, 141:16,
148:7, 152:4,
152:10, 153:5,
161:20, 166:1,
166:21, 169:9,
173:23, 174:10,
174:12, 174:15,
178:18, 180:9,
197:5, 200:3, 203:8,
203:9, 203:15,
203:16, 204:25,
206:8, 206:13,
206:24, 206:25,
207:13, 207:18,
213:5, 219:18,
225:4, 228:23,
231:10, 232:6,
232:25, 235:6,
235:20, 237:12,
238:14, 241:1,
241:19, 241:23,
242:1, 242:12,
244:1, 244:2,
247:14, 248:13,
250:16, 253:21
**one-month** [2] -
138:19, 141:16
**one-offs** [1] - 174:15
**one-on-one** [1] -
12:21
**one-year** [1] - 173:23
**ones** [6] - 135:12,

140:22, 140:24, 173:17, 224:6, 227:4
**online** [1] - 240:4
**open** [8] - 56:1, 72:10, 73:12, 74:1, 74:3, 167:4, 167:20, 229:4
**opened** [1] - 220:1
**operating** [6] - 96:19, 123:18, 178:12, 198:24, 200:21, 201:11
**Operating** [1] - 244:9
**operations** [5] - 11:24, 116:10, 123:7, 194:17, 197:16
**opinion** [6] - 50:10, 51:24, 74:15, 197:1, 248:19
**Opinion** [1] - 233:1
**opportunities** [2] - 110:7, 116:23
**opportunity** [3] - 158:21, 191:14, 191:19
**opposed** [9] - 5:24, 14:11, 14:14, 68:16, 70:1, 105:17, 153:18, 172:10, 182:1
**opposing** [2] - 142:22, 229:24
**OR** [1] - 256:11
**orally** [1] - 144:15
**order** [7] - 96:5, 101:5, 131:2, 135:6, 182:25, 209:3, 229:23
**ordinary** [2] - 105:3, 123:25
**organize** [1] - 76:12
**organized** [2] - 76:10, 228:4
**origin** [2] - 71:10, 138:21
**original** [3] - 15:19, 31:2, 102:12
**originally** [2] - 114:1, 220:24
**originate** [5] - 67:18, 67:22, 208:10, 208:16, 208:18
**originated** [11] - 68:22, 208:14, 210:8, 213:6, 213:22, 213:23, 214:2, 214:15, 215:12, 216:3, 226:21
**origination** [1] - 211:4
**originations** [2] -

176:15, 176:19
**Ormond** [1] - 226:23
**otherwise** [2] - 64:7, 171:16
**outline** [1] - 69:9
**outside** [4] - 10:3, 114:21, 118:22, 239:23
**overall** [7] - 163:24, 176:5, 181:8, 190:18, 198:11, 198:15, 234:2
**overlap** [2] - 56:2, 73:23
**overlay** [1] - 70:9
**overlays** [3] - 97:2, 97:5
**oversee** [1] - 13:17
**overturned** [1] - 96:19
**Overview** [1] - 247:18
**overwhelmingly** [1] - 252:8
**overwhelmingness** [1] - 252:13
**owed** [1] - 85:17
**Owen** [3] - 75:20, 75:23, 76:16
**own** [2] - 13:24, 245:21
**owned** [4] - 10:20, 10:21, 230:16, 242:22
**owner** [3] - 102:5, 228:17, 232:8
**owns** [4] - 242:25, 243:1, 243:3, 244:18

## P

**P&I** [1] - 200:11
**P&L** [71] - 130:9, 131:22, 132:9, 133:4, 133:5, 134:15, 135:15, 135:25, 136:18, 137:10, 138:9, 138:18, 138:19, 138:25, 139:4, 141:16, 141:17, 144:21, 145:16, 149:1, 151:20, 152:5, 153:2, 154:16, 156:9, 156:21, 157:3, 157:8, 157:12, 157:13, 157:17, 157:21, 158:25, 170:3, 184:4, 200:11, 200:25,

201:4, 201:11, 201:14, 201:17, 213:14, 213:16, 214:5, 214:10, 214:20, 224:9, 225:7, 225:21, 226:8, 227:20, 227:22, 248:23, 248:24, 249:3, 249:7, 250:9, 250:10, 250:14, 250:15, 251:7, 251:15, 251:20, 251:23, 252:2, 252:3, 253:7, 253:18, 253:23
**P&Ls** [47] - 130:11, 130:15, 130:17, 130:20, 130:21, 130:22, 131:22, 132:9, 134:17, 134:23, 135:20, 135:21, 138:5, 138:7, 139:14, 139:15, 140:19, 140:21, 140:24, 149:14, 149:19, 151:23, 151:24, 152:2, 153:14, 158:12, 158:14, 158:15, 158:16, 175:4, 175:7, 175:9, 175:10, 196:25, 214:16, 215:1, 215:19, 216:7, 216:8, 219:7, 223:12, 225:13, 249:14, 250:8, 252:5
**p.m** [2] - 1:17, 254:13
**packs** [1] - 109:1
**page** [53] - 16:7, 16:12, 16:14, 16:24, 17:2, 17:8, 19:20, 19:23, 19:24, 20:2, 20:12, 20:19, 20:22, 21:14, 31:14, 33:11, 33:12, 33:13, 33:17, 44:1, 44:2, 63:17, 84:15, 136:8, 136:23, 179:16, 179:17, 184:19, 186:9, 193:17, 194:11, 200:7, 202:4, 220:5, 222:23, 222:24, 222:25, 223:1, 223:4, 223:8, 224:11, 226:25, 229:17, 233:1, 238:18, 239:8, 239:14, 242:2,

255:17, 255:18, 255:18, 256:7
**PAGE** [2] - 3:1, 256:11
**Page** [1] - 4:2
**PAGE/ERRATA** [1] - 256:1
**pages** [6] - 19:23, 179:15, 221:12, 222:18, 239:14, 257:7
**paid** [29] - 20:20, 63:18, 63:24, 64:6, 64:15, 64:16, 64:20, 65:8, 65:24, 66:12, 66:14, 66:18, 66:24, 67:2, 68:3, 68:9, 68:13, 69:4, 69:5, 71:2, 71:8, 76:20, 85:16, 86:1, 86:23, 97:24, 102:5, 236:7
**painting** [1] - 93:5
**pandemic** [6] - 164:3, 167:2, 168:9, 168:12, 183:2, 192:4
**paper** [1] - 129:3
**paragraph** [8] - 16:8, 17:9, 40:9, 184:15, 188:24, 189:14, 189:17, 192:11
**Paramus** [23] - 99:18, 112:21, 112:23, 113:1, 114:14, 129:11, 141:13, 147:24, 147:25, 148:1, 148:11, 148:20, 149:2, 149:13, 149:15, 149:20, 150:24, 151:25, 152:3, 152:16, 160:22, 216:4, 226:25
**Paramus's** [1] - 151:20
**parentheticals** [1] - 186:11
**part** [29] - 13:3, 13:8, 13:15, 18:6, 48:19, 56:11, 56:13, 62:19, 64:8, 64:9, 71:1, 74:24, 76:4, 76:6, 83:5, 87:13, 89:22, 90:9, 103:23, 126:13, 182:18, 191:1, 198:1, 215:25, 229:25, 232:13, 239:5, 244:3, 248:5
**particular** [17] - 14:5, 30:24, 48:6, 55:19, 105:12, 105:14,

136:18, 153:5, 175:17, 197:20, 207:21, 210:8, 219:13, 220:1, 230:21, 238:1, 250:9
**parties** [3] - 51:20, 64:20, 257:9
**parties'** [1] - 257:10
**Partner** [1] - 240:12
**partnered** [1] - 204:18
**parts** [1] - 9:2
**party** [4] - 90:6, 94:11, 230:11, 245:17
**pass** [3] - 94:21, 116:18, 118:2
**passed** [1] - 245:1
**passes** [1] - 210:20
**passing** [2] - 116:22, 117:19
**password** [2] - 237:22, 237:25
**password-protected** [1] - 237:25
**past** [8] - 81:6, 81:24, 101:3, 107:9, 107:21, 131:2, 182:23, 183:11
**path** [2] - 57:18, 187:9
**Paul** [1] - 2:16
**pause** [2] - 132:4, 181:11
**pay** [12] - 65:5, 67:21, 69:1, 78:3, 85:17, 86:11, 86:12, 86:21, 182:7, 236:6, 245:8, 249:21
**payday** [1] - 95:11
**paying** [4] - 63:25, 66:6, 66:11, 195:14
**payments** [3] - 68:15, 68:17, 195:20
**payoff** [1] - 65:20
**Payroll** [2] - 4:15, 4:23
**payroll** [1] - 152:16
**payrolls** [1] - 196:16
**pays** [4] - 86:12, 169:8, 245:9
**peak** [2] - 176:20
**peep** [1] - 109:1
**peer** [1] - 11:1
**peers** [1] - 177:7
**pen** [1] - 129:3
**penalties** [1] - 256:20
**pending** [2] - 6:5, 22:9
**people** [35] - 53:6, 58:13, 64:23, 66:6, 76:6, 76:14, 79:1, 83:11, 86:21, 86:23, 89:25, 90:1, 90:2, 90:9, 90:11, 90:13,

92:2, 92:5, 102:6,
105:3, 106:2, 106:9,
108:6, 110:18,
110:20, 113:20,
117:17, 119:6,
121:2, 131:4,
152:16, 186:21,
191:13, 195:9
**people's** [1] - 191:18
**per** [4] - 74:23, 178:2,
219:12, 222:24
**percent** [14] - 51:8,
160:5, 160:6, 169:2,
185:22, 185:23,
193:3, 193:8, 193:9,
193:12, 195:5,
203:10, 227:23
**percentages** [2] -
160:5, 160:9
**perception** [1] -
166:21
**perceptions** [1] -
191:18
**perfect** [1] - 17:8
**perfectly** [4] - 29:17,
81:18, 103:11,
120:23
**perform** [2] - 106:10,
177:6
**Performance** [2] -
4:20, 181:3
**performance** [7] -
115:21, 176:5,
176:12, 180:16,
194:20, 198:4,
199:18
**performers** [1] -
117:16
**performing** [1] -
186:22
**performs** [1] - 176:18
**perhaps** [5] - 48:8,
73:2, 104:10,
108:21, 116:14
**period** [22] - 29:7,
29:9, 29:18, 29:23,
29:24, 42:18, 65:13,
72:11, 168:5,
170:14, 170:23,
173:19, 180:2,
180:21, 183:10,
189:11, 192:13,
193:14, 201:8,
214:21, 214:25
**periods** [3] - 172:14,
172:17, 177:25
**perjury** [1] - 256:20
**permitted** [1] - 92:20
**person** [26] - 13:13,
39:24, 41:23, 53:13,

66:7, 68:20, 77:18,
83:9, 108:16, 117:3,
120:2, 121:3, 121:4,
125:10, 125:21,
125:22, 191:16,
207:21, 210:8,
215:8, 219:13,
225:19, 242:7,
252:11
**person's** [2] - 70:14,
166:21
**person-by-person** [2]
- 13:13, 225:19
**personal** [17] - 6:18,
15:14, 19:4, 23:16,
23:17, 24:9, 24:10,
24:12, 26:13, 27:9,
28:2, 31:4, 51:19,
107:7, 107:19,
119:11, 210:23
**personally** [5] - 19:11,
85:12, 106:1,
190:17, 257:18
**persons** [2] - 125:4,
208:23
**perspective** [3] -
79:13, 198:20,
246:17
**pertains** [1] - 70:6
**Pewaukee** [1] - 2:16
**Phase** [1] - 54:10
**philosophy** [4] -
150:13, 150:19,
150:23
**phone** [2] - 78:13,
163:3
**phrase** [2] - 107:25,
189:8
**pick** [2] - 32:24,
188:18
**picked** [1] - 32:23
**picks** [1] - 51:15
**picture** [3] - 74:13,
93:5, 203:8
**piece** [1] - 61:10
**piecemeal** [1] - 240:16
**pin** [1] - 31:12
**pipeline** [19] - 24:21,
24:22, 29:3, 44:21,
45:7, 67:24, 68:1,
68:5, 68:12, 68:23,
74:2, 213:24,
214:11, 214:24,
215:3, 215:14,
215:23, 227:8,
227:19
**place** [8] - 67:17,
73:14, 93:24, 95:18,
101:7, 102:8, 117:6,
172:25

**placed** [1] - 64:23
**places** [3] - 157:24,
218:11, 238:9
**Plaintiff** [7] - 1:5, 2:7,
4:3, 4:4, 4:7, 4:12,
16:24
**plaintiff** [10] - 6:18,
18:3, 19:17, 20:12,
20:14, 38:17, 44:6,
44:7, 75:7, 141:2
**plaintiff's** [3] - 20:20,
63:19, 63:21
**Plan** [2] - 4:21
**plan** [14] - 124:4,
185:3, 185:6, 185:7,
185:13, 185:16,
185:22, 192:16,
192:20, 193:24,
199:3, 199:4, 199:8,
199:10
**planned** [6] - 78:15,
119:22, 120:9,
120:12, 121:13,
200:23
**planning** [1] - 89:2
**plate** [2] - 117:12,
117:22
**play** [5] - 31:25, 121:7,
123:12, 125:13,
174:3
**played** [2] - 123:22,
125:10
**playing** [1] - 45:18
**point** [21] - 5:18,
17:19, 19:16, 19:24,
19:25, 20:3, 20:8,
28:8, 39:12, 51:23,
88:13, 133:14,
151:17, 155:11,
155:16, 173:12,
217:6, 220:18,
222:10, 222:15,
230:24
**pointing** [1] - 224:18
**Points** [1] - 134:10
**points** [7] - 126:21,
130:1, 130:8, 160:2,
160:12, 162:7, 183:5
**police** [1] - 5:17
**policies** [2] - 218:7,
218:15
**policy** [1] - 239:19
**polling** [1] - 249:22
**pore** [1] - 34:24
**Portland** [1] - 13:2
**portrayal** [1] - 127:7
**posed** [1] - 142:23
**position** [31] - 10:10,
26:7, 30:15, 31:22,
32:7, 37:9, 56:7,

65:19, 65:25, 66:6,
66:11, 69:25, 77:6,
80:12, 80:22, 81:9,
83:5, 86:18, 97:9,
100:19, 107:4,
143:4, 148:5, 163:6,
199:6, 216:3,
233:11, 233:16,
234:3, 253:4, 253:25
**positive** [1] - 192:16
**possession** [2] -
219:8, 246:20
**possibility** [1] - 82:8
**possible** [2] - 209:20,
249:6
**possibly** [5] - 49:1,
116:20, 117:4,
203:22, 212:16
**potential** [3] - 12:11,
121:4, 143:24
**prefer** [1] - 145:17
**preference** [1] - 50:9
**premise** [1] - 64:21
**premium** [2] - 221:9,
221:10
**prep** [2] - 7:15, 9:15
**prepandemic** [2] -
164:10, 164:17
**preparation** [13] -
7:23, 7:25, 9:8, 10:4,
16:5, 17:15, 25:10,
69:15, 142:1, 216:9,
217:25, 234:1,
234:14
**prepare** [17] - 7:1,
37:8, 37:15, 38:1,
133:21, 136:11,
137:2, 143:12,
146:2, 208:8,
208:12, 208:17,
213:11, 216:2,
216:6, 217:23, 218:2
**prepared** [6] - 30:24,
55:3, 125:4, 141:24,
205:3, 247:22
**preparing** [9] - 9:5,
9:21, 24:13, 27:12,
28:6, 43:18, 106:3,
126:12, 212:4,
214:24, 233:20,
233:21
**PRESENT** [1] - 2:19
**present** [3] - 25:18,
42:19, 83:8
**presented** [4] - 17:24,
121:12, 145:19,
203:19
**preserve** [1] - 61:11
**president** [6] - 10:10,
10:13, 125:7,

182:17, 186:10,
194:17
**pressure** [3] - 181:9,
181:11, 181:12
**presumably** [3] -
73:12, 163:2, 184:12
**pretax** [10] - 184:11,
184:21, 184:25,
185:10, 185:22,
192:15, 193:2,
193:4, 193:11, 199:3
**pretty** [3] - 93:22,
97:15, 151:2
**previous** [9] - 28:18,
35:12, 40:17, 41:7,
47:24, 63:11, 65:2,
70:24, 147:15
**previously** [3] - 12:19,
98:21, 142:20
**prices** [2] - 243:23,
245:1
**pricing** [11] - 45:15,
46:1, 46:3, 110:8,
243:11, 244:5,
244:6, 244:12,
245:4, 251:20
**primary** [2] - 11:22,
11:23
**print** [10] - 146:6,
146:17, 146:24,
147:5, 147:8, 149:5,
157:14, 209:8,
209:10, 239:11
**printed** [3] - 146:25,
154:19, 209:13
**printing** [1] - 203:1
**private** [2] - 51:4, 51:5
**privilege** [3] - 47:1,
217:5, 253:12
**privileged** [5] - 8:22,
27:1, 27:3, 30:11,
128:5
**problem** [16] - 57:4,
83:19, 83:20, 98:13,
103:18, 106:2,
108:19, 108:20,
127:2, 139:10,
141:2, 148:2, 148:4,
220:5, 240:24, 243:5
**Procedure** [1] - 17:5
**procedure** [2] -
238:23, 239:19
**procedures** [3] -
218:7, 218:16, 239:3
**proceeding** [1] - 42:15
**proceeds** [2] - 41:1,
242:3
**process** [6] - 183:13,
190:25, 218:8,
235:1, 235:16,

235:24
**processing** [1] - 249:20
**produce** [5] - 133:9, 143:22, 146:8, 147:20, 237:11
**Produce** [1] - 16:14
**produced** [26] - 23:19, 24:16, 24:23, 34:4, 35:1, 69:7, 70:2, 130:18, 133:9, 138:20, 141:12, 146:1, 146:12, 147:2, 151:10, 151:13, 151:15, 154:19, 157:17, 158:10, 158:12, 181:1, 219:7, 223:18, 236:20, 240:15
**producer** [2] - 116:2, 116:5
**producers** [1] - 89:18
**produces** [1] - 91:8
**producing** [5] - 69:8, 90:23, 91:1, 92:9, 143:5
**product** [7] - 22:19, 25:2, 26:20, 26:21, 27:3, 27:17, 60:11
**Production** [2] - 4:6, 149:13
**production** [14] - 10:12, 10:15, 10:16, 90:1, 90:13, 90:17, 91:2, 91:10, 92:11, 92:18, 103:25, 128:1, 133:10, 133:12
**productive** [2] - 106:14, 186:22
**products** [5] - 96:14, 97:12, 110:7, 110:15, 177:20
**profile** [2] - 11:11, 11:14
**profit** [34] - 18:17, 18:19, 19:2, 19:8, 19:9, 19:10, 31:21, 33:1, 33:3, 126:23, 130:8, 149:12, 155:10, 155:14, 155:15, 155:17, 161:9, 162:6, 162:13, 162:20, 170:19, 170:23, 182:5, 182:25, 186:19, 187:9, 195:16, 196:7, 196:10, 197:12,

197:24, 219:11
**Profit** [6] - 4:14, 4:16, 4:23, 144:24, 160:18, 241:20
**profitability** [17] - 13:3, 13:5, 13:12, 13:14, 13:20, 14:14, 168:18, 169:11, 169:25, 181:12, 183:23, 197:16, 197:25, 198:13, 198:19, 202:1, 204:12
**profitable** [29] - 169:7, 169:14, 169:20, 169:24, 170:9, 170:12, 170:15, 170:17, 178:16, 187:11, 187:13, 187:15, 187:16, 188:6, 197:2, 197:3, 197:9, 197:11, 197:13, 197:21, 198:5, 198:8, 198:9, 198:20, 198:22, 198:23, 198:24, 201:20
**profits** [33] - 18:2, 18:7, 18:9, 19:7, 19:14, 19:16, 20:8, 21:3, 29:11, 31:3, 31:6, 31:10, 31:14, 31:16, 31:23, 32:4, 32:5, 32:6, 32:8, 33:7, 33:8, 72:9, 75:7, 137:2, 137:21, 159:9, 160:2, 160:12, 167:19, 167:22, 194:7
**Profits** [14] - 20:12, 44:6, 129:22, 133:1, 134:10, 135:6, 154:23, 158:7, 159:24, 160:14, 161:16, 163:11, 164:13, 165:13
**program** [1] - 220:6
**progress** [1] - 191:8
**Progress** [1] - 186:18
**prohibited** [1] - 80:24
**prohibition** [1] - 173:16
**project** [1] - 167:3
**projections** [1] - 202:23
**proof** [1] - 141:3
**properly** [2] - 24:3, 214:19
**Property** [1] - 247:18
**protected** [2] - 47:1,

237:25
**Protection** [1] - 228:10
**protection** [1] - 237:22
**protective** [1] - 229:23
**provide** [7] - 135:4, 135:25, 142:25, 147:16, 205:17, 231:23, 235:23
**provided** [8] - 21:25, 24:8, 69:10, 139:6, 139:7, 154:3, 174:11, 206:11
**provides** [1] - 230:12
**proving** [1] - 35:4
**Public** [2] - 1:21, 257:23
**public** [4] - 40:5, 133:3, 233:9, 233:12
**publication** [1] - 229:2
**publicly** [2] - 228:21, 228:22
**published** [1] - 231:15
**pull** [10] - 13:24, 134:8, 146:5, 175:10, 178:2, 178:7, 178:8, 178:9, 179:5
**pulled** [4] - 125:15, 156:14, 156:22, 157:7
**pulling** [3] - 131:21, 135:8, 147:4
**pulls** [1] - 147:7
**purchase** [8] - 165:5, 168:23, 170:20, 176:25, 177:1, 183:7, 188:3, 204:23
**purchase-driven** [2] - 165:5, 204:23
**purchased** [1] - 233:5
**purchases** [3] - 165:5, 183:9, 188:7
**purchasing** [1] - 235:16
**pure** [1] - 109:12
**purpose** [1] - 246:3
**purposes** [15] - 21:17, 50:7, 61:2, 90:12, 104:23, 115:9, 129:10, 133:18, 144:17, 171:16, 173:25, 201:11, 204:11, 222:17, 223:20
**Pursuant** [1] - 1:14, 17:4
**pursuant** [1] - 24:3
**push** [2] - 146:24,

191:20
**pushes** [1] - 182:21
**pushing** [1] - 147:5
**put** [29] - 36:17, 55:5, 57:16, 59:9, 59:13, 59:17, 60:6, 60:8, 61:7, 61:13, 62:17, 70:11, 70:21, 77:5, 84:19, 95:18, 96:5, 102:8, 111:25, 127:7, 128:9, 144:6, 149:4, 149:12, 206:20, 208:20, 234:11, 251:7, 252:25
**puts** [1] - 86:12
**putting** [3] - 129:2, 143:20, 200:22
**PY** [4] - 185:23, 186:2, 186:6

## Q

**quantified** [1] - 55:2
**quantify** [1] - 251:24
**quarantine** [2] - 53:4, 53:5
**quarantined** [2] - 52:19, 53:1
**quarter** [1] - 162:3
**questioning** [2] - 185:25, 237:9
**questions** [6] - 25:13, 47:12, 62:14, 137:16, 153:14, 255:19
**quick** [2] - 71:24, 162:24
**quite** [8] - 51:6, 71:4, 71:16, 76:5, 83:24, 114:4, 180:22, 218:20

## R

**R&D** [1] - 236:22
**rainmaker** [2] - 115:14, 115:17
**range** [5] - 138:3, 161:8, 164:25, 168:1, 168:2
**ranges** [2] - 133:25, 149:23
**rankings** [1] - 115:20
**rarely** [1] - 39:11
**rate** [5] - 105:21, 106:8, 106:12, 177:24, 252:10
**rates** [7] - 106:5,

177:9, 177:12, 177:15, 177:19, 182:21, 183:8
**rather** [10] - 44:13, 49:24, 105:8, 116:17, 145:12, 162:22, 205:24, 225:19, 226:10, 249:16
**rationale** [2] - 170:22, 172:9
**raw** [3] - 226:9, 226:10, 226:11
**reached** [3] - 38:23, 84:5, 89:7
**Read** [1] - 3:3
**read** [30] - 7:3, 17:17, 28:16, 28:18, 35:11, 35:12, 37:18, 38:12, 40:15, 40:17, 41:5, 41:7, 47:21, 47:24, 63:10, 63:11, 64:25, 65:2, 70:23, 70:24, 75:7, 147:14, 147:15, 185:25, 187:13, 190:22, 232:8, 255:16, 256:7, 256:21
**readily** [2] - 134:3, 134:21
**reading** [2] - 86:16, 110:24
**reads** [6] - 16:8, 18:2, 31:14, 63:17, 208:3, 232:7
**ready** [4] - 25:18, 179:11, 205:15, 239:12
**real** [3] - 162:24, 174:12, 204:18
**realize** [1] - 180:21
**really** [51] - 7:6, 8:9, 8:12, 18:20, 26:14, 50:20, 51:23, 59:13, 71:11, 73:20, 78:15, 82:2, 88:15, 89:25, 91:15, 93:14, 103:10, 104:24, 106:1, 106:10, 113:4, 113:5, 113:25, 114:5, 114:23, 117:19, 118:12, 118:24, 119:4, 119:5, 119:13, 126:15, 128:7, 128:10, 128:16, 130:22, 130:23, 135:23, 152:17, 158:24, 167:9, 174:2, 188:1,

25

191:20, 194:6,
202:25, 231:18,
232:19, 236:4,
244:17
**Realtor** [1] - 116:17
**Realtors** [1] - 116:15
**reapplied** [1] - 153:2
**reason** [14] - 81:18,
85:25, 86:4, 87:9,
89:13, 90:5, 94:9,
103:25, 105:4,
138:9, 139:7, 154:5,
190:24, 249:12
**REASON** [1] - 256:11
**reasonable** [6] -
171:1, 171:5,
172:13, 172:23,
203:20, 203:22
**reasonably** [2] -
34:21, 204:15
**reasoning** [1] - 139:6
**reasons** [7] - 41:21,
85:19, 181:10,
204:7, 236:14,
250:8, 250:11
**rebuttal** [1] - 240:21
**receive** [1] - 180:14
**received** [6] - 8:6,
23:14, 52:18, 63:6,
76:6, 192:6
**receiving** [1] - 180:12
**recent** [5] - 133:10,
154:15, 165:24,
166:18, 182:21
**recently** [1] - 154:16
**Recert** [1] - 244:8
**recess** [6] - 28:15,
96:10, 133:17,
142:21, 199:16,
254:9
**recipient** [1] - 199:19
**recite** [1] - 79:16
**recognition** [1] -
68:10
**recognize** [3] -
124:20, 144:21,
152:17
**recollection** [1] -
94:12
**reconcile** [1] - 145:15
**record** [43] - 5:10,
17:17, 35:2, 36:17,
47:14, 58:23, 60:9,
61:14, 70:12, 70:21,
81:8, 84:19, 133:18,
134:8, 137:14,
137:19, 144:17,
147:19, 149:4,
149:11, 163:1,
163:15, 163:21,

163:23, 178:1,
180:3, 208:2,
208:19, 208:20,
209:18, 209:24,
216:16, 216:20,
219:7, 221:21,
222:17, 224:17,
224:18, 229:19,
237:8, 238:17,
253:15, 257:7
**recorded** [2] - 214:14,
215:9
**records** [4] - 177:18,
177:23, 196:23,
216:23
**recourse** [1] - 211:8
**recover** [1] - 199:11
**recovered** [1] - 199:7
**recreate** [1] - 242:8
**recruit** [9] - 11:21,
12:11, 12:17, 78:23,
83:2, 92:21, 93:3,
93:10, 187:4
**recruited** [5] - 56:21,
77:12, 78:19, 98:3,
113:22
**recruiting** [13] - 11:19,
12:2, 12:5, 12:16,
49:3, 76:23, 77:10,
77:11, 77:17, 77:23,
92:7, 187:1, 187:3
**recruitment** [1] - 70:6
**recruits** [2] - 68:7,
104:5
**redo** [1] - 135:1
**reduced** [1] - 187:8
**reduction** [2] - 187:19,
187:20
**refer** [2] - 191:2,
226:18
**REFERENCE** [2] -
255:9, 256:3
**reference** [4] - 75:6,
135:22, 140:2, 226:6
**referenced** [5] - 59:20,
140:21, 149:1,
176:2, 250:20
**references** [2] - 69:18,
248:18
**referencing** [5] - 29:8,
35:4, 111:17, 146:6,
175:8
**referrals** [1] - 192:6
**referred** [6] - 136:10,
143:6, 143:12,
143:14, 146:22,
157:19
**referring** [10] - 14:3,
44:16, 75:9, 75:23,
82:21, 90:21, 133:8,

182:6, 189:22,
200:24
**refinance** [2] - 242:4,
252:12
**refinances** [2] - 165:6,
183:9
**reflect** [2] - 163:1,
202:23
**reflected** [2] - 20:7,
137:8
**reflective** [1] - 192:12
**reflects** [1] - 245:4
**refusing** [2] - 210:1,
210:2
**regard** [6] - 7:23, 8:1,
46:7, 57:25, 79:12
**regarding** [1] - 60:10
**regardless** [5] - 30:23,
82:4, 97:7, 108:5
**REGENCY** [1] - 255:1
**regional** [2] - 75:13,
75:14
**regret** [1] - 59:8
**regular** [1] - 73:25
**rehashing** [1] - 121:11
**relate** [10] - 10:18,
34:13, 36:2, 38:7,
55:10, 70:18,
176:13, 184:3,
186:23
**related** [5] - 38:20,
160:21, 194:9,
194:10, 247:2
**relates** [9] - 43:14,
60:10, 60:16, 60:22,
70:16, 70:19, 194:2,
200:25, 202:8
**relationship** [18] -
37:3, 37:9, 37:20,
44:25, 45:13, 82:4,
101:17, 112:18,
116:17, 117:11,
119:2, 119:5,
119:12, 122:14,
122:24, 165:8,
244:16, 245:6
**relationships** [9] -
14:17, 14:25, 15:11,
15:20, 99:9, 106:21,
112:14, 116:14,
210:15
**relative** [4] - 176:5,
176:19, 257:9,
257:10
**relatively** [1] - 176:23
**release** [1] - 87:25
**released** [1] - 57:24
**relevant** [4] - 40:4,
40:5, 40:6, 106:10,
107:10, 107:21,

108:12, 130:22,
143:17, 192:13,
200:24, 201:14,
201:15, 201:17,
222:4, 226:17
**reliable** [1] - 166:16
**reliant** [1] - 115:8
**relied** [27] - 132:14,
132:21, 133:12,
133:21, 133:23,
135:11, 135:15,
136:10, 136:15,
137:2, 137:7, 137:8,
137:25, 138:7,
138:8, 138:21,
140:12, 140:16,
143:12, 143:14,
145:15, 146:2,
146:22, 157:20,
157:23, 171:16
**rely** [6] - 134:3,
137:20, 137:23,
139:2, 143:21, 155:5
**remain** [2] - 18:17,
197:13
**remaining** [2] - 6:24,
72:10
**remains** [1] - 103:9
**remember** [9] - 10:4,
82:23, 120:14,
128:18, 129:1,
129:2, 180:12,
187:18, 226:18
**remind** [2] - 124:17,
199:25
**rent** [3] - 195:20,
195:25, 196:15
**Rent** [1] - 244:9
**rep** [10] - 25:6, 34:20,
60:3, 69:20, 153:9,
153:17, 153:22,
205:11, 216:22,
222:9
**repeat** [3] - 27:20,
173:14, 253:21
**Report** [1] - 4:17
**report** [16] - 14:4,
14:15, 22:5, 22:21,
49:5, 113:1, 186:14,
209:10, 222:1,
225:18, 225:25,
226:9, 226:11,
228:10, 257:5
**REPORTED** [1] - 1:20
**REPORTER** [3] -
124:18, 200:1, 257:1
**reporter** [12] - 5:15,
6:13, 28:19, 35:12,
40:17, 41:7, 47:24,
63:11, 65:2, 70:24,

147:15, 148:16
**Reporter** [4] - 47:21,
255:24, 257:5,
257:13
**Reporter's** [1] - 3:5
**reporting** [2] - 113:8,
114:15
**REPORTING** [1] -
255:1
**reports** [11] - 13:19,
13:22, 13:24,
112:23, 174:24,
175:2, 176:11,
209:13, 226:1,
227:25
**represent** [1] - 138:2
**representational** [1] -
41:4
**REPRESENTATIVE**
[6] - 1:13, 5:2, 256:2,
256:24, 257:6,
257:18
**Representative** [1] -
255:11
**representative** [1] -
47:12
**represented** [1] -
167:17
**representing** [1] -
39:18
**represents** [1] -
167:19
**Request** [1] - 149:13
**request** [20] - 17:17,
17:23, 34:14, 35:3,
133:10, 133:11,
136:11, 142:23,
143:23, 146:20,
147:19, 149:4,
149:12, 149:16,
157:18, 181:1,
206:11, 206:17,
215:1, 217:10
**requested** [6] -
143:13, 156:10,
157:19, 206:10,
257:7
**Requests** [1] - 4:6
**requests** [2] - 27:13,
143:10
**required** [5] - 34:24,
36:20, 172:3, 172:7,
256:8
**requirement** [1] -
36:20
**requirement's** [1] -
96:13
**rescind** [1] - 246:17
**reside** [1] - 194:4
**resided** [1] - 241:18

26

**Residential** [1] - 242:13
**resign** [2] - 83:14, 104:25
**resignation** [3] - 4:10, 80:13, 105:23
**resignations** [1] - 104:24
**resigned** [6] - 73:7, 94:7, 95:16, 95:17, 205:6, 206:5
**resigning** [2] - 80:25, 85:20
**resonate** [1] - 108:3
**resources** [2] - 237:3, 249:23
**respect** [75] - 6:22, 8:1, 15:1, 19:7, 21:9, 21:22, 25:15, 25:18, 25:20, 25:21, 27:22, 30:17, 30:25, 31:16, 32:1, 33:21, 34:11, 35:23, 36:10, 36:25, 40:21, 43:22, 44:18, 48:5, 48:9, 48:16, 52:5, 54:7, 55:1, 55:2, 55:4, 55:25, 56:5, 56:6, 56:8, 59:14, 59:18, 61:5, 69:4, 69:21, 70:20, 72:7, 73:9, 74:19, 75:1, 90:3, 106:15, 110:17, 112:3, 112:10, 117:25, 123:23, 132:12, 147:22, 154:10, 158:4, 158:6, 161:2, 161:3, 161:16, 162:11, 166:12, 201:4, 208:22, 209:9, 211:3, 211:4, 212:19, 213:4, 217:18, 226:24, 232:23, 241:9, 250:9, 252:1
**respond** [1] - 35:3
**responded** [3] - 146:23, 153:24
**responds** [2] - 61:9, 194:19
**response** [23] - 17:18, 17:23, 17:25, 33:10, 33:11, 34:19, 37:5, 37:11, 37:22, 60:23, 133:10, 133:20, 134:1, 135:12, 137:1, 138:15, 141:19, 143:6, 149:17, 149:20, 194:13, 206:17, 223:18
**Responses** [4] - 4:5, 4:7, 4:12, 16:25
**responses** [8] - 16:3, 21:12, 54:21, 77:4, 77:7, 206:11, 206:21, 238:19
**responsibility** [1] - 12:8
**responsive** [4] - 205:15, 212:13, 223:19, 226:12
**restate** [1] - 24:2
**restrictive** [21] - 42:16, 56:21, 57:1, 58:4, 58:5, 58:10, 65:15, 67:17, 67:20, 76:15, 78:22, 81:4, 81:7, 100:8, 100:23, 101:1, 101:3, 101:6, 101:11, 101:13, 102:11
**restricts** [1] - 237:22
**result** [5] - 45:3, 105:17, 195:11, 195:16, 196:18
**resulted** [2] - 84:6, 84:8
**resulting** [1] - 29:4
**results** [3] - 181:7, 185:21, 192:25
**retail** [1] - 204:23
**retain** [1] - 41:12
**retained** [1] - 104:3
**Retirement** [1] - 232:9
**retrospective** [2] - 167:23, 204:14
**return** [6] - 12:18, 12:24, 130:7, 132:11, 134:9, 155:7
**Return** [1] - 255:18
**returns** [8] - 132:16, 133:9, 133:24, 134:4, 134:11, 134:13, 134:20
**reveal** [6] - 13:19, 33:20, 206:25, 207:14, 207:15, 215:2
**revealing** [1] - 206:14
**revenue** [53] - 14:11, 14:15, 18:2, 18:7, 18:9, 18:14, 18:20, 18:22, 18:25, 19:16, 20:8, 21:3, 31:3, 31:4, 31:6, 31:14, 31:15, 31:19, 31:23, 32:1, 32:2, 32:8, 32:11, 32:12, 32:18, 32:21, 32:23, 33:3,

33:6, 33:7, 55:24, 74:17, 74:23, 115:24, 126:15, 127:7, 131:19, 170:2, 175:24, 196:8, 196:9, 205:4, 207:1, 208:5, 208:24, 210:18, 221:17, 223:6, 223:13, 224:3, 224:24, 225:11, 225:12
**revenues** [1] - 19:6
**reverse** [12] - 10:22, 10:23, 10:25, 124:13, 134:12, 134:13, 159:17, 159:19, 182:11, 183:21, 183:23, 184:7
**Review** [2] - 244:8
**review** [8] - 8:14, 16:4, 37:15, 69:12, 69:17, 70:25, 239:12, 257:6
**reviewed** [7] - 8:17, 10:3, 17:15, 35:14, 36:18, 218:3, 249:14
**reviewing** [4] - 8:24, 223:2, 224:12, 232:16
**revisiting** [1] - 227:24
**Rica** [10] - 49:12, 49:15, 56:22, 57:3, 82:17, 82:24, 92:23, 100:10, 119:13, 119:15
**Richey** [10] - 155:7, 155:19, 156:4, 156:14, 157:25, 158:1, 158:2, 158:25, 159:2, 176:10
**rid** [1] - 186:21
**right-hand** [2] - 160:4, 162:12
**rightsizing** [2] - 186:19, 186:21
**rises** [1] - 238:11
**Road** [1] - 2:16
**road** [2] - 121:9, 153:3
**rob** [1] - 51:16
**robbed** [1] - 51:17
**robs** [1] - 51:14
**rocket** [1] - 51:20
**role** [7] - 13:3, 13:9, 85:4, 85:9, 125:10, 125:13, 188:23
**roles** [3] - 123:12, 123:18, 123:22
**roll** [1] - 83:11

roof [1] - 166:5
room [1] - 38:16
round [2] - 58:2
route [1] - 169:4
row [1] - 145:6
rubber [1] - 121:9
Rule [1] - 4:2
Rules [1] - 17:5
rules [2] - 5:14, 216:17
rumor [3] - 71:6, 71:7, 71:10
run [6] - 11:2, 19:12, 97:14, 197:12, 226:1, 226:10
running [3] - 11:24, 202:4, 202:5
runs [1] - 11:1
RVP [1] - 77:25

**S**

S.C [1] - 2:9
Sale [1] - 4:24
sale [4] - 131:20, 181:17, 181:18, 182:6
sales [12] - 42:9, 58:14, 116:12, 121:4, 123:7, 123:19, 187:3, 187:20, 188:19, 191:1, 195:6, 195:8
salesperson [1] - 83:10
San [1] - 194:4
Sandler [2] - 2:2, 255:6
SAR [1] - 49:5
sat [1] - 126:9
save [1] - 195:11
saved [4] - 195:20, 195:25, 196:18, 196:24
savings [1] - 188:19
saw [4] - 9:17, 9:20, 52:13, 119:19
scaled [1] - 182:23
scaling [1] - 183:11
scenario [3] - 74:6, 210:14, 252:18
Schedule [1] - 244:9
schemed [1] - 124:3
school [2] - 114:2, 114:13
scientist [1] - 51:20
scope [1] - 57:12
Scout [3] - 135:23, 135:24

scratch [1] - 78:1
screen [4] - 139:8, 144:6, 144:13, 239:15
screenshot [2] - 146:8, 146:12
script [3] - 236:10, 236:11, 238:4
se [1] - 178:2
seal [1] - 257:20
search [1] - 225:2
Second [3] - 4:7, 4:13, 16:25
second [17] - 19:24, 19:25, 20:12, 21:14, 43:23, 59:10, 120:22, 132:4, 135:16, 137:15, 138:16, 153:17, 169:9, 179:5, 188:25, 189:2, 215:16
secrecy [2] - 239:5, 248:5
secret [56] - 59:15, 217:24, 218:12, 218:13, 228:2, 228:24, 229:11, 229:14, 230:2, 230:22, 230:25, 231:7, 231:17, 231:25, 232:3, 232:12, 233:4, 234:13, 234:15, 234:21, 234:24, 235:3, 236:16, 237:19, 238:7, 238:11, 238:18, 239:21, 240:1, 240:2, 240:7, 240:22, 240:25, 241:22, 242:5, 242:9, 242:11, 242:14, 243:10, 243:14, 243:19, 244:5, 244:10, 246:17, 247:20, 247:24, 248:2, 248:20, 250:10, 250:19, 252:20, 253:2, 253:5, 254:1
secrets [19] - 217:23, 218:18, 218:24, 219:2, 219:3, 228:7, 231:10, 232:18, 232:22, 233:13, 233:17, 233:21, 234:2, 234:4, 234:8, 235:10, 237:16, 249:4, 250:9

27

**securely** [1] - 39:23
**security** [1] - 53:2
**see** [97] - 9:24, 11:4,
13:24, 16:10, 17:12,
17:19, 18:4, 19:20,
19:24, 20:3, 20:15,
20:21, 21:12, 21:13,
22:1, 26:13, 33:13,
33:15, 35:25, 37:1,
38:12, 39:7, 39:11,
41:2, 58:3, 63:21,
84:16, 84:23, 85:20,
86:1, 96:16, 96:22,
109:25, 121:3,
129:8, 129:23,
130:3, 136:16,
136:22, 136:25,
137:3, 138:14,
140:4, 143:25,
144:25, 145:4,
145:8, 145:12,
150:16, 150:18,
152:15, 152:19,
159:17, 159:24,
160:7, 160:18,
161:19, 162:13,
163:11, 163:13,
165:13, 175:5,
179:24, 180:7,
181:4, 181:7, 185:4,
187:9, 188:19,
189:6, 189:15,
192:25, 193:21,
194:14, 195:6,
196:21, 200:17,
207:25, 208:1,
219:3, 220:21,
222:21, 223:1,
224:7, 224:17,
227:15, 227:16,
228:12, 229:5,
233:2, 235:11,
238:24, 239:15,
241:16, 242:20,
248:8
**seeing** [3] - 141:1,
179:13, 219:25
**seek** [2] - 28:9, 73:11
**seeking** [15] - 18:9,
18:14, 19:6, 20:7,
25:21, 32:7, 32:18,
32:25, 33:8, 46:11,
64:19, 72:9, 92:12,
161:3
**seeks** [1] - 211:8
**seem** [1] - 55:15
**sees** [2] - 51:14, 73:19
**segregate** [1] - 187:24
**selected** [1] - 129:16
**self** [1] - 188:3

**self-sourced** [1] -
188:3
**sell** [5] - 32:10,
181:19, 181:24,
249:19
**Send** [1] - 87:8
**send** [16] - 26:17,
46:6, 50:19, 52:17,
53:18, 58:17, 58:25,
96:21, 134:22,
143:23, 146:20,
181:14, 186:3,
236:4, 239:22,
239:24
**sending** [5] - 38:5,
48:24, 52:16, 57:9,
156:1
**senior** [3] - 125:7,
194:16, 197:15
**sense** [24] - 6:6,
12:10, 12:16, 29:25,
32:16, 44:15, 45:1,
45:3, 45:4, 52:12,
64:6, 71:23, 102:24,
115:23, 137:13,
138:11, 162:7,
170:5, 197:7, 197:8,
197:11, 228:17,
230:15, 230:22
**sent** [48] - 8:13, 8:25,
9:11, 23:2, 23:16,
24:10, 26:14, 39:23,
42:1, 46:5, 50:17,
51:2, 51:18, 51:24,
52:5, 52:13, 54:2,
55:8, 55:9, 55:10,
56:12, 57:21, 58:14,
62:20, 62:21, 63:5,
63:9, 73:3, 75:15,
86:14, 86:15, 133:5,
139:14, 140:19,
180:6, 186:5, 218:3,
218:4, 218:7, 218:9,
218:11, 234:12,
235:22, 248:24,
249:13, 253:25
**sentence** [5] - 17:4,
18:7, 182:15,
188:25, 189:17
**separate** [6] - 6:23,
106:8, 113:19,
151:21, 151:23,
157:3
**separates** [1] - 230:6
**September** [1] -
180:23
**sequentially** [2] -
84:18, 200:7
**series** [2] - 17:18,
136:15

**served** [4] - 22:11,
22:16, 47:3, 132:13
**server** [1] - 9:13
**SERVICE** [1] - 255:1
**services** [1] - 230:12
**servicing** [2] - 189:7,
198:2
**set** [6] - 16:17, 19:12,
41:10, 58:6, 58:12,
117:22
**Set** [3] - 4:6, 4:8, 4:13
**sets** [1] - 86:11
**setting** [1] - 78:12
**settle** [1] - 127:5
**settlement** [1] -
126:17
**Seven** [2] - 172:21,
198:7
**seven** [2] - 174:4
**several** [9] - 41:21,
84:5, 91:10, 98:15,
104:2, 104:3,
155:20, 255:15
**several-lined** [1] -
255:15
**shard** [1] - 128:24
**share** [2] - 88:16,
139:8
**shared** [2] - 7:11, 7:15
**sharing** [4] - 210:9,
210:11, 211:2, 211:3
**sheet** [8] - 148:1,
158:1, 220:21,
226:15, 230:6,
241:19, 255:15,
256:8
**Sheet** [3] - 3:4,
231:16, 231:21
**SHEET** [1] - 256:1
**sheets** [2] - 255:17,
256:9
**Shoot** [1] - 252:24
**short** [3] - 96:6, 134:2,
231:13
**short-circuit** [1] -
231:13
**should've** [9] - 21:8,
24:25, 80:18, 80:20,
80:21, 81:3, 81:5,
237:16
**show** [21] - 14:12,
78:14, 125:17,
126:22, 134:24,
139:6, 142:15,
148:3, 174:24,
177:18, 177:23,
196:25, 205:10,
205:21, 207:25,
211:19, 227:20,
240:19, 243:7,

249:25, 250:22
**showed** [4] - 8:8,
141:17, 198:23,
238:19
**showing** [6] - 237:8,
237:11, 237:12,
239:6, 240:16, 241:2
**shown** [2] - 14:15,
140:17
**shows** [10] - 34:23,
38:4, 137:11, 142:9,
147:18, 170:19,
219:12, 249:16,
249:17, 249:19
**shut** [1] - 253:19
**side** [19] - 55:5,
116:12, 120:3,
123:7, 123:8,
123:20, 132:3,
132:6, 132:7, 160:4,
182:11, 183:21,
183:23, 183:24,
184:7, 187:20,
198:1, 203:23
**sides** [3] - 181:9,
182:10, 204:24
**sift** [1] - 139:12
**sign** [3] - 12:9, 255:17,
256:8
**SIGNATURE** [1] -
256:1
**signature** [3] - 85:3,
255:18
**signed** [3] - 49:7,
70:7, 174:13
**significant** [4] - 193:8,
193:14, 236:22,
237:3
**significantly** [2] -
134:14, 187:8
**signs** [1] - 239:11
**silly** [5] - 38:22, 39:21,
40:8, 40:12, 41:3
**similar** [9] - 38:3,
76:18, 107:21,
157:1, 172:20,
176:3, 180:17,
180:20
**similarly** [2] - 161:2,
163:17
**SimpleNexus** [3] -
239:6, 239:7, 241:2
**simpler** [2] - 131:5,
131:24
**simplest** [1] - 19:13
**simply** [7] - 50:9,
74:16, 78:19, 131:5,
160:1, 171:8, 227:11
**single** [5] - 34:18,
42:10, 104:16,

106:22, 242:2
**single-page** [1] -
242:2
**sister** [1] - 10:23
**sit** [4] - 74:18, 88:9,
138:6, 205:13
**sits** [1] - 205:18
**sitting** [3] - 79:16,
81:21, 126:3
**situation** [3] - 96:17,
173:25, 210:17
**situations** [1] - 45:11
**six** [5] - 12:19, 98:2,
165:21, 174:3, 174:4
**skip** [1] - 188:24
**slightly** [1] - 181:10
**slim** [1] - 106:13
**slow** [4] - 5:18,
155:13, 191:9,
191:16
**slower** [2] - 131:8,
186:18
**small** [2] - 24:8, 194:4
**smaller** [1] - 32:24
**smells** [1] - 83:12
**Smith** [58] - 14:19,
15:3, 64:16, 65:9,
66:17, 66:19, 67:18,
69:5, 69:13, 77:23,
77:24, 78:20, 81:9,
82:10, 86:11, 86:13,
86:17, 87:8, 93:16,
94:13, 94:15, 94:23,
100:18, 101:16,
109:2, 109:16,
111:5, 112:24,
113:1, 113:22,
114:1, 114:6,
114:15, 118:7,
118:13, 118:17,
118:21, 119:3,
121:18, 121:23,
124:11, 124:14,
173:20, 189:22,
189:24, 207:2,
207:15, 208:6,
208:10, 221:18,
223:7, 224:22,
224:23, 224:25,
225:2, 225:4, 225:9
**smoke** [1] - 111:24
**sneaky** [1] - 58:6
**so..** [18] - 12:8, 71:9,
89:20, 93:24,
107:16, 116:8,
125:20, 148:3,
156:19, 184:24,
208:15, 212:7,
216:20, 234:13,
235:5, 236:5, 238:9,

246:15
**socially** [2] - 118:22, 122:21
**sold** [12] - 18:24, 31:11, 31:20, 127:1, 131:5, 131:7, 131:10, 131:17, 131:25, 166:3, 166:4, 169:5
**sole** [1] - 177:11
**solely** [1] - 18:22
**solicit** [8] - 66:7, 78:5, 78:10, 92:16, 93:10, 100:7, 107:15, 173:21
**solicitation** [19] - 44:24, 66:12, 66:20, 79:12, 80:5, 80:11, 80:18, 80:21, 81:15, 81:17, 82:5, 98:9, 100:3, 100:14, 100:20, 102:16, 109:13, 109:18, 123:25
**solicited** [10] - 36:6, 36:14, 41:17, 79:5, 92:16, 124:7, 124:8, 124:11, 124:14, 173:9
**soliciting** [4] - 65:20, 92:15, 100:13, 173:11
**solve** [1] - 222:1
**someone** [8] - 13:24, 52:4, 57:20, 62:1, 87:15, 100:12, 239:24, 252:22
**sometimes** [3] - 14:23, 59:7, 211:2
**somewhere** [4] - 92:4, 93:17, 98:25, 120:1
**sooner** [1] - 161:23
**sorry** [38] - 11:3, 19:5, 19:24, 23:1, 32:22, 42:22, 43:23, 53:15, 71:14, 72:13, 74:9, 75:21, 110:22, 111:10, 131:8, 147:23, 148:17, 155:13, 159:20, 164:12, 164:15, 180:3, 184:14, 187:3, 190:1, 190:21, 190:22, 192:8, 198:11, 200:4, 201:2, 207:5, 239:20, 240:10, 247:14, 251:11, 251:25, 253:13
**Sorry** [1] - 16:11

**sort** [3] - 8:21, 46:25, 217:5
**sorted** [1] - 128:9
**sought** [15] - 9:12, 17:24, 19:4, 21:20, 21:23, 30:13, 30:16, 30:24, 31:13, 33:20, 37:10, 41:9, 47:15, 53:21, 223:6
**sounds** [10] - 19:3, 75:19, 98:18, 101:10, 126:6, 150:3, 216:22, 232:22, 236:10, 248:1
**sourced** [1] - 188:3
**space** [1] - 89:3
**Spanish** [4] - 4:21, 228:11, 229:5, 229:7
**speaking** [6] - 32:13, 97:22, 103:17, 106:2, 177:4, 214:25
**specialize** [1] - 10:24
**specific** [17] - 106:21, 125:1, 133:12, 152:2, 192:12, 199:3, 215:22, 216:9, 218:4, 218:8, 224:19, 234:2, 236:25, 243:11, 246:22, 250:13, 251:15
**specifically** [11] - 46:8, 69:21, 75:9, 132:13, 179:20, 195:23, 213:21, 215:23, 248:12, 249:25, 252:15
**specificity** [3] - 135:8, 205:18, 253:6
**specifics** [1] - 218:5
**spectrum** [3] - 203:9, 203:10, 203:13
**speculation** [11] - 87:2, 87:13, 87:14, 174:18, 203:9, 203:16, 203:24, 204:7, 204:15, 204:24
**speech** [1] - 57:15
**spell** [1] - 5:9
**spend** [10] - 8:24, 126:12, 127:9, 186:23, 186:24, 187:7, 217:14, 232:16, 233:21, 234:4
**spending** [2] - 40:12, 142:5
**spent** [7] - 9:4,

126:13, 139:25, 212:4, 233:20, 234:6, 243:22
**sporadic** [1] - 9:3
**spread** [3] - 91:6, 221:9, 221:10
**spreadsheet** [7] - 8:8, 19:12, 126:4, 126:5, 126:9, 144:19, 220:1
**spreadsheets** [4] - 8:11, 207:8, 207:10, 219:25
**St** [3] - 172:20, 197:12, 198:7
**stab** [1] - 159:14
**stability** [1] - 189:5
**stabilizes** [1] - 188:25
**stable** [1] - 189:1
**stack** [2] - 240:25, 241:4
**staff** [8] - 42:9, 117:17, 183:1, 186:19, 186:20, 190:24, 194:6, 249:18
**stake** [1] - 49:1
**stand** [1] - 62:5
**standing** [1] - 36:17
**standpoint** [1] - 224:8
**stands** [3] - 186:2, 186:6, 241:25
**start** [24] - 6:12, 16:7, 16:10, 16:15, 21:14, 32:22, 33:12, 41:22, 41:23, 41:25, 47:25, 63:23, 72:5, 84:14, 104:17, 144:5, 179:15, 179:16, 180:2, 200:6, 206:21, 224:13, 228:8, 239:13
**started** [6] - 5:15, 23:11, 53:12, 101:18, 129:2, 133:23
**starting** [5] - 33:11, 129:15, 161:13, 205:6, 246:19
**starts** [6] - 84:22, 138:3, 170:14, 186:9, 189:15, 222:20
**State** [2] - 1:21, 257:23
**state** [2] - 5:9, 229:19
**STATE** [2] - 257:2, 257:15
**statement** [19] - 30:15, 60:17, 60:22, 87:7, 132:11, 134:19,

135:15, 156:11, 156:13, 174:10, 184:18, 186:13, 194:25, 195:1, 204:10, 224:9, 235:24, 249:7, 253:8
**Statement** [3] - 4:16, 144:24, 241:20
**statements** [15] - 132:16, 149:12, 155:21, 156:15, 214:20, 219:11, 225:8, 225:21, 248:23, 248:24, 249:3, 251:15, 252:2, 253:19, 253:23
**Statements** [3] - 4:14, 4:17, 4:23
**STATES** [1] - 1:1
**states** [1] - 37:6
**stating** [1] - 205:24
**stay** [9] - 74:1, 103:4, 103:16, 171:21, 172:3, 172:7, 172:21, 174:3, 174:20
**stayed** [10] - 56:1, 95:24, 125:19, 126:23, 167:4, 167:19, 174:8, 197:20, 198:18, 199:7
**staying** [1] - 73:12
**stays** [1] - 74:3
**steered** [2] - 38:24, 50:13
**stenographic** [1] - 257:8
**stenographically** [1] - 257:5
**STEPHANIE** [1] - 2:15
**stick** [1] - 78:22
**still** [38] - 13:17, 19:10, 34:7, 42:1, 48:24, 51:17, 56:23, 72:22, 73:3, 76:13, 80:6, 81:16, 82:14, 85:17, 87:25, 93:1, 99:12, 138:16, 150:12, 164:2, 165:9, 168:24, 170:3, 170:4, 174:2, 177:7, 184:18, 198:24, 213:6, 213:22, 214:2, 215:13, 226:22, 237:18, 241:13, 251:17
**stop** [6] - 18:6,

128:23, 173:10, 183:22, 214:24, 251:1
**stopped** [1] - 200:22
**stopwatch** [1] - 127:11
**Store** [2] - 113:13, 113:16
**story** [1] - 104:1
**strange** [3] - 86:23, 118:2, 118:3
**Street** [4] - 2:2, 2:5, 2:10, 255:7
**strict** [1] - 109:6
**strictly** [1] - 100:14
**strike** [1] - 32:4
**structurally** [1] - 10:19
**structure** [2] - 182:23, 249:23
**structures** [1] - 183:11
**struggling** [2] - 132:17, 151:16
**stuck** [2] - 102:19, 190:24
**stuff** [1] - 109:1
**styled** [1] - 255:15
**Subject** [6] - 4:9, 4:10, 4:19, 4:20, 181:3, 200:9
**subject** [4] - 101:11, 239:4, 241:5, 248:4
**subpoena** [1] - 27:9
**subpoenas** [4] - 26:17, 26:25, 27:6, 28:4
**subscribe** [1] - 256:21
**subsequent** [2] - 145:20, 224:6
**subsidiary** [2] - 10:20, 10:24
**substantially** [1] - 165:9
**subtracting** [4] - 33:3, 131:10, 131:15, 131:17
**successfully** [2] - 97:15, 189:9
**sued** [4] - 53:16, 53:20, 84:9
**suffer** [1] - 177:7
**suffers** [1] - 177:1
**suffice** [1] - 185:8
**suggesting** [1] - 223:18
**Suite** [7] - 1:19, 2:3, 2:6, 2:10, 2:13, 255:2, 255:7
**Summary** [2] - 4:10, 129:7
**supervisors** [1] -

29

15:13
**support** [8] - 53:23,
54:7, 55:11, 56:14,
182:22, 183:1,
188:7, 198:17
**supported** [1] - 51:9
**supposed** [4] - 24:4,
77:2, 80:12, 140:15
**surprise** [7] - 29:1,
29:10, 29:18, 29:19,
114:12, 234:7,
234:10
**surprised** [2] - 134:16,
201:22
**surprisingly** [1] -
190:5
**surrounding** [2] -
70:4, 150:19
**suspect** [2] - 87:3,
202:9
**suspicious** [1] - 121:5
**SVP** [1] - 75:14
**swings** [1] - 189:7
**switch** [1] - 16:15
**switchover** [1] - 164:1
**sworn** [2] - 5:4,
257:19
**system** [34] - 13:23,
14:1, 14:3, 56:24,
111:21, 135:19,
142:8, 143:15,
143:21, 145:23,
146:1, 146:6,
146:17, 147:8,
151:4, 151:5, 151:6,
151:8, 154:15,
156:22, 157:2,
157:4, 157:11,
157:12, 157:14,
158:9, 175:5, 178:9,
178:10, 209:8,
220:18, 229:18,
239:6, 239:23
**systems** [5] - 178:2,
178:3, 178:4, 178:5,
210:8

## T

**tab** [10] - 152:16,
219:12, 219:25,
220:2, 221:7,
221:13, 225:8,
225:14, 251:3, 251:4
**table** [3] - 19:11,
123:4, 245:22
**tabs** [5] - 207:9,
219:24, 249:13,
249:14, 250:15

**TAKEN** [1] - 1:14
**talks** [5] - 31:3,
182:15, 183:11,
188:22, 195:4
**TAMPA** [1] - 1:2
**Tampa** [71] - 1:19,
2:14, 4:11, 4:16,
4:20, 20:14, 44:8,
85:1, 85:4, 85:9,
87:20, 87:22, 88:5,
88:14, 89:2, 99:9,
99:18, 114:7, 114:9,
129:7, 129:11,
139:20, 140:17,
141:12, 141:13,
141:16, 144:24,
148:1, 148:14,
149:1, 150:24,
151:21, 151:23,
151:25, 152:3,
152:5, 160:6,
160:18, 160:22,
161:18, 161:21,
163:11, 163:15,
164:9, 164:16,
164:19, 165:12,
175:18, 182:17,
188:1, 188:3, 200:9,
200:21, 201:3,
201:10, 202:1,
202:8, 215:7, 215:8,
215:9, 216:1, 216:4,
224:21, 226:24,
227:8, 227:20, 255:2
**target** [1] - 188:17
**tax** [11] - 132:11,
132:16, 133:9,
133:24, 134:4,
134:8, 134:11,
134:13, 134:20,
155:7
**taxes** [1] - 196:16
**team** [5] - 67:22,
67:25, 68:2, 236:24,
237:1
**teams** [1] - 168:24
**Teams** [5] - 110:14,
110:17, 111:18,
111:21
**template** [1] - 241:21
**ten** [13] - 9:6, 22:9,
25:11, 28:13, 61:23,
115:3, 142:18,
153:19, 172:22,
174:5, 209:25,
212:4, 250:7
**ten-minute** [1] - 28:13
**tend** [2] - 177:6,
197:12
**tends** [1] - 135:22

**tenure** [1] - 103:7
**term** [2] - 115:16,
115:18
**termed** [1] - 188:11
**terminating** [2] -
188:22, 195:9
**terms** [25] - 11:14,
39:13, 39:15, 45:15,
45:16, 48:13, 49:2,
53:1, 53:2, 69:9,
71:20, 74:23, 76:14,
163:24, 175:24,
176:18, 184:25,
189:9, 190:6, 190:8,
191:10, 232:9,
242:24, 244:18,
254:6
**Terms** [4] - 4:22, 69:7,
228:11, 232:6
**testified** [4] - 5:5,
30:13, 92:6, 112:13
**testify** [32] - 23:8,
23:9, 24:13, 25:10,
27:12, 28:3, 28:10,
30:24, 34:18, 34:20,
47:7, 55:3, 57:7,
67:7, 86:8, 134:9,
135:6, 141:25,
143:18, 205:3,
205:13, 208:8,
212:14, 215:11,
215:20, 216:3,
216:23, 217:24,
223:9, 223:23,
224:2, 250:14
**testifying** [9] - 6:17,
6:21, 6:24, 22:13,
27:21, 28:21, 69:20,
70:8, 133:23
**testimony** [21] - 7:1,
9:8, 22:15, 27:25,
63:3, 70:14, 142:1,
147:10, 171:12,
171:13, 173:8,
211:22, 212:9,
213:4, 213:11,
216:9, 222:11,
225:13, 231:23,
234:15, 253:16
**text** [3] - 184:10,
240:25, 241:3
**that'll** [1] - 155:8
**THE** [11] - 1:1, 5:6,
72:1, 96:2, 124:18,
142:17, 199:13,
200:1, 251:11,
253:13, 254:11
**theme** [1] - 183:6
**themselves** [4] -
83:13, 118:6,

140:20, 244:11
**Theobald** [1] - 70:8
**theoretically** [1] -
191:6
**theory** [1] - 252:2
**THEREUPON** [1] - 5:1
**they've** [5] - 117:5,
122:4, 123:13,
151:10, 183:1
**thin** [2] - 146:14,
147:18
**thinking** [4] - 55:25,
67:8, 71:19, 105:11
**thinks** [1] - 67:12
**third** [10] - 20:2, 51:19,
64:20, 66:9, 66:14,
90:6, 94:11, 169:10,
189:17, 230:11
**thoughts** [4] - 59:10,
189:15, 189:18,
190:4
**thousand** [9] - 32:8,
32:11, 32:12, 32:13,
32:18, 32:20,
184:12, 184:23
**thousands** [2] - 66:13,
184:24
**threatening** [2] -
220:25, 221:21
**three** [20] - 15:1, 20:5,
20:7, 23:20, 29:7,
29:18, 29:21, 66:13,
70:4, 99:17, 102:25,
103:12, 110:3,
110:5, 118:7, 148:7,
162:15, 208:14,
224:3, 227:11
**three-month** [3] -
29:7, 29:18, 29:21
**throughout** [1] - 9:3
**throwing** [1] - 203:1
**tied** [3] - 67:13, 67:15,
69:25
**TIME** [1] - 1:17
**timing** [3] - 71:15,
73:13, 201:16
**title** [3] - 10:12, 41:24,
232:7
**titled** [2] - 228:11,
230:10
**To-Do** [2] - 240:12,
246:18
**today** [38] - 6:17, 7:2,
9:8, 24:14, 25:18,
30:24, 31:5, 60:3,
135:5, 136:12,
138:6, 140:16,
141:6, 142:1,
142:25, 143:2,
143:19, 145:23,

148:4, 154:19,
155:3, 158:18,
168:11, 171:25,
191:22, 209:15,
212:14, 213:1,
215:12, 215:19,
223:25, 243:19,
246:10, 253:6,
253:16, 253:22,
254:3, 254:5
**today's** [1] - 245:19
**together** [19] - 76:10,
97:18, 97:21, 107:8,
107:9, 107:20,
113:17, 113:18,
116:8, 118:11,
118:25, 122:4,
122:22, 123:13,
124:4, 126:10,
127:8, 128:9, 175:10
**Tomalak** [15] - 15:13,
15:23, 83:25, 94:1,
112:2, 112:8,
112:14, 113:14,
114:4, 118:10,
119:7, 189:25,
190:16, 200:8,
200:16
**tomorrow** [5] - 6:24,
69:21, 70:8, 70:17,
166:8
**ton** [3] - 7:22, 10:5,
15:18
**tone** [2] - 85:22, 87:15
**took** [15] - 56:22, 62:2,
62:23, 73:13, 111:1,
125:19, 130:6,
132:2, 133:19,
134:2, 155:10,
155:14, 155:15,
160:11, 252:24
**top** [21] - 39:4, 91:19,
105:25, 115:24,
116:1, 116:2, 116:3,
116:5, 117:16,
129:8, 194:14,
196:21, 201:5,
202:2, 206:3,
218:25, 222:19,
230:10, 242:19
**topic** [22] - 28:10,
31:5, 37:8, 38:2,
38:12, 70:19, 118:4,
205:15, 208:9,
213:9, 213:12,
213:21, 215:11,
215:21, 215:25,
216:6, 216:10,
221:14, 223:9,
227:25, 228:4

**Topic** [19] - 36:25,
37:16, 37:17, 47:9,
47:14, 60:12, 69:21,
70:4, 205:2, 208:3,
208:13, 208:17,
208:23, 211:6,
217:19, 221:16,
223:5, 224:4
**Topics** [6] - 6:22,
60:9, 60:14, 60:25,
61:12, 226:17
**topics** [8] - 6:24,
57:12, 70:10, 86:7,
212:13, 213:5,
233:22
**Total** [3] - 145:6,
222:25, 224:14
**total** [14] - 9:4, 32:9,
49:24, 64:17, 145:7,
155:10, 160:21,
161:6, 175:15,
185:12, 192:19,
202:4, 247:1, 247:3
**totality** [1] - 22:4
**totally** [1] - 253:24
**toward** [1] - 187:9
**towards** [2] - 17:19,
193:20
**track** [5] - 176:14,
176:16, 199:8, 199:9
**tracks** [1] - 86:20
**trade** [72] - 59:15,
217:23, 217:24,
218:12, 218:13,
218:18, 218:23,
219:2, 219:3, 228:1,
228:7, 229:11,
229:14, 230:2,
230:25, 231:7,
231:10, 231:17,
231:24, 232:3,
232:12, 232:18,
232:22, 233:4,
233:12, 233:17,
233:20, 234:2,
234:4, 234:8,
234:13, 234:15,
234:21, 234:24,
235:3, 235:10,
236:15, 236:16,
237:16, 237:19,
238:7, 238:11,
238:18, 239:21,
240:1, 240:2, 240:7,
240:22, 240:25,
241:22, 242:5,
242:9, 242:10,
242:14, 243:9,
243:14, 243:19,
244:5, 244:10,

246:17, 247:20,
247:24, 248:2,
248:20, 249:3,
250:8, 250:10,
250:19, 252:20,
253:2, 253:4, 253:25
**traffic** [1] - 82:13
**Transaction** [1] - 4:24
**transactions** [2] -
174:13, 226:5
**transcript** [5] - 256:7,
256:8, 256:21, 257:7
**transcription** [1] -
256:7
**transfer** [2] - 44:23,
48:21
**transferred** [9] -
24:15, 25:16, 48:16,
61:4, 61:7, 107:9,
107:20, 211:14,
215:6
**transfers** [1] - 74:6
**transition** [1] - 102:20
**transitions** [2] - 67:25,
103:1
**translate** [2] - 197:25,
254:2
**translated** [1] - 229:8
**translates** [2] -
251:23, 252:4
**translation** [2] - 57:6,
229:5
**transmittal** [1] - 253:7
**transmitted** [1] - 60:5
**tremendously** [1] -
205:1
**trends** [1] - 176:14
**trial** [4] - 41:2, 59:25,
111:23, 121:8
**tricky** [1] - 134:11
**tried** [2] - 58:13,
221:24
**triggered** [1] - 229:17
**trip** [11] - 49:15, 82:17,
83:3, 83:10, 119:15,
119:18, 119:23,
120:5, 121:4, 121:16
**trips** [3] - 49:11, 57:3,
76:11
**true** [10] - 86:3, 88:15,
88:17, 105:20,
108:21, 158:6,
158:20, 204:25,
219:15, 257:7
**truer** [2] - 127:6, 127:7
**truly** [1] - 255:21
**trust** [2] - 38:22,
248:19
**try** [9] - 24:24, 28:4,
58:6, 88:4, 89:5,

134:2, 143:25,
159:2, 231:13
**trying** [52] - 27:24,
31:12, 32:16, 33:2,
38:6, 39:12, 52:12,
53:5, 53:16, 53:22,
54:4, 55:1, 55:6,
57:5, 57:16, 61:4,
67:12, 81:19, 91:6,
93:6, 94:2, 115:23,
116:9, 116:21,
120:17, 120:19,
126:14, 130:18,
138:22, 139:11,
140:2, 142:5,
145:14, 152:15,
152:19, 158:17,
161:24, 171:1,
172:13, 173:24,
187:4, 196:8, 197:6,
198:6, 201:19,
210:19, 221:24,
237:17, 240:2,
240:5, 252:15, 253:6
**Tully** [9] - 84:22,
84:25, 85:13, 85:15,
85:25, 86:5, 86:18,
86:24, 87:8
**turn** [15] - 16:7, 17:8,
20:2, 36:23, 63:16,
71:12, 71:23, 72:5,
156:2, 159:7,
159:22, 178:21,
186:8, 206:22,
207:17
**twenty** [1] - 68:19
**twenty-some** [1] -
68:19
**twice** [1] - 32:17
**twist** [1] - 121:2
**two** [23] - 63:21,
64:23, 65:15, 66:12,
68:4, 99:17, 104:9,
106:8, 123:10,
126:19, 131:3,
145:25, 178:15,
182:2, 182:9,
182:23, 183:11,
192:7, 215:25,
227:16, 241:20
**two-part** [1] - 215:25
**Tyler** [1] - 179:20
**type** [6] - 14:25, 15:24,
21:13, 40:13,
117:11, 252:2
**types** [2] - 68:17,
212:1
**typically** [1] - 105:22
**typing** [1] - 5:22

# U

**unable** [1] - 27:22
**unbelievable** [3] -
26:16, 39:20, 40:13
**uncertain** [3] - 74:20,
227:6, 227:18
**uncommon** [1] - 97:23
**undecided** [1] -
110:20
**under** [14] - 37:14,
81:4, 81:7, 130:2,
148:13, 158:7,
194:7, 211:7, 227:6,
227:22, 229:23,
237:22, 256:20
**undercut** [3] - 45:22,
46:1, 251:20
**underperforming** [2] -
177:5, 177:6
**undersigned** [1] -
257:17
**understood** [4] - 6:10,
28:24, 47:22, 110:24
**underwrite** [1] -
247:23
**underwriter** [6] - 23:3,
49:1, 49:5, 49:10,
120:9, 121:13
**underwriting** [26] -
48:24, 49:14, 49:18,
50:16, 76:5, 76:11,
82:17, 82:20, 82:22,
83:9, 92:24, 96:13,
96:17, 97:3, 97:10,
109:6, 109:8, 110:2,
119:22, 119:24,
120:2, 120:12,
121:3, 212:17,
249:20
**unenforceable** [1] -
42:18
**unfortunately** [1] -
200:17
**unhappy** [1] - 94:25
**Uniform** [1] - 242:13
**uniform** [1] - 101:12
**unilaterally** [1] - 9:12
**unique** [2] - 176:23,
177:3
**unit** [1] - 192:13
**UNITED** [1] - 1:1
**unlawful** [29] - 20:13,
27:24, 44:7, 44:9,
55:6, 60:24, 63:20,
65:25, 75:8, 75:10,
76:1, 76:22, 77:4,
77:8, 77:9, 77:16,
77:22, 78:21, 79:22,

79:25, 80:2, 80:6,
81:10, 82:11, 83:2,
86:4, 91:23, 92:19,
104:21
**unless** [5] - 46:7,
67:22, 68:20, 86:22,
138:12
**unstable** [1] - 189:3
**up** [73] - 18:13, 18:22,
22:15, 35:5, 41:23,
51:2, 51:15, 55:15,
58:6, 58:12, 60:25,
64:24, 65:17, 74:11,
77:6, 77:7, 78:1,
78:12, 79:24, 85:16,
86:17, 93:21, 94:21,
96:23, 98:14, 98:15,
105:14, 109:1,
112:24, 114:15,
119:15, 120:24,
121:1, 126:14,
134:8, 134:25,
135:16, 136:1,
137:3, 140:16,
141:7, 143:18,
144:6, 144:13,
144:23, 145:23,
146:5, 147:5, 147:7,
152:20, 156:14,
172:23, 173:7,
179:5, 179:13,
188:15, 188:18,
189:4, 190:22,
196:20, 200:10,
200:15, 205:14,
207:22, 220:1,
223:23, 224:12,
225:9, 229:4, 229:7,
238:4, 250:7, 253:11
**up-front** [2] - 98:14,
105:14
**up-to-date** [1] -
145:23
**Upcharges** [1] - 244:9
**updated** [3] - 146:16,
203:3, 203:5
**ups** [1] - 188:15
**URLA** [1] - 239:14
**usual** [1] - 236:8

# V

**vacation** [4] - 118:25,
119:12, 122:21
**valid** [1] - 70:17
**valuable** [2] - 18:19,
79:18, 166:10,
168:23, 188:6,
218:17, 238:2,
239:22, 240:3,

245:14, 245:16, 245:22
**Value** [2] - 244:9, 244:10
**value** [19] - 38:14, 38:16, 38:21, 39:17, 46:11, 64:22, 65:16, 65:17, 67:5, 67:19, 74:12, 183:6, 189:7, 230:18, 235:4, 239:24, 239:25, 244:13
**values** [1] - 198:2
**variables** [1] - 169:5
**various** [2] - 158:5, 218:11
**venture** [1] - 165:9
**verbal** [2] - 5:23, 8:18
**verification** [1] - 230:12
**verify** [2] - 151:17, 151:19
**versus** [14] - 50:8, 86:5, 87:2, 87:3, 109:20, 125:14, 174:18, 185:3, 185:13, 185:22, 192:16, 192:19, 193:24, 199:4
**via** [1] - 80:2
**vice** [2] - 125:7, 194:16
**view** [5] - 18:20, 19:4, 19:5, 31:4, 73:22
**views** [2] - 118:13, 122:15
**violate** [6] - 57:1, 65:15, 77:19, 79:2, 100:8, 107:2
**violated** [2] - 101:1, 101:4
**violating** [2] - 100:23, 102:11
**virtually** [1] - 152:7
**volatile** [1] - 189:3
**Volume** [4] - 135:17, 139:20, 145:6, 145:10
**volume** [86] - 14:4, 14:11, 115:22, 126:22, 129:19, 131:6, 138:9, 138:10, 139:6, 139:12, 139:20, 140:2, 140:17, 141:12, 142:11, 142:15, 145:7, 147:22, 150:24, 150:25, 151:19, 152:13, 152:20,

154:6, 154:7, 155:11, 155:16, 155:18, 157:2, 160:1, 163:24, 164:9, 164:10, 164:11, 164:15, 164:17, 165:10, 167:7, 167:9, 167:11, 167:15, 168:11, 169:1, 174:25, 175:5, 175:12, 175:17, 175:18, 176:2, 177:2, 177:9, 177:10, 182:22, 182:25, 183:16, 185:12, 185:15, 192:19, 195:22, 205:3, 205:7, 206:1, 206:4, 206:12, 206:25, 207:14, 207:15, 207:23, 208:1, 208:5, 208:24, 209:4, 209:9, 210:6, 210:18, 218:18, 221:17, 223:6, 223:13, 224:3, 224:20, 224:24, 249:16, 250:23, 251:2
**Volumes** [2] - 129:18, 150:20
**volumes** [7] - 149:7, 154:11, 160:16, 183:13, 193:4, 206:6, 232:17
**VP** [1] - 197:15
**vs** [4] - 1:6, 4:21, 255:9, 256:3

## W

**wait** [1] - 32:22
**waited** [1] - 61:10
**waiting** [3] - 5:18, 26:7, 173:11
**walk** [16] - 127:23, 129:14, 143:1, 143:7, 144:1, 148:6, 149:6, 150:2, 150:12, 150:22, 152:7, 155:4, 156:15, 161:20, 186:16
**walked** [1] - 170:1
**walking** [3] - 57:18, 150:1, 153:11
**Walter** [2] - 149:8, 255:13

**WALTER** [344] - 2:1, 8:20, 12:12, 14:20, 15:4, 16:11, 16:22, 18:10, 22:12, 22:18, 23:12, 23:22, 23:24, 24:3, 25:1, 25:4, 25:7, 26:9, 26:12, 26:19, 26:22, 27:2, 27:16, 28:11, 28:13, 29:6, 29:15, 29:22, 30:1, 30:7, 30:10, 30:20, 31:7, 33:22, 34:17, 34:24, 35:7, 35:9, 35:18, 35:20, 36:8, 36:16, 38:9, 40:22, 41:14, 41:18, 42:8, 42:14, 42:20, 43:12, 43:20, 45:2, 46:2, 46:4, 46:18, 46:24, 47:3, 47:7, 47:11, 48:11, 48:22, 49:22, 51:11, 52:24, 53:11, 54:9, 54:19, 55:13, 56:10, 57:11, 57:14, 58:19, 59:2, 60:7, 60:14, 60:18, 60:21, 61:9, 62:18, 62:24, 63:1, 63:7, 65:7, 65:10, 65:22, 66:2, 66:5, 66:10, 66:15, 66:21, 67:6, 67:14, 68:18, 69:19, 70:3, 70:11, 70:20, 71:5, 71:14, 71:18, 71:24, 72:2, 72:17, 73:15, 74:8, 74:10, 74:21, 75:12, 75:20, 76:3, 76:24, 77:1, 80:8, 80:10, 80:15, 80:19, 81:2, 81:12, 83:23, 84:11, 84:19, 86:6, 86:10, 87:10, 87:21, 91:4, 91:14, 91:25, 95:1, 95:5, 95:13, 95:19, 95:25, 96:7, 97:13, 98:10, 99:6, 99:21, 100:4, 100:21, 106:17, 107:13, 107:23, 109:22, 110:21, 111:7, 112:4, 114:22, 115:10, 115:15, 117:1, 117:8, 117:13, 118:15, 118:19, 118:23, 120:6, 120:11, 120:15, 121:20, 121:25, 122:16, 122:19, 123:5, 123:16, 124:2, 128:2, 128:4,

133:8, 133:14, 135:3, 135:8, 137:14, 137:18, 140:18, 141:21, 142:2, 142:7, 142:12, 142:18, 142:20, 143:4, 143:23, 144:3, 146:3, 146:20, 146:23, 147:3, 147:6, 147:9, 147:12, 149:10, 149:18, 149:22, 150:1, 150:6, 150:10, 151:11, 151:24, 153:7, 153:11, 153:20, 153:24, 154:3, 157:18, 158:11, 158:22, 159:15, 166:19, 167:6, 168:10, 171:19, 172:11, 172:15, 173:3, 173:13, 174:9, 174:22, 178:23, 179:3, 179:5, 179:9, 179:12, 181:13, 183:4, 183:18, 184:13, 185:24, 186:3, 187:17, 187:22, 189:12, 189:23, 190:14, 191:3, 191:5, 192:22, 193:10, 193:16, 194:1, 194:22, 196:14, 196:19, 197:4, 197:10, 197:22, 198:21, 199:20, 200:3, 200:5, 200:13, 201:12, 202:7, 203:14, 203:21, 204:1, 204:8, 204:16, 205:8, 205:10, 205:12, 205:17, 205:21, 206:10, 206:16, 207:3, 207:8, 207:17, 207:22, 209:1, 209:11, 209:16, 209:19, 209:22, 210:2, 210:5, 210:10, 211:16, 211:24, 212:10, 212:15, 213:2, 213:13, 215:5, 216:14, 216:18, 217:1, 217:4, 217:9, 217:17, 217:20,

219:6, 219:10, 219:15, 219:18, 219:23, 220:4, 220:11, 220:20, 220:23, 221:15, 221:19, 222:4, 223:10, 223:17, 225:16, 225:20, 226:3, 226:13, 229:15, 230:3, 232:1, 233:23, 234:9, 236:1, 237:7, 238:17, 239:18, 240:9, 240:14, 240:18, 241:7, 241:23, 243:2, 243:20, 244:15, 246:7, 246:12, 246:24, 247:7, 248:6, 248:11, 248:14, 250:3, 250:12, 251:10, 251:12, 251:16, 252:6, 253:9, 253:12, 254:4, 254:12, 255:5
**wants** [1] - 50:4
**Ward** [2] - 1:18, 2:12
**warning** [2] - 188:16
**Washington** [2] - 2:3, 255:8
**waste** [1] - 121:10
**WATERSTONE** [3] - 1:7, 255:10, 256:4
**Waterstone** [174] - 2:15, 4:5, 4:8, 4:13, 15:2, 15:17, 16:4, 17:1, 19:5, 21:9, 22:11, 22:17, 22:22, 23:3, 23:8, 23:19, 24:15, 24:16, 24:23, 24:25, 25:16, 27:24, 29:2, 33:20, 36:3, 36:7, 36:15, 38:5, 38:24, 39:1, 39:10, 39:24, 40:2, 41:17, 42:7, 44:11, 44:23, 45:5, 45:12, 45:15, 46:1, 46:6, 48:7, 48:17, 48:21, 49:8, 50:8, 50:13, 50:14, 50:18, 51:2, 51:7, 51:19, 52:8, 52:17, 52:18, 52:19, 53:13, 53:21, 53:22, 53:23, 56:21, 57:2, 57:22, 58:15, 59:17, 60:6, 60:15, 60:24, 61:4, 61:7, 61:17, 61:20, 62:8, 62:9, 62:12,

62:17, 62:22, 63:19, 63:25, 64:3, 64:4, 64:6, 64:7, 64:11, 64:14, 64:15, 64:16, 64:19, 64:22, 65:5, 65:14, 66:6, 66:11, 67:7, 69:8, 73:3, 73:6, 73:10, 74:3, 74:7, 75:14, 75:15, 76:23, 77:10, 77:14, 77:16, 77:23, 78:4, 78:9, 78:19, 79:9, 79:24, 81:11, 82:11, 82:13, 82:22, 83:20, 86:5, 89:11, 90:4, 90:7, 90:12, 90:24, 91:13, 91:16, 91:21, 91:24, 92:7, 92:14, 92:20, 92:23, 93:2, 93:9, 93:18, 94:5, 96:21, 102:3, 102:22, 106:24, 108:25, 110:7, 110:15, 120:3, 120:10, 121:15, 121:19, 121:24, 123:24, 132:13, 140:15, 143:13, 186:18, 197:2, 197:8, 211:7, 211:8, 217:22, 245:17, 245:24, 246:1, 246:20, 248:25, 250:25, 251:7, 251:20, 251:23, 252:3
**Waterstone's** [7] - 22:1, 22:5, 44:9, 50:15, 52:23, 53:10, 68:15
**Waterstone-producing** [1] - 69:8
**ways** [3] - 126:19, 131:3, 131:24
**weighted** [1] - 160:15
**well-being** [1] - 40:7
**West** [1] - 2:5
**whatsoever** [1] - 40:14
**whichever** [1] - 50:4
**whole** [7] - 56:22, 57:15, 57:24, 77:15, 108:20, 166:14
**wholly** [1] - 10:20
**wide** [2] - 103:19, 189:6
**widely** [1] - 233:12
**wife** [3] - 82:25, 120:8, 121:14
**Williams** [11] - 104:12,

165:8, 165:10, 166:9, 167:13, 174:3, 174:8, 174:12, 174:13, 174:14, 174:21
**willing** [7] - 143:2, 153:4, 182:7, 209:13, 217:7, 217:10, 217:14
**willy** [1] - 39:23
**willy-nilly** [1] - 39:23
**Wisconsin** [2] - 2:11, 2:16
**with..** [1] - 68:21
**witness** [33] - 5:4, 6:23, 22:13, 25:10, 30:13, 47:5, 47:22, 61:1, 70:16, 133:23, 134:3, 134:4, 134:8, 135:4, 135:14, 135:18, 142:24, 143:20, 163:2, 207:24, 216:18, 220:15, 221:2, 221:4, 221:5, 221:25, 222:3, 222:8, 222:10, 223:16, 223:19, 223:24
**WITNESS** [10] - 5:6, 72:1, 96:2, 142:17, 199:13, 251:11, 253:13, 254:11, 256:2, 257:20
**witness's** [1] - 63:3
**Wolf** [43] - 14:19, 15:3, 43:6, 65:24, 65:25, 66:4, 77:17, 78:20, 81:9, 82:4, 82:11, 94:1, 94:13, 94:15, 95:16, 100:18, 101:16, 108:24, 109:16, 111:6, 111:18, 116:5, 121:18, 122:2, 122:10, 122:14, 122:15, 122:25, 123:22, 124:1, 124:8, 124:10, 124:14, 173:20, 190:2, 205:5, 207:1, 207:15, 208:6, 221:18, 223:7, 225:9
**Wolf's** [1] - 121:23
**wondering** [1] - 152:5
**word** [1] - 80:13
**words** [3] - 229:5, 229:7
**workarounds** [1] - 58:6

**Workflow** [2] - 240:13, 246:18
**workings** [1] - 61:17
**works** [7] - 62:13, 75:14, 162:24, 196:7, 239:7, 246:25
**world** [2] - 104:9, 204:19
**worse** [2] - 168:9, 178:21
**would've** [29] - 10:8, 56:1, 56:12, 62:7, 70:7, 81:10, 95:24, 131:25, 132:1, 165:8, 166:4, 166:5, 166:10, 167:19, 199:7, 199:8, 199:9, 199:10, 201:11, 204:22, 204:25, 210:22, 212:9, 212:13, 212:16, 214:9, 216:23, 230:1
**wound** [1] - 173:7
**wow** [1] - 252:20
**write** [4] - 188:15, 191:17, 198:2
**write-down** [1] - 198:2
**write-up** [1] - 188:15
**write-ups** [1] - 188:15
**writes** [3] - 85:15, 181:6, 200:10
**writing** [1] - 242:3
**written** [10] - 17:22, 21:12, 60:23, 77:4, 77:7, 94:12, 100:12, 137:3, 188:16, 231:2
**wrongdoing** [20] - 44:24, 50:8, 50:11, 50:12, 51:21, 52:11, 52:16, 55:16, 66:20, 67:4, 67:13, 67:16, 68:16, 70:1, 105:1, 105:7, 105:18, 106:23, 108:6, 108:9
**wrongful** [10] - 46:16, 48:7, 53:17, 81:15, 83:6, 92:7, 92:14, 123:25, 204:5
**wrongfully** [2] - 36:6, 36:14
**wrote** [2] - 186:13, 186:16

## Y

**year** [40] - 12:4, 129:16, 129:20, 130:6, 145:7, 145:16, 147:22,

150:25, 158:6, 159:11, 162:1, 162:4, 162:6, 163:23, 164:22, 165:3, 165:4, 165:12, 165:17, 165:21, 166:9, 166:22, 167:9, 168:12, 168:13, 170:17, 170:18, 173:4, 173:5, 173:11, 173:23, 175:19, 185:21, 186:7, 192:16, 192:25, 193:4
**Year** [2] - 129:15, 145:3
**year-end** [1] - 145:16
**year-to-date** [3] - 145:7, 185:21, 192:25
**yearly** [1] - 203:6
**years** [29] - 49:14, 57:19, 62:6, 68:19, 91:11, 114:18, 114:19, 114:25, 115:3, 139:3, 145:2, 158:5, 159:14, 162:15, 171:3, 172:22, 174:4, 174:5, 182:24, 183:11, 192:7, 208:23, 209:5, 224:4, 243:22, 244:22
**Years** [1] - 4:18
**yield** [2] - 221:9, 221:10
**yourself** [2] - 9:12, 253:21
**YSP** [11] - 219:11, 220:4, 221:7, 221:8, 225:8, 225:10, 225:12, 225:14, 226:6, 251:4, 252:9
**Yukon** [1] - 114:3

## Z

**ZIEBELL** [1] - 2:15
**Zoom** [7] - 2:1, 2:9, 2:12, 2:15, 56:23, 76:12, 255:6