# **<u>EXHIBIT B</u>**

1

```
1                IN THE UNITED STATES DISTRICT CIRCUIT
                      MIDDLE DISTRICT OF FLORIDA
2                           TAMPA DIVISION
                   CASE NO.: 8:22-cv-01660-TPB-JSS
3
     MUTUAL OF OMAHA
4    MORTGAGE, INC.,

5         Plaintiff,

6    vs.

7    WATERSTONE MORTGAGE
     CORPORATION,
8
          Defendant.
9    _____/

10

11

12

13   DEPOSITION OF:        CHRISTINE LEYDEN

     TAKEN:                Pursuant to Notice by
14                         Counsel for Defendant

15   DATE:                 June 22, 2023

16   TIME:                 9:01 a.m. to 11:24 a.m. EST

17   LOCATION:             Hill Ward Henderson
                           101 East Kennedy Boulevard
18                         Suite 3700
                           Tampa, Florida  33602
19
     REPORTED BY:          Melanie Keefe, FPR
20                         Notary Public
                           State of Florida at Large
21

22

23

24

25
```

2

```
 1    APPEARANCES:        COURTNEY WALTER, ESQUIRE
                          Mitchell Sandler LLC
 2                        1120 20th Street Northwest
                          Suite 725
 3                        Washington, DC  20036

 4                        MARK M. CARROLL, ESQUIRE (Via Zoom)
                          Law Offices of Mark M. Carroll
 5                        1000 South Pine Island Road
                          Suite 420
 6                        Plantation, Florida  33324

 7                             Attorneys for the Plaintiff

 8                        MARIA L. KREITER, ESQUIRE
                          Godfrey & Kahn, S.C.
 9                        833 East Michigan Street
                          Suite 1800
10                        Milwaukee, Wisconsin  53202

11                             Attorney for the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

| | INDEX | PAGE NUMBER |
|---|---|---|
| 1 | | |
| 2 | Examination by Ms. Kreiter | 5 |
| 3 | Read Letter | 111 |
| 4 | Errata Sheet | 112 |
| 5 | Reporter's Certificate | 113 |

4

1          (Exhibit numbers continued from a prior deposition.)

2                          E X H I B I T S

3

| Exhibit | Description | Page |
|---------|-------------|------|
| 20 | LinkedIn for Christine Leyden | 19 |

5

```
 1    THEREUPON,

 2                        CHRISTINE LEYDEN,

 3         a witness herein, having been duly sworn, was examined

 4    and testified upon her oath as follows:

 5                   THE WITNESS:  Yes.

 6                        EXAMINATION

 7    BY MS. KREITER:

 8         Q.    Ms. Leyden, if you would just state your name,

 9    spell it for the record.

10         A.    Christine Leyden, C-h-r-i-s-t-i-n-e L-e-y-d-e-n.

11         Q.    Have you been deposed before?

12         A.    I have.

13         Q.    So some rules of the road for this deposition,

14    we've got the court reporter here.  She's typing down

15    everything that I say, everything that you say, everything

16    that your counsel says.  A few things follow from that.

17    First, I need you to give me oral responses as opposed to

18    nods of the head.  Agreed?

19         A.    Yes.

20         Q.    In addition -- and I will have to police myself

21    as well, but I will try to make a point of waiting for you

22    to answer the full question that I ask.  Sometimes, I think,

23    it's just natural folks think that they know what the

24    question is, I think I know what your answer is, and we

25    start talking.  It makes for a messy record.
```

6

1          So I'm going to make a point to try to wait until

2     you're completely finished with your answer.  In turn, I

3     guess I would ask that you wait until I'm completely

4     finished with my question before you start answering.

5     Agreed?

6          A.    Yes.

7          Q.    In addition, if you don't understand one of the

8     questions that I ask you today, just let me know that.  I

9     will try to rephrase it.  If you don't say anything, I'm

10    going to assume that you understood.  Agreed?

11         A.    Yes.

12         Q.    You're the COO of the forward mortgage --

13         A.    Yes.

14         Q.    -- division of Mutual?

15               What is forward mortgage?

16         A.    Just to distinguish our mortgage division from

17    the reverse mortgage division.  So the forward mortgage

18    division is your traditional mortgage where we lend money to

19    borrowers to purchase or refinance their home as opposed to

20    the reverse division, which is a product for elderly people

21    who don't have payments on the loan.  They get the money up

22    front, and then they -- the payments come out of the equity

23    of their home.  So it's just to distinguish the two.

24         Q.    Okay.  Just from a financial perspective, does

25    any -- does the financial success of the purchase division

7

1    at all relate to the financial success of the reverse

2    division or are they completely separate?

3         A.    The financials do consolidate, so I would say

4    that it's -- it does contribute to the overall success of

5    the entity.

6         Q.    Okay.  Is it a situation where if reverse is

7    doing well, that somehow has an impact on forward and that

8    forward will do better or is the performance completely

9    separate?

10        A.    The performance is separate.

11        Q.    Do Kiley King and Brian Tomalak report to you?

12        A.    Yes.  And not directly, but indirectly, yes.

13        Q.    Is there someone between --

14        A.    Well, it's Jeff and I sort of run the company

15    together, Jeff Gennarelli.

16        Q.    Okay.  Is it that they report more directly to

17    Jeff --

18        A.    Yeah.  It's just -- I mean, we run the company

19    together.  He's more on the sales side of it, and I'm more

20    on the operations side.  So they do report, I would say,

21    more directly to Jeff, but it's both.

22        Q.    Is there anyone else that reports to you or to

23    you and Jeff collectively?

24        A.    I mean, ultimately everyone in the company, I

25    would say, through the org chart.

8

```
 1         Q.   Okay.  How many other regional managers are there

 2    besides Brian and Kiley?

 3         A.   Gosh, I don't know the number.  I don't know how

 4    many.

 5         Q.   Less than five or --

 6         A.   No.  More than five.

 7         Q.   More than 20?

 8         A.   No.

 9         Q.   Okay.  And would those other regional managers

10    report to you or you and Jeff in the same fashion that

11    Mr. King and Mr. Tomalak do?

12         A.   Yes.

13         Q.   Who do you report up to at Mutual?

14         A.   Terry Connealy.

15         Q.   What is Terry's role?

16         A.   He is the president of forward and the -- forward

17    and reverse divisions.

18         Q.   Is it Connealy?

19         A.   Connealy, C-o-n-n-e-a-l-y.

20         Q.   Did Mr. Connealy have any role or involvement in

21    the transition of the Tampa and Daytona offices that are at

22    issue here?

23         A.   I guess I don't really understand the

24    question.  They were -- the Tampa and Daytona offices were

25    part of BBMC when BBMC transitioned over to Synergy One,
```

9

1    which was at the time doing business as Mutual of Omaha

2    Mortgage.  Terry Connealy was involved, but the initial

3    onboarding when we started with them back at BBMC, I would

4    say no.

5        Q.    Okay.  What about the transition of the offices

6    from Mutual of Omaha to Waterstone?

7        A.    What's the question?

8        Q.    Did he have a role in that transition or the

9    disputed issue?  Is he someone that you talked to about this

10   issue?

11       A.    I didn't personally, no.

12       Q.    Was he involved, for example, in assessing any

13   kind of losses associated with the transition of the

14   employees to Waterstone?

15       A.    Not to my knowledge.

16       Q.    Is he somebody that you talked to about -- that

17   either you or others, Jeff Gennarelli, Kiley King, Brian

18   Tomalak, were there any meetings in which Mr. Connealy was a

19   participant relevant to the issues in this suit?

20       A.    Yes.

21       Q.    Okay.  Tell me about those meetings.

22       A.    I mean, I think it was just we would have -- we

23   have our monthly calls, and Mark Carroll would be on --

24           MS. WALTER:  Object to the form to the extent

25       it's getting into any sort of privileged conversations

10

1      with Mr. Carroll.

2          Q.   Go ahead.

3              MS. WALTER:  She's not going to speak about those

4          if Mark was leading these or in any way talking about

5          the issues in this case.

6              THE WITNESS:  Do I have to answer?

7              MS. WALTER:  To the extent Mark wasn't -- I

8          mean --

9          A.   Mark was always on the calls.

10         Q.   Okay.  But Mark's presence on the call doesn't

11    make it privileged.  I mean, was Mark, Mr. Carroll, giving

12    you legal advice on these calls?

13         A.   Yes, I'd say so.

14         Q.   Why don't you just tell me who were the

15    participants on these calls.

16         A.    Terry Connealy, Tyler Larsen, Tim Larsen, Torrey

17    Larsen, Jeff Gennarelli, myself, Mark Carroll, and then

18    there were some people from the reverse that were most

19    likely on the call.

20         Q.   These are regularly scheduled calls?

21         A.   Yeah.

22         Q.   Monthly?  Weekly?  What?

23         A.   Monthly.

24         Q.   Okay.  What was the -- I guess what was the

25    subject matter of the discussion on these calls relevant to

11

1    this suit?

2        A.    Mark Carroll would just give updates on any --

3    any legal issues.  It was an -- it's an executive call, so

4    he would just update us on any legal issues, status.

5        Q.    What -- so the Daytona branch departed at the end

6    of April.  When would the first of these calls that you're

7    referring to have addressed issues relevant to this suit?

8    April of '22 is when the --

9        A.    I don't recall.  I don't know when they -- when

10   they started doing any research or discovery, so I don't

11   know.

12       Q.    Was it shortly after the Daytona branch departed?

13       A.    Within six months, I would say.  I don't know an

14   exact date.

15       Q.    Were there ever any notes or agenda items -- were

16   there any agenda items?  Let's start there.  Were there ever

17   agendas circulated with respect to these calls?

18       A.    No.

19       Q.    What about notes taken during the call?  Was

20   there somebody taking notes?

21       A.    No.

22       Q.    Would it be the same attendees on these -- on

23   each of these calls?

24       A.    Yes, unless someone was on vacation or something.

25       Q.    Separate from the calls that you mentioned, was

12

1    there any -- was there ever any discussion between you and

2    Mr. Larsen or Mr. Connealy about the matters that are at

3    issue in this suit?

4        A.   Not that I recall.

5        Q.   What about between you and Mr. Gennarelli?  Have

6    you talked about the suit and the issues that are relevant

7    to the suit with Mr. Gennarelli?

8        A.   Maybe.  It's not our main topic of conversation.

9    We might've mentioned it.

10       Q.   Okay.  Do you have a role at Mutual with respect

11   to the underwriting process, or is that not within your

12   jurisdiction?

13       A.   It is, yes.

14       Q.   Tell me about that role.

15       A.   So I run all of the operations, so I have an

16   underwriting -- well, we don't really have an underwriting

17   manager.  Lucas Curtolo manages the time off requests and

18   file allocation to the underwriters, but ultimately they

19   report to me.  Lucas and I man an underwriting help desk

20   where they can escalate issues or ask questions.  And all of

21   the loan officers know that ultimately I'm the final

22   decision-maker or chief credit officer basically.

23       Q.   How often -- you know, take a given day.  How

24   often are you presented with a question from an underwriter?

25       A.   Frequently.  More than ten times a day but on the

13

1    underwriting help desk.  It's not only directed to me,

2    but...

3         Q.   Okay.  When you get inquiries through the help

4    desk, do they come to you by e-mail or someone calls you or

5    how does that work?

6         A.   Both.

7         Q.   Both.  And is it that you and Mr. Curtolo split

8    time on doing a certain day, or how do you manage who's --

9         A.   It's a joint -- sorry.  It's a joint e-mail, so

10   whoever is on it.  And there's times that Lucas will --

11   Lucas reports to me.  So there's -- sometimes he doesn't

12   know the answer, and then he'll escalate to me if he doesn't

13   -- he'll say "I looked at this.  I don't know what it is.

14   Can you take a look?"  So --

15        Q.   Got it.  So it could be the underwriter writes a

16   question to both of you or to a DDL or something like that?

17        A.   Correct.  Yes.

18        Q.   And then whoever is free chimes in?

19        A.   Correct.

20        Q.   Is there an effort for Mr. Curtolo to take the

21   first cut of it to save you time, or is it just --

22        A.   Primarily, he does.  He will -- I will usually

23   let him take the first cut just so that I'm not always in

24   there.

25        Q.   You say that's a primary function of your job.

14

1    It sounds like you're spending quite a bit of time on it.

2        A.    One of the primary functions, yes.

3        Q.    What are the other primary functions?

4        A.    Recruiting branches and originators, looking for

5    new products, dealing with post-closing issues as well,

6    post-closing reports up through me.  The whole entire loan

7    process reports up through me, so underwriting is just one

8    piece of that --

9        Q.    Got it.

10        A.    -- the entire fulfillment of the loan.

11        Q.    So underwriting, recruiting, looking for new

12    products, post-closing, and essentially the whole process

13    with respect to loans that are closed through Mutual in the

14    forward division?

15        A.    Correct.

16        Q.    With respect to recruiting, what is your role in

17    the recruiting process?

18        A.    Typically, I'll be brought in just to discuss our

19    fulfillment, our underwriting philosophy, and then our

20    process of getting loans from application to closing.

21        Q.    Okay.  So essentially, explaining the business,

22    you're not the one that's initially bringing in candidates.

23    But once a candidate has brought -- been brought to Mutual,

24    you would have a discussion with that candidate to explain

25    the benefits of Mutual?

15

1      A.   Correct.

2      Q.   Who is the person that is involved in actually

3   sourcing the recruit and bringing them in?

4      A.   A number of different people.  The regional

5   managers are doing that.  I believe that at times we have

6   had an external recruiter looking for candidates and just

7   really anyone who has got -- you know, knows someone in the

8   industry or there's people that will, you know, look at

9   LinkedIn but primarily the regional managers or an external

10  recruiter.

11     Q.   Who makes the decision to say yes or no to a

12  potential candidate?

13     A.   I would say ultimately it would be Jeff

14  Gennarelli's decision and HR.  I mean, there are times where

15  HR has to get involved.

16     Q.   But you're not involved in that final decision?

17     A.   No.

18     Q.   What about compensation levels paid to a

19  particular candidate?  Is that something that you're

20  involved in?

21     A.   No.

22     Q.   Who would that be?  Mr. Gennarelli and HR?

23     A.   Yes.

24     Q.   Is your compensation tied to the revenue of any

25  particular branch or division?

16

1          A.    My compensation is tied to the overall

2     profitability of the company.

3          Q.    The overall profitability of the forward mortgage

4     division or Mutual inclusive of reverse?

5          A.    Forward mortgage only.

6          Q.    Okay.  What was your -- you don't have to tell me

7     the number, but maybe I'll just ask you relative.  Was your

8     compensation in 2020 higher -- or for the year 2020, so I

9     don't know if you get paid at the end of the year, but if

10    you look at what was the compensation that I earned in 2020,

11    was that higher or lower than the compensation you earned in

12    -- for 2021?

13         A.    Higher.

14         Q.    Was your compensation for 2020 higher than it was

15    for '22?

16         A.    Yes.

17         Q.    Was your compensation for 2020 the highest that

18    it has ever been?

19         A.    I'm not sure.  Probably close to it.

20         Q.    Is there another year that comes to mind that you

21    can recall as being higher than 2020?

22         A.    At a former employer, not with Mutual.

23         Q.    Okay.  Approximately when was that?  I mean, are

24    we talking ten years --

25         A.    Yeah, more than ten years ago.

17

1          Q.    So your compensation based on the 2020

2    performance was the highest compensation that you've

3    received in at least the ten years; correct?

4          A.    Yes.

5          Q.    What about the compensation that you received for

6    2021?  Was that higher or lower than '22?

7          A.    Higher.

8          Q.    And I think you already answered this, but maybe

9    my notes -- was the compensation for '21 higher or lower

10   than '20?

11         A.    Higher, I believe.  I'm not sure.  Honestly, I'd

12   have to look.

13         Q.    Okay.  Both '20 and '21 were relatively high

14   compensation years?

15         A.    Yes, yeah.

16         Q.    What about 2023?  We're nearing the halfway mark

17   in 2023.  How does your compensation for '23 compare to

18   2020?

19         A.    It's lower.

20         Q.    Significantly lower?

21         A.    Yes.

22         Q.    I'm trying to not ask you your exact compensation

23   here on the record, but --

24         A.    I don't know if you did, so I don't --

25         Q.    If you can tell me percentage-wise, is it

18

1      50 percent lower for '23 than 2020 or how would you quantify

2      it in a way -- and if you're comfortable, you can say what

3      the numbers are --

4            A.   It's significantly lower.  It's way more than

5      half lower.

6            Q.   Are you comfortable saying what the numbers are

7      or not?

8            A.   I honestly don't -- I don't even know.  My

9      paychecks are direct deposit, and I don't even look at them.

10           Q.   Got it.  But you would say it's significantly

11     lower, your compensation, which is tied to the performance

12     of forward mortgage for 2023 compared to 2020?

13           A.   Correct.

14           Q.   Is your compensation for '23 significantly lower

15     than it was for '21?

16           A.   Yes.

17           Q.   Okay.  I have kind of a general understanding as

18     to how you fit in on the front end when there's recruiting

19     of branches.  Now let's talk about what role you have, if

20     any, when there's a branch departure.  I guess can you just

21     explain to me in general when a branch leaves, what is your

22     role, if any, in connection with that process?

23           A.   Nothing really other than to make sure that if

24     there's loans in the pipeline that need help from me, that

25     I'm involved in that but really no involvement.

19

1      Q.    Okay.  Are you involved, for example, in

2  reallocating the loans to a different loan officer within

3  Mutual?

4      A.    I am not.

5      Q.    Who would be in charge of that?

6      A.    Probably Lucas.

7      Q.    Would, for example, a regional manager, Mr. King

8  or Mr. Tomalak, be involved in that process?

9      A.    They would probably have some input, yes.

10            MS. KREITER:  Have the reporter mark Exhibit 20.

11            MS. WALTER:  Thank you.

12            (Exhibit No. 20 is marked for identification.)

13      Q.    Ms. Leyden, take a look at Exhibit 20.  You

14  recognize this as your LinkedIn profile; correct?

15      A.    Yes.

16      Q.    Just take a look at it.  I don't know how close

17  you update your LinkedIn profile.  Is this accurate, or is

18  there anything missing in terms of your career path in the

19  industry?

20      A.    I think it looks -- I don't really go in and

21  update it very much, but I think it looks --

22      Q.    So for example, you're currently a chief

23  operating officer for forward operations.  You were

24  previously with Bridgeview Bank Mortgage, which we've been

25  calling BBMC?

20

1          A.    Um-hmm, yes.

2          Q.    And then before that, American Bank & Trust?

3          A.    Yes.

4          Q.    Okay.  How did you first meet Chris Smith?

5          A.    I think Brian and Kiley brought him into the

6     Lombard office.  I believe that was the first time I met

7     Chris Smith.

8          Q.    The Lombard office?  Sorry.  What --

9          A.    That's where I work when I'm in Illinois.

10          Q.    So they brought him into that office.  When are

11     we talking about?  Is that in connection with your role at

12     BBMC?

13          A.    Yes.

14          Q.    Okay.  And what was the context of bringing

15     Mr. Smith into the BBMC office in Illinois?

16          A.    I believe just to meet the operations staff and

17     just to see the fulfillment center.

18          Q.    In connection with recruiting Mr. Smith to BBMC?

19          A.    I believe he was already employed.  I'm not 100

20     percent sure.  It was a long time ago, but I think he -- I

21     don't think I met him until after he was onboarded.

22          Q.    Okay.  What about Mr. Hutto?  When did you first

23     meet Mr. Hutto?

24          A.    I don't believe he came to Lombard that time, so

25     it would've -- I don't know.  It would've been way after

21

```
1     that.  It could've even just been on the first executive
2     trip, the rewards trip that we had.  I don't remember.
3         Q.   Is that executive trip -- it's a trip that BBMC
4     put on for high producers?
5         A.   Yes.
6         Q.   And Mr. Hutto attended that trip?
7         A.   Yes.
8         Q.   So he did pretty well at BBMC?
9         A.   Yes.
10        Q.   What about Mr. Smith?  Was he similarly on the
11    executive trips for high producers?
12        A.   Yes.
13        Q.   Would you say that he also did well at BBMC?
14        A.   Yes.
15        Q.   And when I say "doing well," meaning
16    profitability of his branch; correct?
17        A.   Yes.
18        Q.   Mr. Hutto's branch at the time that he worked for
19    BBMC was the Daytona branch; correct?
20        A.   Yes.
21        Q.   And Mr. Smith's branch that he developed and was
22    doing well was the Tampa branch; correct?
23        A.   Yes.
24        Q.   Do you know how long Mr. Smith had the Tampa
25    branch before that branch came over to BBMC?
```

22

1    A.    I don't know.

2    Q.    Do you know how long Mr. -- sorry.

3          MS. KREITER:  Can you read back my last question?

4    I think I might've reversed them.

5          (The previous question was read by the reporter.)

6    Q.    And then -- so I did get it right.  With respect

7    to Mr. Hutto, do you know how long Mr. Hutto had the Daytona

8    branch that was doing well before bringing that branch to

9    BBMC?

10   A.    I don't.

11   Q.    You're aware that Mr. Hutto and Mr. Smith were

12   both running their branches successfully before bringing

13   those branches to BBMC?

14   A.    I don't know that.  I would assume it, but I

15   don't know it.

16   Q.    They were attractive candidates to BBMC?

17   A.    Again, I wasn't involved.  I don't think I met

18   them until after they were onboarded, so I can't really

19   answer that, but I would assume so.

20   Q.    The branches were in the same locations, same

21   physical -- I mean, we talked about them being both in Tampa

22   and Daytona, but were they in the same office space?

23   A.    I don't know.

24   Q.    How well do you know Mr. Smith?

25   A.    I mean, I don't know him that well.  I know him

———REGENCY REPORTING SERVICE, INC. (813)224-0224———

23

1    as an employee.

2         Q.   You don't know him socially?

3         A.   Other than the executive trips, I did not do

4    anything social with him, no.

5         Q.   How often did Mr. Smith attend the executive

6    trips that you mentioned?

7         A.   I only really remember him on two, but he

8    could've been on more.

9         Q.   Does -- at some point, there's a transition from

10   BBMC to Mutual of Omaha?

11        A.   Yes.

12        Q.   Or to Synergy One?

13        A.   Yes.

14        Q.   Did Synergy One and/or Mutual also have the

15   executive trips?

16        A.   Yes.

17        Q.   Do you know whether Mr. Smith and Mr. Hutto were

18   invited on those executive trips hosted by either Synergy

19   One or Mutual?

20        A.   I know we had a trip in Miami that I know

21   Mr. Hutto was on.  I don't remember if Mr. Smith was there.

22   There was a lot of people.  I don't remember if he was there

23   or not.

24        Q.   How exclusive are those executive trips?  Is it,

25   you know, jeez, most of the branch officers get an invite,

24

1    or is there -- this is just for our top five producers?

2    What are the thresholds for getting an invite?

3        A.   It's based on production.  So 2020 when there was

4    a lot of volume, it was a large trip, and I would say most

5    of the regionals would -- they -- they get invited if

6    they've got producers on that were also invited to the trip.

7    So it's -- there's a lot of people that go typically in a

8    good year.

9        Q.   Okay.  So 2020, you mentioned, was a higher --

10       A.   Yeah.

11       Q.   -- attendance rate?

12            That was obviously a very good year?

13       A.   Right.

14       Q.   What about '22?

15       A.   We did not even have a real trip last year.  Each

16   of the regionals did a smaller trip.  There just was not

17   enough people -- not enough people that would've qualified.

18       Q.   What about for '23?  Has there -- I don't know

19   what time of year this trip is or if there's multiple.  Has

20   there been any executive trips in '23?

21       A.   Again, the trips in '23 were from '22 production.

22       Q.   Got it.

23       A.   So nothing from -- I mean, the small regional

24   ones that they've had, some of them might've been towards

25   the end of '22.  I know there was one -- a small one for the

25

1    -- a regional in '23, but it would've been for '22

2    production.

3         Q.   Is it accurate to say '22 wasn't a good year?

4         A.   Yes.

5         Q.   Is it accurate to say that '23, at least the

6    first six months, hasn't been a good year?

7         A.   Yes.

8         Q.   Is there any sense that the next six months or so

9    are going to pick up such that '23 ends being a good year

10   versus the first six months?

11             MS. WALTER:  Object to the form.

12        Q.   Do you understand the question?

13        A.   I do.  It's hard to say.  I mean, I do think that

14   there's potential that it improves significantly.  But to

15   the extent that it's as good as former years, you know,

16   probably not just based on the market.

17        Q.   Are you somebody that receives -- we saw in an

18   earlier deposition that there's monthly performance e-mails

19   that go out to a list of executives.  I'm assuming you're

20   one of the recipients of those monthly e-mails?

21        A.   Yes.

22        Q.   Okay.  So thinking about the e-mails that have

23   gone out talking about the performance in '23, is the

24   performance in '23 consistent with the budget for '23, let's

25   say, or is the performance such that, look, we're not even

26

1    meeting budget for '23?

2         MS. WALTER:  Object to the form.

3         Q.    Do you understand the question?

4         A.    Yes.

5         Q.    Go ahead.

6         A.    We're below budget.  We're not meeting budget.

7         Q.    By how much, if you can estimate a percentage?

8         A.    I mean, we're significantly below budget.  I

9    don't have the exact numbers.  I can't even estimate a

10   percentage.

11        Q.    Okay.  Is it just -- you know, help me understand

12   -- ballpark, significantly below?  Is it more than

13   50 percent?

14        A.    We're barely breaking even, so...

15        Q.    And when you say we are barely breaking even, is

16   that on a corporate level?  Is it at the branch level, or is

17   it at all levels?

18        A.    I mean, some branches are still making money, so

19   it's at the forward division's level.

20        Q.    So Mutual is barely breaking even at the forward

21   division level?

22        A.    Correct.  It's probably even a loss still.  We've

23   made money a couple of months, but it's still -- overall

24   year to date, it's still a loss, so...

25        Q.    In terms of documents that show Mutual as


1    operating at barely breaking even or possibly a loss, is it

2    those monthly e-mails that would show that or is there some

3    other form of report?

4        A.    The monthly e-mails.

5        Q.    And when you say forward division is operating

6    barely breaking even or at a loss, is there a difference

7    between the profitability of the forward mortgage division

8    and Mutual of Omaha corporate?

9        A.    Yes.

10       Q.    Is -- so let's put aside forward division.  Are

11   you privy to the income level at the corporate profitability

12   levels?

13       A.    I don't really see it or pay attention to it.  I

14   think I do get the e-mails on the reverses, but I focus

15   primarily on forward since that's what I'm responsible for.

16       Q.    Okay.  I guess let me ask this question:  My

17   understanding is that -- and maybe this is incorrect, but is

18   it true that the branches might be performing poorly, but

19   Mutual as a corporation can still profit based on those

20   loans that are closed at the branches regardless of how the

21   branches' overall performance --

22       A.    Well, yes, just based on the number of branches

23   that we have.  If one branch performs poorly but other

24   branches are performing well, then the entity --

25       Q.    It can even out?

28

1    A.    (Nodding.)

2    Q.    In general, though, all of the branches are

3    performing not as good as they did in prior years at this

4    time?

5    A.    We do have at least one branch that is still

6    performing as they had in the past.  Their production and

7    their profitability has remained pretty stable.

8    Q.    Which branch is that?

9    A.    Columbia, Maryland.

10    Q.    So what do you attribute the success of the

11    Columbia, Maryland, branch?

12    A.    I don't know.  Good management and the type of

13    leads that they are acquiring and their ability to convert

14    those leads.

15    Q.    Does the Columbia branch focus on purchase loans

16    or refinanced loans?

17    A.    Refinance.

18    Q.    Can you say what the approximate split is for

19    that branch between refinance and purchase?

20    A.    It's mostly refinance.  I'd say -- I'm guessing

21    but 75 percent refinance at least.

22    Q.    Okay.  So I want to get back to the profitability

23    of Mutual of Omaha corporate, understanding that you may

24    have one branch that performs better than the other branch,

25    and so maybe it can be a wash.  If you've got one that's

29

1    down a little bit, but then you've got an all-star branch,

2    maybe overall the company is doing better, but would you say

3    that the corporate level profitability tends to trend

4    proportionately with the performance of the branches?

5         A.    Overall, yes.

6         Q.    For example, in terms of Mutual corporate, is it

7    your understanding that Mutual corporate was less profitable

8    2023 to date compared to 2020, for example?

9         A.    Yes.

10        Q.    What about looking again at just Mutual corporate

11   comparing 2022, the profitability of '22 compared to 2020?

12        A.    It was less.

13        Q.    Suffice to say, looking at the corporate level

14   profitability for Mutual corporate was much higher in 2020

15   and 2021 than in 2022 and 2023; correct?

16        A.    Yes.

17              MS. WALTER:  Object to the form.

18        Q.    Go ahead.

19        A.    Yes.

20        Q.    With respect to Mutual corporate, suffice to say

21   2020 and 2021 were historically high years?

22              MS. WALTER:  Object to the form.

23        A.    Yes.

24        Q.    Were 2020 and 2021 the highest from a

25   profitability perspective for Mutual corporate in recent

REGENCY REPORTING SERVICE, INC. (813)224-0224

30

 1   memory?

 2          MS. WALTER:  Object to the form.

 3      A.   Yes.

 4      Q.   Okay.  You had talked before about, you know, in

 5   the last ten years looking at just forward mortgage, 2020

 6   and 2021 were the highest.  Is the same true looking at the

 7   last ten years but focusing on corporate profitability?

 8          MS. WALTER:  Object to the form.

 9      A.   I haven't been there for ten years, so I couldn't

10   answer that.

11      Q.   Okay.  How long have you been there?

12      A.   We moved over to Mutual of Omaha in -- I don't

13   know.  I think it was --

14      Q.   Take a look at Exhibit 20 if that helps

15   you.  Exhibit 20 was --

16      A.   Yeah, 2018.  December 2018.

17      Q.   So since 2018, would you agree that 2020 and 2021

18   were the highest years since you've been at Mutual dating

19   back --

20      A.   Yes.

21      Q.   -- to 2018?

22      A.   Yes.

23      Q.   Take a look at what has been marked previously at

24   a deposition as Exhibit 14.  Do you recognize Exhibit 14?

25   It says "2024 Plan vs. 2023 Plan" at the top.  Do you see

31

1     that?

2         A.    Yes.

3         Q.    What is Exhibit 14 in your own words?

4         A.    I think it's just the pro forma.

5         Q.    The pro forma?

6         A.    Yeah.

7         Q.    For Mutual overall?

8         A.    Yes.

9         Q.    Is Exhibit 14 something that you have a role in

10    preparing?

11        A.    No.

12        Q.    Who prepares Exhibit 14?

13        A.    I would say it's probably Tyler Larsen and Jeff

14    Gennarelli together.

15        Q.    But it's something that you've seen before?

16        A.    Yes.

17        Q.    In what context have you seen Exhibit 14?

18        A.    Just I know that when they present it to the

19    board, I get a copy.

20        Q.    Are you a member of the board at Mutual?

21        A.    No, no.

22        Q.    Is this Exhibit 14 something that you weigh in

23    on, analyze, and discuss, or you're just copied when it goes

24    to the board?

25        A.    Just copied.

32

1          Q.    Are there other documents that would show the

2    performance of Mutual that go to the board besides

3    Exhibit 14?

4          A.    Not that I'm aware of.

5          Q.    Let's take a look -- if I can direct you, do you

6    see there's four columns in blue, Combined Divisions,

7    Forward Division, Reverse Division, Corporate?  Do you see

8    that?

9          A.    Yes.

10         Q.    The branches that are at issue in this case were

11   located in Tampa, Daytona, and then Paramus, New Jersey.

12   All of those branches were part of the forward division;

13   correct?

14         A.    Yes.

15         Q.    So if you look at the -- under the Forward

16   Division column, there's three subcolumns.  The first is

17   Year-to-Date June 2022 Forecast.  Do you see that?

18         A.    Yes.

19         Q.    And then the middle column is 2023 Plan, and then

20   the far column is 2024 Plan.  Do you see that?

21         A.    Yes.

22         Q.    So if you look at the Net Profit Before Tax

23   associated with the Forward Division Year-to-Date June 2022

24   Forecast, it says 9 million.  Do you see that?

25         A.    Yes.

33

```
 1          Q.   And then if you look at 2023, that same row, Net

 2    Profit, it's 4.26 million; correct?

 3          A.   Yes.

 4          Q.   So the forecast was that the net profit for the

 5    forward division would be cut in half for '23; correct?

 6          A.   Yes.

 7          Q.   To what do you attribute that decrease?

 8          MS. WALTER:  Object to the form.

 9          Q.   Go ahead.

10          A.   Just the market in general.  We've never seen a

11    market where interest rates have increased so quickly and

12    the purchase activity has decreased as -- as quickly.

13          Q.   How long has the market been in the condition

14    that you just described?

15          MS. WALTER:  Object to the form.

16          A.   Over a year.

17          Q.   Is the market that you've just described, which

18    has been the case over a year, does that even compare to the

19    market in 2020 or 2021?

20          MS. WALTER:  Object to the form.

21          A.   No.

22          Q.   This is Year-to-Date June '22 Forecast, 9

23    million.  Has that forecast come to fruition, or is the

24    profit less than 9 million for '22 to date?

25          A.   It's less.
```

34

1          Q.    By how much?

2          A.    Significantly less.  If we -- below -- we're in

3    the red, I believe, for year to date.

4          Q.    So sorry.  Just so I'm clear on the record, so

5    the forward division is in the red year to date for 2023?

6          A.    Yes.

7          Q.    Okay.  What about for 2022?  It says 9 million.

8    Do you know how -- well, year-to-date June '22.  We're in

9    June of '23, I guess.

10         A.    Yeah.

11         Q.    Do you know, for June of '22 --

12         A.    I don't remember.

13         Q.    -- was 9 million achieved?

14         A.    I don't know.  I don't recall.

15         Q.    Are you doubtful about that?

16               MS. WALTER:  Object to the form.

17         A.    I don't know.  I don't remember.

18         Q.    And then a minute ago, I think you said year to

19    date was in the red?

20         A.    Correct.

21         Q.    You were talking about 2023 year to date;

22    correct?

23         A.    Yes.

24         Q.    So on this Exhibit 14, it's forecasting net

25    profit of 4.276 million.  That's not reflective of reality;

35

1      correct?

2          A.   Yes.

3          Q.   Do you know how much in the red the business is

4      for 2023?

5               MS. WALTER:  Object to the form.

6          A.   No.

7          Q.   More than a million?

8               MS. WALTER:  Object to the form.

9          A.   I don't know.

10         Q.   You just know it's in the red?

11         A.   Yes.

12         Q.   Okay.  Then if you would slide over, I'm going to

13     skip the Reverse Division because it sounds like that

14     performance is separate.  And then do you see the column on

15     the right where it says "Corporate"?

16         A.   Yes.

17         Q.   The Year-to-Date June '22 Forecast was negative

18     15 million.  Do you see that?

19         A.   Yes.

20         Q.   Do you know if that is accurate?

21         A.   I don't know.

22         Q.   Do you know whether at the corporate level,

23     looking at the period of -- you know, through June of '22,

24     the corporation was in the red?

25         A.   I don't know.

36

1          Q.   What about if you slide, then there's those same

2     three subcolumns, so Corporate column.  And then looking at

3     the 2023 Plan subcolumn, it says minus 18 million.  Do you

4     see that?

5          A.   Yes.

6          Q.   So certainly, the projection was that 2023 would

7     be worse than 2022; correct?

8               MS. WALTER:  Object to the form.

9          A.   Yes.

10         Q.   And then you see the projection for the 2024 Plan

11    is negative 42 million; correct?

12         A.   Yes.

13         Q.   So clearly, the projection is underwater in '22,

14    even worse in '23 by about $3 million, and then negative 42

15    million for 2024, so a downward trajectory; correct?

16         A.   Yes.

17         Q.   At the corporate level?

18         A.   Yes.

19         Q.   I'm going to direct you now before we get to

20    those four columns in blue on the left, there's -- it

21    doesn't have a column title, but there's different rows.

22    We've been looking at the Net Profit Before Tax row.  Do you

23    see that?

24         A.   Yes.

25         Q.   And that's under -- it says "$ Financials."  If

37

1      you look just below that, it says "Financials in BP."  What

2      is BP?

3           A.   Basis points, I believe.  I'm not seeing it on

4      here, though.

5           Q.   Do you have an understanding of -- and then it

6      looks like the numbers are dissected in a different fashion,

7      not looking at monetary amounts but BP, presumably basis

8      points.  Do you have an understanding of this section of

9      Exhibit 14?

10          A.   Yeah, a basic understanding.

11          Q.   Okay.  Can you just kind of summarize that

12     section for me?  What does it say in terms of profitability

13     of the business?

14          A.   It just shows -- it just shows the profitability

15     based on the basis points of the -- of the loan volume.  It

16     breaks down the total revenue, yield spread premium, service

17     fee, expenses, loan-related expenses, et cetera.

18          Q.   So for example, if you look at the Forward

19     Division column now --

20          A.   Um-hmm.

21          Q.   -- Net Profit Before Tax, it says 14 BP, so 14

22     basis points?

23          A.   Correct.

24          Q.   Is there some correlation between those 14 basis

25     points and the 4.276 million projected for net profit when

38

1    looking at a dollar amount?

2         A.    Yes.

3         Q.    You testified earlier that 2023 there wasn't a

4    net profit of 4.276.  Rather, it's in the red.  Do you know,

5    are these basis point protections also positive or would

6    that be in the red as well?

7         A.    That would also be in the red.

8         Q.    What about -- so that was for the 2023 Plan

9    column.  What about -- let's back up.  Under Year-to-Date

10   June 2022 Forecast, it says "28 basis points."  Do you

11   believe that from a basis point perspective Mutual was

12   positive 28 basis points, or would that be in the red too?

13        A.    I don't recall June 2022, to be honest.  I don't

14   know.

15        Q.    Okay.  Then if you -- kind of looking at this in

16   three sections, we talked about looking at it on a monetary

17   perspective, the basis points section.  And then Financials

18   Per Funded Loan, do you see that?

19        A.    Yes.

20        Q.    Do you have an understanding of this section of

21   the chart?

22        A.    Yes.

23        Q.    Would you expect that the Financials Per Funded

24   Loan section of the chart would be, you know, proportional

25   to the other sections such that if profitability at a dollar

REGENCY REPORTING SERVICE, INC. (813)224-0224

39

1    amount was in the red, these Financials Per Funded Loan

2    section would also be materially less?

3        A.    Yes.

4        Q.    And that would be the same with respect to the

5    Forward Division, all three columns, 2022, 2023 -- and I

6    guess we're not in 2024 yet.

7        A.    Yes.

8        Q.    You can put that one aside.

9              How did you come to learn that the Daytona branch

10   was leaving Mutual?

11       A.    As I recall, I think Brian Tomalak mentioned to

12   Jeff that he was thinking of maybe leaving based on their

13   pipeline and then Jeff told me.

14       Q.    What was it about the pipeline?

15       A.    That it was decreasing.

16       Q.    Was this before the departures actually occurred?

17       A.    I believe so.

18       Q.    Okay.  Are you aware of Jake Lowe leaving the

19   Daytona branch prior to any of the departures of the

20   employees that went to Waterstone?

21       A.    I don't recall.

22       Q.    Do you know who Jake Lowe is?

23       A.    The name is familiar.  I think he was a loan

24   officer, but I'm not positive.

25       Q.    Are you aware that Mr. Lowe left Mutual prior to

40

1    the first departures at the Mutual branch that went to

2    Waterstone?

3         A.   I don't recall.

4         Q.   Could it be that the pipeline in the Daytona

5    branch decreased due to Mr. Lowe's departure?

6              MS. WALTER:  Object to the form.

7         A.   I don't know.

8         Q.   Did Mr. Gennarelli, Mr. Tomalak, or Mr. King

9    raise Mr. Lowe's departure to you?

10        A.   Not that I remember.

11        Q.   It wasn't concerning to them?

12        A.   Not that I remember.  If it was, I wasn't

13   involved.  They would've --

14        Q.   Okay.  So they didn't express any concern to you

15   at least?

16        A.   Correct.

17        Q.   If they had concerns, maybe they expressed it

18   elsewhere?

19        A.   Right.

20        Q.   What impact did the departures have on your job?

21        A.   I mean, my job pretty much remained the same

22   other than, you know, losing a chunk of business on the

23   forward division.  My day-to-day job didn't really change.

24        Q.   When did you first learn that the Tampa branch

25   was leaving Mutual?

41

1      A.   I don't recall, but I think -- I think it was

2   right when they were leaving or left.

3      Q.   When -- the Daytona branch left first.  You

4   understand that; correct?

5      A.   I don't remember that, but okay.

6      Q.   Was there -- my question is was there a concern

7   that given that Daytona left, that Mr. Smith's branch in

8   Tampa would also leave?

9      A.   Probably.

10      Q.   Why do you say "probably"?

11      A.   Just because I think that they worked together.

12      Q.   What do you mean by that?

13      A.   Well, I mean, I think that they came over at

14   close to the same time, if not the same time, and were

15   working together.  I mean, I know that Dwayne and Chris

16   Smith worked together.

17      Q.   Were you surprised to hear that Mr. Smith and the

18   Tampa branch were leaving given the departure of Mr. Hutto

19   and the Daytona branch?

20      A.   I don't remember any conversations around it.  I

21   don't know.

22      Q.   How long has Mr. Smith known Mr. Hutto?

23      A.   I have no idea.

24      Q.   At least going back to BBMC?

25      A.   Yes.

42

1          Q.   Do you know if they knew each other prior to

2     BBMC?

3          A.   I don't know.

4          Q.   Can you describe the relationship between

5     Mr. Smith and Mr. Hutto?

6               MS. WALTER:  Object to the form.

7          A.   I don't know.

8          Q.   How -- do you know them very well?

9          A.   No.

10          Q.   No.  Who within Mutual do you believe knows

11     Mr. Smith and Mr. Hutto the best?

12               MS. WALTER:  Object to the form.

13          A.   I don't know.  I would guess Brian and Kiley, but

14     I don't know the answer for sure.

15          Q.   You may not know these, but I just want to not

16     assume that, and instead get it on the record.  Do you know

17     whether Mr. Smith views -- sorry.  Do you know whether

18     Mr. Hutto views Mr. Smith as a mentor?

19          A.   I don't know.

20          Q.   Do you know if they're close friends outside of

21     work?

22          A.   I don't know.

23          Q.   Do you know if they've vacationed together?

24          A.   I don't know.

25          Q.   What do you know about the relationship between

43

1    Mr. Hutto and Mr. Wolf?

2         A.    I don't know.

3         Q.    Do you have an understanding as to how they

4    manage their branch together?

5         A.    No.

6         Q.    Is it surprising to you that Mr. Wolf would

7    resign and go to Waterstone given that Mr. Hutto resigned

8    and went to Waterstone?

9         A.    I don't know.  I didn't really -- I'm not sure.

10        Q.    Are you aware at all of the relationship between

11   Mr. Wolf and Mr. Smith?

12        A.    Other than they joined together, I know they came

13   to the Lombard office together and worked together.  That's

14   all I know.

15        Q.    Okay.  So is it a similar relationship between

16   Mr. Wolf and Mr. Smith as it is between Mr. Hutto and

17   Mr. Smith?  They came together.  They have a friendship.

18   They've worked together.  Is that accurate?

19             MS. WALTER:  Object to the form.

20        A.    I don't know.  I'm not sure if they worked

21   together in the past, but --

22        Q.    Okay.  But at least when the branches were at

23   Mutual, the Daytona branch and the Tampa branch teamed

24   together in some respect?

25        A.    Yes.

44

```
 1          Q.   Do you know how long Mr. Wolf and Mr. Hutto have
 2    been co-branch managers?
 3          A.   No.
 4          Q.   Do you know if they were co-branch managers prior
 5    to BBMC?
 6          A.   I don't.
 7          Q.   You don't know if they're close friends?
 8          A.   No.
 9          Q.   You don't know if Mr. Wolf views Mr. Hutto as a
10    mentor?
11          A.   No.
12          Q.   You don't know if they're -- if they gather
13    socially outside of work or if they've vacationed together?
14          A.   No.
15          Q.   Are you able to at all describe the relationship
16    between Mr. Wolf and Mr. Hutto?
17               MS. WALTER:  Object to the form.
18          A.   No.
19          Q.   Do you know what each brought to the table in
20    terms of the branch manager role?
21          A.   No.
22          Q.   Is there anything that you do know about the
23    relationship between these three managers that we haven't
24    talked about already?
25          A.   No.
```

45

1          Q.    What about the relationship between the three

2     managers?  And I'll call them the downstream employees or

3     the branch employees.  Are you able to speak to the

4     relationship, including feelings of loyalty, friendships,

5     between the managers and the employees that were at the

6     branch?

7          A.    No.

8          Q.    Are you surprised that the employees at the

9     branch followed the managers?

10               MS. WALTER:  Object to the form.

11         A.    I don't know, no.  I don't know.  I have no

12    opinion.

13         Q.    Have you talked to any of the employees about

14    what caused them to leave Mutual and go to Waterstone?

15         A.    No.

16         Q.    Has anybody at Mutual, to your knowledge, talked

17    to the employees about what caused them to leave Mutual and

18    go to Waterstone?

19         A.    I don't know.

20         Q.    Do you know if the employees are receiving more

21    compensation at Waterstone than they did at Mutual?

22         A.    I don't know.

23         Q.    Do you know whether the employees followed the

24    managers out of loyalty and friendship?

25         A.    I don't know.

REGENCY REPORTING SERVICE, INC. (813)224-0224

46

1          Q.    Do you know whether the employees were solicited?

2          A.    I don't know.  Other than in reviewing some of

3    the documents for the deposition, it looks like there were

4    some calls and -- conference calls about an opportunity.

5    That was the first that I had known about it.

6          Q.    In your preparation for the deposition?

7          A.    Yes.

8          Q.    What e-mails did you review in preparation for

9    the deposition?

10         A.    Just there was an e-mail -- a couple of e-mails

11   that were exhibits about we just had a call.  We're so

12   excited.  I'm paraphrasing, but really that was all, a

13   couple of those types of e-mails.

14         Q.    Okay.  Did those e-mails -- were they sent to you

15   by counsel via e-mail or were they handed to you?

16         A.    I got them from counsel via e-mail.

17         Q.    Did you make any notes on those documents?

18         A.    No.

19         Q.    Did you print them out?

20         A.    No.

21         Q.    How many e-mails were there?

22         A.    I don't know.  Ten maybe.  I'm guessing.

23         Q.    Okay.  But it sounds like separate from the

24   e-mails that were provided to you by counsel in preparation

25   for the deposition, you're unaware of any type of

47

```
1      communications that could possibly be solicitation?
2           A.   Correct.
3           Q.   Do you have any evidence that Waterstone played a
4      role in those communications between the managers and the
5      branch employees?
6           A.   Just the e-mails that I saw in preparation.
7           Q.   Was Waterstone a party to any of the e-mails that
8      you saw?
9           A.   I believe so.  There was an e-mail where some
10     information was sent to someone at Waterstone.
11          Q.   Okay.  Information related to a particular
12     borrower?
13          A.   I believe there was information related to a
14     particular borrower, and I believe there was other items
15     sent over, P&Ls and things of that nature.
16          Q.   Okay.  I want to focus just on the idea that the
17     employees of the branch were somehow solicited.  Did you see
18     any e-mails -- do you understand that there could be
19     solicitation by the managers to the employees?  That's one
20     thing.
21               But Waterstone is the party that's being sued, so
22     it could be that the employees were doing whatever they were
23     going to do or the managers were going to do whatever they
24     were going to do.  I want to know did you see any e-mails
25     that would lead you to believe that Waterstone was the one
```

48

1      orchestrating any type of solicitation of the employees?

2          A.   I think just the one e-mail where the information

3      was sent over and then the Waterstone employee said let's

4      get some -- I'm paraphrasing again, but let's get some time

5      on the calendar.  That's the only one that would indicate to

6      me that they were soliciting them.

7          Q.   Okay.  And I want to be really clear about this.

8      So documents were sent over.  In this e-mail that you're

9      referring to, documents were sent from who to who?

10         A.   I believe it was from Dwayne to someone at

11     Waterstone, and I don't remember the name.

12         Q.   But it related to a particular borrower or to

13     communications with the branch employees?

14         A.   This particular e-mail was related to the branch

15     profitability, I believe, P&Ls, branch production, things

16     like that.

17         Q.   Okay.  And there is certainly an e-mail or two in

18     this case in which Mr. Hutto sends P&Ls to Waterstone.  Are

19     those the e-mails that you're referring to?

20         A.   I believe so.

21         Q.   Are there any e-mails that involve Waterstone

22     separate from the P&Ls but rather, for example, involved

23     Waterstone giving a script to the managers so that they can

24     solicit the branch employees or Waterstone giving

25     instructions to the managers about how to recruit branch

49

1    employees?

2        A.    I didn't see any like that, no.

3        Q.    Other than the e-mail that you're referring to in

4    which Mr. Hutto is sending a P&L to Waterstone, are there

5    any facts that you're aware of that would indicate

6    Waterstone played a role in the solicitation of any branch

7    employees?

8            MS. WALTER:  Object to the form.

9        A.    I only heard after the fact about them taking

10   them on a trip or something, but that was -- I don't have

11   evidence of it.  That's just what I heard from people.

12       Q.    And this is the trip to Costa Rica?

13       A.    I don't even know where they went, to be honest.

14       Q.    Other than the trip to Costa -- wherever it was,

15   this trip, do you have any evidence or information or facts

16   that would lead you to believe that Waterstone played a role

17   in the managers' solicitation of the branch employees?

18       A.    Not that I'm aware of.

19       Q.    Have you had any communication with Mr. Hutto,

20   Mr. Smith, or Mr. Wolf since their resignations?

21       A.    No.

22       Q.    Who at Mutual had the most involvement in

23   addressing the departures of the branches in Tampa, New

24   Jersey, and Daytona?

25       A.    I don't know.

50

1      Q.    I'm assuming that Mr. Tomalak and Mr. King had a

2    good deal of work to do when the two branches resigned --

3            MS. WALTER:  Object to the form.

4      Q.    -- is that accurate?

5      A.    I would assume that also, but I don't know for

6    sure.

7      Q.    Is there anyone else -- and I'm just trying to,

8    you know, make sure that I understand who the key players

9    are, who may have potentially relevant information to the

10   suit.  You were identified as a witness for Mutual in this

11   case, which is why I'm deposing you.

12           You're aware Mr. Tomalak and Mr. King are going

13   to be deposed tomorrow.  Are there others within Mutual that

14   you believe have information that would be relevant to the

15   lawsuit?

16           MS. WALTER:  Object to the form.

17     A.    Not that I can think of.

18     Q.    What about Bernie Manard?  I'm not sure if I'm

19   saying it --

20     A.    Mayle.

21     Q.    Mayle?

22     A.    He prepares the financials.  He prepares the P&Ls

23   for the branches.

24     Q.    Okay.  Would Mr. Mayle have any involvement in

25   the transitions?

51

1          A.    No.

2          Q.    Okay.  What about Mr. Connealy or Mr. Larsen?

3     Would they have had any involvement with respect to the

4     issues in this case, the branch departures, the allegations

5     of solicitation?

6          A.    No, not that I'm aware of.

7          Q.    Other than being on the monthly calls in which

8     there was discussion about the lawsuit or the departures and

9     issues that had arisen, did you have any other role in the

10    branch departures?

11         A.    No.

12         Q.    Who handled transferring the leases over to

13    Waterstone?

14         A.    I don't know.

15         Q.    You're aware that the leases were in the names of

16    the managers or an LLC that they controlled and then there

17    was a sublease to Mutual; correct?

18              MS. WALTER:  Object to the form.

19         A.    No.

20         Q.    You don't have an --

21         A.    I'm not aware.

22         Q.    -- understanding either way?

23         A.    Right.

24         Q.    Got it.  Are you aware of anyone at Mutual

25    reaching out to the branch employees and trying to retain

52

1    them?

2         A.    Not that I'm aware of.

3         Q.    Did you have any role in analyzing loans that

4    transferred to Waterstone rather than closing with Mutual?

5         A.    At the time of the departure or --

6         Q.    At any point in time.

7         A.    I think I was asked an opinion on one or two

8    loans that were transferred over.

9         Q.    Do you recall which loans those were?

10        A.    Off the top of my head, I believe one of them was

11   -- and I don't even know to -- to distinguish them, but I

12   think Palmer might've been one of them where there was a

13   preapproval issued from Mutual and the documents were sent

14   over to Waterstone.  And then there was another loan that I

15   believe the borrower was told we denied that we didn't, and

16   I don't remember -- recall the name of that one.

17        Q.    Do you remember the persons that were involved in

18   that second loan, meaning the underwriter or, you know, who

19   you --

20        A.    I believe -- I know that I actually spoke with

21   Chris Smith about that loan and that the underwriter was

22   Sunny Hermoso.

23        Q.    Sunny, H-e-r-m-o-s-a?

24        A.    -s- --

25        Q.    -s-o?

53

1          A.    -o, I believe.

2          Q.    Okay.  So with respect to -- let's start with

3     that second one.  It's a loan that -- so is Sunny a male or

4     female?

5          A.    Female.

6          Q.    Female.  So Ms. Hermoso essentially reaches out

7     to you.  I mean, we discussed at the outset that you're the

8     go-to when there's questions about underwriting.  So was it

9     in that context that Ms. Hermoso reaches out to you and says

10    something to the effect of, "I have a question on this

11    loan"?  And then what do you recall?

12              MS. WALTER:  I just want to go on the record and

13         say that anything that you were directed to do by

14         counsel or if counsel was involved, do not get into

15         those discussions, but you can answer the question to

16         the extent it's not involving anything that pertained

17         to counsel directing you to do something.

18         Q.    This is presuit.  So my understanding is that

19    Ms. Hermoso calls you at some point --

20         A.    No.

21         Q.    -- and says, "I have a question related to the

22    loan"; is that correct?

23         A.    I don't recall if Ms. Hermoso called me.  I don't

24    think she did.  I believe she reached out to the loan

25    officer and said that there was an issue, that there was a

54

1      second mortgage that was reporting delinquencies.  And based

2      on those delinquencies, we couldn't proceed.

3              And after that, Chris Smith reached out to me and

4      explained the situation saying that the second mortgage was

5      in the name of -- well, the second mortgage was on title to

6      the property.  The obligor was a business.  And our borrower

7      allegedly -- and I don't remember, again, whether we had

8      gotten the documentation but that our borrower was not a

9      part of that business.  And I told him if we can get that

10     documentation, then we can proceed.

11         Q.    Okay.  And then do you have an understanding as

12     to whether that loan did, in fact, proceed at Mutual?

13         A.    It did not.

14         Q.    Do you have e-mails with Ms. Hermoso about this

15     loan?

16         A.    No, not personally.  Not that I'm aware of.

17         Q.    Do you have e-mails with Mr. Smith about this

18     loan?

19         A.    I'm not sure if I do or not.

20         Q.    If Ms. Hermoso had further discussions about the

21     loan, is there any system at Mutual in which Ms. Hermoso

22     would've discussed those?

23         A.    She would've discussed it via e-mail or a phone

24     call with the loan officer.  In some cases, depending on the

25     circumstances, there would also be notes in a conversation

55

1    log about it.

2        Q.   And you mentioned the conversation log.  I guess

3    that's what I maybe figured existed.  Is there -- you know,

4    I think of CRM systems.  Is there a type of system in which

5    underwriters keep notes about a particular loan?

6        A.   It's not a CRM system.  Encompass is our loan

7    origination software that we use, and there's a conversation

8    log in the -- in Encompass.

9        Q.   Okay.  So presumably you could go into the

10    Encompass system, look at this particular borrower, and

11    retrieve any notes that Ms. Hermoso put in the conversation?

12        A.   If she did.  It's not used all the time.  If she

13    did, yes.

14        Q.   Okay.  And it sounds like we don't remember the

15    name of the borrower of that --

16        A.   I can't --

17        Q.   -- particular loan?

18        Let's move to the other loan that you indicated

19    your opinion was sought with respect to the Palmer loan.

20        A.   Yes, if that's the name.  I'm not positive.

21        Q.   And Palmer, maybe it's something else, but your

22    testimony was that a preapproval was issued at Mutual and

23    that documents for the loan were sent to Waterstone?

24        A.   But this was requested from counsel, so I don't

25    know if I should answer that anymore.

56

1    Q.   Well, were you involved in the preapproval being

2  issued at all?

3    A.   No.

4    Q.   But you're aware that documents were sent to

5  Mutual.  Was that by looking at e-mails?

6    A.   It was just looking at the preapproval in the

7  system.

8    Q.   And then -- but your understanding is that the

9  Palmer loan did not close with Mutual; correct?

10    A.   Yes.

11    Q.   And that it closed with Waterstone?

12    A.   I don't know if it closed with Waterstone.

13    Q.   You just know it wasn't closed at Mutual?

14    A.   Right.

15    Q.   And the documents related to the loan were sent

16  over to Waterstone?

17        MS. WALTER:  Object to the form.

18    A.   I don't know that for sure.

19    Q.   Did you have any role with respect to this loan

20  prior to the litigation commencing?

21    A.   No.

22    Q.   Take a look at what we've previously marked as

23  Deposition Exhibit 18, if you would.  Exhibit 18 is the

24  First Amended Complaint.  This is the complaint that Mutual

25  filed and is pending against Waterstone.  Have you seen

57

1    Exhibit 18 before?

2         A.    Yes.

3         Q.    When did you see it?

4         A.    I know I saw it in preparation for the

5    deposition, and I could have seen it before then, but I

6    don't remember seeing it before then.

7         Q.    Is there any particular part of Exhibit 18 that

8    you focused on in preparation for your deposition?

9         A.    Just really anything that I thought would've

10   related to me.

11        Q.    Okay.  Why don't you just take a minute and page

12   through, I guess, find any sections that you think related

13   to you in any way.  If you find a section -- each of the

14   paragraphs are numbered here -- just let me know where

15   you're at.

16        A.    I think paragraph 53 I paid probably close

17   attention to.

18        Q.    Okay.  So paragraph 53, just for purposes of the

19   record, it starts out "On May 25, 2022, Lucas Van Dame, then

20   a Mutual loan -- Mutual Mortgage loan originator, sent an

21   e-mail to a prospective borrower stating that the borrower's

22   loan was not approved by Mutual Mortgage, misrepresenting

23   the basis for the underwriting decision, referring the

24   borrower to Waterstone, and transferring the borrower's file

25   to Waterstone," and then it goes on with a block quote.

58

1             Is that loan referenced in paragraph 53 involving

2    Mr. Van Dame the same one that we talked about -- I think

3    you couldn't remember the borrower's name -- but that

4    involved Sunny Hermoso, or is this a --

5        A.    Yes.

6        Q.    -- different --

7        A.    Same.

8        Q.    Okay.  And you indicated that you focused on

9    paragraph 53 or you had some involvement with the loan

10   referenced in paragraph 53.  Is there anything about that

11   loan in addition to what we talked about already?

12       A.    Nothing specific.  Just that I knew that that

13   statement was incorrect that we denied the loan because we

14   didn't.

15       Q.    Have you subsequently had a discussion with

16   Ms. Hermoso about whether this loan was ultimately approved

17   or denied by Mutual?

18       A.    No.  But I can tell in the system that it didn't

19   close and it was withdrawn.

20       Q.    Have you made any efforts to review the Encompass

21   conversation log to understand whether Ms. Hermoso had

22   subsequent discussions about this loan after you gave the

23   approval?

24             MS. WALTER:  Object to the form.

25       A.    No.

59

1          Q.    Have you done any investigation as to why this

2    loan did not close with Mutual?

3          A.    No.

4          Q.    Do you know one way or another whether

5    Ms. Hermoso had subsequent discussions and ultimately made

6    the decision that this loan would not be approved?

7                MS. WALTER:  Object to the form.

8          A.    She wouldn't.  I mean, if I said that we could do

9    it, she would not take it upon herself to --

10         Q.    Have you asked her?

11         A.    No.

12         Q.    Has anyone at Mutual had a discussion with

13   Ms. Hermoso to understand whether the allegations in

14   paragraph 53 are true?

15               MS. WALTER:  Object to the form.

16         A.    She would've had to issue a denial in the system,

17   and she didn't.

18         Q.    So there would be a record within the system of

19   her denying the loan?

20         A.    Yes.

21         Q.    Is Ms. Hermoso still an employee of Mutual?

22         A.    Yes.

23         Q.    But you've not made any effort to talk to her

24   about this loan?

25               MS. WALTER:  Object to the form.

60

```
 1          A.    No.

 2          Q.    And you don't know whether anyone else has

 3    either?

 4          A.    No.

 5          Q.    Have you ever encountered a situation where an

 6    underwriter rejects a loan after you've weighed in?

 7          A.    No.

 8          Q.    Never?

 9          A.    Never.

10          Q.    And I think I was asking you to go through the

11    complaint and let me know which allegations you have

12    knowledge about.  You stopped at paragraph 53.  I guess I'll

13    ask you to continue.  Are there other allegations within the

14    amended complaint that you have knowledge about?

15                (Mr. Carroll joins Zoom.)

16          A.    No.

17          Q.    Okay.  So for example, take a look at

18    paragraphs 41 and 42.  Just let me know when you're there.

19    Paragraph 41 references a June 10, 2022, event involving

20    Fred Stalls.  And then paragraph 42 involves a June 15th

21    event involving Cody Lamb.  You weren't involved and have no

22    knowledge of either of these events; correct?

23          A.    Correct.

24          Q.    What about -- turn to paragraph 49 and 50.  49

25    relates to an April 12, 2022, event involving Fred Stalls.
```

61

```
 1        Paragraph 50 relates to an April 13, 2022, event involving

 2        Dwayne Hutto.  You have no knowledge or information about

 3        either of those events?

 4             A.   No.

 5             Q.   And the same would be true with respect to all of

 6        the other paragraphs in the amended complaint other than the

 7        paragraphs related to the May 25th Lucas Van Dame event,

 8        correct, that we already talked about?

 9             A.   Right.

10             Q.   Great.  You can put that one aside.

11                  Where are you located out of?

12             A.   I work in -- I'm in Naples, Florida, most of the

13        year and in the Lombard location, and I live in Illinois in

14        the summertime.

15             Q.   Too hot in Florida here for the summer?

16             A.   Yeah.

17             Q.   How often did you personally visit the Tampa

18        branch?

19             A.   I don't think I ever went there, never.

20             Q.   Have you ever visited the Daytona branch?

21             A.   No.

22             Q.   Have you ever visited the New Jersey, Paramus

23        branch?

24             A.   No.

25             Q.   Who were the managers of the Paramus branch in
```

62

1    New Jersey?

2         A.   I don't remember their names.

3         Q.   I'm assuming you didn't know them very well at

4    all?

5         A.   No.

6         Q.   Did you ever meet them?

7         A.   I think I might've met them, yes.

8         Q.   In connection with their onboarding or on an

9    executive trip?

10        A.   Yeah, I think I met them in Miami.  I don't know

11   that they onboarded yet.  I'm not sure.  I don't remember.

12   I know I met them.  I believe I met them.

13        Q.   You don't have any information about the managers

14   of the New Jersey branch and their relationship with

15   Mr. Smith, do you?

16        A.   No.

17        Q.   Why was it that the -- I mean, my understanding

18   is that the Paramus, New Jersey, branch is rolled up through

19   Mr. Smith's branch in Tampa.  Why is that the case?  Just

20   geographically they're not --

21        A.   Typically, when you've got a regional manager

22   with relationships, we don't limit them from recruiting

23   based on geography, so...

24        Q.   Okay.  So is it that Mr. Smith brought on the New

25   Jersey branch?

63

1          MS. WALTER:  Object to the form.

2      A.   I'm not positive but probably.

3      Q.   Okay.  Do you know whether Mr. Smith had a

4  relationship with the managers of the New Jersey branch at

5  BBMC?

6      A.   I don't know.

7      Q.   Do you know whether the New Jersey branch rolled

8  up through Mr. Smith at BBMC?

9          MS. WALTER:  Object to the form.

10     A.   I don't know for sure.

11     Q.   So just for closure, suffice to say you don't

12  know anything about the relationship between the New Jersey

13  branch and Mr. Smith?

14     A.   Correct.

15     Q.   I want to make sure that I understand the

16  different transactions that involve Synergy One, BBMC, and

17  Mutual of Omaha.  You were at Bridgeview Bank and Mortgage

18  Company or BBMC; correct?

19     A.   Yes.

20     Q.   And then BBMC was acquired by Synergy One Lending

21  in 2018; is that accurate?

22     A.   Not really acquired.  It was an asset purchase

23  only, but yes.

24     Q.   So Synergy One buys the assets of BBMC?

25     A.   Yes.

64

1          Q.    And that was in 2018?

2          A.    Yes.

3          Q.    What was the relationship between Synergy One and

4     Mutual in 2018?

5          A.    Mutual of Omaha Bank was in the process of

6     acquiring Synergy One Lending at that time.

7          Q.    The three managers, Chris Wolf, Dwayne Hutto, and

8     Chris Smith, became employees of Synergy One Lending; is

9     that correct?

10         A.    Yes.

11         Q.    And then after that occurred, Synergy One was

12    acquired by Mutual or -- I'm trying to figure out the

13    timing.

14         A.    Yeah, it was around the same time.  They were

15    already in the process when we started talking to Synergy

16    One.  We knew that Mutual of Omaha was acquiring them.  So I

17    don't know the exact time frame either, but it was very

18    close to the same time.  It was almost the same time.

19         Q.    Okay.  But the employer for Mr. Hutto, Mr. Wolf,

20    and Mr. Smith is initially Synergy One Lending; correct?

21         A.    Yes.

22         Q.    And then it could be that very close in time

23    Synergy One was acquired by Mutual?

24         A.    We were doing business as Mutual of Omaha

25    Mortgage as well, so I believe that transaction closed prior

65

1    to, but they purchased Synergy One, so it was both.

2         Q.   Okay.  The employees were nevertheless hired by

3    Synergy One.  Their W-2s reflect Synergy One as their

4    employer; correct?

5         A.   Correct.

6         Q.   At some point, the employees are no longer

7    employed by Synergy One and become employees of Mutual.  Was

8    that around 2020?

9         A.   Yes.

10        Q.   Just describe to me what happened in 2020 that

11   reflected the change of employment in Synergy One to

12   Mutual.

13        A.   Mutual of Omaha Bank was sold, and Mutual of

14   Omaha Insurance Company kept the mortgage division.  And

15   also, Synergy One Lending was diverted away as well.  So at

16   that time, we just became Mutual of Omaha Mortgage owned by

17   the insurance company or one of the insurance companies.  I

18   don't know exactly how the structure --

19        Q.   You say Synergy One is diverted away.  Was it --

20   it was sold off?

21        A.   Yes.

22        Q.   To who?

23        A.   To Steve Majerus and Aaron Nemec.

24        Q.   Who are they?

25        A.   They were running Synergy One Lending when Mutual

66

1    of Omaha -- or BBMC came over with the merger, we were kind

2    of -- we all worked together, but they were former Synergy

3    One leaders.

4           Q.   Okay.  So essentially, the employees come over.

5    They're employed by Synergy One.  Synergy One is then sold

6    back to other --

7           A.   Yeah.

8           Q.   -- Synergy One -- I don't want to say leadership,

9    but there was a surviving Synergy One entity that bought the

10   business back?

11          A.   Synergy One Lending still exists today.  So yes,

12   they -- I don't know the financial impact, if it was sold

13   or, you know, how -- or for how much or any of that, but I

14   do know that Synergy One was separated from Mutual of Omaha.

15          Q.   Okay.  So as it stands today, Synergy One has no

16   affiliation with Mutual right now; correct?

17          A.   Correct.

18          Q.   And the Synergy One sale out of Mutual occurred

19   in 2020; correct?

20          A.   Yes.

21          Q.   So at least since 2020, Synergy One has had no

22   affiliation with Mutual?

23          A.   Correct.

24          Q.   Do you have access to the transaction documents

25   by which Synergy One was first acquired by BBMC or Mutual?

67

1          MS. WALTER:  Object to the form.

2      A.   No.

3      Q.   Let me just ask this:  So was Synergy One -- now

4  I'm going back to the transaction that occurred around

5  2018.  Was Synergy One acquired by BBMC, or was it acquired

6  by Mutual?

7      A.   No, Synergy One was not acquired by BBMC.

8  Synergy One would've been acquired by Mutual, and I was not

9  a part of that transaction at all.  I wasn't --

10     Q.   Synergy One was based in California; correct?

11     A.   Yes.

12     Q.   And then with respect to the sale of Synergy One

13 in 2020, do you have access to the sale documents by which

14 Mutual sold off Synergy One?

15     A.   No.

16          MS. WALTER:  Object to the form.

17     Q.   Who would have access to those documents?

18     A.   I don't know.

19     Q.   Why did Mutual sell Synergy One in 2020?

20          MS. WALTER:  Object to the form.

21     A.   I don't know.

22     Q.   At some point, the employees of Synergy One --

23 obviously, that's being sold off.  That relationship is

24 coming to an end.  The employees become employees of Mutual

25 of Omaha; is that correct?

68

1          A.    I don't understand the question.

2          Q.    Yeah.  Initially, the employees are working for

3    Synergy One, but then Mutual decides I'm selling off Synergy

4    One in 2020.  So obviously, those employees are not going to

5    be employees of Synergy One anymore; correct?

6          A.    Correct.

7          Q.    And rather, they become employees of, I guess,

8    what entity at that point in time?

9          A.    Mutual of Omaha.  They did operate as Mutual of

10    Omaha the entire time, though.  We had sort of -- it was

11    separated out.  Mutual of Omaha -- it was Synergy One

12    Lending doing business as Mutual of Omaha to distinguish the

13    two sort of divisions.

14          Q.    As a trade name essentially?

15          A.    Correct.

16          Q.    But the employer was Synergy One from a corporate

17    standpoint?

18          A.    Yes.

19          Q.    You may have said this already, but do you know

20    why Synergy One was sold off?

21          MS. WALTER:  Object to the form.

22          A.    No.

23          Q.    When the employees were no longer going to be

24    employed by Synergy One and instead were going to be

25    employed by Mutual of Omaha, were there new offer letters,

REGENCY REPORTING SERVICE, INC. (813)224-0224

69

1     employment agreements sent to the employees at that point in

2     time?

3          A.   I don't recall.  I don't know.  I wouldn't have

4     been part of that.

5          Q.   Who would've been part of that?

6          A.   Human resources, I imagine.

7          Q.   Do you know whether there was ever a written

8     assignment of the Synergy One employment agreements to

9     Mutual of Omaha?

10         A.   I don't know.

11         Q.   Who would know the answer to that?

12         A.   Human resources.

13         Q.   Do you know whether the employees were ever paid

14    any kind of bonus or additional compensation when they

15    changed from being employees of Synergy One to employees of

16    Mutual?

17         A.   I don't know.

18         Q.   Would that, again, be something HR might know?

19         A.   Yes.

20         Q.   Sort of the last date in which the employees

21    would've been employees of Synergy One would be prior to the

22    2020 transaction in which Mutual sold Synergy One; correct?

23         A.    Well, I'm not positive just because of the nature

24    of the transaction between the sale of the bank and the

25    insurance company.  I don't know if -- I don't remember if

70

1    they were still operating as Synergy One Lending doing

2    business as Mutual of Omaha or if we changed the employer at

3    that time.  I just don't recall.  There was a lot of moving

4    parts.

5        Q.   Do you know -- maybe you don't, but I just want

6    to vet this, whether you do -- do you know on what grounds

7    is Mutual claiming it has the right to enforce the Synergy

8    One Lending employment agreements?

9             MS. WALTER:  Object to the form.

10       A.   Yeah, I don't know.

11       Q.   Once the Tampa and Daytona offices left and

12   transferred to Waterstone, Mutual had no other offices in

13   Florida; correct?

14       A.   I don't believe so.  I'm not sure, though.

15       Q.   If some of the branch employees decided, "Look, I

16   don't want to follow Mr. Smith or Mr. Hutto.  I want to stay

17   with Mutual," where would those employees have worked?

18       A.   We could've gotten them Regus space or other

19   office space or not transferred the lease, if we did that.

20   I don't know.

21       Q.   Who would've been the manager of the Daytona

22   branch?

23       A.   We have plenty of people that could've managed

24   the branch.  I mean, we would've -- I think Kiley King is

25   down here in the Tampa area, so we could've figured that

71

1     out.

2              Q.    Made Mr. King the manager?

3              A.    Possibly --

4              Q.    Do you know --

5              A.    -- or at least interim manager.

6              Q.    Do you know whether any of the employees know

7     Mr. King?

8              A.    I think they do, but I don't know for sure.

9              Q.    When you say "I think they do," what's the

10    foundation for that statement?

11             A.    Just because he's here local in Florida and he

12    was the regional.

13             Q.    Mr. Tomalak is up in Illinois; correct?

14             A.    Yes.

15             Q.    He wouldn't have become the branch manager of

16    either Tampa or Daytona?

17             A.    He could have remotely supported them.

18             Q.    How many times in the last year did Mr. King

19    visit the Daytona branch?

20             A.    No idea.

21             Q.    How many times in the last -- sorry.  Not the

22    last year, but the last year prior to the Daytona branch

23    leaving, so, you know, April of '22, the end of that month

24    they left.  So look at April '22 and then one-year look

25    back.  How many times in that year did Mr. King visit the

72

1    Daytona branch?

2         A.   Mr. King was sick that year, so I don't know the

3    answer to that, but probably not very often.

4         Q.   What about -- same question with respect to the

5    Tampa branch, which left mid-June, June 15th.  So June 15,

6    2022, and then a year looking back, how often did Mr. King

7    visit the Tampa branch in that year's time?

8         A.   Same.  He was ill, so I don't know.  I would

9    guess not very often.

10         Q.   How many times did Mr. Tomalak visit the Tampa

11    branch in that year's time?

12         A.   I don't know.

13         Q.   How many times in that year window did

14    Mr. Tomalak visit the Daytona branch?

15         A.   I don't know.

16         Q.   Do you know whether Mr. Tomalak knows any of the

17    employees in either of the branches?

18         A.   I believe he knows them, yes.

19         Q.   How would he know them?

20         A.   Well, they reported to him.

21         Q.   They reported directly to him?

22         A.   Well, via the manager.  I mean, the managers

23    reported to him, so --

24         Q.   Is it your testimony that if the employees had

25    some issues with the underwriting or the ability to close

73

1      loans, they would take those issues to Mr. Tomalak or to

2      their branch managers?

3                MS. WALTER:  Object to the form.

4          A.   They would likely take it to the branch manager

5      who would then escalate it to Mr. Tomalak --

6          Q.   Are you aware of --

7          A.   -- if necessary.

8          Q.   -- any direct communications between any of the

9      Daytona or Tampa employees and either Mr. King or

10     Mr. Tomalak?

11         A.   Not that I'm aware of.

12         Q.   Do you have reason to think the employees at

13     either of the branches would have loyalty to Mr. King or

14     Mr. Tomalak over Mr. Hutto, Mr. Wolf, and Mr. Smith?

15               MS. WALTER:  Object to the form.

16         A.   No knowledge of that.

17         Q.   What do you think?  I mean, do you think that the

18     employees would have more loyalty to the branch managers or

19     the regional managers?

20               MS. WALTER:  Object to the form.

21         A.   I don't know.

22         Q.   Do you have a general awareness in your role as

23     CEO and the years that you've been in the industry, do the

24     employees generally have more loyalty to their immediate

25     managers or the regional managers?

74

1             MS. WALTER:  COO.  And object to the form.

2        A.   I think it just varies.  It depends.  Some people

3    don't have a great relationship with their branch manager

4    and have a better relationship with their regional manager,

5    so it varies.

6        Q.   But you don't know about the relationships with

7    respect to the Daytona and Tampa branches, whether that was

8    the case?

9        A.   I do not.

10       Q.   Were there efforts to keep any of the employees

11   in Daytona, Tampa, or New Jersey?

12             MS. WALTER:  Asked and answered.

13       A.   Not that I'm aware of.

14       Q.   Are you aware of Mutual firing employees from

15   Tampa and Daytona who did not go to Waterstone?

16       A.   Not that I'm aware of.

17       Q.   You don't know either way?

18       A.   I don't know either way.

19       Q.   Do you have knowledge of the damages that are

20   sought by Mutual in this case?

21       A.   No.

22       Q.   The answer may very well be no to this question

23   but just to close out the category, take a look at what

24   we've previously marked as Deposition Exhibit No. 7,

25   please.  The first page of Deposition Exhibit 7 is just a

REGENCY REPORTING SERVICE, INC. (813)224-0224

75

1    cover page.  It has the Bates No. MOM-0003484 at the bottom,

2    and then the second page has the actual content.  Have you

3    seen Exhibit 7 before?

4         A.   No.

5         Q.   You certainly played no role in putting together

6    Exhibit 7 or doing the analysis that's reflected in

7    Exhibit 7; correct?

8         A.   No.

9         Q.   Did Mr. Gennarelli ever have discussions with you

10   about the damages that Mutual is seeking from Waterstone?

11        A.   No.

12        Q.   What about Mr. Mayle?

13        A.   No.

14        Q.   Did anybody at Mutual have any discussions with

15   you about the damages it's seeking?

16        A.   Not that I recall.

17        Q.   Okay.  You can put that aside.

18             Are you aware that Mutual is pursuing trade

19   secret misappropriation claims against Waterstone?

20        A.   Just from what I saw on the amended complaint.

21        Q.   In the amended complaint?

22        A.   Yeah.

23        Q.   Again, I just want to close out whether -- I want

24   to know who has knowledge about what.  And if you do have

25   knowledge, then I will ask you questions and make sure that

76

1    I exhaust it.  But for example, did you have any role in

2    identifying the trade secrets that Mutual is relying on in

3    this case?

4         A.    No.

5         Q.    Did you have any role whatsoever in informing the

6    trade secret claims that are in the case?

7         A.    No.

8         Q.    Are you able to list any of the trade secrets

9    that Mutual has cited in support of its claims?

10        A.    No.

11        Q.    Are you aware of any evidence that Waterstone,

12   rather than the former employees, has misappropriated trade

13   secrets that belong to Mutual?

14        A.    No.

15        Q.    You just have no knowledge about the trade

16   secret --

17        A.    No.

18        Q.    -- claims in this case; correct?

19        A.    Yes.  Correct.

20        Q.    That makes my job easier.

21              Before acquiring BBMC, did Mutual have any

22   branches in Florida?

23        A.    I don't know.  I don't believe so, but I'm not

24   positive.

25        Q.    And do you know how long Mr. Hutto had been

77

```
 1          operating the Daytona branch before it became a Mutual

 2          branch or a BBMC branch?

 3               A.   No.

 4               Q.   Same question for Mr. Smith with respect to the

 5          Tampa branch.  You don't know how long he had been operating

 6          his Tampa branch before it became a BBMC branch; correct?

 7               A.   Correct.

 8               Q.   Were there any employees of Mutual that were

 9          given to Mr. Smith or Mr. Hutto for their branches at the

10          time that the branches joined BBMC?

11               A.   Not that I'm aware of.

12               Q.   So, I mean, whoever was at those branches were as

13          a loan officer, loan processor, any of the employees, they

14          were originated by Mr. Smith and Mr. Hutto.  It wasn't that

15          they were transplanted from BBMC and given to them; correct?

16                    MS. WALTER:  Object to the form.

17               A.   I believe so.

18               Q.   Who was responsible -- now I want to talk about

19          the period of time where the branches are operating for

20          Mutual of Omaha.  Who was responsible at that point in time

21          for going and identifying Realtor partners, Mr. Smith,

22          Mr. Wolf, and Mr. Hutto, or did Mutual find Realtor partners

23          and make referrals?

24               A.   I think it was primarily the responsibility of

25          those managers you named.  Mutual would have also
```

78

1    participated in funding any outings or anything like that or

2    sponsorships.  So it certainly played a role, but I think

3    going out and trying to find those relationships would've

4    been primarily the responsibility of those managers.

5          Q.    Okay.  And to the extent that Mutual is funding

6    networking events or anything that bolsters the relationship

7    with the Realtor partners, are those expenses then put on

8    the branches' P&L?

9          A.    Yes.

10         Q.    Okay.  As between Mutual on the one hand and the

11   branch managers on the other hand, who is making decisions

12   about what networking events, marketing efforts are to be

13   made?  Is that a branch manager decision, or is Mutual

14   making those decisions?

15         A.    I think -- I'm not in those discussions, but it

16   would be something that if the branch wanted to sponsor an

17   event, then they would bring it to Mutual, either their

18   regional manager or Jeff or Bernie, the CFO, to determine if

19   we would be able to do that.

20         Q.    Okay.  And if the answer is yes, it gets expensed

21   to the branch and the P&L; correct?

22         A.    Correct.

23         Q.    And ultimately, the branches -- the branch

24   managers are responsible for the expenses and the profits of

25   the branch.  And to the extent there's a profit, that's how

79

1    the branch managers are making money; correct?

2    A.    Correct.  But that profit is also split with

3    corporate, so --

4    Q.    Sure.

5    A.    -- they both take a piece, yeah.

6    Q.    Who has more of a say between -- who has more of

7    a say if you're looking at marketing efforts, the branch

8    managers or Mutual?

9    A.    I think it really does depend on the branch.  If

10   the branch is not profitable, then obviously there would be

11   more discussion around, you know, sponsoring events and

12   things like that.

13   Q.    Right.  What are we pumping money into?

14   A.    Right.

15   Q.    You're going in the red.  Let's not sink like the

16   Titanic.

17   A.    Correct.

18   Q.    If the branch is profitable, are the branch

19   managers given discretion as to how they want to spend for

20   the branch?

21   A.    I would say more so, yes.

22   Q.    And the office building that the Tampa office and

23   the Daytona office were operating out of, those were

24   buildings secured by the branch managers.  It wasn't that

25   Mutual went out and selected that space?

80

1         A.   I don't know that.

2         Q.   What about the employees in each of the branches?

3    Who was recruiting employees, the branch managers or Mutual?

4         A.   I would say probably -- I don't -- I guess I

5    shouldn't even answer, but I would guess it would be the

6    branch manager and the regional managers.

7         Q.   If there was an employee that needed to be fired

8    because he or she wasn't working out, would the managers do

9    that or someone at Mutual -- someone at Mutual besides the

10   managers?

11        A.   I'm not sure if HR would do that or not.

12        Q.   What about setting the compensation of the

13   employees?  Do the branch managers have discretion to set

14   the comp?

15        A.   In conjunction with HR, I would say.

16        Q.   What about picking out the furniture, picking out

17   computers?  Who decides those types of things for the branch

18   office, the managers or someone at Mutual?

19        A.   I don't know.

20        Q.   For example, you know, one of the efforts that

21   Mr. Hutto pursued was he had buses in the Daytona area that

22   were wrapped with advertising him and some of the Realtor

23   partners.  Was that a decision made by Mr. Hutto, or is that

24   a decision made by Mutual?

25        A.   I don't know.

81

1          Q.    What about just originating clients?  We talked

2     about referral partners and Realtors as between Mutual and

3     the branch managers.  Who is actually going out and getting

4     clients?

5          A.    It does vary by the branch, so I wouldn't be able

6     to answer specifically for them because I don't know.  But

7     we -- in some cases, we do purchase leads on our end and

8     then in some cases that they -- the branch managers or the

9     loan officers go out and try to find their own referral

10    partners.

11         Q.    To the extent that Mutual is purchasing leads,

12    does that expense then flow through to the branches on the

13    P&Ls or is that just a bonus and a perk that's provided by

14    Mutual?

15         A.    It would go to the P&L.

16         Q.    Okay.  So when you say Mutual is purchasing the

17    leads, it ultimately bears on the profitability of the

18    branch, which is bearing then on the compensation of the

19    managers?

20         A.    Well, also bearing on Mutual, though, because we

21    split the profit.

22         Q.    Sure.  Are there Realtor relationships that

23    Mr. Hutto, Mr. Smith, or Mr. Wolf had that preceded the

24    acquisition of BBMC?

25         A.    I don't know.

82

1          MS. WALTER:  Object to the form.

2          Q.   Are you aware of any situation in which Mutual is

3     referring Realtors to those branch managers?

4          MS. WALTER:  Object to the form.

5          A.   I don't know.

6          Q.   So I'm trying to get an understanding of the

7     Realtor relationships.  Are those self-sourced by the branch

8     managers, or is it somehow fed to the managers by other

9     divisions of Mutual?

10         A.   It varies based on the circumstances.  I'm sure

11    that some -- in some cases, they are obtained by the branch

12    managers.  But we do also -- like I said earlier, we buy

13    leads, and we have a consumer direct division.  And we

14    purchase leads, and we will direct Realtors to a local

15    office if we get some -- a lead like that.  Now, I don't

16    know if any of these branches ever got one, but we do offer

17    that to -- when there's a local agent, we'll do that.

18         Q.   Okay.  But you can't say -- with respect to the

19    Tampa and the Daytona branches, you can't say whether those

20    relationships were self-sourced by the managers or referred

21    from Mutual?

22         A.   I cannot.

23         Q.   What about the service providers at the Tampa and

24    Daytona offices, the Internet, the phone, et cetera?  Is

25    that something that the managers decided or someone else at

83

1    Mutual?

2         A.   I don't know.

3         Q.   Do you know whether Mr. Hutto hired a virtual

4    assistant?

5         A.   I don't know.

6         Q.   Would that be something he independently decides

7    on or Mutual has to?

8         A.   I really don't know.  I don't know anything about

9    it.

10        Q.   Do you know who Ellie Briones -- Briones,

11   B-r-i-o-n-e-s, do you know who that is?

12        A.   No.

13        Q.   Have you had any discussions with anybody about

14   Ms. Briones?

15        A.   No.

16        Q.   You can't say whether that was somebody who was

17   working for Mr. Hutto well before his departure?

18        A.   I don't know.

19        Q.   Is it accurate to say that the branch managers

20   are decision-makers with respect to the personnel?

21             MS. WALTER:  Object to the form.

22        A.   To some extent.

23        Q.   And is it accurate to say that the branch

24   managers were decision-makers with respect to branch

25   expenses?

84

1          A.    I'm not sure.  I would guess to some extent, yes.

2          Q.    The branch managers are certainly privy to what

3    the branch expenses are, however; correct?

4          A.    Correct.

5          Q.    I mean, they see their P&Ls.  All of the expenses

6    are listed; correct?

7          A.    Yes.

8          Q.    And if a branch manager thought, "Look, I'm

9    spending too much on leads.  I don't want to go forward with

10   that," the branch manager could say, "Let's abandon that

11   type of expense.  We're going to pursue other marketing

12   efforts"; correct?

13         A.    Yes.

14         Q.    So the branch manager has some discretion at

15   least in terms of the expenses that the branches are

16   incurring; correct?

17         A.    Correct.

18         Q.    Which makes sense because that affects the

19   ultimate profitability at the branch and in turn the branch

20   manager's compensation.  And I understand there's a part

21   that goes to Mutual too.  But just my question is

22   understanding, does the branch manager have control over

23   expenses of the branch?

24         A.    Yes.

25         Q.    I want to talk about the transition to BBMC.  Are

85

1      you aware that Mr. Smith had been operating the Tampa branch

2      for Reliant Bank before coming to BBMC?

3              A.   I don't recall, no.

4              Q.   Do you know, when Mr. Smith's branch left

5      wherever he was formerly employed and joined BBMC, did the

6      entire branch follow him?

7              A.   I don't know.

8              Q.   You don't know if the entire branch joined BBMC

9      on the same day, for example?

10             A.   I don't.

11             Q.   I want you to assume that that happened, that the

12     entire branch leaves the former employer and comes to BBMC

13     on the same day.  If so, do you believe that that would

14     necessarily be wrongful, illegal --

15                  MS. WALTER:  Object.

16             Q.   -- improper?

17                  MS. WALTER:  Object to the form.

18             A.   It would depend on the circumstances.

19             Q.   Do you know when Mr. Hutto joined BBMC, did the

20     entire branch of employees follow him to BBMC?

21             A.   I don't know.

22             Q.   You just don't know anything about that

23     transition?

24             A.   I don't recall, no.

25             Q.   For either branch?

—— REGENCY REPORTING SERVICE, INC. (813)224-0224 ——

86

1        A.    Right.

2        Q.    If you assume that the employees followed

3    Mr. Hutto to BBMC and the employees followed Mr. Smith to

4    BBMC, does that change your opinion about the nature of the

5    transition in this case?

6             MS. WALTER:  Object to the form.

7        A.    No, I don't know the circumstances around it.

8        Q.    Okay.  So you had no involvement in the

9    transition from the Tampa and Daytona branches to BBMC other

10   than perhaps after the fact?

11       A.    Correct.

12       Q.    Did you know that Mr. Smith, Mr. Wolf, and

13   Mr. Hutto were unhappy at Mutual prior to their resignation?

14            MS. WALTER:  Object to the form.

15       A.    No.

16       Q.    Were you aware that on numerous occasions Mutual

17   was unable to close loans originated by the Tampa and

18   Daytona branches by the closing date?

19       A.    No.

20       Q.    If closings were missed, who would that be

21   reported to?

22       A.    The branch manager.

23       Q.    Okay.  So Mr. Hutto, Mr. Wolf, and Mr. Smith?

24       A.    Yeah.

25       Q.    Are you aware of either of -- any of those three

87

 1    individuals expressing concerns about missed closings?

 2        A.    No.

 3        Q.    Are you aware of -- forget about those two

 4    branches.  Just in your role with the forward division, are

 5    you aware of missed closings in general?

 6        A.    Occasionally a closing doesn't occur on time, but

 7    typically there's reasons surrounding it such as an

 8    appraisal coming in late or additional documentation being

 9    required.  I don't know it to be a systematic problem at

10    all, no.

11        Q.    Okay.  So you're unaware of any complaints about

12    Mutual failing to close loans on time --

13        A.    I mean --

14        Q.    -- by these branches, Tampa and Daytona?

15        A.    I don't recall any specific complaints about

16    that, no.

17        Q.    Were you aware of complaints about Mutual

18    rejecting loans too often?

19        A.    No.

20        Q.    Were you aware of complaints that Mutual did not

21    have sufficient construction loan products to meet demand?

22        A.    That was never brought to my attention, no.

23        Q.    What is a branch override?

24        A.    It's a -- I would guess it's what the branch

25    manager is paid based on production of employees.

88

1          Q.   Okay.  We don't have to use the term "override."

2     But in general, the idea is if the branch is profitable, the

3     manager gets some percentage of the profitability?

4          A.   Correct.

5          Q.   Do you have an understanding that that cut of the

6     profits is called an override, or is that a misuse of the

7     term?

8          A.   I would not consider that an override.  I would

9     consider that a profit split.  I would consider an override

10    to be if a branch manager has loan originators working under

11    them, they would get an override based on their production

12    that's outside of profitability.  That would be my

13    definition.

14         Q.   Were you aware of Mr. Smith being unhappy that

15    Kiley King and Brian Tomalak received a profit split with

16    respect to his branch?

17         A.   No, not specifically.

18         Q.   What was the profit split for the Tampa branch as

19    between Mr. Smith, Mr. King, and Mr. Tomalak?

20         A.   I don't know.

21         Q.   Would it surprise you if the split was 50/50?

22         A.   I don't know what it was.

23         Q.   How was the profit split between the regional

24    managers and the branch manager determined?

25         A.   I don't know.

89

1      Q.    Is that a -- I guess who's the decision-maker

2    with respect to that?  Is it HR?

3      A.    That would be HR onboarding.  It would be

4    probably decided during the recruiting efforts, but I'm not

5    in those conversations.

6      Q.    What efforts do Mr. King and Mr. Tomalak make

7    that support them getting any profit split from the

8    branches?

9      A.    I don't know what they did for the branches.

10      Q.    Are you aware that Mr. Smith felt that Mr. King

11    and Mr. Tomalak were not doing much to support his branch?

12          MS. WALTER:  Object to the form.

13      A.    Not that I recall.

14      Q.    Are you aware that Mr. Hutto felt Mr. King and

15    Mr. Tomalak were not doing much to support his branch?

16      A.    Not that I recall.

17      Q.    Do you have knowledge of any negotiations between

18    Mr. Smith, Mr. King, and Mr. Tomalak surrounding the profit

19    split and lowering the percentage of profits that would go

20    to the managers versus to Mr. Smith?

21      A.    Not that I'm aware of.

22      Q.    What about -- same line of questions with respect

23    to Mr. Hutto.  I mean, were you aware of any discussions in

24    which Mr. Hutto was unhappy about the large profit split

25    between himself and the managers, Mr. King and Mr. Tomalak?

90

1          A.    No, not aware.

2          Q.    Are you aware of any jokes by Mr. Gennarelli

3     during regularly scheduled calls about how little Mr. King

4     had been working?

5          A.    Not that I'm aware of.

6          Q.    Are you a party to the -- my understanding is

7     that there's monthly calls involving Mr. Gennarelli and the

8     branch managers?

9          A.    Yes.

10          Q.    Are you a participant on those monthly calls?

11          A.    Some, not all.

12          Q.    On those monthly calls, did you ever hear

13     Mr. Gennarelli joke about how little work Mr. King and

14     Mr. Tomalak were doing?

15               MS. WALTER:  Asked and answered.

16          A.    Not that I remember.

17          Q.    Why was it that you would participate in some of

18     those regularly scheduled calls?

19          A.    It would just depend on my schedule.  If I was

20     available, I would participate to try to just keep my pulse

21     on what's happening in the branches, but there's times where

22     I just had other responsibilities and couldn't be on the

23     call.

24          Q.    Are those calls weekly or monthly, or what is the

25     pace?

91

1      A.   I don't know.

2      Q.   With respect to Mr. King and Mr. Tomalak, is

3   there any P&L or other record generated by Mutual that would

4   show the compensation they each received from the branches

5   they were serving as regional manager for?

6      A.   I don't know.

7      Q.   How many branches was Mr. King serving as the

8   regional manager for?

9      A.   I'm not sure, but I think four; I think the three

10  you mentioned and then the Lombard location.  It could be

11  five.  I don't know.  I'm not sure.

12     Q.   About a handful essentially?

13     A.   Yeah, a handful.

14     Q.   So is it true that a majority of the branches

15  Mr. King was managing have now departed?

16          MS. WALTER:  Object to the form.

17     A.   I can't answer that.  I don't know.  There's

18  still some remaining, so...

19     Q.   What about Mr. Tomalak?  Do you know which

20  branches he was managing in addition --

21     A.   The same.  Brian and Kiley were managing them as

22  a team, so it would be the same.

23     Q.   Okay.  Is it that there's no -- to the extent

24  that there's a branch that Mr. King is managing, Mr. Tomalak

25  is also managing that branch.  They're a team?

92

1           A.    Yes.

2           Q.    There's not a branch in Idaho that Mr. Tomalak

3    has jurisdiction over and Mr. King plays no role?

4           A.    No.

5           Q.    Why is it that they're managing the branches

6    together?

7           A.    That's just how it was set up.  I don't know.

8           Q.    Did they -- in terms of supporting the branches,

9    there's two of them.  Are they doing different things to

10   support the branches?

11          A.    Yes.

12          Q.    What role does Mr. King play?

13          A.    I don't know their specific roles.  I do know

14   that Mr. King played a greater role in leads acquisition,

15   but I don't -- I think that they -- while they might've had

16   different strengths, ultimately they were both responsible.

17   So do they do different --

18          Q.    For the branches --

19          A.    -- things, yes.  But if one of them was not

20   available, the other one would fill in.

21          Q.    Okay.  Are there any branches that are managed by

22   just one person rather than a team within the forward

23   division?

24          A.    Yes.

25          Q.    How does that shake out?  I mean, is it most of

93

1    the branches just have one regional manager?

2        A.    I would say most, yeah.

3        Q.    Okay.  Are there other teams of two people

4    besides the King and Tomalak team?

5        A.    I'm not exactly sure how the financials work, if

6    they're split or exactly how that works, but there are other

7    branches where there are -- it's a team approach.

8        Q.    Were Mr. Tomalak and Mr. King managing the Tampa

9    and Daytona branches as a team for BBMC as well?

10       A.    Yes.

11       Q.    Mr. Tomalak lives in Illinois; correct?

12       A.    Yes.

13       Q.    So how did it come that he's managing the Tampa

14   and Daytona branches?

15       A.    Again, just based on the relationships and the

16   onboarding and the recruiting efforts, and everything is

17   done pretty much virtually anyway.

18       Q.    Okay.  And same question with respect to

19   Mr. King.  How did it come to be that he was the regional

20   manager for the Tampa and Daytona branches?

21       A.    Same.  Same answer.

22       Q.    Did they know Mr. Hutto and Mr. Smith prior to

23   BBMC?

24       A.    I'm not sure.  I don't know.

25       Q.    And you know nothing about Jake Lowe?

94

1          A.   No.

2          Q.   My understanding is that Michael Harris, who was

3     the manager of the Rhode Island branch, recently left

4     Mutual; is that correct?

5          A.   I don't know.

6          Q.   You don't know.  Is Mr. Harris -- was there a

7     Mutual branch in Rhode Island?

8          A.   I don't know, to be honest.

9          Q.   You don't know?

10         A.   Yeah.  No.

11         Q.   Have you ever heard of Michael Harris?

12         A.   Yes, the name is familiar.

13         Q.   Do you understand that he's a manager for -- or

14    he was a manager for Mutual of Omaha?

15         A.   Yes, it makes -- I guess if someone would've

16    asked me what his role is, I don't know that I could've

17    answered that, but --

18         Q.   Okay.  Do Mr. King and Mr. Tomalak also manage

19    the Rhode Island branch?

20         A.   I believe so.

21         Q.   Are there any branches that are managed by

22    Mr. Tomalak and Mr. King that have resigned and went

23    somewhere else in the last -- well, I guess in the time that

24    you've been at Mutual aside from the branches that we're

25    talking about here?

95

1          A.    Not that I can name off the top of my head, no.

2          Q.    Okay.  Let's just talk about, you know, branches

3    that come and go within Mutual in general.  Since the time

4    that you've been with Mutual, have there been other branches

5    -- forget about whether they were managed by Mr. Tomalak and

6    Mr. King.  Just in general during your tenure, has Mutual

7    had branches that have left?

8          A.    Yes.

9          Q.    How many?

10         A.    I don't know the answer.  I couldn't guess.

11         Q.    A handful or so?

12         A.    A handful.

13         Q.    In those occasions separate from the three that

14   we're talking about here, have the branches left together?

15         A.    In some cases, most likely, yes.

16         Q.    Has Mutual -- in the time that you've worked for

17   Mutual, have they -- you know, we talked about branches

18   leaving.  There's been at least a few besides the ones at

19   issue that have left, the entire branch, at the same time;

20   correct?

21         A.    Yes.

22         Q.    What about from a recruiting perspective?  In the

23   time that you've been with Mutual, have there been branches

24   that have come aboard at Mutual where the entire branch is

25   coming on, not just a one-off loan officer or manager?

96

1     A.    Yes.

2     Q.    How many times has that happened --

3     A.    A handful.

4     Q.    -- during your tenure?

5     A.    A handful.

6     Q.    When Mutual is bringing on an entire branch, does

7     it have a role in, you know, giving instructions to those

8     managers about how the employees come over or how to have

9     discussions with the employees?

10          MS. WALTER:  Object to the form.

11    A.    Yeah, I don't know.  HR would -- if anything,

12    would have that answer.

13    Q.    Okay.  I mean, is it -- suffice to say in this

14    industry, it's common for branches to move together either

15    to or from employers; correct?

16          MS. WALTER:  Object to the form.

17    A.    Probably.

18    Q.    And why is that common?

19    A.    I think there's a -- they're used to working

20    together.  And yeah, I think that's primarily it.

21    Q.    Are there right now at Mutual branch managers

22    that are unhappy and are at risk of leaving?

23          MS. WALTER:  Object to the form.

24    A.    Not that I'm aware of.

25    Q.    Have there been any branch departures after the

97

1      Tampa branch left?

2          A.    Not that I'm aware of.  There may have been.

3      There might've been an office that we actually had to let go

4      based on performance, but nothing that I'm aware of where I

5      know it took borrower information or anything like that.

6          Q.    I want you to assume that a branch manager is

7      leaving.  Is it more common for the branch manager to leave

8      alone or that the entire branch will follow him or her?

9               MS. WALTER:  Object to the form.

10         A.    I think it varies on the branch.

11         Q.    Based on the relationships?

12              MS. WALTER:  Object to the form.

13         A.    Possibly or the opportunity.

14         Q.    We talked about the time when you were with

15     Mutual, but now I want you to go back to the time period

16     when you were with BBMC.  Were there instances in which

17     branch employees moved together to or from BBMC?

18         A.    Probably.

19         Q.    Do you remember any branches moving -- let's

20     take, you know, joining BBMC.  You were -- you had a role in

21     growing BBMC; correct?

22         A.    Yes.

23         Q.    Were you recruiting at the branch level?

24         A.    No.

25         Q.    Who was doing the recruiting of branches for

98

1      BBMC?

2           A.   I would say either a third-party recruiter, HR.

3      I mean, Jeff would be involved in some of those efforts.

4      And it was similar where, you know, once they had a

5      candidate, then I would come in, but I was not actively

6      recruiting branches.

7           Q.   Okay.  When BBMC was recruiting branches,

8      certainly there would be some diligence done with respect to

9      that branch to understand is it profitable or not

10     profitable; correct?

11          A.   Yes.

12          Q.   So how would BBMC understand is this a profitable

13     branch?  Is there certain information that would be

14     requested?

15          A.   I think that the -- Bernie, the CFO, or whoever

16     the CFO was at the time at BBMC would've asked some

17     information and put together a pro forma to try to estimate

18     the profitability.

19          Q.   Okay.  So Mr. Mayle was also at BBMC?

20          A.   Yes.

21          Q.   Okay.  Did BBMC ever have the benefit of P&L

22     statements when it was recruiting branches?

23          A.   I don't know.

24          Q.   What about at Mutual?  I mean, when Mutual is

25     recruiting an entire branch, does it request or see the P&L

99

1    statements for the branch?

2         A.   I don't know.  I know that they create pro

3    formas, but I don't think that it's based on a P&L.  I think

4    it's just based on estimations, but I don't know for sure.

5    It would be a Bernie question.

6         Q.   Okay.  Is -- within your time at Mutual, is it

7    more common to recruit entire branches or individuals?

8         A.   Individuals.  I mean, the particular branches

9    recruit individuals.  We don't -- we haven't recruited a ton

10   of branches.

11        Q.   I want to talk about longevity of branches that

12   you know of during your time at Mutual.  Is there any

13   internal statistics about how long branches stay at Mutual?

14        A.   Not that I'm aware of, but I know that we have

15   limited turnover.  For the most part, they stay.

16        Q.   Does the former division include refinanced

17   loans?

18        A.   Yes.

19        Q.   As between refinanced loans and purchase loans,

20   not looking at a specific point in time, but let's say over

21   your entire tenure, are there more refinanced loans or

22   purchase loans within the forward division?

23        A.   It really does depend on the market and what's

24   happening with interest rates, but I would say in general

25   there's been more refinanced loans if you go over a long

100

1     period of time.

2          Q.   Okay.  So for example, when interest rates are

3     high, people maybe don't want to refinance.  So right now,

4     for example, the interest rates are high.  I'm assuming

5     refinance is down; correct?

6          A.   In some branches, yes, but not all.  But yes, in

7     general.

8          Q.   Okay.  Is the staffing different for refinance

9     and purchase loans?

10         A.   Not really.

11         Q.   So let me ask it this way:  If a branch is going

12    to focus on purchase loans, does the underwriting department

13    supporting that branch have to be different in any way than

14    the underwriting department, customer service, whoever is

15    working on the closing?  Is there any difference between the

16    support received by the branch focusing on purchase loans

17    and the branch that's focusing on refinance?

18         A.   No.

19         Q.   Is there any greater complexity with respect to a

20    purchase loan compared to a refinanced loan in terms of the

21    underwriting?

22         A.   Not -- no, not really.

23         Q.   I think you said that the Columbia branch is a

24    profitable branch within Mutual?

25         A.   Yes.

101

1        Q.    Are there other branches that are profitable

2    right now?

3        A.    I don't have specifics.  There may be.  They're

4    not extremely profitable, if they are, but I don't have the

5    details.

6        Q.    What was the focus of the Tampa branch, purchase

7    or refinance?

8        A.    Purchase.

9        Q.    What was the focus of the Daytona branch,

10   purchase or refinance?

11       A.    Purchase.

12       Q.    What about Paramus?

13       A.    I don't know for sure.

14       Q.    You would agree right now the interest rates are

15   fairly high; correct?

16       A.    Yes.

17       Q.    What effect does that have on purchase loans?

18             MS. WALTER:  Object to the form.

19       A.    It's not so much -- I don't think that the

20   interest rates are affecting the purchase loans as much as

21   just lack of inventory at this point.  I mean, rates have

22   been higher than this, and we have had a normalized purchase

23   market.  But right now I think just with the speed in which

24   the rates have increased, it's affecting the inventory.

25       Q.    Are you aware of Mutual withholding the

102

1      compensation to Mr. Hutto?

2                MS. WALTER:  Object to the form.

3           A.    I'm not aware.

4           Q.    What about the commissions to any of the branch

5      employees?  Were you involved in any decision with respect

6      to whether to pay commissions to the branch employees in

7      Tampa or Daytona?

8           A.    No.

9           Q.    Or Paramus?

10          A.    No.

11          Q.    You don't know one way or another whether

12     commissions were timely paid with respect to any of the

13     branches?

14          A.    No.

15          Q.    Similarly, just to lock this out, you're not

16     aware of whether Mutual timely paid the compensation for the

17     three managers?  You don't know either way?

18          A.    I don't know.

19          Q.    Do you know whether Mutual is still holding any

20     compensation back with respect to the managers or the branch

21     employees?

22          A.    I don't know.

23          Q.    What is the nature of your relationship with

24     Mr. Gennarelli?

25          A.    We're business partners.  We built a mortgage

REGENCY REPORTING SERVICE, INC. (813)224-0224

103

1    company together.

2        Q.    Does he commonly work from within your physical

3    office?

4        A.    He works out of Lombard primarily, but I'm not

5    there more than half the time now, so --

6        Q.    Okay.  When he's working at the Lombard office,

7    are the two of you working in the same office?

8        A.    Sometimes.

9        Q.    And I'm not talking the same office building

10   where you have separate offices.  Do you share an office

11   with Mr. Gennarelli?

12       A.    Yeah.

13       Q.    Do you travel with Mr. Gennarelli?

14             MS. WALTER:  Object to the form.

15       A.    Occasionally.

16       Q.    Do you have business interests with

17   Mr. Gennarelli outside of Mutual?

18             MS. WALTER:  Same objection.

19       A.    Yes.

20       Q.    What are they?

21       A.    We have an LLC called Blue Rhino where we've

22   purchased some homes and rehabbed them and also some other

23   investments.

24       Q.    Are Mr. Tomalak and Mr. King a party to those LLC

25   Blue Rhino ventures?

104

1          MS. WALTER:  Object to the form.

2     A.   Yes.

3     Q.   Is there any venture outside of Mutual that

4  doesn't involve the four of you?  In other words, is there

5  anywhere it's just you and Mr. Gennarelli versus the group

6  of the four?

7          MS. WALTER:  Same objection.

8     A.   There's one other LLC that also includes Matt

9  Nyman that's called L-e-g-e-n-y, and it's one property that

10  we purchased that we're rehabbing, but that's another LLC.

11     Q.   Sorry.  Is it a fifth person involved?

12     A.   No.  Just the three.

13     Q.   Just the three --

14     A.   Brian and Kiley are not in that one.

15     Q.   Okay.  So it's you, Mr. Gennarelli, and then

16  who's the third person?

17     A.   Matt Nyman.

18     Q.   What is the nature of that venture?

19     A.   We just purchased a property, and we're rehabbing

20  it to sell.

21     Q.   How long have the four of you been involved in

22  business interests outside of Mutual --

23          MS. WALTER:  Object to the form.

24     Q.   -- or BBMC, kind of -- I guess what I'm saying is

25  you have your job at BBMC, your job at Mutual, and it sounds

REGENCY REPORTING SERVICE, INC. (813)224-0224

105

1    like you have these other interests.  How long has that --

2    have those other businesses been pursued by the four of you?

3        A.    I believe that Blue Rhino was probably formed in

4    2019 or 2020, but I'm not 100 percent sure, but I'd

5    guesstimate it somewhere around there.

6        Q.    Okay.  And prior to Blue Rhino, did you have

7    business interests with Mr. Gennarelli, Mr. Tomalak, or

8    Mr. King?

9        A.    There was one other LLC called FHRC where we

10   owned an addiction center that was subsequently sold.  And

11   Brian and Kiley were also included in that, and there were

12   others as well, Frank Sommese and another person, but I

13   can't remember his name, but that's been sold.

14       Q.    How long have you had any kind of working

15   relationship with the three individuals that we've been

16   talking about?

17       A.    Which three?

18       Q.    Mr. Gennarelli, Mr. King, and Mr. Tomalak.

19       A.    With Mr. Gennarelli, since around 2007 or 2008.

20   And then with Mr. King and Mr. Tomalak, when they -- I mean,

21   they joined Bridgeview, I think, in 2010, and then the other

22   side businesses would've just been, as I mentioned, probably

23   2018, 2019, something like that.

24       Q.    Do you feel you have a close relationship with

25   Mr. Gennarelli, Mr. King, and Mr. Tomalak?

106

```
 1              MS. WALTER:  Object to the form.

 2         A.   Yes.

 3         Q.   Mr. Tomalak and Mr. King have been hurt

 4    financially by the departure of these branches, suffice to

 5    say; correct?

 6              MS. WALTER:  Object to the form.

 7         A.   I would guess, yeah.

 8         Q.   Are they the ones that made the decision to file

 9    the lawsuit against Waterstone?

10              MS. WALTER:  Object to the form.

11         A.   Not to my knowledge.

12         Q.   Who made that decision?

13         A.   Counsel.  I don't know.

14         Q.   Did you make that decision?

15         A.   No.

16         Q.   Did Mr. Gennarelli?

17         A.   No.

18         Q.   You're unaware of who made the decision?

19         A.   Right.

20         Q.   Did you have e-mail exchanges in connection with

21    the Tampa and Daytona branch departures?

22         A.   Not that I recall.

23         Q.   Did you have text exchanges in connection with

24    the branch departures with Mr. Tomalak, Mr. King, or

25    Mr. Gennarelli?
```

107

1          A.    Not that I recall.

2          Q.    What about with anyone else at Mutual?  Did you

3     have text exchanges?

4          A.    Not that I recall.

5          Q.    Do you use your phone and text for business

6     purposes?

7          A.    Yeah.

8          Q.    How often do you text Mr. Gennarelli?

9          A.    I mean, at least daily.

10          Q.    Do you ever delete those text messages, or are

11     they still on your phone?

12          A.    They're probably still on my phone.

13          Q.    What about Mr. King?  Would you have deleted any

14     text messages that you've shared with Mr. King?

15          A.    Not -- not deliberately, but, I mean, I've known

16     him for a long time.  I'm sure there's some deleted.

17          Q.    What about -- same question with respect to

18     Mr. Tomalak?  Do you have text exchanges with him?

19          A.    Yes.

20          Q.    And do you -- if, you know --

21          A.    Again --

22          Q.    You haven't deleted any such exchanges from your

23     phone?

24          A.    Correct.

25               MS. KREITER:  If I can just have about a

108

1          five-minute break.

2                  MS. WALTER:  Yeah.  No problem.

3                  (A recess was taken.)

4          Q.    (By Ms. Kreiter)  Ms. Leyden, does Mutual have

5     any reports or analyses in which it compares its performance

6     to that of the market?

7          A.    Nothing specific, no.

8          Q.    So for example, you know, my law firm will look

9     at what's our profitability per partner compared to other

10    Milwaukee law firms.  Anything like that that's analogous to

11    Mutual in your industry?

12         A.    I mean, nothing really.  There's the -- the

13    Mortgage Bankers Association will put out an average profit

14    per loan or origination cost per loan, things of that

15    nature, and you can -- there's other --

16         Q.    Metrics?

17         A.    -- metrics out there that will show, you know,

18    top producing loan officers and things like that but nothing

19    that really outlines, you know, profitability of an entity

20    compared to others.

21         Q.    You mentioned it's the Mortgage Bankers

22    Association?

23         A.    Um-hmm.

24         Q.    Is part of your role within the forward division,

25    do you ever personally compare things like profit per loan

109

1    of Mutual compared to the MBA data?

2        A.   I mean, just when it comes out, I look at it and

3    see where we are.

4        Q.   Okay.  Do you believe that Mutual generally would

5    follow the trend in the industry reported by the MBA?

6        A.   Typically, we --

7             MS. WALTER:  Object to the form.

8        A.   Typically, I think we outperform our peers based

9    on that data, if it's accurate, but I'm just relying on

10   their information.

11       Q.   Let's talk in general about industry trends.  I

12   mean, industry trend, not only did Mutual have historically

13   high years in 2020 and 2021, but the industry in general

14   did; correct?

15       A.   Correct.

16       Q.   And in general, the industry is not doing well,

17   suffice to say, in '22 or year to date in '23; correct?

18       A.   Correct.

19       Q.   And that's the same for the industry and Mutual;

20   correct?

21       A.   Correct.

22       Q.   Okay.  So just in general in terms of following

23   industry trend, you would say that Mutual -- when the

24   industry is doing well, Mutual is probably doing well.  When

25   the industry is not doing well, the same for Mutual;

110

1      correct?

2          A.    Yes.

3              MS. KREITER:  Okay.  I don't have anything

4          further.

5              MS. WALTER:  Nothing from me.

6              (The deposition concluded at 11:24 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

111

**REGENCY REPORTING SERVICE, INC.**
201 East Kennedy Boulevard
Suite 875
Tampa, Florida 33602
813-224-0224

June 26, 2023

COURTNEY WALTER, ESQUIRE
Mitchell Sandler LLC
1120 20th Street Northwest
Suite 725
Washington, DC  20036

CASE REFERENCE:  MUTUAL OF OMAHA MORTGAGE, INC. vs.
WATERSTONE MORTGAGE CORPORATION

Deposition of Christine Leyden

Dear Ms. Walter:

Enclosed is your copy of the deposition taken in the
above-styled cause on June 22, 2023, along with a
several-lined correction sheet.

Please have your client read your copy of the deposition,
make whatever corrections or changes necessary on the lined
sheets, indicating page and line numbers, and then sign the
signature page.  Return only the correction and signature
page.

If you have any questions concerning this, please don't
hesitate to call.

Very truly yours,


*s/ Melanie Keefe*
Melanie Keefe, FPR
Court Reporter

112

1                    SIGNATURE PAGE/ERRATA SHEET

2     WITNESS:  CHRISTINE LEYDEN

3     CASE REFERENCE:  MUTUAL OF OMAHA MORTGAGE, INC. vs.
      WATERSTONE MORTGAGE CORPORATION
4
      CASE NUMBER:  8:22-cv-01660-TPB-JSS
5
      DATE:  June 22, 2023
6
7              After you have read your transcript, please note
      any errors in transcription on this page.  Do not mark on
      the transcript itself.  Please sign and date this sheet as
8     indicated below.  If additional lines are required for
      corrections, attach additional sheets.  If no corrections,
9     please indicate "None."

10    _____

11    PAGE      LINE      ERROR OR AMENDMENT          REASON

12    _____
      _____
13    _____
      _____
14    _____
      _____
15    _____
      _____
16    _____
      _____
17    _____
      _____
18    _____
      _____
19    _____

20             Under penalties of perjury, I declare that I have
      read the foregoing transcript, and I subscribe to its
21    accuracy, to include the corrections or amendments noted
      above or hereto attached.
22
23              _____
                CHRISTINE LEYDEN                DATE
24

25

        ─────REGENCY REPORTING SERVICE, INC. (813)224-0224─────

113

1                         CERTIFICATE OF REPORTER

2      STATE OF FLORIDA              )

3      COUNTY OF HILLSBOROUGH        )

4


5              I, Melanie Keefe, Court Reporter, certify that I
    was authorized to and did stenographically report the
6   deposition of CHRISTINE LEYDEN; that a review of the
    transcript was requested; and that the transcript, pages 5
7   through 110, inclusive, is a true and complete record of my
    stenographic notes.
8
              I further certify that I am not a relative,
9   employee, attorney, or counsel of any of the parties, nor am
    I a relative or employee of any of the parties' attorneys or
10  counsel connected with the action, nor am I financially
    interested in the action.
11
                          *s/ Melanie Keefe*
12                        Melanie Keefe, FPR
                          Court Reporter
13  _____

14                          CERTIFICATE OF OATH

15     STATE OF FLORIDA              )

16     COUNTY OF HILLSBOROUGH        )

17              I, the undersigned authority, certify that
    CHRISTINE LEYDEN personally appeared before me and was duly
18  sworn.

19              WITNESS my hand and official seal this 26th day
    of June, 2023.
20

21                        *s/ Melanie Keefe*
                          Melanie Keefe, FPR
22                        Notary Public
                          State of Florida
23                        My Commission No.:  HH055410
                          Expires:  December 9, 2024
24

25


─────REGENCY REPORTING SERVICE, INC. (813)224-0224─────

**'**

**2019** [2] - 105:4, 105:23
**2020** [30] - 16:8, 16:10, 16:14, 16:17, 16:21, 17:1, 17:18, 18:1, 18:12, 24:3, 24:9, 29:8, 29:11, 29:14, 29:21, 29:24, 30:5, 30:17, 33:19, 65:8, 65:10, 66:19, 66:21, 67:13, 67:19, 68:4, 69:22, 105:4, 109:13
**2021** [9] - 16:17, 17:6, 29:15, 29:21, 29:24, 30:6, 30:17, 33:19, 109:13
**2022** [14] - 29:11, 29:15, 32:17, 32:23, 34:7, 36:7, 38:10, 38:13, 39:5, 57:19, 60:19, 60:25, 61:1, 72:6
**2023** [21] - 1:15, 17:16, 17:17, 18:12, 29:8, 29:15, 30:25, 32:19, 33:1, 34:5, 34:21, 35:4, 36:3, 36:6, 38:3, 38:8, 39:5, 111:4, 111:14, 112:5, 113:19
**2024** [6] - 30:25, 32:20, 36:10, 36:15, 39:6, 113:23
**20th** [2] - 2:2, 111:6
**22** [3] - 1:15, 111:14, 112:5
**25** [1] - 57:19
**25th** [1] - 61:7
**26** [1] - 111:4
**26th** [1] - 113:19
**28** [2] - 38:10, 38:12

**'20** [2] - 17:10, 17:13
**'21** [3] - 17:9, 17:13, 18:15
**'22** [19] - 11:8, 16:15, 17:6, 24:14, 24:21, 24:25, 25:1, 25:3, 29:11, 33:22, 33:24, 34:8, 34:11, 35:17, 35:23, 36:13, 71:23, 71:24, 109:17
**'23** [17] - 17:17, 18:1, 18:14, 24:18, 24:20, 24:21, 25:1, 25:5, 25:9, 25:23, 25:24, 26:1, 33:5, 34:9, 36:14, 109:17

## 1

**10** [1] - 60:19
**100** [2] - 20:19, 105:4
**1000** [1] - 2:5
**101** [1] - 1:17
**110** [1] - 113:7
**111** [1] - 3:3
**112** [1] - 3:4
**1120** [2] - 2:2, 111:6
**113** [1] - 3:5
**11:24** [2] - 1:16, 110:6
**12** [1] - 60:25
**13** [1] - 61:1
**14** [13] - 30:24, 31:3, 31:9, 31:12, 31:17, 31:22, 32:3, 34:24, 37:9, 37:21, 37:24
**15** [2] - 35:18, 72:5
**15th** [2] - 60:20, 72:5
**18** [5] - 36:3, 56:23, 57:1, 57:7
**1800** [1] - 2:9
**19** [1] - 4:3

## 2

**20** [7] - 4:3, 8:7, 19:10, 19:12, 19:13, 30:14, 30:15
**20036** [2] - 2:3, 111:7
**2007** [1] - 105:19
**2008** [1] - 105:19
**201** [1] - 111:1
**2010** [1] - 105:21
**2018** [9] - 30:16, 30:17, 30:21, 63:21, 64:1, 64:4, 67:5, 105:23

## 3

**3** [1] - 36:14
**33324** [1] - 2:6
**33602** [2] - 1:18, 111:2
**3700** [1] - 1:18

## 4

**4.26** [1] - 33:2
**4.276** [3] - 34:25, 37:25, 38:4
**41** [2] - 60:18, 60:19
**42** [4] - 36:11, 36:14, 60:18, 60:20
**420** [1] - 2:5
**49** [2] - 60:24

## 5

**5** [2] - 3:2, 113:6
**50** [4] - 18:1, 26:13, 60:24, 61:1
**50/50** [1] - 88:21
**53** [7] - 57:16, 57:18, 58:1, 58:9, 58:10, 59:14, 60:12
**53202** [1] - 2:10

## 7

**7** [5] - 74:24, 74:25, 75:3, 75:6, 75:7
**725** [2] - 2:2, 111:7
**75** [1] - 28:21

## 8

**813-224-0224** [1] - 111:3
**833** [1] - 2:9
**875** [1] - 111:2
**8:22-cv-01660-TPB-JSS** [2] - 1:2, 112:4

## 9

**9** [6] - 32:24, 33:22, 33:24, 34:7, 34:13, 113:23
**9:01** [1] - 1:16

## A

**a.m** [1] - 1:16, 110:6
**Aaron** [1] - 65:23
**abandon** [1] - 84:10
**ability** [2] - 28:13, 72:25
**able** [5] - 44:15, 45:3, 76:8, 78:19, 81:5
**aboard** [1] - 95:24
**above-styled** [1] - 111:14
**access** [3] - 66:24, 67:13, 67:17
**accuracy** [1] - 112:21
**accurate** [10] - 19:17, 25:3, 25:5, 35:20, 43:18, 50:4, 63:21, 83:19, 83:23, 109:19
**achieved** [1] - 34:13
**acquired** [9] - 63:20, 63:22, 64:12, 64:23,

66:25, 67:5, 67:7, 67:8
**acquiring** [4] - 28:13, 64:6, 64:16, 76:21
**acquisition** [2] - 81:24, 92:14
**action** [2] - 113:10, 113:10
**actively** [1] - 98:5
**activity** [1] - 33:12
**actual** [1] - 75:2
**addiction** [1] - 105:10
**addition** [4] - 5:20, 6:7, 58:11, 91:20
**additional** [4] - 69:14, 87:8, 112:8, 112:8
**addressed** [1] - 11:7
**addressing** [1] - 49:23
**advertising** [1] - 80:22
**advice** [1] - 10:12
**affecting** [2] - 101:20, 101:24
**affects** [1] - 84:18
**affiliation** [2] - 66:16, 66:22
**agenda** [2] - 11:15, 11:16
**agendas** [1] - 11:17
**agent** [1] - 82:17
**ago** [3] - 16:25, 20:20, 34:18
**agree** [2] - 30:17, 101:14
**agreed** [3] - 5:18, 6:5, 6:10
**agreements** [3] - 69:1, 69:8, 70:8
**ahead** [4] - 10:2, 26:5, 29:18, 33:9
**all-star** [1] - 29:1
**allegations** [4] - 51:4, 59:13, 60:11, 60:13
**allegedly** [1] - 54:7
**allocation** [1] - 12:18
**almost** [1] - 64:18
**alone** [1] - 97:8
**Amended** [1] - 56:24
**amended** [4] - 60:14, 61:6, 75:20, 75:21
**AMENDMENT** [1] - 112:11
**amendments** [1] - 112:21
**American** [1] - 20:2
**amount** [2] - 38:1, 39:1
**amounts** [1] - 37:7
**analogous** [1] - 108:10
**analyses** [1] - 108:5

**analysis** [1] - 75:6
**analyze** [1] - 31:23
**analyzing** [1] - 52:3
**answer** [20] - 5:22, 5:24, 6:2, 10:6, 13:12, 22:19, 30:10, 42:14, 53:15, 55:25, 69:11, 72:3, 74:22, 78:20, 80:5, 81:6, 91:17, 93:21, 95:10, 96:12
**answered** [4] - 17:8, 74:12, 90:15, 94:17
**answering** [1] - 6:4
**anyway** [1] - 93:17
**APPEARANCES** [1] - 2:1
**appeared** [1] - 113:17
**application** [1] - 14:20
**appraisal** [1] - 87:8
**approach** [1] - 10:7
**approval** [1] - 58:23
**approved** [2] - 57:22, 58:16, 59:6
**approximate** [1] - 28:18
**April** [6] - 11:6, 11:8, 60:25, 61:1, 71:23, 71:24
**area** [2] - 70:25, 80:21
**arisen** [1] - 51:9
**aside** [5] - 27:10, 39:8, 61:10, 75:17, 94:24
**assessing** [1] - 9:12
**asset** [1] - 63:22
**assets** [1] - 63:24
**assignment** [1] - 69:8
**assistant** [1] - 83:4
**associated** [2] - 9:13, 32:23
**Association** [2] - 108:13, 108:22
**assume** [8] - 6:10, 22:14, 22:19, 42:16, 50:5, 85:11, 86:2, 97:6
**assuming** [4] - 25:19, 50:1, 62:3, 100:4
**attach** [1] - 112:8
**attached** [1] - 112:21
**attend** [1] - 23:5
**attendance** [1] - 24:11
**attended** [1] - 21:6
**attendees** [1] - 11:22
**attention** [3] - 27:13, 57:17, 87:22
**attorney** [1] - 113:9
**Attorney** [1] - 2:11
**attorneys** [1] - 113:9
**Attorneys** [1] - 2:7

2

**attractive** [1] - 22:16
**attribute** [2] - 28:10,
33:7
**authority** [1] - 113:17
**authorized** [1] - 113:5
**available** [2] - 90:20,
92:20
**average** [1] - 108:13
**aware** [46] - 22:11,
32:4, 39:18, 39:25,
43:10, 49:5, 49:18,
50:12, 51:6, 51:15,
51:21, 51:24, 52:2,
54:16, 56:4, 73:6,
73:11, 74:13, 74:14,
74:16, 75:18, 76:11,
77:11, 82:2, 85:1,
86:16, 86:25, 87:3,
87:5, 87:17, 87:20,
88:14, 89:10, 89:14,
89:21, 89:23, 90:1,
90:2, 90:5, 96:24,
97:2, 97:4, 99:14,
101:25, 102:3,
102:16
**awareness** [1] - 73:22

**B**

**ballpark** [1] - 26:12
**bank** [1] - 69:24
**Bank** [6] - 19:24, 20:2,
63:17, 64:5, 65:13,
85:2
**Bankers** [2] - 108:13,
108:21
**barely** [5] - 26:14,
26:15, 26:20, 27:1,
27:6
**based** [19] - 17:1,
24:3, 25:16, 27:19,
27:22, 37:15, 39:12,
54:1, 62:23, 67:10,
82:10, 87:25, 88:11,
93:15, 97:4, 97:11,
99:3, 99:4, 109:8
**basic** [1] - 37:10
**basis** [11] - 37:3, 37:7,
37:15, 37:22, 37:24,
38:5, 38:10, 38:11,
38:12, 38:17, 57:23
**Bates** [1] - 75:1
**BBMC** [59] - 8:25, 9:3,
19:25, 20:12, 20:15,
20:18, 21:3, 21:8,
21:13, 21:19, 21:25,
22:9, 22:13, 22:16,
23:10, 41:24, 42:2,
44:5, 63:5, 63:8,

63:16, 63:18, 63:20,
63:24, 66:1, 66:25,
67:5, 67:7, 76:21,
77:2, 77:6, 77:10,
77:15, 81:24, 84:25,
85:2, 85:5, 85:8,
85:12, 85:19, 85:20,
86:3, 86:4, 86:9,
93:9, 93:23, 97:16,
97:17, 97:20, 97:21,
98:1, 98:7, 98:12,
98:16, 98:19, 98:21,
104:24, 104:25
**bearing** [2] - 81:18,
81:20
**bears** [1] - 81:17
**became** [4] - 64:8,
65:16, 77:1, 77:6
**become** [4] - 65:7,
67:24, 68:7, 71:15
**belong** [1] - 76:13
**below** [6] - 26:6, 26:8,
26:12, 34:2, 37:1,
112:8
**benefit** [1] - 98:21
**benefits** [1] - 14:25
**Bernie** [4] - 50:18,
78:18, 98:15, 99:5
**best** [1] - 42:11
**better** [4] - 7:8, 28:24,
29:2, 74:4
**between** [29] - 7:13,
12:1, 12:5, 27:7,
28:19, 37:24, 42:4,
42:25, 43:10, 43:15,
43:16, 44:16, 44:23,
45:1, 45:5, 47:4,
63:12, 64:3, 69:24,
73:8, 78:10, 79:6,
81:2, 88:19, 88:23,
89:17, 89:25, 99:19,
100:15
**bit** [2] - 14:1, 29:1
**block** [1] - 57:25
**Blue** [4] - 103:21,
103:25, 105:3, 105:6
**blue** [2] - 32:6, 36:20
**board** [4] - 31:19,
31:20, 31:24, 32:2
**bolsters** [1] - 78:6
**bonus** [2] - 69:14,
81:13
**borrower** [11] - 47:12,
47:14, 48:12, 52:15,
54:6, 54:8, 55:10,
55:15, 57:21, 57:24,
97:5
**borrower's** [3] - 57:21,
57:24, 58:3
**borrowers** [1] - 6:19

**bottom** [1] - 75:1
**bought** [1] - 66:9
**Boulevard** [2] - 1:17,
111:1
**BP** [4] - 37:1, 37:2,
37:7, 37:21
**branch** [177] - 11:5,
11:12, 15:25, 18:20,
18:21, 21:16, 21:18,
21:19, 21:21, 21:22,
21:25, 22:8, 23:25,
26:16, 27:23, 28:5,
28:8, 28:11, 28:15,
28:19, 28:24, 29:1,
39:9, 39:19, 40:1,
40:5, 40:24, 41:3,
41:7, 41:18, 41:19,
43:4, 43:23, 44:2,
44:4, 44:20, 45:3,
45:6, 45:9, 47:5,
47:17, 48:13, 48:14,
48:15, 48:24, 48:25,
49:6, 49:17, 51:4,
51:10, 51:25, 61:18,
61:20, 61:23, 61:25,
62:14, 62:18, 62:19,
62:25, 63:4, 63:7,
63:13, 70:15, 70:22,
70:24, 71:15, 71:19,
71:22, 72:1, 72:5,
72:7, 72:11, 72:14,
73:2, 73:4, 73:18,
74:3, 77:1, 77:2,
77:5, 77:6, 78:11,
78:13, 78:16, 78:21,
78:23, 78:25, 79:1,
79:7, 79:9, 79:10,
79:18, 79:20, 79:24,
80:3, 80:6, 80:13,
80:17, 81:3, 81:5,
81:8, 81:18, 82:3,
82:7, 82:11, 83:19,
83:23, 83:24, 84:2,
84:3, 84:8, 84:10,
84:14, 84:19, 84:22,
84:23, 85:1, 85:4,
85:6, 85:8, 85:12,
85:20, 85:25, 86:22,
87:23, 87:24, 88:2,
88:10, 88:16, 88:18,
88:24, 89:11, 89:15,
90:8, 91:24, 91:25,
92:2, 94:3, 94:7,
94:19, 95:19, 95:24,
96:6, 96:21, 96:25,
97:1, 97:6, 97:7,
97:8, 97:10, 97:17,
97:23, 98:9, 98:13,
98:25, 99:1, 100:11,
100:13, 100:16,

100:17, 100:23,
100:24, 101:6,
101:9, 102:4, 102:6,
102:20, 106:21,
106:24
**branches** [76] - 14:4,
18:19, 22:12, 22:13,
22:20, 26:18, 27:18,
27:20, 27:22, 27:24,
28:2, 29:4, 32:10,
32:12, 43:22, 49:23,
50:2, 50:23, 72:17,
73:13, 74:7, 76:22,
77:9, 77:10, 77:12,
77:19, 78:23, 80:2,
81:12, 82:16, 82:19,
84:15, 86:9, 86:18,
87:4, 87:14, 89:8,
89:9, 90:21, 91:4,
91:7, 91:14, 91:20,
92:5, 92:8, 92:10,
92:18, 92:21, 93:1,
93:7, 93:9, 93:14,
93:20, 94:21, 94:24,
95:2, 95:4, 95:7,
95:14, 95:17, 95:23,
96:14, 97:19, 97:25,
98:6, 98:7, 98:22,
99:7, 99:8, 99:10,
99:11, 99:13, 100:6,
101:1, 102:13, 104:4
**branches'** [2] - 27:21,
78:8
**break** [1] - 108:1
**breaking** [5] - 26:14,
26:15, 26:20, 27:1,
27:6
**breaks** [1] - 37:16
**Brian** [10] - 7:11, 8:2,
9:17, 20:5, 39:11,
42:13, 88:15, 91:21,
104:14, 105:11
**Bridgeview** [1] -
19:24, 63:17, 105:21
**bring** [1] - 78:17
**bringing** [6] - 14:22,
15:3, 20:14, 22:8,
22:12, 96:6
**Briones** [3] - 83:10,
83:14
**BRIONES** [1] - 83:11
**brought** [8] - 14:18,
14:23, 20:5, 20:10,
44:19, 62:24, 87:22
**budget** [5] - 25:24,
26:1, 26:6, 26:8
**building** [2] - 79:22,
103:9
**buildings** [1] - 79:24
**built** [1] - 102:25

**buses** [1] - 80:21
**business** [16] - 9:1,
14:21, 35:3, 37:13,
40:22, 54:6, 54:9,
64:24, 66:10, 68:12,
70:2, 102:25,
103:16, 104:22,
105:7, 107:5
**businesses** [2] -
105:2, 105:22
**but..** [1] - 13:2
**buy** [1] - 82:12
**buys** [1] - 63:24
**BY** [2] - 1:19, 5:7

**C**

**C-o-n-n-e-a-l-y** [1] -
8:19
**calendar** [1] - 48:5
**California** [1] - 67:10
**candidate** [5] - 14:23,
14:24, 15:12, 15:19,
98:5
**candidates** [3] -
14:22, 15:6, 22:16
**cannot** [1] - 82:22
**career** [1] - 19:18
**CARROLL** [1] - 2:4
**Carroll** [7] - 2:4, 9:23,
10:1, 10:11, 10:17,
11:2, 60:15
**case** [13] - 10:5, 32:10,
33:18, 48:18, 50:11,
51:4, 62:19, 74:8,
74:20, 76:3, 76:6,
76:18, 86:5
**CASE** [4] - 1:2, 111:9,
112:3, 112:4
**cases** [5] - 54:24,
81:7, 81:8, 82:11,
95:15
**category** [1] - 74:23
**caused** [2] - 45:14,
45:17
**center** [2] - 20:17,
105:10
**CEO** [1] - 73:23
**certain** [2] - 13:8,
98:13
**certainly** [6] - 36:6,
48:17, 75:5, 78:2,
84:2, 98:8
**Certificate** [1] - 3:5
**CERTIFICATE** [2] -
113:1, 113:14
**certify** [2] - 113:5,
113:8, 113:17
**cetera** [2] - 37:17,

3

82:24
**CFO** [3] - 78:18,
98:15, 98:16
**change** [3] - 40:23,
65:11, 86:4
**changed** [2] - 69:15,
70:2
**changes** [1] - 111:16
**charge** [1] - 19:5
**chart** [3] - 7:25, 38:21,
38:24
**chief** [2] - 12:22, 19:22
**chimes** [1] - 13:18
**Chris** [7] - 20:4, 20:7,
41:15, 52:21, 54:3,
64:7, 64:8
**Christine** [3] - 4:3,
5:10, 111:11
**CHRISTINE** [7] - 1:12,
5:2, 5:10, 112:2,
112:23, 113:6,
113:17
**chunk** [1] - 40:22
**CIRCUIT** [1] - 1:1
**circulated** [1] - 11:17
**circumstances** [4] -
54:25, 82:10, 85:18,
86:7
**cited** [1] - 76:9
**claiming** [1] - 70:7
**claims** [4] - 75:19,
76:6, 76:9, 76:18
**clear** [2] - 34:4, 48:7
**clearly** [1] - 36:13
**client** [1] - 111:15
**clients** [2] - 81:1, 81:4
**close** [17] - 16:19,
19:16, 41:14, 42:20,
44:7, 56:9, 57:16,
58:19, 59:2, 64:18,
64:22, 72:25, 74:23,
75:23, 86:17, 87:12,
105:24
**closed** [6] - 14:13,
27:20, 56:11, 56:12,
56:13, 64:25
**closing** [8] - 14:5,
14:6, 14:12, 14:20,
52:4, 86:18, 87:6,
100:15
**closings** [3] - 86:20,
87:1, 87:5
**closure** [1] - 63:11
**co** [2] - 44:2, 44:4
**co-branch** [2] - 44:2,
44:4
**Cody** [1] - 60:21
**collectively** [1] - 7:23
**Columbia** [4] - 28:9,
28:11, 28:15, 100:23

**column** [8] - 32:16,
32:19, 32:20, 35:14,
36:2, 36:21, 37:19,
38:9
**columns** [3] - 32:6,
36:20, 39:5
**Combined** [1] - 32:6
**comfortable** [2] -
18:2, 18:6
**coming** [4] - 67:24,
85:2, 87:8, 95:25
**commencing** [1] -
56:20
**Commission** [1] -
113:23
**commissions** [3] -
102:4, 102:6, 102:12
**common** [4] - 96:14,
96:18, 97:7, 99:7
**commonly** [1] - 103:2
**communication** [1] -
49:19
**communications** [4] -
47:1, 47:4, 48:13,
73:8
**comp** [1] - 80:14
**companies** [1] - 65:17
**Company** [2] - 63:18,
65:14
**company** [8] - 7:14,
7:18, 7:24, 16:2,
29:2, 65:17, 69:25,
103:1
**compare** [3] - 17:17,
33:18, 108:25
**compared** [7] - 18:12,
29:8, 29:11, 100:20,
108:9, 108:20, 109:1
**compares** [1] - 108:5
**comparing** [1] - 29:11
**compensation** [26] -
15:18, 15:24, 16:1,
16:8, 16:10, 16:11,
16:14, 16:17, 17:1,
17:2, 17:5, 17:9,
17:14, 17:17, 17:22,
18:11, 18:14, 45:21,
52:4, 80:12, 81:18,
84:20, 91:4, 102:1,
102:16, 102:20
**Complaint** [1] - 56:24
**complaint** [6] - 56:24,
60:11, 60:14, 61:6,
75:20, 75:21
**complaints** [4] -
87:11, 87:15, 87:17,
87:20
**complete** [1] - 113:7
**completely** [4] - 6:2,
6:3, 7:2, 7:8

**complexity** [1] -
100:19
**computers** [1] - 80:17
**concern** [2] - 40:14,
41:6
**concerning** [2] -
40:11, 111:18
**concerns** [2] - 40:17,
87:1
**concluded** [1] - 110:6
**condition** [1] - 33:13
**conference** [1] - 46:4
**conjunction** [1] -
80:15
**Connealy** [9] - 8:14,
8:18, 8:19, 8:20, 9:2,
9:18, 10:16, 12:2,
51:2
**connected** [1] -
113:10
**connection** [6] -
18:22, 20:11, 20:18,
62:8, 106:20, 106:23
**consider** [2] - 88:8,
88:9
**consistent** [1] - 25:24
**consolidate** [1] - 7:3
**construction** [1] -
87:21
**consumer** [1] - 82:13
**content** [1] - 75:2
**context** [3] - 20:14,
31:17, 53:9
**continue** [1] - 60:13
**continued** [1] - 4:1
**contribute** [1] - 7:4
**control** [1] - 84:22
**controlled** [1] - 51:16
**conversation** [6] -
12:8, 54:25, 55:2,
55:7, 55:11, 58:21
**conversations** [3] -
9:25, 41:20, 89:5
**convert** [1] - 28:13
**COO** [2] - 6:12, 74:1
**copied** [2] - 31:23,
31:25
**copy** [3] - 31:19,
111:13, 111:15
**corporate** [17] - 26:16,
27:8, 27:11, 28:23,
29:3, 29:6, 29:7,
29:10, 29:13, 29:14,
29:20, 29:25, 30:7,
35:22, 36:17, 68:16,
79:3
**Corporate** [3] - 32:7,
35:15, 36:2
**CORPORATION** [3] -
1:7, 111:9, 112:3

**corporation** [2] -
27:19, 35:24
**Correct** [23] - 13:17,
13:19, 14:15, 18:13,
26:22, 34:20, 40:16,
47:2, 60:23, 63:14,
65:5, 66:17, 66:23,
68:6, 68:15, 77:7,
79:2, 79:17, 84:4,
86:11, 88:4, 107:24,
109:21
**correct** [62] - 15:1,
17:3, 19:14, 21:16,
21:19, 21:22, 29:15,
32:13, 33:2, 33:5,
34:22, 35:1, 36:7,
36:11, 36:15, 37:23,
41:4, 51:17, 53:22,
56:9, 60:22, 61:8,
63:18, 64:9, 64:20,
65:4, 66:16, 66:19,
67:10, 67:25, 68:5,
69:22, 70:13, 71:13,
75:7, 76:18, 76:19,
77:6, 77:15, 78:21,
78:22, 79:1, 84:3,
84:6, 84:12, 84:16,
84:17, 93:11, 94:4,
95:20, 96:15, 97:21,
98:10, 100:5,
101:15, 106:5,
109:14, 109:15,
109:17, 109:18,
109:20, 110:1
**correction** [2] -
111:14, 111:17
**corrections** [4] -
111:16, 112:8,
112:21
**correlation** [1] - 37:24
**cost** [1] - 108:14
**Costa** [2] - 49:12,
49:14
**could've** [6] - 21:1,
23:8, 70:18, 70:23,
70:25, 94:16
**Counsel** [1] - 1:14
**counsel** [11] - 5:16,
46:15, 46:16, 46:24,
53:14, 53:17, 55:24,
106:13, 113:9,
113:10
**COUNTY** [2] - 113:3,
113:16
**couple** [3] - 26:23,
46:10, 46:13
**Court** [2] - 111:23,
113:5, 113:12
**court** [1] - 5:14
**COURTNEY** [2] - 2:1,

111:5
**cover** [1] - 75:1
**create** [1] - 99:2
**credit** [1] - 12:22
**CRM** [2] - 55:4, 55:6
**Curtolo** [3] - 12:17,
13:7, 13:20
**customer** [1] - 100:14
**cut** [4] - 13:21, 13:23,
33:5, 88:5

## D

**daily** [1] - 107:9
**damages** [3] - 74:19,
75:10, 75:15
**Dame** [3] - 57:19,
58:2, 61:7
**data** [2] - 109:1, 109:9
**Date** [5] - 32:17,
32:23, 33:22, 35:17,
38:9
**date** [13] - 11:14,
26:24, 29:8, 33:24,
34:3, 34:5, 34:8,
34:19, 34:21, 69:20,
86:18, 109:17, 112:7
**DATE** [3] - 1:15,
112:5, 112:23
**dating** [1] - 30:18
**day-to-day** [1] - 40:23
**Daytona** [42] - 8:21,
8:24, 11:5, 11:12,
21:19, 22:7, 22:22,
32:11, 39:9, 39:19,
40:4, 41:3, 41:7,
41:19, 43:23, 49:24,
61:20, 70:11, 70:21,
71:16, 71:19, 71:22,
72:1, 72:14, 73:9,
74:7, 74:11, 74:15,
77:1, 79:23, 80:21,
82:19, 82:24, 86:9,
86:18, 87:14, 93:9,
93:14, 93:20, 101:9,
102:7, 106:21
**DC** [2] - 2:3, 111:7
**DDL** [1] - 13:16
**deal** [1] - 50:2
**dealing** [1] - 14:5
**Dear** [1] - 111:12
**December** [2] - 30:16,
113:23
**decided** [3] - 70:15,
82:25, 89:4
**decides** [2] - 68:3,
80:17, 83:6
**decision** [17] - 12:22,
15:11, 15:14, 15:16,

57:23, 59:6, 78:13, 80:23, 80:24, 83:20, 83:24, 89:1, 102:5, 106:8, 106:12, 106:14, 106:18
**decision-maker** [2] - 12:22, 89:1
**decision-makers** [1] - 83:20, 83:24
**decisions** [2] - 78:11, 78:14
**declare** [1] - 112:20
**decrease** [1] - 33:7
**decreased** [2] - 33:12, 40:5
**decreasing** [1] - 39:15
**Defendant** [3] - 1:8, 1:14, 2:11
**definition** [1] - 88:13
**delete** [1] - 107:10
**deleted** [3] - 107:13, 107:16, 107:22
**deliberately** [1] - 107:15
**delinquencies** [2] - 54:1, 54:2
**demand** [1] - 87:21
**denial** [1] - 59:16
**denied** [3] - 52:15, 58:13, 58:17
**denying** [1] - 59:19
**departed** [3] - 11:5, 11:12, 91:15
**department** [2] - 100:12, 100:14
**departure** [7] - 18:20, 40:5, 40:9, 41:18, 52:5, 83:17, 106:4
**departures** [11] - 39:16, 39:19, 40:1, 40:20, 49:23, 51:4, 51:8, 51:10, 96:25, 106:21, 106:24
**deposed** [2] - 5:11, 50:13
**deposing** [1] - 50:11
**deposit** [1] - 18:9
**deposition** [14] - 4:1, 5:13, 25:18, 30:24, 46:3, 46:6, 46:9, 46:25, 57:5, 57:8, 110:6, 111:13, 111:15, 113:6
**Deposition** [4] - 56:23, 74:24, 74:25, 111:11
**DEPOSITION** [1] - 1:12
**describe** [3] - 42:4, 44:15, 65:10

**described** [2] - 33:14, 33:17
**Description** [1] - 4:3
**desk** [3] - 12:19, 13:1, 13:4
**details** [1] - 101:5
**determine** [1] - 78:18
**determined** [1] - 88:24
**developed** [1] - 21:21
**difference** [2] - 27:6, 100:15
**different** [11] - 15:4, 19:2, 36:21, 37:6, 58:6, 63:16, 92:9, 92:16, 92:17, 100:8, 100:13
**diligence** [1] - 98:8
**direct** [6] - 18:9, 32:5, 36:19, 73:8, 82:13, 82:14
**directed** [2] - 13:1, 53:13
**directing** [1] - 53:17
**directly** [4] - 7:12, 7:16, 7:21, 72:21
**discovery** [1] - 11:10
**discretion** [3] - 79:19, 80:13, 84:14
**discuss** [2] - 14:18, 31:23
**discussed** [3] - 53:7, 54:22, 54:23
**discussion** [7] - 10:25, 12:1, 14:24, 51:8, 58:15, 59:12, 79:11
**discussions** [10] - 53:15, 54:20, 58:22, 59:5, 75:9, 75:14, 78:15, 83:13, 89:23, 96:9
**disputed** [1] - 9:9
**dissected** [1] - 37:6
**distinguish** [4] - 6:16, 6:23, 52:11, 68:12
**DISTRICT** [2] - 1:1, 1:1
**diverted** [2] - 65:15, 65:19
**division** [25] - 6:14, 6:16, 6:17, 6:18, 6:20, 6:25, 7:2, 14:14, 15:25, 16:4, 26:21, 27:5, 27:7, 27:10, 32:12, 33:5, 34:5, 40:23, 65:14, 82:13, 87:4, 92:23, 99:16, 99:22, 108:24
**Division** [7] - 32:7, 32:16, 32:23, 35:13, 37:19, 39:5

**DIVISION** [1] - 1:2
**division's** [1] - 26:19
**divisions** [3] - 8:17, 68:13, 82:9
**Divisions** [1] - 32:6
**documentation** [3] - 54:8, 54:10, 87:8
**documents** [13] - 26:25, 32:1, 46:3, 46:17, 48:8, 48:9, 52:13, 55:23, 56:4, 56:15, 66:24, 67:13, 67:17
**dollar** [2] - 38:1, 38:25
**done** [3] - 59:1, 93:17, 98:8
**doubtful** [1] - 34:15
**down** [5] - 5:14, 29:1, 37:16, 70:25, 100:5
**downstream** [1] - 45:2
**downward** [1] - 36:15
**due** [1] - 40:5
**duly** [2] - 5:3, 113:17
**during** [6] - 11:19, 89:4, 90:3, 95:6, 96:4, 99:12
**Dwayne** [4] - 41:15, 48:10, 61:2, 64:7

**E**

**e-mail** [14] - 13:4, 13:9, 46:10, 46:15, 46:16, 47:9, 48:2, 48:8, 48:14, 48:17, 49:3, 54:23, 57:21, 106:20
**e-mails** [21] - 25:18, 25:20, 25:22, 27:2, 27:4, 27:14, 46:8, 46:10, 46:13, 46:14, 46:21, 46:24, 47:6, 47:7, 47:18, 47:24, 48:19, 48:21, 54:14, 54:17, 56:5
**earned** [2] - 16:10, 16:11
**easier** [1] - 76:20
**East** [3] - 1:17, 2:9, 111:1
**effect** [2] - 53:10, 101:17
**effort** [2] - 13:20, 59:23
**efforts** [10] - 58:20, 74:10, 78:12, 79:7, 80:20, 84:12, 89:4, 89:6, 93:16, 98:3
**either** [19] - 9:17,

23:18, 51:22, 60:3, 60:22, 61:3, 64:17, 71:16, 72:17, 73:9, 73:13, 74:17, 74:18, 78:17, 85:25, 86:25, 96:14, 98:2, 102:17
**elderly** [1] - 6:20
**Ellie** [1] - 83:10
**elsewhere** [1] - 40:18
**employed** [6] - 20:19, 65:7, 66:5, 68:24, 68:25, 85:5
**employee** [6] - 23:1, 48:3, 59:21, 80:7, 113:9, 113:9
**employees** [68] - 9:14, 39:20, 45:2, 45:3, 45:5, 45:8, 45:13, 45:17, 45:20, 45:23, 46:1, 47:5, 47:17, 47:19, 47:22, 48:1, 48:13, 48:24, 49:1, 49:7, 49:17, 51:25, 64:8, 65:2, 65:6, 65:7, 66:4, 67:22, 67:24, 68:2, 68:4, 68:5, 68:7, 68:23, 69:1, 69:13, 69:15, 69:20, 69:21, 70:15, 70:17, 71:6, 72:17, 72:24, 73:9, 73:12, 73:18, 73:24, 74:10, 74:14, 76:12, 77:8, 77:13, 80:2, 80:3, 80:13, 85:20, 86:2, 86:3, 87:25, 96:8, 96:9, 97:17, 102:5, 102:6, 102:21
**employer** [6] - 16:22, 64:19, 65:4, 68:16, 70:2, 85:12
**employers** [1] - 96:15
**employment** [4] - 65:11, 69:1, 69:8, 70:8
**Enclosed** [1] - 111:13
**encompass** [1] - 55:6
**Encompass** [3] - 55:8, 55:10, 58:20
**encountered** [1] - 60:5
**end** [7] - 11:5, 16:9, 18:18, 24:25, 67:24, 71:23, 81:7
**ends** [1] - 25:9
**enforce** [1] - 70:7
**entire** [14] - 14:6, 14:10, 68:10, 85:6, 85:8, 85:12, 85:20, 95:19, 95:24, 96:6,

97:8, 98:25, 99:7, 99:21
**entity** [5] - 7:5, 27:24, 66:9, 68:8, 108:19
**equity** [1] - 6:22
**Errata** [1] - 3:4
**ERROR** [1] - 112:11
**errors** [1] - 112:7
**escalate** [3] - 12:20, 13:12, 73:5
**ESQUIRE** [4] - 2:1, 2:4, 2:8, 111:5
**essentially** [6] - 14:12, 14:21, 53:6, 66:4, 68:14, 91:12
**EST** [1] - 1:16
**estimate** [3] - 26:7, 26:9, 98:17
**estimations** [1] - 99:4
**et** [2] - 37:17, 82:24
**event** [6] - 60:19, 60:21, 60:25, 61:1, 61:7, 78:17
**events** [5] - 60:22, 61:3, 78:6, 78:12, 79:11
**evidence** [4] - 47:3, 49:11, 49:15, 76:11
**exact** [4] - 11:14, 17:22, 26:9, 64:17
**exactly** [3] - 65:18, 93:5, 93:6
**EXAMINATION** [1] - 5:6
**Examination** [1] - 3:2
**examined** [1] - 5:3
**example** [15] - 9:12, 19:1, 19:7, 19:22, 29:6, 29:8, 37:18, 48:22, 60:17, 76:1, 80:20, 85:9, 100:2, 100:4, 108:8
**exchanges** [5] - 106:20, 106:23, 107:3, 107:18, 107:22
**excited** [1] - 46:12
**exclusive** [1] - 23:24
**executive** [11] - 11:3, 21:1, 21:3, 21:11, 23:3, 23:5, 23:15, 23:18, 23:24, 24:20, 62:9
**executives** [1] - 25:19
**exhaust** [1] - 76:1
**Exhibit** [26] - 4:1, 4:3, 19:10, 19:12, 19:13, 30:14, 30:15, 30:24, 31:3, 31:9, 31:12, 31:17, 31:22, 32:3,

5

34:24, 37:9, 56:23, 57:1, 57:7, 74:24, 74:25, 75:3, 75:6, 75:7
**exhibits** [1] - 46:11
**existed** [1] - 55:3
**exists** [1] - 66:11
**expect** [1] - 38:23
**expense** [2] - 81:12, 84:11
**expensed** [1] - 78:20
**expenses** [9] - 37:17, 78:7, 78:24, 83:25, 84:3, 84:5, 84:15, 84:23
**Expires** [1] - 113:23
**explain** [2] - 14:24, 18:21
**explained** [1] - 54:4
**explaining** [1] - 14:21
**express** [1] - 40:14
**expressed** [1] - 40:17
**expressing** [1] - 87:1
**extent** [10] - 9:24, 10:7, 25:15, 53:16, 78:5, 78:25, 81:11, 83:22, 84:1, 91:23
**external** [2] - 15:6, 15:9
**extremely** [1] - 101:4

**F**

**fact** [3] - 49:9, 54:12, 86:10
**facts** [2] - 49:5, 49:15
**failing** [1] - 87:12
**fairly** [1] - 101:15
**familiar** [2] - 39:23, 94:12
**far** [1] - 32:20
**fashion** [2] - 8:10, 37:6
**fed** [1] - 82:8
**fee** [1] - 37:17
**feelings** [1] - 45:4
**felt** [2] - 89:10, 89:14
**female** [3] - 53:4, 53:5, 53:6
**few** [2] - 5:16, 95:18
**FHRC** [1] - 105:9
**fifth** [1] - 104:11
**figure** [1] - 64:12
**figured** [2] - 55:3, 70:25
**file** [3] - 12:18, 57:24, 106:8
**filed** [1] - 56:25
**fill** [1] - 92:20

**final** [2] - 12:21, 15:16
**financial** [4] - 6:24, 6:25, 7:1, 66:12
**financially** [2] - 106:4, 113:10
**financials** [3] - 7:3, 50:22, 93:5
**Financials** [5] - 36:25, 37:1, 38:17, 38:23, 39:1
**finished** [2] - 6:2, 6:4
**fired** [1] - 80:7
**firing** [1] - 74:14
**firm** [1] - 108:8
**firms** [1] - 108:10
**first** [17] - 5:17, 11:6, 13:21, 13:23, 20:4, 20:6, 20:22, 21:1, 25:6, 25:10, 32:16, 40:1, 40:24, 41:3, 46:5, 66:25, 74:25
**First** [1] - 56:24
**fit** [1] - 18:18
**five** [5] - 8:5, 8:6, 24:1, 91:11, 108:1
**five-minute** [1] - 108:1
**FLORIDA** [3] - 1:1, 113:2, 113:15
**Florida** [10] - 1:18, 1:20, 2:6, 61:12, 61:15, 70:13, 71:11, 76:22, 111:2, 113:22
**flow** [1] - 81:12
**focus** [6] - 27:14, 28:15, 47:16, 100:12, 101:6, 101:9
**focused** [2] - 57:8, 58:8
**focusing** [3] - 30:7, 100:16, 100:17
**folks** [1] - 5:23
**follow** [6] - 5:16, 70:16, 85:6, 85:20, 97:8, 109:5
**followed** [4] - 45:9, 45:23, 86:2, 86:3
**following** [1] - 109:22
**follows** [1] - 5:4
**Forecast** [5] - 32:17, 32:24, 33:22, 35:17, 38:10
**forecast** [2] - 33:4, 33:23
**forecasting** [1] - 34:24
**foregoing** [1] - 112:20
**forget** [2] - 87:3, 95:5
**form** [64] - 9:24, 25:11, 26:2, 27:3, 29:17, 29:22, 30:2, 30:8, 33:8, 33:15, 33:20,

34:16, 35:5, 35:8, 36:8, 40:6, 42:6, 42:12, 43:19, 44:17, 45:10, 49:8, 50:3, 50:16, 51:18, 56:17, 58:24, 59:7, 59:15, 59:25, 63:1, 63:9, 67:1, 67:16, 67:20, 68:21, 70:9, 73:3, 73:15, 73:20, 74:1, 77:16, 82:1, 82:4, 83:21, 85:17, 86:6, 86:14, 89:12, 91:19, 96:10, 96:16, 96:23, 97:9, 97:12, 101:18, 102:2, 103:14, 104:1, 104:23, 106:1, 106:6, 106:10, 109:7
**forma** [3] - 31:4, 31:5, 98:17
**formas** [1] - 99:3
**formed** [1] - 105:3
**former** [6] - 16:22, 25:15, 66:2, 76:12, 85:12, 99:16
**formerly** [1] - 85:5
**Forward** [5] - 32:7, 32:15, 32:23, 37:18, 39:5
**forward** [28] - 6:12, 6:15, 6:17, 7:7, 7:8, 8:16, 14:14, 16:3, 16:5, 18:12, 19:23, 26:19, 26:20, 27:5, 27:7, 27:10, 27:15, 30:5, 32:12, 33:5, 34:5, 40:23, 84:9, 87:4, 92:22, 99:22, 108:24
**foundation** [1] - 71:10
**four** [7] - 32:6, 36:20, 91:9, 104:4, 104:6, 104:21, 105:2
**FPR** [4] - 1:19, 111:22, 113:12, 113:21
**frame** [1] - 64:17
**Frank** [1] - 105:12
**Fred** [2] - 60:20, 60:25
**free** [1] - 13:18
**frequently** [1] - 12:25
**friends** [2] - 42:20, 44:7
**friendship** [2] - 43:17, 45:24
**friendships** [1] - 45:4
**front** [2] - 6:22, 18:18
**fruition** [1] - 33:23
**fulfillment** [3] - 14:10, 14:19, 20:17

**full** [1] - 5:22
**function** [1] - 13:25
**functions** [2] - 14:2, 14:3
**Funded** [3] - 38:18, 38:23, 39:1
**funding** [2] - 78:1, 78:5
**furniture** [1] - 80:16

**G**

**gather** [1] - 44:12
**general** [15] - 18:17, 18:21, 28:2, 33:10, 73:22, 87:5, 88:2, 95:3, 95:6, 99:24, 100:7, 109:11, 109:13, 109:16, 109:22
**generally** [2] - 73:24, 109:4
**generated** [1] - 91:3
**Gennarelli** [25] - 7:15, 9:17, 10:17, 12:5, 12:7, 15:22, 31:14, 40:8, 75:9, 90:2, 90:7, 90:13, 102:24, 103:11, 103:13, 103:17, 104:5, 104:15, 105:7, 105:18, 105:19, 105:25, 106:16, 106:25, 107:8
**Gennarelli's** [1] - 15:14
**geographically** [1] - 62:20
**geography** [1] - 62:23
**given** [7] - 12:23, 41:7, 41:18, 43:7, 77:9, 77:15, 79:19
**go-to** [1] - 53:8
**Godfrey** [1] - 2:8
**gosh** [1] - 8:3
**great** [2] - 61:10, 74:3
**greater** [2] - 92:14, 100:19
**grounds** [1] - 70:6
**group** [1] - 104:5
**growing** [1] - 97:21
**guess** [23] - 6:3, 8:23, 10:24, 18:20, 27:16, 34:9, 39:6, 42:13, 55:2, 57:12, 60:12, 68:7, 72:9, 80:4, 80:5, 84:1, 87:24, 89:1, 94:15, 94:23, 95:10, 104:24, 106:7

**guessing** [2] - 28:20, 46:22
**guesstimate** [1] - 105:5

**H**

**half** [3] - 18:5, 33:5, 103:5
**halfway** [1] - 17:16
**hand** [3] - 78:10, 78:11, 113:19
**handed** [1] - 46:15
**handful** [6] - 91:12, 91:13, 95:11, 95:12, 96:3, 96:5
**handled** [1] - 51:12
**hard** [1] - 25:13
**Harris** [3] - 94:2, 94:6, 94:11
**head** [3] - 5:18, 52:10, 95:1
**hear** [2] - 41:17, 90:12
**heard** [3] - 49:9, 49:11, 94:11
**help** [5] - 12:19, 13:1, 13:3, 18:24, 26:11
**helps** [1] - 30:14
**Henderson** [1] - 1:17
**herein** [1] - 5:3
**hereto** [1] - 112:21
**HERMOSA** [1] - 52:23
**Hermoso** [15] - 52:22, 53:6, 53:9, 53:19, 53:23, 54:14, 54:20, 54:21, 55:11, 58:4, 58:16, 58:21, 59:5, 59:13, 59:21
**herself** [1] - 59:9
**hesitate** [1] - 111:19
**HH055410** [1] - 113:23
**high** [8] - 17:13, 21:4, 21:11, 29:21, 100:3, 100:4, 101:15, 109:13
**higher** [12] - 16:8, 16:11, 16:13, 16:14, 16:21, 17:6, 17:7, 17:9, 17:11, 24:9, 29:14, 101:22
**highest** [5] - 16:17, 17:2, 29:24, 30:6, 30:18
**Hill** [1] - 1:17
**HILLSBOROUGH** [2] - 113:3, 113:16
**himself** [1] - 89:25
**hired** [2] - 65:2, 83:3
**historically** [2] -

29:21, 109:12
**hmm** [3] - 20:1, 37:20, 108:23
**holding** [1] - 102:19
**home** [2] - 6:19, 6:23
**homes** [1] - 103:22
**honest** [3] - 38:13, 49:13, 94:8
**honestly** [2] - 17:11, 18:8
**hosted** [1] - 23:18
**hot** [1] - 61:15
**HR** [10] - 15:14, 15:15, 15:22, 69:18, 80:11, 80:15, 89:2, 89:3, 96:11, 98:2
**human** [2] - 69:6, 69:12
**hurt** [1] - 106:3
**Hutto** [45] - 20:22, 20:23, 21:6, 22:7, 22:11, 23:17, 23:21, 41:18, 41:22, 42:5, 42:11, 42:18, 43:1, 43:7, 43:16, 44:1, 44:9, 44:16, 48:18, 49:4, 49:19, 61:2, 64:7, 64:19, 70:16, 73:14, 76:25, 77:9, 77:14, 77:22, 80:21, 80:23, 81:23, 83:3, 83:17, 85:19, 86:3, 86:13, 86:23, 89:14, 89:23, 89:24, 93:22, 102:1
**Hutto's** [1] - 21:18

**I**

**Idaho** [1] - 92:2
**idea** [4] - 41:23, 47:16, 71:20, 88:2
**identification** [1] - 19:12
**identified** [1] - 50:10
**identifying** [2] - 76:2, 77:21
**ill** [1] - 72:8
**illegal** [1] - 85:14
**Illinois** [5] - 20:9, 20:15, 61:13, 71:13, 93:11
**imagine** [1] - 69:6
**immediate** [1] - 73:24
**impact** [3] - 7:7, 40:20, 66:12
**improper** [1] - 85:16
**improves** [1] - 25:14
**IN** [1] - 1:1

**INC** [4] - 1:4, 111:1, 111:9, 112:3
**include** [2] - 99:16, 112:21
**included** [1] - 105:11
**includes** [1] - 104:8
**including** [1] - 45:4
**inclusive** [2] - 16:4, 113:7
**income** [1] - 27:11
**incorrect** [2] - 27:17, 58:13
**increased** [2] - 33:11, 101:24
**incurring** [1] - 84:16
**independently** [1] - 83:6
**INDEX** [1] - 3:1
**indicate** [3] - 48:5, 49:5, 112:9
**indicated** [3] - 55:18, 58:8, 112:8
**indicating** [1] - 111:16
**indirectly** [1] - 7:12
**individuals** [5] - 87:1, 99:7, 99:8, 99:9, 105:15
**industry** [14] - 15:8, 19:19, 73:23, 96:14, 108:11, 109:5, 109:11, 109:12, 109:13, 109:16, 109:19, 109:23, 109:24, 109:25
**information** [13] - 47:10, 47:11, 47:13, 48:2, 49:15, 50:9, 50:14, 61:2, 62:13, 97:5, 98:13, 98:17, 109:10
**informing** [1] - 76:5
**initial** [1] - 9:2
**input** [1] - 19:9
**inquiries** [1] - 13:3
**instances** [1] - 97:16
**instead** [2] - 42:16, 68:24
**instructions** [2] - 48:25, 96:7
**Insurance** [1] - 65:14
**insurance** [3] - 65:17, 69:25
**interest** [6] - 33:11, 99:24, 100:2, 100:4, 101:14, 101:20
**interested** [1] - 113:10
**interests** [4] - 103:16, 104:22, 105:1, 105:7
**interim** [1] - 71:5
**internal** [1] - 99:13

**Internet** [1] - 82:24
**inventory** [2] - 101:21, 101:24
**investigation** [1] - 59:1
**investments** [1] - 103:23
**invite** [2] - 23:25, 24:2
**invited** [3] - 23:18, 24:5, 24:6
**involve** [3] - 48:21, 63:16, 104:4
**involved** [21] - 9:2, 9:12, 15:2, 15:15, 15:16, 15:20, 18:25, 19:1, 19:8, 22:17, 40:13, 48:22, 52:17, 53:14, 56:1, 58:4, 60:21, 98:3, 102:5, 104:11, 104:21
**involvement** [7] - 8:20, 18:25, 49:22, 50:24, 51:3, 58:9, 86:8
**involves** [1] - 60:20
**involving** [7] - 53:16, 58:1, 60:19, 60:21, 60:25, 61:1, 90:7
**Island** [4] - 2:5, 94:3, 94:7, 94:19
**issue** [8] - 8:22, 9:9, 9:10, 12:3, 32:10, 53:25, 59:16, 95:19
**issued** [2] - 52:13, 55:22, 56:2
**issues** [12] - 9:19, 10:5, 11:3, 11:4, 11:7, 12:6, 12:20, 14:5, 51:4, 51:9, 72:25, 73:1
**items** [3] - 11:15, 11:16, 47:14
**itself** [1] - 112:7

**J**

**Jake** [3] - 39:18, 39:22, 93:25
**jeez** [1] - 23:25
**Jeff** [14] - 7:14, 7:15, 7:17, 7:21, 7:23, 8:10, 9:17, 10:17, 15:13, 31:13, 39:12, 33:13, 78:18, 98:3
**Jersey** [11] - 32:11, 49:24, 61:22, 62:1, 62:14, 62:18, 62:25, 63:4, 63:7, 63:12, 74:11

**job** [7] - 13:25, 40:20, 40:21, 40:23, 76:20, 104:25
**joined** [6] - 43:12, 77:10, 85:5, 85:8, 85:19, 105:21
**joining** [1] - 97:20
**joins** [1] - 60:15
**joint** [2] - 13:9
**joke** [1] - 90:13
**jokes** [1] - 90:2
**June** [20] - 1:15, 32:17, 32:23, 33:22, 34:8, 34:9, 34:11, 35:17, 35:23, 38:10, 38:13, 60:19, 60:20, 72:5, 111:4, 111:14, 112:5, 113:19
**jurisdiction** [2] - 12:12, 92:3

**K**

**Kahn** [1] - 2:8
**Keefe** [5] - 1:19, 111:22, 113:5, 113:12, 113:21
**keep** [3] - 55:5, 74:10, 90:20
**Kennedy** [2] - 1:17, 111:1
**kept** [1] - 65:14
**key** [1] - 50:8
**Kiley** [10] - 7:11, 8:2, 9:17, 20:5, 42:13, 70:24, 88:15, 91:21, 104:14, 105:11
**kind** [8] - 9:13, 18:17, 37:11, 38:15, 66:1, 69:14, 104:24, 105:14
**King** [21] - 7:11, 9:17, 70:24, 88:15, 89:14, 92:14, 93:4, 93:8, 93:19, 94:18, 94:22, 95:6, 103:24, 105:8, 105:18, 105:20, 105:25, 106:3, 106:24, 107:13, 107:14
**king** [26] - 8:11, 19:7, 40:8, 50:1, 50:12, 71:2, 71:7, 71:18, 71:25, 72:2, 72:6, 73:9, 73:13, 88:19, 89:6, 89:10, 89:18, 89:25, 90:3, 90:13, 91:2, 91:7, 91:15, 91:24, 92:3, 92:12

**knowledge** [13] - 9:15, 45:16, 60:12, 60:14, 60:22, 61:2, 73:16, 74:19, 75:24, 75:25, 76:15, 89:17, 106:11
**known** [3] - 41:22, 46:5, 107:15
**knows** [4] - 15:7, 42:10, 72:16, 72:18
**KREITER** [6] - 2:8, 5:7, 19:10, 22:3, 107:25, 110:3
**Kreiter** [2] - 3:2, 108:4

**L**

**L-e-y-d-e-n** [1] - 5:10
**lack** [1] - 101:21
**Lamb** [1] - 60:21
**Large** [1] - 1:20
**large** [2] - 24:4, 89:24
**Larsen** [6] - 10:16, 10:17, 12:2, 31:13, 51:2
**last** [10] - 22:3, 24:15, 30:5, 30:7, 69:20, 71:18, 71:21, 71:22, 94:23
**late** [1] - 87:8
**Law** [1] - 2:4
**law** [2] - 108:8, 108:10
**lawsuit** [3] - 50:15, 51:8, 106:9
**lead** [3] - 47:25, 49:16, 82:15
**leaders** [1] - 66:3
**leadership** [1] - 66:8
**leading** [1] - 10:4
**leads** [9] - 28:13, 28:14, 81:7, 81:11, 81:17, 82:13, 82:14, 84:9, 92:14
**learn** [2] - 39:9, 40:24
**lease** [1] - 70:19
**leases** [2] - 51:12, 51:15
**least** [12] - 17:3, 25:5, 28:5, 28:21, 40:15, 41:24, 43:22, 66:21, 71:5, 84:15, 95:18, 107:9
**leave** [4] - 41:8, 45:14, 45:17, 97:7
**leaves** [1] - 18:21, 85:12
**leaving** [10] - 39:10, 39:12, 39:18, 40:25, 41:2, 41:18, 71:23, 95:18, 96:22, 97:7

**left** [14] - 36:20, 39:25, 41:2, 41:3, 41:7, 70:11, 71:24, 72:5, 85:4, 94:3, 95:7, 95:14, 95:19, 97:1
**legal** [3] - 10:12, 11:3, 11:4
**LEGENY** [1] - 104:9
**lend** [1] - 6:18
**Lending** [10] - 63:20, 64:6, 64:8, 64:20, 65:15, 65:25, 66:11, 68:12, 70:1, 70:8
**less** [7] - 8:5, 29:7, 29:12, 33:24, 33:25, 34:2, 39:2
**Letter** [1] - 3:3
**letters** [1] - 68:25
**level** [10] - 26:16, 26:19, 26:21, 27:11, 29:3, 29:13, 35:22, 36:17, 97:23
**levels** [3] - 15:18, 26:17, 27:12
**Leyden** [6] - 4:3, 5:8, 5:10, 19:13, 108:4, 111:11
**LEYDEN** [6] - 1:12, 5:2, 112:2, 112:23, 113:6, 113:17
**likely** [3] - 10:19, 73:4, 95:15
**limit** [1] - 62:22
**limited** [1] - 99:15
**LINE** [1] - 112:11
**line** [2] - 89:22, 111:16
**lined** [2] - 111:14, 111:16
**lines** [1] - 112:8
**LinkedIn** [4] - 4:3, 15:9, 19:14, 19:17
**list** [2] - 25:19, 76:8
**listed** [1] - 84:6
**litigation** [1] - 56:20
**live** [1] - 61:13
**lives** [1] - 93:11
**LLC** [8] - 2:1, 51:16, 103:21, 103:24, 104:8, 104:10, 105:9, 111:6
**Loan** [3] - 38:18, 38:24, 39:1
**loan** [55] - 6:21, 12:21, 14:6, 14:10, 19:2, 37:15, 37:17, 39:23, 52:14, 52:18, 52:21, 53:3, 53:11, 53:22, 53:24, 54:12, 54:15, 54:18, 54:21, 54:24, 55:5, 55:6, 55:17,

55:18, 55:19, 55:23, 56:9, 56:15, 56:19, 57:20, 57:22, 58:1, 58:9, 58:11, 58:13, 58:16, 58:22, 59:2, 59:6, 59:19, 59:24, 60:6, 77:13, 81:9, 87:21, 88:10, 95:25, 100:20, 108:14, 108:18, 108:25
**loan-related** [1] - 37:17
**loans** [25] - 14:13, 14:20, 18:24, 19:2, 27:20, 28:15, 28:16, 52:3, 52:8, 52:9, 73:1, 86:17, 87:12, 87:18, 99:17, 99:19, 99:21, 99:22, 99:25, 100:9, 100:12, 100:16, 101:17, 101:20
**local** [3] - 71:11, 82:14, 82:17
**located** [2] - 32:11, 61:11
**location** [2] - 61:13, 91:10
**LOCATION** [1] - 1:17
**locations** [1] - 22:20
**lock** [1] - 102:15
**log** [4] - 55:1, 55:2, 55:8, 58:21
**Lombard** [8] - 20:6, 20:8, 20:24, 43:13, 61:13, 91:10, 103:4, 103:6
**longevity** [1] - 99:11
**Look** [2] - 70:15, 84:8
**look** [24] - 13:14, 15:8, 16:10, 17:12, 18:9, 19:13, 19:16, 25:25, 30:14, 30:23, 32:5, 32:15, 32:22, 33:1, 37:1, 37:18, 55:10, 56:22, 60:17, 71:24, 74:23, 108:8, 109:2
**looked** [1] - 13:13
**looking** [19] - 14:4, 14:11, 15:6, 29:10, 29:13, 30:5, 30:6, 35:23, 36:2, 36:22, 37:7, 38:1, 38:15, 38:16, 56:5, 56:6, 72:6, 79:7, 99:20
**looks** [4] - 19:20, 19:21, 37:6, 46:3
**losing** [1] - 40:22
**loss** [4] - 26:22, 26:24, 27:1, 27:6

**losses** [1] - 9:13
**Lowe** [4] - 39:18, 39:22, 39:25, 93:25
**Lowe's** [2] - 40:5, 40:9
**lower** [10] - 16:11, 17:6, 17:9, 17:19, 17:20, 18:1, 18:4, 18:5, 18:11, 18:14
**lowering** [1] - 89:19
**loyalty** [5] - 45:4, 45:24, 73:13, 73:18, 73:24
**Lucas** [7] - 12:17, 12:19, 13:10, 13:11, 19:6, 57:19, 61:7

**M**

**mail** [14] - 13:4, 13:9, 46:10, 46:15, 46:16, 47:9, 48:2, 48:8, 48:14, 48:17, 49:3, 54:23, 57:21, 106:20
**mails** [21] - 25:18, 25:20, 25:22, 27:2, 27:4, 27:14, 46:8, 46:10, 46:13, 46:14, 46:21, 46:24, 47:6, 47:7, 47:18, 47:24, 48:19, 48:21, 54:14, 54:17, 56:5
**main** [1] - 12:8
**Majerus** [1] - 65:23
**majority** [1] - 91:14
**maker** [2] - 12:22, 89:1
**makers** [2] - 83:20, 83:24
**male** [1] - 53:3
**man** [1] - 12:19
**manage** [3] - 13:8, 43:4, 94:18
**managed** [4] - 70:23, 92:21, 94:21, 95:5
**management** [1] - 28:12
**manager** [34] - 12:17, 19:7, 44:20, 62:21, 70:21, 71:2, 71:5, 71:15, 72:22, 73:4, 74:3, 74:4, 78:13, 78:18, 80:6, 84:8, 84:10, 84:14, 84:22, 86:22, 87:25, 88:3, 88:10, 88:24, 91:5, 91:8, 93:1, 93:20, 94:3, 94:13, 94:14, 95:25, 97:6, 97:7
**manager's** [1] - 84:20
**managers** [61] - 8:1,

8:9, 15:5, 15:9, 44:2, 44:4, 44:23, 45:2, 45:5, 45:9, 45:24, 47:4, 47:19, 47:23, 48:23, 48:25, 51:16, 61:25, 62:13, 63:4, 64:7, 72:22, 73:2, 73:18, 73:19, 73:25, 77:25, 78:4, 78:11, 78:24, 79:1, 79:8, 79:19, 79:24, 80:3, 80:6, 80:8, 80:10, 80:13, 80:18, 81:3, 81:8, 81:19, 82:3, 82:8, 82:12, 82:20, 82:25, 83:19, 83:24, 84:2, 88:24, 89:20, 89:25, 90:8, 96:8, 96:21, 102:17, 102:20
**managers'** [1] - 49:17
**manages** [1] - 12:17
**managing** [8] - 91:15, 91:20, 91:21, 91:24, 91:25, 92:5, 93:8, 93:13
**Manard** [1] - 50:18
**MARIA** [1] - 2:8
**mark** [3] - 17:16, 19:10, 112:7
**MARK** [1] - 2:4
**Mark** [8] - 2:4, 9:23, 10:4, 10:7, 10:9, 10:11, 10:17, 11:2
**Mark's** [1] - 10:10
**marked** [4] - 19:12, 10:23, 56:22, 74:24
**market** [9] - 25:16, 33:10, 33:11, 33:13, 33:17, 33:19, 99:23, 101:23, 108:6
**marketing** [3] - 78:12, 79:7, 84:11
**Maryland** [2] - 28:9, 28:11
**materially** [1] - 39:2
**Matt** [2] - 104:8, 104:17
**matter** [1] - 10:25
**matters** [1] - 72:2
**Mayle** [5] - 50:20, 50:21, 50:24, 75:12, 98:19
**MBA** [2] - 109:1, 109:5
**mean** [39] - 7:18, 7:24, 9:22, 10:8, 10:11, 15:14, 16:23, 22:21, 22:25, 24:23, 25:13, 26:8, 26:18, 40:21, 41:12, 41:13, 41:15,

53:7, 59:8, 62:17, 70:24, 72:22, 73:17, 77:12, 84:5, 87:13, 89:23, 92:25, 96:13, 98:3, 98:24, 99:8, 101:21, 105:20, 107:9, 107:15, 108:12, 109:2, 109:12
**meaning** [2] - 21:15, 52:18
**meet** [5] - 20:4, 20:16, 20:23, 62:6, 87:21
**meeting** [2] - 26:1, 26:6
**meetings** [2] - 9:18, 9:21
**Melanie** [5] - 1:19, 111:22, 113:5, 113:12, 113:21
**member** [1] - 31:20
**memory** [1] - 30:1
**mentioned** [9] - 11:25, 12:9, 23:6, 24:9, 39:11, 55:2, 91:10, 105:22, 108:21
**mentor** [2] - 42:18, 44:10
**merger** [1] - 66:1
**messages** [2] - 107:10, 107:14
**messy** [1] - 5:25
**met** [7] - 20:6, 20:21, 22:17, 62:7, 62:10, 62:12
**metrics** [2] - 108:16, 108:17
**Miami** [2] - 23:20, 62:10
**Michael** [2] - 94:2, 94:11
**Michigan** [1] - 2:9
**mid** [1] - 72:5
**mid-June** [1] - 72:5
**MIDDLE** [1] - 1:1
**middle** [1] - 32:19
**might** [2] - 27:18, 69:18
**might've** [7] - 12:9, 22:4, 24:24, 52:12, 62:7, 92:15, 97:3
**million** [14] - 32:24, 33:2, 33:23, 33:24, 34:7, 34:13, 34:25, 35:7, 35:18, 36:3, 36:11, 36:14, 36:15, 37:25
**Milwaukee** [2] - 2:10, 108:10
**mind** [1] - 16:20

**minus** [1] - 36:3
**minute** [3] - 34:18, 57:11, 108:1
**misappropriated** [1] - 76:12
**misappropriation** [1] - 75:19
**misrepresenting** [1] - 57:22
**missed** [3] - 86:20, 87:1, 87:5
**missing** [1] - 19:18
**misuse** [1] - 88:6
**Mitchell** [2] - 2:1, 111:6
**MOM-0003484** [1] - 75:1
**monetary** [2] - 37:7, 38:16
**money** [6] - 6:18, 6:21, 26:18, 26:23, 79:1, 79:13
**month** [1] - 71:23
**monthly** [12] - 9:23, 10:22, 10:23, 25:18, 25:20, 27:2, 27:4, 51:7, 90:7, 90:10, 90:12, 90:24
**months** [5] - 11:13, 25:6, 25:8, 25:10, 26:23
**MORTGAGE** [6] - 1:4, 1:7, 111:9, 111:9, 112:3, 112:3
**Mortgage** [9] - 9:2, 19:24, 57:20, 57:22, 63:17, 64:25, 65:16, 108:13, 108:21
**mortgage** [16] - 6:12, 6:15, 6:16, 6:17, 6:18, 16:3, 16:5, 18:12, 27:7, 30:5, 54:1, 54:4, 54:5, 65:14, 102:25
**most** [9] - 10:18, 23:25, 24:4, 49:22, 61:12, 92:25, 93:2, 95:15, 99:15
**mostly** [1] - 28:20
**move** [2] - 55:18, 96:14
**moved** [2] - 30:12, 97:17
**moving** [2] - 70:3, 97:19
**MS** [79] - 5:7, 9:24, 10:3, 10:7, 19:10, 19:11, 22:3, 25:11, 26:2, 29:17, 29:22, 30:2, 30:8, 33:8,

33:15, 33:20, 34:16, 35:5, 35:8, 36:8, 40:6, 42:6, 42:12, 43:19, 44:17, 45:10, 49:8, 50:3, 50:16, 51:18, 53:12, 56:17, 58:24, 59:7, 59:15, 59:25, 63:1, 63:9, 67:1, 67:16, 67:20, 68:21, 70:9, 73:3, 73:15, 73:20, 74:1, 74:12, 77:16, 82:1, 82:4, 83:21, 85:15, 85:17, 86:6, 86:14, 89:12, 90:15, 91:16, 96:10, 96:16, 96:23, 97:9, 97:12, 101:18, 102:2, 103:14, 103:18, 104:1, 104:7, 104:23, 106:1, 106:6, 106:10, 107:25, 108:2, 109:7, 110:3, 110:5
**multiple** [1] - 24:19
**MUTUAL** [3] - 1:3, 111:9, 112:3
**Mutual** [177] - 6:14, 8:13, 9:1, 9:6, 12:10, 14:13, 14:23, 14:25, 16:4, 16:22, 19:3, 23:10, 23:14, 23:19, 26:20, 26:25, 27:8, 27:19, 28:23, 29:6, 29:7, 29:10, 29:14, 29:20, 29:25, 30:12, 30:18, 31:7, 31:20, 32:2, 38:11, 39:10, 39:25, 40:1, 40:25, 42:10, 43:23, 45:14, 45:16, 45:17, 45:21, 49:22, 50:10, 50:13, 51:17, 51:24, 52:4, 52:13, 54:12, 54:21, 55:22, 56:5, 56:9, 56:13, 56:24, 57:20, 57:22, 58:17, 59:2, 59:12, 59:21, 63:17, 64:4, 64:5, 64:12, 64:16, 64:23, 64:24, 65:7, 65:12, 65:13, 65:16, 65:25, 66:14, 66:16, 66:18, 66:22, 66:25, 67:6, 67:8, 67:14, 67:19, 67:24, 68:3, 68:9, 68:11, 68:12, 68:25, 69:9, 69:16, 69:22, 70:2, 70:7, 70:12, 70:17, 74:14, 74:20, 75:10, 75:14, 75:18, 76:2,

76:9, 76:13, 76:21, 77:1, 77:8, 77:20, 77:22, 77:25, 78:5, 78:10, 78:13, 78:17, 79:8, 79:25, 80:3, 80:9, 80:18, 80:24, 81:2, 81:11, 81:14, 81:16, 81:20, 82:2, 82:9, 82:21, 83:1, 83:7, 84:21, 86:13, 86:16, 87:12, 87:17, 87:20, 91:3, 94:4, 94:7, 94:14, 94:24, 95:3, 95:4, 95:6, 95:16, 95:17, 95:23, 95:24, 96:6, 96:21, 97:15, 98:24, 99:6, 99:12, 99:13, 100:24, 101:25, 102:16, 102:19, 103:17, 104:3, 104:22, 104:25, 107:2, 108:4, 108:11, 109:1, 109:4, 109:12, 109:19, 109:23, 109:24, 109:25

### N

**name** [12] - 5:8, 39:23, 48:11, 52:16, 54:5, 55:15, 55:20, 58:3, 68:14, 94:12, 95:1, 105:13
**named** [1] - 77:25
**names** [2] - 51:15, 62:2
**Naples** [1] - 61:12
**natural** [1] - 5:23
**nature** [6] - 47:15, 69:23, 86:4, 102:23, 104:18, 108:15
**nearing** [1] - 17:16
**necessarily** [1] - 85:14
**necessary** [2] - 73:7, 111:16
**need** [2] - 5:17, 18:24
**needed** [1] - 80:7
**negative** [3] - 35:17, 36:11, 36:14
**negotiations** [1] - 89:17
**Nemec** [1] - 65:23
**Net** [4] - 32:22, 33:1, 36:22, 37:21
**net** [4] - 33:4, 34:24, 37:25, 38:4
**networking** [1] - 78:6,

78:12
**never** [5] - 33:10, 60:8, 60:9, 61:19, 87:22
**nevertheless** [1] - 65:2
**new** [4] - 14:5, 14:11, 68:25
**New** [11] - 32:11, 49:23, 61:22, 62:1, 62:14, 62:18, 62:24, 63:4, 63:7, 63:12, 74:11
**next** [1] - 25:8
**NO** [1] - 1:2
**None** [1] - 112:9
**normalized** [1] - 101:22
**Northwest** [2] - 2:2, 111:6
**Notary** [2] - 1:20, 113:22
**note** [1] - 112:6
**noted** [1] - 112:21
**notes** [9] - 11:15, 11:19, 11:20, 17:9, 46:17, 54:25, 55:5, 55:11, 113:7
**nothing** [8] - 18:23, 24:23, 58:12, 93:25, 97:4, 108:7, 108:12, 108:18, 110:5
**Notice** [1] - 1:13
**number** [4] - 8:3, 15:4, 16:7, 27:22
**NUMBER** [2] - 3:1, 112:4
**numbered** [1] - 57:14
**numbers** [6] - 4:1, 18:3, 18:6, 26:9, 37:6, 111:16
**numerous** [1] - 86:16
**Nyman** [2] - 104:9, 104:17

### O

**OATH** [1] - 113:14
**oath** [1] - 5:4
**object** [64] - 9:24, 25:11, 26:2, 29:17, 29:22, 30:2, 30:8, 33:8, 33:15, 33:20, 34:16, 35:5, 35:8, 36:8, 40:6, 42:6, 42:12, 43:19, 44:17, 45:10, 49:8, 50:3, 50:16, 51:18, 56:17, 58:24, 59:7, 59:15, 59:25, 63:1, 63:9,

78:12
**OF** [11] - 1:1, 1:3, 1:12, 111:9, 112:3, 113:1, 113:2, 113:3, 113:14, 113:15, 113:16
**offer** [2] - 68:25, 82:16
**office** [18] - 20:6, 20:8, 20:10, 20:15, 22:22, 43:13, 70:19, 79:22, 79:23, 80:18, 82:15, 97:3, 103:3, 103:6, 103:7, 103:9, 103:10
**officer** [8] - 12:22, 19:2, 19:23, 39:24, 53:25, 54:24, 77:13, 95:25
**officers** [4] - 12:21, 23:25, 81:9, 108:18
**offices** [7] - 8:21, 8:24, 9:5, 70:11, 70:12, 82:24, 103:10
**Offices** [1] - 2:4
**official** [1] - 113:19
**often** [9] - 12:23, 12:24, 23:5, 61:17, 72:3, 72:6, 72:9, 87:18, 107:8
**OMAHA** [3] - 1:3, 111:9, 112:3
**Omaha** [25] - 9:1, 9:6, 23:10, 27:8, 28:23, 30:12, 63:17, 64:5, 64:16, 64:24, 65:13, 65:14, 65:16, 66:1, 66:14, 67:25, 68:9,

67:1, 67:16, 67:20, 68:21, 70:9, 73:3, 73:15, 73:20, 74:1, 77:16, 82:1, 82:4, 83:21, 85:15, 85:17, 86:6, 86:14, 89:12, 91:16, 96:10, 96:16, 96:23, 97:9, 97:12, 101:18, 102:2, 103:14, 104:1, 104:23, 106:1, 106:6, 106:10, 109:7
**objection** [2] - 103:18, 104:7
**obligor** [1] - 54:6
**obtained** [1] - 82:11
**obviously** [4] - 24:12, 67:23, 68:4, 79:10
**occasionally** [2] - 87:6, 103:15
**occasions** [2] - 86:16, 95:13
**occur** [1] - 87:6
**occurred** [4] - 39:16, 64:11, 66:18, 67:4

68:10, 68:11, 68:12, 68:25, 69:9, 70:2, 77:20, 94:14
**onboarded** [3] - 20:21, 22:18, 62:11
**onboarding** [4] - 9:3, 62:8, 89:3, 93:16
**once** [3] - 14:23, 70:11, 98:4
**one** [39] - 6:7, 14:2, 14:7, 14:22, 24:25, 25:20, 27:23, 28:5, 28:24, 28:25, 39:8, 47:19, 47:25, 48:2, 48:5, 52:7, 52:10, 52:12, 52:16, 53:3, 58:2, 59:4, 61:10, 65:17, 71:24, 78:10, 80:20, 82:16, 92:19, 92:20, 92:22, 93:1, 95:25, 102:11, 104:8, 104:9, 104:14, 105:9
**One** [55] - 8:25, 23:12, 23:14, 23:19, 63:16, 63:20, 63:24, 64:3, 64:6, 64:8, 64:11, 64:16, 64:20, 64:23, 65:1, 65:3, 65:7, 65:11, 65:15, 65:19, 65:25, 66:3, 66:5, 66:8, 66:9, 66:11, 66:14, 66:15, 66:18, 66:21, 66:25, 67:3, 67:5, 67:7, 67:8, 67:10, 67:12, 67:14, 67:19, 67:22, 68:3, 68:4, 68:5, 68:11, 68:16, 68:20, 68:24, 69:8, 69:15, 69:21, 69:22, 70:1, 70:8
**one-off** [1] - 95:25
**one-year** [1] - 71:24
**ones** [3] - 24:24, 95:18, 106:8
**operate** [1] - 68:9
**operating** [9] - 19:23, 27:1, 27:5, 70:1, 77:1, 77:5, 77:19, 79:23, 85:1
**operations** [4] - 7:20, 12:15, 19:23, 20:16
**opinion** [4] - 45:12, 52:7, 55:19, 86:4
**opportunity** [2] - 46:4, 97:13
**opposed** [2] - 5:17, 6:19
**OR** [1] - 112:11
**oral** [1] - 5:17

**orchestrating** [1] - 48:1
**org** [1] - 7:25
**originated** [2] - 77:14, 86:17
**originating** [1] - 81:1
**origination** [2] - 55:7, 108:14
**originator** [1] - 57:20
**originators** [2] - 14:4, 88:10
**outings** [1] - 78:1
**outlines** [1] - 108:19
**outperform** [1] - 109:8
**outset** [1] - 53:7
**outside** [6] - 42:20, 44:13, 88:12, 103:17, 104:3, 104:22
**overall** [8] - 7:4, 16:1, 16:3, 26:23, 27:21, 29:2, 29:5, 31:7
**override** [6] - 87:23, 88:1, 88:6, 88:8, 88:9, 88:11
**own** [2] - 31:3, 81:9
**owned** [2] - 65:16, 105:10

## P

**P&L** [6] - 49:4, 78:8, 78:21, 81:15, 91:3, 98:21, 98:25, 99:3
**P&Ls** [7] - 47:15, 48:15, 48:18, 48:22, 50:22, 81:13, 84:5
**pace** [1] - 90:25
**PAGE** [2] - 3:1, 112:11
**page** [8] - 57:11, 74:25, 75:1, 75:2, 111:16, 111:17, 111:17, 112:7
**Page** [1] - 4:3
**PAGE/ERRATA** [1] - 112:1
**pages** [1] - 113:6
**paid** [7] - 15:18, 16:9, 57:16, 69:13, 87:25, 102:12, 102:16
**Palmer** [4] - 52:12, 55:19, 55:21, 56:9
**paragraph** [11] - 57:16, 57:18, 58:1, 58:9, 58:10, 59:14, 60:12, 60:19, 60:20, 60:24, 61:1
**paragraphs** [4] - 57:14, 60:18, 61:6,

61:7
**Paramus** [6] - 32:11, 61:22, 61:25, 62:18, 101:12, 102:9
**paraphrasing** [2] - 46:12, 48:4
**part** [10] - 8:25, 32:12, 54:9, 57:7, 67:9, 69:4, 69:5, 84:20, 99:15, 108:24
**participant** [2] - 9:19, 90:10
**participants** [1] - 10:15
**participate** [2] - 90:17, 90:20
**participated** [1] - 78:1
**particular** [11] - 15:19, 15:25, 47:11, 47:14, 48:12, 48:14, 55:5, 55:10, 55:17, 57:7, 99:8
**parties** [1] - 113:9
**parties'** [1] - 113:9
**partner** [1] - 108:9
**partners** [7] - 77:21, 77:22, 78:7, 80:23, 81:2, 81:10, 102:25
**parts** [1] - 70:4
**party** [5] - 47:7, 47:21, 90:6, 98:2, 103:24
**past** [2] - 28:6, 43:21
**path** [1] - 19:18
**pay** [2] - 27:13, 102:6
**paychecks** [1] - 18:9
**payments** [2] - 6:21, 6:22
**peers** [1] - 109:8
**penalties** [2] - 112:20
**pending** [1] - 56:25
**people** [13] - 6:20, 10:18, 15:4, 15:8, 23:22, 24:7, 24:17, 49:11, 70:23, 74:2, 93:3, 100:3
**per** [4] - 108:9, 108:14, 108:25
**Per** [3] - 38:18, 38:23, 39:1
**percent** [5] - 18:1, 20:20, 26:13, 28:21, 105:4
**percentage** [5] - 17:25, 26:7, 26:10, 88:3, 89:19
**percentage-wise** [1] - 17:25
**performance** [14] - 7:8, 7:10, 17:2, 18:11, 25:18, 25:23,

25:24, 25:25, 27:21, 29:4, 32:2, 35:14, 97:4, 108:5
**performing** [4] - 27:18, 27:24, 28:3, 28:6
**performs** [2] - 27:23, 28:24
**perhaps** [1] - 86:10
**period** [4] - 35:23, 77:19, 97:15, 100:17
**perjury** [1] - 112:20
**perk** [1] - 81:13
**person** [5] - 15:2, 92:22, 104:11, 104:16, 105:12
**personally** [5] - 9:11, 54:16, 61:17, 108:25, 113:17
**personnel** [1] - 83:20
**persons** [2] - 52:17
**perspective** [5] - 6:24, 29:25, 38:11, 38:17, 95:22
**pertained** [1] - 53:16
**philosophy** [1] - 14:19
**phone** [6] - 54:23, 82:24, 107:5, 107:11, 107:12, 107:23
**physical** [2] - 22:21, 103:2
**pick** [1] - 25:9
**picking** [2] - 80:16
**piece** [2] - 14:8, 79:5
**Pine** [1] - 2:5
**pipeline** [3] - 18:24, 39:13, 39:14, 40:4
**Plaintiff** [2] - 1:5, 2:7
**Plan** [7] - 30:25, 32:19, 32:20, 36:3, 36:10, 38:8
**Plantation** [1] - 2:6
**play** [1] - 92:12
**played** [6] - 47:3, 49:6, 49:16, 75:5, 78:2, 92:14
**players** [1] - 50:8
**plays** [1] - 92:3
**plenty** [1] - 70:23
**point** [14] - 5:21, 6:1, 23:9, 38:5, 38:11, 52:6, 53:19, 65:6, 67:22, 68:8, 69:1, 77:20, 99:20, 101:21
**points** [8] - 37:3, 37:8, 37:15, 37:22, 37:25, 38:10, 38:12, 38:17
**police** [1] - 5:20
**poorly** [2] - 27:18,

27:23
**positive** [7] - 38:5, 38:12, 39:24, 55:20, 63:2, 69:23, 76:24
**possibly** [4] - 27:1, 47:1, 71:3, 97:13
**post** [3] - 14:5, 14:6, 14:12
**post-closing** [3] - 14:5, 14:6, 14:12
**potential** [2] - 15:12, 25:14
**potentially** [1] - 50:9
**preapproval** [4] - 52:13, 55:22, 56:1, 56:6
**preceded** [1] - 81:23
**premium** [1] - 37:16
**preparation** [6] - 46:6, 46:8, 46:24, 47:6, 57:4, 57:8
**prepares** [1] - 31:12, 50:22
**preparing** [1] - 31:10
**presence** [1] - 10:10
**present** [1] - 31:18
**presented** [1] - 12:24
**president** [1] - 8:16
**presuit** [1] - 53:18
**presumably** [2] - 37:7, 55:9
**pretty** [4] - 21:8, 28:7, 40:21, 93:17
**previous** [1] - 22:5
**previously** [4] - 19:24, 30:23, 56:22, 74:24
**primarily** [7] - 13:22, 15:9, 27:15, 77:24, 78:4, 96:20, 103:4
**primary** [3] - 13:25, 14:2, 14:3
**print** [1] - 46:19
**privileged** [2] - 9:25, 10:11
**privy** [2] - 27:11, 84:2
**pro** [4] - 31:4, 31:5, 98:17, 99:2
**problem** [2] - 87:9, 108:2
**proceed** [3] - 54:2, 54:10, 54:12
**process** [9] - 12:11, 14:7, 14:12, 14:17, 14:20, 18:22, 19:8, 64:5, 64:15
**processor** [1] - 77:13
**producers** [4] - 21:4, 21:11, 24:1, 24:6
**producing** [1] - 108:18

**product** [1] - 6:20
**production** [7] - 24:3, 24:21, 25:2, 28:6, 48:15, 87:25, 88:11
**products** [3] - 14:5, 14:12, 87:21
**profile** [2] - 19:14, 19:17
**profit** [18] - 27:19, 33:4, 33:24, 34:25, 37:25, 38:4, 78:25, 79:2, 81:21, 88:9, 88:15, 88:18, 88:23, 89:7, 89:18, 89:24, 108:13, 108:25
**Profit** [4] - 32:22, 33:2, 36:22, 37:21
**profitability** [23] - 16:2, 16:3, 21:16, 27:7, 27:11, 28:7, 28:22, 29:3, 29:11, 29:14, 29:25, 30:7, 37:12, 37:14, 38:25, 48:15, 81:17, 84:19, 88:3, 88:12, 98:18, 108:9, 108:19
**profitable** [10] - 29:7, 79:10, 79:18, 88:2, 98:9, 98:10, 98:12, 100:24, 101:1, 101:4
**profits** [3] - 78:24, 88:6, 89:19
**projected** [1] - 37:25
**projection** [3] - 36:6, 36:10, 36:13
**property** [3] - 54:6, 104:9, 104:19
**proportional** [1] - 38:24
**proportionately** [1] - 29:4
**prospective** [1] - 57:21
**protections** [1] - 38:5
**provided** [2] - 46:24, 81:13
**providers** [1] - 82:23
**Public** [2] - 1:20, 113:22
**pulse** [1] - 90:20
**pumping** [1] - 79:13
**purchase** [21] - 6:19, 6:25, 28:15, 28:19, 33:12, 63:22, 81:7, 82:14, 99:19, 99:22, 100:9, 100:12, 100:16, 100:20, 101:6, 101:8, 101:10, 101:11, 101:17, 101:20,

101:22
**purchased** [4] - 65:1, 103:22, 104:10, 104:19
**purchasing** [2] - 81:11, 81:16
**purposes** [2] - 57:18, 107:6
**Pursuant** [1] - 1:13
**pursue** [1] - 84:11
**pursued** [2] - 80:21, 105:2
**pursuing** [1] - 75:18
**put** [9] - 21:4, 27:10, 39:8, 55:11, 61:10, 75:17, 78:7, 98:17, 108:13
**putting** [1] - 75:5

## Q

**qualified** [1] - 24:17
**quantify** [1] - 18:1
**questions** [6] - 6:8, 12:20, 53:8, 75:25, 89:22, 111:18
**quickly** [2] - 33:11, 33:12
**quite** [1] - 14:1
**quote** [1] - 57:25

## R

**raise** [1] - 40:9
**rate** [1] - 24:11
**rates** [8] - 33:11, 99:24, 100:2, 100:4, 101:14, 101:20, 101:21, 101:24
**rather** [6] - 38:4, 48:22, 52:4, 68:7, 76:12, 92:22
**reached** [2] - 53:24, 54:3
**reaches** [2] - 53:6, 53:9
**reaching** [1] - 51:25
**read** [5] - 22:3, 22:5, 111:15, 112:6, 112:20
**Read** [1] - 3:3
**real** [1] - 24:15
**reality** [1] - 34:25
**reallocating** [1] - 19:2
**really** [22] - 8:23, 12:16, 15:7, 18:23, 18:25, 19:20, 22:18, 23:7, 27:13, 40:23, 43:9, 46:12, 48:7,

57:9, 63:22, 79:9, 83:8, 99:23, 100:10, 100:22, 108:12, 108:19
**Realtor** [6] - 77:21, 77:22, 78:7, 80:22, 81:22, 82:7
**Realtors** [3] - 81:2, 82:3, 82:14
**REASON** [1] - 112:11
**reason** [1] - 73:12
**reasons** [1] - 87:7
**received** [5] - 17:3, 17:5, 88:15, 91:4, 100:16
**receives** [1] - 25:17
**receiving** [1] - 45:20
**recent** [1] - 29:25
**recently** [1] - 94:3
**recess** [1] - 108:3
**recipients** [1] - 25:20
**recognize** [2] - 19:14, 30:24
**record** [10] - 5:9, 5:25, 17:23, 34:4, 42:16, 53:12, 57:19, 59:18, 91:3, 113:7
**recruit** [4] - 15:3, 48:25, 99:7, 99:9
**recruited** [1] - 99:9
**recruiter** [3] - 15:6, 15:10, 98:2
**recruiting** [17] - 14:4, 14:11, 14:16, 14:17, 18:18, 20:18, 62:22, 80:3, 89:4, 93:16, 95:22, 97:23, 97:25, 98:6, 98:7, 98:22, 98:25
**red** [12] - 34:3, 34:5, 34:19, 35:3, 35:10, 35:24, 38:4, 38:6, 38:7, 38:12, 39:1, 79:15
**REFERENCE** [2] - 111:9, 112:3
**referenced** [2] - 58:1, 58:10
**references** [1] - 60:19
**referral** [2] - 81:2, 81:9
**referrals** [1] - 77:23
**referred** [1] - 82:20
**referring** [6] - 11:7, 48:9, 48:19, 49:3, 57:23, 82:3
**refinance** [11] - 6:19, 28:17, 28:19, 28:20, 28:21, 100:3, 100:5, 100:8, 100:17, 101:7, 101:10

**refinanced** [6] - 28:16, 99:16, 99:19, 99:21, 99:25, 100:20
**reflect** [1] - 65:3
**reflected** [2] - 65:11, 75:6
**reflective** [1] - 34:25
**regardless** [1] - 27:20
**REGENCY** [1] - 111:1
**regional** [19] - 8:1, 8:9, 15:4, 15:9, 19:7, 24:23, 25:1, 62:21, 71:12, 73:19, 73:25, 74:4, 78:18, 80:6, 88:23, 91:5, 91:8, 93:1, 93:19
**regionals** [2] - 24:5, 24:16
**regularly** [3] - 10:20, 90:3, 90:18
**Regus** [1] - 70:18
**rehabbed** [1] - 103:22
**rehabbing** [2] - 104:10, 104:19
**rejecting** [1] - 87:18
**rejects** [1] - 60:6
**relate** [1] - 7:1
**related** [10] - 37:17, 47:11, 47:13, 48:12, 48:14, 53:21, 56:15, 57:10, 57:12, 61:7
**relates** [2] - 60:25, 61:1
**relationship** [19] - 42:4, 42:25, 43:10, 43:15, 44:15, 44:23, 45:1, 45:4, 62:14, 63:4, 63:12, 64:3, 67:23, 74:3, 74:4, 78:6, 102:23, 105:15, 105:24
**relationships** [8] - 62:22, 74:6, 78:3, 81:22, 82:7, 82:20, 93:15, 97:11
**relative** [3] - 16:7, 113:8, 113:9
**relatively** [1] - 17:13
**relevant** [6] - 9:19, 10:25, 11:7, 12:6, 50:9, 50:14
**Reliant** [1] - 85:2
**relying** [2] - 76:2, 109:9
**remained** [2] - 28:7, 40:21
**remaining** [1] - 91:18
**remember** [23] - 21:2, 23:7, 23:21, 23:22, 34:12, 34:17, 40:10,

40:12, 41:5, 41:20, 48:11, 52:16, 52:17, 54:7, 55:14, 57:6, 58:3, 62:2, 62:11, 69:25, 90:16, 97:19, 105:13
**remotely** [1] - 71:17
**rephrase** [1] - 6:9
**report** [8] - 7:11, 7:16, 7:20, 8:10, 8:13, 12:19, 27:3, 113:5
**REPORTED** [1] - 1:19
**reported** [5] - 72:20, 72:21, 72:23, 86:21, 109:5
**REPORTER** [1] - 113:1
**reporter** [3] - 5:14, 19:10, 22:5
**Reporter** [3] - 111:23, 113:1
**Reporter's** [1] - 3:5
**reporting** [1] - 54:1
**REPORTING** [1] - 111:1
**reports** [5] - 7:22, 13:11, 14:6, 14:7, 108:5
**request** [1] - 98:25
**requested** [3] - 55:24, 98:14, 113:6
**requests** [1] - 12:17
**required** [2] - 87:9, 112:8
**research** [1] - 11:10
**resign** [1] - 43:7
**resignation** [1] - 86:13
**resignations** [1] - 49:20
**resigned** [3] - 43:7, 50:2, 94:22
**resources** [2] - 69:6, 69:12
**respect** [31] - 11:17, 12:10, 14:13, 14:16, 22:6, 29:20, 39:4, 43:24, 51:3, 53:2, 55:19, 56:19, 61:5, 67:12, 72:4, 74:7, 77:4, 82:18, 83:20, 83:24, 88:16, 89:2, 89:22, 91:2, 93:18, 98:8, 100:19, 102:5, 102:12, 102:20, 107:17
**responses** [1] - 5:17
**responsibilities** [1] - 90:22
**responsibility** [2] - 77:24, 78:4

11

**responsible** [5] -
27:15, 77:18, 77:20,
78:24, 92:16
**retain** [1] - 51:25
**retrieve** [1] - 55:11
**Return** [1] - 111:17
**revenue** [2] - 15:24,
37:16
**Reverse** [2] - 32:7,
35:13
**reverse** [7] - 6:17,
6:20, 7:1, 7:6, 8:17,
10:18, 16:4
**reversed** [1] - 22:4
**reverses** [1] - 27:14
**review** [3] - 46:8,
58:20, 113:6
**reviewing** [1] - 46:2
**rewards** [1] - 21:2
**Rhino** [4] - 103:21,
103:25, 105:3, 105:6
**Rhode** [4] - 94:3, 94:7,
94:19
**Rica** [1] - 49:12
**risk** [1] - 96:22
**Road** [1] - 2:5
**road** [1] - 5:13
**role** [30] - 8:15, 8:20,
9:8, 12:10, 12:14,
14:16, 18:19, 18:22,
20:11, 31:9, 44:20,
47:4, 49:6, 49:16,
51:9, 52:3, 56:19,
73:22, 75:5, 76:1,
76:5, 78:2, 87:4,
92:3, 92:12, 92:14,
94:16, 96:7, 97:20,
108:24
**roles** [1] - 92:13
**rolled** [2] - 62:18, 63:7
**row** [2] - 33:1, 36:22
**rows** [1] - 36:21
**rules** [1] - 5:13
**run** [3] - 7:14, 7:18,
12:15
**running** [2] - 22:12,
65:25

**S**

**S.C** [1] - 2:8
**sale** [4] - 66:18, 67:12,
67:13, 69:24
**sales** [1] - 7:19
**Sandler** [2] - 2:1,
111:6
**save** [1] - 13:21
**saw** [5] - 25:17, 47:6,
47:8, 57:4, 75:20

**schedule** [1] - 90:19
**scheduled** [3] - 10:20,
90:3, 90:18
**script** [1] - 48:23
**seal** [1] - 113:19
**second** [6] - 52:18,
53:3, 54:1, 54:4,
54:5, 75:2
**secret** [3] - 75:19,
76:6, 76:16
**secrets** [3] - 76:2,
76:8, 76:13
**section** [7] - 37:8,
37:12, 38:17, 38:20,
38:24, 39:2, 57:13
**sections** [3] - 38:16,
38:25, 57:12
**secured** [1] - 79:24
**see** [21] - 20:17, 27:13,
30:25, 32:6, 32:7,
32:17, 32:20, 32:24,
35:14, 35:18, 36:4,
36:10, 36:23, 38:18,
47:17, 47:24, 49:2,
57:3, 84:5, 98:25,
109:3
**seeing** [2] - 37:3, 57:6
**seeking** [2] - 75:10,
75:15
**selected** [1] - 79:25
**self** [2] - 82:7, 82:20
**self-sourced** [2] -
82:7, 82:20
**sell** [2] - 67:19, 104:20
**selling** [1] - 68:3
**sending** [1] - 49:4
**sends** [1] - 48:18
**sense** [2] - 25:8, 84:18
**sent** [12] - 46:14,
47:10, 47:15, 48:3,
48:8, 48:9, 52:13,
55:23, 56:4, 56:15,
57:20, 69:1
**separate** [9] - 7:2, 7:9,
7:10, 11:25, 35:14,
46:23, 48:22, 95:13,
103:10
**separated** [2] - 66:14,
68:11
**SERVICE** [1] - 111:1
**service** [3] - 37:16,
82:23, 100:14
**serving** [2] - 91:5,
91:7
**set** [2] - 80:13, 92:7
**setting** [1] - 80:12
**several** [1] - 111:14
**several-lined** [1] -
111:14
**shake** [1] - 92:25

**share** [1] - 103:10
**shared** [1] - 107:14
**Sheet** [1] - 3:4
**sheet** [2] - 111:14,
112:7
**SHEET** [1] - 112:1
**sheets** [2] - 111:16,
112:8
**shortly** [1] - 11:12
**show** [5] - 26:25, 27:2,
32:1, 91:4, 108:17
**shows** [2] - 37:14
**sick** [1] - 72:2
**side** [3] - 7:19, 7:20,
105:22
**sign** [2] - 111:16,
112:7
**signature** [2] - 111:17
**SIGNATURE** [1] -
112:1
**significantly** [8] -
17:20, 18:4, 18:10,
18:14, 25:14, 26:8,
26:12, 34:2
**similar** [2] - 43:15,
98:4
**similarly** [2] - 21:10,
102:15
**sink** [1] - 79:15
**situation** [4] - 7:6,
54:4, 56:5, 82:2
**six** [4] - 11:13, 25:6,
25:8, 25:10
**skip** [1] - 35:13
**slide** [2] - 35:12, 36:1
**small** [2] - 24:23,
24:25
**smaller** [1] - 24:16
**Smith** [49] - 20:4, 20:7,
20:15, 20:18, 21:10,
21:24, 22:11, 22:24,
23:5, 23:17, 23:21,
41:16, 41:17, 41:22,
42:5, 42:11, 42:17,
42:18, 43:11, 43:16,
43:17, 49:20, 52:21,
54:3, 54:17, 62:15,
62:24, 63:3, 63:8,
63:13, 64:8, 64:20,
70:16, 73:14, 77:4,
77:9, 77:14, 77:21,
81:23, 85:1, 86:3,
86:12, 86:23, 88:14,
88:19, 89:10, 89:18,
89:20, 93:22
**Smith's** [4] - 21:21,
41:7, 62:19, 85:4
**SO** [1] - 52:25
**so..** [4] - 26:14, 26:24,
62:23, 91:18

**social** [1] - 23:4
**socially** [2] - 23:2,
44:13
**software** [1] - 55:7
**sold** [10] - 65:13,
65:20, 66:5, 66:12,
67:14, 67:23, 68:20,
69:22, 105:10,
105:13
**solicit** [1] - 48:24
**solicitation** [6] - 47:1,
47:19, 48:1, 49:6,
49:17, 51:5
**solicited** [2] - 46:1,
47:17
**soliciting** [1] - 48:6
**someone** [12] - 7:13,
9:9, 11:24, 13:4,
15:7, 47:10, 48:10,
80:9, 80:18, 82:25,
94:15
**sometimes** [3] - 5:22,
13:11, 103:8
**somewhere** [2] -
94:23, 105:5
**Sommese** [1] - 105:12
**sorry** [7] - 13:9, 20:8,
22:2, 34:4, 42:17,
71:21, 104:11
**sort** [5] - 7:14, 9:25,
68:10, 68:13, 69:20
**sought** [2] - 55:19,
74:20
**sounds** [5] - 14:1,
35:13, 46:23, 55:14,
104:25
**sourced** [2] - 82:7,
82:20
**sourcing** [1] - 15:3
**South** [1] - 2:5
**space** [4] - 22:22,
70:18, 70:19, 79:25
**specific** [5] - 58:12,
87:15, 92:13, 99:20,
108:7
**specifically** [2] - 81:6,
88:17
**specifics** [1] - 101:3
**speed** [1] - 101:23
**spell** [1] - 5:9
**spend** [1] - 79:19
**spending** [2] - 14:1,
84:9
**split** [13] - 13:7, 28:18,
79:2, 81:21, 88:9,
88:15, 88:18, 88:21,
88:23, 89:7, 89:19,
89:24, 93:6
**sponsor** [1] - 78:16
**sponsoring** [1] -

79:11
**sponsorships** [1] -
78:2
**spread** [1] - 37:16
**stable** [1] - 28:7
**staff** [1] - 20:16
**staffing** [1] - 100:8
**Stalls** [2] - 60:20,
60:25
**standpoint** [1] - 68:17
**stands** [1] - 66:15
**star** [1] - 29:1
**start** [4] - 5:25, 6:4,
11:16, 53:2
**started** [3] - 9:3,
11:10, 64:15
**starts** [1] - 57:19
**State** [2] - 1:20,
113:22
**state** [1] - 5:8
**STATE** [2] - 113:2,
113:15
**statement** [2] - 58:13,
71:10
**statements** [2] -
98:22, 99:1
**STATES** [1] - 1:1
**stating** [1] - 57:21
**statistics** [1] - 99:13
**status** [1] - 11:4
**stay** [3] - 70:16, 99:13,
99:15
**stenographic** [1] -
113:7
**stenographically** [1] -
113:5
**Steve** [1] - 65:23
**still** [13] - 26:18,
26:22, 26:23, 26:24,
27:19, 28:5, 59:21,
66:11, 70:1, 91:18,
102:19, 107:11,
107:12
**stopped** [1] - 60:12
**Street** [3] - 2:2, 2:9,
111:6
**strengths** [1] - 92:16
**structure** [1] - 65:18
**styled** [1] - 111:14
**subcolumn** [1] - 36:3
**subcolumns** [2] -
32:16, 36:2
**subject** [1] - 10:25
**sublease** [1] - 51:17
**subscribe** [1] - 112:20
**subsequent** [2] -
58:22, 59:5
**subsequently** [2] -
58:15, 105:10
**success** [4] - 6:25,

7:1, 7:4, 28:10
**successfully** [1] - 22:12
**sued** [1] - 47:21
**suffice** [6] - 29:13, 29:20, 63:11, 96:13, 106:4, 109:17
**sufficient** [1] - 87:21
**suit** [7] - 9:19, 11:1, 11:7, 12:3, 12:6, 12:7, 50:10
**Suite** [6] - 1:18, 2:2, 2:5, 2:9, 111:2, 111:7
**summarize** [1] - 37:11
**summer** [1] - 61:15
**summertime** [1] - 61:14
**Sunny** [4] - 52:22, 52:23, 53:3, 58:4
**support** [6] - 76:9, 89:7, 89:11, 89:15, 92:10, 100:16
**supported** [1] - 71:17
**supporting** [2] - 92:8, 100:13
**surprise** [1] - 88:21
**surprised** [2] - 41:17, 45:8
**surprising** [1] - 43:6
**surrounding** [2] - 87:7, 89:18
**surviving** [1] - 66:9
**sworn** [2] - 5:3, 113:18
**Synergy** [55] - 8:25, 23:12, 23:14, 23:18, 63:16, 63:20, 63:24, 64:3, 64:6, 64:8, 64:11, 64:15, 64:20, 64:23, 65:1, 65:3, 65:7, 65:11, 65:15, 65:19, 65:25, 66:2, 66:5, 66:8, 66:9, 66:11, 66:14, 66:15, 66:18, 66:21, 66:25, 67:3, 67:5, 67:7, 67:8, 67:10, 67:12, 67:14, 67:19, 67:22, 68:3, 68:5, 68:11, 68:16, 68:20, 68:24, 69:8, 69:15, 69:21, 69:22, 70:1, 70:7
**system** [8] - 54:21, 55:4, 55:6, 55:10, 56:7, 58:18, 59:16, 59:18
**systematic** [1] - 87:9
**systems** [1] - 55:4

**T**

**table** [1] - 44:19
**TAKEN** [1] - 1:13
**TAMPA** [1] - 1:2
**Tampa** [42] - 1:18, 8:21, 8:24, 21:22, 21:24, 22:21, 32:11, 40:24, 41:8, 41:18, 43:23, 49:23, 61:17, 62:19, 70:11, 70:25, 71:16, 72:5, 72:7, 72:10, 73:9, 74:7, 74:11, 74:15, 77:5, 77:6, 79:22, 82:19, 82:23, 85:1, 86:9, 86:17, 87:14, 88:18, 93:8, 93:13, 93:20, 97:1, 101:6, 102:7, 106:21, 111:2
**Tax** [3] - 32:22, 36:22, 37:21
**team** [6] - 91:22, 91:25, 92:22, 93:4, 93:7, 93:9
**teamed** [1] - 43:23
**teams** [1] - 93:3
**ten** [8] - 12:25, 16:24, 16:25, 17:3, 30:5, 30:7, 30:9, 46:22
**tends** [1] - 29:3
**tenure** [3] - 95:6, 96:4, 99:21
**term** [2] - 88:1, 88:7
**terms** [9] - 19:18, 26:25, 29:6, 37:12, 44:20, 84:15, 92:8, 100:20, 109:22
**Terry** [3] - 8:14, 9:2, 10:16
**Terry's** [1] - 8:15
**testified** [2] - 5:4, 38:3
**testimony** [2] - 55:22, 72:24
**text** [7] - 106:23, 107:3, 107:5, 107:8, 107:10, 107:14, 107:18
**THE** [3] - 1:1, 5:5, 10:6
**THEREUPON** [1] - 5:1
**they've** [5] - 24:6, 24:24, 42:23, 43:18, 44:13
**thinking** [2] - 25:22, 39:12
**third** [2] - 98:2, 104:16
**third-party** [1] - 98:2
**three** [15] - 32:16, 36:2, 38:16, 39:5,
44:23, 45:1, 64:7, 86:25, 91:9, 95:13, 102:17, 104:12, 104:13, 105:15, 105:17
**thresholds** [1] - 24:2
**tied** [3] - 15:24, 16:1, 18:11
**Tim** [1] - 10:16
**TIME** [1] - 1:16
**timely** [2] - 102:12, 102:16
**timing** [1] - 64:13
**Titanic** [1] - 79:16
**title** [2] - 36:21, 54:5
**today** [3] - 6:8, 66:11, 66:15
**together** [25] - 7:15, 7:19, 31:14, 41:11, 41:15, 41:16, 42:23, 43:4, 43:12, 43:13, 43:17, 43:18, 43:21, 43:24, 44:13, 66:2, 75:5, 92:6, 95:14, 96:14, 96:20, 97:17, 98:17, 103:1
**Tomalak** [42] - 7:11, 8:11, 9:18, 19:8, 39:11, 40:8, 50:1, 50:12, 71:13, 72:10, 72:14, 72:16, 73:1, 73:5, 73:10, 73:14, 88:15, 88:19, 89:6, 89:11, 89:15, 89:18, 89:25, 90:14, 91:2, 91:19, 91:24, 92:2, 93:4, 93:8, 93:11, 94:18, 94:22, 95:5, 103:24, 105:7, 105:18, 105:20, 105:25, 106:3, 106:24, 107:18
**tomorrow** [1] - 50:13
**ton** [1] - 99:9
**took** [1] - 97:5
**top** [5] - 24:1, 30:25, 52:10, 95:1, 108:18
**topic** [1] - 12:8
**Torrey** [1] - 10:16
**total** [1] - 37:16
**towards** [1] - 24:24
**trade** [7] - 68:14, 75:18, 76:2, 76:6, 76:8, 76:12, 76:15
**traditional** [1] - 6:18
**trajectory** [1] - 36:15
**transaction** [6] - 64:25, 66:24, 67:4, 67:9, 69:22, 69:24
**transactions** [1] -
63:16
**transcript** [5] - 112:6, 112:7, 112:20, 113:6
**transcription** [1] - 112:7
**transferred** [4] - 52:4, 52:8, 70:12, 70:19
**transferring** [2] - 51:12, 57:24
**transition** [9] - 8:21, 9:5, 9:8, 9:13, 23:9, 84:25, 85:23, 86:5, 86:9
**transitioned** [1] - 8:25
**transitions** [1] - 50:25
**transplanted** [1] - 77:15
**travel** [1] - 103:13
**trend** [4] - 29:3, 109:5, 109:12, 109:23
**trends** [1] - 109:11
**trip** [16] - 21:2, 21:3, 21:6, 23:20, 24:4, 24:6, 24:15, 24:16, 24:19, 49:10, 49:12, 49:14, 49:15, 62:9
**trips** [8] - 21:11, 23:3, 23:6, 23:15, 23:18, 23:24, 24:20, 24:21
**true** [6] - 27:18, 30:6, 59:14, 61:5, 91:14, 113:7
**truly** [1] - 111:20
**Trust** [1] - 20:2
**try** [6] - 5:21, 6:1, 6:9, 81:9, 90:20, 98:17
**trying** [6] - 17:22, 50:7, 51:25, 64:12, 78:3, 82:6
**turn** [3] - 6:2, 60:24, 107:18
**turnover** [1] - 99:15
**two** [10] - 6:23, 23:7, 48:17, 50:2, 52:7, 68:13, 87:3, 92:9, 93:3, 103:7
**Tyler** [2] - 10:16, 31:13
**type** [5] - 28:12, 46:25, 48:1, 55:4, 84:11
**types** [2] - 46:13, 80:17
**typically** [6] - 14:18, 24:7, 62:21, 87:7, 109:6, 109:8
**typing** [1] - 5:14

**U**

**ultimate** [1] - 84:19
**ultimately** [9] - 7:24, 12:18, 12:21, 15:13, 58:16, 59:5, 78:23, 81:17, 92:16
**Um-hmm** [3] - 20:1, 37:20, 108:23
**unable** [1] - 86:17
**unaware** [3] - 46:25, 87:11, 106:18
**under** [5] - 32:15, 36:25, 38:9, 88:10, 112:20
**undersigned** [1] - 113:17
**understood** [1] - 6:10
**underwater** [1] - 36:13
**underwriter** [5] - 12:24, 13:15, 52:18, 52:21, 60:6
**underwriters** [2] - 12:18, 55:6
**underwriting** [14] - 12:11, 12:16, 12:19, 13:1, 14:7, 14:11, 14:19, 53:8, 57:23, 72:25, 100:12, 100:14, 100:21
**unhappy** [4] - 86:13, 88:14, 89:24, 96:22
**UNITED** [1] - 1:1
**unless** [1] - 11:24
**up** [10] - 6:21, 8:13, 14:6, 14:7, 25:9, 38:9, 62:18, 63:8, 71:13, 92:7
**update** [3] - 11:4, 19:17, 19:21
**updates** [1] - 11:2

**V**

**vacation** [1] - 11:24
**vacationed** [2] - 42:23, 44:13
**Van** [3] - 57:19, 58:2, 61:7
**varies** [4] - 74:2, 74:5, 82:10, 97:10
**vary** [1] - 81:5
**venture** [2] - 104:3, 104:18
**ventures** [1] - 103:25
**versus** [3] - 25:10, 89:20, 104:5
**vet** [1] - 70:6
**Via** [1] - 2:4
**via** [4] - 46:15, 46:16, 54:23, 72:22
**views** [3] - 42:17,

42:18, 44:9
**virtual** [1] - 83:3
**virtually** [1] - 93:17
**visit** [6] - 61:17, 71:19, 71:25, 72:7, 72:10, 72:14
**visited** [2] - 61:20, 61:22
**volume** [2] - 24:4, 37:15
**vs** [4] - 1:6, 30:25, 111:9, 112:3

## W

**W-2s** [1] - 65:3
**wait** [2] - 6:1, 6:3
**waiting** [1] - 5:21
**Walter** [1] - 111:12
**WALTER** [76] - 2:1, 9:24, 10:3, 10:7, 19:11, 25:11, 26:2, 29:17, 29:22, 30:2, 30:8, 33:8, 33:15, 33:20, 34:16, 35:5, 35:8, 36:8, 40:6, 42:6, 42:12, 43:19, 44:17, 45:10, 49:8, 50:3, 50:16, 51:18, 53:12, 56:17, 58:24, 59:7, 59:15, 59:25, 63:1, 63:9, 67:1, 67:16, 67:20, 68:21, 70:9, 73:3, 73:15, 73:20, 74:1, 74:12, 77:16, 82:1, 82:4, 83:21, 85:15, 85:17, 86:6, 86:14, 89:12, 90:15, 91:16, 96:10, 96:16, 96:23, 97:9, 97:12, 101:18, 102:2, 103:14, 103:18, 104:1, 104:7, 104:23, 106:1, 106:6, 106:10, 108:2, 109:7, 110:5, 111:5
**Ward** [1] - 1:17
**wash** [1] - 28:25
**Washington** [2] - 2:3, 111:7
**Waterstone** [39] - 9:6, 9:14, 39:20, 40:2, 43:7, 43:8, 45:14, 45:18, 45:21, 47:3, 47:7, 47:10, 47:21, 47:25, 48:3, 48:11, 48:18, 48:21, 48:23, 48:24, 49:4, 49:6, 49:16, 51:13, 52:4,

52:14, 55:23, 56:11, 56:12, 56:16, 56:25, 57:24, 57:25, 70:12, 74:15, 75:10, 75:19, 76:11, 106:9
**WATERSTONE** [3] - 1:7, 111:9, 112:3
**weekly** [2] - 10:22, 90:24
**weigh** [1] - 31:22
**weighed** [1] - 60:6
**whatsoever** [1] - 76:5
**whole** [2] - 14:6, 14:12
**window** [1] - 72:13
**Wisconsin** [1] - 2:10
**wise** [1] - 17:25
**withdrawn** [1] - 58:19
**withholding** [1] - 101:25
**witness** [2] - 5:3, 50:10
**WITNESS** [4] - 5:5, 10:6, 112:2, 113:19
**Wolf** [15] - 43:1, 43:6, 43:11, 43:16, 44:1, 44:9, 44:16, 49:20, 64:7, 64:19, 73:14, 77:22, 81:23, 86:12, 86:23
**words** [2] - 31:3, 104:4
**works** [2] - 93:6, 103:4
**worse** [2] - 36:7, 36:14
**would've** [18] - 20:25, 24:17, 25:1, 40:13, 54:22, 54:23, 57:9, 59:16, 67:8, 69:5, 69:21, 70:21, 70:24, 78:3, 94:15, 98:16, 105:22
**wrapped** [1] - 80:22
**writes** [1] - 13:15
**written** [1] - 69:7
**wrongful** [1] - 85:14

## Y

**year** [28] - 16:8, 16:9, 16:20, 24:8, 24:12, 24:15, 24:19, 25:3, 25:6, 25:9, 26:24, 33:16, 33:18, 34:3, 34:5, 34:8, 34:18, 34:21, 61:13, 71:18, 71:22, 71:24, 71:25, 72:2, 72:6, 72:13, 109:17
**Year** [5] - 32:17, 32:23, 33:22, 35:17,

38:9
**year's** [2] - 72:7, 72:11
**Year-to-Date** [5] - 32:17, 32:23, 33:22, 35:17, 38:9
**year-to-date** [1] - 34:8
**years** [13] - 16:24, 16:25, 17:3, 17:14, 25:15, 28:3, 29:21, 30:5, 30:7, 30:9, 30:18, 73:23, 109:13
**yield** [1] - 37:16

## Z

**Zoom** [2] - 2:4, 60:15