IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MUTUAL OF OMAHA MORTGAGE, INC.<br><br>        Plaintiff,<br><br>v.<br><br>WATERSTONE MORTGAGE CORPORATION,<br><br>        Defendant. | CASE NO. 8:22-cv-01660-UAM |

**WATERSTONE'S RESPONSE TO MUTUAL'S MOTION FOR CLARIFICATION**

Without saying it directly, Mutual's motion for clarification admits it is again attempting to change the facts post-discovery to support its latest theory of damages. The deposition testimony Mutual submitted reflects Gennarelli and Leyden stating generally branches tend to stay with Mutual. As the Court noted in its March 4, 2025, hearing on this issue, that testimony is "vastly different" than "no one leaves" and "we've not had anyone leave to date." (**Exhibit A** (Transcript of Motion Hearing) 34:3-5.) Apparently, Mutual will endeavor to support its claim for 30 months of lost profit damages by arguing only 2 of 100 branches have left Mutual, through still unspecified witnesses. Whether Mutual will try to retroactively go back and scour the discovery record to bolster this newly minted theory is irrelevant because it does not change that Waterstone had no notice of the theory. Thus, Waterstone had no opportunity to conduct discovery. The Court cannot allow Mutual yet another redo, this time on the eve of trial. More important, the latest

2

duration theory is utter speculation. There is no expert testimony on duration, and a prediction that employees/branches will "stay" with a company is an impermissible speculative opinion by a lay witness. The Court *on the merits* should preclude the theory from being presented to the jury pursuant to case law on point from Florida federal and state courts (and courts of other jurisdictions), as well as black letter law prohibiting speculative lost profit damages.

I. **An evidentiary basis for Mutual's 30-month duration theory announced for the first time in Mutual's brief filed February 26, 2025 (D.E. 281), on the eve of trial, is not found in any deposition testimony.**

Mutual argued at the hearing on March 4, 2025, that Waterstone has been on notice as to its latest theory of damages based on the deposition testimony of Jeff Gennarelli and possibly Christine Leyden. That is not true. Each testified, in sum, that Mutual branches tend to stay. As the Court specifically noted, that is not the same as Mutual putting Waterstone on notice that it claims 30 months of lost profit damages because the 2 branches at issue are the only 2 out of 100 branches that have left Mutual.

Leyden's testimony cited by Mutual (which relates to whether it is natural for employees to follow their managers, not damages) is not possibly supportive of Mutual's latest theory of damages because Leyden admitted she knew nothing about Mutual's the alleged damages:

> **Q.** Do you have knowledge of the damages that are sought by Mutual in this case?
> **A.** No.

(D.E. 258-02 (Leyden Dep. Tr.) 74:19-75:16.) Leyden also testified she knew of no internal statistics, did not mention support for any duration, and could only state that the branches "for the most part… stay":

> **Q.** I want to talk about longevity of branches that you know of during your time at Mutual. Is there any internal statistics about how long branches stay at Mutual?
>
> **A.** Not that I'm aware of, but I know that we have limited turnover. For the most part, they stay.

(*Id*. at 99:11-15.) Leyden most certainly did not put Waterstone on notice that Mutual would base the duration component of its damages theory on what purports to be a statistic that only 2 out of 100 branches have left. Gennarelli's testimony cited by Mutual fairs no better and is best summarized by his statement "[l]ike, generally speaking, people don't leave." (D.E. 296-01 at 106:2.) That too is not the testimony Mutual promised it could provide.

Instead, Mutual seeks to retroactively rely on other "record evidence" to support the theory, without ever disclosing its position. Discovery closed July 31, 2023. It is undisputed that the first time Mutual identified 30 months as its alleged damage duration was in the unilateral stipulation filed in March 2024.[1] (D.E. 144.)

---

[1] Mutual cites NMLS data which it says was permitted by Judge Sneed's Order on January 24, 2024, D.E. 128. The Order was in conjunction with a declaration of Mutual's in-house counsel, Mark Carroll, in which he says, on average, branches stay at Mutual for 51 months. (D.E. 100-1.) Carroll's takeaway was irrelevant because the branches had already been with Mutual 51 months. It forecasted nothing in terms of how much *longer* the branches might have stayed. Mutual then abandoned the 51 months with its subsequent 30-month stipulation, never calculated or disclosed any damages associated with 51 months, attempted to make Rosevear a longevity expert (which your Honor rightfully did not permit), and is now pursuing a separate theory based on 2 out of 100 branches. Nothing about Judge Sneed's order can possibly be interpreted as putting Waterstone on notice of the present damage theory allegedly supporting 30 months. The way a party provides notice of damages is in accordance with the Federal Rules. *See, e.g.*, Fed. R. Civ. P. 26(a)(1)(A)(iii).

The first time Mutual connected that duration to any dollar figure was in June 2024, when it disclosed Candice Rosevear's Supplemental Expert report. (*See* D.E. 215-03.) In that report Rosevear also attempted to inject, for the first time, an analysis on duration using branch longevity and survival rates, which this Court struck. (D.E. 226.) Mutual's February 26, 2025 response brief is the first time Mutual articulated it is entitled to 30 months of lost profits because 2 out of 100 Mutual branches have left. That Mutual filed the current notice and request for clarification along with spreadsheets and other purported citations is telling. It underscores the fact that Mutual did not put Waterstone on notice of its theory at any point prior to its February 2025 filing.

II. **A 12-month time-period is the only duration that has any rationale.**

More important, Mutual cannot pick a duration out of thin air—be it 18 months (Gennarelli), 30 months (per the unilateral post-briefing "stipulation" Mutual filed) or "up to 10 years" (as Rosevear initially claimed). The duration claimed must be grounded in supporting evidence. Claiming branches generally tend to stay at Mutual, or even that Mutual has not lost other branches in recent years, gives the jury no guidance in terms of what duration of alleged damages is reasonably certain. The only duration anchored in fact is 12 months. After 12 months, the former branch managers were free to solicit the downstream Mutual employees (i.e., the branch) and Mutual has produced no evidence that its former at-will employees would have remained at Mutual for any period despite the managers' ability to solicit.

5

Case 8:22-cv-01660-AEP    Document 302    Filed 03/07/25    Page 5 of 11 PageID 7089

Courts in Florida and beyond have held that employees are free to solicit without liability after the applicable restrictive covenant expires, and any damages allegedly incurred thereafter are impermissibly speculative. The court's opinion in *Office Depot, Inc. v. Arnold*, No. 16-CV-81650, 2017 WL 11742779 (S.D. Fla. Aug. 14, 2017) (applying Florida law) is instructive. There, Office Depot alleged that its former employee breached his customer non-solicitation agreement, which prohibited solicitation of Office Depot customers for 12 months post-employment. *Id.* at *1. Office Depot sought lost profit damages based on customers diverted in the 12 months following the employee's departure, as well as "future lost profits" for an additional *four years* based on its alleged customer retention rate. *Id.* at *5-6. The court rejected the four-year duration as speculative:

> In sum, Office Depot has failed to convince me that it can recover lost future profits for diverted customers beyond the one-year term of the restrictive covenant for the period it normally retains customers. That is because, when the non-solicitation agreement expires, Arnold is allowed to solicit those customers.
>
> \* \* \*
>
> Because [Office Depot's] theory and calculation of damages are inconsistent with Arnold's non-solicitation agreement and are divorced from the facts of this case, [Plaintiff's expert's] opinion concerning future lost profits is excluded as speculative.

*Id.* at *6. Because Office Depot's expert did not base his conclusions on evidence, such as multi-year contracts signed by the diverted customers, and instead simply multiplied the lost profits during the term of the non-solicitation period by five based on Office Depot's alleged customer retention rate, the expert's opinion on lost profit damages beyond 12 months was therefore speculative and excluded. *Id.*

6

The Florida Court of Appeals reached a similar conclusion in *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 900 (Fla. 4th DCA 2007). There, a radio station brought breach of contract and tortious interference claims against its former employee and the competitor that hired her seeking to enforce its 12-month non-compete. Before trial, defendants moved to exclude plaintiff's claim for lost profit damages over *five years* on the grounds that it was highly speculative and not supported by evidence of causation. The trial court permitted the claim for lost profits to proceed to a jury. At trial, plaintiff's damages expert testified the damage duration could have been six years, seven years, or even ten years, and agreed he "just stopped at five." *Id.* at 899. The court of appeals reversed, concluding the jury should not have been allowed to consider the expert's testimony because it was speculative and conjectural, and failed to consider variables critical to causation. *Id.* at 899-900. An abundance of other cases are in accord:

- *Aon Consulting, Inc. v. Midlands Financial Benefits, Inc.*, 748 N.W.2d 626, 632-33 (Neb. 2008) (concluding "the district court did not abuse its discretion in holding that evidence of lost profits beyond the 2-year [restricted] period was speculative and, therefore, irrelevant and inadmissible");
- *Coleman v. B.R. Chamberlain & Sons, Inc.*, 766 So. 2d 427, 430 (Fla. 5th DCA 2000) (acknowledging employer's damages would have occurred only during the period its former employee was in breach of his non-competition agreement);
- *The Community Hospital Group, Inc. v. More*, 869 A.2d 884, 900 (N.J. 2005) (holding the plaintiff-employer may only "press its claim for damages" for the period prior to expiration of the restrictive covenant);
- *Vinculum, Inc. v. Goli Techs., LLC*, No. 2048 EDA 2020, 2021 WL 5575829, at *7 (Pa. Super. Ct. Nov. 29, 2021) (upholding the trial court's

7

    decision to limit damages to the one-year noncompetition period, adding the "Court is unable to find any Pennsylvania case law supporting [Plaintiff's] argument that damages should be awarded beyond the time period agreed to by the parties in the Consulting Agreement");

- *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1046-47 (N.J. Super. Ct. 1995) (rejecting plaintiff-employer's argument that it was entitled to recover two years' net profits for its former employee's breach of a covenant not to compete because the period of the applicable covenant was only one year).

    Black letter law also requires that The Court should exclude Mutual's alleged lost profit damages as speculative, unsupported, and not "reasonably certain." *Sun Ins. Mktg. Network, Inc. v. AIG Life Ins. Co.,* 254 F.Supp.2d 1239, 1247-49 (M.D. Fla. 2003) ("Florida law requires that assumptions used to support the conclusions be reasonably certain, not mere best case scenario predictions.") Indeed, Courts consistently reject lost profit damages that rely on the sort of speculative assumptions Mutual now advances via its "branches tend to stay" theory of duration. *See Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1342 (11th Cir. 2019) (affirming district court's determination that plaintiff's lost profits calculation was too speculative where the only evidence offered was lay witness projections of the plaintiff's financial manager who testified that it was her intent to "be conservative" and "reasonable"); *Sostchin v. Doll Enterprises, Inc.*, 847 So.2d 1123 (Fla. 3d DCA 2003) (holding that plaintiff was not entitled to lost profits through the remaining term of its commercial lease; "the loss of profits must be shown with reasonable certainty, and the mere existence of a leasehold interest for six and a half years following the fire does not establish that profits would have been realized for that entire time"); *Florida Outdoor,*

*Inc. v. Stewart*, 318 So.2d 414, 415 (Fla. 2d DCA 1975) (reversing trial court's award of five years of lost profit damages for destruction of a billboard where there was no evidence to support the assumption that the plaintiff would have continued to rent out the billboard for five years).

For example, in *Pier 1 Cruise Experts*, the plaintiff's financial manager projected that plaintiff's online cruise sales would have doubled and expenses would have increased 10%. *Pier 1 Cruise Experts*, 929 F.3d at 1342. The manager's projections were based on historical sales and her intent "to be conservative with respect to the calculations." *Id.* at 1342-43. The district court rejected the manager's projections because she could not explain why it was reasonably certain plaintiff would sell *twice* as many cruises, and her "choice to peg the expense increase at 10% also seem[ed] to have come out of 'thin air'." *Id.* The Eleventh Circuit affirmed, holding the plaintiff's lost profits calculation was too speculative to proceed and, without it, the evidence regarding lost profits was legally insufficient. *Id.* at 1342.

Gennarelli's testimony regarding duration is just as speculative and legally insufficient. His selection of 18 months (notably, not 30 months) was based on nothing other than an effort to be "reasonable":

> **Q.** What was the rationale for using an 18-month period to calculate the lost profit damages associated with the branches closing?
> **A.** Yeah, I mean, we didn't want to use any -- again, we were trying to be reasonable. You know, I think you can make a case for using longer. Most of our branches have been here 10, 15 years, so -- at least the core group. So we could've used longer, but **we thought 18 months was a reasonable amount of time.**
> […]

9

> **Q.** What was the rationale for choosing 18 months as opposed to 12 months or 24?
> **A.** You asked me that. You know, again, it was - - **we were trying to be reasonable.**

(D.E. 296-01 at 170:22-171:5, 172:9-13 (emphasis added).) Mutual's new theory that only the two branches at issue out of 100 branches have left and therefore, these branches would have stayed is also a "best case scenario prediction," based on an assumption Mutual is now making. *Sun Ins. Mktg. Network, Inc.,* 254 F.Supp.2d at 1247-49 (Florida law requires reasonable certainty). The theory should be rejected on the merits.

### III. Claims based on confidential information and trade secrets do not save Mutual's theory.

Mutual cites a 2-year confidentiality provision applicable to Chris Wolf, only one of the three branch managers. D.E. 295 at 2. That does not save its theory. Mutual is not seeking any separate damages based on a confidentiality provision. Mutual seeks damages based on the branch departures. The same is true for the trade secret claims because Mutual, here again, is not seeking trade secrets misappropriation damages separate from the branch departures. (*See* D.E. 254 (memorializing that Mutual does not seek royalty or unjust enrichment damages).) Rather, all claims depend on whether the employees remain, since Mutual is only seeking "branch departure" damages for all claims:



After the 12 month non-solicit, the managers could solicit and there is no certainty. That Mutual has other claims does not save its duration theory.

## IV. Waterstone Should Not Face Trial by Ambush.

If the Court allows Mutual to proceed on a new theory of duration where it contends the jury can conclude the Tampa and Ormond Beach branches would have stayed for 30-months because all other branches have stayed on, Waterstone would be extremely prejudiced. Waterstone would need discovery that includes, at a minimum, the following:

1. Whether it is even true that 100 other branches stayed.

2. Whether the "branches" Mutual counts within the 100 that have allegedly stayed are analogous to the Tampa and Ormond Beach branches at issue.

3. How is Mutual defining a "branch"? For example, the Tampa branch here included a satellite office in New Jersey. Is Mutual double-counting any branch with a satellite (or triple or quadruple counting any branch with 3 or 4 satellites)?

4. Further, Waterstone would hire an expert to conduct a proper statistical analysis and/or to rebut Mutual's alleged prediction.

11

Waterstone has had no opportunity to do this discovery – which cannot be discerned from documents – given it had no notice of the theory. If Waterstone is forced to proceed to trial without such discovery, it cannot effectively cross-examine Mutual witnesses. The jury is going to be left with self-serving, misleading evidence that Waterstone cannot expose as such.

## CONCLUSION

Mutual's alleged damage duration is pure speculation. Lost profit damages should be excluded. At a minimum, the damages must be limited to 12 months.

Dated: March 7, 2025.

/s/ *Maria L. Kreiter*
Maria L. Kreiter (admitted *pro hac vice*)
Emma J. Jewell (admitted *pro hac vice*)
Xavier O. Jenkins (admitted *pro hac vice*)
GODFREY KAHN S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202
(414) 287-9466 (Telephone)
mkreiter@gklaw.com
ejewell@gklaw.com
xjenkins@gklaw.com

Scott A. McLaren (FBN: 414816)
Carolina Y. Blanco (FBN: 0098878)
HILL, WARD & HENDERSON, P.A.
101 East Kennedy Blvd., Suite 3700
Post Office Box 2231
Tampa, Florida 33601
(813) 221-3900 (Telephone)
carolina.blanco@hwhlaw.com
scott.mclaren@hwhlaw.com

*Attorneys for Defendant Waterstone Mortgage Corporation*